**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

-------------------------------------------------------x

## DECLARATION OF WILLIAM D. HOLDEN
## IN SUPPORT OF FIRST DAY MOTIONS

I, William D. Holden, hereby certify and declare as follows:

1.       I am a Managing Director in the restructuring practice of Opportune LLP.  I am serving as the Chief Restructuring Officer for Gawker Media Group, Inc., a Cayman Island corporation ("GMGI"), the parent company of Gawker Media LLC, a Delaware limited liability company ("Gawker Media"), and Kinja Kft., a Hungarian Corporation ("Kinja," together with Gawker Media and GMGI, the "Debtors" or the "Company").   The Debtors are the above-referenced debtors and debtors-in-possession in these chapter 11 cases (the "Chapter 11 Cases"), currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.       I have more than 20 years of investment banking, consulting and operating experience, and my practice focuses on providing operational and strategic advisory services to companies facing complex financial and/or operational challenges.  Prior to joining Opportune LLP ("Opportune"), I was with Alvarez & Marsal for three years providing restructuring services

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

to clients in a variety of industries.  I spent four years previously at The Boathouse Group in New York, independently providing operational, financial advisory and interim management services.  Prior to the Boathouse Group, I worked for Greenhill and Co. in New York as a Vice President.  Prior to Greenhill, I worked at Rhone Group, a New York based private equity group and before that, I was with Everett & Solsvig Associates, a boutique crisis management firm.

3.    I have provided financial and restructuring advisory services in a number of notable chapter 11 cases, including Alpha Natural Resources (Case No. 15-33896 (KRH) (Bankr. E.D. Va.)), GT Advanced Technologies (Case No. 14-11916 (HJB) (Bankr. D. N.H.)), Legend Parent, Inc. (Case No. 14-10701 (JLG) (Bankr. S.D.N.Y.)), Eagle Bulk Shipping Inc. (Case No. 14-12303 (SHL) (Bankr. S.D.N.Y.)), Revel AC, Inc. (Case No. 14-22654 (MBK) (Bankr. D. N.J.)), Fresh & Easy Neighborhood Market Inc. (Case No. 13-12569 (KJC) (Bankr. D. Del.)), Taylor Wharton International, LLC (Case NO. 09-14089) (Bankr. D. Del)), and CornerStone Propane, L.P. (Case No. 04-13856 (Bankr. S.D.N.Y.)).

4.    I have a bachelor's degree in business administration from Skidmore College and a MBA from Columbia Business School.  I am a Certified Turnaround Professional (CTP) and a member of the Turnaround Management Association.

5.    In my capacity as Chief Restructuring Officer and providing financial advisory services to the Company, I have become, and am, generally familiar with the Debtors' capital structure, operations, business affairs, and books and records, as well as the need to commence these Chapter 11 Cases.

6.    On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On June 12, 2016, GMGI and Kinja each filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.[2] To minimize the adverse effects of filing for chapter 11 protection and to enhance the prospect of successful chapter 11 cases, the Debtors are filing a limited number of motions requesting various types of "first day" relief (collectively, the "First Day Motions").

7.        I am familiar with the contents of each First Day Motion, and the facts and descriptions of the relief requested in the First Day Motions are true and correct to the best of my information and belief.  I believe the relief sought in each First Day Motion is necessary to enable the Debtors to transition into chapter 11 with minimal disruption. I further believe the relief sought in each First Day Motion is critical to the Debtors' ability to implement a timely and efficient chapter 11 process, is in the best interests of the Debtors' creditors, and will preserve and maximize the value of the Debtors' estates.

8.        I submit this declaration (the "Declaration") in support of the First Day Motions. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by members of the Debtors' management or its professional advisors, my review of relevant documents, or my opinion based upon my experience and my knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

---

[2]    For purposes of this declaration and the First Day Motions, the "Petition Date" shall mean June 10, 2016 and/or June 12, 2016, as applicable.

56568242_13

## I.    OVERVIEW OF THE DEBTOR'S BUSINESS

### A.    The Debtors' Business Operations

9.    The Debtors in these Chapter 11 Cases include GMGI and its wholly-owned subsidiaries, Gawker Media and Kinja. A corporate organization chart is attached hereto as **Exhibit A**.

10.    The Company is a privately-held, online media company whereby Gawker Media operates seven distinct media brands with corresponding websites under the names *Gawker*, *Deadspin*, *Lifehacker*, *Gizmodo*, *Kotaku*, *Jalopnik*, and *Jezebel* (the "Websites"), all pursuant to intellectual property owned by and licensed from Kinja. While *Gawker* is the most well-known brand and website, the Company is underpinned by the six other brands identified above, which actually represent approximately 85% of revenues. The Company's commercial flagship is Gizmodo, a technology news brand and website, and the Company's video game, sports, how-to and automotive properties (*Kotaku*, *Deadspin*, *Lifehacker*, *and Jalopnik*) are also leaders in their categories. The Company also licenses its web content internationally to third parties that run similar websites based on the Company's brands, such as *Gizmodo en Espanol*, *Gizmodo Australia*, *Kotaku Australia*, and *Lifehacker Australia*.

11.    The Company's various websites cover, among other things, news and commentary on current events, politics, pop culture, sports, cars, fashion, productivity, technology and video games. The Websites have a collective global readership of over 90 million (approximately 50 million in the United States), generally in the age range of 18 to 34 years old. The Debtors are recognized as the only digital media company to grow to scale and viability with minimal external investment. Between 2012 and 2015, the Company experienced a compound annual growth rate of approximately 24%, and the company had revenue in 2015 of approximately $49.9 million. The Company's business is run from their leased offices at 114

Fifth Avenue in New York, New York. The Company also leases *de minimis* office space in other cities for certain employees, including through "WeWork", a co-working office space rental company.

12. The following provides a description of the Company's media brands and the corresponding Websites:

a. **Gizmodo**: *Gizmodo.com* was the first brand launched by the Company, covering consumer electronics and other technology. The scope extends to science and science fiction, and natural and man-made wonders. Gizmodo is the group's commercial flagship, a strong appeal to blue-chip technology and automotive advertisers. Its exclusives, on subjects from the iPhone to the hidden bias in news provided by social media, are drivers for technology conversation. The website has approximately 19.7 million readers in the U.S. and over 35 million readers globally. Approximately 25 staff members at Gawker Media work on the Gizmodo brand.

b. **Deadspin:** *Deadspin.com* focuses on bringing sports fans stories that may not make it to more mainstream sports news. The property is best known for exclusives about sports stars, and Deadspin's coverage has broadened to include male lifestyle coverage. The website has approximately 12 million readers in the U.S. and over 13 million readers globally. Approximately 16 staff members at Gawker Media work on the Deadspin brand.

c. **Gawker:** *Gawker.com* is the most popularly known of the Company's brands. From its origin as a Manhattan-centric media blog, it has grown into a national news operation focused on politics and culture. The website has approximately 11.7 million readers in the U.S. and over 14 million readers globally. Approximately 13 staff members at Gawker Media work on the Gawker brand.

d.    **Jezebel:** *Jezebel.com* is focused on providing media for, by and about women.  It began as an antidote to more typical women's magazines, bringing an intelligent perspective to celebrity, politics and culture.  Jezebel is home to one of the group's most active reader communities.  The website has approximately 9.5 million readers in the U.S. and approximately 13 million readers globally.  Approximately 14 staff members at Gawker Media work on the Jezebel brand.

e.    **Lifehacker:** *Lifehacker.com* focuses readers on how to improve their personal productivity and their lives, whether through a new app or a new method of meditation. Explanatory articles, and the reader discussions they spark, contribute to Lifehacker's reputation as a definitive reference site.  The website has approximately 15.6 million readers in the U.S. and over 27 million readers globally.  Approximately 25 staff members at Gawker Media work on the Lifehacker brand.

f.    **Kotaku:** *Kotaku.com* injects intelligent cultural criticism and a playful spirit to the entertainment industry's largest and newest category, the video game.  As well as reviewing games and other interactive entertainment, Kotaku covers discussion on the politics of video game communities.  The website has approximately 7.5 million readers in the U.S. and over 13 million readers globally.  Approximately 14 staff members at Gawker Media work on the Kotaku brand.

g.    **Jalopnik**: *Jalopnik.com* provides a forum for auto enthusiasts in digital media. Covering new models, industry news, car culture and motorsports, it aims to inject humor and candor into this media category.  The *Jalopnik Film Festival*, sponsored the last two years by a major auto company, is one of the Company's marquee annual events.  In video, the brand has made an impact with *Neat Stuff In Cool Cars*, an unconventional approach to car testing, and

*Jason Drives*, in which a mad genius writer goes for a spin in the weirdest cars on the planet. The website has approximately 7.5 million readers in the U.S. and over 10 million readers globally.  Approximately 10 staff members at Gawker Media work on the Jalopnik brand.

13.     The Company's primary source of revenue is earned through sales of advertising space on the Websites.  The Debtors' advertising businesses builds on the high engagement of the brands' readership, including those readers' participation in online discussions, their expertise on the subjects, and their influence with other consumers.  The Company's influencer marketing programs for clients include sponsored discussions, licensing of testimonials, events which bring invited readers access to new shows and products, and media generated by those events.

14.     The Company has five key departments: sales, technology, editorial, legal, and operations.  The head of each department reports to Nick Denton ("Mr. Denton").  Each of the Company's Websites has its own "editor-in-chief," and those editors report to the Company's Executive Editor.  At present, daily editorial decisions are made by the editors-in-chief and John Cook as Executive Editor, with input from Mr. Denton, and major editorial decisions are made with input of a three-person committee consisting of Mr. Cook, Mr. Denton, and the Company's general counsel.  The Websites' individual editors-in-chief manage editorial staff, including writers, to generate content for the Websites.  Other key roles at the company include the executive editor for feature pieces, the manager of publishing partnerships, the executive managing editor, the director of the Debtors' editorial labs, the art direction department, and the video direction department.  These individuals provide services across the Websites and brands.

15.     Kinja, the Debtor subsidiary operated in Hungary, owns the proprietary publishing and discussions platform and intellectual property used by Gawker Media's brands

and Websites (collectively, the "Kinja Assets").[3]  Gawker Media has an exclusive license of the Kinja Assets, as described below, and also has intercompany arrangements with Kinja to enable the affiliates to maximize use of their complementary assets and employees.  The Kinja platform is unique and geared toward surfacing higher value discussions on posts using an algorithm developed by Kinja.  The Company believes that, due to use of Kinja's proprietary platform, the Websites have the best commenting environment of any digital media group.   Kinja has approximately two dozen employees in Hungary, which consist primarily of computer programming professionals.

### i.        Intercompany Arrangements Between Gawker Media and Kinja

16.        To facilitate Gawker Media's use of Kinja's intellectual property, web domains, and proprietary publishing platform, Gawker Media and Kinja are party to several intercompany agreements, each as described herein.

a.        **Kinja's IP License to Gawker Media.**   First, pursuant to a Master License Agreement, dated as of January 1, 2011 (the "Master License Agreement"), between Gawker Media and Kinja, Gawker Media obtained an exclusive license to use certain brand elements, including trademarks, trade names, and service marks, as well as associated goodwill, websites, web addresses, and URLs, patents, copyrights, works of authorship, trademarks, and related intellectual property.  Under the terms of the Master License Agreement, Gawker Media agreed to pay Kinja a quarterly license fee determined by the amount of revenue received or receivable by Gawker Media over the twelve month calendar year beginning January 1 and ending December 31.

---

[3]   Kinja was formed as Blogwire Hungary Szellemi Alkotast Hasnosito Kft. and changed its name to Kinja Kft. in 2013.

b.    **Gawker Media's Services to Kinja**.    Second, pursuant to a Development
Agreement, dated as of January 1, 2007 (as amended on January 21, 2013, the "Development
Agreement"), by and between Gawker Media and Kinja, Gawker Media provides a number of
development services to Kinja, including designing, developing, and testing scalable software to
serve as a publishing and content managing platform for Kinja's properties and other websites,
handling of content produced by users of the platform (posts, comments, video, photos, etc.),
providing for the storage of media related to content production and aggregation and display of
content sourced from external resources, providing security and authentication systems to ensure
authenticity of user generated content, and providing Kinja with information and assistance as is
necessary to allow Kinja to sell advertising.    Under the terms of the Development Agreement,
Kinja agreed to pay Gawker Media for the direct costs of the services provided plus 5%.    Unless
terminated by one party upon material breach by the other party, the term of the Development
Agreement expires on December 31, 2022.

c.    **Kinja's Services to Gawker Media LLC**.    Third, pursuant to an Intercompany
Services Agreement, dated as of January 1, 2012 (the "Kinja Services Agreement"), also
between Gawker Media and Kinja, Kinja agreed to perform editorial services, content creation
services, and other services for Gawker Media.    Under the terms of the Intercompany Services
Agreement, Gawker Media agreed to pay Kinja for the costs of services provided plus 5%.

B.    **The Debtors' Assets**

17.    GMGI's principal assets are its 100% ownership of Kinja and Gawker Media.
GMGI does not have real estate holdings, significant cash on deposit, or other fixed assets.

18.    Gawker Media's value derives from its Websites' content, primarily from selling
advertising on the Websites and earning revenue from sales of products that Gawker Media
writes about or promotes on the Websites.    Advertising on the Websites accounts for

-9-

approximately 75% of Gawker Media's revenue per year, as compared to all other sources combined, which account for approximately 25% of gross revenue.  Advertising revenue is primarily earned by serving display, content and video advertisements on the site.  Non-advertising revenue is primarily earned via links to products users can purchase on other sites, which in turn pay the Company an affiliate fee or commission.  The Company has an in-house sales team that sells advertising space on the Websites, and the Company also engages a number of third-party sellers to sell its unsold advertising inventory on open exchanges.  The Company's Website advertisers who purchase traditional ad space are not subject to long-term contracts. The company uses standard "insertion orders" that follow the standards established by the Interactive Advertising Bureau.  For custom ad campaigns, the ad purchases typically span one quarter or possibly two quarters.  For regular, non-custom ad purchases, the duration of the ad on the Company's Websites is usually 30 to 60 days.

