ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Kristina K. Alexander
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

-------------------------------------------------------x

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO CONTINUE USING THE DEBTORS' BANK ACCOUNTS, BUSINESS FORMS, AND CASH MANAGEMENT SYSTEM, AND GRANTING RELATED RELIEF

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and

Kinja Kft. ("Kinja") debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), respectfully submit this motion (the "Motion") for entry of an

order, substantially in the forms attached hereto as Exhibit A (the "Proposed Interim Order") and

Exhibit B (the "Proposed Final Order"),  (a) authorizing the Debtors to (i) maintain the existing

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

bank accounts (the "Bank Accounts"); (ii) continue to use their existing business forms;

(iii) continue to operate their existing cash management system (the "Cash Management

System"), including honoring certain prepetition obligations related thereto; (iv) continue

making Intercompany Transfers and recording Intercompany Claims in the ordinary course of

business; (v) grant administrative priority status to postpetition Intercompany Claims, and

continue to perform under certain intercompany arrangements consistent with historical practices

between the Debtors, and (vi) maintain their corporate American Express Account (as defined

herein), including payment of amounts billed to the account prepetition; (b) waiving certain

investment and deposit requirements; and (c) granting related relief as is just and proper.  In

support of the Motion, the Debtors hereby incorporate by reference the *Declaration of William

D. Holden in Support of First Day Motions* (the "First Day Declaration"), filed concurrently

herewith. [2]  In further support of the Motion, the Debtors, by and through their undersigned

proposed counsel, respectfully represent as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 345, 363, 364,

503, and 553 chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule

9013-1(a) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

Southern District of New York (the "Local Bankruptcy Rules").

---

[2]  Capitalized terms but not otherwise defined herein shall have the meanings ascribed in the First Day Declaration.

## Procedural Background

4.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   On the date hereof, GMGI and Kinja each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No official committee of unsecured creditors, nor any trustee or examiner, has been appointed in these cases.

7.      The factual background regarding the Debtors, their business operations, their capital and debt structure, and the events leading up to the filing of these chapter 11 cases are set forth in detail in the First Day Declaration.

## The Cash Management System

1.      As described in the First Day Declaration, the Debtors' structure is relatively simple:  GMGI, a corporation incorporated in the Cayman Islands, is the parent company of two wholly-owned subsidiaries: (i) Gawker Media, a Delaware limited liability company, and (ii) Kinja, a corporation incorporated in Hungary.

2.      In the ordinary course of business, the Debtors maintain a Cash Management System to manage their cash flow and cash transfers, collect and disburse funds generated from their operations, and facilitate cash monitoring, forecasting and reporting.  By use of the Cash Management System, the Debtors are able to efficiently collect and transfer the cash generated by their business and pay their financial obligations.  The Cash Management System incorporates use of corporate Bank Accounts, intercompany transfers and a corporate credit card, as described herein.

A.    **Bank Accounts**

3.     In connection with the Cash Management System, the Debtors maintain five

active bank accounts at one bank in the United States, and one active bank account at a different

bank in Hungary (collectively, the "Bank Accounts").  All accounts in the United States are held

at Silicon Valley Bank, also the Debtors' First Lien Lender.  Kinja also maintains one active

bank account in Hungary, where Kinja maintains separate operations.  The Debtors routinely

deposit money to, withdraw money from, and sometimes transfer money between, the Bank

Accounts by check, draft, automated transfer, and other electronic funds transfers.  The Debtors'

Bank Accounts are listed in the exhibit attached hereto as Exhibit C.

4.     The principal components of the Cash Management System and the flow of funds

among the Debtors' Bank Accounts, are as follows:

   a.   **Gawker Media Operating Account at Silicon Valley Bank**.  This account
        (the "Gawker Media Operating Account") is the operating account for Gawker
        Media.  In general, Gawker Media's operating revenue, including revenue
        from advertisers on each of the seven websites operated by Gawker Media and
        fees for licensing of web content owned by Gawker Media, as well as sublease
        rental income, is deposited into this account.[3]  In general, Gawker Media's
        expenses and obligations are paid from this account, including employee-
        related wage and benefit obligations, rent for the lease of Gawker Media's
        principal place of business in New York, payments to utility companies and
        other vendors that support Gawker Media's business, payments on Gawker
        Media's debt, and general administrative expenses.  In addition, Gawker
        Media's cash payments made to Kinja on account of the Master License
        Agreement (as described in the First Day Declaration) and intercompany
        service arrangements are generally paid from this account.  As of the Petition
        Date, the Gawker Media Operating Account held approximately $2,973,026.

   b.   **GMGI Operating Account at Silicon Valley Bank**.  This account (the
        "GMGI Operating Account") is generally used to pay only GMGI operating
        expenses, such as certain legal expenses, and does not generally receive
        deposits from third parties.  GMGI receives payments from Gawker Media an

