Ropes & Gray LLP
Gregg M. Galardi
Jonathan P. Gill
Kristina K. Alexander
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090


*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                            :
In re                                       :          Chapter 11
                                            :
Gawker Media LLC, *et al.,*[1]              :          Case No. 16-11700 (SMB)
                                            :
                     Debtors.               :          (Joint Administration Requested)
                                            :
-------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY INTERIM AND FINAL ORDERS (I)
AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF PREPETITION WAGES,
SALARIES, BUSINESS EXPENSES, EMPLOYEE BENEFITS AND RELATED ITEMS,
AND (II) DIRECTING ALL FINANCIAL INSTITUTIONS TO HONOR
CHECKS FOR PAYMENT OF SUCH OBLIGATIONS**

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"),  and

Kinja Kft. ("Kinja") debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), respectfully submit this motion (the "Motion") for entry of orders,

substantially in the forms attached hereto as Exhibit A (the "Proposed Interim Order") and

Exhibit B (the "Proposed Final Order"), authorizing the payment of certain prepetition Employee

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

Obligations (as defined below) and the continued payment of Employee Obligations in the

ordinary course of business, directing financial institutions to honor checks for payment of such

Employee Obligations, prohibiting financial institutions from restricting automatic transfers to

Employees' accounts for Employee Obligations, and other related relief, as set forth in more

detail below.  In support of the Motion, the Debtors hereby incorporate by reference the

*Declaration of William Holden in Support of First Day Motions* (the "First Day Declaration"),

filed concurrently herewith.[2]  In further support of the Motion, the Debtors, by and through their

undersigned proposed counsel, respectfully represent as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b),

507(a), 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and

Rules 6003, 6004(a) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

## Procedural Background

4.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.   On the date hereof, GMGI and Kinja each filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors are operating their businesses as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day
Declaration.

6.      No official committee of unsecured creditors, nor any trustee or examiner, has

been appointed in these cases.

7.      The factual background regarding the Debtors, their business operations, their

capital and debt structure, and the events leading up to the filing of these chapter 11 cases are set

forth in detail in the First Day Declaration.

### Relief Requested

8.      By this Motion, the Debtors seek entry of the Interim Order and Final Order,

substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, authorizing, but not

directing, the Debtors to:

a)  pay, on an interim and final basis, prepetition wages, salaries, and other accrued
    compensation to Salaried Employees, Hourly Employees, and Hungarian
    Employees, in an aggregate amount up to $50,000, and continue to pay employee
    wages in the ordinary course of business.

b)  pay, on an interim and final basis, prepetition editorial employee incentives in an
    aggregate amount up to $30,000 and continue to pay them in the ordinary course
    of business.

c)  pay, on an interim and final basis, prepetition compensation to Temporary
    Employees and Independent Contractors, in an aggregate amount up to $153,000,
    and on a final basis, in an aggregate amount up to $307,000; and continue to pay
    employee wages in the ordinary course of business;

d)  continue in the ordinary course of business to honor and pay vacation, sick time
    and holiday time.

e)  pay, on an interim and final basis, prepetition amounts due on account of all
    employee benefit plans and programs, including medical, vision, dental, life,
    supplemental life, and disability insurance; health care spending and flexible
    spending accounts; commuter benefits; the Debtors' 401(k) plan and contributions
    to such plan; and miscellaneous benefits such as health club membership plans,
    eyeglasses benefits and flu vaccinations, each as described herein, in an aggregate
    amount up to $246,000, and continue such benefits in the ordinary course of
    business;

f)  pay, on an interim and final basis, prepetition amounts due for expenses incurred
    prepetition, including mobile phone reimbursements, in an aggregate amount up

to $29,000, and continue to reimburse such Employee Expenses in the ordinary course of business;

 g)  pay on a final basis, prepetition outstanding severance obligations owed to terminated Employees in an aggregate amount not to exceed $136,239 and honor severance obligations that arise from termination of employment on a postpetition basis;

 h)  pay, on an interim and final basis, related prepetition withholdings and payroll-related taxes associated with the Employee Obligations in an aggregate amount not to exceed $350,000 and to continue to pay such taxes in the ordinary course of business; and

 i)  pay, on an interim and final basis, accrued prepetition fees to ADP LLC, the Debtors' payroll administrator in an aggregate amount not to exceed $11,000, and continue to pay such fees in the ordinary course of business ((a) through (i) collectively, the "Employee Obligations").

 9.  The Debtors do not have prepetition obligations on account of Gawker Media's ordinary course, discretionary ad sales team incentive program (the "Sales Incentive Program") described herein, but seek authority to maintain the program and pay sales incentive bonuses at the Debtors' discretion.

 10.  Through the Proposed Interim Order and the Proposed Final Order, the Debtors further seek directing financial institutions to receive, process, honor and pay all checks and electronic payment requests arising out of the Employee Obligations, solely to the extent the Debtors have sufficient funds with such financial institutions, on account of prepetition payroll checks, electronic transfers and all other checks or electronic transfers issued for payments approved by this Motion, regardless of whether such checks or electronic transfers were drawn or issued prior to the Petition Date.  The Debtors also seek to prohibit financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee Obligations.  Finally, the Debtors seek authorization to reissue prepetition checks or electronic transfers for payments approved by this Motion that are dishonored notwithstanding the foregoing direction.

## I.    The Debtors' Employees

11.    As of the Petition Date, Gawker Media employs approximately 192 full-time salaried employees (the "Salaried Employees") and 3 hourly employees (the "Hourly Employees," together with the Salaried Employees, the "U.S. Employees").  The Salaried Employees of Gawker Media include Nick Denton (President), Heather Dietrick (Chief Legal Counsel), Ian Fette (Chief Technology Officer), and Joshua Albertson (Chief Operating Officer). Certain executives of Gawker Media are also directors or officers of GMGI.

