ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Kristina K. Alexander
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090

*Proposed Counsel to the Debtors
and the Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                        :

In re                       :       Chapter 11
                         :

Gawker Media LLC *et al.*,[1]     :       Case No. 16-11700 (SMB)
                         :

           Debtors.      :       Joint Administration Requested
                         :
-------------------------------------------------------x

# DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND RULES 2002, 4001, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING INCURRENCE BY THE DEBTORS OF POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING LIENS, (III) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS AND PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND <u>(V) SCHEDULING A FINAL HEARING</u>

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492), GMGI Group, Inc. (3231) and Kinja Kft (5056).  The Debtors' corporate headquarters is located at 114 Fifth Avenue, 2d Floor, New York, New York 10011.

# TABLE OF CONTENTS

**Page**

Background ................................................................................................................ 5

Jurisdiction and Venue ........................................................................................... 6

    I.      The Debtors' Need for the DIP Facility ................................................ 6

    II.     Summary of the Debtors' Secured Indebtedness ................................... 8

         A.    First Lien Credit Agreement ................................................... 8

         B.    Second Lien Credit Agreement ............................................... 9

    III.    The DIP Facility ................................................................................ 11

         A.    The Debtors' Immediate Need for Liquidity ......................... 11

         B.    The Debtors' Efforts to Obtain Postpetition Financing .......... 12

         C.    Material Terms of the DIP Facility ........................................ 15

    IV.    Use of Cash Collateral and Granting of Adequate Protection ............. 24

Basis for Relief Requested ................................................................................... 25

    I.      Authorization of the DIP Facility is Proper and Necessary ................. 25

         A.    The Debtors Should Be Authorized to Obtain Postpetition
              Financing Under § 364(c) of the Bankruptcy Code ................. 26

    II.     Use of Cash Collateral and Adequate Protection for the Prepetition Second
       Lien Lender ...................................................................................... 36

    III.    The Debtors Require Interim and Immediate Access to the DIP Facility
         and Cash Collateral, Without Which the Debtors Would Suffer Irreparable
         Harm ............................................................................................... 38

Waiver of Bankruptcy Rules 6004(a) and (h) .................................................... 39

Request for a Final Hearing ................................................................................. 39

Notice ..................................................................................................................... 40

No Previous Request ............................................................................................. 40

Conclusion ............................................................................................................. 41

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anchor Savs. Bank FSB v. Sky Valley, Inc.*,
    99 B.R. 117 (N.D. Ga. 1989) ................................................................................32

*Bland v. Farmworker Creditors*,
    308 B.R. 109 (S.D. Ga. 2003) ..............................................................................30

*Bray v. Shenandoah Fed. Say. and Loan Ass'n* (*In re Snowshoe Co.*),
    789 F.2d 1085 (4th Cir. 1986) ........................................................................26, 30

*In re 495 Central Park Ave. Corp.*,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992) ..................................................................30

*In re Ames Dep't Stores, Inc.*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ............................................................. passim

*In re Barbara K Enters., Inc.*,
    2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008).....................................26, 27

*In re Dura Auto. Sys., Inc.*,
    2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007) ...................................27

*In re Reading Tube Indus.*,
    72 B.R. 329 (Bankr. E.D. Pa. 1987) .....................................................................30

*In re YL West 87th Holdings I LLC*,
    423 B.R. 421 (Bankr. S.D.N.Y. 2010) ..................................................................29

*Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug
    Stores, Inc.)*,
    145 B.R. 312 (B.A.P. 9th Cir. 1992).....................................................................28

The debtors in the above-captioned cases (collectively, the "Debtors") submit this motion (the "Motion"), by and through their undersigned proposed counsel, for entry of an interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") and for a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), under §§ 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"):

(i)         authorizing the Debtors, pursuant to sections 363, 364(c), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), to (a) obtain postpetition financing of up to $22,000,000 (the "DIP Facility"), comprised of a $17,000,000 term loan and a $5,000,000 revolving credit facility, pursuant to (I) that certain Financing Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Financing Agreement"), substantially in the form attached to the Motion as Exhibit B, by and among Gawker Media LLC, as borrower ("Gawker Media" or the "Borrower"), and Gawker Media Group, Inc., a Cayman Islands corporation ("GMGI"), and Kinja Kft., a Hungarian corporation ("Kinja"), as guarantors (together, the "Guarantors"), Cerberus Business Finance LLC ("CBF"), as administrative and collateral agent (the "DIP Agent"), and CBF or one or more of its affiliates party thereto (the "DIP Lender" and, together with the DIP Agent, the "DIP Secured Parties") (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), (II) all guarantees and other agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of the DIP Secured Parties (all documents comprising the DIP Facility, each as may be amended,

restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Loan Documents"), and (III) the DIP Orders; and (b) incur the "Obligations" under and as defined in the DIP Financing Agreement (any such Obligations are hereinafter referred to as the "DIP Obligations");

(ii)        authorizing the Debtors that are Guarantors under the DIP Financing Agreement to guarantee the Borrower's DIP Obligations;

(iii)       authorizing the DIP Loan Parties to execute and deliver the DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection therewith;

(iv)       authorizing the Debtors to access up to $14,000,000 of the DIP Facility in the form of a Term Loan (as defined in the DIP Financing Agreement) (inclusive of an aggregate amount of approximately $12.3 million to repay all outstanding obligations and cash collateralize outstanding letters of credit under the Prepetition First Lien Credit Agreement (as defined below)) in an amount equal to 105% of the First Lien Letter of Credit, on an interim basis, for the period (the "Interim Period") from the commencement of these cases through and including the earlier of (I) the entry of the Final Order (as defined below), and (II) thirty (30) days after the Petition Date, in order to avoid immediate and irreparable harm;

(v)        authorizing the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Loan Documents) during the Interim Period in each case in a manner consistent with and subject to the terms and conditions of the DIP Loan Documents and the Interim Order, and in compliance with the Budget (as defined in the DIP Financing Agreement), solely for the purposes set forth in the DIP Loan Documents, including to pay or fund (a) certain costs, fees and expenses related to the Chapter 11 Cases, (b) the

-3-

repayment of all Prepetition First Lien Obligations (as defined below), including to cash collateralize all outstanding letters of credit issued under the Prepetition First Lien Credit Documents (as defined below) in an amount equal to 105% of the First Lien Letter of Credit, and (c) the working capital needs of the Debtors during the Chapter 11 Cases;

(vi)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected liens on and security interests in all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, and hereinafter, "Cash Collateral"), which liens and security interests shall have the priorities set forth in paragraph 2(i) of the Interim Order;

(vii)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Case (as defined below) in respect of all DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have the priorities set forth in paragraph 2(j) of the Interim Order;

(viii)    authorizing the Debtors' use of Cash Collateral on the terms and conditions set forth in the Interim Order, and providing adequate protection on the terms set forth in the Interim Order to the Prepetition Second Lien Lender (as defined below) for any diminution of value of its interest in the Prepetition Collateral (as defined in the Interim Order) (including Cash Collateral) resulting from the subordination to the Carve-Out and the DIP Liens the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value") for their interests in the Prepetition Collateral (as defined below), including the Cash Collateral;

-4-

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(x)    scheduling (a) a final hearing (the "Final Hearing") to consider the Final Order granting the relief requested in the Motion on a final basis, and to approve the form and manner of notice with respect to the Final Hearing; and

(xi)    waiving any applicable stay as provided in the provisions of the Bankruptcy Rules and the Local Rules, and providing for the immediate effectiveness of the Interim Order; and

(xii)    granting related relief,

and respectfully state as follows:

## **Background**

1.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

2.    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.  No committees have been appointed or designated.

