**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                                                  :
In re                                                          :    Chapter 11
                                                                  :
Gawker Media LLC, *et al.*,[1]              :    Case No. 16-11700 (SMB)
                                                                  :
                    Debtors.                              :    (Joint Administration Requested)
                                                                  :
-------------------------------------------------------x

**DECLARATION OF WILLIAM D. HOLDEN**
**IN SUPPORT OF DIP FINANCING MOTION**

I, William D. Holden, hereby certify and declare as follows:

1.  I am a Managing Director in the restructuring practice of Opportune LLP. I am serving as the Chief Restructuring Officer for Gawker Media Group, Inc., a Cayman Island corporation ("GMGI"), the parent company of Gawker Media LLC, a Delaware limited liability company ("Gawker Media"), and Kinja Kft., a Hungarian Corporation ("Kinja," together with Gawker Media and GMGI, the "Debtors" or the "Company"). The Debtors are the above-referenced debtors and debtors-in-possession in these chapter 11 cases (the "Chapter 11 Cases"), currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.  I have more than 20 years of investment banking, consulting and operating experience, and my practice focuses on providing operational and strategic advisory services to companies facing complex financial and/or operational challenges. Prior to joining Opportune LLP ("Opportune"), I was with Alvarez & Marsal for three years providing restructuring services

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011. Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

57333392_1

to clients in a variety of industries. I spent four years previously at The Boathouse Group in New York, independently providing operational, financial advisory and interim management services. Prior to the Boathouse Group, I worked for Greenhill and Co. in New York as a Vice President. Prior to Greenhill, I worked at Rhone Group, a New York based private equity group and before that, I was with Everett & Solsvig Associates, a boutique crisis management firm.

3. I have provided financial and restructuring advisory services in a number of notable chapter 11 cases, including Alpha Natural Resources (Case No. 15-33896 (KRH) (Bankr. E.D. Va.)), GT Advanced Technologies (Case No. 14-11916 (HJB) (Bankr. D. N.H.)), Legend Parent, Inc. (Case No. 14-10701 (JLG) (Bankr. S.D.N.Y.)), Eagle Bulk Shipping Inc. (Case No. 14-12303 (SHL) (Bankr. S.D.N.Y.)), Revel AC, Inc. (Case No. 14-22654 (MBK) (Bankr. D. N.J.)), Fresh & Easy Neighborhood Market Inc. (Case No. 13-12569 (KJC) (Bankr. D. Del.)), Taylor Wharton International, LLC (Case NO. 09-14089) (Bankr. D. Del)), and CornerStone Propane, L.P. (Case No. 04-13856 (Bankr. S.D.N.Y.)).

4. I have a bachelor's degree in business administration from Skidmore College and a MBA from Columbia Business School. I am a Certified Turnaround Professional (CTP) and a member of the Turnaround Management Association.

5. In my capacity as Chief Restructuring Officer and providing financial advisory services to the Company, I have become, and am, generally familiar with the Debtors' capital structure, operations, business affairs, and books and records, as well as the need to commence these Chapter 11 Cases.

6. On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On June 12, 2016, GMGI and Kinja each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[2]

7. I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness, (II) Granting Liens, (III) Authorizing use of Cash Collateral by the Debtors and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* (the "DIP Financing Motion"), filed contemporaneously herewith. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by members of the Debtors' management or its professional advisors, my review of relevant documents, or my opinion based upon my experience and my knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

8. The Debtors seek authority to enter into the DIP Facility,[3] authorize the use of Cash Collateral, and obtain related relief. The DIP Facility, if approved, would provide the Debtors with access to $14,000,000 immediately after entry of the order approving the DIP Facility on an interim basis (the "Interim DIP Order"), and up to $22,000,000 on a final basis.

---

[2] For purposes of this declaration and the DIP Financing Motion, the "Petition Date" shall mean June 10, 2016 and/or June 12, 2016, as applicable.

[3] Capitalized terms not defined in this Section shall have the meanings ascribed to them in the DIP Financing Motion.

-3-

57333392_1

The Debtors have determined that the DIP Facility should be sufficient to support the Debtors' operations through the pendency of these Chapter 11 Cases. Additionally, the DIP Facility will provide the Debtors with access to Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. I believe that the DIP Loan Documents are a reflection of good faith, arms-length, vigorous negotiation among the Debtors and the DIP Secured Parties.

9. The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral to pay, in accordance with the Budget, various parties in the ordinary course of business and as authorized by the Court. These include employees, landlords, third party vendors, utilities, insurance companies, taxing authorities, who in the judgment of the Debtors' management, provide the essential services needed to operate, maintain and insure the Debtors' assets. In addition, the Debtors require funds to retain and pay costs of professionals, consultants and advisors who will enable the Debtors to pursue the Sale and assist the Debtors in the operation of these Chapter 11 Cases in a manner that maximizes value for the Debtors' estates and their creditors. Taken together, the services provided by all of the foregoing parties and other entities are absolutely critical to the preservation of the Debtors' business and asset value. Immediate access to DIP Financing is also essential to the Debtors' efforts to engage in an orderly Sale process through the Chapter 11 Cases.

