<u>Hearing to Consider Entry of Bidding Procedures and APA Assumption Order</u>
**Objection Deadline**: June 27, 2016 at 4:00 p.m. (Eastern Time)
**Proposed Hearing Date and Time**: July 5, 2016 at 10:00 a.m. (Eastern Time)

<u>Hearing to Consider Entry of Sale Order</u>
**Objection Deadline**: July 25, 2016 at 4:00 p.m. (Eastern Time)
**Proposed Hearing Date and Time**: August 3, 2016 at 10:00 a.m. (Eastern Time)

ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Marc B. Roitman
Kristina K. Alexander
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                                      :
In re:                                                :          Chapter 11
                                                      :
Gawker Media LLC, *et al.*,[1]                        :          Case No. 16-11700 (SMB)
                                                      :
                      Debtors.                        :          (Joint Administration Requested)
                                                      :
------------------------------------------------------x

**DEBTORS' MOTION FOR (I) AN ORDER (A) AUTHORIZING AND APPROVING
BIDDING PROCEDURES, BREAKUP FEE AND EXPENSE REIMBURSEMENT,
(B) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AND
ASSUMPTION OF THE STALKING HORSE ASSET PURCHASE AGREEMENT,
(C) APPROVING NOTICE PROCEDURES, (D) SCHEDULING A SALE HEARING
AND (E) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF
CERTAIN CONTRACTS AND LEASES AND DETERMINING CURE AMOUNTS
AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS,
RIGHTS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE ASSET
PURCHASE AGREEMENT AND (C) AUTHORIZING THE DEBTORS TO ASSUME
<u>AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media and GMGI are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja's offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

Gawker Media LLC ("**Gawker Media**"), Gawker Media Group, Inc. ("**GMGI**"), and Kinja Kft. ("**Kinja**"), the debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this motion (the "**Motion**"),[2] pursuant to sections 105, 363, 365, 503(b) and 507 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.[3]  In support of the Motion, the Debtors submit the *Declaration of Reid Snellenbarger* (the "**Sale Declaration**"), attached hereto as Exhibit A, and respectfully state as follows:

### Preliminary Statement

1.    The consummation of a value-maximizing, job-preserving, going concern sale of substantially all of the Debtors' assets through an expeditious process is essential to the Debtors' bankruptcy cases.  Given the nature of the Debtors' business operations, the immediate sale of the Debtors' assets as a going concern is the best possible way to avoid an alternative scenario that could result in the loss of jobs for virtually all of the more than 220 employees of the Debtors.

2.    To achieve that goal, the Debtors engaged in a targeted prepetition marketing effort, and entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**") with ZDGM LLC, as buyer (the "**Stalking Horse Bidder**" or "**Buyer**").  The Stalking Horse Bidder is an affiliate of Ziff Davis, LLC.  Ziff Davis, LLC is a leading global digital-media

---

[2]    Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings given to them in the Stalking Horse APA.

[3]    This Motion also references the Guidelines for the Conduct of Asset Sales promulgated by General Order M-383 of this Court (the "**Sale Guidelines**").

company operating in the technology, gaming, entertainment and lifestyle verticals. Its brands—

IGN, PCMag, AskMen, Speedtest, Offers, ExtremeTech, Geek, Toolbox, TechBargains, Ziff

Davis B2B and emedia—produce and distribute premium content across multiple platforms and

devices. Ziff Davis, LLC delivers advertising, performance marketing and licensing solutions to

thousands of clients worldwide. Ziff Davis, LLC, a subsidiary of j2 Global, Inc. (NASDAQ:

JCOM), is headquartered in New York with offices in San Francisco, Los Angeles, Chicago,

Seattle, Scottsdale, Austin, Montreal, Basingstoke, London and Sydney.

3.      Through the Stalking Horse APA, substantially all of the Debtors' employees will

have the ability to keep their jobs on substantially the same terms and conditions under which

they are currently employed. The consideration offered by the Stalking Horse Bidder is $90

million in cash plus the assumption of certain liabilities, subject to certain adjustments and

subject to higher or otherwise better offers.

4.      In consultation with various stakeholders, the Debtors and their advisors

developed bidding procedures for the sale of substantially all of their assets (the "**Bidding**

**Procedures**"). Under the Bidding Procedures, parties may submit bids for the purchase and sale

of substantially all of the Debtors' assets (the "**Acquired Assets**"). The Bidding Procedures are

intended to generate the greatest level of interest and the highest or otherwise best offer for the

Acquired Assets. The Debtors believe that the Stalking Horse APA and the Bidding Procedures

represent the best available option to maximize value for the Debtors' various stakeholders.

5.      By this Motion, the Debtors seek, among other things, an order approving the

Bidding Procedures, the Debtors' assumption of the Stalking Horse APA and the Assignment

Procedures (as defined below), and an order approving the sale of the Acquired Assets to the

Stalking Horse Bidder or the bidder who submits the highest or otherwise best offer for the Acquired Assets.

<div align="center">

**Background**

</div>

6.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Petition Date**").   On June 12, 2016, GMGI and Kinja each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No official committee of unsecured creditors, nor any trustee or examiner, has been appointed in these cases.

9.      Additional factual background regarding the Debtors, their business operations, their capital and debt structure, and the events leading up to the filing of these Cases is set forth in the *Declaration of William D. Holden in Support of First Day Motions*, filed on June 12, 2016 [Docket No. 7] (the "**First Day Declaration**").

