# Exhibit A

## Sale Declaration

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
:
In re:                                          :    Chapter 11
:
Gawker Media LLC, *et al.*,[1]                  :    Case No. 16-11700 (SMB)
:
           Debtors.              :    (Joint Administration Requested)
:
------------------------------------------------------x

**DECLARATION OF REID SNELLENBARGER IN SUPPORT OF DEBTORS'
MOTION FOR (I) AN ORDER (A) AUTHORIZING AND APPROVING BIDDING
PROCEDURES, BREAKUP FEE AND EXPENSE REIMBURSEMENT,
(B) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AND
ASSUMPTION OF THE STALKING HORSE ASSET PURCHASE AGREEMENT,
(C) APPROVING NOTICE PROCEDURES, (D) SCHEDULING A SALE HEARING
AND (E) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF
CERTAIN CONTRACTS AND LEASES AND DETERMINING CURE AMOUNTS AND
(II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS,
INTERESTS AND ENCUMBRANCES, (B) APPROVING THE ASSET PURCHASE
AGREEMENT AND (C) AUTHORIZING THE DEBTORS TO ASSUME AND
ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

I, Reid Snellenbarger, declare under penalty of perjury as follows:

1.    I am a Shareholder and Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey").  On May 16, 2016, Houlihan Lokey was engaged to serve as investment banker to the above-captioned debtors and debtors in possession (the "Debtors").  I submit this declaration in support of the *Debtors' Motion for (I) an Order (A) Authorizing and Approving Bidding Procedures, Breakup Fee and Expense Reimbursement, (B) Authorizing and Approving the Debtors' Entry Into and Assumption of the Stalking Horse Asset Purchase Agreement, (C) Approving Notice Procedures, (D) Scheduling A Sale Hearing and (E) Approving*

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).  The offices of Gawker Media and GMGI are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja's offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

*Procedures for Assumption and Assignment of Certain Contracts and Leases and Determining Cure Amounts and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (B) Approving the Asset Purchase Agreement and (C) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases*, filed contemporaneously herewith (the "<u>Sale Motion</u>").[2]

### Qualifications

2.      I am a senior member of Houlihan Lokey's Financial Restructuring Group. I have also served on Houlihan Lokey's Technical Valuation Standards Committee. Before joining Houlihan Lokey in 2005, I was a vice president of PricewaterhouseCoopers Corporate Finance LLC, in the Chicago restructuring practice

3.      Houlihan Lokey is a publicly traded (NYSE:HLI), internationally recognized investment banking and financial advisory firm, with eighteen offices worldwide and more than 1,000 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 170 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with special situations and companies both in and outside of bankruptcy.

4.      I received a B.S. with distinction in finance from Purdue University. I am a member of the American Bankruptcy Institute and the Turnaround Management Association, and I am registered with FINRA as a General Securities Representative.

5.      During my nearly two decade professional career, I have specialized in assisting companies, lenders, creditors and investors in unique and stressed situations. My experience

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Sale Motion.

includes conducting acquisitions and divestitures of unique and special situation assets, raising various forms of capital and negotiation relating to the restructuring of private and public securities, both in chapter 11 and in out-of-court situations.

6. I have been involved as an advisor in a wide range of special situation transactions throughout my career, involving both out-of-court transactions and chapter 11 cases, including Phoenix Brands (*company*), Tactical Holdings (*company*), ResCap LLC (*junior secured bondholders*), Kerzner Holdings (*secured op-co debtholders*), Wingspan Holdings (*company*), General Growth Properties *(unsecured creditors' committee),* Saint Vincents Catholic Medical Centers *(unsecured creditors' committee),* USG Corporation (*equity committee*), Island One Resorts (*secured lenders*) and other Chapter 11 cases and out-of-court transactions across a wide range of industries.

7. I have been one of the principal senior engagement personnel working on Houlihan Lokey's engagement with the Debtors since May 16, 2016. In connection with the proposed Sale Order and Asset Purchase Agreement, I, along with the Houlihan Lokey's engagement team, including Mark Patricof (co-head of Houlihan Lokey's Technology, Media & Telecom Group), participated directly in discussions, due diligence, and negotiations alongside the Debtors' management, outside counsel, and other advisors.

8. I am not being compensated specifically for this testimony other than through payments received by Houlihan Lokey as a professional that will be retained by the Debtors in these chapter 11 cases. If called upon to testify, I would testify competently to the facts set forth in this declaration.

**<u>Marketing and Sale Process</u>**

9. On May 16, 2016, Houlihan Lokey was retained by the Debtors to explore the possibility of a sale of all or substantially all of the Debtors' assets, with the goal of maximizing

return to the Debtors' estates in the event of a possible chapter 11 filing.  Houlihan Lokey immediately began formulating a strategy for a possible sale as a contingency in the event of an immediate chapter 11 filing.

