## Exhibit D

**Stalking Horse APA**

EXECUTION VERSION

---

**ASSET PURCHASE AGREEMENT**

**by and among**

**GAWKER MEDIA GROUP, INC.,**

**GAWKER MEDIA, LLC,**

**KINJA, KFT.**

**and**

**ZDGM LLC**

**June 10, 2016**

---

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................................................1

Article II PURCHASE AND SALE ........................................................................16
    Section 2.1    **Purchase and Sale of Acquired Assets** ...............................16
    Section 2.2    **Excluded Assets** ........................................................................18
    Section 2.3    **Assumption of Assumed Liabilities** ..................................18
    Section 2.4    **Excluded Liabilities** ...............................................................18
    Section 2.5    **Purchase Price** ........................................................................20
    Section 2.6    **Purchase Price Adjustment** ................................................20
    Section 2.7    **Assumption and Assignment of Contracts** ....................23
    Section 2.8    **Closing** ......................................................................................27
    Section 2.9    **Deliveries at Closing** .............................................................27
    Section 2.10    **Allocation; Withholding** .......................................................28
    Section 2.11    **Deposit** ......................................................................................29
    Section 2.12    **Escrow Amount** .......................................................................29

Article III SELLERS' REPRESENTATIONS AND WARRANTIES .................29
    Section 3.1    **Organization of Sellers; Good Standing** ...........................29
    Section 3.2    **Authorization of Transaction** .............................................30
    Section 3.3    **Noncontravention; Consents and Approvals** ..................30
    Section 3.4    **Financial Statements; No Undisclosed Liabilities** ...........31
    Section 3.5    **Compliance with Laws** ..........................................................32
    Section 3.6    **Title to Acquired Assets** ........................................................32
    Section 3.7    **Contracts** ..................................................................................33
    Section 3.8    **Intellectual Property** .............................................................34
    Section 3.9    **Litigation** ..................................................................................36
    Section 3.10    **Environmental, Health and Safety Matters** .....................36
    Section 3.11    **Employees and Employment Matters** ................................36
    Section 3.12    **Employee Benefit Plans** ........................................................37
    Section 3.13    **Real Property** ...........................................................................37
    Section 3.14    **Insurance** ..................................................................................37
    Section 3.15    **Brokers' Fees** ...........................................................................38
    Section 3.16    **Anti-Spam and Privacy Laws; Personally Identifiable Information** ...........................................................................38
    Section 3.17    **Material Revenue Generators** ............................................39
    Section 3.18    **Sufficiency of Assets** ..............................................................39
    Section 3.19    **Absence of Changes** ...............................................................39
    Section 3.20    **Certain Payments** ...................................................................39
    Section 3.21    **Related Party Transaction** ...................................................39
    Section 3.22    **OFAC** ........................................................................................40
    Section 3.23    **Holding Company** ...................................................................40

-i-

      Section 3.24    **No Other Representations or Warranties**...............................................40

Article IV BUYER'S REPRESENTATIONS AND WARRANTIES ...........................................41
      Section 4.1    **Organization of Buyer** ...........................................41
      Section 4.2    **Authorization of Transaction**............................................41
      Section 4.3    **Noncontravention**...........................................41
      Section 4.4    **Financial Capacity** ...........................................42
      Section 4.5    **Adequate Assurances Regarding Executory Contracts** .....................42
      Section 4.6    **Brokers' Fees** ...........................................42
      Section 4.7    **Condition of Business** ...........................................42

Article V PRE-CLOSING COVENANTS ...........................................43
      Section 5.1    **Certain Efforts; Cooperation** ...........................................43
      Section 5.2    **Notices and Consents** ...........................................43
      Section 5.3    **Bankruptcy Actions** ...........................................45
      Section 5.4    **Conduct of Business** ...........................................47
      Section 5.5    **Notice of Developments** ...........................................49
      Section 5.6    **Access** ...........................................49
      Section 5.7    **Press Releases and Public Announcements** ...........................49
      Section 5.8    **Bulk Transfer Laws** ...........................................50
      Section 5.9    **Competing Transactions** ...........................................50
      Section 5.10    **Compliance With DIP Financing** ...........................................51
      Section 5.11    **DIP Financing** ...........................................51
      Section 5.12    **Winding-Up Services** ...........................................51
      Section 5.13    **List Records** ...........................................51

Article VI OTHER COVENANTS...........................................51
      Section 6.1    **Cooperation** ...........................................51
      Section 6.2    **Further Assurances**...........................................51
      Section 6.3    **Availability of Business Records**...........................................52
      Section 6.4    **Employee Matters**...........................................52
      Section 6.5    **Recording of Intellectual Property Assignments** ...................55
      Section 6.6    **Transfer Taxes** ...........................................55
      Section 6.7    **Wage Reporting** ...........................................55
      Section 6.8    **Insurance Policies** ...........................................55
      Section 6.9    **Collection of Accounts Receivable** ...........................................56
      Section 6.10    **Name Changes** ...........................................56
      Section 6.11    **Real Property Transition Services** ...........................................57
      Section 6.12    **Dissolution of Kinja** ...........................................57
      Section 6.13    **Dissolution of Holdco** ...........................................57
      Section 6.14    **Schedule of Employees** ...........................................58
      Section 6.15    **Schedule of Contracts** ...........................................58

Article VII CONDITIONS TO CLOSING...........................................58
      Section 7.1    **Conditions to Buyer's Obligations** ...........................................58
      Section 7.2    **Conditions to Sellers' Obligations** ...........................................59

-ii-

**Section 7.3**    **No Frustration of Closing Conditions** ....................................................60

Article VIII TERMINATION ...............................................................................................60
    **Section 8.1**    **Termination of Agreement** ...............................................60
    **Section 8.2**    **Procedure Upon Termination** .........................................62
    **Section 8.3**    **Effect of Termination; Deposit Payout; Expense**
                    **Reimbursement; Breakup Fee; Liquidated Damages**. .....................63
    **Section 8.4**    **Acknowledgement** ...........................................................64

Article IX MISCELLANEOUS .............................................................................................65
    **Section 9.1**    **Expenses** .........................................................................65
    **Section 9.2**    **Entire Agreement** ...........................................................65
    **Section 9.3**    **Incorporation of Schedules, Exhibits and Disclosure Schedule** ..........65
    **Section 9.4**    **Amendments and Waivers** ...............................................65
    **Section 9.5**    **Succession and Assignment** .............................................65
    **Section 9.6**    **Notices** ............................................................................66
    **Section 9.7**    **Governing Law; Jurisdiction** ..........................................67
    **Section 9.8**    **Consent to Service of Process** .........................................67
    **Section 9.9**    **WAIVERS OF JURY TRIAL** ..........................................67
    **Section 9.10**    **Specific Performance** ......................................................67
    **Section 9.11**    **Severability** ....................................................................68
    **Section 9.12**    **No Third Party Beneficiaries** .........................................68
    **Section 9.13**    **No Survival of Representations, Warranties and Agreements** ............68
    **Section 9.14**    **Construction** ...................................................................68
    **Section 9.15**    **Computation of Time** ......................................................68
    **Section 9.16**    **Mutual Drafting** .............................................................69
    **Section 9.17**    **Disclosure Schedule** .......................................................69
    **Section 9.18**    **Headings; Table of Contents** ..........................................69
    **Section 9.19**    **Counterparts; Facsimile and Email Signatures** ...............69
    **Section 9.20**    **Time of Essence** ..............................................................69
    **Section 9.21**    **Sellers' Releases** .............................................................69

Exhibit A    -    Form of Sale Order
Exhibit B    -    Form of Bill of Sale
Exhibit C    -    Form of Assignment and Assumption Agreement
Exhibit D    -    Form of Trademark Assignment Agreement
Exhibit E    -    Form of Copyright Assignment Agreement
Exhibit F    -    Form of Domain Name Assignment Agreement
Exhibit G    -    Form of Bidding Procedures
Exhibit H    -    Form of Bidding Procedures and APA Assumption Order

Disclosure Schedule

LA_LAN01:295956.5
57029633_10

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of June 10, 2016, by and among Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media, LLC, a Delaware limited liability company ("GM LLC"), and Kinja, Kft., a Hungarian corporation ("Kinja" and together with Holdco and GM LLC, "Sellers" and each individually, a "Seller"), and ZDGM LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Sellers and Buyer are referred to collectively herein as the "Parties."  Following the Petition Date (as defined below), the term Sellers shall refer to each Seller as a debtor-in-possession and include such Seller's estate. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, within one (1) Business Day of the date hereof, each Seller shall file a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the date of such voluntary filings shall be referred to as the "Petition Date");

WHEREAS, Sellers engage in the business of publishing news and entertainment websites and owning and licensing related Intellectual Property and other assets (such business, to the extent relating to the Acquired Assets and not the Excluded Assets, the "Business");

WHEREAS, (i) Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, the Acquired Assets, and (ii) Buyer wishes to assume from Sellers the Assumed Liabilities, all on the terms and subject to the conditions set forth herein and in accordance with sections 105, 363 and 365 and other applicable provisions of title 11 of the Bankruptcy Code;

WHEREAS, Sellers have agreed to file the Sale Motion (as defined below) with the Bankruptcy Court on the Petition Date to implement the transactions contemplated hereby upon the terms and subject to the conditions set forth herein and therein; and

WHEREAS, simultaneously with the execution hereof, Ziff Davis, LLC has entered into that certain guarantee dated as of the date hereof ("Guarantee") in favor of Sellers pursuant to which Ziff Davis, LLC has guaranteed, on the terms set forth therein, the obligations of Buyer hereunder.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Accounting Referee" has the meaning set forth in Section 2.6(d).

"Accounts Receivable" means (a) all trade accounts receivable and other rights to payment from customers of Sellers to the extent relating to the Acquired Assets and (b) any security interest, claim, remedy or other right related to any of the foregoing, in each case, arising out of the operation of the Business prior to the Closing.

"Acquired Assets" means all of the Seller Assets, including the assets listed in Section 2.1(a) through (t); provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Acquired Assets shall not include any of the Excluded Assets.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Adverse Interests" means Liens (other than Permitted Liens), including any Liens arising out of bulk transfer Law, debts and claims (as that term is defined in section 101(5) of the Bankruptcy Code), Liabilities, obligations, costs, expenses, causes of action, Avoidance Actions, demands, guaranties, options, rights, contractual commitments, settlements, injunctions, restrictions, interests, encumbrances, reclamation rights, and similar matters of any kind whatsoever, whether known or unknown, fixed or contingent, or arising prior to or subsequent to the commencement of the Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including Successor or Transferee Liability (as defined in the Sale Order) and any and all claims and causes of action of defamation, libel or slander with respect to any content published by Sellers prior to Closing, but excluding the Assumed Liabilities.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in Section 2.10(a).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.9(a)(ii).

"Assumed Contracts" means those Non-Residential Leases and Other Executory Contracts that have been designated by Buyer for assumption and assignment to Buyer by a Seller pursuant to Section 2.7 and with respect to which an order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of the Non-Residential Lease or Other Executory Contract and an Assumption Notice or Post-Closing Designation Notice has been delivered and filed with the Bankruptcy Court. For the avoidance of doubt, "Assumed Contracts" (i) shall not include any Non-Residential Lease or Other Executory Contract that is excluded pursuant to Section 2.7 and (ii) shall not include any Non-Residential Lease or Other Executory Contract that has neither been assumed and assigned nor excluded pursuant to Section 2.7 unless and until it is designated as a Designated Contract by Buyer pursuant to Section 2.7 and with respect to which an order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of

-2-

the Non-Residential Lease or Other Executory Contract and an Assumption Notice or Post-Closing Designation Notice has been delivered and filed with the Bankruptcy Court.

"<u>Assumed Liabilities</u>" means (a) all Liabilities under the Assumed Contracts and the Assumed Permits solely to the extent arising after the Closing, (b) all Liabilities consisting of amounts Buyer has agreed to pay hereunder (including all Cure Amounts) and (c) all current liabilities of Sellers as of immediately prior to the Closing of a category included in Net Working Capital.

"<u>Assumed Permits</u>" means all Permits relating to the Business that are transferable in accordance with their terms, but excluding all Permits to the extent related to any Excluded Asset, including any Non-Residential Lease that is not an Assumed Contract.

"<u>Assumption Notice</u>" has the meaning set forth in <u>Section 2.7(b)</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 5.9</u>.

"<u>Avoidance Actions</u>" means all avoidance claims, rights or causes of action under Chapter 5 of the Bankruptcy Code or any analogous state law claims, in each case, that relate to the Acquired Assets.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Efforts Breach</u>" has the meaning set forth in <u>Section 8.3(f)</u>.

"<u>Base Purchase Price</u>" means $90,000,000.

"<u>Bidding Procedures</u>" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures and APA Assumption Order, in the form of <u>Exhibit G</u> attached hereto with (a) immaterial modifications or clarifications or (b) such other changes as Buyer consents to (such consent not to be unreasonably withheld).

"<u>Bidding Procedures and APA Assumption Order</u>" means an order of the Bankruptcy Court approving the Bidding Procedures, approving, among other things, the procedures for the assumption and assignment of Designated Contracts by Sellers under the Bankruptcy Code and authorizing Sellers' assumption and performance of their obligations under this Agreement, in the form of <u>Exhibit H</u> attached hereto with (a) immaterial modifications or clarifications or (b) such other changes as Buyer consents to (such consent not to be unreasonably withheld).

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.9(a)(i)</u>.

"<u>Breakup Fee</u>" means an amount in cash equal to $2,475,000.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyer Released Parties</u>" has the meaning set forth in <u>Section 9.21</u>.

"<u>Cash</u>" means cash, including all cash in Sellers' or their designee's bank accounts, lock-boxes and cash in transit, cash equivalents, readily marketable securities and other liquid investments.

"<u>Cash Payment</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Chapter 11 Cases</u>" has the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Claim</u>" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.8</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.8</u>.

"<u>Closing Designated Contract List</u>" has the meaning set forth in <u>Section 2.7(b)</u>.

"<u>Closing Excess Cure Amounts</u>" mean the aggregate Excess Cure Amounts as of immediately prior to the Closing.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Closing Working Capital</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>COBRA</u>" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"<u>Committee</u>" means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"<u>Competing Transaction</u>" shall mean any or all of the following, other than an Excluded Transaction: (i) a sale, transfer or other disposition of assets of any of the Sellers in a single transaction or a series of related transactions; (ii) a sale, transfer or assignment of capital stock or other equity interests of any of the Sellers, including by means of a merger; (iii) any Chapter 11 plan of reorganization, any conversion of any of Sellers' Chapter 11 Cases to a Chapter 7 bankruptcy case, or any other liquidation or equivalent event with respect to any or all Sellers; (iv) a transaction that, directly or indirectly, competes with, or otherwise would prohibit or frustrate, the transactions contemplated hereby; or (v) a refinancing, recapitalization or reorganization in a single transaction or a series of related transactions relating to all or a portion of the Acquired Assets.

-4-

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally binding.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Cure Amount Cap" has the meaning set forth in Section 2.7(e).

"Cure Amounts" has the meaning set forth in Section 2.7(e).

"Cure Notice" has the meaning set forth in Section 5.3(c).

"Current Employee" means any officer or other employee of any Seller, in either case who as of the Closing Date is employed by one of the Sellers, including any such employee who is on (i) temporary leave for purposes of jury or military duty, (ii) vacation or (iii) maternity or paternity leave, leave under the Family Medical Leave Act of 1993, short term-disability or medical or sick leave or other approved leave.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2.11.

"Designated Contracts" means those Non-Residential Leases and Other Executory Contracts that have been designated by Buyer for assumption and assignment to Buyer by Seller pursuant to Section 2.7 and with respect to which neither an Assumption Notice nor a Post-Closing Designation Notice has been delivered and filed with the Bankruptcy Court. For the avoidance of doubt, "Designated Contracts" shall not include any Non-Residential Lease or Other Executory Contract that is excluded pursuant to Section 2.7.

"Designation Deadline" means 5:00 p.m. (prevailing Eastern time) on the date that is thirty (30) days after the Closing Date (or such longer period as may be agreed between Buyer and the counterparty of the applicable Contract).

