Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11700-smb

4   Adv. Case No. 16-01085

5   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   GAWKER MEDIA, LLC,

9                    Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11  GAWKER MEDIA, LLC,

12                   Plaintiff

13      Vs.

14  HUON et al,

15                   Defendants.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - -x

17                   U.S. Bankruptcy Court

18                   One Bowling Green

19                   New York, NY   10004

20                   June 15, 2016

21                   11:02 AM

22

23  B E F O R E :

24  HON STUART M. BERNSTEIN

25  U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Debtor's Motion for an Order (I) Granting a

2    Waiver of the Requirements of Local Rule 1007-2(a), (b), and

3    (c), and (11) Granting an Extension of Time to File Lists

4    Required by Bankruptcy Rule 1007.

5

6    Hearing re:  Debtors' Motion for Joint Administration.

7

8    Hearing re:  Debtor's Motion for Entry of an Order (I)

9    Authorizing the Debtors to (A) Prepare a List of Creditors

10   in Lieu of Submitting a Formatted Mailing Matrix and (B)

11   File a Consolidated List of the Debtor's 50 Largest

12   Unsecured Creditors and (11) Approving the Form and Manner

13   of Notifying Creditors of Commencement of These Chapter 11

14   Cases.

15

16   Hearing re:  Debtor's Motion for Entry of an Order Extending

17   Deadline for Debtors to File Their Schedules of Assets and

18   Liabilities and Statements of Financial Affairs.

19

20   Hearing re:  Debtor's Motion for Entry of an Order

21   Establishing Certain Notice, Case Management, and

22   Administrative Procedures and Omnibus Hearing Dates.

23

24   Hearing re:  Debtor's Motion for Entry of Interim and Final

25   Orders Authorizing the Debtors to Continue Using the Debtors

Page 3

1   Bank Accounts, Business Forms, and Cash Management System,

2   and Granting Related Relief.

3

4   Hearing re:  Debtor's Motion for Entry of Interim and Final

5   Orders (I) Authorizing, but not Directing, Payment Of

6   Prepetition Wages, Salaries, Business Expenses, Employee

7   Benefits and Related Items, and (11) Directing All Financial

8   Institutions to Honor Checks for Payment of Such

9   Obligations.

10

11   Hearing re:  Debtor's Motion for Entry of Interim and Final

12   Orders Authorizing Payment of Income Taxes, Property Taxes,

13   Sales and Use Taxes and Hungarian Taxes.

14

15   Hearing re:  Debtor's Motion for Entry of Interim and Final

16   Orders Authorizing the Debtors to Pay Prepetition Claims of

17   Critical Vendors and Foreign Vendors

18

19   Hearing re:  Debtor's Motion for Entry of Interim and Final

20   Orders Authorizing, but not Directing, The Debtors to (A)

21   Continue Insurance Coverage Entered Into Prepetition, (B)

22   Renew or Purchase New Insurance Policies in the Ordinary

23   Course of Business, and (C) Pay all Prepetition Obligations

24   Relating.

25

Page 4

1    Hearing re:  Debtor's Motion for Entry of an Order (A)

2    Prohibiting Utility Companies from Discontinuing, Altering,

3    or Refusing Service, (B) Deeming Utility Companies to have

4    Adequate Assurance of Payment, And (C) Establishing

5    Procedures for Resolving Requests for Additional Assurance.

6

7    Hearing re:  Debtor's Motion for Entry of Interim and Final

8    Orders Pursuant to 11 U.S.C. $5 105,361,362,363 and 364 and

9    Rules 2002, 4001, and 9014 of the Federal Rules of

10   Bankruptcy Procedure (I) Authorizing Incurrence by the

11   Debtors of Postpetition Secured Indebtedness, (11) Granting

12   Liens, (111) Authorizing Use of Cash Collateral by the

13   Debtors and Providing for Adequate Protection, (IV)

14   Modifying the Automatic Stay, and (V) Scheduling a Final

15   Hearing.

16

17   Hearing re:  06-01085-smb Conference re: Motion for

18   Preliminary Injunction and/or Extension of the Automatic

19   Stay.

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   ROPES & GRAY LLP

 4        Attorney for the Debtor

 5        1211 Avenue of the Americas

 6        New York, NY 10036

 7

 8   BY:  KRISTINA K. ALEXANDER

 9        GREGG M. GALARDI

10        MICHAEL S. WINOGRAD

11

12   RIEMER & BRAUNSTEIN LLP

13        Attorney for Silicon Valley Bank ("SVB")

14        Time Square Tower, Suite 2506

15        Seven Time Square

16        New York, NY 10036

17

18   BY:  PAUL S. SAMSON

19

20   BINDER & SCHWARTZ LLP

21        Attorney for Mr. Bollea

22        366 Madison Avenue, 6th Floor

23        New York, NY 10017

24

25   BY:  ERIC B. FISHER
```

Page 6

1    SCHULTE ROTH & ZABEL LLP

2          Attorney for Cerberus Business Finance LLC

3          919 Third Avenue

4          New York, NY 10022

5

6    BY:  ADAM C. HARRIS

7          BRIAN C. TONG

8

9    COHEN & GRESSER LLP

10          800 Third Avenue

11          New York, NY 10022

12

13   BY:  DANIEL H. TABAK

14

15   U.S. DEPARTMENT OF JUSTICE

16          OFFICE OF THE UNITED STATES TRUSTEE

17

18   BY:  SUSAB ARBEIT

19

20   SULLIVAN & CROMWELL

21          Attorneys for Debtor

22          125 Broad Street

23          New York, NY 10041

24

25   BY:  MICHAEL TORKIN

1    ALSO PRESENT TELEPHONICALLY:

2    JASON ADAMS

3    JONATHAN AGUDELO

4    DOUGLAS DEUTSCH

5    SHANA ELBERG

6                              KATY PAPE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S

2                THE CLERK:  All rise.  Please be seated.

3                THE COURT:  Good morning.  Gawker Media?

4                MR. GALARDI:  Good morning, Your Honor.

5                THE COURT:  Good morning.

6                MR. GALARDI:  Greg Galardi of Ropes & Gray on

7    behalf of the Debtors, Gawker Media LLC, Gawker Media Group,

8    Inc., as well as Kinja.

9                Your Honor, first, thank you for, 1, accommodating

10   us last week when we came in on an emergency matter with

11   respect to the request for a TRO.  And before proceeding

12   today, Your Honor, I'd like to introduce a couple people in

13   the courtroom today on our side so that you'll know who's

14   speaking.

15               First, to my left is an associate with our firm at

16   Ropes & Gray who really knows everything about this case,

17   which I don't --

18               THE COURT:  (Indiscernible) speaking.

19               MR. GALARDI:  -- Kristina Alexander.  She will be

20   speaking, Your Honor, so I will cede the podium for exactly

21   that purpose.

22               And then I think you met Mr. Winograd, who is

23   handling the litigation with respect to the TRO on Friday.

24               Also in this courtroom today are representatives,

25   the first-day declarant, Mr. William Holden, and then Mr.

Page 9

1    Reed Snellenberger, who is from Houlihan Lokey, who has done

2    a lot of the work with respect to the DIP and the asset

3    purchase agreement.

4         Your Honor, I leave it to you.  There are really

5    two matter here -- two hearings today.  One is Your Honor

6    had asked for a status conference with respect to the

7    preliminary injunction and TRO.  Then I'll call -- the other

8    part of the hearing is the standard first-day relief that we

9    will be seeking from Your Honor.

10         I can start with an introduction in general and

11    then, at Your Honor's pleasure, which --

12         THE COURT:  Why don't we do the status conference

13    last and let's go through the first-day motions.

14         MR. GALARDI:  Okay, fine, Your Honor.  First, just

15    by way of introduction, I've introduced the people. I wanted

16    to let Your Honor know that the professionals, I believe,

17    were mostly retained in the period in mid-May of this year

18    to work on various matters.

19         In addition, Gawker Media did hire Mr. Holden as a

20    CRO at two of the companies, GMGI as well as Gawker Media

21    LLC.  He is not a CRO at the Kinja, but he is in fact an

22    authorized representative of that company for prosecuting

23    its bankruptcy.

24         In addition, Your Honor, because of the issues

25    that I think will unfold as the course of these cases

1    proceed, we also hired an independent Board member to serve

2    on the Board of Gawker Media Group, Inc.  His name is Scott

3    Tillman.

4            Your Honor, because the company has 190 employees

5    and there is obviously a lot of activity and a lot of

6    litigation going on, Mr. Nick Denton, who is the CEO, and

7    Ms. Heather Dietrick, who is the General Council and

8    President of Gawker Media LLC, are not in the courtroom

9    today.  The authority is given to the CRO to prosecute the

10   first-day motions.  When it's appropriate, we will bring

11   them to the courtroom, but today they're back at the company

12   working with the employees.

13           Just by way of background -- and I'll just say,

14   some of the facts that are set forth in Mr. Holden's

15   declaration, which we would move into evidence at the

16   conclusion -- there are 190 employees at the company.  There

17   are seven media brands that are listed in the first-day

18   declaration.  They range from Gizmodo to Deadspin to Gawker,

19   Jezebel, LifeHacker, Jalopnik and I think it's Kotaku.  But

20   obviously, the one that is the most known for the purpose of

21   this case and the publicity that's come around this case is

22   the Gawker dotcom and the stories that it writes.

23           The primary revenue for the company is generated

24   out of the advertising on those websites.  The corporate

25   structure is set forth in Mr. Holden's declaration and it's

Page 11

1    relatively straightforward.  GMGI, as we call it, is the

2    parent company.  It is a Cayman Islands company.  It is the

3    controlling member of Gawker Media LLC.  Gawker Media LLC is

4    a company that does business out of an office in the city of

5    New York.  It is the United States operating company.  And

6    GMGI also owns the interests of essentially what is a

7    Hungarian LLC, Kinja, and it operates out of Hungary.

8            There is a relationship between all of these

9    company -- the two companies, Kinja and Gawker Media,

10   whereby there are licensing -- the details as set forth in

11   Mr. Holden's affidavit -- there is licensing and then there

12   are servicing agreements.

13           The capital structure, Your Honor, is also what I

14   think simple, although there is a fair amount of debt on the

15   company.  There is a first lien facility that as of today

16   was provided by Silicon Valley Bank.  It is a first lien

17   facility.  The total outstanding borrowings are

18   approximately $6.25 million.

19           There is a second lien facility that was provided

20   by Columbus Nova in the amount of $15 million.  There is an

21   inter-creditor agreement that exists between Silicon Valley

22   Bank and Columbus Nova.

23           In addition to Silicon Valley Bank's $6.25 million

24   outstanding, it issued -- outstanding -- it issued an

25   outstanding as a letter of credit for approximately $5

1    million.  Gawker moved from a place around SoHo up to 14th

2    or 16th Street, and in connection with that new leased

3    space, had to post an LC.  That LC is not currently cash

4    collateralized, but it is an outstanding obligation.

5              In addition to those debts, there are essentially

6    $13 million of intercompany debt.  Most of that intercompany

7    debt is owed by Gawker Media LLC to Kinja, and it's set

8    forth in the forms of two notes, which are described in the

9    first-day declaration.

10             Your Honor, why are we here?  Well, I think, as

11   Your Honor probably knows, there is a lot of litigation that

12   has gone on over the last couple years with respect to a

13   high publicity litigation that's taken place in Florida.

14   There are a number of other litigations that are taking

15   place around the country, many of them styled the same.

16   They're defamation suits, they involve Mr. Denton, they

17   involve Gawker Media, and then oftentimes they involve also

18   an editor, or an articles writer, that has written, whether

19   it's freelance or as an employee of Gawker.

20             THE COURT:  Okay.

21             MR. GALARDI:  That expense has been one burden.

22   Like any other company, the expense of the litigation has

23   been incurred.  That's one of the reasons that the company

24   ultimately took the Columbus Nova second lien debt to try to

25   continue to finance and to prevail in that litigation.

1           Your Honor, it also has the indirect effect -- not

2     just simply the litigation burn -- but there is a certain

3     negative effect that it has had on the advertising.  And as

4     I said earlier, 75 percent of the revenues do come from

5     advertising.  So there has been a negative effect on the

6     advertising.

7           So, Your Honor, it's very much like other

8     businesses we bring to Your Honor.  They have a lack of cash

9     flow necessary to their expenses and it is a depreciating

10    asset in the sense that the advertising has, over the last

11    couple years, stepped away a little bit.  But more

12    importantly, there is just an incredible burn by way of

13    litigation.

14          Your Honor, that came to a very significant

15    conclusion -- it's one of those litigations -- not a

16    conclusion, but a monumental point -- on June 10th.  On June

17    10th, the company -- there had already been a judgment

18    entered, but in the Florida State Court there was a hearing

19    in which Gawker Media and Mr. Denton asked the judge for

20    certain relief from the judgment.  It was two forms of

21    relief that were being asked for.  There may have been more,

22    but the significant ones was to reduce the judgment.  That

23    may have been denied prior to that point in time.

24          But also, there was a bequest to stay the judgment

25    to go forward with the appeal in the Florida Appellate

1    Court.

2            There's back and forth about that and you'll hear

3    a little bit more of the PI.  The judge was going to enter a

4    stay order, but the stay order was not acceptable.  The

5    order had various provisions in it which we need not

6    discuss, but ultimately, the judgment would have allowed, we

7    believe, them to start executing on assets.

8            We learned a little bit more about New York State

9    Law and execution of judgments.  And once it comes here,

10   there could be an execution of a judgment, would put a

11   judgment lien on both Gawker and Mr. Denton's property,

12   which is why we came to your Court once we had learned of

13   that potential.

14           Your Honor, it's not -- that's only one of the

15   litigations, as I mentioned.  There are many other

16   litigations going on, and in fact, Your Honor, we've even

17   been threatened with a cease and desist currently regarding

18   an article regarding one of the presidential candidates,

19   that we received a letter to cease and desist, and we

20   continue to write articles.  We do believe that it is valid

21   journalism and we do believe that we are entitled to write

22   such articles.  At the same time, there are others that will

23   litigate, and we no longer can afford to litigate on all of

24   these fronts.

25           So what we did is we came to a decision to what we

1    think maximizes the value for the creditor constituencies

2    and potentially stockholders, was to come to this Court and

3    file bankruptcy and to seek a sale of the assets.

4            As Your Honor is aware, we negotiated and have

5    filed a stalking horse purchase agreement.  The stalking

6    horse purchase agreement is with a well-known media company,

7    Ziff Davis.  It's a $90 million stalking horse bid.  We will

8    have to talk today at some point, your honor, about

9    scheduling and requirement, and hopefully we can work out a

10   schedule for having that offer subject to higher and better

11   offers.

12           Again, Houlihan has been involved in this process

13   and actually was involved with it prior to the mid-May, to

14   looking for potential acquisition partners or financing, and

15   when it comes time, they will testify to that effect for

16   Your Honor.

17           But we are happy to come here today with an offer

18   to sell the company for $90 million.  It has no financing

19   condition.  It has no due diligence commissions.  And we

20   would like to proceed forward with getting a good procedures

21   hearing on file.

22           Your Honor, we have been in contact with the U.S.

23   Trustee's Office.  There is, I understand, a formation

24   meeting scheduled for next Friday, June 24 at 11:00 a.m. --

25   11:30, that's right -- to accommodate my schedule.  I

1   appreciate it; 11:30 a.m. next Friday.  So we hope to have a

2   committee, if there is going to be one appointed in these

3   cases, up and running.

4          So, Your Honor, how do we get to where we want to

5   go?  Well, we have negotiated a financing.  Again, Mr.

6   Holden's affidavit and declaration set forth how many

7   parties we reached out to.  We are here today with a DIP

8   financing to be provided by an affiliated service.  That DIP

9   financing is in the amount of $22 million.  It is a

10  financing that would take out the first lien facility, which

11  is the Silicon Valley Bank facility.  It would also cash

12  collateralize the LC that's behind it --

13          THE COURT:  Why are you -- why are you cash

14  collateralizing the LC?

15          MR. GALARDI:  Your Honor, I think it's to make

16  sure that Silicon Valley Bank will stay out of its position.

17  Otherwise, it would have an indemnity claim back for the

18  draw on the LC.  And it would be better to -- they can't

19  simply do -- it will either be a back-to-back letter of

20  credit or it would have been a cash collateralized.  It was

21  a condition for them to step aside and not have three banks

22  involved in the case.

23          We can get further to that, but it was a simpler

24  process to do that than to have it go back around Silicon

25  Valley Bank at some point and then coming back, we'd also

1   have a priority issue with respect to all of the lenders.

2          As will also be said -- and I think it's set forth

3   in Mr. Holden's declaration -- Silicon Valley Bank would not

4   consent to a simple straight priming lien.  We had tried to

5   do that.  We could've taken that issue up, Your Honor, with

6   an asset purchase agreement as all the pieces came together.

7   It was -- it was at least the judgment of the company to

8   proceed with a consensual cash collateral with respect to

9   the second lien only and the take out facility of Silicon

10  Valley Bank, obviously, all subject to Your Honor -- to Your

11  Honor's approval.  (Indiscernible) finally, so that's how we

12  get there.  Just want to express a concern about getting

13  there.

14          Your Honor, we did negotiate an asset purchase

15  agreement with a MAC or a MAE clause, however it's described

16  in there.  It does, fortunately, carve out certain -- a

17  certain litigation, the Bollea litigation.  There are other

18  issues, obviously.  There are -- it's not carving out other

19  litigations.  So one of the things -- and this will be my

20  introduction to the preliminary injunction, which we will

21  come back to -- is that there is not a carve-out.

22          So we are concerned, and one of the reasons we did

23  seek a stay with respect to the -- all of the litigations,

24  is to make sure that we can take this breathing spell that

25  we think the Bankruptcy Court should give us, both us and

1   for Mr. Denton -- and you'll hear later about the other

2   third parties involved in that litigation -- to be able to

3   accomplish the sale and to maximize value for the estate,

4   and then we'll deal with all of that litigation.

5          That's the background, Your Honor.  I would cede -

6   - unless Your Honor has questions about --

7          THE COURT:  All right.

8          MR. GALARDI:  -- the background, I'd cede the --

9          THE COURT:  All right.  One question.  You said

10  that the second lien lender is Columbus Nova?

11         MR. GALARDI:  Correct.

12         THE COURT:  Mr. Holden's declaration says it USBC

13  Partners, LP.

14         MR. GALARDI:  That's the name of the -- that's the

15  name of the entity behind it, Your Honor.  I'm sorry to have

16  confused which one it was.

17         THE COURT:  And that's -- and that entity is also

18  a shareholder, correct?

19         MR. GALARDI:  Yes, it is, Your Honor.  And I did -

20  - in that same -- in that same transaction that gave the $15

21  million did get certain of the shares.  Correct, Your Honor.

22         THE COURT:  All right.  Thank you.

23         MR. GALARDI:  Thank you.  I will now turn it over

24  to Ms. Alexander to take Your Honor through the first-day

25  papers.

```
 1              THE COURT:  Before you do that, do you want to
 2    move Mr. Holden's declaration --
 3              MR. GALARDI:  Yes, I would like to move it and I
 4    think it's -- I'd move in his declaration, first-day
 5    declaration into the record, Your Honor.
 6              THE COURT:  Okay.  Is there anyone who objects to
 7    the receipt of Mr. Holden's declaration or wants to cross-
 8    examine Mr. Holden?  The record should reflect there's no
 9    response.  I'll receive his declaration as his testimony.
10              MR. GALARDI:  And Your Honor, he had a second
11    declaration with respect to the DIP financing.  I can move
12    that now if Your Honor would accept it, or we can wait until
13    the hearing --
14              THE COURT:  We can wait on that one.  Just remind
15    me about it.
16              MR. GALARDI:  Okay.  Thank you, Your Honor.
17              THE COURT:  Go ahead.
18              MS. ALEXANDER:  Good morning, Your Honor.
19    Kristina Alexander from Ropes & Gray, counsel for the
20    Debtors.
21              Your Honor, we are before you on a number of
22    first-day motions, a few of which are administrative, and
23    the rest are operational.  And before we get started --
24              THE COURT:  Hold that -- hold -- Mr. Fisher, if
25    you want to speak, please speak outside.
```

1          MR. FISHER:  I apologize, Your Honor.

2          THE COURT:  All right.  I'm sorry.  Go ahead.

3          MS. ALEXANDER:  No problem.  Your Honor, would you

4    prefer to start with the administrative motions?

5          THE COURT:  Yes.

6          MS. ALEXANDER:  Okay.  So we filed a view

7    administrative motions for -- I understand from speaking

8    with your clerk that we won't be going forward on a case

9    management motion?

10          THE COURT:  Well, we're going to get to that.  Let

11    me do the other motions.  Does anybody object to the motion

12    of joint administration?  The record should reflect there's

13    no response.  It's granted.  You can submit an order.

14          MS. ALEXANDER:  Great.  And then --

15          THE COURT:  Does anybody object to the motion to

16    file a consolidated creditors' list in the form described in

17    the motion?  The record should reflect there's no response.

18    That motion is granted.

19          Does anyone object to the extension of time to

20    file the schedules and statement of financial affairs?  The

21    record should reflect there is no response.  The motion is

22    granted.

23          With respect to the case management motion, since

24    this may be the last time creditors get any information

25    about this case other than the confirmation hearing and the

1    bar date, or whatever the Committee may put on its website,

2    serve this motion on all creditors.

3              MS. ALEXANDER:  Serve the motion on all creditors?

4              THE COURT:  And then make it returnable on --

5    let's be -- have you selected a date for the final hearings

6    and (indiscernible)?

7              MS. ALEXANDER:  We have not yet, Your Honor.  We

8    have --

9              THE COURT:  Let me -- let me do that now because

10   I'm going to be out the next -- in and out the next three

11   weeks.

12             MR. GALARDI:  Your Honor, with respect to that,

13   which Court you're -- we did understand there was time on

14   July 7th that we had spoke --

15             THE COURT:  Well, that's something to think about.

16             MR. GALARDI:  Now, one question, Your Honor, and

17   maybe we'll take it up at -- but it is a scheduling matter

18   and not a substantive matter -- we were wondering, with

19   respect to the bid procedures hearing, is there any time

20   before July 7th solely for that purpose that Your Honor may

21   be able to squeeze us in?

22             THE COURT:  Well, I prefer to do it once a

23   committee is appointed.

24             MR. GALARDI:  That's why I mentioned that date.

25   So the last week of June would be wonderful, but I

```
 1    understand it's vacation time and --

 2              THE COURT:  Well, it's not a vacation.

 3              MR. GALARDI:  Okay.

 4              THE COURT:  It's not really on business.  I can do

 5    it the Monday morning of June 27th and then I'm pretty much

 6    out until after the 4th of July.

 7              MR. GALARDI:  One second.  Let me -- because I

 8    know I'm in trial.  I'm in trial.  Your Honor, I'm in trial

 9    so I --

10              THE COURT:  All right --

11              MR. GALARDI:  (Indiscernible) is there.

12              THE COURT:  It'll have to be July 7th then, I

13    guess.

14              MR. GALARDI:  You okay?

15              THE COURT:  I'm just not in the city that week.

16              MR. GALARDI:  Your Honor, let me --

17              THE COURT:  (Indiscernible) Just so you don't

18    think I'm going on vacation.

19              MR. GALARDI:  Your Honor, I wasn't -- I

20    understand.  I'm just trying to think.  If Your Honor could

21    give us just --

22              THE COURT:  Why don't we -- well -- all right, the

23    other stuff is going to go to July 7th and we'll use the

24    afternoon.  July 7th, 2:00.

25              MR. GALARDI:  Your Honor --
```

```
 1              THE COURT:  So you can make your motion returnable

 2    regarding the cash management deliver -- case management

 3    deliver July 7 and 2:00.

 4              MR. GALARDI:  And on the 27th of June, Your Honor,

 5    what time would you have available?

 6              THE COURT:  It'll have to be in the morning

 7    because I have to leave in the afternoon.

 8              MR. GALARDI:  May I have -- may I hold that for

 9    two hours today --

10              THE COURT:  Sure.

11              MR. GALARDI:  -- and then I will get back -- thank

12    you very much.

13              THE COURT:  So you want me to hold June 27th at

14    10:00?

15              MR. GALARDI:  That would be great, or earlier is

16    even better because I believe I go to trial with Judge

17    (indiscernible).

18              THE COURT:  Maybe better (indiscernible).

19              MR. GALARDI:  Sorry.

20              THE COURT:  All right.  Why don't you submit an

21    order today scheduling the (indiscernible) procedures

22    hearing at that time?

23              MR. GALARDI:  Thank you, Your Honor.

24              THE COURT:  All right.  Go ahead.

25              MS. ALEXANDER:  Your Honor, I think then that
```

Page 24

1   resolves the administrative motions.

2          THE COURT:  Yes.

3          MS. ALEXANDER:  And so moving forward, I think we

4   could go to cash management if that works for you?  Your

5   Honor, the Debtor's cash management system is fairly easy to

6   understand.  There are effectively three components in our

7   cash management motion for which we seek relief.

8          The cash management system in general, the Debtors

9   have six bank accounts.  Five bank accounts are held at

10  Silicon Valley Bank here in the United States.  One bank

11  account is held at K&H Bank, which is a bank in Hungary.

12  The bank accounts that the Debtors have are -- there are

13  three operating accounts.

14         Each Debtor has its own operating account in the

15  United States at Silicon Valley.  And then Kinja, the

16  Hungarian subsidiary, also has its own operating account in

17  Hungary at K&H Bank.

18         THE COURT:  How much money was in that account on

19  the petition date?

20         MS. ALEXANDER:  The Kinja operating account at

21  this point, as of the petition date, had very little money.

22  It was (indiscernible) at $743.00.

23         THE COURT:  Okay.

24         MS. ALEXANDER:  I'm sorry.  That's the Kinja

25  operating account in the A -- in the U.S.  My apologies.

1    The Kinja Hungarian account had more than that.  It had

2    $112,000 as of the petition date.

3              THE COURT:  Thank you.

4              MS. ALEXANDER:  And as part of the cash management

5    at the sessions that we've had with the U.S. Trustee, we've

6    made extensive modifications to our order to address their

7    concerns about having funds outside of the United States at

8    a bank in Hungary.

9              So those accommodations will be that -- we've

10   agreed that at no point in time will we ever have more than

11   $200,000 in the account, and that moreover, the Debtors will

12   use all of their best efforts to keep the balance in that

13   account as low as possible and generally keep the balance at

14   $50,000.

15             And so the Debtors will engage in a frequent

16   effort to sweep the account to the extent that balances

17   increase beyond that $50,000 with the caveat that there will

18   be a time or two during the month when the account will have

19   as much as $200,000 to accommodate payroll and payables

20   there.

21             THE COURT:  Who is the U.S. Trustee?

22             MS. ARBEIT:  Good morning, Your Honor.  Susan

23   Arbeit for the U.S. Trustee.

24             The U.S. Trustee, even with those changes, still

25   has concerns.  The Debtor has made representations to me

1    that they will after this interim.  Make all best efforts to

2    try to move the money in the Hungarian account to Kinja's

3    U.S. account.  So, with that representation, the U.S.

4    Trustee has no objections.

5              THE COURT:  Have you seen the revised order?

6              MS. ARBEIT:  I have, yes.

7              THE COURT:  All right.  Does anyone want to be

8    heard with respect to the cash management motion?  I don't

9    think -- had you completed your presentation?

10             MS. ALEXANDER:  No, the only other two things we

11   have, Your Honor, are just standard intercompany transfers.

12   Here, the Debtors have a complex intercompany relationship

13   in terms of accrued intercompany payables at Gawker Media,

14   Gawker Media LLC, and in our companies at Kinja.

15             We're not seeking to, of course, address any of

16   the prepetition intercompany payable debt.  We are only

17   seeking to permit an ongoing transfer from Gawker Media LLC

18   to Kinja of no more than $150,000 per month at this time,

19   simply to fund Kinja.  And that is a pay-down effectively of

20   amounts owed to Kinja.

21             It's paying far less than what's owed to Kinja on

22   a post-petition ongoing basis for Kinja's provision of

23   services and of its licenses under two separate agreements,

24   a master license agreement and a services agreement, after

25   Media LLC makes payments periodically.  And we'd like to

1   continue those on a post-petition basis. And of course, seek

2   (indiscernible) priority treatment for those transfers.

3           The only other component to our cash management

4   motion is to address our credit card account.  We have an

5   American Express.  We use American Express as part of our

6   cash management system.  There are approximately 34 credit

7   cards.  As of the petition date, we had an outstanding

8   balance, I believe, of just under $100,000.

9           THE COURT:  How much?

10          MS. ALEXANDER:  $100,000 -- just under $100,000.

11  And we're seeking to pay that balance as part of our cash

12  management system.

13          THE COURT:  Why is it necessary to pay the balance

14  on an emergency basis?  Remember, these -- all of these

15  motions are predicated on relief that's necessary to avoid

16  immediate, irreparable harm.  What's going to happen between

17  now and July 7th if you don't pay that balance?

18          MS. ALEXANDER:  Sure, Your Honor, absolutely.  The

19  -- as I understand it, the balance is past due and was due

20  at the time that we filed for Chapter 11.  I don't believe

21  we've received any kind of communication from American

22  Express indicating that they would shut down our cards

23  immediately.

24          We would, however, like to pay the balance so that

25  the cards continue to operate in the ordinary course.

1            THE COURT:  But you have another American Express

2    issue coming up in the wage motion, don't you?

3            MS. ALEXANDER:  This is -- this is the same issue.

4    Yeah, this is really the same issue.  The American Express

5    bill is used to -- the American Express cards -- excuse me -

6    - are used to pay employee expenses.

7            THE COURT:  Has American Express threatened to

8    shut down the account if this money isn't paid?

9            MS. ALEXANDER:  Not that I am aware of.  I'm

10   looking to our CRO.  No, we've received no communications.

11   So if Your Honor would like to adjourn this to a final --

12           THE COURT:  Yeah, I think it -- what I'll do is,

13   on an interim basis, I will authorize the continuation of

14   the cash management system.

15           You didn't mention it but I think you've dealt

16   with the issue of the 345(b) compliance with the stipulation

17   regarding the Hungarian account.  And we'll push the

18   question of the credit card bill to July 7th after a

19   committee is appointed.

20           MS. ALEXANDER:  Okay, that's great.  And Your

21   Honor, I should state on the record as part of the order,

22   we've agreed to reduce the period we requested on the 345

23   from 90 to 45 days, subject to further consultation with the

24   U.S. Trustee.

25           We've also agreed to modify our business forms to

1   reflect the Debtor in Possession status as soon as

2   practical.

3            THE COURT:  All right.  So the balance of the

4   motion -- well it's an interim order anyway, so it's

5   adjourned to July 7th at 2:00.

6            MS. ALEXANDER:  Your Honor, moving on to wages

7   motion -- the wages motion, which is really the heart of the

8   business because, of course, this business is an Internet-

9   based business that is -- that consists of writers and

10  editors.  We thought -- different kinds of relief in the

11  wages motion, specifically --

12           THE COURT:  I'm going to ask you the same question

13  on the wages motion that I just asked you about the

14  (indiscernible).

15           MS. ALEXANDER:  Sure.

16           THE COURT:  Other than the way priority wages, --

17           MS. ALEXANDER:  Mm hmm.

18           THE COURT:  -- which I don't have a problem with.

19           MS. ALEXANDER:  What needs to be paid in the

20  immediate -- yet.  So we have spoken with --

21           THE COURT:  And why?

22           MS. ALEXANDER:  -- the Trustee about this and we

23  have agreed all of the references to severance and severance

24  pay will adjourn until the final hearing, as well as there

25  are two incentive programs --

```
 1              THE COURT:  Let's go through the motion, because
 2      there's a lot of stuff in this motion.  It's not just wages,
 3      although it's referred to as a wage motion.
 4              MS. ALEXANDER:  Sure.
 5              THE COURT:  As I said, I've authorized the payment
 6      of wages up to the priority amount.  What's the editorial
 7      employee incentives program?
 8              MS. ALEXANDER:  The editorial employee incentives
 9      program is a program that is -- we think of it kind of as an
10      article of the month type program.  And to be clear, before
11      I explain it, Your Honor, we have agreed with the U.S.
12      Trustee not to seek interim relief on that now.
13              THE COURT:  That one's July 7th --
14              MS. ALEXANDER:  That will be for July 7th, yes.
15              THE COURT:  2:00.
16              MS. ALEXANDER:  Yes.  The U.S. Trustee would like
17      a little more information, and so we intend to file a
18      supplement with respect to that.
19              THE COURT:  (Indiscernible) incentive program?
20              MS. ALEXANDER:  Same thing, Your Honor.  We've
21      agreed to kick that until July 7th.
22              THE COURT:  What's paid time off obligations?
23              MS. ALEXANDER:  Paid time off obligations is to
24      continue in the ordinary course honoring paid time off and
25      the time-off benefits that our employees have.
```

1            THE COURT:  I'll combine that with the wage

2    motion.  So to the extent it's part of the priority, sounds

3    like wages to me anyway, you can pay it as -- up to the

4    priority.

5            MS. ALEXANDER:  Thank you, Your Honor.

6            THE COURT:  Which is an aggregate limit,

7    obviously.

8            MS. ALEXANDER:  Yes.

9            THE COURT:  Next, independent contractors and

10   temporary employees?

11           MS. ALEXANDER:  Yes, our independent contractors.

12   So the nature of the Debtor's business is that they use a

13   lot of independent contractors as writers.  Those writers --

14   in fact, they've used something like a thousand over the

15   last few years.

16           What our -- what the company did was to go through

17   and figure out how many they've used in the last few months

18   and we came up with around 160.  These are individuals who

19   submit individual pieces to be published on the website.

20   So, articles, postings, things like that.

21           They provide content.  And, of course, the content

22   of the website drives the advertising revenue that the

23   company gets.  So these are important parties.

24           The independent contractors, many of them could be

25   salaried employees but choose not to be salaried employees

 1   for one reason or another.  But they are continuing to

 2   provide services to the Debtors on a regular basis.  They're

 3   paid through invoices, effectively invoicing the company or

 4   providing timesheets to the company.

 5          The analysis we've done suggests that there

 6   shouldn't be any independent contractor who's owed at this

 7   time more than around $7,000, based on historical

 8   submissions and how much work we think they've done.  But we

 9   don't seek -- obviously, we don't seek to pay any individual

10   more than the traditional wage cap.

11          THE COURT:  Does anybody object to the payment up

12   to the wage priority of any independent contractors?  The

13   record should reflect there's no response.  I'll approve

14   that they're essentially wages, up to the priority amount

15   per person.

16          MS. ALEXANDER:  The other large component of our

17   motion, Your Honor, is --

18          THE COURT:  And you didn't mention -- you can also

19   pay the temporary employees up to the priority.

20          MS. ALEXANDER:  And then, Your Honor, the other

21   large components of our motion are the employee benefit

22   plans, to continue funding those.  And then as you'll see

23   there on Page 19 of our motion, we have $350,000 of the

24   $881,000 that we seek is actually withholding and payroll

25   tax.

1          THE COURT:  Well, withholding tax I don't have a

2     problem with. It's not the Debtor's money.  They're trust

3     funds.  Do the payroll taxes include the Debtor's portion of

4     the payroll taxes --

5          MS. ALEXANDER:  Yes.

6          THE COURT:  -- or are they just the withholding --

7     withheld taxes?

8          MS. ALEXANDER:  I believe it includes the Debtor's

9     portion of the payroll taxes as well.

10          THE COURT:  Let me go back.  First thing you have

11    are your employee benefit obligations.  There's -- oh, by

12    the way, with respect to all the claimants, their wages, I'm

13    also directing you to pay the taxes that go with the wages,

14    whenever they're due.

15          Tell me about health insurance benefits.

16          MS. ALEXANDER:  The health insurance benefits,

17    Your Honor, the company provides very generous health

18    insurance benefits for its employees.  The health insurance,

19    which includes medical, dental, vision and spending

20    accounts, the core medical is paid somewhere between 77

21    percent and 100 percent for employees, in terms of the

22    company fully providing them with care.  Dental, vision and

23    spending accounts are funded by employees themselves.

24          The company also provides, at its cost, life and

25    disability insurance, health club memberships, and other

Page 34

1   miscellaneous benefits to the employees.

2           We have done the analysis to figure out -- we do

3   not believe that any employee would exceed the cap by having

4   their benefits continued to be paid and the prepetition

5   amounts satisfied on behalf of the employees.  And --

6           THE COURT:  But you say you owe $66,000 on the

7   health insurance benefits?

8           MS. ALEXANDER:  Yes, Your Honor.

9           THE COURT:  When is that payable?

10          MS. ALEXANDER:  I don't know the exact date of

11  when it's payable.  I know it is in the interim, so it would

12  be in the next -- the advice I gave was in the next 21 days

13  and whether or not we needed the funds.

14          THE COURT:  Well, I've scheduled a hearing on July

15  7th.  Can it wait until then?

16          MS. ALEXANDER:  My CRO, Your Honor, is shaking his

17  head no.

18          THE COURT:  And why not?

19          MS. ALEXANDER:  I believe, Your Honor, it's due

20  before then.  We could obviously --

21          THE COURT:  Well, when is it due?  That's what I'm

22  asking.

23          MR. HOLDEN:  June 1st.

24          MS. ALEXANDER:  July 1st.

25          MAN:  Oh, it's past due.

```
 1              THE COURT:  It's past due?

 2              MS. ALEXANDER:  Sorry.

 3              THE COURT:  Does anybody object to the payment of

 4    approximately $66,000 in connection with past due amounts

 5    under the health insurance plan?

 6              The record should reflect there's no response.

 7    I'll authorize that payment.  Again, it's part of the

 8    ultimate priority amounts.

 9              In terms of going forward, you can go forward on

10    an interim basis, but that will be reviewed with the

11    Committee on July 7th or thereafter.

12              And you didn't mention it, but you can pay the

13    Kinja amount to the Hungarian creditor.

14              MS. ALEXANDER:  Okay.  Thank you, Your Honor.

15              THE COURT:  How much do you owe with respect to

16    life and disability?

17              MS. ALEXANDER: Our life and disability insurance

18    is provided by the company.  It's seeking $84,000 in interim

19    relief.  I think that -- excuse me, Your Honor.  I

20    understand that there are outstanding payments that are long

21    past due.  There are a few payments that never made it into

22    our accounts payable.

23              THE COURT:  And then have you gotten any notices

24    from the insurers that they are going to terminate the

25    policies?
```

1          MS. ALEXANDER:  Not to my knowledge, Your Honor.

2          THE COURT:  All right.  We'll put that on for July

3     7th.  If you get such a notice, you can come back.

4          MS. ALEXANDER:  Thank you, Your Honor.

5          THE COURT:  I'm not sure they can send you the

6     notice anyway but -- at this point.

7          Okay.  Spending accounts.

8          MS. ALEXANDER:  Spending accounts.

9          THE COURT: Are these flexible spending accounts?

10         MS. ALEXANDER:  I'm sorry, Your Honor...

11         THE COURT:  These are flexible spending accounts?

12         MS. ALEXANDER:  Yeah, these are flexible spending

13    accounts which I believe, Your Honor, are just held in trust

14    for our employees.

15         THE COURT:  Yeah.  Does anybody object to the

16    payment of $9,000 in connection with the flexible spending

17    accounts?

18         The record should reflect there's no response.

19    That's authorized.

20         Retirement plans.

21         MS. ALEXANDER:  Retirement plans.  So the Debtors

22    operate a 401(k) savings plan through Fidelity Investments.

23    The 401(k) -- for each of the 401(k) plans, the Debtors --

24    oh, for the total 401(k) plan for all the Debtors, I should

25    say -- the Debtors estimate that they hold approximately

1    $39,000 on account of the employee contributions to the

2    plan.

3            Gawker itself also makes contributions to the plan

4    for each of its employees who's been employed for over a

5    year.  The employees get 3 percent of their annual salary

6    contributed.  As of the petition date, Gawker contributes

7    approximately $20,000 on a biweekly basis for the employees

8    who qualify for this contribution.  And at this time, as of

9    the petition date, Gawker believes it owes approximately

10   $20,000 for prepetition contributions to that 401(k) plan.

11           THE COURT:  Does anybody object to the payment of

12   the past-due retirement amounts and going forward, at least

13   on an interim basis?

14           The record should reflect there's no response.

15   I'll approve the payment, certainly the employees' portion

16   of payment if the Debtor holds that in trust, but also the

17   Debtor's portion of the payments, and to continue the plan

18   on an interim basis.

19           And next is health club membership.

20           MS. ALEXANDER:  Health club membership.  The

21   company provides the health club membership for all of its

22   employees.  There are approximately 99 participants in the

23   U.S. and 25 in Hungary.  I don't know the due date for the

24   health club membership fees, though I think there is a

25   chance if Your Honor is reluctant to approve this one that

1    we could --

2              THE COURT:  July 7 at 2:00.

3              MS. ALEXANDER:  Push this to July 7, sure.

4              THE COURT:  Employee expense obligations?

5              MS. ALEXANDER:  Employee expense obligations.  So

6    the company, as of right now, owes approximately $29,000 to

7    employees for expenses that they themselves incurred for the

8    benefit of the company engaged in their work.

9              The expenses for some employees, because they are

10   investigative reporters involved -- large expenses, like

11   flying and cars and lodging and things like that.  The

12   extent of the expenses, as I understand them, the largest

13   one outstanding is just over $2,000, and the average

14   outstanding expense is somewhere around $350.00, again,

15   largely reimbursement for travel costs for reporting.  Of

16   course, the company would very much like to ensure that

17   their employees who have spent their own money doing work

18   can be reimbursed for that immediately so they're not out

19   the funds.

20             THE COURT:  Does there any -- is there anyone who

21   objects to the reimbursement of the employee expenses?

22             The record should reflect there's no response.

23   I'll authorize that.

24             MS. ALEXANDER:  Your Honor, the only other aspects

25   of the motion are severance obligations, which we're

```
 1    obviously not addressing today.

 2              THE COURT:  July 7th.

 3              MS. ALEXANDER:  July 7th?  And then we just have

 4    payroll administration fees.  We use ADP to handle all of

 5    our payroll.  We'd, of course, like them to keep handling

 6    our payroll in the ordinary course.  So we would like to pay

 7    them the $11,000 they're owed.

 8              THE COURT:  You -- actually, we glossed over the

 9    payroll taxes.

10              MS. ALEXANDER:  Oh, I'm sorry, Your Honor.  I

11    thought we covered that.  My apologies.

12              THE COURT:  Now, how much did you say is the

13    Debtor's payroll -- portion of the payroll taxes?

14              MS. ALEXANDER:  Um --

15              THE COURT:  And is that part of the same -- is

16    that part of the same return when you pay the employees'

17    portion?

18              MS. ALEXANDER:  It is -- I don't know that I have

19    it -- the withholding and payroll tax obligations broken out

20    here.  I'm looking.

21              THE COURT:  I think you told me.  You said it was

22    $350,000 in the aggregate.

23              MS. ALEXANDER:  Your Honor, if you'll give me just

24    one moment --

25              THE COURT:  Sure.
```

1          MS. ALEXANDER:  -- I'm going to confer with my

2     CRO.  Hopefully, he can give me the numbers.

3          So it's $300,000 total for employee and employer

4     obligations.

5          THE COURT:  So it's not $350,000?

6          MS. ALEXANDER:  Just one second, Your Honor.

7          Your Honor, the combined is actually $350,000.  I

8     just confirmed.  And we -- at this point in time, we don't

9     know the split between employee versus employer obligations.

10          THE COURT:  It's usually about 80 percent employee

11     and 20 percent (indiscernible).

12          Does anybody object to the payment of the

13     withholding taxes -- oh, the payment of the payroll taxes or

14     the payroll administration fees?

15          The record should reflect there's no response.  I

16     will authorize those payments.

17          MS. ALEXANDER:  Thank you, Your Honor.  With that

18     on wages, we'll obviously revise our order and provided to

19     the U.S. Trustee and all the other parties for their review

20     before submitting it to Your Honor.

21          The next motion we have, if we take them in order,

22     I think is taxes?

23          THE COURT:  Okay.

24          MS. ALEXANDER:  Okay, our tax motion.  On an

25     interim basis, we are seeking to pay a total of about

1    $65,000; $45,000 here in the U.S., which is property tax,

2    and $20,000, which is taxes to various Hungarian taxing

3    authorities, which I will acknowledge to Your Honor I have

4    no mastery of the Hungarian taxing system.

5              THE COURT:  And the last thing you want to do is

6    get into a tax dispute with a foreign country

7    (indiscernible).

8              MS. ALEXANDER:  Yes, certainly, and in a foreign

9    country, no less.  And so that's what we would like to pay

10   on an interim basis.  And then the Hungarian taxes increase,

11   obviously for July 7th.  We're going to need additional

12   funds to keep paying those.

13             THE COURT:  Are the property taxes overdue?  The

14   U.S. property taxes?

15             MS. ALEXANDER:  U.S. property taxes, yes.

16             THE COURT:  Is there anyone who wants to be heard

17   in connection with that motion?

18             MS. ARBEIT:  Your Honor, Susan Arbeit for the U.S.

19   Trustee.  We had requested, and we haven't seen a revised

20   order, just that none of these taxes are being accelerated.

21   Otherwise, we have no objection.

22             THE COURT:  Yeah.  Obviously, I'm not authorizing

23   you to pay them before their due, but once they're due, the

24   taxes accrue at a faster interest rate and you can

25   (indiscernible) your money, so they should be paid.

1          MS. ARBEIT:  Yes, Your Honor.

2          THE COURT:  So, subject to the U.S. Trustee

3    indicating no objection on the order, I'll approve that.

4          MS. ALEXANDER:  And I should say --

5          THE COURT:  On a -- on a final basis, I guess.

6          MS. ALEXANDER:  And the U.S. Trustee made that

7    request in a number of our orders where -- requesting that

8    we add in the specific line saying payments weren't being

9    accelerated.

10          THE COURT:  All right.

11          MS. ALEXANDER:  And I'll represent that we are

12    going to make that in each of those orders.

13          THE COURT:  All right.  Next, critical vendors.

14          MS. ALEXANDER:  Critical vendors, Your Honor.

15          THE COURT:  One of my favorite orders on the first

16    day of the case.

17          MS. ALEXANDER:  The critical vendors, I -- just to

18    set the table a little bit here -- the critical vendors --

19    and I know that most debtors find most of their vendors to

20    be critical.  In our case we've --

21          THE COURT:  Looks like your finding them all to be

22    critical here.

23          MS. ALEXANDER:  So, I'll dress that.

24          THE COURT:  All except the judgment creditor.

25          MS. ALEXANDER:  We're -- here, Your Honor, I think

Page 43

1    that the number I saw this morning is we're seeking to pay

2    approximately 36 percent of our prepetition payables as

3    critical.  And I'll explain why, Your Honor, here, which is

4    that because of the nature of these businesses, there's

5    rapid mobility in terms of providers.

6            It only takes the flip of a switch, and there's no

7    supply chain, there is no unwinding over the delivery of

8    goods.  It literally -- the services that we rely on to keep

9    the websites up and running, to keep the advertisers up and

10   running, can be turned off almost immediately.

11           So the types of vendors that we are seeking to pay

12   our really those service providers that help us to generate

13   revenue for the estate -- for the benefit of the estate.

14           THE COURT:  But you -- how do you demonstrate that

15   you're going to suffer immediate, irreparable harm if you

16   don't make these payments?  What they're going to do is

17   basically speculation.

18           You haven't told me whether any of them are

19   subject to executory contracts which none of them can

20   breach.  They face a substantial risk if they do breach it.

21   That's the problem I have with the motion.  Whereas once a

22   committee is appointed, if a committee takes a look at this

23   -- and it's the committee's money -- or it's the creditors

24   money, after all, and they say yeah, I think they're

25   critical, that goes a long way to convincing me --

 1            MS. ALEXANDER:  Yeah.

 2            THE COURT:  -- if that's the case.  So, can this

 3    wait until July 7th?

 4            MS. ALEXANDER:  Unfortunately, on the amount that

 5    we seek on an interim basis, which is only $95,000, I think

 6    that --

 7            THE COURT:  Every motion is only, only, only and -

 8    -

 9            MS. ALEXANDER:  And then it adds up.

10            THE COURT:  You know, they add up.

11            MS. ALEXANDER:  Yes, Your Honor.  I understand.  I

12    think that one of the discussions we had with the U.S.

13    Trustee was that we provided the U.S. Trustee with a list of

14    who we were paying and who we weren't, an additional

15    (indiscernible) on that.  Obviously, we'd be happy to

16    provide that to the Court in a non-public --

17            THE COURT:  I'd like -- I'd like to see the list

18    with an explanation of whether or not there subject to an

19    executory contract to provide services or goods, I suppose.

20            MS. ALEXANDER:  Sure.

21            THE COURT:  Um --

22            MS. ALEXANDER:  I can represent that I believe the

23    majority --

24            MR. GALARDI:  Whether or not they have expressed,

25    threatened, whatever, that they're not going to provide the

1   services if they don't get paid, it certainly might have

2   been information to considering the motion.

3           MS. ALEXANDER:  Yes, Your Honor.  We can certainly

4   --

5           THE COURT:  And if you want, I'll put this on

6   Monday morning on June 27th.

7           MS. ALEXANDER:  That would be fine, Your Honor,

8   and I would appreciate that very much.  We can submit a

9   supplement.

10          THE COURT:  All right.  But I want the information

11  before.  Make sure you give it to the committee also because

12  the committee's input on this one is important.

13          MS. ALEXANDER:  Okay.  And to be clear, Your

14  Honor, this is not a filing, but just a submission to the

15  Court, correct?

16              THE COURT:  Yes.  No, no -- we don't want the

17  vendors to know who we think -- or who you think is

18  critical.

19          MS. ALEXANDER:  Yes, thank you, Your Honor.  We

20  will make that submission the Court and confer with the U.S.

21  Trustee about any additional information that's needed.

22          THE COURT:  Okay.

23          MS. ALEXANDER:  The next motion on my list, Your

24  Honor, is the insurance motion.

25          THE COURT:  Does anybody object to the payment of

1    the past due premiums and the continuation, at least on an

2    interim basis of the insurance programs?  The record should

3    reflect there's no response.

4            MAN:  Yes.

5            MS. ALEXANDER:  Your Honor, I just wanted to make

6    a correction.

7            THE COURT:  You can snatch defeat from the jaws of

8    victory (Laughter).  Go ahead.

9            MS. ALEXANDER:  I just wanted to make a correction

10   for the record that two of our policies that we listed on

11   our chart on Exhibit C, we listed annual premium and

12   financing costs.  And I just wanted to note that the two

13   that are on an interim basis that are financed are

14   employment practices, liability and our workers comp.

15           THE COURT:  All right.  And again, as in the case

16   of taxes, I'm not authorizing you to accelerate any.

17           MS. ALEXANDER:  Yes, Your Honor.

18           THE COURT:  Just past due payments.  Keep the

19   policies in place pending a review.

20           MS. ALEXANDER:  Thank you, Your Honor.

21           THE COURT:  That's approved on the interim basis.

22           MS. ALEXANDER:  And I think, Your Honor, in terms

23   of first-day operational, we've --

24           THE COURT:  One other thing.  You have a utility

25   motion.  You know, I don't hear that on the first day.  You

1   get a 30 day stay to make a motion on notice your utilities.

2   You can't have that, I assume.  That these are the

3   procedures you're proposing, et cetera.  We'll make it

4   returnable July 7th.  So, get it out. And if anybody has an

5   objection, and sometimes they do object, we'll have a

6   hearing then.

7           MS. ALEXANDER:  Thank you, Your Honor.

8           If you have no further questions, Your Honor, I'll

9   cede the podium back to Mr. Galardi.

10          THE COURT:  Okay.

11          MR. GALARDI:  Your Honor, now turning to the

12  financing for this case, we did in fact, submit a separate

13  declaration.  It's at docket number 20 per again, Mr.

14  Holden, with respect to the DIP facility.

15          Your Honor, the DIP facility, as I've already

16  described it, is providing financing with respect to what we

17  believe is on an interim basis and a need that we will have

18  before the July 7th date.  There has been a budget that has

19  been circulated along with that financing.  The financing is

20  being provided by an affiliate of Cerberus.  We have had

21  discussions with the U.S. Trustee.  I think all issues but

22  maybe one are still open.

23          Your Honor, just very briefly, Mr. Holden has

24  submitted a declaration.  I don't think the people could

25  take cross examination on him, or if Your Honor had

1    questions, he could take the stand.  With respect to the

2    financing, is it one, a first takeout of the Silicon Valley

3    bank facility.  I think as set forth in Mr. Holden's

4    declaration, we shopped high and low with respect to any

5    sort of facilities when we found no one who was prepared to

6    do any sort of junior debt or even layering of debt.

7           Indeed, one of the parties that is the second lien

8    debt, we had many conversations with them, whether they

9    would come in second and add facility.  We had a limited

10   pre-petition with respect to Silicon Valley Bank, and I call

11   it Columbus Nova, Your Honor, but the entity.  There was a

12   little bit of room still to go through Silicon Valley Bank,

13   about $700,000.  So, we couldn't live on that amount.

14          With respect to the professional fees and

15   everything else that was going on, the company made a

16   determination and Mr. Holden would testify that it could not

17   live on cash collateral, even for the interim period, which

18   we had considered at one point going into these cases.

19          So, we went through and looked at all the options

20   for us.  With respect to a priming fight, it was absolutely

21   clear from Silicon Valley Bank that it was not prepared to

22   consent to a priming, so it tried to avoid those costs.  So,

23   when we got to the end of the runway with all of the

24   potential lenders, including Silicon Valley Bank, including

25   Columbus Nova, including Cerberus, the only entity that

1    stepped up to provide this financing which we think is

2    adequate for this case, is the financing from Cerberus.

3            The amount set forth in the document set forth the

4    various interest and fees and the discount.  We believe it

5    is in the best interest, because we do, in fact, need a

6    facility.  Frankly, we did not get any other offer or

7    financing that was as firm or moved as quickly as the

8    Cerberus people had moved on this financing.

9            They did request to take out the first lien

10   financing.  Fortunately, though taking it out -- first lien

11   financing, and therefore, not having the benefit of that

12   second lien credit agreement, we did work a consensual deal

13   with Columbus Nova that will essentially reflect what

14   otherwise would have been in a second lien credit agreement

15   with respect to payments; that they can't exercise certain

16   rights, such as credited rights, et cetera.

17           Importantly, with respect to Columbus Nova, we had

18   back and forth regarding a number of issues.  They are only

19   consenting, as made clear in the order, to an interim

20   priming with reserving rights with respect to final priming.

21   We had back and forth with them.  There is a (indiscernible)

22   issue within the second Columbus Nova facility.  We reserved

23   our rights with respect to that till the final.  Your Honor,

24   I believe the right to respect 506(c) is held out to the

25   final order, as is the request to have liens on avoidance

1    actions is held off to the entry of a final order.

2              I don't know if Your Honor would like to hear more

3    from Mr. Holden or from me.  I don't believe there are any

4    real objections other than one, the U.S. Trustee.

5              THE COURT:  Just one.  I just have a question

6    about collateralizing the letter of credit.

7              MR. GALARDI:  Sure.

8              THE COURT:  Why do it?

9              MR. CATSONDONIS:  Well --

10             THE COURT:  Silicon Valley would have a contingent

11   for reimbursement claim if it was forced to honor the Letter

12   of Credit, but it would be unsecured.  Why secure the claim?

13             MR. GALARDI:  Well, it wouldn't be unsecured, Your

14   Honor.  It has -- it would go into this facility, and it

15   would have a lien on our assets for the payment, so if it

16   honors that Letter of Credit, it has a lien on our assets,

17   just like any other Letter of Credit from the facility

18   would.

19             THE COURT:  Is this the primary that Cerberus is -

20   -

21             MR. GALARDI:  Which in that instance, we would

22   have them first, so Cerberus would have had to prime that

23   facility.  It's still contingent, but it's a contingent

24   first lien liability.  So, either you have them sit there

25   and have the fight and have to prime on a contingent

1    liability --

2            THE COURT:  Okay, now I understand what you are

3    saying.

4            MR. GALARDI:  So, that's why it was easier to take

5    that facility out, to clean up the capital structure and now

6    have Cerberus first and Columbus Nova second.

7            THE COURT:  Did you want to move Mr. Holden's

8    other --

9            MR. GALARDI:  I did want to move docket number 20

10    in, his other declaration in support of the Debtor in

11    Possession finance.

12            THE COURT:  Is there anybody who objects to the

13    receipt of Mr. Holden's declaration as his direct testimony

14    and/or wants to cross examine Mr. Holden?

15            The record should reflect those nos.  I'll receive

16    his second declaration in connection with the financing

17    motion.

18            MR. GALARDI:  Your Honor, I just want to see if

19    the U.S. Trustee -- what status their objection is.

20            MS. ARBEIT:  Your Honor, Susan Arbeit for the U.S.

21    Trustee.  The U.S. Trustee hasn't had a chance to review the

22    most recent proposed order, so we would like a chance to do

23    that.

24            THE COURT:  Well, I have several comments on the

25    order, so let me get through them.

1          MS. ARBEIT:  Okay.

2          MR. GALARDI:  Sure.

3          THE COURT:  Does anybody else want to be heard in

4   connection with the financing -- proposed financing order?

5   Okay, the record should reflect there's no response.

6          Page 6 -- I'm looking at numbers on the bottom,

7   not the ECF numbers.

8          MR. GALARDI:  Right.

9          THE COURT:  You have a funding regarding notice.

10  What's the evidence that supports that?

11         MR. GALARDI:  Yes, Your Honor.  Once we learned

12  from Your Honor that we had a first-day hearing today, in

13  addition to giving parties -- having the documents on file,

14  we learned yesterday and had the service -- served notice of

15  all of the first-day papers to give --

16         (Discussion off the record)

17         MR. GALARDI:  We served the top -- as set forth in

18  the motion, Your Honor, we served parties by notice by way

19  of email, as well as to some overnight mail where it was

20  available, and to others.  It set forth in the motion.

21  Those are the parties.  They were the top 50 creditors, as

22  well as the other parties and interests, Your Honor, and

23  they will follow the declaration.  Prime Clerk who we are

24  seeking to retain as the claims agent -- the notice agent in

25  this case will be filing a certification with respect to

1    that.

2              THE COURT:  And you also filed the notice on ECF.

3              MR. GALARDI:  Yes.

4              THE COURT:  All right.

5              MR. GALARDI:  And Your Honor, I noticed a blank in

6    at least mine, so that would have been -- I think it's June

7    14th will be the date that we'll ultimately get filled in on

8    the date of the notice.

9              THE COURT:  On Page 11, Paragraph I, you have the

10   finding --

11             MR. GALARDI:  Excuse me, Your Honor?

12             THE COURT:  On Page 11, Paragraph I, you have a

13   finding:  Each item of the DIP collateral constitutes

14   property of the Debtor's estates.  That should be a

15   stipulation.  I can't make that finding.

16             MR. GALARDI:  Okay.

17             THE COURT:  Next page.  This is minor, but it

18   relates to the adequate protection for the second lien

19   lenders.

20             MR. GALARDI:  Yes, Your Honor?

21             THE COURT:  364 doesn't apply.  You have it in a

22   couple of spots there, because they're just permitting the

23   use of cash collateral, not lending money.  So, they get

24   adequate protection under Section 363.

25             506(c) and 552(b), waivers, whatever should be

1    subject to the final order.  Those are creditor issues.  I

2    will hear from the committee on that.

3              MS. ARBEIT:  And Your Honor, Susan Arbeit.  One

4    thing we would like to add is an express reservation with

5    respect to the 506(c) waiver.  Perhaps, language -- you

6    know, without creditors, the rights of the parties and

7    interests to object to the final order.

8              THE COURT:  Well, it's subject to a final order,

9    so it's not effective.

10             MS. ARBEIT:  Okay.

11             THE COURT:  Unless it appears in the final order.

12             A legal question for you.  Page 13, Paragraph N,

13   there's a Motion of Business Judgment there, and I know that

14   the second lien lender who is permitting you to use cash

15   collateral is an insider.  So, they get the benefit -- does

16   it get the benefit of the business judgment here?

17             MR. GALARDI:  Your Honor, that's --

18             THE COURT:  I'm asking.  That's not a rhetorical

19   question.

20             MR. GALARDI:  Well no, and I think I have an

21   answer.  One is, with respect to the actual business

22   judgment standard, right, they are an equity holder, but

23   they were not a board member that participated in the

24   decisions with respect to that.  So my view would be, one,

25   as a second lien lender, they don't get that benefit.

```
1              But to the extent they get it as a stockholder

2    because the board acted properly, there may be a derivative

3    issue.  But as a stockholder, I'm not sure you get the

4    benefit of that.

5              THE COURT:  Okay.

6              MR. GALARDI:  It really goes to the board.

7              THE COURT:  And again, on the next page, 14, the

8    second lien lender doesn't get any protections under 364(e),

9    because 364(e) does not apply to the use of cash collateral.

10   Maybe they will get under 363(m).  I'm not sure, but --

11   since it's a sale provision.

12             Under Paragraph N, the only finding that I'm

13   making is that the finance that is necessary to avoid

14   immediate and irreparable harm.  The rest of this stuff

15   isn't the basis for emergency financing work.

16             The next paragraph, O, you have a reference which

17   appears to be by the term acquired lenders, but it's not

18   defined.

19             MR. GALARDI:  It is defined in the credit

20   agreement, Your Honor.

21             THE COURT:  Why don't you refer to the paragraph

22   where it can be found, because I looked at the definitions,

23   and it wasn't really (indiscernible), by the way.

24             MR. GALARDI:  We will modify it to reflect what

25   Your Honor --
```

1            THE COURT:  There are a few in there where you

2    refer to the credit agreement, but you know, the credit

3    agreement is over 80 pages, and it's not easy to find stuff

4    in there.

5            On Page 17, you refer to the DIP budget, and you

6    refer to a variance, which is usually 10 percent or

7    something like that, but it doesn't say so in the order.  It

8    refers again to the DIP financing, which again, is very hard

9    to find in there.  So, the third of the paragraph -- where

10   it can be found.

11           Page 18 under the sub-paragraph repayment of pre-

12   petition first lien obligations, again there's a reference

13   to the DIP financing agreement.  I couldn't find that

14   definition in the definitional section, so refer to where it

15   can be found.

16           Page 19 to 20, the carry over paragraph about DIP

17   lien priority issue.  Last sentence says no lien or interest

18   avoided or preserved for the benefit of any -- I crossed

19   that out, all right.  Never mind.

20           MR. GALARDI:  Excuse me, Your Honor.  Crossed

21   that...?

22           THE COURT:  Never mind.  I already did it.

23           In the DIP -- on Page 20, and I guess this is a

24   matter of contract, but you're making the DIP superpriority

25   claim superior to the cost of sale to some extent.

1         MR. GALARDI:  Correct, Your Honor.  It's senior to

2    the breakup fee.

3         THE COURT:  And you don't think that will chill

4    your ability to sell?

5         MR. GALARDI:  The buyer hasn't in fact, gotten

6    here.  I think that we're not getting another breakup fee,

7    Your Honor.  So, this is really to the liquidated damages or

8    breakup fee expense reimbursement.  You're not really giving

9    that in a new deal, because we have given all at once.  You

10   don't have a second breakup fee.

11        THE COURT:  All right.

12        MR. GALARDI:  You don't have a second expense

13   reimbursement, so I don't believe it will chill bidding.

14        THE COURT:  Okay.  Page 22, Paragraph 4A as a

15   general reference --

16        MR. GALARDI:  364.

17        THE COURT:  -- Section 364(d) for adequate

18   protection for the second lien lender.  On Page 23, the

19   carryover provision, there's a reference to -- around the

20   claim number 364(c)(1) and the second lien lender, and the

21   second lien lender gets a claim that's given under 503(b),

22   and that's it to the extent to that it's a short pull in the

23   collateral.

24        MR. GALARDI:  Mm hmm.

25        THE COURT:  Page 26, the reservation of rights

1   provision.  My only comment is the committee gets standing

2   under this order.  The committee is a substitute for the

3   Debtor, who has entered into all of these stipulations.  The

4   committee doesn't have to comment as to standing.  So, make

5   the order clear that the committee is granted standing to

6   pursue those rights.

7           MR. GALARDI:  Excuse me, Your Honor.  I apologize.

8   The reference -- the provision you're looking at is the

9   Section 507(b) reservation?  Is that what you were

10  commenting on?

11          THE COURT:  No, no.  There is a --

12          THE COURT:  The challenge.

13          MR. GALARDI:  Section 7.  Okay.  Thank you.

14          THE COURT:  The committee doesn't have to ask for

15  standing for the challenge, since the Debtor is stipulating

16  for all this.

17          MR. GALARDI:  I understand, Your Honor.

18          THE COURT:  On Page 36, Subparagraph B, there is a

19  phrase in the second sentence:  Except as specifically

20  provided in this paragraph, the Debtors and the other

21  parties of interest shall not seek authority to use cash

22  collateral without the express written consent of the DIP

23  agent and the required lenders in their sole discretion.

24          Is that just the DIP lenders' cash collateral, or

25  does it include all cash collateral on the case?

1                MR. GALARDI:  Your Honor, I believe it's only the

2     DIP lenders, although we have the -- it's really the

3     agreement to use this cash pursuant to the budget.  That's

4     what both parties have said.

5                THE COURT:  I understand, you know, the financing

6     -- Cerberus is lending money --

7                MR. GALARDI:  Right.

8                THE COURT:  -- and I guess they can impose any

9     reasonable restriction.  But the second lien lenders are

10    allowing you to use cash collateral, and my only point is if

11    they say one day, no, you can't, seems to me you should have

12    the right to come in and say you're adequately protected --

13               MR. GALARDI:  Exactly.

14               THE COURT:  -- I can.  So, I'm just asking, does

15    this limit that's in the subparagraph just apply go the

16    first -- what is basically the first lien lender, now

17    Cerberus?

18               MR. GALARDI:  Yes.  That's what we read it to be.

19    The DIP agent and the required lenders, and Mr. Simon is

20    behind me, and this is a point that's been common.  For the

21    interim period, we're reserving all our rights to say they

22    are adequately protected.

23               THE COURT:  Okay.

24               Page 38, this is a good faith finding.  I don't

25    have a problem with the good faith finding, but the first

1    question, are the rights that are being granted to the DIP

2    lenders under this paragraph, any greater than the rights

3    that are granted under 364(e)?

4              MR. GALARDI:  Your Honor, that's sort of an

5    interesting question, because if I say yes, you could just

6    put 364(e) in.

7              THE COURT:  That's where we're going.

8              MR. GALARDI:  I know that's where you're going.

9    That's why I said it.  I don't believe they are, but I've

10   seen a lot of DIP orders, and this is actually --

11             THE COURT:  That's why they're as long as they

12   are.

13             MR. GALARDI:  That's exactly right.

14             THE COURT:  They're stuck in this, where all you

15   have to say is they'll have the rights under 364(e).

16             MR. GALARDI:  And because of case law and because

17   of other people saying whatever that means, and there's

18   interpretations, that's why it gets expanded.

19             THE COURT:  It's still whatever it means.

20             MR. GALARDI:  I understand, Your Honor.

21             THE COURT:  Why don't you say to the extent

22   consistent with Section 364.  Now, the second lien lender

23   doesn't get any benefits under 364(e).  It's not lending.

24   And as I said, I don't know if it gets the benefit under

25   363(n).  Just why maybe you're better off just having the

1  finding that they agree in good faith to let you use their

2  cash collateral and worry about it at some future day, which

3  will probably never come up.

4         MR. GALARDI:  Exactly, Your Honor.  So we will

5  work with them to make some language adjustments on that and

6  some good faith finding.

7         THE COURT:  The question about the discharge rate

8  on Page 39.  The last letter says the Debtor shall not

9  propose that it would plan or sale of the assets -- I'm

10 paraphrasing.  The entry of a confirmation letter -- a sales

11 order that is not conditioned upon the repayment of all of

12 the DIP obligations on the effective date of such plan of a

13 reorganization of sale.

14        It's an unlikely event, but in the event that

15 there is a dispute about the amount or whatever, how do you

16 deal with that?

17        MR. GALARDI:  Well, Your Honor, if there is a

18 dispute, we're back to Your Honor as to whether those

19 particular things -- whether it's the sale or those in the

20 obligation.  So if Your Honor rules that it's a payment in

21 full, they would -- and I had a dispute with him, he would

22 lose it.  If it's that we consent, then we don't have an

23 issue.  And if I lose, then I'm going to have to pay more

24 money.

25        THE COURT:  I think that has to be decided before

1   you can sell.  I mean, the simple answer is if you have

2   enough money, you just escrow them --

3           MR. GALARDI:  Exactly.  If there is a dispute,

4   that's right, if there's enough money.

5           THE COURT:  All right.  On page 41, the 552(b)

6   waiver -- all this other stuff, equities of the case,

7   although that's a secured parties dispute.  506(c).

8   Equities are the case.  552(b), liens on avoidance claims --

9   it's all subject to a finding ruling.  Those are creditor

10  issues.

11          THE COURT:  Paragraph 19.  It says that -- on Page

12  41, it says that whatever, I guess the DIP lenders do under

13  this order, including enforcing their rights and remedies,

14  they're not control person or prop 4 owners of the property.

15  Right?

16          MR. GALARDI:  Correct.

17          THE COURT:  What happens if they foreclose on the

18  property?  Don't they become owners?

19          MR. GALARDI:  If they foreclose Your Honor, then

20  the argument would be not that they didn't do it.  They

21  don't get it under this order.  They did outside of this

22  order, because Your Honor --

23          THE COURT:  Well, that's exercising the right or

24  remedy under the order.  And you think if they come in and

25  they start to decide who to pay on a day-to-day basis,

Page 63

1    they're not going to be questions of control?

2           MR. GALARDI:  Yes, they can be, Your Honor.

3           THE COURT:  All right.  What I'm prepared to say

4    is that entering into the agreement --

5           MR. GALARDI:  Right.

6           THE COURT:  -- and advancing the funds, they're

7    not control persons.  They're owners and operators.  So,

8    whatever happens in the future, happens in the future.  I

9    can't permit that.

10          MR. GALARDI:  Modify that to say by entry into the

11   agreement?

12          THE COURT:  Just limit it to that.

13          MR. GALARDI:  That's fine, Your Honor.

14          THE COURT:  And on Page 43, we have objections of

15   the rule.  It should be all objections to the interim

16   relief, not of the rule.  The motion includes the request

17   for final approval, and we haven't heard those objections,

18   if any, yet.

19          Is there anything else on this order?

20          MR. GALARDI:  Your Honor, what I'd like to do, and

21   I apologize for having not done it, is we have black lines

22   of the things that have gotten negotiated.  Maybe we can

23   walk through those pretty quickly.  I don't think the

24   subject --

25          THE COURT:  Sure.  What I'll do is, I'll approve -

1    - all right, let me take a look at these first.  Are these

2    black lined what -- the negotiations with the U.S. Trustee

3    or are these -- ?

4                MR. GALARDI:  Yes.

5                THE COURT:  All right.

6                MR. GALARDI:  Your Honor, obviously, there is a

7    change in here that Your Honor has already addressed, so

8    whatever Your Honor has addressed, we'll try not to go back

9    on.

10               THE COURT:  All right.

11               MR. GALARDI:  Not that we would go back on it, but

12   we don't have go over it again here.

13               THE COURT:  I know.

14               MR. GALARDI:  For example, there's enough static

15   (Laughter).  I'm not going to try to do that.  Your Honor,

16   there is obviously, in this black line -- I would just draw

17   your attention to some of the changes.

18               J on Page 13 -- the black line specifically says

19   its consent to the interim order.  We will modify the

20   business judgment issues that Your Honor has raised, the

21   364, so when we go through, I just want to make sure that

22   Your Honor is aware of other changes we have made.  If

23   there's anything that catches my eye, I'm just going to go

24   quickly for Your Honor.

25               There is, Your Honor, just to draw your attention

```
1    -- obviously, Paragraph 3, which is the authorization to use
2    cash collateral has to be --
3              THE COURT:  What page are you on?
4              MR. GALARDI:  24 of the black line.  It's really a
5    clarification there about co-mingling, because you have a
6    separate account, and no one is going to make an argument
7    that because we co-mingled cash that therefore, they've lost
8    their liens.  That was what that paragraph addressed to make
9    the other changes.
10             The adequate protection liens in Paragraph A on
11   the next page, Your Honor, does define a diminution in value
12   and what that means.
13             MR. GALARDI:  I believe the change in Paragraph B
14   on that same page is consistent with what Your Honor has
15   said.  We will re-read it, and obviously, the U.S. Trustee -
16   - we'll keep her in the loop and make sure that she agrees
17   with all of these changes.
18             There is -- I would draw your attention to part of
19   the adequate protection that we are giving to various
20   parties, the second lien lender, is on Page 27.  We have
21   agreed to reimburse them, at least during the interim
22   period, for their professional fees, Your Honor.  We didn't
23   agree to pay them their pre-petition, as it was part of the
24   late minute discussions.  We haven't agree to pay them a
25   make-whole.  That will be something that if we decide to do
```

1   that, that will be something on the final.  It will be put

2   into the budget.  We agreed to an amount capped at $50,000

3   for the interim period.

4           THE COURT:  Is there any objection to that? Okay.

5           MR. GALARDI:  It makes clear, on Page 28,

6   Paragraph B, that they have the right to seek a modification

7   of the adequate protection.  Again, belt and suspenders.  I

8   think we had that, anyway.

9           Your Honor, we'll note, and this will not come

10  out, given what I think Your Honor -- if I'm right in the

11  right spot.  On Page 33, right before the carve-out position

12  paragraph, I think this is where we said that you didn't get

13  standing.  But now, we understand that that will be

14  modified.  We'll go this.  One of the changes that --

15          THE COURT:  You need to say nothing in this

16  interim confers standing about any party of interest other

17  than the committee to --

18          MR. GALARDI:  Okay.  Well, we can express that,

19  Your Honor.  Thank you.

20          Your Honor, with respect to the carve-out

21  language, there was a sentence, and so we wanted to make it

22  clear it doesn't have a change.  There is the typical carve-

23  out, but what I believe is becoming more as typical.  The

24  carve-out with trigger date.  You'll see right after the

25  black line, there is a paragraph -- there is a Sentence 34 -

1    - any unused retainer held by case professionals on the

2    petition date shall be used to pay any allowed fees, in such

3    case, professional before any payment.

4            That was supposed to, and there will be a change

5    to that language that says after the trigger notice.  If

6    professionals have their retainers, they keep them until

7    there is a default, and that would be the first flag to

8    carve out.  I believe those are the substantive changes

9    (indiscernible).

10           Your Honor, I think in Paragraph 13 on Page 40, as

11   I read it and as I understand this change, this is really

12   just a way to say that this is a replacement lien, that the

13   pre-petition second lien lenders have.  So, I don't believe

14   it's substantive, but I did want to point it out, and

15   certainly, if Your Honor has an issue --

16           They have added on Page 42, and we think this is

17   also correct -- on Page 42, there is the same language that

18   you read with respect to the DIP lenders.  We will modify it

19   accordingly with the pre-petition lenders to make it that it

20   is -- you know, the way in which you modified it.  So, we'll

21   just do a parallel change there.

22           Since they now put in on Page 45, a lot of the

23   pre-petition collateral, pre-petition lenders, we'll have to

24   go back and discuss that, take that 364 out.  And I think

25   that is it, Your Honor.  Returnable on July 7th, Your Honor?

1          THE COURT:  That's fine.  Does anyone else want to

2     be heard in connection with the proposed income financing

3     letter?

4          The record should reflect there's no response.

5     What I'll do, because I don't know when you're going to get

6     me the final order and I'm going to be gone, or I may be

7     gone, is I will approve the interim order on the record as

8     modified on the record and by the blackline copy that you

9     gave me.  I'll so order the record all subject to entry of a

10    written order, but you can proceed with the deal in

11    accordance with the documents.

12         MR. GALARDI:  Thank you, Your Honor.  I appreciate

13    it.  Your Honor, that concludes the first part of the first

14    day.

15         (Discussion off the record)

16         MR. GALARDI:  Your Honor, your preference on an

17    objective deadline for matters on July 7th, given the

18    holiday.

19         MAN:  July 5th?

20         THE COURT:  Why don't we make it before the July

21    4th weekend, because nobody is going to work after that.

22    So, make it July 1st.

23         MR. GALARDI:  That's fine, Your Honor.  And when

24    we have a committee, we'll obviously work with them if they

25    need any more time.

```
 1                 THE COURT:  Right.

 2                 MR. GALARDI:  Your Honor, would you like that same

 3      objection deadline for all of the interim relief?

 4                 THE COURT:  Yes.  And what I'd like you to do,

 5      when you send me the clean copy of the findings, you're

 6      going to send me a blacklined original.

 7                 MR. GALARDI:  Right.  Exactly.  Okay.

 8                 THE COURT:  All right.

 9                 MR. GALARDI:  Thank you, Your Honor.  So, I think

10      what we would now turn to is the TRO and the status

11      conference, Your Honor.

12                 THE COURT:  Okay.

13                 MR. GALARDI:  My colleague, Mr. Winograd, will

14      handle it from our side.

15                 MR. WINOGRAD:  Good afternoon, Your Honor.  My

16      name is Michael Winograd from Ropes & Gray on behalf of the

17      Debtors.  Your Honor, I think we're here primarily to set a

18      schedule for the pending motion for a preliminary junction

19      and/or extension of the automatic stay.

20                 It's our understanding from the Court that the

21      earliest date of a hearing for that motion would be

22      available is approximately July 7th.  Debtors, Your Honor,

23      are fine with that date, provided of course --

24                 THE COURT:  I can hear on Friday, June 24th.

25                 MR. WINOGRAD:  I believe that presents a problem
```

1    for our -- for counsel, Your Honor.

2              THE COURT:  Oh, you're seeking -- putting aside

3    the TRO for a moment, you're seeking a preliminary

4    injunction against all the other parties.  You're prepared

5    to wait until July?

6              MR. WINOGRAD:  Yes.

7              THE COURT:  Okay.

8              MR. WINOGRAD:  With two exceptions, two issues

9    that have arisen, Your Honor, between now -- with that

10   timing.  The first issue, Your Honor, is -- and both really

11   relate to, I think what is a need for the Court to either

12   confirm the scope of the TRO or otherwise, extend it.

13             The first issue involves a potential motion that

14   we understand plaintiffs in the Bollea action in Florida

15   intend to file imminently.  On June 10th, Your Honor, just

16   Friday, the TRO was issued.  A hearing was set for today.

17   The TRO enjoined Mr. Bollea from taking any steps to enforce

18   or execute the judgment.  Again, a hearing was set for

19   today.

20             As a courtesy, the same day, I received a call

21   from Mr. Bollea's counsel saying they were being engaged in

22   this bankruptcy case, and they needed more time to respond.

23   As a courtesy, we of course agreed to the extension to June

24   24th.  Just two days later, Your Honor, on that Monday, just

25   the other day, Mr. Bollea's counsel in Florida went in and

1   emailed the Court and said, we want to keep open what's now

2   an open date on July 6th for a hearing, because we

3   anticipate filing a motion or motions in connection with

4   Friday's TRO proceedings in the bankruptcy court.

5            Yesterday, I asked counsel for -- I asked Mr.

6   Fisher if he could advise us as to what kind of motions

7   those may be.

8            THE COURT:  Motions in the Florida court?

9            MR. WINOGRAD:  Yes.  And how they would not

10   violate the TRO.  He said that they did not believe the

11   motions would violate the TRO, but was not at liberty to

12   explain them to us.  This morning, we got a little bit of

13   color.  It appears that at least one of the motions may

14   relate to an affidavit Mr. Denton filed in the Florida

15   action on Thursday, June 9th.

16            But in all events, Your Honor, these types of

17   motions -- and by the way, if you look at the 117 page

18   docket sheet in Florida, it is littered with motion practice

19   and motions by plaintiffs for contempt, motions for punitive

20   damages.  These types of motions -- not only is this motion

21   problematic, we don't even know what it is yet.  But we're

22   concerned about floodgates opening up.  And this is exactly

23   the purpose of the bankruptcy proceedings.

24            THE COURT:  Right now, there's a TRO.  Let's start

25   there.

1          MR. WINOGRAD:  Yes.

2          THE COURT:  Is there an objection to the extension

3    of the TRO to the hearing date?

4          MR. FISHER:  Your Honor, Eric Fisher on behalf of

5    Mr. Bollea.  No, there is not, Your Honor.  And either the

6    June 24th or July 7th date would be acceptable to us,

7    provided we have a reasonable opportunity to take discovery

8    to prepare for an evidentiary hearing.

9          THE COURT:  All right.  So, what date are you

10   talking about for the hearing?

11         MR. WINOGRAD:  I believe we were talking about

12   July 7th, Your Honor, because June 24th does not --

13         THE COURT:  How long do you think all of this will

14   take?

15         MR. WINOGRAD:  It's difficult to say, Your Honor,

16   but I would expect that we'll put on one, maybe two

17   witnesses.  I don't know about the other side.

18         MR. FISHER:  And Your Honor, if I had to estimate,

19   I would think that we would cross examine two or three

20   witnesses.  It could be that there's overlap with the

21   witnesses Mr. Winograd has already referred to.

22         THE COURT:  I can put you on for July 7th, also at

23   2:00.  I don't know if I'll be able to complete it.  I guess

24   we can carry over to you know, the next day, which is a

25   Friday, July 8th.  I know it's during the summer and nobody

1    wants to try a case on Friday, but unless you can agree to a

2    further extension.  And if you want to go to the next week,

3    then I can give you a whole day starting at 10:00.

4              MR. FISHER:  Your Honor, again, from Mr. Bollea's

5    point of view --

6              THE COURT:  You're the only one I'm asking,

7    because you have a TRO, and technically, it expires in 10

8    days.  As long as you're willing to continue it and the

9    Debtor doesn't have a problem with the other issue -- you

10   know, the other cases, then that's fine.

11             MR. FISHER:  Your Honor, I think subject to the

12   clarifications that Mr. Winograd is raising with Your Honor,

13   we don't have a problem putting the hearing over to the

14   following week and keeping the TRO in place.

15             THE COURT:  All right.  I can give you July 13th,

16   Wednesday and you can come in at 10:00 for the witnesses.

17   All right, now tell me about this -- you want to make a

18   motion in Florida, notwithstanding the automatic stay in the

19   TRO.  So, tell me how you're going to do that.

20             MR. FISHER:  Yes, Your Honor, and just a little

21   bit of context, because we have not yet had an opportunity

22   to be heard in connection with this matter.  But the day

23   that the Court entered the TRO here, there was a hearing in

24   Florida in the morning that was attended by Mr. Bollea's

25   lawyers in the Florida action, and then there was a

1    proceeding here ex parte without any notice to any of Mr.

2    Bollea's lawyers.

3            And this will be developed more fully at the

4    evidentiary hearing, Your Honor, but --

5            THE COURT:  That's why I was willing to hear you

6    today.

7            MR. FISHER:  But what was told to the Court in

8    connection -- at least in the written papers, including in

9    Mr. Hogan's declaration in support of the TRO is simply not

10   accurate.  It is not an accurate description of what

11   happened in Florida.

12           What happened in Florida is that on July 9th -- on

13   June 9th, I'm sorry, Your Honor, the day before this

14   bankruptcy filing, a motion was made by Gawker seeking a

15   stay -- pending appeal and seeking relief from the bond

16   requirement.  And in connection with that motion, they

17   offered to pledge their stock.

18           At the hearing that morning in Florida, Mr. Bollea

19   accepted that offer and the Court ruled from the bench that

20   she would be granting the stay on those terms, subject to

21   certain conditions.  And the judge in Florida, later that

22   afternoon, was expecting a written order -- proposed written

23   order reflecting her bench ruling that morning.  And in the

24   interim, there was an ex parte proceeding here that resulted

25   in the TRO.

1          In connection with the pledge of stock, all of Mr.

2     Denton's stock in the Florida action, what was told to the

3     Court or what was represented to the Court was that the

4     stock was valuable.  It was very clever, but also, very

5     misleading.  It made reference to expert reports that had

6     been put in by Mr. Bollea much earlier in the case

7     suggesting stock had an equity value of $81 million.

8          And so, it was made to seem to the Court in

9     Florida that there was a pledge of something of great value

10    as a condition of staying execution, when we now know from

11    the papers that were filed here ex parte, the resolutions

12    had already been passed three days earlier to have this

13    bankruptcy proceeding commence.

14          So, we have serious questions about the timing.

15    We have serious questions about the candor with which the

16    state proceeding was handled in Florida.  And all we're

17    saying with regard to the TRO is of course, the TRO says

18    what it says.  And what it says -- and the Court was very

19    careful to not enjoin the Bollea litigation, which is

20    essentially what they're asking for now.  They want to

21    continue the Bollea litigation.  They want to continue the

22    appeal.  But they essentially --

23          THE COURT:  They'll need relief from the automatic

24    stay for that.

25          MR. FISHER:  They will, Your Honor.  But they're

1    essentially asking us not to take steps in the Florida

2    action that relate directly to the stay litigation and that

3    are not --

4              THE COURT:  So, what is it that you want to do in

5    the Florida action?

6              MR. FISHER:  Your Honor, when I say what I'm going

7    to do, I should point out that --

8              THE COURT:  Are you saying that they were keeping

9    two options open?  They already had the authority to file a

10   bankruptcy.  They were also pursuing the option of pledging

11   the stock which does appear to be valuable, by the way,

12   since they have a $90 million deal.  And they decided,

13   finally, to file bankruptcy.  What are you going to say?

14             MR. FISHER:  Well, Your Honor, that's why -- well

15   really, what was said to the Florida court is for Judge

16   Campbell in Florida to decide.

17             THE COURT:  Right.

18             MR. FISHER:  And of course, what was said to this

19   Court will be for Your Honor to decide at the evidentiary

20   hearing.  Florida counsel and Mr. Bollea want the

21   opportunity to make motions that they believe they're

22   entitled to make.  In particular, for example, motions for

23   sanctions that are not judgment enforcement motions.  This

24   Court has already provisionally --

25             THE COURT:  Are you going to make a motion for

 1   sanctions against the Debtor?

 2          MR. FISHER:  No, of course not, Your Honor.

 3   Against Mr. Denton, who submitted the declaration pledging

 4   his stock and make representations about its value.

 5          THE COURT:  Well, what is the misrepresentation

 6   about the value?

 7          MR. FISHER:  He led the Court to believe that he

 8   was pledging stock of great value in support of --

 9          THE COURT:  And you don't think it's valuable?

10          MR. FISHER:  Your Honor, it's a very preliminary

11   stage in the case, but I --

12          THE COURT:  Well, what percentage of the company

13   does he own?

14          MR. FISHER:  Thirty percent, Your Honor.

15          THE COURT:  Thirty percent, and that will be

16   (indiscernible).  You know, the stock may not be valuable,

17   but the judgment (indiscernible) be insolvent after all is

18   said and done.  But without the judgment, it sounds like

19   it's valuable.

20          MR. FISHER:  Your Honor, I recognize how

21   complicated my issues are, and that I'm --

22          (Simultaneous discussion)

23          THE COURT:  You know what I recognize?  You know

24   what I recognize?  You should just stand down the litigation

25   for the time being.  Because one of the things I want to ask

1    the Trustee -- I'm sorry, the Debtor is how is all of this

2    going to be resolved.

3           Mr. Bollea has a $140 million judgment.  Nothing

4    is going to change about that judgment in this Court.  How

5    are you going to deal with this issue?

6           MR. GALARDI:  Your Honor, I think you've asked the

7    question and actually had answered it before.  What we

8    intend to do is get the sale done, which is the purpose of

9    standing down, and then the stay will be lifted, and that

10   proceeding will proceed in Florida.  There is no choice.

11          THE COURT:  Right.

12          MR. GALARDI:  It either has to proceed or the

13   judgment gets paid.

14          THE COURT:  But what about other all of these

15   other proceedings, because they sound like personal injury

16   type actions?

17          MR. GALARDI:  Again, and Your Honor is very

18   familiar with how you deal with those.  They may file a

19   personal claim.  If they're personal injury, we don't have

20   jurisdiction.  If not -- but those are not at the same stage

21   as this litigation was.

22          THE COURT:  Right.

23          MR. GALARDI:  In fact, to avoid stopping that

24   litigation, we had to -- we let that one run until they got

25   the judgment, and that will -- and I've actually said to Mr.

Page 79

1    Fisher, let's talk about focusing not on the ancillary

2    litigation and all that.  Let's talk about getting that

3    judgment through the appellate process on an expedited

4    basis.  That's what our goal is.

5              But again, Mr. Denton, right now, is involved in

6    the sale process for the next 60 days.  There's a lot going

7    on with the company, which Your Honor understands.  And we

8    simply wanted to stay the activity there for that process.

9    And we'll gladly speak to Mr. Fisher and counsel as to how

10   to let Florida go forward.

11             THE COURT:  Well, Florida is eventually going to

12   go forward.

13             MR. GALARDI:  Yes.

14             THE COURT:  And you know, when I read all this, I

15   thought that everybody should just stand down and let the

16   sale go through, because that's in everybody's interest.

17   And then eventually, you're going to have to go back to

18   Florida and fight out all these issues.

19             MR. FISHER:  Your Honor, Mr. Bollea -- and I hope

20   you'll note from the way we did not take a position on many

21   of the motions today, is interested in giving Gawker the

22   room that it needs to maximize value here.  There just are -

23   - and again, I think an evidentiary hearing is required to

24   really get to the bottom of what was told to this Court, and

25   whether Mr. Denton is really essential to the sale process,

1   given that Houlihan Lokey has been involved in it since May.

2   There is a CRO.  There is a president.  Mr. Denton's name

3   hasn't come up hardly at all during this --

4           THE COURT:  That's an issue for the trial.  So,

5   your intention is to go back to Florida and make this motion

6   against Mr. Denton?

7           MR. FISHER:  Yes, Your Honor.

8           MR. GALARDI:  And Your Honor, if the Court is

9   going to set a hearing date --

10           THE COURT:  Are your witnesses available tomorrow?

11           MR. GALARDI:  I don't know, but we could find out

12   in short order, Your Honor.

13           THE COURT:  All right.  That's the way -- we're

14   going to have to start the trial tomorrow.  All right?

15           MR. FISHER:  Your Honor, may I have a moment to

16   confer with my co-counsel?

17           THE COURT:  Sure.  Why don't we take a recess?

18           MR. FISHER:  Thank you, Your Honor.

19           (Recess)

20           CLERK:  Please be seated.

21           THE COURT:  All right.  I've just had a

22   conversation in chambers.  We have litigants involved in the

23   Florida action, and I'll ask you if you agree to this, but

24   my understanding is that the parties have agreed to a

25   complete standstill of all matters in the Florida litigation

 1    until July 13th, at which point we will take up whether that

 2    standstill should end or should be extended or what else

 3    will happen.  Is that acceptable to the plaintiffs in the

 4    Florida litigation?

 5              MR. FISHER:  Yes it is, Your Honor.

 6              THE COURT:  Is that acceptable to the defendants

 7    in the Florida litigation?  I realize you don't represent

 8    Mr. Denton, but --

 9              MR. GALARDI:  Yes it is, Your Honor.  We

10    understand it.

11              THE COURT:  All right.  Fine.  Then I will so

12    order the record -- I guess it's a modification on consent

13    to the TRO so it's clear.  I'll see you on the 13th.

14              MR. FISHER:  Thank you, Your Honor.

15              MR. GALARDI:  Your Honor, one housekeeping measure

16    that --

17              THE COURT:  I'll see you on the 7th, then.  Yes?

18              MR. GALARDI:  The 27th was the date Your Honor

19    scheduled for a bid procedures hearing.

20              THE COURT:  Yes.

21              MR. GALARDI:  And we have a committee formation on

22    the 24th.  We were going to ask Your Honor a preference for

23    an objection deadline for that bid procedure --

24              THE COURT:  I'll hear objections orally.  I assume

25    it's (indiscernible) bid procedures.

```
 1              MR. GALARDI:  I believe it's plain vanilla.  So,
 2    if it's orally -- is it possible for anyone other than the
 3    committee to just set the June 24th and honor -- if they
 4    have a problem, contact us?  We're not going to -- we won't
 5    hang anybody up to dry, but we wouldn't -- we would like to
 6    know if there an objection from particular parties as we
 7    come into the hearing.  If that would be appropriate, we --
 8    I don't think I've ever raised --
 9              THE COURT:  Well, I can set an objection deadline
10    of 9:00 a.m. on Monday morning, so you might come
11    (indiscernible).
12              MR. TORKIN:  Good morning, Your Honor.  Michael
13    Torkin, Sullivan & Cromwell on behalf of (indiscernible).
14    The only unusual aspect --
15              THE COURT:  You've been here before.  I remember
16    (indiscernible) --
17              MR. TORKIN:  Thank you for recognizing me, Your
18    Honor.
19              The only unusual piece is it is a pre-petition and
20    briefing.  We're asking the Debtors to assume that
21    obviously, subject to Your Honor ultimately approving a
22    sale.  So, it's a little bit more to it, given all the
23    interesting constituencies in this case.
24              It would be better off -- at least I understand
25    from the committee, it would be good by the 24th if there's
```

1    someone other than the committee.  If they would raise

2    objections, obviously, in the committee -- I understand

3    (indiscernible) --

4             THE COURT:  Let me see if I can get another judge

5    to deal with this, because I'll be out of town.  And then,

6    you can have (indiscernible) a couple days later in the

7    week, and that will give you a little bit more time.

8             MR. GALARDI:  Your Honor, that be wonderful for my

9    schedule.  As long as it's before July 1st, then --

10             THE COURT:  Let me see what I can do.  Let's hold

11    onto that June 27th date.  Committee's response --

12    objections, if any, are the 9th.  Is the motion filed?

13             MR. GALARDI:  The motion has been filed, Your

14    Honor, yes.

15             THE COURT:  All right.  Why don't we say that any

16    other objections, I'll give you seven days before, which

17    will be the 27th.  Have you served the motion yet?

18             MR. GALARDI:  Well, we have served it out, along

19    with the other motions.  We have, Your Honor.

20             THE COURT:  All right, so just serve the notice --

21    file the notice on ECF and serve a notice that if they have

22    any objections -- assuming if there are any objections, are

23    due by let's say 4 or 5 p.m. on June 20th.

24             MR. GALARDI:  Your Honor, I may be the only one

25    (indiscernible) in the courtroom.  Are we going to go

1    forward on the 27th, or are you going to look for another

2    date.

3              THE COURT:  Well, let me see if I can find another

4    judge.  Does that schedule work for you?

5              MR. TORKIN:  The 27th would work.

6              THE COURT:  All right.  Knowing that you may not

7    get an objection from the committee until --

8              MR. TORKIN:  If we have an issue with the

9    committee, we'll deal with the committee and adjourn the

10   hearing.

11             THE COURT:  All right, so why don't you --

12             MR. TORKIN:  We'll manage the process.

13             THE COURT:  All right.  Submit a scheduling order

14   today --

15             MR. GALARDI:  Okay.

16             THE COURT:  -- that provides for any objections to

17   the proposed sale procedures are due by June 20th, so

18   they're received by June 20th, 5 p.m.  The committee has

19   until 9 a.m. on June 27th.

20             MR. GALARDI:  Thank you, Your Honor.

21             THE COURT:  All right?

22             MR. GALARDI:  Thank you.  That now adjourns the

23   matter.

24             THE COURT:  All right.

25             MR. GALARDI:  Thank you very much.

Page 85

1                THE COURT:  Thank you.  Good luck.

2                MR. FISHER:  Thanks very much.

3                (Whereupon these proceedings were concluded at

4      12:56 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 86

1                          I N D E X

2

3                          RULINGS

4                                          Page        Line

5    Debtor's Motion for an Order (I) Granting    19          21

6    a Waiver of the Requirements of Local Rule

7    1007-2(a), (b), and (c), and (11) Granting

8    an Extension of Time to File Lists Required

9    by Bankruptcy Rule 1007.

10

11   Debtors' Motion for Joint                    19          14

12   Administration.

13

14   Debtor's Motion for Entry

15   of an Order Establishing Certain Notice,

16   Case Management, and Administrative

17   Procedures and Omnibus Hearing Dates.

18

19   Debtor's Motion for Entry                    27          14

20   of Interim and Final Orders Authorizing

21   the Debtors to Continue Using the Debtors

22   Bank Accounts, Business Forms, and Cash

23   Management System, and Granting Related

24   Relief.

25

Page 87

```
1    Debtor's Motion for Entry of Interim         39          13

2    and Final Orders (I) Authorizing, but

3    not Directing, Payment Of Prepetition

4    Wages, Salaries, Business Expenses,

5    Employee Benefits and Related Items,

6    and (11) Directing All Financial

7    Institutions to Honor Checks for

8    Payment of Such Obligations.

9

10   Debtor's Motion for Entry of Interim         41          2

11   and Final Orders Authorizing Payment

12   of Income Taxes, Property Taxes, Sales

13   and Use Taxes and Hungarian Taxes.

14

15   Insurance Motion Approved                    46          21

16   on an Interim Basis

17

18   Approve the Interim Order                    68          7

19

20

21

22

23

24

25
```

```
 1                   C E R T I F I C A T I O N

 2

 3     I, Sonya Ledanski Hyde, certified that the foregoing

 4     transcript is a true and accurate record of the proceedings.

 5
       Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
 6                             DN: cn=Sonya Ledanski Hyde, o=Veritext,
       Hyde                    ou, email=digital@veritext.com, c=US
 7                             Date: 2016.06.16 10:49:18 -04'00'

 8     Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  June 16, 2016
```