ROPES & GRAY LLP
Gregg M. Galardi
Kristina K. Alexander
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
Gawker Media LLC, et al.,¹              :        Case No. 16-11700 (SMB)
                                        :
                    Debtors.            :        (Jointly Administered)
                                        :
-------------------------------------------------------x
```

**NOTICE OF SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF A
FINAL ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF
PREPETITION WAGES, SALARIES, BUSINESS EXPENSES, EMPLOYEE
BENEFITS AND RELATED ITEMS, AND (II) DIRECTING ALL FINANCIAL
INSTITUTIONS TO HONOR CHECKS FOR PAYMENT OF SUCH OBLIGATIONS**

**PLEASE TAKE NOTICE** that a hearing (the "Hearing") on the motion (the "Motion"),

filed June 12, 2016, and the supplement to the Motion (the "Supplement"), filed concurrently

herewith, of the above-captioned debtors and debtors in possession (collectively, the "Debtors"),

for entry of a final order (I) authorizing, but not directing, payment of prepetition wages, salaries,

business expenses, employee benefits and related items and (II) directing all financial institutions

to honor checks for payment of such obligations will be held before the Honorable Stuart M.

---

¹ The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker
Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group,
Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy
ut 66. 1062 Budapest, Hungary.

Bernstein of the United States Bankruptcy Court for the Southern District of New York (the

"Court"), in Room 723, One Bowling Green, New York, New York 10004-1408, on **July 7,**

**2016 at 2:00 p.m. (prevailing Eastern Time).**

      **PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion or

Supplement, and the relief requested therein, if any, shall be in writing, shall conform to the

Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District

of New York, shall set forth the basis for the response or objection and the specific grounds

therefore, and shall be filed with the Court electronically in accordance with General Order M-

399 by registered users of the Court's case filing system (the User's Manual for the Electronic

Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the

Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule

9028-1 and served so as to be actually received no later than **July 1, 2016**, at **5:00 p.m**.

(prevailing Eastern Time) (the "Objection Deadline"), upon: (i) the Debtors, Gawker Media

LLC, 114 Fifth Avenue, 2d Floor, New York, New York  10011, Attn. Heather Dietrick

(heather@gawker.com); (ii) proposed counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue

of the Americas, New York, New York 10036, Attn: Gregg M. Galardi

(gregg.galardi@ropesgray.com);  (iii) the Office of the United States Trustee for the Southern

District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes &

Susan Arbeit; (iv) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth &

Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris

(adam.harris@srz.com); (v) counsel to US VC Partners LP, as Prepetition Second Lien Lender,

Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn:

David Heller (david.heller@lw.com) & Keith A. Simon, 885 Third Avenue, New York, New

York 10022, Attn: Keith A. Simon (keith.simon@lw.com); and (vi) parties that have requested

notice pursuant to Bankruptcy Rule 2002.

PLEASE TAKE FURTHER NOTICE that a copy of the Motion and Supplement may

be obtained free of charge by visiting the website of Prime Clerk LLC at

http://cases.primeclerk.com/gawker. You may also obtain copies of any pleadings by visiting the

Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set

forth therein.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned

thereafter from time to time without further notice other than an announcement of the adjourned

date or dates at the Hearing or at a later hearing. The Debtors will file an agenda before the

Hearing, which may modify or supplement the Motion and Supplement to be heard at the

Hearing.

57540912_4

**PLEASE TAKE FURTHER NOTICE** that if no objections or other responses are timely filed and served with respect to the Motion and Supplement, the Debtors shall, on or after the Objection Deadline, submit to the Court an order substantially in the form annexed as **Exhibit 1** to the Supplement, which order the Court may enter with no further notice or opportunity to be heard.

Dated:  June 20, 2016
      New York, New York

/s/ Gregg M. Galardi
ROPES & GRAY LLP
Gregg M. Galardi
Kristina K. Alexander
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
kristina.alexander@ropesgray.com
Stacy.dasaro@ropesgray.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

-4-

Ropes & Gray LLP
Gregg M. Galardi
Jonathan P. Gill
Kristina K. Alexander
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                        :

In re                         :       Chapter 11
                          :

Gawker Media LLC, *et al.*,[1]     :       Case No. 16-11700 (SMB)
                          :

              Debtors.     :       (Jointly Administered)
                          :
-------------------------------------------------------x

**SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER (I)
AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF PREPETITION WAGES,
SALARIES, BUSINESS EXPENSES, EMPLOYEE BENEFITS AND RELATED ITEMS,
AND (II) DIRECTING ALL FINANCIAL INSTITUTIONS TO HONOR
CHECKS FOR PAYMENT OF SUCH OBLIGATIONS**

        Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"),  and

Kinja Kft. ("Kinja"), debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), respectfully submit this supplement (the "Supplement") to their

motion (the "Motion") for entry of a final order, as further revised and attached hereto as Exhibit

1 (the "Revised Proposed Final Order"), authorizing the payment of certain prepetition

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

Employee Obligations and the continued payment of certain Employee Obligations in the ordinary course of business, directing financial institutions to honor checks for payment of such Employee Obligations, prohibiting financial institutions from restricting automatic transfers to employees' accounts for Employee Obligations, and other related relief, as set forth in the Motion [Docket No. 13] and this Supplement.  In support of the Motion and this Supplement, the Debtors hereby incorporate by reference the *Declaration of William Holden in Support of First Day Motions* (the "First Day Declaration") [Docket No. 7], and the *Supplemental Declaration of William Holden in Further Support of Debtors' Motion for Entry of a Final Order (I) Authorizing, But Not Directing, Payment of Prepetition Wages, Salaries, Business Expenses, Employee Benefits and Related Items, and (II) Directing All Financial Institutions to Honor Checks for Payment of Such Obligations*, attached hereto as Exhibit 2.[2]  In further support of the relief requested, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 363(c), 503(c), 507(a), 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6004(a) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day Declaration or the Motion.

## Procedural Background

4.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.   On June 12, 2016, GMGI and Kinja each filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors are operating their businesses as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No official committee of unsecured creditors, nor any trustee or examiner, has

been appointed in these cases.

7.      The factual background regarding the Debtors, their business operations, their

capital and debt structure, and the events leading up to the filing of these chapter 11 cases are set

forth in detail in the First Day Declaration.

## Relief Requested

8.      By its Motion the Debtors sought, among other things, entry of orders

authorizing, but not directing, the Debtors to provide certain relief on an interim and final basis,

including to:

    a)  pay editorial employee incentives (the "Editorial Incentives"), and continue to
        honor such obligations in the ordinary course of business (the "Editorial Incentive
        Program");

    b)  pay discretionary incentives to ad sales team members and employees who
        support ad-related sales (the "Sales Incentives" and together with the Editorial
        Incentives, the "Incentive Payments"), and continue to honor such obligations in
        the ordinary course of business (the "Sales Incentive Program" and, together with
        the Editorial Incentive Program, the "Incentive Programs"); and

    c)  honor severance obligations that arise from termination of employment on a
        postpetition basis ("Postpetition Severance Obligations").

9.      The Debtors adjourned all relief on (a) through (c) above, as well as certain other

relief, until the "second day" hearing in these cases, scheduled for July 7, 2016.  The Debtors

-3-

submit this Supplement to provide further information and support with respect to the relief
requested in (a) through (c) above.

### A. Editorial Incentive Program

10.      On a monthly basis, certain editorial, non-executive employees of Gawker Media
are eligible to receive Editorial Incentives, which are incremental payments, as recognition for
publication of one of the best stories for a particular month.  Executive-level employees are not
eligible for this bonus pool.  To administer the Editorial Incentive Program, Gawker Media's
senior editorial and/or executive team review the top stories published to a particular website
(*Gawker, Gizmodo, Deadspin,* etc.), and rate the stories and the website's overall
performance.  Writers with the best stories and coverage are awarded incentive bonuses for their
work.  While the amount awarded to each individual writer is relatively small, as described
below, in the context of the estate's obligations and these chapter 11 cases, the bonuses are
meaningful to the editorial staff, both from a financial and a morale perspective.  The Editorial
Incentive Program was in place prepetition and operated in the ordinary course of the Debtors'
business, and was a component of the Debtors' prepetition business strategy.

11.      The total amount paid on a monthly basis under the Editorial Incentive Program is
determined by current staffing levels.  A total bonus pool is created of approximately $426 per
editorial employee at each website, per month, exclusive of certain high-ranking editors.  A
small amount may be added on account of the number of freelance writers contributing to a
particular website.  From January to April 2016, the average *total* monthly bonus pool that was
paid in the aggregate to all writers at all seven of Gawker Media's websites was approximately
$16,401 per month, with an average number of eligible writers of 165.[3]   Editorial incentives

---

[3] Independent contractors can be eligible for Editorial Incentives.

57540912_4

paid to each writer in a given month from January to April 2016 ranged between $0 and $4,047. The monthly average Editorial Incentive paid to any individual employee in February 2016, March 2016 and April 2016 were $458, $363 and $465, respectively.  From January to April 2016, only six monthly incentive payments to individual writers exceeded $1,000, with the remaining 148 payments being less than that amount.  The Editorial Incentives are entirely discretionary at the time they are awarded, and no employee is entitled to an editorial incentive bonus as part of his or her compensation before that bonus is awarded.   Instead, the Editorial Incentives are additional, discretionary compensation intended to provide motivation to maximize the quality of the content on the Debtors' websites, thus increasing website readership and profitability.

12.     The next scheduled payment for Editorial Incentives is June 30, 2016, representing the bonus pool for May articles, and which is estimated at approximately $22,567 in the aggregate for all seven of the Debtors' websites.   Because such payments are entirely discretionary and not awarded or paid during the prepetition period, no amounts were due to employees prior to the Chapter 11 filing.[4]  By this Motion, the Debtors seek approval to continue their ordinary course, discretionary Editorial Incentives Program, including distribution of bonuses that are scheduled to be awarded on June 30, 2016.

**B.  Sales Incentive Program**

13.     As part of a prepetition sales incentive and bonus program maintained in the ordinary course of the Debtors' businesses, Gawker Media's employees who work on or provide services for ad sales are eligible to receive quarterly bonus payments, payable entirely at the

---

[4] Even if the Editorial Incentives were prepetition obligations to employees, based on the Debtors' analysis no recipient of an Editorial Incentive would be paid above the wage and benefit caps set forth in section 507(a)(4) and (a)(5) of the Bankruptcy Code.

Debtors' discretion.  Sales bonuses are calculated on a quarterly basis, and are generally paid a month following the end of each quarter.   The total Sales Incentives pool is calculated based on aggregate target incentive compensation established for each employee, which is separate and apart from their regular wages.  The aggregate, annual Sales Incentive Program pool is divided by four quarters, and certain employees are eligible to receive a quarterly bonus from the quarterly bonus pool.  Sales Incentives are adjusted up or down based on approximate achievement of sales and business development goals for a respective quarter (either on an individual basis or a group-wide basis), and Debtors' performance overall.  For individuals who do not have a personal, direct revenue target, their bonus is based on performance of their team as a whole.

14.    Historically, the average quarterly aggregate bonus pool for the last four quarters was around $294,000, and approximately 45 people received sales bonuses.  For example, the aggregate Sales Incentives paid in April, 2016, following the end of the first quarter, totaled approximately $259,775.  The average bonus was approximately $5,900.   The next quarterly sales incentive bonus, to the extent the Debtors in their business judgment elect to pay such bonus to any sale(s) employees, would be paid on or around August 1, 2016.   The Debtors expect the Sales Incentives payable on or around August 1, 2016 to approximate the Sales Incentives paid in April 2016.  None of the employees who received bonuses under this program are "insiders", as defined by the Bankruptcy Code and applicable law, and only two people eligible for bonuses under the program are members of the Debtors' senior management.[5]

15.    The payments under the Sales Incentive Program are entirely discretionary.  Certain employees are hired with a "target" cash compensation that includes a salary and a

---

[5]  The Debtors' Senior Vice President of Global Sales and Partnerships and the Vice President of Business Development are eligible to receive a bonus under this program.

potential bonus, but – unlike a promised salary – whether an employee receives a sales incentive bonus, the amount of the bonus and the timing of such bonus are in the complete discretion of the company. Because such payments under the Sales Incentive Program bonuses are discretionary and paid following the end of the second quarter, if paid at all, no amounts were due to employees prior to the chapter 11 filing.[6] By this Motion, the Debtors seek approval to continue their ordinary course, discretionary sales incentive bonus program, so that the Debtors' ad sales team, responsible for driving significant revenue for the Debtors, continues to be properly compensated during these chapter 11 cases.

### C. Severance Benefits

16.    As of March 1, 2016, Gawker Media entered into a collective bargaining agreement (the "CBA") for a term of three years, expiring on February 28, 2019, with the Writers Guild of America, East. The CBA covers all full-time and regular part-time non-executive editorial employees of Gawker Media, which includes writers, columnists, editors, researchers, video employees, illustrators and other employees who perform similar functions. As a result, 102 of Salaried Employees are covered by the CBA.

17.    The CBA provides for the severance benefits of between two weeks and eight weeks of pay, depending on the length of employment with Gawker Media. Employees with

---

[6] Even if the Sales Incentives were prepetition obligations to employees, based on the Debtors' analysis, only twelve people may receive Sales Incentives that would cause their total wage and benefits paid to exceed the caps set forth in 507(a)(4) and (a)(5) of the Bankruptcy Code. These twelve employees are critical to the Debtors' continued ability to generate revenue and maintain its going concern value in advance of a potential sale under section 363 of the Bankruptcy Code. For example, these twelve employees include one individual who is responsible, with others, for generating revenue through the sale of our advertising inventory via private-marketplace and open-exchange auctions. The Debtors expect these efforts to generate approximately one-fifth of the company's total revenue in 2016. Senior level managers in global advertising sales and business development also fall into this group. A failure to properly compensate these twelve individuals by failing to pay their Sales Incentives would devastate the business. These individuals are extremely talented and might leave to pursue other opportunities with other companies. The Debtors would be unable to replace these individuals in the short term, causing irreparable damage to the Debtors' business in advance of a potential sale. Thus, even if the Sales Incentives were prepetition obligations, such payments should be authorized under this Court's authority pursuant to section 105(a) of the Bankruptcy Code and the doctrine of necessity, as described in the Motion.

between six months and one year of employment are eligible for two weeks of severance pay.

An additional two weeks of severance is added for completion of each of the first year, second

year, and third year of employment, such that an employee who has worked for Gawker Media

for three years or more is entitled to eight weeks of severance pay.  In addition, if at least six

employees or 30% of a particular website's staff is terminated as part of the same operational

change, each terminated employee is entitled to eight weeks of severance pay.[7]

18.     In addition, Gawker Media has issued written employment agreements with

certain Salaried Employees that provide for benefits, including severance pay.  Severance pay for

eligible employees ranges from two weeks to six months of pay.  Approximately 42 employees

are eligible for severance as part of their individual employment agreements.  Approximately 36

employees are entitled to two weeks notice *or* two weeks of severance pay, plus one additional

week of severance pay for each year worked with the company, and severance under these

agreements generally range from two to eight weeks based on current employees' hire dates.[8]

Three additional employees, neither of whom are directors or officers, or insiders as defined by

the Bankruptcy Code or applicable law, have a fixed two-month or three-month severance.

Finally, three senior employees of the Debtors – the President and General Counsel, the Chief

Operating Officer, and the Chief Technology Officer of Gawker Media– are entitled to severance

pursuant to their employment agreements of between three and six months' pay.

19.     The Debtors have not assumed or rejected any employment agreements or the

CBA at this time, nor have the Debtors terminated anyone postpetition who is entitled to

---

[7]  For the avoidance of doubt, the Debtors seek only to continue to honor severance obligations consistent with the CBA for terminations that occur between now and such time that the Debtors assume or reject the CBA.  The Debtors are not seeking to assume or reject the CBA at this time.

[8]  These estimates of employees eligible for severance are approximate and based on a review of employment agreements to date.

severance.  As this Court is aware, the Debtors are seeking approval of a stalking horse asset purchase agreement, which agreement proposes to employ substantially all of the Debtors' employees on substantially the same terms and conditions under which they are currently employed.  For the avoidance of doubt, the Debtors do not seek permission to pay severance to any employee who is subsequently employed by any entity that acquires the Debtors' assets through a sale under section 363 of the Bankruptcy Code in these chapter 11 cases.  The Debtors simply seek to assure existing employees that, to the extent the Debtors decide in their business judgment to terminate them prior to or as a result of the sale, severance obligations can be honored, with the exception that severance benefits payable to the single potential insider of the company who is eligible for severance – the President and General Counsel – is limited by section 503(c)(2) of the Bankruptcy Code.[9]

## Basis for Relief

### A.  Continued Participation in the Editorial Incentive Program and Sales Incentive Program Are Ordinary Course Transactions That the Debtors May Pay Without the Need for Notice and a Hearing

20.      In the first instance, the Debtors' employees' continued participation in the Incentive Programs is an ordinary course transaction that is authorized pursuant to section 363(c) of the Bankruptcy Code, subject only to business judgment.

21.      A debtor in possession operating under section 1108 of the Bankruptcy Code may "enter into transactions, including the sale or use of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1); see also In re Mesa Air Grp., Inc., Case No. 10-10018 (MG), 2010 Bankr. LEXIS 3334, at *7–8, (Bankr. S.D.N.Y. Sept. 24,

---

[9]  As explained below, neither the Chief Operating Officer nor the Chief Technology Officer are "insiders" as that term is defined by the Bankruptcy Code and applicable bankruptcy law.

57540912_4

2010) (citing In re Nellson Neutraceutical, 369 B.R. 787 (Bankr. D. Del. 2007)).   The Court in

Nellson Neutraceutical noted that when "a court determines that a transaction is in the ordinary

course of a debtor's business, the court will not entertain an objection to the transaction, provided

that the conduct involves a business judgment made in good faith upon a reasonable basis and

within the scope of authority under the Bankruptcy Code." See id. at 797 (citing In re Curlew

Valley Assocs., 14 B.R. 506, 513 (Bankr. D. Utah 1981)); see also Mesa Air, 2010 Bankr.

LEXIS 3334, at *8-9 ("As an ordinary course transaction, the inquiry is then whether the debtor

has a valid business purpose for engaging in the particular transaction, and whether 'the conduct

involves a business judgment made in good faith upon a reasonable basis and within the scope of

authority under the Bankruptcy Code.'") (quoting Nellson Neutraceutical, 369 B.R. at 799).

    22.    The Debtors believe the Incentive Payments are ordinary course, postpetition

payments to employees that do not require Court notice or a hearing to be continued in the

ordinary course of the Debtors' business.  See, e.g., Comm. of Asbestos–Related Litigants and/or

Creditors v. Johns–Manville Corp. (In re Johns–Manville Corp.), 60 B.R. 612, 616–19 (Bankr.

S.D.N.Y. 1986) (examining whether a transaction was an ordinary course transaction and stating

that, "[o]nly extraordinary transactions which are 'different from those that might be expected to

take place,' need be brought to the attention of creditors and other interested parties to allow

them to voice any objections to the debtor's proposals") (quoting Armstrong World Indus., Inc.

v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391 (S.D.N.Y. 1983).

Nonetheless, out of an abundance of caution, the Debtors seek this Court's authorization to

continue the Incentive Programs.

    23.    The Bankruptcy Code itself does not provide guidance on what constitutes an

"ordinary course" transaction.  Courts have applied a "horizontal" and a "vertical" test to

57540912_4

determine whether a given action is taken in the ordinary course of conducting the Debtors' business.  In re Velo Holdings Inc., 472 B.R. 201, 211-12 (Bankr. S.D.N.Y. 2012).  The horizontal tests asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry"; in other words, "is the transaction abnormal or unusual", or is it a "reasonably common" type of transaction in the industry.  Id., (citing Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.), 207 B.R. 406, 409 (Bankr. S.D.N.Y. 1997)) (internal quotations omitted).  The vertical test "reviews the transaction from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor or trustee to enter into."  Id.  In making this determination, courts look to the debtor's prepetition business practices and compare them to the debtor's postpetition conduct.  In re Leslie Fay Cos., 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).  "If a particular transaction passes the horizontal and vertical tests, it is then considered an 'ordinary course' transaction subject to approval under section 363."  In re Velo Holdings Inc., 472 B.R. at 212 (citing Nellson Neutraceutical, 369 B.R. at 799).  The question then is only whether the debtor has a valid business purpose for engaging in the transaction that involves good faith business judgment.  Id.

24.    The Editorial Incentive Program and the Sales Incentive Program, which are incentive payments (i) to writers and editors for quality stories that increase readership, and (ii) to ad sales and business development professionals for revenue-generating performance, or other types of compensation that tie performance to compensation, satisfy the horizontal and vertical tests.  Bonus programs such as the Incentive Programs, which award website traffic, quality stories and posts, and revenue generation through advertising sales, are standard in the industry,

and the Debtors' management is confident that the Debtors could not effectively compete

without the Incentive Programs.

25.    A form of the Editorial Incentive Program and the Sales Incentive Program have

been in place at Gawker Media for years, such that no creditor should be surprised by the

Debtors' desire to continue such programs after filing for chapter 11 in order to maintain the

going concern value of the company.  As the Court in <u>Dana</u> stated, "a short-term incentive plan

has been a common component of compensation plans at Dana for the past fifty years and does

not differ significantly from Dana's prepetition practice.  Accordingly, it is within the ordinary

course of Debtors' business." <u>In re Dana Corp.</u>, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006).

26.    Once it is determined that a compensation program is an ordinary course

transaction, the inquiry is only whether the compensation structure proposed under the Incentive

Programs satisfies the business judgment rule.  The business judgment rule is "a presumption

that in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the company."

<u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res.,</u>

<u>Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations, quotation and internal quotation marks

omitted).  "Courts are loath to interfere with corporate decisions absent a showing of bad faith,

self-interest, or gross negligence." <u>Id.</u> (citations omitted).  Therefore, courts "uphold the board's

decisions as long as they are attributable to any rational business purpose." <u>Id.</u> (citation omitted).

"Parties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." <u>Id.</u> (citation omitted); <u>see also</u> <u>In re Johns-Manville</u>, 60

B.R. at 616 ("Where the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to debtors' conduct").  In addition, section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

27.    Continuation of the Incentive Programs is a legitimate exercise of the Debtors' business judgment.  The Debtors implemented these programs prepetition to remain competitive and encourage quality writing and increased advertising sales and partnerships, which generate revenue for the business.  The Debtors provide these programs to incentivize employees to continue to publish high quality articles, and to encourage and promote advertising sales and related revenue-generating activity for the websites.

**B.    Even if the Incentive Programs Are Not Ordinary Course Transactions, the Programs Are Supported by the Debtors' Business Judgment and the Facts and Circumstances of these Cases**

28.    Even if maintaining the Editorial Incentive Program and the Sales Inventive Program were not "ordinary course" transactions by the Debtors, continuing to pay the Incentive Payments is supported by the Debtors' business judgment pursuant to section 363(b) of the Bankruptcy Code, and by the facts and circumstances of this case, pursuant to section 503(c)(3) of the Bankruptcy Code. See 11 U.S.C. §§ 363(b) and 503(c)(3).

29.    As a preliminary matter, section 503(c)(1) of the Bankrutpcy Code does not apply to the Incentive Programs because neither of the Incentive Programs provide payments to an "insider," as that term is defined under the Bankruptcy Code.  Specifically, an "insider" of a corporation is a director, officer, person in control of the debtor, partnership in which the debtor is a general partner, a general partner of the debtor, or a relative of one those parties.  See 11 U.S.C. § 101(31)(B).  Here, only two members of the Debtors' senior management are eligible for Incentive Payments: specifically, the Senior Vice President of Global Sales and Partnerships,

-13-

and the Vice President of Business Development, both of whom report to more senior

individuals at the Debtors and are eligible for Sales Incentives.  These roles do not have power to

implement company policy or make executive-level decisions, and are focused instead on

running Gawker Media's sales and business development operations.  Neither would be

considered an insider for bankruptcy purposes.  See, e.g., In re Borders Grp., Inc., 453 B.R. 459,

469-70 (Bankr. S.D.N.Y. 2011) (finding that, regardless of title, employees who lacked

"decision-making authority akin to an executive" and "authority to implement company

policies," and instead were "responsible for running the Debtors' day-to-day operations" and

"[did] not report to the board of directors [but were] subordinate to and required to report to an

officer," were not insiders under the Bankruptcy Code).

30.    Courts are empowered to authorize debtors to implement non-ordinary course

transactions under 363(b)(1), which provides that "[t]he trustee, after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.

§ 363(b)(1).  This section gives the court "broad flexibility in tailoring its orders to meet a wide

variety of circumstances." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y.

1989).  The Second Circuit requires a debtor to show that use of property under section 363(b)(1)

of the Bankruptcy Code, outside of the ordinary course of business, is based on the debtor's

business judgment. See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v.

LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge

determining a 363(b) application must find a good business reason to grant such application); see

also Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063,

1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale

or lease of property outside the ordinary course of business); In re Ionosphere Clubs, Inc., 100

B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason").

31.     Courts are authorized to permit incentive payments that constitute "transfers or obligations that are outside the ordinary course of business . . . including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition" to be paid as administrative expenses under section 503 of the Bankruptcy Code, so long as the "facts and circumstances of the case" justify the payments. 11. U.S.C. 503(c)(3).  Similar to application of section 363(b), if a motion seeks authority under section 503(c)(3) for non-ordinary course incentive payments that are not being made to insiders of the Debtors, courts in this district simply apply the business judgment standard.  See In re AMR Corp., 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013) ("Courts now apply the business judgment standard to motions seeking to pay employees pursuant to Section 503(c)(3) for payments that do not concern retention or severance payments to insiders.") (citing In re Dana Corp., 358 B.R. at 581; In re Global Home Prods., LLC, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); Mesa Air Grp., 2010 WL 3810899, at *4 (same).

32.     In Dana, Judge Lifland articulated several factors a court considers in its assessment of whether a *non-ordinary course* incentive plan is an exercise of the debtor's sound business judgment:

   a.   Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the employees stay for as long as it takes for the debtor to market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

b.  Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

c.  Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

d.  Is the plan or proposal consistent with industry standards?

e.  What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

f.  Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

33.     Indeed, not all factors need be present.  See, e.g., In re Global Home Prods., 369 B.R. at 785-87 (finding that the Debtors did not "squarely satisfy" one factor, but noting that "these are not 'new' compensation programs but, instead, are nearly identical to plans previously used, and approved by a compensation committee and board of directors. In other words, the Plans have satisfied the independent 'test of time.'").

34.     Here, the Debtors have demonstrated that the incentives are the same as those that have been established by the Debtors in previous years.  In addition, a reasonable relationship exists between the incentives and the results to be obtained:  the Incentive Programs are keyed to encourage quality writing and editorial work, and revenue generation through direct ad sales or development of commercial relationships.  The Incentive Programs are also reasonable in light of the Debtors' financial situation, especially considering that the payments are discretionary and subject to the Debtors' ability to implement them through a budget and their debtor in possession financing in these cases.  Additionally, the Incentive Programs do not unfairly discriminate and comport with industry standards, as they are identical to the bonus plans that the Debtors had in place prepetition, and the Debtors believe, based on managements experience, that such plans are standard in their industry.  Finally, the Debtors have exercised proper diligence in formulating

-16-

the Programs.  The Debtors formulated the Programs prepetition based on market analysis and demand, and have consulted their Chief Operating Officer, senior management and financial team to ensure the Incentive Programs remain necessary and affordable for the Debtors.   It is the Debtors' business judgment that these Programs are critical to the company's well-being to ensure that employees continue to give their full effort in their roles in order to maximize the value of the Debtors' estate and maintain the company's performance especially in light of an impending sale of the Debtors' business as a going concern.

### C.  The Debtors Should Be Permitted to Honor Postpetition Severance Obligations in the Ordinary Course

35.    The proposed payment of severance obligations in the ordinary course will not prejudice the Debtors' unsecured creditors, because the claims of any terminated, non-insider employee(s) for severance would constitute administrative expense claims that would be paid in full in these cases.  Under applicable Second Circuit law, where, as here, a severance payment represents a "new benefit earned at termination" by a debtor's employee, the debtor's obligation to make such payment to an employee terminated during the pendency of its bankruptcy case constitutes an administrative expense of the debtor's bankruptcy estate.  See Straus-Duparquet, Inc. v. Local Union No. 3, IBEW, 386 F.2d 649, 651 (2d. Cir. 1967) (holding that severance obligations calculated based on years of service and payable at termination constituted "compensation for termination of employment" properly classified as expenses of administration with respect to employees terminated after the debtor's bankruptcy filing. In re Spectrum Info. Techs., Inc., 193 B.R. 400, 405 (Bankr. E.D.N.Y. 1996) ("[T]he Second Circuit holds that the right to severance pay arises on the date of termination and that the entire amount is entitled to administrative expense priority.") (internal citations omitted); Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 104 (2d Cir. 1986) (Second Circuit law "rest[s] on the basis that

-17-

severance pay is compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated and that it is therefore "earned" when the employees are dismissed. Accordingly it is granted a first priority as a cost of doing business during the bankruptcy proceeding.").

36.     Accordingly, immediate payment of severance benefits to terminated employees, if any, would affect only the timing of such payments and would not adversely affect the Debtors' other creditors.  On the other hand, failing to assure employees now, at a time when employees' futures and livelihood may feel uncertain, that the Debtors will honor their severance commitments to the extent any employee entitled to severance is terminated as part of these chapter 11 cases, would damage employee morale, reduce employee productivity, and encourage employees to leave the Debtors prematurely in pursuit of other employment offers.

37.     Section 503(c)(2) precludes administrative claims for severance payments to insiders of a debtor unless "the payment is part of a program that is generally applicable to all full-time employees" and "the amount of the payment is not greater than 10 times the amount of mean severance pay given to nonmanagement employees during the calendar year in which the payment is made." Id.  But as described above, regardless of title, a person is not an insider of a debtor where the employee lacks "decision-making authority akin to an executive", lacks "authority to implement company policies", "[does] not report to the board of directors [but is] subordinate to and required to report to an officer, or to another director-level employee who, in turn, reports to an officer", and instead is "responsible for running the Debtors' day-to-day operations."  In re Borders Grp., Inc., 453 B.R. 459, 469-70 (Bankr. S.D.N.Y. 2011).

38.     Section 503(c)(2) of the Bankruptcy Code applies to only one person for whom the Debtors may seek to honor severance payments.  Three employees designated as officers of

the Debtors are eligible for severance under their employment agreements: the Chief Operating

Officer (COO), the Chief Technology Officer (CTO), and the President and General Counsel.

Neither the CTO nor the COO have company-wide decision-making authority, or authority to

implement company policy; all such decisions are deferred to the President and General Counsel,

Heather Dietrick; the Chief Executive Officer, Nick Denton; and, where necessary, GMGI's

board of directors.  Both the COO and the CTO report to the Chief Executive Officer.  In

addition, the severance commitments made to both the COO and the CTO were made pursuant to

their employment offer letters in November 2015 and June 2015, respectively, before either were

in their "officer" roles.  Accordingly, the severance commitments to the Chief Operating Officer

and the Chief Technology Officer should not be limited by section 503(c)(2) of the Bankruptcy

Code.

39.      Because the President and General Counsel, Ms. Dietrick, may have decision-

making authority with respect to certain policies and decisions, section 503(c)(2) likely is

applicable to any payments owed to Ms. Dietrick.  The provision of section 503(c)(2) are

satisfied.  First, the Debtors generally provide severance to all full-time employees, either under

the CBA or by separate agreement, thus satisfying the first prong of section 503(c)(2).  Second,

any severance payment to Ms. Dietrick will be limited in amount by section 503(c)(2) of the

Bankruptcy Code (i.e., ten times the amount of the mean severance pay given to non-

management employees during calendar year 2014), even if an amount greater than the statutory

cap becomes owing, and the proposed order attached hereto as Exhibit 1 reflects such a

limitation.

40.      Finally, the Debtors previously sought to pay on a final basis, prepetition

severance obligations owed to two terminated Employees in an aggregate amount of

approximately $136,239.  Upon further review, the Debtors are no longer seeking to pay these

obligations on an administrative priority basis at this time.

### **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

41.     To implement the foregoing successfully, the Debtors request that the Court enter

an order waiving the notice requirements of Bankruptcy Rule 6004(a) and finding that the

Debtors have established cause to exclude such relief from any stay imposed by Bankruptcy Rule

6004(h).

### **Notice**

42.     Notice of this Motion has been provided to (i) the Office of the United States

Trustee for the Southern District of New York; (ii) the 50 largest unsecured creditors of the

Debtors on a consolidated basis; (iii) counsel to Cerberus Business Finance, LLC, as DIP

Lender, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn:

Adam C. Harris (adam.harris@srz.com); (iv) counsel to US VC Partners LP, as Prepetition

Second Lien Lender, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago,

IL 60611, Attn: David Heller (david.heller@lw.com) & Keith A. Simon, 885 Third Avenue,

New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); (v) parties that have

requested notice pursuant to Bankruptcy Rule 2002; (vi) the Internal Revenue Service; and (vii)

the United States Attorney for the Southern District of New York.  A copy of this Application is

also available on the website of the Debtors' proposed notice and claims agent at

https://cases.primeclerk.com/gawker.  In light of the nature of the relief requested, the Debtors

submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the order, substantially in the form annexed hereto as Exhibit 1, granting the relief requested in the Motion and this Supplement to the Motion, and such other and further relief for the Debtors as may be just or proper.

Dated: June 20, 2016
      New York, New York

          */s/ Gregg M. Galardi*
          ROPES & GRAY LLP
          Gregg M. Galardi
          Jonathan P. Gill
          Kristina K. Alexander
          Stacy A. Dasaro
          1211 Avenue of the Americas
          New York, NY 10036-8704
          Telephone: (212) 596-9000
          Facsimile: (212) 596-9090
          gregg.galardi@ropesgray.com
          jonathan.gill@ropesgray.com
          kristina.alexander@ropesgray.com
          stacy.dasaro@ropesgray.com

          *Proposed Counsel to the Debtors*
          *and Debtors in Possession*

57540912_4

## <u>EXHIBIT 1</u>

**Revised Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------x
                                        :
In re                                   :    Chapter 11
                                        :
Gawker Media LLC, et al.,[1]            :    Case No. 16-11700 (SMB)
                                        :
                Debtors.                :    (Joint Administration Requested)
                                        :
------------------------------------------------------x
```

**FINAL ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF
PREPETITION WAGES, SALARIES, BUSINESS EXPENSES, EMPLOYEE BENEFITS
AND RELATED ITEMS, AND (II) DIRECTING ALL FINANCIAL INSTITUTIONS TO
HONOR CHECKS FOR PAYMENT OF SUCH OBLIGATIONS**

Upon the motion (the "Motion") and the supplement (the "Supplement")[2] to the Motion

filed by the above-captioned debtors (the "Debtors"), for entry of a Final Order (the "Final

Order") (i) authorizing, but not directing, the Debtors to pay or otherwise honor the Debtors'

prepetition Employee Obligations to or for the benefit of Employees earned and accrued prior to

the Petition Date that, but for the commencement of these cases, would have otherwise been due

and payable in the ordinary course of business; (ii) authorizing, but not directing, the Debtors to

continue to pay the Employee Obligations postpetition in the ordinary course of business; and

(iii) directing all Financial Institutions to honor checks for payment on account of such

Employee Obligations; and upon the First Day Declaration; and this Court having jurisdiction

over this matter pursuant to 28 U.S.C. § 1334; and this proceeding being a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this Court

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Supplement.

being proper pursuant to 28 U.S.C. § 1408 and 1409; and due and proper notice of the Motion

and the Supplement having been given; and the Court having found that no other or further

notice is needed or necessary; and the Court having reviewed the Motion, the Supplement and

the declarations in support thereof, and having heard statements in support of the Motion and the

Supplement at hearings held before the Court (the "Hearings"); and the Court having determined

that the legal and factual bases set forth in the Motion and the Supplement and at the Hearings

establish just cause for the relief granted herein; and the relief requested in the Motion and the

Supplement to the Motion being in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and any objections to the relief requested in the Motion and the

Supplement to the Motion having been withdrawn or overruled on the merits; and after due

deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, THAT:**

1.      The relief sought in the Motion and related Supplement is GRANTED on a final

basis to the extent provided herein.

2.      The Debtors are authorized, but not directed, to continue paying the Employee

Obligations on a postpetition basis, in the ordinary course of business, in accordance with the

Debtors' prepetition policies and practices, and in the Debtors' discretion, to pay and honor

prepetition amounts related thereto, including that the Debtors are now authorized to make

payments on account of and continue to maintain and honor in the ordinary course (i) the Sales

Incentive Program; (ii) Editorial Incentive Program; (iii) the Health Club Membership Program;

(iv) Combined AD&D and Group Life Insurance, Short Term Disability, Long Term Disability,

New York Disability; and (v) Severance Obligations arising from postpetition terminations of

employment; *provided, however,* that the Debtors shall not make any payments on account of

severance owed to employees terminated prepetition*; and provided further, however*, that the

Debtors shall not make any payments on account of prepetition Employee Wages, Independent

Contractor Obligations, or Temporary Employee Obligations that exceed the priority amounts set

forth in sections 507(a)(4) and 507(a)(5) for prepetition amounts owed to any Employee.

3.      The Debtors are authorized, but not directed, to continue the Employee Benefit

Plans in the ordinary course of business and perform their obligations thereunder.

4.      Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained in the Motion, the Supplement or in this Final Order, or any payments made

pursuant to this Final Order shall constitute, nor is it intended to constitute, an admission as to

the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to

subsequently dispute such claim or lien, or the assumption or adoption of any agreement,

contract, or lease (including the CBA) under section 365 of the Bankruptcy Code.

5.      All banks and other financial institutions on which checks were drawn or

electronic payment requests were made in connection with the payments approved by this Final

Order are authorized and directed to (i) receive, process, honor, and pay all such checks and

electronic payment requests when presented for payment (assuming that sufficient funds are then

available in the Debtors' bank accounts to cover such payments) and (ii) rely on the Debtors'

designation of any particular check or electronic payment request as approved by this Final

Order.

6.      All banks and other financial institutions are hereby prohibited from placing any

holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee

Obligations.

7.      The Debtors are authorized to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for all payments approved by this Order where such method of payment has been dishonored postpetition.

8.      The Debtors are authorized and empowered to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

9.      The requirements of Bankruptcy Rule 6004(a) are hereby waived.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

11.     The Court retains jurisdiction with respect to all matters arising from, or related to, the implementation and interpretation of this Final Order.

Dated: _____, 2016
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## <u>EXHIBIT 2</u>

**Supplemental Declaration of William D. Holden**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                            :
In re                                       :        Chapter 11
                                            :
Gawker Media LLC, *et al.*,[1]               :        Case No. 16-11700 (SMB)
                                            :
                        Debtors.            :        (Jointly Administered)
                                            :
--------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF WILLIAM D. HOLDEN**
**IN FURTHER SUPPORT OF DEBTORS' MOTION FOR ENTRY OF**
**A FINAL ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF**
**PREPETITION WAGES, SALARIES, BUSINESS EXPENSES, EMPLOYEE BENEFITS**
**AND RELATED ITEMS, AND (II) DIRECTING ALL FINANCIAL INSTITUTIONS**
**TO HONOR CHECKS FOR PAYMENT OF SUCH OBLIGATIONS**

I, William D. Holden, hereby certify and declare as follows:

1.      I am a Managing Director in the restructuring practice of Opportune LLP.  I am

serving as the Chief Restructuring Officer for Gawker Media Group, Inc., a Cayman Island

corporation ("GMGI"), the parent company of Gawker Media LLC, a Delaware limited liability

company ("Gawker Media"), and Kinja Kft., a Hungarian Corporation ("Kinja," together with

Gawker Media and GMGI, the "Debtors").  The Debtors are the above-referenced debtors and

debtors-in-possession in these chapter 11 cases (the "Chapter 11 Cases"), currently pending in

the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court").

2.      On June 12, 2016, I submitted the *Declaration of William D. Holden in Support of*

*First Day Motions* (the "First Day Declaration") [Docket No. 7], in support of the Debtors'

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker
Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media LLC and Gawker Media Group,
Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy
ut 66. 1062 Budapest, Hungary.

motion (the "Motion") for entry of an order authorizing, among other things, the payment of certain prepetition Employee Obligations and the continued payment of certain Employee Obligations in the ordinary course of business [Docket No. 13].

3.      I submit this supplemental declaration (the "Supplemental Declaration") in further support of the Motion and the Supplement to the Motion, filed concurrently herewith.[2]  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by members of the Debtors' management or its professional advisors, my review of relevant documents, or my opinion based upon my experience and my knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

4.      On a monthly basis, certain editorial, non-executive employees of Gawker Media are eligible to receive Editorial Incentives, which are incremental payments, as recognition for publication of one of the best stories for a particular month.  Executive-level employees are not eligible for this bonus pool.  To administer the Editorial Incentive Program, Gawker Media's senior editorial and/or executive team review the top stories published to a particular website (*Gawker, Gizmodo, Deadspin,* etc.), and rate the stories and the website's overall performance.  Writers with the best stories and coverage are awarded incentive bonuses for their work.  While the amount awarded to each individual writer is relatively small, as described below, in the context of the estate's obligations and these chapter 11 cases, the bonuses are meaningful to the editorial staff, both from a financial and a morale perspective.  The Editorial

---

[2] Capitalized terms used and not otherwise defined herein shall have the meaning set forth in the Motion or the Supplement.

Incentive Program was in place prepetition and operated in the ordinary course of the Debtors' business, and was a component of the Debtors' prepetition business strategy.

5.    The total amount paid on a monthly basis under the Editorial Incentive Program is determined by current staffing levels.  A total bonus pool is created of approximately $426 per editorial employee at each website, per month, exclusive of certain high-ranking editors.  A small amount may be added on account of the number of freelance writers contributing to a particular website.  From January to April 2016, the average *total* monthly bonus pool that was paid in the aggregate to all writers at all seven of Gawker Media's websites was approximately $16,401 per month, with an average number of eligible writers of 165.[3]  Editorial incentives paid to each writer in a given month from January to April 2016 ranged between $0 and $4,047.  The monthly average Editorial Incentive paid to any individual employee in February 2016, March 2016 and April 2016 were $458, $363 and $465, respectively.  From January to April 2016, only six monthly incentive payments to individual writers were over $1,000, with the remaining 148 payments being less than that amount.  The editorial incentives are entirely discretionary at the time they are awarded, and no employee is entitled to an editorial incentive bonus as part of his or her compensation before that bonus is awarded.  Instead, the Editorial Incentives are additional, discretionary compensation intended to provide motivation to maximize the quality of the content on the Debtors' websites, thus increasing website readership and profitability.

6.    The next scheduled payment for Editorial Incentives is June 30, 2016, representing the bonus pool for May articles, and which is estimated at approximately $22,567 in the aggregate for all seven of the Debtors' websites.  The Editorial Incentive payments the

---

[3] Independent contractors can be eligible for Editorial Incentives.

Debtors seek to pay now are entirely discretionary and were not awarded or paid prior to the Chapter 11 filing.

7.        As part of a prepetition sales incentive and bonus program maintained in the ordinary course of the Debtors' businesses, Gawker Media's employees who work on or provide services for ad sales are eligible to receive quarterly bonus payments, payable entirely at the Debtors' discretion.  Sales bonuses are calculated on a quarterly basis, and are generally paid one month following the end of each quarter.   The total Sales Incentives pool is calculated based on aggregate target incentive compensation established for each employee, which is separate and apart from their regular wages.  The aggregate, annual Sales Incentive Program pool is divided by four quarters, and certain employees are eligible to receive a quarterly bonus from the quarterly bonus pool.   Sales Incentives are adjusted up or down based on approximate achievement of sales and business development goals for a respective quarter (either on an individual basis or a group-wide basis), and Debtors' performance overall.  For individuals who do not have a personal, direct revenue target, the bonus is based on performance of the team as a whole.

8.        Historically, the average quarterly aggregate bonus pool for the last four quarters was around $294,000, and approximately 45 people received sales bonuses.  For example, the aggregate Sales Incentives paid in April, 2016, following the end of the first quarter, totaled approximately $259,775.  The average bonus was approximately $5,900.   The next quarterly sales incentive bonus, to the extent the Debtors in their business judgment elect to pay such bonus to any sale(s) employees, would be paid on or around August 1, 2016.     The Debtors expect the Sales Incentives payable on or around August 1, 2016 to approximate the Sales

Incentives paid in April 2016.  Only two people eligible for bonuses under the program are members of the Debtors' senior management.[4]

9.      The payments under the Sales Incentive Program are entirely discretionary. Certain employees are hired with a "target" cash compensation that includes a salary and a potential bonus, but – unlike a promised salary – whether an employee receives a sales incentive bonus, the amount of the bonus and the timing of such bonus are in the complete discretion of the company.  Because such payments under the Sales Incentive Program bonuses are discretionary and paid following the end of the second quarter, if paid at all, no amounts were due to employees prior to the chapter 11 filing.[5]  By this Motion, the Debtors seek approval to continue their ordinary course, discretionary sales incentive bonus program, so that the Debtors' ad sales team, responsible for driving significant revenue for the Debtors, continues to be properly compensated during these chapter 11 cases.

10.     As of March 1, 2016, Gawker Media entered into a collective bargaining agreement (the "CBA") for a term of three years, expiring on February 28, 2019, with the Writers Guild of America, East.  The CBA covers all full-time and regular part-time non-executive editorial employees of Gawker Media, which includes writers, columnists, editors,

---

[4]  The Debtors' Senior Vice President of Global Sales and Partnerships and the Vice President of Business Development are eligible to receive a bonus under this program.

[5] Approximately twelve people may receive Sales Incentives that would cause their total wage and benefits paid to exceed the caps set forth in 507(a)(4) and (a)(5) of the Bankruptcy Code.  These twelve employees are critical to the Debtors' continued ability to generate revenue and maintain its going concern value in advance of a potential sale under section 363 of the Bankruptcy Code.  For example, these twelve employees include one individual who is responsible, with others, for generating revenue through the sale of our advertising inventory via private-marketplace and open-exchange auctions.  The Debtors expect these efforts to generate approximately one-fifth of the company's total revenue in 2016.  Senior level managers in global advertising sales and business development also fall into this group.  A failure to properly compensate these twelve individuals by failing to pay their Sales Incentives would devastate the business.  These individuals are extremely talented and might leave to pursue other opportunities with other companies. The Debtors would be unable to replace these individuals in the short term, causing irreparable damage to the Debtors' business in advance of a potential sale.

researchers, video employees, illustrators and other employees who perform similar functions. As a result, 102 of Salaried Employees are covered by the CBA.

11.    The CBA provides for the severance benefits of between two weeks and eight weeks of pay, depending on the length of employment with Gawker Media.  Employees with between six months and one year of employment are eligible for two weeks of severance pay. An additional two weeks of severance is added for completion of each of the first year, second year, and third year of employment, such that an employee who has worked for Gawker Media for three years or more is entitled to eight weeks of severance pay.  In addition, if at least six employees or 30% of a particular website's staff is terminated as part of the same operational change, each terminated employee is entitled to eight weeks of severance pay.

12.    In addition, Gawker Media has issued written employment agreements with certain Salaried Employees that provide for benefits, including severance pay.  Severance pay for eligible employees ranges from two weeks to six months of pay.  Approximately 42 employees are eligible for severance as part of their individual employment agreements.  Approximately 36 employees are entitled to two weeks notice *or* two weeks of severance pay, plus one additional week of severance pay for each year worked with the company, and severance under these agreements generally range from two to eight weeks based on current employees' hire dates. [6] Three additional employees, neither of whom are directors or officers, have a fixed two-month or three-month severance.  Finally, three senior employees of the Debtors – the President and General Counsel, the Chief Operating Officer, and the Chief Technology Officer of Gawker Media– are entitled to severance pursuant to their employment agreements of between three and six months' pay.

---

[6]  These estimates of employees eligible for severance are approximate and based on a review of employment agreements to date.

13.     The Editorial Incentive Program and the Sales Incentive Program are incentive payments (i) to writers and editors for quality stories that increase readership, and (ii) to ad sales and business development professionals for revenue-generating performance, or other types of compensation that tie performance to compensation.  Bonus programs such as the Incentive Programs, which award website traffic, quality stories and posts, and revenue generation through advertising sales, are standard in the industry, and the Debtors could not effectively compete without the Incentive Programs.

14.     A form of the Editorial Incentive Program and the Sales Incentive Program have been in place at Gawker Media for years, such that no creditor should be surprised by the Debtors' desire to continue such programs after filing for chapter 11 in order to maintain the going concern value of the company.  The Debtors implemented these programs prepetition to remain competitive and encourage quality writing and increased advertising sales and partnerships, which generate revenue for the business.  The Debtors provide these programs to incentivize employees to continue to publish high quality articles, and to encourage and promote advertising sales and related revenue-generating activity for the websites.

15.     Only two members of the Debtors' senior management are eligible for Incentive Payments: specifically, the Senior Vice President of Global Sales and Partnerships, and the Vice President of Business Development, both of whom report to more senior individuals at the Debtors.  These roles do not have power to implement company policy or make executive-level decisions, and are focused instead on running Gawker Media's sales and business development operations.

16.     The Incentive Programs are keyed to encourage quality writing and editorial work, and revenue generation through direct ad sales or development of commercial

relationships.  The Incentive Programs payments are discretionary and subject to the Debtors'

ability to implement them through a budget and their debtor in possession financing in these

cases.  Additionally, the Incentive Programs comport with industry standards, as they are

identical to the bonus plans that the Debtors had in place prepetition, and the Debtors believe,

based on management's experience, that such plans are standard in their industry.  The Debtors

formulated the Programs prepetition based on market analysis and demand, and have consulted

their Chief Operating Officer, senior management and financial team to ensure the Incentive

Programs remain necessary and affordable for the Debtors.   It is the Debtors' business judgment

that these Programs are critical to the company's well-being to ensure that employees continue to

give their full effort in their roles in order to maximize the value of the Debtors' estate and

maintain the company's performance especially in light of an impending sale of the Debtors'

business as a going concern.

17.    The Debtors are also seeking to honor severance obligations to current employees.

Failing to assure employees now, at a time when employees' futures and livelihood may feel

uncertain, that the Debtors will honor their severance commitments to the extent any employee

entitled to severance is terminated as part of these chapter 11 cases, would damage employee

morale, reduce employee productivity, and encourage employees to leave the Debtors

prematurely in pursuit of other employment offers.

18.    Three employees designated as officers of the Debtors are eligible for severance

under    their    employment    agreements:    the    Chief    Operating

Officer (COO), the Chief Technology Officer (CTO), and the President and General Counsel.

Neither the CTO nor the COO have company-wide decision-making authority, or authority to

implement company policy; all such decisions are deferred to the President and General Counsel,

Heather Dietrick; the Chief Executive Officer, Nick Denton; and, where necessary, GMGI's board of directors.    Both the COO and the CTO report to the Chief Executive Officer.    In addition, the severance commitments made to both the COO and the CTO were made pursuant to their employment offer letters in November 2015 and June 2015, respectively, before either were in their "officer" roles. The President and General Counsel, Ms. Dietrick, does decision-making authority with respect to certain policies and decisions.

[*remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

By: _____
    William D. Holden

Executed On:_____