Ropes & Gray LLP
Gregg M. Galardi
Jonathan P. Gill
Jonathan M. Agudelo
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
Gawker Media LLC, *et al.*,[1]            :    Case No. 16-11700 (SMB)
                                          :
                        Debtors.          :    (Jointly Administered)
                                          :
-------------------------------------------------------x

**NOTICE OF DEBTORS' APPLICATION FOR ENTRY OF AN ORDER**
**AUTHORIZING THE DEBTORS TO RETAIN HOULIHAN LOKEY AS INVESTMENT**
**BANKER FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

       **PLEASE TAKE NOTICE** that a hearing (the "Hearing") on the application (the

"Application," a copy of which is attached hereto) of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") to retain and employ Houlihan Lokey Capital, Inc. as

their investment banker effective *nunc pro tunc* to the Petition Date will be held before the

Honorable Stuart M. Bernstein of the United States Bankruptcy Court for the Southern District

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

of New York (the "Court"), in Room 723, One Bowling Green, New York, New York 10004-1408, on **July 7, 2016 at 2:00 p.m. (prevailing Eastern Time).**

> **PLEASE TAKE FURTHER NOTICE** that responses or objections to the Application and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **July 1, 2016,** at **5:00 p.m.** (prevailing Eastern Time) (the "Objection Deadline"), upon: (i) the Debtors, Gawker Media LLC, 114 Fifth Avenue, 2d Floor, New York, New York  10011, Attn. Heather Dietrick (heather@gawker.com); (ii) proposed counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com);  (iii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes & Susan Arbeit; (iv) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com); (v) counsel to US VC Partners LP, as Prepetition Second Lien Lender, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: David Heller (david.heller@lw.com) & Keith A. Simon, 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); and (vi) parties that have requested notice pursuant to Bankruptcy Rule 2002.

2

**PLEASE TAKE FURTHER NOTICE** that a copy of the Application may be obtained free of charge by visiting the website of Prime Clerk LLC at http://cases.primeclerk.com/gawker. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing. The Debtors will file an agenda before the Hearing, which may modify or supplement the Application to be heard at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that if no objections or other responses are timely filed and served with respect to the Application, the Debtors shall, on or after the Objection Deadline, submit to the Court an order substantially in the form annexed as **Exhibit A** to the Application, which order the Court may enter with no further notice or opportunity to be heard.

Dated: June 20, 2016
New York, New York

*/s/ Gregg M. Galardi*
ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Jonathan M. Agudelo
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
jonathan.gill@ropesgray.com
jonathan.agudelo@ropesgray.com
stacy.dasaro@ropesgray.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

56996818_6

**Hearing Date and Time: July 7, 2016 at 2:00 p.m. (ET)**
**Objection Date and Time: July 1, 2016 at 5:00 p.m. (ET)**

ROPES & GRAY LLP
Gregg M. Galardi
Jonathan P. Gill
Jonathan M. Agudelo
Stacy A. Dasaro
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------x

### DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO RETAIN HOULIHAN LOKEY AS INVESTMENT BANKER FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). The offices of Gawker Media and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011. Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

# TABLE OF CONTENTS

**Page**

Jurisdiction and Venue ................................................................................................. 2

Procedural Background ................................................................................................. 2

No Prior Request ........................................................................................................... 4

Houlihan Lokey's Qualifications ................................................................................. 4

Services to be Provided ................................................................................................. 6

Professional Compensation ........................................................................................... 8

Houlihan Lokey's Disinterestedness ........................................................................... 16

Basis for Relief .............................................................................................................. 17

I.     The Bankruptcy Code Permits the Employment and Retention of Houlihan
       Lokey on Terms Substantially Similar to Those in the Engagement
       Agreement ............................................................................................................ 17

II.    Indemnification, Contribution and Reimbursement Terms of the
       Engagement Agreement are Appropriate ........................................................... 21

Notice ........................................................................................................................... 22

Conclusion .................................................................................................................... 24

56996818_6

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum (In re Nat'l Gypsum Co.)*,
    123 F.3d 861, 862 (5th Cir. 1997) .........................................................................17

*In re AES Thames, L.L.C.*,
    Case No. 11-10334 (KJC) (Bankr. D. Del. Feb. 1, 2011)........................................5

*In re Aventine Renewable Energy Holdings, Inc.*,
    Case No. 09-11214 (KG) (Bankr. D. Del. Apr. 7, 2009)..........................................5

*In re Bally Total Fitness of Greater New York, Inc.*,
    No. 08-14818 (BRL) (Bankr. S.D.N.Y. Jan. 28, 2009) ....................................22, 19

*In re Buffets Holdings, Inc.*,
    Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 22, 2008).....................................5

*In re Charter Commc'ns, Inc.*,
    No. 09-11435 (Bankr. S.D.N.Y. Apr. 15, 2009)....................................................19

*In re Foamex Inter. Inc.*,
    Case No. 09-10560 (KJC) (Bankr. D. Del. Feb. 18, 2009).......................................5

*In re Gen. Mar. Corp.*,
    No. 1115285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011)............................................22

*In re Gen. Mar. Corp.*,
    No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011) ..........................................19

*In re Genco Shipping & Trading Ltd.*,
    Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. May 14, 2014)..................................19

*In re Genco Shipping & TradingLtd.,* Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. May
    14, 2014) ................................................................................................................22

*In re Great Atlantic & Pacific Tea Co.*,
    No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2011)..........................................22

*In re Ion Media Networks, Inc.*,
    No. 09-13125 (Bankr. S.D.N.Y. July 13, 2009) ....................................................19

*In re Mark IV Indus., Inc.*,
    Case No. 09-12705 (SMB) (Bankr. S.D.N.Y. Apr. 30, 2009)..................................5

*In re Motors Liquidation Co. (f/k/a Gen. Motors Corp.)*,
    No. 0950026 (REG) (Bankr. S.D.N.Y. June 25, 2009) ..........................................22

*In re Motors Liquidation Co. (f/k/a Gen. Motors Corp.)*,
    No. 09-50026 (REG) (Bankr. S.D.N.Y. June 25, 2009) ................................................19

*In re MSR Resort Golf Course LLC*,
    Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011) ..........................................5

*In re Northhampton Generating Co., LP*,
    Case No. 11-33095 (JCW) (Bankr. W.D.N.C. Dec. 5, 2011) ........................................5

*In re Patriot Coal Corp.*,
    No. 12-12900 (SCC) (Bankr. S.D.N.Y. Sept. 5, 2012) ............................................19, 22

*In re Premier Inter. Holdings, Inc.*,
    Case No. 09-12019 (CSS) (Bankr. D. Del. Jun. 13, 2009) ..........................................5

*In re Sbarro, Inc.*,
    No. 11-11527 (SCC) (Bankr. S.D.N.Y. May 4, 2011) ...............................................19

*In re Trump Entertainment Resorts, Inc.*,
    No. 14-12103 (KG) (Bankr. D. Del.) ..............................................................5

*In re Truvo USA LLC*,
    Case No. 10-13513 (AJG) (Bankr. S.D.N.Y July 1, 2010) ..........................................5

STATUTES

11 U.S.C. § 101(14) ............................................................................16

11 U.S.C. § 327(a) ...............................................................2, 16, 17, 18

11 U.S.C. § 328 ..........................................................................passim

11 U.S.C. § 330 ...............................................................................13

11 U.S.C. § 363 ................................................................................4

11 U.S.C. § 1102 ..............................................................................3

11 U.S.C. § 1107 ...........................................................................3, 16

28 U.S.C. § 157 ...............................................................................2

28 U.S.C. § 1334 ..............................................................................2

28 U.S.C. § 1408 ..............................................................................2

28 U.S.C. § 1409 ..............................................................................2

56996818_6

**OTHER AUTHORITIES**

Bankruptcy Rule 2016(a) ................................................................................................................14

Local Bankruptcy Rule 2014-1 .........................................................................................................2

Local Bankruptcy Rule 2016-1 ...........................................................................................2, 18, 19

General Order M-447 ..........................................................................................................1, 18, 19

56996818_6

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Kinja Kft. ("Kinja"), debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully submit this application (the "Application") for entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing and approving the employment and retention of Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to serve as the Debtors' investment banker effective *nunc pro tunc* to the Petition Date in accordance with the terms and conditions of that certain engagement letter, under section 328(a) of the Bankruptcy Code, dated as of May 16, 2016 (the "Engagement Agreement"), a copy of which is annexed hereto as **Exhibit B**; (b) approving the proposed compensation arrangements and the indemnification provisions set forth in the Engagement Agreement; (c) modifying the time-keeping requirements of Rule 2016-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), General Order M-447, the Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York Bankruptcy Cases ("General Order M-447"), and any other applicable procedures and orders in connection with Houlihan Lokey's engagement; and (d) granting such other relief as is just and proper. In support of the Application, the Debtors hereby incorporate by reference the *Declaration of D. Reid Snellenbarger* (the "Snellenbarger Declaration"), which is attached hereto as **Exhibit C**. In further support of the Application the Debtors also hereby incorporate by reference the (i) *Declaration of William D. Holden in Support of First Day Motions* (the "First Day Declaration") [Docket No. 7]; (ii) *Declaration of William D. Holden in Support of DIP Financing Motion* [Docket No. 20] (the "Holden DIP Declaration"); and (iii) *Declaration of Reid Snellenbarger in Support of Debtors' Motion for (I) An Order (A) Authorizing and Approving the Bidding Procedures, Breakup fee, and Expense Reimbursement, (B) Authorizing and Approving the*

1

*Debtors' Entry into and Assumption of the Stalking Horse Asset Purchase Agreement, (C)
Approving Notice Procedures, (D) Scheduling a Sale Hearing and (E) Approving Procedures for
Assumption and Assignment of Certain Contracts and Leases and Determining Cure Amounts
and (II) An Order (A) Authorizing the Sale of Substantially all of the Debtors' Assets Free and
Clear of all Claims, Liens, Rights, Interests and Encumbrances, (B) Approving the Asset
Purchase Agreement and (C) Authorizing the Debtors to Assume and Assign Certain Executory
Contracts and Unexpired Leases* [Docket No 21-1].  Capitalized terms used but not otherwise
defined herein have the meanings ascribed to them in the Engagement Agreement.  The Debtors
respectfully represent as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157
and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 327(a) and 328(a)
of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 5002 of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1
of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy
Rules").

### Procedural Background

4.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under
chapter 11 of the Bankruptcy Code.  On June 12, 2016, GMGI and Kinja each filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No committees pursuant to Section 1102 of the Bankruptcy Code have been appointed or designated.

6.      On June 13, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness, (II) Granting Liens, (III) Authorizing Use of Cash Collateral by the Debtors and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Docket No. 20] (the "DIP Financing Motion").  The DIP Financing Motion was approved on an interim basis on June 16, 2016 [Docket No. 38].

7.      On June 13, 2016, Debtors filed the *Motion for (I) An Order (A) Authorizing and Approving Bidding Procedures, Breakup Fee and Expense Reimbursement, (B) Authorizing and Approving the Debtors' Entry Into and Assumption of the Stalking Horse Asset Purchase Agreement, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing and (E) Approving Procedures for Assumption and Assignment of Certain Contracts and Leases and Determining Cure Amounts and (II) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of all Claims, Liens, Rights, Interests and Encumbrances, (B) Approving the Asset Purchase Agreement and (C) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 21] (the "Sale Motion").  The Sale Motion is currently pending before the Court.

8.      The factual background regarding the Debtors, their business operations, their capital and debt structure, and the events leading up to the filing of these Chapter 11 Cases are set forth in detail in the First Day Declaration.

3

**No Prior Request**

9.      No previous application for the relief requested herein has been made to this or to any other court.

**Houlihan Lokey's Qualifications**

10.      Houlihan Lokey is well qualified to provide investment banking services to the Debtors.  Houlihan Lokey has a reputation for quality, a breadth of experience, and a track record of success serving media clients and clients in bankruptcy proceedings. Houlihan Lokey is a nationally recognized investment banking and financial advisory firm with twenty-four offices worldwide and more than eight hundred professionals.  Houlihan Lokey provides corporate finance and financial advisory services, as well as execution capabilities, in a variety of areas, including financial restructuring.  In 2015, Houlihan Lokey ranked as the Number 1 M&A advisor for all U.S. transactions, according to Thomson Reuters.  The firm is one of the leading providers of M&A fairness opinions and has one of the largest worldwide financial restructuring practices of any investment bank.  Houlihan Lokey annually serves more than 800 clients ranging from closely held companies to Global 500 corporations.

11.      The Debtors have determined in the exercise of their business judgment that the size of their business operations and complexity of their current financial difficulties require them to employ an investment banker with knowledge of the Debtors' industry and business experience with the chapter 11 process and to advise them with respect to the anticipated sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code, as set forth in greater detail in the Sale Motion.

12.      The Debtors believe that Houlihan Lokey is well-qualified to provide its services to the Debtors in a cost-effective, efficient, and timely manner.  Retaining Houlihan Lokey will enable the Debtors to carry out their duties in these Chapter 11 Cases and to assist in the sale of

4

substantially of the Debtors' assets, as set forth in the Sale Motion (the "Sale").  Houlihan Lokey has extensive experience and an excellent reputation in providing such services in complex chapter 11 cases and is well-suited to provide the services that the Debtors require.

13.    Houlihan Lokey's Financial Restructuring Group has more than 165 professionals and is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved in financially troubled companies. Houlihan Lokey does work in a variety of industries assisting companies in the midst of complex financial restructurings both in and outside of bankruptcy.  Houlihan Lokey's restructuring experience includes representing debtors in: *Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y.); *In re Trump Entertainment Resorts, Inc.*, No. 14-12103 (KG) (Bankr. D. Del.); *In re Northhampton Generating Co., LP*, Case No. 11-33095 (JCW) (Bankr. W.D.N.C. Dec. 5, 2011); *In re AES Thames, L.L.C.*, Case No. 11-10334 (KJC) (Bankr. D. Del. Feb. 1, 2011); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011); *In re Truvo USA LLC*, Case No. 10-13513 (AJG) (Bankr. S.D.N.Y July 1, 2010); *In re Mark IV Indus., Inc.*, Case No. 09-12705 (SMB) (Bankr. S.D.N.Y. Apr. 30, 2009); *In re Premier Inter. Holdings, Inc.*, Case No. 09-12019 (CSS) (Bankr. D. Del. Jun. 13, 2009); *In re Aventine Renewable Energy Holdings, Inc.,* Case No. 09-11214 (KG) (Bankr. D. Del. Apr. 7, 2009); *In re Foamex Inter. Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. Feb. 18, 2009); and *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 22, 2008).

14.    The Debtors have selected Houlihan Lokey as their investment banker based upon, among other things, (a) the Debtors' need to retain an investment banking firm to provide advice with respect to the restructuring, (b) Houlihan's extensive experience and excellent reputation in providing investment banking services in complex chapter 11 cases, and (c) Houlihan's market

leading Technology, Media and Telecom Group that provides extraordinary expertise and relationships in the industry.

## Services to be Provided

15.    GMGI, on its own behalf and on behalf of its subsidiaries, first engaged Houlihan Lokey pursuant to the Engagement Agreement to provide financial advisory and investment banking services in connection with one or more merger and/or acquisition transactions that may involve, a financial restructuring or reorganization of and/or one or more financing transactions for, the Debtors and with respect to such other matters as to which the Debtors and Houlihan Lokey may agree in writing during the term of the Engagement Agreement (the "Engagement"). The Debtors seek to retain Houlihan Lokey to provide, among other things, the following services (the "Services"):

(a)    reviewing and analyzing the business, operations, properties, capital structure, financial condition and prospects of the Debtors;

(b)    preparing and assisting the Debtors in the development of investor and other stakeholder lists, communicating with such potential investors and other stakeholders and preparing and distributing appropriate information, documents and other materials, including, if appropriate, preparing and assisting the Debtors in the preparation of an information memorandum;

(c)    analyzing and structuring various potential Transaction scenarios and the potential impact of these scenarios on the value of the Debtors and the recoveries of those stakeholders impacted by any potential Transaction(s) and providing strategic advice with respect to any such Transaction(s);

(d)    assisting the Debtors in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers and/or strategic partners;

(e)    coordinating the data room and due diligence investigations of potential counterparties to a potential Transaction;

(f)    assisting the Debtors with the structuring and negotiation of any Transaction(s), including participating in negotiations with creditors and other parties involved in any Transaction(s);

(g)     providing expert advice, testimony and certain agreed upon valuation summaries, guidance and other traditional supporting materials regarding financial matters related to and in support of any Transaction(s), if necessary;

(h)     developing financial and operational data and presentations with respect to the Debtors and attending and presenting at meetings of the Debtors's Board of Directors, creditor groups, official constituencies and other interested parties, as may be appropriate;

(i)     providing financial advice and assistance to the Debtors in structuring any new securities to be issued under any Transactions(s); and

(j)     providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated by the Engagement Agreement, as mutually agreed by the parties hereto.

16.     Houlihan Lokey will use its best efforts to coordinate with other retained professionals to avoid any duplication of services provided by any of the Debtors' other retained professionals in these Chapter 11 Cases.  The Debtors are concurrently seeking the retention of Opportune LLP ("Opportune") to provide, among other things, the Debtors with a chief restructuring officer (the "CRO") and certain additional personnel pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. [1]  However, Opportune's engagement and scope of services are distinct from and do not overlap with the services that Houlihan Lokey is providing to the Debtors.  Specifically, the scope of Houlihan Lokey's work is centered on providing the Debtors with investment banking services in connection with financing, restructuring and sale processes.  By contrast, the CRO primarily will perform the functions relating to coordination, communication, negotiation, cash flow projections, the business plan, the sale process, and contingency planning, and the additional personnel from Opportune will perform other related services as needed.

---

[1] The Debtors are filing the *Debtors' Application Pursuant to Bankruptcy Code Sections 105(a) and 363(b) for Entry of an Order Authorizing the Debtors to (I) Retain Opportune LLP to Provide the Debtors with a Chief Restructuring Officer and Certain Additional Personnel, and (II) Designate William D. Holden as Chief Restructuring Officer for the Debtors, nunc pro tunc to the Petition Date* contemporaneously herewith.

## **Professional Compensation**

17.     Subject to the Court's approval, Houlihan Lokey will be entitled, pursuant to the

terms of the Engagement Agreement, to the following consideration for the Services:[2]

(a)     **Monthly Fees.** Houlihan Lokey will be paid on the 16th day of each month
commencing a nonrefundable cash fee of $150,000 (the "Monthly Fee"), subject
to certain reductions in respect of the completion of a Transaction.

(b)     **Transaction Fees.** In addition to the other fees provided for in the Engagement
Agreement, the Debtors shall pay Houlihan Lokey the following transaction fee(s):

i.     *Sale Transaction Fee.* Upon the closing (subject to Section 8 of the
Engagement Agreement) of a Sale Transaction, Houlihan Lokey shall earn,
and the Debtors shall thereupon pay immediately and directly from the
gross proceeds of such Sale Transaction, as a cost of such Sale
Transaction, a cash fee ("Sale Transaction Fee") based upon Aggregate
Gross Consideration ("AGC"), calculated as follows:

For AGC up to $50 million: $1,250,000 ("Minimum Sale Transaction
Fee"), plus

For AGC from $50 million to $100 million: 2% of such incremental
AGC, plus

For AGC from $100 million to $150 million: 3% of such incremental
AGC, plus

For AGC over $150 million: 5% of such incremental AGC.

If more than one Sale Transaction is consummated, Houlihan Lokey shall
be paid the Sale Transaction Fee based on the AGC from the initial Sale
Transaction and then, for any subsequently consummated Sale Transaction,
Houlihan Lokey shall be paid the outstanding incremental amount of the
Sale Transaction Fee that would have been payable if the AGC of such
subsequent Sale Transaction and all prior Sale Transactions were
aggregated and characterized as a single Sale Transaction, calculated in
the manner set forth above; subject, however, to a minimum incremental
payment of $500,000 for the second and each subsequent Sale Transaction
that is consummated prior to the termination of the Engagement
Agreement (or is the subject of an agreement in principle executed prior to
the termination of the Engagement Agreement and is consummated within
eighteen (18) months following the execution of such agreement in

---

[2] The summary provided herein is for illustrative purposes only and is subject to the Engagement Agreement in all
respects. In the event of any inconsistency between the summary of services as set forth herein and the Engagement
Agreement, the Engagement Agreement will control.

principle with the counterparty named in such agreement or with any affiliate of such counterparty) (which such incremental payment(s) shall also be deemed a "Sale Transaction Fee" for all purposes in the Engagement Agreement).

Notwithstanding any provision in the Engagement Agreement to the contrary, including without limitation Section 4 thereof, if a Sale Transaction results in the beneficial holders of the capital stock of the Debtors outstanding as of the date of the Engagement Agreement beneficially owning in the aggregate less than a majority of the capital stock of the Debtors outstanding immediately following the consummation of such Sale Transaction (a "Liquidity Event"), the Engagement Agreement will then be deemed terminated (unless a non-termination notice is otherwise given by the Debtors prior to the consummation of such Liquidity Event) upon payment to Houlihan Lokey of such related Sale Transaction Fee and any other fees or expenses due and the Debtors shall have no obligation to pay a Sale Transaction Fee with respect to any Sale Transaction consummated following the consummation of such Liquidity Event.

ii. *Restructuring Transaction Fees.* Upon the earlier to occur of: (I) in the case of an out-of- court Restructuring Transaction (as defined below), the closing of such Restructuring Transaction; and (II) in the case of an in-court Restructuring Transaction, the effective date of a confirmed plan of reorganization or liquidation under Chapter 11 or Chapter 7 of the Bankruptcy Code, Houlihan Lokey shall earn, and the Debtors shall promptly pay to Houlihan Lokey, a cash fee ("Restructuring Transaction Fee") of $1,750,000. Notwithstanding the foregoing or anything else to the contrary set forth in the Engagement Agreement, the Debtors shall have no obligation to pay a Restructuring Transaction Fee with respect to more than one Restructuring Transaction.

iii. *Financing Transaction Fees.* Upon the closing of each Financing Transaction (as defined below), Houlihan Lokey shall earn, and the Debtors shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee (a "Financing Transaction Fee") (x) in the case of a Financing Transaction raising gross proceeds equal to or greater than $15,000,000, equal to the greater of: (A) $1,000,000, or (B) the sum of: (I) 2% of the gross proceeds of any indebtedness raised or committed that is senior to other indebtedness of the Debtors, secured by a first priority lien and unsubordinated, with respect to both lien priority and payment, to any other obligations of the Debtors; (II) 4% of the gross proceeds of any indebtedness raised or committed that is secured by a lien (other than a first lien), is unsecured and/or is subordinated; and (III) 5% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed

9

and (y) in the case of a Financing Transaction raising gross proceeds less than $15,000,000, equal to the greater of (A) $150,000 or (B) 3% of the gross proceeds of such Financing Transaction. Any warrants issued in connection with the raising of debt or equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of the Engagement Agreement. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities (as defined below) in such Financing Transaction) or directly by the Debtors. Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by, in the case of debt securities, the face value of each such Security or in the case of equity securities, the price per Security paid in the then current round of financing. The fees set forth in the Engagement Agreement shall be in addition to any other fees that the Debtors may be required to pay to any investor or other purchaser of Securities to secure its financing commitment. Notwithstanding the foregoing, (a) in the event of a Financing Transaction in which one or more of the Existing Lenders provides a majority of the aggregate commitments and/or funds in respect of such individual financing shall not give rise to any Financing Transaction Fee hereunder, unless Houlihan Lokey has undertaken a financing process pursuant to the specific direction of the Debtors that has resulted in the submission of at least a bona fide non-binding financing proposal from a third party provider, in which case Houlihan Lokey shall be entitled to a Financing Transaction Fee as determined  pursuant to paragraphs (x) or (y) of Section 3(ii)(c) of the Engagement Agreement.

(c)    **Expenses**.  In addition to all of the other fees and expenses described in the Engagement Agreement, and regardless of whether any Transaction is consummated, the Debtors shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable and documented out-of-pocket expenses incurred from time to time in connection with its services under the Engagement Agreement, but in no event greater than $20,000 in the aggregate without the Debtors prior approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Debtors' obligations to otherwise pay any other expenses under the Engagement Agreement).  Houlihan Lokey shall, in addition, be reimbursed by the Debtors for the reasonable and out-of-pocket fees and expenses of Houlihan Lokey's external legal counsel incurred

10

in connection with the negotiation and performance of the Engagement Agreement and the matters contemplated in the Engagement Agreement, but in no event greater than $10,000 in the aggregate without the Debtors' prior approval, which approval shall not be unreasonably withheld.

(d)     **Indemnification**.    The Debtors agree (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, suffered or incurred by such Indemnified Party arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, the Engagement Agreement, and (ii) to reimburse each Indemnified Party for all reasonable and out-of-pocket expenses (including, without limitation, the reasonable and out-of-pocket fees and expenses of external counsel) incurred by such Indemnified Party as they are incurred in connection with investigating, preparing, pursuing, defending, settling, compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or related to such engagement or matter. However, the Debtors shall not be liable under the foregoing indemnification provision for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the bad faith, willful misconduct or gross negligence of Houlihan Lokey or such Indemnified Party and in such case, the Debtors shall be entitled to recover from the applicable Indemnified Party any expenses advanced by the Debtors to such Indemnified Party pursuant to the indemnification obligation set forth in this paragraph to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.

With respect to any litigation or other adversarial proceeding to the extent exclusively between Houlihan Lokey and the Debtors, the indemnity provision in the immediately preceding paragraph shall not apply, and the prevailing party in such proceeding shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and expenses and court costs, except that this provision shall not apply to any claims (a) brought by any Indemnified Party to enforce such Indemnified Party's indemnification, contribution and reimbursement rights under this section, or (b) brought by any person or entity asserting claims on behalf of or in right of the Debtors, including, without limitation, a claim made derivatively, or by a shareholder, receiver or person serving in a similar capacity, which claims shall be covered by the indemnity and reimbursement provisions set forth in the immediately preceding paragraph.

11

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any Indemnified Party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Debtors shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Debtors, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by the Engagement Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Debtors shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Debtors (and its affiliates, and their respective directors, employees, agents or other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from the Debtors pursuant to the Engagement Agreement. Relative benefits received by the Debtors, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Debtors, and its security holders and creditors, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under the Engagement Agreement. The Debtors shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, the Engagement Agreement (whether or not an Indemnified Party is an actual or potential party thereto), or participate in or otherwise facilitate any such settlement, compromise, consent or termination, unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Debtors shall not be required to indemnify, reimburse or contribute to any Indemnified Party in respect of any amount paid or payable by such party in the settlement or compromise of any claim or action for which indemnification is sought hereunder, unless such settlement or compromise is consented to in writing by the Debtors, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the Debtors shall be required to indemnify, reimburse or contribute to such Indemnified Party for such amount, even if such settlement or compromise is not consented to by the Debtors, if the Indemnified Party that is considering such settlement or compromise submits the terms of such settlement or compromise to the Debtors and the Debtors have not if requested by the Indemnified Party, within ten (10) business days thereafter, engaged in good faith discussions with such Indemnified Party regarding the Debtors' obligation to indemnify it for the amount payable thereunder.

56996818_6

18.     Investment bankers such as Houlihan Lokey do not typically charge for their services on an hourly basis.  Instead, they customarily charge a monthly advisory fee plus an additional fee that is contingent upon the occurrence of a specified type of transaction.  The Engagement Agreement follows this custom in the investment banking industry and sets forth the monthly and transaction-based fees that are to be paid to Houlihan Lokey as agreed to by the Debtors for the valuable services to be provided thereby.

19.     The compensation arrangements contained in the Engagement Agreement are highly beneficial to the Debtors' estates as they provide certainty and proper inducement for Houlihan Lokey to act expeditiously and prudently with respect to the matters for which it will be employed.  Given the circumstances of these Chapter 11 Cases, including the Sale, the Debtors believe that Houlihan Lokey is uniquely capable of providing the services that the Debtors require in connection within the time requirements extant in the Chapter 11 Cases.  Houlihan Lokey's decision to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with the terms of the Engagement Agreement pursuant to section 328(a) of the Bankruptcy Code, and not section 330 of the Bankruptcy Code.  Accordingly, because the Debtors are seeking to retain Houlihan Lokey under Bankruptcy Code section 328(a), the Debtors believe that Houlihan Lokey's compensation should not be subject to any additional standard of review under Bankruptcy Code section 330 and does not constitute a "bonus" or fee enhancement under applicable law.  However, as is the practice for cases within this District, under the Proposed Order, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") shall retain rights to respond or object to Houlihan Lokey's interim and final applications for compensation based on the reasonableness standard provided for in Bankruptcy Code section 330; provided, that, with respect to the U.S. Trustee's retention

13

of rights under section 330, it is understood and agreed that reasonableness for this purpose shall be evaluated by comparing the fees payable in these cases to fees paid to other investment banking firms offering comparable services in other chapter 11 cases and shall not be evaluated primarily on the basis of time committed or the length of these cases.

20.     Houlihan Lokey does intend to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these Chapter 11 Cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court (to the extent compliance is not waived) and consistent with the proposed compensation set forth in the Engagement Agreement.  Specifically, Houlihan Lokey intends to submit monthly fee statements for its Monthly Fee and expenses, and a fee application for the any Transaction Fees.

21.     As Houlihan Lokey's compensation will be calculated and paid based on the Transaction Fees (in addition to the Monthly Fees), Houlihan Lokey requests that it not be required to file time records in accordance with Bankruptcy Rule 2016(a), Local Rule 2016-1, General Rule M-447, the United States Trustee Fee Guidelines, and any otherwise applicable orders or procedures of the Court.  Notwithstanding that Houlihan Lokey does not charge for its services on an hourly basis, Houlihan Lokey will nonetheless maintain records (in summary format) of its services rendered for the Debtors in half-hour increments, including reasonably detailed descriptions of those services and the individuals who provided those services, and will present such records to the Court in its interim and final fee applications. Houlihan Lokey will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these Chapter 11 Cases.

14

22.     The terms of the Engagement Agreement were negotiated between the Debtors and Houlihan Lokey, and reflect the Debtors' evaluation of the extensive work that has and will be performed by Houlihan Lokey on behalf of the Debtors, and its expertise in such matters and knowledge of the Debtors' businesses and these Chapter 11 Cases.  The Debtors likewise believe that the compensation structure is consistent with, and typical of, compensation arrangements entered into by Houlihan Lokey and other comparable firms in connection with the rendering of similar services under similar circumstances.  As a consequence of the discussions and arm's-length negotiations, the Debtors believe that the compensation structure is reasonable, market-based, and designed to compensate Houlihan Lokey fairly for its work and to cover customary overhead expenses.

23.     Houlihan Lokey's strategic and financial expertise, as well as its restructuring capabilities, some or all of which has and will be required by the Debtors during the term of Houlihan Lokey's engagement, were all important factors to the Debtors in determining the compensation structure.  The Debtors believe that the ultimate benefit of Houlihan Lokey's services hereunder cannot be measured by reference to the number of hours to be expended by Houlihan Lokey's professionals in the performance of such services.  The Debtors and Houlihan Lokey agreed upon the compensation structure in anticipation that a substantial commitment of professional time and effort will be required of Houlihan Lokey and its professionals in connection with these Chapter 11 Cases and in light of the fact that: (a) such commitment may foreclose other opportunities for Houlihan Lokey, and (b) the actual time and commitment required of Houlihan Lokey and its professionals to perform its services under the Engagement Agreement may vary substantially from week-to-week and month-to-month, creating "peak load" issues for Houlihan Lokey.

15

## Houlihan Lokey's Disinterestedness

24.    To the best of the Debtors' knowledge, Houlihan Lokey: (a) is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code and, as required by section 327(a) and referenced by section 328(c) of the Bankruptcy Code, and except as disclosed and described in the Sheollenbarger Declaration (and below) neither holds nor represents any interest adverse to the Debtors and the Debtors' estates and (b) has no connection to the Debtors or to their significant creditors or certain other potential parties- in-interest ("Interested Parties") whose names were supplied to Houlihan Lokey by the Debtors.

25.    Based entirely and in reliance upon the Snellenbarger Declaration, and except as specifically disclosed therein, none of Houlihan Lokey's past or current engagements would or does appear to create an interest materially adverse to the interests of the Debtors, creditors, or equity security holders in this case.  To the extent Houlihan Lokey discovers any additional matters or any pertinent relationships that require disclosure during the period of Houlihan Lokey's retention, Houlihan Lokey has indicated that it will promptly supplement the information contained in the Snellenbarger Declaration.

26.    As described in more detail in the Snellenbarger Declaration, Houlihan Lokey, among other things, has searched and is continuing to search its client databases maintained with respect to the subsidiaries of its direct parent Debtors, Houlihan Lokey, Inc., that are engaged in providing investment banking and financial advisory services globally (collectively, the "Houlihan Lokey Group") to determine whether it represents, or has represented, certain of the Debtors' creditors or other Interested Parties in these proceedings, and/or matters wholly unrelated to those proceedings. Due to the size of Houlihan Lokey and the number of creditors and other parties involved in this case, however, Houlihan Lokey may have represented certain

16

of the Debtors' creditors or other Interested Parties in matters wholly unrelated to these Chapter

11 Cases and which it did not disclose in the Snellenbarger Declaration.

27.     To the best of Debtors' knowledge, information and belief, Houlihan Lokey

(a) has no connection with the Debtors, their creditors, other parties in interest, the attorneys or

accountants of any of the foregoing, the U.S. Trustee, or any person employed in the Office of

the U.S. Trustee; and (b) does not hold any interest adverse to the Debtors' estates.

## Basis for Relief

### I.    The Bankruptcy Code Permits the Employment and Retention of Houlihan Lokey on Terms Substantially Similar to Those in the Engagement Agreement

28.     The Debtors seek approval of the Engagement Agreement, including the

compensation structure and the indemnification provisions (collectively, the "Fee Structure")

pursuant to section 328(a) of the Bankruptcy Code.

29.     Section 327(a) of the Bankruptcy Code authorizes a debtor to employ

professionals that "do not hold or represent an interest adverse to the estate, and that are

disinterested persons." 11 U.S.C. § 327(a).  In addition, section 328(a) of the Bankruptcy Code

provides, in relevant part, that debtors "with the court's approval, may employ or authorize the

employment of a professional person under section 327. . . on any reasonable terms and

conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage

fee basis, or on a contingent fee basis . . . ." 11 U.S.C. § 328(a).  Accordingly, section 328

permits the compensation of professionals, including investment bankers, on more flexible terms

that reflect the nature of their services and market conditions.  As the United States Court of

Appeals for the Fifth Circuit recognized in *Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l*

*Gypsum (In re Nat'l Gypsum Co.)*:

> Prior to 1978 the most able professionals were often unwilling to
> work for bankruptcy estates where their compensation would be

17

subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

123 F.3d 861, 862 (5th Cir. 1997) (internal citations and emphasis omitted).

30.     As discussed above, Houlihan Lokey should be considered disinterested in accordance with section 327(a) of the Bankruptcy Code.

31.     Given the numerous issues that Houlihan Lokey may be required to address in the performance of its services for the Debtors under the Engagement Agreement, Houlihan Lokey's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Houlihan Lokey's services for engagements of this nature, the Debtors believe that the terms and conditions of the Engagement Agreement are fair, reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

32.     Notwithstanding approval of the Engagement Agreement under section 328 of the Bankruptcy Code, Houlihan Lokey intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these Chapter 11 Cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, General Order M-447 and any other applicable procedures and orders of the Court, with certain limited modifications.  Specifically, the Debtors request that the requirements of Local Rule 2016-1 and General Order M-447 be tailored to the nature of Houlihan Lokey's engagement and its compensation structure.  Houlihan Lokey has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a fixed-rate basis and the payment of the fees described in the Engagement Agreement, which, as set forth

18

above, is customary in the investment banking industry. Additionally, it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. As discussed above, however, Houlihan Lokey's personnel, when formally retained in Chapter 11 Cases, and when required by Local Rules, do, and in these Chapter 11 Cases, will, keep summary time records in half-hour increments describing their daily activities and the identity of persons who performed such tasks. In addition, apart from the time-recording practices described above, Houlihan Lokey's personnel do not maintain their time records on a "project category" basis. As such, the Debtors request modification of the requirements under Local Rule 2016-1 and General Order M-447.

33.     The Debtors believe that the Fee Structure appropriately reflects the nature and scope of services to be provided by Houlihan Lokey, Houlihan Lokey's substantial experience with respect to investment banker services and the fee structures typically utilized by Houlihan Lokey and other leading investment banks and investment bankers who do not bill their clients on an hourly basis.

34.     Indeed, monthly fee and transaction fee arrangements in other large chapter 11 cases have been routinely approved and implemented by courts in this jurisdiction. *See, e.g., In re Genco Shipping & Trading Ltd.,* Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. May 14, 2014); *In re Patriot Coal Corp.,* No. 12-12900 (SCC) (Bankr. S.D.N.Y. Sept. 5, 2012); *In re Gen. Mar. Corp.,* No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011); *In re Sbarro, Inc.,* No. 11-11527 (SCC) (Bankr. S.D.N.Y. May 4, 2011); *In re Ion Media Networks, Inc.,* No. 09-13125 (Bankr. S.D.N.Y. July 13, 2009); *In re Charter Commc'ns, Inc.,* No. 09-11435 (Bankr. S.D.N.Y. Apr. 15, 2009); *In re Motors Liquidation Co. (f/k/a Gen. Motors Corp.),* No. 09-50026 (REG) (Bankr.

S.D.N.Y. June 25, 2009); *In re Bally Total Fitness of Greater New York,* Inc., No. 0814818 (BRL) (Bankr. S.D.N.Y. Jan., 28, 2009).

35.    Houlihan Lokey's work to date has already yielded substantial benefits to the Debtors and their estates through the Debtors' obtaining and closing on a $22 million post-petition financing, of which the Court permitted up to $14 million to be borrowed on an interim basis (the "DIP Facility").  Houlihan Lokey led the marketing process and negotiations in respect of the DIP Facility.  More particularly, and as further described in the Holden DIP Declaration, beginning on May 16, 2016, professionals from Houlihan Lokey, at the Debtors' direction, began an expedited marketing effort to obtain post-petition DIP financing.  The Debtors and their other professionals had calls daily (and sometimes multiple times a day) with representatives of Houlihan Lokey regarding the process to obtain DIP financing.  Following a broad marketing process that included conversations with thirty-seven (37) parties, twenty-two (22) parties eventually signed confidentiality agreements and were provided access to the data room that Houlihan Lokey maintained for the DIP marketing process.  Houlihan Lokey, on behalf of the Debtors, spent almost three weeks leading the financial negotiations with the interested parties that eventually yielded the DIP Facility.  Access to the DIP Facility has satisfied the Debtors' immediate and critical need to obtain post-petition financing under the DIP Facility and to use Cash Collateral (as defined in section 363 of the Bankruptcy Code) to pay, various parties, including the Debtors' employees, landlord, third party vendors, utilities, insurance companies, taxing authorities, who, in the judgment of the Debtors' management and as authorized by the Court, provide the essential services needed to operate, maintain and insure the Debtors' assets. Immediate access to the DIP Facility has also been essential to the Debtors' efforts to engage in an orderly Sale process through the Chapter 11 Cases.

36.     Concurrently with its work on marketing the process for the Debtors' post-petition financing, Houlihan Lokey began work to explore the possibility of a sale of all or substantially all of the Debtors' assets, with the goal of maximizing return to the Debtors' estates in the event of a possible chapter 11 filing.  As more fully discussed in the Sale Declaration, Houlihan Lokey immediately began formulating a strategy for a possible sale as a contingency in the event of an immediate chapter 11 filing.  The Debtors and Houlihan Lokey determined that the best possible way to maximize the value of the Debtors' assets and to preserve the jobs for virtually all of the more than 220 employees of the Debtors was through an immediate sale of the Debtors' assets as a going concern.

37.     In order to be prepared for a chapter 11 filing as early as May 25, 2016, Houlihan Lokey contacted a targeted group of six potential stalking horse bidders that would be able to move very quickly towards sale.  The six bidders consisted of strategic parties and parties that had been in prior dialogue with the Debtors regarding potential transactions similar to the Sale Transaction.  Of the six potential stalking horse bidders, two parties submitted term sheets the week of May 22, 2016, while three other parties expressed continued interest in participating in the process and an auction for the Debtors' assets.  In large part owing to Houlihan Lokey's efforts, an affiliate of Ziff Davis, a leading global digital-media company operating in the technology, gaming, entertainment and lifestyle verticals, is the stalking horse bidder for the Debtors' assets.

## II.     Indemnification, Contribution and Reimbursement Terms of the Engagement Agreement are Appropriate

38.     The indemnification provisions in the Engagement Agreement were fully negotiated between the Debtors and Houlihan Lokey. The Debtors and Houlihan Lokey believe that the indemnification provisions in the Engagement Agreement are customary and reasonable

21

for investment banker engagements both out-of-court and in chapter 11 cases. *See, e.g., In re Genco Shipping & Trading Ltd.,* Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. May 14, 2014); *In re Patriot Coal Corp.,* No. 12-12900 (SCC) (Bankr. S.D.N.Y. Sept. 5, 2012); *In re Gen. Mar. Corp.,* No. 1115285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011); In re Sbarro, Inc., No. 11-11527 (SCC) (Bankr. S.D.N.Y. May 5, 2011); *In re Great Atlantic & Pacific Tea Co.,* No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2011); *In re Motors Liquidation Co. (f/k/a Gen. Motors Corp.),* No. 0950026 (REG) (Bankr. S.D.N.Y. June 25, 2009); *In re Bally Total Fitness of Greater New York, Inc.,* No. 08-14818 (BRL) (Bankr. S.D.N.Y. Jan. 28, 2009). Accordingly, the Debtors respectfully submit that the terms of the indemnification provisions are reasonable and customary and should be approved in these Chapter 11 Cases.

## Notice

39. Notice of this Application has been provided to (i) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes & Susan Arbeit; (ii) the 50 largest unsecured creditors of the Debtors on a consolidated basis; (iii) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com); (iv) counsel to US VC Partners LP, as Prepetition Second Lien Lender, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: David Heller (david.heller@lw.com) & Keith A. Simon, 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); (v) Counsel to the Stalking Horse Bidder, Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004; Attn: Michael H. Torkin, Esq. (torkinm@sullcrom.com) and Alexa J. Kranzley, Esq. (kranzleya@sullcrom.com), Fax: (212) 291-9376; (vi) parties that have requested notice pursuant to Bankruptcy Rule 2002; (vi) the Internal Revenue Service; and (viii) the United States Attorney for the Southern District

of New York. A copy of this Application is also available on the website of the Debtors'
proposed notice and claims agent at https://cases.primeclerk.com/gawker.  In light of the nature
of the relief requested, the Debtors submit that no other or further notice is necessary.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**Conclusion**

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto as Exhibit A, granting the relief requested in the Application and such other and further relief for the Debtors as may be just or proper.

Dated: June 20, 2016
        New York, New York

                                    William D. Holden

## Exhibit A

**Proposed Order**

56996818_6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                   :

In re                              :           Chapter 11
                                   :

Gawker Media LLC, *et al.*,[1]      :           Case No. 16-11700 (SMB)
                                   :

           Debtors.         :           (Jointly Administered)
                                   :

-------------------------------------------------------x

## ORDER AUTHORIZING THE DEBTORS TO EMPLOY AND RETAIN HOULIHAN LOKEY AS INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE

Upon the Application, dated June 20, 2016 (the "Application"),[2] of Gawker Media LLC

and its above-captioned debtor affiliates, as debtors and debtors in possession (the "Debtors"),

for an order authorizing the Debtors to (a) retain Houlihan Lokey ("Houlihan Lokey") to serve as

the Debtors' investment banker effective *nunc pro tunc* to the Petition Date in accordance with

the terms and conditions of that certain engagement letter, dated as of May 16, 2016 (the

"Engagement Agreement"), a copy of which is annexed hereto as **Exhibit A**; (b) approving the

proposed compensation arrangements and the indemnification provisions set forth in the

Engagement Agreement; (c) modifying the time-keeping requirements of Rule 2016-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"),

General Order M-447, the Amended Guidelines for Fees and Disbursements for professionals in

the Southern District of New York Bankruptcy Cases ("General Order M-447"), and any other

applicable procedures and orders in connection with Houlihan Lokey's engagement; and (d)

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).   The offices of Gawker Media and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

granting related relief; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this proceeding being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this proceeding this proceeding and the Motion in this Court being proper pursuant to 28 U.S.C. § 1408 and 1409; and due and proper notice of the Motion having been given; and the Court having found that no other or further notice is needed or necessary; and the Court having reviewed the Application and the *Declaration of D. Reid Snellenbarger In Support of Debtors' Application for Entry of an Order Authorizing and Approving the Employment and Retention of Houlihan Lokey as Investment Banker Nunc Pro Tunc to the Petition Date* (the "Snellenbarger Declaration"); and the Court having heard statements in support of the Application at a hearing held before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and the relief requested in the Application being in the best interests of the Debtors' estates, their creditors, and other parties in interest; and any objections to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, THAT:**

1.       The Application is GRANTED to the extent set forth herein, *nunc pro tunc* to the Petition Date.

2.       The Debtors are authorized, pursuant to sections 327 and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Bankruptcy Rule 2014-1, to employ and retain Houlihan Local as their investment banker in accordance with the terms and conditions set forth in the Engagement Agreement, effective *nunc pro tunc* to the Petition Date.

57516976_3

3.      Houlihan Lokey does not hold or represent any interest adverse to the Debtors'
estates with respect to the matters upon which it is to be employed and is a "disinterested person"
as that term is defined in section 101(14) of the Bankruptcy Code.

4.      The terms and conditions of Houlihan Lokey's employment as provided in the
Engagement Agreement are reasonable as required under section 328 of the Bankruptcy Code
and are hereby approved.  Further, the Fee Structure, as set forth in the Engagement Agreement,
including without limitation, the Monthly Fees, the Sale Transaction Fee, the Restructuring
Transaction Fee and the Financing Transaction Fee (each as defined in the Engagement
Agreement), is approved pursuant to section 328(a) of the Bankruptcy Code and Houlihan Lokey
shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code in
accordance with the terms of the Engagement Agreement, subject to the procedures set forth in
the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any other
applicable orders of this Court.

5.      The terms of the Engagement Agreement are approved in all respects except as
set forth herein.

6.      Houlihan Lokey shall file fee applications for interim and final allowance of
compensation and reimbursement of expenses pursuant to the procedures set forth in sections
330 and 331 of the Bankruptcy Code.  Notwithstanding anything to the contrary set forth above,
the U.S. Trustee shall retain rights to respond or object to Houlihan Lokey's interim and final
applications for compensation based on the reasonableness standard provided for in section 330
of the Bankruptcy Code; provided, that, with respect to the U.S. Trustee's retention of rights
under section 330 of the Bankruptcy Code, it is understood and agreed that reasonableness for
this purpose shall be evaluated by comparing the fees payable in these cases to fees paid to other

57516976_3

investment banking firms offering comparable services in other chapter 11 cases and shall not be evaluated primarily on the basis of time committed or the length of these cases.

7.      Houlihan Lokey shall use reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

8.      Houlihan Lokey shall be excused from keeping time records for services rendered in one-tenth of an hour increments as otherwise provided for in Local Rule 2016-1 and General Order M-447, and instead shall only be required to maintain time records in half hour increments.

9.      None of the fees payable to Houlihan Lokey shall constitute a "bonus" or fee enhancement under applicable law.

10.     In the event Houlihan Lokey seeks reimbursement for attorneys' fees pursuant to the terms of the Engagement Agreement, the invoices supporting time records from such attorneys shall be included in Houlihan Lokey's own application and such invoices and time records shall be subject to the U.S. Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed 11 U.S.C. § 330, dated January 30, 1996 (the "U.S. Trustee Guidelines") and the approval of the Bankruptcy Court under the standards of sections 330 and 331 of the Bankruptcy Code.

11.     The Debtors shall be bound by the indemnification, contribution, reimbursement, exculpation, and other provisions of the Engagement Agreement, and will indemnify and hold harmless Houlihan Lokey and its affiliates, and its and their respective directors, officers, members, agents, employees, and controlling persons, and each of their respective successors and assigns (collectively, the "Indemnified Persons"), pursuant to the Engagement Agreement during the pendency of these chapter 11 cases, subject to the following conditions:

-4-

a.      All requests of Indemnified Persons (as defined in the Engagement Agreement) for payment of indemnity, contribution, or otherwise shall be made by means of an interim or final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Engagement Agreement, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the orders of this Court, and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought; *provided* that in no event shall an Indemnified Person be indemnified or receive contribution to the extent that any claim arose or expense has resulted from any such losses finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad-faith, self-dealing, breach of fiduciary duty, if any, gross negligence, or willful misconduct on the part of that or any other Indemnified Person.

b.      In no event shall an Indemnified Person be indemnified or receive contribution or other payment under the indemnification provisions of the Engagement Agreement if the Debtors or a representative of the Debtors' estates asserts a claim for, and the Court determines by final order that such claim primarily arose out of, such person's bad-faith, self-dealing, breach of fiduciary duty, if any, gross negligence, or willful misconduct on the part of that or any other Indemnified Person.

c.      In the event an Indemnified Person seeks reimbursement for attorneys' fees from the Debtors pursuant to the Engagement Agreement, the invoices and supporting time records from such attorneys shall be annexed to Houlihan Lokey's own interim and final fee applications, and such invoices and time records shall be subject to the U.S. Trustee Guidelines and the approval of the Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

12.     The Debtors are authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

13.     To the extent this Order is inconsistent with the Engagement Agreement, this Order shall govern.

57516976_3

14.     The Court retains jurisdiction with respect to all matters arising from, or related

to, the implementation and interpretation of this Order.


Dated: _____, 2016
        New York, New York

_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Engagement Agreement

**<u>Exhibit B</u>**

**Engagement Agreement**



HOULIHAN LOKEY

*Personal and Confidential*

May 16, 2016

Mr. Nick Denton
Founder & CEO
Gawker Media Group, Inc.
114 Fifth Avenue
New York, NY 10011

Dear Mr. Denton:

This letter agreement (this "Agreement") confirms the terms under which Gawker Media Group, Inc. (collectively with its direct and indirect subsidiaries, the "Company") has engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), effective as of the date indicated above (the "Effective Date"), as its exclusive financial advisor to provide financial advisory and investment banking services in connection with one or more merger and/or acquisition transactions that may involve, a financial restructuring or reorganization of and / or one or more financing transactions for, the Company and with respect to such other financial matters as to which the Company and Houlihan Lokey may agree in writing during the term of this Agreement.

1.    **Services**.  In connection with each potential Transaction (as defined below), Houlihan Lokey will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction.  Houlihan Lokey's services will consist of, if requested by the Company, (i) reviewing and analyzing the business, operations, properties, capital structure, financial condition and prospects of the Company, (ii) preparing and assisting the Company in the development of investor and other stakeholder lists, communicating with such potential investors and other stakeholders and preparing and distributing appropriate information, documents and other materials, including, if appropriate, preparing and assisting the Company in the preparation of an information memorandum; (iii) analyzing and structuring various potential Transaction scenarios and the potential impact of these scenarios on the value of the Company and the recoveries of those stakeholders impacted by any potential Transaction(s) and providing strategic advice with respect to any such Transaction(s), (iv) assisting the Company in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers and/or strategic partners; (v) coordinating the data room and due diligence investigations of potential counterparties to a potential Transaction, (vi) assisting the Company with the structuring and negotiation of any Transaction(s), including participating in negotiations with creditors

Gawker Media Group, Inc.
Page 2

and other parties involved in any Transaction(s); (vii) providing expert advice, testimony and certain agreed upon valuation summaries, guidance and other traditional supporting materials regarding financial matters related to and in support of any Transaction(s), if necessary; (viii) developing financial and operational data and presentations with respect to the Company and attending and presenting at meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as may be appropriate; (ix) providing financial advice and assistance to the Company in structuring any new securities to be issued under any Transaction(s), and (x) providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the Effective Dave, as mutually agreed by the parties hereto.

2.    **Exclusive Agency.**  The Company agrees that neither it nor any of its management or Board of Directors will initiate any discussions with a potential counterparty to a Transaction regarding a Transaction, during the term of this Agreement, without informing Houlihan Lokey prior thereto; provided that nothing herein shall restrict any such discussions related to a Personal Action (as defined below). In the event the Company or its management or Board of Directors receives or becomes aware of any inquiry, including to shareholders, regarding a Transaction from any party, the Company shall promptly inform Houlihan Lokey of such inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations. The Company agrees that any contact with Univision Communications, Inc. (collectively with its direct and indirect subsidiaries, "Univision") after the date hereof regarding the consummation of a Transaction shall be conducted in accordance with the exclusivity provisions set forth in the first two sentences of this Section 2. Notwithstanding the foregoing, the Company has been in contact with its existing lenders Silicon Valley Bank and Columbus Nova Technology Partners (including its affiliate US VC Partners LLC) (such existing lenders, including any affiliate thereof, the "Existing Lenders"), and nothing in this Section 2 shall interfere with the Company's continued dialogue with its Existing Lenders. For the avoidance of doubt, the Company will inform Houlihan Lokey of any such discussion with the Existing Lenders regarding a Transaction so that Houlihan Lokey can assist the Company in evaluating the Existing Lenders interest in a Transaction and in any resulting negotiations.

        Houlihan Lokey acknowledges that the Company shall be under no obligation to consummate any Transaction or pay any fees other than as expressly set forth herein.

3.    **Fees.**  In consideration of Houlihan Lokey's acceptance of this engagement, the Company shall pay the following:

    (i)  *Monthly Fees*:  In addition to the other fees provided for herein, upon the execution of this Agreement and during the term of this Agreement on the 16th day of each month thereafter commencing with June 16, 2016, the Company shall pay Houlihan Lokey in advance, without notice or invoice, a nonrefundable cash fee of $150,000 ("Monthly Fee"). Each Monthly Fee shall be earned upon Houlihan Lokey's receipt thereof in consideration of Houlihan Lokey accepting this engagement and performing services as described herein. If this Agreement is terminated by the Company before the end of three months from the Effective Date, the Company hereby agrees to pay to Houlihan Lokey, on the effective date of such termination, any excess of the amount of Monthly Fees for the three months following the Effective Date over the Monthly Fees actually paid to Houlihan Lokey hereunder. Fifty percent (50%) of the Monthly Fees previously paid on a timely basis to Houlihan Lokey after the sixth Monthly Fee shall be credited against the next Transaction Fee (as defined below) to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that no Monthly Fee shall be credited more than once), except that, in no event, shall such Transaction Fee be reduced below zero; and

Gawker Media Group, Inc.
Page 3

(ii) *Transaction Fee(s)*:  In addition to the other fees provided for herein, the Company shall pay Houlihan Lokey the following transaction fee(s):

    a.  *Sale Transaction Fee*. Upon the closing (subject to Section 8) of a Sale Transaction, Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee ("Sale Transaction Fee") based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

        For AGC up to $50 million:  $1,250,000 ("Minimum Sale Transaction Fee"), plus

        For AGC from $50 million to $100 million:  2% of such incremental AGC, plus

        For AGC from $100 million to $150 million: 3% of such incremental AGC, plus

        For AGC over $150 million: 5% of such incremental AGC.

If more than one Sale Transaction is consummated, Houlihan Lokey shall be paid the Sale Transaction Fee based on the AGC from the initial Sale Transaction and then, for any subsequently consummated Sale Transaction, Houlihan Lokey shall be paid the outstanding incremental amount of the Sale Transaction Fee that would have been payable if the AGC of such subsequent Sale Transaction and all prior Sale Transactions were aggregated and characterized as a single Sale Transaction, calculated in the manner set forth above; subject, however, to a minimum incremental payment of $500,000 for the second and each subsequent Sale Transaction that is consummated prior to the termination of this Agreement (or is the subject of an agreement in principle executed prior to the termination of this Agreement and is consummated within eighteen (18) months following the execution of such agreement in principle with the counterparty named in such agreement or with any affiliate of such counterparty) (which such incremental payment(s) shall also be deemed a "Sale Transaction Fee" for all purposes herein).

Notwithstanding any provision in this Agreement to the contrary, including without limitation Section 4, if a Sale Transaction results in the beneficial holders of the capital stock of the Company outstanding as of the date of this Agreement beneficially owning in the aggregate less than a majority of the capital stock of the Company outstanding immediately following the consummation of such Sale Transaction (a "Liquidity Event"), this Agreement will then be deemed terminated (unless a non-termination notice is otherwise given by the Company prior to the consummation of such Liquidity Event) upon payment to Houlihan Lokey of such related Sale Transaction Fee and any other fees or expenses due and the Company shall have no obligation to pay a Sale Transaction Fee with respect to any Sale Transaction consummated following the consummation of such Liquidity Event.

    b.  *Restructuring Transaction Fee*. Upon the earlier to occur of: (I) in the case of an out-of-court Restructuring Transaction (as defined below), the closing of such Restructuring Transaction; and (II) in the case of an in-court Restructuring Transaction, the effective date of a confirmed plan of reorganization or liquidation under Chapter 11 or Chapter 7 of the Bankruptcy Code, Houlihan Lokey shall earn, and the Company shall promptly pay to Houlihan Lokey, a cash fee ("Restructuring Transaction Fee") of $1,750,000. Notwithstanding the foregoing or anything else to the contrary set forth in this

Gawker Media Group, Inc.
Page 4

Agreement, the Company shall have no obligation to pay a Restructuring Transaction Fee with respect to more than one Restructuring Transaction.

c. *Financing Transaction Fee*. Upon the closing of each Financing Transaction (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee ("Financing Transaction Fee") (x) in the case of a Financing Transaction raising gross proceeds equal to or greater than $15,000,000, equal to the greater of (A) $1,000,000, or (B) the sum of: (I) 2% of the gross proceeds of any indebtedness raised or committed that is senior to other indebtedness of the Company, secured by a first priority lien and unsubordinated, with respect to both lien priority and payment, to any other obligations of the Company; (II) 4% of the gross proceeds of any indebtedness raised or committed that is secured by a lien (other than a first lien), is unsecured and/or is subordinated; and (III) 5% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed and (y) in the case of a Financing Transaction raising gross proceeds less than $15,000,000, equal to the greater of (A) $150,000 or (B) 3% of the gross proceeds of such Financing Transaction. Any warrants issued in connection with the raising of debt or equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of this Agreement. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities (as defined below) in such Financing Transaction) or directly by the Company. Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by, in the case of debt securities, the face value of each such Security or in the case of equity securities, the price per Security paid in the then current round of financing. The fees set forth herein shall be in addition to any other fees that the Company may be required to pay to any investor or other purchaser of Securities to secure its financing commitment. Notwithstanding the foregoing, (a) in the event of a Financing Transaction in which one or more of the Existing Lenders provides a majority of the aggregate commitments and/or funds in respect of such individual financing shall not give rise to any Financing Transaction Fee hereunder, unless Houlihan Lokey has undertaken a financing process pursuant to the specific direction of the Company that has resulted in the submission of at least a bona fide non-binding financing proposal from a third party provider, in which case Houlihan Lokey shall be entitled to a Financing Transaction Fee as determined pursuant to paragraphs (x) or (y) of this Section 3(ii)c, above.

Any Restructuring Transaction Fee, Sale Transaction Fee and Financing Transaction Fee is each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees." All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction. No payments received by Houlihan Lokey pursuant to this Agreement will be put into a trust or other segregated account.

Gawker Media Group, Inc.
Page 5

Without limiting the provisions of Section 9 below, fifty percent (50%) of the amount of any Restructuring Transaction Fee payable to Houlihan Lokey shall be credited once against a subsequent Sale Transaction Fee if such Sale Transaction is consummated within twelve months following the consummation of such Restructuring Transaction, provided however, in no event shall a Transaction Fee be reduced below zero. Fifty percent (50%) of the amount of any Sale Transaction Fee payable to Houlihan Lokey shall be credited once against a subsequent Restructuring Transaction Fee if such Restructuring Transaction is consummated within twelve months following the consummation of such Sale Transaction, provided however, in no event shall a Transaction Fee be reduced below zero.

4.      **Term and Termination.**  This Agreement may be terminated at any time by either party upon thirty days' prior written notice of termination to the other party.  The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 through 3 and 5 and (ii) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement.

In addition, notwithstanding the expiration or termination of this Agreement, Houlihan Lokey shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement with respect to a Transaction: (i) so long as such Transaction is consummated during the term of this Agreement (ii) if such Transaction is consummated within twelve (12) months after the date of expiration or termination of this Agreement ("Tail Period"); provided that, in the case of a Financing Transaction, the counterparty to such Financing Transaction is a party that Houlihan Lokey contacted in furtherance of its engagement hereunder pursuant to the specific direction of the Company during the term of this Agreement, and/or (iii) if an agreement in principle to consummate a Transaction is executed by any entity comprising the Company during the term of this Agreement, or within the Tail Period, and such Transaction set forth in such agreement in principle is consummated within eighteen (18) months following the execution of such agreement in principle with the counterparty named in such agreement or with any affiliate of such counterparty.

5.      **Communication and Coordination**.  Houlihan Lokey shall use commercially reasonable efforts to furnish material advice and information relating to a Transaction to the Company's legal counsel and to coordinate with the Company, the Company's legal counsel and other professional advisors that are advising the Company with respect to the Transaction.  Houlihan Lokey shall use commercially reasonable efforts to be available upon the reasonable request of the Company's Existing Lenders for discussions with regards to the status of each Transaction.

6.      **Transaction**.  As used in this Agreement, the term "Transaction" shall mean any of the following:

(i)  *Sale Transaction*.  Any transaction or series of related transactions other than a Restructuring Transaction or a Financing Transaction that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, and also including, among others, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company and/or the affiliates of each) in one or a series of related transactions of (a) more than 50% of the outstanding equity securities of Gawker Media Group, Inc. or more than 50% of the outstanding equity securities of any direct and indirect subsidiary of Gawker Media Group, Inc. and/or (b) more than 50% of the assets (based on the book value thereof) (including the assignment of any executory contracts) or operations of any entity comprising the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a

Gawker Media Group, Inc.
Page 6

recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction, including, without limitation, any sale transaction or change of control (with a third party) transaction under Sections 363, 1129 or any other provision of Title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") (each, a "Sale Transaction");

(ii) *Restructuring Transaction*.   Any transaction or series of transactions other than a Sale Transaction or a Financing Transaction that constitute a recapitalization or restructuring of the equity and/or debt securities and/or other indebtedness, obligations or liabilities (including, without limitation, preferred stock, partnership interests, lease obligations, trade credit facilities, collective bargaining agreements and other contract or tort obligations) of any entity comprising the Company, including accrued and/or accreted interest thereon, which are outstanding as of the Effective Date, including, without limitation, interest bearing trade debt and the Company's senior debt, subordinated debt and other securities, which recapitalization or restructuring is effected pursuant to an exchange transaction, tender offer, a plan of reorganization or liquidation under the Bankruptcy Code, a solicitation of consents, waivers, acceptances or authorizations, exchange, conversion to equity, cancellation, forgiveness, retirement and/or a modification or amendment to the terms, conditions, or covenants (including, without limitation, the principal balance, accrued or accreted interest, payment term, other debt service requirement and/or financial or operating covenant) of any agreements or instruments governing any of the equity and/or debt securities and/or other indebtedness of any entity comprising the Company (such modification or amendment shall include, without limitation, any forbearance for at least 12 months with respect to any payment obligation) or any combination of the foregoing transactions (each a "Restructuring Transaction"); provided that, for the avoidance of doubt, any plan of reorganization, order confirming a plan of reorganization, dismissal, conversion, or any other similar order of the Bankruptcy Court that solely effects the distribution of the proceeds of a Sale Transaction shall not be deemed a Restructuring Transaction regardless of its form; or

(iii) *Financing Transaction*.  (a) Any transaction or series of related transactions other than a Sale Transaction or Restructuring Transaction that constitutes any refinancing of all or any portion of the existing obligations of any entity comprising the Company and/or (b) the placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities, preferred stock, unsecured, non-senior or subordinated debt securities, and/or senior notes or bank debt) or any loan or other financing, including any "debtor in possession financing" or "exit financing" in connection with a case under the Bankruptcy Code by any entity comprising the Company (any or all of which being "Securities"), from any source including, without limitation, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company (whether or not such transaction is effectuated in-court, out-of-court, through the confirmation of a plan of reorganization or otherwise under the Bankruptcy Code, or whether the requisite consents to such transaction(s) are obtained in-court or out-of-court) (each a "Financing Transaction");

Notwithstanding the foregoing and for the avoidance of doubt, a "Transaction" shall not include any transaction or action effected with respect to the personal assets and liabilities of any equityholder, member of management or other stakeholder of the Company, including in connection with debt relief or bankruptcy action or transaction taken in such person or entity's individual capacity (a "Personal Action").

7.    **Aggregate Gross Consideration ("AGC")**.   For the purpose of calculating the Sale Transaction Fee, the AGC shall be, without duplication, the total proceeds and other consideration paid to, or received by, or to be paid to or received by, any entity comprising the Company, or any of its equity or debt holders, or other parties in interest, including, without limitation, holders of warrants and

Gawker Media Group, Inc.
Page 7

convertible securities, and holders of options or stock appreciation rights, whether or not vested (collectively "Constituents"), in connection with the relevant Sale Transaction, net of the aggregate amount of all cash and cash equivalents (including any option exercise price paid or deemed paid in connection with a Sale Transaction) sold or otherwise directly or indirectly transferred in the Sale Transaction. Such proceeds and consideration shall be deemed to include, without limitation and without duplication (and as calculated as set forth herein): any earnest funds deposited by a potential counterparty (to the extent released to the Company or its Constituents and/or applied to the Sale Transaction); cash, notes, securities, and other property; non-contingent payments made in installments (e.g., a Seller note); above-market payments under any employment, non-compete, severance, consulting or similar agreements with any equity holder, Contingent Payments (as defined below) and/or insurance proceeds actually received by the Company in respect of the occurrence of an insurable event that materially diminishes the value of the Company.  In the event that the parties determine that only one Sale Transaction (other than a Sale Transaction structured as an asset sale) will be consummated and upon the closing of such Sale Transaction less than 100% of the ownership of the outstanding equity interests are sold (other than unvested equity interests), the portion of AGC with respect to such Sale Transaction constituting the consideration and proceeds received by the equity holders of the Company shall be calculated as if 100% of the ownership of the outstanding and vested equity interests of the Company on a fully diluted basis had been sold by calculating by dividing (i) the total consideration, whether in cash, securities, notes or other forms of consideration, received or receivable by the Company and/or its equity holders by (ii) the percentage of ownership which is sold.  In the event that a Sale Transaction is consummated and such Sale Transaction will be structured as an asset sale in which assets of a specific type are sold and any non-cash assets of such type will be retained by any entity comprising the Company after the closing of such Sale Transaction, then the AGC with respect to such Sale Transaction will be increased (without duplication to the extent otherwise reflected in the calculation of AGC in such Sale Transaction and provided that such items shall not be taken into account in the calculation of AGC with respect to any future Sale Transaction (whether structured as an asset sale or otherwise)) to reflect the fair market value of any such non-cash assets. In addition, to the extent any liabilities for borrowed money or other "debt-like" financial liabilities to be mutually agreed upon by the parties (including capitalized leases but excluding intercompany liabilities) of any entity comprising the Company are assumed, decreased, satisfied or otherwise paid off in conjunction with a Sale Transaction (by any entity comprising the Company or any investor, in the form of "cure" payments or otherwise), or any of the non-cash assets of any entity comprising the Company are sold or otherwise transferred outside of the Company's ordinary course of business to another party after the date hereof and prior to the closing of a Sale Transaction (including, without limitation, any non-cash dividends or non-cash distributions paid to security holders or non-cash amounts paid to repurchase any securities), the AGC will be increased (without duplication to the extent otherwise reflected in the calculation of AGC with respect to such Sale Transaction and provided that such items shall not be taken into account in the calculation of AGC with respect to any future Sale Transaction (whether structured as an asset sale or otherwise)) to reflect the face value of any such liabilities and the fair market value of any such non-cash assets. "Contingent Payments" shall be defined as the consideration received or receivable by the Company, or any of its Constituents in the form of payments subject to contingencies (other than solely the passage of time) or the substantial risk of forfeiture, including deferred performance-based payments, "earn-outs", holdbacks or escrowed funds released only upon the occurrence or non-occurrence of certain events or satisfaction of contingencies, contingent installment payments, payments made at closing but subject to future clawback or forfeiture (excluding liability for customary indemnification obligations), or other Contingent Payments based upon the future performance of any entity comprising the Company, or any of its businesses or assets.

8.    **Value of Consideration.**  For the purpose of calculating the AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the closing of the Sale Transaction, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the closing of the

Gawker Media Group, Inc.
Page 8

Sale Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period immediately prior to the closing of the Sale Transaction; and (iii) if such securities have not been traded prior to the closing of the Sale Transaction, Houlihan Lokey and the Company shall negotiate in good faith to agree on a fair market valuation thereof for the purposes of calculating the AGC. For any lease payments and other consideration that is not freely tradable or has no established public market, if the consideration utilized consists of property other than securities, then the value of such property shall be the fair market value thereof as determined in good faith by Houlihan Lokey and the Company. If any consideration is to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. The value of any purchase money or other promissory notes shall be deemed to be the face amount of principal thereof. In the event the AGC includes any Contingent Payments, Houlihan Lokey's Transaction Fee shall be calculated based on the present value of such Contingent Payments as of closing, to the extent reasonably ascertainable, as mutually agreed in good faith by Houlihan Lokey and the Company. If the present value of such Contingent Payments is not reasonably ascertainable or the parties cannot reach such an agreement, in good faith, such Contingent Payments shall be excluded from the determination of AGC at the time of the closing and thereafter, if and when any such Contingent Payments are actually received from time to time, AGC shall be recalculated by giving effect to the receipt of such Contingent Payments and, to the extent AGC is increased after giving effect to such recalculation, an additional incremental Sale Transaction Fee shall be paid to Houlihan Lokey from, and on account of, the increase of AGC regardless of any prior termination or expiration of this Agreement. Each such additional incremental Sale Transaction Fee shall be calculated pursuant to the provisions of this Agreement based upon the amount of each such Contingent Payment.

9.      **Characterization of Multiple and/or Complex Transactions.**  In the event the Company and Houlihan Lokey are unable to agree in good faith upon the classification of any single Transaction as a Sale Transaction, Restructuring Transaction or Financing Transaction, or if a single Transaction shall consist of two, or more, of the foregoing types of Transactions, or elements thereof, Houlihan Lokey shall receive only one Transaction Fee in respect of such Transaction, which shall be equal to (and in no event greater than) the greater of the Sale Transaction Fee, Restructuring Transaction Fee or Financing Transaction Fee, as may be applicable, as calculated in accordance with the terms of this Agreement. For the avoidance of doubt, if two or more single Transactions occur simultaneously or at different times that constitute separate and distinct Transactions, the Company shall pay Houlihan Lokey the Transaction Fee for each such separate and distinct Transaction in addition to, and not in lieu of, each other.

10.      **Reasonableness of Fees.**  The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by Houlihan Lokey. Moreover, the amount of time and effort may vary substantially during different periods of the engagement. As a result, in order to ensure the availability of all necessary professional resources, whenever required, Houlihan Lokey may be foreclosed from pursuing other alternative engagement opportunities. In light of the foregoing, and given: (i) the numerous issues which can currently be anticipated in engagements such as this, (ii) Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, (iii) the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and (iv) the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company.

11.      **Expenses.**  In addition to all of the other fees and expenses described in this Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable and documented (except for the expenses in clause (ii) below) out-of-pocket expenses incurred from time to time in connection with its services hereunder,

Gawker Media Group, Inc.
Page 9

but in no event greater than $20,000 in the aggregate without the Company's prior approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Company's obligations to otherwise pay any other expenses under this Agreement). Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed-fee arrangements made with, travel agents, airlines or other vendors, and (ii) research, database and similar information charges paid to third party vendors, and postage, telecommunication and duplicating expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment or percentage of the fees due to Houlihan Lokey.

Houlihan Lokey shall, in addition, be reimbursed by the Company for the reasonable and documented out-of-pocket fees and expenses of Houlihan Lokey's external_legal counsel incurred in connection with the negotiation and performance of this Agreement and the matters contemplated hereby, but in no event greater than $10,000 in the aggregate without the Company's prior approval, which approval shall not be unreasonably withheld(provided that such limitation shall not affect the Company's obligations to otherwise pay any other legal fees and other expenses under this Agreement).

12.    **Invoicing and Payment.** All amounts payable to Houlihan Lokey shall be made in lawful money of the United States in accordance with the payment instructions set forth on the invoice provided with this Agreement, or to such accounts as Houlihan Lokey shall direct, and the Company shall provide contemporaneous written notice of each such payment to Houlihan Lokey. All amounts invoiced by Houlihan Lokey shall be exclusive of value added tax, withholding tax, sales tax and any other similar taxes ("Taxes"). All amounts charged by Houlihan Lokey will be invoiced together with Taxes where appropriate.

13.    **Information.** The Company will provide Houlihan Lokey with access to management and other representatives of the Company and other participants in the Transaction, as reasonably requested by Houlihan Lokey. The Company will furnish Houlihan Lokey with such information as Houlihan Lokey may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's best knowledge, accurate and complete at the time furnished. The Company further represents and warrants that any financial projections delivered to Houlihan Lokey have been or will be reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the future financial results and condition of the Company. The Company will promptly notify Houlihan Lokey in writing of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to, or discussed with, Houlihan Lokey, or any materials provided to any interested party. Houlihan Lokey shall rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by, or discussed with, Houlihan Lokey. The Company understands and agrees that Houlihan Lokey will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein. The Company acknowledges that Houlihan Lokey has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar matters. Houlihan Lokey's role in reviewing any information is limited solely to performing such a review as it shall deem necessary to support its own advice and analysis and shall not be on behalf of any other party. Any advice (whether written or oral) rendered by Houlihan Lokey pursuant to this Agreement is intended solely for the use of the Board of Directors of the Company (solely in its capacity as such) in evaluating a Transaction, and such advice may not be relied upon by any other person or entity or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Houlihan Lokey may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Houlihan Lokey. In addition,

Gawker Media Group, Inc.
Page 10

neither Houlihan Lokey nor the terms of this Agreement may otherwise be referred to without our prior written consent.

14.    **Limitations on Services as Advisor**.  Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. The parties understand that Houlihan Lokey is being engaged hereunder as an independent contractor to provide the services hereunder solely to the Company, and that Houlihan Lokey is not acting as an agent or fiduciary of the Company, its security holders or creditors or any other person or entity in connection with this engagement, and the Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for the Company's decision on whether to pursue, endorse or support any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the Company in its sole discretion.  Any duties of Houlihan Lokey arising by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder will be owed solely to the Company.

15.    **Bankruptcy Court Approval**.  In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall use commercially reasonable efforts to seek an order authorizing the employment of Houlihan Lokey pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code.  In so agreeing to seek Houlihan Lokey's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Houlihan Lokey's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Transaction, that the value to the Company of Houlihan Lokey's services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Transaction Fee(s) is reasonable regardless of the number of hours to be expended by Houlihan Lokey's professionals in the performance of the services to be provided hereunder.  The Company shall submit Houlihan Lokey's employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its best efforts to cause such application to be considered on the most expedited basis.  The employment application and the proposed order authorizing employment of Houlihan Lokey shall be provided to Houlihan Lokey as much in advance of any Chapter 11 filing as is practicable, and must be reasonably acceptable to Houlihan Lokey.  Following entry of the order authorizing the employment of Houlihan Lokey, the Company shall pay all fees and expenses due pursuant to this Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with Houlihan Lokey to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court.  Houlihan Lokey shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Houlihan Lokey's retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Houlihan Lokey in all respects.  If the order authorizing the employment of Houlihan Lokey is not obtained, or is later reversed or set aside for any reason, Houlihan Lokey may terminate this Agreement, and the Company shall reimburse Houlihan Lokey for all fees and expenses reasonably incurred prior to the date of expiration or termination, subject to the requirements of

Gawker Media Group, Inc.
Page 11

the Bankruptcy Code, Bankruptcy Rules and applicable local rules and orders. Prior to commencing a Chapter 11 case, the Company shall pay all amounts due and payable to Houlihan Lokey in cash. The terms of this Section are solely for the benefit of Houlihan Lokey, and may be waived, in whole or in part, only by Houlihan Lokey.

16.    **Additional Services.**  To the extent Houlihan Lokey is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement (such as rendering a fairness opinion or valuation services in the context of litigation), the Company shall pay Houlihan Lokey such fees as shall be mutually agreed upon by the parties hereto in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove; provided, that nothing herein shall restrict the ability of the Company to procure such additional services from another provider.

17.    **Required Services.**  If Houlihan Lokey is legally required to render services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay Houlihan Lokey additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs and expenses, including, among other things, the reasonable legal fees and expenses of Houlihan Lokey's counsel in connection therewith.

18.    **Credit.**  After the announcement or closing of any Transaction, Houlihan Lokey may, at its own expense, place announcements on its corporate website and in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other identifying marks) describing its services in connection therewith; provided that Houlihan Lokey shall have obtained the prior consent of the Company, which consent shall not be unreasonably withheld. Furthermore, if requested by Houlihan Lokey, the Company agrees that in any press release announcing any Transaction, the Company will include in such press release a mutually acceptable reference to Houlihan Lokey's role as financial advisor to the Company with respect to such Transaction. Notwithstanding the foregoing, Houlihan Lokey shall not disclose the financial or other terms of the Transaction without the prior written consent of the Company.

19.    **Choice of Law; Jury Trial Waiver; Jurisdiction.**  THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN NEW YORK.  THIS AGREEMENT AND ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.  EACH OF HOULIHAN LOKEY AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK,

Gawker Media Group, Inc.
Page 12

**WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND AGREES TO VENUE IN SUCH COURTS; PROVIDED THAT SUCH CONSENT AND AGREEMENT SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY CASE INVOLVING THE COMPANY TO BE FILED IN SUCH COURTS, AND IF THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DURING ANY SUCH CASE, ANY CLAIMS MAY ALSO BE HEARD AND DETERMINED BEFORE THE BANKRUPTCY COURT. EACH PARTY FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE EXCLUSIVELY TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY AT 114 FIFTH AVENUE, NEW YORK, NY 10011.**

20.    **Indemnification and Standard of Care.**    As a material part of the consideration for the agreement of Houlihan Lokey to furnish its services under this Agreement, the Company agrees (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, suffered or incurred by such Indemnified Party arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, this Agreement, and (ii) to reimburse each Indemnified Party for all reasonable and out-of-pocket expenses (including, without limitation, the reasonable and out-of-pocket fees and expenses of external counsel) incurred by such Indemnified Party as they are incurred in connection with investigating, preparing, pursuing, defending, settling, compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or related to such engagement or matter. However, the Company shall not be liable under the foregoing indemnification provision for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the bad faith, willful misconduct or gross negligence of Houlihan Lokey or such Indemnified Party and in such case, the Company shall be entitled to recover from the applicable Indemnified Party any expenses advanced by the Company to such Indemnified Party pursuant to the indemnification obligation set forth in this paragraph to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.

With respect to any litigation or other adversarial proceeding to the extent exclusively between Houlihan Lokey and the Company, the indemnity provision in the immediately preceding paragraph shall not apply, and the prevailing party in such proceeding shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and court costs, except that this provision shall not apply to any claims (a) brought by any Indemnified Party to enforce such Indemnified Party's indemnification, contribution and reimbursement rights under this Section, or (b) brought by any person or entity asserting claims on behalf of or in right of the Company, including, without limitation, a claim made derivatively, or by a shareholder, receiver or person serving in a similar capacity, **which** claims

Gawker Media Group, Inc.
Page 13

shall be covered by the indemnity and reimbursement provisions set forth in the immediately preceding paragraph.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any Indemnified Party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company (and its affiliates, and their respective directors, employees, agents or other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from the Company pursuant to this Agreement. Relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders and creditors, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under this Agreement. The Company shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, this Agreement (whether or not an Indemnified Party is an actual or potential party thereto), or participate in or otherwise facilitate any such settlement, compromise, consent or termination, unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Company shall not be required to indemnify, reimburse or contribute to any Indemnified Party in respect of any amount paid or payable by such party in the settlement or compromise of any claim or action for which indemnification is sought hereunder, unless such settlement or compromise is consented to in writing by the Company, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the Company shall be required to indemnify, reimburse or contribute to such Indemnified Party for such amount, even if such settlement or compromise is not consented to by the Company, if the Indemnified Party that is considering such settlement or compromise submits the terms of such settlement or compromise to the Company and the Company has not if requested by the Indemnified Party, within ten (10) business days thereafter, engaged in good faith discussions with such Indemnified Party regarding the Company's obligation to indemnify it for the amount payable thereunder.

If Houlihan Lokey receives actual notice of the commencement of any action or proceeding to which the Company is not a party in respect of which indemnity will be sought from the Company hereunder, Houlihan Lokey shall notify the Company of such action or proceeding, provided that failure to notify the Company shall not relieve the Company from any liability hereunder (a) if the Company had actual notice of such action or proceeding, or (b) unless and only to the extent of any forfeiture by the Company of substantial rights and defenses resulting therefrom, and will not in any event relieve the Company from any obligation or liability that the Company may have to any Indemnified Party otherwise than on account of the indemnity, reimbursement or contribution obligations under this Section 20. If an Indemnified Party has sought indemnification hereunder in connection with an action or proceeding brought by a third party, the Company may, in actions or proceedings other than those brought by or on behalf of the Company, upon written notice to such Indemnified Party, assume the defense thereof, by

Gawker Media Group, Inc.
Page 14

retaining U.S.–based counsel reasonably satisfactory to such Indemnified Party and paying the fees and expenses of such counsel. Any Indemnified Party shall have the right to employ separate counsel in any such action or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel incurred after receipt of such notice from the Company shall be at the expense of such Indemnified Party (but not other out-of-pocket investigation expenses incurred by or on behalf of such Indemnified Party, which expenses shall be reimbursed by the Company) unless (a) the Company has agreed to pay the fees and expenses of such counsel, or (b) the Company shall have failed to timely assume the defense of such action or proceeding or retain counsel reasonably satisfactory to such Indemnified Party, or (c) as reasonably determined by such Indemnified Party upon the advice of competent counsel, (i) there may be legal defenses available to such Indemnified Party or another Indemnified Party that are different from or additional to those available to the Company, or (ii) the representation of the Company and such Indemnified Party by the same counsel would be inappropriate due to an actual or potential conflict of interest (in the case of any of the foregoing clauses (a), (b) or (c), if such Indemnified Party notifies the Company in writing that it elects to retain separate counsel, (A) the Company shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Party, and (B) such Indemnified Party may employ separate counsel to represent or defend it in any such action or proceeding and the Company will pay the reasonable and out-of-pocket fees and expenses of such counsel (in addition any local counsel to the extent reasonably necessary) to the extent such fees and expenses are otherwise required to be paid by the Company as set forth herein).

The Company further agrees that neither Houlihan Lokey nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, this Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the bad faith, willful misconduct or gross negligence of such Indemnified Party.

The Company shall cause any new company that may be formed by the Company, for any purpose, to agree to all of the obligations in this Section to Houlihan Lokey in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to Houlihan Lokey. The Company agrees that Houlihan Lokey may be irreparably injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Houlihan Lokey shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by Houlihan Lokey in connection with this engagement prior to the Effective Date and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of

Gawker Media Group, Inc.
Page 15

the services described in, and any expiration or termination of the relationship established by, this Agreement.

21.      **Miscellaneous.**  This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any Chapter 11 or Chapter 7 trustee appointed on behalf of the Company.

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder.

This Agreement is the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements or understandings regarding the same, whether written or oral.  This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person. Accordingly, the Company will provide Houlihan Lokey upon request certain identifying information necessary to verify the Company's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government-issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

The Company has all requisite power and authority to enter into this Agreement. This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.  This Agreement has been reviewed by the signatories hereto and their counsel.  There shall be no construction of any provision against Houlihan Lokey because this Agreement was drafted by Houlihan Lokey, and the parties waive any statute or rule of law to such effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law.  The Company understands that Houlihan Lokey is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction,

Gawker Media Group, Inc.
Page 16

approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

The Company understands and acknowledges that Houlihan Lokey and its affiliates (collectively, the "Houlihan Lokey Group") engage in providing investment banking, securities trading, financing, financial advisory, and consulting services and other commercial and investment banking products and services to a wide range of institutions and individuals. In the ordinary course of business, the Houlihan Lokey Group and certain of its employees, as well as investment funds in which they may have financial interests or with which they may co-invest, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and other obligations) of, or investments in, the Company or any other party that may be involved in the matters contemplated by this Agreement or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Houlihan Lokey Group may in the past have had, and may currently or in the future have, financial advisory or other investment banking or consulting relationships with parties involved in the matters contemplated by this Agreement, including parties that may have interests with respect to the Company, a Transaction or other parties involved in a Transaction, from which conflicting interests or duties may arise. Although the Houlihan Lokey Group in the course of such other activities and relationships may acquire information about the Company, a Transaction or such other parties, or that otherwise may be of interest to the Company, the Houlihan Lokey Group shall have no obligation to, and may not be contractually permitted to, disclose such information, or the fact that the Houlihan Lokey Group is in possession of such information, to the Company or to use such information on the Company's behalf.

In order to enable Houlihan Lokey to bring relevant resources to bear on its engagement hereunder from among its global affiliates, the Company agrees that Houlihan Lokey may share information obtained from the Company and other parties hereunder with other members of the Houlihan Lokey Group, and may perform the services contemplated hereby in conjunction with such other members.

The Company acknowledges that Houlihan Lokey and/or its affiliates have in the past provided certain financial advisory services to Columbus Nova, LLC, and the Company (on its own behalf and, to the extent permitted by applicable law, on behalf of its security holders) knowingly and voluntarily (a) waives and releases, to the fullest extent permitted by law, any claims it may have against Houlihan Lokey or its affiliates arising out of, resulting from or based upon such engagement, and (b) waives any actual or potential conflicts of interest which may result from Houlihan Lokey's and/or such affiliates' multiple roles as an advisor to Columbus Nova, LLC and an advisor to the Company pursuant to this Agreement.

The parties hereto agree and confirm that the confidentiality obligations set forth in the Confidentiality Agreement, dated April 6, 2016, between the parties hereto shall continue in full force and effect in accordance with its terms following the execution of this Agreement.

If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement along with a check (or wire transfer confirmation) for $150,000 on account of the first Monthly Fee.

Gawker Media Group, Inc.
Page 17

All of us at Houlihan Lokey thank you for choosing us to advise the Company, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY CAPITAL, INC.

By: _____

Mark Patricof
Managing Director

By: _____

D. Reid Snellenbarger
Managing Director

Accepted and agreed to as of the Effective Date:

Gawker Media Group, Inc., on its own behalf, and on behalf of its direct and indirect subsidiaries

By: _____

Mr. Nick Denton
Founder & CEO



## HOULIHAN LOKEY

**Personal and Confidential**

May 16, 2016

Gawker Media Group, Inc.
114 Fifth Avenue
New York, NY 10011
Attn: Mr. Nick Denton, Founder & CEO

First **Monthly** Fee                                        $150,000.00

PAYMENT DUE UPON RECEIPT
**Please Send Checks To:**
Houlihan Lokey Capital, Inc.
Accounts Receivable Department
10250 Constellation Blvd., 5th Floor
Los Angeles, California 90067

**Wire Transfer Instructions:**
Bank of America
Wire Transfer ABA #026009593
ACH ABA #121000358
fbo Houlihan Lokey Capital, Inc.
Account #1453120593
Swift Code (International Wires Only): BOFAUS3N

**<u>Exhibit C</u>**

**D. Reid Snellenbarger Declaration**

56996818_6

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                         :

In re                        :        Chapter 11
                         :

Gawker Media LLC, *et al.*,[1]    :        Case No. 16-11700 (SMB)
                         :

          Debtors.        :        (Jointly Administered)
                         :
-------------------------------------------------------x

### DECLARATION OF D. REID SNELLENBARGER IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE EMPLOYMENT AND RETENTION OF HOULIHAN LOKEY AS <u>INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE</u>

I, D. Reid Snellenbarger, declare as follows:

      1.      I am familiar with the matters set forth herein and, if called as a witness, I could and would testify thereto. Unless otherwise defined, all capitalized terms used herein have the meanings ascribed to them in the Application.

      2.      I am a Managing Director of Houlihan Lokey Capital, Inc. ("<u>Houlihan Lokey</u>"), and am duly authorized to execute this declaration (the "<u>Declaration</u>") on behalf of Houlihan Lokey.

      3.      I make this Declaration in support of the *Debtors' Application for Entry of an Order Authorizing and Approving the Employment and Retention of Houlihan Lokey as Investment Banker Nunc Pro Tunc to the Petition Date* (the "<u>Application</u>").

      4.      This Declaration is also submitted as the statement required pursuant to §§ 328(a), 329 and 504 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).  The offices of Gawker Media and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66. 1062 Budapest, Hungary.

Code") and Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")).

## Qualifications

5.      Houlihan Lokey is an internationally recognized investment banking and financial advisory firm, with twenty-four offices worldwide and more than 800 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 165 professionals, is one of the leading advisors and investment bankers to unsecured and secured creditors, debtors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in some of the largest restructuring cases in the United States, including representing official committees in *Lehman Brothers Holdings Inc., Arcapita Bank B.S.C(c)., Enron Corp., WorldCom, Inc., Delta Air Lines, Inc., General Growth Properties, Capmark,* and representing debtors in *Mark IV Industries, Buffets Holdings, Inc., Bally Total Fitness Holding Corp., XO Communications, Inc., Six Flags, Inc., Granite Broadcasting Corp.* , and *MS Resorts.*

6.      As further described below and in the Application, Houlihan Lokey and the personnel who are assigned to this engagement have a solid understanding of the Debtors' business. Houlihan Lokey has performed services for the Debtors during both the pre-petition and post-petition periods from May 2016 through the present time advising the Debtors' management on behalf of and for the benefit of the Debtors and their estates, in evaluating the potential for and feasibility of implementing a plan of reorganization that would maximize value of the Debtors' estate for all stakeholders and in preparation for a sale of Debtors' assets.

7.      The principal professionals who have rendered, and are expected to render, services to the Debtors are Mark Patricof and myself. A summary of qualifications is attached hereto as **Exhibit 1** and is incorporated herein by this reference.

2

## Scope of Services

8.       Houlihan Lokey has agreed to provide investment banking and financial advisory services to the Debtors in the above-captioned Chapter 11 Cases pursuant to the terms and conditions of the engagement letter dated May 16, 2016 (the "Engagement Agreement"), between the Debtors and Houlihan Lokey, a copy of which is attached hereto as Exhibit B to the Application. The services agreed upon include among other things, the following (the "Services"), if and to the extent requested:[2]

(a)    reviewing and analyzing the business, operations, properties, capital structure, financial condition and prospects of the Debtors;

(b)    preparing and assisting the Debtors in the development of investor and other stakeholder lists, communicating with such potential investors and other stakeholders and preparing and distributing appropriate information, documents and other materials, including, if appropriate, preparing and assisting the Debtors in the preparation of an information memorandum;

(c)    analyzing and structuring various potential Transaction scenarios and the potential impact of these scenarios on the value of the Debtors and the recoveries of those stakeholders impacted by any potential Transaction(s) and providing strategic advice with respect to any such Transaction(s);

(d)    assisting the Debtors in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers and/or strategic partners;

(e)    coordinating the data room and due diligence investigations of potential counterparties to a potential Transaction;

(f)    assisting the Debtors with the structuring and negotiation of any Transaction(s), including participating in negotiations with creditors and other parties involved in any Transaction(s);

(g)    providing expert advice, testimony and certain agreed upon valuation summaries, guidance and other traditional supporting materials regarding financial matters related to and in support of any Transaction(s), if necessary;

---

[2] The summary provided herein is for illustrative purposes only and is subject to the Engagement Agreement in all respects. In the event of any inconsistency between the summary of services as set forth herein and the Engagement Agreement, the Engagement Agreement will control.

56996818_6

(h)    developing financial and operational data and presentations with respect to the Debtors and attending and presenting at meetings of the Debtors' Board of Directors, creditor groups, official constituencies and other interested parties, as may be appropriate;

(i)    providing financial advice and assistance to the Debtors in structuring any new securities to be issued under any Transactions(s); and

(j)    providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated by the Engagement Agreement effective date, as mutually agreed by the parties hereto.

9.    All of the Houlihan Lokey personnel assigned to the Debtors' matters, including myself, will use our best efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these Chapter 11 Cases.

## Compensation

10.    It is my understanding that Houlihan Lokey will be entitled, pursuant to the terms of the Engagement Agreement, to the following consideration for the Services:

(a)    **Monthly Fees.** Houlihan Lokey will be paid on the 16th day of each month commencing a nonrefundable cash fee of $150,000 (the "Monthly Fee"), subject to certain reductions in respect of the completion of a Transaction.

(b)    **Transaction Fees.** In addition to the other fees provided for in the Engagement Agreement, the Debtors shall pay Houlihan Lokey the following transaction fee(s):

   i.    *Sale Transaction Fee.* Upon the closing (subject to Section 8 of the Engagement Agreement) of a Sale Transaction, Houlihan Lokey shall earn, and the Debtors shall thereupon pay immediately and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee ("Sale Transaction Fee") based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

   For AGC up to $50 million: $1,250,000 ("Minimum Sale Transaction Fee"), plus

   For AGC from $50 million to $100 million: 2% of such incremental AGC, plus

   For AGC from $100 million to $150 million: 3% of such incremental AGC, plus

4

<u>For AGC over $150 million</u>: 5% of such incremental AGC.

If more than one Sale Transaction is consummated, Houlihan Lokey shall be paid the Sale Transaction Fee based on the AGC from the initial Sale Transaction and then, for any subsequently consummated Sale Transaction, Houlihan Lokey shall be paid the outstanding incremental amount of the Sale Transaction Fee that would have been payable if the AGC of such subsequent Sale Transaction and all prior Sale Transactions were aggregated and characterized as a single Sale Transaction, calculated in the manner set forth above; subject, however, to a minimum incremental payment of $500,000 for the second and each subsequent Sale Transaction that is consummated prior to the termination of the Engagement Agreement (or is the subject of an agreement in principle executed prior to the termination of the Engagement Agreement and is consummated within eighteen (18) months following the execution of such agreement in principle with the counterparty named in such agreement or with any affiliate of such counterparty) (which such incremental payment(s) shall also be deemed a "<u>Sale Transaction Fee</u>" for all purposes in the Engagement Agreement).

Notwithstanding any provision in the Engagement Agreement to the contrary, including without limitation Section 4, if a Sale Transaction results in the beneficial holders of the capital stock of the Debtors outstanding as of the date of the Engagement Agreement beneficially owning in the aggregate less than a majority of the capital stock of the Debtors outstanding immediately following the consummation of such Sale Transaction (a "<u>Liquidity Event</u>"), the Engagement Agreement will then be deemed terminated (unless a non-termination notice is otherwise given by the Debtors prior to the consummation of such Liquidity Event) upon payment to Houlihan Lokey of such related Sale Transaction Fee and any other fees or expenses due and the Debtors shall have no obligation to pay a Sale Transaction Fee with respect to any Sale Transaction consummated following the consummation of such Liquidity Event.

ii.  *Restructuring Transaction Fees.* Upon the earlier to occur of: (I) in the case of an out-of- court Restructuring Transaction (as defined below), the closing of such Restructuring Transaction; and (II) in the case of an in-court Restructuring Transaction, the effective date of a confirmed plan of reorganization or liquidation under Chapter 11 or Chapter 7 of the Bankruptcy Code, Houlihan Lokey shall earn, and the Debtors shall promptly pay to Houlihan Lokey, a cash fee ("Restructuring Transaction Fee") of $1,750,000. Notwithstanding the foregoing or anything else to the contrary set forth in the Engagement Agreement, the Debtors shall have no obligation to pay a Restructuring Transaction Fee with respect to more than one Restructuring Transaction.

iii. *Financing Transaction Fees.* Upon the closing of each Financing Transaction (as defined below), Houlihan Lokey shall earn, and the Debtors shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee (a "Financing Transaction Fee") (x) in the case of a Financing Transaction raising gross proceeds equal to or greater than $15,000,000, equal to the greater of (A) $1,000,000, or (B) the sum of: (I) 2% of the gross proceeds of any indebtedness raised or committed that is senior to other indebtedness of the Debtors, secured by a first priority lien and unsubordinated, with respect to both lien priority and payment, to any other obligations of the Debtors; (II) 4% of the gross proceeds of any indebtedness raised or committed that is secured by a lien (other than a first lien), is unsecured and/or is subordinated; and (III) 5% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed and (y) in the case of a Financing Transaction raising gross proceeds less than $15,000,000, equal to the greater of (A) $150,000 or (B) 3% of the gross proceeds of such Financing Transaction. Any warrants issued in connection with the raising of debt or equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of the Engagement Agreement. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities (as defined below) in such Financing Transaction) or directly by the Debtors. Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by, in the case of debt securities, the face value of each such Security or in the case of equity securities, the price per Security paid in the then current round of financing. The fees set forth in the Engagement Agreement shall be in addition to any other fees that the Debtors may be required to pay to any investor or other purchaser of Securities to secure its financing commitment. Notwithstanding the foregoing, (a) in the event of a Financing Transaction in which one or more of the Existing Lenders provides a majority of the aggregate commitments and/or funds in respect of such individual financing shall not give rise to any Financing Transaction Fee hereunder, unless Houlihan Lokey has undertaken a financing process pursuant to the specific direction of the Debtors that has

6

resulted in the submission of at least a bona fide non-binding financing proposal from a third party provider, in which case Houlihan Lokey shall be entitled to a Financing Transaction Fee as determined pursuant to paragraphs (x) or (y) of Section 3(ii)(c) of the Engagement Agreement.

(c)    **Expenses**.  In addition to all of the other fees and expenses described in the Engagement Agreement, and regardless of whether any Transaction is consummated, the Debtors shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable and documented out-of-pocket expenses incurred from time to time in connection with its services under the Engagement Agreement, but in no event greater than $20,000 in the aggregate without the Debtors prior approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Debtors' obligations to otherwise pay any other expenses under the Engagement Agreement).  Houlihan Lokey shall, in addition, be reimbursed by the Debtors for the reasonable and out-of-pocket fees and expenses of Houlihan Lokey's external legal counsel incurred in connection with the negotiation and performance of the Engagement Agreement and the matters contemplated in the Engagement Agreement, but in no event greater than $10,000 in the aggregate without the Debtors' prior approval, which approval shall not be unreasonably withheld.

(d)    **Indemnification**.    The Debtors agree (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, suffered or incurred by such Indemnified Party arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, the Engagement Agreement, and (ii) to reimburse each Indemnified Party for all reasonable and out-of-pocket expenses (including, without limitation, the reasonable and out-of-pocket fees and expenses of external counsel) incurred by such Indemnified Party as they are incurred in connection with investigating, preparing, pursuing, defending, settling, compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or related to such engagement or matter. However, the Debtors shall not be liable under the foregoing indemnification provision for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the bad faith, willful misconduct or gross negligence of Houlihan Lokey or such Indemnified Party and in such case, the Debtors shall be entitled to recover from the applicable Indemnified. Party any expenses advanced by the Debtors to such Indemnified Party pursuant to the indemnification obligation set forth in this paragraph to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.

56996818_6

With respect to any litigation or other adversarial proceeding to the extent exclusively between Houlihan Lokey and the Debtors, the indemnity provision in the immediately preceding paragraph shall not apply, and the prevailing party in such proceeding shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and expenses and court costs, except that this provision shall not apply to any claims (a) brought by any Indemnified Party to enforce such Indemnified Party's indemnification, contribution and reimbursement rights under this section, or (b) brought by any person or entity asserting claims on behalf of or in right of the Debtors, including, without limitation, a claim made derivatively, or by a shareholder, receiver or person serving in a similar capacity, which claims shall be covered by the indemnity and reimbursement provisions set forth in the immediately preceding paragraph.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any Indemnified Party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Debtors shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Debtors, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by the Engagement Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Debtors shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Debtors (and its affiliates, and their respective directors, employees, agents or other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from the Debtors pursuant to the Engagement Agreement. Relative benefits received by the Debtors, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Debtors, and its security holders and creditors, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under the Engagement Agreement. The Debtors shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, the Engagement Agreement (whether or not an Indemnified Party is an actual or potential party thereto), or participate in or otherwise facilitate any such settlement, compromise, consent or

termination, unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Debtors shall not be required to indemnify, reimburse or contribute to any Indemnified Party in respect of any amount paid or payable by such party in the settlement or compromise of any claim or action for which indemnification is sought hereunder, unless such settlement or compromise is consented to in writing by the Debtors, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the Debtors shall be required to indemnify, reimburse or contribute to such Indemnified Party for such amount, even if such settlement or compromise is not consented to by the Debtors, if the Indemnified Party that is considering such settlement or compromise submits the terms of such settlement or compromise to the Debtors and the Debtors have not if requested by the Indemnified Party, within ten (10) business days thereafter, engaged in good faith discussions with such Indemnified Party regarding the Debtors' obligation to indemnify it for the amount payable thereunder.

11.     In my experience, investment bankers such as Houlihan Lokey do not typically charge for their services on an hourly basis. Instead, we customarily charge a monthly advisory fee plus an additional fee that is contingent upon the occurrence of a specified type of transaction. The Engagement Agreement follows this custom in the investment banking industry and sets forth the monthly and transaction-based fees that are to be paid to Houlihan Lokey as agreed to by the Debtors for the valuable services to be provided thereby.

12.     Houlihan Lokey does intend to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these Chapter 11 Cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court (to the extent compliance is not waived) and consistent with the proposed compensation set forth in the Engagement Agreement. Specifically, we intend to submit monthly fee statements for the Monthly Fee and expenses, and a fee application for the Transaction Fees.

13.     Since our compensation will be calculated and paid based on the Transaction Fees (in addition to Monthly Fee), we are requesting that we not be required to file time records in

accordance with Bankruptcy Rule 2016(a), Local Rule 2016-1, General Rule M-447, the United

States Trustee Fee Guidelines, and any otherwise applicable orders or procedures of the Court.

Notwithstanding that we do not charge for our services on an hourly basis, we will nonetheless

maintain records (in summary format) of services rendered for the Debtors in half-hour

increments, including reasonably detailed descriptions of those services and the individuals who

provided those services, and will present such records to the Court in its interim and final fee

applications. We will also maintain records in support of any actual, necessary costs and

expenses incurred in connection with the rendering of its services in these Chapter 11 Cases.

**Disinterestedness**

14.     In connection with its proposed retention by the Debtors in these Chapter 11

Cases, Houlihan Lokey undertook to determine whether it had any conflicts or other

relationships that might cause it not to be disinterested or to hold or represent an interest adverse

to the Debtors.   Specifically, Houlihan Lokey obtained from the Debtors and their

representatives the names of individuals and entities that may be parties in interest in these

chapter 11 cases (the "Interested Parties") and such parties are listed on **Exhibit 2**

hereto.  Houlihan Lokey has searched and is continuing to search its client databases maintained

with respect to Houlihan Lokey Group to determine whether Houlihan Lokey Group has or has

been engaged by or can otherwise identify any relationship with any Interested Parties identified

to Houlihan Lokey by the Debtors and listed on **Exhibit 2** hereto.

15.     To the best of my knowledge, information and belief after reasonable inquiry,

other than as disclosed in this Declaration, neither I, the Houlihan Lokey, nor any of our

professionals or employees participating in or connected with Houlihan Lokey's engagement

with the Debtors: (i) is related to the Debtors or any other party in interest herein, the United

States Trustee for this District, or anyone employed in the United States Trustee's Office for this

10

District; or (ii) has any connection with or holds or represents any interest adverse to the Debtors, its estate, its creditors or any other Interested Party or their respective attorneys in the matters on which Houlihan Lokey is proposed to be retained.

16.     As part of its practice, Houlihan Lokey is involved in many different matters and may appear in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, some of whom now, or may in the future, represent claimants and other parties in interest in these cases. Except as otherwise provided for herein, Houlihan Lokey has not been engaged by, and will not be engaged by or represent the interests of, any such parties in relation to the Debtors or their Chapter 11 Cases. Houlihan Lokey does not have any relationship with any such attorneys, accountants, financial consultants, or investment bankers that would be adverse to the Debtors or their estates.

17.     By way of further disclosure:

a)      From time to time, Houlihan Lokey's Financial Restructuring Group, which is providing the services in this case, has provided services, and likely will continue to provide services to certain attorneys, other professionals, creditors (including lenders) and/or security holders of the Debtors and various other parties, some of whom may be providing services to, or may be adverse to, or may be otherwise connected to, the Debtors, in each case in matters unrelated to these Chapter 11 Cases.

b)      In addition to its Financial Restructuring Group, Houlihan Lokey and the other subsidiaries of its direct parent Debtors, Houlihan Lokey, Inc., that are engaged in providing investment banking and financial advisory services globally (collectively, the "Houlihan Lokey Group") provide services to a wide range of institutions and individuals and may in the past have had, and may currently or in the future have, financial advisory or other investment banking or consulting relationships with parties that may have interests with respect to the Debtors. In the ordinary course of business, investment funds affiliated with the Houlihan Lokey Group and certain of the Houlihan Lokey Group's employees, as well as investment funds in which such employees may have financial interests, but over whose investment decisions such employees have no input or control, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and other obligations) of, or investments in, the

11

Debtors or other parties that may have an interest in these Chapter 11 Cases or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. Moreover, the Houlihan Lokey employees who are working on these Chapter 11 Cases are subject to compliance mechanisms and policies and procedures designed to prevent confidential, nonpublic information from being improperly shared.

c)    The Houlihan Lokey Group's Hedge Fund and Derivatives Valuation Services Group provides valuation opinions on the securities and derivative holdings of various business development companies, private equity firms and hedge funds, which may include debt securities of the Debtors. This work is unrelated to the financial advisory and investment banking services that Houlihan Lokey intends to provide in these Chapter 11 Cases. Moreover, the Houlihan Lokey Group, through the establishment of an "Information Wall" has separated its employees in the Hedge Fund and Derivatives Valuation Services Group from the rest of the employees of the Houlihan Lokey Group. This "Information Wall" includes physical and technological barriers, compliance mechanisms and policies and procedures designed to prevent confidential, non-public information and work product from being shared improperly.

d)    In the ordinary course of its business, Houlihan Lokey from time to time discusses issues concerning stressed and distressed companies with creditors and prospective creditors that are clients of the firm, or that otherwise contact Houlihan Lokey, or that are referred to the firm in light of Houlihan Lokey's reputation for covering such companies and/or relevant industry expertise. At the time of those contacts, it is not known whether any particular Debtors will actually file for bankruptcy, or if any of these creditors and/or potential creditors will serve on any future Committee, or even be a creditor of the relevant estate in the event of a future bankruptcy. It is also Houlihan Lokey's customary practice to communicate with and, when appropriate or requested, send materials to one, or more, of the 50 largest unsecured creditors identified by a debtor and who are, therefore, potential members of a creditors' committee, if we either know, work with, are contacted by, or are otherwise referred to the relevant creditor. In some circumstances, we may contact potential committee members with whom we are not previously familiar.

e)    Houlihan Lokey personnel may have business associations with certain creditors of the Debtors or counsel or other professionals involved in these Chapter 11 Cases on matters unrelated to these Chapter 11 Cases. In addition, in the ordinary course of its business, Houlihan Lokey may engage counsel or other professionals in unrelated matters who now

12

represent, or in the future may represent, creditors or other interested parties in these Chapter 11 Cases.

18.    **Exhibit 3** attached hereto lists those Interested Parties identified as having engaged or otherwise having a relationship with certain divisions within the Houlihan Lokey Group in the last five (5) years or by whom certain divisions of the Houlihan Lokey Group are currently engaged or with whom a relationship has been identified, as a result of the relationship check performed by Houlihan Lokey.  Houlihan Lokey Group's current and/or former services for Interested Parties on Exhibit C hereto relate to situations not involving any Debtor. Houlihan Lokey does not believe that any relationship that the Houlihan Lokey Group, or any of our professionals or employees participating in or connected with Houlihan Lokey's engagement with the Debtors may have with any Interested Party in connection with any unrelated matter will interfere with or impair Houlihan Lokey's representation of the Debtor in these Chapter 11 Cases.[3]

26.    To the extent Houlihan Lokey discovers any facts bearing on the matters described herein during the period of Houlihan Lokey's retention, Houlihan Lokey undertakes to amend and supplement the information contained in this Affidavit to disclose such facts.

27.    Based on all of the foregoing, I believe that Houlihan Lokey is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.

28.    No agreement presently exists to share with any other person or firm any compensation received by Houlihan Lokey for its services in this case. If any such agreement is entered into, Houlihan Lokey undertakes to amend and supplement this Declaration to disclose the terms of any such agreement.

---

[3] As disclosed in the Engagement Agreement, Houlihan Lokey previously provided certain financial advisory services to Columbus Nova, LLC.  Such services were provided more than five (5) years prior to Houlihan Lokey's present engagement with the Debtors and are unrelated to this matter.

56996818_6

29.     No promises have been received by Houlihan Lokey, or by any employee thereof, as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

56996818_6

30.    I am generally familiar with the Bankruptcy Code and the Bankruptcy Rules, and

Houlihan Lokey will comply with them, subject to the Orders of this Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of June, 2016.

D. Reid Snellenbarger
Houlihan Lokey Capital, Inc.

**EXHIBIT 1**

**Summary of Qualifications**

**Houlihan Lokey – Financial Restructuring Group (D. Reid Snellenbarger)**

1.      Houlihan Lokey is a publicly traded (NYSE:HLI), internationally recognized investment banking and financial advisory firm, with twenty-four offices worldwide and more than 800 professionals.  Houlihan Lokey's Financial Restructuring Group, which has more than 165 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with special situations and companies both in and outside of bankruptcy.

2.      D. Reid Snellenbarger is a Shareholder and Managing Director of Houlihan Lokey and is a senior member of Houlihan Lokey's Financial Restructuring Group.  He has also served on Houlihan Lokey's Technical Valuation Standards Committee.   Before joining Houlihan Lokey in 2005, Mr. Snellenbarger was a vice president of PricewaterhouseCoopers Corporate Finance LLC, in the Chicago restructuring practice

3.      Mr. Snellenbarger received a B.S. with distinction in finance from Purdue University.  Mr. Snellenbarger is a member of the American Bankruptcy Institute and the Turnaround Management Association, and is registered with FINRA as a General Securities Representative.

4.      During his nearly two decade professional career, Mr. Snellenbarger has specialized in assisting companies, lenders, creditors and investors in unique and stressed situations.   Mr. Snellenbarger's experience includes conducting acquisitions and divestitures of unique and special situation assets, raising various forms of capital and negotiation relating to the restructuring of private and public securities, both in chapter 11 and in out-of-court situations.

5.      Mr. Snellenbarger has been involved as an advisor in a wide range of special situation transactions throughout his career, involving both out-of-court transactions and chapter

11 cases, including Phoenix Brands (*company*), Tactical Holdings (*company*), ResCap LLC (*junior secured bondholders*), Kerzner Holdings (*secured op-co debtholders)*, Wingspan Holdings (*company*), General Growth Properties *(unsecured creditors' committee),* Saint Vincents Catholic Medical Centers *(unsecured creditors' committee),* USG Corporation (*equity committee*), Island One Resorts (*secured lenders*)  and other Chapter 11 cases and out-of-court transactions across a wide range of industries.

**Houlihan Lokey – Technology, Media and Telecom Group (Mark Patricof)**

6.      Houlihan Lokey's Technology, Media and Telecom ("TMT") Group has more than 60 professionals and is one of the leading advisors and investment bankers to companies in the TMT space. Houlihan Lokey does work in a variety of TMT sub-sectors, including digital media.  Houlihan Lokey's digital media sell-side advisory experience includes representing sellers in: Viant Technology Inc.'s sale to Time Inc. (2016), Healthline Media's sale to Summit Partners LLP (2016), World Golf Tour, Inc.'s sale to Topgolf International, Inc. (2016),  Penguin Random House's sale of Author Solutions, LLC to Najafi Companies (2015), Escalate's sale to Acosta, Inc. (2015), OUYA's sale to Razer Inc. (2015), and Songza, Inc.'s sale to Google Inc. (2014).

7.      Mark Patricof is a Managing Director and Co-Head of Houlihan Lokey's Technology, Media and Telecom Group. A digital media pioneer and seasoned investment banker, Mr. Patricof has advised a wide range of leading traditional and digital media and entertainment companies. He is based in the firm's New York office.

8.      Before joining Houlihan Lokey, Mr. Patricof was a Co-Founder and Managing Partner at MESA, a merchant bank and advisory firm specializing in digital and traditional media

and entertainment industry transactions. He also managed MESA Ventures, a seed fund that partnered with top-tier VCs to invest in early-stage digital media, e-commerce, and advertising technology companies around the globe. Prior to MESA, Mr. Patricof was Founder and CEO of <kpe>, a renowned digital media agency and business incubator. Mr. Patricof began his career at Creative Artists Agency in Los Angeles.

9.      Mr. Patricof holds a B.A. from Emory University and is a former Clio Award winner and finalist for Ernst & Young's Entrepreneur of the Year. He currently serves as a member of the Boards of Directors of NEP Broadcasting, New York City Economic Development Corporation, and New York Cruise Lines, and is the longstanding board chair for New York–based nonprofit New Heights.

**EXHIBIT 2**

**Schedules of Interested Parties**

## List of Schedules

| Schedule | Category |
| --- | --- |
| 1(a) | Debtors and Trade Names |
| 1(b) | Current and Recent Former Directors and Officers |
| 1(c) | Potential Contract Counterparties |
| 1(d) | Insurers |
| 1(e) | Other Interested Parties |
| 1(f) | Landlords |
| 1(g) | Litigants |
| 1(h) | Professionals |
| 1(i) | Shareholders |
| 1(j) | Significant Customers |
| 1(k) | Significant Unsecured Creditors |
| 1(l) | Significant Vendors |
| 1(m) | Taxing Authorities |
| 1(n) | U.S. Trustee and Key Court Personnel for the Southern District of New York |
| 1(o) | Utilities |
| 1(p) | Employees and Independent Contractors |

## SCHEDULE 1(a)

### Debtors and Trade Names

Gawker Media Group, Inc.

Gawker Media LLC

Kinja Kft.

Blogwire Hungary Intellectual Property Licensing LLC

Blogwire Hungary Kft.

Gawker.Com

Blogwire Hungary Intellectual Property Licensing LLC

Blogwire Hungary Kft.

Curbed.com LLC

Gawker Sales LLC

Gawker.Com

RGFREE

Vox Media, Inc.

Blogwire

Deadspin

Defamer

Gawker

Gawker Stalker

Gizmodo

io9

Jalopnik

Jezebel

Kinja

Kotaku

Lifehacker

Sploid

Valleywag

## SCHEDULE 1(b)

### <u>Current and Recent Former Directors and Officers</u>

Albertson, Josh

Darbyshire, Gabrielle

Denton, Nicholas

Dietrick, Heather

Epstein, Jason

Fette, Ian

Holden, William

Kidder, Scott

Plunkett, Thomas

Szasz, Peter

Tillman, Scott

Weinbrecht, Adrian

**SCHEDULE 1(c)**

**Contract Counterparties**

114 Fifth Avenue Ground Lessee LLC

114 Fifth Owner LP

204-210 Elizabeth Street LLC c/o S.W.
Management LLC

204-210 Elizabth Street LLC

3293 Pacific LLC

A Mediocre Corporation

A Small Orange, LLC.

A9.com, Inc.

Access Inteligence, LLC

Adam Clark Estes

Adam Pash

Adam Weinstein

Ad-Juster, Inc.

Admeld, LLC

Adsfactor Holdings Limited

AdSlot Technologies, LTD.

Adtech US, Inc.

Aegon Magyarorszag Zrt.

AGIS Fire & Security Kft.

AIG

Alan Henry

Alan Kwon

Albert Burneko

Aleksander Chan

Alex Cranz

Alex Dickinson

Alex Pareene

Alexandra Cannon

Alexandra Philippides

Alexandre Dohrmann

Alissa Walker

All You Can Move SportPass Europe

Allison Jones

Allison Wentz

Allure Media Pty Limited

AM Lab Americas, LLC.

Amanda Marandola

Amazon Services LLC

Amazon Web Services, Inc.

Amazon.com, Inc.

Anastasia Weeks

Andrassy Palota Ingatlanfogalmazo Kft.

Andrea Park

Andrew Collins

Andrew Cush

Andrew Gorenstein

Andrew Harding

Andy Orin

Angela Alzona

Angela Wang

Anna Merlan

Anthony Carnevale

Anthony Hack

AOL Advertising Inc.

Ariana Cohen

Ariel Viera

Ashley Feinberg

Ashton Galloway

Atlantic Metro Communications II, Inc.

Attila Illes

Ava Gyurina

Balazs Keki

BarkBox, Inc.

Barry Petchesky

Ben Regenspan

BlueApron.com

Brainy Labs, LLC

Brandon McCoy

Brendan O'Connor

Bridget Brown

Bryan Lufkin

Bryan Menegus

C&G Group Kft c/o Brody House Group

Cadreon, LLC.

Caitleen Weaver

Camila Cabrer

Camilla Baker

Casey Speer

Casper Sleep Inc.

Catherine LeClair

Cecilia D'Anastasio

Chad Bernstein

Chelsey Hoffman

Cheryl Eddy

Chris Neveu

Chris Person

Chris Vespoli

Christina Blacken

ClickMeter

ClickStream

Cloudinary Ltd.

Clover Hope

ClubW

Colleen McMillan

Colliers International

Colliers International Kft.

Coltiers Nemzetkozi Ingattanuzemeltet6 es Kezel6 Kft.

Combat Flip Flops, LLC.

Comic Cartel

ComScore, Inc.

Corporate Communications Bt.

Courtenay O'Connor

Daniel Morgan

Darren Orf

Dashlane Inc.

DataGram

Datagram Incorporated

Dave McKenna

David Tracy

Dayna Evans

Devin Clark

Diana Moskovitz

Diane Kelly

Diego Pineda

DineInFresh, Inc. dba Plated

Dollar Shave Club, Inc.

DOUBLECLICK

Dr. Torzsa Peter Bt.

DreamHost

Drew Magary

Driftaway Inc.

Earnest Inc.

Eleanor Shechet

Elisa Solinas

Emily Ambruso

Emily Herzig

Emma Carmichael

Emprese Cedente

Eric Goldfarb

Eric Ravenscraft

Erika Audie

Erin Gloria Ryan

Erin Pettigrew

Esther Inglis-Arkell

Ethan Sommer

Evan Narcisse

Eyal Ebel

F451

F451 fka Spicy Media Editora Ltda

F451 Media Editora Ltda.

Fabiola Lara

Facebook Ireland Limited

Facebook, Inc.

Fastly, Inc.

Federal Insurance Company

Fluxmob, LLC.

Framebridge, Inc.

Fritzie Andrade

Future Publishing Limited

Gabrielle Bluestone

GeekFuel, LLC.

Germain Lussier

Giri Nathan

Globalway Participacoes Ltda.

Gloria Clark

Google Inc.

Gorilla Nation Media, LLC

Grace Robertson

Graze Inc.

Green Fox Academy

Greg Howard

Greg Lopez

GroupDynamics Kft

Gunnar Optiks

Gyorgy Bokros

Hajtas Pajtas Kft.

Handy.com

Hannah Keyser

Happy Socks

Heather Dietrick

Heather Hynes

Heidi Grothaus

HelloFresh

Hillary Crosley

Hostgator.com, LLC.

Huckberry

Hunter Slaton

Ian Fette

IDrive Inc.

Ilona Bilevych

Incisive Ltd

Incisive VNU Limited dba Incisive Incisive Ltd

Incisive VNU Ltd

Index Exchange Inc.

Infobahn Inc.

Integral Ad Science, Inc.

IseeQ Kft.

J.K Trotter

| | |
|---|---|
| Jake Inferrera | Justin Cross |
| Jalsovszky Law | Justin Potter |
| James Bartus | JW Player / LongTail Ad Solutions, Inc. |
| James Bit Design | Kaila Hale-Stern |
| James Delgiudice | Kanwar Gill |
| Jamie Weber | Kara Brown |
| JapanCrate | Kargo Global, Inc. |
| Jared Auslander | Karma Mobility Inc. |
| Jason Parham | Kate Dries |
| Jason Schreier | Kate Knibbs |
| Jason Torchinsky | Kate Lovejoy |
| Jay Hathaway | Katharine Trendacosta |
| Jeffrey Hilder | Kathryn McGinnis |
| Jennifer Ouellette | Katie Drummond |
| Jia Tolentino | Kavitha Reddy |
| Jillian Marie Lucas | Kelly Conaboy |
| Jim Boos | Kelly Faircloth |
| Jim Cooke | Kelly Monson |
| Jim Cooke | Kelly Stout |
| Joanna Rothkopf | Kerrie Uthoff |
| Joel Johnson | Kevin Draper |
| John Appel | Kid Thursday LLC., dba Staus Audio |
| John Cook | Kirk Hamilton |
| John Gelini | Kixer |
| Jordan Sargent | Kolozsvari Timea |
| Josh Bottino | Kravitha Reddy |
| Josh Laurito | Krux Digital, Inc. |
| Joshua Albertson | Lacey Donohue |
| Judy Steinbach | Lauren Bertolini |
| Julia Alvidrez | Leah Beckmann |
| Julian Muller | Leah Finnegan |
| Julianne Escobedo Shepherd | LendingTree, LLC. |
| Jung Sin | Lindsay Chipman |

Lindsey Jaffe

Lisa Bolano

LiveIntent, Inc.

LiveRail, Inc.

LOLA

Lucy Haller

Madeleine Davies

Madeleine Stone

Madison Plus Select, Inc.

Malcolm Read

Mandy Mandelstein

Margaret Taormina

Marina Galperina

Mario Aguilar

Maritza Sanche

Mark Weldon

Market Halsey Urban Renewal, LLC.

MarkMonitor Inc.

Matt Hardigree

Matt Novak

Matthew Hamer

Matthew Kulper

Mediagene, Inc.

MediaGene, Inc. fka Infobahn, Inc.

MediaMind Technologies, Inc.

Megan Gilbert

Megbizott

Melissa Green

Melissa Murray

Merch Direct, LLC

Merchant Importacao, Exportacao e
Comercio, Ltda - ME

MeUndies

Mia Libby

Michael Fahey

Michael Kuntz

Michael Lindsay

Michael Nunez

Michael Orell

Michael Roselli

Michele LaFauci

Michelle Chiang

Mike Ballaban

Mikolaj Szabo

Ministry of Supply

Miranda Langrehr

Moat, Inc.

Mobiles Republic, Inc.

Mollie Horan

Moore Stephens Hezicomp Kft.

Mott & Bow

MoviePass

MVMT Watches

Nameaction Brasil Serv de Inter Ltda ME

NameAction Inc.

Nandita Raghuram

Natasha Vargas-Cooper

Nathan Grayson

NatureBox

Nervora Digital Media Group, FZ-LLC

NetMediaEurope

Netus Media Pty Limited dba Allure Media
Pty LTD

Nevora Digital Media Group

NewsCred, Inc.

Nicholas Murphy

| | |
|---|---|
| Nick Stango | Rob Harvilla |
| Noble People | Robert Finger |
| OCP Collective Corp. dba Adcade, Inc. | Ryan Brown |
| Omar Kardoudi | S&T Consulting Hungary Kft. |
| OnMarc Media | Sam Biddle |
| Operative Media, Inc. | Sam Scherer |
| Oppenheim Ugyvedi Iroda | Sam Woolley |
| Opportune LLP | Samantha Lagani |
| Optimizely, Inc. | Samer Kalaf |
| Oriole Media Corporation dba Juice Mobile | Samuel Griffel |
| Oscar Z. Ianello Associates, Inc. | Sarah Dedewo |
| Owen & Fred Corp. | Sarah Wiest |
| Pacific Shaving Company | Scott Kidder |
| Parachute Home | Sean Buckley |
| Patricia Hernadez | Sean MacDonald |
| Patrick Ballester | SeatGeek |
| Patrick Klepek | Shane Roberts |
| Patrick Laffoon | Shep McAllister |
| Patrick Redford | Shopify |
| Paul Sundue | SimpleReach, Inc. |
| PAX | Skillshare, Inc. |
| Percona, Inc. | Skimbit Limited |
| Perfect World Entertainment | SkimBit LTD. |
| Peri Hochwald | SmartFX |
| Pixel Media Asia Limited | SocialFlow, Inc. |
| Platinum Rye, LLC. | Sophie Kleeman |
| Pop Chart Lab | Soundfreaq |
| Poprageous | Specless, LLC. |
| Puja Patel | Spicy Media Editora LTDA |
| Quench USA, Inc. | SpruceWares |
| Quip NYC Inc. | Squarespace, Inc. |
| Rhone Apparel Inc. | Stackcommerce |
| Riley MacLeod | Staq, Inc. |

Starcom SMG

Stassa Edwards

Stephanie Schrader

Stephen Totilo

Steve Climaco

Steven Polletta

Stowawy Cosmetics

STS Meida, Inc.

Stuart Cheshire

Sultana Khan

Superdry Wholesale, LLC

Suzy Kuzy, LLC.

Szolgaltato

Taboola Inc.

Tamas Neltz

Tara Jacoby

Taylor Berman

Technorati, Inc.

Terra Networks Brasil S.A.

TGT

The Rubicon Project, Inc.

The Sasquatch Soap Co., LLC. dba Dr. Squatch

The Status Audio

Thorin Klosowski

Tim Burke

Time Shred Services, Inc.

Times Internet Limited

Tom Ley

Tom Plunkett

Tom Scocca

Tommy Craggs

Toth Eva Nagykanizsa

Tremor Video, Inc.

UCMS Group Hungary Kft.

Udemy.com

Veronica de Souza

Victor Jeffreys

Viddler, Inc.

VNU Business Media Europe Limited

Waves Gear, LLC.

We Work

Wesley Siler

WeWork LA LLC

Whitson Gordon

William Arkin

William Haisley

William Turton

Wine Awesomeness

Wrights Media, LLC

Writers Guild of America, East

Yannick LeJacq

Zach Custer

Zachary Connett

Zoe Stahl

**SCHEDULE 1(d)**

**Insurers**

Aegon Magyarorszag Zrt.

AIG Europe Limited

Dewitt Stern Group, Inc.

Federal Insurance Company

Hartford Casualty Insurance Company

Hudson Insurance Company

National Union Fire Insurance Co. of Pittsburgh PA

United Healthcare Insurance Company

**SCHEDULE 1(e)**

**Other Interested Parties**

Cerberus Business Finance LLC

Houlihan Lokey, Inc.

K&H Bank

Latham & Watkins

Prime Clerk LLC

Riemer & Braunstein, LLP

Schulte Roth & Zabel LLP

Securities & Exchange Commission

Securities & Exchange Commission – NY Office

Silicon Valley Bank

Sullivan & Cromwell LLP

US VC Partners LP

**SCHEDULE 1(f)**

**<u>Landlords</u>**

Andrassy Palota Ingatlanforgalmazo Korlatolt Felelossegu Tarsasag

114 Fifth Owner LP

## SCHEDULE 1(g)

### Litigants

Aulistar Mark

Andrew Hudson

Zachary Cianflone

Lindsay MaHarry

Katherine Castellana

Elizabeth Nadybal

Chelsea Lo Pinto

Tim Barribeau

Patrick Frawley

Elizabeth Weinbloom

Kristin Chan

Samuel Julian

Brian Colgan

Benjamin Dorson

Rachel Atwood

Michael Kennelly

Alyssa Bereznak

Lily Newman

Kwame Opam

Terry Gene Bollea

Mitchell Williams

Meanith Huon

Ashley Terril

Charles Johnson and Got News, LLC

Teresa Thomas

Shiva Ayyadurai

Christopher Sadowski

## SCHEDULE 1(h)

### Professionals

Akerman LLP

Cahill Gordon & Reindel LLC

Citrin Cooperman & Co., LLP

Giskan Solotaroff & Anderson LLP

Goldin Solutions

Jalsovszky Law Firm

John Duncan

Klasko Immigration Law Partners, LLP

Levine Sullivan Koch & Schulz, LLP

Maples & Calder

Morrison Cohen LLP

Newmark & Co. Real Estate, Inc.

Oppenheim Law Firm

Opportune LLP

Proskauer Rose LLP

Trifolium LLC

Wilk Auslander

Zwillgen PLLC

## SCHEDULE 1(i)

## Shareholders

Berman, Taylor

Bertolini, Lauren

Blakeley, Richard Erand

Bluestone, Gabrielle

Brown, Ryan

Carmichael, Emma

Carmon, Irin

Chan, Casey

Coen, Jessica

Cooke, Jim

Craggs, Tommy

Crecente, Brian

D'Addario, John

Darbyshire, Gaby

Daulerio, Albert

DelGiudice, James

Denton, Nick

Diaz, Jesus

Dietrick, Heather

Dimmitt, Elizabeth

Dimmitt, Genevieve

Duncan, John

Ebel, Eyal

Furman, Eliot, as custodian for Alexander Tiberius Furman under the NYUTMA

Futrelle, Genevieve

Giacoman, Gabriela

Gorenstein, Andrew

Greenmount Creek Limited

Hale-Stern, Kaila

Hamer, Matt

Hardigree, Matt

Holmes, Anna

Jefferson, Whitney

Kang, Daniel

Kidder, Scott

Kozma, Jozsef

Lam, Brian

Layne, Ken

Lehnhoff, Jim

Leitch, Will

Lisanti, Mark

Lopez, Greg

Ma, Jesse

McGill, Erin

Nachlin, Jim

Newitz, Annalee

Nolan, Hamilton

O'Connor, Maureen

Pash, Adam

Petrány, Máté

Pettigrew, Erin

Plunkett, Tom

Read, Malcom

Robischon, Noah

Schreier, Jason

Schwartz, Diane

Schweizer, Julia

Scocca, Thomas

Sicha, Choire

Spinelli, Mike

Steele, Lockhart

Stein, Sadie

Takayama, Greg

Tate, Ryan

Thomas, Owen

Toder, Matthew

Trapani, Gina

US VC Partners LP

Vuong, Phillip

Wert, Ray

Winkelman (Ortega), Samantha

Woerner, Meredith

Albertson, Josh

Annis, Rose

Baker, Camie

Batty, Chris

Biddle, Sam

Bodnár, István

Burke, Tim

Climaco, Steve

Cook, John

Curtis, Dustin

Donohue, Lacey

Drummond, Katie

Fette, Ian

George, Patrick

Georgopulos, Steph

Gonzalez, Robert

Graham, Kevin

Grothaus, Heidi

Hathaway, Jay

Henry, Alan

Hilder, Jeff

Jeffries, Victor

Juzwiak, Rich

Kéki, Balázs

Knibbs, Katharine

Körtesi, Gáspár

Laurito, Josh

Libby, Mia

Magary, Drew

Marchman, Tim

McAllister, Shep

McKenna, Dave

Mittelhammer, Eric

Morgan, Daniel

Neltz, Tamas

Nevins, Maxwell

Novak, Matt

O'Connor, Courtenay

Pareene, Alex

Parham, Jason

Petchesky, Barry

Popken, Ben

Price, John

Reddy, Kavi

Regenspan, Ben

Roberts, Shane

Sargent, Jordan

Sommer, Ethan

Sundue, Paul

Szász, Péter

Szatmári, András

Taomina, Margaret

Tiku, Nitasha

Totilo, Stephen

Trotter, JK

Udvardi, Ramóna

Walker, Alissa

Weaver, Caity

Weinstein, Adam

Wentz, Allison

## SCHEDULE 1(j)

### Significant Customers

| | |
|---|---|
| 20th Century Fox | Earnest |
| 360i | Empowering Media LA |
| A9.com Inc. (Amazon Match Buy) | Empowering Media NY |
| Accordant Media | Essence |
| Adslot | f451 - US |
| Aegis Group | Facebook |
| Alliance Games | Factorylabs |
| Allure Media - GM | Fallon |
| Amazon | Future Publishing Ltd (US) |
| Amazon Commerce Revenue | General Mills, Inc. |
| AOL One | Google (BizDev) |
| Asana (Customer) | Graze |
| Assembly | Havas |
| Baru Advertising | Horizon Media |
| Blue Apron | HostGator |
| Blue Wheel Media | Hover |
| Bluehost | HTC Blinkfeed |
| Brigade Marketing | IBM |
| Casper | Indochino |
| Centro | Initiative LA |
| Cisco | Initiative NY |
| Cramer-Krasselt | Interpublic Group of Companies |
| Criteo | iSocket, Inc. |
| Crossmedia | ITVS |
| Desk.com | Kepler Group |
| Dialect Inc | Ketchum |
| DigitasLBi | Kovel Fuller |
| Dollar Shave Club | Kruskopf & Company |
| Draftkings | Liquid Advertising |

LivWell

Logmein.com

MarkLogic

McGarrah Jessee

Me Undies

Mediagene Inc - US

Mediasmith

Mediastorm, LLC

Merkley and Partners

MillerCoors

MNI

MODCo Media

Mullen

NameCheap

Newscred

Nokia

NVIDIA

Omnicom Group

Pereira & Odell

Petrol

PGR Media

Protein

Publicis Groupe

R/West

Rachael Piper Consulting

Randomhouse

RED Interactive Agency

Rodger's Townsend

RPA

Rubicon

Skillshare

Slack

Spacetime Media

SquareSpace

StackSocial

Status Audio

Sterling Rice Group

Superdry Wholesale LLC

Taboola (Biz Dev)

Tangible Media

TaxFyle

The Garage Team Mazda

TubeMogul

UCB

Udemy

Varidesk

Viewster.com

VOX Media - Curbed Investment

VSN

WavesGear

weBoost

Wieden & Kennedy

Wildcard Properties LLC

WPP

Wright's Media

Zeno Group

## SCHEDULE 1(k)

## Significant Unsecured Creditors

| | |
|---|---|
| Ad-Juster, Inc. (media) | JW Player (Longtail Ad Solutions, Inc.) |
| ADP Workforce Now | Katherine Fry |
| Akerman LLP | Kinja Accounts Payable |
| Alex Palmer | Krux Digital |
| Andrew Harding | L-Cut Digital Media, Inc. |
| AOL Advertising | Market Halsey Urban Renewal, LLC |
| Associated Press | Marlena Agency Inc. |
| Blane Bachelor | Medialink |
| Brandtale | Merrill Communications, LLC |
| CDW Direct | Metropolitan Cleaning, LLC |
| Cloudinary Ltd. | Moat Inc. |
| Concur Technologies, Inc. | Morrison Cohen LLP |
| Corbis Corporation | Newmark & Co. Real Estate, Inc. |
| Corey  Foster | Nick Wong Photography |
| Creative Circle, LLC. | NSONE Inc. |
| DataGram | Operative Media, Inc |
| DoubleVerify, Inc. | Optimizely, Inc. |
| DRH Internet Inc | Pacific Coast News |
| Equinox Fitness Clubs - Corp Accts | Plant Specialists LLC |
| Fastly | QZZR |
| Fried, Frank, Harris, Shriver & Jacobson LLP | REDBOOKS |
| Getty Images | Risk Strategies Company |
| Giaco Furino | Shenker & Bonaparte, LLP |
| Google Inc. (DoubleClick) | SimpleReach, Inc. |
| Google, Inc. (Analytics) | Sizmek Technologies Inc. |
| Hunter Slaton | Specless |
| Ian Fette | STAQ, INC. |
| Jelle Claeys Automotive Artwork | Submarine Leisure Club, Inc. (Wirecutter) |
| Joshua M Lees | Submersive Media |

The Hartford

The Oliver Group

Viddler, Inc.

## SCHEDULE 1(l)

## Significant Vendors

| | |
|---|---|
| 114 Fifth Avenue | Kforce Inc. |
| ADP PayEx | Kornhaber Brown, LLC |
| Advanced Electronic Solutions, Inc. | Lay It Out, Inc. |
| AMA Consulting Engineers P.C. | Leiberts Royal Green Appliances Inc. |
| AMEX Corporate GM - 01006 | Lewis Rice LLC |
| Andrew Liszewski | LionTree Advisors LLC |
| Apple Inc. (media) | LJ DUFFY, Inc. |
| Baby Llama Productions LLC | Maples & Calder (GM LLC) |
| Bajibot Media | NetRatings, LLC |
| Big Mango, Inc. | Netsuite, Inc. |
| Bird & Bird LLP | NVE, Inc. |
| Brannock & Humphries | OCP Collective Corp. |
| Cahill Gordon & Reindel LLP | Olson Kundig Architects |
| Cannes Trip 2015 | Olson Kundig Interiors |
| Catalyst | OnMarc Media Inc. |
| Cerberus Capital Management LP | Opportune LLP |
| ComScore Inc. | Redscout LLC |
| Con Edison (210) | Robert Half |
| CytexOne Technology, LLC | Ropes & Gray LLP |
| Dynect, Inc | Santa Monica Air Center, Inc. |
| Emma C Lanigan (Cookson) | Structure Tone |
| Fidelity 401k | SW Management LLC |
| Harder Mirell & Abrams | TangentVector, Inc. |
| Hatch Content, LLC | Tapestry Associates LLC |
| HeartWork, Inc. | Thomas & Locicero PL |
| Houlihan Lokey | Treasury of the United States |
| Howard Kennedy | TrueForm Concrete, LLC |
| Inform Interiors | Veritas Pictures, Inc. |
| Jesus Diaz (vendor) | Versus LLC |

Vizu Corporation

Voya Financial 401K

WB Wood NY

Young America Capital

**SCHEDULE 1(m)**

**Taxing Authorities**

Internal Revenue Service

Budapesti Önkormányzat

Hungary National Tax Authority

New York City Department of Finance

New York State Commissioner of Taxation and Finance

## SCHEDULE 1(n)

### U.S. Trustee and Key Court Personnel for the Southern District of New York

Cecilia G. Morris

James L. Garrity

Martin Glenn

Mary Kay Vyskocil

Michael E. Wiles

Robert D. Drain

Robert E. Grossman

Sean H. Lane

Shelley C. Chapman

Stuart M. Bernstein

Alicia Leonhard

Amanda Cassara

Andrea B. Schwartz

Andy Velez-Rivera

Anna M. Martinez

Brian S. Masumoto

Cheuk M. Ng

Danny A. Choy

Ercilia A. Mendoza

Greg M. Zipes

Guy A. Van Baalen

Ilusion Rodriguez

Kathleen Schmitt

Linda A. Riffkin

Lisa Penpraze

Maria Catapano

Mary V. Moroney

Myrna R. Fields

Nadkarni Joseph

Paul K. Schwartzberg

Richard C. Morrissey

Serene Nakano

Susan Arbeit

Susan Golden

Sylvester Sharp

Victor Abriano

William K. Harrington

**SCHEDULE 1(o)**

<u>**Utilities**</u>

114 Fifth Avenue Ground Lessee

Atlantic Metro Communications

Benefit Resource, Inc.

Cogent Communications

Con Edison

ShoreTel Inc.

## SCHEDULE 1(p)

### Employees and Independent Contractors

| | |
|---|---|
| Asd Mario Aguilar | Devin Clark |
| Joshua Albertson | Gloria Clark |
| Angelica Alzona | Steve Climaco |
| Fritzie Andrade | Ariana Cohen |
| Erika Audie | Andrew Collins |
| Jared Auslander | Zachary Connett |
| Ilene Baker | John Cook |
| Michael Ballaban | James Cooke |
| Patrick Ballester | Alexandra Cranz |
| Chad Bernstein | Hillary Crosley |
| Lauren Bertolini | Justin Cross |
| Sam Biddle | Andrew Cush |
| Ilona Bilevych | Zach Custer |
| Christina Blacken | Madeleine Davies |
| Gabrielle Bluestone | Maritza De Leon |
| James Boos | Veronica de Souza |
| Joshua Bottino | Sarah Dedewo |
| Robert Bricken | Ernest Deeb |
| Ryan Brown | Nick Denton |
| Kara Brown | Alexander Dickinson |
| Bridget Brown | Heather Dietrick |
| Timothy Burke | Alexandre Dohrmann |
| Albert Burneko | Lacey Donohue |
| Camila Cabrer | Kevin Draper |
| Alexandra Cannon | Kathryn Dries |
| Emma Carmichael | Katherine Drummond |
| Anthony Carnevale | Eyal Ebel |
| Casey Chan | Cheryl Eddy |
| Michelle Chiang | Stassa Edwards |

| | |
|---|---|
| Adam Estes | Samer Kalaf |
| Michael Fahey | Omar Kardoudi Segarra |
| Georgia Faircloth | Hannah Keyser |
| Ashley Feinberg | Sophie Kleeman |
| Ian Fette | Patrick Klepek |
| Robert Finger | Thorin Klosowski |
| Ashton Galloway-Taylor | Michele Lafauci |
| Marina Galperina | Patrick Laffoon |
| John Gelini | Samantha Lagani |
| Patrick George | Miranda Langrehr |
| Kanwar Gill | Joshua Laurito |
| Ariel Gononsky | Catherine LeClair |
| George Grayson | Thomas Ley |
| Melissa Green | Mia Libby |
| Samuel Griffel | Michael Lindsay |
| Heidi Grothaus | Katelyn Lovejoy |
| Ava Gyurina | Germain Lussier |
| Anthony Hack | Riley MacLeod |
| William Haisley | Andrew Magary |
| Lucy Haller | Amanda Mandelstein |
| Kirk Hamilton | Timothy Marchman |
| Matt Hardigree | Alex Mason |
| Andrew Harding | Shepherd McAllister |
| Alan Henry | Kathryn McGinnis |
| Patricia Hernandez-Ramos | David McKenna |
| Emily Herzig | Colleen McMillan |
| Clover Hope | Bryan Menegus |
| Mollie Horan | Anna Merlan |
| Heather Hynes | Maria Misra |
| Attila Illes | Kelly Monson |
| Jacob Inferrera | Daniel Morgan |
| Victor Jeffreys | Diana Moskovitz |
| Richard Juzwiak | Julian Muller |

| | |
|---|---|
| Nick Murphy | Michael Roselli |
| Melissa Murray | Joanna Rothkopf |
| Evan Narcisse | William Sansom |
| Giri Nathan | Jordan Sargent |
| Tamas Neltz | Samuel Scherer |
| Chris Neveu | Stephanie Schrader |
| Hamilton Nolan | Jason Schreier |
| Matthew Novak | Jillian Schulz |
| Michael Nunez | Taryn Schweitzer |
| Brendan O'Connor | Thomas Scocca |
| Courtenay O'Connor | Eleanor Shechet |
| Michael Orell | Julianne Shepherd |
| Darren Orf | Hunter Slaton |
| Andrew Orin | Elisa Solinas |
| Raphael Orlove | Ethan Sommer |
| Jennifer Ouellette | Casey Speer |
| Alexander Pareene | Zoe Stahl |
| Andrea Park | Nicholas Stango |
| Adam Pash | Judith Steinbach |
| Puja Patel | Madeleine Stone |
| Christopher Person | Kelly Stout |
| Barry Petchesky | Richard Sundue |
| Alexandra Philippides | Margaret Taormina |
| Diego Pineda | Jia Tolentino |
| Steven Polletta | Jason Torchinsky |
| John Price | Stephen Totilo |
| Nandita Raghuram | David Tracy |
| Eric Ravenscraft | Katharine Trendacosta |
| Kavitha Reddy | Joseph Trotter |
| Patrick Redford | William Turton |
| Benjamin Regenspan | Kerrie Uthoff |
| Shane Roberts | Christopher Vespoli |
| Grace Robertson | Alissa Walker |

| | |
|---|---|
| Angela Wang | Jamie Condliffe |
| Jamie Weber | Chris Mills |
| Anastasia Weeks | James Whitbrook |
| Allison Wentz | David Nield |
| Samuel Woolley | Kathryn Jezer-Morton |
| András Szatmári | Madeleine Collier |
| Attila Kocsis | Fruzsina Kuhari |
| Balázs Kéki | Robert Stokes |
| Balázs Pőcze | Adam Kovac |
| Dmitry Lambrianov | Jared "Jay Allen" Goodwin |
| Gábor Kacsik | Anthony Dejolde |
| Gáspár Körtesi | Carlos Rebato |
| György Bokros | Carlos Hierro |
| Ildikó Kriston | Matias Martinez |
| István Bodnár | Eduardo Marin |
| János Hardi | Miguel Redondo |
| László Heves | Zolani Stewart |
| Levente Molnár | Reshma Bhai |
| Linda Bucsánszki | Manisha Aggarwal |
| Luca Németh | Lindsay Handmer |
| Márton Borlay | Daniel Strudwick |
| Mikhail Mitrofanov | Eva Jurczyk |
| Olivér Kovács | Mihir Patkar |
| Péter Szász | Toshihisa Nakamura |
| Ramóna Udvardi | Kirsten O'Regan |
| Szabolcs Vida | Alexandra Nursall |
| Szilvia Németh | Nicholas Cameron |
| Zoltán Balázs | Ralph Jones |
| Zoltán Kalmár | Elizabeth Edgar |
| George Dvorsky | Rawiya Elkhadir |
| Luke Plunkett | Ian Dransfield |
| Brian Ashcraft | Stefan Janke |
| Andrew Liszewski | Mark Wilson |

Sniff Petrol Limited

James Fell

Peter Ryan

Manuel Mendez Perez

Angel Jiminez

Jacob Rose

Bram Gieben

Eva Holland

Nathan Thompson

Priya Elias

Scaachi Koul

Helen Appleyard

Omar Karduodi Segarra

Cara Ellison

Estelle Tang

Anupa Mistry

Brodie Lancaster

Jess Shanahan

Jesus Diaz

Herbert Lui (Wonder Shuttle Media, Inc)

Graham Ruthven

Stacy May Fowles

Andrew Gibney

Daniel Harris

Alex Hess

Chris Koentges

Kevin O'Brien

Achal Prabhala

David Sommer

Monica Heisey

Sara Mcculloch

Jakob Wenngren

Alex Bejerstrand

Halmar Sveinbjornsson

Amit Reut

Rosa Gregori

Sarah Moroz

Jason Richards

Ravi Somaiya

Reut Amit

Michael "Massoud" Martin

Fariha Roisin

William Herkewitz

Lev Hellebust (Bratishenko)

Pranav Dixit

Danny Allen

Karan Atul Shah

James Baker

Gary Cutlack

Adelaide Dugdale

Katherine Hannaford

Brian Hogg

Andrew James

Chris Mcveigh

Apoorva Prasad

Michelle Tofi

Yareniz Saavedra Padilla

Carlos Risco

Elias Notario Perez

Eric Tecayehuatl

Robert Boffard

Guy Combs

Joel Meadows

Chris Harris

Guy Porepp

Anthony Mark Dewhurst

Peter Orosz

Ryan Pierce

Neill Watson

George Williams

Chris Harris

Natasha Chenier

Esther Sassaman

Luke Malone

Mikhail Mitrofanov

Leo Wichtowski

Kevin Mahon

Simon Parkin

Quintin Smith

Kathleen Williams

Ollie Barder

Simon Mapp

Andrew Mcmillen

David Veselka

Kevin Mahon

David Gilson

Mark O'Neill

Spanner Spencer

Tom Cassell

Kenneth Gibson

Clare Kane

Zolani Stewart

Josephine Huetlin

**EXHIBIT 3**

**Relationships with Interested Parties**

## RELATIONSHIPS WITH INTERESTED PARTIES

| INTERESTED PARTY | ENGAGEMENT SUMMARY | CLIENT STATUS |
|---|---|---|
| AIG | CF - Various Matters<br>FAS – Various Matters<br>FRG – Various Matters | Current; Former |
| Amazon.com, Inc. | FAS – Various Matters | Former |
| Creative Circle, LLC | FAS – Solvency | Former |
| Sullivan & Cromwell LLP | FAS - Various Matters | Current; Former |
| Latham & Watkins | FAS - Various Matters<br>FRG - Various Matters | Current; Former |
| Getty Images | FRG - Creditor | Former |
| Google, Inc. | FAS - Various Matters | Former |
| Google: Doubleclick | FAS - Purchase Price Allocation | Former |
| Proskauer Rose LLP | FAS - Various Matters | Former |
| ShorTel Inc. | FAS - Various Matters | Former |
| Schulte Roth & Zabel LLP | FAS - Various Matters<br>FRG - Creditor<br>Strategic Consulting | Current; Former |
| Securities & Exchange Commission | FAS - Various Matters | Former |

Memo: Engagement Summary Abbreviations:
CF = Corporate Finance
FAS = Financial Advisory Services
FRG = Financial Restructuring Group