**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------x
                                             :
In re                                        :      Chapter 11
                                             :
GAWKER MEDIA LLC, et al.,                    :      Case No. 16-11700 (SMB)
                                             :
                Debtors.¹                     :       Jointly Administered
                                             :
----------------------------------------------------------x
```

**FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364**
**OF THE BANKRUPTCY CODE AND RULES 2002, 4001, AND 9014 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING**
**INCURRENCE BY THE DEBTORS OF POSTPETITION SECURED INDEBTEDNESS,**
**(II) GRANTING LIENS, (III) AUTHORIZING USE OF CASH COLLATERAL BY THE**
**DEBTORS AND PROVIDING FOR ADEQUATE PROTECTION,**
**AND (IV) MODIFYING THE AUTOMATIC STAY**

Upon the motion, dated June 13, 2016 [*ECF No.* 19] (the "Motion") by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking, among other things, the entry of interim and final orders (this "Final Order"):

(i)    authorizing the Debtors, pursuant to sections 363, 364(c), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), to (a) obtain postpetition financing of up to $22,000,000 (the "DIP Facility"), comprised of a $17,000,000 term loan and a $5,000,000 revolving credit facility, pursuant to (I) that certain Financing Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Financing Agreement"), in the form attached hereto as **Exhibit A**, by and among Gawker Media LLC, as borrower (the "Borrower"),

---

¹ The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Gawker Media LLC (3231), Gawker Media Group, Inc. (0491) and Kinja Kft. (5056). The Debtors' corporate headquarters is located at 114 Fifth Avenue, 2nd Floor, New York, NY 10011.

each of the other guarantor parties thereto including any entities that become guarantors thereunder from time to time (the "Guarantors" and, together with the Borrower, the "DIP Loan Parties"), Cerberus Business Finance LLC, as collateral and administrative agent (the "DIP Agent"), and the lender parties thereto including any entities that become lenders thereunder from time to time (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), and (II) all guarantees and other agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of the DIP Secured Parties (all documents comprising the DIP Facility, each as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Loan Documents"); and (b) incur the "Obligations" under and as defined in the DIP Financing Agreement (any such Obligations are hereinafter referred to as the "DIP Obligations");

(ii)     authorizing the Debtors that are Guarantors under the DIP Financing Agreement to guarantee the Borrower's DIP Obligations;

(iii)     authorizing the DIP Loan Parties to execute and deliver the DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iv)     authorizing the Debtors to access the full amount of the DIP Facility on the terms and subject to the conditions set forth in the DIP Financing Agreement and this Final Order;

(v)     authorizing the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Loan Documents) in each case in a manner consistent with and subject to the terms and conditions of the DIP Loan Documents and this

Final Order, and in compliance with the Budget (as defined in the DIP Financing Agreement), solely for the purposes set forth in the DIP Loan Documents, including to pay or fund (a) certain costs, fees and expenses related to the Chapter 11 Cases, (b) the repayment of all Prepetition First Lien Obligations (as defined below), including to cash collateralize all outstanding letters of credit issued under the Prepetition First Lien Credit Documents (as defined below) in an amount equal to 105% of the First Lien Letter of Credit, and (c) the working capital needs of the Debtors during the Chapter 11 Cases;

(vi)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected liens on and security interests in all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, and hereinafter, "Cash Collateral"), which liens and security interests shall have the priorities set forth in paragraph 1(ii)2(i) below;

(vii)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Case (as defined below) in respect of all DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have the priorities set forth in paragraph 1(ii)2(j) below;

(viii)    authorizing the Debtors' use of Cash Collateral on the terms and conditions set forth in this Final Order, and providing adequate protection on the terms set forth in this Final Order to the Prepetition Second Lien Lender (as defined below) for any Diminution in Value (as defined below) for their interests in the Prepetition Collateral (as defined below), including the Cash Collateral;

(ix)    vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Loan Documents and this Final Order; and

(x)    waiving any applicable stay as provided in the provisions of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and/or the Local Bankruptcy Rules for

the Southern District of New York (the "Local Rules"), and providing for the immediate

effectiveness of this Final Order;

The Court having considered the Motion and the *Declaration of William D. Holden in

Support of DIP Financing Motion* [*ECF No.* 20], the exhibits attached thereto, the DIP Financing

Agreement, and the testimony and other evidence submitted at the interim hearing held before

the Court on June 15, 2016 (the "Interim Hearing"); and the Court having entered that certain

Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rules 202, 4001 and

9014 of the Federal Rules of Bankruptcy Procedures (I) Authorizing Incurrence by the Debtors

of Postpetition Secured Indebtedness, (II) Granting Liens, (III) Authorizing the Use of Cash

Collateral by the Debtors and Providing for Adequate Protection, (IV) Modifying the Automatic

Stay, and (V) Scheduling a Final hearing, dated June 16, 2016 [*ECF No.* 38] (the "Interim

Order"); and the Court having considered the testimony and other evidence submitted at the final

hearing held before the Court on July 7, 2016 (the "Final Hearing"); and in accordance with

Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and Rule 4001-2 of the Local Rules, due

and proper notice of the Motion, the Interim Hearing, and the Final Hearing having been given;

and the Interim Hearing and Final Hearing having been held and concluded; and it appearing that

approval of the relief requested in the Motion on a final basis is fair and reasonable and in the

best interests of the Debtors, their creditors and their estates, and is essential for the continued

operation of the Debtors' business and to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders; and it further appearing that the Debtors are unable to secure unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

## IT IS HEREBY FOUND AND CONCLUDED AS FOLLOWS:[2]

A.    **Petition Date**.  On June 10, 2016, (the "<u>Petition Date</u>"), Gawker Media LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").   On June 12, 2016, Gawker Media Group, Inc. and Kinja Kft. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court.   The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Pursuant to an order of this Court, the Chapter 11 Cases have been consolidated for procedural purposes only.  No trustee or examiner has been appointed in the Chapter 11 Cases.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] The findings and conclusions set forth in this Final Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.  **Statutory Committee**.  On June 24, 2016, the Official Committee of Unsecured

Creditors (the "Committee") was appointed in the Chapter 11 Cases by the Office of the United

States Trustee.

D.  **Notice**.  The Final Hearing was held pursuant to Bankruptcy Rules 2002, 4001

and 9014 and Local Rule 4001-2.  Notice of the Final Hearing and the relief requested in the

Motion was provided in accordance with Paragraph 23(b) of the Interim Order.  Under the

circumstances, such notice of the Final Hearing and the relief requested in the Motion is due and

sufficient notice and complies with sections 102(1), 363, 364(c), and 364(d) of the Bankruptcy

Code, Bankruptcy Rules 2002, 4001(b), 4001(c), 4001(d), and the Local Rules, and no other or

further notice of the relief granted pursuant to this Final Order is necessary or required.

E.  **The Debtors' Acknowledgements and Agreements**.  Without prejudice to the

rights of parties in interest as set forth in paragraph 7 below (but subject to the time limitations

set forth in paragraph 7 below), the Debtors admit, stipulate, acknowledge and agree that

(collectively, paragraphs E(i) through E(viii) hereof shall be referred to herein as the "Debtors'

Prepetition Secured Lien Stipulations"):

(i)  **Prepetition First Lien Agreement**.  Prior to the Petition Date, certain of
the Debtors were parties to that certain Loan and Security Agreement,
dated as of September 24, 2012 (as amended, restated, supplemented or
otherwise modified from time to time in accordance with the terms
thereof, the "Prepetition First Lien Credit Agreement" and together with
all other agreements, documents and instruments executed and/or
delivered to or in favor of the parties thereto, the "Prepetition First Lien
Credit Documents"), by and among the Borrower and Silicon Valley Bank
(the "Prepetition First Lien Lender").  Pursuant to the Prepetition First
Lien Credit Agreement, the Prepetition First Lien Lender made available
to the Borrower a secured term loan credit facility in an original principal
amount of approximately $7,666,666.67 and a letter of credit with an
undrawn face amount of $5,302,066.00.

(ii)  **Prepetition Second Lien Credit Agreement**.  Prior to the Petition Date,
Gawker Media Group, Inc. ("GMGI") was party to that certain Second
Lien Loan and Security Agreement, dated as of January 21, 2016 (as

amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Second Lien Credit Agreement" and together with all Loan Documents (as defined therein) and any other agreements, documents, and instruments executed and/or delivered to or in favor of the parties thereto, the "Prepetition Second Lien Credit Documents" and, together with the Prepetition First Lien Credit Documents, the "Prepetition Secured Credit Documents"), by and among GMGI and US VC Partners, LP (solely in its capacity as a lender, the "Prepetition Second Lien Lender" and, together with the Prepetition First Lien Lender, the "Prepetition Secured Lenders"). Pursuant to the Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Lender made available to GMGI a secured term loan credit facility in an original principal amount of approximately $15,000,000. Pursuant to that certain Unconditional Guaranty, dated as of January 21, 2016 (as amended, restated, supplemented or otherwise modified from time to time), each of the other Debtors unconditionally guaranteed, jointly and severally, to the Prepetition Second Lien Lender the prompt and complete payment and performance when due of all of the Prepetition Second Lien Obligations (as defined below).

(iii)    **Prepetition First Lien and Second Lien Obligations**.  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition First Lien Credit Documents was approximately $6,222,222.24 (such amount, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition First Lien Credit Documents and any outstanding letters of credit, accrued and unpaid interest, any fees, expenses and disbursements, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, collectively, the "Prepetition First Lien Obligations").  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition Second Lien Credit Documents was approximately $15,000,000.00 (such amount, together with any amounts paid, incurred or accrued, prior to the Petition Date in accordance with the Prepetition Second Lien Documents, accrued and unpaid Obligations (as defined in the Prepetition Second Lien Credit Agreement), interest, any fees, expenses and disbursements, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, collectively, the "Prepetition Second Lien Obligations" and together with the Prepetition First Lien Obligations, collectively, the "Prepetition Secured Obligations").  Notwithstanding the foregoing, the Debtors reserve all of their rights in respect of their payment obligations, if any, of that certain Make-Whole Amount (as defined in the Second Lien Credit Agreement) which the Prepetition Second Lien Lender asserts is payable in certain circumstances.

(iv)  **Liens Securing Prepetition Secured Obligations.**  Prior to the Petition Date, the Debtors granted to the Prepetition First Lien Lender and the Prepetition Second Lien Lender liens upon and security interests, as follows:

a.  *Prepetition First Lien Credit Agreement.*  Pursuant to the Prepetition First Lien Credit Documents, the Debtors granted to the Prepetition First Lien Lender liens and security interests (the "<u>Prepetition First Liens</u>") on, in and against all "Collateral" (as such term is defined in the Prepetition First Lien Credit Documents and hereinafter referred to as the "<u>Prepetition Collateral</u>").

b.  *Prepetition Second Lien Credit Agreement.*  Pursuant to the Prepetition Second Lien Credit Documents, the Debtors granted to the Prepetition Second Lien Lender liens and security interests (the "<u>Prepetition Second Liens</u>" and, together with the Prepetition First Lien Liens, the "<u>Prepetition Liens</u>"), on, in and against all Prepetition Collateral.

c.  *Priority of Liens in Prepetition Collateral.*  Pursuant to that certain Intercreditor Agreement, dated as of January 21, 2016 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>Intercreditor Agreement</u>"), by and between the Prepetition First Lien Lender and the Prepetition Second Lien Lender, the Prepetition First Liens granted on all Prepetition Collateral are senior to the Prepetition Second Liens on all Prepetition Collateral as set forth in the Intercreditor Agreement.

(v)  **Intercreditor Agreement.**  The Prepetition First Lien Lender and the Prepetition Second Lien Lender entered into the Intercreditor Agreement to govern, among other things, the respective rights, interests, obligations and priority of the Prepetition First Lien Lender  and the Prepetition Second Lien Lender in respect of the Prepetition Collateral to the extent set forth in the Intercreditor Agreement.  The Intercreditor Agreement constitutes a subordination agreement for purposes of section 510(a) and is enforceable in these Chapter 11 Cases.

(vi)  **Validity, Perfection and Priority of Prepetition Liens and Prepetition Secured Obligations.**  As of the Petition Date, (i) the Prepetition Liens were valid, binding, enforceable, non-avoidable and properly perfected; (ii) the Prepetition Liens (x) were senior in priority to any and all other liens on and security interests in the Prepetition Collateral, subject only to certain liens, if any, otherwise permitted pursuant to the Prepetition

Secured Credit Documents,[3] and (y) were not subject to avoidance, recharacterization, subordination or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (iii) the Prepetition Secured Obligations constituted legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the Prepetition Secured Credit Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and were not subject to any objection, offset, defense or counterclaim of any kind, and no portion of the Prepetition Secured Obligations was subject to avoidance, disallowance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iv) the Prepetition Secured Obligations constituted allowed secured claims pursuant to section 506 of the Bankruptcy Code.  On the date that the Interim Order was entered and as of the date this Final Order is entered, the Debtors shall have waived, discharged and released the Prepetition Secured Lenders, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Prepetition Secured Obligations or any of the Prepetition Liens, and (y) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Prepetition Secured Credit Documents. The Debtors do not possess and will not assert any claim, counterclaim, setoff, objection, challenge, cause of action or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition  Liens, or any of the Prepetition Secured Obligations pursuant to the Prepetition Secured Credit Documents.

(vii)    **Interest in Cash Collateral**.  The Prepetition Secured Lenders have legal, valid, binding and non-avoidable security interests in the Cash Collateral of the Debtors, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of Prepetition Collateral, to secure their respective Prepetition Secured Obligations, to the same extent and order of priority as that which was held by each such party on the Petition Date.

(viii)   **Property of the Estate**.   Each item of the DIP Collateral constitutes property of the Debtors' estates.

F.      **Findings Regarding the Post-Petition Financing**.

---

[3] Nothing herein shall constitute a finding or ruling by this Court that any such permitted liens, if any, are valid, enforceable, perfected, non-avoidable or senior to the Prepetition Liens.  Nothing herein shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the Prepetition Secured Lenders, the DIP Secured Parties and the Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection, extent or any other aspect of any such permitted liens.

(i)    **Need for Post-Petition Financing**.  Based on the evidence presented at the Interim Hearing and the Final Hearing, and the representations made by the Debtors in the Motion and on the record of the Interim Hearing and the Final Hearing, a need exists for the Debtors to obtain funds under the DIP Facility and to use Cash Collateral in order to continue operations and to administer and preserve the value of the Debtors' estates.  The ability of the Debtors to meet payroll and finance their operations, and to preserve, maintain and maximize the value of their assets for the benefit of their creditors, requires the immediate availability of working capital provided pursuant to the DIP Facility and use of Cash Collateral.  Without access to the DIP Facility and the use of Cash Collateral, the Debtors have insufficient funds available to sustain operations of any magnitude for any length of time.  The inability to obtain funding under the DIP Facility and use of Cash Collateral would harm the Debtors, their estates and their creditors, and irreparably damage the Debtors' prospects for a successful reorganization or sale of their assets as a going concern or otherwise.

(ii)    **No Credit Available on More Favorable Terms**.  Based on the evidence presented at the Interim Hearing and the Final Hearing, and the representations made by the Debtors in the Motion and on the record of the Interim Hearing and the Final Hearing, the Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain secured credit pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Loan Documents, the Interim Order, and this Final Order.  Financing on a postpetition basis is not otherwise available without granting to the DIP Agent, for the benefit of itself and the DIP Lenders, (a) valid and perfected security

10

interests in and liens on all of the Debtors' existing and after acquired assets with the priorities set forth in the Interim Order and this Final Order, (b) superpriority claims with the priorities set forth in the Interim Order and this Final Order, and (c) the other protections, rights and remedies set forth in the DIP Loan Documents, the Interim Order and this Final Order.

      **G.**    <u>**Use of Proceeds of the DIP Facility**</u>.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Loan Documents) have been and shall be used in a manner consistent with and subject to the terms and conditions of the DIP Loan Documents, and in compliance with the Budget and the limitations set forth in this Final Order, solely for the purposes set forth in the DIP Loan Documents, including to pay or fund (i) certain costs, fees and expenses related to the Chapter 11 Cases; (ii) the repayment of the Prepetition First Lien Obligations and the cash collateralization of certain outstanding letters of credit issued pursuant to the Prepetition First Lien Credit Agreement on the terms set forth in the DIP Financing Agreement; (iii) the Carve-Out (as defined below); and (iv) the working capital needs of the DIP Loan Parties during the Chapter 11 Cases.  Payment of the Prepetition First Lien Obligations in accordance with the Interim Order was necessary as the DIP Agent and the DIP Lenders would not otherwise consent to providing the DIP Facility and extending credit to the Debtors thereunder, and the Prepetition First Lien Lender would not otherwise consent to the use of its Cash Collateral and other Prepetition Collateral or the subordination of its liens to the Carve-Out.  Based on the record of the Interim Hearing, such payment did not prejudice the Debtors or their estates because it appeared that the Prepetition First Lien Obligations were significantly oversecured and, in any event, such payment was subject to the rights of parties in interest under paragraph 7 of the Interim Order and this Final Order.

**H.**     **Application of Proceeds of DIP Collateral**.     All proceeds of a sale or other disposition of the DIP Collateral shall be applied to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Financing Agreement.

**I.**     **Consent to Entry of this Final Order**.  The consent of the Prepetition Second Lien Lender to the priming of its liens by the DIP Liens is limited to the DIP Facility presently before this Court, and shall not, and shall not be deemed to, extend to any other post-petition financing with any party other than the DIP Agent and DIP Lenders.  Furthermore, the consent of the Prepetition Second Lien Lender to the priming of its liens by the DIP Liens and the Debtors' use of Cash Collateral as provided in the Interim Order and this Final Order does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation that its interests in the Prepetition Collateral are adequately protected.   Nothing in this Final Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Prepetition Second Lien Lender are or will be adequately protected with respect to any non-consensual use of Cash Collateral or non-consensual priming of its liens or security interests.

**J.**     **Section 506(c) and Section 552(b)**.  In light of the subordination of their liens and superpriority claims to the Carve-Out and consensual use of Cash Collateral, the Debtors have agreed that the DIP Secured Parties and the Prepetition Second Lien Lender are each entitled to (a) all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply (provided that as to the Prepetition Second Lien Lender such agreement shall not be binding on the Court or the Committee, and the Committee and the Prepetition Second Lien Lender each reserve all rights as to whether the "equities of the

case" exception should apply), and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

K. **Extension of Financing**. Based on the evidence presented at the Interim Hearing and the Final Hearing, and the representations made by the Debtors in the Motion and on the record of the Interim Hearing and Final Hearing, the DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Loan Documents and this Final Order, subject to (i) the satisfaction of all conditions to borrowing set forth in the DIP Loan Documents, and (ii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Secured Parties are good faith financiers, and that the superpriority claims, security interests and liens and other protections granted to DIP Secured Parties pursuant to this Final Order and the DIP Facility will not be affected by any subsequent reversal or modification unless the Final Order is stayed pending appeal, as provided in section 364(e) of the Bankruptcy Code.

L. **Business Judgment and Good Faith Negotiation**. Based on the evidence presented at the Interim Hearing and Final Hearing, and the representations made by the Debtors in the Motion and on the record of the Interim Hearing and Final Hearing, (i) the terms and conditions of this Final Order, the DIP Facility and the DIP Financing Agreement, and the fees and expenses paid and to be paid hereunder and thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Secured Parties, (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a

consequence of which the DIP Secured Parties are entitled to the protection and benefits of

section 364(e) of the Bankruptcy Code; and (iv) the DIP Secured Parties are hereby found to be

acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in entering into

and consummating the DIP Facility contemplated herein and in the DIP Financing Agreement

after the entry of this Final Order.  Based on the evidence presented at the Interim Hearing and

Final Hearing, and the representations made by the Debtors in the Motion and on the record of

the Interim Hearing and Final Hearing, the Prepetition Second Lien Lender has acted in good

faith and at arms' length in negotiating and consenting to the Debtors' use of the Cash Collateral.

**M.**     **Relief Essential**.  Based on the evidence presented at the Interim Hearing and

Final Hearing, and the representations made by the Debtors in the Motion and on the record of

the Interim Hearing and Final Hearing, the relief requested in the Motion is necessary, essential,

and appropriate to avoid harm to the Debtors, their creditors, their businesses, their employees,

and their estates.

**N.**     **Entry of Final Order**.  For the reasons stated above, the Debtors have requested

immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, and the record before the Court with

respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1.     **Motion Granted**.  The Motion is hereby granted, on a final basis, in accordance

with the terms and conditions set forth in this Final Order, the DIP Financing Agreement and the

other DIP Loan Documents.

2.     **DIP Facility Authorization**.

(a)     **Approval of Entry Into DIP Loan Documents**.  Upon the entry of the

Interim Order, the Debtors were expressly and immediately authorized, empowered and directed

14

to execute and deliver the DIP Loan Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of the Interim Order and the DIP Loan Documents, and to execute and deliver all guarantees, instruments and other documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by the Interim Order and the DIP Loan Documents.   The foregoing authorization and empowerment are hereby ratified and confirmed on a final basis.   In the event of any inconsistency between the terms and conditions of the Interim Order and this Final Order, the terms and conditions of this Final Order shall control from and after entry of this Final Order.   The Debtors are hereby authorized and directed to do and perform all acts, pay and guarantee to pay, as applicable, the principal, interest, original issue discount, fees, expenses and other amounts described in the DIP Loan Documents as such become due, including, as applicable, all commitment fees, underwriting fees, unused facility fees, agency fees and other fees and disbursements (including, without limitation, reasonable attorneys' fees and disbursements (such fees and disbursements, the "DIP Lender Professional Fees")) as provided for in the DIP Loan Documents, which amounts (including the DIP Lender Professional Fees) (i) shall not be subject to or require further approval of this Court (except as provided immediately below), and (ii) shall not be subject to compliance with the guidelines promulgated by the United States Trustee (the "Guidelines"), and no recipient of such payments shall be required to file any interim or final fee application with respect thereto; provided, however, that solely with respect to DIP Lender Professional Fees, the Debtors are hereby authorized and directed to pay such fees ten (10) days after the delivery of a monthly statement or invoice for such DIP Lender Professional Fees (which statement shall contain supporting time record summaries (redacted for privilege and confidentiality)) to the Debtors, the

United States Trustee, counsel for the Prepetition Second Lien Lender, and counsel for the Committee, unless, within such ten (10) day period, the Debtors, the United States Trustee, the Prepetition Second Lien Lender or the Committee serves a written objection upon the requesting party, with a copy to the Debtors if the objection is filed by the United States Trustee, the Prepetition Second Lien Lender or the Committee (specifying in detail the basis for such objection), in which case, the Debtors shall pay only such amounts that are not the subject of any such objection with the disputed amount to be paid either upon resolution of the objection by the parties or as ordered by the Court.  Any such principal, interest, fees, expenses, or other amounts previously paid in accordance with the Interim Order are hereby ratified and confirmed on a final basis.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Final Order and DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.

(b)    **Authorization to Borrow**.  To enable the Debtors to continue to operate their businesses during the pendency of these Chapter 11 Cases, and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Financing Agreement, the other DIP Loan Documents, the Budget and this Final Order, the DIP Loan Parties are hereby authorized to borrow or guarantee, as applicable, up to $22,000,000 under the DIP Facility in accordance with the terms and conditions of the DIP Financing Agreement.

(c)    **Budget**.  All borrowings under the DIP Facility and all use of Cash Collateral shall be in compliance with the Budget, a summary schedule of which is annexed hereto as **Exhibit B** (as the same may be modified from time to time consistent with and subject

to the terms of the DIP Financing Agreement, and with the consent of the DIP Agent and the

Required Lenders), and the Debtors shall not use any portion of the proceeds of the DIP Facility,

directly or indirectly, in excess of the amounts set forth in the Budget, except (and to the extent

of) any variance permitted under the DIP Financing Agreement.  The Budget may be updated

and amended (with the consent and/or at the request of the DIP Agent and the Required Lenders,

and after consultation by the Debtors with the Committee) from time to time in accordance with

the DIP Financing Agreement, provided that such updated or amended Budget shall be in form

and substance acceptable to the DIP Agent and the Required Lenders, shall be provided promptly

(to the extent not previously provided) to counsel for the Prepetition Second Lien Lender and the

Committee, and the Debtors shall be required always to comply with the Budget (so long as there

is no Material Adverse Deviation, as defined in section 1.01 of the DIP Financing Agreement) as

set forth in section 8.01(a)(vi) of the DIP Financing Agreement.  Notwithstanding any "first day"

or subsequent orders entered by the Court authorizing the Debtors to pay any prepetition or other

claims and expenses, all such payments shall be made only to the extent they are in compliance

with the Budget.

(d)   **Use of Cash Collateral and DIP Proceeds and Collections**.   Cash

Collateral and the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and

expenses under the DIP Financing Agreement) have been and shall be used, in each case in a

manner consistent with and subject to the terms and conditions of this Final Order and the DIP

Loan Documents, and in compliance with the Budget and the limitations set forth in this Final

Order, solely for the purposes set forth in this Final Order and the DIP Loan Documents

including to pay or fund (i) certain costs, fees and expenses related to the Chapter 11 Cases; (ii)

the repayment of the Prepetition First Lien Obligations and the cash collateralization of certain

17

outstanding letters of credit issued pursuant to the Prepetition First Lien Credit Agreement on the terms set forth in the DIP Financing Agreement; (iii) the Carve-Out; and (iv) the working capital needs of the DIP Loan Parties during the Chapter 11 Cases.  Any and all collections and payments received by the DIP Agent, and all other proceeds of the DIP Collateral, shall be applied to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Financing Agreement.

(e)    **Repayment of Prepetition First Lien Obligations.**  Upon the entry of the Interim Order, subject to the occurrence of the Interim Facility Effective Date (as defined in section 1.01 of the DIP Financing Agreement), the Debtors were expressly authorized, empowered and directed to use the proceeds of the DIP Facility to pay in full all outstanding Prepetition First Lien Obligations, including to cash collateralize all outstanding letters of credit issued under the Prepetition First Lien Credit Documents, all in accordance with the terms, conditions, and procedures set forth in the DIP Financing Agreement and the Interim Order, in compliance with and as limited by the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement).  The foregoing authorization and empowerment are hereby ratified and confirmed on a final basis.

(f)    **Conditions Precedent**.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Financing Agreement unless the conditions precedent to the making of such loan under the DIP Financing Agreement and this Final Order have been satisfied in full or waived by the DIP Secured Parties in their sole discretion.

(g)    **DIP Liens and DIP Collateral**.  Effective immediately upon the execution of the Interim Order, and as ratified, confirmed and continued on a final basis pursuant to this Final Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1) of the

18

Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, was and is granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition liens on and security interests in (collectively, the "DIP Liens") any and all presently owned and hereafter acquired property and assets of the Debtors, whether real or personal, tangible or intangible, and wherever located (including, without limitation, all proceeds of insurance policies of the Debtors), and all proceeds, products, offspring, rents, proceeds of interests in leaseholds and profits thereof, and including, without limitation, the following (all collateral described in this paragraph 2(g), collectively, the "DIP Collateral"):  (i) all Prepetition Collateral, and (ii) all Collateral (as defined in the DIP Financing Agreement, excluding any claims and causes of action of the Debtors and their estates under Chapter 5 of the Bankruptcy Code and any proceeds therefrom (the "Avoidance Actions").  The DIP Liens shall have the priority set forth in paragraph 2(i) below.  Notwithstanding anything to the contrary in the DIP Financing Agreement, the DIP Collateral shall not include and DIP Liens shall not attach to Avoidance Actions.

(h)    **Account Control Agreements**.  The Debtors are authorized and directed to deliver to the DIP Agent deposit account control agreements, as and to the extent required by the DIP Loan Documents, duly executed by such parties as are reasonably required by the DIP Secured Parties, and in each case, in form and substance acceptable to the DIP Agent.

(i)    **DIP Lien Priority**.  The DIP Liens securing the DIP Obligations shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral, junior only to (a) the Carve-Out; and (b) any other valid, perfected, enforceable and non-avoidable liens in the DIP Collateral that were perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the

Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Prepetition Liens under applicable law and after giving effect to any subordination or inter-creditor agreements (any such other liens, the "Other Prepetition Senior Liens").  Other than as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code and in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of the Chapter 11 Cases or any Successor Cases.  For the avoidance of doubt, a Successor Case shall not include any subsequent case under the Bankruptcy Code commenced by any Debtor (i) that becomes a reorganized Debtor under a chapter 11 plan confirmed in these Chapter 11 Cases, or (ii) following the dismissal of such Debtor's Chapter 11 Case by this Court.  The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

(j)    **DIP Superpriority Administrative Claim**.  Effective immediately upon the execution of the Interim Order, and as ratified, confirmed and continued on a final basis pursuant to this Final Order, subject to the Carve-Out, all DIP Obligations were and are deemed to be allowed superpriority administrative expense claims (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority in the Chapter 11 Cases and any Successor Cases, under sections 364(c)(1), 503, and 507 of the Bankruptcy Code and

otherwise, over any and all administrative expense claims of the kinds specified in, arising, or

ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726,

1113, 1114, or any other provision of the Bankruptcy Code (including, without limitation, any

administrative expense claim granted to any prospective purchaser of all or any portion of the

Debtors' assets in the nature of "liquidated damages," a break-up fee, expense reimbursement or

similar fee or claim) and section 506(c) of the Bankruptcy Code, whether or not such expenses or

claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

Other than the Carve-Out, no costs or expenses of administration, including, without limitation,

professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code,

or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor

Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP

Superpriority Claim.  The DIP Superpriority Claim shall be payable from and have recourse to

all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding the

Avoidance Actions).

(k)  **Enforceable Obligations**.  The DIP Loan Documents shall constitute and

evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable

in accordance with their terms against the Debtors, their creditors, their estates and any

successors thereto (including without limitation, any trustee appointed in the Chapter 11 Cases or

in any Successor Cases).

(l)  **Protection of DIP Secured Parties and Other Rights**.  From and after

the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP

Facility only for the purposes specifically set forth in the DIP Financing Agreement, the Interim

Order and this Final Order, and in compliance with the Budget (subject to any variances thereto

21

permitted under the terms and conditions of the DIP Financing Agreement).

3.        **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Final Order and the DIP Loan Documents, and in compliance with the Budget, the Debtors are authorized to use Cash Collateral until the earliest to occur of (a) the Repayment in Full of DIP Obligations (as defined herein), and (b) the date such right to use Cash Collateral otherwise terminates as provided in this Final Order (unless otherwise consented to in writing by the DIP Agent in its sole discretion).  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or the Debtors' use of Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Final Order and the DIP Loan Documents, and in compliance with the Budget.  The Prepetition Liens in the Prepetition Collateral shall continue to attach to the Cash Collateral irrespective of the commingling of the Cash Collateral with any other cash of the Debtors.  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any Cash Collateral shall not be used as a basis to challenge the extent, validity, enforceability or perfected status of the Prepetition Liens.  As to the Prepetition Second Lien Lender, nothing in this Final Order shall, or shall be deemed to, constitute a waiver of the Debtors' rights to seek Court approval for the non-consensual use of Cash Collateral on or after the Termination Declaration Date.

4.        **Adequate Protection**.

(a)        **Adequate Protection Liens**.  Effective immediately upon the execution of the Interim Order, and as ratified, confirmed and continued on a final basis pursuant to this Final Order, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the interests of the Prepetition Second Lien Lender in the Prepetition Collateral against any

Diminution in Value (as defined below) of such interests, the Debtors granted to the Prepetition Second Lien Lender continuing, valid, binding, enforceable, and automatically perfected junior postpetition security interests in and liens on the DIP Collateral and the proceeds thereof (the "Adequate Protection Liens"), with the priority set forth in sub-paragraph (b) below. The Adequate Protection Liens shall not attach to Avoidance Actions. As used in this Final Order, the term "Diminution in Value" means the aggregate diminution in value of the respective interests of the Prepetition Second Lien Lender in the Prepetition Collateral and the Cash Collateral from and after the Petition Date resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code, the Debtors' use, sale, or lease of any of the Prepetition Collateral or Cash Collateral under section 363 of the Bankruptcy Code, the granting or imposition of the DIP Liens under section 364 of the Bankruptcy Code, and/or the imposition or use of the Carve-Out.

(b)  **Priority of Adequate Protection Liens.** In accordance with the terms of this Final Order, the Adequate Protection Liens shall be junior only to (i) the Carve-Out; (ii) the DIP Liens; and (iii) any Other Prepetition Senior Liens. The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. Other than as expressly set forth herein and in the DIP Loan Documents, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code and in any Successor Cases, and/or upon the dismissal of the Chapter 11 Cases or any Successor Cases. The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the

Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate

pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the

Adequate Protection Liens.

(c)    **Adequate Protection Superpriority Claims**.   Effective immediately

upon the execution of the Interim Order, and as ratified, confirmed and continued on a final basis

pursuant to this Final Order, as further adequate protection against any Diminution in Value of

the Prepetition Second Lien Lender in the Prepetition Collateral, the Prepetition Second Lien

Lender was and is granted, as and to the extent provided by sections 503(b) and 507(b) of the

Bankruptcy Code, a continuing separate allowed superpriority administrative expense claim in

the Chapter 11 Cases and any Successor Cases (the foregoing superpriority claims shall be

referred to as the "Adequate Protection Superpriority Claims"), which shall be payable from and

have recourse to all Prepetition Collateral and DIP Collateral and all proceeds thereof.   The

Adequate Protection Superpriority Claims shall not be payable from and have recourse to any

Avoidance Actions.  Except with respect to the (i) DIP Liens, (ii) DIP Superpriority Claim, and

(iii) Carve-Out, the Adequate Protection Superpriority Claims (x) shall have priority in these

Chapter 11 Cases and any Successor Cases under sections 503(b), and 507(b) of the Bankruptcy

Code and otherwise, over any and all administrative expense claims against the Debtors and their

estates, now existing or hereafter arising, of any kind or nature of the kinds specified in, arising,

or ordered pursuant to sections 503(b) or 507(b) or any other provision of the Bankruptcy Code

(including, without limitation, any administrative expense claim granted to any prospective

purchaser of all or any portion of the Debtors' assets in the nature of "liquidated damages," a

break-up fee, expense reimbursement or similar fee or claim), and section 506(c) of the

Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment

24

lien or other non-consensual lien, levy, or attachment, and (y) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate Protection Superpriority Claims.

(d)    **Reimbursement of Costs**.  The Debtors shall promptly pay or reimburse the reasonable fees, expenses, disbursements, and other charges of counsel incurred by the Prepetition Second Lien Lender, whether such amounts arose before or after the Petition Date, in accordance with the Budget (collectively, the "Second Lien Lender Professional Fees"), which amounts (i) shall not be subject to or require further approval of this Court (except as provided immediately below), and (ii) shall not be subject to compliance with the Guidelines, and no recipient of such payments shall be required to file any interim or final fee application with respect thereto; provided, however, that solely with respect to Second Lien Lender Professional Fees, the Debtors are hereby authorized and directed to pay such fees ten (10) days after the delivery of a monthly statement or invoice for such Second Lien Lender Professional Fees (which statement shall contain supporting time record summaries (redacted for privilege and confidentiality)) to the Debtors, the United States Trustee, counsel for the DIP Agent, and counsel for the Committee, unless, within such ten (10) day period, the Debtors, the United States Trustee, the DIP Agent or the Committee serves a written objection upon the requesting party, with a copy to the Debtors if the objection is filed by the United States Trustee, the DIP Agent or the Committee (specifying in detail the basis for such objection), in which case, the Debtors shall pay only such amounts that are not the subject of any such objection with the disputed amount to be paid either upon resolution of the objection by the parties or as ordered by

the Court.

(e)      **Section 507(b) Reservation**.   Nothing herein shall impair or modify the

Prepetition Second Lien Lender's rights under section 507(b) of the Bankruptcy Code in the

event that the adequate protection provided to the Prepetition Second Lien Lender hereunder is

insufficient to compensate for any Diminution in Value of its interests in the Prepetition

Collateral during these Chapter 11 Cases or any Successor Cases, provided, however, that any

section 507(b) claim granted in these Chapter 11 Cases or any Successor Case to the Prepetition

Second Lien Lender shall be junior in the right of payment to all DIP Obligations and subject to

the Carve-Out.   Notwithstanding any other provision hereof, the grant of adequate protection to

the Prepetition Second Lien Lender pursuant hereto is without prejudice to its right to seek

modification of the grant of adequate protection provided hereby so as to provide different or

additional adequate protection from and after the Petition Date.   The rights, defenses, and

objections of the Debtors and any other party in interest are reserved in connection with such

requested modification.

(f)      **Limitation on Enforcement Rights.**   Notwithstanding anything to the

contrary set forth in this Final Order, prior to the Repayment in Full of DIP Obligations (as

defined below), the Prepetition Second Lien Lender shall be prohibited from taking any action to

enforce the Prepetition Second Liens or the Adequate Protection Liens against all or any portion

of the Prepetition Collateral or the DIP Collateral (including, without limitation, seeking relief

from the automatic stay under section 362 of the Bankruptcy Code to commence an enforcement

action unless contemporaneously therewith the Prepetition Second Lien Lender issues a written

commitment in form and substance satisfactory to the DIP Secured Parties providing for the

Repayment in Full of DIP Obligations (as defined below) upon entry of an order granting such

26

relief from stay).

5.    **Right to Credit Bid**.  The DIP Agent, on behalf of itself and the DIP Lenders, shall have the right, pursuant to applicable law, to credit bid the amount of all accrued DIP Obligations during any sale of the DIP Collateral (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code or otherwise.  Subject to there being no assertion of a timely Challenge (as defined below) in accordance with paragraph 7 of this Final Order, the Prepetition Second Lien Lender shall have the right, pursuant to applicable law, to credit bid all or any portion of the Prepetition Second Lien Obligations during any sale of the Prepetition Collateral (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code or otherwise; <u>provided</u> that any such credit bid provides for the Repayment in Full of DIP Obligations (as defined below) on the closing date of such credit bid.  In the event of such a timely Challenge but prior to a final ruling thereon, the Court may order such relief as is appropriate with respect to such credit bidding of the Prepetition Second Lien Obligations, subject to notice and hearing and without prejudice to any party's rights to object.

6.    **Perfection of DIP Liens and Adequate Protection Liens**.

(a)    **No Filings Necessary to Perfect.**  All security interests, liens, mortgages, deeds of trust and other interests and rights granted by the Debtors in favor of (i) the DIP

Secured Parties pursuant to the Interim Order, this Final Order and the DIP Loan Documents, and (ii) the Prepetition Second Lien Lender pursuant to the Interim Order and this Final Order, shall be valid, binding, enforceable and automatically perfected without further act or action of any person or entity. The Interim Order and this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage agreement or taking possession of any asset or property) to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted in the Interim Order and this Final Order. Notwithstanding the foregoing, the DIP Agent and the Prepetition Second Lien Lender may, each in their sole discretion, file such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens or Adequate Protection Liens, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code solely in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date.

(b) **Debtors' Cooperation With Perfection Filings**. The Debtors shall execute and deliver to the DIP Agent and the Prepetition Second Lien Lender all such financing statements, mortgages, notices and other documents as such parties may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Liens. The DIP Agent and the Prepetition Second Lien Lender, in

their respective sole discretion, may file a photocopy of the Interim Order or this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the recording officer shall be authorized to file or record such copy of the Interim Order or this Final Order.

(c)   **Release of Prepetition First Liens**.   Upon the repayment of the Prepetition First Lien Obligations pursuant to the Interim Order, (a) the Prepetition First Lien Lender was expressly authorized and directed to execute and deliver to the DIP Agent all documents needed to terminate any and all financing statements, mortgages, notices and other documents evidencing the Prepetition First Liens; and (b) the DIP Agent was expressly authorized to file, register, or otherwise record a photocopy of the Interim Order, which, once filed, registered, or otherwise recorded, constituted conclusive evidence of the release of all Prepetition First Liens on the Prepetition Collateral.   Such authorization and direction are hereby ratified and confirmed on a final basis.

7.   **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.   Nothing in this Final Order or the DIP Loan Documents shall prejudice the rights of the Committee or any other party in interest, in each case solely to the extent the Committee or such other party in interest has been granted standing, to seek, solely in accordance with this paragraph 7, to assert claims against any Prepetition Secured Lender on behalf of the Debtors, their creditors or interest holders or to otherwise challenge any of the Debtors' Prepetition Secured Lien Stipulations (other than as set forth in Paragraph E(viii) of this Final Order), including with respect to whether any Make-Whole Amount is payable.   The Committee or such party in interest, (i) in each case solely to the extent they have been granted standing at such

time, must commence a contested matter or adversary proceeding, or (ii) if they have not been granted any such standing, must file a motion seeking standing to commence and prosecute an adversary proceeding or contested matter (with a draft complaint attached thereto), raising such objection or challenge, including without limitation, asserting any claim against any Prepetition Secured Lender in the nature of a setoff, counterclaim or defense to, as applicable, the Prepetition Secured Obligations (including but not limited to, those under Chapter 5 of the Bankruptcy Code or by way of suit against the Prepetition Secured Lender; any such objection, claim or challenge, a "Challenge" ), within (a) 75 days following the entry of this Final Order in the case of the Committee and any other party in interest, (b) such later date consented to in writing by the applicable Prepetition Secured Lender in its sole discretion, or (c) such longer period as the Court orders for cause shown prior to the expiration of the foregoing periods (the "Challenge Period").   The date that is the next calendar day after the termination of the Challenge Period[4] shall be referred to as the "Challenge Period Termination Date."   Upon the Challenge Period Termination Date, any and all such Challenges not timely raised in accordance with this paragraph 7 by any party (including, without limitation, the Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, and any other party in interest) shall, without further notice, motion or application to, order of, or hearing before, this Court, be deemed to be forever waived and barred, and the Prepetition Secured Obligations shall (except to the extent raised in any timely filed Challenge) be deemed to be allowed in full as secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Chapter 11 Cases or any Successor Cases without the need or requirement to file any proof of claim, and the Debtors' Prepetition Secured Lien Stipulations shall be binding, final, and

---

[4] In the event a motion for standing is timely filed by any party in interest, the Challenge Period shall be extended solely as to the Challenge(s) specifically identified in such motion for standing until the date that is three (3) business days after the date on which the Court enters an order granting or denying such motion for standing.

conclusive on all creditors, interest holders and parties in interest (including, without limitation, the Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases). For the avoidance of doubt, no challenge commenced against any Prepetition Secured Lender or any relief granted pursuant to any such challenge, shall in any manner impact, impair or alter the validity, priority or enforceability of the DIP Protections or any rights, claims, benefits and entitlements granted to the DIP Secured Parties pursuant to the Interim Order or this Final Order or the DIP Loan Documents.  The Committee is hereby granted standing to assert any Challenge on behalf of any Debtor and the estate of any Debtor, provided however, that nothing in this Final Order confers standing on any party-in-interest other than the Committee to assert any claim on behalf of any Debtor or any estate of any Debtor, or relieves any party-in-interest other than the Committee from any requirement under the Bankruptcy Code or otherwise to obtain authorization from the Court prior to asserting any claim on behalf of any Debtor or any estate of any Debtor.

8.    **Carve-Out Provisions.**

(a)    **Carve-Out.**  All liens and claims granted by the Interim Order and this Final Order shall be subject to the Carve-Out.  As used in the Interim Order, this Final Order and the DIP Loan Documents, the "Carve-Out" shall mean:

(i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6), plus interest, if applicable, at the statutory rate, and any fees payable to the clerk of the Bankruptcy Court;

(ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000;

(iii) with respect to Case Professionals retained by the Debtors and the Committee, if any, all accrued and unpaid claims for fees and expense reimbursements of such Case Professionals (but not any success or transaction fees other than those payable to the Debtors' financial advisor in connection with the closing of the DIP Facility) incurred during the period prior to the Carve-Out Trigger Date (as defined below) but not to exceed the amounts for such Case Professionals set forth in the Budget for such period, subject to such accrued and unpaid fees and expense reimbursements becoming Allowed Fees; and

(iv) an aggregate amount for unpaid fees and expense reimbursements of all Case Professionals (but not any success or transaction fees) incurred after the Carve-Out Trigger Date not to exceed $650,000.00 (the "Professionals Expense Cap"), subject to such fees and expense reimbursements becoming Allowed Fees; provided, however, that any payments actually made to fund unpaid fees and expenses of Case Professionals incurred on or after the Carve-Out Trigger Date shall reduce the Professionals Expense Cap on a dollar for dollar basis.

The Professionals Expense Cap shall be automatically reduced, on a dollar for dollar basis, by the amount of any unused retainers held by Case Professionals on the Carve-Out Trigger Date. Upon the Carve-Out Trigger Date and for so long thereafter as an Event of Default exists, any unused retainers held by Case Professionals on the Petition Date shall be used to pay any Allowed Fees of such Case Professionals before any payment of such Allowed Fees are made from the DIP Facility or DIP Collateral. As used herein, the terms: (i) "Allowed Fees" shall mean fees and expense reimbursement of Case Professionals solely to the extent such fees and expenses have been approved, on a final basis, by an order of this Court that has not been

vacated or stayed; (ii) "Case Professionals" shall mean attorneys, accountants, financial advisors, consultants and other professionals employed, pursuant to sections 327, 328 or 1103 of the Bankruptcy Code, as applicable, by the Debtors or the Committee; and (iii) "Carve-Out Trigger Date" shall mean the first business day after the DIP Agent provides notice (the "Carve-Out Trigger Notice") to the Debtors of the occurrence of an Event of Default.  The Carve-Out and any payments made in respect of the Carve-Out shall not reduce (but shall, to the extent funded under the DIP Facility, be added to and made a part of)  the DIP Obligations, and shall be otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(b)    **No Direct Payment Obligation.**  The DIP Secured Parties and Prepetition Second Lien Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of Case Professionals incurred in connection with the Chapter 11 Cases, any Successor Cases or otherwise.  Nothing in this Final Order or otherwise shall be construed:  (i) to obligate the DIP Secured Parties or the Prepetition Second Lien Lender in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; or (ii) to increase the Carve-Out if Allowed Fees are higher in fact than the amounts subject to the Carve-Out as set forth in the Interim Order and this Final Order.

(c)    **No Waiver of Right to Object to Fees; Payment of Compensation**.  Nothing in this Final Order shall be construed as consent to the allowance of any fees or expense reimbursements of any Case Professionals or shall affect the right of the DIP Secured Parties or the Prepetition Second Lien Lender to object to the allowance and payment of such fees and

expense reimbursements or to permit the Debtors to pay any such amounts not set forth in the Budget.

9.    **Limitations on Use of DIP Facility, DIP Collateral, Cash Collateral, and Carve-Out**.  The DIP Facility, DIP Collateral, Cash Collateral and Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of DIP Agent, DIP Lenders or the Prepetition Secured Lenders, or their respective rights and remedies under the DIP Loan Documents, the Prepetition Secured Credit Documents, the Interim Order or this Final Order, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Debtors or the Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations or the Prepetition Secured Obligations, (iii) for monetary, injunctive or other affirmative relief against any DIP Agent, DIP Lender, or Prepetition Secured Lender, or their respective collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent, the DIP Lenders, or the Prepetition Second Lien Lender of any rights and/or remedies under the Interim Order, this Final Order, the DIP Loan Documents, the Prepetition Secured Credit Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent, the DIP Lenders or the Prepetition Second Lien Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any of the Chapter 11 Cases without the prior written consent of the DIP Agent and the Required Lenders

34

(in their sole discretion) prior to the Repayment in Full of the DIP Obligations; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent and the Required Lenders (in their sole discretion) prior to the Repayment in Full of the DIP Obligations; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtors without the prior written consent of the DIP Agent and the Required Lenders (in their sole discretion) prior to the Repayment in Full of the DIP Obligations, except as otherwise explicitly permitted in the DIP Financing Agreement; (e) to object to, contest, or interfere with in any way the DIP Agent's or any DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred and is continuing, subject to paragraph 16(b) hereof; (f) to use or seek to use Cash Collateral or to sell or otherwise dispose of DIP Collateral without the consent of the DIP Agent and the Required Lenders (in their sole discretion) prior to the Repayment in Full of the DIP Obligations except as otherwise explicitly permitted in the DIP Financing Agreement; (g) to object to or challenge in any way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held by or on behalf of the DIP Agent, the DIP Lenders, or the Prepetition Secured Lenders; (h) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Agent, DIP Lenders, or the Prepetition Secured Lenders; (i) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Secured Obligations, Prepetition Liens, DIP Obligations or DIP Liens or any other rights or interests of the Prepetition Secured Lenders, the DIP Agent or DIP Lenders; (j) to seek the modification, stay, or amendment of this Final Order or any of the DIP Loan Documents without

the prior written consent of the DIP Agent and Required Lenders (in their sole discretion); or (k) to prevent, hinder or otherwise delay the exercise by the DIP Agent, DIP Lenders or the Prepetition Secured Lenders of any rights and remedies granted under the Interim Order or this Final Order.  Notwithstanding the foregoing, an aggregate amount not to exceed $75,000 of the DIP Facility, the DIP Collateral, Cash Collateral and Carve-Out may be used by the Committee to investigate the Prepetition Secured Obligations and Prepetition Liens within the Challenge Period.  Nothing in this section shall impair the Debtors' ability to take actions in accordance with their fiduciary duties (or the rights, defenses and objections of parties in response thereto).

10.    **Additional Covenants and Protections**:  Without in any manner limiting the terms or requirements of the DIP Loan Documents or this Final Order:

(a)    the Debtors shall not propose, file, support or pursue confirmation of a chapter 11 plan unless such plan provides for the Repayment in Full of DIP Obligations (as defined below); and

(b)    the Debtors shall provide the Prepetition Second Lien Lender and its representatives with all access to records, notices, reports and other information provided or made available to the DIP Agent pursuant to Section 8.01 of the DIP Financing Agreement.

11.    **Section 506(c) Claims**.  Nothing contained in this Final Order or the DIP Loan Documents shall be deemed a consent by the DIP Secured Parties or the Prepetition Second Lien Lender to any charge, security interest, lien, assessment or claim against the DIP Collateral or Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.  The Debtors hereby waive any right they may have to seek to impose any charge, security interest, lien, assessment or claim against the DIP Secured Parties' or the Prepetition Second Lien Lender's respective interests in the DIP Collateral or Prepetition Collateral under section 506(c) of the

Bankruptcy Code or otherwise.  Except with respect to the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against the DIP Secured Parties, the Prepetition Second Lien Lender, their respective claims, or DIP Collateral or Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the Required Lenders and the Prepetition Second Lien Lender (as applicable), and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the Required Lenders and the Prepetition Second Lien Lender (as applicable).

12.    **Collateral Rights**.  Unless the DIP Agent and the Required Lenders have provided their prior written consent or (i) all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), (ii) all commitments to lend have terminated, and (iii) all issued and outstanding letters of credit and indemnity obligations under the DIP Financing Agreement have been cash collateralized (the actions set forth in clauses (i), (ii) and (iii), collectively, "Repayment in Full of DIP Obligations"), there shall not be entered in these Chapter 11 Cases, or in any Successor Cases, any order which authorizes any of the following:

(a)    the obtaining of credit or the incurring of indebtedness, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code, that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Secured Parties; or

(b)    relief from stay by any person holding or asserting liens junior to the liens of the DIP Secured Parties on all or any portion of the DIP Collateral.

37

13.    **Disposition of Collateral**.    (a) The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Agent and the Required Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or the Required Lenders, or an order of this Court), except: (i) as otherwise provided for in the DIP Financing Agreement and this Final Order, (ii) as otherwise approved by the Court and consented to by the DIP Agent and the Required Lenders, or (iii) such sale, transfer, lease, encumbrance or other disposition will result in the Repayment in Full of DIP Obligations.

(b)    Any valid, perfected and non-avoidable liens created by the Prepetition Second Lien Credit Documents shall attach to any and all proceeds of Prepetition Collateral realized by the estate of any Debtor in connection with the sale, transfer or other disposition of such Prepetition Collateral, subject to the lien priorities set forth therein and herein and in the DIP Loan Documents.  Subject to the occurrence of the Repayment in Full of DIP Obligations and paragraph 7 of this Final Order and the right to unwind or disgorge any payments upon a successful Challenge, any and all proceeds arising from or in connection with any sale, disposition or lease of DIP Collateral or Prepetition Collateral outside the ordinary course of any Debtor's business shall be transferred within one (1) business day to the Prepetition Second Lien Lender for application to the Prepetition Second Lien Obligations in accordance with the Prepetition Second Lien Documents, and shall not be used by the Debtors for any other purpose; provided that payment of such amounts shall be subject to (i) the Carve-Out and (ii) the Debtors' reservation of rights in Paragraph E(iii) herein.

(c)    Nothing in this section shall impair the Debtors' ability to take actions in accordance with their fiduciary duties (or the rights, defenses and objections of parties in response thereto).

14.    **Proceeds of Subsequent Financing**.  If at any time prior to the Repayment in Full of DIP Obligations, any of the Debtors or any trustee obtains credit or incurs debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code whether or not in violation of the DIP Financing Agreement, any other DIP Loan Documents or this Final Order, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent and applied to the DIP Obligations as set forth in the DIP Financing Agreement.  For the sake of clarity, if at any time prior to the Repayment in Full of DIP Obligations, any of the Debtors or any trustee receives proceeds from the sale of any DIP Collateral, then all of the cash proceeds derived from such shall be applied in accordance with the terms of the DIP Loan Documents and section 2(d) of this Final Order.

15.    **Events of Default**.

Each of the following shall constitute an event of default under this Final Order, unless expressly waived in writing by the DIP Agent and the Required Lenders (collectively, the "Events of Default"):

(a)    the occurrence of the "Maturity Date" (as defined in the DIP Financing Agreement) without the Repayment in Full of DIP Obligations on or before such date or, if sooner, the occurrence of an "Event of Default" under the DIP Loan Documents (after giving effect to any applicable notice, cure and grace period in the relevant DIP Loan Documents);

(b)    the failure by the Debtors to observe or perform any of the terms, provisions, conditions, covenants or obligations under this Final Order that, if subject to cure, is not cured within two (2) business days; or

(c)    the reversal, vacatur or modification of any provision of this Final Order.

Until the Repayment in Full of DIP Obligations, the DIP Protections afforded to the DIP Secured Parties pursuant to this Final Order and under the DIP Loan Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting any of these Chapter 11 Cases to a Successor Case, and the DIP Protections shall continue in these Chapter 11 Cases and in any Successor Cases, and the DIP Protections granted herein shall maintain their priorities as provided by this Final Order.  Until the payment in full in cash of the Prepetition Second Lien Obligations, the rights, benefits, and protections afforded to the Prepetition Second Lien Lender pursuant to this Final Order, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting any of these Chapter 11 Cases to a Successor Case, and such rights, benefits, and protections shall continue in these Chapter 11 Cases and in any Successor Cases, and such rights, benefits, and protections granted herein shall maintain their priorities as provided by this Final Order.

16.    **Rights and Remedies Upon Event of Default**.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent may, or shall, at the direction of the Required Lenders, declare (W) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (X) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains in effect, (Y) the termination of the DIP Financing Agreement and any other DIP Loan Documents as to any future liability or obligation

of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP

Obligations, and/or (Z) a termination, reduction or restriction on the ability of the Debtors to use

Cash Collateral (any such declaration by the DIP Agent shall be referred to herein as a

"Termination Declaration").  The Termination Declaration shall be given by email (or other

electronic means) to counsel to the Debtors, counsel to the Prepetition Second Lien Lender,

counsel to the Committee and the United States Trustee (the date any such Termination

Declaration is made shall be referred to herein as the "Termination Declaration Date").  A copy

of the Termination Declaration shall also be filed on the docket in the Chapter 11 Cases on the

Termination Declaration Date.

> (b)    The DIP Obligations shall be due and payable, without notice or demand,

on the Termination Declaration Date.  From and after the Termination Declaration Date, the

Debtors shall not have any right to use, and except as specifically provided in this paragraph the

Debtors and other parties in interest shall not seek authority to use, Cash Collateral without the

express written consent of the DIP Agent and the Required Lenders provided at their sole

discretion.  Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is

hereby modified so that five (5) business days after the Termination Declaration Date (the

"Remedies Notice Period"), the DIP Agent and the DIP Lenders shall be entitled to exercise all

rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents and

this Final Order and shall be permitted to satisfy the DIP Obligations and DIP Superpriority

Claims, subject to the Carve-Out.  During the Remedies Notice Period, the Debtors or the

Committee shall be entitled to seek an emergency hearing with the Court for the sole purpose of

contesting whether an Event of Default has occurred and/or is continuing, and seeking other

relief in the event it is determined that an Event of Default has not occurred and/or is continuing.

Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the Debtors (and all other parties in interest) shall have no right to use or seek to use Cash Collateral, and the DIP Agent and the DIP Lenders shall be permitted to exercise all remedies set forth herein, in the DIP Financing Agreement and the DIP Loan Documents, as applicable, and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interests in the DIP Collateral or any other rights and remedies granted to the DIP Agent and the DIP Lenders with respect thereto pursuant to the DIP Financing Agreement, DIP Loan Documents or this Final Order.  The rights and remedies of the DIP Agent and the DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Lenders may have under the DIP Loan Documents or applicable law.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, upon the expiration of the Remedies Notice Period the Debtors shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise, including, without limitation, executing and delivering any documents or other instruments, or filing any motions, applications or pleadings requested by the DIP Agent in furtherance of the exercise of any such rights and remedies.  If the Court determines prior to the expiration of the Remedies Notice Period that no Event of Default has occurred or is continuing, then the Debtors shall be permitted to continue using Cash Collateral thereafter, subject to the terms and conditions set forth in this Final Order (including the Budget).

(c)      If the DIP Agent and/or the DIP Lenders exercise any of their rights and remedies upon the occurrence of an Event of Default under the DIP Loan Documents, the DIP Agent may, or shall, at the direction of the Required Lenders, retain one or more agents to sell, lease or otherwise dispose of the DIP Collateral.  In any exercise of its rights and remedies upon an Event of Default under the DIP Loan Documents, the DIP Agent and the DIP Lenders are authorized to proceed under or pursuant to the DIP Loan Documents.

17.      **Proofs of Claim**.  The DIP Secured Parties will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases on account of the DIP Obligations, and the Prepetition Secured Lenders will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases on account of the Prepetition Secured Obligations.

18.      **Other Rights and DIP Obligations**.

(a)      **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of Final Order**.  Based on the evidence presented at the Interim Hearing and Final Hearing, the findings set forth in this Final Order, and the representations made by the Debtors in the Motion and on the record of the Interim Hearing and the Final Hearing, and to the extent allowed under section 364(e) of the Bankruptcy Code, with respect to amounts advanced pursuant to the Interim Order and this Final Order, in the event any or all of the provisions of this Final Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, provided that this Final Order is not stayed pending appeal, no such reversal or modification shall affect the validity and enforceability of any advances made under the DIP Facility or the liens or priority authorized or created hereby.  Notwithstanding any such reversal or modification, any claim granted to the DIP Secured Parties hereunder arising prior to

43

the effective date of such reversal or modification of any DIP Protections granted to the DIP Secured Parties shall be governed in all respects by the original provisions of the Interim Order and this Final Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections, with respect to any such claim, provided that the Interim Order and this Final Order were not stayed at the time the claim arose. Because the loans made pursuant to the DIP Financing Agreement are made in reliance on the Interim Order and this Final Order, the obligations owed the DIP Secured Parties prior to the effective date of any reversal or modification of the Interim Order or this Final Order cannot, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Cases or otherwise, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under the Interim Order, this Final Order and/or the DIP Loan Documents, provided that the Interim Order and/or the Final Order was not stayed at the time such liens or claims arose. Because the use of Cash Collateral pursuant to the Interim Order and this Final Order has been made in good faith, the adequate protection owed to the Prepetition Second Lien Lender prior to the effective date of any reversal or modification of this Final Order cannot, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Cases or otherwise, be subordinated, lose its lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Prepetition Second Lien Lender under the Interim Order and this Final Order, provided that the Interim Order and/or the Final Order was not stayed at the time such liens or claims arose.

(b)     **Discharge Waiver.** The Debtors expressly stipulate, and the Court finds and adjudicates that the DIP Obligations shall not be discharged by the entry of an order

44

confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the

Bankruptcy Code, unless the Repayment in Full of DIP Obligations has occurred on or before the

effective date of a confirmed plan of reorganization.  The Debtors shall not propose or support

any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any

confirmation order or sale order that is not conditioned upon the Repayment in Full of DIP

Obligations on the effective date of such plan of reorganization or sale; <u>provided</u>, however, that

in the event there is a dispute in the amount of any final payoff, sufficient funds shall be held

segregated so as to ensure the Repayment in Full of DIP Obligations.

(c)    **<u>Binding Effect</u>**.  All of the provisions of this Final Order shall be binding

upon and inure to the benefit of the DIP Secured Parties, the Prepetition Second Lien Lender, the

Debtors, the Committee, all other creditors of the Debtors and all other parties-in-interest, and

their respective successors and assigns (including any trustee or other fiduciary hereinafter

appointed as a legal representative of the Debtors or with respect to the property of the estates of

the Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon dismissal of

any of the Chapter 11 Cases or any Successor Cases.

(d)    **<u>No Waiver</u>**.  The failure of the DIP Secured Parties and the Prepetition

Second Lien Lender to seek relief or otherwise exercise their respective rights and remedies, as

applicable, under the DIP Loan Documents, this Final Order or otherwise, shall not constitute a

waiver of any of the DIP Secured Parties' or Prepetition Second Lien Lender's rights hereunder,

thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Final Order is

without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise

impair the rights of the DIP Secured Parties or Prepetition Second Lien Lender under the

Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the

DIP Secured Parties and Prepetition Second Lien Lender to (i) request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code and this Final Order, a plan of reorganization; and (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Secured Parties or Prepetition Second Lien Lender may have pursuant to this Final Order or the DIP Loan Documents, or applicable law.  Notwithstanding anything to the contrary set forth in this Final Order, the entry of this Final Order and the payments authorized herein shall not, and shall not be deemed to, release any non-Debtor obligor of Prepetition Secured Obligations from any such obligations, and is without prejudice to, and shall not constitute a waiver of or otherwise impair any rights of, the Prepetition Secured Lenders or the Debtors against any such non-Debtor obligor.

(e)    **No Third Party Rights**.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, landlord, lessor, equity holder or any direct, indirect, or incidental beneficiary.

(f)    **No Marshaling**.  The DIP Secured Parties and the Prepetition Second Lien Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)    **Section 552(b)**.  In light of the subordination of their liens and superpriority claims to the Carve-Out and consensual use of Cash Collateral, the  DIP Secured Parties and the Prepetition Second Lien Lender are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply (provided that as to the Prepetition Second Lien Lender such agreement shall not be

46

binding on the Court or the Committee, and the Committee and the Prepetition Second Lien

Lender each reserve all rights as to whether the "equities of the case" exception should apply).

(h)    **Amendment of DIP Loan Documents**.  The Debtors and the DIP Agent

(after having obtained any approvals required of the Required Lenders as required under the DIP

Financing Agreement) may amend or waive any provision of the DIP Loan Documents without

further order of this Court, provided that such amendment or waiver, in the reasonable judgment

of the Debtors and the DIP Agent, is not material.  No material amendment or modification of

any DIP Loan Document shall be made or become effective absent further order of the Court

after notice and, if necessary, a hearing.  Except as otherwise provided herein, no waiver,

modification, or amendment of any of the provisions of the DIP Loan Documents shall be

effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Agent (after

having obtain any approvals required of the Required Lenders as required under the DIP

Financing Agreement).

19.    **Limitation of Liability**.  In determining to provide the DIP Facility or permit the

use of Cash Collateral, neither the DIP Secured Parties nor the Prepetition Second Lien Lender

shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible

person" or "owner or operator" with respect to the operation or management of the Debtors (as

such terms, or any similar terms, are used  in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 29 U.S.C. §§9601 *et seq*. as amended, or any similar

federal statute).

20.    **Release and Indemnification of DIP Secured Parties**.    The Debtors shall

defend, indemnify, hold harmless and release the DIP Secured Parties and the Indemnified

Persons (as defined in the DIP Financing Agreement) to the extent set forth in the DIP Loan Documents.

21.    **Survival of Final Order**.    All of the provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any Successor Cases, (c) dismissing any of the Chapter 11 Cases, (d) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court.  The terms and provisions of this Final Order, including the DIP Protections and adequate protection granted pursuant to this Final Order and the DIP Loan Documents and any rights, benefits, and protections granted to the Prepetition Secured Lenders, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections and rights, benefits, and protections granted to the Prepetition Secured Lenders shall maintain their priority as provided by this Final Order until (i) in the case of the DIP Secured Parties, until all of the DIP Obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Loan Documents (and this Final Order) have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms); and (ii) in the case of the Prepetition Secured Lenders, until all of the Prepetition Secured Obligations of the Debtors to the Prepetition Secured Lenders pursuant to the Prepetition Secured Credit Documents have been paid in full in cash and discharged.

(a)  **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, the Interim Order, and/or this Final Order, the provisions of this Final Order shall govern and control.

(b)  **Enforceability**.  This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry of this Final Order on the Court's docket.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.  The rights of all parties in interest to object to the terms of the Final Order, the DIP Financing Agreement and any other DIP Financing Document at the Final Hearing are expressly reserved.

(c)  **Objections Overruled**.  All objections to the relief sought in this Final Order to the extent not withdrawn or resolved, are hereby overruled.

(d)  **No Waivers or Modification of Final Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of the DIP Agent and the Required Lenders and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or the Required Lenders.

22.  **Headings.**  All paragraph headings used in this Final Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

23.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Final Order.

**Dated:  July 7th, 2016**
**New York, New York**        **/S/ STUART M. BERNSTEIN_____**
                              **STUART M. BERNSTEIN**
                              **UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

[DIP Financing Agreement]

## FINANCING AGREEMENT

Financing Agreement, dated as of June 13, 2016, by and among Gawker Media Group, Inc., an exempted company incorporated with limited liability and existing under the laws of the Cayman Islands (the "Parent"), as a debtor and debtor-in-possession, Gawker Media, LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "Borrower"), each subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, each as a debtor and debtor-in-possession (together with the Parent, each a "Guarantor" and, collectively, the "Guarantors"), the lenders from time to time party hereto (each a "Lender" and, collectively, the "Lenders"), Cerberus Business Finance LLC, a Delaware limited liability company ("CBF"), as collateral agent for the Lenders (in such capacity, the "Collateral Agent"), and CBF, as administrative agent for the Lenders (in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agents").

## RECITALS

The Borrower and the Guarantors have commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and the Borrower and the Guarantors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Borrower and the Guarantors have asked the Lenders to make post-petition loans and advances to the Borrower consisting of (a) a revolving credit facility in an aggregate principal amount not to exceed $5,000,000 at any time outstanding and (b) a term loan facility in the aggregate principal amount of $17,000,000; provided that, until the Final Bankruptcy Court Order (as hereinafter defined) shall have been entered by the Bankruptcy Court, no advances or loans under this Agreement shall be made other than a term loan in a principal amount not to exceed $14,000,000. The proceeds of the advances made under the revolving credit facility and the term loan facility shall be used (a) for general working capital purposes of the Borrower and the Guarantors and to pay fees and expenses related to this Agreement and (b) to repay certain existing indebtedness of the Borrower. The Lenders are severally, and not jointly, willing to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth.

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01   Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"Account Debtor" means each debtor, customer or obligor in any way obligated on or in connection with any Account Receivable.

2

"Account Receivable" means, with respect to any Person, any and all rights of such Person to payment for goods sold and/or services rendered, including accounts, general intangibles and any and all such rights evidenced by chattel paper, instruments or documents, whether due or to become due and whether or not earned by performance, and whether now or hereafter acquired or arising in the future, and any proceeds arising therefrom or relating thereto.

"Action" has the meaning specified therefor in Section 13.12.

"Additional Amount" has the meaning specified therefor in Section 2.08(a).

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"Agent" and "Agents" have the meanings specified therefor in the preamble hereto.

"Agreed Administrative Expense Priorities" means that administrative expenses with respect to the Loan Parties and, with respect to sub-clause (ii) of clause "first", any official committee appointed by the Bankruptcy Court, shall have the following order of priority:

first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6), (ii) amounts payable in respect of Carve-Out Expenses, provided that the amount entitled to priority under this sub-clause (ii) of this clause first ("Priority Professional Expenses") shall not exceed the sum of (A) the aggregate amount of professional fees and disbursements accrued and not paid immediately prior to the commencement of a Carve-Out Expense Reduction Period, but solely if, as and to the extent such professional fees are or have been provided for in, and are consistent with, the Budget and are ultimately allowed by the Bankruptcy Court pursuant to Sections 327 and 330 of the Bankruptcy Code and (B) $500,000 (the "Professional Expense Cap"); provided, however, that (1) during any Carve-Out Expense Reduction Period, any payments actually made in respect of Carve-Out Expenses, shall reduce the Professional Expense Cap on a dollar-for-dollar basis, and (2) for the avoidance of doubt, so long as no Carve-Out Expense Reduction Period shall be continuing, the payment of Carve-Out Expenses shall not reduce

3

the Professional Expense Cap, and (iii) all reasonable fees and expenses incurred by a trustee under 11 U.S.C. § 726(b) in an aggregate amount not to exceed $50,000;

second, all Obligations in accordance with Section 4.02, and

third, all other allowed administrative expenses.

"Agreement" means this Financing Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to the Agreement as the same may be in effect at the time such reference becomes operative.

"Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced).

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Collateral Agent, in accordance with Section 13.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Collateral Agent.

"Authorized Officer" means, with respect to any Person other than the Parent, the chief executive officer, chief financial officer, chief restructuring officer, president or executive vice president of such Person and, with respect to the Parent, a director or secretary of the Parent.

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute.

"Bankruptcy Court Orders" means the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order.

"Blocked Person" has the meaning assigned to such term in Section 7.01(ff).

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means, (a) with respect to any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the

4

managing member thereof, (d) with respect to an exempted company, the board of directors of the exempted company or any committee thereof duly authorized to act on behalf of such board; and (e) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" shall mean Gawker Media LLC.

"Budget" means, collectively, the consolidated cash requirement forecasts, cash flow statements, statements of operations and cash availability schedules in the form attached hereto as Schedule 1.01(D), which are (a) prepared by or on behalf of the Loan Parties on a weekly basis (for the next succeeding 13 weeks), and (b) delivered by the Loan Parties to the Agents and the Lenders (i) on or before the Interim Facility Effective Date pursuant to Section 6.01(e)(xiii) hereto and (ii) each month thereafter pursuant to Section 8.01(a)(vi) hereto (or more frequently should the Agents so elect), in each case, which shall be in substance reasonably satisfactory to the Administrative Agent at the time of delivery thereof.

"Business Day" means (a) any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close, and (b) with respect to the borrowing, payment or continuation of, or determination of interest rate on, LIBOR Rate Loans, any day that is a Business Day described in clause (a) above and on which dealings in Dollars may be carried on in the interbank eurodollar markets in New York City and London.

"Capital Expenditures" means, with respect to any Person for any period, the sum of (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed and including all Capitalized Lease Obligations paid or payable during such period, and (b) to the extent not covered by clause (a) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (a) required under GAAP to be capitalized on the balance sheet of such Person or (b) a transaction of a type commonly known as a "synthetic lease" (i.e., a lease transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out Expenses" means any payments permitted to be made by the Bankruptcy Court in respect of fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 Cases pursuant to Sections 327, 328, 330, 331, 363 and

1103 of the Bankruptcy Code, including the fee payable to Houlihan Lokey in connection with the financing pursuant to this Agreement upon the occurrence of the Interim Facility Effective Date and set forth in the Budget, but excluding any other success or transaction fees incurred before or after the occurrence of any Event of Default.

"Carve-Out Expense Reduction Period" means any period during which an Event of Default under this Agreement or a default by any Loan Party in any of its obligations under any of the Bankruptcy Court Orders, in either case, shall have occurred and be continuing.

"Carve-Out Reserve" means a reserve against the Total Revolving Credit Commitment implemented by the Collateral Agent in its reasonable discretion in an amount not exceeding the Professional Expense Cap.

"Cash Management Accounts" means the bank accounts of each Loan Party maintained at one or more Cash Management Banks listed on Schedule 7.01(t).

"Cash Management Bank" has the meaning specified therefor in Section 9.01(a).

"CBF" has the meaning specified therefor in the preamble hereto.

"Change in Law" has the meaning specified therefor in Section 5.05(a).

"Change of Control" means each occurrence of any of the following:

(a)     during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Parent (together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Parent was approved by a vote of at least a majority the directors of the Parent then still in office who were either directors at the beginning of such period, or whose election or nomination for election was previously approved) cease for any reason to constitute a majority of the Board of Directors of the Parent;

(b)     the Parent shall cease to have beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of 100% of the aggregate voting power of the Equity Interests of each other Loan Party, free and clear of all Liens (other than Permitted Liens);

(c)     (i) any Loan Party consolidates or amalgamates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person, or (ii) any entity consolidates or amalgamates with or merges into any Loan Party in a transaction pursuant to which the outstanding voting Equity Interests of such Loan Party is reclassified or changed into or exchanged for cash, securities or other property, other than any such transaction described in this clause (ii) in which in the case of any such transaction involving a Loan Party other than the Parent, the Parent has beneficial ownership of 100% of the aggregate voting power of all Equity Interests of the resulting, surviving or transferee entity; or

(d)     Nick Denton or a chief restructuring officer whose identity and terms of retention are reasonably acceptable to the Agents and the Lenders shall cease to be involved in the day to day operations and management of the business of the Parent, and a successor

reasonably acceptable to the Collateral Agent and the Lenders is not appointed on terms reasonably acceptable to the Collateral Agent and the Lenders within 30 days of such cessation of involvement.

"Chapter 11 Cases" has the meaning specified therefor in the recitals hereto.

"Collateral" has the meaning specified therefor in Section 4.01(a).

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 11.08(a).

"Collection Account" and "Collection Accounts" have the meanings specified therefor in Section 9.01(a).

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commitments" means, with respect to each Lender, such Lender's Revolving Credit Commitment or Term Loan Commitment.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

7

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, among the Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account or for whose account such entitlement or contract is carried, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder and has not cured such failure prior to the date of determination, (b) has otherwise failed to pay over to any Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, and has not cured such failure prior to the date of determination, or (c) has been deemed insolvent or become the subject of an Insolvency Proceeding.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the six (6) calendar years preceding the date of any borrowing hereunder) for employees of any Loan Party or any of its ERISA Affiliates.

"Equity Interest" means (a) with respect to any Person that is a corporation (including, without limitation, an exempted company), any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, and (b) with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

8

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" means any of the events set forth in Section 10.01.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Lender" means any Person other than (a) a Lender, (b) an Affiliate of a Lender, (c) a Related Fund of a Lender, (d) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets or net worth in excess of $100,000,000, (e) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets or net worth in excess of $100,000,000, provided that such bank is acting through a branch or agency located in the United States, and (f) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets or net worth in excess of $100,000,000.

"Existing SVB Credit Facility" means that certain Loan and Security Agreement, dated as of September 24, 2012, among Borrower, Silicon Valley Bank and the other Persons party thereto, as amended, modified or supplemented through the Filing Date.

"Extraordinary Receipts" means any cash received by the Parent or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(i) or (c)(v) hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments, (g) any purchase price adjustment received in connection with any purchase agreement and (h) proceeds of Avoidance Actions. For the avoidance of doubt, any cash received by the Parent or any of its Subsidiaries pursuant to any sub-leases entered into in the ordinary course of business shall not comprise Extraordinary Receipts.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds

9

brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means that certain fee letter, dated as of the date hereof, between the Borrower and the Agents, as amended, restated, supplemented or otherwise modified from time to time.

"Filing Date" means June 10, 2016.

"First Amendment" means the First Amendment to Financing Agreement, dated as of the First Amendment Effective Date, among the Borrower, the Guarantors, the Agents and the Lenders party thereto.

"First Amendment Effective Date" has the meaning specified therefor in Section 4 of the First Amendment.

"Final Bankruptcy Court Order" means the final order of the Bankruptcy Court with respect to the Loan Parties, substantially in the form of the Interim Bankruptcy Court Order and acceptable to the Agents, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Required Lenders and the Borrower.

"Final Bankruptcy Court Order Entry Date" means the date on which the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Final Facility Effective Date" has the meaning specified therefor in Section 6.02.

"Final Maturity Date" means the date which is the earliest of (a) the date which is 30 days following the date of entry of the Interim Bankruptcy Court Order if the Final Bankruptcy Court Order has not been entered by the Bankruptcy Court on or prior to such date, (b) if the Final Bankruptcy Court Order has been entered by the Bankruptcy Court on or prior to 30 days following the date of entry of the Interim Bankruptcy Court Order, then June 13, 2017, (c) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (d) the date of a sale of substantially all or substantially all of the assets of the Loan Parties; and (e) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Final Maturity Date.

"Financial Statements" means (a) the audited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended December 31, 2014, and the related consolidated statement of operations and cash flows for the Fiscal Year then ended, (b) the unaudited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended

December 31, 2015, and the related consolidated statement of operations and cash flows for the Fiscal Year then ended, and (c) the unaudited consolidated balance sheet of the Parent and its Subsidiaries for the four months ended April 30, 2016, and the related consolidated statement of operations and cash flows for the four month period then ended.

"Fiscal Year" means the fiscal year of the Parent and its Subsidiaries ending on December 31st of each year.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture agreement, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization; (d) with respect to an exempted company, the memorandum and articles of association (or any applicable shareholders' or equivalent or comparable agreement) and (e) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guaranteed Obligations" has the meaning specified therefor in Section 12.01.

"Guarantor" means (a) the Parent and each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, and (b) each other Person (including Kinja) which guarantees, pursuant to Section 8.01(b) or otherwise, all or any part of the Obligations.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in ARTICLE XII hereof and (b) each guaranty, in form and substance satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders pursuant to Section 8.01(b) or otherwise, including the Hungarian Guaranty.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdout Lender" has the meaning specified therefor in Section 13.02.

"Hungarian Guaranty" means the direct enforceable guaranty (in Hungarian: *készfizető kezesség*) granted by Kinja for the benefit of the Collateral Agent on or around the date of this Agreement in the form of notarial deed.

"Hungarian Security Documents" means, collectively, the following Hungarian law governed security agreements, each dated on or around the date of this Agreement in the form of notarial deed:

(a)    Pledge over rights and receivables agreement between Kinja, as pledger, and the Collateral Agent, as security beneficiary;

(b)    Pledge over pool of assets agreements between Kinja, as pledger, and the Collateral Agent, as security beneficiary;

(c)    Bank account security agreement between Kinja, as pledger, and the Collateral Agent, as security beneficiary;

(d)    IP pledge agreement between Kinja, as pledger, and the Collateral Agent, as security beneficiary; and

(e)    Quota pledge agreement between the Parent, as pledger, and the Collateral Agent, as security beneficiary, and acknowledged by Kinja.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax

12

ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; and (j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Matters" has the meaning specified therefor in Section 13.15(a).

"Indemnitees" has the meaning specified therefor in Section 13.15(a).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Reference Rate Loan to a LIBOR Rate Loan) and ending 1, 2, or 3 months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c) (e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2 or 3 months after the date on which the Interest Period began, as applicable, and (e) the Borrower may not elect an Interest Period which will end after the Final Maturity Date.

"Interim Bankruptcy Court Order" means the order of the Bankruptcy Court with respect to the Loan Parties, substantially in the form of Exhibit D as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Required Lenders and the Borrower.

"Interim Bankruptcy Court Order Entry Date" means the date on which the Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Interim Facility Effective Date" means the date, on or before June 16, 2016, on which all of the conditions precedent set forth in Section 6.01 are satisfied.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Final Maturity Date.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Kinja" means Kinja Kft., a company organized and existing under the laws of Hungary.

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"Lender" and "Lenders" have the meanings specified therefor in the preamble hereto.

"LIBOR" means, with respect to any LIBOR Loan for any Interest Period, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on page LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided, that, if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time.  "Interpolated Rate" means, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"LIBOR Deadline" has the meaning specified therefor in Section 2.10.

"LIBOR Notice" means a written notice substantially in the form of Exhibit C.

"LIBOR Option" has the meaning specified therefor in Section 2.09.

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the greater of (a) 1% and (b) the rate per annum determined by the Administrative Agent (rounded upwards if necessary, to the next 1/100%) by dividing (i) LIBOR for such Interest Period by (ii) 100% minus the Reserve Percentage.  The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

"LIBOR Rate Loan" means a Loan bearing interest calculated based upon the LIBOR Rate.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any

nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease, any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan" means the Term Loan or any Revolving Loan made by an Agent or a Lender to the Borrower pursuant to ARTICLE II hereof.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged with all Loans made to, and all other Obligations incurred by, the Borrower.

"Loan Document" means this Agreement, the Pledge Agreement, the Hungarian Guaranty, the Hungarian Security Documents and any other pledge agreement, the Fee Letter, any Guaranty, any mortgage, any security agreement, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"Loan Party" means the Borrower and any Guarantor.

"Material Adverse Deviation" means, as of the end of each week commencing with the second full week after the Filing Date, a negative deviation ((i) downward, in the case of the Budget line item entitled "Total Cash Receipts" (representing a decrease in a positive number) and (ii) downward in the case the Budget line items entitled "Kinja", "Total Operating Cash Disbursements" and "Total Professional Fees" (representing an increase in a negative number)) of more than (A) 10% in the case of "Total Professional Fees" and (B) 15% in all other cases, in each case on a cumulative basis from the Filing Date for each such weekly period above any line item set forth in the Budget for such period.

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole (except for the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code), (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Documents to which they are parties, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Lenders on any of the Collateral.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"Net Cash Proceeds" means, with respect to any Disposition by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to

time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (b) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (c) transfer taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (d) net income taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements in each case to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"New Lending Office" has the meaning specified therefor in Section 2.08(d).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.08(d).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 10.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees (including the fees provided for in the Fee Letter), attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"Operating Lease Obligations" means all obligations for the payment of rent for any real or personal property under leases or agreements to lease, other than Capitalized Lease Obligations.

"Other Taxes" has the meaning specified therefor in Section 2.08(b).

"Parallel Debt" has the meaning specified therefor in Section 11.11(a).

"Parent" has the meaning specified therefor in the preamble hereto.

"Participant Register" has the meaning specified therefor in Section 13.07(g).

"Payment Office" means the Administrative Agent's office located at 875 Third Avenue, New York, NY 10022, or at such other office or offices of the Administrative Agent as

may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Borrower.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Period" means the Interim Period or the Final Period, as the context requires.

"Permitted Indebtedness" means:

(a)    any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)    any Indebtedness existing on the Filing Date, including Indebtedness under the Prepetition Junior Credit Facility;

(c)    Indebtedness evidenced by Capitalized Lease Obligations entered into after the Filing Date in order to finance Capital Expenditures made by the Loan Parties in accordance with the provisions of Section 8.02(g), which Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under this clause (c) and clause (d) of this definition, does not exceed $250,000 at any time outstanding;

(d)    Indebtedness permitted by clause (e) of the definition of "Permitted Lien";

(e)    Indebtedness permitted under Section 8.02(e);

(f)    unsecured Indebtedness incurred in the ordinary course of business of the Loan Parties in an aggregate amount not to exceed $250,000; and

(g)    all obligations of the Parent and/or any of its Subsidiaries in respect of any credit card arrangements with American Express authorized pursuant to a cash management order of the Bankruptcy Court with respect to the Loan Parties.

"Permitted Investments" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P 1 by Moody's or A 1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000; and (f) tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's.

17

"Permitted Liens" means:

(a)    Liens securing the Obligations;

(b)    Liens for taxes, assessments and governmental charges the payment of which is not required under Section 8.01(c);

(c)    Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising (provided they are subordinate to the Collateral Agent's Liens on Collateral) in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, or as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)    Liens existing on the Filing Date, as described on Schedule 8.02(a) (other than the Liens described in clause (i) below), but not the extension of coverage thereof to other property or the extension of maturity, refinancing or other modification of the terms thereof or the increase of the Indebtedness secured thereby;

(e)    purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries after the Filing Date in the ordinary course of its business to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition of such equipment; provided, however, that (A) no such Lien shall extend to or cover any other property of any Loan Party or any of its Subsidiaries and (B) the aggregate principal amount of Indebtedness secured by any or all such Liens shall not exceed at any one time outstanding $250,000;

(f)    deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)    easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)    Liens securing Indebtedness permitted by subsection (c) of the definition of Permitted Indebtedness;

(i)    Liens securing the Indebtedness outstanding pursuant to the Prepetition Junior Credit Facility; provided that, such Liens are junior and subordinate in all respect to the Liens securing the Obligations with respect to all Collateral pursuant to the Bankruptcy Court Orders;

18

(j)      licenses and sublicenses of patents, trademarks and other intellectual property rights granted by the Loan Parties in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of the Loan Parties;

(k)      Liens on cash collateral in an amount not to exceed $5,567,169.30 securing reimbursement obligations with respect to letters of credit;

(l)      Liens on cash collateral in an amount not to exceed $350,000 in respect of cash management and indemnity obligations related to the payoff of the Existing SVB Credit Facility; and

(m)      rights of setoff or banker's Liens upon deposits of cash in favor of banks or other depository institutions.

"Permitted Priority Liens" means Liens permitted under clauses (e), (f), (g), (h), (j), (k), (l) and (m) of the definition of the term "Permitted Lien".

"Person" means an individual, corporation, limited liability company, exempted company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Plan" means any Employee Plan or Multiemployer Plan.

"Pledge Agreement" means that certain Pledge Agreement dated as of the date hereof by the Parent in favor of the Collateral Agent.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2% or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2%.

"Prepetition Junior Credit Facility" means that certain Second Lien Loan and Security Agreement, dated as of January 21, 2016, among the Parent, as borrower, the Borrower and Kinja Kft., as guarantors, and US VC Partners, LP, as lender, as amended, modified or supplemented through the Filing Date.

"Pre-Petition Obligations" means all indebtedness, obligations (including obligations in respect of any letters of credit) and liabilities of the Loan Parties incurred prior to the Filing Date plus fees, expenses, and indemnities due thereunder and interest thereon accruing both before and after the Filing Date to the extent allowable under the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Principal Obligations" has the meaning specified therefor in Section 11.11(a).

"Priority Professional Expenses" means those Carve-Out Expenses entitled to a priority as set forth in sub-clause (ii) of the clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Pro Rata Share" means:

(a)    with respect to a Lender's obligation to make Revolving Loans and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Revolving Credit Commitment, by (ii) the Total Revolving Credit Commitment, provided, that, if the Total Revolving Credit Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Revolving Loans (including Collateral Agent Advances) and the denominator shall be the aggregate unpaid principal amount of all Revolving Loans (including Collateral Agent Advances),

(b)    with respect to a Lender's obligation to make the Term Loan and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Term Loan Commitment, by (ii) the Total Term Loan Commitment, provided that if the Total Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Term Loan and the denominator shall be the aggregate unpaid principal amount of the Term Loan, and

(c)    with respect to all other matters (including, without limitation, the indemnification obligations arising under Section 11.05), the percentage obtained by dividing (i) the sum of such Lender's Revolving Credit Commitment and the unpaid principal amount of such Lender's portion of the Term Loan, by (ii) the sum of the Total Revolving Credit Commitment and the aggregate unpaid principal amount of the Term Loan, provided, that, if such Lender's Revolving Credit Commitment shall have been reduced to zero, such Lender's Revolving Credit Commitment shall be deemed to be the aggregate unpaid principal amount of such Lender's Revolving Loans (including Collateral Agent Advances) and if the Total Revolving Credit Commitment shall have been reduced to zero, the Total Revolving Credit Commitment shall be deemed to be the aggregate unpaid principal amount of all Revolving Loans (including Collateral Agent Advances).

"Professional Expense Cap" has the meaning specified in subclause (ii) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Rating Agencies" has the meaning specified therefor in Section 2.07.

"Reference Bank" means JPMorgan Chase Bank, its successors or any other commercial bank designated by the Administrative Agent to the Borrower from time to time.

"Reference Rate" means the greater of (a) 3% and (b) the rate of interest publicly announced by the Reference Bank in New York, New York from time to time as its reference rate, base rate or prime rate. The reference rate, base rate or prime rate is determined from time to time by the Reference Bank as a means of pricing some loans to its borrowers and none is tied to any external rate of interest or index nor necessarily reflects the lowest rate of interest actually charged by the Reference Bank to any particular class or category of customers. Each change in

the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Reference Rate Loan" means a Loan bearing interest calculated based upon the Reference Rate.

"Register" has the meaning specified therefor in Section 13.07(d).

"Registered Loans" has the meaning specified therefor in Section 13.07(d).

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"Related Party Assignment" has the meaning specified therefor in Section 13.07(b).

"Related Party Register" has the meaning specified therefor in Section 13.07(d).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Replacement Lender" has the meaning specified therefor in Section 5.03.

"Reportable Event" means an event described in Section 4043 of ERISA (other than the commencement of the Chapter 11 Cases and any event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Required Lenders" means Lenders whose Pro Rata Shares (calculated in accordance with clause (c) of the definition thereof) aggregate at least 50.1%.

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Revolving Credit Commitment" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrower in the amount set forth opposite such Lender's name in Schedule 1.01(A) hereto, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Revolving Loan" means a loan made by a Lender to the Borrower pursuant to Section 2.01(a)(i).

"Revolving Loan Lender" means a Lender with a Revolving Credit Commitment.

"Revolving Loan Obligations" means any Obligations with respect to the Revolving Loans (including without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 2.07.

"Settlement Period" has the meaning specified therefor in Section 2.02(d)(i) hereof.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"Strategically Important Business Organization" means any business organization qualified as a strategically important business organization (in Hungarian: "*stratégiailag kiemelt jelentőségű gazdálkodó szervezet*") in terms of Chapter IV of the Hungarian Act XLIX of 1991 on Bankruptcy and Liquidation Proceedings.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, exempted company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors or other managing body of such Person, (ii)

in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"Taxes" has the meaning specified therefor in Section 2.08(a).

"Termination Event" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Loan Party or any of its ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan; provided, however, no Termination Event shall be deemed to have occurred as a result of the commencement of the Chapter 11 Cases.

"Term Loan" means, collectively, the loans made by the Term Loan Lenders to the Borrower on the Interim Facility Effective Date and the Final Facility Effective Date pursuant to Section 2.01(a)(ii).

"Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to make the Term Loan to the Borrower in the amount set forth in Schedule 1.01(A) hereto, as the same may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Term Loan Lender" means a Lender with a Term Loan Commitment.

"Term Loan Obligations" means any Obligations with respect to the Term Loan (including without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Total Commitment" means the sum of the Total Revolving Credit Commitment and the Total Term Loan Commitment.

"Total Revolving Credit Commitment" means the sum of the amounts of the Lenders' Revolving Credit Commitments.

"Total Term Loan Commitment" means the sum of the amounts of the Lenders' Term Loan Commitments.

"Transferee" has the meaning specified therefor in Section 2.08(a).

"Uniform Commercial Code" has the meaning specified therefor in Section 1.03.

"Unused Line Fee" has the meaning specified therefor in Section 2.06(b).

23

"WARN" has the meaning specified therefor in Section 7.01(x).

"ZDGM APA" means that certain Asset Purchase Agreement, dated as of the Filing Date, among the Loan Parties and ZDGM LLC.

Section 1.02    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.  References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations).

Section 1.03    Accounting and Other Terms.    Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP applied on a basis consistent with those used in preparing the Financial Statements.  All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine.

Section 1.04    Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Agent or any Lender, such period shall in any event consist of at least one full day.

Section 1.05    Certain Hungarian Terms.  In this Agreement, as it relates to Kinja and in respect of Hungarian Security Documents, a reference to:

(a)    a "Security" or "security interest" means *zálog*, *jelzálog*, *óvadék*, *garancia*, *kezesség* (*készfizető kezesség*), (and any of the following, surviving security instruments: *engedményezés* and *tulajdon átruházása*, *vételi* (*visszavásárlási*) *jog alapítása* or *tulajdonjog fenntartása* provided that the aim of the contract is to provide security);

(b)    a "winding up, administration", "liquidation" or "dissolution" means *csőd*, *felszámolás*, *megszűntnek nyilvánítás* and *kényszertörlési eljárás*;

(c)    a "receiver", "administrator", "administrative receiver", "compulsory manager" or "similar officer" means *vagyonfelügyelő*, *ideiglenes vagyonfelügyelő*, *felszámoló*, *felügyelőbiztos*, *végelszámoló* and *végrehajtó*;

(d)    a "moratorium" means *ideiglenes fizetési haladék*, *fizetési haladék* and *moratórium*;

(e)    "expropriation", "attachment", "sequestration", "distress", "execution" or "any analogous process" means *ideiglenes intézkedés* and all forms of *bírósági végrehajtás* (including *foglalás*, *zár alá vétel* and *biztosítási intézkedés*);

(f)    "Expropriation" means *kisajátítás*;

(g)    "constitutional documents" means *létesítő okirat*, *társasági szerződés*, *alapító okirat*, *alapszabály*, *szervezeti és működési szabályzat*, *igazgatóság ügyrendje* and *felügyelő bizottság ügyrendje*; and

(h)    "shares" means equivalent ownership interests in legal entities (including but not limited to business quotas (in Hungarian: *üzletrész*) in respect of limited liability companies (in Hungarian: *korlátolt felelősségű társaság*) incorporated in Hungary) and "shareholder" shall be construed accordingly (being a "quotaholder" (in Hungarian: *üzletrésztulajdonos*) or "member" (in Hungarian: *tag*) in respect of limited liability companies incorporated in Hungary).

## ARTICLE II

## THE LOANS

Section 2.01    Commitments. (a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth:

(i)    each Revolving Loan Lender severally agrees to make Revolving Loans to the Borrower at any time and from time to time during the Final Period, or until the earlier reduction of its Revolving Credit Commitment to zero in accordance with the terms hereof, in an aggregate principal amount of Revolving Loans at any time outstanding not to exceed the amount of such Lender's Revolving Credit Commitment; and

(ii)    each Term Loan Lender severally agrees to make the Term Loan to the Borrower on two separate dates, on the Interim Facility Effective Date and on the Final

Facility Effective Date, in an aggregate principal amount not to exceed the amount of such Lender's Term Loan Commitment.

(b)    Notwithstanding the foregoing:

(i)    During the Final Period, the aggregate principal amount of Revolving Loans outstanding at any time to the Borrower shall not exceed the Total Revolving Credit Commitment in effect at such time less the Carve-Out Reserve.

(ii)    The Revolving Credit Commitment of each Lender shall automatically and permanently be reduced to zero on the Final Maturity Date.  Within the limits set forth in Section 2.01(b)(i), the Borrower may borrow, repay and reborrow, on or after the Final Bankruptcy Court Order Entry Date and prior to the Final Maturity Date, subject to the terms, provisions and limitations set forth herein.

(iii)    The aggregate principal amount of the Term Loan made on the Interim Facility Effective Date shall not exceed $14,000,000.

(iv)    The aggregate principal amount of the Term Loan made on the Final Facility Effective Date shall not exceed the Total Term Loan Commitment in effect at such time.

(v)    Each Term Loan that is made shall automatically and permanently reduce the Total Term Loan Commitment and the Term Loan Commitment of each Term Loan Lender.  Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

Section 2.02    Making the Loans.  (a) The Borrower shall give the Administrative Agent prior telephonic notice (immediately confirmed in writing, in substantially the form of Exhibit A hereto (a "Notice of Borrowing")), not later than 12:00 noon (New York City time) on the date which is 3 Business Days prior to the date of the proposed Loan (or such shorter period as the Administrative Agent is willing to accommodate from time to time, but in no event later than 12:00 noon (New York City time) on the borrowing date of the proposed Loan).  Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Loan, (ii) whether such Loan is requested to be a Revolving Loan or the Term Loan, (iii) whether the Loan is requested to be a Reference Rate Loan or a LIBOR Rate Loan and, in the case of a LIBOR Rate Loan, the initial Interest Period with respect thereto, and (iv) the proposed borrowing date, which must be a Business Day.  The Administrative Agent and the Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by the Administrative Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Administrative Agent).  Each Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of any such telephonic Notice of Borrowing.  The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary.  The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)     Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrower shall be bound to make a borrowing in accordance therewith.  Each Reference Rate Loan shall be made in a minimum amount of $100,000, and shall be in an integral multiple of $50,000.  Each LIBOR Rate Loan shall be made in a minimum amount of $100,000, and shall be in an integral multiple of $50,000.

(c)     (i)     Except as otherwise provided in this subsection 2.02(c), all Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the Total Revolving Credit Commitment and the Total Term Loan Commitment, as the case may be, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

(ii)     Notwithstanding any other provision of this Agreement, and in order to reduce the number of fund transfers among the Borrower, the Agents and the Lenders, the Borrower, the Agents and the Lenders agree that the Administrative Agent may (but shall not be obligated to), and the Borrower and the Lenders hereby irrevocably authorize the Administrative Agent to, fund, on behalf of the Revolving Loan Lenders, Revolving Loans pursuant to Section 2.01, subject to the procedures for settlement set forth in subsection 2.02(d); provided, however, that (a) the Administrative Agent shall in no event fund any such Revolving Loans if the Administrative Agent shall have received written notice from the Collateral Agent or the Required Lenders on the Business Day prior to the date of the proposed Revolving Loan that one or more of the conditions precedent contained in Section 6.03 will not be satisfied at the time of the proposed Revolving Loan, and (b) the Administrative Agent shall not otherwise be required to determine that, or take notice whether, the conditions precedent in Section 6.03 have been satisfied.  If the Borrower gives a Notice of Borrowing requesting a Revolving Loan and the Administrative Agent elects not to fund such Revolving Loan on behalf of the Revolving Loan Lenders, then promptly after receipt of the Notice of Borrowing requesting such Revolving Loan, the Administrative Agent shall notify each Revolving Loan Lender of the specifics of the requested Revolving Loan and that it will not fund the requested Revolving Loan on behalf of the Revolving Loan Lenders.  If the Administrative Agent notifies the Revolving Loan Lenders that it will not fund a requested Revolving Loan on behalf of the Revolving Loan Lenders, each Revolving Loan Lender shall make its Pro Rata Share of the Revolving Loan available to the Administrative Agent, in immediately available funds, in the Administrative Agent's Account no later than 3:00 p.m. (New York City time) (provided that the Administrative Agent requests payment from such Revolving Loan Lender not later than 1:00 p.m. (New York City time)) on the date of the proposed Revolving Loan.  The Administrative Agent will make the proceeds of such Revolving Loans available to the Borrower on the day of the proposed Revolving Loan by causing an amount, in immediately available funds, equal to the proceeds of all such Revolving Loans received by the Administrative Agent in the Administrative Agent's Account or the amount funded by the Administrative Agent on behalf of the Revolving Loan Lenders to be deposited in an account designated by the Borrower.

27

(iii)    If the Administrative Agent has notified the Revolving Loan Lenders that the Administrative Agent, on behalf of the Revolving Loan Lenders, will not fund a particular Revolving Loan pursuant to subsection 2.02(c)(ii), the Administrative Agent may assume that each such Revolving Loan Lender has made such amount available to the Administrative Agent on such day and the Administrative Agent, in its sole discretion, may, but shall not be obligated to, cause a corresponding amount to be made available to the Borrower on such day.    If the Administrative Agent makes such corresponding amount available to the Borrower and such corresponding amount is not in fact made available to the Administrative Agent by any such Revolving Loan Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Revolving Loan Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for 3 Business Days and thereafter at the Reference Rate.    During the period in which such Revolving Loan Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrower shall, for all purposes hereof, be a Revolving Loan made by the Administrative Agent for its own account.    Upon any such failure by a Revolving Loan Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Borrower of such failure and the Borrower shall immediately pay such corresponding amount to the Administrative Agent for its own account.

(iv)    Nothing in this subsection 2.02(c) shall be deemed to relieve any Revolving Loan Lender from its obligations to fulfill its Revolving Credit Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrower may have against any Revolving Loan Lender as a result of any default by such Revolving Loan Lender hereunder.

(d)    (i)    With respect to all periods for which the Administrative Agent has funded Revolving Loans pursuant to subsection 2.02(c), on Friday of each week, or if the applicable Friday is not a Business Day, then on the following Business Day, or such shorter period as the Administrative Agent may from time to time select (any such week or shorter period being herein called a "Settlement Period"), the Administrative Agent shall notify each Revolving Loan Lender of the unpaid principal amount of the Revolving Loans outstanding as of the last day of each such Settlement Period.    In the event that such amount is greater than the unpaid principal amount of the Revolving Loans outstanding on the last day of the Settlement Period immediately preceding such Settlement Period (or, if there has been no preceding Settlement Period, the amount of the Revolving Loans made on the date of such Revolving Loan Lender's initial funding), each Revolving Loan Lender shall promptly (and in any event not later than 2:00 p.m. (New York City time) if the Administrative Agent requests payment from such Lender not later than 12:00 noon (New York City time) on such day) make available to the Administrative Agent its Pro Rata Share of the difference in immediately available funds.    In the event that such amount is less than such unpaid principal amount, the Administrative Agent shall promptly pay over to each Revolving Loan Lender its Pro Rata Share of the difference in immediately available funds.    In addition, if the Administrative Agent shall so request at any time when a Default or an Event of Default shall have occurred and be continuing, or any other event shall have occurred as a result of which the Administrative Agent shall determine that it is desirable to present claims against the Borrower for repayment, each Revolving Loan Lender

shall promptly remit to the Administrative Agent or, as the case may be, the Administrative Agent shall promptly remit to each Revolving Loan Lender, sufficient funds to adjust the interests of the Revolving Loan Lenders in the then outstanding Revolving Loans to such an extent that, after giving effect to such adjustment, each such Revolving Loan Lender's interest in the then outstanding Revolving Loans will be equal to its Pro Rata Share thereof.   The obligations of the Administrative Agent and each Revolving Loan Lender under this subsection 2.02(d) shall be absolute and unconditional.  Each Revolving Loan Lender shall only be entitled to receive interest on its Pro Rata Share of the Revolving Loans which have been funded by such Revolving Loan Lender.

(ii)     In the event that any Revolving Loan Lender fails to make any payment required to be made by it pursuant to subsection 2.02(d)(i), the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Revolving Loan Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for 3 Business Days and thereafter at the Reference Rate.  During the period in which such Revolving Loan Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrower shall, for all purposes hereof, be a Revolving Loan made by the Administrative Agent for its own account.  Upon any such failure by a Revolving Loan Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Borrower of such failure and the Borrower shall immediately pay such corresponding amount to the Administrative Agent for its own account.  Nothing in this subsection 2.02(d)(ii) shall be deemed to relieve any Revolving Loan Lender from its obligation to fulfill its Revolving Credit Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrower may have against any Revolving Loan Lender as a result of any default by such Revolving Loan Lender hereunder.

Section 2.03   <u>Repayment of Loans; Evidence of Debt</u>.   (a)   The outstanding principal of all Revolving Loans shall be due and payable on the Final Maturity Date.

(b)     The outstanding principal of the Term Loan shall be due and payable on the Final Maturity Date.

(c)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e)     The entries made in the accounts maintained pursuant to paragraph (c) or (d) of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations

29

recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(f)    Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent and reasonably acceptable to the Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 13.07) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04    Interest.    (a)    Revolving Loans.  Subject to the terms of this Agreement, at the option of the Borrower, each Revolving Loan shall be either a Reference Rate Loan or a LIBOR Rate Loan.  Each Revolving Loan that is a Reference Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the Reference Rate plus 7%.  Each Revolving Loan that is a LIBOR Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for such Loan plus 8%.

(b)    Term Loan.  Subject to the terms of this Agreement, at the option of the Borrower, the Term Loan or any portion thereof shall be either a Reference Rate Loan or a LIBOR Rate Loan.  Each portion of the Term Loan that is a Reference Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the Reference Rate plus 7%.  Each portion of the Term Loan that is a LIBOR Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Term Loan (or such portion thereof) plus 8%.

(c)    Default Interest.  To the extent permitted by law, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(d)    Interest Payment.  Interest on each Loan shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which such Loan is made and at maturity (whether upon demand, by acceleration or otherwise).  Interest at the Post-Default Rate shall be payable on demand.  Each Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account pursuant to Section 5.02 with the amount of any interest payment due hereunder.

(e)     General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05     Reduction of Commitment; Prepayment of Loans.

(a)     Reduction of Commitments.

(i)     Revolving Credit Commitments.  The Total Revolving Credit Commitment shall terminate on the Final Maturity Date.  The Borrower may, without premium or penalty, reduce the Total Revolving Credit Commitment to an amount (which may be zero) not less than the sum of (A) the aggregate unpaid principal amount of all Revolving Loans then outstanding and (B) the aggregate principal amount of all Revolving Loans not yet made as to which a Notice of Borrowing has been given by the Borrower under Section 2.02.  Each such reduction (1) shall be in an amount which is an integral multiple of $1,000,000 (unless the Total Revolving Credit Commitment in effect immediately prior to such reduction is less than $1,000,000), (2) shall be made by providing not less than 5 Business Days' prior written notice to the Administrative Agent, and (3) shall be irrevocable.  Once reduced, the Total Revolving Credit Commitment may not be increased.  Each such reduction of the Total Revolving Credit Commitment shall reduce the Revolving Credit Commitment of each Lender proportionately in accordance with its Pro Rata Share thereof.

(ii)     Term Loan Commitment.  The Total Term Loan Commitment shall terminate at 5:00 p.m. (New York City time) on the Final Facility Effective Date.

(b)     Optional Prepayment.

(i)     Revolving Loans.  The Borrower may, at any time and from time to time, prepay the principal of any Revolving Loan, in whole or in part.

(ii)     Term Loan.  The Borrower may, at any time and from time to time, upon at least 5 Business Days' prior written notice to the Administrative Agent, prepay without penalty or premium the principal of the Term Loan, in whole or in part.  Each prepayment made pursuant to this clause (b)(ii) shall be accompanied by the payment of accrued interest to the date of such payment on the amount prepaid.  Each such prepayment shall be applied against the remaining installments of principal due on the Term Loan in the inverse order of maturity.

(iii)     Prepayment In Full.  The Borrower may, upon at least thirty (30) days prior written notice to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations, in full.  If the Borrower has sent a notice of termination pursuant to this clause (iii), then the Lenders' obligations to extend credit hereunder shall terminate and the Borrower shall be obligated to repay the Obligations, in full, on the date set forth as the date of termination of this Agreement in such notice.

(c)     Mandatory Prepayment.

(i)     Immediately upon any Disposition by any Loan Party or its Subsidiaries pursuant to Section 8.02(c)(ii), the Borrower shall prepay the outstanding principal amount of the Loans in accordance with clause (d) below in an amount equal to 100% of the Net

Cash Proceeds received by such Person in connection with such Disposition to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries (and not paid to the Administrative Agent as a prepayment of the Loans) shall exceed for all such Dispositions $10,000 since the Interim Facility Effective Date.  Nothing contained in this subsection (iv) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 8.02(c)(ii).

(ii)     Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding amount of the Loans in accordance with clause (d) below in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.   The provisions of this subsection (ii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iii)    Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts in an aggregate amount in excess of $100,000, the Borrower shall prepay the outstanding principal of the Loans in accordance with clause (d) below in an amount equal to 100% of such Extraordinary Receipts in an aggregate amount in excess of $100,000, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iv)    Notwithstanding the foregoing, with respect to Net Cash Proceeds received by any Loan Party or any of its Subsidiaries in connection with a Disposition or the receipt of Extraordinary Receipts consisting of insurance proceeds or condemnation awards that are required to be used to prepay the Obligations pursuant to Section 2.05(c)(i) or Section 2.05(c)(iii), as the case may be, up to $10,000 in the aggregate since the Interim Facility Effective Date of the Net Cash Proceeds from all such Dispositions and Extraordinary Receipts shall not be required to be so used to prepay the Obligations to the extent that such Net Cash Proceeds and Extraordinary Receipts are used to replace, repair or restore properties or assets used in such Person's business, provided that, (A) no Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds or Extraordinary Receipts, (B) the Borrower delivers a certificate to the Administrative Agent within 30 days after such Disposition or loss, destruction or taking, as the case may be, stating that such Net Cash Proceeds or Extraordinary Receipts shall be used to replace, repair or restore properties or assets used in such Person's business within a period specified in such certificate not to exceed 30 days after the date of receipt of such Net Cash Proceeds or Extraordinary Receipts (which certificate shall set forth estimates of the Net Cash Proceeds or Extraordinary Receipts to be so expended), (C) such Net Cash Proceeds or Extraordinary Receipts are deposited in an account subject to the dominion and control of the Collateral Agent, and (D) upon the earlier of (1) the expiration of the period specified in the relevant certificate furnished to the Administrative Agent pursuant to clause (B) above or (2) the occurrence of a Default or an Event of Default, such Net Cash Proceeds or Extraordinary Receipts, if not theretofore so used, shall be used to prepay the Obligations in accordance with Section 2.05(c)(i) or Section 2.05(c)(iii) as applicable.

(v)     Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of the Loans in whole or in part, the Borrower shall prepay the Loans in full on the date which is thirty (30) days following the entry

32

of the Interim Facility Bankruptcy Court Order in the event that that Final Bankruptcy Court Order shall not have been entered on or before such date.

(d)    Application of Payments.  Each prepayment pursuant to subsections (c)(i), (c)(ii) and (c)(iii) above shall be applied, first, to the Term Loan, and second, to the Revolving Loans.

(e)    Interest and Fees.  Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment, (ii) any Funding Losses payable pursuant to Section 2.11, and (iii) if such prepayment would reduce the amount of the outstanding Loans to zero at a time when the Total Revolving Credit Commitment has been terminated, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)    Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

Section 2.06    Fees.

(a)    Fee Letter.  As and when due and payable under the terms of the Fee Letter, the Borrower shall pay the fees set forth in the Fee Letter.

(b)    Unused Line Fee.  From and after the Interim Facility Effective Date and until the Final Maturity Date, the Borrower shall pay to the Administrative Agent for the account of the Revolving Loan Lenders, in accordance with their Pro Rata Shares, an unused line fee (the "Unused Line Fee"), which shall accrue at the rate per annum of 0.75% on (i) the excess, if any, of the Total Revolving Credit Commitment over the average principal amount of all Revolving Loans outstanding from time to time and (ii) on the undrawn amount, if any, of the Total Term Loan Commitment, and shall be payable monthly in arrears on the first day of each calendar month commencing July 1, 2016.

Section 2.07    Securitization.  The Loan Parties hereby acknowledge that the Lenders and their Affiliates may sell or securitize the Loans (a "Securitization") through the pledge of the Loans as collateral security for loans to the Lenders or their Affiliates or through the sale of the Loans or the issuance of direct or indirect interests in the Loans, which loans to the Lenders or their Affiliates or direct or indirect interests will be rated by Moody's, Standard & Poor's or one or more other rating agencies (the "Rating Agencies").  The Loan Parties shall cooperate with the Lenders and their Affiliates to effect the Securitization including, without limitation, by (a) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by the Lenders in connection with the Securitization, provided that (i) any such amendment or additional documentation does not impose material additional costs on the Loan Parties and (ii) any such amendment or additional documentation does not materially adversely affect the rights, or materially increase the obligations, of the Loan Parties under the Loan Documents or change or affect in a manner adverse to the Loan Parties the financial terms of the Loans and (b) providing such information

as may be reasonably requested by the Lenders in connection with the rating of the Loans or the Securitization.

Section 2.08    Taxes.  (a)  Any and all payments by any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on the net income of any Agent or any Lender (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")) by the jurisdiction in which such Person is organized or has its principal lending office (all such nonexcluded taxes, levies, imposts, deductions, charges withholdings and liabilities, collectively or individually, "Taxes").  If any Loan Party shall be required to deduct any Taxes from or in respect of any sum payable hereunder to any Agent or any Lender (or any Transferee), (i) the sum payable shall be increased by the amount (an "Additional Amount") necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.08) such Agent or such Lender (or such Transferee) shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, each Loan Party agrees to pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document ("Other Taxes").  Each Loan Party shall deliver to each Agent and each Lender official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)    The Loan Parties hereby jointly and severally indemnify and agree to hold each Agent and each Lender harmless from and against Taxes and Other Taxes (including, without limitation, Taxes and Other Taxes imposed on any amounts payable under this Section 2.08) paid by such Person, whether or not such Taxes or Other Taxes were correctly or legally asserted.  Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.

(d)    Each Lender (or Transferee) that is organized under the laws of a jurisdiction outside the United States (a "Non-U.S. Lender") agrees that it shall, no later than the Interim Facility Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section 13.07 hereof after the Interim Facility Effective Date, promptly after the date upon which such Lender becomes a party hereto) deliver to the Agents (or, in the case of an assignee of a Lender which (i) is an Affiliate of such Lender or a Related Fund of such Lender and (ii) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section 13.07(b) for recordation pursuant to Section 13.07(c), to the assigning Lender only, and in the case of a participant, to the Lender granting the participation only) one properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S.

Federal withholding tax and payments of interest hereunder.  In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender hereby represents to the Agents and the Borrower that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code), and such Non-U.S. Lender agrees that it shall promptly notify the Agents in the event any such representation is no longer accurate.  Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office").  In addition, such Non-U.S. Lender shall deliver such forms within 20 days after receipt of a written request therefor from any Agent, the assigning Lender or the Lender granting a participation, as applicable.  Notwithstanding any other provision of this Section 2.08, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.08(d) that such Non-U.S. Lender is not legally able to deliver.

(e)    The Loan Parties shall not be required to indemnify any Non-U.S. Lender, or pay any Additional Amounts to any Non-U.S. Lender, in respect of United States Federal withholding tax pursuant to this Section 2.08 to the extent that (i) the obligation to withhold amounts with respect to United States Federal withholding tax existed on the date such Non-U.S. Lender became a party to this Agreement (or, in the case of a Transferee that is a participation holder, on the date such participation holder became a Transferee hereunder) or, with respect to payments to a New Lending Office, the date such Non-U.S. Lender designated such New Lending Office with respect to a Loan; provided, however, that this clause (i) shall not apply to the extent the indemnity payment or Additional Amounts any Transferee, or Lender (or Transferee) through a New Lending Office, would be entitled to receive (without regard to this clause (i)) do not exceed the indemnity payment or Additional Amounts that the Person making the assignment, participation or transfer to such Transferee, or Lender (or Transferee) making the designation of such New Lending Office, would have been entitled to receive in the absence of such assignment, participation, transfer or designation, or (ii) the obligation to pay such Additional Amounts would not have arisen but for a failure by such Non-U.S. Lender to comply with the provisions of clause (d) above.

(f)    Any Agent or any Lender (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.08 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such Agent or such Lender (or Transferee) to disclose any information such Agent or such Lender (or Transferee) deems confidential and would not, in the sole determination of such Agent or such Lender (or Transferee), be otherwise disadvantageous to such Agent or such Lender (or Transferee).

(g)    The obligations of the Loan Parties under this Section 2.08 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.09    LIBOR Option.  In lieu of having interest charged at the rate based upon the Reference Rate, the Borrower shall have the option (the "LIBOR Option") to have interest on all or a portion of the Loans be charged at a rate of interest based upon the LIBOR Rate.  Interest on LIBOR Rate Loans shall be payable in accordance with Section 2.04(d).  On the last day of each applicable Interest Period, unless the Borrower properly have exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loans automatically shall convert to the rate of interest then applicable to Reference Rate Loans of the same type hereunder.  At any time that a Default or an Event of Default has occurred and is continuing, the Borrower no longer shall have the option to request that any portion of the Loans bear interest at the LIBOR Rate and the Administrative Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans to the rate of interest then applicable to Reference Rate Loans of the same type hereunder.

Section 2.10    Exercise of LIBOR Option.

(a)    The Borrower may, at any time and from time to time, so long as no Default or Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying the Administrative Agent prior to 11:00 a.m. (New York City time) at least 3 Business Days prior to (i) the commencement of the proposed Interest Period or (ii) in the case of the conversion of a LIBOR Rate Loan into a Reference Rate Loan, the last day of the then current Interest Period (the "LIBOR Deadline").  Notice of the Borrower's election of the LIBOR Option for a permitted portion of the Loans and an Interest Period pursuant to this subsection (a) shall be made by delivery to the Administrative Agent of a LIBOR Notice received by the Administrative Agent before the LIBOR Deadline, or by telephonic notice received by the Administrative Agent before the LIBOR Deadline (to be confirmed by delivery to the Administrative Agent of a LIBOR Notice received by the Administrative Agent prior to 5:00 p.m. (New York City time) on the same day).  Promptly upon its receipt of each such LIBOR Notice, the Administrative Agent shall provide a copy thereof to each of the Lenders. Each LIBOR Notice shall be irrevocable and binding on the Borrower.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower (i) shall have not more than four LIBOR Rate Loans in effect at any given time, and (ii) only may exercise the LIBOR Option for LIBOR Rate Loans of at least $100,000 and integral multiples of $50,000 in excess thereof.

(c)    The Borrower may prepay LIBOR Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any mandatory prepayment pursuant to Section 2.05(c) or any application of payments or proceeds of Collateral in accordance with Section 5.04(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrower shall indemnify, defend, and hold the Agents and the Lenders and their participants harmless against any and all Funding Losses in accordance with Section 2.11.

36

Section 2.11    Funding Losses.  In connection with each LIBOR Rate Loan, the Borrower shall indemnify, defend, and hold the Agents and the Lenders harmless against any loss, cost, or expense incurred by any Agent or any Lender as a result of (a) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of a Default or an Event of Default), (b) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto (including as a result of a Default or an Event of Default), or (c) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "Funding Losses").  Funding Losses shall, with respect to any Agent or any Lender, be deemed to equal the amount reasonably determined by such Agent or such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), minus (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Agent or such Lender would be offered were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market.  A certificate of an Agent or a Lender delivered to the Borrower setting forth any amount or amounts that such Agent or such Lender is entitled to receive pursuant to this Section 2.11 shall be conclusive absent manifest error.

Section 2.12    Changes in Law; Impracticability or Illegality.

(a)    The LIBOR Rate may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate.  In any such event, the affected Lender shall give the Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (ii) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under Section 2.11).

(b)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to the Borrower and the Administrative Agent, and

the Administrative Agent promptly shall transmit the notice to each other Lender and (i) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Reference Rate Loans of the same type hereunder, and (ii) the Borrower shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

Section 2.13    No Requirement to Match Fund.    Anything to the contrary contained herein notwithstanding, neither any Agent nor any Lender, nor any of their participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of this Article II shall apply as if each Lender or its participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

# ARTICLE III

# [INTENTIONALLY OMITTED.]

# ARTICLE IV

# SECURITY AND ADMINISTRATIVE PRIORITY

Section 4.01    Collateral; Grant of Lien and Security Interest.

(a)    As security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties hereby, as of the Interim Bankruptcy Court Order Entry Date, assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the Collateral Agent, for the benefit of the Agents and the Lenders, a security interest in and to, and Liens on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of such Loan Party, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the Equity Interests of each Subsidiary of such Loan Party, all of the Equity Interests of all other Persons directly owned by such Loan Party, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this Section 4.01(a) being hereafter collectively referred to as the "Collateral").

(b)    Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as the case may be, the Liens and security interests in favor of the Collateral Agent

referred to in Section 4.01(a) shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than Permitted Priority Liens. Such Liens and security interests and their priority shall, if and to the extent required, be reflected in the Register of Mortgages and Charges of the Parent within one Business Day of their creation and remain in effect until the Total Revolving Credit Commitment shall have been terminated and all Obligations shall have been repaid in cash in full.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted in this Section 4.01(a) and in each other Loan Document and by the Bankruptcy Court Orders shall be subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", and (ii) no Person entitled to such Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

Section 4.02    Administrative Priority.  Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

Section 4.03    Grants, Rights and Remedies.  The Liens and security interests granted pursuant to Section 4.01 and the administrative priority granted pursuant to Section 4.02 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Bankruptcy Court Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agents and the Lenders hereunder and thereunder are cumulative.

Section 4.04    No Filings Required.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, and entry of the Interim Bankruptcy Court Order shall have occurred on or before the date of any Revolving Loan or the interim Term Loan and entry of the Final Bankruptcy Court Order shall have occurred on or before the date of any Term Loan in addition to the interim Term Loan.  The Collateral Agent shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document; provided, that the Collateral Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

Section 4.05    Survival.    The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the Bankruptcy Court Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.    Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" as set forth in Section 4.02, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agents and the Lenders against any Loan Party in respect of any Obligation;

(b)    the Liens in favor of the Agents and the Lenders set forth in Section 4.01 shall constitute valid and perfected first priority Liens and security interests to which other Liens and security interests may be subordinate and junior, subject only to Permitted Priority Liens, and which Liens and security interests shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the Liens in favor of the Agents and the Lenders set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Collateral Agent file financing statements, mortgages, certificates of title or otherwise perfect its Lien under applicable non-bankruptcy law.

Section 4.06    Further Assurances.    The Loan Parties shall take any other actions reasonably requested by the Agents and the Lenders from time to time to cause the attachment, perfection and first priority of, and the ability of the Agents and the Lenders to enforce, the security interest of the Agents and the Lenders in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing the Collateral Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Collateral Agent to enforce, the security interest of the Collateral Agent in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Collateral Agent to enforce, the security interest of the Collateral Agent in such Collateral, and (e) obtaining the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

# ARTICLE V

# FEES, PAYMENTS AND OTHER COMPENSATION

Section 5.01    Audit and Collateral Monitoring Fees.    The Loan Parties acknowledge that pursuant to Section 8.01(f), representatives of the Agents may visit any or all of the Loan Parties and/or conduct audits, inspections, appraisals, valuations and/or field examinations of any or all of the Loan Parties at any time and from time to time in a manner so as to not unduly disrupt the business of the Loan Parties and in any event so long as no Event of Default has occurred and is continuing, no more than once during each fiscal quarter.  The Loan Parties agree to pay (a) $1,500 per day per examiner plus the examiner's out-of-pocket costs and reasonable expenses incurred in connection with all such visits, audits, inspections, appraisals, valuations and field examinations and (b) the cost of all visits, audits, inspections, appraisals, valuations and field examinations conducted by a third party on behalf of the Agents.

Section 5.02    Payments; Computations and Statements.    (a)  The Borrower will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account.  All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day.  All payments shall be made by the Borrower without set-off, counterclaim, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement, provided that the Administrative Agent will cause to be distributed all interest and fees received from or for the account of the Borrower not less than once each month and in any event promptly after receipt thereof.  The Lenders and the Borrower hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any Loan Document.  Each of the Lenders and the Borrower agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Section 6.03 have been satisfied.  Any amount charged to the Loan Account of the Borrower shall be deemed a Revolving Loan hereunder made by the Revolving Loan Lenders to the Borrower, funded by the Administrative Agent on behalf of the Revolving Loan Lenders and subject to Section 2.02 of this Agreement.    The Lenders and the Borrower confirm that any charges which the Administrative Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to the Borrower and solely at the Administrative Agent's discretion, provided that the Administrative Agent shall from time to time upon the request of the Collateral Agent, charge the Loan Account of the Borrower with any amount due and payable under any Loan Document.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days

41

(including the first day but excluding the last day) occurring in the period for which such fees are payable.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    The Administrative Agent shall provide the Borrower, promptly after the end of each calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrower during such month, the amounts and dates of all Loans made to the Borrower during such month, the amounts and dates of all payments on account of the Loans to the Borrower during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrower during such month, and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations.  All entries on any such statement shall be presumed to be correct and, thirty (30) days after the same is sent, shall be final and conclusive absent manifest error.

Section 5.03    Sharing of Payments, Defaulting Lenders, Etc.

(a)    The Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrower to the Administrative Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Commitments (but only to the extent that such Defaulting Lender's Loan was funded by the other Lenders) or, if so directed by the Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loan was not funded by the other Lenders), retain the same to be re-advanced to the Borrower as if such Defaulting Lender had made such Loans to the Borrower.  Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.  This Section shall remain effective with respect to such Lender until (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (ii) the non-Defaulting Lenders, the Administrative Agent, and the Borrower shall have waived such Defaulting Lender's default in writing, or (iii) the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loan and pays to the Administrative Agent all amounts owing by such Defaulting Lender in respect thereof.  The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by the Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.  Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrower at their option, upon written notice from the Borrower to the Administrative Agent, to permanently replace the Defaulting Lender with one or more substitute Lenders (each, a "Replacement Lender"), and the Defaulting Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the

Defaulting Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 13.07(b).  Any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lenders' or the Borrower's rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

(b)    Except as provided in Section 2.02 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered).  The Borrower agree that any Lender so purchasing a participation from another Lender pursuant to this Section 5.03 may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

Section 5.04    Apportionment of Payments.  Subject to Section 2.02 hereof:

(a)    all payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof to the extent set forth in a written agreement among the Agents and the Lenders, and the audit and collateral monitoring fee provided for in Section 5.01) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b)    After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Required Lenders or the Collateral Agent shall, apply all payments in respect of any Obligations and all proceeds of the Collateral, subject to the provisions of this Agreement, (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) second, ratably to pay the Revolving Loan Obligations and the Term Loan Obligations in respect of any fees and indemnities then due and payable to the

Revolving Loan Lenders and the Term Loan Lenders until paid in full; (iii) <u>third</u>, ratably to pay interest then due and payable in respect of Collateral Agent Advances until paid in full; (iv) <u>fourth</u>, ratably to pay principal of the Collateral Agent Advances until paid in full; (v) <u>fifth</u>, ratably to pay interest then due and payable in respect of the Revolving Loans and the Term Loan until paid in full, (vi) <u>sixth</u>, ratably to pay principal of the Revolving Loans and Term Loan until paid in full; and (vii) <u>seventh</u>, to the ratable payment of all other Obligations then due and payable.

(c)     In each instance, so long as no Event of Default has occurred and is continuing, Section 5.04(b) shall not be deemed to apply to any payment by the Borrower specified by the Borrower to the Administrative Agent to be for the payment of Term Loan Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of the Term Loan in accordance with the terms and conditions of Section 2.05.

(d)     In the event of a direct conflict between the priority provisions of this Section 5.04 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 5.04 shall control and govern.

Section 5.05    <u>Increased Costs and Reduced Return</u>.  (a)  If any Lender or any Agent shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty or regulation, or any policy, guideline or directive of, or any change in, the interpretation or administration thereof by, any court, central bank or other administrative or Governmental Authority, or compliance by any Lender, any Agent or any Person controlling any such Agent or any such Lender with any directive of, or guideline from, any central bank or other Governmental Authority or the introduction of, or change in, any accounting principles applicable to any Lender, any Agent or any Person controlling any such Agent or any such Lender (in each case, whether or not having the force of law) (each a "<u>Change in Law</u>"), shall (i) subject such Agent, such Lender, or any Person controlling such Agent or such Lender to any tax, duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender, or change the basis of taxation of payments to such Agent, such Lender or any Person controlling such Agent or such Lender of any amounts payable hereunder (except for taxes on the overall net income of such Agent, such Lender or any Person controlling such Agent or such Lender), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Agent, such Lender or any Person controlling such Agent or such Lender or (iii) impose on such Agent, such Lender or any Person controlling such Agent, such Lender or any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Agent or such Lender of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Agent or such Lender hereunder, then, upon demand by such Agent or such Lender, the Borrower shall pay to such Agent or such Lender such Additional Amounts as will compensate such Agent or such Lender for such increased costs or reductions in amount.

(b)    If any Agent or any Lender shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Agent or such Lender or any Person controlling such Agent or such Lender, and such Agent or such Lender determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, any guaranty or participation with respect thereto, such Agent's, such Lender's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Agent's, such Lender's or such other controlling Person's capital to a level below that which such Agent, such Lender or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained, or any agreement to make Loans, or such Agent's, such Lender's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Agent's, such Lender's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Agent or such Lender, the Borrower shall pay to such Agent or such Lender from time to time such Additional Amounts as will compensate such Agent or such Lender for such cost of maintaining such increased capital or such reduction in the rate of return on such Agent's, such Lender's or such other controlling Person's capital.

(c)    All amounts payable under this Section 5.05 shall bear interest from the date that is ten (10) days after the date of demand by any Agent or any Lender until payment in full to such Agent or such Lender at the Reference Rate.  A certificate of such Agent or such Lender claiming compensation under this Section 5.05, specifying the event herein above described and the nature of such event shall be submitted by such Agent or such Lender to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Agent's or such Lender's reasons for invoking the provisions of this Section 5.05, and shall be final and conclusive absent manifest error.

## ARTICLE VI

## CONDITIONS TO LOANS

Section 6.01    Conditions Precedent to Interim Facility Effectiveness.    This Agreement shall become effective as of the Business Day (the "Interim Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Collateral Agent:

(a)    Interim Bankruptcy Court Order.  The Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court on or before June 16, 2016, and the Collateral Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent prior written consent of the Agents, the Required Lenders and the Borrower. The Interim Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agents and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, during the Interim Period, the Liens and security interests in favor of the Collateral Agent referred to in Section 4.01 hereof shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens.

45

(b)    Payment of Fees, Etc.  The Borrower shall have paid on or before the date of this Agreement all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 13.04.

(c)    Representations and Warranties; No Event of Default.  The following statements shall be true and correct:  (i) the representations and warranties contained in ARTICLE VII and in each other Loan Document, certificate or other writing delivered to any Agent or any Lender pursuant hereto or thereto on or prior to the Interim Facility Effective Date are true and correct on and as of the Interim Facility Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Interim Facility Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(d)    Legality.  The making of the initial Loans under the Interim Facility shall not contravene any law, rule or regulation applicable to any Agent or any Lender.

(e)    Delivery of Documents.  The Agents shall have received on or before the Interim Facility Effective Date the following, each in form and substance satisfactory to the Agents and, unless indicated otherwise, dated the Interim Facility Effective Date:

(i)    the Fee Letter, duly executed by each Borrower;

(ii)    the Pledge Agreement, duly executed by each Loan Party;

(iii)    the original stock certificates representing all of the common stock of each Loan Party's subsidiaries and all intercompany promissory notes of such Loan Parties, accompanied by undated stock and note powers executed in blank and other proper instruments of transfer;

(iv)    results of searches for any tax Lien and judgment Lien filed against any Loan Party, which results, except (1) for the Permitted Liens and (2) as otherwise agreed by the Agents, shall not show any such Liens;

(v)    a copy of the resolutions of the Board of Directors (or other competent body) of each Loan Party, certified as of the Interim Facility Effective Date by an Authorized Officer thereof, authorizing (A) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (B) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(vi)    in relation to the Parent (y) a copy the written consent of the holders of a majority of the Series B preferred shares of the Parent and (z) a certified copy of the Register of Mortgages and Charges of the Parent updated to reflect the grant of the security constituted by the Loan Documents to which the Parent is a party;

46

(vii)    a certificate of an Authorized Officer of each Loan Party, certifying the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers;

(viii)    a certificate of the appropriate official(s) of the state of organization and each state of foreign qualification of each Loan Party certifying as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such states;

(ix)    a copy of the Governing Documents of each Loan Party, together with all amendments thereto, certified as of the Interim Facility Effective Date by an Authorized Officer of such Loan Party (and, in relation to Kinja, a copy of the constitutional documents of Kinja including its articles of association and an up-to-date certified company extract (including a company extract in '.es3' file format);

(x)    (A) an opinion of Ropes & Gray LLP, counsel to the Loan Parties, as to such matters as the Collateral Agent may reasonably request, and (B) Oppenheim Law Firm, Hungarian counsel to the Agents, as to such matters as the Collateral Agent may reasonably request;

(xi)    a certificate of an Authorized Officer of each Loan Party, certifying as to the matters set forth in subsection (c) of this Section 6.01;

(xii)    copies of the Financial Statements and the financial projections described in Section 7.01(g) as of the Interim Facility Effective Date as true and correct by an Authorized Officer of the Borrower;

(xiii)    evidence of the insurance coverage required by Section 8.01(h)and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent may reasonably request, in each case, where requested by the Collateral Agent, with such endorsements as to the named insureds or loss payees thereunder as the Collateral Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' prior written notice to the Collateral Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as the Collateral Agent may request;

(xiv)    a copy of the Budget, together with a certificate of an Authorized Officer of the Borrower stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the Agents; and

(xv)    such other agreements, instruments, approvals, opinions and other documents, each satisfactory to the Collateral Agent in form and substance, as the Collateral Agent may reasonably request.

(f)  Material Adverse Effect.  The Agents shall have determined, in their reasonable judgment, that no event or development shall have occurred since April 30, 2016 (other than the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code, and events set forth in Schedule 6.01(f)) which could have a Material Adverse Effect.

(g)  Priority.  The Collateral Agent shall be satisfied that it has been granted, and holds for the benefit of the Agents and the Lenders, a perfected, first priority Lien on, and security interest in, all of the Collateral owned by the Parent and the Borrower (other than the security interests in the Collateral under the Hungarian Security Documents), subject only to Permitted Priority Liens.

(h)  Approvals.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans shall have been obtained and shall be in full force and effect.

(i)  First Day Motions and Orders.  (i) the Agents shall have received on or before June 13, 2016, copies of the first day motions to be filed by the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance satisfactory to the Agents and (ii) orders of the Bankruptcy Court approving such motions shall have been entered by the Bankruptcy Court on or before June 16, 2016.

(j)  Stalking Horse Bid.  On June 13, 2016 the Loan Parties shall file a motion with the Bankruptcy Court to approve bid procedures and establish the date of an auction to sell all or substantially all of the assets of the Loan Parties to ZDGM LLC for a base purchase price not less than $90 million pursuant to the ZDGM APA (with ZDGM LLC's obligations thereunder being guaranteed by Ziff Davis, LLC), which motion and purchase agreement shall be in form and substance acceptable to the Agents and the Required Lenders.

(k)  Litigation.  There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority and which is not stayed by the automatic stay which relates to the Loans or which, in the opinion of the Agents, could reasonably be expected to have a Material Adverse Effect.

(l)  Commencement of Chapter 11 Cases.  The Loan Parties shall have commenced the Chapter 11 Cases and no trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $250,000.

Section 6.02  Conditions Precedent to Final Facility Effectiveness.  The obligation of any Agent or any Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents:

(a)  Final Bankruptcy Court Order, Etc.  The Final Bankruptcy Court Order shall have been signed and entered by the Bankruptcy Court on a date that is within thirty (30)

48

days following the date of the entry of the Interim Facility Bankruptcy Court Order, and the Agents shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the Agents, the Required Lenders and the Borrower. The Final Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agents and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, on the Final Facility Effective Date, the Liens and security interests in favor of the Collateral Agent referred to in Section 4.01 shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens.

(b)     Payment of Fees, Etc.   The Borrower shall have paid on or before such date all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 13.04.

(c)     Representations and Warranties; No Event of Default.   The following statements shall be true and correct:   (i) the representations and warranties contained in ARTICLE VII and in each other Loan Document, certificate or other writing delivered to the Agents or the Lenders pursuant hereto or thereto on or prior to the Final Facility Effective Date are true and correct on and as of the Final Facility Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Final Facility Effective Date or would result from the making of Loans on such date.

(d)     Liens; Priority.   The Collateral Agent shall be satisfied that it has been granted, and still continues to hold, as the case may be, for the benefit of the Agents and the Lenders, a perfected, first priority Lien on and security interest in all of the Collateral, subject only to Permitted Priority Liens.

(e)     Budget.   The Agents shall have received an updated Budget in accordance with Section 8.01(a)(vi), together with a certificate of an Authorized Officer of the Borrower dated as of the Final Facility Effective Date stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the Agents.

(f)     Restructuring Officer.   The Loan Parties shall have retained, at the Loan Parties' sole cost and expense, a chief restructuring officer, whose identity and terms of retention shall be reasonably acceptable to Agent and the Lenders.   For the avoidance of doubt, the retention of William D. Holden as chief restructuring officer under the terms of the engagement letter dated June 6, 2016 is acceptable to Agent and the Lenders.

Section 6.03   Conditions Precedent to All Loans.  The obligation of any Agent or any Lender to make any Loan after the Interim Facility Effective Date is subject to the fulfillment, in a manner satisfactory to the Agents, of each of the following conditions precedent:

49

(a)     Payment of Fees, Etc.   The Borrower shall have paid all fees, costs, expenses and taxes then payable by the Borrower pursuant to this Agreement and the other Loan Documents, including, without limitation, Section 2.06 and Section 13.04 hereof.

(b)     Representations and Warranties; No Event of Default.   The following statements shall be true and correct, and the submission by the Borrower to the Administrative Agent of a Notice of Borrowing with respect to each such Loan, and the Borrower's acceptance of the proceeds of such Loan, shall each be deemed to be a representation and warranty by each Loan Party on the date of such Loan that: (i) the representations and warranties contained in ARTICLE VII and in each other Loan Document, certificate or other writing delivered to any Agent or any Lender pursuant hereto or thereto on or prior to the date of such Loan are true and correct on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), (ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date and (iii) the conditions set forth in this Section 6.03 have been satisfied as of the date of such request.

(c)     Legality.   The making of such Loan shall not contravene any law, rule or regulation applicable to any Agent or any Lender.

(d)     Notices.   The Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.02 hereof.

Section 6.04    Conditions Subsequent to Effectiveness.   As an accommodation to the Loan Parties, the Agents and the Lenders have agreed to execute this Agreement and to make the Loans on the Interim Facility Effective Date notwithstanding the failure by the Loan Parties to satisfy the conditions set forth below on or before the Interim Facility Effective Date.   In consideration of such accommodation, the Loan Parties agree that, in addition to all other terms, conditions and provisions set forth in this Agreement and the other Loan Documents, including, without limitation, those conditions set forth in Sections 6.01 and 6.02, the Loan Parties shall satisfy each of the conditions subsequent set forth below on or before the date applicable thereto (it being understood that (i) the failure by the Loan Parties to perform or cause to be performed any such condition subsequent on or before the date applicable thereto shall constitute an Event of Default and (ii) to the extent that the existence of any such condition subsequent would otherwise cause any representation, warranty or covenant in this Agreement or any other Loan Document to be breached, the Required Lenders hereby waive such breach for the period from the Interim Facility Effective Date until the date on which such condition subsequent is required to be fulfilled pursuant to this Section 6.04):

(a)     not later than the date that is 10 days after the Interim Facility Effective Date (or such later date as agreed to in writing by the Collateral Agent in its sole discretion), the Collateral Agent shall have received executed copies of the Hungarian Guaranty and Hungarian Security Documents, and the Loan Parties shall take all actions within their control to establish the perfection of the Liens granted under the Hungarian Security Documents in accordance with the terms thereof;

50

(b)    not later than the date that is 30 days after the Interim Facility Effective Date (or such later date as agreed to in writing by the Collateral Agent in its sole discretion), the Collateral Agent shall have received a Control Agreement for each Cash Management Account located in the United States; and

(c)    use commercially reasonable efforts to execute and deliver to the Collateral Agent on or before the date that is 30 days after the Interim Facility Effective Date (i) a domain control agreement executed by MarkMonitor Inc. with respect to each of the domain names registered in the name of Kinja and (ii) an IT data access agreement with Datagram Incorporated, in each case in form and substance satisfactory to the Collateral Agent,.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

Section 7.01    <u>Representations and Warranties</u>.    Each Loan Party hereby represents and warrants to the Agents and the Lenders as follows:

(a)    <u>Organization, Good Standing, Etc.</u>    Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the entry and the terms of the Bankruptcy Court Orders, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrower, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary except, in the case of clause (iii), where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    <u>Authorization, Etc.</u>    The execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene any of its Governing Documents or any applicable material Requirement of Law or any material Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties (other than conflicts, breaches and defaults, the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases).

(c)    <u>Governmental Approvals</u>.    Except for the entry of the Bankruptcy Court Orders, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party.

(d)    Enforceability of Loan Documents.  Subject to the entry of the Bankruptcy Court Orders, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws and (ii) the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Subsidiaries that are not incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.

(e)    Capitalization; Subsidiaries.

(i)    Schedule 7.01(e) is a complete and correct description of the name, jurisdiction of incorporation and ownership of the outstanding Equity Interests of such Subsidiaries of the Parent in existence on the date hereof.  All of the issued and outstanding shares of Equity Interests of such Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  Except as indicated on Schedule 7.01(e), all such Equity Interests are owned by the Parent or one or more of its wholly-owned Subsidiaries, free and clear of all Liens.  There are no outstanding debt or equity securities of the Parent or any of its Subsidiaries and no outstanding obligations of the Parent or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Parent or any of its Subsidiaries, or other obligations of any Subsidiary to issue, directly or indirectly, any shares of Equity Interests of any Subsidiary of the Parent.

(f)    Litigation; Commercial Tort Claims.  Except for pre-petition litigation that is stayed by 11 U.S.C. § 362 or as otherwise set forth in Schedule 7.01(f), (i) there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party before any court or other Governmental Authority or any arbitrator that (A) if adversely determined, could have a Material Adverse Effect or (B) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby and (ii) as of the Interim Facility Effective Date, none of the Loan Parties holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(g)    Financial Condition.

(i)    The Financial Statements, copies of which have been delivered to each Agent and each Lender, fairly present in all material respects the consolidated financial condition of the Loan Parties as at the respective dates thereof and the consolidated results of operations of the Loan Parties for the fiscal periods ended on such respective dates, all in accordance with GAAP, and since April 30, 2016 no event or development has occurred that has had or could have a Material Adverse Effect (other than the commencement of the Chapter 11 Cases and events that typically result from the commencement of the Chapter 11 Cases).

(ii)    The Budget, when delivered, and as so updated, shall be believed by the Loan Parties at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Loan Parties, and shall have been based on assumptions

believed by the Loan Parties to be reasonable at the time made and upon the best information then reasonably available to the Loan Parties, and the Loan Parties shall not be aware of any facts or information that would lead it to believe that such Budget, as so updated, is incorrect or misleading in any material respect.

(h)    Compliance with Law, Etc.  No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any domestic or foreign material Requirement of Law, including, without limitation, any material statute, legislation or treaty, any guideline, directive, rule, standard, requirement, policy, order, judgment, injunction, award or decree of any Governmental Authority, in each case, applicable to it or any of its property or assets, or (iii) any material term of any Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties except, in each case referred to in clause (iii) above, to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and no Default or Event of Default has occurred and is continuing.

(i)    ERISA.  Except as required by Section 4980B of the Internal Revenue Code or as listed on Schedule 7.01(i), no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or coverage after a participant's termination of employment.

(j)    Taxes, Etc.  All Federal, state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k)    Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(l)    Nature of Business.

(i)    No Loan Party is engaged in any business other than producing digital media and related technology and any business related or ancillary thereto, and in the case of the Parent, as set forth in clause (ii) below.

(ii)    The Parent does not have any liabilities (other than (A) under the Existing SVB Credit Facility and the Prepetition Junior Credit Facility and (B) immaterial liabilities), own any assets (other than (A) the Equity Interests in the Borrower and Kinja, (B) the

promissory note in the aggregate principal amount of $250,000 dated October 7, 2015 issued to it by the Borrower and (C) other immaterial assets) or engage in any operations or business.

(m)    Adverse Agreements, Etc.    No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)    Permits, Etc.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect.

(o)    Properties.    (i)  Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(ii)    Schedule 7.01(o) sets forth a complete and accurate list, as of the Interim Facility Effective Date, of the location, by county and street address, of all real property owned or leased by each Loan Party.  As of the Interim Facility Effective Date, each Loan Party has valid leasehold interests in the Leases described on Schedule 7.01(o) to which it is a party.

(p)    Full Disclosure.    Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could result in a Material Adverse Effect.  None of the other reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Agents in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (taken as a whole), in the light of the circumstances under which it was made, not misleading; provided that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time prepared.  There is no contingent liability or fact that may have a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

(q)    [Intentionally omitted].

54

(r)    Insurance.  Each Loan Party keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law or as may be reasonably required by the Collateral Agent (including, without limitation, against larceny, embezzlement or other criminal misappropriation).  Schedule 7.01(r) sets forth a list of all insurance maintained by each Loan Party on the Interim Facility Effective Date.

(s)    Use of Proceeds.  The proceeds of the Loans shall be used in accordance with the Budget to (i) in the case of any Loans made prior to the Final Facility Effective Date, (A) pay fees and expenses in connection with the transactions contemplated hereby, (B) fund working capital of the Loan Parties and for other general corporate purposes and (C) repay the Indebtedness under the Existing SVB Credit Facility, including cash collateralize letters of credit and (ii) in the case of any Loans made on and after the Final Bankruptcy Court Order Date, (A) pay fees and expenses in connection with the transactions contemplated hereby and (B) fund working capital of the Loan Parties and for other general corporate purposes.

(t)    Location of Bank Accounts.  Schedule 7.01(t) sets forth a complete and accurate list as of the Interim Facility Effective Date of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Loan Party, together with a description thereof (i.e., the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

(u)    Intellectual Property.  Except as set forth on Schedule 7.01(u), each Loan Party owns or licenses or otherwise has the right to use all licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not have a Material Adverse Effect.  Set forth on Schedule 7.01(u) is a complete and accurate list as of the Interim Facility Effective Date of all such material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights of each Loan Party.  No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not have, individually or in the aggregate, a Material Adverse Effect.  To the best knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code is pending or proposed, which, individually or in the aggregate, could have a Material Adverse Effect.

(v)    [Intentionally omitted].

(w)    <u>Investment Company Act</u>.  None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)    <u>Employee and Labor Matters</u>.    There is (i) no unfair labor practice complaint pending or, to the best knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party which arises out of or under any collective bargaining agreement or (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or, to the best knowledge of any Loan Party, threatened against any Loan Party.  No Loan Party or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("<u>WARN</u>") or similar state law which remains unpaid or unsatisfied.  Since January 1, 2013, the hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements in any material respect.

(y)    [Intentionally omitted].

(z)    [Intentionally omitted].

(aa)    <u>Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN</u>.  Schedule 7.01(aa) sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Loan Party, (ii) the jurisdiction of organization of each Loan Party, (iii) the organizational identification number of each Loan Party (or indicates that such Loan Party has no organizational identification number), (iv) each place of business of each Loan Party, (v) the chief executive office of each Loan Party and (vi) the federal employer identification number of each Loan Party.

(bb)    [Intentionally omitted].

(cc)    <u>Administrative Priority; Lien Priority</u>.

(i)    After the Interim Bankruptcy Court Order Entry Date or the Final Bankruptcy Court Order Entry Date, as the case may be, the Obligations of the Loan Parties will constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in the Agreed Administrative Expense Priorities.

56

(ii)      Upon entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, the Liens and security interests of the Collateral Agent on the Collateral referred to in Section 4.01 hereof shall be valid and perfected first priority Liens, subject only to Permitted Priority Liens.

(iii)      On or after the Interim Bankruptcy Court Order Entry Date and prior to the Final Bankruptcy Court Order Entry Date, the Interim Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal, absent the written consent of the Collateral Agent, the Administrative Agent, the Required Lenders and the Borrower, and after the Final Bankruptcy Court Order Entry Date, the Final Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Agents, the Required Lenders and the Borrower.

(dd)      <u>Appointment of Trustee or Examiner; Liquidation</u>.  No order has been entered in any Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) to convert any Chapter 11 Case to a Chapter 7 case or to dismiss any Chapter 11 Case.

(ee)      <u>Schedules</u>.  All of the information which is required to be scheduled to this Agreement is set forth on the Schedules attached hereto, is correct and accurate and does not omit to state any information material thereto.

(ff)      <u>Anti-Terrorism Laws</u>.

(i)      <u>General</u>.  None of the Loan Parties nor or any Affiliate of any Loan Party, is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(ii)      <u>Executive Order No. 13224</u>.  None of the Loan Parties, nor or any Affiliate of any Loan Party, or their respective agents acting or benefiting in any capacity in connection with the Loans, Letters of Credit or other transactions hereunder, is any of the following (each, a "<u>Blocked Person</u>"):

(A)      a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(B)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(C)      a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(D)      a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(E)    a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(F)    a Person or entity who is affiliated or associated with a person or  entity listed above.

(gg)    No Loan Party or to the knowledge of any Loan Party, any of its agents acting in any capacity in connection with the Loans or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

## ARTICLE VIII

## COVENANTS OF THE LOAN PARTIES

Section 8.01    Affirmative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)    Reporting Requirements.  Furnish to each Agent and each Lender:

(i)    as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of the Loan Parties commencing with the first fiscal quarter of the Loan Parties ending after the Interim Facility Effective Date, consolidated and consolidating balance sheets, consolidated and consolidating statements of operations and retained earnings and consolidated and consolidating statements of cash flows of the Loan Parties as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Loan Parties as of the end of such quarter and the results of operations and cash flows of the Loan Parties for such quarter, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Loan Parties furnished to the Agents and the Lenders, subject to normal year-end adjustments;

(ii)    as soon as available, and in any event within ninety (90) days after the end of each Fiscal Year of the Loan Parties commencing with the Fiscal Year ending December 31, 2016, consolidated and consolidating balance sheets, consolidated and consolidating statements of operations and retained earnings and consolidated and consolidating statements of cash flows of the Loan Parties as at the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the immediately preceding Fiscal

58

Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an unqualified opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Parent and satisfactory to the Agents (which opinion shall be without (A) a "going concern" or like qualification or exception, (B) any qualification or exception as to the scope of such audit, or (C) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the Budget), together with a written statement of such accountants (A) to the effect that, in making the examination necessary for their certification of such financial statements, they have not obtained any knowledge of the existence of an Event of Default or a Default and (B) if such accountants shall have obtained any knowledge of the existence of an Event of Default or such Default, describing the nature thereof;

(iii)    as soon as available, and in any event for each fiscal month by no later than the last day of each subsequent fiscal month of the Loan Parties (unless such day is not a Business Day in which case by no later than the immediately succeeding Business Day) commencing with the first fiscal month of the Loan Parties ending after the Interim Facility Effective Date, internally prepared consolidated and consolidating balance sheets, consolidated and consolidating statements of operations and retained earnings and consolidated and consolidating statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Loan Parties for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to normal year-end adjustments;

(iv)    simultaneously with the delivery of the financial statements of the Loan Parties required by clauses (i), (ii) and (iii) of this Section 8.01(a), a certificate of an Authorized Officer of the Parent (A) stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Loan Parties during the period covered by such financial statements with a view to determining whether the Loan Parties were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the existence during such period of an Event of Default or Default or, if an Event of Default or Default existed, describing the nature and period of existence thereof and the action which the Loan Parties propose to take or have taken with respect thereto and (B) attaching a schedule showing the calculations in support of such financial statements;

(v)    as soon as available, and in any event for each fiscal month by no later than the last day of each subsequent fiscal month of the Loan Parties (unless such day is not a Business Day in which case by no later than the immediately succeeding Business Day) commencing with the first fiscal month of the Loan Parties ending after the Interim Facility Effective Date, reports in form and detail satisfactory to the Agents and certified by an

Authorized Officer of the Borrower as being accurate and complete (A) listing all Accounts Receivable of the Loan Parties as of such day, which shall include the amount and age of each such Account Receivable, showing separately those which are more than 30, 60, 90 and 120 days old and such other information as any Agent may request and (B) listing all accounts payable of the Loan Parties as of each such day which shall include the amount and age of each such account payable, and such other information as any Agent may request;

(vi)     on or about the twentieth day (20th) of each month, a Budget for the next succeeding 13-week period, prepared in form and substance satisfactory to the Agent and the Required Lenders, which Budget, when delivered and as so updated, shall be (1) prepared on a basis consistent with the Budget delivered to the Agents on or prior to the Interim Facility Effective Date, (2) believed by the Loan Parties at the time furnished to be reasonable, (3) prepared on a reasonable basis and in good faith, and (4) based on assumptions believed by the Loan Parties to be reasonable at the time made and upon the best information then reasonably available to the Loan Parties, and shall be accompanied by a certificate of an Authorized Officer of the Borrower certifying as to the matters set forth in subclauses (1), (2), (3) and (4) above;

(vii)     as soon as available and in any event within four (4) Business Days after the end of each week commencing with the first week ending after the Interim Facility Effective Date, a reconciliation, in form and substance acceptable to the Agents and the Required Lenders, of the actual cash collections and disbursements of the Loan Parties for such week to the budgeted line item amounts set forth in the Budget for such week;

(viii)     promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority;

(ix)     as soon as possible, and in any event within three (3) days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could have a Material Adverse Effect, the written statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(x)     (A) as soon as possible and in any event within ten (10) days after any Loan Party or any ERISA Affiliate thereof knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred, (2) any other Termination Event with respect to any Employee Plan has occurred, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of the Borrower setting forth the details of such occurrence and the action, if any, which such Loan Party or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in any event within three (3) days after receipt thereof by any Loan Party or any ERISA Affiliate thereof from the PBGC, copies of each notice received by any Loan Party or any ERISA Affiliate thereof of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan, (C)

promptly and in any event within ten (10) days after the filing thereof with the Internal Revenue Service if requested by any Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Employee Plan and Multiemployer Plan, (D) promptly and in any event within ten (10) days after any Loan Party or any ERISA Affiliate thereof knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within 3 days after receipt thereof by any Loan Party or any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Loan Party or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within ten (10) days after any Loan Party or any ERISA Affiliate thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party or such ERISA Affiliate thereof;

(xi)    promptly after the commencement thereof but in any event not later than five (5) days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could have a Material Adverse Effect;

(xii)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xiii)    promptly after the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by any Loan Party in the Chapter 11 Cases, which papers and documents shall also be given or served on the each Agent's counsel;

(xiv)    promptly after the sending thereof, copies of all written reports given by any Loan Party to any official or unofficial creditors' committee in the Chapter 11 Cases, other than any such reports subject to privilege, provided that such Person may redact any confidential information contained in any such report if it provides a summary of the nature of the information redacted to each Agent;

(xv)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time may reasonably request; and

(xvi)    Kinja shall promptly notify the Agents if Kinja is qualified as a Strategically Important Business Organization pursuant to applicable Hungarian law.

(b)    Additional Guaranties and Collateral Security.  Cause:

(i)    each Subsidiary of any Loan Party not a party to the Chapter 11 Cases on the Interim Facility Effective Date, but which later becomes a party to the Chapter 11 Cases, to, at the request of the Collateral Agent, execute and deliver to the Collateral Agent

61

promptly (A) a Guaranty guaranteeing the Obligations, (B) a security agreement, (C) if such Subsidiary has any Subsidiaries, a pledge agreement together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary, (2) undated stock powers executed in blank with signature guaranteed, and (3) such opinion of counsel and such approving certificate of such Subsidiary as the Collateral Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares and (D) such other agreements, instruments, approvals, legal opinions or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such security agreement, pledge agreement or mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)    each owner of the Equity Interests of any such Subsidiary to, at the request of the Collateral Agent, execute and deliver promptly a pledge agreement, together with (A) certificates evidencing all of the Equity Interests of such Subsidiary, (B) undated stock powers or other appropriate instruments of assignment executed in blank with signature guaranteed, (C) such opinion of counsel and such approving certificate of such Subsidiary as the Collateral Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares and (D) such other agreements, instruments, approvals, legal opinions or other documents requested by the Collateral Agent.

(c)    <u>Compliance with Laws, Etc.</u>  Comply, and cause each of its Subsidiaries to comply, with all Requirements of Law (including, without limitation, all Environmental Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), such compliance to include, without limitation, (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all lawful claims which if unpaid might become a Lien or charge upon any of its properties, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP or to the extent that such compliance or payment or any enforcement action is stayed as a result of the Chapter 11 Cases.

(d)    <u>Preservation of Existence, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(e)    <u>Keeping of Records and Books of Account</u>.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)    <u>Inspection Rights</u>.  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal

business hours, at the expense of the Loan Parties, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.   In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this Section 8.01(f).

(g)     Maintenance of Properties, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except any non-compliance resulting in a default, the enforcement of which is stayed by the Chapter 11 Cases.

(h)     Maintenance of Insurance.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations with a Best Rating of at least AX unless otherwise agreed to by the Collateral Agent (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent.  All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as its interests may appear, in case of loss, under a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than thirty (30) days' prior written notice to the Collateral Agent of the exercise of any right of cancellation.  If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Loan Parties' expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)      Obtaining of Permits, Etc.  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business.

(j)      [Intentionally omitted].

(k)      Further Assurances.  Subject to the terms of the Bankruptcy Court Orders, take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Agent and each Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document.  In furtherance of the foregoing, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court Orders, each Loan Party (A) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (B) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.  The assurances contemplated by this Section 8.01(k) shall be given under applicable non-bankruptcy law (to the extent not inconsistent with the Bankruptcy Code and the Bankruptcy Court Orders) as well as the Bankruptcy Code, it being the intention of the parties that the Collateral Agent may request assurances under applicable non-bankruptcy law, and such request shall be complied with (if otherwise made in good faith by the Collateral Agent) whether or not any of the Bankruptcy Court Orders are in force and whether or not dismissal of the Chapter 11 Cases or any other action by the Bankruptcy Court is imminent, likely or threatened.

(l)      Change in Collateral; Collateral Records.  (i)  Give the Collateral Agent not less than 30 days' prior written notice of any change in the location of any Collateral, other than to locations set forth on Schedule 7.01(bb) and with respect to which the Collateral Agent has filed financing statements and otherwise fully perfected its Liens thereon and (ii) advise the Collateral Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or the Lien granted thereon.

(m)      Fiscal Year.  Cause the Fiscal Year of the Loan Parties Subsidiaries to end on December 31st of each calendar year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(n)    <u>Use of Proceeds</u>.    Use the proceeds of the Loans strictly in accordance with the expenditure line items in the Budget and subject to the terms, conditions and limitations of this Financing Agreement and the Bankruptcy Court Orders.

(o)    <u>Restructuring Officer</u>.    Retain at all times, at the Loan Parties' sole cost and expense, a chief restructuring officer, in accordance with the terms of a retention agreement, whose identity and terms of retention shall be reasonably acceptable to Agent and the Lenders.

Section 8.02    <u>Negative Covenants</u>.    So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)    <u>Liens, Etc.</u>    Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any Requirement of Law of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable) with recourse to it or any of its Subsidiaries or assign or otherwise transfer, or permit any of its Subsidiaries to assign or otherwise transfer, any account or other right to receive income; other than, as to all of the above, Permitted Liens.

(b)    <u>Indebtedness</u>.    Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)    <u>Fundamental Changes; Dispositions</u>.    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; <u>provided</u>, <u>however</u>, that

(i)    any wholly-owned Subsidiary of any Loan Party (other than a Borrower) may be merged into such Loan Party or another wholly-owned Subsidiary of such Loan Party, or may consolidate with another wholly-owned Subsidiary of such Loan Party, so long as (A) no other provision of this Agreement would be violated thereby, (B) such Loan Party gives the Agents at least 30 days' prior written notice of such merger or consolidation, (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Lenders' rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such

65

merger or consolidation and (E) the surviving Subsidiary, if any, is joined as a Loan Party hereunder and is a party to a Guaranty and a security agreement and the Equity Interests of which Subsidiary is the subject of a pledge agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger or consolidation;

(ii)    any Loan Party and its Subsidiaries may sell or otherwise dispose of other property or assets for cash in an aggregate amount not less than the fair market value of such property or assets, provided that the Net Cash Proceeds of such Dispositions (1) do not exceed $10,000 in the aggregate and (2) are paid to the Administrative Agent for the benefit of the Agents and the Lenders pursuant to the terms of Section 2.05(c)(iv); and

(iii)    the sale of the Loan Parties' assets under the ZDGM APA shall not constitute an Event of Default so long as the proceeds of such sale result in the payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon the consummation of such sale.

(d)    Change in Nature of Business.

(i)    Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 7.01(l).

(ii)    Permit the Parent to have any liabilities (other than (A) under the Existing SVB Credit Facility and the Prepetition Junior Credit Facility and (B) immaterial liabilities), own any assets (other than (A) the Equity Interests in the Borrower and Kinja , (B) the promissory note in the aggregate principal amount of $250,000 dated October 7, 2015 issued to it by the Borrower and (C) other immaterial assets) or engage in any operations or business.

(e)    Loans, Advances, Investments, Etc.  Make or commit or agree to make any loan, advance guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Equity Interests, bonds, notes, debentures or other securities of, or make or commit or agree to make any other investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or permit any of its Subsidiaries to do any of the foregoing, except for:  (i) investments existing on the date hereof, as set forth on Schedule 8.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof, (ii) loans and advances between the Loan Parties made in the ordinary course of business and (iii) Permitted Investments.

(f)    [Intentionally omitted].

(g)    Capital Expenditures.  Make or commit or agree to make, or permit any of its Subsidiaries to make or commit or agree to make, any Capital Expenditure (by purchase or Capitalized Lease) that would cause the aggregate amount of all Capital Expenditures made by the Loan Parties and their Subsidiaries to exceed $500,000 in any Fiscal Year.

(h)    Restricted Payments.  (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Equity Interest of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interest of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (iv) return any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such, (v) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party; or (vi) make any payment to any Subsidiary or any Affiliate that is not a debtor-in-possession in the Chapter 11 Cases.

(i)    Federal Reserve Regulations.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)    Transactions with Affiliates.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, (ii) transactions with another Loan Party and (iii) transactions permitted by Section 8.02(e).

(k)    Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.

(i)    Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any respect,

(ii)    except for the Obligations, make any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund

payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due), or refund, refinance, replace or exchange any other Indebtedness for any such Indebtedness (except to the extent such Indebtedness is otherwise expressly permitted by the definition of "Permitted Indebtedness"), make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Subordinated Indebtedness in violation of the subordination provisions thereof or any subordination agreement with respect thereto, or make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing;

(iii)    amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN, except that a Loan Party may (A) change its name, jurisdiction of organization, organizational identification number or FEIN in connection with a transaction permitted by Section 8.02(c) and (B) change its name upon at least 30 days' prior written notice by the Borrower to the Collateral Agent of such change and so long as, at the time of such written notification, such Person provides any financing statements or fixture filings necessary to perfect and continue perfected the Collateral Agent's Liens;

(iv)    amend, modify or otherwise change any of its Governing Documents, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iv) that either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; or

(v)    increase or reduce the authorized or issued share capital of it or its Subsidiaries nor make a change to its or its Subsidiaries' Register of Members.

(l)    <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(m)    <u>Limitations on Certain Deposit and Securities Accounts</u>.  Permit the aggregate amount of cash and cash equivalents maintained by any Loan Party in any deposit account or securities account located in Hungary or any other jurisdiction outside the United States to exceed $250,000 at any time.

(n)    <u>ERISA</u>.  (i) Establish, sponsor, maintain, become a party or contribute to or become obligated to sponsor, maintain or contribute to any Multiemployer Plan or any defined benefit plan (or permit any of its ERISA Affiliates to do any of the foregoing) or (ii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of

Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or applicable law.

(o)    Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims.

(i)    at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Bankruptcy Court Orders, except for modifications and amendments agreed to by the Agents and the Required Lenders;

(ii)    at any time, suffer to exist a priority for any administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising of any kind or nature whatsoever), including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except as provided in Section 4.02 and for the Carve-Out Expenses having priority of payment over the Obligations to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities";

(iii)    at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders in respect of the Collateral, except for Permitted Priority Liens; and

(iv)    prior to the date on which the Obligations have been paid in full in cash, the Loan Parties shall not pay any administrative expense claims except (A) Priority Professional Expenses and other payments pursuant to sub-clause (i) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (B) Obligations due and payable hereunder, and (C) other administrative expense and professional claims incurred in the ordinary course of the business of the Loan Parties or their respective Chapter 11 Cases, in each case, to the extent and having the order of priority set forth in the definition of the term "Agreed Administrative Expense Priorities".

(p)    Limitation on Prepayments of Prepetition Obligations.    No Loan Party shall (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with any trustee with respect thereto money or securities before due for the purpose of paying when due) of any Pre-Petition Obligations of any Loan Party, in each case, incurred prior to the Filing Date (including any payable or other amounts owed by the Borrower to Kinja under (x) the Intercompany Services Agreement, dated as of January 1, 2012, between the Borrower and Kinja, (y) the Master License Agreement, dated as of January 1, 2011, between the Borrower and Kinja or (z) the promissory notes, dated as of January 10, 2014 and January 10, 2015, in each case by the Borrower for the benefit of Kinja), (ii) pay any interest on any Pre-Petition Obligations of any Loan Party, including obligations under the Prepetition Junior Credit Facility (whether in cash, in kind securities or otherwise) except at the non-default rate to the extent provided for in the Budget and approved by the Bankruptcy Court, or (iii) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code

69

authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing.

## ARTICLE IX

## MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS
## AND OTHER COLLATERAL

Section 9.01    Collection of Accounts; Management of Collateral.  (a)  After the Final Bankruptcy Court Order Entry Date or such later date as the Agents may agree in writing, the Loan Parties shall (i) establish and maintain cash management services of a type and on terms reasonably satisfactory to the Agents at one or more of the banks set forth on Schedule 9.01, each a "Cash Management Bank", and shall take such reasonable steps to enforce, collect and receive all amounts owing on the Accounts Receivable of the Loan Parties or any of their Subsidiaries, and (ii) deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral and all Collections (of a nature susceptible to a deposit in a bank account) and other amounts received by any Loan Party (including payments made by the Account Debtors directly to any Loan Party) into a Cash Management Account or other bank account referenced in the definition of Cash Management Accounts as excluded from the scope thereof.

(b)    After the Final Bankruptcy Court Order Entry Date or such later date as the Agents may agree in writing, the Loan Parties shall, with respect to each Cash Management Account, deliver to the Collateral Agent either (i) a Control Agreement with respect to such Cash Management Account or (ii) with respect to a Cash Management Account with an average monthly balance of $100,000 or less, evidence that the Loan Parties have provided to each Cash Management Bank at which such Cash Management Account is located notice in writing of the Collateral Agent's security interest in such Cash Management Account and irrevocable (absent Collateral Agent's written instructions to the contrary) directions, in form and substance reasonably satisfactory to the Collateral Agent, to send by electronic funds transfer (including, but not limited to, ACH transfers) on each Business Day to a Cash Management Account subject to a Control Agreement all funds on deposit in such Cash Management Account and that each such Cash Management Bank has agreed to do so.  Notwithstanding the foregoing, promptly upon the request of the Collateral Agent, each Loan Party shall deliver a Control Agreement to the Collateral Agent with respect to any Cash Management Account identified by the Collateral Agent.

(c)    Upon the terms and subject to the conditions set forth in a Control Agreement with respect to a Cash Management Account, all amounts received in such Cash Management Account shall at the Administrative Agent's direction be wired each Business Day into the Administrative Agent's Account, except that, so long as no Event of Default has occurred and is continuing, the Administrative Agent will not direct the Cash Management Bank to transfer funds in such Cash Management Account to the Administrative Agent's Account.

(d)    So long as no Default or Event of Default has occurred and is continuing, the Borrower may amend Schedule 9.01 to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank

shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, each Loan Party and such prospective Cash Management Bank shall have executed and delivered to the Collateral Agent a Control Agreement. Each Loan Party shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from the Collateral Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment, or that the operating performance, funds transfer, or availability procedures or performance of such Cash Management Bank with respect to Cash Management Accounts or the Collateral Agent's liability under any Control Agreement with such Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment.

## ARTICLE X

## EVENTS OF DEFAULT

Section 10.01 <u>Events of Default</u>. If any of the following Events of Default shall occur and be continuing:

(a) the Borrower shall fail to pay any principal of or interest on any Loan, any Collateral Agent Advance or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise);

(b) any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to any Agent or any pursuant to any Loan Document, which representation or warranty is subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any respect when made or deemed made; or any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to any Agent or any Lender pursuant to any Loan Document, which representation or warranty is not subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any material respect when made or deemed made;

(c) any Loan Party shall fail to perform or comply with any covenant or agreement contained in ARTICLE VIII or ARTICLE IX, or any Loan Party shall fail to perform or comply with any covenant or agreement contained in any security agreement to which it is a party, any pledge agreement to which it is a party or any mortgage to which it is a party;

(d) any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 10.01, such failure, if capable of being remedied, shall remain unremedied for fifteen (15) days after the earlier of the date a

71

senior officer of any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by any Agent to such Loan Party;

(e)    any Loan Party or any of its Subsidiaries shall fail to pay any principal of or interest or premium on any of its Indebtedness (excluding Indebtedness evidenced by this Agreement), to the extent that the aggregate principal amount of all such Indebtedness exceeds $250,000, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)    the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order shall have been stayed, amended, modified, reversed, vacated or subject to appeal;

(g)    the Final Bankruptcy Court Order shall not have been entered by the Bankruptcy Court within thirty (30) days from the Interim Bankruptcy Court Order Entry Date;

(h)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(i)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(j)    an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the Total Commitment and payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Agents and the Lenders and priorities until such plan effective date;

(k)    an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Total Commitment, and the payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof;

(l)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Agents and the Required Lenders, (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to the extent set forth in the Agreed Administrative Expense Priorities, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(m)      an application for any of the orders described in clauses (f) through (l) above shall be made by a Person and such application is not contested by the Loan Parties in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(n)      an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Loan Party with respect to any claim in an amount equal to or exceeding $250,000 in the aggregate;

(o)      (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent and/or the Lenders', claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement or the Bankruptcy Court Orders shall, for any reason, cease to be valid or (iii) any action is commenced by any Loan Party which contests the validity, perfection or enforceability of any of the Liens and security interests of any Agent and/or the Lenders created by any of the Bankruptcy Court Orders, this Agreement, any mortgage, any security agreement, any pledge agreement or any other security agreement;

(p)      the determination of any Loan Party, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing;

(q)      the Bankruptcy Court Orders or any security agreement, any pledge agreement, any mortgage or any other security document, related to this Agreement or the Bankruptcy Court Orders after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(r)      any provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the

73

invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(s)     one or more judgments, orders or awards (or any settlement of any claim that, if breached, could result in a judgment, order or award) for the payment of money exceeding $250,000 in the aggregate shall be rendered against any Loan Party or any of its Subsidiaries and remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, (ii) there shall be a period of 10 consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) at any time during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, is in effect, such judgment, order, award or settlement is not bonded in the full amount of such judgment, order, award or settlement; provided, however, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection (s) if and for so long as (A) the amount of such judgment, order, award or settlement is covered by a valid and binding policy of insurance between the defendant and the insurer covering full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

(t)     any Loan Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business for more than fifteen (15) days;

(u)     any cessation of a substantial part of the business of any Loan Party for a period which materially and adversely affects the ability of such Person to continue its business on a profitable basis;

(v)     the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party, if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(w)     the indictment of any Loan Party under any criminal statute, or commencement of criminal or civil proceedings against any Loan Party, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person;

(x)     any Loan Party or any of its ERISA Affiliates sponsors, maintains, contributes to or is, or becomes, obligated to contribute to any Multiemployer Plan or any defined benefit plan;

(y)     a Change of Control shall have occurred;

(z)     a Material Adverse Deviation shall have occurred;

(aa)     the Liquidated Damages Amount (as defined in the ZDGM APA) or any other amount in the nature of "liquidated damages", or any break-up fee (other than the Breakup

74

Fee defined in the ZDGM APA) or any other similar fee or claim granted to any prospective purchaser of all or any portion of the Loan Parties' assets shall become due and payable; or

(bb)    in relation to Kinja, if other than pursuant to the Chapter 11 Cases:

(i)    Kinja is unable or admits inability to pay its debts as they fall due (other than solely as a result of liabilities exceeding assets);

(ii)    by reason of actual or anticipated financial difficulties , Kinja suspends or publicly announces an intention to suspend making payments on any of its debts; or

(iii)    by reason of actual or anticipated financial difficulties, Kinja commences formal negotiations with one or more of its financial creditors (excluding any Agent or Lender in its capacity as such) with a view to a general rescheduling any of its Indebtedness (expressly including but without limitation the starting of negotiations with its creditors (excluding any Agent or Lender in its capacity as such) for the purposes set forth in section 5 bis. of the Hungarian Insolvency Act);

(iv)    a moratorium is declared in respect of Kinja or Kinja becomes insolvent (*fizetésképtelen*), as defined under the Hungarian Act XLIX of 1991 on Bankruptcy and Liquidation Proceedings; or

(v)    any formal corporate action or formal legal proceedings is taken in respect of Kinja's winding-up, dissolution, administration or liquidation or there is an appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of Kinja; or if Kinja has filed for its bankruptcy, liquidation or winding-up;

(vi)    Kinja has admitted to the court its inability to pay or has requested the court to grant a maximum 45 days deferred payment; or if it is unable to evidence that it has responded to the court within 8 days (or, in case section 24(3) of Act IL of 1991 on Hungarian insolvency proceedings (as amended from time to time) which provide for a shorter or longer time period, within such shorter or longer period) of receiving the petition for its liquidation or if such response does not challenge the debt in respect of which the petition was filed;

then, and in any such event, the Collateral Agent may, and shall at the request of the Required Lenders, by notice to the Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without further order of, or application to, the Bankruptcy Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code and the Uniform Commercial Code), hereunder and under the other Loan Documents.

75

# ARTICLE XI

# AGENTS

Section 11.01 <u>Appointment</u>.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints and authorizes the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement including:  (a) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (b) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (c) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (d) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (e) to make the Loans and Collateral Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (f) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (g) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; and (h) subject to Section 11.03 of this Agreement, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all makers of Loans.

Section 11.02 <u>Nature of Duties</u>.  The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any

obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If any Agent seeks the consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender.  Each Agent shall promptly notify each Lender any time that the Required Lenders have instructed such Agent to act or refrain from acting pursuant hereto.

Section 11.03  Rights, Exculpation, Etc.  The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agents (a) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 13.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (b) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (c) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (f) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.  The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 5.04, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled.  The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are

promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

Section 11.04  <u>Reliance</u>.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 11.05  <u>Indemnification</u>.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, the Lenders will reimburse and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 11.08; <u>provided</u>, <u>however</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from such Agent's gross negligence or willful misconduct.  The obligations of the Lenders under this Section 11.05 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 11.06  <u>Agents Individually</u>.  With respect to its Pro Rata Share of the Total Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 11.07  <u>Successor Agent</u>.  (a)  Each Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Borrower and each Lender.  Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)  Upon any such notice of resignation, the Required Lenders shall appoint a successor Agent reasonably acceptable to the Borrower.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon

78

succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  After any Agent's resignation hereunder as an Agent, the provisions of this ARTICLE XI shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(c)     If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Agent, with the consent of the other Agent shall then appoint a successor Agent who shall serve as an Agent until such time, if any, as the Required Lenders, with the consent of the other Agent, appoint a successor Agent as provided above.

Section 11.08  Collateral Matters.

(a)     The Collateral Agent may from time to time make such disbursements and advances ("Collateral Agent Advances") which the Collateral Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Loans and other Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 13.04.  The Collateral Agent Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to Revolving Loans that are Reference Rate Loans.  The Collateral Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 5.02.  The Collateral Agent shall notify each Lender and the Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such Collateral Agent Advance.  Without limitation to its obligations pursuant to Section 11.05, each Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Collateral Agent Advance.  If such funds are not made available to the Collateral Agent by such Lender, the Collateral Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for three (3) Business Days and thereafter at the Reference Rate.

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Loans and all other Obligations in accordance with the terms hereof; or constituting property being sold or disposed of in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 11.08(b).

79

(c)    Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 11.08(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 11.08(b).  Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)    The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 11.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 11.09 <u>Agency for Perfection</u>.    Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party.    Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions.    In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents.    Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 11.10 <u>No Reliance on any Agent's Customer Identification Program</u>. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "<u>CIP Regulations</u>"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws. Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 11.11 <u>Parallel Debt</u>.

(a)     The Loan Parties, the Agents and the Lenders expressly agree that this Section 11.11 shall apply to the Hungarian Security Documents and the Hungarian Guaranty. Each Loan Party hereby irrevocably and unconditionally undertakes (such undertaking and the obligations and liabilities which are a result thereof hereinafter being referred to as its "<u>Parallel Debt</u>") to pay to the Collateral Agent an amount equal the aggregate amount payable by it to any Lender and Agent under the Loan Documents (the "<u>Principal Obligations</u>") in accordance with the terms and conditions of such Principal Obligations. The Parallel Debt of each Loan Party shall become due and payable as and when its Principal Obligations become due and payable.

(b)     The Loan Parties, the Agents and the Lenders acknowledge that:

(i)     the Parallel Debt of each Loan Party constitutes an undertaking, obligation and liability of such Loan Party to the Collateral Agent (in its personal capacity and not in its capacity as agent) which is separate and independent from, and without prejudice to, its Principal Obligations and represents the Collateral Agent's own claim to receive payment of such Parallel Debt from such Loan Party;

(ii)     the Collateral Agent may demand and receive payment and enforce performance of the Parallel Debt in its own name as an independent and separate right; and

(iii)     the security created under the Hungarian Security Documents and the Hungarian Guaranty to secure the Parallel Debt is granted to the Collateral Agent in its capacity as sole creditor of the Parallel Debt.

(c)     The Loan Parties, the Agents and the Lenders agree that:

(i)     the Parallel Debt of each Loan Party shall be decreased if and to the extent that its Principal Obligations have been paid or in the case of guarantee obligations discharged or decreased (in each case in whole or in part and by the amount of such payment, discharge or decrease);

(ii)     the Principal Obligations of each Loan Party shall be decreased if and to the extent that its Parallel Debt has been paid or in the case of guarantee obligations discharged or decreased (in each case in whole or in part and by the amount of such payment, discharge or decrease); and

(iii)     the amount payable under the Parallel Debt of each Loan Party shall at no time exceed the amount payable under its Principal Obligations.

(d)     The Parallel Debt is created on the understanding that the Collateral Agent must:

(i)     share the proceeds of the Parallel Debt with the other Lenders and the Administrative Agent; and

(ii)     pay those proceeds to the Lenders and Agents, in accordance with the terms of this Agreement subject to limitations (if any) expressly provided for in any Loan Document.

(e)     The rights of the Lenders and Agents (other than the Collateral Agent) to receive payment of the Principal Obligations of each Loan Party are several and separate and independent from, and without prejudice to, the rights of the Collateral Agent to receive payment under the Parallel Debt.

(f)     The Parallel Debt will be payable in the currency or currencies of the relevant Principal Obligations.

## ARTICLE XII

## GUARANTY

Section 12.01 <u>Guaranty</u>.     Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of the Chapter 11 Cases, whether or not a claim for post-filing interest is allowed in the Chapter 11 Cases), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Agents and the Lenders in enforcing any rights under the guaranty set forth in this ARTICLE XII.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Agents and the Lenders under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving the Borrower.

Section 12.02 <u>Guaranty Absolute</u>.     Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any

jurisdiction affecting any of such terms or the rights of the Agents or the Lenders with respect thereto.  Each Guarantor agrees that this ARTICLE XII constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral.  The obligations of each Guarantor under this ARTICLE XII are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this ARTICLE XII shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)     the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Agent, or any Lender;

(e)     any change, restructuring or termination of the corporate, limited liability company, exempted company or partnership structure or existence of any Loan Party; or

(f)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Agents or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This ARTICLE XII shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agents, the Lenders, or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Section 12.03 <u>Waiver</u>.   Each Guarantor hereby waives (a) promptness and diligence, (b) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this ARTICLE XII and any requirement that the Agents or the Lenders exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (c) any right to compel or direct any Agent or any Lender to seek payment or recovery of any amounts owed under this ARTICLE XII from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (d) any

requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor. Each Guarantor agrees that the Agents and the Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 12.03 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this ARTICLE XII, and acknowledges that this ARTICLE XII is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 12.04 <u>Continuing Guaranty; Assignments</u>. This ARTICLE XII is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than indemnification obligations as to which no claim has been made) and all other amounts payable under this ARTICLE XII and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agents and the Lenders and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments and its Loans) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 13.07.

Section 12.05 <u>Subrogation</u>. No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this ARTICLE XII, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agents and the Lenders against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this ARTICLE XII shall have been paid in full in cash and the Final Maturity Date shall have occurred. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this ARTICLE XII and the Final Maturity Date, such amount shall be held in trust for the benefit of the Agents and the Lenders and shall forthwith be paid to the Agents and the Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this ARTICLE XII, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this ARTICLE XII thereafter arising. If (a) any Guarantor shall make payment to the Agents and the Lenders of all or any part of the Guaranteed Obligations, (b) all of the Guaranteed Obligations and all other amounts payable under this ARTICLE XII shall be paid in full in cash and (c) the Final Maturity Date shall have occurred, the Agents and the Lenders will, at such Guarantor's

84

request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 12.06  Certain Provisions Regarding Kinja.  If, as a result of Kinja being declared a Strategically Important Business Organization, the acceleration of the Obligations of Kinja is not permissible under Hungarian law, neither the Borrower nor the Parent shall be released from their obligations under this Article XII.

## ARTICLE XIII

## MISCELLANEOUS

Section 13.01  Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, if to any Loan Party, at the following address:

Gawker Media, LLC
114 Fifth Ave., 2nd Floor
New York, NY 10011
Attention:  Heather Dietrick
Telephone:  (646) 747-2265
Email:  heather@gawker.com

with a copy to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention:  Joanne De Silva
Telephone:  (212) 596-9280
Telecopier:  (646) 728-1575
Email:  joanne.desilva@ropesgray.com

if to the Administrative Agent or the Collateral Agent, to it at the following address:

Cerberus Business Finance LLC
875 Third Avenue
New York, New York  10022
Attention:  Kevin Genda
Telephone:  (212) 891-2117
Telecopier:  (212) 891-1541

in each case, with a copy to:

85

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022
Attention:  Frederic L. Ragucci, Esq.
Telephone:  212-756-2000
Telecopier:  212-593-5955

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 13.01.  All such notices and other communications shall be effective, (a) if mailed (certified mail, postage prepaid and return receipt requested), when received or 3 days after deposited in the mails, whichever occurs first, (b) if telecopied, when transmitted and confirmation received, or (c) if delivered by hand, Federal Express or other reputable overnight courier, upon delivery, except that notices to any Agent pursuant to ARTICLE II shall not be effective until received by such Agent.  Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Agents and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Agents and the Lenders pursuant to the Bankruptcy Code.

Section 13.02  <u>Amendments, Etc.</u>  (a) No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders or by the Collateral Agent with the consent of the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, <u>provided</u>, <u>however</u>, that no amendment, waiver or consent shall (a) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case without the written consent of any Lender affected thereby, (b) increase the Total Commitment without the written consent of each Lender affected thereby, (c) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder, (d) amend the definition of "Required Lenders" or "Pro Rata Share", (e) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Lenders, or release the Borrower or any Guarantor, (f) amend, modify or waive Section 5.04 or this Section 13.02 of this Agreement or (g) modify, waive, release or subordinate the superpriority claim status of the Obligations (except as permitted in this Agreement and the Loan Documents) in each case, without the written consent of each Lender.  Notwithstanding the foregoing, no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, a Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero.

(b)        If any action to be taken by the Lenders hereunder requires the unanimous consent, authorization, or agreement of all of the Lenders, and a Lender other than the Collateral Agent and the Administrative Agent (the "Holdout Lender") fails to give its consent, authorization, or agreement, then the Collateral Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Replacement Lenders, and the Holdout Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Holdout Lender shall be made in accordance with the terms of Section 13.07(b).  Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

Section 13.03  No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 13.04  Expenses; Taxes; Attorneys' Fees.  The Borrower will pay on demand, all costs and expenses incurred by or on behalf of each Agent (and, in the case of clauses (b) through (m) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable fees, costs, client charges and expenses of counsel for each Agent (and, in the case of clauses (b) through (m) below, each Lender), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 8.01(b) or the review of any of the agreements, instruments and documents referred to in Section 8.01(f)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any

87

Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any facility of any Loan Party, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien, or (m) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing.  Without limitation of the foregoing or any other provision of any Loan Document:  (i) the Borrower agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by any Agent or any Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrower agree to save each Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, (ii) the Borrower agree to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (iii) if the Borrower fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrower.

Section 13.05  Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured.  Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agents and the Lenders under this Section 13.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

88

Section 13.06 <u>Severability</u>.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 13.07 <u>Assignments and Participations</u>.

(a)    This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); <u>provided</u>, <u>however</u>, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Each Lender may (x) with the written consent of the Collateral Agent, assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Term Loan Commitment and any Term Loan made by it and (y) with the written consent of each Agent, assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Revolving Credit Commitment and the Revolving Loans made by it; <u>provided</u>, <u>however</u>, that (i) such assignment is in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (x) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (y) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $5,000,000 or a multiple of $1,000,000 in excess thereof), (ii) except as provided in the last sentence of this Section 13.07(b), the parties to each such assignment shall execute and deliver to the Collateral Agent (and the Administrative Agent, if applicable), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Collateral Agent, for the benefit of the Collateral Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender), (iii) no assignments may be made to an Excluded Lender; <u>provided</u>, that, unless the Agents and the Lenders have actual knowledge that a potential assignee is an Excluded Lender, the Agent and the Lenders shall be entitled to rely upon the representations made by any proposed Lender in the Assignment and Acceptance that such proposed Lender is not an Excluded Lender without any further investigation, and (iv) no written consent of the Collateral Agent or the Administrative Agent shall be required (1) in connection with any assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (2) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender.  Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Collateral Agent (or such shorter period as shall be agreed to by the Collateral Agent and

89

the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).    Notwithstanding anything to the contrary contained in this Section 13.07(b), a Lender may assign any or all of its rights under the Loan Documents to an Affiliate of such Lender or a Related Fund of such Lender without delivering an Assignment and Acceptance to the Agents or to any other Person (a "Related Party Assignment"); provided, however, that (I) the Borrower and the Administrative Agent may continue to deal solely and directly with such assigning Lender until an Assignment and Acceptance has been delivered to the Administrative Agent for recordation on the Register, (II) the Collateral Agent may continue to deal solely and directly with such assigning Lender until receipt by the Collateral Agent of a copy of the fully executed Assignment and Acceptance pursuant to Section 13.07(e), (III) the failure of such assigning Lender to deliver an Assignment and Acceptance to the Agents shall not affect the legality, validity, or binding effect of such assignment, and (IV) an Assignment and Acceptance between the assigning Lender and an Affiliate of such Lender or a Related Fund of such Lender shall be effective as of the date specified in such Assignment and Acceptance and recordation on the Related Party Register referred to in the last sentence of Section 13.07(d) below.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

90

(d)    The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.  In the case of an assignment pursuant to the last sentence of Section 13.07(b) as to which an Assignment and Acceptance is not delivered to the Administrative Agent, the assigning Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained, a register (the "Related Party Register") comparable to the Register on behalf of the Borrower.  The Related Party Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Agent or the Collateral Agent pursuant to Section 13.07(b) (which consent of the Collateral Agent must be evidenced by the Collateral Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(f)    A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide).  Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).  Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(g)    In the event that any Lender sells participations in a Registered Loan, such Lender shall acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).

Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(h)    Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.08(d).

(i)    Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 11.08 of this Agreement or any other Loan Document).  The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.08 and Section 5.05 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender

Section 13.08  Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document mutatis mutandis.

Section 13.09  GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT.

Section 13.10 <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.    EACH LOAN PARTY HEREBY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 13.01.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION.    EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 13.11 <u>WAIVER OF JURY TRIAL, ETC.</u>    EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 13.12 <u>Consent by the Agents and Lenders</u>.    Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent,

approval, satisfaction, determination, judgment, acceptance or similar action (an "<u>Action</u>") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 13.13  <u>No Party Deemed Drafter</u>.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 13.14  <u>Reinstatement; Certain Payments</u>.  If any claim is ever made upon any Agent or any Lender for repayment or recovery of any amount or amounts received by such Agent or such Lender in payment or on account of any of the Obligations, such Agent or such Lender shall give prompt notice of such claim to each other Agent and Lender and the Borrower, and if such Agent or such Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Agent or such Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Agent or such Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Agent or such Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Agent or such Lender.

Section 13.15  <u>Indemnification</u>.    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Agent and each Lender and all of their respective officers, directors, employees, attorneys, consultants and agents (collectively called the "<u>Indemnitees</u>") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Interim Facility Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrower under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "<u>Indemnified Matters</u>"); <u>provided</u>, <u>however</u>, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

94

Section 13.16  [Intentionally Omitted].

Section 13.17  Records.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, including, without limitation, the fees set forth in the Fee Letter, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 13.18  Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 6.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrower pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code), except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Lender, and any assignment by any Lender shall be governed by Section 13.07 hereof.

Section 13.19  Interest.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (a) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrower); and (b) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrower).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent

95

permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 13.19 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 13.19.

For purposes of this Section 13.19, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 13.20 <u>Confidentiality</u>.  Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), <u>provided</u> that nothing herein shall limit the disclosure of any such information (a) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority, (b) to counsel for any Agent or any Lender, (c) to examiners, auditors, accountants or Securitization Parties, (d) in connection with any litigation to which any Agent or any Lender is a party or (e) to any assignee or participant (or prospective assignee or participant) so long as such assignee or participant (or prospective assignee or participant) first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 13.20.

Section 13.21 <u>Public Disclosure</u>.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this

Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure).  Each Loan Party hereby authorizes each Agent and each Lender, after consultation with the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 13.22 <u>Integration</u>.   This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 13.23 <u>USA PATRIOT Act</u>.    Each Lender that is subject to the requirements of the USA PATRIOT Act (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, the "<u>USA PATRIOT Act</u>") hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrower, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrower in accordance with the USA PATRIOT Act.  Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

Section 13.24 <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>.   This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee or successor in interest of any Loan Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

Section 13.25 <u>Certificates and Determinations</u>.    Any certification or determination by a Lender or an Agent of a rate or amount under any Loan Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.  The Lenders and the Agents may also obtain a notarial certificate (in Hungarian: *ténytanúsítvány*) for the

purpose of the determination of the Obligations for the enforcement of the Hungarian Security Documents and/or the Hungarian Guaranty that have been incorporated into a notarial deed and such a certificate signed by any duly authorized officer or representative of a Lender or an Agent of a rate or amount under any Loan Document, in the absence of manifest error, shall be conclusive evidence of such amount against the Kinja or other security providers under the Hungarian Security Documents.    The security providers under the Hungarian Security Documents and the Hungarian Guaranty also authorize each Lender and Agent to make unilateral declarations and statements in the form of notarial certificate with respect to the evidencing that acceleration has occurred.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**<u>BORROWER</u>**:

GAWKER MEDIA, LLC,
as debtor and debtor-in-possession

By: _____
    Name:
    Title:

**<u>GUARANTOR</u>**:

GAWKER MEDIA GROUP, INC.,
as debtor and debtor-in-possession

By: _____
    Name:
    Title:

**<u>ADMINISTRATIVE AGENT AND
COLLATERAL AGENT</u>:**

CERBERUS BUSINESS FINANCE LLC


By: _____
    Name:
    Title:

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE, THE LOANS ARE BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT. REQUESTS FOR INFORMATION REGARDING THE ORIGINAL ISSUE DISCOUNT ON THE LOANS MAY BE DIRECTED TO GAWKER MEDIA, LLC, 114 FIFTH AVENUE, 2ND FLOOR, NEW YORK, NEW YORK 10011.

**FINANCING AGREEMENT**

**Dated as of June 13, 2016**

**by and among**

**GAWKER MEDIA GROUP, INC.,**
**as a debtor and debtor-in-possession,**
**as Parent and Guarantor,**

**GAWKER MEDIA, LLC,**
**as a debtor and debtor-in-possession,**
**as Borrower,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as Lenders,**

**and**

**CERBERUS BUSINESS FINANCE LLC,**
**as Administrative Agent and Collateral Agent**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; CERTAIN TERMS..................................................2
    Section 1.01    Definitions....................................................................2
    Section 1.02    Terms Generally...........................................................24
    Section 1.03    Accounting and Other Terms.......................................24
    Section 1.04    Time References...........................................................24
    Section 1.05    Certain Hungarian Terms.............................................24

ARTICLE II THE LOANS......................................................................................25
    Section 2.01    Commitments................................................................25
    Section 2.02    Making the Loans .........................................................26
    Section 2.03    Repayment of Loans; Evidence of Debt ......................29
    Section 2.04    Interest..........................................................................30
    Section 2.05    Reduction of Commitment; Prepayment of Loans ......31
    Section 2.06    Fees...............................................................................33
    Section 2.07    Securitization ...............................................................33
    Section 2.08    Taxes.............................................................................34
    Section 2.09    LIBOR Option ..............................................................36
    Section 2.10    Exercise of LIBOR Option ...........................................36
    Section 2.11    Funding Losses ............................................................37
    Section 2.12    Changes in Law; Impracticability or Illegality ...........37
    Section 2.13    No Requirement to Match Fund ..................................38

ARTICLE III [Intentionally Omitted.] ..................................................................38

ARTICLE IV SECURITY AND ADMINISTRATIVE PRIORITY.........................38
    Section 4.01    Collateral; Grant of Lien and Security Interest......................38
    Section 4.02    Administrative Priority .................................................39
    Section 4.03    Grants, Rights and Remedies........................................39
    Section 4.04    No Filings Required.......................................................39
    Section 4.05    Survival ........................................................................40
    Section 4.06    Further Assurances........................................................40

ARTICLE V FEES, PAYMENTS AND OTHER COMPENSATION.......................41
    Section 5.01    Audit and Collateral Monitoring Fees .........................41
    Section 5.02    Payments; Computations and Statements ....................41
    Section 5.03    Sharing of Payments, Defaulting Lenders, Etc...........42
    Section 5.04    Apportionment of Payments ........................................43
    Section 5.05    Increased Costs and Reduced Return...........................44

ARTICLE VI CONDITIONS TO LOANS ..............................................................45
    Section 6.01    Conditions Precedent to Interim Facility Effectiveness..........45
    Section 6.02    Conditions Precedent to Final Facility Effectiveness ............48
    Section 6.03    Conditions Precedent to All Loans ..............................49
    Section 6.04    Conditions Subsequent to Effectiveness .....................50

i

ARTICLE VII REPRESENTATIONS AND WARRANTIES ....................................................51
    Section 7.01    Representations and Warranties.................................................................51

ARTICLE VIII COVENANTS OF THE LOAN PARTIES ........................................................58
    Section 8.01    Affirmative Covenants..................................................................58
    Section 8.02    Negative Covenants ......................................................................65

ARTICLE IX MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS
        AND OTHER COLLATERAL ..................................................................70
    Section 9.01    Collection of Accounts; Management of Collateral ...............................70

ARTICLE X EVENTS OF DEFAULT ..................................................................71
    Section 10.01    Events of Default ..................................................................71

ARTICLE XI AGENTS..................................................................76
    Section 11.01    Appointment ..................................................................76
    Section 11.02    Nature of Duties ..................................................................76
    Section 11.03    Rights, Exculpation, Etc ..................................................................77
    Section 11.04    Reliance..................................................................78
    Section 11.05    Indemnification ..................................................................78
    Section 11.06    Agents Individually..................................................................78
    Section 11.07    Successor Agent ..................................................................78
    Section 11.08    Collateral Matters..................................................................79
    Section 11.09    Agency for Perfection ..................................................................80
    Section 11.10    No Reliance on any Agent's Customer Identification Program ............81
    Section 11.11    Parallel Debt..................................................................81

ARTICLE XII GUARANTY..................................................................82
    Section 12.01    Guaranty..................................................................82
    Section 12.02    Guaranty Absolute ..................................................................82
    Section 12.03    Waiver..................................................................83
    Section 12.04    Continuing Guaranty; Assignments..........................................................84
    Section 12.05    Subrogation ..................................................................84
    Section 12.06    Certain Provisions Regarding Kinja ......................................................85

ARTICLE XIII MISCELLANEOUS ..................................................................85
    Section 13.01    Notices, Etc..................................................................85
    Section 13.02    Amendments, Etc ..................................................................86
    Section 13.03    No Waiver; Remedies, Etc..................................................................87
    Section 13.04    Expenses; Taxes; Attorneys' Fees ......................................................87
    Section 13.05    Right of Set-off ..................................................................88
    Section 13.06    Severability ..................................................................89
    Section 13.07    Assignments and Participations ..................................................................89
    Section 13.08    Counterparts ..................................................................92
    Section 13.09    GOVERNING LAW..................................................................92
    Section 13.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS
        AND VENUE ..................................................................93

Section 13.11    WAIVER OF JURY TRIAL, ETC ...........................................................93
Section 13.12    Consent by the Agents and Lenders.......................................................93
Section 13.13    No Party Deemed Drafter ......................................................................94
Section 13.14    Reinstatement; Certain Payments ..........................................................94
Section 13.15    Indemnification .....................................................................................94
Section 13.16    [Intentionally Omitted] ..........................................................................95
Section 13.17    Records ..................................................................................................95
Section 13.18    Binding Effect........................................................................................95
Section 13.19    Interest....................................................................................................95
Section 13.20    Confidentiality .......................................................................................96
Section 13.21    Public Disclosure ..................................................................................96
Section 13.22    Integration ..............................................................................................97
Section 13.23    USA PATRIOT Act................................................................................97
Section 13.24    Parties Including Trustees; Bankruptcy Court Proceedings ...................97
Section 13.25    Certificates and Determinations.............................................................97

## <u>SCHEDULE AND EXHIBITS</u>

Schedule 1.01(A)      Lenders and Lenders' Commitments
Schedule 1.01(D)      Budget
Schedule 6.01(f)       Material Adverse Effect
Schedule 7.01(e)      Capitalization; Subsidiaries
Schedule 7.01(f)       Litigation; Commercial Tort Claims
Schedule 7.01(i)       Employee Welfare Plans
Schedule 7.01(r)       Insurance
Schedule 7.01(t)       Bank Accounts
Schedule 7.01(u)      Intellectual Property
Schedule 7.01(aa)     Name; Jurisdiction of Organization; Organizational ID Number; Chief
                      Place of Business; Chief Executive Office; FEIN
Schedule 8.02(a)      Existing Liens
Schedule 8.02(e)      Existing Investments
Schedule 9.01         Cash Management Banks


Exhibit A      Form of Notice of Borrowing
Exhibit B      Form of Assignment and Acceptance
Exhibit C      Form of LIBOR Notice
Exhibit D      Form of Interim Bankruptcy Court Order

**<u>Exhibit B</u>**

[Summary Budget]