Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11700-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GAWKER MEDIA, LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    U.S. Bankruptcy Court

13                    One Bowling Green

14                    New York, NY   10004

15

16                    July 7, 2016

17                    2:07 PM

18

19

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Initial Case Conference

2

3    Hearing re:  Case Management Motion. Debtors' Motion for

4    Entry of an Order Establishing Certain Notice, Case

5    Management, and Administrative Procedures and Omnibus

6    Hearing Dates. [Docket No. 11]

7

8    Hearing re:  Cash Management Motion. Debtors' Motion for

9    Entry of Interim and Final Orders Authorizing the Debtors to

10   Continue Using the Debtors' Bank Accounts, Business Forms,

11   and Cash Management System and Granting Related Relief.

12   [Docket No. 12]

13

14   Hearing re:  Wages Motion. Debtors' Motion for Entry of

15   Interim and Final Orders (I) Authorizing, but Not Directing,

16   Payment of Prepetition Wages, Salaries, Business Expenses,

17   Employee Benefits and Related Items, and (II) Directing All

18   Financial Institutions to Honor Checks for Payment of Such

19   Obligations. [Docket No. 13]

20

21   Hearing re:  Taxes Motion. Debtors' Motion for Entry of

22   Interim and Final Orders Authorizing Payment of Income

23   Taxes, Property Taxes, Sales and Use Taxes and Hungarian

24   Taxes. [Docket No. 14]

25

Page 3

1   Hearing re:  Insurance Motion. Debtors' Motion for Entry of

2   Interim and Final Orders Authorizing, but Not Directing, the

3   Debtors to (A) Continue Insurance Coverage Entered into

4   Prepetition, (B) Renew or Purchase New Insurance Policies in

5   the Ordinary Course of Business, and (C) Pay All Prepetition

6   Obligations Relating Thereto. [Docket No. 16]

7

8   Hearing re:  Utilities Motion. Debtors' Motion for Entry of

9   an Order (A) Prohibiting Utility Companies from

10  Discontinuing, Altering, or Refusing Service, (B) Deeming

11  Utility Companies to Have Adequate Assurance of Payment, and

12  (C) Establishing Procedures for Resolving Requests for

13  Additional Assurance. [Docket No. 17]

14

15  Hearing re:  DIP Motion. Debtors' Motion for Entry of

16  Interim and Final Orders Pursuant to 11 U.S.C. §

17  105, 361, 362, 363, and 364 and Rules 2002, 4001, and 9014

18  of the Federal Rules of Bankruptcy Procedure (I) Authorizing

19  Incurrence by the Debtors of Postpetition Secured

20  Indebtedness, (11) Granting Liens, (111) Authorizing Use of

21  Cash Collateral by the Debtors and Providing for Adequate

22  Protection, (IV) Modifying the Automatic Stay, and (V)

23  Scheduling a Final Hearing. [Docket No. 19]

24

25

1   Hearing re:  Critical Vendors Motion. Debtors' Motion for

2   Entry of Interim and Final Orders Authorizing the Debtors to

3   Pay Prepetition Claims of Critical Vendors and Foreign

4   Vendors. [Docket No. 15]

5

6   Hearing re:  Interim Compensation Motion. Debtors' Motion

7   for Entry of an Order Establishing Procedures for Interim

8   Compensation and Reimbursement of Expenses of Professionals.

9   [Docket No. 52]

10

11  Hearing re:  Ordinary Course Professionals Motion. Debtors'

12  Motion for Entry of an Order Authorizing the Retention and

13  Compensation of Certain Professionals Utilized in the

14  Ordinary Course of Business. [Docket No. 53]

15

16  Hearing re:  Noticing Agent Application. Debtors'

17  Application Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. §

18  503(b)(1)(A), and Local Rule 5075-1 For Entry of an Order

19  Appointing Prime Clerk LLC as Claims and Noticing Agent Nunc

20  Pro Tunc To The Petition Date. [Docket No. 25]

21

22  Hearing re:  Prime Clerk Retention Application. Debtors'

23  Application Pursuant to 11 U.S.C. § 327(a), Fed. R. Bankr.

24  P. 2014(a) and Local Rules 2014-1 and 2016-1 for Entry of an

25  order Appointing Prime Clerk LLC as Administrative Advisor

1    Nunc Pro Tunc To the Petition Date. [Docket No. 26]

2

3    Hearing re:  Opportune Retention Application. Debtors'

4    Application Pursuant to Bankruptcy Code Sections 105(a) and

5    363(b) for Entry of an Order Authorizing the Debtors to (I)

6    Retain Opportune LLP to Provide the Debtors with a Chief

7    Restructuring Officer and Certain Additional Personnel, and

8    (II) Designate William D. Holden as Chief Restructuring

9    Officer for the Debtors, Nunc Pro Tunc to the Petition Date.

10   [Docket No. 55]

11

12   Hearing re:  Ropes & Gray Retention Application. Debtors'

13   Application for Entry of an Order Authorizing the Retention

14   and Employment of Ropes & Gray LLP as Attorneys for the

15   Debtors and Debtors in Possession Effective Nunc Pro Tunc to

16   the Petition Date. [Docket No. 57]

17

18   Hearing re:  Houlihan Lokey Retention Application. Debtors'

19   Application for Entry of an Order Authorizing the Debtors to

20   Retain Houlihan Lokey as Investment Banker for the Debtors

21   Nunc Pro Tunc to the Petition Date. [Docket No. 58]

22

23   Hearing re:  Sale Motion. Debtors' Motion for (I) An Order

24   (A) Authorizing and Approving Bidding Procedures, Breakup

25   Fee and Expense Reimbursement, (B) Authorizing and Approving

Page 6

1    the Debtors' Entry into and Assumption of the Stalking Horse

2    Asset Purchase Agreement, (C) Approving Notice Procedures,

3    (D) Scheduling a Sale Hearing and (E) Approving Procedures

4    for Assumption and Assignment of Certain Contracts and

5    Leases and Determining Cure Amounts and (II) An Order (A)

6    Authorizing the Sale of Substantially All of the Debtors'

7    Assets Free and Clear of All Claims, Liens, Rights,

8    Interests and Encumbrances, (B) Approving the Asset

9    Purchase Agreement and (C) Authorizing the Debtors to Assume

10   and Assign Certain Executory Contracts and Unexpired Leases.

11   [Docket No. 21]

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 7

1   A P P E A R A N C E S :

2

3   ROPES & GRAY LLP

4        Attorney for the Debtor

5        1211 Avenue of the Americas

6        New York, NY 10036

7

8   BY:  GREGG M. GALARDI

9        KRISTINA K. ALEXANDER

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12       Attorney for the U.S. Trustee

13       201 Varick Street, Suite 1006

14       New York, NY 10014

15

16  BY:  GREG ZIPES

17

18  SCHULTE ROTH & ZABEL LLP

19       Attorney for the DIP Lenders

20       919 Third Avenue

21       New York, NY 10022

22

23  BY:  BRIAN C. TONG

24

25

Page 8

1   ANTHONY M. VASSALLO

2       540 President Street, 3rd Street

3       Brooklyn, NY 11215

4

5   BY:  ANTHONY M. VASSALLO

6

7   SIMPSON THACHER & BARTLETT LLP

8       Attorney for Proposed Counsel for Creditors Committee

9       425 Lexington Avenue

10      New York, NY 10017

11

12  BY:  WILLIAM T. RUSSELL, JR.

13      SANDY QUSBA

14

15  HAYNES and BOONE, LLP

16      Attorney for 114 Fifth Avenue Lease Owner

17      30 Rockefeller Plaza, 26th Floor

18      New York, NY 10112

19

20  BY:  TREVOR R. HOFFMAN

21

22

23

24

25

1    SULLIVAN & CROMWELL LLP

2            Attorney for Ziff-Davis

3            125 Broad Street

4            New York, NY 10004

5

6    BY:   MICHAEL H. TORKIN

7            ALEXA J. KRANZLEY

8

9    ALSO PRESENT TELEPHONICALLY:

10

11    AMIR JAVAID

12    KATY PAPE

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2            THE COURT:  Gawker.

3            MR. GALARDI:  Good afternoon, Your Honor.  For the

4    record, Greg Galardi of Ropes & Gray on behalf of Gawker

5    Media, LLC and the other related Debtors.  Your Honor, we

6    have forwarded to Your Honor an agenda, and I also

7    understand that today is the day to give Your Honor a status

8    conference.

9            So what I'd like to do is first start with a

10   little bit of status conference of what (indiscernible)

11   brings us today, and then I'll turn over many of the matters

12   on the agenda to my colleague, Ms. Alexander, and then I'll

13   be back to deal with a few of the matters.

14           First, with respect to the status, Your Honor,

15   although they've been here before on a discovery matter, I

16   just want to go back to -- the Committee was appointed on

17   June 24th that consists of three members.  Three of those --

18   all three members have contingent litigation claims against

19   the Gawker Media, LLC.  They are represented and retained

20   the counsel of Simpson Tacher, who is to my right, who

21   introduced themselves to Your Honor at that discovery

22   conference.  And then they have also retained the services

23   of Deloitte as the financial advisor.

24           Your Honor, they hit the ground running and within

25   the -- after being retained for the weekend of the 25th and

Page 11

1   also over the July 4th weekend, we've worked very

2   cooperatively and consensually with them so as Your Honor

3   will see on the agenda, there is really no contested matter

4   going forward today, although there will be a series of

5   revised orders that reflect comments from the Committee's

6   counsel as well as some from the U.S. Trustee's counsel.

7            And with their working over that first weekend, we

8   did manage to adjourn, as Your Honor may recall.  There was

9   an initial bid procedures hearing scheduled for that Monday.

10  I believe the day was the 27th.  They have asked for an

11  extension and are potential acquirers, if Davis agreed to

12  that extension to today's hearing so that we can work

13  through the matters.  And that time was well spent with

14  respect to resolving issues on the bid procedures motions.

15  And I can walk through those later.

16            Again, Your Honor, as we has proceeded with these

17  cases, we have a -- our schedules and statements are due

18  July 14th.  We may be -- and I think it'll be consensual

19  with all of the parties -- we may be seeking a few day

20  extension.  The 341 meeting is scheduled presently for July

21  28th, and as we agreed with the U.S. Trustee, no matter what

22  extension we ask for, the schedules and statements will be

23  at least four business days prior to that July 28th date.

24  So that we expect to conduct the 341 in accordance with the

25  schedule.

Page 12

1              Importantly, Your Honor, and as we get to later on

2      the bid procedures, there were earlier dates in the bid

3      procedures for a sale and auction.  And, again, as a result

4      of the efforts of the Committee and with the consent of

5      Ziff-Davis and the Debtors participating, you will hear

6      later, there is schedule for the bid process that we'll ask

7      Your Honor to approve later on with respect to bid

8      procedures that would have the bid deadline now extended to

9      August 15th; an auction to be on August 16th; and ultimately

10     -- and Your Honor's clerks have accommodated us and

11     tentatively scheduled an August 18th at 2 p.m.  hearing on

12     the sale for whoever is the successful bidder at that

13     auction.

14             Finally, Your Honor, as Your Honor is aware, the

15     other matter that is proceeding is the current dispute with

16     respect to the preliminary injunction that we sought on the

17     first day.  Depositions were conducted -- three depositions,

18     about two hours, pursuant to Your Honor's order, were

19     conducted yesterday.  I believe that there has been a brief

20     filed according to the scheduling order on the 5th of July.

21             Our firm will be filing a response, I believe it

22     is on the 11th of July, which is next Monday.  And Your

23     Honor has that hearing scheduled for the 13th.  That matter

24     has not been resolved and it's currently going to be going

25     forward.

Page 13

1          Your Honor, that is the status of all the matters

2     going on with respect to this case.  Unless Your Honor had

3     questions, I would turn the podium over to Ms. Alexander to

4     run through many of the first day motions and changes; and

5     then I'll return for the DIP, the sale, and a couple of

6     other matters.

7          THE COURT:  Okay.

8          MR. GALARDI:  Thank you, Your Honor.

9          THE COURT:  Does anyone else want to be heard in

10    connection with the case conference?  All right, the record

11    should reflect there's no response.  Go ahead.

12         MS. ALEXANDER:  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon.

14         MS. ALEXANDER:  Kristina Alexander of Ropes & Gray

15    for the Debtors.  Your Honor, as Mr. Galardi said, after

16    working cooperatively with the Committee and with the U.S.

17    Trustee over the last couple of weeks, we have made some

18    changes to certain of the orders which we have provided --

19    revised orders and red lines reflecting those changes to

20    Your Honor in a binder.  I'll just go in the order of the

21    agenda if that works for Your Honor.

22         THE COURT:  Sure.

23         MS. ALEXANDER:  First up is just the case

24    management motion.  That was presented at the first day

25    hearing and we deferred.  There have been no comments to

Page 14

1    your objections on the case management motion.

2              THE COURT:  I have some comments.

3              MS. ALEXANDER:  Okay.

4              THE COURT:  Your order refers to -- I guess the

5    procedures refer to a master service list and a 2002 service

6    list and to defined terms, but it doesn't say who maintains

7    them.  I guess the Prime Clerk maintains the 2002 list but

8    who maintains the master service list?  And if I'm making a

9    motion and I have to serve the master service list, how do I

10   know who I have to serve?

11             MS. ALEXANDER:  Yes, Your Honor.  I believe the

12   Prime Clerk would maintain that as well and post it on their

13   website, though I can confirm that that is the case.

14             THE COURT:  Well, but it's not required under the

15   procedures.

16             MS. ALEXANDER:  Okay.  We can add that in if you

17   like, Your Honor.

18             THE COURT:  All right.

19             MS. ALEXANDER:  Yes.

20             THE COURT:  It also looks like the procedures were

21   cut and pasted from your application.  There's a lot of

22   phrases that "at their requests" in the procedures.

23             MS. ALEXANDER:  Okay.

24             THE COURT:  They don't belong in the procedures.

25   It should just say that this is the rule.

1              MS. ALEXANDER:  Your Honor, we can modify that.

2              THE COURT:  It's in there several times.

3    Paragraph 9, Section 342, Requirements, I didn't understand

4    this...  Paragraph 9, I'm sorry, Section 342, Requirements.

5              MS. ALEXANDER:  Your Honor, I can look back at

6    that.  I don't have a copy of (indiscernible) at hand.

7              THE COURT:  How do I predetermine (indiscernible)

8    apply to the provisions?

9              MS. ALEXANDER:  I'm sorry, Your Honor?

10             THE COURT:  How do I predetermine that you've

11   complied with the provisions in connection to the future

12   service?

13             MS. ALEXANDER:  Sure, Your Honor.  We can remove

14   this paragraph.

15             THE COURT:  Okay.  Paragraph 12, the Debtor

16   requests (indiscernible) times.  Paragraph 16, this is the

17   evidentiary hearing provision.  There are certain

18   proceedings under our local rules which require an

19   evidentiary hearing the first day.

20             MS. ALEXANDER:  Okay.

21             THE COURT:  Unless the Court (indiscernible)

22   otherwise.  So, it should say, with respect to any Court

23   finding and an interlineate and subject to Local Bankruptcy

24   Rule 9014-2...  And then the last phrase is -- unless --

25   instead of "unless the proposed hearing agenda provides

1    otherwise", it's "unless the Court orders otherwise."

2              MS. ALEXANDER:  Thank you, Your Honor.

3              THE COURT:  Let me understand Paragraph 23.

4              MS. ALEXANDER:  Yeah, no, we can remove that.

5              THE COURT:  All right.  Oh, I skipped over a

6    couple of pages.  I apologize.  Paragraph 4, you talk about

7    service by electronic mail.  If you exclude the summons and

8    complaint, there are also other pleadings that you can't

9    serve by electronic mail, for example, pleadings under

10   9014B, a subpoena.  So why don't you just say unless the

11   Bankruptcy Code provides -- bankruptcy rules provide

12   otherwise, or I guess the Bankruptcy Code also you can serve

13   by electronic mail?

14             MS. ALEXANDER:  (indiscernible)

15             THE COURT:  We never -- we don't permit service by

16   filing an ECF.  Never adopted a local rule which is required

17   for that.  So you should take out Paragraph 5 since it's

18   unnecessary.  And substitute "Nothing in this order

19   authorizes electronic service through the Court's CNECF

20   system."

21             MS. ALEXANDER:  I'm sorry, Your Honor?

22             THE COURT:  Nothing in this order authorizes

23   electronic service through the Court's CN/ECF system.

24             MS. ALEXANDER:  Got it.

25             THE COURT:  Paragraph 6, in the former papers you

Page 17

1    should add that all pleadings have to be filed in a text-

2    searchable format.  Exhibits can be scanned.  And with those

3    changes I'll approve the case management procedures, unless

4    anybody wants to be heard in connection with the case

5    management procedures.  The record should reflect there's no

6    response.  Okay.

7              MS. ALEXANDER:  Thank you, Your Honor.  The next

8    order, Your Honor, is cash management.  We submitted and I

9    had entered an interim cash management order that reflected

10   comments from the U.S. Trustee.  The Committee has also

11   since provided comments on the order.  And we have provided

12   a red line in the binder reflecting the changes from the

13   proposed final order to the current cash management order.

14             THE COURT:  Does anyone want to be heard in

15   connection with the proposed final order?  I've reviewed the

16   order and the changes and I will approve it.  So you can

17   submit a final version.

18             MS. ALEXANDER:  Thank you.  Next up, Your Honor,

19   on the agenda is the wages motion.  As Your Honor knows, we

20   filed the wages motion for the first day hearing and Your

21   Honor granted certain relief on an interim basis.  We have

22   since consulted with the U.S. Trustee and the Committee

23   extensively on the relief sought in the wages motion that

24   was still open, specifically with respect to the sales

25   incentive program, the editorial incentive program, and the

Page 18

1    severance that could arise if certain employees are not

2    hired by the buyer of the Debtor's company.

3           We've reached a resolution on all of those issues

4    for today.  And I know our agenda said we would be putting

5    forth a final order.  We're actually -- and what's in your

6    binder is a second interim order.  That interim order

7    reflects approval after review by the U.S. Trustee and the

8    Committee of the sales incentive program and payments

9    thereunder, and the editorial incentive program and payments

10   thereunder.

11          We've provided to the Committee confidentially and

12   to the Trustee confidentially a list of all employees to be

13   paid the amounts discussed at length, their role at the

14   company, and ranks.  And they are comfortable with their

15   relief in an ongoing...  Both for now and on an ongoing

16   basis under those two programs, subject to the Committee's

17   cap of 25,000 on the editorial incentives and 340,000 total

18   on the -- on a quarterly basis on the sales incentives.

19          THE COURT:  Does anyone want to be heard in

20   connection with the (indiscernible) order?  Committee?

21          MR. QUSBA?:  No, Your Honor, with those caps that

22   we negotiated we're okay with those aspects of the order.

23          THE COURT:  When do you propose (indiscernible)

24   hearing?

25          MS. ALEXANDER:  I'm sorry?

1          THE COURT:  When do you propose to have the final

2    hearing or another (indiscernible)?

3          MS. ALEXANDER:  Probably the July 26th hearing,

4    Your Honor.  We wanted to give time for the Committee to

5    continue to evaluate.  They're working hard, obviously, but

6    they just got access to a lot of the employment agreements

7    and (indiscernible).

8          THE COURT:  I will adjourn that then to July 26th

9    at 10 o'clock.

10         MS. ALEXANDER:  Okay.

11         MR. QUSBA?: Thank you, Your Honor.

12         THE COURT:  Are you on the morning calendar or the

13   afternoon calendar on July 26th?  It looks like the

14   morning...

15         MS. ALEXANDER:  That's fine.  Okay, the next

16   motion, Your Honor, on the agenda -- the next two motions

17   are the taxes motion and the insurance motion.  Those were

18   both up -- as first days, Your Honor granted interim relief.

19   No substantive changes to the final relief sought for each

20   of those, and no informal or formal objections received on

21   either.

22         THE COURT:  Does anyone want to be heard in

23   connection with those orders?  The record should reflect

24   there's no response.  They're approved.  You can submit a

25   final order.

1          MS. ALEXANDER:  The utilities motion is before

2    Your Honor for the first time today.  We filed that as a

3    first day but it was delayed.  And that's a fairly standard

4    motion.  We've also received --

5          THE COURT:  It's not so standard.

6          MS. ALEXANDER:  Not so standard...

7          THE COURT:  I mean, the order's not so standard.

8    The motion is standard.

9          MS. ALEXANDER:  Okay.

10          THE COURT:  Does anyone want to be heard in

11    connection with the utilities motion?  The issue I have with

12    the utilities motion...if you're supposed to order the

13    adequate assurance, they don't have to ask for it.  And

14    you're not offering any adequate assurance.

15          MS. ALEXANDER:  Your Honor, yes, I understand.

16    Instead of sending out deposits to the utilities we are

17    saying that we will provide deposits at the utilities'

18    request then.  I know that --

19          THE COURT:  That doesn't sound like adequate

20    assurance to me.

21          MS. ALEXANDER:  Your Honor, I know that the

22    utilities can request further adequate assurance if they

23    need it.  To the extent that Your Honor wants us to send out

24    deposits...

25          THE COURT:  Why don't you do the usual two weeks

1    deposits and then if they think they want more, they're

2    entitled to come back under the procedures.

3              MS. ALEXANDER:  Okay, Your Honor.

4              THE COURT:  If they're already holding two-week

5    deposits and there's no prepetition loophole, that's fine

6    also.

7              MS. ALEXANDER:  Okay.  Your Honor, if it's

8    acceptable to you, I'll just skip over the DIP motion for

9    the moment.

10             THE COURT:  Okay.

11             MS. ALEXANDER:  My colleague Mr. Galardi is going

12   to come back up.  And move on to the next motion on the

13   agenda which is the critical vendor's motion.  That motion,

14   Your Honor, was also filed as a first day.  We delayed and

15   didn't do an interim order after consulting with the company

16   and realizing we would be okay to come to this hearing.  But

17   it is up for today.  We submitted, as Your Honor knows,

18   confidential information to you -- to your chambers as well

19   as to the Committee and to the U.S. Trustee, both of whom

20   have evaluated the potential vendors to be paid and amounts

21   to be paid and basis therefore.  And I understand the

22   Committee has no objection and the U.S. Trustee has no

23   objection.

24             THE COURT:  Let me hear from the Committee.

25             MR. QUSBA:  Good afternoon, Your Honor.  Sandy

Page 22

1    Qusba, Simpson Thacher & Bartlett, proposed counsel for the

2    Creditor's Committee.  We have spent some amount of time

3    with respect to the critical vendors' motion; in fact, with

4    Deloitte as well, our proposed financial advisor.  Given the

5    caps and given the vendors' diligence that we did, we're

6    comfortable with respect to the request, and obviously are

7    very focused on maintaining the enterprise as we bridge to a

8    sale.

9             THE COURT:  All right.

10            MS. ALEXANDER:  I should add here, Your Honor.  I

11   notice that the binder that we provided you with had the

12   final order as originally filed.  The Committee has asked

13   for and we will submit to you a notation in that order that

14   will reflect that payments to critical vendors will only be

15   made upon consultation with the Committee.

16            THE COURT:  Okay, all right.  Anyone else want to

17   be heard with respect to the critical vendor order?  With

18   those changes I'll approve the critical vendor order.

19            MS. ALEXANDER:  Okay, the next motion before Your

20   Honor is the interim compensation motion to establish

21   procedures for interim compensation.

22            THE COURT:  Does the proposed order deviate from

23   our guidelines at all?

24            MS. ALEXANDER:  No, I believe the proposed order

25   follows the general order.

1          THE COURT:  Anybody want to be heard with respect

2     to the interim compensation order?  Hearing no response and

3     based on your representation, I'll approve it.

4          MS. ALEXANDER:  The next motion before Your Honor

5     is for retention -- the ability to retain ordinary course

6     professionals.  We've provided a list of those ordinary

7     course professionals as Exhibit E.

8          THE COURT:  Well, some of these ordinary course

9     professionals are just listed at litigation services.  Are

10    they representing the Debtor in discreet litigations?

11         MS. ALEXANDER:  They would be representing the

12    Debtor in discreet litigations.  For most of them the

13    litigation is obviously stayed for all of them at this

14    point.  We've put them--

15         THE COURT:  Why aren't they retained on the 327E?

16    That's what 327E is for.

17         MS. ALEXANDER:  I'm sorry, Your Honor, maybe I

18    misunderstood your question.

19         THE COURT:  Why aren't they retained under 327E?

20    This procedure for retention of ordinary course

21    professionals, which isn't even a bankruptcy code, is really

22    for when you have to pick up the phone and call somebody

23    because you have a labor issue or a landlord-tenant issue or

24    something like that.  But if the law firm is representing

25    the Debtor in a litigation, that's what 327E is designed to

Page 24

1    deal with.

2             MS. ALEXANDER:  Your Honor, I think three of the

3    firms are listed as potential litigation representatives.

4    We can certainly do 327E applications for them, if you like.

5    These are--

6             THE COURT:  It's (indiscernible) what I like.

7             MS. ALEXANDER:  I understand, Your Honor.

8             THE COURT:  I'm telling you that this is not a

9    procedure to retain counsel that represents the Debtor

10   prepetition in a discreet matter and continues to represent

11   the Debtor post-petition.  That's why 327 (indiscernible) on

12   the Bankruptcy Code.

13            MS. ALEXANDER:  Okay, Your Honor.  We can take

14   those few out.  And I will confirm before that--

15            THE COURT:  As far as the litigation -- as far as

16   the corporate counsel is concerned, I understand that.  If

17   there's a problem with paying them...and I assume you're

18   just picking up the phone and asking them a lot of questions

19   at this point.

20            MR. GALARDI:  Your Honor, may I just address it

21   for one second?

22            THE COURT:  Sure.

23            MR. GALARDI:  I agree with Your Honor that

24   ordinary course is usually the 327E person.  Again, why, at

25   least in some courts -- and Your Honor may have a different

Page 25

1   practice.  Sometimes you do the 327E only because of the

2   expense of filing four or five other applications and having

3   them do fee applications.  I just --

4         THE COURT:  I understand it's a practical problem

5   -- issue but, you know, the code is the code.  And if we

6   started ignoring the requirements of the code when it was

7   impractical, this would be a free for all.

8         MR. GALARDI:  I understand.  Even the ordinary

9   course 327A is really not in the code either, Your Honor.

10        THE COURT:  But we overlook that because it's

11  small amounts, and to require somebody who is doing a few

12  hundred dollars' worth of work a month, it just -- it

13  doesn't make sense.  But...

14        MR. GALARDI:  And these are people of a...  And,

15  again, Your Honor, I'm not trying to --

16        THE COURT:  They're stayed litigations.  They're

17  not going to have that much to do.  Or at least they're

18  currently stayed.

19        MR. GALARDI:  Correct, Your Honor.

20        MS. ALEXANDER:  Your Honor, and so -- again, we're

21  happy to go ahead and file the applications for them.  A

22  couple of these I understand to be very small matters.

23        THE COURT:  One other change.  If you're going to

24  add anybody...

25        MS. ALEXANDER:  Yes.

1          THE COURT:  ...it has to be pursuant to court

2    orders.  And the reason for that requirement is that --

3    every judge in this court has a certain law firm or law

4    firms they can't authorize the retention of.  Myself

5    included.  I couldn't authorize the retention of at least

6    one law firm where my son works, even though he has nothing

7    to do with the case under an order like this.  So I'd have

8    to get somebody separate, somebody else to sign that order.

9          So, any additions have to be so ordered by the

10   Court.  And you can submit it with a Certificate of No

11   Objection if you can work out the procedure.

12          MS. ALEXANDER:  Thank you, Your Honor.  We will

13   make those changes.

14          THE COURT:  Otherwise (indiscernible).

15          MS. ALEXANDER:  The remaining matters before Your

16   Honor, before Mr. Galardi returns to the podium, are the

17   retention of Prime Clerk both as noticing agent and as

18   restructuring advisor -- sorry, excuse me -- administrator

19   advisor.

20          THE COURT:  Okay.

21          MS. ALEXANDER:  And we did not receive any

22   objections (indiscernible) to those.

23          THE COURT:  Has the Clerk of the Court approved

24   the noticing agent order?

25          MS. ALEXANDER:  I believe so, Your Honor.  I will

Page 27

1    confirm that the Clerk of the Court has.  I believe that

2    they did.

3              THE COURT:  (indiscernible) sign off on it.

4              MS. ALEXANDER:  Okay, will do.

5              THE COURT:  (indiscernible) the clerk -- on the

6    156C, Prime Clerk was doing the clerk's job.  With respect

7    to these retention orders -- it's a generic comment -- there

8    are all sorts of (indiscernible) indemnification rights

9    under these orders, and there are certain exceptions

10   generally for willful misconduct, gross negligence, breach

11   of fiduciary duty and the lot.

12             A lot of these orders or more often the retention

13   letters say that we're not entitled to indemnity for any

14   reason; we're still entitled to contribution, we're entitled

15   to limitations on liability in certain circumstances.  But

16   if somebody's committed an act that doesn't entitle to

17   indemnity, they're not going to get any limitation

18   liability, any contribution, any exoneration.  So you should

19   add that to the standard clause which is your order.

20             MS. ALEXANDER:  Yes.

21             THE COURT:  I mean, I haven't seen it, obviously.

22   Some of them -- some of these retention provisions provide

23   for arbitration or something like that if there's a dispute

24   under the order.  Any disputes are resolved here.

25             MS. ALEXANDER:  Thank you, Your Honor.  Will do.

1            THE COURT:  Okay.  It's a comment in all of these

2      orders, including the professional retention orders.  It's

3      obviously not in the lawyers' orders but it's in the

4      financial advisors' orders -- so it's up in accountants'

5      orders also.

6            MS. ALEXANDER:  Okay, we will make that edit, Your

7      Honor, in all of the retention applications order --

8            THE COURT:  Right.

9            MS. ALEXANDER:  And then, of course, the order

10     saying that the order governs -- with respect to --

11           THE COURT:  It usually says notwithstanding

12     anything in the retention order or anything else, this is

13     the rule.

14           MS. ALEXANDER:  The last retention application I

15     would present to Your Honor then is more Opportune and of

16     course taking into account those same comments you made to

17     ensure that the order reflects limitations on indemnity and

18     notes that the order governs to the extent it conflicts with

19     the engagement letter.  And then I would cede the podium

20     over to my colleague.

21           THE COURT:  Okay.  So you're proposing the two

22     Prime Clerk orders.  Does anyone want to be heard in

23     connection with either of those orders?

24           MR. ZIPES:  Your Honor, can I just have one

25     moment, please?

1              THE COURT:  Sure.

2              MR. ZIPES:  Subject to the clerk's approval with

3      the 156C order, that's approved.  And the retention as

4      administrative agent is approved.  With the changes.  And

5      what are we up to now?

6              MS. ALEXANDER:  The last one I will present to

7      Your Honor is Opportune.

8              THE COURT:  What number is that?

9              MS. ALEXANDER:  It is under C, Professional

10     Retentions, Number 3 on Page 5 of the agenda.

11             THE COURT:  I'm looking in your books here.

12             MS. ALEXANDER:  Oh, 13 in the book of orders.

13     And, Your Honor...

14             THE COURT:  Does anyone want to be heard in

15     connection with the application to retain Opportune?

16             MS. ALEXANDER:  Mr. Zipes just correctly pointed

17     out to me that Opportune has agreed -- in the order it had

18     said -- and you can (indiscernible)...  At the end of

19     Paragraph 5, it had said that Opportune was not required to

20     maintain time records.  As Mr. Zipes correctly pointed out,

21     they have agreed to maintain time records on a daily basis,

22     and we will make that correction in the order to reflect

23     that they will keep time on a daily basis rather than a

24     point five-hour basis.

25             THE COURT:  All right, this one has a limitation

1    of liability to six months of plead.  So there's still $10

2    million, but you've only paid them $1 million.  The limit of

3    their liability is $1 million over this...

4              MS. ALEXANDER:  Yes, Your Honor, as Mr. Galardi

5    said, we will modify all of those provisions.

6              THE COURT:  All these modified orders that you're

7    sending me, send me a redline copy and a (indiscernible)

8    copy, all right?

9              MS. ALEXANDER:  Yes.

10             THE COURT:  All right, that one is approved.

11             MS. ALEXANDER:  Your Honor, I have no further

12   questions on these orders.  I'll cede the podium back to Mr.

13   Galardi.

14             THE COURT:  Okay.

15             MS. ALEXANDER:  Thank you.

16             MR. GALARDI:  Your Honor, perhaps given your

17   comments, it's best to finish with the retention

18   applications first and then go back to the DIP in the sale.

19   The first one that I would be handling is the Ropes & Gray

20   retention.  Fortunately or unfortunately, lawyers don't get

21   indemnification.  We don't get success fees...

22             THE COURT:  I know that.  I'm still waiting for

23   (indiscernible).

24             MR. GALARDI:  So, I don't think we have any of the

25   same issues.  We've received no comments.  I did, in fact,

1    file a supplemental affidavit last night.  We don't believe

2    we have any conflicts.  We have discussed with the U.S.

3    Trustee -- I don't believe there are any comments to the

4    retention.  So unless Your Honor has some questions about

5    our retention, we'd ask that you approve Ropes & Gray's

6    counsel (indiscernible).

7              THE COURT:  Does anyone want to be heard in

8    connection with the application to approve Ropes & Gray's

9    retention?  The record should reflect there's no response.

10   The application is granted.

11             MR. GALARDI:  Thank you, Your Honor.  Then the

12   final retention application that is up for today -- and

13   there is a representative, Reed Snellenberger, who's in the

14   courtroom today, who put forth the declaration and support -

15   - is the retention application of Houlihan Lokey.

16             Your Honor, just to go over some of the fees, is

17   that it's a $150,000 a month fee.  There is a credit after

18   six months of -- six months at 50 percent.  There is a DIP

19   financing fee, which was the greater of $1 million or a

20   percentage.  As a result of the conduct and the approval of

21   the DIP, at least on an interim basis, they would have

22   earned already a million-dollar fee on that.

23             There is also a transaction fee set forth in the

24   transaction.  Just to give Your Honor an idea of what the

25   transaction fee would be -- given the current $90 million

1    offer, there was a minimum transaction fee in the agreement

2    of $1.25 million.  And based upon the extra 40 over 50,

3    because the offer is a $90 million offer, they're entitled

4    to approximately another $800,000.  So about a 2 -- a little

5    over a $2 million fee.

6          So, they do have what I will call the typical

7    investment banker...

8          THE COURT:  Typically, there's a credit, though,

9    against the monthly fees.

10          MR. GALARDI:  Right.  But the credit in this

11   instance was the very first thing.  There's not a credit for

12   the first three months; there's not even a credit for the

13   first six months.  So, if I were to total up the fees, let's

14   say, as of August, they would've had a June, a July, an

15   August, that's three -- about 450, maybe six if there was a

16   partial month.  Six plus a million DIP fee, plus, roughly, 2

17   million.

18          So, the way we figure, by August, given the

19   activities they've done, by the 1st of September, they will

20   have earned about a $3.75 million fee for their activity in

21   this case.

22          They do have the typical investment banker

23   indemnification.  We will make clear the order about all the

24   provisions that Your Honor had said with respect to -- as

25   I'm used to putting in in the order that says the order

1    governs with respect to indemnification provisions and all

2    of those things.

3           We have obviously circulated this to the U.S.

4    Trustee's Office, to the Creditors Committee.  We have

5    received no objection, and we would ask Your Honor to enter

6    the retention application for Houlihan Lokey.

7           THE COURT:  Does anyone want to be heard in

8    connection with the retention of Houlihan Lokey?  By the

9    way, the provision that I was mentioning, you've already got

10   part of it in 11B of this particular order.  Just they're

11   not entitled to a limitation on liability, contribution, or

12   exoneration if they do any of the things that are listed in

13   this order.  All right.  Otherwise the order is approved.

14          MR. GALARDI:  Thank you, Your Honor.

15          THE COURT:  The motion is approved.

16          MR. GALARDI:  Your Honor, now I would turn back to

17   a motion that was skipped over, which was the DIP motion and

18   final order with respect to the DIP motion.  As I had

19   mentioned earlier in my introduction, we had filed a debtor

20   in possession financing motion as of the first day.  That

21   motion sought interim relief of approximately $17 million,

22   which would've paid off a first lien facility by Silicon

23   Valley Bank and then consensually primed -- I called it

24   Columbus Nova.  There is another name for that - -the actual

25   owner of it.  But a consensual prime.

1          Today we seek to go on a final basis consistent

2     with the provisions that we have a final order entered

3     within the time period set forth in the credit agreement and

4     for approval of $22 million on a final basis.  Your Honor,

5     we have gone through with the Committee and, frankly, there

6     were only a few comments.  And I can certainly walk through

7     Your Honor with respect to the form of order.  We did file a

8     blackline of that order.

9          And probably the best way to work through it --

10    the comments -- most of the comments are simply to reflect

11    that fact that there's a final order.  That there is a

12    committee that's been appointed.  There are a number of

13    strikethroughs, for example, in the findings to reflect that

14    it's now a final order as opposed to an immediate entry of

15    an order.

16         There is, I think, one provision that has

17    increased the carve out from 500 to $650,000.  That was one

18    of the changes that the Committee had requested.  The 506C

19    waiver is now final, Your Honor, under this order.

20         There was a provision, which I think is new

21    entirely in this order, that has been kept in it and it is

22    the waiver of an obligation against any non-debtor obligors

23    on the prepetition debt.  I believe it's in Paragraph 18D of

24    this particular order.  That was requested.  It was not our

25    intention to have actually released a non-debtor guarantor

1     of the debt, but nonetheless, the Committee did, in fact,

2     ask for that provision to be put in.  You will see it at the

3     very end, I believe, of -- on Page 49 of the blackline under

4     D.

5               THE COURT:  What's the reason for that?

6               MR. GALARDI:  I led the Committee...  I am going

7     to speculate that I believe Mr. Denton --

8               THE COURT:  (indiscernible) speculation

9     (indiscernible)...

10              MR. GALARDI:  I think the bottom line is that

11    there is a non-debtor such as Mr. Denton that may have

12    guaranteed certain of this debt, and they just wanted to

13    make it clear that Mr. Denton did not get released --

14              THE COURT:  Oh, this is a non (indiscernible)?

15              MR. GALARDI:  That's what it is.  It's a non

16    (indiscernible)...

17              THE COURT:  I thought it said the other

18    (indiscernible)...

19              MR. GALARDI:  Oh, no, I'm sorry.  No, it is a

20    clarity to not release a third party.

21              THE COURT:  Now I understand.

22              MR. GALARDI:  Okay.  And, again, it was never our

23    intention to do so.  Your Honor, I think there's other

24    clarifications about the timing of payments from the asset

25    sale that would actually go to pay off the debt.  We have

Page 36

1    been advised and Cerberus had asked for, and I was going to

2    put this on the record, that Cerberus asked to be a notice

3    party pursuant to the bid procedures.  They've advised me

4    that they will not be bidding in this transaction.  So we

5    had no objection to that.  That also makes sure that they

6    can come in and first lien lenders want to see that if the

7    sale has gone through and the price is above their debt,

8    then they can no longer -- they are getting paid off, and we

9    had no objections to that.  There is clarification on that.

10           I don't believe that there was -- and the

11   Committee can correct me -- any other, other than

12   clarifications of language, more or less clarifications of

13   language with respect to the DIP order provisions that you

14   wanted me to highlight.

15           MR. QUSBA:  Your Honor, Sandy Qusba, Simpson

16   Thatcher & Bartlett, again, proposed counsel for the

17   Creditors Committee.  We recognize obviously this is a new

18   money financing.  This is not an incumbent prepetition

19   lender searching for ways to improve their position; this is

20   truly new capital coming in.  Accordingly, we reviewed the

21   DIP order and the DIP financing in that context.

22           Nevertheless, we did negotiate a number of other

23   things, including confirming that the DIP financing and the

24   adequate protection liens would not reach to and encumber

25   avoidance actions, which certainly could be an opportunity

1    for us to augment the size of this estate.

2            The Committee is also not bound by the equities of

3    the case exception 552.  The investigation period was

4    extended by another couple of weeks, 15 days.  The same with

5    the investigation budget as well from 35,000 to 75,000.  Mr.

6    Galardi already referenced the increase in the carve out as

7    well.  And we will have consultation rights with respect to

8    any new budgets and certainly will be involved in that

9    aspect of it as well.

10           But, again, we view this as a short-term DIP

11   financing in order to bridge us to a sale transaction.  And

12   we expect Mr. Harris and his clients to be gone in short

13   order.  Obviously, we are retaining rights with respect to

14   our investigation of prepetition debt and exposure, and to

15   be able to disgorge that if there's a problem, subject to

16   Your Honor granting the appropriate orders and the like.

17           THE COURT:  Thank you.

18           MR. QUSBA:  Thank you, Your Honor.

19           THE COURT:  Does anyone else want to be heard with

20   respect to the financing order?  I'll approve the financing

21   order based upon the record that was made at the time the

22   interim order was filed, and the additional information

23   provided by the Committee.  There's nothing remarkable

24   really about the order.  It's a fairly standard order that

25   we see in these cases.

1          I guess the issue I had raised the first time is

2     the rollup, and you tell me that that is to avoid priming

3     problems.

4          MR. GALARDI:  With respect to (indiscernible) you

5     raised the issue as to why we were catch collateralizing VLC

6     and I explained that that was (indiscernible).  Correct.

7     And Mr. Holden is in the courtroom and obviously would

8     affirm his statements in the declaration and the use of the

9     proceeds to the extent Your Honor needed any evidence

10    further with respect to its need.

11         THE COURT:  By the way, when I ask for blackline

12    copies, when you send them it's blacklined off of the most

13    current copy that you're giving me.  Because I've reviewed

14    the changes already up until today.

15         MR. GALARDI:  Correct, Your Honor.  Anything

16    subsequently will be after when we file.

17         THE COURT:  Which brings us to the sale motion.

18         MR. GALARDI:  Which brings us to the bid

19    procedures and sale motion, yes, Your Honor.  Again, as a

20    result of the efforts, cooperative efforts of the Committee

21    as well as Ziff-Davis and the Debtors, Your Honor, we have

22    resolved both the Committee's objections or informal

23    objections as well as the one objection you may recall that

24    Mr. Belaya's counsel had filed an objection early on with

25    respect to the proceeds of avoidance actions or third party

Page 39

1    actions and intercompany actions.

2            So, though they span four documents, all of the

3    objections have been resolved.  What I'd like to do, Your

4    Honor, is to walk through the changes to the bid procedures

5    order since I think they generate -- they are the most

6    significant of the changes, although most of it is dates.

7            As we had always anticipated and now it's

8    explicit, we have agreed to consultation rights, and many of

9    the changes are consultation rights with respect to the

10   procedures, with respect to the auction, with respect to the

11   sale, with respect to sharing of information from potential

12   bidders.  That -- those are changes that we have put

13   throughout.

14           I think, and as I've highlighted in the

15   introduction, one of the most significant changes is on Page

16   3, is the extension of the bid deadline, which had been

17   originally scheduled for July 27th or originally proposed

18   for July 27th, is now August 5th.

19           Your Honor, in that regard, there used to be a

20   concept of a preliminary bid and a preliminary bid deadline.

21   We've deleted the preliminary bid deadline because it just

22   another thing the bidders would have to jump through a hoop.

23   And we agreed in talking with the committee to do that.  And

24   Mr. Torken on behalf of the buyer agreed similarly.

25           Your Honor, the next change is a clarification --

1    and I think this just makes the math much easier -- that the

2    bid requirements include simply a flat $9 million deposit.

3    And that's based on 10 percent.  So, if somebody puts in a

4    little bit bigger bid, we're only going to start with the $9

5    million.  That just made us not have to do math and actually

6    created a little bit less of a threshold so that people

7    could go up higher and put less of a deposit in.

8            We've made clear that we're not going to -- and

9    this was in the motion, and the Committee asked us -- I'm

10   now on Page 4 of the blackline, last paragraph, Paragraph C.

11           THE COURT:  You're looking at the bid procedures

12   now?

13           MR. GALARDI:  I am looking at the bid procedures

14   themselves; not the order.  I apologize.  They're probably

15   blacklined too.

16           THE COURT:  I'm looking at the blacklined.

17           MR. GALARDI:  Okay.  It's Page 4 of the bid

18   procedures.  There's bid requirements.  I did speak to the

19   B, which is the $9,000 deposit.  I'm now in C.  Again, there

20   are clarifications of the amount and what the purchase price

21   will be, and it's a $90 million purchase price.

22           But you will see there is a provided further

23   paragraph at the end, and it is to make clear what we had

24   said in the motion -- that when we determine the highest or

25   otherwise best bid, we're not going to be attributing value

Page 41

1   to the consulting agreement with Mr. Denton or other

2   agreements that Mr. Denton may enter into.

3         Obviously, and as I said to the Committee, we

4   agree to that, but should somebody take on an indemnity

5   obligation, and we may be back here on that.  But other than

6   that, we are making it clear that that -- his getting a

7   separate compensation is not value the company receives.

8         THE COURT:  Along that line, do you think that

9   this transaction is subject to the business judgment rule or

10  some other rule since Mr. Denton has signed the agreement

11  and he has a $400,000 consultant fee -- consulting

12  agreement?

13        MR. GALARDI:  Well, there's two ways we've

14  addressed that, Your Honor.  First, we did hire an

15  independent board member prior to it to make sure we had an

16  independent board member to whom these activities are, in

17  fact, granted.  Second is --

18        THE COURT:  So, did the -- who approved this

19  transaction?

20        MR. GALARDI:  Excuse me?

21        THE COURT:  Who approved this APN?

22        MR. GALARDI:  The independent board member.  The

23  board is full.  So, you have, again, corporate governance

24  issues with respect to whether that's an interested or

25  entitled to the business judgment.  You do have an

1      independent director with no financial stake who did, in

2      fact, approve it.

3                   THE COURT:  But Mr. Denton signed the agreement.

4                   MR. GALARDI:  Yes, he did sign the agreement.  But

5      signing the agreement doesn't mean it's an authorized

6      signatory, right?  It still needs board approval.  So you

7      have all of the wrinkles of whether a single disinterested

8      board member who approves it would be entitled to business

9      judgment, or you have an interested board member who does --

10                  THE COURT:  So, who approved it?

11                  MR. GALARDI:  The board of directors approved it

12     in full with the independent board members separately

13     approving the signing of the asset purchase agreement.

14                  THE COURT:  Okay.  Who on the board -- who are the

15     board members?  Isn't Mr. Denton a board member?

16                  MR. GALARDI:  Mr. Denton is a board member, Ms.

17     Dietrich is a board member, Mr. Tilman is a board member,

18     and Thomas...Plunkett is a board member.

19                  THE COURT:  So I assume that Mr. Denton didn't

20     vote on it.

21                  MR. GALARDI:  I don't remember the board minutes.

22     I think he may have abstained from that, Your Honor.

23                  THE COURT:  (indiscernible) abstained?

24                  MR. GALARDI:  Your Honor, I don't have the board

25     minutes.  But I think...  First of all, I don't believe it's

Page 43

1   necessary for him to have abstained.

2            THE COURT:  Really?

3            MR. GALARDI:  Yes.  That just changes the standard

4    (indiscernible).

5            THE COURT:  Right.  So --

6            MR. GALARDI:  So, I'm starting back with your

7    question of business judgment --

8            THE COURT:  That's why I raise the question.

9    Because your application says it satisfies the business

10   judgment rule.  I'm not sure that's the appropriate

11   standard.

12           MR. GALARDI:  Well, again, Your Honor, I believe -

13   - again, we'll get into the nuances of Delaware corporate

14   law.  One is I don't recall specifically whether Mr. Denton

15   voted on this one or we asked him to abstain from this.

16   Second is it did have the independent board member approve

17   it.  Obviously, before finally going through it, it will be

18   the independent board member that prosecutes that motion.

19   Whether it's --

20           THE COURT:  But the mere approval of the bid

21   procedure subjects the Debtor to a lot of potential

22   liability under the APA, right?

23           MR. GALARDI:  Excuse me?  Yes, it did subject by -

24   - and again --

25           THE COURT:  So, today's the day.  If I approve

Page 44

1    this -- if I sign the bid procedures order, you're locked in

2    to the liquidated damages and everything else, right?

3            MR. GALARDI:  Correct, Your Honor.  And with

4    respect to those procedures -- and, again, those are part of

5    the changes that were made -- with respect to those

6    procedures, one, business judgment we still think applies

7    because the independent director approved all of these

8    provisions and we asked them to separately approve this.

9    So, that's one.

10           Two, even if Your Honor -- and, again, when we

11   talk business judgment standard in Delaware, and we talk

12   business judgment in corporate fiduciary law, and we talk

13   business judgment in the Bankruptcy Court, they're never

14   quite the same.  And I think the cases say that.

15           THE COURT:  Well, I know bankruptcy is very

16   different.

17           MR. GALARDI:  It is very different.  And it's a

18   higher standard.  And so we believe under the business

19   judgment standard, as used in the 363 sale context, we still

20   satisfy that.

21           But even if Your Honor thought it was a higher

22   fairness independent judgment standard, we still think it

23   satisfies those standards.  Again, it was exactly those

24   concerns that the Committee raised with respect to

25   liquidated damages, which we'll walk through -- is a change

Page 45

1    to the order that we believe was appropriate.  We think it's

2    an exceptionally rare circumstance.  And as you will see,

3    it's drafted, and even more exceptionally rare that we would

4    be subjected to that liability.  So the board, and including

5    Mr. Tilman, were quite comfortable with that provision.

6              So, and the other liability, again, is the breakup

7    fee liability.  And that we think has been well-earned.

8    It's a no diligence, no financing out agreement.  So with

9    all of those things all presented to the board -- thought

10   that it was an exercise of business judgment within the

11   standard of the Bankruptcy Code.

12             THE COURT:  Do you think it's an appropriate

13   exercise of business judgment to pay both the breakup fee

14   and the (indiscernible) damages for the same loan?  Just

15   asking.

16             MR. GALARDI:  No, I understand and I'm thinking

17   through this particular agreement.  And I see a little smile

18   on your face.  Do I think it's justified?  Again, I'm going

19   to answer this in the way a lawyer will answer this

20   (indiscernible) have a sale.

21             No, I'm going to say, Your Honor, this was the

22   best deal that we could get.  The liquidated damages clause,

23   though I understand it's a concern, it's that we would have

24   to dismiss this case.  And that's when it's payable.  And

25   there would never be an intention to do that unless there

Page 46

1    was...  So I think making that decision --

2            THE COURT:  No, no, no, liquidated damages --

3    somebody makes a motion to dismiss and you don't use

4    commercially reasonable efforts to oppose it, right?

5            MR. GALARDI:  Again, I don't think there's...  And

6    I think it's been modified in this particular version,

7    anyway, Your Honor, with respect to we have to be the party

8    to make it.  I think that was the change.

9            THE COURT:  No, I think it's -- that opposition --

10           MR. GALARDI:  Commercial?  I would have to use

11   still commercially reasonable...

12           MAN 1:  There are two or three event --

13           THE COURT:  Even if it's dismissed, they earn the

14   breakup fee also, right?

15           MR. GALARDI:  Yes.

16           THE COURT:  Yes.  So they get...

17           MR. GALARDI:  They get a lot of money.

18           THE COURT:  They get $17 million if the case is

19   dismissed.

20           MR. GALARDI:  Correct, Your Honor.  And, again,

21   when you view the risk of that dismissal, and you view the

22   risk of what we have to do to oppose that, I think that is a

23   very limited risk in exchange for which we have now gotten

24   one security with respect to a sale that has no financing

25   and no due diligence out.  It's a standard stalking horse

Page 47

1    provision that sets a floor of $90 million in a troubled

2    company that was subject to litigation.

3              So, again, if Your Honor uses independent

4    judgment, as it would in a court case if this was an

5    interested transaction, I think it's justified.  And I think

6    on the business judgment and based upon the discussions with

7    the independent board member, the independent board member

8    felt comfortable that that was a risk, given the

9    circumstance that was appropriate for the business.

10             With respect to -- well, do you want to continue

11   or shall I go through more changes?

12             THE COURT:  No, go through it.

13             MR. GALARDI:  Sure.  Your Honor, with respect to

14   the other provisions, you will see that there is a deletion.

15   Again, the Committee pursued deletions on Paragraphs F and

16   G, which make the ability for a new bidder to come in and

17   give us flexibility to choose a higher and better -- those

18   two provisions were stricken, so they are no longer stuck to

19   what the provisions are in the various stalking horse APA.

20             You will see there are other consultation rights.

21   We have to consult with the Committee about a qualified

22   bidder.  Then you will see the next big change is on Page 7,

23   which is the auction, which has now been set -- this order

24   provided August 17th.  We've now agreed with the Committee

25   and Mr. Torken on behalf of Ziff-Davis that it'll actually

1    be a day earlier, which will be August 16th, without

2    changing the bid deadline.

3         That will give us two things:  One is there were

4    certain people that were unavailable on the 17th; but I

5    think, more importantly, should we have a robust auction, it

6    gives us a day and it also gives us a day to prepare for the

7    sale hearing so that we've added that -- we've brought back

8    that day, but it does not change the timing or the ability

9    to solicit bids, which has been extended.

10        We added a section on Page 8 with respect to the

11   Committee's advisors having a right to observe all private

12   discussions in meetings between the Debtors and qualified

13   bidder.  We accepted that from the Committee.  That was in

14   addition to the consultation rights.

15        You will see on Page 9, its addition of

16   consultation rights, and we did add a paragraph -- although

17   we did not get the stalking horse -- the currently stalking

18   horse bidder to agree to this, you will see on Page 9 that

19   there is a period of time that backup bidders must stay

20   ready to close for the consummation of the successful bid or

21   20 days after the sale hearing.

22        And, Your Honor, the idea was to make it as short

23   as possible but ensure a closing.  And if we were worried

24   about it, then to be able to close and not lose a bidder or

25   not have to make any big sale.  That was also included on

1   Page 10, where we have the provision that the deposit would

2   have to be returned in that same sort of time period.  And

3   then there was all reservations of rights with respect to

4   the deadlines and consultation of the Committee.

5         Those were the changes to the bid procedures

6   themselves, Your Honor.  I can walk through the changes to

7   the bid procedures order.  Most of those are related.  And I

8   think this is the most significant change, Your Honor, and

9   you can see it in the title.

10        What the original agreement required us to do was

11  to actually assume the contract pursuant to 365 today.  That

12  is no longer the case but we are, as the company is taking

13  on, and this was at the request of the Committee -- we are

14  obligated to perform certain pre-closing obligations.  And

15  that order has been revised so as to not assume the

16  agreement, but to actually direct and enforce certain of the

17  provisions of the asset purchase agreement.

18        That's why we will have an amendment to the asset

19  purchase agreement.  But you will see the changes in the

20  actual order approving bid procedures reflect that in many

21  of the provisions and the changes.  The deadlines that I've

22  already mentioned are changed on Page 6 and 7 of the

23  blackline.

24        And because we did change the obligation -- the

25  agreement from an assumption of the asset purchase

Page 50

1      agreement, you will see the changes in Paragraphs 10, 11,

2      and 12 lay out.  Specifically, the provisions in 10 are laid

3      out as to what we will have to comply with.  The paragraphs

4      of 11 address the damages and what will be the status of the

5      claims in the event that we, in fact, reach the agreement --

6      with no intentional breaches.

7              And then Paragraph 12 sets out the level of the

8      expense -- administrative expenses under 503B and 507 --

9              THE COURT:  What authority granted super-priority

10     to Ziff-Davis?

11             MR. GALARDI:  Excuse me?  What's the authority for

12     granting a super-priority --

13             THE COURT:  Yeah, the statutory authority.

14             MR. GALARDI:  Your Honor, I believe that if

15     they...  Again, my --

16             THE COURT:  They're not lending money so they

17     don't get a super-priority under 364, and they're not

18     talking about a shortfall of the cash collateral, so they're

19     not getting -- or super-priority under 507B.  What's...?

20             MR. GALARDI:  Your Honor, I believe that the Court

21     has the authority to grant administrative expenses or even

22     prior expenses --

23             THE COURT:  Under Section 105A, I assume?

24             MR. GALARDI:  Yes, Your Honor.  Under Section

25     105A.  And, again --

1          THE COURT:  I disagree, by the way, but go ahead.

2          MR. GALARDI:  Well, again, Your Honor, that is the

3    authority that I believe that you can grant and elevate

4    certain expenses so that they get paid ahead of

5    administrative creditors.

6          THE COURT:  Another question I have.  Under

7    Paragraph 25...

8          MR. GALARDI:  Okay.

9          THE COURT:  ...the Debtor's (indiscernible)

10   disagreement without further order of the Court.  So why am

11   I even approving it?

12         MR. GALARDI:  That's the amendment, Your Honor.

13   It's not this order.  And it's the amendment with respect to

14   that --

15         THE COURT:  That's just limited to the amendment?

16         MR. GALARDI:  Yes.  The 25 that I have in the

17   blackline says, "The Debtors are authorized and directed to

18   enter in to the amendment to the stalking horse agreement."

19         THE COURT:  Okay.

20         MR. GALARDI:  Attached is Exhibit 4.  And to take

21   all actions necessary.  Now, am I not reading the same

22   paragraph?

23         THE COURT:  No, I'm sorry.  I misread it.  Because

24   I have seen them where they say you can just change it.

25         MR. GALARDI:  Your Honor, I've seen them.  I've

1    never put one in but somebody may show me an order before...

2    No, so, Your Honor, let's now turn to the actual amendment,

3    Your Honor, which did address the liquidated damages

4    clauses.  This is obviously all new because it is an

5    amendment to the agreement.

6              THE COURT:  Right.

7              MR. GALARDI:  I have it at Docket 77, which, at

8    least my pages started at 143 to 154.  You will see that the

9    amendment makes clear certain excluded assets from the

10   purchase agreement, which is the amendment to -- which is

11   the very first page.

12             Next, Section 2.1H of the asset purchase agreement

13   is also amended.  So, except for the excluded claims, the

14   litigation of the closing claims guarantees insurance.  That

15   is now included in the language.  Again, this was Committee

16   recommendations.

17             The -- 210 is now amended to make sure on the

18   allocation.  As Your Honor knows, I think, from the

19   beginning and what I've mentioned to the Committee, one of

20   the issues will be, and one of the issues which we have

21   determined to wait until the sale proceeds is how will the

22   proceeds among the three Debtors be allocated?

23             As the Committee is well-aware and as I mentioned

24   at the beginning, the creditors that they represent,

25   although they represent all creditors -- the creditors that

1    happen to be on the Committee are creditors of Gawker Media.

2    Kinja has only a few creditors.  And as Your Honor is aware,

3    GMGI is a holding company.  How the allocation of the

4    purchase price from Kinja Assets at the Gawker Media assets

5    is allocated will have an implication for the recoveries of

6    creditors of each of those groups.  And this was to make

7    clear that, despite the fact that a bidder has to or a buyer

8    has to allocate for Internal Revenue Services one of the

9    aspects of that -- well, that will not be governing the

10   allocations with respect to the proceeds in any subsequent

11   dispute or agreement that we have in the future on that

12   issue.

13          Paragraph E, which his 5.3, just says you're not

14   going to hold an auction.  Use your reasonable efforts to

15   have the sale order to be entered by the August 19th cate,

16   which we have done by trying to get to Your Honor on an

17   August 18th hearing date.

18          We need to have the bid procedures order.  You may

19   recall that there was an original paragraph in the agreement

20   that said that we had to have the bid procedures order by

21   July 5th.  This is to confirm that we can get the order

22   today if Your Honor so approves it.

23          It also then on Paragraph 81J amends the 19th on

24   the sale order.  The rest are -- there are more, but I want

25   to draw your attention to Section 8.3.  It does talk about

Page 54

1    the allowed administrative expense, which Your Honor has

2    raised the question with respect to the super-priority.

3    This is an amendment to the asset purchase agreement.

4         8.3F is also amended for the results of the -- any

5    of the provisions being breached.  And it now talks about

6    the liquidated damages clause.  Again, Your Honor, the

7    Committee had raised numerous issues regarding the

8    liquidated damage costs, tried to refine it, and refined it

9    to those provisions where --

10        THE COURT:  Have you ever seen a bankruptcy

11   transaction like this with a liquidated damages clause?

12        MR. GALARDI:  I've been asked that question.  I

13   think I had one in my 23 years that had a liquidated damage

14   clause.

15        THE COURT:  I've been here 23 years, I've never

16   seen one.  And I've done a lot of sales.

17        MR. GALARDI:  And I've done a lot of sales too,

18   Your Honor, and I will say I've not seen an agreement that

19   had both breakup fees, expense reimbursement, and a

20   liquidated damages clause.

21        THE COURT:  Okay.

22        MR. GALARDI:  You will see on Paragraph 8.3G -- K

23   of that, the further amendments with respect to the bid

24   procedures, breakup fees, and then the excluded actions,

25   Your Honor, which I think resolved both Mr. Vassallo's

1    VASSALLO objection as well as the Committee's objection.

2              This is an avoidance.  These are the avoidance

3    actions and, in particular, they are -- they were very

4    concerned not only with preference actions but also with

5    intercompany transactions that could be themselves

6    challenged.  This paragraph, as far as the excluded actions,

7    reflect those changes.

8              Your Honor, the final place in which there are

9    changes to the documents, although not before Your Honor

10   today, is the actual sale order that was being proposed and

11   we have that.  Again, same docket, 77.  I have it beginning

12   at Page 105, 154.  I don't need to go over these in much

13   detail, other than they reflect conforming changes to what

14   happened with the asset purchase agreement, and the not

15   pursuing it on the 365 --

16             THE COURT:  How many (indiscernible) do you think

17   this sale order says the sale's free and clear?  I counted

18   11.  My general practice is to cross out every paragraph

19   after the first one.

20             MR. GALARDI:  And Your Honor, so --

21             THE COURT:  That added up to one paragraph.

22             MR. GALARDI:  And Your Honor --

23             THE COURT:  (indiscernible) liability, I think I

24   counted five.

25             MR. GALARDI:  Your Honor, I understand.  And,

Page 56

1    obviously, since we're not putting the sale order before

2    Your Honor, we have ample time to try to get it down to one

3    paragraph, one paragraph that's clear.  And I'm sure that

4    this bidder is listening as well as potential bidders --

5              THE COURT:  He's standing up.  He's going to speak

6    soon.

7              MR. GALARDI:  I'm sure he is, Your Honor.  And so,

8    Your Honor, we would ask Your Honor with those changes to

9    approve -- and I'm sure the Committee may have some

10   additional comments that they would like to make, but we

11   would like to go forward and we would ask Your Honor to

12   approve the bid procedures.

13             We'd ask Your Honor to approve the amendment to

14   the asset purchase agreement, to reflect the changes to the

15   bid procedures and our obligations to continue to perform

16   under that asset purchase agreement, including the

17   liquidated damages clause changes.  We would also ask Your

18   Honor to enter the bid procedures order.

19             THE COURT:  Tell me more about what the record

20   reflects about the marketing efforts of this asset.

21             MR. GALARDI:  Sure, Your Honor.  And Houlihan is

22   available in the courtroom today, and I think --

23             THE COURT:  That's (indiscernible) in declaration.

24             MR. GALARDI:  Correct, Your Honor.  And, again --

25   and I think we mentioned this at the discovery.  Until this

Page 57

1    order is entered, we have been on a -- other than what is

2    set forth in that declaration as to the efforts of Houlihan,

3    once we entered into this agreement we've been in a no-

4    solicit period.

5              THE COURT:  But all Houlihan says is it came on on

6    May 15th, it spoke to six people or six entities that the

7    Debtor had a dialogue with.  Apparently, there were two

8    bids; they accepted the bid within about 8-10 days after it

9    came on board.  And even though the no-shop, no-talk

10   provision didn't take effect until June 10th, there was no

11   evidence that any discussions occurred between whenever they

12   accepted the bid and June 10th.

13             MR. GALARDI:  With respect to -- with respect to

14   other bidders or the bid?

15             THE COURT:  Other bidders.

16             MR. GALARDI:  Your Honor, with respect to the --

17   and, again, we can put the Houlihan person on but --

18             THE COURT:  It's your show.

19             MR. GALARDI:  That's fine.  And give me one second

20   and we'll talk about what we can put up.  We'll put on and

21   do it...  Your Honor, we're going to put a witness on.  Do

22   you want to take a two-minute break and then we can put him

23   on, if that would be...?

24             THE COURT:  Sure, sure.

25             MR. GALARDI:  Is that cool?  Thank you.

1          THE COURT:  Sure.  Take a two-minute break.  Two

2    minutes for lawyers.

3        (Recess)

4          THE COURT:  Continue.

5          MR. GALARDI:  Your Honor, what we'd like to do is

6    call Mr. Snellenbarger to the stand.

7          THE COURT:  Sure.  Mr. Snellenbarger?

8          MR. SNELLENBARGER:  It's the only place I see.

9          THE COURT:  Would you raise your right hand,

10   please?  Do you solemnly swear that the motion you're about

11   to give is the truth?

12         MR. SNELLENBARGER:  I do.

13         THE COURT:  Please take a seat.  State and spell

14   your name.

15         MR. SNELLENBARGER:  Reid Snellenbarger.

16         MR. GALARDI:  Why don't you spell your name?  I

17   know we gave it to the court reporter --

18         THE COURT:  All right, if the court reporter has

19   it.

20         MR. GALARDI:  She did, she got it beforehand,

21   thank you.

22                        DIRECT EXAMINATION

23   BY MR. GALARDI:

24   Q   Mr. Snellenbarger, would you please tell by whom you're

25   employed?

1   A     Houlihan Lokey.

2   Q     And how long have you been at Houlihan Lokey?

3   A     11 years.

4   Q     And what is your position at Houlihan Lokey?

5   A     Managing Director.

6   Q     Okay.  And Mr. Snellenbarger, what's Houlihan's role

7   with respect to the Gawker Media bankruptcy cases?

8   A     We're the Debtor's investment banker.

9   Q     And just recently retained, correct?

10  A     Correct.

11  Q     And when did Houlihan first enter into an engagement

12  letter with Gawker Media and the other Debtors to be

13  retained?

14  A     I believe it was May 16th, 2016.

15  Q     And what did that engagement letter, in general terms,

16  what did that engagement -- what is your understanding of

17  what that engagement entails?

18  A     We were engaged to market and sell the company, as well

19  as explore financing options for the company, primarily.

20  Q     Okay.  And that was back on about May 16th, you recall?

21  A     Correct.

22  Q     Okay.  And do you have any understanding of why the

23  company sought the services of Houlihan Lokey in particular?

24  A     For two things.  One, it thought it might have to file

25  bankruptcy, given its current litigation situation, and two,

Page 60

1    was interested in exploring sale alternatives.

2    Q    Okay.  And does Houlihan Lokey have a specific group

3    within it that handles media?

4    A    Yes, we do.

5    Q    And who is in charge of that group?

6    A    Mark Patrick Hoff.

7    Q    Okay.  And has Mr. Patrick Hoff -- let me just go back

8    to this.  Have you been directly involved in this

9    engagement?

10   A    I have.

11   Q    And who else from Houlihan Lokey has been involved in

12   this case, engagement?

13   A    My partner, Mark Patrick Hoff, who co-heads the Media

14   Group at Houlihan Lokey, as well as seven other junior

15   professionals.

16   Q    Okay, seven others?

17   A    Correct.

18   Q    Okay.  And so when you first got the engagement, what

19   was the direction given to you by the company?

20   A    Given the dynamic with the litigation scenarios, the

21   company wanted to immediately explore sale and financing

22   options, DIP financially, potentially, as given the

23   liquidity scenarios that were presented to us, and for a

24   sale, given the potential bankruptcy.  It was a collective

25   view that a selecting a stalking horse, and getting to a

Page 61

1   stalking horse agreement was in the best interest of the

2   company to maximize value.

3   Q    Okay.  And what did Houlihan do to come up with

4   potential bidders, with respect to the assets?

5   A    Well, initially when we were first retained on May

6   16th, we were told that the company potentially would have

7   to file on May 25th, merely nine days from our retention.

8   Given that tight timeframe, we, in consultation with the

9   company, decided it was best to have a targeted process, in

10  which we would reach out to the most, what we felt

11  interested parties, the parties that could move very quickly

12  in order to get to a stalking horse agreement.  And that

13  included companies and interested parties that had had

14  previous discussions with the company as well.

15  Q    So was your understand that the company prior to your

16  retention had had various conversations with companies.

17  A    They have, yes.

18  Q    And do you know whether those were with respect to

19  sales of assets or financing?

20  A    Both, I believe.

21  Q    Okay.  But there were companies, to the best of your

22  knowledge, that the company had had contacts with, regarding

23  sales?

24  A    Yes.

25  Q    So did you contact those parties?

Page 62

1    A    We did

2    Q    And did you also add names to that list?

3    A    Yes, we did.

4    Q    Okay.  And so could you tell me, what exactly, over

5    let's say from May 16th to June 10th, when the company

6    filed, what actually activities did Houlihan take on?

7    A    We reached out to six third parties, as well as one

8    interested party, and explored a stalking horse agreement

9    for a sale of the entire company.  Signed NDAs, we opened up

10   a data room, we explored diligence with all parties.

11   Several of the interested parties hired bankruptcy counsel,

12   in which we explained the process, timing, benefits of being

13   a stalking horse, et cetera.  Ultimately, we received a

14   terms sheet from Ziff, the ultimate stalking horse.  We felt

15   that was kind of the highest and best offer we'd received at

16   the time, and we immediately began to push forward with an

17   asset purchase agreement with them.

18   Q    Okay, so let's cover a few of the points.  You said six

19   parties and one interested party.

20   A    Yeah, correct.

21   Q    Without disclosing what the nature of the interest,

22   what did you mean by an interested party?

23   A    A party that already had an interest in the company.

24   Q    So by economic interest in the company?

25   A    Correct.

1    Q    Okay.  Now, with respect to the six other parties, what

2    did you do to identify those six parties to say, "These were

3    the most likely candidates."?

4    A    A combination of these parties' previous interest and

5    discussions with the company, as well as Houlihan

6    relationships, and our view that given the timeframe, and

7    interest, and best fit, candidly.

8    Q    Okay.  Now, had all those six parties already had

9    contact with the company, or did you bring some additional

10   parties?

11   A    We brought some additional parties as well.

12   Q    And how involved was Mr. Patrick Hoff in all of this

13   process?

14   A    Very involved.

15   Q    Okay.  Now, you said you moved and signed NDAs.  Did

16   you get six NDAs, do you get five NDAs, or do you have more

17   NDAs, do you recall?

18   A    I recall at least three NDAs were signed, I believe.

19   And the remaining conversations were at a high level, to

20   determine their interest.

21   Q    Okay.  And what did you do with respect to discussions

22   regarding structuring of transactions, and facilitating --

23   given the timeframe, I think you said that you thought the

24   company might have to file as early as May 25th.  What did

25   you do to facilitate interested parties' ability to get to a

Page 64

1    stalking horse agreement and term sheet.

2    A    We opened up a data room that was filled with the

3    company's financial records, metrics, et cetera, that

4    summarized the business in its entirety, and also by brands.

5    We had numerous diligence calls, both with the principals of

6    the company, and also legal diligence, to discuss a variety

7    of different issues, in order to get to an agreement.

8    Q    Okay.  Now, with respect to the data room, was there

9    already a partial data room when Houlihan got on board?

10   A    There was, and we had modified it, and effectively

11   cleaned it up for the benefit of this process.

12   Q    Okay, and when you say you modified it and cleaned it

13   up, you made it more for a sale process, is that what you

14   mean?

15   A    Correct.

16   Q    And so do you recall any of the documents, or things

17   you had to put into that data room and created?

18   A    Yes.

19   Q    And what did you create, or what did you supplement the

20   data?

21   A    Financial projects, historical financials, key metrics

22   of the businesses, a variety of different legal agreements.

23   Q    Okay.  And now what about the structuring of the

24   transaction?  You have three entities here.  Were there

25   discussions with potential bidders, or thoughts about how to

1   structure the transaction?

2   A    Yes.

3   Q    And could you describe some of the interaction you had

4   with bidders, or their counsel, and how you proceed in that

5   process, during this period from May 16th to June 10th?

6   A    We discussed a variety of different alternatives,

7   whether to acquire, and actually file three entities,

8   acquire the assets, versus acquire the entities of sales,

9   assume liabilities.  I think all were obviously concerned

10  about the litigation liabilities.  Wanted to be clear that

11  they wanted to acquire the assets, and not take on any of

12  the contingent liabilities.  There was also some concern

13  about the Kinja entity, and how to address that during the

14  sale process, which we ultimately were able to resolve.

15  Q    Okay.  And do you recall how many parties that were

16  interested out of these six actually hired bankruptcy

17  counsel to discuss the potential for being a stalking horse

18  bidder?

19  A    I believe three or four of them.

20  Q    Okay.  And were there parties that said they just

21  weren't interested in being a stalking horse, but they may

22  see us at the auction?

23  A    Yes.

24  Q    Do you recall how many of the parties were in that

25  category?

Page 66

1    A    At least four of the six.

2    Q    Okay.  Now, there came a time, did you get term sheets

3    of letters of interest from -- how many people did you get

4    letters of interest or term sheet from with respect to the

5    sales?

6    A    Written, two.

7    Q    Written, two.  And by your purchase "written", were

8    there other oral suggestions of price?

9    A    Yes.

10   Q    Okay.  And how many oral suggestions of what prices

11   they may be?

12   A    One other.

13   Q    Okay.  Now let's break that down.  You got two written

14   term sheets.  I assume you got one from Ziff Davis?

15   A    Correct.

16   Q    And Ziff Davis is the -- so you got the one from Ziff

17   Davis, right?

18   A    Correct.

19   Q    And with respect to Ziff Davis, that's the one that

20   ultimately became an asset purchase agreement, correct?

21   A    That's correct.

22   Q    Okay.  Now in the same time, were you still pursuing

23   term sheets?  From the process, from May 25th to June 10th,

24   you were also still seeking term sheets, correct?

25   A    Absolutely.

Page 67

1    Q    And did you seek term sheets on higher or better bids,

2    even after you received the Ziff Davis term sheet?

3    A    Yes.

4    Q    And could you describe at least what you did, even

5    after receiving the Ziff Davis term sheet?

6    A    We continued to have discussions with these other

7    parties about trying to push them to the level at which Ziff

8    was, and still trying to convey the benefits of being a

9    stalking horse.

10    Q    Okay.  Now, obviously you couldn't tell those bidders

11    the purchase price, given the confidentiality of Ziff Davis,

12    so what exactly did you do with respect to the other parties

13    to try to get them to still bid?

14    A    Well, one, we kept trying to convey the benefits, just

15    being a stalking horse, being a lead, et cetera.  They

16    obviously asked for valuation guidance, and we gave them the

17    general range at which we thought it was appropriate to come

18    in at.

19    Q    And with respect to parties in general, what was the

20    valuation guidance that at least Houlihan was trying to get

21    people at, to be a stalking horse?

22    A    In the $90 million to $100 million range.

23    Q    Now, you did receive another term sheet, you said?

24    A    Correct.

25    Q    Now, and I did want to stay away from confidentiality.

Page 68

1    But did that term sheet contemplate a stalking horse bid?

2    A    Yes.

3    Q    Did that term sheet contemplate bid protections?

4    A    Yes.

5    Q    Okay.  Did that term sheet have a higher or lower value

6    than what you obviously got from Ziff Davis?

7    A    Lower.

8    Q    Would you describe it as significantly lower, or just

9    marginally lower?

10   A    Materially enough that we felt the Ziff was superior.

11   Q    Okay.  And did you still pursue that, despite pursuing

12   Ziff Davis?

13   A    We did.

14   Q    Okay.  Now, you also mentioned an oral offer, correct?

15   Was there ever a number placed on that oral?

16   A    Yes.

17   Q    And was that substantially, or materially, or however

18   you choose you describe it, higher or lower than Ziff Davis?

19   A    It was lower in material enough a way that we felt the

20   Ziff was superior.

21   Q    And would that have required bid protections and

22   expense reimbursement?

23   A    Yes.

24   Q    And with respect to the three offers, and I don't want

25   to use the term too strongly, as formal offers, were the

Page 69

1   breakup fee and bid protection provisions in the same

2   ballpark?

3   A    Yes.

4   Q    Now, was Ziff Davis the only one that had the

5   liquidated damages losses?

6   A    I believe so.

7   Q    Now, did it ultimately come time where Houlihan made a

8   recommendation to the board to pursue the Ziff Davis deal?

9   A    Yes.

10  Q    Okay.  And in making that recommendation, did Houlihan

11  consider the liquidated damages clause?

12  A    We did.

13  Q    And as you sit here today, would you still recommend

14  it, even though there is still that liquidated damage

15  clause, and even though there is the breakup fee and the

16  expense for reimbursement provisions?

17  A    We would.

18  Q    And why?

19  A    We believe the Ziff Davis, for an overall value for the

20  company, was superior to the other alternatives.  And the

21  scenarios in which the liquidated damages would be triggered

22  are very remote, in our view.  And therefore given that

23  dynamic, and given the also, then commercial breakup fee and

24  expenses, we felt that that was the -- and candidly, in our

25  view, given the interest we received, we feel we will have a

1     healthy overbid process once we get started, hopefully

2     tomorrow.  We felt that it was in the best interest of the

3     company to ride that highest value for a baseline, and given

4     the remoteness of the triggers of the liquidated damages, it

5     was in everyone's best interest to move forward with that.

6     Q    Okay, and let me ask you, to the best of your

7     knowledge, does the Ziff Davis document asset purchase

8     agreement have a due diligence out?

9     A    No.

10    Q    To the best of your knowledge, it does not?

11    A    Correct.

12    Q    And to the best of your knowledge, does it have a

13    financing condition?

14    A    It does not have a financing condition?

15    Q    Okay, and how significant was that in your evaluation

16    of the Ziff Davis --

17    A    Extreme --

18    Q    Let me finish.  I know we know each other, so let me --

19    I'll finish my question, then the record, and she will go

20    completely crazy.  How important were those two provisions

21    in Houlihan's assessment of this, the Ziff Davis proposal?

22    A    Extremely.

23    Q    And with respect to the other proposals, were there

24    concerns about financing, closing, or due diligence?

25    A    Yes.

Page 71

1    Q    Could you explain a little bit.

2    A    The other term sheet we received was contingent still

3    on diligence, on a variety of different factors.  Verbal was

4    as well, therefore a real alternative was either we file

5    bankruptcy without a stalking horse at the time, in our

6    view, or we had a full, no diligence, no financing, full-

7    committed deal at $90 million.  And based on that, we felt

8    it was -- our strong recommendation was to move forward with

9    Ziff.

10   Q    And what was your recommendation as to filing with or

11   without a stalking horse bid?

12   A    We felt it was very important to file with a stalking

13   horse.  One, we thought that given the high-profiled-ness of

14   this case, and the situation, we wanted to be clear to the

15   market and to everyone that business was going to continue,

16   and that it was going to, at the very least, to a strategic

17   and safe hands, and we can go on.  And we thought that was

18   important for the inherent value of the business.  And given

19   what we thought was interest in the asset that we could

20   provide a very good baseline value that people that people

21   could compete against.

22   Q    Okay, and as you know, the company filed on June 10th.

23   A    Yes.

24   Q    And do you recall when the asset purchase agreement

25   with Ziff Davis was actually complete, finalized, and

Page 72

1   signed?

2   A     I believe the day before.

3   Q     And up the signing of that document, what did Houlihan

4   do with any other interested bidders?

5   A     We continued to have discussions with them, answer

6   questions, provide diligence, et cetera.  We wanted to make

7   sure -- even up until the very end, to make sure -- or to

8   try to have backup alternatives just in case the Ziff

9   agreement didn't go through.

10  Q     Okay, and at any time other than those six bidder --

11  was there a reason that you only chose the six bidders,

12  other than they were the strategic target?  Was there other

13  concerns?

14  A     Really, it was based on time perspective.  We had very

15  limited time, and we felt that given that, we needed to

16  focus on what we thought were the most logical, most likely

17  candidates to be the stalking horse, and that's why we

18  centered it around those names.

19  Q     Okay.  Now once the company filed, what has Houlihan

20  done with respect to preparing -- should the Court approve

21  the stalking horse bid procedures, and the order that we've

22  sought to have this Court approve, what has Houlihan done

23  with respect to activity, with respect to the sale process?

24  A     We have developed a non-confidential teaser that will

25  be sent to prospective parties.  We finalized a

1    confidentiality agreement with counsel.  We have prepared

2    many offering memorandum, as well as added to the data room

3    that will be made available to buyers, and prepared a more

4    comprehensive buyers list.

5    Q    Okay, so let's talk about that buyers list.  When you

6    say a more comprehensive buyers list, how many names, to the

7    best of your knowledge, are now on the buyers list?

8    A    Approximately 40.

9    Q    40?  Okay.  And where did you get those names?

10   A    Through a combination of Houlihan and our

11   relationships, general understanding of the market, and

12   discussions with the company and other advisors.

13   Q    And I understand you're prepared to go out to them

14   tomorrow -- I may say tonight, but tomorrow, correct?

15   A    That's correct.

16   Q    Okay.  And since the filed, that it announced it was up

17   for sale, have you been contacted by potential bidders?

18   A    We have.  We've received several inbound calls,

19   probably in the neighborhood of at least 10 to 15 parties

20   have reached out.

21   Q    And what have you explained to those parties?

22   A    That we were under a no-shop provision currently with

23   Ziff, that we can't engage with them.  But once the bidding

24   procedures order is entered, and the no-shop is lifted, we

25   could have further discussions about process, timing,

Page 74

1    diligence, et cetera.

2    Q    And did any of those parties provide a concrete offer

3    well in excess of the $90 million?

4    A    They did not.

5    Q    Now, may I take one minute, Your Honor?

6         THE COURT:  Yes.

7    Q    I guess I'll just sort of tie up one other issue.  So

8    we've gone through the no-financing condition, we've gone

9    through the no due diligence condition.  Are there other

10   conditions that you've found -- and again, not a test of

11   memory, but are there other conditions that you've found

12   significant about the Ziff Davis deal, or about Ziff Davis

13   that makes this the transactions you believe that should

14   serve as the stalking horse.

15   A    Only that they are a strategic party that I think the

16   company would fit well with, I think that was our collective

17   view.  They have the financial wherewithal to do the

18   transaction.  Aside from the financing and no contingency, I

19   think those are the critical components.

20        MR. GALARDI:  Your Honor, I just wanted to note

21   for the record, since I know there's the ongoing litigation

22   about Mr. Denton, I'm not going to go into the process and

23   the roles that he's played in all of this, to obviously stay

24   away from all of those topics, with that.  Your Honor, I'd

25   be happy to pass the witness at this point, or --

1          THE COURT:  Is there anyone else who wants to

2     question the witness?

3          MR. RUSSELL:  Very briefly, Your Honor, William

4     Russell, Simpson, Thacher, and Bartlett, proposed counsel

5     for the committee.

6          THE COURT:  Go ahead.

7                    CROSS-EXAMINATION

8     BY MR. RUSSELL:

9     Q     Good afternoon.

10    A     Good afternoon.

11    Q     Did you know, did Ziff Davis have any communications

12    with Gawker Media about a potential transaction before

13    Houlihan was retained?

14    A     I'm not aware.  They may have, I'm just not aware of

15    it.

16    Q     You don't know one way or another.

17    A     Right, correct.

18          MR. RUSSELL:  That's all I have, Your Honor, thank

19    you.

20          THE COURT:  Okay, thank you.  Does anyone else

21    want to question the witness?  Mr. Zipes, I see you rising.

22          Gze Your Honor, Greg Zipes with the U.S. Trustee's

23    office, I just had a few questions regarding the process.

24                    CROSS-EXAMINATION

25    BY MR. ZIPES:

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    As you know, the stalking horse is subject to higher

4    and better offers, right?

5    A    Yes.

6    Q    And if a higher or better offer comes in that doesn't,

7    for example, include Mr. Denton, that will still be passed

8    on to the board, correct?

9    A    Absolutely.

10   Q    And just very briefly, state your contact with the

11   board?  How is it communicated to the board?  And you've

12   mentioned three entities here.  Could you identify the three

13   entities that are subject to the sale?  And let me just --

14   Kinja KFT, Gawker Media LLC, and Gawker Media Group Inc.,

15   are those the three entities?

16   A    Yes.

17   Q    And again, my question was, what is the process for

18   communicating offers to the board?

19   A    We have a board call and/or meeting in which we will

20   convey the material components of such bids.

21   Q    And who sits on the board?  Who would be considering

22   the higher or better offer?

23   A    The board members.

24   Q    And Mr. Denton is a member of the board?

25   A    I believe so.

Page 77

1   Q    Okay.  And to your knowledge, is he one of the people

2   who would be considering the higher and better offers?

3   A    I believe so.

4   Q    Are you aware of any procedures in place to recuse him,

5   as appropriate, from any considerations by the board?

6   A    I'm not.  I'd defer to counsel on that.

7   Q    You'd defer to counsel on that?  Okay.  Thank you, Your

8   Honor, that's all I have?

9        THE COURT:  Anyone else want to question the

10  witness?  I have a couple of questions.  You mentioned three

11  times, I think, that this was a very limited timeframe that

12  you had to work with.  In your professional judgment, do you

13  think you could have gotten a higher and better offer if you

14  had more time?

15       MR. SNELLENBARGER:  Well, I certainly hope we get

16  one during the overbid process.  It's difficult to say.

17  Given what we were based with, we felt very good about --

18       THE COURT:  I understand that under the time

19  constraints -- but my question is, if you had more time.

20  Because all this occurred within about 10 days.

21       MR. SNELLENBARGER:  Sure.

22       THE COURT:  In your view, did the time schedule

23  hamper the ability to get a higher and better offer?

24       MR. SNELLENBARGER:  I guess -- it's hard to say.

25  We don't know.  I mean, we will know through this overbid

1    process whether it did or not, I would think.  Look, I would

2    like to at least have a larger process, prepetition, we were

3    limited, and given the facts, we thought we felt very good

4    about what we did.

5              THE COURT:  Did your Houlihan Lokey did any

6    formal, or seat-of-the-pants valuation of the assets that

7    were being sold?

8              MR. SNELLENBARGER:  No.

9              THE COURT:  You mentioned that you reached out to

10   other parties, in addition to the six that the Debtor had

11   apparently been having a dialogue with, I think dialogue was

12   the phrase in your declaration.  Is that correct?

13             MR. SNELLENBARGER:  Well, there were a total of

14   seven parties that were contacted during the prepetition

15   process.

16             THE COURT:  Where'd you get the names from,

17   though?

18             MR. SNELLENBARGER:  From the company, and

19   Houlihan's own relationships.

20             THE COURT:  But your affidavit says that the

21   parties that you contacted were the ones that had been in a

22   prior dialogue with the Debtors.  Are you saying there are

23   other parties that you contacted?

24             MR. SNELLENBARGER:  The Ziff, I think, may be the

25   one where we weren't aware whether they were in prior

1   dialogue or not.  So the Debtors had been -- given the

2   relationships with these companies, they might have dialogue

3   for a number of different reasons, not just sale-related.

4   So I think they probably were in dialogue.  Whether that

5   constituted sale decisions or not, it's not clear.

6              THE COURT:  You also testified, I think your

7   phrase was there would be a healthy overbid process.  Does

8   that mean you think the assets are worth more than $90

9   million?

10             MR. SNELLENBARGER:  I would hope so, I believe so.

11             THE COURT:  Thank you.  You can step down.

12             MR. GALARDI:  Can I redirect, just two quick

13   questions?  Thank you, Your Honor.

14                       RE-DIRECT EXAMINATION

15   BY MR. GALARDI:

16   Q    Mr. Snellenbarger, you testified about the period from

17   May 16th to June 10th.  Do you believe the process from

18   today to August 15th will give you an ample time to see

19   whether there are overbids?

20   A    We do.

21   Q    And when you were negotiating the stalking horse bid,

22   did you believe that there would be a post-bankruptcy

23   process in which you could solicit higher and better bids?

24   A    We did.

25   Q    And do you believe any of the provisions in the asset

Page 80

1   purchase agreement with Ziff Davis was going to preclude you

2   from getting higher or otherwise better bids?

3   A     No, we don't.

4         MR. GALARDI:  No further questions, Your Honor.

5         THE COURT:  Okay.  You can step down, thank you.

6   Anyone else want to be heard on the bid procedures?

7         MR. QUSBA:  Afternoon, Your Honor.  Sandy Qusba,

8   Simpson, Thacher, and Bartlett, proposed counsel for the

9   creditors' committee.  Your Honor, certainly as identified,

10  the exact issues that we've been discussing, negotiating,

11  scrapping about with the Debtors and the stalking horse

12  bidder for the last two weeks.  But before getting into it,

13  and kind of giving you what our themes and principles were

14  when we were approaching the stalking horse bid, I do want

15  to address some of the points you made or questions you

16  asked with respect to business judgment, or whether this

17  should be a heightened scrutiny test.

18        With respect to the entry of the stalking horse

19  asset purchase agreement, we're not really taking a position

20  on that, because we've had an opportunity now to look at it,

21  and see the conditionality of it, or the lack thereof, with

22  no financing and diligence outs, and general market terms on

23  conditions.  We've looked at the representations and

24  warranties that have to be brought down, and the covenants

25  that have to be adhered to between now and closing.  So

Page 81

1    we're not really taking a position on what tests should be

2    applied with respect to the Debtor's initial entry into the

3    stalking horse arrangement.

4              What we are definitely reserving, and very focused

5    on is the evaluation of any overbids that come in, and the

6    determination as to whether something is a higher or better

7    offer.  And our consultation rights are much more meaningful

8    in this particular context because of the insider

9    involvement, et cetera, in this case.  And accordingly, we

10   certainly reserve the right, if there's a dispute, and there

11   very well may not be, with respect to the evaluation of a

12   competing bid, to come back and say, "Your Honor, the Debtor

13   thinks this, the committee thinks that."  And we'll

14   certainly get into the process, at that point, of how the

15   Debtors made their determination on an evaluation, and how

16   it differs from, or why it should be looked at with a little

17   bit more scrutiny in any particular case.

18             In addition, Your Honor, we were very focused in

19   on letting the buyer universe, the bidders know that in

20   fact, whatever relationship that Ziff Davis, the consulting

21   agreement has with Mr. Denton is meaningless, from a

22   competing bidders' perspective.  And so while it was helpful

23   that it was in the motion, we thought it was important that

24   it would be in the bid procedures themselves, because that's

25   what people generally read, particularly competing bidders,

Page 82

1    or people who are contemplating submitting bids.  The

2    liquidated damages provision was certainly something we

3    focused quite a bit on, but let me get to that in a moment.

4         Our principal objectives, Your Honor, when we got

5    to the bid procedures, was to confirm and make sure that the

6    process was designed to encourage participation, because as

7    Your Honor questioned the pre-bankruptcy marketing process,

8    as did we.  We were very concerned, when we looked at the

9    application of Houlihan Lokey, and their engagement letter

10   was dated May 15th or 16th, and the bankruptcy filing, and

11   the execution of the stalking horse purchase agreement was

12   June 10th.  That's not even 30 days.  We were very

13   concerned.  We had a lot of dialogue with Houlihan and the

14   company with respect to what exactly their marketing process

15   was, and it was, Your Honor, absolutely consistent with the

16   testimony we just heard as well.

17        Nevertheless, we were very focused on increasing

18   the time period allowed for the marketing process, from what

19   the stalking horse came into court with.  And accordingly --

20   and let me back up for a second, Your Honor.  One thing that

21   did mitigate some of our concerns was the fact that this a

22   very high-profile case, okay?  In the sense that it gets a

23   lot of media publicity and attention.  There's no question

24   about it, that people know we're open for business, as far

25   as a sale is concerned.  This is not a widget manufacturer

Page 83

1    in the middle of Nebraska, where nobody knows that it's even

2    up for sale.  People absolutely know.  So then the question

3    becomes, have we afforded potential bidders enough of an

4    opportunity to conduct diligence?  And based on discussions

5    with Deloitte, based on discussions with Houlihan, based on

6    some of the testimony you heard, we thought the marketing

7    process, as much as we could extend it out, would be

8    sufficient to in fact, entice people to participate in the

9    transaction, do their diligence, get it done in a meaningful

10   way, and then provide a bid.

11        So we focused quite a bit on the bid deadline, and

12   in fact got it extended to the dates that Mr. Galardi has

13   already discussed in his remarks.  Next, Your Honor, we

14   wanted to make sure that the process wouldn't create

15   unjustifiable administrative claims.  And so that's where

16   the liquated damages certainly comes up, as does the expense

17   reimbursement and the breakup fee.

18        On the breakup fee, Your Honor, we did negotiate

19   and attempted to, and were somewhat successful in limiting

20   as to when the breakup fee would be triggered.  In essence,

21   it's several different opportunities or events that would

22   trigger the breakup fee.  One is a breach of the Debtor's

23   no-shop requirements.  And remember, Your Honor, the Debtor

24   has been living under a no-shop provision from the day they

25   executed the asset purchase agreement with Ziff Davis,

Page 84

1    basically the day before bankruptcy filing, until Your Honor

2    approves the bid procedures if Your Honor is so included.

3            THE COURT:  Do you realize, though, that under the

4    no-shop provision, as I read it, which means the Debtor

5    can't solicit or discuss a competing transaction, right?  A

6    competing transaction includes a plan.  So if the Debtor

7    calls you up and says, "Let's talk about a plan," having

8    nothing to do with the sale, by the way, assuming it's been

9    consummated, they can walk.  They earn a breakup fee, and as

10   I read the liquidated damages provision, they also earn a

11   liquidated damages claim.

12           MR. QUSBA:  So Your Honor, first the no-shop

13   expires, essentially today, assuming Your Honor enters the

14   bid procedures order.

15           THE COURT:  Only for people who sign NDAs, as I

16   read it.  It continues until the auction, except to the

17   extent that the bidding procedures provide otherwise.

18           MR. QUSBA:  Right.

19           THE COURT:  And the bidding procedure, it's really

20   coursing on potential bidders and the ability to get

21   information, but it still binds you, as I see it, up until

22   the auction.  You can't even discus a plan with the Debtor.

23           MR. QUSBA:  A Chapter 11 plan.

24           THE COURT:  Yeah.

25           MR. QUSBA:  Your Honor, given the circumstances

1    that we're in, given the timeline we're talking about --

2              THE COURT:  Why is that provision there?  Why is

3    that -- why should that be the liquidated damages?

4              MR. QUSBA:  Your Honor, so I'm not, first of all,

5    going to defend --

6              THE COURT:  You're not the advocate.

7              MR. QUSBA:  I am not the advocate of the

8    liquidated damages provision.  I have spent the better --

9              THE COURT:  But you're standing here, so I'm

10   asking.

11             MR. QUSBA:  Absolutely, Your Honor.  And I've

12   spent the better part of two weeks together with my partner

13   and colleagues trying to get rid of this liquidated damages

14   provision.  What we were able to ultimately do, right--

15             THE COURT:  By the way, you've got to pay the

16   liquidated damages within five days.

17             MR. QUSBA:  I understand.  I don't have to pay,

18   but the estate does, but I appreciate that.

19             THE COURT:  Okay.

20             MR. QUSBA:  But what we were able to do was

21   severely limit was triggers the liquidated damages

22   provision.  And in fact, we got it to the point where we're

23   aligned with the bidder, with the stalking horse bidder, as

24   to when those liquidated damages would be triggered.  I'll

25   give you an example.  There are basically, I think three

Page 86

1    circumstances under which, at this point, the liquidated

2    damages are triggered.  Believe me, there were a whole host

3    of provisions that triggered it before we got here, a whole

4    host, including the appointment of a trustee, an examiner

5    with enlarged powers.  It went on and on and on, and we're

6    down to absolutely three issues, or three events.  One is

7    the dismissal of the case, pre-closings.

8              THE COURT:  No, merely the making the motion to

9    dismiss without commercially-reasonable opposition.  Even if

10   it's not granted.  Even if the motion's not granted.

11             MR. QUSBA:  I agree, Your Honor.

12             THE COURT:  And then they get the breakup fee if

13   the motion is granted, also.

14             MR. QUSBA:  If the motion is granted.  The chances

15   of them making a motion to dismiss this case, or not

16   vigorously defending against the motion if somebody else

17   made it, I put at a very, very, very low probability.

18             THE COURT:  I'm not sure what a commercially-

19   reasonable opposition is, but --

20             MR. QUSBA:  But by the way, we reserved rights

21   with respect to fighting about whether a trigger event has

22   occurred in the bid procedures themselves.  So there's no

23   question, if it's gray, you can bet the committee's going to

24   be here, and probably shoulder-to-shoulder with the Debtors

25   with respect to that argument.  Now, it's not like I relish

1   having arguments in the future, but this is what we were

2   working with, right?  We were working with a no-financing,

3   no diligence asset purchase agreement at $90 million, plus

4   the assumption of basically working capital and other

5   liabilities, right?  Against these liquidated damages

6   provisions, expense reimbursements, and breakup fee

7   provisions, and if we could limit their effectiveness, or

8   limit their triggers as much as we could, to the point where

9   we felt comfortable, this isn't going to happen,

10  realistically, and still keep our stalking horse.  That's

11  what we valued as a committee, okay?

12          And so the dismissal, the motion, the filing of

13  the motion, or the dismissal itself?  The dismissal itself I

14  think triggers the breakup fee, if an order is entered,

15  dismissing the case.  And if they file a motion, or don't

16  use commercially-reasonable efforts to defend against one,

17  that would trigger the liquidated damages, right?  I, just,

18  having had conversations, I feel pretty comfortable that

19  that's just not in cards between now and what the proposed

20  sale date is.

21          Next, when and if Ziff is finally approved as the,

22  or selected as the winning bidder, then if the Debtors don't

23  proceed to close it, that could trigger the liquidated

24  damages.  But that's exactly the circumstance, we're aligned

25  with the company, where Ziff and the creditors' committee is

1    aligned.  Once somebody is selected, if it's Ziff, so be it,

2    as the winning bidder, right, we want them to proceed to

3    closing.  We want the cash to come into this estate.  And

4    again, from our perspective, we were aligned with Ziff in

5    making sure that the Debtors did perform, and the Debtors

6    are telling us it's not an issue.  We are, of course, this

7    is our proposal, these are our bid procedures, this is our

8    stalking horse, and if they are the winning bidder, we are

9    absolutely committed to go ahead and continue to close on

10   the transaction.

11            And then the third circumstance is even more

12   remote.  Not only has Ziff been selected as the winning

13   bidder, but now a sale order has been entered.  And if they

14   don't proceed to closing after the entry of the sale order,

15   again, with Ziff being the winning bidder, then that

16   triggers the liquidated damages.  Again, we will be

17   completely aligned with getting this Debtor to close on the

18   transaction once the sale order has been entered.  There's

19   some finality to it, there's some definition to it.  People

20   know exactly what they have to do, and they're going to do

21   it.

22            THE COURT:  But you left out that if the Debtor

23   discusses a competing transaction during this process, that

24   also triggers the liquidated damages, right?

25            MR. QUSBA:  If they violate the bid procedures --

1              THE COURT:  That last sentence of 5.9(b).

2              MR. QUSBA:  Hold on a second, Your Honor, let me

3      get to -- I'm sorry, Your Honor, you are where, exactly?

4              THE COURT:  5.9(b).

5              MAN:  Can we have a page number, Your Honor?

6              THE COURT:  Well, in the original, I guess in the

7      original contract it's Page 51.  I'll read it.  It says

8      sellers will not pursue or agree to any competing

9      transaction, other than as expressly permitted by and in

10     accordance with the bidding procedures.  So I come back to

11     the question, if you want to discuss a plan with the Debtor,

12     that's a competing transaction, that violates that

13     provision, which triggers the liquidated damages provision,

14     and it also entitles them to a breakup fee.  And the

15     Debtor's under a statutory duty to file a plan as soon as

16     practicable.

17             MR. QUSBA:  Right, but it's also made --

18             THE COURT:  So it's interfering with the Debtor's

19     statutory duties under 1106(8)(5), I think.

20             MR. QUSBA:  Well, I'll let the Debtors certainly

21     respond to that.

22             THE COURT:  Doesn't the committee have a duty to

23     negotiate?

24             MR. QUSBA:  Yeah, and obviously we have been.

25             THE COURT:  You have?

1              MR. QUSBA:  What's that?

2              THE COURT:  You have negotiated a plan?

3              MR. QUSBA:  Negotiated a plan?  I'm sorry, I

4    thought you said negotiated these provisions.  I apologize.

5    No, we haven't negotiated a plan.

6              THE COURT:  Sure, that's a violation of the

7    agreement.

8              MR. QUSBA:  Don't enter the bid procedures order,

9    Your Honor, it's not liquidated damages yet.  No, we have

10   not negotiated a plan.  But the Debtors have obviously come

11   into this Chapter 11 proceeding having made a business

12   judgment that the liquidation of the company, as opposed to

13   a reorganization -- a liquidation through the sale of the

14   company, as a going concern, is, in their business judgment,

15   the best way to proceed.  Right now, as far as the

16   creditors' committee is concerned, give the potential

17   preservation of jobs, given the preservation of trade credit

18   and the like, and bringing cash proceeds into the estate,

19   we're of a like mind.  We're of a like mind.  We have no

20   reason to suggest that there should be a reorganization as

21   opposed to a 363 auction process, the way these guys have

22   teed it up, these guys meaning the Debtors, I apologize.

23              So from our perspective, yes, they have an

24   obligation to propose a Chapter 11 plan, right?  But they

25   also, they have some, obviously, a fair amount of leeway

Page 91

1    within the Bankruptcy Code itself with respect to what's in

2    the best interest of this estate.  They made a judgment,

3    that an auction and a 363 is in the best interest of the

4    estate.  Right now, we're not challenging that.  We're not

5    challenging that.  They also were able to secure DIP

6    financing from a third-party source that didn't tie the

7    Debtor's hands with respect to a bunch of milestones in the

8    APA, et cetera, or when that has to close in order to

9    circumvent, or create further friction, with respect to

10   enticing participants to come in and bid on these assets.

11   So from that perspective, again, there are benefits to this

12   stocking horse arrangement.

13          So Your Honor, again, we come back to -- we were

14   not happy with the liquidated damages provision, absolutely

15   not.  Would we rather see it go away?  Absolutely.  But we

16   made a judgment as to when we'd lose the stalking horse

17   itself, and that we didn't want to do, right?  That we

18   valued.  And so we ended up continuing to whittle away,

19   whittle away, whittle away, as far as we could take it, with

20   respect to the stalking horse, and getting the liquidated

21   damages to circumstances we just didn't think would happen.

22   It would be nice in the winter, from our perspective.  And

23   by the way, Your Honor, one other thing that should be

24   noticed.  The liquidated damages are not included in the bid

25   procedures in the sense they're not included as a hurdle for

1    the --

2              THE COURT:  (Indiscernible)

3              MR. QUSBA:  I mean, that would be off the charts.

4    So the initial bid has to clear the breakup fee and the

5    expense reimbursement, but we were absolutely cognizant that

6    it could not chill other bidders.  And we're pretty

7    comfortable, given the circumstances that it's triggered, it

8    has nothing to do with other bidders, and enticing people to

9    come back into the process.  All right, Your Honor, you've

10   heard testimony about -- I can't remember the exact numbers,

11   10 to 15 inbound calls to Houlihan Lokey.  The committee has

12   also received inbound calls from potential bidders.  And

13   we've created a dialogue, and started a dialogue with an

14   inbound bidder ourselves.  We've also, the Debtors and their

15   professionals have also shared the buyers list, the teaser,

16   and they will be sharing the confidential information

17   memorandum as well, and taking our input with respect to

18   that.

19              So we're very focused on making sure that the

20   process is fair, it's level, it entices people to come in.

21   We were very focused, obviously, on not creating

22   administrative expenses, if this thing goes completely in

23   the wrong direction.  And accordingly, we tried to limit the

24   liquidated damages provision.  And Your Honor, one of the

25   other fundamental principles we had was making sure -- and

Page 93

1    Mr. Galardi talked about it and discussed it while he was

2    standing here at the podium, and that was with respect that

3    making sure that causes of action that could inure to the

4    benefit of unsecured creditors weren't being sold for really

5    no consideration to the stalking horse bidder or quite

6    frankly, anyone else.  And accordingly, we spent a lot of

7    time on excluded assets, and basically causes of action.

8             And particularly, Your Honor, per the Debtor's own

9    public filing, there have been some quote-unquote "inter-

10   company loans" made on the eve of bankruptcy to insiders, to

11   Mr. Denton.  That has obviously raised flags for us.  We are

12   very focused on, and will continue to do a substantial

13   amount of diligence with respect to transactions that

14   occurred (indiscernible) year, two years before the

15   bankruptcy filing itself.  We are very focused on inter-

16   company transactions.  And all those claims, cases of

17   action, et cetera, are ring left behind, and not being taken

18   by Ziff Davis, and presumably anybody who overbids them,

19   unless they obviously pay very handsomely for them, and

20   we're satisfied with the payment that we receive.  So in

21   short, Your Honor, we were very focused with respect to

22   that, on maintaining those causes of action with the estate.

23   And the DIP order also dovetails into that with respect to

24   standing, et cetera, and because we do view that, in

25   addition to the asset sale process, as a way to augment the

Page 94

1    size of this estate, as a potential way to augment the size

2    of this estate.

3          Lastly, Your Honor, we're also very focused on

4    making sure this sale closes, whether it's with Ziff Davis,

5    or a higher and better bidder.  And we're focused, and we're

6    having dialogue with Ziff right now, through counsel, and we

7    will have it with anybody who participates in the auction.

8    And that is, to make sure that any defamatory, tortious

9    content that's currently on the web pages today is taken

10   down, in connection with the sale, so their objections

11   aren't filed through the sale, et cetera.  And the stalking

12   horse has been amenable to having that discussion.  We

13   expect other parties to as well.  But again, we're very

14   focused on having a sale conclude, and conclude in a manner

15   that maximizes value to the estate.

16          And if we can get rid of objections on the way

17   there, we're going to try, and that's one of the things

18   we're certainly focused on, is trying to make sure that any

19   buyer takes down allegedly defamatory statements or content,

20   and doesn't inherit a lawsuit the day after they close.  I

21   think that's in everyone's interest.  Your Honor, I'm happy

22   to answer any questions you may have, additional questions

23   about any particular provisions in the bid procedures, the

24   amendment to the asset purchase agreement, sale order, any

25   of the four documents Mr. Galardi --

1            THE COURT:  Well, I do have a question.

2            MR. QUSBA:  Sure.

3            THE COURT:  You're not the author of this one --

4            MR. QUSBA:  I'm happy to answer it anyway.

5            THE COURT:  Since you've invited the question,

6    (indiscernible).

7            MR. QUSBA:  Sure.

8            THE COURT:  This is the application --

9            MR. QUSBA:  I'm sorry, Your Honor.

10           THE COURT:  This is the application, Paragraph 11.

11   The last sentence says, pursuant to the stalking horse APA,

12   the stalking horse bidder will be entitled to receive credit

13   for the full amount that the stalking horse bid protections

14   at the each round of the auction.  How does that work?

15           MR. QUSBA:  So again, I think what they're asking

16   for is basically credit bidding, in essence, their breakup

17   fee and expense reimbursement.

18           THE COURT:  But how could they credit bid if they

19   don't get it, if they're the winning bidder?  They don't

20   earn the breakup fee until somebody else wins the auction.

21           MR. QUSBA:  I agree with that, I agree with that.

22   But if somebody overbids them on that, right?  If somebody's

23   competing with them, they're going to have to cover the

24   breakup fee and expense reimbursement, agreed?  I mean,

25   that's just part of the bid procedures.

1          THE COURT:  I don't know.  They could make a

2     higher and better offer that may not cover the breakup fee

3     in this particular case.  It's a cash deal, so it doesn't

4     matter.  But the point is, people who are bidding should be

5     bidding apples to apples, and then the Debtor and the

6     committee just take into consideration which is the higher

7     and better offer in light of the breakup fee, that's all.

8          MR. GALARDI:  I don't know how you credit bid a

9     fee you don't owe.  And Your Honor, I've done this, so

10    here's the example, and Your Honor's question's a good one.

11    But whenever I do an auction with a breakup fee is, you look

12    at what the net value of the estate is.

13          THE COURT:  Right.

14          MR. GALARDI:  Where this comes into play is on the

15    fourth bid.  It always happens this way, right?  So you have

16    a bid, you get a million dollars, so then the overbid has to

17    cover that breakup fee.  So the second --

18          THE COURT:  Well, as a practical matter, of

19    course.

20          MR. GALARDI:  As a practical matter.  So all that,

21    whether you call it a credit bid, or whether they get credit

22    for it, and I think the phrase may get misstated, it's

23    simply to say the Debtors will view every bid in the

24    successive bid process, what will be the net yield to the

25    estate?  What ends up happening is, if you have an increment

1   of $1 million, and you have an initial bid, an overbid, Ziff

2   Davis comes back, that means the fourth bid's going to have

3   to be very high, because it's not just the million.

4           THE COURT:  But that's a decision you make.  So if

5   the fourth bid is only $1 million, and the breakup fee is $4

6   million, you just say, "That's not a higher and better bid,"

7   that's all.

8           MR. GALARDI:  And that is the paragraph, that's

9   the point of that paragraph.

10          THE COURT:  But in other words, they're not

11  getting a credit, it just comes into the consideration for

12  it.

13          MR. GALARDI:  Well, I've been in situations where

14  we didn't have that language, and then the bidders will

15  complain, "No, you got to look at the number," which doesn't

16  make any sense to me.

17          THE COURT:  But I've seen auctions where the

18  highest number isn't the highest and best bid --

19          MR. GALARDI:  Correct, exactly.

20          THE COURT:  Because you're getting notes, you got

21  to pay a breakup fee, or any other reason.  But that's just

22  part of the (indiscernible) and what goes through your head

23  when you decide what's higher and better.

24          MR. GALARDI:  And most bidders have asked us to

25  articulate it, and I think with respect to Ziff Davis and

1    most bidders that I have dealt with, like to say it this way

2    so that it's absolutely clear that when we go to determine

3    highest and otherwise best bid -- and let's assume an all-

4    cash deal -- you are deducting that amount.  So there's no

5    ambiguity.  I usually start my auctions making that

6    absolutely clear on the auction, that when we consider it in

7    consolation with the committee, we're looking at the net

8    value to (indiscernible).

9              THE COURT:  That makes sense.  But when you say

10   credit bit, that triggers a certain, (indiscernible).

11             MR. GALARDI:  (Indiscernible) secured creditors

12   putting their thing, that language will be modified.

13             THE COURT:  Because they haven't earned that until

14   you've selected somebody else.  So you can't credit bid it.

15             MR. GALARDI:  Correct.  We should modify it.

16   Correct, I understand that.

17             THE COURT:  I was just wondering the way it works.

18             MR. GALARDI:  Yes, that's how it works.  The words

19   are unfortunately.

20             THE COURT:  All right, I have the same question in

21   every case.

22             MR. GALARDI:  Hopefully you get similar answers.

23   Maybe not the same answers.

24             MR. QUSBA:  Your Honor, I think you had also made

25   some points about the super-priority claim status.  From the

1    committee's perspective, whether it's an admin claim or

2    super-priority, it's above us, clearly, and --

3              THE COURT:  Well, but you are subordinating your

4    claim (indiscernible).

5              MR. QUSBA:  Oh, there's no question about it.  But

6    we would, if it was just an admin claim or not.  You mean

7    our professional piece?

8              THE COURT:  (Indiscernible), yeah.

9              MR. QUSBA:  I understand.  We appreciate that.

10             THE COURT:  And there may be trade vendors out

11   there who don't know it, but they're subordinating their

12   claims to that.

13             MR. QUSBA:  We appreciate that.

14             THE COURT:  (indiscernible) provision, which has

15   never been noticed.

16             MR. QUSBA:  We appreciate that.

17             THE COURT:  Okay.

18             MR. QUSBA:  Thank you, Your Honor.

19             THE COURT:  Go ahead.

20             MR. ZIPES:  Greg Zipes, with the U.S. Trustee's

21   office.  I have a few comments that may or may not be

22   helpful to this process, but we've heard today about certain

23   provisions that -- protections that Ziff Davis has

24   requested, one of which is the no-shop, and the trigger for

25   that.  And there's been some testimony today, just to avoid

Page 100

1    any issues down the road, litigation issues, maybe a

2    representation from Ziff Davis that nothing's happened to

3    date.  Assuming this Court approves the bid procedures

4    today, nothing to date has triggered that provision.

5    There's been talk on the record that the Debtor has heard

6    from other bidders, and has maybe discussed it with other

7    bidders, and it's an invention, potentially, for unnecessary

8    litigation.  So I think that should be a consideration in

9    the proving it.

10           And as for the dismissal, the provision that if

11   the case is dismissed, the Debtor has fiduciary obligations,

12   obviously.  And I agree that this provision is unusual.  I

13   can't think of a scenario where it's in the Debtor's

14   fiduciary obligations to support dismissal, but that could

15   happen, down the line.

16           THE COURT:  And I've seen a lot of cases where

17   Debtors move to dismiss the case.

18           MR. ZIPES:  And so Your Honor, I would just say if

19   this provision is approved, then maybe an additional

20   provision, a fiduciary out of the Debtor would also be

21   approved for that, or that this part of the provision not be

22   approved.  I appreciate that the Debtors, even though there

23   was no testimony on this, the Debtors apparently will ensure

24   that Mr. Denton is appropriately recused in any discussions

25   with the board.  There was no testimony on this, the witness

Page 101

1    didn't know one way or the other, but I think the Debtors

2    would be willing to make that representation.  And finally,

3    Your Honor, my office would like to hear if there is a

4    bidder that's been turned down for whatever reason, we're

5    not necessarily going to second-guess that, we just want to

6    hear what happened in that regard, and we'll be in touch

7    with the Debtor regarding that as well.

8              THE COURT:  Okay.  I don't know if that's for the

9    courtroom.

10             MR. ZIPES:  Excuse me.

11             THE COURT:  I don't know if that issue is for the

12   courtroom to discus, why someone was turned down.

13             MR. ZIPES:  We'd like to just know what the

14   process was, and that's not something that (indiscernible).

15             THE COURT:  The process in short, whatever it was.

16             MR. ZIPES:  Thank you, Your Honor.

17             THE COURT:  Anybody else?  You know, I guess you

18   can -- yes, sir?

19             MR. GALARDI:  I had one more representation to put

20   on the course, I thought Mr. Torkin was getting up, and

21   would be in the line of fire.  But two things, Your Honor.

22   One, you raised the statutory, fiduciary duty to negotiate a

23   plan.  I don't think --

24             THE COURT:  To file a plan.

25             MR. GALARDI:  To file a plan.

Page 102

1          THE COURT:  As soon as practicable.

2          MR. GALARDI:  And as soon as practicable within

3    the timeframe.  The Debtors have made a decision that what a

4    plan would look like is after the sale.  As I had mentioned

5    to the committee counsel, that said, we're always willing to

6    consider, and since they're bound by a confidentiality

7    agreement and we are, we believe we can have such

8    negotiations.

9          THE COURT:  (Indiscernible), and I don't even know

10   why that kind of a discussions triggers liquidated damages.

11         MR. GALARDI:  It shouldn't.  But again, the fact

12   of the matter is, I don't believe it does --

13         THE COURT:  So you and I agree on that, then?

14         MR. GALARDI:  We do agree on that one, Your Honor.

15   And now maybe Mr. Torkin will rise.

16         THE COURT:  I'm not sure he's a party in interest

17   in the case.

18         MR. GALARDI:  I understand that.  And with respect

19   to the one, again, subject to Your Honor approving bid

20   procedures, there's always the adequate assurance of future

21   performance with respect to a property.  There is a --

22         THE COURT:  Two days it not enough.

23         MR. GALARDI:  And we've agreed with the landlord.

24   What we've agreed to the landlord is -- look, in the

25   process, it's always my practice, and Houlihan has been

Page 103

1    advised that any bidder who is going to make a bid, as soon

2    as we know, be advised that they're going to have to prepare

3    adequate protection and future performance materials, if

4    they want this lease.

5            THE COURT:  Yes, it's any executory contract.

6            MR. GALARDI:  It is any executory contact, but the

7    one that is the most critical is obviously the real estate

8    lease.  But second is what we advise -- and again, subject

9    to Your Honor, is we will provide that information as soon

10   as we get it.  Obviously, when we go into the auction, we

11   will have that information.  Since the bid deadline is

12   August 15th, we'll provide it on August 15th, subject to

13   Your Honor's willingness to consider this.

14           With respect to the 5th Avenue lease, what we've

15   said is we don't have any issue to their coming to a hearing

16   on a sale, if we're trying to proceed to actually assume and

17   assign that lease on that day, with them raising any

18   objections at that time.  What my has generally been is it's

19   not something that necessarily has to be done, or we have an

20   objection, that matter gets put over for a separate hearing.

21   I think with those representations, counsel, to that

22   landlord, is comfortable with the process, and we're just

23   going to play it out.  We hope that there is somebody, for

24   the reasons Your Honor noted on the DIP, we would rather

25   have somebody take this lease, not cash collateralize the

Page 104

1    LC, have it returned, give them 18 months' security, and

2    have them be free and clear of this lease.

3                MR. HOFFMAN:  Your Honor, Trevor Hoffman from

4    Haines and Boone, and I am here on --

5                THE COURT:  (Indiscernible)

6                MR. HOFFMAN:  That's right, yes.  On behalf of the

7    landlord on the 5th Avenue lease, and Mr. Galardi's

8    representations are correct.  Obviously, we are highly

9    concerned that two days is not enough on adequate assurance,

10   and my view is that if there is a bidder who seeks to have

11   the lease assigned to them, what would probably make the

12   most sense is that we arrive at the hearing and kick that

13   particular issue to a future date, to allow us to talk to

14   them, negotiate with them, and see if we can come to a

15   resolution.

16               THE COURT:  Okay.

17               MR. HOFFMAN:  Thank you, Your Honor.  The one

18   other thing I'll say while I am here, is on this issue that

19   you have raised as to the super-priority status for the

20   breakup fee, et cetera.  As a potential admin claimant, that

21   certainly would be a major concern to my client.

22               THE COURT:  Okay.  Anyone else?  As my questions

23   indicated, I have problems with the -- not with the

24   transactions, so much as some of the things that are

25   attached to the transaction.  I don't have a problem with a

Page 105

1    stalking horse contract, even if the property might be worth

2    a little more, I recognize the value of having someone on

3    the hook, particularly one who doesn't require due diligence

4    or financing.  I don't have a problem with the breakup fee

5    or the reimbursement.  It's certainly reasonable.  I don't

6    have a problem with Ziff Davis, but I have two problems with

7    this, two overriding transactions.

8            The first is that based upon the evidence, it

9    doesn't appear to me that the asset was properly marketed,

10   or sufficiently marketed.  You've heard Mr. Snellenbarger

11   try and defend the time constraints that were imposed upon

12   him, but the impression I had from his testimony is if he

13   had more time, he could have gotten a better deal.  Houlihan

14   Lokey was retained on May 16th.  According to his

15   declaration, he contacted a target group of is potential

16   bidders who were already in a dialogue with the Debtors.  In

17   his testimony, he suggested that he contacted other people,

18   but it's not clear.

19           Two of those six submitted term sheets the week of

20   May 22nd, which is anywhere from about 8 to 10 days after

21   Houlihan Lokey got into the process.  Three others expressed

22   interest.  The testimony now, or the representations now are

23   that there are 40 potentially interested parties that

24   Houlihan Lokey targeted, and presumably could have been

25   targeted if it had more time.  10 or 15 have reached out to

Page 106

1    Houlihan Lokey expressing an interest, and the committee has

2    represented that it received calls from interested parties.

3    So -- and maybe that can be resolved if there is sufficient

4    amount of time for parties to now get in and do due

5    diligence.

6           But the other problem I have, and it's been the

7    subject of some testimony, is this liquidated damages

8    provision.  Mr. Galardi and I have combined our 46 years of

9    experience, and we have concluded, or at least he's told me

10   he's seen it once.  I've never seen it, which suggests to me

11   that it's an unusual provision, which in and of itself, I

12   suppose doesn't condemn it, but it gives me pause.  I note

13   that the liquidated damages provision is triggered if

14   somebody makes a motion to dismiss the case -- and this is a

15   change from the original provision -- if somebody makes a

16   motion to dismiss the case, and the Debtor doesn't oppose it

17   in a commercially-reasonable fashion, even if the motion is

18   denied, if somebody else opposes it -- following, by the

19   way, in that circumstance, if the case is dismissed, Ziff

20   Davis not only gets the liquidated damages, it also gets its

21   breakup fee.  I don't know why it gets both.  Similarly, it

22   gets its breakup fee and liquidated damages if the Debtor

23   pursues or agrees to a competing transaction, which includes

24   a plan with the creditors' committee.

25           Furthermore, as I pointed, all of the fees

Page 107

1    included the liquidated damages gave a superiority.  I don't

2    see any basis in the bankruptcy code for that.  It's

3    prejudicial to potential administrative creditors.  This is

4    a new provision that's not been served on notice to anybody.

5    I've heard one landlord, of the 5th Avenue location, say

6    that it's a concern to it, and I don't know defaults are

7    properly cured, if there are administrative expenses that

8    have to be paid ahead of these defaults.

9            So I'm not going to approve these procedures with

10   that liquidated damages provision in it, nor would I approve

11   an agreement which included that the definition of a

12   competing transaction that included, for example, the

13   discussion of a plan that had nothing to do with the sale

14   itself.  I think it's an overly-broad and draconian penalty

15   provision.  It's highly unusual, and I would not approve an

16   agreement with that.  For all of those reasons, I will deny

17   the motion to approve the bid procedures.

18            MR. GALARDI:  Your Honor, what I would ask for is

19   a 10-minute break, to come back?

20            THE COURT:  Sure.

21            MR. GALARDI:  Thank you.  Oh, Mr. Torkin.

22            MR. TORKIN:  Your Honor, can I be heard?

23            THE COURT:  You can, but I'm not sure you're a

24   party in interest.

25            MR. TORKIN:  A prepetition executory contract.

Page 108

1              THE COURT:  So?  I haven't approved it.

2              MR. TORKIN:  A party -- pardon me?

3              THE COURT:  So?

4              MR. TORKIN:  It's a valid, prepetition --

5              THE COURT:  It's not anything until it's approved

6    by the Court.  But come on up.  It's late.

7              MR. TORKIN:  Thank you, Your Honor.  I appreciate

8    Your Honor understanding that he liquidated damages

9    provision in this context is unusual.  The facts of this

10   case are unusual, at least from a buyer's perspective, and a

11   strategic buyer's perspective.  We were called on before the

12   case to put together a bid with a great deal of uncertainty

13   as to what was happening with the ligation with Mr. -- with

14   Terry, I forget his last name.

15              MAN:  Bollea.

16              MR. TORKIN:  Bollea.  My apologies.  Our big

17   concern, Your Honor, is this could be a one-issue bankruptcy

18   case for Mr. Denton to get a windfall, and that would be

19   inappropriate, and therefore entitle us to liquidated

20   damages.  If, for example, we were to commence the case, and

21   we were to settle the issue with Mr. Bollea for $10 million,

22   $15 million, much less than the value of the litigation --

23   because as well all, know, these estate law litigations,

24   they can be reduced to any number.  There's tremendous

25   equity value in this case.  It was our view that the equity

Page 109

1   holders in this case believed that there was lots of equity

2   value, and any liquidated damages would be coming out of

3   their ultimate recoveries.  So we were concerned that they

4   file for bankruptcy, use our deal as leverage, and say,

5   "This thing is being sold.  If you don't settle now, this is

6   done."  He settles the case, he dismisses the case, he

7   pursues a plan, he does whatever.

8            And so we targeted very specific liquidated

9   damages at a number that is far inside what we would have

10  ever believed anyone to view as a draconian liquidated

11  damages provision, to guard against the possibility that the

12  agreed-upon formula to preserve value and to provide value,

13  which we believe it ultimately going to go to equity.  All

14  due respect to Sandy, and the committee for looking after

15  unsecured creditors, and they have complicated litigation

16  claims that they ultimately have to liquidate, but there's

17  no debt here that is significant, in the context of the bid.

18           THE COURT:  So why do you need a super-priority

19  claim?  (Indiscernible).

20           MR. TORKIN:  Your Honor, I could without the --

21  overzealous lawyering, I could live without -- a super-

22  priority claim is not going to be the end of the day for us,

23  but the liquidated damages here served a very specific

24  purpose in a very unique circumstance for a one-issue case,

25  which is what we have always called it, a one-issue case, a

Page 110

1    $140 million judgment that could be liquidated to $20

2    million.  The committee's agreed with it.  They understand

3    the circumstance on why we (indiscernible) so specific --

4    now let me just, I actually not, as liberal -- you're doing

5    me a greater service, or maybe a disservice, because you're

6    about to deny the motion.  Maybe I'm going to convenience

7    you otherwise, but I don't believe that we can --

8              THE COURT:  Is the motion for reargument on the

9    record?

10             MR. TORKIN:  It is a motion for reargument, then.

11             MR. GALARDI:  As a formality, I'll make the motion

12   for reargument, Your Honor.  (indiscernible) Mr. Torkin.

13             MR. TORKIN:  The idea is if the buyer terminates

14   pursuant to X, Y, and Z, you get X.  I don't believe you can

15   double-dip on the breakup fee and the liquidated damages.

16             THE COURT:  Well, your contract provides for that.

17             MR. TORKIN:  Well, I'm not so sure, because there

18   are very limited circumstances -- and we could go through

19   them and clarify it.  We could go through there, I'll grab

20   my agreement -- but if we terminate for a specific reason,

21   then we get liquidated damages, and then on the breakup fee,

22   I believe it says other than bankruptcy-related default,

23   which is a defined term, in the liquidated damages section,

24   we went through with Simpson Thacher very carefully --

25             THE COURT:  So if your concern is that equity is

Page 111

1    going to get more than -- it might be easier to get more, so

2    why don't you take your liquidated damages after the

3    creditors have paid in full, with interest, and before

4    equity gets a distribution?

5            MR. TORKIN:  Because we negotiated for liquidated

6    -- we negotiated this specific issue, for liquidated

7    damages, and the -- one other piece, on the competing

8    transaction, our view is it's a competing transaction with

9    respect to the acquired assets.  It says that at the end.

10   If it wasn't clear, and it seemed sort of overly-ambitious,

11   our view of the they can't discuss a plan, of course they

12   can discuss a plan to liquidate the proceeds from the bid

13   procedures.  But what they can't do is discuss a plan, and

14   entertain offers and bids that it outside of the parameters

15   for which we agreed.  We wanted specific performance, Your

16   Honor.  If they dismiss the case, we went through

17   complicated negotiations to see whether or not there was an

18   ability for us to get (indiscernible), because we want the

19   asset.  And that would have been better than liquidated

20   damages, from our perspective, and we didn't think that that

21   was workable.

22           And in terms of the bid procedures order, when the

23   committee came to us and asked us not to assume the

24   contract, but to call out specific provisions, we also put

25   in place the specific performance, because we're not

1    interested in liquidated -- I will stipulate today that Ziff

2    Davis does not want liquidated damages, they want Gawker and

3    the business.  So the hope is by far, to close the

4    transaction and win, not to get $13 million, and having put

5    yourself out there.  We're strategic.  We're not a hedge

6    fund, we're strategic.  Strategic -- frankly, Your Honor, it

7    is a disincentive bankruptcy for a strategic to show up

8    before the case, subject itself to a higher and better

9    offer, go completely naked on process until a bid procedure

10   is entered, 20 days in the case, to reach out to employees,

11   to say that we are there, and want this business, and then

12   to turn them down on bid procedures, and in a very unique,

13   (indiscernible), generous, one-issue bankruptcy case, on the

14   liquidated damages, tailored very specifically, very

15   specifically to deal on process.  That's a disincentive for

16   strategics to come in.  So that's my perspective.

17             THE COURT:  Yes, sir.

18             MR. QUSBA:  Your Honor, Sandy Qusba, Simpson,

19   Thacher, and Bartlett, again.  I'm not sure I agree with all

20   of Mr. Torkin's characterizations, this is a one-trick pony

21   case, and things of that nature.  The equity's in the money,

22   this, that, and the other thing.  We have very different

23   views with respect to that, but that's neither here nor

24   there, that's just to clear the record.  But for example,

25   Your Honor, and what Mr. Torkin, how he explained what's

Page 113

1   motivating liquidated damages provision is really almost a

2   penalty vis-à-vis the equity.

3            THE COURT:  It's a penalty, it's not a liquidated

4   damages claim.

5            MR. QUSBA:  But it's a penalty vis-à-vis, really,

6   the equity.  That's what he's concerned about, that's what

7   he said.

8            THE COURT:  Not if the Debtor's insolvent, it's a

9   penalty for the unsecured creditors.

10           MR. QUSBA:  No, I'm saying what he said.  He's

11  concerned that Mr. Denton does something, or the equity, the

12  board does something here, right, that results in a

13  dismissal of the case, and he's out as a strategic, and he's

14  kind of been made to look silly.  And so remember, there are

15  three boxes, right?  There are three boxes in this Chapter

16  11 case.  One is the top box, the Inc., the parent company,

17  it's just a holding company, and then there's Media, LLC,

18  and then there's Kinja, right, where assets reside.  So we

19  would be perfectly happy or prepared to -- if the liquidated

20  damages provision was really a disincentive to equity, then

21  put the claim up at the top box, right?  Because that would

22  structurally subordinate that claim to all unsecured claims.

23           THE COURT:  Thank you.  I'll give you the last

24  word on your motion to reargue.

25           MR. GALARDI:  I've made the motion to reopen, Your

Page 114

1    Honor, and we would again, I think there's a few things.  I

2    think you did hear testimony -- well, with respect to the

3    process, Your Honor, no one is denying that the process with

4    short, but I think that's the bankruptcy process -- nor is

5    the process necessary to be done.  Really, the adequacy is

6    what's the post-bankruptcy process.

7                THE COURT:  Well, the process is short, but that's

8    curable if you have time at the other end.

9                MR. GALARDI:  And I think everybody's agreeing

10   that the testimony is that the period from here through

11   August 17th, August 18th -- August 15th is the bid deadline

12   -- is an adequate period of time.  Nobody has said

13   otherwise.  And indeed, that has to be balanced -- and this

14   was made very clear to the committee, and I think they

15   agreed, we've lost sight of a couple things.  If we don't

16   have a stalking horse, this is a very mobile workforce with

17   employees.  It was very important to send exactly the signal

18   that we do have a stalking horse deal.  So it is absolutely

19   critical that we have the stalking horse deal, which is why

20   Houlihan worked so hard in those days to get what we think

21   is a fairly exceptional deal, both in a bad sense with the

22   liquidated damages clause that offends Your Honor, but

23   actually in the more positive sense, a $90 million, no

24   contingency, no financing offer.  So to walk out of here

25   without a stalking horse agreement to approve is going to

Page 115

1    create -- and again, we don't have another agreement to back

2    up, it's going to create a major problem at the company.

3             THE COURT:  Why not just put the company up for

4    auction?  The same day, with a reserve, and see what comes

5    in?

6             MR. GALARDI:  Two things, Your Honor.  One is,

7    that process doesn't get us an agreement.  Two, advertisers,

8    as we explained the first day, don't know where this

9    company's going to be.  I don't know whether we have a DIP

10   lender, because part of the terms are that they know that

11   they're getting paid off.  We also have a second lien

12   lender, which we've primed, in part because we have this

13   offer.  So the consequences of not having a bidder, which

14   are all the things that we considered in this process.  So

15   we really come down to what your provisions are that I

16   believe you said are putting you to the edge of denying the

17   motion, and now reconsidering it.  One is the liquidated

18   damages.  I heard Mr. Torkin say move it from a super-

19   priority claim to an administrative claim.  We certainly

20   would support that, and I think --

21            THE COURT:  (Indiscernible) structurally

22   subordinate it, but putting it to (indiscernible).

23            MR. GALARDI:  Your Honor, again, we had this

24   discussion.  The committee raised it, Mr. Torkin raised it,

25   if that solves the problem --

1          THE COURT:  Although there'll probably be a joint

2     plan with one class, and it would get paid as a priority

3     claim anyway.

4          MR. QUSBA:  I'm sorry --

5          MR. GALARDI:  Well, it doesn't, actually, Your

6     Honor, the way the assets flow, because of the way in which

7     the money flows.  Your Honor, if that resolves the issue, I

8     can talk to, and I forgot to introduce you to Ms. Dietrich,

9     who is the general counsel and president, is in the

10    courtroom today.  I can talk to the counsel.  I don't

11    believe that that's an issue.  If that's really the way it

12    goes -- because again, as I had convinced both the

13    committee, and I think otherwise, there is no reason that

14    you would dismiss this bankruptcy case unless somebody gave

15    you so much more money --

16         THE COURT:  So why is the provision in there?

17    You're carrying that risk.

18         MR. GALARDI:  Because I think -- well why are we

19    willing to take the risk?

20         THE COURT:  They're not, you are.

21         MR. GALARDI:  We're willing to take the risk

22    because we know we're not doing it.  He's not willing to

23    take the risk, because he's afraid that there will be a

24    settlement.  I think that's pretty clear.  If solving the

25    liquidated damages clause and getting this done means that

Page 117

1  that claim is only payable by Gawker Media Group, Inc.,

2  we're prepared to do that.  I'm not sure that that solves

3  everybody's problems, but again, if the concern is he wants

4  a penalty on equity, we're not going to take the action, his

5  concern is the creditors, that's fine, you can put the

6  liquidated damages clause there.

7           THE COURT:  If the creditors are willing to take

8  the risk that even if it's an unsecured claim, the Debtor is

9  insolvent, and you suddenly have another $13.5 million

10  claim.

11           MR. QUSBA:  At the parent company, Your Honor?

12           THE COURT:  Well, I don't know where it's going to

13  be --

14           MR. QUSBA:  But Your Honor, if we do it at the

15  parent company, we're certainly prepared, because the --

16           THE COURT:  What if it's not?  What if it's at the

17  operating company?

18           MR. QUSBA:  Then it becomes -- again, we

19  negotiated what we did, Your Honor.

20           THE COURT:  I guess I didn't see that distinction.

21  Was the (indiscernible) just against the (indiscernible)

22  company?

23           MR. QUSBA:  No, no, that was my suggestion, based

24  on Mr. Torkin saying --

25           THE COURT:  Then I don't understand.  You're

Page 118

1    saying that you didn't have a problem with it as a super-

2    priority, but now you're saying it's got to be an unsecured

3    claim or whatever at the holding company.

4            MR. QUSBA:  No, no.

5            THE COURT:  Let me save the talk.  You want to

6    talk about it, fine.  The one that that I've been convinced

7    of is this is not a liquidated damages clause, because the

8    purpose of a liquidated damages clause is to provide for

9    damages where actual damages can't be revenue-determined.

10   This is a clause to deter or to prevent equity from getting

11   a windfall in the event it settles principal litigation.  If

12   you want to make it an unsecured claim, that's certainly

13   better than a super-priority claim that has to be paid in

14   five days.  I didn't hear the committee having a problem

15   with it, unless it's at the holding company level, but I

16   don't understand why that distinction, since it wasn't a

17   problem when it was a super-priority claim, period.

18           And I didn't mention it, but under the Lionel

19   factors which govern this, you've failed to sustain your

20   burden of showing that this is an appropriate exercise of

21   business judgment.  One factor is that the proportionate

22   value of the asset (indiscernible) -- to consider the

23   proportionate value of the asset, of the estate as a whole,

24   in a related issue of whether or not there are appraisals.

25   All I'm told is, is that this was done quickly, in eight

1    days, and Mr. Snellenbarger said that he predicts a healthy

2    overbid process, which suggests that the property is worth

3    more than the stalking horse bid.  I realize there's value

4    to a stalking horse bid.  But those are two Lionel factors.

5    Another factor is the amount of the elapsed time since the

6    filing.  This is a quick sale.  Virtually no time has

7    elapsed.  As a matter of fact, the APA dated the date of the

8    filing of the petition.

9            Another factor is the effect of the proposed

10   disposition on future plans of reorganization.  This

11   forecloses all other future plans of reorganization.  It's a

12   liquidation at that point.  The most important factor is

13   whether the asset is increasing or decreasing in value.

14   There's been no evidence on that point at all.  So under the

15   Lionel standards, which I failed to mention, but were

16   subsumed in my comments, you failed to sustain your burden

17   of proof.  If you want to come back with another deal,

18   whether in 10 minutes, tomorrow, or next week, that's fine.

19   But as the deal stands, I'm not going to approve the bidding

20   procedures for the reasons I've stated.  Anything else?

21           MR. GALARDI:  Your Honor, well -- Your Honor, I'd

22   like to have a 10-minute recess.

23           THE COURT:  (Indiscernible)

24           MR. GALARDI:  (Indiscernible) I think the Lionel

25   factors, I think we have evidence, but I will --

1              THE COURT:  But we can address -- that's my

2    conclusion, and I don't know if it's a final order, whether

3    you can appeal it, but that's my conclusion.

4              MR. GALARDI:  Thank you, Your Honor.  I'd ask for

5    10 minutes?

6              THE COURT:  Sure.

7        (Recess)

8              THE COURT:  Please be seated.

9              MR. GALARDI:  Your Honor, I have the privilege of

10   making another motion for reconsideration at this time.

11             THE COURT:  Why don't you just tell me what the

12   story is, straight.

13             MR. GALARDI:  And here's the transaction, and

14   here's where we changed.  First of all, with respect to the

15   liquidated damage provision, to address Your Honor's

16   concerns.  The liquidated damage clause will be solely the

17   liability of Gawker Media Group, Inc., and therefore it will

18   actually be structurally subordinated to the claims of

19   unsecured creditors.  In this case, we don't believe there

20   are any creditors, and as Your Honor will recall, the assets

21   are being sold at the two other entities.  So I believe

22   that's acceptable to the committee, and also to Mr. Torkin.

23             I'm going to make the representation that the

24   Debtors have not violated the non-solicitation, and I

25   believe Mr. Torkin is going to confirm that he is waiving

Page 121

1    today any possible claim for breaches of the no-shop, no

2    solicitation clause as of today.  We will be able to begin

3    shopping as of today.  With respect to the interplay between

4    the breakup fees and with respect to the liquidated damages,

5    there will not be a payment of both in any circumstance.

6    We're going to go back to the docket and make sure that that

7    is absolutely clear, so that it is one or the other under

8    the circumstances, and when the liquidated damages clause is

9    to be paid, it will be paid out of GMGI.  Again, I think

10   it's an extremely remote circumstance.  I believe that was

11   the substance of the changes we would propose --

12           THE COURT:  And the definition of competing

13   transactions?

14           MR. GALARDI:  Oh, right.  You're right, and with

15   respect to the definition of competing transaction, both the

16   Debtors and the committee will be able to pursue the filing

17   of a plan, pursuing a plan, negotiating a plan, and to

18   propose a plan as soon as practicable in those circumstance.

19   That will relate to the breakup fees, and if we were to walk

20   away (indiscernible), but that will be embedded into the

21   breakup fee provision, should we do a plan in lieu of a sale

22   of this scenario.

23           THE COURT:  Is that acceptable to the bidder?

24           MR. TORKIN:  Yes, Your Honor.  Michael Torkin,

25   Sullivan Cromwell, for Ziff Davis.  I agree, I just want to

Page 122

1    make sure we're all clear on the competing transition piece.

2    We are going to make it clear that they can discuss the

3    contours of a plan, providing that it's in the context of

4    the process of bidding procedures.  But whatever plan they

5    want to talk about, that's fine, as long as it complies with

6    our procedures.

7            THE COURT:  Why don't you just say that any plan -

8    - first of all, they can talk about whatever they want.  But

9    if they propose a plan, it has to be consistent with your

10   rights under the APA?

11           MR. TORKIN:  Correct.

12           THE COURT:  All right.  (Indiscernible).

13           MR. QUSBA:  Thank you, Your Honor, and that works

14   for us.  I think the suggestion was made on the record

15   before we left, and people thought about it and agreed with

16   respect to the claim being at the parent company.

17           THE COURT:  All right, with those corrections,

18   I'll approve the bidding procedures order.  I'll so order

19   the record, but what I suggest you do is you give me -- at

20   this point it's not even a blackline copy, but just give me

21   a copy of the bidding procedures order, with the bidding

22   guidelines, and to the extent that there are modifications

23   with the APA, rather than modify the APA, just state in the

24   bidding procedures order that notwithstanding anything to

25   the contrary in the agreements, these are the rules.  All

Page 123

1    right?

2             MR. GALARDI:  That's fine, Your Honor.  With your

3    so ordering, we also understand that we can begin

4    solicitation immediately, and we will get an order to you as

5    soon as we can.

6             THE COURT:  Okay, thank you.  Anything else?

7             MR. GALARDI:  No, but thank you again for your

8    accommodation.

9             THE COURT:  Thank you.

10            MR. QUSBA:  Thank you, Your Honor.

11        (Whereupon these proceedings were concluded at 4:59 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 124
 1                         I N D E X

 2

 3                         RULINGS

 4                                         Page      Line

 5

 6   Case Management Motion Approved          17        3

 7

 8   Cash Management Motion Approved          17        16

 9

10   Wages Motion Adjourned                   19        8

11

12   Taxes Motion Approved                    19        24

13

14   Insurance Motion Approved                19        24

15

16   Critical Vendors Motion Approved         22        18

17

18   DIP Motion Approved                      37       20-24

19

20   Interim Compensation Motion Approved     23        3

21

22   Prime Clerk Retention Application Approved  27      3

23

24   Opportune Retention Application Approved  30       10

25
```

Page 125

1    Ropes & Gray Retention Application Approved   31        10

2

3    Houlihan Lokey Retention Application           33        13

4

5    Motion to Approve the Bid Procedures Approved 122       18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 126

1                  C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya                Digitally signed by Sonya Ledanski
                            Hyde
                            DN: cn=Sonya Ledanski Hyde, o, ou,
       Ledanski Hyde        email=digital1@veritext.com, c=US
7                           Date: 2016.07.11 17:01:01 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  July 11, 2016