Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GAWKER MEDIA, LLC,              Case No. 16-11700-smb

8

9            Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    August 18, 2016

18                    2:04 PM

19

20   B E F O R E :

21   HON STUART M. BERNSTEIN

22   U.S. BANKRUPTCY JUDGE

23

24

25

1   Hearing re:  Case Conference

2

3   Hearing re:  Debtors' Application Pursuant to Sections

4   327(e), 328(a), and 330 of the Bankruptcy Code, Bankruptcy

5   Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1 for

6   Entry of an Order Authorizing the Retention and Employment

7   of Brannock & Humphries as Special Litigation Counsel

8   Effective Nunc Pro Tunc to the Petition Date [Docket No.

9   130]

10

11  Hearing re:  Debtors' Application Pursuant to Sections

12  327(e), 328(a), and 330 of the Bankruptcy Code, Bankruptcy

13  Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1 for

14  Entry of an Order Authorizing the Retention and Employment

15  of Levine Sullivan Koch & Schulz, LLP as Special Litigation

16  Counsel Effective Nunc Pro Tunc to the Petition Date [Docket

17  No. 133]

18

19  Hearing re:  Debtors' Application Pursuant to Sections

20  327(e), 328(a), and 330 of the Bankruptcy Code, Bankruptcy

21  Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1 for

22  Entry of an Order Authorizing the Retention and Employment

23  of Thomas & LoCicero PL as Special Litigation Counsel

24  Effective Nunc Pro Tunc to the Petition Date [Docket No.

25  133]

Page 3

1     Hearing re:  Debtors Motion for (I) An Order (A) Authorizing

2     and Approving Bidding Procedures, Breakup Fee and Expense

3     Reimbursement, (B) Authorizing and Approving The Debtors

4     Entry Into and Assumption of The Stalking Horse Asset

5     Purchase Agreement, (C) Approving Notice Procedures,

6     (D)Scheduling A Sale Hearing and (E) Approving Procedures

7     For Assumption and Assignment of Certain Contracts and

8     Leases And Determining Cure Amounts and (II) and Order (A)

9     Authorizing The Sale Of Substantially All of The Debtors

10    Assets Free and Clear of All Claims, Liens, Rights,

11    Interests And Encumbrances, (B) Approving The Asset Purchase

12    Agreement and (C) Authorizing The Debtors to Assume and

13    Assign Certain Executory Contracts And Unexpired Leases

14    [Docket No. 21]

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

1   A P P E A R A N C E S :

2   ROPES & GRAY

3         Attorney for the Debtor

4         1211 Avenue of the Americas

5         New York, NY 10036-8704

6

7   BY:  GREGG M. GALARDI, ESQ.

8         D. ROSS MARTIN, ESQ.

9

10   LATHAM & WATKINS LLP

11         Attorneys for Unimoda

12         355 South Grand Avenue

13         Los Angeles, California 90071-1560

14

15   BY:  PETER M. GILHULY, ESQ.

16         MARC A. ZELINA, ESQ.

17

18   SIMPSON THACHER & BARTLETT LLP

19         Attorneys for the Committee

20         425 Lexington Avenue

21         New York, NY 10017

22

23   BY:  WILLIAM T. RUSSELL, JR., ESQ.

24         NICHOLAS E. BAKER, ESQ.

25

1   HAYNES AND BOONE, LLP

2         Attorney for 114 Fifth Owner

3         30 Rockefeller Plaza

4         26th Floor

5         New York, NY 10112

6

7   BY:  TREVOR R. HOFFMANN, ESQ.

8

9   SCHULTE ROTH & ZABEL LLP

10        Attorneys for the DIP Lenders

11        919 Third Avenue

12        New York, NY 10022

13

14   BY:  BRIAN C. TONG, ESQ.

15        ADAM C. HARRIS, ESQ.

16

17   SULLIVAN & CROMWELL LLP

18        Attorney for Ziff Davis

19        125 Broad Street

20        New York, NY 10004-2498

21

22   BY:  ALEXA J. KRANZLEY, ESQ.

23

24

25

Page 6

1  LAW OFFICE OF ANTOHNY M. VASSALLO

2        Attorney for Terrill and Ayyadurai

3        540 President Street

4        3rd Floor

5        Brooklyn, NY 11215

6

7

8  BY:  ANTHONY M. VASSALLO, ESQ.

9

10  ALSO PRESENT TELEPHONICALLY:

11  MICHAEL BERRY, ESQ.

12  STEVEN L. BRANNOCK, ESQ.

13  MICHAEL D. SULLIVAN, ESQ.

14  GREGG THOMAS, ESQ.

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                       P R O C E E D I N G S

2              THE COURT:  Please be seated.  Gawker.

3              MR. GALARDI:  Good afternoon, Your Honor.

4              THE COURT:  Good afternoon.

5              MR. GALARDI:  For the record, Greg Galardi on

6     behalf of Gawker Media and the other debtors.

7              Your Honor, we had filed an amended agenda this

8     morning.  There are not new matters on the agenda, but just

9     certain resolutions, and I'd like to go through the agenda

10    in the order.

11             THE COURT:  Go ahead.

12             MR. GALARDI:  Your Honor, first Your Honor had

13    asked for a case management conference.  I'll be very brief,

14    because I think the proceedings will also advise Your Honor

15    as to where we stand on these cases.

16             But very quickly, Your Honor, today is the day for

17    the -- where we seek Court approval of the sale that was

18    commenced -- the sale process that was commenced on the

19    petition date.

20             As Your Honor is aware from the bid procedures

21    hearing there was a non-solicitation period that ran to

22    early July, and this is about, by my count, 68 or 69 days

23    after Your Honor approved the -- since we filed the day and

24    about 48 days during that process.  So we are moving that

25    along.

Page 8

1           Your Honor is also aware of the litigations and

2   our motion to seek a preliminary injunction.

3           With respect to --

4           THE COURT:  Does somebody have a phone?

5           MR. GALARDI:  I think they just stepped out, Your

6   Honor.

7           THE COURT:  Go ahead.

8           MR. GALARDI:  Your Honor, with respect to the

9   litigations and the stay in effect, as Your Honor knows we

10  entered into a stipulation, the parties are here that will

11  -- that had the stay in certain matters go to September 3rd,

12  there's a different closing date.  I've been in contact with

13  counsel for those two plaintiffs.  They will likely extend

14  it.  That matter was complicated by certain of the things on

15  the docket that we will talk about.

16          We have not lifted the stay yet with respect to

17  the underlying Bilao (ph) litigation, but given that we're

18  going to -- looks like we'll -- if Your Honor approves we'll

19  have a sale closing somewhere around September 9th, and

20  that's sort of our time period for thinking about lifting

21  the stay and getting to what I'll the second phrase of this

22  case.

23          Your Honor is also aware that in all of that there

24  were proceedings -- I think Your Honor is aware -- that

25  there were proceedings once Your Honor did not extend the

Page 9

1   preliminary injunction.  Mr. Denton has filed Chapter 11, I

2   think that case is actually pending before Your Honor, and

3   there were proceedings down in Florida.  Those proceedings

4   are still going forward I think with respect to Mr. Delario

5   (ph).

6              Finally, Your Honor, and probably most important

7   for where we go from here, assuming that Your Honor does in

8   fact approve the sale today, there will be significant

9   proceeds.  I think Your Honor may know the amount of the

10  purchase price, we will walk through that with the

11  testimony.

12             But very important with respect to those proceeds

13  that -- what I've said begins, you know, phrase two of this

14  case.  The debtors that are selling the assets are Gawker

15  Media, LLC and Kinja, Kft. There will be or unless resolved

16  an allocation of proceeds issues.  You will see in the

17  papers that all parties are reserving their rights with

18  respect to allocations and how those proceeds are allocated.

19             I did send the committee a meet and confer, we've

20  known about this issue since the first day, so once the

21  proceeds are in we'll hope to try to reach a consensual

22  resolution and avoid spending a lot of those proceeds on

23  litigation.  No guarantees.

24             And then there is, as Your Honor is aware, that

25  litigation and how that litigation with Mr. Bilao and the

Page 10

1    appeal plays into how those proceeds are ultimately

2    resolved.

3              After this, Your Honor, and there'll be testimony

4    today with respect to a liquidating plan, because there will

5    be enough proceeds.  Just to put that in context and then

6    I'm going to turn it over to my partner, Mr. Martin, with

7    respect to the retentions.

8              Your Honor, as we sit here today I believe there's

9    roughly $40 million of secured debt outstanding.  The

10   proceeds from the sale, as Your Honor may have seen in the

11   transcript and we can talk about that transcript, we got a

12   cash purchase price of $135 million, so there will be

13   obviously sufficient proceeds to pay the secured debt, there

14   will be proceeds for unsecured creditors, how those all get

15   distributed will be ultimately a result of the allocation

16   and to whom those proceeds go.

17             Your Honor, what I would do now is the next three

18   matters on the agenda, subject to Your Honor's preference,

19   the next three matters are three retention motions that I

20   think were originally scheduled for early August this month,

21   maybe August 3rd, got pushed to August 9th.

22             We have engaged in conversations and negotiations

23   with both the committee and the creditors and the U.S.

24   Trustee regarding a resolution.

25             I can turn the podium over to my partner,

Page 11

1    Mr. Martin, because we are pleased to announce that there is

2    a similar -- subject to Your Honor's approval, a similar

3    resolution with respect to all three of those.

4              THE COURT:  Sure.

5              MR. MARTIN:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. MARTIN:  Ross Martin, Ropes & Gray for the

8    debtors and debtors in possession.

9              As Mr. Galardi indicated, we have of course on

10   retention matters, all things subject to the Court's

11   authority, a consensual resolution with the creditors'

12   committee and the United States Trustee on three

13   applications for retention of special counsel under

14   Bankruptcy Code Section 327(e).  Those counsel are all

15   involved in the underlying lawsuits that the Court is aware

16   of.

17             And if I could, Your Honor, approach.  The issues

18   that were raised by the United States Trustee and the

19   committee all arise from the fact that special counsel are

20   operating in joint representations with non-debtors in this

21   case.  If I could approach, Your Honor, I have redlines.

22             THE COURT:  Sure.  Thank you.

23             MR. MARTIN:  I don't think these changes will take

24   very long to walk through, Your Honor, and I really propose

25   mostly to walk through the first with respect to Brannock &

Page 12

1    Humphries, because the changes are all similar with one

2    exception that I will point out.

3              Your Honor, as an overview, there were really two

4    issues.  One, the question of conflicts or potential

5    conflicts in the joint representations and allocation of

6    fees and the changes.  I'll go to that.

7              So if you would -- if I could direct the Court's

8    attention to the redline for the Brannock & Humphries order,

9    and the changes I'll walk through here are the same in all

10   three orders, Your Honor.

11             Paragraph 4, which is new, simply clarifies that

12   -- and acknowledges that there is a joint representation of

13   non-debtor defendants and that the special counsel retention

14   could include a claims litigation in this court, to the

15   extent obviously that these parties are creditors and

16   there's a claim objection or other claims litigation, it may

17   behoove the estate on those specialized issues of the size

18   of those claims use special counsel with respect to that.

19   So we wanted to make sure that was clear.

20             Paragraph 6 is -- addresses allocation of fees

21   among the clients -- the debtor and non-debtor clients, and

22   this is in agreement with the committee.

23             The allocation for joint representation matters,

24   which is the -- essentially the bulk of the litigation, some

25   of which is going on in state court, subject to the stay, is

1    85 percent of the fees to these bankruptcy estates, 100

2    percent of the expenses to these bankruptcy estates, and 15

3    percent of the fees to the non-debtor defendants.

4            The arrangement of -- this Court is not being

5    asked to approve what the -- today is not being asked to

6    approve what the arrangement is among the non-debtor

7    defendants, I want to make that clear, they'll have to reach

8    their own agreement, and in the case of Mr. Denton, since he

9    is in Chapter 11, that too, and the order reflects this,

10   would obviously be subject to this Court's review in that

11   case.

12           THE COURT:  Well I was going to raise that.  For

13   instance, you allocate 15 percent to non-debtor defendants,

14   and might not the Denton estate at this point say, no that's

15   an unfair allocation and we don't agree to it and we want

16   separate lawyers?

17           MR. MARTIN:  And they could, Your Honor.  And all

18   this does is cap the amount that this estate is responsible

19   for at the 85 percent and the 100 percent of expenses.

20           THE COURT:  All right.  Well it says the non-

21   debtor defendants shall be liable for the remaining 15

22   percent.

23           MR. MARTIN:  It then goes on to say which shall be

24   due pursuant to arrangements with those, subject to

25   bankruptcy court approval required in any such case.

1            THE COURT:  Maybe you should say the debtor -- the

2    non-debtor defendants shall not be liable for the remaining

3    15 percent and shall be borne by the other debtors or other

4    non-debtor defendants to the extent they are approved by the

5    Court or approval as necessary.  I mean not approving that,

6    for example, Mr. Denton who now has his own Chapter 11 case

7    is liable for 15 percent of the fees.

8            MR. MARTIN:  That's absolutely correct, Your

9    Honor.  We attempted to pick that up in the parenthetical

10   that I think is seven likes down in paragraph 6, subject to

11   any bankruptcy court approvals required --

12           THE COURT:  All right.

13           MR. MARTIN:  -- and any non-debtor defendants.

14   We're obviously happy to change the language or have the

15   Court --

16           THE COURT:  All right.  Is a representative of the

17   Denton estate here?

18           MR. MARTIN:  I don't believe so, Your Honor.

19           MR. GALARDI:  He is represented, but he is not

20   here today.

21           THE COURT:  Okay.

22           MR. MARTIN:  That certainly was not going to be an

23   issue that was going to be addressed today, and we

24   understood that.

25           The other item here, Your Honor, is that as a

Page 15

1    matter of agreement between the committee and the debtors --

2    and I want to be clear that of course the Court -- we're not

3    trying to constrain the Court's review of the applications

4    here in any way -- but one of the issues that we wanted to

5    try to get to with the committee was not having the question

6    of what's allocable and what's not allocable devolve into

7    excessive litigation over that question.  And so the

8    arrangement we've come to, solely with respect to the

9    committee, is contained here in the sentence that's just

10   below the parenthetical I was pointing the Court to in

11   paragraph 6 where it say:

12           "The parties agree that there shall be a

13       rebuttable presumption that services and expenses

14       incurred in connection with the actions were rendered

15       on behalf of the debtors and non-debtor defendants

16       jointly."

17           So we have a litigation we thought and we came to

18   an agreement with the committee that this was a way to not

19   have that devolve into the minutia and get at the big

20   issues, if there are any.

21           Obviously these counsel are going to have to

22   prepare fee apps all the time, there is no request here to

23   change the reporting requirements as sometimes occurs with

24   non -- or sometimes requested with non-lawyer professionals.

25   So the data should all be there, the information should all

Page 16

1    be there.  And as I mentioned, we are not asking for any --

2    you know, the Court's review is still -- we're not asking

3    for the Court to cabin its review at this point in any way.

4         Your Honor, paragraph 7 confirms that the U.S.

5    Trustee's review is also unfettered by this order, and to

6    the extent they want to raise the allocation issues later

7    they're completely free to do so, as well as any other 330

8    issues and that the committee is free to raise other 330

9    issues other than the allocation issues later.

10        Paragraph 8 --

11        THE COURT:  Can't a party in interest raise it?

12        MR. MARTIN:  No other parties in interest

13   objected, Your Honor, and we had asked for the estate to pay

14   in full.  So our view would be no, because there were no

15   other objections to the retention and the estate paying it.

16        THE COURT:  All right.

17        MR. MARTIN:  Paragraph 8 again I think at the

18   suggestion of both the committee and the U.S. Trustee

19   confirms that the firms are not to take on matters that are

20   adverse to the estate, and they're all operating, and we

21   have confirmed this with them, under the understanding that

22   if a conflict were to develop they are permitted to withdraw

23   from the non-debtor defendant clients and represent the

24   estate.  So the estate is not at risk of losing these

25   lawyers by virtue of the joint representation.

1          And paragraph 9 is simply a reservation of rights

2     with respect to recovering fees from applicable insurance

3     policies.  Whether those are available -- whether the stay

4     needs to be lifted to access insurance, all issues for

5     another day, and paragraph 9 is simply a reservation of

6     rights.

7          I'll stop there, Your Honor.  I've got one more

8     item in the second order that I want to point to, but those

9     are the changes that are common to all three.

10          THE COURT:  Which is the second order, the LS --

11          MR. MARTIN:  The -- yes, the LSKS, Your Honor.

12     And this change is at the second half of paragraph 4.  And

13     this simply notes that part of their special counsel

14     retention, in addition to the litigation, they provide

15     certain general First Amendment and other publication law

16     related advice that is not subject to allocation because

17     it's not part of the lawsuit, it's directed to the debtors,

18     and we have agreed for this retention to a cap on those

19     amounts.  It's 100 percent allocable to the estates and the

20     cap is $20,000.  So I just wanted to call that to the

21     Court's attention.

22          The third, Your Honor, for Thomas & LoCicero is

23     essentially identical to the first Brannock set of changes.

24          Happy to entertain any questions from the Court.

25          THE COURT:  The first question I had is why is

Page 18

1    this nunc pro tunc to the petition date?  In theory the

2    debtor has not really been sued or hasn't had to participate

3    in litigation in non-bankruptcy court after the petition

4    date.

5              MR. MARTIN:  Your Honor, I can say myself without

6    I think going too far into the details, that of course in

7    planning the case and thinking about the case we have spoken

8    to and taken advantage of the legal services and knowledge

9    that they provide.

10             THE COURT:  But specifically Mr. Denton is seeking

11   stays in the Florida court after this case was filed before

12   his case was filed.  Is Danem (ph) going to charge this

13   estate for this service?

14             MR. MARTIN:  No, Your Honor.  That is exactly the

15   issue that we discussed with the committee and that falls

16   within the -- yeah, you've got exactly the issue, Your

17   Honor, on which we set up the rebuttable presumption because

18   that's clearly -- if the estate tried to do that it would --

19             THE COURT:  All right.

20             MR. MARTIN:  -- not be allocable, that's correct.

21             THE COURT:  And the other -- only other thing --

22   well there are two other things.

23             First, I think that the people who are being

24   represented are entitled to know that the debtor comes first

25   if there's a dispute, and that's one of the changes.  And

Page 19

1    there should be some sort of noticing procedure of this

2    final order, particularly on the Denton estate, because it's

3    a separate debtor.

4              MR. MARTIN:  Okay, Your Honor.

5              THE COURT:  Nothing is going to happen between now

6    and then any way, at least with respect to these debtors.

7    So these should be on notice to the people who are all

8    affected by the representation and maybe should bring a

9    proceeding at that -- one of the noticed proceedings within

10   the Denton estate for that purpose.

11             The other thing that struck me is it seems like

12   the debtor has a lot of counsel in the same cases.

13             MR. MARTIN:  A question I wanted to make sure that

14   I could answer, Your Honor.  It's quit simple, and I know

15   that the debtors are closely attuned to avoiding

16   duplication.

17             So LSKS is the lead counsel with respect to those

18   matters, but they also have local Florida appellate counsel,

19   which is the Brannock firm.  The Thomas LoCicero firm it was

20   local trial counsel.  The biggest potential duplication

21   issue is I think between the two local Florida firms, but as

22   in any appeal you want to access trial -- from time to time

23   you -- while the Bilao case, for example, is on appeal, you

24   do want to access the knowledge of the local Florida

25   counsel, you know, who was there at the trial.

Page 20

1          So I don't anticipate that it's all three firms

2     handling the appeal if it goes forward in Florida, but

3     that's why the three firms and that's what the division is,

4     Your Honor.

5          THE COURT:  All right.  Does anyone else want to

6     be heard with respect to the proposed retentions?

7          MR. RUSSELL:  Very briefly, Your Honor.  William

8     Russell, Simpson Thacher & Barlett LLP on behalf of the

9     committee.

10         Your Honor, the modifications that Ropes & Gray

11    went through do resolve our objections.

12         We would note and we had some concern over the

13    duplication of effort issue that you identified, but we have

14    not waived our rights to object on that basis when fee

15    applications are filed.  So if these firms do appear to have

16    a duplication of efforts we can still object on that basis.

17         I would like to note that while our objection has

18    been resolved in the reply brief that the debtors filed last

19    night they claimed that the committee was purportedly

20    seeking to disqualify counsel and that it was on the basis

21    of some sort of personal interest, and this is completely

22    unfounded.  In fact we weren't seeking to disqualify counsel

23    at all.  We made it very clear in our objection and in our

24    negotiations with the debtors and the U.S. Trustee that we

25    had absolutely no objection to these firms continuing to

Page 21

1    represent the debtors.  The committee only sought to ensure

2    on behalf of all unsecured creditors that there were no

3    potential conflicts in the work that counsel was doing, that

4    the debtors were not burdened with an unfair share of the

5    costs of any joint representation, and that the debtors

6    weren't effectively obtaining a backdoor indemnification

7    that would have had the estate pay for legal services for

8    non-debtors that provided for no benefit to the estate,

9    exactly like the -- Mr. Denton's unsuccessful attempt to

10   obtain stay of the personal judgment against in him in

11   Florida.

12          The modifications we negotiated ensure that they

13   obtained, you know, these modifications that protect the

14   interests of unsecured creditors.  And again, that was done

15   on behalf of all unsecured creditors generally and not on

16   behalf of any special interest of any committee member and

17   would resent the implication.

18          THE COURT:  All right.  Thank you.  What I'll --

19   yes, sir.

20          MR. MARTIN:  I was simply going to make a

21   suggestion, Your Honor, of picking up on the notice question

22   of ten days and we'll --

23          THE COURT:  Well I'm most concerned with

24   Mr. Denton, because he's a debtor, and if any of these firms

25   are being retained to represent Mr. Denton, as they are,

1    that would have to occur within the Denton estate at this

2    point under 327(e).

3            MR. MARTIN:  Yes, Your Honor.

4            THE COURT:  I mean for all I know they may have a

5    different view of things.

6            MR. MARTIN:  That's entirely possible, Your Honor.

7            THE COURT:  So putting aside Mr. Denton, why don't

8    you present an order on ten days notice to the clients.

9            MR. MARTIN:  Absolutely, Your Honor.

10           THE COURT:  Other than the debtor obviously, so

11   they know what the deal is.

12           And with respect to Mr. Denton you're going to

13   have to figure out procedurally how to get this before me

14   within the context of the debtor in Chapter 11.

15           MR. MARTIN:  I don't think we have to spend time.

16   We'll try to figure that out, Your Honor --

17           THE COURT:  Okay.

18           MR. MARTIN:  -- with that estate.  We don't need

19   to burden the Court today with that.

20           THE COURT:  Thank you.

21           MR. GALARDI:  And, Your Honor, I would just add on

22   that notice, I believe Mr. Martin mentioned it, but all of

23   the engagement letters have already -- have the normal carve

24   out for joint representations, but we'll let the firms know

25   that -- we'll present a notice and give it to them.

Page 23

1              THE COURT:  Okay.

2              MR. GALLAGHER:  Thank you.

3              Your Honor, then what I would now turn to is the

4      -- so that resolves matters one, two, three, and now we come

5      to what is the third part of the hearing, which is the

6      debtor's motion for approval of the sale.

7              Your Honor, first let me just do a little briefly

8      overview of where we stand and what we hope to submit to

9      Your Honor today.

10             First, Your Honor, the documentary evidence that

11     we would ask Your Honor to take judicial notice of and then

12     also to be part of the evidentiary record, there are

13     certificates of service on file, dockets number 136, 166, as

14     well as the cure notice, 115, 128.  There's a long list of

15     documents on page 6 of the agenda that have been filed, some

16     of which are notices.  They are, we believe, appropriate,

17     except for I know a brief is not part of the evidentiary

18     record, but there is filings, the orders, and we have done a

19     number of revised orders, including complying in material

20     respects with the sale and bid procedures order and the

21     timelines there, including the filing of the successful bid,

22     the transmission of -- and I think this will be also in the

23     transcript, Your Honor -- the transmission of those bids.

24             Your Honor, with respect to the witness testimony

25     that we intend to put in -- on for Your Honor today, we

1    intend to call the -- the debtors intend to call two

2    witnesses.  Mr. Reid Snellenbarger, who has actually

3    testified before Your Honor with respect to the bid

4    procedures, also testified in Mr. Denton regarding the sale

5    process, and Mr. Holden the debtor's CRO.

6         My understanding was that the successful bidder,

7    Mr. Gihuly, is here in the courtroom from Latham & Watkins

8    and represents that successful bidder.  I believe he will be

9    calling two witnesses with respect to adequate assurance and

10   financial wherewithal to close the transaction.

11        Your Honor, just briefly as an overview with

12   respect to the standard, and I remember Your Honor the very

13   first day I was here you asked me about the business

14   judgment rule and we'll go through some of that, so --

15        THE COURT:  Well that was because Mr. Denton had a

16   side deal, for lack of a better phrase.  Is that true in

17   this case also?

18        MR. GALARDI:  Yes, Your Honor.  It is true that

19   there is also another deal in that, but Your Honor --

20   listening to Your Honor, and as I remember telling you, we

21   had an independent committee member, that independent

22   committee member was designated as special committee when we

23   were here and he was the sole person responsible for the

24   approval.  And as auctions have a way of working it out, I

25   don't think -- I know we've consulted with the committee and

1    they knew about the negotiations, we'll put on a little bit

2    of testimony with respect to that, the transcript will

3    reflect what went on with Mr. Denton.

4             But with respect to the approval Your Honor had

5    read me when I -- it still stings a little bit on the 363(b)

6    iridium when I didn't get the standard right for -- didn't

7    satisfy the standard on Lyondell, what you will hear today

8    is that we satisfy the Lyondell factors with respect to the

9    sale.

10            You will hear testimony that the value of the

11   assets as relative to the estate as a whole will be

12   substantially all.

13            You will hear about the time, and I've already

14   eluded to it, that we commenced these cases about 68, 69

15   days ago and the sale process has run about 48 days by my

16   count.

17            That this sale is going to be what's necessary for

18   a plan of reorganization, that this company could not

19   reorganize outside of bankruptcy or through a stand-alone

20   plan, there wasn't financing available, Your Honor is

21   familiar with the DIP proceedings.

22            That the proposed disposition of the assets upon

23   sell, that is the cash, is not setting up, is not a sub rosa

24   plan of any sort, it is being kept in a single account for

25   the parties to hopefully resolve consensually on an

Page 26

1    allocation and that will determine creditor distributions.

2            That this is in fact a sale.

3            That Your Honor we conducted, and I think this is

4    a critical point, we conducted an auction.  As Your Honor

5    may recall that the starting cash purchase price under the

6    stalking horse APA was $90 million, as a result of the

7    auction the cash purchase price is now $135 million, and

8    also under the stalking horse APA there were various what I

9    call potential liabilities, including there was an issue of

10   whether the collective bargaining agreement would be

11   assumed, there was an issue of whether the debtor's 5th

12   Avenue lease would be assumed, and then there were a series

13   of other contracts.

14           As you will hear in the testimony from Mr. Holden

15   today those liabilities are also now being assumed by the

16   buyer.

17           Your Honor may also remember the dialogue we had

18   about why were we cash collateralizing the 5th Avenue lease

19   LC.  What is especially helpful about that, and that

20   constituted some of that 40 million of secured debt that I

21   mentioned early on, I believe that there is an agreement

22   with respect to the 5th Avenue landlord who filed an

23   objection as to the adequate assurance.

24           So in connection with the assumption we will get

25   back the LC, the cash collateral comes back, that's a

Page 27

1    significant help to us as well.

2            And, Your Honor, then finally, and I think it's

3    the most important factor as Your Honor cited and as cited

4    in Lyondell, is that whether the assets are increasing or

5    decreasing in value.  You will hear testimony that they are

6    decreasing in value.  I won't say this is the case of the

7    melting iceberg, it's more of a slow melt, but yet there is

8    very serious concerns about the value of the company as its

9    undergone the litigation and other matters.

10           Your Honor, also with respect to the other

11   subdivisions of 363 you will hear that this sale should be a

12   sale free and clear under the five, you know, conjunctive

13   tests.  One applicable law will permit the sale free and

14   clear.

15           THE COURT:  You're selling it for more than the

16   aggregate liens, right?

17           MR. GALARDI:  We're selling it for almost

18   $95 million more than the aggregate liens.

19           THE COURT:  So you satisfy (f)(3) don't you?

20           MR. GALARDI:  We satisfy (f)(3), those -- and

21   again there's a reservation of rights, which I think has

22   been withdrawn, but Your Honor does have findings regarding

23   the publication issue because there are web contents so we

24   are still going to say it's free and clear.  We think

25   applicable law allows you to sell under Philadelphia

Page 28

1    newspapers, we did brief that issue, so that objection is

2    withdrawn, so we don't have a live objection for Your Honor

3    to be comfortable with the findings we're asking you to

4    make.

5                THE COURT:  What is the finding you're asking me

6    to make?

7                MR. GALARDI:  There's a finding about the

8    successor interest here and that it is not an adverse

9    interest, it is being sold free and clear.

10               THE COURT:  You use that phrase adverse interest.

11   I couldn't find a definition of that.

12               MR. GALARDI:  I think it's -- well it's in the

13   agreements, but it is the way in which the bidders have

14   referred to what I'll call the free and clear language of

15   claims, liens, and encumbrances.

16               THE COURT:  Claims, liens, and encumbrances I

17   understand, adverse interest I don't.

18               MR. GALARDI:  Okay.  Then we will --

19               THE COURT:  Well you'll have to put the definition

20   of whatever it is into the order.

21               MR. GALARDI:  We will do so in any order that Your

22   Honor approves.

23               Your Honor, there is an interest that Your Honor

24   may recall from the first day that is still in dispute,

25   which is a secured interest, which is the make whole, that

1    second lien that everybody has reserved their rights on

2    that.  So we believe that although we are not paying that

3    off out of sale proceeds there is sufficient cash -- I

4    believe it's about $4 million if I'm not mistaken -- that

5    size claim, there is sufficient cash to cover it, but it is

6    a bona fide disputed lien so we think we satisfy (4), and we

7    also --

8                THE COURT:  You satisfied (f)(3).

9                MR. GALARDI:  Okay.  Fine.  Satisfied (f)(3).

10               With respect -- what I'll do, Your Honor, let's

11   move on and I just will call my first witness.

12               THE COURT:  Go ahead.

13               MR. GALARDI:  Thank you.  I will call

14   Mr. Snellenbarger to the stand.

15               THE COURT:  Would you raise your right hand,

16   please.

17                  REID SNELLENBARGER, WITNESS, SWORN

18               THE COURT:  Please state -- take a seat and state

19   your name.

20               THE WITNESS:  Reid Snellenbarger.

21                        DIRECT EXAMINATION

22   BY MR. GALARDI:

23   Q    Mr. Snellenbarger, who are you -- by whom are you

24   employed?

25   A    Houlihan Lokey.

1    Q     And what is your position at Houlihan?

2    A     I'm a managing director in the finance and

3    restructuring group.

4    Q     Okay.  And what is Houlihan's role in these cases?

5    A     We are advising the company through a variety of

6    strategic alternatives, including raising financing and

7    selling the company.

8    Q     And you previously testified before this Court

9    regarding the bid procedures -- in the contexts of the bid

10   procedures hearing, correct?

11   A     I did.

12   Q     Okay.  So I'm going to try to stay now all post-bid

13   procedures, okay?

14          So what has been your role in the sale process

15   subsequent to the entry of the bid procedures order?

16   A     We, with the assistance of the company and counsel and

17   other advisors, reached out to a variety of parties to see

18   if they'd be interested in buying the company.  We finalized

19   a data room for those that signed NDAs -- solicited NDAs,

20   got those signed, opened up a data room for those that did

21   it, arranged management meetings for those that were

22   interested, and urged people to submit bids before the

23   qualified bid deadline.

24   Q     Okay.  So how many potential bidders were contacted by

25   Houlihan?

1    A      Sixty-three.

2    Q      Okay.  And how many of those signed non-disclosure

3    agreements?

4    A      Twenty-one.

5    Q      And how many of those conducted due diligence?

6    A      Twenty.

7    Q      And how many ultimately submitted a qualified bid?

8    A      One.

9    Q      And that bidder was that entity?

10   A      Univision.

11   Q      Okay.  Univision.  And it's Unimoda is the entity --

12   A      And Unimoda, the subsidiary that --

13   Q      Okay.  And what is the relationship between Unimoda and

14   Univision?

15   A      Unimoda is a wholly -- 100 percent whole-owned

16   subsidiary of Univision.

17   Q      And when you testified back in the context of the bid

18   procedures hearing I think you testified that there were

19   four or five bidders that had been contacted pre-bankruptcy,

20   correct?

21   A      That's correct.

22   Q      And was that one of the bidders that were contacted

23   pre-bankruptcy?

24   A      Yes.

25   Q      Okay.  And it had been involved in other discussions

Page 32

1    with the company prior to the bankruptcy, correct?

2    A    That's correct.

3    Q    Okay.  It was your understanding that they weren't

4    prepared to be the stalking horse bidder, correct?

5    A    That's correct.

6    Q    Okay.  Now, do you believe that -- in hindsight on the

7    process do you believe that the bidders or the potential

8    bidders had adequate time to determine whether or not to bid

9    on the assets?

10   A    I do.

11   Q    And as you sit here today do you know of any bidders

12   that said that they needed more time to formulate a bid for

13   the assets?

14   A    No.

15   Q    Okay.  And do you think that the company would have

16   gotten a higher or better bid had they extended the time for

17   soliciting bids?

18   A    I do not.

19   Q    Okay.  Why not?

20   A    Based on the feedback we received for those parties

21   that had passed, it was more of a strategic fit or the level

22   of value rather than time, and given the work we had done

23   prepetition on the data room and so forth, we gave people,

24   my opinion, adequate time to do their due diligence.

25   Q    Okay.  Now, did Houlihan play a role in determining

Page 33

1    whether bidders were qualified to bid?

2    A    We did.

3    Q    Okay.  And did Houlihan assess the financial

4    wherewithal of the potential bidders?

5    A    We did.

6    Q    Okay.  And did Houlihan assess the finance wherewithal

7    of Unimoda?

8    A    We did.

9    Q    Okay.  And does Houlihan believe that Unimoda has the

10   -- at the time that it submitted its initial bid -- when did

11   it submit its initial bid?

12   A    Last Friday.

13   Q    Okay.

14   A    Excuse me Monday.

15   Q    Monday.  Seems like a long time ago, correct?

16   A    It does.

17   Q    So it was Monday and the bid deadline was Monday,

18   correct?

19   A    Correct.

20   Q    And is it -- do you understand what the time was for

21   the bid deadline?

22   A    It was 5 p.m. that Monday.

23   Q    Okay.  And did they submit their bid before 5 p.m.?

24   A    They did.

25   Q    And did they also submit a security deposit before

1    5 p.m.?

2    A    They did.

3    Q    And what was the amount of the bid that they submitted

4    at -- on Friday?

5    A    Ninety-five million.

6    Q    Okay.  And did you assess Unimoda and Univision's

7    financial wherewithal to be able to close that transaction

8    at $95 million?

9    A    We did.

10   Q    Okay.  And what did you determine with respect to that

11   financial wherewithal?

12   A    They provided financial statements, along with a

13   description of their financing and cash available.

14   Q    Okay.  And did you advise the board as to the financial

15   wherewithal of Unimoda to close that bid?

16   A    I did.

17   Q    And what did you advise the board in that respect?

18   A    We told them that we believed they had the financial

19   wherewithal to close that bid.

20   Q    Okay.  Now, are you also familiar with the final bid

21   from -- I'm going to call it Univision or Unimoda.

22   A    I am.

23   Q    And what was the amount of the final purchase price

24   offered by Unimoda after the auction?

25   A    A hundred and thirty-five million of cash, plus the

Page 35

1    assumption of the 5th Avenue lease, plus the assumption of

2    the CBA, plus assumption of a few other contracts.

3    Q    Okay.  So based on your review of the financials do you

4    believe that Unimoda has the financial wherewithal to close

5    the transaction at that significantly increased purchase

6    price?

7    A    I do.

8    Q    Do you have a view as to whether they will be able to

9    perform under the contracts they've assumed?

10   A    I do.

11   Q    And what do you base the view on their ability to

12   perform those contracts?

13   A    Based on the information we received relative to the

14   size of their company and their general business profile.

15   Q    Okay.  Let's talk about their general business profile.

16   What do you understand Univision's business profile to be?

17            THE COURT:  Univision or Unimoda?

18            MR. GALARDI:  Unimoda.

19   BY MR. GALARDI:

20   Q    Well Unimoda is an acquisition vehicle, correct?

21   A    Correct.

22   Q    And is it your understanding that Univision stands

23   behind Unimoda financially?

24   A    They do.

25   Q    I'll have to finish, I know I'm going fast.  And is it

1   your understanding that Univision stands financially behind

2   Unimoda?

3   A    It is.

4   Q    Okay.  And is it your understanding that Univision has

5   a number of companies within its family of companies?

6   A    Yes.

7   Q    Okay.  And so when assessing the ability of Unimoda to

8   perform obligations, and given the testimony did you -- what

9   did you consider in making that conclusion -- reaching that

10  conclusion?

11  A    We looked -- again, we looked at Univision's overall

12  financial wherewithal and also Univision at several other

13  online media brands that are consistent with the debtor.

14          THE COURT:  Has Univision guaranteed the purchase

15  price?  The bid?

16          THE WITNESS:  I believe so.  Yeah, I believe so.

17  They're 100 percent owner of Unimoda.

18          THE COURT:  No, that's a different question.

19          MR. GALARDI:  It's a different question.  You're

20  asking a legal question.

21  BY MR. GALARDI:

22  Q    Do you know --

23          THE COURT:  I'll ask you the question.

24          MR. GALARDI:  They have not guaranteed the -- or

25  they have guaranteed the purchase price.  I know they

Page 37

1    guaranteed the lease, but I think they've also guaranteed

2    the --

3                THE COURT:  Okay.

4                MR. GALARDI:  Mr. Gihuly has told me that they had

5    guaranteed it.

6    BY MR. GALARDI:

7    Q    Mr. Snellenbarger, have you had many interactions with

8    the Univision people with respect to the doing of the due

9    diligence here?

10   A    We have.

11   Q    Do you have any reason to believe that they've entered

12   into any agreement with a third party to suppress the price

13   that the debtors would have received at the auction?

14   A    I don't.

15   Q    Okay.  Do you have any understanding -- strike that.

16            Do you have an understanding that they had put as

17   a condition precedent to the deal some agreement with

18   Mr. Denton?

19   A    Yes.

20   Q    Okay.  And what is your understanding of the condition

21   -- what I'll call the condition precedent?

22   A    They wanted to have a non-compete agreement, non-

23   solicitation agreement with (indiscernible).

24   Q    Okay.  And do you know anything about the terms of that

25   agreement?

1    A    I do not.

2    Q    Okay.  And did the company negotiate anything with

3    respect to that as far as you know?

4    A    I'm not aware of any.

5    Q    Mr. Snellenbarger, did you participate in board

6    meetings throughout the sales and marketing process?  And by

7    that process I mean from the bid procedures hearing to

8    today?

9    A    I did.

10   Q    Okay.  And how regular did the board receive updates

11   from Houlihan?

12   A    At least weekly.

13   Q    Okay.  And, Mr. Snellenbarger, do you know who Scott

14   Tillman is?

15   A    I do.

16   Q    And who is Mr. Tillman?

17   A    He is an independent board member of the debtors.

18   Q    Okay.  And do you have an understanding of what role

19   Mr. Tillman played with respect to the sale process?

20   A    I do.

21   Q    Okay.  And what was your understanding of that role?

22   A    He was designated as the sole member of the special

23   committee to determine the -- both the qualified bids and

24   the ultimate highest and best bid for the company.

25   Q    Okay.  Did Houlihan provide input to the board and

1    Mr. Tillman regarding the offers submitted by Unimoda at the

2    board meeting on August 15th, 2016?

3    A    We did.

4    Q    And did Houlihan advise Mr. Tillman and the board that

5    it believed that the Unimoda bid was a qualified bid and

6    that it should be declared what's been defined as the

7    baseline bid under the bid procedures?

8    A    We did.

9    Q    And why did you give that advice?

10   A    Based on the price that was submitted, all the other

11   submissions that ticked off the qualified bid requirements,

12   including financial wherewithal we believed they were a

13   qualified bid and the baseline bid.

14   Q    And so you believed the $95 million met the minimum bid

15   increment?

16   A    We did.

17   Q    And you believed that the agreement was one that was

18   subject -- that could be closed?

19   A    Correct.

20   Q    And you believe they had the financial wherewithal to

21   have -- close that deal?

22   A    That's correct.

23   Q    And I know you're not a lawyer, but it satisfied in

24   your mind all of the other requirements of the bid

25   procedures and qualified bids?

Page 40

1    A    I believe so, yes.

2    Q    Okay.  Now, Mr. Snellenbarger, did you and others from

3    Houlihan attend the auction?

4    A    We did.

5    Q    Did you participate in negotiations outside the room in

6    which the actual auction was taking place?

7    A    We did.

8    Q    Okay.  And how would you characterize those

9    negotiations?

10   A    Primarily clarifying various differences in the

11   contracts -- in the APA and the contracts, and then

12   ultimately during the round of bidding there were assumption

13   of certain contracts, including the 5th Avenue lease, and

14   then therefore there was negotiation discussion of how the

15   debtors valued that assumption.

16   Q    Okay.  Now, I'm going to take you before the auction.

17   You mentioned that there were negotiations regarding the

18   assumptions of lease, correct?

19   A    Correct.

20   Q    During the course of the proceedings have you heard of

21   anything called the bidding matrix?

22   A    Yes.

23   Q    And what's your understanding of the bidding matrix?

24   A    The bidding matrix was a -- effectively a list of what

25   I call kind of non-cash assumptions and components of the

Page 41

1    APA that the debtors reviewed and estimated a value for.

2    Q    Okay.  And did you have conversations with potential

3    bidders about the bid matrix?

4    A    We did.

5    Q    Okay.  And what sort of conversations did you have?

6    And this is prior to the auction.  Let's take prior to the

7    auction.

8    A    All we said was that we were reviewing the various

9    assumption of contracts trying to determine what value we

10   would assign to it.  If they were bid at the auction we

11   would let, you know, buyers know that at the time.

12   Q    Okay.  And did you participate in conversations with

13   the creditors' committee prior to the commencement of the

14   auction regarding the bid matrix of how the sale process

15   would operate?

16   A    I did.

17   Q    And do you recall when that meeting or call was?

18   A    We had weekly calls with the committee and their

19   advisors up -- from the bidding procedures all the way up to

20   the auction.

21   Q    Okay.  And was there a call on a Saturday or Sunday

22   morning right before the auction receiving the bids?

23   A    There was.

24   Q    And were there calls on the evening that the bid was

25   received?

1    A    There was.

2    Q    Okay.  And then did you participate in meetings at

3    which there was either a consultation with the committee or

4    the committee was present when negotiating the terms of the

5    agreements with the two bidders?

6    A    Yes.

7    Q    Now, Mr. Snellenbarger, do you believe the sale

8    transaction should be consummated as soon as possible?

9    A    I do.

10   Q    And why is that?

11   A    Basically like any uncertainly to get to close creates,

12   you know, a concern over getting the deal closed.  I think

13   primarily here I think employees, in our view, want to have

14   comfort that the transition is going to be seamless and

15   quick, and that will reduce any concern of employees

16   leaving.

17   Q    Has there been a concern about employees leaving during

18   the sale process?

19   A    There has.

20   Q    Okay.  And has there been concerns about the offers for

21   employment with respect to the successful bidder?

22   A    Yes.

23   Q    Okay.  And was one of the terms that was negotiated

24   with the successful bidder, did it address one of those

25   concerns about employees?

Page 43

1    A    It did.

2    Q    And could you explain what that provision was?

3    A    I believe part of the kind of final purchase agreement

4    the acquirers agreed to make offers to 95 percent of the

5    employees.

6    Q    Okay.  And do you remember what the phrase was in the

7    stalking horse bid as to the number of offers that would

8    have to be made to employees?

9    A    I believe substantially all.

10   Q    Okay.  And so now this bidder, as well as Ziff,

11   increased that or clarified that to 95 percent of the

12   employees, correct?

13   A    That's correct.

14   Q    I'm going to turn very quickly to the Ziff Davis break-

15   up fee and expense reimbursement.

16   A    Okay.

17   Q    Okay.  Do you have an understanding of what the break-

18   up fee and expense reimbursement provisions were in the Ziff

19   Davis stalking horse agreement?

20   A    I do.

21   Q    And what is your understanding?

22   A    They have a break-up fee I believe 2.475 million, plus

23   an expense reimbursement up to 1.25 million.

24   Q    Okay.  And do you have an understanding or a belief as

25   to whether that expense reimbursement portion, the 1.25,

Page 44

1    will have been expended?

2    A    I believe it will be.

3    Q    Okay.  And if it's not expended what effect will that

4    have on the estate?

5    A    It'll be more net proceeds to the estate.

6    Q    And could you just explain how you come to that

7    conclusion?

8    A    Well since Univision or Unimoda was the acquiring

9    entity we owe Ziff the break-up fee and expense

10   reimbursement that'll come out of the sale proceeds.  If

11   Ziff did not -- will not -- did not use all the 1.25 and

12   it's less we have to pay Ziff less therefore there'll be

13   more proceeds available to the estate.

14   Q    Okay.  And was that all explained on the transcript of

15   the auction?

16   A    I believe it was.

17   Q    And did all of the parties agree, all the parties being

18   two, did Univision agree that they were going to live with

19   the 3.75 as the break-up fee expense reimbursement for each

20   of the successive bids?

21   A    Yes.

22   Q    Now, Mr. Snellenbarger, do you believe that Ziff Davis

23   earned its break-up fee and expense reimbursement?

24   A    Absolutely.

25   Q    Do you believe that you would have had the same sort of

1   transaction had it not served as the stalking horse?

2   A    No.

3           MR. GALARDI:  That's all my questions for

4   Mr. Snellenbarger.

5           THE COURT:  Is there anyone who wants to cross-

6   examine the witness?  Hearing no response you can step down.

7   Thank you.

8           THE WITNESS:  Thank you.

9           MR. GALARDI:  I would call Mr. Holden to the stand

10  now.

11          THE COURT:  Raise your right hand, please.

12              WILLIAM HOLDEN, WITNESS, SWORN

13          THE COURT:  Please take a seat and state your

14  name.

15          THE WITNESS:  Women yam Holden.

16                  DIRECT EXAMINATION

17  BY MR. GALARDI:

18  Q    Mr. Holden, by whom are you employed?

19  A    Opportune.

20  Q    Okay.  And what is your position at Opportune?

21  A    I'm a managing director in their restructuring group.

22  Q    Okay.  And what has your role been in this -- in the

23  case of the Gawker Media case?

24  A    I was retained as the chief restructuring officer.

25  Q    Okay.  And what was your role in the -- in respect to

Page 46

1    the sale process?

2    A    I was primarily the boots on the ground at the company

3    preparing and pulling information that was being requested

4    by various bidders, pulling that together and packaging it

5    and communicating it either directly to prospective bidders

6    or communicating it through Houlihan who would reach out to

7    the bidders.

8    Q    Okay.  And how many parties do you believe that you

9    dealt directly with as opposed to through the counsel or

10   through Houlihan?

11   A    Approximately six.

12   Q    Okay.  And do you have any -- do you believe that the

13   information -- did you ever get a request for information

14   that you don't believe that you satisfied?

15   A    No.

16   Q    And had you heard any bidders say that they weren't

17   getting the information they needed in order to make a bid?

18   A    No.

19   Q    Now, did Opportune help organize the data room?

20   A    We helped organize as well as populate the data room.

21   Q    Okay.  Do you believe that the debtors provided

22   potential bidders with an adequate time in which to conduct

23   due diligence?

24   A    Yes.

25   Q    Okay.  Do you think that if the debtors had more time

1   they would have received a higher bid than that -- than the

2   bid they received at the conclusion of the auction from

3   Unimoda?

4   A    No, I do not.

5   Q    Okay.  Why not?

6   A    The media attention that came to this company involves

7   the -- when it filed for bankruptcy and the announcement of

8   the stalking horse bid was very widespread, and if there was

9   anyone who had any interest that was in this space they knew

10   how to reach out and, you know, talk to Houlihan, talk to

11   the company.

12            In addition to that, in conversations with

13   Houlihan, it sounded as though -- or it was represented that

14   we didn't leave a single stone unturned in terms of the

15   potential interested parties that would be -- that want to

16   buy the assets.

17   Q    Okay.  Now, Mr. Holden, do you have any reason to

18   believe that Unimoda or Univision entered into any agreement

19   with any party to suppress the price of which the debtors

20   would receive in auction?

21   A    No.

22   Q    Would receive at the auction?

23   A    I apologize.  No.

24   Q    Okay.  And were you at the auction?

25   A    Yes, I was.

1   Q    And was there anything said on the transcript of the

2   auction that led you to that conclusion?

3   A    Yes.

4   Q    And what is your recollection?

5   A    I believe you had asked both parties whether or not

6   there was any type of collusionary behavior that they had

7   participated in in terms of being able to suppress the

8   price.

9   Q    And outside of that particular representation by both

10  of the bidders did you come to find or have any belief that

11  there was any collusion or relationships with any of the

12  other bidders?

13  A    No.

14  Q    Now, are you aware of any relationship between any

15  insiders of Gawker and Unimoda or Univision?

16  A    No, I'm not aware.

17  Q    Okay.  And are you aware of any of the conditions

18  precedent to the closing of the -- sorry.

19       Are you aware that one of the conditions precedent

20  to the closing of the transactions that Mr. Denton and

21  Unimoda enter into some sort of non-competition agreement?

22  A    I'm aware of that.

23  Q    Okay.  Are you -- were you aware of any conversations

24  between Mr. Denton and Unimoda prior to their submitting the

25  bid on August 15th?

Page 49

1    A    I was not aware of any conversations.

2    Q    And did Mr. -- did there come a time when Mr. Denton

3    made a representation at a board meeting at which you were a

4    party about that?

5    A    I do not recall.

6    Q    Okay.  That's fine.

7         Do you recall anything at the auction with respect

8    to Unimoda making any representations with respect to

9    conversations between Mr. Denton and --

10   A    I do not -- I'm not aware or do not recall anything

11   being mentioned.

12   Q    Okay.  Mr. Holden, you heard Mr. Snellenbarger testify

13   about the bidding matrix.  Were you the controller if not

14   the author of the bidding matrix?

15   A    Along with my team members we were the ones who were

16   putting the numbers together and reading through the

17   documents.

18   Q    Okay.  And would you describe roughly, other than

19   contracts, were there other things on that bidding matrix?

20   A    The big ones were contracts and leases.

21   Q    Okay.

22   A    There were some other sort of softer items, but they

23   were -- they actually never played a really predominant role

24   in the auction process.

25   Q    Okay.  And the contracts included the collective

Page 50

1    bargaining agreement?

2    A    Contracts included collective bargaining agreement,

3    there was a lease for the headquarters on 5th Ave., there

4    was a large agreement with a counterparty called Tabula

5    (ph), and then there was a number of smaller types of

6    contracts.

7    Q    Okay.  And there was numbers that were given -- there

8    was numbers associated with that?

9    A    Yes.  We put together estimates for what we thought the

10   rejection damages could be in the event that some of these

11   contracts were not taken by the buyer.

12   Q    And was there a discussion that you recall with respect

13   to the value to be placed on rejection damage claims?

14   A    There was a -- there's a number of conversations that

15   we had with them -- with the unsecured creditors' committee.

16   We discussed that we would be valuing these at 100 cents on

17   the dollar.  And there was other conversations about the

18   calculations to determine specifically the amount of

19   rejection damages that we could be suggest to with the

20   headquarters -- with the lease at the 5th Ave.

21   Q    Okay.  And could you describe how the bidding matrix

22   was used both before the auction and -- I mean both before

23   the auction and during the auction?

24   A    Before the auction it was -- before the auction we

25   consulted with the unsecured creditors' committee in terms

Page 51

1    of the numbers that we had and how we had compiled it and

2    why we thought that these were the important factors.  I

3    believe that we had agreement on that.  We did not have any

4    disagreements by --

5                THE COURT:  Hold on for a minute.  Is that phone

6    recording?  You can't record.  Turn it off.  Go ahead.

7                MR. GALARDI:  Thank you, Your Honor.

8                THE COURT:  There's no recording or photo taking

9    in the courtroom.  Go ahead.

10               THE WITNESS:  Where did I get lost?

11               THE COURT:  Maybe we should listen to the record.

12        (Laughter)

13               THE COURT:  Go ahead.

14   BY MR. GALARDI:

15   Q    I think you were talking about the contracts and the

16   conversations that you had had with the committee and going

17   through how you calculated.

18   A    Yeah.  The question at dispute -- the big question at

19   dispute that we had was the rejection damages for the lease

20   that we have on 5th Ave.  At issue was whether or not we

21   could -- we should be valuing it through the full 2029 or

22   there's an early option to come out in 2024, and if you

23   leave in 2024 what are the -- what's the penalty, what are

24   the straight line amortization costs that were borne by the

25   landlord and how do those get fit into the equation.  So it

1    was basically to determine that 6.4 million was a reasonable

2    number to use in the context of the auction.

3    Q    Okay.  And you said there was a dispute.  Was that

4    dispute with the committee or was it a dispute with one of

5    the parties?

6    A    It was a dispute with one of the parties.

7    Q    And that was with Ziff Davis, correct?

8    A    That was with Ziff Davis.

9    Q    And that was -- and there was a question because at

10   some point in the auction did one of the parties decide to

11   assume that lease?

12   A    Yes.

13   Q    And that party was?

14   A    Univision decided to assume the lease.

15   Q    Okay.  And so then there was a conversation regarding

16   the value to be put on that which was the $6.4 million?

17   A    That's correct.

18   Q    And there was a concern as to whether that was too

19   great a value to put on it in light of the potential

20   rejection damage claim?

21   A    That's correct.

22   Q    And that conversation ultimately got resolved, correct?

23   A    It did get resolved.  We got resolved and agreed on the

24   6.4 million that we had original come with.

25             The other issue that developed on that, which we

Page 53

1    also resolved, was the timing of payments and how we could

2    set up a mechanism whereby Ziff would put the 6.4 million

3    into an escrow account and we would run out the extension of

4    our 210 days on the lease.  At the end of that if they

5    ultimately did reject the lease then the debtor would take

6    the 6.4, but if they assumed it at that time they would take

7    the 6.4.  This was basically a mechanism to give them more

8    time to figure out their own real estate issues and how they

9    wanted -- whether or not this was a piece of property that

10   they wanted or not.

11   Q    And in your view the determination to give them that

12   that option was equivalent to the option of assuming the

13   lease, so they each got $6.4 million of value?

14   A    That's correct.

15   Q    Okay.  And then -- and there was no dispute about that

16   once that matter was resolved during the auction, correct?

17   A    No, there was not.

18   Q    And did the committee participate throughout that

19   process as well and consult with respect to that issue?

20   A    As I recall the committee was in the room with us with

21   Ziff, they were outside of the room with us as we came up

22   with numbers.  If they were in 100 percent of every meeting

23   that came in and out I'm not sure, but it was very, very

24   inclusive.

25   Q    Okay.  Now, Mr. Holden, did you participate in board

Page 54

1    meetings throughout what I've called the sale and marketing

2    process which is leading up to the auction but after the bid

3    procedures hearing?

4    A    Yes, I did.

5    Q    Okay.  And how regularly did the board meet and get

6    updates from Opportune?

7    A    A minimum of once a week.

8    Q    Okay.  And, Mr. Holden, who is Scott Tillman?

9    A    Scott Tillman is the company's independent board

10   director.

11   Q    Okay.  And do you have an understanding of the role

12   that Mr. Tillman played with respect to the sale process and

13   ultimately the approval of the successful bid?

14   A    Scott Tillman was appointed as the sole member of a

15   special committee.  This special committee has a number of

16   roles basically to make decisions where he is not

17   financially motivated one direction or another.

18            One of those decisions was to determine whether or

19   not we had a baseline bid that was above -- you know, higher

20   and better than the stalking horse bid, and he was involved

21   in those conversations and those decisions.

22            And subsequently he was eventually the ultimate

23   decision that was made on the Univision bid as being highest

24   and best.

25   Q    Okay.  So did you advise the board and Mr. Tillman on

1   that August 15th board meeting that you believed that the

2   Unimoda bid was a qualified bid and it should be declared as

3   the baseline bid for the purposes of commencing the auction?

4   A    Yes.

5   Q    And did Mr. -- Mr. Tillman ultimately determined that

6   it was a baseline bid at least in part of your advice?

7   A    Yes.

8   Q    Okay.  And do you understand that Mr. Tillman also

9   ultimately approved the revised bid from Unimoda at the

10  conclusion of the auction?

11  A    Yes.

12  Q    Okay.  Now, Mr. Holden, you did say you were at the

13  auction, correct?

14  A    Correct.

15  Q    And you did participate in various negotiations which

16  you've talked about with respect to the Fifth Amendment --

17  the 5th Avenue lease as opposed to the Fifth Amendment?

18  A    That's correct.

19  Q    Okay.  And how would you characterize those

20  negotiations between the parties?

21  A    They were very much work sessions.  They were amicable,

22  they were -- we were working to try and find solutions in

23  order to -- most of the negotiations revolved around trying

24  to neutralize the two contracts from a -- putting them on

25  parity with one another so that you could then commence to

1    the -- to more of the financial part of the auction.

2    Q    And were the debtors successful along with consultation

3    with the committee eventually to get those contracts to what

4    you've called parity?

5    A    Yes.

6    Q    And then how did the auction proceed thereafter?

7    A    From that point forward, and there was a couple of

8    rounds in there where I believe that we opened up the

9    bidding and then Univision said we'll take the lease and so

10   we had to break and go through and get them back on parity.

11   And then we came back to the room, we started going up I

12   think in $1 million bid increments.  There was nothing that

13   was meaningful until again Univision said that they will

14   take some additional contracts.  At that point it was

15   matched with Ziff Davis, which again put the contracts on

16   parity.

17        So then we commenced going through bid increments

18   of$1 million, I think there was a certain point in which the

19   bidding increments increased by the sole -- I think it was

20   not -- it was done on behalf of Univision and Univision

21   alone decided to start increasing their bid increments, and

22   eventually they -- Ziff Davis had indicated that they were

23   not going to bid anymore.

24   Q    Okay.  Mr. Holden, absent a sale do you believe it

25   would be possible for the company to do a stand-alone

1    restructuring to emerge from bankruptcy?

2    A    It would not.

3    Q    Why not?

4    A    There are three or four elements that are out there

5    that will -- would make it virtually impossible.  One is

6    that you have a flight of talent, you have a lot of

7    employees that are leaving the company that are getting

8    poached by other companies.  This is a very scary and

9    daunting place for them to be working for a bankrupt

10   company.  And these are very talented people who are very

11   sought after.  So you would lose employees.

12          We are having problems advertisers.  Advertisers

13   have -- there are some advertisers who have full out

14   stopped.  There are other advertisers who have said, gosh,

15   we really wish that you guys could get through with the sale

16   so that we could kick back into gear here.  I would fear

17   that if this sale did not complete that we would have -- we

18   would lose many more advertisers --

19   Q    And Mr. --

20   A    -- and the loyalty that is actually keeping them with

21   us to this point.

22   Q    I think I may have cut you off.  You've given two, did

23   you really have three in mind?

24   A    I have three in mind.

25   Q    Go ahead, what's the third?

1    A    The third one is the litigation overhang and the

2    potential exposure to future litigation.  This is a

3    lightning rod for a lot of criticism and litigation, and the

4    longer that we keep this out there and exposed the more

5    opportunity there is for more harm or claims to be put up

6    against the estate.

7    Q    Okay.  And you participated in the solicitation of DIP

8    financing, correct?

9    A    In the solicitation, yes.

10   Q    Okay.  And do you think it would also be difficult to

11   find financing for a stand-alone plan given the other three

12   issues that you've just identified?

13   A    It would certainly be difficult.

14   Q    Okay.  Do you believe that the transaction should be

15   consummated as soon as possible?

16   A    I do, for all the reasons that I've previously stated

17   for why it should not -- it wouldn't be able to reorganize.

18   Q    Mr. Holden, what is going to happen with the sale

19   proceeds?

20   A    The sale proceeds are going to be deposited into an

21   account.

22   Q    Okay.  So what is your understanding of the approximate

23   amount of secured debt as you sit here today?

24   A    I -- somewhere between 37- and $40 million.  I use

25   $40 million as a good estimate.

Page 59

1   Q    Okay.  And so the first proceeds will, according to the

2   court order, is to be used to pay whatever the court orders

3   allow to be paid as to that secured debt, correct?

4   A    That is correct.

5   Q    And then the rest of the proceeds are being put into an

6   account in the United States, correct?

7   A    That's correct.

8   Q    And did you get authority to open up account?

9   A    I do have authority.  Well I have authority to open up

10  the account for the bid -- the earnest money deposits.

11  Q    Right.

12  A    Subsequently could that be used for the proceeds, yes.

13  Q    Okay.

14  A    We'll have a choice.

15  Q    And by opening up the account in the United States what

16  name did you open that account in?

17  A    Gawker Media, LLC.

18  Q    Okay.  And by opening the account in Gawker Media, LLC

19  are you saying in any way or suggesting that all of the

20  proceeds from the sale should be allocated to the assets of

21  Gawker Media, LLC?

22  A    Absolutely not.  We are -- I believe that we've

23  actually included language to say that us putting it in

24  there is by no means an indication of any type of

25  allocation.  It is a matter of convenience and ease.  We

Page 60

1    want to try and minimize the amount of administrative burden

2    that we have for the coming six months.

3    Q    And as the committee and the debtor has been clear,

4    that this is not resolving any allocation issue with respect

5    to those proceeds?

6    A    I have not had those conversations, but I've been made

7    aware or advised that is the general understanding.

8    Q    Okay.  Now, after the close of the transaction will

9    there be some lease still -- some properties still behind?

10   A    We will have a handful of assets, which will include

11   obviously the cash, we will have a lease, which we will hope

12   to be able to assume and assign to the existing subtenants,

13   we'll have some shares in a very small media company, which

14   we will attempt to liquidate.

15   Q    Okay.

16   A    Otherwise it's nothing of any type of substance.

17   Q    Okay.  And so do you believe as you sit here today that

18   a consummation of the sale is in the best interest of the

19   debtors, their estates, and other stakeholders?

20   A    Yes.

21   Q    Okay.  And do you have any reason to believe as you sit

22   here today that that sale can't be consummated on the time

23   frame set forth in the Unimoda, Univision asset purchase

24   agreement?

25   A    No.

Page 61

1    Q    And is it your understanding that that deal is slotted

2    to close somewhere in the early September 9th or shortly

3    thereafter?

4    A    September 9th or shortly thereafter is my

5    understanding.

6    Q    Now, I'm going to turn to just a few questions on the

7    Ziff Davis break-up fee.  Did you have an understanding of

8    the Ziff Davis break-up fee and expense reimbursement?

9    A    Yes.

10   Q    And what is your understanding of the maximum amount of

11   the Ziff Davis expense reimbursement?

12   A    1.25 million on the expense reimbursement.

13   Q    And how did that play into the auction?  What

14   assumptions were made for the auction?

15   A    Well there -- it was not just the expense

16   reimbursement, it was also the break-up fee.  I believe that

17   we used 3.6 or 3.7 in the auction, and the idea was that

18   both bidders would be bidding at, you know, same numbers and

19   there would eventually be a credit that would go to Ziff

20   Davis for the 3.6, 3.7 million upon the conclusion of if

21   they were the ultimate -- if they were not the ultimate

22   winner.

23   Q    Okay.  And do you recall the last bid of Ziff Davis?

24   A    The last bid of Ziff Davis I believe was 131.

25   Q    $131 million?

Page 62

1    A      I apologize.  $131 million.

2    Q      And what was the highest and best bid received from

3    Unimoda?

4    A      $135 million.

5    Q      So if you subtracted that expense reimbursement and

6    break-up fee that bid would still be better even after

7    subtracting that than the last bid by Ziff Davis; isn't that

8    correct?

9    A      That's correct.

10           THE COURT:  Were both bidders assuming the same

11   contracts so that the bidding matrix worked out the same

12   also?

13           THE WITNESS:  That is my understanding, yes.

14   BY MR. GALARDI:

15   Q      Let's follow up on that.  They -- and let me clarify.

16   Did Ziff Davis assume the 5th Avenue lease?

17   A      No, they did not.

18   Q      But it did assume -- but --

19   A      They had a mechanism to offset them not acquiring --

20   Q      So the same 6.4 million of value was attributed to both

21   bids?

22   A      That's correct.

23   Q      Okay.  But with respect to the CBA did it ultimately

24   determine that both bidders would assume the CBA?

25   A      Yes.

1    Q    And with respect to the Tabula contract were both

2    bidders assuming the Tabula contract?

3    A    That's correct.

4    Q    And I'm going to lose the name of the one other, I

5    think it's --

6    A    Times International?

7    Q    Yes.  Was that bid -- did both bids assume that

8    contract?

9    A    They both assumed both the Indian international

10   licensing agreement as well as an agreement out of the UK.

11   Q    Okay.  So there are some slight differences between the

12   two on the contract list, right?

13   A    That's correct.

14   Q    But in your estimation were those material economic

15   differences?

16   A    No, they were not.

17   Q    Okay.  And otherwise the bids were and the documents

18   were essentially as you've said parity?

19   A    That's correct.

20   Q    Okay.

21          MR. GALARDI:  No further questions for this

22   witness, Your Honor.

23       (Pause)

24          MR. GALARDI:  I've been reminded to clarify

25   something that I'm hearing Mr. Torkin through Mr. Russell in

Page 64

1    my head.

2    BY MR. GALARDI:

3    Q    The 131 that was bid by --

4    A    Ziff.

5    Q    -- Ziff Davis, they were agreeing to bid the number but

6    it was always getting credit so that bid actually 131 was

7    minus their break-up fees so always giving them credit.  Do

8    you recall that conversation?

9    A    That's correct.

10   Q    So when they said 131 they were always playing 3. -- I

11   led you to there so don't feel guilty -- they were always

12   playing at $3.75 million less; is that correct?

13   A    That's correct.

14   Q    So it's not just a $250,000 difference, it's actually

15   almost a $4 million difference?

16           THE COURT:  No, it's the other bid that's actually

17   less.

18           MR. GALARDI:  Correct.  It was actually -- that's

19   right.  We just used that number so that we can go up.  So

20   it was --

21           THE COURT:  It was 131, we don't subtract anything

22   from that bid.

23           MR. GALARDI:  Correct.  So is there anything -- I

24   have no further questions.

25           THE COURT:  Okay.  Does anybody else want to

Page 65

1    question the witness?

2            MR. GALARDI:  I'm going turn the podium to

3    Mr. Gilhuly.

4            THE COURT:  Yes.

5            MR. GILHULY:  Your Honor, Peter Gilhuly of Laham &

6    Watkins on behalf of Univision and Unimoda.

7            Your Honor, I have two very brief witnesses.

8            THE COURT:  Oh, are you done with this witness?

9            MR. GILHULY:  I am, yes.

10           THE COURT:  Is there anyone who wants to question

11   this witness?  If not you can step down.  Thank you.

12           MR. GILHULY:  I have two witnesses who would have

13   brief testimony.  I'm happy to proceed by way of proffer or

14   put them on live.

15           THE COURT:  I'll accept a proffer.

16           MR. GILHULY:  Okay.  Thank you, Your Honor.

17           Your Honor, in --

18           THE COURT:  Well I'll hear the proffer.

19           MR. GILHULY:  Your Honor, in the courtroom today

20   is Philippe Hoguin who is the president and chief operating

21   officer of Fusion Media Group, which is an unincorporated

22   division of Unimoda -- of Univision which houses its digital

23   assets.

24           If called upon to testify Mr. Hoguin would testify

25   that he is one of the executives at Univision who was

Page 66

1    intimately involved in Univision's efforts to purchase the

2    assets of the debtor, in fact we could fairly call him -- he

3    would testify that he was the chief negotiator on the

4    Univision team to do that.  He was involved prior to the

5    petition date in that capacity, he was involved leading up

6    to the overbid, and he would also testify that he attended

7    the auction and was integral to all the negotiations between

8    Univision and the debtor with respect to this matter.

9            Mr. Hoguin would further testify that after

10   substantial arms length negotiations Univision submitted its

11   overbid on August 15th prior to the bid deadline.

12           He would further testify that he attended the

13   auction and negotiated -- or was part of all --

14   substantially all of the negotiations that went on during

15   the auction and thereafter.

16           He would further testify that he believes that all

17   the negotiations conducted by Univision were conducted in

18   good faith, at arms length, and by parties that were

19   represented by counsel at all times.

20           Finally, Mr. Hoguin would testify that he's not

21   aware of any indication of fraud, any collusion between

22   Univision, the debtors, Ziff Davis, or any other bidder or

23   any similar conduct that would taint the result of this sale

24   process, Your Honor.

25           That concludes the proffer for Mr. Hoguin.

1            THE COURT:  Is there anybody who objects to the

2    proffer and wants to cross-examine the witness?  The record

3    should reflect there's no response.  I'll accept the

4    proffer.

5            MR. GILHULY:  Your Honor, the second proffer is

6    with respect to Mr. Matthew Drucker who is the senior vice

7    president, finance, and corporate controller of Univision

8    Communications, Inc., Your Honor.

9            If called to testify Mr. Drucker would testify

10   that Univision Communications, Inc. has guaranteed the

11   obligations of Unimoda LLC, the buyer entity in connection

12   with Unimota's obligations under the asset purchase

13   agreement, including, Your Honor, share amounts and adequate

14   assurance of future performance.

15           Mr. Drucker would testify that Univision

16   Communications, Inc. has over $500 million in available

17   liquidity under its current credit facilities.

18           And Mr. Drucker would also testify that he's

19   generally familiar with the financial obligations of the

20   purchase price, the cure amounts, and the future amounts due

21   under the contracts, and he believes that Univision

22   Communications, Inc. has more than ample resources to meet

23   all of those obligations.

24           That concludes the proffer with respect to

25   Mr. Drucker.

1          THE COURT:  Is there anyone who objecting to the

2    proffer and wants to cross-examine the witness?  The record

3    should reflect there's no response.  I'll accept the

4    proffer.  Thank you.

5          MR. GILHULY:  Thank you, Your Honor.

6          MR. GALARDI:  Your Honor, that does conclude the

7    testimony that I wanted to put in and for Your Honor with

8    respect to that.  I do have a couple remarks as to the

9    agreements, the order, if Your Honor has questions.

10          The first point I did want to address is there is

11   a definition of adverse interest which is some times used as

12   claims.  It's in the asset purchase agreement.

13          THE COURT:  It should be in the order though.

14          MR. GALARDI:  That's fine.

15          THE COURT:  You know if litigation arises you

16   don't have to go to the asset purchase agreement.

17          MR. GALARDI:  Absolutely agree, Your Honor.  So

18   we'll make that modification.

19          Your Honor, I just want to run through a few of

20   the other changes, because I think it's important for Your

21   Honor to know some of the -- what I'll call the more other

22   significant changes with respect to the asset purchase

23   agreement that were agreed to, and then I'll turn to certain

24   of the objections.

25          First of all, Your Honor, I think everybody here

Page 69

1    heard loud and clear that the liquidated damages clause that

2    was in the original stalking horse agreement should not find

3    its way into the APA.  So we have stricken the liquidated

4    damages clause, Your Honor will not have to approve an asset

5    purchase agreement that has a liquidated damage clause.  Not

6    that it would have had an effect, but we thought that was

7    important.

8            One of the significant changes that occurred with

9    respect to the contract -- with respect to contracts is both

10    bidders agreed and Unimoda agreed that when they make the

11    contract designation, and you'll see their terms in the

12    order closing contract designation, the contracts that they

13    have defined to accept cannot come off the list prior to

14    closing.  There used to be a mechanism that could do it,

15    Your Honor is approving today the documents that they are

16    seeking to assume and assign, that is the fixed list.

17            Then there is a mechanism when I run through the

18    proposed changes to the order, should Your Honor approve the

19    sale, I can explain how those mechanisms agree, but that was

20    very important because we didn't want parties to be told

21    that their contracts were being assumed and assigned, but

22    oh, by the way, three days before the closing they fell off

23    the list.

24            Your Honor, with respect to the closing the --

25    it's the later of the conditions precedent or -- to be

Page 70

1   satisfied or September 9th as I mentioned, and Mr. Holden

2   testified we believe it'll be the 9th or shortly thereafter.

3           Your Honor, there is -- there was a provision in

4   the asset purchase agreement that said promptly liquidate

5   Kinja.  Now there is a mechanism that says Kinja shall

6   remain in the bankruptcy and be promptly liquidated after

7   the bankruptcy.  So the bankruptcy will itself determine it.

8           A little bit background on that provision.  As

9   Your Honor has heard testimony there's an allocation issue,

10  and had you liquidated Kinja then you would have had to give

11  it proceeds to liquidate.  We do believe it's going to have

12  some of the proceeds so it will remain in bankruptcy as a

13  debtor, it has access to cash.  I think it's $2 million.

14  Line of credit that it'll be able to draw upon.  We don't

15  think there are any obligations.  We believe it's solvent on

16  the date of the closing.  We are not incurring

17  administrative expense.

18          You'll see a provision in the order, I think it's

19  paragraph 39 that was negotiated with the committee to

20  address these sorts of issues, but I did want to point that

21  was a important provision to us.

22          As was noted the change from substantially all to

23  95 percent of such employees.  I don't think there are as

24  many employees as Mr. Holden may have suggested.  We think

25  there's been a few and they -- but it's not been that.

Page 71

```
 1    There is a concern, I would say that.

 2            And with respect to the reps and warrants -- the

 3    reps.  There have been some changes with respect to the

 4    reps.

 5            But those were the changes, and frankly both

 6    parties I will say were very cooperative, we had a very

 7    smooth auction conducted, and as Mr. Holden testified we got

 8    to parity, though not identical contracts, parity with

 9    respect to the economics and essentially the terms from a

10    corporate standpoint.

11            Your Honor, what I'd like to do is take up the

12    objections in the order.  I'm going to do them in the order

13    that appeared in our chart attached to the sale objection.

14            Your Honor, the first one is the -- and most of

15    them, Your Honor, I will say were not really objections,

16    they're reservations of rights or cure amounts, so I -- so

17    but the first one I'm just -- my understanding it has been

18    withdrawn.  I think counsel will confirm that it's been

19    withdrawn.  But it did raise an issue, and as I mentioned

20    earlier and we took the time to brief --

21            THE COURT:  Which one is that?

22            MR. GALARDI:  This is the Dr. Sheba (ph)

23    Ayyadurai, I apologize, and Ashley Terrill.

24            THE COURT:  That was a reservation of rights.

25            MR. GALARDI:  That was a reservation of rights.  I
```

1   understand the reservation has been withdrawn.  We did do a

2   small -- a short response to the First Amendment and that

3   goes to the successor issue.  So I think that's been

4   withdrawn.  Counsel can correct me if I'm wrong.

5            MR. VASSALLO:  Yeah, hello, Your Honor.  Anthony

6   Vassallo representing Sheba Ayyadurai and Ashley Terrill.

7            Yes, there seems -- as far as we're concerned

8   reservation of rights is withdrawn, but we have a couple

9   issues about what the debtor said in their reply.

10  Specifically --

11           THE COURT:  Let me just say that I'm not going to

12  get into an argument today about whether there's a

13  continuing tort or anything like that.

14           MR. VASSALLO:  Judge --

15           THE COURT:  That's not for this Court.

16           MR. VASSALLO:  -- I totally agree, and as a matter

17  of fact it seemed that the debtors were concerned that we

18  would come in and start raising those issues.  We would

19  never sandbag the Court.

20           THE COURT:  I'm going to stop you.

21           MR. VASSALLO:  I -- Judge, my only concern was

22  that there were a couple statements in the reply such as

23  that somehow the reservation of rights could appear to be a

24  veiled threat against various parties.  I spoke to counsel

25  for both bidders, they've never perceived -- excuse me, I'm

Page 73

1       fighting a summer cold -- the reservation as any kind of

2       threat.

3                And also there's an issue about that somehow this

4       reservation impacted the sale.  You know, the debtors put on

5       testimony from two parties, neither of them said that the

6       sale was impacted by the fact that this document --

7                THE COURT:  Let me ask you a question.  The -- at

8       least the proposed order, the revised order that I got said

9       -- has a statement that says, "All reservations of rights

10      are hereby overruled on the merits with prejudice."  Do you

11      have an objection to that?

12               MR. VASSALLO:  Yes, Your Honor, because that'll be

13      an issue that's going to be discussed down the road and you

14      can't -- you know, as it is with the potential bidder, you

15      know, we're free to negotiate whatever we want with them.

16               THE COURT:  Right.  Okay.

17               MR. VASSALLO:  That's pretty much it, Your Honor.

18               We supported the sale and I felt that we had to

19      put something in, because we're individual creditors, the

20      creditors' committee represents other things they can't

21      advocate for us individually, and I just -- just in case

22      something had happened I just wanted the ability to speak.

23      That's it.

24               THE COURT:  Thank you.

25               MR. GALARDI:  I'm sure we'll take up that part of

1    the order at some point soon, Your Honor, but I'll go

2    through the rest of the objections.

3             The Writers Guild of America had said -- wanted

4    all bidders to consider and we had -- I think I mentioned

5    this on August 9th to Your Honor, we were an advocate of

6    assuming and assigning the collective bargaining agreement.

7    That matter is resolved because the successful bidder has

8    agreed to assume and assign -- take an assignment of the

9    collective bargaining agreement.

10            The other objection or reservation of rights

11   limited objection was the one from the landlord at 114 5th

12   Avenue.  As Your Honor has heard there has been lots of back

13   and forth.  I do want to thank the -- frankly the counsel

14   for 5th Avenue who was available by phone, he and his

15   partner were available abling us to resolve certain of the

16   issues and bring pending.

17            My understanding is that limited objection has in

18   fact been resolved because the successful bidder and the

19   landlord have agreed as to the adequate protection --

20   adequate assurance and protection package.  They're going to

21   document the agreement, but I understand that that is the

22   case.

23            THE COURT:  Mr. Hoffmann?

24            MR. HOFFMANN:  Good afternoon, Your Honor.  Trevor

25   Hoffmann from Haynes and Boone.

1          Yes, I can confirm that that is the case.  As of

2     now we've seen the adequate assurance package as far as the

3     financial information of the guarantor.  That was

4     satisfactory.  We are still trading drafts with counsel for

5     the purchaser as far as the replacement LC and the

6     guarantee.  We don't anticipate any problems, they've

7     assured us that they're going to give us versions that are

8     substantially similar to the ones that we have now and that

9     that will happen between now and the closing.  And so

10    subject to that happening we have no objections.

11          Obviously we do reserve rights to come back to the

12    Court if something unforeseen happens that -- but we don't

13    anticipate that happening.

14          And since Your Honor did mention it, we obviously

15    would object to the clause that says that reservations of

16    rights are overruled as prejudice.

17          Thank you.

18          MR. GALARDI:  Your Honor, the next objection was

19    the objection of UniAmerica Life Insurance Company of New

20    York.  That contract found its way to what I'd refer to as

21    the maybe list, so it's not a today issue because it's not

22    being assumed and assigned.  So we've asked, subject to your

23    Court -- we've agreed, subject to Your Honor's approval, to

24    move that over to September 13th.  I actually believe

25    that'll probably be moved again until such time as either it

Page 76

1    is actually assumed and assigned and there's a notice

2    provision or there's -- or it's resolved.

3            Your Honor, the next one is partially -- again it

4    is a reservation of rights with respect to that, and again

5    Your Honor I'll go over the language in the order that says

6    reservation of rights are overruled, and I don't know of

7    there having any objections.  What that objection was was if

8    we do not close before I think it's October 2nd or so they

9    wanted to come back, otherwise I believe we've resolved the

10   cure amount.

11           THE COURT:  So it's resolved?

12           MR. GALARDI:  I believe it's resolved, yes.

13           Similarly the next objection is the objection --

14   again, a limited objection of Google, Inc.  There was an

15   objection that we had a cure amount of zero and that in fact

16   there were too many contracts.  Again, doing this list I

17   think we've agreed that there are fewer contracts and that

18   we have agreed that the current cure for the Google

19   contracts is 110,951.48, and I believe that is how we have

20   resolved that objection.

21           THE COURT:  Are these cure payments going to be

22   made by the buyer?

23           MR. GALARDI:  Your Honor, they are made by the

24   buyer subject to a cap, but we are well under the cap for

25   the cure amount, and then after a cap there's a deduction to

1    the purchase price, but I think we're almost a million

2    dollars under the cap.

3            THE COURT:  Okay.

4            MR. GALARDI:  The Super Dry objection, Your Honor,

5    they are a subleasee on this Elizabeth Street property that

6    is not at all affected by the sale, so that has essentially

7    been mooted by the fact that it's neither -- it's been an

8    excluded contract so we won't have it back on an assumption

9    and assignment.  As Mr. Holden had mentioned it's one of the

10   remaining assets.  We hope to bring a motion to assume and

11   assign that to the underlying -- to the landlord.

12           Your Honor, Fastly had an informal objection only

13   as to the cure amount.  We have resolved that.  Again, they

14   were listed at zero, we've agreed that it is 53,869.22, so

15   we believe that informal objection is resolved.  This is

16   reflected on the notices, and again, it's a buyer

17   obligation.

18           The AOL advertising, another informal objection

19   simply as to the cure amount.  The -- again it was listed at

20   zero, they believe that it was $24,615.19, and we believe

21   that resolves that objection.

22           With that, Your Honor, there are no objections to

23   the sale.

24           THE COURT:  What are the -- you said that the

25   UniAmerica limited objection or I guess that particular

1   contract was being kicked over to September 13th.  What's

2   the issue with respect to that?

3           MR. GALARDI:  Well there's really no issue, Your

4   Honor.  The way in which the contract designation worked was

5   the buyer had to determine I'm going to accept these or take

6   an assignment, I'm not going to want any of these, that

7   falls in the Super Dry, and then there was a series of

8   contracts that they had not made a determination about at

9   this point.

10          We've gone through the whole process of giving

11  them notice for adequate assurance and cure amounts, but

12  since the buyer had not yet made the determination if

13  between now and closing there's a determination it'll be

14  easier to deal with the UniAmerica decision on the 13th.  If

15  the --

16          THE COURT:  Well will there be a separate motion

17  either to reject or assume they assign that agreement?

18          MR. GALARDI:  That's exactly to the -- there will

19  not be a separate motion, Your Honor, and that's part of the

20  sale order and the procedures as well as the APA and part of

21  our original relief, again, attempting to save the estate

22  some expense and as made clear if Your Honor will recall we

23  sent out a motion saying we're going to assume and assign

24  all these contracts to the buyer -- to the stalking horse at

25  that time and give notice to you, which we did file on the

1   docket, that if there was a higher or better bid that it

2   would be -- that you would be assumed and assigned to those.

3          All parties had an obligation to come in, one to

4   do the cure amounts so we got those cure objections, and

5   two, Your Honor will recall that this is -- today is the

6   date and time for people to object to the adequate assurance

7   to be provided by a bidder other than the stalking horse.

8          What we have proposed in the order is to do a

9   mechanism where they can come in, we'll give them notice of

10   the assumption and assignment on this maybe clause, they

11   will have ten days to object, if they have ten days to

12   object we can come into the Court and have that objection

13   resolved instead of doing one by one motions with respect to

14   these parties.

15          THE COURT:  All right.  There's no reason to

16   calendar anything for September 13th.

17          MR. GALARDI:  And that's fine, Your Honor, I just

18   didn't -- I don't where to leave it in limbo land because

19   they do have the objection, it's on the maybe list.  We'll

20   certainly take it off the calendar and then just have it

21   fall into the procedure.

22          THE COURT:  Well if you see something that

23   generates a dispute they can write a letter or you can write

24   a letter and we'll put it on the calendar.

25          MR. GALARDI:  And that's fine, Your Honor.  We

1   will take it off the calendar and not schedule it for the

2   13th.

3            Your Honor, I can -- we would ask Your Honor

4   obviously to approve the sale.  I can also run through

5   various changes to the sale order that we have provided.  I

6   don't know if Your Honor has questions about the sale.

7            THE COURT:  Let me ask if anybody wants to be

8   heard in connection with the sale application.  Let the

9   record reflect there's no response.  Go ahead.

10           MR. GALARDI:  Okay.  Your Honor, let me hand up a

11  blackline of the order.  Your Honor, may I approach?

12           THE COURT:  Thank you.  This is blacklined off of

13  the revised order that you --

14           MR. GALARDI:  Yes, Your Honor.  We filed on I

15  think it was Tuesday morning prior to the auction we filed a

16  -- and I can certainly hand up a composite if you would like

17  to go through that.

18           MR. GALARDI:  No, the order that was in your loose

19  leaf was document number 179, 180?

20           MR. GALARDI:  Yes, and that's -- that is -- this

21  is blackline to that one, Your Honor.

22           THE COURT:  Okay.  I am correct.

23           MR. GALARDI:  Yes, it's blacklined to that.

24           Your Honor will notice in that blackline, and I

25  think -- and I was going to highlight it to Your Honor,

1    there weren't very many changes in that order -- well there

2    were many from the beginning because both the stalking horse

3    bidder and we heard Your Honor to say you had a lot of

4    provisions that were redundant so we tried to clear up all

5    those redundancies.

6              Now, with respect -- and then what we did was give

7    each of the bidders prior to the auction and actually the

8    night before the auction the form of the order so we knew we

9    could resolve whatever objections they may have to the form

10   of the order.

11             So what you have in front of Your Honor is the

12   changes from I think it's the August 16th morning order to

13   reflect that Qumoto (ph) is the highest and otherwise best

14   bid, and as I walk through some of the changes you'll see

15   the ways in which we did it.

16             First you'll see a new finding has been stricken

17   that there was -- you know, that we did in fact receive

18   qualified bids so that finding would no longer apply.  We

19   had received it.

20             Your Honor will notice on page 12 of my blackline

21   finding (W) since we are no longer assuming a prepetition

22   agreement we changed the order to provide that it's not an

23   assumption but we are authorized to enter into the APA and

24   so we didn't have to have the reference to Section 365.

25             Your Honor will notice, and I think this is

Page 82

1    important, in findings under the compelling circumstances

2    we've stricken the words "for an immediate sale" and it's a

3    compelling circumstances for the sale.  The findings

4    stricken throughout this --

5              THE COURT:  You don't have to show compelling

6    circumstances, you just have to show appropriate business

7    justification.

8              MR. GALARDI:  But, Your Honor, one of the things

9    that the original order was asking for was to modify so we

10   didn't have to wait 14 days for the stay.  So that --

11             THE COURT:  Well that's a different issue.

12             MR. GALARDI:  -- we're not going that.

13             THE COURT:  You can ask to waive the stay.

14             MR. GALARDI:  Now we're not asking to waive the

15   stay.  We had with the stalking horse bidder and that was in

16   that order, so part of these provisions were to give

17   findings so that we could waive the stay.  We're no longer

18   asking for a waiver of the stay, so this change was part of

19   the reasons why we wanted to make that clear.

20             Your Honor, the other -- and these are the most

21   changes, and this goes to the procedures that I was

22   referring to before.  On page 22 in finding 22 of the

23   blackline there are clarifications about when we will send

24   the order approving this transaction, should Your Honor

25   approve it, and the notices with respect to the closing

Page 83

1    designated contract lists which will tell people that they

2    are in fact having that the specific contracts are being

3    assumed on the closing.

4           And paragraphs 22 and 23 really address those

5    provisions.

6           Paragraph 32 sets forth the part about the

7    procedure where parties who received these notices in the

8    post-closing designation, which is any contract that I've

9    referred to as the maybe that gets assumed, here are the

10   procedures that give them notice to come into the Court and

11   object to that assumption.

12          I would highlight, because it was a committee

13   provision but it's not black lined in this.  If Your Honor

14   would turn to page 31 of the blackline, paragraph 39 I do

15   want to call out, and this goes to the allocation issues and

16   concerns with respect to the process.

17          As Your Honor heard from the testimony the debtors

18   believe that upon the closing of this transaction they will

19   have paid all claims, all liens on their assets, so it will

20   have unencumbered assets.

21          Both sides, the committee and the debtors, are

22   concerned about the operational expenses and how the money

23   gets spent because there's a lot of money.  This is our

24   agreement with the committee that we will provide them with

25   a post-closing budget, they will have the rights to object

1     to that budget, have rights to object to the expenditures,

2     but we're going to try to work through the process for the

3     budgets and how the monies are going to be expended.  So I

4     did want to call that provision out.  That was negotiated

5     with the committee.

6               THE COURT:  Other than litigation expenses going

7     forward what kind of expenses will there be?

8               MR. GALARDI:  There's not going to be very much,

9     Your Honor, other than reports, and again, there's the lease

10    issue to get done as fast as possible, there may be a few

11    operational as -- but there's not going to be -- other than

12    "the litigation" and the filing of a plan and potential

13    litigation with respect to the allocation of the proceeds

14    there's not any real operating expenses to be paid.

15              THE COURT:  Who's going to be running the debtor

16    day-to-day?  Who will you report to?

17              MR. GALARDI:  I report -- I will report to

18    Mr. Holden, and depending upon how all of the offers go

19    there's a transition service agreement, but Mr. Holden will

20    be assuming the positions.  And again, all of this is

21    somewhat in flux because the sale and the offers of

22    employment have not been determined and how that will all

23    work.

24              But again, I think that's one of the issues for

25    the operators budget, that's why we put in exactly the

1   paragraph about discussing the post-closing operating

2   budget.

3            Your Honor, with respect to page 32 of the

4   blackline paragraph 42 I mentioned in the presentation one

5   of the changes was about Kinja, it's continuing viability or

6   its continuing to be a company until the bankruptcy and the

7   allocation issues are addressed.  Paragraph 42 is really to

8   address that paragraph.

9            There are -- there's a solvency rep about Kinja,

10  there are -- there's an obligation for that account that

11  Mr. Holden described to make available up to $2 million, we

12  don't think there's very much there.  We don't think there

13  is much to pay if there is anything to pay.  But we had to

14  do this at the very last minute, and this was the

15  committees' recommendation that they're not bound by certain

16  of those findings.  Again, nobody wants to be prejudiced in

17  a subsequent allocation fight which is determining it.

18            Your Honor, paragraph 43, unfortunately we have

19  not yet gotten a name for the company as is common, so we

20  just put it in the form of that.  We will within the next

21  week get a name for the liquidating entity.  The buyer has

22  in fact taken the name and so we will have an obligation to

23  in fact change that.

24            And finally, Your Honor, again some findings at

25  the very end with respect to the stay (indiscernible) since

1    we are not seeking a stay of the 14-day time period.

2            THE COURT:  All right.  Does anyone want to be

3    heard with respect to the order?

4            Let me go through some of the questions.

5            MR. GALARDI:  Is it easier to go to the prior

6    order, Your Honor?

7            THE COURT:  It's the one I worked with was

8    document 179, and ultimately I'll ask you to blackline all

9    the changes off of 179, okay?

10           MR. GALARDI:  Okay.

11           THE COURT:  The first thing I mentioned is you

12   should have a definition of adverse interest in the order so

13   people don't have to --

14           MR. GALARDI:  Absolutely.

15           THE COURT:  -- find the APA.

16           And then notwithstanding your effort to avoid

17   redundancy there's a lot of -- still a lot of redundancy in

18   the order.  You have conclusions of law and the findings of

19   fact section, et cetera, et cetera.

20           The findings of fact are very straightforward.

21   It's in the corporate exercise of business judgment.  The

22   bid is the highest and best offer.  There was a competitive

23   bidding.  You don't need a lot.  Buyer is a good faith

24   buyer.

25           You have a finding in here that the buyer is not

Page 87

1    holding itself out to the public as a continuation of the

2    debtor's or respected estates.  I don't know that.  There's

3    no evidence as to that.

4            (Q) you say the buyer shall have no obligations

5    with respect to any adverse interests against the debtor, et

6    cetera.  That's just another no successor liability

7    provision.  How many times does it have to be in here?

8            (R) is not a finding of fact.

9            (S) the second sentence is not a finding of fact.

10   And it's all in the conclusions also.

11           With respect to satisfying Section 363 all you

12   have to say is that the sale price exceeds the amount of any

13   alleged liens and satisfies 363(f), but the actual evidence

14   is that it just exceeds the amount of the liens.  And then

15   the conclusion is you've satisfied 363(f).

16           (W) just repeats what preceded it.

17           Getting to the order we're talking about paragraph

18   2 on page 13, I'm not overruling reservations of rights with

19   prejudice.  You know, if the argument is that content which

20   remains on the website post-closing is a separate tort

21   that's an issue between the buyer and aggrieved party or the

22   allegedly aggrieved party.

23           In paragraph 11 you have the usual provision about

24   recording officers are supposed to accept the document.

25   That is of course -- nothing in that grants relief from any

1    of the required filing fees.  So if there's a liquidation

2    fee that's got to be paid.  That should be clear.  It's

3    without prejudice so the filing fees under applicable non-

4    bankruptcy law.

5              Your successor liability provision in 16 is

6    inconsistent with your successor liability provision in

7    paragraph (O).  Paragraph (O) just says that the

8    consummation of the transaction doesn't make them a

9    successor, and paragraph 16 says, "Any action taken in

10   connection with the APA or the operational use of the

11   acquired assets doesn't make them a successor."  I don't

12   know how I could say that.  I don't know what's going happen

13   in the future.  What if they say we're the same old Gawker?

14   You know, so it's the consummation of the transaction which

15   doesn't render them a successor.

16             Paragraph 19 at the very end you have these -- all

17   these clauses about what parties can't do.  It says parties

18   can't take any action relating to, revoking, terminating, or

19   failing or refusing to renew any license, permit, or

20   authorization to operate any of the acquired assets or

21   conduct any of the businesses operated of such assets.  What

22   if five years from now a licensor has the right not to renew

23   a license, the license runs its term, you may they have to

24   renew it?

25             MR. GALARDI:  Your Honor, we can obvious qualify

Page 89

1    that to obviously subject to their contract rights or their

2    rights under law.

3                THE COURT:  Paragraph 24 you talk about the

4    executory contracts and unexpired leases being assumed and

5    assigned free and clear.  How do you assume and assign under

6    Section 365 free and clear?

7                MR. GALARDI:  Well that's why 363 sometimes there

8    are --

9                THE COURT:  Oh, I know you're putting 363 in

10   there, but it's an assumption and assignment 365.

11               MR. GALARDI:  Well but there are instances -- and

12   now I've got to try to think of -- of some people that tried

13   to put rights or foreclose on -- contractual rights, and I

14   still believe when you're selling a contract right you can

15   still sell that contract right.  I mean you can assume and

16   assign that contract and do that free and clear of liens

17   such as security interests in the intangibles.

18               THE COURT:  So how do you adequately protect the

19   interests of those --

20               MR. GALARDI:  Proceeds.  The proceeds of the sale.

21   Those liens are all attaching to the proceeds.

22               THE COURT:  But these aren't necessarily dollar

23   rights.  For example, if the debtor was a landlord and sold

24   a lease free and clear the tenant would be entitled to

25   adequate protection, right?

1          MR. GALARDI:  If the debtor sold -- if the debtor

2   was a landlord --

3          THE COURT:  Debtor was a landlord --

4          MR. GALARDI:  Yes.  Yes.  Yes.

5          THE COURT:  Okay.  So what's the adequate

6   protection, a comparable lease I assume.  So you'd have to

7   move them to a comparable space.

8          Look, if -- you know, I see this all the time and

9   I know Judge Ecton (ph) has written an opinion on the

10  relationship between 365(h) I guess and 363(d).  If nobody

11  is going to object to that, I'm not going to press it, but I

12  always have that question.  I think 365(h) relates to the

13  assumptions and assignments, notwithstanding (indiscernible)

14  or any of those ones.

15         MR. GALARDI:  But (h) is a different circumstance,

16  right?  I mean this one is they may have a claim against

17  that contract, they've been in notice.  I'm not sure that it

18  necessarily attaches.  I understand your -- it's not a -- it

19  might not be a monetary, but --

20         THE COURT:  But let me move on to --

21         MR. GALARDI:  Okay.

22         THE COURT:  -- paragraph 35.

23         MR. GALARDI:  Okay.  35?

24         THE COURT:  Yes.

25         MR. GALARDI:  Eleven more, that's good.

1          THE COURT:  Those are the releases.  You have

2    possibly unborn people giving releases to unborn people.

3    Where's the authority for that?  Even as to those releasors

4    that are living, where is the evidence that you or anybody

5    has authority to give those releases?  You can give releases

6    on behalf of the debtor and Unimoda can give releases on

7    behalf of Unimoda, but --

8          MR. GALARDI:  But you could --

9          THE COURT:  Wait, let me finish.  You have present

10   and future subsidiaries, parents, divisions, affiliates,

11   agents, representatives, insurers, attorneys, successors,

12   and so on they're giving releases.  What's the -- where's

13   the authority to do that?

14         MR. GALARDI:  Your Honor, again, we will revise

15   it.  I think it's broader than because of the notice

16   provision --

17         THE COURT:  Why don't you say that to the

18   extent --

19         MR. GALARDI:  -- applicable.

20         THE COURT:  -- you have the authority to give

21   releases --

22         MR. GALARDI:  Yep.

23         THE COURT:  -- you are giving releases, and

24   they're only on claims -- I assume these are not third-party

25   releases of independent claims are they?

1              MR. GALARDI:  No, they're not.

2              THE COURT:  So essentially you're releasing your

3     claims and you can bring a derivative claim now or in the

4     future with respect to estate claims.

5              MR. GALARDI:  So to the fullest estate permitted

6     by law --

7              THE COURT:  Right.

8              MR. GALARDI:  -- is really the way we put it.

9              THE COURT:  And to the extent you have authority.

10             MR. GALARDI:  And to the extent --

11             THE COURT:  Those are my only comments.

12             With respect to the question of the sale I'll

13    approve the sale subject to the changes in the order.

14             Based upon the evidence it's clear that the assets

15    were accurately marketed, that the period for rendering the

16    bids was sufficient.  I think there was testimony that

17    nobody said they needed more time.  There was an auction,

18    and an auction is the best evidence of what the market price

19    of an asset is.

20             The Univision bid is the highest and best bid not

21    by that much because of the break-up fee and the expense

22    reimbursement, it's by about $300,000, by my count, but it's

23    still higher, and therefore better since they're -- we're

24    talking about cash bids.

25             MR. GALARDI:  Your Honor, if I may just address

1    that point --

2              THE COURT:  Sure.

3              MR. GALARDI:  -- because again, I know we're not

4    clear about that.  We had a long discuss with Mr. Torkin.

5    When we were saying he was bidding, for example, that 131,

6    he was actually bidding cash to the estate of 131 minus 375.

7    That --

8              THE COURT:  That makes no sense.  That's why, you

9    know, when these bid procedures came up and I had it twice

10   today in other cases, it makes no sense to say that a

11   stalking horse can credit bid, because a stalking horse

12   doesn't have a credit bid if it's the winning bidder.

13             MR. GALARDI:  Let me look at -- I understand, Your

14   Honor.

15             THE COURT:  So you're saying he was bidding 127?

16             MR. GALARDI:  That is the understanding because he

17   was bidding the dollars to the estate.  But, Your Honor, I

18   understand -- again --

19             THE COURT:  You've convinced me of why I object to

20   those provisions.

21             MR. GALARDI:  I understand, because we have this -

22   - and the funny thing is we had this conversation on --

23             THE COURT:  I've had it twice this morning in

24   other cases.

25             MR. GALARDI:  I'm sure as my former firm and

Page 94

1     another firm, so I understand.

2              THE COURT:  Your former firm was involved.

3         (Laugher)

4              MR. GALARDI:  So we all learned the bad habit.

5              THE COURT:  They copied it from you I guess.

6              MR. GALARDI:  Maybe, I was there when they started

7     that, but I understand.

8              So I'll change it in the future, Your Honor, but

9     whether it was 300 I think our view it was a little higher,

10    but -- net value to the estate, but I understand your

11    comments.

12             THE COURT:  Well in any event regardless of how we

13    interpret that credit provision Univision offers a bid it's

14    still higher and better by at least $300,000 and you're

15    telling me $4 million, although I don't know.

16             Each of the bids is beneficial to the existing

17    employees, there's a commitment to make offers to 95 percent

18    of the employees.

19             Based upon the testimony of Mr. Holden, while this

20    is not a melting ice cube, the asset is declining in value,

21    its faces defections of employees, loss of advertising

22    income.

23             And for those reasons, as well as the litigation

24    exposure -- although the only plan now is a liquidating plan

25    -- the debtor never really had a chance at a stand-alone

1    plan with all this litigation and the uncertainty that

2    surrounded it.  So yes, theoretically the sale does

3    foreclose a stand-alone plan, but that was never really a

4    real possibility giving the facts and circumstances of the

5    case.

6            So I'm satisfied -- or I find that you've

7    satisfied the Lyondell standards, that the sale was

8    substantially one of the assets outside of the ordinary

9    course of business, that the sale is an appropriate exercise

10   of business judgment, that the price is fair and reasonable,

11   and that the debtor has provided -- the debtors have

12   provided an appropriate business justification for the sale

13   at this time.

14           So subject to the changes in the order, which I

15   will go through and strike out all the redundant provisions,

16   I'm telling Univision now that it'll probably be a ten-page

17   order by the time I'm done, I'll approve the transaction.

18           MR. GALARDI:  And we will do the best we can to

19   strike them out before we get to you, Your Honor, but I

20   appreciate it and I appreciate your time today, and I know

21   it's been a long time.

22           Thank you, Your Honor.

23           THE COURT:  Good luck.  Thank you very much.

24           MR. GALARDI:  Thank you.

25        (Whereupon these proceedings were concluded at 3:48 PM)

Page 96

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2

3                         T E S T I M O N Y

4    DEBTOR'S

5    WITNESS                 EXAM BY                      PAGE

6    REID SNELLENBARGER       MR. GALARDI                  29

7    WILLIAM HOLDEN           MR. GALARDI                  45

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 98

1                            I N D E X

2

3                            RULINGS

4                                                      PAGE

5    Debtors' Application Pursuant to Sections 327(e),

6    328(a), and 330 of the Bankruptcy Code, Bankruptcy

7    Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1

8    for Entry of an Order Authorizing the Retention and

9    Employment of Brannock & Humphries as Special

10   Litigation Counsel Effective Nunc Pro Tunc to the

11   Petition Date [Docket No. 130]                    22

12

13   Debtors' Application Pursuant to Sections 327(e),

14   328(a), and 330 of the Bankruptcy Code, Bankruptcy

15   Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1

16   for Entry of an Order Authorizing the Retention and

17   Employment of Levine Sullivan Koch & Schulz, LLP as

18   Special Litigation Counsel Effective Nunc Pro Tunc to

19   the Petition Date [Docket No. 133]                22

20

21   Debtors' Application Pursuant to Sections 327(e),

22   328(a), and 330 of the Bankruptcy Code, Bankruptcy

23   Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1

24   for Entry of an Order Authorizing the Retention and

25   Employment of Thomas & LoCicero PL as Special

1    Litigation Counsel Effective Nunc Pro Tunc to the

2    Petition Date [Docket No. 133]                                22

3

4    Debtors Motion for (I) An Order (A) Authorizing and

5    Approving Bidding Procedures, Breakup Fee and

6    Expense Reimbursement, (B) Authorizing and Approving

7    The Debtors Entry Into and Assumption of The Stalking

8    Horse Asset Purchase Agreement, (C) Approving Notice

9    Procedures, (D)Scheduling A Sale Hearing and (E)

10   Approving Procedures For Assumption and Assignment

11   of Certain Contracts and Leases And Determining Cure

12   Amounts and (II) and Order (A) Authorizing The Sale

13   Of Substantially All of The Debtors Assets Free and

14   Clear of All Claims, Liens, Rights, Interests And

15   Encumbrances, (B) Approving The Asset Purchase

16   Agreement and (C) Authorizing The Debtors to Assume

17   and Assign Certain Executory Contracts And Unexpired

18   Leases [Docket No. 21]                                      92

19

20

21

22

23

24

25

Page 100

1                      C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Dawn South          Digitally signed by Dawn South
                           DN: cn=Dawn South, o=Veritext, ou,
                           email=digital@veritext.com, c=US
6      _____
                           Date: 2016.08.22 09:17:04 -04'00'

7      Dawn South

8      AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12     Date:  August 22, 2016

13

14

15

16

17

18

19

20

21

22     Veritext Legal Solutions

23     330 Old Country Road

24     Suite 300

25     Mineola, NY 11501