## Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954

———————

TELEPHONE: +1-212-455-2000
FACSIMILE: +1-212-455-2502

Direct Dial Number
+1-212-455-3979

E-mail Address
wrussell@stblaw.com

September 28, 2016

Re:    In re Gawker Media, LLC, et al., Case No. 16-11700 (SMB)

Honorable Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1418

Dear Judge Bernstein:

We represent the Official Committee of Unsecured Creditors (the "Committee") in the above-referenced Chapter 11 cases.  Yesterday, September 27, the Committee electronically filed the attached motion (the "Rule 2004 Motion") seeking an order pursuant to Bankruptcy Rule 2004 authorizing the Committee to seek discovery from the debtors in the above-referenced cases (the "Debtors").   See Dkt. No. 294.

The Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates (the "CMO") [Dkt. No. 93] requires that all matters be heard initially at an Omnibus Hearing "[u]nless otherwise ordered by the Court for good cause shown."  The earliest Omnibus Hearing at which the Committee's Rule 2004 Motion can be heard is scheduled for November 15, 2016, which is 50 days from the filing date.  Good cause exists for this Court to hear the Committee's Rule 2004 Motion sooner.  As detailed in the Rule 2004 Motion, the Debtors have expressed an intent to seek confirmation by yearend, an extremely expedited timetable, and have delayed providing necessary information to the Committee.  The Committee's Rule 2004 Motion must be heard promptly so that the Committee—as an independent estate fiduciary—can begin, and have sufficient time to conduct, a reasonably comprehensive and independent investigation and participate meaningfully in the plan confirmation process.

Consistent with Local Rule 9006-1, the Committee respectfully requests that a hearing on the Rule 2004 Motion be scheduled for October 12, 2016, or as soon thereafter as the Court's schedule allows, with any objections due 7 days prior.  Once a hearing date and objection deadline for the Rule 2004 Motion have been set by this Court, the Committee will provide notice and service of the Rule 2004 Motion in accordance with the CMO.

BEIJING    HONG KONG    HOUSTON    LONDON    LOS ANGELES    PALO ALTO    SÃO PAULO    SEOUL    TOKYO    WASHINGTON, D.C.

Simpson Thacher & Bartlett LLP

September 28, 2016                                          Honorable Stuart M. Bernstein

We appreciate the Court's attention and consideration of this matter.

Respectfully,

/s/ William T. Russell, Jr.＿＿＿

William T. Russell, Jr.

Attachment

cc:    Greg M. Galardi
       Greg Zipes

# Attachment

SIMPSON THACHER & BARTLETT LLP
Sandeep Qusba
William T. Russell, Jr.
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile:  (212) 596-9090

*Counsel to the Official Committee*
*of Unsecured Creditors of Gawker Media LLC, et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Gawker Media LLC, *et al.*[1] | Case No. 16-11700 (SMB) |
| Debtors. | (Jointly Administered) |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE ISSUANCE OF SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS AND THE PROVISION OF TESTIMONY BY THE DEBTORS

The Official Committee of Unsecured Creditors (the "**Committee**") of Gawker Media

LLC ("**Gawker Media**"), Gawker Media Group, Inc. ("**GMGI**"), and Kinja Kft. ("**Kinja**")

(collectively, the "**Debtors**"), by and through its undersigned counsel, hereby moves (the "**Rule**

**2004 Motion**") for entry of an Order, pursuant to 11 U.S.C. §§ 105(a) and 1103(c), Rules 2004,

9006(c)(1), and 9013 of the Federal Rules of Bankruptcy Procedures (the "**Rules**"), and Rule

9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York, in the same or

substantially the same form annexed hereto as **Exhibit A**, authorizing the Committee to conduct

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056).  The offices of Gawker Media LLC and Gawker Media Group, Inc. are located at 114 Fifth Avenue, 2d Floor, New York, NY 10011.  Kinja Kft.'s offices are located at Andrassy ut 66, 1062 Budapest, Hungary.

discovery of the Debtors in the form of the following: (a) the documents requests attached to this motion in draft form at **Exhibit B**, or substantially similar document requests, including follow-up requests as to the same subject matter; and (b) a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) of a representative or representatives of the Debtors who is or are most knowledgeable about the matters for examination set forth in draft form at **Exhibit C**. In support of this Rule 2004 Motion, the Committee respectively represents as follows:

## PRELIMINARY STATEMENT

1.      The Committee, through its legal counsel and financial advisor, have informally sought documents and other information from the Debtors since June 2016 on matters pertinent to the Debtors' financial affairs, assets and pre-petition transactions. These requests, however, have largely gone unanswered. Rather than cooperate with the Committee, the Debtors have repeatedly delayed providing the necessary information to the Committee.

2.      In light of the Debtors' delay in providing information to date and the Debtors' expressed intent to seek confirmation of a yet-to-be proposed plan of reorganization on an extremely expedited basis, the Committee makes this Rule 2004 Motion to ensure that the Committee—as an independent estate fiduciary—can promptly begin, and have sufficient time to conduct, a reasonably comprehensive and independent investigation. An independent investigation is necessary, among other reasons, for the Committee to assess the propriety of the Debtors' soon to be proposed plan of reorganization, to determine whether there are meritorious avoidance actions that should be brought on behalf of the Debtors' estate, and to assess and determine whether the Debtors, or those who controlled the Debtors, engaged in actions that harmed one or more Debtors or otherwise give rise to claims or causes of action. In addition,

information bearing on the allocation of the sale proceeds among the Debtors is of critical
importance to unsecured creditors.

3.      Based upon the Committee's review of the Debtors' bankruptcy filings and other
publicly available information, as well as its review of the limited documents provided to the
Committee by the Debtors to date, the Committee has identified certain matters that require
immediate inquiry.  These matters are enumerated in the attached Exhibits B and C.  Rule 2004
discovery of the Debtors with respect to these matters is necessary in order for the Committee to
fulfill its fiduciary duties.

## JURISDICTION & VENUE

4.      The Court has subject matter jurisdiction to consider this matter pursuant to 28
U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**I.      The Bankruptcy Petitions, Appointment of the Committee and the Sale of Debtors'
Assets**

6.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under
chapter 11 of the Bankruptcy Code.  On June 12, 2016, GMGI and Kinja each filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code.  On June 16, 2016 the Court entered
an Order authorizing the joint administration and procedural consolidation of the Debtors'
chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  On July 14, the Court authorized the
Debtors to retain Opportune LLP ("**Opportune**") to provide the Debtors with a chief
restructuring officer and additional personnel and to retain Ropes & Gray LLP ("**Ropes**") as their
bankruptcy counsel.

7.    The Committee was appointed by the Office of the United States Trustee for the Southern District of New York on Friday, June 24, 2016.  That same day, the Committee selected Simpson Thacher & Bartlett LLP ("**Simpson**") as its proposed counsel, and, on June 28, 2016, selected Deloitte Financial Advisory Services LLP ("**Deloitte**") as its proposed financial advisor.  The retention of Simpson was approved on August 16, 2016.  An application to approve the retention of Deloitte was filed on August 23, 2016, and a hearing on that application is scheduled for October 6, 2016.

8.    On August 16, 2016, an auction of the Debtors' assets was held at the offices of Ropes.  The stalking horse, an affiliate of Ziff Davis, LLC, entered the auction with a $90 million offer.  At the conclusion of the auction, the Debtors designated the $135 million offer from UniModa LLC, a wholly-owned subsidiary of Univision Communications Inc. ("**Univision**"), as the successful bid.

9.    On August 22, 2016, the Court entered an order authorizing the sale of the Debtors' assets to Univision.  The sale closed on September 9, 2016.

## II.    The Committee's Informal Requests for Documents and Information from Debtors

10.    Simpson and Deloitte began to make informal requests to the Debtors for documents and other information beginning in June 2016, shortly after the Committee selected them to serve as its counsel and financial advisor, respectively.  The Committee's requests have largely gone unanswered.  Instead, the Debtors, through Ropes and Opportune, have repeatedly delayed providing the requested information to the Committee.

11.    Initially, the Debtors told the Committee that it would have to wait until the auction on August 16, 2016 before the Debtors could provide the requested information. However, after the auction was completed and the sale to Univision approved, the Debtors then took the position that any responses to the Committee's requests would have to wait until certain

4

Ropes and Opportune personnel returned from vacation because they had to "weigh in" on the requests. Then, once the personnel from Ropes and Opportune returned from vacation, the Debtors next told the Committee that it would have to continue to wait until the sale to Univision had closed before the Debtors could respond to the Committee's informal information requests. However, the Univision sale closed on September 9, 2016, and the Debtors still have provided the Committee with very little of the information that the Committee requested.

12.    On September 20, 2016, with the Committee's requests still largely outstanding, the Debtors informed the Committee that they intended to seek confirmation of a plan of reorganization (not yet filed or otherwise shared with the Committee) on a highly expedited timetable, with a confirmation hearing before the end of the year.

13.    Despite recent representations from the Debtors that they would provide the Committee with the information it had requested months earlier, the Debtors claimed that they could not inform the Committee when it would receive the requested information until September 26. Finally, yesterday, on September 26, 2016—months after the Committee began requesting the information—the Debtors provided a vague response that "many" of the documents would be available by the end of the week and that others were being "gathered" but no deadline was provided.

14.    The Committee is hopeful that these are not empty promises and that the Debtors will finally start producing meaningful amounts of information. Based on the Debtors' conduct to date, however, the Committee fears that absent an Order of this Court the Debtors may continue to delay the provision of documents and other information to the Committee that is necessary for the Committee to fulfill its fiduciary duties and participate meaningfully in the plan confirmation process. The risks associated with further delay by Debtors are especially

pronounced in light of Debtors' expressed intent to seek confirmation of a plan of reorganization

on an extremely expedited timetable.  Accordingly, the Committee is filing this Rule 2004

Motion to ensure that its right to receive sufficient information is preserved.

## RELIEF REQUESTED

15.    Pursuant to Rule 2004, the Committee seeks entry of any order, in the same form

or substantially same form attached hereto as Exhibit A, authorizing it to issue a document

subpoena to, and conduct a 30(b)(6) deposition of, the Debtors.  *See* Exhibit B & Exhibit C.

16.    For example, the Committee seeks permission to issue subpoenas seeking

documents and deposition testimony concerning, among other things: (a) the value of Debtors'

assets, a matter that is highly pertinent to the allocation of the sale proceeds between among the

Debtors under any proposed plan of reorganization; (b) pre-petition intercompany transfers and

related intercompany agreements; (c) pre-petition transfers to or on behalf of insiders, including

Nick Denton and what appears to the a Denton family trust—Greenmount Creek Limited (f/k/a

Gawker Media Limited); (d) the corporate relationships between and among the Debtors; and (e)

other matters affecting or concerning the Debtors' assets, liabilities, and financial condition.

17.    The Committee is entitled to seek and obtain discovery of these matters.  Each of

these matters directly affects the administration of the Debtors' estates and the acts, conduct,

property, liabilities and financial condition of the Debtors; each of these matters must be

investigated by an independent fiduciary before the Debtors' reorganization can proceed.  Thus,

this Rule 2004 Motion should be granted.

## BASIS FOR RELIEF REQUESTED

18.    Rule 2004(a) provides that "[o]n a motion of any party in interest, the court may

order the examination of any entity."  Pursuant to Rule 2004, a party in interest may seek both

documents and oral discovery related to "acts, conduct, or property or to the liabilities and

financial condition of the debtor, or to any matter which may affect the administration of the

debtor's estate, or to the debtor's right to a discharge." Rule 2004(b), (c).  Additionally, in a

Chapter 11 reorganization, "the examination may also relate to the operation of any business and

the desirability of its continuance, the source of any money or property acquired or to be

acquired by the debtor for purposes of consummating a plan and the consideration given or

offered therefor, and any other matter relevant to the case or to the formulation of a plan."  Rule

2004(b).

19.      "The purpose of a Rule 2004 examination is to assist a party in interest in

determining the nature and extent of the bankruptcy estate, revealing assets, examining

transactions and assessing whether wrongdoing has occurred." *In re Almatis B.V.*, No. 10-

12308, 2010 WL 4877868, at *4 (Bankr. S.D.N.Y. Nov. 24, 2010); *see also In re Lufkin*, 255

B.R. 204, 208 (Bankr. E.D. Tenn. 2000) (purpose of Rule 2004 is to "determine the condition,

extent, and location of the debtor's estate in order to maximize distribution to unsecured

creditors").  The committee of unsecured creditors is a party in interest.  *See, e.g.*, *In re Arkin-

Medo, Inc.*, 44 B.R. 138, 139-40 (Bankr. S.D.N.Y. 1984) (finding that committee of unsecured

creditors can conduct Rule 2004 examination).

20.      Rule 2004 may be used as a pre-litigation discovery device, and, consequently, a

Rule 2004 motion need not be tied to specific factual allegations at issue between the parties.

*See, e.g.*, *In re Almatis*, 2010 WL 4877868, at *3 ("No contested matter or adversary proceeding

need be instituted as a prerequisite to conducting an examination under this rule.").

21.      The scope of a Rule 2004 examination is broader than that of discovery under the

Federal Rules of Civil Procedure.  *See, e.g.*, *In re Ecam Publ'n*, 131 B.R. 556, 559 (Bankr.

S.D.N.Y. 1991); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr.

S.D.N.Y. 1991) ("[T]he scope of a Rule 2004 examination is very broad. Rule 2004 discovery is

broader than discovery under the Federal Rules of Civil Procedure."). Rule 2004 examinations

may be "broad [and] unfettered." *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400

(Bankr. W.D. Pa. 2008); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[I]t

is well settled that the scope of examination allowed under Rule 2004 . . . may be in the nature of

a 'fishing expedition.'").

22.     Here, the requested relief is well within the scope of Rule 2004 because it would

authorize the Committee to "determin[e] the nature and extent of the bankruptcy estate, reveal[]

assets, examin[e] transactions and assess[] whether wrongdoing has occurred." *In re Almatis*,

2010 WL 4877868, at *4. For example, it would allow the Committee to discover information

relevant to: (a) determining the value of the various Debtors' assets to evaluate the propriety of

any proposed plan of reorganization by the Debtors; (b) examining pre-petition transactions to

determine their effect on the assets of the estates; and (c) determining whether the Debtors, Nick

Denton (who controlled the Debtors), or other insiders engaged in actions that harmed one or

more Debtors or engaged in actions that otherwise give rise to claims or causes of action.

23.     It is critical that the Committee, as an estate fiduciary, promptly investigate each

of these issues so that it may fulfill its obligations and best represent the interests of unsecured

creditors. The Committee cannot assess, or recommend approval of, any potential plan of

reorganization (or any related settlement) without first conducting a reasonably comprehensive

and independent investigation of the facts and circumstances surrounding, among other topics,

the value of each of the estates and certain pre-petition transfers and transactions.

24.     While the Debtors may wish to rush to confirmation without providing the
Committee with the opportunity to investigate and develop the facts necessary to participate in
that process and ensure that the interests of unsecured creditors are protected, such an approach
is neither fair nor appropriate.  The Committee is committed to working with the Debtors to
move toward confirmation in an expeditious manner, but it must be given access to the
information necessary to the process.  The Debtors cannot push ahead on an expedited basis
while, at the same time, continuing to stonewall the Committee's legitimate requests – some of
which have been outstanding for almost three months.

25.     For each of the reasons stated herein, the Court should grant the Rule 2004
Motion.

### NOTICE

26.     Notice of the Rule 2004 Motion will be provided in accordance with the *Order
Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus
Hearing Dates* [Dkt. No. 93].  The Committee submits that such notice is sufficient and no other
or further notice need be provided.

27.     No prior request for the relief sought in this motion has been made by the
Committee to this or any other Court.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that the Court: (a) enter an order

granting the relief sought herein in the same form or substantially the same form attached hereto

as Exhibit A; and (b) grant such other and further relief as the Court deems just and proper.

Dated: September 27, 2016
     New York, New York

    Respectfully submitted,

    /s/ William T. Russell, Jr.

    SIMPSON THACHER & BARTLETT LLP
    Sandeep Qusba
    William T. Russell, Jr.
    425 Lexington Avenue
    New York, NY 10017
    Tel.: 212-455-2000
    Fax: 212-455-2502
    squsba@stblaw.com
    wrussell@stblaw.com

    *Counsel to the Official Committee of*
    *Unsecured Creditors*

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

Gawker Media LLC, *et al.*

          Debtors.

Chapter 11

Case No. 16-11700 (SMB)

(Jointly Administered)

### ORDER AUTHORIZING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO ISSUE SUBPOENAS COMPELLING THE PRODUCTION OF DOCUMENTS AND PROVISION OF TESTIMONY BY THE DEBTORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Upon consideration of the motion (the "**Rule 2004 Motion**"),[1] dated September 27, 2016, of the Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors (the "**Debtors**"), for entry of an Order, pursuant to 11 U.S.C. §§ 105(a) and 1103(c), Rules 2004, 9006(c)(1), and 9013 of the Federal Rules of Bankruptcy Procedure (the "**Rules**"), and Rule 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), authorizing the Committee to issue subpoenas compelling the production of documents and the provision of testimony by the Debtors; that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and that the Rule 2004 Motion and the relief requested therein are a core proceeding pursuant to 28 U.S.C. § 157(b); that the relief requested in the Rule 2004 Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties-in-interest; that proper notice has been given under the circumstances and no further notice is necessary; and after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby:

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to the them in the Rule 2004 Motion.

ORDERED that the Rule 2004 Motion is granted in its entirety and on the terms set forth

therein;

ORDERED that pursuant to 11 U.S.C. §§ 105(a) and 1103(c); Rules 2004, 9006(c)(1),

9013; and Local Rule 9006-1(b), the Committee is authorized to serve the subpoenas (the

"**Committee Subpoenas**")  compelling the production of documents and the provision of

testimony on the Debtors in substantially the forms attached as exhibits to the Rule 2004 Motion;

ORDERED that the Debtors shall produce responsive, non-privileged documents on a

rolling basis and in the manner instructed on Exhibit B to the Rule 2004 Motion.  Such document

productions shall be substantially completed and received by the Committee no later than

twenty-one (21) days after the Debtors' receipt of a Committee Subpoena, and fully completed

and received by the Committee no later than thirty (30) days after the Debtors' receipt of a

Committee Subpoena, unless otherwise agreed to by the Committee or ordered by the Court;

ORDERED that if a Debtor claims that any privilege or protection excuses production of

any document or part thereof, the Debtor must, consistent with Rule 7026 and Local Rule 26.2 of

the United States District Court for the Southern District of New York, expressly make such

claim in a writing to the Committee that provides a general description of the categories of

documents being withheld and the basis for doing so, sufficient in detail for the Committee to

determine whether there is an adequate basis for invoking privilege or protection.  Such writing

shall be served on the Committee no later than seven (7) days after the Debtor is required by this

Order to complete its document production;

ORDERED that a representative or representatives of the Debtors who is or are most

knowledgeable about the matters for examination, consistent with the matters set forth in Exhibit

B to the Rule 2004 Motion, shall submit to an oral examination at deposition pursuant to Federal

Rule of Civil Procedure 30(b)(6) no later than thirty (30) days after receiving a Committee

Subpoena, unless otherwise agreed to by the Committee or ordered by the Court;

ORDERED that nothing herein shall limit the rights of the Debtors to seek relief under

Rule 9016 or Rule 45 of the Federal Rules of Civil Procedure, except that any objections to a

Committee Subpoena must be served on the Committee no later than ten (10) days after receipt

of such subpoena; and any motion to quash or modify a Committee Subpoena must be filed with

the Court and served on the Committee no later than fourteen (14) days after receipt for such

subpoena;

ORDERED that, in addition to the requirements of the immediately preceding paragraph,

in the event of a discovery dispute in this action counsel shall first meet and confer in an effort to

resolve the dispute before engaging in motion practice.  If counsel are unable to resolve the

dispute, counsel for any party seeking assistance from the Court shall, before filing any

discovery motion, arrange a telephone call with the Court and all counsel directly involved in the

dispute.  The Court will endeavor to resolve the dispute without the filing of motions;

ORDERED that this Court shall retain jurisdiction to resolve any disputes arising from or

related to this Order, and to interpret, implement, and enforce the provisions of this Order.

Dated: _____, 2016
        New York, New York


_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

3

**<u>Exhibit B</u>**

**Proposed Document Subpoena**

### *PROPOSED DOCUMENT SUBPOENA*

### <u>DEFINITIONS</u>

1.      "Debtors" shall mean Gawker Media, GMGI and Kinja.

2.      "DIP Motion" shall mean the Debtors' Motion for Entry of an Interim and Final

Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rules 2002, 4001, and 9014 of

the Federal Rules of Bankruptcy Procedure (I) Authorizing Incurrence by the Debtors of

Postpetition Secured Indebtedness, (II) Granting Liens, (III) Authorizing Use of Cash Collateral

by the Debtors and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and

(V) Scheduling a Final Hearing, dated June 13, 2016 [Dkt. No. 19].

3.      "Document" is defined to be synonymous in meaning and equal in scope to the

usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure and Rule 7034(a) of the

Federal Rules of Bankruptcy Procedure – *i.e.*, including, without limitation, writings, drawings,

graphs, charts, photographs, phonorecords, and other data compilations from which information

can be obtained, translated, if necessary, by the respondent through detection devices into

reasonably usable form – including, without limitation, electronic or computerized data

compilations (including electronic mail).  A draft or non-identical copy or a copy of the same

document from another source is a separate document within the meaning of this term.

4.      "First Day Declaration" shall mean the Declaration of William D. Holden in

Support of First Day Motions, dated June 12, 2016 [Dkt. No. 7].

5.      "GMGI" shall mean Gawker Media Group, Inc. and all of its current and former,

direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all

other persons or entities acting or purporting to act on their behalf or under their control, and

each of their predecessors and successors.

6.      "Gawker Media" shall mean Gawker Media LLC and all of its current and former,

direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all

other persons or entities acting or purporting to act on their behalf or under their control, and

each of their predecessors and successors.

7.      "Kinja" shall mean Kinja Kft., f/k/a Blogwire Hungary Szellemi Alkotast

Hasnosito Kft., and all of its current and former, direct and indirect subsidiaries, employees,

representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting

to act on their behalf or under their control, and each of their predecessors and successors.

8.      "Univison" shall mean Univision Communications Inc. and UniModa LLC and

all of their current and former, direct and indirect subsidiaries, employees, representatives,

agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their

behalf or under their control, and each of their predecessors and successors.

9.      "Univision APA" shall mean the Asset Purchase Agreement by and among

Gawker Media Group, Inc., Gawker Media LLC, Kinja, Kft. and UniModa, LLC, dated August

17, 2016, at Exhibit 1 to the Order (I) Authorizing the Sale of Substantially All of the Debtors'

Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving

and Authorizing the Debtors' Entry into the Asset Purchase Agreement and (III) Authorizing the

Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases, dated August

22, 2016 [Dkt. No. 214].

10.      "Ziff Davis" shall mean Ziff Davis LLC and ZDGM LLC and all of their current

and former, direct and indirect subsidiaries, employees, representatives, agents, advisors,

attorneys, and all other persons or entities acting or purporting to act on their behalf or under

their control, and each of their predecessors and successors.

2

11.    The term "include" is defined to mean "include without limitation."

12.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

13.    The term "concerning" means constituting, containing, showing, relating, regarding, or referring in any way, in whole or in part, including but not limited to documents underlying, supporting, currently or previously attached or appended to, or used in the preparation of any document called for by the request.

## INSTRUCTIONS

1.    The responsive documents should be produced in the manner prescribed by Rule 34 of the Federal Rules of Civil Procedure.

2.    No request is to be construed with reference to any other request for purposes of limitation.

3.    The documents requested include all attachments and enclosures.  If any portion of a document is responsive to the Committee's request, produce the entire document, including all attachments, enclosures, "post-it"-type notes, and any other matter physically attached to the document, whether by paper clip or any other manner.

4.    In responding to these requests, Debtors shall produce all responsive documents in their possession, custody, or control.  A document shall be deemed to be within the Debtors' control if the Debtors have the right to secure the document or a copy of the document from another person having possession or custody of the document.

5.    If the Debtors withholds any document covered by this request by reason of a claim or privilege, a list is to be furnished identifying each such document for which the privilege is claimed together with the following information: (a) the date of the document; (b) the

3

names of its author, authors, or preparers and an identification by employment and title of each

such person; (c) the names of each person who was sent or furnished with the document, or

received, viewed or has had custody of the document, together with an identification of each

such person; (d) a brief description of the document; (e) a statement of the basis for the claim of

privilege; and (f) the paragraph of the request to which the document relates.

6.      If any responsive document was, but is no longer in the Debtors' possession or

subject to the Debtors' control, state whether it is (a) missing or lost; (b) destroyed; (c)

transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each

instance identify the name and address of its current or last known custodian and the

circumstances surrounding such disposition.

7.      If it is otherwise not possible to produce any document called for by this request,

or if any part of this request is objected to, the reasons for the objection and/or other failure to

produce should be stated with specificity as to all grounds.

8.      All documents shall be produced in native electronic format together with

standard-format load files (indicating, for example, any parent/child attachment relationship),

and shall be produced together with all original metadata and searchable text.

9.      Certain highly confidential or otherwise sensitive materials may be produced to

the Committee on a "professionals' eyes only" basis.

10.     These requests for production are continuing in nature, and the Debtors are

required to amend or supplement their responses in the event that the Debtors or other persons

acting on their behalf become aware of additional information that renders the Debtors'

responses no longer correct, accurate or complete.

4

## DOCUMENT REQUESTS

1.      All documents, including communications, concerning any transfers between or among the Debtors from June 10, 2010 to June 12, 2016, including any and all "Intercompany Transfers" (as defined in the First Day Declaration).

2.      All documents, including communications, concerning any transfers, including without limitation any loans, from one or more of the Debtors to or for the benefit of any equity holder, insider, officer or director ("Insider"), or to or for the benefit of any family members, legal representatives, heirs, successors or assigns of such Insiders or to or for the benefit of any entity in which such Insider and/or their family members, legal representatives, heirs, successors or assigns has or had a controlling interest, including, but not limited to, any transfers to or for the benefit of Nick Denton and/or his family members, such as the members of the Weinbrecht family, and including transfers to or on behalf of Gawker Media Limited and Greenmount Creek Limited, from June 10, 2010 to June 12, 2016.

3.      All documents, including communications, concerning the June 8, 2016 loan of $200,000 to Nick Denton, including documents concerning the approval of the loan and the source of the funding of the loan.

4.      All documents, including communications, concerning the formation of, purpose of and management of Gawker Media Limited and Greenmount Creek Limited, including, but not limited to, articles of association and/or bylaws and any documents evidencing the reasons for the formation of the company, control of the company's assets, and any meetings or other deliberations of the company's directors or officers.

5.      All documents, including communications, concerning any intercompany agreements or other arrangements, including, but not limited to, any arrangements concerning

5

the licensing of the "Kinja Assets" (as defined in the First Day Declaration), the "Master License

Agreement" (as defined in the First Day Declaration), the "Development Agreement" (as defined

in the First Day Declaration), and the "Kinja Services Agreement" (as defined in the First Day

Declaration).

6.      All documents, including communications, concerning the "Kinja Promissory

Notes" and the "GMGI Promissory Note" (as defined in the First Day Declaration), including,

but not limited to, documents concerning the creation of the notes, the expected source of

repayments, any security or collateral, the use of the proceeds, and any repayments.

7.      All documents, including communications, concerning the accounts payable from

one Debtor to another Debtor, including the "Kinja Payable" (as defined in the First Day

Declaration).

8.      All documents, including communications and appraisals, concerning any formal

or informal valuation of any assets of the Debtors, including, but not limited to, any valuation of

the "Kinja Assets" (as defined in the First Day Declaration) and any valuations of "good will."

9.      All documents and communications concerning the business purpose for forming

each of the Debtors, respectively.

10.     All communications between the Debtors and Univision or Ziff Davis, including

between their respective agents, investment advisors and lawyers, concerning a proposed

acquisition of the Debtors' assets.

11.     All documents, including communications, concerning meetings, decisions,

deliberations, discussions or actions of the board of directors of a Debtor, any subcommittees

thereof, and of any board of executive officers or executive committee of a Debtor, or any

subcommittees thereof, including, without limitation, any summaries, presentations, minutes,

6

agendas, resolutions, notes, and any documents circulated in connection with such meetings, from June 10, 2010 to September 9, 2016.

12.     All documents evidencing the existence of and the terms of any agreements or purported obligations by a Debtor to indemnify employees, officers or directors of a Debtor, including Nick Denton, that have been in effect at any point from June 10, 2010 to present.

13.     Audit response letters from lawyers or law firms providing legal services to the Debtors from June 10, 2010 to present.

14.     Any valuations, including reserves, concerning potential legal fees and/or liability in connection with the Bollea Litigation (as defined in the First Day Declaration) from October 1, 2012 to June 12, 2016.

15.     Documents, such as organizational charts, sufficient to show the officers, directors and management of each of the Debtors from June 10, 2010 to June 12, 2016, including any changes during that time period.

16.     Documents sufficient to show the extent to which any officers, directors, management, and/or employees of the Debtors served in that capacity for more than one Debtor between June 10, 2010 and June 12, 2016, and all documents and communications reflecting or discussing such overlap.

17.     Documents describing or reflecting the corporate relationships between and among the Debtors from June 10, 2010 to June 12, 2016, including without limitation documents describing or reflecting how those relationships have changed during that time period.

18.     Documents concerning the organization, management and control of each Debtor, including any bylaws, articles of association, and resolutions.

7

19.     Financial statements, including consolidating financial statements, and balance sheets with respect to each of the Debtors from June 10, 2010 to June 12, 2016.

20.     Documents sufficient to show the persons or entities responsible for Kinja's administrative functions and financial management.

21.     Documents sufficient to show the nature of the employment and scope of job responsibilities of the "Hungarian Employees" (as defined in the First Day Declaration).

22.     Documents sufficient to show which Debtor(s) paid the salaries of the "U.S. Employees" and "Hungarian Employees" (as defined in the First Day Declaration).

23.     Agreements with advertisers and/or parties who have paid a Debtor an "affiliate fee or commission" (as that phrase is used in paragraph 18 of the First Day Declaration) in effect from June 10, 2010 to June 12, 2016.

24.     Agreements with third parties pursuant to which the Debtors have provided services to a non-Debtor from June 10, 2010 to June 12, 2016, including any licensing agreements.

25.     All documentation concerning the obligations under the "First Lien Credit Agreement" (as defined in the First Day Declaration), the "Second Lien Credit Agreement" (as defined in the First Day Declaration), and the "Intercreditor Agreement" (as defined in the First Day Declaration), including security, pledge and guaranty agreements.

26.     All financial statements and/or similar financial information provided to lenders in connection with the "First Lien Credit Agreement," the "Second Lien Credit Agreement" and the "DIP Financing Agreement" (as defined in the DIP Motion).

27.    All documents, including communications, concerning the use of the proceeds of "First Lien Credit Agreement," the "Second Lien Credit Agreement" and the "DIP Financing Agreement."

28.    Tax returns for the Debtors from June 10, 2010 to present, including depreciation schedules.

29.    Any employment agreement, or similar agreement concerning services and/or compensation, between one or more Debtors and Nick Denton.

30.    Documents sufficient to show any cash flows with respect to Debtor bank accounts from June 10, 2010 to June 12, 2016.

31.    All documents concerning any applications for trademarks, patents, and copyrights filed by a Debtor or Debtors, including pending applications.

32.    All documents, including communications, concerning the assignment of any intellectual property rights to Kinja.

33.    All documents concerning internally developed or purchased intangible assets from June 10, 2010 to June 12, 2016, including documents sufficient to show the date received and the expiration date and, with respect to purchased intangible assets, documents sufficient to show the rationale for and nature of the acquisition and whether the assets were acquired in an arms-length transaction.

34.    All documents relating to invoices and payments made by the Debtors since June 10, 2010 that do not relate to Avoidance Actions (as defined in the Univision APA) sold to Univision.

35.    Documents sufficient to show the details of any offers to acquire a Debtor or Debtors, or proposed mergers involving a Debtor or Debtors, from June 10, 2010 to June 12,

2016 (other than the Stalking Horse APA, as defined in the First Day Declaration), including the

price offered, the terms of the offer, who made the offer, and the result.

## **<u>Exhibit C</u>**

**Proposed 30(b)(6) Subpoena**

*PROPOSED 30(b)(6) SUBPOENA*

## DEFINITIONS

1.      "Debtors" shall mean Gawker Media, GMGI and Kinja.

2.      "DIP Motion" shall mean the Debtors' Motion for Entry of an Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness, (II) Granting Liens, (III) Authorizing Use of Cash Collateral by the Debtors and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing, dated June 13, 2016 [Dkt. No. 19].

3.      "First Day Declaration" shall mean the Declaration of William D. Holden in Support of First Day Motions, dated June 12, 2016 [Dkt. No. 7].

4.      "GMGI" shall mean Gawker Media Group, Inc. and all of its current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

5.      "Gawker Media" shall mean Gawker Media LLC and all of its current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

6.      "Kinja" shall mean Kinja Kft., f/k/a Blogwire Hungary Szellemi Alkotast Hasnosito Kft., and all of its current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

7.      "Univison" shall mean Univision Communications Inc. and UniModa LLC and all of their current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

8.      "Univision APA" shall mean the Asset Purchase Agreement by and among Gawker Media Group, Inc., Gawker Media LLC, Kinja, Kft. and UniModa, LLC, dated August 17, 2016, at Exhibit 1 to the Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving and Authorizing the Debtors' Entry into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases, dated August 22, 2016 [Dkt. No. 214].

9.      "Ziff Davis" shall mean Ziff Davis LLC and ZDGM LLC and all of their current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

10.     The term "include" is defined to mean "include without limitation."

11.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

12.     The term "concerning" means constituting, containing, showing, relating, regarding, or referring in any way, in whole or in part, including but not limited to documents underlying, supporting, currently or previously attached or appended to, or used in the preparation of any document called for by the request.

2

## **INSTRUCTIONS**

1.       Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Debtors are

to designate one or more officers, directors, agents, or other persons who will testify on their

behalf regarding the subject matters on which examination is requested (the "Subject Matters").

2.       The Debtors shall set forth, for each person designated, the Subject Matter(s) on

which the person will testify.  The person(s) so designated shall testify as to matters known or

reasonably available to the Debtors.

3.       If the Debtors designate more than one person to testify concerning the Subject

Matters, then the deposition of such additional designees shall proceed consecutively after the

conclusion of each deposition unless otherwise agreed

4.       No Subject Matter is to be construed with reference to any other Subject Matter

for purposes of limitation.

5.       Testimony on certain highly confidential or otherwise sensitive materials may be

provided to the Committee on a "professionals' eyes only" basis.

## **SUBJECT MATTERS ON WHICH EXAMINATION IS REQUESTED**

1.       Transfers between or among the Debtors from June 10, 2010 to June 12, 2016,

including any and all "Intercompany Transfers" (as defined in the First Day Declaration).

2.       Transfers, including without limitation any loans, from one or more of the

Debtors to or for the benefit of any equity holder, insider, officer or director ("Insider"), or to or

for the benefit of any family members, legal representatives, heirs, successors or assigns of such

Insiders or to or for the benefit of any entity in which such Insider and/or their family members,

legal representatives, heirs, successors or assigns has or had a controlling interest, including, but

not limited to, any transfers to or for the benefit of Nick Denton and/or his family members, such

3

as the members of the Weinbrecht family, and including transfers to or on behalf of Gawker

Media Limited and Greenmount Creek Limited, from June 10, 2010 to June 12, 2016.

     3.     The June 8, 2016 loan of $200,000 to Nick Denton, including the approval of the

loan and the source of the funding of the loan.

     4.     The formation of, purpose of and management of Gawker Media Limited and

Greenmount Creek Limited, including, but not limited to, the reasons for the formation of the

company, control of the company's assets, and any meetings or other deliberations of the

company's directors or officers.

     5.     Intercompany agreements or other arrangements, including, but not limited to,

any arrangements concerning the licensing of the "Kinja Assets" (as defined in the First Day

Declaration), the "Master License Agreement" (as defined in the First Day Declaration), the

"Development Agreement" (as defined in the First Day Declaration), and the "Kinja Services

Agreement" (as defined in the First Day Declaration).

     6.     The "Kinja Promissory Notes" and the "GMGI Promissory Note" (as defined in

the First Day Declaration), including, but not limited to, the creation of the notes, the expected

source of repayments, any security or collateral, the use of the proceeds, and any repayments.

     7.     The accounts payable from one Debtor to another Debtor, including the "Kinja

Payable" (as defined in the First Day Declaration).

     8.     Valuations or appraisals of any assets of the Debtors, including, but not limited to,

any formal or informal valuation or appraisal of the "Kinja Assets" (as defined in the First Day

Declaration) and any valuations or appraisals of "good will."

     9.     The business purpose for forming each of the Debtors, respectively.

10.     Communications between the Debtors and Univision or Ziff Davis, including between their respective agents, investment advisors and lawyers, concerning a proposed acquisition of the Debtors' assets.

11.     Meetings, decisions, deliberations, discussions or actions of the board of directors of a Debtor, any subcommittees thereof, and of any board of executive officers or executive committee of a Debtor, or any subcommittees thereof, from June 10, 2010 to September 9, 2016.

12.     The existence of and the terms of any agreements or purported obligations by a Debtor to indemnify employees, officers or directors of a Debtor, including Nick Denton, that have been in effect at any point from June 10, 2010 to present.

13.     Any valuations, including reserves, concerning potential legal fees and/or liability in connection with the Bollea Litigation (as defined in the First Day Declaration) from October 1, 2012 to June 12, 2016.

14.     The officers, directors and management of each of the Debtors from June 10, 2010 to June 12, 2016, including any changes during that time period.

15.     The extent to which any officers, directors, management, and/or employees of the Debtors served in that capacity for more than one Debtor between June 10, 2010 and June 12, 2016.

16.     The corporate relationships between and among the Debtors from June 10, 2010 to June 12, 2016, including without limitation how those relationships have changed during that time period.

17.     The organization, management and control of each Debtor.

18.     The financial statements, including consolidating financial statements, and balance sheets with respect to each of the Debtors from June 10, 2010 to June 12, 2016.

5

19. The persons or entities responsible for Kinja's administrative functions and financial management.

20. The nature of the employment and scope of job responsibilities of the "Hungarian Employees" (as defined in the First Day Declaration).

21. Which Debtor(s) paid the salaries of the "U.S. Employees" and "Hungarian Employees" (as defined in the First Day Declaration).

22. Agreements with advertisers and/or parties who have paid a Debtor an "affiliate fee or commission" (as that phrase is used in paragraph 18 of the First Day Declaration) in effect from June 10, 2010 to June 12, 2016.

23. Agreements with third parties pursuant to which the Debtors have provided services to a non-Debtor from June 10, 2010 to June 12, 2016, including any licensing agreements.

24. The obligations under the "First Lien Credit Agreement" (as defined in the First Day Declaration), the "Second Lien Credit Agreement" (as defined in the First Day Declaration), and the "Intercreditor Agreement" (as defined in the First Day Declaration), including security, pledge and guaranty agreements.

25. Financial statements and/or similar financial information provided to lenders in connection with the "First Lien Credit Agreement," the "Second Lien Credit Agreement" and the "DIP Financing Agreement" (as defined in the DIP Motion).

26. The use of the proceeds of "First Lien Credit Agreement," the "Second Lien Credit Agreement" and the "DIP Financing Agreement."

27. Tax returns for the Debtors from June 10, 2010 to present, including depreciation schedules.

6

28.    Any employment agreement, or similar agreement concerning services and/or compensation, between one or more Debtors and Nick Denton.

29.    Cash flows with respect to Debtor bank accounts from June 10, 2010 to June 12, 2016.

30.    Applications for trademarks, patents, and copyrights filed by a Debtor or Debtors, including pending applications.

31.    The assignment of any intellectual property rights to Kinja.

32.    Internally developed or purchased intangible assets from June 10, 2010 to June 12, 2016, including the date received and the expiration date and, with respect to purchased intangible assets, the rationale for and nature of the acquisition and whether the assets were acquired in an arms-length transaction.

33.    Invoices and payments made by the Debtors since June 10, 2010 that do not relate to Avoidance Actions (as defined in the Univision APA) sold to Univision.

34.    Any offers to acquire a Debtor or Debtors, or proposed mergers involving a Debtor or Debtors, from June 10, 2010 to June 12, 2016 (other than the Stalking Horse APA, as defined in the First Day Declaration), including the price offered, the terms of the offer, who made the offer, and the result.