Gregg M. Galardi
D. Ross Martin
Dalila Argaez Wendlandt
Elizabeth Bierut
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090
E-mail:  *gregg.galardi@ropesgray.com*
         *ross.martin@ropesgray.com*
         *dalila.wendlandt@ropesgray.com*
         *elizabeth.bierut@ropesgray.com*

*Counsel to the Debtors and Debtors in Position*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Gawker Media LLC, *et al.*,[1] | Case No. 16-11700 (SMB) |
| Debtors. | Jointly Administered |

**MOTION OF THE DEBTORS FOR LEAVE PURSUANT TO RULE
2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
TO CONDUCT DISCOVERY CONCERNING POTENTIAL PLAN ISSUES
AND POTENTIAL CAUSES OF ACTION, AND TO ESTABLISH
DISCOVERY RESPONSE AND DISPUTE PROCEDURES**

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10020. Kinja Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10020.

## TABLE OF CONTENTS

**Page(s)**

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT .................................................................................................................... 8

I.    THE RULE 2004 LEGAL STANDARD ................................................................ 9

II.   THE DEBTORS' PROPOSED 2004 EXAMINATION IS WARRANTED
UNDER THESE CIRCUMSTANCES ................................................................ 10

     A.    A RULE 2004 EXAMINATION IS NEEDED TO INVESTIGATE THE BASIS
FOR VOTE DESIGNATION AND RELATED RELIEF .......................................... 12

     B.    A RULE 2004 EXAMINATION REGARDING CREDITORS'
ECONOMIC INCENTIVES WILL FACILITATE FORMULATION
OF A REORGANIZATION PLAN AND WILL INCREASE THE
LIKELIHOOD OF A CONSENSUAL RESOLUTION OF THESE
CHAPTER 11 CASES ........................................................................................ 14

     C.    A RULE 2004 EXAMINATION WILL ALLOW THE DEBTORS TO
INVESTIGATE WHETHER THEY HAVE CLAIMS, INCLUDING
AN ACTION FOR PRIMA FACIE TORT UNDER NEW YORK LAW ................. 16

III.  THE DEBTORS' PROPOSED PROCEDURES FOR THE RULE 2004
EXAMINATION ARE APPROPRIATE .......................................................... 18

NO PRIOR REQUEST .................................................................................................... 20

NOTICE ....................................................................................................................... 20

RESERVATION OF RIGHTS ........................................................................................... 21

CONCLUSION .............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993) ..........................................................................9

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147 (D.N.J. 2005) ...............................................................................................................14, 18

*Belton v. Citigroup Inc. (In re Belton)*, No. 15 CV 1934 (VB), 2015 U.S. Dist. LEXIS 144371 (S.D.N.Y. Oct. 14, 2015) ...........................................................9, 16, 17

*Berger v. Seyfarth Shaw LLP*, No. C 07-05279, 2008 U.S. Dist. LEXIS 88811 (N.D. Cal. Oct. 21, 2008) ...........................................................................................................18

*Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.,* No. CV 7841-VCP, 2015 WL 778846 (Del. Ch. Feb. 24, 2015) .................................................................................18

*Durham Indus. v. N. River Ins. Co.*, 673 F.2d 37 (2d Cir. 1982)..................................17

*In re Analytical Sys., Inc.*, 71 B.R. 408 (Bankr. N.D. Ga. 1987).....................................9

*In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005) ......................18

*In re Bressler*, No. 06-11897, 2007 Bankr. LEXIS 93 (S.D.N.Y Jan. 12, 2007)) .........10

*In re Brierley,* 145 B.R. 151 (Bankr. S.D.N.Y. 1992) .....................................................9

*In re CF Holding Corp.*, 145 B.R. 124, 126 (Bankr. D. Conn. 1992) ............................15

*In re Dune Deck Owners Corp.*, 175 B.R. 839 (Bankr. S.D.N.Y. 1995).................12, 13

*In re Hilsen*, No. 87-11261 (JMP), 2008 WL 2945996 (Bankr. S.D.N.Y. July 25, 2008) ..............9

*In re Hughes*, 281 B.R. 224 (Bankr. S.D.N.Y. 2002) ..............................................9, 16

*In re Int'l Oil Trading Co.* , 548 B.R. 825 (Bankr. S.D. Fla. 2016)................................18

*In re Landing Assocs., Ltd.*, 157 B.R. 791 (Bankr. W.D. Tex. 1993)............................13

*In re MacLeod Co.*, 63 B.R. 654 (Bankr. S.D. Ohio 1986) ...........................................13

*In re Recoton Corp.*, 307 B.R. 751 (Bankr. S.D.N.Y. 2004)......................................9, 10

*In re RLD, Inc.,* No. 11-14071, 2012 Bankr. LEXIS 3860 (N.D. Cal. Aug. 22, 2012) ................14

*In re Semel*, 411 F.2d 195 (3d Cir.1969) ......................................................................18

*In re Spoto*, No. 14-21357, 2015 Bankr. LEXIS 1711 (Bankr. W.D.N.Y. May 21, 2015) ..........10

*Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373 (D. Del. 2010) ...............................18

*Miller UK Ltd. v. Caterpillar, Inc.*, No. 10 C 3770, 2014 WL 67340 (N.D. Ill. Jan. 6, 2014) ........................................................................................................................18

*Schoolcraft v. City of New York*, 103 F. Supp. 3d 465 (S.D.N.Y. 2015).....................................16

*Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995) .................16, 17

*Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345 (3d Cir. 2007) ............................................................................................................................9

### STATUTES

11 U.S.C. § 105(a) ....................................................................................... *passim*

11 U.S.C. § 1126(e) ..................................................................................... *passim*

28 U.S.C. § 157.............................................................................................34

28 U.S.C. § 157(b) ........................................................................................34

28 U.S.C. § 1334............................................................................................34

### OTHER AUTHORITIES

124 Cong. Rec. H11,102 (daily ed. Sept. 28, 1978) .....................................14

A.R. Sorkin, *Gawker Founder Suspects a Common Financer Behind Lawsuits*, N.Y. Times, May 23, 2016 ..............................................................................................4

A.R. Sorkin, *Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker*, N.Y. Times, May 26, 2016 ....................................................................................... *passim*

Fed. R. Bankr. P. 2002 ..................................................................................20

Fed. R. Bankr. P. 2004 ................................................................................ *passim*

Fed. R. Bankr. P. 2019 ..............................................................................7, 15

Fed. R. Bankr. P. 9016 ..................................................................................35

Fed. R. Civ. P. 30(b)(6)..................................................................................22

Fed. R. Civ. P. 45(e)(2)(A) .......................................................................19, 35

L. Bankr. R. 2004-1 .......................................................................................19

L. Bankr. R. 7034-1 ................................................................................................20

M. Drange, *Peter Thiel's War on Gawker: A Timeline*, Forbes, June 21, 2016 ............................4

O. Thomas, *Peter Thiel is totally gay, people*, Gawker.com, Dec. 19, 2007 ..................................2

P. Thiel, *Peter Thiel: The Online Privacy Debate Won't End With Gawker*, N.Y. Times,
    Aug. 15, 2016 ....................................................................................................................6

R. Mac, *Behind Peter Thiel's Plan to Destroy Gawker*, Forbes, June 7, 2016 ..............3, 5, 12, 24

R. Mac, *This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's
    Lawsuits Against Gawker*, Forbes, May 24, 2016 ..................................................................2

Gawker Media LLC ("Gawker Media" or the "Company"), Gawker Media Group, Inc. ("GMGI"), and Kinja Kft. ("Kinja"), debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004"), and with respect to procedural relief available under section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code"), hereby move this Court for the entry of an order in the form attached hereto as **Exhibit A** authorizing document discovery and depositions.

A Rule 2004 examination is necessary to investigate the relationship between certain unsecured creditors and Peter Thiel, the person who is reported to have provided over $10 million to fund the very litigation that caused these chapter 11 cases and further reported to have done so to cause the Debtors to go out of business. As detailed below, shortly before these chapter 11 cases commenced, the *New York Times* published an article entitled "*Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker*." The article reported that Mr. Thiel secretly funded one major litigation against Gawker Media for the purpose of ending the Debtors' business operations. Further information suggests that Mr. Thiel may be funding at least two other litigations against Gawker Media. If true, this indicates that three of the unsecured creditors are acting at the behest of Mr. Thiel. But Mr. Thiel is an individual who is not a creditor and who reports say is driven to a greater or lesser degree by a desire for revenge and the aim of putting the Debtors out of business. A focused Rule 2004 examination and immediate discovery of Mr. Thiel, related parties, and creditors who Mr. Thiel has directly or indirectly funded and/or assisted, is material to at least three issues:

- Whether votes to accept or reject any plan of reorganization should be designated for lack of good faith under section 1126(e);

- 1 -

- The formulation of amended plans, that can offer settlements to creditors, taking into account the economic incentives arising from any of Mr. Thiel's litigation financing and/or control that Mr. Thiel may have over such creditor claims; and

- Whether the Debtors should commence causes of action, arising from intent to destroy the Debtors' business, including for *prima facie* tort under New York law, against Mr. Thiel and/or related parties.

## FACTUAL BACKGROUND

1.    Gawker Media commenced the first of these chapter 11 cases on June 10, 2016 as a result of a judgment in March 2016 in *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.) ("Bollea I").

2.    On May 26, 2016 (after the judgment in Bollea I), the *New York Times* published an article entitled "*Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker.*"  A.R. Sorkin, *Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker*, N.Y. Times, May 26, 2016 [Martin Decl. ¶ 3, Ex. A].  As the title indicates, the article reported that Mr. Thiel had developed a plan "years ago" to finance litigation,[2] including the so-called Bollea I lawsuit, with the intent of driving the Debtors "out of business."  And, the article reported that it was a 2007 Gawker.com story about Mr. Thiel's sexual orientation that "drove Mr. Thiel to mount a clandestine war against Gawker." *Id.*[3]  The article quoted Mr. Thiel as stating that his course of conduct was "less about revenge and more about specific deterrence." *Id.*  Finally, Mr. Thiel was quoted as describing his effort against Gawker Media as "one of my greater philanthropic things that I've done." *Id.*

---

[2] Forbes also reported that Mr. Thiel paid the legal fees for Bollea I.  *See* R. Mac, *This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker*, Forbes, May 24, 2016 [Martin Decl. ¶ 4, Ex. B].

[3] The article in question is set forth at Martin Decl. ¶ 5, Ex. C [O. Thomas, *Peter Thiel is totally gay, people*, Gawker.com, Dec. 19, 2007].  This article originally appeared on the Debtors' website "Valleywag.com," whose content was subsequently combined with Gawker.com.

3.      The Debtors did in fact run the story about Mr. Thiel's sexual orientation in December 2007.  And, the <u>Bollea I</u> judgment did in fact cause the Debtors to file these chapter 11 cases.

4.      According to the *New York Times* article, a combination of "revenge" and "specific deterrence" drove Mr. Thiel's actions with respect to the Debtors and related parties (including the unsecured creditors in these chapter 11 cases).  *Id.*  He asserts that this combination amounts to "philanthropy."  *Id.*  His actions, his reported desire to force the Debtors out of business and the attendant control he may possess over the unsecured creditors, are at the core of these chapter 11 cases.

5.      The *New York Times* article is not the only report of Mr. Thiel's purported plan to destroy Gawker Media.  In a June 2016 article in *Forbes* entitled "*Behind Peter Thiel's Plan to Destroy Gawker*," it was reported that Mr. Thiel has spent at least $10 million in his activities against Gawker Media.  R. Mac, *Behind Peter Thiel's Plan to Destroy Gawker*, Forbes, June 7, 2016 [Martin Decl. ¶ 6, Ex. D]; *see also* Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A].  Likewise, the *New York Times* reported that Mr. Thiel disclaimed any personal compensatory or profit motive; instead, he is reported to have stated that he did not "expect to make any money from this.  This is not a business venture."  Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A].

6.      Other public information indicates that Mr. Thiel may be funding multiple lawsuits against Gawker Media.  Specifically, it now appears that most of the litigation against the Debtors has originated from a single attorney and law firm, Mr. Charles Harder and his firm, Harder, Mirell & Abrams.  This is the same attorney and firm representing Mr. Bollea in <u>Bollea I</u> and reportedly funded by Mr. Thiel.  In addition, Mr. Harder's firm represents Ms. Ashley Terrill

(another unsecured creditor) in her lawsuit against Gawker Media, which was filed in the

Southern District of New York on January 19, 2016 and seeks $10 million in damages (the

"Terrill Action").  Similarly, on May 10, 2016, the Harder firm filed a lawsuit against Gawker

Media on behalf of Dr. Shiva Ayyadurai (another unsecured creditor) in the United States

District Court for the District of Massachusetts (the "Ayyadurai Action").  Mr. Harder's

appearance in Bollea I and these two additional cases, coupled with Mr. Thiel's public

statements, strongly suggests that there is a coordinated campaign against the Debtors.  A.R.

Sorkin, *Gawker Founder Suspects a Common Financer Behind Lawsuits*, N.Y. Times, May 23,

2016 [Martin Decl. ¶ 7, Ex. E].

       7.     *New York Times* and other reporting appear to confirm the Debtors' prepetition

concerns.  Gawker Media had suspected that Mr. Bollea had a financer during Bollea I.  In that

case, after Gawker Media had disclosed the terms of insurance coverage, Mr. Bollea voluntarily

dismissed his claim for negligent infliction of emotion distress – the one claim that would have

required Gawker Media's insurance provider to pay for its defense as well as potential judgments

and settlements.  *Id.* [Martin Decl. ¶ 7, Ex. E].

       8.     The *Times* then reported that Mr. Thiel was in fact bankrolling Bollea I and

further that he "funded a team of lawyers to find and help 'victims' of the company's coverage

mount cases against Gawker."    Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A].  Mr.

Thiel is quoted as stating that he and his team "would get in touch with the plaintiffs who

otherwise would have accepted a pittance for a settlement, and they were obviously quite happy

to have this sort of support . . . [i]n a way very similar to how a plaintiff's lawyer on contingency

would do it."  *Id.*  According to more recent press reports, Dr. Ayyadurai, who is seeking $35

million in damages, could not find any lawyer to take his case until Mr. Harder did so.  M.

Drange, *Peter Thiel's War on Gawker: A Timeline*, Forbes, June 21, 2016 [Martin Decl. ¶ 8, Ex. F]. Yet, Dr. Ayyadurai also told *Forbes* that "to the best of [his] knowledge," he is not receiving financial support from Mr. Thiel. Mac, *Behind Peter Thiel's Plan, supra*, at 3 [Martin Decl. ¶ 6, Ex. D]. Discovery is needed to determine the connection, if any, between Mr. Thiel and unsecured creditors.

9.      Discovery is also needed to determine the connection between Mr. Thiel, Mr. Harder and his firm, and at least one other lawsuit filed against Gawker Media. Specifically, in May 2011, Meanith Huon brought a *pro se* lawsuit in the Northern District of Illinois against Gawker Media (the "Huon Action"). Mr. Huon sued for alleged defamation by *Jezebel* (a Gawker website now sold to Univision). At a June 17, 2015 hearing in the Huon Action, Mr. Huon reportedly told the court that he was not worried about funding his case because he was "getting support from Hulk Hogan's lawyers in California." Drange, *supra*, at 4 [Martin Decl. ¶ 8, Ex. F]. Mr. Huon is seeking at least $100 million in damages.

10.     The events of early 2016 – the reported funding of Bollea I by Mr. Thiel, Mr. Thiel's reported motivation to do so, the launching of the Terrill Action and the Ayyadurai Action, and the public disclosure of Mr. Harder's possible involvement in the Huon Action – all suggest potential improper activities that warrant investigation pursuant to Rule 2004. At the least, these reports suggest that Mr. Thiel, who has no claim against the Debtors and is not otherwise a creditor, may be (directly or indirectly) controlling key aspects of these chapter 11 cases or otherwise be playing a large role in the economics of these cases.

11.     Indeed, Mr. Thiel's activities and those of Mr. Harder's firm (who would appear to be the "team of lawyers" that Mr. Thiel is reported to have retained years ago) have continued, including into these chapter 11 cases and have been arguably timed to affect the sales proceeds

that Debtors could obtain in the auction.  For example, just days after the filing of the Gawker

Media chapter 11 case, Gawker Media received a cease and desist letter from Mr. Harder asking

it to remove a story about Donald Trump's $60,000 hair treatments.  Demand Letter from Mr.

Harder (Ivari International and Edward Ivari), June 9, 2016 [Martin Decl. ¶ 9, Ex. G].

12.    This apparently coordinated conduct continued while the Debtors were working to

sell their business in order to maximize the value of their estates.  The day before the Debtors

were to conduct the bankruptcy auction, Mr. Thiel published a *New York Times* op-ed

proclaiming that he would "support [Mr. Bollea] until his final victory."  P. Thiel, *Peter Thiel:*

*The Online Privacy Debate Won't End With Gawker*, N.Y. Times, Aug. 15, 2016 [Martin Decl. ¶

10, Ex. H].   Then, less than a week after the highly successful chapter 11 auction (increasing the

purchase consideration by over 50%), Mr. Harder sent four cease and desist letters to Univision,

the proposed buyer.  While they purported to be from separate clients of Mr. Harder's firm, they

were sent to Univision in a single email.  Demand Letter from Mr. Harder (Heli Soto), Aug. 22,

2016 [Martin Decl. ¶ 11, Ex. I]; Demand Letter from Mr. Harder (International Sherick, LLC),

Aug. 22, 2016 [Martin Decl. ¶ 12, Ex. J]; Demand Letter from Mr. Harder (Pregame.com, RJ

Bell), Aug. 22, 2016 [Martin Decl. ¶ 13, Ex. K]; Demand Letter from Mr. Harder (Toufanian),

Aug. 22, 2016 [Martin Decl. ¶ 14, Ex. L].  The timing of these events appears to have been

selected to affect Univision's appetite for consummating the deal.

13.    As the closing of the Univision sale approached, these demands continued and

broadened.  On September 1, 2016, Mr. Harder wrote to Univision's counsel demanding that

Univision immediately take down stories regarding Dr. Ayyadurai.  Demand Letter from Mr.

Harder (Ayyadurai), Sept. 1, 2016 [Martin Decl. ¶ 15, Ex. M].  Then just two days before the

scheduled closing, Mr. Harder's firm wrote to Univision on behalf of an additional two clients

(again in a coordinated single email), demanding the removal of two articles published by

Gawker.com.  Demand Letter from Mr. Harder (Lee Hnetinka), Sept. 7, 2016 [Martin Decl. ¶ 16,

Ex. N]; Demand Letter from Mr. Harder (Ivari International and Edward Ivari), Sept. 7, 2016

[Martin Decl. ¶ 17, Ex. O].  These events, while ultimately unsuccessful in foiling the sale to

Univision, appear to have been aimed at undermining it.  Discovery is needed to determine

whether these actions were so motivated and their effect on the course of these chapter 11 cases

going forward.

14.     Yet, the Debtors do not have the necessary information.  Mr. Bollea, Ms. Terrill

and Dr. Ayyadurai are the three (disputed) unsecured creditors who are most active in these

chapter 11 cases.  Mr. Bollea, Ms. Terrill, and Dr. Ayyadurai have the same principal counsel

(Mr. Harder) in their respective lawsuits against Gawker Media.  And, Mr. Harder has personally

attended several of the chapter 11 hearings.  Yet, Mr. Harder's firm has not filed a notice of

appearance in these chapter 11 cases, even as co-counsel to these three disputed creditors, despite

having filed the underlying actions in Florida, New York, and Boston.

15.     Mr. Bollea, Ms. Terrill and Dr. Ayyadurai do not share the same bankruptcy

counsel in this Court.  Ms. Terrill and Dr. Ayyadurai have common bankruptcy counsel;

however, that common counsel has not filed a Rule 2019 statement.  And, because Mr. Harder

has not entered an appearance, and Mr. Bollea's bankruptcy counsel has only a single client,

neither has filed a Rule 2019 statement.  Accordingly, there has been no disclosure of the

economic incentives of these parties, and discovery is needed to understand those incentives as

the Debtors move towards formulating a plan of reorganization now that the sale to Univision

has successfully closed.

16.     The increased sale price that the Debtors were able to obtain (despite the apparently coordinated efforts of Messrs. Thiel and Harder) means that, after paying financing debt, there will be significant proceeds to the estates.  The vast bulk of unsecured claims are disputed litigation claims, which creates a situation in which significant proceeds could go to either those creditors if their claims are ultimately allowable (including after existing appeals), or equity holders.

17.     The Debtors have turned to the next phase of these cases, proceeding to formulate and seek confirmation of a plan of reorganization.  The Debtors' board of directors has formed a special committee to investigate and direct matters for which there could be conflicts with equity holders who are also board members, and that special committee has directed counsel to seek a Rule 2004 examination.

## ARGUMENT

18.     The foregoing facts primarily rely on press accounts.  Targeted Rule 2004 discovery is necessary to understand the accuracy of these reports; the impact of Mr. Thiel's financial support of the active litigation creditors in these chapter 11 cases, including the three major ones; and the terms of any control he may have over settlements and creditor actions in these cases.  Such a Rule 2004 examination is material to at least three issues:

- Whether votes to accept or reject any plan of reorganization should be designated for lack of good faith under section 1126(e);

- The formulation of amended plans that can offer settlements to creditors, taking into account the economic incentives arising from any of Mr. Thiel's litigation financing and/or control that Mr. Thiel may have over such creditor claims; and

- Whether the Debtors should commence causes of action, arising from intent to destroy the Debtors' business, including for *prima facie* tort under New York law, against Mr. Thiel and/or other parties.

## I.    THE RULE 2004 LEGAL STANDARD

19.    Bankruptcy Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). The scope of discovery under Rule 2004 relates to "the acts, conduct, or property . . . of the debtor, or to any matter which may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004(b). Under Rule 2004, a moving party is entitled to both the examination of a witness and the production of requested documents. Fed. R. Bankr. P. 2004(c).

20.    "The scope of Rule 2004 examination is very broad, broader even than discovery under the Federal Rules of Civil Procedure." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (allowing proponent of Rule 2004 examination to seek documents and, if necessary, take depositions). As a "pre-litigation" discovery tool, Rule 2004 is designed "to assist the trustee in revealing the nature and extent of the estate, ascertaining assets, and discovering whether any wrongdoing has occurred." *Belton v. Citigroup Inc. (In re Belton)*, No. 15 CV 1934 (VB), 2015 U.S. Dist. LEXIS 144371, at *5 n.3 (S.D.N.Y. Oct. 14, 2015) (internal citation omitted). "Rule 2004 should be freely available to parties in interest in active cases as a means to discover facts regarding case administration . . . ." *In re Hilsen*, No. 87-11261 (JMP), 2008 WL 2945996 (Bankr. S.D.N.Y. July 25, 2008).

21.    Debtors in possession can use Rule 2004 to investigate creditors or third parties where such information is critical to the effective administration of the estate and its assets. *See, e.g.*, *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 354 n.6 (3d Cir. 2007); *In re Analytical Sys., Inc.*, 71 B.R. 408, 413 (Bankr. N.D. Ga. 1987). In fact, a primary purpose of Rule 2004 discovery is the "investigation of potential claims on behalf of the debtor." *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002); *see In re Brierley*, 145 B.R. 151, 170 (Bankr. S.D.N.Y. 1992). "Because the purpose of the Rule 2004 investigation is to aid

- 9 -

in the discovery of assets, *any* third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd sub nom. Sobchak v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 17 F.3d 600 (2d Cir. 1994) (emphasis added).

22.    A Rule 2004 movant need only set forth a *prima facie* case that a third party has some relationship with the debtor. *See In re Spoto*, No. 14-21357, 2015 Bankr. LEXIS 1711, at *5 (Bankr. W.D.N.Y. May 21, 2015) (holding that non-debtor spouse of the debtor and mortgage lenders of the debtor and non-debtor spouse were subject to Rule 2004 investigation); *In re Bressler*, No. 06-11897 (AJG), 2007 Bankr. LEXIS 93, at *1 n.3 (S.D.N.Y Jan. 12, 2007) (finding that former employee of the debtor may be subject to Rule 2004 investigation where he had financial relationship with the debtor); *In re Recoton Corp.*, 307 B.R. at 755 (permitting Rule 2004 examination of  the former directors and officers of the debtor).  As long as the examination is not designed to "abuse or harass" a third party, the court will generally allow it. *In re Recoton Corp.*, 307 B.R. at 755.

## II.    THE DEBTORS' PROPOSED 2004 EXAMINATION IS WARRANTED UNDER THESE CIRCUMSTANCES

23.    The press reports detailed above, regarding Mr. Thiel's funding of the <u>Bollea I</u> litigation, his reported statements regarding his motivation to do so and his desire to fund other lawsuits, coupled with the coincidence that Mr. Harder and the Harder Firm represent all three unsecured creditors, satisfies the *prima facie* evidence requirement under Rule 2004.

24.    Rule 2004 discovery is necessary to allow the Debtors to determine: (i) whether creditor votes for or against any plan of reorganization should be designated for lack of good faith under section 1126(e); (ii) how best to structure a reorganization plan to address the true

economic incentives of alleged major parties in interest; and (iii) whether the Debtors have a

cause of action, including for *prima facie* tort, against Mr. Thiel and/or related parties.

25.    The discovery proposed by the Debtors is narrowly tailored to elicit the

information they require.[4]  Among the subjects for the examination (specific document requests

are set forth on **Appendix 2**) are: (1) litigation finance agreements between Mr. Thiel (or any

affiliated entity) and any of Mr. Harder, Harder, Mirell & Abrams LLP (the "Harder Firm"), or

any plaintiff or potential plaintiff represented by Mr. Harder or the Harder Firm regarding claims

or potential claims against the Debtors ("Harder Client"); (2) any financing agreements between

Mr. Thiel (or any affiliated entity) and the Harder firm; (3) communications regarding any of the

foregoing finance agreements, and any agreements or rights to consent to, or consult regarding,

settlements, litigation decisions, and decisions regarding recourse to insurance policies; (4) any

strategy or planning by Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder

Firm) regarding solicitation of potential plaintiffs against the Debtors, and the reasons for such

activities; (5) any solicitations by Mr. Harder or the Harder Firm for potential plaintiffs against

the Debtors; (6) retainer or other such agreements between the Harder Clients and Mr. Harder or

the Harder Firm; (7) any communications between Mr. Harder or the Harder Firm and any

person or entity that is not a Harder Client, regarding such non-Harder Client's asserted claims

against the Debtors (*e.g.*, communication with Mr. Huon); (8) communications between Mr.

Thiel and individual plaintiffs, and any communications among plaintiffs and potential plaintiffs,

with asserted claims or potential claims against the Debtors (the "Individual Plaintiffs"),

including but not limited to the Harder Clients, regarding the coordination of litigation against

---

[4] The Debtors do not intend to seek discovery that relates solely to Harder Clients, Ivari International or Edward
Ivari.

the Debtors; (9) documents related to Scott Sonnenblick's efforts to purchase, to take control of, or to facilitate a purchase of or taking control of, GMGI, including but not limited to communications between Mr. Sonnenblick and Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder Firm);[5] and (10) communications between Mr. Harder, the Harder Firm, any Harder Client, on the one hand, and any insurer for the Debtor(s), on the other.

26.      Accordingly, this Court should enter an Order in the same or substantially the same form annexed hereto as **Exhibit A**, authorizing the Debtors to request documents from and take depositions of Mr. Thiel, in his individual capacity, Thiel Capital LLC, Mr. Harder, in his individual capacity, Mr. Harder's law firm (Harder, Mirell & Abrams LLP), as well as limited discovery of two of the three disputed major litigation creditors in these cases (collectively, the "Rule 2004 Parties"), all as listed on **Appendix 1**, in the form of the following: (a) the document requests attached to this motion at **Appendix 2**, or substantially similar document requests, including follow-up requests as to the same subject matter; (b) depositions pursuant to Federal Rule of Civil Procedure 30(b)(6) of a representative or representatives of Thiel Capital LLC and Harder, Mirell & Abrams LLP who is or are most knowledgeable about the matters for examination set forth at **Appendix 3** and **Appendix 4**; and (c) individual depositions of Mr. Harder, Mr. Thiel, Ms. Terrill, and Dr. Ayyadurai.

**A.      A RULE 2004 EXAMINATION IS NEEDED TO INVESTIGATE THE BASIS FOR VOTE DESIGNATION AND RELATED RELIEF**

27.      As these chapter 11 cases move into the plan confirmation stage, one potential dispute is vote designation, regarding creditors who may cast votes in bad faith.  As this Court is aware, one of the grounds for vote designation is a creditor acting with a motive to "put the

---

[5] Mac, *Behind Peter Thiel's Plan, supra*, at 3 [Martin Decl. ¶ 6, Ex. D] (reporting that an unidentified Silicon Valley billionaire hired Scott Sonnenblick in an attempt to purchase Gawker Media in January 2016).

debtor out of business . . . , destroy the debtor out of pure malice, or . . . obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize." *In re Dune Deck Owners Corp.*, 175 B.R. 839 (Bankr. S.D.N.Y. 1995). The press reports described above, if substantiated through discovery, and the post-auction-pre-closing activities of Mr. Harder would fall squarely within these "badges of bad faith which may justify disqualification." *Id.* at 846.

28.    To the extent Mr. Thiel is motivated by revenge and a desire to drive the Debtors out of business, and to the extent Mr. Thiel is directly or indirectly controlling the unsecured litigation creditors, this is exactly the type of ulterior motive that constitutes "bad faith" under section 1126(e). *See, e.g.*, *In re MacLeod Co.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986) (designating creditor votes under section 1126(e) because "the rejection of debtor's plan by the named [creditors] was not in good faith, but rather was for the ulterior purpose of destroying or injuring debtor in its business").

29.    To be sure, Mr. Thiel's reported statements about exacting revenge have been equivocal. For example, Mr. Thiel has undertaken a recent wave of public statements regarding his "philanthropy" in supposedly defending privacy rights. Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A]. However, he hid his involvement in Bollea I until after the jury verdict.[6] *Id.*

30.    Because these press reports are the Debtors' only insight into Mr. Thiel's motives and because they offer limited insight as to Mr. Thiel's control over and/or effect on the unsecured litigation creditors, an investigation is appropriate.

---

[6] Mr. Thiel has publicly admitted to financing Bollea I, stating that he is "proud to have contributed financial support to [Mr. Bollea's] case" and "will support [Mr. Bollea] until his final victory[.]" Thiel, *supra*, at 6 [Martin Decl. ¶ 10, Ex. H].

31.     Other evidence justifies inquiry under Rule 2004.  For example, disproportionate spending on attorney's fees to prosecute claims may be evidence of bad faith.  *In re Landing Assocs., Ltd.*, 157 B.R. 791, 809 (Bankr. W.D. Tex. 1993).  Press reports quote Mr. Thiel touting that he has spent at least $10 million as part of his campaign against the Debtors.  Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A].  Understanding the terms of financial support for litigation against Gawker, and any direct support for the Harder Firm or the unsecured litigation creditors, is central to determining whether the Debtors should pursue a motion to designate votes.

32.     The Rule 2004 examination could also support related relief.  For example, the same conduct that can support designation can also support a bankruptcy court overruling confirmation objections.  *In re RLD, Inc.*, No. 11-14071, 2012 Bankr. LEXIS 3860, at *7 (N.D. Cal. Aug. 22, 2012) (overruling creditor's objection to debtor's confirmation plan and designating creditor's vote because both objection and vote were made in "bad faith").

33.     For at least these reasons, the Court should allow Debtors' Rule 2004 motion.

**B.     A RULE 2004 EXAMINATION REGARDING CREDITORS' ECONOMIC INCENTIVES WILL FACILITATE FORMULATION OF A REORGANIZATION PLAN AND WILL INCREASE THE LIKELIHOOD OF A CONSENSUAL RESOLUTION OF THESE CHAPTER 11 CASES**

34.     A Rule 2004 examination is further warranted to allow the Debtors to understand and account for the creditors' economic incentives as they propose a plan of reorganization.[7]

35.     Chapter 11 has the goal of "reorganization plans which deal fairly with creditors and which are arrived at openly."  *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,

---

[7] The Debtors will file a plan of reorganization during their exclusive period.  The Debtors' goal is to have a consensual plan.  One frequent feature of reorganization plans is a settlement offer to creditors, which can be accepted if a class of creditors accepts the plan.  In some cases, settlement discussions with particular creditors include seeking support for a plan.

321 B.R. 147, 165 (D.N.J. 2005).  The goal is a negotiated resolution if possible, with all parties

understanding each other's economic motivation.  *See* 124 Cong. Rec. H11,102 (daily ed. Sept.

28, 1978) (statement of Rep. Edwards).  Understanding the terms of any litigation financing

arrangements, and any consent rights that Mr. Thiel may have regarding the claims of creditors

that he is financing (directly or indirectly), could be critical to the Debtors' evaluation and

proposal of a plan.  Put simply, the best path forward for these chapter 11 cases is for the Debtors

to understand the economic incentives of the three creditors who are most active.

36.     Indeed, understanding these types of economic incentives has been the motivating

policy for the various versions of Bankruptcy Rule 2019, which furthers the Bankruptcy Code's

goal of "complete disclosure during the business reorganization process, and was designed to

cover entities which, during the bankruptcy case, act in a fiduciary capacity to those they

represent, but are not otherwise subject to control of the court."  *In re CF Holding Corp.*, 145

B.R. 124, 126 (Bankr. D. Conn. 1992).  Bankruptcy Rule 2019 "is part of the disclosure scheme

of the Bankruptcy Code and is designed to foster the goal of reorganization plans which deal

fairly with creditors and which are arrived at openly."  *Id.*  The concept is to have disclosure of

"any economic interest that could affect the legal and strategic positions a stakeholder takes in a

chapter 9 or chapter 11 case."  Fed. R. Bank. P. 2019(a) advisory committee's note.

37.     In the present case, Mr. Harder – common counsel to many unsecured creditors in

their respective litigations against Gawker Media – has not made an appearance in these

proceedings and accordingly is not subject to Rule 2019.  Nonetheless, his economic incentives

and those of Mr. Thiel are critical for the Debtors to understand as the plan process moves

forward.

- 15 -

38.     For example, with such information, the Debtors may be able to fashion settlement proposals in a reorganization plan that satisfy many creditors, even if not all of them. Certainly, a fully consensual plan is always preferable.  But if that cannot be accomplished, the Debtors seek to propose a plan and bring it to a confirmation hearing with as much consensus as possible.  A targeted Rule 2004 examination to understand the economic constraints that third party agreements (with Messrs. Thiel and Harder) have placed on creditors in these chapter 11 cases will help advance the case and minimize litigation and costs.

39.     Rule 2004 would give the Debtors the discovery tools they need to understand these economic incentives.

### C.     A RULE 2004 EXAMINATION WILL ALLOW THE DEBTORS TO INVESTIGATE WHETHER THEY HAVE CLAIMS, INCLUDING AN ACTION FOR *PRIMA FACIE* TORT UNDER NEW YORK LAW

40.     As a pre-litigation discovery tool, a Rule 2004 examination would allow the Debtors to ascertain whether they have claims in connection with Mr. Thiel's (direct or indirect) actions and determine whether any wrongdoing has occurred.  *In re Belton*, 2015 U.S. Dist. LEXIS 144371, at *15.  Given the apparent motive of Mr. Thiel to destroy the Debtors by his financial support of (and actual or *de facto* control regarding claims of) major alleged creditors, the Debtors require discovery to ascertain whether certain claims exist on behalf of the estates. *In re Hughes*, 281 B.R. at 226 (allowing Rule 2004 for the "investigation of potential claims on behalf of the debtor").

41.     For example, the *New York Times* report of Mr. Thiel's intent to destroy the Debtors to avenge, *inter alia*, the Gawker.com's 2007 publication (of a story about him) raises the possibility that the Debtors have a cause of action for *prima facie* tort under New York law. *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995).  In such an action, the Debtors admittedly have a "heavy burden."  *Id.* at 681.  Such a tort claim would

- 16 -

require the Debtors to show: (1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful. *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 527 (S.D.N.Y. 2015) (internal citation omitted). As to the second element of *prima facie* tort, the plaintiff must show that the defendant was "***solely*** motivated by malice." *Id.* (emphasis added). Other motives, such as "profit, self-interest, or business advantage will defeat a *prima facie* tort claim." *Sigmon*, 901 F. Supp. at 681.

42. A Rule 2004 examination of Mr. Thiel and related entities would allow the Debtors to understand whether they have a reasonable basis to believe that they can meet this burden. For example, press reports suggest that Mr. Thiel is motivated at least in part by revenge concerning an article in 2007 about him. Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A]; Mac, *Silicon Valley Billionaire*, *supra*, at 2 [Martin Decl. ¶ 4, Ex. B]. Yet, the same press reports also suggest that Mr. Thiel's intent is to defend privacy rights of others. Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A]. The articles ambiguously suggest that Mr. Thiel both is and is not[8] motivated by pecuniary gain.[9] *Id.* [Martin Decl. ¶ 3, Ex. A]. A Rule 2004 examination will allow the Debtors to investigate which, if any, of these possibly conflicting justifications explains Mr. Thiel's activities and determine whether they have a potentially valuable asset in the form of a legitimate claim rather than launching such a suit prematurely with all its attendant costs to the estate. *In re Belton*, 2015 U.S. Dist. LEXIS 144371, at *15

---

[8] Mr. Thiel has reportedly told the New York Times that he has acted "[i]n a way very similar to how a plaintiff's lawyer on contingency would do it," which implies profit motive. Sorkin, *Peter Thiel*, *supra*, at 2 [Martin Decl. ¶ 3, Ex. A]. Yet, he is quoted in that same article as stating he does not "expect to make any money from" his activities and acted with a "philanthropic" intent.

[9] A profit motive may defeat a *prima facie* tort claim. *Durham Indus. v. N. River Ins. Co.*, 673 F.2d 37 (2d Cir. 1982).

(Rule 2004 is used for "pre-litigation discovery" to determine "whether any wrongdoing has

occurred").

43.    Accordingly, the Court should allow the Debtors' Rule 2004 motion in order to

explore whether the estates have a cause of action against Mr. Thiel or other related

persons/entities.

## III.    THE DEBTORS' PROPOSED PROCEDURES FOR THE RULE 2004 EXAMINATION ARE APPROPRIATE

44.    The requested discovery includes documents relating to litigation financing, a law

firm's solicitation materials, and requests to parties that may share the same attorney (Mr.

Harder).  Notably, such information is not privileged.  For example, courts have held that a

litigant waives privilege where he shares (or allows his lawyer to share) due diligence materials

related to the strength of his claims with a third-party funder.  *See, e.g.*, *Miller UK Ltd. v.*

*Caterpillar, Inc.*, No. 10 C 3770, 2014 WL 67340 (N.D. Ill. Jan. 6, 2014); *Leader Techs., Inc. v.*

*Facebook, Inc.*, 719 F. Supp. 2d 373, 376-77 (D. Del. 2010).  Further, litigation financing

agreements themselves are not privileged.  *See, e.g.*, *Berger v. Seyfarth Shaw LLP*, No. C 07-

05279, 2008 U.S. Dist. LEXIS 88811, 8-9 (N.D. Cal. Oct. 21, 2008).  Federal common law of

privilege applies in a Rule 2004 examination, *In re Asia Global Crossing, Ltd.*, 322 B.R. 247,

255 (Bankr. S.D.N.Y. 2005), and there are "strong policy and statutory reasons why the fee

arrangements between attorneys practicing before the bankruptcy courts cannot be privileged."

*Baron & Budd*, 321 B.R. at 169; *In re Semel*, 411 F.2d 195, 197 (3d Cir. 1969) ("[I]n the absence

of unusual circumstances, the fact of a retainer, the identity of the client, the conditions of

employment and the amount of the fee do not come within the privilege of the attorney-client

relationship").[10]

45.     Nevertheless, the Debtors expect that privileges will be asserted if discovery is

permitted.  Although this Court cannot adjudicate privilege assertions until they are made, this

Court should enter an order to allow any disputes regarding privilege to be resolved timely and

efficiently.  Accordingly, the Debtors propose the following procedures for the Rule 2004 Parties

to follow with respect to the production of documents:

- serve on the Debtors within 14 days of service of the Rule 2004 Subpoena any written objections to the requests for production of documents,

- complete production of all documents not subject to applicable privileges or objections within 21 days of service of the Rule 2004 Subpoena, and

- serve on the Debtors a privilege log in accordance with Rule 45(e)(2)(A) of the Federal Rules of Civil Procedure and Rule 7034-1 of the Local Bankruptcy Rules of the Southern District of New York also within 21 days of service of the Rule 2004 Subpoena.

Although Local Bankruptcy Rule 2004-1 states that Local Civil Rule 26.3 applies to "requests

for examinations and the production of documents under Bankruptcy Rule 2004," it is silent as to

the application of Local Bankruptcy Rule 7034-1.  L. Bankr. R. 2004-1.  Local Bankruptcy Rule

7034-1, which applies to all document productions in cases before the Bankruptcy Court of the

Southern District of New York, requires parties to produce full privilege logs that identify, for

each privilege asserted:

1. the nature of the privilege being claimed . . . ; and

---

[10] Even courts that have extended the work product doctrine to financing agreements have required parties to produce the agreements in redacted form.  *See., e.g.*, *In re Int'l Oil Trading Co.*, 548 B.R. 825, 838–39 (Bankr. S.D. Fla. 2016) (finding funding agreement covered by work product protection, but requiring production in redacted form because of "substantial need" for the document on the part of the debtor as part of its legal claim); *Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, No. CV 7841-VCP, 2015 WL 778846, at *9, 11 (Del. Ch. Feb. 24, 2015) (work product protection applies to documents relating to the nature of the relationship between funders and the funded party).

2.  unless divulgence of such information would cause disclosure of the allegedly privileged information: (i) the type of document; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena *duces tecum*, including, where appropriate, the author of the document, the addressee of the document, and, where not apparent, the relationship of the author to the addressee, and the names of all entities that received a copy of the document.

L. Bankr. R. 7034-1.  For the avoidance of doubt, the Debtors' procedures require the Rule 2004 parties to produce a privilege log in accordance with Local Bankruptcy Rule 7034-1.  These procedures are specifically designed to avoid an intervening and costly step of production of a mere categorical privilege log, as contemplated under the local rules of the District Court.   For the same reason, the Debtors propose that the Rule 2004 Parties produce their privilege logs simultaneously with their document production, so that the Debtors can promptly meet and confer with the Rule 2004 Parties to address any privilege issues, and bring any disputes to this Court.

## NO PRIOR REQUEST

46.     No prior motion for the relief requested herein has been made to this Court or any other court.

## NOTICE

47.     Notice of this Motion is being given to: (a) the Office of the U.S. Trustee for the Southern District of New York; (b) the Committee of Unsecured Creditors and their counsel; (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the state attorneys general for states in which the Debtors conduct business; (g) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (h) the Rule 2004 Parties.  The Debtors respectfully submit that no other or further notice need be given.

**RESERVATION OF RIGHTS**

48.    The Debtors reserve their right to request and/or to conduct any other discovery, pursuant to Rule 2004 or other applicable law, from any person or entity, including, without limitation, the 2004 Parties.

**CONCLUSION**

49.    For the foregoing reasons, the Debtors  respectfully request that the Court enter an order in the form attached hereto as **Exhibit A**, granting this motion in its entirety, and granting such other and further relief as it deems just and proper.


Dated:  October 11, 2016
      New York, New York

                           Respectfully Submitted,

                           ROPES & GRAY LLP

                           */s/ Gregg M. Galardi___*
                           Gregg M. Galardi
                           D. Ross Martin
                           Dalila Argaez Wendlandt
                           Elizabeth Bierut
                           1211 Avenue of the Americas
                           New York, New York 10036-8704
                           Tel: (212) 596-9000
                           Fax: (212) 596-9090
                           *gregg.galardi@ropesgray.com*
                           *ross.martin@ropesgray.com*
                           *dalila.wendlandt@ropesgray.com*
                           *elizabeth.bierut@ropesgray.com*

                           *Counsel for the Debtors and Debtors in Possession*

**Appendix 1**
**Rule 2004 Parties[11]**

| RULE 2004 PARTY | TITLE/ROLE | SUBPOENA TYPE |
|---|---|---|
| Charles Harder | Attorney | Documents, Testimony |
| Harder, Mirell & Abrams LLP | Law Firm | Documents, Testimony (Rule 30(b)(6)) |
| Peter Thiel | Litigation Financer/Supporter | Documents, Testimony |
| Thiel Capital LLC | Mr. Thiel's investment firm | Documents, Testimony (Rule 30(b)(6)) |
| Shiva Ayyadurai | Alleged Creditor | Documents, Testimony |
| Ashley Terrill | Alleged Creditor | Documents, Testimony |

---

[11] The Debtors reserve their right to amend this list of proposed Rule 2004 parties.

## Appendix 2
## Discovery Requests[12]

The Debtors seek documents from the Rule 2004 Parties, as listed on Appendix 1, with respect to any:

(1) litigation finance agreements between Mr. Thiel (or any affiliated entity) and any of Mr. Harder, Harder, Mirell & Abrams LLP (the "Harder Firm"), or any plaintiff or potential plaintiff represented by Mr. Harder or the Harder Firm regarding claims or potential claims against the Debtors ("Harder Client");

(2) financing agreements between Mr. Thiel (or any affiliated entity) and Mr. Harder or the Harder Firm;

(3) communications regarding any of the foregoing finance agreements, including without limitation any agreements or rights to consent to, or consultations regarding, settlements, litigation decisions, and decisions regarding recourse to insurance policies;

(4) any strategy or planning by Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder Firm) regarding solicitation of potential plaintiffs against the Debtors, and the reasons for such activities;

(5) any solicitations by Mr. Harder or the Harder Firm for potential plaintiffs against the Debtors and/or documents referring or relating thereto;

(6) retainer or other such agreements between the Harder Clients and Mr. Harder or the Harder Firm;

---

[12] The Debtors reserve their right to amend this list of requests, but do not intend to seek discovery that relates solely to Ivari International or Edward Ivari.

(7) any communications between Mr. Harder or the Harder Firm and any person or entity that is not a Harder Client, regarding such non-Harder Client's asserted claims against the Debtors (*e.g.*, communication with Mr. Huon);

(8) communications between Mr. Thiel and individual plaintiffs (or any of their representatives or attorneys, other than Mr. Harder and the Harder Firm), and any communications among plaintiffs and potential plaintiffs, with asserted claims or potential claims against the Debtors (the "<u>Individual Plaintiffs</u>"), including but not limited to the Harder Clients, regarding litigation against the Debtors;

(9) documents related to Scott Sonnenblick's efforts to purchase, to take control of, or to facilitate a purchase of or taking control of, GMGI, including but not limiting to communications between Mr. Sonnenblick and Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder Firm);[13] and

(10) communications between Mr. Harder, the Harder Firm, any Harder Client, on the one hand, and any insurer for Debtor(s), on the other.

---

[13] Mac, *Behind Peter Thiel's Plan, supra*, at 3 [Martin Decl. ¶ 6, Ex. D] (reporting that an unidentified Silicon Valley billionaire hired Scott Sonnenblick in an attempt to purchase Gawker Media in January 2016).

## Appendix 3
### *Proposed 30(b)(6) Subpoena to Thiel Capital LLC*

### DEFINITIONS[14]

1.      "Debtors" shall mean Gawker Media, GMGI and Kinja.

2.      "Thiel Capital LLC" shall mean an investment firm founded by Peter Thiel.

### INSTRUCTIONS

1.      Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Thiel Capital LLC is to designate one or more officers, directors, agents, or other persons who will testify on its behalf regarding the subject matters on which examination is requested (the "Subject Matters").

2.      Thiel Capital LLC shall set forth, for each person designated, the Subject Matter(s) on which the person will testify.  The person(s) so designated shall testify as to matters known or reasonably available to Thiel Capital LLC.

3.      If Thiel Capital LLC designates more than one person to testify concerning the Subject Matters, then the deposition of such additional designees shall proceed consecutively after the conclusion of each deposition unless otherwise agreed

4.      No Subject Matter is to be construed with reference to any other Subject Matter for purposes of limitation.

5.      Testimony on certain highly confidential or otherwise sensitive materials may be provided to the Debtors on a "professionals' eyes only" basis.

---

[14] This definition section includes the uniform definitions set forth in Rule 26.3 of Local Civil Rules of the Southern District of New York, made applicable through Rule 7026-1 of the Local Bankruptcy Rules of the Southern District of New York.

## SUBJECT MATTERS ON WHICH EXAMINATION IS REQUESTED

1.      Litigation finance agreements between Mr. Thiel or Thiel Capital LLC and any of Mr. Harder, Harder, Mirell & Abrams LLP (the "Harder Firm"), or any plaintiff or potential plaintiff represented by Mr. Harder or the Harder Firm regarding claims or potential claims against the Debtors ("Harder Client").

2.      Financing arrangements between Mr. Thiel or Thiel Capital, LLC and any of Mr. Harder, Harder, the Harder Firm, or any Harder Client.

3.      Agreements between Mr. Thiel or Thiel Capital LLC and the Harder Firm or any Harder Client including without limitation any agreements or rights to consent to, or consultations regarding, settlements, litigation decisions, and decisions regarding recourse to insurance policies.

4.      Strategies or planning by Mr. Thiel or Thiel Capital LLC and/or Mr. Harder (or the Harder Firm) regarding solicitation for potential plaintiffs against the Debtors and/or documents referring or relating thereto.

5.      Communications between Mr. Thiel or Thiel Capital LLC and individual plaintiffs (or any of their representatives or attorneys, other than Mr. Harder and the Harder Firm), and any communications among plaintiffs and potential plaintiffs, with asserted claims or potential claims against the Debtors (the "Individual Plaintiffs"), including but not limited to the Harder Clients, regarding litigation against the Debtors.

6.      Scott Sonnenblick's efforts to purchase, to take control of, or to facilitate a purchase of or taking control of, GMGI, including but not limiting to communications between Mr. Sonnenblick and Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder Firm).

## Appendix 4
### *Proposed 30(b)(6) Subpoena to Harder, Mirell & Abrams LLP*

## DEFINITIONS[15]

1.    "Debtors" shall mean Gawker Media, GMGI and Kinja.

2.    "Harder, Mirell & Abrams LLP" shall mean a California-based law firm at which Charles Harder is a partner.

## INSTRUCTIONS

1.    Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Harder, Mirell & Abrams LLP is to designate one or more officers, directors, agents, or other persons who will testify on its behalf regarding the subject matters on which examination is requested (the "Subject Matters").

2.    Harder, Mirell & Abrams LLP shall set forth, for each person designated, the Subject Matter(s) on which the person will testify.  The person(s) so designated shall testify as to matters known or reasonably available to Harder, Mirell & Abrams LLP.

3.    If Harder, Mirell & Abrams LLP designates more than one person to testify concerning the Subject Matters, then the deposition of such additional designees shall proceed consecutively after the conclusion of each deposition unless otherwise agreed

4.    No Subject Matter is to be construed with reference to any other Subject Matter for purposes of limitation.

5.    Testimony on certain highly confidential or otherwise sensitive materials may be provided to the Debtors on a "professionals' eyes only" basis.

---

[15] This definition section includes the uniform definitions set forth in Rule 26.3 of Local Civil Rules of the Southern District of New York, made applicable through Rule 7026-1 of the Local Bankruptcy Rules of the Southern District of New York.

## SUBJECT MATTERS ON WHICH EXAMINATION IS REQUESTED

1.      Litigation finance agreements between Mr. Thiel (or any affiliated entity) and Harder, Mirell & Abrams LLP (the "Harder Firm"), or any plaintiff or potential plaintiff represented by Mr. Harder or the Harder Firm regarding claims or potential claims against the Debtors ("Harder Client").

2.      Financing arrangements between Mr. Thiel (or any affiliated entity) and Mr. Harder or the Harder Firm.

3.      Agreements between Mr. Thiel (or any affiliated entity) and the Harder Firm or any Harder Client, including without limitation any agreements or rights to consent to, or consultations regarding, settlements, litigation decisions, and decisions regarding recourse to insurance policies.

4.      Strategies or planning by Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder Firm) regarding solicitation of potential plaintiffs against the Debtors, and the reasons for such activities.

5.      Solicitations by Mr. Harder or the Harder Firm for potential plaintiffs against the Debtors and/or documents referring or relating thereto.

6.      Retainer or other such agreements between the Harder Clients and Mr. Harder or the Harder Firm.

7.      Communications between Mr. Harder or the Harder Firm and any person or entity that is not a Harder Client, regarding such non-Harder Client's asserted claims against the Debtors (*e.g.*, communication with Mr. Huon);

8.      Communications between Mr. Thiel and individual plaintiffs (or any of their representatives or attorneys, other than Mr. Harder and the Harder Firm), and any

communications among plaintiffs and potential plaintiffs, with asserted claims or potential claims against the Debtors (the "<u>Individual Plaintiffs</u>"), including but not limited to the Harder Clients, regarding the litigation against the Debtors.

9.       Scott Sonnenblick's efforts to purchase, to take control of, or to facilitate a purchase of or taking control of, GMGI, including but not limiting to communications between Mr. Sonnenblick and Mr. Thiel (or any affiliated entity) and/or Mr. Harder (or the Harder Firm).

10.       Communications between Mr. Harder, the Harder Firm, any Harder Client, on the one hand, and any insurer for Debtor(s), on the other.

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| | ) |
| In re | ) Chapter 11 |
| | ) |
| Gawker Media LLC,[16] | ) Case No. 16-11700 (SMB) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER PURSUANT TO RULE 2004 OF THE FEDERAL RULES OFBANKRUPTCY PROCEDURE AUTHORIZING THE DEBTORS TO CONDUCT DISCOVERY CONCERNING POTENTIAL PLAN ISSUES AND POTENTIAL CAUSES OF ACTION, AND TO ESTABLISH DISCOVERY RESPONSE AND DISPUTE PROCEDURES

Upon consideration of the *Motion of the Debtors for Leave Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Conduct Discovery Concerning Potential Plan Issues and Potential Causes of Action, and to Establish Discovery Response and Dispute Procedures* (the "Motion");[17] and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this proceeding being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and adequate notice of the Motion having been given, and no other or further notice need be given; and after due deliberation and hearing thereon, and sufficient cause appearing therefore; and the Court hereby finding that a Rule 2004 examination is appropriate on the terms and for the reasons set forth in the Motion, and that the time for compliance with subpoenas for the production of documents is reasonable; it is hereby **ORDERED** that:

      1.      The Motion is GRANTED.

---

[16] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10020. Kinja Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10020.

[17] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

2.      The Debtors are hereby authorized pursuant to Rule 2004 of the Federal Rules of

Bankruptcy Procedure to conduct an examination concerning: (i) whether votes to accept or

reject any plan of reorganization should be designated for lack of good faith under section

1126(e); (ii) the formulation of amended plans, that can offer settlements to creditors, taking into

account the economic incentives arising from any of Mr. Thiel's litigation financing and/or

control that Mr. Thiel may have over such creditor claims; (iii) whether the Debtors should

commence causes of action, arising from intent to destroy the Debtors' business, including for

*prima facie* tort under New York law, against Mr. Thiel and/or other parties; and (iv) any other

potential claims or causes of action that are necessary or desirable for the Debtors to investigate

in conjunction with their investigation relating the foregoing topics (collectively, the "Rule 2004

Examination Topics").

3.      The Debtors are hereby authorized, pursuant to Rule 9016 of the Federal Rules of

Bankruptcy Procedure, to issue subpoenas for the production of documents (including all

documents concerning the Rule 2004 Examination Topics) and attendance for examination

(each, a "Rule 2004 Subpoena") in connection with the Rule 2004 Examination Topics,

including but not limited to the Rule 2004 Parties identified in the Motion.

4.      All parties that receive a Rule 2004 Subpoena for the production of documents

shall (i) serve on the Debtors within 14 days of service of the Rule 2004 Subpoena any written

objections to the requests for production of documents, (ii) complete production of all documents

not subject to applicable privileges or objections within 21 days of service of the Rule 2004

Subpoena, and (iii) serve on the Debtors a privilege log in accordance with Rule 45(e)(2)(A) of

the Federal Rules of Civil Procedure and Rule 7034-1 of the Local Bankruptcy Rules of the

Southern District of New York also within 21 days of service of the Rule 2004 Subpoena.

5.      All parties that receive a Rule 2004 Subpoena shall, prior to conducting an electronic search utilizing search terms, meet and confer with the Debtors to attempt to agree on appropriate search terms.

6.      Each party that serves objections to a Rule 2004 Subpoena for the production of documents shall, within three business days of service of the objections, meet and confer with the Debtors to attempt to resolve the objections to production of documents.

7.      The Debtors are hereby authorized to serve Rule 2004 Subpoenas for attendance for examination on five business days' notice.

8.      Unless prior leave of this Court is obtained for cause shown, no objection to, or any motion to quash, a Rule 2004 Subpoena shall be made based on any assertion that any of the periods set forth in paragraphs 4 or 7 above fail to allow a reasonable time to comply.

9.      All disputes concerning Rule 2004 Subpoenas, including objections thereto, that are not resolved by agreement of the parties may only be raised by letter brief to the Court not exceeding five pages, single spaced.  The other party shall file a responsive letter brief within three business days, which shall not exceed five pages, single spaced.

10.     No party shall file any letter brief raising discovery disputes unless the party has made a good faith effort to resolve by agreement the issues raised in the letter brief, and such letter brief shall include an affidavit certifying that such counsel has conferred with counsel to the other party in a good faith effort to resolve by agreement the issues raised by the letter brief without the intervention of the Court and has been unable to reach an agreement.  If any of the issues raised by the letter brief have been resolved by agreement, the affidavit shall specify the issues so resolved and the issues remaining unresolved.

11.    The Debtors shall confer with the Court's chambers to obtain dates for chambers conferences and/or hearings (which may be telephonic) at which all disputes concerning Rule 2004 Subpoenas may be heard.  The Debtors shall file a notice on the docket setting forth such dates.  The party requesting the Court to address a dispute concerning a Rule 2004 Subpoena shall contact the Court's chambers prior to filing a letter brief to obtain the date for a chambers conference or hearing on such matters, and the letter brief shall indicate the date and time of such chambers conference or hearing.

12.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: October __, 2016
       New York, NY

_____
THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE