**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Gawker Media LLC, *et al.*,[1] | ) | Case No. 16-11700 (SMB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF D. ROSS MARTIN IN SUPPORT OF THE MOTION
OF THE DEBTORS FOR LEAVE PURSUANT TO RULE 2004 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE TO CONDUCT DISCOVERY
CONCERNING POTENTIAL PLAN ISSUES AND POTENTIAL CAUSES OF ACTION,
AND TO ESTABLISH DISCOVERY RESPONSE AND DISPUTE PROCEDURES**

Pursuant to 28 U.S.C. § 1746, D. Ross Martin declares as follows:

1.      I am a partner with the law firm Ropes & Gray LLP, counsel to Gawker Media LLC ("Gawker Media), Gawker Media Group, Inc. ("GMGI"), and Kinja Kft. ("Kinja"), (collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned cases.

2.      I submit this declaration in support of the *Motion of the Debtors for Leave Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Conduct Discovery Concerning Potential Plan Issues and Potential Causes of Action, and to Establish Discovery Response and Dispute Procedures* (the "Motion").

3.      Attached as Exhibit A is a true and correct copy of article entitled, "*Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker*," published by the *New York Times* on May 26, 2016, as viewed on August 23, 2016.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10020. Kinja Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10020.

4.      Attached as Exhibit B is a true and correct copy of an article entitled, "*This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker*," published by *Forbes* on May 24, 2016, as viewed on October 4, 2016.

5.      Attached as Exhibit C is a true and correct copy of an article entitled, "*Peter Thiel is totally gay, people*," published by *Valleywag* on December 19, 2007, as viewed on October 4, 2016.

6.      Attached as Exhibit D is a true and correct copy of an article entitled, "*Behind Peter Thiel's Plan to Destroy Gawker*," published by *Forbes* on June 7, 2016, as viewed on August 23, 2016.

7.      Attached as Exhibit E is a true and correct copy of an article entitled, "*Gawker Founder Suspects a Common Financer Behind Lawsuits*," published online by the *New York Times* on May 23, 2016, in print on May 24, 2016, and as viewed online on October 4, 2016.

8.      Attached as Exhibit F is a true and correct copy of an article entitled, "*Peter Thiel's War on Gawker: A Timeline*," published by *Forbes* on June 21, 2016, as viewed on August 23, 2016.

9.      Attached as Exhibit G is a true and correct copy of a letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of Ivari International and Edward Ivari to Heather Dietrick, Esq., General Counsel and President at Gawker Media LLC, dated June 9, 2016.

10.      Attached as Exhibit H is a true and correct copy of op-ed written by Peter Thiel entitled, "*Peter Thiel: The Online Privacy Debate Won't End With Gawker*," published

online by the *New York Times* on August 15, 2016, in print on August 16, 2016, and as viewed on August 23, 2016.

11.    Attached as Exhibit I is a true and correct copy of an email from Tom Hentoff, counsel to Univision, to Heather Dietrick, then President and General Counsel at Gawker Media (redacted for privilege), which forwards an email dated August 22, 2016, from Charles Harder, Esq. of Harder, Mirell & Abrams LLP to Peter Gilhuly, Esq., counsel to Univision, attaching four demand letters, including one on behalf of Heli Soto, dated August 22, 2016.

12.    Attached as Exhibit J is a true and correct copy of a demand letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of International Sherick, LLC to Peter Gilhuly, Esq., counsel to Univision, dated August 22, 2016.

13.    Attached as Exhibit K is a true and correct copy of a demand letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of Pregame.com and R.J. Bell to Peter Gilhuly, Esq., counsel to Univision, dated August 22, 2016.

14.    Attached as Exhibit L is a true and correct copy of a demand letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of Arya Toufanian to Peter Gilhuly, Esq., counsel to Univision, dated August 22, 2016.

15.    Attached as Exhibit M is a true and correct copy of a demand letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of Shiva Ayyadurai to Peter Gilhuly, Esq., counsel to Univision, dated September 1, 2016.

16.    Attached as Exhibit N is a true and correct copy of a demand letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of Lee Hnetinka to Peter Gilhuly, Esq., counsel to Univision, dated September 7, 2016.

17.     Attached as Exhibit O is a true and correct copy of a demand letter from Charles Harder, Esq. of Harder, Mirell & Abrams LLP on behalf of Ivari International and Edward Ivari to Peter Gilhuly, Esq., counsel to Univision, dated September 7, 2016.

Dated: October 11, 2016
        Boston, Massachusetts

                                        */s/ D. Ross Martin*
                                        D. Ross Martin

# Exhibit A

The New York Times | http://nyti.ms/1sbe6AU



WITH FOUNDER
ANDREW ROSS SORKIN

# Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker

By ANDREW ROSS SORKIN    MAY 25, 2016

A billionaire Silicon Valley entrepreneur was outed as being gay by a media organization. His friends suffered at the hands of the same gossip site. Nearly a decade later, the entrepreneur secretly financed a lawsuit to try to put the media company out of business.

That is the back story to a legal case that had already grabbed headlines: The wrestler Hulk Hogan sued Gawker Media for invasion of privacy after it published a sex tape, and a Florida jury recently awarded the wrestler, whose real name is Terry Gene Bollea, $140 million.

What the jury — and the public — did not know was that Mr. Bollea had a secret benefactor paying about $10 million for the lawsuit: Peter Thiel, a co-founder of PayPal and one of the earliest investors in Facebook.

A 2007 article published by Gawker's Valleywag blog was headlined, "Peter Thiel is totally gay, people." That and a series of articles about his friends and others that he said "ruined people's lives for no reason" drove Mr. Thiel to mount a clandestine war against Gawker. He funded a team of lawyers to find and help "victims" of the company's coverage mount cases against Gawker.

"It's less about revenge and more about specific deterrence," he said on Wednesday in his first interview since his identity was revealed. "I saw Gawker pioneer a unique and incredibly damaging way of getting attention by bullying people even when there was no connection with the public interest."

Mr. Thiel said that Gawker published articles that were "very painful and paralyzing for people who were targeted." He said, "I thought it was worth fighting back."

Mr. Thiel added: "I can defend myself. Most of the people they attack are not people in my category. They usually attack less prominent, far less wealthy people that simply can't defend themselves." He said that "even someone like Terry Bollea who is a millionaire and famous and a successful person didn't quite have the resources to do this alone."

Mr. Thiel said that he had decided several years ago to set his plan in motion. "I didn't really want to do anything," he said. "I thought it would do more harm to me than good. One of my friends convinced me that if I didn't do something, nobody would."

Mr. Thiel has donated money to the **Committee to Protect Journalists** and has often talked about protecting freedom of speech. He said he did not believe his actions were contradictory. "I refuse to believe that journalism means massive privacy violations," he said. "I think much more highly of journalists than that. It's precisely because I respect journalists that I do not believe they are endangered by fighting back against Gawker."

He continued, "It's not like it is some sort of speaking truth to power or something going on here. The way I've thought about this is that Gawker has been a singularly terrible bully. In a way, if I didn't think Gawker was unique, I wouldn't have done any of this. If the entire media was more or less like this, this would be like trying to boil the ocean." Mr. Thiel said he had not targeted any other media companies.

But the revelation this week that Mr. Thiel was covertly backing Mr. Bollea's case as well as others has raised a series of new questions about the First

Amendment as well as about the role of big money in the court system — specifically the emerging field of litigation finance, in which third parties like hedge funds and investment firms pay for other people's lawsuits.

Roy D. Simon, a professor emeritus of legal ethics at Hofstra University School of Law, suggested that the practice has helped "level the playing field" by providing resources for people to mount cases against big institutions that would be impossible otherwise.

But he said there was a risk when a lawsuit was funded by a single person with a potential agenda. "I am troubled by Thiel," Professor Simon said. "I guess that one guy is much more likely to have an agenda driven by revenge or personal dislike or wanting to prove a point."

But other legal experts said that the mere fact of Mr. Thiel's involvement did not change the case. And while there is no legal requirement that underwriters like Mr. Thiel reveal their involvement to the opposing side or the jury, it is considered fair game for lawyers to ask questions about financial backing — something that Gawker Media did on Wednesday in court as part of its efforts to overturn the Hogan judgment.

"If you really do have concerns about the merits of this case, finding out who bankrolled it doesn't really help you at all," said Mary Anne Franks, a professor at the University of Miami School of Law. Absent any indication that there is something unlawful about how the funding took place, she said, "you would still need to show that there's something substantively wrong with the ruling."

In a statement, Nick Denton, the founder of Gawker Media, who was also personally named in the Hogan suit, said: "Just because Peter Thiel is a Silicon Valley billionaire, his opinion does not trump our millions of readers who know us for routinely driving big news stories including Hillary Clinton's secret email account, Bill Cosby's history with women, the mayor of Toronto as a crack smoker, Tom Cruise's role within Scientology, the N.F.L. cover-up of domestic abuse by players and just this month the hidden power of Facebook to determine the news you see."

Mr. Thiel is known as a brilliant entrepreneur. Born in West Germany and raised in California, he became a chess prodigy, an academic star and a promising lawyer before settling down in the Bay Area to found companies.

He achieved demigod status among Silicon Valley business leaders, thanks largely to his role at PayPal, where he became the de facto don of the early employee group known as the PayPal mafia. That group went on to become power players at such Silicon Valley institutions as Tesla, YouTube, LinkedIn and Yelp.

Mr. Thiel is also known for his lucrative investment in Facebook, where he is a board member, and his three venture firms, Founders Fund, Mithril and Valar. (His defunct hedge fund, Clarium Capital, has been long forgotten.) He also co-founded the secretive data-crunching start-up Palantir and bankrolled Breakout Labs, which only funds what Mr. Thiel calls "hard tech" start-ups that tackle things like new energy, transportation and biotech companies. "We wanted flying cars, instead we got 140 characters," is the Founders Fund tag line.

But unlike most Silicon Valley billionaires, Mr. Thiel openly supports a wide array of eccentric philanthropic and social efforts aimed at radically altering life as we know it. His Thiel fellowship gives high school and college-age students money to drop out of school and start companies. He has donated to organizations that seek to extend the human life span, such as the Methuselah Foundation. And he co-founded the Seasteading Institute, which aims to create cities that float at sea, beyond the reach of governments and their laws.

A libertarian, Mr. Thiel is a pledged delegate for Donald J. Trump for the 2016 Republican National Convention.

He said that he hired a legal team several years ago to look for cases that he could help financially support. "Without going into all the details, we would get in touch with the plaintiffs who otherwise would have accepted a pittance for a settlement, and they were obviously quite happy to have this sort of support," he said. "In a way very similar to how a plaintiff's lawyer on contingency would do it." Mr. Thiel declined to disclose what other cases he had supported but there are at least two current cases against Gawker.

Without revealing an exact figure, he said that estimates of $10 million in expenses so far were "roughly in the ballpark." He added: "I would underscore that I don't expect to make any money from this. This is not a business venture."

He would not say whether he had compensated any of the people, including Mr. Bollea, which could raise questions in an appeal. He insisted "there was no gray area" in what he had done.

Mr. Thiel was not the only boldface name in Silicon Valley who was outed as gay by Gawker Media — Timothy D. Cook, the chief executive of Apple, is another example.

Owen Thomas, the former editor of Valleywag who wrote the article about Mr. Thiel, offered his side of the story in a telephone interview on Wednesday. "As I've said before, I did not 'out' Peter Thiel," said Mr. Thomas, now business editor at The San Francisco Chronicle. "I did discuss his sexuality, but it was known to a wide circle who felt that it was not fit for discussion beyond that circle. I thought that attitude was retrograde and homophobic, and that informed my reporting. I believe that he was out and not in the closet."

Mr. Thiel said he considered his financial backing of the cases against Gawker to be "one of my greater philanthropic things that I've done. I think of it in those terms."

He refused to divulge exactly what other cases he has funded but said, "It's safe to say this is not the only one."

Speculation that a secret benefactor was backing Mr. Bollea's case was whispered during the trial but largely dismissed as a conspiracy theory. It gained currency in large part as a result of an unusual decision Mr. Bollea's legal team made: It purposely excluded a claim that would have allowed Gawker's insurance company to help pay for its defense as well as damages. The move struck observers as odd because most plaintiffs seeking damages usually hope to settle the case by leveraging the deep pockets of an insurer.

Mr. Thiel said, "I figured it would eventually come out," adding that he was happy his role might spur a conversation about it being "extremely hard for the most common victims to get justice."

He added: "It's not for me to decide what happens to Gawker. If America rallies around Gawker and decides we want more people to be outed and more sex tapes to be posted without consent, then they will find a way to save Gawker, and I can't stop it."

John Herrman, Matthew Goldstein and Katie Benner contributed reporting.

A version of this article appears in print on May 26, 2016, on page A1 of the New York edition with the headline: Tech Billionaire in a Secret War With Gawker.

© 2016 The New York Times Company

# Exhibit B

☰ **Forbes**  🔍 LOG IN



Tech  /  **#HulkVsGawk**

7 Richest Immigrant Billionaires In America 2016


This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker

🐦 **Active on Twitter**


In Need Of PR Services For Your Startup? This Company Will Give You For Free

+288k views in the last 24 hours


Why The 'Blob' East Of Hurricane Matthew's Eye Should Concern Us

in **Active on LinkedIn**


5 Vital Skills Schools Are Failing To Teach Well Enough


Morgan Stanley*Voice:* Beyond Secular Stagnation

🐦 **Active on Twitter**


Community*Voice:* Nine Low-Cost Ways To Improve Your Cybersecurity Efforts

f **Active on Facebook**


Facebook Launches 'Marketplace,' Taking On Craigslist, eBay

🐦 **Active on Twitter**


How Facebook's WhatsApp Could Hold Up Snapchat's Global Growth


Morgan Stanley*Voice:* Generations Change How Spending Is Trending

+1 comments in the last hour


The Apple Watch Enigma: Lower Prices, Fewer Sales?

MAY 24, 2016 @ 07:29 PM    **403,234** VIEWS    The Little Black Book of Billionaire Secrets

# This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker

✉ f 🐦 in g

 **Ryan Mac,** FORBES STAFF ✔
*Staff writer covering technology and e-commerce* FULL BIO ∨



*Facebook investor and billionaire Peter Thiel (Photo: Noah Berger/Bloomberg)*

**By Ryan Mac and Matt Drange**

One of Silicon Valley's best-known investors has been footing a former wrestler's legal bills in lawsuits against a shared enemy.

Peter Thiel, a PayPal cofounder and one of the earliest backers of Facebook FB -0.31% , has been secretly covering the expenses for Hulk Hogan's lawsuits against online news organization Gawker Media. According to people familiar with the situation who agreed to speak on the condition of anonymity, Thiel, a cofounder and partner at Founders Fund, has played a lead role in bankrolling the cases Terry Bollea, a.k.a. Hogan, brought against New York-based Gawker. Hogan is being represented by Charles Harder, a prominent Los Angeles-based lawyer.

A spokesperson for Thiel declined to comment.

The involvement of Thiel, an eccentric figure in Silicon Valley who has advocated for teenagers to skip college and openly supported Republican presidential candidate Donald Trump, adds another wrinkle to a case that has garnered widespread attention for its implications over celebrity privacy and a publication's First Amendment rights. During court proceedings, which ended in late March with a $140 million victory for Hogan, there had been rumors that a wealthy individual had funded Hogan's case though there was never any hard evidence that surfaced to prove that was true.

On Tuesday, in an interview with The New York Times, Gawker founder Nick Denton said he had a "personal hunch" that the financial aid could be linked to someone in Silicon Valley. "If you're a billionaire and you don't like the coverage of you, and you don't particularly want to embroil yourself any further in a public scandal, it's a pretty smart, rational thing to fund other legal cases," he told the Times.

**Forbes** ≡  🔍 LOG IN

**7 Richest Immigrant Billionaires In America 2016**

It is not illegal for an outside entity to help fund another party's lawsuit, and the practice, known as "third-party litigation funding" has become increasingly common in the U.S. Typically, the outside party negotiates for a defined share of any proceeds from the suit.

─── Recommended by Forbes ───


This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker

🐦 *Active on Twitter*


In Need Of PR Services For Your Startup? This Company Will Give You For Free

*+288k views in the last 24 hours*


Why The 'Blob' East Of Hurricane Matthew's Eye Should Concern Us

in *Active on LinkedIn*


5 Vital Skills Schools Are Failing To Teach Well Enough


Morgan Stanley*Voice:* Beyond Secular Stagnation

🐦 *Active on Twitter*


Community*Voice:* Nine Low-Cost Ways To Improve Your Cybersecurity Efforts

f *Active on Facebook*


Facebook Launches 'Marketplace,' Taking On Craigslist, eBay

🐦 *Active on Twitter*


How Facebook's WhatsApp Could Hold Up Snapchat's Global Growth


Morgan Stanley*Voice:* Generations Change How Spending Is Trending

*+1 comments in the last hour*


The Apple Watch Enigma: Lower Prices, Fewer Sales?

>

Billionaire Facebook Investor Peter Thiel Is A Donald Trump Delegate

Nick Denton On How Gawker, Uber and Facebook Will Save Humanity

It is unclear how Thiel became connected to Hogan or Harder or if Thiel, who is worth $2.7 billion by FORBES' estimates, is the only outside financial backer of the cases against Gawker. It is also unknown whether Thiel will see any of the proceeds won by Hogan in a Florida court. Gawker is currently appealing that ruling.

Money may not have been the main motivation in the first place. Thiel, who is gay, has made no secret of his distaste for Gawker, which attempted to out him in late 2007 before he was open about his sexuality. In 2009, Thiel told PEHub that now-defunct Silicon Valley-focused publication Valleywag, which was owned by Gawker, had the "psychology of a terrorist."

"Valleywag is the Silicon Valley equivalent of Al Qaeda," Thiel said at the time.


*Charles Harder (center) is one of former wrestler Hulk Hogan's lawyers in his lawsuits against Gawker Media. (Photo: Gerardo Mora/ Getty Images)*

When reached by phone on Tuesday, Denton said that he did not know of Thiel's involvement but had "heard that name" along with others in the speculation that surrounded Hogan's first lawsuit. (Hogan and Harder sued Gawker again in a Florida state court earlier this month alleging that Gawker attempted to extort Hogan over the release of a sex tape that was the subject of the first lawsuit.) When asked why he thought financial backing was coming from Silicon Valley, Denton said that exposing the money and power in the tech industry was a relatively recent practice.

"We write stories about powerful people in New York, but there are plenty of outlets writing stories about powerful people in New York," he said. "We write stories about

≡ **Forbes**    🔍 LOG IN

**7 Richest Immigrant Billionaires In America 2016**

powerful people in LA, but there are plenty of outlets writing stories about powerful people in LA. What's unique about Gawker is that we're an internet publication and the tech industry is of particular interest to us. There are powerful people in Silicon Valley and the power of Silicon Valley is a relatively new phenomenon."

Launched in 2006, Valleywag spent two years exposing the personal and sometimes darker sides to Silicon Valley's wealthiest and most influential people before being folded into the larger Gawker site in 2008. It re-launched in 2013 before being decommissioned again in Dec. 2015, with Denton citing the company's redeveloped focus on politics and culture as the reason behind its shuttering.

If Gawker fails in its appeal in Hogan's first case, it may not be around much longer to explore that new focus. On top of the $140 million in total damages facing Gawker, the company has already likely accumulated millions of dollars in legal fees defending itself. Lawsuits like these can have a chilling effect on the rest of the media industry, said First Amendment expert Peter Scheer, as they may encourage other wealthy individuals to back litigation against media companies that run unflattering stories about them.

"That's often the purpose of these cases," said Scheer, the director of the First Amendment Coalition. "Winning is the ultimate chilling effect, but if you can't win the case, you at least want the editors to think twice before writing another critical story about you."

Scheer, who has followed the Gawker situation closely but was unaware of a relationship between Thiel, Harder and Hogan, said he expects to see more lawsuits like this one to be brought against other media organizations: "It's more common today than it has ever been, because there are more private individuals with enough unrestricted cash to be able to do that."

Harder, who could not immediately be reached by FORBES for comment on Tuesday, told The New York Times, "I do not discuss the finances of my clients, including any financial arrangements they have with my firm."



🗂 **Gallery**

# Gawker vs. Hogan: The Movie

**Launch Gallery** ›
7 images

A partner with Harder Mirell & Abrams LLP, Harder is a well-known Hollywood lawyer whose past clients included George Clooney, Julia Roberts and a slew of other celebrities. He is also representing plaintiffs against Gawker in other lawsuits, including a defamation case on behalf of Shiva Ayyadurai in Boston that was filed earlier this month. Ayyadurai, who claims to have invented email, was the subject of a story by Gawker journalist Sam Biddle, who wrote that the plaintiff was a "fraud" according to former colleagues. Ayyadurai's lawsuit seeks "no less than $35 million in damages."

---


This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker

🐦 *Active on Twitter*

In Need Of PR Services For Your Startup? This Company Will Give You For Free

*+288k views in the last 24 hours*

Why The 'Blob' East Of Hurricane Matthew's Eye Should Concern Us

in *Active on LinkedIn*

5 Vital Skills Schools Are Failing To Teach Well Enough


Morgan Stanley*Voice:* Beyond Secular Stagnation

🐦 *Active on Twitter*

Community*Voice:* Nine Low-Cost Ways To Improve Your Cybersecurity Efforts

f *Active on Facebook*

Facebook Launches 'Marketplace,' Taking On Craigslist, eBay

🐦 *Active on Twitter*

How Facebook's WhatsApp Could Hold Up Snapchat's Global Growth


Morgan Stanley*Voice:* Generations Change How Spending Is Trending

*+1 comments in the last hour*

The Apple Watch Enigma: Lower Prices, Fewer Sales?

≡ **Forbes**    ⌕ LOG IN

**7 Richest Immigrant Billionaires In America 2016**



This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker


🐦 Active on Twitter



In Need Of PR Services For Your Startup? This Company Will Give You For Free

*+288k views in the last 24 hours*



Why The 'Blob' East Of Hurricane Matthew's Eye Should Concern Us

in Active on LinkedIn



5 Vital Skills Schools Are Failing To Teach Well Enough



Morgan Stanley*Voice:* Beyond Secular Stagnation

🐦 Active on Twitter



Community*Voice:* Nine Low-Cost Ways To Improve Your Cybersecurity Efforts

f Active on Facebook



Facebook Launches 'Marketplace,' Taking On Craigslist, eBay

🐦 Active on Twitter



How Facebook's WhatsApp Could Hold Up Snapchat's Global Growth



Morgan Stanley*Voice:* Generations Change How Spending Is Trending

*+1 comments in the last hour*



The Apple Watch Enigma: Lower Prices, Fewer Sales?

Harder has represented writer Ashley Terrill since January and filed an amended complaint in her lawsuit against Gawker and Biddle in April. She alleges that the site published "a false and highly defamatory hit-piece" about her written by Biddle last year after she had initiated a working relationship with Gawker to publish a story. Earlier this month Gawker's lawyers argued that Terrill's case should be dismissed. On May 18, the judge in the case gave Terrill's legal team two weeks to file a second amended complaint before the case moved forward. As of Tuesday, no additional documents have been filed in the case."

It is unclear if Thiel is helping to fund Ayyadurai or Terrill's cases against Gawker.

Lawyers for Hogan and Gawker are due back in a Florida court Wednesday morning to discuss a number of recent motions in the case, including one filed Monday by Gawker that opposes Hogan's motion for a final judgment. Hogan's lawyers have asked the court to force Gawker and other defendants to put up $150 million in escrow before moving forward with the appeal the case, something that Gawker has also challenged.


▶ 0:00 / 1:00    ⤴ 🔊 ⤢

*Follow Ryan on Twitter at @RMac18 or email him at rmac@forbes.com. Follow Matt on Twitter at @MattDrange at or email him at mdrange@forbes.com.*

*Update on May 30, 2016 at 3:30 a.m.: An earlier version of the story incorrectly spelled the name of a plaintiff who is suing Gawker Media. His name is Shiva Ayyadurai.*

**Comment on this story**    SHARE: ✉ f 🐦 in g

🖶 Print        ✏ Report Corrections    ▢ Reprints & Permissions

**RELATED TOPICS**                          Advertisement

| Best Sources Of Business | Ways to Fund Small |
|---|---|
| Small Business Loans | Best Franchise |
| Financial Investment | Best Investment Options |
| Funding Companies for | 10 Best Income Funds |

**From the Web**                                      Ads by Revcontent ▷



**Learn Why This Razor Is Beating Out The Drugstore Brands**
HARRY&#39;S

**The Future of Cannabis & the US Economy**
MONEY MORNING

**1 Tip To Remove Your Eye Bags Under 60 Seconds**
FOR WHAT&#39;S WORTH

## Forbes   🔍 LOG IN

**7 Richest Immigrant Billionaires In America 2016**



This Silicon Valley Billionaire Has Been Secretly Funding Hulk Hogan's Lawsuits Against Gawker

🐦 *Active on Twitter*

In Need Of PR Services For Your Startup? This Company Will Give You For Free

*+288k views in the last 24 hours*

Why The 'Blob' East Of Hurricane Matthew's Eye Should Concern Us

in *Active on LinkedIn*

5 Vital Skills Schools Are Failing To Teach Well Enough

Morgan Stanley*Voice:* Beyond Secular Stagnation

🐦 *Active on Twitter*

Community*Voice:* Nine Low-Cost Ways To Improve Your Cybersecurity Efforts

f *Active on Facebook*

Facebook Launches 'Marketplace,' Taking On Craigslist, eBay

🐦 *Active on Twitter*

How Facebook's WhatsApp Could Hold Up Snapchat's Global Growth

Morgan Stanley*Voice:* Generations Change How Spending Is Trending

*+1 comments in the last hour*

The Apple Watch Enigma: Lower Prices, Fewer Sales?

**Can 3 Average Guys Learn French In Just 1 Week?**
THE BABBEL MAGAZINE

**Hemp Company Releases Legal CBD Oil Across All 50 States**
BE WELL BUZZ

**3 Common Foods Surgeons Are Now Calling "Death Foods"**
NUCIFIC BIOTICS X4

**Here's What Dental Implants Should Cost - Best Pricing Information In New York**
BROWSE DENTAL IMPLANTS

**20 Family Photos That Trump Didn't Want You To Find!**
DETONATE.COM

## Tech

OCT 4, 2016 @ 09:01 AM

## In Need Of PR Services For Your Startup? This Company Will Give You For Free

✉ f 🐦 in g

⌄

SHARE: ✉ f 🐦 in g

# Exhibit C



# Peter Thiel is totally gay, people

Owen Thomas                                                                    450.80K
12/19/07 07:05PM Filed to: EXCLUSIVE

 By now, you've likely heard how Peter Thiel parlayed a $500,000 investment in Facebook to a stake now worth $750 million. There's been a crush of coverage on his $220 million Founders Fund, which may well change the way entrepreneurs get paid in the Valley. We know about his mansion (he rents it — clever!), his butler, his early-morning jogs. But what no one ever says out loud: Thiel is gay.

Venture capital is a business about risk — but only the right kinds of risk. Unproven technology? Fine. A host of rivals? No problem. A gay founder? Oh, hey, wait a second. Not that there's anything wrong with that. But someone else, somewhere else, might take issue with it. That's VC thinking.

"Of course he's gay. Why would you mention that?" Here in northern California, where intolerance is the only thing we can't tolerate, even alluding to someone's sexual orientation is suspect. (Even if, like me, you're gay yourself.) Yet as one venture capitalist put it, "The VC industry is headquartered in

Menlo Park, not northern California." On Sand Hill Road, like funds like. The clubby ranks of VCs are mostly straight, white and male. They instinctively prefer entrepreneurs who remind them of themselves. At best, it's a wrongheaded sense of caution. At worst, it's prejudice with a handy alibi.

The effects are hard to document. VCs fund so few of the companies they talk to that it's hard to prove a case of discrimination; there are a hundred reasons why they might pass on any given startup. But gay and lesbian entrepreneurs I've spoken to agree it's real. PlanetOut, the gay and lesbian portal, had to buy out Sequoia Capital, which had come to regret its investment in the company, before it found braver VCs and eventually went public. And really: How many out gay VCs do you know?

I think it explains a lot about Thiel: His disdain for convention, his quest to overturn established rules. Like the immigrant Jews who created Hollywood a century ago, a gay investor has no way to fit into the old establishment. That frees him or her to build a different, hopefully better system for identifying and rewarding talented individuals, and unleashing their work on the world.

> **An Empire of Their Own: How the Jews Invented Hollywood**

That's why I think it's important to say this: Peter Thiel, the smartest VC in the world, is gay. More power to him.

---

Terms of Service     Privacy Policy

# Exhibit D

≡ **Forbes**

 

Tech  /  #HulkVsGawk

JUN 7, 2016 @ 02:51 PM     **121,311** VIEWS     🏅 **EDITOR'S PICK**

# Behind Peter Thiel's Plan To Destroy Gawker



Peter Thiel has backed Hulk Hogan's lawsuit against Gawker. But the billionaire's legal tangle with the media company extends far behind the former professional wrestler. (Photo: Sam McCabe For Forbes)



**Ryan Mac,** FORBES STAFF ✔

*Staff writer covering technology and e-commerce* **FULL BIO** ⌄

*This story appears in the June 29, 2016 issue of Forbes.* **Subscribe**

**By Ryan Mac and Matt Drange**

**Forbes**

It's voting season for the Emmy Awards, which means that electioneering in the form of billboards rising into the haze dominates the Los Angeles skyline. Hollywood's elite driving down Sunset Boulevard are first beckoned to support Netflix's *Jessica Jones*. Next up is Amazon.com's *Transparent*. Towering over them all: a 12-story banner extolling HBO's *Silicon Valley*, which lampoons the culture and excesses of America's technology industry.

And lording over that advertisement: the Hollywood Hills mansion of billionaire Peter Thiel, an early Facebook  FB +0.17%  investor who also inspired one of the HBO show's most incisive characters, Peter Gregory, a mix of awkward eccentricity and reserved ruthlessness.

As the past few weeks have shown, the real Thiel is even more eccentric and ruthless than his fictional alter ego.

As FORBES revealed in late May, Thiel is the clandestine financier of numerous lawsuits targeting Gawker Media, the New York-based company whose biting style of journalism has grated on the egos and sullied the reputations of some of the world's most powerful people. The most damaging lawsuit–an invasion-of-privacy case revolving around a sex tape of the wrestler Hulk Hogan (real name, Terry Bollea)–recently resulted in a $140 million jury award and a national debate on the rights of celebrities versus the rights of a publication to disseminate what it considers to be newsworthy.

The revelation that Thiel paid Hogan's
lawyers to the tune of about $10 million
—has transformed that discussion.

Gawker, supported by free-speech
advocates like eBay EBAY +0.21% founder
Pierre Omidyar and Amazon CEO Jeff
Bezos, has denounced Thiel's gambit as
an attempt to permanently snuff out an
unpopular media outlet through
aggressive litigation. Thiel, lauded by a
host of other Silicon Valley heavy hitters
who have felt Gawker's wrath, from
Chris Sacca to Vinod Khosla, has
described his efforts as "one of my
greater philanthropic things," helping
those who have been wronged by a
"singularly terrible bully."

Thiel has been deliberately vague,
granting just one interview–to *The New
York Times* –and refusing to talk to
FORBES about this subject. But over the
past two weeks, which has included
interviews with more than 50 people,
FORBES has pieced together the kind of
narrative that a site like Gawker used to
feast on.

---

**Recommended by Forbes**

This Silicon Valley
Billionaire Has Been
Secretly Funding Hulk
Hogan's Lawsuits...

Hulk Hogan's L
Have Made Sui
Their 'Bread An

≡  **Forbes**                                               🔍  ➦

Rather than simply play the vigilante
available to help those who have been
publicly attacked by a company even the
most ardent press advocates must hold
their noses to defend, Thiel secretly
declared a multi-front war against
Gawker, seeking to crush it by any
means necessary.

Specifically, while Gawker has found
itself defending numerous Thiel-backed
lawsuits attacking its kind of journalism,
there has also been an orchestrated
effort to initiate a class-action labor suit
against it. Some in the Los Angeles legal
community talk openly about a
coordinated strategy against Gawker.
And at least one Silicon Valley
billionaire has quietly pursued the
concept of a Gawker buyout by
indirectly reaching out to former
staffers.

Thiel's level of involvement in each of
these initiatives remains opaque. What
isn't: the impact of this attack on
Gawker. The $140 million judgment,
which isn't covered by insurance, could
prove fatal to the company if it's upheld
—and could serve as a blueprint for any
billionaire who wants to lay siege against
a media outlet.

**THE FATEFUL DANCE** between
Thiel and Gawker can be traced back to
2002. That's the year Nick Denton, a
former Financial Times journalist,
founded Gawker. That's also the year
Peter Thiel and his legendary "mafia,"
which includes Elon Musk and Reid
Hoffman, took PayPal public, giving

Thiel the kind of cash to be able to plunk
out $500,000 for 10% of a raw startup
called Facebook, and then to launch
Palantir, the data-mining giant that's
now worth some $20 billion.

But those big successes had yet to take
hold with the general public when
Gawker.com first made passing mention
of Thiel in March 2006. More than two
dozen blog posts quickly followed,
before the site declared, in a Dec. 19,
2007 headline: "Peter Thiel is totally
gay, people." While some dispute
whether the article actually outed the
billionaire (Thiel said in past interviews
that his friends had known since at least
2003), it certainly broadcast his
sexuality to the rest of the world,
something those close to Thiel say he
was very uncomfortable with.

Over the ensuing years, Thiel's
prominence and wealth—FORBES
estimates he's worth $2.7 billion—rose in
lockstep with Gawker's influence. The
website, which had a heavy focus on
media and gossip, spawned spinoffs like
Deadspin (sports), Jezebel (feminism),
Gizmodo (gadgets) and Valleywag
(Silicon Valley). All shared the mother
ship's formula of snarky, aggressive
commentary, breaking news and click-
friendly headlines. At its best, Gawker
could prompt a congressman to resign
(Christopher Lee did so after sending
shirtless pictures to a Craigslist
paramour) or synthesize the assault
accusations against Bill Cosby. At its
worst, it was a spiteful, bile-fueled
gossip rag whose decisions of

☰  **Forbes**                                                    🔍  ↱

questionable newsworthiness included posting a video of a heavily intoxicated woman having sex in a public bathroom and publishing what appeared to be a clumsy attempt by a then obscure–and married–media executive to solicit a gay encounter.

Gawker and Valleywag made Thiel a favorite subject. He gave them lots of material: The libertarian proposed building ship-bound communities in international waters to escape national governments, including the U.S., and began funding promising teenage entrepreneurs on the explicit condition they skip college to start companies.

"To the extent that there are contradictions, I am much more aware of them than people whose views fit into a very standard matrix," Thiel told FORBES, channeling his inner Peter Gregory, as part of a cover story in 2011.

🖿 **Gallery**

## Gawker vs. Hogan: The Movie



**Launch Gallery**  ›
7 images

The following October Gawker published a short video clip of Hogan having sex with his friend's wife, Heather Clem. The next day Hogan's personal lawyer, David Houston, requested that Gawker immediately take down the post. When the company

‹ ═══════════════════════════════ ›

refused, Hogan sued, filing paperwork in a Florida court with a new, Beverly Hills, Calif.-based lawyer, Charles Harder. A celebrity attorney with clients like Sandra Bullock and George Clooney, Harder held a press conference in Tampa, Fla. on the day of the filing, claiming that the publication's actions were "illegal" and "exceeded the bounds of human decency."

Harder failed to mention that there was another party involved with the case, the one who would finance the legal battle with Gawker: Peter Thiel.

For much of this year, Gawker's Denton floated rumors that someone was behind the Hogan lawsuit. Too many things didn't add up. How could Hogan, who had recently gone through an expensive divorce, afford a high-powered celebrity attorney on what seemed to be a long-shot case? Why didn't he accept several settlement offers? And why did he drop his claim involving negligent infliction of emotional distress–thus freeing the real deep pockets, Gawker's insurance company, from paying any part of a potential recovery?

Denton even maintained a list of at least three billionaire suspects. Sources close to Gawker say that Denton entertained the names of former Facebook president Sean Parker, whose over-the-top wedding in Big Sur, Calif. was skewered by Valleywag (Parker has told BuzzFeed he's not involved with the lawsuits), and IAC chairman Barry Diller, who Gawker has long insinuated is gay (Diller's

spokesperson similarly denies involvement in the suits). "There was no way of knowing, really," Denton told FORBES.

Then there was Thiel. In a 2009 interview he called Valleywag the "Silicon Valley equivalent of Al Qaeda." And true to the man behind Palantir, whose software reportedly helped track down Osama bin Laden, he waited for his moment to strike.

"Most wouldn't think of litigation as a chess game," says a Silicon Valley VC who knows Thiel but wasn't aware of his plan. "But he's also a chess master, and he's incredibly patient. He did three years in law school, and he knows enough to be dangerous." According to one person close to him, Thiel began airing the idea of backing lawsuits against Gawker with some members of his venture capital firm, Founders Fund.

Enter the new attorney, Harder, who has made pursuing Gawker a focal point of his new firm, Harder Mirell & Abrams. According to a former employee of Harder's, someone in Thiel's camp cold-called Harder at his previous law firm, Wolf Rifkin Shapiro Schulman & Rabkin, "looking for an entertainment lawyer." By mid-October 2012 Harder had taken on Hogan as a client. Two months later, even though he was a partner at Wolf Rifkin, the 46-year-old with a southern California tan and bleach-white smile left to set up his own shop, taking the wrestler's case with him. When Harder announced his new

 
# Forbes

company in January 2013, he made the firm's first filing on behalf of Hogan.

It gets weirder. According to multiple sources familiar with Harder's arrangement, he never had any direct contact with Thiel. And, these sources claim, Harder didn't even know who was funding the litigation until FORBES broke the news in May. What he surely did know: The checks cleared. And there was presumably more where that came from, if he could find more cases.



*Gawker Media founder Nick Denton (left) and former editor A.J. Daulerio sit inside a St. Petersburg, Fla. courtroom during the Hulk Hogan trial in March. (Photo: Stephen Yang/AP)*

**BEVERLY HILLS' GLITZY RODEO DRIVE** is exactly the kind of cliché address that the Gawker empire loves to mock. It's out of Harder Mirell's nondescript office here that the Thiel-fueled war machine churns on.

Beyond Hogan, who filed a second suit against Gawker in May alleging extortion in the dissemination of his sex tape, Harder has taken on at least two other clients with cases involving Gawker's reporting. In January 2016 Harder filed suit against Gawker on behalf of Ashley Terrill, a writer who

**Forbes**

originally came to Gawker with a story involving the cofounders of dating app Tinder. Gawker writer Sam Biddle, in turn, published an unfavorable piece on Terrill, highlighting her own alleged inconsistencies and personal issues.

Harder also represents Shiva Ayyadurai, a former lecturer at the Massachusetts Institute of Technology who claims to have invented e-mail. In 2012 Biddle published a story on Gizmodo that undermined that assertion and called Ayyadurai a fraud.

Ayyadurai, who is married to the actress Fran Drescher, says no lawyer would take his case–until he presented it to Harder. Ayyadurai won't discuss his arrangement with Harder, but denies that any third party is paying his bills. "To the best of my knowledge, I'm not seeing any money in my account coming from Peter Thiel," he says.

While Harder's firm publicly represents those two clients, FORBES has found at least two other cases–Gawker is currently a defendant in at least a dozen lawsuits–in which Harder Mirell has worked quietly behind the scenes. One involves soliciting plaintiffs in cases that, contrary to Thiel's claims that he's defending those who have been wronged by the site, have nothing to do with its journalism.

Dating back to January 2013–the same month Harder Mirell was formed –e-mails obtained by FORBES show that Harder was actively vetting unpaid

interns for a labor case against Gawker.

**Forbes**

A former journalist named Phil
Linsalata was e-mailing former Gawker
interns at the time, saying that he was
working on academic research "focusing
on labor conditions in digital media."
After speaking with them on the phone,
he would then send them to Harder's
firm for what he framed as a free
"consultation."

A former Gawker intern named David
Matthews even signed a retainer
agreement with Harder Mirell.
Ultimately Harder passed the interns off
to a New York-based law firm
specializing in labor claims, which
brought a class action against Gawker in
June 2013 that was dismissed and later
privately settled. Matthews claims that
the lawyers misrepresented their
intentions and now says he feels "the
sense of being a pawn or an item in a
ledger."

Harder's web appears to extend to a
federal court in Chicago, where a
plaintiff named Meanith Huon, a lawyer
and former life insurance salesman,
sued Gawker in 2011 for allegedly
implying that he had sexually assaulted
a woman he had met through Craigslist.
He was later acquitted of rape but
sought action against legal news blog
Above the Law and Gawker-owned
Jezebel for suggesting in stories that he
was a serial rapist. In a hearing last year
Huon said that he had decided to settle
with the former—but continue his
crusade against Gawker in a higher
court even after a judge dismissed

claims of defamation. According to John
Mandell, an attorney for Above the Law
who was present at the hearing, Huon
told the judge in open court that he
wasn't worried about his appeal because
he was "getting support from Hulk
Hogan's lawyers in California." Huon
and Harder declined to comment on the
case, which is now on appeal.

Harder takes issue with the idea,
circulating in L.A. legal circles, that
suing Gawker has become his firm's
"bread and butter": "We represent
numerous businesses and individuals in
a plethora of legal matters that have
nothing whatsoever to do with Gawker."

Nor would Harder discuss the specifics
of his arrangement with Thiel. "If a
person has been wronged, he or she is
entitled to be made whole. This is true
whether the person pays their own legal
bill, or has a law firm on contingency, or
is represented by a public interest law
firm, or an attorney on a pro bono case,
or has someone else helping with the
costs."

**SILICON VALLEY IS** circling Gawker
in at least one other way. In January,
following the departure of numerous
executives and editors from the
embattled media company, some former
employees were contacted by Scott
Sonnenblick, a partner at corporate
M&A law firm Linklaters, who said he
was looking to discuss the possibility of
buying the company. Sonnenblick
specifically told some of these ex-
employees that he was calling on behalf

of at least one Silicon Valley
heavyweight.

☰  **Forbes**                                🔍  

There's nothing unusual about making a
bid by approaching former executives,
who bring insiders' knowledge and
outsiders' hunger. But having a Silicon
Valley billionaire circle a private New
York media company under siege from a
Silicon Valley billionaire is certainly
unusual. Sonnenblick and Thiel's camp
declined to comment.

Regardless, Denton needs help. While
Gawker has since been able to secure
funding from Russian billionaire Viktor
Vekselberg's Columbus Nova
Technology Partners, the company
remains under attack. The $140 million
verdict, while widely expected to be
reduced or eliminated on appeal, hangs
over Gawker's head like a guillotine, and
numerous legal expenses are draining its
resources.

During an interview with FORBES at the
Code Conference in Los Angeles, Denton
says that Gawker recorded revenue of
$50 million last year and would have
broken even absent legal fees. However,
with fees, which have totaled about $10
million in the Hogan case alone, 2015
and likely 2016 will end up in the red.
Gawker already initiated a small number
of layoffs to reduce costs.

Gawker has changed, post-Thiel. The
company has shuttered Valleywag and
its celebrity rumor mill, Defamer, and
Denton said last November that the
Gawker flagship would refocus on

**Forbes**

politics. "For a long time the lawsuits seemed like karmic retribution for skating so close to the edge," says a current Gawker employee. "But for once, Nick Denton's conspiracy theories turned out to be true."

In an age where media assets have become a strategic hobby for non-media billionaires, whether they wear white hats (Jeff Bezos and the Washington Post) or black hats (Sheldon Adelson and the Las Vegas Review-Journal), the idea that a media entity can be systematically sued into submission by an aggrieved subject is an ugly long-term prospect.

In the short term, Denton is doing what he needs to do to survive. After sitting down with FORBES at the Code conference, Denton scurries off to his next meeting, garnering sympathetic greetings as he walks to the lobby of a five-star oceanfront resort in Rancho Palos Verdes, Calif. He's more than ten minutes late by the time he arrives. He quickly extends his hand to Sameer Deen, the senior vice president for digital at Univision—a company reportedly interested in investing in Gawker, headaches and all.

*Follow Ryan on Twitter at @RMac18 or email him at rmac@forbes.com. Follow Matt on Twitter at @MattDrange or email him at mdrange@forbes.com.*

**Comment on this story**

✎ Report Corrections    ▤ Reprints & Permissions

**Forbes**

SEE ALSO

| | |
|---|---|
| HOT | ONLINE |
| HIGHEST | 2016 MOST |
| PRIVATE | 2016 LUXURY |
| CHEAP | TOP LUXURY |

## From the Web

Ads by Revcontent ▷

**Hemp Company Releases Legal CBD Oil Across All 50 States**

BE WELL BUZZ

**Could You Replace All Your Wedges With Just One Club?**

XE1 GOLF

**After Getting His Bike Stolen, Victim Gets Revenge With This Simple Device**

TRYNDING

**A Secret To Winning Every Lottery**

LOTTO CRUSHER

**Died Too Young - 35 Celebrities You Didn't Know Passed Away**

TONSOFBUZZ

**Obama Quietly Signed Bill Giving 119 Million Americans "Consumer**

THE OXFORD CLUB

**This Razor Is So Popular It Sold Out Twice**

HARRY'S

**The Truth About Children And Attention Deficit Hyperactivity Disorder**

☰   **Forbes**   🔍 ➤

# Exhibit E

**The New York Times** | http://nyti.ms/1s62fEc



WITH FOUNDER
ANDREW ROSS SORKIN

# Gawker Founder Suspects a Common Financer Behind Lawsuits

Andrew Ross Sorkin

**DEALBOOK**    MAY 23, 2016

At first, Nick Denton, the founder of **Gawker Media**, thought it an unlikely conspiracy theory.

Now, he's starting to believe it himself.

For the last several years, Mr. Denton has been the **target of a lawsuit** brought by the wrestler Hulk Hogan in the now-infamous defamation case over Gawker's publication of a sex tape — an editorial choice that recently resulted in a $140 million jury award to Mr. Hogan. The appeals process is likely to drag on for years, and some legal experts predict that the judgment will ultimately be overturned or the award greatly reduced.

During the trial, a **low hum of speculation** emerged within the legal community that Mr. Hogan's legal case, which dragged on for more than three years, might be funded by someone other than Mr. Hogan — and for reasons other than simply inflicting financial pain on Gawker. At the time, the questions were provoked by

16-11700-smb    Doc 342    Filed 10/11/16    Entered 10/11/16 16:47:03    Main Document
Pg 40 of 104

several strategic decisions on Mr. Hogan's side that didn't appear economically rational. More on that in a moment. Back then, Mr. Denton dismissed the idea of a third party secretly underwriting Mr. Hogan's case as "rather conspiracy-theorylike."

But in recent weeks, in the face of several new lawsuits brought against Gawker that are unrelated to Mr. Hogan's case and seem to personally attack certain Gawker writers, Mr. Denton is having second thoughts. All of the new cases, like Mr. Hogan's, were brought by Charles J. Harder, a Los Angeles-based litigator, working on a contingency basis, who has most likely run up huge legal bills and expenses. Gawker has said it has already spent as much as $10 million on its side of the case.

Mr. Denton has begun to question whether Mr. Harder has a benefactor, perhaps one of the many subjects of Gawker's skewering coverage.

"My own personal hunch is that it's linked to Silicon Valley, but that's nothing really more than a hunch," Mr. Denton told me. "If you're a billionaire and you don't like the coverage of you, and you don't particularly want to embroil yourself any further in a public scandal, it's a pretty smart, rational thing to fund other legal cases."

Mr. Denton's view is based on the huge expenses of legal cases and settlements, the fact that Mr. Hogan's financial health has been erratic — and on the rich history of lawsuits in which lawyers make money only if they win the case. There is an entire industry that exists to provide lines of credit to lawyers working on contingency. There is also a small netherworld of investors who back certain lawsuits.

"The answer may be entirely innocent," Mr. Denton said, musing on the question of whether Mr. Harder was paid by someone other than Mr. Hogan, "but I think in order for people to understand what's going on here, what the stakes are, I think it's important that it be out in public, or at least that he'd be asked the question in public."

Based on my conversation with Mr. Denton as well some independent lawyers who first raised questions about the financing of Mr. Hogan's suit, I approached Mr. Harder and asked him the question directly. In an email, he said, "I do not discuss

the finances of my clients, including any financial arrangements they have with my firm. This applies to all clients."

Stepping aside from this case, it's clear that some lawsuits have been funded for reasons beyond strict economics. Kenneth G. Langone, the co-founder of Home Depot and former director of the New York Stock Exchange, helped fund Maurice R. Greenberg's lawsuit against the United States government over the bankruptcy of the American International Group, which was viewed as being as much as about money as about principle.

And Max Mosley, the former head of Formula One who successfully brought a series of suits against News of the World for publishing pictures of him involved in an orgy, later funded a number of lawsuits against the same tabloid by people who said its journalists had hacked their phones.

As for the lawsuits against Gawker Media, "the evidence has built up over time that there are questions that are unanswered here," Mr. Denton said. "The data point that really got us thinking was the move that they made on insurance, which seemed designed to prevent insurance paying for our defense."

Mr. Denton is referring to a decision by Mr. Hogan's legal team to abruptly drop one of the claims — for "negligent infliction of emotional distress" — from its case. That claim had a particularly special meaning: It was the one claim that required Gawker's insurance company to pay for its defense as well as potential payouts in the case of a settlement. (That provision of Gawker's insurance policy became public after the insurance company, Nautilus, sued Gawker to try to limit payment for defense.)

Several legal experts said that it was particularly unusual for a plaintiff using a lawyer being paid on a contingency basis not only to turn down settlement offers (several sizable settlements were proffered by Gawker) but also to pursue a strategy that prevented an insurance company from being able to contribute to a settlement.

"It's a very unusual thing to do, because the insurance company would have deeper pockets than Gawker," said Larry Geneen, a risk management consultant who has long dealt with lawsuits involving insurance companies. "I've never had a

situation where the plaintiff intentionally took out the claim involving the insurance company."

And given that Mr. Hogan has had financial ups and downs, the cost of the hundreds of motions his lawyers made is significant, and the chances the award is significantly reduced based on previous cases he lost making the same claims in federal court, it's hard to completely understand the motivations at play.

Additionally, Mr. Harder has brought two new cases against Gawker that seem puzzling. One is a defamation case on behalf of Shiva Ayyadurai, who claimed to have invented email. Gawker had written an article challenging his argument, similar to an article from The Washington Post and others on the same topic.

"In L.A. and New York power centers, people are pretty used to an independent and critical press," Mr. Denton said. "It's not like we write that much about Hollywood's celebrities that isn't written in TMZ or in other celebrity news sites."

But some subcultures aren't used to the glare, Mr. Denton added. "Silicon Valley coverage with coverage on Valleywag, and the coverage on Gawker and Gizmodo — I think that has been a change for them."

Gawker has made a virtual industry of skewering the industry. The company got into a public battle with Steve Jobs over the publication of pictures of a prototype iPhone that was found at a bar. It has also poked at the private lives of virtually every member of Silicon Valley's royalty and outed many. (I'll spare them being name-checked here because it will invariably send readers scurrying to Google to search the names.)

Admittedly, it is a bit hard to defend Gawker Media. I often disagree with Gawker's news judgment, and it has routinely published items over the years that crossed the line of good taste. I've been on the other side of Gawker's critical pen, and it is not fun. Even so, I believe in a free press, and that means freedom of speech for Gawker's brand of journalism.

Mr. Denton does too, but he also would like to see more transparency on the financial side. As for the Hulk Hogan lawsuit, "it's a big case that involves the

balance of power between public figures and the press," he said. "I think it's in the public's interest and the media interest for the motives of people on both sides to be out there."

It would be great to know the answer.

A version of this article appears in print on May 24, 2016, on page B1 of the New York edition with the headline: PayPal Founder Is Said to Bankroll Hulk Hogan Suit Against Gawker.

© 2016 The New York Times Company

# Exhibit F



≡  **Forbes**                                                          🔍  ↱

Tech / #HulkVsGawk

JUN 21, 2016 @ 01:22 PM        **23,206** VIEWS

# Peter Thiel's War On Gawker: A Timeline



**Matt Drange,** FORBES STAFF ✔

*I write about technology and money + power in Silicon Valley.* **FULL BIO** ∨



*Graphics by Nick DeSantis*

In May, FORBES broke the news that Silicon Valley investor Peter Thiel bankrolled Hulk Hogan's infamous sex-tape lawsuit against the now-bankrupt Gawker. You might be wondering: so what? Why should I care? Critics have argued that Thiel's money gives other billionaires a blueprint for how to silence media outlets they dislike. Thiel's approach has also added a new twist to what's known as "alternate litigation financing," which, until now was strictly a business opportunity. No longer.

⟨                                                                      ⟩



**August 2004:** PayPal cofounder and venture capitalist Peter Thiel becomes Facebook's first institutional investor when he commits $500,000 to the company for a more than 10 percent stake. He takes a seat alongside CEO Mark Zuckerberg on the board in April 2005, a position which he still holds today. When Facebook goes public on May 18, 2012, Thiel is one of the company's biggest winners. He is now worth an estimated $2.7 billion and has sold off most of his stake in the social media company.



**December 19, 2007:** Gawker.com publishes a story with the headline "Peter Thiel is totally gay, people." Many feel the story is a public outing of Thiel, though Gawker defends the post, saying Thiel had come out to close friends in the past. Regardless, those close to Thiel tell FORBES the story left a mark, and



that it was likely part of his motivation for going after Gawker in court. In a recent interview with The New York Times, Thiel says "Gawker has been a singularly terrible bully."

---

**Recommended by Forbes**

**MOST POPULAR**              **TRENDING ON FACE**

Photos: The World's Highest-Paid Actresses 2016

Why Did Mylan EpiPen Prices 4 Because They C



**May 18, 2009:** Peter Thiel compares Valleywag, Gawker's Silicon Valley-focused website, to Al Qaeda in an interview. "I think they should be described as terrorists, not as writers or reporters," he said. "I don't understand the psychology of people who would kill themselves and blow up buildings, and I don't understand people who would spend their lives being angry." Valleywag would go on to publish dozens of stories about Thiel and other high-profile figures in Silicon Valley.



**October 4, 2012:** Gawker publishes video clips showing Hulk Hogan, whose real name is Terry Bollea, having sex with his friend's wife, Heather Clem. Former Gawker editor AJ Daulerio details the scene in a story that remains on the site today. "Because the internet has made it easier for all of us to be shameless voyeurs and deviants, we love to watch famous people have sex," Daulerio writes. "We watch this footage because it's something we're not supposed to see..." The story draws more than 7 million views.



**October 5, 2012**: Hulk Hogan's personal attorney, David Houston, demands Gawker remove the sex tape clips he says were filmed without Hogan's knowledge. Gawker initially refuses, prompting Hogan to hire additional lawyers and prepare a lawsuit. Houston sends two letters to

**Forbes**

Gawker in the days after the clips were published. Gawker eventually removes the video in the ensuing litigation, publishing a story update: "The video posted here has been removed pending litigation."



**October 15, 2012**: Hulk Hogan's new lawyer, Charles Harder, files a lawsuit against Gawker in a Florida court. Harder became involved with the case between the publication of the tape and the complaint filing. Based in LA, Harder has represented celebrities like George Clooney. It's unclear how Harder became connected to Hogan and when Peter Thiel began funding the litigation. Both Harder and Thiel have declined to discuss specifics of their agreement with FORBES.



**December 5, 2012**: Charles Harder's partner and friend, Jeffrey Abrams, files

incorporation paperwork with the California Secretary of State to start a law firm. Insiders say the firm, Harder Mirell & Abrams LLP, has made suing Gawker its "bread and butter." Harder disputes this, telling FORBES, "The matters against Gawker is one aspect of my firm's practice. We represent numerous businesses and individuals in a plethora of legal matters that have nothing to do with Gawker."



**December 28, 2012**: Charles Harder files an amended complaint with a Florida court on behalf of Hulk Hogan. Underneath his signature, Harder signs "Harder Mirell & Abrams," making the filing the firm's first. Harder brought Hogan's case, along with work for a slew of other celebrity clients, with him when he left his former firm, Wolf Rifkin Shapiro Schulman & Rabkin LLP, around the same time. Hogan's lawsuit would drag on in court for more than three years, drawing lots of media attention.



**February 7, 2013**: A plaintiff in an eventual class action lawsuit against Gawker signs a retainer agreement with Harder to have the lawyer work on his behalf in a case involving unpaid interns. Harder, who typically represents celebrity clients, would not go on to represent the plaintiffs in court; the case was eventually dismissed. Harder later tells FORBES, "It is shocking that Gawker would rather spend a million dollars on lawyers to fight its interns, than simply pay that money to the interns."



**June 17, 2015**: Meanith Huon, a plaintiff in one of many lawsuits currently pending against Gawker, tells a judge during a court hearing in Illinois that he isn't worried about continuing his case against the media company because he was "getting support from Hulk Hogan's lawyers in California."



Huon and Harder would both decline to
comment on the case when questioned
by FORBES. The suit is now on appeal
in the 7th circuit court. Huon is an
attorney and represents himself in the
case.



**January 2016**: Gawker executives, led
by founder Nick Denton, agree to sell a
minority stake in the company to
Russian billionaire Viktor Vekselberg
and his company, Columbus Nova
Technology Partners. The deal would
mark the first time the company has
taken outside investment. Gawker later
says the money was used, in part, to
defend itself from ongoing litigation.
Denton tells FORBES that, if not for the
slew of lawsuits he's up against, the
company would be profitable.



**January 19, 2016**: Charles Harder
files a lawsuit against Gawker on behalf

**Forbes**

of writer Ashley Terrill, alleging the website "published a false and highly defamatory hit-piece." In the Gawker story, journalist Sam Biddle details a series of back and forth exchanges between Terrill and executives at the dating app Tinder. "At the center is Ashley Terrill, a Hollywood columnist on an obsessive, possibly unhinged pursuit of what she says is the truth about [Tinder cofounder] Whitney Wolfe," Biddle writes.



**March 7, 2016**: Hulk Hogan's case against Gawker begins in a state court in St. Petersburg, Fla.

Hogan, who alleges that the New York-based news organization invaded his privacy when it published a video clip of him having sex with his friend's wife, testifies that Gawker's airing of the video "turned my world upside down." Hogan and his attorneys seek $100 million in damages from Gawker, its CEO Nick Denton and its former editor AJ Daulerio.



**March 18, 2016**: A Florida jury awards Hulk Hogan with a $115 million judgment after finding that Gawker invaded the former wrestler's privacy. That amount is later bolstered by an additional $25 million for punitive damages for a total of $140 million. (Gawker is now working to appeal the verdict as it navigates bankruptcy proceedings.) Founder Nick Denton says in a statement, "We feel very positive about the appeal that we have already begun preparing, as we expect to win this case."



**April 5, 2016**: Hulk Hogan's lawyer, Charles Harder, publishes a guest column in the Hollywood Reporter detailing how his client won his case against Gawker. Harder wrote "The jury's verdict sends a message to irresponsible websites: Think twice



before you invade someone's privacy, you violate their rights."

The articles includes a picture of Harder's legal team, along with Hogan, celebrating their win over a champagne-fueled dinner the night the verdict was announced.



**May 2, 2016**: Hogan files a subsequent lawsuit against Gawker alleging extortion around the publication of his sex tape. Charles Harder represents Hogan. Gawker responds to the suit by calling it "ridiculous" and accuses Hogan of "abusing the court system to control his public image." The case does not draw as much attention as the former wrestler's previous lawsuit, in part because the proceedings have been overshadowed by Gawker's subsequent bankruptcy filings.





**Forbes**

**May 10, 2016**: Harder files a lawsuit in Massachusetts against Gawker on behalf of Shiva Ayyadurai, who alleges that the website defamed him when journalist Sam Biddle wrote an article in 2012 for Gawker-owned Gizmodo, challenging Ayyadurai's claims that he invented email. In his suit, Ayyadurai, an MIT graduate married to actress Fran Drescher, seeks $35 million in damages. Ayyadurai later tells FORBES that no lawyer would take his case before Harder agreed.



**May 24, 2016**: FORBES breaks news that billionaire venture capitalist Peter Thiel funded Hogan's expenses in his lawsuits against Gawker. "It is not illegal for an outside entity to help fund another party's lawsuit, and the practice, known as 'third-party litigation funding' has become increasingly common in the U.S," FORBES notes. "Typically, the outside party negotiates for a defined share of any proceeds." The news prompts calls for Facebook to remove Thiel from its board.



**May 25, 2016**: Peter Thiel explains his reasoning for funding Hulk Hogan's case, along with others brought against Gawker (he declined to name them), in an interview with the New York Time. Thiel referred to his funding of the litigation as "one of my greater philanthropic things that I've done," and says he's spent roughly $10 million bankrolling lawsuits against Gawker. Funding arrangements like this are usually done to make a return on investment. Thiel, though, said it's "not a business venture."



**May 26, 2016**: Gawker founder Nick Denton pens an open letter to Peter Thiel, raising a host of unanswered questions. "Is your goal to bankrupt, buy, or wound Gawker Media? If you were to own the company after a final judgment in the Hogan case, what would your editorial strategy be?" Denton asks.



**Forbes**

He continued, "When you say your goal is deterrence rather than revenge, whom do you aim to deter?" The letter comes on the heels of Thiel's first extended interview about the lawsuit.



**June 10, 2016**: Gawker files for Chapter 11 bankruptcy after a Florida judge denies a request for a stay that would have allowed the company to avoid immediately paying Hogan's judgment as it worked on an appeal. At the same time, the company begins an auction supervised by the court. Publisher Ziff Davis is the first bidder and enters an asset purchase agreement for less than $100 million. (At one point Gawker was valued at more than $250 million. Nick Denton still controls the company.)



**June 15, 2016**: FORBES reveals that conservative blogger Charles "Chuck"



Johnson, widely regarded as an internet troll, had contact with Charles Harder's firm about his own defamation lawsuit against Gawker. Johnson sued Gawker in Missouri in the summer of 2015, alleging that Gawker had defamed him in a series of articles. Before the case could be dismissed, he filed a nearly identical lawsuit in California. Johnson is representing himself in the case, which is due back in court this year.



**August 1, 2016**: Gawker founder Nick Denton files for Chapter 11 bankruptcy protection to prevent Hulk Hogan from collecting his share of the $140 million jury verdict. In his filing, Denton estimates his own net worth to be between $10 million to $50 million. Denton is also leading Gawker's efforts to sell of its assets in a court-advised auction. "The brands and the business, which we have built together, are in amazingly robust shape," Denton wrote in a memo to employees.



**August 16, 2016**: Univision Communications agrees to buy Gawker Media's assets for $135 million after outbidding digital publisher Ziff Davis in a bankruptcy auction. Univision, which oversees publications like *Fusion* and *The Onion*, ends Gawker's 14-year run as an independent company. Denton, who previously valued Gawker at $250 million, said he's "pleased" employees will be able to continue to work at Univision "disentangled from the legal campaign against this company."



**August 18, 2016:** Univision and Gawker Media announce Gawker.com will shut down after 13 years. Univision says it will continue operating Gawker Media's other six sites, including Jezebel, Gizmodo and Deadspin. In a meeting with Gawker staff following the announcement, Isaac Lee, Univision's chief digital officer, says the decision not to continue Gawker.com had been made

# Forbes

the day a Florida jury awarded former professional wrestler Hulk Hogan more than $140 million in his invasion of privacy lawsuit against Gawker.

Comment on this story

Report Corrections          Reprints & Permissions

## SEE ALSO

Advertisement

| TOP 10 | DIGITAL |
| CLOUD | SECURE |
| TOP 10 CRM | TECHNOLOG |
| CLOUD | BEST |

## From the Web

Ads by Revcontent

**Donald Trump's Advice For Paying Off Mortgage (It's Genius!)**

ONESMARTPENNY

**New Unauthorized Video Could Force Hillary to Give Up Her White House**

HEALTH SCIENCES INSTITUTE

**1 Odd Trick Ends Tinnitus (Try This Tonight)**

TINNITUS TERMINATOR PROGRAM

**Baltimore Firm Has Scary Record of Predicting World Events**

BONNER & PARTNERS

**Why You Should Rejoice About The Amazon of Wine**

THE HUFFINGTON POST

**Simple Trick That Melts Belly Fat Over Night (Do this Tonight)**

FLAT BELLY OVERNIGHT

☰    **Forbes**

🔍  ↱

**Don't Buy Furniture Until You See This Site**

WAYFAIR

**Skip The Boston Mattress Stores - 3 Ways You're Getting Screwed**

LULL



‹ ▬▬▬▬▬▬▬▬▬▬▬▬ ›

# Exhibit G



132 S. RODEO DRIVE, SUITE 301
BEVERLY HILLS, CA 90212
424.203.1600 · WWW.HMAFIRM.COM

June 9, 2016

**CONFIDENTIAL COMMUNICATION**

**VIA E-MAIL AND CERTIFIED U.S. MAIL**
Heather Dietrick, Esq.
General Counsel and President
GAWKER MEDIA, LLC
114 5th Ave, Second Floor
New York, NY 10011-5611
Email: hdietrick@gawker.com

> **Re:    Ivari International, Edward Ivari – Demand for Retraction, Apology**

Dear Ms. Dietrick:

This law firm is litigation counsel for Ivari International and Edward Ivari (collectively, "Ivari"), who have been libeled by your May 24, 2016 story, "Is Donald Trump's Hair a $60,000 Weave? A Gawker Investigation" (the "Story"). The Story makes numerous false and defamatory statements about my clients.

The following statements in the Story are false and defamatory, and we demand that you publish a full, fair and conspicuous retraction, correction and apology as to each such statement:

1.  "What's more, Ivari's New York location is inside Trump Tower – on the private floor reserved for Donald Trump's own office."

2.  The following false statements taken from a lawsuit filed against Mr. Ivari by Alicia Roach in 2001 – a case won by Ivari - presented to be a true "breakdown of what a microcylinder treatment actually entails":

    a.  "The intervention involves the use of skeins of natural donor hair. Each skein consists of a line of hairs attached to a thread about one inch in length. The threads are then attached end-to-end in concentric circles over the client's head. The circles of thread are then anchored to each other by separate threads, which radiate from the center so that the underside of the resulting hairpiece resembles a spider's web. The client's natural hair is attached to the hairpiece by forty to sixty separate threads. Each of those threads is attached at one end to the web and at the other end to a tiny metal clamp around a few strands of natural hair at the scalp. Every few weeks, as the natural hair grows out from the scalp, the hairpiece loosens on the head. This places increased

Ivari International & Edward Ivari – Demand for Retraction
June 9, 2016
Page 2

> tension on the natural hair to which the microcylinders are attached and can cause hair breakage. A maintenance procedure (maintenance) is necessary wherein the clamps must be removed and replaced closer to the scalp. A maintenance tightens the hairpiece on the client's head."

    b.  The following statement taken out of context from the same lawsuit: "The judge's decision states, 'Ivari, Inc. is in the business of installing exorbitantly-priced hairpieces on the heads of people with thinning hair. These hairpieces are the functional equivalent of wigs and might be expected to look and feel like wigs after attachment.'"

3.  "[T]his nonsurgical 'micro link' method from a hair restoration clinic in Canada appears to be fairly similar" to Ivari's mycrocylinder process.

4.  Ivari's business brochure refers to microcylinders as "microextensions."

5.  Mr. Ivari "often depicts himself as a doctor."

6.  Ivari's company has existed as "Ivari, Ivari International Capillaire" and "the Ivari Treatment Center."

7.  "This was the fourth time that Ivari has had its license suspended in California for tax-related reasons."

8.  "Ivari doesn't just dole out loans, he apparently solicits them, too—or at least, Edward Ivari allegedly did so while treating Dennis Graff."

9.  The following false statements taken from a lawsuit filed by Dennis Graff, are presented by Gawker as an accurate portrayal of my clients and their business practices, when if fact the statements are false and defamatory:

    a.  "Edward Ivari might have good reason for wanting to stay out of sight. The lawsuit claims that 'upon information and belief, Mohammad Ivari is one of several aliases used by Edward Ivari in the furtherance of various highly suspicious and illegal operations in the United States, the Middle East, and elsewhere.'"

    b.  The statements that "in the middle of the 10-to-12 hour process of installing the hair replacement system, Ivari asked Graff 'if he would loan him $250,000 at 6% interest for his various "interests."' Graff declined to loan the man he barely knew a quarter of a million dollars, so Ivari then 'advised Graff he "would be unable to complete his work" and would complete only the top part.' This left Graff with a 'grossly uneven product covering the top of his head only.'"

Ivari International & Edward Ivari – Demand for Retraction
June 9, 2016
Page 3

    c.  "Furthermore, Graff claims that Ivari was suddenly and mysteriously booked solid, meaning that he was stuck with the mess on his head for the two months Ivari claimed it would take to squeeze him in. When the appointment to finish Graff's treatment finally did roll around, Ivari allegedly hit him up for money again—this time for $500,000 at an 18 percent interest rate."

    d.  "When Graff declined to loan Ivari the money yet again, Ivari supposedly said he was suddenly unable to finish the treatment that day. He would, however, be happy to see Graff at his next available appointment date—one whole month from then. That's when things really started to get fun."

    e.  "In July of 2007, Graff appeared for his appointment at Ivari, Inc. to have the hair replacement done. Edward Ivari advised Graff he lost millions of dollars in a Saudi Arabia deal, had actually been held in prison there for a year, and desperately needed to borrow $1,000,000 at 18% to be repaid in 6 months. When Graff declined to loan the money to him, Edward Ivari advised him he could not complete the work until September 2007."

    f.  "A few weeks later, an employee at Ivari called Graff, according to court documents, and told him he needed to pay $12,000 immediately or else Ivari would be unable to ever complete the treatment at all (Graff had already paid the previously agreed upon $60,000 in full). Then, in August, Graff had several hair replacement specialists check out Ivari's partially finished work. The experts described Ivari's product as 'substandard, a dead giveaway it was a hairpiece, not finished, and lacking in good quality.' By October, 'the hair replacement system completely fell apart and needed to be removed as it hung loosely on Graff's head.'"

    g.  "According to the complaint, from the date of his initial appointment to October when he finally had it removed, Graff's friends described the hairpiece as a 'ground hog,' a 'cheap piece of carpet,' and 'an unmade bed.'"

    h.  "Finally, on October 8, 2007, Graff allegedly went back to Ivari and met with Edward Ivari's wife, Amy, who 'was shocked at [the hair replacement system's] quality.' She redid the treatment herself in the hope of avoiding any subsequent lawsuit."

    i.  "… Ivari continued to refuse to fix the hairpiece properly until finally, in May of 2009, Ivari allegedly told Graff that Graff would have to sue them to get what he wanted. In July, Graff did just that. In April of 2010, Graff and Ivari settled the case out of court."

10.  That "Ivari's Paris office—its sole remaining public location—was, until March of this year, in the building pictured below at 26 Place Vendome. It has since moved to a new spot that appears to be Ivari's home address."

Ivari International & Edward Ivari – Demand for Retraction
June 9, 2016
Page 4

Your publication of the Story is false and disparaging to my clients. Your actions constitute, among other claims, libel, false light invasion of privacy and intentional infliction of emotional distress and intentional interference with actual and prospective business relations.

Demand is hereby made that you immediately and permanently remove the Story, and that you publish an immediate apology and retraction of the Story.

## Defamation by Libel

New York law defines libel as a written statement of fact regarding the plaintiff published by the defendant that is false and causes injury to the plaintiff. *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). *See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L.Ed.2d 1, 110 S.Ct. 2695 (1990) (U.S. Supreme Court holding that a statement or publication containing provably false factual assertions constitutes defamation); Restatement (Second) of Torts, § 559 ("A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"); *Dillon v. City of New York*, 261 A.D.2d 34, 37-38 (1999).

The statements further qualify under libel *per se*, which involves a false allegation that a person is engaged in a crime, or that otherwise tends to injure a person in his or her trade, business, or profession. *Geraci v. Probst*, 61 A.D.3d 717, 718, 877 NY.S.2d 386, 388 (2009). Libel *per se* is defamatory "on its face" and does not require explanatory matter to be proven; general damages are assumed.

Here, the Story states false facts about my clients from lawsuits filed against them – lawsuits which Ivari **won** – alleging that Mr. Ivari "often depicts himself as a doctor" and that he lacks professionalism in his business ventures. Because you have published numerous false statements of fact that have the obvious tendency to subject my clients to ridicule and to injure them economically, all elements of a cause of action for libel and libel *per se* are easily met.

Your actions expose you to substantial monetary damages and punitive damages. *Strader v. Ashley*, 61 A.D.3d 1244, 1248, 877, NY.S.2d 747, 751 (2009) (affirming jury's award of punitive damages in connection with a defamation claim).

## False Light Invasion of Privacy

The Story also is actionable under the related legal doctrine of false light invasion of privacy, which constitutes a public statement about a person that either is false or places the person in a false light, is highly offensive to a reasonable person, and is made in reckless disregard of whether the information is false or would place the person in a false light. *See* Restatement (Second) of Torts §652E (1977); *Machleder v. Diaz*, 801 F.2d 46 (2d. Cir. 1986). The statement need not be defamatory. *Id*. False light invasion of privacy includes embellishment (adding false material to a true story which places the subject in a false light) and distortion (arranging otherwise true information in a way to give a false impression). Your actions easily constitute false light invasion of privacy and the remedies for such cause of action include monetary damages, punitive damages, and preliminary and permanent injunctive relief.

Ivari International & Edward Ivari – Demand for Retraction
June 9, 2016
Page 5

## **Intentional Infliction of Emotional Distress**

Your actions also constitute actionable intentional and/or negligent infliction of emotional distress.  Your actions easily qualify under the law to establish liability against you.  Remedies for such conduct include monetary damages, punitive damages, and preliminary and permanent injunctive relief.

## **Tortious Interference**

Your actions also constitute actionable intentional interference with actual and prospective business relations.  Your actions easily qualify under the law to establish liability against you.  Remedies for such conduct include monetary damages, punitive damages, and preliminary and permanent injunctive relief.

In light of the foregoing, we specifically demand that Gawker Media LLC and its affiliated companies, and all of their employees:

1. Immediately and permanently remove the Story and cease and desist from publishing or republishing the Story, and/or the specific defamatory statements listed above, and cease and desist from publishing any future defamatory stories about my clients;

2. Immediately publish a public apology and full retraction of the Story with equal or greater size and prominence as the Story itself;

3. Immediately provide us with the name and all contact information for the unnamed "tipster" of the Story, so that we can serve that person with an immediate cease and desist letter to stop the spread of the false Story; and

4. Immediately preserve all physical and electronic documents, materials and data in your possession, custody and/or control (including, without limitation, emails, text messages and voice mail recordings) that are or might be relevant or related to the foregoing matters.

Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing requests will be, and are being, complied with.

This letter is not intended, and should not be construed, as a complete expression of my client's factual or legal positions with respect to this matter.  Nothing contained in or omitted from this letter is intended, and should not be construed, as a waiver, relinquishment, release or other limitation upon any legal or equitable claims, causes of action, rights and/or remedies available to my client, all of which are hereby expressly reserved.

This letter is confidential and protected by applicable Copyright law, and therefore may not be copied, published, disseminated or used by any person or for any purpose, other than

{00067774;1}

Ivari International & Edward Ivari – Demand for Retraction
June 9, 2016
Page 6

internally at your company and its outside legal representatives for purposes of evaluating the claims herein and complying with the foregoing demands.

We look forward to your immediate response to this letter.

Very truly yours,

CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

cc:  Mr. Edward Ivari (via email)
    Douglas E. Mirell, Esq.
    Seema Ghatnekar, Esq.

# Exhibit H

**The New York Times**  |  http://nyti.ms/2biriiS

The Opinion Pages  |  OP-ED CONTRIBUTOR

# Peter Thiel: The Online Privacy Debate Won't End With Gawker

By PETER THIEL    AUG. 15, 2016

Last month, I spoke at the Republican National Convention in Cleveland because I believe our country is on the wrong track, and we need to solve real problems instead of fighting fake culture wars. I'm glad that an arena full of Republicans stood up to applaud when I said I was proud to be gay, because gay pride shouldn't be a partisan issue. All people deserve respect, and nobody's sexuality should be made a public fixation.

Unfortunately, lurid interest in gay life isn't a thing of the past. Last week, The Daily Beast published an article that effectively outed gay Olympic athletes, treating their sexuality as a curiosity for the sake of internet clicks. The article endangered the lives of gay men from less tolerant countries, and a public outcry led to its swift retraction. While the article never should have been published, the editors' prompt response shows how journalistic norms can improve, if the public demands it.

As an internet entrepreneur myself, I feel partly responsible for a world in which private information can be instantly broadcast to the whole planet. I also know what it feels like to have one's own privacy violated. In 2007, I was outed by the online gossip blog Gawker. It wasn't so many years ago, but it was a different time: Gay men had to navigate a world that wasn't always welcoming, and often faced difficult

choices about how to live safely and with dignity. In my case, Gawker decided to make those choices for me. I had begun coming out to people I knew, and I planned to continue on my own terms. Instead, Gawker violated my privacy and cashed in on it.

It didn't feel good, but I knew it could have been much worse. What I experienced would be minor in comparison with the cruelties that could be inflicted by someone willing to exploit the internet without moral limits.

As the competition for attention was rewarding ever more exploitation, Gawker was leading the way. The site routinely published thinly sourced, nasty articles that attacked and mocked people. Most of the victims didn't fight back; Gawker could unleash both negative stories and well-funded lawyers. Since cruelty and recklessness were intrinsic parts of Gawker's business model, it seemed only a matter of time before they would try to pretend that journalism justified the very worst.

Sure enough, in October 2012 Gawker did something beyond the pale: They published a sex tape without the consent of the people in the video. Unfortunately for Gawker, they had targeted someone who was determined to fight back. Terry Bollea is better known as the wrestler Hulk Hogan, a fact that Gawker claimed justified public access to his private life. Mr. Bollea disagreed. At first he simply requested that Gawker take down the video. But Gawker refused. It was getting millions of page views, and that was making money.

Four years later, the financial calculus has changed. Gawker Media Group has put itself up for sale (bids are due Monday afternoon) in part to satisfy the legal judgment of a unanimous jury that ruled against Gawker and assessed damages of $140 million, proving that there are consequences for violating privacy. Mr. Bollea could not have secured justice without a fight, and he displayed great perseverance. For my part, I am proud to have contributed financial support to his case. I will support him until his final victory — Gawker said it intends to appeal — and I would gladly support someone else in the same position.

A year before the Bollea decision, Gawker retracted an article that outed the chief financial officer of Condé Nast. Gawker made the right decision by backing

down, but I doubt the company would have done so without the pressure of Mr. Bollea's continuing defense of his own rights. Nick Denton, Gawker's founder and chief executive, used the occasion to defend the site's coverage of Mr. Bollea, but he also wrote that it's not enough for a story "simply to be true." He was right about that: A story that violates privacy and serves no public interest should never be published.

The defense of privacy in the digital age is an ongoing cause. As for Gawker, whatever good work it did will continue in the future, and suggesting otherwise would be an insult to its writers and to readers. It is ridiculous to claim that journalism requires indiscriminate access to private people's sex lives.

A free press is vital for public debate. Since sensitive information can sometimes be publicly relevant, exercising judgment is always part of the journalist's profession. It's not for me to draw the line, but journalists should condemn those who willfully cross it. The press is too important to let its role be undermined by those who would search for clicks at the cost of the profession's reputation.

The United States House of Representatives is considering the Intimate Privacy Protection Act, a bipartisan bill that would make it illegal to distribute explicit private images, sometimes called revenge porn, without the consent of the people involved. Nicknamed the Gawker Bill, it would also provide criminal consequences for third parties who sought to profit from such material.

This is a step in the right direction. Protecting individual dignity online is a long-term project, and it will require many delicate judgments. We can begin on solid ground by acknowledging that it is wrong to expose people's most intimate moments for no good reason. That is the kind of clear moral line that Gawker and publishers like it have sought to blur. But they can't do it if we don't let them.

Peter Thiel is a Silicon Valley entrepreneur and investor.

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTOpinion), and sign up for the Opinion Today newsletter.*

A version of this op-ed appears in print on August 16, 2016, on page A21 of the New York edition with the headline: Privacy Issues Won't End With Gawker.

© 2016 The New York Times Company

# Exhibit I

**Subject:**    FW: Demand Letters to Univision
**Attachments:**   Demand Letter to H. Dietrick and R. Goldberg.PDF; ATT00001.htm; CH - Demand Letter
         to Univision (International Sherick, Superstar Machine).PDF; ATT00002.htm; CH -
         Demand Letter to Univision (Pregame, RJ Bell).PDF; ATT00003.htm; CH - Demand Letter
         to Univision (Arya Toufanian).PDF; ATT00004.htm; CH - Demand Letter to Univision
         (Heli Soto).PDF; ATT00005.htm

**From:** "Heather Dietrick" <heather@gawker.com>
**To:** "Martin, D. Ross" <Ross.Martin@ropesgray.com>
**Cc:** "Galardi, Gregg" <Gregg.Galardi@ropesgray.com>, "Gill, Jonathan"
<Jonathan.Gill@ropesgray.com>, "Courtenay O'Connor" <courtenay.oconnor@gawker.com>
**Subject: Fwd: FW: Demand Letters to Univision**

See below. ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████

Heather Dietrick
President and General Counsel
Gawker Media LLC
114 Fifth Avenue, 2d Floor
New York, New York 10011
646-747-2265


---------- Forwarded message ----------
From: **Hentoff, Tom** <THentoff@wc.com>
Date: Mon, Aug 22, 2016 at 7:15 PM
Subject: FW: Demand Letters to Univision
To: Heather Dietrick <heather@gawker.com>, "courtenay.oconnor@gawker.com"
<courtenay.oconnor@gawker.com>
Cc: "Eric N. Lieberman" <eric.lieberman@fusion.net>, Rick Altabef <rickaltabef@gmail.com>,
Jay Grant <JGrant@univision.net>

Hi Heather and Courtenay,


I hope you're doing well.  Univision received today the attached demand letters
sent from Charles Harder's office.


Are you all available tomorrow for a call to have an initial discussion regarding the
letters?  I've copied on this email Eric Lieberman and Rick Altabef, lawyers at
Fusion and Univision, who will participate in the call.


Thanks,


Tom


**Thomas G. Hentoff**

**Williams & Connolly LLP**

725 Twelfth Street, N.W. Washington, DC 20005

202-569-8441 (Direct & Mobile) | 202-824-4190 (Fax)

thentoff@wc.com | www.wc.com/thentoff

**From:** Vivian Winn [mailto:vwinn@hmafirm.com]
**Sent:** Monday, August 22, 2016 10:16 AM
**To:** Gilhuly, Peter (LA)
**Cc:** Charles Harder; Seema Tilak
**Subject:** Demand Letters to Univision

Dear Mr. Gilhuly:

Please see attached for today's correspondence.



**Vivian Winn**

**Legal Assistant**

132 S. RODEO DRIVE, FOURTH FLOOR

BEVERLY HILLS, CA 90212

DIRECT: (424) 203-1613
FAX: (424) 203-1601

VWINN@HMAFIRM.COM

www.HMAFIRM.COM

**Confidentiality Notice:** The information contained in this email and any attachment(s) to it is intended only for the use of the intended recipient and may be confidential and/or privileged.  If any recipient of this communication is not the intended recipient, the unauthorized use, disclosure or copying of this email and any accompanying attachment(s) or other information contained herein is strictly prohibited, and may be

unlawful.  If you have received this communication in error, please immediately notify the sender by return email, destroy this email, and any and all copies thereof (including any attachment(s)) without reading them or saving them in any manner.  Thank you.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---

---

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

Latham & Watkins LLP

---

---

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.



132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 · WWW.HMAFIRM.COM

August 22, 2016

**CONFIDENTIAL COMMUNICATION**

<u>**VIA E-MAIL AND CERTIFIED U.S. MAIL**</u>
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

Re:    <u>**Heli Soto – Demand for Removal**</u>

Dear Mr. Gilhuly:

We write on behalf of Heli Soto in connection with a libelous story published on Deadspin.com on August 6, 2014 at http://deadspin.com/ex-espn-employee-my-boss-kept-sexually-provocative-p-1617052468, and bearing the headline, "Ex-ESPN Employee: My Boss Kept 'Sexually Provocative' Pictures Of Me" (the "Story"). We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media (collectively, "Univision") recently agreed to purchase all or substantially all of the assets of Gawker Media LLC, including Deadspin.com. As the new owner of Deadspin.com, Univision will be subject to liability for the Story if it remains on Deadspin.com after the transaction closes.

Accordingly, we hereby demand that Univision immediately and permanently remove the Story from Deadspin.com or, in the alternative, immediately and permanently remove the following statements in the Story, which are false and defamatory:

1. Soto "Kept 'Sexually Provocative' Pictures Of [Heather Paskewich]"

2. Soto "distorted photos of [Paskewich] to make them 'sexually provocative' and posted them online, and later retaliated at work after she rebuffed his advances."

3. "…in 2009, Paskewich accepted a position as a senior coordinator in the International On-Air Marketing Department. This meant she reported to three people, including Soto, who still had the photos."

4. "…Soto started asking to meet with her outside of work, but…the meetings made Paskewich uncomfortable because Soto would 'steer the conversation to off work topics, and discuss beliefs about monogamy and marriage.'"

{00070987;1}

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: Heli Soto
Page 2

5. "Before Paskewich took a medical leave for foot surgery in 2012, …Soto 'insisted' they go out again, and he tried to kiss her when he said goodnight."

6. "While [Paskewich] was on leave, …Soto would text her about meeting up for dinner or going over to her house."

7. "…when she returned to work, Paskewich learned that Soto had taken up with Sandra Pantoja, another employee under him, even though both were married to other people."

8. "Upon her return to work, Paskewich…found herself 'subjected to hostile and retaliatory treatment' by Soto..."

9. "…Soto told [Paskewich] 'people didn't like her' and said she was being put on a performance improvement plan."

In reality, Soto never took or kept sexually provocative photos of Paskewich, nor did he distort photos of Paskewich to make them sexually provocative or post them online.  Further, Soto never made any advances whatsoever toward Paskewich, never asked her to meet outside of work, never attempted to kiss her, never texted her about meeting up for dinner or going to her house and never contacted Paskewich while she was on medical leave.  Further, Soto never had any romantic relationship with Sandra Pantoja, a very well respected employee who was happily married to another ESPN employee.  Finally, Soto never subjected Paskewich to hostile or retaliatory treatment in any manner.  All decisions regarding Paskewich's employment at ESPN were handled by the Human Resources Department, not Soto, per company policies and procedures.

In sum, Paskewich's allegations were completely fabricated and meritless.  ESPN conducted an internal investigation and concluded that there was no factual basis whatsoever for the allegations.  Soto also has learned that Paskewich has a history of making false accusations and filing lawsuits based thereon.  Nonetheless, publication of the Story has caused, and continues to cause, severe damage to Soto and his family.

Univision is now on notice of the true facts.  Thus, the continued publication of the Story by Univision would be with actual malice and give rise to claims for, among other things, libel, false light invasion of privacy and intentional infliction of emotional distress. *Bank of Oregon v. Indep. News, Inc.*, 298 Or. 434, 437 (1985).  Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be, and is being, complied with.

This letter is not intended, and should not be construed, as a complete expression of my client's factual or legal positions with respect to this matter.  Nothing contained in or omitted from this letter is intended, and should not be construed, as a waiver, relinquishment, release or

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: Heli Soto
Page 3


other limitation upon any legal or equitable claims, causes of action, rights and/or remedies
available to Mr. Soto, all of which are hereby expressly reserved.

We look forward to your immediate response to this letter.


Very truly yours,


CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

# Exhibit J



132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 • WWW.HMAFIRM.COM

August 22, 2016

**CONFIDENTIAL COMMUNICATION**

**VIA E-MAIL AND CERTIFIED U.S. MAIL**
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

      Re:     **International Sherick, Superstar Machine – Demand for Removal**

Dear Mr. Gilhuly:

      We write on behalf of International Sherick, LLC, which runs a personal improvement program called "Superstar Machine" (collectively, "Superstar") in connection with a libelous story published by Jezebel.com on or about May 10, 2016 at http://jezebel.com/inside-superstar-machine-which-ex-members-say-is-a-cul-1775494367 bearing the headline, "Inside Superstar Machine, Which Ex-Members Say Is a Cult Preying on New York's Creative Women" (the "Story").

      We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media Group ("you") recently agreed to purchase substantially all of the assets of Gawker Media LLC, including Jezebel.com.  As the new owner of Jezebel.com, you will be subject to liability for the Story if it remains on Jezebel.com after the transaction closes.

      Accordingly, Superstar hereby demands that you immediately and permanently remove the Story from Jezebel.com or, in the alternative, immediately and permanently remove the following statements in the Story, which are false and defamatory:

1. The headline: "Inside Superstar Machine, Which Ex-Members Say Is a Cult Preying on New York's Creative Women."

2. "A lot of the women were aspiring actresses or involved in other creative fields, where the difference between personal and professional lives can be thin."

3. "Many of the women involved in Superstar Machine are aspiring actresses, or else deeply involved in New York's yoga and wellness communities."

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: International Sherick, Superstar Machine
Page 2

4. "One by one, between 2011 and 2015, each of them were invited by a new female friend to join an exciting, secretive group, one that would promise to fix their relationships with men, draw rivers of money their way, and reveal the Divine's plan for their lives."

5. "Around 2009, a man then known both personally and professionally as Greg Scherick was living in Cotati, California, in a house he referred to as The Barn."

6. "Every month, Sherick traveled to New York."

7. "…Sherick would also stress that the women couldn't do anything without his help."

8. "But men were never allowed into The Process, which evolved into being called Starmaker Machine and then Superstar Machine."

9. "The path for these women is twofold: tapping into the Divine's plan for their lives, and learning to be subservient to their male romantic partners."

10. "Despite all the bubbly positivity, Scherick and his helpers didn't brook any dissent in the ranks.'"

11. "…there weren't a lot of gay members in [Superstar]."

12. "'Dating women doesn't support what [Superstar does] because they're all about serving the masculine,'" [Poppy] says. 'Even when very out women had come to [Superstar] with friends, they were never invited to really sign up.'"

13. "Scherick didn't respond to two emails, a phone call, and a Facebook message requesting comment from Jezebel."

14. "She promised to call again soon. She didn't."

15. International "convinces" members they are "having problems because there's something wrong with [them], or that [they]'re not doing."

16. "Lower-level members of [Superstar] are referred to as the 'audience,' and sit at events without speaking. Occasionally, they're pulled onstage, where Scherick looks at them deeply and zeroes in on what he sees as their core issues."

17. Any statement to the effect that Superstar "originated" from "The Process."

18. An individual "was invited to talk during a Hot School call and describe her current romantic situation."

19. "But she didn't stick to the expected script and Scherick seemed irritated."

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: International Sherick, Superstar Machine
Page 3

20. "Scherick disapproved of . . . casual sex with a couple people."

21. International "has strict rules about how soon you should be having sex with someone you're dating" and that he believes "a woman's reasons for having sex is to get a relationship and a man's is to get more sex."

22. Superstar "pressures" its members for credit card information.

23. "If you properly relate to the masculine, all your problems will be solved."

24. Members lose their group status if they "fail to recruit new members."

25. The fact that "afterparties were 'entirely sex-based.'"

26. "Scherick had specific ideas about what type of sex was best."

27. "Having anal sex was a marker of being a true, fierce powerful woman. The length of your orgasms were also markers of how intense your feminine power was."

28. "We had phone calls having to share how long our orgasms were, the positions we masturbated in."

29. International told women "'to do stuff like get down on the floor,' or instructed them to go home and 'stick fingers up their asses, or stick, like, a carrot up your ass.'"

30. "[U]nder International's guidance, [a woman] 'recovered' a memory of having been sexually abused by a family member."

31. "Besides mandatory meetings and phone calls each week, which the former members say ate up much of their time, they were also expected to post lengthy missives on a group message board, praising 'The Machine' for its positive impacts on their lives."

32. "The posts are read by Shana Kuhn-Siegel or another top administrator named Lisa Paris before they go up, the women say, and if they're not sufficiently adulatory, they are edited and the women are scolded."

33. "…there's punishment for falling out of line."

34. "Members might also be made to stay home from the events . . . or be allowed to attend but forbidden from speaking."

35. International stresses that women should "becom[e] submissive to men."

36. "…it's a fact that [Superstar] members are subject to an exceedingly strict set of behavioral rules regarding communication, including restrictions on when they're allowed to talk to other members of the group."

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: International Sherick, Superstar Machine
Page 4

37. "Members have to get permission to call or text each other . . . from Shana . . . Members had to get permission to 'connect,' as phone calls or texts were referred to, and then tell Shana what had been discussed."

38. "Members also aren't exactly encouraged to talk to outsiders about [Superstar], unless they seem interested in joining."

39. "…the members are also encouraged to rat each other out for infractions."

40. "If you thought anything somebody said wasn't in line with International's teachings, you were required to go back and tell International about it."

41. That members of Superstar would "get in trouble."

42. A member "was punished by being placed on an 'intense' group phone call with other members, where all of them told her in turn how badly she'd messed up."

43. "…[Superstar] members occasionally attend OA meetings for the purpose of recruiting new people."

44. "Therapy is also not encouraged."

45. Members are "not permitted to talk about anything but The Machine, meaning that women who could have helped each other benefit professionally weren't allowed to do so."

46. Superstar "was financially interested in [its members] feeling helpless."

47. "International's dream is to be rich, have great sex, make movies, come back to Hollywood and own it."

48. International has "compared himself to Jesus."

In reality, Superstar is a life-coaching and personal improvement program, guided by Mr. Sherick.  The program welcomes men and women of any sexual orientation and demographic to participate, and includes male members, as well as homosexual members, contrary to the statements in the Story.  The program does not force its members to do anything, and does not make promises to "fix relationships," increase wealth or solve its members' problems.  There are no set "rules" in Superstar as stated in the Story, nor are "punishments" given to members of the program.  The Story quotes anonymous, disgruntled "sources" who claim they were former members of Superstar.  These "sources" state numerous incorrect "facts" that are relied upon by the Story.  The author of the Story reached out to Superstar's representative Ms. Shana Kuhn-Siegel for comment, but then published the Story before Ms. Siegel had an opportunity to send her comments to the author.  The Story has caused Superstar to become the subject of ridicule.  The Story also has caused Superstar to suffer a significant loss of business, clients and partnerships.

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: International Sherick, Superstar Machine
Page 5

     The continued publication of the Story constitutes, among other claims, libel, false light invasion of privacy and intentional infliction of emotional distress.  Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be, and is being, complied with.

     This letter is not intended, and should not be construed, as a complete expression of my client's factual or legal positions with respect to this matter.  Nothing contained in or omitted from this letter is intended, and should not be construed, as a waiver, relinquishment, release or other limitation upon any legal or equitable claims, causes of action, rights and/or remedies available to Superstar, all of which are hereby expressly reserved.

     We look forward to your immediate response to this letter.

          Very truly yours,

          CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

# Exhibit K



132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 • WWW.HMAFIRM.COM

August 22, 2016

**CONFIDENTIAL COMMUNICATION**

**VIA E-MAIL AND CERTIFIED U.S. MAIL**
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

Re:    **Pregame.com, RJ Bell – Demand for Removal**

Dear Mr. Gilhuly:

This law firm is litigation counsel for Pregame.com ("Pregame") and its majority owner Randall James Busack, professionally known as RJ Bell ("Bell"), in connection with a libelous story published by Deadspin.com on or about June 23, 2016 at http://deadspin.com/how-america-s-favorite-sports-betting-expert-turned-a-s-1782438574 and bearing the headline, "How America's Favorite Sports Betting Expert Turned a Sucker's Game Into An Industry" (the "Story").  On June 27, 2016, Bell and Pregame sent Gawker Media, LLC ("Gawker") a letter demanding a retraction of the Story and an apology.  Gawker failed to comply with this demand. A copy of the demand letter is enclosed.

We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media Group (collectively, "you") recently agreed to purchase substantially all of the assets of Gawker, including Deadspin.com.  As the new owner of Deadspin.com, Bell and Pregame will have causes of action against you if the Story remains on Deadspin.com after the transaction closes.

Accordingly, we hereby demand that you immediately and permanently remove the false and defamatory Story from Deadspin.com.  Your continued publication of the Story constitutes, among other claims, libel, false light invasion of privacy and intentional infliction of emotional distress.  Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be, and is being, complied with.

{00071015;1}

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: Pregame.com, RJ Bell
Page 2

      We look forward to your immediate response to this letter.


      Very truly yours,


      CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

# Exhibit L



132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 • WWW.HMAFIRM.COM

August 22, 2016

**CONFIDENTIAL COMMUNICATION**

**VIA E-MAIL AND CERTIFIED U.S. MAIL**
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

  **Re:**  **Arya Toufanian, I'm Shmacked– Demand for Removal**

Dear Mr. Gilhuly:

  We write on behalf of Arya Toufanian in connection with two libelous stories published by Jezebel.com: the first story was published on or about July 23, 2014 at http://jezebel.com/college-party-mogul-threatens-female-journalist-with-ra-1609706385 bearing the headline "College Party Mogul Threatens Female Journalist With Rape" (the "First Story"), and the second story was published on or about September 23, 2014 at http://jezebel.com/im-shmacked-kicks-its-rape-threat-making-cofounder-to-t-1638240396 bearing the headline "'I'm Shmacked' Kicks Its Rape Threat-Making Cofounder to the Curb" (the "Second Story") (collectively, the "Stories").

  We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media Group ("you") recently agreed to purchase all or substantially all of the assets of Gawker Media LLC, including Jezebel.com. As the new owner of Jezebel.com, you will be subject to liability for the Stories if they remain on Jezebel.com after the transaction closes.

  Accordingly, Mr. Toufanian hereby demands that you immediately and permanently remove the Stories from Jezebel.com or, in the alternative, immediately and permanently remove the following statements in the Stories, which are false and defamatory:

1. In the First Story:

  a. The headline: "College Party Mogul Threatens Female Journalist With Rape."

  b. "Toufanian then changed things up yet a third time, telling Byhoff that he had a point and that yes rape is bad but he didn't mean rape rape he just meant like other rape, the kind it's appropriate to joke-threaten a stranger with."

{00071011;1}

Mr. Peter Gilhuly, Esq.
August 22, 2016
Re: Arya Toufanian
Page 2

    c.    "…he threatened a female Business Insider journalist with rape."

    d.    Mr. Toufanian "encouraged harassment of a female Vice Sports editor."

    e.    "…Toufanian threatened to anally rape her and suggested starting a petition to get her fired."

2.    In the Second Story:

    a.    The headline: "'I'm Shmacked' Kicks Its Rape Threat-Making Cofounder to the Curb."

    b.    "He's been sacked. Or, uh, shmacked."

    c.    "…Toufanian has been removed from his position."

Mr. Toufanian has never threatened anyone with rape, including the female Business Insider Journalist mentioned in the First Story, nor has he ever encouraged harassment.  The statements in the Stories, based on Mr. Toufanian's tweets, were taken completely out of context.  Further, the sequence in which the Twitter posts are presented in the First Story is inaccurate, and Mr. Toufanian has hence been portrayed in a false light by the First Story, with this portrayal continuing into the Second Story.  Finally, Mr. Toufanian was never removed from his position at I'm Shmacked.

The continued publication of the Story constitutes, among other claims, libel, false light invasion of privacy and intentional infliction of emotional distress.  Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be, and is being, complied with.

This letter is confidential and protected by applicable Copyright law, and therefore may not be copied, published, disseminated or used by any person or for any purpose, other than internally at your company and its outside legal representatives for purposes of evaluating the claims herein and complying with the foregoing demands.

We look forward to your immediate response to this letter.

Very truly yours,

CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

# Exhibit M



132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 · WWW.HMAFIRM.COM

September 1, 2016

**CONFIDENTIAL COMMUNICATION**

<u>**VIA E-MAIL AND CERTIFIED U.S. MAIL**</u>
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

  Re:  <u>**Dr. Shiva Ayyadurai – Demand for Removal**</u>

Dear Mr. Gilhuly:

  This law firm is litigation counsel for Dr. Shiva Ayyadurai in connection with two libelous stories published by Gizmodo.com.  The first story was published on or about February 22, 2012 at http://gizmodo.com/5887480/the-inventor-of-email-did-not-invent-email bearing the headline "The Inventor of Email Did Not Invent Email?" and the second story was published on or about March 5, 2012 at http://gizmodo.com/5888702/corruption-lies-and-death-threats-the-crazy-story-of-the-man-who-pretended-to-invent-email bearing the headline "'Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email" (collectively, the "Stories").  On May 10, 2016, Dr. Ayyadurai filed a lawsuit against Gawker Media LLC for libel, intentional interference with prospective economic advantage and intentional infliction of emotional distress.  A copy of the Complaint is enclosed.

  We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media Group ("you") recently agreed to purchase all or substantially all of the assets of Gawker Media LLC, including Gizmodo.com.  As the new owner of Gizmodo.com, you will be subject to liability for the Stories if they remain on Gizmodo.com after the transaction closes.

  Accordingly, we hereby demand that you immediately and permanently remove the false and defamatory Stories from Gizmodo.com.  Your continued publication of the Stories constitutes, among other claims, libel, intentional interference with prospective economic advantage and intentional infliction of emotional distress.  Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be, and is being, complied with.

  This letter is not intended, and should not be construed, as a complete expression of my client's factual or legal positions with respect to this matter.  Nothing contained in or omitted from this letter is intended, and should not be construed, as a waiver, relinquishment, release or

Mr. Peter Gilhuly, Esq.
September 1, 2016
Re: Dr. Shiva Ayyadurai
Page 2

other limitation upon any legal or equitable claims, causes of action, rights and/or remedies
available to my client, all of which are hereby expressly reserved.

      We look forward to your immediate response to this letter.


      Very truly yours,


      CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

# Exhibit N



132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 · WWW.HMAFIRM.COM

September 7, 2016

**CONFIDENTIAL COMMUNICATION**

**VIA E-MAIL AND CERTIFIED U.S. MAIL**
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

  **Re:**  **Lee Hnetinka – Demand for Removal**

Dear Mr. Gilhuly:

  We write on behalf of Lee Hnetinka in connection with two libelous stories published by Gawker.com: the first story was published on or about October 14, 2014 at http://valleywag.gawker.com/delusional-delivery-ceo-was-once-arrested-for-scamming-1645922196 bearing the headline "Delusional Delivery CEO Was Once Arrested For Scamming Teenagers" (the "First Story"), and the second story was published on or about October 17, 2014 at http://valleywag.gawker.com/teenage-party-planner-ceo-now-promising-one-hour-delive-1647758194 bearing the headline "'Teenage Party Planner CEO Now Promising One Hour Delivery of Liquor" (the "Second Story") (collectively, the "Stories").

  We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media Group ("you") recently agreed to purchase all or substantially all of the assets of Gawker Media LLC, including Gawker.com.  As the new owner of Gawker.com, you will be subject to liability for the Stories if they remain on Gawker.com after the transaction closes.

  Accordingly, Mr. Hnetinka hereby demands that you immediately and permanently remove the Stories from Gawker.com or, in the alternative, immediately and permanently remove the following statements in the Stories, which are false and defamatory:

  1. In the First Story:

    a. The headline: "Delusional Delivery CEO Was Once Arrested For Scamming Teenagers."

    b. "In the summer of 2012, Hnetinka co-founded a startup that rented multi-million dollar vacation homes in the Hamptons and turned them into party pads for teenagers."

{00072296;1}

Mr. Peter Gilhuly, Esq.
September 7, 2016
Re: Lee Hnetinka
Page 2

    c.   "A 'deeply concerned' judge ordered him to be jailed for 24 hours after he
provided 'false information' in court."

    d.   "He was also accused to (sic) continuing to host paid parties after he was first
arrested."

    e.   "In addition to allegedly trashing homes and knowingly letting high schoolers
drink, he charged high rents and refused refunds for customers that were quickly
evicted by landlords."

    f.   Mr. Hnetinka rented out "his personal home."

    g.   Security guards received instructions "never to open the door to the police."

    h.   Mr. Hnetinka "had an extensive manual of rules for the kids, ordering them to
'not speak' to police and that they were only allowed to drink liquor that was
'clear.'"

2.   In the Second Story:

    a.   The headline: "Teenage Party Planner CEO Now Promising One Hour Delivery
of Liquor."

    b.   Mr. Hnetinka "was once hit with over 150 misdemeanor charges for planning
booze-filled parties for high schoolers."

In reality, Mr. Hnetinka had a business that rented vacation homes to adults.  He never
rented homes to teenagers.  Mr. Hnetinka has never "hosted parties" for teenagers, nor has he
ever encouraged teenagers to drink alcohol or engage in any other illegal activity at the rental
homes.  Security guards were hired for certain events, including graduation parties, by
individuals renting the homes.  Mr. Hnetinka has never given any instructions to the security
guards whatsoever, much less an instruction "never to open the door to the police."

   The continued publication of the Stories constitutes, among other claims, libel, false light
invasion of privacy and intentional infliction of emotional distress.  Please confirm in writing
**within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be,
and is being, complied with.

This letter is confidential and protected by applicable Copyright law, and therefore may
not be copied, published, disseminated or used by any person or for any purpose, other than
internally at your company and its outside legal representatives for purposes of evaluating the
claims herein and complying with the foregoing demands.

Mr. Peter Gilhuly, Esq.
September 7, 2016
Re: Lee Hnetinka
Page 3

　　　　We look forward to your immediate response to this letter.


　　　　　　　　　　Very truly yours,


　　　　　　　　　　CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**

# Exhibit O



**HARDER MIRELL & ABRAMS LLP**

132 S. RODEO DRIVE, FOURTH FLOOR
BEVERLY HILLS, CA 90212
424.203.1600 • WWW.HMAFIRM.COM

September 7, 2016

**CONFIDENTIAL COMMUNICATION**

<u>**VIA E-MAIL AND CERTIFIED U.S. MAIL**</u>
Mr. Peter Gilhuly, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
peter.gilhuly@lw.com

Re:    <u>**Ivari International, Edward Ivari – Demand for Removal**</u>

Dear Mr. Gilhuly:

This law firm is litigation counsel for Ivari International and Edward Ivari (collectively, "Ivari") in connection with a libelous story published by Gawker.com on or about May 24, 2016 at http://gawker.com/is-donald-trump-s-hair-a-60-000-weave-a-gawker-invest-1777581357 and bearing the headline, "Is Donald Trump's Hair a $60,000 Weave?  A Gawker Investigation" (the "Story").  On June 9, 2016, Ivari sent Gawker Media, LLC ("Gawker") a letter demanding a retraction of the Story and an apology.  Gawker failed to comply with this demand.  A copy of the demand letter is enclosed.

We understand that UniModa LLC, Univision Holdings, Inc. and/or Fusion Media Group (collectively, "you") recently agreed to purchase substantially all of the assets of Gawker, including Gawker.com.  As the new owner of Gawker.com, Ivari will have causes of action against you if the Story remains on Gawker.com after the transaction closes.

Accordingly, we hereby demand that you immediately and permanently remove the false and defamatory Story from Gawker.com.  Your continued publication of the Story constitutes, among other claims, libel, false light invasion of privacy and intentional infliction of emotional distress.  Please confirm in writing **within forty-eight (48) hours** of your receipt of this letter that the foregoing demand will be, and is being, complied with.

This letter is confidential and protected by applicable Copyright law, and therefore may not be copied, published, disseminated or used by any person or for any purpose, other than internally at your company and its outside legal representatives for purposes of evaluating the claims herein and complying with the foregoing demands.

{00071015;1}

Mr. Peter Gilhuly, Esq.
September 7, 2016
Re: Ivari International, Edward Ivari
Page 2


We look forward to your immediate response to this letter.


Very truly yours,


CHARLES J. HARDER Of
**HARDER MIRELL & ABRAMS LLP**