**Hearing Date and Time: TBD**
**Response Date and Time: TBD**

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

----------------------------------------------------- x

**OBJECTION OF DEBTOR GAWKER MEDIA LLC TO**
**PROOF OF CLAIM FILED BY SHIVA AYYADURAI,**
**AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C),**
**<u>PURSUANT TO BANKRUPTCY RULES 9014 AND 7012</u>**

Pursuant to section 502(b)(1) of the Bankruptcy Code and Bankruptcy Rule 3007(d),

Gawker Media LLC ("<u>Gawker Media</u>") as debtor and debtor in possession (the "<u>Debtor</u>") in the

above-captioned cases (the "<u>Bankruptcy Cases</u>"), hereby submits this objection (the "<u>Objection</u>")

to claim No. 268 filed by Shiva Ayyadurai (the "<u>Ayyadurai Claim</u>"), a true and correct copy of

---

[1] Gawker Media Group, Inc. ("<u>GMGI</u>"), and Gawker Hungary Kft. ("<u>Gawker Hungary</u>") are also debtors and debtors in possession in these cases, and together with Gawker Media LLC (as debtor and debtor in possession) are refereed to herein as the "<u>Debtors</u>." The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

which is attached hereto as **Exhibit 2**.  In support of this Objection, Gawker Media respectfully represents and sets forth as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Objection is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are section 502(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      As an initial matter, Gawker Media is proceeding to obtain a ruling in the District Court on a motion to dismiss.  Gawker Media filed a motion to dismiss on October 10, 2016.  The objection is due November 28, 2016.    Gawker Media has offered to modify the stay to permit that objection to be filed, although counsel to Dr. Ayyadurai has not yet provided a signed stipulation regarding such modification.

3.      Should it become necessary or appropriate, this Court can fully adjudicate disallowance of the Ayyadurai Claim, which asserts causes of action for defamation and related torts, because it is not a personal injury tort claim within the meaning of 28 U.S.C. 157(b).  Core proceedings include allowance or disallowance of claims against the estate, except "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution."    28 U.S.C. § 157(b)(2)(B)    The Bankruptcy Code does not define what constitutes a "personal injury tort claim," and therefore court decisions have delineated the scope of that term.

4.      Although courts in this District have taken two different approaches on this question, the Ayyadurai Claim does not fall within the definition of "personal injury claim" regardless of which authority is followed.  At least three decisions in this District have adopted a so-called "narrow view," limiting personal injury tort claims to those that involve a "trauma or bodily injury."  *Vinci v. Town of Carmel (In re Vinci)*, 108 B.R. 439, 442 (Bankr. S.D.N.Y. 1989) (Schwartzberg, J.) (a tort without trauma or bodily injury is not within the statutory exception for a personal injury tort); *Perino v. Cohen (In re Cohen)*, 107 B.R. 453 (S.D.N.Y. 1989) (Brieant, J.) (same); *Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey)*, 194 B.R. 728, 734 (S.D.N.Y. 1995) (Keenan, J.) (adopting narrow view to find that legal  malpractice does not constitute a personal injury claim).

5.      More recently, Judge Glenn adopted a so-called "hybrid approach" to decide this issue with respect to proofs of claim for intentional infliction of emotional distress.   He conducted a "searching analysis" into the specifics of each claim that asserts "the invasion of personal rights" for "earmarks of a financial, business or property tort claim, or a contract."  *In re Residential Capital, LLC*, 536 B.R. 566, 572, 575 (Bankr. S.D.N.Y. 2015) ("*ResCap*").  The *ResCap* court concluded that it had core jurisdiction to hear and determine the disallowance of proofs of claim asserting intentional infliction of emotional distress arising from the servicing of home mortgages.  *Id.* at 575.

6.      The Ayyadurai Claim does not qualify as a personal injury tort claim under either (a) the *Vinci/Cohen/Finley-Kumble* line of decisions or (b) the *ResCap* approach.  The Ayyadurai Claim (which incorporates the complaint filed in Ayyadurai's defamation action (the "Complaint," a true and correct copy of which attached hereto as **Exhibit 3**)) alleges against Gawker Media three causes of action: defamation, intentional interference with prospective

economic advantage, and intentional infliction of emotional distress.  None of the causes of

action asserted by Ayyadurai involves "trauma or bodily injury."  *E.g.*, *Vinci*, 108 B.R. at 442.

7.    The Ayyadurai Claim also bears the "earmarks of a financial, business or property

tort claims, or a contract claim" and is therefore not a personal injury tort claim.  *ResCap*, 536

B.R. at 572.   The underlying Complaint admits that the supposedly defamatory statements

"attribute conduct, characteristics and conditions incompatible with the proper exercise of [his]

*business and duties as an inventor, scientist and entrepreneur*."  Compl. ¶ 75 (emphasis added).

The specific damages Dr. Ayyadurai asserts are each related to his reputation in the marketplace

of financial, business and inventing activity.  Compl. ¶ 62 (noting a decrease in the number of

people that "would have otherwise hired or partnered with him,"), ¶ 60 (asserting that "Dr.

Ayyadurai's career was severely damaged"), ¶ 60 (asserting lost teaching positions, speaking

engagements, new contracts and renewals, and opportunities for investment in his emerging

companies).  *In re Finley Kumble*, 194 B.R. at 734   (humiliation and lost reputation resulting

from a business tort do not constitute a personal injury tort).

8.    The rulings of numerous other courts support a conclusion that defamation is not

a personal injury tort claim when asserted as a proof of claim in bankruptcy.  *Massey Energy Co.*

*v. W. Va. Consumers for Justice,* 351 B.R. 348, 351 (E.D. Va. 2006) (defamation and business

conspiracy are not personal injury tort claims); *Mitan v. Davis (In re Davis)*, 334 B.R. 874, 878

n.2 (Bankr. W.D. Ky. 2005) (core jurisdiction over objection to proof of claim based on alleged

defamation contained on website), *aff'd in part, rev'd in part on other grounds sub nom Davis v.*

*Mitan (In re Davis)*, 347 B.R. 607 (W.D. Ky. 2006).[2]

---

[2] The Supreme Court of the United States has considered, but declined to decide (on waiver
grounds), whether a defamation claim is a personal injury tort claim under section 157(b)(2).
*Stern v. Marshall*, 564 U.S. 462, 479 (2011).

9.      The same is true for the "intentional infliction" genre of torts that the Ayyadurai Claim alleges against Gawker Media.  A claim for emotional distress damages not arising out of physical injury is not a "personal injury tort claim."  *ResCap*, 536 B.R. at 576; *see In re Atron Inc.*, 172 B.R. 541 (Bankr. W.D. Mich. 1994) (civil rights complaint alleging damages for mental and emotional distress does not qualify); *In re Interco, Inc.*, 135 B.R. 359 (Bankr. E.D. Mo. 1991) (age discrimination complaint alleging emotional distress does not qualify).  Further, on its face Dr. Ayyadurai's third cause of action, for intentional interference with economic advantage, is not a personal injury tort claim.

10.     In any event, Section 157(b)(2) does not make all determinations regarding disallowance of personal injury tort claims into non-core proceedings.  A bankruptcy court can "summarily dispose of claims which have no basis in law."  *See In re Chateaugay Corp.*, 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990), *aff'd*, *sub nom. LTV Corp. v. Valley Fid. Bank & Tr. Co. (In re Chateaugay Corp.)* 130 B.R. 403 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 961 F.2d 378 (2d Cir. 1992), and aff'd, 146 B.R. 339 (S.D.N.Y. 1992).  This reflects that only "liquidation" and "estimation for purposes of distribution" are non-core, requiring a district court to enter final orders.  Section 101(5) of the Bankruptcy Code indicates that "claims" fall into different categories, and the statutory language of Section 157(b)(2) is clear that only determination of the "liquidated-unliquidated" distinction is non-core.[3]  Thus a bankruptcy court can determine, as a core proceeding, the issue of whether the claim is "disputed-undisputed," in the language of section 101(5) of the Bankruptcy Code.  Of course, if the claim objection cannot be resolved as a matter of law at the outset or on summary judgment, a creditor asserting a personal injury tort claim has a right to a trial (if a trial is necessary) in the district court.  But this is under the

---

[3] Obviously if instead there is to be an estimation of a personal injury tort claim under section 502(c) of the Bankruptcy Code, that necessarily incorporates both a determination of the amount of the claim ("liquidation") and the probability of there being liability ("disputed" claims).

separate <u>venue</u> provision of Section 157(b)(5). *See Stern*, 564 U.S. at 479 (section 157(b)(5) concerns mere venue, is not jurisdictional, and therefore can be waived). Thus, "a finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim." *Chateaugay,* 111 B.R. at 76-77.

11.     Finally, to the extent that this Court concludes that any portion of dispositive pre-trial rulings or the objection to any particular cause of action is a non-core proceeding, this Court must conduct those pretrial proceedings in the first instance. Dr. Ayyadurai volunteered to be a member of the Creditors' Committee; he might consent (whether expressly or impliedly) to this Court's entry of final orders regarding his claim. Section 157(c)(2). Even if he does not consent, pursuant to Section 157(c)(1) this Court must hear the proceeding and submit proposed findings of fact and conclusions of law to the district court. *See Exec. Benefits Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2174-75 (2014) (construing statute to apply Section 157(c)(1) to any proceeding for which the bankruptcy court cannot enter final orders).

## RELIEF REQUESTED

12.     By this Objection, Gawker Media requests entry of an order (the "<u>Proposed Order</u>"), substantially in the form attached hereto as **Exhibit 1**, disallowing Proof of Claim No. 268 because Gawker Media has no liability on account of such claim under applicable nonbankruptcy law.

13.     Gawker Media also requests that Fed. R. Civ. P. 12(b)(6) and 12(c) be made applicable to this contested matter, pursuant to Bankruptcy Rule 9014.

## BACKGROUND

14.     The Ayyadurai Claim asserts, solely against Gawker Media and not the other Debtors, a single proof of claim for not less than $35,000,000. The Ayyadurai Claim is based

entirely on allegations he has already brought in a complaint filed on May 10, 2016 (the

"Complaint"), in the United States District Court for the District of Massachusetts (the

"Massachusetts Federal District Court"), No. 16-cv-10853-NMG (the "Ayyadurai District Court

Action") arising under Massachusetts law.  The Complaint named Gawker Media, Nicholas

Denton, Sam Biddle, John Cook and "DOES 1-20" as defendants.  The Complaint (and therefore

the Ayyadurai Claim) asserts against Gawker Media causes of action for libel, intentional

interference with prospective economic advantage, and intentional infliction of emotional

distress.  The Complaint asserted the same against Mr. Biddle, the author of certain articles

described below.  The Complaint asserted against Messrs. Denton and Cook causes of action for

negligent hiring and retention (of Mr. Biddle); those are not asserted against Gawker Media.

15.    The commencement of Gawker Media's Chapter 11 case stayed the Ayyadurai

District Court Action, solely as to Gawker Media, before any motion to dismiss or responsive

pleading was due.  This Court entered a stay of such action against individual defendants until

September 3, 2016.  In addition, Mr. Denton's commencement of his own Chapter 11 case

stayed the Ayyadurai District Court Action as to him.

16.    Gawker Media, together with Messrs. Biddle and Cook, moved for an extension

of the time to respond to the Complaint, until October 10, 2016.  The Massachusetts Federal

District Court granted such extension.  On October 10, 2016, Gawker Media, Mr. Biddle and Mr.

Cook filed a motion to dismiss the Ayyadurai District Court Action.

I.    **Ayyadurai's Complaint Against Gawker Media**

17.    Dr. Ayyadurai asserts that he invented email when he was 14 years old.  He has

made that assertion in many interviews, on his own website and self-authored books.  Compl. ¶¶

1, 5.  Dr. Ayyadurai's suit against Gawker Media arises from events first described by the

*Washington Post* and then further reported in three articles published on Gawker Media websites, two on *Gizmodo.com* and one on *Gawker.com*.

18.     The two *Gizmodo.com* articles reported on the aftermath of the Smithsonian Institution's acquisition of certain documents and materials from Dr. Ayyadurai.   These two articles report in detail (a) that the *Washington Post* published an article regarding the acquisition of papers said (in the *Post*) to "chronicle the invention of email" (Compl. Ex.A), (b) that the *Washington Post* then published a correction, and (c) interviews and other facts regarding the invention and origin of email systems.

19.     On February 22, 2012, *Gizmodo.com* published an article (the "February 2012 *Gizmodo* Article") reporting that the *Washington Post* article had caused a number of individuals to challenge Dr. Ayyadurai's assertion to have invented email.   The February 2012 *Gizomodo* Article quoted, among other sources, the *Washington Post* article and the website of Mr. Ray Tomlinson for its views on Dr. Ayyadurai's claims.   Compl. Ex. A (February 2012 *Gizmodo* Article).   On March 5, 2012, *Gizmodo.com* published a follow-up article (the "March 2012 *Gizmodo* Article", and together with the February 2012 *Gizmodo* Article, the "2012 *Gizmodo* Articles") elaborating on the nature of Dr. Ayyadurai's claims.   Compl. Ex. B.   The March 2012 *Gizmodo* Article quoted Dr. Ayyadurai extensively and noted the clarification and correction issued by the *Washington Post* with regard to what Dr. Ayyadurai had actually invented.

20.     Over two years later, Dr. Ayyadurai married Ms. Fran Drescher, an actress in television and stage productions. *Gawker.com* published a short article on September 8, 2014 (the "2014 *Gawker* Article" and together with the 2012 *Gizmodo* Articles, the "Gawker Media Articles") suggesting that if Fran Drescher had been a daily reader of *Gizmodo.com* she would

not have "made the mistake" of marrying Dr. Ayyadurai.  Compl. Ex. C.  The 2014 *Gawker*

Article contains an internet hyperlink to the March 2012 *Gizmodo* Article.  Compl. ¶ 61.

21.    On September 28, 2016, Dr. Ayyadurai, through counsel, filed a proof of claim

against Gawker Media in an unliquidated amount of not less than $35,000,000.  As supporting

documentation, Dr. Ayyadurai attached the Complaint.

### APPLYING BANKRUPTCY RULE 7012 TO THIS PROCEEDING

22.    Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim is disallowed to the

extent that it is unenforceable against the debtor and property of the debtor, under any agreement

or applicable nonbankruptcy law.  *E.g., Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec.

Co.*, 549 U.S. 443, 452 (2007).  The Ayyadurai Claim is disallowable as a matter of law. *See

supra*, ¶ 9.

23.    A proof of claim has *prima facie* validity and is "deemed allowed" until an

objection is filed.  To overcome this *prima facie* effect, the objecting party must bring forward

evidence equal in probative force to the evidence underlying the proof of claim.  *In re Oneida,

Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009) (quoting *In re Allegheny Int'l., Inc.*, 954 F.2d 167,

173 (3d Cir. 1992).  The Claimant must then "prove by a preponderance of the evidence that

under applicable law the claim should be allowed." *Id.*; *Helliwell v. George R. Burrows, Inc. (In

re George R. Burrows, Inc.)*, 156 F.2d 640, 641 (2d Cir. 1946) ("[A]s soon as the trustee

introduced any substantial evidence in opposition the claimants needed to establish by a

preponderance of all the evidence that the claims as filed were based on facts which entitled the

claimants to their allowance under the law.  The burden of over-all proof was then on the

claimants.").

24.     This contested matter and resolution of the Ayyadurai Claim (as with several

other claims filed in these bankruptcy cases) will be made more orderly and efficient by applying

certain parts of Rule 7012.  The supporting information for the Ayyadurrai Claim is, in its

entirety, a copy of a civil action complaint filed in a United States District Court.   The

allegations sound in tort, not contractual claims that are typically susceptible to the more

summary, informal procedures of an ordinary claims objection hearing.

25.     Indeed, in many circumstances, bankruptcy courts in this District have analogized

their resolution of proofs of claim based on outside litigation to the ordinary civil litigation

process, without formally invoking and applying Rule 7012. "In determining whether a party has

met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." *In re DJK Residential

LLC*, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009) (sustaining claim objection and disallowing

claim that repeated causes of action in related litigation for failing to satisfy Fed. R. Civ. P. 9

when claimants failed to show that claim was facially plausible); *see also In re Residential

Capital, LLC*, 518 B.R. 720, 726, 731-32 (Bankr. S.D.N.Y. 2014) (disallowing claims, based on

complaint filed pre-petition in state court, that failed to state "a plausible basis for the Debtors'

liability" under federal pleading standards).

26.     In this contested matter, the Court should direct that Federal Rules of Civil

Procedure 12(b)(6) and/or 12(c) (available pursuant to Bankruptcy Rule 7012(b) and 9014(a))

are applicable.  "The court may at any stage in a particular matter direct that one or more of the

other rules in Part VII shall apply."  Fed. R. Bankr. P. 9014.  The Ayyadurai Claim is asserted in

a large amount, potentially subject to appeal, and therefore delineating the precise procedural

posture and basis for ruling in a manner that is common is this type of lawsuit will enhance judicial efficiency both in this Court and on appeal, if any.

27.    Following application of Rule 12(b)(6) and Rule 12(c), this Court will be in a position to resolve this claims objection in either of the two likely paths that litigation will take. If the District Court grants the motion to dismiss, this Court can then formally disallow the proof of claim based on res judicata.  If it becomes necessary or appropriate for this Court to take up the substance of the claim (for example, if it became a central issue preventing progress in these Chapter 11 Cases and for some reason the District Court had not ruled), then this Court can rule on the legal issues presented. This Court could then consider the Complaint (attached to the Ayyadurai Claim), this Objection, any response and any reply papers, either to be briefed on a motion to dismiss or a motion for judgment on the pleadings.

## **OBJECTION**

### I.    Dr. Ayyadurai Has Failed to State a Claim for Defamation, and the Debtor Is Entitled to Judgment on the Pleadings

28.    Among other things, "[i]n determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." *In re DJK Residential*, 416 B.R. at 106; *see also In re Residential Capital*, 518 B.R. at 731.  Accordingly, Dr. Ayyadurai must allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between the possibility and the plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.  The claims in the Complaint all fail to state a claim upon which relief can be granted.

A. <u>Claims Arising from the 2012 *Gizmodo* Articles Are Time-Barred Under the Massachusetts Three-Year Statute of Limitations</u>

29.    To the extent the claims in the Complaint are based on the 2012 *Gizmodo* Articles, such claims are time-barred because those Articles were published more than three years ago. "In Massachusetts, the statute of limitations for defamation or . . . infliction of emotional distress is three years." *Decoulos v. Schroder*, No. 11–10972–DPW, 2013 WL 1795485, *1 (D. Mass. Mar. 26, 2013) (citing 260 Mass. Gen. Laws § 4); *Mourad v. Bos. Globe Newspaper Co.*, 60 Mass. App. Ct. 1106, 2003 WL 22902621, at *1 (Mass. App. Ct. Dec. 9, 2003). The same limitation period also applies to Dr. Ayyadurai's claims for intentional interference with prospective business advantage. 260 Mass. Gen. Laws § 2A ("[A]ctions of tort . . . shall be commenced only within three years next after the cause of action accrues."); s*ee also Lyons v. Gillette*, 882 F. Supp. 2d 217, 235 (D. Mass 2012); *Salois v. Dime Sav. Bank of N.Y., FSB*, 128 F.3d 20, 24 (1st Cir. 1997);

30.    Further, "under Massachusetts law regarding libel and defamation cases . . . the cause of action accrues and the statutory period begins to run on the date of publication. 'The discovery rule does not apply to a public libel printed in a newspaper widely available to the public, including plaintiff.'" *Mourad*, 2003 WL 22902621 at *1 (quoting *Flynn v. Associated Press*, 401 Mass. 776, 781 (Mass. 1988)). This rule also applies when articles, like those at issue here, remain continuously available online long after the date of publication. *See Abate v. Maine Antique Digest*, No. CIV. A. 03-3759, 2004 WL 293903, at *2 (Mass. Super. Jan. 26, 2004) (applying single publication rule to continuously-available internet articles); *see also Graboff v. American Ass'n of Orthopaedic Surgeons*, 559 F. Appx. 191, 195 (3d Cir. 2014).

31.    Dr. Ayyadurai appears to contend that there was a "new publication" in 2014 because the 2014 *Gawker* Article provides a hyperlink to the March 2012 *Gizmodo* Article which

12

in turn links to the February 2012 *Gizmodo* Article. This does not change the result.  Courts around the country have held that including a hyperlink does not constitute a republication of the original article.  *See, e.g., In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) ("[U]nder traditional principles of republication, a mere reference to an article, *regardless how favorable it is* as long as it does not restate the defamatory material, does not republish the material. . . . [T]hough a link and reference may bring readers' attention to the existence of an article, they do not republish the article.") (emphasis added); *Klayman v. City Pages*, 2015 WL 1546173 *12 (M.D. Fla. Apr. 6, 2015) ("[T]he Court researched the issue and could not find any Florida authority for the proposition that providing links to statements already published, without more, republishes those statements."); *Martin v. Daily News L.P.*, 121 A.D.3d 90, 103 (N.Y. App. Div. 1st Dep't 2014) ("[C]ontinuous access to an article posted via hyperlinks to a website is not a republication."); *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) ("[A] reference, without more, is not properly a republication.").

32.    This is the case even where the hyperlink at issue references the underlying content.  *See Doctor's Data, Inc. v. Barrett*, 2016 WL 1086510, at *33 (N.D. Ill. Mar. 21, 2016) (hyperlinks insufficient to constitute republication, despite endorsement of underlying content); *see also In re Phila. Newspapers*, 690 F.3d at 175 (where link allows for easy access to earlier article, it does not amount to the restatement . . . of the allegedly defamatory material in the Articles necessary for republication").  Here, the reference and hyperlink in the 2014 *Gawker* Article, does not republish the March 2012 *Gizmodo* Article.  Instead, the hyperlink simply draws the reader's attention to the earlier article as would a footnote in a book.  Accordingly, it cannot be considered a republication as a matter of law.

33.     Dr. Ayyadurai's argument that the 2014 *Gawker* Article somehow republishes the February 2012 *Gizmodo* Article by linking to the February 2012 *Gizmodo* Article is even more strained.  The 2014 *Gawker* Article does not link to the February 2012 *Gizmodo* Article or mention it at all.  Accordingly, Dr. Ayyadurai's Complaint is time-barred to the extent that it is based on the 2012 *Gizmodo* Articles.

B.  <u>The Complained-of Statements Are Opinion Protected by the First Amendment.</u>

34.     Dr. Ayyadurai's claim based on libel must also be dismissed in its entirety because the complained-of statements are statements of opinion, not fact.  The United States Supreme Court has held that the First Amendment requires that  "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection," so long as such a statement does not "reasonably impl[y] false and defamatory facts."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 546-47 (2d Cir 1999) (affirming dismissal of defamation action where claim based on statements of opinion that did not imply "reasonably specific assertions of fact"); *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 262 (1993); *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015).  "A statement cannot be defamatory if 'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts.'"  *Piccone*, 785 F.3d at 771 (quoting *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000)).

35.     All of the allegedly libelous statements identified in the Complaint constitute opinion.  As to the February 2012 *Gizmodo* Article, the only statement challenged is the phrase "V.A. Shiva Ayyadurai is a fraud."  Compl. ¶ 69. Dr. Ayyadurai attempts to allege that this is a statement of fact, or implied fact, that accuses him of committing a crime.  But as used in the

First Article, "fraud" is a statement of opinion based on fully disclosed facts contained in the

Article.  In context, the allegedly defamatory statement reads:

> V.A. Shiva Ayyadurai is a fraud who has been masquerading for
> years at the pioneering mind behind email.  At least according to a
> bunch of geeks who mobilized from all corners of the digital world
> to try and set the record straight."

Compl. Ex. A.  All of the allegedly libelous statements identified in the Complaint constitute

opinion.  As to the February 2012 *Gizmodo* Article, the only statement challenged is the phrase

"V.A. Shiva Ayyadurai is a fraud."  Compl. ¶ 69. Dr. Ayyadurai attempts to allege that this is a

statement of fact, or implied fact, that accuses him of committing a crime.  This statement does

not reference criminality at all.  This passage of the Article immediately signals to the reader that

the Article is going to be about a debate in the technology community that Dr. Ayyadurai is

considered a fraud.

36.      In addition to this, courts hold that an assertion such as "X is a fake" or "Y is a

fraud" is opinion when an article sets forth facts on both sides of an argument, there is no

allegation that there are material missing facts, and the author of an article expresses the

conclusion that there is a "fake" or "fraud."  For example, in *Phantom Touring, Inc. v. Affiliated

Publications*, 953 F.2d 724 (1st Cir. 1992), the court affirmed the dismissal of a defamation

claim stemming from a series of articles in the *Boston Globe* in which the author criticized a

musical-comedy version of "The Phantom of the Opera" that was different from the famous

Broadway show.  The articles at issue said that the plaintiff's production company had been

"thriving off of the confusion created by the two productions" and that the show was "a rip-off, a

fraud, a scandal, a snake-oil job," described it as "fake," and stated that "Hill & Company [is]

trying to score off the success of Andrew Lloyd Weber's 'Phantom.'"  *Id.* at 726, 729.

37.    The *Phantom Touring* court held that these statements were not actionable both because "[n]ot only is this commentary figurative and hyperbolic, but we also can imagine no objective evidence to disprove it" and because the author of the statements implying deceptive marketing "not only discussed all the facts underlying his views but also gave information from which readers might draw contrary conclusions." *Id.* at 729.  Indeed, "because all sides of the issue, as well as the rationale for [the author's] view, were exposed, the assertion of deceit reasonably could be understood only as [the author's] personal conclusion about the information presented, not as a statement of fact." *Id.* at 730.

38.    The facts here mirror those of *Phantom Touring*.  As used in the February 2012 *Gizmodo* Article, the term "fraud" is exactly this type of author's opinion based on fully disclosed facts contained in the article.  Indeed, immediately following the statement about which Dr. Ayyadurai complains, the remainder of the February 2012 *Gizmodo* Article is dedicated entirely to detailing the statements of Dr. Ayyadurai's critics and potential factual support for the critics' statements.  The article (1) details the backstory involving a *Washington Post* article and another article published on *Techdirt* (an online magazine), (2) explains that the debate over Dr. Ayyadurai's assertions centers on the question of whether the copyrighting of a computer program named "EMAIL" is equivalent in stature to creating the technological basis for networked communications and (3) explains the backstory of ARPANET and the messages sent by Mr. Ray Tomlinson.  Significantly, the Ayyadurai Claim and the Complaint do not challenge the validity of *any* of these factual predicates, and nowhere does Dr. Ayyadurai assert (nor could he), that the "fraud" opinion of other internet commentators being relayed by the article is somehow based on some additional facts *not* revealed in the article itself.  As such, the

use of the word "fraud" in the February 2012 *Gizmodo* Article is, without question, constitutionally protected opinion.

39.     The court should also disallow any claim based on the challenged statements in the March 2012 *Gizmodo* Article. Dr. Ayyadurai challenges only the sentences in the March 2012 *Gizmodo* Article that state he engaged in "semantic tricks, falsehoods, and a misinformation campaign," and that Dr. Ayyadurai engaged in "revisionism." Compl. ¶ 70. Even the most cursory review of the March 2012 *Gizmodo* Article reveals that here, as in *Phantom Touring*, the complained of statements are author-opinion based on facts set forth in the March 2012 *Gizmodo* Article itself. The March 2012 *Gizmodo* Article describes a host of undisputed facts. It reports, on the one hand, that (1) Dr. Ayyadurai is responsible for the creation of an "electronic mail system" called "EMAIL," and not the underlying technology allowing for the exchange of messages between computers; (2) Ray Tomlinson sent the "first text letter between two computers on ARPANET in '71—y'know, an *email*"; (3) evidence of use of some specific language in the header of electronic messages (like "to," from" and "cc") exists from as early as 1973; (4) other computer programs that also facilitated the exchange of inter-computer messages existed long before Dr. Ayyadurai's "EMAIL" program was created; (5) a scholarly journal published before Dr. Ayyadurai began work was entitled "EMMS; Electronic Mail and Message Systems" – suggesting an alternate origin of the term "email"; and (6) the email currently in use has evolved significantly from the 1970s while still relying on the basic message exchange conventions introduced before Dr. Ayyadurai created his program. Compl. Ex. B. It also reports, on the other hand, that: (7) Dr. Ayyadurai engages in self-promotion, including through the use of a public relations professional, the ownership of domain names indicating that he invented email, such as *InventorOfEmail.com*, and participation on media

coverage; (8) Mr. Tomlinson and other early computer programmers generally referred to exchanges between computers as "messages" and not "emails" (and thus that Dr. Ayyadurai might deserve credit for coining the term); and (9) Dr. Ayyadurai could have independently arrived at the idea of using terminology in his program that derived from paper-based office communication methods. *Id.* The March 2012 *Gizmodo* Article also quotes Dr. Ayyadurai extensively, noting his assertion that the "messages" exchanged between computers by Mr. Tomlinson on ARPANET were not true "emails," but were instead more similar to "text messaging and morse code," and his belief that he was being attacked by an "elite group of people who think they own innovation." *Id.*

40.     In a lengthy article with all of these facts, there can be no interpretation of the challenged statements (the terms "semantic tricks, falsehoods, and a misinformation campaign" and "revisionism") as anything other than the author's opinion and conclusion regarding those competing facts. The complained of statements are opinion, based on fully-disclosed facts, and not actionable. The Ayyadurai Claim is disallowable to the extent that it rests on the March 2012 *Gizmodo* Article.

41.     Finally, Dr. Ayyadurai challenges several statements in the 2014 *Gawker* Article, namely that he is a "fraud," and that he is also a "renowned liar," a "big fake," and that he engaged in "cyber-lies." Compl. Ex. C. But the statements in the 2014 *Gawker* Article are protected opinion because they are "rhetorical hyperbole." Rhetorical hyperbole is "loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining" an actual fact about Dr. Ayyadurai. *Milkovich,* 497 U.S. at 21; *see also Phantom Touring*, 953 F.2d at 727 (concluding that descriptions of such as "a rip-off, a fraud, a scandal, a snake-oil job," "fake" and "phony" are protected opinions); *Feld v. Conway*, 16 F.

16-11700-smb    Doc 372    Filed 10/21/16    Entered 10/21/16 20:05:59    Main Document
Pg 19 of 102

Supp. 3d 1, 4 (D. Mass. 2014) ("The phrase 'Mara Feld is … [expletive omitted] crazy,' when viewed in that context, cannot reasonably be understood to state actual facts about plaintiff's mental state."); *Greenbelt Coop Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of the word "blackmail" to describe plaintiff's hard-nosed negotiating tactics could not reasonably be as defamatory); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 285-86 (1974) (union publication accusing someone who crosses a picket line of being a "traitor" could not reasonably be understood to accuse the listed individuals of treason).

42.    Indeed, the statements in the 2014 *Gawker* Article are non-actionable opinion for yet another reason.  It is a short, the two-paragraph note of entertainment news regarding the comedic television and stage actress Fran Drescher, reporting on her marriage to Dr. Ayyadurai. In a tone of mock concern, this article alerts her to her husband's past exaggerations regarding the invention of email.  The article's sarcastic marriage advice to an actress, in an entertainment news piece, cannot be considered anything other than opinion.  *Scholz v. Delp*, 473 Mass. 242, 252 (2015) (statements in newspaper entertainment column, regarding state of mind of subject, would be considered opinion by reasonable reader).

C.    Dr. Ayyadurai Has Failed to Allege Actual Malice

43.    A public figure must plead and prove actual malice in order to prevail on a defamation claim.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  Given that Dr. Ayyadurai is a public figure by his own admission, the Complaint does not plead the requisite intent on the part of Gawker Media to sustain a defamation claim.  Dr. Ayyadurai identifies himself as a "world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur" and cites his participation in media and international recognition for his work. Compl. ¶ 1.  He is a "public figure" and commentary about him is subject to special protection by the First

Amendment.  Dr. Ayyadurai therefore bears the burden of proving "actual malice" on the part of the defendant to establish his claim as a matter of constitutional law. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (individuals who, "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention" are "properly classed public figures").

44.    Dr. Ayyadurai must plausibly allege actual malice in order to survive a motion to dismiss.  *Biro v. Conde Nast,* 807 F.3d 541, 546 (2d Cir. 2015) (allegations of actual malice must be plausibly pled to survive a motion to dismiss); *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir. 2012) ("While plaintiff's complaint contains conclusory allegations about 'ill-will' and 'actual malice,' it contains no factual assertions that in any way lend plausibility to these conclusions."); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) ("[T]o access discovery mechanisms, a plaintiff must *first* produce a complaint that passes the plausibility test—a test that helps keep defendants from wasting time and money in discovery on 'largely groundless' claims." (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)) (emphasis in original).  *See also Melville v. Town of Adams*, 9 F. Supp. 3d 77, 86 (D. Mass. 2014) (dismissing defamation claim on motion to dismiss because plaintiff was a public figure and failed to allege facts sufficient to demonstrate actual malice).  That is, he must do more than merely allege "actual malice buzzwords."  *Id*.  Instead, he "must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice."  *Biro*, 807 F.3d at 546 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 556); *Schatz*, 669 F.3d at 58 ("[T]o make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred.).

45.    Dr. Ayyadurai has not alleged any facts to support a plausible inference of malice, nor could be.  The Gawker Media Articles relied almost entirely on named sources (none of whom Dr. Ayyadurai challenges), and quoted Dr. Ayyadurai extensively about his opposing views.  The Articles duly give Dr. Ayyadurai credit for his contribution to the history of computer-based communication—the copyright of the "EMAIL" program, and even suggest he may deserve credit for the "email" name itself.  In short, there is nothing alleged that could give rise to actual malice.  And any alleged patina of actual malice is undermined by the fact that the Gawker Media Articles go out of their way to include Dr. Ayyadurai's contrary opinions of the outlined facts.  *See, e.g., Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) ("[W]here the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice.").  Instead, Dr. Ayyadurai offers only the kind of actual malice buzzwords rejected in *Schatz*, completely unconnected to what he has to show: that Gawker Media knew that each alleged defamatory statement was made with knowledge of its falsity at the time of publication.  *Schatz*, 669 F.3d at 56.  This is clearly insufficient as a matter of law.

## II.    Dr. Ayyadurai Has Failed to State a Claim with Regard to the Tag Along Claims

46.    Dr. Ayyadurai's tag along claims for intentional interference with prospective economic advantage ("IIPEA") and intentional infliction of emotional distress ("IIED") must also be dismissed.  As an initial matter, both are predicated on the same conduct as the failed defamation claim and, as a result, must be dismissed along with it.  *See Piccone*, 785 F.3d at 774 (IIPEA "premised on precisely the same facts as the defamation claim" should be rejected); *Yohe v. Nugent*, 321 F.3d 35, 42 (1st Cir. 2003) (rejecting IIED claim "premised on precisely the same facts as [the] defamation claim").

21

47.     In addition, both fail on their elements.  As to the IIPEA claim, Dr. Ayyadurai has

failed to plausibly allege any improper motive or means, as required.  *Singh v. Blue Cross &*

*Blue Shield of Mass., Inc.*, 182 F. Supp. 2d 164, 178 (D. Mass. 2001); *James L. Miniter Ins.*

*Agency, Inc. v. Ohio Indem. Co.*, 112 F.3d 1240, 1250 (1st Cir. 1997).  In particular, where

"there is no indication that the report was broadcast for any reason other than the reporting on an

issue of public concern," there can be no recovery for IIPEA.  *Dulgarian v. Stone*, 420 Mass.

843, 852 (1995).  Here, there is no such indication.  In addition, Dr. Ayyadurai has also failed to

plead that the Moving Defendants intended to interfere with Dr. Ayyadurai's business.  *See*

*Spencer Cos., Inc. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194 (D. Mass. 1987) ("Interference

which is merely incidental to another purpose and not the intended result of a party's action is

not a sufficient basis for liability in tort.").  Accordingly, there can be no claim.[4]

48.     As to the IIED claim, "[t]he standard for making a claim of [IIED] is very high."

*Polay v. McMahon*, 468 Mass. 379, 385 (2014).  "Liability cannot be predicated on mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities, not even is it enough that

the defendant has acted with an intent which is tortious or even criminal, or that he has intended

to inflict emotional distress, or even that his conduct has been characterized by malice, or a

degree of aggravation which would entitle plaintiff to punitive damages for another tort."  *Id.*

"The conduct at issue must go 'beyond all bounds of decency, and [be] regarded as atrocious,

and utterly intolerable in a civilized community.'"  Here, there is no such outrageous conduct.

Indeed, publication of the Gawker Media Articles cannot as a matter of law amount to IIED.

*See, e.g. Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 123 (1993); *Polay*, 468 Mass. at 386

(dismissing IIED claim based on the filing of false police reports against plaintiffs, verbally

---

[4] Finally, Dr. Ayyadurai has also failed to specifically plead *any* contemplated or future business relationships as required to state a claim.  *See Furlong v. Bos. Med. Ctr.*, No. 14-10389-FDS, 2016 WL 70450, *11 n. 15 (D. Mass. Jan. 6, 2016).

attacking plaintiff, and monitoring and recording plaintiff's home on a continuous basis is not

"sufficiently extreme and outrageous conduct" to state a claim); *Terravecchia v. Fleet Bank*, No.

20043086F, 2007 WL 1056818, at *6 (Mass. Sup. Ct. Mar. 21, 2007) (rejecting IIED claim

based on allegedly false allegations that plaintiff maintained a poor performance record because

such allegations "even if true, do not rise to the level of extreme and outrageous conduct.").

Finally, the Supreme Court has explicitly held that "public figures . . . may not recover for the

tort of intentional infliction of emotional distress by reason of publications . . . without showing

in addition that the publication contains a false statement of fact which was made with 'actual

malice'." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).   As fully demonstrated

above, no plausible assertion of fact regarding actual malice as to *any* of the complained-of

statements has been made here.  Dr. Ayyadurai's IIED claim must therefore be dismissed.

49.     Accordingly, Dr. Ayyadurai simply cannot establish that he is plausibly entitled to

relief from Gawker Media, and his claim should be disallowed in its entirety.

## RESERVATION OF RIGHTS

50.     Neither the filing of this Objection nor entry of the Proposed Order shall affect

any rights of the Debtors, their estates, any estate representative, or any other party in interest in

these Chapter 11 cases to object this or any other claim for any purposes, including, without

limitation, allowance and distribution under a plan, or any rights of the holders of any Claim to

contest any objection.

## NOTICE

51.     Notice of this Objection has been provided to: (i) the Office of the United States

Trustee for the Southern District of New York; (ii) Simpson Thatcher & Bartlett LLP, counsel to

the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (iii) Latham &

Watkins LLP, counsel to US VC Partners LP, as Second Lien Lender; (iv) Anthony M. Vassallo, Esq., counsel to the Claimant; and (v) all parties requesting notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

[*Remainder of this page intentionally left blank*]

WHEREFORE, for the reasons set forth herein, Gawker Media respectfully request that the Court (a) enter the Proposed Order, and (b) grant such other and further relief as may be just and proper.

Dated: October 21, 2016
      New York, New York

/s/ D. Ross Martin
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

## **Exhibit 1**

Proposed Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
                                          :
In re                                     :         Chapter 11
                                          :
Gawker Media LLC, *et al.*,[1]            :         Case No. 16-11700 (SMB)
                                          :
                          Debtors.        :         (Jointly Administered)
                                          :
----------------------------------------------------------x

**ORDER GRANTING DEBTOR GAWKER MEDIA LLC'S OBJECTION TO PROOF OF
CLAIM FILED BY SHIVA AYYADURAI AND MOTION TO APPLY FED. R. CIV. P.
12(b)(6) AND 12(c), PURSUANT TO BANKRUPTCY RULES 7012 AND 9014**

        Upon the objection of Gawker Media LLC ("<u>Gawker Media</u>") and its motion (together,

the "<u>Objection</u>") for the entry of an order (the "<u>Order</u>") (i) disallowing Proof of Claim No. 268

filed by Shiva Ayyadurai (the "<u>Ayyadurai Clam</u>") and (ii) making Federal Rules of Civil

Procedure 12(b)(6) and 12(c) applicable to the Objection pursuant to Bankruptcy Rule 7012 and

9014, as more fully set forth in the Objection; and the Court having found that the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that

venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and the Court having found that the relief requested in the Objection is in the

best interests of Gawker Media's estate, its creditors, and other parties in interest; and the Court

having found that Gawker provided appropriate notice of the Objection and the opportunity for a

hearing on the Objection under the circumstances; and the Court having reviewed the Objection

and having heard the statements in support of the relief requested therein at a hearing before the

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker
Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s
mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd
Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn:
William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.  All capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Objection.

2.      Federal Rules of Civil Procedure 12(b)(6) and 12(c) are applicable to this contested matter pursuant to Bankruptcy Rules 7012 and 9014.

3.      The Ayyadurai Claim is disallowed in its entirety.

4.      Prime Clerk LLC, the Court-appointed claims agent in these Chapter 11 Cases, is hereby authorized and directed to make such revisions to the official claims register as are necessary to reflect the disallowance of the Ayyadurai Claim.

5.      The Debtors are authorized to take all actions necessary to implement this Order.

6.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2016

_____
THE HONORABLE STUART M BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

2

## **Exhibit 2**

Ayyadurai Claim

United States Bankruptcy Court, Southern District of New York

| Please select applicable Debtor (select only one Debtor per claim form): |
| :--- |
| ☒   Gawker Media, LLC (Case No. 16-11700) |
| ☐   Kinja, Kft. (Case No. 16-11718) |
| ☐   Gawker Media Group, Inc. (Case No. 16-11719) |

**Official Form 410**

Debtor Gawker Media, LLC has listed your claim on Schedule E/F, Part 2 as a Contingent, Unliquidated and Disputed General Unsecured claim in an Unknown amount. You must timely file a proof of claim or be forever barred from recovery.

# Proof of Claim

4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| :--- | :--- |

| 1. | **Who is the current creditor?** | Shiva Ayyadurai |
| :--- | :--- | :--- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | **Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes. From whom? _____ |
| :--- | :--- | :--- |

| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Shiva Ayyadurai<br>c/o Anthony M. Vassallo, Esq.<br>Law Office of Anthony M. Vassallo<br>305 Fifth Avenue \| Suite 1B<br>Brooklyn, NY 11215<br><br>Contact phone  917 862-1936<br>Contact email  tony@amvasslaw.com | **Where should payments to the creditor be sent?** (if different)<br><br>Contact phone _____<br>Contact email _____ |
| :--- | :--- | :--- | :--- |

| 4. | **Does this claim amend one already filed?** | ☒ No<br>☐ Yes.  Claim number on court claims registry (if known)_____  Filed on _____ <br>                                                          MM   / DD   / YYYY |
| :--- | :--- | :--- |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes. Who made the earlier filing? _____ |
| :--- | :--- | :--- |

Claim Number: 268

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 35000000.00 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Tort claim for defamation -- see attached complaint

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                    $_____

**Amount of the claim that is secured:**         $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority:** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Shiva Ayyadurai*
Shiva Ayyadurai (Sep 28, 2016)

**Email:** tony@amvasslaw.com

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Shiva | | Ayyadurai |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | _____ |
|---|---|

| Company | c/o Anthony M. Vassallo, Esq. |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 305 Fifth Avenue | Suite 1B | | |
|---|---|---|---|
| | Number        Street | | |
| | Brooklyn | NY | 11215 |
| | City | State | ZIP Code |

| Contact phone | 917 862-1936 | Email tony@amvasslaw.com |
|---|---|---|

Attach Supporting Documentation (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

[x] I have supporting documentation.
    (attach below)

[ ] I do not have supporting documentation.



PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/gawker.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Gawker Media, LLC Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

**Do not file these instructions with your form**

# EXHIBIT A

## Complaint

(Exhibits to Complaint available on request)

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON, MASSACHUSETTS

| | | |
|---|---|---|
| SHIVA AYYADURAI, an individual, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| GAWKER MEDIA, LLC, a Delaware | ) | |
| limited liability company; SAM BIDDLE, an | ) | *DEMAND FOR JURY TRIAL* |
| individual, JOHN COOK, an individual, | ) | |
| NICHOLAS GUIDO ANTHONY DENTON, | ) | |
| an individual, and DOES 1-20, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Dr. Shiva Ayyadurai, by and through his undersigned attorneys, sues Defendants Gawker Media, LLC, Sam Biddle, John Cook, Nicholas Guido Anthony Denton, and DOES 1-20 (collectively, "Defendants"), and respectfully makes the following allegations.

## <u>SUMMARY OF THE CASE</u>

1.      Dr. Ayyadurai is a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur.  In 1978, Dr. Ayyadurai invented email:  the electronic mail system as we know it today.  On November 15, 2011, *TIME* magazine published an article titled "The Man Who Invented Email," which outlines the backstory of email and Dr. Ayyadurai's invention.  In June 2012, *Wired* magazine reported: "Email … the electronic version of the interoffice, inter-organizational mail system, the email we all experience today, was invented in 1978 by [Dr. Ayyadurai] …. The facts are indisputable."  In July 2015, CBS reported on *The Henry Ford*

*Innovation Nation*, hosted by Mo Rocca: "Next time your fingers hit the keyboard to write a quick email, you might want to say, thank you to Shiva Ayyadurai…. he is credited with inventing email …. in the late 1970s."

2.      Dr. Ayyadurai holds four degrees from the Massachusetts Institute of Technology (MIT): a B.S. in Electrical Engineering and Computer Science, an M.S. in Visual Studies, an M.S. in Mechanical Engineering, and a Ph.D. in Biological Engineering.  Dr. Ayyadurai has been recognized internationally for his developments in early social media portals, email management technologies, and contributions to medicine and biology.  He has been a speaker at numerous international forums, where he has discussed email, science and technology, among other topics. Dr. Ayyadurai also operates his own research and education center:  the International Center for Integrative Systems in Cambridge, Massachusetts.

3.      In 2012, Defendants published two false and highly defamatory articles about Dr. Ayyadurai on their website at Gizmodo.com to discredit Dr. Ayyadurai's invention.  The articles falsely trace the origin of email and call Dr. Ayyadurai a liar, a "fraud" and responsible for "a misinformation campaign."  In 2014, Defendants again published a defamatory article about Dr. Ayyadurai, this time on their Gawker.com website, calling Dr. Ayyadurai a "fraud," a "renowned liar," and a "big fake," among other things. These statements are all demonstrably false.

4.      Defendants' false and defamatory statements have caused substantial damage to Dr. Ayyadurai's personal and professional reputation and career.  As a result of Defendants' defamation, Dr. Ayyadurai has been publicly humiliated, lost business contracts and received a slew of criticism relating to Defendants' false accusations and statements.  Defendants' wrongful

{00065926;4}                                              2

acts, which have been repeated, have left Dr. Ayyadurai with no alternative but to file this

lawsuit.  Dr. Ayyadurai seeks an award of no less than $35 million in damages.

## THE PARTIES

5.      Plaintiff is a resident and domiciliary of the Commonwealth of Massachusetts,

County of Middlesex.

6.      Upon information and belief, Gawker Media, LLC ("Gawker") is a Delaware

limited liability company with its principal place of business located in New York City, New

York.

7.      Upon information and belief, defendant Sam Biddle ("Biddle") is an individual,

domiciled in the State of New York.  At all relevant times, Biddle was a senior staff writer at

Gawker.

8.      Upon information and belief, defendant John Cook ("Cook") is an individual,

domiciled in the State of New York.  At relevant times, Cook was an editor and writer at Gawker.

9.      Upon information and belief, defendant Nicholas Guido Anthony Denton aka

"Nick Denton" ("Denton") is an individual, domiciled in the State of New York.  At all relevant

times, Denton was Founder and CEO of Gawker.

10.      Upon information and belief, Defendants, and each of them, were and are the

agents, licensees, employees, partners, joint-venturers, co-conspirators, owners, principals, and

employers of the remaining Defendants and each of them are, and at all times mentioned herein

were, acting within the course and scope of that agency, license, partnership, employment,

conspiracy, ownership, or joint venture.  Upon further information and belief, the acts and

conduct herein alleged of each of the Defendants were known to, authorized by, and/or ratified

by the other Defendants, and each of them.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendants because they have minimum

contacts with the Commonwealth of Massachusetts.

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because

there is complete diversity of the parties to this action and the amount in controversy exceeds

$75,000.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), in that a

substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

### DR. AYYADURAI'S INVENTION OF EMAIL

14.     In or about 1978, Dr. Ayyadurai created email:  a computer program that created

an electronic version of a paper-based interoffice mail system, which allowed mail to be sent

electronically.  Like the email we use today, Dr. Ayyadurai's invention offered many features for

users, such as, to send electronic mail messages to an "inbox," save sent messages in an

"outbox," add "attachments," and allow users to create an "address book" that included email

addresses of multiple individuals.

15.     Dr. Ayyadurai invented email while working as a Research Fellow at the

University of Medicine and Dentistry of New Jersey.  His role there was to design an electronic

system to mirror the features of the interoffice (or inter-organizational) paper mail system, which

consisted of the Inbox, Outbox, Drafts, Folders, Memo, Attachments, Carbon Copies, Blind

Carbon Copies) (*i.e.,* "To:," "From:," "Date:," "Subject:," "Body:," "Cc:," "Bcc:"), Return

Receipt, Address Book, Groups, Forward, Compose, Edit, Reply, Delete, Archive, Sort, Bulk

Distribution, etc. These features are now the familiar parts of every modern email system.

16.     The invention of email was made by Dr. Ayyadurai as an attempt to manage the

complexity of interoffice communications, and also to reduce the use of paper documents. Dr.

Ayyadurai designed email so it was accessible to ordinary people with little or no computer

experience, at a time when mainly highly-trained technical people could use a computer.

17.     Dr. Ayyadurai wrote nearly 50,000 lines of computer code to implement the

features of the interoffice mail system into his computer program.

18.     Dr. Ayyadueai named his computer program "email". He was the first person to

create this term, because he was inventing the "electronic" (or "e") version of the interoffice

paper-based "mail" system. His naming of "email" also arose out of the limited parameters of

the programming language and operating system, which limited program names to all capital

letters and a five-character limit. Thus, his selection of the letters "E" "M" "A" "I" and "L."

19.     At the time of Dr. Ayyadurai's invention of email, software inventions could not

be protected through software patents. It was not until 1994 that the United States Court of

Appeals for the Federal Circuit ruled that computer programs were patentable as the equivalent

of a "digital machine." However, the Computer Software Act of 1980 allowed software

inventions to be protected to a certain extent, by copyright. Therefore, in or about 1981, Dr.

Ayyadurai registered his invention with the U.S. Copyright Office. On August 30, 1982, Dr.

Ayyadurai was legally recognized by the United States government as the inventor of email

through the issuance of the first Copyright registration for "Email," "Computer Program for

Electronic Mail System." With that U.S. Copyright of the system, the word "email" entered the

{00065926;4}                                    5

English language.[1]

20.     In summary, Dr. Ayyadurai was the first to convert the paper-based interoffice mail system (inbox, outbox, folders, attachments, etc.) to its electronic version; the first to call it "email"; and received the first U.S. Copyright for email that legally recognized Dr. Ayyadurai as the inventor of email.

21.     On or about November 15, 2011, *TIME* magazine published an article titled "The Man Who Invented Email," which outlines the history of email and Dr. Ayyadurai's invention. The article states that "email – as we currently know it – was born" when Dr. Ayyadurai created it replicating an interoffice mail system at the University of Medicine and Dentistry in Newark, New Jersey.  The article states that "the original system was set up for doctors to communicate electronically using the [physical] template they were already used to" and the interface "hasn't changed all that much" in becoming the email system we know and use today.  The *TIME* article also states that in "1981, Shiva took honors at the Westinghouse Science Awards for his 'High Reliability, Network-Wide, Electronic Mail System'" and that in 1982 he "won a White House competition for developing a system to automatically analyze and sort email messages."

22.     In June 2012, *Wired* magazine reported that: "Email … the electronic version of the interoffice, inter-organizational mail system, the email we all experience today, was invented in 1978 by [Dr. Ayyadurai] ….  The facts are indisputable."

23.     In July 2015, CBS reported on *The Henry Ford Innovation Nation,* hosted by Mo Rocca:  "Next time your fingers hit the keyboard to write a quick email, you might want to say, thank you to Shiva Ayyadurai.... he is credited with inventing email…. in the late 1970s."

---

[1] "Email" as defined by Merriam-Webster Dictionary. The Online Etymology Dictionary lists "email" as entering the language in 1982, when Dr. Ayyadurai's Copyright was registered. http://www.etymonline.com/index.php?term=e-mail

<u>**GAWKER DEFENDANTS' FALSE AND DEFAMATORY STATEMENTS ABOUT DR. AYYADURAI**</u>

24.     On or about February 22, 2012, Defendants published on their website, Gizmodo.com, an article authored by Mario Aguilar with the headline: "The Inventor of Email Did Not Invent Email?" (the "February 2012 Article"), a copy of which is attached hereto as **Exhibit A**. The February 2012 Article falsely states: "Ayyadurai is a fraud."

25.     On or about March 5, 2012, Defendants published on Gizmodo.com a lengthy story authored by Sam Biddle with the headline: "Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email" (the "March 2012 Article"), a copy of which is attached hereto as **Exhibit B**. The March 2012 Article contains multiple false statements of fact about Dr. Ayyadurai which Defendants knew to be false at the time the March 2012 Article was written and published.

26.     The false statements of fact in the March 2012 Article include, among others:

    a)  Dr. Ayyadurai engaged in "tricks, falsehoods, and a misinformation campaign."

    b)  Dr. Ayyadurai is engaged in "revisionism" with respect to his claims of invention of email.

27.     On or about September 8, 2014, Defendants published on Gawker.com (another website owned and operated by Gawker) a story authored by Sam Biddle with the headline: "If Fran Drescher Read Gizmodo She Would Not Have Married This Fraud" (the "2014 Article"), a copy of which is attached hereto as **Exhibit C**. The story, from the outset in the title, falsely states that Dr. Ayyadurai is a "fraud," and also states that he is a "renowned liar who pretends he invented email" and a "fake."

28.     The forgoing false statements of fact were made by Defendants with the
knowledge that they were false and likely to harm Dr. Ayyadurai's personal and professional
reputation and business.  The false and libelous statements in the February 2012 Article and the
March 2012 Article (together, the "2012 Articles"), along with those in the 2014 Article, had the
foreseeable effect of severely harming Dr. Ayyadurai's personal and professional reputation and
business.

29.     In or about 2009, Dr. Ayyadurai entered into a contract with MIT as a lecturer.
His position automatically renewed annually.  In or about 2012, Dr. Ayyadurai's lectureship was
rescinded for the 2012-2013 school year.  This was the first time his contract did not renew after
he had lectured at MIT for three years.

30.     In or about 2012, Dr. Ayyadurai was asked by MIT professors not to speak about
email at an MIT Communications Forum in March 2012, which Dr. Ayyadurai had organized.

31.     In or around the time, Dr. Ayyadurai was running one of the most popular elective
courses at MIT called Systems Visualization; was in the midst of garnering contracts for his
research center; and was the Director of a new initiative at MIT.  After Defendants posted the
2012 Articles, MIT disavowed its relationship with the MIT EMAIL LAB; cancelled Dr.
Ayyadurai's class and revoked its support for his new initiative; and funders disappeared and
reneged on their contracts, citing the negative press and its impact on their brand through their
affiliation with Dr. Ayyadurai.

32.     On or about February 16, 2012, The Smithsonian Institute in Washington, D.C.
had acquired documentation, including computer code and copyright information from Dr.
Ayyadurai to profile his work in inventing email.  The display was set to launch later in 2012, but

{00065926;4}                                    8

was cancelled without explanation after Defendants' publication of the 2012 Articles.

33.     Dr. Ayyadurai lost numerous other opportunities in and after 2014, following Defendants' publication of the 2014 Article.

34.     Defendants knew that, by publishing the 2012 Articles and the 2014 Article, other media publications would publish similar stories, and repeat Defendants' statements in the 2012 Articles and the 2014 Article.  Numerous publications did in fact publish similar stories, citing to Defendants' (false) statements in the 2012 Articles and the 2014 Article which called into question Dr. Ayyadurai's invention and his overall character.  These other publications included, among others:  an October 17, 2013 article in *Business Insider* titled "Fran Drescher Is Dating The Guy Who Says He Invented Email", and a March 5, 2012 article in *The Verge* titled "Exposing the self-proclaimed 'inventor of email'".

35.     Prior to the publication of the 2012 Articles, Dr. Ayyadurai was an avid speaker at events around the world.  With Defendants' publication of the 2012 Articles and the 2014 Article, Dr. Ayyadurai has been deliberately attacked as an inventor and a scientist, and has lost numerous paid speaking engagements and lectureships.  The articles also have negatively and significantly affected his ability to purse new opportunities and acquire investment for his new inventions—an important source of his livelihood as an inventor and entrepreneur.

## GAWKER'S WRONGFUL CONDUCT GENERALLY

36.     Plaintiff contends that actual malice is not required to be shown to prove the claims herein.  However, in the event that actual malice were to be determined to be a requirement, the allegations in this Complaint, including the allegations below, demonstrate actual malice.  Moreover, discovery has not yet commenced and Plaintiff expects to obtain

through discovery additional evidence that would support actual malice.

37.    Gawker is a company that routinely engages in wrongful conduct, and specifically, writes and publishes false and defamatory statements about people, invades people's privacy and other rights, and publishes content that is irresponsible and that no other legitimate publication will publish.

38.    Gawker has been sued multiple times for defamation, including currently in an action in New York State Court, by the *Daily Mail* newspaper, and in an action in California by an individual named Charles Johnson, for writing and publishing false and unsubstantiated rumors that Mr. Johnson had been involved in misconduct and criminal activity.

39.    Gawker also has been sued repeatedly for invading the privacy of others. Gawker recently lost a case filed by Terry Bollea, professionally known as "Hulk Hogan," for publishing an illegal, secretly recorded video showing the wrestle naked and having consensual sexual relations in a private bedroom. In March 2016, a Florida jury awarded Hulk Hogan $115 million in compensatory damages plus $15 million, $10 million and $100,000, respectively, in punitive damages against Gawker, Denton and former editor, A.J. Daulerio.

40.    Gawker also was sued by, and paid a substantial settlement to, actress Rebecca Gayheart and her husband, actor Eric Dane, for publishing a stolen private video of them partially nude in a hot tub.

41.    Gawker has also been sued for copyright infringement, including by Dr. Phil's production company after Gawker planned to "steal," and eventually aired, portions of an interview before it aired on Dr. Phil's television show.

42.  Gawker also published a video of a clearly intoxicated young woman engaged in sexual activity on the men's bathroom floor of an Indiana sports bar (the footage was taken by another patron with his mobile phone).  According to published reports, Gawker callously refused to remove the footage from its site for some time, despite repeated pleas from the woman and despite the fact that it was not clear if the sex was consensual or if the video was footage of a rape in progress.

43.  Gawker paid a source for a photograph of what the source claimed was NFL quarterback Brett Favre's penis.  Gawker published the uncensored photo and reported that it showed Mr. Favre's penis.

44.  Gawker published photos of Duchess Kate Middleton's bare breasts, captured by a paparazzi's telephoto lens while she was sunbathing in a secluded, private location.

45.  Gawker published complete, uncensored, and unedited videos of seven innocent individuals being beheaded by ISIS soldiers.  The videos were distributed by ISIS for the purpose of terrorizing the Western world.  On information and belief, Gawker was the only established media company to publish these videos in full and uncensored, showing the victims being beheaded. Gawker was criticized severely by the press and terrorism experts for furthering the terror campaign of ISIS, and showing a total lack of regard for the families of these victims.

46.  Gawker hacked a promotional campaign sponsored by Coca-Cola, in which the company utilized the hashtag "#MakeItHappy."  The campaign was originally designed to allow people to type statements into a decoder, and the decoder converted the statements into positive, happy statements.  Gawker's hack caused the campaign to publish highly offensive statements from Adolf Hitler's *Mein Kampf*.  Gawker was resoundingly criticized throughout the media for

its actions.

47.    Gawker attempted to publicly "out" a private male individual, who is a media

executive at a rival publishing company, by publishing a story alleging that the executive had

attempted to solicit a male porn star and prostitute.  Gawker's actions in publishing these

allegations, including identifying the executive by name and the company he worked for,

publishing the accusations of the gay porn star, and protecting the identity of the porn star

"source," were severely criticized throughout the media industry.  As a result, multiple major

advertisers began to pull their advertising from Gawker; Gawker then removed the story; and a

few days later two senior executives at Gawker promptly resigned their positions.  Following

these events, several more executives and employees resigned or were terminated.

48.    In the past year, seven of the nine most senior executives at Gawker and

Gawker.com resigned:  Chief Operating Officer Scott Kidder, Chief Strategy Officer Erin

Pettigrew, Chief Technology Officer Tom Plunkett, Editorial Chief Tommy Craggs, President of

Advertising Andrew Gorenstein, SVP of Global Sales and Partnerships Michael Kuntz and

Editor-in-Chief of Gawker.com Max Reid.  Of the original Executive Board from one year ago,

only CEO/Founder Denton and General Counsel Heather Dietrick remain at the company.

(Gawker had no CFO during this time.)

49.    In November 2015, former Gawker staff writer, Dayna Evans, published an article

titled:  "On Gawker's Problem With Women" ("the Evans Article") in which Evans exposes

gender inequalities within the company as well as an endemic of reporting failures and failures

of journalistic ethics.  The Evans Article states that the company's reporting tactics "can lead to

dismissiveness and insensitivity, harm and marginalization, often unforgettable and unforgivable

damage." The Evans Article further states that writers and editors at the company "are in fact

REWARDED and admired for their recklessness and immaturity, a recklessness and immaturity,

that, as you know, has gotten the company in heaps of trouble over the past couple of years."

The Evans Article goes on to state that the above assertions are true, "especially so at a place like

Gawker, where bylines are associated with traffic and traffic is associated with success."

**SAM BIDDLE'S WRONGFUL CONDUCT GENERALLY**

50.     In or about 2010, Gawker and Denton hired Biddle as a writer for Gawker's

technology focused website, Gizmodo.com. Biddle was subsequently promoted to editor at

Gawker.com.

51.     Biddle's professed goal is to destroy people's reputations and lives on the Internet,

under the banner of journalism. In 2010, Biddle wrote: "Is it petty to not share in the happiness

of someone else's success? Is it petty to wish—to beg, even, knuckles blistering, eyes bloodshot,

beseeching each god—for their horrific downfall." Biddle reinforced this philosophy in April

2014 when he stated that he would "like to have a 20-to-1 ratio of ruining people's days versus

making them" and that he writes the types of articles he does because "I like attention."

52.     In 2013, Biddle published at Gawker a tweet sent out by a private media

executive which contained a joke made in bad taste. Biddle's sharing of the tweet caused the

executive to lose her job and be subject to widespread scorn and ridicule. Biddle admitted that

his publication of the tweet caused "an incredibly disproportionate personal disaster" for the

executive.

53.     Also in 2013, Biddle wrote a post at Gawker that took the comments of a venture

capitalist out of context and made implicit accusations of racism.

54.    In March 2014, Biddle sanctioned an article by a junior writer which compared a dating website to WWII Comfort Women.  The article received severe criticism throughout the national media.

55.    In October 2014, during National Bullying Prevention Month, Biddle sent out distasteful tweets through his Twitter account that supported bullying, stating: "Nerds should be constantly shamed and degraded into submission" and that society should "Bring Back Bullying."  The tweets and fallout that ensued caused several companies to withdraw advertising from Gawker.  Gawker executives admitted that Biddle's tweets, and the lost advertisers that followed, cost Gawker at least $1 million in advertising revenue.

56.    In late 2015, Biddle wrote an article about his use and abuse of narcotics, including his substantial consumption of benzodiazepines, anti-depressants and SSRIs (selective serotonin reuptake inhibitors).  Biddle's drug abuse was well-known at Gawker, including by Denton and Cook, and they nevertheless continued to employ Biddle, promote him, reward him, and assign him to write articles about people.

## GAWKER'S PHILOSOPHY AND PRACTICES

57.    Defendants have shown little interest in reporting the truth to the public, or investigating the facts underlying a story, or for that matter telling the truth to its readers. Defendants routinely make up lies about the subjects of their stories—Dr. Ayyadurai being one of many—with little or no regard to the substantial consequences that their false statements have on the subjects of their stories.  The impact is serious and real.  Defendants destroy personal and professional reputations and careers as a matter of routine.

{00065926;4}                                                                   14

58.     In or about June 2009, Denton was interviewed by *The Washington Post*, and told

the reporter: "We don't seek to do good.  We may *inadvertently* do good.  We may *inadvertently*

commit journalism.  [Spoken as if it were a crime.]  That is not the institutional intention."

(emphasis added).

59.     Gawker's philosophy and practice is to publish false scandal, for the purpose of

profit, knowing that false scandal drives readership, which in turn drives revenue, and without

regard to the innocent subjects of their stories whose careers are destroyed in the process.

60.     This is the situation here:  Defendants' false statements in the articles at issue had

the effect of so severely discrediting Dr. Ayyadurai—based on the false statement that he is a

"fraud"—that Dr. Ayyadurai's career was severely damaged.  As a direct result of Defendants'

publication of the false and defamatory statements about Dr. Ayyadurai, on information and

belief, Dr. Ayyadurai has lost teaching positions at MIT, lost several paid speaking engagements

at the time and in the future, lost an accolade and display dedicated to his invention at the

Smithsonian Institute, lost contracts and renewals, lost opportunities for investment in his

emerging companies, suffered substantial personal and professional reputational harm, and

suffered substantial harm to his career, business and income.

61.     According to Gawker.com and Gizmodo.com, more than 195,100 people have

read the 2014 Article that Defendants wrote and published; more than 87,900 people have read

the February 2012 Article that Defendants wrote and published; more than 215,100 people have

read the March 2012 Article that Defendants wrote and published; and presumably all of those

readers have spoken to others about the stories.  Moreover, the 2014 Article embeds the March

2012 Article directly in the center of the 2014 Article, summarizes it, and includes a hyperlink to

the March 2012 Article, with a prominent display of the title of the March 2012 article along
with a photo of Dr. Ayyadurai, and urges readers to read it.  The March 2012 Article embeds the
February 2012 Article directly in its center and includes a hyperlink to the February 2012 Article.
Further, when the 2012 Articles were embedded into the 2014 Article, they were directed to a
different audience and readership:  readers of Gawker.com, versus readers of Gizmodo.com.
Therefore, in September 2014, Defendants republished the 2012 Articles, originally published on
Gizmodo.com, by directing them to a new audience of Gawker.com readers and multiplying the
damage done to Dr. Ayyadurai.

62.     As a result of Defendants' wrongful actions, anyone who searches Dr. Ayyadurai
at Google or other search engine will see Defendants' false and libelous stories about him in the
first page of search results across the world.  As a result, anyone who would otherwise have
hired or partnered with Dr. Ayyadurai likely will decline, and have declined, to do so, believing
Defendants' false and libelous statements about him to be true.  These statements also resulted in
a wave of efforts by others to discredit Dr. Ayyadurai and erase him from the history of electronic
communications such as Walter Isaacson's book on Internet pioneers, *The Innovators: How a
Group of Hackers, Geniuses, and Geeks Created the Digital Revolution*;  attacks on Wikipedia
that remove reference to his contributions, and discrediting his other ongoing scientific
contributions unrelated to email technology.  Defendants' actions foreseeably caused such
results.

63.     Defendants are guilty of intentional misconduct.  Defendants had actual
knowledge of the wrongfulness of the conduct described herein and the high probability that
injury or damage to Plaintiff would result and, despite that knowledge, intentionally pursued that

course of conduct, resulting in substantial injury and damage to Dr. Ayyadurai.

64.    Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Dr. Ayyadurai's rights.

65.    Defendants' actions described herein also have had the foreseeable effect of causing severe emotional distress to Dr. Ayyadurai, and did cause him to suffer severe emotional distress.

66.    In 2014, Defendants continued their wrongful actions of 2012 when they published the defamatory 2014 Article about Dr. Ayyadurai, and linked Gawker.com readers to the March 2012 Article, which again linked to the February 2012 Article.

67.    Dr. Ayyadurai requests herein all available legal and equitable remedies, to the maximum extent permissible by law, including without limitation compensatory damages in an amount not less than Thirty-Five Million Dollars ($35,000,000), and punitive damages.

## FIRST CAUSE OF ACTION

### Libel

### (Against All Defendants Except Denton)

68.    Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.    As described herein, the February 2012 Article arises to the level of defamation *per se*, in that it falsely states that "[Dr.] Ayyadurai is a fraud."

70.    As described herein, the March 2012 Article falsely alleges that:

   a)   Dr. Ayyadurai engaged in "semantic tricks, falsehoods, and a misinformation campaign."

{00065926;4}                                    17

b)  Dr. Ayyadurai is engaged in "revisionism" in his claim of invention of email.

71.    As described herein, the 2014 Article arises to the level of defamation *per se*, by stating that Dr. Ayyadurai is a "fraud," thus falsely accusing Dr. Ayyadurai of a crime and causing prejudice to his personal and professional reputation and business.

72.    The 2014 Article also falsely states:

a)  Dr. Ayyadurai is a "renowned liar" with respect to his statements that he invented email,

b)  Dr. Ayyadurai is a "big fake," and

c)  Dr. Ayyadurai is engaged in "cyber-lies."

73.    These false statements wrongly accuse Dr. Ayyadurai of having made statements and acted in a manner that would subject him to hatred, distrust, contempt, aversion, ridicule and disgrace in the minds of a substantial number in the community, and were calculated to harm his social and business relationships, and did harm his social and business relationships.

74.    The statements made intentionally, purposefully and with actual malice by Defendants were false and no applicable privilege or authorization protecting the statements can attach to them.

75.    Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the statements made by Defendants in an amount to be determined at trial.  The false statements attribute conduct, characteristics and conditions incompatible with the proper exercise of Plaintiff's business and duties as an inventor, scientist and entrepreneur.  Because the statements were widely disseminated on the Internet, they were also likely and intended to hold the Plaintiff up to ridicule and to damage his social and business relationships.

76.   The above-quoted published statements constitute egregious conduct constituting moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages relating to Defendants' making of the above-quoted defamatory statements, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (Against All Defendants Except Denton)

77.   Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78.   Defendants knew that Plaintiff, being an MIT professor/lecturer, scientist, inventor, business owner and entrepreneur, had business relationships that were ongoing during the time of Defendants' publications, and had a reasonable expectation of entering into valid business relationships with additional individuals and entities, including with companies and universities, which would have been completed had it not been for Defendants' wrongful acts.

79.   Defendants acted solely out of malice and/or used dishonest, unfair or improper means to interfere with Plaintiff's actual and prospective business relationships, before they defamed him.

80.   Defendants, through the misconduct alleged herein, intended to harm Plaintiff by intentionally and unjustifiably interfering with his actual and prospective business relationships.

81.   Defendants have seriously damaged Plaintiff's actual and prospective business relationships as a direct and proximate cause of these acts.

82.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## **THIRD CAUSE OF ACTION**

### **Intentional Infliction of Emotional Distress**

### **(Against All Defendants Except Denton)**

83.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     Defendants intentionally wrote the 2012 Articles and posted them to the Gizmodo.com website, and again intentionally wrote and published the 2014 Article to the Gawker.com website to humiliate, defame and embarrass Dr. Ayyadurai.

85.     Defendants' posting of the articles was extreme and outrageous in that the contents falsely accuse him of being a fraud and lying about his professional accomplishments and career.

86.     Dr. Ayyadurai has suffered severe emotional distress as a result of the content written in the articles and the ramifications the false content has had on his personal life and professional reputation have been immense.

87.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Negligent Hiring and Retention

### (Against Denton and Cook)

88.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     At all times relevant to the allegations herein, Biddle was engaged in the abuse of multiple drugs including benzodiazepines, anti-depressants and SSRIs (Selective Serotonin Reuptake Inhibitors), while employed at Gawker and particularly during the time that he wrote the 2014 Article.

90.     At all relevant times, Denton and Cook knew or should have known of Biddle's open and continuing abuse of such drugs, and the impact that it was having on his mental health, and the caustic and reckless articles that Biddle was writing about people as a result.

91.     At all relevant times, Denton and Cook also knew or should have known that Biddle sought to libel and destroy the lives of the subjects of his reporting.  In connection with Biddle's reporting, Gawker and its executives, including Denton and Cook, received outcry and criticism about Biddle and his articles, while Biddle was employed with them.

92.     Denton and Cook failed to take reasonable care in the hiring and/or retention of Biddle.

93.     Denton and Cook placed Biddle in a position to cause foreseeable harm to others (including Dr. Ayyadurai) by placing Biddle and retaining him in the position of Senior Writer.

94.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands

{00065926;4}                                              21

punitive damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shiva Ayyadurai respectfully requests:

1.      An award of damages to Plaintiff in an amount to be determined at trial, but in all

events not less than Thirty-Five Million Dollars ($35,000,000);

2.      An award of punitive damages to Plaintiff in an amount to be determined at trial;

3.      An order requiring Defendants to make a public retraction of the false statements;

4.      An order granting preliminary and permanent injunctive relief to prevent

defendants from making further defamatory statements about Plaintiff; and

5.      An award of such other and further relief as the Court may deem just and proper.


Dated: May 10, 2016                    Respectfully submitted,

                                       **CORNELL DOLAN, P.C.**

                                       By: _/s/ Timothy Cornell_

                                       Timothy Cornell, BBO # 654412
                                       One International Place, Suite 1400
                                       Boston, MA 02110
                                       Tel: (617) 535-7763
                                       Fax: (617) 535-7721
                                       tcornell@cornelldolan.com

{00065926;4}                    22

**HARDER MIRELL & ABRAMS LLP**

By: /s/ Charles J. Harder

Charles J. Harder, Esq.
(*Pro Hac Vice application to be filed*)
132 S. Rodeo Drive, Suite 301
Beverly Hills, California 90212
Tel. (424) 203-1600
Email: CHarder@HMAfirm.com

*Counsel for Plaintiff*



# Electronic Proof of Claim - 1611 70000391156

Adobe Sign Document History                                    09/28/2016

| | |
|---|---|
| Created: | 09/28/2016 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAArXj0agsZpNl8-YCguoCZRcKO-6D_McB4 |

# "Electronic Proof of Claim - 161170000391156" History

Widget created by Prime Clerk (epoc@primeclerk.com)
09/28/2016 - 11:22:58 PM EDT

Widget filled in by Shiva Ayyadurai (tony@amvasslaw.com)
09/28/2016 - 11:29:04 PM EDT- IP address: 71.190.18.29

Shiva Ayyadurai (tony@amvasslaw.com) uploaded the following supporting documents:
Attachment
09/28/2016 - 11:29:05 PM EDT

(User email address provided through API 161170000391156, User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_10_5) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/53.0.2785.116 Safari/537.36)
09/28/2016 - 11:29:05 PM EDT- IP address: 71.190.18.29

Signed document emailed to Shiva Ayyadurai (tony@amvasslaw.com) and Prime Clerk (epoc@primeclerk.com)
09/28/2016 - 11:29:05 PM EDT

Prime Clerk    POWERED BY Adobe Sign

## **Exhibit 3**

Ayyadurai Complaint

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON, MASSACHUSETTS

| | | |
|---|---|---|
| SHIVA AYYADURAI, an individual, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| GAWKER MEDIA, LLC, a Delaware | ) | |
| limited liability company; SAM BIDDLE, an | ) | *DEMAND FOR JURY TRIAL* |
| individual, JOHN COOK, an individual, | ) | |
| NICHOLAS GUIDO ANTHONY DENTON, | ) | |
| an individual, and DOES 1-20, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Dr. Shiva Ayyadurai, by and through his undersigned attorneys, sues Defendants Gawker Media, LLC, Sam Biddle, John Cook, Nicholas Guido Anthony Denton, and DOES 1-20 (collectively, "Defendants"), and respectfully makes the following allegations.

## <u>SUMMARY OF THE CASE</u>

1.      Dr. Ayyadurai is a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur.  In 1978, Dr. Ayyadurai invented email:  the electronic mail system as we know it today.  On November 15, 2011, *TIME* magazine published an article titled "The Man Who Invented Email," which outlines the backstory of email and Dr. Ayyadurai's invention.  In June 2012, *Wired* magazine reported: "Email … the electronic version of the interoffice, inter-organizational mail system, the email we all experience today, was invented in 1978 by [Dr. Ayyadurai] …. The facts are indisputable."  In July 2015, CBS reported on *The Henry Ford*

*Innovation Nation,* hosted by Mo Rocca: "Next time your fingers hit the keyboard to write a quick email, you might want to say, thank you to Shiva Ayyadurai…. he is credited with inventing email …. in the late 1970s."

2.      Dr. Ayyadurai holds four degrees from the Massachusetts Institute of Technology (MIT): a B.S. in Electrical Engineering and Computer Science, an M.S. in Visual Studies, an M.S. in Mechanical Engineering, and a Ph.D. in Biological Engineering.  Dr. Ayyadurai has been recognized internationally for his developments in early social media portals, email management technologies, and contributions to medicine and biology.  He has been a speaker at numerous international forums, where he has discussed email, science and technology, among other topics. Dr. Ayyadurai also operates his own research and education center:  the International Center for Integrative Systems in Cambridge, Massachusetts.

3.      In 2012, Defendants published two false and highly defamatory articles about Dr. Ayyadurai on their website at Gizmodo.com to discredit Dr. Ayyadurai's invention.  The articles falsely trace the origin of email and call Dr. Ayyadurai a liar, a "fraud" and responsible for "a misinformation campaign."  In 2014, Defendants again published a defamatory article about Dr. Ayyadurai, this time on their Gawker.com website, calling Dr. Ayyadurai a "fraud," a "renowned liar," and a "big fake," among other things. These statements are all demonstrably false.

4.      Defendants' false and defamatory statements have caused substantial damage to Dr. Ayyadurai's personal and professional reputation and career.  As a result of Defendants' defamation, Dr. Ayyadurai has been publicly humiliated, lost business contracts and received a slew of criticism relating to Defendants' false accusations and statements.  Defendants' wrongful

acts, which have been repeated, have left Dr. Ayyadurai with no alternative but to file this

lawsuit.  Dr. Ayyadurai seeks an award of no less than $35 million in damages.

## THE PARTIES

5.    Plaintiff is a resident and domiciliary of the Commonwealth of Massachusetts,

County of Middlesex.

6.    Upon information and belief, Gawker Media, LLC ("Gawker") is a Delaware

limited liability company with its principal place of business located in New York City, New

York.

7.    Upon information and belief, defendant Sam Biddle ("Biddle") is an individual,

domiciled in the State of New York.  At all relevant times, Biddle was a senior staff writer at

Gawker.

8.    Upon information and belief, defendant John Cook ("Cook") is an individual,

domiciled in the State of New York.  At relevant times, Cook was an editor and writer at Gawker.

9.    Upon information and belief, defendant Nicholas Guido Anthony Denton aka

"Nick Denton" ("Denton") is an individual, domiciled in the State of New York.  At all relevant

times, Denton was Founder and CEO of Gawker.

10.    Upon information and belief, Defendants, and each of them, were and are the

agents, licensees, employees, partners, joint-venturers, co-conspirators, owners, principals, and

employers of the remaining Defendants and each of them are, and at all times mentioned herein

were, acting within the course and scope of that agency, license, partnership, employment,

conspiracy, ownership, or joint venture.  Upon further information and belief, the acts and

conduct herein alleged of each of the Defendants were known to, authorized by, and/or ratified

{00065926;4}                                        3

by the other Defendants, and each of them.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendants because they have minimum

contacts with the Commonwealth of Massachusetts.

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because

there is complete diversity of the parties to this action and the amount in controversy exceeds

$75,000.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), in that a

substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

### DR. AYYADURAI'S INVENTION OF EMAIL

14.     In or about 1978, Dr. Ayyadurai created email:  a computer program that created

an electronic version of a paper-based interoffice mail system, which allowed mail to be sent

electronically.  Like the email we use today, Dr. Ayyadurai's invention offered many features for

users, such as, to send electronic mail messages to an "inbox," save sent messages in an

"outbox," add "attachments," and allow users to create an "address book" that included email

addresses of multiple individuals.

15.     Dr. Ayyadurai invented email while working as a Research Fellow at the

University of Medicine and Dentistry of New Jersey.  His role there was to design an electronic

system to mirror the features of the interoffice (or inter-organizational) paper mail system, which

consisted of the Inbox, Outbox, Drafts, Folders, Memo, Attachments, Carbon Copies, Blind

Carbon Copies) (*i.e.,* "To:," "From:," "Date:," "Subject:," "Body:," "Cc:," "Bcc:"), Return

Receipt, Address Book, Groups, Forward, Compose, Edit, Reply, Delete, Archive, Sort, Bulk

Distribution, etc.  These features are now the familiar parts of every modern email system.

16.     The invention of email was made by Dr. Ayyadurai as an attempt to manage the

complexity of interoffice communications, and also to reduce the use of paper documents.  Dr.

Ayyadurai designed email so it was accessible to ordinary people with little or no computer

experience, at a time when mainly highly-trained technical people could use a computer.

17.     Dr. Ayyadurai wrote nearly 50,000 lines of computer code to implement the

features of the interoffice mail system into his computer program.

18.     Dr. Ayyadueai named his computer program "email".  He was the first person to

create this term, because he was inventing the "electronic" (or "e") version of the interoffice

paper-based "mail" system.  His naming of "email" also arose out of the limited parameters of

the programming language and operating system, which limited program names to all capital

letters and a five-character limit.  Thus, his selection of the letters "E" "M" "A" "I" and "L."

19.     At the time of Dr. Ayyadurai's invention of email, software inventions could not

be protected through software patents.  It was not until 1994 that the United States Court of

Appeals for the Federal Circuit ruled that computer programs were patentable as the equivalent

of a "digital machine."  However, the Computer Software Act of 1980 allowed software

inventions to be protected to a certain extent, by copyright.  Therefore, in or about 1981, Dr.

Ayyadurai registered his invention with the U.S. Copyright Office.  On August 30, 1982, Dr.

Ayyadurai was legally recognized by the United States government as the inventor of email

through the issuance of the first Copyright registration for "Email," "Computer Program for

Electronic Mail System." With that U.S. Copyright of the system, the word "email" entered the

English language.[1]

20.    In summary, Dr. Ayyadurai was the first to convert the paper-based interoffice mail system (inbox, outbox, folders, attachments, etc.) to its electronic version; the first to call it "email"; and received the first U.S. Copyright for email that legally recognized Dr. Ayyadurai as the inventor of email.

21.    On or about November 15, 2011, *TIME* magazine published an article titled "The Man Who Invented Email," which outlines the history of email and Dr. Ayyadurai's invention. The article states that "email – as we currently know it – was born" when Dr. Ayyadurai created it replicating an interoffice mail system at the University of Medicine and Dentistry in Newark, New Jersey.  The article states that "the original system was set up for doctors to communicate electronically using the [physical] template they were already used to" and the interface "hasn't changed all that much" in becoming the email system we know and use today.  The *TIME* article also states that in "1981, Shiva took honors at the Westinghouse Science Awards for his 'High Reliability, Network-Wide, Electronic Mail System'" and that in 1982 he "won a White House competition for developing a system to automatically analyze and sort email messages."

22.    In June 2012, *Wired* magazine reported that: "Email … the electronic version of the interoffice, inter-organizational mail system, the email we all experience today, was invented in 1978 by [Dr. Ayyadurai] ….  The facts are indisputable."

23.    In July 2015, CBS reported on *The Henry Ford Innovation Nation,* hosted by Mo Rocca:  "Next time your fingers hit the keyboard to write a quick email, you might want to say, thank you to Shiva Ayyadurai.... he is credited with inventing email…. in the late 1970s."

---

[1] "Email" as defined by Merriam-Webster Dictionary. The Online Etymology Dictionary lists "email" as entering the language in 1982, when Dr. Ayyadurai's Copyright was registered.
http://www.etymonline.com/index.php?term=e-mail

## Gawker Defendants' False and Defamatory Statements About Dr. Ayyadurai

24.     On or about February 22, 2012, Defendants published on their website, Gizmodo.com, an article authored by Mario Aguilar with the headline: "The Inventor of Email Did Not Invent Email?" (the "February 2012 Article"), a copy of which is attached hereto as **Exhibit A**.  The February 2012 Article falsely states:  "Ayyadurai is a fraud."

25.     On or about March 5, 2012, Defendants published on Gizmodo.com a lengthy story authored by Sam Biddle with the headline: "Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email" (the "March 2012 Article"), a copy of which is attached hereto as **Exhibit B**.  The March 2012 Article contains multiple false statements of fact about Dr. Ayyadurai which Defendants knew to be false at the time the March 2012 Article was written and published.

26.     The false statements of fact in the March 2012 Article include, among others:

   a)  Dr. Ayyadurai engaged in "tricks, falsehoods, and a misinformation campaign."

   b)  Dr. Ayyadurai is engaged in "revisionism" with respect to his claims of invention of email.

27.     On or about September 8, 2014, Defendants published on Gawker.com (another website owned and operated by Gawker) a story authored by Sam Biddle with the headline: "If Fran Drescher Read Gizmodo She Would Not Have Married This Fraud" (the "2014 Article"), a copy of which is attached hereto as **Exhibit C**.  The story, from the outset in the title, falsely states that Dr. Ayyadurai is a "fraud," and also states that he is a "renowned liar who pretends he invented email" and a "fake."

{00065926;4}                                         7

28. The forgoing false statements of fact were made by Defendants with the knowledge that they were false and likely to harm Dr. Ayyadurai's personal and professional reputation and business. The false and libelous statements in the February 2012 Article and the March 2012 Article (together, the "2012 Articles"), along with those in the 2014 Article, had the foreseeable effect of severely harming Dr. Ayyadurai's personal and professional reputation and business.

29. In or about 2009, Dr. Ayyadurai entered into a contract with MIT as a lecturer. His position automatically renewed annually. In or about 2012, Dr. Ayyadurai's lectureship was rescinded for the 2012-2013 school year. This was the first time his contract did not renew after he had lectured at MIT for three years.

30. In or about 2012, Dr. Ayyadurai was asked by MIT professors not to speak about email at an MIT Communications Forum in March 2012, which Dr. Ayyadurai had organized.

31. In or around the time, Dr. Ayyadurai was running one of the most popular elective courses at MIT called Systems Visualization; was in the midst of garnering contracts for his research center; and was the Director of a new initiative at MIT. After Defendants posted the 2012 Articles, MIT disavowed its relationship with the MIT EMAIL LAB; cancelled Dr. Ayyadurai's class and revoked its support for his new initiative; and funders disappeared and reneged on their contracts, citing the negative press and its impact on their brand through their affiliation with Dr. Ayyadurai.

32. On or about February 16, 2012, The Smithsonian Institute in Washington, D.C. had acquired documentation, including computer code and copyright information from Dr. Ayyadurai to profile his work in inventing email. The display was set to launch later in 2012, but

was cancelled without explanation after Defendants' publication of the 2012 Articles.

33.    Dr. Ayyadurai lost numerous other opportunities in and after 2014, following

Defendants' publication of the 2014 Article.

34.    Defendants knew that, by publishing the 2012 Articles and the 2014 Article, other

media publications would publish similar stories, and repeat Defendants' statements in the 2012

Articles and the 2014 Article.  Numerous publications did in fact publish similar stories, citing to

Defendants' (false) statements in the 2012 Articles and the 2014 Article which called into

question Dr. Ayyadurai's invention and his overall character.  These other publications included,

among others:  an October 17, 2013 article in *Business Insider* titled "Fran Drescher Is Dating

The Guy Who Says He Invented Email", and a March 5, 2012 article in *The Verge* titled

"Exposing the self-proclaimed 'inventor of email'".

35.    Prior to the publication of the 2012 Articles, Dr. Ayyadurai was an avid speaker at

events around the world.  With Defendants' publication of the 2012 Articles and the 2014 Article,

Dr. Ayyadurai has been deliberately attacked as an inventor and a scientist, and has lost

numerous paid speaking engagements and lectureships.  The articles also have negatively and

significantly affected his ability to purse new opportunities and acquire investment for his new

inventions—an important source of his livelihood as an inventor and entrepreneur.

### GAWKER'S WRONGFUL CONDUCT GENERALLY

36.    Plaintiff contends that actual malice is not required to be shown to prove the

claims herein.  However, in the event that actual malice were to be determined to be a

requirement, the allegations in this Complaint, including the allegations below, demonstrate

actual malice.  Moreover, discovery has not yet commenced and Plaintiff expects to obtain

through discovery additional evidence that would support actual malice.

37.     Gawker is a company that routinely engages in wrongful conduct, and specifically, writes and publishes false and defamatory statements about people, invades people's privacy and other rights, and publishes content that is irresponsible and that no other legitimate publication will publish.

38.     Gawker has been sued multiple times for defamation, including currently in an action in New York State Court, by the *Daily Mail* newspaper, and in an action in California by an individual named Charles Johnson, for writing and publishing false and unsubstantiated rumors that Mr. Johnson had been involved in misconduct and criminal activity.

39.     Gawker also has been sued repeatedly for invading the privacy of others.  Gawker recently lost a case filed by Terry Bollea, professionally known as "Hulk Hogan," for publishing an illegal, secretly recorded video showing the wrestle naked and having consensual sexual relations in a private bedroom.  In March 2016, a Florida jury awarded Hulk Hogan $115 million in compensatory damages plus $15 million, $10 million and $100,000, respectively, in punitive damages against Gawker, Denton and former editor, A.J. Daulerio.

40.     Gawker also was sued by, and paid a substantial settlement to, actress Rebecca Gayheart and her husband, actor Eric Dane, for publishing a stolen private video of them partially nude in a hot tub.

41.     Gawker has also been sued for copyright infringement, including by Dr. Phil's production company after Gawker planned to "steal," and eventually aired, portions of an interview before it aired on Dr. Phil's television show.

42.     Gawker also published a video of a clearly intoxicated young woman engaged in sexual activity on the men's bathroom floor of an Indiana sports bar (the footage was taken by another patron with his mobile phone).  According to published reports, Gawker callously refused to remove the footage from its site for some time, despite repeated pleas from the woman and despite the fact that it was not clear if the sex was consensual or if the video was footage of a rape in progress.

43.     Gawker paid a source for a photograph of what the source claimed was NFL quarterback Brett Favre's penis.  Gawker published the uncensored photo and reported that it showed Mr. Favre's penis.

44.     Gawker published photos of Duchess Kate Middleton's bare breasts, captured by a paparazzi's telephoto lens while she was sunbathing in a secluded, private location.

45.     Gawker published complete, uncensored, and unedited videos of seven innocent individuals being beheaded by ISIS soldiers.  The videos were distributed by ISIS for the purpose of terrorizing the Western world.  On information and belief, Gawker was the only established media company to publish these videos in full and uncensored, showing the victims being beheaded. Gawker was criticized severely by the press and terrorism experts for furthering the terror campaign of ISIS, and showing a total lack of regard for the families of these victims.

46.     Gawker hacked a promotional campaign sponsored by Coca-Cola, in which the company utilized the hashtag "#MakeItHappy."  The campaign was originally designed to allow people to type statements into a decoder, and the decoder converted the statements into positive, happy statements.  Gawker's hack caused the campaign to publish highly offensive statements from Adolf Hitler's *Mein Kampf*.  Gawker was resoundingly criticized throughout the media for

its actions.

47.     Gawker attempted to publicly "out" a private male individual, who is a media executive at a rival publishing company, by publishing a story alleging that the executive had attempted to solicit a male porn star and prostitute.   Gawker's actions in publishing these allegations, including identifying the executive by name and the company he worked for, publishing the accusations of the gay porn star, and protecting the identity of the porn star "source," were severely criticized throughout the media industry.  As a result, multiple major advertisers began to pull their advertising from Gawker; Gawker then removed the story; and a few days later two senior executives at Gawker promptly resigned their positions.  Following these events, several more executives and employees resigned or were terminated.

48.     In the past year, seven of the nine most senior executives at Gawker and Gawker.com resigned:  Chief Operating Officer Scott Kidder, Chief Strategy Officer Erin Pettigrew, Chief Technology Officer Tom Plunkett, Editorial Chief Tommy Craggs, President of Advertising Andrew Gorenstein, SVP of Global Sales and Partnerships Michael Kuntz and Editor-in-Chief of Gawker.com Max Reid.  Of the original Executive Board from one year ago, only CEO/Founder Denton and General Counsel Heather Dietrick remain at the company. (Gawker had no CFO during this time.)

49.     In November 2015, former Gawker staff writer, Dayna Evans, published an article titled:  "On Gawker's Problem With Women" ("the Evans Article") in which Evans exposes gender inequalities within the company as well as an endemic of reporting failures and failures of journalistic ethics.  The Evans Article states that the company's reporting tactics "can lead to dismissiveness and insensitivity, harm and marginalization, often unforgettable and unforgivable

damage." The Evans Article further states that writers and editors at the company "are in fact

REWARDED and admired for their recklessness and immaturity, a recklessness and immaturity,

that, as you know, has gotten the company in heaps of trouble over the past couple of years."

The Evans Article goes on to state that the above assertions are true, "especially so at a place like

Gawker, where bylines are associated with traffic and traffic is associated with success."

### SAM BIDDLE'S WRONGFUL CONDUCT GENERALLY

50.     In or about 2010, Gawker and Denton hired Biddle as a writer for Gawker's

technology focused website, Gizmodo.com. Biddle was subsequently promoted to editor at

Gawker.com.

51.     Biddle's professed goal is to destroy people's reputations and lives on the Internet,

under the banner of journalism. In 2010, Biddle wrote: "Is it petty to not share in the happiness

of someone else's success? Is it petty to wish—to beg, even, knuckles blistering, eyes bloodshot,

beseeching each god—for their horrific downfall." Biddle reinforced this philosophy in April

2014 when he stated that he would "like to have a 20-to-1 ratio of ruining people's days versus

making them" and that he writes the types of articles he does because "I like attention."

52.     In 2013, Biddle published at Gawker a tweet sent out by a private media

executive which contained a joke made in bad taste. Biddle's sharing of the tweet caused the

executive to lose her job and be subject to widespread scorn and ridicule. Biddle admitted that

his publication of the tweet caused "an incredibly disproportionate personal disaster" for the

executive.

53.     Also in 2013, Biddle wrote a post at Gawker that took the comments of a venture

capitalist out of context and made implicit accusations of racism.

54.     In March 2014, Biddle sanctioned an article by a junior writer which compared a dating website to WWII Comfort Women.  The article received severe criticism throughout the national media.

55.     In October 2014, during National Bullying Prevention Month, Biddle sent out distasteful tweets through his Twitter account that supported bullying, stating: "Nerds should be constantly shamed and degraded into submission" and that society should "Bring Back Bullying."  The tweets and fallout that ensued caused several companies to withdraw advertising from Gawker.  Gawker executives admitted that Biddle's tweets, and the lost advertisers that followed, cost Gawker at least $1 million in advertising revenue.

56.     In late 2015, Biddle wrote an article about his use and abuse of narcotics, including his substantial consumption of benzodiazepines, anti-depressants and SSRIs (selective serotonin reuptake inhibitors).  Biddle's drug abuse was well-known at Gawker, including by Denton and Cook, and they nevertheless continued to employ Biddle, promote him, reward him, and assign him to write articles about people.

## GAWKER'S PHILOSOPHY AND PRACTICES

57.     Defendants have shown little interest in reporting the truth to the public, or investigating the facts underlying a story, or for that matter telling the truth to its readers. Defendants routinely make up lies about the subjects of their stories—Dr. Ayyadurai being one of many—with little or no regard to the substantial consequences that their false statements have on the subjects of their stories.  The impact is serious and real.  Defendants destroy personal and professional reputations and careers as a matter of routine.

58.     In or about June 2009, Denton was interviewed by *The Washington Post*, and told

the reporter:  "We don't seek to do good.  We may *inadvertently* do good. We may *inadvertently*

commit journalism.  [Spoken as if it were a crime.]  That is not the institutional intention."

(emphasis added).

59.     Gawker's philosophy and practice is to publish false scandal, for the purpose of

profit, knowing that false scandal drives readership, which in turn drives revenue, and without

regard to the innocent subjects of their stories whose careers are destroyed in the process.

60.     This is the situation here:  Defendants' false statements in the articles at issue had

the effect of so severely discrediting Dr. Ayyadurai—based on the false statement that he is a

"fraud"—that Dr. Ayyadurai's career was severely damaged.  As a direct result of Defendants'

publication of the false and defamatory statements about Dr. Ayyadurai, on information and

belief, Dr. Ayyadurai has lost teaching positions at MIT, lost several paid speaking engagements

at the time and in the future, lost an accolade and display dedicated to his invention at the

Smithsonian Institute, lost contracts and renewals, lost opportunities for investment in his

emerging companies, suffered substantial personal and professional reputational harm, and

suffered substantial harm to his career, business and income.

61.     According to Gawker.com and Gizmodo.com, more than 195,100 people have

read the 2014 Article that Defendants wrote and published; more than 87,900 people have read

the February 2012 Article that Defendants wrote and published; more than 215,100 people have

read the March 2012 Article that Defendants wrote and published; and presumably all of those

readers have spoken to others about the stories.  Moreover, the 2014 Article embeds the March

2012 Article directly in the center of the 2014 Article, summarizes it, and includes a hyperlink to

the March 2012 Article, with a prominent display of the title of the March 2012 article along

with a photo of Dr. Ayyadurai, and urges readers to read it.  The March 2012 Article embeds the

February 2012 Article directly in its center and includes a hyperlink to the February 2012 Article.

Further, when the 2012 Articles were embedded into the 2014 Article, they were directed to a

different audience and readership:  readers of Gawker.com, versus readers of Gizmodo.com.

Therefore, in September 2014, Defendants republished the 2012 Articles, originally published on

Gizmodo.com, by directing them to a new audience of Gawker.com readers and multiplying the

damage done to Dr. Ayyadurai.

62.     As a result of Defendants' wrongful actions, anyone who searches Dr. Ayyadurai

at Google or other search engine will see Defendants' false and libelous stories about him in the

first page of search results across the world.  As a result, anyone who would otherwise have

hired or partnered with Dr. Ayyadurai likely will decline, and have declined, to do so, believing

Defendants' false and libelous statements about him to be true.  These statements also resulted in

a wave of efforts by others to discredit Dr. Ayyadurai and erase him from the history of electronic

communications such as Walter Isaacson's book on Internet pioneers, *The Innovators: How a

Group of Hackers, Geniuses, and Geeks Created the Digital Revolution*;  attacks on Wikipedia

that remove reference to his contributions, and discrediting his other ongoing scientific

contributions unrelated to email technology.  Defendants' actions foreseeably caused such

results.

63.     Defendants are guilty of intentional misconduct.  Defendants had actual

knowledge of the wrongfulness of the conduct described herein and the high probability that

injury or damage to Plaintiff would result and, despite that knowledge, intentionally pursued that

course of conduct, resulting in substantial injury and damage to Dr. Ayyadurai.

64.     Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Dr. Ayyadurai's rights.

65.     Defendants' actions described herein also have had the foreseeable effect of causing severe emotional distress to Dr. Ayyadurai, and did cause him to suffer severe emotional distress.

66.     In 2014, Defendants continued their wrongful actions of 2012 when they published the defamatory 2014 Article about Dr. Ayyadurai, and linked Gawker.com readers to the March 2012 Article, which again linked to the February 2012 Article.

67.     Dr. Ayyadurai requests herein all available legal and equitable remedies, to the maximum extent permissible by law, including without limitation compensatory damages in an amount not less than Thirty-Five Million Dollars ($35,000,000), and punitive damages.

## FIRST CAUSE OF ACTION

### Libel

### (Against All Defendants Except Denton)

68.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     As described herein, the February 2012 Article arises to the level of defamation *per se*, in that it falsely states that "[Dr.] Ayyadurai is a fraud."

70.     As described herein, the March 2012 Article falsely alleges that:

a)   Dr. Ayyadurai engaged in "semantic tricks, falsehoods, and a misinformation campaign."

{00065926;4}                              17

b) Dr. Ayyadurai is engaged in "revisionism" in his claim of invention of email.

71.     As described herein, the 2014 Article arises to the level of defamation *per se*, by stating that Dr. Ayyadurai is a "fraud," thus falsely accusing Dr. Ayyadurai of a crime and causing prejudice to his personal and professional reputation and business.

72.     The 2014 Article also falsely states:

a) Dr. Ayyadurai is a "renowned liar" with respect to his statements that he invented email,

b) Dr. Ayyadurai is a "big fake," and

c) Dr. Ayyadurai is engaged in "cyber-lies."

73.     These false statements wrongly accuse Dr. Ayyadurai of having made statements and acted in a manner that would subject him to hatred, distrust, contempt, aversion, ridicule and disgrace in the minds of a substantial number in the community, and were calculated to harm his social and business relationships, and did harm his social and business relationships.

74.     The statements made intentionally, purposefully and with actual malice by Defendants were false and no applicable privilege or authorization protecting the statements can attach to them.

75.     Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the statements made by Defendants in an amount to be determined at trial.  The false statements attribute conduct, characteristics and conditions incompatible with the proper exercise of Plaintiff's business and duties as an inventor, scientist and entrepreneur.  Because the statements were widely disseminated on the Internet, they were also likely and intended to hold the Plaintiff up to ridicule and to damage his social and business relationships.

{00065926;4}                                                    18

76.    The above-quoted published statements constitute egregious conduct constituting moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages relating to Defendants' making of the above-quoted defamatory statements, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (Against All Defendants Except Denton)

77.    Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78.    Defendants knew that Plaintiff, being an MIT professor/lecturer, scientist, inventor, business owner and entrepreneur, had business relationships that were ongoing during the time of Defendants' publications, and had a reasonable expectation of entering into valid business relationships with additional individuals and entities, including with companies and universities, which would have been completed had it not been for Defendants' wrongful acts.

79.    Defendants acted solely out of malice and/or used dishonest, unfair or improper means to interfere with Plaintiff's actual and prospective business relationships, before they defamed him.

80.    Defendants, through the misconduct alleged herein, intended to harm Plaintiff by intentionally and unjustifiably interfering with his actual and prospective business relationships.

81.    Defendants have seriously damaged Plaintiff's actual and prospective business relationships as a direct and proximate cause of these acts.

{00065926;4}                                    19

82. The above-described conduct is egregious and constitutes moral turpitude. As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against All Defendants Except Denton)

83. Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84. Defendants intentionally wrote the 2012 Articles and posted them to the Gizmodo.com website, and again intentionally wrote and published the 2014 Article to the Gawker.com website to humiliate, defame and embarrass Dr. Ayyadurai.

85. Defendants' posting of the articles was extreme and outrageous in that the contents falsely accuse him of being a fraud and lying about his professional accomplishments and career.

86. Dr. Ayyadurai has suffered severe emotional distress as a result of the content written in the articles and the ramifications the false content has had on his personal life and professional reputation have been immense.

87. The above-described conduct is egregious and constitutes moral turpitude. As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

## Negligent Hiring and Retention

## (Against Denton and Cook)

88.     Plaintiff hereby repeats and realleges each and every allegation set forth in

paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     At all times relevant to the allegations herein, Biddle was engaged in the abuse of

multiple drugs including benzodiazepines, anti-depressants and SSRIs (Selective Serotonin

Reuptake Inhibitors), while employed at Gawker and particularly during the time that he wrote

the 2014 Article.

90.     At all relevant times, Denton and Cook knew or should have known of Biddle's

open and continuing abuse of such drugs, and the impact that it was having on his mental health,

and the caustic and reckless articles that Biddle was writing about people as a result.

91.     At all relevant times, Denton and Cook also knew or should have known that

Biddle sought to libel and destroy the lives of the subjects of his reporting.  In connection with

Biddle's reporting, Gawker and its executives, including Denton and Cook, received outcry and

criticism about Biddle and his articles, while Biddle was employed with them.

92.     Denton and Cook failed to take reasonable care in the hiring and/or retention of

Biddle.

93.     Denton and Cook placed Biddle in a position to cause foreseeable harm to others

(including Dr. Ayyadurai) by placing Biddle and retaining him in the position of Senior Writer.

94.     The above-described conduct is egregious and constitutes moral turpitude.  As

such, in addition to compensatory damages and/or presumed damages, Plaintiff demands

punitive damages in an amount to be determined at trial.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shiva Ayyadurai respectfully requests:

1.      An award of damages to Plaintiff in an amount to be determined at trial, but in all events not less than Thirty-Five Million Dollars ($35,000,000);

2.      An award of punitive damages to Plaintiff in an amount to be determined at trial;

3.      An order requiring Defendants to make a public retraction of the false statements;

4.      An order granting preliminary and permanent injunctive relief to prevent defendants from making further defamatory statements about Plaintiff; and

5.      An award of such other and further relief as the Court may deem just and proper.

Dated: May 10, 2016                    Respectfully submitted,

                                       **CORNELL DOLAN, P.C.**

                                       By: */s/ Timothy Cornell*

                                       Timothy Cornell, BBO # 654412
                                       One International Place, Suite 1400
                                       Boston, MA 02110
                                       Tel: (617) 535-7763
                                       Fax: (617) 535-7721
                                       tcornell@cornelldolan.com

{00065926;4}                    22

**HARDER MIRELL & ABRAMS LLP**

By: */s/ Charles J. Harder*

Charles J. Harder, Esq.
(*Pro Hac Vice application to be filed*)
132 S. Rodeo Drive, Suite 301
Beverly Hills, California 90212
Tel. (424) 203-1600
Email: CHarder@HMAfirm.com

*Counsel for Plaintiff*

# EXHIBIT A



# GIZMODO



Log in / Sign up

# The Inventor of Email Did Not Invent Email?

Mario Aguilar
2/22/12 9:20pm · Filed to: EMAIL ⌄

88.1K    71    3



IMPOSTER?

V.A. Shiva Ayyadurai is a fraud who has been masquerading for years as the pioneering mind behind email. At least according to a bunch of geeks who mobilized from all corners of the digital world to try to set the record straight.

The imbroglio began late last week with a routine news report and it was settled, appropriately enough, with a detailed email.

TechDirt reports that last Friday, The Washington Post wrote about what should have been a sweet acquisition by the Smithsonian Institution:

> The Smithsonian has acquired the tapes, documentation, copyrights, and over 50,000 lines of code that chronicle the invention of e-mail. The lines of code that produced the first "bcc," "cc," "to" and "from" fields were

Document title: The Inventor of Email Did Not Invent Email?
Capture URL: http://gizmodo.com/5887480/the-inventor-of-email-did-not-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:03:24 GMT

the brainchild of then–14–year–old inventor V.A. Shiva Ayyadurai.

Unfortunately, a lot of people don't believe that Ayyadurai invented email in 1978. The doubters say that all Ayyadurai did was write a computer program called "EMAIL," which he copyrighted in 1982. While I in no way want to undermine Ayyadurai's accomplishments, there's a pretty strong case that he's full of it. The fact is that networked communication actually predates Ayyadurai's computer program by quite a few years.

While holding a copyright might be good enough for some people, the Internet cognoscenti weren't going to have it. When they saw that blasphemy in print, they took to Ayyadurai's Wikipedia page, wrote letters of complaint, and debated as only geeks can. TechDirt dug up this wonderful email written by Thomas Haig to the SIGCIS email list. Randell points out that ARPANET sent the first message between two computers back in 1971.

This version of the story makes ARPANET contractor Ray Tomlinson the inventor of email. Tomlinson doesn't quite take credit for the invention, but he does seem to think that the system he was using back in 1971 was indeed email. According to the description on his website:

> The first message was sent between two machines that were literally side by side. The only physical connection they had (aside from the floor they sat on) was through the ARPANET. I sent a number of test messages to myself from one machine to the other. The test messages were entirely forgettable and I have, therefore, forgotten them. Most likely the first message was QWERTYUIOP or something similar. When I was satisfied that the program seemed to work, I sent a message to the rest of my group explaining how to send messages over the network. The first use of network email announced its own existence.

> These first messages were sent in late 1971. The next release of TENEX went out in early 1972 and included the version of SNDMSG with network mail capabilities. The CPYNET protocol was soon replaced with a real file transfer protocol having specific mail handling features. Later, a number

Document title: The Inventor of Email Did Not Invent Email?
Capture URL: http://gizmodo.com/5887480/the-inventor-of-email-did-not-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:03:24 GMT

of more general mail protocols were developed.

Notice that Tomlinson never goes quite so far as to call himself an inventor here, and in the page's FAQ, he acknowledges the contributions made to the technology both before and after he sent those first messages. That makes Ayyadurai's claim all the more strange—as if the most important part of the accomplishment was coining a term. Thomas Haig, from the email before, has no patience for the semantics game when it comes to this question:

They seem to be confusing copyright protection with patent protection, and implying that he would only have copyright on a program he created if it was the first of its kind. I could write a program called "OPERATING SYSTEM" tomorrow and hold the copyright, but it wouldn't mean I invented operating systems.

Well put! The Washington Post did publish a correction, which only half-admits that Ayyadurai didn't really invent email. Perhaps the truth is that email as we know it really shouldn't be considered a single person's invention. [TechDirt, The Washington Post, and Roy Tomlinson]

Document title: The Inventor of Email Did Not Invent Email?
Capture URL: http://gizmodo.com/5887480/the-inventor-of-email-did-not-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:03:24 GMT

# EXHIBIT B




# GIZMODO

Log in / Sign up

# Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email

Sam Biddle
3/05/12 2:50pm · Filed to: INTERNET ⌄

216.2K    132    7



lant director for academic support, gives some pointers on computer usage to Shiva Ayyad
ring breaks from his schooling at MIT.

Shiva Ayyadurai, pictured above, is a shimmering intellectual. He holds four degrees from MIT (where he lectures), numerous patents, honors, and awards. He also says he invented email, and there's a global conspiracy against him. Guess which one of these statements is true.

In 1978, a precocious 14-year-old from New Jersey invented email. You can see him doing it in the photo at the top right of your screen—the kid glued to his monitor. In that picture, he's busy showing off his creation—a way for office staff to message each other via computer. As he's happy to gab to the

*Washington Post*, which recently ran a profile of him, Ayyadurai was a teen wonder who invented the electronic messaging system with which we all communicate, back in 1978. Ayyadurai's collection of "historical documents" is now to be interred at the Smithsonian, the Post reported, laid gloriously on the pillar of American history alongside artifacts of Occidental Civilzation such as Dizzy Gillespie's trumpet, Thomas Jefferson's Bible, and a 1903 Winton, "the first car driven across the United States." Ayyadurai is about to become more than just a gifted programmer and Professional Smart Man, but a historical figure. All of this leading up to a plum book deal with Norton, proclaiming his place in history as the upstart inventor of email itself.

But why have you never heard of him? Probably because there's precious little evidence that Ayyadurai came remotely close to inventing email, beyond a few misleading childhood documents and a US Copyright form of dubious weight. This was enough to convince the Washington Post and Smithsonian? Before you could even finish the Post's ode, Emi Kolawole, the reporter behind the piece, issued a stumbling correction:

> A number of readers have accurately pointed out that electronic messaging predates V. A. Shiva Ayyadurai's work in 1978. However, Ayyadurai holds the copyright to the computer program called"email," establishing him as the creator of the "computer program for [an] electronic mail system" with that name, according to the U.S. Copyright Office.



West Essex Tribune                    October 30, 1980

Document title: Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email
Capture URL: http://gizmodo.com/5888702/corruption-lies-and-death-threats-the-crazy-story-of-the-man-who-pretended-to-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:01:37 GMT



Shiva Ayyadurai shows plans for the electronic mail system that he designed to math teacher Irman Greenberg and Stella Oleksiak, coordinator of the Independent Study program at Livingston High School.

## Livingston Student Designs Electronic Mail System

On October 7, Irman Greenberg, math teacher, and Stella Oleksiak, Independent Study coordinator, along with Shiva Ayyadurai and his father visited the Computer Center at the College of Medicine and Dentistry of New Jersey to observe the design and implementation of Ayyadurai's electronic mail system.

Ayyadurai, a senior at Livingston High School under the tutelage of Blair Krimmel, head of the math department and the Independent Study program, with the encouragement of Dr. Leslie Michelson, manager of the lab computer, created an electronic mail system with enough sophistication for immediate practical use at the college and commercial potential.

Since the eighth grade, Ayyadurai has proven that he could work mathematically far beyond the traditional classroom. During ninth grade he was bussed from Heritage to

learned various computer languages such as Fortran, Basic, Cobol and Snobol, and was graduated with honors. As a consequence of his math background and his computer training, he began his work at CMDNJ.

During the same year, he was accepted for the Atlantic Regional Math League and competed in the Essex County League and the Iron Hills Conference. As a veteran member of ARML, he and the team placed seventh out of the 43 teams.

While studying Ptolemy's Theorem, Ayyadurai observed an entirely new geometric relationship in the field of vector geometry. This finding was published in the journal "The Mathematics Teacher," Fall 1980 issue. In April 1980, he won individual first place in the advanced math competition in the Essex County Math League.

He is continuing his In-

Document title: Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email
Capture URL: http://gizmodo.com/5888702/corruption-lies-and-death-threats-the-crazy-story-of-the-man-who-pretended-to-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:01:37 GMT

was bussed from Heritage to the high school where he passed the Algebra I and II tests while studying geometry at the same time.

During the summer of 1978, he was accepted for the computer science program at New York University where he

dependent Study Program under Krimmel in the area of statistics.

Well, that's a rather different claim to fame entirely, isn't it? After we posted incredulously, Ayyadurai's PR rep was quick to rally us toward his cause—and the case was urgent. Not only was Ayyadurai desperate to set the record straight, but there was a tale of globalization and woe that explained the detractors. Ayyadurai wasn't being accused of lying about inventing email because hadn't invented it; he was the victim of international character assassination. *This goes all the way to the top.*



**The Inventor of Email Did Not Invent Email?**

V.A. Shiva Ayyadurai is a fraud who has been masquerading for years as the pioneering mind behind...

Read more

In 2009, Ayyadurai worked for the Indian government, helping to run CSIR, a national R&D incubator tasked with finding homegrown patents and turning them into national high tech moneymakers. According to Ayyadurai, the center, with its billions of dollars to spend, was as corrupt as you'd imagine an R&D incubator in a developing country would be. Dissent was verboten, patents were plagiarized, and the few ideas of worth were rounded up laid fallow. When someone tried to speak up, they were canned. Meanwhile, plush villas, fat salaries, and state-provided cars were doled out to scientists within the organization on the dime of the Indian people.

Ayyadurai couldn't sit idly by while this happened. He admonished his management in a letter he circulated within CSIR, calling for freedom of speech among colleagues. The Indian government clamped down immediately: He was banned from further communiques, promptly fired, evicted from his government housing, and urged to flee the country, lest his life and family be

Document title: Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email
Capture URL: http://gizmodo.com/5888702/corruption-lies-and-death-threats-the-crazy-story-of-the-man-who-pretended-to-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:01:37 GMT

harmed. Phone calls of warning and threat were persistent, he says.

So Ayyadurai did flee, returning to MIT, where he's generally described by his colleagues as a nut and fraud—the terms "asshole," and "loon" were tossed around freely by professors who were happy to talk about their coworker but prefer to remain anonymous. "Don't know him, but [he] didn't invent email. If he claims to have done so he's a dick," said one MIT brain.

Ayyadurai is convinced the Indian government isn't through with him. He claims that it hired a team of "bloggers" and PR hatchet men to smear him across the internet. Target number one? His claim to be the father of email.



On the phone, Ayyadurai comes off as kind, a man of nervous tact. But it also

Document title: Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email
Capture URL: http://gizmodo.com/5888702/corruption-lies-and-death-threats-the-crazy-story-of-the-man-who-pretended-to-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:01:37 GMT

absolutely feels like trying to sell you something that's just not sticking—a sort of mainframe Willy Loman. At publications he's duped into letting him opine unfettered, he's email's inventor, through and through. He also owns dozens of immodest domains to that point—InventorOfEmail.com, DrEmail.com, EmailInventor.com—you get the point. No? Well Ayyadura has literally 100 more sites (103 in total) dedicated to making sure you do.

But press Ayyadurai, and he gets desperate, as his entire faux-fame rests upon semantic tricks, falsehoods, and a misinformation campaign.

Shiva Ayyadurai didn't invent email—he created "EMAIL," an electronic mail system implemented at the University of Medicine and Dentistry in Newark, New Jersey. It's doubtful he realized it as a little teen, but laying claim to the name of a product that's the generic term for a universal technology gives you acres of weasel room. But creating a type of airplane named AIRPLANE doesn't make you Wilbur Wright.

The actual pioneers of email were breaking new ground more than a decade before Ayyadurai concocted his dental memo system. Electronic mail predates Ayyadurai's ability to spell, let alone code. Ray Tomlinson is best known for having sent the first text letter between two computers on ARPANET in '71—y'know, an *email*. He also picked out the @ sign. A modest career. And despite Ayyadurai's insistence that, at the very least, he was the first to make use of the To/From/CC/BCC/etc fields we still use in Gmail today, this too is a personal fantasy. Tomlinson, who began working on early inter-computer messaging when Ayyadurai was a year old, explained to us how he became well-versed with these linchpins of modern email years before Ayyadurai drew them up on his own:

> [We] had most of the headers needed to deliver the message (to:, cc:, etc.) as well as identifying the sender (from:) and when the message was sent (date:) and what the message was about. I chose the Latin word "re" meaning "about" for this. This apparently too obscure and was replaced with "subject:". However, "re:" is still use in the subject field to refer to the subject of the message to which the message is a reply. RFC 561

documents the headers as of 1973. Before that the standard was de facto.
You could include any header you wanted in a message, but you had better
use to:, cc:, etc. if you wanted the receiving program to understand.

These email underpinnings were further cemented in 1977's RFC 733, a
foundational document of what became the internet itself—a full year before
Ayyadurai's EMAIL project.

It was rough around the edges, but it was email. The work of Tomlinson and
his peers was limited, but so too was the internet—and both exploded
together. But ask Ayyadurai, and he dismisses it all—these messages weren't
email, but "messages" and nothing more, relegated to some inferior class of
communications that he compares to everyday "text messaging and morse
code." It was all just sloppy streams of letters until he made EMAIL—and only
then did the system behind Gmail, BlackBerry, and every computer on the
planet see light.

But Ayyadurai's claim that he revolutionized how those messages are sent isn't
uncontested either. Dave Crocker, another eminent figure in the history of
actual email, calls Ayyadurai's posturing "theatrical," rattling off a fat list of
email clients—MSG, SNDMSG, HERMES, MS—that did pretty much what
EMAIL did, years and years before Ayyadurai started coding. "For a 14 year old
his work was impressive," Crocker told us over the phone. "What he's saying
about it now as a much older adult is also impressive—but in a very different
way."

It's possible Ayyadurai was the first to come up with the term "EMAIL." That
alone would be a feat. "In 1971, we called them 'messages,'" explains
Tomlinson, a man so accomplished he can casually mention such things. But
even that claim is tenuous, as Crocker points to a scholarly journal titled
"EMMS; Electronic Mail and Message Systems." It was published a year before
Ayyadurai did anything. "Newsletters for a topic don't usually start before the
topic has been invented," says Crocker.

It's also possible the idea of copying decades-old paper standbys like "blind

carbon copy" occurred to Ayyadurai independently of ARPA's work, and that he put it together in a friendly software package. But that's about as much as Ayyadurai has on his side, PR team and media credulity notwithstanding. The fact is that the labors of people like Tomlinson and Crocker are the monkey to your Gmail's *homo sapiens*, explains Tomlinson: "Email has evolved — FTP is no longer used to transport email. Additional media may be used instead of plain text. Messages are stored in a myriad of ways — Gmail stores messages in databases on huge server farms, messages on my end are stored in files on an IMAP server, etc., but the essence, even the at-sign, remains the same." That explanation? The words of an "elite group of people who think they own innovation," according to Ayyadurai.

Except they have history on their side. They need no aggrandizement, no *TIME* article, no need to take the *Washington Post* on a ride, no baseless Smithsonian tribute (the museum declined to comment on Ayyadurai's false apotheosis). They've done their work. But anyone who cares about the history of the astoundingly clever and complex things we use daily might suffer from Ayyadurai's ego campaign. Ayyadurai is free to self-promote—and he's doing a hell of a job—but when he delves into revisionism, it's a rare ego trip we shouldn't let slide.

Document title: Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email
Capture URL: http://gizmodo.com/5888702/corruption-lies-and-death-threats-the-crazy-story-of-the-man-who-pretended-to-invent-email
Capture timestamp (UTC): Mon, 09 May 2016 23:01:37 GMT

# EXHIBIT C

    

Log in / Sign up

# If Fran Drescher Read Gizmodo She Would Not Have Married This Fraud

**Sam Biddle**
9/08/14 1:05pm · Filed to: MARRIAGE ⌄

195.2K    182    40



In 2012, an enterprising young Gizmodo blogger published the story of Shiva Ayyadurai, an MIT lecturer and renowned liar who pretends he invented email. Today, he adds another achievement to the resume, marrying Fran Drescher. Fran, you fucked up!



### Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email

Shiva Ayyadurai, pictured above, is a shimmering intellectual

Document title: If Fran Drescher Read Gizmodo She Would Not Have Married This Fraud
Capture URL: http://gawker.com/if-fran-drescher-read-gizmodo-she-would-not-have-marrie-1631991144
Capture timestamp (UTC): Mon, 09 May 2016 23:03:02 GMT



oiva nyyuuuui, pictureu above, is a summering intellectual.
He holds four degrees from MIT...

Read more gizmodo.com

You had two years to discover that this guy is basically a big fake. And now look at you: stuck with the guy, doomed to nod along to his cyber-lies for a lifetime, as you grow old together and reminisce about things you didn't invent. The lesson here is clear: read Gizmodo daily, or your personal life is headed down the shitter.

*Photo: Getty*

Document title: If Fran Drescher Read Gizmodo She Would Not Have Married This Fraud
Capture URL: http://gawker.com/if-fran-drescher-read-gizmodo-she-would-not-have-marrie-1631991144
Capture timestamp (UTC): Mon, 09 May 2016 23:03:02 GMT

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
SHIVA AYYADURAI, an individual,

**DEFENDANTS**
GAWKER MEDIA, LLC, a Delaware limited liability company; SAM BIDDLE, an individual, JOHN COOK, an individual, NICHOLAS GUIDO ANTHONY DENTON, an individual, and DOES 1-20,

**(b)** County of Residence of First Listed Plaintiff    Middlesex
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    New York
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Timothy Cornell, BBO # 654412
CORNELL DOLAN, P.C., One International Place, Suite 1400
Boston, MA 02110; Tel: (617) 535-7763

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☐ 2   U.S. Government Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

*(Note: ☒ 320 Assault, Libel & Slander)*

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from Another District *(specify)*

☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332(a)
Brief description of cause:
Defendants published false and defamatory statements about Plaintiff.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
35,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
05/09/2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.