Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 16-11700-smbM

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    GAWKER MEDIA, LLC,

7           Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Case No. 16-12239-smb

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   In the Matter of:

12   NICHOLAS G. A. DENTON,

13          Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15                 U.S. Bankruptcy Court

16                 One Bowling Green

17                 New York, NY   10004

18

19                 October 6, 2016

20                 11:01 AM

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1   Hearing re:  Official Committee of Unsecured Creditors'

2   Application to Employ Deloitte Financial Advisory Services

3   LLP as Financial Advisor effective nunc pro tunc to June 28,

4   2016.

5

6   Hearing re:  Debtors' Omnibus Motion Pursuant to 11 U.S.C.

7   365, Fed. R. Bankr. P. 6006, and LBR 6006-1 (I) Authorizing

8   Assumption and Assignment of Certain Executory Contracts in

9   Connection with the Sale, (11) Fixing Cure Amounts Relating

10  to Assumed Executory Contracts, and (111) Granting Certain

11  Related Relief.

12

13  Hearing re:  Debtors' Motion for Entry of an Order Extending

14  Exclusive Periods to File Chapter 11 Plan and Solicit

15  Acceptances Thereof Pursuant to Section 1121(d) of the

16  Bankruptcy Code.

17

18  Hearing re:  Debtors' Motion for Entry of an Order (I)

19  Establishing a Deadline to File Certain Administrative

20  Claims and Procedures Relating Thereto and (II) Approving

21  the Form and Manner of Notice Thereof.

22

23  Hearing re:  Debtors' Motion for Entry of an Order Extending

24  Time to Assume or Reject Unexpired Leases of Nonresidential

25  Real Property Pursuant to 11 U.S.C. 365(d)(4).

Page 3

1    Hearing re:  Motion of St. Paul Fire & Marine Insurance

2    Company to Lift the Automatic Stay.

3

4    Hearing re:  16-11700-smb Case Conference.

5

6    Hearing re:  16-12239-smb Case Conference.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
                                                          Page 4

  1   A P P E A R A N C E S :

  2

  3   COLE SCHOTZ P.C.SCHOTZ

  4        Attorney for Nicholas Denton

  5        Court Plaza North

  6        25 Main Street

  7        Hackensack, NJ 07601

  8

  9   BY:  WARREN A. USATINE

 10

 11   PUTNEY, TWOMBLY, HALL & HIRSON LLP

 12        Attorneys for St. Paul Fire & Marine Insurance

 13        521 Fifth Avenue

 14        New York, NY 10175

 15

 16   BY:  THOMAS A. MARTIN

 17

 18   ROPES & GRAY LLP

 19        Attorney for the Debtor

 20        Prudential Tower

 21        800 Boylston Street

 22        Boston, MA  02199

 23

 24   BY:  D. ROSS MARTIN

 25
```

```
1    ROPES & GRAY LLP
2          Attorney for the Debtor
3          1211 Avenue of the Americas
4          New York, NY 10036
5
6    BY:  GREGG M. GALARDI
7
8    COHEN & GRESSER LLP
9          Attorney for Terry Bollea
10          800 Third Avenue
11          New York, NY 10022
12
13    BY:  DANIEL H. TABAK
14
15    FREJKA PLLC
16          Attorney for Deliotte FAS
17          205 East 42nd Street, 20th Floor
18          New York, NY 10017
19
20    BY:  ELISE S. FREJKA
21
22
23
24
25
```

1    SIMPSON THACHER & BARTLETT LLP

2         Attorney for Creditors' Committee and Sandeep Qusba

3         425 Lexington Avenue

4         New York, NY 10017

5

6    BY:  WILLIAM T. RUSSELL, JR.

7

8    ALSO PRESENT TELEPHONICALLY:

9

10   MARIA CHUTCHIAN

11   KATY PAPE

12   ALEX MCGEE

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              MR. GALARDI:  Good morning, Your Honor.  For the

3    record, Gregg Galardi of Ropes & Gray on behalf of Gawker

4    Media.  If I may suggest an order for taking up matters,

5    this is a status conference with respect to Gawker.  And

6    also, I understand you have a status conference with respect

7    to Mr. Denton's case, so I thought maybe we would take that

8    up together and --

9              THE COURT:  That's fine.

10             MR. GALARDI:  -- and then move onto the agenda.

11   Your Honor, I think I have seen you since we closed the sale

12   on September 9th, but I think what I want to do is go

13   through some significant events, where we are in the case,

14   and then to announce some, I think very encouraging news.

15             So let me start with, as I had mentioned

16   previously on September 9th, we closed the sale to an

17   affiliate of Univision called UniModa.  And with respect to

18   closing of that sale, there was $135 million proceeds.  And

19   much of those proceeds -- about $35 million of those

20   proceeds went to pay down certain secured debt.

21             Since that time, there have been a lot of post

22   closing trends at (indiscernible) that's been done.  For

23   example, Mr. Holden, who is in the courtroom today has been

24   in Hungary to work out who will be the manager.  This is for

25   asset sales, so there are still companies to be dealing with

Page 8

1    there.

2          So he has now become the manager of what we are

3    now going to re-name Gawker Hungary, as required by the

4    asset purchase agreement.  We have been dealing with the

5    fact that there an election by UniModa to leave the

6    Gawker.com assets behind, which included content, URL's.

7    And so, he's been working with respect to that.

8          Your Honor knows we've been subject to a lot of

9    litigation, so one of the transition items that's being

10   worked out, and these are all post-September 9th.  We tried

11   to get as much of it done before that, is with respect to

12   privileged preservation of privilege.

13         And then, there is a working capital adjustment

14   that has to be made.  And one of the things Your Honor will

15   note on the agenda is we had an administrative bar date we

16   said we'd be amending a second amended administrative bar

17   date.  And one of the issues --

18         THE COURT:  I think I signed that.

19         MR. GALARDI:  I think we asked to -- for a

20   modified order today.  So let's see where we stand with

21   that.  But one of the things is, the working capital

22   adjustment has to be resolved.  So among the many things

23   post closing that we've been doing are all of those things.

24         In addition, I wanted to mention some corporate

25   governance, which does in fact affect Mr. Denton, so I think

Page 9

1    it's important to know.  As I had mentioned at the last

2    hearing as part of the sale, the UniModa offer -- every

3    single employee other than Mr. Denton's employment, Mr.

4    Denton, as you know, had a non-compete agreement.

5         All of the employees except for one took the

6    employment.  With respect to GMGI, we took two steps, and

7    it's partially because of Mr. Denton's bankruptcy.  GMGI,

8    which is the parent corporation, now only has two board of

9    director members.  As of September 10th, those two board

10   members are Mr. Scott Tillman, who is the independent board

11   member, and Mr. Thomas Plunkett, who was a board member

12   prior to that date.

13        Mr. Denton still attends board meetings in an

14   observing capacity and as an equity holder, but he is no

15   longer an official member of the Gawker GMGI board.  Mr.

16   Denton was also the manager of Gawker Media LLC, the

17   Delaware Corporation in the bankruptcy company.

18        After the closing of the sale, we -- Mr. Denton no

19   longer has the role of manager there, and we, and as that --

20   result of discussions to make clear certain types of

21   governance and issues that we were facing.

22        GMGI now became the manager of the Gawker Media,

23   LLC.  And as I mentioned, Mr. Holden is the manager of

24   Kinja.  So we took those corporate steps, which were all

25   really consistent with what I had advised Your Honor before,

1   that Mr. Tillman had been given designation of authority

2   with respect to the sale process, which we will -- we're

3   concerned about some potential conflict issues, which Your

4   Honor had mentioned the first day.

5           And as we were approaching the plan and various

6   allocation issues, as I had mentioned to Your Honor, Mr.

7   Tillman had authority with respect to this, so since Mr.

8   Tillman is the independent director at GMGI that has all

9   this authority, we've placed him in the -- we placed GMGI as

10  the manager of Gawker Media.  He has also got control, and

11  to whom Mr. Holden reports on the board at Kinja.

12          And so, Mr. -- we took those formal steps.  We had

13  talked with the Committee about that and those steps were

14  with their consent.  Mr. Denton is also -- because he had an

15  employment agreement, we haven't yet rejected it, but again,

16  in conversations with the Committee, Mr. Denton's employment

17  agreement that had a higher salary, has now been reduced to

18  $4,000 a month to give advice with respect to various

19  matters for a limited period of time of 90 days.

20          We are working with Mr. Denton's counsel to work

21  through those issues with that.  Now also, with respect to

22  Mr. Denton, we have an agreement we need to come back to Mr.

23  Denton's bankruptcy case, that we will be filing an

24  extension of time to raise non-dischargability issues with

25  respect to Mr. Denton.

1          We had talked with the Committee about that, as to

2     any potential claims that the estate may have against Mr.

3     Denton.  These things may all get resolved partially in our

4     plan, and partially, with respect to Mr. Denton.  But there

5     is an agreement to put forth that document with respect to a

6     case.

7          In addition, Your Honor, so that sort of took care

8     of the corporate governance aspects, and I'm building up to

9     the other matters.  The company has been involved, and

10    really, Mr. Holden and Opportune have been involved as

11    required by the sale order to provide a budget to the

12    Committee with respect to ongoing operating expenses.  They

13    have done that.  And then, updated it, and have been working

14    with Deloitte, whose application is -- for retention is on

15    today.

16         The claims bar date.  As Your Honor may recall,

17    you signed an order, I think it was back in August, setting

18    a claims bar date of September 29th in addition to an

19    administrative claims bar date of that same date.  The

20    administrative bar date ran for the period of claims arising

21    before July 31st of the year.

22         That bar date has now run.  We have started to

23    look at the claims, as has the Committee.  They really break

24    down into what I'll call three different types.  There are

25    the litigation claims with some large amounts, which we

Page 12

1    dispute.  Obviously, Mr. Bollea filed a claim, which we

2    dispute, but it's not -- it's contingent and it's now

3    liquidated.

4         There are a number of small pre-petition claims

5    that we believe get resolved by way of the UniModa deal, but

6    have been unable to address that.  And then there are

7    numerous un-liquidated contingent indemnification claims

8    from the writers, who have indemnification or believe they

9    have indemnification in the event they are sued, some of

10   which have been in fact they sued.

11        And finally, Your Honor, I think with respect to

12   the biggest event, we filed, as of last Friday, a plan and

13   disclosure statement that sets forth the Debtor's position

14   at that point, with respect to a number of issues.  The

15   first issue, as I have alluded to, is the allocation of

16   assets and liabilities between the Kinja estate and the

17   Gawker Media estate.

18        We proposed a plan settlement in that, between

19   those two estates.  Second, there was, and I think Your

20   Honor may recall, I have mentioned to Your Honor, an issue

21   that we had with respect to, I call it Columbus Nova, I

22   think it's US v. LV.  Under the second lien debt, there was

23   a make-whole claim by that entity, which have reserved

24   throughout our rights to object to that.

25        That plan also provides for a settlement treatment

Page 13

1    of that Columbus Nova make-whole plan.  We have proposed

2    that, and counsel for Columbus Nova's in the courtroom.  We

3    have proposed a certain settlement.  I will say that it is

4    not completely final at this point, but we are hopeful that

5    that plan will be the settlement or something very close to

6    that.  We have to have some follow-up conversations.

7         With respect to the plan, both before filing the

8    plan and subsequent to filing the plan, we've been in

9    discussions with the Committee, with Columbus Nova, and

10   indeed, with individual creditors, such as Mr. Bollea and

11   the other creditors with regards to solving some of the

12   issues.

13        I'm going to let the Committee say how much they

14   feel comfortable with what I'm going to say here, but with

15   respect to the plan subsequent to filing the plan, we have

16   had substantive conversations with the Committee, and I

17   would say as I stand here, hopeful today that we will

18   resolve plan confirmation allocation issues with the

19   Committee.

20   And we've had some -- and it's not just the Committee, and I

21   think it's important to understand, because it's also going

22   to go to Mr. Denton's case.  As Your Honor is aware, the

23   Committee consists of three Creditors -- Mr. Bollea, who has

24   that liquidated judgment, and then there are two other

25   plaintiffs, Mr. Ayyadurai and Ms. Terrill.  They have all

Page 14

1    asserted claims in these bankruptcy cases, not just against

2    Gawker Media, but I believe they all have claims against Mr.

3    Denton, and they also have claims against certain writers.

4                THE COURT:  There aren't claims against Kinja, is

5    there?

6                MR. GALARDI:  Well, they --

7                THE COURT:  Is Kinja solvent?

8                MR. GALARDI:  Kinja we believe is solvent, Your

9    Honor, but there -- I'll get a little bit to the claims.  We

10   don't believe, and as you may recall, and I'll start of set

11   it, UniModa had asked for us to leave 2 million behind to

12   keep available to Kinja.  Our view is that Kinja is solvent,

13   and indeed has paid all of its claims.  There may be a

14   couple little claims, but there's plenty of money.

15               But a lot depends, to some extent whether -- and

16   the Committee -- and this is why I think it's important to

17   understand why the settlement with the Committee will be

18   incredibly valuable to these estates, there are arguments

19   that Kinja was used improperly.  They could make those

20   arguments that money was funneled out of Gawker Media to go

21   pay Kinja.  So the only reason it might have been solvent is

22   their legal theory that they could advance.

23               There is a claim filed, none of the individuals --

24   well, notwithstanding the fact that they don't have claims,

25   we believe, I will say lawyers file claims against all three

1    entities all of the time, so you'll have your standard

2    claims objections.  So all of the plaintiffs Ms. Terrill and

3    Ayyadurai, I'm going from memory, filed claims against

4    Kinja, but I will say I think Mr. Bollea did.  And then

5    there are litigation claimants that filed claims against all

6    of the entities.

7            For example, Your Honor, Mr. Huon, who Your Honor

8    may recall, we lifted the stay --

9            THE COURT:  From Chicago?

10           MR. GALARDI:  From Chicago.  Filed claims against

11   Kinja.  In fact, he has a complaint that names Kinja.  So --

12   and I was interested in the dialogue before, he did file a

13   complaint that named Kinja.  Now we obviously don't believe

14   that there's a claim with Kinja.  He also filed a claim at

15   Gawker, MGMI, so going through the claims process.

16           THE COURT:  What's the status of that appeal?

17           MR. GALARDI:  The City and the Seventh Circuit I

18   think is waiting for Judge -- I understood it might be

19   Easterbrook -- to make a decision, but that -- again, the

20   stay doesn't preclude that; we lifted the stay there.  And

21   I'm going to get to the stay lifting.

22           So we have been working.  Now one of the big

23   issues in the allocation, which I've described before is if

24   all the money goes over to Kinja, or all the money goes over

25   to Gawker Media, you have various claim pots that have to be

Page 16

1    addressed.

2         We had subsequent conversations with the Committee

3    after filing the plan, and before it, and have been working

4    on a structure.  Importantly, as I was getting to, the

5    structure is such that the Committee, I believe, will

6    support a plan and we're going to work through mechanics,

7    obviously.  We believe we may have a settlement that will

8    work through the, one -- resolving the allocation issue, and

9    two, the individual creditors on the Committee will support

10   the plan, which will have implications for Mr. Denton's

11   case, because those same creditors, as I was mentioning,

12   they have claims against Mr. Denton on their litigation.

13   And in essence, that will allow certain monies to perhaps go

14   out to the preferred shareholders, which may also affect Mr.

15   Denton's case, in exchange for certain money remaining so

16   that you could have the underlying litigation fight held in

17   trust.

18        So we're very hopeful about that.  I'll let the

19   Committee counsel say anything more about that, but that has

20   been a development which we confirmed today before Court.

21        Finally, Your Honor, and I think it's important to

22   also understand status of litigations, because Your Honor

23   has known that these litigations have been the source of the

24   bankruptcy.  One as I already mentioned and Your Honor

25   asked, we had agreed to already to lift the stay with

1    respect to the Seventh Circuit matter and Huon, that's

2    proceeding, it's going to proceed on whatever schedule of

3    the Seventh Circuit.

4            But getting to the more fundamental issues with

5    the Committee, the Ayyadurai and Terrill matters, we have a

6    stipulation with the counsel, we have been waiting for the

7    signature back to lift the stay.  Those matters are

8    presently scheduled to have papers filed on October 10th.

9    The Debtor will be filing papers.  The procedure in those

10   particular courts are that you give a notice as to why you

11   should be able to file a notice of dismiss -- dismissal, the

12   Court decides based on that letter brief whether you can

13   file your motions to dismiss.

14           We, the Debtors, along with the writers, will be

15   filing that.  We are --

16           THE COURT:  Which actions are those?

17           MR. GALARDI:  Those are the Ayyadurai actions and

18   the Terrill actions -- Terrill action.  One is in the

19   District Court of Massachusetts, one is in the District

20   Court -- Southern District of New York.  We don't believe we

21   need stay relief.  We have offered stay relief to the other

22   side.  They were part of the preliminary injunctions, the

23   preliminary injunctions ran off on September 3rd, we are

24   working to do the stipulation.  We believe we have a

25   stipulation.  I think with the holidays we weren't able to

Page 18

1    get it signed by the other party, I was hopeful to file it.

2    We don't believe we need relief from the stay to go forward

3    with that.

4            So the company and the individual writers, Mr.

5    Denton is a different circumstance, will be filing papers

6    and we've agreed to lift the stay for all purposes other

7    than to bring a judgment back in those matters to go

8    forward.

9            That brings now to Mr. Bollea.  Your Honor, you've

10   heard me say that we would like to lift the stay in that

11   matter. I will say, to date we have not come to an agreement

12   with Mr. Bollea regarding the lifting of the stay.  And

13   there are negotiations regarding that.  The Debtors wanted

14   to lift it for the narrow purposes of the appeal, I believe

15   the Bollea group wants to lift it for a broader purpose.

16   There was another wrinkle, but I think that wrinkle is now

17   getting resolved, or will get resolved in the next 30 days

18   as to Mr. Denton being available to take questions.

19           THE COURT:  Are two actions against -- brought by

20   Mr. Bollea, right?  This --

21           MR. GALARDI:  Correct.

22           THE COURT:  -- is agreement as to both actions?

23           MR. GALARDI:  No, actually not, Your Honor.  The -

24   - I call them Bollea 1 and Bollea 2, and I think that's

25   referred to in the plan.

Page 19

1          THE COURT:  Bollea 2 is the one that's the subject

2   of the relief of the -- what do you call it, the relief from

3   stay.

4          MR. GALARDI:  It has -- well, no.  Bollea one, I'm

5   going to -- Bollea 1 is the one in which there is the

6   judgment that's outstanding.  That's the one we're seeking

7   the lift the stay on, with the issue being, essentially, is

8   everything, including contempt, going to be brought or are

9   we just going to go to the final judgment.  That's going to

10  be -- and if we can't resolve that, we believe we'll have a

11  motion before you on November 3rd.

12          What I call Bollea 2 is where there is a number of

13  defendants and it's currently stayed by the Appellate Court

14  on a -- I can't remember if it's mandamus or otherwise, on a

15  recusal motion with respect to the judge.  It's in the state

16  court.

17          THE COURT:  But that's the one that involved the

18  disclosure of the transcript?

19          MR. GALARDI:  Correct.  That's the tape or

20  transcript with, you know, a word that's not to be used.

21  That one we have talked about, but that one is in its

22  infancy, so we have not really gone forward on that lift

23  stay.  I will say that Mr. Bollea filed a claim for both of

24  those in the bankruptcy case.

25          So that is where we stand from the Debtor's

1   perspective.  I would turn it over to Mr. Denton's counsel

2   to add -- or if Your Honor has questions.  Or maybe

3   beforehand, I don't know -- I'd turn it over to the

4   Committee for their comments on the plan, I think that's

5   probably more fitting.

6           MR. QUSBA:  Good morning, Your Honor.  Sandy

7   Qusba, Simpson, Thatcher & Bartlett, counsel for the

8   Unsecured Creditors Committee at Gawker.

9           A couple of things.  That was a very fulsome

10  description that Mr. Galardi gave with respect to matters

11  that have been transpiring.  First on Gawker.com, I think

12  Mr. Galardi mentioned that UniModa, as the purchaser,

13  exercised its election to leave that behind.  And just to

14  clarify, that is -- there's no new content going up on

15  Gawker.com, it's still part of a liquidation, there's no,

16  really significant employees left there, either.  So that

17  was one.

18          Number two, a number of steps have been taken to

19  preserve rights until and hopeful we can get to a

20  settlement.  And again, Mr. Galardi referenced this as well,

21  those steps to preserve rights include, for example, the

22  Debtor's acquiescence to file proofs of claim against each

23  other, against other Debtor entities, to preserve right.

24  And, you know, if we need to seek standing, we'll seek

25  standing, but hopefully, you know, a lot of this can be

Page 21

 1    resolved.

 2              In addition to intra-debtor reservation of rights,

 3    Mr. Galardi also mentioned a stipulation with Mr. -- with

 4    respect to Mr. Denton, and the extension of the non-

 5    dischargability deadline.  So again, all rights are being

 6    preserved until and hopefully when we can get to a

 7    resolution.

 8              We have been, as Mr. Galardi mentioned, in active

 9    dialogue with the company.  We clearly don't agree with the

10    plan that's on file today, but having said that, we are

11    working constructively with the Debtors to ensure that

12    adequate cash will be available to Gawker Media creditors.

13    And we're talking about, you know, 90 or so percent of the

14    cash proceeds being held in some sort of trust or reserve or

15    some form, so that once the underlying litigations are

16    resolved, there's actually a pot of cash that people can

17    look to.

18              In addition, we're also working on other aspects

19    of the Chapter 11 plan with Mr. Galardi and the Debtors,

20    which will hopefully incentivize settlements, Your Honor,

21    and particular with those who have -- who are plaintiffs and

22    have causes of action that are pending.  We would love to

23    not spend money on legal fees and preserve that capital for

24    the benefit of whoever is entitled to it at the end of the

25    day, and so we're working hard to do that.  But preserving

1    rights along the way, in order to ensure that if we can't

2    get to a settlement or a deal, then no one's been

3    prejudiced.

4              THE COURT:  I take it there's a dispute about the

5    allocation?

6              MR. QUSBA:  There is a dispute about the

7    allocation.  But again, we're trying to structure a

8    arrangement such that we don't have to litigate that.

9              THE COURT:  Okay.

10             MR. QUSBA:  Thank you, Your Honor.  If you have no

11   other questions?

12             THE COURT:  Yeah.  Thank you.

13             MR. USATINE:  Good morning, Your Honor.  Warren

14   Usatine, Cole Schotz, on behalf of Nicholas Denton.  Since

15   last I was here, I think we had a status conference just

16   about two weeks ago in this case, but there have been some

17   administrative things that we -- that I told you about and

18   foreshadowed for you the last time that we have been

19   addressing.

20             Number one, we filed our bar date motion.  That's

21   pending.  I think the bar date we're seeking, I don't have

22   it off the top of my head, but I think it's sometime in the

23   second half of November, understanding that our case was

24   filed about two months after the corporate cases.

25             We also have filed our application seeking

Page 23

1    retention of the real estate broker who will market Mr.

2    Denton's appointment.  Your Honor will recall the motion we

3    had about the attempt to lease the asset.

4         We have filed and we -- it took us some time, but

5    we have structured a date and agreement with special

6    litigation counsel, the same special litigation counsel that

7    will be representing the corporate Debtors, Levine Sullivan.

8    We have put their retention application on file, as well as

9    the two firms with whom they have been working, in Florida,

10   to deal with both the Bollea appeal and the other

11   litigations.  To the extent -- we're still evaluating the

12   extent to which Mr. Denton will seek stay relief to join in

13   with what the corporate debtors are doing, certainly with

14   regard to the Bollea appeal, we anticipate that, and so

15   those are upcoming motions as well.

16        Still to come is our retention application with

17   regard to the accounting firm that's going to deal with Mr.

18   Denton's taxes and tax returns.  He obviously could not

19   retain the same firm that historically done his returns,

20   because they were being retained by the corporate debtors.

21   He's identified a new firm, and we're going to be filing

22   their retention applications.  He's on extension for last

23   year, so we have to get that addressed, obviously, in the

24   short term.

25        As far as where we go from here, as I said in the

Page 24

1    near term obviously we're going to deal with stay relief, to

2    the extent we're going to be joining in the Bollea appeal

3    and the motions to dismiss that the corporate debtors are

4    pursuing in the other litigation.

5           The main event, obviously, is the plan that's

6    ongoing now in the corporate cases.  As I said to Your Honor

7    the last time, our -- the disposition of the Denton case

8    largely is going to be dependent upon the outcome of the

9    plan process that's currently underway, to a large extent.

10   Mr. Denton, his most substantial asset is his significant

11   equity holdings at the parent corporate debtor.  Things like

12   the allocation fight that you heard counsel for both the

13   Debtors and the Committee in the corporate cases address are

14   going to have an effect on his ultimate recovery, what's

15   available to his estate on account of that equity interest.

16          He obviously -- we -- and I dialogue, obviously,

17   all the time with corporate counsel to see the developments

18   that are going on in that plan process and how it will

19   affect Mr. Denton's estate.  Ultimately, we're hopeful, as

20   counsel for the Committee said, that when there's momentum

21   going towards a plan, that resolutions will break out.  And

22   again, the resolutions of the claims that the corporate

23   debtors are addressing are the same claims that are being

24   asserted in Mr. Denton's case.  So the next couple of

25   months, obviously, not only are critical to the corporate

Page 25

1    debtors but to Mr. Denton's case as well.  And depending on

2    how that all shakes out, we'll be here talking about the

3    disposition of his case sometime in the near future also.

4              THE COURT:  Do you have another date, so I don't

5    lose track of these status conference?

6              MR. GALARDI:  Your Honor, the next date we have --

7    well, we have a November 3rd disclosure statement hearing

8    date, we have a November 15th omnibus date and then we have

9    a December 13th tentative confirmation date.

10             THE COURT:  All right. I'll adjourn --

11             MR. GALARDI:  I believe those are all our dates.

12             THE COURT:  -- the status conferences to December

13   13.

14             MR. GALARDI:  Okay.

15             THE COURT:  And they'll go forward, even if the

16   confirmation hearing doesn't go forward.

17             MR. GALARDI:  That's fine, Your Honor.

18             Your Honor, I can turn now to the agenda, unless

19   Your Honor has questions about status or how we are --

20             THE COURT:  No.  Go on and proceed.

21             MR. GALARDI:  Your Honor, the first matter on the

22   agenda is actually the Committee, so now I'll sit down and

23   let them handle it.

24             THE COURT:  Thank you, Mr. Galardi.

25             MR. RUSSELL:  Good morning, Your Honor, William

Page 26

1    Russell, Simpson, Thatcher and Bartlett, LLP on behalf of

2    the Committee.  We're here on behalf of the Committee's

3    application to retain Deloitte Financial Advisory Services,

4    LLP as its financial advisors.  There's been no objection to

5    the application, but we note Your Honor did schedule for a

6    hearing.

7            THE COURT:  Yeah.

8            MR. RUSSELL:  So we assume the Court has some

9    questions or concerns.  Deloitte's counsel, Elise Frejka, is

10   here in the courtroom as well to address any concerns the

11   Court may have.

12           THE COURT:  Well, if you look at the services that

13   Deloitte is going to provide, they're going to provide

14   assistance with respect to the Debtor's business plan and

15   relating to the Debtor -- and structuring the Debtor's

16   business operations.  The Debtor isn't going to have any

17   business operations.  They're going to provide operational,

18   financial and strategic restructuring alternatives; there

19   are no alternatives, it's a liquidating plan.  And I could

20   go on and on and on.

21           MR. RUSSELL:  Sure.  Sure.

22           THE COURT:  This is a boilerplate list of things

23   that a Committee might do in an operating case, but what do

24   you need a financial advisor for in this case?

25           MR. RUSSELL:  Yeah, we need a financial advisor

1    to, one, up until this point to examine what the Debtors

2    were doing, their receipt of cash, their operations up until

3    the sale.  After that, it's -- while we're hopeful that we

4    can reach a resolution of the allocation fight and other

5    issues such as inter-company claims, we need financial

6    advisors, in the event that that doesn't come to fruition,

7    to examine whether there are inter-company claims, what they

8    are, to help us with litigation an allocation fight and all

9    the other issues that will come up in the context of this

10   case, to the extent there's not a consensual resolution

11   between the Committee and the Debtors of the issues posed by

12   the plan of reorganization.

13          THE COURT:  All right.  Does anyone else want to

14   be heard on the application?

15          Look, if you submit an order that identifies what

16   they're going to do and not all this boilerplate stuff,

17   which is clearly inapplicable in a case like this, I'll

18   probably sign the order. I don't know -- I haven't reviewed

19   the retention letter to see if it's got all those carve outs

20   from liability and indemnity and it has a provision that all

21   disputes will be settled before arbitration, so, you know I

22   have a usual clause which I think has probably been in the

23   other retention orders relating to exceptions to the

24   indemnity and the limitations on liability and the

25   determination of any disputes, if that's in there.  So on

Page 28

1    that basis, you know, assuming that what you put in there is

2    acceptable, I'll sign the order.

3            MR. RUSSELL:  Thank you, Your Honor.  We'll submit

4    a revised order to the Court.

5            THE COURT:  All right.

6            MR. RUSSELL:  Obviously with copies to the

7    Committee and U.S. Trustee's office.

8            THE COURT:  And make sure Deloitte consents.

9            MR. RUSSELL:  Thank you very much, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           MS. FREJKA:  May I be excused?

12           THE COURT:  Yes.

13           MR. GALARDI:  Your Honor, moving to Item Number 2

14   on the agenda, again, there's no objections, but this was

15   the Debtor's motion to authorize the assumption and

16   assignment of certain executory contracts to UniModa.  These

17   were, I think if you recall, we had three groups of leases,

18   these were on the maybes.  These were now assigned, after we

19   had gone through and got to the closing, there are

20   additional contracts identified as wanting to be taken.  We

21   did send out notice, obviously of this.  These are assumed

22   as of the sale date.  The cure amounts were set forth, all

23   of these -- the parties had notice of this, plus they had

24   notice of the fact that this motion was on.  And so we would

25   ask Your Honor, barring there is no objection, to approve

Page 29

1    the motion to assume and assign the contracts that are

2    listed on the exhibit to UniModa.

3            THE COURT:  Does anyone want to be heard in

4    connection with that application?  That application is

5    granted, it's really part of the sale.  Submit an order.

6            MR. GALARDI:  Thank you, Your Honor.

7            The next one is the notice to extend the period of

8    -- the exclusive periods, both the exclusive period and to

9    solicit acceptances.  We obviously filed this before we

10   filed the plan.  We have sought a 60 day extension, the

11   Committee had not objected to it.  We're asking for an

12   exclusive period to extend to December 9th, and the

13   exclusive solicitation period to February 7th, 2007.

14           THE COURT:  All you really need is an exclusive

15   period to solicit at this point, right?  You filed a plan.

16           MR. GALARDI:  I've gone back and forth at times,

17   Your Honor.  If we had to withdraw the plan and file a new

18   plan, whether it's caught in the exclusive periods or

19   whether I've now terminated the exclusive period, so it's

20   been my view, as a practice, that I seek to extend both out

21   of that abundance of caution for that one scenario.

22           THE COURT:  Fair enough.  Does anybody object to

23   the proposed extensions?  All right.  The record should

24   reflect there's no response.  It appears that you're working

25   with the Committee to come up with a consensual plan, or at

Page 30

1    least consent on many issues, so I'll grant that motion.

2    You can submit the order.

3            MR. GALARDI:  Thank you, Your Honor.  The next

4    motion is the Debtor's motion for a second administrative

5    bar date.  Your Honor, as I mentioned in my opening, the

6    first administrative bar date took us through July 31st.

7            THE COURT:  All right.

8            MR. GALARDI:  What we are seeking here

9    is to flesh out any other administrative claims through

10   September 31st, the date that we sought -- would seek to

11   have the bar date -- the second administrative bar date set

12   for is November 15th.  That is after the disclosure

13   statement hearing, but before confirmation.  We want to make

14   sure we have all of the administrative claims that could

15   possibly be filed.

16           THE COURT:  But these don't apply to professional

17   (indiscernible)

18           MR. GALARDI:  Correct.  These don't apply for

19   professional --

20           THE COURT:  So why did administrative claims --

21   what is the estate incurring post-closing?

22           MR. GALARDI:  Post-closing, we don't believe there

23   are really any in the ordinary course, but Your Honor, it

24   goes to the litigation nature of the business, because I

25   think as Mr. -- as the Committee's counsel said, one is, we

Page 31

1    still own Gawker.com and the content, and it is still on the

2    website.

3              Two, prior to the closing, there was still a

4    control of content.  I will say, we've received demands that

5    would demand takedowns of publications, whether it be up to

6    the closing or even after the closing.

7              THE COURT:  I thought the website was taken down.

8              MR. GALARDI:  The website is not taken down.  It's

9    -- no one's operating it.  The content is there.  You can go

10   to Gawker.com.  It's still a site we may sell, depending

11   upon the outcome, but there is still content on the website.

12   So out of that concern, we want it, among other things.

13             THE COURT:  So why don't you just take down the

14   website, if there's a possibility that it's creating post-

15   petition liability?

16             MR. GALARDI:  First of all, I don't believe --

17   there's two reasons.  One is, the question is the value that

18   you would -- may destroy because Gawker.com may still have

19   value.  And if you talk to experts, the mere fact that it's

20   up there, it still gets hits a day.

21             THE COURT:  Mm hmm.

22             MR. GALARDI:  And we actually may use it for other

23   purposes, like advertising.  So there is a value to that

24   site.  Now we may dispute the value.  I know the Committee

25   has a certain view about some of the content.  But when you

Page 32

1    weigh the pluses and minuses, leave aside -- and post-

2    closing, since we're not publishing any new articles, we

3    think that's a minimum liability.  This bar date really

4    stops on -- we picked September 31st because it's the end of

5    the month as opposed to September 10th.

6            THE COURT:  There is no September 31st.

7            MR. GALARDI:  I'm -- September 30th -- I'm sorry.

8    September 30th, as opposed to September 9th.  But the bar

9    date covers pre-closing, when you were actually still having

10   an active website.

11           THE COURT:  All right.  Is this the same -- form

12   of the same order that I saw in the (indiscernible) --

13           MR. GALARDI:  It is the same form, except for one

14   carve-out, I believe, Your Honor, that when we filed the

15   motion, UniModa, who has the working capital adjustment,

16   asked for a carve-out to the bar date so that it could

17   assert claims, if it ever has them, under the asset purchase

18   agreement.

19           So we would ask Your Honor to -- we would ask to

20   submit a revised order, which we circulated to the Committee

21   and UniModa and the U.S. Trustee, once they approve it, that

22   would have that carve-out.  So UniModa didn't have to file a

23   claim.

24           THE COURT:  So submit a black long copy -- black

25   lined -- also the last order that I --

1          MR. GALARDI:  Okay.

2          THE COURT:  -- signed, with a clean copy, and you

3     can represent that the Committee has no objection to it, or

4     if you can, make that representation, settle it on notice

5     and we'll file an objection.

6          MR. GALARDI:  And I may have misspoke.  One other

7     change is that we learned our lesson, so we didn't have to

8     file proofs of claim.  We carved out inter-company claims as

9     well.  So that was another change that I didn't have to file

10    proofs of claim.  So we'll note that in --

11         THE COURT:  And whatever the changes are, just put

12    them in a black (indiscernible) --

13         MR. GALARDI:  Yes, absolutely, Your Honor.  Your

14    Honor, the next motion was the motion to extend the time to

15    assume or reject unexpired leases.  We really have to

16    subleases.  We were on the verge of a deal, when -- and we

17    are the lessor, and then, the lessee of two or three leases,

18    all at Elizabeth Street.

19         We thought we had a deal.  We didn't finish that

20    deal, so we filed a motion to seek to extend the time to

21    assume or reject the non-residential leases that we are a

22    party to.  We served it on the outstanding parties.  No one

23    objected.  We've asked for that date to be extended to

24    December 7th.  We have no objections.

25         THE COURT:  Are you still occupying the space?

1          MR. GALARDI:  We weren't occupying it during the

2     course of the case.  We are both the lessee and the lessor

3     on two subleases.

4          THE COURT:  So passing through and (indiscernible)

5     --

6          MR. GALARDI:  Actually, we're making a little bit

7     of money on it, so there's no net drain on the estate from

8     this.

9          THE COURT:  Does anybody want to be heard in

10    connection with that motion?  The record should reflect

11    there's no response.  It's granted.  Submit an order.

12          (Debtor's Motion for Entry of an Order Extending

13    Time to Assume or Reject Unexpired Lease of Nonresidential

14    Real Property Pursuant to 11 U.S.C. 365(d)(4) Granted)

15          MR. GALARDI:  Your Honor, I'm going to skip over

16    the contested matter and then go to set -- the Page 5 on the

17    agenda, which is the second contested matter.  I apologize

18    for not having gotten it on the agenda.

19          There was a motion, notice of presentment, with

20    respect to Akin Gump to be counsel to the independent

21    committee, Mr. Tillman.  There have been discussions.  The

22    U.S. Trustee and the Committee have all agreed to an

23    adjournment to move that over to the, I think it's the

24    November 15th.  We put it on the omnibus date.  And we've

25    asked Your Honor to approve that adjournment of that matter

1    over to November 15th.

2         THE COURT:  Does anybody object to an adjournment?

3    What's the effect of objecting to the adjournment?

4         MR. GALARDI:  We'd have to put it on today and we

5    would (indiscernible).

6         THE COURT:  All right.  Well, it's not even on my

7    calendar today.

8         MR. GALARDI:  Okay.  Well, (indiscernible) --

9         THE COURT:  (indiscernible) and that's the other

10   thing.

11        MR. GALARDI:  Okay.  With that, Your Honor, I

12   would turn the -- well, it's actually Travelers Motion for

13   the lift stay, which Mr. Martin at my office will handle.

14        THE COURT:  I'll hear from the movants first.

15        MR. T. MARTIN:  Good morning, Your Honor.  Thomas

16   Martin of Putney, Twombly, Hall & Hirson on behalf of the

17   St. Paul Fire & Marine, which is one of the issuing

18   companies of the Travelers Group of insurance companies.

19   We're seeking relief from the automatic stay related to the

20   case I've heard described today as Bollea 2, which is

21   apparently stayed, but there are discussions where a relief

22   from the stay in regards to that action may be sought.

23        This application is brought for relief for relief

24   from the automatic stay so the Travelers can commence a

25   declaratory judgment action in the State of New York, the

Page 36

1    location of the -- this policy and Gawker's business, to

2    have its rights determined, whether indeed it has defense

3    indemnity obligations under a policy of general liability

4    insurance, and that umbrella policy that was issued for the

5    period October 14th -- October of 2014 to October of 2015.

6           Travelers received a tender within two days of the

7    Bollea suit being filed, that is Bollea 2.  Travelers issued

8    a declination letter, and there was a subsequent letter from

9    Gawker also pressing their view, that Travelers had a

10   defense obligation under the policies of insurance that they

11   issued.

12          It was on that basis that Travelers brought this

13   motion because in the absence of the stay, they would've

14   commenced a declaratory judgment action to have their

15   coverage obligations determined.  So up --

16          THE COURT:  I'm just curious about the way this

17   works.  And I know that, you know, there are certain

18   ramifications in terms of disputing coverage, if you don't

19   proper -- if you don't at least decline to defend.  If

20   declined to defend, so you're not going to defend, and

21   you're being thwarted in your effort to resolve this in

22   state court, so what's the downside?  I'm asking.  I don't

23   know the answer to this.

24          MR. T. MARTIN:  Yeah.

25          THE COURT:  What's the downside to Travelers,

Page 37

1    other than uncertainty, if I deny the motion and you never

2    bring that declaration, that declaratory judgment action?

3            MR. T. MARTIN:  Well, the problem is, Your Honor,

4    that obviously, if we do have coverage obligations, we lose

5    all our rights related to the ongoing litigation, if it were

6    to proceed.  Obviously, Travelers has the election, to issue

7    a declination letter and rely on that declination letter.

8            But the litigation can then go forward being

9    defended by the insured at their discretion and in their

10   manner.  And at the end, if we sit on our declination

11   letter, they can then come and sue Travelers and say, "You

12   now owe us whatever, the total defense and indemnity

13   obligation that is now the result of this ongoing

14   litigation."

15           So in a situation like this, where obviously

16   there's a substantial exposure, Travelers would make the

17   election to have those rights determined early on so that

18   they can know, both from a financial planning standpoint and

19   also from their rights in regards to that litigation, to

20   participate in that, as the insurance carrier, because they

21   have the right to select defense counsel.  They have a right

22   to control that, in a sense, in the by bipartite

23   relationship between insurance companies and the counsel

24   that they retain and the insured.

25           So here, especially when I'm hearing today in

Page 38

1    Court that there are negotiations to lift that stay in

2    Florida, it becomes important that Travelers go ahead with

3    its coverage litigation and have those rights determined.

4    It seems to me, as we've put in our papers, Your Honor, that

5    it would be beneficial to everybody to know whether that

6    belay a two-case might have potential insurance dollars

7    available to it.

8            Obviously, the proceeds of that are not going to

9    be proceeds that are going to go to the estate, they can

10   only go to the claimant, Mr. Bollea, if there were to be

11   coverage.  Travelers feels there is no coverage and --

12           THE COURT:  Well, he can say that, but for

13   example, if the Debtor paid the Bollea proof of claim, we're

14   going to have a right of indemnification under the policy?

15   I haven't seen the policies, but I assume they have a right

16   of indemnification.  I assume that there's a limit and that

17   every dollar that you pay to Bollea or anybody else

18   adversely affects the Debtors to the extent that their

19   insurance coverage is decreased, right?

20           MR. T. MARTIN:  Well, I don't know how it affects

21   the Debtors.  I mean, it would affect Travelers.  It would

22   help the Debtor.

23           THE COURT:  It would certainly affect the stay

24   because there'd be less insurance available.

25           MR. T. MARTIN:  If it were a covered claim.

Page 39

1    That's why we want to determine whether in fact it is a

2    covered claim.

3              THE COURT:  I know, I --

4              MR. T. MARTIN:  In your scenario, Your Honor, in

5    essence, you're saying that if we give up these rights, that

6    that claim can be resolved.  And now, with us having no

7    input into the resolution of the case --

8              THE COURT:  I'm responding to -- questioning the

9    argument that the estate has no rights in the proceeds.

10   This isn't a D&O policy, where the officers and directors

11   have direct rights in the policy, and there's always a

12   question of who owns the proceeds.

13             MR. T. MARTIN:  Yeah, I --

14             THE COURT:  Even though the Debtor owns the

15   policy.  Bollea can't sue Travelers.  I mean, maybe under

16   New York (indiscernible) judgments and then --

17             MR. T. MARTIN:  Well, there are certain

18   circumstances that they could.

19             THE COURT:  -- it returns unsatisfied.

20             MR. T. MARTIN:  Correct.

21             THE COURT:  Then they could sue you directly.  But

22   we're certainly a long way from that.

23             MR. T. MARTIN:  We are, Your Honor, admittedly.

24             THE COURT:  So to the extent you say it's not the

25   Debtor's proceeds, I don't really think that that's

Page 40

1    accurate.  And certainly, every dollar that eats into that

2    coverage adversely affects the estate, potentially.  It's

3    like any other insurance company -- case.

4              MR. T. MARTIN:  I would take issue with that, Your

5    Honor, as to whether it affects the estate, because it --

6    those dollars are only going to answer to claims.  They're

7    not going to -- at the end of the day, if there is no

8    erosion of that coverage, the estate can't come to Travelers

9    and say, "Well, you didn't pay on the policy, so pay us the

10   proceeds of that policy in the absence of a claim."

11             THE COURT:  Yeah, there is no -- if there is an

12   erosion of the coverage to the point that all of the

13   coverage is exhausted, the creditors of the estate may be --

14   who have not had the -- would not meet with the same speed

15   maybe adversely affected because they may also have claims

16   that would have been covered by the policy.

17             MR. T. MARTIN:  Potentially, I suppose that's

18   correct, Your Honor.

19             THE COURT:  All right.  Let me ask you another

20   question.

21             MR. T. MARTIN:  Yeah.

22             THE COURT:  Don't you resolve all this by just

23   filing an adversary proceeding here?

24             MR. T. MARTIN:  That is an election, we --

25             THE COURT:  We get them all the time.

Page 41

```
 1              MR. T. MARTIN:  We're -- we will consider that,

 2     Your Honor.

 3              THE COURT:  All right.

 4              MR. T. MARTIN:  Obviously, we felt and feel that

 5     the Supreme Court of the State of New York is the more

 6     logical locale.

 7              THE COURT:  I know that's where you usually

 8     litigate these things, but this -- and in, you know,

 9     notwithstanding the Debtor's argument, that I don't think

10     this is a terribly complex case.  You can bear the complaint

11     of the policy and then you decide whether or not

12     (indiscernible) to defend.  That's it.

13              MR. T. MARTIN:  Absolutely correct, Your Honor.

14              THE COURT:  All right.  Let me hear from the

15     Debtor.

16              MR. R. MARTIN:  Good morning, Your Honor.  Ross

17     Martin, Ropes and Gray --

18              THE COURT:  It's Martin versus Martin, actually,

19     it's actually matrimonial, actually.

20              MR. R. MARTIN:  It's been a cordial matrimony,

21     outside the courtroom.

22              THE COURT:  I'm very happy to hear that.

23              MR. R. MARTIN:  The -- Your Honor, I won't be

24     long.  I think the Court got to the nub of the issues.  As

25     you've heard from Mr. Galardi, the estate has been very
```

1   focused on the sale and the plan and (indiscernible) plans -

2   -

3        THE COURT:  That's all (indiscernible).  The

4   estate has nothing to do except litigate at this point.

5        MR. R. MARTIN:  That is correct, Your Honor, and I

6   agree with that.  And so, but as you also heard Mr. Galardi

7   say, we just have the claims bar date.  We are still in the

8   process of sorting out, as Your Honor indicated, what might

9   and might not be covered claims.

10        And to get just to the end and the fundamental

11   point of it, one of the benefits of the stay, especially in

12   a case where there's lots of litigation and it centers

13   around litigation, is for the Debtor, obviously in

14   consultation with the Creditors, to sequence and try to do

15   things in a way that helps resolve, to focus on the issues

16   that we want to focus on, to, as the Committee indicated, to

17   try to incentivize settlements, and to simply allow, frankly

18   in this case, a non-creditor to come forward and inject that

19   issue and require us to go to another Court, disrupts them.

20        THE COURT:  Well, let me make two points.  First

21   of all, they could file the same adversary proceeding here,

22   so what's the difference, whether they file it in the state

23   court or here?  That's point one.

24        Two, they are drawn into this, because you're

25   negotiating relief from the stay, in some of these

Page 43

1   litigations, where you've already demanded that they take

2   over the defense of action and they've declined.  So it --

3           MR. D. MARTIN:  If I could --

4           THE COURT:  They have a different interest or a

5   specific interest in this issue than the general creditors,

6   for example.

7           MR. D. MARTIN:  I agree with that, Your Honor.

8           THE COURT:  Or some of the (indiscernible)

9   creditors.

10          MR. D. MARTIN:  But I do want to clarify the

11  record on that point.  What Mr. Galardi said is the estate's

12  position lift the stay in Bollea 1, for the appeal, we have

13  not expressed an interest in lifting the stay in Bollea 2,

14  at this point.

15          THE COURT:  So you have no intention of agreeing

16  (indiscernible)?

17          MR. D. MARTIN:  That's part of the discussions,

18  Your Honor, but the question of whether the coverage action

19  should proceed should proceed when we know what the facts

20  are.  I mean, I'll just -- I'll repeat what Mr. Galardi

21  said.  We're negotiating that point.  It may be that we

22  don't come to a resolution, and we're here on a motion to

23  have a narrow lift with Mr. Bollea opposing.

24          And once we get a resolution to see what is and is

25  not going forward would be a much more appropriate time to

Page 44

1   consider that.  It may be, and because the estate's here,

2   we've paid the secured debt with the exception to that

3   disputed make-whole claim, and there's plenty of cash, the

4   estate is in fact paying -- can pay the defense costs.  We

5   don't need the inbound insurance to pay that --

6           THE COURT:  Well, (indiscernible) insurance --

7           MR. D. MARTIN:  And we can seek recovery later.

8           THE COURT:  Well, but that's the point.  The

9   insurance company, as I understand it, loses control of the

10  action.

11          MR. D. MARTIN:  That's a choice they make, Your

12  Honor.

13          THE COURT:  And I understand that on some -- under

14  some state law cases, they may only be entitled to a

15  (indiscernible) of coverage issues and not exclusions,

16  although I'm not sure that's the law.  So there is, in

17  effect, if not adjudicate on the insurer, not adjudicating

18  these issues in a timely fashion, and you're suggesting that

19  the decision should be made when as and if there's an

20  agreement relating to relief from the automatic stay.  But

21  what happens between the stay relief and the time that the

22  state court decides the question of whether or not they have

23  to provide a defense?  They have no control over the action,

24  right?

25          MR. D. MARTIN:  But that's a contract -- that's a

1    choice that they made, and every insurance company makes

2    from the time they issue a declination letter, until --

3    that's a --

4            THE COURT:  (indiscernible) --

5            MR. D. MARTIN:  That's an issue that exists for

6    them when they make that choice.

7            THE COURT:  Okay.

8            MR. D. MARTIN:  I don't -- I'm happy to run

9    through the factors, Your Honor, but it's clear the Court is

10   familiar with the situations, and I don't want -- I don't

11   mean to belabor the point.

12           THE COURT:  Yeah, yeah, I (indiscernible) -- this

13   is not a SunEdison case.

14           MR. D. MARTIN:  No, no, it is not.

15           THE COURT:  There's a lot more going on in that

16   case than there is going on in this case, that's all I'll

17   say.  All right.  Anything else?

18           MR. D. MARTIN:  I don't have anything else.

19           THE COURT:  Anything else, the other Mr. Martin?

20           MR. T. MARTIN:  Sorry, Your Honor.  I mean, when

21   Mr. Martin says you know, that's a choice the insurance

22   company makes, but in the ordinary circumstance, when we

23   make that choice, we have the option to promptly bring a

24   coverage action and have those coverage rights determined.

25           THE COURT:  But the net effect of what he's saying

Page 46

1    is the lifting of the stay is the equivalent of filing the

2    complaint that day, so that you're not behind in the time,

3    because normally, you would presumably -- the earliest you

4    would decline coverage is the day the complaint is filed,

5    because that's the earliest the issue would come up.

6              And he's saying you're going to get the same right

7    here, and I mean, maybe he's implying that if the stay is

8    lifted, that it'll also be lifted for you to go ahead and do

9    the declaration -- your declaratory judgment action, which

10   is --

11             MR. T. MARTIN:  Well --

12             THE COURT:  -- what you're (indiscernible) about.

13             MR. T. MARTIN:  Unless the Debtor goes ahead with

14   a coverage action of their own.  So --

15             THE COURT:  No, the Debtor could only

16   (indiscernible) its own (indiscernible) objection, but

17   (indiscernible).

18             MR. T. MARTIN:  It depends where they file it,

19   Your Honor.

20             THE COURT:  They're either going to file it here

21   or the New York State Court, and it's -- maybe Florida, I

22   don't know, maybe in Florida.

23             MR. T. MARTIN:  Well, the action is pending in

24   Florida.

25             THE COURT:  Yeah.

```
 1                    MR. T. MARTIN:  So --

 2                    THE COURT:  Does that really make a difference?

 3       What (indiscernible) the insurance contract?

 4                    MR. T. MARTIN:  New York, clearly.  But one

 5       wonders about arguing that to a Florida court, so the --

 6                    THE COURT:  All right.  Thank you.  I'll reserve

 7       decisions.  Thank you very much.

 8                    MR. T. MARTIN:  Thank you, Your Honor.

 9                    THE COURT:  Is that the end of the calendar?

10                    MR. GALARDI:  That is, Your Honor.

11       (indiscernible).

12                    THE COURT:  Okay.  Thank you very much.

13                    MR. T. MARTIN:  Thank you, Your Honor.

14                    MR. GALARDI:  Is there anything you would need us

15       to do on the Travelers, you're just going to issue a

16       decision?

17                    THE COURT:  I'll reserve decision.

18                    MR. T. MARTIN:  I understand, Your Honor.

19                    THE COURT:  Thank you.  I'll leave it at that.

20       All right, thank you.

21                    MR. T. MARTIN:  Thank you, Your Honor.

22                    THE COURT:  Now, let me ask the Travelers a

23       question, are you insisting that I decide this in 30 days?

24                    MR. T. MARTIN:  Pardon me?

25                    THE COURT:  Are you insisting that I decide this
```

Page 48

1    in 30 days?

2              MR. T. MARTIN:  No, Your Honor.

3              THE COURT:  Okay.  Thank you very much.

4              MR. GALARDI:  Thank you, Your Honor.

5              MR. T. MARTIN:  (indiscernible).

6              THE COURT:  (indiscernible).

7    (Whereupon these proceedings were concluded at 11:50 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                        Page        Line

5

6    Debtor's motion to authorize the        16          6

7    assumption and assignment of certain

8    executory contracts to UniModa Granted

9

10   Debtors' Motion for Entry of an Order    17          2

11   Extending Exclusive Periods

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5      Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde,
6                              o=Veritext, ou,
                               email=digital@veritext.com, c=US
7      Hyde                    Date: 2016.10.13 16:13:15 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  October 13, 2016