ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                    :
In re                               :      Chapter 11
                                    :
Gawker Media LLC, et al.,[1]        :      Case No. 16-11700 (SMB)
                                    :
              Debtors.              :      (Jointly Administered)
                                    :
-------------------------------------------------------x
```

**NOTICE OF OBJECTION OF DEBTOR GAWKER MEDIA LLC
TO PROOF OF CLAIM NO. 6 FILED BY MITCHELL WILLIAMS,
AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C)
PURSUANT TO BANKRUPTCY RULES 9014 AND 7012**

  **PLEASE TAKE NOTICE** that the undersigned have filed the attached *Objection of*

*Debtor Gawker Media LLC to Proof of Claim No. 6 Filed by Mitchell Williams, and Motion to*

*Apply Fed. R. Civ. P. 12(b)(6) and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012* (the

"Objection"), which seeks to alter your rights by disallowing your claim against the above-

captioned Debtors.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place on **December 1, 2016 at 10:30 a.m. (Eastern Time)** before the Honorable Judge Stuart M. Bernstein, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Courtroom No. 723.

**PLEASE TAKE FURTHER NOTICE** that responses to the Objection and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **November 14, 2016, at 4:00 p.m. (Eastern Time)** (the "Response Deadline"), upon: (i) the Debtors, Gawker Media LLC, c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022 (wholden@opportune.com); (ii) counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com); (iii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes & Susan Arbeit; (iv) the Internal Revenue Service, Attn: Centralized Insolvency Operation, 2970 Market Street, Philadelphia, PA 19104 (mimi.m.wong@irscounsel.treas.gov); (v) the United States Attorney's Office for the Southern District of New York, Attn: Bankruptcy Division, 86

Chambers Street, 3rd Floor, New York, NY 10007 (david.jones6@usdoj.gov; Jeffrey.Oestericher@usdoj.gov; Joseph.Cordaro@usdoj.gov; Carina.Schoenberger@usdoj.gov); (vi) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com); (vii) counsel to US VC Partners LP, as Prepetition Second Lien Lender, Latham & Watkins LLP, at both 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: David Heller (david.heller@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); (viii) counsel for the Official Committee of Unsecured Creditors, Simpson Thacher & Bartlett, 425 Lexington Ave., New York, NY 10017, Attn: Sandy Qusba (squsba@stblaw.com) and William T. Russell (wrussell@stblaw.com); and (ix) parties that have requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Objection by the Response Deadline, the Bankruptcy Court may deem any opposition waived, treat the Objection as conceded, and enter an order granting the relief requested in the Objection without further notice or hearing.

[*Remainder of this page intentionally left blank*]

**PLEASE TAKE FURTHER NOTICE** that a copy of the Objection may be obtained free of charge by visiting the website of Prime Clerk LLC at http://cases.primeclerk.com/gawker. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: October 31, 2016
      New York, New York

/s/ D. Ross Martin

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

---------------------------------------------------------x

## OBJECTION OF DEBTOR GAWKER MEDIA LLC TO PROOF OF CLAIM NO. 6 FILED BY MITCHELL WILLIAMS, AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C) PURSUANT TO BANKRUPTCY RULES 9014 AND 7012

Pursuant to section 502(b)(1) of the Bankruptcy Code and Bankruptcy Rule 3007,

Gawker Media LLC ("Gawker Media") as debtor and debtor in possession (the "Debtor") in the

above-captioned cases (the "Bankruptcy Cases"), hereby submits this objection (the "Objection")

to claim No. 6, filed by Mitchell Williams (the "Williams Claim").  The Williams Claim asserts

---

[1] Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft. (f/k/a Kinja Kft., "Gawker Hungary") are also debtors and debtors in possession in these cases, and together with Gawker Media LLC (as debtor and debtor in possession) are refereed to herein as the "Debtors"). The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

a single claim of $50,000,000 under New Jersey law based on alleged defamation and related torts solely against Gawker Media.  The Williams Claim is based entirely on a complaint (the "<u>Complaint</u>") asserting causes of action that he already brought in state court in New Jersey (the "<u>Williams Defamation Action</u>"),[2] and which the New Jersey Superior Court dismissed with prejudice.[3]  Accordingly, as demonstrated below, the Williams Claim (as defined below) should be disallowed both under the doctrine of issue preclusion under New Jersey law, and alternatively on the merits for the same reasons as given by the New Jersey State Court (defined below).  In support of this Objection, the Debtor respectfully represents and sets forth as follows.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Objection is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are section 502(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "<u>Bankruptcy Code</u>"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

2.      Although the Williams Claim should not be considered a personal injury tort claim, *see infra* ¶¶ 33-41, there is no question that this Court can disallow any claim that is based on *res judicata* or collateral estoppel as a threshold matter. In any event, Section 157(b)(2) does not make all determinations regarding disallowance of personal injury tort claims into non-core proceedings. A bankruptcy court can "summarily dispose of claims which have no basis in law."

---

[2] A copy of the operative complaint with exhibits in the Williams Defamation Action, as provided in support of the Williams Claim is attached as **Exhibit 3**.  A copy of the full Williams Claim will be provided to chambers.  Copies are available to parties upon request.

[3] Copies of the relevant orders on a motion to dismiss and a motion for summary judgment are attached as **Exhibits 4 and 5**.

*See In re Chateaugay Corp.*, 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990), *aff'd, sub nom. LTV Corp. v. Valley Fid. Bank & Tr. Co. (In re Chateaugay Corp.)* 130 B.R. 403 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 961 F.2d 378 (2d Cir. 1992). Disallowance of a claim based on preclusion is among the rulings that the bankruptcy court can make. *See id.* at 69, 75.

## RELIEF REQUESTED

3.    By this Objection, Gawker Media requests entry of an order (the "Proposed Order") disallowing Proof of Claim No. 6 because Gawker Media has no liability on account of such claim under applicable nonbankruptcy law.

## BACKGROUND

### I.    The Williams Claim

4.    Williams is a former Major League Baseball player who alleges that after his retirement from professional sports he had a second career as a "successful sports broadcaster," including (formerly) with *The MLB Network*. Ex. 3, ("Compl.") ¶ 18-23, 41-42.  The Williams Claim arises from a series of three news articles published on *Deadspin.com*, a website formerly owned and operated by the Debtors.  The news articles (the "Williams Articles") reported on Mr. Williams' conduct at (and temporary ejection from) a May 2014 Mother's Day Little League baseball tournament.  Compl., Ex. B, C, F.

5.    In the Williams Articles, *Deadspin.com* reported that Mr. Williams was ejected from a May 10 little league tournament game after having an on-field argument with an umpire. Compl. Ex. B (May 11, 2014 *Deadspin.com* Article).  The Williams Articles also included accounts from witnesses present at the little league tournament, describing Mr. Williams as having, among other things, (1) cursed at and threatened to fight the umpire at the May 10 game (*id.*); (2) cursed at the players of an opposing team at a May 11 game, including calling one child

3

a "pussy" (Compl. Ex. C. (May 16, 2014 *Deadspin.com* Article); and (3) ordered a "beanball"[4]

thrown at a child on an opposing team at the May 11 game.  The Williams Articles also included

(1) a series of embedded tweets by Mr. Williams, describing his version of the events at the May

10 game, (2) a series of photographs of him standing nose-to-nose with the umpire during the

altercation at the May 10 game, and (3) embedded video of Mr. Williams at the tournament, as

recorded by the sponsor of the tournament, Ripken Baseball.  Compl. Ex. B (May 11, 2014

*Deadspin.com* Article).

        6.      When *The MLB Network* placed Mr. Williams on "an indefinite leave of absence"

from his broadcasting position, *Deadspin.com* published a follow-up article on May 19, 2016.

This *Deadspin.com* report included witness accounts that criticized both Mr. Williams' conduct

at the little league tournament and his performance as a broadcaster.  Compl. Ex. F. (May 19,

2014 *Deadspin.com* Article).  On June 16, 2014, Mr. Williams' contract with *The MLB Network*

was terminated.

## II.     Procedural History of the Williams Defamation Action

        7.      Mr. Williams filed a complaint (the "Complaint") in the Superior Court of

Camden County, New Jersey (the "New Jersey State Court") on September 24, 2014.  Williams'

complaint asserted twelve causes of action against *The MLB Network* and five causes of action

against Gawker Media.

        8.      Gawker Media moved to dismiss.  On March 6, 2015 the New Jersey State Court

entered an order dismissing the claims against Gawker except as to three challenged statements.

Ex. 4, Motion to Dismiss Order.  After discovery Gawker Media moved for summary judgment

---

[4] A "beanball" is a baseball term for a pitch thrown with the intention of striking the batter for the purpose of
causing harm or intimidating opposing players. According to a May 16, 2014 *Deadspin.com* article, witnesses
reported that Williams instructed his pitcher to hit an opposing batter, who was then hit "square in the ribs." Compl.
Ex. C (May 16, 2014 *Deadspin.com* Article).

on Mr. Williams' remaining claims, and on June 1, 2016 the New Jersey State Court granted

summary judgment for Gawker Media.  The New Jersey State Court's order dismissed all claims

by Mr. Williams against Gawker Media with prejudice "with ability to appeal all rulings as to

Gawker Defendants." Ex. 5, Order Granting Gawker Media's Motion for Summary Judgment.

Mr. Williams has not taken an appeal and has not sought any separate order, to the extent one

were necessary to take an appeal.

### III.    The Chapter 11 Cases and the Williams Claim

9.    On June 10, 2016 (the "Petition Date"), Gawker Media filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.  On June 12, 2016, GMGI and Gawker

Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

Debtors are operating their businesses as debtors and debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

10.    On July 11, 2016 Mr. Williams, through counsel, filed a proof of claim in the

amount of $50,000,000 against Gawker Media. As supporting documentation, Mr. Williams

attached only the complaint in the Williams Defamation Action.

### APPLYING BANKRUPTCY RULE 7012 TO THIS PROCEEDING

11.    Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim is disallowed to the

extent that it is unenforceable against the debtor and property of the debtor, under any agreement

or applicable nonbankruptcy law.  *Travelers Cas. & Sur. Co. of N. Am. v. Pac. Gas & Elec. Co.*,

549 U.S. 443, 452 (2007).  Mr. Williams' allegations have already been resolved in favor of

Gawker Media, and consequently, Gawker Media objects to the Williams Claim and seek entry

of an order disallowing and expunging the Williams Claim in its entirety.  The Williams Claim

should be disallowed based on the New Jersey law of issue preclusion.  In addition, to the extent

5

that this Court does not resolve the claim as a matter of law on issue preclusion grounds, the Williams Claim should be disallowed on the merits for the reasons set forth in the state-court proceeding, as set forth below.

12.     A proof of claim has *prima facie* validity and is "deemed allowed" until an objection is filed.  To overcome this *prima facie* effect, the objecting party must bring forward evidence equal in probative force to the evidence underlying the proof of claim.  *In re Oneida, Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009) (quoting *In re Allegheny Intern., Inc.* 954 F.2d 167, 173 (3d Cir. 1992).  The claimant must then "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.*; *Helliwell v. George R. Burrows, Inc. (In re George R. Burrows, Inc.)*, 156 F.2d 640, 641 (2d Cir. 1946) ("[A]s soon as the trustee introduced any substantial evidence in opposition the claimants needed to establish by a preponderance of all the evidence that the claims as filed were based on facts which entitled the claimants to their allowance under the law.  The burden of over-all proof was then on the claimants.").

13.     This contested matter and resolution of the Williams Claim (as with several other claims filed in these bankruptcy cases) will be made more orderly and efficient by applying certain parts of Rule 7012.  The supporting information for the Williams Claim is, in its entirety, a copy of a civil action complaint filed in the New Jersey State Court.  The allegations sound in tort, in contrast to contractual claims that are typically susceptible to the more summary, informal procedures of an ordinary claims objection hearing.

14.     Indeed, in many circumstances, bankruptcy courts in this District have analogized their resolution of proofs of claim based on outside litigation to the ordinary civil litigation process, without formally invoking and applying Rule 7012. "In bankruptcy cases, courts have

traditionally analogized a creditor's claim to a civil complaint, a trustee's objection to an answer."
*In re 20/20 Sport, Inc.*, 200 B.R. 972, 978 (Bankr. S.D.N.Y. 1996) (Lifland, J.). Further, "[i]n
determining whether a party has met their burden in connection with a proof of claim,
bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of
Civil Procedure." *In re DJK Residential LLC*, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009)
(sustaining claim objection and disallowing claim that repeated causes of action in related
litigation for failing to satisfy Fed. R. Civ. P. 9 when claimants failed to show that claim was
facially plausible); *see also In re Residential Capital, LLC*, 518 B.R. 720, 726, 731-32 (Bankr.
S.D.N.Y. 2014) (disallowing claims, based on complaint filed pre-petition in state court, that
failed to state "a plausible basis for the Debtors' liability" under federal pleading standards).

15.     In this contested matter, the Court should direct that Federal Rules of Civil
Procedure 12(b)(6) and/or 12(c) (available pursuant to Bankruptcy Rule 7012(b) and 9014(a))
shall apply.  "The court may at any stage in a particular matter direct that one or more of the
other rules in Part VII shall apply." Fed. R. Bankr. P. 9014.

16.     Following application of Rule 12(b)(6) and Rule 12(c), this Court could then
consider the Complaint (attached to the Williams Claim), this Objection, any response and any
reply papers, either to be briefing on a motion to dismiss or a motion for judgment on the
pleadings.

## OBJECTION

## I.    Williams' Claim Is Barred By Issue Preclusion

17.     "[I]t is well settled that a court may dismiss a claim on *res judicata* or collateral
estoppel grounds on a Rule 12(b)(6) motion." *Sassower v. Abrams*, 833 F.Supp. 253, 264 n.18
(S.D.N.Y. 1993). Mr. Williams' sole basis for his claim is the complaint filed in the Williams

Defamation Action, and all of Mr. Williams' causes of actions in the Williams Defamation Action have been dismissed with prejudice by the New Jersey State Court.

18.     The Full Faith and Credit Statute, 28 U.S.C. 1738, provides that the "judicial proceedings [of any State] . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State." Therefore, this Court must give the same preclusive effect to the decisions of the New Jersey State Court in the William Defamation Action as would another New Jersey court.

19.     Under New Jersey law this situation involves issue preclusion and not full "claim preclusion" or *res judicata.* The orders of the New Jersey State Court regarding Gawker Media are not yet "final" for appellate purposes, solely because another defendant, *The MLB Network*, remains in the case and is proceeding to trial.[5] However, the New Jersey State Court in the Williams Defamation Action has issued dispositive rulings and orders, conclusively determining that all causes of action against Gawker Media should be dismissed.

20.     Although the terms "issue preclusion" and "collateral estoppel" are often considered synonymous, the *Restatement (Second) of Judgments* recognizes two variations of issue preclusion: "collateral estoppel" and "direct estoppel." *Id.* § 17 cmt. c. The former (collateral estoppel) applies when the prior action is based on a different claim and the latter (direct estoppel) when it is based on the same claim. New Jersey law would deem this situation to involve "direct estoppel," but the more common term, collateral estoppel, will be used for purposes of this motion because the elements necessary to give preclusive effect are the same. *See id.*

---

[5] This is analogous to the situation under the Federal Rules of Civil Procedure (and the Federal Rules of Bankruptcy Procedure), in which Mr. Williams could have sought an order under Fed. R.Civ. P. 54(b), to obtain a separate judgment against Gawker Media in order to immediately take an appeal. He did not do so, and the judgment against him is unstated and in effect.

21.     Collateral estoppel bars relitigation of any issue actually determined in a prior action between the parties. *Suarez v. Camden Cnty. Bd. Of Chosen Freeholders*, 972 F.Supp. 269, 273 (D. N.J. 1997).  For the doctrine of issue preclusion to foreclose the relitigation of an issue, the party asserting the bar must show (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.  *Matter of Estate of Dawson*, 641 A.2d 1026, 1034-35 (N.J. 1994).  Issue preclusion applies "whenever an action is sufficiently firm to be accorded conclusive effect."  *Hills Dev. Co v. Township of Bernards*, 510 A.2d 621, 652 (N.J. 1986) (citation and internal quotations omitted).  Where summary judgment is granted in a prior action and that action involves "the same claims, parties, relief requested, and factual allegations," issue preclusion bars relitigation of those issues in another forum. *Suarez*, 972 F. Supp. at 274.

22.     The New Jersey State Court has ruled and decided in favor of Gawker Media, finding that it has no liability at all to Mr. Williams.  The Williams Claim is based entirely on the Williams Defamation Action.  The causes of action stated are the same, and therefore the issues are the same.  The issue of Gawker Media's liability on those causes of action was actually decided against him, the New Jersey State Court having heard and determined Gawker Media's motion to dismiss and summary judgment motion.  Each cause of action and issue was essential to the judgment, as the New Jersey State Court addressed each claim.

23.     The New Jersey State Court has issued a final judgment on the merits, an order dismissing all claims "with ability to appeal all rulings as to Gawker Defendants," (Ex. 4, Order

Granting Gawker Media's Motion for Summary Judgment).  This operated to "completely resolve" the issues, *Suarez* at 273-74, such that collateral estoppel applies.  "[G]eneral principles of law have long held that res judicata is applicable only when a final judgment is rendered, and the doctrine of collateral estoppel applies whenever an action is sufficiently firm to be accorded conclusive effect." *Hills Dev. Co.*, 510 A.2d at 652.  "Unlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable." *In re Brown*, 951 F.2d 564, 569 (3d Cir.1991); *see also East/West Venture v. Fort Lee*, 669 A.2d 260, 271 (N.J. App.Div. 1996); Restatement (Second) of Judgments § 13 cmt. g; *id.* § 27 cmt. k. The New Jersey State Court order fully and finally resolved all of Mr. Williams' allegations in this manner.  Privity cannot be disputed, as Gawker Media is the defendant/debtor in the two relevant proceedings.  The sole basis for the Williams Claim is the Williams Defamation Action, and collateral estoppel applies under New Jersey law.

### III.    The Williams Claim Should Be Disallowed On The Merits

24.    Assuming, *arguendo*, that this Court does not disallow the Williams Claim based on the doctrine of collateral estoppel, the Williams Claim should be disallowed on the merits.  A proof of claim has *prima facie* validity and is "deemed allowed" until an objection is filed. 11 U.S.C. § 502(a). Then the creditor-claimant must prove its claim by alleging facts sufficient to support its claim for entitlement to relief. *In re Aiolova*, No. 11-10503 (BRL), 2013 WL 5818893, at *2 (Bankr. S.D.N.Y. Oct. 29, 2013).

25.    As discussed above, "[i]n determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." *In re DJK Residential LLC*, 416 B.R. 100, 106

(Bankr. S.D.N.Y. 2009); *see also In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr.

S.D.N.Y. 2014). Accordingly, to meet his initial burden, Williams must allege "enough facts to

state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Intern.,* 604

F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a

complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

line between the possibility and the plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.

26.    None of the claims asserted in Mr. Williams' complaint state a claim upon which

relief can be granted. Examination of (1) the photographs and video referenced in the complaint

and (2) Mr. Williams' own tweets as embedded in the May 11, 2014 *Deadspin.com* Article[6]

demonstrate that many of the challenged statements are not materially false. While Mr. Williams

may complain about particular details in the Williams Articles, on the face of his complaint and

the incorporated exhibits he ultimately cannot carry his burden of establishing that the "gist or

sting" of the challenged statements is not substantially true. *La Rocca v. N.Y. News, Inc.*, 156

N.J. Super 59, 63 (N.J. App. Div. 1978); *see also G.D. v. Kenny*, 205 N.J. 275, 289 (2011)

(affirming dismissal of claims about statements that were "fairly accurate"); 1 Robert D. Sack,

*Sack on Defamation* § 3:9 (4th ed. 2010) (defamation must ultimately prove "that the conduct

alleged [in the challenged statement] is *substantially different* from the conduct in which [he or

she] in fact engaged.") (emphasis added). Setting aside those statements which the complaint

itself refutes, Mr. Williams also challenges a number of characterizations of his conduct as a

coach and broadcaster that are constitutionally-protected expressions of opinion, and therefore

not actionable. *DeAngelis v. Hill*, 180 N.J. 1, 14 (2004) ("statements of opinion, as a matter of

---

[6] Williams does not allege that the embedded tweets were not accurately presented.

constitutional law, enjoy absolute immunity" because a statement of opinion cannot be objectively disproven) (citation and internal quotations omitted).

27.    For those statements which are neither substantiated by the complaint itself nor unable to support liability as expressing mere opinion, Mr. Williams has still failed to establish a claim, as he has failed to plead the requisite intent on the part of Gawker Media to sustain his defamation. As a retired professional athlete and "successful sports broadcaster," Mr. Williams is a "public figure" and commentary about him is subject to special protection by the First Amendment. Mr. Williams therefore bears the burden of proving "actual malice" on the part of the defendant to establish his claim as a matter of constitutional law. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (public figures must prove actual malice to establish a defamation claim); *Time, Inc. v. Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (retired professional basketball player a public figure); *Cepeda v. Cowles Magazines & Broad, Inc.*, 392 F.2d 417, 419 (9th Cir. 1968) (same).

28.    Even setting aside Mr. Williams' status as a public figure, the Constitution of the State of New Jersey provides additional protection for statements regarding matters of public concern beyond that afforded by the United States Constitution. *Sisler v. Gannett Co.*, 104 N.J. 256, 271-72 (1986) ("New Jersey accepted the invitation to provide greater protection to speech involving matters of public concern than mandated by the United States Supreme Court's First Amendment jurisprudence."). Private figure plaintiffs must prove actual malice on the part of the defendant in defamation cases involving speech on matters of public concern. *Id.* at 279. In a case directly on point, the New Jersey Appellate Division recently ruled that a report of a non-celebrity parent's conduct during an incident involving an opposing pitcher at a Little League baseball game "indisputably involved a matter of public interest or concern." *Rossi v. CBS*, 2012

12

WL 2529357 at *7 (N.J. App. Div. July 3, 2012). As the New Jersey Supreme Court has further

made clear, "the actual malice standard applies to *all speech-based torts* involving matters of

public concern." *Durando v. Nutley Sun*, 209 N.J. 235, 250 (2012) (emphasis added).

29.     Whether factual allegations are sufficient to show actual malice is a question for

the Court. *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 168 (1999). To adequately allege actual

malice, a plaintiff's allegations taken as true must prove with "convincing clarity" that the

defendant published his statements about plaintiff with knowledge of their falsity or reckless

regard of whether they were true or false." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491

U.S. 657, 688 (1989); *see also Darakjian v. Hanna*, 366 N.J. Super. 238, 247-50 (N.J. App. Div.

2004) (ordering dismissal of claim in absence of sufficient factual allegations of actual malice).

Here the inquiry is subjective, focusing on the speaker's state of mind regarding the truth at the

time the statement was made. *See, e.g., Costello v. Ocean Cnty. Observer*, 136 N.J. 594, 615

(1994). Plaintiff bears the burden of alleging *facts* that demonstrate "that the defendant *in fact*

entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S.

727, 731 (1968) (emphasis added).

30.     Here, the Complaint's conclusory allegations of malice, Compl. ¶¶ 295, 308, 326,

are insufficient as a matter of law. New Jersey law is clear that a "bare conclusory assertion that

the press defendants" acted with actual malice is not enough.  *Darakjian*, 366 N.J. Super. at 248.

Here the Complaint's only factual allegation in support of its conclusory allegations of actual

malice is that *Deadspin.com* failed to contact Mr. Williams. *See* Compl. ¶¶ 76, 97, 153. As an

initial matter, *Deadspin.com* included Mr. Williams' side of the story, including his tweets about

the first game and an assertion that he only directed his pitcher to pitch "inside" during the

second game. *See* Compl. Exs. B & C (May 11 and May 16, 2016 Deadspin Articles); *see also*

13

*Contemporary Misson, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 622 (2d Cir. 1988) (finding no actual malice and noting "the article does present [the plaintiffs'] position with respect to the various controversies"). But even if it had not, as a matter of constitutional law even a *complete* lack of investigation is insufficient to establish actual malice fault. *Harte-Hanks Commc'ns*, 491 U.S. at 688.

31.    Again, Mr. Williams' complaint is not only inadequate, but also self-refuting. The complaint, and the video and articles incorporated therein, demonstrate that (a) there were photographs of Mr. Williams and an umpire arguing chest to chest during the first game, (b) there were tweets from Mr. Williams confirming that he was ejected from that game after an exchange that was sufficiently heated that the umpire threatened to fight him, (c) there was video footage from the second game showing confrontations and a pitch that struck a batter immediately after Mr. Williams talked to his catcher and the catcher talked to the pitcher, (d) Ripken Baseball officials intervened, both through announcements and on-the-field involvement of its personnel, (e) comments from a number of first-hand observers corroborated the accounts for both games, (f) a Ripken official questioned the conduct of Mr. Williams, and (g) Mr. Williams was suspended by *The MLB Network*. The *Deadspin* Articles were thoroughly reported and included a number of readily verifiable depictions of Mr. Williams' conduct at the Ripken Tournament. Even if portions of *Deadspin.com*'s reporting turned out to be false (which Gawker Media denies, but assumes for purposes of this Objection), Mr. Williams simply cannot establish that Gawker Media subjectively believed its reporting to be false.

32.    Even if Mr. Williams' attaching his state-court complaint met the basic burden for a proof of claim (which it unequivocally does not), the state-court rejection of those causes of action (if somehow not rising to the level of collateral estoppel) unquestionably satisfies Gawker

Media's evidentiary burden of providing "evidence equal in force" to the *prima facie* case." *See*

*In re Allegheny Intern., Inc.* 954 F.2d 167, 173 (3d Cir. 1992) (objecting party must produce

evidence equal in force to the *prima facie* case made by the claim).  Consequently, Mr. Williams

must, but cannot, carry his burden to prove his claim in this Court.  Accordingly, the Williams

Claim should be disallowed and expunged in full.

**III.    The Williams Claim Can Be Determined by this Court**

33.    Nor can Mr. Williams contend that this Court does not have the power to

determine the merits of his claims. This Court can fully adjudicate disallowance of the Williams

Claim, which asserts causes of action for defamation and related torts, because they are not

personal injury tort claims within the meaning of 28 U.S.C. 157(b).  Core proceedings include

allowance or disallowance of claims against the estate, except "the liquidation or estimation of

contingent or unliquidated personal injury tort or wrongful death claims against the estate for

purposes of distribution." 28 U.S.C. § 157(b)(2)(B)  The Bankruptcy Code does not define what

constitutes a "personal injury tort claim," and therefore court decisions have delineated the scope

of that term.

34.    Although courts in this District have taken two different approaches on this

question, the Williams Claim does not fall within the definition of "personal injury tort claim"

regardless of which authority is followed.  At least three decisions in this District have adopted a

so-called "narrow view," limiting personal injury tort claims to those that involve a "trauma or

bodily injury."  *Vinci v. Town of Carmel (In re Vinci)*, 108 B.R. 439, 442 (Bankr. S.D.N.Y.

1989) (Schwartzberg, J.) (a tort without trauma or bodily injury is not within the statutory

exception for a personal injury tort); *Perino v. Cohen (In re Cohen)*, 107 B.R. 453 (S.D.N.Y.

1989) (Brieant, J.) (same); *Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg,*

15

*Manley, Myerson, & Casey)*, 194 B.R. 728, 734 (S.D.N.Y. 1995) (Keenan, J.) (adopting narrow

view to find that legal malpractice does not constitute a personal injury claim).

35.     More recently, Judge Glenn adopted a so-called "hybrid approach" to decide this

issue with respect to proofs of claim for intentional infliction of emotional distress.   He

conducted a "searching analysis" into the specifics of each claim that asserts "the invasion of

personal rights" for "earmarks of a financial, business or property tort claim, or a contract." *In re*

*Residential Capital, LLC*, 536 B.R. 566, 572, 575 (Bankr. S.D.N.Y. 2015) ("*ResCap*").  The

*ResCap* court concluded that it had core jurisdiction to hear and determine the disallowance of

proofs of claim asserting intentional infliction of emotional distress arising from the servicing of

home mortgages.  Id. at 575.

36.     The Williams Claim does not qualify as a personal injury tort claim under either

(a) the *Vinci/Cohen/Finley-Kumble* line of decisions or (b) the *ResCap* approach.  The Williams

Claim (which incorporates the last complaint filed in the Williams Defamation Action) alleges

against Gawker Media five causes of action.[7]  None of the causes of action asserted by Williams

involves "trauma or bodily injury." *E.g., Vinci*, 108 B.R. at 442.

37.     The Williams Claim also bears the "earmarks of a financial, business or property

tort claims, or a contract claim" and is therefore not a personal injury tort claim.  *ResCap*, 536

B.R. at 572.   The underlying Complaint alleges that Gawker "exposed Plaintiff to hatred,

contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the

tendency to injure him in his trade or business."  Compl. ¶¶ 87, 112.  Mr. Williams asserts that

"reputation has been damaged and he has suffered economic loss, humiliation, embarrassment,

mental anguish and suffering, and loss of standing in the community and in his profession."

---

[7]  The causes of action are (1) intentional defamation, (2) defamation *per se*; (3) negligent defamation; (4) false light
invasion of privacy; and (5) negligent misrepresentation.

Compl. ¶ 167.  The specific damages that Mr. Williams asserts are each related to his reputation in the marketplace of financial and business activity: "lost earnings and other financial losses and expenses."  Compl. ¶¶ 299, 312, 320.  *See also* Compl. ¶¶ 329 ("financial losses and expenses"), 335 ("economic harm").  To the extent he asserts "humiliation" and similar harms, humiliation and lost reputation resulting from a business tort do not constitute a personal injury tort.  *In re Finley Kumble*, 194 B.R. at 734.

38.     The rulings of numerous other courts support a conclusion that defamation is not a personal injury tort claim when asserted as a proof of claim in bankruptcy.  *Massey Energy Co. v. W. Va. Consumers for Justice*, 351 B.R. 348, 351 (E.D. Va. 2006) (defamation and business conspiracy are not personal injury tort claims); *Mitan v. Davis (In re Davis)*, 334 B.R. 874, 878 n.2 (Bankr. W.D. Ky. 2005) (core jurisdiction over objection to proof of claim based on alleged defamation contained on website), *aff'd in part, rev'd in part on other grounds sub nom Davis v. Mitan (In re Davis)*, 347 B.R. 607 (W.D. Ky. 2006).[8]

39.     The same is true for the "intentional infliction" genre of torts that the Williams Claim alleges against Gawker Media.  A claim for emotional distress damages not arising out of physical injury is not a "personal injury tort claim."  *ResCap*, 536 B.R. at 576; *see In re Atron Inc. of Mich.*, 172 B.R. 541 (Bankr. W.D. Mich. 1994) (civil rights complaint alleging damages for mental and emotional distress does not qualify); *Priest v. Interco, Inc. (In re Interco, Inc.)*, 135 B.R. 359 (Bankr. E.D. Mo. 1991) (age discrimination complaint alleging emotional distress does not qualify).  Further, on its face Mr. Williams' cause of action for intentional interference with prospective economic advantage is not a personal injury tort claim.

---

[8] The Supreme Court of the United States has considered, but declined to decide (on waiver grounds), whether a defamation claim is a personal injury tort claim under section 157(b)(2).  *Stern v. Marshall*, 564 U.S. 462, 479 (2011).

40.     Furthermore, Section 157(b)(2)(B) designates only "liquidation" and "estimation for purposes of distribution" as non-core, requiring a district court to enter final orders.  Section 101(5) of the Bankruptcy Code indicates that "claims" fall into different categories, and the statutory language of Section 157(b)(2) is clear that only determination of the "liquidated-unliquidated" distinction is non-core.[9]  Thus a bankruptcy court can determine, as a core proceeding, the issue of whether the claim is "disputed-undisputed," in the language of section 101(5) of the Bankruptcy Code.  Of course, if the claim objection cannot be resolved as a matter of law at the outset or on summary judgment, a creditor asserting a personal injury tort claim has a right to a trial (if a trial is necessary) in the district court.  But this is under the separate <u>venue</u> provision of Section 157(b)(5).  *See Stern*, 564 U.S. at 479 (section 157(b)(5) concerns mere venue, is not jurisdictional, and therefore can be waived).  Thus, "a finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim."  *In re Chateaugay,* 111 B.R. at 76-77.

41.     Finally, to the extent that this Court concludes that any portion of dispositive pre-trial rulings or the objection to any particular cause of action is a non-core proceeding, this Court must conduct those pretrial proceedings in the first instance.  Mr. Williams might consent (whether expressly or impliedly) to this Court's entry of final orders regarding his claim.  Section 157(c)(2).  Even if he does not consent, pursuant to Section 157(c)(1) this Court must hear the proceeding and submit proposed findings of fact and conclusions of law to the district court.  *See Exec. Benefits Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2174-75 (2014) (construing statute to apply Section 157(c)(1) to any proceeding for which the bankruptcy court cannot enter final orders).

---

[9] Obviously if instead there is to be an estimation of a personal injury tort claim under section 502(c) of the Bankruptcy Code, that necessarily incorporates both a determination of the amount of the claim ("liquidation") and the probability of there being liability ("disputed" claims).

## RESPONSES TO THIS OBJECTION

42.    Any responses to this Objection must be filed on or before 4:00 p.m. (New York Time) on November 14, 2016, in accordance with the procedures set forth in the notice of this Objection.

## RESERVATION OF RIGHTS

43.    Neither the filing of this Objection nor entry of the Proposed Order shall affect any rights of the Debtors, their estates, the Plan Administrator, or any other party in interest in these chapter 11 cases to object to this or any other claim for any purposes, including, without limitation, allowance and distribution under the Proposed Plan, or any rights of the holders of any Claim to contest any objection.

## NOTICE

44.    Notice of this Objection has been provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Simpson Thacher & Bartlett LLP, counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (iii) Latham & Watkins LLP, counsel to US VC Partners LP, as Second Lien Lender; (iv) Rahul Munshi, Esq., counsel to the Claimant; and (v) all parties requesting notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that further notice of this Objection is neither required nor necessary.

[*Remainder of this page intentionally left blank*]

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Proposed Order, and (b) grant such other and further relief as may be just and proper.

Dated: October 31, 2016
      New York, New York

<div style="margin-left:50%">

/s/ D. Ross Martin
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

</div>

## **EXHIBIT 1**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
Gawker Media LLC, *et al.*,[1]            :        Case No. 16-11700 (SMB)
                                          :
                Debtors.                  :        (Jointly Administered)
                                          :
-------------------------------------------------------x

### ORDER GRANTING OBJECTION OF DEBTOR GAWKER MEDIA LLC
### TO PROOF OF CLAIM NO. 6 FILED BY MITCHELL WILLIAMS

Upon the objection of Gawker Media LLC ("Gawker Media") and its motion (together,

the "Objection") for the entry of an order (the "Order") (i) disallowing Proof of Claim No. 6 filed

by Mitchell Williams (the "Williams Clam") and (ii) making Federal Rules of Civil Procedure

12(b)(6) and 12(c) applicable to the Objection pursuant to Bankruptcy Rule 7012 and 9014, as

more fully set forth in the Objection; and the Court having found that the Court has jurisdiction

over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this

proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and the Court having found that the relief requested in the Objection is in the best interests of

Gawker Media's estate, its creditors, and other parties in interest; and the Court having found

that Gawker provided appropriate notice of the Objection and the opportunity for a hearing on

the Objection under the circumstances; and the Court having reviewed the Objection and having

heard the statements in support of the relief requested therein at a hearing before the Court

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

1

(the "Hearing"); and the Court having determined that the legal and factual bases set forth in the

Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.  All capitalized terms used but not

defined herein shall have the meanings attributed to such terms in the Objection.

2.      Federal Rules of Civil Procedure 12(b)(6) and 12(c) are applicable to this

contested matter pursuant to Bankruptcy Rules 7012 and 9014.

3.      The Williams Claim is disallowed in its entirety.

4.      Prime Clerk LLC, the Court-appointed claims agent in these Chapter 11 Cases, is

hereby authorized and directed to make such revisions to the official claims register as are

necessary to reflect the disallowance of the Williams Claim.

5.      The Debtors are authorized to take all actions necessary to implement this Order.

6.      The Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation of this Order."

New York, New York
Dated: _____, 2016

_____
THE HONORABLE STUART M BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 2</u>**

**Martin Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| Gawker Media LLC, *et al.,*[1] | ) | Case No. 16-11700 (SMB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### DECLARATION OF D. ROSS MARTIN IN SUPPORT OF THE OBJECTION OF DEBTOR GAWKER MEDIA LLC TO PROOF OF CLAIM NO. 6 FILED BY MITCHELL WILLIAMS

Pursuant to 28 U.S.C. § 1746, D. Ross Martin declares as follows:

1.      I am a partner with the law firm Ropes & Gray LLP, counsel to Gawker Media LLC ("Gawker Media), Gawker Media Group, Inc. ("GMGI"), and Kinja Kft. ("Kinja"), (collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned cases.

2.      I submit this declaration in support of the *Objection of Debtor Gawker Media LLC To Proof of Claim No. 6 Filed by Mitchell Williams* (the "Objection").

3.      Attached as Exhibit 3 is a true and correct copy of the complaint in the Williams Defamation Action filed by claimant Mitchell Williams in the Superior Court of New Jersey, Camden County, as attached in support of Claim No. 6 filed by Williams.

4.      Attached as Exhibit 4 is a true and correct copy of the Order entered on March 6, 2015 by the Superior Court of New Jersey, Camden County in the Williams Defamation action, granting in part and denying in part Gawker Media LLC's motion to dismiss.

---

[1]    The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

5.      Attached as Exhibit 5 is a true and correct copy of the Order entered on

June 1, 2016 by the Superior Court of New Jersey, Camden County in the Williams Defamation

action, granting Gawker Media LLC's motion for summary judgment and dismissing all claims

against Gawker Media LLC with prejudice.

Dated: October 31, 2016
       Boston, Massachusetts

                                    */s/ D. Ross Martin*
                                    D. Ross Martin

# **EXHIBIT 3**

**Williams Complaint**

**CONSOLE LAW OFFICES LLC**
110 Marter Avenue, Suite 105
Moorestown, NJ 08057
(215) 545-7676
(215) 565-2854 fax

**Laura Carlin Mattiacci**
Identification No. 01789-2002
mattiacci@consolelaw.com
**Stephen G. Console**
console@consolelaw.com
Identification No. 04028-1983
Attorneys for Plaintiff, Mitchell Williams

---

| | |
|---|---|
| **MITCHELL WILLIAMS**<br>**Medford, NJ 08055** : | **SUPERIOR COURT OF NEW JERSEY-** |
| : | **CAMDEN COUNTY – LAW DIVISION** |
| **Plaintiff,** : | |
| : | **DOCKET NO.** |
| **v.** : | |
| : | **PLAINTIFF'S CIVIL ACTION COMPLAINT** |
| **THE MLB NETWORK, INC.** : | |
| **One MLB Network Plaza** : | **JURY TRIAL DEMANDED** |
| **Secaucus, NJ 07094** : | |
| : | |
| **and** : | |
| : | |
| : | |
| **THE GAWKER MEDIA GROUP, INC.** : | |
| **210 Elizabeth Street** : | |
| **Fourth Floor** : | |
| **New York, NY 10012** : | |
| : | |
| **and** : | |
| : | |
| **GAWKER MEDIA, LLC** : | |
| **219 Elizabeth Street** : | |
| **Fourth Floor** : | |
| **New York, NY 10012** : | |
| : | |
| **and** : | |
| : | |
| **JOHN DOE INDIVIDUALS 1-50** : | |
| : | |
| **and** : | |
| : | |
| **JOHN DOE CORPORATIONS 1-50** : | |
| : | |
| **Defendants.** : | |

---



# CIVIL ACTION COMPLAINT

## I.  PRELIMINARY STATEMENT

MLB Network, which is owned by Major League Baseball and Comcast, threatened Mitch Williams - former Phillies pitcher; now broadcaster - with termination unless he signed an Amendment to his Contract, which would prohibit him from attending the sporting events of his five children, including those of his 11-year-old autistic son. Mr. Williams refused to allow MLB Network to interfere with what he could do as a father and, as a result, MLB Network terminated and breached his Contract, depriving Mr. Williams of an approximately $2 million Contract balance. The repulsive demands of MLB Network came on the heels of defamatory articles published by the sports website Deadspin.com (owned by Defendant Gawker Media Group, Inc. and Gawker Media, LLC), which falsely and maliciously accused Mr. Williams of potentially criminal conduct by ordering a beanball (which never happened), and using lewd language (which was never said), during his 10-year-old son's little league baseball game – despite there being both written and video evidence contradicting the false and baseless accusations. Further, without any right or justification, Defendant MLB Network suspended Plaintiff, published false and misleading statements about his "leave of absence" and then terminated him when he refused to sign away his rights as father. As a result, Mr. Williams has also lost jobs with MLB.com, The Sports Network ("TSN"), and FOX Sports; he has suffered an enormous personal loss of reputation, has been humiliated publically and permanently, and has had to endure the severe distress caused by MLB Network and Gawker Media Group, who used Mr. Williams' children, and those he voluntarily coaches, as pawns in pursuit of their own financial gain.

Plaintiff, Mitchell Williams, by and through his undersigned counsel, brings this action

against Defendants seeking damages, and in support thereof, avers as follows:

## II.    **PARTIES**

1.      Plaintiff Mitchell Williams is an individual and a citizen of the State of New Jersey residing in Medford, NJ 08055.

2.      Defendant The MLB Network, Inc. ("MLB Network") is an entity incorporated in the State of New Jersey and is headquartered at One MLB Network Plaza, Secaucus, NJ 07094.

3.      Defendant The Gawker Media Group, Inc., a/k/a/ and d/b/a/ "Gawker" is an online media company incorporated in the Cayman Islands and is headquartered at 210 Elizabeth Street, New York, NY 10012.

4.      Defendant Gawker Media, LLC, a/k/a/ and d/b/a/ "Gawker" is an online media company incorporated in the state of Delaware and is headquartered at 210 Elizabeth Street, New York, NY 10012.

5.      At all material times hereto, Defendant Gawker Media, LLC, was under the control of Defendant The Gawker Media Group, Inc., each of whom are collectively referred to herein collectively as "Defendant Gawker" or "Gawker."

6.      Defendant Gawker is the parent company to, and owns, operates, and publishes, the sports website www.Deadspin.com ("Deadspin").

7.      Defendant(s) John Doe Individuals 1-50 are fictitiously named individual defendants, who are presently unknown but are responsible for the harm that occurred to Plaintiff, jointly and severally, including but not limited to, those owners, partners, employees and/or agents of MLB Network and/or Gawker who are presently unknown but are responsible for the harm that occurred to Plaintiff.  This claim is being made against these John Doe defendants personally as well as in their official capacities working in the course and scope of

3

their employment. Defendant(s) John Doe Individuals also represent and put on notice all other individuals who are presently unknown but are responsible for the harm that occurred to Plaintiff.

8.      Defendant(s) John Doe Corporations 1-50 are fictitiously named corporate defendants, who are presently unknown, but are responsible for the harm that occurred to Plaintiff, jointly and severally, and at all times maternal hereto, resided in or conducted business in the State of New Jersey. Defendant(s) John Doe Corporations 1-50 include, but are not limited to, those corporations, companies, partnerships, subsidiaries and entities who reside and/or conduct business in New Jersey, are presently unknown to Plaintiff, but who are responsible for the harm that occurred to Plaintiff.

9.      At all times material hereto, Defendant MLB Network was a person within the meaning of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(a), (l), *et al.* (hereinafter "NJLAD"), and subject to the obligations of non-discrimination in contracts, including but not limited to, an obligation not to discriminate on the basis of, or perception of, another's "disability" as defined by the NJLAD.

10.      At all times relevant to this action, Defendants acted through their respective officers, agents, servants, and employees.

11.      At all times relevant to this action, the action of Defendants, jointly and severally, resulted in severe emotional, economic and reputational harm to Plaintiff.

### III.      JURISDICTION AND VENUE

12.      Jurisdiction over the parties in the courts of Camden County in the State of New Jersey is proper pursuant to NJ Rule 4:3-2.

13.      Defendant MLB Network is an American sports channel dedicated to baseball.

Defendant MLB Network does business in Camden County, New Jersey in various ways, including but not limited to, broadcasting its programs and games through television providers, including Comcast, Time Warner, and Verizon, among others and advertising its business in Camden County, New Jersey. While employed, Plaintiff regularly performed broadcast services which were disseminated by Defendant MLB Network in Camden County, New Jersey.

14.    Plaintiff's Contract for services with Defendant MLB Network, discussed *infra*, which was drafted by Defendant MLB Network, states: "All claims, disputes or disagreements which may arise out of the interpretation, performance, or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New Jersey or the Federal District Courts located in New Jersey..." [Section 19.04 of the November 2011 Contract.]

15.    Defendant Gawker operates and publishes Deadspin, a sports website that has generated over 750,000,000 unique viewers since its launch in 2005.

16.    Defendant Gawker has caused harm and tortious injury to Plaintiff by publishing and disseminating defamatory statements in the State of New Jersey.

17.    Defendants MLB Network and Gawker conduct continuous and systematic business within the State of New Jersey and within the County of Camden.

IV.    **BACKGROUND FACTS**

A.    **Plaintiff's Baseball Playing and Coaching Career**

18.    Plaintiff is a former professional baseball player with the Philadelphia Phillies, Texas Rangers, and Chicago Cubs, among other Major League Baseball teams.

19.    During his 11-year career as a Major League Baseball pitcher, Plaintiff appeared in 619 games and amassed 192 career saves.

20.     Plaintiff was selected as a Major League Baseball All-Star in 1989 as a member of the Chicago Cubs.

21.     During his career, Plaintiff twice finished in the top-10 for the Cy Young Award, given to the league's most outstanding pitcher.

22.     Plaintiff retired from Major League Baseball in 1997.

23.     From 2001 to 2003, Plaintiff served as a coach for the Atlantic City Surf of the independent Atlantic League.  Over the past several years, Plaintiff has worked as a successful sports broadcaster.

24.     Since 2011, in his private life, Plaintiff has acted as a coach for the Jersey Wild youth baseball team.

25.     Plaintiff is the father of five (5) children, two (2) of whom are autistic.  Plaintiff's youngest son is a member of the Jersey Wild team.

26.     The Jersey Wild is an Amateur Athletic Union ("AAU") 501(c)(3) non-profit organization that Plaintiff established as a youth baseball team.  Plaintiff is a volunteer coach and subsidizes costs associated with the operation of the team, including paying for team equipment and indoor practice facility time.

27.     The Jersey Wild has participated in youth baseball tournaments for players 10-years-old and younger throughout the Mid-Atlantic Region.

**B.  Defendant MLB Network**

28.     Defendant MLB Network launched as a 24-hour cable sports channel on or around January 1, 2009.

29.     The President and Chief Executive Officer ("CEO") of Defendant MLB Network is Tony Petitti.

30.     Defendant MLB Network's annual live game coverage includes approximately 150 regular season games, two (2) League Division Series game telecasts, more than 150 Spring Training games, and other special event game telecasts.

31.     Defendant MLB Network operates year-round and is broadly distributed across cable, telco and satellite systems, including Comcast, Time Warner, and Verizon FIOS, among others, in New Jersey.

32.     Defendant MLB Network's official website is owned and operated under MLB.com, the official website of Major League Baseball, Inc.

**C.   Plaintiff's Broadcasting Career**

33.     Plaintiff joined Defendant MLB Network on or around January 3, 2009 as a studio analyst.

34.     On or about September 30, 2009, Plaintiff entered into a contract with Defendant MLB Network to provide professional services and on-camera talent for the company's varied broadcasts as an Independent Contractor.

35.     On or about November 1, 2011, due to Plaintiff's success, Plaintiff and Defendant MLB entered into a new contract for services (Referred to Herein as "November 2011 Contract" or "Contract," attached hereto as Exhibit A).

36.     The November 2011 Contract term continued for a period up to and including the later of (1) November 1, 2016, and (2) the day after the last game of the 2016 World Series is actually completed ("Initial Period").

37.     The November 2011 Contract term also provided for an option period at Defendant MLB Network's discretion for an additional period up to and including the later of (1) November 1, 2017 and (2) the day after the last game of the 2017 World Series is completed

7

("Option Period").

38.    The November 2011 Contract called for payments from Defendant MLB Network to Plaintiff in the following amounts:

1.  From November 1, 2011 through October 31, 2012: $435,000;

2.  From November 1, 2012 through October 31, 2013: $575,000;

3.  From November 1, 2013 through October 31, 2014: $625,000;

4.  From November 1, 2014 through October 31, 2015: $650,000;

5.  From November 1, 2015 through the Initial Period: $700,000; and

6.  For the Option Period: $750,000.

39.    Pursuant to the November 2011 Contract, Defendant MLB Network was obligated to pay Plaintiff the above sums provided that Plaintiff did not materially breach or default on the November 2011 Contract.

40.    According to the November 2011 Contract, Plaintiff's services for Defendant MLB Network included reporting, analyst and interview segments on-air; performing standard openings, closings, lead-ins, voice-overs, looping, retakes, promotional spots and trailers; and journalistic authoring, in addition to other broadcasting duties.

41.    By way of example, in April 2014, Plaintiff appeared on-air for Defendant MLB Network on nineteen (19) separate days, co-hosting the *MLB Tonight* and *MLB Now* programs in addition to participating in various interviews and promotional spots and trailers.

42.    During his contractual period, Plaintiff helped Defendant MLB Network win several Emmy Awards for outstanding baseball programming and broadcasts.

43.    Plaintiff's November 2011 Contract also specified that he was an "Independent Contractor" for Defendant MLB Network.  Specifically, the Contract states:

8

INDEPENDENT CONTRACTOR

"Artist (Plaintiff) acknowledges, understand and agrees that Artist will not be
eligible to participate in any of the Company's voluntary benefits programs
including, but not limited to, retirement, disability, hospitalization,
medical/health, dental and life insurance policies." [Paragraph 6.01]

"As an independent contractor, Artist will be solely responsible to pay all
applicable taxes arising from payments made to Artist by Company, including,
but not limited to, Social Security, self-employment taxes and disability
insurance. Accordingly, Company agrees that it shall make no tax withholdings
or deductions in connection with any monies paid to the Artist hereunder, unless
required by law." ..." [Paragraph 6.02]

44.     Under the terms of the Contract with Defendant MLB Network, Plaintiff was
permitted to provide on-air commentary in connection with two (2) local Philadelphia radio
shows and a Sirius/XM Satellite Radio baseball show throughout the duration of the contract
term.

45.     Moreover, throughout the duration of his Contract with Defendant MLB Network,
Plaintiff continued to work as a sports commentator for FOX Sports and TSN on a game-by-
game basis.

46.     At no point during Plaintiff's five (5) years of performing on-air and promotional
services for Defendant MLB did he ever receive a negative performance review or write-up
concerning any performance deficiency.

V.     **THE MAY 2014 RIPKEN YOUTH BASEBALL TOURNAMENT**

   A.     **Saturday, May 10, 2014**

47.     On Saturday, May 10, 2014, Plaintiff attended his ten-year-old son's youth
baseball games at Ripken Stadium in Aberdeen, Maryland in connection with a Ripken Baseball
tournament.

48.     Former Major League Baseball players Cal Ripken, Jr. and Bill Ripken own and

operate the Ripken Baseball youth tournaments.

49.    Plaintiff's son is a member of the Jersey Wild.

50.    Plaintiff co-coaches the Jersey Wild with Corey Ahart and Craig Yates.

51.    On the morning of Saturday, May 10, 2014, the Jersey Wild played a game against the Olney Pirates of Maryland.

52.    The Jersey Wild were stationed in the First Base dugout while the Olney Pirates were stationed in the Third Base dugout.

53.    On the field, Plaintiff was the Jersey Wild's First Base Coach.

54.    While the Jersey Wild were at bat, Plaintiff stood in the First Base Coach's Box, located near the Jersey Wild's dugout.

55.    Parents of the Jersey Wild players were generally located along the First Base stands during the game.

56.    Prior to the start of the fifth inning, Plaintiff was conversing with Jeremy Baltz, a parent of a Jersey Wild player.  Plaintiff was standing in or near the First Base Coach's Box and Mr. Baltz was located a very short distance away off the field, along the fence near First Base, and adjacent to the Jersey Wild dugout.

57.    While Plaintiff was talking to Mr. Baltz, the base umpire, stationed near second base, suddenly and rapidly began approaching Plaintiff.

58.    Plaintiff remained in the First Base Coach's Box.

59.    The umpire harangued Plaintiff for allegedly arguing over balls and strikes, which Plaintiff did not do.  The umpire continued to approach Plaintiff until his face nearly contacted Plaintiff's face.

60.    Plaintiff remained in the First Base Coach's Box.

61.     The umpire threatened to fight Plaintiff, including, but not limited to, telling Plaintiff to "pick a time and place" and the umpire ejected Plaintiff from the baseball game.

62.     Plaintiff exited the baseball field and watched the remainder of the game from the stands behind home plate.

63.     Under the Ripken Baseball tournament rules, an individual ejected from a baseball game is banned from attending any other games during the tournament.

64.     However, after the game, the Ripken Baseball officials spoke with Plaintiff and other witnesses who explained to them what had happened.  Plaintiff was reinstated to the tournament because the Ripken Baseball officials determined that Plaintiff was not at fault for the ejection.  Rather, the Ripken Baseball officials banned the umpire from the rest of the tournament for acting unprofessionally, finding that he (and not Plaintiff) was at fault for inciting the altercation during the game.

**B.  Sunday, May 11, 2014**

65.     The following morning, on Sunday, May 11, 2014, the Jersey Wild again played the Olney Pirates at Ripken Stadium.

66.     Because the ejection from the previous day was effectively reversed, Plaintiff was permitted by the Ripken Baseball officials to attend and coach the Sunday, May 11, 2014 games.

67.     Plaintiff was the First Base Coach during the Sunday morning game, where several Ripken Baseball officials were present.

68.     The Jersey Wild won the morning game, eliminating the Olney Pirates from the tournament and moving on to the tournament championship against the South Jersey ("SJ") Titans.

69.     In the afternoon of Sunday, May 11, the Jersey Wild played the SJ Titans for the

11

tournament championship.

70.     Plaintiff was the First Base Coach during the Sunday afternoon game, where several Ripken Baseball officials were present.

71.     The SJ Titans ultimately won the game and the Ripken Baseball youth tournament.

## VI.  DEFENDANT GAWKER PUBLISHES A DEFAMATORY ARTICLE ON PLAINTIFF AT 8:30PM ON SUNDAY, MAY 11, 2014

72.     At 8:30pm on Sunday, May 11, 2014, Defendant Gawker published an article on Deadspin.com entitled: "Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing" ("May 11, 2014 Gawker Article," attached hereto as Exhibit B).

73.     The May 11, 2014 Gawker Article was written by Timothy Burke, Video/Assignment Editor at Deadspin.com and an employee of Defendant Gawker.

74.     The May 11, 2014 Gawker Article stated in relevant part:

> MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after a profanity-laced tirade in which he called an umpire a "motherfucker" in front of the children, observers tell us.
>
> Williams coached his son's 10U Jersey Wild team, which was participating in a Ripken Baseball tournament in Aberdeen, Md. We've confirmed through several sources that Mitch Williams – who was once tossed from his daughter's youth basketball game for cursing at a ref – had complained about numerous calls throughout the game, ranging from balls and strikes to a close play at the plate that ended a Jersey Wild rally. This led to repeated arguments with umpires on the field.
>
> One umpire finally confronted Williams after the former MLB pitcher shouted something to a parent in the stands about getting that umpire fired. The confrontation sparked a face-to-face argument that, one parent told us, was "just like the major leagues." Two different observers told us Williams had to be physically separated from the umpire by other coaches. Williams then refused to leave the field, causing a 10-minute delay in play;

> as a result of his antics, he was initially banned from the
> tournament.
>
> . . .
>
> We've attempted to access the video of the incident, but the game
> in question is curiously unavailable from the service providing
> feeds from the rest of the tournament. An individual familiar with
> the situation informs us that after hearing Williams's explanation,
> Ripken Baseball officials lifted the ban – saying the umpire failed
> to act professionally. But according to our witnesses, the umpire's
> "unprofessional" behavior came well after Mitch Williams had
> been ejected and refused to leave. (Ripken Baseball "monitored"
> Williams closely during his team's two games today. Jersey Wild
> did not win the tournament.) Exh. B

75.     The May 11, 2014 Gawker Article also featured two (2) pictures of the umpire

ejecting Plaintiff from the game. However, the pictures are misleading do not show that Plaintiff

was located in the First Base Coach's Box or that the umpire aggressively approached Plaintiff

from the field.

76.     At no point did Mr. Burke or any representative of Defendant Gawker contact

Plaintiff to verify the accuracy of the facts they published in the May 11, 2014 Gawker Article.

77.     The statements contained in the May 11, 2014 Gawker Article state and/or imply,

individually and/or collectively, and when read in their totality, that Plaintiff engaged in

misconduct in failing to conduct himself in an appropriate manner at the youth baseball game.

78.     It is not true that Plaintiff engaged in misconduct. It is not true that Plaintiff

failed to conduct himself in an appropriate manner at the youth baseball game.

79.     The statements contained in the May 11, 2014 Gawker Article state and/or imply,

individually and/or collectively, and when read in their totality, that Plaintiff yelled profane

language, physically confronted and nearly fought an umpire, and therefore was ejected from a

youth baseball game for his allegedly aggressive conduct.

80.     Specifically, the May 11, 2014 Gawker Article falsely states and/or implies, when read in its totality, that:

    a.   Plaintiff went on a "profanity-laced tirade" at the youth baseball game;

    b.   Plaintiff "called an umpire a 'motherfucker' in front of the children";

    c.   Plaintiff instigated "repeated arguments with umpires on the field";

    d.   Plaintiff "shouted something to a parent in the stands about getting that umpire fired";

    e.   Plaintiff "sparked a face-to-face argument" with the umpire;

    f.   Plaintiff "threatened" the umpire;

    g.   Plaintiff "went off" and "went nuts" on the umpire; and

    h.   Plaintiff had to be "physically separated from the umpire by other coaches" and "restrained by other coaches."

81.     It is not true that Plaintiff went on a "profanity-laced tirade" at the youth baseball game. Rather, Plaintiff did not use any profane language at any point during this interaction with the umpire.

82.     It is not true that Plaintiff "called an umpire a 'motherfucker' in front of the children." Rather, Plaintiff did not use any profane language at any point during this interaction with the umpire.

83.     It is not true that Plaintiff instigated "repeated arguments with umpires on the field." The implication of this statement, and others contained in the May 11, 2014 Gawker Article, is that Plaintiff engaged in misconduct and failed to conduct himself in an appropriate manner at the youth baseball game. At no point did Plaintiff engage in misconduct during the youth baseball game.

84.    It is not true that Plaintiff "shouted something to a parent in the stands about getting that umpire fired." Rather, Plaintiff was engaged in a close conversation with Mr. Baltz, a parent located near the First Base Coach's box, when the base umpire aggressively confronted and strode towards Plaintiff.

85.    It is not true that Plaintiff "sparked a face-to-face argument" with the umpire, "threatened" the umpire, or "went off" or "went nuts" on the umpire. Rather, as confirmed by the Ripken Baseball officials' ruling, the umpire was at fault for acting unprofessionally and they ejected the umpire from the rest of the tournament. Moreover, Plaintiff never left the First Base Coach's box throughout the interaction, never threatened the umpire, and never struck or made any physical contact with the umpire.

86.    It is not true that Plaintiff had to be "physically separated from the umpire by other coaches" and "restrained by other coaches." The implication of these statements, and others contained in the May 11, 2014 Gawker Article, is that Plaintiff sought to physically harm the umpire through violent actions. At no point did Plaintiff threaten the umpire or indicate that he would physically harm the umpire. Rather, the umpire threatened Plaintiff, telling Plaintiff to "pick a time and place" to fight.

87.    Defendant Gawker's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

88.    Defendant Gawker intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

## VII.    PLAINTIFF CONTINUES TO WORK ON-AIR FOR DEFENDANT MLB NETWORK AFTER THE SUNDAY, MAY 11, 2014 DEADSPIN ARTICLE

89.    Plaintiff continued to work for Defendant MLB Network as scheduled on

Monday, May 12, 2014. On that day, Plaintiff co-hosted the *MLB Now* and *MLB Tonight*
programs.

90.     On Tuesday, May 13, 2014, Plaintiff had a scheduled off-day.

91.     On Wednesday, May 14, 2014, Plaintiff worked at Defendant MLB Network as
scheduled. Plaintiff co-hosted the *MLB Now* program that evening.

92.     On Thursday, May 15, 2014, Plaintiff work at Defendant MLB Network as
scheduled. Plaintiff again co-hosted the *MLB Tonight* program.

## VIII.   DEFENDANT GAWKER PUBLISHES A DEFAMATORY ARTICLE ON PLAINTIFF AT 2:15PM ON FRIDAY, MAY 16, 2014

93.     On May 16, 2014, at 2:15pm, Defendant Gawker published another article on
Plaintiff on its Deadspin.com website ("May 16, 2014 Gawker Article," attached hereto as
Exhibit C).

94.     This second article covered the Sunday afternoon game from the previous
weekend between the Jersey Wild and the SJ Titans.

95.     The article, again by Mr. Burke, was titled: "Witnesses: Mitch Williams Called
Child 'A Pussy,' Ordered Beanball."

96. The article stated in relevant part:

> The fallout continues from MLB Network analyst Mitch
> Williams's meltdown at a Ripken Baseball youth tournament this
> past weekend . . . as parents and coaches tell Deadspin that "The
> Wild Thing" called one child "a pussy" while ordering one of his
> own 10-year-old players to hit the opposing pitcher with a
> beanball.

> While video of the Saturday ejection is still suspiciously
> unavailable, we were able to acquire footage from Sunday's
> championship game between the Williams-coached Jersey Wild
> and SJ Titans, another elite 10U baseball team from New Jersey.
> The film at the top shows an interaction between Williams and
> some SJ Titans players. Multiple witnesses report that interaction

consisted of Williams calling the SJ Titans pitcher "a pussy."
Children on the team heard this, and one asked his parent on the
ride home what it meant.  The comment sparked a meeting behind
home plate between SJ Titans coaches, umpires, Williams, and a
handler (one witness called him a "babysitter") assigned by Ripken
Baseball to keep Williams in line after Saturday's ejection.

Even in this interaction, you can see Williams being aggressive
and argumentative.

Here's video of an incident that happened in the fifth inning, when
the SJ Titans pitcher came to bat in the leadoff position.  Watch as
Williams says something to his catcher, after which the catcher
goes to the mound to say something to his pitcher.  SJ Titans
coaches and players overheard this interaction, and report that
Williams ordered his pitcher to intentionally hit the SJ Titans batter
with the first pitch.  One witness told us it was in an attempt to
knock the SJ Titans pitcher out of the game.

Sure enough, the first pitch hits the SJ Titans player square in the
ribs.  (The home plate umpire, who had been made aware of the
upcoming beanball, warned both benches.)  One SJ Titans assistant
coach confronted Williams about the pitch after the game, and
reported that Williams stated, "I told him to throw it inside."

Other witnesses – a number of parents, coaches, and other
observers contacted us about Mitch Williams's behavior – state
that Williams was heckling SJ Titans coaches throughout the
game, repeatedly calling one a "squirrely little teapot," and making
harassing comments about the appearance of 10-year-old baseball
players on the opposing team.  (Lest you think these reports come
from a team of sore losers, know that SJ Titans defeated Jersey
Wild in the championship game.)  [See Exhibit C.]

97.    At no point did Mr. Burke or any representative of Defendant Gawker contact

Plaintiff to verify the accuracy of the facts they published in the May 16, 2014 Article.

98.    The statements contained in the May 16, 2014 Gawker Article state and/or imply,

individually and/or collectively, and when read in their totality, that Plaintiff used profane

language and engaged in misconduct in failing to conduct himself in an appropriate manner at

the youth baseball game.

99.     The May 16, 2014 Gawker Article further implies that Plaintiff engaged in criminal behavior by ordering a baseball player to intentionally assault another individual with a baseball.

100.    It is not true that Plaintiff used profane language or engaged in misconduct.  It is not true that Plaintiff failed to conduct himself in an appropriate manner at the youth baseball game.  It is not true that Plaintiff in any way engaged in criminal activity.

101.    Specifically, the May 16, 2014 Gawker Article falsely states and/or implies, when read in its totality, that:

a.   Plaintiff "called one child 'a pussy'";

b.   Plaintiff "order[ed] one of his own 10-year-old players to hit the opposing pitcher with a beanball";

c.   Plaintiff "was heckling" SJ Titans coaches throughout the game;

d.   Plaintiff repeatedly calling one a 'squirrely little teapot'";

e.   Plaintiff made "harassing comments about the appearance of 10-year-old baseball players on the opposing team;"

f.   Plaintiff was assigned a "handler" by the Ripkin organization; and,

g.   The home plate umpire "had been made aware of the upcoming beanball."

102.    It is not true that Plaintiff called a child, or anyone, a "pussy."  Rather, Plaintiff did not use any profane language at any point during the game.

103.    It is not true that Plaintiff ordered a child to hit another child with a baseball.

104.    It is not true that Plaintiff heckled SJ Titans coaches or that he repeatedly called one a "squirrely little teapot."

105.    It is not true that Plaintiff made any harassing comments about the youth baseball

players.

106.   The May 16, 2014 Gawker Article also includes two (2) videos from the Sunday championship game.  The May 16, 2014 Gawker Article falsely states and/or implies, when read in its totality, that the videos show that:

> a.   Plaintiff was "aggressive and argumentative";
>
> b.   Plaintiff told his team's catcher to tell the pitcher to intentionally hit the opposing team's batter with the first pitch;
>
> c.   Plaintiff ordered his pitcher to intentionally hit the opposing team's batter; and
>
> d.   The first pitch of the inning hit a SJ Titans player "square in the ribs".

107.   Neither video shows Plaintiff calling the SJ Titans player "a pussy."

108.   It is not true that the videos show Plaintiff being aggressive.

109.   It is not true that the videos show Plaintiff being argumentative.

110.   It is not true that the videos show Plaintiff instructing his pitcher and/or catcher to intentionally hit a SJ Titans batter.

111.   It is not true that the videos show a SJ Titans player getting hit "square in the ribs."

112.   Defendant Gawker's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

113.   Defendant Gawker intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

IX.   **DEFENDANT MLB NETWORK ISSUES DEFAMATORY STATEMENTS ABOUT PLAINTIFF TO THE PRESS REGARDING PLAINTIFF'S SUSPENSION FROM DEFENDANT MLB NETWORK**

114.   On Friday, May 16, 2014, Plaintiff was scheduled to co-host *MLB Live* for Defendant MLB Network.

115.   At around 4pm, Plaintiff was told that Mr. Petitti, Defendant MLB Network's President and CEO, did not want Plaintiff on-air.

116.   Plaintiff was directed to speak with Lorraine Fisher, Defendant MLB Network's Public Relations Director.

117.   Shortly thereafter, in Ms. Fisher's office, Plaintiff and Ms. Fisher reviewed the videos featured in the May 16, 2014 Gawker Article posted on Deadspin.com by Defendant Gawker.

118.   Plaintiff reiterated to Ms. Fisher that the Deadspin.com article was false, and explained that the videos did not even show the purported conduct.

119.   Nevertheless, Plaintiff was told he was not permitted to go on-air as scheduled.

120.   The following day, on Saturday, May 17, 2014, Mr. Petitti called Mr. Spielman, Plaintiff's agent.

121.   Mr. Petitti stated that Defendant MLB Network is investigating the matter, suspending Plaintiff, and that the anticipated return date would be in thirty (30) days.

122.   Thereafter, Mr. Petitti called Plaintiff, who was driving home from a baseball tournament with his wife and a player from his team.

123.   While on speakerphone, Mr. Petitti lambasted Plaintiff.

124.   Mr. Petitti told Plaintiff that he was suspended from Defendant MLB Network.

125.   Plaintiff told Mr. Petitti that he did not want to go on suspension and that there

was no reason to suspend him.

126.   Mr. Petitti told Plaintiff that it did not matter what Plaintiff wanted, that he was being suspended as they looked into the situation further.

127.   Mr. Petitti also told Plaintiff that either MLB Network would issue a statement concerning the suspension or Plaintiff could.   Plaintiff told Mr. Petitti that he would prefer to issue the statement, rather than MLB Network.

128.   Yet unbeknownst to Plaintiff, Defendant MLB Network had already unilaterally issued a statement to the New York *Daily News* via email.

129.   Defendant MLB Network's statement to the New York *Daily News* read:  "**Mitch Williams has decided** to take a leave of absence from his role at MLB Network at this time . . . We are continuing to look into the matter."  (New York *Daily News* article, dated May 17, 2014, attached hereto as Exhibit D).

130.   Defendant MLB Network's statement to the New York *Daily News* is false.

131.   Defendant MLB Network's statement to the New York *Daily News* placed Plaintiff in false light.

132.   Specifically, it is not true that "[Plaintiff] has decided" to take a leave of absence from Defendant MLB Network.  Plaintiff never wanted to take a leave of absence.  Rather, the decision to suspend Plaintiff and place him on a leave of absence was unilaterally made by Defendant MLB Network.

133.   It is not true that Plaintiff had voluntarily taking a leave of absence from Defendant MLB Network and that Defendant MLB Network was conducting an investigation into Plaintiff's misconduct.

134.   The statements contained in the press statement to the New York *Daily News* state

and/or imply, individually and/or collectively, and when read in their totality, that Plaintiff admitted to the misconduct or wrongdoing in connection with the Ripken Baseball tournament and that Plaintiff in fact committed the alleged wrongful actions.

135.   Defendant MLB Network's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

136.   Defendant MLB Network intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

137.   Defendant MLB Network also unilaterally issued a statement to *USA Today* via email.

138.   Defendant MLB Network's statement to *USA Today* was different than the statement they issues to the New York Daily News – but still false.  It stated that "the decision to take the leave was **mutual**," and that there was no timetable for Plaintiff's return to broadcasts. ("*USA Today* article," dated May 19, 2014, attached hereto as Exhibit E).

139.   Defendant MLB Network's statement to *USA Today* is false.

140.   Defendant MLB Network's statement to *USA Today* placed Plaintiff in false light.

141.   Specifically, it is not true that the decision to take a leave of absence from Defendant MLB Network was mutual.  Plaintiff never wanted to take a leave of absence.  Rather, the decision to suspend Plaintiff and place him on a leave of absence was unilaterally made by Defendant MLB Network.

142.   The statements contained in the press statement to *USA Today* state and/or imply, individually and/or collectively, and when read in their totality, that Plaintiff admitted to the

misconduct or wrongdoing in connection with the Ripken Baseball tournament, that Plaintiff in fact committed the alleged wrongful actions, that Plaintiff was voluntarily taking a leave of absence from Defendant MLB Network, and that Defendant MLB Network was conducting an investigation into Plaintiff's misconduct.

143.    Defendant MLB Network's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

144.    Defendant MLB Network intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

145.    Further, the November 2011 Contract does not permit Defendant MLB Network to suspend Plaintiff's on-air engagement absent illness, incapacity, or default by Plaintiff or a "force majeure" (such as war, strike, or earthquake) event.

146.    The November 2011 Contract does not permit Defendant MLB Network to issue a unilateral press release regarding Plaintiff's Contract for services with Defendant MLB Network.

147.    As a result of Defendant MLB Network's defamatory statements about Plaintiff, he has suffered damages.

148.    As a result of Defendant MLB Network's defamatory statements about Plaintiff, his existing and prospective economic advantage and contractual relations have been interfered with.

149.    For example, on May 19, 2014, FOX Sports, whom Plaintiff has a contractual relationship with to perform on-air commentary services, cancelled Plaintiff's scheduled broadcast of a June 28, 2014 Philadelphia Phillies game and has not been called upon for

broadcast services since the suspension articles were published.

150.     Furthermore, several news outlets have either canceled their contracts and/or relationships with Plaintiff since the defamatory statements and wrongful conduct of Defendants, including but not limited to, MLB.com, which is operated by Major League Baseball, Inc.; cable channel TSN cancelled Plaintiff's weekly broadcasts indefinitely.

## X.     DEFENDANT GAWKER PUBLISHES A DEFAMATORY ARTICLE ON PLAINTIFF AT 11:13AM ON MONDAY, MAY 19, 2014

151.     On Monday, May 19, 2014, Defendant Gawker published another defamatory article on Plaintiff on its website Deadspin.com titled:  MLB Network Puts Mitch Williams on Hiatus ("May 19, 2014 Gawker Article," attached hereto as Exhibit F).

152.     The May 19, 2014 Article, again written by Mr. Burke, stated in relevant part:

> MLB Network analyst Mitch Williams is on an indefinite leave of absence from the league-owned cable channel after a series of incidents at a youth baseball tournament that witnesses tell us included the former big-league hurler calling a ten-year-old "a pussy."
>
> The *Daily News* has the scoop . . . though it's not certain the leave of absence is directly tied to his behavior last weekend.  Several readers wrote in last week, informing us Williams's appearances on MLB Network were erratic and that the "Wild Thing" was slurring his words.
>
> While Ripken Baseball has yet to respond formally to our requests for information, one employee of that organization who witnessed his behavior last weekend at the 10U tournament told us that Williams was "very unprofessional in the way he acted, coached, and the way he carried himself."  This individual told us Williams has been out of line repeatedly and complaints about his behavior stretch back at least a year, and noted that a "warning" message from Bill Ripken, reminding coaches and visitors about proper sportsmanship, had to be played four times during his initial outburst . . . that earned him an ejection.
>
> The Ripken Baseball employee went on to opine that Williams should be banned for life from that organization's events.  Several

24

readers in attendance at Jersey Wild's games this past weekend
noted Williams was not coaching his team, though he was in
attendance as a spectator.

153.    At no point did Mr. Burke or any representative of Defendant Gawker contact
Plaintiff to verify the accuracy of the facts they published in the May 19, 2014 Gawker Article.

154.    The statements contained in the May 19, 2014 Gawker Article state and/or imply,
individually and/or collectively, and when read in their totality, that Plaintiff used profane
language and engaged in misconduct in failing to conduct himself in an appropriate manner at
the youth baseball games.

155.    The May 19, 2014 Gawker Article further implies that Plaintiff engaged in
criminal behavior by ordering a baseball player to intentionally assault another individual with a
baseball.

156.    It is not true that Plaintiff used profane language or engaged in misconduct.  It is
not true that Plaintiff failed to conduct himself in an appropriate manner at the youth baseball
game.  It is not true that Plaintiff engaged in criminal behavior.

157.    Specifically, the May 19, 2014 Gawker Article falsely states and/or implies, when
read in its totality, that:

     a.   Plaintiff "call[ed] a ten-year-old 'a pussy'";

     b.   Plaintiff's appearances on Defendant MLB Network were "erratic";

     c.   Plaintiff was "slurring his words" on Defendant MLB Network; and

     d.   Plaintiff was "very unprofessional in the way he acted, coached, and the way
        he carried himself."

158.    Plaintiff never called a ten-year-old player "a pussy."

159.    Plaintiff's appearances on Defendant MLB Network were not "erratic" and he

was not "slurring his words." The implication of this statement is that Plaintiff was inebriated, drunk, or otherwise under the influence of drugs or alcohol when on-air for Defendant MLB Network. It is untrue that Plaintiff was inebriated, drunk, or otherwise under the influence of drugs or alcohol when on-air for Defendant MLB Network.

160. It is untrue that Plaintiff was "very unprofessional." Rather, Ripken Baseball officials determined that Plaintiff was not at fault when he was ejected from the Ripken Baseball tournament, and he was reinstated to the tournament that same day. Instead, the umpire who ejected Plaintiff was banned from the tournament because of his unprofessional conduct.

161. Defendant Gawker's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

162. Defendant Gawker intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

163. As a result of Defendant Gawker's false and defamatory statements and implications, Plaintiff was suspended and his November 2011 Contract was ultimately terminated by Defendant MLB Network.

164. Several national websites, publications, and blogs reprinted Defendant Gawker's false and defamatory articles, including, but not limited to, Yahoo!, *USA Today*, and CBS Sports, among others. Several publications also added additional commentary to Defendant Gawker's stories, including but not limited to, an article on a sports blog which posted a picture of Plaintiff with the headline: "Mitch Williams: Baseball Terrorist."

165. Gawker continues to defame Plaintiff. On August 19, 2014, Gawker published an article on Deadspin which stated: "…not all youth coaches and parents are psychopath" making

reference to a little league coach who gave an inspiring speech to his players. ("August 19, 2014 Gawker Article," attached hereto as Exhibit G). The word "psychopath" was hyperlinked to the Deadspin/Gawker May 11, 2014 defamatory article about Mr. Williams described above (i.e. Exh. B).

166.    In addition, several broadcast news programs, such as FOX 29 in Philadelphia, cited and quoted Defendant Gawker's false and defamatory articles on-air.

167.    As a result of Defendant Gawker's false and defamatory statements and implications, Plaintiff's reputation has been damaged and he has suffered economic loss, humiliation, embarrassment, mental anguish and suffering, and loss of standing in the community and in his profession.

## XI.    DEFENDANT MLB NETWORK FAILED TO REASONABLY INVESTIGATE THE EASILY AVAILABLE EVIDENCE BEFORE SUSPENDING AND TERMINATING

168.    During the week of May 19, 2014, Plaintiff obtained several statements from parents and coaches who were in attendance during the Ripken Baseball tournament.

169.    For example, on Tuesday, May 20, 2014, Mr. Ahart (Plaintiff's co-coach of the Jersey Wild) gave Plaintiff a written recitation of the events at the tournament.

170.    Mr. Ahart, a first-hand witness, described the base umpire's conduct at the May 10, 2014 game, which included aggressively confronting Plaintiff. Mr. Ahart also stated that the umpire said to Plaintiff, "anytime, anyplace," referring to a potential fistfight. Mr. Ahart further explained that at no time during the youth baseball tournament did Plaintiff use any profanity.

171.    Plaintiff also obtained statements from parents of players on the SJ Titans youth baseball team – the team that played against Plaintiff's Jersey Wild team. SJ Titans parents Angel Martinez, Fran Montone, and Jason Dullin all emailed Plaintiff regarding the events of the

tournament weekend.

172.    For example, in a May 24, 2014 email, Mr. Martinez explained that he witnessed the entire game from behind home plate and did not hear Plaintiff state anything offensive to anyone during this time.

173.    Furthermore, on June 5, 2014, Mr. Lisgar, the SJ Titans head coach (the opposing team), sent an email to Mr. Ahart describing the true events of the Jersey Wild versus SJ Titans baseball game.

174.    Mr. Lisgar wrote that he never heard Plaintiff use profanity on the baseball field. Also, Mr. Lisgar wrote that he never heard Plaintiff instruct one of his players to hit a SJ Titans player with a pitch.

175.    Similarly, Mr. Montone and Mr. Dulin (both coaches of the SJ Titans team that played against Plaintiff's Jersey Wild team) wrote to Plaintiff that none of the SJ Titans coaches heard Plaintiff order a player to get hit, and none of the coaches heard Plaintiff use any profanity on the field.

176.    Plaintiff and his agent, Mr. Spielman, repeatedly informed Mr. Petitti that the allegations concerning Plaintiff's alleged conduct were false.  Plaintiff and Mr. Spielman stated to Mr. Petitti that several parents and coaches who were involved in the youth baseball tournament unequivocally denied that Plaintiff acted unprofessionally, and that they had in their possession letters from parents and coaches from both teams that contradict the anonymous reports of inappropriate conduct.

177.    Mr. Petitti told Plaintiff and Mr. Spielman that he was not interested in viewing this evidence of what actually occurred during Plaintiff's son's little league game.

XII.  **DEFENDANT MLB NETWORK ORDERED PLAINTIFF TO SIGN AN
OUTRAGEOUS AMENDMENT TO HIS CONTRACT THAT REQUIRED
PLAINTIFF TO SIGN AWAY HIS RIGHTS AS A FATHER AND THEN
TERMINATED HIM WHEN HE REFUSED TO SIGN IT**

178.  At no point from May 10, 2014 to June 13, 2014 did Defendant MLB Network
threaten to terminate Plaintiff's existing November 2011 Contract for services.

179.  Rather, Plaintiff remained on-air until May 16, 2014, and was placed on a leave of
absence thereafter.  Defendant MLB Network informed Plaintiff that the leave of absence would
likely be in effect for thirty (30) days.

180.  On Friday, June 13, 2014, Defendant MLB Network sent Mr. Spielman an email
attaching an amendment to the November 2011 Contract (attached hereto as Exhibit H, and
referred to as the "Amendment").

181.  The November 2011 Contract does not permit Defendant MLB Network to
unilaterally impose any amendment, including the Amendment described herein, to the
November 2011 Contract in exchange for Plaintiff's continued services.

182.  Plaintiff and his wife have been married for twenty (20) years and they have five
(5) children, two (2) of whom are autistic.

183.  According to Defendant MLB Network, Plaintiff would be returned to his on-air
duties only if he agreed to sign this contract Amendment, which states: "In consideration for
Company's covenant to not exercise its rights to terminate the Agreement as a result of the
Artist's Incident(s), Artist covenants and agrees to [the following]…"

184.  The Amendment specifically required Plaintiff to sign away his rights as a father
by forbidding him to even **attend**, let alone coach, any of his children's games.  In addition to his
ten-year-old son's little league baseball games, this would include, attending his 11-year-old
autistic son's flag football games and tennis events.

29

185.    Further, as described above, Plaintiff's ten-year-old son is an avid youth baseball player who competes in baseball tournaments throughout the baseball season. As a father and coach, Plaintiff routinely attends his son's games and practices, which often require significant travel.

186.    Further, Plaintiff's daughter is currently a high-school senior and all-county basketball player who has aspirations to play basketball in college. Plaintiff routinely attends his daughter's basketball games. The Amendment forced onto Plaintiff would have required Plaintiff to miss his daughter's final high school basketball games.

187.    The Amendment also states that Plaintiff will agree to attend "therapeutic counseling."

188.    The Amendment further states that Plaintiff agrees that he cannot so much as post a picture of his family on Facebook without prior approval by Defendant MLB Network.

189.    The Amendment stated that Plaintiff agrees he engaged in the alleged inappropriate conduct and that this conduct was a breach of the November 2011 Contract.

190.    Plaintiff did not engage in inappropriate conduct at his son's little league games and he did nothing which would constitute a breach of the November 2011 Contract.

191.    The Amendment states, among other things:

    i.    For a period of one (1) year from the date of the discontinuance of the leave of absence, **Plaintiff shall not attend, in any manner or by any means, any amateur athletic event(s) of any kind**, including, without limitation, any youth, middle school, high school, and college athletic events;

    ii.    During the remainder of the term of the contract, Plaintiff shall not participate in (e.g., coach, advise, speaker, etc.) in any manner or by any means, any amateur athletic event(s) of any kind, including, without limitation, any youth, middle school, high school, and college athletic events; and

30

    iii.   During the remainder of the term, Plaintiff shall not, unless approved in advance, and in writing, post to, or otherwise actively participate in, any social media outlets (e.g., Twitter, Facebook, etc.) for any purpose.

    iv.   That Plaintiff agree that he has obtained, and will continue to attend, **therapeutic counseling**. [See Exhibit H].

192.    None of these provisions appeared in the original November 2011 Contract signed by Plaintiff and Defendant MLB Network.

193.    The Amendment also stated that a violation of any of the aforementioned mandates would constitute a breach of the agreement and would permit Defendant MLB Network to immediately terminate the agreement.

194.    Plaintiff did not sign the Amendment.

195.    On June 26, 2014, by way of letter from Tim Sullivan, Defendant MLB Network's Vice President of Human Resources, Defendant MLB Network notified Plaintiff that effective immediately Defendant MLB Network was terminating the November 2011 Contract pursuant to Section 15.03.

196.    Plaintiff did not commit any acts which violated Section 15.01 of the November 2011 Contract.

197.    The alleged incidents that, according to Defendant MLB Network, purportedly violated Section 15.03 of the November 2011 Contract took place on May 10 and May 11, 2014, during his son's baseball game. Plaintiff worked on-air for Defendant MLB Network during the following week. Even after instituting a leave of absence, Defendant MLB Network planned to return Plaintiff to his usual broadcasting duties after thirty (30) days.

198.    However, over six (6) weeks after the alleged incidents and over one (1) month after the suspension, only **after** Plaintiff refused to sign the unilateral Amendment to the November 2011 Contract in effect signing away his rights as a father, did Defendant MLB

Network terminate the Contract.

199.   Plaintiff has not received payments in accordance with the November 2011 Contract since June 26, 2014.

200.   According to the November 2011 Contract, Defendant MLB Network shall be permitted to withhold payment from Plaintiff **only** if Plaintiff materially breaches or defaults on the Contract.  Section 4.01 of the November 2011 Contract states in relevant part:

> Provided Artist is not in material breach or default of this Agreement, and Artist renders all Services as required by Company hereunder, then in full consideration of all Services rendered and rights granted to Company hereunder, Company shall be obligated to pay Artist the entire amount of the following sums, subject to any contingencies contained herein. . . .

See Exhibit A.

201.   Plaintiff did not materially breach the November 2011 Contract.

202.   Defendant wrongfully terminated the November 2011 Contract, has withheld payment from Plaintiff, and therefore materially breached the Contract.

203.   Further, Defendant MLB Network terminated the November 2011 Contract because Plaintiff did not sign the unlawful Amendment unilaterally imposed by Defendant MLB Network which would have required Plaintiff to sign away his rights as a father.

## COUNT I:  BREACH OF CONTRACT
## PLAINTIFF v. DEFENDANT MLB NETWORK

204.   Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

205.   The November 2011 Contract constitutes a valid and enforceable Contract between Plaintiff and Defendant MLB Network.

206.   Plaintiff did not engage in any conduct which breached the November 2011

32

Contract.

207.    Defendant breached the November 2011 Contract by, including but not limited to, unilaterally suspending Plaintiff, issuing false statements regarding the suspension, failing to pay Plaintiff, and wrongfully terminating Plaintiff.

208.    Defendant MLB's conduct was intentional and outrageous and proximately caused Plaintiff severe, foreseeable emotional distress.

209.    As a result of Defendant MLB Network's breach, Plaintiff has suffered and will in the future suffer contract damages in the amount of $2,315,000, not including interest and costs, which constitutes the remainder of amounts owed to Plaintiff for the November 2011 Contract plus option year.  As a result of Defendant MLB Network's breach, Plaintiff also suffered lost future income and opportunity, consequential damages, personal hardship, and severe emotional distress.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, damages for delay, consequential damages, including emotional distress damages, and any such relief as this Court deems just and proper.

## COUNT II: BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
## PLAINTIFF v. DEFENDANT MLB NETWORK

210.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

211.    The November 2011 Contract constitutes a valid and enforceable Contract between Plaintiff and Defendant MLB Network.

212.    Plaintiff did not engage in any conduct which breached the November 2011

Contract.

213.    Defendants breached the implied covenant of good faith and fair dealing concerning the November 2011 Contract by, including but not limited to, unilaterally suspending Plaintiff, issuing false statements regarding the suspension, failing to pay Plaintiff, and wrongfully terminating Plaintiff.

214.    Defendant MLB's conduct was intentional and outrageous and proximately caused Plaintiff severe, foreseeable emotional distress.

215.    As a result of Defendants' breach, Plaintiff has suffered and will in the future suffer contract damages in the amount of $2,315,000, not including interest and costs, which constitutes the remainder of amounts owed to Plaintiff for the November 2011 Contract plus option year.  As a result of Defendant MLB Network's breach, Plaintiff also suffered lost future income and opportunity, consequential damages, personal hardship, and severe emotional distress.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, damages for delay, consequential damages, including emotional distress damages, and any such relief as this Court deems just and proper.

## COUNT III:  NEGLIGENT MISREPRESENTATION
## PLAINTIFF v. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

216.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

217.    Defendants had a duty to exercise reasonable care in communicating facts about Plaintiff's employment and leave of absence with third-parties, including but not limited to, the

New York *Daily News* and *USA Today*, when it voluntarily undertook to embark on such communications.

218.    Defendants breached this duty by providing false and/or misleading information, and/or omitting information, to third-parties, who justifiably relied upon this information.

219.    As a result of Defendants' dissemination of false and/or misleading information, and/or omitting information, concerning Plaintiff, Plaintiff was caused to sustain damages, including but not limited to economic harm, emotional distress, and punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against Defendants, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and costs, and any such relief as this Court deems just and proper.

<div align="center">

**COUNT IV: NEGLIGENCE**
**PLAINTIFF v. DEFENDANT MLB NETWORK**
**AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50**

</div>

220.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

221.    Defendants had a duty to exercise reasonable care in investigating the conduct of Plaintiff at the youth baseball game before suspending and terminating Plaintiff.

222.    Defendants breached this duty by ignoring the readily available evidence from parents and coaches from both teams which contradicted the anonymous witnesses cited in the defamatory articles.

223.    As a result of Defendants' negligence, Plaintiff was caused to sustain damages, including but not limited to economic harm and emotional distress.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of damages, plus interest and costs, requests damages for

delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and

costs, and any such relief as this Court deems just and proper.

## COUNT V:  NEW JERSEY LAW AGAINST DISCRIMINATION
### N.J.S.A. 10:5-12(a), (l), *et al.*
### PLAINTIFF v. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

224.    Plaintiff incorporates the above paragraphs as though set forth herein in their

entirety.

225.    At all times material hereto, Plaintiff was entitled to protection from

discrimination and retaliation under the NJLAD.

226.    At all times material hereto, Defendants discriminated against Plaintiff because of

his "disability" and/or regarded, or perceived, Plaintiff as having a "disability" within the

meaning of the NJLAD.

227.    Defendants violated the NJLAD by engaging in disability discrimination and

retaliation against Plaintiff by, including but not limited to, ordering Plaintiff to sign an

Amendment to his Contract which required him to attend "therapeutic counseling," suspending

Plaintiff, and by terminating Plaintiff's November 2011 Contract when he objected to the

Amendment and refused to sign it.

228.    Members of upper management of Defendants had actual participation in, or

willful indifference to, Defendant's wrongful conduct described herein.

229.    Defendants' wrongful actions were especially egregious, warranting the

imposition of punitive damages.

230.    As a result of Defendants' violations of the NJLAD, Plaintiff was caused to

sustain damages, including but not limited to economic harm, emotional distress, and punitive damages.

231.   Plaintiff is now suffering and will continue to suffer irreparable injury as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

## COUNT VI:  INTENTIONAL DEFAMATION
## PLAINTIFF V. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

232.   Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

233.   At all times material hereto, Plaintiff was a private figure who, at all material times hereto, did not thrust himself into any public controversy as defined by prevailing law. The events to which the defamatory statements are ascribed occurred while Mr. Williams was in his private life, coaching his son's baseball game.

234.   Defendants issued false and defamatory statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom, with malice, knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

235.   Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory, injurious to Plaintiff's reputation,

exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

236.    The false and defamatory statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff and understood those statements to be defamatory.

237.    The false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences published by Defendants have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

238.    As a result of Defendants' defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory publications.

239.    Defendants' publication of the false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive and is therefore entitled to an award of punitive damages.

    **WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

## COUNT VII: DEFAMATION *PER SE*
## PLAINTIFF V. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

240. Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

241. The statements made by Defendants to the New York *Daily News* and *USA Today* falsely imply that Plaintiff in fact ordered a child to intentionally hit an opposing team's batter with a pitch. The statements further imply that as a result of Plaintiff's intentional misconduct and wrongdoing, Plaintiff has voluntarily taken a leave of absence from Defendant MLB Network.

242. New Jersey Criminal Code 2C:12-1 defines assault as an "attempt[] to cause or purposely, knowingly or recklessly cause[] bodily injury to another" or an "attempt[] by physical menace to put another in fear of imminent serious bodily injury."

243. Defendants' defamatory communications described herein constitute defamation *per se* because the statements, directly and through implication, impute criminal behavior onto Plaintiff.

244. Defendant issued false and defamatory *per se* statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom with knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

245. Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory *per se*, injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

246.    The false and defamatory *per se* statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff and understood those statements to be defamatory *per se*.

247.    The false and defamatory *per se* statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences issued by Defendants' have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

248.    As a result of Defendant's defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory *per se* publications.

249.    Defendants' publication of the false and defamatory *per se* statements misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive and therefore Plaintiff is entitled to recover an award of punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

## COUNT VIII:  NEGLIGENT DEFAMATION
## PLAINTIFF V. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

250.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

251.    In its publication of the statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein, Defendants failed to exercise due care to determine the truth or falsity of the defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences.

252.    Defendants issued these defamatory statements with knowledge of their falsity or with a high degree of awareness that they were probably false or with serious doubts as to the truth of the statements.

253.    Defendants' negligent publication of the false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein had the effect of diminishing the personal esteem, good will, respect and confidence in which Plaintiff was held throughout the community.

254.    In its publication Defendants failed to exercise due care by failing to receive, or even seek, comment from Plaintiff regarding the actual events that occurred at the Ripken Baseball youth tournament.

255.    As a result of Defendant's defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' defamatory publications.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of damages, plus interest and costs, requests damages for

delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and

cost, a fee enhancement, and any such relief as this Court deems just and proper.

<div align="center">

**COUNT IX:  INTENTIONAL INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE
PLAINTIFF V. DEFENDANT MLB NETWORK
AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50**

</div>

256.    Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

257.    Plaintiff had a reasonable expectation that he would be called upon to broadcast

games and/or provide written material for several television, internet and radio programs,

including but not limited to, MLB.com, TSN, and FOX Sports, and that he would receive

economic benefit from this work.

258.    In fact, Defendant MLB Network directly controlled whether Plaintiff would be

chosen as an analyst for broadcast work for FOX Sports.

259.    Since the time MLB Network suspended Plaintiff and disseminated false and

defamatory emails about the status of his employment and nature of his leave of absence,

Plaintiff has not been called upon by any entity to provide broadcast, commentary or writing

services or any kind.

260.    Defendant MLB Network intentionally, and without justification or excuse,

interfered with Plaintiff's prospective economic advantage.

261.    As a result of Defendants' conduct, Plaintiff was caused to sustain damages,

including but not limited to economic harm, emotional distress, and punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

### COUNT X:  INVASION OF PRIVACY – FALSE LIGHT
### PLAINTIFF V. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

262.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

263.    The publication by Defendants of those statements described herein portrayed Plaintiff in a false light, which was highly offensive to a reasonable person in that Defendants knowingly, recklessly and/or negligently gave a discrete presentation of information in a fashion which made the publications as a whole susceptible to inferences that Plaintiff appear before the public in an objectionable false light or false position.

264.    The publications by Defendants maliciously implied and suggested, by innuendo, inference, implication, and insinuation, that Plaintiff engaged in severe misconduct, acted inappropriately at a youth baseball tournament, and voluntarily took a leave of absence from Defendant MLB Network.

265.    Defendants acted negligently, recklessly, maliciously, and with knowledge or with reckless disregard as to whether Plaintiff would be cast in a false light by Defendants in its publications and statements.

266.    The statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences given publicity by Defendants about Plaintiff were issued with reckless disregard as to whether the statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences cast Plaintiff in a false light and with intentional and

reckless disregard for the injuries which said statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences would inflict upon Plaintiff.

267.    Plaintiff endured injury to his right to privacy, injury to reputation, mental suffering, shame, and humiliation as a result of the publication and Defendants realized, or should have realized, that Plaintiff would be justified in feeling seriously hurt by such publications.

268.    As a result of Defendant's conduct, Plaintiff suffered damages and is entitled to recover such damages as will compensate him for the injuries received as a result of the invasion of that privacy, including emotional distress damages, as well as for any and all financial losses and expenses resulting from Defendants' publication of matters placing him in a false light.

269.    Defendants' publication of such matters placing Plaintiff in a false light warrants an award of punitive damages because Defendants' conduct was outrageous and in reckless disregard of Plaintiff's right of privacy and was malicious, outrageous, and the result of improper motive.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

**COUNT XI:  CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")
N.J. Stat. Ann. § 34:19-1 et seq.
PLAINTIFF V. DEFENDANT MLB NETWORK
AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50**

270.    Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

271.     Plaintiff was an "employee" of Defendant MLB Network for purposes of the CEPA statute.

272.     At all times material hereto, Defendant maintained the right to control: the means and manner of Plaintiff's work performance; the method and amount of payment; and, the manner of termination of the work relationship.   Defendant MLB Network furnished the equipment and workplace for Plaintiff's work and Plaintiff's work was an integral part of the business of MLB Network.   Also, Plaintiff was routinely and regularly at the disposal of MLB Network to perform a portion of MLB Network's work.

273.     According to Defendant MLB Network, Plaintiff's continued employment was contingent upon Plaintiff signing an Amendment to his Contract which in effect signed away his rights as a father.

274.     The provisions in Defendant MLB Network's Amendment, among other personal intrusions, prohibited Plaintiff from attending the sporting events of his five (5) children, including those of his 11 year-old autistic son.

275.     The New Jersey Common Law Against Invasion of Privacy and Article I, Paragraph I of the New Jersey State Constitution provide for the right to be free of an intentional intrusion upon one's private affairs or concerns, which would be highly offensive to a reasonable person.

276.     A parent's right to the care and companionship of his child is a fundamental interest, protected by the Constitution and New Jersey case law.

277.     New Jersey law states that children have right and privilege to know, love and respect both parents and "no court should permit either parent to interfere with the successful

attainment of these facets of a child's welfare." Likewise, the employer of a parent does not have

the right to interfere with a parent-employee's successful attainment of these facets of their

child's welfare.

278.    It is incompatible with the public policy of the state of New Jersey for employers

to make employment contingent upon the employee-parents contractually signing away their

constitutional rights to the companionship of their child.

279.    Plaintiff reasonably believed that Defendant's Amendment violated New Jersey

law.

280.    Plaintiff reasonably believed that Defendant's Amendment was incompatible with

a clear mandate of New Jersey public policy, established through the laws stated above, which

concerned the public health, safety and welfare of parents and children.

281.    Plaintiff objected to and/or refusal to participate in Defendant MLB Network's

activity, policy and/or practice which he reasonably believed violated his statutory, constitutional

rights and/or was incompatible with a clear mandate of New Jersey public policy.

282.    As a result of Plaintiff's objection to and/or refused to participate in Defendant

MLB Network's wrongful activity, policy and/or practice, Plaintiff was terminated.

283.    As a direct and proximate result of Defendant MLB Network's violations of

CEPA, Plaintiff has suffered economic harm and emotional distress damages.

284.    Defendant MLB Network were willfully indifferent to the violations of CEPA

and/or it's conduct was especially egregious warranting the imposition of punitive damages.

285.    At least one member of upper management of Defendant MLB Network

participated in, or was willfully indifferent to, the wrongful conduct suffered by Plaintiff,

warranting the imposition of punitive damages.

286.     Plaintiff is now suffering and will continue to suffer irreparable injury, economic

damages, and emotional distress damages as a result of Defendant MLB Network's unlawful acts

unless and until this Court grants the relief requested herein.

287.     Plaintiff is entitled to all costs and attorneys' fees incurred as a result of

Defendant's violation of CEPA.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of damages, plus interest and costs, requests damages for

delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and

cost, a fee enhancement, and any such relief as this Court deems just and proper.

### COUNT XII:  PRIMA FACIE TORT
### PLAINTIFF V. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

288.     Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

289.     The above described improper and tortious acts were carried out by Defendants

and/or employees of Defendants acting within the course and scope of their employment.

290.     The Defendants' conduct was intentional in causing and producing the injury

and/or the Defendants acted in deliberate disregard of high probability that injury would occur

and/or Defendants were substantially certain that injury would occur to Plaintiff.

291.     As a result of Defendant MLB Network's tortious conduct, Plaintiff has sustained

the injuries, damages, and losses set forth herein.

292.     Defendants acted without justification or with insufficient justification in the acts

alleged above.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

### COUNT XIII: INTENTIONAL DEFAMATION
### PLAINTIFF v. DEFENDANT GAWKER
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

293.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

294.    At all times material hereto, Plaintiff has been a private figure who has not thrust himself into any public controversy as defined by prevailing law.

295.    Defendants published false and defamatory statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom with knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

296.    Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory, injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

297.    The false and defamatory statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff and understood those statements to be defamatory.

298.    The false and defamatory statements, misstatements, suggestions, implications,

48

16-11700-smb-1 Doc 391  Filed 10/31/16  Part 2  Entered 07/31/16 16:42:58 of Main Document
16-11700-smb  Claim 03-1/Part 2  Filed 07/31/16  Pg 51 of 108
Pg 80 of 139

innuendoes, insinuations, and inferences published by Defendants' have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

299.   As a result of Defendants' defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory publications.

300.   Defendants' publication of the false and defamatory statements misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive.

301.   Plaintiff is entitled to recover an award of punitive damages as a result of Defendants' outrageous conduct and for the purpose of punishing Defendant Gawker for its malicious defamation and deterring Defendants and others from the repetition of similar defamation in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

### COUNT XIV: DEFAMATION *PER SE*
### PLAINTIFF v. DEFENDANT GAWKER
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

302.   Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

49

303.    The May 16, 2014 Gawker Article and the May 19, 2014 Gawker Article falsely

state that Plaintiff ordered a child to intentionally hit an opposing team's batter with a pitch.

304.    The statement made by Defendants that Plaintiff is a "psychopath" in the August

19, 2014 Gawker Article is false.

305.    New Jersey Criminal Code 2C:12-1 defines assault as an "attempt[] to cause or

purposely, knowingly or recklessly cause[] bodily injury to another" or an "attempt[] by physical

menace to put another in fear of imminent serious bodily injury."

306.    Defendants' defamatory communications described herein constitute defamation

*per se* because the statements impute criminal behavior onto Plaintiff.

307.    Defendants' defamatory communications described herein constitute defamation

*per se* because the statements, directly and through implication alleging that Plaintiff has a foul

or loathsome disease and/or adversely reflect on his fitness to conduct his business or trade.

308.    Defendants published false and defamatory *per se* statements as set forth herein

and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom with

knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with

malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

309.    Defendants' aforementioned statements, misstatements, suggestions, implications,

innuendoes, insinuations, and inferences are defamatory *per se*, injurious to Plaintiff's

reputation, exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt

toward him by others, and had the tendency to injure him in his trade or business.

310.    The false and defamatory *per se* statements set forth herein were read by persons

in Camden County, the surrounding area and elsewhere, including individuals in the local and

national sports broadcast community, who understood the statement to be concerning Plaintiff

and understood those statements to be defamatory per se.

311.  The false and defamatory *per se* statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences published by Defendants have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

312.  As a result of Defendants' defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory *per se* publications.

313.  Defendants' publication of the false and defamatory *per se* statements misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive.

314.  Plaintiff is entitled to recover an award of punitive damages as a result of Defendant Gawker's outrageous conduct and for the purpose of punishing Defendants for its malicious defamation and deterring Defendants and others from the repetition of similar defamation in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

## COUNT XV: NEGLIGENT DEFAMATION
## PLAINTIFF v. DEFENDANT GAWKER
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

315.   Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

316.   In its publication of the statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein, Defendants failed to exercise due care to determine the truth or falsity of the defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences.

317.   Defendants issued these defamatory statements with knowledge of their falsity or with a high degree of awareness that they were probably false or with serious doubts as to the truth of the statements.

318.   Defendants' negligent publication of the false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein had the effect of diminishing the personal esteem, good will, respect and confidence in which Plaintiff was held throughout the community.

319.   In its publication Defendants failed to exercise due care by failing to receive, or even seek, comment from Plaintiff regarding the actual events that occurred at the Ripken Baseball youth tournament.

320.   As a result of Defendant's defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' defamatory publications.

321.   Defendants' publication of the false and defamatory statements misstatements,

52

suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive

damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was

malicious, outrageous and the result of improper motive.

322.    Plaintiff is entitled to recover an award of punitive damages as a result of

Defendants' outrageous conduct and for the purpose of punishing Defendant Gawker for its

malicious defamation and deterring Defendants and others from the repetition of similar

defamation in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of compensatory damages, plus interest and costs,

requests an award of punitive damages, requests damages for delay, and any such relief as this

Court deems just and proper.

<div align="center">

**COUNT XVI: INVASION OF PRIVACY – FALSE LIGHT**
**PLAINTIFF v. DEFENDANT GAWKER**
**AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50**

</div>

323.    Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

324.    The publication by Defendants of those statements described herein portrayed

Plaintiff in a false light, which was highly offensive to a reasonable person in that Defendants

knowingly, recklessly and/or negligently gave a discrete presentation of information in a fashion

which made the publications as a whole susceptible to inferences that Plaintiff appear before the

public in an objectionable false light or false position.

325.    The publications by Defendants maliciously implied and suggested, by innuendo,

inference, implication, and insinuation, that Plaintiff engaged in severe misconduct and acted

inappropriately at a youth baseball tournament.  This is a clear misrepresentation of Plaintiff's

activities.

326.   Defendants acted negligently, recklessly, maliciously, and with knowledge or with reckless disregard as to whether Plaintiff would be cast in a false light by Defendants in its publications.

327.   The statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences given publicity by Defendants about Plaintiff were published with reckless disregard as to whether the statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences cast Plaintiff in a false light and with intentional and reckless disregard for the injuries which said statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences would inflict upon Plaintiff.

328.   Plaintiff endured injury to his right to privacy, injury to reputation, mental suffering, shame, and humiliation as a result of the publication and Defendants realized, or should have realized, that Plaintiff would be justified in feeling seriously hurt by such publications.

329.   As a result of Defendants' conduct, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injuries received as a result of the invasion of that privacy, as well as for any and all financial losses and expenses resulting from Defendants' publication of matters placing him in a false light.

330.   Defendants' publication of such matters placing Plaintiff in a false light warrants an award of punitive damages because Defendants' conduct was in reckless disregard of Plaintiff's right of privacy and was malicious, outrageous, and the result of improper motive.

331.   Plaintiff is entitled to recover an award of punitive damages as a result of Defendants' outrageous conduct in order to punish Defendants for its invasion of Plaintiff's

privacy and deter it and others from a repetition of similar invasions of privacy in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

<div align="center">

**COUNT XVII: NEGLIGENT MISREPRESENTATION**
**PLAINTIFF v. DEFENDANT GAWKER**
**AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50**

</div>

332.  Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

333.  Defendants had a duty to exercise reasonable care in publishing articles concerning Plaintiff on its websites which are viewed by millions of people.

334.  Defendants breached this duty by publishing false and/or misleading information, and/or omitting information, on its websites, which are viewed by millions of people.

335.  As a result of Defendants' dissemination of false and/or misleading information, and/or omitting information, concerning Plaintiff, Plaintiff was caused to sustain damages, including but not limited to economic harm, emotional distress, and punitive damages.


**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for

delay, consequential damages, emotional distress damages, punitive damages, and any such relief as this Court deems just and proper.

CONSOLE LAW OFFICES LLC

Dated: September 24, 2014

By: _____
Laura C. Mattiacci
Stephen G. Console

Attorneys for Plaintiff,
Mitchell Williams

## DESIGNATION OF TRIAL COUNSEL

## PURSUANT TO RULE 4:25-4

Please take notice that <u>Laura Carlin Mattiacci, Esquire</u> is hereby designated as trial

counsel for Plaintiff, Mitchell Williams.


## DEMAND FOR JURY TRIAL

Please take notice that demand is hereby made by the Plaintiff, Mitchell Williams, for

Trial by Jury as to all issues of these causes of action.


**CONSOLE LAW OFFICES LLC**

Dated:  September 24, 2014                    By:

LAURA C. MATTIACCI, ESQUIRE


## CERTIFICATION PURSUANT TO RULES 4:5-1 AND 4:6-1(d)

1.      The Complaint has been filed within the time period allowed by the Rules of the Court.

2.      To the best of my knowledge and belief, this matter is not the subject of any other matters

pending in the Superior Court of New Jersey for Camden County.

3.      To the best of my knowledge and belief, there are no other parties who should be joined

in this action pursuant to Rule 4:30A.


**CONSOLE LAW OFFICES LLC**

Dated:  September 24, 2014                    By:

LAURA C. MATTIACCI, ESQUIRE

# Exhibit A



<div align="right">Dated as of November 1, 2011</div>

Mr. Mitchell Williams
c/o The Agency Sports Management
230 Park Avenue, Suite 851
New York, NY 10169
Attn: Russ Spielman

Dear Mr. Williams:

   This letter confirms the agreement between Mitchell Williams ("you" or "Artist") and The MLB Network, Inc., One MLB Network Plaza, 40 Hartz Way, Secaucus, NJ 07094 (the "Company"), with respect to your Services (as defined below) (the "Agreement") and is effective as of the Effective Date (as defined below).

<div align="center">WITNESSETH THAT:</div>

   WHEREAS, Artist and Company have previously entered into that certain Agreement dated as of September 30, 2009 (the "Talent Agreement Renewal"), as the same may have been amended.

   WHEREAS, in consideration of the mutual covenants herein set forth, the adequacy of which consideration is hereby acknowledged, the parties hereby agree as follows.

1.    SERVICES.

   Company hereby engages Artist to provide the Services (as defined below) exclusively to Company during the Term (as defined below) of this Agreement, subject to the terms and conditions set forth herein. In consideration for the compensation set forth in Section 4 below, Artist shall render all artistic and professional services customarily rendered by on-camera talent in connection with the production of sports and entertainment programming designated by Company (each a "Program", and collectively, the "Programs") for use by Company including in connection with the MLB Network (the "Network") and as otherwise specified herein.  Artist shall provide such services under Company's supervision, direction, and control, and such services shall include, without limitation: performing reporting, analyst and interview segments on-air; performing standard openings, closings, lead-ins, lead-outs, voice-overs, looping, retakes, added scenes, rain dates, promotional spots and trailers, attending meetings, attending and participating in rehearsals, and participating in publicity interviews, stills sessions and promotional appearances, creative, journalistic, and editorial authoring, and such other activities reasonably specified by Company from time to

CONFIDENTIAL                     - 1 -
EXECUTION COPY

time (the "Services"). Artist's Services hereunder shall be rendered on an in-person, first priority, full-time basis during all production periods during the Term (as defined below), as required by Company. Artist's Services will be rendered either alone or in cooperation with other persons in such manner as Company may reasonably direct, under the reasonable instructions and in strict accordance with the controls and schedules established by Company's authorized representatives and at the times, places and in the manner reasonably required by said representatives. Artist acknowledges and agrees that Company shall maintain creative control over the Programs. All Services rendered by Artist shall be of a quality consistent with first-class industry standards and shall be rendered in an artistic, conscientious, efficient and punctual manner to the reasonable best of Artist's ability and with full regard to the careful, economical and expeditious production of the Programs and policies established by Company. For the avoidance of doubt, during the Term Artist will render all such Services exclusively to Company, and Company will have the exclusive right to your Services and the results and proceeds thereof for use in any and all media now known or hereafter devised in accordance with Section 3 below. Artist's Services shall be exclusive to Company throughout the Term, provided, that Artist shall be permitted to (i) provide on-air commentary services in connection with up to two (2) local Philadelphia radio shows, (ii) continue Artist's current efforts in connection with the authoring of Artist's book, provided, that (a) Artist provides Company with an advance copy of the book for review reasonably in advance of publication, and (b) the book does not contain any disparaging statements or content concerning Major League Baseball, (iii) continue to operate Artist's "Mitch Williams Wild Thing Southpaw Salsa" business, and (iv) provide (A) on-air commentary services in connection with (1) one (1) Sirius/XM Satellite Radio show (or any successor satellite radio show), and (2) a reasonable number of additional fill-in, on-air commentary performances on other Sirius/XM Satellite Radio baseball related shows, and (B) analyst services to MLB Advanced Media, L.P. for MLB.com's online and mobile media assets, provided that Artist is identified as an "MLB Network Analyst" during each such appearance on any such shows, further, that any such exception to Artist's exclusivity to Company set forth in (i) through (iv) above will not conflict with Artist's obligations to Company and Artist will provide his services to Company on a first-priority basis. During the months of November, December, January and February during the Term Artist will only be required to provide the Services to Company for a total of two (2) weeks during each such calendar month of the Term (provided Artist shall not be required to render Services for any period in excess of five (5) consecutive day during said months unless mutually agreed upon by Artist and Company).

2.    TERM.

2.01    In consideration of the mutual covenants herein set forth, the adequacy of which consideration is hereby acknowledged, the parties hereby agree to terminate the Term (as defined in the Talent Agreement Renewal) of the Talent Agreement Renewal effective as of the Effective Date.

2.02    The "Term" of this Agreement shall commence on November 1, 2011 (the "Effective Date") and shall continue for a period up to and including the later of (i) November 1, 2016, and (ii) the day after the last game of the 2016 World Series is actually completed (the "Initial Period"), and the Option Period (as defined below) if exercised by Company. Artist hereby grants to Company one (1) option to extend the Term for an additional contract period to commence immediately after the end of the Initial Period and continue for a period up to and including the later of (a) November 1, 2017, and (b) the day after the last game of the 2017 World Series is actually completed (the "Option Period") on the same terms and conditions except as otherwise provided herein. Company may exercise its option for the Option Period by written notice to Artist at any time no later than September 1, 2016.

**CONFIDENTIAL**

- 2 -

**EXECUTION COPY**

3.  <u>RIGHTS</u>.

3.01    All artistic, literary, dramatic, musical and other materials and performances submitted by
Artist, together with the results and proceeds of Artist's Services in connection with this Agreement
(collectively, the "<u>Materials</u>") shall, for purposes of copyright law, from their inception shall be deemed a
"work made for hire" for Company by Artist.  Artist acknowledges that the Materials are prepared within
the scope of Company's engagement of Artist's personal services and is a work made for hire and prepared
as part of a work specially ordered by Company.  All Materials from their inception and all reproductions
made therefrom and all copyrights therein and thereto throughout the Universe (the "<u>Territory</u>"), and all
renewals and extensions thereof, shall be entirely property of the Company (and/or its affiliates), free of any
claims whatsoever by Artist, or any other individual, corporation, partnership, limited liability company,
other entity, association or other organized group of persons or the legal successors, assigns or
representatives of the foregoing (individually "<u>Person</u>", and collectively, the "<u>Persons</u>").  Company shall
have the exclusive right to obtain registration of copyright (and all renewals and extensions) in the
Materials, in Company's name, as the owner and author thereof.  If Company shall be deemed not to be the
author of any Materials or if any Materials are deemed not to be "works made for hire," this Agreement
shall constitute an irrevocable transfer to Company of ownership of copyright (and all renewals and
extensions) in those Materials, including all right of the owner of copyright specified in 17 U.S.C. §106 and
under the law or laws of any foreign state, territory or country.  Artist shall, upon Company's request, cause
to be executed and delivered to Company transfers of ownership of copyright (and all renewals and
extensions) in those Materials and any other documents as Company may deem necessary or appropriate to
vest in Company the rights granted to Company in this Agreement, and Artist hereby irrevocably appoints
Company as Artist's attorney-in-fact for the purpose of executing those transfers of ownership and other
documents in Artist's name, provided that any such documents shall be subject to Artist's reasonable
approval prior to Company's execution thereof, and provided further, that Artist shall have three (3)
business days following Artist's receipt of any such documents for approval to respond.  In the event Artist
fails to respond to any such request for approval in accordance with the immediately preceding sentence,
then Artist's approval shall be deemed given.  Notwithstanding anything to the contrary set forth above, if in
Company's reasonable determination there is insufficient time to allow for Artist's approval of any such
documents then Company may forgo such Artist approval process and execute any such documents in
accordance with the terms of this subsection 3.01 and Company shall provide notice to Artist of the
execution of any such documentation by Company.  Without limiting the generality of the foregoing,
Company and any Person designated by Company shall have the exclusive, perpetual and worldwide right
to reproduce, edit, change, alter, add to, take from, manufacture, sell, distribute, advertise, license, publicly
perform in any medium now known or hereafter devised, and/or otherwise exploit the Materials and other
reproductions embodying the Materials under any trademarks, or trade names, and to lease, license, convey
or otherwise use or dispose of any Materials, by any method, or in any field of use, now or hereafter known,
on any terms Company approves (subject to subsection 3.02 below), or Company may refrain from doing
any of the foregoing in its sole and absolute discretion. Artist hereby waives any so-called "moral rights" or
"droit moral rights" (or any similar rights) Artist may have in any Materials hereunder.  For the avoidance
of doubt and not in limitation of any of Company's rights herein, the Programs and all recordings or
reproductions thereof shall be the sole and exclusive property of Company, and Company may use, deal
with and otherwise exploit the same, without limitation, in Company's sole and absolute discretion
throughout the Territory at any time or times, in any manner and in any media whatsoever in perpetuity in
accordance with the terms set forth herein, including, without limitation, any and all means of television
transmission and delivery (including free, basic cable, satellite and pay cable); pay-per-view, in-flight, all
forms of on-demand television (including, without limitation, subscription video-on-demand and near
video-on-demand), and cybercasting, including, without limitation, broadband/intranet closed system

**CONFIDENTIAL**

- 3 -

**EXECUTION COPY**

cybercasting, Internet download and streaming, alternative media platforms (e.g., Google, iTunes, Yahoo!), mobile communications devices, in-transit television and video streaming, on-air promotional campaigns, outdoor marketing, radio, print, sound recordings, and publishing. Further, as between Artist and Company, all Materials, and elements of the Programs, whether or not furnished by Artist, used on or in connection with any Program, shall be the sole and absolute property of Company (and/or its affiliates) for any and all purposes set forth in this Agreement, and Artist does not have, and will not claim to have under this Agreement, any right, title or interest of any kind or nature whatsoever in or to any such Materials or elements.

3.02    Company and any Person designated by Company shall have the right throughout the Territory to use, reproduce, print, publish, or disseminate in any medium Artist's name, portrait, picture, likeness, and voice, and biographical material concerning Artist (collectively, the "Artist's Likeness"), as news or information for the purposes of advertising or promoting any Programs hereunder or for "institutional" advertising of Company (and/or its affiliates) (i.e., advertising designed to create good will and prestige and not for the purpose of selling any specific product or service), provided that Artist shall have the right to approve any use of Artist's name, likeness, portrait, picture, and biographical material in connection with any such advertising and promotion of the Programs or the Company other than any performance or portion thereof embodied in the Programs. Whenever Artist's approval is required pursuant to the preceding sentence, such approval shall not be unreasonably withheld and shall be deemed given within five (5) business days of Company's request if Artist fails to respond to any such requests by Company. The rights granted to Company pursuant to this paragraph 3.02 shall be exclusive during the Term and non-exclusive thereafter, except as otherwise provided herein. During the Term, and except as set forth on Schedule A attached hereto and made a part hereof by reference, in the event Artist desires to authorize or permit any Person other than Company to use Artist's name, voice, or likeness in connection with the advertising or sale of any products or services or otherwise then Artist shall provide Company with prior written notice, and in the event Company notifies Artist of any objection to such endorsement by Artist then Artist covenants and agrees to discuss with Company, in good faith, not entering into any such endorsement arrangement, provided, that if (i) Artist does enter into any such endorsement arrangement in contravention of Company's objections, and (ii) Company does not exercise its option for the Option Period, then Company will be relieved of its obligation to pay to Artist the amount set forth in subsection 4.01(e) below. For the purposes of clarification, nothing set forth in the immediately preceding sentence shall prevent or restrict Artist from entering into such an arrangement or agreement contrary to the desire of Company.

4.    COMPENSATION.

4.01    Provided Artist is not in material breach or default of this Agreement, and Artist renders all Services as required by Company hereunder, then in full consideration of all Services rendered and rights granted to Company hereunder, Company shall be obligated to pay Artist the entire amount of the following sums, subject to any contingencies contained herein:

(a) Promptly following the complete execution and delivery of this Agreement, Company shall pay to Artist a signing bonus in the amount of Fifty Thousand Dollars ($50,000).

(b) During the period commencing on the Effective Date through October 31, 2012 (the "First Contract Year") the sum of Four Hundred and Thirty-Five Thousand Dollars ($435,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

**CONFIDENTIAL**

- 4 -

**EXECUTION COPY**

(c) During the period commencing on November 1, 2012 through October 31, 2013 (the "Second Contract Year") the sum of Five Hundred and Seventy-Five Thousand Dollars ($575,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(d) During the period commencing on November 1, 2013 through October 31, 2014 (the "Third Contract Year") the sum of Six Hundred and Twenty-Five Thousand Dollars ($625,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(e) During the period commencing on November 1, 2014 through October 31, 2015 (the "Fourth Contract Year") the sum of Six Hundred and Fifty Thousand Dollars ($650,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(f) During the period commencing on November 1, 2015 through the later of (i) November 1, 2016, and (ii) the day after the last game of the 2016 World Series is actually completed (the "Fifth Contract Year") the sum of Seven Hundred Thousand Dollars ($700,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(g) During the Option Period, if any, the sum of Seven Hundred and Fifty Thousand Dollars ($750,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such Option Period;

(h) Upon request, Artist will provide Company with invoices in connection with any payments due to Artist by Company as set forth above in this subsection 4.01.

(i) Time is of the essence with respect to all payments due Artist hereunder.

4.02     In connection with the performance of Artist's obligations to Company, during the Term, Company will provide and arrange for Artist's local accommodations in New Jersey during any such required production periods.

4.03     During the Term, Company shall endeavor to maintain a wardrobe supplier agreement in order to provide Artist with a complimentary wardrobe in connection with Artist's Services hereunder. Any wardrobe items that may be selected by Company pursuant to any such wardrobe supplier agreement, or otherwise, for use by Artist hereunder shall be subject to Artist's approval, not to be unreasonably withheld or delayed. Company reserves the right to substitute or replace any wardrobe items provided to Artist hereunder at any time, subject to Artist's approval of any such substitute or replacement items, not to be unreasonably withheld or delayed.

4.04     In the event Artist is required by Company to travel to a location other than Company's Secaucus, NJ facilities in connection with the provision of Services hereunder, Company will provide Artist with travel benefits, including the reimbursement for reasonable out-of-pocket expenses incurred by Artist during the course of such required travel, in accordance with Company's then applicable travel policies for Artist's service status, provided, that Company acknowledges that Company's current travel policies, which are subject to change from time to time, provide that Company will provide Artist with business class airfare, if available, otherwise, first-class air fare, if available, for any flights with a total flight time in

excess of three (3) hours in connection with any required travel by Artist hereunder. Artist acknowledges and agrees that from time to time Artist may be required to travel on airplanes that do not provide for either business class or first-class seating and in such event Artist will be provided with the best seating available.

5.      RIGHT OF FIRST NEGOTIATION/MATCHING RIGHT.

         5.01      In consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, Artists hereby grants to Company the exclusive right of first negotiation for Artist's Services beyond the Term hereof. The parties hereto shall engage in an exclusive thirty (30) day negotiation period commencing on September 1, 2016, or in the event Company exercises its option for the Option Period hereunder then the parties hereto shall engage in an exclusive thirty (30) day negotiation period commencing on September 1, 2017 (the "Exclusive Negotiation Period") (or, if this Agreement is terminated early by Company, the Exclusive Negotiation Period shall commence immediately upon termination, and continue for a period of thirty (30) days from such date of termination), during which time Company and Artist shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions upon which Company may engage or retain, as the case may be, Artist's Services beyond the Term. If, upon conclusion of the Exclusive Negotiation Period, no agreement has been reached with respect to the material terms and conditions, Artist shall submit a final written offer setting forth the material terms and conditions under which Artist would agree to provide her Services exclusively to Company after the Term, comparable to those rights and Services set forth herein (the "Artist Final Offer"). Artist shall provide Company with a copy of the Artist Final Offer no later than five (5) business days following expiration of the Exclusive Negotiation Period, and Company shall have seven (7) business days to accept the Artist Final Offer (the "Company Acceptance Period"). Following the date upon which Artist submits to Company the Artist Final Offer in accordance with the terms herein, Artist shall thereafter, for the remainder of the Term, be free to enter into negotiations with any bona fide third party for the provision of Artist's Services after the Term, but only pursuant to the material terms and conditions set forth in the Artist Final Offer or material terms and conditions more favorable to Artist than were set forth in the Artist Final Offer (the "More Favorable Offer"). For the period commencing upon the date on which Artist submits to Company the Artist Final Offer in accordance with the terms herein up to and including ninety (90) days following the last day of the Term hereof, Artist covenants and agrees to present to Company any bona fide third party offer containing material terms and conditions less favorable to Artist than those set forth in the Artist Final Offer or made to any bona fide third party by Artist which such third party has expressed an intention to accept, or made to Artist by any such third party and which Artist intends to accept, must be presented in writing to Company prior to its acceptance by such third party or Artist (as applicable) (the "Less Favorable Offer"), and Company shall have five (5) business days following its receipt of all such material terms and conditions to accept such Less Favorable Offer in writing. Notwithstanding anything to the contrary herein, for the period commencing upon the date on which Artist submits to Company the Artist Final Offer in accordance with the terms herein up to and including ninety (90) days following the last day of the Term hereof, Artist covenants and agrees to present to Company any More Favorable Offer from a bona fide third party or a More Favorable Offer by Artist to any bona fide third party for Artist's Services to allow Company to confirm, in good faith, the more favorable status of any such More Favorable Offer. For the purposes of clarification, after the date upon which Artist submits the Artist Final Offer to Company or the earlier termination of this Agreement, Artist shall be free to enter into negotiations with any bona fide third party with respect to the provision of his Services. At no time prior to the date upon which Artist submits the Artist Final Offer to Company shall Artist seek, solicit, request, negotiate, invite, agree upon terms and conditions, or otherwise respond to any other offer(s), or otherwise engage in any discussions or negotiations with any party other than Company with respect to the provision of Artist's Services following expiration or termination of the Term.

CONFIDENTIAL

EXECUTION COPY

- 6 -

5.02    In connection with any Less Favorable Offer, Company shall have the option, but no obligation, to either (i) match any non-monetary item(s) ("Non-Cash Consideration") included in any Less Favorable Offer, or (ii) pay a cash amount equal to the monetary value of any Non-Cash Consideration ("Cash Equivalent"). If Company elects the Cash Equivalent, Company and Artist shall attempt in good faith to mutually agree upon a Cash Equivalent of the Non-Cash Consideration included in any such offer made by or to Artist. If, within twenty (20) days, the parties are unable to reach agreement with respect to the value of the Non-Cash Consideration, the Non-Cash Consideration shall be submitted in writing to a mutually-selected independent appraiser of national standing (the "Appraiser"). The Appraiser shall make a determination of the Cash Equivalent of the Non-Cash Consideration within twenty (20) days following submission. The costs of the Appraiser shall be shared equally by the parties. At no time prior to the expiration of the Company Acceptance Period shall Artist seek, solicit, request, negotiate, invite, agree upon terms and conditions, or otherwise respond to any other offer(s), or otherwise engage in any discussions or negotiations with any party other than Company with respect to the provision of Artist's Services following expiration or termination of the Term, or the Exclusive Negotiation Period, as the case may be, except that Artist and his representatives shall be permitted to disclose that Artist must comply with the obligations set forth in this Section 5.

6.    INDEPENDENT CONTRACTOR.

6.01    Artist acknowledges, understands, and irrevocably agrees that Artist will not be eligible to participate in any of Company's voluntary benefits programs including, but not limited to, retirement, disability, hospitalization, medical/health, dental, and life insurance benefits. Notwithstanding the preceding sentence, Artist hereby acknowledges and agrees that Artist will be subject to and bound by the terms and conditions of Company's office policies and procedures, as may be amended from time to time, including, but not limited to, code of conduct, security, travel and entertainment, and office operations, provided the same are provided to Artist in writing.

6.02    As an independent contractor, Artist will be solely responsible to pay all applicable taxes arising from payments made to Artist by Company, including, but not limited to, Social Security, self-employment taxes and disability insurance. Accordingly, Company agrees that it shall make no tax withholdings or deductions in connection with any monies paid to Artist hereunder, unless required by law.

7.    CONDITIONS PRECEDENT/COMPLIANCE WITH LAWS.

7.01    All of Company's payment obligations under this Agreement are expressly conditioned upon Artist's compliance with all applicable governmental requirements including, but not limited to, completing, signing and delivering to us all required tax and immigration forms as provided to Artist (as applicable), provided, that Artist shall have a reasonable amount of time to cure any such failure by Artist to comply with this Section 7.01 following Artist's receipt of written notice of such failure from Company.

7.02    Company agrees to comply with all applicable governmental requirements (as applicable).

8.    PRODUCT INTEGRATION.

Company reserves the right to identify product integration deals for the Programs, Network, or the Company, and Artist shall cooperate with any and all such efforts to solicit any such deals and shall implement any such product integration deals originated by Company, subject to subsection 3.02 above. For the purposes of illustration, Artist shall be required to cooperate with the implementation of any wardrobe agreement obtained by Company for Artist's benefit pursuant to subsection 4.03 above and any

**CONFIDENTIAL**

- 7 -

**EXECUTION COPY**

other apparel integration agreements obtained by Company. For the avoidance of doubt, no portion of any revenues from such Company identified product integration deals shall be shared with Artist.

9.    CONFIDENTIALITY.

    9.01    In connection with Artist's engagement hereunder by Company, Company anticipates that Artist may be provided with or exposed to certain non-public information concerning Company, its affiliates, assigns, or licensees businesses which information, together with notes, analyses, compilations, studies or other documents prepared by Company or Company Representatives (as hereinafter defined) based upon, containing or otherwise reflecting such information, is hereinafter referred to as the "Confidential Material". In consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged Artist hereby agrees that Artist will, except to the extent permitted by subsection 9.02 below, keep such Confidential Material strictly confidential in perpetuity, however, Artist shall be permitted to disclose such Confidential Material to his legal, financial, and other representatives, on a need to know basis, solely for the limited scope of their provision of professional services and provided such persons or entities are bound by a confidentiality agreement in connection with such Confidential Material that is at least as protective as the terms set forth in this Section 9. For the purposes of this Section 9 Confidential Information shall include, without limitation, all of the terms of this Agreement. Further, for the purposes of this Section 9 "Representatives" shall mean Company's directors, officers, employees, subsidiaries, affiliates, auditors, independent contractors, and advisors.

    9.02    In the event that Artist is required by law or by judicial or regulatory process to disclose the Confidential Material or any other information the disclosure of which is restricted by the terms of this Agreement, Artist shall provide Company with prompt prior written notice of such requirement so that Company may seek an appropriate protective order. If in the absence of a protective order, Artist is nonetheless, in the opinion of Artist's counsel, required by law or otherwise to disclose Confidential Material, disclosure may be made only as to that portion of the Confidential Material or such other information which Artist is seeking to disclose is advised by counsel is legally required to be disclosed. Artist will exercise reasonable efforts at the expense of the other party to obtain assurance that confidential treatment will be accorded such Confidential Material.

    9.03    All Confidential Material disclosed by Company shall be and shall remain Company property. Except to the extent Artist is advised by counsel that such action is prohibited by law Artist shall (i) redeliver all documents furnished by Company, and (ii) destroy all written material, memoranda, notes and other writings or recordings whatsoever prepared by Company or our Representatives based upon, containing or otherwise reflecting any Confidential Material. Any Confidential Material that is not returned or destroyed, including, without limitation, any oral Confidential Material, shall remain subject to the confidentiality obligations set forth in this Agreement.

    9.04    It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this Section 9 and that Company shall be entitled to specific performance, including, without limitation, injunctive relief, as a remedy for any such breach by Artist. Such remedy shall not be deemed to be the exclusive remedy for breach of this Section 9 but shall be in addition to all other remedies available at law or equity including, but not limited to, the right to immediately terminate this Agreement after receiving knowledge of any such breach of this Section 9.

    9.05    With respect to information provided by Company or based upon, containing or otherwise reflecting such information, the term "Confidential Material" shall be deemed not to include information which (i) is or becomes generally available to the public other than (a) as a result of a disclosure by Artist or

**CONFIDENTIAL**

**EXECUTION COPY**

- 8 -

any other person who directly or indirectly receives such information from Artist in violation of this Agreement or (b) in violation of a confidentiality obligation to Company known to Artist, (ii) is or becomes available to Artist on a non-confidential basis from a source which, to the knowledge of Artist, is entitled to disclose it, (iii) was known to Artist prior to its disclosure to it by Company or (iv) is verifiably developed by Artist without the benefit of the information provided by Company.

10.     UNION STATUS.

Artist acknowledges that Artist is not a party to any collective bargaining agreement with any guild or union which may claim jurisdiction over the Services to be rendered hereunder and that Company will have no obligation with respect to Artist's status as a guild or union member or for any payments which may be required by any such guild or union.

11.     NO OBLIGATION TO USE.

Nothing set forth herein shall be deemed to obligate Company, its affiliates, licensees, or other Persons to use or exploit Artist's Services, the Materials, or any and all results of such Services, or otherwise to exploit any rights granted hereunder; provided, however, that Company shall remain obligated to pay to Artist any compensation accrued and payable to Artist hereunder, subject to any contingencies contained herein.

12.     PAYOLA / PLUGOLA.

Artist acknowledges that Artist has been advised that it is a federal criminal offense, unless disclosed in writing to Company  (at the address indicated above, Attn: Legal Department) prior to exhibition on television or other exploitation, to (a) give or agree to give any member of the production staff, anyone associated in any manner with a Program, promotion or commercial or any other Person any portion of Artist's compensation or anything else of value for arranging Artist's appearance therein, or (b) accept or agree to accept anything of value, other than Artist's compensation, for appearance on a Program, promotion or commercial to promote any product, service or venture on the air, or otherwise in the course of the provision of Artist's Services hereunder or use any prepared material containing such a promotion where Artist knows the writer received consideration for it.  Artist shall not accept or pay, or agree to accept or pay any such consideration in contravention of these requirements.  Any breach hereof shall be a material breach of this Agreement.

13.     REPRESENTATIONS AND WARRANTIES.

Artist represents and warrants that (i) Artist has no existing endorsement, sponsorship or similar agreements concerning Artist's services or Artist's Likeness, except as otherwise expressly provided for herein, and Artist shall not enter into any such endorsement, sponsorship or similar agreements during the Term of this Agreement other than in accordance with subsection 3.02 above, (ii) except for any material Company provides to Artist, the Materials (including, without limitation, all ideas or materials of any nature which Artist furnishes hereunder) will be Artist's original creation and will not violate or infringe any rights of any third party, including, without limitation, a defamation, libel, slander or violation of any right of privacy or publicity, (iii) Artist has the full right, power and authority to enter into and completely perform Artist's obligations under this Agreement and to grant all rights herein, (iv) Artist's obligations under this Agreement do not and will not violate, interfere with or infringe upon the rights of any third party, including, without limitation, a defamation, libel, slander or violation of any right of privacy or publicity, and (v) Artist has no knowledge of any rights or commitments of any nature outstanding in favor of any Person that would impair, interfere with or infringe upon the rights herein granted and Artist has obtained or

CONFIDENTIAL

EXECUTION COPY

- 9 -

will obtain all required permission or grants of authority necessary with respect to Artist's obligations hereunder.

14.    INDEMNITY.

14.01   Artist will indemnify and hold Company and each of its officers, partners, agents, employees, affiliates, assigns, and licensees, harmless from and against any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees and disbursements) (collectively, "Losses") arising out of (i) any actual breach of any representation, warranty, covenant or agreement made by Artist herein, or arising out of Artist's unauthorized acts or use of any Materials furnished by you hereunder, (ii) the use of any materials furnished by Artist hereunder, excluding materials furnished by Artist at Company's request or direction (including its authorized affiliates, agents, employees, and contractors), or (iv) any negligent acts done or words spoken by Artist or furnished by Artist in connection with the production, rehearsal or broadcast of any Program, unless such negligent acts or words shall have been requested, directed, or supplied by Company (including its authorized affiliates, agents, employees, and contractors) or undertaken in furtherance of this Agreement.

14.02   Company will indemnify and hold Artist, and his heirs harmless from and against any and all Losses arising out of (i) material supplied to Artist by Company (including its authorized affiliates, agents, employees, and contractors), (ii) our production, distribution or exploitation of the Programs (except to the extent Artist's indemnification set forth above applies), (iii) acts or words requested or authorized by Company (including its authorized affiliates, agents, employees, and contractors), or (iv) any claims relating to Company's production, promotion, advertisement, distribution and other exploitation of the Programs.

14.03   The party seeking indemnification (the "Indemnified Party") shall timely notify the indemnifying party (the "Indemnifying Party") in writing of any claim or action for which such indemnification applies. The Indemnifying Party shall undertake the defense of any such claim or action and permit the Indemnified Party to participate therein at its own expense.  All decisions regarding litigation or the settlement thereof shall be made by the Indemnifying Party.  Any settlement by the Indemnified Party without the prior written consent of the Indemnifying Party shall release the Indemnifying Party from its indemnity obligation as to the claim or action so settled.  The Indemnified Party shall cooperate fully with the Indemnifying Party in the defense of any claim hereunder.  The Indemnified Party may participate in the defense of any such claim through counsel of the Indemnified Party's selection at its own expense, but the Indemnifying Party shall retain control of the defense of such claim.

15.    SUSPENSION / TERMINATION.

15.01   Notwithstanding anything to the contrary contained herein, Company shall have the right to suspend Artist's engagement and compensation hereunder during any and all periods: (i) that Artist does not render Services hereunder because of illness, incapacity, or default; or (ii) that the development of the Programs or the Company is prevented, interrupted, or materially interfered with because of "force majeure" events, which shall include events by reason of any governmental law, ordinance, order or regulation, or by reason of fire, flood, earthquake, labor dispute, lock-out, strike, accident, act of God or public enemy, or by reason of any other customary force majeure or occurrence of the same or similar nature not within our control that makes production impracticable upon providing written notice to Artist and subject to the terms set forth herein, suspend the performance of Services by Artist during the period of such suspension and Company may reduce Artist's compensation hereunder pro rata except as may be required by law and as set forth herein during any such periods of suspension.  If this Agreement is suspended, the Term hereof shall be deemed extended by a period equivalent to all such periods of suspension.  Such suspension shall end as

soon as such force majeure terminates and Artist will not be suspended unless all other similarly situated talent are suspended with respect to the same force majeure event. Notwithstanding the foregoing, Company will use reasonable efforts to reassign Artist to other broadcasting services during any such suspension (Artist will have reasonable approval over such reassigned events) and if Artist agrees to provide Services in connection with such reassigned events, Company will continue to pay Artist the full compensation set forth in this Agreement and in the same manner set forth in this Agreement. Should any suspension under this paragraph (not including any reassignment to other events wherein Company is continuing to pay Artist the full compensation) exceed thirty (30) consecutive days, then Artist may, by written notice to Company, terminate this Agreement, provided, however, that if such notice is given by Artist, it shall not be effective if within seven (7) days after receipt of such notice by Company, Company notifies Artist of reinstatement of Artist's obligations to render the Services and Company's obligations to pay Artist pursuant to this Agreement. In the event of such a reinstatement, Company shall not have the right to suspend the Agreement again for that same continuing event of force majeure. If any matter referred to in subparagraph (i) above, other than default, continues for more than thirty (30) consecutive days, or sixty (60) days in the aggregate in any twelve (12) month period during the Term, and Company has endeavored to reasonably accommodate any illness or incapacity of Artist, or if any matter referred to in subparagraph (ii) above continues for more than thirty (30) consecutive days, or in the event of Artist's death, subject to any exceptions set forth herein, Company may thereafter terminate this Agreement by sending written notice to Artist, and if Company does so, Company shall have no further obligation to Artist hereunder, except (provided Artist is not in default) to pay Artist pursuant to Paragraph 4 above for Services satisfactorily rendered as of the date of termination. Notwithstanding the immediately preceding sentence, in connection with any Artist breach hereof resulting from illness or incapacity, as provided in subsection 15.01(i) above, Artist shall have ten (10) days from the date of Artist's receipt of Company's written notice of the breach concerned to cure such breach. As used herein, "incapacity" shall mean any material physical, mental or other disability which renders Artist incapable of fully performing all essential Services required to be performed by Artist.

15.02   Company may terminate this Agreement in the event that Artist defaults, breaches any provision hereof, or in the event of the inaccuracy of any representation or warranty contained herein and made by Artist, and Company shall have no further obligations to Artist hereunder, provided that any such breach or inaccuracy shall be subject to cure within ten (10) days from the giving of notice from Company. Company's exercise of its rights as set forth in this subsection 15.02, or 15.01 above, if any, shall be without prejudice to any other remedy of any kind or nature available to Company herein or otherwise. For the purposes of this Section 5 a "default" shall include, without limitation, if Artist is unable, fails, neglects, or refuses to perform fully one or more of Artist's obligations hereunder (except if such non-performance is a result of an event of force majeure and/or Company's breach of this Agreement).

15.03   <u>Morals.</u>      If Artist should, prior to or during the Term hereof commits any act, or omits from any action, which: (i) violates widely held social morals; (ii) brings Artist into (non-trivial) public disrepute, scandal, contempt or ridicule or which shocks, insults or offends a substantial portion or group of the community or reflects unfavorably (in a non-trivial manner) on any of the parties; or (iii) materially reduces Artist's commercial value as a professional sports commentator, then Company may, in addition to and without prejudice to any other remedy of any kind or nature set forth herein, terminate this Agreement at any time after the occurrence of any such event upon written notice to Artist. Notwithstanding the foregoing, the parties hereto agree that no act or omission of Artist occurring prior to the Term, which is known to the general public at large as of the date hereof, shall entitle Company to terminate this Agreement pursuant to this Section 15.03.

CONFIDENTIAL

EXECUTION COPY

- 11 -

15.04  Notwithstanding any termination or expiration of this Agreement, the provisions of Sections 3, 5, 9, 14, 15.04, 16, 17, 18, and 19 shall survive indefinitely or as otherwise specified.

16.     <u>REMEDIES.</u>

Any remedies Artist may have against Company in connection with the Programs and/or this Agreement shall be limited to the right to recover damages, if any, in an action at law, and Artist hereby waives any right or remedy in equity, including, without limitation, the right to seek injunctive relief.

17.     <u>NON-SOLICIT.</u>

Artist hereby covenants and agrees that during the Term and for a period of one (1) year thereafter Artist will not at any time either alone or in association with others (i) solicit, or facilitate any organization with which Artist is associated in soliciting, any employee or independent contractor of Company or any of its subsidiaries to leave the engagement or employ of Company or any of its subsidiaries, (ii) solicit for employment, hire or engage as an independent contractor, or facilitate any organization with which Artist is associated in soliciting for employment, hire or engagement as an independent contractor, any person who was employed or engaged by Company or any of its subsidiaries at any time during the term of Artist's engagement or employ with Company or any of its subsidiaries, provided, that this clause (ii) shall not apply to any individual whose employment or engagement with Company or any of its subsidiaries has been terminated for a period of one (1) year or longer, or (iii) solicit, facilitate, propose, or pitch any Person new programming concepts, materials, or ideas.

18.     <u>NON-DISPARAGEMENT.</u>

Artist hereby covenants and agrees that during the Term and for a period of one (1) year thereafter, Artist shall not make any public disparaging statements concerning Company, Company's officers, directors, employees, attorneys, agents, or contracting parties, or its business or operations.  Company hereby covenants and agrees that during the Term and for a period of one (1) year thereafter, Company shall not make any public disparaging statements concerning Artist.

19.     <u>MISCELLANEOUS.</u>

19.01  <u>Entire Agreement.</u>  This Agreement sets forth Artist's and Company's (and any affiliates of Company's) entire understanding relating to its subject matter and supersedes all prior and contemporaneous understandings relating to the same which have been merged herein.  This Agreement shall not become effective until signed by Artist and countersigned by a duly authorized officer of Company.  No modification, waiver or termination of this Agreement or any of its terms shall be binding upon Company unless confirmed by a document signed by a duly authorized officer of Company.  No waiver by Artist or Company of any term of this Agreement or of any default hereunder shall affect Artist's or Company's respective rights thereafter to enforce that term or to exercise any right or remedy in the event of any other default, whether or not similar.  If any part of this Agreement is determined to be void or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, such decision shall not affect any other provisions hereof, and the remainder of this Agreement shall be effective as though such void or unenforceable provision had not been contained herein.

19.02  <u>Breach; Opportunity to Cure.</u>  Company shall not be deemed to be in breach of any of Company's obligations hereunder unless and until Artist shall have given Company specific written notice,

**CONFIDENTIAL**

**EXECUTION COPY**

- 12 -

describing in detail the alleged breach and Company shall have failed to cure that alleged breach within fifteen (15) days after Company's receipt of that written notice.

19.03   No Agency.   Nothing herein contained shall constitute an agency relationship between Artist and Company.  Except as otherwise expressly provided herein, Artist is performing its obligations hereunder as independent contractors.  Artist shall not hold itself out contrary to the terms of this paragraph, and Company shall not become liable for any representation, act or omission of Artist to the contrary of the provisions hereof.  Artist does not have the right to execute any agreement or incur any obligation for which Company may be liable or otherwise bound.  This Agreement shall not be deemed to give any right or remedy to any third party whatsoever unless that right or remedy is specifically granted by Company in writing to that third party.

19.04   Governing Law; Jurisdiction.  This Agreement has been entered into in the State of New Jersey and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of New Jersey applicable to contracts entered into and performed entirely within the State of New Jersey (without regard to the conflicts of law principles of such State).  All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New Jersey or the Federal District Courts located in New Jersey; provided, however, if Company is sued or joined in any other court or forum (including an arbitration proceeding) by a Person other than Artist in respect of any matter which may give rise to a claim by Company hereunder, Artist's consent to the jurisdiction of such court or forum over any such claim which may be asserted by Company.  Any process in any action or proceeding commenced in the courts of the State of New Jersey arising out of any such claim, dispute or disagreement, may among other methods, be served upon Artist by delivering or mailing the same, via certified mail, addressed to Artist at the address given in this Agreement or such other address as Artist may from time to time designate by notice in conformity with paragraph 19.06.

19.05   Assignment.  Company shall have the right to assign this Agreement or any of Company's rights and obligations hereunder to any affiliate of Company or any Company acquiring an owning a controlling interest in Company, and any rights and obligations so assigned may also be likewise assigned by the assignee (under the same restrictions).  Company shall also have the right to assign any of its rights hereunder to any of its licensees in order to effectuate the purposes hereof.  Artist shall not have the right to assign any of Artist's rights or obligations hereunder, and any purported assignment by Artist in contravention of the foregoing shall be null and void.  Notwithstanding anything to the contrary in the immediately preceding sentence, if at any time during the Term Company and Artist mutually agree that Artist's services shall be furnished to Company by or through a third party services company (e.g. a "loan-out" entity) then Company and Artist shall work in good faith to amend the terms hereof solely to provide that Artist's Services are to be furnished to Company by any such services company and any other amendments required to provide for such an arrangement and all other terms and conditions set forth herein shall remain unchanged.

19.06   Notices.  All notices to be given to Artist shall be addressed to Artist at the address set forth on page 1 or at such other address as Artist shall designate in writing from time to time.  All notices to be given to Company hereunder shall be addressed to Company to the attention of the Senior Vice President of Programming & Business Affairs at the address set forth on page 1 hereof or at such other address as Company shall designate in writing from time to time.  A copy of all notices to Artist hereunder shall simultaneously be delivered to:  Rand E. Sacks, Esq., The Sacks Group, PLLC, 5335 Wisconsin Avenue, NW, Suite 850, Washington, DC  20015.  To be effective, all notices hereunder must be in writing, addressed to the proper party specified above and sent by: (i) registered or certified mail, return receipt

CONFIDENTIAL

EXECUTION COPY

- 13 -

requested; (ii) personal delivery; or (iii) expedited, receipted courier service (e.g., Fedex or UPS).  Notices shall be deemed given when personally delivered, deposited with the courier service or mailed, all charges prepaid, except that notices of change of address shall be effective only after actual receipt.

19.07  _Insurance_.  Company may at any time during the Term obtain, at Company's cost, insurance on the life of Artist.  Company or its designees shall be the sole beneficiary of that insurance.   Artist shall, as Company may designate, submit to such physical examinations and to otherwise cooperate with Company fully for the purpose of enabling Company to secure that insurance.  In the event (i) any such examination establishes a substantial doubt as to Artist's physical ability to complete Artist's services hereunder, (ii) Artist fails to appear for such examination at the time and place designated by Company, or (iii)if Company is unable to procure insurance covering Artist at normal rates and without special exclusions, Company may terminate this Agreement hereunder and be relieved of any further obligation to Artist.

19.08  _Remedies_.  Artist acknowledges that Artist's Services hereunder are special and unique and that a breach of this Agreement by Artist shall cause Company irreparable injury that cannot be adequately compensated by money damages.  Accordingly, Company shall be entitled to injunctive relief, in addition to any other remedies that it may have, to enforce the terms of this Agreement.

19.09  _Arm's Length Proceeding/Ambiguities_.       The provisions of this Agreement are the product of arms-length negotiation between the parties and their respective legal counsel.  Neither Artist nor Company shall be deemed to be the drafter of this Agreement, it being the parties' mutual intention that this Agreement not be construed, in whole or in part, against either of the parties hereto pursuant to any doctrine, law or rule of construction which provides that contract provisions are to be construed against the party drafting such provisions.  No alterations from any prior draft shall be used to construe any provision hereof.

19.10  _Counterparts_.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which when taken together shall be construed as a single instrument.  This Agreement may be executed by facsimile, and signatures on a facsimile copy hereof shall be deemed

*[Signature Page Follows]*

CONFIDENTIAL

EXECUTION COPY

- 14 -

authorized original signatures.  This Agreement shall not be deemed binding unless this Agreement has been executed by an authorized signatory of each of the parties hereto.

If the foregoing correctly sets forth the terms of the agreement between Artist and Company, please sign in the space provided below.

Sincerely yours,

THE MLB NETWORK, INC.

By: _____

Name: Tony Petitti

Title: President & CEO

AGREED AND ACCEPTED:

MITCHELL WILLIAMS

By: _____

CONFIDENTIAL

EXECUTION COPY

## SCHEDULE A

Ashley Furniture (in connection with radio show)
Coastal Spine (in connection with radio show)
Lucas Auto Group (local television commercial)
MLB Extra Innings (Baseball Academy)
One A Day Multivitamins

16-11700-smb   Claim 31-1 Part 2   Filed 07/11/16   Pg 75 of 108

# Exhibit B

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing     http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...




**DEADSPIN** (/)

(/)

## Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

Timothy Burke (http://bubbaprog.kinja.com)                                               222,211      30
Filed to: MITCH WILLIAMS (/TAG/MITCH-WILLIAMS)   5/11/14 8:30pm (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-

(http://bubbaprog.kinja.com)



MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after a profanity-laced tirade in which he called an umpire a "motherfucker" in front of the children, observers tell us.

Williams coaches his son's 10U Jersey Wild team, which was participating in a Ripken Baseball tournament in Aberdeen, Md. We've confirmed through several sources that Mitch Williams—who was once tossed from his daughter's youth basketball game for cussing at the ref—had complained about numerous calls throughout the game, ranging from balls and strikes to a close play at the plate that ended a Jersey Wild rally. This led to repeated arguments with umpires on the field.



1 of 6                                                                                      8/27/2014 3:20 PM

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing          http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...



1 (/dip-tin-for-the-win-1575042911)

One umpire finally confronted Williams after the former MLB pitcher shouted something to a parent in the stands about getting that umpire fired. The confrontation sparked a face-to-face argument that, one parent told us, was "just like the major leagues." Two different observers told us Williams had to be physically separated from the umpire by other coaches. Williams then refused to leave the field, causing a 10-minute delay in play; as a result of his antics, he was initially banned from the tournament.



Williams discussed the incident on Twitter this morning:

8/27/2014 3:20 PM

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing            http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...


**Hit Me SEO** @HitMeSEO                                            11 May
Phillies Fan, embarrassed to watch @WildThingMLBN Mitch Williams get
thrown out of a 10 year old baseball game today @RipkenBaseball

**Mitch Williams**                                                 **Follow**
@WildThingMLBN

@HitMeSEO to set the record straight. I was thrown out
for laughing at a call.then the threatened to fight me.said
pick a time and place.
7:57 AM - 11 May 2014  Edgewood, MD, United States

16 RETWEETS  5 FAVORITES


**Hit Me SEO** @HitMeSEO                                            11 May
Phillies Fan, embarrassed to watch @WildThingMLBN Mitch Williams get
thrown out of a 10 year old baseball game today @RipkenBaseball

**Mitch Williams**                                                 **Follow**
@WildThingMLBN

@HitMeSEO for those that think I'm making this up.it is
on film.,and when he threatened me 1 of my coaches
came out and put his hands on him
8:01 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES


**Hit Me SEO** @HitMeSEO                                            11 May
Phillies Fan, embarrassed to watch @WildThingMLBN Mitch Williams get
thrown out of a 10 year old baseball game today @RipkenBaseball

**Mitch Williams**                                                 **Follow**
@WildThingMLBN

@HitMeSEO the ump and moved him away.the ump said
you can't touch me.what the ump didn't know is my
coach is a judge. And my coach told him
8:03 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  1 FAVORITE


**Hit Me SEO** @HitMeSEO                                            11 May
Phillies Fan, embarrassed to watch @WildThingMLBN Mitch Williams get
thrown out of a 10 year old baseball game today @RipkenBaseball



@HitMeSEO if we weren't in Maryland you would be in
handcuffs and arrested for threatening me. All I care
about is the kids.the entire game
8:04 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES





Hit Me SEO @HitMeSEO                                    11 May
Phillies Fan, embarrassed to watch Mitch Williams get
thrown out of a 10 year old baseball game today



**Mitch Williams**                                      Follow
@WildThingMLBN

@HitMeSEO is taped by Ripken. They have it and it will
show everything.ive never seen an ump at so out of
control especially at a 10yrold gm

8:08 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES

**Mitch Williams**                                      Follow
@WildThingMLBN

It started in the 1st inn, the ump yelled at the opposing
coach,then yelled at me.i asked why r u yelling at me I
haven't even met u yet.

8:13 AM - 11 May 2014  Edgewood, MD, United States

16 RETWEETS  26 FAVORITES


We've attempted to access the video of the incident, but the game in question is curiously unavailable from the service providing feeds from the rest of the tournament. An individual familiar with the situation informs us that after hearing Williams's explanation, Ripken Baseball officials lifted the ban—saying the umpire failed to act professionally. But according to our witnesses, the umpire's "unprofessional" behavior came well after Mitch Williams had been ejected and refused to leave. (Ripken Baseball "monitored" Williams closely during his team's two games today. Jersey Wild did not win the tournament.)

Here's how other people in attendance described the incident.

*[Mitch Williams] just got kicked out his sons little league game for threatening an umpire at Ripken Stadium*

*He has been arguing balls and strikes and was upset about a play at the plate where his team was called out. In the top of the 5th while he was coaching first base he yelled to another parent that he would have the umpire fired. The Umpire confronted him and Mitch went off. He threatened the umpire called him a motherfucker in front of 10 year olds. They were faced to face inches from each other arguing. He had to be restrained by other coaches. The umpire rightfully kicked him out.*

*He refused to leave the field until speaking to he spoke to management. He left the field took off his jersey and watched the rest of the game from behind home plate without incident.*

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing          http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...

*It was such a train wreck. He was arguing with calls and making comments to both of the umpires all game. He was coaching first base as the game was going on, and the second base umpire threw him out. He "said" he was making a comment to one of the parents in the stands, when the second base umpire tossed him. He was making comments the whole game about the bad calls, and the 2nd base ump just had enough.*

*He went nuts. He got into the umpires face like it was the major leagues. He claimed that the umpire who was about 65 years old threatened him and said to pick a time and a place to fight Mitch.*

*The game was delayed for about 10 minutes as they needed to call in an official from Ripken until he finally was removed. It was crazy. Never saw a player get ejected from a game and not leave. This is all going on while 10 year olds are playing baseball, or trying to play baseball.*

*Ironically, the audio at the beginning of the game is from Cal Ripken which talks about how parents should let the players play, the coaches coach, and the umpires umpire. (IE - parents, don't act like idiots). Mitch was the idiot.*

*I was very upset with the decision [to lift the ban] because Williams was confrontational all game, and it was clear to everyone there that whatever the ump said that was inappropriate came after he was already tossed and refused to leave the field, and the ump was reacting to Williams, not the other way around.*

There's nothing worse than the Bad Sports Parent (http://deadspin.com/5985288/which-sport-produces-the-worst-parents), and Williams has a bit of a history (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane) playing this role. In 2008, he was tossed from his then-10-year-old daughter's youth-league basketball game for dropping f-bombs on a referee. "I'm emotional when it comes to my kids," he explained later. "What I saw happening was completely unfair."



(http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)
Mitch Williams Supports Youth Athletics, Is Not At All Insane (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)Mitch Williams Supports Youth Athletics, Is Not At All Insane (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)Mitch Williams Supports Youth Athletics, Is Not At (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)
Former Phillies reliever Mitch Williams has never been one to see an injustice go unchallenged,...
Read more (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)

*To contact the author of this post, write to tim@deadspin.com (mailto:tim@deadspin.com) or find him on Twitter @bubbaprog (https://twitter.com/bubbaprog). Photos used by permission.*

Like   1.7k                                                                            10      109      Reply

Timothy Burke's Discussions (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

16-11700-smb    Claim 3-1 Part 2    Filed 09/11/16    Pg 83 of 108

# Exhibit C



# DEADSPIN (/)

(/)

## Witnesses: Mitch Williams Called Child "A Pussy," Ordered Beanball (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)



Timothy Burke (http://bubbaprog.kinja.com)          138 146          2
Filed to: MITCH WILLIAMS (/tag/MITCH-WILLIAMS)     5/16/14 2:15pm (http://deadspin.com)

(http://bubbaprog.kinja.com)



The fallout continues from MLB Network analyst Mitch Williams's meltdown at a Ripken Baseball youth tournament this past weekend (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005), as parents and coaches tell Deadspin that "The Wild Thing" called one child "a pussy" while ordering one of his own 10-year-old players to hit the opposing pitcher with a beanball.



(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-

williams-ejected-from-childs-baseball-game-for-ar-1574736005)Mitch Williams Ejected From Child's
Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-
baseball-game-for-ar-1574736005)Mitch Williams Ejected From Child's Baseba...
(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Read more (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

While video of the Saturday ejection is still suspiciously unavailable, we were able to acquire footage from
Sunday's championship game between the Williams-coached Jersey Wild and SJ Titans, another elite
10U baseball team from New Jersey. The film at the top of this post shows an interaction between
Williams and some SJ Titans players. Multiple witnesses report that interaction consisted of Williams
calling the SJ Titans pitcher "a pussy." Children on the team heard this, and one asked his parent on the
ride home what it meant. The comment sparked a meeting behind home plate between SJ Titans
coaches, umpires, Williams, and a handler (one witness called him a "babysitter") assigned by Ripken
Baseball to keep Williams in line after Saturday's ejection.

Even in this interaction, you can see Williams being aggressive and argumentative.



Here's video of an incident that happened in the fifth inning, when the SJ Titans pitcher came to bat in
the leadoff position. Watch as Williams says something to his catcher, after which the catcher goes out to
the mound to say something to his pitcher. SJ Titans coaches and players overheard this interaction, and
report that Williams ordered his pitcher to intentionally hit the SJ Titans batter with the first pitch. One
witness told us it was in an attempt to knock the SJ Titans pitcher out of the game

Sure enough, the first pitch hits the SJ Titans player square in the ribs. (The home plate umpire, who had been made aware of the upcoming beanball, warned both benches.) One SJ Titans assistant coach confronted Williams about the pitch after the game, and reported that Williams stated, "I told him to throw it inside."

Other witnesses--a number of parents, coaches, and other observers contacted us about Mitch Williams's behavior—state that Williams was heckling SJ Titans coaches throughout the game, repeatedly calling one a "squirrely little teapot," and making harassing comments about the appearance of 10-year-old baseball players on the opposing team. (Lest you think these reports come from a team of sore losers, know that SJ Titans defeated Jersey Wild in the championship game.)

We've noted Williams being a Bad Sport Parent (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane) for years, and numerous sources reported to us on his various behaviors both at the most recent Ripken Baseball tournament and in other sports, in other cities. Here's a sampling of what they told us.

> *We hosted a tournament last weekend and 2 weekends ago and he was screaming at the umpires all weekend.*

> *Mitch Williams is trying to get into the heads of ten-year-olds.*

> *What an unbelievable douchebag Mr Williams acted like all weekend!*

> *He basically was questioning every call, balls n strikes, bitching whining etc...he was basically a horses ass...well it really exploded on a very close play....he went off...cursing the ump...yelling at a spectator or two or three.*

> *Basically in a nutshell, both days I saw this guy, he acted like an arrogant classless foul mouthed tool bag and DEFINITELY not someone id want coaching my kids!!!*

*At games all over our town and others, he berates teenage and adult umpires. He goes ballistic regularly from the dugout or from the first baseline and these dopey Philly fans still give him a fist pump when he walks by.*

*It's such a shame when you live in a town where someone famous could use it for such good things, but he garners absolutely no respect from those who know him here in town. His talented sons are passed over in rec league drafts just so the coaches and families don't have to deal with the parents.*

We contacted several Ripken Baseball representatives. They have not responded to our questions, though one individual familiar with the situation informs us the organization is "taking matters quite seriously." Mitch Williams works alongside Bill Ripken at MLB Network.

**Update (5/17, 12:41 p.m.):** Several observers of today's Jersey Wild game at the Diamond Nation tournament note Mitch Williams, while in attendance, is not coaching the team.

*To contact the author of this post, write to tim@deadspin.com (mailto:tim@deadspin.com) or find him on Twitter @bubbaprog (https://twitter.com/bubbaprog)*

|  |  |  |
|---|---|---|
| 2 | 189 | Reply |

Timothy Burke's Discussions (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

All replies (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834/all)

16-11700-smb   Claim 3-1 Part 2   Filed 07/11/16   Pg 88 of 108

# Exhibit D

JETER   THE SCORE   BASEBALL   FOOTBALL   BASKETBALL   HOCKEY   COLLEGE   HIGH SCHOOL   SOCCER   I-TEAM   MORE SPORTS   BLOGS

# Ex-MLB pitcher Mitch 'Wild Thing' Williams taking leave of absence from MLB Network after reportedly ordering beanball and other bad behavior at youth baseball game

**Williams, known as 'Wild Thing' during an 11-year big league career as a reliever, reportedly ordered the beaning of an opposing player during a youth baseball tournament last weekend in Maryland. He had been ejected the day before for a reported 'profanity-laced tirade' directed at the ump.**

BY ANDY CLAYTON   Follow   / NEW YORK DAILY NEWS  /  Published: Saturday, May 17, 2014, 11:45 AM
/ Updated: Saturday, May 17, 2014, 7:14 PM                          A A A

SHARE THIS URL

143        112              13        nydn.us/1kbIGCM


**BLOGGING THE BOMBERS**

**Daily News Yankees Podcast: Derek Jeter Day roundup**


SURFING THE METS

**Eric Campbell steals a run, first time Mets pull off feat since 2011**


Mitch 'Wild Thing' Williams coaches with the independent league Atlantic City Surf following his playing days. Williams is taking a leave of absence from his current gig as an analyst with the MLB Network.


KEEP UP with JETER'S FINAL SEASON HERE!

Mitch Williams is apparently just as 'Wild' as a coach.

Williams, known as 'Wild Thing' during an 11-year big league career as a reliever, reportedly ordered the beaning of an opposing player during a youth baseball tournament last weekend in Maryland.

Deadspin, citing information provided to the website by parents and coaches, reported Friday that the former All-Star and current MLB Network analyst told one of his 10-year-old players to hit the opposing pitcher.

The MLB Network told the Daily News Saturday afternoon that Williams is taking a leave of absence from the network.

"Mitch Williams has decided to take a leave of absence from his role at MLB Network at this time," an MLB Network spokesperson said in an email to the Daily News. "We are continuing to look into the matter."

The ordering of the beanball reportedly came one day


PLAY FOR FREE
FanDuel.com
DAILY NEWS PRESENT
ONE-DAY FANTASY LEAGUES for REAL MONEY
PLAY NOW

**EDITORS' PICKS**

**KNOCKOUT: Video shows NFL star Ray Rice slugging wife**
A Baltimore Ravens running back was suspended for just two games after knocking a woman out cold

That's a nickel less than his number. Eagles running back LeSean McCoy dropped a 20 cent tip on a $61.56

9/9/2014   Ex-MLB pitcher Mitch 'Wild Thing' Williams taking leave of absence from MLB Network after reportedly ordering beanball and other bad behavior ...

 **Mitch Williams**   Follow

I regret what happened at this weekend's tournament & apologize. I love baseball & coaching.

after Williams was ejected from the Jersey Wild team's semifinal game in a Ripken Baseball tournament in Aberdeen, Md., for a "profanity-laced tirade." The website reported that Williams called the umpire a "mother—er." Williams' son plays on the Jersey Wild team.

Last Sunday's beanball incident reportedly took place in the fifth inning of the age-group's championship game against the SJ Titans. Witnesses, including members of the Titans, told Deadspin that Williams was overheard ordering his pitcher to hit the next Titans batter - the opposing pitcher - with the first pitch of the inning. The Titans pitcher was hit in the ribs with the beanball.

Williams' apparent out-of-control antics - which reportedly included calling one of the Titans players "a pussy" - did not prevent the Titans from beating the Jersey Wild in the title game.

Witnesses told Deadspin that Williams heckled opposing coaches throughout the game and was also making harassing comments about the appearance of the 10-year-old players.

Williams, who pitched for six teams including the Phillies and Cubs during his career, apologized for the ejection on Sunday via Twitter.

"I regret what happened at this weekend's tournament & apologize," Williams tweeted. "I love baseball & coaching."

He added: "I did not curse at the umpire & will walk away in the future. Again, I apologize."

CHARLES KRUPA/AP
Mitch Williams caps his major league career with the Kansas City Royals in 1997.

**PICTURED Eagles running back leaves 20 cent tip at Philly burger joint**


**'THIS IS OUR LIFE': Ray Rice's wife Janay Palmer speaks out — says husband's ouster from NFL is a**
Disgraced NFL star Ray Rice's wife says no one


**Myers: Eli Manning is West Toast in Giants new dink-and-dunk offense**
It was the Same Old Eli on Monday night, but unfortunately for the Giants,


**Mets GM: Now is time to be careful with young arms**
With the future of the franchise riding on young arms, Sandy Alderson has made it clear just how

FROM AROUND THE WEB


**Olympic Figure Skater Kiira Korpi Shows Off Her Figure In These Photos**
(RantSports)


**8 Celebrities That Nobody Wants To Work With**
(Your Daily Scoop)


**Red Sox-Blue Jays: Clay Buchholz Battles Jays, Mother Nature At Fenway**
(NESN)


**Singapore's four solutions for water scarcity**
(Singapore Economic Development Board)

Recommended by

PROMOTED STORIES




**Jessica Szohr Shows Why She's Aaron Rodgers New Fling**


**Erin Andrews Talks Super Bowl, Dating Athletes**


**The Lowest Moment in High School Football History**

EDITORS' PICKS


**Yankees hopeful, but weak output makes it hard to see Derek Jeter in postseason**
The narrative would practically write itself. Who didn't think the Yankees


**Smash hits in U.S. Open history**
With the U.S. Open in full swing, the News dipped into our archive for historic shots from the tournament's former venue in Forest Hills

Michael Jordan and stars come out to say goodbye to

16-11700-smb Claim 3-1 Part 2 Filed 07/11/16 Pg 91 of 108

# Exhibit E

 **SPORTS**



# Ex-MLB pitcher Mitch Williams takes leave from MLB Network after flap in youth tournament

By: TED BERG May 19, 2014 1:55 pm ET    Follow @ogtedberg

**7.9k shares**            SHARE        TWEET        EMAIL



**Hit Me SEO**
@HitMeSEO

Follow

@WildThingMLBN - you don't act like this as a coach of young boys Mitch. Kids had to
watch this behavior for 10 mins.

7:22 PM - 11 May 2014

21 RETWEETS  6 FAVORITES

Former MLB relief pitcher Mitch Williams has taken a leave of absence from his role as an MLB
Network analyst after eyewitnesses at a youth-baseball tournament in Maryland described
Williams being combative with umpires and opposing players in his role as coach of a New Jersey-
based 10-and-under travel team.

In an email to USA TODAY Sports, an MLB Network spokesperson confirmed that "the decision to
take the leave was mutual," and said there is currently no timetable for Williams' return to
broadcasts.

Parents and fans in attendance at a Ripken Baseball tournament in Aberdeen, Md. told Deadspin
last week that Williams was ejected from a game for arguing with umpires, saying that the one-
time Phillies closer had to be restrained and calling his behavior "confrontational" and "a train
wreck."

The next day, Deadspin followed up with reports suggesting that Williams used expletives toward an opposing player and had his team's pitcher intentionally throw at the player — who, again, is no more than 10 years old.

On Twitter, Williams contested the reports, apologizing for his behavior but insisting he did not curse at the umpire.



**Hit Me SEO** @HitMeSEO                                                    11 May
Phillies Fan, embarrassed to watch @WildThingMLBN Mitch Williams get thrown out of a 10 year old baseball game today @RipkenBaseball



**Mitch Williams**                                        [ Follow ]
@WildThingMLBN

@HitMeSEO is taped by Ripken. They have it and it will show everything.ive never seen an ump at so out of control especially at a 10yrold gm

8:08 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES



**Mitch Williams**                                        [ Follow ]
@WildThingMLBN

I regret what happened at this weekend's tournament & apologize. I love baseball & coaching.

3:53 PM - 12 May 2014

33 RETWEETS  37 FAVORITES



**Mitch Williams**                                        [ Follow ]
@WildThingMLBN

I did not curse at the umpire & will walk away in the future. Again, I apologize.

3:54 PM - 12 May 2014

21 RETWEETS  34 FAVORITES

Williams' off-air behavior also drew headlines last year, when he clashed with former teammate Lenny Dykstra at an event at a Pennsylvania mall.

9/22/2014          Ex-MLB pitcher Mitch Williams takes leave from MLB Network after flap in youth tournament | For The Win

A phone call to Williams' representative, Russ Spielman, for comment was not immediately returned.

Basthanal and Dore, Mitch Williams, Philadelphia, Philadelphia Phillies, NFL

## 7.9k shares          SHARE          TWEET          EMAIL

## Be friends with For The Win.

Like us on Facebook! Follow on Twitter!

Like  [35k]          [ Follow @forthewin ] [40.1K followers]

## MORE FTW

**NFL**
**Yes, the Cincinnati Bengals are the best team in football**

**HIGH SCHOOL**
**High School football player gives the most incredible post game speech you will ever hear**

**MLB**
**Lenny Dykstra, ex-Phillies teammate Mitch Williams clash at a mall**

## THE LATEST

# The 7 freshest college football uniforms from Week 4

By: Mike Foss 3 minutes ago

16-11700-smb   Claim 31 Part 2   Filed 07/11/16   Pg 98 of 108

# Exhibit F









Timothy Burke (http://bubbaprog.kinja.com)                                                    1
Filed to: MITCH WILLIAMS (/TAG/MITCH-WILLIAMS)   5/19/14 11:13am (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451{

# MLB Network Puts Mitch Williams On Hiatus (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834/1578450916/+bubbaprog)



MLB Network analyst Mitch Williams is on an indefinite leave of absence from the league-owned cable channel after a series of incidents at a youth baseball tournament that witnesses tell us included the former big-league hurler calling a ten-year-old "a pussy."

The *Daily News* has the scoop (http://www.nydailynews.com/sports/baseball/report-mitch-wild-williams-ordered-beanball-youth-game-article-1.1796104), though it's not certain the leave of absence is directly tied to his behavior last weekend. Several readers wrote in last week, informing us Williams's appearances on MLB Network were erratic and that the "Wild Thing" was slurring his words.

While Ripken Baseball has yet to respond formally to our requests for information, one employee of that organization who witnessed his behavior last weekend at the 10U tournament told us that Williams was "very unprofessional in the way he acted, coached, and the way he carried himself." This individual told us Williams has been out of line repeatedly and complaints about his behavior stretch back at least a year, and noted that a "warning" message from Bill Ripken, reminding coaches and visitors about proper sportsmanship, had to be played four times during his initial outburst (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005) that earned him an ejection.

The Ripken Baseball employee went on to opine that Williams should be banned for life from that organization's events. Several readers in attendance at Jersey Wild's games this past weekend noted Williams was not coaching his team, though he was in attendance as a spectator.



(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

MLB Network Puts Mitch Williams On Hiatus          http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-orde...



MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after a profanity-laced tirade in which he called an... Read... (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

Like  78                                                                                                    |    Reply

5/16/14 2:15pm (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

Original post by Timothy Burke (http://bubbaprog.kinja.com) on DEADSPIN (HTTP://DEADSPIN.COM) (/)                                2

## Witnesses: Mitch Williams Called Child "A Pussy," Ordered Beanball (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)



The fallout continues from MLB Network analyst Mitch Williams's meltdown at a Ripken Baseball youth tournament this past weekend (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005), as parents and coaches tell Deadspin that "The Wild Thing" called one child "a pussy" while ordering one of his own 10-year-old players to hit the opposing pitcher with a beanball.



(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)Mitch Williams Ejected From Child's Baseball G (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after ...
Read more (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

While video of the Saturday ejection is still suspiciously unavailable, we were able to acquire footage from Sunday's championship game

http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-orde...

shows an interaction between Williams and some SJ Titans players. Multiple witnesses report that interaction consisted of Williams calling the SJ Titans pitcher "a pussy." Children on the team heard this, and one asked his parent on the ride home what it meant. The comment sparked a meeting behind home plate between SJ Titans coaches, umpires, Williams, and a handler (one witness called him a "babysitter") assigned by Ripken Baseball to keep Williams in line after Saturday's ejection.

Even in this interaction, you can see Williams being aggressive and argumentative.



Here's video of an incident that happened in the fifth inning, when the SJ Titans pitcher came to bat in the leadoff position. Watch as Williams says something to his catcher, after which the catcher goes out to the mound to say something to his pitcher. SJ Titans coaches and players overheard this interaction, and report that Williams ordered his pitcher to intentionally hit the SJ Titans batter with the first pitch. One witness told us it was in an attempt to knock the SJ Titans pitcher out of the game.

Sure enough, the first pitch hits the SJ Titans player square in the ribs. (The home plate umpire, who had been made aware of the upcoming beanball, warned both benches.) One SJ Titans assistant coach confronted Williams about the pitch after the game, and reported that Williams stated, "I told him to throw it inside."

Other witnesses—a number of parents, coaches, and other observers contacted us about Mitch Williams's behavior—state that Williams was

the appearance of 10-year-old baseball players on the opposing team. (Lest you think these reports come from a team of sore losers, know that SJ Titans defeated Jersey Wild in the championship game.)

We've noted Williams being a Bad Sport Parent (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane) for years, and numerous sources reported to us on his various behaviors both at the most recent Ripken Baseball tournament and in other sports, in other cities. Here's a sampling of what they told us.

*We hosted a tournament last weekend and 2 weekends ago and he was screaming at the umpires all weekend.*

*Mitch Williams is trying to get into the heads of ten-year-olds.*

*What an unbelievable douchebag Mr Williams acted like all weekend!*

*He basically was questioning every call, balls n strikes, bitching whining etc...he was basically a horses ass...well it really exploded on a very close play....he went off...cursing the ump...yelling at a spectator or two or three.*

*Basically in a nutshell, both days I saw this guy, he acted like an arrogant classless foul mouthed tool bag and DEFINITELY not someone id want coaching my kids!!!*

*At games all over our town and others, he berates teenage and adult umpires. He goes ballistic regularly from the dugout or from the first baseline and these dopey Philly fans still give him a fist pump when he walks by.*

*It's such a shame when you live in a town where someone famous could use it for such good things, but he garners absolutely no respect from those who know him here in town. His talented sons are passed over in rec league drafts just so the coaches and families don't have to deal with the parents.*

We contacted several Ripken Baseball representatives. They have not responded to our questions, though one individual familiar with the situation informs us the organization is "taking matters quite seriously." Mitch Williams works alongside Bill Ripken at MLB Network.

**Update (5/17, 12:41 p.m.):** Several observers of today's Jersey Wild game at the Diamond Nation tournament note Mitch Williams, while in attendance, is not coaching the team.

*To contact the author of this post, write to tim@deadspin.com (mailto:tim@deadspin.com) or find him on Twitter @bubbaprog (https://twitter.com /bubbaprog).*

Like    656                                                                    2      179      Reply

Timothy Burke's Discussions (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

All replies (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834/all)

# Exhibit G



## Little League Coach Gives Great Post-Game Speech To Kids After Loss (http://deadspin.com/little-league-coach-gives-great-post-game-speech-to-kid-1623699530)

Sean Newell (http://sean-newell.kinja.com)
Filed to: LITTLE LEAGUE WORLD SERIES (/TAG/LITTLE-LEAGUE-WORLD-SERIES)   8/19/14 12:51am (http://deadspin.com/little-league-c
(http://sean-newell.kinja.com)

171,382   81 ☆



This is a great little reminder that not all youth coaches and parents are psychopaths (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005). After losing to Jackie Robinson West 8-7 (http://www.providencejournal.com/sports/content/20140818-little-league-world-series-cumberland-american-falls-just-short-8-7-in-classic.ece), Dave Belisle gathered his Cumberland American team from Rhode Island to let them know that even though they lost, it's not a reason to be upset or disappointed.

As most of the kids in the huddle cried, Belisle made them all lift their heads and look him in the eye as he told them to be proud because they had their hometown "jumpin', the whole state jumpin', you had New England jumpin', you had ESPN jumpin'." He also told them the only reason he would cry after this run is because he won't be coaching them. You don't often see moving post-game speeches from the losing side, but this one was excellent.

[ESPN]

16-11700-smb    Claim 3-1 Part 2    Filed 07/11/16    Pg 103 of 105

# Exhibit H



Dated as of June 15, 2014

Mr. Mitchell Williams
c/o The Agency Sports Management
1500 Broadway – 25th Floor
New York, NY 10036
Attn: Russ Spielman

Re:     THE MLB NETWORK, INC. -W- MITCHELL WILLIAMS

Dear Mr. Williams:

WHEREAS, reference is hereby made to the agreement between Artist and Company dated as of November 1, 2011, as amended (the "**Agreement**"). Capitalized terms that are used and not defined herein shall have the meanings assigned to such terms in the Agreement;

WHEREAS, in May 2014 Artist was involved in reported incidents of inappropriate behavior during Artist's participation in, and/or attendance at, certain youth athletic events, and, subsequent thereto, internal incidents which arose from such reported incidents (collectively, the "**Artist Incident(s)**");

WHEREAS, Company and Artist previously mutually agreed to Artist taking a paid leave of absence for an indefinite period of time;

WHEREAS, such actions by Artist during each Artist Incident constitutes a breach of the Agreement by Artist, including, without limitation, with respect to Section 15.03 of the Agreement, pursuant to which Company may terminate the Agreement; and

WHEREAS, Company and Artist have mutually agreed to discontinue such leave of absence by Artist effective on a date to be mutually determined by Company and Artist, but in no event earlier than August 1, 2014, subject to all of the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the following, when fully executed by the parties hereto, shall amend and supplement the Agreement (this "**Second Amendment**") as of June 15, 2014 (the "**Second Amendment Effective Date**"):

1.    In consideration for Company's covenant to not exercise its right to terminate the Agreement as a result of the Artist Incident(s), Artist hereby covenants and agrees that (i) for a period of one (1) year from the date of discontinuance of Artist's leave of absence, Artist shall

not attend, in any manner or by any means, any amateur athletic event(s) of any kind, including, without limitation, any youth, middle school, high school, and college athletic events (ii) during the remainder of the Term, Artist shall not participate in (e.g., coach, advise, speaker, etc.) in any manner or by any means, any amateur athletic event(s) of any kind, including, without limitation, any youth, middle school, high school, and college athletic events (iii) during the remainder of the Term, Artist shall not, unless approved in advance, and in writing, by Company, post to, or otherwise actively participate in, any social media outlets (e.g., Twitter, Facebook, etc.) for any purpose, and (iv) Artist has obtained, and will continue to attend, therapeutic counseling. For the avoidance of doubt, nothing set forth herein shall be deemed to waive any rights and/or remedies of Company with respect to any other Artist action(s) including, without limitation, (a) any action(s) of which Company is currently unaware and (b) any Artist action(s) in connection with the Artist Incident(s) of which Company is currently unaware.

2.    In addition to any rights and remedies available to Company pursuant to the Agreement, all of which are hereby reserved by Company, if Artist breaches any covenant set forth in Section 1 above, then Company shall have the right to immediately terminate the Agreement, and Company shall not have any liability to Artist, and Artist hereby agrees that Artist shall have no right to cure any such breach by Artist, if curable.

Except as expressly modified by this Second Amendment, the Agreement, as amended, is, and will continue to be, in full force and effect, and this Second Amendment will not operate as a waiver of any provision of the Agreement. This Second Amendment may be executed in counterparts, each of which is an original and all of which together constitute one and the same agreement. Signatures to this Second Amendment may be delivered by facsimile and will be binding upon the parties.

Please have this Second Amendment executed in the space provided below to signify your acknowledgement and acceptance of the foregoing.

Sincerely yours,

**THE MLB NETWORK, INC.**

By: _____
Name: _____
Title: _____

AGREED AND ACCEPTED:

**MITCHELL WILLIAMS**

By: _____

## EXHIBIT 4

**Order re Gawker MTD**

TRUE COPY

*[signature]*

MICHAEL J. KASSEL, J.S.C.

**SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CAMDEN COUNTY**

Mitchell Williams

**Plaintiff(s)**

DOCKET #    CAM
            L - 3675 -14

v.

The MLB Network et al.

**Defendant(s)**

**CIVIL ACTION ORDER**

This matter being opened to the Court by _Defendant Gawker Media, LLC ("Gawker")_

on _its motion to dismiss_ and for good cause shown;

It is hereby on this _6th_ day of _March_, 201_5_

Ordered that _the motion is granted in part and denied in part._
_Plaintiff's claims against Gawker are dismissed except as to_
_challenged statements that Plaintiff (1) ordered a beanball,_
_(2) used the profanity "motherf*****r" in front of children,_
_and (3) called a child a "p***y"._

_[signature]_

Michael J. Kassel, J.S.C.

**\*\*Reasons on the record**

Chad R. Bowman, counsel for Gawker Media, LLC
_[signature]_, counsel for Williams

## **EXHIBIT 5**

**Order Granting Gawker's MSJ**

RECEIVED

2016 APR 29 PM 5: 27

SUPERIOR COURT/LAW DIV.

TRUE COPY



MICHAEL J KASSEL, J.S.C

F I L E D

JUN 1 2016

CAMDEN COUNTY SUPERIOR COURT

LEVINE SULLIVAN KOCH & SCHULZ, LLP
Thomas B. Kelley (*pro hac vice* motion pending)
Chad R. Bowman (admitted *pro hac vice*)
Elizabeth Seidlin-Bernstein (No. 052882014)
1760 Market Street, Suite 1001
Philadelphia, PA 19103
Phone: (215) 988-9778

*Attorneys for Defendant Gawker Media, LLC*

| | | |
|---|---|---|
| **MITCHELL WILLIAMS,** | : | **SUPERIOR COURT OF NEW JERSEY** |
| | : | **LAW DIVISION** |
| **Plaintiff,** | : | **CAMDEN COUNTY** |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **DOCKET NO. CAM-L-3675-14** |
| **THE MLB NETWORK, INC., et al.,** | : | |
| | : | [PROPOSED] **ORDER GRANTING** |
| **Defendants.** | : | **DEFENDANT GAWKER MEDIA,** |
| | : | **LLC'S MOTION FOR SUMMARY** |
| | | **JUDGMENT** |

THIS MATTER having been opened to the Court by Levine Sullivan Koch & Schulz,

LLP, attorneys for Defendant Gawker Media, LLC ("Gawker"), for an Order dismissing all

*, with ability to appeal all rulings as to Gawker Defendants*

claims against Gawker with prejudice; on notice to the Console Law Offices, LLC, attorney for

Plaintiff, and the Court having considered the papers submitted by the parties and any oral

argument thereon, and for good cause shown;

IT IS on this 1st day of June, 2016 ORDERED as follows:

1.   Gawker's motion for summary judgment is granted; that

2.   all claims against Gawker are dismissed with prejudice; and that *with ability to appeal all ruling as to Gawker Defendants.*

3.   a copy of this Order shall be served upon all counsel within __5__ days of entry

hereof.

_____
                              J.S.C.

*Norris MWR 5/27/16*
*6/1/16*

*Agreed*

*Chol R. Bau / For Defendant*
*Gawker Media LLC*

*Laura Mithacci / for Plaintiff*