ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                                        :
In re                                                   :     Chapter 11
                                                        :
Gawker Media LLC, *et al.*,[1]                          :     Case No. 16-11700 (SMB)
                                                        :
                        Debtors.                        :     (Jointly Administered)
                                                        :
--------------------------------------------------------x

### NOTICE OF DEBTORS' OMNIBUS OBJECTION TO PROOFS OF CLAIM NOS. 53, 202, AND 298 FILED BY GOT NEWS LLC, AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C), PURSUANT TO BANKRUPTCY RULES 9014 AND 7012

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Debtors'*

*Omnibus Objection to Proofs of Claim Nos. 53, 202, and 298 Filed by Got News LLC, and*

*Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c), Pursuant to Bankruptcy Rules 9014 and*

*7012* (the "Objection"), which seeks to alter your rights by disallowing your claims against the

above-captioned Debtors.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place on **December 1, 2016 at 10:30 a.m. (Eastern Time)** before the Honorable Judge Stuart M. Bernstein, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Courtroom No. 723.

**PLEASE TAKE FURTHER NOTICE** that responses to the Objection and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **November 14, 2016**, **at 4:00 p.m.** **(Eastern Time)** (the "Response Deadline"), upon: (i) the Debtors, Gawker Media LLC, c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022 (wholden@opportune.com); (ii) counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com); (iii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes & Susan Arbeit; (iv) the Internal Revenue Service, Attn: Centralized Insolvency Operation, 2970 Market Street, Philadelphia, PA 19104 (mimi.m.wong@irscounsel.treas.gov); (v) the United States Attorney's Office for the Southern District of New York, Attn: Bankruptcy Division, 86

Chambers Street, 3rd Floor, New York, NY 10007 (david.jones6@usdoj.gov; Jeffrey.Oestericher@usdoj.gov; Joseph.Cordaro@usdoj.gov; Carina.Schoenberger@usdoj.gov); (vi) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com); (vii) counsel to US VC Partners LP, as Prepetition Second Lien Lender, Latham & Watkins LLP, at both 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: David Heller (david.heller@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); (viii) counsel for the Official Committee of Unsecured Creditors, Simpson Thacher & Bartlett, 425 Lexington Ave., New York, NY 10017, Attn: Sandy Qusba (squsba@stblaw.com) and William T. Russell (wrussell@stblaw.com); and (ix) parties that have requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Objection by the Response Deadline, the Bankruptcy Court may deem any opposition waived, treat the Objection as conceded, and enter an order granting the relief requested in the Objection without further notice or hearing.

[*Remainder of this page intentionally left blank*]

**PLEASE TAKE FURTHER NOTICE** that a copy of the Objection may be obtained

free of charge by visiting the website of Prime Clerk LLC at http://cases.primeclerk.com/gawker.

You may also obtain copies of any pleadings by visiting the Court's website at

http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: October 31, 2016
      New York, New York

*/s/ D. Ross Martin*
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------- x
                                                     :

In re                                         :         Chapter 11
                                              :

Gawker Media LLC, *et al.*,[1]       :         Case No. 16-11700 (SMB)
                                              :

                   Debtors.         :         (Jointly Administered)
                                              :
--------------------------------------------------- x

### DEBTORS' OMNIBUS OBJECTION TO PROOFS OF CLAIM NOS. 53, 202, AND 298 FILED BY GOT NEWS LLC, AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C), PURSUANT TO BANKRUPTCY RULES 9014 AND 7012

Pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007(d), Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft. ("Gawker Hungary" f/k/a Kinja Kft.) as debtors and debtors in possession (the "Debtor") in the above-captioned cases (the "Bankruptcy Cases"), hereby submit this objection (the "Objection") to claims No. 53, 202, and 298 (the "Got News Claims") filed by Got News

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

LLC ("Got News").[2] In support of this Objection, Gawker Media respectfully represents and sets forth as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Objection is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are section 502(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

**I.     Procedural History**

2.     The Got News Claims assert identical claims against each of the Debtors for $20,000,000.  The Got News Claims are based entirely on allegations it has filed twice before against Gawker.  Got News initially filed a compliant as co-plaintiff with Charles Johnson in Missouri state court, which was then removed and dismissed by a federal district court for lack of personal jurisdiction.  *See Johnson v. Gawker Media, LLC*, No. 4:15-CV-1137 CAS, 2016 WL 193390 (E.D. Mo. Jan. 15, 2016).  Johnson[3] then filed a new version of its complaint with an additional count in California Superior Court for Fresno County, on December 9, 2015.  *See Johnson v. Gawker Media, LLC*, No. 15CECG03734 (Cal. Super. Ct. Dec. 9, 2015) (the "California Action").  This California Complaint named Gawker Media, J.K. Trotter, and Greg

---

[2] True and correct copies of the Got News Claims will be provided separately to the Court. Copies of the Got News Claims will be provided to all other parties upon request.

[3] Johnson is the signatory on the complaint that gives rise to the Got News claims. Because he is not only the author of record on the complaint, but also the owner, president and primary writer for Got News (Compl. ¶ 1), and because all of the challenged statements identified in the complaint are statements about Johnson, the Debtors treat the complaints and bankruptcy claim filed on its behalf as filed by Johnson for purposes of this Objection. Furthermore, because all of the challenged statements are about Johnson specifically rather than Got News generally,

Howard as defendants. Neither the version of the complaint filed in Missouri nor the version of the complaint filed in California (herein after the "Complaint," **Exhibit 3**) named either GMGI or Gawker Hungary as defendants. The Complaint (and therefore the Got News Claims) alleges causes of action for libel, false light, and a violation of 42 U.S.C. § 1983 for conspiracy to interfere with civil rights against Gawker Media. The Complaint alleges the same causes of action against Messrs. Trotter and Howard, the authors of certain articles published by Gawker Media, described below.

3. For six months after Johnson commenced the California Action, he did not attempt to serve the complaint on any of the defendants. The commencement of Gawker Media's Chapter 11 case stayed the California Action, solely as to Gawker Media, before the Complaint was served or any motion to dismiss or responsive pleading was due. On September 28, 2016 Johnson filed a claim against each of the Debtors attaching the Complaint as his sole supporting documentation.

## II. Charles C. Johnson and GotNews

4. Johnson is a twenty-eight year old internet journalist who began his career as a writer for the *Wall Street Journal*, *Weekly Standard*, *Daily Caller* and *the Blaze*.[4] In time, however, his editors disapproved of his "loose-cannon approach."[5] As a result, he decided to found a news site of his own, Got News. Compl. ¶ 1. Johnson's work reaches a wide audience. He has appeared as a guest on Fox News, CNN and numerous other programs.[6] Johnson alleges that his website became "a very popular news and opinion website" and that his "brand, good

---

[4] David Carr, *Sowing Mayhem, One Click at a Time*, N.Y. Times, Dec. 14, 2014, *available at* http://www.nytimes.com/2014/12/15/business/media/sowing-mayhem-one-click-at-a-time.html.

[5] *Id.*

[6] *See About*, GotNews, *available at* http://gotnews.com/about.

will and website traffic, all surged" following Johnson's reporting on the shooting death of Michael Brown in Ferguson, Missouri. Compl. ¶¶ 109-10.

5. The stated aim of Johnson and Got News is "to transform journalism" on the theory that "most published stories [are] only partially true, while other important stories [are] never told at all."[7] As a result, Got News and Johnson have published numerous stories that contain false information. For example, he published false statements that Senator Cory Booker did not live in Newark when he was the City's mayor, that President Obama was gay, and that the New York Times had published the address of the Ferguson, Missouri police offer who shot Michael Brown.[8]

6. Johnson has become a frequent subject of national news stories criticizing both the accuracy of his reporting and his character.[9] He was temporarily suspended from Twitter for publishing the personal information of others.[10] *The New York Times* described Johnson as a "less [than] edifying creation[]" of the internet who "has a knack for staking an outrageous, attacking position on a prominent news event, then pounding away until he is noticed."[11]

7. At the same time, and notwithstanding his professed belief that news stories often contain false information, Johnson himself is quick to <u>threaten</u> libel actions against other media sources who publish stories about him. He has publicly threatened to bring dozens of libel suits since 2011.[12] Yet by his own admission in the Complaint, he does not carry through with these

---

[7] *Id.*

[8] *Id.*

[9] *See, e.g.*, *Id.*; *see also, e.g.*, Compl. ¶ 126 nn.1-2 (citing *ABC News* and *Buzzfeed News* articles debunking Johnson stories).

[10] *Id.*

[11] *Id.*

[12] *See The Internet Has Been Free of Libel Claims or Lawsuit Threats by Chuck C. Johnson For..., available at* http://chuckcjohnson.info/ (cataloguing public threats of libel litigation by Johnson).

threats and "has never before initiated a lawsuit for defamation." Compl. ¶ 2. And even here (as noted above), Johnson sued but never actually served the Complaint.

### III. Johnson's Complaint

8.     The Got News Claims stem from three articles[13] from Gawker in December 2014 (collectively the "Gawker Articles"):

> (i) a December 9, 2014 article titled "What is Chuck Johnson, and Why? The World's Worst Journalist, Explained" (the "December 9 Trotter Article," a true and correct copy of which is attached hereto as **Exhibit 4**);
>
> (ii) a December 9, 2014 article titled "Wait, Did Clowntroll Blogger Chuck Johnson [Defecate] on the Floor One Time?" (the "December 9 Howard Article," a true and correct copy of which is attached hereto as **Exhibit 5**); and
>
> (iii) a December 15, 2014 article titled "Which of These Disgusting Chuck Johnson Rumors Are True?" (the "December 15 Trotter Article," a true and correct copy of which is attached hereto as **Exhibit 6**).

*See* Compl. ¶¶ 118-56, 177-201.[14] Johnson challenges twelve statements, all of them pertaining to Johnson personally, that appear in the articles.[15] Each of the challenged statements is either: (1) a statement regarding Johnson's journalistic acumen; (2) a statement reporting on a rumor about Johnson together with reporting that the rumor is not true; or (3) non-Gawker-written material, consisting of comments made by third-party visitors to Gawker Media websites.

### RELIEF REQUESTED

9.     By this Objection, Gawker Media requests entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit 1**, disallowing Proofs of Claim No.

---

[13] The challenged articles are incorporated by reference as Exhibits 14, 15, and 16 of the Complaint. Compl. ¶ 7. Though Mr. Johnson did not attach the complaint's exhibits to his proof of claim, the Court may properly consider them as part of the complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

[14] Debtors note that the paragraphs in Johnson's complaint revert from number 247 to 232 on page 58. The relevant statements of which Johnson complains are identified on pages 48-58.

[15] For the Court's convenience, a table of the challenged statements identifying their source and the paragraph of the complaint alleging that they are defamatory is attached hereto as **Exhibit 7.**

53, 202, and 298 because the Debtors have no liability on account of such claim under applicable nonbankruptcy law.

10.    The Debtors also request that Fed. R. Civ. P. 12(b)(6) and 12(c) be made applicable to this contested matter, pursuant to Bankruptcy Rule 9014.

## APPLYING BANKRUPTCY RULE 7012 TO THIS PROCEEDING

11.    Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim is disallowed to the extent that it is unenforceable against the debtor and property of the debtor, under any agreement or applicable nonbankruptcy law. *E.g.*, *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007). The Got News Claims are disallowable as a matter of law. *See supra*, ¶ 9.

12.    A claimant bears the initial burden of alleging facts sufficient to support the claim, and only then is the claim afforded a *prima facie* presumption of validity. *E.g.*, *In re Aiolova*, No. 11-10503 (BRL), 2013 WL 5818893, at *2 (Bankr. S.D.N.Y. Oct. 29, 2013). Once a claimant has established the *prima facie* validity of its claim, the claim is "deemed allowed" until an objection is filed. To overcome this *prima facie* effect, the objecting party must bring forward evidence equal in probative force to the evidence underlying the proof of claim. *In re Oneida, Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). The Claimant must then "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.*; *see also Helliwell v. George R. Burrows, Inc. (In re George R. Burrows, Inc.)*, 156 F.2d 640, 641 (2d Cir. 1946).

13.    This contested matter and resolution of the Got News Claims (as with several other claims filed in these bankruptcy cases) will be made more orderly and efficient by applying certain parts of Rule 7012. The supporting information for the Got News Claims consists

entirely of copies of a civil action complaint filed in a California Superior Court. The allegations sound in tort, not contractual claims, which are typically more susceptible to the summary, informal procedures of an ordinary claims objection hearing.

14.     For this reason, in many circumstances bankruptcy courts in this District have analogized their resolution of proofs of claim based on outside litigation to the ordinary civil litigation process, without formally invoking and applying Rule 7012. "In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." *In re DJK Residential LLC*, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009) (sustaining claim objection and disallowing claim that repeated causes of action in related litigation for failing to satisfy Fed. R. Civ. P. 9 when claimants failed to show that claim was facially plausible); *see also In re Residential Capital, LLC*, 518 B.R. 720, 731-32 (Bankr. S.D.N.Y. 2014) (disallowing claims, based on complaint filed pre-petition in state court, that failed to state "a plausible basis for the Debtors' liability" under federal pleading standards).

15.     In this contested matter, the Court should direct that Federal Rules of Civil Procedure 12(b)(6) and/or 12(c) (available pursuant to Bankruptcy Rule 7012(b) and 9014(a)) are applicable. "The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." Fed. R. Bankr. P. 9014. The Got News Claims are asserted in a large amount, and therefore delineating the precise procedural posture and basis for ruling in a manner that is common in this type of lawsuit will enhance judicial efficiency both in this Court and during any potential appeal. Following application of Rule 12(b)(6) and Rule 12(c), this Court could then consider the Complaint (attached to the Got News Claims), this Objection,

any response and any reply papers, either to be briefing on a motion to dismiss or a motion for judgment on the pleadings.

## ARGUMENT

**I.  Johnson's Defamation and Invasion of Privacy Claims Are Barred by California's Anti-SLAPP Statute**

16.  Both Johnson and Got News are residents of California, and their purported injury took place in California. Compl. at 2.  California has a so-called Anti-SLAPP statute.  Cal. Civ. Proc. Code § 425.16.  "SLAPP" is an acronym for "strategic lawsuits against public participation," and describes litigious behavior designed to chill constitutionally-protected speech and stifle criticism.  The California legislature found that "there ha[d] been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Id.* § 452.16(a).

17.  The Anti-SLAPP statute creates a special rule regarding burdens of proof when a claim involves these matters of public participation.  Defendants have immunity from suit if they face causes of action "arising from any act" that is "in furtherance of the right of . . . free speech" and "in connection with a public issue."  Defendants can file a special motion to strike the complaint at the outset of the proceedings, putting forward evidence of the protected actions.  *Id.* If the motion is successful, the case is dismissed in its entirety, with prejudice. *Id.* § 425.16(c)(1).

18.  The allowance and disallowance of claims in bankruptcy cases includes state-law rules that have substantive effect such as the burden of proof.  *Raleigh v. Ill. Dep't of Taxation*, 530 U.S. 15 (2000).  The Anti-SLAPP statute both changes the burden of proof (requiring at the very outset the plaintiff to rebut evidence that there is a public-participation component to the defendant's actions) and adds an element to the underlying cause of action (i.e. defendant not

engaged in public-participation ).  Accordingly, the Got News Claims must be disallowed if the Anti-SLAPP statute would prevent them.

19.     California courts often resolve motions to dismiss SLAPP actions under the anti-SLAPP standard.  *See, e.g.*, *I & U, Inc. v. Publishers Sols. Int'l*, No. 14-56473, 2016 WL 3434731, at *1 (9th Cir. June 17, 2016) (affirming a district court order granting an anti-SLAPP based "special motion to dismiss"); *Elnaggar v. Irvine Co.*, No. G051262, 2016 WL 6275305, at *1 (Cal. Ct. App. Sept. 28, 2016) (affirming all counts but one of a motion to dismiss on anti-SLAPP grounds); *Schroeder v. Irvine City Council*, 118 Cal. Rptr. 2d 330 (2002) (granting anti-SLAPP motion while referring to motion as a "motion to dismiss" and "motion to strike" interchangeably).

20.     Federal courts recognize this substantive nature of the Anti-SLAPP law.  *See Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999) (applying California's Anti-SLAPP statute in a diversity case).  California Anti-SLAPP has been applied by bankruptcy courts.  *See, e.g., Restaino v. Bah (In re Bah)*, 321 B.R. 41, 46 (B.A.P. 9th Cir. 2005).

### A.     California's Anti-SLAPP Law Applies to Johnson's Causes of Action

21.     Five counts in the Complaint are state-law claims.[16]  California law applies because Johnson and Got News are California residents.  There has been a judicial finding that there are not substantial ties to another state.  *See Johnson*, 2016 WL 193390, at *10 (finding that litigating Johnson's claims in Missouri "would offend traditional notions of fair play and substantial justice").

---

[16] The sixth count is brought under a federal statute, 42 U.S.C. § 1983, which – as explained below, ¶¶ 66-67, creates a cause of action against state defendants. Neither federal actors nor non-governmental persons subject to their regulation are proper defendants in such an action.

22.     Under California law, Johnson's four counts of defamation and one count of invasion of privacy for placing him in a false light are considered using the same analysis. *See, e.g.*, *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887 n.1 (9th Cir. 2016) ("Because [plaintiff's] libel and false light claims rely on the same set of facts and require her to prove the same elements relevant to this appeal, we consider the two claims collectively"); *Copp v. Paxton*, 45 Cal. App. 4th 829, 848 (1996) ("[T]he statutory restrictions on a cause of action for defamation apply to an alternative theory of invasion of privacy based on the same facts").

23.     The determination as to whether the Anti-SLAPP law applies is a two-step process. First, the defendant must make a *prima facie* showing that its activities arise from a category of constitutionally protected speech or is conduct that furthers protected speech, including pre-publication acts such as investigating and newsgathering. *See Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 953 (9th Cir. 2013); *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010). Second, if the defendant makes that showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the merits. *See Lockheed*, 190 F.3d at 971.

24.     Johnson's defamation and invasion of privacy claims target Gawker Media's constitutionally protected First Amendment speech rights, and are thus precisely the types of claims California's Anti-SLAPP statute was designed to deter. Furthermore, Johnson is unable to sustain his burden of establishing a likelihood of success on the merits of his claims. Accordingly, the Anti-SLAPP statute bars all of Johnson's California law claims.

**B.      Gawker Media's Articles Are Acts in Furtherance of Free Speech**

25.     Johnson's defamation and invasion of privacy claims stem from three articles Gawker posted online. All of these stories are forms of online speech, which "stands on the same footing as other speech—there is 'no basis for qualifying the level of First Amendment scrutiny

that should be applied' to online speech." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)).

26.    The Anti-SLAPP statute specifically defines the actions that qualify for protection under the statute: any "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1), (e). Among the examples meeting this broad definition are all "written or oral statement[s] or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest." *Id.* § 425.16(e)(3).

27.    All three of the articles cited by Johnson meet this definition. First, they are "written or oral statement[s] or writing[s] made in a place open to the public or a public forum," a phrase that has been interpreted broadly to include all sorts of publications. *See, e.g.*, *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1037-38 (2008) (including newspapers and magazines in the definition); *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 474-80 (2000) (homeowner's association newsletter); *Macias v. Hartwell*, 55 Cal. App. 4th 669, 674 (1997) ("speech by mail" such as a campaign flyer). Courts have specifically included Internet sources within the definition. *See, e.g.*, *Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 950 (2007) ("Web sites accessible to the public are 'public forums' for the purposes of the anti-SLAPP statute"); *see also Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 693-95 (2012) (internet communications among multiple people); *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006) (communications on internet messageboard). Written stories published on an Internet news site, such as Gawker, also qualify. *See, e.g.*, *Reno*, 521 U.S. at 868 (explaining that publishing statements online is fully protected speech, and is analogous to acting as a "town crier" or a "pamphleteer").

28.     The Gawker stories also satisfy the remainder of the § 425.16(e)(3) criteria, in that they were published "in connection with an issue of public interest."  The California Anti-SLAPP statute takes an expansive view of what speech is "in connection with an issue of public interest." The Anti-SLAPP statute "shall be construed broadly."  *Id.* § 425.16(a).   Accordingly, California courts have construed "public interest" in the statute to include "any issue in which the public is interested," including celebrity gossip.  *Nygard, Inc.*, 159 Ca. App. 4th at 1042-43. In other words, matters of "public interest" need not touch on an important issue of social value in order to have broad Anti-SLAPP protection.   Stories about individuals even of dubious celebrity qualify.  *See, e.g.*, *Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337 (2007) (*Celebrity Justice* program about Marlon Brando's housekeeper's inheritance qualified); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798 (2002) ("tabloid" radio show mocking a *Who Wants to Marry a Multi-Millionaire* reality television contestant).

29.     The speech targeted by the Got News Claims falls well within this broad standard. Johnson's own complaint describes that after the Ferguson, Missouri police shooting of Michael Brown, Johnson "began investigating matters relating to the death of Brown, and also the subsequent riots." Compl.¶ 98. These stories were "among the top media stories in the St. Louis, Missouri media market for 2014." *Id.* ¶ 99. The success of the stories caused Johnson and his website to "become a very popular news and opinion website for readers in the St. Louis region," with "an online readership of nearly 83,000 people in Missouri, including at least 37,441 in the St. Louis region."   In short, Johnson himself claims to have "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved," making both his reporting and himself a matter of public interest.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).  The Got News Claims allege that the Gawker articles are retaliatory

stories. Compl. ¶¶ 109-11. In his complaint Johnson essentially claims he is sufficiently synonymous with his business such that statements about him even outside the context of his reporting harm its business and reputation as a matter of course. [17] Accordingly, even if the challenged statements somehow affected Got News in some way independently of Johnson, and they do not, Got News is a public figure to the same extent Johnson is.

30. Courts have routinely held that similarly situated journalists qualify as "limited purpose public figures," justifying public interest in their reporting and relevant personal attributes. *See Adler v. Conde Nast Publ'ns*, 643 F. Supp. 1558, 1565 (S.D.N.Y. 1986) (finding that a magazine writer was a limited purpose public figure who had injected herself into a public controversy through her writing); *Live Oak Publ'g Co. v. Cohagan*, 234 Cal. App. 3d 1277, 1289-90 (1991) (finding managerial newspaper employees to be limited purpose public figures with regard to the operation of their newspaper). In Johnson's case, he regularly interjects himself into public controversies of national importance, threatens journalists who challenge his work, and has been harshly criticized for his character and lack of professionalism by major news outlets, including *The New York Times*, *ABC News*, and *Buzzfeed News*. This clearly makes Johnson a public figure. *See supra* ¶¶ 4-6.

## C. Johnson Cannot Demonstrate a Probability of Success on His Claims

31. The Got News Claims have no probability of success, because they fail as a matter of law for the reasons described in Sections II and III, *infra*.

---

[17] The Debtors note that *all* of the challenged statements are about Johnson and concern Got News by association. Some of the statements concern reporting Johnson has done for other news outlets, and some of the challenged statements do not even discuss Johnson's reporting expressly but rather satirize his reporting style by discussing his low personal reputation. *See* Section II.B, *infra*. Nonetheless, all of the counts in the Complaint formulaically recite that "Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation" without any attempt to differentiate interests. Compl. pp. 48-62.

**II.     The Challenged Statements Are Not Actionable as a Matter of Law**

32.     A statement is actionable as defamation only where "a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." *Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 385 (2004).  Whether a statement is actionable as defamation is a question of law.  *Eisenberg v. Alameda Newspapers, Inc*., 74 Cal. App. 4th 1359, 1382 (1999).  To determine whether a statement is actionable, a court considers the totality of the circumstances.  *Overstock.com, Inc. v. Gradient Analytics, Inc*., 151 Cal. App. 4th 688, 701 (2007).  Under the totality of the circumstances test, both the words and their context must be "understood in a defamatory sense." *Baker v. L.A. Herald Exam'r*, 42 Cal. 3d 254, 260–61 (1986).  Specifically, a court must examine "the nature and full content of the particular communication, as well as the knowledge and understanding of the audience targeted by the publication."  *Overstock.com*, 151 Cal. App. 4th at 701.

33.     Under long-standing defamation law, none of the twelve statements Johnson challenges are actionable.  First, a number of the statements merely present opinions about Johnson's journalistic acumen, which are not actionable either because (i) as opinions they are not provably false assertions of fact or (ii) when framed as conclusions the author has reached, they disclose the sources relied upon by Gawker Media, allowing readers to draw their own conclusions.  Second, a number of the statements are presented not as serious allegations but as humorous rumors that the articles expressly do not adopt, but rather offer as evidence of a broadly-held opinion of Johnson among people in his past.  Finally, the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1), expressly shields Gawker Media from liability for the third-party statements (i.e. reader comments) made on Gawker Media's Kinja platform.  As discussed in Section I, *supra* ¶¶ 22, California courts consider defamation and invasion of

privacy/false light claims as one, so the fifth count of Johnson's complaint falls with his defamation claims.

A. **Four of the Challenged Statements Are Merely Opinions About Johnson's Journalistic Ability, and Are Therefore Not Defamatory**

34. When a publisher presents a mere "opinion it had formed on the basis of the (nonactionable) information it had presented," a defamation suit does not lie. *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1067-68 (9th Cir. 1999). Courts in California have defined "nonactionable opinion" for purposes of libel law as "any 'broad, unfocused and wholly subjective comment." *Eisenberg*, 74 Cal. App. 4th at 1383. The "essential difference between a statement of fact and a statement of opinion is that a statement of fact implies a provably false factual assertion while a statement of opinion does not." *Rodriguez v. Panayiotou*, 314 F.3d 979, 986 (9th Cir. 2002) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). While California distinguishes further between non-actionable opinion and provably false factual assertions, even statements "generally . . . considered as statement[s] of fact may well assume the character of statements of opinion" when published in a "setting in which the audience may anticipate efforts by the parties to persuade other to their positions by use of epithets, fiery rhetoric, or hyperbole." *Manufactured Home Cmtys., Inc. v. Cty. of San Diego*, 544 F.3d 959, 963 (9th Cir. 2008).

35. Four challenged statements are not actionable because they merely represent the opinions of writers J.K. Trotter and Greg Howard about Johnson's journalistic ability:

*[Remainder of this page intentionally left blank]*

| Statement | Paragraph in Complaint | Article | Quote |
|---|---|---|---|
| A | 231(a)(i)(1) | December 9 Trotter Article | "The list of Johnson stories that have been proven wrong is long, but his greatest hits include . . . [e]rroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark." |
| B | 231(a)(i)(2) | December 9 Trotter Article | "…Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The story turned out to be a complete fabrication, and may have been planted by the Cuban government." |
| C | 231(a)(ii) | December 9 Trotter Article | "Earlier this year [Johnson] collected screenshots of murdered teenager Michael Brown's Instagram account. (Quoting Johnson), 'Brown's Instagram account also shows a violent streak that may help explain what led to a violent confrontation with Police officer Darren Wilson,' Johnson wrote. In other words, Brown deserved to die." |
| D | 237(a)(i) | December 9 Howard Article | "[Johnson] gets things wrong *a lot*." |

All of these statements merely assess Johnson's journalistic ability, or offer Trotter and Howard's subjective interpretation of Johnson's writing. For example, Statement A, describing a story written by Johnson with false information in it, characterizes the story as one of Johnson's "greatest hits."

36. When an opinion discloses "all the facts on which it [is] based and [does] not imply that there are other, unstated facts supporting the belief" expressed, it is actionable only to the extent that the disclosed facts are false and defamatory. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 387 (2004). When a story discloses all the facts supporting the opinion of the author, as in the December 9 Trotter and Howard Articles, it is clear that an opinion is all that is being offered, and "readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts." *Id.*; *see also Partington v. Bugliosi*, 56 F.3d 1147, 1156-67 (9th Cir. 1995) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader

free to draw his own conclusions, those statements are generally protected by the First Amendment").

37.     Because Johnson brought "a defamation action against a [media source]" as an individual "suing over statements of public concern," the burden of proving the falsity of *opinion* falls on Johnson. *Phila. Newspapers v. Hepps*, 475 U.S. 767, 768-69 (1986). Because Johnson could not possibly disprove Trotter's characterization of one story over another as a "greatest hit," Statement A is not actionable.

38.     Statement B's description characterization of a story as "infamous" and a "fabrication" is also an opinion, because Gawker Media published the story in a setting in which the intended audience knew full well that Trotter would attempt to persuade his readers to his position "by use of epithets, fiery rhetoric, or hyperbole." *Manufactured Home, Inc.*, 544 F.3d at 963.

39.     Statement C involves Trotter's subjective interpretation of Johnson's journalism. Analyzing Johnson's contention that Michael Brown had a "violent streak that may help explain what led to a violent confrontation" with the police, Trotter interpreted Johnson's article as trying to shift blame for Brown's death onto the victim. In turn, Trotter sensibly reasoned that the subtext of Johnson's article was that "Brown deserved to die." As Johnson and all of Gawker's readers are well aware, Gawker Media published stories critical of public personalities and other media figures, and participated in a genre of media criticism "in which readers expect to find spirited critiques." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 311 (D.C. Cir. 1994). When, as with Statement C, a critical opinion constitutes a "supportable interpretation" of enumerated sources and examples, the statement is protected from a defamation claim. *Id.* at 311-13.

40.     In Statement D, Howard asserting that Johnson "gets things wrong a lot," the words Johnson is objecting to are simply Howard's opinion of Johnson's ability. Statement D is merely the writer's opinion of Johnson's journalistic prowess.  Again the burden would fall on Johnson, *Phila. Newspapers*, 475 U.S. at 768-69.  And Johnson cannot prove the opinion is false, in light of the objective untruth of  at least some of Johnson's so-called journalism, such as his "journalistic assertions" regarding the residence of a sitting United States Senator and the sexual orientation of the President of the United States..

41.     Accordingly, Statements A, B, C and D are merely opinions about the content or caliber of Johnson's journalism and are shielded from any defamation claim.

**B.      Statements Addressing Unsavory Rumors About Johnson Are Not Actionable Because None of the Statements Asserts the Rumors Are True**

42.     Four of the statements forming the basis of the Got News Claims are not actionable because the Gawker Articles simply do not say what Johnson claims—he takes the statements out of context.   Under California law challenged statements must be read in their entire context in order to determine whether they could be defamatory.  *Baker*, 42 Cal. 3d at 260. "[C]ontextual analysis [also] demands that courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed."  *Id.* at 261 (citing *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596, 602-03 (1976)).

43.     Johnson asserts that the Gawker Articles state as a <u>factual</u> matter that he (Johnson) "was involved in a number of unsavory incidents" during his college life.  Compl. ¶¶ 231, 237. What Johnson ignores is the most fundamental context of all: the headlines of the two Gawker stories.  Those stories are from the very outset framed as presenting <u>questions</u> about facts— "Wait, Did Clowntroll Blogger Chuck Johnson [Defecate] on the Floor One Time?" and "Which

of These Disgusting Chuck Johnson Rumors Are True?"  Thus when Johnson challenges the following statements as factual assertions he is taking them out of context:

| Statement | Paragraph in Complaint | Article | Quote |
|-----------|------------------------|---------|-------|
| E | 231(b)(i) | December 15 Trotter Article | "Rumor 1: Johnson [defecated] on the floor in college." |
| F | 231(b)(iii) | December 15 Trotter Article | "Rumor 3: Johnson [fornicated with] a sheep." |
| G | 237(a)(ii)* | December 9 Howard Article | "Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor [defecating] incident." |
| H | 237(b)* | December 9 Howard Article | "Tell you what.  There is some good-ass kinja to be had re: Chuck [defecating] on the floor one time over at Gawker." |

Questions alone are not actionable, because "it is generally settled as a matter of defamation law" that "a question, 'however embarrassing or unpleasant to its subject, is not an accusation.'" *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993)).  By their very nature, "[q]uestions indicate a defendant's 'lack of definitive knowledge about the issue.'"  *Id.* (quoting *Partington*, 56 F.3d at 1157).  The two articles are merely asking questions, and are therefore not defamatory.

44.     Statements E and F are not actionable for another reason; the article in which they appear does not assert the rumors as fact.  Rather, it explicitly identifies them as "very unbelievable" rumors and repeatedly encourages the reader not to believe them.  As Johnson himself states in the Complaint (Compl. ¶¶ 184-85), the December 15 Trotter Article clearly states, when discussing the challenged rumors:

1. "Verdict: There is **no evidence** that Chuck Johnson [defecated] on the floor in college.

2. Verdict: There is **no evidence** that Chuck Johnson was arrested in 2002 for pinning a sheep to a fence and [fornicated with] it.

Ex. 6, December 15 Trotter Article.

45.     The article containing Statements E and F even further suggests that the rumors are fabricated. As described above, the article offers these statements merely to support the conclusion the Johnson is an unpleasant person so thoroughly disliked that individuals will make up rumors about him out of spite.  Ex. 6 December 15 Trotter Article (*see, e.g.,* "Johnson is, however, the **kind of guy** about whom random people make up and circulate rumors about him being arrested in 2002 for pinning a sheep to a fence and [fornicating with] it.") (emphasis in original). Johnson may not like this assessment of his character, but it is nonetheless nonactionable opinion. As the California Supreme Court has observed, "[t]he First Amendment protects even sharp attacks on the character, motives, or moral qualifications." *Okun v. Super. Ct. of L.A. Cty.*, 29 Cal. 3d 442, 451, 629 P.2d 1369, 1374 (1981).

46.     Statement G similarly cannot be "understood in a defamatory context" as it merely reflects a *location* of unsavory rumors about Johnson that he himself does not dispute exist. And Johnson acknowledges that he himself brought up the rumor in an email conversation with Mr. Howard, just as the December 9 Howard Article described. Compl. ¶¶ 149-51. Johnson concedes in his complaint that the December 9 Howard Article is substantially true insofar as these rumors were being asserted by third parties on the day in question. That alone is enough to make Statement G nonactionable. *See Gantry Const. Co. v. Am. Pipe & Const. Co.*, 49 Cal. App. 3d 186, 194 ("The concept that it is the gist or sting of the alleged defamatory statements that must be false rather than the specific details of the charge is deeply rooted in our common law."). Nowhere in the article does Mr. Howard adopt the rumors as accurate, and indeed, as discussed above, the title of the article is posed as a question.

47.     Finally, Statement H is nonactionable as a humorous statement not meant to be taken as an assertion that the allegations regarding Johnson's purported public defecation or bestiality are true. Further, as Johnson himself essentially alleges, the statement is merely a humorous way of saying there are some entertaining reader comments. Compl. ¶ 158 (alleging that the phrase "good-ass kinja" refers to "high quality reader comments that readers, content creators and others would be advised to view). Whether certain statements are entertaining or "high quality" is unquestionably a matter of opinion and therefore nonactionable for the reasons explained in Section II.A.

**C.     Four of the Challenged Statements Are Third Party Statements, and Gawker Is Protected from Liability by the Communications Decency Act**

48.     Section 230 of the CDA states that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and that "[n]o cause of action may be brought" nor any "liability . . . imposed under any State or local law . . . inconsistent with" this section.  47 U.S.C. §§ 230(c)(1), (e)(3).  Courts have routinely immunized websites that host or publish third-party content from defamation liability based on this provision of the CDA.  *See, e.g.*, *Johnson v. Arden*, 614 F.3d 785, 790-92 (8th Cir. 2010); *Zeran v. AOL, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *S.C. v. Dirty World, LLC*, No. 11-CV-00392-DW, 2012 WL 3335284, at *4 (W.D. Mo. Mar. 12, 2012); *M.A. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).

49.     The following challenged statements are not actionable because they were made by third parties on a website hosted by Gawker Media, who is protected by the CDA, 47 U.S.C. § 230(c)(1), from any liability for the statements of third parties taking advantage of Gawker Media's interactive web forum:

| Statement | Paragraph in Complaint | Article | Quote |
|---|---|---|---|
| I | 231(b)(ii)(1) | Comment to December 15 Trotter Article | "Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm). I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems." |
| J | 231(b)(ii)(2); 237(b)(ii)(1) | Comment to December 15 Trotter Article | "I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassmen talked about it regularly and it was an undisputed fact that he did it. Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people taking about it can be seen in the comment archives from 2008-2011." |
| K | 231(b)(iv)(1) | Comment to December 15 Trotter Article | "Chuck had a 2002 bestiality charge expunged from his record due to his being a minor, 14 at the time." |
| L | 231(b)(iv)(2) | Comment to December 15 Trotter Article | "A friend is in the San Bernardino County Sherriff Dept. As I heard it, Chuck was about 14, had gone to stay with his cousins [for] a few weeks. . . He went for a weekend with one to a friend of the cousin's who owned a ranch near Wrightwood. The father of the friend got suspicious when they caught him coming back inside very late in the first night. The next night, he apparently wandered back out & got the cops called on him by a neighbor when he was spotted attempting to copulate with his wool sheep. The neighbor took pics with a telephoto lens, which, since the cops didn't catch him mid-act, were used as the basis for his conviction. He was pants down pinning the sheep against the fence. The story is still famous in circles of San Bernardino County law enforcement, apparently. He got it expunged in 2007, saying he was just a kid experimenting, and he didn't want it to reflect badly when he was in college working for collegiate newspapers. My friend won't give interviews, because he'd get in trouble for leaking expunged records, but it definitely happened, and word is that the files & pics still exist. Hope that helps!!" |

50.     As a leading case construing Section 230 explained:

> By its plain language, **§ 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.** Specifically, § 230 precludes courts from entertaining claims that would place a computer service

provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.

*Zeran*, 129 F.3d at 330. Gawker Media enjoys immunity for Statements I, J, K, and L, under the statute because its website and Kinja software "enable[] computer access by multiple users to a computer sever," clearly establishing Gawker Media as an "interactive computer service" provider entitled to protection under the CDA. 47 U.S.C. § 230(f)(2). Simply put, Gawker Media cannot be liable for statements made on their website, even defamatory ones for which Johnson would have a claim against the speaker, if those claims "originate[d] with . . . a third-party user." *Zeran*, 129 F.3d at 330. Here, it is undisputed that all four statements were made by Gawker readers rather than Trotter or other Gawker Media staff, making the statements nothing more than third-party content hosted by Gawker Media. Therefore, the statements fit precisely within the protections of the CDA, and eliminate any defamation liability to Gawker.

> **D.** **Plaintiff's False Light Claim Fails as a Matter of Law**

51. Because Johnson's defamation claim is not actionable, his false light claim fails as well. As discussed, *supra* ¶ 22, the same analysis applies to evaluate defamation and various kinds of invasion of privacy claims, such as false light. *See, e.g.*, *Seelig*, 97 Cal. App. 4th at 798 ("Since all of plaintiff's causes of action arise from and depend upon her claims of defamation, the motion to strike should have been granted as to her entire complaint."); *Blatty v. N.Y. Times Co.*, 42 Cal. 3d. 1033 (1986) (noting that the First Amendment's "zone of protection for the press" is "not peculiar to [defamation] actions but apply to all claims whose gravamen is the alleged injurious falsehood of the statement," including false light).

52. Johnson's complaint demonstrates the justification for treating these torts in unison, explicitly linking the false light claim to his defamation claims by asserting that "[a]s a

direct result of the publication of the statements described in Counts I-IV," the defamation counts, Johnson has suffered the exact same reputational damage, emotional injury, and pecuniary injury to his business interests he claims were caused by Gawker Media's alleged defamation. Compl. ¶¶ 236-37. Because Johnson's defamation claims fail, his false light claim necessarily fails as well.

53. Additionally, Johnson's false light claim is not actionable when asserted on behalf of Got News because corporations cannot maintain such a claim. Corporations do not have the privacy interests that torts, such as false light, are designed to protect for individuals. False light is intended specifically to redress attacks to a person's character, feelings, and peace of mind. *Ion Equipment Corp. v. Nelson*, 110 Cal. App. 3d 868, 878 (Cal. App. 1st 1980). Because "[a] corporation is a fictitious person . . . [it] has no 'feelings' which may be injured in the sense of the tort." *Id.* Accordingly, Got News' false light claim is also not actionable.

## III. Johnson's Defamation and False Light Causes of Action Fail Because He Has Not Plausibly Alleged That Gawker Media Acted with "Actual Malice"

54. Even if any challenged statements were actionable, which for the reasons explained above they are not, Johnson's Complaint fails to state a claim because he has failed to allege that Gawker Media acted with actual malice, as is required by the First Amendment. As someone who regularly publishes, provides commentary in, and serves as the subject of national news stories, under First Amendment law Johnson is an all-purpose public figure, and at the very least a limited-purpose public figure. Thus, statements about Johnson are protected from liability by the First Amendment unless they are made with "actual malice" – that is, with the knowledge that they are false or with reckless disregard for their truth or falsity. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). For his complaint to survive a motion to dismiss, Johnson bears the burden of plausibly pleading actual malice. *Biro v. Conde Nast,* 807 F.3d 541, 546 (2d Cir.

2015) (allegations of actual malice must be plausibly pled to survive a motion to dismiss). Johnson not only fails to plead any facts to support a finding of actual malice, but in fact pleads facts that would negate any such finding. Accordingly, his claims for defamation and false light must be dismissed.

### A. Johnson Is an All-Purpose Public Figure as a Matter of Law

55. The law affords different levels of protection from suits by defamation plaintiffs, based on the plaintiff's ability to counteract false statements. *Gertz*, 418 U.S. at 344. Public figures assume a place on the public stage and thus, "run the risk of closer public scrutiny." *Id.* In addition, they also have "significantly greater access to the channels of effective communication" to correct falsehoods against them. *Id.* As a result, the state interest in protecting them is accordingly lower. *Id.* Whether a person is a public figure is a "question of law for the court to decide." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000). Courts recognize two types of public figures: all-purpose and limited-purpose. *Gertz*, 418 U.S. at 345. Plaintiffs are properly classified as all-purpose public figures based on "the notoriety of their achievements or the vigor and success with which they seek the public's attention." *Id.* at 342.

56. Johnson is an all-purpose public figure based on the public record and the facts alleged in the Complaint. Aside from publishing on Got News and on other media outlets, Johnson holds himself out as a media celebrity on the Got News website. Gotnews.com regularly engages in media criticism, aiming "to transform journalism."[18] Johnson alleges that his site became "a very popular news and opinion website" and that his "brand, good will and website traffic, all surged" following his reporting on Brown's death. Compl. ¶¶ 109-10.

---

[18] *See About*, GotNews, *available at* http://gotnews.com/about.

Johnson has appeared on Fox News, including with Megyn Kelly, Sean Hannity, and Lou Dobbs, and has participated on numerous radio programs, including with Rusty Humphries, Dennis Prager, Larry Elder, and Mark Levin.[19]

57. Courts regularly find journalists and other media personalities to be public figures. *See, e.g.*, *Buckley v. Littell*, 539 F.2d 882, 885–86 (2d Cir. 1976) (describing political commentator and media personality as "a public figure for all purposes and in the classic sense" of Supreme Court precedent); *Diaz Rodriguez v. Torres Martir*, 394 F. Supp. 2d 389, 393 (D.P.R. 2005) (host of programs on Univision Television Network was a general purpose public figure); *Braden v. News World Commc'ns, Inc.*, No. CA-10689'89, 1991 WL 161497, at *9 (D.C. Super. Ct. Mar. 1, 1991) (former co-host of television program "Crossfire" was a general purpose public figure). Furthermore, as the complete identity between the claims asserted and statements challenged by Johnson and those asserted and challenged by Got News in the Complaint demonstrates, Got News is a public figure to the same extent Johnson is. Johnson cannot assert that his reputational concerns are identical to that of his business and then claim that public perceptions significantly differ between the two.

**B. Gawker Media's Statements Criticizing Johnson and Got News for Their Approach to Journalism Merit Additional First Amendment Protection**

58. Not only is Johnson an all-purpose public figure as a media celebrity, he and his business are also a limited-purpose public figures to the extent that he regularly thrusts himself into public controversies by reporting on them. *Gertz*, 418 U.S. at 345 (1974); *see also* **Nadel v. Regents of Univ. of Cal.**, 28 Cal. App. 4th 1251, 1263–64 (1994) (affirming public figure status for protesters who had "thrust themselves to the forefront" of a controversy); a plaintiff is a limited-purpose public figure if he has "(1) successfully invited public attention to his views in

---

[19] *See* About, GotNews, http://www.gotnews.com/about/ (last visited Oct. 28, 2016).

an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Biro v. Condé Na*st, 622 Fed. App'x 67, 69 (2d Cir. 2015) (citing *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-37 (2d Cir. 1984)). As a media figure who touts his own wide readership as a product of his success countering the "hackneyed narrative[s]" of more traditional media outlets (Compl. ¶ 109), Johnson is unquestionably a public figure for the purposes of the stories upon which he reports. *Adler*, 643 F. Supp. at 1565 (S.D.N.Y. 1986) (finding that a magazine writer was a limited public figure who had injected herself into a public controversy through her writing). Johnson's journalism includes political topics of public interest and debate, including the Mississippi Senate Republican primary race, United States Senator Robert Menendez, and the Ferguson, Missouri police shooting of Michael Brown. Compl. ¶¶ 122, 98-101, 127.

59.     "[C]omments regarding a limited purpose public figure are subject to heightened scrutiny only to the extent that they are relevant to the public figure's involvement in a given controversy." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013). Yet, "once a plaintiff is deemed a limited purpose public figure, courts allow the heightened protections to sweep broadly, covering all statements by defendants that are not 'wholly unrelated to the controversy.'" *Id.* (citing *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980)). Courts take a view of "relevance' broad enough to reveal whether the statement might affect public opinion without discriminating based on the reasons why." Id. (citing *Kisser v. Coalition for Religious Freedom*, No. 92 Civ. 4508, 1995 WL 3996, at *2 (N.D.Ill. Jan. 5, 1995)).

60.     Accordingly, statements regarding the accuracy of Johnson's reporting on subjects of public controversy are protected by the First Amendment unless they are published with actual malice. Therefore, none of Statements A through D, which Johnson challenges as having asserted his reporting is inaccurate, can support a claim unless Johnson sufficiently alleges they were made with reckless disregard for the truth. As discussed below, he has failed to do so.

61.     Furthermore, none of the statements regarding rumors of Johnson's alleged defecation or bestiality are actionable, because they are part of a satirical commentary on Johnson's brand of "journalism" and are thus related to the controversies on which Johnson reports. Johnson's stock in trade involves identifying figures he dislikes in the news pursuant to public controversies and publishing embarrassing stories about them that have questionable factual bases. The Michael Brown story, which Johnson describes at length in the Complaint, is one such example. After Brown's death, Johnson traveled to St. Louis and published stories regarding Brown's juvenile criminal record and Johnson's battle to have it unsealed. Compl. ¶¶ 98-109. Johnson pursued these records after hearing a rumor from law enforcement officials that Brown had been involved in a murder in his youth, but this rumor was never substantiated as the records were never unsealed. *Id.* According to Johnson his purpose in publishing these stories regarding rumors about Brown was to combat the "hackneyed narrative" pushed by other media outlets reporting on the subject. *Id.* ¶ 109. The incident detailed in the complaint is part of a pattern of behavior on Johnson's part that includes wrongfully asserting that New York Times reporter posed for *Playgirl* magazine[20] and publicly misidentifying a woman as the alleged perpetrator of a rape hoax.[21]

---

[20]*See* Ex. 4, December 9 Trotter Article; s*ee also* David Weigel, *Daily Caller Cites 24-Year-Old Fake Princeton Newspaper to Attack NYT's Benghazi Report*, Slate, Jan. 6, 2014, *available at*

62.    In order to satirize Johnson's practice of reporting rumor as fact, Gawker articles discussed rumors about Johnson, expressly framed as questions and as part of a describing Johnson's *modus operandi*. Both of the articles discussing the rumors are framed around a discussion of the quality of Johnson's reporting. The December 9 Howard Article precedes its discussion of the rumor with a discussion of Johnson's "lack of skill in reporting" and Johnson's publication of the photo of a woman that Johnson wrongfully alleged had perpetrated a rape hoax. Ex. 5, December 9 Howard Article. The article then reported on Johnson's own discussion of the rumor of Johnson's public defecation.  The article then asks for further information from readers since "it's more important than ever to fact check." This was plainly satire.

63.    So too is the December 15 Trotter article. The article prefaces its discussion of the rumors about Johnson as "very unbelievable" but goes on to discuss them "[g]iven Johnson's various struggles with accuracy and his dogged pursuit of a *Times* reporter's teenage misdemeanor."  Ex. 6, December 15 Trotter Article. The article then satirically forms an opinion that the rumors Johnson complains of are a result of how broadly disliked he is.  Johnson would be the first to assert that his unconventional brand of journalism should be considered a matter of public interest. [22] He must therefore accept attendant criticism, including publication of the Gawker Articles' satire, that comes with his public role in such affairs.  Defamation and other torts require, in this circumstance, factual falsehoods (not mere opinion or questions) and actual malice.

---

http://www.slate.com/blogs/weigel/2014/01/06/daily_caller_cites_24_year_old_fake_princeton_newspaper_to_attack_the_nyt.html

[21] *See* Ex. 5, December 9 Howard Article; Charles C. Johnson, *Corrected… #JackieCoakley Retweeted Slut Walk 2011*, Got News,  Dec. 9, 2014, *available at* http://gotnews.com/breaking-fraud-jackiecoakley-cried-rape-uvahoax/ (printing correction of misidentification).

[22] *See About*, GotNews, *available at* http://gotnews.com/about (complaining of "the lack of serious investigative journalism, and the adversity to risk of the national media" and inviting readers to "join the revolution and change the world).

### C.   Johnson Has Failed to Plausibly Allege Actual Malice

64.    Courts impose a higher standard when a general-purpose or limited-purpose public figure brings a claim for defamation.  *Celle*, 209 F.3d at 176.  Public figures must plead "actual malice" – a term of art meaning that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times Co.*, 376 U.S. at 279-80.  "Reckless disregard" is a subjective standard that focuses on the speaker's actual state of mind.  The test is whether the defendant made the challenged statements with a "subjective awareness of [their] probable falsity."  *Lerman*, 745 F.2d at 138.  To that end, even failure to investigate before publishing does not meet the heightened standard of actual malice unless the publisher has purposely avoided the truth.  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

65.    Not only is "[p]roving actual malice [] a heavy burden" on its own, but also the seminal decisions regarding pleading standards (*Iqbal* and *Twombly*) apply at the outset of the action and require more than conclusory pleading, as well as detail and plausibility regarding, the actual malice requirement.  *Biro*, 963 F. Supp. 2d at 278.  *Iqbal* holds that "where a particular state of mind is a necessary element of a claim, defendant's pleading of that state of mind must be plausible and supported by factual allegations."  *Id.* (citing *Iqbal*, 556 U.S. at 686-87).  As a result, courts will dismiss claims for defamation where the allegations of actual malice are merely conclusory.  *See, e.g.*, *Egiazaryan v. Zalmayev*, No. 11 Civ. 2670 (PKC), 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011); *Schatz*, 669 F.3d at 56 (explaining that "actual-malice buzzwords" are insufficient to sustain a defamation claim); *Biro*, 807 F.3d at 544 ("naked assertions" or "conclusory statements" are not enough).

66.     Johnson's sole allegations of malice are that that the Articles are false, misleading, injurious, and "intrinsically malicious and defamatory."  Compl. ¶¶ 178, 183.  These are nothing more than conclusory "actual-malice buzzwords" unsupported by any well-pled facts.  *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012).  Johnson alleges that, with respect to the December 15 Article, Trotter had "serious reason to believe [the rumors] are false."  *Id.* at 192.  Yet, Johnson alleges no facts to suggest Gawker Media's "subjective awareness" of the alleged falsity.  To the contrary, the Complaint indicates that Gawker Media investigated the facts before publishing the Articles.  For example, before publishing the December 9 Howard Article, Howard emailed Johnson multiple times to determine whether Howard's information was "accurate" and provided Johnson opportunity to comment.  Compl. ¶¶ 149, 152, 177.  Trotter reviewed and then posted links to other articles or source material so that readers could draw their own conclusions.  *See* Compl. ¶¶ 28, n.1-2, 145, 146.[23]  Thus, the complaint and the articles on their face negate any plausible inference of malice.  Therefore Johnson's defamation and false light causes of action must be dismissed.

**IV.     Johnson Fails to Allege a Section 1983 Conspiracy Because Congress May Constitutionally Limit Liability of Information Content Providers, and Neither Congress Nor Gawker Media Is a State Actor Within the Meaning of Section 1983**

67.     Johnson's Section 1983 count is an attempt (indeed a bizarre one) to turn an important and critical congressionally-enacted safe harbor, designed to prevent out-of-control litigation arising from internet communications, into some kind of implied, affirmative cause of

---

[23] To the extent the Complaint alleges that Gawker Media published unrelated defamatory articles against David Geithner, James Franco, and Charles Barkley, such allegations are irrelevant here.  Compl. ¶¶ 48, 69.  In order to show actual malice, Johnson must show that a *specific statement* was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times Co.*, 376 U.S. at 279-80.  Courts have rejected more general efforts to insinuate "that a failure to follow professional journalism standards . . . constitutes actual malice," as courts do not "sit 'as some kind of journalism review seminar offering our observations on contemporary journalism and journalists.'"  *Fletcher v. San Jose Mercury News*, 216 Cal. App. 3d 172, 187 (1989) (quoting *Tavoulareas v. Piro*, 718 F.2d 762, 796 (D.C. Cir. 1987)); *see also Harte-Hanks Comm., Inc.*, 491 U.S. at 666 ("[T]here is no question that public figure libel cases are controlled by the *New York Times* standard and not the professional standards rule, which never commanded a majority of this Court").

action.   His Section 1983 "civil rights" claim is premised on the limitations Section 230 of the Communications Decency Act (CDA) place on his claims.   Section 230 provides a safe harbor: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."   This is not an affirmative right enjoyed by Johnson; rather, it protects Gawker from being liable for reader comments.

68.     Perhaps more fundamentally, in order to state a claim under 42 U.S.C. § 1983,[24] there must be an underlying predicate of "state action" – not action by private persons or the federal government.   Johnson must show that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) (emphasis added).   Section 230 of the CDA is a federal statute enacted by Congress, and Section 1983 "does not apply to any federal government entity or to federal officials acting under the color of federal law." *Halim v. Donovan*, 951 F. Supp. 2d 201, 208 (D.D.C. 2013) (citing *Settles v. United States Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005)) (emphasis added). Courts have dismissed similar Section 1983 claims filed by *pro se* litigants on exactly these grounds. *See, e.g.*, *Williams v. Tuscaloosa Veterans Affairs Med. Ctr.*, No. 7:16-CV-00263-RDP, 2016 WL 3087046, at *5 (N.D. Ala. June 2, 2016).

69.     Johnson's misconception regarding state action aside, he has failed to articulate a cognizable right of which he has been deprived.   Nothing in the Fourteenth Amendment restricts Congress from limiting liability of online content providers for user content posts, as Johnson

---

[24] The cause of action for conspiracy to deprive civil rights is actually established by 42 U.S.C. § 1985.  However, because a claim under Section 1985 is contingent on an underlying violation of Section 1983, *Caldeira v. Cty. of Kauai*, 866 F.2d 1175, 1182 (9th Cir. 1989), the Debtors address Johnson's cause of action under the statutory provision he has pleaded.  Under either analysis, Johnson's claim fails.

appears to allege. Compl. ¶ 235.[25] Even if it did, section 1983 would not provide him with a remedy against the Debtors for asserting the CDA as a defense to libel actions like his.

70. The 1983 count reflects that the only grievance Johnson has is regarding reader comments. Congress has made clear that Gawker may not be held liable for those comments. That was Congress's choice to make, but it reflects Congress's belief that publishers should not be punished for facilitating free and open communications on the Internet. Congress was thus acting to protect the constitutional rights of persons like Gawker. The only way that section 1983 would be relevant here is if state tort law (i.e., defamation and false light claims) were used to deprive *Gawker* of its constitutional rights by seeking to punish it for the articles it published.

## V.    The Defamation and False Light Claims Against GMGI and Gawker Hungary Are Time-Barred Under the Applicable California Statute of Limitations

71. Got News filed its Claims in these chapter 11 cases against each of the Debtors – Gawker Media, GMGI, and Gawker Hungary. *See* Claim Nos. 53, 202, and 298. The Claims incorporate the Complaint filed by Johnson and his co-plaintiff Got News in the Superior Court of California on December 9, 2015. In the Complaint, Johnson alleges causes of action against only Gawker Media for defamation, and invasion of privacy - false light. *See* Compl. ¶¶ 226-240. The Complaints failed to name GMGI and Gawker Hungary as defendants and thus the Claims filed against them in Bankruptcy Court must therefore be disallowed. Since the applicable statute of limitations for all Causes of Action alleged in the Complaints expired in

---

[25] The case cited by Johnson in his complaint, *Zinermon v. Burch*, 494 U.S. 113 (1990), held that allegations in a mental patient's complaint that employees at a **state** mental treatment facility admitted him as a voluntary patient without taking any steps to ascertain his mental competency were sufficient to state a claim. It in no way establishes that Johnson has a "right to file a defamation lawsuit under the Fourteenth Amendment of the United States Constitution" as Johnson appears to assert. *See* Compl. ¶ 235.

December 2015, Johnson may not now seek recovery from GMGI or Gawker Hungary – since he failed to bring claims against those entities within the statute of limitations.[26]

72. In California, causes of action for libel and defamation have a one year statute of limitations, which begins to run "on the date of publication." Cal. Code Civ. Proc. § 340 (statute of limitations for libel and slander); *see also Shively v. Bozanich*, 31 Cal. 4th 1230, 1247 (2003) (barring claim for defamation filed at least one year and one day after publication of alleged defamatory statement). The same limitation period applies to Johnson's claim for invasion of privacy/false light. *Fellows v. Nat'l Enquirer, Inc.*, 42 Cal. 3d 234 (1986) (statute of limitations for defamation applicable to claim for false light).

73. The Complaints allege that on December 9, 2014 and again on December 15, 2014, defendants published "three defamatory articles" about Johnson and Got News. Complaints ¶¶ 118, 229, 231. Because the causes of action for defamation and false light alleged in the Complaint are subject to a one year statute of limitations, they expired no later than December 15, 2015. Accordingly these causes of action fail to support Johnson's claim against GMGI and Gawker Hungary.

## VI. This Court Can Fully Adjudicate the Got News Claims Because They Are Not Personal Injury Tory Claims, and Can Be Resolved Prior to Trial

74. This Court can fully adjudicate disallowance of the Got News Claims, which assert causes of action for defamation and related torts, because they are not personal injury tort claims within the meaning of 28 U.S.C. 157(b). Core proceedings include allowance or disallowance of claims against the estate, except "the liquidation or estimation of contingent or

---

[26] Even if Johnson had named GMGI and Gawker Hungary in the Complaints, they would not be proper defendants for the defamation, invasion of privacy, or Section 1983 claims. While Gawker Media publishes web content on its sites, including the allegedly "defamatory" articles at issue in the Complaints, neither GMGI nor Gawker Hungary is involved with publishing decisions or front-end production. *See* First Day Decl. ¶¶ 10-15 (Dkt. No 7). Further, nowhere in his complaint does Johnson mention GMGI or Gawker Hungary as business entities, much less allege any facts that would support liability for any claim.

unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution." 28 U.S.C. § 157(b)(2)(B). The Bankruptcy Code does not define what constitutes a "personal injury tort claim," and therefore court decisions have delineated the scope of that term.

75. Courts in this District have taken two different approaches on this question, but the Got News Claims do not fall within either definition of "personal injury claim." At least three decisions in this District have adopted a so-called "narrow view," limiting personal injury tort claims to those that involve a "trauma or bodily injury." *Vinci v. Town of Carmel (In re Vinci)*, 108 B.R. 439, 442 (Bankr. S.D.N.Y. 1989) (Schwartzberg, J.) (a tort without trauma or bodily injury is not within the statutory exception for a personal injury tort); *Perino v. Cohen (In re Cohen)*, 107 B.R. 453, 455 (S.D.N.Y. 1989) (Brieant, J.) (same); *Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey)*, 194 B.R. 728, 734 (S.D.N.Y. 1995) (Keenan, J.) (adopting a narrow view to find that legal malpractice does not constitute a personal injury claim).

76. More recently, Judge Glenn adopted a so-called "hybrid approach" to decide this issue with respect to proofs of claim for intentional infliction of emotional distress. He conducted a "searching analysis" into the specifics of each claim that asserts "the invasion of personal rights" for "earmarks of a financial, business or property tort claim, or a contract," with claims ultimately characterized primarily as "a financial, business or property tort claim" disqualified from being treated as a "personal injury tort claim." *In re Residential Capital, LLC*, 536 B.R. 566, 572, 575 (Bankr. S.D.N.Y. 2015) ("*ResCap*"). The *ResCap* court concluded that it had core jurisdiction to determine the disallowance of proofs of claim asserting intentional infliction of emotional distress arising from the servicing of home mortgages. *Id.* at 575.

77. The Got News Claims do not qualify as a personal injury tort claim under either (a) the *Vinci/Cohen/Finley-Kumble* line of decisions or (b) the *ResCap* approach. The Got News Claims (all of which incorporate the complaint filed in Johnson's defamation action) allege three causes of action against Gawker Media: defamation, false light, and conspiracy to interfere with civil rights under 42 U.S.C. § 1983 for depriving Johnson and his business of "their right to file a defamation lawsuit under the Fourteenth Amendment of the United States Constitution." Compl. ¶ 235. None of the causes of action asserted by Johnson involves "trauma or bodily injury." *E.g.*, *Vinci*, 108 B.R. at 442.

78. The Got News Claims also bear the "earmarks of a financial, business or property tort claims, or a contract claim" and are therefore not a personal injury tort claim. *ResCap*, 536 B.R. at 572. Here the claim asserted is *on behalf of Johnson's business,* and many of the challenged statements criticize Johnson's conduct in the operation of that business. Leaving aside the matter of whether a business can even be subject to personal injury within the meaning of the *ResCap* approach, Johnson makes no effort to identify any sort of non-purely economic harm that Got News has suffered by virtue of the challenged statements. In each count recited in the complaint, Johnson alleges that "Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost business investments, due to damaged business reputation." Compl. ¶¶ 237, 239, 240, 246.[27] Johnson repeatedly asserts only generally that his "business has been placed in jeopardy" by virtue of the challenged statements. Compl. ¶¶ 236, 238, 239, 245. While Johnson makes passing reference to damaged reputation and "emotional injury," neither humiliation nor lost reputation suffered in conjunction with harm to one's business constitute a personal injury tort for purposes of bankruptcy

---

[27] Debtors note that the paragraphs in Johnson's complaint revert from number 247 to 232 on page 58. The relevant statements cited above are on pages 53, 58, 59, and 62

jurisdiction, and neither of those injuries are suffered by Got News. *ResCap*, 536 B.R. at 576. Numerous other courts have held that defamation is not a personal injury tort claim when asserted as a proof of claim in bankruptcy. *Massey Energy Co. v. W. Va. Consumers for Justice,* 351 B.R. 348, 351 (E.D. Va. 2006) (defamation and business conspiracy are not personal injury tort claims); *Mitan v. Davis (In re Davis)*, 334 B.R. 874, 878 n.2 (Bankr. W.D. Ky. 2005) (core jurisdiction over objection to proof of claim based on alleged defamation contained on website), *aff'd in part, rev'd in part on other grounds sub nom. Davis v. Mitan (In re Davis)*, 347 B.R. 607 (W.D. Ky. 2006).[28]

79. The same is true for the other two torts that the Got News Claims allege against the debtors--false light and violation of section 1983--because they are similarly based on business concerns and otherwise fail to allege any sort of physical injury to Got News as a corporate person.[29] Simply put, a claim for emotional distress damages not arising out of physical injury is not a "personal injury tort claim." *ResCap*, 536 B.R. at 576; *see In re Atron Inc. of Mich.*, 172 B.R. 541 (Bankr. W.D. Mich. 1994) (civil rights complaint alleging damages for mental and emotional distress does not qualify); *Priest v. Interco, Inc. (In re Interco, Inc.)*, 135 B.R. 359 (Bankr. E.D. Mo. 1991) (age discrimination complaint alleging emotional distress does not qualify).

80. In any event, Section 157(b)(2) does not make all determinations regarding disallowance of personal injury tort claims into non-core proceedings. A bankruptcy court can "summarily dispose of claims which have no basis in law." *See In re Chateaugay Corp.*, 111

---

[28] The Supreme Court of the United States has considered, but declined to decide (on waiver grounds), whether a defamation claim is a personal injury tort claim under section 157(b)(2). *Stern v. Marshall*, 564 U.S. 462, 479 (2011).

[29] The Debtors note that Got News as a corporation is not subject to the emotional injury Johnson himself alludes to passingly. *Ion Equipment Corp. v. Nelson*, 110 Cal. App. 3d 868, 878 (Cal. App. 1st 1980) (noting that corporations have no feelings that can be injured in the sense of the tort of false light).

B.R. 67, 76 (Bankr. S.D.N.Y. 1990), *aff'd, sub nom. LTV Corp. v. Valley Fid. Bank & Tr. Co. (In re Chateaugay Corp.)* 130 B.R. 403 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 961 F.2d 378 (2d Cir. 1992), *aff'd,* 146 B.R. 339 (S.D.N.Y. 1992). This reflects that only "liquidation" and "estimation for purposes of distribution" are non-core, requiring a district court to enter final orders. Section 101(5) of the Bankruptcy Code indicates that "claims" fall into different categories, and the statutory language of Section 157(b)(2) is clear that only determination of the "liquidated-unliquidated" distinction is non-core.[30] Thus, a bankruptcy court can determine, as a core proceeding, the issue of whether the claim is "disputed-undisputed," in the language of section 101(5) of the Bankruptcy Code. Of course, if the claim objection cannot be resolved as a matter of law at the outset or on summary judgment, a creditor asserting a personal injury tort claim has a right to a trial (if a trial is necessary) in the district court. But this is under the separate <u>venue</u> provision of Section 157(b)(5). *See Stern*, 564 U.S. at 479 (section 157(b)(5) concerns mere venue, is not jurisdictional, and therefore can be waived). Thus, "a finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim." *In re Chateaugay,* 111 B.R. at 76-77.

81.     Finally, to the extent that this Court concludes that any portion of dispositive pre-trial rulings or the objection to any particular cause of action is a non-core proceeding, this Court must conduct those pretrial proceedings in the first instance. Pursuant to Section 157(c)(1), this Court must hear the proceeding and submit proposed findings of fact and conclusions of law to the district court. *See Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2174-75 (2014) (construing statute to apply Section 157(c)(1) to any proceeding for which the bankruptcy court cannot enter final orders).

---

[30] If instead there is to be an estimation of a personal injury tort claim under section 502(c) of the Bankruptcy Code, that necessarily incorporates both a determination of the amount of the claim ("liquidation") and the probability of there being liability ("disputed" claims).

**RESERVATION OF RIGHTS**

82.     Neither the filing of this Objection nor entry of the Proposed Order shall affect any rights of the Debtors, their estates, any estate representative, or any other party in interest in these Chapter 11 cases to object this or any other claim for any purposes, including, without limitation, allowance and distribution under a plan, or any rights of the holders of any Claim to contest any objection.

**NOTICE**

83.     Notice of this Objection has been provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Simpson Thatcher & Bartlett LLP, counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (iii) Latham & Watkins LLP, counsel to US VC Partners LP, as Second Lien Lender; (iv) John C. Burns, Esq., counsel to the Claimant; and (v) all parties requesting notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that further notice of this Objection is neither required nor necessary.

[*Remainder of this page intentionally left blank*]

WHEREFORE, for the reasons set forth herein, Gawker Media respectfully request that the Court (a) enter the Proposed Order, and (b) grant such other and further relief as may be just and proper.

Dated: October 31, 2016
      New York, New York

_/s/ D. Ross Martin_

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Peter Walkingshaw (admitted _pro hac vice_)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

_Counsel to the Debtors_
_and Debtors in Possession_

**<u>EXHIBIT 1</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                              :
In re                                         :        Chapter 11
                                              :
Gawker Media LLC, *et al.*,[1]                :        Case No. 16-11700 (SMB)
                                              :
                      Debtors.                :        (Jointly Administered)
                                              :
-------------------------------------------------------x

### ORDER GRANTING DEBTORS' OMNIBUS OBJECTION TO PROOFS OF CLAIM NOS. 53, 202, AND 298 FILED BY CHARLES C. JOHNSON, AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C), PURSUANT TO BANKRUPTCY RULES 9014 AND 7012

Upon the objection of Gawker Media LLC ("Gawker Media") and its motion (together, the "Objection") for the entry of an order (the "Order") (i) disallowing Proof of Claim Nos. 53, 203, and 298 filed by Got News (the "Got News Claims") and (ii) making Federal Rules of Civil Procedure 12(b)(6) and 12(c) applicable to the Objection pursuant to Bankruptcy Rule 7012 and 9014, as more fully set forth in the Objection; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Objection is in the best interests of Gawker Media's estate, its creditors, and other parties in interest; and the Court having found that Gawker provided appropriate notice of the Objection and the opportunity for a hearing on the Objection under the circumstances; and the Court having reviewed the Objection

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.  All capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Objection.

2.      Federal Rules of Civil Procedure 12(b)(6) and 12(c) are applicable to this contested matter pursuant to Bankruptcy Rules 7012 and 9014.

3.      The Got News Claims are disallowed in their entirety.

4.      Prime Clerk LLC, the Court-appointed claims agent in these Chapter 11 Cases, is hereby authorized and directed to make such revisions to the official claims register as are necessary to reflect the disallowance of the Got News Claims.

5.      The Debtors are authorized to take all actions necessary to implement this Order.

6.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2016

_____
THE HONORABLE STUART M BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 2

## Martin Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| Gawker Media LLC, *et al.*,[1] | ) | Case No. 16-11700 (SMB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### DECLARATION OF D. ROSS MARTIN IN SUPPORT OF THE DEBTORS' OMNIBUS OBJECTION TO PROOFS OF CLAIM NOS. 53, 202, AND 298 FILED BY GOT NEWS LLC, AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C), PURSUANT TO BANKRUPTCY RULES 9014 AND 7012

Pursuant to 28 U.S.C. § 1746, D. Ross Martin declares as follows:

1.     I am a partner with the law firm Ropes & Gray LLP, counsel to Gawker Media LLC ("Gawker Media), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.. ("Gawker Hungary"), (collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned cases.

2.     I submit this declaration in support of the *Debtors' Objection To Proofs of Claim Nos. 53, 202, and 298 Filed By Got News LLC, and Motion To Apply Fed. R. Civ. P. 12(b)(6) AND 12(b), Pursuant To Bankruptcy Rules 9014 And 7012* (the "Objection").

3.     Attached as Exhibit 3 is a true and correct copy of the complaint in the Johnson Defamation Action filed by claimant Got News LLC in the Superior Court of California, Fresno County, as attached in support of all proofs of claim filed by Got News LLC.

---

[1]     The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056).  Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

4.      Attached as Exhibit 4 is a true and correct copy of an article entitled, "*What Is Chuck Johnson, and Why? The Web's Worst Jounalist, Explained*" published by *Gawker* on December 9, 2014, as viewed on October 31, 2016, *available at* http://gawker.com/what-is-chuck-johnson-and-why-the-web-s-worst-journal-1666834902.

5.      Attached as Exhibit 5 is a true and correct copy of an article entitled, "*Wait, Did Clowntroll Blogger Chuck Johnson* [*Defecate*] *On the Floor One Time?*" published by *Gawker* on December 9, 2014, as available on February 3, 2016 at http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the1668919746, retrieved using the internet archiving tool the WayBack Machine, *available at* http://archive.org/web/

6.      Attached as Exhibit 6 is a true and correct copy of an article entitled, "*Which of These Disgusting Chuck Johnson Rumors are True*" published by *Gawker* on December 15, 2014, as viewed on October 31, 2016, *available at* http://gawker.com/which-of-these-disgusting-chuck-johnson-rumors-are-true-1669433099.

7.      Attached as Exhibit 7 is a copy of a chart prepared under my supervision that identifies the statements challenged in the Johnson complaint, their source, and the reason each statement is not actionable.

Dated: October 31, 2016
          Boston, Massachusetts


                                        */s/ D. Ross Martin*
                                        D. Ross Martin

## **EXHIBIT 3**

## **Johnson Complaint**

Charles C. Johnson



In Propria Persona



FILED

DEC 09 2015

FRESNO SUPERIOR COURT

By_____
DEPUTY

SUPERIOR COURT OF CALIFORNIA
COUNTY OF FRESNO

CHARLES C. JOHNSON,               )
                                  )   $435.00
                                  )   Civil-2015- 0033223
And                               )   Case No.:  15 CE CG 03734
                                  )
GOT NEWS, LLC,                    )   COMPLAINT
     Plaintiffs                   )
                                  )
     vs.                          )
                                  )
GAWKER MEDIA, LLC,                )
**Hold Service:** Gawker Media LLC)
Privileged Attorney-Client        )
Communications and                )
Work Product                      )
                                  )
And                               )
                                  )
J.K. TROTTER, in his individual   )
capacity                          )
**Hold Service:** Gawker Media    )
Privileged                        )
Attorney-Client                   )
Communications                    )
and Work Product                  )
                                  )
                                  )
GREG HOWARD, in his individual    )
capacity                          )
**Hold Service:** Gawker Media    )
Privileged                        )
Attorney-Client                   )
Communications                    )
   d W  kP  d  t                   )
                                  )



1             Defendants.       )

2                           )

## COMPLAINT FOR DEFAMATION, INJURIOUS FALSEHOOD, AND INVASION OF PRIVACY (FALSE LIGHT)

COMES NOW Plaintiffs Charles C. Johnson and Got News LLC, by and through his undersigned counsel, and for his First Amended Complaint against Defendants Gawker Media LLC, ("Gawker") J.K. Trotter ("Trotter") and Greg Howard ("Howard") (collectively, "Defendants"), states as follows:

### JURISDICTION AND VENUE

Because Plaintiffs are residents of the State of California and have been injured in the State of California, the matter is properly before this court.

### FACTUAL ALLEGATIONS

1. Plaintiff Charles C. Johnson is a journalist and the president and owner of Got News, LLC, a media company which owns Gotnews.com, a news and commentary website.

2. Plaintiff Charles C. Johnson has never before initiated a lawsuit for defamation.

3. Defendant Gawker Media LLC, is a corporation organized and existing under the laws of the state of Delaware with its primary place of business located in New York, New York.

4. Defendant J.K. Trotter, upon information and belief, is a resident of the state of New York.

5. Defendant Greg Howard, upon information and belief, is a resident of the state of New York.

6.    At all times relevant to this Complaint, Defendants Trotter and Howard were employed as journalists by Defendant Gawker.

7.    As a threshold matter, Plaintiff hereby incorporates herein by reference, Exhibits 1-42 as if fully stated herein. An index of exhibits is included after the signature block of this Complaint.

8.    As a threshold matter, unless specifically stated otherwise, all factual allegations are upon information and belief.

9.    Defendant Gawker owns a family of tightly-linked, internet-based media properties, with sub-brands that are each, individually and collectively marketed by Gawker.

10.   Among the media properties owned and marketed by Gawker are Deadspin.com and Gawker's flagship site, Gawker.com.

11.   Upon information and belief, the Gawker online media properties have in excess of sixty-four million (64,000,000) unique monthly readers in the United States.[1]

12.   Gawker had approximately 540,000 twitter followers in December of 2014.

13.   Per Quantcast, Gawker Media has over **One Million** unique Missouri readers.

14.   Gawker's media properties, such as the properties mentioned above, contain a variety of content. For example,

---

[1] http://advertising.gawker.com/about/ last accessed June 17, 2015.

Deadspin.com is primarily a sports news and sports commentary website. The remaining properties may have different topical focuses, but each carries content primarily consisting of news and commentary.

15. Gawker earns revenue, among other ways, by selling advertising on its media properties.

16. Gawker has over a million readers in Missouri, as evidenced Quantcast data showing Gawker.com's web traffic.

17. Gawker properties have endlessly written about the Ferguson riots and related topics,[1] including publishing articles highly critical of Plaintiffs' efforts in investigative journalism regarding various "Ferguson" topics.[2]

18. Further, Deadspin.com, a Gawker media property dedicated to sports, famously, viciously, repeatedly, and continuously, attacked the St. Louis Cardinals recently.[3]

---

[1] See, James West, "*Gawker Took Only One Day to Report and Vet the Story That Blew Up in Its Face,*" published by Mother Jones on July 24, 2015. http://www.motherjones.com/media/2015/07/gawker-conde-nast-fallout-timeline-denton.

[2] See, e.g., A.J. Daulerio, "The Story Behind the Stories You Loved This Year: Hulk Hogan's Mesmorizing Sex Tape," published by gawker.com on December 26, 2012. http://gawker.com/5971314/the-story-behind-the-stories-you-loved-this-year-hulk-hogans-mesmerizing-sex-tape.

[3] Drew Magary, "*Eat Shit, Cardinals*" June 16, 2015 (http://deadspin.com/eat-shit-cardinals-1711726377 last accessed October 4, 2015); Drew Magary, "*Why Your Cardinals Suck,*" October 10, 2013 (http://deadspin.com/why-your-cardinals-suck-1443513646 last accessed October 4, 2015) (emphasis added); Tom Ley, "*Everyone Involved In The Cardinals Hacking Scandal Seems To Be An Idiot,*" (http://deadspin.com/everyone-involved-in-the-cardinals-hacking-scandal-seem-1711682201 last accessed October 4, 2015); Samer Kalaf, "*Report:*

4

19. Tracking technology currently exists which allows advertisers on media websites to track readers' age, gender, **location**, and many other data points.[1]

20. After working for a time as a reporter for the Financial Times, Nick Denton founded Gawker in 2003.

21. Denton's goal was to change journalism by turning *ordinary people* into content creators:[2]

Similarly, Denton admits that the journalistic standards of his blogs are lower than those in traditional media. But, he says, that's the whole point of the venture. "We go after sacred cows. We run stories on the basis of one anonymous source, in many cases, and a bit of judgment. We put it out there. We make clear the level of confidence we have in a story. We ask for help [from site visitors], we ask for corroboration, we ask for denials. Every single story is a work in progress, it's not meant to be final. It's like a reporter's notebook."

22. Concurrent with starting Gawker, Denton also began a pornography blog (also featuring hardcore porn) called "Fleshbot" which is part of the Gawker empire.

---

*FBI Investigates the St. Louis Cardinals For Hacking the Astros*," June 16, 2015 (http://deadspin.com/report-fbi-investigates-st-louis-cardinals-for-hackin-1711673515, last accessed October 4, 2015); Drew Magary, "*Moron USA Today Columnist Thinks The Cardinals Poop Vanilla Sprinkle*," March 5, 2015 (http://deadspin.com/moron-usa-today-columnist-thinks-the-cardinals-poop-van-1689616561, last accessed October 4, 2015).

[1]For example, see Plaintiffs' Ex. 41, which is a screenshot taken by Plaintiffs' counsel when he visited gawker.com's home page (www.gawker.com) on Sunday, October 4, 2015. Note that there is an ad on the page marketing "**Budweiser Brewery Experience SAINT LOUIS - This Tour's For You - BudweiserTours.com**" This ad clearly is marketing to Plaintiffs' counsel because the gawker.com technology gurus have tracking tech which knows that Plaintiffs' counsel is a reader, **viewing the site from St. Louis, Missouri**.

[2] Excerpt from, Jay Rayner, "*The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008. http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9. 2015).

23. Denton's first big hits were as a result of publishing private sex tapes of public figures. For example, the infamous Paris Hilton sex tape.[1]

24. Denton told The Hollywood Reporter in 2013 in an article entitled, *"Gawker's Nick Denton Explains Why Invasion of Privacy Is Positive for Society"*:[2]

**THR: When you started Gawker, did you have an idea that you were going to change things?**

**Denton:** Yeah. The basic concept was two journalists in a bar telling each other a story that's much more interesting than whatever hits the papers the next day.

**THR: Do you think journalists censor themselves?**

**Denton:** Well, I used to think it had to do with legal reasons and people being too fearful of libel. But actually, now I think the larger factor is a journalist's desire for respectability – not wanting to expose themselves, not wanting to say, "Hey we've heard this, we're not completely sure whether it's true." People are talking about this. We're just going to share with you as we would share with our colleagues what we have.

**THR: What have you learned along the way?**

**Denton:** We've removed a lot of obstacles to free journalism and yet –

**Cook:** There is still the desire to be right. That is still important to me and to everyone we work with. We want to get it right. Our standards for getting it right are different from larger, more established institutions, and we do not just throw out every tip that we get on the site. We evaluate and report.

**Denton:** That is a disagreement between us. That's a disagreement between me and a lot of our journalists is that I would like more of the tips to be published. Maybe not published under John's name but published under a tipster's name or under a tipster's anonymous handle. I would like them to be published.

25. The excerpt demonstrates the operating principle of Gawker: publish sensational rumors - regardless of whether or

---

[1] Excerpt from, Jay Rayner, *"The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008. http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9. 2015).

[2] May 22, 2013, by Eriq Gardner (http://www.hollywoodreporter.com/thr-esq/gawkers-nick-denton-explains-why-526548 last accessed October 8, 2015).

1 not Gawker has any possible way of establishing the truth or
2 falsity of the claim.

3     26.   Denton has admitted that his site has lower
4 journalistic standards than "traditional media."

5     27.   Nick Denton has made clear that Gawker relies upon
6 readers of his site to provide content for his site - in other
7 words, that his readers are collaborators on articles:[1]

> The future, Nick says, lies with what he calls iterative reporting, in which posts are used to request information and to help stand up stories. 'As a print journalist, if you hear a rumour you try to stand it up and if you can't the story dies,' he says. 'With a blog you can throw the rumour out there and ask for help. You can say: "We don't know if this is true or not."' What about libel? 'We just have to make sure we're not doing it maliciously and that we also admit when we're wrong. Personally, as a print journalist, I always found the most interesting stories to be the ones hacks talked about in the bar after work. Those are the ones we deal in.' He goes further, talking about how he wants his readers to be the source of stories, how they'll split page-view bonuses with them if the story runs. 'I want to institutionalise and automate chequebook journalism.'

15     28.   In 2006, Gawker initiated a feature on the site called
16 "Gawker Stalker,"[2] which allowed the readership of the website to
17 "crowdsource"[3] the geographic locations of celebrities in "real-
18 time."[4]

19     29.   The feature tied-into Google Maps and allowed users to
20 pinpoint the locations, much to the terror of celebrities.

---

[1]   James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006

(http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015).

[2]   See John Cook, entitled "A Judge Told Us to Take Down Our Hulk Hogan Sex Tape Post. We Won't." published by gawker.com on April 25, 2013, available online at http://gawker.com/a-judge-told-us-to-take-down-our-hulk-hogan-sex-tape-po-481328088 and Jessica, entitled "Introducing Gawker Stalker," published by gawker.com on March 14, 2006, available at http://gawker.com/160338/introducing-gawker-stalker-maps.

[3]   "Crowdsourcing" has been defined by Merriam-Webster as: "The practice of obtaining needed services, ideas, or content by soliciting contributions from a large group of people and especially from the online community rather than from traditional employees or suppliers." (http://www.merriam-webster.com/dictionary/crowdsourcing last accessed Oct. 9, 2015).

[4]   "Real Time" has been defined by Merriam-Webster as, "The actual time during which something takes place." (http://www.merriam-webster.com/dictionary/real%20time last accessed Oct. 9, 2015).

Despite obvious concerns for the safety of individual public figures.[1]

30. Denton was extremely pleased with the scandal surrounding the new feature, because it made Gawker a great deal of money.[2]

31. Specifically, Denton was pleased because subsequent to the creation of Gawker Stalker, celebrities such as George Clooney publicly attacked the feature because they feared being stalked, generating free publicity, clicks, and traffic for Gawker.

32. Kinja is a news content aggregator across Gawker sites.[3]

33. It allows Readers as well as paid Gawker Staff to create user profiles, chat real time, comment on news articles, and create unique blogs - which can sometimes become so popular by other users that Gawker will co-opt the blog and bring it into the Gawker family.

34. In essence, Kinja removes virtually all distinctions between paid staff content and unpaid staff content. And this is by design, because it is part of Nick Denton's vision:[4]

[1] Celebrities are already at high risk without Gawker creating a de facto GPS tracking device. By way of example, John Lennon, born October 9, 1940, was shot and killed by a deranged fan.
https://en.wikipedia.org/wiki/Death_of_John_Lennon (last accessed October 9, 2015).
[2] James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006 (http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015).
[3] https://en.wikipedia.org/wiki/Kinja (last accessed Oct. 9, 2015).
[4] Excerpt from Nick Denton, "*Introducing Group Chats In Kinja*," http://product.kinja.com/introducing-group-chats-in-kinja-1517330082. February 6, 2014. Last accessed Oct. 8, 2015.

Messaging applications are the standard for personal communication: swift, stripped down and lively. Kinja is an effort to apply the same qualities to public sites whether from Gawker writers, partner publishers or solo bloggers. It is a *collaborative journalism platform* with the following feature at its heart, what we call the *group chat*.

Each group chat has an instigator, typically but not necessarily the blog owner or one of their authors. The instigator can launch a topic with a news or opinion piece with a headline; or just with a question to another user.

Even a long and exhaustive article should be just a starting point. Sites on the latest Kinja template display subsequent discussion with the same graphical treatment and respect as the author's starter post. The exchange should read like a question-and-answer session, the classic web chat format. We believe this conversational format will encourage the story to develop and the truth to be tested.

35.    As the above excerpt demonstrates, Kinja is the realization of Denton's dream of removing the barrier between "author" and reader.

36.    Gawker believes that the news will, long term, become entirely **dependent** upon crowdsourcing:[1]

**(1) Crowd-sourcing / collaboration / socialization of everything**

As with many other sectors, the news will become increasingly depending on gathering information from every person possible, especially those who have firsthand accounts of an event or those who are experts in the topic being discussion. How can we highlight and maximize this in our system?

37.    **Paid or unpaid by Gawker,** all content creators are statistically ranked by how much traffic they bring to Gawker's sites.[1]

---

[1] Maggie Rose, *"World Future Part 4: The Future of Kinja,"* Aug. 5, 2015 http://maggierosetao.kinja.com/world-future-2015-part-4-the-future-of-kinja-1726375719 (last accessed Oct. 9, 2015).

38.   J.K. Trotter and Greg Howard, paid content creators for Gawker/Kinja as well as Defendants in this case, are ranked at 97th and unranked, respectively.[2]

39.   "Collin Krum," on the other hand, is an unpaid content creator, as is Kevin Purdy, who are ranked 117 and 115 respectively.[3]

40.   Collaboration between paid and unpaid content creators is central to Gawker's media strategy, and crucial from both a content creation standpoint as well as a marketing standpoint.

41.   "Gawker executives introduced a "Kinja bonus," modeled after the unique bonus,[4] in an effort to boost writers' engagement with the comments."[5]

42.   To circumvent liability for anonymous tipsters, Gawker has not only created **tutorials** for unpaid content creator collaborators to leak information without fear of defamation suit repercussions (see *infra*), but Gawker **has actually designed, as part of its Kinja platform, specific tools to avoid liability for defamation actions** - burner accounts and Gawker SecureDrop.

---

[1] See http://gawker.com/stats/leaderboard (last accessed Oct. 10, 2015).
[2] *Id.*
[3] *Id.*
[4] Paid writers get a bonus for the number of unique visitors they bring to Gawker sites.
[5] See Caitlin Petre, "The Traffic Factories: Metrics at Chartbeat, Gawker Media, and The New York Times," published by Tow Center for Digital Journalism on May 7, 2015, available at http://towcenter.org/research/traffic-factories/.

43. A "burner account" is an anonymous Kinja user profile wherein Gawker does not store any personally identifying information about the user.

44. In "How to Leak to Gawker Anonymously,"[1] a Gawker "how to" article written by Defendant J.K. Trotter, Trotter describes a variety of alternatives for the would-be tipster to circumvent liability for defamation.

45. In it, Trotter instructs tipsters to use Gawker's "SecureDrop," and he hyperlinks to a Gawker site which carries a "how-to" article specific to using "SecureDrop."[2]

46. In the case before this Court, the anonymous unpaid content creator collaborator commenters at issue used "burner accounts," to protect their anonymity.

47. Gawker "SecureDrop" is carefully and deliberately devised means for anonymous tipsters to totally circumvent defamation liability. ("maximizing your anonymity and frustrating any attempts (including by [Gawker]) to identify [the Tipster] as the source").

48. In July of 2015, Gawker published an article alleging that a Conde Nast executive[3] - David Geithner, brother of former

---

[1] J.K. Trotter, "*How to Leak to Gawker Anonymously*," August 8, 2014. http://gawker.com/how-to-leak-to-gawker-anonymously-1613394137 (last accessed Oct. 9, 2015).

[2] "Welcome to the Gawker Media SecureDrop." Undated. https://gawkermediagroup.com/securedrop/ (last accessed Oct. 9, 2015).

[3] Media titan Conde Nast is a direct competitor of Gawker. See Erik Wemple, "*Conde Nast Exec Story: Gawker is Keeping its Sleaze Game in Shape*," The Washington Post, July 17, 2015

Treasury Secretary Timothy Geithner - had solicited sex from a homosexual escort.

49. David Geithner is publicly heterosexual, married, and the father of three young children.[1]

50. Reports surfaced that the article might have been based on false accusations, a hoax even.[2]

51. Even if true, Geithner was a limited public figure at best.

52. There had been no previous public knowledge of Geithner's sexuality as anything other than heterosexual.

53. Subsequent to the publication of the Gawker piece purporting to "out" Geithner as a closet homosexual, other media outlets began to scrutinize Gawker's reporting of the story.

54. The source of the article was the alleged gay prostitute and porn star Leif Derek Truitt (porn alias Brodie Sinclair) - a man the Gawker article referred to as "Ryan."

55. Other news outlets interviewed "Ryan" and revealed him to be a deeply troubled man with paranoid delusions.[3]

---

(https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/07/17/conde-nast-exec-story-gawker-is-keeping-its-sleaze-game-in-shape/ last accessed Oct. 9, 2015)

[1] Jordan Sargent, "*Conde Nast's CFO Tried to Pay $2,500 for a Night with a Gay Porn Star,*" Gawker, July 16, 2015 ( article has been removed from site but is available at https://archive.is/EUkg0#selection-1198.0-1200.0 last accessed Oct. 6, 2015).

[2] Charles Johnson, "*Is The Gawker Story An Elaborate Hoax? Sure Looks That Way,*" GotNews.com July 17, 2015 (http://www.gotnews.com/breaking-exclusive-is-the-gawker-story-an-elaborate-hoax-sure-looks-that-way/ last accessed Oct. 10, 2015).

[3] Chuck Ross, "*Interview With The Gay Porn Star Behind That Terrible Gawker Article,*" The Daily Caller, July 17, 2015 (http://dailycaller.com/2015/07/17/exclusive-interview-with-the-gay-porn-star-behind-that-terrible-gawker-article/ last accessed Oct. 9, 2015).

56.   Worse, upon further investigation, it became likely Ryan's motivation for contacting Gawker, might have been to blackmail Geithner.[1]

57.   Gawker had taken ONE WORKDAY to investigate, vet, and publish the article on the Geithner "sex scandal."[2]

58.   Gawker's actions demonstrated that the *rush to publish* clearly outweighed any concern for the accuracy of the reporting.

59.   In criticizing Gawker's coverage of the Geithner story, the Washington Post said: "Shadowy encounters plus possible criminal activity plus high-ranking official in the classic New York industry of publishing equal a pretty automatic editor decision at the gossip site. Publish! The rest of the world, meanwhile, screams in condemnation..."[3]

60.   "Ryan" believes the end of the world is near because since 1980 the numbers 666 have been selected as the winning lottery number 25 times; that 9/11 was carried out by the Russian government; that Barack Obama is the "son of the devil;" that he ("Ryan") has ultra secret information that he *must* release to the media about who *really* is responsible for the

[1] Robby Soave, "*Gawker Helps Gay Escort Blackmail Timothy Geithner's Brother, Ted Cruz Is the Hero of the Story*," Reason Magazine, July 17, 2015 (https://reason.com/blog/2015/07/17/gawker-helps-gay-escort-blackmail-timoth last accessed Oct. 9, 2015).

[2] James West, "*Gawker Took Only One Day to Report and Vet the Story That Blew Up in Its Face*," Mother Jones, Friday July 24, 2015 (http://www.motherjones.com/media/2015/07/gawker-conde-nast-fallout-timeline-denton last accessed October 9, 2015).

[3] Erik Wemple, "*Conde Nast Exec Story: Gawker is Keeping its Sleaze Game in Shape*," The Washington Post, July 17, 2015 (https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/07/17/conde-nast-exec-story-gawker-is-keeping-its-sleaze-game-in-shape/ last accessed Oct. 9, 2015)

Pennsylvania train crash of May 2015, and the downing of Malaysian Airlines Flight 370.[1]

61. "Unfortunately, I'm just a guy who has a lot of information. I wish I didn't," was "Ryan's" explanation to one news outlet.[2]

62. Gawker founder Nick Denton, in explaining its decision to take down the story, gave a non-apology apology, apologizing merely for being insensitive, and for *arguably* participating in "gay-shaming."[3]

63. Denton issued a weak-hearted apology, but also stated, "The point of [the Geithner sex scandal story] was not in my view sufficient to offset the embarrassment to the subject and his family."[4]

64. A former Gawker writer, Current *Vanity Fair* contributor Richard Lawson, publicly admitted that during his time at Gawker he fabricated stories.[5]

65. Lawson has said, "When I was at Gawker I wrote baseless posts accusing an actor of raping an ex-boyfriend. I did it [because] my boss told me to, but I wanted to, too."[6]

---

[1] Chuck Ross, "*Interview With The Gay Porn Star Behind That Terrible Gawker Article*," The Daily Caller, July 17, 2015 (http://dailycaller.com/2015/07/17/exclusive-interview-with-the-gay-porn-star-behind-that-terrible-gawker-article/ last accessed Oct. 9, 2015).
[2] *Id.*
[3] Nick Denton, "*Taking a Post Down*," July 17, 2015 (http://nick.kinja.com/taking-a-post-down-1718581684 last accessed Oct. 9, 2015).
[4] *Id.*
[5] Larry Womack, "*Anyone Else Think James Franco Should Sue the Hell Out of Gawker*," Huffington Post, July 17, 2015 (http://www.huffingtonpost.com/larry-womack/james-franco-gawker_b_7816032.html last accessed Oct. 10, 2015).
[6] *Id.*

14

66. The fabricated articles Lawson referenced were a series of articles he wrote which accused actor James Franco of (a) being a closeted homosexual, and (b) having **raped** a man and then paid the victim to keep him quiet.

67. The articles by Lawson are attached and incorporated herein as *Exhibits* 3-7.

68. In a third article, entitled, "The People Have Spoken, And They Think James Franco is a Rapist,"[1] Lawson concludes, based upon the polling he did from the commenters in the previous post, that James Franco is the rapist that The New York Post was reporting on.

69. A month later, in a fourth article entitled, "'Gay Rapist' Actor Surprisingly Cool About His Sexuality,"[2] Lawson again revisited the topic:

> Is James Franco gay or what? You'll remember there was that ominous rumor that he once raped his gay lover that was sort of intense and icky. We're told that the original tip that prompted the *Page Six* blind item, about an actor who broke into his ex-boyfriend's house an sexually assaulted him, mentioned Franco specifically. We received several other anonymous (and admittedly questionable) emails saying the same thing, one providing explicit details. So who the heck knows, but for whatever reason the rumor had traction. Which makes us queasy. But now the actor is on the cover of *Out* magazine this month, acting calm, collected, and confident in his heterosexuality, so we're all confused again. In the interview, he discusses

70. The excerpt above alleges several things:

---

[1] Richard Lawson, "*The People Have Spoken And They Think James Franco Is a Rapist*," Gawker, August 22, 2008 (http://gawker.com/5040524/the-people-have-spoken-and-they-think-james-franco-is-a-rapist last accessed Oct. 10, 2015).

[2] Richard Lawson, "'*Gay Rapist' Actor Surprisingly Cool About His Sexuality*," Gawker, September 29, 2008 (http://gawker.com/5056330/gay-rapist-actor-surprisingly-cool-about-his-sexuality last accessed Oct. 9, 2015).

15

(a) that there was an ominous rumor that Franco once raped his gay lover;

(b) that Gawker, Lawson or both received some information from some source to suggest that the original New York Post article about the unknown actor come gay rapist was actually based on a "tip" from a source, and that in the original telling of the "tip" the actor-culprit was reported to be Franco;

(c) that Gawker, Lawson or both have received multiple anonymous emails which, although questionable in their reliability, nevertheless name Franco as the unknown gay rapist from the New York Post article;

(d) Lawson states that he doesn't know if the rumor about Franco is true, but that the rumor had "traction";

(e) that the rumor makes Lawson and possibly other Gawker staff "queasy"; and

(f) that Gawker staff or Lawson or both are uncertain as to Franco's true sexuality, given his decision to grace the cover of "Out" Magazine.[1]

71. Lawson knew, because he fabricated the entire story, that any anonymous emails naming Franco as the gay rapist *were not only questionable, but were actually false.*

72. The tone of this article is one of reporting on actual events.

73. Despite directly expressing belief that Franco was a "gay rapist," Lawson's presentation of facts is deliberately misleading and was designed to perpetuate a rumor that Franco was a "gay rapist."

---

[1] Out, "is a popular gay and lesbian fashion, entertainment, and lifestyle magazine, with the highest circulation of any gay monthly publication in the United States." (https://en.wikipedia.org/wiki/Out_(magazine) last accessed Oct. 10, 2015).

74. Gawker published (the author was simply listed as "Gawker Sources") an article in March of 2012 entitled, "Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off?"[1]

75. The article recounts *anonymous tips* that some **unnamed comedian** - "our nation's most hilarious stand-up comic and critically cherished sitcom auteur … traps unsuspecting women in his hotel room and makes them stick around until he's done [masturbating]."

76. The article went on to give additional details, recounting a story about the same **unnamed comedian** from the "Aspen Film Festival a few years ago" wherein the unnamed comedian trapped two women in a hotel room and forced them to watch him masturbate.

77. Thereafter, as the article explains, the unnamed comedian's "extremely powerful" manager contacted the women and threatened to destroy their careers if they complained.

78. The article detailed attempts to reach out to one of the unnamed victims, but the victim refused to comment, stating only, "first of all, your facts are wrong. And secondly, I don't want to be a part of this story. I'm sure you understand."[2]

---

[1] Gawker Sources, *"Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off,"* Gawker, March, 19, 2012 (http://gawker.com/5894527/which-beloved-comedian-likes-to-force-female-comics-to-watch-him-jerk-off?comment=48089921 last accessed Oct. 9, 2015.)
[2] *Id.*

79. Subsequently, in May of 2015, Gawker's subsidiary blog website called "Defamer"[1] published an article written by Jordan Sargent entitled, "Louis C.K. Will Call You Up To Talk About His Alleged Sexual Misconduct."[2]

80. The article introduces an unnamed source given the pseudonym "Jason."

81. "Jason" explained that two female friends of his had been mistreated by Louis C.K., but the only incident described by "Jason" is supposedly from 2014, wherein Louis C.K. purportedly came up behind the one friend, grabbed her by the back of the neck and whispered, "I'm going to fuck you."

82. On the basis of this, Jason is reported as having had an email communication with Louis C.K.,[3] wherein Jason accuses C.K. of sexual assault and C.K. responds by asking Jason for his telephone number.

83. The section written by paid-Gawker-content-creators does not accuse Louis C.K. However, many **anonymous**, unpaid-content-creators (Kinja commenters) *do name* Louis C.K. in the 2012 article. In fact, the 2015 article cites as evidence, comments by unpaid-content-creator-commenters on the 2012 article:

---

[1] "Defamer" is a subsidiary blog within the Gawker family of sites. The content theme is self-explanatory. http://defamer.gawker.com.

[2] Jordan Sargent, "Louis C.K. Will Call You Up to Talk About His Alleged Sexual Misconduct," Defamer-Gawker, May 5, 2015 (http://defamer.gawker.com/louis-c-k-will-call-you-up-to-talk-about-his-alleged-s-1687820755 last accessed Oct. 9, 2015).

[3] The article published screenshots of the supposed emails with C.K. as well as the actual email address purportedly belonging to Louis C.K.

This was not the first allegation of sexual misconduct levied against C.K. In March of 2012, we ran a blind item titled "Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off?," which described an incident that had supposedly taken place in Aspen a few years prior involving "our nation's most hilarious stand-up comic and critically cherished sitcom auteur." and two unnamed female comedians:

84. The article cites to "Barberaham Lincoln," an independent content creator who claims to have a great deal of comedy industry insider knowledge, but without any substantiation whatsoever.

85. The article closed by mentioning additional unsuccessful attempts to corroborate the allegations as being properly against Louis C.K. The attempts purportedly failed because "Jason's" female friends who were assaulted refused to come forward, citing their fear of C.K.'s power in the comedy industry.

86. The article says that thereafter, the two men had a vacuous phone conversation, wherein, C.K. was "sizing [Jason] up' to 'find out what I had heard.'"

87. The article closes with a call to action, asking unpaid content creator commenters to comment with any information they have.

88. The Louis C.K. articles compared with the previous described ethical lapses, *supra*, represent a pattern at Gawker: recklessly publishing sensational claims (e.g., rape, sexual assault, serial rape and sexual assault) which carry the

prospect of career destruction[1] on the basis of weak, unsubstantiated tips.

89. A further pattern is using their anonymous-unpaid-content-creator-commenters as sources in their own right, but which in effect amounts to Gawker citing to itself.

90. In this way, Gawker can be the source of the rumor, and then repeatedly earn revenue on subsequent articles based upon the rumor it itself initiated.

91. Gawker's sites offer readers, paid Gawker staff, and others an opportunity to create content on the individual web pages carrying stand-alone writings of a particular subject matter.

92. The stand-alone writings are *consciously* and *deliberately* **initiated** by journalists such as Defendants Trotter and Howard.

93. The only restrictions on the content created by the readers, is that readers cannot initiate the stand-alone writings, their content is placed on the webpage - first come, first serve - beneath the portion of the writing begun by the initiator, and their content creation is subject to being kept under a removable veil until "approval" by the initiator of the stand-alone writing.

94. Readers can, at their own option, lift the veil and view the content created by non-initiating content creators,

---

[1] See generally, Bill Cosby.

regardless of whether or not the stand-alone writing's initiator approves or disapproves of the content.

95.  In order to create content, a non-initiating content creator must create a content creator profile titled under their real name or under a pseudonym.

96.  It is very common for non-initiating content creators to create anonymous profiles, or even multiple anonymous profiles.

97.  It is very common for initiators of writings (such as Defendants Howard and Trotter) to create content **amongst other non-initiating content creators**, and to directly *respond-to* and *collaborate* with non-initiating content creators, *instigate* and *solicit* responses from non-initiating content creators, and *adopt the conclusions* of or otherwise *advertise* or *approve* of the content of non-initiating content creators as signified through text content or by hyperlinking[1] to additional locations on the same webpage or the webpages of other stand-alone writings.

98.  Beginning in August of 2014 shortly after the death of Michael Brown, Plaintiffs began investigating matters relating to the death of Brown, and also the subsequent riots.

---

[1] A **hyperlink** is "an electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or a different document." http://www.merriam-webster.com/dictionary/hyperlink last accessed June 17, 2015.

99. The Brown death and the Ferguson Riots were among the top media stories in the St. Louis, Missouri media market for 2014.

100. The riots destroyed large swaths of Ferguson, Missouri, nearly overran police positions on multiple occasions and resulted in multiple US Department of Justice investigations, public official firings, and additional riots throughout the St. Louis region, such that the Missouri Governor was forced to dispatch more than 2,000 National Guardsmen.

101. Johnson personally traveled throughout the St. Louis region to report on events and also sources within local law enforcement and in various places regionally, who assisted him in his reporting.

102. Local and national law enforcement sources provided Johnson with credible information which suggested that Michael Brown, as a juvenile, was implicated in a murder.

103. As a result of these leads, Johnson has invested tens of thousands of dollars in trying to convince Missouri courts to unlock Michael Brown's juvenile records.

104. In pursuit of this objective, Johnson has filed multiple lawsuits in multiple Missouri Circuit Courts.

105. Upon ultimately being denied by the juvenile court of St. Louis County in mid-September 2014, Johnson temporarily halted his pursuit.

106. Upon discovering that the records were not reviewed as part of the grand jury evidence, Plaintiffs resumed the legal battle for the records by appealing the denial to the Missouri Court of Appeals for the Eastern District of Missouri in late November, 2014.

107. On or about December 4, 2014, a preliminary writ was granted by the Court of Appeals, but the writ was ultimately permanently denied on December 18, 2014.

108. In May of 2015, Johnson appealed the records denial to the Missouri Supreme Court, which ultimately denied him the records.

109. As a result of his reporting, and his exposure of facts which did not fit the common and hackneyed narrative pushed by Gawker[1] and other media entities external to St. Louis, Missouri, Plaintiffs became a very popular news and opinion website for readers in the St. Louis Region, which is shown by data tracking Plaintiff GotNews' website's traffic.

110. Plaintiffs' reputation amongst St. Louisans became very positive and Plaintiffs' brand, goodwill, and website traffic, all surged, as evidenced by a sudden increase in Plaintiffs' web traffic.

---

[1] For example, one Gawker editor has encouraged hackers to steal former Officer Darren Wilson's money. The general implication being that Wilson is a racist murderer. See Charles Johnson, "*Gawker Blogger Calls for Hackers to Steal Darren Wilson's Money*," Gotnews, September 9, 2014 (http://gotnews.com/gawker-blogger-calls-hackers-steal-officer-darrenwilsons-money/ last accessed Oct. 9, 2015).

111. Between September of 2014 and February of 2015, Got News enjoyed an online readership of nearly 83,000 people in Missouri, including at least 37,441 in the St. Louis Region.

112. Gawker staff first began to track the career of Plaintiff Charles Johnson during the summer of 2014.[1]

113. Johnson is generally of a different ideological persuasion then the Defendants.[2]

114. On December 4, 2014, Defendant Greg Howard published an article entitled, "Charles Barkley Has Nothing to Say to America."[3]

115. In his article, Howard stated:

> This conversation is over; there is not debate to be had about the killing of Eric Garner, and there really isn't one to be had on the degradation, imprisonment, and systemic murder of minorities. It is a system of control, a machine, doing the work it was designed to do. Those who blame its workings on its victims, invoking black pathologies and enumerating all the ways in which black people need to become better and more moral to earn the right to complain about being killed without their killers even facing any consequences, are engaging in an old, tired respectability politics. They don't know what the fuck they're talking about.
>
> Charles Barkley does not know what the fuck he's talking about.

116. In the "discussion" section beneath his article, Howard engaged in an extensive dialogue with an independent

---

[1] See, e.g., Adam Weinstein, "*Is Ratfucking Journalism Dead?*" Gawker, July 8, 2014 (http://gawker.com/is-ratfucking-journalism-dead-1601527887 last accessed Oct. 10, 2015).

[2] *Id.*

[3] See Greg Howard, entitled "Charles Barkley Has Nothing To Say To America," published by deadspin.com on December 4, 2014, available online at http://deadspin.com/charles-barkley-has-nothing-to-say-to-america-1666864783.

content creator and ultimately stated the following,

demonstrating his position on the death of Michael Brown and

those who believed Brown was not totally innocent:

 jijijojiji ⟩ Greg Howard
12/08/14 4:31pm

One for you: http://www.pbs.org/wgbh/pages/fro...

↪ Reply

 Greg Howard ⟩ jijijojiji
12/08/14 4:48pm

Nah, I mean this very seriously. There aren't two sides to this. If you think
there are, you are wrong. If you find someone who thinks there are, they are
wrong, too. I don't care if they're black or white. W.E.B. DuBois was wrong.
Angela Davis was wrong. This isn't a debate. That said, you have a great day.

↪ Reply

*See* Ex. 40, Amended Complaint for the entire exchange.

117. On December 5, 2014, one day after Defendant Greg

Howard published his the article described immediately above,

Plaintiffs published an article on the Gotnews website entitled,

"BREAKING: GotNews Wins First Stage of Appeal on Michael Brown

Records, #Ferguson."[1]

118. In retaliation, on December 9, 2014, Defendants Howard

and Trotter published three defamatory articles designed to

malign and humiliate Plaintiffs.

---

[1] Gotnews, December 5, 2014 (http://gotnews.com/breaking-gotnews-wins-first-

stage-appeal-michaelbrown-records-ferguson-ericgarner/ last accessed, Oct. 9,

2015).

119. On or about the morning of December 9, 2014, Defendant Trotter composed, published, and initiated, a stand-alone writing entitled, "What Is Chuck Johnson, and Why? The Web's Worst Journalist, Explained," (referred to hereafter as "Trotter First").[1]

120. In the article, Trotter maliciously characterizes Johnson as a racist, as well as using malicious paraphrasing to suggest that Johnson is a racist.

121. In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by proceeding to attempt to show how Plaintiff Johnson was the "web's worst journalist," by juxtaposing Plaintiff Johnson's journalistic professionalism alongside screenshots (*provided with no accompanying context*) of defamatory, false, and injurious Twitter postings ("tweets") made by various persons, each of which openly requested that Twitter, Inc. staff permanently ban Plaintiffs from posting on twitter.com, and which defamed Plaintiffs by alleging, inter alia, that Plaintiffs were "stalking," "[h]arass[ing]," and otherwise "endanger[ing]," other individuals.

122. In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by stating that Johnson drew attention to himself as a result of his **flawed reporting** in the Senate Republican Primary race in Mississippi. ("he's drawn attention for his (flawed) reporting in the Senate Republican

---

[1] http://gawker.com/what-is-chuck-johnson-and-why-the-web-s-worst-journal-1666834902 last accessed, June 17, 2015.

primary race in Mississippi"). As a further proof of the allegation of "flawed" reporting, Trotter linked to another news article, which itself drew no conclusion and offered no proof of error in Johnson's reporting in the Senate Republican Primary race in Mississippi.

123. In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by paraphrasing a quote by Johnson, misleadingly stating that Johnson really meant that the deceased Michael Brown, Jr., who was killed by Ferguson, Missouri police officer Darren Wilson, **"deserved to die"** *because* he was African American.[1] Trotter would go on to call this "racist."

124. Importantly, Trotter is attacking Johnson's ability as a journalist, directly accusing him of *falsely reporting* in an article that senate candidate (for New Jersey) Cory Booker didn't actually reside in New Jersey at the time of his candidacy (thereby rendering him ineligible, if true). Trotter cites to another article[2] as evidence that Booker did in fact live in New Jersey, and thus proof that Johnson falsely reported.

125. However, the article Trotter cites to *is itself inconclusive* on the matter.

---

[1] *See* Exhibit 16.

[2] Ruby Cramer, *"Cory Booker: Yes, I Live In Newark,"* Buzz Feed News, Oct. 14, 2013 (http://www.buzzfeed.com/rubycramer/cory-booker-yes-i-live-in-newark#.lmZ115Wm1 last accessed Oct. 9, 2015).

126. In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by stating that Johnson is, "well-known for publishing stories that fall apart under the slightest scrutiny. The list of Johnson stories that have been proven wrong is long, but his greatest hits include: … [e]rroneously reporting that former Newark Mayor Cory Booker didn't actually reside in Newark[1] … Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The Story turned out to be a complete fabrication,[2] and may have even been planted by the Cuban government."

127. Johnson's article was not a lie, not a fabrication, and in fact the Senator has been indicted (March 6, 2015) by the Department of Justice on 14 counts, including corruption charges.[3]

128. The *Department of Justice* reports that the allegations of sex with underage prostitutes in the Dominican Republic has been corroborated.[4]

---

[1] Defendant Trotter offered as proof, a link to a "Buzz Feed News" article which itself drew no conclusions and simply reported the perspectives of competing viewpoints. See Ruby Cramer, "Cory Booker: Yes, I Live in Newark," Buzz Feed News, October 14, 2013, http://www.buzzfeed.com/rubycramer/cory-booker-yes-i-live-in-newark#.dyPmMdGDX last accessed June 17, 2015.

[2] Here again, as supposed proof, Trotter inserted a link to an ABC News online article which simply reported on the controversy surrounding Senator Menendez and proffered no conclusions one way or another. See Rhonda Schwartz, Brian Ross and Ned Berkowitz, "The Menendez Prostitution 'Scandal': How It Happened." ABC News, March 6, 2013, http://abcnews.go.com/Blotter/robert-menendez-prostitution-scandal-happened/story?id=18664472 last accessed June 17, 2015.

[3] Chuck Ross, "*DOJ: Underage Prostitution Allegations Against Robert Menendez Backed By 'Corroborating Evidence*,'" The Daily Caller, August, 24, 2015 (http://dailycaller.com/2015/08/24/doj-underage-prostitution-allegations-against-robert-menendez-backed-by-corroborating-evidence/ last accessed Oct. 9, 2015).

[4] *Id.*

28

129. Trotter cites **as proof** that Johnson *fabricated* - that is, completely *invented* - the Menendez story, an article by ABC News,[1] which does not reach a conclusion and at best for Trotter, merely expresses doubt about Johnson's allegations in his article.

130. Trotter, on the other hand, reports that **conclusively**, Johnson lied and made up the entire article.

131. Trotter cited **no** other sources to support his statement that Johnson had fabricated the story about Senator Menendez.

132. In Trotter First, a number of anonymous, non-initiating content creators defamed, falsely portrayed, and injured Plaintiffs.

133. Shortly after the initial section of Trotter First was published on gawker.com, several of such anonymous content creators published defamatory content on Trotter First.

134. One such anonymous content creator, "*Cmcalumna*," claimed to have attended college with Johnson.

135. Though she is anonymous, she suggests she has special knowledge of Johnson: "Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm)."

---

[1] Rhonda Schwartz, Brian Ross and Ned Berkowitz, "*The Menendez Prostitution 'Scandal': How It Happened*," ABC News Online, March 6, 2013 (http://abcnews.go.com/Blotter/robert-menendez-prostitution-scandal-happened/story?id=18664472 last accessed Oct. 9, 2015).

136. She then let slip her motivation for releasing such a tidbit of information: "I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems."

137. *Cmcalumna* published false information about Johnson on Trotter First, cast him in a false light, and injured Johnson by stating as a matter of fact that Johnson publicly defecated in either the hallway or elevator of his dormitory in college.

138. Defendant Trotter incited and solicited additional false, injurious and defamatory comments from *Cmcalumna* as well as other content creators on Trotter First.

139. When another unpaid-content-creator asked *Cmcalumna* to "elaborate on the poop story," *Cmcalumna* replied, at **1:05pm** on December 9, 2014,[1] that since she started at college two years after Johnson, she didn't actually have any basis of knowing whether or not Johnson had publicly defecated. Rather, she simply described upper-classmen talking about it "regularly" but yet that it was an "undisputed fact that he did it."[2]

140. At **1:44 p.m.** on December 9, 2014,[3] anonymous unpaid-content-creator *"CCJ Facebook Friend"* published a discussion directed at J.K. Trotter, in which he claims to faithfully reproduce, from Johnson's **Private**, **invite-only** Facebook account page, a letter written by Johnson and posted on Johnson's

---

[1] See Plaintiff's Ex. 18.
[2] *Id.*
[3] *Id.*

30

Facebook wall for dissemination to former classmates of his on Facebook. "This is from his Facebook account late last night. I don't know how to screenshot the whole thing."[1]

141. *Notably, the letter posted by CCJ Facebook Friend is exactly the same as the one Greg Howard would publish two hours later in his post on Deadspin.*

142. Greg Howard did not have access to Johnson's Facebook page, because they were not Facebook friends.

143. On <u>December 10, 2014</u>,[2] Trotter would respond to *CCJ Facebook Friend*, seeking additional leads, information, collaboration: "Are there any other comments on that Facebook post?"

144. Some anonymous content creators **begged** Defendant Trotter to write an article about the defamatory matters discussed by *Cmcalumna*, but Trotter informed the individual that Defendant Howard had already written, and initiated/published, on or about the afternoon of December 9, 2014, a stand-alone writing on deadspin.com, entitled, "<u>Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?</u>" (hereafter, "Howard First").[3]

145. At **4:19 p.m.** on December 9, 2014,[4] content creator "IkerCatsillas" posts a discussion piece (directed at Trotter)

---

[1] *Id.*
[2] *Id.*
[3] http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746 last accessed, June 17, 2015.
[4] *Id.*

on the First Trotter article: "Please J.K. You gotta scoop this poop story for us. For journalism. I need to know more." At **4:43 p.m.**,[1] Trotter responds: "[Deadspin] is on it." The phrase "on it" is hyperlinked and links to Greg Howard's "clowntroll" article.

146. On December 9, 2014 (at 4:20 p.m.), Trotter posted another article entitled, "The Daily Caller Can't Quit Chuck Johnson."[2]

147. In the article, Trotter repeatedly states that Johnson wrote **false** stories.

148. In Trotter Second, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs reporting that Johnson contributed to a false story about New Jersey Senator Bob Menendez supposedly soliciting prostitutes in the Dominican Republic."[3]

149. Between **2:00 p.m. and 2:14 p.m.** on December 9, 2014, Greg Howard **emailed** Charles Johnson and asked various questions:[4] "Chuck, we just got a tip that you wrote up a Facebook post for your past classmates. Just checking to see it actually happened and is accurate. [The email goes on to quote a portion of the letter posted by *CCJ Facebook Friend* to the First Trotter

---

[1] *Id.*

[2] See J.K. Trotter, entitled "The Daily Caller Can't Quit Chuck Johnson," published by gawker.com on December 9, 2014, available online at http://gawker.com/the-daily-caller-can-t-quit-chuck-johnson-1668910086.

[3] *Id.*

[4] See Plaintiffs Ex. 39. Note that time appears as 11am because it was received by Charles Johnson in California at 11am (2 p.m. Eastern Time).

article initiated/instigated at **11:25 am**.] This is your writing, correct? Thanks, Greg."[1]

150. At **2:06 p.m.** on December 9, 2014,[2] Johnson responded: "Run it in its entirety. Don't do me like you did Cory Gardner, though."

151. At **2:14 pm**. on December 9, 2014,[3] Johnson emailed Howard, stating, "Oh, and the comments about me shitting on the floor were made up," - referencing the *Cmcalumna* discussion post earlier at **12:30 pm and 1:05p.m.** on the Trotter article.

152. At **2:20 p.m.** on December 9, 2014,[4] Howard again emailed Johnson: "If you have time, we got a tip that you had a 2002 bestiality charge expunged from your record because you were a minor at the time. Is this true?"

153. Prior to Defendant Howard publishing Howard First, Plaintiff Johnson emailed Defendant Howard and categorically denied that incident that was the basis for the article's title ever occurred.

154. At **4:00 p.m.**, Greg Howard initiated/ "instigated" his piece, "Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?"[5]

155. The article includes references to anonymous rumors that Johnson publicly defecated in college: "there are cryptic

[1] *Id.*
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746 last accessed Oct. 9, 2015).

33

comments from friends and former classmates about some mysterious floor-shitting incident." Howard then proceeded to solicit additional tips, photos, and context from additional Kinja content-creators.

156. In Howard First, Defendant Howard also created content amongst other non-initiating content-creators, soliciting information from them as well as adopting and advertising defamatory content published by *Cmcalumna* on the Trotter First website, encouraging other readers and content creators to view the defamatory statements by hyperlinking to *Cmcalumna's* published content. ("I'll tell you what. There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker [hyperlink inserted into the text]").

157. "Kinja" refers to Gawker's proprietary social-media, media content aggregating tool that readers, content creators and others use to collect and view content created on various Gawker media property websites.

158. The phrase "good-ass kinja" refers to high quality content that readers, content creators, and others would be advised to view.

159. Stating that particular content is "good-ass kinja," as well as instantly providing the link to said content, serves as express endorsement of the linked content, and Defendant Howard intended to direct as many readers as possible to view the defamatory content.

160. By adopting, endorsing, advertising, responding to, interacting with, and directing additional content-creators, readers, and others to such defamatory, false, misleading, and injurious content created by a non-initiating content creator, Defendants Howard and Gawker formally adopted and are liable for, all of *Cmcalumna's* content published on Trotter First and Howard First.

161. Instead of basing his reporting of the public defecation on discussion posts on Trotter's article, Howard misrepresents that he saw such allegations on Johnson's Facebook page. "Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident."[1]

162. However, as mentioned, Howard doesn't have access to this page. And in any event there were **no comments** made on Johnson's Facebook page during this time that referenced or alleged public defecation.[2]

163. Howard lied about his source.

164. To give the accusations greater weight, Howard reported that he saw them on Johnson's Facebook wall.

165. Howard closed out his article by smearing and defaming Johnson further: "…[H]e's been caught lying many times before…"[3]

---

[1] See Plaintiff's Ex. 14.
[2] See Plaintiffs' Ex. 37. These screenshots evidence that Howard lied about where he saw the floor defecating comments, as there were no floor defecation comments on Johnson's Facebook page.
[3] See Plaintiff's Ex. 14.

166. Howard provides no evidence of Johnson having ever lied, nor does he provide any evidence that Johnson was ever caught lying.

167. At **4:34 p.m.** on December 9, 2014,[1] Gawker writer Jordan Sargent posts a discussion post directed at Greg Howard on the "clowntroll" article, stating, "This guy shitting on the floor is a very apt metaphor for why he's in the news now."

168. At **5:09 p.m.** on December 9, 2014,[2] *ChekhovsGum(ItsGonnaPop!)* wrote a discussion post on the First Trotter article, and directed at Cmcalumna: "I have heart breaking news, team, there was never any proof that he actually was the one who pooped on the floor. Someone did poop on the floor and just to sort of troll the Mountain King himself, people started posting that he pooped. It was one of those things no one could proof or disprove … but alas it's not *really* true."

169. At **10:26 p.m.** on December 9, 2014,[3] *Cmcalumna* wrote a discussion post on Howard's Deadspin "clowntroll" article, replying to Greg Howard's previous discussion post ("…There is some good-ass kinja to be had re: chuck shitting on the floor one time over at Gawker") in *which she clarifies that she has no proof of the defecation incident having occurre*d: "I think you made my year **by writing an entire article based on my comment.**

---

[1] *Id.*
[2] *Id.*
[3] See J.K. Trotter, entitled "The Daily Caller Can't Quit Chuck Johnson," published by gawker.com on December 9, 2014, available online at http://gawker.com/the-daily-caller-can-t-quit-chuck-johnson-1668910086.

I'd give anything to have some proof, but I wasn't there when it occurred … I am so glad when someone googles his name this will appear. I hope him pooping in stark [dorm] follows him forever, just goes to show you how important it is to use a bathroom (and not be an asshole your entire life)." (emphasis added).

170. *Cmcalumna* had no proof, therefore, that Johnson publicly defecated, but yet she was extremely pleased that Howard wrote his article based upon her comment.

171. Later in the day on or about December 9, 2014, after Defendant Howard had published content directing viewers to *Cmcalumna's* defamatory, false, and injurious content, *Cmcalumna* published additional content as a direct response to Defendant Howard's publication (i.e., "There is some good-ass kinja to be had…").

172. On **December 9, 2014**, sometime shortly after *Cmcalumna* initiated the rumor about public defecation, the first "tweet" was published on Twitter. See Plaintiffs Ex. 8.

173. Also on **December 9, 2014**, sometime after instigating his article, Howard himself tweeted on Twitter:[1] "We need answers: Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" He then posted a link to the article he instigated.

---

[1] See Plaintiffs' Ex. 29.

174. Defendant Howard would have been uniquely and particularly made aware of *Cmcalumna's* publication on the writing Howard had initiated.

175. Plaintiff Johnson repeatedly requested that Defendant Howard publically retract his defamatory statements, but Defendant Johnson refused.

176. When *Cmcalumna* ultimately posted a discussion post reply directly to Howard, informing him in no uncertain terms that she had absolutely no basis of knowledge as to whether or not Johnson publicly defecated, Howard still refused to print a retraction.

177. On **December 12, 2014**, at **12:42 p.m.**,[1] Trotter emailed Charles Johnson: "Hi Charles, I'm a reporter at Gawker, and I'm writing because we've received a pair of allegations involving you, and wanted to give you an opportunity to address them.[2] The second allegation is that, in 2002, you were photographed sexually assaulting a sheep behind a family member's ranch in San Bernardino County, near Wrightwood; that you were arrested by the San Bernardino County Sheriff and later convicted of this; and that, in 2007, you successfully petitioned to have records of the incident expunged. Is this allegation true? The sources for both claims supplied detailed accounts of each of the incidents described above. Please let me know if you have

---

[1] The first rumor Trotter discusses is not part of this suit and is therefore omitted from the excerpt. Please see Plaintiffs' Ex. 38 for the full text. *Id.*
[2] *Id.*

any other questions, or if you need any other information to address these allegations. My working deadline is midnight EST, but that is flexible, so please let me know if you require more time."

178. Johnson responded:[1] "Neither story is true. I honestly have no idea where these crazy stories come from."

179. On **December 12, 2014**, at **4:08 p.m.**,[2] Trotter would follow up with Johnson: "The first story comes from a person who says they were physically present, and personally witnessed the conversation. We've verified that this person attended Claremont with you. This person provided a very specific account of the incident. The second story comes a person [sic] who is friends with an officer in the San Bernardino County Sheriff, who is familiar with the details of the alleged assault. Apparently the incident has become fairly well-known within that county's law enforcement circles. Again, I just wanted to get your input before putting anything up. I'm fairly sure you understand that."

180. On or about December 15, 2014, Trotter wrote, published, and initiated a writing entitled, "Which of These Disgusting Chuck Johnson Rumors are True?" (hereafter, "Trotter Third").[3]

---

[1] *Id.*
[2] *Id.*
[3] http://gawker.com/which-of-these-disgusting-chuck-johnson-rumors-are-true-1669433099 last accessed June 17, 2015.

181. **Also on December 15, 2014,**[1] Greg Howard published on his Twitter social media account a hyperlink to Trotter's instigated article ("Which of These Disgusting Rumors…") and stating: "Torn. I kinda feel like sheepfucking is something you grow into. On the other hand, [Charles Johnson] is a prodigy."

182. In Trotter Third, Defendant Trotter presented disgusting rumors which were not items of public concern prior to Defendants collective creation, collaboration, publication and incitation.

183. In Trotter Third, in which Defendant Trotter describes the initiated writing as a "RUMORMONGER[ING]"[2] published writing, Trotter defamed, misleadingly and falsely portrayed, and injured Plaintiff Johnson by heavily quoting from *Cmcalumna's* false and defamatory content published in Trotter First, wherein *Cmcalumna* stated that she knew from either personal knowledge or from other certain, undisclosed evidence, that Johnson defecated in public.

184. Specifically, Trotter stated, "there is no evidence of Chuck Johnson took a shit on the floor in college. Chuck Johnson was, however, so **thoroughly disliked** in college that his classmates chose to blame an unattributed shit on him."

185. Trotter also stated, "There is **no evidence** that Chuck Johnson was arrested in 2002 for pinning a sheep to a fence and

---

[1] See Plaintiffs' Ex. 1.
[2] Rumermonger: a person who spreads rumors. http://www.merriam-webster.com/dictionary/rumormonger last accessed June 17, 2015.

40

fucking it. Johnson is, however, **the kind of guy** about whom

random people make up and circulate rumors about him being

arrested in 2002 for pinning a sheep to a fence and fucking it."

186. However, similar to Lawson's conclusions in the fourth

"gay rapist" James Franco article, Trotter suggests the

bestiality and public defecation rumors might be true, because

it cannot be confirmed or denied, but stated, "A search through

public records and the archives of local newspapers did not turn

up any mention of an arrest matching the one our source

described. (This does not necessarily mean that the arrest

didn't occur, though; editors don't necessarily publish all

incidents involving the police, and public records databases

would not contain an expunged record.)"

187. After instrumentally generating minor interest at

least as to the rumor of public defecation, Defendant Trotter

concocted a false, misleading, pseudo-journalistic device to

make it appear to a casual viewer that he was merely reporting

on a pre-existing matter of public concern. ("You may have read

The New York Times' profile of Charles C. Johnson, the worst

journalist on the internet. You also may have seen several very

elaborate, very unbelievable, and very gross rumors about

Johnson's past misdeeds floating around Twitter and Facebook. So

maybe you're wondering: Which of those rumors are real?").

188. In Trotter Third, Defendant Trotter reported that Defendant Howard had previously written about allegations of public defecation as against Johnson.

189. Discussing a rumor ("Rumor 1: Johnson shit on the floor in college"), Defendant Trotter then reported that *two* of Johnson's college classmates, writing anonymously on Gawker,[1] had stated as a matter of fact that Johnson had defecated publicly at college. Trotter then purported to quote from, and hyperlinked to, various publications on Trotter First by two anonymous, non-initiating content-creators: *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)*.

190. However, Defendant Trotter acknowledged that *ChekhovsGum(ItsGonnaPop!)* did not make such a statement about public defecation actually occurring. Rather, *ChekhovsGum(ItsGonnaPop!)* stated that while *some* person did in fact defecate in the dormitory, several years ago, it was not Johnson, and that any attribution to Johnson was out of extreme spite.

191. Thus, as evidenced by the writing in Trotter Third, Defendant Trotter's **only basis** upon which to base his reporting were the publications of a *single, anonymous content creator (Cmcalumna), made on an article Trotter himself had initiated and published.*

---

[1] Trotter describes them as being classmates of Johnson, but does not describe the basis of his knowledge that they were, in fact, classmates of Johnson. Trotter also describes them as having used "burner" Gawker content creator profiles. A "burner" profile is slang for an anonymously created non-initiating content-creator account.

192. The manner in which Defendant Trotter wrote the initiating portion of the writing was designed to give the audience the impression that Defendants Trotter and Howard were privy to special and hidden information, and this created an atmosphere in which the rumors could be perceived as being more true than false, even though Trotter and Howard had serious reason to believe they were false.

193. For example, in Trotter Third, Defendant Trotter also **failed to report** that *Cmcalumna* had, subsequent to stating that it was "an undisputed fact" that Johnson had publicly defecated, recanted that statement and other similar statements, directly to Greg Howard.

194. Further, Trotter failed to mention that *Cmcalumna* had expressed extreme hatred of Johnson and had deliberately defamed him.

195. In Trotter Third, Trotter deliberately misattributed and omitted facts in order to mislead readers into believing there was a factual basis to the allegation that Johnson had publicly defecated.

196. Thus, any reader would be left with the impression that Johnson may have defecated publicly, even though Defendant Trotter himself had reason to know that this was not the case.

197. In Trotter Third, Defendant Trotter also reported upon the investigation he and Greg Howard had conducted into a "tip" that Johnson had "<u>fucked a sheep</u>."

43

198. Defendant Trotter wrote that his source had told him that "Chuck had a 2002 bestiality charge expunged from his record due to his being a minor, 14 at the time."

199. Similar to the previous rumor, Defendant Trotter did not divulge any information about his source and the basis of knowledge.

200. Defendant Trotter continues on to describe his attempt to verify the allegations made in the "tip," and also describes an additional tipster who called Defendant Howard on the telephone and relayed a graphic allegation of Johnson having sex with a sheep, and Trotter recounts the allegation at length with enough detail to seemingly lend credence to the allegation. ("[Johnson] was spotted attempting to copulate with his wool sheep. The neighbor took pics with a telephoto lens, which, since the cops didn't catch him mid-act, were used as the basis for his conviction. He was pants-down, pinning the sheep against the fence … [Johnson] got it expunged in 2007 saying he was just a kid experimenting").

201. Defendant Trotter also recounted that he and Defendant Howard had contacted the San Bernardino County district attorney's office seeking Johnson's juvenile records related to the alleged charge of bestiality, and that a representative at the juvenile division there said that the office could not divulge information pertaining to individuals arrested and charged as juveniles, "as Johnson allegedly was."

202. Important to note, Plaintiffs have come under intense, hateful criticism for having sought the juvenile records of Michael Brown, Jr.

203. Trotter Third is simply a play-by-play account of reporting on largely self-created or incited rumors on matters which at no point were a matter of public concern.

204. The Trotter Third content described above is false, misleading, injurious, and intrinsically malicious and defamatory.

205. Upon publication of the initiating segment of Trotter Third, Defendant Howard published a statement using his Twitter account (@greghoward88) to advertise, endorse, and direct viewer traffic to Trotter Third. ("torn. i kinda feel like sheepfucking is something you grow into. on the other hand, @chuckcjohnson is a prodigy.' [link to Trotter Second as well as screenshot of the article]"

206. Trotter, Howard, and other Gawker paid content creators communicated in the discussion/comments section of Gawker articles and actively sought additional defamatory statements to be published.

207. Gawker has a history of soliciting defamatory comments from unpaid content creators and then using such defamatory content as an excuse to publish "news" articles discussing the merits of the incited rumors.

208. Gawker specifically attempts to utilize the nature of the initiator of the defamatory content (i.e., the anonymous unpaid content creator publishing on Gawker's articles) and illusory non-agency of the same as a tool to attempt to circumvent liability for the defamatory comments.

209. A significant number of Gawker's readers visit their sites primarily to read the discussion/comments sections.

210. Defendant Howard's @greghoward88 Twitter account reaches nearly thirteen thousand (13,000) individual followers nationally, including numerous followers throughout Missouri.

211. Defendant Gawker's @gawker Twitter account is followed by and reaches in excess of five hundred and thirty-eight thousand (538,000) individuals.

212. On December 9, 2015, @gawker published a "tweet" advertising Trotter Second.

213. On December 15, 2015, @gawker published a "tweet" advertising Trotter One.

214. Defendant Mr. Howard has a long history of defaming people whom he simply does not like or disagrees with.

215. Jason Whitlock is a competing sports writer (Mr. Howard writes primarily for Deadspin.com a sports blog).

216. Mr. Howard and other deadspin writers have set out to destroy Mr. Whitlock's reputation in a very similar way to their attacks on Mr. Johnson.

217. They have fabricated stories about him and mischaracterized his statements.

218. Mr. Whitlock is claiming that Howard has made up stories about him and encouraged Deadspin writers to use the word "nigger" twice, in stories about him.[1]

219. It is apparent that Mr. Howard is trying to create the same sort of mischaracterized racial animus that he attributed to Mr. Johnson by mischaracterizing him and his ideas.[2]

220. Mr. Howard and Gawker have a long and continuing history of creating offensive libelous material about those who disagree with them.

221. Howard, Trotter, Gawker, and independent content creators *Cmcalumna*, *ChekhovsGum(ItsGonnaPop!)* conspired together through Gawkers' "Securedrop" and "burner accounts" systems to deny Plaintiffs' their property right to lawsuits for defamation against the anonymous content creators under the 14th Amendment to the United States Constitution.

222. Howard, Trotter, Gawker, and independent content creators *Cmcalumna*, *ChekhovsGum(ItsGonnaPop!)* conspired together to defame Plaintiffs.

223. Plaintiffs hereby incorporate by reference, as if fully stated herein, Exhibit 42, consisting of statements A-AJ, for Counts I-IV against Gawker, Howard, and Trotter.

---

[1] See Jake O'Donnell, entitled "Jason Whitlock Goes All-In on Deadspin, Greg Howard Responds With Pure Fire," published by sportsgrid.com on October 15, 2015, available at http://www.sportsgrid.com/uncategorized/jason-whitlock-goes-all-in-in-fued-with-deadspin-greg-howard-responds/
[2] Id.

47

224. Each of statements A-AJ in Exhibit 42 are provably false, reasonably capable of being interpreted by the trier of fact as having a defamatory meaning, were published with malice, were published with knowledge that they were false or with reckless disregard for their veracity, were not opinions, were not published solely for the purpose of satire or humor, were not neutrally or fairly reported, were not matters of public concern, and were defamatory when taken in their literary contexts.

225. As to each of statements A-AJ, *supra*, Plaintiffs have been damaged in reputation and have suffered pecuniary damages of lost business and lost investments due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

**Counts I and II: Defamation and Injurious Falsehood**
(Against Defendants Gawker and Trotter)

226. Plaintiff restates and incorporates by reference, as if fully set forth herein, all prior allegations of this Complaint.

227. This claim arose in St. Louis County, Missouri.

228. However, the claim is also cognizable in California and throughout the United States.

229. On or about December 9, 2014 and again on December 15, 2014, Defendants Trotter and Gawker composed and published three

48

internet news articles including statements about Plaintiff's person and Plaintiff's business.

230. Defendant J.K. Trotter was at fault in publishing the articles described in paragraph 64 and knew that the statements were libelous when published.

231. The statements described in paragraph 229 (and 223-225) were defamatory in that they asserted -through false statements- that Plaintiff Charles C. Johnson is an unskilled and incompetent journalist and also that during his college life he was involved in a number of unsavory incidents. Specifically, the statements included the following direct quotations:

    a.   From the December 9, 2014 article titled "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained"

        i.   "The list of Johnson stories that have been proven wrong is long, but his greatest hits include:

            1.   "Erroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark."

            2.   "Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The story turned out to be a complete fabrication, and may have been planted by the Cuban government."

ii.    Defendant Trotter states: "Earlier this year, [Johnson] collected screenshots of murdered teenager Michael Brown's Instagram account. (Quoting Johnson,) 'Brown's Instagram account also shows a violent streak that may help explain what led to a violent confrontation with Police officer Darren Wilson,' Johnson wrote. **In other words, Brown deserved to die.**" (emphasis added). This statement contains the induced allegation of fact that Plaintiff asserted Michael Brown deserved to die.

b.    From the December 15, 2014 article titled, "Which of These Disgusting Chuck Johnson Rumors are True?"

i.    In bold, **"Johnson shit on the floor in college."**

ii.    Defendant Trotter's article then goes on to publish comments from Gawker readers who allege to be former classmates of Plaintiff:

1.    *"Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm). I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems."*

2.     *I started two years after him, so I*
*wasn't there since he did it as a freshman or*
*sophomore. But the upperclassman talked about it*
*regularly and* ***it was an undisputed fact that he***
***did it.*** *Multiple people talked about it in great*
*detail [confirmed by another commenter] on the*
*school's paper/website the cmcforum.com and I bet*
*many instances of people talking about it can be*
*seen in the comment archives from 2008-2011.*

iii. In bold, **"Johnson fucked a sheep."**

iv.  Defendant Trotter again published comments
posted to Gawker from individuals who claim to
know Plaintiff:

1.     *Chuck had a 2002 bestiality charge*
*expunged from his record due to his being a*
*minor, 14 at the time.*

2.     *A friend is in the San Bernardino*
*County Sheriff Dept. As I heard it, Chuck was*
*about 14, had gone to stay with his cousins [for]*
*a few weeks... He went for a weekend with one to*
*a friend of the cousin's who owned a ranch near*
*Wrightwood.*

***The father of the friend got suspicious when they***
***caught him coming back inside very late the first***
***night. The next night, he apparently wandered***

> *back out & got the cops called on him by a*
> *neighbor when he was spotted attempting to*
> *copulate with his wool sheep. The neighbor took*
> *pics with a telephoto lens, which, since the cops*
> *didn't catch him mid-act, were used as the basis*
> *for his conviction. He was pants-down, pinning*
> *the sheep against the fence.*
>
> *The story is still famous in circles of San*
> *Bernardino County law enforcement, apparently. He*
> *got it expunged in 2007, saying he was just a kid*
> *experimenting, and he didn't want it to reflect*
> *badly when he was in college working for*
> *collegiate newspapers. My friend won't give*
> *interviews, because he'd get in trouble for*
> *leaking expunged records, but it definitely*
> *happened, and word is that the files & pics still*
> *exist. Hope that helps!!*

232. The above statements published by Defendant Trotter are statements of fact that are objectively falsifiable.

233. The above statements published by Defendant Trotter are patently false.

234. The statements described in 229- 233 (and 223-225) were published online and circulated around the entire United States. The statements were intentionally made available to and read by the general public in the state of Missouri.

52

235. By his online publication of the statements described in paragraphs 229- 233 (and 223-225) Defendant Trotter intentionally targeted the state of Missouri and knew or should have known that residents of the state of Missouri would read the statements.

236. The statements tend to deprive plaintiff of the benefit of public confidence and social and business associations, and the defendant published the statements knowing they were defamatory.

237. Defendant Trotter intended to harm Plaintiff's interests by publishing the statements described in paragraphs 229- 233 (and 223-225) or Defendant Trotter recognized or should have recognized that such harm was likely.

238. As a direct result of the publication of the statements described in paragraphs 229- 233 (and 223-225) has been damaged in reputation, Plaintiff's business has been placed in jeopardy, and Plaintiff has suffered emotional injury, all to his damage in a sum to exceed $2,000,000.

239. As a direct result of the publication of the statements described in paragraphs 229- 233 (and 223-225), Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost investments due to damaged business reputation, as well as the need for Plaintiff to file this

lawsuit to defend his good name and the related costs from

attorney's fees, in an amount exceeding $2,000,000.

240. Defendant Trotter's conduct in publishing the statements described in paragraphs 229- 233 (and 223-225) was done with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true, thereby warranting an award of punitive damages in a sum of not less than $20,000,000.

241. Defendant Trotter was an agent, servant, and employee of Defendant Gawker, and as at all such times acting within the scope and course of his agency and employment; and/or his actions were expressly authorized by Defendant Gawker; and/or his actions were ratified by Defendant Gawker, thus making Defendant Gawker liable for said actions under the doctrine of *respondeat superior.*

WHEREFORE, plaintiff prays judgment against Defendants Trotter and Gawker on Counts I and II of this Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief, as the court shall deem proper.

**Counts III and IV: Defamation and Injurious Falsehood**
(Against Defendants Gawker and Howard)

232. Plaintiff restates and incorporates by reference, as if fully set forth herein, all prior allegations of this Complaint.

54

233. This claim arose in St. Louis County, Missouri.

234. However, the claim is also cognizable in California and throughout the United States.

235. On or about December 9, 2014, Defendant Howard composed and published an Internet news article including statements about Plaintiff's person and Plaintiff's business.

236. Defendant Greg Howard was at fault in publishing the articles described in paragraph 79 and knew that the statements were libelous when published.

237. The statements described in paragraph 245 (and 223-225) as defamatory in that it asserted -through false statements- that Plaintiff Charles C. Johnson is an unskilled and incompetent journalist and also that during his college life he was involved in a number of unsavory incidents. Specifically, the statements included the following direct quotations:

a.    From the December 9, 2014 article titled "Wait,
   Did Clowntroll Blogger Chuck Johnson Shit On The Floor One
   Time?"

      i.    "[Johnson] gets things wrong *a lot*."

      ii.   Defendant Howard states: "Sure enough, on
         the Facebook post, there are cryptic comments from
         friends and former classmates about some mysterious
         floor-shitting incident"

b.    In the Comments section, titled "Greg Howard's
   Discussions," on the article's webpage, Defendant

Howard posts to himself, "Tell you what. There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker."

    i.   In the above-mentioned comment posted by Defendant Howard, the words "good-ass kinja" are hyperlinked to a comment by *Cmcalumna* on a Gawker article titled, "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained."

    ii.  *Cmcalumna's* comment, posted 12/09/14 at 1:05 PM, reads as follows:

        1.   *I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassman talked about it regularly and it was an undisputed fact that he did it. Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people talking about it can be seen in the comment archives from 2008-2011.*

238. The above statements published by Defendant Howard are statements of fact that are objectively falsifiable.

239. The above statements published by Defendant Howard are patently false.

240. The statements described in paragraphs 245-249 (and 223-225) were published online and circulated around the entire

56

United States. The statements were intentionally made available to and read by the general public in the state of Missouri.

241. By his publication of the statements described in paragraphs 245-249 (and 223-225) online, Defendant Howard intentionally targeted the state of Missouri and knew or should have known that residents of the state of Missouri would read the statements.

242. The statements tend to deprive plaintiff of the benefit of public confidence and social and business associations, and the defendant published the statements knowing they were defamatory.

243. Defendant Howard intended to harm Plaintiff's interests by publishing the statements described in paragraphs 245-249 (and 223-225), or Defendant Howard recognized or should have recognized that such harm was likely.

244. Defendant Howard was an agent, servant, and employee of Defendant Gawker, and as at all such times acting within the scope and course of his agency and employment; and/or his actions were expressly authorized by Defendant Gawker; and/or his actions were ratified by Defendant Gawker, thus making Defendant Gawker liable for said actions under the doctrine of *respondeat superior*.

245. As a direct result of the publication of the statements described in 245-249 (and 223-225) Plaintiff has been damaged in reputation, Plaintiff's business has been placed in

jeopardy, and Plaintiff has suffered emotional injury, all to his damage in a sum to exceed $2,000,000.

246. As a direct result of the publication of the statements described in paragraphs 245-249 (and 223-225) Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost investments due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

247. Defendant Howard's conduct in publishing the statements described in paragraphs 245-249 (and 223-225) was done with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true, thereby warranting an award of punitive damages in a sum of not less than $20,000,000.

WHEREFORE, plaintiff prays judgment against defendants in Count III and IV of his Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief, as the court shall deem proper.

### Count V: Invasion of Privacy - False Light
#### (Against All Defendants)

232. Plaintiff restates and incorporates by reference, as if fully set forth herein, all prior allegations of this Complaint.

58

233. Defendants have given publicity to <u>fictional matters</u> not of public concern, and have falsely and publicly attributed these fictional and outrageous acts to Plaintiffs in an effort to harm Plaintiffs.

234. Defendants have twisted Plaintiff's words and the context in which they were made to such an extraordinary degree as to given them a highly offensive meaning not originally present, all in an effort to harm Plaintiffs.

235. Defendants have presented Plaintiffs to the public in a false light, and either knew precisely that they were misrepresenting Plaintiffs to the public, or Defendants acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

236. As a direct result of the publication of the statements described in Counts I-IV, Plaintiff has been damaged in reputation, Plaintiff's business has been placed in jeopardy, and Plaintiff has suffered emotional injury, all to his damage in a sum to exceed $2,000,000.

237. As a direct result of the publication of the statements described in Counts I-IV, Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost business investments, due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend

his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

238. Defendants' conduct in publishing the statements described in Counts I-IV was done with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true, thereby warranting an award of punitive damages in a sum of not less than $20,000,000.

WHEREFORE, plaintiff prays judgment against Defendants on Count V of this Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief as the court shall deem proper.

## COUNT VI-42 U.S.C. § 1983 - Conspiracy to Interfere with Civil Rights

### Under the Fourteenth Amendment

(AGAINST ALL DEFENDANTS)

232. The allegations contained in all paragraphs above are incorporated by reference as if fully set forth.

233. Because of Defendants' use of "securedrop" and "burner accounts," Plaintiffs are unable to identify anonymous content creators *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)*.

234. For the same reasons, Plaintiffs are unable to serve the anonymous content creators with a lawsuit for defamation, and are thus unable to exercise their right to bring defamation claims against the independent content creators.

235. Defendants have conspired for the purpose of depriving Plaintiffs their right to file a defamation lawsuit under the Fourteenth Amendment of the United States Constitution. *Zinermon v. Burch,* 494 u.s. 113 (1990).

236. Specifically, Defendants Gawker, Trotter, and Howard conspired with anonymous content creators *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)* and others to defame Plaintiffs and deprive them of their civil rights by inciting defamatory rumors, developing means to keep anonymous content creators identities a secret, by then hiding behind the anonymous unpaid content creators while publishing the defamatory statements, and by refusing and potentially destroying any information which would allow the anonymous content creators to be identified.

237. Defendant Gawker has demonstrated a track record and a procedure, which Plaintiffs have established, of inciting defamatory statements from anonymous content creators, publishing said statements, and then skirting liability by carefully and subtly publishing their own thoughts on the statements without confirming or denying them, playing it all off as "news."

238. Defendants are state actors by virtue of their use of CDA § 230, in that they use that statute as a shield to enable them to take otherwise illegal and unconstitutional actions.

61

239. When a state actor inserts itself between an individual and the individual's realization of his rights, such is Constitutionally impermissible.

240. As a result of the foregoing, Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost business investments, due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

WHEREFORE, plaintiff prays judgment against Defendants on Count VI of this Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief as the court shall deem proper.

### DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury, on all issues in this case which are so triable.

Dated this DECEMBER 9, 2015

Charles C. Johnson

### INDEX OF EXHIBITS

62

|   | **EXHIBIT** | **DOCUMENT** |
|---|---|---|

1

2

3     1.         Tweet written by Greg Howard with a link to

4                   "Which of These Disgusting Chuck Johnson

5                   Rumors are true?" 12/25/2014

6

7     2.         Tweet written by Anna Merlan with a link to:

8                   "Wait Did Clowntroll Blogger Chuck Johnson Shit

9                   On The Floor One Time?" 12/9/2014

10

11     3.         Tweet written by Erin Gloria Ryan with a link to:

12                   "Which of These Disgusting Chuck Johnson Rumors

13                   Are True?" 12/15/2014

14

15     4.         Tweet written by Taylor Berman with a link to:

16                   "Which of These Disgusting Chuck Johnson Rumors

17                   Are True?" 12/15/2014

18

19     5.         Tweet written by Adam Weinstein with a link to:

20                   "Wait Did Clowntroll Blogger Chuck Johnson Shit

21                   On The Floor One Time?" 12/9/2014

22

23     6.         Tweet written by Adam Weinstein saying "when

24                   chuck Johnson poops on your floor allegedly"

25                   [Sad kitten picture]. 4/8/2015

26

27     7.         Tweet written by Adam Weinstein with a link to:

28                   "Which of These Disgusting Chuck Johnson Rumors

Are True?" 12/15/2014

8.     Tweet written by Gawker with a link to:
       "The Daily Caller Can't Quit Chuck Johnson"
       12/9/2014

9.     Tweet written by Gawker with a link to:
       "What is Chuck Johnson, and Why? The Web's
       Worst Journalist Explained" 12/9/2014

10.    Tweet written by Gawker with a link to:
       "Which of These Disgusting Chuck Johnson Rumors
       Are True?" 12/15/2014

11.    Tweet written by Gawker with a link to:
       "What is Chuck Johnson, and Why? The Web's
       Worst Journalist Explained" 5/24/2015

12.    Tweet written by Gawker with a link to:
       "Which of These Disgusting Chuck Johnson Rumors
       Are True?" 6/8/2015

13.    "Which of These Disgusting Chuck Johnson Rumors
       Are True?" by J.K. Trotter 12/15/2014

14.    "Wait, Did Clowntroll Blogger Chuck Johnson Shit
       On The Floor One Time?" by Greg Howard 12/9/2014

64

15. "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained" by J.K. Trotter 12/9/2014

16. "The Daily Caller Can't Quit Chuck Johnson" by J.K. Trotter 12/9/2014

17. Comments from, "Wait Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" 12/9/2014

18. Cmcalumna Kinja Comment History

19. Comments from, "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained" 12/9/2014

20. Comments from, "Which of These Disgusting Chuck Johnson Rumors are True?" 12/15/2014

21. J.K. Trotter discussion with fellow commenter, "TheOneWhoKnocks" 12/15/2014

22. J.K. Trotter discussion with fellow commenter, "m" 12/15/2014

23. J.K. Trotter discussion with fellow commenter, "Russianist" 12/15/2014

| | |
|---|---|
| 1 | 24.     J.K. Trotter discussion with fellow commenter, |
| 2 | "ihatepickinggames" 12/15/2014 |
| 3 | |
| 4 | 25.     J.K. Trotter discussion with fellow commenter, |
| 5 | "cassienyc" 12/15/2014 |
| 6 | |
| 7 | 26.     J.K. Trotter discussion with fellow commenter, |
| 8 | "Josh Wolf" 12/15/2014 |
| 9 | |
| 10 | 27.     J.K. Trotter discussion with fellow commenter, |
| 11 | "yankeeinchucktown" 12/15/2014 |
| 12 | |
| 13 | 28.     Comment made by "hiphoptimusprime" to |
| 14 | J.K. Trotter 12/15/2014 |
| 15 | |
| 16 | 29.     Tweet written by Greg Howard with a link to: |
| 17 | "Wait, Did Clowntroll Blogger Chuck Johnson |
| 18 | Shit On The Floor One Time?" 12/9/2014 |
| 19 | |
| 20 | 30.     "GotNews" comments at Cmcaluma 12/9/2014 |
| 21 | |
| 22 | 31.     Cmcalumna defecation allegations against |
| 23 | Mr. Johnson, directed to Greg Howard 12/9/2014 |
| 24 | |
| 25 | 32.     More Cmcalumna defecation allegations against |
| 26 | Mr. Johnson, directed to J.K. Trotter 12/9/2014 |
| 27 | |
| 28 | 33.     Jordan Sargent comment to Greg Howard |

66

12/9/2014

34.     Greg Howard post stating, "There is some good-ass
        Kinja to be had" linking to his defamatory
        article 12/9/2014

35.     Statement of Charles C. Johnson 10/15/2015

36.     Recent Tweet written by Greg Howard once again
        Implying Mr. Johnson defecated on the floor in
        college. 6/18/2015

37.     Facebook Post written by Mr. Johnson 12/9/2014

38.     Email conversation between Mr. Johnson and
        Mr. Trotter 12/12/2014

39.     Email conversation between Mr. Johnson and
        Mr. Howard 12/9/2014-12/12/2014

40.     Charles Barkley article written by Mr. Howard
        12/4/2014

41.     Budweiser advertisement from Gawker website,
        Demonstrating their St. Louis targeted
        advertising

42.     Table of Defamatory Statements

# **EXHIBIT 4**

## **Dec 9 Trotter Article**



# What Is Chuck Johnson, and Why? The Web's Worst Journalist, Explained



J.K. Trotter
12/09/14 11:25AM Filed to: EXPLAINER

262.04K



If you were active on social media this weekend, you may have noticed frequent references to a website called "GotNews" and a writer named Charles C. Johnson. Often these references took the form of tweets like these:

hey @twitter @Support can you ban @ChuckCJohnson forever and prevent him from using your website to harass more people

— chris randle (@randlechris) December 7, 2014

Seriously, @support @twitter etc, @chuckcjohnson must go. Harassment, stalking, releasing personal information to endanger people, etc.

— Connor Goldsmith (@dreamoforgonon) December 7, 2014

hey @support @twitter please perma ban @chuckcjohnson for repeated harassment and releasing of personal information

— big titty LARPer (@rachelmillman) December 7, 2014

Who is @ChuckCJohnson, and why do people want him banned from Twitter? This guide is for the lucky few who haven't caught up on the story of Charles C. Johnson, and are curious why so many people, particularly in the mainstream media, despise him.

## Who is Charles C. Johnson?

Johnson is a California-based 26-year-old independent journalist and proprietor of GotNews.com, where he publishes the majority of his articles. According to his online biography, he's written for a litany of conservative publications in the past, including *The Wall Street Journal*, *The Weekly*

*Standard*, and *The New York Sun*. He is also the author of two books, one of which is enthusiastically blurbed by Texas Senator Ted Cruz.

## He's a conservative journalist?

Not exactly. Johnson rejects being labeled as "conservative," and describes himself instead as "a radical" and "a revolutionary." He frequently feuds with other conservative journalists. In a tweet published earlier this month, Johnson wrote: "I'm going to enthusiastically burn down the entire political establishment for fun. It's time someone did."

## So he's a crazy conservative journalist?

Sort of. Johnson is well-known for ending the career of a foreign policy analyst named Elizabeth O'Bagy, who among other things misrepresented her academic credentials to her employer, The Institute for the Study of War. More recently, he's drawn attention for his (flawed) reporting in the Senate Republican primary race in Mississippi.

## If he's just another crazy conservative journalist, why has he become so internet-famous?

Johnson is equally well-known for publishing stories that fall apart under the slightest scrutiny. The list of Johnson stories that have been proven wrong is long, but his greatest hits include:

- Falsely accusing a *New York Times* reporter of secretly posing for *Playgirl* (after that reporter, David D. Kirkpatrick, published a story that deflated a few Benghazi conspiracy theories).
- Erroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark.
- Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the

Dominican Republic. The story turned out to be a complete fabrication, and may have even been planted by the Cuban government.

He also thinks Obama is gay.

**What?**

Behold:

I know we aren't supposed to talk about this but Obama is clearly gay, guys. Not that there's anything wrong with that.

— Charles C. Johnson (@ChuckCJohnson) December 3, 2014

Why did Obama have an openly gay activist man as his mentor at Occidental? Why did he travel with gay man in Pakistan?

— Charles C. Johnson (@ChuckCJohnson) December 3, 2014

Why did Obama live with several openly gay men if he's not gay? Why can't we find any women who had sex with OBAMA & will talk? (Fixed it!)

— Charles C. Johnson (@ChuckCJohnson) December 3, 2014

(He had previously tweeted: "Why can't we find any women who have had sex with me & will talk?")

Once you accept the premise that Obama is gay a lot of things start to make sense.

— Charles C. Johnson (@ChuckCJohnson) December 3, 2014

Note how closed minded my critics are tonight. They haven't wondered if maybe, just maybe, Obama is gay. And I'm the one that's a bigot?

— Charles C. Johnson (@ChuckCJohnson) December 3, 2014

### Johnson seems pretty clearly incompetent. But why do people *loathe* him?

Johnson's work for larger news organizations is mostly inept rubbish. But the stuff he publishes on GotNews.com tends to be intensely hateful—bizarre, non-sequitur, victim-attacking bile directly from, and directly for, the online right-wing's id.

Johnson likes to publish articles, for example, insinuating that victims of police violence—particularly black victims—pretty much had it coming. Earlier this year, he collected screenshots of murdered teenager Michael Brown's Instagram account. "Brown's Instagram account also shows a violent streak that may help explain what led to a violent confrontation with Police officer Darren Wilson," Johnson wrote. In other words, Brown deserved to die.

He gave a similar treatment to a pregnant woman named Dornella Connors, who was blinded by a bean bag fired by police officers in Ferguson, Mo. to quell protestors. Since Connors apparently lacked a criminal record, Johnson went after her boyfriend, Deangelas Lee, in an article titled "BREAKING: Blinded Pregnant Ferguson Protestor's Boyfriend Tried Killing Cops With Car, Is Criminal." To drive the point home, Johnson embedded a video of Lee rapping.

### That's really racist.

Yes. And these articles also put a lie to Johnson's self-spun image as a radical patriot fighting against the political establishment. In article after article, he props up the interests of one of the most powerful political lobbies in the country: the police.

It's not just Johnson's attitude toward people of color who've been victimized by cops. Johnson in general likes to retaliate against certain individuals by publishing their personal information (a.k.a. doxxing). A recent example: After the *New York Times* published a copy of former Ferguson cop Darren Wilson's marriage certificate, and named the street on which he used to live, Johnson published the home addresses—down to the house and apartment numbers—of the pair of reporters who authored the *Times* story. The headline read: "Why Can't We Publish Addresses Of *New York Times* Reporters?"

### Is that why people want Twitter to permanently ban him?

The most recent calls for Johnson to be banned from Twitter arose from Johnson's decision to publish what he claims is the full name of "Jackie," the woman who spoke to *Rolling Stone* about being raped at a U.V.A. fraternity in 2012. It's not yet clear whether the name Johnson published is "Jackie's" real name. But Johnson was so sure that Jackie lied about being raped that he began issuing threats on Twitter to publish more information about her:

I'm giving Jackie until later tonight to tell the truth and then I'm going to start revealing everything about her past.

— Charles C. Johnson (@ChuckCJohnson) December 7, 2014

Last night, he attempted to deliver on that promise by publishing a picture of a woman—who may or may not be Jackie—"proudly displaying a sign suggesting yet another rape" at a 2011 SlutWalk rally. Within hours of publication, Johnson updated the post to clarify that he didn't actually know whether the woman in the photo was actually Jackie—thereby retracting the claim that Jackie "cried rape BEFORE #UVAHoax." Still, he later promised even *more* news about Jackie:

Thank you to everyone who corrected me. Now I'm going to break more news that blows this wide open, okay?

— Charles C. Johnson (@ChuckCJohnson) December 9, 2014

**That's all really fucked up.**

Yes, it is.

**I'm having difficulty understanding why he's writing this stuff.**

There are a number of theories. Many think he simply craves attention; outspoken conservatives regularly accuse him of being insane. Here's an email Sean Davis of The Federalist sent Johnson earlier this month:

This is how the well fed right responds to you questioning their 'reporting' on #EricGarner & fake chokehold story. pic.twitter.com/6MWQEaqKfv

— Charles C. Johnson (@ChuckCJohnson) December 4, 2014

Far more noteworthy than any of Johnson's journalism stunts, however, is his intellectual pedigree.

## What do you mean?

Johnson isn't really a marginal or peripheral figure in mainstream conservatism, as his critics often make him out to be. Here's his auto-biography:

> He has written for The Wall Street Journal, The New York Post, The Los Angeles Times, The New Criterion, The American Spectator, The Claremont Review of Books, City Journal, Reason.com, National Review Online, Tablet Magazine, The Weekly Standard, Powerline, and The New York Sun.

> His work has been featured on Real Clear Politics, the Drudge Report, Hotair.com, The Blaze, Breitbart.com, Rush Limbaugh's Show, and the Wall Street Journal's Best of the Web. He has been on Fox News with Megyn Kelly, Sean Hannity, and Lou Dobbs and numerous radio programs, including Rush Limbaugh, Larry Elder, John Batchelor, Rusty Humphries, Dennis Prager, Larry Elder, Mark Levin, and Larry Kudlow. [...]

> Charles has worked for Alan M. Dershowitz at Harvard Law School, Seth Lipsky at the New York Sun, Carl Schramm at the Kauffman Foundation, and Charles Kesler at the Claremont Review of Books.

The outlets and individuals named here aren't InfoWars or Alex Jones. Indeed, Johnson's biography describes someone raised by the intellectual right—his Calvin Coolidge biography was enthusiastically endorsed by John Yoo—and offered a platform by some of the most influential conservative publications.

## Why does that matter?

It is certainly true that Johnson has alienated a wide swath of prominent conservatives with his tactics. But it's disingenuous to argue that he's disconnected from, or doesn't represent, the main threads of conservative politics. (The same day Johnson published Jackie's full name, *National Review* writer Kevin D. Williamson wrote an essay titled "We Should Name Rape Accusers.") So the next time Johnson shits the conservative movement's bed, for whatever reason, it's important to remember exactly where he came from.

---

Photo credit: YouTube

---

Terms of Service    Privacy Policy

# **EXHIBIT 5**

## **Dec 9 Howard Article**


 THE **CONCOURSE** ↑

# Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?

Greg Howard

12/09/14 4:00pm · Filed to: POOPERS ⌄

🔥 **167.7K**   💬 **393**   ⭐ **60**   ⋮



If you've been online this week, you may have heard of Charles "Chuck" C. Johnson, an odious conservative blogger who has gained some fame by rolling around in the shit left in the wake of last month's *Rolling Stone* piece, which told the story of a University of Virginia student who claimed she was raped by seven men at a frat party her freshman year in school. Since then, *Rolling Stone* has revealed that they really, really fucked up, and elements of the story are inaccurate.

We don't really know *how* the report is inaccurate, or by how much; there are peripheral discrepancies in Jackie's story, while the fraternity Phi Kappa Psi denies a rape ever happened. This caused an uproar, largely from those who saw this story, and rape, really, as an attempt by the propagandist left to push an agenda of marginalizing straight, white men, or whatever. This is where the fuzzy ginger manbaby comes in.

**The UVA Mess Is Now a Full-Fledged Shitstorm**





INTERNET ARCHIVE
WayBackMachine
http://theconcourse.deadspin.com/how-rolling-stone-...

45 captures
10 Dec 14 – 12 Sep 16

On Friday, Rolling Stone announced in a note signed by
managing editor Will Dana that in light of...

DEC  FEB  MAR    Close
◀  **3**  ▶
2015  **2016**  2017   Help

Johnson is a self-stylized journalist whose lack of skill in reporting is only augmented by the curtain-hanger abortion of his soul. (Here's the full docket on him. He gets things wrong *a lot*.) Johnson attempted to punish Jackie by revealing her identity, along with a photo and contact information. The monstrous travail turned out even worse than expected; he appears to have doxxed the wrong girl.



**What Is Chuck Johnson, and Why? The Web's Worst Journalist, Explained**

If you were active on social media this weekend, you may have noticed frequent references to a...

Johnson went to Claremont McKenna College, a small, liberal arts school in California. In this school, he had classmates, some of whom are his friends, and many of whom most definitely do not fuck with him one bit. Both factions have tried to reach out to him. Late last night, he posted this on his Facebook wall, addressing everyone. Today, it was emailed to me:

http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-  Go

INTERNET ARCHIVE
WayBackMachine

46 captures
10 Dec 14 - 12 Sep 16

DEC  FEB  MAR   Close

◀  3  ▶

2015  2016  2017   Help

**Dear past classmates,**

I have received a number of emails, tweets, and phone calls, etc. from you and want to make some things clear about me and you now.

Please relay this message widely as it needs to be internalized by you about me.

I wasn't friends with most of you. Most of you weren't particularly kind to me throughout my academic career. That's fine. I didn't ask for it. I did well despite you. I wrote books, formed companies, got married, traveled widely, and had interesting, formative experiences.

Perhaps you were angry at me because I was poor. Perhaps it was because I was neuroatypical. Perhaps it was because my mother was ill. Perhaps it was because we didn't get along because I was busy making a living and doing interesting things while you were not. Perhaps you were mad because your parents saw more of themselves in me than you and so liked me more and you were resentful. There are many reasons why weaker people dislike strong people: jealousy, misunderstandings, hatred of what's different.

That's not important now.

Now that I have some measure of notoriety and success, I do not owe you phone calls or responses to your condescending "concern" for me. Please know that most of these emails will be deleted or archived. Some will be openly mocked. Others may be retweeted or written about in future things.

Some of you have talked to the press about me and pretended that we were close. We were not but you've decided to trade on relationships we never had in the hopes of seeing your name in the press. This is pathetic.

Here's what you may not do:

You may not accuse me of racism, sexism, blah blah-ish without asking me for my point of view first. I may or may not choose to give it to you.

I'm also not interested in your pop psychological explanations about what's wrong with me.

The truth of the matter is that I'm the happiest I have ever been doing the work I love doing. I'm very busy on that project.


INTERNET ARCHIVE
WayBackMachine
46 captures
10 Dec 14 - 12 Sep 16

DEC | FEB | MAR | Close
◄ **3** ►
2015 | 2016 | 2017 | Help

I have lived a colorful, difficult, exciting, crazy life thus far and it's only just beginning. I make no apologies for it. I have made and will make mistakes and some of them may be huge. But I have lived life on my own terms.

Those of you I count as true friends, you know who you are. I owe you the world.

There's some good shit in here! I emailed Johnson about it, and he confirmed that he jammed the above jam. We then went on to trade snarky pleasantries. He told this site not to do him like Cory Gardner; I asked him if he ever played football. "Oh and do please tell Nick Denton I said hi," he directed; "I'm working from home," I replied, regretfully. And then he sent this:



Charles Johnson
to me ▾                                    2:14 PM (0 minutes ago)

Oh, and the comments about me shitting on the floor were made up.

*Word?*

Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident.

I'd be inclined to believe the guy, or at least give him the benefit of the doubt. But he's been caught lying many times before, and in the wake of *Rolling Stone* deputy editor Sean Woods tendering his resignation, it's more important than ever to fact check. And so I ask you, dearest readers: Did Chuck Johnson really shit on the floor in college? Please send context, stories, and photos to tips@deadspin.com. If you have physical evidence, you'd be better served just throwing that shit, as it were, on Amazon. As Johnson can attest, he's somebody.



# Which of These Disgusting Chuck Johnson Rumors are True?



J.K. Trotter
12/15/14 03:30PM  Filed to: RUMORMONGER

175.10K



You may have read *The New York Times*' profile of Charles C. Johnson, the worst journalist on the internet. You also may have seen several very elaborate, very unbelievable, and very gross rumors about Johnson's past misdeeds floating around Twitter and Facebook. So maybe you're wondering: Which of those rumors are real?

Given Johnson's various struggles of with accuracy and his dogged pursuit of a *Times* reporter's teenage misdemeanor, we've examined three stories going around about the conservative media icon. Let's see how they stack up, from least to most horrible.

Be warned: This post contains disturbing language.

---

**Rumor 1: Johnson shit on the floor in college**

This rumor, first noted (but not confirmed) by Deadspin's Greg Howard, alleges that Johnson defecated on a dormitory floor when he attended Claremont McKenna College in suburban Los Angeles. Last week, two of Johnson's college classmates, using Gawker burner accounts, filled in the details of the shitting story.

The first classmate:

> Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm). I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems.

The second:

> I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassman talked about it regularly and it was an undisputed fact that he did it. Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people talking about it can be seen in the comment archives from 2008-2011.

However, in a subsequent comment the first classmate clarified that the shitting rumor was in fact an "apocryphal origin story":

I have heart-breaking news, team, there was never any proof that he actually was the one who pooped on the floor. Someone did poop on the floor and just to sort of troll the Mountain King himself people started posting that he pooped. It was one of those things no one could prove or disprove. It started as a joke but has sort of morphed into apocryphal origin story. And there is a sort of poetic justice in tarring the biggest shit on campus with that fecal crime...but alas it's not *really* true.

Furthermore, Johnson has explicitly denied the shitting story on Twitter:

It's interesting that the same media that accuses me of making shit up is making shit up about me me shitting on the floor. Irony. Funny.

— Charles C. Johnson (@ChuckCJohnson) December 10, 2014

*Verdict:* There is **no evidence** that Chuck Johnson took a shit on the floor in college. Chuck Johnson was, however, so **thoroughly disliked** in college that his classmates chose to blame an unattributed shit on him.

---

## Rumor 2: Johnson bragged about urinating in his girlfriend's mouth

This story is apparently confined to alumni of the Claremont Institute, a think tank based in Claremont, California which sponsors summer fellowships for conservative college students. Johnson attended the Institute as a "Publius Fellow" in 2012. During his stay, according to another Claremont fellow,

Johnson bragged about urinating in his girlfriend's mouth as punishment for infidelity. (We've verified that this fellow attended the Institute with Johnson.)

As the fellow put in an email:

> One night during the Claremont program, about four guys are sitting outside on the balcony at our very nice hotel. I'm there, and so is Charles. He's drunk, which was not unusual since he's terrible at holding his liquor. I think we had been talking about past relationships. At some point, Charles announces that he sticks to Asian women because they value intelligence, which means he can get a higher "grade" of woman. Not a completely ridiculous comment, but I just mention it to point out that the trolling never really ends; it's become embedded in his being. Each thing that comes out of his mouth is designed to offend at least one person in the room.
>
> A few minutes later he starts talking about his ex-girlfriend, some (by his account) "fucking whore" (or something) who cheated on him (shocking!). According to Charles, he found out about the cheating, but his ex was unaware that she had been caught. **So he devises a plan: wait until his girlfriend is giving him a blowjob, and then pee in her mouth. He announces to us that he executed the plan successfully. He pee'd in her mouth. She was obviously horrified, and he gleefully revealed that he knew about the cheating**. *Fuck yeah; she totally deserved that. High Five* (not really). He was very proud to tell us.
>
> I called bullshit. He insisted that he did it. We go back and forth and he finally tries to call his ex. It goes to voicemail. Maybe Charles Johnson didn't pee in his girlfriend's mouth. Either way, he wanted us to believe that he did. Or maybe he actually did. Both options are psychotic. I'd rather not have my name associated with this story, but I just wanted to throw it out there.

In an email to Gawker, Johnson denied that he bragged about urinating into his ex-girlfriend's mouth. However on Twitter he characterized the same ex-girlfriend as "psychotic"—an apparent insinuation that our source is his ex-girlfriend. That's not true.

We reached out to every other male Publius fellow from the summer of 2012 for whom we could find contact information. Most did not respond to requests for comment, or ceased communication after we provided the details of the story above. The one fellow who did respond said: "I was not present for that story, nor do I recall hearing it from others. I am decidedly not a fan of his but I can't attest to it."

*Verdict:* Chuck Johnson is **credibly accused** of bragging about urinating in an ex-girlfriend's mouth. Whether or not he actually performed such urination is **unknown**. You **probably would not** want to be romantically involved with him.

---

## Rumor 3: Johnson fucked a sheep

This story requires a detailed accounting. Shortly after Deadspin's floor-shitting post, Greg Howard received the following tip:

> Chuck had a 2002 bestiality charge expunged from his record due to his being a minor, 14 at the time.

As far as rumors go, this was both outlandish and thinly-sourced. But who knew, maybe there was something there. So Howard sent a short email to Johnson asking about it. Twelve hours later, in the middle of the night, Johnson tweeted a screenshot of Howard's inquiry (without confirming or denying it).

This is why deadspin got the Cory Gardner story wrong.

pic.twitter.com/BxdSmyWxiT

— Charles C. Johnson (@ChuckCJohnson) December 10, 2014

(The tweet refers to a debunked Deadspin piece about Senator-elect Cory Gardner's high school football career.)

Johnson's response would have probably halted any further reporting beyond a few searches through Lexis-Nexis and public records. After all, nobody seemed to know where the charge, if it existed, was filed. Even if someone determined where the incident took place, there wasn't a great chance of obtaining the incriminating police report if Johnson had it expunged.

But then, later on Wednesday, Howard received an iMessage from an unfamiliar number. It began: "Hey, sorry to use the # from chucky's post, but the bestiality story is 100% true..."

And went on:

> A friend is in the San Bernardino County Sheriff Dept... As I heard it, Chuck was about 14, had gone to stay with his cousins [for] a few weeks... He went for a weekend with one to a friend of the cousin's who owned a ranch near Wrightwood.
>
> **The father of the friend got suspicious when they caught him coming back inside very late the first night. The next night, he apparently wandered back out & got the cops called on him by a neighbor when he was spotted attempting to copulate with his wool sheep. The neighbor took pics with a telephoto lens, which, since the cops didn't catch him mid-act, were used as the basis for**

**his conviction. He was pants-down, pinning the sheep against the fence.**

The story is still famous in circles of San Bernardino County law enforcement, apparently. He got it expunged in 2007, saying he was just a kid experimenting, and he didn't want it to reflect badly when he was in college working for collegiate newspapers. My friend won't give interviews, because he'd get in trouble for leaking expunged records, but it definitely happened, and word is that the files & pics still exist. Hope that helps!!

In a subsequent text, the tipster explained how their friend put two and two together:

His wife was browsing my Twitter feed one day & he saw Chuck's name & pic over her shoulder... He called me right away & told me the story. Said it was the strangest case he'd ever worked on as a police officer.

The source declined to provide the contact information for their officer friend, but was otherwise willing to speak on the phone at length about the incident. So we know, at the very least, that this source is a real person.

Johnson denied this account on Twitter after Gawker followed up with him:

Gawker is making up two stories about me fucking animals and pissing in an ex-girlfriend's mouth. Seriously. pic.twitter.com/blITThk2TM

— Charles C. Johnson (@ChuckCJohnson) December 12, 2014

In an email he sent an hour later, Johnson added: "Both statements are untrue, in their entirety. If you publish these stories, or any version of them, you will have intentionally libeled me, with malice."

A search through public records and the archives of local newspapers did not turn up any mention of an arrest matching the one our source described. (This does not necessarily mean that the arrest didn't occur, though; editors don't necessarily publish all incidents involving the police, and public records databases would not contain an expunged record.)

The San Bernardino County Sheriff referred our inquiry to the county's district attorney; a representative at the juvenile division there said they do not divulge information pertaining to individuals arrested and/or charged as juveniles, as Johnson allegedly was.

*Verdict:* There is **no evidence** that Chuck Johnson was arrested in 2002 for pinning a sheep to a fence and fucking it. Johnson is, however, **the kind of guy** about whom random people make up and circulate rumors about him being arrested in 2002 for pinning a sheep to a fence and fucking it.

---

*If you know any more about these or other stories, send an email to trotter@gawker.com or hop in below.*

*Photo credit: YouTube*

---

Terms of Service      Privacy Policy

# EXHIBIT 7

## Got News - Statement Chart

In re Gawker Media LLC, *et al*.
Chart of Statements – Objection to Got News LLC Proofs of Claim

| | Paragraph in Complaint | Quote | Location of Statement | Reason Not Actionable |
|---|---|---|---|---|
| **A** | 231(a)(i)(1) | "The list of Johnson stories that have been proven wrong is long, but his greatest hits include . . . [e]rroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark." | December 9 Trotter Article | Opinion |
| **B** | 231(a)(i)(2) | "…Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The story turned out to be a complete fabrication, and may have been planted by the Cuban government." | December 9 Trotter Article | Opinion |
| **C** | 231(a)(ii) | "Earlier this year [Johnson] collected screenshots of murdered teenager Michael Brown's Instagram account. (Quoting Johnson), 'Brown's Instagram account also shows a violent streak that may help explain what led to a violent confrontation with Police officer Darren Wilson,' Johnson wrote. In other words, Brown deserved to die." | December 9 Trotter Article | Opinion |
| **D** | 237(a)(i)* | "[Johnson] gets things wrong *a lot*." | December 9 Howard Article | Opinion |
| **E** | 231(b)(i) | "Rumor 1: Johnson shit on the floor in college." | December 15 Trotter Article | Not Asserted as Fact |
| **F** | 231(b)(iii) | "Rumor 3: Johnson fucked a sheep." | December 15 Trotter Article | Not Asserted as Fact |
| **G** | 237(a)(ii)* | "Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor shitting incident." | December 9 Howard Article s | Not Asserted as Fact |
| **H** | 237(b)* | "Tell you what. There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker." | December 9 Howard Article | Opinion; Not Asserted as Fact |

| | | | | |
|---|---|---|---|---|
| **I** | 231(b)(ii)(1) | "Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm). I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems." | Comment on December 15 Trotter Article | § 230 Immunity |
| **J** | 231(b)(ii)(2); 237(b)(ii)(1)* | "I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassmen talked about it regularly and it was an undisputed fact that he did it. Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people taking about it can be seen in the comment archives from 2008-2011." | Comment on December 15 Trotter Article | § 230 Immunity |
| **K** | 231(b)(iv)(1) | "Chuck had a 2002 bestiality charge expunged from his record due to his being a minor, 14 at the time." | Comment on December 15 Trotter Article | § 230 Immunity |
| **L** | 231(b)(iv)(2) | "A friend is in the San Bernardino County Sherriff Dept. As I heard it, Chuck was about 14, had gone to stay with his cousins [for] a few weeks. . . He went for a weekend with one to a friend of the cousin's who owned a ranch near Wrightwood. The father of the friend got suspicious when they caught him coming back inside very late in the first night. The next night, he apparently wandered back out & got the cops called on him by a neighbor when he was spotted attempting to copulate with his wool sheep. The neighbor took pics with a telephoto lens, which, since the cops didn't catch him mid-act, were used as the basis for his conviction. He was pants down pinning the sheep against the fence. The story is still famous in circles of San Bernardino County law enforcement, apparently. He got it expunged in 2007, saying he was just a kid experimenting, and he didn't want it to reflect badly when he was in college working for collegiate newspapers. My friend won't give interviews, because he'd get in trouble for leaking expunged records, but it definitely happened, and word is that the files & pics still exist. Hope that helps!!" | Comment on December 15 Trotter Article | § 230 Immunity |
| * The paragraphs in Johnson's complaint revert from number 241 to 232 on page 54. The relevant statements cited above are on pages 55 and 56. | | | | |