Ropes & Gray LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                              :
In re                                         :        Chapter 11
                                              :
Gawker Media LLC, *et al.*,[1]                :        Case No. 16-11700 (SMB)
                                              :
                    Debtors.                  :        (Jointly Administered)
                                              :
--------------------------------------------------------x

**NOTICE OF OBJECTION OF DEBTOR GAWKER MEDIA LLC TO**
**PROOF OF CLAIM NO. 269 FILED BY ASHLEY TERRILL,**
**AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C),**
**PURSUANT TO BANKRUPTCY RULES 9014 AND 7012**

   **PLEASE TAKE NOTICE** that the undersigned have filed the attached *Objection of*

*Debtor Gawker Media to Proof of Claim No. 269 Filed by Ashley Terrill and Motion to Apply*

*Fed. R. Civ. P. 12(B)(6) and 12(C), Pursuant to Bankruptcy Rules 9014 and 7012* (the

"Objection"), which seeks to alter your rights by disallowing your claims against the above-

captioned Debtors.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place on **December 1, 2016 at 10:30 a.m. (Eastern Time)** before the Honorable Judge Stuart M. Bernstein, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Courtroom No. 723.

**PLEASE TAKE FURTHER NOTICE** that responses to the Objection and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **November 14, 2016**, **at 4:00 p.m. (Eastern Time)** (the "Response Deadline"), upon: (i) the Debtors, Gawker Media LLC, c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022 (wholden@opportune.com); (ii) counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com);  (iii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes & Susan Arbeit; (iv) the Internal Revenue Service, Attn: Centralized Insolvency Operation, 2970 Market Street, Philadelphia, PA 19104 (mimi.m.wong@irscounsel.treas.gov); (v) the United States Attorney's Office for the Southern District of New York, Attn: Bankruptcy Division, 86

2

Chambers Street, 3rd Floor, New York, NY 10007 (david.jones6@usdoj.gov; Jeffrey.Oestericher@usdoj.gov; Joseph.Cordaro@usdoj.gov; Carina.Schoenberger@usdoj.gov); (vi) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com); (vii) counsel to US VC Partners LP, as Prepetition Second Lien Lender, Latham & Watkins LLP, at both 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: David Heller (david.heller@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); (viii) counsel for the Official Committee of Unsecured Creditors, Simpson Thacher & Bartlett, 425 Lexington Ave., New York, NY 10017, Attn: Sandy Qusba (squsba@stblaw.com) and William T. Russell (wrussell@stblaw.com); and (ix) parties that have requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Objection by the Response Deadline, the Bankruptcy Court may deem any opposition waived, treat the Objection as conceded, and enter an order granting the relief requested in the Objection without further notice or hearing.

[*Remainder of this page intentionally left blank*]

59334665_5

**PLEASE TAKE FURTHER NOTICE** that a copy of the Objection may be obtained

free of charge by visiting the website of Prime Clerk LLC at http://cases.primeclerk.com/gawker.

You may also obtain copies of any pleadings by visiting the Court's website at

http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: October 31, 2016                    */s/ D. Ross Martin*

      New York, New York             ROPES & GRAY LLP

                                       Gregg M. Galardi

                                       D. Ross Martin

                                       Jonathan M. Agudelo

                                       Peter Walkingshaw (admitted *pro hac vice*)

                                       1211 Avenue of the Americas

                                       New York, NY 10036-8704

                                       Telephone: (212) 596-9000

                                       Facsimile: (212) 596-9090

                                       gregg.galardi@ropesgray.com

                                       ross.martin@ropesgray.com

                                       jonathan.agudelo@ropesgray.com

                                       peter.walkingshaw@ropesgray.com

                                       *Counsel to the Debtors*

                                       *and Debtors in Possession*

4

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
Gawker Media LLC, *et al.*,[1]          :        Case No. 16-11700 (SMB)
                                        :
                Debtors.                :        (Jointly Administered)
                                        :
------------------------------------------------------x

**OBJECTION OF DEBTOR GAWKER MEDIA LLC TO
PROOF OF CLAIM NO. 269 FILED BY ASHLEY TERRILL,
AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C),
<u>PURSUANT TO BANKRUPTCY RULES 9014 AND 7012</u>**

Pursuant to section 502(b)(1) of the Bankruptcy Code and Bankruptcy Rule 3007(d),

Gawker Media LLC ("<u>Gawker Media</u>") as debtor and debtor in possession in the above-

captioned cases (the "<u>Bankruptcy Cases</u>"), hereby submits this objection (the "<u>Objection</u>") to

claim No. 269 filed by Ashley Terrill (the "<u>Terrill Claim</u>"), a true and correct copy of which is

attached hereto as **<u>Exhibit 2</u>**.  The Terrill Claim is based on a civil action (the "<u>Terrill Action</u>")

---

[1] Gawker Media Group, Inc. ("<u>GMGI</u>"), and Gawker Hungary Kft. (f/k/a Kinja Kft., "<u>Gawker Hungary</u>") are also debtors and debtors in possession in these cases, and together with Gawker Media LLC (as debtor and debtor in possession) are refereed to herein as the "<u>Debtors</u>."  The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft. ) (5056).  Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

that Ms. Terrill filed in the United States District Court for the Southern District of New York

(the "District Court") against Gawker Media and certain other defendants (collectively, the

"Defendants").  In support of this Objection, Gawker Media respectfully represents and sets forth

as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Objection is a core

proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested

herein are section 502(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the

"Bankruptcy Code"), and Rules 3007, 7012 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

2.      As an initial matter, Gawker Media is proceeding to obtain a ruling in the District

Court on a motion to dismiss the Terrill Action.  In accordance with its chambers rules, the

District Court has granted Gawker Media leave to file a motion to dismiss.  Gawker Media

anticipates filing that motion on November 11, 2016.  Gawker Media has offered to modify the

stay to permit that objection to be filed, although counsel to Ms. Terrill has not yet provided a

signed stipulation regarding such modification.

## RELIEF REQUESTED

3.      By this Objection, Gawker Media requests entry of an order (the "Proposed

Order"), substantially in the form attached hereto as **Exhibit 1**, disallowing Proof of Claim No.

269 because Gawker Media has no liability on account of such claim under applicable

nonbankruptcy law.

2

4.      Gawker Media also requests that Fed. R. Civ. P. 12(b)(6) and 12(c) be made applicable to this contested matter, pursuant to Bankruptcy Rules 7012 and 9014.

## BACKGROUND

5.      The Terrill Claim asserts, solely against Gawker Media, a single claim of $10,000,000 under New York law.

6.      Ms. Terrill is a journalist whose suit against Gawker Media stems from an article (the "Article") published on *Gawker.com* on November 23, 2015.  The Article describes Ms. Terrill's investigation into Whitney Wolfe ("Wolfe"), a former executive at Tinder, a popular dating app.  The Article reported that Ms. Terrill claimed to have uncovered inconsistencies in a sexual harassment lawsuit Wolfe brought against Tinder.  Ms. Terrill also believed that people connected to Wolfe were attempting to harass and intimidate her.  The Article reported on the history of Wolfe's dispute with Tinder, Ms. Terrill's fears that Wolfe was "trying to destroy her" for investigating him, as well as Wolfe's belief that there was a "possibility that [Ms.] Terrill was building her case against Wolfe with cooperation from Tinder."  Compl., Ex. A.  The Article intentionally declined to reach a conclusion as to what actually transpired between the subjects, leaving the reader to make her own decision.

7.      Ms. Terrill filed her original complaint (the "Original Complaint") in the District Court on January 19, 2016 against the Defendants.  Ms. Terrill has twice amended the Original Complaint on April 5, 2016 (the "First Amended Complaint") and on June 1, 2016 (the "Complaint").

8.      The Complaint asserts six causes of action based on the Article.  First, the Complaint asserts a claim for libel based on fifteen different statements in the Article.  Complaint ¶¶ 62-70.  Next, the Complaint asserts a breach of confidence claim based on the

3

allegation that a Gawker Media employee promised her that truthful information she provided him would be kept confidential. *Id.* ¶¶ 71-80. Third, the Complaint asserts that the defendant's disclosure and misappropriation of confidential information constituted a breach of contract. *Id.* ¶¶ 81-85. The fourth claim in the Complaint seeks damages for intentional interference with prospective economic relations, *id.* ¶¶ 86-92, and the fifth claim seeks damages for fraudulent misrepresentation. *Id.* ¶¶ 93-99. Last, Ms. Terrill seeks damages for negligent hiring or retention, alleging that the an employee of Gawker Media that she had spoken with, Sam Biddle, was a drug abuser, his drug abuse would somehow foreseeably cause him to commit the illegal conduct alleged in the Complaint, and the Defendants somehow knew or should have known those matters before hiring or retaining him. *Id.* ¶¶ 100-106.

## APPLYING BANKRUPTCY RULE 7012 TO THIS PROCEEDING

9.    Pursuant to section 502(b)(1) of the Bankruptcy Code, a claim is disallowed to the extent that it is unenforceable against the debtor and property of the debtor, under any agreement or applicable nonbankruptcy law. *E.g., Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007). The Terrill Claim is disallowable as a matter of law.

10.    A proof of claim has *prima facie* validity and is "deemed allowed" until an objection is filed. To overcome this prima facie effect, the objecting party must bring forward evidence equal in probative force to the evidence underlying the proof of claim. *In re Oneida, Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009) (quoting *In re Allegheny Int'l., Inc.* 954 F.2d 167, 173 (3d Cir. 1992)). The Claimant must then "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.*; *Helliwell v. George R. Burrows, Inc. (In re George R Burrows, Inc.)*, 156 F.2d 640, 641 (2d Cir. 1946) ("[A]s soon as the trustee introduced any substantial evidence in opposition the claimants needed to establish by a

4

preponderance of all the evidence that the claims as filed were based on facts which entitled the claimants to their allowance under the law.  The burden of over-all proof was then on the claimants.").

11.     This contested matter and the resolution of the Terrill Claim (as with several other claims filed in these bankruptcy cases) will be made more orderly and efficient by applying certain parts of Rule 7012.  The supporting information for the Terrill Claim is, in its entirety, a copy of a civil action complaint filed in a United States District Court.  The allegations sound in tort, not contractual claims that are typically susceptible to the more summary, informal procedures of an ordinary claims objection hearing.

12.     Indeed, in many circumstances, bankruptcy courts in this District have analogized their resolution of proofs of claim based on outside litigation to the ordinary civil litigation process, without formally invoking and applying Rule 7012.  "In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure."  *In re DJK Residential LLC*, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009) (sustaining claim objection and disallowing claim that repeated causes of action in related litigation for failing to satisfy Fed. R. Civ. P. 9 when claimants failed to show that claim was facially plausible); *see also In re Residential Capital, LLC*, 518 B.R. 720, 726, 731-32 (Bankr. S.D.N.Y. 2014) (disallowing claims, based on complaint filed pre-petition in state court, that failed to state "a plausible basis for the Debtors' liability" under federal pleading standards).

13.     In this contested matter, the Court should direct that Federal Rules of Civil Procedure 12(b)(6) and/or 12(c) (available pursuant to Bankruptcy Rule 7012(b) and 9014(a)) are applicable.  "The court may at any stage in a particular matter direct that one or more of the

other rules in Part VII shall apply." Fed. R. Bankr. P. 9014. The Terrill Claim is asserted in a large amount, and therefore delineating the precise procedural posture and basis for ruling in a manner that is common in this type of lawsuit will enhance judicial efficiency.

14.    Following application of Rule 12(b)(6) and Rule 12(c), this Court will be in a position to resolve the Objection in either of the two likely paths that litigation will take. If the District Court grants the motion to dismiss, this Court can then formally disallow the proof of claim based on res judicata. If it becomes necessary or appropriate for this Court to take up the substance of the claim (for example, if it became a central issue preventing progress in these chapter 11 cases and for some reason the District Court had not ruled), then this Court can rule on the legal issues presented. This Court could then consider the Complaint (attached to the Terrill Claim), this Objection, any response and any reply papers, either to be briefed on a motion to dismiss or a motion for judgment on the pleadings.

## **OBJECTION**

15.    Among other things, "[i]n determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." *In re DJK Residential*, 416 B.R. at 106; *see also In re Residential Capital*, 518 B.R. at 731. Accordingly, Ms. Terrill must allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between the possibility and the plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. The claims in the Complaint all fail to state a claim upon which relief can be granted.

## I.    Ms. Terrill Has Failed to State a Claim for Libel (Defamation)

16.    To begin with, Ms. Terrill's libel claim fails for several reasons.  First, Ms. Terrill

fails to plead a false statement of fact upon which she bases her claim.  This is fatal to her claim

because no cause of action for defamation can be sustained where the words at issue are

substantially true.  *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)

(citation omitted).  Here, Ms. Terrill claims she was defamed by statements in the Article about

(i) her investigation of Wolfe, or (ii) her belief that Wolfe or Wolfe's agents were harassing her.

But her own complaint alleges the substantial truth of the factual basis for all of these statements

– and indeed, explicitly acknowledges that she herself was Gawker Media's source for all of

these facts.  Compl. ¶ 71.  For example, Ms. Terrill pleads that she was investigating Wolfe and

Wolfe's dispute with Tinder because she found "inconsistencies" in Wolfe's prior statements.

Comp. ¶¶ 13-18.    Similarly, the Complaint pleads that shortly after Ms. Terrill began her

investigation, Wolfe's agents called to make threats and Ms. Terrill's phone and computer

showed signs of being hacked.  Compl. ¶¶ 19-22.  Reading the Complaint as a whole reveals that

there are no false facts at issue.  More than that, the statements at issue are not defamatory and/or

are constitutionally protected opinions.  *See, e.g., Biro v. Conde Nast*, 883 F. Supp. 2d 441, 468

(S.D.N.Y. 2012) ("[c]ourts have consistently held that when an author fully sets forth the factual

basis for a particular view (and that factual basis is not challenged as false), then the author's

conclusion constitutes nonactionable opinion").  Ms. Terrill may have desired a more flattering

story – in line with the promotional materials she provided Gawker for publication, but

disappointment is not a cognizable cause of action.  *See* Compl. ¶ 71.

17.    Second, Ms. Terrill is a journalist who has written about Wolfe and injected

herself into the debate over the merits of Wolfe's lawsuit against Tinder.  Compl. Summary of

the Case, ¶¶ 10-11, 73.  Under First Amendment law, this makes Ms. Terrill a public figure as to the subject-matter of the Article.  *See, e.g., Hotchner v. Castillo-Puche*, 551 F.2d 910, 911 (2d Cir. 1977) (holding writer to be limited-purpose public figure with respect to the subject of his work).  For claims of defamation to survive a motion to dismiss, they must go beyond conclusory allegations of actual malice to plead "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' actual malice."  *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal punctuation omitted), cert. denied, 136 S. Ct. 2015 (2016)).  A finding of "actual malice" requires clear and convincing proof of either "knowledge of falsity" or "reckless disregard for the truth," and that "reckless disregard" requires the same quantum of evidence demonstrating that "'the defendant in fact entertained serious doubts as to the truth of his publication.'"  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (citation omitted).  Yet Ms. Terrill fails to plead any facts that would create a plausible inference that Gawker Media acted with a subjective knowledge of falsity, claiming alternately that (i) "actual malice is not required to be shown" and (ii) that it can be shown by general (and false) allegations of misconduct by Gawker and Mr. Biddle not related to Plaintiff or the Article.  Compl. ¶¶ 30-50.  Because these allegations of wrongdoing have nothing with the Article, they cannot establish actual malice.  *See, e.g., Tavoulareas v. Piro*, 93 F.R.D. 35, 44 (D.D.C. 1981) (refusing to permit discovery pertaining to unrelated defamatory articles by defendants).  Ms. Terrill's claim for defamation should therefore be dismissed for failure to plead actual malice with sufficient particularity.

18.    Even if Ms. Terrill is not a public figure, the Complaint must still plausibly allege actual malice as a component of a punitive damages claim.  *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139-42 (2d Cir. 1984).  In addition, for a claim as to liability to survive a motion to

dismiss, it would have to plausibly allege that the Defendants acted in a grossly irresponsible manner. *See Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 200 (1975). As with the actual malice standard, allegations of misconduct that "extend[] beyond the scope of the article challenged" are irrelevant for this purpose. *See, e.g., Talbot v. Johnson Newspaper Corp.*, 124 A.D.2d 284, 285 (3d Dep't 1986).

## II.    Ms. Terrill Has Failed to State a Claim for Breach of Confidence

19.    Unlike a traditional breach of contract claim, breach of confidence sounds in invasion of privacy. *Young v. U.S. Dep't of Justice*, 882 F. 2d 633, 641 (2d Cir. 1989). While the claim has survived in limited contexts, such as doctor-patient relationships, it is inapplicable here. The New York Court of Appeals has consistently held that there is no common-law right to privacy in New York. *See Arrington v. N.Y. Times Co.*, 55 N.Y. 2d 433, 439–41 (1982). The Court of Appeals has adopted this reasoning in no small measure because to do otherwise would be to offend the "values our State and Federal Constitutions bespeak in the area of free speech and free press." *Id.* at 439. Allowing a breach of confidence claim for a news article would "merely circumvent established privacy law." *Madden v. Creative Services, Inc.*, 84 N.Y. 2d 738, 747 (1995). Moreover, any such claim is disproved by the allgeations in the Complaint. The Complaint admits that Ms. Terrill "was willing to agree that Defendants may publish her work," Compl. ¶ 71, and fails to identify a single statement that was supposedly subject to a confidentiality agreement. Further still, emails that Ms. Terrill relies on and incorporates by reference into the Complaint show that Mr. Biddle expressly did not agree to the confidential arrangement alleged by Ms. Terrill. *See* Compl. ¶71. Ms. Terrill's disappointment in the Article does not allow retroactive and unilateral creation of a breach of confidence where no such agreement existed.

9

20.    To the extent this cause of action is now restyled as "tortious" breach of confidence, as discussed in Part III _infra_, Ms. Terrill has not alleged an underlying agreement or circumstances that could lead to a duty of confidence (contractual, quasi-contractual or in tort).

### III.    Ms. Terrill Has Failed to State a Claim for Breach of Contract

21.    Ms Terrill has failed to plead the factual content necessary to allow the court to draw a reasonable inference that an agreement existed, or that Gawker Media breached it. Among other things, Ms. Terrill has not pled the date of the contract's formation, and not identified a single statement in the Article that was subject to the alleged confidentiality agreement. _See, e.g., Berman v. Sugo LLC_, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008). The Complaint and its allegations also conflict with emails incorporated by reference into the Complaint which establish that Mr. Biddle rejected the terms of the agreement alleged, meaning that there was never a meeting of the minds.  Accordingly, Ms. Terrill has failed to plead "factual content that allows the court to draw the reasonable inference" that Gawker Media is liable as required by _Iqbal_ and _Twombly._

22.    Even if the Court concludes there is sufficient pleading of a contract, any contract claim is barred by New York's statute of frauds, N.Y. Gen. Oblig. Law § 5-701(a)(1). Under the statute of frauds, a verbal agreement is unenforceable unless "'full performance by all parties [is] possible within a year.'" _Guilbert v. Gardner_, 480 F.3d 140, 151 (2d Cir. 2007) (citation omitted). Earlier this year, the District Court (Rakoff, J.) held that a verbal journalist-source confidentiality agreement effectively identical to the one alleged in this case was barred by the statute of frauds, and granted judgment on the pleadings. _See Almeciga v. Ctr. for Investigative Reporting, Inc._, 2016 WL 2621131, at *3 (S.D.N.Y. May 6, 2016); _see also Watson v. MTV Network Enters._, 2013 WL 5885726, at *2 (Sup. Ct. N.Y. Cnty. Oct. 30, 2013) (holding journalist-source confidentiality agreement to be unenforceable in part because it did not comply

10

with statute of frauds).  There is no allegation in the Complaint that the full performance of the alleged oral confidentiality agreement at issue here was possible within a year – indeed, the Complaint suggests it was an unlimited obligation.  Compl. ¶ 23.  Here, as in *Almeciga*, the breach of contract claim is therefore barred by the statute of frauds.

23.    Because the statute of frauds renders the alleged confidentiality agreement unenforceable, the claims for tortious breach of confidence and fraudulent misrepresentation – which are premised on nothing more than Gawker Media's alleged breach of that agreement – must fail as well.  *See, e.g., Needel v. Flaum*, 248 A.D.2d 957, 958-59 (4th Dep't 1998); *Massey v. Byrne*, 112 A.D.3d 532, 533-34 (1st Dep't 2013).

## IV.    Ms. Terrill Has Failed to State a Claim for Intentional Interference with Prospective Economic Advantage

24.    Ms. Terrill also fails to state a claim for intentional interference with prospective economic advantage because this tort requires that "the defendant must direct some activities towards the third party."  *B&M Linen, Corp. v. Kannegeisser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (citation omitted).  Posting the Article to Gawker Media's website – the only action Ms. Terrill alleges – does not satisfy this requirement as a matter of law.  *Couloute v. Ryncarz*, 2012 WL 541089, at *4 (S.D.N.Y. Feb. 17, 2012).  In addition, this tort requires Ms. Terrill to demonstrate that Gawker Media "acted solely out of malice, or used dishonest, unfair, or improper means."  *Kirch v. Liberty Media Corp.*, 449 F. 3d 388, 400 (2d Cir. 2006) (citation omitted).  And, as a matter of law, Gawker Media's expressive conduct in publishing the Article, notwithstanding allegations of malice, "cannot be found [to amount to] the wrongful or improper conduct required to sustain a claim" of tortious interference.  *Huggins v. Povitch*, 1996 WL 515498, at *9 (Sup. Ct. N.Y. Cty. Apr. 19, 1996).

25.    The Complaint pleads that the only harm suffered by Ms. Terrill as a result of the alleged interference was reputational harm arising from the publication of the Article.  Compl. ¶¶ 53, 88.  The exclusive remedy under New York law for injury to reputation caused by a publication is a claim for defamation.  *See Chao v. Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012); *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 725-26 (S.D.N.Y. 2014).  Accordingly, any claim related to an intentional interference claim should be disallowed.

26.    Furthermore, in the context of libel claims, intentional interference claims are evaluated under the same First Amendment standards.  All of the arguments of Part I, supra, regarding defamation and libel, are equally applicable grounds for disallowance of any claim based on intentional interference with prospective economic advantage.

## V.    Ms. Terrill Has Failed to State a Claim for Fraudulent Misrepresentation

27.    Ms. Terrill also fails to state a claim for fraudulent misrepresentation.  "A promissory statement of what will be done in the future . . . gives rise *only* to a breach of contract cause of action."  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F. 3d 171, 184 (2d Cir. 2007) (emphasis added).  Accordingly, "[m]erely falsely indicating an intent to perform under a contract 'is not sufficient to support a claim of fraud under New York law.'"  *AXA Versicherung AG ex rel. Albingia Versicherungs AG v. New Hampshire Ins. Co.*, 348 F. App'x 628, 629 (2d Cir. 2009) (citation omitted).  Because the basis of the fraudulent misrepresentation claim is that Gawker Media failed to disclose some intention to breach the confidentiality agreement or some motivation for doing so, the claim must fail.  And on a fraud claim, a plaintiff may only recover "damages for the actual pecuniary loss sustained as the direct result of the wrong."  *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996).  Ms. Terrill has alleged no such injury.

## VI.    Ms. Terrill Has Failed to State a Claim for Negligent Hiring or Retention

28.    Next, Ms. Terrill's claim for negligent hiring or retention must be dismissed because "employees' actions within the scope of their employment do not subject their employers to liability for negligent hiring, training, supervision, or retention." *LaFontaine v. N.Y.C.*, 2009 WL 3335362, at \*12 (S.D.N.Y. Oct. 14, 2009).  Here, Ms. Terrill has *alleged* that Mr. Biddle's actions were "within the course and scope of…[his] employment."  Compl. ¶ 6. That is fatal to her claim.  Moreover, the premise of this claim, repeated over and over in the Complaint, is that the author of the Article was engaging in "drug abuse" or "abuse of narcotics" that caused him to write the Article.  Ms. Terrill makes this grave allegation based on one unspecified article.  *See* Compl. ¶ 49, Summary of the Case.  It is clear why Ms. Terrill did not cite the article she incorporates by reference as the foundation of this claim.  In a December 2015 essay, Ms. Biddle described not drug or narcotics abuse but his use of *prescription medication for depression and anxiety under medical supervision*.

29.    There is a more basic pleading flaw, beyond that substance. Ms. Terrill has not sufficiently pled, other than in conclusory fashion, that Gawker Media had knowledge of Mr. Biddle's alleged addiction and/or that retaining him or hiring him was unreasonable in light of that knowledge.  *See Doe v. Alsaud*, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014).  These allegations do not meet the plausibility threshold required even on a motion to dismiss.

## VII.    This Court Can Adjudicate the Terrill Claim

30.    Should it become necessary or appropriate, this Court can fully adjudicate disallowance of the Terrill Claim, which asserts causes of action for defamation and related torts, because it is not a personal injury tort claim within the meaning of 28 U.S.C. 157(b).  Core proceedings include allowance or disallowance of claims against the estate, except "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death

claims against the estate for purposes of distribution." 28 U.S.C. § 157(b)(2)(B). The Bankruptcy Code does not define what constitutes a "personal injury tort claim," and therefore court decisions have delineated the scope of that term.

31.     Although courts in this District have taken two different approaches on this question, the Terrill Claim does not fall within the definition of "personal injury claim" regardless of which authority is followed. At least three decisions in this District have adopted a so-called "narrow view," limiting personal injury tort claims to those that involve a "trauma or bodily injury." *Vinci v. Town of Carmel (In re Vinci)*, 108 B.R. 439, 442 (Bankr. S.D.N.Y. 1989) (Schwartzberg, J.) (a tort without trauma or bodily injury is not within the statutory exception for a personal injury tort); *Perino v. Cohen (In re Cohen)*, 107 B.R. 453 (S.D.N.Y. 1989) (Brieant, J.) (same); *Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey)*, 194 B.R. 728, 734 (S.D.N.Y. 1995) (Keenan, J.) (adopting narrow view to find that legal  malpractice does not constitute a personal injury claim).

32.     More recently, Judge Glenn adopted a so-called "hybrid approach" to decide this issue with respect to proofs of claim for intentional infliction of emotional distress. He conducted a "searching analysis" into the specifics of each claim that asserts "the invasion of personal rights" for "earmarks of a financial, business or property tort claim, or a contract." *In re Residential Capital, LLC*, 536 B.R. 566, 572, 575 (Bankr. S.D.N.Y. 2015) ("*ResCap*"). The *ResCap* court concluded that it had core jurisdiction to hear and determine the disallowance of proofs of claim asserting intentional infliction of emotional distress arising from the servicing of home mortgages. *Id.* at 575.

33.     The Terrill Claim does not qualify as a personal injury tort claim under either (a) the *Vinci/Cohen/Finley-Kumble* line of decisions or (b) the *ResCap* approach. The Terrill Claim

14

alleges against Gawker Media various causes of action all relating to Ms. Terrill's professional work and her business relationships with Gawker Media. defamation, intentional interference with prospective economic advantage, and intentional infliction of emotional distress.  None of the causes of action asserted by Ms. Terrill involves "trauma or bodily injury."  *E.g.*, *Vinci*, 108 B.R. at 442.

34.    The Terrill Claim also bears the "earmarks of a financial, business or property tort claims, or a contract claim" and is therefore not a personal injury tort claim.  *ResCap*, 536 B.R. at 572; *see In re Finley Kumble*, 194 B.R. at 734  (humiliation and lost reputation resulting from a business tort do not constitute a personal injury tort).

35.    The rulings of numerous other courts support a conclusion that defamation is not a personal injury tort claim when asserted as a proof of claim in bankruptcy.  *Massey Energy Co. v. W. Va. Consumers for Justice,* 351 B.R. 348, 351 (E.D. Va. 2006) (defamation and business conspiracy are not personal injury tort claims); *Mitan v. Davis (In re Davis)*, 334 B.R. 874, 878 n.2 (Bankr. W.D. Ky. 2005) (core jurisdiction over objection to proof of claim based on alleged defamation contained on website), *aff'd in part, rev'd in part on other grounds sub nom Davis v. Mitan (In re Davis)*, 347 B.R. 607 (W.D. Ky. 2006).[2]

36.    The same is true for the "intentional infliction" genre of torts that the Terrill Claim alleges against Gawker Media.  A claim for emotional distress damages not arising out of physical injury is not a "personal injury tort claim."  *ResCap*, 536 B.R. at 576; *see In re Atron Inc.*, 172 B.R. 541 (Bankr. W.D. Mich. 1994) (civil rights complaint alleging damages for mental and emotional distress does not qualify); *In re Interco, Inc.*, 135 B.R. 359 (Bankr. E.D. Mo. 1991) (age discrimination complaint alleging emotional distress does not qualify).

---

[2] The Supreme Court of the United States has considered, but declined to decide (on waiver grounds), whether a defamation claim is a personal injury tort claim under section 157(b)(2).  *Stern v. Marshall*, 564 U.S. 462, 479 (2011).

37.    In any event, Section 157(b)(2) does not make all determinations regarding disallowance of personal injury tort claims into non-core proceedings. A bankruptcy court can "summarily dispose of claims which have no basis in law." *See In re Chateaugay Corp.*, 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990), *aff'd*, *sub nom. LTV Corp. v. Valley Fid. Bank & Tr. Co. (In re Chateaugay Corp.)* 130 B.R. 403 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 961 F.2d 378 (2d Cir. 1992), and aff'd, 146 B.R. 339 (S.D.N.Y. 1992). This reflects that only "liquidation" and "estimation for purposes of distribution" are non-core, requiring a district court to enter final orders. Section 101(5) of the Bankruptcy Code indicates that "claims" fall into different categories, and the statutory language of Section 157(b)(2) is clear that only determination of the "liquidated-unliquidated" distinction is non-core.[3] Thus a bankruptcy court can determine, as a core proceeding, the issue of whether the claim is "disputed-undisputed," in the language of section 101(5) of the Bankruptcy Code. Of course, if the claim objection cannot be resolved as a matter of law at the outset or on summary judgment, a creditor asserting a personal injury tort claim has a right to a trial (if a trial is necessary) in the district court. But this is under the separate venue provision of Section 157(b)(5). *See Stern*, 564 U.S. at 479 (section 157(b)(5) concerns mere venue, is not jurisdictional, and therefore can be waived). Thus, "a finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim." *Chateaugay*, 111 B.R. at 76-77.

38.    Finally, to the extent that this Court concludes that any portion of dispositive pre-trial rulings or the objection to any particular cause of action is a non-core proceeding, this Court must conduct those pretrial proceedings in the first instance. Ms. Terrill volunteered to be a member of the Creditors' Committee; she might consent (whether expressly or impliedly) to this

---

[3] Obviously if instead there is to be an estimation of a personal injury tort claim under section 502(c) of the Bankruptcy Code, that necessarily incorporates both a determination of the amount of the claim ("liquidation") and the probability of there being liability ("disputed" claims).

Court's entry of final orders regarding her claim.  Section 157(c)(2).  Even if she does not consent, pursuant to Section 157(c)(1) this Court must hear the proceeding and submit proposed findings of fact and conclusions of law to the district court.  *See Exec. Benefits Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2174-75 (2014) (construing statute to apply Section 157(c)(1) to any proceeding for which the bankruptcy court cannot enter final orders).

## RESERVATION OF RIGHTS

39.    Neither the filing of this Objection nor entry of the Proposed Order shall affect any rights of the Debtors, their estates, any estate representative, or any other party in interest in these chapter 11 cases to object this or any other claim for any purposes, including, without limitation, allowance and distribution under a plan, or any rights of the holders of any Claim to contest any objection.

## NOTICE

40.    Notice of this Objecction has been provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Simpson Thacher & Bartlett LLP, counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (iii) Latham & Watkins LLP, counsel to US VC Partners LP, as Second Lien Lender; (iv) Anthony M. Vassallo, Esq., counsel to the Claimant; and (v) all parties requesting notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

*[Remainder of this page intentionally left blank]*

WHEREFORE, for the reasons set forth herein, Gawker Media respectfully request that the Court (a) enter the Proposed Order, and (b) grant such other and further relief as may be just and proper.

Dated: October 31, 2016
       New York, New York

/s/ D. Ross Martin
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Jonathan M. Agudelo
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

18

## EXHIBIT 1

**Proposed Order**

59334665_5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                         :

In re                              :          Chapter 11
                                           :

Gawker Media LLC, *et al.*,[1]       :          Case No. 16-11700 (SMB)
                                           :

              Debtors.           :          (Jointly Administered)
                                           :

-------------------------------------------------------x

### ORDER GRANTING DEBTOR GAWKER MEDIA LLC'S OBJECTION TO PROOF OF CLAIM NO. 269 FILED BY ASHLEY TERRILL, AND MOTION TO APPLY FED. R. CIV. P. 12(B)(6) AND 12(C), PURSUANT TO BANKRUPTCY RULES 9014 AND 7012

Upon the objection of Gawker Media LLC ("Gawker Media") and its motion (together, the "Objection") for the entry of an order (the "Order") (i) disallowing Proof of Claim No. 269 filed by Ashley Terrill (the "Terrill Clam") and (ii) making Federal Rules of Civil Procedure 12(b)(6) and 12(c) applicable to the Objection pursuant to Bankruptcy Rule 7012 and 9014, as more fully set forth in the Objection; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Objection is in the best interests of Gawker Media's estate, its creditors, and other parties in interest; and the Court having found that Gawker provided appropriate notice of the Objection and the opportunity for a hearing on

---

[1] Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft. (f/k/a Kinja Kft., "Gawker Hungary") are also debtors and debtors in possession in these cases, and together with Gawker Media LLC (as debtor and debtor in possession) are refereed to herein as the "Debtors." The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft. ) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

59334665_5

the Objection under the circumstances; and the Court having reviewed the Objection and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.  All capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Objection.

2.      Federal Rules of Civil Procedure 12(b)(6) and 12(c) are applicable to this contested matter pursuant to Bankruptcy Rules 7012 and 9014.

3.      The Terrill Claim is disallowed in its entirety.

4.      Prime Clerk LLC, the Court-appointed claims agent in these chapter 11 cases, is hereby authorized and directed to make such revisions to the official claims register as are necessary to reflect the disallowance of the Terrill Claim.

5.      The Debtors are authorized to take all actions necessary to implement this Order.

6.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.


New York, New York
Dated: _____, 2016

                                        _____
                                        THE HONORABLE STUART M BERNSTEIN
                                        UNITED STATES BANKRUPTCY JUDGE

2

## **EXHIBIT 2**

**Terrill Claim**

United States Bankruptcy Court, Southern District of New York

| Please select applicable Debtor (select only one Debtor per claim form): |
|---|
| ☒  Gawker Media, LLC (Case No. 16-11700) |
| ☐  Kinja, Kft. (Case No. 16-11718) |
| ☐  Gawker Media Group, Inc. (Case No. 16-11719) |

## Official Form 410

# Proof of Claim                                                                4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | Ashley Terrill |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☒ No |
|---|---|---|
| | | ☐ Yes. From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | | |
| | | Contact phone 917 862-1936 | Contact phone _____ |
| | | Contact email tony@amvasslaw.com | Contact email _____ |

| 4. | Does this claim amend one already filed? | ☒ No |  |
|---|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known)_____ | Filed on _____ <br> MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☒ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

**Claim Number: 269**

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☐ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

**7. How much is the claim?**    $ 10000000.00 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Tort claim for defamation -- see attached complaint

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | **Amount entitled to priority:** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☐ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ _____ |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *Ashley Terrill*
Ashley Terrill (Sep 28, 2016)

**Email:** tony@amvasslaw.com

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Ashley | | Terrill |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | | | |
| Company | c/o Anthony M. Vassallo, Esq. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 305 Fifth Avenue | Suite 1B | |
| | Number        Street | | |
| | Brookyln | NY | 11215 |
| | City | State | ZIP Code |
| Contact phone | 917 862-1936 | Email tony@amvasslaw.com | |

Attach Supporting Documentation (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
   (attach below)

☐ I do <u>not</u> have supporting documentation.



PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

---

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
18 U.S.C. §§ 152, 157 and 3571.

---

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/gawker.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Gawker Media, LLC Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

---

**Do not file these instructions with your form**

# EXHIBIT A

## Complaint

(Exhibits to Complaint available on request)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

—————————————————————

ASHLEY TERRILL, an individual,                    CASE NO. 1:16-cv-00411 (NRB)

           Plaintiff,                                  SECOND AMENDED COMPLAINT

   v.

GAWKER MEDIA, LLC, a Delaware limited
liability company; SAM BIDDLE, an
individual, JOHN COOK, an individual,
NICHOLAS GUIDO DENTON, an individual,
and DOES 1-20,

           Defendants.

—————————————————————

      Plaintiff Ashley Terrill ("Plaintiff" or "Terrill"), by and through her undersigned

attorneys, sues defendants Gawker Media, LLC, Sam Biddle, John Cook, Nicholas Guido

Denton, and DOES 1-20 (collectively, "Defendants"), and respectfully makes the following

allegations.

### SUMMARY OF THE CASE

      Ashley Terrill is a journalist, researcher and writer.  In 2015, she notified Defendants

about a major story matter that she was researching and writing about, and obtained Defendants'

agreement to (1) maintain in strict confidence the information and materials that she would

disclose to Defendants, and (2) provide assistance to her regarding the matter.  Unbeknownst to

Terrill, Defendants concealed that they were working with the very subjects of Terrill's

investigation and story and had no intention of keeping their promises to her.  Defendants then

published a false and highly defamatory hit-piece about Terrill, and in the process disclosed

{00067445;1}                                                   1

publicly confidential information and materials that Terrill had disclosed pursuant to Defendants'

agreement to maintain them in strict confidence. Terrill promptly demanded a retraction and

removal of the false and defamatory statements about her, and the confidential information that

she had disclosed to Defendants. Defendants refused Terrill's demands. Defendants' wrongful

acts have caused substantial damages to Terrill, including to her personal and professional

reputation. Defendants' refusal to do anything to remedy their wrongful acts has left Terrill with

no alternative but to bring this lawsuit. Terrill seeks an award of no less than $10 million in

damages.

After filing this lawsuit, Terrill learned that in late 2015, Biddle blogged about his own

drug abuse and having mental health issues as a result, and that these problems intensified in the

latter part of 2015—when Biddle was engaged in the wrongful acts alleged herein. Plaintiff is

informed and believes that Biddle's drug abuse and problems relating thereto were well known to

both Nick Denton, the CEO of defendant Gawker Media, LLC, and to John Cook (Biddle's

editor), but that Denton and Cook nevertheless retained Biddle as an employee, and were well-

aware that Biddle's drug abuse was causing him to engage in wrongful conduct with respect to

his reckless reporting, and the resulting harm that such reporting was causing to the subjects of

his articles, including to Terrill as alleged herein. Terrill therefore brings a claim against both

Denton and Cook for their negligent retention of Biddle.

## PARTIES

1.  Plaintiff is a resident of the City of Jupiter, County of Palm Beach, State of Florida.

2.  Upon information and belief, Gawker Media, LLC ("Gawker") is a Delaware

limited liability company with its principal place of business located in New York City, New

Case 1:16-cv-00941-NRB   Document 23   Filed 06/01/16   Page 3 of 29

York.

3.      Upon information and belief, defendant Sam Biddle ("Biddle") is an individual, domiciled in the State of New York.  At all relevant times, Biddle was, and is, a Senior Writer at Gawker.

4.      Upon information and belief, defendant John Cook ("Cook") is an individual, domiciled in the State of New York.  At all relevant times, Cook was, and is, an Executive Editor at Gawker.

5.      Upon information and belief, defendant Nicholas Guido Denton ("Denton") is an individual, domiciled in the State of New York.  At all relevant times, Denton was, and is, the Founder and CEO of Gawker.

6.      Upon information and belief, Defendants, and each of them, were and are the agents, licensees, employees, partners, joint-venturers, co-conspirators, owners, principals, and employers of the remaining Defendants and each of them are, and at all times mentioned herein were, acting within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture.  Upon further information and belief, the acts and conduct herein alleged of each of the Defendants were known to, authorized by, and/or ratified by the other Defendants, and each of them.

## JURISDICTION & VENUE

7.      This Court has personal jurisdiction over Defendants because they have minimum contacts with the State of New York, and are domiciliaries of the State of New York.

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of the parties to this action and the amount in controversy exceeds

{00067445;1}                                       3

$75,000.

9.     Venue is proper in this district pursuant to 28 U.S.C. Section 1391(b), in that each

of the defendants reside here and a substantial part of the events or omissions giving rise to the

claim occurred here.

### FACTS RELEVANT TO ALL CAUSES OF ACTIONS

10.    In or about October of 2013, Terrill pitched two stories to ELLE magazine about the

co-founders of the billion-dollar technology company and dating app "Tinder."  In connection

with her research for those stories, Terrill interviewed with Tinder's CEO, Sean Rad ("Rad") and

Vice President of Marketing, Whitney Wolfe ("Wolfe"), among others.

11.    On or about October 21, 2013, Terrill's interview with Wolfe was posted on

Elle.com.

12.    In or about April of 2014, Wolfe resigned from Tinder.

13.    Two months later, on June 30, 2014, Wolfe filed a lawsuit against Tinder, Tinder's

parent company Match.com and their parent company, IAC, Inc.  The lawsuit was premised on

allegations of sexual harassment and sexual discrimination against Wolfe by Rad, and Tinder's

Chief Marketing Officer, Justin Mateen ("Mateen").  The lawsuit made national news, and

thousands of articles were written about it.

14.    That same day, Terrill received a phone message from an attorney representing

Wolfe.  The attorney informed Terrill of Wolfe's lawsuit against Tinder and offered to send

information, or speak to her, about the case.

15.    Terrill read Wolfe's complaint, and certain statements in it seemed inconsistent with

Terrill's recollection of the events as described to her by those with first hand knowledge.  Terrill

then went back to her research, including her recorded interview of Wolfe and others. Terrill found that there were potential inconsistences between Wolfe's allegations in the lawsuit and Terrill's past research, specifically Wolfe's previous statements to Terrill.

16.    In light of the inconsistencies, Terrill shifted the focus of her research, and started researching the founding of Tinder. Terrill reviewed numerous materials, reached out to more than thirty individuals and conducted on-the-record interviews with at least fourteen sources close to the subjects of this new story. Terrill sought to fully and fairly research matters which she believed had been only superficially covered by numerous news outlets who had not investigated the underlying facts.

17.    Throughout the course of her research, Terrill sought only to ascertain the truth regarding Tinder's history as well as the allegations in Wolfe's lawsuit.

18.    After leaving Tinder, Wolfe joined two other ex-Tinder employees, Sarah Mick ("Mick") and Christopher Gulczynski ("Gulczynski") to launch a competitor company called "Bumble." The event was major business news, and covered in thousands of news articles.

19.    On or about August 18, 2015, Terrill received a voicemail message from Bumble's Vice President of Communications, Jennifer Stith ("Stith"), who stated that she wished to "confirm" with Terrill that she was working on a piece about Whitney Wolfe "before taking any next steps."

20.    Hours later, Terrill received a voicemail message from the attorney representing Wolfe in her lawsuit. Wolfe's attorney demanded that Terrill make contact with him before she wrote anything "that could potentially subject [Terrill] or others to legal liability." The obvious implication of the statement was that if Terrill proceeded to research and/or write about the

underlying facts regarding Wolfe, including the potential inconsistencies between Wolfe's past

statements and other events from the past, and Wolfe's allegations in her lawsuit against her

fellow co-founders at Tinder, then Terrill could expect a lawsuit to follow.

21.    Almost immediately following these two phone calls, Terrill's personal computer

and smart phone started acting erratically and showing signs of potentially having been hacked.

Terrill also observed unusual activity in her personal surroundings.

22.    Terrill reached out to a friend of hers for help with this situation and the friend

referred her to a producer at Gawker.  Hoping the producer might have some insight or advice,

Terrill explained the two phone calls to the producer and described the unusual activity with both

her personal computer and smart phone.  Terrill expressed concern about potentially being

hacked and intimidated.  The producer at Gawker told Terrill that Gawker Executive Editor John

Cook and his team had the resources to research the unsettling activity that Terrill was

experiencing.

23.    Gawker Senior Writer Sam Biddle then contacted Terrill and told Terrill that she

could trust him.  Terrill expressed to Biddle that she was looking for help with her situation and

unsure of what to do.  She asked Biddle to maintain the confidentiality of the information that

she was to share with him, and provide her with whatever advice or assistance that he could.

Biddle agreed; assured Terrill that her communications to Gawker would be treated

confidentially; agreed that Gawker would not misappropriate her story; asked her to furnish

supporting materials; and informed Terrill that he intended to provide her with advice and

assistance in her situation.

24.    Apparently, all such statements, representations and agreements by Defendants to

Terrill were knowingly false at the time they were made.  Terrill was not aware of the falsity of
the statements, representations and agreements, and reasonably relied upon the truth of those
statements, representations and agreements to her detriment.  Defendants in fact had no interest,
desire or intent to assist Terrill.  Nor did Defendants have any interest in seeking the truth
underlying the story of the co-founders of Tinder or any discrepancies in Wolfe's allegations in
her complaint against her fellow co-founders.

25.    Rather, Defendants had only one interest:  to write their own scathing article about
Terrill in a way that was knowingly false, libelous of Terrill, and would foreseeably harm, if not
destroy, her personal and professional reputation.

26.    The motivation for Biddle's betrayal, in addition to economic gain, appeared to be
Biddle's ongoing personal relationship with Wolfe and Gulczynski, which he actively concealed
from Terrill.  In fact, on information and belief, Biddle was regularly communicating with Wolfe
and Gulczynski throughout the time that Terrill was confiding in Biddle.  Biddle concealed his
relationship with Wolfe and Gulczynski from Terrill because Biddle knew that he could not
successfully induce Terrill to disclose her confidential research if she knew about the relationship
with Wolfe and Gulczynski.

27.    On or about November 23, 2015, Defendants published on Gawker's flagship
website Gawker.com, a lengthy story with the headline "Tinder Confidential: The Hookup App's
Founders Can't Swipe Away the Past" (the "Gawker Story"), a true and correct copy of which is
attached hereto as Exhibit A.  The Gawker Story is replete with numerous false statements of
fact, of and concerning Terrill, which Defendants knew to be false at the time the Gawker Story
was written and published.

{00067445;1}                                          7

28.    The false statements in the Gawker Story include, among others:

a.    "Ashley Terrill was in hiding the first time I heard her voice, splitting time
between her Los Angeles home and a $600-a-night room at the Beverly
Wilshire Hotel. Terrill had locked her laptop and phone in a secret vault, and
would only contact me on disposable phones—all because, she claimed, the
estranged co-founder of Tinder was trying to destroy her."

b.    "At the center is Ashley Terrill, a Hollywood columnist on an obsessive,
possibly unhinged pursuit of what she says is the truth about Whitney Wolfe.
Depending on who's doing the guessing, Terrill is the target of a secret
harassment operation, the agent of a covert mudslinging campaign, or an
outside observer caught up in a paranoid freakout."

c.    "It's this audio recording that Terrill says is proof that Whitney Wolfe is not
who she says she is—neither a victim nor a co-founder, but a fraud who
parlayed a sex lawsuit into a career boost and fame."

d.    "Terrill's claims range from dubious to absurd, but her exhaustive
investigation into Wolfe's background has pumped the submerged bile
between the two camps up to the surface."

e.    "Terrill's research is an anomaly in the saga of Wolfe vs Tinder, a rare attempt
to discredit rather than lionize the plaintiff."

f.    "…Ashley Terrill was compiling evidence against her for some sort of
intricate character assassination."

g.    "…[Wolfe] should expect a 'takedown story' coming soon from Terrill."

h.  "…[I]t immediately looked like a covert attempt to smear her (and her company) without breaking their mutual non-defamation agreement."

i.  "…Terrill's takedown [story] could appear as a magazine story, a book, or possibly even a film, all aimed at portraying [Wolfe] as the villain in the Tinder breakup."

j.  "Terrill … claimed she'd found vast inconsistencies that not only undermined the legal case, but Wolfe's entire character. It was deeply personal."

k.  "Terrill's conclusion was that Wolfe is [a businesswoman who ruthlessly exploited every opportunity for her gain (even if unethically)]."

l.  "Terrill was in a state of absolute terror and perpetual anxiety—it hung on her voice as she mentioned ... the friends she could no longer contact, and the people she could no longer trust."

m.  "[T]he only evidence she furnished of a phone hack was a generic security warning message."

n.  "The most interesting part was a denial that she'd been put up to her project by her friend at Tinder, nor been compensated for it"

o.  "…[S]he's still making a very charged claim about someone from whom she has little objective distance. Why call Wolfe a liar, a year later?"

29.    The forgoing false statements of fact were made by defendants with the intention and knowledge that they were false and were likely to harm Terrill's personal and professional reputation.  The false and libelous statements in the Gawker Story had the foreseeable effect of severely harming Terrill's personal and professional reputation.

{00067445;1}                                           9

## GAWKER'S WRONGFUL CONDUCT GENERALLY

30.   Plaintiff contends that actual malice is not required to be shown to prove the claims herein.  However, in the event that actual malice were to be determined to be a requirement, the allegations in this complaint, including the allegations below, demonstrate actual malice.  Moreover, discovery has not yet commenced and Plaintiff expects to obtain through discovery additional evidence that would support actual malice.

31.   Gawker is a company that routinely engages in wrongful conduct, and specifically, writes and publishes false and defamatory statements about people, invades people's privacy and other rights, and publishes content that is irresponsible and that no other legitimate publication will publish.

32.   Gawker has been sued multiple times for defamation, including, among others, currently in an action in New York State Court by the *Daily Mail* newspaper; in an action in California by an individual named Charles Johnson, for writing and publishing false and unsubstantiated rumors that Mr. Johnson had been involved in misconduct and criminal activity; in an action in California by Hannah Cornett for writing and publishing false statements that she is a "grifter" who committed credit card fraud and refused to pay a $20,000 hotel bill; and in an action in Massachusetts by Dr. Shiva Ayyaduri for writing and publishing that he is a "fraud", "fake", and liar" for describing the activities that he actually did, which constituted the invention of email and for which *Time* magazine and *Wired* magazine both reported he was the inventor of email.

33.   Gawker also has been sued repeatedly for invading the privacy of others.  Gawker recently lost a case filed by Terry Bollea (professionally known as "Hulk Hogan") for publishing

Case 1:16-cv-38411-NRB    Document 25    Filed 05/01/15    Page 11 of 29

an illegal, secret recording showing him naked and having consensual sexual relations in a private bedroom.  In March 2016, a Florida jury awarded Bollea $115 million in compensatory damages plus $15 million, $10 million and $100,000, respectively, in punitive damages against Gawker, Denton and former Editor in Chief of Gawker.com, A.J. Daulerio.  In May 2016, the trial court denied the defendants' motion for a new trial, and to reduce the amount of the award.

34.    Gawker also was sued by, and paid a substantial settlement, for publishing a stolen private video of actors Rebecca Gayheart, her husband Eric Dane, and an acquaintance, partially nude in a hot tub.

35.    Gawker has also been sued for copyright infringement, including by Dr. Phil's production company, after Gawker planned to "steal," and did air, portions of an interview before it aired on Dr. Phil's television show.

36.    Gawker published videotape of a clearly intoxicated young woman engaged in sexual activity on the floor of an Indiana sports bar (the footage was taken by another patron with his cell phone).  According to published reports, Gawker callously refused to remove the footage from its site for some time, despite repeated pleas from the woman to do so and despite the fact that it was not clear that the sex was consensual or whether the video was footage of a rape in progress.

37.    Gawker paid a source for a photograph of what the source claimed was NFL quarterback Brett Favre's penis.  Gawker published the photo, uncensored, stating that it was a photograph of Mr. Favre's penis.

38.    Gawker published photos of Duchess Kate Middleton's bare breasts, captured by a paparazzi's telephone lens while she was sunbathing at a secluded, private estate in France.

39.     Gawker published complete, uncensored, and unedited videos of seven innocent individuals being beheaded by ISIS soldiers.  The videos were distributed by ISIS for the purpose of terrorizing the Western world.  On information and belief, Gawker was the only established media company to publish these videos in full and uncensored, showing the victims being beheaded.  Gawker was criticized severely by the press and terrorism experts for furthering the terror campaign of ISIS, and showing a total lack of regard for the families of these victims.

40.     Gawker hacked a promotional campaign sponsored by Coca-Cola, in which the company utilized the hashtag "#MakeItHappy."  The campaign was originally designed to allow people to type statements into a decoder, and the decoder converted the statements into positive, happy statements.  Gawker's hack caused the campaign to publish highly offensive statements from Adolf Hitler's *Mein Kapf*.  Gawker was resoundingly criticized throughout the media for its actions.

41.     Gawker attempted to publicly "out" a private individual, a media executive at a rival publishing company, by publishing a story alleging that the executive had attempted to solicit a male porn star and prostitute.  Gawker's actions in publishing these allegations, including identifying the executive by name and the company for whom he worked, publishing the accusations of the gay porn star, and protecting the identity of the porn star "source," were severely criticized throughout the media industry.  As a result, Gawker removed the story within about a day.  A few days later, two senior executives at Gawker promptly resigned their positions, and many other Gawker employees followed suit.  It was reported that multiple major advertisers pulled their advertising from Gawker, and Gawker's revenues sank.  Following these events, several more executives and employees resigned or were terminated.

{00067445;1}                                                     12

42.    In the past year, seven of the nine most senior executives at Gawker and

Gawker.com resigned:  President of Advertising Andrew Gorenstein, COO Scott Kidder, Chief

Strategy Officer Erin Pettigrew, Chief Technology Officer, Tom Plunkett, Editorial Chief Tommy

Craggs, SVP of Global Sales and Partnerships, Michael Kuntz, and Editor-in-Chief of

Gawker.com, Max Reid.  Of the original Executive Board from one year ago, only CEO/founder

Denton and head lawyer Heather Dietrick remain at the company.  (Gawker had no CFO during

this time.)

43.    A former Gawker staff writer, Dayna Evans, published a November 2015 article

entitled, "On Gawker's Problem With Women," ("the Evans Article") in which the writer

exposed gender inequalities within the company as well as an endemic of reporting failures and

failures of journalistic ethics.  The Evans Article states that the company's reporting tactics "can

lead to dismissiveness and insensitivity, harm and marginalization, often unforgettable and

unforgivable damage."  The Evans Article further states that writers and editors at the company

"are in fact REWARDED and admired for their recklessness and immaturity, a recklessness and

immaturity, that, as you know, has gotten the company in heaps of trouble over the past couple of

years."  The Evans Article goes on to state that the above assertions are true, "especially so at a

place like Gawker, where bylines are associated with traffic and traffic is associated with

success."

## SAM BIDDLE'S WRONGFUL CONDUCT GENERALLY

44.    In 2010, Gawker and Denton hired Biddle as a writer for Gawker's technology

focused website, Gizmodo.com.  Biddle was subsequently promoted to Editor of Valleywag, a

sub-site of Gawker.com that focused on Silicon Valley.  At the end of 2014, Gawker and Denton

announced that they were closing the Valleywag site and transferred Biddle to Gawker.com.

45.     Biddle's professed goal is to destroy people's reputations and lives on the Internet, under the banner of journalism.  In 2010, before joining Gawker, Biddle wrote: "Is it petty to not share in the happiness of someone else's success? Is it petty to wish—to beg, even, knuckles blistering, eyes bloodshot, beseeching each god—for their horrific downfall."  Biddle reinforced this philosophy in April 2014 when he stated that he would "like to have a 20-to-1 ratio of ruining people's days versus making them" and that he writes the types of articles he does because "I like attention."

46.     In 2013, Biddle shared on Valleywag a tweet sent out by a private media executive that contained a joke made in bad taste.  Biddle's sharing of the tweet caused the executive to be subject to widespread scorn and lose her job.  Biddle later admitted that his sharing of the tweet caused "an incredibly disproportionate personal disaster" for the executive.

47.     Later in 2013, Biddle wrote a post on Valleywag that took the comments of a Silicon Valley venture capitalist out of context and made implicit accusations of racism.

48.     In March 2014, Biddle sanctioned an article by a junior writer comparing a dating website to WWII Comfort Women.  Following the wide-ranging fall out from the article, Biddle's response was: "It was a joke."

49.     In October 2014, during National Bullying Prevention Month, Biddle tweeted distasteful messages supporting bullies, stating: "Nerds should be constantly shamed and degraded into submission" and that society should "Bring Back Bullying."  The tweets and fall out that ensued caused several companies to withdraw advertising from Gawker.  Gawker executives admitted that Biddle's tweets, and the lost advertisers that followed, cost Gawker at

least $1 million in advertising revenue.

50.   On information and belief, during the times described above, and based on Biddle's own public statements about his use and abuse of narcotics, Biddle was consuming substantial amounts of narcotics including benzodiazepines, anti-depressants and SSRIs (selective serotonin reuptake inhibitors).  This abuse was known at Gawker, including by Denton and Cook, and they continued to employ Biddle, reward him, and assign him to write various articles.

## GAWKER'S PHILOSOPHY AND PRACTICES

51.   Defendants have no interest in reporting the truth to the public, or investigating the facts underlying a story, or for that matter even telling the truth to their readers.  Rather, Defendants make up lies about the subjects of their stories—Terrill being one—without any regard to the substantial consequences that their false statements will have on the subjects of their stories: destroying their personal and professional reputations.

52.   Defendants also have no regard for maintaining the confidentiality of their sources (here, Terrill), or honoring their assurances, representations, and agreements to their sources to maintain confidentiality and not write stories (particularly false and completely fictionalized stories) about their subjects.  Rather, Gawker's only interest is to publish false scandal, for the purpose of increased public attention, readership and profit, knowing that the false stories will severely harm if not destroy the careers of innocent people who are the subject of their stories.

53.   This is precisely the situation in this case:  Defendants' actions have had the effect of so severely discrediting Terrill—based on Defendants' knowingly false statements about her— that Terrill's career has been severely harmed, if not destroyed.  On information and belief, as a direct result of Defendants' publication of the false and defamatory statements about Terrill,

Conde Nast Entertainment decided not to publish or produce Terrill's work and Buzzfeed
declined to hire her as a writer at its website.  Terrill is further informed and believes that
Defendants interfered with other opportunities of hers, including with *New York Magazine* and
Buzzfeed.

54.    According to Gawker.com, more than 164,000 people have read the story that
Defendants wrote and published, and presumably those readers have spoken to others about the
story.  Moreover, anyone who might search Terrill through a search engine will see Gawker's
false and libelous story about her.  As a result, anyone who might otherwise have been inclined
to hire or partner with Terrill will likely decline, and have declined, to do so, believing
Defendants' false and libelous statements about her to be true.

55.    Defendants actively and knowingly participated in the conduct described herein.

56.    Defendants are guilty of intentional misconduct.  Defendants had actual knowledge
of the wrongfulness of the conduct described herein and the high probability that injury or
damage to Plaintiff would result and, despite that knowledge, intentionally pursued that course of
conduct, resulting in injury or damage.

57.    Defendants' conduct was so reckless or wanting in care that it constituted a
conscious disregard or indifference to the rights of persons exposed to such conduct.

58.    Defendants' actions described herein also have had the foreseeable effect of causing
severe emotional distress to Terrill.

59.    On December 24, 2015, Terrill's counsel sent a letter to Defendants requesting that
they remove each of the false statements in the November 23, 2015 story and publish a
correction, apology and retraction of those statements.  Defendants failed to comply with Terrill's

request, in whole or in part.

60.    As a result, Terrill had no other alternative but to file this lawsuit.

61.    Terrill requests herein all available legal and equitable remedies, to the maximum
extent permissible by law, including without limitation compensatory damages and punitive
damages in an amount not less than Ten Million Dollars ($10,000,000).

**FIRST CAUSE OF ACTION**
**(Libel)**

62.    Plaintiff hereby repeats and realleges each and every allegation set forth in
paragraphs 1 through 61 of this Second Amended Complaint as if fully set forth herein.

63.    As described herein, on or about November 23, 2015, Defendants authored and
published false statements about Plaintiff in a lengthy story on the website Gawker.com entitled
"Tinder Confidential: The Hookup App's Founders Can't Swipe Away the Past."  These false
statements include:

a.    "Ashley Terrill was in hiding the first time I heard her voice, splitting time
between her Los Angeles home and a $600-a-night room at the Beverly
Wilshire Hotel. Terrill had locked her laptop and phone in a secret vault, and
would only contact me on disposable phones—all because, she claimed, the
estranged co-founder of Tinder was trying to destroy her."

b.    "At the center is Ashley Terrill, a Hollywood columnist on an obsessive,
possibly unhinged pursuit of what she says is the truth about Whitney Wolfe.
Depending on who's doing the guessing, Terrill is the target of a secret
harassment operation, the agent of a covert mudslinging campaign, or an
outside observer caught up in a paranoid freakout."

Case 1:16-cv-30411-NRB    Document 23    Filed 06/01/16    Page 18 of 29

c. "It's this audio recording that Terrill says is proof that Whitney Wolfe is not who she says she is—neither a victim nor a co-founder, but a fraud who parlayed a sex lawsuit into a career boost and fame."

d. "Terrill's claims range from dubious to absurd, but her exhaustive investigation into Wolfe's background has pumped the submerged bile between the two camps up to the surface."

e. "Terrill's research is an anomaly in the saga of Wolfe vs Tinder, a rare attempt to discredit rather than lionize the plaintiff."

f. "…Ashley Terrill was compiling evidence against her for some sort of intricate character assassination."

g. "…[Wolfe] should expect a 'takedown story' coming soon from Terrill."

h. "…[I]t immediately looked like a covert attempt to smear her (and her company) without breaking their mutual non-defamation agreement."

i. "…Terrill's takedown [story] could appear as a magazine story, a book, or possibly even a film, all aimed at portraying [Wolfe] as the villain in the Tinder breakup."

j. "Terrill … claimed she'd found vast inconsistencies that not only undermined the legal case, but Wolfe's entire character. It was deeply personal."

k. "Terrill's conclusion was that Wolfe is [a businesswoman who ruthlessly exploited every opportunity for her gain (even if unethically)]."

l. "Terrill was in a state of absolute terror and perpetual anxiety—it hung on her voice as she mentioned ... the friends she could no longer contact, and the

people she could no longer trust."

m. "[T]he only evidence she furnished of a phone hack was a generic security
warning message."

n. "The most interesting part was a denial that she'd been put up to her project
by her friend at Tinder, nor been compensated for it"

o. "…[S]he's still making a very charged claim about someone from whom she
has little objective distance. Why call Wolfe a liar, a year later?"

64. These false statements are libelous because they wrongly accuse Plaintiff of having
made statements and acted in a manner that would subject her to hatred, distrust, contempt,
aversion, ridicule and disgrace in the minds of a substantial number in the community, and were
calculated to harm her social and business relationships, and did harm her social and business
relationships.

65. The false statements also constitute libel per se, including because they disparage
and discredit Terrill in the way of her profession and trade as a journalist. The false statements
(and the underlying false facts contained within those statements) were not disclosed by Terrill to
Defendants, but were manufactured by Defendants for purposes of defaming, attacking and
harming Terrill.

66. The statements made by Defendants were false and no applicable privilege or
authorization protecting the statements can attach to them.

67. Defendants made the above false statements after Biddle: (a) fraudulently
represented to Plaintiff that her communications to Gawker would be treated confidentially and
that Gawker would not misappropriate her story, and (b) concealed the fact that he was in regular

contact with Wolfe and Gulczynski during the time that he was inducing, and did induce, Plaintiff to disclose confidential and highly sensitive information to him.

68.    Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the statements made by Defendants in an amount to be determined at trial.  The false statements attribute conduct, characteristics and conditions incompatible with the proper exercise of Plaintiff's business and duties as a journalist.  Because the statements were widely disseminated on the Internet, they were also likely and intended to hold the Plaintiff up to ridicule and to damage her social and business relationships.

69.    The above-quoted published statements constitute egregious conduct constituting moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages relating to defendants' making of the above-quoted defamatory statements, in an amount to be determined at trial.

70.    Plaintiff has complied with all notice requirements prior to filing this action by informing Defendants of their defamatory statements, and requesting a retraction, in a letter dated December 24, 2015.

## SECOND CAUSE OF ACTION
### (Tortious Breach of Confidence)

71.    Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 70 of this Second Amended Complaint as if fully set forth herein.

72.    Plaintiff requested, and Biddle agreed, that Plaintiff's communications to Defendants would be treated confidentially; that Defendants would not misappropriate her story; and that Defendants would provide advice and assistance in her situation.

73.    As a result of the agreement between the parties to maintain the confidentiality of

Case 1:16-cv-30411-NRB   Document 23   Filed 06/01/16   Page 21 of 29

Plaintiff's communications and story, Plaintiff disclosed, and Defendants encouraged Plaintiff to disclose, confidential and proprietary information, including much of the confidential and highly sensitive information Plaintiff obtained through interviews and research.  Terrill made clear to Defendants that she did not provide the information and materials to Defendants for publication or quoting.  To the extent that Defendants wished to convey Terrill's work in a story, Terrill was willing to agree that Defendants may publish her work only as expressed in her emails to three specific news outlets (Texas Tribune, Vice/Broadly, and Buzzfeed), in its full written expression, and not as selected or block quotes (which would be a mischaracterization of her work). Otherwise, everything would be subject to their confidentiality agreement.

74.    Plaintiff reposed trust and confidence in Defendants and Defendants encouraged and accepted such trust.

75.    Defendants have improperly breached their promise of confidentiality to Plaintiff and have improperly used the confidential information they obtained as a result of such confidential relationship by:

(a)  Repudiating any obligation of confidence to Plaintiff;

(b)  Widely disseminating Plaintiff's confidential research in the Gawker Story published at Gawker.com;

(c)  Using and disclosing to others, in competition with Plaintiff, Plaintiff's confidential information or exploiting such confidential information for Defendants' profit.

76.    Defendants have acted knowingly, willfully, and unlawfully, and with the intent to use and profit from Plaintiff's confidences.

77.   Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

78.   Plaintiff has suffered and will continue to suffer irreparable injury by reason of the aforementioned conduct.

79.   Plaintiff has additionally suffered and will continue to suffer monetary loss as a result of the breach of confidence in which Defendants have engaged.

80.   The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

81.   Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 80 of this Second Amended Complaint as if fully set forth herein.

82.   Plaintiff and Defendants entered into an agreement whereby Plaintiff and Defendants agreed, in consideration for Plaintiff's disclosure of confidential information and materials to Defendants, that: (a) Plaintiff's communications to Defendants would be treated confidentially by Defendants; (b) Defendants would not misappropriate her story; and (c) Defendants would provide advice and assistance in her situation.  Terrill made clear to Defendants that she did not provide the information and materials to Defendants for publication or quoting.  To the extent that Defendants wished to convey Terrill's work in a story, Terrill was willing to agree that Defendants may publish her work only as expressed in her emails to three specific news outlets (Texas Tribune, Vice/Broadly, and Buzzfeed), in its full written expression,

and not as selected or block quotes (which would be a mischaracterization of her work). Otherwise, everything would be subject to their confidentiality agreement.

83.    Plaintiff performed and disclosed confidential and proprietary information to Defendants, including much of the confidential and highly sensitive information Plaintiff obtained through interviews and research.

84.    Defendants materially breached the agreement by:

(a)    Repudiating any obligation of confidence to Plaintiff;

(b)    Widely disseminating Plaintiff's confidential research in the Gawker Story published at Gawker.com; and

(c)    Using and disclosing to others, in competition with Plaintiff, Plaintiff's confidential information or exploiting such confidential information for Defendants' profit.

85.    As a result of Defendants' material breach(es) of the agreement, Plaintiff has suffered and will continue to suffer damages in an amount to be determined.

### FOURTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Advantage)

86.    Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 85 of this Second Amended Complaint as if fully set forth herein.

87.    Defendants knew that Plaintiff, being a journalist, had business relationships with publishers as well as a reasonable expectation of entering into valid business relationships with additional publishers, including Conde Nast Entertainment, Buzzfeed and *New York Magazine*, which would have been completed had it not been for Defendants' unlawful acts.  On

information and belief, Defendants' actions were directed towards the publishers, including

Conde Nast Entertainment, Buzzfeed and *New York Magazine*.

88.    On information and belief, as a direct result of Defendants' publication of the false

and defamatory statements about Terrill, Conde Nast Entertainment decided not to publish or

produce Terrill's work and Buzzfeed declined to hire her as a writer at its website.  Terrill is

further informed and believes that Defendants interfered with other opportunities of hers,

including with *New York Magazine* and Buzzfeed.

89.    Defendants acted solely out of malice, and/or used dishonest, unfair, or improper

means to interfere with Plaintiff's actual and prospective business relationships, when

Defendants defamed Terrill, disclosed confidential sources and information to the public despite

promises to maintain confidentiality, and misappropriated Terrill's story.

90.    Defendants, through the misconduct alleged herein, intended to harm Plaintiff by

intentionally and unjustifiably interfering with her actual and prospective business relationships.

91.    Defendants have seriously damaged Plaintiff's actual and prospective business

relationships as a direct and proximate cause of these acts.

92.    The above-described conduct is egregious and constitutes moral turpitude.  As such,

in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive

damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

93.    Plaintiff hereby repeats and realleges each and every allegation set forth in

paragraphs 1 through 92 of this Second Amended Complaint as if fully set forth herein.

{00067445;1}                                                    24

94.    Defendants intentionally and fraudulently misrepresented to Plaintiff that her communications to Gawker would be treated confidentially and that Gawker would not misappropriate her story.

95.    Defendant Sam Biddle also concealed his ongoing close, personal relationship with Wolfe and Gulczynski, who are among the subjects of Plaintiff's story, from Plaintiff.  Biddle was regularly communicating with Wolfe and Gulczynski throughout the time that Plaintiff was confiding in Biddle and providing him with confidential information at his request and inducement, and under an obligation to Terrill to maintain such information in confidence.

96.    Defendants knew that the representations described herein were false at the time they were made.  The representations and promises were made by Defendants with a preconceived and undisclosed intention by Defendants of not performing them.  Defendants, while knowing that Plaintiff had reposed her trust and confidence in them, were under a duty to disclose the truth to Plaintiff.

97.    Plaintiff relied on Defendants' misrepresentations to her detriment.  Defendants' misrepresentations and omissions were intended to induce, and did induce, Plaintiff to disclose her confidential and proprietary research.

98.    Plaintiff has been seriously damaged as a direct and proximate result of these misrepresentations by Defendants.

99.    The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Negligent Hiring and Retention)

100.   Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 99 of this Second Amended Complaint as if fully set forth herein.

101.   At all times relevant to the allegations herein, Biddle was engaged in the abuse of multiple drugs including benzodiazepines, anti-depressants and SSRIs (Selective Serotonin Reuptake Inhibitors), while employed at Gawker and particularly during the time that he engaged in conversations with Plaintiff and subsequently researched and wrote the Gawker Story.

102.   At all relevant times, Gawker, Denton and Cook knew or should have known of Biddle's open and continuing abuse of such drugs, and the impact that it was having on his mental health, and the caustic and reckless articles that Biddle was writing about people as a result.

103.   At all relevant times, Gawker, Denton and Cook also knew or should have known that Biddle sought to libel and destroy the lives of the subjects of his reporting.  In connection with Biddle's reporting, Gawker and its executives, including Denton and Cook, received outcry and criticism about Biddle while Biddle was employed with them.

104.   Gawker, Denton and Cook failed to take reasonable care in the hiring and/or retention of Biddle, and/or acted with gross negligence in the hiring and/or retention of Biddle.

105.   Gawker, Denton and Cook placed Biddle in a position to cause foreseeable harm to others (including Terrill) by placing and retaining Biddle in the position of Senior Writer.

{00067445;1}                         26

106.  The above-described conduct is egregious and constitutes moral turpitude and/or gross negligence.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

### DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ashley Terrill respectfully requests:

(a) An award of damages to Plaintiff in an amount to be determined at trial, but in all events not less than Ten Million Dollars ($10,000,000);

(b) An award of punitive damages to Plaintiff in an amount to be determined at trial;

(c) An order requiring Defendants to make a public retraction of the false statements;

(d) An order granting preliminary and permanent injunctive relief to prevent defendants from making further defamatory statements about Plaintiff; and

(e)  An award of such other and further relief as the Court may deem just and

proper.

Dated: June 1, 2016                    Respectfully submitted,

                                       **HARDER MIRELL & ABRAMS LLP**


                                       By: */s/ Charles J. Harder*_____

                                       Charles J. Harder, Esq.
                                       132 S. Rodeo Drive, Suite 301
                                       Beverly Hills, California 90212
                                       Tel. (424) 203-1600

                                       Andrea Moss, Esq.
                                       100 Church Street, 8th Floor
                                       New York, New York 10007
                                       Tel. (212) 242-6152

                                       *Counsel for Plaintiff*



# Electronic Proof of Claim - 1611 70000391164

Adobe Sign Document History                    09/28/2016

| | |
|---|---|
| Created: | 09/28/2016 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAXqKChgc0KmAla8rxGMaSejmEq1vKZd6g |

# "Electronic Proof of Claim - 161170000391164" History

Widget created by Prime Clerk (epoc@primeclerk.com)
09/28/2016 - 10:55:01 PM EDT

Widget filled in by Ashley Terrill (tony@amvasslaw.com)
09/28/2016 - 11:04:10 PM EDT- IP address: 71.190.18.29

Ashley Terrill (tony@amvasslaw.com) uploaded the following supporting documents:
   Attachment
09/28/2016 - 11:04:12 PM EDT

(User email address provided through API 161170000391164, User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_10_5) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/53.0.2785.116 Safari/537.36)
09/28/2016 - 11:04:12 PM EDT- IP address: 71.190.18.29

Signed document emailed to Prime Clerk (epoc@primeclerk.com) and Ashley Terrill (tony@amvasslaw.com)
09/28/2016 - 11:04:12 PM EDT

Prime Clerk      POWERED BY Adobe Sign