ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x
                                                   :
In re                                              :        Chapter 11
                                                   :
Gawker Media LLC, *et al.*,[1]                     :        Case No. 16-11700 (SMB)
                                                   :
                    Debtors.                       :        (Jointly Administered)
                                                   :
---------------------------------------------------x

**NOTICE OF FILING OF DISCLOSURE STATEMENT FOR
DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION**

**PLEASE TAKE NOTICE** that on September 30, 2016, the Debtors filed the (i)

*Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Liquidation for Gawker Media*

*Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 308] (as it may be

modified, amended, or supplemented the "Disclosure Statement") and (ii) *Debtors Motion For*

*the Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the*

*Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan of*

*Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III)*

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* [Docket No. 309] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the changes from the Disclosure Statement filed on September 30, 2016 is attached hereto as **Exhibit B**.  This redline also includes an exhibit that reflects changes from the initial *Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* filed on September 30, 2016 to the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* filed contemporaneously herewith.

**PLEASE TAKE FURTHER NOTICE** that the hearing (the "Hearing") on the Motion to consider (i) the adequacy of the Proposed Disclosure Statement; (ii) the solicitation procedures with respect to confirmation of the Plan; (iii) the form of ballots and notices in connection therewith; and (iv) the scheduling of certain dates related thereto, will be held before the Honorable Stuart M. Bernstein of the United States Bankruptcy Court for the Southern District of New York (the "Court"), in Room 723, One Bowling Green, New York, New York 10004-1408, on **November 3, 2016, at 10:00 a.m. (New York Time)**.

*[Remainder of Page Intentionally Left Blank]*

2

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing.

Dated: November 2, 2016
      New York, New York

/s/ Gregg M. Galardi

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

59596608_3

## EXHIBIT A

**Disclosure Statement**

Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                              :     Chapter 11
In re                            :
                              :     Case No. 16-11700 (SMB)
Gawker Media LLC, *et al.*,[1]        :
                              :     (Jointly Administered)
            Debtors.            :
                              :
———————————————————— x

**DISCLOSURE STATEMENT FOR THE DEBTORS' AMENDED JOINT
CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA
GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.[2]**

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

Dated: November 2, 2016

---

[1]     The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2]     Pursuant to the Unimoda APA, the Debtor entity that was formerly named Kinja Kft. was required to be re-named, and has now been re-named as Gawker Hungary Kft.

THIS DISCLOSURE STATEMENT IS PROVIDED IN CONNECTION WITH SOLICITATION OF VOTES ON THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.  PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING CLAIMS AND EQUITY INTERESTS IN THE FOLLOWING CLASSES:

| Voting Class | Name of Class Under the Plan |
|---|---|
| Class 1A | GMGI – Second Lien Make-Whole Claim |
| Class 1C | GMGI – General Unsecured Claims |
| Class 1F | GMGI – Preferred Equity Interests |
| Class 2A | Gawker Media – Second Lien Make-Whole Guaranty Claim |
| Class 2C | Gawker Media – General Unsecured Claims |
| Class 2D | Gawker Media – Punitive Damage Claims |
| Class 3A | Gawker Hungary – Second Lien Make-Whole Guaranty Claim |

IF YOU HOLD A CLAIM OR EQUITY INTEREST IN ONE OF THESE CLASSES, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

THE DEADLINE TO VOTE ON THE PLAN IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME).  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE *AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.*  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN AND THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS DESCRIBED IN ARTICLE IX.E. HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, EACH OF WHOM URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.  THE DEBTORS FURTHER URGE EACH HOLDER OF A CLAIM OR EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.   THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT

THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' CURRENT AND FORMER MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF, OR SUCH OTHER DATES AS ARE SPECIFICALLY NOTED HEREIN, AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

59473927_10

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THIS DISCLOSURE STATEMENT.  THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN AND THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS DESCRIBED IN ARTICLE IX.E. HEREIN.

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................1

II.     PRELIMINARY STATEMENT ................................................................................1

III.    SUMMARY OF THE PLAN .....................................................................................2

IV.     THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ....................9

        A.    Overview of the Debtors' Business ..........................................................9
        B.    Intercompany Arrangements Between Gawker Media and Gawker Hungary ................................9
        C.    The Debtors' Primary Assets ..................................................................10
        D.    The Debtors' Capital Structure and Prepetition Indebtedness ....................11
        E.    Employees and Independent Contractors ...............................................13
        F.    Directors and Officers ...........................................................................13

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS .........................................14

        A.    Bollea Judgment ....................................................................................14
        B.    Article Lawsuits ....................................................................................15
        C.    Appointment of Independent Director .....................................................17

VI.     EVENTS DURING THE BANKRUPTCY CASES ................................................17

        A.    First Day Pleadings and Other Case Matters ..........................................17
        B.    The Appointment of Special Board Committee .......................................21
        C.    Sale of Substantially All of the Debtors' Assets ....................................21
        D.    Committee Investigation and Request Letter ..........................................22

VII.    DESCRIPTION OF PLAN SETTLEMENTS .........................................................23

        A.    Settlement of Inter-Debtor Allocation, Intercompany Claims, and Significant Creditor
              Disputes ...............................................................................................23
        B.    Second Lien Make-Whole Settlement .....................................................29
        C.    Treatments of Claims and Interests Resolving Plan Disputes ......... **Error! Bookmark not defined.**
        D.    Bankruptcy Court Approval of the Plan Settlements ...............................31

VIII.   THE PLAN – OVERVIEW .....................................................................................31

        A.    Overview of Chapter 11 .........................................................................31
        B.    Administrative Claims, Priority Tax Claims, and Other Unclassified Claims ................32
        C.    Classification of Claims and Interests ....................................................33
        D.    Claims Asserted Against the Debtors ......................................................34
        E.    Treatment of Claims and Interests ..........................................................35
        F.    Means of Implementation of Plan ..........................................................40

IX.     THE PLAN – OTHER PROVISIONS .....................................................................43

        A.    Treatment of Executory Contracts and Unexpired Leases .......................43
        B.    Provisions Governing Distributions ........................................................43
        C.    Provisions for Treatment of Subsequent Plan Distributions .....................44
        D.    Conditions Precedent to Confirmation and Effective Date of the Plan ................45

i

|        | E. | Effect of Plan Confirmation | 46 |
|        | F. | Retention of Jurisdiction | 48 |
|        | G. | Miscellaneous Provisions | 50 |
|        | H. | Notices | 50 |

| **X.** | **LIQUIDATION ANALYSIS** | | **51** |

| **XI.** | **RISK FACTORS** | | **52** |
|         | A. | Certain Bankruptcy Law Considerations | 52 |
|         | B. | Risks Related to Recoveries Under the Plan | 54 |
|         | C. | Disclosure Statement Disclaimer | 55 |
|         | D. | Liquidation Under Chapter 7 | 56 |

| **XII.** | **SOLICITATION AND VOTING PROCEDURES** | | **56** |
|          | A. | Holders of Claims Entitled to Vote on the Plan | 56 |
|          | B. | Voting Record Date | 57 |
|          | C. | Voting on the Plan | 57 |
|          | D. | Ballots and Election Forms Not Counted | 57 |

| **XIII.** | **CONFIRMATION OF THE PLAN** | | **57** |
|           | A. | Requirements for Confirmation of the Plan | 57 |
|           | B. | Best Interests of Creditors/Liquidation Analysis | 58 |
|           | C. | Feasibility | 58 |
|           | D. | Acceptance by Impaired Classes | 58 |
|           | E. | Confirmation without Acceptance by All Impaired Classes | 58 |

| **XIV.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **59** |
|          | A. | In General | 59 |
|          | B. | U.S. Federal Income Tax Consequences to the Debtors | 60 |
|          | C. | Professional Fee Claims Reserves | 62 |
|          | D. | U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests | 62 |
|          | E. | Backup Withholding and Information Reporting | 63 |

| **XV.** | **RECOMMENDATION** | | **64** |

ii

**EXHIBITS**

EXHIBIT A        Joint Plan of Liquidation

EXHIBIT B        Disclosure Statement Order

EXHIBIT C        Liquidation Analysis

59473927_10

## I.      INTRODUCTION

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft., fka Kinja Kft. ("Gawker Hungary"), as debtors and debtors in possessions (collectively, the "Debtors" or the "Company"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to Holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of acceptances of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may be amended, supplemented, and modified from time to time, the "Plan"),[3] dated September 30, 2016. The Plan provides for the liquidation of the Debtors and the resolution of all Claims against and Equity Interests in each of the three Debtors in these chapter 11 cases (the "Bankruptcy Cases"), and constitutes a separate chapter 11 plan of liquidation for each Debtor. Each Class of Claims against or Equity Interests in the Debtors shall be deemed to constitute a separate Class of Claims against and Equity Interests in the relevant Debtor, as applicable, and each such Class shall vote as a single separate Class for such Debtor, as applicable, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each of the Debtors.

**THE DEBTORS EACH BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND EQUITY INTEREST HOLDERS.**

**THE INDEPENDENT DIRECTOR OF GMGI, FOR GMGI ITSELF, AND FOR GMGI TO TAKE ACTION AS THE MANAGER OF GAWKER MEDIA AND THE MANAGER OF GAWKER HUNGARY, HAVE APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND THE DEBTORS EACH RECOMMEND THAT ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

The Debtors in these Bankruptcy Cases are GMGI and its wholly-owned subsidiaries, Gawker Media and Gawker Hungary. Prior to filing for bankruptcy, the Company was a privately-held, online media company whereby Gawker Media operated seven distinct media brands with corresponding websites under the names Gawker, Deadspin, Lifehacker, Gizmodo, Kotaku, Jalopnik, and Jezebel (the "Websites"), using certain intellectual property and other intangible assets owned by and licensed from Gawker Hungary. While Gawker is the most well-known brand and website, the six other brands identified above represented approximately 85% of revenues. The Debtors also license their web content internationally to third parties that run similar websites based on the Company's brands, such as Gizmodo en Espanol, Gizmodo Australia, Kotaku Australia, and Lifehacker Australia. Gawker Media's primary source of revenue was earned through sales of advertising space on the Websites.

Historically, the Company's financial health was good; it survived the 2008-2009 recession and was profitable from 2010 until 2015. However, despite its long running success and commendable growth trajectory, the Company suffered from substantial legal expenses and a recent Florida State court judgment totaling more than $130 million. While Gawker Media believes that the judgment would be overturned on appeal, it could not post a bond to obtain a stay pending appeal and therefore the imposition of liens on Gawker Media's assets as well as potential execution on the judgment was imminent. Accordingly, the Company sought immediate chapter 11 relief.

On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Gawker Media Petition Date"). On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively with the Gawker Media Petition Date, the "Petition Dates"). The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Bankruptcy Cases.

---

[3]      The Plan is attached hereto as **Exhibit A** and incorporated into this Disclosure Statement by reference. Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

The chapter 11 process provided the Debtors with breathing room from execution on the Florida state court judgment and the opportunity to negotiate with creditors regarding a plan of liquidation that will enable the Debtors to address creditor claims, including through an appeal of that judgment. The Florida judgment and other pending litigation made it unrealistic for the Debtors to reorganize their business, so, at the outset of the Bankruptcy Cases, the Debtors sought and received approval from the Bankruptcy Court to enter an agreement with a stalking horse bidder and commence an auction process to sell their assets in order to generate proceeds that could be used to satisfy Claims against and Equity Interests in the Debtors. Additionally, the Debtors retained a chief restructuring officer to oversee and coordinate with the Debtors' officers and management a rapid and successful sale that would yield the highest and best outcome for all stakeholders. GMGI also appointed an Independent Director with no prior relationship with, or financial interest in, the Debtors to oversee, among other things, the sale process, the negotiation and prosecution of the plan(s) of liquidation, and make any decisions with respect thereto.

As a result of extensive marketing efforts by the Debtors and their advisors, a second bidder emerged and an auction was held on August 16, 2016 at the offices of Ropes & Gray LLP. At the conclusion of the auction, the Debtors, in consultation with the Committee determined that the successful bidder was Unimoda LLP ("Unimoda"), a wholly-owned subsidiary of Univision Communications Inc., with a bid of $135 million in cash (plus other consideration) to acquire substantially all of the Debtors' assets as set forth in further detail below. On August 22, 2016, the Bankruptcy Court entered an order approving the proposed Unimoda Sale. The Unimoda Sale closed on September 9, 2016. Since then, the Debtors have held discussions regarding terms of a potential consensual plan of liquidation for the Debtors with the Committee, major preferred equity holders and the Second Lien Lender, and certain significant creditors. The Plan, and this Disclosure Statement, reflect certain agreements that have been reached among those parties.

The Plan incorporates the following five proposed settlements: (i) an intercompany settlement of disputes among the Debtors regarding the appropriate allocation of proceeds from the Unimoda Sale and various liabilities among them; (ii) a resolution of disputes regarding the outstanding Second Lien Make-Whole Claims in exchange for subordinating portions of the otherwise Disputed, Secured Second Lien Lender claims to general unsecured creditors at each Debtor entity, as well as release and resolution of certain disputed claims or causes of action among the Debtors; (iii) a settlement of all Claims that Bollea has asserted, (a) against any of the Debtors including, but not limited to, claims (i) under the Bollea I Lawsuit and the Bollea II Lawsuit, including on account of the Bollea Compensatory Judgment and the Bollea Punitive Damage Judgment, (ii) based on theories of veil piercing, substantive consolidation, or *alter ego*, and (b) against third-parties for which the Debtors have Debtor Indemnification Obligations, in exchange for (x) $31.0 million in Cash on the Effective Date, *plus* (y) a Pro Rata share (together with other holders of unsecured Claims against Gawker Media) of a 45% portion of certain Gawker Media Contingent Proceeds, as discussed further below; (iv) a settlement of all Claims that Ms. Terrill has asserted against any of the Debtors and the waiver of any claims Ms. Terrill has against third parties that would have Debtor Indemnification Obligations; and (v) a settlement of all Claims that Dr. Ayyadurai has asserted against any of the Debtors and the waiver of any claims Dr. Ayyadurai has against third parties that would have Debtor Indemnification Obligations.

The Debtors have also had settlement discussions Denton. Although the parties have not reached a final settlement agreement, the Debtors are hopeful that a settlement agreement with Denton will be part of the Confirmation Hearing.

## III.    SUMMARY OF THE PLAN

This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Disclosure Statement and in the accompanying Plan.

| | |
|---|---|
| **Background Information:** | The Bankruptcy Code requires acceptance by creditors holding at least two-thirds in dollar amount and a majority in number of allowed claims in at least one Impaired Class of each Debtor, counting only those claims actually voting to accept or reject the Plan. |
| **Voting Record Date:** | The Voting Record Date is October 31, 2016. Only holders of Claims or Equity Interests in Classes 1A, 1C, 1E(ii), 1F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E as of the Voting Record Date are entitled to vote on the Plan. The Debtors reserve the right to establish a |

2

later Voting Record Date if the Debtors decide to extend the Voting Deadline.

**Voting Deadline; Extension; Termination; Amendments:**

The Voting Deadline is December 5, 2016. If the Debtors extend the Voting Deadline, the term Voting Deadline will mean the latest time and date as to which the solicitation of votes on the Plan is extended. Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension.

**Voting Procedures:**

Any holder of a Claim or Equity Interest as of the Voting Record Date eligible to vote pursuant to the terms of the Solicitation Procedures should deliver a properly completed Ballot to the Voting Agent so that it is actually received on or before the Voting Deadline.

**Revocation or Withdrawal of Ballots:**

Any holder of a Claim or Equity Interest may withdraw their Ballot(s) up until the Voting Deadline. Following the Voting Deadline, Ballots may not be withdrawn.

**Voting Agent:**

Prime Clerk LLC.

**The Plan:**

The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. As a result, for the Plan to become effective and for the Debtors to make any distributions thereunder, the Bankruptcy Court must confirm the Plan with respect to each Debtor, individually. If any Claim against or Equity Interest in any of the Debtors is Impaired, for the Bankruptcy Court to confirm the Plan with respect to that Debtor by consent of an Impaired Class, the Bankruptcy Code requires that the applicable Debtor must receive votes to approve the Plan prior to the Voting Deadline from holders of Impaired Claims, that constitute (i) at least two-thirds in amount of the Claims of the holders in such Impaired Class of Claims who actually cast votes in respect of the Plan and (ii) more than one-half in number of the holders of such Impaired Class of Claims who actually cast votes with respect to the Plan. The Bankruptcy Court may confirm the Plan with respect to any of the Debtors so long as one Impaired Class of Claims against such Debtor votes to accept the Plan and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Debtor.

If the Plan is confirmed by the Bankruptcy Court, holders of Claims and Equity Interests will receive, in full satisfaction and discharge of such Claim against or Equity Interest in the Debtors, the treatment provided for in the Plan and summarized in the section entitled Treatment of Claims and Equity Interests below.

**Effectiveness of the Plan:**

The Effective Date will not occur, and distributions will not be made under the Plan, unless the Debtors have received the requisite votes to accept the Plan under the Bankruptcy Code, the Bankruptcy Court has confirmed the Plan as satisfying the requirements set forth in section 1129 of the Bankruptcy Code, and the other conditions to effectiveness set forth in Section 6.02 of the Plan have been satisfied. The Debtors cannot assure you that they will receive the requisite votes to accept the Plan under the Bankruptcy Code, that the Bankruptcy Court will confirm the Plan, or that the other conditions to effectiveness of the Plan will be satisfied.

If the Bankruptcy Court confirms the Plan and it becomes effective, the terms of the Plan will bind every holder of a Claim against or Equity Interest in the Debtors, whether or not such holder voted to accept the Plan.

**Treatment of Claims and Equity Interests:**

The table below summarizes each Class of Claims and Equity Interests in the Plan for each Debtor, and the treatment of each Class, the aggregate amount of Claims or Equity Interests comprising each Class asserted through the date of filing of this Disclosure Statements, and the range of projected recoveries of each Class based on such estimates.

3

Claims asserted against the Debtors include Claims filed by Terry Gene Bollea that are subject to the Bollea Settlement and many further Claims to which the Debtors either (i) have already filed objections, or (ii) to which the Debtors anticipate they will file objections, as set forth in greater detail in section V.A., V.B., and VIII.D. below. Accordingly, when the Debtors anticipate that the Allowed amount of Claims in a Class will be lower than the asserted amount, the table below identifies the Debtors' current estimate of the aggregate amount of Claims that will be Allowed in such Class, after accounting for the Plan Settlements and the Debtors' objections. The amounts of Claims estimated by the Debtors below are based on the state of the Debtors' analysis as of Claims as of October 31. The Pro Rata Share that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the claims resolution process. The "Recoveries" column of the chart includes value ranges for certain classes because of the very significant litigation claims filed by certain creditors against multiple Debtors. The Debtors have objected to these Claims but should those objections be denied, recoveries to all constituencies will be materially decreased.

## GMGI

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Amount | Recoveries |
|---|---|---|---|---|---|
| 1A | Second Lien Make-Whole Claim | (a) on the Effective Date, a distribution in Cash in the amount of $500,000; <br><br> (b) on, or as soon as practicable after, the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have been paid in full, up to an aggregate total of $750,000; and <br><br> (c) in the event that Gawker Hungary dissolves before all Disputed GMGI General Unsecured Claims have become Allowed or Disallowed, the Second Lien Lender shall receive the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan. | Impaired / Entitled to Vote | Allowed in the amount of $2.0 million | 40 – 100% (based on distributions under all Plans) |
| 1B | Other Priority Claims | Payment in full in Cash. | Unimpaired/ Deemed to Accept/ Not Entitled to Vote | Asserted: $88,993 <br><br> Est. Allowed: $0 | 100% |
| 1C | General Unsecured Claims | Pro Rata share of GMGI Cash distributed on the Effective Date, or within 15 days of Allowance of such Claim, up to the Allowed amount of Claims, plus Post-Petition Interest. | Impaired / Entitled to Vote | Asserted: $811,124,088.90 plus unliquidated amounts <br><br> Est. Allowed: $0 to $500,000 | 10 – 100% |

4

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Amount | Recoveries |
|---|---|---|---|---|---|
| 1D | General Unsecured Convenience Claims | A single distribution on the Effective Day in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000, in full and complete settlement and release of, and in exchange for, such Claim and any other Claim held by such General Unsecured Convenience Creditor against any of the Debtors. | Impaired / Entitled to Vote | Unknown- will depend on creditor elections | Lesser of (a) the Allowed Claim amount and (b) $25,000 |
| 1E(i) | Gawker Hungary Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired / Deemed to Reject/ Not entitled to Vote | Resolved Pursuant to Plan Settlements | 0% |
| 1E(ii) | Gawker Media Intercompany Claims | Pursuant to Settlement, GMGI to provide $2.0 million Plan Guaranty for the benefit of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims. | Impaired / Entitled to Vote | Resolved Pursuant to Plan Settlements | Up to $2.0 million |
| 1F | Preferred Equity Interests | Pro Rata share of GMGI Cash remaining after payment of all Class 1A Claims have been paid in full, up to the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference. | Impaired / Entitled to Vote | Distributions up to the aggregate GMGI Preferred Shares Liquidation Preference of $60.6 million | $0 to $42 million |
| 1G | Common Equity Interests | Pro Rata share of any GMGI Cash remaining after holders of Class 1F Equity Interests have received distributions totaling the aggregate amount of their Preferred Shares Liquidation Preferences. | Impaired/ Deemed to Reject/ Not Entitled to Vote | Class 1F holds the residual interests in GMGI | $0 |

## GAWKER MEDIA

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Amount | Recoveries |
|---|---|---|---|---|---|
| 2A | Gawker Media Second Lien Make-Whole Guaranty Claim | (a) A distribution in Cash in the amount of $500,000; and (b) Distributions equal to any Cash remaining in a $750,000 Gawker Media Second Lien Make-Whole Guaranty Reserve after payment of all Allowed Gawker Media General Unsecured Claims. | Impaired / Entitled to Vote | Allowed in the aggregate amount of $1.25 million | 40 – 100% (based on distributions under all Plans) |
| 2B | Gawker Media Other Priority Claims | Payment in full in Cash. | Unimpaired/ Deemed to Accept/ Not Entitled to Vote | Asserted: $22,588.41 Est. Allowed: $50,000 | 100% |

5

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Amount | Recoveries |
|---|---|---|---|---|---|
| 2C | Gawker Media General Unsecured Claims | Distributions made in the following order up until it receives the amount of its Allowed Claim, excluding Post-Petition Interest:<br><br>FIRST: on the Gawker Media Claims Reserve Distribution Date, a Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;<br><br>SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account;<br><br>THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Make-Whole Reserve; and<br><br>FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve. | Impaired / Entitled to Vote | Asserted: $858,551,246 plus unliquidated amounts<br><br>Est. Allowed: $32.5 million to $36 million (including Bollea Claims, Terrill Claims, and Ayyadurai Claims) | 15 – 100% |
| 2D | Gawker Media Punitive Damage Claims | Distributions made in the following order up until it receives the amount of its Allowed Claim, excluding Post-Petition Interest:<br><br>FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;<br><br>SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims excluding Post-Petition Interest;<br><br>THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims excluding Post-Petition Interest; and<br><br>FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims excluding Post-Petition Interest. | Impaired / Entitled to Vote | Asserted: $25.1 million<br><br>Est. Allowed: $0 | 0 – 100% |
| 2E | Gawker Media General Unsecured Convenience Class | A single distribution on the Effective Day in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000, in full and complete settlement and release of, and in exchange for, such Claim and any other Claim held by such General Unsecured Convenience Creditor against any of the Debtors. | Impaired / Entitled to Vote | Unknown: Depends on creditor elections | Lesser of (a) the Allowed Claim amount and (b) $25,000 |
| 2F(i) | Gawker Media Gawker Hungary Intercompany Claims | Pursuant to Intercompany Settlement, Gawker Hungary Intercompany Claims against Gawker Media will be satisfied in full in Cash, excluding Post-Petition Interest. | Impaired / Entitled to Vote | Resolved Pursuant to Settlement | 80-100% |

6

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Amount | Recoveries |
|---|---|---|---|---|---|
| 2F(ii) | Gawker Media GMGI Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired / Deemed to Reject/ Not entitled to Vote | Resolved Pursuant to Settlement | $0 |
| 2G | Gawker Media Membership Interest | (a) Pro Rata share of the Gawker Media Contingent Equity Proceeds; and<br><br>(b) Cash remaining in the Gawker Media Claims Reserve after satisfaction of all Allowed Class 2C, 2D, 2E, and 2F(i) Claims,<br><br>which amounts shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan. | Impaired/ Entitled to Vote | One Member | $0 to $1 million |

## GAWKER HUNGARY

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Amount | Recoveries |
|---|---|---|---|---|---|
| 3A | Gawker Hungary Second Lien Make-Whole Claims | (a) A distribution in Cash in the amount of $500,000 and<br><br>(b) if and when all Class 1C Claims have either (i) been paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Class 1C Claims, a distribution in Cash from a $750,000 Gawker Hungary Second Lien Make-Whole Guaranty Reserve; provided, however, that in the event that Gawker Hungary dissolves before all Disputed Claims in Class 1C have become Allowed or Disallowed, GMGI assumes this obligation, and the Second Lien Lender shall receive the corresponding distribution from GMGI Pro Rata with the treatment of the GMGI Second Line Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan. | Impaired / Entitled to Vote | Allowed in the aggregate amount of $1.25 million | 40 – 100% (based on distributions under all Plans) |
| 3B | Gawker Hungary Other Priority Claims | Payment in full in Cash plus Post-Petition Interest. | Unimpaired/ Deemed to Accept/ Not Entitled to Vote | $0 – $500,000 | 100% |
| 3C | Gawker Hungary General Unsecured Claims | Payment in full in Cash plus Post-Petition Interest. | Unimpaired / Deemed to Accept/ Not Entitled to Vote | Asserted: $651,007,657<br><br>Est. Allowed: $0 – $500,000 | 30 – 100% |
| 3D(i) | Gawker Hungary GMGI Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired/ Deemed to Reject/ Not Entitled to Vote | Resolved Pursuant to Settlement | 0% |

7

| 3D(ii) | Gawker Hungary Gawker Media Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired/ Entitled to Vote | Resolved Pursuant to Settlement | 0% |
|---|---|---|---|---|---|
| 3E | Gawker Hungary Membership Interest | (a) A distribution of all of the Cash held by Gawker Hungary after payment in full of the Class 3C Claims and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Class 1C Claims and anticipated expenses of liquidating Gawker Hungary, and<br><br>(b) upon dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan | Impaired/ Entitled to Vote | One Member | $0 to $42 million |

**Convenience Class Election:** Each holder of a General Unsecured Claim against Gawker Media or GMGI will have an option on its Ballot to elect to participate in the Gawker Media Convenience Class or the GMGI Convenience Class, as applicable. Any holder who makes such election will receive only a single distribution on account of any and all Claims against Gawker Media, Gawker Hungary and GMGI from the Gawker Media Claims Reserve. In the event a holder elects to participate in the Gawker Media Convenience Class on one Ballot, and does not make an election or makes an inconsistent election on another submitted Ballot, such holder will be deemed part of the Gawker Media Convenience Class and receive only the single distribution on account of all of the holder's claims against the Debtors.

**Distribution Date:** Distributions to be made under the Plan will be made on the Effective Date, the Gawker Media Claims Reserve Distribution Date, and each Gawker Media Contingent Proceeds Distribution Date. The Effective Date will be the date as soon as reasonably practicable after the Confirmation Date when all conditions to the Effective Date in Section 6.02 of the Plan (including the Confirmation Order having become a Final Order) have been met or waived and no stay of the Confirmation Order is in effect. The Gawker Media Claims Reserve Distribution Date will be designated by the Plan Administrator promptly following such time as all there remain no Disputed Claims Against Gawker Media. Each Gawker Media Contingent Proceeds Distribution Date will be designated by the Plan Administrator in its sole discretion, based on the receipt of Gawker Media Contingent Proceeds, or as the Plan Administrator may otherwise determine.

**Plan Supplement:** The Debtors will file the Plan Supplement no later than five (5) days before the deadline for voting on the Plan (or such later date as may be approved by the Bankruptcy Court). It is anticipated that the Plan Supplement will include, among other things, the form of Plan Administrator Agreement.

**Exculpations and Releases:** **AS PART OF, AND/OR TO FACILITATE THE CONTEMPLATED SETTLEMENT, THE PLAN PROVIDES FOR CERTAIN EXCULPATIONS AND RELEASES BY THE DEBTORS AND THIRD PARTIES. THESE EXCULPATIONS AND RELEASES ARE DETAILED IN ARTICLE 9 HEREOF.**

**Injunction** Upon entry of the Confirmation Order, parties will be enjoined from taking specified actions that interfere with consummation of the transactions contemplated in the Plan. This injunction is detailed in Article 9 hereof.

8

| Certain U.S. Federal Income Tax Consequences: | For a summary of certain U.S. federal income tax consequences of the Plan to holders, see Article 14 hereof. |
| --- | --- |
| Risk Factors: | Prior to deciding whether and how to vote on the Plan, each holder of a Claim or Equity Interest should consider carefully all of the information in this Disclosure Statement, especially the "Risk Factors" described in Article 11 hereof. |

## IV.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

Since its inception in 2002 as a single blog operated from Nick Denton's apartment, the Company grew into a network of seven branded news and lifestyle Websites, each with millions of readers. Historically, the Company's financial health was good; it survived the 2008-2009 recession and was profitable from 2010 until 2015. However, despite its long running success and commendable growth trajectory in 2016, the Company incurred significant legal expenses and had awarded against it the Bollea Judgments of more than $130 million in the Bollea I Lawsuit. While Gawker Media believes that the Bollea Judgments would be overturned on appeal, it could not post the required bond or agree to alternative conditions required for a stay pending appeal and therefore the imposition of liens on Gawker Media's assets as well as potential execution on the judgment were imminent. Accordingly, the Company sought immediate chapter 11 relief.

### A.    Overview of the Debtors' Business

The Debtors in these Bankruptcy Cases include GMGI and its wholly-owned subsidiaries, Gawker Media and Gawker Hungary. Prior to filing for bankruptcy, the Company was a privately-held, online media company whereby Gawker Media operated seven distinct media brands with corresponding websites under the names Gawker, Deadspin, Lifehacker, Gizmodo, Kotaku, Jalopnik, and Jezebel (the "Websites"), using certain intellectual property and other intangibles owned by and licensed from Gawker Hungary. While Gawker is the most well-known brand and website, the six other brands identified above represented approximately 85% of revenues. The Debtors also license their web content internationally to third parties that run similar websites based on the Company's brands, such as Gizmodo Australia, Kotaku Australia, and Lifehacker Australia. The Debtors' primary source of revenue was earned through sales of advertising space on the Websites. Additional information about each of the Websites is available in the First Day Declaration.

Prior to filing for bankruptcy, Gawker Hungary, the Debtors' subsidiary operated in Hungary, owned the proprietary publishing and discussions platform and intellectual property used by Gawker Media's brands and the Websites (collectively, the "Gawker Hungary Assets"). Gawker Media had an exclusive license of the Gawker Hungary Assets and intercompany arrangements with Gawker Hungary to enable the affiliates to maximize use of their complementary assets and employees.

To facilitate Gawker Media's use of Gawker Hungary's intellectual property, web domains, and proprietary publishing platform, Gawker Media and Gawker Hungary were party to several intercompany agreements, each as described herein.

### B.    Intercompany Arrangements Between Gawker Media and Gawker Hungary

*Gawker Hungary's IP License to Gawker Media*. First, pursuant to a Master License Agreement, dated as of January 1, 2011 (the "Master License Agreement"), between Gawker Media and Gawker Hungary, Gawker Media obtained an exclusive license to use certain brand elements, including trademarks, trade names, and service marks, as well as associated goodwill, websites, web addresses, and URLs, patents, copyrights, works of authorship, trademarks, and related intellectual property. Under the terms of the Master License Agreement, Gawker Media agreed to pay Gawker Hungary a quarterly license fee determined by the amount of revenue received or receivable by Gawker Media over the twelve month calendar year beginning January 1 and ending December 31.

*Gawker Media's Services to Gawker Hungary*. Second, pursuant to a Development Agreement, dated as of January 1, 2007 (as amended on January 21, 2013, the "Development Agreement"), by and between Gawker

9

Media and Gawker Hungary, Gawker Media provided certain development services to Gawker Hungary, including designing, developing, and testing scalable software to serve as a publishing and content management platform for Gawker Hungary's properties and other websites, handling of content produced by users of the platform (i.e., posts, comments, video, photos, etc.), providing for the storage of media related to content production and aggregation and display of content sourced from external resources, providing security and authentication systems to ensure authenticity of user generated content, and providing Gawker Hungary with information and assistance as is necessary to allow Gawker Hungary to sell advertising.  Under the terms of the Development Agreement, Gawker Hungary agreed to pay Gawker Media for the direct costs of the services provided plus 5%.  Unless terminated by one party upon material breach by the other party, the term of the Development Agreement expires on December 31, 2022.

*Gawker Hungary's Services to Gawker Media LLC*.  Third, pursuant to an Intercompany Services Agreement, dated as of January 1, 2012 (the "Gawker Hungary Services Agreement"), by and between Gawker Media and Gawker Hungary, Gawker Hungary agreed to perform certain editorial services, content creation services, and other services for Gawker Media.  Under the terms of the Intercompany Services Agreement, Gawker Media agreed to pay Gawker Hungary for the costs of services provided plus 5%.

## C.    The Debtors' Primary Assets

### 1. GMGI Assets

GMGI's principal assets are its direct 100% ownership of Gawker Hungary and Gawker Media.  GMGI does not have real estate holdings, significant cash on deposit, or other fixed assets.

GMGI also holds a $200,000 Promissory Note from Denton to GMGI for funds that GMGI lent Denton on June 7, 2016 to enable Denton to hire independent bankruptcy counsel (the "Denton Note").  The Denton Note accrues interest at the rate of 5% compounded annually and is due to be repaid with accrued interest on June 7, 2018.  Denton filed for personal chapter 11 bankruptcy on August 1, 2016.  The Debtors have been granted an extension of time to file proofs of claim in Denton's chapter 11 cases, but any such claim will include a claim based on the Denton Note.

### 2. Gawker Media Assets

Gawker Media's share of the Company's value derived from the Websites' content, primarily from selling advertising on the Websites and earning revenue from sales of products that Gawker Media wrote about or promoted on the Websites.  Advertising on the Websites accounts for approximately 75% of Gawker Media's revenue per year, as compared to all other sources combined, which accounted for approximately 25% of gross revenue.  Advertising revenue was primarily earned by serving display, content and video advertisements on the site.  Non-advertising revenue was primarily earned via links to products users could purchase on other sites, which in turn paid the Gawker Media an affiliate fee or commission.  The Gawker Media had an in-house sales team that sold advertising space on the Websites, and the Gawker Media also engaged a number of third-party sellers to sell its unsold advertising inventory on open exchanges.  The Website advertisers who purchased traditional ad space were not subject to long-term contracts.  The company used standard "insertion orders" that followed the standards established by the Interactive Advertising Bureau.  For custom ad campaigns, the ad purchases typically spanned one quarter or possibly two quarters.  For regular, non-custom ad purchases, the duration of the ad on the Websites was usually 30 to 60 days.

Gawker Media also derived a small portion of its revenue from international licensing of the content from the Websites.  For example, Gawker Media licensed the content of its Gizmodo Website to entities in Brazil, Europe and Japan, and those international entities in turn use the Gizmodo content for their own websites using rich site summary (RSS) feeds.

### 3. Gawker Hungary Assets

Gawker Hungary's assets were primarily comprised of its ownership of the intellectual property and other intangible assets that it licensed to Gawker Media.

### 4. The Unimoda Sale Proceeds

Substantially all of the Debtors' assets described in the foregoing paragraphs were sold in the Unimoda Sale described in greater detail in Section 6.C. below. The Debtors received $135 million in cash proceeds from the purchase price in the asset sale. The Unimoda Sale expressly excluded from the acquired assets the "gawker.com" internet domain name and Website content related to the Gawker Website (collectively, the "Gawker.com Assets"), which the Plan contemplates will be liquidated by the Plan Administrator for the benefit of the Debtors' creditors and equity holders, as described in greater detail in Section 8.F.6.(e). below.

### 5. Other Assets

Prior to the Unimoda Sale, Gawker Media had available cash on hand of $12.9 million, Gawker Hungary had available cash on hand of $2.3 million and GMGI had cash on hand of $8,000.

### D.    The Debtors' Capital Structure and Prepetition Indebtedness

As of the Petition Date, the Debtors had approximately $21.2 million of outstanding funded indebtedness, comprised of the First Lien Term Loan and Second Lien Term Loan (each, as defined herein). The Debtors were also obligated on a posted, but not drawn, letter of credit collateralized by a cash deposit of approximately $5.6 million (the "First Lien Letter of Credit").

### 1. First Lien Term Loan

On September 24, 2012, Gawker Media entered into a loan and security agreement (as subsequently amended, the "First Lien Credit Agreement") with Silicon Valley Bank (the "First Lien Lender"), pursuant to which the First Lien Lender agreed to provide to Gawker Media a term loan facility in the aggregate principal amount of $7.7 million (the "First Lien Term Loan") and the First Lien Letter of Credit. The Debtors and Denton also executed certain security, pledge and guaranty agreements and other documentation in connection with the First Lien Obligations. The First Lien Obligations were guaranteed by GMGI and Gawker Hungary. The First Lien Obligations were also secured on a first priority basis by liens on substantially all of the assets of the Debtors.

As of the Petition Date, approximately $6.2 million plus accrued interest, fees, and other charges was outstanding under the First Lien Credit Agreement (the "First Lien Obligations"). On June 16, 2016, the First Lien Obligations were paid in full pursuant to the Interim DIP Order.

### 2. Second Lien Term Loan

On January 21, 2016, GMGI entered into a loan and security agreement (the "Second Lien Loan and Security Agreement") with US VC Partners LP ("Second Lien Lender"), a Delaware limited partnership, pursuant to which Second Lien Lender agreed to extend a term loan facility to GMGI in the initial amount of $15 million (the "Second Lien Term Loan"). The Second Lien Credit Agreement purports to require the payment of a make-whole amount in the event (a "Second Lien Make-Whole Event") that prior to the Maturity Date, the Second Lien Term Loan obligations are accelerated or otherwise become due, in each case, in respect of any Event of Default (as defined in the Second Lien Credit Agreement), including, but not limited to, the occurrence of a bankruptcy or insolvency event (the "Second Lien Make-Whole Provision").

The Second Lien Obligations are guaranteed by Gawker Media and Gawker Hungary. The Second Lien Obligations are secured, pursuant to the Second Lien Loan and Security Agreement, by a second priority lien on substantially all of the assets of GMGI, Gawker Media, and Gawker Hungary.

As of the Petition Date, approximately $15 million plus accrued interest was outstanding under the Second Lien Credit Agreement (the "Second Lien Obligations"). In addition, as a result of the filing of the bankruptcy cases, a Second Lien Make-Whole Event occurred and the Second Lien Lender alleges a Claim pursuant to the Second Lien Make-Whole Provision. On September 10, 2016, pursuant to the Section 2.5(b)(i) of the Unimoda APA, the Second Lien Obligations were paid in full out of the Purchase Price received at the closing of the Unimoda Sale. The Second Lien Lender continues to assert a Claim relating to the Second Lien Make-Whole Provision.

### *3. Intercompany Debt*

As of the Petition Date, Gawker Media had $13 million in outstanding intercompany debt under the Gawker Hungary Promissory Notes, and $250,000 in outstanding intercompany debt owed to GMGI under the GMGI Promissory Note. Intercompany receivables also accrued among the Debtors' estates both before and after the Petition Date. This intercompany debt consisted of the following:

- **First Gawker Hungary Promissory Note.** Pursuant to the Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016 (the "First Gawker Hungary Promissory Note"), Gawker Media promised to pay $8 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. The January 2014 Promissory Note matures on the earliest of (i) January 10, 2019, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Gawker Hungary, or GMGI. There is currently $8 million outstanding on the January 2014 Promissory Note.

- **Second Gawker Hungary Promissory Note.** Pursuant to the Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016 (the "Second Gawker Hungary Promissory Note" and, together with the January 2014 Promissory Note, the "Gawker Hungary Promissory Notes"), Gawker Media promised to pay $5 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. The January 2015 Promissory Note matures on the earliest of (i) January 10, 2020, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Gawker Hungary, or GMGI. There is currently $5 million outstanding on the January 2015 Promissory Note.

- **GMGI Promissory Note.** Pursuant to the Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016 (the "GMGI Promissory Note"), Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually. The GMGI Promissory Note matures on the earliest of (i) December 31, 2020, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Gawker Hungary, or GMGI. There is currently $250,000 outstanding on the GMGI Promissory Note.

- **Intercompany Receivables among Gawker Media and Gawker Hungary.** In the ordinary course of the Debtors' intercompany arrangements, the Debtors have also accrued intercompany receivables owing to one another. As of September 9, 2016, Gawker Hungary had approximately $12.82 million in accounts receivable outstanding from Gawker Media on account of amounts owing under the Master License Agreement. The rates charged under the Master License Agreement were established in 2011 based on the Transfer Pricing Opinion discussed below in Section VII.A.1, which reflected an allocation of the value of the Debtors' assets approximately 2/3 to Gawker Hungary and 1/3 to Gawker Media. As part of the Intercompany Settlement, the Debtors are agreeing to allocate 60% of Unimoda Purchase Price to Gawker Media and 40% to Gawker Hungary, so the Debtors are also agreeing to a corresponding reduction to the accounts receivable due from Gawker Media to Gawker Hungary under the Master License Agreement to $10.7 million.

Also as of September 9, 2016, Gawker Hungary had approximately $0.27 million in accounts receivable from Gawker Media on account of amounts owing under the Gawker Hungary Services Agreement, and Gawker Media had approximately $4.8 million in accounts receivable from Gawker Hungary, neither of which were calculated by reference to the allocation of value among the Debtors' estates.. Accordingly, as of September 9, 2016, the net intercompany balance owing from Gawker Media to Gawker Hungary,

accounting for the adjustment described above, was $6.1 million. GMGI also had approximately 0.1 million in accounts receivable from Gawker Media.

### 4. Unsecured Debt and Potential Unsecured Claims

The Debtors do not have funded unsecured debt. The largest potential unsecured claims are disputed claims arising from the Bollea Judgment (described below) and other pending litigations against Gawker Media (excluding the Bollea Claims, the "Article Lawsuits"). In general, the Bollea Judgment and Article Lawsuits arise from claims for invasion of privacy, defamation or related torts based on articles written for and published by a Gawker Media Website. The aggregate amount of Proofs of Claim filed by plaintiffs asserting such claims exceeds $500 million (counting only once amounts asserted in Proofs of Claim filed against multiple Debtors). A summary of the Bollea Judgment and Article Lawsuits is below.

### E.        Employees and Independent Contractors

As of the Petition Date, GMGI did not have any employees, and GMGI does not have any employees as of the date of this Disclosure Statement.

As of the Petition Date, Gawker Media employed approximately 192 full-time salaried employees and used numerous independent contractors (the "Salaried Employees and Independent Contractors"), and 3 hourly employees (the "Hourly Employees," together with the Salaried Employees and Independent Contractors, the "U.S. Employees and Independent Contractors"). The U.S. Employees and Independent Contractors loosely fit into three departments (i) editorial – 104 employees; (ii) business – 52 employees; and (iii) technology and operations – 39 employees. As of March 1, 2016, 102 of the Salaried Employees and Independent Contractors were covered by a three-year collective bargaining agreement (the "CBA") expiring on February 28, 2019, with the Writers Guild of America, East (the "WGAE").

As of the Petition Date, Gawker Hungary employed 25 individuals, who provide technology and programming, editorial, and administrative services (the "Hungarian Employees," together with the "U.S. Employees and Independent Contractors," the "Employees").

Following the Unimoda Sale, all of the Debtors' Employees except Denton were offered employment by UniModa and all but one of those employees accepted such employment.

### F.        Directors and Officers

As of the date of this Disclosure Statement, the Debtors' directors and officers were as follows:

**GMGI**
William Holden- Chief Restructuring Officer
Thomas Plunkett- Director
Scott Tillman- Director

**Gawker Media**
William Holden- Chief Restructuring Officer
Nick Denton- Executive Vice President

**Gawker Hungary**
William Holden- Managing Director

The Debtors have Debtor Indemnification Obligations with respect to the foregoing directors and officers and certain Salaried Employees and Independent Contractors (including Denton).

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Bollea Judgment

The Bollea litigation arises out of a publication on Gawker.com of an article (the "Hogan Story") commenting on a video depicting plaintiff Terry Gene Bollea, the professional wrestler and entertainer known as "Hulk Hogan," having sexual relations with Heather Clem, the wife of his then-best friend, radio disk jockey Bubba Clem, along with highly edited video excerpts (the "Excerpts").  Bollea initially challenged both the publication of the Hogan Story and the Excerpts, but by the time of trial had narrowed his claim to focus only on the Excerpts.

Bollea's claims consist of causes of action for, among other things, publication of private facts, intrusion upon seclusion, intentional infliction of emotional distress, violation of plaintiff's common law right of publicity and violation of Florida's wiretap act.  Bollea initially sued a number of defendants, but only three defendants were left at the time of trial:  Gawker Media LLC, Nick Denton, and A.J. Daulerio (the author of the Hogan Story).

Bollea initially sued in federal court.  Bollea tried on several occasions to obtain preliminary injunctive relief to have the video removed, but the federal judge (Hon. James Whittemore) denied each of the motions, relying on the First Amendment.  *See, e.g.*, *Bollea v. Gawker Media LLC*, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012); *Bollea v. Gawker Media LLC*, 913 F. Supp. 2d 1325 (M.D. Fla. 2012).  Thereafter, Bollea dismissed his federal action and re-filed his claims in state court (the "Bollea I Lawsuit").  The state court entered a temporary injunction, which was then stayed and reversed by Florida's Second District Court of Appeal.  *See Gawker Media LLC v. Bollea*, 129 So. 3d 1196 (Fla. 2d DCA 2014).  The appeals court unanimously reversed the injunction on the basis that the Hogan Story and Excerpts addressed a matter of public concern and were protected by the First Amendment. *Id.* at 1200-02.  Despite this ruling, the trial court denied the defendants' motions to dismiss and for summary judgment.

The trial proceeded in March 2016.  A jury found Gawker Media liable for $115 million in compensatory damages and $15 million in punitive damage, for a total of $130 million (the "Bollea Judgment").  An additional $10 million of punitive damage was assessed against Denton separately, and an additional $100,000 of punitive damage was assessed against Mr. Daulerio separately.  The defendants filed motions for judgment notwithstanding the verdict, and for a new trial or remittitur of damages, and the plaintiff filed a motion for entry of judgment.  Those motions were heard on May 25, 2016, and the Florida state court denied the defendants' motions and entered final judgment on June 7, 2016.

Gawker Media appeared before the trial court again on June 10, 2016, to request a stay of the judgment pending appeal, without the bond required by Florida law.  At the hearing, the trial court ruled that it would enter an order proposed by the plaintiff that would permit the plaintiff to secure liens on Gawker Media's property.  The Florida trial court also denied Gawker Media a temporary stay of any length to pursue its appellate rights.  Accordingly, Gawker Media filed its petition for relief under the Bankruptcy Code on an emergency basis.  Prior to seeking bankruptcy protection, Gawker Media noticed an appeal of the Bollea Judgment in the Florida court.

Bollea filed a proof of claim against Gawker Media asserting a general unsecured claim of $140.1 million based on the Bollea Judgment.  Based on the repeated prior rulings by the appellate court in the defendants' favor, including on the dispositive First Amendment issue, Gawker Media believes that the Bollea Judgment would be reversed or, at a minimum, substantially reduced on appeal.  Bollea believes that the Bollea Judgment would be upheld on appeal.  Bollea also filed proofs of claims against GMGI asserting a general unsecured claim of $140.1 million, and against Gawker Hungary asserting a general unsecured claim of $130.0 million, based on the Bollea I Lawsuit.  Those claims have already been dismissed with respect to Gawker Hungary (with prejudice) and GMGI in the Bollea I Lawsuit proceedings.  As discussed below, these Bollea Claims are settled pursuant to the Bollea Settlement.

14

### B.    Article Lawsuits

In addition to the Bollea Judgment, Gawker Media is also a defendant in the following Article Lawsuits:

- ***Huon v. Denton, et al.***, No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.) (the "Huon Litigation").  Gawker Media, Nick Denton, Gabrielle Darbyshire and Irin Cameron are defendants in this suit, which asserts causes of action for defamation and related torts arising from an article published by Gawker and from third-party user comments posted on Gawker's website.  The article at issue reported on plaintiff's filing of a lawsuit against another publisher, Above the Law, over its report about an Illinois criminal proceeding in which Huon was charged with rape and acquitted by a jury.  The trial court dismissed the case against each Gawker defendant (including the individuals).  Huon appealed the decision and the U.S. Court of Appeals for the Seventh Circuit heard argument on May 31, 2016.  Gawker Media consented to the Court's lifting the stay for the limited purpose of allowing the Seventh Circuit to render its decision.

  The Plaintiff, Mr. Huon is seeking at least $100 million in damages, and filed multiple claims (the "Huon Claims") asserting a general unsecured claim of $100 million against each of Gawker Media, GMGI, and Gawker Hungary based on the Huon Litigation.  On October 31, 2016, the Debtors filed an objection to the Huon Claims [Docket No. 392], asserting, (i) that Mr. Huon has not previously alleged any claims against GMGI and Gawker Hungary and there are no plausible facts upon which those Debtors could be liable, and (ii) that Mr. Huon's claims against Gawker Media should be disallowed because the trial court's dismissal of his case against Gawker Media precludes allowance of claims based on the same occurrence and facts under principles of collateral estoppel and *res judicata*.

- ***Ashley Terrill v. Gawker Media LLC, et al.***, No. 16-CV-00411 (S.D.N.Y.) (the "Terrill Litigation").  Gawker Media, Sam Biddle, John Cook, and Nick Denton are defendants in this suit for defamation, breach of confidence, breach of contract, intentional interference with prospective economic advantage, fraudulent misrepresentation, and negligent hiring and retention.  The suit arises from an article regarding plaintiff's investigation into a former executive for the dating application Tinder, and plaintiff's belief that she was being harassed for undertaking the investigation.  The Terrill Litigation is currently pending in the Southern District of New York.  The Court has not set a briefing schedule for Defendants' motion to dismiss.  Plaintiff is seeking at least $10 million in damages.

  Ms. Terrill filed two proofs of claim against Gawker Media, asserting a general unsecured claim of $10 million based on the claims in the Terrill Litigation (the "Terrill Litigation Claim") and an unliquidated administrative priority claim based on Gawker Media's post-petition failure to remove the three articles that are the subject of the Terrill Litigation (the "Terrill Administrative Claim" and together with the Terrill Litigation Claim, the "Terrill Claims").  On October 31, 2016, the Debtors filed an objection to the Terrill Claims [Docket No. 399], asserting, among other things, the complaint in the underlying Terrill Litigation fails to state claims that entitle the plaintiff to relief.  As discussed below, the Debtors have settled the Terrill Claims pursuant to a settlement agreement with Terrill.

- ***Ayyadurai v. Gawker Media LLC, et al.***, No. 16-CV-10853 (D. Mass.) (the "Ayyadurai Litigation").  Gawker Media, Nick Denton, Sam Biddle, and John Cook are defendants in this suit for libel, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and negligent hiring and retention.  The suit arises from publication of three articles regarding the plaintiff's claims to have invented e-mail.  The complaint is filed in the District of Massachusetts.  The plaintiff is seeking at least $35 million in damages.  Gawker Media filed a motion to dismiss on October 10, 2016.  The objection is due November 28, 2016.

  Mr. Ayyadurai filed two proofs of claim against Gawker Media, asserting a general unsecured claim of $35 million based on the claims in the Ayyadurai Litigation (the "Ayyadurai Litigation Claim") and an unliquidated administrative priority claim based on Gawker Media's post-petition failure to remove the three articles that are the subject of the Ayyadurai Litigation (the "Ayyadurai Administrative Claim" and together with the Ayyadurai Litigation Claim, the "Ayyadurai Claims").  On October 21, 2016, the Debtors

filed an objection to the Ayyadurai Claims [Docket No. 372], asserting, among other things, the complaint in the underlying Ayyadurai Litigation fails to state claims that entitle the plaintiff to relief. As discussed below, the Debtors have settled the Ayyadurai Claims pursuant to a settlement agreement with Dr. Ayyadurai.

- ***Charles C. Johnson, et al. v. Gawker Media LLC, et al.***, No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (the "Johnson Litigation"). Gawker Media, J.K. Trotter, and Greg Howard are defendants in this suit for defamation, injurious falsehood, invasion of privacy, and conspiracy to interfere with civil rights. The suit arises from three articles regarding plaintiff's behavior. The complaint was filed in Superior Court of California, County of Fresno, but Defendants have not been served. The plaintiff is seeking at least $24 million in damages.

    The Plaintiffs, Mr. Johnson and Got News, LLC, each filed multiple claims asserting a general unsecured claim of $20 million against each of Gawker Media, GMGI, and Gawker Hungary based on the Johnson Litigation. On October 31, 2016, the Debtors filed an objection to each of the claims filed by both Mr. Johnson [Docket No. 396] and Got News, LLC [Docket No. 397], asserting, (i) that neither Mr. Johnson nor Got News, LLC has previously alleged any claims against GMGI and Gawker Hungary and there are no plausible facts upon which those Debtors could be liable, and (ii) that the claims filed by Mr. Johnson and Got News, LLC against Gawker Media should be disallowed because the complaint in the underlying Johnson Litigation fails to state claims that entitle the plaintiff to relief.

- ***Bollea v. Buchwald, et.al.***, No. 16-002861-CI (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea II Litigation"). Gawker Media is a defendant in this suit for intentional interference with contractual relations and intentional infliction of emotional distress, arising from an alleged leak of a sealed transcript containing racially charged statements by plaintiff. Plaintiff also has asserted claims against third parties, who are unrelated to the Debtors, for invasion of privacy, public disclosure of private facts, intrusion upon seclusion, intentional infliction of emotion distress, intentional interference with contractual relations, violation of a Florida Statute prohibiting the dissemination of private oral communications, civil conspiracy, and intentional interference with contractual relations and advantageous business relationships. Shortly before the Petition Date, the appellate court in Florida issued an order for plaintiff to show cause for why Gawker Media's petition for a writ recusing the trial judge should not be granted.

    Bollea filed a claim asserting a general unsecured claim in an undetermined amount against each of Gawker Media, GMGI, and Gawker Hungary based on the Bollea II Litigation. As discussed below, these Bollea Claims are being settled pursuant to the Bollea Settlement.

- ***Williams v. The MLB Network***, No. A-1674-14T3 (N.J. Super. Ct. Camden Cty.) (the "Williams Litigation"). Gawker Media was a defendant in this defamation suit arising from a blog post regarding the plaintiff's behavior at a baseball game, currently pending in the Superior Court of New Jersey, Camden County, Law Division. The Court entered summary judgment in Gawker Media's favor on June 1, 2016.

    Mr. Williams filed a proof of claim (the "Williams Claim") against Gawker Media in the amount of $50 million. On October 31, 2016, the Debtors filed an objection to the Williams Claim [Docket No. 391], asserting, among other things, that the trial court's summary judgment decision precludes allowance of claims based on the same occurrence and facts under principles of collateral estoppel and *res judicata* and even if it did, the complaint in the underlying Williams Litigation fails to state claims that entitle the plaintiff to relief.

- ***Mail Media Inc. d/b/a Mail Online v. Gawker Media LLC and James King.***, No. 159134/2015 (N.Y. Sup. Ct., N.Y. Cty.) (the "Mail Media Litigation"). Gawker Media and James King are in this defamation suit arising from a blog post regarding journalistic practices used by the website *The Daily Mail*, currently pending in the Supreme Court for the State of New York, County of New York.

16

- *Threatened Litigation Demands*.  In addition to the Article Lawsuits where complaints are pending, the Debtors also received a number of litigation "demand letters" alleging illegal conduct by the Debtors, with an implicit or explicit threat that the demanding party intends to take some form of legal action.

Along similar lines, XP Vehicles Group filed four proofs of claim (the "XP Vehicles Claims") in the Bankruptcy Cases.  First, XP Vehicles Group filed a proof of claim against each of Gawker Media, GMGI, and Gawker Hungary asserting a general unsecured claim of $175 million based on multiple documents attached to the proof of claim. XP Vehicles Group filed a fourth proof of claim against only GMGI that asserts a general unsecured claim of $150 million based on multiple documents attached to the proof of claim.  On October 31, 2016, the Debtors filed an objection to the XP Vehicles Claims [Docket No. 393], asserting, among other things, that (i) the fourth proof of claim against GMGI was amended and superseded by the additional Proof of Claim filed against GMGI, and (ii) none of the XP Vehicles Claims provide sufficient basis for a Claim against any of the Debtors as should be dismissed as a matter of law.

### C.    Appointment of Independent Director

On May 24, 2016, Mr. Scott Tillman (the "Independent Director"), joined the GMGI's board of directors (the "GMGI Board").  Mr. Tillman had no prior relationship with any of the Debtors and no financial interest in any of the Debtors.  Since the Petition Date, Mr. Tillman has participated in Board meetings and been an active participant with respect to the sale process, formulation, negotiation and prosecution of the plans of liquidation and creditor settlements, and the allocation of value among Debtors.

## VI.    EVENTS DURING THE BANKRUPTCY CASES

On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date").  On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continues to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Bankruptcy Cases.

### A.    First Day Pleadings and Other Case Matters

#### *1. First and Second Day Pleadings*

To facilitate the commencement of these Bankruptcy Cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Petition Date or shortly thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings filed by the Debtors and approved by the Bankruptcy Court include the following:

##### a.    Cash Management Systems

To enable the Debtors to maintain to access their cash and continue in the ordinary course of business during these chapter 11 case, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Using the Debtors' Bank Accounts, Business Forms and Cash Management System, and Granting Related Relief* [Docket No. 12].  On June 16, 2016, the Bankruptcy Court entered the *Interim Order Authorizing the Debtors to Continue Using the Debtors' Bank Accounts, Business Forms, and Cash Management System, and Granting Related Relief* [Docket No. 40].  On July 13, 2016, the Bankruptcy Court granted the relief requested on a final basis [Docket No. 92].

##### b.    Employee Wages and Benefits

On June 13, 2016, the Debtors filed the *Debtors' Motion for Entry Interim and Final Orders (I) Authorizing, but Not Directing, Payment of Prepetition Wages, Salaries, Business Expenses, Employee Benefits and*

17

*Related Items, and (II) Directing All Financial Institutions to Honor Checks for Payment of Such Obligations* [Docket No. 13] (the "Wages Motion").  On June 16, 2016, the Bankruptcy Court entered an order granting the relief requested on an interim basis [Docket No. 44].  On June 20, 2016, the Debtors filed a supplemental motion requesting entry of a order granting the relief request on a final basis [Docket No. 56].  The Bankruptcy Court extended its grant of relief on an interim basis on July 13, 2016 [Docket No. 91] and August 11, 2016 [Docket No. 170].  Following the closing of the Unimoda Sale, on September 21, 2016, the Debtors withdrew the request for entry of an order granting the relief request on a final basis [Docket No. 285].

### c.        Taxes and Fees

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees.  Accordingly, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Income Taxes, Sales and Use Taxes and Hungarian Taxes* [Docket No. 14].  The Bankruptcy Court granted the relief requested on an interim basis on June 16, 2016 [Docket No. 45] and on a final basis on July 13, 2016 [Docket No. 90].

### d.        Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services.  To ensure uninterrupted utility service, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Service* [Docket No. 17], seeking the Bankruptcy Court's approval of procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.  On July 13, 2016, the Bankruptcy Court granted the relief requested [Docket No. 88].

### e.        Insurance

In the ordinary course of business, the Debtors maintain nine insurance policies (the "Insurance Policies") covering a variety of matters including, without limitation, general commercial liability insurance, non-owned and hired automobile insurance, errors and omissions insurance, directors and officers insurance, and employment practices insurance.  The Debtors are required to pay premiums under the Insurance Policies (the "Premiums"), based on a rate established and billed by each insurer.  Accordingly, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Renew or Purchase New Insurance Policies in the Ordinary Course of Business, and (C) Pay All Prepetition Obligations Relating Thereto* [Docket No. 16]. The Bankruptcy Court granted the relief requested on an interim basis on June 16, 2016 [Docket No. 46] and on a final basis on July 13, 2016 [Docket No. 89].

### 2.    Procedural and Administrative Motions

To facilitate a smooth and efficient administration of these Bankruptcy Cases and reduce the administrative burdens associated therewith, on June 16, 2016 the Bankruptcy Court also entered procedural and administrative orders, including the: (a) *Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 41]; (b) *Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (II) Approving the Form and Manner of Notifying Creditors of Commencement of the Debtors' Chapter 11 Cases* [Docket No. 43]; (c) *Order Extending Deadline for the Debtors to File Schedules and Statements of Assets and Liabilities* [Docket No. 42].  Additionally, on July 13, 2016, the Bankruptcy Court entered the *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates* [Docket No. 93].  On July 14, 2016, the Bankruptcy Court entered order further extending the time for the Debtors to file their schedules and statement of assets and liabilities [Docket No. 102].

a.        **Ordinary Course Professionals**

In the ordinary course of business, the Debtors retain various attorneys and other ordinary course professionals (collectively, "OCPs") who render a wide range of services to the Debtors in a variety of matters unrelated to these Bankruptcy Cases, including litigation, regulatory, labor and employment, intellectual property, general corporate, franchise, and other matters that have a direct impact on the Debtors' day-to-day operations. To prevent disruption to these services, on June 20, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 53]. On July 13, 2016, the Bankruptcy Court granted the relief requested [Docket No. 86].

### 3. *Retention of Restructuring Professionals*

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code as debtors-in-possession in these Bankruptcy Cases. The Bankruptcy Court approved the retention and employment of the following advisors:

(a)    Prime Clerk LLC ("Prime Clerk"), as Claims and Noticing Agent [Docket No. 100] and Administrative Advisor to the Debtors [Docket No. 99];

(b)    Ropes & Gray LLP ("Ropes & Gray") as Counsel to the Debtors [Docket No. 101];

(c)    Opportune LLP ("Opportune"), to provide a chief restructuring officer and certain additional personnel to the Debtors [Docket No. 98];

(d)    Houlihan Lokey ("Houlihan"), as Investment Banker to the Debtors [Docket No. 97]; and

(e)    Citrin Cooperman LLP as Independent Auditor and Accounting Services Provide to the Debtors [Docket No. 268].

### 4. *Retention of Special Counsel*

The Debtors also filed several applications and obtained authority to retain various special counsel to represent the Debtors in the Article Lawsuits.. The Bankruptcy Court approved the retention and employment of the following advisors:

(a)    Brannock & Humphries as Special Litigation Counsel to the Debtors [Docket No. 287];

(b)    Levine Sullivan Koch & Schulz, LLP as Special Litigation Counsel to the Debtors [Docket No. 288]; and

(c)    Thomas & LoCicero as Special Litigation Counsel to the Debtors [Docket No. 289].

On July 13, 2016, the Bankruptcy Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 94].

### 5. *Postpetition Financing*

Shortly after the Petition Date, the Debtors filed a motion (the "DIP Motion") requesting interim and final approval of postpetition financing of up to $22 million (the "DIP Facility"), comprised of a $17 million term loan (the "DIP Term Loan") and a $5 million revolving credit facility (the "DIP Revolving Loan"), pursuant to (i) that certain Financing Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Financing Agreement"), by and among Gawker Media, as borrower, GMGI and Gawker Hungary, as guarantors, Cerberus Business Finance LLC ("CBF"), as administrative and collateral agent (the "DIP Agent"), and CBF or one or more of its affiliates party thereto (the "DIP Lender" and, together with the DIP Agent, the "DIP Secured Parties"), and (ii) all guarantees and other

19

agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of the DIP Secured Parties (all documents comprising the DIP Facility, each as may be amended restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Loan Documents"). An interim order granting the DIP Motion was entered on June 16, 2016 [Docket No. 38] (the "Interim DIP Order"), which authorized the Debtors to, among other things, (i) borrow up to $14 million of the DIP Term Loan, (ii) use approximately $12.3 million of the proceeds of the DIP Term Loan to repay the First Lien Obligations and (iii) use cash collateral on the terms set forth therein. A final order granting the DIP Motion was entered on July 8, 2016 [Docket No. 81] (the "Final DIP Order"), which authorized the Debtors to, among other things, access the full amount of the DIP Facility. In total, the Debtors borrowed $17 million in aggregate funds through the DIP Facility (including any interest or other fees thereon, the "DIP Facility Obligations").

### 6. Appointment of the Creditors' Committee and Its Advisors

On June 24, 2016, the U.S. Trustee appointed the Committee [Docket No. 62]. The Committee is composed of the following members (collectively, the "Committee Members"):

(a)     Terry Gene Bollea;

(b)     Shiva Ayyadurai; and

(c)     Ashely A. Terrill.

The Committee also filed several applications and obtained authority to retain various professionals to assist the Committee in carrying out its duties under the Bankruptcy Code, including:

(a)     Simpson Thacher & Bartlett LLP, as Counsel to the Committee [Docket No. 184];

(b)     Deloitte Financial Advisory Services LLP, as Financial Advisor to the Committee [Docket No. 348];

(c)     Mourant Ozannes, as Special Foreign Counsel to the Committee [Docket No. 265]; and

(d)     Reczicza Dentons Europe, as Special Counsel to the Committee [Docket No. 293].

To facilitate the Committee's representation of the interests of all creditors in these Bankruptcy Cases, the Committee filed the Motion of the Official Committee of Unsecured Creditors for an Order Providing that the Official Committee of Unsecured Creditors is not Authorized or Required to Provide Access to Confidential Information of the Debtors or to Privileged Information [Docket No. 162].

### 7. Preliminary Injunction Proceedings.

On the Petition Date, the Debtors filed a motion [Docket No. 4] and initiated an adversary proceeding (Case No. 16-01085-smb) seeking (i) issuance of a preliminary and permanent injunction enjoining (a) the Article Lawsuits, pending the termination of the automatic stay, as against certain non-Debtor parties who were also parties to the Article Lawsuits, including Nick Denton and certain current or former employees of the Company including John Cook, A.J. Daulerio, Gabrielle Darbyshire, Irin Carmon, Greg Howard, JK Trotter, and Sam Biddle (the "Individual Defendants") and (b) the plaintiffs in the Article Lawsuits from taking further action in the Article Lawsuits and from taking further action in any other existing litigation or filing further claims against Denton or any Individual Defendant where the conduct alleged was in the course of, and within the scope of, Denton's or the Individual Defendant's employment with the Debtor, absent approval of the Bankruptcy Court and/or (ii) extension of the automatic stay imposed by section 362(a) of the Bankruptcy Code to stay the Article Lawsuits as against Denton and the Individual Defendants (collectively, the "Injunction Request"). On June 10, 2016, the Bankruptcy Court entered a temporary restraining order with respect to the Article Lawsuits [Docket No. 2; Case No. 16-01085-smb], which extended through the date scheduled for a hearing on the Injunction Request [Docket No. 19; Case No. 16-01085-smb], which was extended by consent of the parties through July 19, 2016. The Bankruptcy Court held a

hearing on July 19, 2016 to consider the Injunction Request. The Debtors withdrew the injunction request with respect to the Huon Litigation and the Johnson Litigation. The Bankruptcy Court entered an injunction regarding the Terrill Litigation and the Ayyadurai Litigation that expired on September 3, 2016. On July 25, 2016, the Bankruptcy Court entered an order denying the Injunction Request and vacating the temporary restraining order with respect to the Bollea Litigation and lifting the stay of the Bollea Litigation as to Nick Denton and A.J. Daulerio [Docket No. 52; Case No. 16-01085-smb]. On August 1, 2016, as a result of the denial of the Injunction Request and a denial of a stay of the judgment pending appeal by the Florida court, Denton filed for chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, which remains pending [Case No. 16-12239-smb].

### 8. Claims Bar Dates

On July 21, 2016 the Debtors filed the *Debtors' Motion Pursuant to 11 U.S.C. §§ 502 and 503, Fed. R. Bankr. P. 2002 and 3003(c)(3), and Local Rule 3003-1 for Entry of Order (I) Establishing a Deadline to File Proofs of Claim, Certain Administrative Claims, and Procedures Relating Thereto, and (II) Approving the Form and Notice Thereof* [Docket No. 127]. With this motion, the Debtors sought to fix a deadline for filing proofs of claim of September 19, 2016 and a deadline for filing certain administrative claims between the Petition Date and July 31, 2016, inclusive, of September 29, 2016 (the "First General Claims Bar Date") in these Bankruptcy Cases, as well as a separate deadline for governmental units to file proofs of claims of December 9, 2016 (the "Government Claims Bar Date"), and to establish procedures for the filing of proofs of claim and the provision of appropriate notice of the Claims Bar Dates to potential claimants. On August 11, 2016, the Bankruptcy Court granted the relief requested [Docket No. 168].

On September 21, 2016, the Debtors filed the *Debtors' Motion for Entry of Order (I) Establishing a Deadline to File Certain Administrative Claims and Procedures Relating Thereto, and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 281]. With this motion, the Debtors sought to fix a deadline for filing certain administrative claims between August 1, 2016 and September 30, 2016, inclusive, of November 15, 2016 (the "Second Administrative Claims Bar Date," and, together with the First General Claims Bar Date and the General Administrative Claims Bar Date, the "Claims Bar Dates"). On October 11, 2016, the Bankruptcy Court granted the relief requested [Docket No. 339]

### B.   The Appointment of Special Board Committee

On August 2, 2016, the GMGI Board adopted a resolution appointing a special committee (the "Special Board Committee"), comprised only of the Independent Director, with exclusive responsibility for, among other things, oversight with respect to the sale process and ultimate approval of any sale transaction on behalf of each Debtor, and allocation of proceeds from any sale of the Debtors' assets and any related intercompany payments and litigation. In that capacity, the Special Board Committee also has authority over the process for negotiating, formulating, and approving the Debtors' proposed plans of liquidation and any related settlements.

On September 1, 2016, the Debtors filed an application seeking authorization to retain Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as special counsel to the Special Board Committee, effective *nunc pro tunc* to August 3, 2016 [Docket No. 239]. On September 12, 2016, the Committee objected to the proposed terms of Akin Gump's retention [Docket No. 260], and the parties are holding discussions to try to reach a consensual resolution.

### C.   Sale of Substantially All of the Debtors' Assets

The Debtors commenced these Bankruptcy Cases with a goal of selling substantially all of their assets as a going concern (the "Assets"). To that end, the Debtors entered into the Stalking Horse APA with ZDGM LLC (the "Stalking Horse Bidder"), an affiliate of Ziff Davis, LLC, a leading global digital-media company operating in the technology, gaming, entertainment and lifestyle verticals. In the Stalking Horse APA, the Stalking Horse Bidder agreed to (i) purchase the Assets for $90 million in cash, (ii) assume certain liabilities of the Business, and (iii) provide offers of employment to substantially all of the Debtors' employees on substantially the same terms and conditions under which they are currently employed.

<div align="center">21</div>

On July 8, 2016, the Bankruptcy Court entered the *Order (I) Authorizing and Approving Bidding Procedures, Breakup Fee and Expense Reimbursement, (II) Authorizing and Approving the Debtors' Performance of Pre-Closing Obligations Under the Stalking Horse Asset Purchase Agreement, (III) Approving Notice Procedures, (IV) Scheduling a Sale Hearing and (V) Approving Procedures for Assumption and Assignment of Certain Contracts and Leases and Determining Cure Amounts* [Docket No. 82] (the "Bidding Procedures Order"). The Bidding Procedures Order, among other things, approved the Stalking Horse APA, specified procedures regarding the assumption and assignment of the Debtors' executory contracts and unexpired leases, and scheduled an auction (the "Auction") for the sale of the Assets (the "Unimoda Sale"). The Stalking Horse APA remained subject to higher or otherwise better offers. To that end, the Debtors, in conjunction with their advisors and acting in accordance with the Bid Procedures Order, continued to engage in an extensive sale and marketing process of the Assets.

Pursuant to the Bidding Procedures Order, the Auction was conducted on August 16, 2016 at the New York offices of Ropes & Gray LLP. The Debtors' extensive marking efforts bore fruit as one additional approved bidder and the Stalking Horse Bidder participated in the Auction. At the conclusion of the Auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "Committee") determined that the successful bidder was UniModa, LLC ("Unimoda"), a wholly-owned subsidiary of Univision Communications Inc. Unimoda bid $135 million in cash to acquire substantially all of the Assets, specifically excluding the Gawker.com Assets, and irrevocably agreed to assume certain of the Debtors' executory contracts and unexpired leases for which the Debtors could otherwise face considerable rejection damages claims, including the CBA with the WGAE and the Debtors' commercial lease for their main office space. Unimoda also made offers of employment to all the Debtors' employees, except Nick Denton, on substantially the same terms and conditions under which they are currently employed. The Debtors and Unimoda agreed upon the terms of an asset purchase agreement for the sale of the Assets to Unimoda (the "Unimoda APA").

On August 22, 2016, after a hearing to consider approval of the Unimoda Sale was held on August 18, 2016, the Bankruptcy Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving and Authorizing the Debtors' Entry Into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 214] (the "Sale Order").

On September 9, 2016 (the "Sale Closing Date"), the closing of the Unimoda Sale occurred pursuant to the Unimoda APA. On that date, Unimoda, as purchaser, made the Cash Payment (as defined in the Unimoda APA) in the amount of $135 million to the Debtors, subject certain closing adjustments. Pursuant to Section 2.5(b) of the Unimoda APA and consistent with the Sale Order, on the closing date, Unimoda made payments in cash to the DIP Lender and Second Lien Lender to satisfy in full the DIP Facility Obligations and the Second Lien Obligations (excluding alleged Claims relating to the Second Lien Make-Whole Provision), respectively. Following the Closing Date, the Debtors held $1.0 million in an escrow account. All amounts held in escrow remain subject to the Unimoda APA.

### D.    Committee Investigation and Request Letter

Since June 2016, the Committee, through its legal counsel and financial advisor, has requested documents and other information from the Debtors on matters pertinent to the Committee's investigation of claims that it believes are held by the Debtors. The Debtors have cooperated and sought to provide requested information in a timely fashion, including scheduling conference calls and meetings, providing the Committee advisors access to a data room with over 27,500 pages of documents to date, and continuing to provide further information.

On October 18, 2016, the Committee sent to the Debtors a letter (the "Standing Request") requesting that the Debtors consent to the Committee being granted standing to commence and prosecute (including compromising) an enumerated list of claims across seven generic categories, and asked that the Debtors provide a response within two days, by October 20, 2016. Prior to receiving that letter, the Debtors had already formed a special independent board committee to, among other things, review intercompany transactions and claims against insiders. As a result the Debtors advised the Committee that most of the claims for which the Committee requested standing related to intercompany matters and shareholder transfer and dividend issues that the Debtors' advisors were already investigating and had considered and were being addressed in the Plan Settlement discussed in section VII below.

22

Specifically, most of the Claims identified in the Standing Request, such as those relating to recharacterizing the Kinja Promissory Notes and the GMGI Promissory Note as equity, were already addressed in the Intercompany Settlement that the Debtors proposed in the Plan of Liquidation filed on September 30, 2016.

The Standing Request also asserted that there were potential claims against certain of the Debtors' advisors (other than bankruptcy and restructuring advisors), of which the Debtors were already aware. Nonetheless, to ensure that no such claims were inadvertently waived, the Debtors clarified the releases in the Plan to exclude such advisors, and preserve such potential causes of action for the benefit of the stakeholders in the Debtors' estates.

## VII.    DESCRIPTION OF PLAN SETTLEMENTS

From the inception of the Bankruptcy Cases, two general disputes needed to be resolved in order to liquidate the Debtors' estates and determine the recoveries that would be received by different Debtors' stakeholders. The primary set of disputes related to allocation of sale proceeds and expenses, resolution of various intercompany claims, and the treatment of disputed creditor claims asserted in amounts far in excess of the Debtors' assets. The second and more discrete dispute related to whether the Second Lien Make-Whole Claims were enforceable, and if so, in what amount.

The Debtors believe the comprehensive Plan Settlements resolve these interrelated disputes, and that the Plan Settlements are in the best interests of the various parties in interest and the Debtors' estates for several reasons. First, as discussed more extensively below, the outcomes of the potential allocation, intercompany and creditor litigation disputes that are being settled are uncertain. Second, the Plan Settlements take into account the risks and potential recoveries related to each of the intercreditor and the debtor-creditor issues described herein. Third, the Plan Settlements avoid delay and dissipation of estate assets that would result from litigating the disputed claims. For example, the Committee has indicated it will seek to undertake a full forensic accounting analysis for many years of the Debtors' operations. Thus, the Debtors believe that the cost of litigating the intercompany disputes and an appeal from the Bollea Judgment and litigation of the Bollea II Lawsuit would be between $9-12 million, if not more. Fourth, the Plan Settlements allow the Debtors to obtain substantial tax benefits by consummating the Plan before the end of 2016, including offsetting taxable gain attributable to the sale of assets. Finally, the Plan Settlements best address the competing considerations that arise because the vast majority, if not all, of the claims in these cases are litigation claims, or indemnification claims related to such litigation claims, and are primarily against one of the three Debtors, Gawker Media. Accordingly, pursuant to Bankruptcy Rule 9019, and pursuant to the terms of the Plan, at and as part of the hearing on confirmation of the Plan, the Debtors will request that the Bankruptcy Court approve the Plan Settlements as fair and equitable and in the best interests of the Debtors' estates.

### A.    Settlement of Inter-Debtor Allocation, Intercompany Claims, and Significant Creditor Disputes

Prior to the Unimoda Sale, the board of directors of GMGI formed a special committee and delegated to it authority to address substantially all intercompany matters, including any settlement regarding asset value allocation, the formulation of a plan of liquidation, and the settlement of various litigation claims. As described above, the GMGI board appointed a single member to constitute that special committee, Mr. Scott Tillman, who was not a director until May 2016, and thus not involved in the events regarding, or the litigation of, the Bollea I Lawsuit, which lead to the filing of these Bankruptcy Cases. The special committee considered and approved the Plan Settlements from the perspective of each estate, and the proposed plans of liquidation on behalf of GMGI, and directed GMGI to approve the plan for both Gawker Media and Gawker Hungary. The special committee received advice from Ropes & Gray LLP, certain advice of counsel from Akin Gump Strauss Hauer & Feld LLP, and advice from financial professionals in connection with making these determinations.

The primary group of interrelated disputes being resolved under the Plan Settlements falls into three general sub-categories. The first sub-category consists of allocation of assets and expenses across the three Debtors' three estates, including (i) allocation of the purchase price obtained for the Debtors' assets in connection with the Unimoda Sale, (ii) the allocation of the DIP Loan debt and repayment thereof, (iii) the allocation of Second Lien Term Loan between guarantors, (iv) the allocation of administrative expenses, including professional fees paid or incurred prior to the closing of the Unimoda Sale, (v) the allocation of administrative expenses, including professional fees, incurred subsequent to that closing through the Effective Date, and (vi) the allocation of reserves

23

for post-Effective-Date expenses. The second sub-category consists of resolution of inter-Debtor claims, including (a) resolution of amounts of outstanding intercompany debts, (b) potential claims and causes of action of Gawker Media against GMGI and its directors and officers, and (c) contentions that there should be substantive consolidation of the Debtors' estates, veil piercing, *alter ego* or other similar claims. The third sub-category consists of resolving three of the most significant disputed Claims asserted against the Debtors' estates, including (x) the Bollea Claims (and potential appeals relating thereto), (y) Terrill Claims, and (z) Ayyadurai Claims.

These disputes are summarized below.

### 1.    Allocation

#### a.    Unimoda Sale Purchase Price Allocation among Debtors' Estates

The Unimoda Sale had a cash purchase price of $135 million, subject to certain closing adjustments (the "Purchase Price"). Unimoda purchased assets, some of which were owned by Gawker Hungary and some of which were owned by Gawker Media. The Sale Order provides that the Purchase Price would be deposited in a single bank account in the United States and held in the name of Gawker Media. The Sale Order also provides that this deposit shall not be deemed to have any effect on the allocation of the Purchase Price to Gawker Hungary or Gawker Media; *i.e.* the question of how much Purchase Price was paid for the assets of each of the two seller Debtor estates (the "Purchase Price Allocation").

As described above, at the time of its founding, much of the Debtors' operations were in Hungary and critical intangible assets were owned by Gawker Hungary. Gawker Hungary was the Debtor that owned the various URLs under which the Debtors operated their major web content platforms. All of the Debtors' trademarks were owned by Gawker Hungary, except one, which was a not a trademark used in attracting viewers to the Debtors' URL websites. The majority of software development, including critical work on the discussion system, among other things, occurred in Hungary, by employees of Gawker Hungary.

In 2011 the Debtors undertook an evaluation of the economic terms under which Gawker Hungary could license the use of its intangible assets to Gawker Media under the Master License Agreement. The Debtors engaged the firm of Mayer Brown LLP to evaluate and provide an opinion regarding the arms-length terms of that contract (the "Transfer Pricing Opinion").

The Transfer Pricing Opinion developed a range for an arms-length royalty rate between Gawker Media and Gawker Hungary. The Master License Agreement provides for a royalty calculated in four tiers, depending on the "Cumulative Annual Revenue" (as defined in the Master License Agreement) of Gawker Media. For such revenue (a) up to $3.0 million, 5% royalty, (b) above $3.0 million up to $6.0 million, $150,000 plus 10% of such tier revenue, (c) above $6.0 million up to $9.0 million, $450,000 plus 15% of such tier revenue, and (d) above $30 million, $150,000 plus 24% of such tier revenue.

There are two other intercompany agreements between Gawker Media and Gawker Hungary. Under a Development Agreement amended on January 1, 2013, Gawker Hungary purchases certain services from Gawker Media, for which Gawker Media pays an amount equal to direct costs plus 5%. Under an Intercompany Services Agreement dated January 1, 2012, Gawker Media pays for various services from Gawker Hungary, an amount also equal to direct costs plus 5%.

These economic agreements that Gawker Media and Gawker Hungary arrived at reflect an approximate allocation of the value of assets of two-thirds of the value attributable to Gawker Hungary assets, and one-third of the value attributable to Gawker Media assets. These economic agreements were not, however, updated in recent years. In discussions with the Committee and individual creditors, those stakeholders took the position that a far greater share of the value of the Debtors' assets, as much as 100% of the value, should be allocable to Gawker Media because the substantial majority of revenues are collected by Gawker Media and Gawker Media employs significantly more Salaried Employees and Independent Contractors. As a result, the Debtors reviewed their analysis and the Plan Settlements reflect certain modifications to the allocation implied by the historical economic agreements.

24

The dispute over Unimoda Purchase Price allocation has significant consequences for both creditors and equityholders because different creditors and equityholders hold Claims against, and/or Equity Interests in, different Debtors or combinations of Debtors. For example, absent any settlements, creditors holding Claims solely against Gawker Media would not have direct recourse to any Unimoda Purchase Price amounts allocated to Gawker Hungary or GMGI. Conversely, holders of Equity Interests in GMGI may recover from amounts allocated to Gawker Media (through GMGI's membership interest in Gawker Media) only after any Claims against Gawker Media are fully satisfied.

### b.    Paydown of DIP Loan

The DIP Loan was obtained at the outset of these Bankruptcy Cases. Gawker Media was the borrower, and GMGI and Gawker Hungary were guarantors. Funds were used, *inter alia,* for Gawker Media operations and the posting cash to backstop an approximately $5.6 million of letter of credit held by the landlord for the commercial property at Fifth Avenue in New York City, leased by Gawker Media (the "Fifth Avenue Letter of Credit"). At the closing of the Unimoda Sale, and in accordance with the DIP Financing Order, Gawker Media as borrower repaid all amounts due under the DIP Loan, totaling approximately $17.2 million.

Gawker Hungary and GMGI, as guarantors, could argue that they have no responsibility for any repayment of the DIP Loan; Gawker Media was the primary obligor under the DIP Loan documents. Gawker Media could argue that Gawker Hungary, to the extent of benefits to Gawker Hungary from the DIP Loan, should bear the burden as primary obligor, notwithstanding the documents providing that Gawker Hungary was only a guarantor.

### c.    Paydown of Second Lien Term Loan

The Second Lien Term Loan was made on January, 21, 2016 to GMGI. Gawker Media and Gawker Hungary are each guarantors of the Second Lien Term Loan. All of the funds from the GMGI borrowing were contributed to Gawker Media at the time of the loan. As described above, the sale proceeds received during these chapter 11 cases were in respect of the sale of assets of Gawker Media and Gawker Hungary, not assets of GMGI. At closing of the Unimoda Sale, the Second Lien Term Loan was paid down by approximately $16.5 million, the amount of outstanding principal, interest (including default interest) and professional fees (the "Second Lien Payoff"), but excluding the amount of an asserted make-whole premium of approximately $3.75 million (the "Second Lien Make Whole").

The respective amounts of the Second Lien Payoff that Gawker Media and Gawker Hungary paid were not determined at the time of the closing of the Unimoda Sale, with each chapter 11 estate reserving its rights. As guarantors, each would have contribution rights against the other for any amounts paid on the loan. The relevant guaranty agreement does not contain any provision stating how such contribution rights are to be allocated. Each estate might argue (based on common law or other principles) that each of them should ultimately bear 50% of the Second Lien Payoff, as some legal authority provides for guarantor contribution rights to be apportioned by the number of guarantors (in this case there are two). On the one hand, Gawker Media could instead argue (based on fraudulent conveyance or other law) that Gawker Hungary should ultimately bear the economic burden of the Second Lien Term Loan in proportion to the allocation of asset value to Gawker Hungary, and that, if Gawker Hungary receives a large asset allocation, then Gawker Media should have a large contribution claim unless Gawker Hungary pays more than 50% of the Second Lien Term Loan. However, creditors of Gawker Media might not prefer such an argument as it would deplete assets allocated to the Gawker Media estate. On the other hand, Gawker Hungary might argue (based on fraudulent conveyance or other law) that the proceeds of the Second Lien Term Loan were contributed to Gawker Media, that they were principally used by Gawker Media, and therefore Gawker Hungary should have a large contribution claim unless Gawker Media pays more than 50% of the Second Lien Term Loan.

### d.    Allocation of Administrative and other Expenses

From the Petition Date to the final date of liquidation of the Debtors' assets and distribution to parties in interest, there will be substantial costs of administration. Those costs will be dramatically greater if there is litigation over the intercompany disputes and disputes regarding the Second Lien Make-Whole Claims. There will

also be substantial costs in resolving the various disputed litigation claims against the various Debtors, including the appeal of the Bollea Judgment.

For purposes of the Plan Settlements, these costs are divided into three categories: (a) costs from the Petition Date to the closing of the Unimoda Sale, (b) costs from that sale to the Effective Date (primarily anticipated costs of litigating the intercompany and Second Lien Lender disputes in the context of a plan confirmation proceeding), and (c) costs from and after the Effective Date (primarily anticipated costs of litigation claims objections and appeals, including of the Bollea Judgment). Each of these could be allocated differently as between the three Debtors' estates, primarily Gawker Media and Gawker Hungary.

### 2. The Intercompany Claims

#### a.    Outstanding Intercompany Obligations

Prior to the beginning of 2015, Gawker Media made periodic payments to Gawker Hungary for balances due under the intercompany agreements between Gawker Media and Gawker Hungary. At various times, Gawker Hungary lent amounts back to Gawker Media which were memorialized in the Gawker Hungary Intercompany Notes. Since the beginning of 2015, Gawker Media has received invoices from Gawker Hungary for balances due under the intercompany agreements between Gawker Media and Gawker Hungary, which have accrued into a receivables balance. Under the First Gawker Hungary Promissory Note, Gawker Media promised to pay $8 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. Under the Second Gawker Hungary Promissory Note, Gawker Media promised to pay $5.0 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. Under the GMGI Promissory Note, Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually.

#### b.    Intercompany Receivables among Gawker Media and Gawker Hungary.

In the ordinary course of the Debtors' intercompany arrangements, the Debtors have also accrued intercompany receivables owing to one another. As of September 9, 2016, Gawker Hungary had approximately $12.82 million in accounts receivable outstanding from Gawker Media on account of amounts owing under the Master License Agreement. The rates charged under the Master License Agreement were established in 2011 based on the Transfer Pricing Opinion discussed below in Section VII.A.1, which reflected an allocation of the value of the Debtors' assets approximately 2/3 to Gawker Hungary and 1/3 to Gawker Media. As part of the Intercompany Settlement, the Debtors are agreeing to allocate 60% of Unimoda Purchase Price to Gawker Media and 40% to Gawker Hungary, so the Debtors are also agreeing to a corresponding reduction to the accounts receivable due from Gawker Media to Gawker Hungary under the Master License Agreement to $10.7 million.

Also as of September 9, 2016, Gawker Hungary had approximately $0.27 million in accounts receivable from Gawker Media on account of amounts owing under the Gawker Hungary Services Agreement, and Gawker Media had approximately $4.8 million in accounts receivable from Gawker Hungary, neither of which were calculated by reference to the allocation of value among the Debtors' estates.. Accordingly, as of September 9, 2016, the net intercompany balance owing from Gawker Media to Gawker Hungary, accounting for the adjustment described above, was $6.1 million (the "Intercompany Obligations").

Gawker Hungary could assert that the full amount of the Intercompany Obligations plus interest are general unsecured claims against Gawker Media that share *pari passu* with any recovery of creditors at Gawker Media. So, for example, even if the asserted litigation claims were valid (a conclusion with which the Debtors disagree) and aggregated to, for example, $150 million, the Intercompany Obligations would materially dilute the recovery of unsecured creditors, by more than 4%. Furthermore, Gawker Hungary could also assert that these valid general unsecured claims are senior in bankruptcy to any punitive damage claims against Gawker Media.

Gawker Media could assert that the Intercompany Obligations are not general unsecured claims at all or that they should be subordinated, but there is a substantial risk that all or a substantial amount of the Intercompany Obligations would be allowed and dilute creditor recoveries at Gawker Media.

26

The Debtors are investigating additional intercompany claims, including those identified by the Committee.

The Plan Settlements provide for Gawker Media to repay $16.0 million of the outstanding balance of Gawker Hungary's Intercompany Claims against it, which amounts the Debtors anticipate will ultimately be distributed to GMGI, as the sole member of Gawker Hungary.  In addition, the balance of the Gawker Media Gawker Hungary Intercompany Claims plus any interest will be subordinated to the payment in full of the Gawker Media Unsecured Claims and the Gawker Media Punitive Damage Claims and will receive a further distribution only upon payment in full (without interest) of these claims.  In addition, GMGI will directly provide the GMGI Plan Guaranty in the amount of $2.0 million to ensure that the holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims receive the distributions to which they are entitled under the Plan.  This repayment of the outstanding Intercompany Obligations balance is also accounted for in the allocation of Unimoda Purchase Price proceed and Debtor expenses that assures minimum reserves of $6.5 million for satisfaction of any such Claims.  There may also be some Cash remaining at Gawker Media after making the anticipated Effective Date distributions and the establishment and funding of the Plan Reserve Accounts.  The Plan Settlements also include a provision under which GMGI waives all of its intercompany claims against Gawker Media and provides Gawker Media with consideration in the form of the GMGI Plan Guaranty in full satisfaction of any and all intercompany claims by Gawker Media against GMGI.

### c.    Potential Fiduciary Duty Causes of Action Against GMGI and Directors & Officers

The Debtors are beginning an investigation of any claims against GMGI, or its directors and officers, for breach of fiduciary duties to Gawker Media, and have been advised that the Committee believes that such claims exist. GMGI was at relevant times the sole member of Gawker Media, and Nicholas Denton was the sole manager of Gawker Media.  Gawker Media's operating agreement does not contain any disclaimer of fiduciary duties.  Gawker Media is a Delaware limited liability company and under Delaware law, managers and controlling equityholders could owe a fiduciary duty to Gawker Media.  Thus Gawker Media could assert breach of fiduciary duty claims, although under Delaware law there is no particular fiduciary duty owed to creditors.  GMGI has an interest in resolving any such fiduciary duty claims against itself, and also claims against Denton, because GMGI has indemnified Denton.

GMGI and its directors and officers, and Mr. Denton, could defend those suits on the grounds, *inter alia*, that Gawker Media is a wholly owned subsidiary of GMGI, and actions taken were in GMGI's interest.  As part of the Plan Settlements, GMGI is providing the $2.0 million GMGI Plan Guaranty to creditors of Gawker Media in settlement of all such claims, as well as taking all the other actions under the plan.

### d.    Substantive Consolidation, Veil Piercing, and *Alter Ego*

Gawker Media might argue that there should be no allocation of the purchase price, and instead that Gawker Media creditors should have recourse to, and obtain recoveries from, the value of assets of Gawker Hungary and GMGI.  There are several legal theories that Gawker Media might assert, including substantive consolidation of the Debtors' estates, veil piercing or *alter ego*.

The theory of "substantive consolidation" refers to the merging of the assets and liabilities of distinct, bankrupt entities and the treatment of those assets and liabilities as if they belonged to a single entity.  The two critical factors considered in assessing whether substantive consolidation is warranted are (i) whether creditors dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the Debtors are so entangled that consolidation will benefit all creditors, by the costs of disentangling them are so great that the cost outweighs the benefit to each affected party in interest.  The second factor involves whether there has been a commingling of the assets and business functions and considers whether all creditors will benefit because untangling is either impossible or so costly as to consume the assets.  Full substantive consolidation would result in general unsecured creditors receiving a relative distribution in excess of what the Plan Settlements provide if the litigation claims were allowed.

With respect to the first factor, the litigation creditors who are the principal creditors of Gawker Media do not have Allowable Claims against either of the other two Debtors; indeed in the lawsuit that resulted in a judgment

27

against Gawker Media, Bollea voluntarily dismissed Gawker Hungary and did not amend his complaint to include GMGI within the final time period set by the Florida court. There is no "reliance" by these disputed, litigation creditors that would justify giving them recourse to the assets of the other Debtors. With respect to the second factor, the Debtors estimate that the cost of a full dispute regarding the purchase price allocation and intercompany matters would cost as much as $12.0 million. However, if the Gawker Hungary position is correct (that two-thirds of the purchase price is allocable to Gawker Hungary assets, and there are no material intercompany claims against Gawker Hungary), then there would be in excess of $26.7 million (after taxes) available first to GMGI creditors, and then to preferred shareholders, depending on the outcome of substantive litigation regarding certain indemnification claims. Thus the costs of the dispute do not exceed the amount at stake, and the estates cannot be substantively consolidated.

Regarding legal theories of *alter ego* and veil piercing, it may be the case that the financial books and records of Gawker Hungary and Gawker Media were not kept perfectly, and therefore creditors of Gawker Media, or the estate itself, could raise these claims. However, Gawker Hungary was formed at the outset of the company's operations, years before the (disputed) claims of current creditors ever arose. Gawker Hungary has since its inception had real business operations, including the primary activities relating to development of the Debtors' proprietary software; it maintained offices and a number of software engineers and other employees, and was not a mere vehicle for owning certain assets. Gawker Hungary itself bought various URLs, and registered the relevant trademarks under which various websites are operated. As a result, there would be a substantial and fact-bound trial of any alter ego or veil piercing claims, and Gawker Hungary would have very substantial defenses.

### 3. The Disputed Creditor Claims

#### a.    The Bollea Claims

As discussed above, a jury has found Gawker Media liable to Bollea for $115 million in compensatory damages and $15 million in punitive damages, for a total of the $130 million Bollea Judgment. An additional $10 million of punitive damage was assessed against Denton separately, and an additional $100,000 of punitive damages was assessed against Mr. Daulerio separately, for which those defendants have asserted indemnification claims against the Debtors.

The Debtors have appealed that Florida State court judgment, which is not merely subject to an appeal of factual findings in that case. Rather, the Bollea Judgment is in the unusual posture of being based on a ruling that a Gawker Media publication was not speech protected under the First Amendment, when two other courts (including the exact same state appellate court that will consider the judgment) have already (as part of proceedings regarding injunctive relief) ruled against the plaintiff on that same key legal issue. Consequently, a similar appellate ruling on that same legal issue would likely result in a reversal of the Bollea Judgment, or at least a significant reduction of that judgment. Because of the procedural posture of the case, the Debtors are presently not able to seek any ruling from the bankruptcy court on the judgment itself, but the bankruptcy court can take into account the particular posture of the case solely in connection with weighting the fairness of the Plan Settlements.

Bollea believes that an appeal would likely sustain the finding of liability as well as damages awards that exceed the Debtors' assets available for distribution under a plan. In that regard, Bollea believes that there is no genuine dispute regarding Gawker Media's posting of a sexually explicit video of Bollea without his consent, so the primary (if not exclusive) basis for Gawker Media to contest liability would be its contention that the First Amendment protects Gawker Media's publication of the video. Bollea believes that neither the testimony of Gawker Media's witnesses at trial nor the substantial body of case law rejecting First Amendment protection for the publication of sexually explicit videos support Gawker Media's legal argument, and he believes that the standards used in prior decisions to address injunctive relief before there was a factual record are inapplicable on this appeal. As to damages, Bollea believes the award will be sustained because (i) the economic damages award was supported by the only expert testimony offered at trial, (ii) the non-economic damage award is in line with similar cases, and (iii) the punitive damage awards are not excessive because they were a fraction of the compensatory damage award and were tailored by the jury to the net worth of each defendant. If the Bollea Judgment is ultimately allowed at its full amount, it would dramatically reduce potential recoveries to other smaller unsecured creditors of Gawker Media.

28

*b.*        **The Terrill and Ayyadurai Claims**

Unlike the Bollea Judgment, neither the Terrill Claims nor the Ayyadurai Claims have been determined to have liability or liquidated. In the Terrill Litigation, Terrill is seeking at least $10 million in damages and a briefing schedule has just been set. In the Ayyadurai Litigation, Ayyadurai is seeking at least $35 million in damages, and the Debtors have already filed a motion to dismiss the underlying claims. The Debtors have filed objections to proofs of claim filed by Terrill and Ayyadurai based on these lawsuits and the Debtors believe that they would be likely to prevail if the claims were fully litigated. Due to the uncertainty of the outcome of litigation, and the time and expense necessary to filly litigate the underlying matters, the Debtors held separate negotiations with each of Terrill and Ayyadurai and reached agreements to settle their claims.

**B.        Second Lien Make-Whole Settlement**

The Second Lien Make-Whole Claims are subject to discrete disputed legal separate from the disputes relating to allocation, inter-Debtor claims, and unsecured creditor recoveries. Under the documentation for the Second Lien Term Loan, each of the Debtors is liable for the $3.75 million asserted as the Second Lien Make-Whole Claims: GMGI as borrower, and Gawker Media and Gawker Hungary as guarantors. However, the Debtors dispute in its entirety the enforceability of the Second Lien Make-Whole Provision, on the grounds, among others, that it is an unenforceable penalty (and not an enforceable liquidated damage) under New York law. The Second Lien Lender disputes that, and asserts that the amount is fully enforceable and payable.

Based on the sale proceeds allocation that the Plan Settlements contemplate, the Second Lien Make-Whole Claims are treated as a disputed, fully secured claim against each of the three Debtor estates. The GMGI estate could argue that the security interest of the Second Lien Lender in the equity of Gawker Hungary could be avoided as a preferential transfer. That security interest was perfected only in early March 2016, two months after the loan was made and more than 90 days prior to the Petition Date, and the Second Lien Lender was, at the time, arguably an insider of GMGI, because a individual who is a principal of the Second Lien Lender was, at that time, also a director of GMGI. The Second Lien Lender could, however, raise several defenses to this argument. First, the perfection could be a transfer for contemporaneous new value (and therefore not avoidable), as the parties contemplated that it was contemporaneous with the closing of the Second Lien Term Loan, but the perfection steps took some time in Hungary (and the loan needed to be made quickly) but remained substantially contemporaneous within the meaning of the Bankruptcy Code. Second, the Debtors would agree that at the time of this perfection, Gawker Hungary was solvent, so that GMGI was also solvent, as the trial in the Bollea I Lawsuit had not yet occurred and the value of the Debtors' assets at that time; if GMGI was solvent, a preference action would fail. Third, the Second Lien Lender could argue that it was not an insider, as there was not overlapping 20% voting equity ownership with the Debtors, and merely sharing a single director does not automatically make an entity an insider. Finally (and separately), even if the security interest were avoided, that would not eliminate the Second Lien Make-Whole Claims at GMGI. The more substantial economic effect is the argument (set forth above) that the claim is unenforceable.

The Plan Settlements contemplate that the Allowed Claim will be reduced at each guarantor estate to $1.25 million, a substantially reduced portion of the $3.75 million of liability that each has. The overall liability at GMGI will likewise be reduced to not more than $2.0 million. Each estate will pay $500,000 in cash on the Effective Date to the Second Lien Lender. The Second Lien Lender also receives, as part of the Plan Settlements, subordinated claims at Gawker Media and GMGI placed in reserve accounts to satisfy Claims of unsecured creditors of the respective Debtor estates, and distributable to the Second Lien Lender only after general unsecured creditors at such estate are paid in full. As of the filing of this Disclosure Statement, the Second Lien Lender has not agreed to such treatment.

**C.  Consequences of the Plan Settlements**

The Plan Settlements constitute a global resolution of these disputes through a series of compromises. Although we describe the resolutions of disputes with different creditor groups as separate "settlements," they are all inextricably intertwined with and interdependent on one another. In resolving the allocation, inter-Debtor and claims settlements, the Debtors consulted with creditors and equity holders, and the balance in resolving disputes

was give creditors more value through allocation resolution and claims settlement in exchange for settlements facilitating expeditious distributions and establishment reserves for balance of the potential litigation claims.

Under the Second Lien Make-Whole Claims Settlement, in full and complete settlement, release, and discharge of, and in exchange for, any outstanding claims that the Second Lien Holder may assert arising from, or in connection with, the Second Lien Loan and Security Agreement, including, without limitation, any rights relating to the Second Lien Make Whole Provision, the Second Lien Holder agrees to receive the allowance and treatment of the Second Lien Make-Whole Claims provided for in the Plan. Specifically, the $3.75 million asserted Second Lien Make-Whole Claims will receive only $1.5 million in Cash on the Effective Date ($500,000 from each of the Debtors' estates), and the remaining amounts owed at each Debtor paid only on subordinated bases.

Under the Bollea Settlement, in full and complete settlement, release, and discharge of, and in exchange for, the Bollea Claims, including the $130.0 million Bollea Judgment and the waiver of Bollea's claims against third parties that would have Debtor Indemnification Obligations, Bollea will receive $31.0 million Cash from Gawker Media, and a Pro Rata share of Distributions from the Gawker Media Contingent Proceeds Creditor Account. Under the other creditor Plan Settlements, (i) in full and complete settlement, release, and discharge of, and in exchange for, the Terrill Claims and the waiver of Terrill's claims against third parties that would have Debtor Indemnification Obligations, Terrill will receive $500,000 Cash from Gawker Media, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account and (ii) in full and complete settlement, release, and discharge of, and in exchange for, the Ayyadurai Claims, and the waiver of Ayyadurai's claims against third parties that would have Debtor Indemnification Obligations, Ayyadurai will receive $750,000 Cash from Gawker Media, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account. The effect of the Bollea Settlement and the other creditor Plan Settlements is to dramatically reduce the amount of the Gawker Media General Unsecured Claims pool and also to create certainty about the amounts that will be available to other Gawker Media unsecured creditors and the holders of GMGI's Preferred Equity Interests.

In that regard, Intercompany Settlement is among the three Debtors, and consists of the following integrated provisions:

1.      The Debtors will allocate the Unimoda Purchase Price and other proceeds and expenses discussed above in a manner that provides for establishment of the Plan Reserve Accounts and treatments of Claims and Equity Interests set forth in the Plan.

2.      GMGI will provide the GMGI Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims;

3.      GMGI agrees to contribute 45.0% of Gawker Media Contingent Proceeds for deposit in the Gawker Media Contingent Proceeds Creditor Account for satisfaction of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims.

4.      Each of the Debtors agrees that the treatment of Claims and Equity Interests of each of the Debtors against or in the other Debtors will be as set forth in the Plan

5.      Each of the Debtors agrees to the terms of the Second Lien Make-Whole Claims Settlement, the Bollea Settlement, and the settlement of the Terrill Claims and Ayyadurai Claims.

The baseline net economic effect of this Intercompany Settlement in conjunction with the Bollea Settlement and the settlement of the Terrill Claims and Ayyadurai Claims is that the unsecured creditors of Gawker Media will have first recourse to a total of at least $6.5 million of Cash consisting of the $3.75 million Gawker Media Claims Reserve, the $0.75 million Gawker Media Second Lien Make-Whole Guaranty Reserve, the $2.0 million GMGI Plan Guaranty. There may also be some Cash remaining at Gawker Media after making the anticipated Effective Date distributions and the establishment and funding of the Plan Reserve Accounts. To the extent that amount is insufficient to satisfy such Claims, excluding Post-Petition Interest, 45% of any Gawker Media

30

Contingent Proceeds will also be available to satisfy Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest, and, upon full satisfaction of such amounts, Allowed Gawker Media Punitive Damage Claims.

The Debtors believe that this baseline benefit is higher than the alternative of fully litigating the disputes resolved under the Plan Settlements. In this scenario, the Debtors believe that it is very likely unsecured creditors of Gawker Media will receive satisfaction of the full, Allowed amount of their claims, excluding Post-Petition Interest, by the end of calendar year 2016. In the alternative litigation scenario, there is a reasonable likelihood that the Bollea Judgment would be Allowed in full, dramatically diminishing the value of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims. There is also a reasonable likelihood that, among other possibilities, a significant portion of the Unimoda Sale Proceeds would be allocated to Gawker Hungary, consistent with the Debtors' historical allocation approach. In that scenario, recoveries to Gawker Media general unsecured creditors other than Bollea would be negligible. Even were the Bollea Judgment to be reversed, litigating that appeal to judgment would substantially delay any distributions to Gawker Media general unsecured creditors, and would still not necessarily increase eventual distributions after accounting for the substantial cost of that litigation and litigation of intercompany allocation and the outcome of litigation over allocation of proceeds and expenses among the Debtors' estates.

### D.        Bankruptcy Court Approval of the Plan Settlements

The Debtors propose to effectuate the terms of the Plan Settlements under the Plan in accordance with section 1123(b)(3)(A) of the Bankruptcy Code. At the Confirmation Hearing, the Debtors will request, pursuant to Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, that the Bankruptcy Court approve the Plan Settlements. Such approval by the Bankruptcy Court will entail consideration of certain factors to determine whether the Plan Settlements are in the best interests of the Debtors' estates. Among the determinative factors to be considered are:

- the probability of success in the litigation;

- the complexity of the litigation and the expenses, inconveniences and delays necessarily attendant to the prosecution of the litigation;

- the difficulties, if any, to be encountered in the collection of any judgment that might be obtained; and

- the interests of the Debtors' estates, including those of the creditors and other parties in interest and giving appropriate deference to the reasonable views expressed by them in relation to the proposed Settlement.

Based upon the factors set forth above – and considering in particular the uncertainty of the litigation outcomes and the relative cost of litigation compared to estates of this size – the Debtors believe the Plan Settlements fall well within the range of reasonableness and reflect a reasonable compromise of complex issues. As discussed above, the outcomes of the potential litigations being settled are uncertain. Moreover, litigation of the intercompany issues would result in protracted litigation requiring considerable time and expense. Litigation would result in a diminution of the estate because ultimately, regardless of the outcome, no additional funds will be brought into the estate. For all of the foregoing reasons, the Debtors believe that the Plan Settlements are in the best interest of the estates in these Bankruptcy Cases.

## VIII.    THE PLAN – OVERVIEW

### A.        Overview of Chapter 11

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes fair and equitable treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

31

The Plan is a liquidating plan.  As a result of the Unimoda Sale, the Debtors' business operations were terminated and the Plan provides for the liquidation of the Debtors' remaining assets and distribution of all sale proceeds after paying the costs and expenses of administering the Debtors' estates.  The Plan provides for the payment in full to holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims, and specified holders of Claims against or Equity Interests in Gawker Hungary. The Plan further provides for a recovery to the holder of the Second Lien Make-Whole Claims against GMGI, Gawker Media, and Gawker Hungary, the holders of General Unsecured Claims against GMGI and Gawker Media, the holders of the Punitive Damage Claims against Gawker Media, and the holders of Preferred and Common Equity Interests in GMGI and Membership Interest in Gawker Media.  Confirmation and consummation of the Plan are contingent upon the satisfaction of all of the conditions precedent set forth in Sections 6.01 and 6.02 of the Plan, respectively, unless waived pursuant to Section 6.03 of the Plan.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan itself, and the more detailed information and financial statements contained elsewhere in this Disclosure Statement.

## B.    Administrative Claims, Priority Tax Claims, and Other Unclassified Claims

### 1. Administrative Claims

Pursuant to Sections 2.05(a)(i), 2.06(a)(i), and 2.07(a)(i) of the Plan, each holder of an Allowed Administrative Claim will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

### 2. United States Trustee's Fees

Pursuant to Section 2.05(a)(ii), 2.06(a)(ii), and 2.07(a)(ii) of the Plan, the outstanding fees due to the United States Trustee pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) shall be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) after the Effective Date will be paid by the applicable Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

### 3. Professional Fees

Pursuant to Section 2.03 of the Plan, to the extent that a Professional's final fee application is approved by the Bankruptcy Court, or claims pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases are Allowed by the Bankruptcy Court, the requesting Person shall receive: (i) payment of Cash from the GMGI Professional Fee Claim Reserve, Gawker Media Professional Fee Claim Reserve and/or Gawker Hungary Professional Fee Claim Reserve, as applicable, in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases, such payment to be made before the later of (a) the Effective Date or (b) three Business Days after the order Allowing such Person's final fee application, or (ii) payment on such other terms as may be mutually agreed upon by the holder of the Professional Fee Claim and the applicable Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases).

### 4. Priority Tax Claims

Pursuant to Section 2.05(a)(iv), 2.06(a)(iv), and 2.07(a)(iv) of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Claim becomes an Allowed Priority Claim, each holder of an Allowed Priority Claim shall receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Priority Claim or payment as agreed between the holder of the Allowed Priority Claim and the Debtors.

32

*5.* *Bar Date for Administrative Claims*

Pursuant to Section 2.04 of the Plan, requests for payment of Administrative Claims (other than Professional Fee Claims) that were not previously required to be filed by an order of the Bankruptcy Court received no later than the Administrative Claims Bar Date established in the Confirmation Order. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such applicable Administrative Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the requesting party no later than the Administrative Claims Objection Deadline.

## C.    Classification of Claims and Interests

Section 1123(a)(1) of the Bankruptcy Code requires a chapter 11 plan to designate classes of claims and classes of interests. The Plan segregates the various Claims against and Equity Interests in the Debtors into various classes. The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. The Debtors believe that all Claims and Equity Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court determines that such classification is incorrect, however, the Bankruptcy Court could deny confirmation of the Plan.

If the Bankruptcy Court finds that a different classification is required for confirmation of the Plan, the Debtors may seek to (i) modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) use the acceptances received from any holder of Claims or Equity Interests pursuant to this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which the holder of such Claim or Equity Interest was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan adversely affects the treatment of a holder of Claims in a manner that requires re-solicitation, the Debtors likely will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims or Equity Interests pursuant to this Disclosure Statement will constitute a consent to the Plan's treatment of such holder regardless of the Class to which such holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that a chapter 11 plan provide for the same treatment for each Claim or Equity Interest within a particular Class unless the holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. The Debtors believe the Plan complies with the requirement of equal treatment for each Claim or Equity Interest of a particular Class.

Only Classes that are "impaired" (pursuant to section 1124 of the Bankruptcy Code) under a chapter 11 plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan. As a general matter, a class of claims or equity interests is considered to be "unimpaired" under a chapter 11 plan if the plan does not alter the legal, equitable, and contractual rights of the holders of such claims or equity interests. Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted a proposed chapter 11 plan. Holders of Claims or Equity Interests that do not receive or retain anything under a proposed chapter 11 plan are deemed to have rejected such plan.

The categories of Claims and Equity Interests outlined in the Plan and listed below classify Claims and Equity Interests for all purposes, including for purposes of voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Pursuant to Article 2 of the Plan, a Claim or Equity Interest is (i) classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and (ii) classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class. A Claim or Equity Interest is also

59473927_10

classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, U.S. Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| GMGI | | | |
|---|---|---|---|
| Class | Claims and Interests | Status | Voting Rights |
| 1A | Second Lien Make-Whole Claim | Impaired | Entitled to Vote |
| 1B | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 1C | General Unsecured Claims | Impaired | Entitled to Vote |
| 1D | General Unsecured Convenience Claims | Impaired | |
| 1E(i) | Gawker Hungary Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 1E(ii) | Gawker Media Intercompany Claims | Impaired | Entitled to Vote |
| 1F | Preferred Equity Interests | Impaired | Entitled to Vote |
| 1G | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Gawker Media | | | |
|---|---|---|---|
| Class | Claims and Interests | Status | Voting Rights |
| 2A | Second Lien Make-Whole Guaranty Claim | Impaired | Entitled to Vote |
| 2B | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2C | General Unsecured Claims | Impaired | Entitled to Vote |
| 2D | Punitive Damage Claims | Impaired | Entitled to Vote |
| 2E | General Unsecured Convenience Claims | Impaired | |
| 2F(i) | Gawker Hungary Intercompany Claims | Impaired | Entitled to Vote |
| 2F(ii) | GMGI Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 2G | Membership Interest | Impaired | Entitled to Vote |

| Gawker Hungary | | | |
|---|---|---|---|
| Class | Claims and Interests | Status | Voting Rights |
| 3A | Second Lien Make- Whole Guaranty Claims | Impaired | Entitled to Vote |
| 3B | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3C | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3D(i) | GMGI Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 3D(ii) | Gawker Media Intercompany Claims | Impaired | Entitled to Vote |
| 3E | Gawker Hungary Membership Interest | Impaired | Entitled to Vote |

## D.    Claims Asserted Against the Debtors

Since the First General Claims Bar Date on September 29, 2016, the Debtors have undertaken the process of reconciling the amount and classification of outstanding Claims and filing and prosecuting objections to Claims. As of October 31, 2016, approximately 320 proofs of claim (including proofs of claim filed against more than one Debtor) had been filed against the Debtors.

As of October 31, 2016, the Debtors had filed the six individual objections to proofs of claim, described in greater detail above in Section V.B, and two omnibus objections to proofs of claim in which the Debtors objected to various types of Claims, such as (i) Claims that were previously paid or otherwise satisfied; and (ii) Claims asserted

against the wrong Debtor entity. Through the omnibus objections, as of October 31, 2016, the Debtors had objected to Claims included in approximately 100 proofs of claim (including those proofs of claim filed against more than one Debtor). The Debtors expect to continue preparing, filing and resolving objections to certain other Claims throughout the course of the Bankruptcy Cases.

Approximately 62 individuals filed proofs of claim against each of the three Debtors asserting contingent, unliquidated claims for indemnification, contribution, reimbursement, or other such obligations of the Debtors, arising out of (i) employment, severance or independent contractor agreements, (ii) the Debtors' organizational documents or governing corporate documents, and (iii) the Debtors' policies and practices of advancing certain litigation defense costs to writers under certain circumstances. The Debtors have filed objections to certain of these proofs of claim that the Debtors believe were filed against the wrong Debtor.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates. While the Debtors are working actively to resolve disputed Claims, most disputed Claims have not yet been resolved, and additional administrative and governmental claims could be filed. Additionally, the Debtors are in the process of reviewing their Schedules and, upon the completion of such review, may decide to amend or supplement the Schedules in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court. The Debtors also continue to investigate differences between claim amounts asserted by Creditors and claim amounts determined in accordance with the Debtors' books and records. Certain Claims may be duplicative of other claims filed against the Debtors or their affiliates, may be based on contingencies that have not occurred or may be otherwise overstated, and would therefore be subject to reduction or disallowance. The Debtors plan to continue to review and resolve such matters throughout the Bankruptcy Cases.

The amount of the Pro Rata Share that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the claims resolution process.

### E.    Treatment of Claims and Interests

The treatment of Claims and Equity Interests pursuant to Article 3 of the Plan is as follows:

#### 1. Treatment of Claims Against and Equity Interests in GMGI

##### a.    Class 1A – GMGI Second Lien Make-Whole Claim

Class 1A consists of the GMGI Second Lien Make-Whole Claim against GMGI. Class 1A is Impaired and the holder of the GMGI Second Lien Make-Whole Claim against GMGI is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures. The GMGI Second Lien Make-Whole Claim is Allowed as a Secured Claim against GMGI in the amount of $2.0 million. The Second Lien Lender will receive, in full and complete settlement and release of, and in exchange for, the GMGI Second Lien Make-Whole Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000, (b) on the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have been satisfied full, up to an aggregate total of $750,000, and (c) in the event that Gawker Hungary dissolves before all Disputed GMGI General Unsecured Claims have become Allowed or Disallowed, the Second Lien Lender will receive the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

##### b.    Class 1B – GMGI Other Priority Claims

Class 1B consists of the Other Priority Claims against GMGI. Class 1B is Unimpaired and holders of Class 1B Claims are presumed to have accepted the Plan. Each holder of an Allowed GMGI Other Priority Claim will receive payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

35

#### c.        Class 1C – GMGI General Unsecured Claims

Class 1C consists of the GMGI General Unsecured Claims.  Class 1C is Impaired and holders of Class 1C Claims are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Each holder of an Allowed GMGI General Unsecured Claim will receive distributions equal to its Pro Rata share of GMGI Cash distributed on the Effective Date, or within 15 days of Allowance of such Claim, up to the amount of its Allowed Claim plus Post-Petition Interest.

#### d.        Class 1D – GMGI General Unsecured Convenience Claims

Class 1D consists of holders of GMGI General Unsecured Claims that elected to vote to accept the Plan and have their Claims against all Debtors treated as GMGI General Unsecured Convenience Claims.  Class 1D is Impaired.  Each holder that elects to have its Claims treated as an Allowed GMGI General Unsecured Convenience Claim will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.  The Debtors believe that establishment of this convenience class will enhance the administrative efficiency of these Bankruptcy Cases and preserve Debtor resources where the cost of litigating certain disputed Claims could exceed the cost of the proposed treatment of GMGI General Unsecured Convenience Claims.

#### e.        Class 1E(i) – GMGI Gawker Hungary Intercompany Claims

Class 1E(i) consists of the Gawker Hungary Intercompany Claims against GMGI.  Class 1E(i) is Impaired, Gawker Hungary, as holder of the Class 1E(i) Claims, is deemed to reject the Plan.  Any and all Intercompany Claims held by Gawker Hungary against GMGI are resolved pursuant to the Intercompany Settlement.

#### f.        Class 1E(ii) – GMGI Gawker Media Intercompany Claims

Class 1E(ii) consists of the Gawker Media Intercompany Claims against GMGI.  Class 1E(ii) is Impaired and holders of Class 1E(ii) Claims are deemed to reject the Plan.  Pursuant to the Intercompany Settlement, in exchange for any and all Intercompany Claims held by Gawker Media against GMGI, on the Effective Date, GMGI will provide the GMGI Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims, as well as agreeing to the other terms of the Intercompany Settlement.

#### g.        Class 1F – GMGI Preferred Equity Interests

Class 1F consists of the holders of GMGI Preferred Shares.  Class 1F is Impaired and holders of Equity Interests in Class 1F are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Each holder of a GMGI Preferred Share will receive on each date applicable Distributions are made, a Pro Rata share of any remaining Cash after the GMGI Second Lien Make-Whole Claim has been paid in full, up to an aggregate total of the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference.

#### h.        Class 1G – GMGI Common Equity Interests

Class 1G consists of the holders of GMGI Common Shares.  Class 1G is Impaired and holders of Class 1G Claims are deemed to reject the Plan.  Each holder of a GMGI Common Share will receive on each date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after holders of Allowed GMGI Preferred Share Equity Interests have received distributions totaling the aggregate amount of their Preferred Shares Liquidation Preferences.

### 2. Treatment of Claims Against and Equity Interests in Gawker Media

#### a.        Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claim

Class 2A consists of the Gawker Media Second Lien Make-Whole Guaranty Claim.  Class 2A is Impaired and holders of Class 2A Claims are entitled to vote to accept or reject the Plan pursuant to the terms of the

36

Solicitation Procedures.  The Gawker Media Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Media in the amount of $1.25 million.  The Second Lien Lender will receive (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) on the Gawker Media Claims Reserve Distribution Date, distributions equal to any Cash remaining in the Second Lien Make-Whole Guaranty Reserve after distributions with respect to Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of the Plan.

### b.        Class 2B – Gawker Media Other Priority Claims

Class 2B consists of the Other Priority Claims against Gawker Media.  Class 2B is Unimpaired and holders of Class 2B Claims are presumed to have accepted the Plan.  Each holder of an Allowed Gawker Media Priority Claim will receive payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Priority Claim becomes an Allowed Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

### c.        Class 2C – Gawker Media General Unsecured Claims

Class 2C consists of the holders of Gawker Media General Unsecured Claims.  Class 2C is Impaired and holders of Class 2C Claims are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Unless otherwise agreed to in writing, each holder of an Allowed Gawker Media General Unsecured Claim will receive Distributions made in the following order until such holder receives the amount of its Allowed Claim, excluding Post-Petition Interest:

> FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;

> SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account;

> THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Make-Whole Reserve; and

> FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve.

### d.        Class 2D – Gawker Media Punitive Damage Claim

Class 2D consists of the holders of Punitive Damage Claims against Gawker Media.  Class 2D is Impaired and holders of Class 2D Claims are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Unless otherwise agreed to in writing, each holder of an Allowed Punitive Damage Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, Distributions made in the following order until such holder it receives the full amount of its Allowed Claim, excluding Post-Petition Interest:

> FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

> SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

> THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest.

### e.      Class 2E – Gawker Media General Unsecured Convenience Claims

Class 2E consists of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims that elected to vote to accept the Plan and have their Claims against all Debtors treated as Gawker Media General Unsecured Convenience Claims.  Class 2E is Impaired.  Each holder that elects to have its Claims treated as an Allowed Gawker Media General Unsecured Convenience Claim will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.  The Debtors believe that establishment of this convenience class will enhance the administrative efficiency of these Bankruptcy Cases and preserve Debtor resources where the cost of litigating certain disputed Claims could exceed the cost of the proposed treatment of the Gawker Media Convenience Claims.

### f.      Class 2F(i) – Gawker Media Gawker Hungary Intercompany Claims

Class 2F(i) consists of the Gawker Hungary Intercompany Claims against Gawker Media, including, but not limited to, the Claim resulting from the Gawker Hungary Intercompany Notes and outstanding Intercompany Obligations.  Class 2F(i) is Impaired and Gawker Hungary, as holder of the Class 2F(i) Claims, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Pursuant to the Intercompany Settlement, Gawker Hungary will receive on account of the Gawker Media Gawker Hungary Intercompany Claim (i) a distribution of $16,000,000 in Cash from Gawker Media on the Effective Date, and (ii) a distribution of any Cash remaining at Gawker Media on the Gawker Media Claims Reserve Distribution Date after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have received the full amount of the treatment set forth in Sections 3.02(c) and 3.02(d) of the Plan, to repay up to any outstanding amounts of the Gawker Media Gawker Hungary Intercompany Claims, including any interest that accrues on such outstanding amounts through the Gawker Media Claims Reserve Distribution Date, which repayment to Gawker Media shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

### g.      Class 2F(ii) – Gawker Media GMGI Intercompany Claims

Class 2F(ii) consists of the GMGI Intercompany Claims against Gawker Media, including, but not limited to, the Claim resulting from the GMGI Promissory Note.  Class 2F(ii) is Impaired and GMGI, as the holder of the Class 2F(i) Claims, is deemed to reject the Plan.  Any and all Intercompany Claims held by GMGI against Gawker Media are resolved pursuant to the Intercompany Settlement, and the Gawker Media GMGI Intercompany Claim will not receive any distribution.

### h.      Class 2G – Gawker Media Membership Interest

Class 2G consists of GMGI, as the holder of the Gawker Media Membership Interest.  Class 2G is Impaired and GMGI, as holder of the Class 2G Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  GMGI will receive (a) its Pro Rata share of the Gawker Media Contingent Equity Proceeds, and (b) on the Gawker Media Claims Reserve Distribution Date, Cash remaining in the Gawker Media Claims Reserve after satisfaction of all Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims, excluding Post-Petition Interest, which amounts shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

### 3. Treatment of Claims Against and Equity Interests in Gawker Hungary

**a.    Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claims.**

Class 3A consists of the Gawker Hungary Second Lien Make-Whole Guaranty Claim.  Class 3A is Impaired and each holder of a Class 3A Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  The Gawker Hungary Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Hungary in the amount of $1.25 million plus any fees, expenses and outstanding interest. The Second Lien Lender will receive (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) if and when all GMGI General Unsecured Claims have either (i) been paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Allowed GMGI General Unsecured Claims, a distribution in Cash from the Gawker Hungary Second Lien Make-Whole Guaranty Reserve; provided, however, that in the event that Gawker Hungary dissolves before all Disputed Claims in Class 1C have become Allowed or Disallowed, GMGI assumes this obligation, and the Second Lien Lender will receive the corresponding distribution from GMGI Pro Rata with the treatment of the GMGI Second Line Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

**b.    Class 3B – Gawker Hungary Other Priority Claims**

Class 3B consists of the Other Priority Claims against Gawker Hungary.  Class 3B is Unimpaired and holders of Class 3B Claims are presumed to have accepted the Plan.  Each holder of an Allowed Gawker Hungary Other Priority Claim will receive payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

**c.    Class 3C – Gawker Hungary General Unsecured Claims**

Class 3C consists of the Gawker Hungary General Unsecured Claims.  Class 3C is Unimpaired and holders of Class 3C Claims are presumed to have accepted the Plan.  Each holder of an Allowed Gawker Hungary General Unsecured Claim will receive a distribution on the Effective Date, or when the Claim is Allowed, equal to payment in full in Cash of the Allowed Gawker Hungary General Unsecured Claim, including any interest accrued on such claim from the Petition Date through the Effective Date.

**d.    Class 3D(i) – Gawker Hungary GMGI Intercompany Claims**

Class 3D(i) consists of the GMGI Intercompany Claims against Gawker Hungary.  Class 3D(i) is Impaired and GMGI, as holder of the Class 3D(i) Claims, is deemed to reject the Plan.  Any and all Intercompany Claims held by GMGI against Gawker Hungary are resolved pursuant to the Intercompany Settlement and will not receive any distribution.

**e.    Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims**

Class 3D(ii) consists of the Gawker Media Intercompany Claims against Gawker Hungary.  Class 3D(ii) is Impaired and Gawker Media, as holder of the Class 3D(ii) Claim, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Any and all Intercompany Claims held by Gawker Media against Gawker Hungary are resolved pursuant to the Intercompany Settlement.

**f.    Class 3E – Gawker Hungary Membership Interest**

Class 3E consists of GMGI, as the holder of the Gawker Hungary Membership Interest.  Class 3E is Impaired and GMGI is entitled to vote to accept or reject the Plan.  GMGI will receive (a) on the Effective Date, a distribution of all of the Cash held by Gawker Hungary after payment in full of the Allowed Claims against Gawker Hungary and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Claims against Gawker Hungary and anticipated expenses of liquidating Gawker Hungary, and (b) on the date of the dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which

shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan.

### 4. Confirmation Pursuant to 1129(b) of the Bankruptcy Code

Because the Plan includes Classes of Claims and Equity Interests that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### F.    Means of Implementation of Plan

#### 1. Corporate Action

Pursuant to Section 4.05 of the Plan, confirmation of the Plan shall constitute authorization for the Debtors, and their respective officers, board of directors, and agents, to effectuate the Plan and to execute, issue, deliver, file, or record all contracts, instruments, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other entity except for those expressly required pursuant to this Plan. All matters provided for in the Plan involving any corporate action to be taken by or required of the Debtors in connection with the Plan shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects, without any requirement of further action by the Debtors, or their agents, representatives, trustees, stockholders, members, managers, officers, or directors.

#### 2. Vesting of Assets

Pursuant to Section 4.06 of the Plan, except as otherwise provided in the Plan, upon the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, all property of the estate of each Debtor not otherwise distributed or released on the Effective Date shall vest in that Debtor for the benefit of the holders of Claims against and Equity interests in that Debtor consistent with the treatments set forth in Article 3 of the Plan.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, after the Effective Date, each of the Debtors shall retain and enforce any claims or interests belonging to each of their respective chapter 11 bankruptcy estates that were not released by the Plan.  From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action consistent with the terms of the Plan, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

#### 3. Dissolution of the Debtors

Pursuant to Section 4.14 of the Plan, any Debtor not yet dissolved shall be dissolved upon the occurrence of the Gawker Media Claims Reserve Distribution Date and their completion of their duties and obligations under the Plan, and all corporate approvals necessary for such action shall be deemed satisfied.  The Plan Administrator may, in its discretion, dissolve Gawker Hungary (as required under the Unimoda APA) or Gawker Media following the Effective Date but prior to the Gawker Media Claims Reserve Distribution Date, upon the completion of Gawker Hungary or Gawker Media's duties and obligations under the Plan.

#### 4. Continuation of Stays

Pursuant to Section 4.12 of the Plan, unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

### *5. Cancellation and Surrender of Instruments, Securities, and Existing Agreements*

Pursuant to Section 4.13 of the Plan, and concurrently with the applicable distributions made pursuant to Articles 3, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests against the Debtors shall be deemed cancelled and of no further force and effect against the Debtors, without any further action on the part of any Debtor. From and after the making of the applicable distributions pursuant to the Plan, the holders of such notes, instruments, certificates, and other documents shall have no rights against the Debtors arising from or relating to such notes, instruments, certificates, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan.

### *6. Plan Administrator and Plan Implementation*

(a)    <u>Plan Administrator</u>.  Pursuant to Section 4.08 of the Plan, on and after the Effective Date, the Debtors will be managed by the Plan Administrator, who shall have all corporate powers, including those for which board and/or shareholder voting would otherwise be necessary.  The initial Plan Administrator shall be identified in the Plan Supplement.  Except as otherwise ordered by the Court, the expenses incurred by the Debtors on or after the Effective Date may be paid by the Debtors in accordance with the Plan Administrator Agreement, without further order of the Bankruptcy Court.  The Plan Administrator shall have no obligation to pursue third-party claims for the benefit of the Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement or are consistent with the Plan Administrator's fiduciary obligations.  In the event that such claims are pursued, the Debtors shall be responsible for the costs and expenses associated with the prosecution of such claims except as otherwise provided in the Plan. Any such third-party claims shall be identified at the time of the Plan Supplement.

(b)    <u>Plan Administrator Agreement</u>.  Pursuant to Section 4.09 of the Plan, on the Effective Date, the Plan Administrator Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.  After the Effective Date, the Plan Administrator Agreement may be amended in accordance with its terms without further order of the Court.  The Plan Administrator Agreement shall be substantially in the form of Exhibit A to the Plan Supplement Agreement, which shall be filed prior to the Confirmation Hearing.

(c)    <u>Effective Date Transactions</u>.  Pursuant to Section 4.02 of the Plan, on the Effective Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(i)    GMGI establishes and funds the GMGI Professional Fee Claim Reserve, Gawker Media establishes and funds the Gawker Media Professional Fee Claim Reserve, and Gawker Hungary establishes and funds the Gawker Hungary Professional Fee Claim Reserve;

(ii)    Gawker Media establishes and funds the Gawker Media Claims Reserve and Gawker Media Second Lien Make-Whole Guaranty Reserve, and establishes Gawker Media Contingent Proceeds Creditor Account,

(iii)    Gawker Hungary establishes and funds the Gawker Hungary Second Lien Make-Whole Guaranty Reserve;

(iv)    GMGI establishes and funds the GMGI Plan Guaranty Reserve;

(v)    Gawker Hungary makes distributions to holders of Claims against and Equity Interests in Gawker Hungary, pursuant to the Plan treatments set forth in Section 3.03 of the Plan, subject to the reserve required under Section 3.03(a)(iii)(b)(2) of the Plan;

41

(vi)       Gawker Media makes distributions to holders of certain Claims against, and Equity Interests in, Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a)(iii)(a), 3.02(b), 3.02(e), 3.02(f)(i), and 3.02(h) of the Plan; and

(vii)     GMGI makes distributions to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserves required under Sections 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of the Plan.

(d)      <u>Gawker Media Claims Reserve Distribution Date Transactions</u>.  On the Gawker Media Claims Reserve Distribution Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(i)       Gawker Media makes distributions to holders of Claims against and Equity Interests in Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a), 3.02(c), and 3.02(d) of this Plan;

(ii)      Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve;

(iii)     Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the GMGI Plan Guaranty Reserve;

(iv)     Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from any Cash remaining at Gawker Media;

(v)      The Plan Administrator distributes to the Second Lien Lender any amounts remaining in the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(vi)     The Plan Administrator distributes to GMGI any amounts remaining in the Gawker Media Plan Guaranty Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(vii)    Gawker Media distributes any Cash remaining after satisfaction of all outstanding Gawker Media Gawker Hungary Intercompany Claims to GMGI for distribution to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan; and

(viii)   GMGI makes distributions of remaining Cash at GMGI to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) of the Plan, if any.

(e)      <u>Gawker Media Contingent Proceeds Distribution Date Transactions</u>.  Upon receipt of Gawker Media Contingent Proceeds, (i) the Gawker Media Contingent Equity Proceeds shall be

42

distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan and (ii) the 45% of such proceeds will be deposited in the Gawker Media Contingent Proceeds Creditor Account. On each Gawker Media Contingent Proceeds Distribution Date, the Plan Administrator shall make Distributions from the Gawker Media Contingent Proceeds Creditor Account to holders of Claims against Gawker Media pursuant to Sections 3.02(c) and 3.02(d) of this Plan, with Bollea to receive a Pro Rata share of such Distributions.

### 7. Sale of Gawker.com Assets.

Pursuant to Section 4.10 of the Plan, the Plan Administrator, in conjunction with its advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets, subject to any limitations set forth in the non-compete agreement that is part of the Unimoda Sale.

### 8. Dissolution of the Committee

Pursuant to Section 4.15 of the Plan, on the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases, except to the extent necessary to prosecute any appeals or other matters with respect to which they have been granted standing. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

## IX.   THE PLAN – OTHER PROVISIONS

### A.   Treatment of Executory Contracts and Unexpired Leases

#### 1. Rejection of Executory Contracts and Unexpired Leases

Section 7.01 of the Plan provides that, pursuant to sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, shall be deemed rejected on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of executory contracts and unexpired leases pursuant to this Section of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

#### 2. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Section 7.02 of the Plan provides that Claims created by the rejection of executory contracts and unexpired leases pursuant to Section 7.01 of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Plan Administrator no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section 7.01 for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Debtors' estate and their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article 5 of the Plan.

### B.   Provisions Governing Distributions

#### 1. Manner of Payments Under Plan of Liquidation

Pursuant to Section 3.07 of the Plan, unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Debtors shall be made, at the election of the Debtors or the Plan Administrator, as applicable, by check drawn on a domestic bank or by electronic or wire transfer from a domestic bank; provided,

however, that no Cash payments shall be required to be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than twenty dollars ($20.00).

### 2. Delivery of Distributions and Undeliverable or Unclaimed Distributions

(a)    General.  Pursuant to Section 3.08 of the Plan, and subject provisions of Section 3.09 of the Plan, distributions and deliveries to each holder of an Allowed Claim or Equity Interest will be made (i) at the address set forth for such holder in the Debtors' Schedules if no proof of claim has been filed on behalf of such holder, (ii) at the address reflected in the proof of claim filed by such holder, or (iii) at the address set forth in any written notices of address change delivered after the date of any related proof of claim by such holder.  If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Plan Administrator is notified of the holder's then current address, in which case all missed distributions will be made to the holder without interest on the next GMGI or Gawker Media Distribution Date, as applicable.  Any claim in respect of such an undeliverable distribution shall be made on or before the first anniversary of the Effective Date or the applicable GMGI or Gawker Media Distribution Date.  After such date, all claims in respect of undeliverable distributions shall be discharged and forever barred and the Debtors shall retain all monies related thereto.  The Debtors shall be entitled to rely upon the register of Claims as of the Distribution Record Date.

(b)    Uncashed Checks.  Pursuant to Section 3.09 of the Plan, checks issued by the Debtors on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the applicable Debtor by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first anniversary of the (a) Effective Date or (b) the applicable GMGI or Gawker Media Distribution Date, or (ii) ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of voided checks shall be discharged and forever barred and the applicable Debtor shall retain all monies related thereto.

### 3. Setoff and Recoupment

Pursuant to Section 3.05 of the Plan, except to the extent an Administrative or Priority Claim has been previously Allowed or is Allowed by the Plan, a Debtor may, but shall not be required to, set off or recoup against any Administrative or Priority Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Administrative or Priority Claim, claims of any nature whatsoever which a Debtor may have against the holder of such Administrative or Priority Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Administrative Claim hereunder shall constitute a waiver or release by the applicable Debtor of any such claim or counterclaim that it may have against such holder.

### 4. Compliance with Tax Requirements

Pursuant to Section 3.04 of the Plan, for purposes of distributions on any interest-bearing obligations, distributions under the Plan shall be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Petition Date.  Notwithstanding any other provision of this Plan, each entity receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other tax obligations.

### C.    Provisions for Treatment of Subsequent Plan Distributions

### 1. Objections to and Estimation of Claims

Pursuant to Section 5.01 of the Plan, after the Effective Date, the Debtors or the Plan Administrator shall have sole authority to object to the allowance of Claims and Equity Interests with respect to which they dispute liability in whole or in part.  All objections shall be litigated to a Final Order; provided, however, that the Debtors or the Plan Administrator may compromise and settle, withdraw, or resolve by any other method approved by the

44

Bankruptcy Court, any objections to Claims or Equity Interests. In addition, the Debtors or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim. Except as otherwise provided by order of the Bankruptcy Court, the Debtors or the Plan Administrator may file an objection to any Claim or Equity Interest until 180 days after the Effective Date.

### 2. Professional Fee Claim Procedures

Pursuant to Section 5.02 of the Plan, notwithstanding any other provision of the Plan dealing with unclassified Claims, any Person asserting a Professional Fee Claim shall, no later than ten (10) days after the Confirmation Date, provide the Debtors and the Plan Administrator with a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but unbilled fees and expenses through the Effective Date) (for each Person, its "Professional Fee Claim Summary"). All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Committee prior to the Effective Date must be filed with the Bankruptcy Court and served on the Plan Administrator, Debtors, the Committee, their respective counsel, and the United States Trustee, no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Plan Administrator, the United States Trustee, and the requesting party no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### 3. Professional Fee Claim Reserves.

Pursuant to Section 5.03 of the Plan on and after the Effective Date, the Plan Administrator shall set aside and withhold from distribution, the Professional Fee Claim Reserves. Amounts held in the Professional Fee Claim Reserves shall not constitute property of the Debtors and shall only be distributed in accordance with this Section 5.03. Each Person asserting a Professional Fee Claim against any of the Debtors shall be entitled to a maximum amount from the applicable Professional Fee Claim Reserve equal to the amount of the Professional Fee Claim Summary submitted by such Person with respect to the applicable Debtor, less all interim compensation paid to such Person during the Bankruptcy Cases. In the event there is a remaining balance in the GMGI, Gawker Media, or Gawker Hungary Professional Fee Claim Reserve after payment of all Allowed Professional Fee Claims against the applicable Debtor, in accordance with Section 2.03 of the Plan, such remaining amount, if any, shall be returned to the applicable Debtor for distribution pursuant to the Plan.

### 4. Payments and Distributions on Disputed Claims

Pursuant to Section 5.04 of the Plan, on the Gawker Media Distribution Date and each GMGI Distribution Date, each holder of an Allowed Claim and Equity Interest will receive all payments and distributions to which such holder is then entitled under the Plan. No partial payments and no partial distributions shall be made with respect to a Disputed Claim until the resolution of all Disputed Claims by settlement, Final Order, or other form of resolution of such Claim reasonably determined by the Plan Administrator.

### D.    Conditions Precedent to Confirmation and Effective Date of the Plan

### 1. Conditions to Confirmation

Section 6.01 of the Plan provides that the confirmation of the Plan by the Bankruptcy Court shall be subject to, and conditioned upon, entry of an order by the Bankruptcy Court approving the Disclosure Statement.

### 2. Conditions to the Effective Date

Section 6.02 of the Plan provides that the effectiveness of the Plan shall be subject to, and conditioned upon:

(a)    The Confirmation Order becoming a Final Order,

(b)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made or, if made, remaining pending, and

(c)    All other actions and documents necessary to implement the Plan shall have been effected or executed.

### 3. Waiver of Conditions to Confirmation or the Effective Date

Pursuant to Section 6.03 of the Plan, the conditions to confirmation and the conditions to the Effective Date may be waived in whole or part at any time by the Debtors without an order of the Bankruptcy Court.

### 4. Revocation of the Plan

Pursuant to Section 10.02 of the Plan, the Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### E.    Effect of Plan Confirmation

### 1. Binding Effect

Pursuant to Section 10.05 of the Plan, the Plan shall be binding upon, and shall inure to the benefit of the Debtors, the holders of all Claims and Equity Interests, and any other Person identified in the Plan, and their respective successors and assigns.

### 1. Injunction Against Asserting Claims of the Debtors

**PURSUANT TO SECTION 9.01 OF THE PLAN, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES OTHER THAN THE PLAN ADMINISTRATOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEBT, RIGHT, OR CAUSE OF ACTION OF THE DEBTORS FOR WHICH A DEBTOR RETAINS SOLE AND EXCLUSIVE AUTHORITY TO PURSUE IN ACCORDANCE WITH ARTICLE 4 OF THE PLAN.**

### 2. Injunction Against Interference with Plan

**PURSUANT TO SECTION 9.02 OF THE PLAN, UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS AND OTHER PARTIES IN INTEREST (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, PRESENT OR FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER CONTENT PROVIDERS, PRESENT OR FORMER WRITERS, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT**

46

LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

  **3.** *Releases by the Debtors.*

  PURSUANT TO SECTION 9.03 OF THE PLAN, ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, THE DEBTORS, ON THEIR OWN BEHALF AND AS REPRESENTATIVE OF THE DEBTORS' ESTATES, RELEASE UNCONDITIONALLY AND ARE HEREBY DEEMED TO RELEASE UNCONDITIONALLY, (I) EACH AND ALL OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE IN CONNECTION WITH THE DEBTORS, THEIR ASSETS, OR PROPERTY AND (II) EACH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, <u>PROVIDED, HOWEVER</u>, THAT THE DEBTORS DO NOT WAIVE ANY DEFENSES THAT THE DEBTORS HAVE TO CLAIMS THAT SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR MAY ASSERT AGAINST THE DEBTORS.

  **4.** *Exculpation.*

  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND APPROVED IN THE CONFIRMATION ORDER, NONE OF THE DEBTORS OR THE COMMITTEE, NOR ANY OF THEIR RESPECTIVE FORMER OR CURRENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, ADVISORS, AFFILIATES, ATTORNEYS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, REPRESENTATIVES, OR AGENTS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF, (I) ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY RELATING TO THE DEBTORS OR THE COMMENCEMENT AND PROSECUTION OF OR THE BANKRUPTCY CASES, (II) THE FORMULATION, NEGOTIATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, (III) THE SOLICITATION OF

ACCEPTANCES OF THE PLAN, (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR (V) THE ENFORCEMENT OF THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED THEREUNDER; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACTIONS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER.  IN ADDITION, THE EXCULPATED PARTIES SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.  NOTHING HEREIN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ATTORNEY DISCIPLINARY RULES..

> ### 5. *Third-Party Releases of Released Employees and Independent Contractors.*

PURSUANT TO SECTION 9.05 OF THE PLAN, ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, PROVIDED, HOWEVER, THAT THE FOREGOING THIRD PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE.

> ### 6. *Term of Bankruptcy Injunction or Stays.*

Pursuant to Section 4.11 of the Plan, unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date..

### F.        Retention of Jurisdiction

Article 8 of the Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of these proceedings to the extent legally permissible, including for the following purposes,

(a)        to determine any and all applications, adversary proceedings, and contested matters pending as of the Effective Date, if any;

(b)        to determine any and all objections to the allowance of Claims and Equity Interests, if any;

59473927_10

(c)         to determine any and all applications for allowance of compensation and reimbursement of expenses;

(d)         to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order;

(e)         to effectuate payments under and performance of the provisions of the Plan;

(f)         to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)         to determine the Debtors' motion, if any, to modify the Plan in accordance with section 1127 of the Bankruptcy Code;

(h)         to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)         to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, in the Confirmation Order;

(j)         to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

(k)         to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

(l)         to enter a final decree closing the Bankruptcy Case;

(m)         to determine any matter (1) under the Unimoda APA, (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement;

(n)         to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

(o)         to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors; and

(p)         to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Cases, including the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### G.  Miscellaneous Provisions

#### *1. Governing Law*

Section 1.07 of the Plan provides that, except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of a contract, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and constructed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

#### *2. Severability*

Pursuant to Section 10.01 of the Plan, should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

### H.  Notices

Pursuant to Section 10.07 of the Plan, any notice required or permitted to be provided under the Plan shall be in writing and served by: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight carrier service, freight prepaid, to be addressed as follows:

If to Gawker Media LLC, to:

> Gawker Media LLC
> c/o Opportune LLP
> Attn: William D. Holden
> Chief Restructuring Officer
> 10 East 53rd Street, 33rd Floor
> New York, NY 10022

If to Gawker Hungary, to:

> Gawker Hungary Kft.
> c/o Opportune LLP
> Attn: William D. Holden
> 10 East 53rd Street, 33rd Floor
> New York, NY 10022

If to GMGI, to:

> Gawker Media Group, Inc.
> c/o Opportune LLP
> Attn: William D. Holden
> Chief Restructuring Officer
> 10 East 53rd Street, 33rd Floor
> New York, NY 10022

59473927_10

with copies to:

>Ropes & Gray LLP
>1211 Avenue of the Americas
>New York, NY 10036-8704
>Attn:   Gregg M. Galardi
>          D. Ross Martin
>          Joshua Y. Sturm
>          Jonathan M. Agudelo
>Facsimile: (212) 596-9090
>gregg.galardi@ropesgray.com
>ross.martin@ropesgray.com
>joshua.sturm@ropesgray.com
>jonathan.agudelo@ropesgray.com

If to the Plan Administrator:

>[See Plan Supplement]

## X.    LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Impaired Equity Interest that has not voted to accept the Plan must receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Article 10 hereof). If all members of an impaired class of claims or interests have accepted the Plan, the "best interests test" does not apply with respect to that class.

The Debtors have already liquidated substantially all of their assets through the Unimoda Sale. The Debtors currently hold cash, the Gawker.com Assets and potential causes of action. In the Plan, Administrative and Priority Claims will be paid in full, as required by Bankruptcy Code section 1129, and the remaining funds will be disbursed in Cash on the Effective Date or through the Plan Administrator on the Gawker Media Distribution Date and GMGI Distribution Dates. The Debtors believe the Plan is the simplest and least expensive mechanism to distribute the Debtors' remaining assets.

The Debtors believe that holders of Claims and Equity Interests will receive equal or greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation for several reasons. First, the Debtors believe a chapter 7 liquidation would take longer to resolve Administrative and Priority Claims than the Plan, delaying distributions to the holders of Impaired Claims and Equity Interests, and would incur more costs than the Plan. Second, in a chapter 7, it is likely that a chapter 7 trustee with no prior knowledge or experience with the Debtors or its operations would be appointed, increasing the time to resolve Administrative and Priority Claims. Third, a chapter 7 trustee would incur expenses in distributing the assets, which would likely include a percentage fee on assets distributed. This percentage fee, which could be significant in a chapter 7 case, will be avoided by the Plan.

More importantly, the Plan embodies the Plan Settlements among the three Debtor estates, the Second Lien Lender, and Bollea. In a chapter 7 liquidation, the estates would be required to expend significant additional expenses in litigating the allocation of assets among the Debtors' estates, potential claims relating to intercompany obligations, Allowance of the Second Lien Make-Whole Claims, and the Bollea Claims. The Plan eliminates these expenses and yields more value to be distributed among holders of Claims against and Equity Interests in the Debtors.

In summary, the Debtors believe that chapter 7 liquidations of the Debtors would result in substantial diminution in the value to be realized by holders of Claims and Equity Interests entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

51

- the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- additional expenses would be generated litigating over allocation of value among Debtor estates, allowance of Second Lien Lender make-whole claims, and the Bollea Claims, all of which would be entitled to priority (and expenses of the Second Lien Lender may also be entitled to priority if it prevails);

- additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation of the Debtor;

- the cost and expense attributable to the time value of money resulting from a potentially more protracted chapter 7 proceeding than the estimated length of the Bankruptcy Cases; and

- the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a chapter 7 liquidation.

Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater return to holders of Claims and Equity Interests than a chapter 7 liquidation. A more comprehensive analysis of the potential outcomes of a chapter 7 liquidation on the Debtors' estates is set forth in Exhibit C hereto.

## XI.    RISK FACTORS

Holders of Claims and Equity Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims or Equity Interests in such Impaired Classes.

#### 1. Parties-in-Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

#### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is subject to a number of conditions precedent, as outlined in Section 6.02 of the Plan. The conditions to the Effective Date are discussed in further detail in Section 9.D.2. hereof. While the Debtors believe the conditions to the Effective Date will be satisfied or waived and the

52

Plan will become effective, there can be no assurance that all such conditions will occur (or be waived in accordance with the terms of the Plan). If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Equity Interests as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article 6 of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Equity Interests would receive with respect to their Allowed Claims and Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any Impaired Class of Claims or Equity Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### 6. *The Debtors May Object to the Amount or Classification of a Claim or Equity Interest*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim or Equity Interest where such Claim is subject to an objection. Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 7. *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 8. *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Equity Interests and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Equity Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from the estimated Claims and Equity Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Equity Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims and Equity Interests under the Plan.

### 9. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

The Plan provides for certain releases, injunctions, and exculpations. However, such releases, injunctions, and exculpations are subject to objection by parties-in-interest and may not be approved.

### B.    **Risks Related to Recoveries Under the Plan**

### 1. *Debtors Cannot State with Certainty What Recovery Will Be Available to holders of Allowed Claims and Equity Interests in Impaired Classes*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in Impaired Classes that will ultimately be Allowed. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to holders of Allowed Claims in Impaired Classes.

### 2. *Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims and Equity Interests*

The aggregate amount of damages alleged by plaintiffs in Article Lawsuits and awarded in the Bollea Judgment that is under appeal exceeds $250 million. There may also be additional general unsecured litigation Claims asserted against the Debtors. All of these Claims are Disputed. While the Debtors believe that these Claims should be Allowed in the amount of $0, it is possible that the courts adjudicating the Article Lawsuits and the Bollea Claims or another litigation Claim may enter Final Orders awarding substantial judgments, or that such Claims will be settled for substantial amounts of Allowed Claims. The amounts of Claims ultimately Allowed against the Debtors on account of the Article Lawsuits and Bollea Claims will have a significant impact on the amount of distributions to holders of all non-priority Claims and Equity Interests against Gawker Media and GMGI.

54

**3.** ***If the Effective Date Does Not Occur Prior to December 31, 2016, the Percentage Recovery on Unsecured Claims and Equity Interests May Be Adversely Affected***

The Debtors' projections incorporated in the Plan and Disclosure Statement assume that the Effective Date will occur prior to December 31, 2016. If the Effective Date were to occur on January 1, 2017 or later, it could have adverse tax consequences that would materially reduce the amount of cash available for distribution to, and recoveries of, holders of unsecured Claims and Equity Interests.

**C.    Disclosure Statement Disclaimer**

**1.** ***Information Contained Herein Is for Soliciting Votes***

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

**2.** ***No Legal or Tax Advice Is Provided to You by this Disclosure Statement***

***This Disclosure Statement is not legal advice to you.***   The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**3.** ***No Admissions Made***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

**4.** ***Failure to Identify Litigation Claims or Projected Objections***

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

**5.** ***No Waiver of Right to Object or Right to Recover Transfers and Assets***

The vote by a holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, or rights of the Debtors, or the Reorganized Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim or Equity Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code of the Debtors or their respective Estates, are specifically or generally identified herein.

**6.** ***Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### *7. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### *8. No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or relating to the Debtors, these Bankruptcy Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the U.S. Trustee, and counsel to the Committee.

### D.    Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Debtors' Liquidation Analysis is described herein.

## XII.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims and Equity Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit B**.

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

---

**THE DISCUSSION OF THE SOLICITATION, AND VOTING SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF SOLICITATION AND VOTING.

---

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan. The table in Section 7.C. of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Equity Interest) under the Plan. As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 1A, 1C, 1E(ii), 1F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E (collectively, the "Voting Classes").

The holders of Claims and Equity Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims and Equity Interest in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Claims and Interests in Classes 1B, 1D(i), 1F, 2B, 2F(ii), 3B, 3C, and 3D(i); however, the Debtors are sending a notice of non-voting status (the "Notice of Non-Voting Status"), to such holders.

Holders of Claims to which the Debtors have filed an objection will be entitled to vote, subject to the terms of the Solicitation Procedures.

B.      **Voting Record Date**

**The Voting Record Date is October 31, 2016**.  The Voting Record Date is the date on which it will be determined which holders of Claims and Equity Interests in the Impaired Classes are entitled to vote to accept or reject the Plan and whether Claims or Equity Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim or Equity Interest.

C.      **Voting on the Plan**

**The Voting Deadline is December 5, 2016, at 5:00 p.m. (New York Time)**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that they are **actually received** on or before the Voting Deadline by the Debtors' Notice and Claims Agent at the following address:

<table>
<tr><td>

**DELIVERY OF BALLOTS AND ELECTION FORMS**

**If by Regular Mail, Hand-Delivery or Overnight Courier to:**

**Gawker Ballot Processing**
**c/o Prime Clerk LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**

</td></tr>
</table>

D.      **Ballots and Election Forms Not Counted**

**No Ballot or Election Form will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by facsimile, email or other electronic means; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules of assets and liabilities as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

<table>
<tr><td>

**IF YOU HAVE ANY QUESTIONS ABOUT SOLICITATION, OR VOTING PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL-FREE AT (866) 692-6696.**
**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

</td></tr>
</table>

XIII.   **CONFIRMATION OF THE PLAN**

A.      **Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy

all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.      Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

As set forth in Section X of the Plan, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' businesses would result in a substantial decrease in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of, the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.

The Plan contemplates the reorganization of the Debtors as a going concern and will significantly reduce the Debtors' long-term debt and annual interest payments. In addition, the Plan will result in a stronger, de-levered balance sheet for the Debtors while allowing creditors to participate in future upside in the Reorganized Debtors. Specifically, the Plan contemplates the conversion of most of the Debtors' current outstanding debt to equity. As such, the Debtors believe that the confirmation of the Plan is not likely to be followed by a further financial reorganization and, therefore, is feasible.

### D.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[4]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.      Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if one or more classes of creditors are impaired, and all creditor Classes have not accepted it; *provided*, that the plan has been

---

[4]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

accepted by at least one impaired class of creditors, without counting the accepting votes of "insiders" (the "Impaired Accepting Class Requirement").  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. All holders of Claims and Equity Interests in Classes 1D(i), 1D(ii), 2E(i), 2E(ii), 2F, 3D(i), 3D(ii), and 3F are "insiders" under the applicable definition provided in Section 101(31) of the Bankruptcy Code. Although these Classes are Impaired, and will vote to Accept the Plan, only acceptance of the Plan by one Classes 1A, 2A, or 3A can satisfy the Impaired Accepting Class Requirement, unless there are no impaired classes of creditors.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including the right to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than one hundred percent (100%) of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XIV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    In General

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan.  This summary is based on the Internal Revenue Code ("IRC"), U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only.  The tax treatment of a beneficial owner of Claims or Equity Interests (each a "Holder" and collectively, the "Holders") may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim or Equity Interest in a manner not explicitly provided for in the Plan.

This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders that are non-U.S. persons or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities; Holders that hold Claims or Equity Interest as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims or Equity Interest in connection with the performance of services. This summary does not address Hungarian or Cayman Islands tax laws and should not be construed as providing advice with respect to those jurisdictions. Holders subject to tax laws of those jurisdictions should consult with their advisors with respect to the application of those laws to the Plan. In calculating treatments and recoveries for purposes of this Disclosure Statement, the Debtors have relied on preliminary assessed basis and taxes potentially attributable to the Unimoda Sale. The following summary assumes that the Claims and Equity Interest are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim or Equity Interest and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim or Equity Interest; (v) the length of time that the Claim or Equity Interest has been held; (vi) whether the Claim or Equity Interest was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim or Equity Interest (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim or Equity Interest is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### B.    U.S. Federal Income Tax Consequences to the Debtors

#### 1. Cancellation of Debt and Reduction of Tax Attributes

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would

give rise to cancellation of debt ("COD") income, which must be included in the debtor's income.  Settlement of a guarantee should not give rise to COD.

The Debtors should be able to utilize a special tax provision which excludes from income COD income attributable to debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under section 108(b) of the IRC and Treasury regulations that apply to members of a consolidated group, each Debtor that does not include COD income in computing taxable income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor; attributes that arose in separate return limitation years of such Debtor (if any); and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that, to the extent the Debtors have any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account gains from the Unimoda Sale that closed in 2016, and any income or gain resulting from implementation of the Plan, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of the Debtors should be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

### 2. Taxable Income Resulting From the Unimoda Sale

The Unimoda Sale is expected to trigger income or gain recognition by the Debtors.  However, the Debtors will not be able to determine the amount of such income or gain with certainty, and consequently will not be able to finally determine the U.S. federal income tax, if any, attributable to the Unimoda Sale, until the final allocation of sale proceeds is determined and pending litigation against Gawker Media is resolved. Under certain assumptions about the allocation of proceeds from the Unimoda Sale, the Debtors may incur regular U.S. federal income tax. Additionally, if the IRS were to prevail in assessing U.S. federal income tax for taxable years ending after the Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

### 3. Gawker.com Assets

The Debtors are still in the process of developing a plan for the maximization of value realizable from the residual Gawker.com Assets, and are considering various options with respect thereto. The Debtors may incur taxable income in connection with a disposition of the Gawker.com Assets, or the ongoing operation of the Gawker.com Assets, although the amount and timing of such taxable income will vary depending on the nature and timing of the plan of disposition, and the amount realized therefrom.

### 4. Limitation of NOL Carryforwards and Other Tax Attributes

Under section 382 of the IRC ("Section 382"), if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change) and tax credits that may be utilized to offset future taxable income generally is subject to an annual limitation.

Notwithstanding the general rule, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

The Debtors do not expect to have NOL carryovers and other tax attributes available on the Effective Date, as a result of giving effect to income from the Unimoda Sale and other items of taxable income prior to the Effective Date.  Moreover, to the extent the Debtors have NOL carryovers and other tax attributes available on the Effective

Date, the Debtors do not expect to have any such NOL carryovers or other tax attributes remaining after implementation of the Plan, as a result of attribute reduction resulting from the Debtors' COD income excluded under the Bankruptcy Exception. Therefore, the Debtors could incur a federal income tax liability in connection with any income earned, including through the liquidation of the Debtors' remaining assets, if any, or the operation of a licensing entity after the Effective Date.

However, the amount of such NOL carryovers and other tax attributes that could be available following the Effective Date is based on a number of factors and it is impossible to determine with certainty at this time whether any NOL carryovers and other tax attributes will be available after emergence.

### C.      Professional Fee Claims Reserves

The Plan Administrator will create one or more reserve accounts for Cash held on account of Professional Fee Claims. Under the IRC, interest and other income earned on such accounts are subject to current tax. However, the U.S. Treasury Department has not issued Treasury regulations to address the U.S. federal income tax treatment of such funds that specifically applies in a bankruptcy context. Accordingly, the proper tax treatment of such funds is uncertain. Distributions from the Professional Fee Claim Reserves will be made to Holders of Professional Fee Claims when such Claims are subsequently Allowed and, if applicable, to other Holders when Professional Fee Claims are subsequently disallowed. The Debtors intend to treat the Professional Fee Claims Reserves as a disputed ownership fund, taxable as a separate entity for U.S. federal income tax purposes. Under such treatment, the Plan Administrator shall file all income tax returns with respect to any income attributable to the Professional Fee Claims Reserves and shall pay the federal, state and local income taxes attributable to the Professional Fee Claims Reserves using Cash available in the Professional Fee Claims Reserves, based on the items of income, deduction, credit or loss allocable thereto.

Holders should note the tax treatment of the Professional Fee Claims Reserves is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Professional Fee Claims Reserves.

### D.      U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

#### 1. Generally

Generally, a Holder of an Allowed Claim or Equity Interest will realize gain or loss on the exchange under the Plan of its Allowed Claim or Equity Interest for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim or Equity Interest for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim or Equity Interest exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see Section XIV.D.4 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests — Interest Income with Respect to Allowed Claims and Equity Interests*). When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the Holder and is held for more than one year. Each Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

#### 2. Holders of Professional Fee Claims

Although not free from doubt, Holders of Professional Fee Claims should not recognize any gain or loss on the date that the assets of the Debtors are transferred to the Professional Fee Claims Reserves, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. Holders of Disputed Claims should note the tax treatment of the Professional Fee Claims Reserves is unclear and should consult their tax advisors as to the tax

consequences to them of the establishment of, the income on, and distributions from, the Professional Fee Claims Reserves.

### 3. Interest Income with Respect to Allowed Claims

Pursuant to Section 3.06 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### E.    Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims or Equity Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.   NONE OF THE DEBTORS, THE CREDITORS' COMMITTEE OR THEIR RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## XV.    RECOMMENDATION

In the opinion of each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims and Equity Interest entitled to vote on the Plan vote to accept the Plan and support confirmation of the Plan.

Dated:  November 2, 2016

Respectfully submitted,

GAWKER MEDIA GROUP, INC.

By: _____
          William D. Holden
          Chief Restructuring Officer

GAWKER MEDIA LLC

By: _____
          William D. Holden
          Chief Restructuring Officer

GAWKER HUNGARY KFT.

By: _____
          William D. Holden
          Managing Director

Prepared by:

*/s/ Gregg M. Galardi* _____
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

## EXHIBIT A

**Joint Plan of Liquidation**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————— X
                                :

In re                             :        Chapter 11
                                  :

Gawker Media LLC, *et al.*,[1]      :        Case No. 16-11700 (SMB)
                                  :

            Debtors.          :        (Jointly Administered)
                                  :

———————————————————— x

### AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.[2]

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

---

[1]      The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2]      Pursuant to the Unimoda APA, the Debtor entity that was formerly named Kinja Kft. was required to be re-named, and has now been re-named as Gawker Hungary Kft.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS AND CONSTRUCTION OF TERMS** ........................................................1

    1.01    Terms Defined in the Plan.........................................................................................1
    1.02    Terms Defined in the Bankruptcy Code...................................................................14
    1.03    Rules of Interpretation...............................................................................................14
    1.04    Exhibits ......................................................................................................................14
    1.05    Time Periods ..............................................................................................................14
    1.06    Reference to Monetary Figures ..................................................................................14
    1.07    Governing Law...........................................................................................................14

**ARTICLE 2 CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** .................................15

    2.01    Summary of Classification .........................................................................................15
    2.02    Settlement of Claims ..................................................................................................16
    2.03    Professional Fee Claims .............................................................................................16
    2.04    Bar Date for Administrative Claims...........................................................................16
    2.05    Classification of Claims Against and Equity Interests in GMGI ...............................16

           (a)    GMGI Unclassified Claims .......................................................................16

                     (i)     GMGI Administrative Claims......................................................17
                     (ii)    GMGI United States Trustee's Fees............................................17
                     (iii)   GMGI Professional Fee Claims. ..................................................17
                     (iv)   GMGI Priority Tax Claims ..........................................................17

           (b)    GMGI Classified Claims ...........................................................................17

    2.06    Classification of Claims Against and Equity Interests in Gawker Media ...........................18

           (a)    Gawker Media Unclassified Claims .........................................................18

                       (i)     Gawker Media Administrative Claims.........................................18
                     (ii)    Gawker Media United States Trustee's Fees................................18
                     (iii)   Gawker Media Professional Fee Claims. ....................................18
                     (iv)   Gawker Media Priority Tax Claims .............................................18

           (b)    Gawker Media Classified Claims ..............................................................18

    2.07    Classification of Claims Against and Equity Interests in Gawker Hungary.......................19

           (a)    Gawker Hungary Unclassified Claims ......................................................19

                       (i)     Gawker Hungary Administrative Claims .....................................19
                     (ii)    Gawker Hungary United States Trustee's Fees............................19
                     (iii)   Gawker Hungary Professional Fee Claims...................................19
                     (iv)   Gawker Hungary Priority Tax Claims..........................................19

           (b)    Gawker Hungary Classified Claims ..........................................................19

    2.08    Unimpaired Classes Deemed to Accept Plan .............................................................20
    2.09    Impaired Classes Deemed to Reject the Plan .............................................................20

2.10    Impaired Classes Entitled to Vote on Plan ............................................................20
2.11    Impairment and Voting Controversies ...................................................................20

**ARTICLE 3 TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS .....................20**

3.01    Classification and Treatment of Claims Against and Equity Interests in GMGI ...............................20

    (a)    Class 1A – GMGI Second Lien Make-Whole Claim ..................................20
    (b)    Class 1B – GMGI Other Priority Claims ...................................................21
    (c)    Class 1C – GMGI General Unsecured Claims ...........................................21
    (d)    Class 1D – GMGI General Unsecured Convenience Claims ......................22
    (e)    Class 1E(i)  – GMGI Gawker Hungary Intercompany Claims ..................22
    (f)    Class 1E(ii)  – GMGI Gawker Media Intercompany Claims......................22
    (g)    Class 1F – GMGI Preferred Equity Interests .............................................22
    (h)    Class 1G – GMGI Common Equity Interests ..............................................23

3.02    Classification and Treatment of Claims Against and Equity Interests in Gawker Media ...................23

    (a)    Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claims. ...............................23
    (b)    Class 2B – Gawker Media Other Priority Claims .....................................24
    (c)    Class 2C – Gawker Media General Unsecured Claims ..............................24
    (d)    Class 2D – Gawker Media Punitive Damage Claims .................................25
    (e)    Class 2E – Gawker Media General Unsecured Convenience Claims...................................26
    (f)    Class 2F(i) – Gawker Media Gawker Hungary Intercompany Claims ...............................26
    (g)    Class 2F(ii) – Gawker Media GMGI Intercompany Claims......................26
    (h)    Class 2G – Gawker Media Membership Interest ........................................27

3.03    Classification and Treatment of Claims Against and Equity Interests in Gawker Hungary................27

    (a)    Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claim.....................27
    (b)    Class 3B – Gawker Hungary Other Priority Claims..................................28
    (c)    Class 3C – Gawker Hungary General Unsecured Claims...........................28
    (d)    Class 3D(i) – Gawker Hungary GMGI Intercompany Claims...................28
    (e)    Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims ...............................29
    (f)    Class 3E – Gawker Hungary Membership Interest....................................29

3.04    Compliance with Tax Requirements .......................................................................29
3.05    Payments to Plan Reserve Accounts.  Any payment to a Plan Reserve Account shall be deemed a Distribution to the applicable beneficiary(ies) of such Plan Reserve Account as of the date of funding of the Plan Reserve Account...................................................................30
3.06    Set-offs and Recoupments......................................................................................30
3.07    Allocation of Distributions.....................................................................................30
3.08    Manner of Payments ..............................................................................................30
3.09    Delivery of Distributions........................................................................................30
3.10    Uncashed Checks ...................................................................................................31
3.11    Amendment to Claims ............................................................................................31

**ARTICLE 4 IMPLEMENTATION OF THE PLAN ..................................................................31**

4.01    Plan Settlements.....................................................................................................31

    (a)    The Second Lien Make-Whole Claims Settlement.....................................31
    (b)    Intercompany Settlement ..........................................................................31
    (c)    Bollea Settlement......................................................................................32
    (d)    Other Settlements ......................................................................................32

-ii-

4.02     Effective Date Transactions .................................................................................32
4.03     Gawker Media Claims Reserve Distribution Date Transactions................................33
4.04     Gawker Media Contingent Proceeds Distribution Date Transactions......................34
4.05     Corporate Action.................................................................................................34
4.06     Vesting of Assets.................................................................................................34
4.07     Resignation of Officers and Directors...................................................................34
4.08     Plan Administrator ..............................................................................................35
4.09     Plan Administrator Agreement...............................................................................35
4.10     Sale of Gawker.com Assets..................................................................................35
4.11     Binding Effect ....................................................................................................35
4.12     Continuation of Stays..........................................................................................35
4.13     Cancellation and Surrender of Instruments, Securities, and Existing Agreements .......35
4.14     Dissolution of the Debtors....................................................................................36
4.15     Dissolution of the Committee ...............................................................................36

**ARTICLE 5 PROVISIONS FOR TREATMENT OF  SUBSEQUENT PLAN DISTRIBUTIONS...36**

5.01     Objections to and Estimation of Claims.................................................................36
5.02     Professional Fee Claim Procedures........................................................................36
5.03     Professional Fee Claim Reserves ..........................................................................37
5.04     Payments and Distributions on Disputed Claims .....................................................37

**ARTICLE 6 CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN .......37**

6.01     Conditions to Confirmation...................................................................................37
6.02     Conditions to the Effective Date ...........................................................................37
6.03     Waiver of Conditions to Confirmation or the Effective Date.....................................38
6.04     Effect of Nonoccurrence of Conditions to the Effective Date....................................38
6.05     Notice of Effective Date.......................................................................................38

**ARTICLE 7 TREATMENT OF CONTRACTS AND LEASES .................................................38**

7.01     Rejection of Executory Contracts and Unexpired Leases ..........................................38
7.02     Claims Based on Rejection of Executory Contracts and Unexpired Leases .................38

**ARTICLE 8 RETENTION OF JURISDICTION.....................................................................38**

8.01     Retention of Jurisdiction ......................................................................................38

**ARTICLE 9 INJUNCTIONS, RELEASES, AND EXCULPATION .........................................40**

9.01     **INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.** ...........................40
9.02     **INJUNCTION AGAINST INTERFERENCE WITH PLAN**.......................................40
9.03     **RELEASES BY THE DEBTORS** .........................................................................41
9.04     **EXCULPATION** ...............................................................................................42
9.05     **THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT
         CONTRACTORS**............................................................................................42

**ARTICLE 10 MISCELLANEOUS .......................................................................................43**

10.01    Severability .......................................................................................................43
10.02    Revocation of the Plan.........................................................................................43
10.03    Effectuating Documents; Further Transactions; Timing ...........................................43
10.04    Exemption from Transfer Taxes............................................................................43
10.05    Binding Effect ....................................................................................................43

-iii-

10.06    Modification of Treatment ........................................................................................44
10.07    Notices ......................................................................................................................44
10.08    Post-Confirmation Fees And Reports.........................................................................46

59354792_8

Gawker Media LLC, a Delaware limited liability company ("Gawker Media"), Gawker Media Group, Inc., a Cayman Island corporation ("GMGI"), and Gawker Hungary Kft., a Hungarian corporation ("Gawker Hungary"), propose the following joint chapter 11 plan of liquidation (the "Plan") for the resolution of all outstanding Claims against and Equity Interests in the Debtors pursuant to section 1121 of the Bankruptcy Code.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Only holders of certain Claims and Equity Interests specified in Section 2.10 are entitled to vote on the Plan.  The Plan is the product of a preliminary analysis of intercompany claims and issues, and the Debtors have held significant discussion regarding the Plan with the Second Lien Lender, the Official Committee of Unsecured Creditors, Terry Gene Bollea, other creditors and equityholders.  A Disclosure Statement, distributed contemporaneously with the Plan, contains a discussion of the Debtors' assets, liabilities, history, material asset sale and a summary of the Plan and the proposed settlements and distributions to be made hereunder.

Other agreements and documents supplementing the Plan and Exhibits to the Plan will be filed with the Bankruptcy Court.  These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

**ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY AND CONSULT WITH COUNSEL AND OTHER APPLICABLE PROFESSIONALS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. WITHOUT LIMITING THE FOREGOING, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE PARTICULARLY URGED TO READ CAREFULLY THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SET FORTH IN ARTICLE 9 BECAUSE SUCH PROVISIONS AFFECT NOT ONLY SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST THE DEBTORS, BUT ALSO SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST CERTAIN NON-DEBTOR PERSONS IDENTIFIED IN SUCH ARTICLE. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, IN BANKRUPTCY RULE 3019 THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

<div align="center">

**ARTICLE 1
DEFINITIONS AND CONSTRUCTION OF TERMS**

</div>

1.01    <u>Terms Defined in the Plan</u>.  Capitalized terms used in the Plan shall have the following meanings when used in capitalized form in the Plan:

"<u>Administrative Claim</u>" means a Claim against any of the Debtors for costs and expenses of administration of such Debtor's Bankruptcy Case that is allowed under section 503(b) of the Bankruptcy Code and that is entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (i) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the estates and operating the applicable Debtor; (ii) all fees and charges assessed against a Debtor estate under Chapter 123 of Title 28 of the United States Code;

and (iii) all other Claims entitled to administrative claim status pursuant to a non-appealable order of the Bankruptcy Court, excluding Professional Fee Claims.

"<u>Administrative Claims Bar Date</u>" means, (i) with respect to Administrative Claims arising through July 31, 2016, September 29, 2016 at 5:00 p.m. (New York Time); (ii) with respect to Administrative Claims arising between August 1, 2016 and September 30, 2016, inclusive, November 15, 2016 at 5:00 p.m. (New York Time); (iii) with respect to Administrative Claims arising from October 1, 2016 through the Effective Date, the date that is thirty (30) days after the Effective Date at 5:00 p.m. (New York Time), and (iv) such other date(s) that the Bankruptcy Court may approve with respect to the filing of Administrative Claims.

"<u>Administrative Claims Objection Deadline</u>" means the date that is one-hundred-twenty (120) days after the Effective Date.

"<u>Allowed</u>" means with respect to any Claim or Equity Interest, except as otherwise provided herein: (i) a Claim that is evidenced by a Proof of Claim filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be filed); (ii) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely filed; or (iii) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection has been so interposed and the Claim shall have been Allowed by a Final Order.

"<u>Avoidance Actions</u>" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

"<u>Ayyadurai</u>" means Shiva Ayyadurai.

"<u>Ayyadurai Claims</u>" means all claims of Ayyadurai that Ayyadurai has asserted or may assert, including without limitation pursuant to (a) the proceedings in *Ayyadurai v. Gawker Media LLC, et al.*, No. 16-CV-10853 (D. Mass.), and (b) any proofs of claim filed against any Debtor for Claims or Administrative Claims.

"<u>Bankruptcy Cases</u>" means the Gawker Media Bankruptcy Case, the GMGI Bankruptcy Case and the Gawker Hungary Bankruptcy Case, collectively.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York, except to the extent that the reference is withdrawn as to any proceeding or Bankruptcy Case, or 28 U.S.C. § 157 or other law requires entry of a particular judgment by the District Court.

- 2 -

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as in effect on the Petition Date and as thereafter amended, together with local rules adopted by the Bankruptcy Court, or such similar rules as may be in effect from time to time in the Bankruptcy Court, all as in effect at the relevant time of application.

"Bollea" means Terry Gene Bollea, aka Hulk Hogan.

"Bollea I Lawsuit" means the proceedings in *Bollea v. Gawker Media LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.).

"Bollea II Lawsuit" means the proceedings in *Bollea v. Buchwald, et.al.*, No. 16-002861-CI (Fla. 6th Jud. Cir. Pinellas Cty.).

"Bollea Claims" means all claims of Bollea, whether filed in a Proof of Claim or not, (a) against any of the Debtors including, but not limited to, claims (i) under the Bollea I Lawsuit and the Bollea II Lawsuit, including on account of the Bollea Compensatory Judgment and the Bollea Punitive Damage Judgment, (ii) based on theories of veil piercing, substantive consolidation, or *alter ego*, and (b) against third-parties for which the Debtors have Debtor Indemnification Obligations.

"Bollea Compensatory Judgment" means the judgment against Gawker Media for compensatory damages in favor of Bollea in the amount of $115,000,000 in the Bollea I Lawsuit.

"Bollea Punitive Damage Judgment" means the judgment against Gawker Media for punitive damage in favor of Bollea in the amount of $15,000,000 in the Bollea I Lawsuit.

"Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Cash" means cash, cash equivalents, and other readily marketable securities or instruments.

"Causes of Action" means all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, and Avoidance Actions belonging to or that can be brought on behalf of the Debtors' estates, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or indirectly or derivatively in law, equity, or otherwise.

"Claim" means any "claim" against any of the Debtors as defined in section 101(5) of the Bankruptcy Code which has not been disallowed by an order of the Bankruptcy Court or for which an order of disallowance of the Bankruptcy Court has been reversed on appeal by a Final Order of an appellate court.

"Claims Bar Date" means, as applicable, the General Claims Bar Date, Administrative Claims Bar Date, and/or Governmental Claims Bar Date.

- 3 -

"Class" means any class of holders of Claims or Equity Interests as specified in Article 3 of the Plan.

"Committee" means the Official Unsecured Creditors' Committee appointed for the Bankruptcy Case.

"Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Bankruptcy Court.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming this Plan.

"Daulerio" means Alfred James Daulerio, aka A.J. Daulerio.

"Debtor Indemnification Obligations" means indemnification, contribution, reimbursement, or other such obligations of the Debtors, arising out of (i) employment, severance or independent contractor agreements (including the employment agreement of Denton), (ii) the Debtors' organizational documents or governing corporate documents, and (iii) the Debtors' policies and practices of advancing certain litigation defense costs to writers under certain circumstances.

"Debtors" means Gawker Hungary, GMGI, and Gawker Media, each as a debtor and debtor in possession in the Bankruptcy Cases, and after the Effective Date.

"Denton" means Nicholas G.A. Denton, aka Nick Denton.

"DIP Loan" means the loan under the Financing Agreement, dated as of June 13, 2016 (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof), by and among Gawker Media, as borrower, GMGI and Gawker Hungary, as guarantors, the lenders from time to time party thereto, and Cerberus Business Finance LLC, as administrative and collateral agent for the lenders.

"DIP Lender" means Cerberus Business Finance LLC, as lender under the DIP Agreement.

"Disallowed" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest, or any portion thereof, that (i) has been disallowed by an order entered by the Bankruptcy Court, (ii) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (iv) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed timely filed under applicable law or this Plan, (v) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (vi) has been withdrawn by the holder thereof.

"Disclosure Statement Order" means an order entered by the Bankruptcy Court approving, among other things, the Disclosure Statement with respect to the Plan as containing adequate information pursuant to section 1125 of the Bankruptcy Code, authorizing solicitation of the Disclosure Statement and the Plan, and approving related solicitation materials.

"Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest, or any portion thereof, that is not an Allowed Claim or Equity Interest or a Disallowed Claim or Equity Interest.

"Distribution" means any initial or subsequent payment or transfer to holders of Claims or Equity Interests made under the Plan.

"Distribution Record Date" means the date designated as the "Voting Record Date" in the Disclosure Statement.

"Effective Date" means a Business Day, as determined by the Debtors, that: (a) is as soon as reasonably practicable after the Confirmation Date; and (b) is the day on which (i) all conditions to the Effective Date in Section 6.02 have been met or waived pursuant to Section 6.03 and (ii) no stay of the Confirmation Order is in effect.

"Equity Interest" means any rights of holders of equity of the Debtors, including GMGI Preferred Shares, GMGI Common Shares, the Gawker Media Membership Interest and the Gawker Hungary Membership Interest.

"Final Order" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Bankruptcy Case (or any related adversary proceeding) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in any Bankruptcy Case (or any related adversary proceeding), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek *certiorari* or similar discretionary review or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for *certiorari* or similar discretionary review or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* or similar discretionary review that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* or similar discretionary review was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, Bankruptcy Rule 9024 or any analogous rule in a nonbankruptcy forum, may be filed relating to such order shall not prevent such order from being a Final Order.

"Final Professional Fees" means Professional Fee Claims that accrue through the Effective Date.

"First Gawker Hungary Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $8,000,000 to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.

"Gawker.com Assets" means the assets relating to the Gawker.com Website that were excluded from the Unimoda Sale and remain owned by the Debtors.

"Gawker Hungary" means Gawker Hungary Kft., fka Kinja Kft., a Hungarian corporation, or any successor corporation thereof as debtor and debtor in possession.

"Gawker Hungary Administrative Claim" means an Administrative Claim against Gawker Hungary.

"Gawker Hungary Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by Gawker Hungary, No. 16-11718 (SMB).

"Gawker Hungary General Unsecured Claim" means a General Unsecured Claim against Gawker Hungary.

"Gawker Hungary Intercompany Notes" means the First Gawker Hungary Promissory Note and the Second Gawker Hungary Promissory Note.

"Gawker Hungary Priority Tax Claim" means a Priority Tax Claim against Gawker Hungary.

"Gawker Hungary Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for Gawker Hungary Professional Fees.

"Gawker Hungary Professional Fees" means the amount of Final Professional Fees allocable to Gawker Hungary.

"Gawker Hungary Second Lien Make-Whole Guaranty Claim" means an Allowed Secured Claim of the Second Lien Lender against Gawker Hungary as guarantor under the Second Lien Loan and Security Agreement on account of (i) alleged obligations under the Second Lien Make-Whole Provision and (ii) any fees and expenses under the Second Lien Loan and Security Agreement.

"Gawker Hungary Second Lien Make-Whole Guaranty Reserve" means a reserve in the amount of $750,000 established on the Effective Date to be distributed pursuant to Section 3.03(a) of this Plan.

"Gawker Media" means Gawker Media LLC, a Delaware limited liability company as debtor and debtor in possession.

- 6 -

"Gawker Media Administrative Claim" means an Administrative Claim against Gawker Media.

"Gawker Media Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by Gawker Media, No. 16-11700 (SMB).

"Gawker Media Claims Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, in the aggregate amount of $3,750,000, established by Gawker Media on the Effective Date, for the benefit of holders of Allowed Gawker Media General Unsecured Claims and Allowed Gawker Media Punitive Damage Claims.

"Gawker Media Claims Reserve Distribution Date" means a Business Day designated by the Plan Administrator that shall be promptly following such time as (i) there remain no Disputed Claims against Gawker Media and (ii) the Plan Administrator distributes all remaining Cash held in the Gawker Media Claims Reserve in accordance with this Plan.

"Gawker Media Contingent Proceeds" means (i) the proceeds from the sale or disposition of the Gawker.com Assets net of any payments made (a) to any purchasers of the Gawker.com Assets and (b) to an investment bank, if any, working for the Debtors in connection with the sale; and (ii) any recoveries from Retained Causes of Action net of any setoffs from such recoveries or contingency fees paid to attorneys out of the recoveries.

"Gawker Media Contingent Proceeds Creditor Account" means a separate, segregated bank account to be established on the Effective Date and administered by the Plan Administrator, into which 45.0% of Gawker Media Contingent Proceeds will be deposited for the benefit of holders of Claims against Gawker Media.

"Gawker Media Contingent Proceeds Distribution Date" means a Business Day, as designated by the Plan Administrator in its sole discretion, upon which a Distribution is made to holders of Claims in Classes 2C and 2D, according to their respective entitlements under Section 3.02 of the Plan, as a result of the receipt of Gawker Media Contingent Proceeds.

"Gawker Media Contingent Equity Proceeds" means 55% of the Gawker Media Contingent Proceeds.

"Gawker Media Convenience Class Creditor" means a holder of a General Unsecured Claim against Gawker Media that elects to receive the treatment set forth in Section 3.02(e) of this Plan from Gawker Media in full settlement and satisfaction of all Claims against any of the Debtors, including Gawker Hungary and GMGI.

"Gawker Media General Unsecured Claim" means a General Unsecured Claim against Gawker Media, including the Bollea Claims, the Terrill Claims and the Ayyadurai Claims.

"Gawker Media General Unsecured Convenience Claim" means the Claim of a Gawker Media Convenience Class Creditor.

"Gawker Media Priority Tax Claim" means a Priority Tax Claim against Gawker Media.

- 7 -

"Gawker Media Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve by Gawker Media in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for Gawker Media Professional Fees.

"Gawker Media Professional Fees" means the amount of Final Professional Fees allocable to Gawker Media.

"Gawker Media Punitive Damage Claim" means a Claim asserted against Gawker Media, including the Bollea Punitive Damage Claim, that in a chapter 7 case of any of the Debtors, would have the priority set forth in section 726(a)(4) of the Bankruptcy Code.

"Gawker Media Second Lien Make-Whole Guaranty Claim" means an Allowed Secured Claim of the Second Lien Lender against Gawker Media as guarantor under the Second Lien Loan and Security Agreement on account of (i) alleged obligations under the Second Lien Make-Whole Provision and (ii) any fees and expenses under the Second Lien Loan and Security Agreement.

"Gawker Media Second Lien Make-Whole Guaranty Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, established by Gawker Media on the Effective Date in the amount of $750,000 to be distributed pursuant to Sections 3.02(a). 3.02(c), and 3.02(d) of this Plan.

"General Claims Bar Date" means September 29, 2016 at 5:00 p.m. (New York Time), by which general Proofs of Claim were required to be filed in the Debtors' Bankruptcy Cases.

"General Unsecured Claim" means, any Claim, to the extent of the amount of such Claim which (i) is not secured by any valid and unavoidable lien on or security interest in property of the applicable Debtor, or (ii) is greater than the value of any valid and unavoidable lien on or security interest in property of the Debtor which secures such Claim.

"GMGI" means Gawker Media Group, Inc., a Cayman Island corporation, and the parent company of Gawker Media and Gawker Hungary as debtor and debtor in possession.

"GMGI Administrative Claim" means an Administrative Claim against GMGI.

"GMGI Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by GMGI, No. 16-11719 (SMB).

"GMGI Common Shares" means outstanding common shares of GMGI, including any GMGI Common Shares acquired through the exercise of GMGI Common Share Options.

"GMGI Common Share Options" means options to acquire GMGI Common Shares.

"GMGI Convenience Class Creditor" means a holder of a General Unsecured Claim against GMGI that elects to receive the treatment set forth in Section 3.01(e) of this Plan from

- 8 -

Gawker Media in full settlement and satisfaction of all Claims against any of the Debtors, including Gawker Hungary and GMGI.

"GMGI General Unsecured Convenience Claim" means the Claim of a GMGI Convenience Class Creditor.

"GMGI Distribution Date" means a Business Day, as designated by the Plan Administrator in its sole discretion, upon which a Distribution is made to holders of Claims against, and Equity Interests in, GMGI as a result of Distributions to GMGI from Gawker Media or Gawker Hungary, Allowance or Disallowance of Disputed Claims against GMGI, or as the Plan Administrator may otherwise determine.

"GMGI General Unsecured Claim" means a General Unsecured Claim against GMGI.

"GMGI Plan Guaranty" means a guaranty in the amount of $2,000,000 by GMGI, in consideration for the Intercompany Settlement, which amount shall be deposited in the GMGI Plan Guaranty Reserve on the Effective Date.

"GMGI Plan Guaranty Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, established by Gawker Media on the Effective Date, funded by the GMGI Plan Guaranty in consideration for the Intercompany Settlement, for the benefit holders of Allowed Gawker Media General Unsecured Claims and Allowed Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

"GMGI Preferred Options" means options to acquire GMGI Series A Preferred Shares.

"GMGI Preferred Shares" means all outstanding GMGI Series A Preferred Shares and the GMGI Series B Preferred Share, including all GMGI Preferred Shares acquired through the exercise of GMGI Preferred Options.

"GMGI Preferred Shares Liquidation Preference" means an amount per GMGI Series A Preferred Share or GMGI Series B Preferred Share (as applicable) equal to the GMGI Share Original Issue Price for such Series A Preferred Share or Series B Preferred Share (as applicable) plus all declared and unpaid dividends on such Series A Preferred Share or Series B Preferred Share.

"GMGI Priority Tax Claim" means a Priority Tax Claims against GMGI.

"GMGI Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually.

"GMGI Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for GMGI Professional Fees.

"GMGI Professional Fees" means the amount of Final Professional Fees allocable to GMGI.

"GMGI Second Lien Make-Whole Claim" means the Allowed Secured Claim of the Second Lien Lender against GMGI as Borrower under the Second Lien Loan and Security Agreement, on account of (i) alleged obligation under the Second Lien Make-Whole Provision and (ii) any fees and expenses under the Second Lien Loan and Security Agreement.

"GMGI Series A Preferred Shares" means Series A Preferred Shares of GMGI.

"GMGI Series B Preferred Shares" means Series B Preferred Shares of GMGI.

"GMGI Share Original Issue Price" means, with respect to the GMGI Series A Preferred Shares, $0.55 per share, and with respect to the GMGI Series B Preferred Shares, $0.836 per share.

"Governmental Claims Bar Date" means December 9, 2016 at 5:00 p.m. (New York Time), or such other date as may be established by an Order of the Bankruptcy Court, by which Governmental Units may file Proofs of Claim in the Debtors' Bankruptcy Cases.

"Impaired" means, with respect to any Claim, Equity Interest, or Class, the condition or effects described in section 1124 of the Bankruptcy Code.

"Intercompany Claims" means any claims by any Debtor against another Debtor, including, but not limited to, claims arising from the Gawker Hungary Intercompany Notes and the GMGI Promissory Note.

"Intercompany Settlement" means the settlement among the Debtors incorporated in the Plan Settlements, as set forth in Section 4.01(a) herein.

"LSKS" means Levine Sullivan Koch & Schultz, LLP.

"Petition Date" means the date of the filing by each Debtor of its voluntary petition commencing the Bankruptcy Case, which for Gawker Media was June 10, 2016, and for GMGI and Gawker Hungary was June 12, 2016.

"Plan" means these Amended Joint Chapter 11 Plans of Liquidation for the Debtors, dated November 2, 2016, filed by the Debtors, together with the exhibits thereto, either in their present form or as altered, amended, or modified from time to time.

"Plan Administrator" means the Person identified in the Plan Supplement, or other filing with the Bankruptcy Court, who shall be reasonably acceptable to the Committee, and retained as of the Effective Date pursuant to the Plan Administrator Agreement, as the employee or fiduciary responsible for implementing the applicable provisions of the Plan relating to the Plan Reserve Accounts and liquidation of any remaining assets of the Debtors.

"Plan Administrator Agreement" means an agreement, to be entered into as of the Effective Date, by the Debtors and the Plan Administrator, which sets forth, among other things, the duties, indemnification and compensation of the Plan Administrator.

"Plan Reserve Accounts" means Gawker Hungary Second Lien Make-Whole Guaranty Reserve, Gawker Media Claims Reserve, Gawker Media Contingent Proceeds Creditor Account, Gawker Media Second Lien Make-Whole Guaranty Reserve, GMGI Plan Guaranty Reserve, and the Professional Fee Claim Reserves.

"Plan Settlements" means the Intercompany Settlement, the Second Lien Make-Whole Claims Settlement, the Bollea Settlement, and the other settlements as may be incorporated in the Plan as set forth in Section 4.01 of the Plan.

"Plan Supplement" means the compilation of documents and forms of documents as amended from time to time that constitute exhibits to the Plan filed with the Bankruptcy Court no later than five (5) days before the deadline for voting on the Plan (or such later date as may be approved by the Bankruptcy Court), which shall include a copy of the final settlement agreements between the Debtors and each of Bollea, Ayyadurai, and Terrill and any other separately documented Plan settlements.

"Post-Petition Interest" means with respect to eligible Claims, interest that accrues from the Petition Date through the Effective Date, calculated at the higher of (i) the federal judgment rate established by 18 U.S.C. § 1961(a) and (ii) any contractual rate applicable to such Claim.

"Priority Claim" means the Claims against the Debtors, if any, entitled to priority under section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

"Priority Tax Claim" means an Unsecured Claim of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means, that proportion that an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such Class.

"Professional" means any professional, claims agent, or other person employed in the Bankruptcy Case pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Bankruptcy Case pursuant to section 503(b)(4) of the Bankruptcy Code, including, without limitation, Ropes & Gray LLP, Opportune LLP, Prime Clerk LLC, Akin Gump Strauss Hauer & Feld LLP, LSKS, Brannock & Humphries, Thomas & LoCicero PL, Cahill, Gordon & Reindel LLP, Citrin Cooperman & Company LLP, Simpson Thacher & Bartlett LLP, Deloitte Financial Advisory Services LLP, Reczicza Dentons Europe LLP, and Mourant Ozanne.

"Professional Fee Claim" means (i) any amounts that the Bankruptcy Court allows pursuant to section 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by Professionals employed by the Debtors and the Committee, and (ii) any amounts the Bankruptcy Court allows pursuant to

sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases.

"Professional Fee Claim Reserves" means (i) the Gawker Media Professional Fee Claim Reserve, (ii) the Gawker Hungary Professional Fee Claim Reserve, and (iii) the GMGI Professional Fee Claim Reserve.

"Professional Fee Claim Summary" means a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but unbilled fees and expenses through the Confirmation Date).

"Proof of Claim" means a proof of claim filed against any of the Debtors in the Bankruptcy Cases.

"Released Party" means, each of, and solely in its capacity as such: (i) the Debtors, (ii) the Second Lien Lender, (iii) the Committee, and (iv) with respect to each of the foregoing entities in clauses (i) through (iii), respective current and former subsidiaries, predecessors, successors, assigns, heirs, insurers, agents, representatives, and attorneys, directors, managers, officers, equity holders, principals, current and former members, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, excluding LSKS and the chapter 11 bankruptcy estate of Denton.

"Released Employees and Independent Contractors" means each current and former employee, writer, editor, and independent contractor that was employed by, or paid to contribute articles to, the Debtors including, without limitation, current and former 1099 employees and current and former independent contractors, that filed a Proof of Claim in the Bankruptcy Cases.

"Releasing Party" means each of, and solely in its capacity as such: (i) the Debtors, (ii) the Second Lien Lender, and (iii) with respect to each of the foregoing entities in clauses (i) and (ii), respective current and former subsidiaries, predecessors, successors, assigns, heirs, insurers, agents, representatives, and attorneys directors, managers, officers, equity holders, principals, members, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"Retained Causes of Action" means Claims and/or Causes of Action against third-parties that are not released under the Plan or any Order of the Bankruptcy Court and are retained and prosecuted by the Debtors on behalf of the Debtors' estates, as identified in the Plan Supplement.

"Sale Closing Date" means September 9, 2016, the date of closing of the Unimoda Sale.

"Sale Order" means the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving and Authorizing the Debtors' Entry Into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 214].

- 12 -

59354792_8

"Schedules" means, collectively, (a) the schedules of assets, liabilities, and executory contracts and unexpired leases and (b) the statement of financial affairs, as each may be amended and supplemented from time to time, filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code.

"Second Gawker Hungary Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $5,000,000 to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.

"Second Lien Loan and Security Agreement" means that Second Lien Loan and Security Agreement, dated as of January 21, 2016, by and among GMGI and the Second Lien Lender, pursuant to which the Second Lien Lender agreed to provide to GMGI the Second Lien Term Loan.

"Second Lien Lender" means US VC Partners LP, a Delaware limited partnership, solely in its capacity as lender under the Second Lien Loan and Security Agreement.

"Second Lien Make-Whole Claims" means the GMGI Second Lien Make-Whole Claim, the Gawker Media Second Lien Make-Whole Guaranty Claim, and the Gawker Hungary Second Lien Make-Whole Guaranty Claim.

"Second Lien Make-Whole Claims Settlement" means the settlement among the Debtors and the Second Lien Lender incorporated in the Plan Settlements, as set forth in Section 4.01(b) herein.

"Second Lien Make-Whole Provision" means the provision set forth in Section 2.1.5 of the Second Lien Loan and Security Agreement requiring GMGI to pay to the Second Lien Lender $3,750,000 upon prepayment, refinancing, substitution or replacement of Second Lien Term Loan obligations prior to the applicable maturity date.

"Second Lien Term Loan" means that certain term loan facility in the aggregate principal amount of $15,000,000 plus any fees, expenses and outstanding interest, provided by the Second Lien Lender to GMGI, pursuant to the Second Lien Loan and Security Agreement.

"Secured" means, with respect to any Claim, secured by a valid and unavoidable lien on or security interest in property of the Debtors, to the extent of the value of such lien or security interest.

"Solicitation Procedures" means those solicitation procedures annexed as Exhibit 1, and approved pursuant, to the Disclosure Statement Order.

"Terrill" means Ashley Terrill.

"Terrill Claims" means all claims of Terrill that Terrill has asserted or may assert, including without limitation pursuant to (a) the proceedings in *Ashley Terrill v. Gawker Media LLC, et al.*, No. 16-CV-00411 (S.D.N.Y.), and (b) any proofs of claim filed against any Debtor for Claims or Administrative Claims.

- 13 -

"Unimoda APA" means that certain Asset Purchase Agreement by and between the Debtors and UniModa, LLC, dated August 17, 2016, as amended, modified or supplemented from time to time in accordance with the terms thereof.

"Unimoda Purchase Price" means the $135,000,000 cash purchase price paid, and such other consideration provided, to the Debtors under the Unimoda APA.

"Unimoda Sale" means the sale of substantially all of the Debtors' assets, excluding the Gawker.com Assets, pursuant to the Unimoda APA.

"United States Trustee" means the Office of the United States Trustee for the Southern District of New York.

1.02    Terms Defined in the Bankruptcy Code.  Capitalized terms used in the Plan that are not defined in Section 1.01 but which are defined in the Bankruptcy Code shall have the respective meanings specified in the Bankruptcy Code.

1.03    Rules of Interpretation.  For purposes of the Plan: (i) whenever it appears appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means such document substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified, or supplemented; (iv) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; and (v) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, except to the extent inconsistent with the express provisions of this Section 1.03 of the Plan.

1.04    Exhibits.  Exhibits to the Plan may be amended from time to time, and both original and amended Exhibits may be filed with the Bankruptcy Court from time to time, but in no event later than five (5) days before the deadline for voting on the Plan (or such later date as may be approved by the Bankruptcy Court).  Current copies of Exhibits may be obtained by reference to the Bankruptcy Court's docket or shall be provided to parties in interest upon written request to the Debtors.

1.05    Time Periods.  Except as specifically provided in the Plan, Bankruptcy Rule 9006(a) applies to the computation of any period of time prescribed or allowed by the Plan, and Bankruptcy Rules 9006(b) and 9006(c) apply respectively to the enlargement or reduction of any period of time prescribed or allowed by the Plan.

1.06    Reference to Monetary Figures.  All references in the Plan to monetary figures refer to the lawful currency of the United States of America.

1.07    Governing Law.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of a contract, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and constructed and enforced in

- 14 -

accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

## ARTICLE 2
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

2.01    <u>Summary of Classification</u>.  This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  The Claims against and Equity Interests in each of the Debtors are categorized below for all purposes under the Plan, including voting, confirmation, and distribution pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  To the extent a holder has a Claim that may be asserted against more than one Debtor, such holder shall receive a separate Ballot for each such Claim, and may submit a Ballot with respect to each such Claim, which Ballot shall be counted as a vote of such Claim against the Debtor with respect to which such Ballot is submitted.

A Claim or Equity Interest is (i) classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and (ii) classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified.  For purposes of the Plan, such Claims have, however, been allocated among the Debtors for determining expected distributions under the Plan.  The classification of all other Claims and Equity Interests against each of the Debtors under the Plan is detailed in the tables contained in Sections 2.05(b), 2.06(b) and 2.07(b) below.  Each table specifies the Classes that are (i) Impaired or Unimpaired by this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; <u>provided</u>, <u>however</u>, that, in the event no holder of a Claim or Equity Interest with respect to a specific Class for a particular Debtor timely submits a Ballot in compliance with the Solicitation Procedures indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan pursuant to the Confirmation Order.  The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

- 15 -

2.02    Settlement of Claims.    Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan of (i) each Debtor against the other Debtors, (ii) the Second Lien Lender against each Debtor with respect to the Second-Lien Make-Whole Claims, (iii) the Debtors and Bollea regarding the Bollea Claims, and (iv) among certain creditors and each of the Debtors, as set forth in greater detail in Section 4.01 of the Plan.    The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are fair and equitable.

2.03    Professional Fee Claims.    To the extent that a Professional's final fee application is Allowed by the Bankruptcy Court, or claims pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases are Allowed by the Bankruptcy Court, the requesting Person will receive: (i) payment of Cash from the GMGI Professional Fee Claim Reserve, Gawker Media Professional Fee Claim Reserve and/or Gawker Hungary Professional Fee Claim Reserve, as applicable, in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases, such payment to be made before the later of (a) the Effective Date or (b) three Business Days after the order Allowing such Person's final fee application, or (ii) payment on such other terms as may be mutually agreed upon by the holder of the Professional Fee Claim and the applicable Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases).

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals shall terminate.

2.04    Bar Date for Administrative Claims.    Except as otherwise provided herein, requests for payment of Administrative Claims (other than Professional Fee Claims) not required to be have been filed by a prior Administrative Claim Bar Date, must be filed and served on the Debtors and Plan Administrator within ninety (90) days of the Effective Date.    Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.    Objections to such requests, if any, must be filed and served on the applicable Debtor and the requesting party no later than the Administrative Claims Objection Deadline.

2.05    Classification of Claims Against and Equity Interests in GMGI.

(a)    GMGI Unclassified Claims.    Allowed Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against GMGI will be paid in full in Cash, pursuant to the following terms:

- 16 -

(i)    GMGI Administrative Claims. Each holder of an Allowed Administrative Claim against GMGI will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    GMGI United States Trustee's Fees. The outstanding fees due to the United States Trustee from GMGI pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date. All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from GMGI after the Effective Date shall be paid by GMGI in accordance therewith until the earlier of the conversion or dismissal of the GMGI Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the GMGI Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    GMGI Professional Fee Claims. Approved GMGI Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02, and 5.03 of this Plan.

(iv)    GMGI Priority Tax Claims. On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against GMGI, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and GMGI.

(b)    GMGI Classified Claims. All other Claims against and Equity Interests in GMGI are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1A | Second Lien Make-Whole Claim | Impaired | Yes |
| 1B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 1C | General Unsecured Claims | Impaired | Yes |
| 1D | General Unsecured Convenience Claims | Impaired | N/A |
| 1E(i) | Gawker Hungary Intercompany Claims | Impaired | No (Deemed to Reject) |
| 1E(ii) | Gawker Media Intercompany Claims | Impaired | Yes |
| 1F | Preferred Equity Interests | Impaired | Yes |
| 1G | Common Equity Interests | Impaired | No (Deemed to Reject) |

59354792_8

2.06    Classification of Claims Against and Equity Interests in Gawker Media.

(a)    Gawker Media Unclassified Claims.    Allowed Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against Gawker Media will be paid in full in Cash, pursuant to the following terms:

(i)    Gawker Media Administrative Claims.    Each holder of an Allowed Administrative Claim against Gawker Media will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    Gawker Media United States Trustee's Fees.    The outstanding fees due to the United States Trustee from Gawker Media pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date.    All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from Gawker Media after the Effective Date shall be paid by Gawker Media in accordance therewith until the earlier of the conversion or dismissal of the Gawker Media Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Gawker Media Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    Gawker Media Professional Fee Claims.    Approved Gawker Media Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02, and 5.03 of this Plan.

(iv)    Gawker Media Priority Tax Claims.    On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against Gawker Media, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and Gawker Media.

(b)    Gawker Media Classified Claims.    All other Claims against and Equity Interests in Gawker Media are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 2A | Second Lien Make-Whole Guaranty Claim | Impaired | Yes |
| 2B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2C | General Unsecured Claims | Impaired | Yes |
| 2D | Punitive Damage Claims | Impaired | Yes |
| 2E | General Unsecured Convenience Claims | Impaired | N/A |

- 18 -

| 2F(i) | Gawker Hungary Intercompany Claims | Impaired | Yes |
| 2F(ii) | GMGI Intercompany Claims | Impaired | No (Deemed to Reject) |
| 2G | Membership Interest | Impaired | Yes |

2.07    Classification of Claims Against and Equity Interests in Gawker Hungary.

(a)    Gawker Hungary Unclassified Claims.  Allowed Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against Gawker Hungary will be paid in full in Cash, pursuant to the following terms:

(i)    Gawker Hungary Administrative Claims.  Each holder of an Allowed Administrative Claim against Gawker Hungary will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    Gawker Hungary United States Trustee's Fees.  The outstanding fees due to the United States Trustee from Gawker Hungary pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from Gawker Hungary after the Effective Date shall be paid by Gawker Hungary in accordance therewith until the earlier of the conversion or dismissal of the Gawker Hungary Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Gawker Hungary Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    Gawker Hungary Professional Fee Claims.  Approved Gawker Media Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02,  and 5.03 of this Plan.

(iv)    Gawker Hungary Priority Tax Claims.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against Gawker Hungary, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and Gawker Hungary.

(b)    Gawker Hungary Classified Claims.  All other Claims against and Equity Interests in Gawker Hungary are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
| --- | --- | --- | --- |
| 3A | Second Lien Make-Whole Guaranty Claim | Impaired | Yes |

- 19 -

| 3B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 3C | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 3D(i) | GMGI Intercompany Claims | Impaired | No (Deemed to Reject) |
| 3D(ii) | Gawker Media Intercompany Claims | Impaired | Yes |
| 3E | Membership Interest | Impaired | Yes |

2.08    Unimpaired Classes Deemed to Accept Plan.  Classes 1B, 2B, 3B, and 3C are Unimpaired under the Plan.  Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims against or Equity Interests in the Debtors in such Classes are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

2.09    Impaired Classes Deemed to Reject the Plan.  Holders in Classes 1E(i), 1F, 2F(ii), and 3D(i) are not entitled to receive or retain any property under the Plan on account of their Claims.  Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims against the Debtors in such Classes are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

2.10    Impaired Classes Entitled to Vote on Plan.  Classes 1A, 1C, 1E(ii), 1F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E are Impaired.  Accordingly, holders of Claims against or Equity Interests in the Debtors in such Classes are entitled to vote on the Plan pursuant to the Solicitation Procedures.

2.11    Impairment and Voting Controversies.  If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Equity Interests, is impaired under the Plan or entitled to vote on the Plan pursuant to the Solicitation Procedures, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

# ARTICLE 3
## TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

3.01    Classification and Treatment of Claims Against and Equity Interests in GMGI.

(a)    Class 1A – GMGI Second Lien Make-Whole Claim.  As a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)    Classification:  Class 1A shall consist of the GMGI Second Lien Make-Whole Claim.

(ii)    Allowance:  The GMGI Second Lien Make-Whole Claim is Allowed as a Secured Claim against GMGI in the amount of $2,000,000.

- 20 -

(iii)    Treatment:  The Second Lien Lender will receive, in full and complete settlement and release of, and in exchange for, the GMGI Second Lien Make-Whole Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000, (b) on, or as soon as practicable after, the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have been paid in full, up to an aggregate total of $750,000, and (c) in the event that Gawker Hungary dissolves before all Disputed GMGI General Unsecured Claims have become Allowed or Disallowed, the Second Lien Lender will receive the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

(iv)    Voting:  Class 1A is Impaired.  The holder of the GMGI Second Lien Make-Whole Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    <u>Class 1B – GMGI Other Priority Claims</u>.

(i)    Classification:  Class 1B shall consist of all Other Priority Claims against GMGI.

(ii)    Treatment:  Except to the extent that a holder of an Allowed GMGI Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed GMGI Other Priority Claim will receive on account of, and in full and complete settlement, and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting: Class 1B is Unimpaired.  Each holder of an Allowed GMGI Other Priority Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of GMGI Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)    <u>Class 1C – GMGI General Unsecured Claims</u>.

(i)    Classification: Class 1C shall consist of the GMGI General Unsecured Claims.

(ii)    Treatment:  Except to the extent that a holder of an Allowed GMGI General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed GMGI General Unsecured Claim will receive, in full and complete settlement and release, and in exchange for, such Claim distributions equal to its Pro Rata share of GMGI Cash distributed on the Effective Date, or within 15 days of Allowance of such Claim, up to the amount of its Allowed Claim plus Post-Petition Interest.

(iii)    Voting:  Classes 1C is Impaired.  Holders of Claims in Class 1C are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

- 21 -

(d)     Class 1D – GMGI General Unsecured Convenience Claims.

(i)     Classification:  Class 1D shall consist of the GMGI Unsecured Convenience Claims.

(ii)    Treatment:  Each holder of a GMGI General Unsecured Claim that elects to have its Claim(s) treated as an GMGI General Unsecured Convenience Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim(s) against GMGI, as well as any other asserted Claims held by such GMGI General Unsecured Convenience Creditor against Gawker Media and/or Gawker Hungary, a single distribution on the Effective Date in Cash from the Gawker Media Claims Reserve of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.

(ii)    Voting: Class 1D is Impaired.  By electing to participate in the GMGI Convenience Claims Class, holders of Claims in Class 1D are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures.

(e)     Class 1E(i)  – GMGI Gawker Hungary Intercompany Claims.

(i)     Classification: Class 1E(i) shall consist of the Gawker Hungary Intercompany Claims against GMGI.

(ii)    Treatment:  Any and all Intercompany Claims held by Gawker Hungary against GMGI are resolved pursuant to the Intercompany Settlement, with no distribution on account of such Claims.

(iii)   Voting:  Class 1E(i) is Impaired. Holders of Claims in Class 1E(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(f)     Class 1E(ii)  – GMGI Gawker Media Intercompany Claims.

(i)     Classification:  Class 1E(ii) shall consist of the Gawker Media Intercompany Claims against GMGI.

(ii)    Treatment:  Pursuant to the Intercompany Settlement, in satisfaction of any and all Intercompany Claims held by Gawker Media against GMGI, on the Effective Date, GMGI will make the GMGI Claims Settlement Payment to Gawker Media.

(iii)   Voting: Classes 1E(ii) is Impaired.  Holders of Claims in Class 1E(ii) are entitled to vote to accept or reject the Plan.

(g)     Class 1F – GMGI Preferred Equity Interests.

(i)     Classification: Class 1F shall consist of the holders of GMGI Preferred Shares.

- 22 -

(ii)     Treatment: Except to the extent that a holder of a GMGI Preferred Share agrees to less favorable treatment, each holder of a GMGI Preferred Share will receive, in full and complete settlement and release of, and in exchange for, such GMGI Preferred Share, on each date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after the GMGI Second Lien Make-Whole Claim has been paid in full, up to an aggregate total of the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference.

(iii)    Voting:  Class 1F is Impaired.  Holders of Equity Interests in Class 1F are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(h)    Class 1G – GMGI Common Equity Interests.

(i)     Classification: Class 1G shall consist of the holders of GMGI Common Shares.

(ii)    Treatment: Except to the extent that a holder of a GMGI Common Share agrees to less favorable treatment, each holder of a GMGI Common Share will receive, in full and complete settlement, release, and discharge of, and in exchange for, such GMGI Common Share, on each date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after holders of Allowed GMGI Preferred Share Equity Interests have received distributions totaling the aggregate amount of their Preferred Shares Liquidation Preferences.

(iii)    Voting:  Holders of Claims in Class 1G are not expected to receive any Distributions under the Plan and are therefore not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

3.02    Classification and Treatment of Claims Against and Equity Interests in Gawker Media.

(a)    Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claims.  As part of a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)     Classification:  Class 2A shall consist of the Gawker Media Second Lien Make-Whole Guaranty Claim.

(ii)    Allowance:  The Gawker Media Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Media in the amount of $1,250,000.

(iii)    Treatment:  The Second Lien Lender will receive, in full and complete settlement, release, and discharge of, and in exchange for, the Gawker Media Second Lien Make-Whole Guaranty Claims, (a) on the Effective Date, a distribution in Cash in

- 23 -

the amount of $500,000 and (b) on the Gawker Media Claims Reserve Distribution Date, distributions equal to any Cash remaining in the Gawker Media Second Lien Make-Whole Guaranty Reserve after distributions with respect to Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

(iv)    Voting:  Class 2A is Impaired.  The holder of the Gawker Media Second Lien Make-Whole Guaranty Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    Class 2B – Gawker Media Other Priority Claims.

(i)    Classification:  Class 2B shall consist of all Other Priority Claims against Gawker Media.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Gawker Media Other Priority Claim will receive on account of, and in full and complete settlement and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Priority Claim becomes an Allowed Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting:  Class 2B is Unimpaired.  Each holder of an Allowed Gawker Media Other Priority Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of such Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)    Class 2C – Gawker Media General Unsecured Claims.

(i)    Classification:  Class 2C shall consist of the Gawker Media General Unsecured Claims.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media General Unsecured Claim agrees to less favorable treatment, including electing to participate in the Gawker Media Convenience Class or as otherwise provided in Section 4.01(c) and (d) of the Plan, each holder of an Allowed Gawker Media General Unsecured Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, Distributions made in the following order until such holder receives the full amount of its Allowed Claim, excluding Post-Petition Interest, from the sources identified below:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account;

THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve; and

- 24 -

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve.

(iii)      Voting:  Class 2C is Impaired.  Holders of Claims in Class 2C are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(d)      Class 2D – Gawker Media Punitive Damage Claims.

(i)      Classification:  Class 2D shall consist of the Gawker Media Punitive Damage Claims.

(ii)      Treatment:  Except to the extent that a holder of an Allowed Gawker Media Punitive Damage Claim agrees to less favorable treatment, including electing to participate in the Gawker Media Convenience Class or as otherwise provided in Section 4.01(c) and (d) of the Plan, each holder of an Allowed Gawker Media Punitive Damage Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, Distributions made in the following order until such holder receives the full amount of its Allowed Claim, excluding Post-Petition Interest, from the sources identified below:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest.

(iii)      Voting:  Class 2D is Impaired.  Holders of Claims in Class 2D are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

- 25 -

(e)   Class 2E – Gawker Media General Unsecured Convenience Claims.

(i)   Classification:  Class 2E shall consist of the Gawker Media General Unsecured Convenience Claims.

(ii)   Treatment:   Each holder of a Gawker Media General Unsecured Claim or Gawker Media Punitive Damage Claim that elects to have its Claim(s) treated as a Gawker Media General Unsecured Convenience Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim(s) against Gawker Media, as well as any other asserted Claims held by such Gawker Media General Unsecured Convenience Creditor against GMGI and/or Gawker Hungary, a single distribution on the Effective Date in Cash from the Gawker Media Claims Reserve of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.

(ii)   Voting:  Class 2E is Impaired.  By electing to participate in the Gawker Media Convenience Claims Class, holders of Claims in Class 2E are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures.

(f)   Class 2F(i) – Gawker Media Gawker Hungary Intercompany Claims.

(i)   Classification:   Class 2F(i) shall consist of Gawker Hungary Intercompany Claims against Gawker Media, including, but not limited to, the Claim resulting from the Gawker Hungary Intercompany Notes.

(ii)   Treatment:   Pursuant to the Intercompany Settlement, Gawker Hungary will receive on account of the Gawker Media Gawker Hungary Intercompany Claim (i) a distribution of $16,000,000 in Cash from Gawker Media on the Effective Date, and (ii) a distribution of any Cash remaining at Gawker Media on the Gawker Media Claims Reserve Distribution Date after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have received the full amount of the treatment set forth in Sections 3.02(c) and 3.02(d) of this Plan, to repay up to any outstanding amounts of the Gawker Media Gawker Hungary Intercompany Claims, including any interest that accrues on such outstanding amounts through the Gawker Media Claims Reserve Distribution Date, which repayment to Gawker Media shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of this Plan.

(iii)   Voting:  Class 2F(i) is Impaired.  Holders of Claims in Class 2F(i) entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(g)   Class 2F(ii) – Gawker Media GMGI Intercompany Claims.

(i)   Classification:   Class 2F(ii) shall consist of GMGI Intercompany Claims against Gawker Media, including, but not limited to the Claim resulting from the GMGI Promissory Note.

- 26 -

(ii)    Treatment:  Any and all Intercompany Claims held by GMGI against Gawker Media are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:  Class 2F(ii) is Impaired.  Holders of Claims in Class 2F(ii) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(h)    Class 2G – Gawker Media Membership Interest.

(i)    Classification:  Class 2G shall consist of GMGI, the holder of the Gawker Media Membership Interest.

(ii)    Treatment:  GMGI will receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Media Membership Interest, (a) its Pro Rata share of the Gawker Media Contingent Equity Proceeds and (b) on the Gawker Media Claims Reserve Distribution Date, Cash remaining in the Gawker Media Claims Reserve after satisfaction of all Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims, excluding Post-Petition Interest, which amounts shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

(iii)    Voting:  Class 2G is Impaired.  GMGI, in its capacity as holder of the Gawker Media Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

3.03    Classification and Treatment of Claims Against and Equity Interests in Gawker Hungary.

(a)    Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claim.  As part of a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)    Classification: Class 3A shall consist of the Gawker Hungary Second Lien Make-Whole Guaranty Claim.

(ii)    Allowance:  The Gawker Hungary Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Hungary in the amount of $1,250,000 plus any fees, expenses and outstanding interest.

(iii)    Treatment:  The Second Lien Lender will receive, in full and complete settlement and release of, and in exchange for, the Gawker Hungary Second Lien Make-Whole Guaranty Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) if and when all GMGI General Unsecured Claims have either (i) been paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Allowed GMGI General Unsecured Claims, a distribution in Cash from the Gawker Hungary Second Lien Make-Whole Guaranty Reserve; provided, however, that in the event that Gawker

- 27 -

Hungary dissolves before all Disputed Claims in Class 1C have become Allowed or Disallowed, GMGI assumes this obligation, and the Second Lien Lender will receive the corresponding distribution from GMGI Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

(iv)    Voting:  Class 3A is Impaired.  The holder of the Gawker Hungary Second Lien Make-Whole Guaranty Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    <u>Class 3B – Gawker Hungary Other Priority Claims</u>.

(i)    Classification:  Class 3B shall consist of all Other Priority Claims against Gawker Hungary.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Hungary Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Gawker Hungary Other Priority Claim will receive on account of, and in full and complete settlement and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting:  Class 3B is Unimpaired.  Holders of claims in Class 3B are not entitled to vote to accept or reject the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(c)    <u>Class 3C – Gawker Hungary General Unsecured Claims</u>.

(i)    Classification:  Class 3C shall consist of the Gawker Hungary General Unsecured Claims.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Hungary General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Gawker Hungary General Unsecured Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, a distribution on the Effective Date equal to payment in full in Cash of the Allowed Gawker Hungary General Unsecured Claim, plus Post-Petition Interest.

(iii)    Voting:  Class 3C is unimpaired.  Holders of claims in Class 3C are not entitled to vote to accept or reject the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(d)    <u>Class 3D(i) – Gawker Hungary GMGI Intercompany Claims</u>.

(i)    Classification:  Class 3D(i) shall consist of the GMGI Intercompany Claims against Gawker Hungary.

- 28 -

(ii)    Treatment:   Any and all Intercompany Claims held by GMGI against Gawker Hungary are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:    Class 3D(i) is Impaired.   Holders of claims in Class 3D(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(e)    Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims.

(i)    Classification:   Class 3D(ii) shall consist of the Gawker Media Intercompany Claims against Gawker Hungary.

(ii)    Treatment:   Any and all Intercompany Claims held by Gawker Media against Gawker Hungary are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:   Class 3D(ii) is Impaired.   Holders of claims in Class 3D(ii) are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(f)    Class 3E – Gawker Hungary Membership Interest.

(i)    Classification:   Class 3E shall consist of GMGI, the holder of the Gawker Hungary Membership Interest.

(ii)    Treatment: GMGI will receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Hungary Membership Interest, (a) on the Effective Date, a distribution of all of the Cash held by Gawker Hungary after payment in full of the Allowed Claims against Gawker Hungary and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Claims against Gawker Hungary and anticipated expenses of liquidating Gawker Hungary, and (b) on the date of the dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan.

(iii)    Voting:   Class 3E is Impaired.   GMGI, in its capacity as holder of the Gawker Hungary Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

3.04    Compliance with Tax Requirements.   For purposes of distributions on any interest-bearing obligations, distributions under the Plan shall be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Petition Date.   Notwithstanding any other provision of this Plan, each entity receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction

and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other tax obligations.

3.05    Payments to Plan Reserve Accounts.    Any payment to a Plan Reserve Account shall be deemed a Distribution to the applicable beneficiary(ies) of such Plan Reserve Account as of the date of funding of the Plan Reserve Account.

3.06    Set-offs and Recoupments.    Except to the extent an Administrative or Priority Claim has been previously Allowed or is Allowed by the Plan, a Debtor may, but shall not be required to, set off or recoup against any Administrative or Priority Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Administrative or Priority Claim, claims of any nature whatsoever which a Debtor may have against the holder of such Administrative or Priority Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Administrative Claim hereunder shall constitute a waiver or release by the applicable Debtor of any such claim or counterclaim that it may have against such holder.

3.07    Allocation of Distributions.    Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

3.08    Manner of Payments.    Unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Debtors shall be made, at the election of the Debtors or the Plan Administrator, as applicable, by check drawn on a domestic bank or by electronic or wire transfer from a domestic bank; provided, however, that no Cash payments shall be required to be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than twenty dollars ($20.00).

3.09    Delivery of Distributions.    Subject to the provisions of Section 3.09 of the Plan, distributions and deliveries to each holder of an Allowed Claim or Equity Interest will be made (i) at the address set forth for such holder in the Debtor's Schedules if no proof of claim has been filed on behalf of such holder, (ii) at the address reflected in the proof of claim filed by such holder, or (iii) at the address set forth in any written notices of address change delivered after the date of any related proof of claim by such holder.  If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Plan Administrator is notified of the holder's then current address, in which case all missed distributions will be made to the holder without interest on the next GMGI or Gawker Media Distribution Date, as applicable.  Any claim in respect of such an undeliverable distribution shall be made on or before the first anniversary of the Effective Date or the applicable GMGI or Gawker Media Distribution Date.  After such date, all claims in respect of undeliverable distributions shall be discharged and forever barred and the Debtors shall retain all monies related thereto.  The Debtors shall be entitled to rely upon the register of Claims as of the Distribution Record Date.

59354792_8

3.10    Uncashed Checks.  Checks issued by the Debtors on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the applicable Debtor by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first anniversary of the (a) Effective Date or, (b) as applicable, the GMGI Distribution Date or the Gawker Media Distribution Date, or (ii) ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of voided checks shall be discharged and forever barred and the applicable Debtor shall retain all monies related thereto.

3.11    Amendment to Claims.  On or after the Effective Date, except as provided herein, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the Plan Administrator, and, to the extent such prior authorization is not received, any such amended Claim filed shall be deemed disallowed in full and expunged without any further action.

# ARTICLE 4
# IMPLEMENTATION OF THE PLAN

4.01    Plan Settlements.  The terms of this Plan incorporate the Plan Settlements among the Debtors, the Second Lien Lender, Bollea, and certain other creditors that shall become effective on the Effective Date.  The terms of the Plan Settlements are as follows:

(a)    The Second Lien Make-Whole Claims Settlement.  In full and complete settlement, release, and discharge of, and in exchange for, any outstanding claims that the Second Lien Holder may assert arising from, or in connection with, the Second Lien Loan and Security Agreement, including, without limitation, any rights relating to the Second Lien Make Whole Provision, the Second Lien Holder agrees to receive the treatment of the Second Lien Make-Whole Claims set forth in Sections 3.01(a), 3.02(a), and 3.03(a) of this Plan.

(b)    Intercompany Settlement.  In full and complete settlement, release, and discharge of, and in exchange for, any claims that any of the Debtors might have against one another on account of (i) the Gawker Hungary Intercompany Notes, (ii) the GMGI Promissory Note, (iii) any Claims or Causes of Actions that any Debtor may assert against any other Debtor, including, without limitation and claims or causes of action arising based on subrogation, veil piercing or *alter ego*, and (iv) allocation among the Debtors' estates of (1) the Unimoda Purchase Price, (2) payment of outstanding principal, accrued interest and fees under the DIP Loan and the Second Lien Term Loan, (3) professional fees and other administrative expenses accrued from each Debtor's Petition Date through closing of the Unimoda Sale, (4) Final Professional Fees, (5) the Second Lien Make-Whole Claims Settlement, and (6) any other allocation of claims among the Debtor estates, each of the Debtors agrees to the following provisions:

(i)    the Debtors will allocate the proceeds and expenses listed above in Section 4.01(b)(iv) of this Plan in a manner that provides for establishment of the Plan Reserve Accounts and treatments of Claims and Equity Interests set forth in Article 3 of this Plan;

59354792_8

(ii)    GMGI will provide the GMGI Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims;

(iii)    GMGI shall transfer 45.0% of Gawker Media Contingent Proceeds for deposit in the Gawker Media Contingent Proceeds Creditor Account for satisfaction of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims.

(iv)    Each of the Debtors agrees that the treatment of Claims and Equity Interests of each of the Debtors against or in the other Debtors will be as set forth in Article 3 of this Plan; and

(v)    each of the Debtors agrees to the terms of the Second Lien Make-Whole Claims Settlement ,and the Bollea Settlement, and the settlement of the Terrill Claims and Ayyadurai Claims.

(c)    Bollea Settlement.  In full and complete settlement, release, and discharge of, and in exchange for, the Bollea Claims, Bollea will receive (i) on the Effective Date, or within three Business Days thereafter, $31,000,000 million in Cash from Gawker Media, and (ii) its Pro Rata share (calculated based on an Allowed Gawker Media General Unsecured Claim amount of $115,000,000) of Distributions from the Gawker Media Contingent Proceeds Creditor Account.

(d)    Other Settlements.  In full and complete settlement, release, and discharge of, and in exchange for, the Ayyadurai Claims and the Terrill Claims, Ayyadurai and Terrill will receive, on the Effective Date, or within three Business Days thereafter, $750,000 and $500,000 respectively, in Cash from Gawker Media, have their Claims shall be deemed Allowed in such amounts solely for voting purposes, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account,.

4.02    Effective Date Transactions.  On the Effective Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(a)    GMGI establishes and funds the GMGI Professional Fee Claim Reserve, Gawker Media establishes and funds the Gawker Media Professional Fee Claim Reserve, and Gawker Hungary establishes and funds the Gawker Hungary Professional Fee Claim Reserve;

(b)    Gawker Media establishes and funds the Gawker Media Claims Reserve and Gawker Media Second Lien Make-Whole Guaranty Reserve, and establishes Gawker Media Contingent Proceeds Creditor Account;

(c)    Gawker Hungary establishes and funds the Gawker Hungary Second Lien Make-Whole Guaranty Reserve;

(d)    GMGI establishes and funds the GMGI Plan Guaranty Reserve;

- 32 -

(e)    Gawker Hungary makes distributions to holders of Claims against and Equity Interests in Gawker Hungary, pursuant to the Plan treatments set forth in Section 3.03 of the Plan, subject to the reserve required under Section 3.03(a)(iii)(b)(2) of this Plan;

(f)    Gawker Media makes distributions to holders of certain Claims against, and Equity Interests in, Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a)(iii)(a), 3.02(b), 3.02(e), 3.02(f)(i), and 3.02(h) of this Plan; and

(g)    GMGI makes distributions to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserves required under Sections 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of this Plan.

4.03    <u>Gawker Media Claims Reserve Distribution Date Transactions</u>.    On the Gawker Media Claims Reserve Distribution Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(a)    Gawker Media makes distributions to holders of Claims against and Equity Interests in Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a), 3.02(c), and 3.02(d) of this Plan;

(b)    Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve;

(c)    Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the GMGI Plan Guaranty Reserve;

(d)    Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from any Cash remaining at Gawker Media;

(e)    The Plan Administrator distributes to the Second Lien Lender any amounts remaining in the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(f)    The Plan Administrator distributes to GMGI any amounts remaining in the Gawker Media Plan Guaranty Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(g)    Gawker Media repays any Cash remaining to Gawker Hungary on account of Gawker Media Gawker Hungary Intercompany Claims that remain outstanding, including accrued interest on such outstanding Gawker Media Gawker Hungary Intercompany Claims, which amount Gawker Hungary then distributes to GMGI for distribution to holders of Claims against and equity interests in, GMGI;

- 33 -

(h)    Gawker Media distributes any Cash remaining after satisfaction of all outstanding Gawker Media Gawker Hungary Intercompany Claims to GMGI for distribution to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan; and

(i) GMGI makes distributions of remaining Cash at GMGI to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) of this Plan, if any.

4.04    <u>Gawker Media Contingent Proceeds Distribution Date Transactions</u>.  On each Gawker Media Contingent Proceeds Distribution Date, the Plan Administrator shall make Distributions from the Gawker Media Contingent Proceeds Creditor Account to holders of Claims against Gawker Media pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

4.05    <u>Corporate Action</u>.  Confirmation of the Plan shall constitute authorization for the Debtors, and their respective trustees, officers, board of directors, and agents, to effectuate the Plan and to execute, issue, deliver, file, or record all contracts, instruments, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other entity except for those expressly required pursuant to this Plan.  All matters provided for in the Plan involving any corporate action to be taken by or required of the Debtors in connection with the Plan shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects, without any requirement of further action by the Debtors, or their agents, representatives, trustees, stockholders, members, managers, officers, or directors.

4.06    <u>Vesting of Assets</u>.  Except as otherwise provided in the Plan, upon the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all property of the estate of each Debtor not otherwise distributed or released on the Effective Date shall vest in that Debtor for the benefit of the holders of Claims against and Equity Interests in that Debtor consistent with the treatments set forth in Article 3 of this Plan.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, after the Effective Date, each of the Debtors shall retain and enforce any claims or interests belonging to each of their respective chapter 11 bankruptcy estates that were not released by the Plan.  From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action consistent with the terms of the Plan, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

4.07    <u>Resignation of Officers and Directors</u>.  Upon the Effective Date, any of the Debtors' remaining officers and members of their boards of directors shall be deemed to have resigned, if they have not already done so, without the necessity of any further action or writing, and they shall be released from any responsibilities, duties, and obligations that arise after the Effective Date to the Debtors or their creditors under the Plan or applicable law.

59354792_8

4.08    Plan Administrator.  On and after the Effective Date, the Debtors will be managed by the Plan Administrator, who shall have all corporate powers, including those for which board and/or shareholder voting would otherwise be necessary.   The initial Plan Administrator shall be identified in the Plan Supplement.  Except as otherwise ordered by the Court, the expenses incurred by the Debtors on or after the Effective Date may be paid by the Debtors in accordance with the Plan Administrator Agreement, without further order of the Bankruptcy Court.  The Plan Administrator shall have no obligation to pursue third-party claims for the benefit of the Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement or are consistent with the Plan Administrator's fiduciary obligations.  In the event that such claims are pursued, they shall be prosecuted on a contingency fee basis, and the Debtors shall be responsible for the costs and expenses associated with the prosecution of such claims. Any such third-party claims shall be identified at the time of the Plan Supplement.

4.09    Plan Administrator Agreement.   On the Effective Date, the Plan Administrator Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.  After the Effective Date, the Plan Administrator Agreement may be amended in accordance with its terms without further order of the Court.   The Plan Administrator Agreement shall be substantially in the form contained in the Plan Supplement, which shall be filed prior to the Confirmation Hearing.

4.10    Sale of Gawker.com Assets.  The Plan Administrator, in conjunction with its advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets upon the expiration of the non-compete agreement that is part of the Unimoda Sale.

4.11    Binding Effect.  On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan

4.12    Continuation of Stays.  Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

4.13    Cancellation and Surrender of Instruments, Securities, and Existing Agreements.  On the Effective Date and concurrently with the applicable distributions made pursuant to Articles 3 of the Plan, except the Membership Interests in Gawker Media and Gawker Hungary, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests against the Debtors shall be deemed cancelled and of no further force and effect against the Debtors, without any further action on the part of any Debtor.  From and after the making of the applicable distributions pursuant to the Plan, the holders of such notes, instruments, certificates, and other documents shall have no rights against the Debtors arising from or relating to such notes, instruments, certificates, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan.

- 35 -

4.14    Dissolution of the Debtors.    Any Debtor not yet dissolved shall be dissolved upon the occurrence of the final Gawker Media Claims Reserve Distribution Date and its completion of its respective duties and obligations under the Plan, and all corporate approvals necessary for such action shall be deemed satisfied.    The Plan Administrator may, in its discretion, dissolve Gawker Hungary (as required under the Unimoda APA) or Gawker Media following the Effective Date but prior to the Gawker Media Claims Reserve Distribution Date, upon the completion of Gawker Hungary or Gawker Media's duties and obligations under the Plan.

4.15    Dissolution of the Committee.  On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases, except to the extent necessary to prosecute any appeals or other matters with respect to which they have been granted standing. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

# ARTICLE 5
# PROVISIONS FOR TREATMENT OF
# SUBSEQUENT PLAN DISTRIBUTIONS

5.01    Objections to and Estimation of Claims.    After the Effective Date, the Debtors or the Plan Administrator shall have sole authority to object to the allowance of Claims and Equity Interests with respect to which they dispute liability in whole or in part.    All objections shall be litigated to a Final Order; provided, however, that the Debtors or the Plan Administrator may compromise and settle, withdraw, or resolve by any other method approved by the Bankruptcy Court, any objections to Claims or Equity Interests.  In addition, the Debtors or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim.  Except as otherwise provided by order of the Bankruptcy Court, the Debtors or the Plan Administrator may file an objection to any Claim or Equity Interest until 180 days after the Effective Date.

5.02    Professional Fee Claim Procedures.  Notwithstanding any other provision of the Plan dealing with unclassified Claims, any Person asserting a Professional Fee Claim shall, no later than ten (10) days after the Confirmation Date, provide the Debtors and the Plan Administrator with a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but unbilled fees and expenses through the Effective Date) (for each Person, its "Professional Fee Claim Summary").  All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Committee prior to the Effective Date must be filed with the Bankruptcy Court and served on the Plan Administrator, Debtors, the Committee, their respective counsel, and  the United States Trustee, no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Plan Administrator, the United States Trustee, and the requesting

- 36 -

party no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

        5.03    <u>Professional Fee Claim Reserves.</u>  On and after the Effective Date, the Plan Administrator shall set aside and withhold from distribution, the Professional Fee Claim Reserves.  Amounts held in the Professional Fee Claim Reserves shall not constitute property of the Debtors, shall reflect the Plan Administrator's good faith estimate of the fees required to administer each of the Debtors after the Effective Date, and shall only be distributed in accordance with this Section 5.03.  Each Person asserting a Professional Fee Claim against any of the Debtors shall be entitled to a maximum amount from the applicable Professional Fee Claim Reserve equal to the amount of the Professional Fee Claim Summary submitted by such Person with respect to the applicable Debtor, less all interim compensation paid to such Person during the Bankruptcy Cases.  In the event there is a remaining balance in the GMGI, Gawker Media, or Gawker Hungary Professional Fee Claim Reserve after payment of all Allowed Professional Fee Claims against the applicable Debtor, in accordance with Section 2.03 of the Plan, such remaining amount, if any, shall be returned to the applicable Debtor for distribution pursuant to the Plan.  For the avoidance of doubt, the amount reserved by the Plan Administrator pursuant to this Section 5.03 shall not be deemed an admission as to the allowability or amount of any Claim in whole or in part.  To the extent that the Professional Fee Reserves prove insufficient to satisfy Professional Fee Claims, the Plan Administrator shall pay Professionals from funds that might otherwise be available to distribute to holders of Allowed Claims and Equity Interests.

        5.04    <u>Payments and Distributions on Disputed Claims</u>.  On the Gawker Media Distribution Date and each GMGI Distribution Date, each holder of an Allowed Claim and Equity Interest will receive all payments and distributions to which such holder is then entitled under the Plan.  No partial payments and no partial distributions shall be made with respect to a Disputed Claim until the resolution of all Disputed Claims by settlement, Final Order, or other form of resolution of such Claim reasonably determined by the Plan Administrator.

<div align="center">

**ARTICLE 6**
**CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

</div>

        6.01    <u>Conditions to Confirmation</u>.  The confirmation of the Plan by the Bankruptcy Court shall be subject to, and conditioned upon, entry of an order by the Bankruptcy Court approving the Disclosure Statement.

        6.02    <u>Conditions to the Effective Date</u>.  The effectiveness of the Plan shall be subject to, and conditioned upon:

        (a)    The Confirmation Order becoming a Final Order,

        (b)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made or, if made, remaining pending, and

        (c)    All other actions and documents necessary to implement the Plan shall have been effected or executed.

<div align="center">- 37 -</div>

6.03    Waiver of Conditions to Confirmation or the Effective Date.    The conditions to confirmation and the conditions to the Effective Date may be waived in whole or part at any time by any Debtor without an order of the Bankruptcy Court.

6.04    Effect of Nonoccurrence of Conditions to the Effective Date.  The Debtors reserve the right to seek to vacate the Plan at any time prior to the Effective Date.  If the Confirmation Order is vacated pursuant to this Section 6.04: (i) the Plan shall be null and void in all respects, and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against, or any interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

6.05    Notice of Effective Date.    The Debtors shall provide notice of the Effective Date of the Plan in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court.

## ARTICLE 7
## TREATMENT OF CONTRACTS AND LEASES

7.01    Rejection of Executory Contracts and Unexpired Leases.    Pursuant to sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, shall be deemed rejected on the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of executory contracts and unexpired leases pursuant to this Section of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

7.02    Claims Based on Rejection of Executory Contracts and Unexpired Leases. Claims created by the rejection of executory contracts and unexpired leases pursuant to Section 7.01 of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Plan Administrator no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section 7.01 for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Debtors' estate and their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article 5 of the Plan.

## ARTICLE 8
## RETENTION OF JURISDICTION

8.01    Retention of Jurisdiction.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive

jurisdiction of these proceedings to the extent legally permissible, including for the following purposes, among other things:

(a)    to determine any and all applications, adversary proceedings, and contested matters pending as of the Effective Date, if any;

(b)    to determine any and all objections to the allowance of Claims and Equity Interests, if any;

(c)    to determine any and all applications for allowance of compensation and reimbursement of expenses;

(d)    to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order;

(e)    to effectuate payments under and performance of the provisions of the Plan;

(f)    to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to determine the Debtors' motion, if any, to modify the Plan in accordance with section 1127 of the Bankruptcy Code;

(h)    to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, in the Confirmation Order;

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

(k)    to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

(l)    to enter a final decree closing the Bankruptcy Case;

(m)    to determine any matter (1) under the Unimoda APA, (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement;

(n)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the

Disclosure Statement or the Confirmation Order, as well as to ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

(o)    to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors; and

(p)    to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Cases, including the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE 9
## INJUNCTIONS, RELEASES, AND EXCULPATION

9.01    **INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS. ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES OTHER THAN THE PLAN ADMINISTRATOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEBT, RIGHT, OR CAUSE OF ACTION OF THE DEBTORS FOR WHICH A DEBTOR RETAINS SOLE AND EXCLUSIVE AUTHORITY TO PURSUE IN ACCORDANCE WITH ARTICLE 4 OF THE PLAN.**

9.02    **INJUNCTION AGAINST INTERFERENCE WITH PLAN.  UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS AND OTHER PARTIES IN INTEREST (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, PRESENT OR FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER CONTENT PROVIDERS, PRESENT OR FORMER WRITERS, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS  ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE**

- 40 -

PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

   9.03 **RELEASES BY THE DEBTORS.** ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, THE DEBTORS, ON THEIR OWN BEHALF AND AS REPRESENTATIVE OF THE DEBTORS' ESTATES, RELEASE UNCONDITIONALLY AND ARE HEREBY DEEMED TO RELEASE UNCONDITIONALLY, (I) EACH AND ALL OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE IN CONNECTION WITH THE DEBTORS, THEIR ASSETS, OR PROPERTY AND (II) EACH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, **PROVIDED, HOWEVER,** THAT THE DEBTORS DO NOT WAIVE ANY DEFENSES

THAT THE DEBTORS HAVE TO CLAIMS THAT SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR MAY ASSERT AGAINST THE DEBTORS.

9.04  **EXCULPATION.**  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND APPROVED IN THE CONFIRMATION ORDER, NONE OF THE DEBTORS OR THE COMMITTEE, NOR ANY OF THEIR RESPECTIVE FORMER OR CURRENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, ADVISORS, AFFILIATES, ATTORNEYS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, REPRESENTATIVES, OR AGENTS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF, (I) ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY RELATING TO THE DEBTORS OR THE COMMENCEMENT AND PROSECUTION OF OR THE BANKRUPTCY CASES, (II) THE FORMULATION, NEGOTIATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, (III) THE SOLICITATION OF ACCEPTANCES OF THE PLAN, (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR (V) THE ENFORCEMENT OF THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED THEREUNDER; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACTIONS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER. IN ADDITION, THE EXCULPATED PARTIES SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. NOTHING HEREIN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ATTORNEY DISCIPLINARY RULES.

9.05  **THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS.**  ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A

- 42 -

**FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING THIRD PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE.**

## ARTICLE 10
## MISCELLANEOUS

10.01    <u>Severability</u>.    Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

10.02    <u>Revocation of the Plan</u>.    The Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

10.03    <u>Effectuating Documents; Further Transactions; Timing</u>.    Each of the officers of the Debtors shall be deemed to be authorized as fully as if under resolutions of the Debtors' boards of directors or shareholders to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such action(s) as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.  All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously.

10.04    <u>Exemption from Transfer Taxes</u>.    Pursuant to section 1146(c) of the Bankruptcy Code, none of (i) the issuance transfer or exchange of any security under, in furtherance of, or in connection with, this Plan, (ii) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by this Plan (including real and personal property), or (iii) the disposition and/or encumbrance of assets in connection with any transactions contemplated hereunder (including any subsequent sale of property pursuant to the Plan), shall be subject to any stamp, real estate transfer, mortgage recording sales, use, or other similar tax.

10.05    <u>Binding Effect</u>.    The Plan shall be binding upon, and shall inure to the benefit of the Debtors, the holders of all Claims and Equity Interests, and any other Person identified in the Plan, and their respective successors and assigns.

- 43 -

10.06  <u>Modification of Treatment</u>.  The Debtors reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the holder of such Claim or Equity Interest at any time after the Effective Date upon the prior written consent of the holder whose Allowed Claim or Equity Interest treatment is being adversely affected.

10.07  <u>Notices</u>.  Any notice required or permitted to be provided under the Plan shall be in writing and served by: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight carrier service, freight prepaid, to be addressed as follows:

> If to Gawker Media LLC, to:

> Gawker Media LLC
> c/o Opportune LLP
> Attn: William D. Holden
> Chief Restructuring Officer
> 10 East 53rd Street, 33rd Floor
> New York, NY 10022

> If to Gawker Hungary, to:

> Gawker Hungary Kft.
> c/o Opportune LLP
> Attn: William D. Holden
> 10 East 53rd Street, 33rd Floor
> New York, NY 10022

> If to GMGI, to:

> Gawker Media Group, Inc.
> c/o Opportune LLP
> Attn: William D. Holden
> Chief Restructuring Officer
> 10 East 53rd Street, 33rd Floor
> New York, NY 10022

> with copies to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036-8704
> Attn: Gregg M. Galardi
>         D. Ross Martin
>         Joshua Y. Sturm
>         Jonathan M. Agudelo
> Facsimile: (212) 596-9090
> gregg.galardi@ropesgray.com
> ross.martin@ropesgray.com

- 44 -

joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com


If to the Plan Administrator:

[See Plan Supplement]

- 45 -

10.08  <u>Post-Confirmation Fees And Reports</u>.  Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator shall be responsible for the timely payment of all fees incurred pursuant to section 1930 of Title 28 to the United States Code. Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator also shall file with the Bankruptcy Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the Bankruptcy Case remain open, in a format prescribed by the United States Trustee in accordance with the guidelines of the Office of the United States Trustee.

New York, New York
November 2, 2016

GAWKER MEDIA LLC

By: _____
Name: William D. Holden
Title: Chief Restructuring Officer

GAWKER MEDIA GROUP, INC.

By: _____
Name: William D. Holden
Title: Chief Restructuring Officer

GAWKER HUNGARY KFT.

By: _____
Name: William D. Holden
Title: Managing Director

## SUMMARY OF EXHIBITS

| Exhibit | Document |
|---------|----------|
| A | Form of Plan Administrator Agreement |

The form of Plan Administrator Agreement will be filed with the Plan Supplement.

**EXHIBIT A**

**Form of Plan Administrator Agreement**

[To be filed in the Plan Supplement]

**EXHIBIT B**

**Disclosure Statement Order**

59473927_10

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                       :

In re                            :          Chapter 11
                                         :

Gawker Media LLC, *et al.*,[1]    :          Case No. 16-11700 (SMB)
                                         :

                Debtors.          :          (Jointly Administered)
                                         :

-------------------------------------------------------x

**ORDER APPROVING (I) THE ADEQUACY OF THE DISCLOSURE
STATEMENT, (II) SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE AMENDED JOINT CHAPTER 11 PLAN
OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER
MEDIA LLC, AND GAWKER HUNGARY KFT., (III) THE FORM OF BALLOTS
AND NOTICES IN CONNECTION THEREWITH, AND (IV) THE
<u>SCHEDULING OF CERTAIN DATES WITH RESPECT THERETO</u>**

Upon the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for the entry of an order (the "<u>Order</u>") approving: (a) the adequacy of the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "<u>Disclosure Statement</u>"), (b) solicitation and notice procedures with respect to confirmation of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "<u>Plan</u>"), (c) the forms of Ballots (as defined herein) and notices in connection therewith, and (d) the scheduling of certain dates with respect thereto, all as more fully set forth in the Motion; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.  All capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Motion.

2.      **Disclosure Statement Hearing.**  The Disclosure Statement Hearing Notice, filed by the Debtors and served upon parties in interest in these chapter 11 cases constitutes adequate and sufficient notice of the Disclosure Statement Hearing, the manner in which a copy of the Disclosure Statement (and exhibits thereto, including the Plan) could be obtained, and the time fixed for filing objections thereto, in accordance with Bankruptcy Rules 2002 and 3017.

3.      **Approval of Disclosure Statement.**  The Disclosure Statement is approved pursuant to section 1125(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3017(b) as containing adequate information (as defined by section 1125(a) of the Bankruptcy Code).  To the extent not withdrawn, settled, or otherwise resolved, any objections to the approval of the Disclosure Statement are overruled.

4.      The Debtors are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan, the Solicitation Package, and related documents without further order of the Court, including changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and related documents (including the appendices thereto).

5.      **Voting Record Date.**  Pursuant to Bankruptcy Rule 3018(a), October 31, 2016 shall be the Voting Record Date for determining: (a) holders of Claims or Equity Interests that are entitled to vote on the Plan; and (b) whether Claims or Equity Interests have been properly transferred, including pursuant to Bankruptcy Rule 3001(e), such that the assignee may vote on the Plan.

6.      Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

7.      **Solicitation Procedures.**  The Solicitation Procedures, substantially in the form attached hereto as **Exhibit 1** and incorporated by reference herein, are approved in their entirety. The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures.

8.      **Solicitation Packages.**  The Debtors shall cause the Solicitation Packages to be distributed to all Entities entitled to vote to accept or reject the Plan on or before November 7, 2016 (the "Solicitation Deadline").

9.      In addition to the Disclosure Statement and exhibits thereto, the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those holders of Claims in

the Voting Classes entitled to vote on the Plan as of the Voting Record Date shall include the following, the form of each of which is hereby approved:

      a.     the Confirmation Hearing Notice, substantially in the form attached hereto as **Exhibit 2**, which complies with the requirements of Bankruptcy Rules 2002(b), 2002(d), and 3017(d); and

      b.     the appropriate form of Ballot (including voting instructions), substantially in the form attached hereto as **Exhibit 4**.

10.     The Notice and Claims Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against and Equity Interests in the Debtors, (c) responding to inquiries from holders of Claims and Equity Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

11.     **Confirmation Hearing Notice.**  On or before the Solicitation Deadline, the Debtors shall send the Confirmation Hearing Notice to all known holders of Claims and Equity Interests.  The Confirmation Hearing Notice constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

12.     **Publication Notice.**  On or before November 16, 2016, the Debtors shall publish the Confirmation Hearing Notice once in the national edition of *USA Today* in substantially the form attached hereto as **Exhibit 2** and hereby approved.  The publication of the Publication Notice in this manner will provide sufficient notice of the Voting Deadline, Objection Deadline,

and time, date, and place of the Confirmation Hearing to persons who do not otherwise receive notice by mail as provided for in this Order.

13.     **Voting Deadline.**  The Voting Deadline shall be on December 5, 2016 at 5:00 p.m., New York Time, unless otherwise extended by the Debtors.  All votes to accept or reject the Plan must be cast by using the appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by:  (a) first class mail or in the return envelope provided with each Ballot or Opt-Out Notice; (b) overnight delivery; or (c) personal delivery, so that the Ballots are **actually received** by the Notice and Claims Agent no later than the Voting Deadline at the return address set forth in the applicable Ballot.

14.     **Approval of Form of Non-Voting Status Notices.**  Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Equity Interests in the Non-Voting Classes, as such holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Deadline, the Notice and Claims Agent shall mail to such parties, as applicable, a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved.

15.     The Non-Voting Status Notice for Unimpaired Classes, substantially in the form attached hereto as **Exhibit 5**, is approved.

16.     The Non-Voting Status Notice for Deemed Rejecting Classes, substantially in the form attached hereto as **Exhibit 6**, is approved.

17.     The Debtors shall not be required to solicit votes from the following:  (a) holders of Administrative Claims or Priority Tax Claims (each in their capacities as such) because such claims are Unclassified under the Plan and therefore are not entitled to vote on the Plan; (b) holders of Claims or Equity Interests in the Unimpaired Classes because such Claims and

5

Equity Interests are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan; and (c) holders of Claims or Equity Interests in the Deemed Rejecting Classes because such Claims and Equity Interest are deemed to have rejected the Plan. In lieu of distributing a Solicitation Package to such holders of Claims or Equity Interests, the Debtors shall cause (a) the Confirmation Hearing Notice, and (b) the Non-Voting Status Notices, as applicable, to be served on such holders of Claims and Equity Interests that are not entitled to vote.

18.     The Debtors shall be excused from mailing Solicitation Packages to those Entities to whom the Debtors caused a Disclosure Statement Hearing Notice to be mailed and received a notice from the United States Postal Service or other carrier that such notice was undeliverable unless such Entity provides the Debtors, through the Notice and Claims Agent, an accurate address not less than ten (10) days prior to the Solicitation Date. If an Entity has changed its mailing address after the Petition Date, the burden is on such Entity, not the Debtors, to advise the Debtors and the Notice and Claims Agent of the new address.

19.     The Debtors are not required to mail Solicitation Packages or other solicitation materials to holders of Claims that have already been paid in full during the chapter 11 cases.

20.     **Disputed Claims.** Holders of Claims that are subject to a pending objection by the Debtors as of the Voting Record Date, October 31, 2016, will receive a notice, substantially in the form attached hereto as **Exhibit 7**, which notice is approved. Holders of such Claims are not entitled to vote the disputed portion of their Claim; provided, however, that a holder of a Claim that is the subject of a pending objection on the Voting Record Date and is classified in Class 1C, Class 2C or Class 2D may elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached as Exhibit A to the Disputed Claim

6

Notice and submitting it to the Notice and Claims Agent in accordance with the instructions therein.

21.    If a Claim or Equity Interest is objected to after the Voting Record Date, such Claim or Equity Interest will be Allowed for voting purposes unless the Bankruptcy Court enters an order at or before the Confirmation Hearing granting the Debtors' objection. The Debtors may object to a Claim or Equity Interest no later than seven (7) days prior to the Voting Deadline. The hearing on any such objections shall be the Confirmation Hearing unless a Resolution Event occurs prior to that date.

22.    The Plan Confirmation Schedule, as set forth below and subject to Court-approved modification as necessary, is approved. All times shall be New York Time.

| Event | Date |
|---|---|
| Voting Record Date | October 31, 2016 |
| Solicitation Commencement Deadline | November 7, 2016 |
| Deadline to Cause Confirmation Hearing Notice to Be Published in Notice Publications | November 16, 2016 |
| Deadline to File Plan Supplement | November 30, 2016 |
| Voting Deadline | December 5, 2016, at 5:00 p.m. |
| Plan Objection Deadline for All Parties | December 5, 2016, at 4:00 p.m. |
| Deadline to File Voting Report | December 6, 2016 |
| Pre-Trial Motion Deadline | December 9, 2016 |
| Deadline to File Confirmation Brief and Response to Objections to the Plan | December 9, 2016 |
| Commencement of Confirmation Hearing | December 13, 2016, at 10:00 a.m. |

23.    **Bankruptcy Rule 3016(c).** The Disclosure Statement, the Plan, the Confirmation Hearing Notice, the Ballots, and the Non-Voting Status Notices provide all parties in interest with sufficient notice regarding the settlement, release, exculpation, and injunction provisions contained in the Plan in compliance with Bankruptcy Rule 3016(c).

7

24.     **Procedures for Filing Objections to Plan.**  Any objections to the Plan must be filed by the Plan Objection Deadline and must:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest; (d) state with particularity the basis and nature of any objection to the Plan; (e) propose a modification to the Plan (or related materials) that would resolve such objection (if applicable); and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified in the Confirmation Hearing Notice by the Plan Objection Deadline.

25.     **Confirmation Hearing.**  The Confirmation Hearing shall be held on **December 13, 2016, at 10:00 a.m., New York Time**, which hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on:  (a) all entities that have filed a request for service of filings in the chapter 11 cases pursuant to Bankruptcy Rule 2002; and (b) each of the notice parties identified in the Confirmation Hearing Notice.

26.     Except to the extent as may be modified herein, all time periods in this Order shall be calculated in accordance with Bankruptcy Rules 2002 and 9006.

27.     To the extent any of the dates approved herein do not comply with those required under the Bankruptcy Rules or Local Rules, the reductions to such notice period(s) are approved pursuant to Bankruptcy Rule 9006(c).

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

29.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8

30.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2016

_____
THE HONORABLE STUART M BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Solicitation Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                            :
In re                                       :         Chapter 11
                                            :
Gawker Media LLC, *et al.*,[1]              :         Case No. 16-11700 (SMB)
                                            :
                        Debtors.            :         (Jointly Administered)
                                            :
--------------------------------------------------------x

## SOLICITATION PROCEDURES

On November [___], 2016, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Order") that, among other things, (a) approved the adequacy of the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as amended and including all exhibits and supplements thereto, the "Disclosure Statement") filed in support of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as amended and including all exhibits thereto, the "Plan") and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances or rejections of the Plan from holders of Impaired Claims and Equity Interests who are (or may be) entitled to receive distributions under the Plan.[2]

### A.    The Voting Record Date

**The Court has approved October 31, 2016 as the record date (the "Voting Record Date") for purposes of determining which holders of Claims and Equity Interests in Class 1A (GMGI – Second Lien Make-Whole Claim), Class 1C (GMGI – General Unsecured Claims), Class 1E(ii) (GMGI – Gawker Media Intercompany Claims), Class 1F (GMGI – Preferred Equity Interests), Class 2A (Gawker Media – Second Lien Make-Whole**

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. Copies of the Plan and the Disclosure Statement may be obtained free of charge by visiting the case website maintained by Prime Clerk LLC, the Debtors' Notice and Claims agent for these chapter 11 cases, available at https://cases.primeclerk.com/gawker/. You may also obtain copies of any pleadings by visiting the Court's website at www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**Guaranty Claim), Class 2C (Gawker Media – General Unsecured Claims), Class 2D (Gawker Media – Punitive Damage Claims), Class 2F(i) (Gawker Media – Gawker Hungary Intercompany Claims), Class 2G (Gawker Media – Membership Interest), Class 3A (Gawker Hungary – Second Lien Make-Whole Guaranty Claim), 3D(ii) (Gawker Hungary – Gawker Media Intercompany Claims) and Class 3E (Gawker Hungary – Membership Interest) are entitled to vote on the Plan.  The Claims and Equity Interests comprising Classes 1E(ii), 2F(i), 2G, 3D(ii), and 3E are all held by Debtors that are also proponents of the Plan, and therefore will be deemed to vote to accept the Plan.**

### B.    The Voting Deadline

The Court has approved December 5, 2016, at 5:00 p.m., New York Time, as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court; provided, however, that the deadline to object to confirmation of the Plan must be extended by an equal amount of time.  To be counted as votes to accept or reject the Plan, all ballots ("Ballots") sent to registered holders of Claims and Equity Interests must be properly executed, completed, and delivered by:  (1) first class mail; (2) overnight courier; or (3) personal delivery so that they are ***actually received***, in any case, no later than the Voting Deadline by the Notice and Claims Agent.  All Ballots should be sent to: Gawker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.  Delivery of a Ballot to the Notice and Claims Agent by facsimile, email, or any other electronic means (other than the online portal) will not be valid.

### C.    Form, Content, and Manner of Notices

1.    **The Solicitation Package.**    The following materials shall constitute the solicitation package (the "Solicitation Package"):

(a)    a copy of these Solicitation Procedures;

(b)    the *Notice of Entry of Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto*, in substantially the form annexed as **Exhibit 2** to the Disclosure Statement Order (the "Confirmation Hearing Notice");

(c)    an appropriate form of Ballot, in substantially the form of applicable Ballot annexed as **Exhibit 4** to the Disclosure Statement Order, as applicable;

(d)    the approved Disclosure Statement (together with the proposed Plan attached as **Exhibit A** thereto); and

(e)    any supplemental documents the Debtors file with the Court and any documents that the Court orders to be made available.

2

  2.  **Distribution of the Solicitation Package**.

  The Solicitation Package shall provide the Disclosure Statement and Plan in electronic format (*i.e.*, CD-ROM or flash drive), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format.  Any holder of a Claim or Equity Interest may obtain at no charge a paper copy of the documents otherwise provided by: (a) accessing the Notice and Claims Agent's website at https://cases.primeclerk.com/gawker/; (b) writing to the Notice and Claims Agent, by first-class mail, hand delivery, or overnight mail, Gawker Media, LLC, *et al*., Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; (c) calling the Notice and Claims Agent at (855) 639-3375; or (d) emailing gawkerballots@primeclerk.com.

  The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package on:  (a) the U.S. Trustee; (b) counsel to the Official Committee of Unsecured Creditors; and (c) all parties who have requested service of papers in these chapter 11 cases pursuant to Bankruptcy Rule 2002.   In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to the following Entities in the Voting Classes on or before November 7, 2016:

  (a)  all Entities who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim that has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that:  (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection on the Voting Record Date; provided that the holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection;

  (b)  all Entities listed in the Debtors' Schedules as holding a noncontingent, liquidated, undisputed Claim as of the Voting Record Date, except to the extent that such Claim was paid, expunged, disallowed, disqualified, or superseded by a timely filed Proof of Claim prior to the Voting Record Date;

  (c)  all Entities that hold Claims or Equity Interests pursuant to an agreement or settlement with the Debtors executed prior to the Voting Record Date, as reflected in a document filed with the Court, in an order entered by the Court, or in a document executed by the Debtors pursuant to authority granted by the Court, regardless of whether a Proof of Claim has been filed;

  (d)  holders of any Disputed Claim that has been temporarily Allowed to vote or whose Claim was objected to on a "reduce and allow" basis; and

  (e)  with respect to any Entity described in subparagraphs (a) through (d) above who, on or before the Voting Record Date, has transferred such Entity's Claim or Equity Interest to another Entity, to the assignee of such Claim or Equity Interest in lieu of sending such Solicitation Package to the assigning Entity; provided that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

Holders of Claims and Equity Interests in classes that are Unimpaired will receive mailings with only the Confirmation Hearing Notice and the appropriate Non-Voting Status Notice.

3. **Resolution of Disputed Claims for Voting Purposes; Resolution Event**.

(a)    The holder of a Claim or Equity Interest that is the subject of an objection as of the Voting Record Date will receive a Disputed Claim Notice, substantially in the form annexed as **Exhibit 7** to the Proposed Disclosure Statement Order, together with the Solicitation Package (excluding Ballots). Any such holder that is classified in Class 1C, Class 2C or Class 2D may elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached as Exhibit A to the Disputed Claim Notice and submitting it to the Notice and Claims Agent in accordance with the instructions therein.

(b)    The holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

(c)    If a Claim or Equity Interest is objected to after the Voting Record Date, such Claim or Equity Interest will be deemed temporarily Allowed for voting purposes unless the Bankruptcy Court enters an order at or before the Confirmation Hearing granting the Debtors' objection. The Debtors may object to a Claim or Equity Interest no later than seven (7) days prior to the Voting Deadline. The hearing on any such objections shall be the Confirmation Hearing unless a Resolution Event occurs prior to that date.

(d)    A "Resolution Event" means the occurrence of one or more of the following events no later than three (3) days prior to the Voting Deadline:

i.    an order of the Court is entered allowing the Disputed Claim or Equity Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

ii.    an order of the Court is entered temporarily allowing the Disputed Claim or Equity Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii.    a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors resolving the objection and allowing such Disputed Claim or Equity Interest in an agreed upon amount;

iv.    a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors temporarily allowing the holder of such Claim or Equity Interest to vote its Claim or Equity Interest in an agreed upon amount; or

v.    the pending objection to the Disputed Claim or Equity Interest is voluntarily withdrawn by the Debtors.

4

(e)    No later than two (2) days following the occurrence of a Resolution Event, the Debtors shall cause the Notice and Claims Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder.

4.    **Non-Voting Status Notices for Unimpaired Classes**.  Certain holders of Claims and Equity Interests that are not classified in accordance with 11 U.S.C. § 1123(a)(1) or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under 11 U.S.C. § 1126(f) will receive only the *Notice of Non-Voting Status with Respect to Unclassified and Unimpaired Classes Deemed to Accept the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft.*, substantially in the form annexed as **Exhibit 5** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

5.    **Non-Voting Status Notices for Deemed Rejecting Classes**.  Certain holders of Claims and Equity Interests that are not entitled to vote because they are deemed to reject the Plan under 11 U.S.C. § 1126(g) will receive only the *Notice of Non-Voting Status with Respect to Impaired Classes Deemed to Reject the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft.*, substantially in the form annexed as **Exhibit 6** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

D.    **Voting and Tabulation Procedures**

6.    **Holders of Claims Entitled to Vote**.  Only the following holders of Claims and Equity Interest in the Voting Classes shall be entitled to vote with regard to such Claims or Equity Interests:

(a)    holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim which has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection on the Voting Record Date, other than a "reduce and allow" objection, pending a Resolution Event as provided herein; provided that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection; further provided that a holder of a Claim that is the subject of a pending objection on the Voting Record Date and is classified in Class 1C, Class 2C or Class 2D may elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached as Exhibit A to the Disputed Claim Notice and submitting it to the Notice and Claims Agent in accordance with the instructions therein;

(b)    holders of Claims that are listed in the Schedules, *other than* Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed,

5

contingent, or unliquidated Claims that have been paid or superseded by a timely filed Proof of Claim);

(c)    holders whose Claims arise pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, in an order entered by the Court, or in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed; and

(d)    the assignee of a timely filed Proof of Claim or a Claim listed in the Schedules shall be permitted to vote such Claim only if the transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

7.    **Establishing Amounts of Claims and Equity Interests for Voting Purposes**. The amount of a Claim or Equity Interest established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim or Equity Interest.  Moreover, any amounts filled in on Ballots by the Debtors through the Notice and Claims Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim or Equity Interest associated with each claimant's vote:

(a)    the Claim or Equity Interest amount settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, in an order of the Court, or in a document executed by the Debtors pursuant to authority granted by the Court;

(b)    the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under the procedures set forth in the Solicitation Procedures;

(c)    the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; provided, however, that Ballots cast by holders of Claims who timely file a Proof of Claim in respect of a contingent Claim *or* in a wholly-unliquidated or unknown amount that is not the subject of an objection will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as Ballots for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and, if a Proof of Claim is filed as partially liquidated and partially unliquidated, such Claim will be Allowed for voting purposes only in the liquidated amount; provided further, however, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim; and

(d)    the Claim amount listed in the Schedules, provided that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid.

In the absence of any of the foregoing, such Claim or Equity Interest shall be disallowed for voting purposes.

8.    **General Voting and Ballot Tabulation Procedures.**  The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

(a)    except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

(b)    the Notice and Claims Agent will date-stamp all Ballots when received.  The Notice and Claims Agent shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court;

(c)    no later than December 6, 2016, the Debtors will file with the Court a certification of votes (the "Voting Report").  The Voting Report shall, among other things, certify to the Court in writing the amount and number of allowed Claims or allowed Equity Interests of each class accepting or rejecting the Plan, and delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail, or damaged ("Irregular Ballots").  The Voting Report shall indicate the Debtors' intentions with regard to each such Irregular Ballot.  The Voting Report shall also certify to the Court in writing the amount and number of allowed Claims or allowed Equity Interests of each class.  The Voting Report shall be served upon the Committee and the U.S. Trustee;

(d)    the method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Claims Agent actually receives the original executed Ballot;

(e)    an original executed Ballot is required to be submitted by the Entity submitting such Ballot, and delivery of a Ballot to the Notice and Claims Agent by facsimile, email, or any other electronic means (other than the online portal) will not be valid;

(f)    no Ballot should be sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), the Debtors' financial or legal advisors, the Committee, or the Committee's advisors, and if so sent will not be counted;

(g)    if multiple Ballots are received from the same holder with respect to the same Claim or Interest prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot;

(h)    holders must vote all of their Claims or Equity Interests within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are

7

multiple Claims within the same Class, the Debtor may, in its discretion, aggregate the Claims or Equity Interests of any particular holder within a Class for the purpose of counting votes;

(i)    a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims or Equity Interests must indicate such capacity when signing;

(j)    the Debtors, subject to contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

(k)    neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

(l)    unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

(m)    in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Equity Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

(n)    subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided that any such rejections will be documented in the Voting Report;

(o)    if a Claim has been estimated or otherwise Allowed for voting purposes only by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(p)    if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

(q)    the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim or Equity Interest; (ii) any Ballot cast by an Entity that does not hold a Claim or Equity Interest in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed; (iv) any unsigned Ballot or any Ballot or lacking an original signature; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

8

(r)      after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors; and

(s)      the Debtors are authorized to enter into stipulations with the holder of any Claim agreeing to the amount of a Claim for voting purposes.

## E.    Amendments to the Plan and Solicitation Procedures

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

59365223_4

**<u>EXHIBIT 2</u>**

**Confirmation Hearing Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                            :

In re                           :         Chapter 11
                            :

Gawker Media LLC, *et al.*,[1]      :         Case No. 16-11700 (SMB)
                            :

                Debtors.       :         (Jointly Administered)
                            :
--------------------------------------------------------x

### NOTICE OF ENTRY OF ORDER APPROVING (I) THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT., (III) THE FORM OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND (IV) THE SCHEDULING OF CERTAIN DATES WITH RESPECT THERETO

**TO ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND PARTIES IN INTEREST:**

1.     **Court Approval of the Disclosure Statement and the Solicitation Procedures.**  On November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under section 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"), and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes with regard to the acceptance or rejection of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Plan").[2]

---

[1] The last four digits of the taxpayer identification number of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2.    **Voting Record Date.**  The Voting Record Date for purposes of determining (a) which Holders of Claims are entitled to vote on the Plan and (b) whether Claims have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of the Claim was October 31, 2016.

3.    **Voting Deadline.**  If you held a Claim against or Equity Interest in one of the Debtors as of the Voting Record Date and are entitled to vote on the Plan, you have received a Ballot and voting instructions appropriate for your Claim(s) or Equity Interest(s).  For your vote to be counted in connection with Confirmation of the Plan, you must follow the appropriate voting instructions, complete all required information on the Ballot, and execute and return the completed Ballot so that it is actually received in accordance with the voting instructions by **December 5, 2016, at 5:00 p.m., New York Time** (the "Voting Deadline").  Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your vote on the Plan.

4.    **Solicitation Packages.**  Solicitation Packages (except the Ballots) may be obtained at no charge from the claims agent retained by the Debtors in these chapter 11 cases (the "Notice and Claims Agent") by:    (a) accessing the Notice and Claims Agent's website at https://cases.primeclerk.com/gawker/; (b) writing to the Notice and Claims Agent, by first-class mail, hand delivery, or overnight mail, Gawker Media LLC, et al., Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; or (c) calling the Notice and Claims Agent at (855) 639-3375.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at www.nysb.uscourts.gov.  The Notice and Claims Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

5.    **Objections to the Plan.**  The Court has established **December 5, 2016, at 4:00 p.m., New York Time** (the "Plan Objection Deadline"), as the deadline for filing and serving objections to the Confirmation of the Plan.  Any objection to the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (c) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest, (d) state with particularity the basis and nature of any objection to the Plan, (e) propose a modification to the Plan that would resolve such objection (if applicable), and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified herein by the Plan Objection Deadline:

| Debtors | Counsel to the Debtors |
|---|---|
| Gawker Media LLC<br>c/o Opportune LLP<br>10 East 53rd Street, 33rd Floor<br>New York, NY 10022<br>Attn:    William D. Holden | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attn:    Gregg M. Galardi<br>          D. Ross Martin<br>          Joshua Y. Sturm<br>          Jonathan M. Agudelo |

2

| United States Trustee | Counsel to the Committee |
|---|---|
| Office of the United States Trustee for the Southern 201 Varick Street, Room 1006 New York, NY  10014 Attn:      Greg Zipes          Susan Arbeit | Simpson Thacher & Bartlett LLP 425 Lexington Avenue New York, New York  10017 Attn:      Sandeep Qusba |
| **Counsel to the Second Lien Lender** | |
| Latham & Watkins LLP 330 North Wabash Avenue,Suite 2800 Chicago, IL 606011 Attn:      David Heller          Keith A. Simon  885 Third Avenue New York, New York 10022 Attn:      Keith A Simon | *[Intentionally Left Blank]* |

6.  **Confirmation Hearing.**  A hearing to confirm the Plan will commence on **December 13, 2016, at 10:00 a.m., New York Time** (the "Confirmation Hearing"), before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York.  Please be advised that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Court or otherwise.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing as permitted by the Bankruptcy Code.

7.  **Plan Supplement.**  The Debtors intend to file a Plan Supplement prior to the Confirmation Hearing that includes, among other things, the list of assumed Executory Contracts and Unexpired Leases.  The Debtors do not intend to serve copies of the Plan Supplement on all parties in interest in these chapter 11 cases; the Plan Supplement, however, may be obtained from the Notice and Claims Agent in accordance with the preceding paragraph.

8.  **Release, Exculpation, and Injunction Language in the Plan.**  Please take notice that Article 9 of the Plan contains the following release, exculpation, and injunction provisions:

> **EXCULPATION.  To the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts,**

3

instruments, releases, agreements, and documents delivered thereunder; **provided**, **however**, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order. In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.

**INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.** On and after the Effective Date, all Persons and Entities other than the Plan Administrator are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which a Debtor retains sole and exclusive authority to pursue in accordance with Article 4 of the Plan.

**INJUNCTION AGAINST INTERFERENCE WITH PLAN.** Upon the entry of the Confirmation Order, except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, present or former independent contractors, present or former content providers, present or former writers, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of

4

the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

**THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS.** On the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, _provided_, _however_, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION, AND INJUNCTION PROVISIONS INCLUDED THEREIN, AS YOUR RIGHTS MIGHT BE AFFECTED.**

Dated: November___, 2016
     New York, New York

/s/ _Draft_____
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

_Counsel to the Debtors_
_and Debtors in Possession_

5

## **EXHIBIT 3**

**Publication Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                  :

In re                               :        Chapter 11

                                  :

Gawker Media LLC, *et al.*,[1]        :        Case No. 16-11700 (SMB)

                                  :

               Debtors.       :        (Jointly Administered)

                                  :

--------------------------------------------------------x

### NOTICE OF VOTING AND OBJECTION DEADLINES REGARDING AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND PROPOSED INJUNCTIONS AND THIRD-PARTY RELEASES

**THE FOLLOWING CONCERNS THE APPROVAL PROCESS FOR A PROPOSED AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION. PLEASE TAKE NOTE THAT THE PLAN OF LIQUIDATION INCLUDES THE INJUNCTIONS AND THIRD-PARTY RELEASES DESCRIBED IN PARAGRAPH 8 OF THIS NOTICE.**

**TO ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND PARTIES IN INTEREST:**

1. **Solicitation of Votes on Amended Joint Chapter 11 Plan of Liquidation.** Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., have filed a Amended Joint Chapter 11 Plan of liquidation. [2] The Bankruptcy Court has approved a disclosure statement for that plan and authorized the Debtors to solicit votes on such plan from creditors and equity holders in certain classes. The Bankruptcy Court has also set a hearing to consider confirmation of the plan.

2. **Voting Record Date.** The Voting Record Date for purposes of determining (a) which Holders of Claims or Equity Interests are entitled to vote on the Plan and (b) whether Claims or Equity Interests have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of the Claim was October 31, 2016.

3. **Voting Deadline.** If you held a Claim against or Equity Interest in one of the Debtors as of the Voting Record Date and timely filed a proof of claim or, in certain instances, such claim or Equity Interest was listed on the Debtors' schedules, you are entitled to vote on the Plan. For your vote to be counted in connection with Confirmation of the Plan, you must follow

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

the appropriate voting instructions, complete all required information on the Ballot, and execute and return the completed Ballot so that it is actually received in accordance with the voting instructions by **December 5, 2016, at 5:00 p.m., New York Time** (the "Voting Deadline").  Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your vote on the Plan.

4.     **Solicitation Packages.**  Solicitation Packages (except the Ballots) may be obtained at no charge from the claims agent retained by the Debtors in these chapter 11 cases (the "Notice and Claims Agent") by:    (a) accessing the Notice and Claims Agent's website at https://cases.primeclerk.com/gawker/; (b) writing to the Notice and Claims Agent, by first-class mail, hand delivery, or overnight mail, Gawker Media LLC, et al., Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; or (c) calling the Notice and Claims Agent at (855) 639-3375.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at www.nysb.uscourts.gov.  The Notice and Claims Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

5.     **Objections to the Plan.**  The Court has established **December 5, 2016, at 4:00 p.m., New York Time** (the "Plan Objection Deadline"), as the deadline for filing and serving objections to the Confirmation of the Plan.   Any objection to the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (c) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest, (d) state with particularity the basis and nature of any objection to the Plan, (e) propose a modification to the Plan that would resolve such objection (if applicable), and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified herein by the Plan Objection Deadline:

| Debtors | Counsel to the Debtors |
|---|---|
| Gawker Media LLC<br>c/o Opportune LLP<br>10 East 53rd Street, 33rd Floor<br>New York, NY 10022<br>Attn:    William D. Holden | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attn:    Gregg M. Galardi<br>          D. Ross Martin<br>          Joshua Y. Sturm<br>          Jonathan M. Agudelo |
| **United States Trustee** | **Counsel to the Committee** |
| Office of the United States Trustee<br>for the Southern<br>201 Varick Street, Room 1006<br>New York, NY  10014<br>Attn:    Greg Zipes<br>          Susan Arbeit | Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York  10017<br>Attn:    Sandeep Qusba |
| **Counsel to the Second Lien Lender** | |
| Latham & Watkins LLP<br>330 North Wabash Avenue,Suite 2800<br>Chicago, IL 606011<br>Attn:    David Heller<br>          Keith A. Simon<br><br>885 Third Avenue<br>New York, New York 10022 | *[Intentionally Left Blank]* |

2

| Attn:    Keith A Simon | |
|---|---|

**6.    Confirmation Hearing.**  A hearing to confirm the Plan will commence on **December 13, 2016, at 10:00 a.m., New York Time** (the "Confirmation Hearing"), before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York.  Please be advised that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Court or otherwise.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing as permitted by the Bankruptcy Code.

**7.    Plan Supplement.**  The Debtors intend to file a Plan Supplement prior to the Confirmation Hearing that includes, among other things, the list of assumed Executory Contracts and Unexpired Leases.  The Debtors do not intend to serve copies of the Plan Supplement on all parties in interest in these chapter 11 cases; the Plan Supplement, however, may be obtained from the Notice and Claims Agent in accordance with the preceding paragraph.

**8.    Release, Exculpation, and Injunction Language in the Plan.**  Please take notice that Article 9 of the Plan contains the following release, exculpation, and injunction provisions:

> **EXCULPATION.  To the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.  In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.**

> **INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.  On and after the Effective Date, all Persons and Entities other than the Plan Administrator are permanently enjoined from commencing or continuing in**

3

any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which a Debtor retains sole and exclusive authority to pursue in accordance with Article 4 of the Plan.

**INJUNCTION AGAINST INTERFERENCE WITH PLAN.** Upon the entry of the Confirmation Order, except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, present or former independent contractors, present or former content providers, present or former writers, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

**THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS.** on the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that

4

are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, **provided**, **however**, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION, AND INJUNCTION PROVISIONS INCLUDED THEREIN, AS YOUR RIGHTS MIGHT BE AFFECTED.**

Dated: November ___, 2016
New York, New York

/s/ *Draft*_____
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

5

**<u>EXHIBIT 4A</u>**

**Class 1A Ballot**

Class 1A: Second Lien Make-Whole Claim

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                              :
In re                                         :        Chapter 11
                                              :
Gawker Media LLC, *et al.*,[1]                :        Case No. 16-11700 (SMB)
                                              :
               Debtors.                       :        (Jointly Administered)
                                              :
-----------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 1A:  Second Lien Make-Whole Claim**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
> **DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | |
|---|---|---|
| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visting:** https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 1A:  Second Lien Make-Whole Claim

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, AND 4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1A CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 1A Claim Against GMGI.** The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1A Claim against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 1A Claim against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.          ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

59365223_4

Class 1A:  Second Lien Make-Whole Claim

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

   a.   as of the Voting Record Date, the undersigned was the holder of Class 1A Claim against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

   b.   the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

   c.   the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

   d.   the undersigned has cast the same vote with respect to all of the holder's Class 1A Claims;

   e.   the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

   f.   the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

   g.   the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

59365223_4

Class 1A: Second Lien Make-Whole Claim

**Item 4. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

4

Class 1A:  Second Lien Make-Whole Claim

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 1A BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1A BALLOT WILL NOT BE COUNTED.

---

5

# IMPORTANT INFORMATION

1.   **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Second Lien Make-Whole Claim has been placed in Class 1A under the Plan.

2.   If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.   To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.   If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 1A Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.   The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6.   If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7.   **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.   Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.   The following Ballots will NOT be counted:

   a.   any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b.   any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

   c.   any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

## **EXHIBIT 4B**

**Class 1C Ballot**

59365223_4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                    :
In re                                               :          Chapter 11
                                                    :
Gawker Media LLC, *et al.*,[1]                      :          Case No. 16-11700 (SMB)
                                                    :
                        Debtors.                    :          (Jointly Administered)
                                                    :
-------------------------------------------------------------------x

### BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC, GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.

### CLASS 1C:  General Unsecured Claims

> ### THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

59365223_4

Class 1C:  General Unsecured Claims

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, 3 (IF APPLICABLE) AND 5.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1C CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

59365223_4

**Item 1.  Amount of Vote Class 1C Claim Against GMGI**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1C Claim against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 1C Claim against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check one box):

☐  **Accept** the Plan.            ☐  **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

**Item 3. Convenience Class Election by Holder of Claims That Has Accepted the Plan.**

Each holder of a Class 1C Claim against GMGI that votes to accept the Plan has the option to elect to participate in the GMGI Convenience Class.  Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 1C Claim and (b) $25,000, on account of all of its Claims against any Debtors.

You may complete this Item 3 **only if you voted to accept the Plan in item 2 above**.  By checking this box, the undersigned holder of a Class 1C Claim against GMGI identified herein elects to have its Class 1C Claim treated as a Class 1D – GMGI General Unsecured Convenience Claim and receive the treatment set forth in Article 3.01 (d)(ii) of the Plan.

☐  **Elects** to be treated as a Class 1D – GMGI General Unsecured Convenience Claim

**ANY HOLDER THAT ELECTS TO PARTICIPATE IN THE GMGI CONVENIENCE CLASS ON THIS BALLOT, AND MAKES AN INCONSISTENT ELECTION ON A BALLOT WITH RESPECT TO ITS CLASS 2C AND/OR CLASS 2D CLAIM(S) IS DEEMED PART OF THE GMGI CONVENIENCE CLASS AND WILL RECEIVE ONLY A SINGLE DISTRIBUTION ON ACCOUNT OF ALL CLAIMS AGAINST ANY DEBTOR(S).**

3

**Item 4. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 1C Claim against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 1C Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

4

Class 1C:  General Unsecured Claims

**Item 5. Holder of Claim Information and Signature**.

_____

Name of Holder of Claim (Please Print)

_____

Authorized Signature

_____

Name of Signatory

_____

If by Authorized Agent, Name and Title

_____

Name of Institution

_____

Street Address

_____

City, State, Zip Code

_____

Telephone Number

_____

Email Address

_____

Social Security or Federal Taxpayer Identification Number

_____

Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the
instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,
BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

5

Class 1C:  General Unsecured Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 1C BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1C BALLOT WILL NOT BE COUNTED.

---

6

Class 1C:  General Unsecured Claims

# IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote. You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan. Your General Unsecured Claim has been placed in Class 1C under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/. The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot." Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description. **Each Ballot is only for voting those Claims described on the Ballot. Please complete and return each Ballot you receive. The attached Ballot is designated only for voting Class 1C Claims.** You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote. Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. If you elect to participate in the GMGI Convenience Class on this Ballot, and make an inconsistent election on a Ballot with respect to your Class 2C and/or 2D claims, you will be deemed part of the GMGI Convenience Class and receive only the single distribution on account of all Claims against any Debtors.

6. The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

7. If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

8. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted. An envelope addressed to the Voting Agent is enclosed for your convenience. Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

9. Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

10. The following Ballots will NOT be counted:

   a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

7

c.      any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

8

## **EXHIBIT 4C**

## **Class 1F Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                             :
In re                                        :        Chapter 11
                                             :
Gawker Media LLC, *et al.*,[1]               :        Case No. 16-11700 (SMB)
                                             :
                       Debtors.              :        (Jointly Administered)
                                             :
-------------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 1F:  Preferred Equity Interests**

<div style="border:1px solid">

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

</div>

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | |
|---|---|---|
| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:**  https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Floor, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Floor, 33rd Floor, New York, NY 10022.

Class 1F:  Preferred Equity Interests

---

## VOTING INSTRUCTIONS
## FOR COMPLETING THE BALLOT

1.  COMPLETE ITEMS 1, 2, AND 4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1F EQUITY INTEREST EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 1F Equity Interest Against GMGI**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1F Equity Interest against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 1F Equity Interest against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.          ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A EQUITY INTEREST THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL EQUITY INTERESTS OF ONE CLASS WILL NOT BE COUNTED.**

2

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 1F Equity Interest against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 1F Equity Interests;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Equity Interests identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Equity Interests, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

Class 1F:  Preferred Equity Interests

**Item 4. Holder of Equity Interest Information and Signature**.

_____
Name of Holder of Equity Interest (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the
instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,
BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

4

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Equity Interests described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 1F BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1E BALLOT WILL NOT BE COUNTED.

---

Class 1F:  Preferred Equity Interests

# IMPORTANT INFORMATION

1.    **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Equity Interest(s) under the Plan.  Your Preferred Equity Interest has been placed in Class 1F under the Plan.

2.    If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.    To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.    If you hold Equity Interests in more than one voting Class under the Plan, you may receive a separate Ballot for each such Equity Interest, coded by Class number and description.  **Each Ballot is only for voting those Equity Interests described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 1F Equity Interests.**  You must vote all of your Equity Interests within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Equity Interests within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.    The Ballot does not constitute and shall not be deemed a proof of Equity Interest or an assertion of a Equity Interest.

6.    If you cast more than one Ballot voting the same Equity Interest prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Equity Interest.

7.    **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.    Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.    The following Ballots will NOT be counted:

    a.    any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.    any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Equity Interest;

    c.    any Ballot cast by an entity that (a) does not hold a Equity Interest in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

59365223_4

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Equity Interest;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Equity Interests of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

# EXHIBIT 4D

## Class 2A Ballot

Class 2A:  Second Lien Make-Whole Guaranty Claim

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|   | : |   |
| In re | : | Chapter 11 |
|   | : |   |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
|   | : |   |
| Debtors. | : | (Jointly Administered) |
|   | : |   |

-----------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2A:  Second Lien Make-Whole Guaranty Claim**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2A:  Second Lien Make-Whole Guaranty Claim

---

# VOTING INSTRUCTIONS
## FOR COMPLETING THE BALLOT

1.  COMPLETE ITEMS 1, 2, AND 4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2A CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 2A Claim Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2A Claim against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2A Claim against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.        ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

59365223_4

Class 2A:  Second Lien Make-Whole Guaranty Claim

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 2A Claim against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 2A Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

3

Class 2A:  Second Lien Make-Whole Guaranty Claim

**Item 4. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the
instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,
BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

4

Class 2A:  Second Lien Make-Whole Guaranty Claim

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT ***ACTUALLY RECEIVE*** THIS CLASS 2A BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2A BALLOT WILL NOT BE COUNTED.

---

5

Class 2A:  Second Lien Make-Whole Guaranty Claim

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Second Lien Make-Whole Guaranty Claim has been placed in Class 2A under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 2A Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").**  If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.  The following Ballots will NOT be counted:

    a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

    c.  any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

Class 2A:  Second Lien Make-Whole Guaranty Claim

d.    any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.    any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.    any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.    any unsigned Ballot;

h.    any Ballot that does not contain an original signature; or

i.    any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

7

## EXHIBIT 4E

## Class 2C Ballot

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                    :
In re                                               :        Chapter 11
                                                    :
Gawker Media LLC, *et al.*,[1]                      :        Case No. 16-11700 (SMB)
                                                    :
                      Debtors.                      :        (Jointly Administered)
                                                    :
-------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2C:  General Unsecured Claims**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2C:  General Unsecured Claims

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, 3 (IF APPLICABLE) AND 5.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2C CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

59365223_4

**Item 1.  Amount of Vote Class 2C Claim Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2C Claim against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2C Claim against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.          ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

**Item 3. Convenience Class Election by Holder of Claims That Has Accepted the Plan.**

Each holder of a Class 2D Claim against Gawker Media that votes to accept the Plan has the option to elect to participate in the Gawker Media Unsecured Convenience Class.  Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 2D Claim and (b) $25,000, on account of all of its Claims against any Debtors.

You may complete this Item 3 **only if you voted to accept the Plan in item 2 above**.  By checking this box, the undersigned holder of a Class 2D Claim against Gawker Media identified herein elects to have its Class 2D Claim treated as a Class 2E – Gawker Media General Unsecured Convenience Claim and receive the treatment set forth in Article 3.02 (e)(ii) of the Plan.

☐ **Elects** to be treated as a Class 2E – Gawker Media General Unsecured Convenience Claim

**ANY HOLDER THAT ELECTS TO PARTICIPATE IN THE GAWKER MEDIA CONVENIENCE CLASS ON THIS BALLOT, AND MAKES AN INCONSISTENT ELECTION ON A BALLOT WITH RESPECT TO ITS CLASS 1C AND/OR CLASS 2D CLAIM(S) IS DEEMED PART OF THE GAWKER MEDIA CONVENIENCE CLASS AND WILL RECEIVE ONLY A SINGLE DISTRIBUTION ON ACCOUNT OF ALL CLAIMS AGAINST ANY DEBTOR(S).**

**Item 4. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 2C Claim against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 2C Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

**Item 5. Holder of Claim Information and Signature**.

_____

Name of Holder of Claim (Please Print)

_____

Authorized Signature

_____

Name of Signatory

_____

If by Authorized Agent, Name and Title

_____

Name of Institution

_____

Street Address

_____

City, State, Zip Code

_____

Telephone Number

_____

Email Address

_____

Social Security or Federal Taxpayer Identification Number

_____

Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

Class 2C:  General Unsecured Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 2C BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2C BALLOT WILL NOT BE COUNTED.

---

Class 2C:  General Unsecured Claims

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote. You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan. Your General Unsecured Claim has been placed in Class 2C under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/. The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot." Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description. **Each Ballot is only for voting those Claims described on the Ballot. Please complete and return each Ballot you receive. The attached Ballot is designated only for voting Class 2C Claims.** You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote. Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  If you elect to participate in the Gawker Media Convenience Class on this Ballot, and make an inconsistent election on a Ballot with respect to your Class 1C and/or 2D claims, you will be deemed part of the Gawker Media Convenience Class and receive only the single distribution on account of all Claims against any Debtors.

6.  The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

7.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

8.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted. An envelope addressed to the Voting Agent is enclosed for your convenience. Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

9.  Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

10. The following Ballots will NOT be counted:

    a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

7

c.      any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

## **EXHIBIT 4F**

## **Class 2D Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
In re                                           :         Chapter 11
:
Gawker Media LLC, *et al.*,[1]                  :         Case No. 16-11700 (SMB)
:
Debtors.                     :         (Jointly Administered)
:
-------------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2D:  Punitive Damage Claims**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
> **DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.   The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | |
|---|---|---|
| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:**    https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2D:  Punitive Damage Claims

## VOTING INSTRUCTIONS
## FOR COMPLETING THE BALLOT

1.  COMPLETE ITEMS 1, 2, 3(IF APPLICABLE), AND 5.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2D CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

59365223_4

Class 2D:  Punitive Damage Claims

**Item 1.  Amount of Vote Class 2D Claim Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2D Claim against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2D Claim against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.          ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

**Item 3. Convenience Class Election by Holder of Claims That Has Accepted the Plan.**

Each holder of a Class 2D Claim against Gawker Media that votes to accept the Plan has the option to elect to participate in the Gawker Media Unsecured Convenience Class.  Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 2D Claim and (b) $25,000, on account of all of its Claims against any Debtors.

You may complete this Item 3 **only if you voted to accept the Plan in item 2 above**.  By checking this box, the undersigned holder of a Class 2D Claim against Gawker Media identified herein elects to have its Class 2D Claim treated as a Class 2E – Gawker Media General Unsecured Convenience Claim and receive the treatment set forth in Article 3.02 (e)(ii) of the Plan.

☐ **Elects** to be treated as a Class 2E – Gawker Media General Unsecured Convenience Claim

**ANY HOLDER THAT ELECTS TO PARTICIPATE IN THE GAWKER MEDIA CONVENIENCE CLASS ON THIS BALLOT, AND MAKES AN INCONSISTENT ELECTION ON A BALLOT WITH RESPECT TO ITS CLASS 1C AND/OR CLASS 2C CLAIM(S) IS DEEMED PART OF THE GAWKER MEDIA CONVENIENCE CLASS AND WILL RECEIVE ONLY A SINGLE DISTRIBUTION ON ACCOUNT OF ALL CLAIMS AGAINST ANY DEBTOR(S).**

59365223_4

**Item 4. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.   as of the Voting Record Date, the undersigned was the holder of Class 2D Claim against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.   the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.   the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.   the undersigned has cast the same vote with respect to all of the holder's Class 2D Claims;

e.   the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.   the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.   the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

Class 2D:  Punitive Damage Claims

**Item 5. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)

_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

5

Class 2D:  Punitive Damage Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 2D BALLOT ON
OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2D BALLOT WILL
NOT BE COUNTED.

---

59365223_4

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Punitive Damage Claim has been placed in Class 2D under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 2D Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  If you elect to participate in the Gawker Media Convenience Class on this Ballot, and make an inconsistent election on a Ballot with respect to your Class 1C and/or 2C claims, you will be deemed part of the Gawker Media Convenience Class and receive only the single distribution on account of all Claims against any Debtors.

6.  The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

7.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

8.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

9.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

10.  The following Ballots will NOT be counted:

   a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

7

Class 2D:  Punitive Damage Claims

c.      any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

8

**<u>EXHIBIT 4G</u>**

**<u>Class 2G Ballot</u>**

Class 2G: Membership Interest

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                        :
In re                                                   :       Chapter 11
                                                        :
Gawker Media LLC, *et al.*,[1]                          :       Case No. 16-11700 (SMB)
                                                        :
                     Debtors.                           :       (Jointly Administered)
                                                        :
----------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT
CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2G: Membership Interest**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS
> DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement. The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order"). The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft. Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable. References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below. Ballots received after the Voting Deadline will not be counted.

| | | |
|---|---|---|
| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:** https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2G:  Membership Interest

---

## VOTING INSTRUCTIONS
## FOR COMPLETING THE BALLOT

1. COMPLETE ITEMS 1, 2, AND 4.

2. SIGN THE BALLOT.

3. RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4. THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5. YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2G EQUITY INTEREST EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6. ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7. ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 2G Equity Interest Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2G Equity Interest against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2G Equity Interest against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.          ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A EQUITY INTEREST THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL EQUITY INTERESTS OF ONE CLASS WILL NOT BE COUNTED.**

2

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 2G Equity Interest against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 2G Equity Interests;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Equity Interests identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Equity Interests, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

3

Class 2G:  Membership Interest

**Item 4. Holder of Equity Interest Information and Signature**.

_____
Name of Holder of Equity Interest (Please Print)

_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the
instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,
BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU  MAY  ALSO  EMAIL  THE  VOTING  AGENT  AT  GAWKERBALLOTS@PRIMECLERK.COM**

4

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Equity Interests described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 2F BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2F BALLOT WILL NOT BE COUNTED.

---

5

# IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Equity Interest(s) under the Plan.  Your Membership Interest has been placed in Class 2G under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Equity Interests in more than one voting Class under the Plan, you may receive a separate Ballot for each such Equity Interest, coded by Class number and description.  **Each Ballot is only for voting those Equity Interests described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 2G Equity Interests.**  You must vote all of your Equity Interests within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Equity Interests within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Equity Interest or an assertion of a Equity Interest.

6. If you cast more than one Ballot voting the same Equity Interest prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Equity Interest.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8. <u>Please be sure to sign and date your Ballot.</u>  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

   a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Equity Interest;

   c. any Ballot cast by an entity that (a) does not hold a Equity Interest in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.    any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.    any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Equity Interest;

f.    any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.    any unsigned Ballot;

h.    any Ballot that does not contain an original signature; or

i.    any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Equity Interests of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

**<u>EXHIBIT 4H</u>**

**<u>Class 3A Ballot</u>**

59365223_4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Gawker Media LLC, *et al.*,[1] | : | Case No. 16-11700 (SMB) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
-------------------------------------------------------------------x

### BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT
### CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
### GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.

#### CLASS 3A:  Second Lien Make-Whole Guaranty Claim

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Hungary Kft. (the "Gawker Hungary Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft. ("Gawker Hungary").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Hungary Plan, as incorporated in the Joint Plan.

The Gawker Hungary Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Hungary Plan and if the Gawker Hungary Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Hungary Plan if it finds that the Gawker Hungary Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Hungary Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Hungary Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | |
|---|---|---|
| **By Regular Mail,** **Hand Delivery or** **Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting** **Agent's E-Ballot** **Platform by visiting:** https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 3A: Second Lien Make-Whole Guaranty Claim

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.   COMPLETE ITEMS 1, 2, AND 4.

2.   SIGN THE BALLOT.

3.   RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.   BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.   AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.   THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.   YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 3A CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.   ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.   ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.   IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 3A Claim Against Gawker Hungary**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 3A Claim against Gawker Hungary in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 3A Claim against Gawker Hungary as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.                    ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

59365223_4

Class 3A:  Second Lien Make-Whole Guaranty Claim

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.   as of the Voting Record Date, the undersigned was the holder of Class 3A Claim against Gawker Hungary of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.   the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.   the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.   the undersigned has cast the same vote with respect to all of the holder's Class 3A Claims;

e.   the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.   the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.   the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

3

**Item 4. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

4

Class 3A:  Second Lien Make-Whole Guaranty Claim

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT ***ACTUALLY RECEIVE*** THIS CLASS 3A BALLOT ON
OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 3A BALLOT WILL
NOT BE COUNTED.

---

59365223_4

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Second Lien Make-Whole Guaranty Claim has been placed in Class 3A under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 3A Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").**  If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.  The following Ballots will NOT be counted:

    a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

    c.  any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

6

Class 3A:  Second Lien Make-Whole Guaranty Claim

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

7

# **EXHIBIT 4I**

## **Class 3E Ballot**

59365223_4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
: 
In re : Chapter 11
: 
Gawker Media LLC, *et al.*,[1] : Case No. 16-11700 (SMB)
: 
Debtors. : (Jointly Administered)
: 
-------------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 3E:  Membership Interest**

| **THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS DECEMBER 5. 2016. at 5:00 P.M. (NEW YORK TIME).** |
| --- |

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Hungary Kft. (the "Gawker Hungary Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft. ("Gawker Hungary").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Hungary Plan, as incorporated in the Joint Plan.

The Gawker Hungary Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Hungary Plan and if the Gawker Hungary Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Hungary Plan if it finds that the Gawker Hungary Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Hungary Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Hungary Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | |
| --- | --- | --- |
| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Via the Voting Agent's E-Ballot Platform by visiting:** https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 3E:  Membership Interest

---

## VOTING INSTRUCTIONS
## FOR COMPLETING THE BALLOT

1.  COMPLETE ITEMS 1, 2, AND 4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 3E EQUITY INTEREST EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 3E Equity Interest Against Gawker Hungary**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 3E Equity Interest against Gawker Hungary in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 3E Equity Interest against Gawker Hungary as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

☐ **Accept** the Plan.            ☐ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A EQUITY INTEREST THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL EQUITY INTERESTS OF ONE CLASS WILL NOT BE COUNTED.**

2

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 3E Equity Interest against Gawker Hungary of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 3E Equity Interests;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Equity Interests identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Equity Interests, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

3

Class 3E:  Membership Interest

**Item 4. Holder of Equity Interest Information and Signature**.

_____
Name of Holder of Equity Interest (Please Print)

_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the instructions below.

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

4

Class 3E: Membership Interest

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Equity Interests described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 3E BALLOT ON
OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 3E BALLOT WILL
NOT BE COUNTED.

---

59365223_4

# IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Equity Interest(s) under the Plan.  Your Membership Interest has been placed in Class 3E under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Equity Interests in more than one voting Class under the Plan, you may receive a separate Ballot for each such Equity Interest, coded by Class number and description.  **Each Ballot is only for voting those Equity Interests described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 3E Equity Interests.  You must vote all of your Equity Interests within a single Class either to accept or reject the Plan and m**ay not split your vote.  Accordingly, if you return more than one Ballot voting different Equity Interests within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Equity Interest or an assertion of a Equity Interest.

6. If you cast more than one Ballot voting the same Equity Interest prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Equity Interest.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8. <u>Please be sure to sign and date your Ballot.</u>  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

   a.   any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b.   any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Equity Interest;

   c.   any Ballot cast by an entity that (a) does not hold a Equity Interest in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

6

Class 3E:  Membership Interest

d.	any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.	any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Equity Interest;

f.	any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.	any unsigned Ballot;

h.	any Ballot that does not contain an original signature; or

i.	any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Equity Interests of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

59365223_4

# **EXHIBIT 5**

**Non-Voting Status Notice for Unimpaired Classes**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                       :
In re                                  :        Chapter 11
                                       :
Gawker Media LLC, et al.,[1]           :        Case No. 16-11700 (SMB)
                                       :
                    Debtors.           :        (Jointly Administered)
                                       :
-------------------------------------------------------x
```

<div align="center">

**NOTICE OF NON-VOTING STATUS WITH RESPECT TO
UNCLASSIFIED AND UNIMPAIRED CLASSES DEEMED TO
ACCEPT THE DEBTORS' AMENDED JOINT CHAPTER 11
PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

</div>

**PLEASE TAKE NOTICE** that on November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Order"), approving the Disclosure Statement, filed September 30, 2016 (the "Disclosure Statement"), for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft. (the "Joint Plan"), for use by Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI") and Gawker Hungary Kft. ("Gawker Hungary"), as debtors and debtors in possession (collectively, the "Debtors"), in soliciting acceptances or rejections of the Plan from holders of certain impaired claims who are entitled to vote and are (or may be) entitled to receive distributions under the Plan.

**PLEASE TAKE FURTHER NOTICE** that you are receiving this notice because, pursuant to the terms of Article 3 of the Plan and the applicable provisions of the Bankruptcy Code, your Claim(s) against or Equity Interest(s) in the Debtors are Unimpaired and, therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan.  Accordingly, this notice and the *Notice of Entry of Order Approving (I) the Adequacy of the Disclosure Statement, (I) the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Amended Joint Chapter 11 Plan for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* are being sent to you for informational purposes only.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding this Notice of Non-Voting Status, holders of Claims or Equity Interests in the Unclassified and Unimpaired Classes have the right to (i) contest their non-voting status, and (ii) object to the confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** THAT ARTICLE 9 OF THE JOINT PLAN CONTAINS EXCULPATION FOR THE DEBTORS, THE COMMITTEE AND CERTAIN RELATED PERSONS AS WELL AS THIRD-PARTY RELEASES OF CERTAIN FORMER EMPLOYEES AND INDEPENDENT CONTRACTORS, WHICH ARE SET FORTH ON UNDERLINE EXHIBIT 1 HERETO. **YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER EXHIBIT 1,** AND TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION AND RELEASE PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

**PLEASE TAKE FURTHER NOTICE** that, if you believe that you may have a claim against the Debtors that has been misclassified and which entitles you to vote on the Plan, then you must file with the Bankruptcy Court a motion for an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (a "3018 Motion"), temporarily allowing such claim in a different class for purposes of voting to accept or reject the Joint Plan (i) on or before **November 23, 2016**, or (ii) if the Debtors file an objection to a claim after the Confirmation Hearing Notice served, on or before ten (10) calendar days after service of notice of such objection (either (i) or (ii), the "3018 Motion Deadline").

The 3018 Motion must be served so as to be **actually received** no later than **5:00 p.m. (Prevailing Eastern Time) on the 3018 Motion Deadline** by the following notice parties:  (i) the chambers of the Honorable Stuart M. Bernstein, One Bowling Green, New York, New York 10004, Courtroom 723; (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Greg Zipes and Susan Arbeit); (iii) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036 (Attn: Gregg Galardi), attorneys for the Debtors; (iv) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandeep Qusba), counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (v) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 606011, Attn: David Heller & Keith A. Simon, 885 Third Avenue, New York, New York 10022 (Attn: Keith A Simon), counsel to US VC Partners LP, as Prepetition Second Lien Lender.

**PLEASE TAKE FURTHER NOTICE** THAT YOU WILL NOT BE SERVED WITH A COPY OF THE ORDER, THE PLAN, OR THE DISCLOSURE STATEMENT.  If you have any questions about your claim(s) or would like to request a copy of the Order, the Plan or Disclosure Statement, you should contact the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.

59365223_4

Dated: November ___, 2016
      New York, New York

/s/ DRAFT_____
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

59365223_4

## EXHIBIT 1

## EXCULPATION

**Pursuant to section 9.04 of the Plan, to the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.  In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.**

## THIRD-PARTY RELEASES OF RELEASED EMPLOYEES
## AND INDEPENDENT CONTRACTORS.

**Pursuant to section 9.05 of the Plan, on the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, provided, however, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.**

4

# **EXHIBIT 6**

**Non-Voting Status Notice for Deemed Rejecting Classes**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
Gawker Media LLC, *et al.*,[1]            :        Case No. 16-11700 (SMB)
                                          :
                    Debtors.              :        (Jointly Administered)
                                          :
--------------------------------------------------------x

## NOTICE OF NON-VOTING STATUS WITH RESPECT TO UNCLASSIFIED AND UNIMPAIRED CLASSES DEEMED TO ACCEPT THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC, GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.

**PLEASE TAKE NOTICE** that on November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Order"), approving the Disclosure Statement, filed September 30, 2016 (the "Disclosure Statement"), for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft. (the "Joint Plan"), for use by Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI") and Gawker Hungary Kft. ("Gawker Hungary"), as debtors and debtors in possession (collectively, the "Debtors"), in soliciting acceptances or rejections of the Plan from holders of certain impaired claims who are entitled to vote and are (or may be) entitled to receive distributions under the Plan.

**PLEASE TAKE FURTHER NOTICE** that you are receiving this notice because, pursuant to the terms of Article 3 of the Plan and the applicable provisions of the Bankruptcy Code, your Claim(s) against or Equity Interest(s) in the Debtors are Unimpaired and, therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the *Notice of Entry of Order Approving (I) the Adequacy of the Disclosure Statement, (I) the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Amended Joint Chapter 11 Plan for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* are being sent to you for informational purposes only.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding this Notice of Non-Voting Status, holders of Claims or Equity Interests in the Unclassified and Unimpaired Classes have the right to (i) contest their non-voting status, and (ii) object to the confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** THAT ARTICLE 9 OF THE JOINT PLAN CONTAINS EXCULPATION FOR THE DEBTORS, THE COMMITTEE AND CERTAIN RELATED PERSONS AS WELL AS THIRD-PARTY RELEASES OF CERTAIN FORMER EMPLOYEES AND INDEPENDENT CONTRACTORS, WHICH ARE SET FORTH ON EXHIBIT 1 HERETO.  **YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER EXHIBIT 1,** AND TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION AND RELEASE PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

**PLEASE TAKE FURTHER NOTICE** that, if you believe that you may have a claim against the Debtors that has been misclassified and which entitles you to vote on the Plan, then you must file with the Bankruptcy Court a motion for an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (a "3018 Motion"), temporarily allowing such claim in a different class for purposes of voting to accept or reject the Joint Plan (i) on or before **November 23, 2016**, or (ii) if the Debtors file an objection to a claim after the Confirmation Hearing Notice served, on or before ten (10) calendar days after service of notice of such objection (either (i) or (ii), the "3018 Motion Deadline").

The 3018 Motion must be served so as to be **actually received** no later than **5:00 p.m. (Prevailing Eastern Time) on the 3018 Motion Deadline** by the following notice parties:  (i) the chambers of the Honorable Stuart M. Bernstein, One Bowling Green, New York, New York 10004, Courtroom 723; (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Greg Zipes and Susan Arbeit); (iii) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036 (Attn: Gregg Galardi), attorneys for the Debtors; (iv) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandeep Qusba), counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (v) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 606011, Attn: David Heller & Keith A. Simon, 885 Third Avenue, New York, New York 10022 (Attn: Keith A Simon), counsel to US VC Partners LP, as Prepetition Second Lien Lender.

**PLEASE TAKE FURTHER NOTICE** THAT YOU WILL NOT BE SERVED WITH A COPY OF THE ORDER, THE PLAN, OR THE DISCLOSURE STATEMENT.  If you have any questions about your claim(s) or would like to request a copy of the Order, the Plan or Disclosure Statement, you should contact the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.

59365223_4

Dated: November ___, 2016
    New York, New York

*/s/ DRAFT*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

3

## EXHIBIT 1

### EXCULPATION

**Pursuant to section 9.04 of the Plan, to the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.  In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.**

### THIRD-PARTY RELEASES OF RELEASED EMPLOYEES
### AND INDEPENDENT CONTRACTORS.

**Pursuant to section 9.05 of the Plan, on the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, provided, however, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.**

4

## **EXHIBIT 7**

**Disputed Claim Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                           :
In re                                      :    Chapter 11
                                           :
Gawker Media LLC, *et al.*,[1]             :    Case No. 16-11700 (SMB)
                                           :
                    Debtors.               :    (Jointly Administered)
                                           :
-------------------------------------------------------x

### NOTICE OF DISPUTED CLAIM STATUS AND ELECTION FORM

**PLEASE TAKE NOTICE THAT** on November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under section 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"), and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes with regard to the acceptance or rejection of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice in addition to the Solicitation Package because you are the Holder of a Claim or Equity Interest that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless a Resolution Event (as defined below) has taken place by the Confirmation Hearing;** provided, however that if your Claims is classified in Class 1C, Class 2C or Class 2D you **may** elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached hereto as **Exhibit A** and submitting it to the Voting Agent in accordance with the instructions therein.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** a "<u>Resolution Event</u>" means the occurrence of one or more of the following events no later than three (3) days prior to the Voting Deadline:

(a)     an order of the Court is entered allowing the Disputed Claim or Equity Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

(b)     an order of the Court is entered temporarily allowing the Disputed Claim or Equity Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

(c)     a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors resolving the objection and allowing such Disputed Claim or Equity Interest in an agreed upon amount;

(d)     a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors temporarily allowing the holder of such Claim or Equity Interest to vote its Claim or Equity Interest in an agreed upon amount; or

(e)     the pending objection to the Disputed Claim or Equity Interest is voluntarily withdrawn by the Debtors.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact Prime Clerk LLC, the Voting Agent Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.

Dated: November ___, 2016      */s/ DRAFT*____
     New York, New York      ROPES & GRAY LLP
                                        Gregg M. Galardi
                                        D. Ross Martin
                                        Joshua Y. Sturm
                                        Jonathan M. Agudelo
                                        1211 Avenue of the Americas
                                        New York, NY 10036-8704
                                        Telephone: (212) 596-9000
                                        Facsimile: (212) 596-9090
                                        gregg.galardi@ropesgray.com
                                        ross.martin@ropesgray.com
                                        joshua.sturm@ropesgray.com
                                        jonathan.agudelo@ropesgray.com

                                        *Counsel to the Debtors*
                                        *and Debtors in Possession*

59365223_4

## EXHIBIT A

**Disputed Claim Convenience Class Election Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                    :

In re                                 :        Chapter 11

                                    :

Gawker Media LLC, *et al.*,[1]       :        Case No. 16-11700 (SMB)

                                    :

             Debtors.        :        (Jointly Administered)

                                    :

-------------------------------------------------------x

## DISPUTED CLAIM CONVENIENCE CLASS ELECTION FORM

---

**THE DEADLINE TO SUBMIT THIS ELECTION FORM IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This form (the "Election Form") is being provided to you in connection with the Notice of Disputed Claim Status and Election Form (the "Disputed Claim Notice") in order to provide you with the opportunity to elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, pursuant to the Debtors' Plan (the "Election"). Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 1C Claim and (b) $25,000, on account of all of its Claims against any Debtors. Capitalized terms used in this Election Form or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Disputed Claim Notice and Election Form or the Plan, as applicable.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

In order for your Election to be effective, you must complete, sign, and return this Election Form to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Election Deadline"), at the applicable address indicated below. Election Forms received after the Election Deadline will not be counted.

| | |
|---|---|
| **By Regular Mail,** | Gawker Ballot Processing |
| **Hand Delivery or** | c/o Prime Clerk LLC |
| **Overnight Courier:** | 830 Third Avenue, 3rd Floor |
| | New York, NY 10022 |

---

[1] The last four digits of the taxpayer identification number of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Disputed Claim Convenience Class Election Form

## ELECTION INSTRUCTIONS
## FOR COMPLETING THE ELECTION FORM

1.      COMPLETE ITEMS 1, 2, AND 4.

2.      **SIGN THE ELECTION FORM.**

3.      RETURN THE ELECTION FORM TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE ELECTION DEADLINE.   ELECTION FORMS RECEIVED AFTER THE ELECTION DEADLINE WILL NOT BE EFFECTIVE.   AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.      THE VOTING AGENT WILL NOT ACCEPT ELECTION FORMS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS.

5.      ALL ELECTION FORMS MUST BE FULLY EXECUTED TO BE VALID.  IF AN ELECTION FORM IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE ELECTION FORM <u>MUST</u> BE INCLUDED WITH THE ELECTION FORM.

59365223_4

Disputed Claim Convenience Class Election Form

**Item 1.  Amount of Claims**.  The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of the Claims set forth below;

        Class 1C – GMGI General Unsecured Claims:       $_____

        Class 2C – Gawker Media General Unsecured Claims:   $_____

        Class 2D – Gawker Media Punitive Damage Claims:   $_____

**Item 2. Convenience Class Election.**

By checking this box, the undersigned holder of the Claims listed in Item 1 (a) elects to be treated as GMGI or Gawker Media Convenience Class Creditor, as applicable, and receive the treatment set forth in Article 3 of the Plan (b) affirms its understanding that by making the Election it will be deemed to have voted to Accept the Plan as a member of Class 1D or Class 2E, as applicable.

☐  **Elects** to be treated as a GMGI or Gawker Media Convenience Class Creditor, as applicable.

-3-

59365223_4

Disputed Claim Convenience Class Election Form

**Item 3. Certifications and Acknowledgments**.  By signing this Election Form, the undersigned certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of the Claims in the amount listed in Item 1 above and has the full authority to complete this Election Form;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned understands and acknowledges that no other Election Forms with respect to the Claims identified in Item 1 above have been submitted or, if any other Election Forms have been submitted with respect to such Claims, then any such earlier received Election Forms are hereby revoked; and

e.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Election Form, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Disputed Claim Convenience Class Election Form

**Item 4. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)

_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS ELECTION FORM AND RETURN THE ORIGINAL ELECTION FORM PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

---

**TO BE EFFECTIVE, YOUR ELECTION FORM MUST BE
ACTUALLY RECEIVED BY THE ELECTION DEADLINE, WHICH IS
DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME)**

**ELECTION FORMS RECEIVED VIA EMAIL OR FAX WILL NOT BE EFFECTIVE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS ELECTION FORM OR THE ELECTION
PROCESS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,
BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_4

**<u>EXHIBIT C</u>**

**Liquidation Analysis**

**[To Come]**

# **EXHIBIT B**

**Redline Against Disclosure Statement Filed on September 30, 2016**

Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                  :     Chapter 11
In re                                             :
                                                  :     Case No. 16-11700 (SMB)
Gawker Media LLC, *et al.*,[1]                    :
                                                  :     (Jointly Administered)
                Debtors.                          :
                                                  :
———————————————————— x

**DISCLOSURE STATEMENT FOR THE DEBTORS' AMENDED JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA**
**GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.[2]**

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

Dated:  ~~September 30,~~ November 2, 2016

---

[1]   The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY ~~10020~~10022. Gawker Media Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY ~~10020~~10022.

[2]   Pursuant to the Unimoda APA, the Debtor entity that ~~is currently known as~~was formerly named Kinja Kft. ~~is~~was required to ~~change its name. The Debtors anticipate that, by the date of the Disclosure Statement Hearing, that Debtor will be~~be re-named, and has now been re-named as Gawker Hungary Kft.

THIS ~~DOSCLOSURE~~DISCLOSURE STATEMENT IS PROVIDED IN CONNECTION WITH SOLICITATION OF VOTES ON THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING CLAIMS AND EQUITY INTERESTS IN THE FOLLOWING CLASSES:

| Voting Class | Name of Class Under the Plan |
|---|---|
| Class 1A | ~~GMGI Second~~GMGI – Second Lien Make-Whole Claim |
| Class 1C | ~~GMGI~~GMGI – General Unsecured Claims |
| Class 1~~E~~F | ~~GMGI~~GMGI – Preferred Equity Interests |
| Class 2A | Gawker ~~Media~~Media – Second Lien Make-Whole Guaranty Claim |
| Class 2C | Gawker ~~Media~~Media – General Unsecured Claims |
| Class 2D | Gawker ~~Media~~Media – Punitive ~~Damages~~Damage Claims |
| Class 3A | Gawker ~~Hungary~~Hungary – Second Lien Make-Whole Guaranty Claim |

IF YOU HOLD A CLAIM OR EQUITY INTEREST IN ONE OF THESE CLASSES, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

THE DEADLINE TO VOTE ON THE PLAN IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME). FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE *AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE TO ACCEPT ~~OR REJECT~~OR REJECT THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN~~.~~ AND THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS DESCRIBED IN ARTICLE IX.E. HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, EACH OF WHOM URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN. THE DEBTORS FURTHER URGE EACH HOLDER OF A CLAIM OR EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN. THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' CURRENT AND FORMER MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF, OR SUCH OTHER DATES AS ARE SPECIFICALLY NOTED HEREIN, AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR

REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THIS DISCLOSURE STATEMENT. THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN. **AND THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS DESCRIBED IN ARTICLE IX.E. HEREIN.**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................... ~~4~~1

II.     PRELIMINARY STATEMENT ................................................................ ~~4~~1

III.    SUMMARY OF THE PLAN ..................................................................... ~~5~~2

IV.     THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ... ~~12~~9

        A.      Overview of the Debtors' Business .............................................. ~~12~~9
        B.      Intercompany Arrangements Between Gawker Media and Gawker Hungary ... ~~13~~9
        C.      The Debtors' Primary Assets ...................................................... ~~13~~10
        D.      The Debtors' Capital Structure and Prepetition Indebtedness ........ ~~14~~11
        E.      Employees ~~16~~ and Independent Contractors ................................. 13
        F.      Directors and Officers ............................................................... ~~16~~13

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................ ~~16~~14

        A.      Bollea Judgment ....................................................................... ~~16~~14
        B.      Article Lawsuits ....................................................................... ~~17~~15
        C.      Appointment of Independent Director .......................................... ~~18~~17

VI.     EVENTS DURING THE BANKRUPTCY CASES ................................... ~~19~~17

        A.      First Day Pleadings and Other Case Matters ................................ ~~19~~17
        B.      The Appointment of Special Board Committee ............................. ~~23~~21
        C.      Sale of Substantially All of the Debtors' Assets .......................... ~~23~~21
        D.      Committee Investigation and Request Letter ............................... 22

VII.    DESCRIPTION OF PLAN SETTLEMENTS .......................................... ~~24~~23

        A.      ~~The~~Settlement of Inter-Debtor Allocation, Intercompany Claims, and Significant Creditor Disputes ~~Resolved by the Plan Settlements 25~~ ... 23
        B.      ~~The Plan Settlements 30~~Second Lien Make-Whole Settlement ....... 29
        C.      Treatments of Claims and Interests Resolving Plan Disputes ......... 29
        ~~C~~D.     Bankruptcy Court Approval of the Plan Settlements ..................... 31

VIII.   THE PLAN – OVERVIEW ...................................................................... 31

        A.      Overview of Chapter 11 ............................................................. 31
        B.      Administrative Claims, Priority Tax Claims, and Other Unclassified Claims ... 32
        C.      Classification of Claims and Interests .......................................... 33
        D.      Claims Asserted Against the Debtors ........................................... 34
        ~~D~~E.     Treatment of Claims and Interests ............................................... ~~34~~35
        ~~E~~F.     Means of Implementation of Plan ............................................... ~~38~~40

IX.     THE PLAN – OTHER PROVISIONS ...................................................... ~~40~~43

        A.      Treatment of Executory Contracts and Unexpired Leases .............. ~~40~~43
        B.      Provisions Governing Distributions ............................................. ~~41~~43
        C.      Provisions for Treatment of Subsequent Plan Distributions ........... ~~42~~44
        D.      Conditions Precedent to Confirmation and Effective Date of the Plan ... ~~43~~45

i

E.      Effect of Plan Confirmation .................................................. 4346
F.      Retention of Jurisdiction ...................................................... 4548
G.      Miscellaneous Provisions ..................................................... 4650
H.      Notices ................................................................................ 4650

X.      LIQUIDATION ANALYSIS ........................................................... 4751

XI.     RISK FACTORS .............................................................................. 4852

        A.      Certain Bankruptcy Law Considerations ............................. 4852
        B.      Risks Related to Recoveries Under the Plan ....................... 5054
        C.      Disclosure Statement Disclaimer ......................................... 5155
        D.      Liquidation Under Chapter 7 ............................................... 5256

XII.    SOLICITATION AND VOTING PROCEDURES ............................. 5256

        A.      Holders of Claims Entitled to Vote on the Plan ................. 5356
        B.      Voting Record Date ............................................................. 5357
        C.      Voting on the Plan ............................................................... 5357
        D.      Ballots and Election Forms Not Counted ............................ 5357

XIII.   CONFIRMATION OF THE PLAN .................................................. 5457

        A.      Requirements for Confirmation of the Plan ......................... 5457
        B.      Best Interests of Creditors/Liquidation Analysis ................ 5458
        C.      Feasibility ............................................................................. 5458
        D.      Acceptance by Impaired Classes ......................................... 5458
        E.      Confirmation without Acceptance by All Impaired Classes ... 5558

XIV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN ............................................................................................... 5659

        A.      In General ............................................................................. 5659
        B.      U.S. Federal Income Tax Consequences to the Debtors ...... 5760
        C.      Professional Fee Claims Reserves ....................................... 5862
        D.      U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests ... 5862
        E.      Backup Withholding and Information Reporting ................... 5963

XV.     RECOMMENDATION ..................................................................... 6164

ii

**EXHIBITS**

EXHIBIT A      Joint Plan of Liquidation

EXHIBIT B      Disclosure Statement Order

EXHIBIT C      Liquidation Analysis

## I.    INTRODUCTION

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft., fka Kinja Kft. ("Gawker Hungary"), as debtors and debtors in possessions (collectively, the "Debtors" or the "Company"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to Holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of acceptances of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may be amended, supplemented, and modified from time to time, the "Plan"),[3] dated September 30, 2016.  The Plan provides for the liquidation of the Debtors and the resolution of all Claims against and Equity Interests in each of the three Debtors in these chapter 11 cases (the "Bankruptcy Cases"), and constitutes a separate chapter 11 plan of liquidation for each Debtor.  Each Class of Claims against or Equity Interests in the Debtors shall be deemed to constitute a separate Class of Claims against and Equity Interests in the relevant Debtor, as applicable, and each such Class shall vote as a single separate Class for such Debtor, as applicable, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each of the Debtors.

**THE DEBTORS EACH BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND EQUITY INTEREST HOLDERS.**

**THE INDEPENDENT DIRECTOR OF GMGI, FOR GMGI ITSELF, AND FOR GMGI TO TAKE ACTION AS THE MANAGER OF GAWKER MEDIA AND THE MANAGER OF GAWKER HUNGARY, HAVE APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND THE DEBTORS EACH RECOMMEND THAT ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors in these Bankruptcy Cases are GMGI and its wholly-owned subsidiaries, Gawker Media and Gawker Hungary.  Prior to filing for bankruptcy, the Company was a privately-held, online media company whereby Gawker Media operated seven distinct media brands with corresponding websites under the names Gawker, Deadspin, Lifehacker, Gizmodo, Kotaku, Jalopnik, and Jezebel (the "Websites"), using certain intellectual property and other intangible assets owned by and licensed from Gawker Hungary.  While Gawker is the most well-known brand and website, the six other brands identified above represented approximately 85% of revenues.  The Debtors also license their web content internationally to third parties that run similar websites based on the Company's brands, such as Gizmodo en Espanol, Gizmodo Australia, Kotaku Australia, and Lifehacker Australia.  Gawker Media's primary source of revenue was earned through sales of advertising space on the Websites.

Historically, the Company's financial health was good; it survived the 2008-2009 recession and was profitable from 2010 until 2015.  However, despite its ~~longrunning~~long running success and commendable growth trajectory, the Company suffered from substantial legal expenses and a recent Florida State court judgment totaling more than $130 million.  While ~~the Company~~Gawker Media believes that the judgment ~~will~~would be overturned on appeal, it could not ~~meet conditions for~~post a bond to obtain a stay pending appeal ~~set by the Florida state court~~ and therefore the imposition of liens on Gawker Media's assets as well as potential execution ~~of~~on the judgment was ~~possible~~imminent.  Accordingly, the Company sought immediate chapter 11 relief.

---

[3]    The Plan is attached hereto as **Exhibit A** and incorporated into this Disclosure Statement by reference.  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

~~59220981_8~~59473927_10

On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Gawker Media Petition Date").  On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively with the Gawker Media Petition Date, the "Petition Dates").  The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Bankruptcy Cases.

The chapter 11 process ~~provides~~provided the Debtors with breathing room from execution on the Florida state court judgment and the opportunity to negotiate with creditors regarding a plan of liquidation that will enable the Debtors to address creditor claims, including through an appeal of that judgment.  The Florida judgment and other pending litigation made it unrealistic for the Debtors to reorganize their business, so, at the outset of the Bankruptcy Cases, the Debtors sought and received approval from the Bankruptcy Court to enter an agreement with a stalking horse bidder and commence an auction process to sell their assets in order to generate proceeds that could be used to satisfy Claims against and Equity Interests in the Debtors.  Additionally, the Debtors retained a chief restructuring officer to oversee and coordinate with the Debtors' officers and management a rapid and successful sale that would yield the highest and best outcome for all stakeholders.  GMGI also appointed an Independent Director with no prior relationship with, or financial interest in, the Debtors to oversee, among other things, the sale process, the negotiation and prosecution of the plan(s) of liquidation, and make any decisions with respect thereto.

As a result of extensive marketing efforts by the Debtors and their advisors, a second bidder emerged and an auction was held on August 16, 2016 at the offices of Ropes & Gray LLP.  At the conclusion of the auction, the Debtors, in consultation with the Committee determined that the successful bidder was Unimoda LLP ("Unimoda"), a wholly-owned subsidiary of Univision Communications Inc., with a bid of $135 million in cash (plus other consideration) to acquire substantially all of the Debtors' assets as set forth in further detail below.  On August 22, 2016, the Bankruptcy Court entered an order approving the proposed Unimoda Sale.  The Unimoda Sale closed on September 9, 2016.  Since then, the Debtors have held discussions regarding terms of a potential consensual plan of liquidation for the Debtors with the Committee, major preferred equity holders and the Second Lien Lender, ~~but have not yet reached definitive~~and certain significant creditors.  The Plan, and this Disclosure Statement, reflect certain agreements that have been reached among those parties.

The Plan incorporates ~~a~~the following five proposed settlements: (i) an intercompany settlement of disputes among the Debtors regarding the appropriate allocation of proceeds from the Unimoda Sale and various liabilities among them.  ~~The proposed Plan also includes~~; (ii) a resolution of disputes regarding the outstanding Second Lien Make-Whole Claims in exchange for subordinating portions of the otherwise Disputed, Secured Second Lien Lender claims to general unsecured creditors at each Debtor entity, as well as release and resolution of certain disputed claims or causes of action among the Debtors.; (iii) a settlement of all Claims that Bollea has asserted, (a) against any of the Debtors including, but not limited to, claims (i) under the Bollea I Lawsuit and the Bollea II Lawsuit, including on account of the Bollea Compensatory Judgment and the Bollea Punitive Damage Judgment, (ii)  based on theories of veil piercing, substantive consolidation, or *alter ego*, and (b) against third-parties for which the Debtors have Debtor Indemnification Obligations, in exchange for (x) $31.0 million in Cash on the Effective Date, *plus* (y) a Pro Rata share (together with other holders of unsecured Claims against Gawker Media) of a 45% portion of certain Gawker Media Contingent Proceeds, as discussed further below; (iv) a settlement of all Claims that Ms. Terrill has asserted against any of the Debtors and the waiver of any claims Ms. Terrill has against third parties that would have Debtor Indemnification Obligations; and (v) a settlement of all Claims that Dr. Ayyadurai has asserted against any of the Debtors and the waiver of any claims Dr. Ayyadurai has against third parties that would have Debtor Indemnification Obligations.

The Debtors have also had settlement discussions Denton.  Although the parties have not reached a final settlement agreement, the Debtors are hopeful that a settlement agreement with Denton will be part of the Confirmation Hearing.

2

### III.    SUMMARY OF THE PLAN

       This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Disclosure Statement and in the accompanying Plan.

| | |
|---|---|
| **Background Information:** | The Bankruptcy Code requires acceptance by creditors holding at least two-thirds in dollar amount and a majority in number of allowed claims in at least one Impaired Class of each Debtor, counting only those claims actually voting to accept or reject the Plan. |
| **Voting Record Date:** | The Voting Record Date is October 31, 2016.  Only holders of Claims or Equity Interests in Classes 1A, 1C, 1D̶E(ii), 1E̶F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E as of the Voting Record Date are entitled to vote on the Plan.  The Debtors reserve the right to establish a later Voting Record Date if the Debtors decide to extend the Voting Deadline. |
| **Voting Deadline; Extension; Termination; Amendments:** | The Voting Deadline is December 5, 2016.  If the Debtors extend the Voting Deadline, the term Voting Deadline will mean the latest time and date as to which the solicitation of votes on the Plan is extended.  Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension. |
| **Voting Procedures:** | Any holder of a Claim or Equity Interest as of the Voting Record Date eligible to vote pursuant to the terms of the Solicitation Procedures should deliver a properly completed Ballot to the Voting Agent so that it is actually received on or before the Voting Deadline. |
| **Revocation or Withdrawal of Ballots:** | Any holder of a Claim or Equity Interest may withdraw their Ballot(s) up until the Voting Deadline.  Following the Voting Deadline, Ballots may not be withdrawn. |
| **Voting Agent:** | Prime Clerk LLC. |
| **The Plan:** | The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  As a result, for the Plan to become effective and for the Debtors to make any distributions thereunder, the Bankruptcy Court must confirm the Plan with respect to each Debtor, individually.  If any Claim against or Equity Interest in any of the Debtors is Impaired, for the Bankruptcy Court to confirm the Plan with respect to that Debtor by consent of an Impaired Class, the Bankruptcy Code requires that the applicable Debtor must receive votes to approve the Plan prior to the Voting Deadline from holders of Impaired Claims, that constitute (i) at least two-thirds in amount of the Claims of the holders in such Impaired Class of Claims who actually cast votes in respect of the Plan and (ii) more than one-half in number of the holders of such Impaired Class of Claims who actually cast votes with respect to the  Plan.  The Bankruptcy Court may confirm the Plan with respect to any of the Debtors so long as one Impaired Class of Claims against such Debtor votes to accept the Plan and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Debtor. |
| | If the Plan is confirmed by the Bankruptcy Court, holders of Claims and Equity Interests will receive, in full satisfaction and discharge of such Claim against or Equity Interest in the Debtors, the treatment provided for in the Plan and summarized in the section entitled Treatment of Claims and Equity Interests below. |
| **Effectiveness of** | The Effective Date will not occur, and distributions will not be made under the Plan, unless the Debtors have received the requisite votes to accept the Plan under the Bankruptcy Code, the Bankruptcy Court has confirmed the Plan as satisfying the |

| | |
|---|---|
| **the Plan:** | requirements set forth in section 1129 of the Bankruptcy Code, and the other conditions to effectiveness set forth in Section 6.02 of the Plan have been satisfied. The Debtors cannot assure you that they will receive the requisite votes to accept the Plan under the Bankruptcy Code, that the Bankruptcy Court will confirm the Plan, or that the other conditions to effectiveness of the Plan will be satisfied. |
| | If the Bankruptcy Court confirms the Plan and it becomes effective, the terms of the Plan will bind every holder of a Claim against or Equity Interest in the Debtors, whether or not such holder voted to accept the Plan. |
| **Treatment of Claims and Equity Interests:** | The table below summarizes each Class of Claims and Equity Interests in the Plan for each Debtor, and the treatment of each Class, the ~~projected~~ aggregate amount of Claims or Equity Interests comprising each Class asserted through the date of filing of this Disclosure Statements, and the range of projected recoveries of each Class. based on such estimates. |
| | Claims asserted against the Debtors include Claims filed by Terry Gene Bollea that are subject to the Bollea Settlement and many further Claims to which the Debtors either (i) have already filed objections, or (ii) to which the Debtors anticipate they will file objections, as set forth in greater detail in section V.A., V.B., and VIII.D. below. Accordingly, when the Debtors anticipate that the Allowed amount of Claims in a Class will be lower than the asserted amount, the table below identifies the Debtors' current estimate of the aggregate amount of Claims that will be Allowed in such Class, after accounting for the Plan Settlements and the Debtors' objections. The amounts of Claims estimated by the Debtors below are based on the state of the Debtors' analysis as of Claims as of October 31. The Pro Rata Share that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the claims resolution process. The "Recoveries" column of the chart includes wide ranges for certain classes because of the very significant litigation claims filed by certain creditors against multiple Debtors. The Debtors have objected to these Claims but should those objections be denied, recoveries to all constituencies will be materially decreased. |

## GMGI

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | Estimated Amount | Range of Estimated Recoveries |
|---|---|---|---|---|---|
| 1A | Second Lien Make-Whole Claim | (a) on the Effective Date, a distribution in Cash in the amount of $500,000;<br><br>(b) on, or as soon as practicable after, the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have been paid in full, up to an aggregate total of $750,000; and<br><br>(c) in the event that Gawker Hungary dissolves before all Disputed GMGI General Unsecured Claims have become Allowed or Disallowed, the Second Lien Lender shall receive the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan; and<br><br>.(d) if and to the extent that the Gawker Media Second Lien Make-Whole Guaranty Claim treatment set forth in Section 3.03(a)(iii)(b) of the Plan is not satisfied by Gawker Media, distributions from GMGI Cash remaining after distributing all amounts contemplated by Section 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of the Plan. | Impaired / Entitled to Vote | Allowed in the amount of $2.0 million | 40% – 100% (based on distributions under all Plans) |
| 1B | Other Priority Claims | Payment in full in Cash. | Unimpaired/ Deemed to Accept/ Not Entitled to Vote | Asserted: $88,993<br><br>Est. Allowed: $0 | 100% |
| 1C | General Unsecured Claims | Pro Rata share of GMGI Cash distributed on the Effective Date, or within 15 days of Allowance of such Claim, up to the Allowed amount of Claims, plus Post-Petition Interest. | Impaired / Entitled to Vote | Asserted: $811,124,088.90 plus unliquidated amounts<br><br>Est. Allowed: $0–300 million to $500,000 | 10 – 100% |
| 1D | General Unsecured Convenience Claims | A single distribution on the Effective Day in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000, in full and complete settlement and release of, and in exchange for, such Claim and any other Claim held by such General Unsecured Convenience Creditor against any of the Debtors. | Impaired / Entitled to Vote | Unknown- will depend on creditor elections | Lesser of (a) the Allowed Claim amount and (b) $25,000 |
| 1DE(i) | Gawker Hungary Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired / Deemed to Reject/ Not entitled to Vote | Resolved Pursuant to Plan Settlements | 0% |

5

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | ~~Estimated~~ Amount | ~~Range of Estimated~~ Recoveries |
|---|---|---|---|---|---|
| 1~~F~~E(ii) | Gawker Media Intercompany Claims | Pursuant to Settlement, GMGI to ~~make~~provide $2.0 million ~~GMGI Claims Settlement to~~Plan Guaranty for the benefit of Gawker Media ~~in satisfaction of all~~General Unsecured Claims and Gawker Media ~~Intercompany~~Punitive Damage Claims. | Impaired / ~~Deemed to Reject/~~ Entitled to Vote | Resolved Pursuant to Plan Settlements | Up to $2.0 million~~.~~ |
| 1~~E~~F | Preferred Equity Interests | Pro Rata share of GMGI Cash remaining after payment of all Class 1~~B and 1C~~A Claims have been paid in full, up to the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference. | Impaired / Entitled to Vote | Distributions up to the aggregate GMGI Preferred Shares Liquidation Preference of $60.6 million | $0~~-57.3~~ to $42 million |
| 1~~F~~G | Common Equity Interests | Pro Rata share of any GMGI Cash remaining after holders of Class 1~~E~~F Equity Interests have received distributions totaling the aggregate amount of their Preferred Shares Liquidation Preferences. | Impaired/ Deemed to Reject/ Not Entitled to Vote | Class 1F holds the residual interests in GMGI~~.~~ | $0~~%~~ |

6

~~59220981_8~~59473927_10

## GAWKER MEDIA

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | ~~Estimated~~ Amount | ~~Range of Estimated Recoveries]~~ |
|---|---|---|---|---|---|
| 2A | Gawker Media Second Lien Make-Whole Guaranty Claim | (a) A distribution in Cash in the amount of $500,000; and<br><br>(b) Distributions equal to any ~~Gawker Media~~ Cash remaining <u>in a $750,000 Gawker Media Second Lien Make-Whole Guaranty Reserve</u> after payment of all Allowed Gawker Media General Unsecured Claims,~~ up to an aggregate total of $750,000.~~ | Impaired / Entitled to Vote | Allowed in the aggregate amount of $1.25 million | 40%– 100% (based on distributions under all Plans) |
| 2B | Gawker Media Other Priority Claims | Payment in full in Cash. | Unimpaired/ Deemed to Accept/ Not Entitled to Vote | ~~$0 – 500,000~~<u>Asserted: $22,588.41</u><br><br><u>Est. Allowed: $50,000</u> | 100% |
| 2C | Gawker Media General Unsecured Claims | ~~A distribution equal to its Pro Rata share of distributable Gawker Media Cash, up to the amount of its Allowed Claim, plus, if all claims in Class 2D are Allowed and paid in full, Post-Petition Interest.~~<u>Distributions made in the following order up until it receives the amount of its Allowed Claim, excluding Post-Petition Interest:</u><br><br><u>FIRST: on the Gawker Media Claims Reserve Distribution Date, a Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;</u><br><br><u>SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account;</u><br><br><u>THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Make-Whole Reserve; and</u><br><br><u>FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve.</u> | Impaired / Entitled to Vote | ~~$0 – 300 million~~<u>Asserted: $858,551,246 plus unliquidated amounts</u><br><br><u>Est. Allowed: $32.5 million to $36 million (including Bollea Claims, Terrill Claims, and Ayyadurai Claims)</u> | ~~Approximately 0~~<u>15</u> ~~– 10~~ <u>100</u>% |

7

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | ~~Estimated~~ Amount | ~~Range of Estimated Recoveries]~~ |
|---|---|---|---|---|---|
| 2D | Gawker Media Punitive ~~Damages~~Damage Claims | Distributions made in the following order up until it receives the amount of its Allowed Claim, excluding Post-Petition Interest:<br><br>~~Its~~FIRST: A Distribution equal to its Pro Rata share of ~~distributable~~Cash in the Gawker Media ~~Cash~~Claims Reserve remaining after ~~payment~~satisfaction of all Allowed ~~Class 2C~~Gawker Media General Unsecured Claims, ~~up to the amount of its Allowed Claim plus~~excluding Post-Petition Interest~~.~~;<br><br>SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims excluding Post-Petition Interest;<br><br>THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims excluding Post-Petition Interest; and<br><br>FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims excluding Post-Petition Interest. | Impaired / Entitled to Vote | Asserted: $0 – 50 25.1 million<br><br>Est. Allowed: $0 | 0% – 100% |
| 2E | Gawker Media General Unsecured Convenience Class | A single distribution on the Effective Day in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000, in full and complete settlement and release of, and in exchange for, such Claim and any other Claim held by such General Unsecured Convenience Creditor against any of the Debtors. | Impaired / Entitled to Vote | Unknown: Depends on creditor elections | Lesser of (a) the Allowed Claim amount and (b) $25,000 |
| 2F F(i) | Gawker Media Gawker Hungary Intercompany Claims | ~~No recovery pursuant~~Pursuant to Intercompany Settlement, Gawker Hungary Intercompany Claims against Gawker Media will be satisfied in full in Cash, excluding Post-Petition Interest. | Impaired / ~~Deemed to Reject/~~ ~~Not entitled~~Entitled to Vote | Resolved Pursuant to Settlement | ~~$0 (Waived under Plan Settlements)~~80-100% |
| 2F F(ii) | Gawker Media GMGI Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired / Deemed to Reject/ Not entitled to Vote | Resolved Pursuant to Settlement | $0 ~~(Waived under Plan Settlements)~~ |

~~59220981_8~~59473927_10

| Class | Description of Class | Treatment of Allowed Claims in Class | Status/ Voting Right | ~~Estimated~~ Amount | ~~Range of Estimated Recoveries]~~ |
|---|---|---|---|---|---|
| 2~~H~~G | Gawker Media Membership Interest | (a) Pro Rata share of the Gawker Media Contingent Equity Proceeds; and ~~Gawker Media~~(b) Cash remaining in the Gawker Media Claims Reserve after ~~distribution to~~satisfaction of all Allowed Class 2C, 2D, 2E, and 2F(i) Claims, which amounts shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in Section 3.01 of the Plan. | Impaired/ ~~Deemed to Reject/ Not~~ Entitled to Vote | One Member | ~~Approximately~~ $0 ~~28~~ to $1 million |

## GAWKER HUNGARY

| Class | Description of Class | Treatment of Allowed Claims in Class | ~~Class~~Status/ Voting Right | ~~Class~~Amount | ~~Class~~Recoveries |
|---|---|---|---|---|---|
| 5A | Gawker Hungary Second Lien Make-Whole Claims | (a) A distribution in Cash in the amount of $500,000 and (b) if and when all Class 1C Claims have either (i) been paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Class 1C Claims, a distribution in Cash from a $750,000 ~~reserve established by~~ Gawker Hungary Second Lien Make-Whole Guaranty Reserve; provided, however, that in the event that Gawker Hungary dissolves before all Disputed Claims in Class 1C have become Allowed or Disallowed, GMGI assumes this obligation, and the Second Lien Lender shall receive the corresponding distribution from GMGI Pro Rata with the treatment of the GMGI Second Line Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan. | Impaired / Entitled to Vote | Allowed in the aggregate amount of $1.25 million | 40~~%~~ – 100% (based on distributions under all Plans) |
| 5B | Gawker Hungary Other Priority Claims | Payment in full in Cash plus Post-Petition Interest. | Unimpaired/ Deemed to Accept/ Not Entitled to Vote | $0 ~~2.0 million~~ $500,000 | 100% |
| 5C | Gawker Hungary General Unsecured Claims | Payment in full in Cash plus Post-Petition Interest. | Unimpaired / Deemed to Accept/ Not Entitled to Vote | Asserted: $651,007,657 Est. Allowed: $0 – $500,000 | 30 – 100% |
| 5D(i) | Gawker Hungary GMGI Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired/ Deemed to Reject/ Not Entitled to Vote | Resolved Pursuant to Settlement | ~~$~~0~~%~~ |

9

| §D(ii) | Gawker Hungary Gawker Media Intercompany Claims | No recovery pursuant to Intercompany Settlement. | Impaired/ Entitled to Vote | Resolved Pursuant to Settlement | $12.5 million plus other consideration under the Plan Settlements.0% |
|---|---|---|---|---|---|
| §E | Gawker Hungary Membership Interest | (a) A distribution of all of the Cash held by Gawker Hungary after payment in full of the Class 3C Claims and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Class 1C Claims and anticipated expenses of liquidating Gawker Hungary, and<br><br>(b) upon dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan | Impaired/ Entitled to Vote | One Member | Approximately $30$0 to $42 million |

| | |
|---|---|
| **Convenience Class Election:** | Each holder of a General Unsecured Claim against Gawker Media or GMGI will have an option on its Ballot to elect to participate in the Gawker Media Convenience Class or the GMGI Convenience Class, as applicable. Any holder who makes such election will receive only a single distribution on account of any and all Claims against Gawker Media, Gawker Hungary and GMGI from the Gawker Media Claims Reserve. In the event a holder elects to participate in the Gawker Media Convenience Class on one Ballot, and does not make an election or makes an inconsistent election on another submitted Ballot, such holder will be deemed part of the Gawker Media Convenience Class and receive only the single distribution on account of all of the holder's claims against the Debtors. |
| **Distribution Date:** | Distributions to be made under the Plan will be made on the Effective Date, the Gawker Media Claims Reserve Distribution Date, and each GMGIGawker Media Contingent Proceeds Distribution Date. The Effective Date will be the date as soon as reasonably practicable after the Confirmation Date when all conditions to the Effective Date in Section 6.02 of the Plan (including the Confirmation Order having become a Final Order) have been met or waived and no stay of the Confirmation Order is in effect. The Gawker Media Claims Reserve Distribution Date will be designated by the Plan Administrator promptly following such time as all there remain no Disputed Claims Against Gawker Media. GMGIEach Gawker Media Contingent Proceeds Distribution DatesDate will be designated by the Plan Administrator in its sole discretion, when a Distribution is made to holders of claims against GMGI as a result of distributions to GMGI frombased on the receipt of Gawker Media or Gawker Hungary, Allowance or Disallowance of Disputed Claims against GMGIContingent Proceeds, or as the Plan Administrator may otherwise determine. |
| **Plan Supplement:** | The Debtors will file the Plan Supplement notno later than five (5) days before the earlier of the (i) Voting Deadline and (ii) deadline for objections to Confirmation ofvoting on the Plan (or such later date as may be approved by the Bankruptcy Court). It is anticipated that the Plan Supplement will include, among other things, the form of Plan Administrator Agreement. |

59220981_859473927_10

| | |
|---|---|
| **Exculpations and Releases:** | AS PART OF, AND/OR TO FACILITATE THE CONTEMPLATED SETTLEMENT, THE PLAN PROVIDES FOR CERTAIN EXCULPATIONS AND RELEASES BY THE DEBTORS AND THIRD PARTIES. THESE EXCULPATIONS AND RELEASES ARE DETAILED IN ARTICLE 9 HEREOF. |
| **Injunction** | Upon entry of the Confirmation Order, parties will be enjoined from taking specified actions that interfere with consummation of the transactions contemplated in the Plan. This injunction is detailed in Article 9 hereof. |
| **Certain U.S. Federal Income Tax Consequences:** | For a summary of certain U.S. federal income tax consequences of the Plan to holders, see Article 14 hereof. |
| **Risk Factors:** | Prior to deciding whether and how to vote on the Plan, each holder of a Claim or Equity Interest should consider carefully all of the information in this Disclosure Statement, especially the "Risk Factors" described in Article ~~XI~~11 hereof. |

## IV.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

Since its inception in 2002 as a single blog operated from Nick Denton's apartment, the Company grew into a network of seven branded news and lifestyle Websites, each with millions of readers. Historically, the Company's financial health was good; it survived the 2008-2009 recession and was profitable from 2010 until 2015. However, despite its ~~longrunning~~long running success and commendable growth trajectory in 2016, the Company incurred significant legal expenses and had awarded against it the Bollea Judgments of more than $130 million in the Bollea I ~~Case~~Lawsuit. While ~~the Company~~Gawker Media believes that the Bollea Judgments ~~will~~would be overturned on appeal, it could not post the ~~$50 million bond required by the Florida state court to stay execution of the judgments while the appeal is pending~~required bond or agree to alternative conditions required for a stay pending appeal and therefore the imposition of liens on Gawker Media's assets as well as potential execution on the judgment were imminent. Accordingly, the Company sought immediate chapter 11 relief.

### A.    Overview of the Debtors' Business

The Debtors in these Bankruptcy Cases include GMGI and its wholly-owned subsidiaries, Gawker Media and Gawker Hungary. Prior to filing for bankruptcy, the Company was a privately-held, online media company whereby Gawker Media operated seven distinct media brands with corresponding websites under the names Gawker, Deadspin, Lifehacker, Gizmodo, Kotaku, Jalopnik, and Jezebel (the "Websites"), using certain intellectual property and other intangibles owned by and licensed from Gawker Hungary. While Gawker is the most well-known brand and website, the six other brands identified above represented approximately 85% of revenues. The Debtors also license their web content internationally to third parties that run similar websites based on the Company's brands, such as Gizmodo Australia, Kotaku Australia, and Lifehacker Australia. The Debtors' primary source of revenue was earned through sales of advertising space on the Websites. Additional information about each of the Websites is available in the First Day Declaration.

Prior to filing for bankruptcy, Gawker Hungary, the Debtors' subsidiary operated in Hungary, owned the proprietary publishing and discussions platform and intellectual property used by Gawker Media's brands and the Websites (collectively, the "Gawker Hungary Assets"). Gawker Media had an exclusive license of the Gawker Hungary Assets and intercompany arrangements with Gawker Hungary to enable the affiliates to maximize use of their complementary assets and employees.

To facilitate Gawker Media's use of Gawker Hungary's intellectual property, web domains, and proprietary publishing platform, Gawker Media and Gawker Hungary were party to several intercompany agreements, each as described herein.

11

### B.    Intercompany Arrangements Between Gawker Media and Gawker Hungary

***Gawker Hungary's IP License to Gawker Media.***  First, pursuant to a Master License Agreement, dated as of January 1, 2011 (the "Master License Agreement"), between Gawker Media and Gawker Hungary, Gawker Media obtained an exclusive license to use certain brand elements, including trademarks, trade names, and service marks, as well as associated goodwill, websites, web addresses, and URLs, patents, copyrights, works of authorship, trademarks, and related intellectual property.  Under the terms of the Master License Agreement, Gawker Media agreed to pay Gawker Hungary a quarterly license fee determined by the amount of revenue received or receivable by Gawker Media over the twelve month calendar year beginning January 1 and ending December 31.

***Gawker Media's Services to Gawker Hungary.***  Second, pursuant to a Development Agreement, dated as of January 1, 2007 (as amended on January 21, 2013, the "Development Agreement"), by and between Gawker Media and Gawker Hungary, Gawker Media provided certain development services to Gawker Hungary, including designing, developing, and testing scalable software to serve as a publishing and content management platform for Gawker Hungary's properties and other websites, handling of content produced by users of the platform (i.e., posts, comments, video, photos, etc.), providing for the storage of media related to content production and aggregation and display of content sourced from external resources, providing security and authentication systems to ensure authenticity of user generated content, and providing Gawker Hungary with information and assistance as is necessary to allow Gawker Hungary to sell advertising.  Under the terms of the Development Agreement, Gawker Hungary agreed to pay Gawker Media for the direct costs of the services provided plus 5%.  Unless terminated by one party upon material breach by the other party, the term of the Development Agreement expires on December 31, 2022.

***Gawker Hungary's Services to Gawker Media LLC.***  Third, pursuant to an Intercompany Services Agreement, dated as of January 1, 2012 (the "Gawker Hungary Services Agreement"), by and between Gawker Media and Gawker Hungary, Gawker Hungary agreed to perform certain editorial services, content creation services, and other services for Gawker Media.  Under the terms of the Intercompany Services Agreement, Gawker Media agreed to pay Gawker Hungary for the costs of services provided plus 5%.

### C.    The Debtors' Primary Assets

#### *1. GMGI Assets*

GMGI's principal assets are its direct 100% ownership of Gawker Hungary and Gawker Media.  GMGI does not have real estate holdings, significant cash on deposit, or other fixed assets.

GMGI also holds a $200,000 Promissory Note from Denton to GMGI for funds that GMGI lent Denton on June 7, 2016 to enable Denton to hire independent bankruptcy counsel (the "Denton Note").  The Denton Note accrues interest at the rate of 5% compounded annually and is due to be repaid with accrued interest on June 7, 2018.  Denton filed for personal chapter 11 bankruptcy on August 1, 2016.  The Debtors have been granted an extension of time to file proofs of claim in Denton's chapter 11 cases, but any such claim will include a claim based on the Denton Note.

#### *2. Gawker Media Assets*

Gawker Media's share of the Company's value derived from the Websites' content, primarily from selling advertising on the Websites and earning revenue from sales of products that Gawker Media wrote about or promoted on the Websites.  Advertising on the Websites accounts for approximately 75% of Gawker Media's revenue per year, as compared to all other sources combined, which accounted for approximately 25% of gross revenue.  Advertising revenue was primarily earned by serving display, content and video advertisements on the site.  Non-advertising revenue was primarily earned via links to products users could purchase on other sites, which in turn paid the Gawker Media an affiliate fee or commission.  The Gawker Media had an in-house sales team that sold advertising space on the Websites, and the Gawker Media also engaged a number of third-party sellers to sell its unsold advertising inventory on open exchanges.  The Website advertisers who purchased traditional ad space were not subject to long-term contracts.  The company used standard "insertion orders" that

followed the standards established by the Interactive Advertising Bureau. For custom ad campaigns, the ad purchases typically spanned one quarter or possibly two quarters. For regular, non-custom ad purchases, the duration of the ad on the Websites was usually 30 to 60 days.

Gawker Media also derived a small portion of its revenue from international licensing of the content from the Websites. For example, Gawker Media licensed the content of its Gizmodo Website to entities in Brazil, Europe and Japan, and those international entities in turn use the Gizmodo content for their own websites using rich site summary (RSS) feeds.

### 3. Gawker Hungary Assets

Gawker Hungary's assets were primarily comprised of its ownership of the intellectual property and other intangible assets that it licensed to Gawker Media.

### 4. The Unimoda Sale Proceeds

Substantially all of the Debtors' assets described in the foregoing paragraphs were sold in the Unimoda Sale described in greater detail in ~~Article~~Section 6.C. below. The Debtors received $135 million in cash proceeds from the purchase price in the asset sale. The Unimoda Sale expressly excluded from the acquired assets the "gawker.com" internet domain name and Website content related to the Gawker Website (collectively, the "Gawker.com Assets"), which the Plan contemplates will be liquidated by the Plan Administrator for the benefit of the Debtors' creditors and equity holders~~.~~, as described in greater detail in  Section 8.F.6.(e). below.

### 5. Other Assets

Prior to the Unimoda Sale, Gawker Media had available cash on hand of $12.9 million, Gawker Hungary had available cash on hand of $~~0.3~~2.3 million and GMGI had cash on hand of $8,000.

### D.    The Debtors' Capital Structure and Prepetition Indebtedness

As of the Petition Date, the Debtors had approximately $21.2 million of outstanding funded indebtedness, comprised of the First Lien Term Loan and Second Lien Term Loan (each, as defined herein). The Debtors were also obligated on a posted, but not drawn, letter of credit collateralized by a cash deposit of approximately $5.6 million (the "First Lien Letter of Credit").

### 1. First Lien Term Loan

On September 24, 2012, Gawker Media entered into a loan and security agreement (as subsequently amended, the "First Lien Credit Agreement") with Silicon Valley Bank (the "First Lien Lender"), pursuant to which the First Lien Lender agreed to provide to Gawker Media a term loan facility in the aggregate principal amount of $7.7 million (the "First Lien Term Loan") and the First Lien Letter of Credit. The Debtors and ~~Mr.~~ Denton also executed certain security, pledge and guaranty agreements and other documentation in connection with the First Lien Obligations. The First Lien Obligations were guaranteed by GMGI and Gawker Hungary. The First Lien Obligations were also secured on a first priority basis by liens on substantially all of the assets of the Debtors.

As of the Petition Date, approximately $6.2 million plus accrued interest, fees, and other charges was outstanding under the First Lien Credit Agreement (the "First Lien Obligations"). On June 16, 2016, the First Lien Obligations were paid in full pursuant to the Interim DIP Order.

### 2. Second Lien Term Loan

On January 21, 2016, GMGI entered into a loan and security agreement (the "Second Lien Loan and Security Agreement") with US VC Partners LP ("Second Lien Lender"), a Delaware limited partnership, pursuant to which Second Lien Lender agreed to extend a term loan facility to GMGI in the initial amount of $15 million (the "Second Lien Term Loan"). The Second Lien Credit Agreement purports to require the

13

payment of a make-whole amount in the event (a "Second Lien Make-Whole Event") that prior to the Maturity Date, the Second Lien Term Loan obligations are accelerated or otherwise become due, in each case, in respect of any Event of Default (as defined in the Second Lien Credit Agreement), including, but not limited to, the occurrence of a bankruptcy or insolvency event (the "Second Lien Make-Whole Provision").

The Second Lien Obligations are guaranteed by Gawker Media and Gawker Hungary. The Second Lien Obligations are secured, pursuant to the Second Lien Loan and Security Agreement, by a second priority lien on substantially all of the assets of GMGI, Gawker Media, and Gawker Hungary.

As of the Petition Date, approximately $15 million plus accrued interest was outstanding under the Second Lien Credit Agreement (the "Second Lien Obligations"). In addition, as a result of the filing of the bankruptcy cases, a Second Lien Make-Whole Event occurred and the Second Lien Lender alleges a Claim pursuant to the Second Lien Make-Whole Provision. On September 10, 2016, pursuant to the Section 2.5(b)(i) of the Unimoda APA, the Second Lien Obligations were paid in full out of the Purchase Price received at the closing of the Unimoda Sale. The Second Lien Lender continues to assert a Claim relating to the Second Lien Make-Whole Provision.

### 3. Intercompany Debt

As of the Petition Date, Gawker Media had $13 million in outstanding intercompany debt ~~owed to~~ under the Gawker Hungary Promissory Notes, and $250,000 in outstanding intercompany debt owed to GMGI under the GMGI Promissory Note. Intercompany receivables also accrued among the Debtors' estates both before and after the Petition Date. This intercompany debt consisted of the following ~~as follows~~:

- **First Gawker Hungary Promissory Note.** Pursuant to the Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016 (the "First Gawker Hungary Promissory Note"), Gawker Media promised to pay $8 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. The January 2014 Promissory Note matures on the earliest of (i) January 10, 2019, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Gawker Hungary, or GMGI. There is currently $8 million outstanding on the January 2014 Promissory Note.

- **Second Gawker Hungary Promissory Note.** Pursuant to the Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016 (the "Second Gawker Hungary Promissory Note" and, together with the January 2014 Promissory Note, the "Gawker Hungary Promissory Notes"), Gawker Media promised to pay $5 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. The January 2015 Promissory Note matures on the earliest of (i) January 10, 2020, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Gawker Hungary, or GMGI. There is currently $5 million outstanding on the January 2015 Promissory Note.

- **GMGI Promissory Note.** Pursuant to the Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016 (the "GMGI Promissory Note"), Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually. The GMGI Promissory Note matures on the earliest of (i) December 31, 2020, (ii) the signing by Gawker Media of an agreement to sell substantially all of its assets, provided that GMGI's stockholders hold or control less than 50% of the voting power of the surviving or acquiring entity, and (iii) the consummation of the first public offering of the common stock of Gawker Media, Gawker Hungary, or GMGI. There is currently $250,000 outstanding on the GMGI Promissory Note.

- **Intercompany Receivables among Gawker Media and Gawker Hungary.** In the ordinary course of the Debtors' intercompany arrangements, the Debtors have also accrued intercompany receivables

14

owing to one another. As of ~~January 1~~September 9, 2016, ~~(i)~~ Gawker Hungary had approximately $~~10.2~~12.82 million in accounts receivable outstanding from Gawker Media~~, (ii) Gawker Media~~ on account of amounts owing under the Master License Agreement.  The rates charged under the Master License Agreement were established in 2011 based on the Transfer Pricing Opinion discussed below in Section VII.A.1, which reflected an allocation of the value of the Debtors' assets approximately 2/3 to Gawker Hungary and 1/3 to Gawker Media.  As part of the Intercompany Settlement, the Debtors are agreeing to allocate 60% of Unimoda Purchase Price to Gawker Media and 40% to Gawker Hungary, so the Debtors are also agreeing to a corresponding reduction to the accounts receivable due from Gawker Media to Gawker Hungary under the Master License Agreement to $10.7 million.

Also as of September 9, 2016, Gawker Hungary had approximately $~~3.1~~0.27 million in accounts receivable from Gawker Media on account of amounts owing under the Gawker Hungary Services Agreement, and Gawker Media had approximately $4.8 million in accounts receivable from Gawker Hungary, ~~and (iii) GMGI had~~ neither of which were calculated by reference to the allocation of value among the Debtors' estates..  Accordingly, as of September 9, 2016, the net intercompany balance owing from Gawker Media to Gawker Hungary, accounting for the adjustment described above, was $6.1 million.  GMGI also had approximately 0.1 million in accounts receivable from Gawker Media.

### *4. Unsecured Debt and Potential Unsecured Claims*

The Debtors do not have funded unsecured debt.  The largest potential unsecured claims are disputed claims arising from the Bollea Judgment (described below) and other pending litigations against Gawker Media (excluding the Bollea Claims, the "Article Lawsuits").  In general, the Bollea Judgment and Article Lawsuits arise from claims for invasion of privacy, defamation or related torts based on articles written for and published by a Gawker Media Website.  The aggregate amount of ~~damages asserted~~Proofs of Claim filed by plaintiffs ~~or awarded to plaintiffs~~asserting such claims exceeds $~~250~~500 million (counting only once amounts asserted in Proofs of Claim filed against multiple Debtors).  A summary of the Bollea Judgment and Article Lawsuits is below.

### E.    **Employees and Independent Contractors**

As of the Petition Date ~~and the date of this Disclosure Statement~~, GMGI did not have any employees, and GMGI does not have any employees as of the date of this Disclosure Statement.

As of the Petition Date, Gawker Media employed approximately 192 full-time salaried employees and used numerous independent contractors (the "Salaried Employees and Independent Contractors"), and 3 hourly employees (the "Hourly Employees," together with the Salaried Employees and Independent Contractors, the "U.S. Employees and Independent Contractors").  The U.S. Employees and Independent Contractors loosely fit into three departments (i) editorial – 104 employees; (ii) business – 52 employees; and (iii) technology and operations – 39 employees.  As of March 1, 2016, 102 of the Salaried Employees and Independent Contractors were covered by a three-year collective bargaining agreement (the "CBA") expiring on February 28, 2019, with the Writers Guild of America, East (the "WGAE").

As of the Petition Date, Gawker Hungary employed 25 individuals, who provide technology and programming, editorial, and administrative services (the "Hungarian Employees," together with the "U.S. Employees and Independent Contractors," the "Employees").

Following the Unimoda Sale, all of the Debtors' ~~employees~~Employees except ~~Mr.~~ Denton were offered employment by UniModa and all but one of those employees accepted such employment.

15

### F.    Directors and Officers

As of the date of this Disclosure Statement, the Debtors' directors and officers were as follows:

**GMGI**
William Holden- Chief Restructuring Officer
Thomas Plunkett- Director
Scott Tillman- Director
~~Nick Denton- Director~~
**Gawker Media**
William Holden- Chief Restructuring Officer
Nick Denton- ~~Director and~~ Executive Vice President

**Gawker Hungary**
William Holden- Managing Director

The Debtors have Debtor Indemnification Obligations with respect to the foregoing directors and officers and certain Salaried Employees and Independent Contractors (including Denton).

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Bollea Judgment

The Bollea litigation arises out of a publication on Gawker.com of an article (the "Hogan Story") commenting on a video depicting plaintiff Terry Gene Bollea, the professional wrestler and entertainer known as "Hulk Hogan," having sexual relations with Heather Clem, the wife of his then-best friend, radio disk jockey Bubba Clem, along with ~~brief and~~ highly edited video excerpts (the "Excerpts"). Bollea ~~at times~~ initially challenged both the publication of the Hogan Story and the Excerpts, but by the time of trial had narrowed his claim to focus only on the Excerpts.

Bollea's claims consist of causes of action for, among other things, publication of private facts, intrusion upon seclusion, intentional infliction of emotional distress, violation of plaintiff's common law right of publicity and violation of Florida's wiretap act. Bollea initially sued a number of defendants, but only three defendants were left at the time of trial: Gawker Media LLC, Nick Denton, and A.J. Daulerio (the author of the Hogan Story).

Bollea initially sued in federal court. Bollea tried on several occasions to obtain preliminary injunctive relief to have the video removed, but the federal judge (Hon. James Whittemore) denied each of the motions, relying on the First Amendment. *See, e.g.*, *Bollea v. Gawker Media LLC*, 2012 WL 5509624 (M.D. Fla. Nov. 14, 2012); *Bollea v. Gawker Media LLC*, 913 F. Supp. 2d 1325 (M.D. Fla. 2012). Thereafter, Bollea dismissed his federal action and re-filed his claims in state court (the "Bollea I Lawsuit"). The state court entered a temporary injunction, which was then stayed and reversed by Florida's Second District Court of Appeal. *See Gawker Media LLC v. Bollea*, 129 So. 3d 1196 (Fla. 2d DCA 2014). The appeals court unanimously reversed the injunction on the basis that the Hogan Story and Excerpts addressed a matter of public concern and were protected by the First Amendment. *Id.* at 1200-02. Despite this ruling, the trial court denied the defendants' motions to dismiss and for summary judgment.

The trial proceeded in March 2016. A jury found Gawker Media liable for $115 million in compensatory damages and $15 million in punitive ~~damages~~ damage, for a total of $130 million (the "Bollea Judgment"). An additional $10 million of punitive ~~damages~~ damage was assessed against ~~Mr.~~ Denton separately, and an additional $100,000 of punitive ~~damages~~ damage was assessed against Mr. Daulerio separately. The defendants filed motions for judgment notwithstanding the verdict, and for a new trial or remittitur of damages, and the plaintiff filed a motion for entry of judgment. Those motions were heard on May

16

25, 2016, and the Florida state court denied the defendants' motions and entered final judgment on June 7, 2016.

Gawker Media appeared before the trial court again on June 10, 2016, to request a stay of the judgment pending appeal, without the bond required by Florida law. At the hearing, the trial court ruled that it would enter an order proposed by the plaintiff that would permit the plaintiff to ~~begin the process of executing on the Bollea Judgment by securing~~secure liens on Gawker Media's property. The Florida trial court also denied Gawker Media a temporary stay of any length to pursue its appellate rights. Accordingly, Gawker Media filed its petition for relief under the Bankruptcy Code on an emergency basis. Prior to seeking bankruptcy protection, Gawker Media noticed an appeal of the Bollea Judgment in the Florida court.

Bollea filed a proof of claim against Gawker Media asserting a general unsecured claim of $140.1 million based on the Bollea Judgment. Based on the repeated prior rulings by the appellate court in the defendants' favor, including on the dispositive First Amendment issue, Gawker Media believes that the Bollea Judgment ~~will~~would be reversed or, at a minimum, substantially reduced on appeal. Bollea believes that the Bollea Judgment would be upheld on appeal. Bollea also filed proofs of claims against GMGI asserting a general unsecured claim of $140.1 million, and against Gawker Hungary asserting a general unsecured claim of $130.0 million, based on the Bollea I Lawsuit. Those claims have already been dismissed with respect to Gawker Hungary (with prejudice) and GMGI in the Bollea I Lawsuit proceedings. As discussed below, these Bollea Claims are settled pursuant to the Bollea Settlement.

**B.    Article Lawsuits**

In addition to the Bollea Judgment, Gawker Media is also a defendant in the following Article Lawsuits:

- ***Huon v. Denton, et al.***, No. 11-cv-03054 (N.D. Ill.) and on appeal No. 15-3049 (7th Cir.) (the "Huon Litigation"). Gawker Media, Nick Denton, Gabrielle Darbyshire and Irin Cameron are defendants in this suit, which asserts causes of action for defamation and related torts arising from an article published by Gawker and from third-party user comments posted on Gawker's website. The article at issue reported on plaintiff's filing of a lawsuit against another publisher, Above the Law, over its report about an Illinois criminal proceeding in which Huon was charged with rape and acquitted by a jury. The trial court dismissed the case against each Gawker defendant (including the individuals). Huon appealed the decision and the U.S. Court of Appeals for the Seventh Circuit heard argument on May 31, 2016. Gawker Media consented to the Court's lifting the stay for the limited purpose of allowing the Seventh Circuit to render its decision. ~~Huon is seeking at least $100 million in damages.~~

  The Plaintiff, Mr. Huon is seeking at least $100 million in damages, and filed multiple claims (the "Huon Claims") asserting a general unsecured claim of $100 million against each of Gawker Media, GMGI, and Gawker Hungary based on the Huon Litigation. On October 31, 2016, the Debtors filed an objection to the Huon Claims [Docket No. 392], asserting, (i) that Mr. Huon has not previously alleged any claims against GMGI and Gawker Hungary and there are no plausible facts upon which those Debtors could be liable, and (ii) that Mr. Huon's claims against Gawker Media should be disallowed because the trial court's dismissal of his case against Gawker Media precludes allowance of claims based on the same occurrence and facts under principles of collateral estoppel and *res judicata*.

- ***Ashley Terrill v. Gawker Media LLC, et al.***, No. 16-CV-00411 (S.D.N.Y.) (the "Terrill Litigation"). Gawker Media, Sam Biddle, John Cook, and Nick Denton are defendants in this suit for defamation, breach of confidence, breach of contract, intentional interference with prospective economic advantage, fraudulent misrepresentation, and negligent hiring and retention. The suit arises from an article regarding plaintiff's investigation into a former executive for the dating application Tinder, and plaintiff's belief that she was being harassed for undertaking the investigation. The Terrill Litigation is currently pending in the Southern District of New York. The Court has not set a briefing schedule for Defendants' motion to dismiss. Plaintiff is seeking at least $10 million in damages.

17

Ms. Terrill filed two proofs of claim against Gawker Media, asserting a general unsecured claim of $10 million based on the claims in the Terrill Litigation (the "Terrill Litigation Claim") and an unliquidated administrative priority claim based on Gawker Media's post-petition failure to remove the three articles that are the subject of the Terrill Litigation (the "Terrill Administrative Claim" and together with the Terrill Litigation Claim, the "Terrill Claims"). On October 31, 2016, the Debtors filed an objection to the Terrill Claims [Docket No. 399], asserting, among other things, the complaint in the underlying Terrill Litigation fails to state claims that entitle the plaintiff to relief. As discussed below, the Debtors have settled the Terrill Claims pursuant to a settlement agreement with Terrill.

- ***Ayyadurai v. Gawker Media LLC, et al.***, No. 16-CV-10853 (D. Mass.) (the "Ayyadurai Litigation"). Gawker Media, Nick Denton, Sam Biddle, and John Cook are defendants in this suit for libel, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and negligent hiring and retention. The suit arises from publication of three articles regarding the plaintiff's claims to have invented e-mail. The complaint is filed in the District of Massachusetts. The plaintiff is seeking at least $35 million in damages. Gawker Media filed a motion to dismiss on October 10, 2016. The objection is due November 28, 2016.

  Mr. Ayyadurai filed two proofs of claim against Gawker Media, asserting a general unsecured claim of $35 million based on the claims in the Ayyadurai Litigation (the "Ayyadurai Litigation Claim") and an unliquidated administrative priority claim based on Gawker Media's post-petition failure to remove the three articles that are the subject of the Ayyadurai Litigation (the "Ayyadurai Administrative Claim" and together with the Ayyadurai Litigation Claim, the "Ayyadurai Claims"). On October 21, 2016, the Debtors filed an objection to the Ayyadurai Claims [Docket No. 372], asserting, among other things, the complaint in the underlying Ayyadurai Litigation fails to state claims that entitle the plaintiff to relief. As discussed below, the Debtors have settled the Ayyadurai Claims pursuant to a settlement agreement with Dr. Ayyadurai.

- ***Charles C. Johnson, et al. v. Gawker Media LLC, et al.***, No. 15CECG03734 (Cal. Super. Ct. Fresno Cty.) (the "Johnson Litigation"). Gawker Media, J.K. Trotter, and Greg Howard are defendants in this suit for defamation, injurious falsehood, invasion of privacy, and conspiracy to interfere with civil rights. The suit arises from three articles regarding plaintiff's behavior. The complaint was filed in Superior Court of California, County of Fresno, but Defendants have not been served. The plaintiff is seeking at least $24 million in damages.

  The Plaintiffs, Mr. Johnson and Got News, LLC, each filed multiple claims asserting a general unsecured claim of $20 million against each of Gawker Media, GMGI, and Gawker Hungary based on the Johnson Litigation. On October 31, 2016, the Debtors filed an objection to each of the claims filed by both Mr. Johnson [Docket No. 396] and Got News, LLC [Docket No. 397], asserting, (i) that neither Mr. Johnson nor Got News, LLC has previously alleged any claims against GMGI and Gawker Hungary and there are no plausible facts upon which those Debtors could be liable, and (ii) that the claims filed by Mr. Johnson and Got News, LLC against Gawker Media should be disallowed because the complaint in the underlying Johnson Litigation fails to state claims that entitle the plaintiff to relief.

- ***Bollea v. Buchwald, et.al.***, No. 16-002861-CI (Fla. 6th Jud. Cir. Pinellas Cty.) (the "Bollea II Litigation"). Gawker Media is a defendant in this suit for intentional interference with contractual relations and intentional infliction of emotional distress, arising from an alleged leak of a sealed transcript containing racially charged statements by plaintiff. Plaintiff also has asserted claims against third parties, who are unrelated to the Debtors, for invasion of privacy, public disclosure of private facts, intrusion upon seclusion, intentional infliction of emotion distress, intentional interference with contractual relations, violation of a Florida Statute prohibiting the dissemination of private oral communications, civil conspiracy, and intentional interference with contractual relations and advantageous business relationships. Shortly before the Petition Date, the appellate court in Florida recently issued an order for plaintiff to show cause for why Gawker Media's petition for a writ recusing the trial judge should not be granted.

Bollea filed a claim asserting a general unsecured claim in an undetermined amount against each of Gawker Media, GMGI, and Gawker Hungary based on the Bollea II Litigation. As discussed below, these Bollea Claims are being settled pursuant to the Bollea Settlement.

- **Williams v. The MLB Network**, No. A-1674-14T3 (N.J. Super. Ct. Camden Cty.) (the "Williams Litigation"). Gawker Media was a defendant in this defamation suit arising from a blog post regarding the plaintiff's behavior at a baseball game, currently pending in the Superior Court of New Jersey, Camden County, Law Division. The Court entered summary judgment in Gawker Media's favor on June 1, 2016.

  Mr. Williams filed a proof of claim (the "Williams Claim") against Gawker Media in the amount of $50 million. On October 31, 2016, the Debtors filed an objection to the Williams Claim [Docket No. 391], asserting, among other things, that the trial court's summary judgment decision precludes allowance of claims based on the same occurrence and facts under principles of collateral estoppel and *res judicata* and even if it did, the complaint in the underlying Williams Litigation fails to state claims that entitle the plaintiff to relief.

- **Mail Media Inc. d/b/a Mail Online v. Gawker Media LLC and James King**., No. 159134/2015 (N.Y. Sup. Ct., N.Y. Cty.) (the "Mail Media Litigation"). Gawker Media and James King are in this defamation suit arising from a blog post regarding journalistic practices used by the website *The Daily Mail*, currently pending in the Supreme Court for the State of New York, County of New York.

- **Threatened Litigation Demands**. In addition to the Article Lawsuits where complaints are pending, the Debtors also received a number of litigation "demand letters" alleging illegal conduct by the Debtors, with an implicit or explicit threat that the demanding party intends to take some form of legal action.

  Along similar lines, XP Vehicles Group filed four proofs of claim (the "XP Vehicles Claims") in the Bankruptcy Cases. First, XP Vehicles Group filed a proof of claim against each of Gawker Media, GMGI, and Gawker Hungary asserting a general unsecured claim of $175 million based on multiple documents attached to the proof of claim. XP Vehicles Group filed a fourth proof of claim against only GMGI that asserts a general unsecured claim of $150 million based on multiple documents attached to the proof of claim. On October 31, 2016, the Debtors filed an objection to the XP Vehicles Claims [Docket No. 393], asserting, among other things, that (i) the fourth proof of claim against GMGI was amended and superseded by the additional Proof of Claim filed against GMGI, and (ii) none of the XP Vehicles Claims provide sufficient basis for a Claim against any of the Debtors as should be dismissed as a matter of law.

### C.    Appointment of Independent Director

On May 24, 2016, Mr. Scott Tillman (the "Independent Director"), joined the GMGI's board of directors (the "GMGI Board"). Mr. Tillman had no prior relationship with any of the Debtors and no financial interest in any of the Debtors. Since the Petition Date, Mr. Tillman has participated in Board meetings and been an active participant with respect to the sale process, formulation, negotiation and prosecution of the plans of liquidation, and allocations and creditor settlements, and the allocation of value among Debtors.

## VI.    EVENTS DURING THE BANKRUPTCY CASES

On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date"). On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continues to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Bankruptcy Cases.

19

A.    **First Day Pleadings and Other Case Matters**

*1. First and Second Day Pleadings*

To facilitate the commencement of these Bankruptcy Cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Petition Date or shortly thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings filed by the Debtors and approved by the Bankruptcy Court include the following:

a.    **Cash Management Systems**

To enable the Debtors to maintain to access their cash and continue in the ordinary course of business during these chapter 11 case, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Using the Debtors' Bank Accounts, Business Forms and Cash Management System, and Granting Related Relief* [Docket No. 12].  On June 16, 2016, the Bankruptcy Court entered the *Interim Order Authorizing the Debtors to Continue Using the Debtors' Bank Accounts, Business Forms, and Cash Management System, and Granting Related Relief* [Docket No. 40].  On July 13, 2016, the Bankruptcy Court granted the relief requested on a final basis [Docket No. 92].

b.    **Employee Wages and Benefits**

On June 13, 2016, the Debtors filed the *Debtors' Motion for Entry Interim and Final Orders (I) Authorizing, but Not Directing, Payment of Prepetition Wages, Salaries, Business Expenses, Employee Benefits and Related Items, and (II) Directing All Financial Institutions to Honor Checks for Payment of Such Obligations* [Docket No. 13] (the "Wages Motion").  On June 16, 2016, the Bankruptcy Court entered an order granting the relief requested on an interim basis [Docket No. 44].  On June 20, 2016, the Debtors filed a supplemental motion requesting entry of a order granting the relief request on a final basis [Docket No. 56].  The Bankruptcy Court extended its grant of relief on an interim basis on July 13, 2016 [Docket No. 91] and August 11, 2016 [Docket No. 170].  Following the closing of the Unimoda Sale, on September 21, 2016, the Debtors withdrew the request for entry of an order granting the relief request on a final basis [Docket No. 285].

c.    **Taxes and Fees**

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees.  Accordingly, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Income Taxes, Sales and Use Taxes and Hungarian Taxes* [Docket No. 14].  The Bankruptcy Court granted the relief requested on an interim basis on June 16, 2016 [Docket No. 45] and on a final basis on July 13, 2016 [Docket No. 90].

d.    **Utilities**

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services.  To ensure uninterrupted utility service, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Service* [Docket No. 17], seeking the Bankruptcy Court's approval of procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.  On July 13, 2016, the Bankruptcy Court granted the relief requested [Docket No. 88].

### e.    Insurance

In the ordinary course of business, the Debtors maintain nine insurance policies (the "Insurance Policies") covering a variety of matters including, without limitation, general commercial liability insurance, non-owned and hired automobile insurance, errors and omissions insurance, directors and officers insurance, and employment practices insurance.  The Debtors are required to pay premiums under the Insurance Policies (the "Premiums"), based on a rate established and billed by each insurer.  Accordingly, on June 13, 2016, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Renew or Purchase New Insurance Policies in the Ordinary Course of Business, and (C) Pay All Prepetition Obligations Relating Thereto* [Docket No. 16]. The Bankruptcy Court granted the relief requested on an interim basis on June 16, 2016 [Docket No. 46] and on a final basis on July 13, 2016 [Docket No. 89].

### 2. *Procedural and Administrative Motions*

To facilitate a smooth and efficient administration of these Bankruptcy Cases and reduce the administrative burdens associated therewith, on June 16, 2016 the Bankruptcy Court also entered procedural and administrative orders, including the:  (a) *Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 41]; (b) *Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (II) Approving the Form and Manner of Notifying Creditors of Commencement of the Debtors' Chapter 11 Cases* [Docket No. 43]; (c) *Order Extending Deadline for the Debtors to File Schedules and Statements of Assets and Liabilities* [Docket No. 42].  Additionally, on July 13, 2016, the Bankruptcy Court entered the *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates* [Docket No. 93].  On July 14, 2016, the Bankruptcy Court entered order further extending the time for the Debtors to file their schedules and statement of assets and liabilities [Docket No. 102].

### a.    Ordinary Course Professionals

In the ordinary course of business, the Debtors retain various attorneys and other ordinary course professionals (collectively, "OCPs") who render a wide range of services to the Debtors in a variety of matters unrelated to these Bankruptcy Cases, including litigation, regulatory, labor and employment, intellectual property, general corporate, franchise, and other matters that have a direct impact on the Debtors' day-to-day operations.  To prevent disruption to these services, on June 20, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 53].   On July 13, 2016, the Bankruptcy Court granted the relief requested [Docket No. 86].

### 3. *Retention of Restructuring Professionals*

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code as debtors-in-possession in these Bankruptcy Cases.  The Bankruptcy Court approved the retention and employment of the following advisors:

(a)    Prime Clerk LLC ("Prime Clerk"), as Claims and Noticing Agent [Docket No. 100] and Administrative Advisor to the Debtors [Docket No. 99];

(b)    Ropes & Gray LLP ("Ropes & Gray") as Counsel to the Debtors [Docket No. 101];

(c)    Opportune LLP ("Opportune"), to provide a chief restructuring officer and certain additional personnel to the Debtors [Docket No. 98];

(d)    Houlihan Lokey ("Houlihan"), as Investment Banker to the Debtors [Docket No. 97]; and

21

(e)     Citrin Cooperman LLP as Independent Auditor and Accounting Services Provide to the Debtors [Docket No. 268].

### 4. Retention of Special Counsel

The Debtors also filed several applications and obtained authority to retain various special counsel to represent the Debtors in the Article Lawsuits.. The Bankruptcy Court approved the retention and employment of the following advisors:

(a)     Brannock & Humphries as Special Litigation Counsel to the Debtors [Docket No. 287];

(b)     Levine Sullivan Koch & Schulz, LLP as Special Litigation Counsel to the Debtors [Docket No. 288]; and

(c)     Thomas & LoCicero as Special Litigation Counsel to the Debtors [Docket No. 289].

On July 13, 2016, the Bankruptcy Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 94].

### 5. Postpetition Financing

Shortly after the Petition Date, the Debtors filed a motion (the "DIP Motion") requesting interim and final approval of postpetition financing of up to $22 million (the "DIP Facility"), comprised of a $17 million term loan (the "DIP Term Loan") and a $5 million revolving credit facility (the "DIP Revolving Loan"), pursuant to (i) that certain Financing Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Financing Agreement"), by and among Gawker Media, as borrower, GMGI and Gawker Hungary, as guarantors, Cerberus Business Finance LLC ("CBF"), as administrative and collateral agent (the "DIP Agent"), and CBF or one or more of its affiliates party thereto (the "DIP Lender" and, together with the DIP Agent, the "DIP Secured Parties"), and (ii) all guarantees and other agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of the DIP Secured Parties (all documents comprising the DIP Facility, each as may be amended restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Loan Documents"). An interim order granting the DIP Motion was entered on June 16, 2016 [Docket No. 38] (the "Interim DIP Order"), which authorized the Debtors to, among other things, (i) borrow up to $14 million of the DIP Term Loan, (ii) use approximately $12.3 million of the proceeds of the DIP Term Loan to repay the First Lien Obligations and (iii) use cash collateral on the terms set forth therein. A final order granting the DIP Motion was entered on July 8, 2016 [Docket No. 81] (the "Final DIP Order"), which authorized the Debtors to, among other things, access the full amount of the DIP Facility. In total, the Debtors borrowed $17 million in aggregate funds through the DIP Facility (including any interest or other fees thereon, the "DIP Facility Obligations").

### 6. Appointment of the Creditors' Committee and Its Advisors

On June 24, 2016, the U.S. Trustee appointed the Committee [Docket No. 62]. The Committee is composed of the following members (collectively, the "Committee Members"):

(a)     Terry Gene Bollea;

(b)     Shiva Ayyadurai; and

(c)     Ashely A. Terrill.

The Committee also filed several applications and obtained authority to retain various professionals to assist the Committee in carrying out its duties under the Bankruptcy Code, including:

(a)    Simpson Thacher & Bartlett LLP, as Counsel to the Committee [Docket No. 184];

(b)    Deloitte Financial Advisory Services LLP, as Financial Advisor to the Committee [Docket No. ~~TBD~~348];

(c)    Mourant Ozannes, as Special Foreign Counsel to the Committee [Docket No. 265]; and

(d)    Reczicza Dentons Europe, as Special Counsel to the Committee [Docket No. 293].

To facilitate the Committee's representation of the interests of all creditors in these Bankruptcy Cases, the Committee filed the Motion of the Official Committee of Unsecured Creditors for an Order Providing that the Official Committee of Unsecured Creditors is not Authorized or Required to Provide Access to Confidential Information of the Debtors or to Privileged Information [Docket No. 162].

### 7. Preliminary Injunction Proceedings.

On the Petition Date, the Debtors filed a motion [Docket No. 4] and initiated an adversary proceeding (Case No. 16-01085-smb) seeking (i) issuance of a preliminary and permanent injunction enjoining (a) the Article Lawsuits, pending the termination of the automatic stay, as against certain non-Debtor parties who were also parties to the Article Lawsuits, including Nick Denton and certain current or former employees of the Company including John Cook, A.J. Daulerio, Gabrielle Darbyshire, Irin Carmon, Greg Howard, JK Trotter, and Sam Biddle (the "Individual Defendants") and (b) the plaintiffs in the Article Lawsuits from taking further action in the Article Lawsuits and from taking further action in any other existing litigation or filing further claims against ~~Mr.~~ Denton or any Individual Defendant where the conduct alleged was in the course of, and within the scope of, ~~Mr.~~ Denton's or the Individual Defendant's employment with the Debtor, absent approval of the Bankruptcy Court and/or (ii) extension of the automatic stay imposed by section 362(a) of the Bankruptcy Code to stay the Article Lawsuits as against ~~Mr.~~ Denton and the Individual Defendants (collectively, the "Injunction Request").   On June 10, 2016, the Bankruptcy Court entered a temporary restraining order with respect to the Article Lawsuits [Docket No. 2; Case No. 16-01085-smb], which extended through the date scheduled for a hearing on the Injunction Request [Docket No. 19; Case No. 16-01085-smb], which was extended by consent of the parties through July 19, 2016.   The Bankruptcy Court held a hearing on July 19, 2016 to consider the Injunction Request.   The Debtors withdrew the injunction request with respect to the Huon Litigation and the Johnson Litigation.   The Bankruptcy Court entered an injunction regarding the Terrill Litigation and the Ayyadurai Litigation that expired on September 3, 2016.   On July 25, 2016, the Bankruptcy Court entered an order denying the Injunction Request and vacating the temporary restraining order with respect to the Bollea Litigation and lifting the stay of the Bollea Litigation as to Nick Denton and A.J. Daulerio [Docket No. 52; Case No. 16-01085-smb].   On August 1, 2016, as a result of the denial of the Injunction Request and a denial of a stay of the judgment pending appeal by the Florida court, ~~Mr.~~ Denton filed for chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, which remains pending [Case No. 16-12239-smb].

### 8. Claims Bar Dates

On July 21, 2016 the Debtors filed the *Debtors' Motion Pursuant to 11 U.S.C. §§ 502 and 503, Fed. R. Bankr. P. 2002 and 3003(c)(3), and Local Rule 3003-1 for Entry of Order (I) Establishing a Deadline to File Proofs of Claim, Certain Administrative Claims, and Procedures Relating Thereto, and (II) Approving the Form and Notice Thereof* [Docket No. 127].   With this motion, the Debtors sought to fix a deadline for filing proofs of claim of September 19, 2016 and a deadline for filing certain administrative claims between the Petition Date and July 31, 2016, inclusive, of September 29, 2016 (the "First General ~~Administrative~~ Claims Bar Date") in these Bankruptcy Cases, as well as a separate deadline for governmental units to file proofs of claims of December 9, 2016 (the "Government Claims Bar Date" ~~and, together with the General Claims Bar Date and the General Administrative Claims Bar Date, the "Claims Bar Dates"~~), and to establish procedures for the filing of proofs of claim and the provision of appropriate notice of the Claims Bar Dates to potential claimants.   On August 11, 2016, the Bankruptcy Court granted the relief requested, ~~fixing the deadline for filing proofs of claim of September 29, 206~~ [Docket No. 168].

23

On September 21, 2016, the Debtors filed the *Debtors' Motion for Entry of Order (I) Establishing a Deadline to File Certain Administrative Claims and Procedures Relating Thereto, and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 281]. With this motion, the Debtors sought to fix a deadline for filing certain administrative claims between August 1, 2016 and September 30, 2016, inclusive, of November 15, 2016. (the "Second Administrative Claims Bar Date," and, together with the First General Claims Bar Date and the General Administrative Claims Bar Date, the "Claims Bar Dates"). On October 11, 2016, the Bankruptcy Court granted the relief requested [Docket No. 339]

## B.     The Appointment of Special Board Committee

On August 2, 2016, the GMGI Board adopted a resolution appointing a special committee (the "Special Board Committee"), comprised only of the Independent Director, with exclusive responsibility for, among other things, oversight with respect to the sale process and ultimate approval of any sale transaction on behalf of each Debtor, and allocation of proceeds from any sale of the Debtors' assets and any related intercompany payments and litigation. In that capacity, the Special Board Committee also has authority over the process for negotiating, formulating, and approving the Debtors' proposed plans of liquidation and any related settlements.

On September 1, 2016, the Debtors filed an application seeking authorization to retain Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as special counsel to the Special Board Committee, effective *nunc pro tunc* to August 3, 2016 [Docket No. 239]. On September 12, 2016, the Committee objected to the proposed terms of Akin Gump's retention [Docket No. 260], and the parties are holding discussions to try to reach a consensual resolution.

## C.     Sale of Substantially All of the Debtors' Assets

The Debtors commenced these Bankruptcy Cases with a goal of selling substantially all of their assets as a going concern (the "Assets"). To that end, the Debtors entered into the Stalking Horse APA with ZDGM LLC (the "Stalking Horse Bidder"), an affiliate of Ziff Davis, LLC, a leading global digital-media company operating in the technology, gaming, entertainment and lifestyle verticals. In the Stalking Horse APA, the Stalking Horse Bidder agreed to (i) purchase the Assets for $90 million in cash, (ii) assume certain liabilities of the Business, and (iii) provide offers of employment to substantially all of the Debtors' employees on substantially the same terms and conditions under which they are currently employed.

On July 8, 2016, the Bankruptcy Court entered the *Order (I) Authorizing and Approving Bidding Procedures, Breakup Fee and Expense Reimbursement, (II) Authorizing and Approving the Debtors' Performance of Pre-Closing Obligations Under the Stalking Horse Asset Purchase Agreement, (III) Approving Notice Procedures, (IV) Scheduling a Sale Hearing and (V) Approving Procedures for Assumption and Assignment of Certain Contracts and Leases and Determining Cure Amounts* [Docket No. 82] (the "Bidding Procedures Order"). The Bidding Procedures Order, among other things, approved the Stalking Horse APA, specified procedures regarding the assumption and assignment of the Debtors' executory contracts and unexpired leases, and scheduled an auction (the "Auction") for the sale of the Assets (the "Unimoda Sale"). The Stalking Horse APA remained subject to higher or otherwise better offers. To that end, the Debtors, in conjunction with their advisors and acting in accordance with the Bid Procedures Order, continued to engage in an extensive sale and marketing process of the Assets.

Pursuant to the Bidding Procedures Order, the Auction was conducted on August 16, 2016 at the New York offices of Ropes & Gray LLP. The Debtors' extensive marking efforts bore fruit as one additional approved bidder and the Stalking Horse Bidder participated in the Auction. At the conclusion of the Auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "Committee") determined that the successful bidder was UniModa, LLC ("Unimoda"), a wholly-owned subsidiary of Univision Communications Inc. Unimoda bid $135 million in cash to acquire substantially all of the Assets, specifically excluding the Gawker.com Assets, and irrevocably agreed to assume certain of the Debtors' executory contracts and unexpired leases for which the Debtors could otherwise face considerable rejection damages claims, including the CBA with the WGAE and the Debtors' commercial lease for their main office space. Unimoda also made offers of employment to all the Debtors' employees, except Nick Denton, on substantially the same

24

terms and conditions under which they are currently employed.  The Debtors and Unimoda agreed upon the terms of an asset purchase agreement for the sale of the Assets to Unimoda (the "Unimoda APA").

On August 22, 2016, after a hearing to consider approval of the Unimoda Sale was held on August 18, 2016, the Bankruptcy Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving and Authorizing the Debtors' Entry Into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 214] (the "Sale Order").

On September 9, 2016 (the "Sale Closing Date"), the closing of the Unimoda Sale occurred pursuant to the Unimoda APA.  On that date, Unimoda, as purchaser, made the Cash Payment (as defined in the Unimoda APA) in the amount of $135 million to the Debtors, subject certain closing adjustments.  Pursuant to Section 2.5(b) of the Unimoda APA and consistent with the Sale Order, on the closing date, Unimoda made payments in cash to the DIP Lender and Second Lien Lender to satisfy in full the DIP Facility Obligations and the Second Lien Obligations (excluding alleged Claims relating to the Second Lien Make-Whole Provision), respectively. Following the Closing Date, the Debtors held $1.0 million in an escrow account. All amounts held in escrow remain subject to the Unimoda APA.

### D. Committee Investigation and Request Letter

Since June 2016, the Committee, through its legal counsel and financial advisor, has requested documents and other information from the Debtors on matters pertinent to the Committee's investigation of claims that it believes are held by the Debtors.  The Debtors have cooperated and sought to provide requested information in a timely fashion, including scheduling conference calls and meetings, providing the Committee advisors access to a data room with over 27,500 pages of documents to date, and continuing to provide further information.

On October 18, 2016, the Committee sent to the Debtors a letter (the "Standing Request") requesting that the Debtors consent to the Committee being granted standing to commence and prosecute (including compromising) an enumerated list of claims across seven generic categories, and asked that the Debtors provide a response within two days, by October 20, 2016.  Prior to receiving that letter, the Debtors had already formed a special independent board committee to, among other things, review intercompany transactions and claims against insiders.  As a result the Debtors advised the Committee that most of the claims for which the Committee requested standing related to intercompany matters and shareholder transfer and dividend issues that the Debtors' advisors were already investigating and had considered and were being addressed in the Plan Settlement discussed in section VII below.    Specifically, most of the Claims identified in the Standing Request, such as those relating to recharacterizing the Kinja Promissory Notes and the GMGI Promissory Note as equity, were already addressed in the Intercompany Settlement that the Debtors proposed in the Plan of Liquidation filed on September 30, 2016.

The Standing Request also asserted that there were potential claims against certain of the Debtors' advisors (other than bankruptcy and restructuring advisors), of which the Debtors were already aware. Nonetheless, to ensure that no such claims were inadvertently waived, the Debtors clarified the releases in the Plan to exclude such advisors, and preserve such potential causes of action for the benefit of the stakeholders in the Debtors' estates.

## VII.    DESCRIPTION OF PLAN SETTLEMENTS

From the inception of the Bankruptcy Cases, ~~the Debtors have understood that the eventual allocation of sale proceeds among the Debtors' estates and the resolution of other intercompany disputes would be central to potential settlements and negotiation with respect to a chapter 11 plan.  These issues materially affect the recoveries of parties in interest in these cases and would take significant time and expense to fully litigate and resolve absent settlement.~~two general disputes needed to be resolved in order to liquidate the Debtors' estates and determine the recoveries that would be received by different Debtors' stakeholders.  The primary set of disputes related to allocation of sale proceeds and expenses, resolution of various intercompany claims, and the

treatment of disputed creditor claims asserted in amounts far in excess of the Debtors' assets. The second and more discrete dispute related to whether the Second Lien Make-Whole Claims were enforceable, and if so, in what amount.

The Debtors believe the comprehensive Plan Settlements resolve these interrelated disputes, and that the Plan Settlements are in the best interests of the various parties in interest and the Debtors' estates for several reasons. First, as discussed more extensively below, the outcomes of the potential allocation, intercompany and creditor litigation disputes that are being settled are uncertain. Second, the Plan Settlements take into account the risks and potential recoveries related to each of the intercreditor and the debtor-creditor issues described herein. Third, the Plan Settlements avoid delay and dissipation of estate assets that would result from litigating the disputed claims. For example, the Committee has indicated it will seek to undertake a full forensic accounting analysis for many years of the Debtors' operations. Thus, the Debtors believe that the cost of litigating the intercompany disputes and an appeal from the Bollea Judgment and litigation of the Bollea II Lawsuit would be between $9-12 million, if not more. Fourth, the Plan Settlements allow the Debtors to obtain substantial tax benefits by consummating the Plan before the end of 2016, including offsetting taxable gain attributable to the sale of assets. Finally, the Plan Settlements best address the competing considerations that arise because the vast majority, if not all, of the claims in these cases are litigation claims, or indemnification claims related to such litigation claims, and are primarily against one of the three Debtors, Gawker Media. Accordingly, pursuant to Bankruptcy Rule 9019, and pursuant to the terms of the Plan, at and as part of the hearing on confirmation of the Plan, the Debtors will request that the Bankruptcy Court approve the Plan Settlements as fair and equitable and in the best interests of the Debtors' estates.

## A. Settlement of Inter-Debtor Allocation, Intercompany Claims, and Significant Creditor Disputes

Prior to the Unimoda Sale, the board of directors of GMGI formed a special committee and delegated to it authority to address substantially all intercompany matters, including any settlement regarding asset value allocation. This necessarily involved, the formulation of a plan of liquidation, and the settlement of various litigation claims. As described above, the GMGI board appointed a single member to constitute that special committee, Mr. Scott Tillman, who was not a director until May 2016, and thus not involved in the events regarding, or the litigation of, the Bollea I Lawsuit, which lead to the filing of these Bankruptcy Cases. The special committee considered and approved the Plan Settlements from the perspective of each estate, and the proposed Plans plans of liquidation on behalf of GMGI, and directed GMGI to approve the plan for both Gawker Media and Gawker Hungary. The special committee received advice from Ropes & Gray LLP, certain advice of counsel from Akin Gump and Strauss Hauer & Feld LLP, and advice from financial professionals in connection with making these determinations.

The Debtors propose and support the Plan Settlements described below because it provides for the fair and equitable resolution of numerous issues, which the Debtors believe is in the best interests of parties in interest as a whole. In accordance with Bankruptcy Rule 9019, and pursuant to the terms of the Plan, at and as part of the hearing on confirmation of the Plan, the Debtors will request that the Bankruptcy Court approve the Plan Settlements as fair and equitable and in the best interests of the Debtors' estates.

The Debtors believe the Plan Settlements are in the best interests of the various parties in interest and the Debtors' estates for several reasons. First, as discussed more extensively below, the outcomes of the potential intercompany disputes and litigation that are being settled are uncertain. Second, the Plan Settlements take into account the risks and potential recoveries related to each of the intercreditor and the debtor-creditor issues described herein. Finally, the Plan Settlements best address the competing considerations that arise because the vast majority, if not all, of the claims in these cases are all litigation claims or indemnification claims related to such claims, and are primarily against one of the three Debtors, Gawker Media.

Although there is a judgment against Gawker Media, the Bollea Judgment, that state law judgment is not merely subject to an appeal of factual findings in that case. Instead, the Bollea Judgment is in the unusual posture of being based on a ruling that Gawker Media publication was not speech protected under the First Amendment, when two other courts (including the exact same state appellate court that will consider the judgment) have already (as part of proceedings regarding injunctive relief) ruled against the plaintiff on that

same key legal issue. Consequently, a similar appellate ruling on that same legal issue would likely result in a reversal of the Bollea Judgment, or at least a significant reduction of that judgment. Because of the procedural posture of the case, the Debtors are presently not able to seek any ruling from the bankruptcy court on the judgment itself, but the bankruptcy court can take into account the particular posture of the case solely in connection with weighting the fairness of the Plan Settlements.

Further, regardless of the eventual outcome of the disputes resolved by the Plan Settlements, continued litigation would result in substantial cost to the estates. For example, the Committee has indicated it will seek to undertake a full forensic accounting analysis for many years of the Debtors' operations. The Debtors believe that the cost of litigating the intercompany disputes would be between $9-12 million.

**A. The Disputes Resolved by the Plan Settlements**

This centerpiece of the Plan, and one of its principal benefits to creditors and equityholders, includes a resolution of numerous and substantial disputes that exist among the bankruptcy estates. Those disputes pose substantial costs and risks for many creditors, including those with claims arising from the Article Lawsuits (the "Publication Plaintiffs") even if they prevail in litigation regarding their respective disputed claims. The disputes also pose substantial costs and risks for equityholders, even if Gawker Media prevails in litigation with all Publication Plaintiffs and there are no such creditors.

The ~~potential~~primary group of interrelated disputes ~~and causes of action~~ being resolved ~~pursuant to~~under the Plan Settlements ~~include: (a~~falls into three general sub-categories. The first sub-category consists of allocation of assets and expenses across the three Debtors' three estates, including (i) allocation of the purchase price obtained for the Debtors' assets in connection with the Unimoda Sale, (~~b~~ii) the allocation of the DIP Loan debt and repayment thereof, (~~e~~iii) the allocation of Second Lien Term Loan between guarantors, (~~d~~iv) the allocation of administrative expenses, including professional fees paid or incurred prior to the closing of the Unimoda Sale, (~~d~~v) the allocation of administrative expenses, including professional fees, incurred subsequent to that closing through the Effective Date, and (~~e~~vi) the allocation of reserves for post-Effective-Date expenses. ~~(f) the enforceability of a $3.75 million make whole amount claimed by the Second Lien Lender against all three Debtors, (g) claims.~~ The second sub-category consists of resolution of inter-Debtor claims, including (a) resolution of amounts of outstanding intercompany debts, (b) potential claims and causes of action of Gawker Media against GMGI and its directors and officers, ~~(h) the Intercompany claims held by Gawker Hungary against Gawker Media, (i) the Intercompany claim held by GMGI against Gawker Media,~~ and (~~j~~c) contentions that there should be substantive consolidation of the Debtors' estates, veil piercing, *alter ego* or other similar claims. The third sub-category consists of resolving three of the most significant disputed Claims asserted against the Debtors' estates, including (x) the Bollea Claims (and potential appeals relating thereto), (y) Terrill Claims, and (z) Ayyadurai Claims.

~~The various~~These disputes are ~~described~~summarized below.

*i.* *Allocation*

a. **Unimoda Sale Purchase Price Allocation among Debtors' Estates**

The Unimoda Sale had a cash purchase price of $135 million, subject to certain closing adjustments (the "Purchase Price"). Unimoda purchased assets, some of which were owned by Gawker Hungary and some of which were owned by Gawker Media. The Sale Order provides that the Purchase Price would be deposited in a single bank account in the United States and held in the name of Gawker Media. The Sale Order also provides that this deposit shall not be deemed to have any effect on the allocation of the Purchase Price to Gawker Hungary or Gawker Media; *i.e.* the question of how much Purchase Price was paid for the assets of each of the two seller Debtor estates (the "Purchase Price Allocation").

As described above, at the time of its founding, much of the Debtors' operations were in Hungary. ~~The majority of all software development, including critical work on the discussion system, among other things, occurred in Hungary, by employees of~~and critical intangible assets were owned by Gawker Hungary. Gawker

27

Hungary was the Debtor that owned the various URLs under which the Debtors operated their major web content platforms. All of the Debtors' trademarks were owned by Gawker Hungary, except one, which was a not a trademark used in attracting viewers to the Debtors' URL websites. The majority of software development, including critical work on the discussion system, among other things, occurred in Hungary, by employees of Gawker Hungary.

In 2011 the Debtors undertook an evaluation of the economic terms under which Gawker Hungary could license the use of its intangible assets to Gawker Media (under the "Master License Agreement"). The Debtors engaged the firm of Mayer Brown LLP to evaluate and provide an opinion regarding the arms-length terms of that contract (the "Transfer Pricing Opinion").

The Transfer Pricing Opinion developed a range for an arms-length royalty rate between Gawker Media and Gawker Hungary. The Master License Agreement provides for a royalty calculated in four tiers, depending on the "Cumulative Annual Revenue" (as defined in the Master License Agreement) of Gawker Media. For such revenue (a) up to $3.0 million, 5% royalty, (b) above $3.0 million up to $6.0 million, $150,000 plus 10% of such tier revenue, (c) above $6.0 million up to $9.0 million, $450,000 plus 15% of such tier revenue, and (d) above $30 million, $150,000 plus 24% of such tier revenue.

There are two other intercompany agreements between Gawker Media and Gawker Hungary. Under a Development Agreement amended on January 1, 2013, Gawker Hungary purchases certain services from Gawker Media, for which Gawker Media pays an amount equal to direct costs plus 5%. Under an Intercompany Services Agreement dated January 1, 2012, Gawker Media pays for various services from Gawker Hungary, an amount also equal to direct costs plus 5%.

These economic agreements that Gawker Media and Gawker Hungary arrived at reflect an approximate allocation of the value of assets of two-thirds of the value attributable to Gawker Hungary assets, and one-third of the value attributable to Gawker Media assets. The Debtors believe that this allocation continues to reflect the relative value attributable to Gawker Hungary, on the one hand, and Gawker Media, on the other, as of the closing of the Unimoda Sale. The six major brands sold to Unimoda (*Jalopnik, Jezebel, Deadspin, Lifehacker, Gizmodo* and *Kotaku*) reflect the value of the URLs, trademarks, brands and other intangible assets that Gawker Hungary owns. The Committee maintains that this is not a reflection of the relative allocation of value and that most, if not all, These economic agreements were not, however, updated in recent years. In discussions with the Committee and individual creditors, those stakeholders took the position that a far greater share of the value of the Debtors' assets, as much as 100% of the value, should be allocated to the allocable to Gawker Media estate. because the substantial majority of revenues are collected by Gawker Media and Gawker Media employs significantly more Salaried Employees and Independent Contractors. As a result, the Debtors reviewed their analysis and the Plan Settlements reflect certain modifications to the allocation implied by the historical economic agreements.

The dispute over Unimoda Purchase Price allocation has significant consequences for both creditors and equityholders. If the allocation is one-third to Gawker Media and two-thirds to Gawker Hungary, taking into account other cash and before any paydown of secured debt and administrative costs, it results in approximately $60.0 million of distributable value to Gawker Media and $92.9 million of distributable value to Gawker Hungary. At the outside range of potential outcomes, even if 100% of the asset allocation were to Gawker Media, the unsecured creditors at Gawker Media would have potential of recourse (if their claims are Allowed after all appeals) to approximately $75.2 million. On the other hand, if the allocation were resolved in favor of Gawker Hungary (two thirds to Gawker Hungary, the position the Debtors expect equityholders would take) Gawker Media creditors would have recourse only to approximately $16.0 million. because different creditors and equityholders hold Claims against, and/or Equity Interests in, different Debtors or combinations of Debtors. For example, absent any settlements, creditors holding Claims solely against Gawker Media would not have direct recourse to any Unimoda Purchase Price amounts allocated to Gawker Hungary or GMGI. Conversely, holders of Equity Interests in GMGI may recover from amounts allocated to Gawker Media (through GMGI's membership interest in Gawker Media) only after any Claims against Gawker Media are fully satisfied.

*The Intercompany Claims*

Prior to the beginning of 2015, Gawker Media made periodic payments to Gawker Hungary for balances due under the Intercompany Agreements. At various times, Gawker Hungary loaned amounts back to Gawker Media which were memorialized in the Gawker Hungary Intercompany Notes. Since the beginning of 2015, Gawker Media has received invoices from Gawker Hungary for balances due under the Intercompany Agreements, which have accrued into a receivables balance. Under that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, Gawker Media promised to pay $8 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. Under that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, Gawker Media promised to pay $5.0 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually. Under that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually. As of January 1, 2016, (i) Gawker Hungary had approximately $10.2 million in accounts receivable from Gawker Media, (ii) Gawker Media had approximately $3.1 million in accounts receivable from Gawker Hungary, and (iii) GMGI had approximately $0.1 million in accounts receivable from Gawker Media. The net balance of these intercompany promissory notes and accounts receivable as of December 31, 2016, totaled intercompany obligations of approximately $20.1 million from Gawker Media to Gawker Hungary and $0.1 million from Gawker Media to GMGI (collectively with intercompany receivables accruing from January 1, 2016 through the Petition Date, the "Intercompany Obligations").

Gawker Hungary could assert that the Intercompany Obligations are general unsecured claims against Gawker Media that share *pari passu* with any recovery of creditors at Gawker Media. So, for example, even if the asserted litigation claims were valid (a conclusion with which the Debtors disagree) and aggregated to, for example, $180 million, the Intercompany Notes would materially dilute the recovery of unsecured creditors, by more than 10%. Gawker Hungary would also assert that these valid general unsecured claims are senior in bankruptcy to any punitive damages claims against Gawker Media.

Gawker Media could assert that the Intercompany Obligations are not general unsecured claims, but there is a substantial risk that all or a substantial amount of the Intercompany Obligations would be allowed and dilute creditor recoveries at Gawker Media.

The Debtors are investigating additional intercompany claims and have been advised by the Committee that such other claims exist.

The Plan Settlements include a provision under which Gawker Hungary and GMGI waive all of their intercompany claims against Gawker Media and provides Gawker Media with additional consideration in full satisfaction of any and all intercompany claims by Gawker Media against Gawker Hungary and GMGI.

*Allocation of Financing Debt Repayment*

### b.      Paydown of DIP Loan

The DIP Loan was obtained at the outset of these Bankruptcy Cases. Gawker Media was the borrower, and GMGI and Gawker Hungary were guarantors. Funds were used, *inter alia,* for Gawker Media operations and the posting cash to backstop an approximately $5.6 million of letter of credit held by the landlord for the commercial property at Fifth Avenue in New York City, leased by Gawker Media (the "Fifth Avenue Letter of Credit"). At the closing of the Unimoda Sale, and in accordance with the DIP Financing Order, Gawker Media as borrower repaid all amounts due under the DIP Loan, totaling approximately $17.2 million.

Gawker Hungary and GMGI, as guarantors, could argue that they have no responsibility for any repayment of the DIP Loan; Gawker Media was the primary obligor under the DIP Loan documents. Gawker Media could argue that Gawker Hungary, to the extent of benefits to Gawker Hungary from the DIP Loan, should bear the burden as primary obligor, notwithstanding the documents providing that Gawker Hungary was

29

only a guarantor. ~~Notwithstanding the various agreements, the Plan contemplates that, as part of the Plan Settlements (including the post confirmation loans from Gawker Hungary to Gawker Media) approximately $3.0 million of the DIP Loan paydown will be allocated to Gawker Hungary. In addition, Gawker Media will receive all of the cash released in connection with the return of the Fifth Avenue Letter of Credit.~~

<u>c.</u>    **Paydown of Second Lien Term Loan**~~.~~

The Second Lien Term Loan was made on January, 21, 2016 to GMGI. Gawker Media and Gawker Hungary are each guarantors of the Second Lien Term Loan. All of the funds from the GMGI borrowing were contributed to Gawker Media at the time of the loan. As described above, the sale proceeds received during these chapter 11 cases were in respect of the sale of assets of Gawker Media and Gawker Hungary, not assets of GMGI. At closing of the Unimoda Sale, the Second Lien Term Loan was paid down by approximately $16.5 million, the amount of outstanding principal, interest (including default interest) and professional fees (the "<u>Second Lien Payoff</u>"), but excluding the amount of an asserted make-whole premium of approximately $3.75 million (the "<u>Second Lien Make Whole</u>").

The respective amounts of the Second Lien Payoff that Gawker Media and Gawker Hungary paid were not determined at the time of the closing of the Unimoda Sale, with each chapter 11 estate reserving its rights. As guarantors, each would have contribution rights against the other for any amounts paid on the loan. The relevant guaranty agreement does not contain any provision stating how such contribution rights are to be allocated. Each estate might argue (based on common law or other principles) that each of them should ultimately bear 50% of the Second Lien Payoff, as some legal authority provides for guarantor contribution rights to be apportioned by the number of guarantors (in this case there are two). On the one hand, Gawker Media could instead argue (based on fraudulent conveyance or other law) that Gawker Hungary should ultimately bear the economic burden of the Second Lien Term Loan in proportion to the allocation of asset value to Gawker Hungary, and that, if Gawker Hungary receives a large asset allocation, then Gawker Media should ~~therefore~~ have a large contribution claim unless Gawker Hungary pays more than 50% of the Second Lien Term Loan. However, creditors of Gawker Media might not prefer such an argument as it would deplete assets allocated to the Gawker Media estate. On the other hand, Gawker Hungary might argue (based on fraudulent conveyance or other law) that the proceeds of the Second Lien Term Loan were contributed to Gawker Media, that they were principally used by Gawker Media, and therefore Gawker Hungary should have a large contribution claim unless Gawker Media pays more than 50% of the Second Lien Term Loan. ~~As part of the Plan Settlements, the Plan allocates the Second Lien Payoff 50% to Gawker Media and 50% to Gawker Hungary.~~

~~*Second Lien Make Whole Settlement*~~

~~Under the documentation for the Second Lien Term Loan, each of the Debtors is liable for the $3.75 million asserted as the Second Lien Make Whole Claims: GMGI as borrower, and Gawker Media and Gawker Hungary as guarantors. However, the Debtors dispute in its entirety the enforceability of the Second Lien Make-Whole Provision, on the grounds, among others, that it is an unenforceable penalty (and not an enforceable liquidated damage) under New York law. The Second Lien Lender disputes that, and asserts that the amount is fully enforceable and payable.~~

~~Based on the sale proceeds allocation that the Plan Settlements contemplate, the Second Lien Make Whole Claims are treated as a disputed, fully secured claim against each of the three Debtor estates. The GMGI estate could argue that the security interest of the Second Lien Lender in the equity of Gawker Hungary could be avoided as a preferential transfer. That security interest was perfected only in early March 2016, two months after the loan was made and more than 90 days prior to the Petition Date, and the Second Lien Lender was, at the time, arguably an insider of GMGI, because a individual who is a principal of the Second Lien Lender was, at that time, also a director of GMGI. The Second Lien Lender could, however, raise several defenses to this argument. First, the perfection could be a transfer for contemporaneous new value (and therefore not avoidable), as the parties contemplated that it was contemporaneous with the closing of the Second Lien Term Loan, but the perfection steps took some time in Hungary (and the loan needed to be made quickly) but remained substantially contemporaneous within the meaning of the Bankruptcy Code. Second, the Debtors would agree that at the time of this perfection, Gawker Hungary was solvent, so that GMGI was also solvent, as~~

30

the trial in the Bollea I Lawsuit had not yet occurred and the value of the Debtors' assets at that time; if GMGI was solvent, a preference action would fail. Third, the Second Lien Lender could argue that it was not an insider, as there was not overlapping 20% voting equity ownership with the Debtors, and merely sharing a single director does not automatically make an entity an insider. Finally (and separately), even if the security interest were avoided, that would not eliminate the Second Lien Make Whole Claims at GMGI. The more substantial economic effect is the argument (set forth above) that the claim is unenforceable.

The Plan Settlements contemplate that the Allowed claim will be reduced at each guarantor estate to $1.25 million, a substantially reduced portion of the $3.75 million of liability that each has. The overall liability at GMGI will likewise be reduced to not more than $2.0 million. Each estate will pay $500,000 in cash on the Effective Date to the Second Lien Lender. The Second Lien Lender also receives, as part of the Plan Settlements, subordinated claims at Gawker Media and GMGI, payable only after general unsecured creditors at such estate are paid in full. As of the filing of this Disclosure Statement, the Second Lien Lender has not agreed to such treatment.

### d.    Allocation of Administrative and other Expenses

From the Petition Date to the final date of liquidation of the Debtors' assets and distribution to parties in interest, there will be substantial costs of administration. Those costs will be dramatically greater if there is litigation over the intercompany disputes and disputes regarding the Second Lien Make-Whole Claims. There will also be substantial costs in resolving the various disputed litigation claims against the various Debtors, including the appeal of the Bollea Judgment.

For purposes of the Plan Settlements, these costs are divided into three categories: (a) costs from the Petition Date to the closing of the Unimoda Sale, (b) costs from that sale to the Effective Date (primarily anticipated costs of litigating the intercompany and Second Lien Lender disputes in the context of a plan confirmation proceeding), and (c) costs from and after the Effective Date (primarily anticipated costs of litigation claims objections and appeals, including of the Bollea Judgment). Each of these could be allocated differently as between the three Debtors' estates, primarily Gawker Media and Gawker Hungary.

The Plan settlement contemplates the following allocations of such expenses:

- For the pre-closing period, $6.0 million to Gawker Media and $11.5 million to Gawker Hungary. This includes an allocation of the breakup fee payable to the stalking horse bidder primarily to Gawker Hungary, in accordance with the Plan Settlements' allocation of Unimoda Sale proceeds to Gawker Hungary.

- For the period from closing of the Unimoda Sale to the Effective Date, $10.0 million to Gawker Media and $8.0 million to Gawker Hungary.

- For the post-Effective Date period, $5.5 million to Gawker Media and $2.0 million to Gawker Hungary (or GMGI, if Gawker Hungary is dissolved).

### 2. The Intercompany Claims

#### a.    Outstanding Intercompany Obligations

Prior to the beginning of 2015, Gawker Media made periodic payments to Gawker Hungary for balances due under the intercompany agreements between Gawker Media and Gawker Hungary. At various times, Gawker Hungary lent amounts back to Gawker Media which were memorialized in the Gawker Hungary Intercompany Notes. Since the beginning of 2015, Gawker Media has received invoices from Gawker Hungary for balances due under the intercompany agreements between Gawker Media and Gawker Hungary, which have accrued into a receivables balance. Under the First Gawker Hungary Promissory Note, Gawker Media promised to pay $8 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of

31

1.75%, compounded annually.  Under the Second Gawker Hungary Promissory Note, Gawker Media promised to pay $5.0 million to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.  Under the GMGI Promissory Note, Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually.

**b.    Intercompany Receivables among Gawker Media and Gawker Hungary.**

In the ordinary course of the Debtors' intercompany arrangements, the Debtors have also accrued intercompany receivables owing to one another. As of September 9, 2016, Gawker Hungary had approximately $12.82 million in accounts receivable outstanding from Gawker Media on account of amounts owing under the Master License Agreement.  The rates charged under the Master License Agreement were established in 2011 based on the Transfer Pricing Opinion discussed below in Section VII.A.1, which reflected an allocation of the value of the Debtors' assets approximately 2/3 to Gawker Hungary and 1/3 to Gawker Media.  As part of the Intercompany Settlement, the Debtors are agreeing to allocate 60% of Unimoda Purchase Price to Gawker Media and 40% to Gawker Hungary, so the Debtors are also agreeing to a corresponding reduction to the accounts receivable due from Gawker Media to Gawker Hungary under the Master License Agreement to $10.7 million.

Also as of September 9, 2016, Gawker Hungary had approximately $0.27 million in accounts receivable from Gawker Media on account of amounts owing under the Gawker Hungary Services Agreement, and Gawker Media had approximately $4.8 million in accounts receivable from Gawker Hungary, neither of which were calculated by reference to the allocation of value among the Debtors' estates..  Accordingly, as of September 9, 2016, the net intercompany balance owing from Gawker Media to Gawker Hungary, accounting for the adjustment described above, was $6.1 million (the "Intercompany Obligations").

Gawker Hungary could assert that the full amount of the Intercompany Obligations plus interest are general unsecured claims against Gawker Media that share *pari passu* with any recovery of creditors at Gawker Media.  So, for example, even if the asserted litigation claims were valid (a conclusion with which the Debtors disagree) and aggregated to, for example, $150 million, the Intercompany Obligations would materially dilute the recovery of unsecured creditors, by more than 4%.  Furthermore, Gawker Hungary could also assert that these valid general unsecured claims are senior in bankruptcy to any punitive damage claims against Gawker Media.

Gawker Media could assert that the Intercompany Obligations are not general unsecured claims at all or that they should be subordinated, but there is a substantial risk that all or a substantial amount of the Intercompany Obligations would be allowed and dilute creditor recoveries at Gawker Media.

The Debtors are investigating additional intercompany claims, including those identified by the Committee.

The Plan Settlements provide for Gawker Media to repay $16.0 million of the outstanding balance of Gawker Hungary's Intercompany Claims against it, which amounts the Debtors anticipate will ultimately be distributed to GMGI, as the sole member of Gawker Hungary.  In addition, the balance of the Gawker Media Gawker Hungary Intercompany Claims plus any interest will be subordinated to the payment in full of the Gawker Media Unsecured Claims and the Gawker Media Punitive Damage Claims and will receive a further distribution only upon payment in full (without interest) of these claims.  In addition, GMGI will directly provide the GMGI Plan Guaranty in the amount of $2.0 million to ensure that the holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims receive the distributions to which they are entitled under the Plan.  This repayment of the outstanding Intercompany Obligations balance is also accounted for in the allocation of Unimoda Purchase Price proceed and Debtor expenses that assures minimum reserves of $6.5 million for satisfaction of any such Claims.  There may also be some Cash remaining at Gawker Media after making the anticipated Effective Date distributions and the establishment and funding of the Plan Reserve Accounts.  The Plan Settlements also include a provision under which GMGI waives all of its

intercompany claims against Gawker Media and provides Gawker Media with consideration in the form of the GMGI Plan Guaranty in full satisfaction of any and all intercompany claims by Gawker Media against GMGI.

### c.    Potential Fiduciary Duty Causes of Action Against GMGI and Directors & Officers

The Debtors are beginning an investigation of any claims against GMGI, or its directors and officers, for breach of fiduciary duties to Gawker Media, ~~but~~and have been advised that the Committee believes that such claims exist~~, but has been unwilling to state the basis of those claims~~. GMGI was at relevant times the sole member of Gawker Media, and Nicholas Denton was the sole manager of Gawker Media. Gawker Media's operating agreement does not contain any disclaimer of fiduciary duties. Gawker Media is a Delaware limited liability company and under Delaware law, managers and controlling equityholders could owe a fiduciary duty to Gawker Media. Thus Gawker Media could assert breach of fiduciary duty claims, although under Delaware law there is no particular fiduciary duty owed to creditors. GMGI has an interest in resolving any such fiduciary duty claims against itself, and also claims against ~~Mr.~~ Denton, because GMGI has indemnified ~~Mr.~~ Denton.

GMGI and its directors and officers, and Mr. Denton, could defend those suits on the grounds, *inter alia*, that Gawker Media is a wholly owned subsidiary of GMGI, and actions taken were in GMGI's interest. As part of the Plan Settlements, GMGI is ~~contributing~~providing the $2.0 million ~~to~~GMGI Plan Guaranty to creditors of Gawker Media in settlement of all such claims, as well as taking all the other actions under the plan.

### d.    Substantive Consolidation, Veil Piercing, and *Alter Ego*

Gawker Media might argue that there should be no allocation of the purchase price, and instead that Gawker Media creditors should have recourse to, and obtain recoveries from, the value of assets of Gawker Hungary and GMGI. There are several legal theories that Gawker Media might assert, including substantive consolidation of the Debtors' estates, veil piercing or *alter ego*.

The theory of "substantive consolidation" refers to the merging of the assets and liabilities of distinct, bankrupt entities and the treatment of those assets and liabilities as if they belonged to a single entity. The two critical factors considered in assessing whether substantive consolidation is warranted are (i) whether creditors dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the Debtors are so entangled that consolidation will benefit all creditors, by the costs of disentangling them are so great that the cost outweighs the benefit to each affected party in interest. The second factor involves whether there has been a commingling of the assets and business functions and considers whether all creditors will benefit because untangling is either impossible or so costly as to consume the assets. Full substantive consolidation would result in ~~General Unsecured Creditors~~general unsecured creditors receiving a relative distribution in excess of what the Plan Settlements provide if the litigation claims were allowed.

With respect to the first factor, the litigation creditors who are the principal creditors of Gawker Media do not have Allowable Claims against either of the other two Debtors; indeed in the lawsuit that resulted in a judgment against Gawker Media, Bollea voluntarily dismissed Gawker Hungary and did not amend his complaint to include GMGI within the final time period set by the Florida court. There is no "reliance" by these disputed, litigation creditors that would justify giving them recourse to the assets of the other Debtors. With respect to the second factor, the Debtors estimate that the cost of a full dispute regarding the purchase price allocation and intercompany matters would cost as much as $12.0 million. However, if the Gawker Hungary position is correct (that two-thirds of the purchase price is allocable to Gawker Hungary assets, and there are no material intercompany claims against Gawker Hungary), then there would be in excess of $26.7 million (after taxes) available first to GMGI creditors, and then to preferred shareholders, depending on the outcome of substantive litigation regarding certain indemnification claims. Thus the costs of the dispute do not exceed the amount at stake, and the estates cannot be substantively consolidated.

33

Regarding legal theories of *alter ego* and veil piercing, it may be the case that the financial books and records of Gawker Hungary and Gawker Media were not kept perfectly, and therefore creditors of Gawker Media, or the estate itself, could raise these claims. However, Gawker Hungary was formed at the outset of the company's operations, years before the (disputed) claims of current creditors ever arose. Gawker Hungary has since its inception had real business operations, including the primary activities relating to development of the Debtors' proprietary software; it maintained offices and a number of software engineers and other employees, and was not a mere vehicle for owning certain assets. Gawker Hungary itself bought various URLs, and registered the relevant trademarks under which various websites are operated. As a result, there would be a substantial and fact-bound trial of any alter ego or veil piercing claims, and Gawker Hungary would have very substantial defenses.

### *3. The Disputed Creditor Claims*

#### a.    ~~B.~~ The ~~Plan Settlements~~Bollea Claims

As discussed above, a jury has found Gawker Media liable to Bollea for $115 million in compensatory damages and $15 million in punitive damages, for a total of the $130 million Bollea Judgment. An additional $10 million of punitive damage was assessed against Denton separately, and an additional $100,000 of punitive damages was assessed against Mr. Daulerio separately, for which those defendants have asserted indemnification claims against the Debtors.

The Debtors have appealed that Florida State court judgment, which is not merely subject to an appeal of factual findings in that case. Rather, the Bollea Judgment is in the unusual posture of being based on a ruling that a Gawker Media publication was not speech protected under the First Amendment, when two other courts (including the exact same state appellate court that will consider the judgment) have already (as part of proceedings regarding injunctive relief) ruled against the plaintiff on that same key legal issue. Consequently, a similar appellate ruling on that same legal issue would likely result in a reversal of the Bollea Judgment, or at least a significant reduction of that judgment. Because of the procedural posture of the case, the Debtors are presently not able to seek any ruling from the bankruptcy court on the judgment itself, but the bankruptcy court can take into account the particular posture of the case solely in connection with weighting the fairness of the Plan Settlements.

Bollea believes that an appeal would likely sustain the finding of liability as well as damages awards that exceed the Debtors' assets available for distribution under a plan. In that regard, Bollea believes that there is no genuine dispute regarding Gawker Media's posting of a sexually explicit video of Bollea without his consent, so the primary (if not exclusive) basis for Gawker Media to contest liability would be its contention that the First Amendment protects Gawker Media's publication of the video. Bollea believes that neither the testimony of Gawker Media's witnesses at trial nor the substantial body of case law rejecting First Amendment protection for the publication of sexually explicit videos support Gawker Media's legal argument, and he believes that the standards used in prior decisions to address injunctive relief before there was a factual record are inapplicable on this appeal. As to damages, Bollea believes the award will be sustained because (i) the economic damages award was supported by the only expert testimony offered at trial, (ii) the non-economic damage award is in line with similar cases, and (iii) the punitive damage awards are not excessive because they were a fraction of the compensatory damage award and were tailored by the jury to the net worth of each defendant. If the Bollea Judgment is ultimately allowed at its full amount, it would dramatically reduce potential recoveries to other smaller unsecured creditors of Gawker Media.

### b.    The Terrill and Ayyadurai Claims

Unlike the Bollea Judgment, neither the Terrill Claims nor the Ayyadurai Claims have been determined to have liability or liquidated. In the Terrill Litigation, Terrill is seeking at least $10 million in damages and a briefing schedule has just been set. In the Ayyadurai Litigation, Ayyadurai is seeking at least $35 million in damages, and the Debtors have already filed a motion to dismiss the underlying claims. The Debtors have filed objections to proofs of claim filed by Terrill and Ayyadurai based on these lawsuits and the Debtors believe that they would be likely to prevail if the claims were fully litigated. Due to the uncertainty of the outcome of litigation, and the time and expense necessary to filly litigate the underlying matters, the Debtors held separate negotiations with each of Terrill and Ayyadurai and reached agreements to settle their claims.

**B.**    ~~The Plan Settlements consist of two separate settlements: the~~ **Second Lien Make-Whole Claims Settlement** ~~and the Intercompany Settlement.~~

The Second Lien Make-Whole Claims are subject to discrete disputed legal separate from the disputes relating to allocation, inter-Debtor claims, and unsecured creditor recoveries. Under the documentation for the Second Lien Term Loan, each of the Debtors is liable for the $3.75 million asserted as the Second Lien Make-Whole Claims: GMGI as borrower, and Gawker Media and Gawker Hungary as guarantors. However, the Debtors dispute in its entirety the enforceability of the Second Lien Make-Whole Provision, on the grounds, among others, that it is an unenforceable penalty (and not an enforceable liquidated damage) under New York law. The Second Lien Lender disputes that, and asserts that the amount is fully enforceable and payable.

Based on the sale proceeds allocation that the Plan Settlements contemplate, the Second Lien Make-Whole Claims are treated as a disputed, fully secured claim against each of the three Debtor estates. The GMGI estate could argue that the security interest of the Second Lien Lender in the equity of Gawker Hungary could be avoided as a preferential transfer. That security interest was perfected only in early March 2016, two months after the loan was made and more than 90 days prior to the Petition Date, and the Second Lien Lender was, at the time, arguably an insider of GMGI, because a individual who is a principal of the Second Lien Lender was, at that time, also a director of GMGI. The Second Lien Lender could, however, raise several defenses to this argument. First, the perfection could be a transfer for contemporaneous new value (and therefore not avoidable), as the parties contemplated that it was contemporaneous with the closing of the Second Lien Term Loan, but the perfection steps took some time in Hungary (and the loan needed to be made quickly) but remained substantially contemporaneous within the meaning of the Bankruptcy Code. Second, the Debtors would agree that at the time of this perfection, Gawker Hungary was solvent, so that GMGI was also solvent, as the trial in the Bollea I Lawsuit had not yet occurred and the value of the Debtors' assets at that time; if GMGI was solvent, a preference action would fail. Third, the Second Lien Lender could argue that it was not an insider, as there was not overlapping 20% voting equity ownership with the Debtors, and merely sharing a single director does not automatically make an entity an insider. Finally (and separately), even if the security interest were avoided, that would not eliminate the Second Lien Make-Whole Claims at GMGI. The more substantial economic effect is the argument (set forth above) that the claim is unenforceable.

The Plan Settlements contemplate that the Allowed Claim will be reduced at each guarantor estate to $1.25 million, a substantially reduced portion of the $3.75 million of liability that each has. The overall liability at GMGI will likewise be reduced to not more than $2.0 million. Each estate will pay $500,000 in cash on the Effective Date to the Second Lien Lender. The Second Lien Lender also receives, as part of the Plan Settlements, subordinated claims at Gawker Media and GMGI placed in reserve accounts to satisfy Claims of unsecured creditors of the respective Debtor estates, and distributable to the Second Lien Lender only after general unsecured creditors at such estate are paid in full. As of the filing of this Disclosure Statement, the Second Lien Lender has not agreed to such treatment.

### C.    Consequences of the Plan Settlements

The Plan Settlements constitute a global resolution of these disputes through a series of compromises. Although we describe the resolutions of disputes with different creditor groups as separate "settlements," they are all inextricably intertwined with and interdependent on one another. In resolving the allocation, inter-

35

Debtor and claims settlements, the Debtors consulted with creditors and equity holders, and the balance in resolving disputes was give creditors more value through allocation resolution and claims settlement in exchange for settlements facilitating expeditious distributions and establishment reserves for balance of the potential litigation claims.

Under the Second Lien Make-Whole Claims Settlement, in full and complete settlement, release, and discharge of, and in exchange for, any outstanding claims that the Second Lien Holder may assert arising from, or in connection with, the Second Lien Loan and Security Agreement, including, without limitation, any rights relating to the Second Lien Make Whole Provision, the Second Lien Holder agrees to receive the allowance and treatment of the Second Lien Make-Whole Claims provided for in the Plan. Specifically, the $3.75 million asserted Second Lien Make-Whole Claims will receive only $1.5 million in Cash on the Effective Date ($500,000 from each of the Debtors' estates), and the remaining amounts owed at each Debtor paid only on subordinated bases.

Under the Bollea Settlement, in full and complete settlement, release, and discharge of, and in exchange for, the Bollea Claims, including the $130.0 million Bollea Judgment and the waiver of Bollea's claims against third parties that would have Debtor Indemnification Obligations, Bollea will receive $31.0 million Cash from Gawker Media, and a Pro Rata share of Distributions from the Gawker Media Contingent Proceeds Creditor Account. Under the other creditor Plan Settlements, (i) in full and complete settlement, release, and discharge of, and in exchange for, the Terrill Claims and the waiver of Terrill's claims against third parties that would have Debtor Indemnification Obligations, Terrill will receive $500,000 Cash from Gawker Media, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account and (ii) in full and complete settlement, release, and discharge of, and in exchange for, the Ayyadurai Claims, and the waiver of Ayyadurai's claims against third parties that would have Debtor Indemnification Obligations, Ayyadurai will receive $750,000 Cash from Gawker Media, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account. The effect of the Bollea Settlement and the other creditor Plan Settlements is to dramatically reduce the amount of the Gawker Media General Unsecured Claims pool and also to create certainty about the amounts that will be available to other Gawker Media unsecured creditors and the holders of GMGI's Preferred Equity Interests.

The~~In that regard,~~ Intercompany Settlement is among the three Debtors, and consists of the following integrated provisions:

      1.     The Debtors will allocate the Unimoda Purchase Price ~~will be allocated one third to Gawker Media and two thirds to Gawker Hungary.~~ and other proceeds and expenses discussed above in a manner that provides for establishment of the Plan Reserve Accounts and treatments of Claims and Equity Interests set forth in the Plan.

      2.     GMGI will provide the GMGI Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims;

      3.     GMGI agrees to contribute 45.0% of Gawker Media Contingent Proceeds for deposit in the Gawker Media Contingent Proceeds Creditor Account for satisfaction of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims.

      4.     Each of the Debtors agrees that the treatment of Claims and Equity Interests of each of the Debtors against or in the other Debtors will be as set forth in the Plan

      5.     Each of the Debtors agrees to the terms of the Second Lien Make-Whole Claims Settlement, the Bollea Settlement, and the settlement of the Terrill Claims and Ayyadurai Claims.

      ~~2. Gawker Hungary will make a loan to Gawker Media of $12.5 million (the "Gawker Hungary Plan Loan"), with the proceeds held in escrow until the Gawker Media Distribution Date with such proceeds to be used only for making distributions to Allowed Claims in Class 2C and 2D.~~

3. GMGI will pay $2.0 million to Gawker Media, in settlement of all claims and causes of action that the Gawker Media estate has and could assert against GMGI and all officers and directors of any of the Debtors, and any indemnification claims of such officers and directors against GMGI solely to the extent they arise from claims of breach of fiduciary duty (and not indemnification claims arising from direct tort claims against such persons).

4. Gawker Hungary will waive all intercompany claims against Gawker Media, and each of Gawker Hungary and Gawker Media waive all intercompany claims they each have against GMGI.

5. Gawker Hungary will distribute to GMGI nearly all remaining cash and non-cash assets, including the Intercompany Notes and the Gawker Hungary Plan Loan.

The baseline net economic effect of this Intercompany Settlement in conjunction with the Bollea Settlement and the settlement of the Terrill Claims and Ayyadurai Claims is that the unsecured creditors of Gawker Media will have the amount against which they have recourse increased from approximately $16.0 million to at least $30.0 million. first recourse to a total of at least $6.5 million of Cash consisting of the $3.75 million Gawker Media Claims Reserve, the $0.75 million Gawker Media Second Lien Make-Whole Guaranty Reserve, the $2.0 million GMGI Plan Guaranty. There may also be some Cash remaining at Gawker Media after making the anticipated Effective Date distributions and the establishment and funding of the Plan Reserve Accounts. To the extent that amount is insufficient to satisfy such Claims, excluding Post-Petition Interest, 45% of any Gawker Media Contingent Proceeds will also be available to satisfy Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest, and, upon full satisfaction of such amounts, Allowed Gawker Media Punitive Damage Claims.

The Debtors believe that this baseline benefit is higher. To the extent that the Committee does not expend amounts in challenging the Plan Settlements additional funds would be available to Gawker Media creditors. This amount could be as much as $5.0 million. In addition, the economic effect of Gawker Hungary's waiver of the Intercompany Obligations increases those recoveries; that benefit varies depending on the total amount of allowed claims at Gawker Media, but if the claims are as the creditors assert (approximately $180 million), this benefit would be in excess of $3.0 million as a result of the pool of Allowed Claims being reduced by $20.1 million. As a result, the structure of the Plan Settlements (including a Gawker Hungary post-confirmation loan and a GMGI contribution) provide the unsecured creditors of Gawker Media with nearly the same amount of potential recovery that they would have if the Unimoda Purchase Price were allocated one-half to Gawker Hungary and one half to Gawker Media (assuming that payment of the Second Lien Make-Whole Claims Settlement is allocated to Gawker Media). The Plan Settlements do so in a structure that preserves the existing and beneficial tax structure of the Debtors' operations, for the circumstances (equally important in these cases because the creditor claims are heavily disputed) in which equity is in the money. than the alternative of fully litigating the disputes resolved under the Plan Settlements. In this scenario, the Debtors believe that it is very likely unsecured creditors of Gawker Media will receive satisfaction of the full, Allowed amount of their claims, excluding Post-Petition Interest, by the end of calendar year 2016. In the alternative litigation scenario, there is a reasonable likelihood that the Bollea Judgment would be Allowed in full, dramatically diminishing the value of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims. There is also a reasonable likelihood that, among other possibilities, a significant portion of the Unimoda Sale Proceeds would be allocated to Gawker Hungary, consistent with the Debtors' historical allocation approach. In that scenario, recoveries to Gawker Media general unsecured creditors other than Bollea would be negligible. Even were the Bollea Judgment to be reversed, litigating that appeal to judgment would substantially delay any distributions to Gawker Media general unsecured creditors, and would still not necessarily increase eventual distributions after accounting for the substantial cost of that litigation and litigation of intercompany allocation and the outcome of litigation over allocation of proceeds and expenses among the Debtors' estates.

**D.** ~~C.~~ **Bankruptcy Court Approval of the Plan Settlements**

The Debtors propose to effectuate the terms of the Plan Settlements under the Plan in accordance with section 1123(b)(3)(A) of the Bankruptcy Code. At the Confirmation Hearing, the Debtors will request, pursuant to Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, that the Bankruptcy Court approve

the Plan Settlements. Such approval by the Bankruptcy Court will entail consideration of certain factors to determine whether the Plan Settlements are in the best interests of the Debtors' estates. Among the determinative factors to be considered are:

- the probability of success in the litigation;

- the complexity of the litigation and the expenses, inconveniences and delays necessarily attendant to the prosecution of the litigation;

- the difficulties, if any, to be encountered in the collection of any judgment that might be obtained; and

- the interests of the Debtors' estates, including those of the creditors and other parties in interest and giving appropriate deference to the reasonable views expressed by them in relation to the proposed Settlement.

Based upon the factors set forth above – and considering in particular the uncertainty of the litigation outcomes and the relative cost of litigation compared to estates of this size – the Debtors believe the Plan Settlements fall well within the range of reasonableness and ~~reflects~~reflect a reasonable compromise of complex issues. As discussed above, the outcomes of the potential litigations being settled are uncertain. Moreover, litigation of the intercompany issues would result in protracted litigation requiring considerable time and expense. Litigation would result in a diminution of the estate because ultimately, regardless of the outcome, no additional funds will be brought into the estate. For all of the foregoing reasons, the Debtors believe that the Plan Settlements are in the best interest of the estates in these Bankruptcy Cases.

## VIII. THE PLAN – OVERVIEW

### A.    Overview of Chapter 11

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes fair and equitable treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The Plan is a liquidating plan. As a result of the Unimoda Sale, the Debtors' business operations were terminated and the Plan provides for the liquidation of the Debtors' remaining assets and distribution of all sale proceeds after paying the costs and expenses of administering the Debtors' estates. The Plan provides for the payment in full to holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims, and specified holders of Claims against or Equity Interests in Gawker Hungary. The Plan further provides for a recovery to the holder of the Second Lien Make-Whole Claims against GMGI, Gawker Media, and Gawker Hungary., the holders of General Unsecured Claims against GMGI and Gawker Media, ~~General Unsecured Claims Bollea I Judgment Claims and~~the holders of the Punitive Damage Claims against Gawker Media, and the holders of Preferred and Common Equity Interests in GMGI and Membership Interest in Gawker Media. Confirmation and consummation of the Plan are contingent upon the satisfaction of all of the conditions precedent set forth in Sections 6.01 and 6.02 of the Plan, respectively, unless waived pursuant to Section 6.03 of the Plan.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan itself, and the more detailed information and financial statements contained elsewhere in this Disclosure Statement.

**B.      Administrative Claims, Priority Tax Claims, and Other Unclassified Claims**

### 1. Administrative Claims

Pursuant to Sections 2.05(a)(i), 2.06(a)(i), and 2.07(a)(i) of the Plan, each holder of an Allowed Administrative Claim ~~shall~~will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

### 2. United States Trustee's Fees

Pursuant to Section 2.05(a)(ii), 2.06(a)(ii), and 2.07(a)(ii) of the Plan, the outstanding fees due to the United States Trustee pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) shall be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) after the Effective Date ~~shall~~will be paid by the applicable Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

### 3. Professional Fees

Pursuant to Section 2.03 of the Plan, to the extent that a Professional's final fee application is ~~Allowed~~approved by the Bankruptcy Court, or claims pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases are Allowed by the Bankruptcy Court, the requesting Person shall receive: (i) payment of Cash from the GMGI Professional Fee Claim Reserve, Gawker Media Professional Fee Claim Reserve and/or Gawker Hungary Professional Fee Claim Reserve, as applicable, in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases, such payment to be made before the later of (a) the Effective Date or (b) three Business Days after the order Allowing such Person's final fee application, or (ii) payment on such other terms as may be mutually agreed upon by the holder of the Professional Fee Claim and the applicable Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases).

### 4. Priority Tax Claims

Pursuant to Section 2.05(a)(~~iii~~iv), 2.06(a)(~~iii~~iv), and 2.07(a)(~~iii~~iv) of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Claim becomes an Allowed Priority Claim, each holder of an Allowed Priority Claim shall receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Priority Claim or payment as agreed between the holder of the Allowed Priority Claim and the Debtors.

### 5. Bar Date for Administrative Claims

Pursuant to Section 2.04 of the Plan, requests for payment of Administrative Claims (other than Professional Fee Claims) ~~must have been, or be filed (as applicable depending on the period incurred), and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order~~that were not previously required to be filed by an order of the Bankruptcy Court received no later than the Administrative Claims Bar Date established in the Confirmation Order.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such applicable ~~date~~Administrative Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the ~~applicable Debtor and the~~ requesting party no later than the Administrative Claims Objection Deadline.

### C.    Classification of Claims and Interests

Section 1123(a)(1) of the Bankruptcy Code requires a chapter 11 plan to designate classes of claims and classes of interests. The Plan segregates the various Claims against and Equity Interests in the Debtors into various classes. The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. The Debtors believe that all Claims and Equity Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court determines that such classification is incorrect, however, the Bankruptcy Court could deny confirmation of the Plan.

If the Bankruptcy Court finds that a different classification is required for confirmation of the Plan, the Debtors may seek to (i) modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) use the acceptances received from any holder of Claims or Equity Interests pursuant to this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which the holder of such Claim or Equity Interest was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan adversely affects the treatment of a holder of Claims in a manner that requires re-solicitation, the Debtors likely will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims or Equity Interests pursuant to this Disclosure Statement will constitute a consent to the Plan's treatment of such holder regardless of the Class to which such holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that a chapter 11 plan provide for the same treatment for each Claim or Equity Interest within a particular Class unless the holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. The Debtors believe the Plan complies with the requirement of equal treatment for each Claim or Equity Interest of a particular Class.

Only Classes that are "impaired" (pursuant to section 1124 of the Bankruptcy Code) under a chapter 11 plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan.  As a general matter, a class of claims or equity interests is considered to be "unimpaired" under a chapter 11 plan if the plan does not alter the legal, equitable, and contractual rights of the holders of such claims or equity interests.  Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted a proposed chapter 11 plan.  Holders of Claims or Equity Interests that do not receive or retain anything under a proposed chapter 11 plan are deemed to have rejected such plan.

The categories of Claims and Equity Interests outlined in the Plan and listed below classify Claims and Equity Interests for all purposes, including for purposes of voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Pursuant to Article 2 of the Plan, a Claim or Equity Interest is (i) classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and (ii) classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.

59220981_859473927_10

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, U.S. Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| GMGI | | | |
|---|---|---|---|
| Class | Claims and Interests | Status | Voting Rights |
| 1A | Second Lien Make-Whole Claim | Impaired | Entitled to Vote |
| 1B | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 1C | General Unsecured Claims | Impaired | Entitled to Vote |
| 1D | General Unsecured Convenience Claims | Impaired | |
| 1DE(i) | Gawker Hungary Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 1DE(ii) | Gawker Media Intercompany Claims | Impaired | Not Entitled to Vote |
| 1EF | Preferred Equity Interests | Impaired | Entitled to Vote |
| 1FG | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Gawker Media | | | |
|---|---|---|---|
| Class | Claims and Interests | Status | Voting Rights |
| 2A | Second Lien Make-Whole Guaranty Claim | Impaired | Entitled to Vote |
| 2B | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2C | General Unsecured Claims | Impaired | Entitled to Vote |
| 2D | Punitive Damages Damage Claims | Impaired | Entitled to Vote |
| 2E | General Unsecured Convenience Claims | Impaired | |
| 2EF(i) | Gawker Hungary Intercompany Claims | Impaired | Not Entitled to Vote |
| 2EF(ii) | GMGI Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 2FG | Membership Interest | Impaired | Entitled to Vote |

| Gawker Hungary | | | |
|---|---|---|---|
| Class | Claims and Interests | Status | Voting Rights |
| 3A | Second Lien Make- Whole Guaranty Claims | Impaired | Entitled to Vote |
| 3B | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3C | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3D(i) | GMGI Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 3D(ii) | Gawker Media Intercompany Claims | Impaired | Entitled to Vote |
| 3E | Gawker Hungary Membership Interest | Impaired | Entitled to Vote |

**D.    Claims Asserted Against the Debtors**

Since the First General Claims Bar Date on September 29, 2016, the Debtors have undertaken the process of reconciling the amount and classification of outstanding Claims and filing and prosecuting objections to Claims. As of October 31, 2016, approximately 320 proofs of claim (including proofs of claim filed against more than one Debtor) had been filed against the Debtors.

As of October 31, 2016, the Debtors had filed the six individual objections to proofs of claim, described in greater detail above in Section V.B, and two omnibus objections to proofs of claim in which the Debtors objected to various types of Claims, such as (i) Claims that were previously paid or otherwise satisfied; and (ii) Claims asserted against the wrong Debtor entity. Through the omnibus objections, as of October 31, 2016, the Debtors had objected to Claims included in approximately 100 proofs of claim (including those proofs of claim filed against more than one Debtor). The Debtors expect to continue preparing, filing and resolving objections to certain other Claims throughout the course of the Bankruptcy Cases.

Approximately 62 individuals filed proofs of claim against each of the three Debtors asserting contingent, unliquidated claims for indemnification, contribution, reimbursement, or other such obligations of

41

the Debtors, arising out of (i) employment, severance or independent contractor agreements, (ii) the Debtors' organizational documents or governing corporate documents, and (iii) the Debtors' policies and practices of advancing certain litigation defense costs to writers under certain circumstances. The Debtors have filed objections to certain of these proofs of claim that the Debtors believe were filed against the wrong Debtor.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates. While the Debtors are working actively to resolve disputed Claims, most disputed Claims have not yet been resolved, and additional administrative and governmental claims could be filed. Additionally, the Debtors are in the process of reviewing their Schedules and, upon the completion of such review, may decide to amend or supplement the Schedules in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court. The Debtors also continue to investigate differences between claim amounts asserted by Creditors and claim amounts determined in accordance with the Debtors' books and records. Certain Claims may be duplicative of other claims filed against the Debtors or their affiliates, may be based on contingencies that have not occurred or may be otherwise overstated, and would therefore be subject to reduction or disallowance. The Debtors plan to continue to review and resolve such matters throughout the Bankruptcy Cases.

The amount of the Pro Rata Share that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the claims resolution process.

### E. ~~D.~~ Treatment of Claims and Interests

The treatment of Claims and Equity Interests pursuant to Article 3 of the Plan is as follows:

#### *1. Treatment of Claims Against and Equity Interests in GMGI*

##### a. Class 1A – GMGI Second Lien Make-Whole Claim

Class 1A consists of the GMGI Second Lien Make-Whole Claim against GMGI. Class 1A is Impaired and the holder of the GMGI Second Lien Make-Whole Claim against GMGI is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures. The GMGI Second Lien Make-Whole Claim is Allowed as a Secured Claim against GMGI in the amount of $2.0 million. The Second Lien Lender ~~shall~~will receive, in full and complete settlement and release of, and in exchange for, the GMGI Second Lien Make-Whole Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000, (b) on the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have been satisfied full, up to an aggregate total of $750,000, and (c) in the event that Gawker Hungary dissolves before all Disputed GMGI General Unsecured Claims have become Allowed or Disallowed, the Second Lien Lender ~~shall~~will receive the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan~~, and (d) on the Gawker Media Distribution Date, if and to the extent that the Gawker Media Second Lien Make-Whole Guaranty Claim treatment set forth in Section 3.03(a)(iii)(b) is not satisfied by Gawker Media, distributions from Cash of GMGI remaining after distributing all amounts set forth under Section 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of the Plan.~~.

##### b. Class 1B – GMGI Other Priority Claims

Class 1B consists of the Other Priority Claims against GMGI. Class 1B is Unimpaired and holders of Class 1B Claims are presumed to have accepted the Plan. Each holder of an Allowed GMGI Other Priority Claim ~~shall~~will receive payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

~~59220981_8~~59473927_10

**c.** **Class 1C – GMGI General Unsecured Claims**

Class 1C consists of the GMGI General Unsecured Claims ~~against GMGI~~. Class 1C is Impaired and holders of Class 1C Claims are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures. Each holder of an Allowed GMGI General Unsecured Claim ~~shall~~will receive distributions equal to its Pro Rata share of GMGI Cash distributed on ~~each GMGI Distribution Date~~the Effective Date, or within 15 days of Allowance of such Claim, up to the amount of its Allowed Claim plus Post-Petition Interest.

**d.** **Class 1D – GMGI General Unsecured Convenience Claims**

Class 1D consists of holders of GMGI General Unsecured Claims that elected to vote to accept the Plan and have their Claims against all Debtors treated as GMGI General Unsecured Convenience Claims. Class 1D is Impaired. Each holder that elects to have its Claims treated as an Allowed GMGI General Unsecured Convenience Claim will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000. The Debtors believe that establishment of this convenience class will enhance the administrative efficiency of these Bankruptcy Cases and preserve Debtor resources where the cost of litigating certain disputed Claims could exceed the cost of the proposed treatment of GMGI General Unsecured Convenience Claims.

**e.** ~~d.~~ **Class 1~~D~~E(i) – GMGI Gawker Hungary Intercompany Claims**

Class 1~~D~~E(i) consists of the Gawker Hungary Intercompany Claims against GMGI. Class 1~~D~~E(i) is Impaired ~~and holders of~~, Gawker Hungary, as holder of the Class 1~~D~~E(i) Claims ~~are~~, is deemed to reject the Plan. Any and all Intercompany Claims held by Gawker Hungary against GMGI are resolved pursuant to the Intercompany Settlement.

**f.** ~~e.~~ **Class 1~~D~~E(ii) – GMGI Gawker Media Intercompany Claims**

Class 1~~D~~E(ii) consists of the Gawker Media Intercompany Claims against GMGI. Class 1~~D~~E(ii) is Impaired and holders of Class 1~~D~~E(ii) Claims are deemed to reject the Plan. Pursuant to the Intercompany Settlement, in exchange for any and all Intercompany Claims held by Gawker Media against GMGI, on the Effective Date, GMGI will ~~make~~provide the GMGI ~~Claims Settlement Payment to~~Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims, as well as agreeing to the other terms of the Intercompany Settlement.

**g.** ~~f.~~ **Class 1~~E~~F – GMGI Preferred Equity Interests**

Class 1~~E~~F consists of the holders of GMGI Preferred Shares. Class 1~~E~~F is Impaired and holders of Equity Interests in Class 1~~E~~F are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures. Each holder of a GMGI Preferred Share ~~shall~~will receive on each ~~GMGI Distribution Date~~date applicable Distributions are made, a Pro Rata share of any remaining Cash after the GMGI Second Lien Make-Whole Claim has been paid in full, up to an aggregate total of the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference.

**h.** ~~g.~~ **Class 1~~F~~G – GMGI Common Equity Interests**

Class 1~~F~~G consists of the holders of GMGI Common Shares. Class 1~~F~~G is Impaired and holders of Class 1~~F~~G Claims are deemed to reject the Plan. Each holder of a GMGI Common Share ~~shall~~will receive on each ~~GMGI Distribution Date~~date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after holders of Allowed GMGI Preferred Share Equity Interests have received distributions totaling the aggregate amount of their Preferred Shares Liquidation Preferences.

~~59220981_8~~59473927_10

### 2. Treatment of Claims Against and Equity Interests in Gawker Media

#### a.    Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claim

Class 2A consists of the Gawker Media Second Lien Make-Whole Guaranty Claim ~~against Gawker Media~~.  Class 2A is Impaired and holders of Class 2A Claims are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  The Gawker Media Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Media in the amount of $1.25 million.  ~~Each holder of an Allowed Gawker Media~~ The Second Lien ~~Make-Whole Guaranty Claim shall~~ Lender will receive (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) on the Gawker Media Claims Reserve Distribution Date, distributions equal to any ~~Gawker Media~~ Cash remaining ~~after payment of all~~ in the Second Lien Make-Whole Guaranty Reserve after distributions with respect to Allowed Gawker Media General Unsecured Claims ~~up to an aggregate total of $750,000~~ and Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of the Plan.

#### b.    Class 2B – Gawker Media Other Priority Claims

Class 2B consists of the Other Priority Claims against Gawker Media.  Class 2B is Unimpaired and holders of Class 2B Claims are presumed to have accepted the Plan.  Each holder of an Allowed Gawker Media Priority Claim ~~shall~~ will receive payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Priority Claim becomes an Allowed Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

#### c.    Class 2C – Gawker Media General Unsecured Claims

Class 2C consists of the holders of Gawker Media General Unsecured Claims ~~against Gawker Media~~.  Class 2C is Impaired and holders of Class 2C Claims are entitled to vote to accept or reject the Plan. ~~Each~~ pursuant to the terms of the Solicitation Procedures.  Unless otherwise agreed to in writing, each holder of an Allowed Gawker Media General Unsecured Claim ~~shall receive a distribution on the Gawker Media Distribution Date equal to its Pro Rata share of distributable Gawker Media Cash up to~~ will receive Distributions made in the following order until such holder receives the amount of its Allowed Claim~~.~~, excluding Post-Petition Interest:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account;

THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Make-Whole Reserve; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve.

#### d.    Class 2D – Gawker Media Punitive ~~Damages~~ Damage Claim

Class 2D consists of the holders of Punitive ~~Damages~~ Damage Claims against Gawker Media.  Class 2D is Impaired and holders of Class 2D Claims are entitled to vote to accept or reject the Plan. ~~Each~~ pursuant to the terms of the Solicitation Procedures.  Unless otherwise agreed to in writing, each holder of an Allowed Punitive ~~Damages Claim shall receive a distribution on the Gawker Media Distribution Date equal to its Pro Rata share of distributable Gawker Media~~ Damage Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, Distributions made in the following order until such holder it receives the full amount of its Allowed Claim, excluding Post-Petition Interest:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

~~Cash~~THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve remaining after ~~payment~~satisfaction of all Allowed Gawker Media General Unsecured Claims, ~~up to the amount of its Allowed Claim.~~excluding Post-Petition Interest; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest.

**e.    Class 2E – Gawker Media General Unsecured Convenience Claims**

Class 2E consists of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims that elected to vote to accept the Plan and have their Claims against all Debtors treated as Gawker Media General Unsecured Convenience Claims.  Class 2E is Impaired.  Each holder that elects to have its Claims treated as an Allowed Gawker Media General Unsecured Convenience Claim will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.  The Debtors believe that establishment of this convenience class will enhance the administrative efficiency of these Bankruptcy Cases and preserve Debtor resources where the cost of litigating certain disputed Claims could exceed the cost of the proposed treatment of the Gawker Media Convenience Claims.

**f.   ~~e.~~ Class 2~~E~~F(i) – Gawker Media Gawker Hungary Intercompany Claims**

Class 2~~E~~F(i) consists of the Gawker Hungary Intercompany Claims against Gawker Media, including, but not limited to, the Claim resulting from the Gawker Hungary Intercompany Notes ~~against Gawker Media~~and outstanding Intercompany Obligations.  Class 2~~E~~F(i) is Impaired and ~~holders of Class 2E(i) Claims are deemed to reject the Plan.  Any and all Intercompany Claims held by Gawker Hungary against Gawker Media are resolved pursuant to the Plan Settlements and such claims will not receive any distribution.~~Gawker Hungary, as holder of the Class 2F(i) Claims, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Pursuant to the Intercompany Settlement, Gawker Hungary will receive on account of the Gawker Media Gawker Hungary Intercompany Claim  (i) a distribution of $16,000,000 in Cash from Gawker Media on the Effective Date, and (ii) a distribution of any Cash remaining at Gawker Media on the Gawker Media Claims Reserve Distribution Date after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have received the full amount of the treatment set forth in Sections 3.02(c) and 3.02(d) of the Plan, to repay up to any outstanding amounts of the Gawker Media Gawker Hungary Intercompany Claims, including any interest that accrues on such outstanding amounts through the Gawker Media Claims Reserve Distribution Date, which repayment to Gawker Media shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

**g.   ~~f.~~ Class 2~~E~~F(ii) – Gawker Media GMGI Intercompany Claims**

Class 2~~E~~F(ii) consists of the GMGI Intercompany Claims against Gawker Media, including, but not limited to, the ~~Gawker Hungary Intercompany Notes, against Gawker Media~~Claim resulting from the GMGI Promissory Note.  Class 2~~E~~F(ii) is Impaired and ~~holders of~~GMGI, as the holder of the Class 2~~E~~F(i) Claims ~~are~~, is deemed to reject the Plan.  Any and all Intercompany Claims held by GMGI against Gawker Media are

resolved pursuant to the Intercompany Settlement, and the Gawker Media GMGI Intercompany Claim will not receive any distribution.

**h.    g.   Class 2FG – Gawker Media Membership Interest**

Class 2G consists of GMGI, as the holder of the Gawker Media Membership Interest. Class 2G is Impaired and GMGI is deemed to, as holder of the Class 2G Membership Interest, is entitled to vote to accept or reject the Plan. GMGI shall pursuant to the terms of the Solicitation Procedures. GMGI will receive (a) its Pro Rata share of the Gawker Media Contingent Equity Proceeds, and (b) on the Gawker Media Claims Reserve Distribution date Gawker MediaDate, Cash remaining in the Gawker Media Claims Reserve after paymentsatisfaction of all Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive DamagesDamage Claims, excluding Post-Petition Interest, which amounts shall be immediately distributed on the following GMGI Distribution Date to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

*3. Treatment of Claims Against and Equity Interests in Gawker Hungary*

**a.    Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claims.**

Class 3A consists of the Gawker Hungary Second Lien Make-Whole Guaranty Claims against Gawker HungaryClaim. Class 3A is Impaired and each holder of a Class 3A Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures. The Gawker Hungary Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Hungary in the amount of $1.25 million plus any fees, expenses and outstanding interest. Each holder of an Allowed Gawker HungaryThe Second Lien Make-Whole Guaranty Claim shallLender will receive (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) if and when all GMGI General Unsecured Claims have either (i) been paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Allowed GMGI General Unsecured Claims, a distribution in Cash from a $750,000 reserve established bythe Gawker Hungary Second Lien Make-Whole Guaranty Reserve; provided, however, that in the event that Gawker Hungary dissolves before all Disputed Claims in Class 1C have become Allowed or Disallowed, GMGI assumes this obligation, and the Second Lien Lender shallwill receive the corresponding distribution from GMGI Pro Rata with the treatment of the GMGI Second Line Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

**b.    Class 3B – Gawker Hungary Other Priority Claims**

Class 3B consists of the Other Priority Claims against Gawker Hungary. Class 3B is Unimpaired and holders of Class 3B Claims are presumed to have accepted the Plan. Each holder of an Allowed Gawker Hungary Other Priority Claim shallwill receive payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

**c.    Class 3C – Gawker Hungary General Unsecured Claims**

Class 3C consists of the Gawker Hungary General Unsecured Claims against Gawker Hungary. Class 3C is Unimpaired and holders of Class 3C Claims are presumed to have accepted the Plan. Each holder of an Allowed Gawker Hungary General Unsecured Claim shallwill receive a distribution on the Effective Date, or when the Claim is Allowed, equal to payment in full in Cash of the Allowed Gawker Hungary General Unsecured Claim, including any interest accrued on such claim from the Petition Date through the Effective Date.

**d.    Class 3D(i) – Gawker Hungary GMGI Intercompany Claims**

Class 3D(i) consists of the GMGI Intercompany Claims against Gawker Hungary. Class 3D(i) is Impaired and holders ofGMGI, as holder of the Class 3D(i) Claims are, is deemed to reject the Plan. Any and

59220981_859473927_10

all Intercompany Claims held by GMGI against Gawker Hungary are resolved pursuant to the Intercompany Settlement and will not receive any distribution.

>            **e.        Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims**

Class 3D(ii) consists of the Gawker Media Intercompany Claims against Gawker Hungary.  Class 3D(ii) is Impaired and ~~holders of~~Gawker Media, as holder of the Class 3D(ii) ~~Claims deemed to~~Claim, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.  Any and all Intercompany Claims held by Gawker Media against Gawker Hungary are resolved pursuant to the Intercompany Settlement.

>            **f.        Class 3E – Gawker Hungary Membership Interest**

Class 3E consists of GMGI, as the holder of the Gawker Hungary Membership Interest.  Class 3E is Impaired and GMGI is ~~deemed to~~entitled to vote to accept or reject the Plan ~~reject the Plan~~.  GMGI ~~shall~~will receive (a) on the Effective Date, a distribution of all of the Cash held by Gawker Hungary after payment in full of the Allowed Claims against Gawker Hungary and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Claims against Gawker Hungary and anticipated expenses of liquidating Gawker Hungary, and (b) on the date of the dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan.

>        *4. Confirmation Pursuant to 1129(b) of the Bankruptcy Code*

Because the Plan includes Classes of Claims and Equity Interests that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

>    **F.        ~~E.~~ Means of Implementation of Plan**

>        *1. Corporate Action*

Pursuant to Section 4.05 of the Plan, confirmation of the Plan shall constitute authorization for the Debtors, and their respective ~~trustees,~~ officers, board of directors, and agents, to effectuate the Plan and to execute, issue, deliver, file, or record all contracts, instruments, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other entity except for those expressly required pursuant to this Plan. All matters provided for in the Plan involving any corporate action to be taken by or required of the Debtors in connection with the Plan shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects, without any requirement of further action by the Debtors, or their agents, representatives, trustees, stockholders, members, managers, officers, or directors.

>        *2. Vesting of Assets*

Pursuant to Section 4.06 of the Plan, except as otherwise provided in the Plan, upon the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, all property of the estate of each Debtor not otherwise distributed or released on the Effective Date shall vest in that Debtor for the benefit of the holders of Claims against and Equity interests in that Debtor consistent with the treatments set forth in Article 3 of the Plan. Pursuant to section 1123(b)(3) of the Bankruptcy Code, after the Effective Date, each of the Debtors shall retain and enforce any claims or interests belonging to each of their respective chapter 11 bankruptcy estates that were not released by the Plan.  From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action consistent with the terms of the Plan, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if

there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

### 3. Dissolution of the Debtors

Pursuant to Section 4.14 of the Plan, any ~~Debtors~~Debtor not yet dissolved shall be dissolved upon the occurrence of the ~~final GMGI~~Gawker Media Claims Reserve Distribution Date and their completion of their duties and obligations under the Plan, and all corporate approvals necessary for such action shall be deemed satisfied.  The Plan Administrator may, in its discretion, dissolve Gawker Hungary (as required under the Unimoda APA) or Gawker Media following the Effective Date but prior to the ~~final GMGI~~Gawker Media Claims Reserve Distribution Date, upon the completion of Gawker Hungary or Gawker Media's duties and obligations under the Plan.

### 4. Continuation of Stays

Pursuant to Section 4.12 of the Plan, unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

### 5. Cancellation and Surrender of Instruments, Securities, and Existing Agreements

Pursuant to Section 4.13 of the Plan, and concurrently with the applicable distributions made pursuant to Articles 3, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests against the Debtors shall be deemed cancelled and of no further force and effect against the Debtors, without any further action on the part of any Debtor.  From and after the making of the applicable distributions pursuant to the Plan, the holders of such notes, instruments, certificates, and other documents shall have no rights against the Debtors arising from or relating to such notes, instruments, certificates, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan.

### 6. Plan Administrator and Plan Implementation

(a)    Plan Administrator.  Pursuant to Section 4.08 of the Plan, on and after the Effective Date, the Debtors will be managed by the Plan Administrator, who shall have all corporate powers, including those for which board and/or shareholder voting would otherwise be necessary.  The initial Plan Administrator shall be [_____]identified in the Plan Supplement.  Except as otherwise ordered by the Court, the expenses incurred by the Debtors on or after the Effective Date may be paid by the Debtors in accordance with the Plan Administrator Agreement, without further order of the Bankruptcy Court.  The Plan Administrator shall have no obligation to pursue third-party claims for the benefit of the Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement or are consistent with the Plan Administrator's fiduciary obligations.  In the event that such claims are pursued, the Debtors shall be responsible for the costs and expenses associated with the prosecution of such claims except as otherwise provided in the Plan. Any such third-party claims shall be identified at the time of the Plan Supplement.

(b)    Plan Administrator Agreement.  Pursuant to Section ~~5.08~~4.09 of the Plan, on the Effective Date, the Plan Administrator Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.  After the Effective Date, the Plan Administrator Agreement may be amended in accordance with its terms without further order of the Court.  The Plan Administrator Agreement shall be substantially in the form of Exhibit A to the Plan Supplement Agreement, which shall be filed prior to the Confirmation Hearing.

(c)    Effective Date Transactions.  Pursuant to Section 4.02 of the Plan, on the Effective Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(i)    GMGI establishes and funds the GMGI Professional Fee Claim Reserve, Gawker Media establishes and funds the Gawker Media

48

Professional Fee Claim Reserve, and Gawker Hungary establishes and funds the Gawker Hungary Professional Fee Claim Reserve;

(ii)    Gawker Media establishes and funds the Gawker Media Claims Reserve and Gawker Media Second Lien Make-Whole Guaranty Reserve, and establishes Gawker Media Contingent Proceeds Creditor Account,

(iii)    (ii) Gawker Hungary makesestablishes and funds the Gawker Hungary Plan Loan to Gawker MediaSecond Lien Make-Whole Guaranty Reserve;

(iv)    GMGI establishes and funds the GMGI Plan Guaranty Reserve;

(v)    (iii) Gawker Hungary makes distributions to holders of Claims against and Equity Interests in Gawker Hungary, pursuant to the Plan treatments set forth in Section 3.03 of the Plan, subject to the reserve required under Section 3.03(a)(iii)(b)(2) of the Plan;

(vi)    (iv) Gawker Media makes distributions to holders of certain Claims against, and Equity Interests in, Gawker Media, pursuant to the Plan treatments set forth in SectionSections 3.02(a)(iii)(a), 3.02(b), 3.02(e), 3.02(f)(i), and 3.02(h) of the Plan; and

(v) GMGI makes the GMGI Claims Settlement Payment to Gawker Media; and

(vii)    (vi) GMGI makes distributions to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserves required under Sections 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of the Plan.

(d)    Gawker Media Claims Reserve Distribution Date Transactions.    Pursuant to Section 4.03 of the Plan, onOn the Gawker Media Claims Reserve Distribution Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(i)    Gawker Media makes distributions to holders of Claims against and Equity Interests in Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(ea) through, 3.02(gc), and 3.02(d) of thethis Plan;

(ii) To the extent any amounts from the Gawker Hungary Plan Loan or the GMGI Claims Settlement Payment remain after all Allowed Claims against Gawker Media have been satisfied in full, such amounts are distributed to GMGI; and

(ii)    Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve;

49

(iii)    Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the GMGI Plan Guaranty Reserve;

(iv)    Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from any Cash remaining at Gawker Media;

(v)    The Plan Administrator distributes to the Second Lien Lender any amounts remaining in the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(vi)    The Plan Administrator distributes to GMGI any amounts remaining in the Gawker Media Plan Guaranty Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(vii)    Gawker Media distributes any Cash remaining after satisfaction of all outstanding Gawker Media Gawker Hungary Intercompany Claims to GMGI for distribution to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan; and

(viii)    (iii)  GMGI makes distributions of remaining Cash at GMGI to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) of the Plan, if any.

(c) GMGI Distribution Date Transactions.  On each GMGI Distribution Date, the Plan Administrator shall make distributions to holders of Claims against and Equity Interest in GMGI pursuant to Section 3.01 of the Plan (and to holders of claims set forth under Section 3.03(a)(iii)(2) of the Plan, if applicable).

(e)    Gawker Media Contingent Proceeds Distribution Date Transactions.  Upon receipt of Gawker Media Contingent Proceeds, (i) the Gawker Media Contingent Equity Proceeds shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan and (ii) the 45% of such proceeds will be deposited in the Gawker Media Contingent Proceeds Creditor Account.  On each Gawker Media Contingent Proceeds Distribution Date, the Plan Administrator shall make Distributions from the Gawker Media Contingent Proceeds Creditor Account to holders of Claims against Gawker Media pursuant to Sections 3.02(c) and 3.02(d) of this Plan, with Bollea to receive a Pro Rata share of such Distributions.

### 7. Sale of Gawker.com Assets.

Pursuant to Section 4.10 of the Plan, the Plan Administrator, in conjunction with its advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets upon the expiration of, subject to any limitations set forth in the non-compete agreement that is part of the Unimoda Sale.

### 8. Dissolution of the Committee

Pursuant to Section 4.15 of the Plan, on the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases, except to the extent necessary to prosecute any appeals or other matters with

50

respect to which they have been granted standing. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

## IX.    THE PLAN – OTHER PROVISIONS

### A.    Treatment of Executory Contracts and Unexpired Leases

#### *1. Rejection of Executory Contracts and Unexpired Leases*

Section 7.01 of the Plan provides that, pursuant to sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, shall be deemed rejected on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of executory contracts and unexpired leases pursuant to this Section of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

#### *2. Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Section 7.02 of the Plan provides that Claims created by the rejection of executory contracts and unexpired leases pursuant to Section 7.01 of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Plan Administrator and served on the Plan Administrator no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section 7.01 for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Debtors' estate and their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article 5 of the Plan.

### B.    Provisions Governing Distributions

#### *1. Manner of Payments Under Plan of Liquidation*

Pursuant to Section 3.07 of the Plan, unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Debtors shall be made, at the election of the Debtors or the Plan Administrator, as applicable, by check drawn on a domestic bank or by electronic or wire transfer from a domestic bank; provided, however, that no Cash payments shall be required to be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than twenty dollars ($20.00).

#### *2. Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a)    General.  Pursuant to Section 3.08 of the Plan, and subject provisions of Section 3.09 of the Plan, distributions and deliveries to each holder of an Allowed Claim or Equity Interest will be made (i) at the address set forth for such holder in the Debtors' Schedules if no proof of claim has been filed on behalf of such holder, (ii) at the address reflected in the proof of claim filed by such holder, or (iii) at the address set forth in any written notices of address change delivered after the date of any related proof of claim by such holder.  If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Plan Administrator is notified of the holder's then current address, in which case all missed distributions will be made to the holder without interest on the next GMGI or Gawker Media Distribution Date, as applicable. Any claim in respect of such an undeliverable distribution shall be made on or before the first anniversary of the Effective Date or the applicable GMGI or Gawker Media Distribution Date. After such date, all claims in respect of undeliverable distributions shall be discharged and forever barred and

the Debtors shall retain all monies related thereto.  The Debtors shall be entitled to rely upon the register of Claims as of the Distribution Record Date.

(b)    Uncashed Checks.  Pursuant to Section 3.09 of the Plan, checks issued by the Debtors on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the applicable Debtor by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first anniversary of the (a) Effective Date or (b) the applicable GMGI or Gawker Media Distribution Date, or (ii) ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of voided checks shall be discharged and forever barred and the applicable Debtor shall retain all monies related thereto.

### 3. Setoff and Recoupment

Pursuant to Section 3.05 of the Plan, except to the extent an Administrative or Priority Claim has been previously Allowed or is Allowed by the Plan, a Debtor may, but shall not be required to, set off or recoup against any Administrative or Priority Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Administrative or Priority Claim, claims of any nature whatsoever which a Debtor may have against the holder of such Administrative or Priority Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Administrative Claim hereunder shall constitute a waiver or release by the applicable Debtor of any such claim or counterclaim that it may have against such holder.

### 4. Compliance with Tax Requirements

Pursuant to Section 3.04 of the Plan, for purposes of distributions on any interest-bearing obligations, distributions under the Plan shall be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Petition Date.  Notwithstanding any other provision of this Plan, each entity receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other tax obligations.

### C.    Provisions for Treatment of Subsequent Plan Distributions

### 1. Objections to and Estimation of Claims

Pursuant to Section 5.01 of the Plan, after the Effective Date, the Debtors or the Plan Administrator shall have sole authority to object to the allowance of Claims and Equity Interests with respect to which they dispute liability in whole or in part.  All objections shall be litigated to a Final Order; provided, however, that the Debtors or the Plan Administrator may compromise and settle, withdraw, or resolve by any other method approved by the Bankruptcy Court, any objections to Claims or Equity Interests.  In addition, the Debtors or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim.  Except as otherwise provided by order of the Bankruptcy Court, the Debtors or the Plan Administrator may file an objection to any Claim or Equity Interest until 180 days after the Effective Date.

### 2. Professional Fee Claim Procedures

Pursuant to Section 5.02 of the Plan, notwithstanding any other provision of the Plan dealing with unclassified Claims, any Person asserting a Professional Fee Claim shall, no later than ten (10) days after the Confirmation Date, provide the Debtors and the Plan Administrator with a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but

unbilled fees and expenses through the Effective Date) (for each Person, its "Professional Fee Claim Summary"). All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Committee prior to the Effective Date must be filed with the Bankruptcy Court and served on the Plan Administrator, Debtors, the Committee, their respective counsel, and the United States Trustee, no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Plan Administrator, the United States Trustee, and the requesting party no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### 3. Professional Fee Claim Reserves.

Pursuant to Section 5.03 of the Plan on and after the Effective Date, the Plan Administrator shall set aside and withhold from distribution, the Professional Fee Claim Reserves. Amounts held in the Professional Fee Claim Reserves shall not constitute property of the Debtors and shall only be distributed in accordance with this Section 5.03. Each Person asserting a Professional Fee Claim against any of the Debtors shall be entitled to a maximum amount from the applicable Professional Fee Claim Reserve equal to the amount of the Professional Fee Claim Summary submitted by such Person with respect to the applicable Debtor, less all interim compensation paid to such Person during the Bankruptcy Cases. In the event there is a remaining balance in the GMGI, Gawker Media, or Gawker Hungary Professional Fee Claim Reserve after payment of all Allowed Professional Fee Claims against the applicable Debtor, in accordance with Section 2.03 of the Plan, such remaining amount, if any, shall be returned to the applicable Debtor for distribution pursuant to the Plan.

### 4. Payments and Distributions on Disputed Claims

Pursuant to Section ~~4.03~~5.04 of the Plan, on the Gawker Media Distribution Date and each GMGI Distribution Date, each holder of an Allowed Claim and Equity Interest ~~shall~~will receive all payments and distributions to which such holder is then entitled under the Plan. No partial payments and no partial distributions shall be made with respect to a Disputed Claim until the resolution of all Disputed Claims by settlement, Final Order, or other form of resolution of such Claim reasonably determined by the Plan Administrator.

### D.    Conditions Precedent to Confirmation and Effective Date of the Plan

#### 1. Conditions to Confirmation

Section 6.01 of the Plan provides that the confirmation of the Plan by the Bankruptcy Court shall be subject to, and conditioned upon, entry of an order by the Bankruptcy Court approving the Disclosure Statement.

#### 2. Conditions to ~~Effectiveness~~the Effective Date

Section 6.02 of the Plan provides that the effectiveness of the Plan shall be subject to, and conditioned upon:

(a)    The Confirmation Order becoming a Final Order,

(b)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made or, if made, remaining pending, and

(c)    All other actions and documents necessary to implement the Plan shall have been effected or executed.

### 3. Waiver of Conditions to Confirmation or the Effective Date

Pursuant to Section 6.03 of the Plan, ~~except for the condition requiring the Confirmation Order to have become a Final Order,~~ the conditions to confirmation and the conditions to the Effective Date may be waived in whole or part at any time by the Debtors without an order of the Bankruptcy Court.

### 4. Revocation of the Plan

Pursuant to Section 10.02 of the Plan, the Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### E.    Effect of Plan Confirmation

### 1. Binding Effect

Pursuant to Section 10.05 of the Plan, the Plan shall be binding upon, and shall inure to the benefit of the Debtors, the holders of all Claims and Equity Interests, and any other Person identified in the Plan, and their respective successors and assigns.

### ~~2. Exculpation.~~

### *1. Injunction Against Asserting Claims of the Debtors*

**PURSUANT TO SECTION ~~9.04~~9.01 OF THE PLAN, ~~TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND APPROVED IN THE CONFIRMATION ORDER, NONE OF THE DEBTORS OR THE COMMITTEE, NOR ANY OF THEIR RESPECTIVE FORMER OR CURRENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, ADVISORS, AFFILIATES, ATTORNEYS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, REPRESENTATIVES, OR AGENTS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF, (I) ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY RELATING TO THE DEBTORS OR THE COMMENCEMENT AND PROCESUTION OF THE BANKRUPTCY CASES, (II) THE FORMULATION, NEGOTIATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, (III) THE SOLICITATION OF ACCEPTANCES OF THE PLAN, (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR (V) THE ENFORCEMENT OF THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED THEREUNDER; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACTIONS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER. IN ADDITION, THE EXCULPATED PARTIES SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. NOTHING HEREIN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ATTORNEY DISCIPLINARY RULES.~~ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES OTHER THAN THE PLAN ADMINISTRATOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEBT, RIGHT, OR CAUSE OF ACTION OF THE DEBTORS FOR WHICH A DEBTOR**

~~59220981_8~~59473927_10

RETAINS SOLE AND EXCLUSIVE AUTHORITY TO PURSUE IN ACCORDANCE WITH ARTICLE 4 OF THE PLAN.

*2. 3. Injunction Against ~~Asserting Claims of the Debtors and Against~~ Interference with ~~the~~ Plan*

PURSUANT TO SECTION ~~9.01~~9.02 OF THE PLAN, ~~ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEBT, RIGHT, OR CAUSE OF ACTION OF THE DEBTORS FOR WHICH A DEBTOR RETAINS SOLE AND EXCLUSIVE AUTHORITY TO PURSUE IN ACCORDANCE WITH ARTICLE 4 OF THE PLAN.~~UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS AND OTHER PARTIES IN INTEREST (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, PRESENT OR FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER CONTENT PROVIDERS, PRESENT OR FORMER WRITERS, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS, THE PROPERTY OF ANY OF THE DEBTORS, THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES, EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

*3. Releases by the Debtors.*

PURSUANT TO SECTION ~~9.02~~9.03 OF THE PLAN, ~~UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS AND OTHER PARTIES IN INTEREST (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS, ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS OR THE~~

55

~~PROPERTY OF ANY OF THE DEBTORS, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS OR THE PROPERTY OF ANY OF THE DEBTORS, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS OR THE PROPERTY OF ANY OF THE DEBTORS, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS OR THE PROPERTY OF ANY OF THE DEBTORS ,EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN; (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN; AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.~~ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, THE DEBTORS, ON THEIR OWN BEHALF AND AS REPRESENTATIVE OF THE DEBTORS' ESTATES, RELEASE UNCONDITIONALLY AND ARE HEREBY DEEMED TO RELEASE UNCONDITIONALLY, (I) EACH AND ALL OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE IN CONNECTION WITH THE DEBTORS, THEIR ASSETS, OR PROPERTY AND (II) EACH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, PROVIDED, HOWEVER, THAT THE DEBTORS DO NOT WAIVE ANY DEFENSES THAT THE DEBTORS HAVE TO CLAIMS THAT SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR MAY ASSERT AGAINST THE DEBTORS.

*4. Exculpation.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND APPROVED IN THE CONFIRMATION ORDER, NONE OF THE DEBTORS OR THE COMMITTEE, NOR ANY OF THEIR RESPECTIVE FORMER OR CURRENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, ADVISORS, AFFILIATES, ATTORNEYS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, REPRESENTATIVES, OR AGENTS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF, (I) ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY RELATING TO THE DEBTORS OR THE COMMENCEMENT AND PROSECUTION OF OR THE BANKRUPTCY CASES, (II) THE FORMULATION, NEGOTIATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, (III) THE SOLICITATION OF ACCEPTANCES OF THE PLAN, (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR (V) THE ENFORCEMENT OF THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED THEREUNDER; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE

WOULD RESULT FROM ANY SUCH ACTIONS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER.  IN ADDITION, THE EXCULPATED PARTIES SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.  NOTHING HEREIN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ATTORNEY DISCIPLINARY RULES..

     *5. 4. Third-Party Releases by the Debtors of Released Employees and Independent Contractors.*

ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, THE DEBTORS ON THEIR OWN BEHALF AND AS REPRESENTATIVE OF THE DEBTORS' ESTATES RELEASE UNCONDITIONALLY AND ARE HEREBY DEEMED TO RELEASE UNCONDITIONALLY, EACH AND ALL OF THE RELEASED PARTIES, EXCLUDING THE CHAPTER 11 BANKRUPTCY ESTATE OF MR. NICK DENTON, OF AND PURSUANT TO SECTION 9.05 OF THE PLAN, ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE IN CONNECTION WITH THE DEBTORS, THEIR ASSETS OR PROPERTY NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, PROVIDED, HOWEVER, THAT THE FOREGOING THIRD PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE.

     *6. 5. Term of Bankruptcy Injunction or Stays.*

Pursuant to Section 4.11 of the Plan, unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date..

**F.    Retention of Jurisdiction**

Article 8 of the Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of these proceedings to the extent legally permissible, including for the following purposes,

       (a)    to determine any and all applications, adversary proceedings, and contested matters pending as of the Effective Date, if any;

57

(b)        to determine any and all objections to the allowance of Claims and Equity Interests, if any;

(c)        to determine any and all applications for allowance of compensation and reimbursement of expenses;

(d)        to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order;

(e)        to effectuate payments under and performance of the provisions of the Plan;

(f)        to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)        to determine the Debtors' motion, if any, to modify the Plan in accordance with section 1127 of the Bankruptcy Code;

(h)        to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)        to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, in the Confirmation Order;

(j)        to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

(k)        to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

(l)        to enter a final decree closing the Bankruptcy Case;

(m)        to determine any matter (1) under the Unimoda APA, (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement;

(n)        to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

(o)        to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors; and

(p)        to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Cases, including the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### G.    Miscellaneous Provisions

#### *1. Governing Law*

Section 1.07 of the Plan provides that, except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of a contract, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and constructed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

#### *2. Severability*

Pursuant to Section 10.01 of the Plan, should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

### H.    Notices

Pursuant to Section 10.07 of the Plan, any notice required or permitted to be provided under the Plan shall be in writing and served by: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight carrier service, freight prepaid, to be addressed as follows:

> If to Gawker Media LLC, to:
>
>> Gawker Media LLC
>> c/o Opportune LLP
>> Attn: William D. Holden
>> Chief Restructuring Officer
>> 10 East 53rd Street, 33rd Floor
>> New York, NY 10022
>
> If to Gawker Hungary, to:
>
>> Gawker Hungary Kft.
>> c/o Opportune LLP
>> Attn: William D. Holden
>> 10 East 53rd Street, 33rd Floor
>> New York, NY 10022
>
> If to GMGI, to:
>
>> Gawker Media Group, Inc.
>> c/o Opportune LLP
>> Attn: William D. Holden
>> Chief Restructuring Officer
>> 10 East 53rd Street, 33rd Floor
>> New York, NY 10022

59220981_8 59473927_10

with copies to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036-8704
> Attn:   Gregg M. Galardi
>         D. Ross Martin
>         Joshua Y. Sturm
>         Jonathan M. Agudelo
> Facsimile: (212) 596-9090
> gregg.galardi@ropesgray.com
> ross.martin@ropesgray.com
> joshua.sturm@ropesgray.com
> jonathan.agudelo@ropesgray.com

If to the Plan Administrator:

> [~~——————~~See Plan Supplement]

~~with copies to counsel to the Plan Administrator:~~

> [~~————~~]

## X.    LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Impaired Equity Interest that has not voted to accept the Plan must receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the debtor ~~was~~were liquidated under chapter 7 of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Article 10 hereof).  If all members of an impaired class of claims or interests have accepted the Plan, the "best interests test" does not apply with respect to that class.

The Debtors have already liquidated substantially all of their assets through the Unimoda Sale.  The Debtors currently hold cash, the Gawker.com Assets and potential causes of action. In the Plan, Administrative and Priority Claims will be paid in full, as required by Bankruptcy Code section 1129, and the remaining funds will be disbursed in Cash on the Effective Date or through the Plan Administrator on the Gawker Media Distribution Date and GMGI Distribution Dates.   The Debtors believe the Plan is the simplest and least expensive mechanism to distribute the Debtors' remaining assets.

The Debtors believe that holders of Claims and Equity Interests will receive equal or greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation for several reasons. First, the Debtors believe a chapter 7 liquidation would take longer to resolve Administrative and Priority Claims than the Plan, delaying distributions to the holders of Impaired Claims and Equity Interests, and would incur more costs than the Plan. Second, in a chapter 7, it is likely that a chapter 7 trustee with no prior knowledge or experience with the Debtors or its operations would be appointed, increasing the time to resolve Administrative and Priority Claims.  Third, a chapter 7 trustee would incur expenses in distributing the assets, which would likely include a percentage fee on assets distributed.  This percentage fee, which could be significant in a chapter 7 case, will be avoided by the Plan.

More importantly, the Plan embodies the Plan Settlements among the three Debtor estates ~~and~~, the Second Lien Lender, and Bollea.  In a chapter 7 liquidation, the estates would be required to expend significant additional expenses in litigating the allocation of assets among the Debtors' estates, potential claims relating to intercompany obligations, ~~and~~Allowance of the Second Lien Make-Whole Claims, and the Bollea Claims.  The

60

Plan eliminates these expenses and yields more value to be distributed among holders of Claims against and Equity Interests in the Debtors.

In summary, the Debtors believe that chapter 7 liquidations of the Debtors would result in substantial diminution in the value to be realized by holders of Claims and Equity Interests entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- additional expenses would be generated litigating over allocation of value among Debtor estates and, allowance of Second Lien Lender make-whole claims, and the Bollea Claims, all of which would be entitled to priority (and expenses of the Second Lien Lender may also be entitled to priority if it prevails);

- additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation of the Debtor;

- the cost and expense attributable to the time value of money resulting from a potentially more protracted chapter 7 proceeding than the estimated length of the Bankruptcy Cases; and

- the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a chapter 7 liquidation.

Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater return to holders of Claims and Equity Interests than a chapter 7 liquidation. A more comprehensive analysis of the potential outcomes of a chapter 7 liquidation on the Debtors' estates is set forth in Exhibit C hereto.

## XI.    RISK FACTORS

Holders of Claims and Equity Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims or Equity Interests in such Impaired Classes.

#### *1. Parties-in-Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is subject to a number of conditions precedent, as outlined in Section 6.02 of the Plan. The conditions to the Effective Date are discussed in further detail in Section 9.D.2. hereof. While the Debtors believe the conditions to the Effective Date will be satisfied or waived and the Plan will become effective, there can be no assurance that all such conditions will occur (or be waived in accordance with the terms of the Plan). If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Equity Interests as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article 6 of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Equity Interests would receive with respect to their Allowed Claims and Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any Impaired Class of Claims or Equity Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the

plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### 6. The Debtors May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim or Equity Interest where such Claim is subject to an objection. Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 7. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 8. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Equity Interests and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Equity Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from the estimated Claims and Equity Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Equity Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims and Equity Interests under the Plan.

### 9. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

The Plan provides for certain releases, injunctions, and exculpations. However, such releases, injunctions, and exculpations are subject to objection by parties-in-interest and may not be approved.

## B.    Risks Related to Recoveries Under the Plan

### 1. Debtors Cannot State with Certainty What Recovery Will Be Available to holders of Allowed Claims and Equity Interests in Impaired Classes

The Debtors cannot know with certainty, at this time, the number or amount of Claims in Impaired Classes that will ultimately be Allowed. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to holders of Allowed Claims in Impaired Classes.

### 2. Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims and Equity Interests

The aggregate amount of damages alleged by plaintiffs in Article Lawsuits and awarded in the Bollea Judgment that is under appeal exceeds $250 million. There may also be additional general unsecured litigation Claims asserted against the Debtors. All of these Claims are Disputed. While the Debtors believe that these Claims should be Allowed in the amount of $0, it is possible that the courts adjudicating the Article Lawsuits and the Bollea Claims or another litigation Claim may enter Final Orders awarding substantial judgments, or that such Claims will be settled for substantial amounts of Allowed Claims. The amounts of Claims ultimately Allowed against the Debtors on account of the Article Lawsuits and Bollea Claims will have a significant impact on the amount of distributions to holders of all non-priority Claims and Equity Interests against Gawker Media and GMGI.

### 3. If the Effective Date Does Not Occur Prior to December 31, 2016, the Percentage Recovery on Unsecured Claims and Equity Interests May Be Adversely Affected

The Debtors' projections incorporated in the Plan and Disclosure Statement assume that the Effective Date will occur prior to December 31, 2016. If the Effective Date were to occur on January 1, 2017 or later, it could have adverse tax consequences that would materially reduce the amount of cash available for distribution to, and recoveries of, holders of unsecured Claims and Equity Interests.

### C.    Disclosure Statement Disclaimer

### 1. Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 2. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**_This Disclosure Statement is not legal advice to you._** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 3. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

### 4. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 5. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, or rights of the Debtors, or the Reorganized Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim or Equity Interest, or

64

recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code of the Debtors or their respective Estates, are specifically or generally identified herein.

### 6. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 7. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 8. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, these Bankruptcy Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the U.S. Trustee, and counsel to the Committee.

### D.     Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Debtors' Liquidation Analysis is described herein.

## XII.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims and Equity Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit B**.

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

**THE DISCUSSION OF THE SOLICITATION, AND VOTING SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

59220981_859473927_10

> **PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF SOLICITATION AND VOTING.**

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan.  The table in Section 7.C. of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Equity Interest) under the Plan.  As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 1A, 1C, 1D̶E(ii), 1E̶F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E (collectively, the "Voting Classes").

The holders of Claims and Equity Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims and Equity Interest in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Claims and Interests in Classes 1B, 1D(i), 1F, 2B, 2E̶(̶i̶)̶,̶ ̶2̶E̶F(ii), 3B, 3C, and 3D(i); however, the Debtors are sending a notice of non-voting status (the "Notice of Non-Voting Status"), to such holders.

Holders of Claims to which the Debtors have filed an objection will be entitled to vote, subject to the terms of the Solicitation Procedures.

### B.    Voting Record Date

**The Voting Record Date is October 31, 2016**.  The Voting Record Date is the date on which it will be determined which holders of Claims and Equity Interests in the Impaired Classes are entitled to vote to accept or reject the Plan and whether Claims or Equity Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim or Equity Interest.

### C.    Voting on the Plan

**The Voting Deadline is December 5, 2016, at 5:00 p.m. (New York Time)**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that they are **actually received** on or before the Voting Deadline by the Debtors' Notice and Claims Agent at the following address:

---

### DELIVERY OF BALLOTS AND ELECTION FORMS

**If by Regular Mail, Hand-Delivery or Overnight Courier to:**

**Gawker Ballot Processing**
**c/o Prime Clerk LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**

---

### D.    Ballots and Election Forms Not Counted

**No Ballot or Election Form will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by facsimile, email or other electronic means; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules of assets and liabilities as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed;

(v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT SOLICITATION, OR VOTING PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL-FREE AT (866) 692-6696. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

## XIII.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

As set forth in Section X of the Plan, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' businesses would result in a substantial decrease in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of, the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.

The Plan contemplates the reorganization of the Debtors as a going concern and will significantly reduce the Debtors' long-term debt and annual interest payments. In addition, the Plan will result in a stronger, de-levered balance sheet for the Debtors while allowing creditors to participate in future upside in the Reorganized Debtors. Specifically, the Plan contemplates the conversion of most of the Debtors' current outstanding debt to equity. As such, the Debtors believe that the confirmation of the Plan is not likely to be followed by a further financial reorganization and, therefore, is feasible.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[4]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in the number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

## E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if one or more classes of creditors are impaired, and all creditor Classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class of creditors, without counting the accepting votes of "insiders" (the "Impaired Accepting Class Requirement"). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. All holders of Claims and Equity Interests in Classes 1D(i), 1D(ii), 2E(i), 2E(ii), 2F, 3D(i), 3D(ii), and 3F are "insiders" under the applicable definition provided in Section 101(31) of the Bankruptcy Code. Although these Classes are Impaired, and will vote to Accept the Plan, only acceptance of the Plan by one Classes 1A, 2A, or 3A can satisfy the Impaired Accepting Class Requirement, unless there are no impaired classes of creditors.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including the right to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### *1. No Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### *2. Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than one hundred percent

---

[4] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

(100%) of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XIV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    In General

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan.  This summary is based on the Internal Revenue Code ("IRC"), U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only.  The tax treatment of a beneficial owner of Claims or Equity Interests (each a "Holder" and collectively, the "Holders") may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim or Equity Interest in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders that are non-U.S. persons or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities; Holders that hold Claims or Equity Interest as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims or Equity Interest in connection with the performance of services. This summary does not address Hungarian or Cayman Islands tax laws and should not be construed as providing advice with respect to those jurisdictions.  Holders subject to tax laws of those jurisdictions should consult with their advisors with respect to the application of those laws to the Plan.  In calculating treatments and recoveries for purposes of this Disclosure Statement, the Debtors have relied on preliminary assessed basis and taxes potentially attributable to the Unimoda Sale.  The following summary assumes that the Claims and Equity Interest are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim or Equity Interest and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim or Equity Interest; (v) the length of time that the Claim or Equity Interest has been held; (vi) whether the Claim or Equity Interest was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim or Equity Interest (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim or Equity Interest is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for

69

information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### B.    U.S. Federal Income Tax Consequences to the Debtors

#### 1. Cancellation of Debt and Reduction of Tax Attributes

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income.  Settlement of a guarantee should not give rise to COD.

The Debtors should be able to utilize a special tax provision which excludes from income COD income attributable to debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under section 108(b) of the IRC and Treasury regulations that apply to members of a consolidated group, each Debtor that does not include COD income in computing taxable income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor; attributes that arose in separate return limitation years of such Debtor (if any); and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that, to the extent the Debtors have any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account gains from the Unimoda Sale that closed in 2016, and any income or gain resulting from implementation of the Plan, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of the Debtors should be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

#### 2. Taxable Income Resulting From the Unimoda Sale

The Unimoda Sale is expected to trigger income or gain recognition by the Debtors.  However, the Debtors will not be able to determine the amount of such income or gain with certainty, and consequently will not be able to finally determine the U.S. federal income tax, if any, attributable to the Unimoda Sale, until the final allocation of sale proceeds is determined and pending litigation against Gawker Media is resolved. Under

59220981_8 59473927_10

certain assumptions about the allocation of proceeds from the Unimoda Sale, the Debtors may incur regular U.S. federal income tax. Additionally, if the IRS were to prevail in assessing U.S. federal income tax for taxable years ending after the Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

### 3. Gawker.com Assets

The Debtors are still in the process of developing a plan for the maximization of value realizable from the residual Gawker.com Assets, and are considering various options with respect thereto. The Debtors may incur taxable income in connection with a disposition of the Gawker.com Assets, or the ongoing operation of the Gawker.com Assets, although the amount and timing of such taxable income will vary depending on the nature and timing of the plan of disposition, and the amount realized therefrom.

### 4. Limitation of NOL Carryforwards and Other Tax Attributes

Under section 382 of the IRC ("Section 382"), if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change) and tax credits that may be utilized to offset future taxable income generally is subject to an annual limitation.

Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

The Debtors do not expect to have NOL carryovers and other tax attributes available on the Effective Date, as a result of giving effect to income from the Unimoda Sale and other items of taxable income prior to the Effective Date. Moreover, to the extent the Debtors have NOL carryovers and other tax attributes available on the Effective Date, the Debtors do not expect to have any such NOL carryovers or other tax attributes remaining after implementation of the Plan, as a result of attribute reduction resulting from the Debtors' COD income excluded under the Bankruptcy Exception. Therefore, the Debtors could incur a federal income tax liability in connection with any income earned, including through the liquidation of the Debtors' remaining assets, if any, or the operation of a licensing entity after the Effective Date.

However, the amount of such NOL carryovers and other tax attributes that could be available following the Effective Date is based on a number of factors and it is impossible to determine with certainty at this time whether any NOL carryovers and other tax attributes will be available after emergence.

### C.    Professional Fee Claims Reserves

The Plan Administrator will create one or more reserve accounts for Cash held on account of Professional Fee Claims. Under the IRC, interest and other income earned on such accounts are subject to current tax. However, the U.S. Treasury Department has not issued Treasury regulations to address the U.S. federal income tax treatment of such funds that specifically applies in a bankruptcy context. Accordingly, the proper tax treatment of such funds is uncertain. Distributions from the Professional Fee Claim Reserves will be made to Holders of Professional Fee Claims when such Claims are subsequently Allowed and, if applicable, to other Holders when Professional Fee Claims are subsequently disallowed. The Debtors intend to treat the Professional Fee Claims Reserves as a disputed ownership fund, taxable as a separate entity for U.S. federal income tax purposes. Under such treatment, the Plan Administrator shall file all income tax returns with respect to any income attributable to the Professional Fee Claims Reserves and shall pay the federal, state and local income taxes attributable to the Professional Fee Claims Reserves using Cash available in the Professional Fee Claims Reserves, based on the items of income, deduction, credit or loss allocable thereto.

59220981_8 59473927_10

Holders should note the tax treatment of the Professional Fee Claims Reserves is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Professional Fee Claims Reserves.

### D.    U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

#### 1. Generally

Generally, a Holder of an Allowed Claim or Equity Interest will realize gain or loss on the exchange under the Plan of its Allowed Claim or Equity Interest for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim or Equity Interest for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim or Equity Interest exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see Section XIV.D.4 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests — Interest Income with Respect to Allowed Claims and Equity Interests*). When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the Holder and is held for more than one year. Each Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

#### 2. Holders of Professional Fee Claims

Although not free from doubt, Holders of Professional Fee Claims should not recognize any gain or loss on the date that the assets of the Debtors are transferred to the Professional Fee Claims Reserves, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. Holders of Disputed Claims should note the tax treatment of the Professional Fee Claims Reserves is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Professional Fee Claims Reserves.

#### 3. Interest Income with Respect to Allowed Claims

Pursuant to Section 3.06 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### E.    Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances,

59220981_859473927_10

corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims or Equity Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.  NONE OF THE DEBTORS, THE CREDITORS' COMMITTEE OR THEIR RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

59220981_8 59473927_10

## XV.    RECOMMENDATION

In the opinion of each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims and Equity Interest entitled to vote on the Plan vote to accept the Plan and support confirmation of the Plan.

Dated:   ~~September 30~~November 2, 2016

Respectfully submitted,

GAWKER MEDIA GROUP, INC.

By:    ~~/s/  Draft~~
        William D. Holden
        Chief Restructuring Officer


GAWKER MEDIA LLC

By:    ~~/s/  Draft~~
        William D. Holden
        Chief Restructuring Officer


GAWKER HUNGARY KFT.

By:    ~~/s/  Draft~~
        William D. Holden
        ~~Authorized Signatory~~Managing Director

Prepared by:
/s/ ~~Draft~~Gregg M. Galardi
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors
and Debtors in Possession*

## EXHIBIT A

**Joint Plan of Liquidation**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____  X
                                         :
In re                                    :        Chapter 11
                                         :
Gawker Media LLC, *et al.*,[1]           :        Case No. 16-11700 (SMB)
                                         :
            Debtors.                     :        (Jointly Administered)
                                         :
_____  x


**AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER**
**MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.**[2]

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056).  Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY ~~10020. Kinja~~10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY ~~10020~~10022.

[2]    Pursuant to the Unimoda APA, the Debtor entity that ~~is currently~~was formerly named Kinja Kft. ~~is~~was required to ~~change its name.  The Debtors anticipate that, by the date of the Disclosure Statement Hearing, that Debtor will be~~be re-named, and has now been re-named as Gawker Hungary Kft.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS AND CONSTRUCTION OF TERMS** ........................................ 1
    1.01    Terms Defined in the Plan ..................................................................................... 1
    1.02    Terms Defined in the Bankruptcy Code ........................................................ ~~12~~14
    1.03    Rules of Interpretation ........................................................................ ~~12~~14
    1.04    Exhibits ....................................................................................................... ~~12~~14
    1.05    Time Periods ................................................................................................. ~~12~~14
    1.06    Reference to Monetary Figures ........................................................ ~~12~~14
    1.07    Governing Law .......................................................................................... ~~12~~14

**ARTICLE 2 CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ........... ~~13~~15
    2.01    Summary of Classification ...................................................................... ~~13~~15
    2.02    Settlement of Claims ............................................................................... ~~13~~16
    2.03    Professional Fee Claims ............................................................................ ~~14~~16
    2.04    Bar Date for Administrative Claims ........................................................ ~~14~~16
    2.05    Classification of Claims Against and Equity Interests in GMGI .......... ~~14~~16
        (a)    GMGI Unclassified Claims ...................................................... ~~14~~16
            (i)    GMGI Administrative Claims ........................................ ~~14~~17
            (ii)    GMGI United States Trustee's Fees ............................... ~~15~~17
            (iii)    GMGI Professional Fee Claims. ...................................... 17
            (~~iii~~iv)    GMGI Priority Tax Claims .......................................... ~~15~~17
        (b)    GMGI Classified Claims .............................................................. ~~15~~17
    2.06    Classification of Claims Against and Equity Interests in Gawker Media ... ~~15~~17
        (a)    Gawker Media Unclassified Claims ............................................. ~~15~~18
            (i)    Gawker Media Administrative Claims ........................... ~~15~~18
            (ii)    Gawker Media United States Trustee's Fees ................ ~~16~~18
            (iii)    Gawker Media Professional Fee Claims. ..................... 18
            (~~iii~~iv)    Gawker Media Priority Tax Claims ........................... ~~16~~18
        (b)    Gawker Media Classified Claims ............................................... ~~16~~18
    2.07    Classification of Claims Against and Equity Interests in Gawker Hungary ... ~~16~~19
        (a)    Gawker Hungary Unclassified Claims ....................................... ~~16~~19
            (i)    Gawker Hungary Administrative Claims ...................... ~~16~~19
            (ii)    Gawker Hungary United States Trustee's Fees ........... ~~17~~19
            (iii)    Gawker Hungary Professional Fee Claims ................. 19
            (~~iii~~iv)    Gawker Hungary Priority Tax Claims ...................... ~~17~~19
        (b)    Gawker Hungary Classified Claims ........................................... ~~17~~19
    2.08    Unimpaired Classes Deemed to Accept Plan ....................................... ~~17~~20
    2.09    Impaired Classes Deemed to Reject the Plan ...................................... ~~17~~20
    2.10    Impaired Classes Entitled to Vote on Plan ......................................... ~~18~~20
    2.11    Impairment and Voting Controversies ................................................. ~~18~~20

**ARTICLE 3 TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS** ... ~~18~~20
    3.01    Classification and Treatment of Claims Against and Equity Interests in GMGI ... ~~18~~20
        (a)    Class 1A – GMGI Second Lien Make-Whole Claim ............... ~~18~~20

| | (b) | Class 1B – GMGI Other Priority Claims | ~~19~~21 |
| | (c) | Class 1C – GMGI General Unsecured Claims | ~~19~~21 |
| | (d) | Class 1D – GMGI General Unsecured Convenience Claims | 22 |
| | (d~~e~~) | Class 1~~D~~E(i)  – GMGI Gawker Hungary Intercompany Claims | ~~19~~22 |
| | (e~~f~~) | Class 1~~D~~E(ii)  – GMGI Gawker Media Intercompany Claims | ~~20~~22 |
| | (f~~g~~) | Class 1~~E~~F – GMGI Preferred Equity Interests | ~~20~~22 |
| | (g~~h~~) | Class 1~~F~~G – GMGI Common Equity Interests | ~~20~~23 |
| 3.02 | | Classification and Treatment of Claims Against and Equity Interests in Gawker Media | ~~21~~23 |
| | (a) | Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claims. | ~~21~~23 |
| | (b) | Class 2B – Gawker Media Other Priority Claims | ~~21~~24 |
| | (c) | Class 2C – Gawker Media General Unsecured Claims | ~~21~~24 |
| | (d) | Class 2D – Gawker Media Punitive ~~Damages~~Damage Claims | ~~22~~25 |
| | (e) | Class 2E – Gawker Media General Unsecured Convenience Claims | 25 |
| | (e~~f~~) | Class 2~~E~~F(i) – Gawker Media Gawker Hungary Intercompany Claims | ~~22~~26 |
| | (f~~g~~) | Class 2~~E~~F(ii) – Gawker Media GMGI Intercompany Claims | ~~22~~26 |
| | (g~~h~~) | Class 2~~F~~G – Gawker Media Membership Interest | ~~23~~27 |
| 3.03 | | Classification and Treatment of Claims Against and Equity Interests in Gawker Hungary ~~23~~27 |  |
| | (a) | Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claim | ~~23~~27 |
| | (b) | Class 3B – Gawker Hungary Other Priority Claims | ~~24~~28 |
| | (c) | Class 3C – Gawker Hungary General Unsecured Claims | ~~24~~28 |
| | (d) | Class 3D(i) – Gawker Hungary GMGI Intercompany Claims | ~~24~~28 |
| | (e) | Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims | ~~25~~29 |
| | (f) | Class 3E – Gawker Hungary Membership Interest | ~~25~~29 |
| 3.04 | | Compliance with Tax Requirements | ~~25~~29 |
| 3.05 | | Payments to Plan Reserve Accounts.  Any payment to a Plan Reserve Account shall be deemed a Distribution to the applicable beneficiary(ies) of such Plan Reserve Account as of the date of funding of the Plan Reserve Account. | 30 |
| ~~3.05~~3.06 | | Set-offs and Recoupments | ~~25~~30 |
| ~~3.06~~3.07 | | Allocation of Distributions | ~~26~~30 |
| ~~3.07~~3.08 | | Manner of Payments | ~~26~~30 |
| ~~3.08~~3.09 | | Delivery of Distributions | ~~26~~30 |
| ~~3.09~~3.10 | | Uncashed Checks | ~~26~~30 |
| ~~3.10~~3.11 | | Amendment to Claims | ~~27~~31 |
| | | | |
| **ARTICLE 4** | **IMPLEMENTATION OF THE PLAN** | | ~~27~~31 |
| 4.01 | | Plan Settlements | ~~27~~31 |
| | (a) | The Second Lien Make-Whole Claims Settlement | ~~27~~31 |
| | (b) | Intercompany Settlement | ~~27~~31 |
| | (c) | Bollea Settlement | 32 |
| | (d) | Other Settlements | 32 |
| 4.02 | | Effective Date Transactions | ~~28~~32 |
| 4.03 | | Gawker Media Claims Reserve Distribution Date Transactions | ~~29~~33 |
| 4.04 | | ~~GMGI~~Gawker Media Contingent Proceeds Distribution Date Transactions | ~~29~~34 |
| 4.05 | | Corporate Action | ~~29~~34 |
| 4.06 | | Vesting of Assets | ~~29~~34 |
| 4.07 | | Resignation of Officers and Directors | ~~30~~34 |
| 4.08 | | Plan Administrator | ~~30~~34 |

| 4.09 | Plan Administrator Agreement | 30~~35~~ |
| 4.10 | Sale of Gawker.com Assets | 30~~35~~ |
| 4.11 | Binding Effect | 30~~35~~ |
| 4.12 | Continuation of Stays | 30~~35~~ |
| 4.13 | Cancellation and Surrender of Instruments, Securities, and Existing Agreements | 30~~35~~ |
| 4.14 | Dissolution of the Debtors | 31~~35~~ |
| 4.15 | Dissolution of the Committee | 31~~36~~ |

**ARTICLE 5 PROVISIONS FOR TREATMENT OF  SUBSEQUENT PLAN DISTRIBUTIONS** 31~~36~~

| 5.01 | Objections to and Estimation of Claims | 31~~36~~ |
| 5.02 | Professional Fee Claim Procedures | 31~~36~~ |
| 5.03 | Professional Fee Claim Reserves | 32~~37~~ |
| 5.04 | Payments and Distributions on Disputed Claims | 32~~37~~ |

**ARTICLE 6 CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN** 32~~37~~

| 6.01 | Conditions to Confirmation | 32~~37~~ |
| 6.02 | Conditions to the Effective Date | 32~~37~~ |
| 6.03 | Waiver of Conditions to Confirmation or the Effective Date | 33~~37~~ |
| 6.04 | Effect of Nonoccurrence of Conditions to the Effective Date | 33~~38~~ |
| 6.05 | Notice of Effective Date | 33~~38~~ |

**ARTICLE 7 TREATMENT OF CONTRACTS AND LEASES** 33~~38~~

| 7.01 | Rejection of Executory Contracts and Unexpired Leases | 33~~38~~ |
| 7.02 | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 33~~38~~ |

**ARTICLE 8 RETENTION OF JURISDICTION** 33~~38~~

| 8.01 | Retention of Jurisdiction | 33~~38~~ |

**ARTICLE 9 INJUNCTIONS, RELEASES, AND EXCULPATION** 35~~40~~

| 9.01 | ~~Injunction Against Asserting Claims of Debtors 35~~**INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.** | 40 |
| 9.02 | ~~Injunction Against Interference with Plan 35~~**INJUNCTION AGAINST INTERFERENCE WITH PLAN.** | 40 |
| 9.03 | ~~Releases by the Debtors 36~~**RELEASES BY THE DEBTORS** | 41 |
| 9.04 | ~~Exculpation~~**EXCULPATION** | 36~~41~~ |
| 9.05 | **THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS** | 42 |

**ARTICLE 10 MISCELLANEOUS** 36~~43~~

| 10.01 | Severability | 36~~43~~ |
| 10.02 | Revocation of the Plan | 36~~43~~ |
| 10.03 | Effectuating Documents; Further Transactions; Timing | 36~~43~~ |
| 10.04 | Exemption from Transfer Taxes | 37~~43~~ |
| 10.05 | Binding Effect | 37~~43~~ |
| 10.06 | Modification of Treatment | 37~~43~~ |
| 10.07 | Notices | 37~~43~~ |
| 10.08 | Post-Confirmation Fees And Reports | 39~~45~~ |

~~59354792_1~~59354792_8

Gawker Media LLC, a Delaware limited liability company ("Gawker Media"), Gawker Media Group, Inc., a Cayman Island corporation ("GMGI"), and Gawker Hungary Kft., a Hungarian corporation ("Gawker Hungary"), propose the following joint chapter 11 plan of liquidation (the "Plan") for the resolution of all outstanding Claims against and Equity Interests in the Debtors pursuant to section 1121 of the Bankruptcy Code. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Only holders of certain ~~Allowed~~ Claims and Equity Interests specified in Section 2.10 are entitled to vote on the Plan. The Plan is the product of a preliminary analysis of intercompany claims and issues, and the Debtors have held significant discussion regarding the Plan with the Second Lien Lender, the Official Committee of Unsecured Creditors ~~(the "Committee"),~~ Terry Gene Bollea, other creditors and equityholders. A Disclosure Statement, distributed contemporaneously with the Plan, contains a discussion of the Debtors' assets, liabilities, history, material asset sale and a summary of the Plan and the proposed settlements and distributions to be made hereunder.

Other agreements and documents supplementing the Plan and Exhibits to the Plan will be filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

**ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY AND CONSULT WITH COUNSEL AND OTHER APPLICABLE PROFESSIONALS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. WITHOUT LIMITING THE FOREGOING, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE PARTICULARLY URGED TO READ CAREFULLY THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SET FORTH IN ARTICLE 9 BECAUSE SUCH PROVISIONS AFFECT NOT ONLY SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST THE DEBTORS, BUT, ~~WITH RESPECT TO EXCULPATION,~~ ALSO SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST CERTAIN NON-DEBTOR PERSONS IDENTIFIED IN SUCH ARTICLE. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, IN BANKRUPTCY RULE 3019 THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION OF TERMS

1.01    Terms Defined in the Plan. Capitalized terms used in the Plan shall have the following meanings when used in capitalized form in the Plan:

"Administrative Claim" means a Claim against any of the Debtors for costs and expenses of administration of such Debtor's Bankruptcy Case that is allowed under section 503(b) of the Bankruptcy Code and that is entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (i) any actual and necessary costs and

expenses, incurred on or after the Petition Date, of preserving the estates and operating the applicable Debtor; (ii) all fees and charges assessed against a Debtor estate under Chapter 123 of Title 28 of the United States Code; and (iii) all other Claims entitled to administrative claim status pursuant to a non-appealable order of the Bankruptcy Court, excluding Professional Fee Claims.

"Administrative Claims Bar Date" means, (i) with respect to Administrative Claims arising through July 31, 2016, September 29, 2016 at 5:00 p.m. (New York Time) ~~and~~; (ii) with respect to Administrative Claims arising ~~from August~~between August 1, 2016 and September 30, 2016, inclusive, November 15, 2016 at 5:00 p.m. (New York Time); (iii) with respect to Administrative Claims arising from October 1, 2016 through the Effective Date, the date that is thirty (30) days after the Effective Date at 5:00 p.m. (New York Time), and (~~iii~~iv) such other date(s) that the Bankruptcy Court may approve with respect to the filing of Administrative Claims.

"Administrative Claims Objection Deadline" means the date that is ~~ninety~~one-hundred-twenty (~~90~~120) days after the Effective Date.

"Allowed" means with respect to any Claim or Equity Interest, except as otherwise provided herein: (i) a Claim that is evidenced by a Proof of Claim filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be filed); (ii) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely filed; or (iii) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection has been so interposed and the Claim shall have been Allowed by a Final Order.

"Avoidance Actions" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

"Ayyadurai" means Shiva Ayyadurai.

"Ayyadurai Claims" means all claims of Ayyadurai that Ayyadurai has asserted or may assert, including without limitation pursuant to (a) the proceedings in *Ayyadurai v. Gawker Media LLC, et al.*, No. 16-CV-10853 (D. Mass.), and (b) any proofs of claim filed against any Debtor for Claims or Administrative Claims.

"Bankruptcy Cases" means the Gawker Media Bankruptcy Case, the GMGI Bankruptcy Case and the Gawker Hungary Bankruptcy Case, collectively.

~~59354792_1~~59354792_8

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, except to the extent that the reference is withdrawn as to any proceeding or Bankruptcy Case, or 28 U.S.C. § 157 or other law requires entry of a particular judgment by the District Court.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as in effect on the Petition Date and as thereafter amended, together with local rules adopted by the Bankruptcy Court, or such similar rules as may be in effect from time to time in the Bankruptcy Court, all as in effect at the relevant time of application.

"Bollea" means Terry Gene Bollea, aka Hulk Hogan.

"Bollea I Lawsuit" means the proceedings in *Bollea v. Gawker Media LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.).

 "Bollea II Lawsuit" means the proceedings in *Bollea v. Buchwald, et.al.*, No. 16-002861-CI (Fla. 6th Jud. Cir. Pinellas Cty.).

"Bollea Claims" means all claims of Bollea, whether filed in a Proof of Claim or not, (a) against any of the Debtors including, but not limited to, claims (i) under the Bollea I Lawsuit and the Bollea II Lawsuit, including on account of the Bollea Compensatory Judgment and the Bollea Punitive Damage Judgment, (ii) based on theories of veil piercing, substantive consolidation, or *alter ego*, and (b) against third-parties for which the Debtors have Debtor Indemnification Obligations.

"Bollea Compensatory Judgment" means the judgment against Gawker Media for compensatory damages in favor of ~~Terry Gene~~ Bollea in the amount of $115,000,000 in the Bollea I Lawsuit.

~~"Bollea Judgment" means, the Bollea Compensatory Judgment and the Bollea Punitive Damages Judgment, collectively.~~

"Bollea Punitive ~~Damages~~Damage Judgment" means the judgment against Gawker Media for punitive ~~damages~~damage in favor of ~~Terry Gene~~ Bollea in the amount of $15,000,000 in the Bollea I Lawsuit.

"Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Cash" means cash, cash equivalents, and other readily marketable securities or instruments.

"Causes of Action" means all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, and Avoidance Actions belonging to or that can be brought on behalf of the Debtors' estates, whether known or unknown, reduced to judgment, not reduced to judgment,

- 3 -

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or indirectly or derivatively in law, equity, or otherwise.

"Claim" means any "claim" against any of the Debtors as defined in section 101(5) of the Bankruptcy Code which has not been disallowed by an order of the Bankruptcy Court or for which an order of disallowance of the Bankruptcy Court has been reversed on appeal by a Final Order of an appellate court.

"Claims Bar Date" means, as applicable, the General Claims Bar Date, Administrative Claims Bar Date and any other date or dates to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed in the Debtors' Bankruptcy Cases, including the general bar date of September 29, 2016 at 5:00 p.m. (New York Time) and the governmental bar date of December 9, 2016 at 5:00 p.m. (New York Time) established by the *Order (I) Establishing a Deadline to File Proofs of Claim, Certain Administrative Claims and Procedures Relating Thereto and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 168]., and/or Governmental Claims Bar Date.

"Class" means any class of holders of Claims or Equity Interests as specified in Article 3 of the Plan.

"Committee" means the Official Unsecured Creditors' Committee appointed for the Bankruptcy Case.

"Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Bankruptcy Court.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming this Plan.

"Daulerio" means Alfred James Daulerio, aka A.J. Daulerio.

"Debtor Indemnification Obligations" means indemnification, contribution, reimbursement, or other such obligations of the Debtors, arising out of (i) employment, severance or independent contractor agreements (including the employment agreement of Denton), (ii) the Debtors' organizational documents or governing corporate documents, and (iii) the Debtors' policies and practices of advancing certain litigation defense costs to writers under certain circumstances.

"Debtors" means Gawker Hungary, GMGI, and Gawker Media, each as a debtor and debtor in possession in the Bankruptcy Cases, and after the Effective Date, as a liquidating company.

"Denton" means Nicholas G.A. Denton, aka Nick Denton.

"DIP Loan" means the loan under the Financing Agreement, dated as of June 13, 2016 (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof), by and among Gawker Media, as

- 4 -

borrower, GMGI and Gawker Hungary, as guarantors, the lenders from time to time party thereto, and Cerberus Business Finance LLC, as administrative and collateral agent for the lenders.

"DIP Lender" means Cerberus Business Finance LLC, as lender under the DIP Agreement.

"Disallowed" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest, or any portion thereof, that (i) has been disallowed by an order entered by the Bankruptcy Court, (ii) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (iv) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed timely filed under applicable law or this Plan, (v) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (vi) has been withdrawn by the holder thereof.

"Disclosure Statement Order" means an order entered by the Bankruptcy Court approving, among other things, the Disclosure Statement with respect to the Plan as containing adequate information pursuant to section 1125 of the Bankruptcy Code, authorizing solicitation of the Disclosure Statement and the Plan, and approving related solicitation materials.

"Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest, or any portion thereof, that is not an Allowed Claim or Equity Interest or a Disallowed Claim or Equity Interest.

"Distribution" means any initial or subsequent payment or transfer to holders of Claims or Equity Interests made under the Plan.

"Distribution Record Date" means the date designated as the "Voting Record Date" in the Disclosure Statement.

"Effective Date" means a Business Day, as determined by the Debtors, that: (a) is as soon as reasonably practicable after the Confirmation Date; and (b) is the day on which (i) all conditions to the Effective Date in Section [6.02] have been met or waived pursuant to Section 6.03 and (ii) no stay of the Confirmation Order is in effect.

"Effective Date Professional Fees" means Professional Fee Claims that accrue through the Effective Date.

"Equity Interest" means any rights of holders of equity of the Debtors, including GMGI Preferred Shares, GMGI Common Shares, the Gawker Media Membership Interest and the Gawker Hungary Membership Interest.

- 5 -

"Final Order" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Bankruptcy Case (or any related adversary proceeding) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in any Bankruptcy Case (or any related adversary proceeding), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek *certiorari* or similar discretionary review or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for *certiorari* or similar discretionary review or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* or similar discretionary review that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* or similar discretionary review was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, Bankruptcy Rule 9024 or any analogous rule in a nonbankruptcy forum, may be filed relating to such order shall not prevent such order from being a Final Order.

"Final Professional Fees" means Professional Fee Claims that accrue through the Effective Date.

"First Gawker Hungary Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which  Gawker Media promised to pay $8,000,000 to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.

"Gawker.com Assets" means the assets relating to the Gawker.com Website that were excluded from the Unimoda Sale and remain owned by the Debtors.

"Gawker Hungary" means Gawker Hungary Kft., fka Kinja Kft., a Hungarian corporation, or any successor corporation thereof as debtor and debtor in possession.

"Gawker Hungary Administrative Claim" means an Administrative Claim against Gawker Hungary.

"Gawker Hungary Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by Gawker Hungary, No. 16-11718 (SMB).

"Gawker Hungary Effective Date Professional Fees" means the amount of Effective Date Professional Fees allocable to Gawker Hungary.

"Gawker Hungary General Unsecured Claim" means a General Unsecured Claim against Gawker Hungary.

"Gawker Hungary Intercompany Notes" means the First Gawker Hungary Promissory Note and the Second Gawker Hungary Promissory Note.

"Gawker Hungary Plan Loan" means a loan in the amount of $12,500,000 made by Gawker Hungary to Gawker Media on the Effective Date, which amount shall be used by Gawker Media for distribution on the Gawker Media Distribution Date to holders of Allowed General Unsecured Claims against Gawker Media.

"Gawker Hungary Priority Tax Claim" means a Priority Tax Claim against Gawker Hungary.

"Gawker Hungary Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for Gawker Hungary Effective Date Professional Fees.

"Gawker Hungary Promissory NotesProfessional Fees" means the Firstamount of Final Professional Fees allocable to Gawker Hungary Promissory Note and the Second Gawker Hungary Promissory Note.

"Gawker Hungary Second Lien Make-Whole Guaranty Claim" means an Allowed Secured Claim of the Second Lien Lender against Gawker Hungary as guarantor under the Second Lien Loan and Security Agreement on account of (i) alleged obligations under the Second Lien Make-Whole Provision and (ii) any fees and expenses under the Second Lien Loan and Security Agreement.

"Gawker Hungary Second Lien Make-Whole Guaranty Reserve" means a reserve in the amount of $750,000 established on the Effective Date to be distributed pursuant to Section 3.03(a) of this Plan.

"Gawker Media" means Gawker Media LLC, a Delaware limited liability company as debtor and debtor in possession.

"Gawker Media Administrative Claim" means an Administrative Claim against Gawker Media.

"Gawker Media Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by Gawker Media, No. 16-11700 (SMB).

"Gawker Media Claims Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, in the aggregate amount of $3,750,000, established by Gawker Media on the Effective Date, for the benefit of holders of Allowed Gawker Media General Unsecured Claims and Allowed Gawker Media Punitive Damage Claims.

"Gawker Media Claims Reserve Distribution Date" means a Business Day designated by the Plan Administrator that shall be promptly following such time as (i) there remain no

- 7 -

Disputed Claims ~~Against~~against Gawker Media and (ii) the Plan Administrator distributes all remaining Cash held ~~by~~in the Gawker Media Claims Reserve in accordance with this Plan.

"Gawker Media Contingent Proceeds" means (i) the proceeds from the sale or disposition of the Gawker.com Assets net of any payments made (a) to any purchasers of the Gawker.com Assets and (b) to an investment bank, if any, working for the Debtors in connection with the sale; and (ii) any recoveries from Retained Causes of Action net of any setoffs from such recoveries or contingency fees paid to attorneys out of the recoveries.

"Gawker Media Contingent Proceeds Creditor Account" means a separate, segregated bank account to be established on the Effective Date and administered by the Plan Administrator, into which 45.0% of Gawker Media Contingent Proceeds will be deposited for the benefit of holders of Claims against Gawker Media.

"Gawker Media Contingent Proceeds Distribution Date" means a Business Day, as designated by the Plan Administrator in its sole discretion, upon which a Distribution is made to holders of Claims in Classes 2C and 2D, according to their respective entitlements under Section 3.02 of the Plan, as a result of the receipt of Gawker Media Contingent Proceeds.

"Gawker Media ~~Effective Date Professional Fees" means the amount of Effective Date Professional Fees allocable to~~Contingent Equity Proceeds" means 55% of the Gawker Media Contingent Proceeds.

"Gawker Media Convenience Class Creditor" means a holder of a General Unsecured Claim against Gawker Media that elects to receive the treatment set forth in Section 3.02(e) of this Plan from Gawker Media in full settlement and satisfaction of all Claims against any of the Debtors, including Gawker Hungary and GMGI.

"Gawker Media General Unsecured Claim" means a General Unsecured Claim against Gawker Media, including~~, among others,~~ the Bollea ~~Compensatory Judgment Claim~~Claims, the Terrill Claims and the Ayyadurai Claims.

"Gawker Media General Unsecured Convenience Claim" means the Claim of a Gawker Media Convenience Class Creditor.

"Gawker Media Priority Tax Claim" means a Priority Tax Claim against Gawker Media.

"Gawker Media Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve by Gawker Media in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for Gawker Media ~~Effective Date~~ Professional Fees.

"Gawker Media Professional Fees" means the amount of Final Professional Fees allocable to Gawker Media.

"Gawker Media Punitive Damage Claim" means a Claim asserted against Gawker Media, including the Bollea Punitive Damage Claim, that in a chapter 7 case of any of the Debtors, would have the priority set forth in section 726(a)(4) of the Bankruptcy Code.

"Gawker Media Second Lien Make-Whole Guaranty Claim" means an Allowed Secured Claim of the Second Lien Lender against Gawker Media ~~and Gawker Hungary~~ as guarantor under the Second Lien Loan and Security Agreement on account of (i) alleged obligations under the Second Lien Make-Whole Provision and (ii) any fees and expenses under the Second Lien Loan and Security Agreement.

"Gawker Media Second Lien Make-Whole Guaranty Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, established by Gawker Media on the Effective Date in the amount of $750,000 to be distributed pursuant to Sections 3.02(a), 3.02(c), and 3.02(d) of this Plan.

"General Claims Bar Date" means September 29, 2016 at 5:00 p.m. (New York Time), by which general Proofs of Claim were required to be filed in the Debtors' Bankruptcy Cases.

"General Unsecured Claim" means, any Claim, to the extent of the amount of such Claim which (i) is not secured by any valid and unavoidable lien on or security interest in property of the applicable Debtor, or (ii) is greater than the value of any valid and unavoidable lien on or security interest in property of the Debtor which secures such Claim.

"GMGI" means Gawker Media Group, Inc., a Cayman Island corporation, and the parent company of Gawker Media and Gawker Hungary as debtor and debtor in possession.

"GMGI Administrative Claim" means an Administrative Claim against GMGI.

"GMGI Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by GMGI, No. 16-11719 (SMB).

"GMGI Common Shares" means outstanding common shares of GMGI, including any GMGI Common Shares acquired through the exercise of GMGI Common Share Options.

"GMGI Common Share Options" means options to acquire GMGI Common Shares.

~~"GMGI Claims Settlement Payment" means a payment in the amount of $[2,000,000] made by GMGI to Gawker Media on the Effective Date, in consideration for the Intercompany Settlement, which amount shall be reserved by Gawker Media for distributions on the Distribution Date to holders of Allowed General Unsecured Claims against Gawker Media, with excess funds remaining after such distributions, if any, to be distributed to GMGI.~~

"GMGI Convenience Class Creditor" means a holder of a General Unsecured Claim against GMGI that elects to receive the treatment set forth in Section 3.01(e) of this Plan from Gawker Media in full settlement and satisfaction of all Claims against any of the Debtors, including Gawker Hungary and GMGI.

- 9 -

"GMGI General Unsecured Convenience Claim" means the Claim of a GMGI Convenience Class Creditor.

"GMGI Distribution Date" means a Business Day, as designated by the Plan Administrator in its sole discretion, upon which a Distribution is made to holders of ~~claims~~Claims against, and Equity Interests in, GMGI as a result of ~~distributions~~Distributions to GMGI from Gawker Media or Gawker Hungary, Allowance or Disallowance of Disputed Claims against GMGI, or as the Plan Administrator may otherwise determine.

~~"GMGI Effective Date Professional Fees" means the amount of Effective Date Professional Fees, allocable to GMGI.~~

"GMGI General Unsecured Claim" means a General Unsecured Claim against GMGI.

"GMGI Plan Guaranty" means a guaranty in the amount of $2,000,000 by GMGI, in consideration for the Intercompany Settlement, which amount shall be deposited in the GMGI Plan Guaranty Reserve on the Effective Date.

"GMGI Plan Guaranty Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, established by Gawker Media on the Effective Date, funded by the GMGI Plan Guaranty in consideration for the Intercompany Settlement, for the benefit holders of Allowed Gawker Media General Unsecured Claims and Allowed Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

"GMGI Preferred Options" means options to acquire GMGI Series A Preferred Shares.

"GMGI Preferred Shares" means all outstanding GMGI Series A Preferred Shares and the GMGI Series B Preferred Share, including all GMGI Preferred Shares acquired through the exercise of GMGI Preferred Options.

"GMGI Preferred Shares Liquidation Preference" means an amount per GMGI Series A Preferred Share or GMGI Series B Preferred Share (as applicable) equal to the GMGI Share Original Issue Price for such Series A Preferred Share or Series B Preferred Share (as applicable) plus all declared and unpaid dividends on such Series A Preferred Share or Series B Preferred Share.

"GMGI Priority Tax Claim" means a Priority Tax Claims against GMGI.

"GMGI Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually.

"GMGI Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve in a segregated account, which reserve shall be held in trust and maintained by the Plan

- 10 -

Administrator, solely for the benefit and payment of Allowed Claims for GMGI ~~Effective Date~~ Professional Fees.

"GMGI Professional Fees" means the amount of Final Professional Fees allocable to GMGI.

"GMGI Second Lien Make-Whole Claim" means the Allowed Secured Claim of the Second Lien Lender against GMGI as Borrower under the Second Lien Loan and Security Agreement, on account of (i) alleged obligation under the Second Lien Make-Whole Provision and (ii) any fees and expenses under the Second Lien Loan and Security Agreement.

"GMGI Series A Preferred Shares" means Series A Preferred Shares of GMGI.

"GMGI Series B Preferred Shares" means Series B Preferred Shares of GMGI.

"GMGI Share Original Issue Price" means, with respect to the GMGI Series A Preferred Shares, $0.55 per share, and with respect to the GMGI Series B Preferred Shares, $0.836 per share.

"Governmental Claims Bar Date" means December 9, 2016 at 5:00 p.m. (New York Time), or such other date as may be established by an Order of the Bankruptcy Court, by which Governmental Units may file Proofs of Claim in the Debtors' Bankruptcy Cases.

"Impaired" means, with respect to any Claim, Equity Interest, or Class, the condition or effects described in section 1124 of the Bankruptcy Code.

"Intercompany Claims" means any claims by any Debtor against another Debtor, including, but not limited to, claims arising from the Gawker Hungary Intercompany Notes and the GMGI Promissory Note.

"Intercompany Settlement" means the settlement among the Debtors incorporated in the Plan Settlements, as set forth in Section 4.01(a) herein.

"LSKS" means Levine Sullivan Koch & Schultz, LLP.

"Petition Date" means the date of the filing by each Debtor of its voluntary petition commencing the Bankruptcy Case, which for Gawker Media was June 10, 2016, and for GMGI and Gawker Hungary was June 12, 2016.

"Plan" means these Amended Joint Chapter 11 Plans of Liquidation for the Debtors, dated ~~September 30~~November 2, 2016, filed by the Debtors, together with the exhibits thereto, either in their present form or as altered, amended, or modified from time to time.

"Plan Administrator" means [NAME] or anotherthe Person identified in the ~~Confirmation Order~~Plan Supplement, or other filing with the Bankruptcy Court, who shall be reasonably acceptable to the Committee, and retained as of the Effective Date pursuant to the Plan Administrator Agreement, as the employee or fiduciary responsible for implementing the applicable

- 11 -

provisions of the Plan relating to the Plan Reserve Accounts and liquidation of the Liquidation Assetsany remaining assets of the Debtors.

"Plan Administrator Agreement" means an agreement, to be entered into as of the Effective Date, by the Debtors and the Plan Administrator, which sets forth, among other things, the duties, indemnification and compensation of the Plan Administrator.

"Plan Reserve Accounts" means Gawker Hungary Second Lien Make-Whole Guaranty Reserve, Gawker Media Claims Reserve, Gawker Media Contingent Proceeds Creditor Account, Gawker Media Second Lien Make-Whole Guaranty Reserve, GMGI Plan Guaranty Reserve, and the Professional Fee Claim Reserves.

"Plan Settlements" means the Intercompany Settlement and, the Second Lien Make-Whole Claims Settlement, the Bollea Settlement, and the other settlements as may be incorporated in the Plan as set forth in Section 4.01 of the Plan.

"Plan Supplement" means the compilation of documents and forms of documents as amended from time to time that constitute exhibits to the Plan filed with the Bankruptcy Court no later than five (5) days before the deadline for voting on the Plan (or such later date as may be approved by the Bankruptcy Court), which shall include a copy of the final settlement agreements between the Debtors and each of Bollea, Ayyadurai, and Terrill and any other separately documented Plan settlements.

"Post-Petition Interest" means with respect to eligible Claims, interest that accrues from the Petition Date through the Effective Date, calculated at the higher of (i) the federal judgment rate established by 18 U.S.C. § 1961(a) and (ii) any contractual rate applicable to such Claim.

"Priority Claim" means the Claims against the Debtors, if any, entitled to priority under section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

"Priority Tax Claim" means an Unsecured Claim of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means, that proportion that an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such Class.

"Professional" means any professional, claims agent, or other person employed in the Bankruptcy Case pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Bankruptcy Case pursuant to section 503(b)(4) of the Bankruptcy Code, including, without limitation, Ropes & Gray LLP, Opportune LLP, Prime Clerk LLC, Akin Gump Strauss Hauer & Feld LLP, Levine Sullivan Koch & Schultz, LLP,LSKS, Brannock & Humphries, Thomas & LoCicero PL, Cahill, Gordon & Reindel LLP, Citrin Cooperman & Company LLP,

- 12 -

Simpson Thacher & Bartlett LLP, Deloitte Financial Advisory Services LLP, ~~and~~ Reczicza Dentons Europe LLP, and Mourant Ozanne.

"Professional Fee Claim" means (i) any amounts that the Bankruptcy Court allows pursuant to section 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by Professionals employed by the Debtors and the Committee, and (ii) any amounts the Bankruptcy Court allows pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases.

"Professional Fee Claim Reserves" means (i) the Gawker Media Professional Fee Claim Reserve, (ii) the Gawker Hungary Professional Fee Claim Reserve, and (iii) the GMGI Professional Fee Claim Reserve.

"Professional Fee Claim Summary" means a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but unbilled fees and expenses through the Confirmation Date).

"Proof of Claim" means a proof of claim filed against any of the Debtors in the Bankruptcy Cases.

~~"Punitive Damages Claim" shall mean any claim that in a chapter 7 case of any of the Debtors, would have the priority set forth in section 726(a)(4) of the Bankruptcy Code, including, but not limited to the Bollea Punitive Damages Judgment Claim.~~

"Released Party" means, each of, and solely in its capacity as such: (i) the Debtors ~~and~~, (ii) the Second Lien Lender, ~~and~~ (iii) the Committee, and (iv) with respect to each of the foregoing entities in clauses (i) ~~and~~ through (ii~~iii~~), respective current and former subsidiaries, predecessors, successors, assigns, heirs, insurers, agents, representatives, and attorneys, directors, managers, officers, equity holders, principals, ~~such entity's~~ current and former members, ~~employees,~~ agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, excluding LSKS and the chapter 11 bankruptcy estate of Denton.

"Released Employees and Independent Contractors" means each current and former employee, writer, editor, and independent contractor that was employed by, or paid to contribute articles to, the Debtors including, without limitation, current and former 1099 employees and current and former independent contractors, that filed a Proof of Claim in the Bankruptcy Cases.

"Releasing Party" means each of, and solely in its capacity as such: (i) the Debtors ~~and~~, (ii) the Second Lien Lender, and (iii) with respect to each of the foregoing entities in clauses (i) and (ii), respective current and former subsidiaries, predecessors, successors, assigns, heirs, insurers, agents, representatives, and attorneys directors, managers, officers, equity holders, principals, ~~such entity's current and former~~ members, ~~employees,~~ agents, advisory board

- 13 -

members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"Retained Causes of Action" means Claims and/or Causes of Action against third-parties that are not released under the Plan or any Order of the Bankruptcy Court and are retained and prosecuted by the Debtors on behalf of the Debtors' estates, as identified in the Plan Supplement.

"Sale Closing Date" means September 9, 2016, the date of closing of the Unimoda Sale.

"Sale Order" means the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving and Authorizing the Debtors' Entry Into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 214].

"Schedules" means, collectively, (a) the schedules of assets, liabilities, and executory contracts and unexpired leases and (b) the statement of financial affairs, as each may be amended and supplemented from time to time, filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code.

"Second Gawker Hungary Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $5,000,000 to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.

"Second Lien Loan and Security Agreement" means that Second Lien Loan and Security Agreement, dated as of January 21, 2016, by and among GMGI and the Second Lien Lender, pursuant to which the Second Lien Lender agreed to provide to GMGI the Second Lien Term Loan.

"Second Lien Lender" means US VC Partners LP, a Delaware limited partnership, solely in its capacity as lender under the Second Lien Loan and Security Agreement.

"Second Lien Make-Whole Claims" means the GMGI Second Lien Make-Whole Claim, the Gawker Media Second Lien Make-Whole Guaranty Claim, and the Gawker Hungary Second Lien Make-Whole Guaranty Claim.

"Second Lien Make-Whole Claims Settlement" means the settlement among the Debtors and the Second Lien Lender incorporated in the Plan Settlements, as set forth in Section 4.01(b) herein.

"Second Lien Make-Whole Provision" means the provision set forth in Section 2.1.5 of the Second Lien Loan and Security Agreement requiring GMGI to pay to the Second Lien Lender $3,750,000 upon prepayment, refinancing, substitution or replacement of Second Lien Term Loan obligations prior to the applicable maturity date.

- 14 -

"Second Lien Term Loan" means that certain term loan facility in the aggregate principal amount of $15,000,000 plus any fees, expenses and outstanding interest, provided by the Second Lien Lender to GMGI, pursuant to the Second Lien Loan and Security Agreement.

"Secured" means, with respect to any Claim, secured by a valid and unavoidable lien on or security interest in property of the Debtors, to the extent of the value of such lien or security interest.

"Solicitation Procedures" means those solicitation procedures annexed as Exhibit 1, and approved pursuant, to the Disclosure Statement Order.

"Terrill" means Ashley Terrill.

"Terrill Claims" means all claims of Terrill that Terrill has asserted or may assert, including without limitation pursuant to (a) the proceedings in *Ashley Terrill v. Gawker Media LLC, et al.*, No. 16-CV-00411 (S.D.N.Y.), and (b) any proofs of claim filed against any Debtor for Claims or Administrative Claims.

"Unimoda APA" means that certain Asset Purchase Agreement by and between the Debtors and UniModa, LLC, dated August 17, 2016, as amended, modified or supplemented from time to time in accordance with the terms thereof.

"Unimoda Purchase Price" means the $135,000,000 cash purchase price paid, and such other consideration provided, to the Debtors under the Unimoda APA.

"Unimoda Sale" means the sale of substantially all of the Debtors' assets, excluding the Gawker.com Assets, pursuant to the Unimoda APA.

"United States Trustee" means the Office of the United States Trustee for the Southern District of New York.

1.02    **Terms Defined in the Bankruptcy Code**.  Capitalized terms used in the Plan that are not defined in Section 1.01 but which are defined in the Bankruptcy Code shall have the respective meanings specified in the Bankruptcy Code.

1.03    **Rules of Interpretation**.  For purposes of the Plan: (i) whenever it appears appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means such document substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified, or supplemented; (iv) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; and (v) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, except to the extent inconsistent with the express provisions of this Section 1.03 of the Plan.

- 15 -

1.04    Exhibits.  Exhibits to the Plan may be amended from time to time, and both original and amended Exhibits may be filed with the Bankruptcy Court from time to time, but in no event later than five (5) days before the deadline for voting on the Plan (or such ~~other~~later date as may be ~~authorized~~approved by the Bankruptcy Court).  Current copies of Exhibits may be obtained by reference to the Bankruptcy Court's docket or shall be provided to parties in interest upon written request to the Debtors.

1.05    Time Periods.  Except as specifically provided in the Plan, Bankruptcy Rule 9006(a) applies to the computation of any period of time prescribed or allowed by the Plan, and Bankruptcy Rules 9006(b) and 9006(c) apply respectively to the enlargement or reduction of any period of time prescribed or allowed by the Plan.

1.06    Reference to Monetary Figures.  All references in the Plan to monetary figures refer to the lawful currency of the United States of America.

1.07    Governing Law.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of a contract, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and constructed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

## ARTICLE 2
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

2.01    Summary of Classification.  This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  The Claims against~~,~~ and Equity Interests in~~,~~ each of the Debtors are categorized below for all purposes under the Plan, including voting, confirmation, and distribution pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  To the extent a holder has a Claim that may be asserted against more than one Debtor, ~~the vote of~~ such holder ~~in connection with~~shall receive a separate Ballot for each such Claim, and may submit a Ballot with respect to each such Claim, which Ballot shall be counted as a vote of such Claim against ~~each~~the Debtor with respect to which such Ballot is submitted.

A Claim or Equity Interest is (i) classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and (ii) classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.

- 16 -

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified.  For purposes of the Plan, such Claims have, however, been allocated among the Debtors for determining expected distributions under the Plan.  The classification of all other Claims and Equity Interests against each of the Debtors under the Plan is detailed in the tables contained in Sections 2.05—(b), 2.06(b) and 2.07(b) below.  Each table specifies whichthe Classes that are (i) Impaired or Unimpaired by this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that, in the event no holder of a Claim or Equity Interest with respect to a specific Class for a particular Debtor timely submits a Ballot in compliance with the Disclosure Statement OrderSolicitation Procedures indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan pursuant to the Confirmation Order.  The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

2.02    Settlement of Claims.    Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan of (i) each Debtor against the other Debtors and, (ii) the Second Lien Lender against any of theeach Debtor with respect to the Second-Lien Make-Whole Claims, (iii) the Debtors and Bollea regarding the Bollea Claims, and (iv) among certain creditors and each of the Debtors, as set forth in greater detail in Section 4.01 of the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are fair and equitable.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

2.03    Professional Fee Claims.  To the extent that a Professional's final fee application is Allowed by the Bankruptcy Court, or claims pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases are Allowed by the Bankruptcy Court, the requesting Person shallwill receive: (i) payment of Cash from the GMGI Professional Fee Claim Reserve, Gawker Media Professional Fee Claim Reserve and/or Gawker Hungary Professional Fee Claim Reserve, as applicable, in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases, such payment to be made before the later of (a) the Effective Date or (b) three Business Days after the order Allowing such Person's final fee application, or (ii) payment on such other terms as may be mutually agreed upon by the holder of the Professional Fee Claim and the applicable Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases).

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals shall terminate.

2.04    Bar Date for Administrative Claims.    Except as otherwise provided herein, requests for payment of Administrative Claims (other than Professional Fee Claims) not required to be have been filed by a prior Administrative Claim Bar Date, must be filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Barand Plan Administrator within ninety (90) days of the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the applicable Debtor and the requesting party no later than the Administrative Claims Objection Deadline.

2.05    Classification of Claims Against and Equity Interests in GMGI.

(a)    GMGI Unclassified Claims.    Allowed Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against GMGI will be paid in full in Cash, pursuant to the following terms:

(i)    GMGI Administrative Claims.    Each holder of an Allowed Administrative Claim against GMGI shallwill receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    GMGI United States Trustee's Fees.    The outstanding fees due to the United States Trustee from GMGI pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) shallwill be paid in full on or before the Effective Date. All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from GMGI after the Effective Date shall be paid by GMGI in accordance therewith until the earlier of the conversion or dismissal of the GMGI Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the GMGI Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    GMGI Professional Fee Claims.    Approved GMGI Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02, and 5.03 of this Plan.

(iv)    (iii)    GMGI Priority Tax Claims.    On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against GMGI, each holder of an

- 18 -

Allowed Priority Tax Claim ~~shall~~will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and GMGI.

(b)    GMGI Classified Claims.  All other Claims against and Equity Interests in GMGI are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1A | Second Lien Make-Whole Claim | Impaired | Yes |
| 1B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 1C | General Unsecured Claims | Impaired | Yes |
| 1D | General Unsecured Convenience Claims | Impaired | N/A |
| 1~~D~~E(i) | Gawker Hungary Intercompany Claims | Impaired | No (Deemed to Reject) |
| 1~~D~~E(ii) | Gawker Media Intercompany Claims | Impaired | Yes |
| 1~~E~~F | Preferred Equity Interests | Impaired | Yes |
| 1~~F~~G | Common Equity Interests | Impaired | No (Deemed to Reject) |

2.06    Classification of Claims Against and Equity Interests in Gawker Media.

(a)    Gawker Media Unclassified Claims.  Allowed Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against Gawker Media will be paid in full in Cash, pursuant to the following terms:

(i)    Gawker Media Administrative Claims.  Each holder of an Allowed Administrative Claim against Gawker Media ~~shall~~will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    Gawker Media United States Trustee's Fees.  The outstanding fees due to the United States Trustee from Gawker Media pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) ~~shall~~will be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from Gawker Media after the Effective Date shall be paid by Gawker Media in accordance therewith until the earlier of the conversion or dismissal of the Gawker Media Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Gawker Media Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

- 19 -

(iii)    Gawker Media Professional Fee Claims.    Approved Gawker Media Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02, and 5.03 of this Plan.

(iv)    (iii) Gawker Media Priority Tax Claims.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against Gawker Media, each holder of an Allowed Priority Tax Claim shallwill receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and Gawker Media.

(b)    Gawker Media Classified Claims.  All other Claims against and Equity Interests in Gawker Media are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 2A | Second Lien Make-Whole Guaranty Claim | Impaired | Yes |
| 2B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2C | General Unsecured Claims | Impaired | Yes |
| 2D | Punitive JudgmentDamage Claims | Impaired | Yes |
| 2E | General Unsecured Convenience Claims | Impaired | N/A |
| 2EF(i) | Gawker Hungary Intercompany Claims | Impaired | No (Deemed to Reject)Yes |
| 2EF(ii) | GMGI Intercompany Claims | Impaired | No (Deemed to Reject) |
| 2FG | Membership Interest | Impaired | Yes |

2.07    Classification of Claims Against and Equity Interests in Gawker Hungary.

(a)    Gawker Hungary Unclassified Claims.  Allowed Administrative Expense Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against Gawker Hungary will be paid in full in Cash, pursuant to the following terms:

(i)    Gawker Hungary Administrative Claims.  Each holder of an Allowed Administrative Claim against Gawker Hungary shallwill receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

- 20 -

(ii)    **Gawker Hungary United States Trustee's Fees**.    The outstanding fees due to the United States Trustee from Gawker Hungary pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) ~~shall~~will be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from Gawker Hungary after the Effective Date shall be paid by Gawker Hungary in accordance therewith until the earlier of the conversion or dismissal of the Gawker Hungary Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Gawker Hungary Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    **Gawker Hungary Professional Fee Claims**.    Approved Gawker Media Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02,  and 5.03 of this Plan.

(iv)    ~~(iii)~~ Gawker Hungary Priority Tax Claims.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against Gawker Hungary, each holder of an Allowed Priority Tax Claim ~~shall~~will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and Gawker Hungary.

(b)    **Gawker Hungary Classified Claims**.  All other Claims against and Equity Interests in Gawker Hungary are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 3A | Second Lien Make-Whole Guaranty Claim | Impaired | Yes |
| 3B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 3C | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 3D(i) | GMGI Intercompany Claims | Impaired | No (Deemed to Reject) |
| 3D(ii) | Gawker Media Intercompany Claims | Impaired | Yes |
| 3E | Membership Interest | Impaired | Yes |

2.08    Unimpaired Classes Deemed to Accept Plan.  Classes 1B, 2B, 3B, and 3C are Unimpaired under the Plan.  Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, holders of ~~Allowed~~ Claims against or Equity Interests in the Debtors in such Classes are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

- 21 -

2.09    Impaired Classes Deemed to Reject the Plan.  Holders in Classes 1~~D~~E(i), 1F, 2~~E(i), 2E~~F(ii), and 3D(i) are not entitled to receive or retain any property under the Plan on account of their Claims.  Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, holders of ~~Allowed~~ Claims against the Debtors in such Classes are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

2.10    Impaired Classes Entitled to Vote on Plan.  Classes 1A, 1C, 1~~D~~E(ii), 1~~E~~F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E are Impaired.  Accordingly, holders of ~~Allowed~~ Claims against or Equity Interests in the Debtors in such Classes are entitled to vote on the Plan pursuant to the Solicitation Procedures.

2.11    Impairment and Voting Controversies.  If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Equity Interests, is impaired under the Plan or entitled to vote on the Plan pursuant to the Solicitation Procedures, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

# ARTICLE 3
## TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

3.01    Classification and Treatment of Claims Against and Equity Interests in GMGI.

(a)    Class 1A – GMGI Second Lien Make-Whole Claim.  As a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)    Classification:  Class 1A shall consist of the GMGI Second Lien Make-Whole Claim ~~against GMGI~~.

(ii)    Allowance:  The GMGI Second Lien Make-Whole Claim is Allowed as a Secured Claim against GMGI in the amount of $2,000,000.

(iii)    Treatment:  The Second Lien Lender ~~shall~~will receive, in full and complete settlement and release of, and in exchange for, the GMGI Second Lien Make-Whole Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000, (b) on, or as soon as practicable after, the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have been paid in full, up to an aggregate total of $750,000, and (c) in the event that Gawker Hungary dissolves before all Disputed GMGI General Unsecured Claims have become Allowed or Disallowed, the Second Lien Lender ~~shall~~will receive the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan~~, and (d) on the Gawker Media Distribution Date, if and to the extent that the Gawker Media Second Lien Make-Whole Guaranty Claim treatment set forth in Section 3.03(a)(iii)(b) is not satisfied by Gawker Media, distributions from GMGI Cash~~

- 22 -

remaining after distributing all amounts contemplated by Sections 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of the Plan.

(iv)    Voting:  Class 1A is Impaired.  The holder of the GMGI Second Lien Make-Whole Claim against GMGI is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    Class 1B – GMGI Other Priority Claims.

(i)    Classification:  Class 1B shall consist of all GMGI Other Priority Claims against GMGI.

(ii)    Treatment:  Except to the extent that a holder of an Allowed GMGI Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed GMGI Other Priority Claim shallwill receive on account of, and in full and complete settlement, and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting: Class 1B is Unimpaired.  Each holder of an Allowed GMGI Other Priority Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of GMGI Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)    Class 1C – GMGI General Unsecured Claims.

(i)    Classification: Class 1C shall consist of the GMGI General Unsecured Claims against GMGI.

(ii)    Treatment:  Except to the extent that a holder of an Allowed GMGI General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed GMGI General Unsecured Claim shallwill receive, in full and complete settlement and release, and in exchange for, such Claim distributions equal to its Pro Rata share of GMGI Cash distributed on each GMGI Distribution Datethe Effective Date, or within 15 days of Allowance of such Claim, up to the amount of its Allowed Claim plus Post-Petition Interest.

(iii)    Voting:  Classes 1C is Impaired.  Holders of Claims in Class 1C are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(d)    Class 1D – GMGI General Unsecured Convenience Claims.

(i)    Classification:  Class 1D shall consist of the GMGI Unsecured Convenience Claims.

(ii)    Treatment:  Each holder of a GMGI General Unsecured Claim that elects to have its Claim(s) treated as an GMGI General Unsecured Convenience

Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim(s) against GMGI, as well as any other asserted Claims held by such GMGI General Unsecured Convenience Creditor against Gawker Media and/or Gawker Hungary, a single distribution on the Effective Date in Cash from the Gawker Media Claims Reserve of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.

(ii)    Voting:  Class 1D is Impaired.  By electing to participate in the GMGI Convenience Claims Class, holders of Claims in Class 1D are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures.

(e)    (d) Class 1DE(i)  – GMGI Gawker Hungary Intercompany Claims.

(i)    Classification: Class 1DE(i) shall consist of the Gawker Hungary Intercompany Claims against GMGI.

(ii)    Treatment:  Any and all Intercompany Claims held by Gawker Hungary against GMGI are resolved pursuant to the Intercompany Settlement, with no distribution on account of such Claims.

(iii)    Voting:  Class 1DE(i) is Impaired. Holders of Claims in Class 1DE(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(f)    (e) Class 1DE(ii)  – GMGI Gawker Media Intercompany Claims.

(i)    Classification: Class 1DE(ii) shall consist of the Gawker Media Intercompany Claims against GMGI.

(ii)    Treatment:  Pursuant to the Intercompany Settlement, in satisfaction of any and all Intercompany Claims held by Gawker Media against GMGI, on the Effective Date, GMGI will make the GMGI Claims Settlement Payment to Gawker Media.

(iii)    Voting:  Classes 1DE(ii) is Impaired.  Holders of Claims in Class 1DE(ii) are entitled to vote to accept or reject the Plan.

(g)    (f) Class 1EF – GMGI Preferred Equity Interests.

(i)    Classification: Class 1EF shall consist of the holders of GMGI Preferred Shares.

(ii)    Treatment: Except to the extent that a holder of a GMGI Preferred Share agrees to less favorable treatment, each holder of a GMGI Preferred Share shallwill receive, in full and complete settlement and release of, and in exchange for, such GMGI Preferred Share, on each GMGI Distribution Datedate applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after the GMGI Second Lien

- 24 -

Make-Whole Claim has been paid in full, up to an aggregate total of the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference.

(iii)   Voting:   Class 1~~E~~F is Impaired.   Holders of Equity Interests in Class 1~~E~~F are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(h)   ~~(g)~~ Class 1~~F~~G – GMGI Common Equity Interests.

(i)   Classification: Class 1~~F~~G shall consist of the holders of GMGI Common Shares.

(ii)   Treatment: Except to the extent that a holder of a GMGI Common Share agrees to less favorable treatment, each holder of a GMGI Common Share ~~shall~~will receive, in full and complete settlement, release, and discharge of, and in exchange for, such GMGI Common Share, on each ~~GMGI Distribution Date~~date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after holders of Allowed GMGI Preferred Share Equity Interests have received distributions totaling the aggregate amount of their Preferred Shares Liquidation Preferences.

(iii)   Voting:   Holders of Claims in Class 1~~F~~G are not expected to receive any Distributions under the Plan and are therefore not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

3.02   Classification and Treatment of Claims Against and Equity Interests in Gawker Media.

(a)   Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claims.   As part of a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)   Classification:   Class 2A shall consist of the Gawker Media Second Lien Make-Whole Guaranty Claim ~~against Gawker Media~~.

(ii)   Allowance:  The Gawker Media Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Media in the amount of $1,250,000.

(iii)   Treatment: The Second Lien Lender ~~shall~~will receive, in full and complete settlement, release, and discharge of, and in exchange for, the Gawker Media Second Lien Make-Whole Guaranty Claims, (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) on the Gawker Media Claims Reserve Distribution Date, distributions equal to any ~~Gawker Media~~ Cash remaining ~~after payment of all~~in the Gawker Media Second Lien Make-Whole Guaranty Reserve after distributions with respect to Allowed

Gawker Media General Unsecured Claims, up to an aggregate total of $750,000 and Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

(iv)    Voting:  Class 2A is Impaired.  The holder of the Gawker Media Second Lien Make-Whole Guaranty Claim against Gawker Media is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    Class 2B – Gawker Media Other Priority Claims.

(i)    Classification:  Class 2B shall consist of all Other Priority Claims against Gawker Media.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Gawker Media Other Priority Claim shall will receive on account of, and in full and complete settlement and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Priority Claim becomes an Allowed Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting:  Class 2B is Unimpaired.  Each holder of an Allowed Gawker Media Other Priority Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of such Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)    Class 2C – Gawker Media General Unsecured Claims.

(i)    Classification:  Class 2C shall consist of the Gawker Media General Unsecured Claims against Gawker Media.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media General Unsecured Claim agrees to less favorable treatment, including electing to participate in the Gawker Media Convenience Class or as otherwise provided in Section 4.01(c) and (d) of the Plan, each holder of an Allowed Gawker Media General Unsecured Claim shall will receive, in full and complete settlement and release of, and in exchange for, such Claim, a distribution on the Gawker Media Distribution Date equal to its Pro Rata share of distributable Gawker Media Cash, up to the Distributions made in the following order until such holder receives the full amount of its Allowed Claim plus, excluding Post-Petition Interest. , from the sources identified below:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;

SECOND: A Distribution equal to its Pro Rata share of Gawker Media Contingent Proceeds Creditor Account;

- 26 -

THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve.

(iii)    Voting:   Class 2C is Impaired.   Holders of Claims in Class 2C are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(d)    Class 2D – Gawker Media Punitive ~~Damages~~Damage Claims.

(i)    Classification:   Class 2D shall consist of the Gawker Media Punitive ~~Damages~~Damage Claims.

(ii)    Treatment:   Except to the extent that a holder of an Allowed Gawker Media Punitive ~~Damages~~Damage Claim agrees to less favorable treatment, including electing to participate in the Gawker Media Convenience Class or as otherwise provided in Section 4.01(c) and (d) of the Plan, each holder of an Allowed Gawker Media Punitive ~~Damages~~Damage Claim ~~shall~~will receive, in full and complete settlement and release of, and in exchange for, such Claim, ~~a distribution on the Gawker Media Distribution Date equal to its Pro Rata share of distributable Gawker Media~~Distributions made in the following order until such holder receives the full amount of its Allowed Claim, excluding Post-Petition Interest, from the sources identified below:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

~~Cash~~THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve remaining after ~~payment~~satisfaction of all Allowed Gawker Media General Unsecured Claims, ~~up to the amount of its Allowed Claim.~~excluding Post-Petition Interest; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest.

- 27 -

(iii)    Voting:  Class 2D is Impaired.  Holders of Claims in Class 2D are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(e)    Class 2E – Gawker Media General Unsecured Convenience Claims.

(i)    Classification:  Class 2E shall consist of the Gawker Media General Unsecured Convenience Claims.

(ii)    Treatment:  Each holder of a Gawker Media General Unsecured Claim or Gawker Media Punitive Damage Claim that elects to have its Claim(s) treated as a Gawker Media General Unsecured Convenience Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim(s) against Gawker Media, as well as any other asserted Claims held by such Gawker Media General Unsecured Convenience Creditor against GMGI and/or Gawker Hungary, a single distribution on the Effective Date in Cash from the Gawker Media Claims Reserve of the lesser of (a) the Allowed amount of its Claim and (b) $25,000.

(ii)    Voting:  Class 2E is Impaired.  By electing to participate in the Gawker Media Convenience Claims Class, holders of Claims in Class 2E are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures.

(f)    (e) Class 2EF(i) – Gawker Media Gawker Hungary Intercompany Claims.

(i)    Classification:   Class 2EF(i) shall consist of Gawker Hungary Intercompany Claims against Gawker Media, including, but not limited to, the Claim resulting from the Gawker Hungary Intercompany Notes, against Gawker Media.

(ii) Treatment:  Any and all Intercompany Claims held by Gawker Hungary against Gawker Media are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(ii)    Treatment:  Pursuant to the Intercompany Settlement, Gawker Hungary will receive on account of the Gawker Media Gawker Hungary Intercompany Claim (i) a distribution of $16,000,000 in Cash from Gawker Media on the Effective Date, and (ii) a distribution of any Cash remaining at Gawker Media on the Gawker Media Claims Reserve Distribution Date after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have received the full amount of the treatment set forth in Sections 3.02(c) and 3.02(d) of this Plan, to repay up to any outstanding amounts of the Gawker Media Gawker Hungary Intercompany Claims, including any interest that accrues on such outstanding amounts through the Gawker Media Claims Reserve Distribution Date, which repayment to Gawker Media shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of this Plan.

- 28 -

(iii)    Voting:  Class 2EF(i) is Impaired.  Holders of Claims in Class 2EF(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code pursuant to the terms of the Solicitation Procedures.

(g)    (f)  Class 2EF(ii) – Gawker Media GMGI Intercompany Claims.

(i)    Classification:    Class 2EF(ii) shall consist of GMGI Intercompany Claims against Gawker Media, including, but nonot limited to the claimClaim resulting from the GMGI Promissory Note.

(ii)    Treatment:  Any and all Intercompany Claims held by GMGI against Gawker Media are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:  Class 2EF(ii) is Impaired.  Holders of Claims in Class 2EF(ii) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(h)    (g)  Class 2FG – Gawker Media Membership Interest.

(i)    Classification:    Class 2FG shall consist of GMGI, the holder of the Gawker Media Membership Interest.

(ii)    Treatment:  On the Gawker Media Distribution Date, GMGI shallwill receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Media Membership Interest, (a) its Pro Rata share of the Gawker Media Contingent Equity Proceeds and (b) on the Gawker Media Claims Reserve Distribution Date, Cash remaining in the Gawker Media Claims Reserve after distributionsatisfaction of all Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive JudgmentDamage Claims, excluding Post-Petition Interest, which amounts shall be immediately distributed on the following GMGI Distribution Date to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

(iii)    Voting:  Class 2FG is Impaired.  GMGI, in its capacity as holder of the Gawker Media Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

3.03    Classification and Treatment of Claims Against and Equity Interests in Gawker Hungary.

(a)    Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claim.  As part of a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

- 29 -

(i)    Classification:  Class 3A shall consist of the Gawker Hungary Second Lien Make-Whole Guaranty Claim ~~against Gawker Hungary~~.

(ii)    Allowance:   The Gawker Hungary Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Hungary in the amount of $1,250,000 plus any fees, expenses and outstanding interest.

(iii)    Treatment:  The Second Lien Lender ~~shall~~will receive, in full and complete settlement and release of, and in exchange for, the Gawker Hungary Second Lien Make-Whole Guaranty Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) if and when all GMGI General Unsecured Claims have either (i) been paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Allowed GMGI General Unsecured Claims, a distribution in Cash from ~~a $750,000 reserve established by~~the Gawker Hungary Second Lien Make-Whole Guaranty Reserve; provided, however, that in the event that Gawker Hungary dissolves before all Disputed Claims in Class 1C have become Allowed or Disallowed, GMGI assumes this obligation, and the Second Lien Lender ~~shall~~will receive the corresponding distribution from GMGI Pro Rata with the treatment of the GMGI Second ~~Line~~Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

(iv)    Voting:  Class 3A is Impaired.  The holder of the Gawker Hungary Second Lien Make-Whole Guaranty Claim ~~against Gawker Hungary~~ is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    Class 3B – Gawker Hungary Other Priority Claims.

(i)    Classification:  Class 3B shall consist of all Other Priority Claims against Gawker Hungary.

(ii)    Treatment:   Except to the extent that a holder of an Allowed Gawker Hungary Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Gawker Hungary Other Priority Claim ~~shall~~will receive on account of, and in full and complete settlement and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting:  Class 3B is Unimpaired.  Holders of claims in Class 3B are not entitled to vote to accept or reject the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(c)    Class 3C – Gawker Hungary General Unsecured Claims.

(i)    Classification:   Class 3C shall consist of the Gawker Hungary General Unsecured Claims ~~against Gawker Hungary~~.

- 30 -

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Hungary General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Gawker Hungary General Unsecured Claim ~~shall~~will receive, in full and complete settlement and release of, and in exchange for, such Claim, a distribution on the Effective Date equal to payment in full in Cash of the Allowed Gawker Hungary General Unsecured Claim, plus Post-Petition Interest.

(iii)    Voting:  Class 3C is unimpaired.  Holders of claims in Class 3C are not entitled to vote to accept or reject the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(d)    Class 3D(i) – Gawker Hungary GMGI Intercompany Claims.

(i)    Classification:  Class 3D(i) shall consist of the GMGI Intercompany Claims against Gawker Hungary.

(ii)    Treatment:  Any and all Intercompany Claims held by GMGI against Gawker Hungary are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:  Class 3D(i) is Impaired.  Holders of claims in Class 3D(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(e)    Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims.

(i)    Classification:  Class 3D(ii) shall consist of the Gawker Media Intercompany Claims against Gawker Hungary.

(ii)    Treatment:  Any and all Intercompany Claims held by Gawker Media against Gawker Hungary are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:  Class 3D(ii) is Impaired.  Holders of claims in Class 3D(ii) are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(f)    Class 3E – Gawker Hungary Membership Interest.

(i)    Classification:  Class 3E shall consist of GMGI, the holder of the Gawker Hungary Membership Interest.

(ii)    Treatment: GMGI ~~shall~~will receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Hungary Membership Interest, (a) on the Effective Date, a distribution of all of the Cash held by Gawker Hungary after payment in full of the Allowed Claims against Gawker Hungary and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Claims against Gawker

- 31 -

Hungary and anticipated expenses of liquidating Gawker Hungary, and (b) on the date of the dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan.

(iii)     Voting:  Class 3E is Impaired.  GMGI, in its capacity as holder of the Gawker Hungary Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

3.04     Compliance with Tax Requirements.  For purposes of distributions on any interest-bearing obligations, distributions under the Plan shall be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Petition Date.  Notwithstanding any other provision of this Plan, each entity receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other tax obligations.

3.05     Payments to Plan Reserve Accounts.  Any payment to a Plan Reserve Account shall be deemed a Distribution to the applicable beneficiary(ies) of such Plan Reserve Account as of the date of funding of the Plan Reserve Account.

3.06     3.05  Set-offs and Recoupments.  Except to the extent an Administrative or Priority Claim has been previously Allowed or is Allowed by the Plan, a Debtor may, but shall not be required to, set off or recoup against any Administrative or Priority Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Administrative or Priority Claim, claims of any nature whatsoever which a Debtor may have against the holder of such Administrative or Priority Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Administrative Claim hereunder shall constitute a waiver or release by the applicable Debtor of any such claim or counterclaim that it may have against such holder.

3.07     3.06  Allocation of Distributions.  Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

3.08     3.07  Manner of Payments.  Unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Debtors shall be made, at the election of the Debtors or the Plan Administrator, as applicable, by check drawn on a domestic bank or by electronic or wire transfer from a domestic bank; provided, however, that no Cash payments shall be required to be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than twenty dollars ($20.00).

3.09     3.08  Delivery of Distributions.  Subject to the provisions of Section 3.09 of the Plan, distributions and deliveries to each holder of an Allowed Claim or Equity Interest

- 32 -

will be made (i) at the address set forth for such holder in the Debtor's Schedules if no proof of claim has been filed on behalf of such holder, (ii) at the address reflected in the proof of claim filed by such holder, or (iii) at the address set forth in any written notices of address change delivered after the date of any related proof of claim by such holder.  If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Plan Administrator is notified of the holder's then current address, in which case all missed distributions will be made to the holder without interest on the next GMGI or Gawker Media Distribution Date, as applicable.  Any claim in respect of such an undeliverable distribution shall be made on or before the first anniversary of the Effective Date or the applicable GMGI or Gawker Media Distribution Date.  After such date, all claims in respect of undeliverable distributions shall be discharged and forever barred and the Debtors shall retain all monies related thereto.  The Debtors shall be entitled to rely upon the register of Claims as of the Distribution Record Date.

3.10    3.09  Uncashed Checks.  Checks issued by the Debtors on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the applicable Debtor by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first anniversary of the (a) Effective Date or, (b) as applicable, the GMGI Distribution Date or the Gawker Media Distribution Date, or (ii) ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of voided checks shall be discharged and forever barred and the applicable Debtor shall retain all monies related thereto.

3.11    3.10  Amendment to Claims.  On or after the Effective Date, except as provided herein, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the Plan Administrator and, to the extent such prior authorization is not received, any such amended Claim filed shall be deemed disallowed in full and expunged without any further action.

## ARTICLE 4
## IMPLEMENTATION OF THE PLAN

4.01    Plan Settlements.  The terms of this Plan incorporate the Plan Settlements among the Debtors and, the Second Lien Lender, Bollea, and certain other creditors that shall become effective on the Effective Date.  The terms of the Plan Settlements are as follows:

(a)    The Second Lien Make-Whole Claims Settlement.  In full and complete settlement, release, and discharge of, and in exchange for, any outstanding claims that the Second Lien Holder may assert arising from, or in connection with, the Second Lien Loan and Security Agreement, including, without limitation, any rights relating to the Second Lien Make Whole Provision, the Second Lien Holder agrees to receive the treatment of the Second Lien Make-Whole Claims set forth in Sections 3.01(a), 3.02(a), and 3.03(a) of this Plan.

- 33 -

(b)    Intercompany Settlement.    In full and complete settlement, release, and discharge of, and in exchange for, any claims that any of the Debtors might have against one another on account of (i) the Gawker Hungary Intercompany Notes, (ii) the GMGI Promissory Note, (iii) any Claims or Causes of Actions that any Debtor may assert against any other Debtor, including, without limitation and claims or causes of action arising based on subrogation, veil piercing or *alter ego*, and (iv) allocation among the Debtors' estates of (1) the ~~proceeds from the~~ Unimoda ~~Sale~~Purchase Price, (2) payment of outstanding principal, accrued interest and fees under the DIP Loan and the Second Lien Term Loan, (3) professional fees and other administrative expenses accrued from each Debtor's Petition Date through closing of the Unimoda Sale, (4) ~~Effective Date~~Final Professional Fees, (5) the Second Lien Make-Whole Claims Settlement, and (6) any other allocation of claims among the Debtor estates, each of the Debtors agrees to the following provisions:

~~(i) of the $135,000,000 total purchase price received upon closing of the Unimoda Sale, $44,550,000 is allocated to Gawker Media and $90,450,000 is allocated to Gawker Hungary, subject to closing adjustments under the Unimoda APA;~~

(i)    the Debtors will allocate the proceeds and expenses listed above in Section 4.01(b)(iv) of this Plan in a manner that provides for establishment of the Plan Reserve Accounts and treatments of Claims and Equity Interests set forth in Article 3 of this Plan;

(ii)    ~~of the $17.0 million paid from proceeds of the Unimoda Sale to the DIP Lender on account of outstanding principal, accrued interest and fees under the DIP Loan, $14.1 million is deemed to have been paid by Gawker Media and $3.0 million is deemed to have been paid by Gawker Hungary;~~GMGI will provide the GMGI Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims;

(iii)    ~~of the $16.5 million paid from proceeds of the Unimoda Sale to the Second Lien Lender on account of outstanding principal, accrued interest and fees under the Second Lien Term Loan, $8.25 million is deemed to have been paid by Gawker Media and $8.25 million is deemed to have been paid by Gawker Hungary;~~GMGI shall transfer 45.0% of Gawker Media Contingent Proceeds for deposit in the Gawker Media Contingent Proceeds Creditor Account for satisfaction of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims.

(iv)    ~~of the $11.6 million paid on account of professional fees and other administrative expenses from each Debtor's Petition Date through closing of the Unimoda Sale, $4.0 million is deemed to have been paid by Gawker Media and $7.6 million is deemed to have been paid by Gawker Hungary;~~Each of the Debtors agrees that the treatment of Claims and Equity Interests of each of the Debtors against or in the other Debtors will be as set forth in Article 3 of this Plan; and

(v)     each of the Debtors agrees to the terms of the Second Lien Make-Whole Claims Settlement ,and the Bollea Settlement, and the settlement of the Terrill Claims and Ayyadurai Claims.

(c)     Bollea Settlement.  In full and complete settlement, release, and discharge of, and in exchange for, the Bollea Claims, Bollea will receive (i) on the Effective Date, or within three Business Days thereafter, $31,000,000 million in Cash from Gawker Media, and (ii) its Pro Rata share (calculated based on an Allowed Gawker Media General Unsecured Claim amount of $115,000,000) of Distributions from the Gawker Media Contingent Proceeds Creditor Account.

(d)     Other Settlements.  In full and complete settlement, release, and discharge of, and in exchange for, the Ayyadurai Claims and the Terrill Claims, Ayyadurai and Terrill will receive, on the Effective Date, or within three Business Days thereafter, $750,000 and $500,000 respectively, in Cash from Gawker Media, have their Claims shall be deemed Allowed in such amounts solely for voting purposes, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account,.

(v) of the $16.0 million of aggregate Professional Fees that have accrued since the closing of the Unimoda Sale and are anticipated to accrue through the Effective Date, $8.2 million is allocated to Gawker Media and $7.8 million is allocated to Gawker Hungary;

(vi) on the Effective Date, Gawker Hungary will make the Gawker Hungary Plan Loan to Gawker Media;

(vii) on the Effective Date, GMGI will pay the GMGI Claims Settlement Payment to Gawker Media from the proceeds of the distribution that GMGI would otherwise receive as treatment for GMGI's Membership Interest in Gawker Hungary;

(viii) Debtors agree that the Claims and Equity Interests of each of the Debtors in the other Debtors as set forth in Article 3 of this Plan.

4.02    Effective Date Transactions.    On the Effective Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(a)     GMGI establishes and funds the GMGI Professional Fee Claim Reserve, Gawker Media establishes and funds the Gawker Media Professional Fee Claim Reserve, and Gawker Hungary establishes and funds the Gawker Hungary Professional Fee Claim Reserve;

(b)     Gawker Hungary makes the Gawker Hungary Plan Loan to Gawker Media;Media establishes and funds the Gawker Media Claims Reserve and Gawker Media Second Lien Make-Whole Guaranty Reserve, and establishes Gawker Media Contingent Proceeds Creditor Account;

- 35 -

(c)     Gawker Hungary establishes and funds the Gawker Hungary Second Lien Make-Whole Guaranty Reserve;

(d)     GMGI establishes and funds the GMGI Plan Guaranty Reserve;

(ce)     Gawker Hungary makes distributions to holders of Claims against and Equity Interests in Gawker Hungary, pursuant to the Plan treatments set forth in Section 3.03 of the Plan, subject to the reserve required under Section 3.03(a)(iii)(b)(2) of thethis Plan;

(df)     Gawker Media makes distributions to holders of certain Claims against, and Equity Interests in, Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a)(iii)(a) and, 3.02(b) of the, 3.02(e), 3.02(f)(i), and 3.02(h) of this Plan; and

(e)     GMGI makes the GMGI Claims Settlement Payment to Gawker Media; and

(fg)     GMGI makes distributions to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserves required under Sections 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of thethis Plan.

4.03    Gawker Media Claims Reserve Distribution Date Transactions.  On the Gawker Media Claims Reserve Distribution Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(a)     Gawker Media makes distributions to holders of Claims against and Equity Interests in Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(ea) through, 3.02(hc), and 3.02(d) of thethis Plan;

(b)     To the extent any amounts from the Gawker Hungary Plan Loan or the GMGI Claims Settlement Payment remain after Allowed Claims against Gawker Media have been paid in full, such amounts are repaid to GMGI in respect of the Gawker Hungary Plan Loan; andGawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve;

(c)     Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the GMGI Plan Guaranty Reserve;

(d)     Gawker Media makes any distributions remaining due to holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from any Cash remaining at Gawker Media;

(e)     The Plan Administrator distributes to the Second Lien Lender any amounts remaining in the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

- 36 -

(f)    The Plan Administrator distributes to GMGI any amounts remaining in the Gawker Media Plan Guaranty Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have been satisfied in full, excluding Post-Petition Interest;

(g)    Gawker Media repays any Cash remaining to Gawker Hungary on account of Gawker Media Gawker Hungary Intercompany Claims that remain outstanding, including accrued interest on such outstanding Gawker Media Gawker Hungary Intercompany Claims, which amount Gawker Hungary then distributes to GMGI for distribution to holders of Claims against and equity interests in, GMGI;

(h)    Gawker Media distributes any Cash remaining after satisfaction of all outstanding Gawker Media Gawker Hungary Intercompany Claims to GMGI for distribution to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan; and

(ei) GMGI makes distributions of remaining Cash at GMGI to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) of ~~the~~this Plan, if any.

4.04    ~~GMGI~~Gawker Media Contingent Proceeds Distribution Date Transactions.  On each ~~GMGI~~Gawker Media Contingent Proceeds Distribution Date, the Plan Administrator shall make ~~distributions~~Distributions from the Gawker Media Contingent Proceeds Creditor Account to holders of Claims against ~~and Equity Interest in GMGI~~Gawker Media pursuant to ~~Section 3.01 of the Plan (and to holders of claims set forth under Section 3.03(a)(iii)(2) of the~~Sections 3.02(c) and 3.02(d) of this Plan~~, if applicable~~).

4.05    Corporate Action.  Confirmation of the Plan shall constitute authorization for the Debtors, and their respective trustees, officers, board of directors, and agents, to effectuate the Plan and to execute, issue, deliver, file, or record all contracts, instruments, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other entity except for those expressly required pursuant to this Plan.  All matters provided for in the Plan involving any corporate action to be taken by or required of the Debtors in connection with the Plan shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects, without any requirement of further action by the Debtors, or their agents, representatives, trustees, stockholders, members, managers, officers, or directors.

4.06    Vesting of Assets.  Except as otherwise provided in the Plan, upon the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all property of the estate of each Debtor not otherwise distributed or released on the Effective Date shall vest in that Debtor for the benefit of the holders of Claims against and Equity Interests in that Debtor, consistent with the treatments set forth in Article 3 of this Plan.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, after the Effective Date, each of the Debtors shall retain

- 37 -

and enforce any claims or interests belonging to each of their respective chapter 11 bankruptcy estates that were not released by the Plan.  From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action consistent with the terms of the Plan, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

4.07    Resignation of Officers and Directors.  Upon the Effective Date, any of the Debtors' remaining officers and members of their boards of directors shall be deemed to have resigned, if they have not already done so, without the necessity of any further action or writing, and they shall be released from any responsibilities, duties, and obligations that arise after the Effective Date to the Debtors or their creditors under the Plan or applicable law.

4.08    Plan Administrator.  On and after the Effective Date, the Debtors will be managed by the Plan Administrator, who shall have all corporate powers, including those for which board and/or shareholder voting would otherwise be necessary.  The initial Plan Administrator shall be [NAME]identified in the Plan Supplement.  Except as otherwise ordered by the Court, the expenses incurred by the Debtors on or after the Effective Date may be paid by the Debtors in accordance with the Plan Administrator Agreement, without further order of the Bankruptcy Court.  The Plan Administrator shall have no obligation to pursue third-party claims for the benefit of the Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement or are consistent with the Plan Administrator's fiduciary obligations.  In the event that such claims are pursued, they shall be prosecuted on a contingency fee basis, and the Debtors shall be responsible for the costs and expenses associated with the prosecution of such claims. Any such third-party claims shall be identified at the time of the Plan Supplement.

4.09    Plan Administrator Agreement.  On the Effective Date, the Plan Administrator Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.  After the Effective Date, the Plan Administrator Agreement may be amended in accordance with its terms without further order of the Court.  The Plan Administrator Agreement shall be substantially in the form contained in the Plan Supplement, which shall be filed prior to the Confirmation Hearing.

4.10    Sale of Gawker.com Assets.  The Plan Administrator, in conjunction with its advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets upon the expiration of the non-compete agreement that is part of the Unimoda Sale.

4.11    Binding Effect.  On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan

- 38 -

4.12    <u>Continuation of Stays</u>.    Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

4.13    <u>Cancellation and Surrender of Instruments, Securities, and Existing Agreements</u>.    On the Effective Date and concurrently with the applicable distributions made pursuant to Articles 3 of the Plan, except the Membership Interests in Gawker Media and Gawker Hungary, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests against the Debtors shall be deemed cancelled and of no further force and effect against the Debtors, without any further action on the part of any Debtor. From and after the making of the applicable distributions pursuant to the Plan, the holders of such notes, instruments, certificates, and other documents shall have no rights against the Debtors arising from or relating to such notes, instruments, certificates, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan.

4.14    <u>Dissolution of the Debtors</u>.    Any Debtor not yet dissolved shall be dissolved upon the occurrence of the final ~~GMGI~~<u>Gawker Media Claims Reserve</u> Distribution Date and its completion of its respective duties and obligations under the Plan, and all corporate approvals necessary for such action shall be deemed satisfied. The Plan Administrator may, in its discretion, dissolve Gawker Hungary (as required under the Unimoda APA) or Gawker Media following the Effective Date but prior to the ~~final GMGI~~<u>Gawker Media Claims Reserve</u> Distribution Date, upon the completion of Gawker Hungary or Gawker Media's duties and obligations under the Plan.

4.15    <u>Dissolution of the Committee</u>.    On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases, except to the extent necessary to prosecute any appeals or other matters with respect to which they have been granted standing. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

# ARTICLE 5
# PROVISIONS FOR TREATMENT OF
# SUBSEQUENT PLAN DISTRIBUTIONS

5.01    <u>Objections to and Estimation of Claims</u>.    After the Effective Date, the Debtors or the Plan Administrator shall have sole authority to object to the allowance of Claims and Equity Interests with respect to which they dispute liability in whole or in part. All objections shall be litigated to a Final Order; <u>provided</u>, <u>however</u>, that the Debtors or the Plan Administrator may compromise and settle, withdraw, or resolve by any other method approved by the Bankruptcy Court, any objections to Claims or Equity Interests. In addition, the Debtors or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim. Except

- 39 -

as otherwise provided by order of the Bankruptcy Court, the Debtors or the Plan Administrator may file an objection to any Claim or Equity Interest until 180 days after the Effective Date.

5.02    Professional Fee Claim Procedures.    Notwithstanding any other provision of the Plan dealing with unclassified Claims, any Person asserting a Professional Fee Claim shall, no later than ten (10) days after the Confirmation Date, provide the Debtors and the Plan Administrator with a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but unbilled fees and expenses through the Effective Date) (for each Person, its "Professional Fee Claim Summary").  All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Committee prior to the Effective Date must be filed with the Bankruptcy Court and served on the Plan Administrator, Debtors, the Committee, their respective counsel, and  the United States Trustee, no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Plan Administrator, the United States Trustee, and the requesting party no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

5.03    Professional Fee Claim Reserves.    On and after the Effective Date, the Plan Administrator shall set aside and withhold from distribution, the Professional Fee Claim Reserves.  Amounts held in the Professional Fee Claim Reserves shall not constitute property of the Debtors, shall reflect the Plan Administrator's good faith estimate of the fees required to administer each of the Debtors after the Effective Date, and shall only be distributed in accordance with this Section 5.03.  Each Person asserting a Professional Fee Claim against any of the Debtors shall be entitled to a maximum amount from the applicable Professional Fee Claim Reserve equal to the amount of the Professional Fee Claim Summary submitted by such Person with respect to the applicable Debtor, less all interim compensation paid to such Person during the Bankruptcy Cases.  In the event there is a remaining balance in the GMGI, Gawker Media, or Gawker Hungary Professional Fee Claim Reserve after payment of all Allowed Professional Fee Claims against the applicable Debtor, in accordance with Section [2.03] of the Plan, such remaining amount, if any, shall be returned to the applicable Debtor for distribution pursuant to the Plan.  For the avoidance of doubt, the amount reserved by the Plan Administrator pursuant to this Section 5.03 shall not be deemed an admission as to the allowability or amount of any Claim in whole or in part.  To the extent that the Professional Fee Reserves prove insufficient to satisfy Professional Fee Claims, the Plan Administrator mayshall pay Professionals from funds that might otherwise be available to distribute to holders of Allowed Claims and Equity Interests.

5.04    Payments and Distributions on Disputed Claims.    On the Gawker Media Distribution Date and each GMGI Distribution Date, each holder of an Allowed Claim and Equity Interest shallwill receive all payments and distributions to which such holder is then entitled under the Plan.  No partial payments and no partial distributions shall be made with

- 40 -

respect to a Disputed Claim until the resolution of all Disputed Claims by settlement, Final Order, or other form of resolution of such Claim reasonably determined by the Plan Administrator.

## ARTICLE 6
## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

6.01    Conditions to Confirmation.    The confirmation of the Plan by the Bankruptcy Court shall be subject to, and conditioned upon, entry of an order by the Bankruptcy Court approving the Disclosure Statement.

6.02    Conditions to the Effective Date.    The effectiveness of the Plan shall be subject to, and conditioned upon:

(a)    The Confirmation Order becoming a Final Order,

(b)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made or, if made, remaining pending, and

(c)    All other actions and documents necessary to implement the Plan shall have been effected or executed.

6.03    Waiver of Conditions to Confirmation or the Effective Date.    The conditions to confirmation and the conditions to the Effective Date (other than the condition in Section 6.02(a)) may be waived in whole or part at any time by any Debtor without an order of the Bankruptcy Court.

6.04    Effect of Nonoccurrence of Conditions to the Effective Date.    The Debtors reserve the right to seek to vacate the Plan at any time prior to the Effective Date.  If the Confirmation Order is vacated pursuant to this Section [6.04]6.04: (i) the Plan shall be null and void in all respects, and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against, or any interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

6.05    Notice of Effective Date.    The Debtors shall provide notice of the Effective Date of the Plan in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court.

## ARTICLE 7
## TREATMENT OF CONTRACTS AND LEASES

7.01    Rejection of Executory Contracts and Unexpired Leases.  Pursuant to sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date,

- 41 -

shall be deemed rejected on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of executory contracts and unexpired leases pursuant to this Section of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

    7.02 <u>Claims Based on Rejection of Executory Contracts and Unexpired Leases</u>. Claims created by the rejection of executory contracts and unexpired leases pursuant to Section [7.01] of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Plan Administrator no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section 7.01 for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Debtors' estate and their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article 5 of the Plan.

<div align="center">

**ARTICLE 8**
**RETENTION OF JURISDICTION**

</div>

    8.01 <u>Retention of Jurisdiction</u>. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of these proceedings to the extent legally permissible, including for the following purposes, among other things:

      (a) to determine any and all applications, adversary proceedings, and contested matters pending as of the Effective Date, if any;

      (b) to determine any and all objections to the allowance of Claims and Equity Interests, if any;

      (c) to determine any and all applications for allowance of compensation and reimbursement of expenses;

      (d) to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order;

      (e) to effectuate payments under and performance of the provisions of the Plan;

      (f) to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

      (g) to determine the Debtors' motion, if any, to modify the Plan in accordance with section 1127 of the Bankruptcy Code;

59354792_159354792_8

(h)    to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, in the Confirmation Order;

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

(k)    to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

(l)    to enter a final decree closing the Bankruptcy Case;

(m)    to determine any matter (1) under the Unimoda APA, (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement;

(n)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

(o)    to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors; and

(p)    to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Cases, including the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE 9
## INJUNCTIONS, RELEASES, AND EXCULPATION

**9.01** ~~Injunction Against Asserting Claims of Debtors~~**INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS**.  **ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES OTHER THAN THE PLAN ADMINISTRATOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR**

- 43 -

CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEBT, RIGHT, OR CAUSE OF ACTION OF THE DEBTORS FOR WHICH A DEBTOR RETAINS SOLE AND EXCLUSIVE AUTHORITY TO PURSUE IN ACCORDANCE WITH ARTICLE [4] OF THE PLAN.

9.02    Injunction Against Interference with Plan**INJUNCTION AGAINST INTERFERENCE WITH PLAN**.  UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS AND OTHER PARTIES IN INTEREST (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, **PRESENT OR FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER CONTENT PROVIDERS, PRESENT OR FORMER WRITERS,** AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS,  ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTORS or, THE PROPERTY OF ANY OF THE DEBTORS, **THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES,** (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS or, THE PROPERTY OF ANY OF THE DEBTORS, **THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES,** (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS or, THE PROPERTY OF ANY OF THE DEBTORS, **THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES,** (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTORS  or, THE PROPERTY OF ANY OF THE DEBTORS, **THE RELEASED EMPLOYEE PARTIES, OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEE PARTIES,** EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

9.03 ~~Releases by the Debtors~~RELEASES BY THE DEBTORS.  ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, THE DEBTORS, ON THEIR OWN BEHALF AND AS REPRESENTATIVE OF THE DEBTORS' ESTATES, RELEASE UNCONDITIONALLY AND ARE HEREBY DEEMED TO RELEASE UNCONDITIONALLY, (I) EACH AND ALL OF THE RELEASED PARTIES~~, excluding the Chapter 11 bankruptcy estate of Nick Denton, of and~~ FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE IN CONNECTION WITH THE DEBTORS, THEIR ASSETS, OR PROPERTY. AND (II) EACH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, PROVIDED, HOWEVER, THAT THE DEBTORS DO NOT WAIVE ANY DEFENSES THAT THE DEBTORS HAVE TO CLAIMS THAT SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR MAY ASSERT AGAINST THE DEBTORS.

9.04 ~~Exculpation~~EXCULPATION.   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND APPROVED IN THE CONFIRMATION ORDER, NONE OF THE DEBTORS OR THE COMMITTEE, NOR ANY OF THEIR RESPECTIVE FORMER OR CURRENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, ADVISORS, AFFILIATES, ATTORNEYS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, REPRESENTATIVES, OR AGENTS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF, (I) ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY RELATING TO THE DEBTORS OR THE COMMENCEMENT AND PROSECUTION OF OR THE BANKRUPTCY CASES, (II) THE FORMULATION, NEGOTIATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, (III) THE SOLICITATION OF ACCEPTANCES OF THE PLAN, (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO

- 45 -

BE DISTRIBUTED UNDER THE PLAN, OR (V) THE ENFORCEMENT OF THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED THEREUNDER; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACTIONS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER.  IN ADDITION, THE EXCULPATED PARTIES SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.  NOTHING HEREIN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ATTORNEY DISCIPLINARY RULES.

9.05    THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS.  ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, PROVIDED, HOWEVER, THAT THE FOREGOING THIRD PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE.

# ARTICLE 10
## MISCELLANEOUS

10.01  Severability.  Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

10.02  Revocation of the Plan.  The Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

10.03  Effectuating Documents; Further Transactions; Timing.  Each of the officers of the Debtors shall be deemed to be authorized as fully as if under resolutions of the Debtors' boards of directors or shareholders to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such action(s) as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.  All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously.

10.04  Exemption from Transfer Taxes.  Pursuant to section 1146(c) of the Bankruptcy Code, none of (i) the issuance transfer or exchange of any security under, in furtherance of, or in connection with, this Plan, (ii) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by this Plan (including real and personal property), or (iii) the disposition and/or encumbrance of assets in connection with any transactions contemplated hereunder (including any subsequent sale of property pursuant to the Plan), shall be subject to any stamp, real estate transfer, mortgage recording sales, use, or other similar tax.

10.05  Binding Effect.  The Plan shall be binding upon, and shall inure to the benefit of the Debtors, the holders of all Claims and Equity Interests, and any other Person identified in the Plan, and their respective successors and assigns.

10.06  Modification of Treatment.  The Debtors reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the holder of such Claim or Equity Interest at any time after the Effective Date upon the prior written consent of the holder whose Allowed Claim or Equity Interest treatment is being adversely affected.

10.07  Notices.  Any notice required or permitted to be provided under the Plan shall be in writing and served by: (i) certified mail, return receipt requested, postage prepaid;

- 47 -

(ii) hand delivery; or (iii) reputable overnight carrier service, freight prepaid, to be addressed as follows:

If to Gawker Media LLC, to:

Gawker Media LLC
c/o Opportune LLP
Attn: William D. Holden
Chief Restructuring Officer
10 East 53rd Street, 33rd Floor
New York, NY 10022

If to Gawker Hungary, to:

Gawker Hungary Kft.
c/o Opportune LLP
Attn: William D. Holden
10 East 53rd Street, 33rd Floor
New York, NY 10022

If to GMGI, to:

Gawker Media Group, Inc.
c/o Opportune LLP
Attn: William D. Holden
Chief Restructuring Officer
10 East 53rd Street, 33rd Floor
New York, NY 10022

with copies to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attn: Gregg M. Galardi
        D. Ross Martin
        Joshua Y. Sturm
        Jonathan M. Agudelo
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

If to the Plan Administrator:

- 48 -

[————See Plan Supplement]

with copies to counsel to the Plan Administrator:
[————]

- 49 -

      10.08  <u>Post-Confirmation Fees And Reports</u>.  Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator shall be responsible for the timely payment of all fees incurred pursuant to section 1930 of Title 28 to the United States Code. Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator also shall file with the Bankruptcy Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the Bankruptcy Case remain open, in a format prescribed by the United States Trustee in accordance with the guidelines of the Office of the United States Trustee.

New York, New York
~~September 30~~November 2, 2016

GAWKER MEDIA LLC

By: _____
Name: William D. Holden
Title: Chief Restructuring Officer


GAWKER MEDIA GROUP, INC.

By: _____
Name: William D. Holden
Title: Chief Restructuring Officer


~~KINJA~~GAWKER HUNGARY KFT.

By: _____
Name: William D. Holden
Title: ~~Authorized Signatory~~Managing Director

59354792_159354792_8

## <u>SUMMARY OF EXHIBITS</u>

| Exhibit | Document |
|---------|----------|
| A | Form of Plan Administrator Agreement |

The form of Plan Administrator Agreement ~~shall~~<u>will</u> be filed with the Plan Supplement.

**EXHIBIT A**

**Form of Plan Administrator Agreement**

[To be filed in the Plan Supplement]

| Summary report: Litéra® Change-Pro TDC 7.5.0.145 Document comparison done on 11/2/2016 11:29:48 AM | |
|---|---|
| **Style name:** RG_Default_Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://RGDMS/Active/59354792/1 | |
| **Modified DMS:** iw://RGDMS/Active/59354792/8 | |
| **Changes:** | |
| Add | 525 |
| Delete | 418 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 2 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 948 |

# **EXHIBIT B**

**Disclosure Statement Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                    :
In re                               :        Chapter 11
                                    :
Gawker Media LLC, *et al.*,[1]      :        Case No. 16-11700 (SMB)
                                    :
            Debtors.                :        (Jointly Administered)
                                    :
-------------------------------------------------------x

### ORDER APPROVING (I) THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT., (III) THE FORM OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND (IV) THE SCHEDULING OF CERTAIN DATES WITH RESPECT THERETO

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order (the "Order") approving:

(a) the adequacy of the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "Disclosure Statement"), (b) solicitation and notice procedures with respect to confirmation of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "Plan"), (c) the forms of Ballots (as defined herein) and notices in connection therewith, and (d) the scheduling of certain dates with respect thereto, all as more fully set forth in the Motion; and the Court having found that

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Kinja Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

59365223_1 59365223_4

the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Motion is granted as set forth herein.  All capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Motion.

2.     **Disclosure Statement Hearing.**   The Disclosure Statement Hearing Notice, filed by the Debtors and served upon parties in interest in these chapter 11 cases constitutes adequate and sufficient ~~notice of the adequate~~ notice of the Disclosure Statement Hearing, the manner in which a copy of the Disclosure Statement (and exhibits thereto, including the Plan) could be obtained, and the time fixed for filing objections thereto, in accordance with Bankruptcy Rules 2002 and 3017.

3.     **Approval of Disclosure Statement.**   The Disclosure Statement is approved pursuant to section 1125(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3017(b) as

containing adequate information (as defined by section 1125(a) of the Bankruptcy Code).  To the extent not withdrawn, settled, or otherwise resolved, any objections to the approval of the Disclosure Statement are overruled.

4.     The Debtors are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan, the Solicitation Package, and related documents without further order of the Court, including changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and related documents (including the appendices thereto).

5.     **Voting Record Date.**  Pursuant to Bankruptcy Rule 3018(a), October 31, 2016 shall be the Voting Record Date for determining: (a) holders of Claims or Equity Interests that are entitled to vote on the Plan; and (b) whether Claims or Equity Interests have been properly transferred, including pursuant to Bankruptcy Rule 3001(e), such that the assignee may vote on the Plan.

6.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

7.     **Solicitation Procedures.**  The Solicitation Procedures, substantially in the form attached hereto as **Exhibit 1** and incorporated by reference herein, are approved in their entirety.  The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures.

8.     **Solicitation Packages.**  The Debtors shall cause the Solicitation Packages to be distributed to all Entities entitled to vote to accept or reject the Plan on or before November 7, 2016 (the "Solicitation Deadline").

9.      In addition to the Disclosure Statement and exhibits thereto, the Solicitation

Packages to be transmitted on or before the Solicitation Deadline to those holders of Claims in

the Voting Classes entitled to vote on the Plan as of the Voting Record Date shall include the

following, the form of each of which is hereby approved:

a.      the Confirmation Hearing Notice, substantially in the form attached
hereto as **Exhibit 2**, which complies with the requirements of
Bankruptcy Rules 2002(b), 2002(d), and 3017(d); and

b.      the appropriate form of Ballot (including voting instructions),
substantially in the form attached hereto as **Exhibit 4**.

10.     The Notice and Claims Agent is authorized to assist the Debtors in (a)

distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to

accept or reject the Plan by holders of Claims against and Equity Interests in the Debtors, (c)

responding to inquiries from holders of Claims and Equity Interests and other parties in interest

relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all

other related documents and matters related thereto, including the procedures and requirements

for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the

Plan, and (e) if necessary, contacting creditors regarding the Plan.

11. The Debtors shall be excused from mailing Solicitation Packages to those Entities

to whom the Debtors caused a notice regarding the Disclosure Statement Hearing to be mailed

and received a notice from the United States Postal Service or other carrier that such notice

was undeliverable unless such Entity provides the Debtors, through the Notice and Claims

Agent, an accurate address not less than ten (10) days prior to the Solicitation Date.  If an

Entity has changed its mailing address, the burden is on such Entity, not the Debtors, to advise

the Debtors and the Notice and Claims Agent of the new address.

4

12. The Debtors are not required to mail Solicitation Packages or other solicitation materials to holders of Claims that have already been paid in full during the Chapter 11 Cases or that were authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court.

11.     13. **Confirmation Hearing Notice.**  On or before the Solicitation Deadline, the Debtors shall send the Confirmation Hearing Notice to all known holders of Claims and Equity Interests.  The Confirmation Hearing Notice constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

12.     14. **Publication Notice.**  On or before November 16, 2016, the Debtors shall publish the Confirmation Hearing Notice once in the national edition of *USA Today* in substantially the form attached hereto as **Exhibit 2** and hereby approved.  The publication of the Publication Notice constitutes in this manner will provide sufficient notice of the Voting Deadline, Objection Deadline, and time, date, and place of the Confirmation Hearing to persons who do not otherwise receive notice by mail as provided for in this Order.

13.     15. **Voting Deadline.**  The Voting Deadline shall be on December 5, 2016 at 5:00 p.m., New York Time, unless otherwise extended by the Debtors.  All votes to accept or reject the Plan must be cast by using the appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by:  (a) first class mail or in the return envelope provided with each Ballot or Opt-Out Notice; (b) overnight delivery; or (c) personal delivery, so that the Ballots are **actually received** by the

5

Notice and Claims Agent no later than the Voting Deadline at the return address set forth in the applicable Ballot.

14.    ~~16.~~ **Approval of Form of Non-Voting Status Notices.**  Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Equity Interests in the Non-Voting Classes, as such holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Deadline, the Notice and Claims Agent shall mail to such parties, as applicable, a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved.

15.    ~~17.~~ The Non-Voting Status Notice for Unimpaired Classes, substantially in the form attached hereto as **Exhibit 5**, is approved.

16.    ~~18.~~ The Non-Voting Status Notice for Deemed Rejecting Classes, substantially in the form attached hereto as **Exhibit 6**, is approved.

17.    ~~19.~~ The Debtors shall not be required to solicit votes from the following:  (a) holders of Administrative Claims or Priority Tax Claims (each in their capacities as such) because such claims are Unclassified under the Plan and therefore are not entitled to vote on the Plan; (b) holders of Claims or Equity Interests in the Unimpaired Classes because such Claims and Equity Interests are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan; and (c) holders of Claims or Equity Interests in the Deemed Rejecting Classes because such Claims and Equity Interest are deemed to have rejected the Plan.  In lieu of distributing a Solicitation Package to such holders of Claims or Equity Interests, the Debtors shall cause (a) the Confirmation Hearing Notice, and (b) the Non-Voting Status Notices, as applicable, to be served on such holders of Claims and Equity Interests that are not entitled to vote.

18. 20. The Debtors shall be excused from mailing Solicitation Packages to those Entities to whom the Debtors caused a Disclosure Statement Hearing Notice to be mailed and received a notice from the United States Postal Service or other carrier that such notice was undeliverable unless such Entity provides the Debtors, through the Notice and Claims Agent, an accurate address not less than ten (10) days prior to the Solicitation Date. If an Entity has changed its mailing address after the Petition Date, the burden is on such Entity, not the Debtors, to advise the Debtors and the Notice and Claims Agent of the new address.

19. The Debtors are not required to mail Solicitation Packages or other solicitation materials to holders of Claims that have already been paid in full during the chapter 11 cases.

20. 21. **Disputed Claims.** Holders of Claims that are subject to a pending objection by the Debtors as of the Voting Record Date, October 31, 2016, are not entitled to vote the disputed portion of their Claim. As such, holders of such Claims will receive a notice, substantially in the form attached hereto as **Exhibit 7**, which notice is approved. Holders of such Claims are not entitled to vote the disputed portion of their Claim; provided, however, that a holder of a Claim that is the subject of a pending objection on the Voting Record Date and is classified in Class 1C, Class 2C or Class 2D may elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached as Exhibit A to the Disputed Claim Notice and submitting it to the Notice and Claims Agent in accordance with the instructions therein.

21. 22. If a Claim or Equity Interest is objected to after the Voting Record Date, the such Claim or Equity Interest will be Allowed for voting purposes unless the Bankruptcy Court enters an order at or before the Confirmation Hearing granting the Debtors' objection.

7

The Debtors may object to a Claim or Equity Interest no later than seven (7) days prior to the Voting Deadline.  The hearing on any such objections shall be the Confirmation Hearing unless a Resolution Event occurs prior to that date.

22.   ~~23.~~ The Plan Confirmation Schedule, as set forth below and subject to Court-approved modification as necessary, is approved.  All times shall be New York Time.

| Event | Date |
|-------|------|
| Voting Record Date | October 31, 2016 |
| Solicitation Commencement Deadline | November 7, 2016 |
| Deadline to Cause Confirmation Hearing Notice to Be Published in Notice Publications | November 16, 2016 |
| Deadline to File Plan Supplement | November ~~23~~30, 2016 |
| Voting Deadline | December 5, 2016, at 5:00 p.m. ~~New York Time~~ |
| Plan Objection Deadline for All Parties | December 5, 2016, at 4:00 p.m. ~~New York Time~~ |
| Deadline to File Voting Report | December 6, 2016 |
| Pre-Trial Motion Deadline | December 9, 2016 |
| Deadline to File Confirmation Brief and Response to Objections to the Plan | December 9, 2016 |
| Commencement of Confirmation Hearing | December 13, 2016, at 10:00 a.m. ~~New York Time~~ |

23.   ~~24.~~ **Bankruptcy Rule 3016(c).**   The Disclosure Statement, the Plan, the Confirmation Hearing Notice, the Ballots, and the Non-Voting Status Notices provide all parties in interest with sufficient notice regarding the settlement, release, exculpation, and injunction provisions contained in the Plan in compliance with Bankruptcy Rule 3016(c).

24.   ~~25.~~ **Procedures for Filing Objections to Plan.**   Any objections to the Plan must be filed by the Plan Objection Deadline and must:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest; (d) state with particularity the basis and nature of any objection to the Plan; (e) propose a modification to the

8

Plan (or related materials) that would resolve such objection (if applicable); and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified in the Confirmation Hearing Notice by the Plan Objection Deadline.

25. 26. **Confirmation Hearing.**   The Confirmation Hearing shall be held on **December 13, 2016, at 10:00 a.m., New York Time**, which hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on:  (a) all entities that have filed a request for service of filings in the chapter 11 cases pursuant to Bankruptcy Rule 2002; and (b) each of the notice parties identified in the Confirmation Hearing Notice.

26. 27. Except to the extent as may be modified herein, all time periods in this Order shall be calculated in accordance with Bankruptcy Rules 2002 and 9006.

27. 28. To the extent any of the dates approved herein do not comply with those required under the Bankruptcy Rules or Local Rules, the reductions to such notice period(s) are approved pursuant to Bankruptcy Rule 9006(c).

28. 29. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

29. 30. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

30. 31. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

59365223_1 59365223_4

New York, New York
Dated: _____, 2016

_____

THE HONORABLE STUART M BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

59365223_159365223_4

## EXHIBIT 1

**Solicitation Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x
                            :
In re                        :       Chapter 11
                            :
Gawker Media LLC, *et al.*,[1]   :       Case No. 16-11700 (SMB)
                            :
                Debtors.     :       (Jointly Administered)
                            :
------------------------------------------------------x

## SOLICITATION PROCEDURES

On November [\_\_\_], 2016, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Order") that, among other things, (a) approved the adequacy of the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as amended and including all exhibits and supplements thereto, the "Disclosure Statement") filed in support of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as amended and including all exhibits thereto, the "Plan") and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances or rejections of the Plan from holders of Impaired Claims and Equity Interests who are (or may be) entitled to receive distributions under the Plan.[2]

A.      **The Voting Record Date**

**The Court has approved October 31, 2016 as the record date (the "Voting Record Date") for purposes of determining which holders of Claims and Equity Interests in Class 1A (GMGI – Second Lien Make-Whole Claim), Class 1C (GMGI – General**

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY ~~10020~~10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY ~~10020~~10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. Copies of the Plan and the Disclosure Statement may be obtained free of charge by visiting the case website maintained by Prime Clerk LLC, the Debtors' Notice and Claims agent for these chapter 11 cases, available at https://cases.primeclerk.com/gawker/. You may also obtain copies of any pleadings by visiting the Court's website at www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Unsecured Claims), Class 1DE(ii) (GMGI – Gawker Media Intercompany Claims), Class 1EF (GMGI – Preferred Equity Interests), Class 2A (Gawker Media – Second Lien Make-Whole Guaranty Claim), Class 2C (Gawker Media – General Unsecured Claims), Class 2D (Gawker Media – Punitive ~~Damages~~Damage Claims), Class 2F(i) (Gawker Media – Gawker Hungary Intercompany Claims), Class 2G (Gawker Media – Membership Interest), Class 3A (Gawker Hungary – Second Lien Make-Whole Guaranty Claim), 3D(ii) (Gawker Hungary – Gawker Media Intercompany Claims) and Class 3E (Gawker Hungary – Membership Interest) are entitled to vote on the Plan.  The Claims and Equity Interests comprising Classes 1E(ii), 2F(i), 2G, 3D(ii), and 3E are all held by Debtors that are also proponents of the Plan, and therefore will be deemed to vote to accept the Plan.

     B.     **The Voting Deadline**

The Court has approved December 5, 2016, at 5:00 p.m., New York Time, as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court; provided, however, that the deadline to object to confirmation of the Plan must be extended by an equal amount of time. To be counted as votes to accept or reject the Plan, all ballots ("Ballots") sent to registered holders of Claims and Equity Interests must be properly executed, completed, and delivered by: (1) first class mail; (2) overnight courier; or (3) personal delivery so that they are ***actually received***, in any case, no later than the Voting Deadline by the Notice and Claims Agent.  All Ballots should be sent to:  Gawker Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022.  Delivery of a Ballot to the Notice and Claims Agent by facsimile, email, or any other electronic means (other than the online portal) will not be valid.

     C.     **Form, Content, and Manner of Notices**

     1.     **The Solicitation Package.**  The following materials shall constitute the solicitation package (the "Solicitation Package"):

     (a)     a copy of these Solicitation Procedures;

     (b)     the *Notice of Entry of Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto*, in substantially the form annexed as **Exhibit 2** to the Disclosure Statement Order (the "Confirmation Hearing Notice");

     (c)     an appropriate form of Ballot, in substantially the form of applicable Ballot annexed as **Exhibit 4** to the Disclosure Statement Order, as applicable;

(d)    the approved Disclosure Statement (together with the proposed Plan attached as **Exhibit A** thereto); and

(e)    any supplemental documents the Debtors file with the Court and any documents that the Court orders to be made available.

2.    **Distribution of the Solicitation Package**.

The Solicitation Package shall provide the Disclosure Statement and Plan in electronic format (*i.e.*, CD-ROM or flash drive), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any holder of a Claim or Equity Interest may obtain at no charge a paper copy of the documents otherwise provided by: (a) accessing the Notice and Claims Agent's website at https://cases.primeclerk.com/gawker/; (b) writing to the Notice and Claims Agent, by first-class mail, hand delivery, or overnight mail, Gawker Media, LLC, *et al.*, Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; (c) calling the Notice and Claims Agent at (855) 639-3375; or (d) emailing gawkerballots@primeclerk.com.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package on:  (a) the U.S. Trustee; (b) counsel to the Official Committee of Unsecured Creditors; and (c) all parties who have requested service of papers in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to the following Entities in the Voting Classes on or before November [4]7, 2016:

(a)    all Entities who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim that has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that:  (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection on the Voting Record Date; *provided* that the holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection;

(b)    all Entities listed in the Debtors' Schedules as holding a noncontingent, liquidated, undisputed Claim as of the Voting Record Date, except to the extent that such Claim was paid, expunged, disallowed, disqualified, or superseded by a timely filed Proof of Claim prior to the Voting Record Date;

(c)    all Entities that hold Claims or Equity Interests pursuant to an agreement or settlement with the Debtors executed prior to the Voting Record Date, as reflected in a document filed with the Court, in an order entered by the Court, or in a document executed by the Debtors pursuant to authority granted by the Court, regardless of whether a Proof of Claim has been filed;

3

(d)      holders of any Disputed Claim that has been temporarily Allowed to vote or whose Claim was objected to on a "reduce and allow" basis; and

(e)      with respect to any Entity described in subparagraphs (a) through (d) above who, on or before the Voting Record Date, has transferred such Entity's Claim or Equity Interest to another Entity, to the assignee of such Claim or Equity Interest in lieu of sending such Solicitation Package to the assigning Entity; provided that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

Holders of Claims and Equity Interests in classes that are Unimpaired will receive mailings with only the Confirmation Hearing Notice and the appropriate Non-Voting Status Notice.

3.      **Resolution of Disputed Claims for Voting Purposes; Resolution Event**.

(a)      The holder of a Claim or Equity Interest that is the subject of an objection as of the Voting Records Record Date will receive a Disputed Claim Notice, substantially in the form annexed as **Exhibit 7** to the Proposed Disclosure Statement Order, together with the Solicitation Package. (excluding Ballots). Any such holder that is classified in Class 1C, Class 2C or Class 2D may elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached as Exhibit A to the Disputed Claim Notice and submitting it to the Notice and Claims Agent in accordance with the instructions therein.

(b)      The holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

(c)      If a Claim or Equity Interest is objected to after the Voting Record Date, such Claim or Equity Interest will be deemed temporarily Allowed for voting purposes unless the Bankruptcy Court enters an order at or before the Confirmation Hearing granting the Debtors' objection. The Debtors may object to a Claim or Equity Interest no later than seven (7) days prior to the Voting Deadline. The hearing on any such objections shall be the Confirmation Hearing unless a Resolution Event occurs prior to that date.

(d)      A "Resolution Event" means the occurrence of one or more of the following events no later than three (3) days prior to the Voting Deadline:

i.      an order of the Court is entered allowing the Disputed Claim or Equity Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

ii.      an order of the Court is entered temporarily allowing the Disputed Claim or Equity Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii.    a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors resolving the objection and allowing such Disputed Claim or Equity Interest in an agreed upon amount;

iv.    a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors temporarily allowing the holder of such Claim or Equity Interest to vote its Claim or Equity Interest in an agreed upon amount; or

v.    the pending objection to the Disputed Claim or Equity Interest is voluntarily withdrawn by the Debtors.

(e)    No later than two (2) days following the occurrence of a Resolution Event, the Debtors shall cause the Notice and Claims Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder.

4.    **Non-Voting Status Notices for Unimpaired Classes**.    Certain holders of Claims and Equity Interests that are not classified in accordance with 11 U.S.C. § 1123(a)(1) or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under 11 U.S.C. § 1126(f) will receive only the *Notice of Non-Voting Status with Respect to Unclassified and Unimpaired Classes Deemed to Accept the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft.*, substantially in the form annexed as **Exhibit 5** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

5.    **Non-Voting Status Notices for Deemed Rejecting Classes**.    Certain holders of Claims and Equity Interests that are not entitled to vote because they are deemed to reject the Plan under 11 U.S.C. § 1126(g) will receive only the *Notice of Non-Voting Status with Respect to Impaired Classes Deemed to Reject the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft.*, substantially in the form annexed as **Exhibit 6** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

D.    **Voting and Tabulation Procedures**

6.    **Holders of Claims Entitled to Vote**.  Only the following holders of Claims and Equity Interest in the Voting Classes shall be entitled to vote with regard to such Claims or Equity Interests:

(a)    holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim which has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection on the Voting Record Date, other than a "reduce and allow" objection, filed with the Court at least seven (7) days prior to the Voting Deadline,

5

pending a Resolution Event as provided herein; provided that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection; further provided that a holder of a Claim that is the subject of a pending objection on the Voting Record Date and is classified in Class 1C, Class 2C or Class 2D may elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached as Exhibit A to the Disputed Claim Notice and submitting it to the Notice and Claims Agent in accordance with the instructions therein;

(b)      holders of Claims that are listed in the Schedules, ***other than*** Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely filed Proof of Claim);

(c)      holders whose Claims arise pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, in an order entered by the Court, or in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed; and

(d)      the assignee of a timely filed Proof of Claim or a Claim listed in the Schedules shall be permitted to vote such Claim only if the transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

7.      **Establishing Amounts of Claims and Equity Interests for Voting Purposes**. The amount of a Claim or Equity Interest established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim or Equity Interest.  Moreover, any amounts filled in on Ballots by the Debtors through the Notice and Claims Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim or Equity Interest associated with each claimant's vote:

(a)      the Claim or Equity Interest amount settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, in an order of the Court, or in a document executed by the Debtors pursuant to authority granted by the Court;

(b)      the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under the procedures set forth in the Solicitation Procedures;

(c)      the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; provided, however, that Ballots cast by holders of Claims who timely file a Proof of Claim in respect of a contingent Claim *or* in a wholly-unliquidated or unknown amount that is not the subject of an objection will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as Ballots for Claims in the amount of $1.00 solely for the

purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and, if a Proof of Claim is filed as partially liquidated and partially unliquidated, such Claim will be Allowed for voting purposes only in the liquidated amount; provided further, however, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim; and

(d)     the Claim amount listed in the Schedules, provided that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid.

In the absence of any of the foregoing, such Claim or Equity Interest shall be disallowed for voting purposes.

8.     **General Voting and Ballot Tabulation Procedures.** The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

(a)     except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

(b)     the Notice and Claims Agent will date-stamp all Ballots when received. The Notice and Claims Agent shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court;

(c)     no later than December 6, 2016, the Debtors will file with the Court a certification of votes (the "Voting Report"). The Voting Report shall, among other things, certify to the Court in writing the amount and number of allowed ~~claims~~Claims or allowed ~~interest~~Equity Interests of each class accepting or rejecting the ~~plan~~Plan, and delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail, or damaged ("Irregular Ballots"). The Voting Report shall indicate the Debtors' intentions with regard to each such Irregular Ballot. The Voting Report shall also certify to the Court in writing the amount and number of allowed ~~claims~~Claims or allowed ~~interests~~Equity Interests of each class~~, and delineate every Ballot, that has opted not to grant the third party releases contained in Section 9.03 of the Plan~~. The Voting Report shall be served upon the Committee and the U.S. Trustee;

(d)     the method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be

7

deemed delivered only when the Notice and Claims Agent actually receives the original executed Ballot;

(e)    an original executed Ballot is required to be submitted by the Entity submitting such Ballot, and delivery of a Ballot to the Notice and Claims Agent by facsimile, email, or any other electronic means (other than the online portal) will not be valid;

(f)    no Ballot should be sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), the Debtors' financial or legal advisors, the Committee, or the Committee's advisors, and if so sent will not be counted;

(g)    if multiple Ballots are received from the same holder with respect to the same Claim or Interest prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot;

(h)    holders must vote all of their Claims or Equity Interests within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the Debtor may, in its discretion, aggregate the Claims or Equity Interests of any particular holder within a Class for the purpose of counting votes;

(i)    a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims or Equity Interests must indicate such capacity when signing;

(j)    the Debtors, subject to contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

(k)    neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

(l)    unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

(m)    in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Equity Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

(n)    subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided that any such rejections will be documented in the Voting Report;

(o)    if a Claim has been estimated or otherwise Allowed for voting purposes only by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(p)    if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

(q)    the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim or Equity Interest; (ii) any Ballot cast by an Entity that does not hold a Claim or Equity Interest in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed; (iv) any unsigned Ballot or any Ballot or lacking an original signature; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

(r)    after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors; and

(s)    the Debtors are authorized to enter into stipulations with the holder of any Claim agreeing to the amount of a Claim for voting purposes.

E.    **Amendments to the Plan and Solicitation Procedures**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

59365223_1 59365223_4

**EXHIBIT 2**

**Confirmation Hearing Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                  :

In re                          :        Chapter 11
                                  :

Gawker Media LLC, *et al.*,[1]    :        Case No. 16-11700 (SMB)
                                  :

            Debtors.        :        (Jointly Administered)
                                  :
-------------------------------------------------------x

**NOTICE OF ENTRY OF ORDER APPROVING (I) THE ADEQUACY**
**OF THE DISCLOSURE STATEMENT, (II) THE SOLICITATION AND**
**NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE**
**AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA**
**GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT., (III) THE**
**FORM OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND**
**(IV) THE SCHEDULING OF CERTAIN DATES WITH RESPECT THERETO**

**TO ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND PARTIES IN INTEREST:**

1.    **Court Approval of the Disclosure Statement and the Solicitation Procedures.** On November \_\_\_, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under section 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"), and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes with regard to the acceptance or rejection of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary*

---

[1] The last four digits of the taxpayer identification number of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

*Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Plan").[2]

2. **Voting Record Date.**  The Voting Record Date for purposes of determining (a) which Holders of Claims are entitled to vote on the Plan and (b) whether Claims have been properly transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of the Claim was October 31, 2016.

3. **Voting Deadline.**  If you held a Claim against or Equity Interest in one of the Debtors as of the Voting Record Date and are entitled to vote on the Plan, you have received a Ballot and voting instructions appropriate for your Claim(s) or Equity Interest(s).  For your vote to be counted in connection with Confirmation of the Plan, you must follow the appropriate voting instructions, complete all required information on the Ballot, and execute and return the completed Ballot so that it is actually received in accordance with the voting instructions by **December 5, 2016, at 5:00 p.m., New York Time** (the "Voting Deadline").  Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your vote on the Plan.

4. **Solicitation Packages.**  Solicitation Packages (except the Ballots) may be obtained at no charge from the claims agent retained by the Debtors in these chapter 11 cases (the "Notice and Claims Agent") by:    (a) accessing the Notice and Claims Agent's website at https://cases.primeclerk.com/gawker/; (b) writing to the Notice and Claims Agent, by first-class mail, hand delivery, or overnight mail, Gawker Media LLC, et al., Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; or (c) calling the Notice and Claims Agent at (855) 639-3375.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at www.nysb.uscourts.gov.  The Notice and Claims Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

5. **Objections to the Plan.**  The Court has established **December 5, 2016, at 4:00 p.m., New York Time** (the "Plan Objection Deadline"), as the deadline for filing and serving objections to the Confirmation of the Plan ~~(the "Plan Objection Deadline")~~.  Any objection to the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (c) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest, (d) state with particularity the basis and nature of any objection to the Plan, (e) propose a modification to the Plan that would resolve such objection (if applicable), and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified herein by the Plan Objection Deadline:

| Debtors | Counsel to the Debtors |
|---|---|
| Gawker Media LLC c/o Opportune LLP 10 East 53rd Street, 33rd Floor | Ropes & Gray LLP 1211 Avenue of the Americas New York, NY 10036 |

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

| New York, NY 10022<br>Attn:    William D. Holden | Attn:    Gregg M. Galardi<br>D. Ross Martin<br>Joshua Y. Sturm<br>Jonathan M. Agudelo |
|---|---|
| **United States Trustee** | **Counsel to the Committee** |
| Office of the United States Trustee<br>for the Southern<br>201 Varick Street, Room 1006<br>New York, NY  10014<br>Attn:    Greg Zipes<br>Susan Arbeit | Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York  10017<br>Attn:    Sandeep Qusba |
| **Counsel to the Second Lien Lender** | |
| Latham & Watkins LLP<br>330 North Wabash Avenue,Suite 2800<br>Chicago, IL 606011<br>Attn:    David Heller<br>Keith A. Simon<br><br>885 Third Avenue<br>New York, New York 10022<br>Attn:    Keith A Simon | *[Intentionally Left Blank]* |

6.   **Confirmation Hearing.**  A hearing to confirm the Plan ~~(the "Confirmation Hearing")~~ will commence on **December 13, 2016, at 10:00 a.m., New York Time** (the "Confirmation Hearing"), before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York.  Please be advised that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Court or otherwise.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing as permitted by the Bankruptcy Code.

7.   **Plan Supplement.**  The Debtors intend to file a Plan Supplement prior to the Confirmation Hearing that includes, among other things, the list of assumed Executory Contracts and Unexpired Leases.  The Debtors do not intend to serve copies of the Plan Supplement on all parties in interest in these chapter 11 cases; the Plan Supplement, however, may be obtained from the Notice and Claims Agent in accordance with the preceding paragraph.

8.   **Release, Exculpation, and Injunction Language in the Plan.**  Please take notice that Article 9 of the Plan contains the following release, exculpation, and injunction provisions:

> **EXCULPATION.  To the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any**

3

act, omission, transaction, or other occurrence taking place prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.  In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.

INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.  On and after the Effective Date, all Persons and Entities other than the Plan Administrator are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which a Debtor retains sole and exclusive authority to pursue in accordance with Article 4 of the Plan.

INJUNCTION AGAINST INTERFERENCE WITH PLAN.  Upon the entry of the Confirmation Order, except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, present or former independent contractors, present or former content providers, present or former writers, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors or, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iii) creating, perfecting, or otherwise enforcing in any

4

manner, directly or indirectly, any encumbrance of any kind against the Debtors or, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors or, the property of any of the Debtors, except as contemplated or allowed by the Plan; the Released Employee Parties, or the property of any of the Released Employee Parties, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

59365223_159365223_4

**THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS. On the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, provided, however, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.**

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION, AND INJUNCTION PROVISIONS INCLUDED THEREIN, AS YOUR RIGHTS MIGHT BE AFFECTED.**

Dated: November___, 2016
New York, New York

/s/ *Draft*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

**<u>EXHIBIT 3</u>**

**Publication Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
Gawker Media LLC, *et al.*,[1]          :        Case No. 16-11700 (SMB)
                                        :
                    Debtors.            :        (Jointly Administered)
                                        :
---------------------------------------------------x

**NOTICE OF VOTING AND OBJECTION DEADLINES REGARDING
AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND
PROPOSED INJUNCTIONS AND THIRD-PARTY RELEASES**

**THE FOLLOWING CONCERNS THE APPROVAL PROCESS FOR A PROPOSED
AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION.  PLEASE TAKE NOTE
THAT THE PLAN OF LIQUIDATION INCLUDES THE INJUNCTIONS AND THIRD-
PARTY RELEASES DESCRIBED IN PARAGRAPH 8 OF THIS NOTICE.**

**TO ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND PARTIES IN
INTEREST:**

9.    9. **Solicitation of Votes on Amended Joint Chapter 11 Plan of Liquidation.**  Gawker
      Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., have filed a joint
      chapter Amended Joint Chapter 11 plan Plan of liquidation.[2]  The Bankruptcy Court has
      approved a disclosure statement for that plan and authorized the Debtors to solicit votes on
      such plan from creditors and equity holders in certain classes.  The Bankruptcy Court has
      also set a hearing to consider confirmation of the plan.

10.   10. **Voting Record Date.**  The Voting Record Date for purposes of determining (a) which
      Holders of Claims or Equity Interests are entitled to vote on the Plan and (b) whether
      Claims or Equity Interests have been properly transferred to an assignee pursuant to
      Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of the Claim was
      October 31, 2016.

---

[1] The last four digits of the taxpayer identification number of the Debtors debtors are: Gawker Media LLC
(0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media
LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden,
Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s
mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York,
NY 10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Plan.

59365223_1 59365223_4

**11.** ~~11.~~ **Voting Deadline.** If you held a Claim against or Equity Interest in one of the Debtors as of the Voting Record Date and timely filed a proof of claim or, in certain instances, such claim or Equity Interest was listed on the Debtors' schedules, you are entitled to vote on the Plan. For your vote to be counted in connection with Confirmation of the Plan, you must follow the appropriate voting instructions, complete all required information on the Ballot, and execute and return the completed Ballot so that it is actually received in accordance with the voting instructions by **December 5, 2016, at 5:00 p.m., New York Time** (the "Voting Deadline"). Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your vote on the Plan.

**12.** ~~12.~~ **Solicitation Packages.** Solicitation Packages (except the Ballots) may be obtained at no charge from the claims agent retained by the Debtors in these chapter 11 cases (the "Notice and Claims Agent") by: (a) accessing the Notice and Claims Agent's website at https://cases.primeclerk.com/gawker/; (b) writing to the Notice and Claims Agent, by first-class mail, hand delivery, or overnight mail, Gawker Media LLC, et al., Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022; or (c) calling the Notice and Claims Agent at (855) 639-3375. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at www.nysb.uscourts.gov. The Notice and Claims Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

**13.** ~~13.~~ **Objections to the Plan.** The Court has established **December 5, 2016, at 4:00 p.m., New York Time** (the "Plan Objection Deadline"), as the deadline for filing and serving objections to the Confirmation of the Plan ~~(the "Plan Objection Deadline")~~. Any objection to the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (c) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest, (d) state with particularity the basis and nature of any objection to the Plan, (e) propose a modification to the Plan that would resolve such objection (if applicable), and (f) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by each of the notice parties identified herein by the Plan Objection Deadline:

| Debtors | Counsel to the Debtors |
|---|---|
| Gawker Media LLC<br>c/o Opportune LLP<br>10 East 53rd Street, 33rd Floor<br>New York, NY 10022<br>Attn:   William D. Holden | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attn:   Gregg M. Galardi<br>         D. Ross Martin<br>         Joshua Y. Sturm<br>         Jonathan M. Agudelo |
| **United States Trustee** | **Counsel to the Committee** |
| Office of the United States Trustee<br>for the Southern<br>201 Varick Street, Room 1006<br>New York, NY  10014<br>Attn:   Greg Zipes<br>         Susan Arbeit | Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York  10017<br>Attn:   Sandeep Qusba |
| **Counsel to the Second Lien Lender** | |
| Latham & Watkins LLP | |

| | |
|---|---|
| 330 North Wabash Avenue, Suite 2800<br>Chicago, IL 606011<br>Attn:    David Heller<br>           Keith A. Simon<br><br>885 Third Avenue<br>New York, New York 10022<br>Attn:    Keith A Simon | *[Intentionally Left Blank]* |

**14.**   ~~14.~~ **Confirmation Hearing.**  A hearing to confirm the Plan ~~(the "Confirmation Hearing")~~ will commence on **December 13, 2016, at 10:00 a.m., New York Time** (the "Confirmation Hearing"), before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York.  Please be advised that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Court or otherwise.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing as permitted by the Bankruptcy Code.

**15.**   ~~15.~~ **Plan Supplement.**   The Debtors intend to file a Plan Supplement prior to the Confirmation Hearing that includes, among other things, the list of assumed Executory Contracts and Unexpired Leases.  The Debtors do not intend to serve copies of the Plan Supplement on all parties in interest in these chapter 11 cases; the Plan Supplement, however, may be obtained from the Notice and Claims Agent in accordance with the preceding paragraph.

**16.**   ~~16.~~ **Release, Exculpation, and Injunction Language in the Plan.**  Please take notice that Article 9 of the Plan contains the following release, exculpation, and injunction provisions:

> **EXCULPATION.  To the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful**

3

~~59365223_1~~59365223_4

misconduct or gross negligence as determined by a Final Order.   In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.

**INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.  On and after the Effective Date, all Persons and Entities other than the Plan Administrator are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which a Debtor retains sole and exclusive authority to pursue in accordance with Article 4 of the Plan.**

**INJUNCTION AGAINST INTERFERENCE WITH PLAN.  Upon the entry of the Confirmation Order, except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, present or former independent contractors, present or former content providers, present or former writers, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, from  (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors or, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or, the property of any of the Debtors, the Released Employee Parties, or the property of any of the Released Employee Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors or, the property of any of the Debtors, except as contemplated or allowed by the Plan; the Released Employee Parties, or the property of any of the Released Employee Parties, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform**

4

to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

**THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS. on the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, provided, however, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.**

YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION, AND INJUNCTION PROVISIONS INCLUDED THEREIN, AS YOUR RIGHTS MIGHT BE AFFECTED.

Dated: November ___, 2016  
    New York, New York

/s/ *Draft* _____  
ROPES & GRAY LLP  
Gregg M. Galardi  
D. Ross Martin  
Joshua Y. Sturm  
Jonathan Agudelo  
1211 Avenue of the Americas  
New York, NY 10036-8704  
Telephone: (212) 596-9000  
Facsimile: (212) 596-9090  
gregg.galardi@ropesgray.com  
ross.martin@ropesgray.com  
joshua.sturm@ropesgray.com  
jonathan.agudelo@ropesgray.com  

*Counsel to the Debtors*  
*and Debtors in Possession*

# EXHIBIT 4A

**Class 1A Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
In re                                           :        Chapter 11
:
Gawker Media LLC, *et al.*,[1]                  :        Case No. 16-11700 (SMB)
:
Debtors.                      :        (Jointly Administered)
:
------------------------------------------------------------x

### BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC, GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.

### CLASS 1A:  Second Lien Make-Whole Claim

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, ~~filed on September 30, 2016~~ (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, ~~filed on September 30, 2016~~ (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or** | Gawker Ballot Processing c/o Prime Clerk LLC | **Via the Voting Agent's E-Ballot** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

~~59365223_1~~

Class 1A:  Second Lien Make-Whole Claim

| | |
|---|---|
| **Overnight Courier:** | 830 Third Avenue, 3rd Floor New York, NY 10022 |

**Platform by visting:**

59365223_159365223_4

Class 1A:  Second Lien Make-Whole Claim

---

**VOTING INSTRUCTIONS
FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, AND ~~3~~4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1A CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 1A Claim Against GMGI**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1A Claim against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 1A Claim against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.                    **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

3

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 1A Claim against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 1A Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

Class 1A:  Second Lien Make-Whole Claim

**Item 4. Holder of Claim Information and Signature**.

---
Name of Holder of Claim (Please Print)

---
Authorized Signature

---
Name of Signatory

---
If by Authorized Agent, Name and Title

---
Name of Institution

---
Street Address

---
City, State, Zip Code

---
Telephone Number

---
Email Address

---
Social Security or Federal Taxpayer Identification Number

---
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

59365223_1 59365223_4

Class 1A:  Second Lien Make-Whole Claim

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_159365223_4

Class 1A:  Second Lien Make-Whole Claim

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of
 your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

<div style="border:1px solid black; padding:10px; text-align:center;">

**IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 1A BALLOT ON OR BEFORE DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1A BALLOT WILL NOT BE COUNTED.**

</div>

59365223_159365223_4

## IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Second Lien Make-Whole Claim has been placed in Class 1A under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 1A Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6. If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

8. Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

    a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

c.     any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.     any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.     any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.     any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.     any unsigned Ballot;

h.     any Ballot that does not contain an original signature; or

i.     any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

# **EXHIBIT 4B**

## **Class 1C Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
: 
In re                                    :    Chapter 11
: 
Gawker Media LLC, *et al.*,[1]           :    Case No. 16-11700 (SMB)
: 
Debtors.                     :    (Jointly Administered)
: 
----------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 1C:  General Unsecured Claims**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | | |
|---|---|---|---|
| **By Regular Mail,** | Gawker Ballot Processing | **Via the Voting** | https://cases.primeclerk.com/gawker |
| **Hand Delivery or** | c/o Prime Clerk LLC | **Agent's E-Ballot** | / |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

59365223_1

59365223_4

Class 1C:  General Unsecured Claims

| | | |
|---|---|---|
| **Overnight Courier:** | 830 Third Avenue, 3rd Floor New York, NY 10022 | **Platform by visiting:** |

59365223_159365223_4

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.   COMPLETE ITEMS 1, 2, ~~AND~~ 3 (IF APPLICABLE) AND 5.

2.   SIGN THE BALLOT.

3.   RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.   THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.   YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1C CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.   ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.   ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

~~59365223_1~~59365223_4

**Item 1.  Amount of Vote Class 1C Claim Against GMGI**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1C Claim against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 1C Claim against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.                    **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

Class 1C:  General Unsecured Claims

**Item 3.** ~~Certifications and Acknowledgments~~.  ~~By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:~~**Convenience Class Election by Holder of Claims That Has Accepted the Plan.**

Each holder of a Class 1C Claim against GMGI that votes to accept the Plan has the option to elect to participate in the GMGI Convenience Class.  Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 1C Claim and (b) $25,000, on account of all of its Claims against any Debtors.

You may complete this Item 3 **only if you voted to accept the Plan in item 2 above**.  By checking this box, the undersigned holder of a Class 1C Claim against GMGI identified herein elects to have its Class 1C Claim treated as a Class 1D – GMGI General Unsecured Convenience Claim and receive the treatment set forth in Article 3.01 (d)(ii) of the Plan.

_____ **Elects** to be treated as a Class 1D – GMGI General Unsecured Convenience Claim

**ANY HOLDER THAT ELECTS TO PARTICIPATE IN THE GMGI CONVENIENCE CLASS ON THIS BALLOT, AND MAKES AN INCONSISTENT ELECTION ON A BALLOT WITH RESPECT TO ITS CLASS 2C AND/OR CLASS 2D CLAIM(S) IS DEEMED PART OF THE GMGI CONVENIENCE CLASS AND WILL RECEIVE ONLY A SINGLE DISTRIBUTION ON ACCOUNT OF ALL CLAIMS AGAINST ANY DEBTOR(S).**

~~a. as of the Voting Record Date, the undersigned was the holder of Class 1C Claim against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;~~

~~b. the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;~~

~~c. the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;~~

~~d. the undersigned has cast the same vote with respect to all of the holder's Class 1C Claims;~~

~~e. the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;~~

~~f. the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and~~

~~g. the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.~~

~~59365223_1~~59365223_4

Class 1C:  General Unsecured Claims

**Item 4. Holder of Claim Information and Signature.**

Name of Holder of Claim (Please Print)

Authorized Signature

Name of Signatory

If by Authorized Agent, Name and Title

Name of Institution

Street Address

City, State, Zip Code

Telephone Number

Email Address

Social Security or Federal Taxpayer Identification Number

Date Completed

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

**YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN. BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED. IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

6

59365223_159365223_4

Class 1C:  General Unsecured Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 1C BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME)**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1C BALLOT WILL NOT BE COUNTED.

---

7

59365223_1 59365223_4

Class 1C:  General Unsecured Claims

## IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your General Unsecured Claim has been placed in Class 1C under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 1C Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6. If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").**  If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8. Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

   a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

   c. any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

59365223_1 59365223_4

d. any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e. any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f. any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g. any unsigned Ballot;

h. any Ballot that does not contain an original signature; or

i. any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**
**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

**EXHIBIT 4C**
**Class 1D(ii) Ballot**

59365223_1

Class 1D(ii):  Gawker Media Intercompany Claims

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                        :
In re-                                                  :    Chapter 11
                                                        :
Gawker Media LLC, *et al.*,[1]                          :    Case No. 16-11700 (SMB)
                                                        :
                Debtors.                                :    (Jointly Administered)
                                                        :
-------------------------------------------------------x

BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT
CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.
CLASS 1D(ii):  Gawker Media Intercompany Claims

THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS
DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| By Regular Mail, Hand Delivery or Overnight Courier: | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor | Via the Voting Agent's E-Ballot Platform by visiting: | https://cases.primeclerk.com/gawker / |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

1

Class 1D(ii):  Gawker Media Intercompany Claims

New York, NY 10022

Class 1D(ii): Gawker Media Intercompany Claims

**VOTING INSTRUCTIONS
FOR COMPLETING THE BALLOT**

1. COMPLETE ITEMS 1, 2, AND 3.

2. SIGN THE BALLOT.

3. RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4. THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5. YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1D(II) CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6. ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7. ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT MUST BE INCLUDED WITH THE BALLOT.

**Item 1.  Amount of Vote Class 1D(ii) Claim Against GMGI**.  The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1D(ii) Claim against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**.  The undersigned, a holder of a Class 1D(ii) Claim against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check one box):

_____ **Accept** the Plan.             _____ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

3

59365223_1

**Item 34. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 1D(ii)C Claim against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 1D(ii)C Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

4

Class 1D(ii): Gawker Media Intercompany Claims

**Item 4<u>5</u>. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

59365223_1

Class 1D(ii): Gawker Media Intercompany Claims

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

6

Class 1D(ii):  Gawker Media Intercompany Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 1D(ii)C BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME)**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1D(ii)C BALLOT WILL NOT BE COUNTED.

---

59365223_1

Class 1D(ii):  Gawker Media Intercompany Claims

# IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote. You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan. Your ~~Gawker Media Intercompany~~General Unsecured Claim has been placed in Class 1~~D(ii)~~C under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/. The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot." Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description. **Each Ballot is only for voting those Claims described on the Ballot. Please complete and return each Ballot you receive. The attached Ballot is designated only for voting Class 1~~D(ii)~~C Claims.** You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote. Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. If you elect to participate in the GMGI Convenience Class on this Ballot, and make an inconsistent election on a Ballot with respect to your Class 2C and/or 2D claims, you will be deemed part of the GMGI Convenience Class and receive only the single distribution on account of all Claims against any Debtors.

6. ~~5.~~The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

7. ~~6.~~If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

8. ~~7.~~**Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted. An envelope addressed to the Voting Agent is enclosed for your convenience. Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

9. ~~8.~~Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

10. ~~9.~~The following Ballots will NOT be counted:

    a.   any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and

8

Class 1D(ii): Gawker Media Intercompany Claims

(b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

b.    any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

c.    any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.    any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.    any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.    any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.    any unsigned Ballot;

h.    any Ballot that does not contain an original signature; or

i.    any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

9

**EXHIBIT 4~~D~~C**

**Class 1~~E~~F Ballot**

Class 1EF:  Preferred Equity Interests

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re                                          :          Chapter 11
: 
Gawker Media LLC, *et al.*,[1]        :          Case No. 16-11700 (SMB)
: 
Debtors.                            :          (Jointly Administered)
: 
---------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 1EF:  Preferred Equity Interests**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
> **DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft. filed on September 30, 2016* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media Group, Inc. (the "GMGI Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft. filed on September 30, 2016* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the GMGI Plan, as incorporated in the Joint Plan.

The GMGI Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the GMGI Plan and if the GMGI Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the GMGI Plan if it finds that the GMGI Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the GMGI Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the GMGI Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or** | Gawker Ballot Processing c/o Prime Clerk LLC | **Via the Voting Agent's E-Ballot** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

59365223_1

Class 1EF:  Preferred Equity Interests

**Overnight Courier:**    830 Third Avenue, 3rd
Floor
New York, NY 10022

**Platform by visiting:**

59365223_159365223_4

Class 1EF:  Preferred Equity Interests

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, AND 34.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 1EF EQUITY INTEREST EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT MUST BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 1EF Equity Interest Against GMGI**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 1EF Equity Interest against GMGI in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 1EF Equity Interest against GMGI as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check one box):

**Accept** the Plan.                    **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A EQUITY INTEREST THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL EQUITY INTERESTS OF ONE CLASS WILL NOT BE COUNTED.**

59365223_1 59365223_4

Class 1EF:  Preferred Equity Interests

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 1EF Equity Interest against GMGI of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 1EF Equity Interests;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Equity Interests identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Equity Interests, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

**Item 4. Holder of Equity Interest Information and Signature**.

_____
Name of Holder of Equity Interest (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

Class 1EF:  Preferred Equity Interests

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_159365223_4

Class 1EF:  Preferred Equity Interests

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Equity Interests described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT ***ACTUALLY RECEIVE*** THIS CLASS 1EF BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 1E BALLOT WILL NOT BE COUNTED.

---

7

59365223_159365223_4

Class 1EF:  Preferred Equity Interests

## IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Equity Interest(s) under the Plan.  Your Preferred Equity Interest has been placed in Class 1EF under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Equity Interests in more than one voting Class under the Plan, you may receive a separate Ballot for each such Equity Interest, coded by Class number and description.  **Each Ballot is only for voting those Equity Interests described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 1EF Equity Interests.**  You must vote all of your Equity Interests within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Equity Interests within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  The Ballot does not constitute and shall not be deemed a proof of Equity Interest or an assertion of a Equity Interest.

6.  If you cast more than one Ballot voting the same Equity Interest prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Equity Interest.

7.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.  The following Ballots will NOT be counted:

    a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Equity Interest;

8

59365223_159365223_4

c.      any Ballot cast by an entity that (a) does not hold a Equity Interest in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Equity Interest;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Equity Interests of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

**EXHIBIT 4~~E~~D**

**Class 2A Ballot**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                            :
In re                                       :        Chapter 11
                                            :
Gawker Media LLC, et al.,¹                  :        Case No. 16-11700 (SMB)
                                            :
           Debtors.                         :        (Jointly Administered)
                                            :
-------------------------------------------------------------x
```

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT
CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2A:  Second Lien Make-Whole Guaranty Claim**

```
┌────────────────────────────────────────────────────────────┐
│ THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS   │
└────────────────────────────────────────────────────────────┘
```

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended* Joint Chapter 11 *Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* filed on September 30, 2016 (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* filed on September 30, 2016 (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | | |
|---|---|---|---|
| **By Regular Mail,** | Gawker Ballot Processing | **Via the Voting** | https://cases.primeclerk.com/gawker |
| **Hand Delivery or** | c/o Prime Clerk LLC | **Agent's E-Ballot** | / |

---

¹ The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2A:  Second Lien Make-Whole Guaranty Claim

| | | |
|---|---|---|
| **Overnight Courier:** | 830 Third Avenue, 3rd Floor<br>New York, NY 10022 | **Platform by visiting:** |

Class 2A:  Second Lien Make-Whole Guaranty Claim

---

**VOTING INSTRUCTIONS
FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, AND ~~3~~4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2A CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 2A Claim Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2A Claim against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2A Claim against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.          **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

3

Class 2A:  Second Lien Make-Whole Guaranty Claim

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 2A Claim against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 2A Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

59365223_1 59365223_4

Class 2A:  Second Lien Make-Whole Guaranty Claim

**Item 4. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

59365223_1 59365223_4

Class 2A:  Second Lien Make-Whole Guaranty Claim

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_1 59365223_4

Class 2A:  Second Lien Make-Whole Guaranty Claim

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of
 your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 2A BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2A BALLOT WILL NOT BE COUNTED.

---

59365223_159365223_4

Class 2A:  Second Lien Make-Whole Guaranty Claim

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Second Lien Make-Whole Guaranty Claim has been placed in Class 2A under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 2A Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.  The following Ballots will NOT be counted:

    a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

59365223_1 59365223_4

Class 2A:  Second Lien Make-Whole Guaranty Claim

    c.          any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

    d.          any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

    e.          any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

    f.          any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

    g.          any unsigned Ballot;

    h.          any Ballot that does not contain an original signature; or

    i.          any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

9

**EXHIBIT 4~~F~~E**

**Class 2C Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                              :
In re                                         :          Chapter 11
                                              :
Gawker Media LLC, *et al.*,[1]                :          Case No. 16-11700 (SMB)
                                              :
            Debtors.                          :          (Jointly Administered)
                                              :
------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2C:  General Unsecured Claims**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order"). The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

**By Regular Mail,**    Gawker Ballot Processing    **Via the Voting**    https://cases.primeclerk.com/gawker

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2C:  General Unsecured Claims

| **Hand Delivery or Overnight Courier:** | c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 | **Agent's E-Ballot Platform by visiting:** | / |

Class 2C:  General Unsecured Claims

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.    COMPLETE ITEMS 1, 2, ~~AND~~ 3 (IF APPLICABLE) AND 5.

2.    SIGN THE BALLOT.

3.    RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.    THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.    YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2C CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.    ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.    ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

3

Class 2C:  General Unsecured Claims

**Item 1.  Amount of Vote Class 2C Claim Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2C Claim against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2C Claim against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.                    **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

**Item 3. Convenience Class Election by Holder of Claims That Has Accepted the Plan.**

Each holder of a Class 2D Claim against Gawker Media that votes to accept the Plan has the option to elect to participate in the Gawker Media Unsecured Convenience Class.  Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 2D Claim and (b) $25,000, on account of all of its Claims against any Debtors.

You may complete this Item 3 **only if you voted to accept the Plan in item 2 above**.  By checking this box, the undersigned holder of a Class 2D Claim against Gawker Media identified herein elects to have its Class 2D Claim treated as a Class 2E – Gawker Media General Unsecured Convenience Claim and receive the treatment set forth in Article 3.02 (e)(ii) of the Plan.

_____ **Elects** to be treated as a Class 2E – Gawker Media General Unsecured Convenience Claim

**ANY HOLDER THAT ELECTS TO PARTICIPATE IN THE GAWKER MEDIA CONVENIENCE CLASS ON THIS BALLOT, AND MAKES AN INCONSISTENT ELECTION ON A BALLOT WITH RESPECT TO ITS CLASS 1C AND/OR CLASS 2D CLAIM(S) IS DEEMED PART OF THE GAWKER MEDIA CONVENIENCE CLASS AND WILL RECEIVE ONLY A SINGLE DISTRIBUTION ON ACCOUNT OF ALL CLAIMS AGAINST ANY DEBTOR(S).**

59365223_159365223_4

Class 2C:  General Unsecured Claims

**Item 3~~4~~. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

    a.  as of the Voting Record Date, the undersigned was the holder of Class 2C Claim against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

    b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

    c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

    d.  the undersigned has cast the same vote with respect to all of the holder's Class 2C Claims;

    e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

    f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

    g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

5

~~59365223_1~~59365223_4

Class 2C:  General Unsecured Claims

**Item 45. Holder of Claim Information and Signature**.

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

59365223_1 59365223_4

Class 2C:  General Unsecured Claims

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_1 59365223_4

Class 2C:  General Unsecured Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of
 your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *__ACTUALLY RECEIVE__* THIS CLASS 2C BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2C BALLOT WILL NOT BE COUNTED.

---

59365223_159365223_4

Class 2C:  General Unsecured Claims

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your General Unsecured Claim has been placed in Class 2C under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 2C Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  *If you elect to participate in the Gawker Media Convenience Class on this Ballot, and make an inconsistent election on a Ballot with respect to your Class 1C and/or 2D claims, you will be deemed part of the Gawker Media Convenience Class and receive only the single distribution on account of all Claims against any Debtors.*

6.  ~~5.~~ The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

7.  ~~6.~~ If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

8.  ~~7.~~ **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").**  If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

9.  ~~8.~~ Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

10.  ~~9.~~ The following Ballots will NOT be counted:

   a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

~~59365223_1~~59365223_4

Class 2C:  General Unsecured Claims

b.      any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

c.      any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

59365223_1 59365223_4

**EXHIBIT 4~~G~~F**

**Class 2D Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                  :

In re                            :       Chapter 11
                                  :

Gawker Media LLC, *et al.*,[1]     :       Case No. 16-11700 (SMB)
                                  :

          Debtors.         :       (Jointly Administered)
                                  :

------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 2D:  Punitive ~~Damages~~Damage Claims**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS**
**DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.~~, filed on September 30, 2016~~* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.~~, filed on September 30, 2016~~* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

**By Regular Mail,**    Gawker Ballot Processing    **Via the Voting**    https://cases.primeclerk.com/gawker

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft~~.~~ (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

~~59365223_1~~

Class 2D:  Punitive ~~Damages~~ Damage Claims

| **Hand Delivery or** | c/o Prime Clerk LLC | **Agent's E-Ballot** | / |
| **Overnight Courier:** | 830 Third Avenue, 3rd | **Platform by visiting:** | |
| | Floor | | |
| | New York, NY 10022 | | |

~~59365223_1~~59365223_4

Class 2D:  Punitive ~~Damages~~Damage Claims

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1. COMPLETE ITEMS 1, 2, ~~AND 3~~(IF APPLICABLE), AND 5.

2. SIGN THE BALLOT.

3. RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4. THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5. YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2D CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6. ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7. ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

Class 2D:   Punitive ~~Damages~~ Damage Claims

**Item 1.  Amount of Vote Class 2D Claim Against Gawker Media**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2D Claim against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 2D Claim against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.           **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

**Item 3. Convenience Class Election by Holder of Claims That Has Accepted the Plan.**

Each holder of a Class 2D Claim against Gawker Media that votes to accept the Plan has the option to elect to participate in the Gawker Media Unsecured Convenience Class.  Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 2D Claim and (b) $25,000, on account of all of its Claims against any Debtors.

You may complete this Item 3 **only if you voted to accept the Plan in item 2 above**.  By checking this box, the undersigned holder of a Class 2D Claim against Gawker Media identified herein elects to have its Class 2D Claim treated as a Class 2E – Gawker Media General Unsecured Convenience Claim and receive the treatment set forth in Article 3.02 (e)(ii) of the Plan.

_____ **Elects** to be treated as a Class 2E – Gawker Media General Unsecured Convenience Claim

**ANY HOLDER THAT ELECTS TO PARTICIPATE IN THE GAWKER MEDIA CONVENIENCE CLASS ON THIS BALLOT, AND MAKES AN INCONSISTENT ELECTION ON A BALLOT WITH RESPECT TO ITS CLASS 1C AND/OR CLASS 2C CLAIM(S) IS DEEMED PART OF THE GAWKER MEDIA CONVENIENCE CLASS AND WILL RECEIVE ONLY A SINGLE DISTRIBUTION ON ACCOUNT OF ALL CLAIMS AGAINST ANY DEBTOR(S).**

4

Class 2D:  Punitive ~~Damages~~Damage Claims

**Item ~~3~~4. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 2D Claim against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 2D Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

5

Class 2D:  Punitive ~~Damages~~Damage Claims

**Item 45. Holder of Claim Information and Signature.**

_____
Name of Holder of Claim (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

~~59365223_1~~59365223_4

Class 2D:  Punitive ~~Damages~~Damage Claims

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

~~59365223_1~~59365223_4

Class 2D:  Punitive ~~Damages~~Damage Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of
 your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT ***ACTUALLY RECEIVE*** THIS CLASS 2D BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2D BALLOT WILL NOT BE COUNTED.

---

~~59365223_1~~59365223_4

Class 2D:  Punitive ~~Damages~~Damage Claims

## IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote. You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan. Your Punitive ~~Damages~~Damage Claim has been placed in Class 2D under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/. The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot." Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description. **Each Ballot is only for voting those Claims described on the Ballot. Please complete and return each Ballot you receive. The attached Ballot is designated only for voting Class 2D Claims.** You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote. Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. If you elect to participate in the Gawker Media Convenience Class on this Ballot, and make an inconsistent election on a Ballot with respect to your Class 1C and/or 2C claims, you will be deemed part of the Gawker Media Convenience Class and receive only the single distribution on account of all Claims against any Debtors.

6. ~~5.~~ The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

7. ~~6.~~ If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

8. ~~7.~~ **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted. An envelope addressed to the Voting Agent is enclosed for your convenience. Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

9. ~~8.~~ Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

10. ~~9.~~ The following Ballots will NOT be counted:

    a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

~~59365223_1~~59365223_4

Class 2D:   Punitive ~~Damages~~Damage Claims

b.   any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

c.   any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.   any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.   any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.   any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.   any unsigned Ballot;

h.   any Ballot that does not contain an original signature; or

i.   any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

~~59365223_1~~59365223_4

**<u>EXHIBIT 4~~H~~G</u>**

**<u>Class 2~~F~~G Ballot</u>**

Class 2FG:  Membership Interest

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
Gawker Media LLC, *et al.*,[1]          :        Case No. 16-11700 (SMB)
                                        :
           Debtors.                     :        (Jointly Administered)
                                        :
-------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT
CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

CLASS 2FG:  Membership Interest

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS
DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft., filed on September 30, 2016* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Media LLC (the "Gawker Media Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft., filed on September 30, 2016* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc., and Gawker Hungary Kft.  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Media Plan, as incorporated in the Joint Plan.

The Gawker Media Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Media Plan and if the Gawker Media Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Media Plan if it finds that the Gawker Media Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Media Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Media Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| | | | |
|---|---|---|---|
| **By Regular Mail, Hand Delivery or** | Gawker Ballot Processing c/o Prime Clerk LLC | **Via the Voting Agent's E-Ballot** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Kinja Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 2FG:  Membership Interest

**Overnight Courier:**    830 Third Avenue, 3rd
Floor
New York, NY 10022

**Platform by visiting:**

2

59365223_159365223_4

Class 2~~F~~G:  Membership Interest

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1.  COMPLETE ITEMS 1, 2, ~~and 3~~AND 4.

2.  SIGN THE BALLOT.

3.  RETURN THE BALLOT TO ~~the voting agent~~THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  ~~An envelope addressed to the Voting Agent is enclosed for your convenience.~~AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

~~4.  the voting agent will not accept ballots by facsimile, e-mail, or other electronic means (other than the online portal).~~

4.  THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.  YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 2~~F~~G EQUITY INTEREST EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.  ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.  ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.   Amount of Vote Class 2~~F~~G Equity Interest Against Gawker Media**.  The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 2~~F~~G Equity Interest against Gawker Media in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**.  The undersigned, a holder of a Class 2~~F~~G Equity Interest against Gawker Media as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.                    **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A EQUITY INTEREST THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL EQUITY INTERESTS OF ONE CLASS WILL NOT BE COUNTED.**

~~59365223_1~~59365223_4

Class 2~~F~~G:  Membership Interest

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 2~~F~~G Equity Interest against Gawker Media of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 2~~F~~G Equity Interests;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Equity Interests identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Equity Interests, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

4

Class 2FG:  Membership Interest

**Item 4. Holder of Equity Interest Information and Signature**.

_____

Name of Holder of Equity Interest (Please Print)

_____

Authorized Signature

_____

Name of Signatory

_____

If by Authorized Agent, Name and Title

_____

Name of Institution

_____

Street Address

_____

City, State, Zip Code

_____

Telephone Number

_____

Email Address

_____

Social Security or Federal Taxpayer Identification Number

_____

Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

59365223_159365223_4

Class 2FG:  Membership Interest

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_159365223_4

Class 2~~F~~G:  Membership Interest

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Equity Interests described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

<div style="border:1px solid black; padding:10px;">

IF THE VOTING AGENT DOES NOT *ABSTRACT ACTUALLY RECEIVE* THIS CLASS 2F BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 2F BALLOT WILL NOT BE COUNTED.

</div>

~~59365223_1~~59365223_4

Class 2FG:  Membership Interest

# IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote. You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Equity Interest(s) under the Plan. Your Membership Interest has been placed in Class 2FG under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/. The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot." Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Equity Interests in more than one voting Class under the Plan, you may receive a separate Ballot for each such Equity Interest, coded by Class number and description. **Each Ballot is only for voting those Equity Interests described on the Ballot. Please complete and return each Ballot you receive. The attached Ballot is designated only for voting Class 2FG Equity Interests.** You must vote all of your Equity Interests within a single Class either to accept or reject the Plan and may not split your vote. Accordingly, if you return more than one Ballot voting different Equity Interests within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Equity Interest or an assertion of a Equity Interest.

6. If you cast more than one Ballot voting the same Equity Interest prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Equity Interest.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted. An envelope addressed to the Voting Agent is enclosed for your convenience. Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

8. Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

   a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Equity Interest;

8

Class 2~~F~~G:  Membership Interest

c.    any Ballot cast by an entity that (a) does not hold a Equity Interest in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.    any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.    any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Equity Interest;

f.    any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.    any unsigned Ballot;

h.    any Ballot that does not contain an original signature; or

i.    any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Equity Interests of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

**EXHIBIT 4~~I~~H**

**Class 3A Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                             :
In re                                        :        Chapter 11
                                             :
Gawker Media LLC, *et al.*,[1]               :        Case No. 16-11700 (SMB)
                                             :
                 Debtors.                    :        (Jointly Administered)
                                             :
------------------------------------------------------------x

### BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC, <u>GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.</u>

### CLASS 3A:  Second Lien Make-Whole Guaranty Claim

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft., filed on September 30, 2016* (the "<u>Joint Plan</u>"), solely with respect to the plan of liquidation for Gawker Hungary Kft. (the "<u>Gawker Hungary Plan</u>"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.* ("<u>Gawker Hungary</u>"), filed on September 30, 2016 (the "<u>Disclosure Statement</u>") and is attached as <u>Exhibit A</u> to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "<u>Disclosure Statement Order</u>").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft. ("<u>Gawker Hungary</u>").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Hungary Plan, as incorporated in the Joint Plan.

The Gawker Hungary Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Hungary Plan and if the Gawker Hungary Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Hungary Plan if it finds that the Gawker Hungary Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Hungary Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Hungary Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "<u>Voting Agent</u>"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "<u>Voting Deadline</u>"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

**By Regular Mail,**    Gawker Ballot Processing    **Via the Voting**    https://cases.primeclerk.com/gawker

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Class 3A:  Second Lien Make-Whole Guaranty Claim

| | | |
|---|---|---|
| **Hand Delivery or** | c/o Prime Clerk LLC | **Agent's E-Ballot** / |
| **Overnight Courier:** | 830 Third Avenue, 3rd | **Platform by visiting:** |
| | Floor | |
| | New York, NY 10022 | |

2

59365223_1 59365223_4

Class 3A:  Second Lien Make-Whole Guaranty Claim

---

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1. COMPLETE ITEMS 1, 2, AND ~~3~~4.

2. SIGN THE BALLOT.

3. RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4. THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5. YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 3A CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6. ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7. ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.  Amount of Vote Class 3A Claim Against Gawker Hungary**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 3A Claim against Gawker Hungary in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 3A Claim against Gawker Hungary as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.                    **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

3

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 3A Claim against Gawker Hungary of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 3A Claims;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

59365223_159365223_4

Class 3A: Second Lien Make-Whole Guaranty Claim

**Item 4. Holder of Claim Information and Signature**.

Name of Holder of Claim (Please Print)

Authorized Signature

Name of Signatory

If by Authorized Agent, Name and Title

Name of Institution

Street Address

City, State, Zip Code

Telephone Number

Email Address

Social Security or Federal Taxpayer Identification Number

Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

59365223_1 59365223_4

Class 3A:  Second Lien Make-Whole Guaranty Claim

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

6

59365223_1 59365223_4

Class 3A:  Second Lien Make-Whole Guaranty Claim

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT ***ACTUALLY RECEIVE*** THIS CLASS 3A BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 3A BALLOT WILL NOT BE COUNTED.

---

59365223_1 59365223_4

Class 3A:  Second Lien Make-Whole Guaranty Claim

# IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Claim(s) under the Plan.  Your Second Lien Make-Whole Guaranty Claim has been placed in Class 3A under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description.  **Each Ballot is only for voting those Claims described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 3A Claims.**  You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote.  Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6. If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8. Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

   a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

   b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

59365223_1 59365223_4

c.   any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.   any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.   any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f.   any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.   any unsigned Ballot;

h.   any Ballot that does not contain an original signature; or

i.   any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK ~~LL~~LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO ~~EMAITHE~~EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

~~59365223_1~~59365223_4

## EXHIBIT 4~~J~~I

## Class 3~~D(ii)~~E Ballot

Class 3D(ii):  Gawker Media Intercompany Claims

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                                            :
In re                                                       :          Chapter 11
                                                            :
Gawker Media LLC, *et al.*,[1]                              :          Case No. 16-11700 (SMB)
                                                            :
        Debtors.                                            :          (Jointly Administered)
                                                            :
-----------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**
**CLASS 3D(ii):  Gawker Media Intercompany Claims**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS DECEMBER 5, 2016, at 5:00 P.M. (NEW YORK TIME).**

---

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Hungary Kft. (the "Gawker Hungary Plan"), which is described in the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.*, filed on September 30, 2016 (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft. ("Gawker Hungary").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Hungary Plan, as incorporated in the Joint Plan.

The Gawker Hungary Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Hungary Plan and if the Gawker Hungary Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Hungary Plan if it finds that the Gawker Hungary Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Hungary Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Hungary Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd | **Via the Voting Agent's E-Ballot Platform by visiting:** | https://cases.primeclerk.com/gawker / |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

1

59365223_1

Class 3D(ii):  Gawker Media Intercompany Claims

Floor
New York, NY 10022

Class 3D(ii): Gawker Media Intercompany Claims

**VOTING INSTRUCTIONS**
**FOR COMPLETING THE BALLOT**

1. COMPLETE ITEMS 1, 2, AND 3.

2. SIGN THE BALLOT.

3. RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE. BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED. AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4. THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5. YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 3D(II) CLAIM EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6. ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7. ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED. IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT MUST BE INCLUDED WITH THE BALLOT.

**Item 1. Amount of Vote Class 3D(ii) Claim Against Gawker Hungary.** The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 3D(ii) Claim against Gawker Hungary in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote.** The undersigned, a holder of a Class 3D(ii) Claim against Gawker Hungary as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check one box):

_____ **Accept** the Plan.          _____ **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A CLAIM THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL CLAIMS OF ONE CLASS WILL NOT BE COUNTED.**

3

Class 3D(ii): Gawker Media Intercompany Claims

**Item 3. Certifications and Acknowledgment**s.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

   a.  as of the Voting Record Date, the undersigned was the holder of Class 3D(ii) Claim against Gawker Hungary of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

   b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

   c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

   d.  the undersigned has cast the same vote with respect to all of the holder's Class 3D(ii) Claims;

   e.  the undersigned understands and acknowledges that no other Ballots with respect to the Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier received Ballots are hereby revoked;

   f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

   g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

4

59365223_1

Class 3D(ii):  Gawker Media Intercompany Claims

**Item 4. Holder of Claim Information and Signature.**

Name of Holder of Claim (Please Print)

Authorized Signature

Name of Signatory

If by Authorized Agent, Name and Title

Name of Institution

Street Address

City, State, Zip Code

Telephone Number

Email Address

Social Security or Federal Taxpayer Identification Number

Date Completed

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL
BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL,
OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

**YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING DEADLINE,
WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),
TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.
BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.
IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,
BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

5

59365223_1

Class 3D(ii):  Gawker Media Intercompany Claims

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

> IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 3D(ii) BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 3D(ii) BALLOT WILL NOT BE COUNTED.

6

Class 3D(ii): Gawker Media Intercompany Claims

## IMPORTANT INFORMATION

1. **You should review the Plan and Disclosure Statement before you vote.** The Plan and Disclosure Statement provide information to assist you in deciding how to vote. You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your claim(s) under the Plan. Your Gawker Media Intercompany Claim has been placed in Class 3D(ii) under the Plan.

2. If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/. The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3. To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot." Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4. If you hold Claims in more than one voting Class under the Plan, you may receive a separate Ballot for each such Claim, coded by Class number and description. **Each Ballot is only for voting those Claims described on the Ballot. Please complete and return each Ballot you receive. The attached Ballot is designated only for voting Class 3D(ii) Claims.** You must vote all of your Claims within a single Class either to accept or reject the Plan and may not split your vote. Accordingly, if you return more than one Ballot voting different Claims within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5. The Ballot does not constitute and shall not be deemed a proof of Claim or an assertion of a Claim.

6. If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Claim.

7. **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").** If a Ballot is received after the Voting Deadline, it will not be counted. An envelope addressed to the Voting Agent is enclosed for your convenience. Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted. *Ballots should not be sent to the Debtors.*

8. Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in-fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9. The following Ballots will NOT be counted:

    a. any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b. any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

7

59365223_1

Class 3D(ii): Gawker Media Intercompany Claims

c. any Ballot cast by an entity that (a) does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d. any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e. any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Claim;

f. any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g. any unsigned Ballot;

h. any Ballot that does not contain an original signature; or

i. any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Claims of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

8

**EXHIBIT 4K**
**Class 3E Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re                                              :        Chapter 11
: 
Gawker Media LLC, *et al.*,[1]                     :        Case No. 16-11700 (SMB)
: 
Debtors.                        :        (Jointly Administered)
: 
---------------------------------------------------------------x

**BALLOT FOR ACCEPTING OR REJECTING DEBTORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,**
**GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

**CLASS 3E:  Membership Interest**

| THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN IS |
| --- |

This Ballot is submitted to you to solicit your vote to accept or reject the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft., filed on September 30, 2016* (the "Joint Plan"), solely with respect to the plan of liquidation for Gawker Hungary Kft. (the "Gawker Hungary Plan"), which is described in the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft., filed on September 30, 2016* (the "Disclosure Statement") and is attached as Exhibit A to the Disclosure Statement.  The Disclosure Statement has been approved by order of the Bankruptcy Court (the "Disclosure Statement Order").  The Joint Plan constitutes a separate chapter 11 plan of liquidation for each of Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary Kft. ("Gawker Hungary").  Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Joint Plan or the Disclosure Statement Order, as applicable.  References to the "Plan" in this Ballot shall refer only to the Gawker Hungary Plan, as incorporated in the Joint Plan.

The Gawker Hungary Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Gawker Hungary Plan and if the Gawker Hungary Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Gawker Hungary Plan if it finds that the Gawker Hungary Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Gawker Hungary Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Gawker Hungary Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

To have your vote counted, you must complete, sign, and return this Ballot to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Voting Deadline"), at the applicable address indicated below.  Ballots received after the Voting Deadline will not be counted.

| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd | **Via the Voting Agent's E-Ballot Platform by visiting:** | https://cases.primeclerk.com/gawker/ |

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Floor
New York, NY 10022

59365223_159365223_4

---

**VOTING INSTRUCTIONS
FOR COMPLETING THE BALLOT**

1.   COMPLETE ITEMS 1, 2, AND ~~3~~4.

2.   SIGN THE BALLOT.

3.   RETURN THE BALLOT TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE VOTING DEADLINE.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.   THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS (OTHER THAN THE ONLINE PORTAL).

5.   YOU MUST VOTE THE FULL AMOUNT OF YOUR CLASS 3E EQUITY INTEREST EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.

6.   ANY BALLOT THAT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.

7.   ALL BALLOTS MUST BE FULLY EXECUTED TO BE COUNTED.  IF A BALLOT IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE BALLOT <u>MUST</u> BE INCLUDED WITH THE BALLOT.

---

**Item 1.   Amount of Vote Class 3E Equity Interest Against Gawker Hungary**. The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of a Class 3E Equity Interest against Gawker Hungary in the aggregate amount set forth below.

Voting Amount: $_____

**Item 2. Vote**. The undersigned, a holder of a Class 3E Equity Interest against Gawker Hungary as of October 31, 2016, in the amount set forth in Item 1 above, votes to (check <u>one</u> box):

**Accept** the Plan.          **Reject** the Plan.

**ANY BALLOT EXECUTED BY THE HOLDER OF A EQUITY INTEREST THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN OR DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN FOR ALL EQUITY INTERESTS OF ONE CLASS WILL NOT BE COUNTED.**

**Item 3. Certifications and Acknowledgments**.  By signing this Ballot, the undersigned acknowledges receipt of the Solicitation Package and certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of Class 3E Equity Interest against Gawker Hungary of the type and in the amount set forth in Item 1 above and has the full authority to vote to accept or reject the Plan;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned has cast the same vote with respect to all of the holder's Class 3E Equity Interests;

e.  the undersigned understands and acknowledges that no other Ballots with respect to the Equity Interests identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Equity Interests, then any such earlier received Ballots are hereby revoked;

f.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned; and

g.  the undersigned understands that, if this Ballot is otherwise validly executed but does not indicate either acceptance or rejection of the Plan, this Ballot will not be counted.

59365223_159365223_4

Class 3E: Membership Interest

**Item 4. Holder of Equity Interest Information and Signature**.

_____
Name of Holder of Equity Interest (Please Print)


_____
Authorized Signature

_____
Name of Signatory

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Social Security or Federal Taxpayer Identification Number

_____
Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN THE ORIGINAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor
New York, NY 10022

You may also return your Ballot online via the Voting Agent's E-Ballot Platform in accordance with the

---

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME), TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

**BALLOTS RECEIVED VIA EMAIL OR FAX WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC,**

5

59365223_1 59365223_4

Class 3E:  Membership Interest

**BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA
OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.
YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_159365223_4

Class 3E:  Membership Interest

In addition, to submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/gawker, click on "Submit E-Ballot" and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#: _____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Equity Interests described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

IF THE VOTING AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 3E BALLOT ON OR BEFORE **DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME),** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 3E BALLOT WILL NOT BE COUNTED.

---

# IMPORTANT INFORMATION

1.  **You should review the Plan and Disclosure Statement before you vote.**  The Plan and Disclosure Statement provide information to assist you in deciding how to vote.  You may wish to seek independent legal advice concerning the Plan and the classification and treatment of your Equity Interest(s) under the Plan.  Your Membership Interest has been placed in Class 3E under the Plan.

2.  If you did not receive the Plan and Disclosure Statement with your Ballot, you may obtain copies by contacting the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.  The Bankruptcy Court's approval of the Disclosure Statement does not indicate its approval of the Plan.

3.  To ensure that your Ballot is counted, you *must either:* (a) complete and submit this hard copy Ballot; or (b) vote through the Voting Agent's online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/gawker and clicking on "Submit E-Ballot."  Ballots will not be accepted by facsimile or other electronic means (other than the online portal).

4.  If you hold Equity Interests in more than one voting Class under the Plan, you may receive a separate Ballot for each such Equity Interest, coded by Class number and description.  **Each Ballot is only for voting those Equity Interests described on the Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 3E Equity Interests.  You must vote all of your Equity Interests within a single Class either to accept or reject the Plan and m**ay not split your vote.  Accordingly, if you return more than one Ballot voting different Equity Interests within a single Class and the Ballots are not voted in the same manner, such Ballots shall not be counted.

5.  The Ballot does not constitute and shall not be deemed a proof of Equity Interest or an assertion of a Equity Interest.

6.  If you cast more than one Ballot voting the same Equity Interest prior to the Voting Deadline, the last properly executed Ballot received by the Voting Agent on or before the Voting Deadline will supersede and revoke any prior Ballots with respect to such Equity Interest.

7.  **Ballots must be received by the Voting Agent by December 5, 2016 at 5:00 P.M. (New York Time) (the "Voting Deadline").**  If a Ballot is received after the Voting Deadline, it will not be counted.  An envelope addressed to the Voting Agent is enclosed for your convenience.  Ballots submitted by email, fax, or other means of electronic transmission (except via the E-Ballot platform) will not be accepted.  *Ballots should not be sent to the Debtors.*

8.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

9.  The following Ballots will NOT be counted:

    a.  any Ballot received after the Voting Deadline unless (a) the Debtors (in their sole discretion) shall have granted a written extension of the Voting Deadline with respect to such Ballot and (b) the Bankruptcy Court shall have authorized the counting and/or consideration of such Ballot;

    b.  any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Equity Interest;

59365223_1 59365223_4

c.      any Ballot cast by an entity that (a) does not hold a Equity Interest in a Class that is entitled to vote to accept or reject the Plan or (b) is not otherwise entitled to vote pursuant to the procedures described in the Disclosure Statement Order;

d.      any Ballot sent to any party other than the Voting Agent, including the Debtors and the Bankruptcy Court;

e.      any inconsistent or duplicate Ballots that are simultaneously cast with respect to the same Equity Interest;

f.      any Ballot transmitted to the Voting Agent by email, fax (other than the online portal), or other means not specifically approved in the Disclosure Statement Order;

g.      any unsigned Ballot;

h.      any Ballot that does not contain an original signature; or

i.      any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan for all Equity Interests of one Class.

---

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE SOLICITATION PROCEDURES, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323.**

**YOU MAY ALSO EMAIL THE VOTING AGENT AT:**

**GAWKERBALLOTS@PRIMECLERK.COM.**

---

# EXHIBIT 5

**Non-Voting Status Notice for Unimpaired Classes**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                         :

In re                              :         Chapter 11

                                       :

Gawker Media LLC, *et al.*,[1]      :         Case No. 16-11700 (SMB)

                                       :

            Debtors.         :         (Jointly Administered)

                                       :

-----------------------------------------------------x

### NOTICE OF NON-VOTING STATUS WITH RESPECT TO UNCLASSIFIED AND UNIMPAIRED CLASSES DEEMED TO ACCEPT THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC, GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.

**PLEASE TAKE NOTICE** that on November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Order"), approving the Disclosure Statement, filed September 30, 2016 (the "Disclosure Statement"), for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft.~~, filed on September 30, 2016~~ (the "Joint Plan"), for use by Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI") and Gawker Hungary Kft. ("Gawker Hungary"), as debtors and debtors in possession (collectively, the "Debtors"), in soliciting acceptances or rejections of the Plan from holders of certain impaired claims who are entitled to vote and are (or may be) entitled to receive distributions under the Plan.

**PLEASE TAKE FURTHER NOTICE** that you are receiving this notice because, pursuant to the terms of Article 3 of the Plan and the applicable provisions of the Bankruptcy Code, your Claim(s) against or Equity Interest(s) in the Debtors are Unimpaired and, therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the *Notice of Entry of Order Approving (I) the Adequacy of the Disclosure Statement, (I) the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Amended Joint Chapter 11 Plan for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the*

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

*Scheduling of Certain Dates with Respect Thereto* are being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding this Notice of Non-Voting Status, holders of Claims or Equity Interests in the Unclassified and Unimpaired Classes have the right to (i) contest their non-voting status, and (ii) object to the confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** THAT ARTICLE 9 OF THE JOINT PLAN CONTAINS EXCULPATION FOR THE DEBTORS, THE COMMITTEE AND CERTAIN RELATED PERSONS AS WELL AS THIRD-PARTY RELEASES OF CERTAIN FORMER EMPLOYEES AND INDEPENDENT CONTRACTORS, WHICH ARE SET FORTH ON EXHIBIT 1 HERETO. **YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER EXHIBIT 1,** AND TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION AND RELEASE PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

**PLEASE TAKE FURTHER NOTICE** that, if you believe that you may have a claim against the Debtors that has been misclassified and which entitles you to vote on the Plan, then you must file with the Bankruptcy Court a motion for an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (a "3018 Motion"), temporarily allowing such claim in a different class for purposes of voting to accept or reject the Joint Plan (i) on or before **November 23, 2016**, or (ii) if the Debtors file an objection to a claim after the Confirmation Hearing Notice served, on or before ten (10) calendar days after service of notice of such objection (either (i) or (ii), the "3018 Motion Deadline").

The 3018 Motion must be served so as to be **actually received** no later than **5:00 p.m. (Prevailing Eastern Time) on the 3018 Motion Deadline** by the following notice parties:  (i) the chambers of the Honorable Stuart M. Bernstein, One Bowling Green, New York, New York 10004, Courtroom 723; (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Greg Zipes and Susan Arbeit); (iii) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036 (Attn: Gregg Galardi), attorneys for the Debtors; (iv) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandeep Qusba), counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (v) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 606011, Attn: David Heller & Keith A. Simon, 885 Third Avenue, New York, New York 10022 (Attn: Keith A Simon), counsel to US VC Partners LP, as Prepetition Second Lien Lender.

**PLEASE TAKE FURTHER NOTICE** THAT YOU WILL NOT BE SERVED WITH A COPY OF THE ORDER, THE PLAN, OR THE DISCLOSURE STATEMENT.  If you have any questions about your claim(s) or would like to request a copy of the Order, the Plan or Disclosure Statement, you should contact the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.  In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.

59365223_1 59365223_4

Dated:        November ___, 2016          /s/ DRAFT _____
              New York, New York          ROPES & GRAY LLP
                                          Gregg M. Galardi
                                          D. Ross Martin
                                          Joshua Y. Sturm
                                          Jonathan M. Agudelo
                                          1211 Avenue of the Americas
                                          New York, NY 10036-8704
                                          Telephone: (212) 596-9000
                                          Facsimile: (212) 596-9090
                                          gregg.galardi@ropesgray.com
                                          ross.martin@ropesgray.com
                                          joshua.sturm@ropesgray.com
                                          jonathan.agudelo@ropesgray.com

                                          *Counsel to the Debtors
                                          and Debtors in Possession*

59365223_159365223_4

## EXHIBIT 1

## EXCULPATION

Pursuant to section 9.04 of the Plan, to the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place ~~on or after the Petition Date through the~~ prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; **provided**, **however**, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.  In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.

**THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS.**

Pursuant to section 9.05 of the Plan, on the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, provided, however, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.

4

~~59365223_1~~
59365223_4

## **EXHIBIT 6**

**Non-Voting Status Notice for Deemed Rejecting Classes**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                  :
In re                                             :        Chapter 11
                                                  :
Gawker Media LLC, *et al.*,[1]                    :        Case No. 16-11700 (SMB)
                                                  :
                    Debtors.                      :        (Jointly Administered)
                                                  :
-------------------------------------------------------x

<div align="center">

**NOTICE OF NON-VOTING STATUS WITH RESPECT TO
UNCLASSIFIED AND UNIMPAIRED CLASSES DEEMED TO
ACCEPT THE DEBTORS' AMENDED JOINT CHAPTER 11
PLAN OF LIQUIDATION FOR GAWKER MEDIA LLC,
GAWKER MEDIA GROUP, INC., AND GAWKER HUNGARY KFT.**

</div>

**PLEASE TAKE NOTICE** that on November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Order"), approving the Disclosure Statement, filed September 30, 2016 (the "Disclosure Statement"), for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft., filed on September 30, 2016 (the "Joint Plan"), for use by Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI") and Gawker Hungary Kft. ("Gawker Hungary"), as debtors and debtors in possession (collectively, the "Debtors"), in soliciting acceptances or rejections of the Plan from holders of certain impaired claims who are entitled to vote and are (or may be) entitled to receive distributions under the Plan.

**PLEASE TAKE FURTHER NOTICE** that you are receiving this notice because, pursuant to the terms of Article 3 of the Plan and the applicable provisions of the Bankruptcy Code, your Claim(s) against or Equity Interest(s) in the Debtors are Unimpaired and, therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the *Notice of Entry of Order Approving (I) the Adequacy of the Disclosure Statement, (I) the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors'* Amended *Joint Chapter 11 Plan for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the*

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

*Scheduling of Certain Dates with Respect Thereto* are being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding this Notice of Non-Voting Status, holders of Claims or Equity Interests in the Unclassified and Unimpaired Classes have the right to (i) contest their non-voting status, and (ii) object to the confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** THAT ARTICLE 9 OF THE JOINT PLAN CONTAINS EXCULPATION FOR THE DEBTORS, THE COMMITTEE AND CERTAIN RELATED PERSONS AS WELL AS THIRD-PARTY RELEASES OF CERTAIN FORMER EMPLOYEES AND INDEPENDENT CONTRACTORS, WHICH ARE SET FORTH ON EXHIBIT 1 HERETO. **YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER EXHIBIT 1,** AND TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE EXCULPATION AND RELEASE PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

**PLEASE TAKE FURTHER NOTICE** that, if you believe that you may have a claim against the Debtors that has been misclassified and which entitles you to vote on the Plan, then you must file with the Bankruptcy Court a motion for an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (a "3018 Motion"), temporarily allowing such claim in a different class for purposes of voting to accept or reject the Joint Plan (i) on or before **November 23, 2016**, or (ii) if the Debtors file an objection to a claim after the Confirmation Hearing Notice served, on or before ten (10) calendar days after service of notice of such objection (either (i) or (ii), the "3018 Motion Deadline").

The 3018 Motion must be served so as to be **actually received** no later than **5:00 p.m. (Prevailing Eastern Time) on the 3018 Motion Deadline** by the following notice parties: (i) the chambers of the Honorable Stuart M. Bernstein, One Bowling Green, New York, New York 10004, Courtroom 723; (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Greg Zipes and Susan Arbeit); (iii) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036 (Attn: Gregg Galardi), attorneys for the Debtors; (iv) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandeep Qusba), counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (v) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 606011, Attn: David Heller & Keith A. Simon, 885 Third Avenue, New York, New York 10022 (Attn: Keith A Simon), counsel to US VC Partners LP, as Prepetition Second Lien Lender.

**PLEASE TAKE FURTHER NOTICE** THAT YOU WILL NOT BE SERVED WITH A COPY OF THE ORDER, THE PLAN, OR THE DISCLOSURE STATEMENT. If you have any questions about your claim(s) or would like to request a copy of the Order, the Plan or Disclosure Statement, you should contact the Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323. In addition, the Plan and Disclosure Statement are available for review, without charge, at the Debtors' case website at https://cases.primeclerk.com/gawker/.

59365223_1 59365223_4

Dated:          November ___, 2016           */s/ DRAFT* _____
          New York, New York                 Ropes & Gray LLP
                                              Gregg M. Galardi
                                              D. Ross Martin
                                              Joshua Y. Sturm
                                              Jonathan M. Agudelo
                                              1211 Avenue of the Americas
                                              New York, NY 10036-8704
                                              Telephone: (212) 596-9000
                                              Facsimile: (212) 596-9090
                                              gregg.galardi@ropesgray.com
                                              ross.martin@ropesgray.com
                                              joshua.sturm@ropesgray.com
                                              jonathan.agudelo@ropesgray.com

                                              *Counsel to the Debtors
                                              and Debtors in Possession*

59365223_159365223_4

## EXHIBIT 1

### EXCULPATION

Pursuant to section 9.04 of the Plan, to the fullest extent permitted by applicable law and approved in the Confirmation Order, none of the Debtors or the Committee, nor any of their respective former or current directors, officers, members, employees, advisors, affiliates, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, representatives, or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of, (i) any act, omission, transaction, or other occurrence taking place ~~on or after the Petition Date through the~~prior to the Effective Date and in any way relating to the Debtors or the commencement and prosecution of or the Bankruptcy Cases, (ii) the formulation, negotiation, confirmation, or consummation of the Plan, (iii) the solicitation of acceptances of the Plan, (iv) the administration of the Plan or property to be distributed under the Plan, or (v) the enforcement of the terms of the Plan and the contracts, instruments, releases, agreements, and documents delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.  In addition, the exculpated parties shall, in all respects, be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall limit the liability of the professional to their respective clients pursuant to the applicable attorney disciplinary rules.

### THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS.

Pursuant to section 9.05 of the Plan, on the Effective Date and effective simultaneously with the effectiveness of the Plan, for good and valuable consideration, to the fullest extent permitted under applicable law, each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan shall be deemed to have forever released unconditionally each of the Released Employees and Independent Contractors from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Petition Date that are not the result of gross negligence or willful misconduct as determined by a Final Order, and for which the Debtors have Debtor Indemnification Obligations, provided, however, that the foregoing third party releases will apply only to Released Employees and Independent Contractors who vote in favor of the Plan, and only to the extent that each such Released Employee and Independent Contractor waives and releases any and all of its claims against the Debtors for Debtor Indemnification Obligations, except for any amounts already due and owing as of the Effective Date.

**EXHIBIT 7**

**Disputed Claim Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------x
                                                          :
In re                                                     :        Chapter 11
                                                          :
Gawker Media LLC, *et al.*,[1]                            :        Case No. 16-11700 (SMB)
                                                          :
                          Debtors.                        :        (Jointly Administered)
                                                          :
-----------------------------------------------------x

### NOTICE OF ~~NON-VOTING STATUS WITH RESPECT TO~~ DISPUTED ~~CLAIMS~~CLAIM STATUS AND ELECTION FORM

    **PLEASE TAKE NOTICE THAT** on November ___, 2016, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under section 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"), and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes with regard to the acceptance or rejection of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may further be amended from time to time and including all exhibits and supplements thereto, the "Plan").[2]

    **PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice in addition to the Solicitation Package because you are the Holder of a Claim or Equity Interest that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless ~~one or more of the following events have~~a Resolution Event (as defined below) has taken place by the Confirmation Hearing**

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**(you may, however, cast a provisional ballot)** (each, a "Resolution Event"):**;** provided, however that if your Claims is classified in Class 1C, Class 2C or Class 2D you **may** elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, by completing the election form attached hereto as **Exhibit A** and submitting it to the Voting Agent in accordance with the instructions therein.

**PLEASE TAKE FURTHER NOTICE THAT** a "Resolution Event" means the occurrence of one or more of the following events no later than three (3) days prior to the Voting Deadline:

(a)    (t) an order of the Court is entered allowing the Disputed Claim or Equity Interest pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

(b)    (u) an order of the Court is entered temporarily allowing the Disputed Claim or Equity Interest for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

(c)    (v) a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors resolving the objection and allowing such Disputed Claim or Equity Interest in an agreed upon amount;

(d)    (w) a stipulation or other agreement is executed between the holder of the Disputed Claim or Equity Interest and the Debtors temporarily allowing the holder of such Claim or Equity Interest to vote its Claim or Equity Interest in an agreed upon amount; or

(e)    (x) the pending objection to the Disputed Claim or Equity Interest is voluntarily withdrawn by the Debtors.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact Prime Clerk LLC, the Voting Agent Voting Agent by mail at 830 Third Avenue, 3rd Floor, New York, NY 10022, by email at gawkerballots@primeclerk.com, or by phone at (855) 639-3375 within the United States or Canada, or outside of the United States or Canada by calling (917) 651-0323.

59365223_1 59365223_4

Dated:          November ___, 2016
        New York, New York

*/s/ DRAFT*_____
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors
and Debtors in Possession*

59365223_1 59365223_4

# EXHIBIT A

**Disputed Claim Convenience Class Election Form**

Disputed Claim Convenience Class Election Form

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
:
In re                                    :        Chapter 11
:
Gawker Media LLC, *et al.*,[1]          :        Case No. 16-11700 (SMB)
:
Debtors.          :        (Jointly Administered)
:
-----------------------------------------------------x

## DISPUTED CLAIM CONVENIENCE CLASS ELECTION FORM

| THE DEADLINE TO SUBMIT THIS ELECTION FORM IS |
| --- |

This form (the "Election Form") is being provided to you in connection with the Notice of Disputed Claim Status and Election Form (the "Disputed Claim Notice") in order to provide you with the opportunity to elect to be treated as a GMGI General Unsecured Convenience Class Creditor or a Gawker Media General Unsecured Convenience Class Creditor, as applicable, pursuant to the Debtors' Plan (the "Election"). Any holder who makes such election will receive a single distribution on the Effective Date in Cash of the lesser of (a) the Allowed amount of its Class 1C Claim and (b) $25,000, on account of all of its Claims against any Debtors. Capitalized terms used in this Election Form or the attached instructions that are not otherwise defined shall have the meanings ascribed to them in the Disputed Claim Notice and Election Form or the Plan, as applicable.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class of Claims and at least two-thirds in amount of the Equity Interests in each impaired Class of Equity Interests who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Plan and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you, whether or not you vote.

In order for your Election to be effective, you must complete, sign, and return this Election Form to Prime Clerk LLC (the "Voting Agent"), so that it is **actually received** by **December 5, 2016, at 5:00 P.M. (New York Time)** (the "Election Deadline"), at the applicable address indicated below. Election Forms received after the Election Deadline will not be counted.

| **By Regular Mail, Hand Delivery or Overnight Courier:** | Gawker Ballot Processing c/o Prime Clerk LLC 830 Third Avenue, 3rd Floor New York, NY 10022 |
| --- | --- |

---

[1] The last four digits of the taxpayer identification number of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Disputed Claim Convenience Class Election Form

## ELECTION INSTRUCTIONS
## FOR COMPLETING THE ELECTION FORM

1.      COMPLETE ITEMS 1, 2, AND 4.

2.      **SIGN THE ELECTION FORM.**

3.      RETURN THE ELECTION FORM TO THE VOTING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE ELECTION DEADLINE.  ELECTION FORMS RECEIVED AFTER THE ELECTION DEADLINE WILL NOT BE EFFECTIVE.  AN ENVELOPE ADDRESSED TO THE VOTING AGENT IS ENCLOSED FOR YOUR CONVENIENCE.

4.      THE VOTING AGENT WILL NOT ACCEPT ELECTION FORMS BY FACSIMILE, E-MAIL, OR OTHER ELECTRONIC MEANS.

5.      ALL ELECTION FORMS MUST BE FULLY EXECUTED TO BE VALID.  IF AN ELECTION FORM IS EXECUTED BY A PARTY OTHER THAN THE CREDITOR, AN OFFICER OR EMPLOYEE OF THE CREDITOR, OR AN ATTORNEY-AT-LAW ACTING FOR THE CREDITOR, SUFFICIENT EVIDENCE OF THE PARTY'S AUTHORITY TO EXECUTE THE ELECTION FORM MUST BE INCLUDED WITH THE ELECTION FORM.

59365223_4

Disputed Claim Convenience Class Election Form

**Item 1.  Amount of Claims**.  The undersigned hereby certifies that as of October 31, 2016, the undersigned was the holder of the Claims set forth below;

      Class 1C – GMGI General Unsecured Claims:     $_____

      Class 2C – Gawker Media General Unsecured Claims: $_____

      Class 2D – Gawker Media Punitive Damage Claims: $_____

**Item 2. Convenience Class Election.**

By checking this box, the undersigned holder of the Claims listed in Item 1 (a) elects to be treated as GMGI or Gawker Media Convenience Class Creditor, as applicable, and receive the treatment set forth in Article 3 of the Plan (b) affirms its understanding that by making the Election it will be deemed to have voted to Accept the Plan as a member of Class 1D or Class 2E, as applicable.

   ___ **Elects** to be treated as a GMGI or Gawker Media Convenience Class Creditor, as applicable.

59365223_4

Disputed Claim Convenience Class Election Form

**Item 3. Certifications and Acknowledgments**.  By signing this Election Form, the undersigned certifies that:

a.  as of the Voting Record Date, the undersigned was the holder of the Claims in the amount listed in Item 1 above and has the full authority to complete this Election Form;

b.  the undersigned has received a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d.  the undersigned understands and acknowledges that no other Election Forms with respect to the Claims identified in Item 1 above have been submitted or, if any other Election Forms have been submitted with respect to such Claims, then any such earlier received Election Forms are hereby revoked; and

e.  the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Election Form, and every obligation of the undersigned, shall be binding upon the transferees, successors, assignees, heirs, executors, administrators, and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

59365223_4

Disputed Claim Convenience Class Election Form

**Item 4. Holder of Claim Information and Signature**.

Name of Holder of Claim (Please Print)

Authorized Signature

Name of Signatory

If by Authorized Agent, Name and Title

Name of Institution

Street Address

City, State, Zip Code

Telephone Number

Email Address

Social Security or Federal Taxpayer Identification Number

Date Completed

---

**PLEASE COMPLETE, SIGN, AND DATE THIS ELECTION FORM AND RETURN THE ORIGINAL ELECTION FORM PROMPTLY IN THE ENVELOPE PROVIDED OR BY REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

Gawker Ballot Processing
c/o Prime Clerk, LLC
830 Third A venue, 3rd Floor

---

**TO BE EFFECTIVE, YOUR ELECTION FORM MUST BE ACTUALLY RECEIVED BY THE ELECTION DEADLINE, WHICH IS DECEMBER 5, 2016 AT 5:00 P.M. (NEW YORK TIME).**

**ELECTION FORMS RECEIVED VIA EMAIL OR FAX WILL NOT BE EFFECTIVE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS ELECTION FORM OR THE ELECTION PROCESS, PLEASE CALL THE DEBTORS' VOTING AGENT, PRIME CLERK, LLC, BY TOLL-FREE TELEPHONE AT (855) 639-3375 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA BY CALLING (917) 651-0323. YOU MAY ALSO EMAIL THE VOTING AGENT AT GAWKERBALLOTS@PRIMECLERK.COM**

59365223_4

Disputed Claim Convenience Class Election Form

59365223_4

| | |
|---|---|
| **Summary report:**<br>**Litéra® Change-Pro TDC 7.5.0.145 Document comparison done on**<br>**11/2/2016 11:41:56 AM** | |
| **Style name:** RG_Default_Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://RGDMS/Active/59365223/1 | |
| **Modified DMS:** iw://RGDMS/Active/59365223/4 | |
| **Changes:** | |
| Add | 433 |
| Delete | 514 |
| Move From | 28 |
| Move To | 28 |
| Table Insert | 3 |
| Table Delete | 5 |
| Table moves to | 1 |
| Table moves from | 1 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 7 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1020 |

**EXHIBIT C**

**Liquidation Analysis**

**[To Come]**

| | |
|---|---|
| **Summary report:**<br>**Litéra® Change-Pro TDC 7.5.0.145 Document comparison done on**<br>**11/2/2016 11:42:49 AM** | |
| **Style name:** RG_Default_Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://RGDMS/Active/59473927/1 | |
| **Modified DMS:** iw://RGDMS/Active/59473927/10 | |
| **Changes:** | |
| Add | 658 |
| Delete | 503 |
| Move From | 33 |
| Move To | 33 |
| Table Insert | 5 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1233 |