1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11700-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GAWKER MEDIA, LLC,

8             Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                  U.S. Bankruptcy Court

12                  One Bowling Green

13                  New York, NY   10004

14

15                  November 3, 2016

16                  10:54 AM

17

18

19

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

1    Hearing re:  Debtors Motion For the Entry of an Order

2    Approving (I) Adequacy of the Disclosure. Statement, (II)

3    the Solicitation and Notice Procudures with Respect to

4    Confirmation of the Joint Chapter 11 Plan of Liquidation for

5    Gawker Media Group, Inc., Gawker Media LLC, and Gawker

6    Hungary Kft., (III) the Form of Ballots and Notices in

7    Connection Therewith, and (IV) the Scheduling of Certain

8    Dates with Respect Thereto (related document(s)308).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
                                                       Page 3

 1   A P P E A R A N C E S :

 2

 3   SIMPSON THACHER & BARTLETT LLP

 4        Attorney for the Unsecured Creditors Committee

 5        425 Lexington Avenue

 6        New York, NY 10017

 7

 8   BY:  WILLIAM T. RUSSELL, JR.

 9

10   COLE SCHOTZ P.C.

11        Attorney for Nicholas Denton

12        Court Plaza North

13        25 Main Street

14        Hackensack, NJ 07601

15

16   BY:  WARREN A. USATINE

17

18   SAUL EWING LLP

19        Attorneys for Interested Parties

20        One Riverfront Plaza

21        1037 Raymond Boulevard, Suite 1520

22        Newark, NJ 07102

23

24   BY:  DIPESH PATEL

25
```

1   ROPES & GRAY LLP

2        Attorney for the Debtor

3        1211 Avenue of the Americas

4        New York, NY 10036

5

6   BY:  GREGG M. GALARDI

7        JOSHUA STURM

8

9   UNITED STATES DEPARTMENT OF JUSTICE

10        Attorney for the U.S. Trustee

11        201 Varick Street, Suite 1006

12        New York, NY 10014

13

14   BY:  GREG ZIPES

15

16   BINDER & SCHWARTZ LLP

17        Attorney for Terry Bollea

18        366 Madison Avenue, 6th Floor

19        New York, NY 10017

20

21   BY:  ERIC B. FISHER

22

23

24

25

1  COHEN & GRESSER LLP

2        Attorney for Terry Bollea

3

4  BY:  DANIEL H. TABAK

5

6  LATHAM & WATKINS LLP

7        Attorney for Columbus Nova

8        885 Third Avenue

9        New York, NY 10022

10

11  BY:  KEITH SIMON

12

13  ALSO PRESENT TELEPHONICALLY:

14

15  SHANA ELBERG

16  TIFFANY KARY

17  ALEX MCGEE

18  JESSICA STEINHAGEN

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2            MR. GALARDI:  Good morning, Your Honor.

3            THE COURT:  Good morning.

4            MR. GALARDI:  For the record, Gregg Galardi, on

5    behalf of Gawker Media LLC and the related Debtors.  Your

6    Honor, we filed an agenda.  Why don't I go to the second

7    matter first because it is the matter on a 2004 exam, and

8    the parties have consulted and we'd requested an

9    adjournment.  Your Honor had originally granted it for

10   November, I think, 14th or 15th, and then we contacted and

11   our agreement is to put it off even longer than that.  It's

12   noted in the status.

13           THE COURT:  I don't have that on my calendar

14   because it was probably adjourned, so just deal with

15   chambers if we agreed to a different date.

16           MR. GALARDI:  That's right, and it's on for

17   December 29th.  So the only matter that is really -- is on

18   today for the agenda is the Debtor's motion for approval of

19   a disclosure statement and plan.

20           Your Honor, we had originally filed a plan back in

21   September.  We filed an amended plan and disclosure

22   statement yesterday.  We did convey it to Court, there were

23   a few extra changes that happened overnight, but I emphasize

24   they are very few.

25           What I would propose to do, Your Honor, is first

Page 7

1    note for the record that there are Certificates of Service

2    on file with respect to the service of the disclosure

3    statement.  Those are at Dockets #326, 346, 353, and 382.

4    What I would then turn to, Your Honor, is maybe just giving

5    Your Honor a little bit of an overview of the plan and a

6    summary of the plan, and then take up the standard by which

7    we think that we have satisfied the requirements of adequate

8    information.

9            But I think -- and Your Honor, there are four --

10   there were two objections.  Well, there are two reservations

11   of rights that were actually filed.  One is by the

12   creditor's committee, and one was from certain former

13   employees and independent contractors.  We believe that

14   those reservations of rights have been resolved by our

15   disclosure statement in the plan.  I would note two other

16   parties that we've been in contact.  One obviously is the

17   U.S. Trustee, who's reserved all rights; there are releases

18   in these plans, and they've reserved all rights with respect

19   to all matters for confirmation.  And I've been in contact

20   with the U.S. Trustee's Office.

21           The second party that contacted us is the party

22   that is the second-lien make-whole owner, Columbus Nova.

23   I've referred to them before.  We are still working through

24   whether the plan treatment that we have provided to them is

25   resolved.  There are still some issues, but we believe we

1   will resolve that during the course of the next six weeks

2   and prior to confirmation.

3           So we don't believe that there are currently any

4   objections to the disclosure statement as it has been

5   amended.  And, indeed, what I believe we've done is made

6   significant progress, as Your Honor probably can see from

7   the last time we spoke, resolving certain of the claims that

8   we've talked about in these cases.  And what I think is

9   maybe most useful to Your Honor is to go through what I

10  think are the most significant changes in the plan and

11  disclosure statement if Your Honor has questions.  And what

12  I see for the next six weeks, should Your Honor approve it,

13  is having adequate information and answer any questions from

14  Your Honor.

15          THE COURT:  Go ahead.

16          MR. GALARDI:  First, Your Honor, I think that the

17  key issue for this plan is now what we call the plan

18  settlement section, which is in plan -- in Section 7 of the

19  disclosure statement.  As Your Honor may recall, when we

20  first filed the disclosure statement and as Your Honor has

21  heard on numerous occasions when I've been before Your Honor

22  on these matters, one of the major issues in the case was

23  after the sale of substantially all of the assets, how would

24  those assets be allocated among the various three estates.

25          As Your Honor will recall, the only estates whose

1    assets were sold were the assets of Gawker Media and what we

2    now refer to as Gawker Hungary because we had to change the

3    name.  The holding company, which is GMGI, is totally

4    dependent on distributions out of one of those two estates.

5            Your Honor, in the first disclosure statement that

6    we filed, we noted that it was at least the Debtor's

7    position that the assets should be allocated two-thirds to

8    Gawker Hungary and one-third to Gawker Media, based on

9    historical transfer pricing.  The committee obviously had

10   objected to that and had raised concerns about that.

11           As I announced, I believe, at the last hearing,

12   which was a status conference, we had productive

13   conversations with the committee about potentially resolving

14   that, but not resolving certain of the creditor claims.  We

15   continued to proceed with those discussions, but at the same

16   time, Your Honor, it made sense to the parties -- and I

17   thank the parties for their efforts -- to not only address

18   the allocation issues, but a lot of the other issues.  And

19   as set forth in the disclosure statement, the committee had

20   filed -- or not filed -- had sent us a demand, a standing

21   demand, and there were issues with respect to the creditor

22   claims, so we entered into negotiations.  I think it was

23   probably three days in my office with Mr. Bollea and his

24   counsel, and in addition, conversations with Terrill and

25   also Mr. Ayyadurai, who happen to be the three committee

Page 10

1    members, but they're also three of the most active

2    plaintiffs who have actually prosecuted their claims, and I

3    think that's significant.

4            Your Honor, as a result and as set forth in the

5    plan settlement, again, subject to Your Honor's approval

6    under a 9019 standard going to confirmation, what we have

7    laid out is a series of those settlements.  And I'll call --

8    this is settlement Category 1, which I believe settles

9    allocation -- that two-thirds/one-third I mentioned --

10   intercompany debts -- how do those debts and claims between

11   the two companies get treated -- and certain causes of

12   action, and those are causes are action that could either

13   mush all of the estates together, a technical term, into a

14   substantive consolidation estate or alter ego veil piercing-

15   type plans.  And in addition, which is absolutely critical

16   to the creditors, it is their particular claims, and then

17   the other creditors out there claims.

18           So that is all set forth in Section 7 of the plan.

19   That's one major settlement.

20           THE COURT:  How did you settle the intercompany

21   claims?  I understand the creditor claims and the

22   allocations of 60/40 split at this point.

23           MR. GALARDI:  Correct.  Well, again, when you ask

24   me about intercompany claims, I'm going to break them into

25   two different types of intercompany claims.  Let's take what

Page 11

1    I'll call not really intercompany debt claims, but the sort

2    of breaches of fiduciary duty alter ego substantive

3    consolidation-type claims.  Those claims are resolved

4    pursuant to the settlement in the following way: One -- and,

5    again, we don't believe that there are valid such claims,

6    but I think Your Honor is asking me what consideration and

7    where can I look in the plan to see what you basically

8    valued it and what am I anticipating for a 9019 motion, so

9    I'll answer it that way.

10            One is there was an intercompany claim between --

11   well, there was two claims, let me put it this way.  There

12   was $23 million allegedly on the books of Gawker Hungary

13   that Gawker Media would have had to pay.  Let's call that

14   the big intercompany claim from Gawker Media over to Gawker

15   Hungary.  On the other side of the balance sheet, there was

16   about a $3 million intercompany claim that Gawker Hungary

17   owed to Gawker Media, okay.  The way in which we resolved

18   this, and it also was tax purposes and other purposes, the

19   way that that has been resolved in this plan is as follows:

20   First, based upon the reallocation, there's been essentially

21   -- I won't call it a write down because it's not a

22   forgiveness of debt -- there's been a restatement of what

23   that debt was -- and I think we describe it here.  It comes

24   from -- one of the intercompany licensing revenues, I think

25   if my recollection's correct and Mr. Holden is here, roughly

1    came down from 10 to 7.  So there was a straight you don't

2    have that debt.

3            Second, that left about $19 to $20 million.  Under

4    the plan, you will notice that the intercompany claims,

5    subject to Your Honor's approval, from Gawker Media to pay

6    Gawker Hungary gets paid $16 million.  And then the balance

7    of that claim, which is roughly $3/$4 million is

8    subordinated until after all of the unsecured creditors are

9    paid in full.  So essentially, there's a reduction and not a

10   full payment of that intercompany claim.

11           But that's not the end of the story because there

12   was other intercompany claims.  So, again, I've lived it so

13   I'm going to try to say it simply here.  The Gawker Hungary

14   really doesn't have any unsecured creditors left as a result

15   of the sale.  So if you think about the flow of money, the

16   money goes from the intercompany and then would be a

17   distribution.  If Your Honor approves that $16 million, it

18   would be a distribution up to GMGI.  And under this plan,

19   GMGI has offered, as part of the settlement, to give a $2

20   million guaranty to unsecured creditors.  And there's a long

21   priority scheme, which I'll talk about, with unsecured

22   creditors of Gawker Media, so there's a benefit to the

23   Gawker Media creditors.

24           In addition to think about GMGI, GMGI has

25   essentially said, we're not going to look at this of two-

Page 13

1    thirds/one-third.  They've essentially settled the issue by

2    saying, we'll let it be a 60/40 split.  And in that sense,

3    GMGI -- or, ultimately, the equity -- is settling for less

4    than they might otherwise get so that Gawker Media, we

5    believe, will be able to pay all of the unsecured creditors

6    in full wit what we've left behind.

7          So part of the settlement and part of the

8    discussions -- and, again, there were more equity members

9    than Mr. Denton, and Mr. Denton was involved, but there were

10   other preferred equity members.  They obviously want their

11   money now as fast as possible.  Gawker Media obviously wants

12   money available to the unsecured creditors, so there was a

13   tension of how to essentially split it up so that they get

14   something, they get reasonable assurances, and creditors --

15   and I think Mr. Zipes asked the same question -- so

16   creditors at Gawker Media will be able to come in at

17   confirmation and say, that reserve is not enough, that

18   creditor trust is not enough, what you've pointed out that

19   intercompany claim should not go as much, that guaranty is

20   not as much.

21          We anticipate having all of those potential issues

22   at confirmation, but that's the structure of the

23   intercompany debts and settlements.  There's a forgiveness

24   of a $200,000 note, I believe, between GMGI and Gawker

25   Media.  There's not going to be prosecutions of claims.  And

1    I think one of the biggest points of all of this -- and I

2    think the committee has agreed with us -- litigating the

3    morass of those issues saves the estate probably $10 million

4    minimum, and the allocation and the claims results in a tax

5    savings of roughly another $9 to $10 million if we

6    consummate this transaction by year end.

7             So in some sense, by settling, GMGI may get more,

8    but it's also the creditors get more available.  And in a

9    sense, that was what started the conversations when we then

10   met with Mr. Bollea and the other claimants because

11   obviously if we had stuck with the two-thirds/one-third,

12   there wouldn't have been enough to pay the unsecured

13   creditors at Gawker Media.  So both the committee and the

14   individuals wanted to make sure that there was enough money.

15   And we've done, and Your Honor probably has seen, a series

16   of objections with respect to a number of the other claims

17   that are in the hundreds of millions, which we dispute.

18             So did I answer your question about --?

19             THE COURT:  Yes.

20             MR. GALARDI:  Okay.  Your Honor, and all of that

21   is set out in the plan settlement.  There was a flow of

22   funds, it's also in the liquidation.  So what we believe is

23   if this plan is approved, then we put on evidence on 9019.

24   We'll put on evidence about the sale proceeds; we'll put on

25   evidence about the expenses; we'll put on evidence about the

1    intercompany claims; we'll put on evidence about our

2    investigation of the breaches of fiduciary duty to

3    substantive consolidation; and also, we're going to put on

4    evidence with respect to the creditor's views.

5            THE COURT:  Before we leave this, in the earlier

6    version, you had had a section, second lien make-whole

7    settlement.  Are you telling me that's not settled?

8            MR. GALARDI:  Your Honor, in that plan, again, we

9    noted that that was what we believed the settlement is.

10   They have not accepted that treatment.  We are still having

11   those negotiations.  We believe we will settle it at that

12   amount or some very close to that.

13           THE COURT:  So explain to me what the claim is and

14   what the proposed treatment is.

15           MR. GALARDI:  Sure.  Your Honor, the claim is, as

16   you'll recall, we paid off the -- I call it the Columbus

17   note of debt.  Let's call it the second lien debt.  The

18   second lien debt was paid in full with interest, including

19   default interest, at the time of the closing.  In addition

20   to being paid in full with default interest, there was also

21   a provision in the agreement that provides for a 25 percent,

22   I think it is, make-whole, or $3.75 million.  The primary

23   obligor on that obligation is GMGI, the parent company, but

24   it is guaranteed by both of the subsidiaries.

25           Your Honor is familiar enough with make-whole

1    litigation, that there are a number of arguments that you

2    could make, and obviously a number of arguments that they

3    say that are not valid.  But the one that we have focused

4    most on is that this is a penalty.  You got your full

5    payment, you got your default interest, and now you're going

6    to kick in a 25 percent extra penalty.

7            The circumstances of that loan, Your Honor, were

8    that it was a borrowing in the beginning of this year.  And

9    it was to help the company, one, through the litigation and,

10   two, there was -- Columbus Nova had a representative put on

11   the board and it was for purchase of certain of the equity.

12   The proposed treatment under the plan is the following.  So,

13   again, looking at it -- and, again, Mr. Simon is here today

14   on behalf of Columbus Nova -- but looking at it, the Debtors

15   said that this is a penalty, we don't want to spend much

16   money litigating it, you'll spend $3.75 million very

17   quickly, let's settle it this way.

18           The settlement provides that the first $1.5

19   million of that penalty is paid on a non-subordinated basis,

20   500 from each of the three Debtor entities.  The second

21   part, the balance of that, is that, at least with respect to

22   Gawker Media -- and I think that's the critical one --

23   Gawker Media would be obligated to pay the 750.  So after,

24   after all unsecured claims at Gawker Media are paid in full.

25           So a moment ago when I referred to the waterfall

1   scheme for unsecured creditors, in our plan, that's the

2   third level of the waterfall scheme.  So why don't I turn to

3   that for a second and I'll come back.  The first level is

4   the creditor reserve; I think it's at 3.75 now.  The second

5   level is there are retained assets, one of which is the

6   gawker.com asset that may be sold, so you top up on that.

7   If, and only if, those two amounts are not sufficient to pay

8   the unsecured claims, they can look to the 750.  And if, and

9   only if, that doesn't happen, you could look to the $2

10  million guaranty that I talked about before.  Again, all

11  assuming Your Honor approves the plan, but that's the

12  structure.

13          THE COURT:  How'd you come up with 750?  I thought

14  you said $1.5 million was being paid by the three entities.

15          MR. GALARDI:  We did 500 -- well, we did 1. --

16  what we split, we split the claim into three parts, each

17  1.25.  I got to do math at the stand here today, at the

18  podium, but 1.25 each.

19          THE COURT:  Oh, 1.25 each.

20          MR. GALARDI:  Well, the total claim against each

21  entity was 1.25 each.  The first 500 of each of those claims

22  was paid from the entities, and that left 750 at each of the

23  entities.  But because the primary obligor was at GMGI and

24  because it was a pass-through, we sort of moved that all up

25  to GMGI that -- those two 750, but there's still 750 over at

Page 18

1      Gawker Media.

2              THE COURT:  Okay.

3              MR. GALARDI:  And so, as -- I won't say as a

4      penalty, but as a compromise, they've subordinated their

5      payment at Gawker Media, the 750, and they've also

6      subordinated the payment at GMGI.  And so, that's how we've

7      proposed to resolve it.  The discussions have been about the

8      amount and the terms on that and the risk factors.  We've

9      had those discussions.

10             And, again, since we were in other settlement

11     conversations and wanted to see how the case went out, they

12     sort of stayed on where they were the last time I was here,

13     until such time as we could announce these other settlements

14     and get them comfortable with the cash flows.  But we do --

15     we're very confident that we will have that settlement, Your

16     Honor, and not a litigation over whether that was a penalty.

17             The other aspect of the settlement, Your Honor,

18     which went to the allocation, but resolve certain allocation

19     issues -- and I think is very important as has been picked

20     up in the press -- we have agreed that Mr. Bollea's claim --

21     and, Your Honor, he had $115 million claim and he also had a

22     punitive claim.  But his claims will be settled for $31

23     million, plus a percentage of recovery from what we call the

24     contingent account; that's where the retained causes of

25     action are.  Mr. Ayyadurai has agreed to a settlement in the

1    amount of $750,000, and will not have a claim to the

2    contingent proceeds account.  And Miss Terrill will have a

3    settlement of $500,000 and no claim to the creditor -- to

4    that residual.  And that residual was split again in

5    negotiations with Mr. Bollea -- 45 percent to the creditors,

6    55 percent to GMGI, which could be to the benefit of the

7    equity.

8            Those were the allocation settlements.  I think

9    it's also important to understand about the settlements.

10   And, again, final documentation on Mr. Bollea is due on the

11   plan supplement date or earlier.  You spend enough time on a

12   term sheet, you're pretty much to the settlement agreement.

13   It's just been my busy on doing the disclosure statement.

14           Mr. Bollea agrees to waive -- and this'll get to

15   the releases -- Mr. Bollea is taking this payment in

16   satisfaction of certain claims against Mr. Denton and A.J.

17   Daulerio, who, as Your Honor knows from the previous

18   proceedings, were subject to various litigations, as well

19   as, you'll see in the plan, employees and independent

20   contractors as a defined term.  Mr. Bollea filed claims up

21   at the parent; he filed claims in Mr. Denton's case; he

22   filed claims here.

23           What's still left out is a punitive damage claim

24   against those individuals, and they will deal with that in,

25   I believe, Mr. Denton's case, but we're hopeful that that

Page 20

1    also gets resolved.  And with respect to Mr. Ayyadurai and

2    with respect to Miss Terrill, those claims also waive claims

3    against the other parties to the extent that they're covered

4    by indemnity.  So the Debtor has essentially gotten out of

5    indemnity-type claims, as well, and third-party claims,

6    which helps clear what has been referred to as the indemnity

7    dam at Gawker Media or GMGI.

8            So that's -- so I think I've covered the plan

9    settlements, Your Honor, unless you have a question about

10   those.

11           THE COURT:  No.

12           MR. GALARDI:  Okay.  Now, obviously -- well, maybe

13   not obvious to everyone -- the plan settlements drive, as

14   well as tax concerns that I had mentioned at one point in

15   these hearings, drive what I'll call the summary chart that

16   is in the disclosure statement, which lays out creditors'

17   recoveries.  Importantly, we're not seeking substantive

18   consolidation of these plans.  And generally, you'll see

19   unsecured creditors have ranges of recoveries, but I want to

20   focus on that for a few seconds.

21           There are claims -- and Your Honor is familiar

22   with bankruptcy.  You'll have, for example, claims by Mr.

23   Huang, who you remember he appeared earlier on a case.  I

24   can't remember, he was 100 million, but he's probably filed

25   three claims of 100 million at Gawker Media; just updating,

Page 21

1    he's also probably filed a claim in the Hungary case and in

2    the case of GMGI.  Whether or not he has claims against the

3    other entities, that's something that's the subject of a

4    claims objection.  Mr. Bollea had filed claims in a lot of

5    those entities.

6          So we believe those range of claims is way high;

7    and, indeed, other than the claims that we are settling and

8    some standard trade claims, we actually believe there are no

9    other claims left in the case, but that is something Your

10   Honor will decide on the claims objections.  Many of these

11   are not traditional or personal injuries -- I don't know if

12   you've read the objections, but we don't -- we believe Your

13   Honor can, in fact, resolve those.  So you'll see a wide

14   range, but our view is that the unsecured creditors here

15   will, in fact, receive 100 percent distribution, which will

16   help, obviously, with the argument of the intercompany and

17   everything else.  We have filed objections and will be

18   proceeding with those.

19          Again, another benefit, though not in my case, as

20   I mentioned, the GMGI estate, we're trying to deal with all

21   of the indemnity claims.  It's wholly dependent, but as Your

22   Honor knows, Mr. Denton is a large preferred shareholder, so

23   how that estate does will help and affect his estate.  His

24   counsel is here.  I think this is progress in both cases,

25   especially since we've gotten rid or at least claims for

Page 22

1   which indemnity would be asserted by Mr. Denton or Bollea

2   that we can resolve those, as well as Mr. Daulerio.

3           As I mentioned, there's the Gawker Media unsecured

4   creditors waterfall.  I've walked through that for you.  And

5   Gawker Hungary, as I mentioned to you, to them and to the

6   creditors of Gawker Hungary, the allocation issue, other

7   than for tax reasons, was not a major issue because all of

8   those claims had been paid in full.  Now there may be things

9   that come out of the woodwork, and as Your Honor may recall

10  from Univision sale, we had an obligation to dissolve, but

11  also to leave a $2 million credit support.  We believe this

12  will resolve all of those issues.

13          So turning now to what I believe is the other

14  major change, or at least one major change or what I want to

15  highlight for Your Honor as a two comm controversial issue -

16  - not seeking approval, obviously, but highlighted.  You

17  will see, Your Honor, there are releases in the plan.  There

18  is an injunction; I'm not sure that's controversial.  There

19  is exculpation, which I don't believe is --

20          THE COURT:  Well, about your injunction.

21          MR. GALARDI:  Okay.

22          THE COURT:  The injunction runs in favor of the

23  Debtors, and then it says and other parties and interests.

24  I don't know who that is.

25          MR. GALARDI:  Your Honor, I think the answer is

Page 23

1    going to be -- I think we can clarify that.  What the main

2    focus of that injunction is is the Debtors and the employees

3    and the independent contractors for exactly the publication

4    issues.  So we certainly clarify that.  I understand the

5    ambiguity of just other parties and interests.  It can't be

6    everybody in the case.

7              THE COURT:  On the exculpation, you're

8    exculpating parties from the enforcement that the terms of

9    the plan and the contracts, instruments, et cetera.  In

10   other words, it's -- and it's exculpated, and it's

11   exculpation from future conduct.  How do I do that?  So no

12   matter what they do --

13             MR. GALARDI:  And I think it's, again, bad

14   drafting that we can correct.  You think it's overreaching;

15   I'll say it's bad drafting on the point.  So I think what

16   we'll do is we'll modify it to make it clear that it's

17   exculpated for anything taken up until the entry of the

18   Confirmation Order, which is, I think, the standard way to

19   do that.

20             THE COURT:  Okay.  And then on your third-party

21   releases.

22             MR. GALARDI:  Yes.  May I make my pitch?

23             THE COURT:  The releases are not limited to the

24   claims relating to the Debtor.

25             MR. GALARDI:  Correct.

1           THE COURT:  So that if you have a bank creditor,

2    let's say who has a mortgage against one of these released

3    employees, this third-party release would release that

4    mortgage claim.

5           MR. GALARDI:  Well, that's not the intention, Your

6    Honor.

7           THE COURT:  I'm sure it's not.

8           MR. GALARDI:  So --

9           THE COURT:  That's what it does.

10          MR. GALARDI:  Okay, that will be fixed.  What is

11   intended by that --

12          THE COURT:  Unless it goes to the beginning of

13   time, it has nothing to do with what occurred during the

14   case or anything like that.

15          MR. GALARDI:  Yes, Your Honor, and there's also

16   going to be a temporal element to it.  So I think what we

17   can do is clearly modify that because -- let me explain to

18   Your Honor what we have in mind.  And I'm glad we're having

19   a dialogue before now and not on the confirmation hearing.

20          As Your Honor is well aware, we are subject to

21   litigation for publishing articles.  There is generally, as

22   I've learned through this case, a one-year statute of

23   limitations from which people can sue you.  We obviously

24   have the benefit of a bar date, an administrative bar date.

25   Mr. Denton will eventually have the benefit of his bar date.

1   Writers and the independent contractors that wrote the

2   articles, the people like Mr. Daulerio, and I don't want to

3   speak to the benefit, they will not have that benefit; but

4   yet, they would have indemnification claims, and they're

5   represented by counsel.

6            THE COURT:  What happens to those claims if

7   they're not filed or liquidated by the time of confirmation?

8            MR. GALARDI:  Exactly why we have put in the plan

9   a third-party release.  We are saying to those people who

10  have gotten a benefit under our bankruptcy case that they

11  are being asked to waive the claims against those

12  individuals.  So they would be barred from bringing any new

13  claims against those individuals, i.e., the writers, the

14  employees, and the independent contractors.  We believe they

15  are getting consideration for that because they are going to

16  be able to get distributions.

17           THE COURT:  That's fine, as long as the claims

18  arise from stuff they did for the Debtor.

19           MR. GALARDI:  Exactly.

20           THE COURT:  This is much broader than that.  It's

21  a release of any claims that may exist that may have nothing

22  to do with the Debtor.

23           MR. GALARDI:  Correct, Your Honor.  And, again,

24  bad drafting, last minute drafting.  That has to be clear,

25  and we will make it clear in the version that goes out.

1              THE COURT:  Okay, so we admit it's only drafted.

2    What else?

3              MR. GALARDI:  Your Honor, I would say that there

4    are two other -- and at this point, what I'd like to do is

5    just hand up to Your Honor the very light changes that we

6    did last night.  And these, I believe, are really in the

7    spirit of (indiscernible).  May I approach?

8              THE COURT:  Sure.  I have one other question about

9    the plan that relates to these releases.  You have a

10   definition in the plan releasing party.  I don't think it

11   appears anywhere in the plan itself, other than in the

12   definitions.

13             MR. GALARDI:  We'll check that, Your Honor.

14             THE COURT:  Why don't you just do a word search.

15             MR. GALARDI:  Yeah, we will.  Again, it's gone

16   through many iterations, so I'm not surprised that we have

17   some stray definitions.  And, Your Honor, I do want to make

18   clear -- and Mr. Tabak reminds me -- the only releases is a

19   release to the extent under law that we actually have these

20   indemnifications.  I just -- again, Your Honor, with respect

21   to the few changes -- and I do think these are

22   clarifications -- what I'd ask you to first look to is the

23   disclosure statement.  Though there are a couple of omits,

24   one thing -- and, again, as you read things and then prepare

25   for the disclosure statement hearing, I thought there was

1      not a clear statement.  So on Page 11 of the disclosure

2      statement --

3                    THE COURT:  Is this the one you just gave me?

4                    MR. GALARDI:  This is the one I just handed to

5      you.  You will see that these changes are extremely light,

6      but just so that there could be no issue, I thought it was

7      there, but you read everything and you don't see.  Paragraph

8      6, we wanted to note that the value of the Debtor's asset,

9      retained assets.  I've seen cases that say you have to tell

10     them where it is.  We're only five months into the case, we

11     don't have -- know the current value of the retained assets,

12     including the gawker.com assets.  We are going to file a

13     plan supplement that looks at the litigations, but I did

14     want to know for readers that we didn't know that.  But,

15     again, we may have a solvent case.  So one of the issues

16     will be, can you even bring preferences if there were,

17     obviously, if it's a solvent case.  So that's part of what's

18     going to happen over the next six weeks.  So I did want Your

19     Honor to be aware of that.

20                    Page 48 of that disclosure statement is the other

21     second big change, but this is really a conforming change of

22     definitions.  We had a definition of employee parties; we

23     had changed last night or yesterday the employees and

24     independent contractor definitions.  So that just makes

25     clear that the injunction obviously will take Your Honor's

Page 28

1   comments into effect and make those changes.

2          Finally, Your Honor, on the plan, and I think this

3   is, again, we think it was covered.  If Your Honor would

4   turn to Page 4 of the plan document that I provided to Your

5   Honor, we made one other clarification, and I've realized

6   the result of a question yesterday.  You'll see the Debtor

7   indemnification obligation said meant -- it originally means

8   indemnification, contribution, reimbursement, or such other

9   -- or other such obligations.

10          We always thought it covered advance of defense

11  costs of duty to defend, we wanted to make that clear and we

12  still left or other such clarifications; otherwise, those --

13  I think we actually captured all of the other substantive

14  changes to the disclosure statement and plan in what we

15  handed to Your Honor.  And I apologize that it was late in

16  the day yesterday or midway through the day and it was late.

17  But, Your Honor, I think that was better to get you all of

18  them at once, as opposed to watching the sausage be made, so

19  to speak.

20          Your Honor, with respect to the general standard,

21  Your Honor is familiar that adequate information has to be

22  sufficient detailed.  In light of the circumstances, there

23  is -- there are 18 factors that have been floated around by

24  the courts.  I'll just go quickly through them with Your

25  Honor, and I'll point to the sections.  We think we actually

1    satisfy all 18.

2         The circumstances that gave rise to the filing of

3    bankruptcy is in Section 5.  The explanation of the

4    available assets and values is in Section 4.  The

5    anticipated future of the Debtor is spread throughout these

6    sections -- 1, 2, 3.  The sources of information are in the

7    preface.  A disclaimer is in Section 11.  The condition and

8    performance of the Debtors while in Chapter 11 is 6.  The

9    information regarding claims and the estates is in 8 and

10   elsewhere.  A liquidation analysis is in 10.  There was a

11   description, and we filed yesterday a liquidation analysis.

12   And I'll spend a couple of minutes with Your Honor on that

13   liquidation analysis because I think it also helps clarify

14   some of Your Honor's questions.

15        The information and accounting methods used to

16   produce the financial information.  We don't have

17   projections because we have liquidated, but we do have the

18   financial, and there are the books and records of the

19   company that is disclosed.  Information regarding the future

20   management of the company; we have a plan administration who

21   is to be identified in the plan supplement.  A summary of

22   the plan and reorganization and liquidation; as I mentioned,

23   we already went through that, and it's also the liquidation

24   is in the liquidation analysis.  An estimate of all

25   administrative expenses, including attorneys' fees and

Page 30

1   accountants; there's no specific numbers in there, other

2   than they are reflected in the allocation and they are also

3   reflected in the liquidation analysis.

4          Again, M is projections.  We have some tables that

5   say what the recoveries are, so that's about the best we do,

6   but we're not a going concern.  Information to the risks;

7   there is a risk section.  The actual projected value that

8   can be obtained from avoidable transfers, I just mentioned

9   why I added in that paragraph today.  We didn't have

10  anything that was crisp on that one.  The existence and

11  likelihood of possible success of non-bankruptcy litigation.

12  We did go through our litigations and, as we've said many

13  times on the record, that we believe we will succeed on

14  those litigations and settle the ones -- settle the Bollea

15  litigation where there was a judgment.

16         The tax consequences of the plan.  There is a tax

17  disclosure and, as I've mentioned a couple of times, Your

18  Honor, one of the major issues is to try to go effective

19  before year end because of the way that Hungarian count tax

20  works and the way that U.S. tax work, so we've got a lot of

21  work to do between now and the 13th, but that is a major

22  factor here, and there is disclosure with respect to that.

23         The relationship of the Debtor with its affiliates

24  is described in Section 4.  And the collectability of any

25  accounts receivable.  We really don't have accounts

Page 31

1    receivable, they've been sold, but there is a description in

2    Section 7.

3            Your Honor, just to point out, I think it's

4    important for the liquidation analysis, and I actually had a

5    debate a little bit about this.  We filed --

6            THE COURT:  Where is the liquidation analysis?

7            MR. GALARDI:  It was filed as a separate document,

8    Exhibit C.  I'm not sure, it may be tabbed.

9            THE COURT:  I didn't have it in the loose-leaf you

10   sent last weekend.

11           MR. GALARDI:  May I hand the Court a copy?  Let me

12   just see if I have it here.

13           THE COURT:  Yes, please.

14           MR. GALARDI:  I think it's helpful for a couple of

15   important points.  It's Docket 405, Your Honor.  The first

16   important point I want to point out, and I had many debates

17   with myself and others about this.  There is a methodology,

18   Your Honor, and the second paragraph of the methodology I

19   think is very important for this particular Debtor and this

20   particular liquidation analysis.

21           My understanding under New York law is that if you

22   were to look at a liquidation under a Chapter 7, the Trustee

23   could come in and say, well, I'll take all of the

24   settlements or whatever you've done, and I'm supposed to do

25   a liquidation analysis getting the benefit of those

Page 32

1    settlements.  Whether or not they can do that is another

2    question.

3         So one of the important points we wanted to point

4    out in this liquidation analysis, which I -- is that we made

5    four critical assumptions:  First, that the Trustee proceeds

6    with the settlements with the creditors set forth in the

7    plan, even if there were in a plan; second is that the

8    Trustee proceeds with the allocation settlement set forth in

9    the plan, even if there were in a plan; the Trustee is able

10   to succeed on the prosecutions of the claims objections,

11   though is really new to the case and has no knowledge; and

12   the Trustee makes distributions before year end securing the

13   tax benefits.

14        So we've done what I think if someone wanted to

15   challenge the best interest test at confirmation, we've

16   given them what I think is the strongest case against us.

17   That was important for us.  And then what you will see, Your

18   Honor -- and, again, we've used the assumptions that we used

19   favorable to us in the plan -- you will that this, if it

20   works out the way we believe, one we will -- and, again, not

21   for Your Honor's ruling, but I do want to point out -- we go

22   through the cash, we go through the allocation, you see the

23   distributions, and you see that we have set the claims at

24   the numbers that I had mentioned to Your Honor before.  For

25   example, at Gawker Media, you'll see unsecured claims of $36

1    million; you'll see that there was intercompany claims of

2    24, which also had GMGI; we've given a recovery.  Those are

3    derived recoveries, and creditors would get somewhere

4    between 90 and 93 percent.  Our view is they would get 100

5    percent under our plan.

6            The rest of it is almost irrelevant because you

7    can't get more than 100 percent.  So if it flows through, it

8    goes to the equity; and if you look at the equity here,

9    equity has an upside and a downside compared to liquidation.

10   Again, with all the favorable, this would be better for the

11   equity because they can get potentially more under the

12   assumption.  So that's how we did the analysis, and it flows

13   through.  And, obviously, at confirmation, we will make a

14   more detailed presentation with respect to it and if any

15   objection is actually raised.

16           THE COURT:  How much cash is going to be left in

17   these combined estates these settlements go through and pay

18   off the settlements?

19           MR. GALARDI:  Well, take it collectively -- let me

20   do it this way.

21           THE COURT:  Or if you want, how much cash in the

22   case and how much will the claims be, assuming the

23   settlements and (indiscernible) beyond liquidated claims to

24   be?

25           MR. GALARDI:  I think the simplest way to answer

Page 34

1    that question is the following: If we're right about

2    unsecured claims and you use up the entire reserve, but go

3    no higher than the reserve, right, that 3.75 that I've

4    referred to, which we still think is a high number, there

5    will be that could flow through the system and go all the

6    way up to GMGI somewhere around $39-$40 million.

7                THE COURT:  But what's the total amount of debt in

8    the three cases?

9                MR. GALARDI:  The only -- there's -- when you say

10   debt, there's no more secured debt, it's all been paid off.

11               THE COURT:  But assuming that -- I asked you how

12   much money is in the case and how much money is the debt.

13   So assume nothing's been paid off, but, you know, have been

14   settled.  If it's 100 cent case, it doesn't really matter if

15   you're paying now or later, I suppose.

16               MR. GALARDI:  Correct.  And the only issue about

17   whether it's a 100 cent case is when you have three or four

18   claims -- 20 million, 80 million, and a 100 million --

19   that's the whole dilemma we have.

20               THE COURT:  What do you think the unsecured debt

21   is going to come in at.

22               MR. GALARDI:  I think it's going to be under $36

23   million, including the settlements we've set up.

24               THE COURT:  Including the settlements?

25               MR. GALARDI:  Correct.

1              THE COURT:  And how much cash is in the case?

2              MR. GALARDI:  Well, in the Gawker Media case, it's

3        --

4              THE COURT:  What's the total?

5              MR. GALARDI:  Well, there's 60 plus, I think.  Let

6        me just look at where we are on the Gawker Hungary.  I think

7        there's about 100, right; 70-80 for distribution.

8              THE COURT:  Okay.  And how much is Gawker Hungary

9        getting after it makes its contribution and is basically out

10       of the case?

11             MR. GALARDI:  Let's start with what does it -- I'm

12       going to say on the down stroke.  So day one and as a result

13       of the allocation, without that 16 that sweeps over -- let

14       me get to the waterfall, okay -- 34, right?  Okay, so Your

15       Honor, we also did a waterfall analysis.  So the easy way to

16       say it, and now this is -- I'll just put on for Your Honor.

17       After you split purchase price and gross sources, there's

18       about $152 million in the estate, okay.  Let's just start

19       with that.  But then we subtracted out debt.  So as we sit

20       here today with anticipated cash, we think there will be

21       available to fund a plan 55 million -- $56 million over at

22       GM LLC, 35 million at Gawker Hungary, and basically $8,000

23       at GMGI.  So now let's pay the claimants.

24             THE COURT:  And Gawker Hungary is contributing how

25       much to the case, to the Gawker Media case, which basically

Page 36

1    has all the debt.

2            MR. GALARDI:  To GMGI?

3            THE COURT:  No, to -- most of the debt resides in

4    Gawker Media, right?

5            MR. GALARDI:  Correct, let's say 100 percent of

6    the debt.

7            THE COURT:  Okay.  And isn't Gawker Hungary paying

8    something to Gawker Media?

9            MR. GALARDI:  It's not really paying something;

10   it's not collecting on its intercompany debt.

11           THE COURT:  I understand.  Is that 16 million part

12   of the --

13           MR. GALARDI:  34?  No.

14           THE COURT:  Okay.  So you don't count that as part

15   of the debt.

16           MR. GALARDI:  Correct.

17           THE COURT:  All right.  How much are

18   unsubordinated unsecured debt is there in the case?

19           MR. GALARDI:  Again, I come back to we believe the

20   unsecured debt in total is about $36 million.

21           THE COURT:  And that includes the subordinated

22   debt?

23           MR. GALARDI:  I'm not sure what you're referring

24   to as subordinated.

25           THE COURT:  Well, you're saying that certain

Page 37

1    claims will not be paid until the unsecured creditors are

2    paid in full.

3              MR. GALARDI:  That's 750 and another $3-4 million.

4              THE COURT:  Is that $4 million in subordinated

5    debt?

6              MR. GALARDI:  There's the subordinated piece of

7    the intercompany to Hungary, which I would say is roughly 4;

8    and then there's the 750 make-whole claim, which is 750.

9              THE COURT:  It's almost $5 million in un -- in

10   subordinated debt.

11             MR. GALARDI:  Yes.

12             THE COURT:  And that's included within the 36

13   million in total?

14             MR. GALARDI:  No.

15             THE COURT:  Okay.  So there's 36 million in non-

16   subordinated unsecured debt.

17             MR. GALARDI:  Correct.

18             THE COURT:  And how much money is there to pay

19   that?

20             MR. GALARDI:  About $55 million.

21             THE COURT:  All right, oaky.

22             MR. GALARDI:  I'm sorry, I was a little bit slow

23   on that one.

24             THE COURT:  You've been moving pretty fast.

25             MR. GALARDI:  And, Your Honor, there's funding --

Page 38

1    and, again, there's details and we have a cash flow.  And,

2    again, I'm thinking of confirmation, you know, we have

3    reserved various amounts under the plan for professionals

4    and costs and all of those sorts of things.  But at the end

5    of the day, if we pay 36 -- now to answer your question --

6    if we pay the full 36, there would still be a little extra

7    money to go over to Gawker Hungary and go back up to GMGI

8    and there'll be about $39 million by my quick math on that.

9              THE COURT:  Okay, all right.  Thanks.

10             MR. GALARDI:  Okay.  And, again, a lot of those

11   creditors have claims up at the parent too.  So, Your Honor,

12   with respect to that, we think the disclosure statement

13   contains adequate information, and we'd ask Your Honor to

14   approve it.  I'd like to turn just very briefly --

15             THE COURT:  Before we get to the Order, let me ask

16   if anybody wants to be heard on the disclosure statement.

17   Hearing no response, go ahead.

18             MR. GALARDI:  Your Honor, with respect to the

19   proposed disclosure statement Order, we've had very few

20   changes to the Order that -- and we did file a notice of

21   that.  I don't know if Your Honor has questions about that

22   or the changes to anything in the solicitation procedures.

23   I think they're -- I would say they're standard.  I will

24   note we did one thing.

25             THE COURT:  (indiscernible).

1          MR. GALARDI:  I will note that we did one thing,

2     and I think this also goes to expediting a resolution.

3     We've objected to claims, large litigation claims.  Now,

4     whether they accept it or not, we added a convenience class

5     to this plan.  Whether they take $25,000, I don't know.

6          THE COURT:  One of the things I wanted to mention

7     is it wasn't clear to me that -- or it may not be clear to

8     them -- that by opting into this convenience class, that

9     resolves the objection and waives any further claims.

10          MR. GALARDI:  Okay.  We will make that clear, yes.

11          THE COURT:  That should be made clear.

12          MR. GALARDI:  Okay, and that's clearly our

13     intention.  And it's also our intention that you don't get a

14     75 bite, one of each.

15          THE COURT:  I assumed that.  Well, just say that

16     by opting into the convenience class resolves the objection

17     and the claim is allowed in that amount basically.

18          MR. GALARDI:  Correct.

19          THE COURT:  Is what you're saying.

20          MR. GALARDI:  That is right.

21          THE COURT:  That is the settlement of the claim.

22          MR. GALARDI:  Correct.  And Your Honor, and we are

23     actually giving to a -- there's a non-voting status since

24     they have a pending objection since we filed those.  There

25     will be a box that they can still make that election.  So

Page 40

```
 1     even though we've taken the position it's zero, it's well

 2     worth our time to pay 25,000 to make it go away.  We also

 3     hope -- and this is, again, what we've said to the committee

 4     -- we'd love to engage in settlement negotiations because,

 5     again, our main goal is to make sure we get plans, get the

 6     claims done, and get effective before year end and not have

 7     fights over reserves at confirmation.

 8             I don't know if Your Honor had other questions

 9     about --

10             THE COURT:  Yeah, another point.  When you're

11     talking about resolution events, I guess this is the Order

12     rather than the -- that was for solicitation procedures.  So

13     I'm looking at the redline copy.

14             MR. GALARDI:  Okay.

15             THE COURT:  It talks a resolution of end, and it

16     talks about certain things that have to occur no later than

17     three days prior to the voting deadline.  And one of the

18     things is -- well, there are several things, one of which

19     being the Court temporarily allows a claim under Rule

20     1318(a).  Is it possible that deadline can run before you

21     even file an objection?  I mean, you can object to a claim

22     after the voting deadline, can't you?

23             MR. GALARDI:  Yes, but what we did in our

24     procedures, which we thought about exactly -- and, again,

25     people have done it for gerrymandering purposes.  It's not
```

1    my style.  What we particularly did was, we gave ourselves a

2    deadline that you had to file by October 31st the objection;

3    or else if we filed an objection after this date, it's our

4    obligation to go in and say, we don't think you should have

5    an allowed claim.  So if we just filed a random objection,

6    they still get to vote that claim.

7             THE COURT:  Next, on Page 8 of the redline, it's

8    the carryover of Paragraph 8, and subsection (g) says that

9    if you send in two ballots, we'll count the later ballot,

10   right?

11            MR. GALARDI:  Yes.

12            THE COURT:  What happens if the second ballot

13   changes the vote from an acceptance to a rejection or a

14   rejection to an acceptance?

15            MR. GALARDI:  Is it a late -- did you say late

16   ballot?

17            THE COURT:  A timely ballot.

18            MR. GALARDI:  It changes the vote to the

19   acceptance or rejection.

20            THE COURT:  Can't do that without a Court Order

21   under Rule 3018(a).

22            MR. GALARDI:  That's true.

23            THE COURT:  So you can count the ballot subject to

24   Rule 3018(a).

25            MR. GALARDI:  Okay.  And Your Honor, most times

Page 42

1    that doesn't have an effect on voting, so it's usually not

2    an issue to deal with at confirmation, but we'll deal it

3    with then.

4              THE COURT:  Next, it's not really going to affect

5    this kind of a case, but you have an aggregation in the next

6    paragraph.  If I'm a creditor with 30 claims, you can count

7    me as one claim, right?  What's the authority for that?

8              MR. GALARDI:  Well, again, a lot depends on the

9    kinds of claims.  You're right --

10             THE COURT:  It's not going to happen in this case,

11   but I'm curious, what's the authority for that?

12             MR. GALARDI:  I'm going to say --

13             THE COURT:  So if somebody wants to go out and buy

14   up claims to block a confirmation.

15             MR. GALARDI:  You're 100 percent correct, Your

16   Honor, and it should not be there.

17             THE COURT:  Under Section 1126(c), we can't

18   (indiscernible).

19             MR. GALARDI:  Correct.

20             THE COURT:  With respect to -- this comes up a

21   couple of times.  Starting with J, you essentially say that

22   the Debtors can waive any defects subject to contrary Court

23   Order.  There are those out there who might think that the

24   Debtor would waive the defects for the acceptances, but not

25   the rejections.  So you can't waive anything without a Court

 1    Order.

 2            MR. GALARDI:  And so, Your Honor, what we'll do is

 3    if we intend to waive it, we'll come in at confirmation and

 4    ask Your Honor.

 5            THE COURT:  Well, what you're going to do is in

 6    your -- and this may be eventually a rule change in the

 7    national rules -- your certification should identify those

 8    claims which you contend should not be counted or don't

 9    comply.

10            MR. GALARDI:  Right.

11            THE COURT:  And then if it's -- you know, if it

12    matters, then we'll go through them.  It may not matter.

13            MR. GALARDI:  Sure.

14            THE COURT:  Same comment with subsection (l),

15    where you can waive, I guess, more defects and

16    irregularities.  Again, that's only with a Court Order.

17            MR. GALARDI:  Okay.

18            THE COURT:  With respect to (n), which gives you

19    the general right to do anything you want, it's only subject

20    to Court Order.  And (r), where you say no ballot can be

21    withdrawn or modified after the voting deadline without the

22    prior written consent of the Debtors, that may also

23    implicate a change in voting.  I'm not sure you can vote

24    after the deadline.  But, you know, will have to comply with

25    Rule 3018(a) if they want to change their vote.

Page 44

1           MR. GALARDI:  Sure, understood.

2           THE COURT:  Okay?

3           MR. GALARDI:  Yes.

4           THE COURT:  Anything else on the Order?

5           MR. GALARDI:  Not unless Your Honor has other

6   things on the Order.

7           THE COURT:  Does anyone else want to be heard on

8   the application?

9           MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

10  Trustee's Office.  We have no objection, and the

11  presentation was very helpful to me.  I just wanted to flag

12  one potential issue, which I don't think is going to happen

13  based on the presentation.  But unsecured debt is project at

14  about $36 million by the Debtor, and that would be to 100

15  percent plus interest, or unless the parties had agreed to

16  some other treatment, which they have.  But I just wanted to

17  flag one issue.  There's a payment to the three main

18  creditors here and they're getting in full for their claim.

19  There are other unsecured creditors as well.

20          THE COURT:  Yeah, I know.  Who represents the

21  interests of the unsecured creditors, the other unsecured

22  creditors?

23          MR. ZIPES:  Well, I'm just -- I think it's

24  probably, based on what he's saying, it's not going to make

25  a difference in this case.  But I just want to flag it as an

Page 45

1    issue that I might raise at con --

2           THE COURT:  Well, the committee still represents

3    the interests of the unsecured creditors, assuming they

4    haven't resigned, and the committee had separate counsel.

5           MR. RUSSELL:  Your Honor, William Russell, Simpson

6    Thacher & Bartlett LLP, on behalf of the committee.  I was

7    going to make exactly that point, Your Honor.  Despite the

8    fact that the three members of the committee have settled

9    their individual claims against the estate, they're

10   cognizant of their obligations as members of the committee.

11   The committee still functions, and we're out there to

12   safeguard the interests of the unsecured creditors generally

13   and will continue to do so.

14          MR. ZIPES:  Your Honor, may I just interject.

15          THE COURT:  The problem may be, Mr. Zipes,

16   particularly with these personal injury claims, we may not

17   know for a very long time what those claims come in at.

18          MR. GALARDI:  And I would just add -- I mean,

19   again, back and forth between committee counsel, a lot of

20   the reserve has been part of the back and forth there after

21   we had settled those claims, and they were not parties to

22   the individuals, so I would add that.

23          One thing I do want to correct about what Mr.

24   Zipes says -- and, again, another debate, and I don't think

25   it's become a confirmation issue.  We are paying a

1    settlement amount; that does not mean we are paying claims

2    in full.  And I think he came up and said it's claims in

3    full.  These claims are still impaired.

4             THE COURT:  Well, they're not impaired if you're

5    settling them.

6             MR. GALARDI:  Your Honor, we may have --

7             THE COURT:  (indiscernible) a case that says that

8    if you pay in accordance with the settlement that it's not

9    an impaired claim.

10            MR. GALARDI:  Okay.

11            THE COURT:  I think the argue -- what Mr. Zipes

12   was saying is you're paying these guys the full amount that

13   you've agreed that you owe them.

14            MR. GALARDI:  Two of them.

15            THE COURT:  If down the road another personal

16   injury claim comes in at a high number, you may not be able

17   to pay that claim 100 percent.

18            MR. GALARDI:  Well, and again, Your Honor, you're

19   right, although we've been very rigorous about the bar date

20   and the administration claims bar date.

21            THE COURT:  No, I understand it's the nature of

22   the claims that you may not know for a long time what a lot

23   of these tort claims come in at, if they come in at

24   anything.

25            MR. GALARDI:  Correct, Your Honor.  And, again,

1    why we were stringent about bar dates, administrative bar

2    dates, is exactly for that purpose.  And our current bar

3    date runs out straight through where we closed operations,

4    and now we're covered even by administrative bar dates for a

5    date three weeks after we stop publishing.

6            THE COURT:  And with respect to Mr. Bollea, he

7    does have $140 million judgment.  Might it be reversed?

8    Yes.  Might it be reduced?  Yes.  But there's a danger it

9    won't be.  And under the circumstances, a $31 million

10   payment, it makes it very possible, if not probable, that

11   all the creditors will be paid in full sounds to me like

12   it's a settlement.

13           MR. GALARDI:  And on that, Your Honor, I think Mr.

14   Denton said in his thing, this is a hard piece.  You know,

15   some people will say we paid Mr. Bollea too much.  Mr.

16   Bollea, I know has said to me, we're paying him too little.

17   So it is part of the allocation, which helps with all these

18   matters.

19           THE COURT:  It's a good sign that nobody's happy,

20   right?

21           MR. GALARDI:  And I'm the least favorite person in

22   the room on both sides, Your Honor.  Your Honor, with

23   respect to that --

24           THE COURT:  You say it proudly.

25           MR. GALARDI:  With respect to the disclosure

Page 48

1   statement, Your Honor, we'd ask you to approve it.  We have

2   a voting deadline and we'll distribute it.  What I would

3   anticipate doing -- and, again, I think you raised many

4   points that would be confirmation points.  I don't know if

5   you need to see those changes to the disclosure statement

6   before we do it, or whether we will draft it and just get it

7   out and ask Your Honor to approve the disclosure statement.

8   I leave it to you.  I think we have a mailing deadline of

9   November 7th, we will do it.  Obviously, it's our risk if we

10  don't meet Your Honor's standard come confirmation.

11          THE COURT:  All right.  Is there anyone else who

12  wants to be heard?  Subject to the changes I suggested,

13  which are really confirmation issues, I guess, and not

14  disclosure issues, I'm satisfied that the disclosure

15  statement contains adequate information and will permit a

16  hypothetical investor or creditor to make a decision whether

17  to accept or reject the plan, so I'll approve it.

18          The Order requires the changes that I've

19  indicated.  So what I will ask you to do is send me a

20  redline copy of the Order, a clean copy of the Order.  And

21  the clean copy of the Order should, as an attachment, have

22  the disclosure statement and exhibits that you handed up to

23  me today, so everybody knows what disclosure statement is

24  being approved.

25          MR. GALARDI:  And, Your Honor, two things with

Page 49

1    respect to that.  One is obviously, your comments on the

2    solicitation procedures will be in this one and have to be

3    approved, so we have to make those.  What I was referring to

4    is the disclosure statement.

5                    THE COURT:  No, I said they are confirmation --

6    primarily confirmation issues, like the scope of the

7    release.  I'm confident you'll make the corrections;

8    otherwise, this may be an exercise in futility.

9                    MR. GALARDI:  Exactly.  And, Your Honor, what I

10   would -- unless you want a separate those pages, what I

11   think we will do is --

12                   THE COURT:  I don't have to see any further

13   changes to the disclosure statement, but I do want a fully

14   blackline copy of the solicitation procedures and also the

15   Order to clarify that the election to opt into to the

16   convenience class resolves the objection and that's it.

17                   MR. GALARDI:  Thank you, Your Honor.  Then we'll

18   filed a conformed disclosure statement, send it out as is

19   practice.  Thank you very much for your time, Your Honor.

20                   THE COURT:  Well, don't send anything out until I

21   sign the Order.

22                   MR. GALARDI:  Yes, obviously.  I (indiscernible)

23   jump the gun that much.  I appreciate it.  Thank you, Your

24   Honor.

25                   THE COURT:  Thank you very much.

1              MR. RUSSELL:  Your Honor?

2              THE COURT:  Yes, sir.

3              MR. RUSSELL:  Before we adjourn, I had one issue

4      I'd like to clarify with the Court.

5              THE COURT:  For what?

6              MR. RUSSELL:  When Your Honor entered the Order

7      approving the retention of the Deloitte Financial Advisory

8      Services and its financial advisors to the committee on

9      October 13th, Your Honor struck one of the tasks that

10     Deloitte would be performing that related to activities

11     relating to the 363 sale.  Rather than assume that Your

12     Honor did that because by the time the Order was signed, the

13     363 sale was over or assume that it was subsumed in one of

14     the catch-alls (indiscernible).

15             THE COURT:  Wasn't there an -- I left in there the

16     allocation issue, didn't I?

17             MR. RUSSELL:  Well, yes, certainly, you left to

18     the allocation and advising the committee in connection with

19     negotiations and due diligence.

20             THE COURT:  Yeah.

21             MR. RUSSELL:  So, okay, we just want to make sure

22     that Your Honor wasn't taking the position that work

23     Deloitte had done in connection with the sale was not

24     excellent.

25             THE COURT:  What did it do in connection with the

Page 51

1    sale?

2         MR. RUSSELL:  Well, they did a lot, Your Honor.

3    They performed financial analysis of the various bids and

4    letters of intent we received, rather the Debtors received

5    from potential buyers.

6         THE COURT:  Does the U.S. Trustee have any

7    objection to a supplemental order expanding the retention --

8    I think it was a nunc pro tunc retention.

9         MR. RUSSELL:  It was, Your Honor.

10        THE COURT:  That include work done in connection

11   with the sale.

12        MR. ZIPES:  We discussed this; we have no

13   objections.

14        THE COURT:  All right, so why don't you submit a

15   proposed Order which expands the retention to that extent.

16        MR. ZIPES:  Thank you very much, Your Honor.

17        MR. GALARDI:  Your Honor, may I just -- one other

18   issue, and I'm trying to avoid professional fees.  There's

19   an outstanding objection by the committee to the Akin Gump

20   application.

21        THE COURT:  What are they being retained for?

22        MR. GALARDI:  They were retained to give Mr.

23   Tillman independent director advice regarding the analysis

24   of the claims with respect to Mr. Bollea when we were --

25   before we were having all these settlement discussions.  I'm

1    hopeful that we will resolve that.  If we can resolve it

2    with the committee -- there's a hearing next week, I think

3    it is, the 15th.  If we can resolve it, I'd like to put it

4    in on certificate of no objection, but I don't know if Your

5    Honor would want to have that on a separate hearing, have

6    that hearing in any event.

7              THE COURT:  What's the objection?

8              MR. RUSSELL:  Your Honor, we didn't really see the

9    need to retain Akin Gump here.  To the extent there are

10   conflicts, we don't think they're resolved by Mr. Tillman

11   having separate counsel and weren't sure that Akin Gump was

12   doing anything that could not be done as well by Ropes &

13   Gray.  We are negotiating perhaps some sort of cap or some

14   sort of more comfort on the amount of fees.  Assuming we can

15   come to agreement on that, we will withdraw our objection.

16             THE COURT:  All right.  Well, you can proceed on

17   notice of presentment and a certificate of no objection, but

18   I'll look in the Order.  And if I have any questions, as I

19   did with Deloitte, I'll have a hearing.

20             MR. GALARDI:  That's fine, Your Honor, we'll

21   proceed that way, and then we can keep Your Honor apprised

22   if it need adjournment or resolution for the next hearing.

23             THE COURT:  All right.

24             MR. GALARDI:  Thank you again for your time.

25             THE COURT:  Anything else?

Page 53

1          MR. RUSSELL:  Thank you, Your Honor.

2          THE COURT:  All right, thank you very much.

3          (Whereupon these proceedings were concluded at

4    11:54 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2016.11.04 16:26:04 -04'00'

7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  November 4, 2016