UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                              :    Chapter 11
                                                    :
GAWKER MEDIA LLC,                                   :    Case No.: 16-11700 (SMB)
                                                    :
                    Debtors.                        :    (Jointly Administered)
------------------------------------------------------------x

**OPPOSITION TO OMNIBUS OBJECTIONS TO
PROOFS OF CLAIM AS TO CHARLES C. JOHNSON AND GOT NEWS LLC**

Even in bankruptcy, stripped of their flagship assets, Debtors continue to assault Claimants Charles C. Johnson and Got News, LLC. It is one thing to question Mr. Johnson's reporting, as he rightly questioned *Rolling Stone's* now-proven libel against University of Virginia Dean Nicole Eramo. It is entirely different, and beyond the pale, to lie and to purposely and repeatedly publish defamatory rumors in order to associate those rumors with Mr. Johnson.[1] Claimants Charles C. Johnson ("Johnson") and Got News, LLC ("Got News") (collectively, "Claimants") hereby respond to and oppose Debtors' Omnibus Objection to Proofs of Claim Nos. 54, 223, and 246 Filed by Charles C. Johnson, and Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012 (Doc. No. 396) and Debtors' Omnibus Objection to Proofs of Claim Nos. 52, 202, and 298 Filed by Got News LLC, and Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012 (Doc. No. 397).

**I.    Introduction**

1.    At the time Debtors Gawker Media, LLC ("Gawker"), Gawker Media Group Inc. ("GMGI"), and Gawker Hungary Kft. f/k/a Kinja Kft. ("Kinja") filed their petitions, Claimants had a pending suit against Gawker in the California Superior Court.[2] See *Johnson v. Gawker*

---

[1] "If a lie is only printed often enough, it becomes a quasi-truth, and if such a truth is repeated often enough, it becomes an article of belief, a dogma, and men will die for it." Blagden, Isa, *The Crown of Life*, Vol. III at 155 (1869).

[2] Although Debtors suggest Claimants failed to prosecute the California case, because the non-debtor defendants, J.K. Trotter and Greg Howard, were not served, they were unrepresented and could not be expected to understand how a case is stayed against one defendant but not all three. As set forth below, although GMGI and Kinja were not named as Defendants, had a judgment

*Media, LLC,* No. 15CECG03734 (Cal. Super. Ct. Dec. 9, 2015).[3] Such litigation was previously the subject of an injunction by this Court, *see Gawker Media, LLC v. Meanith Huon, et al.*, Case No. 16-01085 (SMB) (SDNY Bk. Ct.), and motions to extend the time to remove the case to this Court, DE 152, 212, 314, & 361. In a naked attempt to distract from the issues at hand, Debtors raise misleading allegations against Mr. Johnson, the founder of Got News,[4] irrelevant to their libel. *See* DE 396 at ¶¶ 5, 6 & 7.[5] As discussed in detail below, Claimants would have prevailed in their suit and been awarded damages consistent with their claims. Rather than accept responsibility for its actions and those of its employees, Gawker and the other debtors are now frivolously objecting to the claim.[6] The objections should be denied and the Claims should be allowed.

## II.     Factual Background

2.     Charles C. Johnson is a journalist and the owner of Got News, LLC, which runs the GotNews.com news website. Complaint at ¶ 1.[7] Debtor Gawker was a popular media entity, operating widely viewed websites such as Gawker.com and Deadspin.com. *Id*. at ¶¶ 3 & 9-13.

---

issued against Gawker, Claimants may have pursued veil piercing and reverse veil piercing claims against them, rendering such claims valid.

[3] Claimants had previously filed suit in Missouri, which Gawker removed to Federal court. See *Johnson v. Gawker Media, LLC,* 2016 WL 193390 (E.D. Mo. Jan. 15, 2016); once Claimants anticipated that a dismissal was imminent for want of personal jurisdiction, Claimants properly refiled in California, one of the two jurisdictions Gawker suggested might appropriately hear the case.

[4] In a footnote, Debtors assert that all of the statements are about Mr. Johnson, and they are only concerning Got News by association. DE 397 at p. 12, n. 17. The defamatory articles specifically link to Mr. Johnson's work on GotNews.com and treat them as being one and the same, making their interests coextensive. At a minimum, all claims relating to his publications on GotNews.com defame both Mr. Johnson and Got News.

[5] One point does warrant brief attention: Debtors lambaste Mr. Johnson for prior warnings of a libel suit that were not actually filed. Unlike those other incidents, Gawker's actions were so egregious that Mr. Johnson actually filed suit, and this disparity highlights the severity of Gawker's wrongs.

[6] Claimants agree to the jurisdictional and venue statement of Debtors. *See* Objections (both) at ¶ 1.

[7] Unless otherwise indicated, this section is taken from the "Factual Allegations" section of Claimants' California complaint, submitted with their proofs of claims.

Gawker employed writers such as J.K. Trotter and Greg Howard and regularly used the services of the public as writers and agents through the Kinja platform. *Id*. at ¶¶ 4-6, 22, 27-38, 40, 91-94, & 97. In 2014-15, Claimants gained a modicum of publicity surrounding their investigative reporting into the death of Michael Brown and the ensuing Ferguson riots. *Id*. at ¶¶ 98-110.

3. Mr. Howard, for Gawker, took a public position challenging any narrative that would suggest Michael Brown was a murder victim. *Id*. at ¶ 116; *see also* Exhibit 1.[8] But one day later, on December 5, 2014, Claimants published an article touting their efforts to obtain Mr. Brown's juvenile offender record. *See* Exhibit 2;[9] *see also* Complaint at ¶ 117. Within days, Gawker, through Mr. Howard and Mr. Trotter, as well as the public writers, began an orchestrated campaign against Claimants.

4. On December 9, 2014, in retaliation, Mr. Trotter, for Gawker, published "**What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained**". Complaint at ¶¶ 118-119. *See* Exhibit 3.[10] As discussed below, the article defames Claimants, *inter alia* falsely stating they made errors in reporting, that Mr. Johnson was dangerous, and that he thought Mr. Brown deserved to die. Complaint at ¶¶ 120-132 & 231. Thereupon, one of Gawker's public writers began an additional attack, repeated by Mr. Howard and Mr. Trotter, falsely stating Mr. Johnson had publicly defecated on the floor in college. *Id*. at ¶¶ 133-139. This culminated in the Gawker articles by Mr. Howard "**Wait, Did Clowntroll Blogger Chuck Johnson Shit on the Floor One Time?**" and by Mr. Trotter "**The Daily Caller Can't Quit Chuck Johnson**" and **"Which of these Disgusting Chuck Johnson Rumors are True**?". Complaint at ¶¶ 144, 146, 180, 231, 237;

---

[8] Greg Howard, "Charles Barkley Has Nothing To Say To America," DEADSPIN, Dec. 4, 2014, available at: <https://deadspin.com/charles-barkley-has-nothing-to-say-to-america-1666864783> (last accessed Nov. 15, 2016).

[9] Charles C. Johnson, "BREAKING: GotNews Wins First Stage of Appeal on #MichaelBrown Records #Ferguson #EricGarner," GOTNEWS, Dec. 5, 2014, available at: <http://gotnews.com/breaking-gotnews-wins-first-stage-appeal-michaelbrown-records-ferguson-ericgarner/> (last accessed Nov. 15, 2016).

[10] J.K. Trotter, "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained," GAWKER, Dec. 9, 2014, available at: <http://gawker.com/what-is-chuck-johnson-and-why-the-web-s-worst-journal-1666834902> (last accessed Nov. 15, 2016).

- 3 -

Exhibit 4;[11] Exhibit 5;[12] Exhibit 6.[13]  These articles repeated the lies about Claimants' reporting and reported these scurrilous lies about Mr. Johnson, including claims of public defecation and bestiality.  Complaint at ¶¶ 146-148, 154-156, 161-165, 180-204, 231, & 237.  And the articles including the contributions of the public writers and Mr. Howard in the Kinja sections, further publishing these defamatory remarks.  Complaint at ¶¶ 156-160, 167-170.  Gawker also repeated these defamatory remarks on the Twitter platform, including stating that Mr. Johnson was a "prodigy" at bestiality.  Complaint at ¶¶ 172-173, 181, 205 & 212-213.  Gawker knew these statements were false or simply was willfully and recklessly blind to the truth; it wanted to hurt Mr. Johnson, who had dared to question their narrative.  Complaint at ¶¶ 234, 243, 235 (2nd).  These lies were hurtful and financially harmful.  Complaint at ¶¶ 238-239, 245-246, 236-237 (2nd).  As a result, Claimants brought suit in Missouri, which was removed to Federal court and dismissed without prejudice for lack of personal jurisdiction.  *See* Order of Dismissal, *Johnson v. Gawker Media, LLC*, Case No. 4:15-CV-1137-CAS (MO E.D. Jan. 15, 2016), attached hereto as Exhibit 7.  The matter was re-filed in California superior court, where it remains pending, albeit subject to the automatic stay.

**III.    There is No Reason to Invoke Rule 7012**

5.    Claimants' claims are not core proceedings as they are intentional personal injury torts.  *See* 28 U.S.C. § 157(b)(2)(B).  Defamation claims are personal injury torts under the

---

[11] Greg Howard, "Wait, Did Clowntroll Blogger Chuck Johnson Shit on the Floor One Time?", THE CONCOURSE, Dec. 9, 2016. This article was previously available at the URL <http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746?>, but has since been disabled.  The article remains available using Archive.org's Wayback Machine at the URL <https://web.archive.org/web/20160506114918/http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746?> (last accessed Nov. 15, 2016).
[12] J.K. Trotter, "The Daily Caller Can't Quit Chuck Johnson," GAWKER, Dec. 9, 2014, available at: <http://gawker.com/the-daily-caller-can-t-quit-chuck-johnson-1668910086> (last accessed Nov. 15, 2016).
[13] J.K. Trotter, "Which of These Disgusting Chuck Johnson Rumors are True?", GAWKER, Dec. 15, 2014, available at: <http://gawker.com/which-of-these-disgusting-chuck-johnson-rumors-are-true-1669433099> (last accessed Nov. 15, 2016).

- 4 -

Bankruptcy Code. *See, e.g., In re Goidel*, 150 B.R. 885, 888 (Bankr. S.D.N.Y. 1993) (determining that defamation claim should be tried in District Court per Section 157(b)(5)); see also *In re Residential Capital, LLC*, 536 B.R. 566, 573 (Bankr. S.D.N.Y. 2015) citing *Texas Capital Bank, N.A. v. Dallas Roadster, Ltd. (In re Dallas Roadster, Ltd.)*, Nos. 11-43725, 11-43726, Adv. Proc. No. 13-4033, 2013 Bankr. LEXIS 4398, 2013 WL 5758632, at *3 & n.1 (Bankr. E.D. Tex. Sept. 27, 2013) ("In addition, certain of [the] counterclaims may be personal injury torts which are expressly excluded from the automatic referral to the Bankruptcy Court—and thus are already in the District Court." (indicating that the counterclaims consist of IIED and "defamation/business disparagement" causes of action)); *In re Boyer*, 93 B.R. 313, 317 (Bankr. N.D.N.Y. 1988) ("The term "personal injury tort" embraces a broad category of private or civil wrongs or injuries for which a court provides a remedy in the form of an action for damages, and includes damage to an individual's person and any invasion of personal rights, such as libel, slander and mental suffering"). Unlike the IIED claim in *ResCap*, taking the hybrid approach, Claimants' claims do not simply arise out of financial, business, or property claims; it recognized that defamation claims meet this standard. *See In re Residential Capital, LLC*, 536 B.R. 566, 572 (Bankr. S.D.N.Y. 2015) citing *Adelson v. Smith (In re Smith)*, 389 B.R. 902, 908-13 (Bankr. D. Nev. 2008) (applying hybrid view and concluding that libel claim under Nevada law is a personal injury tort, but plaintiff consented to bankruptcy court adjudication of claim). Thus, the matter is not a core proceeding and the claim should be determined by the District Court.[14]

6.     Further, and assuming *arguendo,* this is a core proceeding, although Debtors invoke Fed. R. Bankr. P. 7012, essentially moving under Fed. R. Civ. P. 12(b)(6) and/or 12(c) for failure to state a claim/judgment on the pleadings, such is not appropriate. Debtors' citation to *In re DJK Residential LLC*, 416 B.R. 100 (Bankr. S.D.N.Y. 2009) is inapposite; the Bankruptcy Court did

---

[14]   Debtors provide no case to suggest that corporate persons are treated differently under Section 157(b) than individuals. Corporations are "persons" under the Bankruptcy Code. See *Shawmut Bank Conn. v. First Fid. Bank (In re Secured Equip. Tr. of E. Air Lines)*, 38 F.3d 86, 89 (2d Cir. 1994) quoting 11 U.S.C. § 101(41). If Mr. Johnson's claims are personal injury torts, so, too, are those of Got News, LLC.

- 5 -

not invoke Rule 7012, but rather merely considered whether Fed. R. Civ. P. 8 & 9(b) pleading requirements were met. *Accord In re Residential Capital, LLC*, 518 B.R. 720, 731-32 (Bankr. S.D.N.Y. 2014). Rule 7012 is not among the specified rules identified in Rule 9014(c). *See Chase v. Chase (In re Chase)*, Nos. 05-45706 (AJG), 08-01128 (AJG), 2008 Bankr. LEXIS 2124, at *22-24 n.12 (U.S. Bankr. S.D.N.Y. July 25, 2008). Claimants have otherwise met their pleading obligations and there is no reason to evade the normal procedures for the few proofs of claim to which Debtors object.

7.  Further assuming, *arguendo*, the motion to dismiss is entertained, Claimants' claims contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (Rule 12(b)(6)); *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (Rule 12(c)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As set forth below, the Proofs of Claim, incorporating the California complaint, demonstrate Debtors' liability and, therefore, plausibility.

**IV.  California Anti-SLAPP Law is Not Applicable**

8.  Although Debtors cite to *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 973 (9th Cir. 1999), the Second Circuit Court of Appeals has recently questioned whether state anti-SLAPP statutes are applicable in federal court. *See Ernst v. Carrigan*, 814 F.3d 116, 119 n.1 (2d Cir. 2016); *but see Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (finding the Nevada anti-SLAPP law "unproblematic," but resolving the issue on other grounds). To the extent it may be applicable, in federal court and in bankruptcy court, only the state law claims would be subject; Claimants' section 1983 claims are not.[15] *See Restaino v. Bah (In re Bah)*, 321 B.R. 41, 47 (B.A.P. 9th Cir. 2005). Similarly, as neither GMGI nor Kinja were parties to the California action, Debtors have proffered no reason why they might enjoy the benefits

---

[15] Although the anti-SLAPP motion would not apply to the Section 1983 claim, Claimants nonetheless have decided not to pursue the claim styled as Count VI in the complaint.

- 6 -

of the California anti-SLAPP statute. *Contrast Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) (finding California law applicable on case transferred from California).

9.  Notably, this is not a transferred California case; that action against Gawker was automatically stayed by the filing of the bankruptcy petition. The filing of the proof of claim occurred in New York. Contrary to the assertion of Debtors at DE 396, ¶ 21, California was not the only possible forum; Gawker itself argued that New York was also a permissible forum. *See* Defendants' Motion to Dismiss the Complaint, *Johnson v. Gawker Media, LLC*, Case No. 4:15-CV-1137-CAS (MO E.D. Aug. 24, 2016). And, although Claimants' domicile might often govern choice-of-law, *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999), the nine-factor test applies where multi-state publication occurred. *See Zuck v. Interstate Publ'g Corp.*, 317 F.2d 727, 734 n.12 (2d Cir. 1963). The place of emanation, publisher's domicile, main publishing office, state where defamation was first communicated, and the forum are all New York-centered.[16] The suffering of greatest harm,[17] place of Claimants' principal activity, and place of principal circulation are all nationwide.[18] *See* Declaration of Charles C. Johnson, attached hereto as Exhibit 9. Only Claimants' domicile relates to California. Although the proofs of claim attach the California complaint, this is not a California action—it is a New York proof of claim. Thus, there is no reason why California claimants should be subject to different rules in a New York bankruptcy court, bringing claims arising under the laws of New York and Missouri, merely because of their domicile; the California anti-SLAPP law is therefore not applicable.

10. Even if the California anti-SLAPP law were otherwise applicable, Debtors are not entitled to relief thereunder. First, as set forth below, Claimants have not just a probability, but a likelihood, of prevailing on their claims. Second, the alleged speech is largely not "in connection with a public issue". *See* Cal. Code of Civ. P. § 425.16(b)(1). Claimants recognize that

---

[16] In its objection to the Got News claim, Debtors assert the injury took place in California. DE 397 at ¶ 8. They offer no basis for this assertion.
[17] Although harm was nationwide, it was focused, at the time, in Missouri.
[18] These would be proven at trial and discovery prior to adjudication would be appropriate. Certainly, these issues cannot be resolved at the motion to dismiss stage.

Mr. Johnson may be a limited purpose public figure with respect to his then-notable **reporting**, specifically related to the issues of Michael Brown's possible criminal history and the *Rolling Stone* false accusations of rape, but the defamatory statements were unrelated to those issues.[19] Further, the question of limited purpose public figure does not necessarily determine "connection with a public interest" under the statute. "The most commonly articulated definitions of 'statements made in connection with a public issue' focus on whether (1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) the statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest." *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 898, 17 Cal. Rptr. 3d 497, 506 (2004) (citations omitted). Although Mr. Johnson may have been in the public eye, neither of the other two factors are met. Rumors about alleged activities before his professional reporting career began neither affect large numbers of people nor have widespread public interest. And even the false statements about the reports on Sens. Menendez and Booker were unrelated to the topical Michael Brown and *Rolling Stone* controversies, and thus the statements did not then affect large numbers of people nor were those then topics of public interest.

**V.    Debtors are Liable to Claimants for Defaming Them as Liars and Grotesques**

11.    Debtors libeled Claimants. In New York,[20] the elements of a defamation claim are: "(1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) causing special harm or constituting [defamation] per se; and (7) not protected by privilege." *Camprubi-Soms v. Aranda*, 2001 U.S. Dist. LEXIS 11291, *37 (S.D.N.Y. June 12, 2001) (citing Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001)). Debtors do not dispute the elements of falsity, publication, "of and concerning", and harm. Instead, they assert that eight false statements are not

---

[19]   As addressed below, however, the defamatory statements about his reporting were uttered with actual malice.

[20]   As discussed above, New York law applies to these claims. However, the same principles appear in the California standards cited by Debtors and the analysis is essentially identical.

- 8 -

of fact, that four are privileged under Section 230 of the Communications Decency Act, and that the level of fault, asserted to be actual malice, has not been met. These defenses are insufficient; Claimants properly pleaded all elements the disputes are better suited to trial.

12. Further, Debtors only take issue with twelve defamatory statements, which they label "A" through "L", on the basis of opinion and privilege. Claimants identified many other false and defamatory statements. *See* Complaint at ¶¶ 121 (claiming **stalking**, **harassing**, and **endangering** others), 122 (claiming **flawed reporting**), 147 (claiming Mr. Johnson wrote **false stories**),[21] 165 (claiming Mr. Johnson had been caught **lying**), 181 (claiming Mr. Johnson was a prodigy at **bestiality**), 189 (repeating allegations of **public defecation**), 197 (asserting Mr. Johnson committed **bestiality**), and 201 (alleging Mr. Johnson had been **charged as a juvenile**). Further, the Complaint incorporated at ¶ 223, thirty-six statements in an exhibit table. A copy appears at <u>Exhibit 10</u>. That table identified the specific sources, which are filed herewith. *See* <u>Exhibit 11</u>. Those sources were also incorporated into the complaint. *See* Complaint at ¶ 7. Although the first ten are among the ones challenged by Debtors, the remaining statements are otherwise unchallenged, save for standard of fault, addressed below.

A. <u>Statements A-D Are Statements of Fact</u>

13. With respect to the statements Debtors actually challenge, Statements A-D are not statements of opinion. The four statements identified in their Objection at DE 396, ¶ 35, are not statements of opinion, but set forth factual statements.[22] *See Gertz v. Robert Welch*, 418 U.S. 323, 339-40 (1974). Whether a statement is factual is a question of law. *See Gertz*, 418 U.S. at 339-40. A court must consider the overall context, tone, and apparent purpose of a statement and whether a reasonable reader would interpret a statement literally or otherwise view it as a mere expression of opinion, hyperbole or otherwise. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*,

---

[21] *See* <u>Exhibit 5</u>.
[22] For ease of reference, Claimants will use, where applicable, the Statement Letter designations set forth by Debtors. Further, the two objections are essentially identical and citation to one should be interpreted to be a citation to the other, except where there are distinctions between the Claimants raised.

759 F.2d 219, 229 (2d Cir. 1985); *see also Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014); *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995); *Torain v. Liu*, 279 Fed. Appx. 46, 46 (2d Cir. 2008); *Fleiss v. Wiswell*, 157 Fed. Appx. 417, 417 (2d Cir. 2005) (summary order).  New York uses "a flexible approach in distinguishing actionable fact from non-actionable opinion," considering factors such as:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal … readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Id.* at 153 (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993)).

14.     Statement A factually states there is a long list of stories in which Mr. Johnson's reporting was proven to be wrong; only three were actually identified, far from being a long list. Those words have precise meaning and whether a story has been proven wrong can easily be shown to be true or false.  The signal is that it was reported as factual, as one does not "prove" an opinion. To the extent "long" is a matter of opinion, the author, J.K. Trotter, for Gawker, failed to disclose "all the facts"; three stories is hardly "long".  *See* Exhibit 3.  As to the question of Senator Booker, the article hyperlinked by Gawker does not "prove" the Senator lived in Newark, although the information provided to Buzzfeed may be evidence.  *See* Exhibit 12.[24]  More important, Mr. Johnson never said Senator Booker did not live in Newark; he reported on the sources who stated Senator Booker did not live in Newark.  *See* Exhibit 13.[25]  If something was "proven wrong", it was not anything Mr. Johnson himself said.  He has never been "proven wrong" about his own statements about the Senator in any forum.

---

[24] Ruby Cramer, "Cory Booker: Yes, I Live In Newark," BUZZFEED NEWS, Oct. 14, 2013, available at: <https://www.buzzfeed.com/rubycramer/cory-booker-yes-i-live-in-newark> (last accessed Nov. 15, 2016).

[25] Charles C. Johnson, "Neighbors: Cory Booker never lived in Newark," THE DAILY CALLER, Oct. 14, 2013, available at: <http://dailycaller.com/2013/10/14/neighbors-cory-booker-never-lived-in-newark/> (last accessed Nov. 15, 2016).

15. Similarly, nothing in Statement B, about anything Mr. Johnson himself said, has been "proven wrong". First, the underlying *Daily Caller* story was not written by Mr. Johnson; he was merely listed as having "contributed reporting." See Exhibit 14.[26] The ABC News and Washington Post stories cited by Gawker does not identify what Mr. Johnson specifically reported or that his contribution was wrong. See Exhibit 15;[27] *see also* Exhibit 16.[28] Once more, Mr. Johnson never said Senator Menendez cavorted with prostitutes; the article reports on sources who made such assertions. Moreover, although one of the alleged prostitutes may have recanted, it has not been proven which of her versions of the truth were accurate. Neither was the entire *Daily Caller* report called into question by the recanting prostitute; issues relating to Sen. Menendez's travel schedule, and the donations of Dr. Melgen, related to the corruption investigation, remain the subject of prosecution. *See, e.g., United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016). Mr. Johnson, himself, was not proven wrong about any of this.

16. As to Statement C, there is no question that Mr. Johnson published some of Michael Brown's Instagram pictures and stated the quoted phrase. See Exhibit 17.[29] But Gawker did not link to Mr. Johnson's article; instead, it links to an article that states that "some conservatives" label Mr. Brown as a "no-goodnik who probably got what he deserved", and only discussing Mr. Johnson's article, who himself is labeled as a "right-wing", *i.e.* conservative, blogger.

---

[26] Matthew Boyle, "Women: Sen. Bob Menendez paid us for sex in the Dominican Republic [VIDEO]," THE DAILY CALLER, November 1, 2012, available at: <http://dailycaller.com/2012/11/01/women-sen-bob-menendez-paid-us-for-sex-in-the-dominican-republic/> (last accessed Nov. 15, 2016).

[27] Rhonda Schwartz, "The Menendez Prostitution 'Scandal': How It Happened," ABC NEWS, Mar. 6, 2013, available at: <http://abcnews.go.com/Blotter/robert-menendez-prostitution-scandal-happened/story?id=18664472> (last accessed Nov. 15, 2016).

[28] Carol D. Leonnig, "Sen. Robert Menendez seeks probe of alleged Cuban plot to smear him," THE WASHINGTON POST, July 7, 2014, available at: <http://www.washingtonpost.com/politics/sen-robert-menendez-seeks-probe-of-alleged-cuban-plot-to-smear-him/2014/07/07/e9ba25a0-efe8-11e3-914c-1fbd0614e2d4_story.html> (last accessed Nov. 15, 2016).

[29] Charles C. Johnson, "EXCLUSIVE: What We Found On #MichaelBrown's Instagram Account," GOTNEWS, Sept. 5, 2014, available at: <http://gotnews.com/found-michaelbrowns-instagram-account/> (last accessed Nov. 15, 2016).

*See* Exhibit 18.[30] Mr. Johnson never said that "Mr. Brown got what he deserved," let alone Mr. Trotter's rebranding of it as "**In other words, Brown deserved to die**." Mr. Brown was not "murdered;" a grand jury refused to even indict Officer Wilson. *See, e.g.,* Exhibit 19.[31] Gawker falsely reported Mr. Johnson as suggesting Mr. Brown deserved his fate rather than, as his reporting did, highlight evidence that might help the public understand why Officer Darren Wilson shot Mr. Brown. Whether someone **deserves to die** is a far different proposition as to whether a police officer might have been justified in using deadly force. The phrase "in other words" does not signal opinion; it directs a reader to a purported truth and that purported truth is not a supportable interpretation of what Mr. Johnson actually wrote.

17. Unlike the Trotter article, the December 9 article by Greg Howard has been taken offline. *See* Exhibit 4. Statement D reported that Mr. Johnson "gets things wrong *a lot*." (emphasis in original). The only basis for that statement was Mr. Trotter's article, linked to in the preceding sentence. Necessarily, then, Mr. Howard supports his allegation of Mr. Johnson getting things wrong through Statements A and B, which, as discussed, Mr. Johnson himself did not get wrong. And the term "a lot" should suggest more than three items,[33] two of which Mr. Johnson did not get wrong. Like "proven wrong", getting things wrong is a statement of fact. Thus, Statements A-D are all false statements of fact.

B. The Statements About Mr. Johnson are False

18. In context, Statements E & F portray rumors with implicit outcomes. There is no question that it is defamatory to falsely claim Mr. Johnson committed **public defecation and bestiality**. Even the case to which Debtors cite acknowledges that questions raised without

---

[30] Adam Weinstein, "James O'Keefe Wannabe 'Exposes' Michael Brown's Instagram," FORTRESSAMERICA, Sept. 5, 2014, available at: <http://fortressamerica.gawker.com/james-okeefe-wannabe-exposes-michael-browns-instagram-1631039505> (last accessed Nov. 15, 2016).
[31] "No charges against Darren Wilson, grand jury decides," ST. LOUIS POST-DISPATCH, Nov. 24, 2014, available at: <http://www.stltoday.com/news/local/crime-and-courts/no-charges-against-darren-wilson-grand-jury-decides/article_9afc71c9-a858-5f37-aba3-faba3fe12dfe.html> (last accessed Nov. 15, 2016).
[33] Mr. Johnson agrees that he was misled by a spoof article from 1990.

- 12 -

journalistic purpose can be defamatory. *See Abbas v. Foreign Policy Grp., LLC*, 414 U.S. App. D.C. 465, 476, 783 F.3d 1328, 1339 (2015)[34] ("**a question's wording or tone or context sometimes may be read as *implying* the writer's answer to that question**"). Such does not represent "a genuine effort to obtain information" that would not be defamatory. *Id*. quoting 1 *Sack on Defamation* § 2:4.8. Thus, "[a] question can conceivably be defamatory, though it must reasonably be read as an *assertion* of a false *fact*." *Partington v. Bugliosi*, 56 F.3d 1147, 1161 (9th Cir. 1995). Such an outrageous and defamatory statement does not become protected simply by slapping a question mark on at the end of it.

19.    In his December 15 article, Mr. Trotter, again on behalf of Gawker, published multiple false statements about Mr. Johnson. *See* Exhibit 6. The article makes three false statements about Johnson, none of which were supported by evidence. Mr. Johnson vehemently denies the false claims made against him. *See* Statement of Charles C. Johnson, attached hereto as Exhibit 20. Further, as to Statements 1 and 3 (Statements E & F), Gawker explicitly states there is "no evidence" to support the rumors. But, in saying "no evidence," Debtors did so in a tongue-in-cheek fashion; they published all of the allegedly supporting statements and left the outcome inconclusive. Notwithstanding the "no evidence" declarations, the questions are reasonably read as assertions of false facts. "Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite: 'The lady doth protest too much, methinks.'" *United States v. Allied Stevedoring Corp.*, 241 F.2d 925, 933 (2d Cir. 1957) quoting Shakespeare, Hamlet, Act II, Scene II, line 242. Mr. Trotter's article reads as implying he believes that the allegations may be true for, if they were "very unbelievable" as he set forth at the outset, the detailed article would be unnecessary.

---

[34] Curiously, Debtors failed to cite *Abbas* in their discussion of the application of state anti-SLAPP law. Notably, *Abbas* precludes the application of an anti-SLAPP statute as disruptive of the comprehensive scheme of the Federal Rules, agreeing with dissenting judges in the Ninth Circuit. See *Abbas v. Foreign Policy Grp., LLC,* 414 U.S. App. D.C. 465, 474, 783 F.3d 1328, 1337 (D.C. Cir. 2015). Thus, if Debtors find *Abbas* persuasive, they should not have brought their motion under the California anti-SLAPP law.

20. Statements G and H must, as Debtors indicate, be read in context; Mr. Howard published them within fifteen minutes of each other. Statement G refers to "cryptic comments on the Facebook post" regarding public defecation, which comments Mr. Howard does not republish. By referring to them as "cryptic", Mr. Howard states that they may be credible. Similarly, by describing the comments on Kinja as "good-ass" in Statement H, Mr. Howard again attests that the rumors may be valid, in addition to the very purpose of Kinja to be about information discovery, not jokes. *See* Exhibit 21 ("Sharing, recommending, and following within the Kinja ecosystem allows for improved information discovery.")[36] Nothing in the context suggests that Mr. Howard wrote the statement in a humorous fashion. In fact, the entire December 9 article by Mr. Howard solicits further rumormongering—that is its very purpose—in furtherance of the December 15 article by Mr. Trotter. Gawker's motto was "Today's gossip is tomorrow's news." *See, e.g.,* "@Gawker," TWITTER, attached hereto as Exhibit 22.[37] Debtors intended that the articles, and Statements G & H, be treated as news, not as humor. Thus, Statements E-H must be treated as actionable defamation.

C. Gawker is at Fault for the Defamation

21. Mr. Johnson is a limited purpose public figure. Gawker originally used that phrase in its motion to dismiss the Missouri complaint. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss, *Johnson v. Gawker Media, LLC*, Case No. 4:15-cv-1137-CAS (Aug. 24, 2015), at p. 9. Claimants agreed. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, *Johnson v. Gawker Media, LLC*, Case No. 4:15-cv-1137-CAS (Oct. 22, 2015), attached hereto as Exhibit 23, at pp. 8-11. Gawker reiterated that position in its reply memorandum, making it a section header. *See* Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, *Johnson v. Gawker Media, LLC*, Case No. 4:15-cv-1137-CAS (Nov. 12, 2015), at p. 4 ("Plaintiffs Are Limited Purpose Public Figures"). In that

---

[36] Kinja Platform Description, GAWKER, available at: <http://advertising.gawker.com/platform/> (last accessed Nov. 15, 2016).
[37] Available at: <https://twitter.com/gawker> (last accessed Nov. 15, 2016).

reply memorandum, Gawker seemed not to understand that "limited" meant that Mr. Johnson was public for some purposes, but not all. Now, for the first time, Gawker suggests Mr. Johnson is an "all-purpose" public figure; he is not.

22.  In the cases cited by Debtors, (1) William F. Buckley, Jr., stipulated he was a public figure in *Buckley v. Littell*, 539 F.2d 882, 885 (2d Cir. 1976); (2) Rafael Jose agreed he was a public figure in *Diaz Rodriguez v. Torres Martir*, 394 F. Supp. 2d 389, 393 (D.P.R. 2005); and (3) Thomas Braden admitted he was a public figure, was watched by over 1 million viewers nightly, and otherwise did not dispute that he was recognized by a large percentage of the citizenry in *Braden v. News World Commc'ns, Inc.*, 18 Med.L.Rptr. 2209, 1991 WL 161497 (D.C. Super Ct. 1991). In contrast, Mr. Johnson is not as well known to the masses as these icons. He is far more akin to the plaintiff in *Knudsen v. Kan. Gas & Elec. Co.*, 248 Kan. 469, 478, 807 P.2d 71, 78 (1991), a reporter found to be a limited purpose public figure, or the opinion author-plaintiff in *Rybachek v. Sutton*, 761 P.2d 1013 (Alaska 1988). Notably, Debtors try to turn Mr. Johnson into an all-purpose public figure by associating him with media giants like Megyn Kelly, Sean Hannity, and Mark Levin. *See* Objection at p. 24. If Mr. Johnson were as well-known as Debtors claim, no such association would be necessary; they could point to evidence to suggest he has a household name. At a minimum, such is an issue for discovery and trial; Debtors' *ipse dixit* will not suffice.

23.  Because Mr. Johnson is only a limited purpose public figure, Debtors concede that in such circumstance, only Statements A-D would be subject to the actual malice standard.[38]

---

[38] The Second Circuit has established a four-part test in determining whether a plaintiff is a limited-purpose public figure. The plaintiff must have:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Biro v. Condé Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013) quoting *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136-37 (2d Cir. 1984). With respect to Statement B, Mr. Johnson was not the author of the article about Sen. Menendez, but only contributed to the reporting. Thus, he might not even have met the first three prongs. However, Claimants will assume *arguendo* that he met them.

Limited purpose public figures must meet a heightened standard and "show that the statements were made with 'actual malice' — that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279- 80 (1964)) (public officials); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (public figures); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137, 139 (2d Cir. 1984) (limited-purpose public figures). Claimants plausibly alleged actual malice.[39] As discussed above, nothing in even the sources cited by Gawker suggest Mr. Johnson got anything wrong. A plain reading of those articles indicates as much.[40] All Mr. Johnson and the author of the Menendez article did was write "so-and-so said 'X'" — as a news organization itself, Gawker knew that so long as so-and-so actually said "X", the journalist got nothing wrong.[41] Gawker knew its own statements were false or otherwise recklessly disregarded the falsity in order to paint Mr. Johnson as a bad journalist.

24.  As to Statements E-H, assuming *arguendo* Mr. Johnson is a public figure for such purpose, Debtors now attempt to paint them as satire. There is nothing in the articles that distinguishes such "satire" from Gawker's ordinary news reporting. Gawker's aim in publishing was not satire, however, it was retribution; it wanted to give Mr. Johnson what it believed to be a taste of his own medicine.[42] *See* Objection at p.¶ 60. Gawker knows what satire is—it reports on

---

[39] Although Debtors assert Claimants failed to plead actual malice (see, e.g., Doc. 396 at ¶¶ 63-65), this is erroneous. To the contrary, Claimants wrote that the statements were made "with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true." Complaint at ¶ 240.

[40] Claimants agree that they must assert specific statements were made with actual malice. However, the allegations regarding Messrs. Geithner, Franco, and Barkley was to show that actual malice is Gawker's *modus operandi*.

[41] Although Debtors may argue Gawker was similarly reporting what others said, Gawker acted with actual malice and the Kinja contributors made their comments as agents of Gawker, which actively encouraged and developed the defamatory content.

[42] Mr. Johnson's article about the *New York Times* reporter reiterated a story that had been previously published; that Mr. Johnson was fooled by parody does not negate the fact that the parody had been available to the public for decades. The investigation of Michael Brown's past was fully relevant to the national debate on the character of Mr. Brown. And, unlike Gawker, Mr. Johnson apologized when he honestly misidentified a picture as being of Jackie Coakley. S*ee* Charles C. Johnson, "CORRECTED… #JackieCoakley Retweeted Slut Walk 2011," GOTNEWS,

what is clear satire. *See, e.g.*, Exhibit 25.[43] The Gawker articles, however, had none of the indicia of satire that the *Boston Globe* article, dated a year into the future, had. Moreover, satire remains actionable under the First Amendment where a publication containing false statements of fact are made with actual malice. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S. Ct. 876, 882, 99 L. Ed. 2d 41 (1988). Other than calling them "satire," Debtors fail to provide any reason why they were not made with actual malice, let alone negligently.

25. Finally, although Debtors claim that "actual malice" was not actually pled, they admit that the complaint does assert that the articles were "intrinsically malicious." *See* Objection at ¶ 65. They also seem to ignore that it was specifically pleaded that they were published with knowledge of falsity or with reckless disregard. *See* Complaint at ¶ 240. They recognize that Claimants pleaded that Gawker did an investigation, yet nonetheless chose to publish the false statements. Such publication is necessarily with reckless disregard for their falsity or, more likely, with knowledge they were false. This is true for Statements A-D, where links to the articles demonstrating Mr. Johnson did not actually commit error was provided. And, for Statements E-H, even though Mr. Johnson was not a public figure for such purpose, they were published with the admission that there was no substantiating evidence.

D. Statements I-L are Not Privileged

26. Debtors claim immunity from liability for four comments to the December 15, 2015, article pursuant to 47 U.S.C. § 230 ("Section 230"), which would otherwise make such statements privileged. Although Mr. Howard and Mr. Trotter may not have "provided" the offending content; Gawker did. *See* 47 U.S.C. § 230(c)(1). When commenters are agents of an

---

Dec. 9, 2014, attached hereto as Exhibit 24, and available at: <http://gotnews.com/breaking-fraud-jackiecoakley-cried-rape-uvahoax/> (last accessed Nov. 15, 2016).

[43] Brendan O'Connor, "Very Mad Donald Trump Calls the *Boston Globe* 'Stupid' and 'Worthless' in Response to Satirical Front Page," GAWKER, April 11, 2016, available at: <http://gawker.com/very-mad-donald-trump-calls-the-boston-globe-stupid-a-1770239322> (last accessed Nov. 15, 2016).

interactive service provider, rather than being another information content provider, Section 230's protections do not apply. *See Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 2016 U.S. Dist. LEXIS 89160, at *14 (S.D.N.Y. July 8, 2016). As discussed therein:

> Under New York law, an express agency is created through (1) "the principal's manifestation of intent to grant authority to the agent," (2) "agreement by the agent," and (3) the principal's "control over key aspects of the undertaking." *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (collecting cases). Even where there is no "actual" authority, an implied agency is created where the principal's conduct, "reasonably interpreted, causes [ ] third [parties] to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir. 1990); *accord Dinaco, Inc. v. Time Warner Inc.*, 98 Civ. 6422 (JSM), 2002 U.S. Dist. LEXIS 20173, 2002 WL 31387265, at *3 (S.D.N.Y. Oct. 22, 2002), *aff'd*, 346 F.3d 64 (2d Cir. 2003) (implied agency exists where principal is "responsible for [the agent's] appearance of authority and … [the third party's] reliance on the appearance of authority was reasonable").

*Enigma Software Grp. USA* at * 14-16. Gawker made commenters express agents or, at a minimum, implied agents. The comments section to the article is not akin to a traditional comments section. Rather, Gawker used its proprietary "Kinja" platform, which it describes as:

> Kinja is our publishing platform designed to make great stories by breaking down the lines between the traditional roles of content creators and consumers. Everyone — editors, readers, marketers — have access to the same tools to engage in passionate discussion and reveal the truth. Sharing, recommending, and following within the Kinja ecosystem allows for improved information discovery.
> The Gawker Media Group and the brand stories created by Studio@Gawker are powered and connected by Kinja. It bolsters our dedication to breaking news and sharing intelligent perspectives with the most informed voices — yours and ours.

*See* Exhibit 21; *see also* Complaint at ¶¶ 27 & 34. In "breaking down the lines between" the "content creators and consumers," Gawker appointed the readers as its own agents, inviting them to publish information on Gawker's behalf.

27.   In fact, just two days ago, the Seventh Circuit Court of Appeals found that Claimant Meanith Huon could proceed with his defamation claim against Gawker by virtue of statements

- 18 -

authored by Kinja users. See *Huon v. Denton*, 2016 U.S. App. LEXIS 20433 at * 14-20 (7th Cir. Nov. 14, 2016). Claimants make essentially identical allegations as to how Gawker itself was the information content provider, held sufficient to survive a Section 230 challenge at the Rule 12(b)(6) stage. See *id.* at * 16-17. Gawker is collaterally estopped from asserting otherwise. *See Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 955 (2d Cir. 1964). Debtors provide no other reason why statements I-L are not otherwise actionable.

### VI.    Claimants' Other Claims Should Proceed

28.    The only basis on which Debtors assert that the false light claims must be denied is because the defamation claims are not actionable. *See* Objection, DE 396, at ¶¶ 51-52. Claimants agree there is a substantial overlap between the torts of false light invasion of privacy and defamation. However, they are not identical. The false light claim was brought under Missouri law,[45] which recognizes such a claim where a false opinion is attributed to a plaintiff or where a plaintiff's likeness is used next to a story that has no bearing on the Plaintiff.[46] *See Sullivan v. Pulitzer Broad. Co.*, 709 S.W.2d 475, 480 (Mo. 1986). Gawker falsely attributed to Claimants the opinion that Sen. Booker did not live in Newark and that Sen. Menendez cavorted with prostitutes. Gawker used Mr. Johnson's likeness in discussing rumors of public defecation and bestiality. The false light claim is actionable.

29.    Claimants may also pursue their claims against GMGI and Kinja; they are not time-barred. Although there are no direct claims against them, they are subject to veil-piercing and alter-ego liability. The statute of limitations would not bar this equitable remedy. Gawker is a Delaware limited liability company. See DE 1, Bankruptcy Petition. "There is no dispute that veil-piercing and alter-ego claims in Delaware are only available in courts of chancery, i.e., they are

---

[45] "As with choice of law generally, New York courts applying dépeçage determine what law to apply to a specific issue by resort to the paramount interest test." *Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir. 1984). Mr. Johnson was in and focused upon Missouri when he was placed in a false light; that state has the paramount interest with respect to that claim.

[46] Notwithstanding Debtors' citation to California law (DE 397 at ¶ 53), Claimants are unaware of any Missouri case suggesting that a business entity, such as Got News, LLC, could not bring an invasion of privacy claim.

only available in equity." *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 333 (S.D. Tex. 2008) citing *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, France,* Consolidated C.A. No. 19760-NC, 2004 Del. Ch. LEXIS 21, at *8 (Del Ch. 2004). Similarly, in New York, "alter ego claims are well within the applicable twenty-year statute of limitations of N.Y. C.P.L.R. § 211(b)." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 295 F. Supp. 2d 366, 377 (S.D.N.Y. 2003). Claimants, upon proving their claims against Gawker, may pierce the veil and pursue GMGI and the sister Kinja entity; Gawker otherwise uses Kinja, which operates the namesake platform, as an alter ego. Therefore, the statute of limitations does not bar such claims.

### VII.  Conclusion

30.  Gawker has a tortured relationship with the truth. Rather than engage in investigative journalism, Gawker ignored the evidence before it to heap calumnies upon Claimants. The claims should be heard in the District Court as personal injury torts and otherwise addressed through a proper adversarial process. Claimants have properly asserted claims for defamation and false light invasion of privacy, and there is no basis to disallow those claims, enter an order of dismissal, or strike them under California law.

WHEREFORE Claimants respectfully request this Honorable Court deny Debtors' omnibus Objections and Motions.

Dated: November 16, 2016          Respectfully Submitted,

*/s/ Jay M. Wolman*
Jay M. Wolman (JW0600)
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tele:  702-420-2001
Fax:   305-437-7662
Email: ecf@randazza.com

*Attorneys for Claimants,*
*Charles C. Johnson and Got News LLC*