# EXHIBIT  B

Hearing Date & Time: _____, 2016 at ____ a.m. (Eastern Time)
Objection Deadline: _____ __, 2016

CHIESA SHAHINIAN & GIANTOMASI PC
One Boland Drive
West Orange, New Jersey 07052
Telephone: (973) 325-1500
Facsimile: (973) 325-1501
Robert E. Nies, Esq. (rnies@csglaw.com)
Michael R. Caruso, Esq. (mcaruso@csglaw.com)

*Attorneys for Mitchell Williams*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GAWKER MEDIA LLC, et al., | Case No. 16-11700 (SMB) |
| Debtors. [1] | (Jointly Administered) |

**DECLARATION OF RAHUL MUNSHI IN SUPPORT OF MOTION OF MITCHELL
WILLIAMS FOR AN ORDER (I) MODIFYING THE AUTOMATIC STAY, FOR
"CAUSE", PURSUANT TO 11 U.S.C. § 362(d) TO PERMIT AN APPEAL IN STATE
COURT LITIGATION INVOLVING A PERSONAL INJURY DEFAMATION CLAIM
AGAINST DEBTOR; (II) AUTHORIZING A TRIAL FOR STATE COURT OF
WILLIAMS' PERSONAL INJURY DEFAMATION CLAIM AGAINST DEBTOR,
SOLELY TO ESTABLISH LIABILITY AND AMOUNT OF WILLIAMS' CLAIM; AND
(III) GRANTING SUCH OTHER FURTHER RELIEF AS MAY BE APPROPRIATE**

I, RAHUL MUNSHI, declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that:

1.      I am an attorney with the law firm of Console Law Offices LLC, located at 1525

Locust Street, 9th Floor Philadelphia, PA 19102. We are counsel to Mitchell Williams. I am

authorized to make this Declaration in support of the motion (the "**Motion**") of Mitchell

Williams for an order (i) modifying the automatic stay, for "cause", pursuant to 11 U.S.C. §

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker
Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Lft.) (5056). Gawker Media LLC and Gawker
Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring
Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o
Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

362(d) to permit an appeal in state court litigation involving a personal injury defamation claim against Debtor; (ii) authorizing a trial for state court of Williams' personal injury defamation claim against Debtor, solely to establish liability and amount of Williams' claim; and (iii) granting such other further relief as may be appropriate. Except as to any matters stated upon information and belief, I have personal knowledge of the facts attested to herein based upon my representation of Mitchell Williams.   As to any matters of opinion or matters stated upon information and belief, I believe them to be true and correct.

2.     Williams' complaint and jury demand (the "**Williams Complaint**") -- filed on September 24, 2014 in the New Jersey State Court -- asserted five (5) causes of action against Gawker and twelve (12) causes of action against The MLB Network, Inc., the former employer of Williams. Williams asserts personal injury, defamation tort claims against Gawker and various claims against The MLB Network, Inc. Attached as **Exhibit 1** is a copy of the Williams Complaint.

3.     On March 6, 2015, the New Jersey State Court entered an Order granting in part and denying in part Gawker's motion to dismiss the Williams Complaint. Specifically, the New Jersey State Court denied Gawker's motion as to the three challenged defamatory statements as explained in the Motion.  Attached as **Exhibit 2** is a copy of the New Jersey State Court Order granting in part and denying in part Gawker's motion to dismiss.

4.     On May 7, 2015, the New Jersey State Court denied Gawker's Motion for Reconsideration of the refusal to dismiss the three surviving defamation statements. Attached as **Exhibit 3** is a copy of the Order that denied Gawker's Motion for Reconsideration. The lawsuit continued through discovery as to those three surviving defamation statements.

5.     In discovery, Debtor answered an interrogatory propounded by Williams as

follows: "Gawker has a Media Content Insurance policy with American International Group, Inc. (AIG) that might be applicable to the claim asserted in this case, with a coverage limit of $1 million. Gawker has provided notice under this policy."

6.      After discovery closed, Gawker moved for summary judgment against Williams. On June 1, 2016, the New Jersey State Court granted summary judgment for Gawker and entered the SJO, which SJO dismissed with prejudice all (remaining three) claims against Gawker and expressly preserved for Williams the right and "ability to appeal all rulings as to Gawker defendants." Attached as **Exhibit 4** is a copy of the SJO. The New Jersey State Court did not provide a written or reasoned oral opinion supporting the ruling.

7.      Nine days later, on June 10, 2016 (the "**Petition Date**"), Gawker filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  As of the Petition Date, Williams was not required, nor obligated, to file an appeal or to file any other action to preserve his right to appeal, nor did the New Jersey State Court express findings of undisputed material facts and conclusions of law.

8.      Before Gawker's bankruptcy filing and before the entry of the SJO, the Williams Claim was scheduled to be tried before a jury on June 27, 2016 in the New Jersey State Court. Since the Petition Date, the case has proceeded against the defendant The MLB Network, Inc. and the jury trial has been adjourned twice by the New Jersey State Court.

9.      On July 11, 2016, Williams filed Proof of Claim No. 6 (the "**Williams Claim**") in the Chapter 11 case based on the three defamatory statements under New Jersey law. A confirmation hearing on Debtor's proposed amended joint Chapter 11 plan of liquidation dated as of November 3, 2016 (the "**Plan**") is presently scheduled to commence on December 13, 2016.

6327905.2

10.    Contemporaneous with the Motion, Williams has filed opposition (the "**Opposition**") to the Debtor's Objection to Williams Claim. The Opposition argues, among other things, that the Bankruptcy Court lacks jurisdiction to conclusively determine the personal injury Williams Claim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  November 17, 2016
        Philadelphia, Pennsylvania

RAHUL MUNSHI

4

6327905.2

# EXHIBIT  1

# TO DECLARATION OF RAHUL MUNSHI

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 7 of 117
16-11700-smb16-11700-smbFiled 10/31/1BartEnteFiled 07/11/166:#2g53of 105in Document
Pg 32 of 139

**CONSOLE LAW OFFICES LLC**
110 Marter Avenue, Suite 105
Moorestown, NJ 08057
(215) 545-7676
(215) 565-2854 fax

**Laura Carlin Mattiacci**
Identification No. 01789-2002
mattiacci@consolelaw.com
**Stephen G. Console**
console@consolelaw.com
Identification No. 04028-1983
Attorneys for Plaintiff, Mitchell Williams

---

| | |
|---|---|
| **MITCHELL WILLIAMS**<br>**Medford, NJ 08055**<br><br>                    Plaintiff,<br><br>          v.<br><br>**THE MLB NETWORK, INC.**<br>**One MLB Network Plaza**<br>**Secaucus, NJ 07094**<br><br>          and<br><br>**THE GAWKER MEDIA GROUP, INC.**<br>**210 Elizabeth Street**<br>**Fourth Floor**<br>**New York, NY 10012**<br><br>          and<br><br>**GAWKER MEDIA, LLC**<br>**219 Elizabeth Street**<br>**Fourth Floor**<br>**New York, NY 10012**<br><br>          and<br><br>**JOHN DOE INDIVIDUALS 1-50**<br><br>          and<br><br>**JOHN DOE CORPORATIONS 1-50**<br><br>                    Defendants. | :<br>:<br>:    **SUPERIOR COURT OF NEW JERSEY-**<br>:    **CAMDEN COUNTY – LAW DIVISION**<br>:<br>:    **DOCKET NO.**<br>:<br>:    **PLAINTIFF'S CIVIL ACTION COMPLAINT**<br>:<br>:    **JURY TRIAL DEMANDED**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |



16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 8 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Entered 07/11/16 16:42:58 of Main Document
Pg 33 of 139

# CIVIL ACTION COMPLAINT

## I.    PRELIMINARY STATEMENT

MLB Network, which is owned by Major League Baseball and Comcast, threatened

Mitch Williams - former Phillies pitcher; now broadcaster - with termination unless he signed an

Amendment to his Contract, which would prohibit him from attending the sporting events of his

five children, including those of his 11-year-old autistic son. Mr. Williams refused to allow

MLB Network to interfere with what he could do as a father and, as a result, MLB Network

terminated and breached his Contract, depriving Mr. Williams of an approximately $2 million

Contract balance. The repulsive demands of MLB Network came on the heels of defamatory

articles published by the sports website Deadspin.com (owned by Defendant Gawker Media

Group, Inc. and Gawker Media, LLC), which falsely and maliciously accused Mr. Williams of

potentially criminal conduct by ordering a beanball (which never happened), and using lewd

language (which was never said), during his 10-year-old son's little league baseball game –

despite there being both written and video evidence contradicting the false and baseless

accusations. Further, without any right or justification, Defendant MLB Network suspended

Plaintiff, published false and misleading statements about his "leave of absence" and then

terminated him when he refused to sign away his rights as father. As a result, Mr. Williams has

also lost jobs with MLB.com, The Sports Network ("TSN"), and FOX Sports; he has suffered an

enormous personal loss of reputation, has been humiliated publically and permanently, and has

had to endure the severe distress caused by MLB Network and Gawker Media Group, who used

Mr. Williams' children, and those he voluntarily coaches, as pawns in pursuit of their own

financial gain.

Plaintiff, Mitchell Williams, by and through his undersigned counsel, brings this action

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 9 of 117
16-11700-smb16-11700-smbFiledDoc 4n03/31/18artEnteFiled 07/3/11/66:29:53of 105in Document
Pg 34 of 139

against Defendants seeking damages, and in support thereof, avers as follows:

## II.    PARTIES

1.    Plaintiff Mitchell Williams is an individual and a citizen of the State of New Jersey residing in Medford, NJ 08055.

2.    Defendant The MLB Network, Inc. ("MLB Network") is an entity incorporated in the State of New Jersey and is headquartered at One MLB Network Plaza, Secaucus, NJ 07094.

3.    Defendant The Gawker Media Group, Inc., a/k/a/ and d/b/a/ "Gawker" is an online media company incorporated in the Cayman Islands and is headquartered at 210 Elizabeth Street, New York, NY 10012.

4.    Defendant Gawker Media, LLC, a/k/a/ and d/b/a/ "Gawker" is an online media company incorporated in the state of Delaware and is headquartered at 210 Elizabeth Street, New York, NY 10012.

5.    At all material times hereto, Defendant Gawker Media, LLC, was under the control of Defendant The Gawker Media Group, Inc., each of whom are collectively referred to herein collectively as "Defendant Gawker" or "Gawker."

6.    Defendant Gawker is the parent company to, and owns, operates, and publishes, the sports website www.Deadspin.com ("Deadspin").

7.    Defendant(s) John Doe Individuals 1-50 are fictitiously named individual defendants, who are presently unknown but are responsible for the harm that occurred to Plaintiff, jointly and severally, including but not limited to, those owners, partners, employees and/or agents of MLB Network and/or Gawker who are presently unknown but are responsible for the harm that occurred to Plaintiff.  This claim is being made against these John Doe defendants personally as well as in their official capacities working in the course and scope of

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 10 of 117
16-11700-smb  16-11700smb Filed  Claim 3-1 Part  Entered  Filed 07/11/16  16:42:58 of Main Document
Pg 35 of 139

their employment.  Defendant(s) John Doe Individuals also represent and put on notice all other individuals who are presently unknown but are responsible for the harm that occurred to Plaintiff.

8.    Defendant(s) John Doe Corporations 1-50 are fictitiously named corporate defendants, who are presently unknown, but are responsible for the harm that occurred to Plaintiff, jointly and severally, and at all times maternal hereto, resided in or conducted business in the State of New Jersey. Defendant(s) John Doe Corporations 1-50 include, but are not limited to, those corporations, companies, partnerships, subsidiaries and entities who reside and/or conduct business in New Jersey, are presently unknown to Plaintiff,  but who are responsible for the harm that occurred to Plaintiff.

9.    At all times material hereto, Defendant MLB Network was a person within the meaning of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(a), (l), *et al.* (hereinafter "NJLAD"), and subject to the obligations of non-discrimination in contracts, including but not limited to, an obligation not to discriminate on the basis of, or perception of, another's "disability" as defined by the NJLAD.

10.    At all times relevant to this action, Defendants acted through their respective officers, agents, servants, and employees.

11.    At all times relevant to this action, the action of Defendants, jointly and severally, resulted in severe emotional, economic and reputational harm to Plaintiff.

### III.    JURISDICTION AND VENUE

12.    Jurisdiction over the parties in the courts of Camden County in the State of New Jersey is proper pursuant to NJ Rule 4:3-2.

13.    Defendant MLB Network is an American sports channel dedicated to baseball.

4

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 11 of 117
16-11700-smb16-11700-smbFiledClaim/3111artEnteFiled 07/11/16.6:49158of 105in Document
Pg 36 of 139

Defendant MLB Network does business in Camden County, New Jersey in various ways, including but not limited to, broadcasting its programs and games through television providers, including Comcast, Time Warner, and Verizon, among others and advertising its business in Camden County, New Jersey. While employed, Plaintiff regularly performed broadcast services which were disseminated by Defendant MLB Network in Camden County, New Jersey.

14.    Plaintiff's Contract for services with Defendant MLB Network, discussed *infra*, which was drafted by Defendant MLB Network, states: "All claims, disputes or disagreements which may arise out of the interpretation, performance, or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New Jersey or the Federal District Courts located in New Jersey..." [Section 19.04 of the November 2011 Contract.]

15.    Defendant Gawker operates and publishes Deadspin, a sports website that has generated over 750,000,000 unique viewers since its launch in 2005.

16.    Defendant Gawker has caused harm and tortious injury to Plaintiff by publishing and disseminating defamatory statements in the State of New Jersey.

17.    Defendants MLB Network and Gawker conduct continuous and systematic business within the State of New Jersey and within the County of Camden.

IV.    **BACKGROUND FACTS**

A.    **Plaintiff's Baseball Playing and Coaching Career**

18.    Plaintiff is a former professional baseball player with the Philadelphia Phillies, Texas Rangers, and Chicago Cubs, among other Major League Baseball teams.

19.    During his 11-year career as a Major League Baseball pitcher, Plaintiff appeared in 619 games and amassed 192 career saves.

20.    Plaintiff was selected as a Major League Baseball All-Star in 1989 as a member of the Chicago Cubs.

21.    During his career, Plaintiff twice finished in the top-10 for the Cy Young Award, given to the league's most outstanding pitcher.

22.    Plaintiff retired from Major League Baseball in 1997.

23.    From 2001 to 2003, Plaintiff served as a coach for the Atlantic City Surf of the independent Atlantic League.  Over the past several years, Plaintiff has worked as a successful sports broadcaster.

24.    Since 2011, in his private life, Plaintiff has acted as a coach for the Jersey Wild youth baseball team.

25.    Plaintiff is the father of five (5) children, two (2) of whom are autistic.  Plaintiff's youngest son is a member of the Jersey Wild team.

26.    The Jersey Wild is an Amateur Athletic Union ("AAU") 501(c)(3) non-profit organization that Plaintiff established as a youth baseball team.  Plaintiff is a volunteer coach and subsidizes costs associated with the operation of the team, including paying for team equipment and indoor practice facility time.

27.    The Jersey Wild has participated in youth baseball tournaments for players 10-years-old and younger throughout the Mid-Atlantic Region.

B. **Defendant MLB Network**

28.    Defendant MLB Network launched as a 24-hour cable sports channel on or around January 1, 2009.

29.    The President and Chief Executive Officer ("CEO") of Defendant MLB Network is Tony Petitti.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 13 of 117
16-11700-smb16-11700-smbFiledaDoc09-31.1PaBt6:4EnterEdile1.0/73/1/1166.:42g53of L10sin Document
Pg 38 of 139

30.    Defendant MLB Network's annual live game coverage includes approximately
150 regular season games, two (2) League Division Series game telecasts, more than 150 Spring
Training games, and other special event game telecasts.

31.    Defendant MLB Network operates year-round and is broadly distributed across
cable, telco and satellite systems, including Comcast, Time Warner, and Verizon FIOS, among
others, in New Jersey.

32.    Defendant MLB Network's official website is owned and operated under
MLB.com, the official website of Major League Baseball, Inc.

### C. Plaintiff's Broadcasting Career

33.    Plaintiff joined Defendant MLB Network on or around January 3, 2009 as a
studio analyst.

34.    On or about September 30, 2009, Plaintiff entered into a contract with Defendant
MLB Network to provide professional services and on-camera talent for the company's varied
broadcasts as an Independent Contractor.

35.    On or about November 1, 2011, due to Plaintiff's success, Plaintiff and Defendant
MLB entered into a new contract for services (Referred to Herein as "November 2011 Contract"
or "Contract," attached hereto as Exhibit A).

36.    The November 2011 Contract term continued for a period up to and including the
later of (1) November 1, 2016, and (2) the day after the last game of the 2016 World Series is
actually completed ("Initial Period").

37.    The November 2011 Contract term also provided for an option period at
Defendant MLB Network's discretion for an additional period up to and including the later of (1)
November 1, 2017 and (2) the day after the last game of the 2017 World Series is completed

7

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 14 of 117
16-11700-smb-1D70039mb Filelai0/3-1/1Part 2nterfied1/07311136616 #&:58 of Mlab Document
Pg 39 of 139

("Option Period").

38.    The November 2011 Contract called for payments from Defendant MLB Network to Plaintiff in the following amounts:

> 1.  From November 1, 2011 through October 31, 2012: $435,000;
>
> 2.  From November 1, 2012 through October 31, 2013: $575,000;
>
> 3.  From November 1, 2013 through October 31, 2014: $625,000;
>
> 4.  From November 1, 2014 through October 31, 2015: $650,000;
>
> 5.  From November 1, 2015 through the Initial Period: $700,000; and
>
> 6.  For the Option Period: $750,000.

39.    Pursuant to the November 2011 Contract, Defendant MLB Network was obligated to pay Plaintiff the above sums provided that Plaintiff did not materially breach or default on the November 2011 Contract.

40.    According to the November 2011 Contract, Plaintiff's services for Defendant MLB Network included reporting, analyst and interview segments on-air; performing standard openings, closings, lead-ins, voice-overs, looping, retakes, promotional spots and trailers; and journalistic authoring, in addition to other broadcasting duties.

41.    By way of example, in April 2014, Plaintiff appeared on-air for Defendant MLB Network on nineteen (19) separate days, co-hosting the *MLB Tonight* and *MLB Now* programs in addition to participating in various interviews and promotional spots and trailers.

42.    During his contractual period, Plaintiff helped Defendant MLB Network win several Emmy Awards for outstanding baseball programming and broadcasts.

43.    Plaintiff's November 2011 Contract also specified that he was an "Independent Contractor" for Defendant MLB Network. Specifically, the Contract states:

8

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 15 of 117
16-11700-smb 16-11700-smb Filed Doc 31 Part Entered 107/31/116 16:44:58 of Main Document
Pg 40 of 139

INDEPENDENT CONTRACTOR

"Artist (Plaintiff) acknowledges, understand and agrees that Artist will not be eligible to participate in any of the Company's voluntary benefits programs including, but not limited to, retirement, disability, hospitalization, medical/health, dental and life insurance policies." [Paragraph 6.01]

"As an independent contractor, Artist will be solely responsible to pay all applicable taxes arising from payments made to Artist by Company, including, but not limited to, Social Security, self-employment taxes and disability insurance. Accordingly, Company agrees that it shall make no tax withholdings or deductions in connection with any monies paid to the Artist hereunder, unless required by law." ..." [Paragraph 6.02]

44.    Under the terms of the Contract with Defendant MLB Network, Plaintiff was permitted to provide on-air commentary in connection with two (2) local Philadelphia radio shows and a Sirius/XM Satellite Radio baseball show throughout the duration of the contract term.

45.    Moreover, throughout the duration of his Contract with Defendant MLB Network, Plaintiff continued to work as a sports commentator for FOX Sports and TSN on a game-by-game basis.

46.    At no point during Plaintiff's five (5) years of performing on-air and promotional services for Defendant MLB did he ever receive a negative performance review or write-up concerning any performance deficiency.

**V.    THE MAY 2014 RIPKEN YOUTH BASEBALL TOURNAMENT**

    **A.    Saturday, May 10, 2014**

47.    On Saturday, May 10, 2014, Plaintiff attended his ten-year-old son's youth baseball games at Ripken Stadium in Aberdeen, Maryland in connection with a Ripken Baseball tournament.

48.    Former Major League Baseball players Cal Ripken, Jr. and Bill Ripken own and

9

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 16 of 117
16-11700-smb-11700-smb    Filed 10/31/16art Entered 10/31/16 16:43:52 of Main Document
Pg 41 of 139

operate the Ripken Baseball youth tournaments.

49.   Plaintiff's son is a member of the Jersey Wild.

50.   Plaintiff co-coaches the Jersey Wild with Corey Ahart and Craig Yates.

51.   On the morning of Saturday, May 10, 2014, the Jersey Wild played a game against the Olney Pirates of Maryland.

52.   The Jersey Wild were stationed in the First Base dugout while the Olney Pirates were stationed in the Third Base dugout.

53.   On the field, Plaintiff was the Jersey Wild's First Base Coach.

54.   While the Jersey Wild were at bat, Plaintiff stood in the First Base Coach's Box, located near the Jersey Wild's dugout.

55.   Parents of the Jersey Wild players were generally located along the First Base stands during the game.

56.   Prior to the start of the fifth inning, Plaintiff was conversing with Jeremy Baltz, a parent of a Jersey Wild player.  Plaintiff was standing in or near the First Base Coach's Box and Mr. Baltz was located a very short distance away off the field, along the fence near First Base, and adjacent to the Jersey Wild dugout.

57.   While Plaintiff was talking to Mr. Baltz, the base umpire, stationed near second base, suddenly and rapidly began approaching Plaintiff.

58.   Plaintiff remained in the First Base Coach's Box.

59.   The umpire harangued Plaintiff for allegedly arguing over balls and strikes, which Plaintiff did not do.  The umpire continued to approach Plaintiff until his face nearly contacted Plaintiff's face.

60.   Plaintiff remained in the First Base Coach's Box.

10

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 17 of 117
16-11700-smb-10700-39mb Filahib0/31/Part EnteFied10781116614g:53 of Main Document
Pg 42 of 139

61.    The umpire threatened to fight Plaintiff, including, but not limited to, telling Plaintiff to "pick a time and place" and the umpire ejected Plaintiff from the baseball game.

62.    Plaintiff exited the baseball field and watched the remainder of the game from the stands behind home plate.

63.    Under the Ripken Baseball tournament rules, an individual ejected from a baseball game is banned from attending any other games during the tournament.

64.    However, after the game, the Ripken Baseball officials spoke with Plaintiff and other witnesses who explained to them what had happened.    Plaintiff was reinstated to the tournament because the Ripken Baseball officials determined that Plaintiff was not at fault for the ejection.    Rather, the Ripken Baseball officials banned the umpire from the rest of the tournament for acting unprofessionally, finding that he (and not Plaintiff) was at fault for inciting the altercation during the game.

**B.    Sunday, May 11, 2014**

65.    The following morning, on Sunday, May 11, 2014, the Jersey Wild again played the Olney Pirates at Ripken Stadium.

66.    Because the ejection from the previous day was effectively reversed, Plaintiff was permitted by the Ripken Baseball officials to attend and coach the Sunday, May 11, 2014 games.

67.    Plaintiff was the First Base Coach during the Sunday morning game, where several Ripken Baseball officials were present.

68.    The Jersey Wild won the morning game, eliminating the Olney Pirates from the tournament and moving on to the tournament championship against the South Jersey ("SJ") Titans.

69.    In the afternoon of Sunday, May 11, the Jersey Wild played the SJ Titans for the

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 18 of 117
16-11700-smb-11700-smb   Filed 10/31/16 art   Entered 10/31/16 16:29:58 of Main Document
Pg 43 of 139

tournament championship.

70.     Plaintiff was the First Base Coach during the Sunday afternoon game, where several Ripken Baseball officials were present.

71.     The SJ Titans ultimately won the game and the Ripken Baseball youth tournament.

## VI.    DEFENDANT GAWKER PUBLISHES A DEFAMATORY ARTICLE ON PLAINTIFF AT 8:30PM ON SUNDAY, MAY 11, 2014

72.     At 8:30pm on Sunday, May 11, 2014, Defendant Gawker published an article on Deadspin.com entitled: "Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing" ("May 11, 2014 Gawker Article," attached hereto as Exhibit B).

73.     The May 11, 2014 Gawker Article was written by Timothy Burke, Video/Assignment Editor at Deadspin.com and an employee of Defendant Gawker.

74.     The May 11, 2014 Gawker Article stated in relevant part:

> MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after a profanity-laced tirade in which he called an umpire a "motherfucker" in front of the children, observers tell us.
>
> Williams coached his son's 10U Jersey Wild team, which was participating in a Ripken Baseball tournament in Aberdeen, Md. We've confirmed through several sources that Mitch Williams – who was once tossed from his daughter's youth basketball game for cursing at a ref – had complained about numerous calls throughout the game, ranging from balls and strikes to a close play at the plate that ended a Jersey Wild rally. This led to repeated arguments with umpires on the field.
>
> One umpire finally confronted Williams after the former MLB pitcher shouted something to a parent in the stands about getting that umpire fired. The confrontation sparked a face-to-face argument that, one parent told us, was "just like the major leagues." Two different observers told us Williams had to be physically separated from the umpire by other coaches. Williams then refused to leave the field, causing a 10-minute delay in play;

12

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 19 of 117
16-11700-smb  16-11700-smb  Filed 10/31/16  Part Entered 10/31/16 16:42:58  of Main Document
Pg 44 of 139

as a result of his antics, he was initially banned from the
tournament.

. . .

We've attempted to access the video of the incident, but the game
in question is curiously unavailable from the service providing
feeds from the rest of the tournament. An individual familiar with
the situation informs us that after hearing Williams's explanation,
Ripken Baseball officials lifted the ban – saying the umpire failed
to act professionally. But according to our witnesses, the umpire's
"unprofessional" behavior came well after Mitch Williams had
been ejected and refused to leave. (Ripken Baseball "monitored"
Williams closely during his team's two games today. Jersey Wild
did not win the tournament.) Exh. B

75.    The May 11, 2014 Gawker Article also featured two (2) pictures of the umpire

ejecting Plaintiff from the game. However, the pictures are misleading do not show that Plaintiff

was located in the First Base Coach's Box or that the umpire aggressively approached Plaintiff

from the field.

76.    At no point did Mr. Burke or any representative of Defendant Gawker contact

Plaintiff to verify the accuracy of the facts they published in the May 11, 2014 Gawker Article.

77.    The statements contained in the May 11, 2014 Gawker Article state and/or imply,

individually and/or collectively, and when read in their totality, that Plaintiff engaged in

misconduct in failing to conduct himself in an appropriate manner at the youth baseball game.

78.    It is not true that Plaintiff engaged in misconduct. It is not true that Plaintiff

failed to conduct himself in an appropriate manner at the youth baseball game.

79.    The statements contained in the May 11, 2014 Gawker Article state and/or imply,

individually and/or collectively, and when read in their totality, that Plaintiff yelled profane

language, physically confronted and nearly fought an umpire, and therefore was ejected from a

youth baseball game for his allegedly aggressive conduct.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 20 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 14:56 of Main Document
Pg 45 of 139

80.    Specifically, the May 11, 2014 Gawker Article falsely states and/or implies, when read in its totality, that:

    a.  Plaintiff went on a "profanity-laced tirade" at the youth baseball game;

    b.  Plaintiff "called an umpire a 'motherfucker' in front of the children";

    c.  Plaintiff instigated "repeated arguments with umpires on the field";

    d.  Plaintiff "shouted something to a parent in the stands about getting that umpire fired";

    e.  Plaintiff "sparked a face-to-face argument" with the umpire;

    f.  Plaintiff "threatened" the umpire;

    g.  Plaintiff "went off" and "went nuts" on the umpire; and

    h.  Plaintiff had to be "physically separated from the umpire by other coaches" and "restrained by other coaches."

81.    It is not true that Plaintiff went on a "profanity-laced tirade" at the youth baseball game. Rather, Plaintiff did not use any profane language at any point during this interaction with the umpire.

82.    It is not true that Plaintiff "called an umpire a 'motherfucker' in front of the children." Rather, Plaintiff did not use any profane language at any point during this interaction with the umpire.

83.    It is not true that Plaintiff instigated "repeated arguments with umpires on the field." The implication of this statement, and others contained in the May 11, 2014 Gawker Article, is that Plaintiff engaged in misconduct and failed to conduct himself in an appropriate manner at the youth baseball game. At no point did Plaintiff engage in misconduct during the youth baseball game.

14

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 21 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part Entered 10/31/16 14:58 of Main Document
Pg 46 of 139

84.    It is not true that Plaintiff "shouted something to a parent in the stands about getting that umpire fired." Rather, Plaintiff was engaged in a close conversation with Mr. Baltz, a parent located near the First Base Coach's box, when the base umpire aggressively confronted and strode towards Plaintiff.

85.    It is not true that Plaintiff "sparked a face-to-face argument" with the umpire, "threatened" the umpire, or "went off" or "went nuts" on the umpire. Rather, as confirmed by the Ripken Baseball officials' ruling, the umpire was at fault for acting unprofessionally and they ejected the umpire from the rest of the tournament. Moreover, Plaintiff never left the First Base Coach's box throughout the interaction, never threatened the umpire, and never struck or made any physical contact with the umpire.

86.    It is not true that Plaintiff had to be "physically separated from the umpire by other coaches" and "restrained by other coaches." The implication of these statements, and others contained in the May 11, 2014 Gawker Article, is that Plaintiff sought to physically harm the umpire through violent actions. At no point did Plaintiff threaten the umpire or indicate that he would physically harm the umpire. Rather, the umpire threatened Plaintiff, telling Plaintiff to "pick a time and place" to fight.

87.    Defendant Gawker's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

88.    Defendant Gawker intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

## VII.    PLAINTIFF CONTINUES TO WORK ON-AIR FOR DEFENDANT MLB NETWORK AFTER THE SUNDAY, MAY 11, 2014 DEADSPIN ARTICLE

89.    Plaintiff continued to work for Defendant MLB Network as scheduled on

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 22 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 16:42:58 of Main Document
Pg 47 of 139

Monday, May 12, 2014. On that day, Plaintiff co-hosted the *MLB Now* and *MLB Tonight*
programs.

90.    On Tuesday, May 13, 2014, Plaintiff had a scheduled off-day.

91.    On Wednesday, May 14, 2014, Plaintiff worked at Defendant MLB Network as
scheduled. Plaintiff co-hosted the *MLB Now* program that evening.

92.    On Thursday, May 15, 2014, Plaintiff work at Defendant MLB Network as
scheduled. Plaintiff again co-hosted the *MLB Tonight* program.

## VIII. DEFENDANT GAWKER PUBLISHES A DEFAMATORY ARTICLE ON PLAINTIFF AT 2:15PM ON FRIDAY, MAY 16, 2014

93.    On May 16, 2014, at 2:15pm, Defendant Gawker published another article on
Plaintiff on its Deadspin.com website ("May 16, 2014 Gawker Article," attached hereto as
Exhibit C).

94.    This second article covered the Sunday afternoon game from the previous
weekend between the Jersey Wild and the SJ Titans.

95.    The article, again by Mr. Burke, was titled: "Witnesses: Mitch Williams Called
Child 'A Pussy,' Ordered Beanball."

96. The article stated in relevant part:

> The fallout continues from MLB Network analyst Mitch
> Williams's meltdown at a Ripken Baseball youth tournament this
> past weekend . . . as parents and coaches tell Deadspin that "The
> Wild Thing" called one child "a pussy" while ordering one of his
> own 10-year-old players to hit the opposing pitcher with a
> beanball.
>
> While video of the Saturday ejection is still suspiciously
> unavailable, we were able to acquire footage from Sunday's
> championship game between the Williams-coached Jersey Wild
> and SJ Titans, another elite 10U baseball team from New Jersey.
> The film at the top shows an interaction between Williams and
> some SJ Titans players. Multiple witnesses report that interaction

16

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 23 of 117
16-11700-smb-1070039mb Filed 10/31/16art Entered 10/31/16 16:42:58 of Main Document
Pg 48 of 139

consisted of Williams calling the SJ Titans pitcher "a pussy." Children on the team heard this, and one asked his parent on the ride home what it meant. The comment sparked a meeting behind home plate between SJ Titans coaches, umpires, Williams, and a handler (one witness called him a "babysitter") assigned by Ripken Baseball to keep Williams in line after Saturday's ejection.

Even in this interaction, you can see Williams being aggressive and argumentative.

Here's video of an incident that happened in the fifth inning, when the SJ Titans pitcher came to bat in the leadoff position. Watch as Williams says something to his catcher, after which the catcher goes to the mound to say something to his pitcher. SJ Titans coaches and players overheard this interaction, and report that Williams ordered his pitcher to intentionally hit the SJ Titans batter with the first pitch. One witness told us it was in an attempt to knock the SJ Titans pitcher out of the game.

Sure enough, the first pitch hits the SJ Titans player square in the ribs. (The home plate umpire, who had been made aware of the upcoming beanball, warned both benches.) One SJ Titans assistant coach confronted Williams about the pitch after the game, and reported that Williams stated, "I told him to throw it inside."

Other witnesses – a number of parents, coaches, and other observers contacted us about Mitch Williams's behavior – state that Williams was heckling SJ Titans coaches throughout the game, repeatedly calling one a "squirrely little teapot," and making harassing comments about the appearance of 10-year-old baseball players on the opposing team. (Lest you think these reports come from a team of sore losers, know that SJ Titans defeated Jersey Wild in the championship game.) [See Exhibit C.]

97.    At no point did Mr. Burke or any representative of Defendant Gawker contact Plaintiff to verify the accuracy of the facts they published in the May 16, 2014 Article.

98.    The statements contained in the May 16, 2014 Gawker Article state and/or imply, individually and/or collectively, and when read in their totality, that Plaintiff used profane language and engaged in misconduct in failing to conduct himself in an appropriate manner at the youth baseball game.

17

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 24 of 117
16-11700-sm16-1D70039mb  FileClaind0/31/Part EnterFdeld1073111616F2g:28 of Maßn Document
Pg 49 of 139

99.    The May 16, 2014 Gawker Article further implies that Plaintiff engaged in criminal behavior by ordering a baseball player to intentionally assault another individual with a baseball.

100.    It is not true that Plaintiff used profane language or engaged in misconduct.  It is not true that Plaintiff failed to conduct himself in an appropriate manner at the youth baseball game.  It is not true that Plaintiff in any way engaged in criminal activity.

101.    Specifically, the May 16, 2014 Gawker Article falsely states and/or implies, when read in its totality, that:

a.    Plaintiff "called one child 'a pussy'";

b.    Plaintiff "order[ed] one of his own 10-year-old players to hit the opposing pitcher with a beanball";

c.    Plaintiff "was heckling" SJ Titans coaches throughout the game;

d.    Plaintiff repeatedly calling one a 'squirrely little teapot'";

e.    Plaintiff made "harassing comments about the appearance of 10-year-old baseball players on the opposing team;"

f.    Plaintiff was assigned a "handler" by the Ripkin organization; and,

g.    The home plate umpire "had been made aware of the upcoming beanball."

102.    It is not true that Plaintiff called a child, or anyone, a "pussy."  Rather, Plaintiff did not use any profane language at any point during the game.

103.    It is not true that Plaintiff ordered a child to hit another child with a baseball.

104.    It is not true that Plaintiff heckled SJ Titans coaches or that he repeatedly called one a "squirrely little teapot."

105.    It is not true that Plaintiff made any harassing comments about the youth baseball

18

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 25 of 117
16-11700-smb  16-11700-smb  Filed  01/31/16  Part 2  Filed  07/11/16  Pg 23 of Main Document
Pg 50 of 139

players.

106.    The May 16, 2014 Gawker Article also includes two (2) videos from the Sunday
championship game.  The May 16, 2014 Gawker Article falsely states and/or implies, when read
in its totality, that the videos show that:

    a.  Plaintiff was "aggressive and argumentative";

    b.  Plaintiff told his team's catcher to tell the pitcher to intentionally hit the
        opposing team's batter with the first pitch;

    c.  Plaintiff ordered his pitcher to intentionally hit the opposing team's batter; and

    d.  The first pitch of the inning hit a SJ Titans player "square in the ribs".

107.    Neither video shows Plaintiff calling the SJ Titans player "a pussy."

108.    It is not true that the videos show Plaintiff being aggressive.

109.    It is not true that the videos show Plaintiff being argumentative.

110.    It is not true that the videos show Plaintiff instructing his pitcher and/or catcher to
intentionally hit a SJ Titans batter.

111.    It is not true that the videos show a SJ Titans player getting hit "square in the
ribs."

112.    Defendant Gawker's statements and implications were injurious to Plaintiff's
reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence
felt towards him by others, and had the tendency to injure him in his trade or business.

113.    Defendant Gawker intentionally, maliciously, recklessly and/or negligently failed
to investigate its statements and implications about Plaintiff before making them.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 26 of 117
16-11700-smb 16-11700-smb Filed 03-11/Part Entered 07/11/16 16:29:23 of Main Document
Pg 51 of 139

IX.    **DEFENDANT MLB NETWORK ISSUES DEFAMATORY STATEMENTS ABOUT PLAINTIFF TO THE PRESS REGARDING PLAINTIFF'S SUSPENSION FROM DEFENDANT MLB NETWORK**

114.    On Friday, May 16, 2014, Plaintiff was scheduled to co-host *MLB Live* for Defendant MLB Network.

115.    At around 4pm, Plaintiff was told that Mr. Petitti, Defendant MLB Network's President and CEO, did not want Plaintiff on-air.

116.    Plaintiff was directed to speak with Lorraine Fisher, Defendant MLB Network's Public Relations Director.

117.    Shortly thereafter, in Ms. Fisher's office, Plaintiff and Ms. Fisher reviewed the videos featured in the May 16, 2014 Gawker Article posted on Deadspin.com by Defendant Gawker.

118.    Plaintiff reiterated to Ms. Fisher that the Deadspin.com article was false, and explained that the videos did not even show the purported conduct.

119.    Nevertheless, Plaintiff was told he was not permitted to go on-air as scheduled.

120.    The following day, on Saturday, May 17, 2014, Mr. Petitti called Mr. Spielman, Plaintiff's agent.

121.    Mr. Petitti stated that Defendant MLB Network is investigating the matter, suspending Plaintiff, and that the anticipated return date would be in thirty (30) days.

122.    Thereafter, Mr. Petitti called Plaintiff, who was driving home from a baseball tournament with his wife and a player from his team.

123.    While on speakerphone, Mr. Petitti lambasted Plaintiff.

124.    Mr. Petitti told Plaintiff that he was suspended from Defendant MLB Network.

125.    Plaintiff told Mr. Petitti that he did not want to go on suspension and that there

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 27 of 117
16-11700-smb16-11700smb Filed in 10/31/16art Entered 10/31/16 16:42:33 of Main Document
Pg 52 of 139

was no reason to suspend him.

126.    Mr. Petitti told Plaintiff that it did not matter what Plaintiff wanted, that he was being suspended as they looked into the situation further.

127.    Mr. Petitti also told Plaintiff that either MLB Network would issue a statement concerning the suspension or Plaintiff could.  Plaintiff told Mr. Petitti that he would prefer to issue the statement, rather than MLB Network.

128.    Yet unbeknownst to Plaintiff, Defendant MLB Network had already unilaterally issued a statement to the New York *Daily News* via email.

129.    Defendant MLB Network's statement to the New York *Daily News* read:  "**Mitch Williams has decided** to take a leave of absence from his role at MLB Network at this time . . . We are continuing to look into the matter."  (New York *Daily News* article, dated May 17, 2014, attached hereto as Exhibit D).

130.    Defendant MLB Network's statement to the New York *Daily News* is false.

131.    Defendant MLB Network's statement to the New York *Daily News* placed Plaintiff in false light.

132.    Specifically, it is not true that "[Plaintiff] has decided" to take a leave of absence from Defendant MLB Network.  Plaintiff never wanted to take a leave of absence.  Rather, the decision to suspend Plaintiff and place him on a leave of absence was unilaterally made by Defendant MLB Network.

133.    It is not true that Plaintiff had voluntarily taking a leave of absence from Defendant MLB Network and that Defendant MLB Network was conducting an investigation into Plaintiff's misconduct.

134.    The statements contained in the press statement to the New York *Daily News* state

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 28 of 117
16-11700-smb16-11700-smb  Filed 10/31/16art EnteFiled 10/31/16 16 49:38 of Main Document
Pg 53 of 139

and/or imply, individually and/or collectively, and when read in their totality, that Plaintiff admitted to the misconduct or wrongdoing in connection with the Ripken Baseball tournament and that Plaintiff in fact committed the alleged wrongful actions.

135.    Defendant MLB Network's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

136.    Defendant MLB Network intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

137.    Defendant MLB Network also unilaterally issued a statement to *USA Today* via email.

138.    Defendant MLB Network's statement to *USA Today* was different than the statement they issues to the New York Daily News – but still false. It stated that "the decision to take the leave was **mutual**," and that there was no timetable for Plaintiff's return to broadcasts. ("*USA Today* article," dated May 19, 2014, attached hereto as Exhibit E).

139.    Defendant MLB Network's statement to *USA Today* is false.

140.    Defendant MLB Network's statement to *USA Today* placed Plaintiff in false light.

141.    Specifically, it is not true that the decision to take a leave of absence from Defendant MLB Network was mutual. Plaintiff never wanted to take a leave of absence. Rather, the decision to suspend Plaintiff and place him on a leave of absence was unilaterally made by Defendant MLB Network.

142.    The statements contained in the press statement to *USA Today* state and/or imply, individually and/or collectively, and when read in their totality, that Plaintiff admitted to the

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 29 of 117
16-11700-sm16-11700-39mb Filehain0/31/1Part EnteFiled10731116616PG:28 ofMain Document
Pg 54 of 139

misconduct or wrongdoing in connection with the Ripken Baseball tournament, that Plaintiff in fact committed the alleged wrongful actions, that Plaintiff was voluntarily taking a leave of absence from Defendant MLB Network, and that Defendant MLB Network was conducting an investigation into Plaintiff's misconduct.

143.    Defendant MLB Network's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

144.    Defendant MLB Network intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

145.    Further, the November 2011 Contract does not permit Defendant MLB Network to suspend Plaintiff's on-air engagement absent illness, incapacity, or default by Plaintiff or a "force majeure" (such as war, strike, or earthquake) event.

146.    The November 2011 Contract does not permit Defendant MLB Network to issue a unilateral press release regarding Plaintiff's Contract for services with Defendant MLB Network.

147.    As a result of Defendant MLB Network's defamatory statements about Plaintiff, he has suffered damages.

148.    As a result of Defendant MLB Network's defamatory statements about Plaintiff, his existing and prospective economic advantage and contractual relations have been interfered with.

149.    For example, on May 19, 2014, FOX Sports, whom Plaintiff has a contractual relationship with to perform on-air commentary services, cancelled Plaintiff's scheduled broadcast of a June 28, 2014 Philadelphia Phillies game and has not been called upon for

23

16-11700-smb   Doc 460-3   Filed 11/17/16   Entered 11/17/16 15:53:17   Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William   Pg 30 of 117
16-11700-smb 16-11700-smb   Doc 391 Filed 10/31/16 Part 2 Entered 10/31/16 16:42:36   Main Document
Pg 55 of 139

broadcast services since the suspension articles were published.

150.   Furthermore, several news outlets have either canceled their contracts and/or relationships with Plaintiff since the defamatory statements and wrongful conduct of Defendants, including but not limited to, MLB.com, which is operated by Major League Baseball, Inc.; cable channel TSN cancelled Plaintiff's weekly broadcasts indefinitely.

## X.   DEFENDANT GAWKER PUBLISHES A DEFAMATORY ARTICLE ON PLAINTIFF AT 11:13AM ON MONDAY, MAY 19, 2014

151.   On Monday, May 19, 2014, Defendant Gawker published another defamatory article on Plaintiff on its website Deadspin.com titled:   MLB Network Puts Mitch Williams on Hiatus ("May 19, 2014 Gawker Article," attached hereto as Exhibit F).

152.   The May 19, 2014 Article, again written by Mr. Burke, stated in relevant part:

> MLB Network analyst Mitch Williams is on an indefinite leave of absence from the league-owned cable channel after a series of incidents at a youth baseball tournament that witnesses tell us included the former big-league hurler calling a ten-year-old "a pussy."
>
> The *Daily News* has the scoop . . . though it's not certain the leave of absence is directly tied to his behavior last weekend.   Several readers wrote in last week, informing us Williams's appearances on MLB Network were erratic and that the "Wild Thing" was slurring his words.
>
> While Ripken Baseball has yet to respond formally to our requests for information, one employee of that organization who witnessed his behavior last weekend at the 10U tournament told us that Williams was "very unprofessional in the way he acted, coached, and the way he carried himself."   This individual told us Williams has been out of line repeatedly and complaints about his behavior stretch back at least a year, and noted that a "warning" message from Bill Ripken, reminding coaches and visitors about proper sportsmanship, had to be played four times during his initial outburst . . . that earned him an ejection.
>
> The Ripken Baseball employee went on to opine that Williams should be banned for life from that organization's events.   Several

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 31 of 117
16-11700-smb-1D70039mb Filed Claib0/31/Part EntdFitedl1073111616Pag:28 ofMain Document
Pg 56 of 139

> readers in attendance at Jersey Wild's games this past weekend
> noted Williams was not coaching his team, though he was in
> attendance as a spectator.

153.   At no point did Mr. Burke or any representative of Defendant Gawker contact Plaintiff to verify the accuracy of the facts they published in the May 19, 2014 Gawker Article.

154.   The statements contained in the May 19, 2014 Gawker Article state and/or imply, individually and/or collectively, and when read in their totality, that Plaintiff used profane language and engaged in misconduct in failing to conduct himself in an appropriate manner at the youth baseball games.

155.   The May 19, 2014 Gawker Article further implies that Plaintiff engaged in criminal behavior by ordering a baseball player to intentionally assault another individual with a baseball.

156.   It is not true that Plaintiff used profane language or engaged in misconduct. It is not true that Plaintiff failed to conduct himself in an appropriate manner at the youth baseball game. It is not true that Plaintiff engaged in criminal behavior.

157.   Specifically, the May 19, 2014 Gawker Article falsely states and/or implies, when read in its totality, that:

   a.   Plaintiff "call[ed] a ten-year-old 'a pussy'";

   b.   Plaintiff's appearances on Defendant MLB Network were "erratic";

   c.   Plaintiff was "slurring his words" on Defendant MLB Network; and

   d.   Plaintiff was "very unprofessional in the way he acted, coached, and the way he carried himself."

158.   Plaintiff never called a ten-year-old player "a pussy."

159.   Plaintiff's appearances on Defendant MLB Network were not "erratic" and he

25

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 32 of 117
16-11700-smb16-11700-smb Fi Claim 10/31/16art EnteFiled 10/31/16 16:28 of Main Document
Pg 57 of 139

was not "slurring his words." The implication of this statement is that Plaintiff was inebriated, drunk, or otherwise under the influence of drugs or alcohol when on-air for Defendant MLB Network. It is untrue that Plaintiff was inebriated, drunk, or otherwise under the influence of drugs or alcohol when on-air for Defendant MLB Network.

160.    It is untrue that Plaintiff was "very unprofessional." Rather, Ripken Baseball officials determined that Plaintiff was not at fault when he was ejected from the Ripken Baseball tournament, and he was reinstated to the tournament that same day. Instead, the umpire who ejected Plaintiff was banned from the tournament because of his unprofessional conduct.

161.    Defendant Gawker's statements and implications were injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, loss of the good will and confidence felt towards him by others, and had the tendency to injure him in his trade or business.

162.    Defendant Gawker intentionally, maliciously, recklessly and/or negligently failed to investigate its statements and implications about Plaintiff before making them.

163.    As a result of Defendant Gawker's false and defamatory statements and implications, Plaintiff was suspended and his November 2011 Contract was ultimately terminated by Defendant MLB Network.

164.    Several national websites, publications, and blogs reprinted Defendant Gawker's false and defamatory articles, including, but not limited to, Yahoo!, *USA Today*, and CBS Sports, among others. Several publications also added additional commentary to Defendant Gawker's stories, including but not limited to, an article on a sports blog which posted a picture of Plaintiff with the headline: "Mitch Williams: Baseball Terrorist."

165.    Gawker continues to defame Plaintiff. On August 19, 2014, Gawker published an article on Deadspin which stated: "...not all youth coaches and parents are psychopath" making

26

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 33 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 1 Entered 10/31/16 14:38 of Main Document
Pg 58 of 139

reference to a little league coach who gave an inspiring speech to his players. ("August 19, 2014 Gawker Article," attached hereto as Exhibit G). The word "psychopath" was hyperlinked to the Deadspin/Gawker May 11, 2014 defamatory article about Mr. Williams described above (i.e. Exh. B).

166.    In addition, several broadcast news programs, such as FOX 29 in Philadelphia, cited and quoted Defendant Gawker's false and defamatory articles on-air.

167.    As a result of Defendant Gawker's false and defamatory statements and implications, Plaintiff's reputation has been damaged and he has suffered economic loss, humiliation, embarrassment, mental anguish and suffering, and loss of standing in the community and in his profession.

## XI.    DEFENDANT MLB NETWORK FAILED TO REASONABLY INVESTIGATE THE EASILY AVAILABLE EVIDENCE BEFORE SUSPENDING AND TERMINATING

168.    During the week of May 19, 2014, Plaintiff obtained several statements from parents and coaches who were in attendance during the Ripken Baseball tournament.

169.    For example, on Tuesday, May 20, 2014, Mr. Ahart (Plaintiff's co-coach of the Jersey Wild) gave Plaintiff a written recitation of the events at the tournament.

170.    Mr. Ahart, a first-hand witness, described the base umpire's conduct at the May 10, 2014 game, which included aggressively confronting Plaintiff. Mr. Ahart also stated that the umpire said to Plaintiff, "anytime, anyplace," referring to a potential fistfight. Mr. Ahart further explained that at no time during the youth baseball tournament did Plaintiff use any profanity.

171.    Plaintiff also obtained statements from parents of players on the SJ Titans youth baseball team – the team that played against Plaintiff's Jersey Wild team. SJ Titans parents Angel Martinez, Fran Montone, and Jason Dullin all emailed Plaintiff regarding the events of the

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 34 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part Entered 10/31/16 14:38 of Main Document
Pg 59 of 139

tournament weekend.

172.    For example, in a May 24, 2014 email, Mr. Martinez explained that he witnessed the entire game from behind home plate and did not hear Plaintiff state anything offensive to anyone during this time.

173.    Furthermore, on June 5, 2014, Mr. Lisgar, the SJ Titans head coach (the opposing team), sent an email to Mr. Ahart describing the true events of the Jersey Wild versus SJ Titans baseball game.

174.    Mr. Lisgar wrote that he never heard Plaintiff use profanity on the baseball field. Also, Mr. Lisgar wrote that he never heard Plaintiff instruct one of his players to hit a SJ Titans player with a pitch.

175.    Similarly, Mr. Montone and Mr. Dulin (both coaches of the SJ Titans team that played against Plaintiff's Jersey Wild team) wrote to Plaintiff that none of the SJ Titans coaches heard Plaintiff order a player to get hit, and none of the coaches heard Plaintiff use any profanity on the field.

176.    Plaintiff and his agent, Mr. Spielman, repeatedly informed Mr. Petitti that the allegations concerning Plaintiff's alleged conduct were false.  Plaintiff and Mr. Spielman stated to Mr. Petitti that several parents and coaches who were involved in the youth baseball tournament unequivocally denied that Plaintiff acted unprofessionally, and that they had in their possession letters from parents and coaches from both teams that contradict the anonymous reports of inappropriate conduct.

177.    Mr. Petitti told Plaintiff and Mr. Spielman that he was not interested in viewing this evidence of what actually occurred during Plaintiff's son's little league game.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 35 of 117
16-11700-smb-11700-smb    Filed 10/31/16 art Entered 10/31/16 Pg:38 of Main Document
Pg 60 of 139

**XII.  DEFENDANT MLB NETWORK ORDERED PLAINTIFF TO SIGN AN OUTRAGEOUS AMENDMENT TO HIS CONTRACT THAT REQUIRED PLAINTIFF TO SIGN AWAY HIS RIGHTS AS A FATHER AND THEN TERMINATED HIM WHEN HE REFUSED TO SIGN IT**

178.    At no point from May 10, 2014 to June 13, 2014 did Defendant MLB Network threaten to terminate Plaintiff's existing November 2011 Contract for services.

179.    Rather, Plaintiff remained on-air until May 16, 2014, and was placed on a leave of absence thereafter.  Defendant MLB Network informed Plaintiff that the leave of absence would likely be in effect for thirty (30) days.

180.    On Friday, June 13, 2014, Defendant MLB Network sent Mr. Spielman an email attaching an amendment to the November 2011 Contract (attached hereto as Exhibit H, and referred to as the "Amendment").

181.    The November 2011 Contract does not permit Defendant MLB Network to unilaterally impose any amendment, including the Amendment described herein, to the November 2011 Contract in exchange for Plaintiff's continued services.

182.    Plaintiff and his wife have been married for twenty (20) years and they have five (5) children, two (2) of whom are autistic.

183.    According to Defendant MLB Network, Plaintiff would be returned to his on-air duties only if he agreed to sign this contract Amendment, which states: "In consideration for Company's covenant to not exercise its rights to terminate the Agreement as a result of the Artist's Incident(s), Artist covenants and agrees to [the following]…"

184.    The Amendment specifically required Plaintiff to sign away his rights as a father by forbidding him to even **attend**, let alone coach, any of his children's games.  In addition to his ten-year-old son's little league baseball games, this would include, attending his 11-year-old autistic son's flag football games and tennis events.

29

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 36 of 117
16-11700-smb16-11700-smb Filed Doc10/31/16art Entered10/31/1616 Pg:38 of Main Document
Pg 61 of 139

185.    Further, as described above, Plaintiff's ten-year-old son is an avid youth baseball player who competes in baseball tournaments throughout the baseball season. As a father and coach, Plaintiff routinely attends his son's games and practices, which often require significant travel.

186.    Further, Plaintiff's daughter is currently a high-school senior and all-county basketball player who has aspirations to play basketball in college. Plaintiff routinely attends his daughter's basketball games. The Amendment forced onto Plaintiff would have required Plaintiff to miss his daughter's final high school basketball games.

187.    The Amendment also states that Plaintiff will agree to attend "therapeutic counseling."

188.    The Amendment further states that Plaintiff agrees that he cannot so much as post a picture of his family on Facebook without prior approval by Defendant MLB Network.

189.    The Amendment stated that Plaintiff agrees he engaged in the alleged inappropriate conduct and that this conduct was a breach of the November 2011 Contract.

190.    Plaintiff did not engage in inappropriate conduct at his son's little league games and he did nothing which would constitute a breach of the November 2011 Contract.

191.    The Amendment states, among other things:

    i.    For a period of one (1) year from the date of the discontinuance of the leave of absence, **Plaintiff shall not attend, in any manner or by any means, any amateur athletic event(s) of any kind**, including, without limitation, any youth, middle school, high school, and college athletic events;

    ii.    During the remainder of the term of the contract, Plaintiff shall not participate in (e.g., coach, advise, speaker, etc.) in any manner or by any means, any amateur athletic event(s) of any kind, including, without limitation, any youth, middle school, high school, and college athletic events; and

30

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 37 of 117
16-11700-smb 16-11700-smb Doc 39 Filed 11/03/16 Part 2 Filed 10/31/16 16:49:33 of Main Document
Pg 62 of 139

iii.    During the remainder of the term, Plaintiff shall not, unless approved in advance, and in writing, post to, or otherwise actively participate in, any social media outlets (e.g., Twitter, Facebook, etc.) for any purpose.

iv.    That Plaintiff agree that he has obtained, and will continue to attend, **therapeutic counseling**. [See Exhibit H].

192.    None of these provisions appeared in the original November 2011 Contract signed by Plaintiff and Defendant MLB Network.

193.    The Amendment also stated that a violation of any of the aforementioned mandates would constitute a breach of the agreement and would permit Defendant MLB Network to immediately terminate the agreement.

194.    Plaintiff did not sign the Amendment.

195.    On June 26, 2014, by way of letter from Tim Sullivan, Defendant MLB Network's Vice President of Human Resources, Defendant MLB Network notified Plaintiff that effective immediately Defendant MLB Network was terminating the November 2011 Contract pursuant to Section 15.03.

196.    Plaintiff did not commit any acts which violated Section 15.01 of the November 2011 Contract.

197.    The alleged incidents that, according to Defendant MLB Network, purportedly violated Section 15.03 of the November 2011 Contract took place on May 10 and May 11, 2014, during his son's baseball game.  Plaintiff worked on-air for Defendant MLB Network during the following week.  Even after instituting a leave of absence, Defendant MLB Network planned to return Plaintiff to his usual broadcasting duties after thirty (30) days.

198.    However, over six (6) weeks after the alleged incidents and over one (1) month after the suspension, only **after** Plaintiff refused to sign the unilateral Amendment to the November 2011 Contract in effect signing away his rights as a father, did Defendant MLB

31

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 38 of 117
16-11700-smb-11700-smb Filed 10/31/16 art Entered 10/31/16 16:42:38 of Main Document
Pg 63 of 139

Network terminate the Contract.

199.    Plaintiff has not received payments in accordance with the November 2011 Contract since June 26, 2014.

200.    According to the November 2011 Contract, Defendant MLB Network shall be permitted to withhold payment from Plaintiff **only** if Plaintiff materially breaches or defaults on the Contract.  Section 4.01 of the November 2011 Contract states in relevant part:

> Provided Artist is not in material breach or default of this Agreement, and Artist renders all Services as required by Company hereunder, then in full consideration of all Services rendered and rights granted to Company hereunder, Company shall be obligated to pay Artist the entire amount of the following sums, subject to any contingencies contained herein. . . .

See Exhibit A.

201.    Plaintiff did not materially breach the November 2011 Contract.

202.    Defendant wrongfully terminated the November 2011 Contract, has withheld payment from Plaintiff, and therefore materially breached the Contract.

203.    Further, Defendant MLB Network terminated the November 2011 Contract because Plaintiff did not sign the unlawful Amendment unilaterally imposed by Defendant MLB Network which would have required Plaintiff to sign away his rights as a father.

## COUNT I:  BREACH OF CONTRACT
## PLAINTIFF v. DEFENDANT MLB NETWORK

204.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

205.    The November 2011 Contract constitutes a valid and enforceable Contract between Plaintiff and Defendant MLB Network.

206.    Plaintiff did not engage in any conduct which breached the November 2011

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 39 of 117
16-11700-smb16-11700-smb Filed-10/31/Part 2Entered-10/31/1616 16:38 of Main Document
Pg 64 of 139

Contract.

207.    Defendant breached the November 2011 Contract by, including but not limited to,
unilaterally suspending Plaintiff, issuing false statements regarding the suspension, failing to pay
Plaintiff, and wrongfully terminating Plaintiff.

208.    Defendant MLB's conduct was intentional and outrageous and proximately
caused Plaintiff severe, foreseeable emotional distress.

209.    As a result of Defendant MLB Network's breach, Plaintiff has suffered and will in
the future suffer contract damages in the amount of $2,315,000, not including interest and costs,
which constitutes the remainder of amounts owed to Plaintiff for the November 2011 Contract
plus option year.  As a result of Defendant MLB Network's breach, Plaintiff also suffered lost
future income and opportunity, consequential damages, personal hardship, and severe emotional
distress.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants
jointly and severally, requests an award of damages, plus interest and costs, damages for delay,
consequential damages, including emotional distress damages, and any such relief as this Court
deems just and proper.

### COUNT II: BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING
### PLAINTIFF v. DEFENDANT MLB NETWORK

210.    Plaintiff incorporates the above paragraphs as though set forth herein in their
entirety.

211.    The November 2011 Contract constitutes a valid and enforceable Contract
between Plaintiff and Defendant MLB Network.

212.    Plaintiff did not engage in any conduct which breached the November 2011

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 40 of 117
16-11700-smb-1D7O039mb  File1ai1d0/31/1Part 2nteFrited107311661642:36 ofMa6n Document
Pg 65 of 139

Contract.

213.    Defendants breached the implied covenant of good faith and fair dealing
concerning the November 2011 Contract by, including but not limited to, unilaterally suspending
Plaintiff, issuing false statements regarding the suspension, failing to pay Plaintiff, and
wrongfully terminating Plaintiff.

214.    Defendant MLB's conduct was intentional and outrageous and proximately
caused Plaintiff severe, foreseeable emotional distress.

215.    As a result of Defendants' breach, Plaintiff has suffered and will in the future
suffer contract damages in the amount of $2,315,000, not including interest and costs, which
constitutes the remainder of amounts owed to Plaintiff for the November 2011 Contract plus
option year.  As a result of Defendant MLB Network's breach, Plaintiff also suffered lost future
income and opportunity, consequential damages, personal hardship, and severe emotional
distress.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants
jointly and severally, requests an award of damages, plus interest and costs, damages for delay,
consequential damages, including emotional distress damages, and any such relief as this Court
deems just and proper.

### COUNT III:  NEGLIGENT MISREPRESENTATION
### PLAINTIFF v. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

216.    Plaintiff incorporates the above paragraphs as though set forth herein in their
entirety.

217.    Defendants had a duty to exercise reasonable care in communicating facts about
Plaintiff's employment and leave of absence with third-parties, including but not limited to, the

34

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 41 of 117
16-11700-smb16-11700-smb Filed Doc 391nb Filed 10/31/Part 2nt Entered 10/31116 16:43:37 of Main Document
Pg 66 of 139

New York *Daily News* and *USA Today*, when it voluntarily undertook to embark on such communications.

218.    Defendants breached this duty by providing false and/or misleading information, and/or omitting information, to third-parties, who justifiably relied upon this information.

219.    As a result of Defendants' dissemination of false and/or misleading information, and/or omitting information, concerning Plaintiff, Plaintiff was caused to sustain damages, including but not limited to economic harm, emotional distress, and punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against Defendants, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and costs, and any such relief as this Court deems just and proper.

### COUNT IV: NEGLIGENCE
### PLAINTIFF v. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

220.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

221.    Defendants had a duty to exercise reasonable care in investigating the conduct of Plaintiff at the youth baseball game before suspending and terminating Plaintiff.

222.    Defendants breached this duty by ignoring the readily available evidence from parents and coaches from both teams which contradicted the anonymous witnesses cited in the defamatory articles.

223.    As a result of Defendants' negligence, Plaintiff was caused to sustain damages, including but not limited to economic harm and emotional distress.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 42 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Filed 10/31/16 16:48:38 of Main Document
Pg 67 of 139

jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and costs, and any such relief as this Court deems just and proper.

### COUNT V:  NEW JERSEY LAW AGAINST DISCRIMINATION
### N.J.S.A. 10:5-12(a), (l), *et al.*
### PLAINTIFF v. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

224.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

225.    At all times material hereto, Plaintiff was entitled to protection from discrimination and retaliation under the NJLAD.

226.    At all times material hereto, Defendants discriminated against Plaintiff because of his "disability" and/or regarded, or perceived, Plaintiff as having a "disability" within the meaning of the NJLAD.

227.    Defendants violated the NJLAD by engaging in disability discrimination and retaliation against Plaintiff by, including but not limited to, ordering Plaintiff to sign an Amendment to his Contract which required him to attend "therapeutic counseling," suspending Plaintiff, and by terminating Plaintiff's November 2011 Contract when he objected to the Amendment and refused to sign it.

228.    Members of upper management of Defendants had actual participation in, or willful indifference to, Defendant's wrongful conduct described herein.

229.    Defendants' wrongful actions were especially egregious, warranting the imposition of punitive damages.

230.    As a result of Defendants' violations of the NJLAD, Plaintiff was caused to

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 43 of 117
16-11700-smb    Doc 391    Filed 10/31/16    Entered 10/31/16 14:38    of Main Document
Pg 68 of 139

sustain damages, including but not limited to economic harm, emotional distress, and punitive damages.

231.    Plaintiff is now suffering and will continue to suffer irreparable injury as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

### COUNT VI: INTENTIONAL DEFAMATION
### PLAINTIFF V. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

232.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

233.    At all times material hereto, Plaintiff was a private figure who, at all material times hereto, did not thrust himself into any public controversy as defined by prevailing law. The events to which the defamatory statements are ascribed occurred while Mr. Williams was in his private life, coaching his son's baseball game.

234.    Defendants issued false and defamatory statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom, with malice, knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

235.    Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory, injurious to Plaintiff's reputation,

37

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 44 of 117
16-11700-smb16-11700-smb Filed Doc 1010/31/1639rt Entered Filed 10731116161 49:58 of Main Document
Pg 69 of 139

exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

236.    The false and defamatory statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff and understood those statements to be defamatory.

237.    The false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences published by Defendants have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

238.    As a result of Defendants' defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory publications.

239.    Defendants' publication of the false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive and is therefore entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 45 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part Entered 10/31/16 Pg of Main Document
Pg 70 of 139

## COUNT VII:  DEFAMATION *PER SE*
## PLAINTIFF V. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

240.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

241.    The statements made by Defendants to the New York *Daily News* and *USA Today* falsely imply that Plaintiff in fact ordered a child to intentionally hit an opposing team's batter with a pitch.  The statements further imply that as a result of Plaintiff's intentional misconduct and wrongdoing, Plaintiff has voluntarily taken a leave of absence from Defendant MLB Network.

242.    New Jersey Criminal Code 2C:12-1 defines assault as an "attempt[] to cause or purposely, knowingly or recklessly cause[] bodily injury to another" or an "attempt[] by physical menace to put another in fear of imminent serious bodily injury."

243.    Defendants' defamatory communications described herein constitute defamation *per se* because the statements, directly and through implication, impute criminal behavior onto Plaintiff.

244.    Defendant issued false and defamatory *per se* statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom with knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

245.    Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory *per se*, injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 46 of 117
16-11700-smb 16-1070039mb Filed 03/1/16 art Entered 07/11/16 16:48:53 of Main Document
Pg 71 of 139

246. The false and defamatory *per se* statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff and understood those statements to be defamatory *per se*.

247. The false and defamatory *per se* statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences issued by Defendants' have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

248. As a result of Defendant's defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory *per se* publications.

249. Defendants' publication of the false and defamatory *per se* statements misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive and therefore Plaintiff is entitled to recover an award of punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 47 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 16:42:53 of Main Document
Pg 72 of 139

## COUNT VIII: NEGLIGENT DEFAMATION
## PLAINTIFF V. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

250.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

251.    In its publication of the statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein, Defendants failed to exercise due care to determine the truth or falsity of the defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences.

252.    Defendants issued these defamatory statements with knowledge of their falsity or with a high degree of awareness that they were probably false or with serious doubts as to the truth of the statements.

253.    Defendants' negligent publication of the false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein had the effect of diminishing the personal esteem, good will, respect and confidence in which Plaintiff was held throughout the community.

254.    In its publication Defendants failed to exercise due care by failing to receive, or even seek, comment from Plaintiff regarding the actual events that occurred at the Ripken Baseball youth tournament.

255.    As a result of Defendant's defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' defamatory publications.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

41

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 48 of 117
16-11700-smb  16-11700-smb  Filed 10/31/16  Part Entered 10/31/16 16:42:58 of Main Document
Pg 73 of 139

jointly and severally, requests an award of damages, plus interest and costs, requests damages for

delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and

cost, a fee enhancement, and any such relief as this Court deems just and proper.

## COUNT IX:  INTENTIONAL INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE
## PLAINTIFF V. DEFENDANT MLB NETWORK
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

256.    Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

257.    Plaintiff had a reasonable expectation that he would be called upon to broadcast

games and/or provide written material for several television, internet and radio programs,

including but not limited to, MLB.com, TSN, and FOX Sports, and that he would receive

economic benefit from this work.

258.    In fact, Defendant MLB Network directly controlled whether Plaintiff would be

chosen as an analyst for broadcast work for FOX Sports.

259.    Since the time MLB Network suspended Plaintiff and disseminated false and

defamatory emails about the status of his employment and nature of his leave of absence,

Plaintiff has not been called upon by any entity to provide broadcast, commentary or writing

services or any kind.

260.    Defendant MLB Network intentionally, and without justification or excuse,

interfered with Plaintiff's prospective economic advantage.

261.    As a result of Defendants' conduct, Plaintiff was caused to sustain damages,

including but not limited to economic harm, emotional distress, and punitive damages.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

16-11700-smb   Doc 460-3   Filed 11/17/16   Entered 11/17/16 15:53:17   Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William   Pg 49 of 117
16-11700-smb-11700-39mb   Filed ib0/31/16art Entered107311616FPg:55 of Main   Document
Pg 74 of 139

jointly and severally, requests an award of damages, plus interest and costs, requests damages for

delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and

cost, a fee enhancement, and any such relief as this Court deems just and proper.

## COUNT X:  INVASION OF PRIVACY – FALSE LIGHT
### PLAINTIFF V. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

262.   Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

263.   The publication by Defendants of those statements described herein portrayed

Plaintiff in a false light, which was highly offensive to a reasonable person in that Defendants

knowingly, recklessly and/or negligently gave a discrete presentation of information in a fashion

which made the publications as a whole susceptible to inferences that Plaintiff appear before the

public in an objectionable false light or false position.

264.   The publications by Defendants maliciously implied and suggested, by innuendo,

inference, implication, and insinuation, that Plaintiff engaged in severe misconduct, acted

inappropriately at a youth baseball tournament, and voluntarily took a leave of absence from

Defendant MLB Network.

265.   Defendants acted negligently, recklessly, maliciously, and with knowledge or

with reckless disregard as to whether Plaintiff would be cast in a false light by Defendants in its

publications and statements.

266.   The statements, suggestions, misstatements, implications, innuendoes,

insinuations, and inferences given publicity by Defendants about Plaintiff were issued with

reckless disregard as to whether the statements, suggestions, misstatements, implications,

innuendoes, insinuations, and inferences cast Plaintiff in a false light and with intentional and

43

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 50 of 117
16-11700-smb 16-11700-smb Filed 03/31/1 Part Entered 10/31/16 16:46:56 of Main Document
Pg 75 of 139

reckless disregard for the injuries which said statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences would inflict upon Plaintiff.

267.    Plaintiff endured injury to his right to privacy, injury to reputation, mental suffering, shame, and humiliation as a result of the publication and Defendants realized, or should have realized, that Plaintiff would be justified in feeling seriously hurt by such publications.

268.    As a result of Defendant's conduct, Plaintiff suffered damages and is entitled to recover such damages as will compensate him for the injuries received as a result of the invasion of that privacy, including emotional distress damages, as well as for any and all financial losses and expenses resulting from Defendants' publication of matters placing him in a false light.

269.    Defendants' publication of such matters placing Plaintiff in a false light warrants an award of punitive damages because Defendants' conduct was outrageous and in reckless disregard of Plaintiff's right of privacy and was malicious, outrageous, and the result of improper motive.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.


**COUNT XI:  CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")**
**N.J. Stat. Ann. § 34:19-1 et seq.**
**PLAINTIFF V. DEFENDANT MLB NETWORK**
**AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50**


270.    Plaintiff incorporates by reference the above paragraphs as though set forth herein

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 51 of 117
16-11700-smb-1Doc0390mb Fileaib0/3-1/1Bart 2nteFiteed107311116616Ag:58 of Mafn Document
Pg 76 of 139

in their entirety.

271.    Plaintiff was an "employee" of Defendant MLB Network for purposes of the CEPA statute.

272.    At all times material hereto, Defendant maintained the right to control: the means and manner of Plaintiff's work performance; the method and amount of payment; and, the manner of termination of the work relationship.    Defendant MLB Network furnished the equipment and workplace for Plaintiff's work and Plaintiff's work was an integral part of the business of MLB Network.    Also, Plaintiff was routinely and regularly at the disposal of MLB Network to perform a portion of MLB Network's work.

273.    According to Defendant MLB Network, Plaintiff's continued employment was contingent upon Plaintiff signing an Amendment to his Contract which in effect signed away his rights as a father.

274.    The provisions in Defendant MLB Network's Amendment, among other personal intrusions, prohibited Plaintiff from attending the sporting events of his five (5) children, including those of his 11 year-old autistic son.

275.    The New Jersey Common Law Against Invasion of Privacy and Article I, Paragraph I of the New Jersey State Constitution provide for the right to be free of an intentional intrusion upon one's private affairs or concerns, which would be highly offensive to a reasonable person.

276.    A parent's right to the care and companionship of his child is a fundamental interest, protected by the Constitution and New Jersey case law.

277.    New Jersey law states that children have right and privilege to know, love and respect both parents and "no court should permit either parent to interfere with the successful

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 52 of 117
16-11700-smb 16-11700-smb Filed 10/3-1/Part 2 Entered 10/31/16 16:40:58 of Main Document
Pg 77 of 139

attainment of these facets of a child's welfare." Likewise, the employer of a parent does not have

the right to interfere with a parent-employee's successful attainment of these facets of their

child's welfare.

278.    It is incompatible with the public policy of the state of New Jersey for employers

to make employment contingent upon the employee-parents contractually signing away their

constitutional rights to the companionship of their child.

279.    Plaintiff reasonably believed that Defendant's Amendment violated New Jersey

law.

280.    Plaintiff reasonably believed that Defendant's Amendment was incompatible with

a clear mandate of New Jersey public policy, established through the laws stated above, which

concerned the public health, safety and welfare of parents and children.

281.    Plaintiff objected to and/or refusal to participate in Defendant MLB Network's

activity, policy and/or practice which he reasonably believed violated his statutory, constitutional

rights and/or was incompatible with a clear mandate of New Jersey public policy.

282.    As a result of Plaintiff's objection to and/or refused to participate in Defendant

MLB Network's wrongful activity, policy and/or practice, Plaintiff was terminated.

283.    As a direct and proximate result of Defendant MLB Network's violations of

CEPA, Plaintiff has suffered economic harm and emotional distress damages.

284.    Defendant MLB Network were willfully indifferent to the violations of CEPA

and/or it's conduct was especially egregious warranting the imposition of punitive damages.

285.    At least one member of upper management of Defendant MLB Network

participated in, or was willfully indifferent to, the wrongful conduct suffered by Plaintiff,

warranting the imposition of punitive damages.

46

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 53 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 Pg 58 of Main Document
Pg 78 of 139

286.    Plaintiff is now suffering and will continue to suffer irreparable injury, economic damages, and emotional distress damages as a result of Defendant MLB Network's unlawful acts unless and until this Court grants the relief requested herein.

287.    Plaintiff is entitled to all costs and attorneys' fees incurred as a result of Defendant's violation of CEPA.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for delay, consequential damages, emotional distress damages, punitive damages, attorneys' fees and cost, a fee enhancement, and any such relief as this Court deems just and proper.

### COUNT XII:  PRIMA FACIE TORT
### PLAINTIFF V. DEFENDANT MLB NETWORK
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

288.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

289.    The above described improper and tortious acts were carried out by Defendants and/or employees of Defendants acting within the course and scope of their employment.

290.    The Defendants' conduct was intentional in causing and producing the injury and/or the Defendants acted in deliberate disregard of high probability that injury would occur and/or Defendants were substantially certain that injury would occur to Plaintiff.

291.    As a result of Defendant MLB Network's tortious conduct, Plaintiff has sustained the injuries, damages, and losses set forth herein.

292.    Defendants acted without justification or with insufficient justification in the acts alleged above.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 54 of 117
16-11700-smb-11700-smb    Filed 10/31/16    Part 2    Entered 10/31/16 14:58 of Main Document
Pg 79 of 139

jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

## COUNT XIII: INTENTIONAL DEFAMATION
## PLAINTIFF v. DEFENDANT GAWKER
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

293.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

294.    At all times material hereto, Plaintiff has been a private figure who has not thrust himself into any public controversy as defined by prevailing law.

295.    Defendants published false and defamatory statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom with knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

296.    Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory, injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

297.    The false and defamatory statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff and understood those statements to be defamatory.

298.    The false and defamatory statements, misstatements, suggestions, implications,

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 55 of 117
16-11700-smb-1DTo0039nb Filed 10/31/16art Entered 10/31/16 16:2:58 of Main Document
Pg 80 of 139

innuendoes, insinuations, and inferences published by Defendants' have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

299.    As a result of Defendants' defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory publications.

300.    Defendants' publication of the false and defamatory statements misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive.

301.    Plaintiff is entitled to recover an award of punitive damages as a result of Defendants' outrageous conduct and for the purpose of punishing Defendant Gawker for its malicious defamation and deterring Defendants and others from the repetition of similar defamation in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

### COUNT XIV: DEFAMATION *PER SE*
### PLAINTIFF v. DEFENDANT GAWKER
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

302.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 56 of 117
16-11700-smb16-11700-smb Filed 03/11/16art Entered 07/11/16 16:49:52 of Main Document
Pg 81 of 139

303.    The May 16, 2014 Gawker Article and the May 19, 2014 Gawker Article falsely state that Plaintiff ordered a child to intentionally hit an opposing team's batter with a pitch.

304.    The statement made by Defendants that Plaintiff is a "psychopath" in the August 19, 2014 Gawker Article is false.

305.    New Jersey Criminal Code 2C:12-1 defines assault as an "attempt[] to cause or purposely, knowingly or recklessly cause[] bodily injury to another" or an "attempt[] by physical menace to put another in fear of imminent serious bodily injury."

306.    Defendants' defamatory communications described herein constitute defamation *per se* because the statements impute criminal behavior onto Plaintiff.

307.    Defendants' defamatory communications described herein constitute defamation *per se* because the statements, directly and through implication alleging that Plaintiff has a foul or loathsome disease and/or adversely reflect on his fitness to conduct his business or trade.

308.    Defendants published false and defamatory *per se* statements as set forth herein and the suggestions, implications, innuendos, insinuations, and inferences arising therefrom with knowledge of their falsity and/or with reckless disregard as to their truth or falsity and with malicious, intentional or reckless disregard for the injury to the name and reputation of Plaintiff.

309.    Defendants' aforementioned statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences are defamatory *per se*, injurious to Plaintiff's reputation, exposed Plaintiff to hatred, contempt, ridicule, a loss of good will and confidence felt toward him by others, and had the tendency to injure him in his trade or business.

310.    The false and defamatory *per se* statements set forth herein were read by persons in Camden County, the surrounding area and elsewhere, including individuals in the local and national sports broadcast community, who understood the statement to be concerning Plaintiff

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 57 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Entered 10/31/16 14:58 Main Document
Pg 82 of 139

and understood those statements to be defamatory per se.

311.    The false and defamatory *per se* statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences published by Defendants have severely blackened Plaintiff's reputation, and falsely ascribe to him misconduct, as well as a lack of decency, integrity, and responsibility.

312.    As a result of Defendants' defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' false and defamatory *per se* publications.

313.    Defendants' publication of the false and defamatory *per se* statements misstatements, suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was malicious, outrageous and the result of improper motive.

314.    Plaintiff is entitled to recover an award of punitive damages as a result of Defendant Gawker's outrageous conduct and for the purpose of punishing Defendants for its malicious defamation and deterring Defendants and others from the repetition of similar defamation in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 58 of 117
16-11700-smb 16-11700-smb Filed 10/31/16art Entered 10/31/16 16:49:58 of Main Document
Pg 83 of 139

## COUNT XV: NEGLIGENT DEFAMATION
## PLAINTIFF v. DEFENDANT GAWKER
## AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

315.    Plaintiff incorporates by reference the above paragraphs as though set forth herein in their entirety.

316.    In its publication of the statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein, Defendants failed to exercise due care to determine the truth or falsity of the defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences.

317.    Defendants issued these defamatory statements with knowledge of their falsity or with a high degree of awareness that they were probably false or with serious doubts as to the truth of the statements.

318.    Defendants' negligent publication of the false and defamatory statements, misstatements, suggestions, implications, innuendoes, insinuations, and inferences described herein had the effect of diminishing the personal esteem, good will, respect and confidence in which Plaintiff was held throughout the community.

319.    In its publication Defendants failed to exercise due care by failing to receive, or even seek, comment from Plaintiff regarding the actual events that occurred at the Ripken Baseball youth tournament.

320.    As a result of Defendant's defamatory statements, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injury to his reputation, as well as for any and all damages, including lost earnings and other financial losses and expenses resulting from Defendants' defamatory publications.

321.    Defendants' publication of the false and defamatory statements misstatements,

52

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 59 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 14:58 of Main Document
Pg 84 of 139

suggestions, implications, innuendoes, insinuations, and inferences warrant an award of punitive

damages because Defendants' conduct, in reckless disregard of Plaintiff's interests, was

malicious, outrageous and the result of improper motive.

322.    Plaintiff is entitled to recover an award of punitive damages as a result of

Defendants' outrageous conduct and for the purpose of punishing Defendant Gawker for its

malicious defamation and deterring Defendants and others from the repetition of similar

defamation in the future.

**WHEREFORE**, Plaintiff, Mitchell Williams, demands judgment against defendants

jointly and severally, requests an award of compensatory damages, plus interest and costs,

requests an award of punitive damages, requests damages for delay, and any such relief as this

Court deems just and proper.

### COUNT XVI: INVASION OF PRIVACY – FALSE LIGHT
### PLAINTIFF v. DEFENDANT GAWKER
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

323.    Plaintiff incorporates by reference the above paragraphs as though set forth herein

in their entirety.

324.    The publication by Defendants of those statements described herein portrayed

Plaintiff in a false light, which was highly offensive to a reasonable person in that Defendants

knowingly, recklessly and/or negligently gave a discrete presentation of information in a fashion

which made the publications as a whole susceptible to inferences that Plaintiff appear before the

public in an objectionable false light or false position.

325.    The publications by Defendants maliciously implied and suggested, by innuendo,

inference, implication, and insinuation, that Plaintiff engaged in severe misconduct and acted

inappropriately at a youth baseball tournament.  This is a clear misrepresentation of Plaintiff's

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 60 of 117
16-11700-smb 16-11700smb Filed 10/31/16 Part 2 Entered 10/31/16 14:56 of Main Document
Pg 85 of 139

activities.

326.    Defendants acted negligently, recklessly, maliciously, and with knowledge or with reckless disregard as to whether Plaintiff would be cast in a false light by Defendants in its publications.

327.    The statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences given publicity by Defendants about Plaintiff were published with reckless disregard as to whether the statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences cast Plaintiff in a false light and with intentional and reckless disregard for the injuries which said statements, suggestions, misstatements, implications, innuendoes, insinuations, and inferences would inflict upon Plaintiff.

328.    Plaintiff endured injury to his right to privacy, injury to reputation, mental suffering, shame, and humiliation as a result of the publication and Defendants realized, or should have realized, that Plaintiff would be justified in feeling seriously hurt by such publications.

329.    As a result of Defendants' conduct, Plaintiff has suffered and is entitled to recover such damages as will compensate him for the injuries received as a result of the invasion of that privacy, as well as for any and all financial losses and expenses resulting from Defendants' publication of matters placing him in a false light.

330.    Defendants' publication of such matters placing Plaintiff in a false light warrants an award of punitive damages because Defendants' conduct was in reckless disregard of Plaintiff's right of privacy and was malicious, outrageous, and the result of improper motive.

331.    Plaintiff is entitled to recover an award of punitive damages as a result of Defendants' outrageous conduct in order to punish Defendants for its invasion of Plaintiff's

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B - Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 61 of 117
16-11700-smb16-11700-smb Filed 10/31/16 Part Entered 10/31/16 14:58 of Main Document
Pg 86 of 139

privacy and deter it and others from a repetition of similar invasions of privacy in the future.

**WHEREFORE,** Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of compensatory damages, plus interest and costs, requests an award of punitive damages, requests damages for delay, and any such relief as this Court deems just and proper.

### COUNT XVII: NEGLIGENT MISREPRESENTATION
### PLAINTIFF v. DEFENDANT GAWKER
### AND INDIVIDUAL AND CORPORATE JOHN DOES 1- 50

332.    Plaintiff incorporates the above paragraphs as though set forth herein in their entirety.

333.    Defendants had a duty to exercise reasonable care in publishing articles concerning Plaintiff on its websites which are viewed by millions of people.

334.    Defendants breached this duty by publishing false and/or misleading information, and/or omitting information, on its websites, which are viewed by millions of people.

335.    As a result of Defendants' dissemination of false and/or misleading information, and/or omitting information, concerning Plaintiff, Plaintiff was caused to sustain damages, including but not limited to economic harm, emotional distress, and punitive damages.

**WHEREFORE,** Plaintiff, Mitchell Williams, demands judgment against defendants jointly and severally, requests an award of damages, plus interest and costs, requests damages for

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 62 of 117
16-11700-smb-1070039mb Filed 10/31/16art Entered 10731116161458 of Main Document
Pg 87 of 139

delay, consequential damages, emotional distress damages, punitive damages, and any such

relief as this Court deems just and proper.


CONSOLE LAW OFFICES LLC


Dated:  September 24, 2014                    By: _____
                                                 Laura C. Mattiacci
                                                 Stephen G. Console

                                                 Attorneys for Plaintiff,
                                                 Mitchell Williams

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 63 of 117
16-11700-smb-11700-smb Filed 10/31/16art 2ntered 07311 6616 49:58 of Main Document
Pg 88 of 139

## DESIGNATION OF TRIAL COUNSEL

### PURSUANT TO RULE 4:25-4

Please take notice that Laura Carlin Mattiacci, Esquire is hereby designated as trial counsel for Plaintiff, Mitchell Williams.

### DEMAND FOR JURY TRIAL

Please take notice that demand is hereby made by the Plaintiff, Mitchell Williams, for Trial by Jury as to all issues of these causes of action.

CONSOLE LAW OFFICES LLC

Dated:  September 24, 2014                          By:

LAURA C. MATTIACCI, ESQUIRE

### CERTIFICATION PURSUANT TO RULES 4:5-1 AND 4:6-1(d)

1.    The Complaint has been filed within the time period allowed by the Rules of the Court.

2.    To the best of my knowledge and belief, this matter is not the subject of any other matters pending in the Superior Court of New Jersey for Camden County.

3.    To the best of my knowledge and belief, there are no other parties who should be joined in this action pursuant to Rule 4:30A.

CONSOLE LAW OFFICES LLC

Dated:  September 24, 2014                          By:

LAURA C. MATTIACCI, ESQUIRE

57

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 64 of 117
16-11700-smb16-11700-smb Filed 10/31/16art Entered 10/31/16 16:42:58 of Main Document
Pg 89 of 139

# Exhibit A

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 65 of 117
16-11700-smb-11700-smb    Filed 10/31/16    Part 2    Entered 10/31/16 16:49:58    Main Document
Pg 90 of 139



Dated as of November 1, 2011

Mr. Mitchell Williams
c/o The Agency Sports Management
230 Park Avenue, Suite 851
New York, NY 10169
Attn: Russ Spielman

Dear Mr. Williams:

This letter confirms the agreement between Mitchell Williams ("you" or "Artist") and The MLB Network, Inc., One MLB Network Plaza, 40 Hartz Way, Secaucus, NJ 07094 (the "Company"), with respect to your Services (as defined below) (the "Agreement") and is effective as of the Effective Date (as defined below.

WITNESSETH THAT:

WHEREAS, Artist and Company have previously entered into that certain Agreement dated as of September 30, 2009 (the "Talent Agreement Renewal"), as the same may have been amended.

WHEREAS, in consideration of the mutual covenants herein set forth, the adequacy of which consideration is hereby acknowledged, the parties hereby agree as follows.

1.      SERVICES.

Company hereby engages Artist to provide the Services (as defined below) exclusively to Company during the Term (as defined below) of this Agreement, subject to the terms and conditions set forth herein. In consideration for the compensation set forth in Section 4 below, Artist shall render all artistic and professional services customarily rendered by on-camera talent in connection with the production of sports and entertainment programming designated by Company (each a "Program", and collectively, the "Programs") for use by Company including in connection with the MLB Network (the "Network") and as otherwise specified herein. Artist shall provide such services under Company's supervision, direction, and control, and such services shall include, without limitation: performing reporting, analyst and interview segments on-air; performing standard openings, closings, lead-ins, lead-outs, voice-overs, looping, retakes, added scenes, rain dates, promotional spots and trailers, attending meetings, attending and participating in rehearsals, and participating in publicity interviews, stills sessions and promotional appearances, creative, journalistic, and editorial authoring, and such other activities reasonably specified by Company from time to

**CONFIDENTIAL**          - 1 -
**EXECUTION COPY**

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 66 of 117
16-11700-smb16-11700-smb File Claim 03/11/16art Entered 07/11/16 16:29:68 of Main Document
Pg 91 of 139

time (the "Services"). Artist's Services hereunder shall be rendered on an in-person, first priority, full-time basis during all production periods during the Term (as defined below), as required by Company. Artist's Services will be rendered either alone or in cooperation with other persons in such manner as Company may reasonably direct, under the reasonable instructions and in strict accordance with the controls and schedules established by Company's authorized representatives and at the times, places and in the manner reasonably required by said representatives. Artist acknowledges and agrees that Company shall maintain creative control over the Programs. All Services rendered by Artist shall be of a quality consistent with first-class industry standards and shall be rendered in an artistic, conscientious, efficient and punctual manner to the reasonable best of Artist's ability and with full regard to the careful, efficient, economical and expeditious production of the Programs and policies established by Company. For the avoidance of doubt, during the Term Artist will render all such Services exclusively to Company, and Company will have the exclusive right to your Services and the results and proceeds thereof for use in any and all media now known or hereafter devised in accordance with Section 3 below. Artist's Services shall be exclusive to Company throughout the Term, provided, that Artist shall be permitted to (i) provide on-air commentary services in connection with up to two (2) local Philadelphia radio shows, (ii) continue Artist's current efforts in connection with the authoring of Artist's book, provided, that (a) Artist provides Company with an advance copy of the book for review reasonably in advance of publication, and (b) the book does not contain any disparaging statements or content concerning Major League Baseball, (iii) continue to operate Artist's "Mitch Williams Wild Thing Southpaw Salsa" business, and (iv) provide (A) on-air commentary services in connection with (1) one (1) Sirius/XM Satellite Radio show (or any successor satellite radio show), and (2) a reasonable number of additional fill-in, on-air commentary performances on other Sirius/XM Satellite Radio baseball related shows, and (B) analyst services to MLB Advanced Media, L.P. for MLB.com's online and mobile media assets, provided that Artist is identified as an "MLB Network Analyst" during each such appearance on any such shows, further, that any such exception to Artist's exclusivity to Company set forth in (i) through (iv) above will not conflict with Artist's obligations to Company and Artist will provide his services to Company on a first-priority basis. During the months of November, December, January and February during the Term Artist will only be required to provide the Services to Company for a total of two (2) weeks during each such calendar month of the Term (provided Artist shall not be required to render Services for any period in excess of five (5) consecutive day during said months unless mutually agreed upon by Artist and Company).

2.    TERM.

2.01    In consideration of the mutual covenants herein set forth, the adequacy of which consideration is hereby acknowledged, the parties hereby agree to terminate the Term (as defined in the Talent Agreement Renewal) of the Talent Agreement Renewal effective as of the Effective Date.

2.02    The "Term" of this Agreement shall commence on November 1, 2011 (the "Effective Date") and shall continue for a period up to and including the later of (i) November 1, 2016, and (ii) the day after the last game of the 2016 World Series is actually completed (the "Initial Period"), and the Option Period (as defined below) if exercised by Company. Artist hereby grants to Company one (1) option to extend the Term for an additional contract period to commence immediately after the end of the Initial Period and continue for a period up to and including the later of (a) November 1, 2017, and (b) the day after the last game of the 2017 World Series is actually completed (the "Option Period") on the same terms and conditions except as otherwise provided herein. Company may exercise its option for the Option Period by written notice to Artist at any time no later than September 1, 2016.

CONFIDENTIAL

EXECUTION COPY

- 2 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 67 of 117
16-11700-smb16-11700-smb Filed 10/31/16art Entered 10/31/16 16:32:53 of Main Document
Pg 92 of 139

3.    <u>RIGHTS.</u>

3.01    All artistic, literary, dramatic, musical and other materials and performances submitted by Artist, together with the results and proceeds of Artist's Services in connection with this Agreement (collectively, the "<u>Materials</u>") shall, for purposes of copyright law, from their inception shall be deemed a "work made for hire" for Company by Artist.  Artist acknowledges that the Materials are prepared within the scope of Company's engagement of Artist's personal services and is a work made for hire and prepared as part of a work specially ordered by Company.  All Materials from their inception and all reproductions made therefrom and all copyrights therein and thereto throughout the Universe (the "<u>Territory</u>"), and all renewals and extensions thereof, shall be entirely property of the Company (and/or its affiliates), free of any claims whatsoever by Artist, or any other individual, corporation, partnership, limited liability company, other entity, association or other organized group of persons or the legal successors, assigns or representatives of the foregoing (individually "<u>Person</u>", and collectively, the "<u>Persons</u>").  Company shall have the exclusive right to obtain registration of copyright (and all renewals and extensions) in the Materials, in Company's name, as the owner and author thereof.  If Company shall be deemed not to be the author of any Materials or if any Materials are deemed not to be "works made for hire," this Agreement shall constitute an irrevocable transfer to Company of ownership of copyright (and all renewals and extensions) in those Materials, including all right of the owner of copyright specified in 17 U.S.C. §106 and under the law or laws of any foreign state, territory or country.  Artist shall, upon Company's request, cause to be executed and delivered to Company transfers of ownership of copyright (and all renewals and extensions) in those Materials and any other documents as Company may deem necessary or appropriate to vest in Company the rights granted to Company in this Agreement, and Artist hereby irrevocably appoints Company as Artist's attorney-in-fact for the purpose of executing those transfers of ownership and other documents in Artist's name, provided that any such documents shall be subject to Artist's reasonable approval prior to Company's execution thereof, and provided further, that Artist shall have three (3) business days following Artist's receipt of any such documents for approval to respond.  In the event Artist fails to respond to any such request for approval in accordance with the immediately preceding sentence, then Artist's approval shall be deemed given.  Notwithstanding anything to the contrary set forth above, if in Company's reasonable determination there is insufficient time to allow for Artist's approval of any such documents then Company may forgo such Artist approval process and execute any such documents in accordance with the terms of this subsection 3.01 and Company shall provide notice to Artist of the execution of any such documentation by Company.  Without limiting the generality of the foregoing, Company and any Person designated by Company shall have the exclusive, perpetual and worldwide right to reproduce, edit, change, alter, add to, take from, manufacture, sell, distribute, advertise, license, publicly perform in any medium now known or hereafter devised, and/or otherwise exploit the Materials and other reproductions embodying the Materials under any trademarks, or trade names, and to lease, license, convey or otherwise use or dispose of any Materials, by any method, or in any field of use, now or hereafter known, on any terms Company approves (subject to subsection 3.02 below), or Company may refrain from doing any of the foregoing in its sole and absolute discretion.  Artist hereby waives any so-called "moral rights" or "droit moral rights" (or any similar rights) Artist may have in any Materials hereunder.  For the avoidance of doubt and not in limitation of any of Company's rights herein, the Programs and all recordings or reproductions thereof shall be the sole and exclusive property of Company, and Company may use, deal with and otherwise exploit the same, without limitation, in Company's sole and absolute discretion throughout the Territory at any time or times, in any manner and in any media whatsoever in perpetuity in accordance with the terms set forth herein, including, without limitation, any and all means of television transmission and delivery (including free, basic cable, satellite and pay cable); pay-per-view, in-flight, all forms of on-demand television (including, without limitation, subscription video-on-demand and near video-on-demand), and cybercasting, including, without limitation, broadband/intranet closed system

CONFIDENTIAL

EXECUTION COPY

- 3 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 68 of 117
16-11700-smb16-11700-smb Filed 10/31/16art Entered 10/31/16 16:46:68 of Main Document
Pg 93 of 139

cybercasting, Internet download and streaming, alternative media platforms (e.g., Google, iTunes, Yahoo!), mobile communications devices, in-transit television and video streaming, on-air promotional campaigns, outdoor marketing, radio, print, sound recordings, and publishing. Further, as between Artist and Company, all Materials, and elements of the Programs, whether or not furnished by Artist, used on or in connection with any Program, shall be the sole and absolute property of Company (and/or its affiliates) for any and all purposes set forth in this Agreement, and Artist does not have, and will not claim to have under this Agreement, any right, title or interest of any kind or nature whatsoever in or to any such Materials or elements.

3.02    Company and any Person designated by Company shall have the right throughout the Territory to use, reproduce, print, publish, or disseminate in any medium Artist's name, portrait, picture, likeness, and voice, and biographical material concerning Artist (collectively, the "Artist's Likeness"), as news or information for the purposes of advertising or promoting any Programs hereunder or for "institutional" advertising of Company (and/or its affiliates) (i.e., advertising designed to create good will and prestige and not for the purpose of selling any specific product or service), provided that Artist shall have the right to approve any use of Artist's name, likeness, portrait, picture, and biographical material in connection with any such advertising and promotion of the Programs or the Company other than any performance or portion thereof embodied in the Programs. Whenever Artist's approval is required pursuant to the preceding sentence, such approval shall not be unreasonably withheld and shall be deemed given within five (5) business days of Company's request if Artist fails to respond to any such requests by Company. The rights granted to Company pursuant to this paragraph 3.02 shall be exclusive during the Term and non-exclusive thereafter, except as otherwise provided herein. During the Term, and except as set forth on Schedule A attached hereto and made a part hereof by reference, in the event Artist desires to authorize or permit any Person other than Company to use Artist's name, voice, or likeness in connection with the advertising or sale of any products or services or otherwise then Artist shall provide Company with prior written notice, and in the event Company notifies Artist of any objection to such endorsement by Artist then Artist covenants and agrees to discuss with Company, in good faith, not entering into any such endorsement arrangement, provided, that if (i) Artist does enter into any such endorsement arrangement in contravention of Company's objections, and (ii) Company does not exercise its option for the Option Period, then Company will be relieved of its obligation to pay to Artist the amount set forth in subsection 4.01(e) below. For the purposes of clarification, nothing set forth in the immediately preceding sentence shall prevent or restrict Artist from entering into such an arrangement or agreement contrary to the desire of Company.

4.    COMPENSATION.

4.01    Provided Artist is not in material breach or default of this Agreement, and Artist renders all Services as required by Company hereunder, then in full consideration of all Services rendered and rights granted to Company hereunder, Company shall be obligated to pay Artist the entire amount of the following sums, subject to any contingencies contained herein:

(a)    Promptly following the complete execution and delivery of this Agreement, Company shall pay to Artist a signing bonus in the amount of Fifty Thousand Dollars ($50,000).

(b)    During the period commencing on the Effective Date through October 31, 2012 (the "First Contract Year") the sum of Four Hundred and Thirty-Five Thousand Dollars ($435,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

**CONFIDENTIAL**

- 4 -

**EXECUTION COPY**

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 69 of 117
16-11700-smb 16-11700-smb Filed Doc 391 Part Filed 01/31/16 Entered 01/31/16 16:16:26:58 of Main Document
Pg 94 of 139

(c) During the period commencing on November 1, 2012 through October 31, 2013 (the "Second Contract Year") the sum of Five Hundred and Seventy-Five Thousand Dollars ($575,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(d) During the period commencing on November 1, 2013 through October 31, 2014 (the "Third Contract Year") the sum of Six Hundred and Twenty-Five Thousand Dollars ($625,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(e) During the period commencing on November 1, 2014 through October 31, 2015 (the "Fourth Contract Year") the sum of Six Hundred and Fifty Thousand Dollars ($650,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(f) During the period commencing on November 1, 2015 through the later of (i) November 1, 2016, and (ii) the day after the last game of the 2016 World Series is actually completed (the "Fifth Contract Year") the sum of Seven Hundred Thousand Dollars ($700,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such period;

(g) During the Option Period, if any, the sum of Seven Hundred and Fifty Thousand Dollars ($750,000) per annum payable on or about the fifteenth (15th) and thirtieth (30th) of each calendar month of the Term in arrears for Services provided during such Option Period;

(h) Upon request, Artist will provide Company with invoices in connection with any payments due to Artist by Company as set forth above in this subsection 4.01.

(i) Time is of the essence with respect to all payments due Artist hereunder.

4.02    In connection with the performance of Artist's obligations to Company, during the Term, Company will provide and arrange for Artist's local accommodations in New Jersey during any such required production periods.

4.03    During the Term, Company shall endeavor to maintain a wardrobe supplier agreement in order to provide Artist with a complimentary wardrobe in connection with Artist's Services hereunder. Any wardrobe items that may be selected by Company pursuant to any such wardrobe supplier agreement, or otherwise, for use by Artist hereunder shall be subject to Artist's approval, not to be unreasonably withheld or delayed. Company reserves the right to substitute or replace any wardrobe items provided to Artist hereunder at any time, subject to Artist's approval of any such substitute or replacement items, not to be unreasonably withheld or delayed.

4.04    In the event Artist is required by Company to travel to a location other than Company's Secaucus, NJ facilities in connection with the provision of Services hereunder, Company will provide Artist with travel benefits, including the reimbursement for reasonable out-of-pocket expenses incurred by Artist during the course of such required travel, in accordance with Company's then applicable travel policies for Artist's service status, provided, that Company acknowledges that Company's current travel policies, which are subject to change from time to time, provide that Company will provide Artist with business class airfare, if available, otherwise, first-class air fare, if available, for any flights with a total flight time in

CONFIDENTIAL
- 5 -
EXECUTION COPY

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 70 of 117
16-11700-smb    Doc 39    Filed 09/31/16    Part 2    Entered 07/11/16 14:56 of Main    Document
Pg 95 of 139

excess of three (3) hours in connection with any required travel by Artist hereunder. Artist acknowledges and agrees that from time to time Artist may be required to travel on airplanes that do not provide for either business class or first-class seating and in such event Artist will be provided with the best seating available.

5.    RIGHT OF FIRST NEGOTIATION/MATCHING RIGHT.

      5.01    In consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, Artists hereby grants to Company the exclusive right of first negotiation for Artist's Services beyond the Term hereof. The parties hereto shall engage in an exclusive thirty (30) day negotiation period commencing on September 1, 2016, or in the event Company exercises its option for the Option Period hereunder then the parties hereto shall engage in an exclusive thirty (30) day negotiation period commencing on September 1, 2017 (the "Exclusive Negotiation Period") (or, if this Agreement is terminated early by Company, the Exclusive Negotiation Period shall commence immediately upon termination, and continue for a period of thirty (30) days from such date of termination), during which time Company and Artist shall negotiate confidentially, exclusively and in good faith with respect to the terms and conditions upon which Company may engage or retain, as the case may be, Artist's Services beyond the Term. If, upon conclusion of the Exclusive Negotiation Period, no agreement has been reached with respect to the material terms and conditions, Artist shall submit a final written offer setting forth the material terms and conditions under which Artist would agree to provide her Services exclusively to Company after the Term, comparable to those rights and Services set forth herein (the "Artist Final Offer"). Artist shall provide Company with a copy of the Artist Final Offer no later than five (5) business days following expiration of the Exclusive Negotiation Period, and Company shall have seven (7) business days to accept the Artist Final Offer (the "Company Acceptance Period"). Following the date upon which Artist submits to Company the Artist Final Offer in accordance with the terms herein, Artist shall thereafter, for the remainder of the Term, be free to enter into negotiations with any bona fide third party for the provision of Artist's Services after the Term, but only pursuant to the material terms and conditions set forth in the Artist Final Offer or material terms and conditions more favorable to Artist than were set forth in the Artist Final Offer (the "More Favorable Offer"). For the period commencing upon the date on which Artist submits to Company the Artist Final Offer in accordance with the terms herein up to and including ninety (90) days following the last day of the Term hereof, Artist covenants and agrees to present to Company any bona fide third party offer containing material terms and conditions less favorable to Artist than those set forth in the Artist Final Offer or made to any bona fide third party by Artist which such third party has expressed an intention to accept, or made to Artist by any such third party and which Artist intends to accept, must be presented in writing to Company prior to its acceptance by such third party or Artist (as applicable) (the "Less Favorable Offer"), and Company shall have five (5) business days following its receipt of all such material terms and conditions to accept such Less Favorable Offer in writing. Notwithstanding anything to the contrary herein, for the period commencing upon the date on which Artist submits to Company the Artist Final Offer in accordance with the terms herein up to and including ninety (90) days following the last day of the Term hereof, Artist covenants and agrees to present to Company any More Favorable Offer from a bona fide third party or a More Favorable Offer by Artist to any bona fide third party for Artist's Services to allow Company to confirm, in good faith, the more favorable status of any such More Favorable Offer. For the purposes of clarification, after the date upon which Artist submits the Artist Final Offer to Company or the earlier termination of this Agreement, Artist shall be free to enter into negotiations with any bona fide third party with respect to the provision of his Services. At no time prior to the date upon which Artist submits the Artist Final Offer to Company shall Artist seek, solicit, request, negotiate, invite, agree upon terms and conditions, or otherwise respond to any other offer(s), or otherwise engage in any discussions or negotiations with any party other than Company with respect to the provision of Artist's Services following expiration or termination of the Term.

CONFIDENTIAL

EXECUTION COPY

- 6 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 71 of 117
16-11700-smb16-11700-smb Filed 10/31/16 Part Entered 10/31/16 14:58 of Main Document
Pg 96 of 139

5.02      In connection with any Less Favorable Offer, Company shall have the option, but no obligation, to either (i) match any non-monetary item(s) ("Non-Cash Consideration") included in any Less Favorable Offer, or (ii) pay a cash amount equal to the monetary value of any Non-Cash Consideration ("Cash Equivalent"). If Company elects the Cash Equivalent, Company and Artist shall attempt in good faith to mutually agree upon a Cash Equivalent of the Non-Cash Consideration included in any such offer made by or to Artist. If, within twenty (20) days, the parties are unable to reach agreement with respect to the value of the Non-Cash Consideration, the Non-Cash Consideration shall be submitted in writing to a mutually-selected independent appraiser of national standing (the "Appraiser"). The Appraiser shall make a determination of the Cash Equivalent of the Non-Cash Consideration within twenty (20) days following submission. The costs of the Appraiser shall be shared equally by the parties. At no time prior to the expiration of the Company Acceptance Period shall Artist seek, solicit, request, negotiate, invite, agree upon terms and conditions, or otherwise respond to any other offer(s), or otherwise engage in any discussions or negotiations with any party other than Company with respect to the provision of Artist's Services following expiration or termination of the Term, or the Exclusive Negotiation Period, as the case may be, except that Artist and his representatives shall be permitted to disclose that Artist must comply with the obligations set forth in this Section 5.

6.      INDEPENDENT CONTRACTOR.

6.01      Artist acknowledges, understands, and irrevocably agrees that Artist will not be eligible to participate in any of Company's voluntary benefits programs including, but not limited to, retirement, disability, hospitalization, medical/health, dental, and life insurance benefits. Notwithstanding the preceding sentence, Artist hereby acknowledges and agrees that Artist will be subject to and bound by the terms and conditions of Company's office policies and procedures, as may be amended from time to time, including, but not limited to, code of conduct, security, travel and entertainment, and office operations, provided the same are provided to Artist in writing.

6.02      As an independent contractor, Artist will be solely responsible to pay all applicable taxes arising from payments made to Artist by Company, including, but not limited to, Social Security, self-employment taxes and disability insurance. Accordingly, Company agrees that it shall make no tax withholdings or deductions in connection with any monies paid to Artist hereunder, unless required by law.

7.      CONDITIONS PRECEDENT/COMPLIANCE WITH LAWS.

7.01      All of Company's payment obligations under this Agreement are expressly conditioned upon Artist's compliance with all applicable governmental requirements including, but not limited to, completing, signing and delivering to us all required tax and immigration forms as provided to Artist (as applicable), provided, that Artist shall have a reasonable amount of time to cure any such failure by Artist to comply with this Section 7.01 following Artist's receipt of written notice of such failure from Company.

7.02      Company agrees to comply with all applicable governmental requirements (as applicable).

8.      PRODUCT INTEGRATION.

Company reserves the right to identify product integration deals for the Programs, Network, or the Company, and Artist shall cooperate with any and all such efforts to solicit any such deals and shall implement any such product integration deals originated by Company, subject to subsection 3.02 above. For the purposes of illustration, Artist shall be required to cooperate with the implementation of any wardrobe agreement obtained by Company for Artist's benefit pursuant to subsection 4.03 above and any

CONFIDENTIAL

EXECUTION COPY

- 7 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 72 of 117
16-11700-smb 16-11700-smb Filed in 10/31/16 art Entered 10/31/16 14:58 of Main Document
Pg 97 of 139

other apparel integration agreements obtained by Company.  For the avoidance of doubt, no portion of any revenues from such Company identified product integration deals shall be shared with Artist.

9.    CONFIDENTIALITY.

9.01    In connection with Artist's engagement hereunder by Company, Company anticipates that Artist may be provided with or exposed to certain non-public information concerning Company, its affiliates, assigns, or licensees businesses which information, together with notes, analyses, compilations, studies or other documents prepared by Company or Company Representatives (as hereinafter defined) based upon, containing or otherwise reflecting such information, is hereinafter referred to as the "Confidential Material". In consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged Artist hereby agrees that Artist will, except to the extent permitted by subsection 9.02 below, keep such Confidential Material strictly confidential in perpetuity; however, Artist shall be permitted to disclose such Confidential Material to his legal, financial, and other representatives, on a need to know basis, solely for the limited scope of their provision of professional services and provided such persons or entities are bound by a confidentiality agreement in connection with such Confidential Material that is at least as protective as the terms set forth in this Section 9.  For the purposes of this Section 9 Confidential Information shall include, without limitation, all of the terms of this Agreement.  Further, for the purposes of this Section 9 "Representatives" shall mean Company's directors, officers, employees, subsidiaries, affiliates, auditors, independent contractors, and advisors.

9.02    In the event that Artist is required by law or by judicial or regulatory process to disclose the Confidential Material or any other information the disclosure of which is restricted by the terms of this Agreement, Artist shall provide Company with prompt prior written notice of such requirement so that Company may seek an appropriate protective order.  If in the absence of a protective order, Artist is nonetheless, in the opinion of Artist's counsel, required by law or otherwise to disclose Confidential Material, disclosure may be made only as to that portion of the Confidential Material or such other information which Artist is seeking to disclose is advised by counsel is legally required to be disclosed. Artist will exercise reasonable efforts at the expense of the other party to obtain assurance that confidential treatment will be accorded such Confidential Material.

9.03    All Confidential Material disclosed by Company shall be and shall remain Company property. Except to the extent Artist is advised by counsel that such action is prohibited by law Artist shall (i) redeliver all documents furnished by Company, and (ii) destroy all written material, memoranda, notes and other writings or recordings whatsoever prepared by Company or our Representatives based upon, containing or otherwise reflecting any Confidential Material.  Any Confidential Material that is not returned or destroyed, including, without limitation, any oral Confidential Material, shall remain subject to the confidentiality obligations set forth in this Agreement.

9.04    It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this Section 9 and that Company shall be entitled to specific performance, including, without limitation, injunctive relief, as a remedy for any such breach by Artist.  Such remedy shall not be deemed to be the exclusive remedy for breach of this Section 9 but shall be in addition to all other remedies available at law or equity including, but not limited to, the right to immediately terminate this Agreement after receiving knowledge of any such breach of this Section 9.

9.05    With respect to information provided by Company or based upon, containing or otherwise reflecting such information, the term "Confidential Material" shall be deemed not to include information which (i) is or becomes generally available to the public other than (a) as a result of a disclosure by Artist or

**CONFIDENTIAL**

**EXECUTION COPY**

- 8 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 73 of 117
16-11700-smb16-11700-smb Filed 10/31/16art Entered 10/31/16 16:58:68 of Main Document
Pg 98 of 139

any other person who directly or indirectly receives such information from Artist in violation of this Agreement or (b) in violation of a confidentiality obligation to Company known to Artist, (ii) is or becomes available to Artist on a non-confidential basis from a source which, to the knowledge of Artist, is entitled to disclose it, (iii) was known to Artist prior to its disclosure to it by Company or (iv) is verifiably developed by Artist without the benefit of the information provided by Company.

10.    UNION STATUS.

Artist acknowledges that Artist is not a party to any collective bargaining agreement with any guild or union which may claim jurisdiction over the Services to be rendered hereunder and that Company will have no obligation with respect to Artist's status as a guild or union member or for any payments which may be required by any such guild or union.

11.    NO OBLIGATION TO USE.

Nothing set forth herein shall be deemed to obligate Company, its affiliates, licensees, or other Persons to use or exploit Artist's Services, the Materials, or any and all results of such Services, or otherwise to exploit any rights granted hereunder; provided, however, that Company shall remain obligated to pay to Artist any compensation accrued and payable to Artist hereunder, subject to any contingencies contained herein.

12.    PAYOLA / PLUGOLA.

Artist acknowledges that Artist has been advised that it is a federal criminal offense, unless disclosed in writing to Company   (at the address indicated above, Attn: Legal Department) prior to exhibition on television or other exploitation, to (a) give or agree to give any member of the production staff, anyone associated in any manner with a Program, promotion or commercial or any other Person any portion of Artist's compensation or anything else of value for arranging Artist's appearance therein, or (b) accept or agree to accept anything of value, other than Artist's compensation, for appearance on a Program, promotion or commercial to promote any product, service or venture on the air, or otherwise in the course of the provision of Artist's Services hereunder or use any prepared material containing such a promotion where Artist knows the writer received consideration for it.  Artist shall not accept or pay, or agree to accept or pay any such consideration in contravention of these requirements.  Any breach hereof shall be a material breach of this Agreement.

13.    REPRESENTATIONS AND WARRANTIES.

Artist represents and warrants that (i) Artist has no existing endorsement, sponsorship or similar agreements concerning Artist's services or Artist's Likeness, except as otherwise expressly provided for herein, and Artist shall not enter into any such endorsement, sponsorship or similar agreements during the Term of this Agreement other than in accordance with subsection 3.02 above, (ii) except for any material Company provides to Artist, the Materials (including, without limitation, all ideas or materials of any nature which Artist furnishes hereunder) will be Artist's original creation and will not violate or infringe any rights of any third party, including, without limitation, a defamation, libel, slander or violation of any right of privacy or publicity, (iii) Artist has the full right, power and authority to enter into and completely perform Artist's obligations under this Agreement and to grant all rights herein, (iv) Artist's obligations under this Agreement do not and will not violate, interfere with or infringe upon the rights of any third party, including, without limitation, a defamation, libel, slander or violation of any right of privacy or publicity, and (v) Artist has no knowledge of any rights or commitments of any nature outstanding in favor of any Person that would impair, interfere with or infringe upon the rights herein granted and Artist has obtained or

**CONFIDENTIAL**

- 9 -

**EXECUTION COPY**

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 74 of 117
16-11700-smb  Doc 39  Filed 10/31/16  Part Entered 10/31/16 14:58 of Main Document
Pg 99 of 139

will obtain all required permission or grants of authority necessary with respect to Artist's obligations hereunder.

14.    <u>INDEMNITY</u>.

14.01    Artist will indemnify and hold Company and each of its officers, partners, agents, employees, affiliates, assigns, and licensees, harmless from and against any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees and disbursements) (collectively, "<u>Losses</u>") arising out of (i) any actual breach of any representation, warranty, covenant or agreement made by Artist herein, or arising out of Artist's unauthorized acts or use of any Materials furnished by you hereunder, (ii) the use of any materials furnished by Artist hereunder, excluding materials furnished by Artist at Company's request or direction (including its authorized affiliates, agents, employees, and contractors), or (iv) any negligent acts done or words spoken by Artist or furnished by Artist in connection with the production, rehearsal or broadcast of any Program, unless such negligent acts or words shall have been requested, directed, or supplied by Company (including its authorized affiliates, agents, employees, and contractors) or undertaken in furtherance of this Agreement.

14.02    Company will indemnify and hold Artist, and his heirs harmless from and against any and all Losses arising out of (i) material supplied to Artist by Company (including its authorized affiliates, agents, employees, and contractors), (ii) our production, distribution or exploitation of the Programs (except to the extent Artist's indemnification set forth above applies), (iii) acts or words requested or authorized by Company (including its authorized affiliates, agents, employees, and contractors), or (iv) any claims relating to Company's production, promotion, advertisement, distribution and other exploitation of the Programs.

14.03    The party seeking indemnification (the "<u>Indemnified Party</u>") shall timely notify the indemnifying party (the "<u>Indemnifying Party</u>") in writing of any claim or action for which such indemnification applies. The Indemnifying Party shall undertake the defense of any such claim or action and permit the Indemnified Party to participate therein at its own expense. All decisions regarding litigation or the settlement thereof shall be made by the Indemnifying Party. Any settlement by the Indemnified Party without the prior written consent of the Indemnifying Party shall release the Indemnifying Party from its indemnity obligation as to the claim or action so settled. The Indemnified Party shall cooperate fully with the Indemnifying Party in the defense of any claim hereunder. The Indemnified Party may participate in the defense of any such claim through counsel of the Indemnified Party's selection at its own expense, but the Indemnifying Party shall retain control of the defense of such claim.

15.    <u>SUSPENSION / TERMINATION</u>.

15.01    Notwithstanding anything to the contrary contained herein, Company shall have the right to suspend Artist's engagement and compensation hereunder during any and all periods: (i) that Artist does not render Services hereunder because of illness, incapacity, or default; or (ii) that the development of the Programs or the Company is prevented, interrupted, or materially interfered with because of "force majeure" events, which shall include events by reason of any governmental law, ordinance, order or regulation, or by reason of fire, flood, earthquake, labor dispute, lock-out, strike, accident, act of God or public enemy, or by reason of any other customary force majeure or occurrence of the same or similar nature not within our control that makes production impracticable upon providing written notice to Artist and subject to the terms set forth herein, suspend the performance of Services by Artist during the period of such suspension and Company may reduce Artist's compensation hereunder pro rata except as may be required by law and as set forth herein during any such periods of suspension. If this Agreement is suspended, the Term hereof shall be deemed extended by a period equivalent to all such periods of suspension. Such suspension shall end as

CONFIDENTIAL

EXECUTION COPY

- 10 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 75 of 117
16-11700-smb-1D0039mb Fil Claim 0/31/Part Entered 07311116616 Pg:38 of Main Document
Pg 100 of 139

soon as such force majeure terminates and Artist will not be suspended unless all other similarly situated talent are suspended with respect to the same force majeure event. Notwithstanding the foregoing, Company will use reasonable efforts to reassign Artist to other broadcasting services during any such suspension (Artist will have reasonable approval over such reassigned events) and if Artist agrees to provide Services in connection with such reassigned events, Company will continue to pay Artist the full compensation set forth in this Agreement and in the same manner set forth in this Agreement. Should any suspension under this paragraph (not including any reassignment to other events wherein Company is continuing to pay Artist the full compensation) exceed thirty (30) consecutive days, then Artist may, by written notice to Company, terminate this Agreement, provided, however, that if such notice is given by Artist, it shall not be effective if within seven (7) days after receipt of such notice by Company, Company notifies Artist of reinstatement of Artist's obligations to render the Services and Company's obligations to pay Artist pursuant to this Agreement. In the event of such a reinstatement, Company shall not have the right to suspend the Agreement again for that same continuing event of force majeure. If any matter referred to in subparagraph (i) above, other than default, continues for more than thirty (30) consecutive days, or sixty (60) days in the aggregate in any twelve (12) month period during the Term, and Company has endeavored to reasonably accommodate any illness or incapacity of Artist, or if any matter referred to in subparagraph (ii) above continues for more than thirty (30) consecutive days, or in the event of Artist's death, subject to any exceptions set forth herein, Company may thereafter terminate this Agreement by sending written notice to Artist, and if Company does so, Company shall have no further obligation to Artist hereunder, except (provided Artist is not in default) to pay Artist pursuant to Paragraph 4 above for Services satisfactorily rendered as of the date of termination. Notwithstanding the immediately preceding sentence, in connection with any Artist breach hereof resulting from illness or incapacity, as provided in subsection 15.01(i) above, Artist shall have ten (10) days from the date of Artist's receipt of Company's written notice of the breach concerned to cure such breach. As used herein, "incapacity" shall mean any material physical, mental or other disability which renders Artist incapable of fully performing all essential Services required to be performed by Artist.

15.02   Company may terminate this Agreement in the event that Artist defaults, breaches any provision hereof, or in the event of the inaccuracy of any representation or warranty contained herein and made by Artist, and Company shall have no further obligations to Artist hereunder, provided that any such breach or inaccuracy shall be subject to cure within ten (10) days from the giving of notice from Company. Company's exercise of its rights as set forth in this subsection 15.02, or 15.01 above, if any, shall be without prejudice to any other remedy of any kind or nature available to Company herein or otherwise. For the purposes of this Section 5 a "default" shall include, without limitation, if Artist is unable, fails, neglects, or refuses to perform fully one or more of Artist's obligations hereunder (except if such non-performance is a result of an event of force majeure and/or Company's breach of this Agreement).

15.03   <u>Morals</u>.      If Artist should, prior to or during the Term hereof commits any act, or omits from any action, which: (i) violates widely held social morals; (ii) brings Artist into (non-trivial) public disrepute, scandal, contempt or ridicule or which shocks, insults or offends a substantial portion or group of the community or reflects unfavorably (in a non-trivial manner) on any of the parties; or (iii) materially reduces Artist's commercial value as a professional sports commentator, then Company may, in addition to and without prejudice to any other remedy of any kind or nature set forth herein, terminate this Agreement at any time after the occurrence of any such event upon written notice to Artist. Notwithstanding the foregoing, the parties hereto agree that no act or omission of Artist occurring prior to the Term, which is known to the general public at large as of the date hereof, shall entitle Company to terminate this Agreement pursuant to this Section 15.03.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 76 of 117
16-11700-smb16-11700-smb Filed in03/31/ Part Entered10/31/16616249:52 of Main Document
Pg 101 of 139

15.04   Notwithstanding any termination or expiration of this Agreement, the provisions of Sections 3, 5, 9, 14, 15.04, 16, 17, 18, and 19 shall survive indefinitely or as otherwise specified.

16.     REMEDIES.

Any remedies Artist may have against Company in connection with the Programs and/or this Agreement shall be limited to the right to recover damages, if any, in an action at law, and Artist hereby waives any right or remedy in equity, including, without limitation, the right to seek injunctive relief.

17.     NON-SOLICIT.

Artist hereby covenants and agrees that during the Term and for a period of one (1) year thereafter Artist will not at any time either alone or in association with others (i) solicit, or facilitate any organization with which Artist is associated in soliciting, any employee or independent contractor of Company or any of its subsidiaries to leave the engagement or employ of Company or any of its subsidiaries, (ii) solicit for employment, hire or engage as an independent contractor, or facilitate any organization with which Artist is associated in soliciting for employment, hire or engagement as an independent contractor, any person who was employed or engaged by Company or any of its subsidiaries at any time during the term of Artist's engagement or employ with Company or any of its subsidiaries, provided, that this clause (ii) shall not apply to any individual whose employment or engagement with Company or any of its subsidiaries has been terminated for a period of one (1) year or longer, or (iii) solicit, facilitate, propose, or pitch any Person new programming concepts, materials, or ideas.

18.     NON-DISPARAGEMENT.

Artist hereby covenants and agrees that during the Term and for a period of one (1) year thereafter, Artist shall not make any public disparaging statements concerning Company, Company's officers, directors, employees, attorneys, agents, or contracting parties, or its business or operations.   Company hereby covenants and agrees that during the Term and for a period of one (1) year thereafter, Company shall not make any public disparaging statements concerning Artist.

19.     MISCELLANEOUS.

19.01   Entire Agreement.   This Agreement sets forth Artist's and Company's (and any affiliates of Company's) entire understanding relating to its subject matter and supersedes all prior and contemporaneous understandings relating to the same which have been merged herein.   This Agreement shall not become effective until signed by Artist and countersigned by a duly authorized officer of Company.   No modification, waiver or termination of this Agreement or any of its terms shall be binding upon Company unless confirmed by a document signed by a duly authorized officer of Company.   No waiver by Artist or Company of any term of this Agreement or of any default hereunder shall affect Artist's or Company's respective rights thereafter to enforce that term or to exercise any right or remedy in the event of any other default, whether or not similar.   If any part of this Agreement is determined to be void or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, such decision shall not affect any other provisions hereof, and the remainder of this Agreement shall be effective as though such void or unenforceable provision had not been contained herein.

19.02   Breach; Opportunity to Cure.   Company shall not be deemed to be in breach of any of Company's obligations hereunder unless and until Artist shall have given Company specific written notice,

CONFIDENTIAL
                                        - 12 -
EXECUTION COPY

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 77 of 117
16-11700-smb-11700-39mb File ab0/3-1/ Part Entered10731116616Pg:38 of Main Document
Pg 102 of 139

describing in detail the alleged breach and Company shall have failed to cure that alleged breach within fifteen (15) days after Company's receipt of that written notice.

19.03  No Agency.  Nothing herein contained shall constitute an agency relationship between Artist and Company.  Except as otherwise expressly provided herein, Artist is performing its obligations hereunder as independent contractors.  Artist shall not hold itself out contrary to the terms of this paragraph, and Company shall not become liable for any representation, act or omission of Artist to the contrary of the provisions hereof.  Artist does not have the right to execute any agreement or incur any obligation for which Company may be liable or otherwise bound.  This Agreement shall not be deemed to give any right or remedy to any third party whatsoever unless that right or remedy is specifically granted by Company in writing to that third party.

19.04  Governing Law; Jurisdiction.  This Agreement has been entered into in the State of New Jersey and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of New Jersey applicable to contracts entered into and performed entirely within the State of New Jersey (without regard to the conflicts of law principles of such State).  All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New Jersey or the Federal District Courts located in New Jersey; provided, however, if Company is sued or joined in any other court or forum (including an arbitration proceeding) by a Person other than Artist in respect of any matter which may give rise to a claim by Company hereunder, Artist's consent to the jurisdiction of such court or forum over any such claim which may be asserted by Company.  Any process in any action or proceeding commenced in the courts of the State of New Jersey arising out of any such claim, dispute or disagreement, may among other methods, be served upon Artist by delivering or mailing the same, via certified mail, addressed to Artist at the address given in this Agreement or such other address as Artist may from time to time designate by notice in conformity with paragraph 19.06.

19.05  Assignment.  Company shall have the right to assign this Agreement or any of Company's rights and obligations hereunder to any affiliate of Company or any Company acquiring an owning a controlling interest in Company, and any rights and obligations so assigned may also be likewise assigned by the assignee (under the same restrictions).  Company shall also have the right to assign any of its rights hereunder to any of its licensees in order to effectuate the purposes hereof.  Artist shall not have the right to assign any of Artist's rights or obligations hereunder, and any purported assignment by Artist in contravention of the foregoing shall be null and void.  Notwithstanding anything to the contrary in the immediately preceding sentence, if at any time during the Term Company and Artist mutually agree that Artist's services shall be furnished to Company by or through a third party services company (e.g. a "loan-out" entity) then Company and Artist shall work in good faith to amend the terms hereof solely to provide that Artist's Services are to be furnished to Company by any such services company and any other amendments required to provide for such an arrangement and all other terms and conditions set forth herein shall remain unchanged.

19.06  Notices.  All notices to be given to Artist shall be addressed to Artist at the address set forth on page 1 or at such other address as Artist shall designate in writing from time to time.  All notices to be given to Company hereunder shall be addressed to Company to the attention of the Senior Vice President of Programming & Business Affairs at the address set forth on page 1 hereof or at such other address as Company shall designate in writing from time to time.  A copy of all notices to Artist hereunder shall simultaneously be delivered to:  Rand E. Sacks, Esq., The Sacks Group, PLLC, 5335 Wisconsin Avenue, NW, Suite 850, Washington, DC 20015.  To be effective, all notices hereunder must be in writing, addressed to the proper party specified above and sent by: (i) registered or certified mail, return receipt

**CONFIDENTIAL**

- 13 -

**EXECUTION COPY**

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 78 of 117
16-11700-smb16-11700-smb Filed 10/31/16art EntFiled 10/31/16 16 Pg 38 of Main Document
Pg 103 of 139

requested; (ii) personal delivery; or (iii) expedited, receipted courier service (e.g., Fedex or UPS). Notices shall be deemed given when personally delivered, deposited with the courier service or mailed, all charges prepaid, except that notices of change of address shall be effective only after actual receipt.

19.07  Insurance.  Company may at any time during the Term obtain, at Company's cost, insurance on the life of Artist. Company or its designees shall be the sole beneficiary of that insurance. Artist shall, as Company may designate, submit to such physical examinations and to otherwise cooperate with Company fully for the purpose of enabling Company to secure that insurance. In the event (i) any such examination establishes a substantial doubt as to Artist's physical ability to complete Artist's services hereunder, (ii) Artist fails to appear for such examination at the time and place designated by Company, or (iii)if Company is unable to procure insurance covering Artist at normal rates and without special exclusions, Company may terminate this Agreement hereunder and be relieved of any further obligation to Artist.

19.08  Remedies.  Artist acknowledges that Artist's Services hereunder are special and unique and that a breach of this Agreement by Artist shall cause Company irreparable injury that cannot be adequately compensated by money damages. Accordingly, Company shall be entitled to injunctive relief, in addition to any other remedies that it may have, to enforce the terms of this Agreement.

19.09  Arm's Length Proceeding/Ambiguities.    The provisions of this Agreement are the product of arms-length negotiation between the parties and their respective legal counsel. Neither Artist nor Company shall be deemed to be the drafter of this Agreement, it being the parties' mutual intention that this Agreement not be construed, in whole or in part, against either of the parties hereto pursuant to any doctrine, law or rule of construction which provides that contract provisions are to be construed against the party drafting such provisions. No alterations from any prior draft shall be used to construe any provision hereof.

19.10  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which when taken together shall be construed as a single instrument. This Agreement may be executed by facsimile, and signatures on a facsimile copy hereof shall be deemed

*[Signature Page Follows]*

CONFIDENTIAL

EXECUTION COPY

- 14 -

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 79 of 117
16-11700-smb16-11700-smb Filed 10/31/16art Entered 10/31/16616 20:38 of Main Document
Pg 104 of 139

authorized original signatures.  This Agreement shall not be deemed binding unless this Agreement has been
executed by an authorized signatory of each of the parties hereto.

If the foregoing correctly sets forth the terms of the agreement between Artist and Company, please sign in
the space provided below.

Sincerely yours,

THE MLB NETWORK, INC.

By: _____

Name: Tony Petitti

Title: President & CEO

AGREED AND ACCEPTED:

MITCHELL WILLIAMS

By: _____

CONFIDENTIAL

EXECUTION COPY

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 80 of 117
16-11700-smb  16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 16:48:36 of Main Document
Pg 105 of 139

## SCHEDULE A

Ashley Furniture (in connection with radio show)
Coastal Spine (in connection with radio show)
Lucas Auto Group (local television commercial)
MLB Extra Innings (Baseball Academy)
One A Day Multivitamins

**CONFIDENTIAL**

**EXECUTION COPY**

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 81 of 117
16-11700-smb-1070089mb Filed 10/31/16rt Entered 10/31/16 14:38 of Main Document
Pg 106 of 139

# Exhibit B

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 82 of 117
16-11700-smb-11700-smb Filed 10/31/16art Entered 10/31/11 16:16:48:58 of Main Document
Pg 107 of 139

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing        http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...





## Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

Timothy Burke (http://bubbaprog.kinja.com)
(http://bubbaprog.kinja.com)    Filed to: MITCH WILLIAMS (/TAG/MITCH-WILLIAMS)    5/11/14 8:30pm (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-    222,211    10



MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after a profanity-laced tirade in which he called an umpire a "motherfucker" in front of the children, observers tell us.

Williams coaches his son's 10U Jersey Wild team, which was participating in a Ripken Baseball tournament in Aberdeen, Md. We've confirmed through several sources that Mitch Williams—who was once tossed from his daughter's youth basketball game for cussing at the ref—had complained about numerous calls throughout the game, ranging from balls and strikes to a close play at the plate that ended a Jersey Wild rally. This led to repeated arguments with umpires on the field.



1 of 6

8/27/2014 3:20 PM

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 83 of 117
16-11700-smb16-11700-smb Filed 10/31/16art 2nteFiled 10/31/16616 Pg: 58 of Main Document
Pg 108 of 139

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing        http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...



1/ dip-tin-for-the-win-1575042911

One umpire finally confronted Williams after the former MLB pitcher shouted something to a parent in the stands about getting that umpire fired. The confrontation sparked a face-to-face argument that, one parent told us, was "just like the major leagues." Two different observers told us Williams had to be physically separated from the umpire by other coaches. Williams then refused to leave the field, causing a 10-minute delay in play; as a result of his antics, he was initially banned from the tournament.





Williams discussed the incident on Twitter this morning:

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 84 of 117
16-11700-smb-1D700391nb Filed in0/31/16art EntereFiled10/31/16616 4:86 of M015n Document
Pg 109 of 139

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing          http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...



Hit Me SEO @HitMeSEO                                        11 May
Phillies Fan, embarrassed to watch     Mitch Williams get
thrown out of a 10 year old baseball game today

**Mitch Williams**          Follow
@WildThingMLBN

@HitMeSEO to set the record straight. I was thrown out
for laughing at a call.then the threatened to fight me.said
pick a time and place.
7:57 AM - 11 May 2014  Edgewood, MD, United States

16 RETWEETS  5 FAVORITES



Hit Me SEO @HitMeSEO                                        11 May
Phillies Fan, embarrassed to watch   Mitch Williams get
thrown out of a 10 year old baseball game today



**Mitch Williams**          Follow
@WildThingMLBN

@HitMeSEO for those that think I'm making this up.it is
on film.,and when he threatened me 1 of my coaches
came out and put his hands on him
8:01 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES



Hit Me SEO @HitMeSEO                                        11 May
Phillies Fan, embarrassed to watch   Mitch Williams get
thrown out of a 10 year old baseball game today



**Mitch Williams**          Follow
@WildThingMLBN

@HitMeSEO the ump and moved him away.the ump said
you can't touch me.what the ump didn't know is my
coach is a judge. And my coach told him
8:03 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  1 FAVORITE



Hit Me SEO @HitMeSEO                                        11 May
Phillies Fan, embarrassed to watch   Mitch Williams get
thrown out of a 10 year old baseball game today

@HitMeSEO if we weren't in Maryland you would be in
handcuffs and arrested for threatening me. All I care
about is the kids.the entire game
8:04 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES

8/27/2014 3:20 PM

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B - Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 85 of 117
16-11700-smb-1D700-39mb  Fileiaih0/3-1/16art 2nterFdeiid10731116616r2g:88 of Main Document
Pg 110 of 139

Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing      http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-f...



Hit Me SEO @HitMeSEO                                                     11 May
Phillies Fan, embarrassed to watch ⚾ 🏟 😒 😑 ⚾ Mitch Williams got
thrown out of a 10 year old baseball game today 😅 😅 😳 😳 😅



**Mitch Williams**                                          Follow
@WildThingMLBN

@HitMeSEO is taped by Ripken. They have it and it will
show everything.ive never seen an ump at so out of
control especially at a 10yrold gm

8:08 AM · 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES

**Mitch Williams**                                          Follow
@WildThingMLBN

It started in the 1st inn, the ump yelled at the opposing
coach,then yelled at me.i asked why r u yelling at me I
haven't even met u yet.

8:13 AM · 11 May 2014  Edgewood, MD, United States

16 RETWEETS  26 FAVORITES

We've attempted to access the video of the incident, but the game in question is curiously unavailable from the service providing feeds from the rest of the tournament. An individual familiar with the situation informs us that after hearing Williams's explanation, Ripken Baseball officials lifted the ban—saying the umpire failed to act professionally. But according to our witnesses, the umpire's "unprofessional" behavior came well after Mitch Williams had been ejected and refused to leave. (Ripken Baseball "monitored" Williams closely during his team's two games today. Jersey Wild did not win the tournament.)

Here's how other people in attendance described the incident.

*[Mitch Williams] just got kicked out his sons little league game for threatening an umpire at Ripken Stadium*

*He has been arguing balls and strikes and was upset about a play at the plate where his team was called out. In the top of the 5th while he was coaching first base he yelled to another parent that he would have the umpire fired. The Umpire confronted him and Mitch went off. He threatened the umpire called him a motherfucker in front of 10 year olds. They were faced to face inches from each other arguing. He had to be restrained by other coaches. The umpire rightfully kicked him out.*

*He refused to leave the field until speaking to he spoke to management. He left the field took off his jersey and watched the rest of the game from behind home plate without incident.*

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 86 of 117
16-11700-smb 16-11700-smb Filed Claim 03-1 Part Entered Filed 07/11/16 16:42:82 of Main Document
Pg 111 of 139

*It was such a train wreck. He was arguing with calls and making comments to both of the umpires all game. He was coaching first base as the game was going on, and the second base umpire threw him out. He "said" he was making a comment to one of the parents in the stands, when the second base umpire tossed him. He was making comments the whole game about the bad calls, and the 2nd base ump just had enough.*

*He went nuts. He got into the umpires face like it was the major leagues. He claimed that the umpire who was about 65 years old threatened him and said to pick a time and a place to fight Mitch.*

*The game was delayed for about 10 minutes as they needed to call in an official from Ripken until he finally was removed. It was crazy. Never saw a player get ejected from a game and not leave. This is all going on while 10 year olds are playing baseball, or trying to play baseball.*

*Ironically, the audio at the beginning of the game is from Cal Ripken which talks about how parents should let the players play, the coaches coach, and the umpires umpire. (IE - parents, don't act like idiots). Mitch was the idiot.*


*I was very upset with the decision [to lift the ban] because Williams was confrontational all game, and it was clear to everyone there that whatever the ump said that was inappropriate came after he was already tossed and refused to leave the field, and the ump was reacting to Williams, not the other way around.*

There's nothing worse than the Bad Sports Parent (http://deadspin.com/5985288/which-sport-produces-the-worst-parents), and Williams has a bit of a history (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane) playing this role. In 2008, he was tossed from his then-10-year-old daughter's youth-league basketball game for dropping f-bombs on a referee. "I'm emotional when it comes to my kids," he explained later. "What I saw happening was completely unfair."



(http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)
Mitch Williams Supports Youth Athletics, Is Not At All Insane (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)Mitch Williams Supports Youth Athletics, Is Not At All Insane (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)Mitch Williams Supports Youth Athletics, Is Not At (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)
Former Phillies reliever Mitch Williams has never been one to see an injustice go unchallenged,...
Read more (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-insane)

*To contact the author of this post, write to tim@deadspin.com (mailto:tim@deadspin.com) or find him on Twitter @bubbaprog (https://twitter.com/bubbaprog). Photos used by permission.*

Like    1.7k                                                                                    10        109      Reply

Timothy Burke's Discussions (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 87 of 117
16-11700-smb-1070039mb Filed 10/31/16art Entered 07311166142:88 of Main Document
Pg 112 of 139

# Exhibit C

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 88 of 117
16-11700-smb    Doc 39    Claim 3-1    Part 2    Filed 10/31/16    Pg 88 of Main Document
Pg 113 of 139

 **DEADSPIN (/)**

## Witnesses: Mitch Williams Called Child "A Pussy," Ordered Beanball (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

Timothy Burke (http://rybbanca.kinja.com)                        138 146        2
Filed to: MITCH WILLIAMS , MITCH TELEVISIONS ,  5/6/14 2:15pm (http://deadspin.com



The fallout continues from MLB Network analyst Mitch Williams's meltdown at a Ripken Baseball youth tournament this past weekend (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-arg-1574736005), as parents and coaches tell Deadspin that "The Wild Thing" called one child "a pussy" while ordering one of his own 10-year-old players to hit the opposing pitcher with a beanball.

(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch

16-11700-smb   Doc 460-3   Filed 11/17/16   Entered 11/17/16 15:53:17   Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William   Pg 89 of 117
16-11700-smb   Doc 390   Filed 10/31/16   Part 2   Entered 10/31/16 14:58   of Main Document
Pg 114 of 139

While video of the Saturday ejection is still suspiciously unavailable, we were able to acquire footage from Sunday's championship game between the Williams-coached Jersey Wild and SJ Titans, another elite 10U baseball team from New Jersey. The film at the top of this post shows an interaction between Williams and some SJ Titans players. Multiple witnesses report that interaction consisted of Williams calling the SJ Titans pitcher "a pussy." Children on the team heard this, and one asked his parent on the ride home what it meant. The comment sparked a meeting behind home plate between SJ Titans coaches, umpires, Williams, and a handler (one witness called him a "babysitter") assigned by Ripken Baseball to keep Williams in line after Saturday's ejection.

Even in this interaction, you can see Williams being aggressive and argumentative.



Here's video of an incident that happened in the fifth inning, when the SJ Titans pitcher came to bat in the leadoff position. Watch as Williams says something to his catcher, after which the catcher goes out to the mound to say something to his pitcher. SJ Titans coaches and players overheard this interaction, and report that Williams ordered his pitcher to intentionally hit the SJ Titans batter with the first pitch. One witness told us it was in an attempt to knock the SJ Titans pitcher out of the game

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 90 of 117
16-11700-smb-11700-smb Filed 10/31/16art Entered 10/31/16 16:48:86 of Main Document
Pg 115 of 139

Sure enough, the first pitch hits the SJ Titans player square in the ribs. (The home plate umpire, who had been made aware of the upcoming beanball, warned both benches.) One SJ Titans assistant coach confronted Williams about the pitch after the game, and reported that Williams stated, "I told him to throw it inside."

Other witnesses--a number of parents, coaches, and other observers contacted us about Mitch Williams's behavior--state that Williams was heckling SJ Titans coaches throughout the game, repeatedly calling one a "squirrelly little teapot," and making harassing comments about the appearance of 10-year-old baseball players on the opposing team. (Lest you think these reports come from a team of sore losers, know that SJ Titans defeated Jersey Wild in the championship game.)

We've noted Williams being a Bad Sport Parent (http://deadspin.com/5662777/mitch-williams-supports-youth-athletics-is-not-at-all-insane) for years, and numerous sources reported to us on his various behaviors both at the most recent Ripken Baseball tournament and in other sports, in other cities. Here's a sampling of what they told us.

> We hosted a tournament last weekend and 2 weekends ago and he was screaming at the umpires all weekend.

> Mitch Williams is trying to get into the heads of ten-year-olds.

> What an unbelievable douchebag Mr Williams acted like all weekend!

> He basically was questioning every call, balls n strikes, bitching whining etc...he was basically a horses ass...well it really exploded on a very close play....he went off...cursing the ump...yelling at a spectator or two or three.

> Basically in a nutshell, both days I saw this guy, he acted like an arrogant classless foul mouthed tool bag and DEFINITELY not someone id want coaching my kids!!!

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 91 of 117
16-11700-smb-11700-smb Filed 10/3/16 Part 2 Entered 10/31/16 16:49:33 of Main Document
Pg 116 of 139

*At games all over our town and others, he berates teenage and adult umpires. He goes ballistic regularly from the dugout or from the first baseline and these dopey Philly fans still give him a fist pump when he walks by.*

*It's such a shame when you live in a town where someone famous could use it for such good things, but he garners absolutely no respect from those who know him here in town. His talented sons are passed over in rec league drafts just so the coaches and families don't have to deal with the parents.*

We contacted several Ripken Baseball representatives. They have not responded to our questions, though one individual familiar with the situation informs us the organization is "taking matters quite seriously." Mitch Williams works alongside Bill Ripken at MLB Network.

**Update (5/17, 12:41 p.m.):** Several observers of today's Jersey Wild game at the Diamond Nation tournament note Mitch Williams, while in attendance, is not coaching the team.

*To contact the author of this post, write to tim@deadspin.com (mailto:tim@deadspin.com) or find him on Twitter @bubbaprog (https://twitter.com/bubbaprog)*

2        189        Reply

Timothy Burke's Discussions (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

All replies (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834/all)

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 92 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 1 Entered 10/31/16 14:88 of Main Document
Pg 117 of 139

# Exhibit D

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 93 of 117
16-11700-smb 16-11700-smb Filed Claim 03-1/16art 2nt Filed 10731116616 Pg 88 of Main Document
Pg 118 of 139

9/9/2014    Ex-MLB pitcher Mitch 'Wild Thing' Williams taking leave of absence from MLB Network after reportedly ordering beanball and other bad behavior …

JETER    THE SCORE    BASEBALL    FOOTBALL    BASKETBALL    HOCKEY    COLLEGE    HIGH SCHOOL    SOCCER    I-TEAM    MORE SPORTS    BLOGS

# Ex-MLB pitcher Mitch 'Wild Thing' Williams taking leave of absence from MLB Network after reportedly ordering beanball and other bad behavior at youth baseball game

**Williams, known as 'Wild Thing' during an 11-year big league career as a reliever, reportedly ordered the beaning of an opposing player during a youth baseball tournament last weekend in Maryland. He had been ejected the day before for a reported 'profanity-laced tirade' directed at the ump.**

BY ANDY CLAYTON    Follow    / NEW YORK DAILY NEWS  /  Published: Saturday, May 17, 2014, 11:45 AM

/ Updated: Saturday, May 17, 2014, 7:14 PM                                    A A A

                                            SHARE THIS URL

    143        112                          11            nydn.us/1kbIGCM




BLOGGING THE BOMBERS

**Daily News Yankees Podcast: Derek Jeter Day roundup**

 
KRISTIE ACKERT


**Eric Campbell steals a run, first time Mets pull off feat since 2011**

                                            CHET GORDON
Mitch 'Wild Thing' Williams coaches with the independent league Atlantic City Surf following his playing days. Williams is taking a leave of absence from his current gig as an analyst with the MLB Network.


KEEP UP WITH JETER'S FINAL SEASON HERE!

Mitch Williams is apparently just as 'Wild' as a coach.

Williams, known as 'Wild Thing' during an 11-year big league career as a reliever, reportedly ordered the beaning of an opposing player during a youth baseball tournament last weekend in Maryland.

Deadspin, citing information provided to the website by parents and coaches, reported Friday that the former All-Star and current MLB Network analyst told one of his 10-year-old players to hit the opposing pitcher.

The MLB Network told the Daily News Saturday afternoon that Williams is taking a leave of absence from the network.

"Mitch Williams has decided to take a leave of absence from his role at MLB Network at this time," an MLB Network spokesperson said in an email to the Daily News. "We are continuing to look into the matter."

The ordering of the beanball reportedly came one day


PLAY FOR FREE
FanDuel.com
DAILY NEWS
PRESENT
ONE-DAY FANTASY LEAGUES for REAL MONEY
PLAY NOW

EDITORS' PICKS

**KNOCKOUT: Video shows NFL star Ray Rice slugging wife**
A Baltimore Ravens running back was suspended for just two games after knocking a woman out cold.


That's a nickel less than his number. Eagles running back LeSean McCoy dropped a 20 cent tip on a $61.56

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 94 of 117
16-11700-smb16-11700-smb Filed Claim 03-1/1Part 2 Filed 07/11/16161 Pg 98 of Main Document
Pg 119 of 139

9/9/2014    Ex-MLB pitcher Mitch 'Wild Thing' Williams taking leave of absence from MLB Network after reportedly ordering beanball and other bad behavior ...



**Mitch Williams**    Follow

I regret what happened at this weekend's tournament & apologize. I love baseball & coaching.

after Williams was ejected from the Jersey Wild team's semifinal game in a Ripken Baseball tournament in Aberdeen, Md., for a "profanity-laced tirade." The website reported that Williams called the umpire a "mother----er." Williams' son plays on the Jersey Wild team.

Last Sunday's beanball incident reportedly took place in the fifth inning of the age-group's championship game against the SJ Titans. Witnesses, including members of the Titans, told Deadspin that Williams was overheard ordering his pitcher to hit the next Titans batter - the opposing pitcher - with the first pitch of the inning. The Titans pitcher was hit in the ribs with the beanball.

Williams' apparent out-of-control antics - which reportedly included calling one of the Titans players "a pussy" - did not prevent the Titans from beating the Jersey Wild in the title game.

Witnesses told Deadspin that Williams heckled opposing coaches throughout the game and was also making harassing comments about the appearance of the 10-year-old players.

Williams, who pitched for six teams including the Phillies and Cubs during his career, apologized for the ejection on Sunday via Twitter.

"I regret what happened at this weekend's tournament & apologize," Williams tweeted. "I love baseball & coaching."

He added: "I did not curse at the umpire & will walk away in the future. Again, I apologize."

PICTURED Eagles running back leaves 20 cent tip at Philly burger joint ...



'THIS IS OUR LIFE': Ray Rice's wife Janay Palmer speaks out — says husband's ouster from NFL is a
Disgraced NFL star Ray Rice's wife says no one

**Myers: Eli Manning is West Toast in Giants new dink-and-dunk offense**
It was the Same Old Eli on Monday night, but unfortunately for the Giants,



**Mets GM: Now is time to be careful with young arms**
With the future of the franchise riding on young arms, Sandy Alderson has made it clear just how



FROM AROUND THE WEB



Olympic Figure Skater Kiira Korpi Shows Off Her Figure In These Photos
(RantSports)



8 Celebrities That Nobody Wants To Work With
(Your Daily Sports)



Red Sox-Blue Jays: Clay Buchholz Battles Jays, Mother Nature At Fenway
(NESN)



Singapore's four solutions for water scarcity
(Singapore Economic Development Board)

Recommended by



CHARLES KRUPA/AP
Mitch Williams caps his major league career with the Kansas City Royals in 1997.

PROMOTED STORIES



Jessica Szohr Shows Why She's Aaron Rodgers New Fling



Erin Andrews Talks Super Bowl, Dating Athletes



The Lowest Moment In High School Football History



EDITORS' PICKS

Yankees hopeful, but weak output makes it hard to see Derek Jeter in postseason
The narrative would practically write itself. Who didn't think the Yankees



Smash hits in U.S. Open history
With the U.S. Open in full swing, the News dipped into our archive for historic shots from the tournament's former venue in Forest Hills.



Michael Jordan and stars come out to say goodbye to

# Exhibit E

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 96 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part 2 Entered 10/31/16 16:48:93 of Main Document
Pg 121 of 139

9/22/2014                 Ex-MLB pitcher Mitch Williams takes leave from MLB Network after flap in youth tournament | For The Win

 SPORTS



# Ex-MLB pitcher Mitch Williams takes leave from MLB Network after flap in youth tournament

By: TED BERG May 19, 2014 1:55 pm ET    Follow @ogtedberg

7.9k shares          SHARE          TWEET          EMAIL

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 97 of 117
16-11700-smb 16-11700-smb Filed Claim 3-1 Part 2 Filed 10/31/16 16:42:53 Main Document
Pg 122 of 139



**Hit Me SEO**
@HitMeSEO

Follow

@WildThingMLBN - you don't act like this as a coach of young boys Mitch. Kids had to watch this behavior for 10 mins.

7:22 PM - 11 May 2014

21 RETWEETS  5 FAVORITES

Former MLB relief pitcher Mitch Williams has taken a leave of absence from his role as an MLB Network analyst after eyewitnesses at a youth-baseball tournament in Maryland described Williams being combative with umpires and opposing players in his role as coach of a New Jersey-based 10-and-under travel team.

In an email to USA TODAY Sports, an MLB Network spokesperson confirmed that "the decision to take the leave was mutual," and said there is currently no timetable for Williams' return to broadcasts.

Parents and fans in attendance at a Ripken Baseball tournament in Aberdeen, Md. told Deadspin last week that Williams was ejected from a game for arguing with umpires, saying that the one-time Phillies closer had to be restrained and calling his behavior "confrontational" and "a train wreck."

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 98 of 117
16-11700-smb 16-11700-smb Filed Claim 03-1/1 Part 2 Filed 10/31/16 16:42:98 of Main Document
Pg 123 of 139

The next day, Deadspin followed up with reports suggesting that Williams used expletives toward an opposing player and had his team's pitcher intentionally throw at the player — who, again, is no more than 10 years old.

On Twitter, Williams contested the reports, apologizing for his behavior but insisting he did not curse at the umpire.

 **Hit Me SEO** @HitMeSEO                                                11 May
Phillies Fan, embarrassed to watch @WildThingMLBN Mitch Williams get thrown out of a 10 year old baseball game today @RipkenBaseball

 **Mitch Williams**                                               [ Follow ]
@WildThingMLBN

@HitMeSEO is taped by Ripken. They have it and it will show everything.ive never seen an ump at so out of control especially at a 10yrold gm

8:08 AM - 11 May 2014  Edgewood, MD, United States

4 RETWEETS  2 FAVORITES

 **Mitch Williams**                                               [ Follow ]
@WildThingMLBN

I regret what happened at this weekend's tournament & apologize. I love baseball & coaching.

3:53 PM - 12 May 2014

33 RETWEETS  37 FAVORITES

 **Mitch Williams**                                               [ Follow ]
@WildThingMLBN

I did not curse at the umpire & will walk away in the future. Again, I apologize.

3:54 PM - 12 May 2014

41 RETWEETS  39 FAVORITES

Williams' off-air behavior also drew headlines last year, when he clashed with former teammate Lenny Dykstra at an event at a Pennsylvania mall.

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 99 of 117
16-11700-smb 16-11700-smb Filed 10/3-1/ Part Entered 107311161614:98 of Main Document
Pg 124 of 139

9/22/2014                Ex-MLB pitcher Mitch Williams takes leave from MLB Network after flap in youth tournament | For The Win

A phone call to Williams' representative, Russ Spielman, for comment was not immediately returned.

## 7.9k shares

SHARE              TWEET                EMAIL

---

## Be friends with For The Win.

Like us on Facebook! Follow on Twitter!

Like  [35k]      [Follow @forthewin]  [40.1K followers]

---

## MORE FTW

**NFL**
Yes, the Cincinnati Bengals are the best team in football

**HIGH SCHOOL**
High School football player gives the most incredible post game speech you will ever hear

**MLB**
Lenny Dykstra, ex-Phillies teammate Mitch Williams clash at a mall

## THE LATEST

# The 7 freshest college football uniforms from Week 4

By: Mike Foss 3 minutes ago

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 100 of 117
16-11700-smb-11700-39mb Filed in 3-1/16art Entered 10731116616 42:96 of Main Document
Pg 125 of 139

# Exhibit F

16-11700-smb   Doc 460-3   Filed 11/17/16   Entered 11/17/16 15:53:17   Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William   Pg 101 of 117
16-11700-smb   Doc 390   Filed 10/31/16   Part 2 Entered 10/31/16 14:57:56   of Main Document
Pg 126 of 139









Timothy Burke (http://bubbaprog.kinja.com)
Filed to: MITCH WILLIAMS (/TAG/MITCH-WILLIAMS)   5/19/14 11:13am (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

## MLB Network Puts Mitch Williams On Hiatus (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834/1578450916/+bubbaprog)



MLB Network analyst Mitch Williams is on an indefinite leave of absence from the league-owned cable channel after a series of incidents at a youth baseball tournament that witnesses tell us included the former big-league hurler calling a ten-year-old "a pussy."

The *Daily News* has the scoop (http://www.nydailynews.com/sports/baseball/report-mitch-wild-williams-ordered-beanball-youth-game-article-1.1796104), though it's not certain the leave of absence is directly tied to his behavior last weekend. Several readers wrote in last week, informing us Williams's appearances on MLB Network were erratic and that the "Wild Thing" was slurring his words.

While Ripken Baseball has yet to respond formally to our requests for information, one employee of that organization who witnessed his behavior last weekend at the 10U tournament told us that Williams was "very unprofessional in the way he acted, coached, and the way he carried himself." This individual told us Williams has been out of line repeatedly and complaints about his behavior stretch back at least a year, and noted that a "warning" message from Bill Ripken, reminding coaches and visitors about proper sportsmanship, had to be played four times during his initial outburst (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005) that earned him an ejection.

The Ripken Baseball employee went on to opine that Williams should be banned for life from that organization's events. Several readers in attendance at Jersey Wild's games this past weekend noted Williams was not coaching his team, though he was in attendance as a spectator.



(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

16-11700-smb   Doc 460-3   Filed 11/17/16   Entered 11/17/16 15:53:17   Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William   Pg 102 of 117
16-11700-smb   Doc 399   Filed 10/31/16   Entered 10/31/16 12:58   of Main Document
Pg 127 of 139

MLB Network Puts Mitch Williams On Hiatus                         http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-orde...

MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after a profanity-laced tirade in which he called an... Read... (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

Like   78                                                                                        ⋮    Reply

5/16/14 2:15pm (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

Original post by Timothy Burke (http://bubbaprog.kinja.com) on DEADSPIN (HTTP://DEADSPIN.COM)   (/)                      2

### Witnesses: Mitch Williams Called Child "A Pussy," Ordered Beanball (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)



The fallout continues from MLB Network analyst Mitch Williams's meltdown at a Ripken Baseball youth tournament this past weekend (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005), as parents and coaches tell Deadspin that "The Wild Thing" called one child "a pussy" while ordering one of his own 10-year-old players to hit the opposing pitcher with a beanball.



(http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)Mitch Williams Ejected From Child's Baseball G (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)
MLB Network analyst Mitch Williams was ejected Saturday from a baseball game for 10-year-olds after ...
Read more (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005)

While video of the Saturday ejection is still suspiciously unavailable, we were able to acquire footage from Sunday's championship game

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 103 of 117
16-11700-smb 16-11700-smb Filed 10/31/16 Part Entered 10/31/16 16:29:38 of Main Document
Pg 128 of 139

MLB Network Puts Mitch Williams On Hiatus                    http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-orde...

shows an interaction between Williams and some SJ Titans players. Multiple witnesses report that interaction consisted of Williams calling
the SJ Titans pitcher "a pussy." Children on the team heard this, and one asked his parent on the ride home what it meant. The comment
sparked a meeting behind home plate between SJ Titans coaches, umpires, Williams, and a handler (one witness called him a "babysitter")
assigned by Ripken Baseball to keep Williams in line after Saturday's ejection.

Even in this interaction, you can see Williams being aggressive and argumentative.



Here's video of an incident that happened in the fifth inning, when the SJ Titans pitcher came to bat in the leadoff position. Watch as
Williams says something to his catcher, after which the catcher goes out to the mound to say something to his pitcher. SJ Titans coaches and
players overheard this interaction, and report that Williams ordered his pitcher to intentionally hit the SJ Titans batter with the first pitch.
One witness told us it was in an attempt to knock the SJ Titans pitcher out of the game.

Sure enough, the first pitch hits the SJ Titans player square in the ribs. (The home plate umpire, who had been made aware of the upcoming
beanball, warned both benches.) One SJ Titans assistant coach confronted Williams about the pitch after the game, and reported that
Williams stated, "I told him to throw it inside."

Other witnesses—a number of parents, coaches, and other observers contacted us about Mitch Williams's behavior—state that Williams was

the appearance of 10-year-old baseball players on the opposing team. (Lest you think these reports come from a team of sore losers, know
that SJ Titans defeated Jersey Wild in the championship game.)

We've noted Williams being a Bad Sport Parent (http://deadspin.com/366277/mitch-williams-supports-youth-athletics-is-not-at-all-
insane) for years, and numerous sources reported to us on his various behaviors both at the most recent Ripken Baseball tournament and in
other sports, in other cities. Here's a sampling of what they told us.

*We hosted a tournament last weekend and 2 weekends ago and he was screaming at the umpires all weekend.*

MLB Network Puts Mitch Williams On Hiatus                    http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-orde...

*Mitch Williams is trying to get into the heads of ten-year-olds.*

*What an unbelievable douchebag Mr Williams acted like all weekend!*

*He basically was questioning every call, balls n strikes, bitching whining etc...he was basically a horses ass...well it really exploded on a very close play....he went off...cursing the ump...yelling at a spectator or two or three.*

*Basically in a nutshell, both days I saw this guy, he acted like an arrogant classless foul mouthed tool bag and DEFINITELY not someone id want coaching my kids!!!*

*At games all over our town and others, he berates teenage and adult umpires. He goes ballistic regularly from the dugout or from the first baseline and these dopey Philly fans still give him a fist pump when he walks by.*

*It's such a shame when you live in a town where someone famous could use it for such good things, but he garners absolutely no respect from those who know him here in town. His talented sons are passed over in rec league drafts just so the coaches and families don't have to deal with the parents.*

We contacted several Ripken Baseball representatives. They have not responded to our questions, though one individual familiar with the situation informs us the organization is "taking matters quite seriously." Mitch Williams works alongside Bill Ripken at MLB Network.

**Update (5/17, 12:41 p.m.):** Several observers of today's Jersey Wild game at the Diamond Nation tournament note Mitch Williams, while in attendance, is not coaching the team.

*To contact the author of this post, write to tim@deadspin.com (mailto:tim@deadspin.com) or find him on Twitter @bubbaprog (https://twitter.com /bubbaprog).*

Like  656                                                                                    2    179    Reply

Timothy Burke's Discussions (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834)

All replies (http://deadspin.com/witnesses-mitch-williams-called-child-a-pussy-order-1577451834/all)

# Exhibit G

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 106 of 117
16-11700-smb  16-11700-smb    Doc 460-3/Part 2  Entered 07/31/16 16:42:52 of Main Document
Pg 131 of 189
Little League Coach Gives Great Post-Game Speech To Kids After Loss                    Page 1 of 1



## Little League Coach Gives Great Post-Game Speech To Kids After Loss (http://deadspin.com/little-league-coach-gives-great-post-game-speech-to-kid-1623699530)

Sean Newell (http://sean-newell.kinja.com)                                171,382 ⟳  81 ☆
(http://sean-newell.kinja.com)
Filed to: LITTLE LEAGUE WORLD SERIES (/TAG/LITTLE-LEAGUE-WORLD-SERIES)   8/19/14 12:51am (http://deadspin.com/little-league-c



This is a great little reminder that not all youth coaches and parents are psychopaths (http://deadspin.com/mitch-williams-ejected-from-childs-baseball-game-for-ar-1574736005). After losing to Jackie Robinson West 8-7 (http://www.providencejournal.com/sports/content/20140818-little-league-world-series-cumberland-american-falls-just-short-8-7-in-classic.ece), Dave Belisle gathered his Cumberland American team from Rhode Island to let them know that even though they lost, it's not a reason to be upset or disappointed.

As most of the kids in the huddle cried, Belisle made them all lift their heads and look him in the eye as he told them to be proud because they had their hometown "jumpin', the whole state jumpin', you had New England jumpin', you had ESPN jumpin'." He also told them the only reason he would cry after this run is because he won't be coaching them. You don't often see moving post-game speeches from the losing side, but this one was excellent.

[ESPN]

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 107 of 117
16-11700-smb   16-11700-smb   Filed 10/31/26   Entered 07/31/16 16:42:53   of Main Document
Pg 132 of 139

# Exhibit H

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 108 of 117
16-11700-smb 16-11700-smb Filed Claim 10/31/16 Part 2 Entered 10/31/16 16:42:53 of Main Document
Pg 133 of 139



Dated as of June 15, 2014

Mr. Mitchell Williams
c/o The Agency Sports Management
1500 Broadway – 25th Floor
New York, NY 10036
Attn: Russ Spielman

Re:    THE MLB NETWORK, INC. -W- MITCHELL WILLIAMS

Dear Mr. Williams:

WHEREAS, reference is hereby made to the agreement between Artist and Company dated as of November 1, 2011, as amended (the "**Agreement**"). Capitalized terms that are used and not defined herein shall have the meanings assigned to such terms in the Agreement;

WHEREAS, in May 2014 Artist was involved in reported incidents of inappropriate behavior during Artist's participation in, and/or attendance at, certain youth athletic events, and, subsequent thereto, internal incidents which arose from such reported incidents (collectively, the "**Artist Incident(s)**");

WHEREAS, Company and Artist previously mutually agreed to Artist taking a paid leave of absence for an indefinite period of time;

WHEREAS, such actions by Artist during each Artist Incident constitutes a breach of the Agreement by Artist, including, without limitation, with respect to Section 15.03 of the Agreement, pursuant to which Company may terminate the Agreement; and

WHEREAS, Company and Artist have mutually agreed to discontinue such leave of absence by Artist effective on a date to be mutually determined by Company and Artist, but in no event earlier than August 1, 2014, subject to all of the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the following, when fully executed by the parties hereto, shall amend and supplement the Agreement (this "**Second Amendment**") as of June 15, 2014 (the "**Second Amendment Effective Date**"):

1.  In consideration for Company's covenant to not exercise its right to terminate the Agreement as a result of the Artist Incident(s), Artist hereby covenants and agrees that (i) for a period of one (1) year from the date of discontinuance of Artist's leave of absence, Artist shall

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B -
Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 109 of 117
16-11700-smb  16-11700-smb  Claim 10-1, Part 2 Entered 10/31/16 16:42:55  of Main Document
Pg 134 of 139

not attend, in any manner or by any means, any amateur athletic event(s) of any kind, including, without limitation, any youth, middle school, high school, and college athletic events (ii) during the remainder of the Term, Artist shall not participate in (e.g., coach, advise, speaker, etc.) in any manner or by any means, any amateur athletic event(s) of any kind, including, without limitation, any youth, middle school, high school, and college athletic events (iii) during the remainder of the Term, Artist shall not, unless approved in advance, and in writing, by Company, post to, or otherwise actively participate in, any social media outlets (e.g., Twitter, Facebook, etc.) for any purpose, and (iv) Artist has obtained, and will continue to attend, therapeutic counseling. For the avoidance of doubt, nothing set forth herein shall be deemed to waive any rights and/or remedies of Company with respect to any other Artist action(s) including, without limitation, (a) any action(s) of which Company is currently unaware and (b) any Artist action(s) in connection with the Artist Incident(s) of which Company is currently unaware.

2.    In addition to any rights and remedies available to Company pursuant to the Agreement, all of which are hereby reserved by Company, if Artist breaches any covenant set forth in Section 1 above, then Company shall have the right to immediately terminate the Agreement, and Company shall not have any liability to Artist, and Artist hereby agrees that Artist shall have no right to cure any such breach by Artist, if curable.

Except as expressly modified by this Second Amendment, the Agreement, as amended, is, and will continue to be, in full force and effect, and this Second Amendment will not operate as a waiver of any provision of the Agreement. This Second Amendment may be executed in counterparts, each of which is an original and all of which together constitute one and the same agreement. Signatures to this Second Amendment may be delivered by facsimile and will be binding upon the parties.

Please have this Second Amendment executed in the space provided below to signify your acknowledgement and acceptance of the foregoing.

Sincerely yours,

**THE MLB NETWORK, INC.**

By: _____
Name: _____
Title: _____

AGREED AND ACCEPTED:

**MITCHELL WILLIAMS**

By: _____

# EXHIBIT  2

# TO DECLARATION OF RAHUL MUNSHI

16-11700-smb    Doc 460-3    Filed 11/17/16    Entered 11/17/16 15:53:17    Exhibit B - Declaration of Rahul Munshi in Support of Motion of Mitchell William    Pg 111 of 117

16-11700-smb    Doc 391    Filed 10/31/16    Entered 10/31/16 16:42:58    Main Document    Pg 136 of 139

TRUE COPY

MICHAEL J. KASSEL, J.S.C.

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION, CAMDEN COUNTY**

Mitchell Williams

**DOCKET #**   CAM
L - 3675 -14

**Plaintiff(s)**

**v.**

**CIVIL ACTION ORDER**

The MLB Network et al.

**Defendant(s)**

This matter being opened to the Court by _Defendant Gawker Media, LLC_ ("Gawker")

on _its motion to dismiss_ and for good cause shown;

It is hereby on this _6th_ day of _March_ , 2014̶5̶

Ordered that _the motion is granted in part and denied in part._

_Plaintiff's claims against Gawker are dismissed except as to_

_challenged statements that Plaintiff (1) ordered a beanball,_

_(2) used the profanity "motherf*****r" in front of children,_

_and (3) called a child a "p***y"._

Michael J. Kassel, J.S.C.

**\*\*Reasons on the record**

Chad R. Bowman, counsel for Gawker Media, LLC

_____, counsel for Williams

# EXHIBIT  3

# TO DECLARATION OF RAHUL MUNSHI

44

TRUE COPY

MICHAEL J. KA

**LEVINE SULLIVAN KOCH & SCHULZ, LLP**
Gayle C. Sproul (No. 0129-1983)
Seth D. Berlin (admitted *pro hac vice*)
Chad R. Bowman (admitted *pro hac vice*)
1760 Market Street, Suite 1001
Philadelphia, PA 19103
Phone: (215) 988-9778

| | |
|---|---|
| **MITCHELL WILLIAMS,** | : **SUPERIOR COURT OF NEW JERSEY** |
| | : **LAW DIVISION** |
| **Plaintiff,** | : **CAMDEN COUNTY** |
| | : |
| **v.** | : **CIVIL ACTION** |
| | : **DOCKET NO. CAM-L-3675-14** |
| **THE MLB NETWORK, INC., et al.,** | : |
| | : **[PROPOSED] ORDER GRANTING** |
| **Defendants.** | : **DEFENDANT GAWKER MEDIA,** |
| | : **LLC'S MOTION FOR** |
| | **RECONSIDERATION AND** |
| | **DISMISSING ALL REMAINING** |
| | **CLAIMS AGAINST GAWKER** |

THIS MATTER having been opened to the Court by Levine Sullivan Koch & Schulz,

LLP, attorneys for Defendant Gawker Media, LLC ("Gawker"), for an Order reconsidering the

partial denial of Gawker's motion to dismiss and dismissing all claims against Gawker with

prejudice; on notice to the Console Law Offices, LLC, attorney for Plaintiff, and the Court

having considered the papers submitted by the parties and any oral argument thereon, and for

good cause shown;

IT IS on this _____ day of _____ ORDERED as follows:

1. Gawker's motion for reconsideration is granted; that

2. Gawker's motion to dismiss is granted; that

3. all claims against Gawker are dismissed with prejudice; and that

4. a copy of this Order shall be served upon all counsel within _____ days of entry

hereof.

_____
J.S.C.

# EXHIBIT  4

# TO DECLARATION OF RAHUL MUNSHI

RECEIVED

2016 APR 29 PM 5: 27

SUPERIOR COURT/LAW DIV.

TRUE COPY



MICHAEL J. KASSEL, J.S.C.

F I L E D

JUN 1 2016

CAMDEN COUNTY SUPERIOR COURT

LEVINE SULLIVAN KOCH & SCHULZ, LLP
Thomas B. Kelley (*pro hac vice* motion pending)
Chad R. Bowman (admitted *pro hac vice*)
Elizabeth Seidlin-Bernstein (No. 052882014)
1760 Market Street, Suite 1001
Philadelphia, PA 19103
Phone: (215) 988-9778

*Attorneys for Defendant Gawker Media, LLC*

| | |
|---|---|
| **MITCHELL WILLIAMS,** | **SUPERIOR COURT OF NEW JERSEY** |
| | **LAW DIVISION** |
| **Plaintiff,** | **CAMDEN COUNTY** |
| | |
| **v.** | **CIVIL ACTION** |
| | **DOCKET NO. CAM-L-3675-14** |
| **THE MLB NETWORK, INC., et al.,** | |
| | **[PROPOSED]** **ORDER GRANTING** |
| **Defendants.** | **DEFENDANT GAWKER MEDIA,** |
| | **LLC'S MOTION FOR SUMMARY** |
| | **JUDGMENT** |

THIS MATTER having been opened to the Court by Levine Sullivan Koch & Schulz,

LLP, attorneys for Defendant Gawker Media, LLC ("Gawker"), for an Order dismissing all

*with ability to appeal all rulings as to Gawker Defendants*

claims against Gawker with prejudice; on notice to the Console Law Offices, LLC, attorney for

Plaintiff, and the Court having considered the papers submitted by the parties and any oral

argument thereon, and for good cause shown;

IT IS on this 1st day of _June, 2016_____ ORDERED as follows:

1.  Gawker's motion for summary judgment is granted; that  *with inability to appeal*

2.  all claims against Gawker are dismissed with prejudice; and that  *all rulings as to Gawker Defendants.*

3.  a copy of this Order shall be served upon all counsel within __5__ days of entry

hereof.

_____
                                J.S.C.

A greed
_____

Chul R. Bae / For Defendant
              Gawker Media LLC

Laura Nittacci / for Plaintiff