19.    Finally, Gawker Media also derives a small portion of its revenue from international licensing of the content from its Websites.  For example, Gawker Media licenses the content of its *Gizmodo* Website to entities in Brazil, Europe and Japan, and those international entities in turn use the *Gizmodo* content for their own websites using rich site summary (RSS) feeds.

20.    Kinja's assets are primarily comprised of its ownership of the intellectual property that it licenses to Gawker Media.

### C.    The Debtors' Capital Structure and Summary of Debt

21.    As of the Petition Date, the Debtors had approximately $21.2 million of outstanding funded indebtedness, comprised of first and second lien bank debt.   The Debtors are also obligated on a posted, but not drawn, letter of credit in the amount of approximately $5.3 million.

-10-

### i. *First Lien Credit Agreement*

22.     On September 24, 2012, Gawker Media entered into a loan and security agreement (as subsequently amended, the "<u>First Lien Credit Agreement</u>") with Silicon Valley Bank (the "<u>First Lien Lender</u>"), pursuant to which the First Lien Lender agreed to provide to Gawker Media a term loan facility in the aggregate principal amount of $7,666,666.67 (the "<u>First Lien Term Loan</u>") and a letter of credit with an undrawn face amount of $5,302,066.00 (the "<u>First Lien Letter of Credit</u>").   The Debtors and Mr. Denton also executed certain security, pledge and guaranty agreements and other documentation in connection with the obligations under the First Lien Credit Agreement.  The obligations under the First Lien Credit Agreement are guaranteed by the GMGI and Kinja.  Such obligations are also secured on a first priority basis by liens on substantially all of the assets of the Debtors.

23.     As of the Petition Date, approximately $6,222,222 plus accrued interest was outstanding under the First Lien Credit Agreement.

### ii. *Second Lien* **Credit** *Agreement*

24.     On January 21, 2016, GMGI entered into a credit agreement (the "<u>Second Lien Credit Agreement</u>") with US VC Partners LP ("<u>Second Lien Lender</u>"), a Delaware limited partnership, pursuant to which Second Lien Lender agreed to extend a term loan facility to GMGI in the initial amount of $15,000,000 (the "<u>Second Lien Term Loan</u>").[4]  The Debtors and Mr. Denton also executed certain security, pledge and guaranty agreements and other documentation in connection with the obligations under the Second Lien Credit Agreement.  The obligations under the Second Lien Credit Agreement are guaranteed by Gawker Media.  Such

---

[4] The Second Lien Credit Agreement also contemplates a "make-whole" payment, payable in certain circumstances.

obligations are also secured by a second priority lien on substantially all of the assets of the Debtors.

25.     As of the Petition Date, approximately $15,000,000 plus accrued interest was outstanding under the Second Lien Credit Agreement.

### iii.     *Intercreditor Agreement*

26.     The relationship among Gawker's lenders are governed by an Intercreditor Agreement, dated as of January 21, 2016, by and between the First Lien Lender and the Second Lien Lender (the "Intercreditor Agreement").

### iv.     *Intercompany Debt*

27.     Gawker Media currently has $13 million in outstanding intercompany debt owed to its Debtor affiliate, Kinja, and $250,000 in outstanding intercompany debt owed to its Debtor-parent, GMGI, as follows:

a.     Pursuant to the Promissory Note, dated as of January 10, 2014 (the "January 2014 Promissory Note"), Gawker Media promised to pay $8 million to Kinja, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.  The January 2014 Promissory Note matures on the earliest of (i) January 10, 2019, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Kinja, or GMGI.  There is currently $8 million outstanding on the January 2014 Promissory Note.

28.     Pursuant to the Promissory Note, dated as of January 10, 2015 (the "January 2015 Promissory Note" and, together with the January 2014 Promissory Note, the "Kinja Promissory Notes"), Gawker Media promised to pay $5 million to Kinja, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.  The January 2015

-12-

Promissory Note matures on the earliest of (i) January 10, 2020, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Kinja, or GMGI.  There is currently $5 million outstanding on the January 2015 Promissory Note.

29.     Pursuant to the Promissory Note, dated as of October 7, 2015 (the "GMGI Promissory Note"), Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually.  The GMGI Promissory Note matures on the earliest of (i) December 31, 2020, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Kinja, or GMGI.  There is currently $250,000 outstanding on the GMGI Promissory Note.

### v.     *Unsecured Debt and Potential Unsecured Claims*

30.     The Debtors do not have funded unsecured debt, and their trade obligations to date have been manageable.  The largest potential unsecured claims are contingent, disputed claims arising from pending litigations against Gawker Media (the "Article Lawsuits").  In general, the Article Lawsuits arise from claims for defamation or related torts based on articles written for and published by a Gawker Media Website.  The aggregate amount of damages alleged by plaintiffs or awarded to plaintiffs exceeds $250,000,000.  A summary of the Article Lawsuits is below:

- ***Bollea v. Gawker Media LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea Litigation").**  Gawker Media, Nick Denton, and AJ Daulerio are defendants in this lawsuit for invasion of privacy, right of publicity, intrusion upon seclusion, intentional infliction of emotional distress, and violations of Florida's wiretap statute arising from publication of a report and commentary and

accompanying video excerpts involving Plaintiff's extramarital affair, a tape depicting it, and Plaintiff's sex life and public persona more generally.  A Florida jury awarded $140.1 million to the Plaintiff.  Mr. Denton and Mr. Daulerio are each jointly and severally liability on $115 million of the judgment.  An additional $10 million of punitive damages was assessed against Mr. Denton separately, and an additional $100,000 of punitive damages was assessed against Mr. Daulerio separately.  The bond to stay execution of the judgments pending appeal is $50 million for each of the Bollea Litigation defendants.  The court has refused to reduce the cash bond and denied Gawker Media's request to post stock or alternative collateral in lieu of the bonds.  As of June 10, 2016, the judgments in the Bollea Litigation became available for execution.

- *Huon v. Denton, et al.*, **No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.) (the "<u>Huon Litigation</u>").**  Gawker Media, Nick Denton and Gabrielle Darbyshire are defendants in this suit, which asserts causes of action for defamation and related torts arising from an article published by Gawker and from third-party user comments posted on Gawker's website.  The article at issue reported on plaintiff's filing of a lawsuit against another publisher, Above the Law, over its report about an Illinois criminal proceeding in which Huon was charged with rape and acquitted by a jury.  The trial court dismissed the case against each Gawker defendant (including the individuals).  Huon appealed the decision and the U.S. Court of Appeals for the Seventh Circuit heard argument on May 31, 2016.  Huon is seeking at least $100,000,000 in damages.

- *Ashley Terrill v. Gawker Media LLC, et al.,* **No. 16-CV-00411 (S.D.N.Y.) (the "<u>Terrill Litigation</u>").**  Gawker Media, Sam Biddle, John Cook, and Nick Denton are defendants in this suit for defamation, breach of confidence, intentional interference with prospective economic advantage, fraudulent misrepresentation, and negligent hiring and retention.  The suit arises from an article regarding plaintiff's investigation into a former executive for the dating application Tinder, and plaintiff's belief that she was being harassed for undertaking the investigation.  The Terrill Litigation is currently pending in the Southern District of New York.  The Court has not set a briefing schedule for Defendants' motion to dismiss.  Plaintiff is seeking at least $10,000,000 in damages.

- *Teresa Thomas v. Gawker Media LLC, et al.*, **No. 16-CV-09519 (Or. Multnomah Cty. Cir. Ct.) (the "<u>Thomas Litigation</u>").**  Gawker Media, Nick Denton, and John Cook are defendants in this defamation and invasion of privacy suit arising from an article that referenced plaintiff's employment at Yahoo Inc. and her potential romantic involvement with a Yahoo, Inc. executive.  The case is pending in the Circuit Court for the State of Oregon, County of Multnomah.  There has been no activity in the case to date aside from the filing of the complaint and purported service of the complaint.  The plaintiff is seeking $74,000 in damages.

- *Ayyadurai v. Gawker Media LLC, et al.*, **No. 16-CV-10853 (D. Mass.) (the "<u>Ayyadurai Litigation</u>").**  Gawker Media, Nick Denton, Sam Biddle, and John Cook are defendants in this suit for libel, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and negligent hiring and

retention.  The suit arises from publication of three articles regarding the plaintiff's claims to have invented e-mail.  The complaint is filed in the District of Massachusetts, but the Defendants have not been served.  The plaintiff is seeking at least $35,000,000 in damages.

- ***Charles C. Johnson, et al. v. Gawker Media LLC, et al.*, No. 15CECG03734  (Cal. Super. Ct. Fresno Cty.) (the "**Johnson Litigation**").**  Gawker Media, J.K. Trotter, and Greg Howard are defendants in this suit for defamation, injurious falsehood, invasion of privacy, and conspiracy to interfere with civil rights.  The suit arises from three articles regarding plaintiff's behavior.  The complaint was filed in Superior Court of California, County of Fresno, but Defendants have not been served.  The plaintiff is seeking at least $24,000,000 in damages.

- ***Bollea v. Buchwald, et.al.*, No. 16-002861-CI** (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea II Litigation").  Gawker Media is a defendant in this suit for intentional interference with contractual relations and intentional infliction of emotional distress, arising from an alleged leak of a sealed transcript containing racially charged statements by plaintiff.  Plaintiff also brings claims against third parties, who are unrelated to the Debtors, for invasion of privacy, public disclosure of private facts, intrusion upon seclusion, intentional infliction of emotion distress, intentional interference with contractual relations, violation of a Florida Statute prohibiting the dissemination of private oral communications, civil conspiracy, and intentional interference with contractual relations and advantageous business relationships.  The appellate court in Florida recently issued an order to show cause for why Gawker Media's writ for recusal of the trial judge should not be granted.

- ***Williams v. The MLB Network*, No. A-1674-14T3** (N.J. Super. Ct. Camden Cty.) (the "Williams Litigation").  Gawker Media was a defendant in this defamation suit arising from a blog post regarding the plaintiff's behavior at a baseball game, currently pending in the Superior Court of New Jersey, Camden County, Law Division.  Gawker Media has been dismissed as a defendant at this time.

- ***Mail Media Inc. d/b/a Mail Online v. Gawker Media LLC and James King*.**, No. 159134/2015 (N.Y. Sup. Ct., N.Y. Cty.) (the "Mail Media Litigation").  Gawker Media and James King are in this defamation suit arising from a blog post regarding journalistic practices used by the website *The Daily Mail*, currently pending in the Supreme Court for the State of New York, County of New York.

### D.    Equity Ownership

31.    GMGI is a privately held company.  GMGI has issued and outstanding Series A Preferred Shares, Series A Preferred Options, Series B Preferred Shares, Common Shares and Common Share Options.  As of the Petition Date, founder Nick Denton was the single largest shareholder in the company.  Other share owners include US VC Partners LP, a family trust,

current and former executives and employees, and other members of the founding team. GMGI's equity holders are set forth as an Exhibit to its Chapter 11 petition.

## II.   EVENTS LEADING UP TO THE CHAPTER 11 CASE

32.     Since its inception in 2002 as a single blog operated from Nick Denton's apartment, the Company has grown into a network of seven branded news and lifestyle Websites, each with millions of readers.  Historically, the Company's financial health was good; it survived the 2008-2009 recession and was profitable from 2010 until 2015.  However, despite its long-running success and commendable growth trajectory, the Company suffered this year from exorbitant legal expenses and a recent judgment totaling more than $130 million.  While the Company feels strongly that the judgment will be overturned on appeal, it cannot post the $50 million bond required by the Florida state court to stay execution of the judgment while the appeal is pending.

33.     Accordingly, the Company was forced to seek immediate chapter 11 relief.  The Company has determined that an organized restructuring through the chapter 11 process has the potential to preserve the jobs of employees, the wealth of the media brands developed at the Company and its affiliate over the last decade, and to maximize value for the creditors of the Debtors' estates.

### A.     *Bollea* Litigation and Judgment

34.     The *Bollea* litigation arises out of a publication on Gawker.com of an article (the "Hogan Story") commenting on a video depicting plaintiff Terry Gene Bollea, the professional wrestler and entertainer known as "Hulk Hogan," having sexual relations with Heather Clem, the wife of his then-best friend, radio disk jockey Bubba Clem, along with brief and highly edited excerpts from the Video (the "Excerpts").  Bollea initially challenged both the publication of both the Hogan Story and the Excerpts, later narrowing his claim to focus only on the Excerpts.

35.    Bollea's claims consist of causes of action for, among other things, publication of private facts and violation of plaintiff's common law right of publicity.  Bollea initially sued a number of defendants, but only three defendants were left at the time of trial:  Gawker Media LLC, Nick Denton, and A.J. Daulerio (the author of the Hogan Story).

36.    Bollea initially sued in federal court.  Bollea tried on several occasions to obtain preliminary injunctive relief to have the video removed, but the federal judge (Hon. James Whittemore) denied each of the motions, finding that the Hogan Story and Excerpts were protected by the First Amendment.  *See, e.g.*, *Bollea v. Gawker Media LLC*, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012); *Bollea v. Gawker Media LLC*, 913 F. Supp. 2d 1325 (M.D. Fla. 2012).  Thereafter, Bollea dismissed his federal action and re-filed his claims in state court.  The state court entered a temporary injunction, which was then stayed and reversed by Florida's Second District Court of Appeal.  *See Gawker Media LLC v. Bollea*, 129 So. 3d 1196 (Fla. 2d DCA 2014).  The appeals court unanimously reversed the injunction on the basis that the Hogan Story and Excerpts addressed a matter of public concern and that a temporary injunction could not issue under the First Amendment.  *Id.* at 1200-02.   Based on these findings by the appellate court to which the Company has now appealed the verdict, the Company believes the verdict will be overturned.[5]

37.    The trial proceeded in March 2016.  A jury found the Company liable for $115 million in compensatory damages and $15 million in punitive damages, for a total of $130 million.  The defendants filed motions for judgment notwithstanding the verdict, and for a new

---

[5] The parties have disputed whether the temporary injunction ruling was binding on the trial court or otherwise served as controlling precedent.  In both their motion to dismiss and their motion for summary judgment, the defendants contended that the temporary injunction ruling warranted dismissal on that basis.  The trial court denied both motions, and the defendants' petition to the appeals court to intervene was dismissed for lack of appellate jurisdiction.  *See Gawker Media LLC v. Bollea*, 160 So. 3d 424 (Fla. 2d DCA 2014) (Table).

trial or remittitur of damages, and the plaintiff filed a motion for entry of judgment.  Those

motions were heard on May 25, 2015, and the Florida state court denied the motions.  Gawker

Media appeared before the trial court again on June 10, 2016, but the trial court refused to reduce

the bond or allow the Company to post stock or alternative collateral in lieu of a $50 million

bond.  At a hearing on June 10, 2016, Gawker Media was denied a complete, temporary stay in

Florida state court to pursue its appellate rights.  Instead, the trial court ruled that it would enter

an order proposed by the plaintiff that would permit the plaintiff to begin the process of

executing on the judgment by securing liens on Gawker Media's property.  Accordingly, Gawker

Media was forced to file its petition for relief under the Bankruptcy Code on an emergency basis.

Gawker Media is appealing the $130 million judgment.

## III.    THE CHAPTER 11 CASES

38.    With no protection from immediate execution of a $130 million judgment against

Gawker Media by one litigation creditor whose verdict is subject to appeal, the Company

initiated a process to explore its alternatives.  The Company hired restructuring and financial

advisors and, in consultation with its advisors, determined that seeking chapter 11 relief and

selling the Company quickly was in the best interests of the Company and its constituencies.

39.    To achieve that goal, the Debtors engaged in a targeted prepetition marketing

effort, and entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**")

with ZDGM LLC, as buyer (the "**Stalking Horse Bidder**" or "**Buyer**").  The Stalking Horse

Bidder is an affiliate of Ziff Davis, LLC.  Ziff Davis, LLC is a leading global digital-media

company operating in the technology, gaming, entertainment and lifestyle verticals.  Its brands—

IGN, PCMag, AskMen, Speedtest, Offers, ExtremeTech, Geek, Toolbox, TechBargains, Ziff

Davis B2B and emedia—produce and distribute premium content across multiple platforms and

devices.  Ziff Davis, LLC delivers advertising, performance marketing and licensing solutions to

thousands of clients worldwide.  Ziff Davis, LLC, a subsidiary of j2 Global, Inc. (NASDAQ:

JCOM), is headquartered in New York with offices in San Francisco, Los Angeles, Chicago,

Seattle, Scottsdale, Austin, Montreal, Basingstoke, London and Sydney.  A complete summary

of the proposed sale of the Debtors' assets and the Stalking Horse APA will be submitted to the

Court by separate motion and declaration in support of the motion.

## IV.    FIRST DAY MOTIONS

40.    The Debtors intend to file a number of First Day Motions seeking targeted relief

to allow the Debtors to minimize the adverse effects of the commencement of these chapter 11

cases on their ongoing business operations. I believe Court approval of the relief requested in the

First Day Motions is essential to providing the Debtors with the opportunity to successfully meet

its creditor obligations in a manner that benefits all of the Debtors' constituents. Capitalized

terms used but not otherwise defined herein shall have the meanings ascribed to them in the

respective First Day Motions.

### A.    Debtors' Motion for Joint Administration (the "Joint Administration Motion")

41.    By the Joint Administration Motion, the Debtors seek an order directing the joint

administration of the Debtors' chapter 11 cases. I believe that joint administration will reduce the

administrative burdens and costs by avoiding duplicative filings, notices, and hearings, and will

allow all parties in interest to monitor and participate in these cases with greater ease, because

the Debtors operate integrated businesses under common ownership and control.  The Debtors

also seek authority to file the monthly operating reports required by the Operating Guidelines

and Financial Reporting Requirements promulgated by the office of the United States Trustee on

a consolidating basis.

42.     The Debtors operate integrated businesses under common ownership and control. As a result, the motions, hearings, and related proceedings involving one of the Debtors will affect the other Debtors.  I believe that filing the required monthly operating reports on a consolidating basis will further administrative economy and efficiency, and that granting the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates, creditors, and stakeholders.

**B.      Motion for an Order Extending Deadline for Debtor to File its Schedules of Assets and Liabilities and Statement of Financial Affairs (the "<u>Extension Motion</u>")**

43.     By the Extension Motion, the Debtors seek an extension of the deadline by which they must file its schedules of assets and liabilities and statement of financial affairs (collectively, the "<u>Schedules and Statements</u>"). Although the Debtors have commenced the process of gathering the necessary information to prepare and finalize the Schedules and Statements, the 14-day time period provided by Bankruptcy Rule 1007 will be insufficient to complete those tasks.  The limited staff available to perform the required internal review of its financial records and affairs and the pressure incident to the commencement of these Chapter 11 Cases provide ample cause justifying, if not necessitating, a twenty (20) day extension of the deadline to file the Schedules and Statements.

44.     While the Debtors, with the help of their professional advisors, are diligently preparing the Schedules and Statements, resources are limited. The Debtors' primary focus thus far has been preparing for the filing of the Chapter 11 Cases.  Thus, the Debtors have not been able to gather and analyze all the necessary information to prepare and file their Schedules and Statements prior to the Petition Date.  In view of the amount of work entailed in completing the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to continue business operations during the initial postpetition

period, the Debtors will not be able to complete the Schedules and Statements properly and accurately within the required 14-day time period.

45.    I believe that focusing the attention of the Debtors' personnel on critical restructuring issues during the early days of these Chapter 11 Cases will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of the estate for the benefit of creditors.  Consequently, I believe it is in the best interests of the Debtors to obtain a twenty (20) day extension of the filing deadline, which would provide the Debtors until July 14, 2016 to file the Schedules and Statements, and request that the Court approve the Extension Motion.

C.    **Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates (the "Case Management Motion")**

46.    By the Case Management Motion, the Debtors seek an order establishing case management and administrative procedures for its chapter 11 case. Specifically, the Debtors seek approval of, among other things, a Master Service List (as defined in the Case Management Motion), service and noticing procedures, omnibus hearing dates, and procedures governing motion practice, requests for emergency hearings, hearing agendas, and adversary proceedings.

47.    Approval of the procedures set forth in the Case Management Motion will significantly reduce the administrative and economic burden placed on this Court, the Debtors, creditors, and parties-in-interest with respect to hearings and the filing and serving of documents in these cases.

48.    In addition, the costs and burdens associated with the possibility of numerous, fragmented hearings, plus the costs associated with copying and mailing or otherwise serving all filings to parties without the limitation proposed in the Case Management Motion, will impose an administrative and economic burden on the Debtors' estates, this Court, and the parties-in-

-21-

interest. Indeed, mass mailings could be costly to the Debtors' estate and would require the Debtors to divert limited resources to comply with all administrative requirements. Therefore, I believe approval of the Case Management Motion is in the best interests of the Debtors' estates, creditors and all parties in interest.

**D.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, and file a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (II) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases (the "<u>Consolidated Creditor Matrix Motion</u>")**

49.    By the Consolidated Creditor Matrix Motion, the Debtors seek an order (I) authorizing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and file a consolidated list of the Debtors' 50 largest unsecured creditors and (II) approving the form and manner of notifying creditors of commencement of these chapter 11 cases.

50.    I understand that the Bankruptcy Code requires a debtor in a voluntary chapter 11 case to file a list containing the name and complete address of each creditor, and to also file a list containing the name, address and claim of the creditors holding the twenty largest unsecured claims against the Debtor.

51.    There are three entities that are Debtors in these chapter 11 cases. As of the Petition Date, it is estimated that there are hundreds of potential creditors and parties in interest (on a consolidated basis) in these chapter 11 cases. I believe that permitting the Debtors to file one consolidated list of the fifty largest unsecured creditors of the Debtors on a consolidated basis will allow the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate filings.

**E.**     **Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Payment of Prepetition Wages, Salaries, Business Expenses, and Related Items, and (II) Directing All Financial Institutions to Honor Checks for Payment of Such Obligations (the "<u>Wages Motion</u>")**

52.     Through the Wages Motion, the Debtors seek to pay prepetition amounts owed to employees for compensation, and related expenses including expenses, benefits, withholding taxes, and payroll administration fees; and to continue making payments related to these items in the ordinary course of business during the post-petition period.

53.     As of the Petition Date, Gawker Media employs approximately 192 full-time salaried employees (the "<u>Salaried Employees</u>") and 3 hourly employees (the "<u>Hourly Employees</u>," together with the Salaried Employees, the "<u>U.S. Employees</u>").    The Salaried Employees of Gawker Media include Nick Denton (President), Heather Dietrick (Chief Legal Counsel), Ian Fette (Chief Technology Officer), and Joshua Albertson (Chief Operating Officer). Certain executives of Gawker Media are also directors or officers of GMGI.

54.     The U.S. Employees perform a variety of critical functions, including content creation and editing, sales, marketing, finance, legal, operations, and technology functions.    The skills and expertise of the U.S. Employees are essential to the Debtors' ongoing business operations.

55.     The largest proportion of U.S. Employees work in the editorial department, with approximately 104 employees.    Certain writers and editors are assigned to a particular website, while other writers and editors perform editorial work for all of the websites.

56.     Gawker Media employs approximately 52 individuals in the business department, who are primarily responsible for the sales, marketing, and business development functions of the Debtors' business.

56568242_13

57.     Gawker Media employs approximately 39 individuals in the technology and operations departments, who perform engineering, product design, technology operations, and other related services for the Debtors.

58.     Gawker Media has issued written employment offer letters to each of its Salaried Employees.  Certain of those employment letters provide for benefits, including participation in benefits programs and severance pay.  Severance pay for eligible employees ranges from two weeks and six months of pay.

59.     As of March 1, 2016, Gawker Media entered into a collective bargaining agreement (the "CBA") for a term of three years, expiring on February 28, 2019, with the Writers Guild of America, East.  The CBA covers all full-time and regular part-time non-executive editorial employees of Gawker Media, which includes writers, columnists, editors, researchers, video employees, illustrators and other employees who perform similar functions. As a result, 102 of Salaried Employees are covered by the CBA.[6]

60.     The CBA provides for the following benefits, among others: (i) annual 3% increases in pay; (ii) minimum starting salaries for various positions; (iii) fixed cost health benefits for employees, with any increases up to 10% to be absorbed by Gawker Media; (iv) automatic contributions to eligible employees' 401(k) plans of up to 3% of an eligible employee's salary after one year of employment; (v) certain severance benefits, ranging from between two weeks and eight weeks of pay; (vi) the grant of a nonexclusive license to employees for book rights based on work they have created for Gawker Media, including the right to take 100% of the royalties of any book deal, subject to approval by Gawker Media for use of its marks or logos; (vii) Hourly Employee pay equal to unionized employees compensation for

---

[6] For the avoidance of doubt, the Debtors seek only to continue to pay wages and honor its other obligations consistent with the CBA.  The Debtors are not seeking to assume or reject the CBA at this time.

Hourly Employees who have worked for Gawker Media for more than one year; and (viii) limitations on editorial decisions.

61.    GMGI, the parent company of Gawker Media, does not have any employees.

62.    As of the Petition Date, Kinja employs 25 individuals, who provide technology and programming, editorial, and administrative services (the "Hungarian Employees," together with the "U.S. Employees," the "Employees").

63.    The U.S. Employees receive regular pay on an hourly or annualized basis, which are paid on a semi-monthly basis, and the Hungarian Employees also receive regular pay, which is paid monthly (collectively, the "Regular Wages"). As of the Petition Date, approximately $50,000 in Regular Wages are outstanding. The Salaried Employees and Hourly Employees in the United States are generally paid on the 15th and last day of each month (or on the last business day immediately preceding the scheduled pay date), either by check or by direct deposit. The average semi-monthly (i.e., per pay period) wages to Salaried Employees and Hourly Employees in the U.S. is $819,168.00 inclusive of taxes. The Hungarian Employees are paid monthly. The average monthly Hungarian Wages is approximately $125,000, inclusive of taxes.

64.    As of the Petition Date, the Debtors do not have any outstanding payroll checks that have not yet cleared. Gawker Media's next scheduled payroll is June 30, 2016, and Kinja's next scheduled payroll is July 4, 2016.

65.    On a monthly basis, certain editorial, non-executive employees of Gawker Media are eligible to receive Editorial Employee Incentives, which are incremental payments, as recognition for publication of one of the ten best stories for a particular month. To administer the Editorial Employee Incentives, Gawker Media's executive team reviews those top ten stories,

and assigns a rating to each story.  The total amount paid on a monthly basis is determined by then-current staffing levels, at $426 per editor, exclusive of certain high-ranking editors.  On average, Gawker Media pays approximately $30,000 per month in Editorial Employee Incentives, which are included in the paycheck issued at the end of the month.  The next scheduled payment for Editorial Employee Incentives is June 30, 2016.

66.     As part of a prepetition sales incentive and bonus program maintained in the ordinary course of the Debtors' businesses, U.S. Employees who work on the sales team are eligible to receive quarterly bonus payments, payable entirely at the Debtors' discretion, based on ad sales performance.  Sales bonuses are calculated on a quarterly basis, and are paid on the first month following the end of each quarter.  The next quarterly sales incentive bonus, to the extent the Debtors in their business judgment elect to pay such bonus any sale(s) employees, would be paid on August 1, 2016.  Historically, the average quarterly aggregate bonuses paid ranged between $150,000 and $200,000, and approximately 40 people received sales bonuses.  Because such payments are discretionary following the end of the quarter and not yet earned, no prepetition amounts are due.  By this Motion, the Debtors seek approval to continue their ordinary course, discretionary sales incentive bonus program, so that the Debtors' ad sales team, responsible for driving significant revenue for the Debtors, continues to be properly compensated during these chapter 11 cases.

67.     Prior to the Petition Date, the Debtors offered their Employees paid time off (including nationally observed holidays) and other earned time off.  The Debtors seek to continue to honor paid time off, as these forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees to operate their businesses.

68.     Gawker Media offers unlimited paid time off, but any Gawker Employee who intends to take more than fifteen (15) days off must obtain approval for such time off.

69.     Gawker Media formerly provided a sabbatical program to Salaried Employees who had been employees of Gawker Media for at least four years (the "Sabbatical Program"). Under the Sabbatical Program, Gawker Media provided four weeks of paid leave to an eligible Salaried Employee. Notwithstanding the termination of the Sabbatical Program, any employee who would have earned Sabbatical leave by September 1, 2016 will be permitted to take such leave. As of the Petition Date, 18 Salaried Employees are eligible for the Sabbatical Program, and two are currently on leave under the Sabbatical Program.  The Debtors seek to honor the obligations remaining under the Sabbatical Program.

70.     Kinja offers the Hungarian Employees, based upon local laws, paid vacation based upon on the age of employees and number of children and it is pro-rated according to the length of the employment in the year. The basic annual vacation is 20 days and extra vacation day is added when the employee is 25 years old and the number rises up to 10 extra days until the employee is 45 years old. Depending on the number of children, employees can be entitled to 2-7 extra vacation days. Vacation days are paid at 100% of their salaries.  Additionally, Employees are entitled to 15 days of sick leave and the employer will pay 70% of their salaries for these days. The sick days above 15 days are unpaid leaves that the National Health Insurance Office pay for the employees instead of employer.

71.     Gawker Media regularly employs approximately 5 independent contractors and approximately160 independent contractors from time to time, as needed, in the United States and internationally, who generally perform freelance editorial and studio work (the "Independent

Contractors").[7]   Of the approximately 160 Independent Contractors who provide services to Gawker

Media, the overwhelming majority work within the editorial department, although some assist with the

business and technology departments.    As of the Petition Date, the Debtors estimate that

approximately $307,000 is owed to Independent Contractors (the "Independent Contractor

Compensation").

72.    Gawker Media has employed temporary employees through various employment

agencies, including Kforce, Abacas, and Robert Half, for administrative and accounting support

functions (the "Temporary Employees").   As of the Petition Date, one Temporary Employee is

working for Gawker Media, and Gawker Media expects to continue to need the services of the

Temporary Employees on an ongoing basis during the course of these chapter 11 cases.   As of

the Petition Date, approximately $12,000 is owed to the Temporary Employee (the "Temporary

Employee Compensation").

73.    The Independent Contractor Compensation and Temporary Employee

Compensation is paid upon submission of an invoice which can sometimes be up to three months

in arrears, directly by Gawker Media.

74.    The Debtors offer medical, vision, dental, life, supplemental life, and disability

insurance; health care spending and flexible spending accounts; commuter benefits; a 401(k)

plan and contributions to such plan; and miscellaneous benefits such as cell phone

reimbursement and health club membership benefits ("Employee Benefits"), under plans

(collectively, the "Employee Benefit Plans"), each as described herein, to Salaried Employees

and Hungarian Employees.   The Debtors seek authority to pay all prepetition amounts owed on

---

[7] The Debtors have used hundreds of independent contractors in the last one to two years for various types
of work.  The Debtors currently estimate that approximately 160 independent contractors have provided
services in the last three months.

account on the Employee Benefit Plans, not to exceed $246,000 and to continue to make payments as necessary to continue the Employee Benefit Plans in the ordinary course of business.  The Debtors believe it is essential to continue each of the Employee Benefit Plans because the Employees rely on these benefits for their health and well-being; cancelling these programs would impose undue hardship on the employees and would be detrimental to the company.

75.    Gawker Media provides medical and prescription drug benefits to its eligible employees through United Healthcare (the "Medical Plan").[8]  Employees who participate in the Medical Plan contribute between $0 and $191.98 on a semi-monthly, pre-tax basis.  As of the Petition Date, 180 employees participate in the Medical Plan.  Gawker Media pays United Healthcare for its portion of the premiums due for the Medical Plan.

76.    Gawker Media also provides its eligible employees with dental insurance through United Healthcare (the "Dental Plan").  Employees who participate in the Dental Plan contribute between $10.39 and $29.87 on a semi-monthly, pre-tax basis.  As of the Petition Date, 163 employees participate in the Dental Plan, and collects 100% of the premium from participating employees via payroll deduction.

77.    Gawker Media also provides its eligible employees with vision insurance through United Healthcare (the "Vision Plan").  Employees who participate in the Vision Plan pay 100% of the total premium for the Vision Plan, and contribute between $3.24 and $10.12 on a semi-monthly, pre-tax basis.  As of the Petition Date, 135 employees participate in the Vision Plan.

---

[8] Pursuant to the CBA, Gawker Media pays 77-100% of the applicable premiums and has agreed to absorb any increases to those premiums up to 10%.  With respect to employees who are not subject to the CBA, Gawker Media pays 77-100% of the premiums.

Gawker Media pays United Healthcare the total premiums due for the Vision Plan and collects 100% of the premium from participating employees via payroll deduction.

78.     The Debtors seek authority to pay the amounts owed to United Healthcare for the Medical Plan, Dental Plan, and Vision Plan for prepetition amounts due, in a total amount of $66,000.  The Debtors also seek approval to continue paying the premiums to continue those plans.

79.     Kinja does not provide health insurance or similar benefits to the Hungarian employees, as those benefits are provided by the Hungarian government.  However, Kinja Pays approximately $7,000 per month to the Hungarian government to cover these costs.

80.     Gawker Media provides accidental death and dismemberment ("AD&D"), short term disability, long term disability, and group life insurance benefits for eligible employees through Unimerica Life Insurance Company of New York ("Unimerica").  Gawker Media pays 100% of the premiums for each of these insurance policies.  Gawker Media also maintains a disability policy, as required by New York law.

81.     As of the Petition Date, Gawker Media owes $84,000 on account of premiums for the AD&D, short term disability, long term disability, and group life insurance benefits, to Unimerica.  Gawker Media seeks approval to pay these prepetition amounts owed and also to continue making regular payments to continue each of these programs in the ordinary course of business.

82.     Gawker Media also offers its employees the option of additional and supplemental life insurance.  The employees pay the full cost of premiums associated with these additional, increased benefits.

83.     Gawker Media offers its eligible employees the opportunity to put aside pre-tax funds to pay for various medical and dependent care expenses, through spending account programs and health and dependent care flexible spending account programs (the "Spending Accounts").  The Spending Accounts are administered through Benefit Resources, Inc. ("BRI").  Gawker pays the costs of administering the Spending Accounts to BRI, but does not contribute to the Spending Accounts.  As of the Petition Date, Gawker Media owes BRI $9,000 for prepetition amounts due on account of the Spending Accounts.

84.     Kinja does not offer a spending account to the Hungarian Employees.

85.     Gawker Media maintains a 401k savings plan (the "401k Plan") through Fidelity Investments ("Fidelity"), which provides Employees a tax-effective way to save for retirement.  All Employees are eligible to participate in the 401k Plan upon their commencement of employment with Gawker Media.  As of the Petition Date, all employees of Gawker Media are participating in the 401k Plan.

86.     For each employee of Gawker Media that participates in the 401k Plan, Gawker Media withholds the elected contribution amount from such employee's paycheck, and then pays those funds to Fidelity on a semi-monthly basis, at or around the same time paychecks are issued.

87.     As of the Petition Date, the Debtors estimate that they hold approximately $39,000 on account of employee contributions to the 401k Plan that have not yet been remitted to Fidelity.

88.     After an employee has been employed by Gawker Media for one year, Gawker Media will contribute the equivalent of 3% of such employee's salary to the 401k Plan (the "3% Contribution").  As of the Petition Date, Gawker Media contributes approximately $20,000 on a

bi-weekly basis for the employees who qualify for the 3% Contribution.  In addition, Gawker Media incurs annual fees in connection with administering the 401k Plan.

89.    As of the Petition Date, the Debtors estimate that they owe approximately $20,000 for prepetition obligations on account of the 3% Contribution, and $0 for quarterly fees owed to Fidelity.  The Debtors seek to pay these prepetition amounts owed in connection with the 401k Plan. The Debtors also seek to continue the 3% Contribution, and to continue to pay any fees owed to Fidelity for administering the 401k Plan, in the ordinary course of business.

90.    Kinja contributes to employee pension accounts on a monthly basis, which averages approximately $10,000 per month.

91.    Gawker Media and Kinja provide health club benefits to their respective employees (the "Health Club Membership Program"), providing employees with options to join certain health clubs at a discounted rate, or to receive partial reimbursement for memberships with other health clubs.

92.    Approximately 99 employees of Gawker Media participate in the Health Club Membership Program.  Approximately 25 Hungarian Employees participate in the Health Club Membership Program.  The total monthly cost of administering the Health Club Membership Program is $14,000 for both Gawker Media and Kinja.

93.    The Debtors seek approval to pay all prepetition amounts owed, and to continue making payments on account of the Health Club Membership Program in the ordinary course of business.

94.    Kinja provides other miscellaneous benefits including flu vaccination, local transportation passes, eyeglasses reimbursement and unemployment benefits paid to the state. As of the Petition Date, Kinja owes approximately $4,000 for these benefits.

56568242_13

95.     The Debtors seek approval to pay all prepetition amounts owed, and to continue making payments on account of the Health Club Membership Program in the ordinary course of business.

96.     In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment on the Debtors' behalf relate to travel, meals, hotels, relocation expenses including costs related to obtaining visas, other qualifying expenses (the "Reimbursable Expenses"). The Reimbursable Expenses are incurred by Employees who do not have a Corporate Card, but rather pay for incurred Reimbursable Expenses by using a personal credit card or cash.  As of the Petition Date, the Debtors estimate that approximately $40,000 of Reimbursable Expenses incurred prepetition are outstanding.  Failure to pay the prepetition Reimbursable Expenses could result in financial hardship for Employees, as they have paid for such Reimbursable Expenses with the understanding that they would be reimbursed.  Although the Debtors ask that reimbursement requests be submitted promptly, sometimes there is a delay between the incurrence of a Reimbursable Expense and the date such expense is submitted to the Debtors for processing.

97.     In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment on the Debtors' behalf relate to travel, meals, hotels, relocation expenses including costs related to obtaining visas, other qualifying expenses (the "Reimbursable Expenses"). The Reimbursable Expenses are incurred by Employees who do not have a Corporate Card, but rather pay for incurred Reimbursable Expenses by using a personal credit card or cash.  As of the Petition Date, the Debtors estimate that approximately $22,000 of Reimbursable Expenses incurred prepetition are outstanding.  Failure to pay the prepetition Reimbursable Expenses could result in financial hardship for Employees, as they

have paid for such Reimbursable Expenses with the understanding that they would be reimbursed. Although the Debtors ask that reimbursement requests be submitted promptly, sometimes there is a delay between the incurrence of a Reimbursable Expense and the date such expense is submitted to the Debtors for processing. Accordingly, the Debtors seek authority to satisfy any and all accrued but unpaid prepetition Reimbursable Expenses, and to continue to pay the Reimbursable Expenses on a postpetition basis in the ordinary course of business.

98.     Prior to the Petition Date, Gawker Media and Kinja reimbursed employees on a monthly basis, up to $80 per month, for use of their mobile phones (the "Mobile Phone Expenses"). The Mobile Phone Expenses cost the Debtors approximately $12,000 per month in the aggregate. As of the Petition Date, the Debtors estimate that approximately $7,000 of Mobile Phone Expenses incurred prepetition are outstanding.

99.     Because the Employees incur the Reimbursable Expenses and Mobile Phone Expenses while performing duties on the Debtors' behalf, the Debtors consider these expenses to be ordinary business expenses, and not compensation. As of the Petition Date, the Debtors estimate that there is $29,000 in unpaid prepetition amounts for Reimbursable Expenses and Mobile Phone Expenses. The Debtors seek authorization, but not direction, to pay the outstanding amounts and continue to pay all Reimbursable Expenses and Mobile Phone Expenses as they become due in the ordinary course of business.

100.     The CBA provides for minimum severance payments, upon termination of any Unionized Employee. In addition, certain of Gawker Media's employment agreements with employees call for severance pay, ranging from two weeks to six months. To the extent any Gawker Media Employee is terminated post-petition, or has been terminated and not yet been paid severance, the Debtors seek approval to make such severance payments at their discretion.

The Debtors have approximately $136,239 outstanding in Severance Obligations as of the Petition Date.

101.    The Debtors accrue in the ordinary course of business state, local, and federal employment and withholding taxes, and payroll taxes as wages are earned by the Employees (the "Withholding and Payroll Taxes Obligations"). The Debtors routinely withhold from Employees' paychecks amounts that the Debtors are required to remit to third parties. Examples of such Withholding and Payroll Taxes Obligations include Social Security taxes, federal, state and local income taxes, wage garnishments, and other court-ordered deductions.  As of the Petition Date, Gawker Media owes $150,000 in Withholding and Payroll Taxes Obligations, and Kinja owes approximately $30,000 in Withholding and Payroll Taxes Obligations.  By this Motion, the Debtors seek the authority to pay all prepetition amounts due, and to continue to timely pay the Withholding and Payroll Taxes Obligations as they become due in the ordinary course of business.

102.    Gawker Media utilizes ADP, LLC ("ADP"), a payroll service, to, among other things, process payroll checks and remit appropriate withholding taxes for the Employees (collectively, the "Payroll Services"). Gawker Media pays a *de minimis* amount to ADP for payroll administration and other payroll-related services.  As of the Petition Date, Gawker Media owes ADP a total of $9,000.  Gawker Media seeks to pay the prepetition amount owed to ADP, and seeks approval to continue paying ADP for the Payroll Services in the ordinary course of business.

103.    Kinja utilizes UCMS Group, for Payroll Services.  Kinja pays approximately $630 to UCMS Group for Payroll Services per month.  As of the Petition Date, Kinja does now

owe any amounts to UCMS Group.  Kinja seeks to approval to continue paying for the Payroll Services in the ordinary course of business.

104.    In total, the Debtors seek authority to pay a total of $881,000 in Employee Obligations on an interim basis, and $1,171,239 on a final basis.

105.    The Debtors also seek an order authorizing and directing all financial institutions to receive, process, honor, and pay any and all checks, drafts, and other forms of payment drawn on the Debtors' bank accounts related to the Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

106.    In addition, the Debtors seek an order prohibiting financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee Obligations.

107.    Finally, the Debtors seeks an order authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Employee Obligations or other payments authorized in this Motion to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

108.    I believe that the relief sought in the Wages Motion is necessary for the continued viability of the Debtors' business.  I understand that the prepetition wages and benefits the Debtors seek to pay would be entitled to priority under the Bankruptcy Code, such that payment of those prepetition wages and benefits would merely accelerate the timing of those payments. I also believe that continuation of the Employee Obligations in the ordinary course of business will minimize disruption and expense to the Debtors during the course of these chapter 11 cases.

**F.    Debtors' Motion For Entry of Interim and Final Orders Authorizing, But Not Directing, The Debtors to (A) Continue Insurance Coverage Entered Into Prepetition, (B) Renew or Purchase New Insurance Policies in the Ordinary Course of Business, and (C) Pay all Prepetition Obligations Relating Thereto  (the "_Insurance Motion_")**

109.    By the Insurance Motion, the Debtors seek authorization to (a) continue insurance coverage entered into prepetition (the "_Insurance Policies_"); (b) renew or purchase new insurance policies in the ordinary course of business and pay any related expenses; and (c) pay all prepetition obligations, including deductibles, relating thereto.

110.    In the ordinary course of business, the Debtors maintain nine Insurance Policies covering a variety of matters including, without limitation, general commercial liability insurance, non-owned and hired automobile insurance, errors and omissions insurance, directors and officers insurance, and employment practices insurance.  The Debtors are required to pay premiums under the Insurance Policies (the "_Premiums_"), based on a rate established and billed by each Insurer.  The Premiums total approximately $342,000 on an annual basis.

111.    The Debtors also seek authority to pay its insurance brokers, Dewitt Stern Group, Inc. and USI, fees incurred in connection with obtaining the Insurance Policies and any new insurance policies purchased in the ordinary course of business.

112.    The Insurance Policies provide a comprehensive range of coverage for the Debtors' employees, businesses, and property.  I believe that if the Insurance Policies were allowed to lapse, the Debtors could be exposed to substantial liability for any damage resulting to persons and property of the Debtors and others.  Failure to maintain the Insurance Policies, therefore, would be detrimental to the Debtors' reorganization efforts and adversely affect the value of their estates by exposing them to unnecessary risks of loss.

113.    Gawker Media typically obtains its Insurance Policies through its insurance broker, Dewitt Stern Group, Inc. ("_Dewitt Stern_"), except for its worker's compensation

insurance policy, which it obtains through USI ("USI").  Kinja obtains its insurance policies

through ERIX Biztosítási Alkusz és tanácsadó Kft. ("ERIX" together with Dewitt Stern and USI,

the "Brokers").    The Brokers assists the Debtors with obtaining insurance coverage by

negotiating and procuring the Insurance Policies, so that the Debtors obtain the Insurance

Policies on favorable terms and at competitive rates.  The Debtors pay the Brokers a fee based on

the total premiums for the Insurance Policies that the Broker procures.[9]

114.    As of the Petition Date, the Debtors owe approximately $114,540 in outstanding

Premiums.  Approximately $20,216.73 in outstanding amounts owed to Insurers will become due

within the next thirty days.

115.    Payment of prepetition premiums, continuation and renewal of the Insurance

Policies, and entry into new insurance policies if necessary are all essential to preserving the

value of the Debtors' businesses, properties, and assets.  Moreover, in certain cases, I understand

that the Debtors are required by law to maintain certain types of insurance coverage.

116.    I believe that the relief requested in the Insurance Motion is necessary to avoid

cancellation, default, alteration, assignment, attachment, lapse, or any other form of impairment

to the coverage, benefits, or proceeds provided under any Insurance Policy.   Any lapse in

insurance coverage for failure to pay prepetition obligations or honor obligations coming due

during the chapter 11 case could expose the Debtors to substantial liability for damages and

negatively impact the Debtor's ability to wind down its business.   Moreover, in such

circumstances, the Debtors may be required to obtain replacement policies on an expedited basis

at a significant cost to their estates.

---

[9] Over the past twelve months, the Debtors have paid approximately $38,652.07 to Dewitt Stern.  As of
the Petition Date, the Debtors do not believe any amounts are due and owing to the Dewitt Stern, USI, or
ERIX.  The Debtors seek to continue paying any fees due to the Brokers in the ordinary course of
business.

56568242_13

### G. Debtors' Motion For Interim and Final Orders Authorizing Payment of Income Taxes, Property Taxes, Sales and Use Taxes, and Hungarian Taxes (the "Taxes Motion")

117.    By the Taxes Motion, the Debtors seek authorization to pay any taxes that accrued prepetition. The Debtors are subject to a variety of federal, state, and local income taxes.

118.    It is my understanding that as of the Petition Date, GMGI and Gawker Media do not anticipate any net income tax liability for the prepetition period.

119.    The Debtors are subject to "Commercial Rent Tax," which is owed to the City of New York, and the Debtors estimate that approximately $45,000 is due and owing on or before June 20, 2016.  The Debtors are also subject to a "Sales and Use Tax" imposed by the State of New York.  The Debtors believe that they are current on their obligations to pay Sales and Use Taxes.[10]

120.    In the ordinary course of business, the Debtors incur "Sales and Use Taxes" imposed by New York State for the purchase of goods.  As of the Petition date, the Debtors believe they are current on all Sales and Use Taxes currently due and owing.[11]

121.    Kinja is a Hungarian corporation (Kft.) operating in Budapest, Hungary and incurs various taxes levied by the Hungarian government including, but not limited to, corporate income, local business, innovation contribution and value added  ("Hungarian Taxes").  As of the Petition Date, the Kinja owes approximately $67,300 in Hungarian Taxes, $20,006 of which will become due within twenty-one days of the Petition Date.

---

[10]  I understand that the State of New York is conducting an audit of the Debtors' Sales and Use Tax liability, which could result in a pre-petition amount due, which the Debtors also seek approval to pay through the Taxes Motion.

[11]  The State of New York is currently conducting an audit of the Sales and Use Taxes, which could result in prepetition amounts due.

122.    I believe that the interim and final relief sought is in the best interests of the Debtors' estates, their creditors and stakeholders. Accordingly, I respectfully submit that the Taxes Motion should be approved.

**H.    Debtors' Motion for Entry of an Order (A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to have Adequate Assurance of Payment, and (C) Establishing Procedures For Resolving Requests for Additional Assurance (the "Utilities Motion")**

123.    By the Utilities Motion, the Debtors seek an order (a) prohibiting providers of certain utility services to the Debtors (collectively, the "Utility Companies") from discontinuing, altering, or refusing service to the Debtors except as set forth in this Motion; (b) determining that the Utility Companies have been provided with adequate assurance of payment on the basis of the establishment of the Utility Deposits (as defined below); and (c) approving the Debtors' proposed procedures for Utility Companies to request additional assurance of payment.

124.    In connection with the operation of their business, the Debtors regularly incur expenses for certain utility services.  The Debtors spend approximately $14,000 per month for Utility Services for electricity, phone, and internet services.

125.    To provide adequate assurance of payment for future services to its Utility Companies, the Debtors propose to provide a deposit to each of the Utility Companies equal to approximately 50% of the Debtors' estimated monthly utility spend attributable to such Utility Company (a "Utility Deposits"), immediately upon request of such Utility Company.  If the Debtors identify an Added Utility Company (as defined below), the Debtors will provide a deposit to the Added Utility Company, by an amount equal to the value of two weeks of services used by the Debtors, based on historical averages, from such Added Utility Company, immediately upon request of such Added Utility Company.  The Debtors also seek to establish reasonable procedures (the "Adequate Assurance Procedures") by which a Utility Company may

-40-

request additional assurance of future payment, if such Utility Company believes that the Utility

Deposit does not provide it with satisfactory adequate assurances.

126.    I believe that uninterrupted utility services are essential to the Debtors' continued

operations, and it is therefore, critical that Utility Companies be prevented from interrupting the

Debtors' utility services.  Accordingly, I respectfully submit that the Utilities Motion should be

approved.

     **I.**      **Debtors' Motion For Entry of Interim and Final Orders Authorizing the
Debtors to Pay Prepetition Claims of Critical Vendors and Foreign Vendors
and to Continue Paying the Critical Vendors and Foreign Vendors in the
Ordinary Course of Business (the "<u>Critical Vendors Motion</u>")**

127.    By the Critical Vendors Motion, the Debtors seek interim and final relief, for

authorization to pay the prepetition claims of certain categories of Critical Vendors and Foreign

Vendors (as defined in the Critical Vendors Motion), and to continue paying the Critical Vendors

and Foreign Vendors in the ordinary course of business.  To implement the relief requested, the

Debtors also request that all banks and other financial institutions on which checks were drawn

or electronic payment requests were made in connection with the amounts described in the

Critical Vendors Motion be authorized and directed to (a) receive, process, honor, and pay all

such checks and electronic payment requests when presented for payment (assuming the

availability of sufficient funds) and (b) rely on the Debtors' designation of any particular check

or electronic payment request in respect of the relief requested herein.  The Debtors also seek

authorization to reissue checks, wire transfers, automated clearing house payments, electronic

payments, or other similar methods of payment for the amounts described in this Motion where

such method of payment has been dishonored postpetition.

128.    In the ordinary course of business, the Debtors incur obligations to suppliers of

goods and services.  The Critical Vendors generally fall into five categories:

a.      **Advertising Operations**: These include vendors involved in the process of serving and collecting data for advertising campaigns.  The vendors allow the Debtors to deliver on advertising campaigns and determine the appropriate amount of revenue earned by each customer.  Discontinuance of services by these vendors would halt display of advertisements.  These vendor services also include providing campaign and site-level analytics, allowing the Debtors to deliver information and insights to advertisers.

b.      **IT & Hosting**: These include information technology vendors that ensure the Debtors' websites, platforms, and internal technology systems run without interruption.  These vendors host all images on the Debtor's websites, and provide caching and image resizing services.  Without these vendors, there would be no physical servers to power the websites and, thus, no websites at all.

c.      **Editorial Expenses**: These expenses relate to vendors that allow the Debtors' editorial department to create quality content for publication, including licensing of photos used by the editorial team on the Debtors' website.

d.      **Specialized Campaign Vendors**: These include vendors with specialized skillsets not available in-house that produce custom work related to specific advertising campaigns for customers.  These vendors allow the Debtors to research client activity and previous content programs and campaigns, and provide visibility into client interactions with competitors.  Additionally, one of these vendors provides the primary serving mechanism for custom-built banners, the loss of which would negatively impact revenue.

e.      **General & Administrative**: These include vendors providing general and administrative goods and services, such as sales-staffing support.  These services are required to ensure no interruption to the day-to-day operations of the Debtors' businesses and maintenance of revenue-generating personnel.

129.    These vendors, many of whom supply technology-related goods and services such as ad operations, IT hardware and software (and related support), web and video hosting, and editorial content, are crucial to the ongoing viability of the Debtors' business.  Such services are required by the Debtors to keep their websites up and running on a daily basis.  As a global media company that relies on the web presence of its seven brands, the Debtors' entire platform would come to a halt if any of the technology-related goods and services were discontinued for lack of payment.  Moreover, without assurance of payment through this Court's approval, there is a risk that certain vendors may cease doing business with the Debtors on account of these

bankruptcy cases.  Such an outcome would significantly reduce the value of the Debtors, to the detriment of the estates, their creditors, and other parties in interest.

130.    The Debtors propose to pay prepetition claims of Critical Vendors up to an aggregate capped maximum of $365,000.  Of this amount, the Debtors are requesting authority to pay approximately $95,000 prior to the final hearing on the relief requested in the Critical Vendors Motion.

131.    Kinja plays a critical role in the Debtors' overall operations, and its ability to continue to operate throughout these chapter 11 cases is crucial.  Certain vendors provide services to Kinja, in the nature of general and administrative services in the ordinary course of business (the "Foreign Vendors").  As of the Petition Date, the books and records indicate that there is nothing currently owed to Foreign Vendors (the "Foreign Vendor Claims") on a prepetition basis.  Based on historical patterns where invoices from foreign vendors are not delivered on a timely basis, however, the Debtors believe that up to $20,000 in Foreign Vendor Claims for prepetition services are outstanding and will come due.[12]  Accordingly, the Debtors seek authority to make payments in the aggregate amount of no more than $20,000 on account of Foreign Vendor Claims on an interim and final basis.

132.    Uninterrupted relationships with the Critical Vendors and Foreign Vendors are imperative to the Debtors' continued operation and ability to reorganize.  I believe that maintaining Customary Trade Terms (as defined in the Critical Vendors Motion) will enable the Debtors to avoid unnecessary expense because such trade terms will help the Debtors maintain their liquidity and will facilitate their ability to sustain operations while reorganizing.  Such terms will also allow the Debtors to avoid the inherent operational inefficiencies and

---

[12] The Foreign Vendor Claims do not include any prepetition amounts the Debtors seek to pay pursuant to any other motion filed on the date hereof, or subsequently throughout the pendency of these chapter 11 cases.

perturbations of paying cash on demand and managing billing processes for numerous vendors that may require cash in advance or choose to shorten their trade terms

133.    I believe payment of the interim amount of $95,000 is necessary to ensure that the Critical Vendors will continue to provide necessary goods and services therefore will preserve the value of the Debtors' business during these chapter 11 cases.  I also believe that approval to pay the aggregate capped maximum of $365,000 to the Critical Vendors on a final basis is necessary because failure to continue paying the Critical Vendors could have a material adverse impact on the Debtors' day-to-day operations which would, in turn, hinder the Debtors' restructuring.  Moreover, payment of the Foreign Vendor Claims is essential to assure that Kinja continues to receive goods and services necessary for the uninterrupted operation of the Debtors' business.

**J.**    **Motion For Entry of Interim and Final Orders Authorizing the Debtors to Continue Using the Debtors' Bank Accounts, Business Forms, and Cash Management System, and Granting Related Relief (the "Cash Management Motion")**

134.    By the Cash Management Motion, the Debtors seek the Court's approval (i) authorizing the Debtors to continue using their existing cash management system (the "Cash Management System"), bank accounts ("Bank Accounts"), and business forms, and to pay related prepetition obligations, (ii) waiving certain investment and deposit requirements, (iii) authorizing the Debtors to continue engaging in intercompany transactions in the ordinary course of business, (iv) according administrative expense priority status to postpetition intercompany claims, and (v) granting other such relief as the Court may deem just and proper.

135.    The principal components of the Cash Management System and the flow of funds among the Debtors' Bank Accounts, are as follows:

a.    **Gawker Media Operating Account at Silicon Valley Bank**.  This account (the "Gawker Media Operating Account") is the operating account for

-44-

Gawker Media.  In general, Gawker Media's operating revenue, including revenue from advertisers on each of the seven websites operated by Gawker Media and fees for licensing of web content owned by Gawker Media, as well as sublease rental income, is deposited into this account.[13]  In general, Gawker Media's expenses and obligations are paid from this account, including employee-related wage and benefit obligations, rent for the lease of Gawker Media's principal place of business in New York, payments to utility companies and other vendors that support Gawker Media's business, payments on Gawker Media's debt, and general administrative expenses.  In addition, Gawker Media's cash payments made to Kinja on account of the Master License Agreement (as described in the First Day Declaration) and intercompany service arrangements are generally paid from this account.  As of the Petition Date, Gawker Media Operating Account held approximately $2,973,026.

b.    **GMGI Operating Account at Silicon Valley Bank**.  This account (the "GMGI Operating Account") is generally used to pay only GMGI operating expenses, such as certain legal expenses, and does not generally receive deposits from third parties.  GMGI receives payments from Gawker Media an account of intercompany services arrangements and an intercompany loan from GMGI to Gawker Media.  As of the Petition Date, Gawker Media Operating Account held approximately $7,769.

c.    **Gawker Media "Lockbox" Account at Silicon Valley Bank**.  Payments made by check to Gawker Media are deposited first into this account (the "Lockbox Account"), and then swept daily into Gawker Media Operating Account.  No other deposits are made into this account.

d.    **Letter of Credit Collateral Account at Silicon Valley Bank**.  This account was established in 2016.  Gawker Media's First Lien Credit Agreement is subject to borrowing base adjustments that are evaluated on a monthly basis.  If the First Lien Lenders' eligible accounts receivable (as defined in the First Lien Credit Agreement) falls below a certain level, Gawker Media is required to deposit cash, based on a pre-determined formula, into this Letter of Credit Collateral Account.  As of the Petition Date, the Letter of Credit Collateral Account held approximately $1,076,296.

e.    **Kinja Operating Account at Silicon Valley Bank**.  Gawker Media makes payments to this account (the "Kinja US Operating Account") for Kinja on account of royalty and service fee payments under certain intercompany licensing and services agreements.  The Kinja US Operating Account also receives

---

[13] Certain of these payments, if made by check, are first deposited into the Gawker Media "Lockbox" Account described herein.

payments from certain third-party international licensing partners who license intellectual property from Kinja. This account is used to pay the USD-denominated operating expenses of Kinja. The majority of funds in this account are converted to Hungarian currency (Forint) and transferred to Kinja's Hungarian Account to fund Kinja's operating expenses in Hungary. As of the Petition Date, the Kinja Operating Account held approximately $743.

> f.    **Kinja Hungarian Account at K&H Bank in Hungary**. The Kinja Hungarian Account receives payments from a limited number of international licensing partners who license intellectual property of Kinja. The account also receives any payments made in Hungarian currency. The Kinja Hungarian Account also receives funds from the Kinja Operating Account in the United States after those funds are converted to Hungarian currency. This account is used to pay the HUF-denominated operating expenses of Kinja, including salaries of Kinja employees and rent for their office in Budapest. As of the Petition Date, the Kinja Hungarian Account held approximately $112,745.[14]

136.    In the ordinary course of businesses, the Debtors transfer funds among themselves (the "Intercompany Transfers"). The Debtors account for each Intercompany Transfer with intercompany obligations that are recorded as bookkeeping entries. The Debtors' customary cross-border Intercompany Transfers are set forth below in greater detail:

> a.    As described in the First Day Declaration, Gawker Media pays Kinja to license domain names, trademarks, and Kinja's propriety publishing platform under the Master Licensing Agreement, and also pays Kinja for services provided under the 2012 Kinja Services Agreement. Gawker Media makes periodic payments to Kinja on account of these obligations, which funds are transferred from the Gawker Media Operating Account to the Kinja Operating Account, based on the liquidity needs of Kinja and/or Gawker Media.[15] There was approximately $10,877,174.40 in accounts payable due from Gawker Media to Kinja on account of the Master License Agreement and 2012 Kinja Services Agreement (the "Kinja Payable") as of the last reconciliation date. Gawker Media will not reduce the Kinja Payable during the chapter 11 cases. Gawker Media anticipates making intercompany transfers of up to $150,000 per month to Kinja on account of post-petition obligations to Kinja under both agreements and seeks authority to permit such Intercompany Transfers.

---

[14] Kinja has one inactive account in Hungary at K&H that has not been used recently and is not part of the general cash management system. The account has a zero balance.

[15] This transfer from Gawker Media to the Kinja US Operating Account is generally followed by a purchase of HUF and transfer from the Kinja US Operating Account to the Hungary HUF Operating Account.

b.       In addition to accruing the Kinja Payable, based on cash flow needs at the respective companies, Gawker Media and Kinja have, at times, agreed to allow Gawker Media to issue promissory notes in lieu of making cash payments to Kinja.  Pursuant to two Promissory Notes, dated as of January 10, 2014 and January 10, 2015, between Gawker Media and Kinja (the "Kinja Promissory Notes"), Gawker Media agreed to pay to Kinja $8 million and $5 million, respectively, in lieu of making the payments to Kinja otherwise due on the Master License Agreement and/or the 2012 Kinja Services Agreement.  The terms of the Kinja Promissory Notes are described in the First Day Declaration.  No payments will be made on the Kinja Promissory Notes during the pendency of the chapter 11 cases.

c.       As described in the First Day Declaration, pursuant to a  Promissory Note (the "GMGI Promissory Note"), dated as of October 7, 2015, between GMGI and Gawker Media, Gawker Media agreed to pay GMGI $250,000.  No payment will be made on the GMGI Promissory Note during the pendency of the chapter 11 cases.

d.       There are also accounts payable due from Kinja to Gawker Media of $3,703,655.00.  This payable is owed on account of Kinja's obligations under the Development Agreement, as described in the First Day Declaration, pursuant to which Kinja pays Gawker Media for the costs of Gawker Media employees who work on Kinja's proprietary publishing platform.  Kinja will not reduce these accounts payable during the chapter 11 cases.

e.       Gawker Media owes approximately $100,000 in receivables to GMGI (the "GMGI Payable").  Gawker Media makes periodic payments on these receivables and transfers funds from the Gawker Media Operating Account to the GMGI Operating Account accordingly.  Gawker Media will not reduce the GMGI Payable during the chapter 11 cases.  Gawker Media does, however, anticipate making intercompany transfers of up to $10,000 per month to GMGI on account of the post-petition obligations to Kinja under both agreements, and seeks authority to permit such Intercompany Transfers.

137.   Through the Cash Management Motion, the Debtors seek authority to to continue making ordinary course Intercompany Transfers.   The Debtors account for such transactions and Intercompany Transfers with intercompany debts that are recorded as bookkeeping entries (the "Intercompany Claims").

138.   The Debtors request that the Court grant any postpetition Intercompany Claims administrative priority status under sections 507(a)(2) and 503(b) of the Bankruptcy Code.

139.     Given the Debtors' use of the Bank Accounts as part of a global, centralized Cash Management System, Intercompany Transfers among the Debtors are a necessary aspect of the Debtors' operations.   Absent the ability to continue the Intercompany Transfers, the Debtors would be unable to continue their operations and meet their obligations as they come due, to the detriment of all Debtors, their estates, and their stakeholders.

140.     Finally, in the ordinary course of business, the Debtors maintain a corporate creditor card account with American Express (the "American Express Account").   The average monthly balance on the account is $200,000 to $300,000, and approximately $100,000 is owed on the American Express Account as of the Petition Date.   Approximately 34 cards are tied to the American Express Account.   The bills for the American Express Account are received and paid by the Company directly.   Using rough estimates, approximately half of the charges on the American Express Account are employee-related expenses, including meals, airfare and travel costs, ground transportation, and professional meeting or conference expenses.   Approximately a quarter of the costs billed to the American Express Account are software license subscription costs, including payments to vendors whose services are critical to producing ads on Gawker Media's Websites. The balance of the charges billed to the American Express Account generally include production expenses, including studio, video and editorial expenses, and general administrative and IT-related costs incurred by the Debtors.

141.     Given the Debtors' reliance on the American Express Account as part of their general, daily Cash Management System, the Debtors seek to pay the outstanding approximately $100,000 owed on the American Express Account, and continue to use the American Express Account and related credit cards in the ordinary course.   As described above, based on cumulative analysis of the most recent months' bills, the majority of the charges on this account

-48-

have been employee expense related, or payments for which the Debtors would have sought relief to pay as "Critical Vendors" in that separate motion filed by the Debtors contemporaneously herewith, if payment were due to such vendors in cash. Payment and continued use of the American Express Account will minimize disruption and ensure continuity, benefitting the Debtors' estates.

142. If the Debtors were required to close any bank accounts and open new postpetition bank accounts, such requirements would disrupt the Debtors' business, causing delays in payments to vendors, administrative creditors, employees, and others, thereby impeding the Debtors' efforts to maximize the value of their estates. The Bank Accounts are central to the Cash Management System, which the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of business. Disrupting the Cash Management System would serve no legitimate or rehabilitative purpose and would be destructive to the Debtors' value as a going concern.

143. Additionally, given the Debtors' use of the Bank Accounts as part of a global, centralized Cash Management System, Intercompany Transfers among the Debtors are a necessary aspect of the Debtors' operations. Absent the ability to continue the Intercompany Transfers, the Debtors and Kinja would be unable to continue their operations and meet their obligations as they come due, to the detriment of all Debtors, their estates, and their stakeholders.

144. The Debtors also seek relief from the U.S. Trustee operating guidelines to the extent that they require the Debtors to make all disbursements by check. The complexity of the Debtors' operations requires the Debtors to conduct transactions by debit, wire, and other similar methods. Preventing the Debtors from conducting transactions by debit, wire, and other similar

methods would unnecessarily disrupt the Debtors' business operations and create additional and unnecessary costs.

145.    The Debtors also seek authority to use their existing Business Forms without imprinting "DIP" or "Debtor in Possession" thereon until such forms run out.   With the exception of  check stock, the Debtors seek the further authority to, as needed, re-order new Business Forms without such legends during their chapter 11 cases because changing Business Forms in the middle of the chapter 11 cases would be needlessly expensive and burdensome to the Debtors' estates and disruptive to their business operations.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the Debtors' provision of notice of the commencement of these Chapter 11 Cases, the press releases issued by the Debtors, and information circulating within the Debtors' industry.

146.    The Debtors believe that any funds held in the Bank Accounts in excess of the amounts insured by the FDIC are secure, and obtaining bonds to immediately secure these funds, as required by section 345(b) of the Bankruptcy Code is unnecessary in light of the facts and circumstances of these chapter 11 cases.  The Debtors seek a 90-day extension of the time to comply with section 345(b) of the Bankruptcy Code for "cause."  During the extension period, the Debtors will continue to engage the U.S. Trustee in discussions over what modifications to their current practices, if any, would be appropriate under the circumstances.

147.    I believe that the relief sought in the Cash Management Motion will enable the Debtors to maintain smooth collections and disbursements, continue their operations, meet their obligations as they come due, and maximize the value of their estates.

**K.      Debtors' Motion For Entry of an Order Authorizing the Retention and Compensation of Certain Professionals in the Ordinary Course of Business (the "Ordinary Course Professionals Motion")**

148.      The Debtors intend to file an Ordinary Course Professionals Motion, in which the Debtors will seek authority to continue to retain and compensate the Ordinary Course Professionals (the "OCPs") (as defined in the Ordinary Course Professionals Motion) on a post-petition basis in accordance with the OCP Procedures set forth in the Motion, without the need for each OCP to file formal applications for retention and compensation pursuant to sections 327, 328, 330, and 331 of the Bankruptcy Code; and (b) granting related relief.

149.      In the ordinary course of business, the Debtors employ various professional services to the Debtors on various litigation, corporate, tax, real estate, and public relations matters, all of which are necessary to the continued operation of the Debtors' business without interruption.    Certain Ordinary Course Professionals may hold unsecured claims against the Debtors in connection with prepetition services rendered, but I do not believe such amounts give rise to an interest that is materially adverse to the Debtors, their creditors, or other parties in interest.    In the ordinary course of business, Kinja utilizes the services of UCMS Group Hungary Kft., a local accounting firm that assists with day-to-day finance, bookkeeping, tax, and accounting functions.    In addition, Kinja employs several local law firms who advise in areas of corporate, real estate and other general legal matters.

150.      The OCP Procedures provide for a monthly cap of $50,000 per professional, and an aggregate cap of $500,000 per professional.    The Ordinary Course Procedures also require the Debtors to file quarterly statements, disclosing (i) the name of the OCP; (ii) the aggregate amounts paid as compensation for services rendered and reimbursement of expenses incurred by that OCP during the reported Quarter; (iii) all postpetition payments made to that OCP to date; and (iv) a general description of the services rendered by that OCP.

-51-

151.    I believe that the relief sought in the Ordinary Course Professionals Motion is

necessary because if the Debtors lose the expertise and background knowledge of the Ordinary

Course Professionals for the particular matters for which they were responsible prior to the

Petition Date, the Debtors' estate will incur additional and unnecessary expenses in retaining and

familiarizing new counsel with such matters.  Therefore, I believe it is in the best interests of the

Debtors' estate to avoid any disruption in the professional services required for the day-to-day

operations of the Debtors' business.

**L.      Motion for an Order Establishing Procedures for Interim Monthly
        Compensation and Reimbursement of Expenses of Professionals (the
        "Interim Compensation Motion")**

152.    The Debtors plan to file an Interim Compensation Motion, whereby the Debtors

seek an order establishing procedures (the "Compensation Procedures") for interim monthly

compensation and reimbursement of expenses of professionals whose services are authorized by

this Court (the "Professionals") and who will be required to file applications for allowance of

such compensation and expenses. The Debtors propose that all fees and expenses paid to

professionals under the Compensation Procedures will be subject to disgorgement until final

allowance by the Court.

153.    The Debtors further request that the Court limit service of interim and final fee

applications (collectively, the "Applications") to the Notice Parties (as defined in the Interim

Compensation Motion), with notices of any hearings on the Applications (the "Hearing Notices")

to be served on all other parties that have filed a notice of appearance with the Court and

requested notice of pleadings in the chapter 11 case. The Debtors additionally request that the

Court require all Professionals to provide a copy of any Application to any party other than the

Notice Parties upon receipt of a written request from such party. I believe that serving the

Applications and the Hearing Notices in this manner will permit the parties most active in the

chapter 11 case to review and object to the Professionals' fees efficiently and will save unnecessary duplications and mailing expenses.

154.    I believe that the proposed Compensation Procedures will enable the Debtors and other core parties in interest to closely monitor costs of administration, maintain a level cash flow availability and implement efficient cash management procedures. Moreover, the Compensation Procedures will allow the Court and key parties in interest to ensure the reasonableness and necessity of the compensation and reimbursement sought by the Professionals. I believe that the efficient administration of these Chapter 11 Cases will be significantly aided by establishing the proposed Compensation Procedures.

## Retention Related Pleadings

**P.      Debtors' Application for entry of an Order Authorizing the Retention and Employment of Ropes & Gray LLP ("R&G") as Attorneys for the Debtors and Debtors In Possession Effective *Nunc Pro Tunc* to the Petition Date ("Ropes Retention Application").**

155.    The Debtors plan to file an application to retain R&G as their restructuring attorneys. R&G has extensive experience and knowledge in, and an excellent reputation for providing, high-quality legal services in the field of debtor protections, creditor rights, and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these chapter 11 cases, R&G has become familiar with the Debtors' businesses and the legal issues that may arise in these chapter 11 cases. I believe that R&G is well-qualified and uniquely able to represent the Debtors in these chapter 11 cases and respectfully submit that the Ropes Retention Application should be approved.  The Debtors intend to file the Ropes Retention Application after the commencement of these cases.

**M.**   **Debtors' Application for Entry of an Order Authorizing and Approving
Employment and Retention of Prime Clerk LLC as Administrative Advisor
for the Debtors and Debtors in Possession *Nunc Pro Tunc* To the Petition
Date ("Prime Clerk Administrative Advisor Application")**

156.   The Debtors will seek to retain Prime Clerk as administrative advisor in these
chapter 11 cases. I believe that the Debtors' estates and creditors will benefit from Prime Clerk's
services. Prime Clerk specializes in solicitation, balloting, and other administrative tasks
necessary to operate these chapter 11 cases effectively. It is my understanding that Prime Clerk is
fully equipped to assist in the preparation of the schedules of assets and liabilities and statements
of financial affairs and to solicit, ballot, and tabulate votes as required in support of the
confirmation of a chapter 11 plan in these chapter 11 cases and, therefore, I respectfully submit
that the Prime Clerk Administrative Advisor Retention Application should be approved.  The
Debtors intend to file the Prime Clerk Administrative Advisor Retention Application after the
commencement of these cases.

**N.**   **Debtors' Application for Entry of an Order Appointing Prime Clerk LLC as
Claims and Noticing Agent *Nunc Pro Tunc* To the Petition Date ("Prime
Clerk Claims and Noticing Agent Application")**

157.   The Debtors will seek to retain Prime Clerk as the Claims and Noticing Agent in
these chapter 11 cases. The Debtors obtained and reviewed engagement proposals from three (3)
court-approved claims and noticing agents, including Prime Clerk.  Following that review, and in
consideration of the number of anticipated claimants and parties in interest, the nature of the
Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a
Claims and Noticing Agent, I submit that the appointment of Prime Clerk as Claims and
Noticing Agent is both necessary and in the best interests of the Debtors' estates.

158.   Based on Prime Clerk's experience in providing similar services in large chapter
11 cases, I believe that Prime Clerk is qualified to serve as Claims and Noticing Agent in these

chapter 11 cases.  A detailed description of the services that Prime Clerk has agreed to render and the compensation and other terms of the engagement are provided in the Prime Clerk Claims and Noticing Agent Application.  I have reviewed the terms of the engagement and believe that the Debtors' estates, creditors, parties in interest, and the Court will benefit as a result of Prime Clerk's experience and cost-effective methods.

159.    I believe that the relief requested in the Prime Clerk Claims and Noticing Agent Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and should be approved.  The Debtors intend to file the Prime Clerk Claims and Noticing Agent Application after the commencement of these cases.

**O.    Debtors' Application for Entry of an Order Authorizing and Approving the Retention of Houlihan Lokey, Inc. ("Houlihan"), as Investment Banker *Nunc Pro Tunc* to the Petition Date ("Houlihan Retention Application")**

160.    Given the size and complexity of these chapter 11 cases, I believe the Debtors require a qualified and experienced investment banker with the resources, capabilities, and experience of Houlihan to assist them in their chapter 11 cases. Further, I believe that the Debtors' estates, and particularly their creditors, will benefit from Houlihan's services.  Houlihan is a preeminent investment banking, financial advisory, and asset management firm that has considerable experience in advising financially distressed companies both in and out of court. Accordingly, I believe that the investment banking services provided by Houlihan are crucial to the Debtors during these chapter 11 cases and, therefore, I respectfully submit that the Court approve an Application seeking to employ Houlihan as investment banker to the Debtors.  The Debtors intend to file the Houlihan Retention Application after the commencement of these cases.

56568242_13

## V.     <u>INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2</u>

161.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibit B** through **Exhibit I**. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[16]

- Pursuant to Local bankruptcy Rule 1007-2(a)(3), the Debtors have not provided the names and addresses of the members of, and attorneys for, a committee organized prior to the order for relief in these chapter 11 cases. Upon information and belief, no such committee has been formed.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit B** hereto provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account, if known; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit C** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), a summary of the Debtors' assets and liabilities is provided above.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), there are no publicly held securities of the Debtors.

---

[16]     The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

56568242_13

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), which requires disclosure of any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity, the Debtors believe that certain property of the Debtors may be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, or secured creditors. Through these arrangements, the Debtors' ownership interest is not affected. Providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical at this time.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Exhibit D** hereto provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Exhibit E** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Exhibit F** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit G** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Exhibit H** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit I** hereto provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

56568242_13

## Conclusion

162.   For all the reasons described herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in each of the First Day Motions.


Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

By: _____
William D. Holden


Executed On: _6 | 12 | 16_____

56568242_13

# **EXHIBIT A**

## **Corporate Organizational Chart**

**Gawker Media Group, Inc.**
Cayman Islands Holding Company

100% owner of Gawker Media, LLC and
Kinja, Kft.

...                    ...

**Gawker Media, LLC**
Delaware LLC

**Kinja, Kft.**
Hungarian Corporation

**EXHIBIT B**

**Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Terry Gene Bollea Harder Mirell & Abrams 132 S Rodeo Dr Ste 301 Beverly Hills, CA 90212 | Terry Gene Bollea Harder Mirell & Abrams Attn: Charles Harder PHONE: 424-203-1600 FAX: EMAIL: charder@HMAfirm.com | Litigation | **Disputed** | | | $130,000,000.00 |
| 2 | Morrison Cohen LLP Attn: General Counsel 909 Third Avenue 27th Floor New York, NY 10022 | Morrison Cohen LLP Attn: General Counsel PHONE: 212-735-8640 FAX: EMAIL: dcohen@morrisoncohen.com | Trade Debt | | | | $115,379.48 |
| 3 | Risk Strategies Company DeWitt Stern Group 420 Lexington Avenue Suite 2700 New York, NY 10170 | Risk Strategies Company DeWitt Stern Group PHONE: 617-330-5700 FAX: EMAIL: | Trade Debt | | | | $82,300.38 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. |
|---|---|---|---|---|---|---|
| 4 | SimpleReach, Inc. Attn: General Counsel 122 W. 27th St., 7th Floor New York, NY 10001 | SimpleReach, Inc. Attn: General Counsel PHONE: 646-398-7633 FAX: EMAIL: ops@simplereach.com | Trade Debt | | | $82,215.06 |
| 5 | Google Inc. (DoubleClick) Attn: General Counsel 1600 Amphitheatre Parkway Mountain View, CA 94043 | Google Inc. (DoubleClick) Attn: General Counsel PHONE: 800-786-6139 FAX: 212-287-1203 EMAIL: collections-us@google.com | Trade Debt | | | $67,603.25 |
| 6 | Cloudinary Ltd.Attn: General Counsel111 W. Evelyn Ave. Suite 206 Sunnyvale, CA 94086 | Cloudinary Ltd.Attn: General Counsel PHONE: FAX: EMAIL: billing@cloudinary.com | Trade Debt | | | $54,022.68 |
| 7 | Krux Digital Attn: General Counsel 660 4th St #269 San Francisco, CA 94107 | Krux Digital Attn: General Counsel PHONE: 888-415-5789 FAX: EMAIL: billing@krux.com | Trade Debt | | | $51,143.32 |
| 8 | Fastly Attn: General Counsel 475 Brannan St Ste 320 San Francisco, CA 94107 | Fastly Attn: General Counsel PHONE: FAX: marketing@fastly.com EMAIL: billing@fastly.com | Trade Debt | | | $42,051.23 |
| 9 | Fried, Frank, Harris, Shriver & Jacobson LLP Attn: General Counsel One New York Plaza New York, NY 10004-1980 | Fried, Frank, Harris, Shriver & Jacobson LLP Attn: General Counsel PHONE: 212-859-8000 FAX: 212-859-4000 EMAIL: annemarie.crouch@friedfrank.com | Trade Debt | | | $39,578.48 |
| 10 | Medialink Attn: General Counsel 1901 Avenue of the Stars Suite 1775 Los Angeles, CA 90067 | Medialink Attn: General Counsel PHONE: (310) 424-4444 FAX: EMAIL: accounting@medialink.com | Trade Debt | | | $37,800.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 11 | DataGram Attn: General Counsel 500 West Madison Street Suite 801 Chicago, IL 60661 | DataGram Attn: General Counsel PHONE: (312) 447-2580 FAX: EMAIL: billing@datagram.com | Trade Debt | | | | $30,006.96 |
| 12 | Getty Images Attn: General Counsel 605 5th Avenue South Suite 400 Seattle, WA 98104 | Getty Images Attn: General Counsel PHONE: 206-925-5000 FAX: 206-925-5623 EMAIL: sales@gettyimages.com | Trade Debt | | | | $29,680.00 |
| 13 | The Hartford Attn: General Counsel One Hartford Plaza Hartford, CT 6155 | The Hartford Attn: General Counsel PHONE: 866-467-8730 FAX: EMAIL: | Trade Debt | | | | $27,470.60 |
| 14 | JW Player (Longtail Ad Solutions, Inc.) Longtail Ad Solutions, Inc. 8 West 38th Street Floor 6 New York , NY 10018 | JW Player (Longtail Ad Solutions, Inc.) Longtail Ad Solutions, Inc. PHONE: 212-244-0140 FAX: EMAIL: payments@jwplayer.com | Trade Debt | | | | $22,900.00 |
| 15 | Specless Attn: General Counsel 116 W. Illinois St Suite 6E-M Chicago, IL 60610 | Specless Attn: General Counsel PHONE: 312-212-8491 FAX: EMAIL: steve@gospecless.com | Trade Debt | | | | $22,500.00 |
| 16 | Moat Inc. Attn: General Counsel 222 S Albany Street#2 Ithaca, NY 14850 | Moat Inc.Attn: General Counsel PHONE: 917-848-1190 FAX: EMAIL: jonah@moat.com | Trade Debt | | | | $20,443.76 |
| 17 | Google, Inc. (Analytics) Attn: General Counsel 1600 Amphitheatre Parkway Mountain View, CA 94043 | Google, Inc. (Analytics) Attn: General Counsel PHONE: 800-786-6139 FAX: EMAIL: collections-us@google.com | Trade Debt | | | | $17,500.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 18 | Brandtale 588 Broadway Ste 503 New York, NY 10012 | Brandtale PHONE: 917-640-4978 FAX: EMAIL: ben@brandtale.com | Trade Debt | | | | $16,331.25 |
| 19 | STAQ, INC. Attn: General Counsel 44 West 28th Street 14th Floor New York, NY 10001 | STAQ, INC. Attn: General Counsel PHONE: FAX: EMAIL: ar@staq.com | Trade Debt | | | | $15,750.00 |
| 20 | Shenker & Bonaparte, LLP Attn: General Counsel 1500 SW 1st Ave #765 Portland, OR 97201 | Shenker & Bonaparte, LLP Attn: General Counsel PHONE: 503-294-1118 FAX: EMAIL: brooke@bb-law.net | Trade Debt | | | | $13,566.84 |
| 21 | Equinox Fitness Clubs - Corp Accts Corporate Accounts Office 895 Broadway New York, NY 10003 | Equinox Fitness Clubs - Corp Accts Corporate Accounts Office PHONE: 646-572-4676 FAX: 212-774-6363 EMAIL: corpbilling@equinox.com | Trade Debt | | | | $13,137.00 |
| 22 | AOL Advertising Attn: General Counsel 770 Broadway New York, NY 10003 | AOL Advertising Attn: General Counsel PHONE: 877-265-0823 FAX: EMAIL: rebecca.mcdaniel@teamaol.com | Trade Debt | | | | $12,844.48 |
| 23 | Operative Media, Inc Attn: General Counsel 6 East 32nd Street, 3rd Floor New York, NY 10016 | Operative Media, Inc Attn: General Counsel PHONE: FAX: EMAIL: AR@operative.com | Trade Debt | | | | $11,820.00 |
| 24 | Akerman LLP Attn: General Counsel 98 Southeast Seventh Street Three Brickell City Centre, Suite 1100 Miami, FL 33131 | Akerman LLP Attn: General Counsel PHONE: 407-423-4000 FAX: 608-257-2029 EMAIL: charles.brumback@akerman.com | Trade Debt | | | | $11,185.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. |
|---|---|---|---|---|---|---|
| 25 | Sizmek Technologies Inc. Attn: General Counsel 220 5th Avenue New York, NY 10001 | Sizmek Technologies Inc. Attn: General Counsel PHONE: 646-437-3748 FAX: EMAIL: Barbara.Blyden@sizmek.com | Trade Debt | | | $11,019.77 |
| 26 | Metropolitan Cleaning, LLC Attn: General Counsel 142 West 57th Street New York, NY 10019 | Metropolitan Cleaning, LLCAttn: General Counsel PHONE: (646) 341-9830 FAX: (212) 956-6250 EMAIL: jessica.fluke@metbldg.com | Trade Debt | | | $10,173.59 |
| 27 | Marlena Agency Inc. Attn: General Counsel 322 Ewing St. Princeton, NJ 8540 | Marlena Agency Inc. Attn: General Counsel PHONE: (609) 252-9405 FAX: (609) 252-1949 EMAIL: marlena@marlenaagency.com | Trade Debt | | | $10,000.00 |
| 28 | Submersive Media Attn: General Counsel 580 Broadway Suite 905 New York, NY 10012 | Submersive Media Attn: General Counsel PHONE: (212) 630-7170 FAX: EMAIL: info@submersivemedia.com | Trade Debt | | | $8,100.00 |
| 29 | Ad-Juster, Inc. (media) Attn: Michael Lewis 13280 Evening Creek Dr. S Suite 100 San Diego, CA 92128 | Ad-Juster, Inc. (media) Attn: Michael Lewis PHONE: (858) 442-6216 FAX: EMAIL: accountservices@ad-juster.com | Trade Debt | | | $7,200.00 |
| 30 | NSONE Inc. Attn: General Counsel 16 Beaver Street 3rd Floor New York, NY 10004 | NSONE Inc. Attn: General Counsel PHONE: (855) 438-6766 FAX: EMAIL: support@ns1.com | Trade Debt | | | $7,200.00 |
| 31 | CDW Direct Attn: General Counsel 200 N. Milwaukee Ave Vernon Hills, IL 60061 | CDW DirectAttn: General Counsel PHONE: (312) 630-6000 FAX: EMAIL: drewmcm@cdw.com | Trade Debt | | | $6,332.17 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | |
|---|---|---|---|---|---|---|
| 32 | Jelle Claeys Automotive Artwork Attn: General Counsel 48 Corte De Rosas Fremont, CA 94555 | Jelle Claeys Automotive Artwork Attn: General Counsel PHONE: FAX: EMAIL: info@jelleclaeys.be | Trade Debt | | | $5,000.00 |
| 33 | REDBOOKS Attn: General Counsel 330 Seventh Avenue, Floor 10 New York, NY 10001 | REDBOOKS Attn: General Counsel PHONE: (800) 908-5395 FAX: EMAIL: michael.emerson@redbooks.com | Trade Debt | | | $4,349.56 |
| 34 | Joshua M Lees Attn: General Counsel 957 Kent Ave Brooklyn, NY 11205 | Joshua M Lees Attn: General Counsel PHONE: 802-777- 4423 FAX: EMAIL: | Trade Debt | | | $1,160.00 |
| 35 | Market Halsey Urban Renewal, LLC Attn: General Counsel 112 West 34th Street Ste. 2106 New York, NY 10120 | Market Halsey Urban Renewal, LLC Attn: General Counsel PHONE: 212-265- 5570 FAX: EMAIL: hrozell@jjop.com | Trade Debt | | | $3,692.08 |
| 36 | Associated Press Attn: General Counsel 450 W. 33rd St New York, NY 10001 | Associated Press Attn: General Counsel PHONE: (212) 621-1808 FAX: EMAIL: apdsalesoperations@ap.org | Trade Debt | | | $3,640.00 |
| 37 | ShoreTel Inc. Attn: General Counsel 4921 Solution Center Chicago, IL 60677-4009 | ShoreTel Inc. Attn: General Counsel PHONE: (877) 884-3865 FAX: (408) 331-3333 EMAIL: skysupport@shoretel.com | Trade Debt | | | $3,089.58 |
| 38 | L-Cut Digital Media, Inc. Attn: General Counsel 150 S. 1 St. Apt 2D Brooklyn, NY 11211 | L-Cut Digital Media, Inc. Attn: General Counsel PHONE: (646) 256-2190 FAX: EMAIL: lcutdigital@gmail.com | Trade Debt | | | $3,000.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 39 | Merrill Communications, LLC Attn: General Counsel One Merrill Circle Saint Paul, MN 55108 | Merrill Communications, LLC Attn: General Counsel PHONE: (212) 229-6656 FAX: EMAIL: Billing@merrillcorp.com | Trade Debt | Contingent | | | $2,981.10 |
| 40 | Submarine Leisure Club, Inc. (Wirecutter) Attn: General Counsel 2424 Pine Street San Francisco, CA 94115 | Submarine Leisure Club, Inc. (Wirecutter) Attn: General Counsel PHONE: FAX: EMAIL: notes@thewirecutter.com | Trade Debt | | | | $2,876.68 |
| 41 | Corey Foster Attn: General Counsel 1019 Larkwoord Rd Kingston Springs , TN 37082 | Corey Foster Attn: General Counsel PHONE: 615-519- 3389 FAX: EMAIL: corey@gawker.com | Trade Debt | | | | $2,650.00 |
| 42 | ADP Workforce Now ADP, LLC 1 ADP Boulevard Roseland, NJ 07068 | ADP Workforce Now ADP, LLC PHONE: 800-840-3505 FAX: EMAIL: | Trade Debt | | | | $2,629.61 |
| 43 | Optimizely, Inc. Attn: General Counsel 631 Howard Street, Suite 100 San Francisco, CA 94105 | Optimizely, Inc. Attn: General Counsel PHONE: FAX: (650) 745-0728 EMAIL: sales@optimizely.com | Trade Debt | | | | $2,613.00 |
| 44 | Atlantic Metro Communications Atlantic Metro Invoice 4 Century Drive, Suite 102 Parsippany, NJ 7054 | Atlantic Metro Communications Atlantic Metro Invoice PHONE: (212) 792-9950 ex. 3 FAX: EMAIL: billing@atlanticmetro.net | Trade Debt | | | | $2,407.00 |
| 45 | Cogent Communications Attn: General Counsel 2450 N Street NW Washington, DC 20037 | Cogent Communications Attn: General Counsel PHONE: 877-726-4368 FAX: EMAIL: billing@cogentco.com | Trade Debt | | | | $2,000.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 46 | Pacific Coast News c/o Bwp Media USA, Inc 22287 Mulholland Hwy Calabasas, CA 91302 | Pacific Coast News c/o Bwp Media USA, Inc PHONE: (310) 822-0419 FAX: (310) 822-2659 EMAIL: plubbock@photoshot.com | Trade Debt | | | | $2,000.00 |
| 47 | Creative Circle, LLC. Attn: General Counsel 28027 Network Place Chicago, IL 60673-1280 | Creative Circle, LLC. Attn: General Counsel PHONE: (323) 930-3112 FAX: EMAIL: CollectionsNY@creativecircle.com | Trade Debt | | | | $1,925.00 |
| 48 | C&G Group Kft. Attn: General Counsel Vörösmarty utca 38 1064 Budapest, Hungary | C&G Group Kft. Attn: General Counsel PHONE: FAX: EMAIL: | Trade Debt | | | | $1,794.97 |
| 49 | The Oliver Group Attn: General Counsel 595 Greenhaven Rd Pawcatuck, CT 06379 | The Oliver Group Attn: General Counsel PHONE: (860) 599-9760 FAX: (860) 599-9768 EMAIL: cnilsen@the-olivergroup.com | Trade Debt | | | | $1,757.80 |
| 50 | Concur Technologies, Inc. 62157 Collections Center Drive Chicago, IL 60693 | Concur Technologies, Inc. PHONE: (425) 590-5000 FAX: EMAIL: ARCustomerSupport@concur.com | | | | | $1,512.66 |

## EXHIBIT C

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name of Creditor | Creditor Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of Claim | Collateral Description and Value |
|---|---|---|---|
| Silicon Valley Bank | Jocelyn Hartmann, 617.243.2946 JHartmann@svb.com 275 Grove St., Suite 2-200 Newton, MA 02466 | $6,222,222.24 | Description: All of the Debtors' right, title and interest in to all goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located (with each of the foregoing capitalized terms as defined in the Uniform Commercial Code in effect in the State of New York); and all of the Debtors' books and records related to the foregoing, and any and all claims, rights and interests in any of the above and all substitution for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Collateral Value: Uncertain. |

| US VC Partners LP | Arnold Jung<br>ajung@columbusnova.com<br>900 3rd Ave. #19<br>New York, NY 10022 | $15,000,000.00 | **Description**: All of the Debtors' right, title and interest in and to, wherever located, whether now owned or hereafter acquired or arising, of all goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, Instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, Deposit Accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, Supporting Obligations, and Financial Assets, whether now owned or hereafter acquired, wherever located (with each of the foregoing capitalized terms as defined in the Uniform Commercial Code in effect in the State of New York); and all of the Debtors' books and records related to the foregoing, and any and all claims, rights and interests in any of the above and all substitution for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.<br><br>**Collateral Value**: Uncertain. |

## EXHIBIT D

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 114 Fifth Avenue 2d Floor | New York | NY | USA | Leased |
| Andrassy ut 66. | 1062 Budapest | | Hungary | Leased |

**EXHIBIT E**

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location
of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
|---|---|
| Books and Records | Kinja, Kft.<br>Andrassy ut 66.<br>1062 Budapest, Hungary |

## EXHIBIT F

## Summary of Legal Actions Against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim & Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|
| Gawker Media, LLC | Ayyadurai, Shiva | See summary in First Day Declaration | 16-CV-10853 | United States District Court for the District of Massachusetts |
| Gawker Media, LLC | Bollea, Terry Gene | See summary in First Day Declaration | 12012447-CI-011 | Florida 6th Judicial Circuit for Pinellas County |
| Gawker Media, LLC | Bollea, Terry Gene | See summary in First Day Declaration | 16-002861-CI | Florida 6th Judicial Circuit for Pinellas County |
| Gawker Media, LLC; Gawker Media Group, Inc. | Huon, Meanith | See summary in First Day Declaration | 11-cv-03054 15-3049 (Appeal) | United States District Court for the Northern District of Illinois United States Court of Appeals for the Seventh Circuit (Appeal) |
| Gawker Media, LLC | Mail Media Inc. d/b/a Mail Online | See summary in First Day Declaration | 159134/2015 | New York Superior Court for New York County |
| Gawker Media, LLC | Johnson, Charles | See summary in First Day Declaration | 15CECG03734 | California Superior Court for Fresno County |
| Gawker Media, LLC | Terrill, Ashley | See summary in First Day Declaration | 16-CV-00411 | United States District Court for the Southern District of New York |
| Gawker Media, LLC | Thomas, Teresa | See summary in First Day Declaration | 16-CV-09519 | Oregon Multnomah County Circuit Court |
| Gawker Media, LLC | Williams, Mitchell | See summary in First Day Declaration | A-1674-14T3 | New Jersey Superior Court for Camden County |
| Gawker Media, LLC | Sadowski | Copyright Infringement | No. 16-cv-4178 | United States District Court for the Southern District of New York |

## **EXHIBIT G**

### **Debtors' Senior Management**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Debtor | Relevant Experience / Responsibility | Tenure |
|---|---|---|---|
| Nicholas Denton | GMGI, Gawker Media, Kinja | Chief Executive Officer | 8/2002 |
| Heather Dietrick | GMGI, Gawker Media | President, General Counsel | 6/2013 |
| Josh Albertson | Gawker Media | Chief Operating Officer | 11/2015 |
| William Holden | GMGI, Gawker Media | Chief Restructuring Officer | 6/2016 |
| Peter Szasz | Kinja | Managing Director | 5/2011 |
| Ian Fette | Gawker Media | Chief Technology Officer | 8/2015 |
| Mia Libby | Gawker Media | SVP, Global Sales & Partnerships | 1/2012 |
| John Cook | Gawker Media | Executive Editor | 1/2015 |
| Ryan Brown | Gawker Media | VP Business Development | 2/2013 |

## <u>EXHIBIT H</u>

**Debtors' Payroll for the 30 Day Period Following the Filing of the
Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $1,678,388 |
| Payments to officers, directors, and stockholders | $112,459 |
| Payments to financial and business consultants | $0 |

## <u>EXHIBIT I</u>

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

   Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $3,919,205 |
| Cash Disbursements | ($4,109,646) |
| Net Cash Loss | ($190,441) |
| Unpaid Obligations (excluding professional fees) | $1,213,952 |
| Unpaid Receivables (excluding professional fees) | $11,867,752 |