---

[3] Certain of these payments, if made by check, are first deposited into the Gawker Media "Lockbox" Account
described herein.

account of intercompany services arrangements and an intercompany loan from GMGI to Gawker Media. As of the Petition Date, the Gawker Media Operating Account held approximately $7,769.

c. **Gawker Media "Lockbox" Account at Silicon Valley Bank**. Payments made by check to Gawker Media are deposited first into this account (the "Lockbox Account"), and then swept daily into the Gawker Media Operating Account. No other deposits are made into this account.

d. **Letter of Credit Collateral Account at Silicon Valley Bank**. This account was established in 2016. Gawker Media's First Lien Credit Agreement is subject to borrowing base adjustments that are evaluated on a monthly basis. If the First Lien Lenders' eligible accounts receivable (as defined in the First Lien Credit Agreement) falls below a certain level, Gawker Media is required to deposit cash, based on a pre-determined formula, into this Letter of Credit Collateral Account. As of the Petition Date, the Letter of Credit Collateral Account held approximately $1,076,296.

e. **Kinja Operating Account at Silicon Valley Bank**. Gawker Media makes payments to this account (the "Kinja US Operating Account") for Kinja on account of royalty and service fee payments under certain intercompany licensing and services agreements. The Kinja US Operating Account also receives payments from certain third-party international licensing partners who license intellectual property from Kinja. This account is used to pay the USD-denominated operating expenses of Kinja. The majority of funds in this account are converted to Hungarian currency (Forint) and transferred to Kinja's Hungarian Account to fund Kinja's operating expenses in Hungary. As of the Petition Date, the Kinja Operating Account held approximately $743.

f. **Kinja Hungarian Account at K&H Bank in Hungary**. The Kinja Hungarian Account receives payments from a limited number of international licensing partners who license intellectual property of Kinja. The account also receives any payments made in Hungarian currency. The Kinja Hungarian Account also receives funds from the Kinja Operating Account in the United States after those funds are converted to Hungarian currency. This account is used to pay the HUF-denominated operating expenses of Kinja, including salaries of Kinja employees and rent for their office in Budapest. As of the Petition Date, the Kinja Hungarian Account held approximately $112,745.[4]

---

[4] Kinja has one inactive account in Hungary at K&H that has not been used recently and is not part of the general cash management system. The account has a zero balance.

56675558_14

B.    **Intercompany Transfers**

5.    In the ordinary course of businesses, the Debtors transfer funds among themselves (the "Intercompany Transfers").  The Debtors account for each Intercompany Transfer with intercompany obligations that are recorded as bookkeeping entries.  The Debtors' customary cross-border Intercompany Transfers are set forth below in greater detail:

a.  As described in the First Day Declaration, Gawker Media pays Kinja to license domain names, trademarks, and Kinja's propriety publishing platform under the Master Licensing Agreement, and also pays Kinja for services provided under the 2012 Kinja Services Agreement.  Gawker Media makes periodic payments to Kinja on account of these obligations, which funds are transferred from the Gawker Media Operating Account to the Kinja Operating Account, based on the liquidity needs of Kinja and/or Gawker Media.[5]  There was approximately $10,877,174.40 in accounts payable due from Gawker Media to Kinja on account of the Master License Agreement and 2012 Kinja Services Agreement (the "Kinja Payable") as of the last reconciliation date. Gawker Media will not reduce the Kinja Payable during the chapter 11 cases. Gawker Media anticipates making intercompany transfers of up to $150,000 per month to Kinja on account of post-petition obligations to Kinja under both agreements and seeks authority to permit such Intercompany Transfers.

b.  In addition to accruing the Kinja Payable, based on cash flow needs at the respective companies, Gawker Media and Kinja have, at times, agreed to allow Gawker Media to issue promissory notes in lieu of making cash payments to Kinja.  Pursuant to two Promissory Notes, dated as of January 10, 2014 and January 10, 2015, between Gawker Media and Kinja (the "Kinja Promissory Notes"), Gawker Media agreed to pay to Kinja $8 million and $5 million, respectively, in lieu of making the payments to Kinja otherwise due on the Master License Agreement and/or the 2012 Kinja Services Agreement. The terms of the Kinja Promissory Notes are described in the First Day Declaration.  No payments will be made on the Kinja Promissory Notes during the pendency of the chapter 11 cases.

c.  As described in the First Day Declaration, pursuant to a  Promissory Note (the "GMGI Promissory Note"), dated as of October 7, 2015, between GMGI and Gawker Media, Gawker Media agreed to pay GMGI $250,000.  No payment will be made on the GMGI Promissory Note during the pendency of the chapter 11 cases.

---

[5] This transfer from Gawker Media to the Kinja US Operating Account is generally followed by a purchase of HUF and transfer from the Kinja US Operating Account to the Hungary HUF Operating Account.

    d.    There are also accounts payable due from Kinja to Gawker Media of $3,703,655.00. This payable is owed on account of Kinja's obligations under the Development Agreement, as described in the First Day Declaration, pursuant to which Kinja pays Gawker Media for the costs of Gawker Media employees who work on Kinja's proprietary publishing platform. Kinja will not reduce these accounts payable during the chapter 11 cases.

    e.    Gawker Media owes approximately $100,000 in receivables to GMGI (the "GMGI Payable"). Gawker Media makes periodic payments on these receivables and transfers funds from the Gawker Media Operating Account to the GMGI Operating Account accordingly. Gawker Media will not reduce the GMGI Payable during the chapter 11 cases. Gawker Media does, however, anticipate making intercompany transfers of up to $10,000 per month to GMGI on account of the post-petition obligations to Kinja under both agreements, and seeks authority to permit such Intercompany Transfers.

6.       In this Motion, the Debtors seek authority, but not direction, to continue making ordinary course Intercompany Transfers. The Debtors account for such transactions and Intercompany Transfers with intercompany debts that are recorded as bookkeeping entries (the "Intercompany Claims").

7.       The Debtors request that the Court grant any postpetition Intercompany Claims administrative priority status under sections 507(a)(2) and 503(b) of the Bankruptcy Code.

8.       Given the Debtors' use of the Bank Accounts as part of a global, centralized Cash Management System, Intercompany Transfers among the Debtors are a necessary aspect of the Debtors' operations. Absent the ability to continue the Intercompany Transfers, the Debtors would be unable to continue their operations and meet their obligations as they come due, to the detriment of all Debtors, their estates, and their stakeholders.

7

C.    **Credit Card Account**

9.      Finally, in the ordinary course of business, the Debtors maintain a corporate creditor card account with American Express (the "American Express Account").  The average monthly balance on the account is $200,000 to $300,000, and approximately $100,000 is owed on the American Express Account as of the Petition Date.  Approximately 34 cards are tied to the American Express Account.  The bills for the American Express Account are received and paid by the Company directly.  Using rough estimates, approximately half of the charges on the American Express Account are employee-related expenses, including meals, airfare and travel costs, ground transportation, and professional meeting or conference expenses.  Approximately a quarter of the costs billed to the American Express Account are software license subscription costs, including payments to vendors whose services are critical to producing ads on Gawker Media's Websites. The balance of the charges billed to the American Express Account generally include production expenses, including studio, video and editorial expenses, and general administrative and IT-related costs incurred by the Debtors.

10.      Given the Debtors' reliance on the American Express Account as part of their general, daily Cash Management System, the Debtors seek to pay the outstanding approximately $100,000 owed on the American Express Account, and continue to use the American Express Account and related credit cards in the ordinary course.  As described above, based on cumulative analysis of the most recent months' bills, the majority of the charges on this account have been employee expense related, or payments for which the Debtors would have sought relief to pay as "Critical Vendors" in that separate motion filed by the Debtors contemporaneously herewith, if payment were due to such vendors in cash.  Payment and

continued use of the American Express Account will minimize disruption and ensure continuity, benefitting the Debtors' estates.

## Relief Requested

11.    By this Motion, the Debtors seek entry of interim and final orders authorizing, but not directing,  the Debtors to: (i) maintain the existing Bank Accounts; (ii) continue to use their existing business forms; (iii) continue to operate their existing Cash Management System, including honoring certain prepetition obligations related thereto; (iv) continue making Intercompany Transfers and recording Intercompany Claims in the ordinary course of business; (v) grant administrative priority status to postpetition Intercompany Claims, and continue to perform under certain intercompany arrangements consistent with historical practices between the Debtors, and (vi) maintain their corporate American Express Account (as defined herein), including payment of amounts billed to the account prepetition.

12.    The Debtors further request that the Court authorize the Banks identified on the attached **Exhibit C** to continue to maintain, service and administer the Bank Accounts and debit the Bank Accounts in the ordinary course of business on account of checks or electronic funds transfers drawn on the accounts that were presented for payment at the banks or exchanged for cashier's checks before the Petition Date to the extent instructed to do so by the Debtors.

## Basis For Relief

### A.    The Debtors Should Be Granted Authority to Maintain Their Existing Bank Accounts and Make Ordinary Course Intercompany Transfers

13.    To supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession.  Those guidelines, among other things, require chapter 11 debtors to immediately: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for

56675558_14

all estate monies required for the payment of taxes, including payroll taxes, and (iii) maintain a

separate debtor in possession account for cash collateral.

14.    The Debtors seek a waiver of the requirements that they close any bank accounts

and open new postpetition bank accounts.  If enforced in these chapter 11 cases, such

requirements would disrupt the Debtors' business, causing delays in payments to vendors,

administrative creditors, employees, and others, thereby impeding the Debtors' efforts to

maximize the value of their estates. As described above, the Bank Accounts are central to the

Cash Management System, which the Debtors need to maintain to ensure smooth collections and

disbursements in the ordinary course of business.  Disrupting the Cash Management System

would serve no legitimate or rehabilitative purpose and would be destructive to the Debtors'

value as a going concern.

15.    The Debtors request the authority to continue to use the Bank Accounts with the

same account numbers, styles, and business forms as the Debtors used prepetition.  The Debtors

also seek authority to open new accounts whenever needed, provided that the Debtors give the

U.S. Trustee adequate notice of such newly-opened accounts. The Debtors represent that if the

relief requested in this Motion is granted, they will not pay, and will direct each of their banks to

not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.[6]

16.    In connection with continuing the use of the Bank Accounts, the Debtors request

the authority to pay prepetition bank fees and charges to the extent of the amount of the Debtors'

cash held by such bank.  Each bank may have setoff rights with respect to any of the Debtors'

cash it holds and could request that this Court lift the automatic stay to exercise those setoff

---

[6] The Debtors have sought authority to pay certain of their prepetition obligations in various motions filed contemporaneously herewith.

10

rights.  The Debtors seek authority to pay the prepetition bank fees and charges to the extent the

Debtors determine, in their good faith business judgment, that the banks have valid setoff claims

pursuant to Section 553 of the Bankruptcy Code (but only to the extent of such claims).  This

will save the Debtors the time and expense of responding to such lift stay requests and/or

negotiating stipulated orders to allow the banks to exercise setoff rights.  The Debtors further

submit that such relief requested would not prejudice the interests of any other creditors or other

parties-in-interest.

17.     Courts have routinely granted similar relief in other complex chapter 11 cases.

See, e.g., In re Aereo, Inc., No. 14-13200 (SHL) (Bankr. S.D.N.Y. Dec. 24, 2014) [Docket No.

100]; In re ConnectEdu, Inc., No. 14-11238 (SCC) (Bankr. S.D.N.Y. May 27, 2014) [Docket No.

129]; In re RDA Holding Co., No. 13-22233 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) [Docket

No. 170]; In re LodgeNet Interactive Corp., No. 13-10238 (SCC) (Bankr. S.D.N.Y. Feb. 27,

2013) [Docket No. 160]; In re Atari, Inc., No. 13-10176 (JLG) (Bankr. S.D.N.Y. Feb. 15, 2013)

[Docket No. 83]; In re Houghton Mifflin Harcourt Publ'g Co., No. 12-12171 (REG) (Bankr.

S.D.N.Y. June 21, 2012) [Docket No. 120]; In re Inverness Distribution Ltd., No. 11-15939

(SCC) (Bankr. S.D.N.Y. Mar. 26, 2012) [Docket No. 47].

18.     Further, authorization to continue ordinary course Intercompany Transfers among

the Debtors is critical to the Debtors' continued business operations and is in the best interests of

the Debtors and their estates.

19.     As noted above, the Debtors account for Intercompany Transfers by establishing

intercompany debts through bookkeeping entries, and the Debtors will continue such practice

during these chapter 11 cases.  The Debtors seek relief in this motion designating any such

postpetition intercompany claims as administrative expenses under section 503(b) of the

56675558_14

Bankruptcy Code.  All parties in interest will be able to trace the flow of funds among the

Debtors, and no creditors of any Debtor will be harmed by the postpetition Intercompany

Transfers.  Finally, the Debtors will notify the U.S. Trustee to the extent that aggregate

Intercompany Transfers between the Debtors exceeds $150,000 in any calendar month, and will

not permit the account balance of the Kinja Hungarian Account to exceed $200,000 at any time.

**B.      The Debtors Should Be Authorized to Continue Using Debit, Wire, and Automatic
         Clearing House Payments**

20.      The Debtors should be granted further relief from the U.S. Trustee operating

guidelines to the extent that they require the Debtors to make all disbursements by check.  In

particular, the U.S. Trustee operating guidelines require that all receipts and disbursements of the

estates funds occur by check with a notation representing the reason for the disbursement.

21.      The complexity of the Debtors' operations requires the Debtors to conduct

transactions by debit, wire, and other similar methods. Preventing the Debtors from conducting

transactions by debit, wire, and other similar methods would unnecessarily disrupt the Debtors'

business operations and create additional and unnecessary costs.

**C.      The Debtors Should Be Authorized to Continue to Use Their Existing Cash
         Management System, Continue Intercompany Transfers and Maintain Their
         Corporate Credit Card**

22.      The Debtors' Cash Management System, including the Bank Accounts, constitute

a customary and essential business practice and is similar to those used by other major

international corporate enterprises. The Cash Management System provides significant benefits

to the Debtors, including the ability to control corporate funds centrally and to ensure the

availability of funds to the Debtors as necessary.

23.      Compelling the Debtors to adopt a new cash management system would be

extremely expensive, time consuming, and disruptive, and would impede the Debtors' immediate

reorganization efforts.  The Debtors' ability to continue using the Cash Management System is essential to sustaining the Debtors' going concern value and is in the best interests of all the Debtors, their estates, and their stakeholders.

24.    The Debtors' request for authorization to continue to use its Cash Management System is entirely consistent with section 363(c) of the Bankruptcy Code, which allows debtors in possession to use estate property in the ordinary course of business. See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997); In re Enron Corp., No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1453 (10th Cir. 1996) (Section 363(c) permits debtors to continue engaging in routine transactions, including cash management systems).

25.    The Debtors' request to maintain their corporate American Express Account in the ordinary course of business, including payment of amounts billed to the account prepetition, is also warranted.  Again, section 363(c) of the Bankruptcy Code permits the debtors in possession to use estate property in the ordinary course of business, and the majority of funds owed on the American Express Account as of the Petition Date are for underlying expenses that would otherwise be included in the Debtors' other first-day relief motions to reimburse employees for expenses incurred, and to pay certain vendors that are critical to the Debtors' operations.

26.    Further, as noted above, the Debtors request that the Court grant any intercompany claims arising from postpetition Intercompany Transfers administrative priority status under sections 507(a)(2) and 503(b) of the Bankruptcy Code.

27.    Courts have granted similar relief in other large and complex chapter 11 cases.

See, e.g., In re Houghton Mifflin Harcourt Publ'g Co., No. 12-12171 (REG) (Bankr. S.D.N.Y.

June 21, 2012); In re Pinnacle Airlines Corp., No. 12-11343 (RG) (Bankr. S.D.N.Y. Apr. 23,

2012); In re Velo Holdings Inc., No. 12-11387 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012); In re Gen.

Mar. Corp., No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 28, 2011).

**D.    The Debtors Should Be Granted Authority to Continue to Use Existing Business Forms**

28.    To minimize expenses to their estates, the Debtors also request authorization to

continue using all correspondence and business forms (including, but not limited to, letterheads,

purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock

(collectively, the "Business Forms")) existing immediately prior to the Petition Date without

reference to the Debtors' status as debtors in possession.

29.    The Debtors seek authority to use their existing Business Forms without

imprinting "DIP" or "Debtor in Possession" thereon until such forms run out.  With the

exception of check stock, the Debtors seek the further authority to, as needed, re-order new

Business Forms without such legends during their chapter 11 cases because changing Business

Forms in the middle of the chapter 11 cases would be needlessly expensive and burdensome to

the Debtors' estates and disruptive to their business operations.  Parties doing business with the

Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the

Debtors' provision of notice of the commencement of these Chapter 11 Cases, the press releases

issued by the Debtors, and information circulating within the Debtors' industry.

30.    Courts have routinely permitted the continued use of existing business forms

without the "debtor in possession" legend in other chapter 11 cases.  See, e.g., In re Excel

Maritime Carriers LTD, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Dec. 6, 2013); In re Gen. Mar.

14

Corp., No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 28, 2011); In re Great Atl. & Pac. Tea Co., No.

10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011).

**F.      Extension of Time to Comply with Section 345(b) of the Bankruptcy Code**

31.      Section 345(b) of the Bankruptcy Code requires that any deposit or other

investment made by a debtor, except those (a) insured or guaranteed by the United States or by a

department, agency, or instrumentality of the United States or (b) backed by the full faith and

credit of the United States, be secured by either (i) a bond in favor of the United States that is

secured by the undertaking of a corporate surety approved by the U.S. Trustee for the relevant

district or (ii) the deposit of securities of the kind specified in 31 U.S.C. § 9303. See 11 U.S.C.

§ 345(b).

32.      Requiring the Debtors to strictly comply with the requirements of section 345(b)

of the Bankruptcy Code would be inconsistent with section 345(a), which permits a debtor in

possession to make such investments of money of the estate "as will yield the maximum

reasonable net return on such money."  Thus, in 1994, to avoid "needlessly handcuff[ing] larger,

more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to

provide that its strict investment requirements may be waived or modified if the Court so orders

"for cause." 140 Cong. Rec. H10,767 (Oct. 4, 1994).

33.      The Debtors believe that any funds held in the Bank Accounts in excess of the

amounts insured by the FDIC are secure, and obtaining bonds to immediately secure these funds,

as required by section 345(b) is unnecessary in light of the facts and circumstances of these

chapter 11 cases.

34.      By this Motion, the Debtors seek a 90-day extension of the time to comply with

section 345(b) of the Bankruptcy Code for "cause."  During the extension period, the Debtors

will continue to engage the U.S. Trustee in discussions over what modifications to their current

practices, if any, would be appropriate under the circumstances.  The Debtors believe that the benefits of the requested extension far outweigh any harm to the estates.  See In re Serv. Merch. Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (noting that a factor to consider in determining whether cause exists "for relief from the strictures of § 345(b)" is whether benefits to debtor outweigh harm, if any, to estate).

35.    Similar extensions have been granted in other chapter 11 cases. See, e.g., In re dELiA*s, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014) [Docket No. 99]; In re Inversiones Alsacia S.A., Case No. 14-12896 (MG) (Bankr. S.D.N.Y. Dec. 4, 2014) [Docket No. 99]; In re SIGA Techs., Inc., Case No. 14-12623 (SHL) (Bankr. S.D.N.Y. Oct. 23, 2014) [Docket No. 91]; In re LodgeNet Interactive Corp., Case No. 13-10238 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2013) [Docket No. 160]; In re TBS Shipping Servs. Inc., Case No. 12-22224 (RDD) (Bankr. S.D.N.Y. Feb. 8, 2012) [Docket No. 37].

36.    Based on the foregoing, the Debtors submit that the requested relief is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

**The Requirements of Bankruptcy Rule 6003 Have Been Satisfied**

37.    Bankruptcy Rule 6003 empowers this Court to grant relief within the first 21 days after the Petition Date to the extent that such relief is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  For reasons stated herein, the Debtors submits that the requested relief is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted promptly in all respects to avoid immediate and irreparable harm to the Debtors' estate, notwithstanding the 21-day period provided in Bankruptcy Rule 6003.

16

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

38.     To implement the foregoing successfully, the Debtors request that the Court enter an order waiving the notice requirements of Bankruptcy Rule 6004(a) and finding that the Debtors have established cause to exclude such relief from any stay imposed by Bankruptcy Rule 6004(h).

## **No Prior Request**

39.     No previous motion for the relief requested herein has been made to this or to any other court.

## **Notice**

40.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) the 50 largest unsecured creditors of the Debtors (on a consolidated basis); (iii) counsel to the First Lien Lender; (iv) counsel to the Second Lien Lender; (v) the Internal Revenue Service; and (vi) the United States Attorney for the Southern District of New York.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

17

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, a) authorizing the Debtors to (i) maintain the existing Bank Accounts; (ii) continue to use their existing business forms; (iii) continue to operate their existing Cash Management System, including honoring certain prepetition obligations related thereto; (iv) continue making Intercompany Transfers and recording Intercompany Claims in the ordinary course of business; (v) grant administrative priority status to postpetition Intercompany Claims, and continue to perform under certain intercompany arrangements consistent with historical practices between the Debtors, and (vi) maintain their corporate American Express Account (as defined herein), including payment of amounts billed to the account prepetition; (b) waiving certain investment and deposit requirements; and (c) granting related relief as is just and proper.

Dated: June 12, 2016
     New York, New York

*/s/ Gregg M. Galardi*
ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Kristina K. Alexander
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
jonathan.gill@ropesgray.com
kristina.alexander@ropesgray.com
stacy.dasaro@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

56675558_14

## Exhibit A

Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
Gawker Media LLC, *et al.*,[1]            :        Case No. 16-11700 (SMB)
                                          :
                 Debtors.                 :        (Joint Administration Requested)
                                          :
-------------------------------------------------------x

**INTERIM ORDER AUTHORIZING THE DEBTORS TO CONTINUE USING**
**DEBTORS' BANK ACCOUNTS, BUSINESS FORMS, AND**
**CASH MANAGEMENT SYSTEM, AND GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors"), for

entry of an interim order (this "Interim Order") (a) authorizing the Debtors to (i) maintain the

existing Bank Accounts; (ii) continue to use their existing business forms; (iii) continue to

operate their existing Cash Management System, including honoring certain prepetition

obligations related thereto; (iv) continue making Intercompany Transfers and recording

Intercompany Claims in the ordinary course of business; (v) grant administrative priority status

to postpetition Intercompany Claims, and continue to perform under certain intercompany

arrangements consistent with historical practices between the Debtors, and (vi) maintain their

corporate American Express Account (as defined herein), including payment of amounts billed

to the account prepetition; (b) waiving certain investment and deposit requirements; and (c)

granting related relief as is just and proper; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

proceeding pursuant to 28 U.S.C § 157(b)(2); and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C §§ 1408 and 1409; and

this Court having found that the relief requested in the Motion is in the best interests of the

Debtors' estates, their creditors, and other parties in interest; and this Court having found that the

Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate

under the circumstances and no other notice need be provided; and this Court having reviewed

the motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Hearing"); and this Court having determined that the legal and factual

bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

and upon all of the proceedings had before this Court; and after due deliberation and sufficient

cause appearing therefor, it is it is hereby

**ORDERED, THAT:**

1.      The Motion is GRANTED on an interim basis to the extent set forth herein.

2.      A final hearing on the relief requested in the Motion shall be set for _____,

2016 at _____ (Prevailing Eastern Time) and any objections or responses to the

Motion shall be in writing, filed with the Court and served upon (i) proposed counsel for the

Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn:

Gregg M. Galardi (gregg.galardi@ropesgray.com); (ii) the United States Trustee for the

Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014,

Attn: Greg Zipes and Susan Arbeit; (iii) attorneys for any statutory committee of unsecured

creditors appointed in these chapter 11 cases; (iv) counsel to Silicon Valley Bank, Riemer &

Braunstein, LLP, 3 Center Plaza, Boston, MA 02108, Attn: Alexander Rheaume

(ARheaume@riemerlaw.com); (v) counsel to US VC Partners LP, Latham & Watkins, 355 South

Grand Ave., Los Angeles, CA 90071, Attn: Mark O. Morris (mark.morris@lw.com); and (vi) the

50 largest unsecured creditors of the Debtors (on a consolidated basis); in each case so as to be

received no later than 4:00 p.m. (Prevailing Eastern Time) on _____, 2016.

3.       Subject to further order of the Court, the Debtors are authorized to continue to

manage their cash pursuant to the Cash Management System maintained by the Debtors before

the Petition Date; to collect, concentrate, and disburse cash in accordance with the Cash

Management System, including intercompany funding among the Debtors, and to make ordinary

course changes to their Cash Management System without further order of the Court.

4.       The Debtors are authorized to maintain and continue to use any or all of their

existing Bank Accounts in the names and with the account numbers existing immediately before

the Petition Date, deposit funds in and withdraw funds from such accounts by all usual means,

pay any bank fees or charges associated with the Bank Accounts, whether arising before or after

the Petition Date, and treat their prepetition Bank Accounts for all purposes as debtor in

possession accounts.  Each of the Banks is authorized and directed to continue to honor transfers,

as directed by the Debtors, of funds among the Debtors' Bank Accounts.

5.       The Debtors are authorized to continue using their existing Business Forms,

without reference to the Debtors status as debtors in possession.  With the exception of check

stock, the Debtors are authorized to, as needed, re-order new Business Forms without such

legends during their chapter 11 cases.

6.       The Debtors are authorized to continue engaging in Intercompany Transfers in the

ordinary course of business.  Intercompany Claims are hereby granted administrative expense

status pursuant to sections 364(b), 503(b)(1), and 507(a)(2) of the Bankruptcy Code.

7.    The Debtors are authorized to maintain their corporate American Express Account, and to pay amounts billed to the account prepetition in the aggregate amount of approximately $100,000, on an interim basis.

8.    The Debtors shall maintain accurate records of all transfers within the Cash Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Petition Date.

9.    The Debtors are authorized, but not directed to pay prepetition bank fees, to the extent the Debtors determine, in their good faith business judgment, that a bank has a valid setoff claim pursuant to section 553 of the Bankruptcy Code, only to the extent of such claim.  The automatic stay is hereby modified for the limited purpose of permitting the Debtors to pay such prepetition bank fees.

10.    Nothing herein shall prevent the Debtors from opening any additional bank accounts at authorized depositories, or closing any existing Bank Accounts as they may deem necessary and appropriate.  The Banks are authorized to honor the Debtors' request to open or close, as applicable, such Bank Accounts.  The Debtors shall notify parties in interest and the United States Trustee of the opening of any new Bank Accounts at authorized depositories or closing of any existing Bank Accounts by providing information regarding any such new or closed account in the Debtors' monthly operating reports.

11.    The Debtors are permitted a 90-day extension of the time to comply with section 345(b) of the Bankruptcy Code.  During the extension period, the Debtors will continue to engage the U.S. Trustee in discussions over what modifications to their current practices, if any, would be appropriate under the circumstances.

12.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

13.     The requirements of Bankruptcy Rule 6004(a) are hereby waived.

14.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this

Interim Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Interim Order.

16.     The Court shall retain jurisdiction with respect to any and all matters arising from

or relating to the implementation or interpretation of this Interim Order.


Dated: _____, 2016
          New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

Proposed Final Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                 :
In re                             :       Chapter 11
                                 :
Gawker Media LLC. *et al.*,[1]    :       Case No. 16-11700 (SMB)
                                 :
           Debtors.        :       (Joint Administration Requested)
                                 :
-------------------------------------------------------x

**FINAL ORDER AUTHORIZING THE DEBTORS TO CONTINUE USING
DEBTORS' BANK ACCOUNTS, BUSINESS FORMS, AND
CASH MANAGEMENT SYSTEM, AND GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors"), for

entry of a final order (this "Final Order") (a) authorizing the Debtors to (i) maintain the existing

Bank Accounts; (ii) continue to use their existing business forms; (iii) continue to operate their

existing Cash Management System, including honoring certain prepetition obligations related

thereto; (iv) continue making Intercompany Transfers and recording Intercompany Claims in the

ordinary course of business; (v) grant administrative priority status to postpetition Intercompany

Claims, and continue to perform under certain intercompany arrangements consistent with

historical practices between the Debtors, and (vi) maintain their corporate American Express

Account (as defined herein), including payment of amounts billed to the account prepetition; (b)

waiving certain investment and deposit requirements; and (c) granting related relief as is just and

proper; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

§ 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C §§ 1408 and 1409; and this Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for a hearing on the Motion were appropriate under the circumstances and no other

notice need be provided; and this Court having reviewed the motion and having heard the

statements in support of the relief requested therein at a hearing before this Court (the

"Hearing"); and this Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor, it is it is hereby

**ORDERED, THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      The Debtors are authorized to continue to manage their cash pursuant to the Cash

Management System maintained by the Debtors before the Petition Date; to collect, concentrate,

and disburse cash in accordance with the Cash Management System, including intercompany

funding among the Debtors, and to make ordinary course changes to their Cash Management

System without further order of the Court.

3.      The Debtors are authorized to maintain and continue to use any or all of their

existing Bank Accounts in the names and with the account numbers existing immediately before

the Petition Date, deposit funds in and withdraw funds from such accounts by all usual means,

pay any bank fees or charges associated with the Bank Accounts, whether arising before or after

the Petition Date, and treat their prepetition Bank Accounts for all purposes as debtor in

possession accounts.  Each of the Banks is authorized and directed to continue to honor transfers, as directed by the Debtors, of funds among the Debtors' Bank Accounts.

4.      The Debtors are authorized to continue using their existing Business Forms, without reference to the Debtors status as debtors in possession.  With the exception of check stock, the Debtors are authorized to, as needed, re-order new Business Forms without such legends during their chapter 11 cases.

5.      The Debtors are authorized to continue engaging in Intercompany Transfers in the ordinary course of business.  Intercompany Claims are hereby granted administrative expense status pursuant to sections 364(b), 503(b)(1), and 507(a)(2) of the Bankruptcy Code.

6.      The Debtors are authorized to maintain their corporate American Express Account, and to pay amounts billed to the account prepetition in the aggregate amount of approximately $100,000.

7.      The Debtors shall maintain accurate records of all transfers within the Cash Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Petition Date.

8.      The Debtors are authorized, but not directed to pay prepetition bank fees, to the extent the Debtors determine, in their good faith business judgment, that a bank has a valid setoff claim pursuant to section 553 of the Bankruptcy Code, only to the extent of such claim.  The automatic stay is hereby modified for the limited purpose of permitting the Debtors to pay such prepetition bank fees.

9.      Nothing herein shall prevent the Debtors from opening any additional bank accounts at authorized depositories, or closing any existing Bank Accounts as they may deem

necessary and appropriate.  The Banks are authorized to honor the Debtors' request to open or

close, as applicable, such Bank Accounts.  The Debtors shall notify parties in interest and the

United States Trustee of the opening of any new Bank Accounts at authorized depositories or

closing of any existing Bank Accounts by providing information regarding any such new or

closed account in the Debtors' monthly operating reports.

10.    The Debtors are permitted a 90-day extension of the time to comply with section

345(b) of the Bankruptcy Code.  During the extension period, the Debtors will continue to

engage the U.S. Trustee in discussions over what modifications to their current practices, if any,

would be appropriate under the circumstances.

11.    The requirements of Bankruptcy Rule 6004(a) are hereby waived.

12.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final

Order shall be immediately effective and enforceable upon its entry.

13.    The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Final Order.

14.    The Court shall retain jurisdiction with respect to any and all matters arising from

or relating to the implementation or interpretation of this Final Order.


Dated: _____, 2016
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

# Exhibit C

**Bank Accounts**

| Debtor Account Holder | Account Type | Institution | Account Number (last 4 digits) |
|---|---|---|---|
| Gawker Media LLC | Operating | Silicon Valley Bank | 2011 |
| Gawker Media LLC | L/C Collateral | Silicon Valley Bank | 7785 |
| Gawker Media LLC | Lockbox | Silicon Valley Bank | 0192 |
| Gawker Media Group Inc. | Operating | Silicon Valley Bank | 2079 |
| Kinja Kft. | Operating Account | K&H Bank Zrt. | 0002 |
| Kinja Kft. | Operating Account | Silicon Valley Bank | 2064 |