12.    The U.S. Employees perform a variety of critical functions, including content creation and editing, sales, marketing, finance, legal, operations, and technology functions.  The skills and expertise of the U.S. Employees are essential to the Debtors' ongoing business operations.

13.    The largest proportion of U.S. Employees work in the editorial department, with approximately 104 employees.  Certain writers and editors are assigned to a particular website, while other writers and editors perform editorial work for all of the websites.

14.    Gawker Media employs approximately 52 individuals in the business department, who are primarily responsible for the sales, marketing, and business development functions of the Debtors' business.

15.    Gawker Media employs approximately 39 individuals in the technology and operations departments, who perform engineering, product design, technology operations, and other related services for the Debtors.

16.    Gawker Media has issued written employment offer letters to each of its Salaried Employees.  Certain of those employment letters provide for benefits, including participation in

56581264_20

benefits programs and severance pay.  Severance pay for eligible employees ranges from two weeks and six months of pay.

17.     As of March 1, 2016, Gawker Media entered into a collective bargaining agreement (the "CBA") for a term of three years, expiring on February 28, 2019, with the Writers Guild of America, East.  The CBA covers all full-time and regular part-time non-executive editorial employees of Gawker Media, which includes writers, columnists, editors, researchers, video employees, illustrators and other employees who perform similar functions. As a result, 102 of Salaried Employees are covered by the CBA.[3]

18.     The CBA provides for the following benefits, among others: (i) annual 3% increases in pay; (ii) minimum starting salaries for various positions; (iii) fixed cost health benefits for employees, with any increases up to 10% to be absorbed by Gawker Media; (iv) automatic contributions to eligible employees' 401(k) plans of up to 3% of an eligible employee's salary after one year of employment; (v) certain severance benefits, ranging from between two weeks and eight weeks of pay; (vi) the grant of a nonexclusive license to employees for book rights based on work they have created for Gawker Media, including the right to take 100% of the royalties of any book deal, subject to approval by Gawker Media for use of its marks or logos; (vii) Hourly Employee pay equal to unionized employees compensation for Hourly Employees who have worked for Gawker Media for more than one year; and (viii) limitations on editorial decisions.

19.     GMGI, the parent company of Gawker Media, does not have any employees.

---

[3] For the avoidance of doubt, the Debtors seek only to continue to pay wages and honor its other obligations consistent with the CBA.  The Debtors are not seeking to assume or reject the CBA at this time.

20.     As of the Petition Date, Kinja employs approximately 28 individuals, who provide technology and programming, editorial, and administrative services (the "Hungarian Employees," together with the "U.S. Employees," the "Employees").

## II.     Current Employee Wages Obligations of Gawker Media

21.     The U.S. Employees receive regular pay on an hourly or annualized basis, which are paid on a semi-monthly basis, and the Hungarian Employees also receive regular pay, which is paid monthly (collectively, the "Regular Wages"). Certain editors are also eligible for certain incentives in connection with stories they publish as part of their regular compensation, as described herein (the "Editorial Employee Incentives" and, together with Regular Wages, the "Employee Wages").

22.     As of the Petition Date, the Debtors do not have any outstanding payroll checks that have not yet cleared. Gawker Media's next scheduled payroll is June 30, 2016, and Kinja's next scheduled payroll is July 4, 2016.

### A.   **Regular Wages**

23.     As of the Petition Date, approximately $50,000 in Regular Wages are outstanding. The Salaried Employees and Hourly Employees in the United States are generally paid on the 15th and last day of each month (or on the last business day immediately preceding the scheduled pay date), either by check or by direct deposit. The average semi-monthly (i.e., per pay period) wages to Salaried Employees and Hourly Employees in the U.S. is $819,168.00 inclusive of taxes. The Hungarian Employees are paid monthly. The average monthly Hungarian Wages is approximately $125,000, inclusive of taxes.

B. **Editorial Employee Incentives**

24.     On a monthly basis, certain editorial, non-executive employees of Gawker Media

are eligible to receive Editorial Employee Incentives, which are incremental payments, as

recognition for publication of one of the ten best stories for a particular month.  To administer

the Editorial Employee Incentives, the Gawker Media's executive team reviews those top ten

stories, and assigns a rating to each story.  The total amount paid on a monthly basis is

determined by then-current staffing levels, at $426 per editor, exclusive of certain high-ranking

editors.  On average, Gawker Media pays approximately $30,000 per month in Editorial

Employee Incentives, which are included in the paycheck issued at the end of the month.  The

next scheduled payment for Editorial Employee Incentives is June 30, 2016.

C. **Sales Incentive Program**

25.     As part of a prepetition sales incentive and bonus program maintained in the

ordinary course of the Debtors' businesses, U.S. Employees who work on the sales team are

eligible to receive quarterly bonus payments, payable entirely at the Debtors' discretion, based

on ad sales performance.  Sales bonuses are calculated on a quarterly basis, and are paid on the

first month following the end of each quarter.  The next quarterly sales incentive bonus, to the

extent the Debtors in their business judgment elect to pay such bonus any sale(s) employees,

would be paid on August 1, 2016.  Historically, the average quarterly aggregate bonuses paid

ranged between $150,000 and $200,000, and approximately 40 people received sales bonuses.

Because such payments are discretionary following the end of the quarter and not yet earned, no

prepetition amounts are due.  By this Motion, the Debtors seek approval to continue their

ordinary course, discretionary sales incentive bonus program, so that the Debtors' ad sales team,

-8-

responsible for driving significant revenue for the Debtors, continues to be properly compensated during these chapter 11 cases.

### III.    Paid Time Off Obligations

26.    Prior to the Petition Date, Gawker Media offered the Salaried Employees paid time off (including nationally observed holidays) and other earned time off.  Gawker Media seeks to continue to honor these paid time off benefits, as these forms of compensation are usual, customary, and necessary in order to retain qualified employees to operate their businesses.

27.    Gawker Media offers unlimited paid time off, but any Salaried Employee who intends to take more than fifteen (15) days off must obtain approval for such time off.

28.    Gawker Media formerly provided a sabbatical program to Salaried Employees who had been employees of Gawker Media for at least four years (the "Sabbatical Program"). Under the Sabbatical Program, Gawker Media provided four weeks of paid leave to an eligible Salaried Employee. Notwithstanding the termination of the Sabbatical Program, any Salaried Employee who would have earned Sabbatical leave by September 1, 2016 will be permitted to take such leave. As of the Petition Date, 18 Salaried Employees are eligible for the Sabbatical Program, and two are currently on leave under the Sabbatical Program.  The Debtors seek to honor the obligations remaining under the Sabbatical Program.

29.    Kinja offers the Hungarian Employees, based upon local laws, paid vacation based upon on the age of employees and number of children and it is pro-rated according to the length of the employment in the year. The basic annual vacation is 20 days and extra vacation day is added when the employee is 25 years old and the number rises up to 10 extra days until the employee is 45 years old. Depending on the number of children, employees can be entitled to 2-7 extra vacation days. Vacation days are paid at 100% of their salaries.  Additionally,

-9-

Employees are entitled to 15 days of sick leave and the employer will pay 70% of their salaries for these days. The sick days above 15 days are unpaid leaves that the National Health Insurance Office pay for the employees instead of employer.

## IV.    Independent Contractors & Temporary Employees

30.    Gawker Media regularly employs approximately 5 independent contractors and approximately160 independent contractors from time to time, as needed, in the United States and internationally, who generally perform freelance editorial and studio work (the "Independent Contractors").[4] Of the approximately160 Independent Contractors who provide services to Gawker Media, the overwhelming majority work within the editorial department, although some assist with the business and technology departments.  As of the Petition Date, the Debtors estimate that approximately $307,000 is owed to Independent Contractors (the "Independent Contractor Compensation").

31.    Gawker Media has employed temporary employees through various employment agencies, including Kforce, Abacas, and Robert Half, for administrative and accounting support functions (the "Temporary Employees").  As of the Petition Date, one Temporary Employee is working for Gawker Media, and Gawker Media expects to continue to need the services of the Temporary Employees on an ongoing basis during the course of these chapter 11 cases.  As of the Petition Date, approximately $12,000 is owed to the Temporary Employee (the "Temporary Employee Compensation").

---

[4] The Debtors have used hundreds of independent contractors in the last one to two years for various types of work.  The Debtors currently estimate that approximately 160 independent contractors have provided services in the last three months.

-10-

32.     The Independent Contractor Compensation and Temporary Employee Compensation is paid, upon submission of an invoice which can sometimes be up to three months in arrears, directly by Gawker Media.

## V.     Employee Benefit Obligations

33.     The Debtors offer medical, vision, dental, life, supplemental life, and disability insurance; health care spending and flexible spending accounts; commuter benefits; a 401(k) plan and contributions to such plan; and miscellaneous benefits such as cell phone reimbursement and health club membership benefits ("Employee Benefits"), under plans (collectively, the "Employee Benefit Plans"), each as described herein, to Salaried Employees and Hungarian Employees.  The Debtors seek authority to pay all prepetition amounts owed on account on the Employee Benefit Plans, not to exceed $246,000 and to continue to make payments as necessary to continue the Employee Benefit Plans in the ordinary course of business.  The Debtors believe it is essential to continue each of the Employee Benefit Plans because the Employees rely on these benefits for their health and well-being; cancelling these programs would impose undue hardship on the employees and would be detrimental to the company.

### A.     Health Insurance Benefits

34.     Gawker Media provides medical and prescription drug benefits to eligible employees through United Healthcare (the "Medical Plan").[5]  Employees who participate in the Medical Plan contribute between $0 and $191.98 on a semi-monthly, pre-tax basis.  As of the

---

[5] Pursuant to the CBA, Gawker Media pays 77-100% of the applicable premiums and has agreed to absorb any increases to those premiums up to 10%.  With respect to employees who are not subject to the CBA, Gawker Media pays 77-100% of the premiums.

Petition Date, 180 employees participate in the Medical Plan.  Gawker Media pays United

Healthcare for its portion of the premiums due for the Medical Plan.

35.     Gawker Media also provides its eligible employees with dental insurance through

United Healthcare (the "Dental Plan").  Employees who participate in the Dental Plan contribute

between $10.39 and $29.87 on a semi-monthly, pre-tax basis.  As of the Petition Date, 163

employees participate in the Dental Plan, and collects 100% of the premium from participating

employees via payroll deduction.

36.     Gawker Media also provides its eligible employees with vision insurance through

United Healthcare (the "Vision Plan").  Employees who participate in the Vision Plan pay 100%

of the total premium for the Vision Plan, and contribute between $3.24 and $10.12 on a semi-

monthly, pre-tax basis.  As of the Petition Date, 135 employees participate in the Vision Plan.

Gawker Media pays United Healthcare the total premiums due for the Vision Plan and collects

100% of the premium from participating employees via payroll deduction.

37.     The Debtors seek authority to pay the amounts owed to United Healthcare for the

Medical Plan, Dental Plan, and Vision Plan for prepetition amounts due, in a total amount of

$66,000.  The Debtors also seek approval to continue paying the premiums to continue those

plans.

38.     Kinja does not provide health insurance or similar benefits to the Hungarian

employees, as those benefits are provided by the Hungarian government.  However, Kinja Pays

approximately $7,000 per month to the Hungarian government to cover these costs.

**B.    Life Insurance and Disability Benefits**

39.     Gawker Media provides accidental death and dismemberment ("AD&D"), short

term disability, long term disability, and group life insurance benefits for eligible employees

through Unimerica Life Insurance Company of New York ("Unimerica") and Arch Insurance

("Arch").  Gawker Media pays 100% of the premiums for each of these insurance policies.

Gawker Media also maintains a disability policy, as required by New York law.  The annual

premiums for each policy are as follows:

| Policy Description | Annual Premium |
|---|---|
| Combined AD&D and Group Life Policy (0.020 AD&D / 0.060 Life per $1,000) | $9,552 |
| Short Term Disability | $61,167 |
| Long Term Disability | $21,524 |
| New York Disability | $9,157 |

40.    As of the Petition Date, Gawker Media owes $84,000 on account of premiums for

the AD&D, short term disability, long term disability, and group life insurance benefits, to

Unimerica and Arch.  Gawker Media seeks approval to pay these prepetition amounts owed and

also to continue making regular payments to continue each of these programs in the ordinary

course of business.

41.    Gawker Media also offers its employees the option of additional and

supplemental life insurance.  The employees pay the full cost of premiums associated with these

additional, increased benefits.

**C.    Spending Accounts**

42.    Gawker Media offers its eligible employees the opportunity to put aside pre-tax

funds to pay for various medical and dependent care expenses, through spending account

programs and health and dependent care flexible spending account programs (the "Spending

Accounts").  The Spending Accounts are administered through Benefit Resources, Inc. ("BRI").

Gawker pays the costs of administering the Spending Accounts to BRI, but does not contribute to

the Spending Accounts.  As of the Petition Date, Gawker Media owes BRI $9,000 for prepetition

amounts due on account of the Spending Accounts.

43.    Kinja does not offer a spending account to the Hungarian Employees.

**D.    Retirement Plans**

44.    Gawker Media maintains a 401k savings plan (the "401k Plan") through Fidelity

Investments ("Fidelity"), which provides Employees a tax-effective way to save for retirement.

All Employees are eligible to participate in the 401k Plan upon their commencement of

employment with Gawker Media.  As of the Petition Date, all employees of Gawker Media are

participating in the 401k Plan.

45.    For each employee of Gawker Media that participates in the 401k Plan, Gawker

Media withholds the elected contribution amount from such employee's paycheck, and then pays

those funds to Fidelity on a semi-monthly basis, at or around the same time paychecks are issued.

46.    As of the Petition Date, the Debtors estimate that they hold approximately

$39,000 on account of employee contributions to the 401k Plan that have not yet been remitted

to Fidelity.

47.    After an employee has been employed by Gawker Media for one year, Gawker

Media will contribute the equivalent of 3% of such employee's salary to the 401k Plan (the "3%

Contribution").  As of the Petition Date, Gawker Media contributes approximately $20,000 on a

bi-weekly basis for the employees who qualify for the 3% Contribution.  In addition, Gawker

Media incurs annual fees in connection with administering the 401k Plan.

48.    As of the Petition Date, the Debtors estimate that they owe approximately

$20,000 for prepetition obligations on account of the 3% Contribution, and $0 for quarterly fees

owed to Fidelity.  The Debtors seek to pay these prepetition amounts owed in connection with

-14-

the 401k Plan. The Debtors also seek to continue the 3% Contribution, and to continue to pay

any fees owed to Fidelity for administering the 401k Plan, in the ordinary course of business.

49.    Kinja contributes to employee pension accounts on a monthly basis, which

averages approximately $10,000 per month.

**E.    Health Club Membership**

50.    Gawker Media and Kinja provide health club benefits to their respective

employees (the "Health Club Membership Program"), providing employees with options to join

certain health clubs at a discounted rate, or to receive partial reimbursement for memberships

with other health clubs.

51.    Approximately 99 employees of Gawker Media participate in the Health Club

Membership Program.  Approximately 25 Hungarian Employees participate in the Health Club

Membership Program.  The total monthly cost of administering the Health Club Membership

Program is $14,000 for both Gawker Media and Kinja.

52.    The Debtors seek approval to pay all prepetition amounts owed, and to continue

making payments on account of the Health Club Membership Program in the ordinary course of

business.

53.    Kinja provides other miscellaneous benefits including flu vaccination, local

transportation passes, eyeglasses reimbursement and unemployment benefits paid to the state.

As of the Petition Date, Kinja owes approximately $4,000 for these benefits.

54.    The Debtors do not seek, pursuant to this Motion, to make payments to any

employee, independent contractor or temporary employee, on account of prepetition Employee

Wages or Employee Benefits, amounts exceeding the priority amounts set forth in sections

507(a)(4) and 507(a)(5) of the Bankruptcy Code.

V.    **Employee Expense Obligations**

55.    In the ordinary course of business, the Debtors reimburse Employees for certain

expenses incurred in the scope of their employment on the Debtors' behalf relate to travel, meals,

hotels, relocation expenses including costs related to obtaining visas, other qualifying expenses

(the "Reimbursable Expenses"). The Reimbursable Expenses are incurred by Employees who do

not have a Corporate Card, but rather pay for incurred Reimbursable Expenses by using a

personal credit card or cash.  As of the Petition Date, the Debtors estimate that approximately

$22,000 of Reimbursable Expenses incurred prepetition are outstanding.  Failure to pay the

prepetition Reimbursable Expenses could result in financial hardship for Employees, as they

have paid for such Reimbursable Expenses with the understanding that they would be

reimbursed.  Although the Debtors ask that reimbursement requests be submitted promptly,

sometimes there is a delay between the incurrence of a Reimbursable Expense and the date such

expense is submitted to the Debtors for processing.  Accordingly, the Debtors seek authority to

satisfy any and all accrued but unpaid prepetition Reimbursable Expenses, and to continue to pay

the Reimbursable Expenses on a postpetition basis in the ordinary course of business.

56.    Prior to the Petition Date, the Gawker Media and Kinja reimbursed employees on

a monthly basis, up to $80 per month, for use of their mobile phones (the "Mobile Phone

Expenses").  The Mobile Phone Expenses cost the Debtors approximately $12,000 per month in

the aggregate.  As of the Petition Date, the Debtors estimate that approximately $7,000 of Mobile

Phone Expenses incurred prepetition are outstanding.

57.    Because the Employees incur the Reimbursable Expenses and Mobile Phone

Expenses while performing duties on the Debtors' behalf, the Debtors consider these expenses to

be ordinary business expenses, and not compensation.  In total, as of the Petition Date, the

-16-

Debtors estimate that there is $29,000 in unpaid prepetition amounts for Reimbursable Expenses

and Mobile Phone Expenses.  The Debtors seek authorization, but not direction, to pay the

outstanding amounts and continue to pay all Reimbursable Expenses and Mobile Phone

Expenses as they become due in the ordinary course of business.

## VI.    Severance Obligations

58.    The CBA provides for minimum severance payments, upon termination of any

Unionized Employee.  In addition, certain of Gawker Media's employment agreements with

employees call for severance pay, ranging from two weeks to six months.  To the extent any

Gawker Media Employee is terminated post-petition, or has been terminated and not yet been

paid severance, the Debtors seek approval to make such severance payments at their discretion.

The Debtors have approximately $136,239 outstanding in Severance Obligations as of the

Petition Date.

## VIII.    Withholding and Payroll Taxes Obligations

59.    The Debtors accrue in the ordinary course of business state, local, and federal

employment and withholding taxes, and payroll taxes as wages are earned by the Employees (the

"Withholding and Payroll Taxes Obligations").  The Debtors routinely withhold from

Employees' paychecks amounts that the Debtors are required to remit to third parties. Examples

of such Withholding and Payroll Taxes Obligations include Social Security taxes, federal, state

and local income taxes, wage garnishments, and other court-ordered deductions.  As of the

Petition Date, the Gawker Media owes $150,000 in Withholding and Payroll Taxes Obligations,

and Kinja owes approximately $30,000 in Withholding and Payroll Taxes Obligations.  By this

Motion, the Debtors seek the authority to pay all prepetition amounts due, and to continue to

timely pay the Withholding and Payroll Taxes Obligations as they become due in the ordinary course of business.

## IX.    Payroll Administration Fees

60.    Gawker Media utilizes ADP, LLC ("ADP"), a payroll service, to, among other things, process payroll checks and remit appropriate withholding taxes for the Employees (collectively, the "Payroll Services"). Gawker Media pays a *de minimis* amount to ADP for payroll administration and other payroll-related services.  As of the Petition Date, Gawker Media owes ADP a total of $9,000.  Gawker Media seeks to pay the prepetition amount owed to ADP, and seeks approval to continue paying ADP for the Payroll Services in the ordinary course of business.

61.    Kinja utilizes UCMS Group, for Payroll Services.  Kinja pays approximately $630 to UCMS Group for Payroll Services per month.  As of the Petition Date, Kinja does not believe it owes any amounts to UCMS.  Kinja seeks approval to continue paying for the Payroll Services in the ordinary course of business.

## X.    Summary of Payments Requested

62.    The chart below summarizes the relief the Debtors are requesting for each type of Employee Obligation covered by this Motion on an Interim and Final Basis:

| Description | Interim Amount | Final Amount (Total) |
|---|---|---|
| Regular Wages (Hourly and Salaried Employees) | $50,000 | $50,000 |
| Editorial Employee Incentives | $30,000 | $30,000 |
| Independent Contractors | $153,000 | $307,000 |
| Temporary Employees | $12,000 | $12,000 |
| **Employee Wages Sub-Total** | **$245,000** | **$399,000** |
| Health Insurance (medical, dental, vision, spending accounts) | $66,000 | $66,000 |
| Life, disability | $84,000 | $84,000 |
| Spending accounts | $9,000 | $9,000 |

| | | |
|---|---|---|
| 401k Plan and pension | $69,000 | $69,000 |
| Health club memberships | $14,000 | $14,000 |
| Other Kinja Benefits | $4,000 | $4,000 |
| **Employee Benefits Sub-Total** | **$246,000** | **$246,000** |
| Employee Expense Obligations (Reimbursable Expenses and Mobile Phone) | $29,000 | $29,000 |
| Severance Obligations | $0 | $136,239 |
| Withholding and Payroll Taxes Obligations | $350,000 | $350,000 |
| Payroll Administration Fees | $11,000 | $11,000 |
| **Total Employee Obligations** | **$881,000** | **$1,171,239** |

## XI.    Direction to Financial Institutions

63.    The Debtors also seek an order authorizing and directing all financial institutions to receive, process, honor, and pay any and all checks, drafts, and other forms of payment drawn on the Debtors' bank accounts related to the Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

64.    In addition, the Debtors seek an order prohibiting financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee Obligations.

65.    Finally, the Debtors seeks an order authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Employee Obligations or other payments authorized in this Motion to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

## Basis for Relief

### A.  Certain Employee Obligations Are Entitled to Priority Treatment

66.      Section 507(a)(4) of the Bankruptcy Code gives priority up to $12,850 per individual for prepetition claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual," or "sales commissions earned by an individual . . ." 11 U.S.C. § 507(a)(4)(A), (B).  Additionally, section 507(a)(5) of the Bankruptcy Code gives priority to claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for such plan, to the extent of—

   i.    the number of employees covered by each such plan multiplies by $12,850; less

   ii.   the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

Id. § 507(a)(5).

67.      By this Motion, the Debtors seek authority to pay Employee wages up to $12,850 per person.  The amounts the Debtors seek authority to pay are entitled to priority under sections 507(a)(4) and (a)(5) of the Bankruptcy Code, and, as such, must be paid in full as a condition to confirmation of a chapter 11 plan. See id. § 1129(a)(9).  Payment in the ordinary course of business simply accelerates the timing of the payment of obligations that otherwise will have to be paid in any event, and therefore does not significantly alter the priority scheme set forth in the Bankruptcy Code.

68.      In other chapter 11 cases, courts in this district have approved payment of prepetition claims for compensation and benefits similar to those described herein.  See, e.g., In re dELiA*s, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014) [Docket No. 100];

In re MPM Silicones, LLC, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014) [Docket No. 215]; In re Am. Roads LLC, Case No. 13-12412 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2013) [Docket No. 35]; In re Broadview Networks Holdings, Inc., Case No. 12-13581 (SCC) (Bankr. S.D.N.Y. Sept. 14, 2012) [Docket No. 94]; In re Velo Holdings Inc., Case No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 92]; In re TBS Shipping Servs. Inc., Case No. 12-22224 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012) [Docket No. 86]; In re United Retail Grp, Inc., Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 22, 2012) [Docket No. 249]; In re Eastman Kodak Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012) [Docket No. 357]; In re Old HB, Inc. (f/k/a Hostess Brands, Inc.), Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 27, 2012) [Docket No. 194].

69.    The Debtors respectfully submit that payment of prepetition Employee Obligations and continued payment of the Employment Obligations in the ordinary course of business should be approved by this Court, to ensure the continued viability of the Debtors' business.

**B.    The Withholding and Payroll Taxes Obligations Must Be Paid by Law**

70.    The Debtors seek approval to pay the Withholding and Payroll Taxes Obligations to the appropriate taxing authorities, as those obligations are incurred directly in connection with employee compensation.  Indeed, various federal and state laws require the Debtors to withhold certain tax payments from employees' wages.  26 U.S.C. § 6672, 7501(a).

71.    Additionally, paying the Withholding and Payroll Taxes Obligations will not prejudice the Debtors' creditors, because such funds are held in trust for the benefit of the payees and accordingly do not constitute property of the Debtors' estates pursuant to section 541 of the

Bankruptcy Code.  See Begier v. IRS, 496 U.S. 53, 65 (1990) (certain withholding taxes are held

by debtor in trust for a third party, and do not constitute property of the estate).

**C.     Payment of the Employee Obligations Is Justified Under the Doctrine of Necessity**

72.     Section 105(a) of the Bankruptcy Code empowers the court to "issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).  This equitable power is granted to effect the policies and goals of chapter 11

reorganization, which are to "create a flexible mechanism that will permit the greatest likelihood

of survival of the debtor and payment of creditors in full or at least proportionately."  Mich.

Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R.

279, 287 (S.D.N.Y. 1987); see also In re Structurlite Plastics Corp., 86 B.R. 922, 932 (Bankr.

S.D. Ohio 1998) (rejecting a bright line rule prohibiting payment of prepetition debts because it

"may well be too inflexible to permit the effectuation of the rehabilitative purposes of the

Code").

73.     Under the "doctrine of necessity" or "necessity of payment" rule, first articulated

in Miltenberger v. Logansport C. & S. W. R. Co., 106 U.S. 286 (1882), bankruptcy courts can

exercise these equitable powers "to authorize a debtor in a reorganization case to pay pre-petition

claims where such payment is essential to the continued operation of the debtor."  In re

Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Lehigh & N.E.

Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (stating that payment of a claim arising before

reorganization is authorized if it is "essential to the continued operation of the [debtor]"); In re

Fin. News Network Inc., 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) (observing that the

doctrine of necessity "stands for the principle that a bankruptcy court may allow pre-plan

payments of prepetition obligations where such payments are critical to the debtor's

reorganization"); In re Columbia Gas Sys., Inc., 171 B.R. 189, 192 (Bankr. D. Del. 1994) (noting

that, in the Third Circuit, a debtor may pay prepetition creditors "in advance of a confirmed

plan," where such payments are "essential to the continued operation of the [debtor's]

business"). The doctrine of necessity permits a deviation from the equal treatment of creditors

because "otherwise there will be no reorganization and no creditor will have an opportunity to

recoup any part of its pre-petition claim." In re United Am., Inc., 327 B.R. 776, 781 (Bankr.

E.D. Va. 2005); see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (stating that

the necessity of payment exception is "well-established in bankruptcy common law").

74.    The Debtors respectfully submit that the prepetition amounts owed in connection

with the Employee expense reimbursements, certain benefits, and fees for Payroll Services

squarely fall within the "doctrine of necessity."

**D.  The Debtors May Pay Certain Employee Obligations Pursuant to Section 363**

75.    Courts are also empowered to authorize debtors to pay prepetition claims under

section 363(b)(1), which provides that "[t]he trustee, after notice and a hearing, may use, sell, or

lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.

§ 363(b)(1). This section gives the court "broad flexibility in tailoring its orders to meet a wide

variety of circumstances." In re Ionosphere Clubs, Inc., 98 B.R. at 175. Before the court can

apply section 363(b) in its favor, the debtor must "articulate some business justification, other

than mere appeasement of major creditors . . . ." Id. (finding that the debtor gave "sound

business reasons for its decision to pay pre-petition wages," those reasons being that it was

necessary to "preserve and protect its business and ultimately reorganize, retain its currently

working employees and maintain positive employee morale"). Here, the Debtors' request to pay

prepetition amounts related to Employee Obligations satisfies this standard because the failure to do so could have a material adverse impact on the reorganization.

76.     Accordingly, the Debtors respectfully submit that the relief requested herein should be granted in all respects because it is (i) necessary and appropriate in light of the foregoing and (ii) in the best interests of the Debtors' estates, its creditors and other parties in interest.

### The Requirements of Bankruptcy Rule 6003 Have Been Satisfied

77.     Bankruptcy Rule 6003 empowers this Court to grant relief within the first 21 days after the Petition Date to the extent that such relief is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  For reasons stated herein, the Debtors submits that the requested relief is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted promptly in all respects to avoid immediate and irreparable harm to the Debtors' estate, notwithstanding the 21-day period provided in Bankruptcy Rule 6003.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

78.     To implement the foregoing successfully, the Debtors request that the Court enter an order waiving the notice requirements of Bankruptcy Rule 6004(a) and finding that the Debtors have established cause to exclude such relief from any stay imposed by Bankruptcy Rule 6004(h).

### Reservation of Rights

79.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the

Bankruptcy Code. The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### The Requirements of Bankruptcy Rule 6003 Have Been Satisfied

80.    Bankruptcy Rule 6003 empowers this Court to grant relief within the first 21 days after the Petition Date to the extent that such relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). For reasons stated herein, the Debtors submits that the requested relief is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted promptly in all respects to avoid immediate and irreparable harm to the Debtors' estate, notwithstanding the 21-day period provided in Bankruptcy Rule 6003.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

81.    To implement the foregoing successfully, the Debtors request that the Court enter an order waiving the notice requirements of Bankruptcy Rule 6004(a) and finding that the Debtors have established cause to exclude such relief from any stay imposed by Bankruptcy Rule 6004(h).

### No prior request

82.    No prior motion for the relief requested herein has been made to this or any other court.

-25-

## **Notice**

83.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) the 50 largest unsecured creditors of the Debtors (on a consolidated basis); (iii) counsel to the First Lien Lender; (iv) counsel to the Second Lien Lender; (v) the Internal Revenue Service; and (vii) the United States Attorney for the Southern District of New York.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter orders, substantially in the form annexed hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, granting the relief requested in the Motion and such other and further relief for the Debtors as may be just or proper.

Dated: June 12, 2016
   New York, New York

         <u>*/s/ Gregg M. Galardi*</u>
         ROPES & GRAY LLP
         Gregg M. Galardi
         Jonathan P. Gill
         Kristina K. Alexander
         Stacy A. Dasaro
         1211 Avenue of the Americas
         New York, NY 10036-8704
         Telephone: (212) 596-9000
         Facsimile: (212) 596-9090
         gregg.galardi@ropesgray.com
         jonathan.gill@ropesgray.com
         kristina.alexander@ropesgray.com
         stacy.dasaro@ropesgray.com

         *Proposed Counsel to the Debtors*
         *and Debtors in Possession*

# **EXHIBIT A**

## **Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                    :
In re                               :        Chapter 11
                                    :
Gawker Media LLC, *et al.*,[1]      :        Case No. 16-11700 (SMB)
                                    :
                Debtors.            :        (Joint Administration Requested)
                                    :
------------------------------------------------------x

**INTERIM ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF
PREPETITION WAGES, SALARIES, BUSINESS EXPENSES, EMPLOYEE BENEFIT
AND RELATED ITEMS,AND (II) DIRECTING ALL FINANCIAL INSTITUTIONS TO
HONOR CHECKS FOR PAYMENT OF SUCH OBLIGATIONS**

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors"), for

entry of an Interim Order (the "Interim Order") (i) authorizing, but not directing, the Debtors to

pay or otherwise honor the Debtors' prepetition Employee Obligations to or for the benefit of

Employees earned and accrued prior to the Petition Date that, but for the commencement of these

cases, would have otherwise been due and payable in the ordinary course of business; (ii)

authorizing, but not directing, the Debtors to continue to pay the Employee Obligations

postpetition in the ordinary course of business; and (iii) directing all Financial Institutions to

honor checks for payment on account of such Employee Obligations; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334;

and this proceeding being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this

proceeding and the Motion in this Court being proper pursuant to 28 U.S.C. § 1408 and 1409;

and due and proper notice of the Motion having been given; and the Court having found that no

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

other or further notice is needed or necessary; and the Court having reviewed the Motion and the

First Day Declaration and having heard statements in support of the Motion at a hearing held

before the Court (the "Hearing"); and the Court having determined that the legal and factual

bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

and the relief requested in the Motion being in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and any objections to the relief requested in the Motion

having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause

appearing therefor, it is hereby

**ORDERED, THAT:**

1.      The Motion is GRANTED on an interim basis to the extent provided herein.

2.      A final hearing on the relief requested in the Motion shall be set for _____,

2016 at _____ (Prevailing Eastern Time) and any objections or responses to the

Motion shall be in writing, filed with the Court and served upon (i) proposed counsel for the

Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn:

Gregg M. Galardi (gregg.galardi@ropesgray.com); (ii) the United States Trustee for the

Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014,

Attn: Greg Zipes and Susan Arbeit; (iii) attorneys for any statutory committee of unsecured

creditors appointed in these chapter 11 cases; (iv) counsel to Silicon Valley Bank, Riemer &

Braunstein, LLP, 3 Center Plaza, Boston, MA 02108, Attn: Alexander Rheaume

(ARheaume@riemerlaw.com); and (v) counsel to US VC Partners LP, Latham & Watkins, 355

South Grand Ave., Los Angeles, CA 90071, Attn: Mark O. Morris (mark.morris@lw.com); in

each case so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on

_____, 2016.

-2-

3.      The Debtors are authorized, but not directed, to continue paying the Employee

Obligations on a postpetition basis, in the ordinary course of business, in accordance with the

Debtors' prepetition policies and practices, and in the Debtors' discretion, to pay and honor

prepetition amounts related thereto in interim amounts as set forth in the Motion, for an

aggregate interim amount not to exceed $881,000; *provided that*, the Debtors shall not make any

payments on account of prepetition Employee Wages, Independent Contractor Obligations, or

Temporary Employee Obligations that exceed the priority amounts set forth in sections 507(a)(4)

and 507(a)(5) for prepetition amounts owed to any Employee, pursuant to this Interim Order.

4.      The Debtors are authorized, but not directed, to continue the Employee Benefit

Plans in the ordinary course of business and perform their obligations thereunder.

5.      Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained in the Motion or in this Interim Order, or any payments made pursuant to this

Interim Order shall constitute, nor is it intended to constitute, an admission as to the validity or

priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently

dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease

(including the CBA) under section 365 of the Bankruptcy Code.

6.      All banks and other financial institutions on which checks were drawn or

electronic payment requests were made in connection with the payments approved by this

Interim Order are authorized and directed to (i) receive, process, honor, and pay all such checks

and electronic payment requests when presented for payment (assuming that sufficient funds are

then available in the Debtors' bank accounts to cover such payments) and (ii) rely on the

Debtors' designation of any particular check or electronic payment request as approved by this

Interim Order.

-3-

7.      All banks and other financial institutions are hereby prohibited from placing any

holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee

Obligations.

8.      The Debtors are authorized to reissue checks, wire transfers, automated clearing

house payments, electronic payments, or other similar methods of payment for all payments

approved by this Interim Order where such method of payment has been dishonored postpetition.

9.      The Debtors are authorized and empowered to take all actions necessary to

effectuate the relief granted in this Interim Order in accordance with the Motion.

10.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

11.     The requirements of Bankruptcy Rule 6004(a) are hereby waived.

12.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this

Interim Order shall be immediately effective and enforceable upon its entry.

13.     The Court retains jurisdiction with respect to all matters arising from, or related

to, the implementation and interpretation of this Interim Order.


Dated: _____, 2016
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

56581264_20

## **EXHIBIT B**

**Proposed Final Order**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
:
In re                                           :          Chapter 11
:
Gawker Media LLC, *et al.*,[1]                  :          Case No. 16-11700 (SMB)
:
Debtors.                      :          (Joint Administration Requested)
:
------------------------------------------------------x

### FINAL ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF PREPETITION WAGES, SALARIES, BUSINESS EXPENSES, EMPLOYEE BENEFITS AND RELATED ITEMS, AND (II) DIRECTING ALL FINANCIAL INSTITUTIONS TO HONOR CHECKS FOR PAYMENT OF SUCH OBLIGATIONS

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors"), for

entry of a Final Order (the "Final Order") (i) authorizing, but not directing, the Debtors to pay or

otherwise honor the Debtors' prepetition Employee Obligations to or for the benefit of

Employees earned and accrued prior to the Petition Date that, but for the commencement of these

cases, would have otherwise been due and payable in the ordinary course of business; (ii)

authorizing, but not directing, the Debtors to continue to pay the Employee Obligations

postpetition in the ordinary course of business; and (iii) directing all Financial Institutions to

honor checks for payment on account of such Employee Obligations; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334;

and this proceeding being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this

proceeding and the Motion in this Court being proper pursuant to 28 U.S.C. § 1408 and 1409;

and due and proper notice of the Motion having been given; and the Court having found that no

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

other or further notice is needed or necessary; and the Court having reviewed the Motion and the

First Day Declaration and having heard statements in support of the Motion at a hearing held

before the Court (the "Hearing"); and the Court having determined that the legal and factual

bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

and the relief requested in the Motion being in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and any objections to the relief requested in the Motion

having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause

appearing therefor, it is hereby

**ORDERED, THAT:**

1.      The Motion is GRANTED on a final basis to the extent provided herein.

2.      The Debtors are authorized, but not directed, to continue paying the Employee

Obligations on a postpetition basis, in the ordinary course of business, in accordance with the

Debtors' prepetition policies and practices, and in the Debtors' discretion, to pay and honor

prepetition amounts related thereto, in an amount not to exceed $1,171,239; *provided that*, the

Debtors shall not make any payments on account of prepetition Employee Wages, Independent

Contractor Obligations, or Temporary Employee Obligations that exceed the priority amounts set

forth in sections 507(a)(4) and 507(a)(5) for prepetition amounts owed to any Employee.

3.      The Debtors are authorized, but not directed, to continue the Employee Benefit

Plans in the ordinary course of business and perform their obligations thereunder.

4.      Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained in the Motion or in this Final Order, or any payments made pursuant to this

Final Order shall constitute, nor is it intended to constitute, an admission as to the validity or

priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently

dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease (including the CBA) under section 365 of the Bankruptcy Code.

5.      All banks and other financial institutions on which checks were drawn or electronic payment requests were made in connection with the payments approved by this Final Order are authorized and directed to (i) receive, process, honor, and pay all such checks and electronic payment requests when presented for payment (assuming that sufficient funds are then available in the Debtors' bank accounts to cover such payments) and (ii) rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

6.      All banks and other financial institutions are hereby prohibited from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee Obligations.

7.      The Debtors are authorized to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for all payments approved by this Order where such method of payment has been dishonored postpetition.

8.      The Debtors are authorized and empowered to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

9.      The requirements of Bankruptcy Rule 6004(a) are hereby waived.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

11.     The Court retains jurisdiction with respect to all matters arising from, or related to, the implementation and interpretation of this Final Order.

56581264_20

Dated: _____, 2016
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

56581264_20