3.    The factual background relating to the Debtors' commencement of the Chapter 11 Cases and the facts and circumstances supporting the relief requested herein are set forth in greater detail in the *Declaration of William D. Holden in Support of DIP Financing Motion* (the "Holden Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**Jurisdiction and Venue**

4.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are §§ 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

I.      **The Debtors' Need for the DIP Facility**

5.      The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility to, in accordance with the Budget, operate their businesses and bridge them to an anticipated going concern sale of substantially all of their assets in these Chapter 11 Cases (the "Sale").  As more fully discussed in the Holden Declaration, the Debtors have sought immediate chapter 11 relief in light of the judgment in the *Bollea* litigation, which totals over $130 million.  While the Debtors feel strongly that the judgment in the *Bollea* litigation will be overturned on appeal, they also believe that the Sale, orderly effected through these Chapter 11 Cases, will preserve value for the estates, creditors, and other parties in interest.

6.      The proposed DIP financing—consisting of a $22 million superpriority senior secured DIP Facility—will provide the Debtors with much needed liquidity to operate during these Chapter 11 Cases through the Sale process.  The DIP Facility will provide cash with which the Debtors can continue operations and maintain their valuable relationships with their employees, vendors, and suppliers and also pay utilities, insurance companies, and taxing authorities, among others, who in the judgment of the Debtors' management, provide the essential services needed to operate maintain and insure the Debtors' assets.  In addition, the Debtors require funds to retain and pay costs of professionals, consultants and advisors who will enable the Debtors to conduct the Sale in a manner that the Debtors believe will maximize value

-6-

for the Debtors' estates and their creditors.  Taken together, the services provided by all of the foregoing parties are absolutely critical to the preservation of the Debtors' business and asset value.  As further discussed below, a portion of the DIP Facility will also be used to repay in full the Debtors' obligations under the First Lien Facility (as defined herein).

7.      In conformity with Local Rule 4001-2(h), the Debtors reasonably believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.  As discussed below, the Debtors seek to use Cash Collateral.  However, the Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.  Without access to the DIP Facility and the use of Cash Collateral, the Debtors would suffer immediate and irreparable harm and the entire bankruptcy proceedings and the Sale will be jeopardized to the significant detriment of the Debtors' estates and their creditors.

8.      The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral in order to satisfy their postpetition liquidity needs.  Financing on a postpetition basis is not otherwise available without granting the DIP Lender (i) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after acquired assets with the

-7-

priorities set forth herein, (ii) superpriority claims, and (iii) the other protections set forth in the DIP Orders.

9.      Obtaining the necessary DIP financing on the terms proposed in this Motion is well within the sound discretion and the business judgment of the Debtors and will permit them to preserve the value of their businesses to the benefit of all involved.  Currently, the Debtors' financing capacity under the prepetition secured financing facilities described herein is exhausted. The DIP Facility reflects the best terms available given the deterioration of the Debtors' liquidity position and the unavailability of any reasonable alternative funding source.

10.     For the reasons set forth below, the Debtors respectfully submit that the Court should authorize and grant the Debtors' request to obtain the DIP financing through the DIP Facility and the use of Cash Collateral.

**II.      Summary of the Debtors' Secured Indebtedness**

11.     As of the Petition Date, the Debtors had approximately $21.2 million of outstanding funded indebtedness, comprised of first and second lien bank debt.   The Debtors are also obligated on a posted, but not drawn, letter of credit in the amount of approximately $5.3 million.

A.      First Lien Credit Agreement

12.     On September 24, 2012, Gawker Media entered into a loan and security agreement (as subsequently amended, the "First Lien Credit Agreement") with Silicon Valley Bank (the "Prepetition First Lien Lender"), pursuant to which the Prepetition First Lien Lender agreed to provide to Gawker Media a term loan facility in the aggregate principal amount of $7,666,666.67 (the "First Lien Term Loan") and a letter of credit with an undrawn face amount of $5,302,066.00 (the "First Lien Letter of Credit").   The Debtors and non-debtor Nick Denton also executed certain security, pledge and guaranty agreements and other documentation in

-8-

connection with the obligations under the First Lien Credit Agreement. The obligations under the First Lien Credit Agreement are guaranteed by the GMGI and Kinja. Such obligations are also secured on a first priority basis by liens on substantially all of the assets of the Debtors (the First Lien Credit Agreement and all related documents and transactions entered thereto, the "First Lien Facility").

13.    As of the Petition Date, approximately (i) $6,222,222, plus accrued and fees interest was outstanding under the First Lien Credit Agreement and (ii) $5,302,066 was outstanding on the First Lien Letter of Credit.

B.    Second Lien Credit Agreement

14.    On January 21, 2016, GMGI entered into a credit agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Second Lien Credit Agreement" and together with all other agreements, documents, and instruments executed and/or delivered to or in favor of the parties thereto, the "Prepetition Second Lien Credit Documents") with US VC Partners LP ("Prepetition Second Lien Lender," and together with the Prepetition First Lien Lender, the "Prepetition Secured Lenders"), a Delaware limited partnership, pursuant to which Second Lien Lender agreed to extend a term loan facility to GMGI in the initial amount of $15,000,000 (the "Second Lien Term Loan").[2] The Debtors and Mr. Denton also executed certain security, pledge and guaranty agreements and other documentation in connection with the obligations under the Second Lien Credit Agreement. The obligations under the Second Lien Credit Agreement are guaranteed by Gawker Media and Kinja. Such obligations are also secured by a second priority lien on substantially all of the

---

[2] The Second Lien Credit Agreement also contemplates a 25%, or $3.75 million, "make-whole" payment, payable in certain circumstances.

assets of the Debtors (the Second Lien Credit Agreement and all related documents and transactions entered thereto, the "Second Lien Facility").

15.    As of the Petition Date, approximately $15,000,000 plus accrued interest was outstanding under the Second Lien Credit Agreement.

16.    The relationships among the Prepetition Secured Lenders are governed by that certain Intercreditor Agreement, dated as of January 21, 2016, by and between the Prepetition First Lien Lender and the Prepetition Second Lien Lender (the "Intercreditor Agreement").

17.    As discussed below, proceeds of the DIP Facility, if authorized by the Court, would be used to satisfy the Debtors' obligations under the First Lien Facility in full (including to cash collateralize the First Lien Letter of Credit in an amount equal to 105% of the First Lien Letter of Credit), leaving the Second Lien Facility as the Debtors sole prepetition secured indebtedness.

-10-

**III.    The DIP Facility**

       A.     <u>The Debtors' Immediate Need for Liquidity</u>

      18.     In anticipation of their immediate need for postpetition financing and the use of cash collateral, the Debtors have, in consultation with their proposed financial advisor, Opportune LLP ("<u>Opportune</u>"), performed a review and analysis of their projected cash needs. Based upon that review and analysis, the Debtors and Opportune have prepared a draft Budget outlining the Debtors' postpetition cash needs, a copy of which is attached hereto as **<u>Exhibit C</u>**; *see also* Holden Decl. ¶ 11. The Debtors believe that the Budget is an accurate reflection of their funding requirements, considering all available assets and will allow them to meet their obligations - including administrative expenses in these Chapter 11 Cases. Holden Decl. ¶ 11. The Debtors also believe, and therefore submit, that the Budget is fair, reasonable, and appropriate under the circumstances. *Id.*

      19.     As reflected in the Budget, the Debtors must obtain immediate postpetition financing as contemplated by the DIP Facility to continue their operations. Absent this key source of funding at this critical early stage, the Debtors will immediately face a severe liquidity crisis, which would force the Debtors to liquidate, and jeopardize the Debtors' going concern value to the detriment of all parties in interest.

      20.     Without immediate postpetition financing, as contemplated in the Budget, the Debtors will be unable to fund payroll and benefit obligations to employees, resulting in substantial job losses and departures. Immediate access to the funds proposed to be advanced under the DIP Financing is essential to the Debtors' efforts to continue their ordinary course, day-to-day operations, including satisfying payroll obligations and the Debtors' efforts to effectuate an orderly Sale process through the Chapter 11 Cases. Holden Decl. ¶ 8-9. Put simply, without the relief requested in the Motion, the Debtors would suffer substantial and irreparable

harm, and would be forced to liquidate.  *Id.* ¶ 16.  Accordingly, the Debtors' need for access to postpetition financing on the terms set forth in the DIP Facility is immediate and urgent.  In contrast, once the relief sought in this motion is approved, the Debtors' ability to continue their business operations will be substantially enhanced.  *Id.* ¶ 9.

B.      The Debtors' Efforts to Obtain Postpetition Financing

21.     In May 2016, the Debtors retained Houlihan Lokey, Inc. ("Houlihan Lokey") to provide an assessment of their capital structure and liquidity alternatives.  Holden Decl. ¶ 12.  As stated above, the Debtors have difficulty in meeting the litigation and judgment costs in the *Boella* litigation, their continuing liquidity needs, and the desire to effect the Sale for the benefit of their creditors.  Holden Decl. ¶ 14.

22.     Beginning on May 16, 2016, Houlihan Lokey, at the Debtors' direction, began an expedited marketing effort to obtain proposals for postpetition debtor-in-possession ("DIP") financing.  The Debtors solicited interest in any kind of DIP financing, and did not expressly seek or solicit bids that would prime any prepetition secured party or satisfy the Debtors' obligations under the First Lien Facility.

23.     The Debtors and their advisors had contact with thirty seven (37) different parties to solicit interest in DIP financing, including the Prepetition First Lien Lender.  The Prepetition First Lien Lender expressed willingness to consent to the use of its Cash Collateral under certain circumstances, but declined the opportunity to provide the Debtors with DIP financing.  *Id.* ¶ 10.  Moreover, the Prepetition First Lien Lender consistently expressed its position that it would not consensually agree to the use of its Cash Collateral if the Debtors sought to obtain DIP financing with liens or claims that were senior or equal to the liens held by the First Lien Facility.  *Id.*

24.     Twenty-two (22) parties eventually signed confidentiality agreements and were provided access to the data room that Houlihan Lokey established for the DIP marketing process.

-12-

Following access to the data room, four parties expressed serious interest in providing DIP financing. The Debtors and their advisors have spent almost three weeks engaging in good faith negotiations with these counterparties in order to obtain DIP financing on favorable terms to the Debtors' estates. *Id.* ¶ 13.

25.    In light of the Debtors' difficulty in meeting the litigation and judgment costs in the *Bollea* litigation, their continuing liquidity needs, and the desire to effect the Sale for the benefit of their creditors, the Debtors determined, after consulting with their advisors, that CBF's DIP financing proposal was superior to all other offers. *Id.* ¶ 14. Following negotiations among the Debtors and CBF, CBF eventually determined that it would be willing to provide DIP financing to assist the Debtors through (assuming that the DIP Orders are entered as provided in the DIP Financing Agreement) the earliest of (i) twelve months following the date of the entry of the Interim Order, (ii) substantial consummation of a plan of reorganization in the Chapter 11 Cases; and (iii) the sale of all or substantially all of the assets of the Debtors. *Id.* CBF's proposal contemplates providing liquidity to allow the Debtors to file these Chapter 11 Cases, to continue operating their businesses, and to have time to engage in the Sale. *Id.*

26.    The Debtors and CBF conducted urgent and rigorous negotiations on CBF's proposal prior to the Debtors' bankruptcy filing. *Id.* ¶ 15. CBF engaged in a significant amount of due diligence with the Debtors and their advisors to complete this transaction, which included on-site diligence meetings at CBF's offices and the development of an agreed upon Budget. *Id.* The Debtors and CBF negotiated the DIP Financing Agreement and the necessary first day motions. *Id.* The Debtors, their advisors, CBF, and their respective advisors invested a significant amount of effort and attention to the details in order to prepare for this filing in a compressed period of time.

-13-

56796584_9

27.     The proposed DIP Facility will be a senior secured superpriority facility that will be used, in part, to satisfy in full the First Lien Facility (including to cash collateralize the First Lien Letter of Credit in an amount equal to 105% of the First Lien Letter of Credit) and will be secured by liens senior to the liens of the Prepetition Second Lien Lender.  The Debtors would not be able to obtain financing on an unsecured basis pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code, or even a superpriority basis under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the DIP Facility.  *See* Holden Decl. ¶ 16.  The Debtors solicited offers for financing secured by liens on their unencumbered assets (which are virtually nonexistent) pursuant to section 364(c)(2) of the Bankruptcy Code, or junior liens on their encumbered assets pursuant to section 364(c)(3) of the Bankruptcy Code; no such financing was available.  *Id.*

28.     These factors, coupled with the Debtors' review of debtor in possession financing facilities that have been approved in other recent cases, have confirmed that the DIP Facility proposed here is fair and reasonable, and represents the best financing currently available to the Debtors.  *Id.* ¶ 18.

29.     CBF is prepared to provide the Debtors with the DIP Facility, but solely on the terms and conditions set forth in the DIP Loan Documents and the Interim Order.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their business judgment, that the financing to be provided by CBF pursuant to the terms of the DIP Loan Documents and the Interim Order represents the best financing presently available to the Debtors. *Id.* ¶ 17.

-14-

C.      Material Terms of the DIP Facility

30.      The principal terms of the DIP Facility are as follows:[3]

| **DIP Facility Parties:**<br><br>*DIP Financing Agreement, Preamble*<br><br>*FRBP 4001(c)(1)(B)* | **Borrower:** Gawker Media (the "<u>Borrower</u>")<br><br>**Guarantors:** GMGI and Kinja (and together with the Borrower, the "<u>Loan Parties</u>")<br><br>**DIP Agent:** Cerberus Business Finance LLC ("<u>CBF</u>")<br><br><u>**Lenders:**</u> CBF, or one or more affiliates thereof designated on the Closing Date as a DIP Lender, and such other DIP Lender party to the DIP Facility from time to time |
|---|---|
| **DIP Facility Amount:**<br><br>*DIP Financing Agreement Preamble*<br><br>*FRBP 4001(c)(1)(B) and Local Rule 4001- 2(a)(1)* | **Amount in Interim Period:** $14 million<br><br>**Amount in Final Period:** Up to $22 million, which includes the $14 million in the interim period, comprised of a $17 million term loan facility and $5 million revolving credit facility |
| **Interest Rate:**<br><br>*DIP Financing Agreement § 2.04*<br><br>*FRBP 4001(c)(1)(B) and Local Rule 4001- 2(a)(3)* | **Interest Rates**: The loans under the facilities will bear interest at the rate per annum equal to LIBOR plus eight percent (8.00%) or the Reference Rate plus seven percent (7.00%). Interest will be payable monthly in arrears on all loans. All interest and fees would be computed on the basis of a year of 360 days for the actual days elapsed<br><br>As used herein, "LIBOR" would be defined as the London Interbank Offered Rate determined by the Agent in accordance with its customary procedures for interest periods of 1, 2, or 3 months, as selected by the Borrower, adjusted by the reserve percentage prescribed by governmental authorities as determined by the DIP Agent, provided that at no time would LIBOR referred to above be less than one percent (1.00%)<br><br>As used herein, "Reference Rate" would be defined as the rate of interest publicly announced from time to time by JPMorgan Chase Bank in New York, New York at its reference rate, base rate or prime rate, provided that at no time would the Reference Rate referred to above be less than three percent (3.00%)<br><br>**Post-Default Interest Rates**: If any Event of Default under the DIP Financing Agreement occurs and is continuing, interest would accrue at a rate per annum equal to two percent (2.00%) above the rate previously |

---

[3] This summary is qualified, in its entirety by the provisions of the DIP Financing Agreement and the Interim Order. Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the DIP Financing Agreement, and if not in the DIP Financing Agreement, then in the Interim Order.

|  | applicable to such obligation, payable on demand |
|---|---|
|  | **OID**: The DIP Loans are being issued with a 4.00% original issue discount |
| **Fees:**<br><br>*DIP Financing Agreement § 2.06*<br><br>*FRBP 4001(c)(1)(B) and Local Rule 4001- 2(a)(3)* | **Commitment Fee**: Two percent (2.00%) of the DIP Facility non-refundable and earned in full and payable upon acceptance of a commitment<br><br>**Unused Line Fee**: Three-quarters of one percent (0.75%) on the unused portion of the Revolving Credit Facility, payable monthly in arrears |
| **Maturity/Termination Date:**<br><br>*DIP Financing Agreement § 2.03*<br><br>*FRBP 4001(c)(1)(B)* | The DIP Facility loans are to be repaid in full on the date that is the earliest of (i) 30 days from the date of the Interim Order, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) the date that is twelve (12) months following the date of entry of the Interim Order, (iii) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of Company (a "<u>Plan</u>") in the Chapter 11 Case, which has been confirmed by an order (the "<u>Confirmation Order</u>") entered by the Bankruptcy Court in the Chapter 11 Cases, and (iv) the sale of all or substantially all of the assets of the Debtors (such earliest date, the "<u>Maturity Date</u>") |
| **Prepayment:**<br><br>*DIP Financing Agreement § 2.05(b)-(c)*<br><br>*Local Rule 4001-2(a)(13)* | Customary mandatory prepayments, subject to customary exceptions agreed upon by the DIP Agent and the Borrower, as included in the DIP Loan Documents for the facilities (e.g., issuance of additional debt, non-ordinary course sale of assets, tax refunds and other extraordinary events, casualty events, etc.), such payments as applied in the order and to the loan facilities as set forth in the DIP Loan Documents |
| **Purpose of DIP Facility and Limitations on Use of DIP Facility and Cash Collateral:**<br><br>*Local Rule 4001- 2(a)(7), 4001-2(a)(9)* | (i) To repay the outstanding indebtedness under the First Lien Facility, including cash collateralize letters of credit; (ii) to fund general corporate needs, including working capital needs; and (iii) to pay fees and expenses related to this transaction, including administrative expenses relating to bankruptcy |
| **Collateral:**<br><br>*DIP Financing Agreement § 4.01(b)*<br><br>*Interim Order ¶ 2(g)*<br><br>*FRBP 4001(c)(1)(B)(i) and (vii) and Local Rule 4001-2(a)(4)* | All of the property, assets or interests in property or assets of the Loan Parties, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of such Loan Party, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the Equity Interests of each Subsidiary of such Loan Party, all of the Equity Interests of all other Persons directly owned by such Loan Party, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof, subject to entry of the Final Order), and all cash and non-cash proceeds, rents, products and profits of any of |

-16-

| | |
|---|---|
| | collateral described above (the "<u>DIP Collateral</u>") |
| **Liens and Priorities:**<br><br>*DIP Financing Agreement § 4.01(c)*<br><br>*FRBP 4001(c)(1)(B) and Local Rule 4001-2(a)(4)* | <u>Liens:</u>  As security for the full and timely payment and performance of all of the Obligations (as defined in the DIP Financing Agreement), each of the Loan Parties assigns, pledges and grants to the DIP Agent, for the benefit of the DIP Secured Parties, a security interest in, and Lien on the DIP Collateral secured pursuant to sections §§ 364(c)(2) and (c)(3) and § 364(d) of the Bankruptcy Code<br><br><u>Priorities:</u>  The security interests in and first priority liens on all assets and property of the estate of the Loan Parties shall, subject to the Carve-Out Expenses and other permitted liens as set forth in Section 4.05(b) of the DIP Financing Agreement, be priming liens over all existing liens on the assets of the Loan Parties.  The DIP Agent's lien will not be released until all amounts due under the DIP Facility are paid in full in cash<br><br><u>Administrative Priority:</u>  Subject to the Carve-Out, all DIP Obligations shall constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claim</u>" and, together with the DIP Liens, the "<u>DIP Protections</u>") with priority in the Chapter 11 Cases and any Successor Cases, under sections 364(c)(1), 503, and 507 of the Bankruptcy Code and otherwise, over any and all administrative expense claims of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, 1114, or any other provision of the Bankruptcy Code (including, without limitation, any administrative expense claim granted to any prospective purchaser of all or any portion of the Debtors' assets in the nature of "liquidated damages," a break-up fee, expense reimbursement or similar fee or claim) and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.   The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, except that the DIP Superpriority Claim shall not attach to Avoidance Actions and proceeds thereof unless such relief is approved in the Final Order. |
| **Carve-Out:**<br><br>*Interim Order ¶ 9*<br><br>*Local Rule 4001-2(a)(5), 4001-2(d)* | The DIP Liens and the DIP Superpriority Claims shall be subject to the following carve-out (the "<u>Carve-Out</u>"):<br><br>(i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6), plus interest, if applicable, at the statutory rate, and any fees payable to the clerk of the Bankruptcy Court;<br><br>(ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000;<br><br>(iii) with respect to Case Professionals retained by the Debtors and the Committee, if any, all accrued and unpaid claims for fees and expense reimbursements of such Case Professionals (but not any success or |

| | |
|---|---|
| | transaction fees other than those payable to the Debtors' financial advisor in connection with the closing of the DIP Facility) incurred during the period prior to the Carve-Out Trigger Date (as defined below) but not to exceed the amounts for such Case Professionals set forth in the Budget for such period, subject to such accrued and unpaid fees and expense reimbursements becoming Allowed Fees; and <br><br> (iv) an aggregate amount for unpaid fees and expense reimbursements of all Case Professionals (but not any success or transaction fees) incurred after the Carve-Out Trigger Date not to exceed $500,000 (the "Professionals Expense Cap"), subject to such fees and expense reimbursements becoming Allowed Fees; provided, however, that any payments actually made to fund unpaid fees and expenses of Case Professionals incurred on or after the Carve-Out Trigger Date shall reduce the Professionals Expense Cap on a dollar for dollar basis. |
| **Validity of DIP Liens:** <br><br> *Interim Order ¶ 7* <br><br> *FRBP 4001(c)(1)(B)(iii)* | The DIP Liens and security interests shall be deemed valid and automatically perfected by entry of the Interim Order and the Final Order. |
| **Conditions Precedent:** <br><br> *DIP Financing Agreement §§6.01-6.02* <br><br> *FRBP 4001(c)(1)(B) and Local Rule 4001-2(a)(2)* | The DIP Financing Agreement incorporates conditions precedent as are usual and customary for financings of this including (and as set forth in greater detail in the DIP Financing Agreement): <br><br> **Conditions Precedent to Interim Facility:** <br><br> (i)    The Interim Order shall have been entered by the Bankruptcy Court; <br><br> (ii)    The Borrower shall have paid all fees, costs, expenses and taxes payable as required under the DIP Financing Agreement; <br><br> (iii)    The representations and warranties in the DIP Financing Agreement are true and correct except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), and no Default or Event of Default <br><br> (iv)    No Default or Event of Default shall have occurred and be continuing or would result from the DIP Loan Documents becoming effective in accordance with its or their respective terms. <br><br> (v)    The DIP Agent shall have received a copy of the Budget, together with a certificate of an Authorized Officer of the Borrower stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the DIP Agent <br><br> (vi)    The DIP Agent shall have received such other agreements, |

-18-

instruments, approvals, opinions and other documents, each satisfactory to the DIP Agent in form and substance, as the DIP Agent may reasonably request.

(vii) The DIP Agent shall have received on or before June 13, 2016 copies of the first day motions to be filed by the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance reasonably satisfactory to the DIP Agent and (ii) orders of the Bankruptcy Court approving such motions shall have been entered by the Bankruptcy Court on or before June 16, 2016.

(viii) On or before June 13, 2016, the Loan Parties shall file a motion with the Bankruptcy Court to approve bid procedures and establish the date of an auction to sell all or substantially all of the assets of the Loan Parties to ZD GM Acquisition LLC for a base purchase price not less than $90 million pursuant to a purchase agreement annexed thereto (with ZDGM LLC's obligations thereunder being guaranteed by Ziff Davis, LLC, which motion and purchase agreement shall be in form and substance acceptable to the DIP Agent and the Required Lenders.

(ix) The Loan Parties shall have commenced the Chapter 11 Cases and no trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over DIP Collateral with an aggregate fair market value in excess of $250,000.

**Conditions Precedent to Full DIP Facility Availability:**

(i)    The Final Order shall have been signed and entered by the Bankruptcy Court on a date that is within thirty (30) days following the date of the entry of the Interim Order, and the DIP Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the DIP Agent, the Required Lenders and the Borrower. The Final Order shall (i) find and conclude that the DIP Loan Documents were negotiated in good faith and that the Agents and the DIP Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, on the Final Facility Effective Date, the Liens and security interests in favor of the DIP Agent shall be valid and perfected Liens and security interests in the DIP Collateral, prior to all other Liens and security interests in the DIP Collateral and subject only to Permitted Priority Liens.

(ii)   The Borrower shall have paid all fees, costs, expenses and taxes payable as required under the DIP Financing Agreement;

(iii)  The representations and warranties in the DIP Financing Agreement are true and correct except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case

-19-

|  |  |
|---|---|
|  | such representation or warranty shall be true and correct on and as of such earlier date), and no Default or Event of Default shall have occurred and be continuing. |
|  | (iv) The DIP Agent shall have received an updated Budget in accordance with the terms of the DIP Financing Agreement, together with a certificate of an Authorized Officer of the Borrower dated as of the Final Facility Effective Date stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the DIP Agent. |
|  | (v) The Loan Parties shall have retained, at the Loan Parties' sole cost and expense, a chief restructuring officer, whose identity and terms of retention shall be reasonably acceptable to the DIP Secured Parties. |
| **Budget:**<br><br>*Local Rule 4001-2(a)(2)* | Please see Exhibit C hereto. |
| **Waiver or Modification of Automatic Stay:**<br><br>*Interim Order* ¶ 17(b)<br><br>*FRBP 4001(c)(1)(B)(iv),* Local Rule 4001-2(c)(1) | Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is modified so that five (5) days after the Termination Declaration Date, the DIP Agent and the DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents and the Interim Order and shall be permitted to satisfy the DIP Obligations and DIP Superpriority Claims, subject to the Carve-Out. |
| **Sections 506(c), 552(b) "Equities of the Case," and Marshalling Waivers:**<br><br>*Interim Order* ¶¶ 12, 19(f), 19(g)<br><br>*FRBP 4001(c)(1)(B)(x)* | **Section 506(c) Waiver:** Subject to the Final Order, with the exception of the Carve-Out, the DIP Collateral shall not be subject to surcharge by the Debtors or any other party in interest pursuant to sections 105 and 506(c) of the Bankruptcy Code or otherwise<br><br>**Section 552(b).** The Debtors agree that (i) the DIP Secured Parties and the Prepetition Second Lien Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties and the Prepetition Second Lien Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral<br><br>**No Marshaling.** Subject to the entry of the Final Order, the DIP Secured Parties and the Prepetition Second Lien Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral |
| **Representations and Warranties:** | **Customary Representations and Warranties:** The DIP Financing Agreement incorporates representations and warranties made as are usual |

| | |
|---|---|
| *DIP Financing Agreement Article VII* | and customary for financings of this including:<br><br>(i) Organizational good standing; jurisdiction and identification of the Loan Parties;<br>(ii) Authorization to enter into the DIP Loan Documents;<br>(iii) Satisfaction of required government approvals or permits;<br>(iv) Enforceability of DIP Loan Documents;<br>(v) Compliance with governing law;<br>(vi) Representations regarding existing litigation, financial condition, and real and personal property;<br>(vii) Timely and proper filing of applicable taxes;<br>(viii) Investment Company Act, financial law and regulation compliance;<br>(ix) Compliance with Anti-Terrorism laws;<br>(x) Certifications regarding labor matters and absence of pending actions that could have a material adverse effect;<br>(xi) No existence of any Default or Event of Default under the DIP Loan Documents; and<br>(xii) Representations and warranties related to the Chapter 11 Cases |
| **Indemnification:**<br><br>*DIP Financing Agreement §§ 2.08, 13.15*<br><br>*FRBP 4001(c)(1)(B)(ix)* | **General Indemnification:** Each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each DIP Secured Party and all of their respective officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Interim Facility Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of the DIP Financing Agreement, any other DIP Loan Document or of any other document executed in connection with the transactions contemplated by the DIP Financing Agreement, (ii) any DIP Secured Party's furnishing of funds to the Borrower under the DIP Financing Agreement or the other DIP Loan Documents, including, without limitation, the management of any such Loans, (iii) any matter relating to the financing transactions contemplated by the DIP Financing Agreement or the other DIP Loan Documents or by any document executed in connection with the transactions contemplated by the DIP Financing Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.<br><br>**Tax Indemnification:** Subject to certain exclusions as set forth in the DIP Financing Agreement, the Loan Parties jointly and severally indemnify and agree to hold each Agent and each Lender harmless from and against Taxes and Other Taxes (including, without limitation, Taxes and Other Taxes imposed on any amounts payable under Section 2.08 of the DIP Financing |

| | |
|---|---|
| | Agreement) paid by such Person, whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Taxes or Other Taxes. |
| **Covenants:**<br><br>*DIP Financing Agreement § 8.01-8.02*<br><br>*FRBP 4001(c)(1)(B) and Local Rule 4001-2(a)(8)* | Customary financial and negative covenants consistent with a DIP financing facility. Financial reporting covenants include, but are not limited to: (i) annual, audited, financial statements, (ii) quarterly, internally prepared, financial statements, (iii) monthly, internally prepared, financial statements and an updated Budget for the next succeeding 13-week period, (iv) monthly, internally prepared, 13-week cash flow projections, and (v) other reporting as required by the DIP Agent and the DIP Lender |
| **Events of Default:**<br><br>*DIP Financing Agreement § 10.01*<br><br>*Interim Order ¶ 17*<br><br>*FRBP 4001(c)(1)(B) and Local Rule 4001-2(a)(10)* | Each of the following shall constitute an event of default under the Interim Order, unless expressly waived in writing by the DIP Agent and the Required Lenders:<br>(a)  the occurrence of the Maturity Date without the Repayment in Full of DIP Obligations on or before such date or, if sooner, the occurrence of an "Event of Default" under the DIP Loan Documents (after giving effect to any applicable notice, cure and grace period in the relevant DIP Loan Documents);<br><br>(b)  the failure by the Debtors to observe or perform any of the terms, provisions, conditions, covenants or obligations under the Interim Order that, if subject to cure, is not cured within two (2) business days;<br><br>(c)  the reversal, vacatur or modification of any provision of the Interim Order; or<br><br>(d)  the failure of the Debtors to obtain entry of the Final Order on or before the date which is thirty (30) days after the Petition Date<br><br>The DIP Financing Agreement contains such events of default as are usual and customary for financings of this kind, including without limitation:<br><br>(i)  the Chapter 11 Cases shall be dismissed or, without the prior written consent of the DIP Agent, converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers shall be appointed; any other superpriority administrative expense claim which is senior to or pari passu with the DIP Agent's and the DIP Lender' claims shall be granted; or the Interim Order or the Final Order, as the case may be, shall be stayed, amended, modified, reversed or vacated;<br><br>(ii)  the Final Order shall not have been entered within thirty (30) days from the date of the entry of the Interim Order;<br><br>(iii)  a Plan shall be confirmed in the Chapter 11 Case which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of the Loan Parties' obligations thereunder on |

-22-

|  |  |
|---|---|
|  | the effective date of such Plan; or an order shall be entered which dismisses the of the Loan Parties' Chapter 11 Cases and which order does not provide for termination of the DIP Facility and payment in full in cash of all obligations thereunder; or |
|  | (iv)   any Loan Party shall take any action, including the filing of an application, in support of any of the foregoing or any person or entity other than any Loan Party shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or |
|  | (v)   the Bankruptcy Court shall enter an order granting relief from the automatic stay under the Chapter 11 Cases to the holder of any security interest in any asset of the Loan Parties having a book value in an amount equal to or exceeding an amount to be agreed upon |
| **Change of Control:**<br><br>*DIP Financing Agreement §1.01*<br><br>*Local Rule 4001-2(a)(11)* | **Change of Control**.  Change of Control means each occurrence of any of the following:<br><br>(i)   during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of GMGI (together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Parent was approved by a vote of at least a majority the directors of GMGI then still in office who were either directors at the beginning of such period, or whose election or nomination for election was previously approved) cease for any reason to constitute a majority of the Board of Directors of GMGI;<br><br>(ii)   GMGI shall cease to have beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of 100% of the aggregate voting power of the Equity Interests of each other Loan Party, free and clear of all Liens (other than Permitted Liens);<br><br>(iii)   (a) any Loan Party consolidates or amalgamates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person, or (b) any entity consolidates or amalgamates with or merges into any Loan Party in a transaction pursuant to which the outstanding voting Equity Interests of such Loan Party is reclassified or changed into or exchanged for cash, securities or other property, other than any such transaction described in this clause (ii) in which in the case of any such transaction involving a Loan Party other than GMGI, GMGI has beneficial ownership of 100% of the aggregate voting power of all Equity Interests of the resulting, surviving or transferee entity; or<br><br>(iv)   Nick Denton or a chief restructuring officer reasonably acceptable to the Collateral Agent and the DIP Lender shall cease to be involved in the day to day operations and management of the business of the Parent, and a successor reasonably acceptable to the DIP Agent is not appointed on terms reasonably acceptable to the DIP Secured Parties |

| | within 30 days of such cessation of involvement |
|---|---|
| **Joint Liability:**<br><br>*DIP Financing Agreement §12.01*<br><br>*Local Rule 4001-2(a)(14), 4001-2(e)* | <u>**Joint and Several Liability**</u>.  Each Guarantor jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any DIP Loan Document |
| **Expenses:**<br><br>*DIP Financing Agreement § 13.04*<br><br>*Interim Order ¶ 2(a)* | The Borrower shall reimburse the DIP Agent and the DIP Lender for all of the DIP Agent's and the DIP Lender's reasonable and documented out-of-pocket costs and expenses relating to the DIP Facility transaction, including, but not limited to, search fees, filing and recording fees, attorneys' fees and expenses, and financial examination and collateral inspection and appraisal and valuation fees and expenses |

## IV.  Use of Cash Collateral and Granting of Adequate Protection

31.    The Debtors additionally seek approval of the Interim Order regarding the Debtors' use of the Prepetition Second Lien Lender's cash and Cash Collateral, if any, on the terms and conditions set forth in the Interim Order.

32.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of certain provisions of the Interim Order regarding the terms of the Debtors' use of the Prepetition Second Lien Lender's cash and Cash Collateral, if any, and adequate protection provided therein.

| **Replacement Liens:**<br><br>*Interim Order ¶¶ 4(a-b)* | The Interim Order provides that pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection for the interests of the Prepetition Prepetition Second Lien Lender in the Prepetition Collateral against any Diminution in Value of such interests, the Debtors grant to the Prepetition Second Lien Lender continuing, valid, binding, enforceable, and automatically perfected junior postpetition security interests in and liens on the DIP Collateral and the proceeds thereof (the "Adequate Protection Liens").  In accordance with the terms of the Interim Order, the Adequate Protection Liens shall be junior only to (i) the Carve-Out; (ii) the DIP Liens; and (iii) any Other Prepetition Senior Liens.  The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral |
|---|---|
| **Superpriority Claims:**<br><br>*Interim Order ¶ 4(c)* | The Interim Order provides that as further adequate protection against any Diminution in Value of the Prepetition Second Lien Lender in the Prepetition Collateral, the Prepetition Second Lien Lender is granted, as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, a separate allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the foregoing superpriority claims shall be referred to as the |

-24-

"Adequate Protection Superpriority Claims"); provided, that, the Adequate Protection Superpriority Claims shall not attach to Avoidance Actions and all proceeds thereof, unless approved in the Final Order. Except with respect to the (i) DIP Liens, (ii) DIP Superpriority Claim, and (iii) Carve-Out, the Adequate Protection Superpriority Claims (x) shall have priority in these Chapter 11 Cases under sections 105, 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature of the kinds specified in or ordered pursuant to sections 503(b) or 507(b) of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and (y) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate Protection Superpriority Claims

## Basis for Relief Requested

### I.    Authorization of the DIP Facility is Proper and Necessary

33.    The Debtors believe that the DIP Facility is the best financing available to them. The Debtors have been unable to procure financing (a) in the form of unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code, or (b) solely as an administrative expense under § 364(a)-(b) of the Bankruptcy Code. Therefore, for the reasons stated herein, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to § 364 of the Bankruptcy Code.

34.    Section 364 of the Bankruptcy Code distinguishes among: (a) obtaining unsecured credit in the ordinary course of business; (b) obtaining unsecured credit out of the ordinary course of business; and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain sufficient postpetition credit on an unsecured basis, § 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is: (x) entitled to superpriority administrative expense status, or (y) is

-25-

secured by a senior lien on unencumbered property or a junior lien on encumbered property; or
(z) both.  Furthermore, § 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize
a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property
(*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of the
existing lienholders are adequately protected.  *See* 11 U.S.C. §§ 364(c), (d).

35.     The Debtors request that the DIP Facility be granted superpriority administrative
expense status and be secured by any and all assets of the Debtors.  Specifically, the DIP Facility
would be secured by a priming lien on all assets of the Debtors (now or hereafter acquired and all
proceeds thereof) that were subject to a lien as of the Petition Date under the Second Lien
Facility, senior to the liens of the Second Lien Facility on all assets encumbered by the Second
Lien Facility.  Simply put, the DIP Facility Liens would have superpriority administrative
expense status and would be senior to the liens of the Second Lien Facility.

A.     The Debtors Should Be Authorized to Obtain Postpetition Financing Under §
       364(c) of the Bankruptcy Code

36.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to
obtain unsecured credit allowable as an administrative expense, the court may authorize the
debtor to obtain credit or incur debt:  (a) on a superpriority administrative basis; (b) secured by a
lien on the debtor's unencumbered assets; and (c) secured by a junior lien on the debtor's already
encumbered assets.  *See* 11 U.S.C. § 364(c).  Section 364(c) financing is appropriate when the
debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative
claim.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990) (debtor
must show that it has made a reasonable effort to seek other sources of financing under §§ 364(a)
and (b) of the Bankruptcy Code).

-26-

37.    Courts apply a three-part test to determine whether a debtor is entitled to financing under § 364(c) of the Bankruptcy Code.  Specifically, courts review whether:  (a) the debtor is unable to obtain unsecured credit under § 364(b), *i.e.*, by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *See id.* at 37-39.  The Debtors here satisfy each part of this test.

(i)    The Debtors Could Not Obtain Unsecured Financing.

38.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of § 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Say. and Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also In re Ames Dep't Stores*, 115 B.R. at 40 (debtor made reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

(i)    Entry Into the DIP Facility is Necessary to Preserve Assets of the Estates and is in the Best Interest of Creditors.

39.    A debtor's decision to enter into a postpetition lending facility under § 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Barbara K Enters., Inc.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (courts defer to debtor's business judgment); *In re Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under § 364 of the Bankruptcy Code must reflect debtor's business judgment).  Courts grant a debtor considerable deference in acting in accordance with its business judgment.  *See*, *e.g.*,

-27-

*Barbara K Enters.*, 2008 WL 2439649, at *14 (courts defer to debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

40.   To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (*quoting In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

41.   The Debtors' execution of the DIP Facility is in the Debtors' business judgment and warrants approval by the Court.   The Debtors and their advisors have analyzed, reviewed, and conducted a detailed investigation as to the Debtors' projected financing needs during the pendency of these Chapter 11 Cases, and determined that the Debtors would require postpetition financing to support their operational and restructuring activities.   The Debtors determined that the DIP Facility is the best option available to them, and that entry of the Interim Order and Final Order is in the best interests of the Debtors, their estates, and their stakeholders.   Absent the DIP Facility, the Debtors will lack the liquidity necessary to continue operating and their businesses will fail.   *See*, *e.g.*, Holden Decl. ¶ 16.

42.   Indeed, approval of the DIP Facility will extend to the Debtors a business lifeline. The DIP Facility will provide the Debtor with access to $14 million immediately after entry of the Interim Order, and up to an additional $8 million after entry of the Final Order (subject to the terms and conditions of the DIP Loan Documents), which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations through the Chapter 11 Cases.

43.      The Debtors' management, board of directors and advisors have reviewed their restructuring alternatives in detail over the past several weeks and have explored various alternative sources of capital and financing as part of this process, including the DIP Facility. The Debtors' management took steps they deemed necessary and exercised their business judgment in negotiating the DIP Facility.  The Debtors' management and its board of directors ultimately concluded that the DIP Facility will provide immediate access to capital to pay vendors and employees, satisfy the First Lien Facility, support the Sale process, and establish the prudent cash balances required for a business of the Debtors' size and stabilize operations, all on more favorable terms than any other reasonable alternative.  Accordingly, the Debtors submit that their decision to enter into the proposed DIP Facility is an exercise of their business judgment that warrants approval by the Court.

        (ii)     The Terms of the DIP Facility Are Fair and Reasonable Under the
                 Circumstances.

44.      As described in the Holden Declaration and elsewhere herein, the Debtors have concluded that the DIP Lender's proposal is the best alternative available for post-petition financing, and further have concluded that credit cannot be obtained from another source on more favorable terms.  The DIP Facility provides the Debtors the liquidity they need to operate their business through the Sale process, on fair and customary terms.  Holden Decl. ¶ 17-18.

45.      Moreover, the various fees and charges associated with obtaining the DIP Facility are usual and customary and well within the range of reasonableness.  Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them.  *See, e.g., Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to § 364 of the Bankruptcy Code that included a lender "enhancement fee").

-29-

46.     Further, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lender to the Carve-Out for certain administrative and professional fees, including (i) fees required to be paid to the Court and to the U.S. Trustee, and (ii) fees and disbursements incurred by professional persons employed by the Debtors, or any statutory committee in the Debtors' Chapter 11 Cases.  Carve-outs for professional fees are reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals.  *See In re Ames Dep't Stores*, 115 B.R. at 38.

47.     Accordingly, after thorough analysis by the Debtors' management, professional consultants the Debtors' advisors, the Debtors have concluded that the terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances.  Holden Decl. ¶ 18.

> (iii)    The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens Under § 364(d) of the Bankruptcy Code.

48.     The DIP Secured Parties seek to prime the liens of the Second Lien Facility under the DIP Facility.  The Prepetition Second Lien Lender has consented to such priming.  Section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise; and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  *See* 11 U.S.C. § 364(d)(1); *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).]

49.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien, as authorized by § 364(d) of the Bankruptcy Code, courts evaluate whether the transaction will enhance the value of the debtor's assets, considering a number of factors including, without limitation: (a) whether alternative financing is available on any other basis

-30-

(*i.e.*, whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); (d) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and (e) whether the proposed financing agreement adequately protects prepetition secured creditors. *See, e.g., Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *In re Ames Dep't Stores*, 115 B.R. at 37-39. The DIP Facility satisfies each of these factors.

50.     First, the Debtors and their advisors explored a variety of possible financing scenarios and ultimately determined that the DIP Lender offered the best option for obtaining the postpetition financing that injects sufficient liquidity into the estates to fund business operations through these Chapter 11 Cases. The Debtors and the DIP Lender conducted good faith, arm's length negotiations. The DIP Loan Documents reflect the most favorable terms on which the DIP Lender was willing to offer financing. Accordingly, the Debtors submit that the priming liens and payoff of the First Lien Facility provided by the DIP Facility are appropriate under the circumstances.[4]

51.     Second, the funds provided under the DIP Facility preserve the value of the Debtors' estates for the benefit of all creditors and other parties in interest. Absent access to the

---

[4] Courts require that a debtor have made a reasonable effort to seek credit from other sources available under § 364, but § 364(d) does not require an exhaustive search. *See In re Snowshoe Co.*, 789 F.2d at 1088*; see also In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien."); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Courts have found 20 attempts [to secure funding] and 2 attempts [to secure funding] to be sufficient under the particular circumstances of each case but . . . one attempt is not sufficient.").

DIP Facility and the use of the Cash Collateral, the Debtors will be unable to operate their businesses or to proceed with the Chapter 11 Cases, which will threaten the Debtors' going concern value and the Sale process. Providing the Debtors with the liquidity necessary to preserve going concern value through the pendency of the Chapter 11 Cases is in the best interest of all stakeholders. *Id.* ¶ 18.

52.     Third, the DIP Facility is reasonable and adequate given the circumstances. The DIP Loan Documents will provide the Debtors with immediate access to $14 million in postpetition financing, with up to an additional $8 million available after entry of a Final Order, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain operations and relationships with key constituents notwithstanding the commencement of the Chapter 11 Cases. Relatedly, the DIP Facility authorizes the Debtors to satisfy the First Lien Facility in full. As discussed above, in pre-petition negotiations with the Debtors, the Prepetition First Lien Lender steadfastly refused to agree to consent to a lien that was senior or equal in priority to the liens securing the obligations under the First Lien Facility. While the Debtors believe that they could have sought and obtained the use of the Prepetition First Lien Lender's cash collateral on a non-consensual basis, such a process could have been costly, time-consuming, and possibly value damaging to the Debtors' estates while they concurrently seek to effectuate the Sale. Moreover, the Debtors submit that payment in full of the First Lien Facility will not harm the estates' creditors or other parties in interest. The First Lien Lenders' claims are significantly oversecured, as demonstrated by the motion to approve the Sale filed prior to the requested interim hearing on the Motion (the "Sale Motion"). The Sale Motion which will include an Asset Purchase Agreement that sets forth a stalking horse bid of $90 million for substantially all of the Debtors' assets (which are

subject to the Prepetition First Lien Lender's liens). Additionally, the rights of a party in interest to challenge the Prepetition First Lien Lender's liens are preserved in the Interim Order during the Challenge Period (as defined in the Interim Order).

53. Fourth, as described throughout this motion and as set forth in the Holden Declaration, the Debtors and the DIP Lender negotiated the DIP Loan Documents in good faith and at arm's-length. Holden Decl. ¶¶ 8, 18. Further, the Debtors submit that entry into the DIP Loan Documents is an exercise of their sound business judgment, and is in the best interests of its estates, the creditors, and all other parties in interest. *See*, *e.g.*, Holden Decl. ¶ 18.

54. Fifth and finally, the Debtors will provide adequate protection for the Prepetition Second Lien Lender for any diminution in the value of its interests in the Prepetition Collateral resulting from the Debtors' use of Cash Collateral and the priming effected by the DIP Facility. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (consenting to imposition of priming lien "relieved the debtor of having to demonstrate that [the lienholders] were adequately protected"). Specifically, the Debtors have agreed to provide the Prepetition Second Lien Lender with a replacement security interest in and lien on all assets of the Debtors, subject and subordinate only to the Carve-Out and the liens securing the DIP Facility; and (2) subject to the Carve-Out, a superpriority administrative expense claim junior only to the DIP Superpriority Claims. On this basis, the Debtors submit that the Prepetition Second Lien Lender's interests are adequately protected under the terms of the DIP Facility.

55. Based on the foregoing, the Debtors believe that the adequate protection proposed herein is fair and reasonable under the circumstances of these Chapter 11 Cases and is more than sufficient to satisfy the requirements of § 364(d) of the Bankruptcy Code.

        (iv)    The Modification of the Automatic Stay Provision is Warranted.

56.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Financing Agreement and Interim Order contemplate a modification to the automatic stay to the extent necessary to permit the Debtors and the DIP Secured Parties to take all actions necessary to implement the DIP Loan Documents and the Interim Order.  The DIP Agent will provide five (5) days' notice to the Debtors, U.S. Trustee, counsel to the Prepetition Second Lien Lender, and any committee appointed under sections 1102 or 1114 of the Bankruptcy Code after an event of default before enforcing remedies under the DIP Loan Documents.

57.     Stay modification provisions of this type are customary components of postpetition DIP financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances, as they will provide the Debtors and other parties reasonable time to cure or contest an event of default.  Accordingly, the Debtors request that the Court authorize a modification to the automatic stay in accordance with the terms set forth in the Interim Order.

          (v)     The Debtors Should be Authorized to Pay the Fees Required by the DIP Lender.

58.     The Borrower has agreed, subject to Court approval, to pay certain fees to the DIP Lender in exchange for its providing the DIP Facility.  Specifically, the Debtors will pay to the DIP Lender:  (a) a Commitment Fee, an amount equal to 2.00% of the total DIP Facility and; (b) an Unused Line Fee, a fee in the amount of 0.75% on the unused portion of the Revolving Credit Facility (as defined in the DIP Financing Agreement), payable monthly in arrears.  Furthermore, the DIP Loans are being issued with a 4.00% original issue discount.  The Borrower will also reimburse the DIP Secured Parties for all of their reasonable and documented out-of-pocket costs and expenses relating to the DIP Facility.  The Debtors believe that the fees paid to the DIP Secured Parties and the other obligations under the DIP Loan Documents represent the most

-34-

favorable terms to the Debtors on which the DIP Lender would agree to make the DIP Facility available. The Debtors considered the fees described above when determining, in their business judgment, that the DIP Loan Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue its operations and proceed with the Chapter 11 Cases. Paying these fees in order to obtain the DIP Facility is also in the best interests of the Debtors' estates, creditors, and other parties in interest.

(vi)    The Scope of the Carve-Out is Appropriate.

59.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Secured Parties to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See In re Ames Dep't Stores*, 115 B.R. at 40. In addition, the Carve-Out ensures that proceeds of the DIP Facility may be used for the payment of U.S. Trustee fees and professional fees of the Debtors and any future statutory committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

(vii)    The DIP Secured Parties Should be Deemed Good Faith Lenders Under Section 364(e)

60.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. 11 U.S.C § 364(e).

61.    As explained in detail herein and in the Holden Declaration, the DIP Loan Documents are the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of

-35-

arm's-length, good faith negotiations between the Debtors and the DIP Lender.  Holden Decl. ¶¶ 8, 18.  The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## II.    Use of Cash Collateral and Adequate Protection for the Prepetition Second Lien Lender

62.     In addition to the DIP Facility, the Debtors submit that they have a compelling need to use cash that the Prepetition Second Lien Lender asserts is Cash Collateral during the course of the Debtors' cases.  Immediate and ongoing use of such cash is necessary in order to, among other things, permit the orderly continuation of the Debtors' businesses, preserve the going concern value of the Debtors and their non-Debtor subsidiaries, make payroll and satisfy other working capital and general corporate purposes of the Debtors (including costs related to the Chapter 11 Cases).  The Debtors' Budget relies on the Debtors being able to draw on the DIP Facility and use Cash Collateral.  Absent authorization to use Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtors' estates.  Indeed, were this Court to decline to approve the Interim Order, and were the Debtors' access to cash limited during the course of a dispute over its use, the Debtors' reorganization efforts certainly would be harmed, even if the DIP Facility were otherwise approved.

63.     The Debtors cannot meet their ongoing postpetition obligations unless they are authorized to use cash that may constitute Cash Collateral.  To the extent that the Debtors' cash

is encumbered by valid, perfected and unavoidable liens of the Prepetition Second Lien Lender, the Debtors' use of Cash Collateral, as proposed herein, is appropriate under section 363(c)(2) of the Bankruptcy Code, which provides that the Debtors may not use, sell or lease Cash Collateral unless: "(a) each entity that has an interest in such Cash Collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).   Additionally, section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest.

64.    The Debtors' request is also appropriate under section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the [the Bankruptcy Code]." 11 U.S.C. § 105(a).   The Debtors propose to use cash and Cash Collateral, if any, on the terms and conditions set forth in the Interim Order, as is necessary to continue their operations, including payments to vendors, employee payroll and to fund certain capital expenditures.   Access to such cash and Cash Collateral, if any, is therefore crucial to the Debtors' ability to maintain their businesses and to avoid immediate and irreparable harm to their estates, employees and creditors.

65.    In requesting the use of Cash Collateral, the Debtors also seek to provide adequate protection for the Prepetition Second Lien Lenders, as disclosed and discussed above.   The Debtors believe that the adequate protection proposed herein is fair and reasonable under the circumstances of these Chapter 11 Cases and is more than sufficient to satisfy the requirements of section 364 of the Bankruptcy Code.

### III. The Debtors Require Interim and Immediate Access to the DIP Facility and Cash Collateral, Without Which the Debtors Would Suffer Irreparable Harm

66.    Bankruptcy Rule 4001 provides that a final hearing on a motion to obtain postpetition financing and use of cash collateral may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary, expedited hearing on the motion and to authorize the use of cash collateral and the proposed DIP financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P. 4001(c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Ames Dep't Stores*, 115 B.R. at 38.

67.    The Debtors have an urgent and immediate need for cash to continue to operate.  Absent access to the DIP Facility and the use of Cash Collateral, the Debtors will have no ability to meet their ongoing obligations to suppliers, vendors, employees, and other creditors.  The Debtors' use of Cash Collateral and access to the DIP Facility will ensure that the going concern value of their assets is preserved, a value substantially greater than the value which would be realized if the Debtors were forced to cease operations immediately due to a lack of liquidity.  Holden Decl. ¶ 16.  Accordingly, the Debtors request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to use Cash Collateral and to borrow up to $14 million under the DIP Facility, all to avoid immediate and irreparable harm to their estates.

68.    Bankruptcy Rule 4001 provides that a final hearing on a motion to obtain postpetition financing and use of Cash Collateral may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to

-38-

conduct a preliminary, expedited hearing on the motion and to authorize the use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Fed. R. Bankr. P. 4001(c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Ames Dep't Stores*, 115 B.R. at 38.

69.    Accordingly, the Debtors respectfully request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to immediately borrow up to $14 million under the DIP Facility and use Cash Collateral, all in order to avoid immediate and irreparable harm to their estates.

## Waiver of Bankruptcy Rules 6004(a) and (h)

70.    To implement the foregoing successfully, the Debtors respectfully request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Facility and the use of Cash Collateral are essential to prevent irreparable damage to the Debtor's operations, value, and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## Request for a Final Hearing

71.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date no later than 30 days following the Petition Date to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.  The Debtors also request authority to serve a copy of the signed Interim Order, which

-39-

fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further requests that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## **Notice**

72.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) the 50 largest unsecured creditors of the Debtors (on a consolidated basis); (iii) counsel to the DIP Agent; (iv) counsel to the Prepetition Secured Lenders; (v) the Internal Revenue Service; and (vii) the United States Attorney for the Southern District of New York.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## **No Previous Request**

73.     No prior motion for the relief requested herein has been made by the Debtor to this or any other court.

-40-

**Conclusion**

**WHEREFORE** the Debtors respectfully request that the Court (a) enter an order substantially in the form of the proposed Interim Order annexed hereto as Exhibit A; (b) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (c) grant such other and further relief for the Debtors as may be just or proper.

Dated:  June 13, 2016
          New York, New York

ROPES & GRAY LLP

By:  */s/ Gregg M. Galardi*

Gregg M. Galardi
Jonathan P. Gill
Kristina K. Alexander
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
E-mail:   Gregg.Galardi@ropesgray.com
            Jonathan.Gill@ropesgray.com
            Kristina.Alexander@ropesgray.com
            Jonathan.Agudelo@ropesgray.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

-41-