10. Additionally, approximately $12.3 million of the DIP Facility will be used to satisfy the Debtors' obligations under the First Lien Facility in full. Silicon Valley Bank expressed willingness to consent to the use of its cash collateral under certain circumstances, but expressed to me and the Debtors' other advisors that they were not interested in providing DIP financing. Moreover, Silicon Valley Bank informed me and the Debtors' other advisors that it

would not consensually agree to the use of its cash collateral if the Debtors sought to obtain a DIP lien that is senior or equal in priority to Silicon Valley Bank's first lien. Using a portion of the proceeds of the DIP Facility to satisfy the First Lien Facility in full will provide the Debtors with the greater benefit of additional capital obtained as part of the DIP Facility, without the need for a contested dispute with Silicon Valley over the priority of its liens.

11. In anticipation of an immediate need for postpetition financing and cash collateral, the Debtors' management and Opportune prepared the Budget, which process I oversaw. I am familiar with the Budget and its contents. The Debtors believe that the Budget is fair, reasonable, and appropriate under the circumstances. The Debtors also reasonably believe that the Budget will be adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Budget.

12. In May 2016, the Debtors retained Houlihan Lokey to provide an assessment of the Debtors' capital structure and liquidity alternatives. Beginning on May 16, 2016, professionals from Houlihan Lokey, at the Debtors' direction, began an expedited marketing effort to obtain postpetition DIP financing. I am generally familiar with the process that Houlihan Lokey undertook in obtaining DIP financing, and had calls daily (and sometimes multiple times a day) with Houlihan Lokey regarding the process to obtain DIP financing. The Debtors solicited interest in any kind of debtor-in-possession financing, and did not expressly seek or solicit bids that would be superior in priority to the liens of any prepetition secured party or satisfy the Debtors' obligations under the First Lien Facility.

13. I understand that twenty-two (22) parties eventually signed confidentiality agreements and were provided access to the data room that Houlihan Lokey maintained for the DIP marketing process. Four parties expressed serious interest in providing DIP financing. The

Debtors and their advisors have spent almost three weeks engaging in good faith negotiations with these parties in order to obtain DIP financing on favorable terms to the Debtors' estates.

14. In light of the Debtors' difficulty in meeting the litigation and judgment costs in the *Bollea* litigation, their continuing liquidity needs, and the desire to effect the Sale for the benefit of their creditors, the Debtors determined, after consulting with their advisors, that the DIP Lender's DIP financing proposal was superior to all other offers. Following negotiations among the Debtors and the DIP Lender, the DIP Lender eventually determined that it would be willing to provide DIP financing to assist the Debtors through (assuming that the DIP Orders are entered as provided in the DIP Financing Agreement) the earlier of (i) twelve months following the date of the entry of the Interim Order, (ii) substantial consummation of a plan of reorganization in the Chapter 11 Cases; and (iii) the sale of all or substantially all of the assets of the Debtors. The DIP Lender's proposal contemplates providing liquidity to allow the Debtors to file these Chapter 11 Cases, to continue operating their businesses, and to have time to engage in the Sale.

15. The Debtors and the DIP Lender conducted urgent and rigorous negotiations on the DIP Lender's proposal prior to the Debtors' bankruptcy filing. The Debtors and the DIP Lender engaged in a significant amount of due diligence with the Debtors and their advisors to complete the DIP Facility, which included on-site diligence meetings at the DIP Lender's offices and the development of an agreed upon Budget. The Debtors and the DIP Lender negotiated the DIP Facility Agreement and the necessary first day motions.

16. Without access to the DIP Facility and use of Cash Collateral, the Debtors would suffer immediate and irreparable harm and the Debtors would be forced to liquidate. I believe that the use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition

57333392_1

liquidity needs. The Debtors have been unable to obtain unsecured credit allowable as an administrative expense. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. I do not believe that the Debtors would be able to obtain financing on an unsecured basis pursuant to sections 364(b) and 503(1) of the Bankruptcy Code, or even on a superiority basis under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral in order to satisfy their postpetition liquidity needs. Financing on a postpetition basis is not otherwise available without granting the DIP Lender the protections that the parties negotiated pursuant to the DIP Loan Documents. If the Debtors were to continue to solicit offers for financing secured by liens on their unencumbered assets (which are virtually nonexistent) pursuant to section 364(c)(2) of the Bankruptcy Code, or junior liens on their encumbered assets pursuant to section 364(c)(3) of the Bankruptcy Code, the Debtors believe that such financing would be unattainable.

17. After considering all of their alternatives, the Debtors have concluded based on their own analysis and considering the advice of their counsel and other professionals, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Loan Documents and the Interim DIP Order represents the best financing presently available to the Debtors.

18. The Debtors have negotiated the DIP Facility and the DIP Loan Documents in good faith and at arm's length with the DIP Agent and the DIP Lender. The Debtors believe that the terms of the DIP Facility are fair, reasonable, appropriate, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. The Debtors believe that entry

into the DIP Loan Documents is an exercise of their sound business judgment, and is in the best interests of its estates, the creditors, and all other parties in interest.

## Conclusion

19.    For all the reasons described herein and in the DIP Financing Motion, I respectfully request that the Court grant the relief requested in the DIP Financing Motion.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

By: _____
William D. Holden

Executed On: 6/13/16

56568242_13