<div align="center">

**Jurisdiction**

</div>

10.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<div align="center">

**Relief Requested**

</div>

11.      Pursuant to sections 105, 363, 365, 503(b) and 507 of the **Bankruptcy Code, Bankruptcy** Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1, the Debtors seek entry of:

A.    the "**Bidding Procedures and APA Assumption Order**," substantially in the form attached hereto as <u>Exhibit B</u>:

    (i)    authorizing and approving the Bidding Procedures, substantially in the form attached as <u>Exhibit 1</u> to the Bidding Procedures and APA Assumption Order;

    (ii)    authorizing and approving certain bidding protections to the Stalking Horse Bidder, including a breakup fee (the "**Breakup Fee**") and expense reimbursement (the "**Expense Reimbursement**," and together with the Breakup Fee, the "**Stalking Horse Protection**"), each subject to the occurrence of certain conditions set forth in the Stalking Horse APA;

    (iii)    setting the deadline for potential bidders to submit a proposal to purchase the Acquired Assets (the "**Bid Deadline**"), scheduling the auction for the Acquired Assets (the "**Auction**"), and scheduling the hearing with respect to the approval of the sale and notices related thereto (the "**Sale Hearing**");

    (iv)    authorizing and approving (a) notice of the Auction and the Sale hearing, substantially in the form attached as <u>Exhibit 2</u> to the Bidding Procedures and APA Assumption Order (the "**Sale Notice**"), and (b) notice of the proposed cure costs and the assumption and assignment of certain contracts of the Debtors, substantially in the form attached as <u>Exhibit 3</u> to the Bidding Procedures and APA Assumption Order (the "**Cure Notice**");

    (v)    authorizing and approving the Debtors' entry into and assumption of (but not consummation of) the Stalking Horse APA, subject only to higher and better offers submitted in accordance with the Bidding Procedures;

    (vi)    authorizing and approving the procedures set forth in paragraphs 20-22 of the Bidding Procedures and APA Assumption Order for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "**Assignment Procedures**"); and

    (vii)    granting related relief; and

B.    the "**Sale Order**," substantially in the form attached hereto as <u>Exhibit C</u>, authorizing and approving:

    (i)    the sale of the Acquired Assets (such sale, the "**Sale Transaction**") free and clear of all liens, claims, interests and encumbrances;

    (ii)    the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

    (iii)    granting related relief.

**The Proposed Sale Transaction Marketing Process**

12.    On May 16, 2016, Houlihan Lokey, Inc. ("**Houlihan**") was retained by the Debtors to explore the possibility of a sale of all or substantially all of the Debtors' assets, with the goal of maximizing return to the Debtors' estates in the event of a possible chapter 11 filing. Houlihan immediately began formulating a strategy for a possible sale as a contingency in the event of an immediate chapter 11 filing.

13.    In order to be prepared for a chapter 11 filing as early as May 25, 2016, Houlihan contacted a targeted group of six potential stalking horse bidders that would be able to move very quickly towards sale. The six bidders consisted of strategic parties and parties that had been in prior dialogue with the Debtors regarding potential transactions similar to the Sale Transaction. Of the six potential stalking horse bidders, two parties submitted term sheets the week of May 22, 2016, while three other parties expressed continued interest in participating in the process and Auction.  Based on the two term sheets received, the Stalking Horse Bidder's bid was identified as superior due to the bid value and use of cash rather than other forms of consideration.

14.    Since May 25, 2016, press reports, including reports noting that Houlihan had been hired and suggesting the Debtors' assets were for sale, has generated additional inbound interest from strategic parties.  Although no additional parties have submitted a term sheet, subject to the terms of the Stalking Horse APA, Houlihan will continue to engage interested parties and encourage participation in the Auction process.

15.    Additional details regarding the Debtors' and Houlihan's targeted prepetition marketing process and the evaluation of bids are set forth in the Sale Declaration.

## The Need for a Timely Sale Process

16.     The Debtors believe that the auction process and the time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase the Acquired Assets.  In formulating the procedures and time periods, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to quickly and efficiently sell the Debtors' assets while they have realizable value and can be maintained as a going concern.  Furthermore, potential bidders have had and will, in accordance with the Bidding Procedures, continue to have access to comprehensive information prepared by the Debtors and their advisors compiled in an electronic data room.

17.     Completion of the sale process in a timely manner will maximize the value of the Acquired Assets.  The time periods set forth in the Bidding Procedures were negotiated by the Stalking Horse Bidder, and failure to adhere to such time periods could jeopardize the closing of the Sale Transaction, which the Debtors believe is the best means of maximizing the value of their assets and the only means of maintaining the business as a going concern, which could enable hundreds of employees to retain their jobs and will reduce claims against the Debtors' estates.  Thus, the Debtors have determined that pursuing the Sale Transaction in the manner and with the procedures proposed is in the best interest of the Debtors' estates and will provide all interested parties with sufficient opportunity to participate.

## **Stalking Horse APA and Sale Order**[4]

18.    The Stalking Horse APA is attached hereto as <u>Exhibit D</u>.  Certain material terms

of the Stalking Horse APA are described below:

**Acquired Assets**: The Buyer will acquire all of the Sellers' assets, other than the Excluded Assets.

**Assumed Liabilities**: The liabilities to be assumed by the Buyer are: (i) liabilities under the Assumed Contracts and Assumed Permits arising on and after the Closing Date, as expressly set forth in the Stalking Horse APA; (ii) any liabilities under the Stalking Horse APA itself (including Cure Amounts up to the Cure Amount Cap); and (iii) current liabilities Sellers immediately prior to closing of a category included in Net Working Capital.  Assumed Liabilities do not include, among other things, liabilities related to *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.), as described in the First Day Declaration.

**Base Purchase Price**: The Base Purchase Price of $90 million for the Acquired Assets is paid as follows: the payment of an amount in cash (the "**Cash Payment**") less certain deductions (the payoff of certain indebtedness and a potential deduction for excess Cure Amounts) specified in the Stalking Horse APA, subject to certain adjustments, further subject to a Net Working Capital adjustment, in addition to the assumption of the Assumed Liabilities.

**Termination and Other Deadlines**: Among other things, the provisions of the Stalking Horse APA allow the Buyer to terminate the Stalking Horse APA if (i) the Bankruptcy Court shall not have entered the Bidding Procedures and APA Assumption Order within twenty-one (21) days of the Petition Date;[5] (ii) the Debtors shall not have commenced the Auction (if such Auction is necessary) on or before sixty (60) days after the Petition Date, unless an auction is not required to be held pursuant to the terms of the Bidding Procedures and APA Assumption Order; (iii) the Sale Order shall not have been entered by the Bankruptcy Court within sixty (60) days after the Petition Date and does not become a Final Order within seventy-five (75) days after the Petition Date; (iii) the Bankruptcy Court enters an order dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to case under Chapter 7, appointing a trustee or an examiner with enlarged powers, or lifting the automatic stay pursuant to Bankruptcy Code section 362

---

[4]    The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse APA. In the event of any inconsistencies between the provisions of the Stalking Horse APA and the terms set forth herein, the terms of the Stalking Horse APA will govern.

[5]    The Stalking Horse Bidder has agreed to waive this termination right if the Bankruptcy Court enters the Bidding Procedures and APA Assumption Order by July 5, 2016 or the first date thereafter on which the Bankruptcy Court is available for a hearing with respect to approval of the Bidding Procedures.

with respect to any material Acquired Assets; or (iv) Buyer is not selected as the Successful Bidder at the conclusion of the Auction.

Further, and among other things, both the Buyer and Sellers can terminate the Stalking Horse APA if: (i) the Closing has not occurred by one hundred and twenty (120) days from the date of the Stalking Horse APA (the "**Outside Date**"); or (ii) there shall be a breach by the other party of any representation, warranty, covenant or obligation which would result in a failure of one or more of the Conditions Precedent and which breach cannot be cured or has not been cured by the earlier of (A) 20 calendar days after the giving of written notice by the Buyer or the Sellers, as applicable, and (B) the Outside Date.

**Stalking Horse Protection:** Under the terms of the Stalking Horse APA, the Sellers will pay to the Buyer the Breakup Fee in the amount of $2.475 million (*i.e.*, 2.75% of the Purchase Price) and Expense Reimbursement not to exceed $1.25 million if, among other things, the Stalking Horse APA is terminated because the Bankruptcy Court has approved, or the Sellers have consummated, a Competing Transaction. The Breakup Fee and the Expense Reimbursement shall constitute an allowed administrative expense of Sellers under Bankruptcy Code sections 503(b) and 507(a)(1). Under certain circumstances, the Sellers will be obligated to pay the Breakup Fee and the Expense Reimbursement even if the Sellers do not consummate any sale of the Acquired Assets.

**Liquidated Damages:** Under the terms of the Stalking Horse APA, the Sellers shall pay to Buyer liquidated damages of $13.5 million if the Stalking Horse APA is terminated by Buyer because (i) any Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a petition for relief under Chapter 7 of the Bankruptcy Code, (ii) any Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, the entry of an order by the Bankruptcy Court appointing a trustee in the Chapter 11 Bankruptcy Cases or an examiner with enlarged powers relating to the operation of the Sellers' Business, or (iii) Sellers fail to use their reasonable best efforts to (x) obtain the issuance and entry of the Bidding Procedures and APA Assumption Order and the Sale Order, or (y) prosecute and obtain an expedited resolution of any appeal of the Sale Order or any other order of the Bankruptcy Court relating to the Stalking Horse APA or the Sale Transactions.

**Limited No Shop:** Under the terms of the Stalking Horse APA, the Sellers agreed that (i) between the date of the Stalking Horse APA and the date the Bidding Procedures and APA Assumption Order is entered by the Bankruptcy Court and (ii) from and after the date that the Auction is declared closed by Sellers, Sellers will not (A) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction or otherwise facilitate any effort or attempt to make a proposal or offer with respect to a Competing Transaction or (B) engage in,

continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data to any Person relating to, any Competing Transaction. The Stalking Horse APA does not have a "fiduciary out" provision, which was omitted because the Stalking Horse APA is subject to higher and better offers submitted in accordance with the Bidding Procedures until the Auction is declared closed by Sellers.

**Releases:** Under the terms of the Stalking Horse APA, the Sellers, on behalf of themselves and certain related parties, will release the Buyer and certain related parties from any and all claims in any way related to the Stalking Horse APA, the Sale Transaction, or any related transactions or agreements, other than claims under the Stalking Horse APA or such related agreements themselves.

**Sale Free and Clear**: All Acquired Assets will be transferred to the Buyer, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, free and clear of all claims, liens, encumbrances, interests and other restrictions of any kind whatsoever. Any such liens existing at the time of the consummation of the Sale Transaction will attach to the sale proceeds according to their relative priorities.

**Record Retention**: The Stalking Horse Bidder will acquire certain books and records of the Debtors and, subject to the terms and conditions of the Stalking Horse APA, will permit the Sellers to have reasonable access to such books and records, which shall be preserved for six (6) years following the Closing Date.

**No Successor Liability**: The terms of the proposed Sale Order provide that the Stalking Horse Bidder and its affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities assumed under or pursuant to the Stalking Horse APA.

## The Bidding Procedures

19.    The Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze and compare all bids received to determine which bid or collection of bids is in the best interests of the Debtors' estates and creditors. The Bidding Procedures describe, among other things, the procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing Bidding Procedures. The Debtors submit

that the Bidding Procedures afford the Debtors a sufficient opportunity to pursue a sale process

that will maximize the value of their estates.

20.    The Stalking Horse APA contains a number of milestones and termination rights

related to the Bidding Procedures, including:

a.    Within fifty (50) days following the Petition Date, Sellers shall hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures;

b.    The Stalking Horse APA may be terminated by Buyer if the Auction is not held on or before the date that is sixty (60) days after the Petition Date, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures;

c.    The Stalking Horse APA may be terminated by Buyer if the Sale Hearing is not held on or before the date that is five (5) days after the selection of a Successful Bidder; and

d.    The Stalking Horse APA may be terminated by Buyer if the Bankruptcy Court shall not have entered the Sale Order within sixty (60) days after the Petition Date and does not become a Final Order within seventy-five (75) days after the Petition Date.

21.    To accommodate those milestones, the Debtors have requested that the

Bankruptcy Court establish the following key dates and deadlines for the sale process:

| June 27, 2016 at 4:00 p.m. | Objection deadline with respect to entry of Bidding Procedures and APA Assumption Order |
|---|---|
| July 5, 2016 at 10:00 a.m. | Proposed date of the hearing on the Motion |
| July 11, 2016 | Date on which the Debtors shall file and serve the Cure Notice |
| July 25, 2016 at 4:00 p.m. | Objection deadline with respect to (i) entry of the Sale Order; and (ii) the proposed assumption and assignment of any of the executory contracts or unexpired leases listed on the schedule attached to the Cure Notice or to the cure amount proposed with respect thereto |
| July 25, 2016 at 5:00 p.m. | Preliminary Bid Deadline: the deadline by which a person interested in participating in the bidding process must deliver the Preliminary Bid Documents |

| July 27, 2016 at 5:00 p.m. | Qualified Bid Deadline: the deadline by which all Qualified Bids must be actually received by the Debtors' investment banker and legal advisors, as set forth in the Bidding Procedures |
|---|---|
| July 28, 2016 | Date on which the Debtors shall designate Qualified Bidders and notify all Qualified Bidders and Notice Parties of such designation and the Baseline Bid |
| July 29, 2016 at 10:00 a.m. | Auction: the date and time the Auction, if one is needed, will be held at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 |
| August 3, 2016 at 10:00 a.m. | Proposed date of the Sale Hearing |

### Assignment and Cure Procedures

22.     The Assignment Procedures in the Bidding Procedures and APA Assumption Order establish procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases and assign them to the eventual purchaser.

23.     The Assignment Procedures provide that, on or before the date that is fourteen (14) days prior to the Sale Objection Deadline (as defined in the Bidding Procedures and APA Assumption Order), the Debtors shall file with the Court and serve via first class mail the Cure Notice on all non-Debtor counterparties to all Non-Residential Leases and Other Executory Contracts, and their respective known counsel, and provide a copy of same to the Stalking Horse Bidder. Upon request by a counterparty under any Non-Residential Lease or Other Executory Contract, the Debtors shall serve, by electronic mail, the evidence of adequate assurance of future performance under the Non-Residential Leases and Other Executory Contracts provided by the Stalking Horse Bidder. Objections, if any, to the proposed assumption and assignment by the Stalking Horse Bidder of any Non-Residential Lease or Other Executory Contract or to the cure amount proposed with respect thereto must be filed with the Court and served in accordance

with the Assignment Procedures so as to be actually received before the Sale Objection Deadline (as defined in the Bidding Procedures and APA Assumption Order).

24.     If the Stalking Horse Bidder is not the Successful Bidder, or if the Successful Bid identifies different contracts or leases for assumption and assignment, or rejection, the Debtors will provide counterparties to the Non-Residential Leases and Other Executory Contracts with an opportunity to object to the assumption and assignment of any Non-Residential Lease or Other Executory Contract by no later than two (2) days before the Sale Hearing, solely on the issue of whether the Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

## Sale Notice

25.     Within three (3) days of the entry of the Bidding Procedures and APA Assumption Order, the Debtors (or their agents) will serve the Sale Notice on (a) counsel for any official committee of unsecured creditors; (b) the Office of the United States Trustee for the Southern District of New York; (c) all parties entitled to notice pursuant to Bankruptcy Rule 2002; (d) counsel to the Debtors' prepetition and postpetition lenders; (e) all applicable state and local taxing authorities; (f) the Internal Revenue Service; (g) the United States Attorney General/Antitrust Division of Department of Justice; (h) each of the non-Debtor counterparties to the Assumed Contracts; (i) counsel to the Stalking Horse Bidder; and (j) all entities who are known to possess or assert a claim against the Debtors (collectively, the "**Notice Parties"**).

26.     Within five (5) business days of the entry of the Bidding Procedures and APA Assumption Order, the Debtors will publish the Sale Notice in the United States edition of the *USA Today.*

27.     Within one (1) business day after the conclusion of the Auction, the Debtors will file a notice (i) identifying the Successful Bidder and the Back-Up Bidder, if any, and

(ii) providing adequate assurance materials demonstrating the ability of the Successful Bidder and the Back-Up Bidder, if any, to perform under the Assumed Contracts (the "**Notice Of Successful Bidder**").

28.     The Debtors submit that the Sale Notice, the Cure Notice, and the Notice of Successful Bidder, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, comply fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto. Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

**Extraordinary Provisions Under the Court's Guidelines for the Conduct of Asset Sales**

29.     The Bidding Procedures and the Stalking Horse APA contain the following provisions that may be considered Extraordinary Provisions under the Sale Guidelines:

a.     **Agreements with Management**:  As set forth in the Sale Declaration, in connection with entering into the Stalking Horse APA, and subsequent to the time that the Debtors had committed substantial effort and expense to the Stalking Horse APA, the Stalking Horse Bidder requested that Nick Denton, President of Gawker Media and the largest shareholder of GMGI ("**Mr. Denton**") agree to provide certain consulting services to the Stalking Horse Bidder following the closing of the Sale Transaction and comply with certain restrictive covenants, which agreements constitute a material inducement to the Stalking Horse Bidder to acquire the Acquired Assets and consummate the other transactions contemplated by the Stalking Horse APA. To that end, the Stalking Horse Bidder and Mr. Denton entered into that certain Consulting and Non-Solicitation Agreement, dated June 10, 2016 (the "**Consulting Agreement**"). Pursuant to the Consulting Agreement, the Stalking Horse Bidder will engage Mr. Denton as a consultant and advisor for twenty-four (24) months beginning on the Closing Date (the "**Consulting Period**") and, during the Consulting Period, will pay Mr. Denton monthly fees in the amount of $16,666. Pursuant to the Consulting Agreement, Mr. Denton agreed that, through the end of the Consulting Period, he will not, among other things: (i) associate with any business enterprise that engages in the same or similar business as the Debtors (excluding gawker.com); or (ii) hire or solicit any employee of the Stalking Horse Bidder or encourage any such employee to terminate his or her employment with the Stalking Horse Bidder. The Stalking Horse Bidder believes that entering into the Consulting Agreement with Mr. Denton is in its best interest because Mr.

Denton has unique knowledge and experience with respect to the Acquired Assets that will permit the Stalking Horse Bidder to efficiently transition the Acquired Assets and related employees into its business. In addition, Mr. Denton's agreement to the restrictive covenants will help the Stalking Horse Bidder to preserve and realize the value of the Acquired Assets. To ensure the fairness of the proposed Sale Transaction in light of the Consulting Agreement, the Debtors' determination under the Bidding Procedures of the highest or otherwise best bid submitted during the Auction will be made without attributing any value to the Consulting Agreement, and all bids submitted during the Auction will be evaluated by the Debtors without regard for whether or not the Qualified Bidder intends to enter into any agreement with Mr. Denton in connection with the Sale Transaction.

b.   **Deadlines that Effectively Limit Notice**:  The identity of the Successful Bidder or Back-Up Bidder will not be known until the conclusion of the Auction and, under the Stalking Horse APA, the Sale Hearing is required to be held on or before the date that is five (5) days after the selection of the a Successful Bidder. The Debtors therefore request that the time for filing any objection on the issue of whether the Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance, as required by section 365 of the Bankruptcy Code, be shortened to two (2) days before the Sale Hearing.

c.   **Record Retention**:  As noted above, the Stalking Horse APA provides that the Stalking Horse Bidder will acquire certain books and records of the Debtors. However, as noted above, the Stalking Horse APA permits the Sellers to have reasonable access to such books and records to enable the Debtors to administer the Chapter 11 Cases.

d.   **Sale of Avoidance Actions**:  The Stalking Horse APA provides that the Stalking Horse Bidder will acquire all avoidance claims, rights or causes of action under Chapter 5 of the Bankruptcy Code or any analogous state law claims, in each case, that relate to the Acquired Assets.  The sale of those assets is justified because the Stalking Horse Bidder intends to continue the Debtors' business as a going concern. As set forth in the Sale Declaration, the Stalking Horse Bidder insisted on purchasing those avoidance actions so that it can seek to continue the Debtors' relationships with certain vendors and contract counterparties and assure them that they will not be subject to litigation with respect to the purchased avoidance actions after the closing of the Sale Transaction.

e.   **Requested Findings as to Successor Liability**:  The proposed Sale Order includes findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.  As noted above, the Debtors will provide actual notice of the Auction, the Bidding Procedures, and the proposed Sale Transactions to each of the Notice Parties and will also provide notice by publication.  The Debtors submit that such notice is adequate for the Court to make findings in connection with the Sale Order that the Stalking Horse Bidder shall have no liability with respect to the Debtors' respective businesses or

operations or any of the Debtors' obligations based on any theory of successor or vicarious liability.  The Debtors believe that the Stalking Horse Bidder will give substantial consideration under the Stalking Horse APA in exchange for such release from successor liability.

f.      **Requested Findings as to Fraudulent Conveyance**:  The proposed Sale Order includes findings of fact and conclusions of law with respect to the consideration provided by the Stalking Horse Bidder and the elements of a fraudulent transfer. The Debtors believe that the bidding process and the Auction will support the Court's findings and conclusions that the consideration paid constitutes reasonably equivalent value and is fair and reasonable, and that the Debtors and the Successful Bidder acted in good faith and without any intent to hinder, delay, or defraud any of the Debtors' present or future creditors.  The Debtors believe that such findings are necessary to maximize the value of the Acquired Assets.

g.      **Relief from Bankruptcy Rule 6004(h)**:  The Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h) because, to preserve jobs and maximize the value of the Acquired Assets, the Sale Transaction should be consummated as soon as practicable.

## Legal Basis for Relief Requested

**The Bidding Procedures Are Fair, Appropriate and
Designed to Maximize the Value Received for the Acquired Assets**

30.      Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The Debtors submit that the Bidding Procedures are appropriate, consistent with procedures routinely approved by courts in this district, ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Acquired Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the Debtors and all parties in interest can be assured that the consideration for the Acquired Assets will be fair and reasonable.  At the same time, the Bidding

Procedures provide the Debtors with an adequate opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Acquired Assets.  Accordingly, the Debtors submit that the Court should approve the Bidding Procedures.

**Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code**

31.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).   In the Second Circuit, a debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Roaming LLC v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (a judge determining a section 363(b) application must expressly find from the evidence presented a good business reason to grant the application); *see also Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) (same).

32.     As set forth herein and in the Sale Declaration, the Debtors possess ample and sound business reasons for expeditiously selling the Acquired Assets.  Any delay in the sale of the Acquired Assets could result in further deterioration and ultimate loss of the Debtors' going concern value, which could result in the loss of jobs for virtually all of the Debtors' employees.  In contrast, approval of the proposed Bidding Procedures and the consummation of the proposed Sale Transaction will enable the Debtors to realize their going concern value, maximize recoveries for the Debtors' stakeholders, and preserve jobs.  For these reasons, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interests of the Debtors' estates.

33.    The Debtors also meet the additional requirements necessary for approval of a sale under section 363 of the Bankruptcy Code.  As stated herein, the Debtors will provide adequate notice of the Sale Transaction to interested parties, and the Debtors submit that the aforementioned notice procedures are reasonable and adequate under the circumstances.  In addition, from the date of entry of the Bidding Procedures and APA Assumption Order through the Auction, the Debtors will market the Acquired Assets to maximize the number of participants who may participate at the Auction and to obtain the highest and best offer for the Acquired Assets. The Debtors' marketing efforts and the Bidding Procedures will ensure that the Debtors receive fair consideration for the Acquired Assets.

34.    Finally, the Stalking Horse Bidder has proceeded in good faith.  Both the Debtors and the Stalking Horse Bidder were represented by sophisticated advisors in the arm's-length negotiations of the Stalking Horse APA.  As such, it is a valid exercise of the Debtors' business judgment to seek the relief requested by this Motion.

**The Proposed Sale Transaction Satisfies the**
**<u>Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear</u>**

35.    The Debtors request approval to sell the Acquired Assets free and clear of any and all liens, claims, interests and encumbrances (except for Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if:

a.    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      d.      such interest is in bona fide dispute; or

      e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

36. The Debtors submit that the sale transaction will satisfy the requirements of section 363(f) of the Bankruptcy Code. To the extent a party objects to the Sale Transaction on the basis that it holds a lien or encumbrance on the Acquired Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such Claims or that such lien would be in bona fide dispute. In addition, the Debtors will provide any such party with notice of, and an opportunity to object to, the Sale Transaction. Absent objection, each such party will be deemed to have consented to the sale of the Acquired Assets.

37. Accordingly, the Debtors believe that the Sale Transaction (i) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code, and (ii) should be approved free and clear of all liens, claims, interests and encumbrances.

**A Successful Bidder Should Be**
**Entitled to the Protections of Bankruptcy Code Section 363(m).**

38. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under [section 363(b)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct
> during the course of the sale proceedings; where there is a lack of
> such integrity, a good faith finding may not be made.    A
> purchaser's good faith is lost by "fraud, collusion between the
> purchaser and other bidders or the trustee," or an attempt to take
> grossly unfair advantage of other bidders.

*Gucci*, 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp*., 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m) of the Bankruptcy

Code)).  In other words, a party would have to show fraud or collusion between the buyer and the

debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  *See,*

*e.g.*, *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111

F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good

faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *Rock*

*Indus. Mach. Corp*., 572 F.2d at 1198).  Due to the absence of a bright line test for good faith,

the determination is based on the facts of each case, concentrating on the "integrity of [an

actor's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.,* 66 B.R. 671,

673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach. Corp.,* 572 F.2d at 1198).

39.    The Debtors submit that the Stalking Horse Bidder, or other Successful Bidder

arising from the Auction, is, or would be, a "good faith purchaser" within the meaning of section

363(m) of the Bankruptcy Code.  The Stalking Horse APA, or any marked version thereof, is, or

would be, a good faith agreement on arm's-length terms.  The consideration to be received by the

Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable.  Additionally,

the parties will enter into the Stalking Horse APA in good faith and after extensive, arm's-length

negotiations, during which both parties have been and will be represented by competent counsel

of similar bargaining positions.

40.     There is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale Transaction or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code.  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Debtors' boards in consultation with the Debtors' professionals. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder) and the Stalking Horse APA (or other purchase agreement) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

**Debtors' Assumption of the Stalking Horse APA Should be Approved**

41.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession may, subject to court approval, "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir. 1993). Where "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

42.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank,* 762 F.2d 1303, 1311 (5th Cir. 1985).

43.     The Debtors' assumption of the Stalking Horse APA is an exercise of reasonable business judgment, as the Stalking Horse APA will be a critical step forward for the Debtors to achieve their goals of maximizing value, preserving jobs, and continuing as a going concern. The Stalking Horse APA was the result of extensive, arm's-length negotiations between the Debtors and the Stalking Horse Bidder.   In addition, the Stalking Horse APA establishes a foundation for potential bidders to consider the purchase of the Acquired Assets, sets a floor for the value of the Acquired Assets, and enables the Debtors to move forward expeditiously with the sale process.   Critically, the consummation of the sale of the Debtors' assets to the Stalking Horse Bidder is subject to compliance with the Bidding Procedures and the Court's entry of the Sale Order.

44.     In addition, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.   11 U.S.C. 365(b)(1).   The Debtors submit that they have provided adequate assurance of future performance under the Stalking Horse APA and that no default exists in the Debtors' performance under the Stalking Horse APA as of the date hereof.

45.     The Debtors respectfully submit that they have exercised reasonable business judgment in deciding to assume the Stalking Horse APA and, accordingly, request that the Court authorize the Debtors to assume the Stalking Horse APA.

**The Breakup Fee and Expense Reimbursement**
**Have Sound Business Purpose and Should Be Approved**

46.    The Stalking Horse APA provides for the Stalking Horse Protection, including:
(i) the Breakup Fee in the amount of $2.475 million (*i.e.*, 2.75% of the Purchase Price), which
will be paid to the Stalking Horse Bidder upon the earlier to occur of (a) the consummation of a
Competing Transaction, and (b) forty-five (45) days after termination of the Stalking Horse
APA; and (ii) the Expense Reimbursement not to exceed $1.25 million, which will be paid to the
Stalking Horse Bidder within five (5) business days of termination of the Stalking Horse APA.
The Stalking Horse Protection was heavily negotiated in good faith and was necessary to secure
the Stalking Horse Bidder's commitment to purchase the Acquired Assets.  In addition, as stated
above, the Debtors believe that the presence of the Stalking Horse Bidder will set a floor for the
value of the Acquired Assets and attract other potential buyers to bid for the Acquired Assets,
thereby maximizing the realizable value of the Acquired Assets for the benefit of the Debtors'
estates, creditors and other parties-in-interest.

47.    Courts in this district have recognized that bid protections may be used to protect
bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and
that such fees can be "important tools to encourage bidding and to maximize the value of the
debtor's assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re
Integrated Res., Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir.
1993).  Such stalking horse bid protections enable a debtor to assure a sale to a contractually-
committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor
with the opportunity to obtain even greater benefits for the estate through an auction process.
*See In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives

may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

48.    The Stalking Horse Protection is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder.  The Breakup Fee represents no more than approximately 2.75% of the base purchase price for the Debtors' assets.  The Expense Reimbursement is an amount equal to the reasonable out-of-pocket documented fees and expenses incurred by the Stalking Horse Bidder in connection with the Stalking Horse APA, and is capped at $1.25 million.

49.    Courts in this district have approved breakup fees and expense reimbursements so long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *Integrated Res., Inc.*, 147 B.R. at 657. The Debtors submit that the Breakup Fee and the Expense Reimbursement will not chill bidding, are reasonable, and ultimately will promote the Debtors' ability to maximize the value of their estates.

50.    This Court has approved protections similar to the proposed Stalking Horse Protection as reasonable and consistent with the type and range of bidding protections typically approved.  *See, e.g.*, *In re D.A.B. Grp., LLC*, No. 14-12057 (SCC) (Bankr. S.D.N.Y. Dec. 18, 2014) (approving bidder protections of approximately 3% of the purchase price); *In re Choice Building Supplies of Westchester Co. Inc*., No. 13-23859 (RDD) (Bankr. S.D.N.Y. May 5, 2014) (approving bidder protections of approximately 3.64% of the purchase price); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 28, 2013) (approving a breakup fee of approximately 3% of the purchase price); *In re HMX Acquisition Corp*., No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012) (approving bidder protections of approximately 3.46% of the

purchase price); *In re Bos. Generating, LLC*, No. 10-14419 (SCC) (Bankr. S.D.N.Y. Oct. 12,

2010) (approving bidder protections totaling approximately 3.18% of the purchase price); *In re*

*Cabrini Med. Ctr.*, No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a breakup

fee of approximately 3.75% of the purchase price); *In re Tronox Inc.*, No. 09-10156 (ALG)

(Bankr. S.D.N.Y. Sept. 23, 2009) (approving a breakup fee and expense reimbursement totaling

approximately 3.72% of the total purchase price); *In re BearingPoint, Inc.*, No. 09-10691 (REG)

(Bankr. S.D.N.Y. Apr. 7, 2009) (approving a breakup fee and expense reimbursement totaling

approximately 3.43% of the purchase price); *In re SiliconGraphics, Inc.*, No. 09-11701 (MG)

(Bankr. S.D.N.Y. Apr. 3, 2009) (approving a breakup fee and expense reimbursement totaling

approximately 6% of the total purchase price).

51.    In addition, this Court has also granted superpriority administrative expense status

to breakup fees that become due under the terms of a stalking horse purchase agreement.  *See In*

*re Cabrini Med. Ctr.*, No. 09-14398 (AJG), 2009 WL 7193577, at *5 (Bankr. S.D.N.Y. Dec. 30,

2009) (granting stalking horse purchaser an allowed superpriority administrative expense claim

with respect to the debtor's obligation to pay a breakup fee where, among other things, purchaser

required such superpriority as a prerequisite to entering into the sale); *see also In re Worldspace,*

*Inc.*, No. 08-12412 (PJW), 2010 WL 4739929, at *6 (Bankr. D. Del. Jun. 2, 2010) (granting

breakup fee superpriority administrative status where such breakup fee was an essential element

of the purchase agreement); *In re Taylor-Wharton Int'l LLC*, No. 09-14089 (BLS), 2010 WL

5093120, at *5 (Bankr. D. Del. May 12, 2010) (granting stalking horse bidder an allowed

superpriority administrative expense claim in each of the debtors' chapter 11 cases with respect

to the debtors' obligation to pay a breakup fee and expense reimbursement, subject only to

certain expenses arising in connection with the debtors' postpetition financing arrangement).

The Buyer requires the Breakup Fee and the Expense Reimbursement as a precondition to entering into the Stalking Horse APA, and the Debtors have determined the inclusion of it into the Stalking Horse APA is absolutely necessary to successfully pursue the Sale Transaction and maximize recoveries for the Debtors' estates.

52.     The Stalking Horse Protection is necessary to successfully pursue the Sale Transaction, will not chill bidding, and will maximize recoveries for the Debtors' estates. Accordingly, the Debtors submit that the Stalking Horse Protection reflects a sound business purpose and is fair and appropriate under the circumstances, and should be approved.

**Assumption and Assignment of Executory**
**Contracts and Unexpired Leases Should Be Authorized**

53.     As stated above, section 365(a) of the Bankruptcy Code provides that a debtor in possession may, subject to court approval, "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy court approval of a debtor's decision to assume or reject an executory contract is appropriate where the debtor exercised reasonable business judgment.  *See, e.g., Orion* 4 F.3d 1095 at 1099.

54.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if (A) the trustee assumes such contract . . . and (B) adequate assurance of future performance by the assignee . . . is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case.  Adequate assurance may be provided, among other means, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has

financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

55.    The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or the Successful Bidder.  The Debtors further request that the Sale Order provide that the Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or the Successful Bidder notwithstanding any provisions in the Assumed Contracts, including those described in Bankruptcy Code sections 365(b)(2), (f)(1) and (f)(3), that prohibit such assignment.

56.    To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Stalking Horse Bidder or the Successful Bidder to perform under the Assumed Contracts.  The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or the Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts, as required under Bankruptcy Code section 365(b)(1)(C).

57.    Further, as set forth above, the Debtors will give notice to all parties to the Assumed Contracts.  This notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code.  Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

**Requests for Immediate Relief & Waiver of Stay**

58.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h). Similarly, Bankruptcy Rule 6006(d)

provides that an "order authorizing the trustee to assign an executory contract or unexpired lease

. . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders

otherwise." FED. R. BANKR. P. 6006(d).  The Debtors request that the Bidding Procedures and

APA Assumption Order and the Sale Order be effective immediately by providing that the

fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

59.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on

Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale

or other transaction to close immediately "where there has been no objection to the procedure."

10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2011).   Furthermore, Collier on Bankruptcy

provides that if an objection is filed and overruled, and the objecting party informs the court of

its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such

appeal.  *Id*.

60.     In light of the Debtors' current financial condition, the Debtors believe that the

Sale Transaction should be consummated as soon as practicable to preserve jobs and maximize

the value of the Acquired Assets.   Accordingly, the Debtors hereby request that the Bidding

Procedures and APA Assumption Order and the Sale order be effective immediately upon entry

of such orders and that the fourteen-day stay periods under Bankruptcy Rules 6004(h) and

6006(d) be waived.

**Notice**

61.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel to the Stalking Horse Bidder; (iv) counsel to the Debtors' prepetition and postpetition lenders, and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors have also provided notice in accordance with the Sale Guidelines to (a) entities known or reasonably believed to have expressed an interest in acquiring any of the assets offered for sale, (b) all parties who are known to claim interests in or liens upon the Acquired Assets, and (c) parties to executory contracts and unexpired leases proposed to be assumed and assigned, or rejected as part of the Sale Transaction.  The Debtors submit that no other or further notice need be provided.

**No Prior Request**

62.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Bidding Procedures and APA Assumption Order in substantially the form attached hereto as Exhibit B; (b) enter the Sale Order in substantially the form attached hereto as Exhibit C, authorizing the sale of the Acquired Assets to the Stalking Horse Bidder or another Successful Bidder(s) at the Auction; and (c) grant such other and further relief to the Debtors as the Court may deem proper.


Dated: June 13, 2016
          New York, New York

<div style="margin-left:40%">

/s/ Gregg M. Galardi
ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Marc B. Roitman
Kristina K. Alexander
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: Gregg.Galardi@ropesgray.com
          Jonathan.Gill@ropesgray.com
          Marc.Roitman@ropesgray.com
          Kristina.Alexander@ropesgray.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

</div>