10.    The Debtors and Houlihan Lokey determined that the best possible way to maximize the value of the Debtors' assets and to preserve the jobs for virtually all of the more than 220 employees of the Debtors was through an immediate sale of the Debtors' assets as a going concern.

11.    In order to be prepared for a chapter 11 filing as early as May 25, 2016, Houlihan Lokey contacted a targeted group of six potential stalking horse bidders that would be able to move very quickly towards sale.  The six bidders consisted of strategic parties and parties that had been in prior dialogue with the Debtors regarding potential transactions similar to the Sale Transaction.  Of the six potential stalking horse bidders, two parties submitted term sheets the week of May 22, 2016, while three other parties expressed continued interest in participating in the process and Auction.  Based on the two term sheets received, the Stalking Horse Bidder's bid was identified as superior due to the bid value and use of cash rather than other forms of consideration.  The Stalking Horse Bidder is an affiliate of Ziff Davis, LLC.  Ziff Davis, LLC is a leading global digital-media company operating in the technology, gaming, entertainment and lifestyle verticals.

12.    The Bidding Procedures are intended to generate the greatest level of interest and the highest or otherwise best offer for the Acquired Assets.  Since May 25, 2016, press reports, including reports noting that Houlihan Lokey had been hired and suggesting the Debtors' assets were for sale, has generated additional inbound interest from strategic parties.  Although no additional parties have submitted a term sheet, subject to the terms of the Stalking Horse APA,

Houlihan Lokey will continue to engage interested parties and encourage participation in the Auction process.

### The Stalking Horse APA

13.     Under the Stalking Horse APA, the Buyer will acquire all of the Sellers' assets, other than the Excluded Assets. The consideration offered by the Stalking Horse Bidder is $90 million in cash plus the assumption of certain liabilities, subject to certain adjustments and subject to higher or otherwise better offers. Through the Stalking Horse APA, substantially all of the Debtors' employees will have the ability to keep their jobs on substantially the same terms and conditions under which they are currently employed.

14.     The Stalking Horse APA constitutes the best offer available for the Acquired Assets at this time. I believe that the competitive bidding and auction process established by the Bidding Procedures will enable the Debtors to realize the highest and best value for the Acquired Assets.

### The Need for an Expeditious Sale Process

15.     Any delay in the sale of the Acquired Assets could result in further deterioration and ultimate loss of the Debtors' going concern value, which could result in the loss of jobs for virtually all of the Debtors' employees. In contrast, approval of the proposed Bidding Procedures will enable the Debtors to conduct an efficient process to realize their going concern value, maximize recoveries for the Debtors' stakeholders, and preserve jobs. For these reasons, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interests of the Debtors' estates.

16.     The Stalking Horse APA contains a number of milestones and termination rights related to the Bidding Procedures, including:

    a.    Within fifty (50) days following the Petition Date, Sellers shall hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures;

    b.    The Stalking Horse APA may be terminated by Buyer if the Auction is not held on or before the date that is sixty (60) days after the Petition Date, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures;

    c.    The Stalking Horse APA may be terminated by Buyer if the Sale Hearing is not held on or before the date that is five (5) days after the selection of a Successful Bidder; and

    d.    The Stalking Horse APA may be terminated by Buyer if the Bankruptcy Court shall not have entered the Sale Order within sixty (60) days after the Petition Date and does not become a Final Order within seventy-five (75) days after the Petition Date.

17.    To accommodate those milestones, the Debtors have requested that the Bankruptcy Court establish the following key dates and deadlines for the sale process:

| | |
|---|---|
| June 27, 2016 at 4:00 p.m. | Objection deadline with respect to entry of Bidding Procedures and APA Assumption Order |
| July 5, 2016 at 10:00 a.m. | Proposed date of the hearing on the Motion |
| July 11, 2016 | Date on which the Debtors shall file and serve the Cure Notice |
| July 25, 2016 at 4:00 p.m. | Objection deadline with respect to (i) entry of the Sale Order; and (ii) the proposed assumption and assignment of any of the executory contracts or unexpired leases listed on the schedule attached to the Cure Notice or to the cure amount proposed with respect thereto |
| July 25, 2016 at 5:00 p.m. | Preliminary Bid Deadline: the deadline by which a person interested in participating in the bidding process must deliver the Preliminary Bid Documents |
| July 27, 2016 at 5:00 p.m. | Qualified Bid Deadline: the deadline by which all Qualified Bids must be actually received by the Debtors' investment banker and legal advisors, as set forth in the Bidding Procedures |
| July 28, 2016 | Date on which the Debtors shall designate Qualified Bidders and notify all Qualified Bidders and Notice Parties of such designation and the Baseline Bid |

| | |
|---|---|
| July 29, 2016 at 10:00 a.m. | Auction: the date and time the Auction, if one is needed, will be held at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 |
| August 3, 2016 at 10:00 a.m. | Proposed date of the Sale Hearing |

18. The Debtors believe that the proposed timeline provides them with the longest possible marketing period that complies with the milestones set forth in the Stalking Horse APA, while preserving due process considerations in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

**Stalking Horse Protection**

19. The Stalking Horse APA provides for the Stalking Horse Protection, including: (i) the Breakup Fee in the amount of $2.475 million (*i.e.*, 2.75% of the Purchase Price), which will be paid to the Stalking Horse Bidder upon the earlier to occur of (a) the consummation of a Competing Transaction, and (b) forty-five (45) days after termination of the Stalking Horse APA; and (ii) the Expense Reimbursement not to exceed $1.25 million, which will be paid to the Stalking Horse Bidder within five (5) business days of termination of the Stalking Horse APA. The Stalking Horse Protection was heavily negotiated in good faith and was necessary to secure the Stalking Horse Bidder's commitment to purchase the Acquired Assets. The Debtors and Houlihan Lokey believe that the Stalking Horse Protection is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder.

20. The Debtors and Houlihan Lokey believe that the Stalking Horse Protection is necessary to successfully pursue the Sale Transaction and will not chill bidding. The Debtors and Houlihan Lokey believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Acquired Assets and attract other potential buyers to bid for the Acquired Assets,

thereby maximizing the realizable value of the Acquired Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

### Consulting and Non-Solicitation Agreement

21.    In connection with entering into the Stalking Horse APA, and subsequent to the time that the Debtors had committed substantial effort and expense to the Stalking Horse APA, the Stalking Horse Bidder requested that Nick Denton, President of Gawker Media and the largest shareholder of GMGI ("Mr. Denton") agree to provide certain consulting services to the Stalking Horse Bidder following the closing of the Sale Transaction and comply with certain restrictive covenants.  The Stalking Horse Bidder indicated that such agreements would be a material inducement to the Stalking Horse Bidder to acquire the Acquired Assets and consummate the other transactions contemplated by the Stalking Horse APA.

22.    To that end, the Stalking Horse Bidder and Mr. Denton entered into that certain Consulting and Non-Solicitation Agreement, dated June 10, 2016 (the "Consulting Agreement"). Pursuant to the Consulting Agreement, the Stalking Horse Bidder will engage Mr. Denton as a consultant and advisor for twenty-four (24) months beginning on the Closing Date (the "Consulting Period") and, during the Consulting Period, will pay Mr. Denton monthly fees in the amount of $16,666.  Pursuant to the Consulting Agreement, Mr. Denton agreed that, through the end of the Consulting Period, he will not, among other things: (i) associate with any business enterprise that engages in the same or similar business as the Debtors (excluding gawker.com); or (ii) hire or solicit any employee of the Stalking Horse Bidder or encourage any such employee to terminate his or her employment with the Stalking Horse Bidder.  The Stalking Horse Bidder informed the Debtors that it believes that entering into the Consulting Agreement with Mr. Denton is in its best interest because Mr. Denton has unique knowledge and experience with respect to the Acquired Assets that will permit the Stalking Horse Bidder to efficiently transition

the Acquired Assets and related employees into its business. In addition, Mr. Denton's agreement to the restrictive covenants will help the Stalking Horse Bidder to preserve and realize the value of the Acquired Assets.

23. To ensure the fairness of the proposed Sale Transaction in light of the Consulting Agreement, the Debtors' determination under the Bidding Procedures of the highest or otherwise best bid submitted during the Auction will be made without attributing any value to the Consulting Agreement, and all bids submitted during the Auction will be evaluated by the Debtors without regard for whether or not the Qualified Bidder intends to enter into any agreement with Mr. Denton in connection with the Sale Transaction.

### Sale of Avoidance Actions

24. In negotiating the Stalking Horse APA, the Stalking Horse Bidder insisted on acquiring all avoidance claims, rights or causes of action under Chapter 5 of the Bankruptcy Code or any analogous state law claims, in each case, that relate to the Acquired Assets (the "Avoidance Actions"). The Debtors and Houlihan Lokey believe that the sale of the Avoidance Actions is justified because the Stalking Horse Bidder intends to continue the Debtors' business as a going concern. The Debtors and Houlihan Lokey understand that the Stalking Horse Bidder intends to continue the Debtors' relationships with certain vendors and contract counterparties and, in doing so, will seek to assure them that they will not be subject to litigation with respect to the Avoidance Actions after the closing of the Sale Transaction.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

By: /s/ Reid Snellenbarger
    Reid Snellenbarger