"DIP Financing" means a debtor-in-possession financing agreement or other documents evidencing a debtor-in-possession credit facility between Sellers and any lenders party from time to time thereto, as approved by the Bankruptcy Court.

-5-

"DIP Financing Obligations" means the "Obligations" as defined under the DIP Financing.

"Disclosure Schedule" has the meaning set forth in Article III.

"DMCA" has the meaning set forth in Section 3.8(c).

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not subject to ERISA, and any other material written benefit or compensation (including equity-based compensation) plan, program, policy, agreement or arrangement of any kind, in each case, sponsored, maintained or contributed to by any Seller or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"End Date" means the date that is one hundred and twenty (120) calendar days after the Petition Date.

"Enforcing Parties" has the meaning set forth in Section 9.10(a).

"Environmental, Health and Safety Requirements" means, as enacted and in effect on or prior to the Closing Date, all applicable Laws concerning worker health and safety, pollution or the protection of the environment.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Account" has the meaning set forth in Section 2.11.

"Escrow Amount" means an amount equal to 10% of Estimated Net Working Capital.

"Escrow Agent" has the meaning set forth in Section 2.11.

"Excess Cure Amounts" has the meaning set forth in Section 2.7(e).

"Excess Cure Adjustment Amounts" means an amount equal to the Final Excess Cure Amounts minus the Closing Excess Cure Amounts.

"Excluded Asset Contract" has the meaning set forth in Section 2.7(b).

"Excluded Assets" means, collectively, the following assets of Sellers: (a) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity; (b) all equity securities of any Seller and all net operating losses or other tax assets or attributes of any Seller; (c) all Excluded Contracts and all Leased Real Property related to Excluded Contracts that are Non-Residential Leases (it being understood that any Non-Residential Lease or Other Executory Contract that has neither been assumed and assigned nor excluded pursuant to Section 2.7 shall

-6-

not be deemed to be an Excluded Contract unless and until it becomes an Excluded Contract pursuant to Section 2.7); (d) the Excluded Claims; (e) any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) Records or other documents that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; provided, further, that the making of such copies is not contrary to Law and would not cause any applicable privilege to be waived; (f) all Permits other than the Assumed Permits; (g) the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement; (h) all Cash of any Seller as of immediately prior to the Closing; (i) all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, Tax deposits, Tax prepayments and estimated Tax payments; (j) any Records related to Taxes paid or payable by any Seller; (k) all assets listed on the Excluded Assets Schedule; and (l) any intercompany payment due to a Seller from any other Seller.

"Excluded Claims" means rights, including rights of set-off and rights of recoupment, refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties to the extent solely related to any Excluded Asset or Excluded Liability.

"Excluded Contract" means any Non-Residential Lease or Other Executory Contract that has not been designated as a Designated Contract by the Designation Deadline.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Transaction" means the transaction described in this Agreement or any other transaction with Buyer.

"Expense Reimbursement" has the meaning set forth in Section 8.3(b).

"Expenses" shall mean all reasonable out-of-pocket documented fees and expenses of Buyer and its Affiliates, including all fees and expenses of counsel, accountants, consultants, financial advisors, financing sources and investment bankers, incurred by such party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution, financing and performance of this Agreement and the transactions contemplated hereby; provided, however, that in no event shall the Expenses exceed $1,250,000 in the aggregate.

"Fifth Avenue Lease" has the meaning set forth in Section 6.11.

"Final Excess Cure Amounts" means the aggregate Excess Cure Amounts as of the date of delivery of the Closing Statement.

"Final Order" means an order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Final Working Capital" has the meaning set forth in Section 2.6(f).

"First Lien Credit Agreement" means that certain Loan and Security Agreement, dated as of September 24, 2012, as amended by that certain First Amendment to Loan and Security Agreement, dated as of December 13, 2013, that certain Second Amendment to Loan and Security Agreement, dated October 14, 2014, that certain Third Amendment to Loan and Security Agreement, dated as of June 10, 2015 and that certain Fourth Amendment to Loan and Security Agreement, dated January 21, 2016, by and among Silicon Valley Bank and GM LLC.

"First Lien Credit Agreement Obligations" means the "Obligations" as defined under the First Lien Credit Agreement.

"Former Employees" means all individuals who have been employed by any Seller (or any of their predecessors) who are not Current Employees.

"Furnishings and Equipment" means tangible personal property (other than Intellectual Property) which is used or held for use in connection with the Acquired Assets or the operation of the Business.

"GAAP" means generally accepted accounting principles in the United States as set forth in accounting rules and standards promulgated by the Financial Accounting Standards Board or any organization succeeding to any of its principal functions.

"GM LLC" has the meaning set forth in the preamble.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law).

"Guarantee" has the meaning set forth in the recitals.

"Hazardous Substance" means any substance that is listed, defined, designated or classified as hazardous, toxic or otherwise harmful under applicable Laws or is otherwise regulated by a Governmental Entity, including petroleum products and byproducts, asbestos-containing material, polychlorinated biphenyls, lead-containing products and mold.

"Holdco" has the meaning set forth in the preamble.

"HSR Act" has the meaning set forth in Section 7.1(c).

"Hungarian Business Transfer" has the meaning set forth in Section 6.12.

-8-

"Indebtedness" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course of Business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf of, or providing insurance coverage to, the Business, Sellers and their operations, properties and assets, including all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means all intellectual property rights of every kind arising under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all provisional applications, statutory invention registrations, reissues, continuations, continuations-in-part, divisionals, extensions, substitutions, and reexaminations in connection therewith; (b) rights in trademarks, service marks, symbols, logos, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names, uniform resource locators ("URLs"), other similar source identifiers, in each case whether or not registered, along with all applications, registrations and renewals in connection therewith, and all common law rights goodwill associated with any of the foregoing; (c) works of authorship and rights associated therewith, whether or not copyrightable, including mask work rights, copyrights, computer software programs, applications, source code and object code, and databases, other compilations of information, manual and other documentation, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, including extensions, renewals, restorations, reversions, derivatives, translations, localizations, adaptations and combinations of the above, and all common law and moral rights therein; (d) trade secrets, know-how, and confidential proprietary information ("Trade Secrets");; and (e) all other intellectual property rights and/or proprietary rights.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a)(iii).

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Kinja" has the meaning set forth in the preamble.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Decree of any Governmental Entity, including any securities law.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers or any of their Affiliates which is used in the Business. "Liability" means any liability, Indebtedness, guaranty, claim, loss, Tax, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured).

"Lien" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type, including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code.

"List Records" has the meaning set forth in Section 5.13.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Business or the Acquired Assets, in each case, taken as a whole; provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America, except to the extent that such change disproportionately affects the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets, including any disruption thereof or any decline in the price of securities generally or any market or index, except to the extent that such change disproportionately affects the Business relative to the adverse effect that such change has on other companies in the industry in which the Business operates; (iii) any change in GAAP or Law; (iv) the taking of any action required by this

-10-

Agreement or any Related Agreement; (v) any change directly attributable to the announcement of this Agreement or any Related Agreement; (vi) any change resulting from any act of God or other force majeure event, including natural disasters; (vii) the failure to meet or exceed any projection or forecast (it being understood that the facts and circumstances giving rise to such failure may be deemed to constitute, and may be taken into account in determining, whether a there has been a Material Adverse Effect); (viii) any change arising by reason of the commencement or pendency of the Chapter 11 Cases; (ix) inaction by Sellers due to Buyer's refusal to consent to a request for consent by Seller under Section 5.4 hereof; or (x) any matter listed on Section 1.1(a) of the Disclosure Schedule; or (b) would reasonably be expected to prevent, materially delay beyond the End Date or materially impair the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Material Revenue Generator" has the meaning set forth in Section 3.17.

"Net Working Capital" means the current assets of Sellers in the categories specifically set forth on the Net Working Capital Schedule, reduced by the current liabilities of Sellers in the categories specifically set forth on the Net Working Capital Schedule (including, for the avoidance of doubt, all such liabilities that would have been so included in current liabilities assuming the bankruptcy filings contemplated hereby had not occurred and whether incurred before or after the Petition Date), in each case, as of immediately prior to the Closing and prepared in accordance with the principles, policies, methods and procedures, consistently applied, used in the preparation of the Historical Financial Statements and the Net Working Capital Schedule (including any adjustment specified in the Net Working Capital Schedule).

"Net Working Capital Schedule" means the illustrative calculation of Net Working Capital included in Section 1.1(b) of the Disclosure Schedule.

"Non-Residential Lease" or "Non-Residential Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"OFAC" means the Office of Foreign Assets Control, within the U.S. Department of Treasury.

"Off-the-Shelf Software" means any license agreement for commercial "off-the-shelf", "click wrap", or "shrink wrap" software products or technology licensed to Sellers or their Affiliates that has a total, aggregate annual license, maintenance and other support cost of less than $100,000.

"Offerees" has the meaning set forth in Section 6.4(a).

"Operated Seller Sites" has the meaning set forth in Section 3.8(c).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice of Sellers.

-11-

"Other Executory Contracts" means the Contracts to which any Seller is a party other than the Non-Residential Leases.

"Qualified Bid Deadline" means the "Bid Deadline" as specified in the Bidding Procedures.

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes which are not yet delinquent or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; and (f) matters that would be disclosed on an accurate survey or inspection of the real property but which do not interfere in any material respect with the right or ability to use the property as currently used or operated or to convey fee simple title.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Personally Identifiable Information" means information that alone or in combination with other information held by any Seller or their respective Subsidiaries can be used to specifically identify an individual person and any individually identifiable health information, including any of the following information that specifically identifies any employee, independent contractor, individual consumer or other third party who has provided such information to a Seller in connection with the conduct of the Business: (a) addresses, telephone numbers, health information, drivers' license numbers, and government issued identification; and (b) any nonpublic personally identifiable financial information, such as information relating to a

-12-

relationship between an individual person and a financial institution, and/or related to a financial transaction by such individual person with a financial institution.

"Petition Date" has the meaning set forth in the recitals.

"Post-Closing Designation Notice" has the meaning set forth in Section 2.7(b).

"Pre-Closing Designation Deadline" means one (1) Business Day prior to the Qualified Bid Deadline.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Privacy Laws" has the meaning set forth in Section 3.16(a).

"Privacy Policies" has the meaning set forth in Section 3.16(a).

"Professional Services" has the meaning set forth in Section 2.4(f).

"Purchase Price" has the meaning set forth in Section 2.5.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business or the Acquired Assets.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement(s), the Intellectual Property Assignments.

"Related Party" means, with respect to any Seller, each of such Seller's direct and indirect Subsidiaries, each of their respective officers, directors, managers and equity holders, and each member of the immediate family of the foregoing Persons.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" has the meaning set forth in Section 5.3(a).

"Sale Order" means the sale order entered by the Bankruptcy Court in the Chapter 11 Cases in the form of Exhibit A attached hereto with (a) immaterial modifications or clarifications or (b) such other changes as Buyer consents to (such consent not to be unreasonably withheld).

"Second Lien Credit Agreement" means that Second Lien Loan and Security Agreement, dated as of January 21, 2016, by and among US VC Partners, LP and Holdco.

"Second Lien Credit Agreement Obligations" means the "Obligations" as defined under the Second Lien Credit Agreement.

"Section 6.15 Contract" has the meaning set forth in Section 6.15.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Assets" means all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible, whether real, personal or mixed, whether accrued, contingent or otherwise, wherever situated or located, existing as of the Closing.

"Seller Owned Software" has the meaning set forth in Section 3.8(h).

"Seller Releasing Parties" has the meaning set forth in Section 9.21.

"Seller Sites" has the meaning set forth in Section 3.8(c).

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of Nick Denton, Heather Dietrick and Peter Szasz or the knowledge that individuals holding a similar position as Nick Denton, Heather Dietrick and Peter Szasz would reasonably be expected to have as a result of the performance of their duties.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successful Bid" shall have the meaning assigned to such term in the Bidding Procedures.

"Successful Bidder" shall have the meaning assigned to such term in the Bidding Procedures.

-14-

"Successor" has the meaning set forth in Section 8.4.

"Superior Bid" means a Successful Bid by a Successful Bidder that the boards of directors (or similar governing bodies) of Sellers has determined in the exercise of their fiduciary duties is superior from a financial point of view to the bid represented by this Agreement (taking into account any Liabilities to be assumed in connection with such bid), which determination shall take into account, among other considerations, whether such proposed bid would result in a superior economic recovery to Sellers' stakeholders taking into account the conditionality and timing associated with such proposal.

"Target Working Capital" means $9,000,000.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, all software, servers, hardware, databases, computer systems, workstations, network connectivity, communication equipment, and peripherals, in each case used in or necessary for the operation of the Business.

"Transfer Date" has the meaning set forth in Section 6.4(a).

"Transfer Offer" has the meaning set forth in Section 6.4(a).

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(b).

"UCE Laws" has the meaning set forth in Section 3.16(b).

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act, or any similar applicable federal, state, provincial, local, municipal, foreign or other Law.

"Willful and Intentional Breach" means a breach or failure to perform that is a consequence of an act or omission undertaken by the breaching party with the knowledge that the taking of, or failure to take, such act would, or would reasonably be expect to, cause a breach of this Agreement.

"Winding-Up Services Agreement" has the meaning set forth in Section 5.12.

-15-

# ARTICLE II
# PURCHASE AND SALE

**Section 2.1**    <u>**Purchase and Sale of Acquired Assets**</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing or, with respect to Acquired Assets subject to <u>Section 2.7</u>, at such later time as provided in this Agreement, Buyer or one or more designees of Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer or one or more designees of Buyer, all of the Acquired Assets as of the Closing or, with respect to Acquired Assets subject to <u>Section 2.7</u>, as of such later time that such assets become Acquired Assets as provided in this Agreement, in each case free and clear of all Adverse Interests, for the consideration specified in Section 2.5. Without limiting the generality of the foregoing, the Acquired Assets shall include the following (except to the extent included as an Excluded Asset):

(a)    all Accounts Receivable of any Seller as of immediately prior to the Closing;

(b)    all items of machinery, equipment, supplies, furniture, fixtures and leasehold improvements (to the extent of any Seller's rights to any leasehold improvements under the Non-Residential Leases that are Assumed Contracts) owned by any of the Sellers and all other Furnishings and Equipment as of the Closing;

(c)    without duplication of the above, all other current assets of any Seller as of the Closing;

(d)    without duplication of the above, all royalties (except for any royalties under any Excluded Asset), advances, prepaid assets and deferred items, including all prepaid rentals, unbilled charges, fees and deposits, prepaid insurance premiums, and other prepayments of any Seller as of the Closing to the extent relating to Acquired Assets or Assumed Contracts;

(e)    all Intellectual Property owned by any Seller, including the Intellectual Property set forth on <u>Section 3.8(a)</u>;

(f)    all Technology owned by any Seller;

(g)    all Records, excluding Records related to Taxes paid or payable by any Seller;

(h)    except for the Excluded Claims, all Litigation of any Seller as of the Closing against any Persons (regardless of whether or not such claims and causes of action have been asserted by Sellers) and all guaranties, rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by any Seller as of the Closing (regardless of whether such rights are currently exercisable), including, without limitation all Avoidance Actions;

-16-

(i)      all Assumed Contracts;

(j)      all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers;

(k)      all rights of any Seller under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, independent contractors and agents of any Seller or with third parties for the benefit of any Seller, in each case to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(l)      subject to Section 2.7(h), all of the Assumed Permits, or, to the extent provided in Section 2.7(h), all of the rights and benefits accruing under any Permits relating to the Acquired Assets;

(m)      the amount of, and all rights to any, insurance proceeds received by any Seller after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets of a type set forth in Section 2.1(a) or 2.1(e), occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(n)      all other rights, demands, claims, credits, allowances, rebates or other refunds, rights in respect of promotional allowances or rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against any Seller, arising out of or relating to the Acquired Assets as of the Closing, including all deposits, including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise, advances and prepayments;

(o)      to the extent transferable, all Insurance Policies that Buyer designates in writing to Sellers as Acquired Assets hereunder, and all rights and benefits of any Seller of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any order of the Bankruptcy Court or relating to the DIP Financing) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(p)      all rights under or pursuant to all warranties, representations and guarantees made by independent contractors and any other Person to the extent relating to services provided to any Seller or to the extent affecting any Acquired Assets and/or Assumed Liabilities;

(q)      the right to receive and retain mail, Accounts Receivable payments and other communications of any Seller and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(r)      all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names owned or licensed by any Seller, including all List Records;

-17-

(s)      all other assets that are related to or used in connection with the Acquired Assets, including assets under lease (to the extent such lease is an Assumed Contract); and

(t)      all other assets of any Seller that are not Excluded Assets.

**Section 2.2    Excluded Assets**. Nothing contained herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Buyer, and each Seller shall retain all of its right, title and interest to, in and under the Excluded Assets.

**Section 2.3    Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.7), Buyer shall assume and become responsible for, or shall cause one or more designees of Buyer to assume or become responsible for, only the Assumed Liabilities and no other Liabilities of Sellers or any of their Affiliates, and from and after the Closing agrees to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, the Assumed Liabilities in accordance with the terms thereof.

**Section 2.4    Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, including on the basis of any Law imposing successor liability, other than the Assumed Liabilities and the obligations of Buyer under this Agreement (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"). Without limiting the foregoing, Buyer shall not be obligated to assume, does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any Seller, any predecessor of any Seller or any other Person, whether incurred or accrued before or after the Petition Date or the Closing, in each case except for the Assumed Liabilities or otherwise expressly set forth in this Agreement:

(a)      all Liabilities of Sellers arising from or relating to any Litigation against any Seller or any of their Affiliates, or arising from or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or with respect to facts or circumstances existing as of or prior to the Closing including, for the avoidance of doubt, with respect to any content published on any website used in connection with the Business prior to Closing;

(b)      all Liabilities of Sellers (other than current liabilities described in clause (c) of the definition of Assumed Liabilities) arising from or relating to the operation or condition of the Acquired Assets or the Assumed Liabilities prior to the Closing or arising from or relating to the operation of the Business prior to the Closing, including all Liabilities and other amounts payable by any Seller to any other Seller and/or its Affiliates;

(c)      all Liabilities arising from or related to any asset of any Seller or any of their respective Affiliates, whether arising prior to or after the Closing (other than post-

-18-

Closing Liabilities related to the Acquired Assets and current liabilities described in clause (c) of the definition of Assumed Liabilities);

(d)     all Liabilities in respect of any royalty payments to third parties or other fees or payments relating to any Intellectual Property, whether arising prior to or after the Closing (other than post-Closing Liabilities related to the Acquired Assets);

(e)     all Taxes of Sellers, including Taxes imposed on Sellers under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax Law (other than post-Closing Taxes described in clause (a) of the definition of Assumed Liabilities);

(f)     all Liabilities of Sellers relating to legal services, accounting services, financial advisory services, investment banking services or any other institutional professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;

(g)     all Liabilities of Sellers relating to or arising from any collective bargaining agreement with a labor union, including any related multiemployer pension plan;

(h)     all Liabilities of Sellers relating to (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long service leave, workers' compensation claims (provided that, and for the avoidance of doubt, any letter(s) of credit issued on behalf of any Seller in support of such workers' compensation claims are an Excluded Asset) and unemployment benefits of any Current Employee and/or Former Employee (except for such Liabilities incurred by Buyer after the Closing with respect to Transferred Employees) and (ii) all severance, retention and termination agreements entered into between any Seller and any Current Employees and/or Former Employees;

(i)     all Liabilities of Sellers arising out of, relating to, or with respect to any notice pay or benefits, including under COBRA unless otherwise required by applicable Law, and claims under the WARN Act with respect to (A) Transferred Employees to the extent incurred on or prior to the time of Closing and (B) Excluded Employees and Former Employees regardless of when incurred;

(j)     all Liabilities of Sellers arising out of, relating to, or with respect to any Employee Benefit Plan, including any Liabilities related to any Employee Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or IRC Section 412 with respect to (A) Transferred Employees to the extent incurred on or prior to the time of Closing and (B) Excluded Employees and Former Employees regardless of when incurred;

(k)     all Liabilities of Sellers in respect of Indebtedness (except to the extent of any Cure Amounts under any Assumed Contracts);

(l)     all Liabilities of Sellers arising in connection with any violation of any applicable Law relating to the period prior to the Closing, including any Environmental, Health and Safety Requirements;

(m)     all Liabilities which Buyer may or could become liable for as a result of or in connection with any "de facto merger" or "successor-in-interest" theories of liability, in each case to the extent incurred by Sellers on or prior to the Closing;

(n)     all Liabilities of Sellers under this Agreement and the Related Agreements and the transactions contemplated hereby or thereby;

(o)     all Liabilities arising out of the rejection of the Excluded Contracts by Sellers;  and

(p)     all other Liabilities of Sellers that are not expressly included in the Assumed Liabilities.

**Section 2.5    Purchase Price**. In consideration of the sale of the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price") shall be composed of the following:

(a)     the payment of an amount in cash (the "Cash Payment") equal to (i) the Base Purchase Price less (ii) the Deposit, less (iii) the Escrow Amount, less (iv) the Closing Excess Cure Amounts, less  (v) the amounts to be paid pursuant to clause (b), plus (vi) the amount, if any, by which Estimated Working Capital is greater than the Target Working Capital, and minus (vii) the amount, if any, by which Estimated Working Capital is less than the Target Working Capital (subject to adjustment pursuant to Section 2.6);

(b)     the payoff in full by Buyer of all of (i) the outstanding First Lien Financing Obligations in accordance with the First Lien Financing, (ii) the outstanding Second Lien Financing Obligations in accordance with the Second Lien Financing and (iii) the outstanding DIP Financing Obligations in accordance with the DIP Financing;

(c)     the payment of any Cure Amounts as set forth in Section 2.7(e); and

(d)     the assumption by Buyer of the Assumed Liabilities.

**Section 2.6    Purchase Price Adjustment**.

(a)     At least five (5) Business Days prior to the anticipated Closing Date, Sellers shall deliver to Buyer a certificate (the "Estimated Closing Statement") setting forth Sellers' good faith calculation of Net Working Capital as of immediately prior to the Closing ("Closing Working Capital" and, Sellers' calculation thereof contained in the Estimated Closing Statement, the "Estimated Working Capital").  Prior to the Closing, the Parties will cooperate in good faith to answer any questions and resolve any issues

-20-

raised by Buyer and its representatives in connection with their review of the Estimated Closing Statement.

(b)    As promptly as practicable, but no later than sixty (60) days after the Closing Date, Buyer shall cause to be prepared and delivered to Sellers a certificate (the "Closing Statement") setting forth Buyer's good faith estimate of the Closing Working Capital and the Final Excess Cure Amounts.  The preparation of the Closing Statement shall be for the sole purpose of (i) calculating the difference between Estimated Working Capital and Buyer's calculation of Closing Working Capital delivered pursuant to this Section 2.6(b)) and (ii) calculating the difference between the Closing Excess Cure Amounts and the Final Excess Cure Amounts pursuant to this Section 2.6(b).

(c)    If Sellers disagree with Buyer's calculation of Closing Working Capital and/or Final Excess Cure Amounts delivered pursuant to Section 2.6(b)), Sellers may, within thirty (30) days after delivery of the Closing Statement, deliver a notice to Buyer disagreeing with such calculation and setting forth Sellers' calculation of the Closing Working Capital and/or Final Excess Cure Amounts. Any such notice of disagreement shall specify those items or amounts as to which Sellers disagree, and Sellers shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of Closing Working Capital and Final Excess Cure Amounts delivered pursuant to Section 2.6(b).

(d)    If a notice of disagreement shall be duly and timely delivered pursuant to Section 2.6(c), Buyer and Sellers shall, during the fifteen (15) days following such delivery, use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Closing Working Capital and/or Final Excess Cure Amounts, which amount, in each case, shall not be more than the amount thereof shown in Sellers' calculation delivered pursuant to Section 2.6(c) nor less than the amount thereof shown in Buyer's calculation delivered pursuant to Section 2.6(b). If during such period, Buyer and Sellers are unable to reach such agreement, they shall promptly thereafter cause an independent accountant to be mutually agreed upon by Sellers and Buyer) (the "Accounting Referee") to review this Agreement and the disputed items or amounts for the purpose of calculating Closing Working Capital and/or the Final Excess Cure Amounts. In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement and Sellers' calculation of Closing Working Capital and/or Final Excess Cure Amounts as to which Sellers have disagreed. The Accounting Referee shall deliver to Buyer and Sellers, as promptly as practicable (but in any case no later than thirty (30) days from the date of engagement of the Accounting Referee), a report setting forth such calculation or calculations. Such report shall be final and binding upon Buyer and Sellers. Any fees and expenses relating to the engagement of the Accounting Referee shall be borne pro rata by Buyer, on the one hand, and Sellers, on the other hand, in proportion to the difference between the calculation of the Closing Working Capital and/or the Final Excess Cure Amounts as determined by the Accounting Referee and the calculation of the Closing Working Capital and/or Final Excess Cure Amounts proposed by Buyer in the Closing Statement or by Sellers in the notice of disagreement.  For example, if Sellers' calculation

-21-

of the Closing Working Capital contained in the notice of disagreement is $1,000 higher than Buyer's calculation of the Closing Working Capital in the Closing Statement and Sellers' calculation of the Final Excess Cure Amounts contained in the notice of disagreement is $1,000 lower than Buyer's calculation of the Final Excess Cure Amounts and the Accounting Referee determines that the Closing Working Capital is $750 higher than Buyer's calculation of the Closing Working Capital in the Closing Statement and $750 lower than Buyer's calculation of the Final Excess Cure Amounts, then Sellers shall pay 25% of the Accounting Referee's expenses and Buyer will pay 75% of the Accounting Referee's expenses.

(e)     Buyer and Sellers shall, and shall cause their respective Representatives to, cooperate and assist in the review referred to in this Section 2.6, including, without limitation, the making available during normal business hours to the extent necessary of relevant books, records, work papers and personnel.  Without limiting the generality of the foregoing, Buyer shall provide to Sellers such additional back up or supporting data relating to the Closing Statement, the Closing Working Capital and the Final Excess Cure Amounts as Sellers may reasonable request, and shall cooperate with and assist Sellers as reasonably requested by Sellers in conducting their review of the Closing Statement, the Closing Working Capital and the Final Excess Cure Amounts, including reasonable access during normal business hours, to the extent necessary in connection with Sellers' review of the Closing Statement, the Closing Working Capital and the Final Excess Cure Amounts, to books, records, accountants' work papers and appropriate personnel.

(f)     If Final Working Capital exceeds Estimated Working Capital by more than $200,000, Buyer shall pay to Sellers the amount by which Final Working Capital exceeds Estimated Working Capital plus $200,000, or if Estimated Working Capital exceeds Final Working Capital by more than $200,000, Buyer shall be paid the amount by which Estimated Working Capital exceeds Final Working Capital plus $200,000. "Final Working Capital" means Closing Working Capital (i) as shown in Buyer's calculation delivered pursuant to Section 2.6(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 2.6(c) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Buyer and Sellers pursuant to Section 2.6(d) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 2.6(d); provided, however, that in no event shall Final Working Capital be less than Buyer's calculation of Closing Working Capital delivered pursuant to Section 2.6(a) or more than Sellers' calculation of Closing Working Capital delivered pursuant to Section 2.6(c).

(g)     As soon as practicable after the Final Working Capital has been determined pursuant to Section 2.6 (but in any event within five (5) Business Days after such determination):

(i)     If Estimated Working Capital exceeds Final Working Capital by more than $200,000, then (i) Sellers and Buyer shall jointly instruct the Escrow Agent to disburse (A) to Buyer from the Escrow Amount (plus any interest earned thereon in the Escrow Account), by wire transfer of immediately available funds to an account designated by Buyer, the amount (if any) by which (1) the

-22-

Estimated Working Capital exceeds (2) Final Working Capital plus $200,000 and (B) to Sellers, the remaining portion of the Escrow Amount (if any, after taking into account any Excess Cure Adjustment Amounts payable pursuant to <u>Section 2.6(h)</u>), together with interest earned thereon, after the payment to Buyer in accordance with the foregoing clause (A), by wire transfer of immediately available funds to an account designated by Sellers and (ii) if the amount by which (A) the Estimated Working Capital exceeds (B) the Final Working Capital plus $200,000 is greater than the funds in the Escrow Account, Sellers shall pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to the amount that such excess is greater than the funds in the Escrow Account; or

(ii)    If the Final Working Capital equals or exceeds the Estimated Working Capital, then (A) Sellers and Buyer shall jointly instruct the Escrow Agent to disburse to Sellers all of the remaining Escrow Amount (after taking into account any Excess Cure Adjustment Amounts payable pursuant to <u>Section 2.6(h)</u>), by wire transfer of immediately available funds to an account designated by Sellers, together with interest earned thereon and (B) Buyer shall pay to Sellers, by wire transfer of immediately available funds to an account designated by Sellers, the amount (if any) by which (1) Final Working Capital exceeds (2) the Estimated Working Capital plus $200,000.

(h)    As soon as practicable after the Final Excess Cure Adjustment Amounts have been determined pursuant to <u>Section 2.6</u> (but in any event within five (5) Business Days after such determination), Sellers and Buyer shall jointly instruct the Escrow Agent to disburse to Buyer from the Escrow Amount (plus any interest earned thereon in the Escrow Account), by wire transfer of immediately available funds to an account designated by Buyer, the Excess Cure Adjustment Amounts, if any.  If the Final Excess Cure Adjustment Amounts are greater than the funds in the Escrow Account, Sellers shall pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to the amount that the Final Excess Cure Adjustment Amounts are greater than the funds in the Escrow Account.

**Section 2.7**    <u>**Assumption and Assignment of Contracts**</u>.

(a)    The Sale Order shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned by Sellers to Buyer, of the Designated Contracts pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this <u>Section 2.7</u>, and shall provide for the Designation Deadline as defined herein. At Buyer's request, and at Buyer's sole cost and expense, Sellers shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Designated Contract upon assumption of such Designated Contract by Buyer (and Sellers shall reasonably cooperate with Buyer to the extent reasonably requested with Buyer in negotiations with the counterparties thereof), or (ii) to otherwise amend any Designated Contract to the extent such amendments would not adversely affect any Seller; <u>provided</u> that Sellers shall not be required to enter into any such amendment if such amendment

-23-

would result in an assumption by any Seller of such Designated Contract unless such Designated Contract will be assigned to Buyer at the time of such assumption.

(b)    Buyer shall have until one (1) Business Day prior to the Qualified Bid Deadline (the "Pre-Closing Designation Deadline") to deliver to Sellers a list of Non-Residential Leases and Other Executory Contracts that Buyer elects to be treated as Designated Contracts to be assumed and assigned to Buyer on the Closing Date (such list, as may be amended in accordance with this Agreement, the "Closing Designated Contract List"); provided, however, Buyer may not include any Contract on the Closing Designated Contract List that is an Excluded Asset (any such Contract, an "Excluded Asset Contract").  Prior to the Pre-Closing Designation Deadline, Buyer may, in its sole discretion, add or remove any Non-Residential Lease or Other Executory Contract to or from the Closing Designated Contract List.  Within two (2) Business Days following the Bid Deadline, the applicable Seller shall file with the Bankruptcy Court and serve notice (an "Assumption Notice") by first class mail on all non-debtor counterparties to any Contract included on the Closing Designated Contract List, and provide a copy of such Assumption Notice to Buyer; provided that the assumption of any Contract on the Closing Designated Contract List will only occur on the Closing Date.  Buyer may, in its sole discretion, exclude or remove from the Closing Designated Contract List any Non-Residential Lease or Other Executory Contract by delivering written notice to Sellers; provided that such notice must be delivered three (3) Business Days prior to the Closing Date.  At Closing, the applicable Seller shall assume and assign to, and Buyer shall accept the assignment of and assume each Non-Residential Lease or Other Executory Contract included on the Closing Designated Contract List on the Closing Date. Following the Closing Date until the Designation Deadline, Buyer may, in its sole discretion, designate any Non-Residential Lease or Other Executory Contract (other than an Excluded Asset Contract) that was never included on the Closing Designated Contract List as a Designated Contract by providing written notice (a "Post-Closing Designation Notice") to Sellers, specifying additional Non-Residential Leases or Other Executory Contracts to be assumed by Sellers and assigned to Buyer. Upon receipt of a Post-Closing Designation Notice, the applicable Seller shall, within three (3) Business Days thereof, file an Assumption Notice with the Bankruptcy Court and serve such notice by first class mail on all non-debtor counterparties to such Contracts, and provide a copy of the same to Buyer.  Upon filing of the Assumption Notice, Seller shall assume and assign to, and Buyer shall accept the assignment of and assume such Non-Residential Lease or Other Executory Contract.  For the avoidance of doubt, (x) if Buyer has not provided a written designation to assume any Non-Residential Lease or Other Executory Contract in accordance with the foregoing, then such Non-Residential Lease or Other Executory Contract shall be deemed to be excluded, (y) no prepetition Cure Amount shall be due or payable with respect to any Non-Residential Leases or Other Executory Contracts until the permanent assumption thereof and (z) each Contract that becomes an Assumed Contract pursuant to this Section 2.7 shall concurrently be deemed to have become an Acquired Asset.  If following the Pre-Closing Designation Deadline Buyer removes any Non-Residential Lease or Other Executory Contract from the Closing Designated Contract List, the Sellers incurred any direct incremental administrative expenses allowed pursuant to section 503(b) of the Bankruptcy Code associated with its continuance of

-24-

such Contract during the period between the Pre-Closing Designation Deadline and the date Buyer delivered notice to exclude such previously Designated Contract, the Buyer shall, within forty-five (45) days following the Closing Date, reimburse the Sellers for such incremental expenses (other than expenses caused as a result of Seller's breach of such Contract).  In addition to the foregoing, if (x) Buyer has not duly elected to exclude any Section 6.15 Contract from the Closing Designated Contract List and (y) the Sellers incurred any incremental administrative expenses allowed pursuant to section 503(b) of the Bankruptcy Code associated with its continuance of such Section 6.15 Contract during the period between the Pre-Closing Designation Deadline and the date Buyer delivers notice to exclude such Section 6.15 Contract or if Buyer has failed to specifically exclude such Section 6.15 Contract by the Designation Deadline, the Buyer shall, within forty-five (45) days following the Closing Date, reimburse Sellers for such incremental expenses (other than expenses incurred as a result of Seller's breach of such Section 6.15 Contract).

(c)    After the Closing and prior to the Designation Deadline, Sellers shall not terminate, amend, supplement, modify or waive any rights under, or create any Lien with respect to, any Other Executory Contract or any Non-Residential Lease (other than an Excluded Asset Contract), or take any affirmative action not required by the terms thereof, without the prior written consent of Buyer (not to be unreasonably withheld or delayed), unless Buyer has provided notice to Sellers in writing designating such Non-Residential Lease or Other Executory Contract for exclusion pursuant to Section 2.7(b).

(d)    As part of the Sale Motion (or as necessary in one or more separate motions), Sellers shall request that, by virtue of any Seller providing ten (10) Business Days' prior notice of its intent to assume and assign any Designated Contract, the Bankruptcy Court deem any non-debtor party to such Designated Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any required Consent to the assumption of the Designated Contract by the relevant Seller and assignment to Buyer.

(e)    In connection with the assumption and assignment to Buyer of any Designated Contract that is executory pursuant to this Section 2.7, the cure amounts, as determined by the Bankruptcy Court, if any (such amounts, the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Designated Contracts, including any amounts payable to any landlord under any Non-Residential Lease that is a Designated Contract that relates to the period prior to the delivery of an Assumption Notice or a Post-Closing Designation Notice, as applicable, with respect thereto, shall be paid by Buyer by the later of the Closing and one (1) Business Day after the filing of the Assumption Notice or Post-Closing Designation Notice, as applicable, with the Bankruptcy Court, and not by Sellers; provided that in the event that Buyer is obligated to pay any Cure Amounts in excess of $1,800,000 in the aggregate (the "Cure Amount Cap"), the Purchase Price shall be reduced in accordance with Section 2.5 on a dollar-for-dollar basis to the extent that the Cure Amounts paid by Buyer exceed the Cure Amount Cap (such excess amounts, "Excess Cure Amounts").  For the avoidance of doubt, Cure Amounts shall not include

-25-

any cure amounts described in first sentence of this Section 2.7(e) to the extent that such amounts are included in the calculation of Closing Working Capital.

(f)        Sellers shall use their respective reasonable best efforts to obtain one or more orders of the Bankruptcy Court, which order(s) shall be in form and substance reasonably acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Designated Contracts to Buyer on the terms set forth in this Section 2.7. In the event Sellers are unable to obtain such an order for assumption and assignment of any such Designated Contract to Buyer, then the Parties shall use commercially reasonable efforts until the Designation Deadline to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Designated Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts.

(g)        To the extent that any Consent that is required to assume and assign to Buyer any Designated Contract is not obtained by the Designation Deadline, each Seller shall, with respect to each such Designated Contract, from and after the Closing and until the earliest to occur of (x) the date on which such applicable Consent is obtained (which Consents the Parties shall use their reasonable best efforts, and cooperate with each other, to obtain promptly; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer), and (y) the date on which Buyer delivers a written notice of exclusion of such Designated Contract pursuant to this Section 2.7 or the Designated Contract is deemed rejected under Section 365 of the Bankruptcy Code, use reasonable best efforts during the term of such Assumed Contract to (i) provide to Buyer the benefits under such Designated Contract, (ii) cooperate in any reasonable and lawful arrangement, including holding such Contract in trust for Buyer pending receipt of the required Consent, designed to provide such benefits to Buyer and (iii) use its reasonable best efforts to enforce for the account of Buyer any rights of such Seller under such Designated Contract, including the right to elect to terminate such Designated Contract in accordance with the terms thereof upon the written direction of Buyer. Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.7(g).

(h)        Notwithstanding the foregoing, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is designated for exclusion by a Seller in accordance with the terms hereof, deemed rejected under Section 365 of the Bankruptcy Code, or terminated by the other party thereto or terminates or expires in accordance with its terms on or prior to the Designation Deadline and is not continued or otherwise extended prior to or upon assumption and assignment, or (ii) requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Buyer of such Contract pursuant to Section 365 of the Bankruptcy Code, and no such Consent has been obtained prior to the Designation Deadline. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or

-26-

other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.8    Closing**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing at 11:00 a.m. local time on the date (the "Closing Date") that is the third (3rd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. The Closing shall be deemed to have occurred at 12:01 a.m. (prevailing Eastern time) on the Business Day that is the Closing Date.

**Section 2.9    Deliveries at Closing**.

(a)    At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

(i)    one or more Bills of Sale substantially in the form of Exhibit B attached hereto ("Bill of Sale");

(ii)    one or more Assignment and Assumption Agreements substantially in the form of Exhibit C attached hereto (each, an "Assignment and Assumption Agreement");

(iii)    instruments of assignment substantially in the forms of Exhibit D, Exhibit E and Exhibit F attached hereto for each Registered patent, Registered trademark, Registered copyright and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "Intellectual Property Assignments");

(iv)    a copy of the Sale Order as entered by the Bankruptcy Court;

(v)    a certificate signed by an authorized officer of Holdco to the effect that each of the conditions specified in Sections 7.1(a), 7.1(b) and 7.1(g) is satisfied in accordance with the terms thereof;

(vi)    a customary payoff letter in form and substance reasonably satisfactory to Sellers evidencing that all of the outstanding First Lien Credit Agreement Obligations have been satisfied in full by Buyer and that all Liens thereunder against Sellers and the Excluded Assets have been fully discharged and released;

(vii)    a customary payoff letter in form and substance reasonably satisfactory to Sellers evidencing that all of the outstanding Second Lien

-27-

Financing Obligations have been satisfied in full by Buyer and that all Liens thereunder against Sellers and the Excluded Assets have been fully discharged and released;

(viii)    if Sellers have obtained the DIP Financing, a customary payoff letter in form and substance reasonably satisfactory to Sellers evidencing that all of the outstanding obligations under the DIP Financing Obligations have been satisfied in full by Buyer and that all Liens thereunder against Sellers and the Excluded Assets have been fully discharged and released;

(ix)    evidence from the electronic Collateral Registry (*Hitelbiztosítéki nyilvántartás*) of de-registration of the asset pledges relating to the First Lien Credit Agreement;

(x)    evidence from the electronic Collateral Registry (*Hitelbiztosítéki nyilvántartás*) of de-registration of the asset pledges relating to the Second Lien Credit Agreement; and

(xi)    if Sellers have obtained the DIP Financing, evidence from the electronic Collateral Registry (*Hitelbiztosítéki nyilvántartás*) of de-registration of the asset pledges relating to the DIP Financing, if applicable.

(b)    At the Closing, Buyer shall deliver to Sellers or the designated third party recipients pursuant to Section 2.5 the following documents, cash amounts and other items, duly executed by Buyer or one or more designees of Buyer, as applicable:

(i)    the Assignment and Assumption Agreement(s);

(ii)    a certificate to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) is satisfied in accordance with the terms thereof;

(iii)    the Cash Payment by wire transfer of immediately available funds to one or more bank accounts designated by Sellers or the designated third party recipients thereof in writing to Buyer; and

(iv)    the payment in full of all of (i) the outstanding First Lien Financing Obligations in accordance with the First Lien Financing, (ii) the outstanding Second Lien Financing Obligations in accordance with the Second Lien Financing and (iii) in the event that DIP Financing is obtained, the outstanding DIP Financing Obligations in accordance with the DIP Financing.

**Section 2.10    Allocation; Withholding**.

(a)    As promptly as reasonably practicable after the Closing Date, and in any event within thirty (30) days thereafter, Buyer and Sellers shall in good faith agree upon an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury

-28-

Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate), which allocation shall be binding upon Sellers and Buyer (the "Allocation"). Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with the Allocation unless required to do so by applicable Law.

(b)     Buyer shall be entitled to deduct and withhold from any payment to the Sellers or any other Person under this Agreement such amounts as Buyer is required by Law to deduct and withhold with respect to the transactions contemplated by this Agreement. To the extent that amounts are so withheld or deducted and timely paid to the appropriate Tax authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Seller or such other Person in respect of which such deduction and withholding was made.

**Section 2.11    Deposit**. The parties have selected Citibank, N.A. to serve as escrow agent (the "Escrow Agent"), to hold the Deposit in escrow (the "Escrow Account"). Within one (1) Business Day following entry of the Bidding Procedures and APA Assumption Order, Buyer shall make a cash deposit in an amount equal to $9,000,000 (the "Deposit") by wire transfer of immediately available funds in accordance with such wire transfer instructions as are provided by the Escrow Agent. In the event that the Closing occurs, Buyer shall direct the Escrow Agent to release the Deposit to Sellers at the Closing. In any other event, the Deposit shall be released by the Escrow Agent to the Party entitled thereto in accordance with Section 8.3, and the Parties shall promptly direct the Escrow Agent to release the Deposit accordingly. The Deposit shall only constitute property of the Sellers' bankruptcy estates in the event that the Deposit is required to be released to Sellers by the Escrow Agent in accordance with the terms of this Agreement.

**Section 2.12    Escrow Amount**. On the Closing Date, Sellers, Buyer and the Escrow Agent shall execute the Closing Escrow Agreement and Buyer shall deposit, or cause one or more of Buyer's designees to deposit, the Escrow Amount with the Escrow Agent.

### ARTICLE III
### SELLERS' REPRESENTATIONS AND WARRANTIES

Each of the Sellers jointly and severally represents and warrants to Buyer that, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

**Section 3.1    Organization of Sellers; Good Standing**.

(a)     Holdco is a Cayman Island exempted company duly organized, validly existing and in good standing under the Laws of the Cayman Island.  GM LLC is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Kinja is a corporation duly organized, validly existing and in good standing under the Laws of Hungary.

-29-

(b)     Sellers have all requisite corporate or similar power and authority to own, lease and operate the Acquired Assets and to carry on the Business as currently conducted.

(c)     Each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(d)     No Seller has any Subsidiaries or owns any equity interest in any other Person (other than other Sellers, if applicable).

**Section 3.2     Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)     each Seller has all requisite corporate or similar power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other corporate or similar action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the transactions contemplated hereby or thereby; and

(b)     this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3     Noncontravention; Consents and Approvals**.

(a)     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, including the assignments and assumptions of Contracts pursuant to <u>Sections 2.7</u>, will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation,

-30-

by-laws or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under any Contract to which any Seller is a party or by which it is bound or to which any of the Acquired Assets is subject, after giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any such Contract that is a Designated Contract hereunder, and, in the case of clauses (ii) and (iii), for such violations, conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, be material to the Business or the Acquired Assets, in each case, taken as a whole or prevent, materially delay or materially impair the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

(b)     Subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except for (i) compliance with the applicable requirements of the HSR Act or other competition Laws and (ii) other immaterial Consents, notices or filings.

**Section 3.4     Financial Statements; No Undisclosed Liabilities.**

(a)     Sellers have provided Buyer with true, correct and complete copies of the consolidated, audited financial statements of Sellers for the fiscal year ended December 31, 2014 and the consolidated, unaudited financial statements of Sellers for the fiscal year ended December 31, 2015 (collectively, the "Annual Financial Statements"), as well as the unaudited, consolidated balance sheet as of, and the statements of income, changes in stockholders' equity and cash flows of Sellers for the four-month period ended, April 30, 2016 (such statements, the "Interim Financial Statements" and, collectively, with the Annual Financial Statements, the "Historical Financial Statements"). The Historical Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved, and fairly present, in all material respects, the financial condition and results of operations and cash flows of the Business as of the dates thereof or the periods then ended, except, in each case, as expressly indicated in such Historical Financial Statements, and subject, in the case of the Interim Financial Statements, to normal year-end adjustments that will not be material in amount or effect and the absence of footnotes.

(b)     Sellers do not have any Liabilities of any nature (whether accrued, absolute, contingent or otherwise), except for Liabilities that (i) were incurred on or after April 30, 2016 in the Ordinary Course of Business and that would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole, (ii) arise under this Agreement or the Related Agreements, (iii) will be or are Liabilities of Sellers as debtors in the Chapter 11 Cases and that will not result in any Adverse Interests on the Acquired Assets following the entry of the Sale Order, (iv) are

-31-

reflected in or reserved against in the consolidated, unaudited balance sheet of Sellers referred to in the Interim Financial Statements or (v) set forth on <u>Section 3.4</u> of the Disclosure Schedule.

**Section 3.5**      <u>**Compliance with Laws**</u>.

(a)      Each Seller is, and since January 1, 2014, has been in compliance with all Laws applicable to the Business or the Acquired Assets (including all applicable Laws related to rights to privacy and rights to publicity), except in any such case where the failure to be in compliance would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole, and no Seller has received any notice within the past twelve months relating to violations or alleged violations or material defaults under any Decree or any Permit, in each case, with respect to the Business, except in respect of violations, alleged violations or material defaults that would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole.

(b)      <u>Section 3.5(b)</u> of the Disclosure Schedule contains a complete and accurate list of each material Permit that is held by a Seller. Such Permits collectively constitute all of the Permits necessary to permit each Seller to lawfully conduct and operate the Business in the manner it currently is conducted and operated and to permit each Seller to own and use its assets in the manner in which it currently owns and uses the Acquired Assets. (i) Each such Permit is valid and in full force and effect; (ii) each Seller is in compliance in all material respects with all of the terms and requirements of each such Permit; (iii) no Seller has received any written notice from any Governmental Entity or any other relevant authority regarding any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination, violation or failure to comply with any term or requirement of, or modification to any such Permit; and (iv) all applications required to have been filed for the renewal of such Permits have been duly filed on a timely basis with the appropriate Governmental Entity, and all other filings required to have been made with respect to such Permits have been duly made on a timely basis with the appropriate Governmental Entities, in each case, except as would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole.

**Section 3.6**      <u>**Title to Acquired Assets**</u>. Sellers have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, free and clear of all Liens (except for Permitted Liens and Liens arising under the First Lien Credit Agreement and Second Lien Credit Agreement). At the Closing, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

LA_LAN01:295956.5
57029633_10

**Section 3.7** **Contracts**.

(a)    Section 3.7 of the Disclosure Schedule includes a true and complete list of the following Contracts (including any amendment, supplement, or modification thereof) to which a Seller is a party with respect to the Business, the Acquired Assets or the Assumed Liabilities as of the date hereof:

(i)    each Contract that involves performance of services or delivery of goods or materials by a Seller of an amount or value in excess of $1,000,000;

(ii)    each Contract that involves performance of services or delivery of goods or materials to a Seller of an amount or value in excess of $500,000 (other than an Employee Benefit Plan);

(iii)    each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real property or material personal property;

(iv)    any Contract that is a collective bargaining agreement with a labor union;

(v)    any licenses of material Intellectual Property to or from any Person (other than licenses for Off-the-Shelf Software);

(vi)    any employment Contracts (other than offer letters) as to which an employee is entitled to receive an annual salary in excess of $300,000, and all Contracts as to which an employee is entitled to severance in excess of any severance required by applicable Law;

(vii)    any Contract (A) containing covenants that restrict the business activity of a Seller (other than non-disclosure agreements entered into in the Ordinary Course of Business) or (B) limiting the freedom of a Seller to engage in any line of business or to compete with any Person, in each case, in any material respect;

(viii)    any Contracts relating to any (A) Indebtedness for money borrowed and (B) any other material Indebtedness;

(ix)    any Contracts that create or govern a partnership, joint venture, strategic alliance or similar arrangement;

(x)    any Contracts (other than purchase orders accepted or confirmed in the Ordinary Course of Business) with the ten (10) largest Material Revenue Generators, based on the amount of consideration paid to Sellers during the twelve (12) month period ended December 31, 2015 and the four (4) month period ended April 30, 2016;

-33-

(xi)    any Contracts with any Related Party, other than Contracts relating to employment; and

(xii)    each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by a Seller other than in the Ordinary Course of Business.

(b)    Sellers have made available, prior to the date hereof, true and complete copies of all Contracts required to be set forth on Section 3.7 of the Disclosure Schedule. With respect to each such Contract: (i) to Sellers' Knowledge, such Contract is in full force and effect and constitutes the valid and legally binding obligation of a Seller and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity; and (ii) except for breaches or defaults caused by or resulting from the Bankruptcy Events, neither the Seller party thereto nor, to Sellers' Knowledge, the counterparty thereto is in breach or default thereof that presently would permit or give rise to a right of termination, modification or acceleration thereunder, except, in the case of either clause (i) or (ii), for such failure to be in full force and effect, breaches or defaults which would not, individually or in the aggregate, be material to the Business or the Acquired Assets, in each case, taken as a whole.

**Section 3.8    Intellectual Property**.

(a)    Section 3.8(a) of the Disclosure Schedule sets forth a true and complete list of all Registered Intellectual Property that is owned by any Seller which is currently used in the Business ("Company Registered Intellectual Property"), indicating for each Registered item the registration or application number, registration or application date and the applicable filing jurisdiction (or in the case of an Internet domain name, the applicable domain name registrar).  All Company Registered Intellectual Property is subsisting, and to Sellers' Knowledge, valid and enforceable. All registration, maintenance and renewal fees currently due in connection with the Company Registered Intellectual Property have been paid and all documents, recordations and certificates in connection with the Company Registered Intellectual Property currently required to be filed have been filed with the relevant Governmental Entity.

(b)    Sellers own, free and clear of any Liens (except Permitted Liens),or have the right to use, pursuant to an enforceable license, all Intellectual Property used in or necessary for the Business as currently conducted (collectively, the "Company Intellectual Property").

(c)    Section 3.8(c) of the Disclosure Schedules sets forth a true and complete list of all domains that are Company Intellectual Property owned by any Seller (the "Seller Sites") and indicates which Seller Sites are actually operated by a Seller (the "Operated Seller Sites"), it being understood that Seller Sites "operated" by a Seller shall not include domains that are merely redirects to other Seller Sites or localized

-34-

international Seller Sites that are operated by third parties. Sellers have taken commercially reasonable steps to take advantage, if and when applicable, of the safe harbors provided by Section 512 of the Digital Millennium Copyright Act ("DMCA"), including: (i) since January 1, 2010, and (ii) between Sellers' acquisition of each Seller Site and January 1, 2010, to Sellers' Knowledge, by informing end users of the Seller Sites of its DMCA policy, designating an agent for notice of infringement claims, registering such agent with the U.S. Copyright Office, and taking appropriate action upon receiving notice of possible infringement in accordance with the "notice and take-down" procedures of the DMCA.

(d)     To Sellers' Knowledge, (i) the operation of the Business as currently conducted (including the content of the Seller Sites) does not infringe, constitute the misappropriation of or otherwise violate the Intellectual Property rights of any other Person, and (ii) no other Person is infringing, misappropriating, or otherwise violating Company Intellectual Property.

(e)     As of the date hereof, to the Sellers' Knowledge: no Litigation is currently pending or threatened against any Seller and no Seller has received any notice in the past thirty-six (36) months (including cease and desist letters and written invitations to take a license) that (i) challenges the validity, ownership, registerability, enforceability or use of any Company Intellectual Property or (ii) alleges that the operation of the Business infringes, constitutes the misappropriation of or otherwise violates the Intellectual Property rights of any other Person, and in each of (i) and (ii), to Sellers' Knowledge there is no reasonable basis for any such challenge or allegation. During the thirty-six (36) month period immediately preceding the date of this Agreement, to the Sellers' Knowledge, no Seller has asserted or threatened, any Litigation (including cease and desist letters and written invitations to take a license) against any other Person alleging infringement, misappropriation or violation of any Company Intellectual Property.

(f)     Sellers have taken commercially reasonable steps to effect, evidence, and protect Sellers' ownership of the Company Intellectual Property, including requiring that all parties (including current and former employees, officers, directors, and individual independent contractors) who have created or developed Company Intellectual Property execute written, valid, and enforceable assignments of any work, invention, improvement, or other rights therein to the Sellers.

(g)     Each Seller takes and has taken all commercially reasonable actions to protect and preserve the confidentiality of all Trade Secrets that are owned, used or held by Sellers. To the Seller's Knowledge, no Person has discovered or otherwise obtained access to any Trade Secret owned by any Seller, except pursuant to written, enforceable non-disclosure agreements.

(h)     No software owned by any Seller and included in the Company Intellectual Property ("Seller Owned Software") is subject to any obligation or condition under any license identified as an open source license by the Open Source Initiative (www.opensource.org/) (each, an "Open Source License") that conditions the: (i) the disclosure, licensing or distribution of any source code for any portion of any Seller

-35-

Owned Software, (ii) the granting to licensees of the right to make derivative works or other modifications to any Seller Owned Software, (iii) the licensing under terms that allow any Seller Owned Software or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than by operation of law), or (iv) distribution of any Seller Owned Software on the redistribution of any Seller Owned Software at no license fee.

(i)    The Technology (i) operates and performs as required by each of the Sellers in connection with the Business and to Sellers' Knowledge, in all material respects in accordance with their documentation and functional specifications , and (ii) to Sellers' Knowledge, is free from material bugs or other defects, and do not contain any computer virus, worm, time bomb, spyware, "Trojan Horse", logic bomb, "back door" access routine, or other such computer program. To Sellers' Knowledge, in the past thirty-six (36) months, no Person has gained unauthorized access to the Technology.

**Section 3.9    Litigation.** There is no Litigation pending or, to Sellers' Knowledge, threatened, before any Governmental Entity brought by or against any Seller that, if adversely determined, would be, individually or in the aggregate, material to the Business or the Acquired Assets, in each case, taken as a whole or would prevent, materially delay or materially impair Sellers' ability to consummate the transactions contemplated hereby or by the Related Agreements.

**Section 3.10    Environmental, Health and Safety Matters.**

(a)    Each Seller is, and since January 1, 2014, has been in compliance with all applicable Environmental, Health and Safety Requirements with respect to the Leased Real Property, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and there are no Liabilities under any Environmental, Health and Safety Requirements with respect to the Business which would reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole.

(b)    To Sellers' Knowledge, no Seller has received any notice or report regarding any violation of Environmental, Health and Safety Requirements or any Liabilities relating to the Business, any Leased Real Property arising under Environmental, Health and Safety Requirements which violation has not been appropriately addressed and/or cured in accordance with such Environmental, Health and Safety Requirements. There are no Decrees outstanding, or any Litigations pending or, to Sellers' Knowledge, threatened, relating to compliance with or Liability under any Environmental, Health and Safety Requirements affecting the Business, any Leased Real Property, except in any such case where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole.

**Section 3.11    Employees and Employment Matters.** No Seller is a party to or bound by any collective bargaining agreement with a labor union covering the Current Employees (as determined as of the date of this Agreement), nor is there any ongoing strike, walkout, work

-36-

stoppage, or other similar collective bargaining dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement). Within the ninety (90) day period ending on the date hereof, no Seller has implemented any plant closing or layoff of the Current Employees (as determined as of the date of this Agreement) in violation of the WARN Act. Each individual Person who has performed or rendered services since January 1, 2013 or is currently performing or rendering services to or for any Seller with respect to the Business has been, and/or is (as applicable), properly classified by Sellers as an employee or independent contractor for purposes of employment-related Laws, except in any such case where the failure to properly classify would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole. Each Seller has fully and accurately reported the compensation it has paid to individual Persons currently performing or rendering services to or for any Seller with respect to the Business who are classified as independent contractors on IRS Forms 1099 or similar forms when required to do so by applicable Law.  No Seller currently has, nor has previously had, any obligations to provide any health, welfare or retirement benefits with respect to any individual independent contractor currently performing or rendering services to or for any Seller with respect to the Business, in his or her capacity as such, under any Employee Benefit Plan subject to ERISA. No Seller employs, nor since January 1, 2013 has employed, any "leased employees" as defined in Section 414(n) of the IRC.

**Section 3.12    Employee Benefit Plans**.

(a)    Section 3.12 of the Disclosure Schedule lists each Employee Benefit Plan that Sellers maintain or to which Sellers contribute.

(b)    Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service or may rely on a favorable opinion letter issued by the United States Internal Revenue Service.  Each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws. As of the date hereof, there is no material pending or, to Sellers' Knowledge, threatened, Litigation relating to the Employee Benefit Plans.

**Section 3.13    Real Property**.

(a)    Sellers do not own any real property.

(b)    Section 3.13(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Non-Residential Leases for such Leased Real Property. Sellers have made available to Buyer prior to the date hereof true and complete copies of such Non-Residential Leases and all other material Contracts or instruments entered into or delivered in connection therewith, as amended through the date hereof.

**Section 3.14    Insurance**. Section 3.14(a) of the Disclosure Schedule contains a true and complete list, as of the date hereof, of all Insurance Policies. All of the Insurance Policies are in

-37-

full force and effect and no notice of cancellation or termination has been received by Sellers with respect to any of such Insurance Policies. All premiums due and payable by Sellers or their Affiliates under the Insurance Policies prior to the date hereof have been duly paid. There is no material claim pending under any of the material Insurance Policies, and no material claim thereunder made between January 1, 2014 and the date hereof has been denied.

**Section 3.15**    **Brokers' Fees**. Except for amounts due to Houlihan Lokey, Inc., no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.16**    **Anti-Spam and Privacy Laws; Personally Identifiable Information**.

(a)    Sellers have all complied, and currently comply with (i) the publicly posted privacy policy applicable to the Seller Sites ("Privacy Policies") and (ii) all Laws and contractual obligations relating to data privacy, data protection and data security ("Privacy Laws"), including Laws related to the collection, storage, transmission, transfer (including, without limitation, cross-border transfers), disclosure, destruction and use of Personally Identifiable Information, except in any such case where the failure to be in compliance would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole.  Sellers have taken commercially reasonable measures to protect Personally Identifiable Information in their possession against loss, damage, and unauthorized access or use. Since January 1, 2013, no Litigation has existed or, to Sellers' Knowledge, has been threatened regarding and, to Sellers' Knowledge there has not existed any, (x) violation of such Privacy Policies or any implementation of the Privacy Policies by a Seller, or (y) violation of any Privacy Laws by a Seller. To Sellers' Knowledge, no Seller has been served with an information or enforcement notice (including, without limitation, pursuant to section 40 of the Data Protection Act 1998) by any data protection regulatory authority.

(b)    Each Seller is, and since January 1, 2013 has been, in compliance with the CAN-SPAM Act of 2003 (15 U.S.C. 7701, et seq.) and Canada's Anti-Spam Legislation (CASL), the EU Directive on Privacy and Electronic Communications and any similar Laws in other countries (collectively, the "UCE Laws"), except in any such case where the failure to be in compliance would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole. No claims have been asserted against any Seller in writing alleging a violation of any of the UCE Laws and, to Sellers' Knowledge, no such claims are threatened against any Seller.

(c)    No Seller engages in, or since January 1, 2014, has engaged in, any marketing practices prohibited under any applicable Law, except in any such case where the failure to be in compliance would not reasonably be expected to be material to the Business or the Acquired Assets, in each case, taken as a whole.

(d)    Each Seller has taken commercially reasonable steps and implemented commercially reasonable security measures to protect Technology used in the operation

-38-

of the Business from unauthorized access or use. Sellers have implemented commercially reasonable backup and disaster recovery technology.

(e)      Sellers' policies in effect as of the Petition Date regarding Personally Identifiable Information permit the sharing of certain Personally Identifiable Information with Buyer as reasonably deemed necessary by Sellers, in connection with a sale of the assets of Sellers.

**Section 3.17    Material Revenue Generators**.  Section 3.17 of the Disclosure Schedules sets forth (a) the top 20 advertisers, retailers, manufacturers or representatives that have paid consideration to Sellers for the period beginning January 1, 2016 and ending April 30, 2016 and for calendar year 2015 (each a "Material Revenue Generator," and, collectively, the "Material Revenue Generators"); and (b) the amount of consideration each Material Revenue Generator has paid to Sellers for each such period. No Seller has received any written notice that any of the Material Revenue Generators has or intends to terminate or materially reduce its relationship with any Seller.

**Section 3.18    Sufficiency of Assets**. The Acquired Assets, together with any Other Executory Contract and Non-Residential Lease designated for exclusion by Buyer in accordance with Section 2.7(b) and the Excluded Assets, constitute all of the material rights, interests and tangible and intangible assets used to conduct the Business, as is currently being conducted and necessary to enable Buyer, immediately following the Closing, to conduct the Business in the Ordinary Course of Business, as it is currently being conducted.

**Section 3.19    Absence of Changes**. Except with respect to the Chapter 11 Cases, since December 31, 2015, the Business has been conducted in the Ordinary Course of Business, and there is no state of facts, change, event, effect, development, condition, circumstance of occurrence that has occurred to, the Sellers' Knowledge, been threatened that, individually or in the aggregate, has had or is reasonably expected to have a Material Adverse Effect.

**Section 3.20    Certain Payments**. Since January 1, 2014, no director or officer or, to the Sellers' Knowledge, any agent or employee of any Seller or any other Person acting for or on behalf of any Seller, has directly or indirectly, unlawfully (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of any Seller, or (iv) in violation of any Law, or (b) established or maintained any fund or asset that has not been recorded in the books and records of any Seller.

**Section 3.21    Related Party Transaction**. Except for employment related agreements entered into in the Ordinary Course of Business and made available to Buyer prior to the date hereof, no Seller or any Related Person of any Seller is a party to any Contract with, has any claim or right against, or is a creditor of, any Seller.  For purposes of this Agreement, the term "Related Person" means (a) with respect to a particular individual: (i) each other member of such individual's Family; (ii) any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family; (iii) any Person in which such individual or

-39-

members of such individual's Family hold (individually or in the aggregate) a Material Interest; and (iv) any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity); and (b) with respect to a specified Person other than an individual: (i) any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person; (ii) any Person that holds a Material Interest in such specified Person; (iii) each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity); (iv) any Person in which such specified Person holds a Material Interest; (v) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and (vi) any Related Person of any individual described in clause (ii) or (iii). For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least 5% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 5% of the outstanding equity securities or equity interests in a Person.

    Section 3.22    **OFAC**. Since January 1, 2014, to the Sellers' Knowledge, no Seller has been a party to any contract with, and has not conducted business or participated in any transaction involving, (i) any Person identified on OFAC's list of Specially Designated Nationals and Blocked Persons or targeted by an OFAC Sanctions Program; (ii) the government, including any political subdivision, agency, instrumentality, or national thereof, of any country with respect to which the United States or any jurisdiction in which any Seller is operating or located administers or imposes economic or trade sanctions or embargoes; (iii) any Person acting, directly or indirectly, on behalf of, or an entity that is owned or controlled by, a Specially Designated National and Blocked Person or by a government or Person identified in clause (ii) above, or (iv) a Person on any other similar export control, terrorism, money laundering or drug trafficking related list administered by any Governmental Entity either within or outside the United States with whom it is illegal to conduct business pursuant to applicable Law in each case, in violation of any applicable Law.

    Section 3.23    **Holding Company**. Holdco does not own any Acquired Assets other than through its ownership of the equity interests of the other Sellers.

    Section 3.24    **No Other Representations or Warranties**. Except for the representations and warranties contained in this Article III (as qualified, amended, supplemented and modified by the Disclosure Schedule), neither a Seller nor any other Person makes (and Buyer is not relying upon) any other express or implied representation or warranty with respect to Sellers, the Business, the Acquired Assets, including the value, condition or use of any Acquired Asset, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective officers, directors, employees, agents or Representatives.

LA_LAN01:295956.5
57029633_10

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1    Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the transactions contemplated hereby or thereby.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally binding obligation of Sellers, this Agreement constitutes a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, including the assignments and assumptions referred to in Article II will (i) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults,

-41-

accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

Section 4.4    **Financial Capacity**.  As of the date of this Agreement and as of the Closing, Buyer has (and will have on the Closing Date) available to it the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the transactions contemplated by this Agreement) and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**. Buyer as of the date of this Agreement and as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Designated Contracts.

Section 4.6    **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.7    **Condition of Business**. Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement (as modified by the Disclosure Schedules), Sellers, including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives, make no express or implied representations or warranties whatsoever, including any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Business.  Buyer acknowledges and agrees that it has conducted its own independent review and analysis of the Business and the Acquired Assets and that Buyer will acquire the Acquired Assets (x) without any representation or warranty, express or implied, as to the quality, merchantability, fitness for any particular purpose, conformity to samples, or condition of the Acquired Assets or any part thereof and (y) in an "as is" condition and on a "where is" and "with all faults" basis, except, in each case, for the representations and warranties expressly set forth in Article III of this Agreement (as modified by the Disclosure Schedules).

-42-

**ARTICLE V**
**PRE-CLOSING COVENANTS**

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.

(a)    Subject to Sellers' right to solicit and consummate a Competing Transaction in accordance with Section 5.9, each of the Parties shall use its reasonable best efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement on or prior to the End Date, including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby set forth in Article VII, except as otherwise provided in Section 5.2. Without limiting the generality of the foregoing, each of the Parties shall use its reasonable best efforts not to take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any other Party to consummate, or materially delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

(b)    Sellers shall remain in material compliance with all Privacy Policies that are in place as of the date of this Agreement and shall cooperate with Buyer to ensure that the transfer of all Personally Identifiable Information to Buyer in connection with the transactions contemplated by this Agreement will be consistent with such Privacy Policies.

(c)    Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken by themselves or any of their respective Affiliates, all appropriate action, to do or cause to be done by Sellers and Buyer or any of their respective Affiliates all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Acquired Assets, free and clear of all Adverse Interests.

**Section 5.2    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use commercially reasonable efforts to obtain any third party consents or sublicenses; provided, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer.

-43-

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the transactions contemplated hereby and (ii) in promptly (but in any event within ten (10) Business Days after Sellers' selection of Buyer as the Successful Bidder if this Agreement and the sale of the Acquired Assets to Buyer on the terms and conditions hereof are determined to be the Successful Bid in accordance with the Bidding Procedures) making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers. Each Party shall use its reasonable best efforts to resolve objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement.

(c)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated by this Agreement, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

-44-

(d)      Nothing contained in this Section 5.2 or in any other provision of this Agreement shall be construed as requiring Buyer or any of its respective Affiliates to, as a condition to, or in connection with, obtaining any necessary approvals or consents under the HSR Act or any other required governmental or regulatory consents, approvals, waivers and authorizations, and none of Sellers or their respective Affiliates may, without the prior written consent of Buyer, become subject to, consent to, or offer or agree to, or otherwise take any action with respect to, any requirement, condition, limitation, understanding, agreement or order to (i) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any Acquired Assets or any assets, business or portion of business of Buyer or any of its Affiliates in any manner, (ii) conduct, restrict, operate, invest or otherwise change the Acquired Assets or any assets, business or portion of business of Buyer or any of its Affiliates in any manner or (iii) impose any restriction, requirement or limitation on the operation of the Acquired Assets or any business or portion of the business of Buyer or any of its Affiliates in any manner, in each case, as a condition to, or in connection with, obtaining any necessary approvals or consents under the HSR Act or any other required governmental or regulatory consents, approvals, waivers and authorizations.

**Section 5.3     Bankruptcy Actions**.

(a)      Within one (1) Business Day of the date hereof, each Seller shall file or cause to be filed a petition for relief under Chapter 11 of the Bankruptcy Code on behalf of such Seller with the Bankruptcy Court.  The jointly administered bankruptcy cases initiated by Sellers pursuant to this Section 5.3 shall be referred to as the "Chapter 11 Cases."  On the Petition Date, Sellers shall serve and file a motion or motions (the "Sale Motion") in the Chapter 11 Cases requesting that the Bankruptcy Court (i) enter the Bidding Procedures and APA Assumption Order and (ii) schedule a hearing on the Sale Motion for entry of the Sale Order. Thereafter, (i) Buyer and Sellers shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order and (ii) Sellers shall use reasonable best efforts to obtain the issuance and entry of the Bidding Procedures and APA Assumption Order and the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.   Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

(b)      Sellers shall provide appropriate notice of the hearings on the Sale Motion, as is required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, to all Persons entitled to notice, including all Persons that have expressed interest in buying the Acquired Assets, all Persons that have asserted Liens, claims or other interests in the Acquired Assets, all parties to the Designated Contracts, all applicable state and local taxing authorities, including the Internal Revenue Service, each Governmental Entity that is an interested party with respect to the Acquired Assets and the Bidding Procedures and APA Assumption Order and all Taxing and environmental authorities in jurisdictions

-45-

applicable to Sellers. Sellers shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to Buyer prior to their filing with the Bankruptcy Court for Buyer's prior review.

(c)     On or before the date that is ten (10) days prior to the deadline to file an objection to the Sale Motion, Sellers shall file with the Bankruptcy Court and serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Other Executory Contracts and Non-Residential Leases and provide a copy of the same to Buyer. The Cure Notice shall inform each recipient that its respective Non-Residential Lease or Other Executory Contract may be designated by Buyer as either assumed or excluded, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the Non-Residential Lease or Other Executory Contract, (ii) the name of the counterparty to the Non-Residential Lease or Other Executory Contract, (iii) Sellers' good faith estimates of the Cure Amounts required in connection with such Non-Residential Lease or Other Executory Contract, (iv) the identity of Buyer and (v) the deadline by which any such Non-Residential Lease or Other Executory Contract counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(d)     Within fifty (50) days following the Petition Date, Sellers shall hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures.

(e)     The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Bidding Procedures and APA Assumption Order and the Sale Order. Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Sale Motion, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel. No Seller shall seek any modification to the Bidding Procedures and APA Assumption Order and the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Chapter 11 Cases has been appealed, in each case, without the prior written consent of Buyer (not to be unreasonably withheld).

(f)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures and APA Assumption Order and the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use reasonable best efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

-46-

(g)      Notwithstanding anything expressed or implied herein to the contrary, other than in the Ordinary Course of Business, Sellers shall not consent or agree to the allowance of any Claim to the extent it would constitute an Assumed Liability without the prior written consent of Buyer.  Each Seller shall use reasonable best efforts to cause the Sale Order to provide that Buyer will have standing in the Chapter 11 Cases to object to the amount of any Claim to the extent it would constitute an Assumed Liability and that the Bankruptcy Court will retain the right to hear and determine such objections.

**Section 5.4      Conduct of Business**. Except (1) as may be required by the terms of this Agreement, (2) as may be required, authorized or restricted pursuant to the Bankruptcy Code or pursuant to an order of the Bankruptcy Court upon motion by Sellers, (3) as otherwise agreed to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof until the Closing or (4) as set forth on Section 5.4 of the Disclosure Schedule (collectively, the "Permitted Exceptions"), Sellers shall use commercially reasonable efforts to operate the Business in the Ordinary Course of Business.  Notwithstanding the generality of the foregoing, Sellers shall, except as permitted by the Permitted Exceptions, between the date of this Agreement and the Closing, use commercially reasonable efforts to:  (i) conduct the Business in compliance with all applicable Laws, (ii) preserve their current relationships with any Persons having business dealings with the Business, (iii) maintain their assets, properties and facilities relating to the Acquired Assets in their current working order, (iv) from and after such time as they are identified, perform all material obligations under the Assumed Contracts and (v) maintain all Insurance Policies relating to the Acquired Assets required, or suitable replacements therefor, in full force and effect through the close of business on the Closing Date.  Without limiting the generality of the foregoing, except as permitted by the Permitted Exceptions, Sellers shall not:

(a)      sell, lease (as lessor), transfer or otherwise dispose of (or permit to become subject to any additional Lien, other than Liens expressly contemplated by the Sale Order, Liens arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), Liens arising in connection with the DIP Financing and Liens that will not be enforceable against any Acquired Asset following the Closing in accordance with the Sale Order) any material Acquired Assets;

(b)      make any loans, advances, guarantees or capital contributions to or investments in any Person (other than any other Seller);

(c)      declare, set aside, make or pay any dividend or other distribution (excluding any payments made pursuant to any existing Contracts between GM LLC and Kinja) of any assets, including Cash, to any Affiliate or other Person holding direct or indirect equity interests in any Seller;

(d)      except as required pursuant to the terms of any Employee Benefit Plan or Contract in effect as of the date hereof or pursuant to applicable Law, (i) grant or provide any severance or termination payments or benefits to any Current Employee, (ii) increase the compensation, bonus (or bonus opportunity) or pension, retirement, welfare, severance, termination or other benefits of, pay any bonus to, or make any new equity awards to any Current Employee, except for increases in base salary in the Ordinary

-47-

Course of Business for employees who are not officers, (iii) establish, adopt, amend or terminate any Employee Benefit Plan or amend the terms of any outstanding equity-based awards, (iv) take any action intended to accelerate the vesting or payment, or fund or in any other way secure the payment, of compensation or benefits under any Employee Benefit Plan, to the extent not already required by any such Employee Benefit Plan, (v) enter into any employment, severance, change in control, termination, deferred compensation or other similar agreement with any Current Employee, other than, in the Ordinary Course of Business, offer letters or employment agreements for employees who are not officers that provide for at-will employment with no severance obligation, (vi) change any actuarial or other assumptions used to calculate funding obligations with respect to any Employee Benefit Plan or to change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, (vii) forgive any loans to Current Employees, or (viii) extend an offer of employment to any natural Person who, if so employed as of the date hereof, would be a Current Employee, other than in the Ordinary Course of Business for employees who are not officers;

(e)     acquire, dispose of, abandon or allow to lapse any material assets or properties (other than Excluded Assets);

(f)     outside of the Ordinary Course of Business, grant, assign, license, let lapse, abandon, cancel, or otherwise dispose of any Company Intellectual Property, other than Excluded Assets or pursuant to non-exclusive licenses of such Intellectual Property granted in the Ordinary Course of Business;

(g)     enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(h)     cancel or compromise any material Indebtedness or claim or waive or release any material right, in each case, that is Indebtedness or a claim or right that is an Acquired Asset or Assumed Liability;

(i)     introduce any material change with respect to the operation of the Business, including any material  change in the types, nature, composition or quality of products or services sold in the Business;

(j)     enter into or renew any material Contract (other than a Contract that will be an Excluded Asset) or modify, terminate, amend, restate or supplement in any material respect or waive any material rights under or with respect to any existing material Contract (other than a Contract that is an Excluded Asset), in each case other than in the Ordinary Course of Business or with respect to the DIP Financing; provided that Sellers shall provide drafts of any proposed DIP Financing to Buyer reasonably in advance of entering into any Contracts with respect thereto, consult with Buyer in connection with such proposed DIP Financing and consider in good faith any comments of Buyer in connection thereto;

-48-

(k)     other than in the Ordinary Course of Business, terminate, amend, restate, supplement, renew or waive any rights under or with respect to, any Non-Residential Lease or any material Contract or Permit, or increase any payments required to be paid thereunder (whether or not in connection with obtaining any Consents) by Buyer after the Closing;

(l)     change in any material respect the cash management practices, policies or procedures of Sellers with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts receivable, accrual of accounts receivable, payment of accounts payable, purchases, prepayment of expenses or deferral of revenue, from Sellers' practices, policies and procedures with respect thereto in the Ordinary Course of Business, including (i) taking (or omitting to take) any action that would have the effect of accelerating revenues, accelerating cash receipts or accelerating the collection of accounts receivable to pre-Closing periods that would otherwise be expected to take place or be incurred in post-Closing periods, or (ii) taking (or omitting to take) any action that would have the effect of delaying or postponing the payment of any accounts payable to post-Closing periods that would otherwise be expected to be paid in pre-Closing periods; or

(m)     enter into any agreement with any labor union or labor organization, including but not limited to any collective bargaining agreement.

**Section 5.5     Notice of Developments**. From the date hereof until the Closing Date or termination of this Agreement in accordance with Article VIII, Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

**Section 5.6     Access**. Upon reasonable request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, management personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

**Section 5.7     Press Releases and Public Announcements**. Prior to the Closing and for a period of ninety (90) days following the Closing Date, no Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of each of Buyer and Holdco; provided, however, that (a) any Party may disclose that this Agreement exists (but not the terms hereof), (b) any Party may make (and

-49-

permit the making of) any public disclosure that it believes in good faith is necessary or required by applicable Law, the rules of any applicable stock exchange or court process, including the Chapter 11 Cases (in which case the disclosing Party, as applicable, shall use its reasonable best efforts to advise the other Parties, as applicable, prior to making the disclosure), and (c) any Party may make public disclosures that are consistent with any prior public disclosure made in accordance with this Section 5.7.  Notwithstanding the foregoing, this Section 5.7 shall not prohibit or restrict a Party from responding to questions relating to the subject matter of this Agreement in a public forum.

Section 5.8   **Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall use reasonable best efforts to so provide in the Sale Order.

Section 5.9   **Competing Transactions**.

(a)   Sellers agree that (i) between the date of this Agreement and the date the Bidding Procedures and APA Assumption Order is entered by the Bankruptcy Court and (ii) from and after the date that the Auction is declared closed by Sellers, Sellers will not, and will not permit their Affiliates or their respective Representatives to, directly or indirectly, (A) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction or otherwise facilitate any effort or attempt to make a proposal or offer with respect to a Competing Transaction or (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data to any Person relating to, any Competing Transaction.  Until the entry of the Bidding Procedures and APA Assumption Order, Sellers shall promptly (and, in any event, within forty-eight (48) hours) notify Buyer if any written proposals or offers with respect to a Competing Transaction, are received by it or any of their Affiliates or their respective officers, directors, agents or representatives indicating, in connection with such notice, the material terms and conditions of any such proposals or offers but not the name of the offeror (including, if applicable, copies of any written requests, proposals or offers, including proposed agreements, in each case with the name of such offeror and other identifying details redacted) and thereafter shall keep Buyer informed, on a current basis, of the status and terms of any such proposals or offers (including any material amendments thereto).

(b)   Other than to the extent expressly permitted by and in accordance with the Bidding Procedures, from and after the date the Bidding Procedures and APA Assumption Order is entered by the Bankruptcy Court until the date that the Auction is declared closed by Sellers, Sellers will not, and will not permit their Affiliates or their respective Representatives to, directly or indirectly, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction or (ii) engage in, continue or otherwise participate in any

-50-

discussions or negotiations regarding, or provide any non-public information or data to any Person relating to, any Competing Transaction. For the avoidance of doubt, Sellers will not pursue or agree to any Competing Transaction other than as expressly permitted by and in accordance with the Bidding Procedures.

**Section 5.10**    **Compliance With DIP Financing**. From the date Sellers obtain DIP Financing until the earlier to occur of (x) the Closing and (y) the termination of this Agreement, Sellers shall use their reasonable best efforts not to violate the terms and conditions of the DIP Financing in a manner that would reasonably be expected to prevent, materially delay or materially impair the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

**Section 5.11**    **DIP Financing**. In the event that Sellers intend to obtain DIP Financing, Sellers shall give notice to Buyer of such intention and the estimated amount of such financing, and Buyer will have the right to make an offer to Sellers to provide the DIP Financing, which Sellers may accept or decline in their sole discretion.

**Section 5.12**    **Winding-Up Services**. On or prior to the Closing, the Parties shall negotiate in good faith a services agreement, to be effective as of the Closing, providing for the provision by Buyer of such support services to Sellers as is reasonably needed by Sellers in connection with the winding up of the bankruptcy estate of Sellers (the "<u>Winding-Up Services Agreement</u>"). The Winding-Up Services Agreement shall provide for payment by Sellers of an amount equal to Buyer's costs, without mark-up, incurred by Buyer in providing such services.

**Section 5.13**    **List Records**. Within thirty (30) days of the date hereof, Sellers shall deliver to Buyer a record containing the number of email addresses owned or controlled by each Seller segmented into (i) email addresses acquired from third parties, (ii) email addresses of Persons who subscribed directly from a website owned or operated by a Seller, and (iii) email addresses acquired by other lawful means by a Seller (collectively, the "<u>List Records</u>."). If it is discovered that any item in the List Records cannot be used by Buyer after Closing for email marketing without restriction, subject to applicable Law, Seller shall take all reasonable actions necessary to correct the List Records, including promptly removing any Person's information from the List Records as applicable.

# ARTICLE VI
# OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1**    **Cooperation**. Each of the Parties shall cooperate with each other, and shall use their reasonable best efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the transactions contemplated hereby.

**Section 6.2**    **Further Assurances**.

-51-

(a)     In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action, including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information, as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities.

(b)     If any Seller or any of their respective Subsidiaries following the Closing shall have in its possession any Acquired Asset, such party shall promptly deliver or cause to be delivered such Acquired Asset or right to Buyer.  If Buyer or any of its Subsidiaries following the Closing shall have in its possession any Excluded Assets, Buyer shall or shall cause its applicable Subsidiary to deliver such Excluded Asset to Sellers.

(c)     If any Seller, Buyer or any of their respective Subsidiaries, from time to time, identifies any Assumed Liability that was not transferred to Buyer, or any Excluded Liability that was transferred to Buyer, Sellers and Buyer shall use their reasonable best efforts to transfer those Liabilities to the correct party as promptly as reasonably practicable after Closing.

**Section 6.3    Availability of Business Records**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records relating to the Business and the Acquired Assets and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records for a period of six (6) years following the Closing Date. Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer shall use commercially reasonable efforts to comply with the preservation orders and legal holds listed on Section 6.3 of the Disclosure Schedule with respect to the Acquired Assets that are subject to such preservation orders and legal holds, and upon reasonable request by Sellers, Buyer shall permit Sellers and their Representatives to have reasonable access during normal business hours, in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to such Records solely in connection with applicable Litigation.

**Section 6.4    Employee Matters**.

(a)     Prior to the Closing, Buyer (through and in consultation with Representatives of Sellers) shall offer (or cause a designee of Buyer to offer) to employ, effective as of the Transfer Date (as defined below), substantially all of the Current Employees whose work is primarily associated with the Acquired Assets (the "Offerees") (which shall include, at a minimum, that certain number of Current Employees that will

-52-

avoid triggering obligations on the part of any Seller under the WARN Act). Employment of each such Offeree shall be contingent upon such Offeree remaining continuously employed by a Seller (without regard to any approved leave of absence) until immediately prior to the applicable Transfer Date.  Prior to the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees.  Each Offeree who accepts such offer prior to the Closing and who commences employment with Buyer as of the applicable Transfer Date shall be referred to herein as a "Transferred Employee." Except to the extent Buyer is restricted from doing so as a result of Sellers' failure to comply with Section 6.4 (which failure is not cured within ten (10) Business Days following Buyer's notice to Sellers of such failure), Buyer hereby agrees that the offer (each, a "Transfer Offer") to each Offeree shall include an annual compensation opportunity (other than with respect to equity and equity-linked compensation, but including with respect to Offerees that have elected to defer a portion of his or her annual salary for 2016 in exchange for equity compensation of the Sellers, an additional amount equal to such deferred salary, which shall be no greater than $106,000 in the aggregate for all such Offerees) and employee benefits that are substantially similar in the aggregate to the annual compensation opportunity (other than with respect to equity and equity-linked compensation) and employee benefits provided to such Offeree by Sellers as of the date of this Agreement.  Each Transferred Employee's employment with Buyer shall commence as of the Closing Date, except that, in the case of any Current Employee on temporary leave for purposes of military duty, maternity or paternity leave, leave under the Family Medical Leave Act of 1993, approved personal leave or short term-disability or medical leave, and subject to applicable Laws, such Current Employee's employment with Buyer shall commence (and such Current Employee shall become a Transferred Employee) upon such Current Employee's return from leave, provided such return occurs no later than six (6) months following the Closing Date; and provided, further, that no Seller will be liable for any claims by any such Current Employee against Buyer with respect to the expiration of such Transfer Offer, and Buyer will not be liable for any claims by any such Current Employee against any Seller with respect to the expiration of such Transfer Offer.  The date a Transferred Employee commences employment with Buyer is referred to herein as the "Transfer Date".

(b)    Each Current Employee of a Seller who does not become a Transferred Employee shall referred to herein as an "Excluded Employee."

(c)    Sellers shall bear responsibility for all Liabilities arising out of, relating to, or with respect to any compensation and employee benefits relating to the employment or termination of employment with the Sellers and their Affiliates of each of the Current Employees (including the Excluded Employees and the Transferred Employees) and Former Employees whenever arising, whether before, on or after the Closing Date, and shall pay such Liabilities in the Ordinary Course of Business.  For the avoidance of doubt, (i) Sellers shall bear responsibility for any severance liabilities for which any Excluded Employees and Transferred Employees become entitled in connection with the transactions contemplated under this Agreement, and (ii) Buyer shall bear responsibility for all Liabilities arising out of, relating to, or with respect to any compensation and

-53-

employee benefits relating to the employment or termination of employment with the Buyer of each of the Transferred Employees on or after the applicable Transfer Date.

(d)    Following the date of this Agreement,

(i)    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of management during normal business hours; provided, however, that such access shall not unduly interfere with the operation of the Business prior to the Closing;

(ii)    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives rights under Section 6.4(a) to make Transfer Offers to Current Employees, or (B) solicit or encourage any Current Employee who received a Transfer Offer pursuant to Section 6.4(a) not to accept, or to reject, any such offer of employment; and

(iii)    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of appropriate terms and conditions of employment for any Current Employee to be made a Transfer Offer pursuant to Section 6.4(a), including, a list of all Current Employees, and with respect to each Current Employee, (A) date of hire, (B) position, (C) annual base salary (or wages) (including any portion of his or her annual salary that the Current Employee may have elected with the Seller to defer in exchange for equity compensation of the Sellers), (D) 2016 annual incentive opportunity (and 2015 annual incentive paid), (E) the Seller for whom such Current Employee performs services, (F) the location where such Current Employee performs services for the applicable Seller, and (G) status as full-time or part-time.

(e)    Notwithstanding anything in this Agreement to the contrary,

(i)    Sellers shall be liable for, and shall process the payroll and pay, or cause to be paid, the base salary (or wages) and employee benefits that are due and payable (A) on, prior to and after the Closing Date with respect to all Current Employees who do not become Transferred Employees, and (B) on or prior to the time of transfer on the applicable Transfer Date with respect to all Transferred Employees;

(ii)    Buyer shall be liable for, and shall process the payroll and pay, or cause to be paid, base wages, base salary and benefits that accrue on or after the applicable Transfer Date with respect to all Transferred Employees.

(f)    The parties hereto agree to cooperate in good faith, including by sharing information about terminations of employment in a timely manner, to determine whether any notification may be required under the WARN Act as a result of the transactions

contemplated by this Agreement. Buyer shall be responsible for providing any notice required pursuant to the WARN Act with respect to any employment losses involving Transferred Employees that occur on or after the Closing Date and agrees to not, at any time after the Closing Date, take any action that would obligate any Seller to have provided notice to any Current Employees prior to or on the Closing Date under the WARN Act. Sellers shall be responsible for providing any notice (or pay in lieu of notice) required pursuant to the WARN Act with respect to any employment losses involving Current Employees who do not become Transferred Employees that occur after the date hereof and prior to, on or after the Closing Date (except to the extent that such notice is required as a result of Buyer's breach of its obligations under this Section 6.4).

(g)    Nothing contained herein shall be construed as requiring Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any Seller, or any of their respective Affiliates (including any of Sellers' Employee Benefit Plans), nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any third-party beneficiary rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.5    Recording of Intellectual Property Assignments**. All of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Entities as promptly as practicable following the Closing.

**Section 6.6    Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, then Buyer shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by Article II of this Agreement. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.7    Wage Reporting**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8    Insurance Policies**.

(a)    To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Acquired Assets or the Assumed Liabilities. In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall

-55-

reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Acquired Assets.

(b)    To the extent that any current or prior Insurance Policy of any Seller relates to the Acquired Assets or Assumed Liabilities and the Excluded Assets or the Excluded Liabilities, and such Insurance Policy is transferred to Buyer at the Closing, Buyer shall hold such Insurance Policy with respect to the Excluded Assets or Excluded Liabilities, as applicable, for the benefit of Sellers, shall reasonably cooperate with Sellers in pursuing any claims thereunder, and shall pay over to Sellers promptly any insurance proceeds paid or recovered thereunder with respect to the Excluded Assets or the Excluded Liabilities.

## Section 6.9    <u>Collection of Accounts Receivable</u>.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Seller's order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Acquired Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.10    <u>Name Changes</u>.** Neither Sellers nor any of their Affiliates shall use, license or permit any third party to use, or file any motion to change the caption of the Chapter 11 Cases to, any name, slogan, logo or trademark which is similar or confusingly or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Acquired Assets, and within thirty (30) days following the Closing Date, each Seller shall (a) change its corporate name to a name which (i) does not use any name, slogan, logo or trademark that is included in the Intellectual Property included in the Acquired Assets or

-56-

any other name that references or reflects any of the foregoing in any manner whatsoever or is similar or confusingly or deceptively similar thereto, (ii) is otherwise substantially dissimilar to its present name and (iii) is approved in writing by Buyer and (b) use its reasonable best efforts to change the caption of the Chapter 11 Cases to names that are not similar to any of the foregoing names.

Section 6.11    **Real Property Transition Services**. With regard to the lease agreement relating to the Leased Real Property located at 114 Fifth Avenue New York, NY 10011 (the "Fifth Ave Lease"), if not included in the Acquired Assets as of the Closing Date, Sellers and Buyer shall enter into a sub-lease agreement pursuant to which Buyer and its Affiliates shall be permitted to occupy and have access to such Leased Real Property (in the same manner as the Business occupied and had access to such property prior to Closing) until the date that is 120 days following the Petition Date or, upon Buyer's request and to the extent the Bankruptcy Court approves, up to 210 days following the Petition Date. Upon Buyer's request, Sellers shall make such filings as are reasonably required to seek such extension. During such applicable sub-lease period, the applicable Seller shall maintain and shall not reject the Fifth Ave Lease. Such sub-lease agreement shall (y) include customary terms and conditions as are required to ensure that Buyer is obligated to perform all of Sellers' obligations pursuant to the Fifth Ave Lease during the period of occupancy following Closing and (z) provide for payment by Buyer to Sellers of a fee equal to the rental payments required to be paid by Sellers during such occupancy by Buyer, plus Sellers' other actual, out-of-pocket costs and expenses incurred. For the avoidance of doubt, any payments required to be made by Buyer pursuant to clause (z) of this Section 6.11 shall exclude any damages resulting from Sellers' rejection of the Fifth Ave Lease.

Section 6.12    **Dissolution of Kinja**. Promptly following completion of the sale and purchase of the assets of Kinja contemplated by this Agreement (the "Hungarian Business Transfer"), each of Kinja and Holdco shall, and shall procure that their respective officers, employees and advisers (as applicable) shall, take all such actions (including, but not limited to, passing all necessary resolutions, approving the appointment of an administrator or liquidator (as appropriate) and making all filings with the relevant authorities) as may be necessary or desirable in order to effect, as soon as reasonably practicable following completion of the Hungarian Business Transfer, a voluntary dissolution of Kinja in accordance with Act V of 2006 on Public Company Information, Company Registration and Winding-up Proceeding (as amended or superseded from time to time) or, as applicable, a liquidation of Kinja in accordance with Act XLIX of 1991 on Bankruptcy Proceedings and Liquidation Proceedings.

Section 6.13    **Dissolution of Holdco**. Promptly following the resolution of the Chapter 11 Case (either through a confirmed plan or conversion to chapter 7), Holdco shall, and shall procure that its respective officers, shareholders and advisers (as applicable) shall, take all such actions (including, but not limited to, passing all necessary resolutions, approving the appointment of a voluntary liquidator and making all filings with the relevant authorities) as may be necessary or desirable in order to effect, as soon as reasonably practicable following resolution of the Chapter 11 Case (either through a confirmed plan or conversion to chapter 7), a voluntary liquidation of Holdco in accordance with Part V of the Companies Law (2013 Revision) and Order 13 of the Companies Winding Up Rules 2008 (as amended or superseded from time to time).

-57-

**Section 6.14    Schedule of Employees**. Within ten (10) days of the date of this Agreement, Sellers shall deliver to Buyer a true and complete list of all Current Employees of any Seller, indicating for each Current Employee such Current Employee's (i) name, (ii) title, (iii) annual base salary or base wage (including any changes since January 1, 2015), (iv) annual incentive/bonus or commission opportunity, (v) equity compensation, (vi) paid time off entitlements as of April 30, 2016, (vii) leave of absence status, if any (including, short- or long-term disability, military leave, maternity leave, family leave and/or administrative leave), (viii) full or part-time status, (ix) primary work location (if not Sellers' headquarters) and (x) date of hire or service commencement date.

**Section 6.15    Schedule of Contracts**. Promptly following the Petition Date (but in any event with five (5) Business Days thereof), Sellers shall deliver to Buyer a true and complete list of all Non-Residential Leases and Other Executory Contracts and within two (2) Business Day of Buyer's request, Sellers shall make available a true and complete copy of any such Non-Residential Lease or Other Executory Contract (each such Non-Residential Lease and Other Executory Contract set forth on such list and to the extent requested by Buyer, timely delivered by Seller to Buyer, a "Section 6.15 Contract").

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**. Subject to Section 7.3, Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 shall be true and correct in all material respects (other than each such representation or warranty qualified by "materiality" or "Material Adverse Effect," which shall be true and correct in all respects), and (ii) each other representation or warranty set forth in Article III (in each case, without giving effect to any qualifications as to "materiality" or "Material Adverse Effect") shall be true and correct in all respects, other than such failures to be true and correct that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    any waiting period under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended (the "HSR Act"), to the extent applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated and all

-58-

other required governmental or regulatory consents, approvals, waivers and authorizations shall have been obtained and all other applicable waiting periods shall have expired;

(d)     the Bidding Procedures and APA Assumption Order (i) shall not have been voided, reversed or vacated or subject to a stay and (ii) shall not have been amended, modified or supplemented in any way, subject only to immaterial clarifications, without Buyer's prior written consent (provided that clause (ii) of this Section 7.1(d) shall be waived with respect to a particular amendment, modification or supplement if Buyer does not exercise its right to terminate this Agreement pursuant to Section 8.1(h) within fifteen (15) Business Days after such amendment, modification or supplementation provided that Buyer shall have the right to terminate pursuant to Section 8.1(h) without any time restrictions if such amendment, modification or supplementation occurred due to Sellers' breach of this Agreement;

(e)     the Sale Order (i) shall have become a Final Order and (ii) shall not have been amended, modified or supplemented in any way, subject only to immaterial clarifications, without Buyer's prior written consent (provided that clause (ii) of this Section 7.1(f) shall be waived with respect to a particular amendment, modification or supplement if Buyer does not exercise its right to terminate this Agreement pursuant to Section 8.1(h) within fifteen (15) Business Days after such amendment, modification or supplementation provided that Buyer shall have the right to terminate pursuant to Section 8.1(h) without any time restrictions if such amendment, modification or supplementation occurred due to Sellers' breach of this Agreement;

(f)     the Bankruptcy Court shall not have entered an order (i) appointing a trustee or examiner with expanded powers or (ii) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

(g)     from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(h)     Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), 7.1(b) and 7.1(g) has been satisfied.

**Section 7.2     Conditions to Sellers' Obligations**. Subject to Section 7.3, Sellers' obligation to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all material respects (other than each such representation or warranty qualified by "materiality" or "Material Adverse Effect," which shall be true and correct in all respects), and (ii) each other representation or warranty set forth in Article IV (in each case, without giving effect to any

-59-

qualifications as to "materiality" or "Material Adverse Effect") shall be true and correct in all respects, other than such failures to be true and correct that, individually or in the aggregate, would not reasonably be expected to prevent, materially delay or materially impair the consummation of the transactions contemplated hereby or by any Related Agreement;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)    the Sale Order (i) shall have been entered by the Bankruptcy Court and be effective, (ii) shall not have been voided, reversed or vacated or subject to a stay and (iii) shall not be materially different than the form of Sale Order set forth on Exhibit A attached hereto except to the extent that Buyer has waived any deviation from the Sale Order attached as Exhibit A;

(d)    any waiting period under the HSR Act, to the extent applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated and all other required governmental or regulatory consents, approvals, waivers and authorizations shall have been obtained and all other applicable waiting periods shall have expired; and

(e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and 7.2(a) has been satisfied.

Section 7.3    **No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the transactions contemplated hereby or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    **Termination of Agreement**. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by Buyer if there has been a breach of any representation, warranty, covenant or agreement made by Sellers, or any such representation and warranty shall have become untrue after the date of this Agreement such that any condition set forth in

-60-

Section 7.1 would not be satisfied and such breach is not curable or, if curable, is not cured within the earlier of (x) twenty (20) days after written notice thereof is given by Buyer to Sellers and (y) the End Date.

(c)    by Sellers if there has been a breach of any representation, warranty, covenant or agreement made by Buyer, or any such representation and warranty shall have become untrue after the date of this Agreement such that any condition set forth in Section 7.2 would not be satisfied and such breach is not curable or, if curable, is not cured within the earlier of (x) twenty (20) days after written notice thereof is given by Sellers to Buyer and (y) the End Date.

(d)    by Sellers, upon written notice to Buyer following the Bankruptcy Court approval of any Superior Bid, provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 8.1(d) if at the time of delivery of such termination notice to Buyer, Sellers are or have at any time been in breach of their obligations under Section 5.9;

(e)    by Buyer or Sellers, on any date that is after the End Date if the Closing shall not have occurred by the End Date; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(e) if, at the time of such termination, Sellers would be entitled to terminate this agreement pursuant to Section 8.1(c) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(c)); provided, further, that Sellers shall not have the right to terminate this Agreement under this Section 8.1(e) if, at the time of such termination, Buyer would be entitled to terminate this agreement pursuant to Section 8.1(b) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(b)); and provided, further, that the right to terminate this Agreement under this Section 8.1(e) shall not be available to any party whose breach of this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur by such date;

(f)    by Buyer, if Buyer is not selected as a Successful Bidder at the conclusion of the Auction;

(g)    by Buyer if (i) any Seller or any Seller's Affiliate seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a petition for relief under Chapter 7 of the Bankruptcy Code, (ii) any Seller or any Affiliate of the Sellers seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, the entry of an order by the Bankruptcy Court appointing a trustee in the Chapter 11 Bankruptcy Cases or an examiner with enlarged powers relating to the operation of the Sellers' Business, (iii) the Bankruptcy Court orders, for any reason, an order of a type identified in clause (i) or (ii) above or (iv) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material Acquired Assets;

-61-

(h)    by Buyer if (i) following entry by the Bankruptcy Court of the Bidding Procedures and APA Assumption Order, such order is (A) amended, modified or supplemented without the Buyer's prior written consent or (B) voided, reversed or vacated or is subject to a stay or (ii) following entry by the Bankruptcy Court of the Bidding Procedures and APA Assumption Order and the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without the Buyer's prior written consent or (B) voided, reversed or vacated or is subject to a stay; provided, that with respect to a termination of this Agreement pursuant to clause (i)(A) or clause (i)(B) of this Section 8.1(h), Buyer may exercise such termination right only within ten (10) Business Days of such amendment, modification or supplementation;

(i)    by Buyer, if the Bankruptcy Court shall not have entered the Bidding Procedures and APA Assumption Order within twenty-one (21) days of the Petition Date; provided, that Buyer shall not be able to terminate this Agreement pursuant to this Section 8.1(i) if, prior to such termination, the Bankruptcy Court shall have entered the Bidding Procedures and APA Assumption Order;

(j)    by Buyer, if the Bankruptcy Court shall not have entered the Sale Order within sixty (60) days after the Petition Date and does not become a Final Order within seventy-five (75) days after the Petition Date; provided, that Buyer shall not be able to terminate this Agreement pursuant to this Section 8.1(j) if, prior to such termination, the Bankruptcy Court shall have entered the Sale Order or Final Order, as applicable;

(k)    by Buyer, if the Bidding Procedures and APA Assumption Order is entered by the Bankruptcy Court and (i) the Auction is not held on or before the date that is sixty (60) days after the Petition Date, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures or (B) the Sale Hearing (as defined in the Bidding Procedures) is not held on or before the date that is five (5) days after the selection of a Successful Bidder; provided, that Buyer shall not be able to terminate this Agreement pursuant to this Section 8.1(k) if, prior to such termination, the Auction or Sale Hearing shall have been held, as applicable;

(l)    by either Buyer or Sellers, if any Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing; and

(m)    automatically, upon consummation of a transaction with respect to a Superior Bid in accordance with Section 5.9 and the Bidding Procedures and APA Assumption Order.

**Section 8.2    Procedure Upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by Buyer or Sellers.

-62-

**Section 8.3     Effect of Termination; Deposit Payout; Expense Reimbursement; Breakup Fee; Liquidated Damages**.

(a)     If any Party or the Parties terminate this Agreement pursuant to Section 8.1, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I (*Definitions*), Article IX (*Miscellaneous*), and this Article VIII (*Termination*) shall survive any such termination) and no Party shall have any Liability to any other Party, as applicable, hereunder except as otherwise expressly set forth in this Agreement; provided that nothing herein shall relieve any party hereto from Liability to another party resulting from fraud or Willful and Intentional Breach.

(b)     If this Agreement is terminated pursuant to any provision of Section 8.1 other than Section 8.1(c), then the Deposit shall be returned to Buyer within two (2) Business Days of such termination.

(c)     If this Agreement is terminated pursuant to Section 8.1(c), then the Deposit shall be disbursed to Sellers within two (2) Business Days of such termination (it being understood and agreed that disbursement of the Deposit to Sellers shall be liquidated damages and Sellers shall not have any other rights or remedies at law or in equity except in the case of fraud or Willful and Intentional Breach).

(d)     If this Agreement is terminated (i) by Buyer pursuant to Section 8.1(b), Section 8.1(e), Section 8.1(f), Section 8.1(g), Section 8.1(h), Section 8.1(i), Section 8.1(j) or Section 8.1(k), (ii) by Sellers pursuant to Section 8.1(d) or Section 8.1(e) or (iii) automatically pursuant to Section 8.1(m), then Sellers shall pay to Buyer an amount equal to the Expenses of Buyer and its Affiliates (the "Expense Reimbursement"), which Expenses shall constitute an allowed administrative expense of Sellers under Bankruptcy Code sections 503(b) and 507(a)(1) to be paid within five (5) Business Days of such termination.

(e)     If this Agreement is terminated (i) by Buyer pursuant to Section 8.1(b), and prior to such termination, any Seller has taken any action that results in a breach, in any material respect, of any covenant set forth in Section 5.9, (ii) by Sellers pursuant to Section 8.1(d), (iii) by Buyer pursuant to Section 8.1(f),  Section 8.1(g) (other than with respect to a Bankruptcy Efforts Breach), or Section 8.1(h), or (iv) automatically pursuant to Section 8.1(m), then Sellers shall pay to Buyer the Breakup Fee, which shall constitute an allowed administrative expense of Sellers under Bankruptcy Code sections 503(b) and 507(a)(1) to be paid upon the earliest to occur of (A) Sellers consummating a Competing Transaction and (B) forty-five (45) days after such termination.

(f)     If this Agreement is terminated by Buyer pursuant to clause (i) or (ii) of Section 8.1(g) or pursuant to Section 8.1(b) due to a breach by Sellers of their obligations in the penultimate sentence of Section 5.3(a) or their obligations in Section 5.3(f) (a "Bankruptcy Efforts Breach"), then Sellers shall pay to Buyer liquidated damages of $13,500,000 (the "Liquidated Damages Amount"), which shall constitute an allowed

-63-

administrative expense of Sellers under Bankruptcy Code sections 503(b) and 507(a)(1) to be paid within five (5) Business Days of such termination.

(g)    Any amounts due and payable to Buyer in connection with (1) a breach of the terms of this Agreement (including a Bankruptcy Efforts Breach), (2) the Expense Reimbursement or (3) the Breakup Fee shall be entitled to administrative priority under Section 503(b) of the Bankruptcy Code.

(h)    Buyer and Sellers agree (i) that the damages resulting from a Bankruptcy Efforts Breach would be difficult to quantify with precise measurement, (ii) that the Liquidated Damages Amount is a reasonable estimate of the damages Buyer would incur as a result of a Bankruptcy Efforts Breach and (iii) that payment by Sellers of such Liquidated Damages Amount does not, and is not intended to, constitute a penalty. Buyer's pursuit and/or recovery of the Liquidated Damages Amount shall not affect Buyer's rights to seek and obtain equitable or injunctive relief or, in the case of fraud or Willful and Intentional Breach, any other relief, and Sellers agree that such remedies are cumulative.

**Section 8.4    <u>Acknowledgement</u>**.    Each Party agrees and acknowledges that Buyer's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal and other resources by Buyer and its Affiliates, and that such due diligence, efforts, negotiation and execution have provided value to Sellers. The obligations to return the Deposit and pay the Breakup Fee and Expense Reimbursement in accordance with the provisions of <u>Section 8.3</u> are an integral part of this Agreement, without which Buyer would not have entered into this Agreement.    The obligations to return the Deposit and pay the Breakup Fee and Expense Reimbursement in accordance with the provisions of <u>Section 8.3</u> will (i) be binding upon and enforceable against each Seller immediately upon the Bankruptcy Court's entering the Bidding Procedures and APA Assumption Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion, dismissal or consolidation of the Chapter 11 Cases, any plan of reorganization or liquidation in the Chapter 11 Cases, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to return the Deposit and pay Buyer the Breakup Fee and Expense Reimbursement, as and when required under this Agreement, are intended to be, and upon entry of the Bidding Procedures and APA Assumption Order specifically provide that they are, binding upon (i) each Seller, (ii) any successors or assigns of any Seller, (iii) any trustee, examiner or other representative of a Seller's estate, (iv) the reorganized Sellers and (v) any other entity vested or revested with any right, title or interest in or to a Seller, or any other Person claiming any rights in or control (direct or indirect) over any Seller (each of (i) through (v), a "<u>Successor</u>") as if such Successor were a Seller hereunder. The obligations of Seller to return the Deposit and the obligations to pay Buyer the Breakup Fee and Expense Reimbursement, as and when required under this Agreement may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

LA_LAN01:295956.5
57029633_10

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1**     **Expenses**. Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses, including all court costs and reasonable attorneys' fees, as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.2**     **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements and the Guarantee.

**Section 9.3**     **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4**     **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.4 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.5**     **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; and provided, further, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment.

-65-

**Section 9.6**    **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given upon receipt and may be delivered (i) personally to the recipient; (ii) by reputable overnight courier service (charges prepaid); or (iii) by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

> Gawker Media Group, Inc.
> 114 Fifth Avenue, 2nd Floor
> New York, New York 10011
> Attention:  Heather Dietrick
> Email:  heather@gawker.com

with a copy to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Attention:  Gregg M. Galardi
> Email:  gregg.galardi@ropesgray.com

If to Buyer, then to:

> Ziff Davis, LLC
> 28 E. 28th St.
> New York, NY 10010
> Attention:  Legal Dept/General Counsel

with copies (which shall not constitute notice) to:

> Sullivan & Cromwell LLP
> 1888 Century Park East, 21st Floor
> Los Angeles, California 90067
> Attention:  Patrick S. Brown
> Email:  brownp@sullcrom.com
>
> and
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, New York 10004
> Attention:  Michael H. Torkin
> Email:  torkinm@sullcrom.com

-66-

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.6</u>.

**Section 9.7    <u>Governing Law; Jurisdiction</u>**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of New York, sitting in New York City, New York, and the federal courts of the United States of America sitting in New York City, New York, shall have exclusive jurisdiction over such Litigation.

**Section 9.8    <u>Consent to Service of Process</u>**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.6</u>.

**Section 9.9    <u>WAIVERS OF JURY TRIAL</u>**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 9.10    <u>Specific Performance</u>**.

(a)    Notwithstanding anything to the contrary in this Agreement, each of the Parties acknowledges and agrees that the other Parties (collectively, the "<u>Enforcing Parties</u>") would be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity (including the right to sue for damages in the event of such nonperformance or breach), each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof (except as otherwise expressly set forth herein).

(b)    Each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought in accordance with this <u>Section 9.10</u> on the basis that the Enforcing Parties have an adequate remedy at law or that any award of specific performance is, for any reason, not an appropriate remedy (except as otherwise expressly set forth herein). The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy.

-67-

**Section 9.11** __Severability__. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12** __No Third Party Beneficiaries__. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13** __No Survival of Representations, Warranties and Agreements__. None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this __Article IX__, and (iii) all defined terms set forth in __Article I__ that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

**Section 9.14** __Construction__. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.15** __Computation of Time__. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

-68-

**Section 9.16    Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.17    Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which the relevance of such disclosed matter is reasonably apparent on the face of the disclosure (based on a plain reading thereof) contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.

**Section 9.18    Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.19    Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.20    Time of Essence**. Time is of the essence of this Agreement.

**Section 9.21    Sellers' Releases**.    Effective upon the Closing, Sellers, on behalf of themselves and their respective past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns (collectively, in their capacities as parties granting releases pursuant to this Section 9.21, the "Seller Releasing Parties"), hereby release, remise, acquit and forever discharge the Buyer and its past, present and future subsidiaries, parents, divisions, Affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (except, in each case, the Seller Releasing Parties) (collectively, in their capacities as parties being released pursuant to this Section 9.21, the "Buyer Released Parties"), from any and all claims, contracts,

-69-

demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, Liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution, which any Seller Releasing Party has, may have had or may hereafter assert against any Buyer Released Party arising from or related in any way, either directly or indirectly, to the negotiation, documentation, performance or consummation of this Agreement, any Related Agreements or any other agreements entered into in connection with the transactions contemplated hereby; provided, however, that the foregoing release shall not apply to Sellers' rights or the Buyer's obligations under this Agreement (including Section 6.9 hereof), any Related Agreements and/or any other agreements entered into in connection with the transactions contemplated hereby.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

LA_LAN01:295956.5
57029633_10

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS**:

GAWKER MEDIA LLC

By:    _____
          Name: Nicholas Denton
          Title: Manager

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

SELLERS:

GAWKER MEDIA GROUP, INC.

By: _____
Name: Heather Dietrick
Title: President

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS**:

KINJA KFT.

By: _____
Name: Peter Szasz
Title: Managing Director

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

**BUYER**:

ZDGM LLC

By: _____
Name: STEPHEN Hichs
Title: Secretary

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT