ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                  :
In re                             :          Chapter 11
                                  :
Gawker Media LLC, *et al.*,[1]    :          Case No. 16-11700 (SMB)
                                  :
                    Debtors.      :          (Jointly Administered)
                                  :
---------------------------------------------------------x

### NOTICE OF DEBTORS' OMNIBUS OBJECTION TO PROOFS OF CLAIM NOS. 293, 294 AND 295 FILED BY ALBERT JAMES DAULERIO

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Debtors' Omnibus Objection to Proofs of Claim Nos. 293, 294, and 295 Filed by Albert James Daulerio* (the "Objection"), which seeks to alter your rights by disallowing certain of your claims against the above-captioned Debtors.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place on **December 29, 2016 at 10:00 a.m. (Eastern Time)** before the Honorable Judge Stuart M. Bernstein, at the United States Bankruptcy Court for the Southern District of New York,

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Courtroom No. 723.

**PLEASE TAKE FURTHER NOTICE** that responses to the Objection and the relief requested therein, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall set forth the basis for the response or objection and the specific grounds therefore, and shall be filed with the Court electronically in accordance with General Order M-399 by registered users of the Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Court), with a hard copy delivered directly to chambers pursuant to Local Bankruptcy Rule 9028-1 and served so as to be actually received no later than **December 12, 2016, at 4:00 p.m.** **(Eastern Time)** (the "Response Deadline"), upon: (i) the Debtors, Gawker Media LLC, c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022 (wholden@opportune.com); (ii) counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com); (iii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Greg Zipes & Susan Arbeit; (iv) the Internal Revenue Service, Attn: Centralized Insolvency Operation, 2970 Market Street, Philadelphia, PA 19104 (mimi.m.wong@irscounsel.treas.gov); (v) the United States Attorney's Office for the Southern District of New York, Attn: Bankruptcy Division, 86 Chambers Street, 3rd Floor, New York, NY 10007 (david.jones6@usdoj.gov; Jeffrey.Oestericher@usdoj.gov; Joseph.Cordaro@usdoj.gov; Carina.Schoenberger@usdoj.gov); (vi) counsel to Cerberus Business Finance, LLC, as DIP Lender, Schulte Roth & Zabel LLP, 919

2

Third Avenue, New York, New York 10022, Attn: Adam C. Harris (adam.harris@srz.com); (vii) counsel to US VC Partners LP, as Prepetition Second Lien Lender, Latham & Watkins LLP, at both 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: David Heller (david.heller@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Keith A. Simon (keith.simon@lw.com); (viii) counsel for the Official Committee of Unsecured Creditors, Simpson Thacher & Bartlett, 425 Lexington Ave., New York, NY 10017, Attn: Sandy Qusba (squsba@stblaw.com) and William T. Russell (wrussell@stblaw.com); and (ix) parties that have requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Objection by the Response Deadline, the Bankruptcy Court may deem any opposition waived, treat the Objection as conceded, and enter an order granting the relief requested in the Objection without further notice or hearing.

*[Remainder of this page intentionally left blank]*

PLEASE TAKE FURTHER NOTICE that a copy of the Objection may be obtained free of charge by visiting the website of Prime Clerk LLC at http://cases.primeclerk.com/gawker. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: November 28, 2016
     New York, New York

*/s/ Gregg M. Galardi*
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                        :
In re                                                   :        Chapter 11
                                                        :
Gawker Media LLC, *et al.*,[1]                          :        Case No. 16-11700 (SMB)
                                                        :
                    Debtors.                            :        (Jointly Administered)
                                                        :
-------------------------------------------------------x

**DEBTORS' OMNIBUS OBJECTION TO PROOFS OF
CLAIM NOS. 293, 294 AND 295 FILED BY ALBERT JAMES DAULERIO**

Pursuant to sections 502(b), 502(c), and 502(e)(1) of the Bankruptcy Code and

Bankruptcy Rules 3001(e)(1) and 3007(d), Gawker Media LLC ("Gawker Media"), Gawker

Media Group, Inc. ("GMGI"), and Gawker Hungary Kft. ("Gawker Hungary"), as debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Bankruptcy

Cases"), hereby submit this objection (the "Objection") to three proofs of claim (Nos. 293, 294,

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

1

and 295) (collectively, the "Daulerio Claims")[2] filed by Albert James Daulerio ("Daulerio").

The Daulerio Claims all assert liability resulting form the Debtors' alleged duty to defend and

indemnify Daulerio in connection with his liability resulting from the Bollea Judgments (as

defined herein) and additional pending and potential lawsuits by Bollea (as defined herein)

against Daulerio.  In support of this Objection, the Debtors respectfully represent and set forth as

follows.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core

proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested

herein are section 502 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the

"Bankruptcy Code") and Rule 3001(e)(1) and 3007 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

2.     By this Motion, the Debtors request entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "Proposed Order"), (i) disallowing and expunging the Daulerio

Claims with respect to amounts asserted based on the Debtors' duties to indemnify and defend

Daulerio—other than costs of defending Daulerio in the Bollea I Lawsuit (as defined herein) that

have not already been paid by the Debtors—because the Debtors have no current liability to

Daulerio on account of such claims and any contingent future obligations should be disallowed

pursuant to section 502(e)(1) of the Bankruptcy Code and (ii) estimating for purposes of

allowance the potential future costs of defending Daulerio with respect to the Bollea I Lawsuit in

---

[2] True and correct copies of the Daulerio Claims will be provided separately to the Court.  Copies of the Daulerio Claims will be provided to all other parties upon request.

2

an amount up to the $100,000 amount of the Daulerio Punitive Damage Judgment (as defined herein), which Gawker Media would be prepared to pay if and to the extent Bollea seeks such payment.

## BACKGROUND

### I.    Daulerio's Employment Agreement

3.    Daulerio was party to an employment agreement dated November 23, 2011 (the "Employment Agreement") with Gawker Entertainment, LLC ("Gawker Entertainment").  In December 2012, Gawker Entertainment was liquidated in a corporate restructuring, and as a result, Daulerio contends the Employment Agreement was assumed by Gawker Media and/or its affiliated Debtors.  Supplement to Daulerio Claims ("Supp.") ¶ 33.i.[3]

4.    That Employment Agreement included the following representations and warranties by Daulerio (collectively, the "Employment Representations"):

a. The Work[4] will not violate  . . . any … rights of any person or entity, such as rights of privacy or publicity.

b. The Work created by [Daulerio] for the Site does not and will not contain, publish or display any libelous, defamatory, obscene or illegal content or material to the best of [Daulerio]'s knowledge.

c. Failure to comply with the undertakings in this Appendix will be a breach of this Appendix and [Daulerio's] Employment Agreement and will be deemed to adversely affect Company's reputation.

Employment Agreement, "Appendix A: Editorial Terms and Conditions" (the "Employment Appendix") ¶ 16.

---

[3] A copy of the Employment Agreement is attached as Exhibit 8 to the Daulerio Claims.

[4] "Work" is defined to mean "any and all content provided by Company, developed or conceived by [Daulerio] or other employees, contributors, assistants and/or interns pursuant to and during employment.  The "Company" is defined to mean Gawker Entertainment, LLC

3

5.      That Employment Appendix also contained two separate indemnification provisions, the first one running from Daulerio to Gawker Entertainment and the second running from Gawker Entertainment to Daulerio:

a.  [Daulerio] agrees to indemnify and hold [Gawker Entertainment] harmless from and against any judgments resulting from a breach **or claimed breach** by [Daulerio] of any of [Daulerio's] representations, warranties or covenants contained in the Employment Agreement (including its Appendices).   Strict Adherence to [Gawker Entertainment] policies shall constitute a complete defense for [Daulerio] against any suggested breach of his representations, covenants or warranties.  *Id.*, ¶ 19 (emphasis added) (the "Daulerio Indemnification Provision").

b.  [Gawker Entertainment] agrees to indemnify and hold [Daulerio] harmless from and against any judgments resulting from any claims arising from any content or images used by [Daulerio] in accordance with [Gawker Entertainment]'s content policies in force at the time of such use.  Furthermore, [Gawker Entertainment] undertakes to pay all legal fees incurred by [Daulerio] in the event of a legal action resulting from any such content that follows [Gawker Entertainment]'s policies in force and at the time the content is published.  *Id.*, ¶ 20 (the "Company Indemnification Provision").

6.      The Employment Appendix provided that it would be governed by the laws of the State of New York. *Id.* ¶ 23.

7.      As of January 2013, Daulerio was no longer employed by any of the Debtors or their affiliates. Supp. ¶ 11.

## II.    Summary of Relevant Litigation Proceedings

### A.    The Bollea I Lawsuit

8.      The Daulerio Claims initially arise out of an article (the "Bollea Article") written by Daulerio and published by Gawker Media on October 4, 2012, commenting on a video  (the "Bollea Video") depicting plaintiff Terry Gene Bollea ("Bollea").   As a result of the Bollea Article, Bollea asserted causes of action for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section

4

934.10, Florida Statutes against each of Gawker Media, Mr. Nicholas Denton and Daulerio (collectively, the "Defendants") for damages (the "Bollea I Lawsuit").

9.      On March 18, 2016, a jury entered its verdict finding the Defendants liable in connection with the Bollea I Lawsuit (the "Jury Verdict").[5] Specifically, the Jury Verdict found, among other things, that (i) the Defendants, including Daulerio, had a specific intent to harm Bollea when posting the Bollea Video online, *id. ¶* 17, (ii) the Defendants, including Daulerio intended to cause Bollea severe emotional distress or acted with reckless disregard of the high probability of causing Bollea severe emotional distress, *id.* ¶ 9, (iii) the Bollea Video was posted in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities, *id. ¶* 5, and (iv) the posting of the Bollea Video was extreme and outrageous to a person of ordinary sensibilities, *id.* at ¶ 8.

10.     On June 7, 2016, the Florida state court entered final judgment holding the Defendants jointly and severally liable for $115 million in compensatory damages (the "Compensatory Damage Judgment").  In addition, the jury found that each of the Defendants was liable for punitive damages to Bollea (the "Punitive Damage Judgments," and together with the Compensatory Damage Judgment, the "Bollea Judgments") in the following amounts: (i) Gawker Media in the amount of $15 million; (ii) Mr. Denton in the amount of $10 million; and Daulerio in the amount of $100,000 (the "Daulerio Punitive Damage Judgment").  On June 10, 2016, the Defendants filed a notice of appeal from the Bollea Judgments.

11.     Gawker Media provided Daulerio with a defense in the Bollea I Lawsuit by paying for the services of the law firm Levine Sullivan Koch & Schulz LLP ("LSKS") and the law firm of Thomas & LoCicero to represent Daulerio.  Gawker Media provided this defense

---

[5] A copy of the jury verdict in the Bollea I Lawsuit is attached as **Exhibit B** hereto.

from the suit's inception through entry of the Bollea Judgments and the filing of the notice of appeal. Supp. ¶ 22.

12.     On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since that date, the proceedings to enforce the Bollea Judgments against Gawker Media have been stayed as a result of Gawker Media's chapter 11 case.  On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under the Bankruptcy Code.  The proceedings to enforce the Bollea Judgments against Mr. Denton are also currently stayed as a result as of his commencing a separate chapter 11 bankruptcy case.

### B.     The Daulerio Judgment Satisfaction Order

13.     Subsequent to the commencement of the Debtors' chapter 11 cases, Bollea continued to pursue the enforcement of the Bollea Judgments against Daulerio, and on August 17, 2016, the Florida state court entered an Order transferring certain of Daulerio's assets to Bollea (the "Daulerio Judgment Satisfaction Order").[6]  The Daulerio Judgment Satisfaction Order found that:

> Daulerio has rights, **not exempt from execution**, which may be applied towards the satisfaction of the [Bollea Judgments, including the Daulerio Punitive Damage Judgment], arising out of a GMGI and Gawker [Media] policy and practice, pursuant to which they agreed to defend him against and to pay part or all of the [final judgment] awarded to Mr. Bollea.

Daulerio Judgment Satisfaction Order, at Findings ¶ 11 (emphasis added) (the "Daulerio Indemnification Rights").  Importantly, the Daulerio Judgment Satisfaction Order simply ruled that Daulerio's rights to have Gawker Media and GMGI pay part or all of the Bollea Judgments were thereby "transferred and assigned to Mr. Bollea" and that Bollea was "deemed to be the

---

[6] A copy of the Daulerio Judgment Satisfaction Order is attached as Exhibit 4 to the Daulerio Claims.

owner of the rights, with full power and authority to enforce said rights against Gawker [Media] and GMGI." *Id.* at Order ¶ 1.

14.     The Daulerio Judgment Satisfaction Order specifically did **not** find that such rights or the Claims asserted by Daulerio based on those rights were valid or actually enforceable against GMGI or Gawker Media.  Rather, the Florida court made clear in its findings that it did "not adjudicate the validity or enforceability of Daulerio's rights against Gawker [Media] or GMGI," so "Mr. Bollea is only entitled to take ownership of Daulerio's rights against Gawker [Media] and GMGI, and to then seek enforcement of those rights . . . in their pending bankruptcy proceedings." *Id*. Findings ¶ 13.

15.     On August 23, 2016, Daulerio filed a notice of appeal from the Daulerio Judgment Satisfaction Order in the Florida's Second District Court of Appeal [Case No. 2D16-3721] seeking reversal of that Order.  The Daulerio Judgment Satisfaction Order has not been stayed.

### C.     The Supplemental Daulerio Litigation

16.     Separate from the claims in the Bollea I Lawsuit complaint, on August 5, 2016, Bollea filed a motion for sanctions in the Bollea I Lawsuit, solely against Daulerio, which was later amended on October 13, 2016, to include a request for sanctions against LSKS in connection with its representation of the Debtors and Daulerio (as amended, the "Sanctions Motion").[7]  The Sanctions Motion seeks entry of an order imposing sanctions as a result of Daulerio's and/or his counsel's material misrepresentations and entry of an order to show cause why Daulerio and/or his counsel should not be held in contempt for hindering and obstructing the administration of justice.

---

[7] A copy of the Sanctions Motion is attached as **Exhibit C** hereto.

7

17.     Further, on October 6, 2016, Bollea filed an emergency motion to enforce the permanent injunction provided in the Bollea Judgments to prevent Daulerio from violating Florida's "Revenge Porn" laws and engaging in video voyeurism and extortion, by requiring Daulerio to immediately turn over any and all copies, excerpts and/or still images of all surreptitiously recorded, sexually explicit recordings and images of Bollea (the "Video Turnover Motion" and, together with the Sanctions Motion, the "Supplemental Daulerio Litigation").[8]  An evidentiary hearing to consider these Supplemental Daulerio Litigation motions has been deferred pending settlement negotiations [Docket No 49069512; Case No. 12012447 CI-011].

18.     Daulerio was not employed by the Debtors when the alleged actions giving rise to the Supplemental Daulerio Litigation occurred and those actions do not directly relate to content published by Gawker Media.

## III.     The Debtors' Plan And The Bollea Settlement

19.     On November 2, 2016, the Debtors filed their *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 403] (as amended and including all exhibits and supplements thereto, the "Disclosure Statement") in support of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. (as amended and including all exhibits thereto, the "Plan").  On November 4, 2016, this Court entered an order, among other things, approving that Disclosure Statement [Docket No. 413] (the "Disclosure Statement Order").  In accordance with the Disclosure Statement Order, the Debtors have commenced solicitation of acceptances and rejections on the Plan.  A hearing to consider confirmation of the Plan is currently scheduled for December 13, 2016.

---

[8] A copy of the Video Turnover Motion is attached as **Exhibit D** hereto.

59757611_9

20.     As described in the Disclosure Statement, the Debtors and Bollea agreed on terms

of a settlement (the "Bollea Settlement").[9]  If approved by the Court, the Bollea Settlement

would settle (i) the Bollea Judgments against Gawker Media, (ii) any and all other claims

asserted by Bollea against the Debtors, including Bollea's claim as the owner of any Daulerio

Indemnification Rights against GMGI and Gawker Media, (iii) Bollea's claim based on the

Compensatory Damage Judgment against Daulerio; and (iv) Bollea's claim based on the

Compensatory Damage Judgment against Mr. Denton.  The Bollea Settlement also contemplates

that Bollea would release either or both of the remaining $100,000 Daulerio Punitive Damage

Judgment against Daulerio and the $10 million Punitive Damage Judgment against Mr. Denton,

and terminate proceedings on executing on the Daulerio Punitive Damage Judgment, if either or

both of Daulerio and Mr. Denton, respectively, enter into an agreement that provides that

Daulerio and/or Mr. Denton, respectively: (i) dismiss his appeals relating to the Bollea I Lawsuit,

(ii) return and assign any rights associated with certain content relating to the Bollea Video,

(iii) execute a proposed declaration attached to the Bollea Settlement, and (iv) execute mutual

releases with Bollea (the "Proposed Supplemental Settlement").  The Proposed Supplemental

Settlement would not require any payments by Daulerio or Mr. Denton.  To date, Daulerio has

not accepted the Proposed Supplemental Settlement.

**IV.     The Daulerio Claims**

21.     On September 29, 2016, after entry of the Daulerio Judgment Satisfaction order,

Daulerio filed an identical, contingent claim against each of the three Debtors.  Each Daulerio

Claim lists the amount of the claim at $6 million, but the supplement attached to each Daulerio

Claim explains that amount is "an estimate only, based on legal fees incurred as of September

---

[9] A copy of the Bollea Settlement agreement will be filed with the Court as part of the plan supplement
contemplated by the Plan.

2016, potential future legal fees, amounts and value of Daulerio's property seized by (and transferred to) Bollea as of September 29, 2016, and potential future seizures by or on behalf of Bollea." Supp. ¶ 32.

22.    The Daulerio Claims allege that these obligations arise from the Debtors' duties and obligations to:

a.  defend Daulerio and pay legal fees and related expenses beginning on June 10, 2016, and continuing into the future with respect to:

(i) defending the Bollea I Lawsuit (the "Bollea Lawsuit Defense Costs");

(ii) defending Bollea's efforts to satisfy the Bollea Judgments (the "Bollea Judgment Defense Costs");

(iii) asserting and defending the Daulerio Claims (the "Daulerio Claims Costs");

(iv) settling, or attempting to settle, the Bollea I Lawsuit (the "Bollea Settlement Costs"); and

(v) protecting Daulerio's interests in connection with the Bollea I Lawsuit (the "Daulerio Personal Interest Costs");

b.  indemnify Daulerio with regard to the Bollea Judgments;

c.  indemnify Daulerio with regard to future orders and/or judgments; and

d.  indemnify Daulerio with regard to future settlements (the indemnification claims in subsections b., c., and d., collectively, the "Indemnification Claims"). *Id.*, ¶¶ 28-31.

The Daulerio Claims identify three potential sources of these claims against the Debtors: (i) the Employment Agreement, (ii) general practice and policy of the Debtors set forth in the declaration of William Holden[10] and Gawker Media's established course of providing a defense

---

[10] A copy of such declaration is attached as Exhibit 7 to the Daulerio Claims (the "Holden Declaration")

to Daulerio since the inception of the Bollea I Lawsuit, and (iii) New York state law.  Supp.

¶ 33.i.-iii. [11]

## **OBJECTION**

23.    Pursuant to section 502(a) of the Bankruptcy Code, a filed proof of claim is deemed allowed unless a party in interest objects thereto.  *See* 11 U.S.C. § 502(a).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that it is unenforceable against the debtor and property of the debtor, under any agreement or applicable law.  *See* 11 U.S.C. § 502(b)(1).  As explained below and except as noted, the Daulerio Claims should be expunged and disallowed for the following reasons:

a. Daulerio has not been the owner of any Indemnification Claims since the Daulerio Judgment Satisfaction Order transferring those claims to Bollea was entered on August 17, 2006, so any proof of claim Daulerio filed thereafter with respect to such claims is invalid under Bankruptcy Rule 3001(e)(2);

b. Even if any Indemnification Claims had not been transferred to Bollea—and they were— (i) upon approval by the Court of the Bollea Settlement, the Bollea Compensatory Damage Judgment claims against Daulerio will be resolved so there can be no remaining indemnification obligation with respect thereto and (ii) any contingent Indemnification Claims for potential future judgments or settlements must be disallowed pursuant to section 502(e) of the Bankruptcy Code;

c. The Jury Verdict makes clear that Daulerio's publication of the Bollea Video violated his Employment Representations and company policies, so (i) under the Daulerio Indemnification Provision of the Employment Appendix, Daulerio is liable to indemnify Gawker Media for resulting damages and (ii) the Company Indemnification Provision does not provide indemnity or defense costs to Daulerio with respect to actions arising from publication of the Bollea Video;

d. Daulerio never had any conceivable claims against GMGI or Gawker Hungary for indemnification or a duty to defend because neither of those Debtors was a party to the Employment Agreement (or even an employer of Daulerio), and neither had a policy or practice of defending or indemnifying Gawker Media employees from claims such as those in the Bollea I Lawsuit;

---

[11] The Daulerio Claims cite "the law of the state of New York" as a basis for the asserted claims, Supp ¶ 33.iii., but do not specify any  particular statute or principle of New York law—and the Debtors are not aware of any—that would independently create indemnification and/or defense obligations on any of the Debtors.

e.  Even if the Company Indemnification Provision created an obligation for Gawker Media to indemnify and defend Daulerio with respect to the Bollea I Lawsuit—and it did not— Daulerio still never had any basis for claims for indemnification or a duty to defend arising out of the Supplementary Daulerio Litigation, filing of proofs of claim against the Debtors, or any other claims that likewise (i) relate to activities that occurred after Daulerio was no longer employed by Gawker Media and (ii) are outside the scope of the Company Indemnification Provision;

f.  Upon approval by the Court of the Bollea Settlement, the only judgment remaining against Daulerio potentially subject to indemnification will be the $100,000 Daulerio Punitive Damage Judgment (even though those Indemnification Claims are presently owned by Bollea), and as a matter of New York public policy, the Daulerio Punitive Damage Judgment is not subject to indemnification so Gawker Media has no remaining duty to defend that sole remaining claim; and

g.  Nevertheless, in the interest of avoiding dissipation of estate assets, Gawker Media is prepared to pay the $100,000 amount of the Daulerio Punitive Damage Judgment, so the Daulerio Claims should be allowed solely against Gawker Media, up to that amount, and Daulerio should not be reimbursed additional amounts beyond his potential exposure to defend the Bollea Judgments.

Accordingly, the Debtors request that the Court disallow all three of the Daulerio Claims, except to the extent of allowing the Daulerio Claims solely against Gawker Media up to an amount of $100,000 that Daulerio can demonstrate were actually incurred in connection with litigating the Bollea I Lawsuit.

## I.    Daulerio Is Not The Owner Of The Indemnification Claims

24.    As discussed in paragraphs 13 and 14 above, the Daulerio Judgment Satisfaction Order stipulated that, to the extent Daulerio had any rights to indemnification from, or a duty to defend by, the Debtors, those rights were "transferred and assigned to Mr. Bollea" and "Mr. Bollea [was] deemed to be the owner of the rights, with full power and authority to enforce said rights against Gawker [Media] and GMGI." *Id.*, at Order ¶ 1.  That transfer occurred in August 17, 2016 upon entry of the Daulerio Judgment Satisfaction Order, which has not been stayed or vacated.

25.     Bankruptcy Rule 3001(e)(1) is therefore squarely on point.  It provides that, "[i]f a claim has been transferred other than for security before proof of the claim has been filed, the proof of claim may be filed only by the transferee or an indenture trustee."  The entire premise of Daulerio filing proofs of claim for the Indemnification Claims is therefore fatally flawed; Daulerio was not the owner of those claims when he filed the Daulerio Claims.  To the extent that those Indemnification Claims exist at all, they were transferred to Bollea, who had sole authority to file proofs of claim.

## II.     Any Contingent Indemnification Claims Shall Be Disallowed Under Bankruptcy Code Section 502(e)(1)

26.     The only current judgments against Daulerio for which Indemnification Claims exist (had they not been transferred to Bollea, which they were) are the Bollea Compensatory Damage Judgment against Daulerio and the Daulerio Punitive Damage Judgment.  The first will be resolved upon approval of the Bollea Settlement, and as discussed in Section VI below, the Daulerio Punitive Damage Judgment is not indemnifiable as a matter of New York public policy. The remaining Indemnification Claims with respect to future orders, judgments and/or settlements are contingent claims that must be disallowed pursuant to section 502(e) of the Bankruptcy Code.  Similarly, section 502(e) also disallows any claim Daulerio may be trying to assert to preserve additional claims in case of the contingency that the Daulerio Judgment Satisfaction Order or one of the other judgments of the Florida state court are reversed or modified on appeal.

27.     Specifically, section 502(e)(1) of the Bankruptcy Code provides, in relevant part, that:

[T]he court shall disallow any claim for reimbursement or contribution of any entity that is liable with the debtor ... to the extent that —
(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim.

13

Thus, three elements must be met for a claim to be disallowed under section 502(e)(1)(B):

    a.   the claim must be for reimbursement or contribution;

    b.   the party asserting the claim must be liable with the debtor on the claim of a third party; and

    c.   the claim must be contingent at the time of its allowance or disallowance.

*In re Chemtura Corp.*, 436 B.R. 286, 292-293 (Bankr. S.D.N.Y. 2010).

      28.     Courts have consistently held that claims for indemnification, such as those at issue in the Daulerio Claims, are encompassed by the first requirement of section 502(e)(1). *See, e.g., In re Wedtech Corp.*, 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988); *In re Caribbean Petroleum Corp.*, Case No. 10-12553 (KG), 2012 WL 1899322, at *3 (Bankr. D. Del. May 24, 2012). Courts also interpret co-liability under Section 502(e)(1)(B) broadly. The inquiry involves whether a debtor could be co-liable with a third party on an underlying claim, not whether a debtor is "automatically" liable. *In re Chemtura Corp.*, 436 B.R. at 295 (*citing In re Amatex Corp.*, 110 B.R. 168, 171 (Bankr. E.D. Pa. 1990) ("Congress clearly meant to include all situations wherein indemnitors or contributors could be liable with the debtor within the scope of § 502(e)(1)(B).")). The Daulerio Indemnification Claims assert that the Debtors would be co-liable with Daulerio for any such indemnifiable judgments, so they would be included in the second requirement of section 502(e)(1)(B). More importantly, the Bollea Judgments state that the Defendants, including both Gawker Media and Daulerio, are jointly and severally liable. Finally, no present indemnification obligations of any Debtor to Daulerio will remain after approval of the Bollea Settlement, so any other Indemnification Claims are necessarily contingent on filing of a future claim, settlement or judicial decision. Accordingly, the Daulerio Claims for indemnification for any judgment or settlement (including in the Supplemental

14

Daulerio Litigation) or any potential future claims, must be disallowed under section 502(e)(1) of the Bankruptcy Code.

### III.   Daulerio's Violation Of His Employment Representations Makes Him Liable To Gawker Media; Daulerio Is Not Entitled to Indemnification Or Defense For Claims Arising From That Violation

29.     Any consideration of indemnification claims between Gawker Media and Daulerio has to begin with consideration of the specific indemnification provisions in the written agreement between the parties.   As set forth in paragraph 5 above, the first indemnification provision in the Employment Appendix provides that Daulerio indemnifies and holds Gawker Media harmless from and against any judgments "resulting from a breach **or claimed breach**" by Daulerio of any of Daulerio's representations, warranties or covenants in the Employment Agreement and Appendix.   Employment Appendix ¶ 19 (emphasis added).   Those representations, warranties and covenants include representations that (i) content and materials developed by Daulerio pursuant to and during employment (the "Work") would "not violate any rights of any person or entity, such as rights of privacy or publicity," *id.* ¶ 16.a., and (ii) Work created by Daulerio for the gawker.com website will not contain, publish or display any "defamatory, obscene, or illegal content or materials to the best of [Daulerio]'s knowledge," *id.* ¶ 16.b.

30.     The claims in the Bollea I Lawsuit fit well within that indemnification requirement merely by **claiming** that Daulerio published private and confidential information, invaded Bollea's privacy by intrusion, violated Bollea's common law right of publicity, and intentionally and negligently inflicted emotional distress.   The specific findings set forth in the Jury Verdict and noted in paragraph 9 above make clear that Daulerio had, in fact, breached his

15

Employment Representations in a number of ways by publishing the Bollea Video.[12]  As a result

of the willful and intentional conduct of Daulerio, Gawker Media is subject to compensatory

damages in the amount of $115 million and punitive damages in the amount of $15 million.

Accordingly, absent the Bollea Settlement, Daulerio would be required to indemnify Gawker

Media for some or all of the $130 million in damages awarded to Bollea from Gawker Media

arising from Daulerio's breach of his Employment Representations.

31.    Further, the Employment Agreement expressly provides that Daulerio is only

entitled to indemnification or a duty to defend "with respect to claims arising from any content or

images used by Daulerio in accordance with Gawker Entertainment's content policies in force at

the time of such use."  With respect to the judgments in the Bollea I Lawsuit, Daulerio seems to

contend that the fact that the Florida state court held Gawker Media liable for the acts of

Daulerio that gave rise to the Bollea Judgment and the Daulerio Punitive Damage Judgment

"means that the trial court in the Bollea case adjudged Daulerio's acts to have been within the

scope of his employment."  Supp ¶ 14.  While the Debtors do not dispute the fact that the

conduct occurred during Daulerio's employment, the conduct that gave rise to the Daulerio

Claims simply cannot fall within the "scope of employment" if that is intended to mean Daulerio

is entitled to indemnification for the Daulerio Punitive Damages Judgment.  Specifically, in

finding that Daulerio was liable for punitive damages, the jury found that Daulerio, among other

things, (i) had a specific intent to harm Bollea when posting the Bollea Video online, *id.* ¶ 17,

(ii) intended to cause Bollea severe emotional distress or acted with reckless disregard of the

high probability of cause Bollea severe emotional distress, *id.* ¶ 9, (iii) the Bollea Video was

---

[12] The Daulerio Indemnification Provision allows that strict adherence to Gawker Entertainment policies constitutes a complete defense against any suggested breach of Daulerio's representations, covenants or warranties, *Id.*, ¶ 19, but Daulerio makes no assertion to support an inference that his actions were in "strict" adherence to Gawker Entertainment's policies.

posted in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities, *id.* ¶ 5, and (iv) posting of the Bollea Video was extreme and outrageous to a person of ordinary sensibilities, *id.* at ¶ 8.  Plainly, such conduct could not be within the content policies in force at Gawker Media at the time of the Bollea Article.

32.    In the presence of the written Employment Agreement, the Daulerio Claims do not allege any facts supporting an unwritten historical policy and practice of Gawker Media that would modify the clear written terms of that Employment Agreement to pay to defend or indemnify employees from defamation claims.   Moreover, even assuming Daulerio could establish that an unwritten policy and practice modified his written Employment Agreement, that unwritten policy and practice was simply to defend employees with respect to the articles they wrote and pay judgments if and to the extent that Gawker Media was also jointly and severally liable for the judgment.   In no prior situation, however, had Gawker Media paid a judgment levied solely against an employee and certainly none in which an employee was liable for punitive damages.

## IV.    Daulerio Does Not Have Any Claims Against GMGI And Gawker Hungary

33.    As set forth above, Daulerio has filed claims against GMGI and Gawker Hungary, as well as Gawker Media.  His Claims against GMGI and Gawker Hungary are simply without basis.

34.    <u>First</u>, the Daulerio Claims assert that Gawker Media—not Gawker Hungary or GMGI—assumed the obligations under his Employment Agreement with Gawker Entertainment. Supp.   ¶ 10.   GMGI and Gawker Hungary are therefore not parties to the Employment Agreement nor employers of Daulerio.  Daulerio therefore has not, and cannot, allege that either of those Debtors assumed Gawker Entertainment's obligations under the Employment

17

Agreement, so he has no contractual basis upon which his claims against GMGI or Gawker Hungary can properly rest.

35.    <u>Second</u>, Daulerio has offered nothing—nor could he—to establish a prima facie case that GMGI or Gawker Hungary had a practice or policy of indemnifying Gawker Media writers, editors or the like.  GMGI was a holding company with no employees, and Gawker Hungary's employees were not writers, editors or the like, but instead were primarily responsible for the intellectual property and website design.  Moreover, although Daulerio attempts to rest these claims on the Holden Declaration, any such reliance is misplaced.  Specifically, the Holden Declaration states that there was a practice and policy of indemnification pursuant to which "the Debtor defends and indemnify their (sic) writers and editorial staff in connection with lawsuits related to the Company's web content."  Holden Decl.  ¶ 24.  The Holden Declaration defines "Debtor" to refer solely to Gawker Media and "Company" to refer to GMGI and Gawker Media collectively.  *Id.* ¶ 1.  Thus, the policy and practice was that of Gawker Media, not GMGI and Gawker Hungary.  Consequently, Daulerio's Claims against GMGI and Gawker Hungary cannot rest on a policy and practice that GMGI and Gawker Hungary simply did not have.

36.    <u>Finally</u>, although not cited by Daulerio, it is the case that in June 2016, the GMGI board of directors approved a resolution authorizing, but not directing, any authorized officer to "take any actions necessary, appropriate, proper, or desirable in the interest of [GMGI] in connection with the chapter 11 case," with "such determination to be conclusively evidenced by such execution or taking of such action, to indemnify any Employee Defendant" up to the full amount of their costs and expenses in connection with any future GMGI-related lawsuit.[13]  For purposes of the resolution, "Employee Defendants" were defined to include "writers and editors

---

[13] A copy of the relevant GMGI resolution is attached as **<u>Exhibit E</u>** hereto.

59757611_9

who are named as defendants in civil actions, in connection with their work for [GMGI]." This resolution, however, was not meant to retrospectively address the Bollea I Lawsuit and the Bollea Judgments. As the evidence at the hearing on the Objection will establish, GMGI was not assuming responsibility for the then-pending Bollea I Lawsuit or the Bollea Judgments. Instead, GMGI was addressing the reality that it believed that Mr. Thiel was funding additional litigation against Gawker Media and its **current** writers and editors. *See, Motion of the Debtors for Leave Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Conduct Discovery Concerning Potential Plan Issues and Potential Causes of Action, and to Establish Discovery Response and Dispute Procedures* [Docket No. 341]. In an effort to maximize value by maintaining Gawker Media's current workforce of editors and writers during the sale process, GMGI intended to exercise discretion to indemnify and defend the writers in certain then-existing (*e.g.*, Ayyadurai, Terrill, and Huon) and threatened future litigation.[14]

## V.    Daulerio Has No Claims Relating To The Supplemental Daulerio Litigation, Filing Of Proofs Of Claim Against the Debtors, Or Any Future Suits Based On Actions Following The Conclusion Of His Employment By Gawker Media

37.    To begin with the obvious—the Employment Agreement covered only actions and conduct taken by Daulerio in the course of his employment by Gawker Media. Daulerio's employment by Gawker Media concluded in January 2013. Consequently, to the extent that the Daulerio Claims request indemnification or defense for conduct or actions Daulerio took after January 2013, the Daulerio Claims must be disallowed.

38.    Moreover, the Company Indemnification Provision, upon which Daulerio apparently relies, provides only an undertaking to pay legal fees in an action relating to website content; it does not provide that Gawker Media will pay for Daulerio to hire separate counsel to

---

[14] In that regard, Mr. Denton's indemnification rights are very different. He had contracts with GMGI and Gawker Media that provided him with express rights to indemnification and defense.

file proofs of claim against the Debtors' estates in bankruptcy proceedings. And Daulerio does not—and cannot—allege that Gawker Media had a policy and practice to indemnify or defend former employees for actions taken after their employment. It therefore follows that Daulerio is simply not entitled to indemnification or defense costs for the Supplemental Daulerio Litigation, Bollea Judgment Defense Costs, the Daulerio Claims Costs, and the Daulerio Personal Interest Costs, or any other claims for actions Daulerio took subsequent to his employment by Gawker Media.

**VI.   Gawker Media Has Discharged Any Obligation It Has To Daulerio Because The Daulerio Punitive Damage Judgment Is Not Indemnifiable As A Matter of Public Policy**

39.     Notwithstanding the fact that the Daulerio Judgment Satisfaction Order divested Daulerio of any indemnification rights with respect to the Bollea Judgments, Gawker Media did not abandon its responsibilities to Daulerio. Gawker Media has in fact discharged all of its existing obligations under the Employment Agreement. Specifically, as Daulerio readily admits, Gawker Media paid all of the legal costs related to the Bollea I Lawsuit through the appeal of the Bollea Judgments on June 10, 2016. Supp ¶ 22. Moreover, pursuant to the Bollea Settlement, Gawker Media is satisfying not only the Bollea Judgments as they apply to Gawker Media, but also the $115 million Compensatory Damage Judgment against Daulerio.

40.     With respect to the Daulerio Punitive Damages Judgment, Daulerio is not entitled to indemnification or the associated duty to defend as a matter of public policy. The Daulerio Claims assert that they arise under New York law, which expressly governed the Employment Appendix. *Id.* ¶ 23. Public policy of New York precludes indemnification for punitive damages "whether the punitive damages are based on intentional actions or actions which, while not intentional, amount to gross negligence, recklessness, or wantonness or conscious disregard of the rights of others or for conduct so reckless as to amount to such disregard." *Home Ins. Co. v*

20

*American Home Prods. Corp.*, 75 NY2d 196, 200 (1990) (internal citations omitted). The New York Court of Appeals has stated that to allow indemnification of such damages would defeat the purpose of punitive damages which "is solely to punish the offender and to deter similar conduct on the part of others." *Zurich Ins. Co. v Shearson Lehman Hutton, Inc.*, 84 NY2d 309, 316 (1994).

41.    Nor should New York public policy be disregarded because a punitive damages award has been rendered in another state. *Home Ins. Co*., 75 NY2d at 201. The New York Court of Appeals formulated a two-part test to decide whether an out-of-state punitive damages judgment is indemnifiable under New York law. First a court examines the nature of the claim, including the degree of wrongfulness for which damages were awarded in the foreign State to determine whether the award may be considered "punitive" in nature. The court must then examine the other State's law and policy relating to punitive damages in order to properly ascertain whether reimbursement would offend New York public policy. *Id.*

42.    "Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future." *WR. Grace & Co. v Waters*, 638 So. 2d 502, 504 (Fla. 1994). In Florida, the law is well settled that "[p]unitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for rights of others." *Owens-Corning Fiberglass Corp. v Ballard*, 749 So. 2d 483, 486 (Fla. 1999); *see also BDO Seidman, LLP v Banco Espirito Danto Inti.*, 38 So. 3d 874 (Fla. 2010); *Hardiman v. Stevens*, 2011 WL 1480401 (M.D. Fla. 2011).

43.     There is no significant difference between the law of New York governing punitive damages and comparable law in Florida.   Under both States' laws, the purpose of punitive damages is the same, namely, to punish conduct having a high degree of moral culpability and to serve as a warning to others in the future.   Thus, conduct such as that for which the jury found Daulerio guilty and awarded punitive damages, would also support a jury verdict in New York awarding punitive damages.   It therefore follows that indemnification coverage for the punitive damages awarded in the Bollea I Lawsuit would be contrary to New York public policy.  *Certain Underwriters at Lloyd's, et al. v. BDO Seidman LLP*, 2012 WL 3115581 (N.Y. Sup. July 27, 2012).

44.     The fact that there is an appeal of the Daulerio Punitive Judgment pending before the Florida state court of appeals does not preclude a determination on whether Daulerio's claims are indemnifiable.   Daulerio "has presented no reason for this court to question the regularity of the Florida judgment awarding punitive damages or the legitimacy of the Florida judgment awarding punitive damages."  *Certain Underwriters at Lloyd's, et al. v. BDO Seidman LLP* at 9. More importantly, under the particular facts present here, Daulerio is not entitled to costs for pursuing the appeal of the Daulerio Punitive Damages Judgment because that will be the sole claim remaining in the Bollea I Lawsuit after the Bollea Settlement resolves the Compensatory Damage Judgment, and Gawker Media cannot be required to continue providing a defense for claims it is not required to indemnify.  *See, e.g.*, *Allstate Ins. Co. v. Mende*, 176 A.D.2d 907, 908, 575 N.Y.S.2d 520, 522 (1991) (affirming declaratory judgment that, following settlement of covered claims, insurance company no longer had any duty to defend and indemnify defendants for claims not covered by the insurance policy); *Schnipper v. Home Indem. Co.*, 99 A.D.2d 959,

960, 472 N.Y.S.2d 653, 655 (1984) (insurer obligated to provide defense to insured against complaint up until time complaint was amended to drop the only claim within policy coverage).

45.    Even without remaining legal obligations, Gawker Media negotiated with Bollea to provide for the option of the Proposed Supplemental Settlement that would resolve Bollea's claim against Daulerio for punitive damages without any cost to Daulerio.  While Daulerio is certainly free to pursue his rights, Gawker Media cannot be required to fund litigation pursuing only the reversal of a punitive damage judgment not subject to indemnification.[15]

## VII.    Claims For Litigation Fees And Expenses In Connection With Appealing The Bollea Judgments Should Be Estimated For Allowance In The Amount of $100,000, Solely Against Gawker Media

46.    Gawker Media acknowledges that it is obligated to pay reasonable expenses in connection with defending Daulerio in the Bollea I Lawsuit, and has done so by paying counsel for Daulerio through the notice of appeal of the Bollea Judgments on the date of Gawker Media's bankruptcy filing.  As set forth above, neither the Employment Agreement nor any policy and practice obligates Gawker Media to pay for defense of claims against Daulerio arising from actions and/or omissions by Daulerio when he was no longer a Gawker Media employee.

47.    To the extent that the Company Indemnification Provision requires Gawker Media to protect Daulerio from claims relating to publication of content on its websites, Gawker Media has done that.  Gawker Media has also obtained for Daulerio the option to dispose of all of Bollea's claims against him for no cost, in exchange for return of the Bollea Video and mutual releases, which Daulerio has thus far declined.  Daulerio's Employment Agreement never contemplated that Gawker Media would be required to pay counsel fees to allow Daulerio to

---

[15] To the extent Daulerio is successful, he could seek to be reimbursed for the costs of his appeal; however, as set forth in section II, any such indemnification claim should be disallowed under section 502(e) of the Bankruptcy Code.

retain possession of a sex tape subject to a Florida court injunction or fund Daulerio's efforts to establish First Amendment precedent.

48.     Thus, to avoid permitting Daulerio to dissipate estate assets for personal reasons through uneconomic litigation that prejudices holders of Allowed general unsecured claims against Gawker Media, the Debtors request that the Court limit the allowed amount, if any, the Daulerio Claims to $100,000, the amount of the Daulerio Punitive Damage Judgment, solely against Gawker Media. The Debtors maintain that such amount is fair and reasonable under the circumstances and consistent with section 502(c) of the Bankruptcy Code. Specifically, section 502(c) clearly permits this Court the authority to estimate unliquidated claims and provides it with wide latitude in doing so. *In re Chemtura Corp.*, 448 B.R. 635, 648 (Bankr. S.D.N.Y. 2011) (noting bankruptcy court's wide discretion in estimating claims). As a result of the Bollea Settlement, the most that Daulerio may be financially liable is the amount of the Daulerio Punitive Damage Judgment. Therefore, any reasonable claim Daulerio might have for payment of legal fees and expenses going forward must reflect the indisputable fact that Daulerio is ultimately only financially liable for $100,000. Therefore, while Daulerio may stand on his contractual rights, under New York law a covenant of good faith exist in every contract. *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 228-29 (2011) ("The implied covenant of good faith and fair dealing embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). In the present circumstances, the covenant of good faith cannot countenance a reading of the Employment Agreement to permit Daulerio to incur fees and expenses in an amount in excess of the Daulerio Punitive Damage Judgment, and impose those excess fees and expenses on Gawker Media and its unsecured creditors, when Gawker Media is willing to pay the Daulerio Punitive

24

Damage Judgment to avoid such fees and costs. Accordingly, the Daulerio Claim should be allowed at no more than $100,000.

## RESPONSES TO THIS OBJECTION

49.     Any responses to this Objection must be filed on or before 4:00 p.m. (New York Time) on December 12, 2016, in accordance with the procedures set forth in the notice of this Objection.

## RESERVATION OF RIGHTS

50.     Neither the filing of this Objection nor entry of the Proposed Order shall affect any rights of the Debtors, their estates, the Plan Administrator, or any other party in interest in these chapter 11 cases to object to the Daulerio Claims for any purposes, including, without limitation, allowance and distribution under the Plan.

51.     The Debtors and their estates reserve any and all rights to amend, supplement or otherwise modify this Objection or the Proposed Order. The Debtors and their estates also reserve any and all rights, claims and defenses with respect to any and all of the Daulerio Claims, and nothing included in or omitted from this Objection or the Proposed Order is intended or shall be deemed to impair, prejudice, waive or otherwise affect any rights, claims, or defenses of the Debtors and their estates with respect to the Daulerio Claims.

## NOTICE

52.     Notice of this Objection has been provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Simpson Thacher & Bartlett LLP, counsel to the Official Committee of Unsecured Creditors of Gawker Media LLC, et al.; (iii) Latham & Watkins LLP, counsel to US VC Partners LP, as Second Lien Lender; (iv) the address of the Claimant, provided on the Daulerio Claims; and (v) all parties requesting notice in these chapter

11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that further notice of this Objection is neither required nor necessary.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Proposed Order, and (b) grant such other and further relief as may be just and proper.

Dated: November 28, 2016
       New York, New York

*/s/ Gregg M. Galardi*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

26

# **EXHIBIT A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                              :
In re                                         :        Chapter 11
                                              :
Gawker Media LLC, *et al.*,[1]                :        Case No. 16-11700 (SMB)
                                              :
            Debtors.                          :        (Jointly Administered)
                                              :
--------------------------------------------------------x

## ORDER GRANTING DEBTORS' FIRST OMNIBUS OBJECTION
## TO PROOFS OF CLAIM FILED BY ALBERT JAMES DAULERIO

Upon the objection (the "Objection") of Gawker Media LLC ("Gawker Media"), Gawker

Media Group, Inc. ("GMGI"), and Gawker Hungary Kft. ("Gawker Hungary") as debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Bankruptcy

Cases"), for entry of an order (the "Order") disallowing Proof of Claim Nos. 293, 294, and 295

filed by Albert James Daulerio (the "Daulerio Claims"); and the Court having found that the

Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court

having found that venue of this proceeding and the Objection in this district is proper pursuant to

28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the

Objection is in the best interests of the Debtors' estate, their creditors, and other parties in

interest; and the Court having found that the Debtors provided appropriate notice of the

Objection and the opportunity for a hearing on the Objection under the circumstances; and the

Court having reviewed the Objection and having heard the statements in support of the relief

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft) (5056).  Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

requested therein at a hearing before the Court (the "Hearing"); and the Court having determined

that the legal and factual bases set forth in the Objection and at the Hearing establish just cause

for the relief granted herein; and upon all of the proceedings had before the Court; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.  All capitalized terms used but not

defined herein shall have the meanings attributed to such terms in the Objection.

2.      The Daulerio Claims are Allowed, solely against Gawker Media, up to an amount

of $100,000 that Daulerio can demonstrate was actually incurred in connection with litigating the

Bollea I Lawsuit.

3.      All of the remaining Daulerio Claims are disallowed in their entirety.

4.      Prime Clerk LLC, the Court-appointed claims agent in these Chapter 11 Cases, is

hereby authorized and directed to make such revisions to the official claims register as are

necessary to reflect the disallowance of the Daulerio Claims.

5.      The Debtors are authorized to take all actions necessary to implement this Order.

6.      The Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation of this Order.


New York, New York
Dated: _____, 2016

_____
THE HONORABLE STUART M BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

**Jury Verdict**

# IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
## IN AND FOR PINELLAS COUNTY, FLORIDA

**TERRY GENE BOLLEA**
**professionally known as HULK**     **Case No. 12012447CI-011**
**HOGAN,**

     Plaintiff,

vs.

**GAWKER MEDIA, LLC aka**
**GAWKER MEDIA; NICK**
**DENTON; A.J.**
**DAULERIO,**

     Defendants.

_____/

```
FILED

MAR 18 2016

KEN BURKE
CLERK CIRCUIT COURT
```

### VERDICT

We, the jury, return the following verdict:

### First Claim

### PUBLICATION OF PRIVATE FACTS

1. Did Plaintiff prove that, by posting the VIDEO, Defendants publicly disclosed private facts about Plaintiff in a manner that a reasonable person would find highly offensive?

     YES __✓__          NO____

If your answer is **YES**, please answer **Question 2**.

If your answer is **NO**, then your verdict is against Plaintiff on claim for publication of private facts, and you should proceed to **Question 3**.

1

2. Did Plaintiff prove that the VIDEO was **NOT** a matter of legitimate public concern?

YES  ✓          NO _____

If you answered **YES** to Questions **1-2**, then your verdict on the claim of publication of private facts is in favor of **Plaintiff**.  Please proceed to **Question 3**.

If you answered **NO** to **Question 2**, then your verdict is against Plaintiff on **ALL** of his claims, and in favor of **Defendants** on their **First Amendment Defense**; and your deliberations are over and you will <u>not</u> consider any further claims, or damages.  You should only sign this Verdict form and return it to the courtroom.

3. Did **Nick Denton** participate in the posting of the VIDEO on Gawker.com?

YES ✓          NO_____

Please proceed to **Question 4**.

2

## **Second Claim**

### **INVASION OF PRIVACY BASED ON INTRUSION**

4. Did Plaintiff prove that Defendants wrongfully intruded into a place where he had a reasonable expectation of privacy?

    YES __✓__      NO _____

If your answer is **YES**, please answer **Question 5**.

If your answer is **NO**, then your verdict is against Plaintiff on his claim for invasion of privacy based on intrusion, and you should proceed to **Question 6**.

5. Did Plaintiff prove that the VIDEO was posted in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities?

    YES __✓__      NO _____

If you answered **YES** to **Questions 4-5**, then your verdict on the claim of invasion of privacy based on intrusion is in favor of **Plaintiff**.

If you answered **NO** to **Question 5**, then your verdict is ███████ against Plaintiff on his claim for invasion of privacy based on intrusion. Please proceed to **Question 6**.

3

## Third Claim

### VIOLATION OF FLORIDA COMMON LAW RIGHT OF PUBLICITY

6. Did Plaintiff prove that Defendants used Plaintiff's name or likeness for a commercial or advertising purpose?

YES __✓__   NO _____

If your answer is **YES**, please answer **Question7**.

If your answer is **NO**, then your verdict is against Plaintiff on his claim for violation of Florida common law right of publicity, and you should proceed to **Question 8**.

7. Did Plaintiff prove that he **did not** authorize the use of his name or likeness?

YES __✓__   NO _____

If you answered **YES** to Questions **6-7**, then your verdict on the claim of violation of Florida common law right of publicity is in favor of **Plaintiff,** and you should proceed to **Question 8.**

If you answered **NO** to **Question 7**, then your verdict is against Plaintitff on claim for violation of Florida common law right of publicity. Please answer **Question 8**.

4

## Fourth Claim

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

8. Did Plaintiff prove that posting the VIDEO was extreme and outrageous to a person of ordinary sensibilities?

    YES __✓__      NO _____

    If your answer is **YES**, please answer **Question 9**.

    If your answer is **NO**, then your verdict on Plaintiff's claim for intentional infliction of emotional distress is against Plaintiff, and you should proceed to **Question 11**.

9. Did Plaintiff prove that Defendants intended to cause him severe emotional distress, or acted with reckless disregard of the high probability of causing him severe emotional distress?

    YES __✓__      NO _____

    If your answer is **YES**, please answer **Question 10**.

    If your answer is **NO**, then your verdict on Plaintiff's claim for intentional infliction of emotional distress is against Plaintiff, and you should proceed to **Question 11**.

5

10.    Did Plaintiff prove that the posting of the VIDEO caused him severe emotional distress?

YES __✓__    ·    NO _____

If you answered **YES** to Questions **8-10,** then your verdict on the claim of intentional infliction of emotional distress is in favor of **Plaintiff.** Please proceed to **Question 11.**

If you answered **NO** to **Question 10,** then your verdict is against Plaintiff on his claim for intentional infliction of emotional distress. Please proceed to **Question 11.**

## Fifth Claim

### VIOLATION OF FLORIDA'S SECURITY OF COMMUNICATIONS ACT

11.    Did Plaintiff prove that Defendants intentionally used or disclosed the VIDEO?

YES __✓__       NO ____

If your answer is **YES**, please answer **Question 12**.

If your answer is **NO**, then your verdict on Plaintiff's claim for violation of Florida's Security of Communications Act is against Plainitiff, and you should proceed to **Question 15**.

12.    Did Plaintiff prove that he had a reasonable expectation of privacy in the bedroom where the VIDEO was recorded?

YES __✓__       NO ____

If your answer is **YES**, please answer **Question 13**.

If your answer is **NO**, then your verdict on Plaintiff's claim for violation of Florida's Security of Communications Act is against Plaintiff, and you should proceed to **Question 15**.

13.    Did Plaintiff prove that Defendants knew or had reason to know that he was recorded on the VIDEO without his knowledge or consent?

YES __✓__       NO ____

If your answer is **YES** to Questions **11-13**, then your verdict on Plaintiff's claim for violation of Florida's Security of Communications Act is in favor of **Plaintiff,** and you should proceed to **Question 14** to consider Defendants' "good faith" defense.

If your answer to **Question 13** is **NO**, then your verdict on Plaintiff's claim for violation of Florida's Security of Communications Act is against Plaintiff, and you should proceed to the **Damages Introduction** paragraph **before Question 15**. (on page 8)

## **Good Faith Defense**

14.   As to only Plaintiff's claim for violation of Florida's Security of Communications Act, did Defendants prove that they acted in good faith reliance on a good faith determination that their conduct was lawful?

YES _____        NO __✓__

If your answer to **Question 14** is **YES**, then your verdict on Plaintiff's claim for violation of Florida's Security of Communications Act is in favor of Defendants.

If your answer to **Question 14** is **NO**, then your verdict on Defendants' good faith defense is against Defendants, and in favor of **Plaintiff** on his claim for violation of Florida's Security of Communications Act.

## **Damages Introduction**

If your verdict was in favor of Plaintiff on his claims for publication of private facts (YES to Questions 1-2), invasion of privacy for intrusion (YES to Questions 4-5), violation of common law right of publicity (YES to Questions 6-7), intentional infliction of emotional distress (YES to Questions 8-10) and/or violation of Florida's Security of Communications Act (YES Questions 11-13), you will consider the matter of damages and should proceed to **Question 15**.

## DAMAGES

15.

    A.    What is the total amount of money that
will fairly and adequately compensate
Plaintiff for any economic injuries,    **$ 55M**
losses or damages caused by the
Defendants' conduct?

    B.    What is the total amount of money that
will fairly and adequately compensate
Terry Bollea for the emotional distress,
which resulted from the Defendants    **$ 60M**
posting the VIDEO on the Internet?

**TOTAL DAMAGES OF PLAINTIFF**
(add lines 15A and 15B above)    **$ 115M**

Please proceed to: **PUNITIVE DAMAGES**.

9

## PUNITIVE DAMAGES

16.    Under the circumstances of this case, state whether you find by clear
and convincing evidence that punitive damages are warranted against:

Gawker Media, LLC          Yes ✓    No ____

Nick Denton                Yes ✓    No ____

A.J. Daulerio              Yes ✓    No ____

If you answered **YES** for any Defendant, please answer **Question 17** as to
that Defendant/those Defendants. If you answered **NO** as to all
Defendants, please sign and date this verdict form and return it to the
courtroom.

17.    Did Defendants have a specific intent to harm Plaintiff when they posted
the VIDEO on the Internet?

Gawker Media, LLC          Yes ✓    No ____

Nick Denton                Yes ✓    No ____

A.J. Daulerio              Yes ✓    No ____

Please sign and date this verdict form and return it to the courtroom.

SO SAY WE ALL, this __18th__ day of __March__, 2016.

_____
FOREPERSON

## EXHIBIT C

**Sanctions Motion**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

TERRY GENE BOLLEA professionally
known as HULK HOGAN,

            Plaintiff,

vs.

GAWKER MEDIA, LLC aka GAWKER
MEDIA; NICK DENTON; A.J. DAULERIO,

            Defendants.

_____/

Case No. 12012447 CI-011

### BOLLEA'S AMENDED MOTION FOR SANCTIONS AND FOR
### ORDER TO SHOW CAUSE AGAINST DAULERIO AND HIS COUNSEL

Plaintiff, Terry Bollea known professionally as Hulk Hogan ("Mr. Bollea"), by counsel,

moves this Court for an order imposing sanctions against Defendant A.J. Daulerio

("Mr. Daulerio")[1] and his counsel, Levine, Sullivan, Koch & Schultz, LLP ("LSKS"), because

they knowingly and routinely misled the jury, this Court and Mr. Bollea about central issues in

this case, concealed and misrepresented material facts, and engaged in a scheme to improperly

influence the trier of fact and interfere with the proper administration of justice.  The grounds

upon which this motion is based are as follows:

### Introduction

It is axiomatic that the "integrity of the civil litigation process depends on truthful

disclosure of facts." *Morgan v. Campbell*, 816 So.2d 251, 254 (Fla. 2d DCA 2002) (citing *Cox

v. Burke*, 706 So.2d 43, 47 (Fla. 5th DCA 1998).  Indeed, few wrongs strike more viciously

against the integrity of our system of justice than subverting the truth.  *Empire World Towers,*

---

[1]  Because of their bankruptcy proceedings and the associated automatic stays, Mr. Bollea does not seek any relief
against Defendants, Gawker Media, LLC and Nick Denton.  Mr. Bollea fully reserves his right to do so upon the
lifting of the stay(s).

*LLC v. CDR Creances, S.A.S.*, 89 So.3d 1034, 1038 (Fla. 3d DCA 2012). That is why, on the spectrum of sanctionable conduct, perjury is perhaps the most egregious. *Id.* "Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals." *Ramey v. Haverty Furniture Companies, Inc.*, 993 So.2d 10114, 1020 (Fla. 2d DCA 2008) (*citing U.S. v. Holland*, 22 F.3d 1040, 1047 (11th Cir. 1994)).

The Defendants in this case, including Mr. Daulerio, at least outwardly acknowledged the importance of being honest. They purported to be the proverbial watchdog of modern journalism, committed to exposing the "unvarnished truth" and practicing complete "transparency" under the rubric that "hypocrisy is the only modern sin." (*See* Trial Trans. p. 1310:10-15; Trial Ex. 30.) For their part, Mr. Daulerio's attorneys from LSKS are officers of the Court who took oaths to perform their duties with honesty and integrity and, at the outset of this case, swore under penalty of perjury to abide by the Florida Rules of Professional Conduct. Having filed three of their own motions for sanctions against Mr. Bollea (all of which were correctly denied), Mr. Daulerio and LSKS are aware of the standards governing sanctionable conduct in Florida.[2]

The recent revelation of numerous instances in which Mr. Daulerio and LSKS concealed and misrepresented material facts about issues central to this case, in sworn filings and proceedings before this Court and before the jury, are deeply troubling. Their misconduct goes well beyond mere oversight or failed memory concerning collateral issues. Rather, we are dealing with a calculated effort to impede fair decision-making on core issues presented to the

---

[2] On May 8, 2014, December 22, 2015 and May 18, 2016, the Defendants moved for sanctions against Mr. Bollea based on alleged frauds upon the Court. All of these motions failed because, among other reasons, they were based on incidents that, even if true, were at worst examples of oversight or failed memory about collateral and immaterial issues.

trier of fact, as part of a calculated scheme to allow intentional tortfeasors found guilty of maliciously posting illegally recorded, sexually explicit footage of Mr. Bollea on the Internet to avoid accountability for their actions.  Stated simply, we are dealing with an unconscionable scheme to subvert the truth and the integrity of the Court.

We now know that Mr. Daulerio, LSKS and others forged a path of deception that can be traced back to the trial of this case.  Their goals were to try to spare Nick Denton from personal liability, protect his Gawker empire from exposure for indemnity, reduce Mr. Daulerio's and Mr. Denton's responsibility for punitive damages, and prevent Mr. Bollea from collecting the $140.1 million Final Judgment he is owed.

Mr. Daulerio, the man who was convinced to fall on the sword to protect Nick Denton's blog empire, finally seems to be realizing that he was used and abandoned by those he trusted.  As a result, the truth has slowly come to light.  For example, in a recent interview, Mr. Daulerio revealed that "the lawyers that were representing Gawker in this case… **need[ed] me to remember things in a certain way**."  Recent court filings have also confirmed that Mr. Daulerio and LSKS knew, from the outset of this case, that Mr. Daulerio and Mr. Denton had valuable indemnity rights that they were concealing, which had a direct impact on the core issue of punitive damages awarded at trial.  Recently, Mr. Daulerio filed bankruptcy Proofs of Claim against each of the Gawker entities[3] seeking to enforce the indemnity rights that he and LSKS hid from the jury and this Court.

Even after this Court determined, on July 29, 2016, that it had been misled about Mr. Daulerio's and Mr. Denton's Gawker Media Group, Inc. ("GMGI") stock (in connection with their request to stay execution), Mr. Daulerio and his lawyers continued concealing assets from Mr. Bollea.  Mr. Daulerio signed and his lawyers filed financial affidavits that they knew

---

[3]  Copies of the Proofs of Claim are attached as **Exhibits A** (Gawker), **B** (GMGI) and **C** (Kinja).

were inaccurate.  They continued to omit his indemnity rights, several laptop computers (some of

which LSKS physically possesses) and a copy of the illegally recorded, sexually explicit 30-

Minute Video of Mr. Bollea.    Incredibly, after Mr. Daulerio and LSKS openly mocked

Mr. Bollea with a flippant letter and press statements offering to return Mr. Daulerio's rice

cooker and a golf club,[4] Mr. Daulerio publicly threatened Mr. Bollea with the release of this

entire 30-minute sex tape—the very same tape which Mr. Daulerio repeatedly failed to disclose

in his affidavits and at his deposition.

The evidence is clear.  It convincingly establishes that Mr. Daulerio and LSKS thumbed

their noses at the integrity of this proceeding by routinely misrepresenting and omitting material

facts that went to the heart of liability, punitive damages and execution upon the Final Judgment.

Accordingly, harsh sanctions should be imposed.

### Overview of the Web of Deceit

In what is best described as a concerted effort to protect Nick Denton and his Gawker

empire, Mr. Daulerio was admittedly urged to "remember things in a certain way," and he and

LSKS knowingly concealed and misrepresented facts and evidence that were material to this

case on numerous occasions:

- LSKS advised Mr. Daulerio to "remember things a certain way," which seems to explain why Mr. Daulerio tried to take the fall at trial for Nick Denton, by remembering their fire escape conversation about posting the Bollea video[5] inconsistently with Mr. Denton's sworn testimony.

- Mr. Daulerio's and Mr. Denton's indemnity rights against Gawker Media, LLC ("Gawker"), Kinja, Kft. ("Kinja") and Gawker Media Group, Inc. ("GMGI"), were concealed in order to shield Kinja and GMGI from liability and reduce Mr. Daulerio's and Mr. Denton's exposure to punitive damages.

---

[4]  *See* Daulerio's 8/23/16 Claim of Exemption, Ex. A.
[5]  This was the conversation during which Mr. Denton testified at his deposition that he was informed of and approved the publication of the sexually explicit footage of Mr. Bollea, which helped to establish Mr. Denton's personal liability.

- Mr. Daulerio and his LSKS counsel misled the Court about Mr. Daulerio's and Mr. Denton's assets and their value in order to obtain a temporary stay of execution, which they then rejected and misled a bankruptcy court about receiving.

- On several different occasions, Mr. Daulerio and his LSKS counsel knowingly executed and filed Court ordered financial disclosures which they knew did not identify all of Mr. Daulerio's assets.

### The Already Adjudicated Misconduct

On July 29, 2016, this Court entered its Order Granting in Part Plaintiff's Motion to Vacate; Denying Stay of Execution Pending Appeal; and Denying Defendants' Motion for Stay to Seek Appellate Review (the "July 29 Order"). In the July 29 Order, this Court found that Mr. Daulerio "misled" the Court in connection with his pledge of GMGI stock as "adequate" security to stay execution of the $115,100,000 judgment against him. (July 29 Order ¶ 8) This Court further found that Mr. Daulerio and his counsel failed to advise the Court about material facts of which they were aware that significantly impacted the value of the GMGI stock that was pledged. (Id. ¶ 11)

The Court reserved jurisdiction "to award attorneys' fees and costs as a sanction, impose additional sanctions and remedies, and to issue an order to show cause as to why Mr. Daulerio and/or [his] counsel should not be held in contempt of court, all of which this Court takes under advisement at this time." The Court specially set a sanctions hearing for October 31, 2016.

### The Coaxing of Daulerio's Memory

On or about September 28, 2016, an interview of Mr. Daulerio was posted on the *Longform Podcast*,[6] during which Mr. Daulerio threatened to release the full 30-Minute Video of Mr. Bollea in violation of this Court's Permanent Injunction. As set forth below, Mr. Daulerio

---

[6] *See* Ex. A. to Bollea's 10/6/16 Emergency Motion to Enforce Permanent Injunction.

repeatedly failed to disclose that he had this video, including at a deposition attended by LSKS counsel.

During this interview, Mr. Daulerio expressed his frustration over his lawyers, whom he identified as "representing Gawker," and revealed that as "some paranoia" set in during this case "they [the lawyers] need[ed] me to remember things in a certain way."[7]  Looking back, Mr. Daulerio thinks that "Gawker at that time was also trying to basically protect their company as best as they possibly can."[8]

Within the context of these statements, Mr. Daulerio's testimony at trial regarding the conversation that he had with Nick Denton on the fire escape outside Gawker's offices about whether to publish the Bollea video stands out.  On direct examination at trial, Mr. Daulerio testified that he did not speak with Nick Denton before posting the Bollea video.  (Trial Trans. 2738:25-2739:5)  This testimony was elicited to support Mr. Denton's argument that he did not participate in the posting of the video, and therefore was not personally liable for its publication. (Verdict Form Question 3)

However, Mr. Denton previously testified at his deposition that he had spoken to Mr. Daulerio on Gawker's fire escape outside the fourth floor of the Gawker office, and that Mr. Daulerio was excited about posting the video.  (Trial Trans. 2769:7-2770:14)  When confronted with this on cross-examination, Mr. Daulerio claimed that "the conversation never occurred… [and that].. I think he [Denton] was confusing two different conversations."  (Id. at 2770:15-2771:4)  In closing argument, Mr. Bollea's counsel pointed out this transparent attempt to "circle the wagons around Denton."  (Id. at 3700:16-21)

---

[7]  *See* 9/28/16 Trans. pp. 54:3-22; 9:4-10:5; 17:14-18:6.
[8]  *Id*. at p. 64:4-17.

In his September 28, 2016, interview, Mr. Daulerio confirmed this strategy. When asked about whether he would do it all over again, Mr. Daulerio acknowledged that Nick Denton *was* involved in the decision to post the Bollea video:

> MR. DAULERIO: Well, and that's the thing is just like I had gone over that scenario actually and prepared for that question specifically in terms of just like going back in time and, you know, this is -- *I hope this doesn't incriminate* -- I mean, **what the f\*ck is there to lose at this point**, obviously, but, you know, I'm saying this -- *like if I had that conversation with Nick, and Nick and I are sitting there basically just saying this story will result in this culture war*.
>
> INTERVIEWER: Yeah.
>
> MR. DAULERIO: **If it smokes out those enemies, yes, you absolutely do it.** I think Nick fights this one hundred percent of the way. If it can potentially like just end Gawker.com, no, nobody would absolutely do that. And, you know, that wasn't -- that wasn't -- that wasn't at risk here, you know.

(*See* 9/28/16 Trans. pp. 72:7-73:2.) (Emphasis added)  The clear implication of Mr. Daulerio's recent "self-incrimination" is that he, at the urging of his counsel, heeded their call to "remember" the fire escape conversation differently to try to protect Nick Denton from individual liability.

The seriousness of lying under oath, particularly by those professing to be purveyors of the "unvarnished truth," cannot be ignored. Perjury regarding a material matter is a third degree felony in Florida. *See* § 837.02, *Fla. Stat.* Witness tampering is also a crime. *See* § 914.22, *Fla. Stat.*[9] Florida's Rules of Professional Conduct prohibit lawyers from offering false testimony, and require the disclosure and correction of false evidence once it is presented to the Court—even after the conclusion of the proceeding. *See* Rule 4-3.3 (Candor Toward the Tribunal).

---

[9]  It bears mentioning that during the pendency of this case, Nick Denton approved a $500,000 Gawker investment in Mr. Daulerio's new gossip website, Ratter.com. (Trial Ex. 366)

## Additional Misrepresentations About & Concealment of Assets

Mr. Daulerio and LSKS also made several material misrepresentations about his (and, as to LSKS, Mr. Denton's) assets and net worth that materially impacted the punitive damages phase of the trial, as well as this Court's initial decision to grant a temporary stay of execution. Specifically, they knowingly concealed indemnity rights that Mr. Daulerio and Mr. Denton hold against Gawker, Kinja and GMGI, and entered into a financial worth stipulation that they knew to be false because it excluded these indemnity rights and other assets. These indemnity rights and assets should have been disclosed and included within the Defendants' net worth for purposes of punitive damages, as well as for purposes of their request for a stay of execution based on alternative security and in connection with discovery and execution upon the Final Judgment. They were not.

Prior to trial, Mr. Bollea propounded financial worth discovery to Mr. Denton and Mr. Daulerio, including interrogatories which asked them to identify *all* of their assets and, specifically, their choses in action. In their verified responses, Mr. Denton and Mr. Daulerio did not disclose their indemnity rights as an asset. (*See* 6/4/2015 Responses # 3) In fact, Mr. Denton and Mr. Daulerio affirmatively represented that they did not have any such rights. (*Id.* #4). LSKS served these responses.

The parties entered into a Stipulation at trial for purposes of punitive damages regarding Mr. Denton's and Mr. Daulerio's net worth. This Stipulation did not identify any indemnity rights. Moreover, as to Mr. Daulerio, the Stipulation stated: "A.J. Daulerio has no material assets and has student loan debt in the amount of $27,000." (*See* Stipulation ¶ 6) This stipulation was read to the jury. (3891:10-3892:21)

Mr. Bollea's counsel (and the Court) took Mr. Daulerio and LSKS at their word, relied upon the net worth Stipulation, and structured Mr. Bollea's argument to the jury accordingly. At one point, LSKS even objected to a portion of the punitive damages closing that addressed GMGI's $276 million stipulated value, because "Gawker Media Group is not a party to this case." (3899:16-3901:15) Mr. Daulerio's counsel followed by arguing that the **"$115,000,000 verdict … means financial ruin for Mr. Daulerio … he has no material assets … he will never be able to pay $115,000,000**." (3910:25-3911:5) Mr. Daulerio's counsel also addressed the financial condition and exposure of Mr. Denton, Gawker and GMGI:

> As you just heard from Mr. Turkel, [Mr. Denton's] main asset is his ownership interest in Gawker Media's Parent Company, GMGI. That company is not a party to this case. It is not before you to be held liable.
> …
> Mr. Denton owns a percentage of that company. Besides that, besides that ownership interest, he has total assets—besides that, he has total assets, as the judge told you of $3.6 million. That includes his home, his checking account, his savings account, his retirement funds. **Everything.** $3.6 million. **The verdict already rendered will be financially devastating to Mr. Denton.**

(3910:5-24) (emphasis added)

On rebuttal, Mr. Bollea's counsel acknowledged Mr. Daulerio's position that GMGI was not a party to the case. (3915: 14-24) Mr. Bollea's counsel also acknowledged, based on Mr. Daulerio's factual representations and the Stipulation, (all of which counsel believed to be true), that Mr. Bollea, in fairness, could not tell the jury that a "gentleman who has no assets and $27,000 worth of student loans as his present worth would not be bankrupted or be financially destroyed by this." (3917: 5-10)

At Defendants' request and over Mr. Bollea's objection, the jury was instructed that it could not award an amount "that would financially destroy or bankrupt any of the defendants." (3890:20-22) The jury followed that instruction, particularly as to Mr. Daulerio, by assessing only $100,000 in punitive damages against him.

After trial, in support of the Defendants' motion to stay execution, LSKS filed

Mr. Denton's and Mr. Daulerio's sworn affidavits.  Mr. Denton's Affidavit was signed June 9,

2016, and states as follows:

> 2.    As has been previously documented in this litigation, my principal asset is my ownership interest in Gawker Media Group, Inc.

> 3.    I have a retirement account whose current value is $91,707.14 (See Ex. 1), a brokerage account whose current value is $13.50 (See Ex. 2), a personal banking account whose value is $5,078.64 (See Ex. 3), and a joint bank account with my spouse whose value is $3,661.71 (See Ex. 4).  I also recently opened a second personal banking account which contains $45,000 that I withdrew from my retirement account to pay for living expenses.  See Ex. 5

> …

> 7.    As security for the appeal in the above-captioned matter, I am willing to pledge the entirety of my interest in GMGI.

> 8.    I respectfully request that the Court deem that full ownership interest to be adequate security to stay the judgment pending appeal.  (emphasis added)

At the June 10, 2016 hearing on the motion for stay, LSKS reaffirmed Denton's

representations regarding his assets:

> We understand that plaintiff has an interest in seeking security for his judgment. We have taken time.  We have employed other people to come up with a solution to balance that interest, that interest in security and judgment with the interest in a right to appeal that means something.

> We've undertaken a serious analysis, and what we are offering is a serious condition.  **We have pledged what, between the three defendants, is the most meaningful asset they have.  And, again, it's effectively what the plaintiff could get if he were to execute.**

(6/10/16 Trans. pp. 16:16-17:4)(emphasis added).

Mr. Denton's Affidavit is materially false in two respects.  First, Mr. Denton did not

disclose that, on June 8, 2016, his now-bankrupt company loaned him $200,000 for personal

expenses; this $200,000 appears nowhere in any of his disclosed bank accounts.  Second,

Mr. Denton did not disclose that GMGI owed him contractual indemnity rights under an Indemnity Agreement, dated December 31, 2009. With respect to these indemnity rights, Heather Dietrick had already assured Mr. Denton, both **before trial** and after, that GMGI would honor its indemnity obligations. (Denton 7/6/16 Depo. pp. 76-80; Dietrick 7/6/16 Depo. pp. 56-59)[10]

Mr. Daulerio's Affidavit in support of the motion for stay also was signed June 9, 2016, and filed by LSKS, and states as follows:

2.    My assets are:

a.    A 44.7% ownership interest in RGFree, Inc. ("RGFree"), a privately-held start-up media company. RGFree is not currently operational, and it has not earned any revenue. As a result, my ownership interest in RGFree is not of material value.

b.    5,900 shares in Gawker Media Group, Inc.

c.    Checking and savings accounts holding approximately $13,000. The money comes exclusively from gifts and some freelance writing work. I do not currently have full-time employment.

3.    **I do not own a home, a car, or any other material assets.**

Like Mr. Denton, Mr. Daulerio concealed his indemnification rights from Mr. Bollea, from the jury and from the Court. In reality, Mr. Daulerio is also "subject to a company practice and policy of indemnification, by which the Debtor[s] defend and indemnify their writers and editorial staff in connection with lawsuits related to the company's web content." (*See* Holden Dec. ¶ 24)

We now know, based on Gawker's June 10, 2016 bankruptcy filings, subsequent deposition testimony, and the verified bankruptcy Proofs of Claim recently filed by Mr. Daulerio, that Nick Denton and Mr. Daulerio do indeed have indemnity rights which were

---

[10]  The deposition transcripts of Denton and Dietrick have already been filed confidentially under seal.

concealed from the Court, the jury and Mr. Bollea.  In fact, Mr. Daulerio testified at his August 17, 2016 deposition in aid of execution that he fully expects GMGI to pay the amount of the judgment he owes.  (8/17/16 Trans. p. 71:17-21)  Consequently, when Mr. Daulerio and LSKS represented to the jury that there was no way Mr. Daulerio could pay the $115 million compensatory damage award, they were not being truthful.[11]  When LSKS argued that Mr. Denton's only material assets were his GMGI stock, financial accounts, and his condo, they were not being truthful.  And, when Mr. Daulerio and LSKS represented to the jury that Mr. Daulerio "has no material assets," they were likewise not being truthful.  Under Florida law, indemnity rights and choses in action are indisputably assets.  *See Puzzo v. Ray*, 386 So.2d 49, 51 (Fla. 4th DCA 1980); *General Guaranty Ins. Co. of Fla. v. DaCosta*, 190 So.2d 211, 213-14 (Fla. 3d DCA 1966).  Moreover, as set forth below, Mr. Daulerio had several other undisclosed, material assets.

When the jury, this Court and Mr. Bollea took Mr. Daulerio and LSKS at their word about Mr. Daulerio's true financial condition, we were all deceived.  In no uncertain terms, LSKS represented to the jury that the compensatory damage award would financially destroy Mr. Daulerio because he was worth so little, when in fact Mr. Daulerio and LSKS knew that he held valuable indemnity rights which would ensure that the Gawker entities (worth at least $276 million) would pay any judgment entered against Mr. Daulerio and Mr. Denton.  The Court should have been told about these facts before the jury was given punitive damages instructions.  And the jury was entitled to know the whole truth about Mr. Daulerio's and Mr. Denton's financial condition when it was deciding the amount of punitive damages to assess.

---

[11]  Regardless of whether Mr. Daulerio's indemnity rights flow from GMGI and/or Gawker, GMGI's President and General Counsel had already assured Mr. Denton that GMGI would pay all of the $115 million compensatory damages awarded by the jury.

As for materiality, the fact that Mr. Daulerio and Mr. Denton had indemnity rights that were concealed during financial worth discovery would have justified striking Mr. Denton's and Mr. Daulerio's "pauper" defense at trial. Improperly withholding net worth information justifies disallowing a "low net worth" defense. *Belle Glade Chevrolet-Cadillac Buick Pontiac Oldsmobile, Inc. v. Figgie*, 54 So.3d 991, 996-97 (Fla. 4th DCA 2011). More importantly, once LSKS made the argument to the jury that a large punitive award would "financially destroy" Mr. Daulerio and Mr. Denton, their indemnity rights became relevant. *Humana Health Ins. Co. of Florida, Inc. v. Chipps,* 802 So.2d 492, 497-98 (Fla. 4th DCA 2011), is directly on point: "Once [defendant] claimed that a large award would hurt or bankrupt the company financially, the [indemnity] agreement became relevant for purposes of proving otherwise." If there is evidence to rebut a defendant's assertion that a large award would force it into financial straits, then it should be admitted. *Id.; see also Wheeler v. Murphy*, 452 S.E.2d 416, 424 (W.Va. 1994) ("A defendant's net worth is relevant to the issue of punitive damages, and in this case, where defense counsel offered evidence of Mr. Murphy's meager finances, the plaintiff's rebuttal evidence disclosing the existence and policy limits of Mr. Murphy's liability insurance is not barred…"); *Wallace v. Poulos*, 861 F.Supp.2d 587, 602 (D. Md. 2012) ("[I]nforming the jury of the indemnification agreement makes jurors aware that Defendants' ability to pay is essentially a moot point [and] ensures that jurors have an accurate understanding of the likely deterrence effect of their judgment.")

Here, Mr. Bollea was denied his right to discover and present this highly relevant evidence to the jury because Mr. Daulerio and LSKS concealed valuable indemnity rights. While the validity and enforceability of these indemnity rights may be subject to debate, that fact is of no consequence at this point because the preemptive deception of the jury and this Court at

trial cannot be undone – any debate about that should have been raised after full disclosure and before the jury rendered its punitive damages award, not after the trial and a final judgment has been entered.   Moreover, as set forth above, Gawker and GMGI's General Counsel and President, Heather Dietrick, already assured Mr. Denton, before and after the trial, that his indemnity rights for the entire amount of the Bollea judgment would be honored.  (*See* Dietrick 7/6/15 Depo. at pp. 55-70.)  Unless GMGI and Gawker intend to take an inconsistent position against Mr. Daulerio, and leave him exposed (notwithstanding Gawker's bankruptcy case argument and public assertion that doing so would have a "chilling effect" on Gawker's other writers), Mr. Daulerio must have been extended the same assurances that Mr. Denton received. Regardless, the entire $276 million stipulated value of GMGI should have been available to the jury to support a punitive damage award against Mr. Denton and Mr. Daulerio.  It was not.

Making matters worse, Mr. Daulerio only recently revealed that he also has indemnity rights against Kinja.  For some reason, Mr. Daulerio and LSKS did not disclose these indemnity rights against Kinja in connection with the Proceedings Supplementary initiated by Mr. Bollea – including before, at and after the August 11, 2016 hearing held to address Mr. Daulerio's indemnity rights.   Nevertheless, on September 29, 2016, Mr. Daulerio filed a Proof of Claim against Kinja in its pending bankruptcy proceeding based on his indemnity rights against that entity.  (*See* **Exhibit C**)

Mr. Daulerio's and LSKS's concealment of this relevant and material evidence directly impacted the trial.  The fact that Mr. Daulerio and Mr. Denton, who were represented by the same counsel, *both* concealed their indemnity rights demonstrates a calculated scheme to reduce their exposure to punitive damages, while simultaneously shielding Gawker, GMGI and Kinja from liability.

Mr. Daulerio's and LSKS's concealment of Mr. Daulerio's and Mr. Denton's true net worth also impacted the post-trial proceedings. At the hearing held in this Court at 9:00 a.m. on June 10, 2016, Mr. Daulerio's counsel acknowledged that they and their clients "understood that the plaintiff wants security for the judgment." (6/10/16 Trans. p. 6:19-21)[12] They also urged this Court to accept the pledge of Mr. Daulerio's GMGI stock and options as adequate security in exchange for a stay of execution pending appeal. They represented to the Court that, "we're not seeking some sort of free ride. We're not seeking an unsecured stay." (6/10/16 Trans. p. 7:14-17) "Mr. Denton, as we [LSKS] said in [the Motion for Stay] and now I can say the same for Mr. Daulerio, are literally willing to put their money where their mouth is. Both of them will pledge their shares of Gawker Media Group, Inc., as security for the judgment that has been entered…" (6/10/16 Trans. pp. 7:20-8:4). Then, LSKS reaffirmed Mr. Daulerio's and Mr. Denton's false representations regarding their assets:

> We've done a **serious analysis**, and what we are offering is a serious condition. We have pledged what, between the three defendants, is the **most meaningful asset** they have. And, again, it's **effectively what the plaintiff could get if he were to execute**.

(6/10/16 Trans. pp. 16:16-17:4) (emphasis added). This assertion was also untrue.

Within hours of LSKS making this statement to this Court, Gawker obtained a temporary restraining order from the bankruptcy court that protected Mr. Denton and Mr. Daulerio; that TRO was based, in part, on the sworn assertion that Mr. Daulerio and Mr. Denton have indemnity rights – a fact that directly contradicts what LSKS had just represented to this Court. Moreover, those indemnity rights are indeed assets which are reachable through proceedings supplementary to help satisfy the judgment. *Puzzo*, 386 So.2d 49, 51; *DaCosta*, 190 So.2d 211,

---

[12] The June 10, 2016 Hearing Transcript has previously been filed.

213-14; *see also In re. Celotex Corp.*, 204 B.R. 586, 613-14 (M.D. Fla. 1996) (indemnification rights are property of a debtor's estate, which can be assigned or transferred).

Having undertaken a "serious analysis," Mr. Daulerio and LSKS certainly knew that indemnity rights against Gawker, GMGI and Kinja were available to help satisfy Mr. Bollea's judgment. In fact, according to Mr. Daulerio's August 9, 2016 Objection to Notice of Hearing (*see* Footnote 2 herein), LSKS even told Daulerio, *at the outset of this case*, that, because of a conflict, they could not advise Mr. Daulerio about his indemnity rights. Importantly, these indemnity rights flowed from a non-party, GMGI, whose stipulated value was $276 million; as well as non-party, Kinja, to which Defendants have attributed 2/3 of the value of GMGI.

Mr. Daulerio's recent filings and *Longform Podcast* interview further crystalized why the indemnity rights against Gawker, GMGI and Kinja were concealed. In Mr. Daulerio's August 9, 2016, Objection to Notice of Hearing, he objected to proceeding with an August 11, 2016 hearing on Mr. Bollea's already pending request for sanctions (referred to as one of "many matters the Levine Sullivan firm has been handling"). Tellingly, Mr. Daulerio's objection states:

> Undersigned counsel explained to Mr. Daulerio at the outset of the case that, under the Rules of Professional Responsibility, they could not advise him about indemnification rights against Gawker since they are also representing the company. Because Plaintiff[13] has objected in the bankruptcy proceeding to Gawker's continuing to pay for his defense in this action, making that matter a live issue for the first time, Mr. Daulerio is attempting to engage separate counsel to address indemnification issues.

Mr. Daulerio's indemnification rights did not become a "live issue for the first time" in August 2016. His indemnity rights were a core issue before, during and after trial. The concealment of those rights, given the above admissions about when Mr. Daulerio and LSKS knew those rights existed and the associated conflict of interest involved with them, raises grave

---

[13] Mr. Bollea did not object. The Creditors Committee did.

concern over why the indemnity rights were not disclosed long before Gawker's June 10, 2016 bankruptcy filing.

According to Mr. Daulerio's *Longform Podcast* interview, he operated under the assumption that, because he was indemnified, Mr. Bollea couldn't pursue him personally. (9/28/16 Trans. p. 17:14-24)  However, Mr. Daulerio wasn't offered advice because "there were so many conflicts at that point."  (Id. at 18:3-6)  After apparently being blindsided by the reality of his personal liability at the last minute, Mr. Daulerio concluded that "everything that was told to me from the beginning about that this would actually impact me personally – was bullsh*t." (Id. at 20:10-18)

Mr. Daulerio has now retained independent counsel to advise him about his indemnity rights.  (*See* Marburger 10/7/16 Motion for *Pro Hac Vice* Admission.)  However, according to Mr. Daulerio, he still has no intention of conceding his wrongdoing:

> MR. DAULERIO:  Because that's the part about this that's really hard is definitely being trapped, and also that feeling of being trapped and kind of just not only being trapped but still I have a hearing on October 31st where I'm basically going to be sitting in front of that judge who is going to kind of decide whether or not I was lying on my financial affidavit about these indemnity rights which apparently are worth money, that I was lying about them to cover up this fact, and then she can fine me some more.  Like that's preposterous, but that's the way the legal system works right now, and that's the position that I'm in.  And, you know, the choices ultimately just like they're giving me are kind of just like take back everything you loved about Nick, Gawker, and your job, and we'll give you your thousand dollars back, or your ability to make money, or you can walk away from this, but you just can't talk about it ever again.  I don't see there's any question for me.  I mean, I definitely thought long and hard about it, and I've definitely talked to a lot of people about it.  It's just not in me.

(9/28/16 Trans. p. 78:7-79:10)

Incredibly, the pattern of deception continued even after Mr. Bollea had already moved for relief and sanctions (based on *some* of Mr. Daulerio's and LSKS's misconduct), and after this Court had already issued its July 29 Order and set the October 31st sanctions hearing.

Mr. Daulerio and LSKS persisted in concealing Mr. Daulerio's assets.  For example, after the Court issued its August 1, 2016 Notice to Appear and Show Cause on Proceedings Supplementary, Mr. Daulerio signed, and his LSKS counsel filed, an affidavit and an accompanying Response, in which they still failed to identify Mr. Daulerio's indemnity rights against Kinja, and also failed to disclose Mr. Daulerio's ownership of three (3) laptop computers and his possession of the 30-Minute Video of Mr. Bollea.[14]

After the Court issued its August 16, 2016 Order on Proceedings Supplementary, Mr. Daulerio appeared on August 17, 2016 for the taking of his deposition in aid of execution, at which he was represented by LSKS counsel.  At that deposition, Mr. Daulerio revealed that he owned *two* (2) laptop computers, one of which LSKS stated on the record was being preserved in LSKS's physical possession.  (Daulerio 8/17/16 Depo. pp. 7:5-8; 7:21-24)  After Mr. Daulerio was asked about all of the other items of personal property he possessed, the undersigned sought to confirm that Mr. Daulerio had finally disclosed all of his assets:

> Q.    Do you have any other property, or property interest, that we haven't discussed so far?
>
> A.    No.
>
> …
>
> Q.    And other than what we've talked about today, are you aware of any other personal property, intellectual property, rights under contracts, anything like that, that we haven't talked about?
>
> A.    No.

(Daulerio 8/17/16 Depo. pp. 59:12-14; 73:16-20)

In fact, Mr. Daulerio had *another* (third) laptop computer that was also in LSKS's physical possession,[15] as well as a copy of the full 30-minute illegally recorded, sexually explicit

---

[14] Mr. Daulerio also failed to disclose numerous other assets, including property he sold and gave to another person before moving to Florida.

[15] *See* Daulerio 8/31/16 Response to Plaintiffs' Objection to Claim of Exemption, p. 2, FN1.

video of Mr. Bollea.[16]  Mr. Daulerio's and his LSKS counsel's concealment of these assets is not

immaterial.  The significant value of the 30-Minute Video is evidenced by the damages awarded

at trial.  And Mr. Daulerio's laptops (which he values at $2,000 each) were in and of themselves

sufficient to exceed the amount of the personal property exemptions to execution that

Mr. Daulerio claimed under Florida and New York law.  (*See* Daulerio's 8/23/16 Claim of

Exemption.)

    While Mr. Daulerio and LSKS were concealing Mr. Daulerio's assets, Mr. Daulerio was

also squandering substantial amounts of money traveling and pampering himself on a lavish full-

time vacation in Florida.  (*See* Bollea's 8/26/16 Objection to Daulerio's Claim of Exemption.)

He dissipated tens of thousands of dollars, which included several trips from Florida to New

York and Los Angeles, regular golf outings and massages.  (Id. at p. 4)  He also sold personal

property worth at least $1,000 for $300 to a bar in New York, and gave furniture, artwork and

sports memorabilia worth at least a few thousand dollars to a friend.  (Id.)

    In all, Mr. Daulerio blew through $50,000 given to him by his family and a friend, and

failed to disclose at least $10,000 of personal property.  These assets could have satisfied a

substantial portion of the $100,000 punitive damage award against him.    Incredibly,

Mr. Daulerio and LSKS responded by claiming that his undisclosed assets are not "material."

(*See* Daulerio's 8/31/16 Response p. 2.)

    The fact that Mr. Daulerio and LSKS have publicly taunted Mr. Bollea with personal

property they knowingly and repeatedly failed to disclose, while also knowing that they had

concealed indemnity rights throughout this case from the jury, this Court and Mr. Bollea, and

that Mr. Daulerio's attempt to "remember things in a certain way" to protect Nick Denton had

failed at trial, clearly establishes that the misconduct at issue is intentional, inexcusable and

---

[16]  *See* Bollea 10/6/16 Emergency Motion to Enforce Permanent Injunction.

intolerable.  This misconduct struck a severe blow to the integrity of this Honorable Court, and must be dealt with accordingly.

**Argument**

As set forth above, the civil litigation process depends on truthful disclosure of facts. *Morgan*, 816 So.2d at 254.  ***"Revealing only <u>some</u> of the facts does not constitute [the] 'truthful disclosure' that is required to maintain the 'integrity of the civil litigation process.'"***  *Ramey*, 993 So.2d at 1019 (citing *Morgan*, 816 So.2d at 254; and quoting *Cox*, 706 So.2d at 47) (emphasis added).  Preserving the integrity of the judicial process and protecting the proper administration of justice are of paramount importance.  That is why attorneys are primarily officers of the Court, bound to serve the ends of justice with openness, candor and fairness to all—even when it appears in conflict with a client's interests.  *Ramey v. Thomas*, 382 So.2d 78, 81 (Fla. 5th DCA 1980).  In fact, the duty of candor toward the tribunal is viewed as one of the most sacrosanct ethical and legal obligations in the Rules of Professional Conduct and under Florida law.  See, Rules 4-3.3 and 4-8.4, Fla. R. Prof. Cond.; *Phillip Morris USA, Inc. v. Green*, 175 So.2d 312, 315 (Fla. 5th DCA 2015).

"Every court has the prerogative and duty to see that its processes are not abused." *Marine Transport Lines, Inc. v. Green*, 114 So.2d 710, 711 (Fla. 1st DCA 1959).  In furtherance of this duty, all courts have the inherent authority to impose sanctions for bad faith litigation. *Patsy v. Patsy*, 666 So.2d 1045, 1046-47 (Fla. 4th DCA 1996); *Sheldon Greene & Assoc., Inc. v. Williams Island Assoc., Ltd.*, 592 So.2d 307 (Fla. 3d DCA 1991); *Emerson Realty Group, Inc. v. Schanze*, 572 So.2d 942, 945 (Fla. 5th DCA 1991).

Section 45.045, Florida Statutes, also gives this Court substantial discretion to impose sanctions.  Under Section 45.045(4), "[i]f the trial or appellate court determines that an appellant

has dissipated or diverted assets outside the course of its ordinary business or is in the process of doing so, the court may enter orders necessary to protect the appellee… and impose other remedies and sanctions as the Court deems appropriate." *See also*, Fla. R. App. P. 9.310(b)(3).

Mr. Daulerio and LSKS knowingly and intentionally misled this Court, the jury and Mr. Bollea about the core issues in this case by "remembering things in a certain way" and concealing Mr. Daulerio's and Mr. Denton's indemnity rights so they could cry poverty in order to reduce their punitive damages exposure and protect the Gawker entities. Then, they continued to intentionally mislead this Court and Mr. Bollea by purposely concealing material facts associated with Mr. Daulerio's and Mr. Denton's assets and the value and legitimacy of the alternative security they pledged in exchange for a request, which this Court orally granted, to stay execution of the Final Judgment. The pledge of GMGI stock was illusory, and at the time this Court was asked to grant the extraordinary remedy of staying execution without having to post a "good and sufficient bond" required under Florida law, Mr. Daulerio and LSKS were also concealing other material assets. Then, after Mr. Bollea and this Court unwittingly accepted their false representations and illusory stock pledge, Mr. Daulerio and LSKS were implicitly, if not directly, participants in the scheme to misrepresent this Court's June 10, 2016 ruling in order to obtain a stay on more preferable conditions in Gawker's bankruptcy proceedings. When that tactic failed, Mr. Daulerio and LSKS continued to misrepresent Mr. Daulerio's financial condition and assets to try to prevent Mr. Bollea from collecting what he is owed. All of these misrepresentations involve matters at the core of this case, not collateral issues. *Ramey*, 993 So.2d at 1020. Such misrepresentations by their very nature unfairly hampered the presentation of Mr. Bollea's claims. *Id.* (citing *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989).

Mr. Daulerio's and his counsel's misconduct interfered with this Court's and the jury's ability to impartially adjudicate this case, and improperly influenced the trier of fact regarding the central issues of liability, punitive damages, a stay of execution and collection.  Mr. Daulerio and LSKS are guilty of making material misrepresentations that directly impacted core issues at trial and during post-trial proceedings, and should be sanctioned accordingly.

"Tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."  *Ramey*, 933 So.2d at 1020-21 (citing, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), *receded from on other grounds by Standard Oil Co. of Cal. v. U.S.*, 429 U.S. 17 (1976)).

In light of the severity and repetition of the misconduct at issue, Mr. Daulerio and LSKS also should be required to show cause why they should not be held in contempt.  Contempt is an act that hinders or obstructs a court in the administration of justice.  *Ex parte Crews*, 173 So. 275 (1937).  Florida cases have recognized the use of direct and indirect criminal contempt to punish the making of false statements.  *Haeussler v. State*, 100 So.3d 732, 734 (Fla. 2d DCA 2010).  Direct criminal contempt is an act committed in the presence of the court so as to hinder judicial proceedings, and may result in serious consequences, including immediate imprisonment.  *Emanuel v. State*, 601 So.2d 1273, 1275 (Fla. 4th DCA 1992).  Intentionally underrepresenting one's financial condition in sworn documents filed with a trial court is punishable by at least indirect criminal contempt.  *Haeussler*, 100 So.3d at 734.

In situations such as this one, courts have the discretion to cite a guilty person for contempt, direct that the record be sent to the State Attorney's office for investigation or, in

proper cases, strike pleadings or testimony shown to be a sham. *Parham v. Kohler*, 134 So.2d 274, 276 (Fla. 3d DCA 1961). Remedies for perjury, slander and the like committed during judicial proceedings are left to the discipline of the courts, the bar association, and the state. *Wright v. Yurko*, 446 So.2d 1162, 1164 (Fla. 5th DCA 1984); *Sheldon Greene & Assoc., Inc.*, 592 So.2d 307; *Emerson Realty*, 572 So.2d at 945; Rule 2.515, *Fla. R. Jud. Admin.*; *Emanuel*, 601 So.2d at 1275; *Parham*, 134 So.2d at 276; *Wright*, 446 So.2d at 1164.

"[B]asic, fundamental dishonesty… is a serious flaw, which cannot be tolerated" because dishonesty and a lack of candor "cannot be tolerated by a profession that relies on the truthfulness of its members." *The Florida Bar v. Head*, 27 So.3d 1, 8 (Fla. 2010). "Dishonest conduct demonstrates the utmost disrespect for the court and is destructive to the legal system as a whole." *Id*. at 8-9. When such conduct occurs, courts have the authority to assess sanctions against parties as well as their counsel. *Patsy*, 666 So.2d at 1047; *Levine v. Keaster*, 862 So.2d 876, 880 (Fla. 4th DCA 2003).

The case of *The Florida Bar v. Dupee*, 160 So.3d 838 (Fla. 2015), illustrates the sorts of repercussions that can flow from conduct like the conduct at issue here. In *Dupee*, a lawyer knowingly filed an inaccurate financial affidavit, failed to disclose the existence of an asset (a cashier's check) belonging to her client, and allowed her client to provide "false evasive testimony" at a deposition. The attorney was suspended one year for violating Rule 3-4.3 (unlawful and dishonest acts), Rule 4-3.3 (making or failing to correct a false statement of material fact made to a tribunal), Rule 4-3.4 (a lawyer must not fabricate evidence), Rule 4-4.1 (making a false statement or failing to disclose a material fact) and Rule 4-8.4 (a lawyer shall not violate the Rules of Professional Conduct or do so through the acts of another and shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.). *Id*. at 847. When

the lawyers from LSKS sought permission to appear *pro hac vice* in this case, they agreed to be bound by these very same rules, and to subject themselves to the jurisdiction of this state for enforcement. The violation of that agreement has consequences.

## CONCLUSION

The misconduct engaged in by Mr. Daulerio and LSKS cannot be ignored nor justified. The integrity of this Court and our justice system must be protected. To achieve that, this Court is empowered to consider the full array of available sanctions.

WHEREFORE, Mr. Bollea respectfully requests that this Court adjudicate Mr. Daulerio and LSKS guilty of engaging in a pattern of deception involving core issues and material facts that misled the jury and this Court,[17] sanction Mr. Daulerio and LSKS, consider entering an order to show cause why Mr. Daulerio and/or his counsel should not be held in contempt, consider referral for other remedial measures; and grant any other relief this Court deems just and appropriate.

DATED:  October 13, 2016.

/s/ Kenneth G. Turkel
Kenneth G. Turkel, Esq.
Florida Bar No. 867233
Email: kturkel@bajocuva.com
Shane B. Vogt
Florida Bar No. 257620
Email:  svogt@bajocuva.com
BAJO CUVA COHEN & TURKEL, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193

- and -

---

[17]  Mr. Bollea seeks specific findings regarding Mr. Daulerio's misconduct because such misconduct may impact his rights in his appeals of the Final Judgment and this Court's Order on Proceedings Supplementary.  *See Andrews v. Palmas De Majorca Condo.*, 898 So.2d 1066, 1070 (Fla. 5th DCA 2015) (Fraud committed against trial court may warrant dismissal of an appeal, given that fraud on court, any court, infects the entire proceeding.)

Charles J. Harder, Esq.
PHV No. 102333
HARDER MIRELL & ABRAMS LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, CA  90212
Tel: (424) 203-1600
Fax: (424) 203-1601
Email: charder@hmafirm.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by E-Mail via the e-portal system this 13th day of October, 2016 to the following:

Gregg D. Thomas, Esquire
Rachel E. Fugate, Esquire
Thomas & LoCicero PL
601 S. Boulevard
Tampa, Florida 33606
gthomas@tlolawfirm.com
rfugate@tlolawfirm.com
kbrown@tlolawfirm.com
abeene@tlolawfirm.com
*Counsel for Gawker Defendants*

Seth D. Berlin, Esquire
Paul J. Safier, Esquire
Alia L. Smith, Esquire
Michael D. Sullivan, Esquire
Levine Sullivan Koch & Schulz, LLP
1899 L. Street, NW, Suite 200
Washington, DC 20036
sberlin@lskslaw.com
psafier@lskslaw.com
asmith@lskslaw.com
msullivan@lskslaw.com
*Pro Hac Vice Counsel for*
*Gawker Defendants*

Steven L. Brannock, Esquire
Celene H. Humphries, Esquire
Brannock & Humphries
1111 West Cass Street, Suite 200
Tampa, FL  33606
sbrannock@bhappeals.com
chumphries@bhappeals.com
eservice@bhappeals.com
*Co-Counsel for Gawker Defendants*

Michael Berry, Esquire
Levine Sullivan Koch & Schultz, LLP
1760 Market Street, Suite 1001
Philadelphia, PA  19103
mberry@lskslaw.com
*Pro Hac Vice Counsel for*
*Gawker Defendants*

David R. Houston, Esquire
Law Office of David R. Houston
432 Court Street
Reno, NV 89501
dhouston@houstonatlaw.com
krosser@houstonatlaw.com

Stuart C. Markman, Esquire
Kristin A. Norse, Esquire
Kynes, Markman & Felman, P.A.
Post Office Box 3396
Tampa, Florida  33601
smarkman@kmf-law.com
knorse@kmf-law.com
plawhead@kmf-law.com
*Appellate Co-Counsel for Plaintiff*

Andrew B. Greenlee, Esquire
Greenlee, P.A.
401 E. 1st Street, Unit 261
Sanford, FL  32772
Tel:  (407) 808-6411
andrew@andrewgreenleelaw.com

David Marburger, Esquire
Marburger Law LLC
14650 Detroit Avenue, Suite 450
Cleveland, OH  44107
Tel:  (216) 930-0500
[david@marburger-law.com](mailto:david@marburger-law.com)
*Counsel for A. J. Daulerio*

/s/ Kenneth G. Turkel
Attorney

**EXHIBIT A**

BOLLEA'S AMENDED MOTION FOR SANCTIONS AND FOR
ORDER TO SHOW CAUSE AGAINST DAULERIO AND HIS COUNSEL

United States Bankruptcy Court, Southern District of New York

| Please select applicable Debtor (select only one Debtor per claim form): |
|---|
| ☒  Gawker Media, LLC (Case No. 16-11700) |
| ☐  Kinja, Kft. (Case No. 16-11718) |
| ☐  Gawker Media Group, Inc. (Case No. 16-11719) |

## Official Form 410

# Proof of Claim

4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | Albert James Daulerio (born 1974) |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor    A.J. Daulerio |

| 2. | Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? _____ |
|---|---|---|

| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Marburger Law LLC attn: David Marburger<br>14650 Detroit Avenue, Suite 450<br>Cleveland, OH 44107<br><br>Contact phone  216 930 0500<br>Contact email  david@marburger-law.com | **Where should payments to the creditor be sent?** (if different)<br><br><br><br><br><br>Contact phone _____<br>Contact email _____ |
|---|---|---|---|

| 4. | Does this claim amend one already filed? | ☒ No<br>☐ Yes.  Claim number on court claims registry (if known)_____ | Filed on _____<br>MM  / DD  / YYYY |
|---|---|---|---|

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? _____ |
|---|---|---|

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| **7. How much is the claim?** | $ 6,000,000.00 . **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Duty to defend and indemnify - see Supplement & Exhibits

**9. Is all or part of the claim secured?**

☑ No<br>
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>
☐ Motor vehicle<br>
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%<br>
☐ Fixed<br>
☐ Variable

**10. Is this claim based on a lease?**

☑ No<br>
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No<br>
☐ Yes. Identify the property: _____

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:*                                 **Amount entitled to priority:**<br><br>  ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).         $_____<br><br>  ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).     $_____<br><br>  ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).     $_____<br><br>  ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).     $_____<br><br>  ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).     $_____<br><br>  ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies.     $_____<br><br>* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**   $_____ |

## Part 3:    Sign Below

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>**Signature:** *Albert James Daulerio*<br>              Albert James Daulerio (Sep 29, 2016)<br><br>**Email:** david@marburger-law.com<br><br>_____<br>   Signature<br>**Print the name of the person who is completing and signing this claim:**<br><br>Name     Albert James Daulerio (born 1974)<br>        First name            Middle name            Last name<br><br>Title     n/a<br><br>Company     n/a<br>        Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address     c/o Marburger Law LLC, 14650 Detroit Avenue, Suite 450<br>        Number      Street<br>        Cleveland             OH     44107<br>        City                  State     ZIP Code<br><br>Contact phone   216 930 0500           Email david@marburger-law.com |

# EXHIBIT B

BOLLEA'S AMENDED MOTION FOR SANCTIONS AND FOR
ORDER TO SHOW CAUSE AGAINST DAULERIO AND HIS COUNSEL





# Creditor Data Details for Claim # 294

Creditor
Daulerio, Albert James

Debtor Name
Gawker Media Group, Inc.

Schedule Number

Date Filed
09/29/2016

Claim Number
294

Proof of Claim
Suppressed

| | Schedule Amount | C* | U* | D* | Asserted Claim Amount | C* | U* | F* | Current Claim Value | Claim Status |
|---|---|---|---|---|---|---|---|---|---|---|
| General Unsecured | | | | | $6,000,000.00 | | | | $6,000,000.00 | Asserted |
| Priority | | | | | | | | | | |
| Secured | | | | | | | | | | |
| 503(b)(9) Admin Priority | | | | | | | | | | |
| Admin Priority | | | | | | | | | | |
| Total | $0.00 | | | | $6,000,000.00 | | | | $6,000,000.00 | |

*C=Contingent, U=Unliquidated, D=Disputed, F=Foreign

Prime Clerk maintains this website for the public's convenience and for general informational purposes only. Anyone using this website is cautioned NOT to rely on any information contained on this Website, and any user of this website should not take or refrain from taking any action based upon anything included or not included on this website. We are not a law firm or a substitute for an attorney or law firm. Users of this website may want to seek legal counsel on the particular facts and circumstances at issue. All search results provided through this website are qualified in their entirety by the official register of claims and the Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements") filed in the bankruptcy case/s of the Debtor/s.

Nothing contained on this Site or in the Debtors' Schedules and Statements shall constitute an admission or a waiver of any of the Debtors' rights to assert claims or defenses. Any failure by a Debtor to designate a claim listed on the Schedules as "disputed," "contingent," or "unliquidated" does not constitute an admission that such amounts are not "disputed," "contingent," or "unliquidated." For the avoidance of doubt, listing a claim on Schedule D as "secured," on Schedule E as "priority," on Schedule F as "non-priority," or listing a contract or lease on Schedule G as "executory" or "unexpired," does not constitute an admission by the Debtors of the legal rights of the claimant, or a waiver of the Debtors' right to recharacterize or reclassify such claim or contract. Each Debtor reserves the right to amend their Schedules and Statements as necessary or appropriate. Debtors further reserve the right to dispute, on any grounds, or to assert offsets or defenses to, any claim reflected on their Schedules or filed against a Debtor, including objecting to the amount, liability, classification or priority of such claim, or to otherwise subsequently designate any claim as "disputed," "contingent" or "unliquidated."

Print page

# EXHIBIT C

BOLLEA'S AMENDED MOTION FOR SANCTIONS AND FOR
ORDER TO SHOW CAUSE AGAINST DAULERIO AND HIS COUNSEL

United States Bankruptcy Court, Southern District of New York

| Please select applicable Debtor (select only one Debtor per claim form): |
| :--- |
| ☐   Gawker Media, LLC (Case No. 16-11700) |
| ☒   Kinja, Kft. (Case No. 16-11718) |
| ☐   Gawker Media Group, Inc. (Case No. 16-11719) |

Official Form 410

# Proof of Claim

4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

---

## Part 1:   Identify the Claim

| | |
| :--- | :--- |
| 1. **Who is the current creditor?** | Albert James Daulerio (born 1974) <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor   A.J. Daulerio |
| 2. **Has this claim been acquired from someone else?** | ☒ No <br> ☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Marburger Law LLC, attn: David Marburger <br> 14650 Detroit Avenue, Suite 450 <br> Cleveland, OH  44107 <br><br><br> Contact phone  216 930 0500 <br> Contact email  david@marburger-law.com <br><br> **Where should payments to the creditor be sent?** (if different) <br><br><br><br><br><br> Contact phone _____ <br> Contact email _____ |
| 4. **Does this claim amend one already filed?** | ☒ No <br> ☐ Yes.   Claim number on court claims registry (if known)_____   Filed on _____ <br> MM  / DD  / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No <br> ☐ Yes. Who made the earlier filing? _____ |

Claim Number: 293

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| **7. How much is the claim?** | $ 6,000,000.00 . **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Duty to defend and indemnify - see Supplement & Exhibits |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br><br>**Amount of the claim that is secured:** $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority: |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(    ) that applies.    $ _____

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**    $ _____

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:**  *Albert James Daulerio*
Albert James Daulerio (Sep 29, 2016)

**Email:**  david@marburger-law.com

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Albert James Daulerio (born 1974) |
|---|---|
|  | First name        Middle name        Last name |
| Title | n/a |
| Company | n/a |
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | c/o Marburger Law LLC, 14650 Detroit Avenue, Suite 450 |
|  | Number        Street |
|  | Cleveland        OH        44107 |
|  | City        State        ZIP Code |
| Contact phone | 216 930 0500        Email david@marburger-law.com |

## <u>EXHIBIT D</u>

**Video Turnover Motion**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

TERRY GENE BOLLEA professionally
known as HULK HOGAN,

      Plaintiff,

vs.

Case No.:   12012447-CI-011

HEATHER CLEM; GAWKER MEDIA,
LLC aka GAWKER MEDIA, et al.,

      Defendants.

_____/

### PLAINTIFF'S EMERGENCY MOTION TO ENFORCE PERMANENT INJUNCTION AND PREVENT A.J. DAULERIO FROM ENGAGING IN REVENGE PORN, EXTORTION AND VIDEO VOYEURISM

Plaintiff Terry Bollea known professionally as Hulk Hogan ("Mr. Bollea") by counsel and pursuant to the Court's June 7, 2016, Final Judgment and Permanent Injunction ("Permanent Injunction") moves for the entry of an order on an emergency basis enforcing the Permanent Injunction and, pursuant to and §§ 784.049, 836.05 and 810.145, *Fla. Stat.,* the entry of an order preventing Defendant A.J. Daulerio ("Mr. Daulerio") from violating Florida's "Revenge Porn," Video Voyeurism and Extortion Laws, by requiring Mr. Daulerio to immediately turn over to Mr. Bollea's counsel any and all copies, excerpts and/or still images of all surreptitiously recorded, sexually explicit recordings and images of Mr. Bollea, and to verify under oath that he no longer has any access to or ability to access such recordings and images, and in support states as follows:

### Introduction

Since its inception, this case has always been and will continue to be about a person's right to stop other people from posting illegally recorded, sexually explicit images of him or her

{BC00102867;1}

on the Internet without their consent. This case is not an attack upon the freedom of press nor the First Amendment. Its goal has never been to silence the voice of the people nor journalists who are telling the public about matters of legitimate public concern. Rather, in an age in which everyone has a camera phone and computer hacks of peoples' private nude photos have become commonplace, the goal of this case has always been to draw a clear line that publishers cannot cross demarking the point at which journalism ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into the private life of another, with which a reasonable member of the public with decent standards would say that he or she has no legitimate concern. Seven months ago, a Pinellas County jury drew that line, held the defendants accountable for crossing it, and sent a message to anyone who might consider doing the same: don't post illegally obtained, private, sexually explicit images of people on the Internet without their consent because they are not "news." This Court did the same in its Permanent Injunction.

Incredibly, Mr. Daulerio has not learned anything over the past four years. He still believes that secretly recorded footage of people having sex can be passed off as "news," and that there are no limits to what he can post on the Internet. In fact, Mr. Daulerio proudly stated in a recent interview that he believes he can post the entire 30-minute video of Mr. Bollea on his website, Ratter.com, because he thinks it is "completely newsworthy." He even planned to do so. Mr. Daulerio even bragged about still having a copy of the entire 30-minute, illegally recorded encounter.

Mr. Daulerio should not be given the opportunity to follow-through on his threats. Mr. Bollea should not have to live in fear of being sexually exploited at the whim of an angry and desperate, self-proclaimed "voyeur and deviant," who has threatened to violate this Court's

Permanent Injunction and Florida law to try to coerce Mr. Bolela to stop collecting the $115.1 million judgment that Mr. Daulerio owes.

Once again, and almost four years to the day of Mr. Daulerio's original Hulk Hogan sex tape post, Mr. Bollea finds himself being victimized and trying to stop Mr. Daulerio from publishing an illegally recorded sex tape against Mr. Bollea's will. Only this time, Mr. Bollea is already armed with a jury verdict, Permanent Injunction and Florida's Revenge Porn, Video Voyeurism and extortion statutes at his sides. Mr. Daulerio must be stopped before he inflicts more harm than he has already caused.

### Factual Background

Six months ago, Mr. Daulerio and his attorneys stood in a Pinellas County courtroom and promised the jury, this Court and Mr. Bollea that Mr. Daulerio understood that he could no longer post explicit, illegally recorded sex tapes masquerading as news, that he would be deterred by the jury's verdict, and that he had learned his lesson. He has not.



Ex-Gawker Editor Almost Went Into Hiding After Hulk
Hogan Verdict

But AJ Daulerio also had a plan to go out with a bang

Tim Molloy | September 28, 2016 @ 8:11 PM

As set forth in the above-referenced article,[1] on or about September 28, 2016, an interview of Mr. Daulerio was posted on the *Longform Podcast* (a copy of the transcript of which is attached as **Exhibit A**[2]), during which he stated, among other things:

> MR. DAULERIO: I don't think anybody was going to give me, the child pornographer, like any sort of money at that point, but what I did think initially was that, well, all is lost, ***but I do still have a copy of the sex tape, and it is completely newsworthy at this point.*** I was just like, okay, well, ***how about I do a post*** on ***Ratter[3] that says here's what $140 million sex tape looks like, and then just "peace out," and then just go to Miami, and just like be on the lam and just do that.*** And this is what I was planning on doing. I was getting -- I was getting phones, like, you know, I was basically going to get burner phones, I was going to do this all kind of covert and have, you know, signals and all these people I was working for, and thankfully some people talked me off the ledge --
>
> INTEREVIEWER: Yeah.
>
> MR. DAULERIO: -- and just said, you know, you're not out of this yet, obviously, and Gawker is not out of this, and I didn't want to do anything to jeopardize Gawker more so than I already had in trial, but that was my first instinct was basically just like, you know, that -- ***that much frustration and that much kind of anger and that much sadness over just like what had transpired.*** It was just like I had that brief sliver of a ***revenge fantasy*** so to speak, and also at that time I said to myself, well, what is a thing that we can do that makes this a positive experience in some ways for someone. [Emphasis added.]

Mr. Daulerio's thinly-veiled threat to release the entire full length 30-minute Video confirms the fears Mr. Bollea expressed throughout this case and, most recently, in his request for the Permanent Injunction. (*See* Bollea's 5/11/2016 Motion, p. 9-10.) Mr. Daulerio opposed entry of the Permanent Injunction by representing that: "All Denton and Daulerio were saying is that they still believe that the video excerpts were part of a legitimately newsworthy publication,

---

[1] *See* Ex. 1 to Affidavit of Gayla Arnold.

[2] *See* Ex. 2 to Affidavit of Gayla Arnold.

[3] With funding approved by Gawker Media, LLC's CEO, Nick Denton, Ratter.com is a now-defunct website still controlled by Mr. Daulerio.

not that they plan to repost the video excerpts, or post any additional sex-tape footage." (*See* 5/23/16 Opposition, p. 6.) The September 28, 2016 interview makes clear that, once again, this Court and Mr. Bollea have been misled.

Fortunately, the Court knew better than to take Mr. Daulerio's representation at face value. It entered the Permanent Injunction based in part on findings that "Gawker Defendants continue to possess additional footage of Mr. Bollea, including the full 30-Minute Video that they received, the contents of which have never been made public… [and that]… while Gawker Defendants are not currently making the Gawker Video or 30-Minute Video available, there is no court order currently in place that prohibits them from doing so." (*See* Permanent Injunction ¶ 52.)

For most people, a court order such as the Permanent Injunction (and its attendant threat of contempt) would be a sufficient deterrent. However, this remains a special case involving defendants such as Mr. Daulerio who have exhibited complete disrespect for the law and this Court's authority. For example:

- The day after this Court entered its temporary injunction (but before it was reversed on appeal) the defendants defiantly posted s story headlined: "A Judge Told Us to Take Down Our Hulk Hogan Sex Tape Post. We Won't." (*See* Depo. Ex. 227.)

- Mr. Daulerio was willing to go to jail in order to post pictures of Brett Favre's penis. (*See* Depo. Ex. 4; Daulerio 9/30/2013 Depo. pp. 75-77.)

- Sealed discovery was leaked to and published by *The National Enquirer*. Mr. Daulerio tweeted "xoxoxo" to Mr. Bollea at 6:52 a.m., within minutes of the leak being posted. This prompted the Court to enter an electronic discovery order. (*See* 10/21/2015 Order; Ex. A to Mr. Bollea's Reply in Support of Emergency Motion.)

- Mr. Daulerio misled this Court about the value of GMGI stock to obtain a temporary stay of execution. (*See* 7/29/2016 Order.)

- Mr. Daulerio made material misrepresentations about his net worth (most notably, his indemnity rights), before, during and after trial. (*See* 8/5/16

Renewed Motion for Sanctions.)  Several of these misrepresentations were made in filings required by Court Order.

Mr. Daulerio's lack of respect and appreciation for this Court's authority is particularly disconcerting now that Mr. Daulerio claims to have reached the end of his rope and believes he has "nothing to lose."  For example, Nick Denton and Gawker Media, LLC ("Gawker") abandoned Mr. Daulerio after they each filed for bankruptcy protection, leaving Mr. Daulerio standing alone to face collection. ("Somehow, getting $115 million is basically falling squarely on my head, because, you know, Gawker and Nick have both declared bankruptcy…"[4]) Mr. Denton secured a $200,000 "loan"[5] for himself from Gawker to retain personal bankruptcy counsel immediately before Gawker filed for bankruptcy protection, but left Mr. Daulerio without the same protection—even though they both held some of the same indemnity rights.

According to Mr. Daulerio, his desperation is exacerbated by his belief that he was wronged by "Gawkers lawyers." ("…any conversations I would have with *the lawyers that were representing Gawker in this case*, it was always bad news, and it was always there's another worst case scenario, another bad day in court.")[6]  Throughout this case, Mr. Daulerio apparently operated under the assumption that because he was indemnified, Mr. Bollea couldn't pursue him personally. (9/28/16 Trans. p. 17:14-24)  However, Mr. Daulerio recently revealed that he was blindsided by the reality of his personal liability at the last minute. (9/28/16 Trans. p. 17:14-24)  In fact, in the September 28, 2016 interview, Mr. Daulerio states: **"everything that was told to me from the beginning about that this would actually impact me personally—was bullsh\*t."**  (9/28/16 Trans. p. 20:10-18)  Mr. Daulerio also contends his lawyers did not advise him about his indemnity rights due to "conflicts." (9/28/16 Trans. p. 18:3-6)

---

[4] *See* 9/28/16 Trans. p. 10:14-24.
[5] According to Mr. Daulerio, he would have needed $30,000 to retain his own bankruptcy counsel. (*See* 9/28/16 Trans. pp. 16:16-17:13.)
[6] *See* 9/28/16 Trans. p. 9:4-9.  [Emphasis added]

Mr. Daulerio further attributes his desolation to the upcoming October 31, 2016, sanctions hearing involving, among other things, the concealment of these same indemnity rights. (9/28/16 Trans. pp. 78:7-79:5)  Mr. Daulerio now admits that his indemnity rights have significant monetary value. (9/28/16 Trans. pp. 12:24-13:13; 78:7-79:14)  In fact, on September 29, 2016, Mr. Daulerio filed bankruptcy Proofs of Claim against Gawker, Gawker Media Group, Inc. ("GMGI") and Kinja, Kft. ("Kinja"), in the amount of $6 million each, based on the companies' duties to defend and indemnify Mr. Daulerio in this case. (A copy of the Proof of Claim against Gawker, and the Supplement (without exhibits) is attached as **Exhibit B**). According to these filings, Mr. Daulerio (who claims he is broke) already owes LSKS $190,000 for services rendered from June 10, 2016 through August 31, 2016 (*See* S. Berlin 9/28/16 letter attached as **Exhibit C**), and another $20,000 to his recently retained independent counsel. (*See* Marburger Law 9/29/16 letter attached as **Exhibit D**.)

Unfortunately, Mr. Daulerio's anger and frustration over his litany of problems is being directed solely toward Mr. Bollea, simply because Mr. Bollea is engaging in routine collection efforts to secure the money Mr. Daulerio owes.  Mr. Daulerio's last ditch effort to avoid paying Mr. Bollea entails threatening to engage in revenge porn and video voyeurism by releasing more or all of the 30-minute, illegally recorded, sexually explicit footage of Mr. Bollea.  The timing of Mr. Daulerio's decision to publicly brag about still having a copy of that video footage and his plan to release it is not a coincidence.[7]

Moreover, Mr. Daulerio persists in his belief that he has every right to publicly disclose the entirety of the illegally recorded sex tape without Mr. Bollea's consent, and in violation of Florida law and the Permanent Injunction.  In fact, Mr. Daulerio inexplicably claims that it is

---

[7] For example, Mr. Daulerio's September 28, 2016 interview was contemporaneous with his filing of the Proofs of Claim against the Gawker entities.

somehow "completely newsworthy at this point," even though the jury and this Court have already concluded otherwise.

Mr. Daulerio cannot be trusted with any sexually explicit footage of Mr. Bollea. He certainly should not be allowed to keep the means through which he could follow through on his recent threats against Mr. Bollea.

## Argument

Recently, Florida's Legislature recognized what Mr. Bollea has been saying throughout this case:  publishing sexually explicit images of another on the Internet without that victim's consent creates a permanent record of that victim's private nudity and private sexual conduct worldwide, which can be easily reproduced and shared, and causes significant psychological harm. *See* § 784.09(1)(b)-(f), *Fla. Stat.* In order to protect against this harm, an aggrieved person is entitled to "obtain all appropriate relief in order to prevent or remedy a violation of this section." *See* § 784.09(5)(a), *Fla. Stat.*

In the Permanent Injunction previously entered in this case, this Court reached the same conclusions: "Publication of the explicit content of the Gawker Video and/or the 30-Minute Video would violate a clear legal right and cause irreparable injury for which Mr. Bollea has no adequate remedy at law… Mr. Bollea will suffer irreparable harm unless a permanent injunction is entered to prohibit further public dissemination of the explicit content of the Gawker Video and the 30-Minute Video… The publication of the explicit contents of Gawker Video or the 30-Minute Video would constitute an invasion of Mr. Bollea's privacy and violation of Florida law accompanied by extensive harm which an award of monetary damages is insufficient to address." (*See* Permanent Injunction ¶¶ 42, 50, 51.) This Court also specifically found that:

> While the jury's award of compensatory damages represents an attempt to redress the harm and injuries Mr. Bollea suffered in the

> past as a result of the posting of the Gawker Video, several factors
> require that an injunction issue to prohibit any further distribution
> of explicit audio or visual footage of Mr. Bollea engaged in sexual
> activity in a private bedroom. …. Second, Gawker defendants
> continue to possess additional footage of Mr. Bollea, including the
> full 30-Minute Video that they received, the contents of which
> have never been made public. (Permanent Injunction ¶ 52)

Accordingly, this Court permanently enjoined Mr. Daulerio from publicly posting,

publishing, broadcasting, or disclosing any nudity or sexual activity, whether video or audio,

contained in the Gawker Video or 30-Minute Video.    However, the Court also reserved

jurisdiction to enforce the Permanent Injunction, and to issue additional relief, including, but not

limited to, an order requiring that Mr. Daulerio and the other Gawker Defendants deliver all

copies of the Gawker Video or the 30-Minute Video, or any excerpts thereof, to Mr. Bollea

and/or his counsel. (Permanent Injunction p. 9, ¶ 2)  The Permanent Injunction has not been

stayed pending appeal.

Mr. Daulerio's desperate situation and his above-quoted threats clearly establish that he

still does not respect the verdict or this Court's authority, and does not fear the consequences of

violating Florida law or this Court's Permanent Injunction.  Mr. Daulerio has possession of the

subject recording, and is more than prepared to release it and then "go into hiding."

Mr. Daulerio also knows that doing so would be wrong, but believes he has nothing to lose.

Given the overall content and context of Mr. Daulerio's September 28, 2016, interview,

in which he states that he will never settle with Mr. Bollea and that Mr. Bollea needs to stop

collection efforts against him, while at the same time threatening the release of the entire 30-

minute video, Mr. Daulerio's conduct also amounts to extortion under Florida law.    Florida

Statute section 836.05 provides:

> **Threats; extortion.**—Whoever, either verbally or by a written or
> printed communication, maliciously threatens to accuse another of
> any crime or offense, or by such communication *maliciously*

> *threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another*, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or *any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will*, shall be guilty of a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

If Mr. Daulerio were allowed to follow through on his threats, he also would violate Florida's Video Voyeurism Law, section 810.45, Florida Statutes. Under § 810.145(3), a person "commits the offense of video voyeurism dissemination if that person, knowing or having reason to believe that an image was created [with a secret camera], intentionally disseminates, distributes, or transfers the image to another person for the purpose of amusement... or for the purpose of degrading or abusing another person." The jury and this Court already concluded that Mr. Bollea was secretly recorded naked and having sex in a private bedroom. (Permanent Injunction ¶ 11) The jury and this Court also concluded that Mr. Daulerio knew or had reason to know that Mr. Bollea was recorded without his knowledge or consent. (Permanent Injunction ¶ 12)

Florida law allows its courts to prevent violations of criminal laws. *Mid-American Waste Systems v. City of Jacksonville*, 596 So.2d 1187, 1189 (Fla. 1st DCA 1992). That authority should be exercised to prevent Mr. Daulerio from engaging in revenge porn, extortion and video voyeurism.

Through this motion, Mr. Bollea seeks to enforce the Permanent Injunction, while simultaneously seeking protection under Florida's Revenge Porn, Video Voyeurism and Extortion Laws. A bond is not required for a permanent injunction entered upon a final decree. *International Longshoreman's Assoc., Local 146, AFL-CIO v. Eastern Steamship Lines, Inc.*,

206 So.2d 473 (Fla. 3d DCA 1968). Accordingly, a bond should not be required in connection with the relief sought herein.

However, to the extent the relief sought herein could be characterized as temporary injunctive relief, Mr. Bollea is prepared to post a bond. The purpose of an injunction bond is to provide sufficient funds to cover the adverse party's costs and damages if the injunction is wrongly issued. *Longshore Lakes Joint Venture v. Mundy*, 616 So.2d 1047 (Fla. 2d DCA 1993). When setting the bond, the trial court may also consider other factors, including the adverse party's chances of overturning the temporary injunction. *Id*.

Here, Mr. Daulerio has already been permanently enjoined from publishing the materials that Mr. Bollea seeks to have returned and deleted. Mr. Daulerio's potential damages, if any, are *de minimus*.[8] His prospects of overturning the relief requested herein are equally miniscule, particularly given the Permanent Injunction and recent enactment of Florida's Revenge Porn Law. Consequently, if a bond is required, it should be no greater than $10,000.

## CONCLUSION

Time and time again, Mr. Daulerio has proven that he is an angry "buccaneering fellow" who thumbs his nose at the law and cannot be trusted. He should not be given the opportunity to violate Florida's Revenge Porn, Video Voyeurism and Extortion Laws, as well as the Permanent Injunction. To prevent such misconduct, Mr. Daulerio should not be permitted to retain any copies or excerpts of any sexually explicit footage, images or recordings of Mr. Bollea, including, but not limited to, the Gawker Video and 30-Minute Video. Moreover, Mr. Daulerio should be required to appear before this Court and verify under oath that he: (1) has turned over to Mr. Bollea's counsel any and all hard copies (*i.e.,* CDs, DVDs, thumb drives) of sexually

---

[8] Mr. Daulerio's counsel of record still has a copy of the subject footage, so requiring Mr. Daulerio to return and delete his copy/copies will not cause any harm, including for purposes of any pending appeals.

explicit video and audio recordings (including all excerpts thereof and still images) of Mr. Bollea which he possesses; (2) has permanently deleted or otherwise destroyed any and all electronically stored (*i.e.,* computer files, files stored on the cloud) copies of such recordings, excerpts and images within his possession or control; (3) has no access, or ability to access, any such recordings, excerpts and images; and (4) verify before this Court the identity of every person to whom he has ever personally transmitted or afforded access to such recordings, excerpts and images.

## Basis for Emergency Relief

The undersigned hereby certifies that Mr. Bollea seeks the relief set forth herein on an emergency basis because, as recognized in Florida Statute Section 784.049 and this Court's Permanent Injunction, the publication of explicit images of Mr. Bollea on the Internet will cause irreparable and significant psychological harm and create a permanent record of such images worldwide that can be easily reproduced and shared. Moreover, given Mr. Daulerio's past conduct, current legal and financial situations, mental state, obvious animosity toward Mr. Bollea, plan to release the footage, and expressed belief that the entire 30-Minute Video is "completely newsworthy at this point," there is a significant and substantial likelihood that Mr. Daulerio will release the footage at any time.

*/s/ Shane B. Vogt*
Kenneth G. Turkel, Esq.
Florida Bar No. 867233
Shane B. Vogt
Florida Bar No. 0257620
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: (813) 443-2199
Fax: (813) 443-2193
Email: kturkel@bajocuva.com
Email: svogt@bajocuva.com

-and-

Charles J. Harder, Esq.
PHV No. 102333
HARDER MIRELL & ABRAMS LLP
132 South Rodeo Drive, Suite 301
Beverly Hills, CA  90212-2406
Tel: (424) 203-1600
Fax: (424) 203-1601
Email:  charder@hmafirm.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by E-mail via the e-portal system, this 6th day of October, 2016, to the following:

Gregg D. Thomas, Esquire
Rachel E. Fugate, Esquire
Thomas & LoCicero PL
601 S. Boulevard
Tampa, Florida 33606
gthomas@tlolawfirm.com
rfugate@tlolawfirm.com
kbrown@tlolawfirm.com
abeene@tlolawfirm.com
*Counsel for Gawker Defendants*

Seth D. Berlin, Esquire
Paul J. Safier, Esquire
Alia L. Smith, Esquire
Michael D. Sullivan, Esquire
Levine Sullivan Koch & Schulz, LLP
1899 L. Street, NW, Suite 200
Washington, DC 20036
sberlin@lskslaw.com
psafier@lskslaw.com
asmith@lskslaw.com
msullivan@lskslaw.com
*Pro Hac Vice Counsel for*
*Gawker Defendants*

Steven L. Brannock, Esquire
Celene H. Humphries, Esquire
Brannock & Humphries
1111 West Cass Street, Suite 200
Tampa, FL 33606
sbrannock@bhappeals.com
chumphries@bhappeals.com
eservice@bhappeals.com
*Co-Counsel for Gawker Defendants*

Michael Berry, Esquire
Levine Sullivan Koch & Schultz, LLP
1760 Market Street, Suite 1001
Philadelphia, PA 19103
mberry@lskslaw.com
*Pro Hac Vice Counsel for*
*Gawker Defendants*

David R. Houston, Esquire
Law Office of David R. Houston
432 Court Street
Reno, NV 89501
dhouston@houstonatlaw.com
krosser@houstonatlaw.com

Stuart C. Markman, Esquire
Kristin A. Norse, Esquire
Kynes, Markman & Felman, P.A.
Post Office Box 3396
Tampa, Florida 33601
smarkman@kmf-law.com
knorse@kmf-law.com
plawhead@kmf-law.com
*Appellate Co-Counsel for Plaintiff*

/s/ Shane B. Vogt
Attorney

# EXHIBIT A

## to Plaintiff's Emergency Motion to Enforce Permanent Injunction and Prevent A.J. Daulerio from Engaging in Revenge Porn, Extortion and Video Voyeurism

***ELECTRONICALLY FILED 10/06/2016 03:36:16 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

```
1    IN RE:  TERRY BOLLEA VS. GAWKER MEDIA, LLC

2    CASE NO.:  12012447C1011
     ------------------------------------------------
3

4

5

6

7

8                   LONGFORM PODCAST OF

9            AARON LAMMER AND A.J. DAULERIO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   (Thereupon:)

 2                MAX:  It's Max.  Before we get

 3        started, I want to tell you quickly about a

 4        new sponsor we've got on the show.  It's

 5        the School of the Art Institute of Chicago,

 6        specifically their masters in new arts

 7        journalism program.

 8                If you want to learn how to write

 9        about the arts, if you want to learn how to

10        be a cultural critical, this is the program

11        for you.  You're going to do it in Chicago,

12        land of fantastic art, and you're not just

13        going to learn how to write, they're going

14        to teach you how to use the full Adobe

15        Suite, you're going to get the basics on

16        HTML and CSS, you can build your own

17        websites, you can learn to write for the

18        internet, not a thing that everyone is

19        teaching you.

20                The application for this program is

21        February 1st.  If you want some more

22        information, go to SAIC.EDU/longform.

23        That's SAIC.EDU/longform.  Go spend a

24        couple of years in Chicago, learn how to

25        write about art, but for now, listen to the
```

```
 1    podcast.

 2           MR. LAMMER:  Hey.

 3           MAX:  Hello, Aaron Lamer.

 4           MR. LAMMER:  Hi.  Hi Max.  Hello

 5    from Detroit.

 6           MAX:  Welcome to your own podcast.

 7           MR. LAMMER:  Good to be back.

 8           MAX:  You were in Detroit, Michigan.

 9    Evan is also on the road.  I am all alone

10    in the studio.  That's lonely, man.  I'm

11    sad here.

12           MR. LAMMER:  I'll tell you this,

13    when I pick up the call, and I hear you on

14    this line, Evan could have been sitting

15    there the whole time, I wouldn't know.

16           MAX:  It's basically a normal intro.

17           MR. LAMMER:  But actually I've been

18    trying to pick up an interview here and

19    there along my path, and this is the first

20    one I've done.  I did it in Los Angeles,

21    and it was with A.J. Daulerio, a guest that

22    I know you've wanted to get on for some

23    time, Max.

24           MAX:  I'm excited that A.J. is on

25    the show.  Anyone who is listening to this
```

 1   show probably knows about A.J.'s time as

 2   the editor of Gawker, and he's been in the

 3   news.  He was the editor who decided to run

 4   the Hulk Hogan sex tape.  He's named in

 5   Hulk Hogan's suit.  He currently has a

 6   massive lien against his bank account, and

 7   it's really exciting to have him on the

 8   show.

 9        It sounds like, Aaron, he sort of

10   wanted to talk about what this has been

11   like for him.

12        MR. LAMMER:  Yeah, I mean, I think

13   people who are interested in the purely

14   legal story, it's been pretty well

15   reported, but I think we're the first

16   people that he's talked to about the

17   personal side of what this has meant for

18   him and what it means for journalism and

19   other people who could end up involved in a

20   similar experience.

21        So it's a bit of a cautionary

22   episode, but I really appreciate him doing

23   it, I appreciate him choosing to do it with

24   us, and I'm really excited for who will

25   hear this.

1        MAX:  I don't want to take too much

2  of their time, but quickly, Aaron, we have

3  a pair of sponsors.

4        MR. LAMMER:  Tell me more.

5        MAX:  It's that time of year again,

6  my friend.  It's FIFA time.

7        MR. LAMMER:  Oh, my God, it's my

8  favorite holiday.  I was actually

9  wondering, because you'll notice that our

10  FIFA playing has trailed off a little bit.

11  We've been in the offseason here.  Been

12  waiting for somebody to motivate us, get

13  back on the court, now -- now we're there.

14        MAX:  We are there.  The latest

15  version of FIFA from EA Sports, our

16  favorite video game for now, what, like --

17  how long were you playing this game, 15

18  years you and I have been playing FIFA.

19        MR. LAMMER:  At least.

20        MAX:  It's something absurd.  The

21  latest version came out yesterday.  I can't

22  really describe it to you.  It's like --

23  it's FIFA, Aaron.  The new FIFA is here.

24  It's great.

25        MR. LAMMER:  They just keep making

```
 1   it better and better.  It's got the updated
 2   players, all -- all the stuff you've come
 3   to expect from what is in my opinion the
 4   greatest video game sports franchise of all
 5   time.
 6        MAX:  Absolutely.  I can tell you
 7   this, I have been playing.  It's not the
 8   same not being in the same room with you
 9   and playing, but even by myself, it's
10   equally addictive.  FIFA is back in my
11   life.
12        MR. LAMMER:  How old does your son
13   have to be for us to get him on it, on the
14   controller?
15        MAX:  I've been -- I've been handing
16   him the controller, and he just kind of
17   mashes the buttons, and he's like almost as
18   good as we are.
19        MR. LAMMER:  Well, thank you FIFA,
20   supporters from the very beginning.
21   We really appreciate it.  Go check that out
22   FIFA 17.
23        MAX:  I'll tell you another --
24   another group of good people who have been
25   with us from the very beginning, Aaron,
```

1   it's MailChimp.

2       MR. LAMMER:  Actually, I just sent

3   off a MailChimp email or a little project

4   I'm doing.  I'm on a Canadian little Wi-Fi

5   download, it's very, very slow, and

6   I really have to think about every single

7   web page that I load, because I have to pay

8   by the megabyte for it.  I was never

9   happier to be with MailChimp, they make

10  everything so simple, there was no hiccups,

11  there was no going back and fixing stuff.

12  Straight out the door best email provider

13  in the game.  Thank you MailChimp.

14      MAX:  Okay.  Here's Aaron with A.J.

15  Daulerio.

16      MR. LAMMER:  Feel good?

17      MR. DAULERIO:  Yeah, yeah, I mean,

18  I have to like go through this process

19  where I'm like don't be glib, don't be

20  glib, don't be glib.

21      MR. LAMMER:  Is that out of a

22  self-preservation -- is that -- is that

23  like a -- is that you don't want to be glib

24  or you don't want to come across as glib?

25      MR. DAULERIO:  I don't want to come

A.J. Daulerio

8

 1   across as glib.  I mean, I -- I know that a

 2   lot of the way I've answered things in the

 3   past, I mean, it's a lot of

 4   self-deprecation and sarcasm, so I'll try

 5   to answer things as directly as possible.

 6         MR. LAMMER:  Well, I mean, I feel

 7   like very few people end up in a position

 8   where the glibness of their commentary can

 9   have repercussions deep into their life

10   like this.

11         MR. DAULERIO:  That's true.  Yeah,

12   I definitely didn't anticipate this, this

13   is -- you never get presented with

14   something along those lines where how you

15   are, where you've worked, things that

16   you've said can, you know, bankrupt a

17   company and also just like leave you with

18   $115 million in debt to a professional

19   wrestler at this point.

20         MR. LAMMER:  Okay.  So how many

21   years of your life has this been the

22   dominant theme of now?

23         MR. DAULERIO:  Well, it's -- I left

24   Gawker in January 2013, but I think

25   it really started about September of 2013

 1   where the invisible handcuffs started to

 2   come on --

 3       MR. LAMMER:  Yeah.

 4       MR. DAULERIO:  -- and that any

 5   conversations I would have with the lawyers

 6   that were representing Gawker in this case,

 7   it was always bad news, and it was always

 8   there's another worse case scenario,

 9   another bad day in court.  And, you know,

10   the original defendant list which I believe

11   was eight or nine had gone down to just

12   myself and Nick and Gawker Media.

13       And, you know, then there was some

14   paranoia that had set in, I believe, at

15   that point, and this was always something

16   that was looming, and it wasn't something

17   that was constant, it was something that

18   every three weeks or so I would have a

19   conversation with the lawyers who would

20   tell me that they need more emails, they

21   need my computers, they need my phone, they

22   need me to remember things in a certain

23   way.

24       I mean, all the stuff that goes into

25   kind of at least constructing what would be

```
 1    a -- a case, but also being a little bit on

 2    the outside of it, because I was no longer

 3    working at Gawker Media, and I think the

 4    interpretation by some of the lawyers was

 5    that I was a minor player in this.

 6         MR. LAMMER:  Yeah.

 7         MR. DAULERIO:  Especially if it's

 8    something that's a civil suit, I don't have

 9    a $100 million.  I was employed by this

10    company.

11         MR. LAMMER:  At what point did you

12    realize that a person might be liable for

13    the journalistic actions of a company?

14         MR. DAULERIO:  I -- I still don't

15    know the answer to that, because I'm --

16    because I'm still -- we're at the beginning

17    stages of another part for me, and it still

18    has this -- this creep factor to it,

19    somehow getting $115 million is basically

20    falling squarely on my head, because, you

21    know, Gawker and Nick have both declared

22    bankruptcy, and I think the feeling was,

23    was that, well, they're not going to go

24    after me personally at this point.

25         MR. LAMMER:  Yeah, because your
```

 1   assets are not in the $115 million range.

 2       MR. DAULERIO:  No, nor are Gawker's

 3   or Nick's for that matter, but obviously,

 4   I mean, there's more at play here.  The

 5   trial is kind of irrelevant into what's

 6   happening now, because what's happening now

 7   is obviously Peter Thiel is bank rolling

 8   this revenge plot, and the lawyers on the

 9   other side have to -- this is what

10   unlimited billable hours do, keep these

11   things tied up.

12       MR. LAMMER:  Right.

13       MR. DAULERIO:  They can do all these

14   things.  All these things that are

15   happening to me in terms of just what

16   someone sees as harassment or bullying, I

17   mean, are perfectly legal.  I mean, are --

18   are they ethical?  I don't know, I can't

19   answer that, but --

20       MR. LAMMER:  It's a technique that

21   actually could be applied outside

22   journalism also.  It's sort of a dangerous

23   part of the American justice system, is

24   there's no real penalty for jamming it.

25       MR. DAULERIO:  Yeah, and, you

 1   know --

 2        MR. LAMMER:  A filibuster.

 3        MR. DAULERIO:  And you know, that's

 4   the part of it that's extremely tough to

 5   process, is that, you know, after going

 6   through the theatricality of that trial and

 7   the traumatic experience that was that

 8   trial for, I think, everyone involved, and

 9   then to try to move on, and I -- as soon as

10   I began to start to think about what would

11   be the next phase of my life, this whole

12   $115 million judgment comes crashing down

13   on my head, and I don't know why.

14        I think the only reason why that

15   happens, and I'm sure the other side has

16   their theories as well, that is what's --

17   this money that is being bankrolled by

18   Peter Thiel is affording these guys to do,

19   which is to try to drive a wedge between

20   myself and Gawker, to try to just, you

21   know, pin what's happening to me on like

22   how Gawker betrayed me or how these guys

23   left you out to dry.

24        And -- and the one thing that's been

25   important to me and which was actually the

1  good part of this phase, if there is a good

2  part, is that I've also had to kind of take

3  on my own lawyers at this point, obviously

4  without any money, so there's been a lot of

5  pro bono work done on my behalf at this

6  point, but the first couple of lawyers that

7  I talked to, I told them, just like, look,

8  your job is to say no to these people.

9       Like I'm -- as much as they want to

10  kind of hold my life hostage right now and

11  any kind of settlement talks begin and end

12  for them with an NDA and confidentiality

13  agreement, and I won't do that.

14       MR. LAMMER:  Confidentiality around

15  what?

16       MR. DAULERIO:  What -- talking about

17  the case, talking about the trial.

18       MR. LAMMER:  Okay.

19       MR. DAULERIO:  Anything -- anything

20  that -- anything that --

21       MR. LAMMER:  Like the very

22  conversation we're having right now --

23       MR. DAULERIO:  Absolutely.

24       MR. LAMMER:  -- would be -- would be

25  restricted by it.

```
 1          MR. DAULERIO:  Yeah, the way -- the
 2   way this is set up is basically just like
 3   maybe this will come back to bite me in the
 4   ass.
 5          MR. LAMMER:  Yeah.
 6          MR. DAULERIO:  I mean, absolutely
 7   will.  My thought process at this point is
 8   just like, okay, well, I have $115 million
 9   hanging over my head.  They're treating
10   it like it's 10 grand and they're trying to
11   collect --
12          MR. LAMMER:  Yeah.
13          MR. DAULERIO:  -- and acting like,
14   yes, I -- I -- and of course, legal, I do
15   owe this money, and up until the appeals
16   process, they can do very, you know,
17   aggressive and invasive things in order to
18   try to collect on that.
19          MR. LAMMER:  Have they done invasive
20   things to try to collect?
21          MR. DAULERIO:  Yeah, of course.
22          MR. LAMMER:  Yeah.
23          MR. DAULERIO:  I went through a
24   whole, you know, what they call a financial
25   colonoscopy which, you know, required me to
```

```
 1   go through my last four months of spending

 2   habits, and anything over $100 they then

 3   grilled me about, trying to kind of what

 4   I call like "dad me up" over like my

 5   spending habits over the last six months.

 6         MR. LAMMER:  Yeah.

 7         MR. DAULERIO:  Like acting like,

 8   well, you should have been saving for this

 9   $115 million judgment.

10         MR. LAMMER:  Saving -- saving so you

11   can get another couple of thousand dollars

12   out toward them on the -- yeah.

13         MR. DAULERIO:  Exactly, and he was

14   like, you know, well, jeez, you shouldn't

15   have spent $100 on golf, and you should

16   have bought yourself a lawyer at this

17   point.

18         MR. LAMMER:  Yeah.

19         MR. DAULERIO:  And I'm like, you

20   know, that's the part that's frustrating.

21         MR. LAMMER:  Yeah.

22         MR. DAULERIO:  Because look, he's

23   doing his job, but his job right now is to

24   be an asshole to me.

25         MR. LAMMER:  Yeah.
```

```
 1          MR. DAULERIO:  And that's the part

 2    that obviously I got in trouble in my first

 3    deposition in terms of not reacting well,

 4    so I have to kind of go into that to kind

 5    of be bullied in some capacity by attorneys

 6    who have -- are trying to get information

 7    that they're legally allowed to do, but I'm

 8    waiting for logic to prevail.  I'm waiting

 9    to just like have him say, just like, oh,

10    well, this doesn't make any sense, you

11    clearly don't have $115 million.

12          MR. LAMMER:  Right.

13          MR. DAULERIO:  And the appeals

14    process is coming, and we will wait until

15    that point.

16          MR. LAMMER:  And declaring

17    bankruptcy would mean you don't get the

18    opportunity to make this appeal?

19          MR. DAULERIO:  In order for me to

20    declare bankruptcy to protect my thousand

21    dollars that was in my checking account at

22    that time --

23          MR. LAMMER:  Yeah.

24          MR. DAULERIO:  -- would cost me

25    about 30 grand to hire a bankruptcy
```

```
 1   attorney, and every bankruptcy attorney,

 2   I mean, was excellent in terms of being

 3   very transparent about the fact that just

 4   like, you know, you are against a very

 5   aggressive plaintiff right now.

 6        $115 million judgment which could be

 7   disputed in bankruptcy court, so you're

 8   essentially going in to file for

 9   bankruptcy, and then potentially have it

10   unblocked.  You'll spend 100 grand to

11   protect your $1,000 or this $115 million

12   you still may owe, and you'll also lose

13   your representation in Florida.

14        That was what was -- I was told

15   really at last minute type of situation,

16   because I mean, ultimately I'm operating

17   under the assumption that because I am

18   indemnified by Gawker that -- and they're

19   not going to come after me personally for

20   this at this point, at this juncture, that

21   this was not something I necessarily had to

22   concern myself with, and, you know,

23   I was -- I may have been naive about that,

24   I don't know, I don't know --

25        MR. LAMMER:  Yeah.
```

 1          MR. DAULERIO:  -- it all happened so

 2    quickly.

 3          MR. LAMMER:  I mean, they didn't

 4    even offer you advice about this.

 5          MR. DAULERIO:  Exactly, there were

 6    so many conflicts at that point.

 7          MR. LAMMER:  Oh, when I was sued for

 8    $115 million here was my game plan.

 9          MR. DAULERIO:  Well, that -- and

10    that -- and that was the part where it's

11    just like you're still having these

12    discussions with these attorneys, the

13    attorneys that have been representing

14    myself and Gawker throughout this whole

15    entire time whom I've gotten to know fairly

16    well, obviously, for the past three years,

17    and who are trying to explain to me, you

18    know, well, if you file for Chapter 7

19    bankruptcy -- filing for Chapter 7

20    bankruptcy, it's not easy.  It's not

21    something --

22          MR. LAMMER:  Yeah, it's not supposed

23    to be easy.

24          MR. DAULERIO:  It's not something

25    where, you know, a Turbo Tax situation.

```
 1    It's some pretty dense paperwork --
 2          MR. LAMMER:  Yeah.
 3          MR. DAULERIO:  -- that, I mean,
 4    if I screw up will then possibly come back
 5    to haunt me, and I'm -- and I'm weighing
 6    all these options, and I'm still like, you
 7    know, why is this happening.
 8          And then 24 hours, less than that,
 9    I get an alert from Chase Bank, who is very
10    good about their alerts, that there is a
11    hold on my bank account for $230 million,
12    which was put thereby Pinellas County
13    Courthouse courtesy of one Terry Bollea,
14    and I'm like, okay, now what do you do.
15          MR. LAMMER:  Right.
16          MR. DAULERIO:  And it was -- it was
17    funny, because Chase had like said
18    something in the lines, well, we're waiving
19    the processing fee, I'm like all right.
20    These guys are excellent, but at that point
21    when you're looking at this number, which
22    looks like a pinball score --
23          MR. LAMMER:  Yeah.
24          MR. DAULERIO:  -- and there's --
25    well, do I get overdraft fees for -- how do
```

```
 1   I -- do I stop banking there?  Everything
 2   just freezes.
 3        MR. LAMMER:  Yeah.
 4        MR. DAULERIO:  And so then I have no
 5   access to kind of get any money to any
 6   perspective lawyers, I have like
 7   everything --
 8        MR. LAMMER:  And you were living in
 9   Florida at the time.
10        MR. DAULERIO:  I was living in
11   Florida at an Airbnb which I had rented and
12   paid in advance for, which was -- my lease
13   was running out soon, but it was not really
14   that was the problem, in was more that that
15   number, it was just like, okay, everything
16   that was told to me from the beginning
17   about that this would not actually impact
18   me personally --
19        MR. LAMMER:  Yeah.
20        MR. DAULERIO:   -- was bullshit.
21        MR. LAMMER:  Yeah.
22        MR. DAULERIO:  And that at this
23   point this is what we see is what could
24   potentially happen to someone else.
25        MR. LAMMER:  Yeah.
```

```
 1          MR. DAULERIO:  The one part that
 2   I think that most -- I would be very happy
 3   to be a journalist right now in this time
 4   period, because you can see exactly where
 5   the monsters are.
 6          MR. LAMMER:  Yeah.
 7          MR. DAULERIO:  Regardless of just
 8   thinking of what you think of me or what
 9   you think of Gawker, you can see that
10   Charles Harder who is basically the firm
11   that, you know, is representing Hulk Hogan,
12   his business is booming right now.
13          MR. LAMMER:  Yeah, he's representing
14   all kinds of -- he's got --
15          MR. DAULERIO:  Exactly.
16          MR. LAMMER:  Yeah, he's got the
17   Trump's got -- got -- I mean --
18          MR. DAULERIO:  Yeah, and this isn't
19   going to stop any time soon.
20          MR. LAMMER:  Yeah.
21          MR. DAULERIO:  And I think that most
22   people who are just going -- critical of
23   Gawker or any of (Inaudible), I hope it's
24   out of their system.
25          MR. LAMMER:  Yeah.
```

```
 1        MR. DAULERIO:  Because, you know,

 2   right now, I mean, especially just with the

 3   hints that, you know, Roger Ailes is going

 4   after Gabriel Sherman and New York Magazine

 5   and stuff like that.

 6        MR. LAMMER:  Yeah.

 7        MR. DAULERIO:  It's clearly not just

 8   a Gawker problem anymore.

 9        MR. LAMMER:  Yeah.

10        MR. DAULERIO:  And that's the part

11   that -- it's worthwhile for people to know

12   that somebody has to stop it.

13        MR. LAMMER:  Yeah.

14        MR. DAULERIO:  And the only way to

15   actually stop it is for journalists to do

16   their job at this point, but I also

17   understand how tough it is for publishers

18   in this environment who are going to kind

19   of just like actually have to make a

20   decision where it's just like, okay,

21   if we are going to say something negative

22   about someone who is powerful or actually

23   has access to Charles Harder's law firm at

24   this point, is that worth the risk, is that

25   worth the story, and that's something that
```

 1   is, I think, has not been as black and

 2   white as it is right now.

 3        MR. LAMMER:  Well, I think it would

 4   be -- it's interesting, I didn't even draw

 5   the connection.  Gabriel Sherman was on the

 6   show two weeks ago, three weeks ago.

 7        MR. DAULERIO:  Uh-huh, right.

 8        MR. LAMMER:  So we potentially have

 9   two guests in a one-month span who are both

10   going to be the subjects of lawsuits from

11   the same law firm.  It -- it shows you that

12   with enough money, these lawsuits can be an

13   exponential force.  It's not a hard to

14   scale operation --

15        MR. DAULERIO:  Yeah.

16        MR. LAMMER:  -- suing people in

17   these sorts of situations.  It doesn't

18   discriminate journalistically across a wide

19   spectrum of different forms of journalism.

20   I mean, the things that Gabriel Sherman is

21   reporting is that Ails probably had him

22   tailed, had him investigated.

23        MR. DAULERIO:  Yeah.

24        MR. LAMMER:  And may have discussed

25   killing him.

 1        MR. DAULERIO:  Right.

 2        MR. LAMMER:  Yeah.

 3        MR. DAULERIO:  There's people -- all

 4   the people who said there's a conversation

 5   in the room where Ails talked about killing

 6   him, that should be more on people's mind

 7   as a sort of a check on who has more power

 8   in this balance.

 9        MAX:  Hey, I'm going to pause things

10   here to give you a quick word from our

11   sponsor, Casper.  Casper is a sleep brand

12   that created one perfect mattress and

13   sells it directly to consumers eliminating

14   the commission-driven inflated prices that

15   you probably have experienced in some kind

16   of a warehouse.

17        It's an award winning sleep surface

18   developed in house, has a sleek design, and

19   it's delivered in a small

20   how-did-they-do-that-sized box.  In

21   addition to the mattress, Casper also

22   offers an adaptive pillow and soft

23   breathable sheets.  This is a pack that

24   will have you sleeping better immediately.

25   It's a pack with latex and supportive

```
 1   memory foam.  It's a pack that costs a lot
 2   less than you pay almost anywhere.
 3       You're usually going to pay over
 4   1,500 bucks for a mattress.  Casper's range
 5   from 500 for a twin up to 850 for a queen,
 6   950 for a king.  Anyway, buy a Casper
 7   mattress.  It's completely risk free.  You
 8   can keep it for one hundred nights with
 9   absolutely no obligation.
10       If you don't it, they'll pick it up
11   for you, but I think you're really going to
12   like it, and I think it's going to change
13   the way you sleep.  So I encourage you to
14   go to Casper.com/longform.  You get 50
15   bucks off any mattress, and you'll be
16   supporting the show.
17       Again, Casper.com/longform.  Use the
18   offer code "longform," support Longform and
19   sleep so much better today without the
20   hassle.  Thank you, Casper.
21       Our next sponsor is Texture.
22   Texture has put all of the magazines you
23   love in one superconvenient place.  Where
24   is that place?  The Texture app.  They let
25   you tap into the world's most popular
```

1   magazines anytime, anywhere using your

2   smart phone or tablet.

3        You can breeze through hundreds of

4   your favorite magazines including back

5   issues and pick the articles that interest

6   you most.  I'm just browsing through this

7   list here, Bloomberg Business Week, ESPN

8   the Magazine, Hollywood Reporter.

9        If you read Longform, you're going

10  to recognize a lot of these magazines, and

11  you're going to enjoy them.  Texture has

12  made it easy to find the articles you care

13  about.  I don't get just the magazines,

14  I also get recommendations from the Texture

15  editorial team, plus deeper dive personal

16  collections.

17       Anyway, I really like it.  Sign up

18  for Texture right now and gain insider

19  access to all the content from the world's

20  best publications, Texture.com/Longform.

21  That's right, you go there, you get a free

22  trial.  It doesn't cost anything.  Again,

23  Texture.com/Longform, gain immediate entry

24  to all the top magazines and start binge

25  reading today.  Thank you, Texture.

       1            MR. LAMMER:  How did you come to
       2    Gawker in the first place?
       3            MR. DAULERIO:  I originally came to
       4    Gawker back in 2005.
       5            MR. LAMMER:  Yeah.
       6            MR. DAULERIO:  And that was to --
       7            MR. LAMMER:  Simpler times.
       8            MR. DAULERIO:  Yeah, definitely,
       9    and, you know, I was there to run a now
      10    dead gambling blog called Odd Jack.  Got
      11    the job not based off of anything that
      12    I knew about gambling or poker.  I tried to
      13    mimic what I thought was a Gawker voice at
      14    the time, and Lockhart had offered me that
      15    job, then he fired me six months later when
      16    there was no traffic on that cite.
      17            I mean, it was the total blogger in
      18    Odd Jack.  I mean, there was this thing
      19    they used to do initially back in the 2005
      20    era where mostly you were paid per post
      21    (Inaudible) at the end of the month.
      22    If you were under a certain threshold, you
      23    got maybe half your pay.
      24            So at the end of the month there
      25    would always be this routine where there

28

 1   would be three days left, and I would be

 2   like 85 posts short.  So then I would

 3   frantically basically do lines on every

 4   single college football game there was

 5   between Division I and III and just throw

 6   them up in this mad dash to basically get

 7   paid that month.

 8         And, yeah, I used to always get

 9   those kind of just very bemused emails from

10   Lockhart at the end of the month, basically

11   just like, wow, you hit the quota right on

12   the nose again, which, you know, they let

13   me slide with.

14         But when I was at Deadspin the

15   second time around, I just had a vision for

16   Deadspin that just like we were going to

17   have a blog site, we were going to have a

18   longer form side.  I mean, we had already

19   started to put those things together.

20         I knew I could get traffic, I knew

21   I could do the scummy stuff that Will

22   wouldn't touch --

23         MR. LAMMER:  Yeah.

24         MR. DAULERIO:  -- and we would have

25   no qualms about it, because that was the

1   business part of it for me.  The writing

2   part, we wanted to have a site where

3   basically those things could live in the

4   same world.

5         MR. LAMMER:  Yeah, I was a Gawker

6   reader, I've always read this stuff.

7   I always kind of felt like the dirtier,

8   scummier stuff was going to like stain the

9   good work that was done.

10         MR. DAULERIO:  Right.

11         MR. LAMMER:  Not bring down the

12   whole ship in a -- in a -- you know, in a

13   flaming disaster.  So as that duality was

14   something you were building --

15         MR. DAULERIO:  Yeah.

16         MR. LAMMER:  -- did you ever sort of

17   say -- like look at whether it's the tips

18   box and the stuff is going in, kind of, you

19   know, hunting for scandal really.

20         MR. DAULERIO:  Right, yeah.

21         MR. LAMMER:  Like, oh, God, we could

22   go too far, this could be a problem.  Was

23   that even like in the room as that stuff

24   was building up?

25         MR. DAULERIO:  Well, it's kind of

```
 1    interesting you say that, because I think
 2    that every Gawker editor at some point has
 3    a moment where they're staring over a
 4    cliff --
 5           MR. LAMMER:  Yeah.
 6           MR. DAULERIO:  -- in terms of just,
 7    you know, very hesitant about pushing the
 8    "publish" button knowing that there's going
 9    to be some blow back.
10           MR. LAMMER:  Yeah.
11           MR. DAULERIO:  And either -- and
12    then there could be a story, especially,
13    and this was kind of at the -- at the time
14    I remember the moment when Gizmodo broke
15    the iPhone 4 story.
16           MR. LAMMER:  Totally.
17           MR. DAULERIO:  And I was in awe of
18    them.  I was just like this is the greatest
19    thing I've ever seen in my entire life.
20    The news cycle has stopped and is
21    absolutely focusing on this story, and, you
22    know, obviously, they got a lot of flack
23    for it, too --
24           MR. LAMMER:  Yeah.
25           MR. DAULERIO:  -- and were
```

```
 1   criticized for it, but everyone was talking

 2   about it.

 3        MR. LAMMER:  Apple sent the police,

 4   right, to --

 5        MR. DAULERIO:  Yeah, DC10, they

 6   broke down his door.

 7        MR. LAMMER:  Yeah.

 8        MR. DAULERIO:  And, you know, as bad

 9   as that was, I mean, I'm like sitting there

10   just like absolutely just like so envious.

11        MR. LAMMER:  Yeah.

12        MR. DAULERIO:  And I'm just like,

13   God, I wish I could do something that would

14   absolutely have that type of impact.

15        MR. LAMMER:  It felt like sort of

16   breaking the journalistic fourth wall where

17   I was like --

18        MR. DAULERIO:  Yeah.

19        MR. LAMMER:  -- I thought this is

20   all supposed to be like --

21        MR. DAULERIO:  Right.

22        MR. LAMMER:  -- page view fun and

23   games here, no one was supposed to like

24   SWAT someone.

25        MR. DAULERIO:  Exactly, and that
```

```
 1   was -- and that was a part, but I mean,
 2   it was just like, you know, all -- like all
 3   of the publications that I had admired
 4   going into it like always had that whiskey
 5   feel to it.
 6        I mean, just like I said, Jeff
 7   Koyen's New York Press was so influential
 8   just because of him, and I remember having
 9   this moment where he took me up to Lit,
10   that bar on the Lower East Side at one
11   point, and he was about to publish, but
12   it was this full issue dedicated to the
13   assassination of George W. Bush, and the
14   whole issue was dedicated to if that had
15   happened.
16        And it was -- like my eyes lit up.
17   I was just like, man, this is like the
18   coolest thing I've ever seen in my entire
19   life, and like, I mean, it was just I love
20   that rush --
21        MR. LAMMER:   Yeah.
22        MR. DAULERIO:   -- kind of just like
23   I was getting from him talking about it,
24   and I was just like that's -- that's kind
25   of just the way I'm wired.  I knew that
```

 1   I was wired that way as an editor, and

 2   I always -- I always loved that part, you

 3   know, I used to call it the professional

 4   wrestling of blogging.

 5        MR. LAMMER:  (Inaudible.)

 6        MR. DAULERIO:  Yeah.

 7        MR. LAMMER:  Yeah.

 8        MR. DAULERIO:  But I mean -- and

 9   I always felt that just a good editor for

10   Gawker or any of the Gawker sites was

11   someone who kind of took on that role.

12        MR. LAMMER:  Yeah.

13        MR. DAULERIO:  But that I would take

14   on that role, and the rest of the staff

15   could actually be smart and great and do

16   the things that were actually just, you

17   know, the things that I love to read.

18        You know, my byline I always

19   considered was just ten percent of my job.

20        MR. LAMMER:  Yeah.

21        MR. DAULERIO:  And that ten percent

22   was always done for just kind of business

23   purposes.  That's just like how

24   I considered it.

25        MR. LAMMER:  The pro wrestling, I'm

1  sorry, it's a good analogy.

2      MR. DAULERIO:  I know, but it sucks

3  now.

4      MR. LAMMER:  The --

5      MR. DAULERIO:  Yeah.

6      MR. LAMMER:  That interplay among

7  the editors and the writers and the

8  readers, and that's sort of -- I think it's

9  some of the stuff that's made the tone of

10  this whole Gawker affair hard to read,

11  because, you know, the people who were

12  writing for Gawker and editing for Gawker

13  in that period were really talking to a

14  very specific audience that almost knew you

15  as characters.

16      MR. DAULERIO:  Yeah.

17      MR. LAMMER:  Like I never met you

18  before.

19      MR. DAULERIO:  Yeah.

20      MR. LAMMER:  Until you walked into

21  this room, I kind of had known you as like

22  a character.

23      MR. DAULERIO:  Right.

24      MR. LAMMER:  You played -- and you

25  play up a certain kind of like

1  scumbagginess and character, but then I'm

2  also sitting across the room from someone

3  who is basically sacrificing years of their

4  life toward a higher (Inaudible.)

5       MR. DAULERIO:  Yeah.

6       MR. LAMMER:  And I don't actually

7  find that incongruous, but I can see how to

8  a person sitting reading U.S.A. Today --

9       MR. DAULERIO:  Yeah.

10      MR. LAMMER:  -- the nuances of that

11  are easy to lose.

12      MR. DAULERIO:  They are, and I think

13  that that's -- you know, a lot of the part

14  that also gets lost in this -- these

15  stories don't age well.  Remember just like

16  also just like, you know, a lot of where

17  Gawker's nuance comes in is the speed of

18  it, too.

19      MR. LAMMER:  Yeah.

20      MR. DAULERIO:  We're also in a very

21  different environment online --

22      MR. LAMMER:  Yeah.

23      MR. DAULERIO:  -- to where a lot of

24  these things that -- I mean, I think

25  would -- would clearly be jokes are done

     1   for shock value are just kind of just put

     2   to a different type of audience and kind of

     3   just like scrutinized a lot differently as

     4   well.

     5        MR. LAMMER:  Yeah.

     6        MR. DAULERIO:  The one part that

     7   was -- like I mentioned a thing about, you

     8   know, staring over a cliff --

     9        MR. LAMMER:  When I had Leah

    10   Finnegan on this show, and she also -- the

    11   way she described it was a finger hovering

    12   over a button and falling off a cliff.

    13   I think if we go back, she used both of

    14   those exact phrase --

    15        MR. DAULERIO:  Oh, really.

    16        MR. LAMMER:  -- phrases to describe

    17   that moment, so it must be --

    18        MR. DAULERIO:  Yeah, I didn't work

    19   with her.

    20        MR. LAMMER:  It must be something

    21   that haunts the dreams of editors who have

    22   been in that position.  Like I'm interested

    23   in how you saw that line and whether you

    24   had regrets prior to this, which I don't

    25   know that you do regret this particular

A.J. Daulerio

```
 1    thing.
 2          MR. DAULERIO:  Right.
 3          MR. LAMMER:  But, you know, among
 4    the many times that your finger hovered
 5    over the button and you hit or did not hit
 6    "send."
 7          MR. DAULERIO:  Huh.
 8          MR. LAMMER:  Like what was that
 9    experience like?
10          MR. DAULERIO:  I mean, it's --
11    it's -- there -- there are certain stories
12    that you want back for different reasons
13    than -- none of them are because they were
14    published, let's put it that way.
15          MR. LAMMER:  Yeah.
16          MR. DAULERIO:  It's usually because
17    they're executed in a way that may have
18    fallen flat or may have kind of been
19    misinterpreted.
20          MR. LAMMER:  Yeah.
21          MR. DAULERIO:  Some things that
22    I had written that I wish I had the budget
23    to farm out to another writer.
24          MR. LAMMER:  Right.
25          MR. DAULERIO:  Those sort of things,
```

 1   and one major story that I wish I had the

 2   budget to farm out to another writer was

 3   the Brett Farve story, actually.

 4        MR. LAMMER:  Which in some ways is

 5   probably the most well-known story that you

 6   are a part of prior to the Hulk Hogan

 7   story.

 8        MR. DAULERIO:  I -- that was --

 9   yeah, exactly.  I mean, just it's one of

10   those things where I mean, I consider the

11   thing that I love the most is kind of being

12   the producer of websites in that kind of

13   role --

14        MR. LAMMER:  Yeah.

15        MR. DAULERIO:  -- and working with

16   writers that I love --

17        MR. LAMMER:  Yeah.

18        MR. DAULERIO:  -- and trying to

19   figure out a way for them to kind of enjoy

20   the job as much as I do in some ways, and

21   my byline is just filled with dicks.  But

22   that's -- that's also the -- the role that

23   I took on.  It's not -- I don't want to

24   kind of delegitimize those stories.

25        MR. LAMMER:  Yeah.

 1        MR. DAULERIO:  The Brett Farve story

 2   is not about his dick.

 3        MR. LAMMER:  Yeah.

 4        MR. DAULERIO:  What his dick did was

 5   basically prove that the woman who told me

 6   about this story about him sexually

 7   harassing him was true.

 8        MR. LAMMER:  Right.

 9        MR. DAULERIO:  That's what that did.

10        MR. LAMMER:  Yeah.

11        MR. DAULERIO:  But, you know, this

12   notion that because we paid for it, that

13   information, or that it was done for page

14   view purposes on clicks or however people

15   want to say it, all that did was kind of

16   just put nine months of work to bed and say

17   just like, yeah, she was not lying, she's

18   not an opportunist, and if we're not going

19   to hold Brett Farve accountable for his

20   personal life, why are we always kind of

21   talking about his wife's illness or his

22   father's death or his struggle with

23   Vicodin.

24        And every single person that

25   I talked to in main stream media who was

 1  covering Brett Farve knew about this story.

 2       MR. LAMMER:  Yeah.

 3       MR. DAULERIO:  Like, I mean, that's

 4  the fight.  And, you know, they obviously

 5  couldn't do it in that way, because they

 6  had just heard about it, they hadn't seen

 7  any evidence of it.

 8       MR. LAMMER:  Right.

 9       MR. DAULERIO:  And Brett Farve was

10  the most famous quarterback on the planet

11  at that point.  He was going into his last

12  year, and a lot of television companies and

13  the NFL had built a lot of the season

14  around his last year.

15       MR. LAMMER:  It's interesting, a lot

16  of the way this stuff ends up getting

17  talked about is through pages and clicks as

18  if like doing a -- like in-depth, like

19  months-long investigation is like the

20  easiest cheapest way to get how many clicks

21  you got on that story.

22       MR. DAULERIO:  Whatever, yeah.

23       MR. LAMMER:  It's not -- it's not a

24  one-to-one relationship like that.

25       MR. DAULERIO:  Yeah.

```
 1        MR. LAMMER:  But as you're going

 2   after stories like this, was there ever

 3   oversight from above about what you should

 4   and shouldn't do?

 5        MR. DAULERIO:  Are we talking about

 6   God or Nick Denton?

 7        MR. LAMMER:  Nick Denton or any --

 8   or anyone else, but yeah, Nick Denton

 9   (Inaudible.)

10        MR. DAULERIO:  Like Nick and I,

11   we have the editorial DNA --

12        MR. LAMMER:  Yeah.

13        MR. DAULERIO:  -- ultimately, and

14   I think that's a lot of the reason why

15   we did get along mostly.

16        MR. LAMMER:  Yeah.

17        MR. DAULERIO:  And I think that

18   he felt like that I was probably the person

19   who was catering to his kind of instincts

20   more than anyone else.

21        MR. LAMMER:  Yeah.

22        MR. DAULERIO:  So I had a lot of

23   (Inaudible.)

24        MR. LAMMER:  Yeah.

25        MR. DAULERIO:  And, you know, that
```

```
 1   was -- you know, that's a level of autonomy
 2   that you can't -- it's irreplaceable in a
 3   lot of ways.
 4           MR. LAMMER:  Yeah.
 5           MR. DAULERIO:  I mean, I knew that
 6   I was in kind of a situation where just
 7   like, wow, you know, here's a guy that is
 8   supporting me on a lot of this stuff.
 9           MR. LAMMER:  Yeah.
10           MR. DAULERIO:  Even though -- even
11   though there was a huge backlash from, you
12   know, readers or other publications --
13           MR. LAMMER:  Yeah.
14           MR. DAULERIO:  -- or I have people
15   calling me an asshole or monster or
16   whatever and all this stuff, and this guy
17   was, you know, always the first in line to
18   basically say just, you know, how are you,
19   and then I'd be just like, man, I'm like
20   kind of just beaten up over this.
21           He's just like, all right, take a
22   day, but then get right back to it, because
23   you're -- there was never any question
24   about what we were doing was true.
25           MR. LAMMER:  Right.
```

 1          MR. DAULERIO:  It was just -- it was

 2     always a point where just, oh, is this --

 3          MR. LAMMER:  Is that like a loud

 4     form of (Inaudible.)

 5          MR. DAULERIO:  Yeah and I think --

 6     I think there's some of that, and I'm

 7     like -- believe me, I mean, I'm the first

 8     to admit that I -- I reveled in the heel

 9     factor of some of the stuff I was doing.

10          MR. LAMMER:  Yeah.

11          MR. DAULERIO:  I didn't have any

12     question about just like, you know,

13     whether -- if it was right, it was true,

14     I wasn't throwing shit against the wall

15     just to kind of start a reaction.  I --

16     I made sure that all that stuff was pretty

17     airtight.

18          MR. LAMMER:  Yeah.

19          MR. DAULERIO:  And then I was going

20     to take the backlash anyway, because at

21     some point it's just like, you know, my --

22     my vantage point is just like the people

23     that matter the least for a publication are

24     the readers and other people in the media.

25          MR. LAMMER:  Right.

```
 1        MR. DAULERIO:  The person -- the

 2   people that I end up putting forward first

 3   are the writers and that's it.

 4        MR. LAMMER:  Yeah.

 5        MR. DAULERIO:  And especially at an

 6   operation like Gawker where you're on a

 7   shoestring budget, per se, and you don't

 8   have the same sort of, you know, cushion to

 9   kind of, you know, have fact checkers and

10   all that other stuff like online.  You --

11   you really kind of have to put yourself out

12   there as the last line of defense --

13        MR. LAMMER:  Yeah.

14        MR. DAULERIO:  -- in terms of just

15   like, okay, if there's going to be an

16   asshole in this situation, it will be me.

17        MR. LAMMER:  Yeah.

18        MR. DAULERIO:  And everybody else

19   can look smart.

20        MR. LAMMER:  Yeah.

21        MR. DAULERIO:  And but when I edited

22   Deadspin and when I edited Gawker, I think

23   most people confused my byline with the

24   rest of the site.

25        MR. LAMMER:  Yeah.
```

 1          MR. DAULERIO:  And, you know, that,

 2    you know, Gawker 2012, which is always

 3    probably going to be remembered for the

 4    Hulk Hogan story, unfortunately.

 5          MR. LAMMER:  Yeah.

 6          MR. DAULERIO:  And, you know,

 7    interesting enough in terms of just like,

 8    like I said, stories that I stared over the

 9    cliff about --

10          MR. LAMMER:  Yeah.

11          MR. DAULERIO:  -- Hulk Hogan was not

12    one of them.  What about the version that

13    people ended up with in court which was

14    also like -- you know, most people I think

15    that was just like, oh, that's going to

16    trial, wow, that's weird --

17          MR. LAMMER:  Yeah.

18          MR. DAULERIO:  -- and let's watch

19    this toilet fire happen.

20          MR. LAMMER:  If I was suing Gawker

21    and I wanted a story to sue Gawker over,

22    it wouldn't have been my pick, right?

23          MR. DAULERIO:  Um, yeah.

24          MR. LAMMER:  It's not the -- it's

25    not the most out-there thing Gawker did,

```
 1   it's not -- it didn't get the most traffic.
 2        MR. DAULERIO:  No.
 3        MR. LAMMER:  It's -- it's kind of a
 4   random story in a way.
 5        MR. DAULERIO:  And it was kind --
 6   it was -- what it was was a more -- it was
 7   just an outgrowth of the way that I had
 8   done Deadspin.
 9        MR. LAMMER:  Right.
10        MR. DAULERIO:  I mean, I had become
11   known for doing those very splashy tabloid
12   sleazy, scumbaggy stories.
13        MR. LAMMER:  Yeah.
14        MR. DAULERIO:  And that was
15   something that I embraced in some way, so
16   obviously people who like the gentleman who
17   sent me the Hulk Hogan tape are going to
18   come to me.
19        MR. LAMMER:  Yeah.
20        MR. DAULERIO:  I understand that.
21        MR. LAMMER:  Right.
22        MR. DAULERIO:  What I never wanted
23   to do with that was present it as a sex
24   tape.  It was more a story about a sex
25   tape.
```

 1          MR. LAMMER:  Right.

 2          MR. DAULERIO:  And more than

 3   anything it was a meditative piece, and

 4   I don't want to put too much of a halo

 5   around it.

 6          MR. LAMMER:  Yeah.

 7          MR. DAULERIO:  But if you read the

 8   way it's constructed, it's 1,400 words.

 9          MR. LAMMER:  Yeah.

10          MR. DAULERIO:  It's a 33-minute tape

11   that's spliced down to a minute which is

12   basically just to show that, you know,

13   okay, the guy that was out there recently

14   just talking about this story in TMZ, and

15   this is already in the public sphere --

16          MR. LAMMER:  Yeah.

17          MR. DAULERIO:  -- I got ahold of it,

18   this is what this is all about.

19          MR. LAMMER:  So has this experience

20   made you rethink anything about your

21   experience at Gawker, like what kind of a

22   lens do you see those years on now with

23   this removed?

24          MR. DAULERIO:  Well, obviously

25   there's a part -- like when the first

```
 1    judgment was handed down, especially the

 2    punitive damages --

 3          MR. LAMMER:  Yeah.

 4          MR. DAULERIO:  -- that were handed

 5    down.

 6          MR. LAMMER:  How long was that?

 7          MR. DAULERIO:  I guess March at this

 8    point.

 9          MR. LAMMER:  March.  Okay.

10          MR. DAULERIO:  So the end of --

11    well, the verdict came on my birthday,

12    actually.

13          MR. LAMMER:  Oh, happy birthday to

14    you.

15          MR. DAULERIO:  That was wonderful,

16    but once the punitive damages came down,

17    and they wanted to give me $100,000 in,

18    I believe, yard work for the State of

19    Florida for all eternity, it was obviously

20    something that seemed steep in its own way,

21    but at the same time I began to think of

22    that as, okay, that's a tax that I would be

23    willing to pay, because I loved that

24    experience at Gawker so much.

25          MR. LAMMER:  Yeah.
```

```
 1          MR. DAULERIO:  You have to
 2    understand that, you know, that site during
 3    that year, there were four site leads on
 4    that staff.
 5          MR. LAMMER:  Yeah.
 6          MR. DAULERIO:  Between Leah
 7    Beckmann, Max Read, John Cook, and Emma
 8    Carmichael.
 9          MR. LAMMER:  Right.
10          MR. DAULERIO:  The rest of the staff
11    was Adrian Chen and Neetzan Zimmerman and
12    Rich Juzwiak and Camille Dodero and Cord
13    Jefferson.
14          MR. LAMMER:  Yeah.
15          MR. DAULERIO:  It's a site that will
16    never exist again with that caliber of
17    people.
18          MR. LAMMER:  Yeah.
19          MR. DAULERIO:  They were all people
20    who were really hitting their stride for
21    what they were going to do after Gawker --
22          MR. LAMMER:  Yeah, I mean --
23          MR. DAULERIO:  -- or at least after
24    that year.
25          MR. LAMMER:  -- Adrian was, what, 23
```

 1   or 24 years old at that point.

 2        MR. DAULERIO:  No, I don't I think

 3   he was -- I mean, he was -- he was there

 4   for three years at that point.

 5        MR. LAMMER:  Yeah.

 6        MR. DAULERIO:  But he was --

 7        MR. LAMMER:  He's a young man, and

 8   now he's writing for the New Yorker.

 9        MR. DAULERIO:  Well, I mean, and

10   the -- and the system that I had put into

11   place was ultimately one that I wanted the

12   writers to kind of have the time to do the

13   things they really wanted to do.

14        MR. LAMMER:  Yeah.

15        MR. DAULERIO:  I didn't want them to

16   hate Gawker, I didn't want them to feel

17   like they were fulfilling some sort of

18   quota --

19        MR. LAMMER:  Yeah.

20        MR. DAULERIO:  -- but this was all

21   about traffic for me.  I -- traffic was a

22   business problem I needed to solve, so

23   I hired Neetzan.

24        MR. LAMMER:  Right.

25        MR. DAULERIO:  And it's like there's

 1  your traffic.

 2          MR. LAMMER:  Yeah.

 3          MR. DAULERIO:  And then the rest of

 4  the staff, I said to them, just like go do

 5  whatever the fuck you want --

 6          MR. LAMMER:  Yeah.

 7          MR. DAULERIO:  -- and let's make the

 8  site work for you as opposed to you working

 9  for the site, because I mean, it's --

10  traffic is something that you inherit with

11  any Gawker property.  It's there.  Like,

12  you know, how you basically get other

13  people to take advantage of that audience,

14  that's -- that's what I think the job of

15  the editor is, is to basically just like

16  have the writers on that staff enjoy that

17  privilege of basically just having a huge

18  audience all the time, because it's very

19  interesting that once you either leave

20  Gawker, how that goes away real quickly.

21          That year was so special to me just

22  because of like the people that worked

23  there and the people that worked there, you

24  know, how close they were to one another

25  and how everyone really believed in this

```
 1   style of doing Gawker, that, you know,
 2   having -- having it kind of just completely
 3   obliterated --
 4         MR. LAMMER:  Yeah.
 5         MR. DAULERIO:  -- by, you know, both
 6   critics on the outside and then obviously
 7   legally, it was -- it was something that
 8   I was just like, oh, well, that's a
 9   bittersweet ending in some ways.
10         MR. LAMMER:  It's pretty rare that
11   anyone would say, oh, I would still feel
12   like that was worth it, that I worked that
13   job that year, even if my salary was --
14         MR. DAULERIO:  Right.
15         MR. LAMMER:  -- negative $100,000
16   for it.
17         MR. DAULERIO:  Well, you know,
18   that's -- that's the thing, it's just like
19   I did, and I actually written a story for
20   Max Read at Select All spelling that out
21   when I thought it was just a $100,000 that
22   I owed.
23         MR. LAMMER:  Yeah.
24         MR. DAULERIO:  Because at that point
25   once the Peter Theal came -- was revealed,
```

```
 1   this was after --
 2         MR. LAMMER:  Yeah.
 3         MR. DAULERIO:  I was just like, oh,
 4   well, this is just like Nick and Peter
 5   Theal.
 6         MR. LAMMER:  Yeah.
 7         MR. DAULERIO:  They're not going to
 8   go after me.
 9         MR. LAMMER:  Yeah, this is going to
10   be like ended with like a charity --
11   charity boxing match or something.
12         MR. DAULERIO:  Well, it was also one
13   of those things where before the trial
14   I was running a site called Ratter.
15         MR. LAMMER:  Yeah.
16         MR. DAULERIO:  I was doing it for
17   two years, and it was a startup and was
18   just at the precipice of basically were
19   we going to raise more money and continue
20   or were we going to shut it down.  I wanted
21   to put it on hold until after the trial to
22   see where the trial left me.
23         Probably not the best time to raise
24   money for a website at that point that's
25   basically in the image of Gawker being run
```

 1  by me.

 2       MR. LAMMER:  Yeah.

 3       MR. DAULERIO:  I don't think anybody

 4  was going to give me, the child

 5  pornographer, like any sort of money at

 6  that point, but what I did think initially

 7  was that, well, all is lost, but I do still

 8  have a copy of the sex tape, and it is

 9  completely newsworthy at this point.  I was

10  just like, okay, well, how about I do a

11  post on Ratter that says here's what $140

12  million sex tape looks like, and then just

13  "peace out," and then just go to Miami, and

14  just like be on the lam and just do that.

15  And this is what I was planning on doing.

16       I was getting -- I was getting

17  phones, like, you know, I was basically

18  going to get burner phones, I was going to

19  do this all kind of covert and have, you

20  know, signals and all these people I was

21  working for, and thankfully some people

22  talked me off the ledge --

23       MR. LAMMER:  Yeah.

24       MR. DAULERIO:  -- and just said, you

25  know, you're not out of this yet,

```
 1    obviously, and Gawker is not out of this,
 2    and I didn't want to do anything to
 3    jeopardize Gawker more so than I already
 4    had in trial, but that was my first
 5    instinct was basically just like, you know,
 6    that -- that much frustration and that much
 7    kind of anger and that much sadness over
 8    just like what had transpired.
 9         It was just like I had that brief
10    sliver of a revenge fantasy so to speak,
11    and also at that time I said to myself,
12    well, what is a thing that we can do that
13    makes this a positive experience in some
14    ways for someone.
15         MR. LAMMER:  Yes.
16         MR. DAULERIO:  So I began making
17    monthly donations to the NAACP in the name
18    of Hulk Hogan, and then I told the lawyers
19    that, and they freaked out.
20         MR. LAMMER:  Yeah.
21         MR. DAULERIO:  Rightfully so, and,
22    you know, it's obviously something, too,
23    that I -- but my thought was just like,
24    okay, well, you know, obviously everybody's
25    an asshole out of this thing, but, you
```

```
 1   know, let's not forget the racist guy.
 2         MR. LAMMER:  Yeah, yeah.
 3         MR. DAULERIO:  If I have to pay for
 4   this, why don't I start paying it now, but
 5   I'm going to start paying it in his name to
 6   the NAACP.
 7         MR. LAMMER:  Yeah.
 8         MR. DAULERIO:  And I did do that,
 9   and then my checking account got shut down,
10   so but also now that all my spending is
11   basically being kind of raked over the
12   coals and I'm being poked and prodded --
13         MR. LAMMER:  Yeah.
14         MR. DAULERIO:  -- for every single
15   amount of spending that I do, because it's
16   all supposed to go toward him in some
17   capacity, it's not the best idea right now,
18   even though I think it's a great one and
19   I think it's obviously one that's necessary
20   in order for anyone to kind of come out of
21   this with somewhat clean hands.
22         MR. LAMMER:  What's -- I mean,
23   what's you're existence like right now?
24         MR. DAULERIO:  I --
25         MR. LAMMER:  Are you able to work,
```

```
 1   are you able --

 2         MR. DAULERIO:  Yeah, I started --

 3   I started a new job, I'm not able to

 4   disclose at this point, but I did move out

 5   here to L.A. to work.

 6         MR. LAMMER:  Here in lovely Downtown

 7   Los Angeles.

 8         MR. DAULERIO:  I have a limited

 9   amount of money that I can make at this

10   point.

11         MR. LAMMER:  Got it.

12         MR. DAULERIO:  And a limited amount

13   of money that I can take in and, you know,

14   a lot of friends and family have been

15   helping me out just until I get everything

16   straightened out legally, which is not

17   really kind of straightened out that this

18   is going to go away but what they are going

19   to take from me at this point, what

20   possessions of mine they can take.

21         You know, they have -- Hulk Hogan

22   I think owns 44.8 percent of Ratter and all

23   my Gawker stock and everything that he can

24   take at this point legally he's allowed to

25   take it.
```

```
 1        And I still have to find a
 2   collections attorney in California who will
 3   let me know exactly what the exemptions are
 4   here, but in the meantime, I will be
 5   hassled for the $115 million that I have to
 6   pay back up until hopefully the appeals
 7   process reverses it.
 8        MR. LAMMER:  I mean, what has this
 9   been like for you personally?  I mean, your
10   comments in the deposition are certainly
11   like the main thing that got recorded about
12   you in the trial --
13        MR. DAULERIO:  I know, right.
14        MR. LAMMER:  -- not so much that you
15   have spent years of your life fighting
16   against a unjust verdict.  In my opinion,
17   and I don't really even feel like it's a
18   particularly arguable position, but, you
19   know, what is it like for people you know,
20   people who are not in the like New York
21   media journal -- journalism circle to have
22   this --
23        MR. DAULERIO:  Well, I had two funny
24   experiences with that where it just like
25   was -- and I've had these experiences
```

```
 1   before where stories blowup.
 2        MR. LAMMER:  Yeah.
 3        MR. DAULERIO:  And, you know, people
 4   have from my past have reached out to me,
 5   et cetera.
 6        MR. LAMMER:  Yeah.
 7        MR. DAULERIO:  And just like, you
 8   know, what the hell are you doing with your
 9   life, this is a strange existence.  At the
10   time after the video deposition had
11   dropped, I was back in, you know, the hotel
12   in Florida just not paying attention to
13   anything, because you do this long enough,
14   you don't have to see what people are
15   saying on Twitter to just feel it, you
16   know.
17        MR. LAMMER:  Yeah, it's a low hum,
18   yeah.
19        MR. DAULERIO:  And the text messages
20   I was getting from people, I mean were --
21   from people that, you know, I was very
22   close to basically just like were showing
23   their support and obviously like that.
24        MR. LAMMER:  Yeah.
25        MR. DAULERIO:  And then I had a
```

 1   friend of mine from high school who I

 2   hadn't spoken to in four or five months,

 3   and he was in London at the time, and

 4   he Face Times me, and he's basically like

 5   A.J., it seems like you're involved in a

 6   child pornography ring.  Just let me know

 7   what I can do, no questions asked.

 8        Just like -- I'm like, no, obviously

 9   that's not it, but he was clearly reading

10   the scroll and my comments --

11        MR. LAMMER:  Yeah.

12        MR. DAULERIO:  -- about what was --

13        MR. LAMMER:  Yeah.

14        MR. DAULERIO:  -- I said in, you

15   know, that deposition, but yeah, that

16   was -- that was a -- a tough moment.

17   It was a tough moment to process on every

18   single level that you would think it would

19   be.  I knew it was coming clearly for two

20   years.

21        Looking back on that day in that

22   deposition, I mean, ultimately what I was

23   thinking was that there was a person across

24   from me who was asking me the same question

25   time and time again who was trying to take

```
 1   away a thing that I loved.  I did my best
 2   to basically not give them anything and
 3   also just did my best to try to keep
 4   control --
 5        MR. LAMMER:  Yeah.
 6        MR. DAULERIO:  -- at that point, but
 7   then there was that moment --
 8        MR. LAMMER:  Yeah.
 9        MR. DAULERIO:  - where it was hour
10   eight or so, and I -- there was also --
11   remember, there was no trial at this point,
12   this was just for the purposes of kind of
13   information gathering.
14        MR. LAMMER:  It was a bunch of like
15   lawyers sitting in a conference room kind
16   of situation.
17        MR. DAULERIO:  Yeah, I was a year
18   away from Gawker at that point, and, you
19   know, I came into that with a lot of
20   attitude and was there to basically mumble
21   and grunt and give them a hard time.  That
22   was my thinking in my head, and never in a
23   minute thinking that this would come back
24   to haunt me in the way that it did, nor the
25   company in that way.
```

```
 1              MR. LAMMER:  Yeah.

 2              MR. DAULERIO:  But -- and after --

 3     after I got out of that deposition,

 4     I remember chatting with Tommy, and he was

 5     just like -- I was just like, man, I did

 6     great, I didn't give them shit, I didn't

 7     give them anything.  Well, there was this

 8     one part.

 9              MR. LAMMER:  Yeah.

10              MR. DAULERIO:  And, you know, but --

11     but never thinking that, A, people would

12     take it literally, and I understand just so

13     you know how it was edited and presented in

14     court and presented to a jury of six who

15     were not happy to be there --

16              MR. LAMMER:  Yeah.

17              MR. DAULERIO:  -- and obviously

18     think of the media some way as not me.

19              MR. LAMMER:  And we're in Florida

20     just in general.

21              MR. DAULERIO:  Well, but -- but

22     I think -- I think that, hey, you never do

23     consider that something like that can and

24     will be used against you in a court of law

25     --
```

1        MR. LAMMER:  Yeah.

2        MR. DAULERIO:  -- even though that

3  that is something that is basically

4  engrained in everyone's head, and that was

5  definitely something that I didn't -- this

6  was never going to go to trial in my mind.

7        MR. LAMMER:  Right.

8        MR. DAULERIO:  I mean, this was

9  something that was going to be settled.

10        MR. LAMMER:  Yeah.

11        MR. DAULERIO:  And, you know, that

12  was the part of this where I knew something

13  was amiss was the fact that it was not,

14  because I didn't think that Hulk Hogan, who

15  had seemingly suffered all of this

16  embarrassment from this publication and who

17  has, you know, had his world turned upside

18  down over this would actually want to

19  suffer the indignity of revisiting it in a

20  trial format where like a lot more people

21  would potentially hear about it who may

22  have not.

23        MR. LAMMER:  Yeah.

24        MR. DAULERIO:  So that was the part

25  where I was just like this is something

 1   that's kind of bigger than anything that's

 2   happening -- going to happen in this

 3   courtroom.

 4        MR. LAMMER:  Did you feel like

 5   Gawker supported you in the ways they

 6   should have?

 7        MR. DAULERIO:  It's a question I go

 8   over in a lot of ways, and the short answer

 9   is basically just I think everyone was in

10   over their head.

11        MR. LAMMER:  Yeah.

12        MR. DAULERIO:  I don't think anyone

13   knew exactly just like what the full scope

14   of this was going to be.  I think that

15   Gawker at the time was also trying to

16   basically protect their company as best as

17   they possibly can.

18        MR. LAMMER:  Yeah.

19        MR. DAULERIO:  I think that I was in

20   a situation which, I mean, especially after

21   the Geithner story had run, that, you know,

22   Gawker was in this mode of being 20 percent

23   nicer, which I think was just ultimately a

24   protective way for Nick to kind of just

25   like distance, try to basically, you know,

 1   have the -- the good Gawker kind of rise

 2   above some of this stuff, even though that

 3   this was the thing that was actually going

 4   to trial.

 5        MR. LAMMER:  Yeah.

 6        MR. DAULERIO:  I realized I did not

 7   fit in that 20 percent nicer category in

 8   any way, shape, or form.

 9        MR. LAMMER:  Yeah.

10        MR. DAULERIO:  And I knew I was

11   going there, and they had told me this.

12   I mean, I entered into Florida never having

13   met some of the lawyers that were

14   representing me, them having not met me,

15   and I get presented with a manilla folder

16   with basically every single thing I've ever

17   done on the internet that could now be

18   presented in this Court to basically make

19   me look like an asshole.

20        MR. LAMMER:  Yeah.

21        MR. DAULERIO:  And I was just like,

22   well, how do I -- because you can't

23   apologize.  Like, I mean, you smile, you're

24   an asshole, you are expressionless, which

25   is mostly what they told me to be the whole

```
 1   time.  You're a sociopath, that's how
 2   you're going to be perceived.
 3        And I knew that, and it was -- it
 4   was something that everyday was basically
 5   just, okay, you're going to get punched in
 6   the face today, they're going to go hard on
 7   you today.  Just sit there and take it.
 8   We're going to take this, and they
 9   shouldn't be coming after you.  They're
10   after the money, which is Gawker.
11        I -- I think that it was clear that
12   I was a major part of what the plaintiff
13   was trying to present as the story of who
14   Gawker was.  Did I feel under prepared?
15   Yeah, but I don't think anybody can really
16   kind of prepare you for exactly what was
17   going on there, because it didn't seem
18   real.
19        MR. LAMMER:  Yeah.
20        MR. DAULERIO:  It seemed at some
21   point someone would just kind of just like
22   either move on, or just like, okay, what's
23   the issue at hand here, but it wasn't,
24   it was -- it was troubling on all fronts.
25        I -- I -- I hated the way we were
```

 1   going after Hulk Hogan and his family and

 2   just like showing pictures of him and his

 3   family at that time.  I was just like this

 4   is all dirty pool.  This is basically like

 5   an ugly situation.

 6           MR. LAMMER:  Right.

 7           MR. DAULERIO:  And then everyone

 8   like after it was basically, well, that's

 9   kind of what happens in trial.

10           MR. LAMMER:  Yeah.

11           MR. DAULERIO:  And just like, all

12   right.  So there's no truth at all.

13           MR. LAMMER:  Well, it's an ugly

14   situation that the stakes had no real

15   reason to exist.  I mean, it's one thing,

16   you know, I don't know, the Pentagon papers

17   or something.

18           MR. DAULERIO:  Yeah, yeah.

19           MR. LAMMER:  You know, a legal

20   battle about an American atrocity or

21   something like that.

22           MR. DAULERIO:  Right.

23           MR. LAMMER:  This is about -- this

24   is an argument that only has stakes in --

25   through -- in the justice system, otherwise

 1   it really is a totally meaningless,

 2   frivolous chapter in human history --

 3         MR. DAULERIO:  Exactly.

 4         MR. LAMMER:  -- in almost every way.

 5         MR. DAULERIO:  Yeah, so I mean, like

 6   I mean, my -- I was -- I was shell shocked

 7   and just completely just defenseless in a

 8   lot of ways, and that's how I felt.  It was

 9   the worst feeling in the world, and that

10   year was kind of -- I knew -- I knew it was

11   going to be bad, I didn't know it was going

12   to be apocalyptic in any sort of way,

13   because I didn't think that was possible of

14   happening.  I don't think most people did.

15         MR. LAMMER:  I mean, is it right to

16   say that this sets a precedent that a

17   writer on the internet or an editor on the

18   internet is equally liable --

19         MR. DAULERIO:  Yeah.

20         MR. LAMMER:  -- for what they

21   publish to the publisher even if the

22   publisher instructed them to publish that

23   sort of thing --

24         MR. DAULERIO:  Yeah.

25         MR. LAMMER:  -- and it was perhaps

```
 1   even part of the terms of their employment?
 2        MR. DAULERIO:  Here's the thing,
 3   they obviously did not instruct me to
 4   publish that.  I mean, I had a lot -- you
 5   have -- I, like a lot of other Gawker
 6   editors, had a lot of editorial freedom,
 7   especially at that time.
 8        MR. LAMMER:  Sure.
 9        MR. DAULERIO:  I mean, Gawker was a
10   different company in 2012 than it is now or
11   was in 2015, 2014.
12        MR. LAMMER:  And it was a company
13   set up by design to give editors that
14   editorial freedom.
15        MR. DAULERIO:  Yes, and you make
16   those decisions basically just like never
17   about the -- the risking kind of just like
18   having the company fall into the ocean is
19   never -- like that's never a moment where
20   you're basically this is going to happen
21   with this story.
22        MR. LAMMER:  Right.
23        MR. DAULERIO:  I never felt that
24   with that story, especially since it was
25   vetted internally.
```

 1          MR. LAMMER:  Yeah.

 2          MR. DAULERIO:  I mean, there's a

 3     reason it's a minute and 4 seconds.

 4          MR. LAMMER:  Right.

 5          MR. DAULERIO:  I mean, there's a

 6     reason the snippets of sex that are shown

 7     are there.  There's a reason we linked back

 8     to all of the stories that had already been

 9     talking about this tape.

10          MR. LAMMER:  Right.

11          MR. DAULERIO:  So --

12          MR. LAMMER:  And Gawker was fighting

13     off -- I mean, Gawker was used to lawsuits.

14          MR. DAULERIO:  Right.

15          MR. LAMMER:  Like part of the Gawker

16     business involved knowing that they would

17     be sued.

18          MR. DAULERIO:  Of course.

19          MR. LAMMER:  Yeah.

20          MR. DAULERIO:  And that's -- I think

21     any tabloid publication is basically just

22     like subjected to that.  Everyone kind of

23     knows that end of it.  It's not pleasant,

24     but -- and you definitely don't feel safe

25     one hundred percent of the time, but this

     1   was one where it's like this was not an

     2   option where I was presented with this,

     3   it's just like, look, you're really

     4   risking -- really putting the company as

     5   risk by publishing this story.

     6        That conversation never happened,

     7   and I don't think many, many people have

     8   had that conversation at Gawker, and that's

     9   not to say that just like anything was

    10   just -- it's not as reckless as that

    11   sounds, but at the same time, the editors

    12   had -- it was the editors' judgment in

    13   terms of just like what was something that

    14   people would read.

    15        MR. LAMMER:  Well, it's

    16   impossible -- I mean -- okay.  Here's a

    17   scenario to throw at 2012 A.J. Daulerio.

    18        MR. DAULERIO:  Yeah.

    19        MR. LAMMER:  In four years you'll be

    20   owing $115 million to Hulk Hogan --

    21        MR. DAULERIO:  Yeah.

    22        MR. LAMMER:  -- as a result of a

    23   lawsuit by Peter Thiel --

    24        MR. DAULERIO:  Right.

    25        MR. LAMMER:  -- who is being talked

 1   about as a potential supreme court justice

 2   under the presidency of Donald Trump.

 3           MR. DAULERIO:  Yes.

 4           MR. LAMMER:  That -- like how on

 5   Earth do you plan for these kind of

 6   eventualities.

 7           MR. DAULERIO:  Well, and that's the

 8   thing is just like I had gone over that

 9   scenario actually and prepared for that

10   question specifically in terms of just like

11   going back in time and, you know, this

12   is -- I hope this doesn't incriminate --

13   I mean, what the fuck is there to lose at

14   this point, obviously, but, you know, I'm

15   saying this -- like if I had that

16   conversation with Nick, and Nick and I are

17   sitting there basically just saying this

18   story will result in this culture war.

19           MR. LAMMER:  Yeah.

20           MR. DAULERIO:  If it smokes out

21   those enemies, yes, you absolutely do it.

22   I think Nick fights this one hundred

23   percent of the way.  If it can potentially

24   like just end Gawker.com, no, nobody would

25   absolutely do that.  And, you know, that

 1   wasn't -- that wasn't -- that wasn't at

 2   risk here, you know.

 3        MR. LAMMER:  Yeah.

 4        MR. DAULERIO:  But, you know,

 5   ultimately, I mean, this is -- this is

 6   something -- as -- as sleazy as the story

 7   is, all this is, is basically just like me

 8   catching a powerful person lying.

 9        MR. LAMMER:  Yeah.

10        MR. DAULERIO:  That's it, and

11   that's -- you know, the -- the sex tape

12   factor of it, basically if people just want

13   to kind of just look at it and say, oh,

14   this is what you get for publishing a sex

15   tape, I also question basically just like

16   their interest in this story.  Like I mean,

17   nobody is kind of interested in that case

18   if it's about a lien against Hulk Hogan's

19   house.

20        MR. LAMMER:  Right.

21        MR. DAULERIO:  So like, I mean,

22   I think a lot of people are getting kind of

23   self-righteous over something that, I mean,

24   they're basically participating in at the

25   same time.

Podcast of A.J. Daulerio

74

```
 1          MR. LAMMER:  Right.
 2          MR. DAULERIO:  So the fact that
 3   it is a story and it's still one hundred
 4   percent a story --
 5          MR. LAMMER:  Yeah.
 6          MR. DAULERIO:  -- and will now be a
 7   story forever, unfortunately --
 8          MR. LAMMER:  Yeah.
 9          MR. DAULERIO:  That is something
10   that was never in doubt for me.
11          MR. LAMMER:  You bring up this idea
12   of smoking out the enemies.
13          MR. DAULERIO:  Yeah.
14          MR. LAMMER:  And now that it is
15   pretty clear that Gawker is not the end
16   target but --
17          MR. DAULERIO:  Yeah.
18          MR. LAMMER:  -- that there is a
19   larger target of suing journalists and
20   publishers out of business and using the
21   infinite resources of at least one person,
22   Peter Thiel, but it's a tactic that could
23   be replicated --
24          MR. DAULERIO:  Absolutely.
25          MR. LAMMER:  -- mostly by the rich
```

 1  people, what do we do?  What can be done

 2  here?

 3       MR. DAULERIO:  Well, I mean, here's

 4  the thing.  Like I said, I am not -- I am

 5  not going to settle at all.  Like until

 6  this thing gets to the appeals court, I'm

 7  not settling.  This is an inconvenience,

 8  this is obviously something that's hanging

 9  over my head, this is not something I wish

10  upon anyone else.

11       MR. LAMMER:  Yeah.

12       MR. DAULERIO:  I'm getting through

13  it by persevering, and that's it.  I still

14  cannot for the life of me sign a piece of

15  paper that in any way puts me on that side

16  of the table.  I just can't do it, and I --

17  I -- I think that more than ever, like

18  I said, this would be a really great time

19  to be a journalist.

20       Everybody talks about this chilling

21  effect, it's already happened.  I guarantee

22  you that there are publishers that are

23  basically just absolutely backing off

24  things or --

25       MR. LAMMER:  And there's

Deposition of A.J. Daulerio

1   22-year-olds listening to this show who are

2   going do I want like a career in internet

3   writing where I'm liable, you know.

4        MR. DAULERIO:  Yeah, and it's just

5   like -- remember also like this is not --

6   this is not about just whether or not

7   I publish a sex tape for why I got in

8   trouble.  This was a thing that was picked

9   to basically set a company through this

10  kind of grinder, and if it wasn't this

11  case, there were five other ones coming

12  right after it.

13       I mean, this was -- this was a

14  tactical approach that will probably be

15  used against other people who piss off

16  powerful people on the side of the media.

17  I'm in a good position right now where it's

18  basically like I have no wife, I have no

19  kids, I have no house, I have none of the

20  assets and the trappings that can

21  ultimately kind of be -- I mean, I'm never

22  going to get a great mortgage rate on a

23  house, I don't think.

24       You know, ultimately, I mean,

25  that -- that's the thing that I had to kind

 1   of just make that decision when I was

 2   offered a settlement that was just

 3   atrocious in my mind, which was essentially

 4   just say basically, all right, you know,

 5   it's sign away and say that you basically

 6   just like this is all your fault, or it's

 7   not all your fault, it's all Nick's fault,

 8   or sign a piece of paper that basically

 9   just like incriminates everyone, or

10   basically just like has to capitulate to

11   like the demands of people who are

12   absolutely just -- this has nothing to do

13   with Hulk Hogan at this point.

14          MR. LAMMER:  Yeah.

15          MR. DAULERIO:  He's just one guy

16   sitting at the other end of the table with

17   an uncashed lottery ticket --

18          MR. LAMMER:  Yeah.

19          MR. DAULERIO:  -- and I'm at the

20   other end, and the part -- the thing is, is

21   just like, you know, I'll be able to kind

22   of get through this hopefully for a year or

23   two.  I'm not going to talk to a lot of

24   people about it, because it's just like one

25   of these things that is going to be

```
 1    ongoing, and I have to kind of just --
 2    I have good days and bad days about it.
 3    I hope I wasn't yelling too much or
 4    sounding too bitter about it this whole
 5    time.
 6         MR. LAMMER:  Not at all.
 7         MR. DAULERIO:  Because that's the
 8    part about this that's really hard is
 9    definitely being trapped, and also that
10    feeling of being trapped and kind of just
11    not only being trapped but still I have a
12    hearing on October 31st where I'm basically
13    going to be sitting in front of that judge
14    who is going to kind of decide whether or
15    not I was lying on my financial affidavit
16    about these indemnity rights which
17    apparently are worth money, that I was
18    lying about them to cover up this fact, and
19    then she can fine me some more.
20         Like that's preposterous, but that's
21    the way the legal system works right now,
22    and that's the position that I'm in.  And,
23    you know, the choices ultimately just like
24    they're giving me are kind of just like
25    take back everything you loved about Nick,
```

```
 1   Gawker, and your job, and we'll give you
 2   your thousand dollars back, or your ability
 3   to make money, or you can walk away from
 4   this, but you just can't talk about it ever
 5   again.
 6         I don't see there's any question for
 7   me.  I mean, I definitely thought long and
 8   hard about it, and I've definitely talked
 9   to a lot of people about it.  It's just not
10   in me.
11         Some days I absolutely just like
12   wish I can say like is there a phone call
13   I can make to make this all go away,
14   because I want my life back.
15         MR. LAMMER:  Yeah.
16         MR. DAULERIO:  That's happened, but
17   for the most part I -- I just think I would
18   regret doing that.  That's it.
19         MR. LAMMER:  Well, thank you for
20   being so open about this.  You're invited
21   back on if you ever want to talk about
22   it again.  I'd love to know where you are
23   in a couple of years.
24         MR. DAULERIO:  Yeah, I mean, I think
25   that -- hopefully, that's -- I mean, that's
```

 1   the part about this, I would like to talk

 2   about this in another capacity after Phase

 3   17 of this happens.

 4        MR. LAMMER:  All right.  Well,

 5   I hope that people listening -- man, this

 6   episode made me a little emotional, I'll be

 7   honest.

 8        MR. DAULERIO:  Uh-huh.

 9        MR. LAMMER:  I got a little like

10   weird teary voice there.  I hope you were

11   listening, guys, that if this is what can

12   be done to someone over a --

13        MR. DAULERIO:  Blog post.

14        MR. LAMMER:  -- meaningless blog

15   post, what are the stakes of the actually

16   important truths that many people who are

17   on this show are working on, and see you in

18   a couple of years.

19        MR. DAULERIO:  Yeah.

20        MAX:  And that was the Longform

21   Podcast.  Thank you very much to A.J.

22   Daulerio for doing this.  Thanks to my

23   cohost Max Linsky and Evan Ratliff for

24   holding down the fort in my absence.  Thank

25   you to our editor, Mickey Capper.  Thank

Podcast #217 Daulerio

81

1   you to our intern, Courtney Perell.  Thank

2   you to our sponsors, EA Sports FIFA 17,

3   MailChimp, School of the Art Institute of

4   the Chicago, yeah, Casper, Texture.  Thank

5   you all.  We'll be back here next week.

6        (End of recording.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      CERTIFICATE

 2

 3                         -  -  -

 4

 5            I, Matthew J. Haas, Court Reporter and

 6    Transcriptionist, do hereby certify that I was

 7    authorized to and did listen to and

 8    stenographically transcribe the foregoing

 9    recorded proceedings and that the transcript is a

10    true record to the best of my professional

11    ability.

12

13

14

15            Dated this 29th day of September,

16    2016.

17

18

19

20

21

22    _____

23            MATTHEW J. HAAS
              Court reporter
24

25
```

# EXHIBIT B

### to Plaintiff's Emergency Motion to Enforce Permanent Injunction and Prevent A.J. Daulerio from Engaging in Revenge Porn, Extortion and Video Voyeurism

PrimeClerk, E-POC Filed on 09/29/2016

**United States Bankruptcy Court, Southern District of New York**

Please select applicable Debtor (select only one Debtor per claim form):

☒ Gawker Media, LLC (Case No. 16-11700)

☐ Kinja, Kft. (Case No. 16-11718)

☐ Gawker Media Group, Inc. (Case No. 16-11719)

## Official Form 410

# Proof of Claim

4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | **Albert James Daulerio (born 1974)** | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor   A.J. Daulerio | |
| 2. Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>Marburger Law LLC attn: David Marburger<br>14650 Detroit Avenue, Suite 450<br>Cleveland, OH 44107<br><br>Contact phone  216 930 0500<br>Contact email  david@marburger-law.com | Where should payments to the creditor be sent?(if different)<br><br><br><br><br>Contact phone _____<br>Contact email _____ |
| 4. Does this claim amend one already filed? | ☒ No<br>☐ Yes.  Claim number on court claims registry (if known)_____ | Filed on _____<br>MM  / DD  / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? _____ | |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____ |
| **7. How much is the claim?** | $ 6,000,000.00 .  **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br><br>Duty to defend and indemnify - see Supplement & Exhibits |
| **9. Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**  $_____<br><br>**Amount of the claim that is secured:**  $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**  $_____<br><br>**Annual Interest Rate** (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |
| **10. Is this claim based on a lease?** | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____ |
| **11. Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:*                                     **Amount entitled to priority:**<br><br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).     $_____<br><br>☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).     $_____<br><br>☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).     $_____<br><br>☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).     $_____<br><br>☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).     $_____<br><br>☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies.     $_____<br><br>* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**     $_____ |

## Part 3:  Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>**Signature:** *Albert James Daulerio*<br>             Albert James Daulerio (Sep 29, 2016)<br><br>**Email:** david@marburger-law.com<br><br>   Signature<br>**Print the name of the person who is completing and signing this claim:**<br><br>Name     Albert James Daulerio (born 1974)<br>         First name         Middle name         Last name<br><br>Title     n/a<br><br>Company     n/a<br>         Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address     c/o Marburger Law LLC, 14650 Detroit Avenue, Suite 450<br>         Number     Street<br>         Cleveland             OH     44107<br>         City               State     ZIP Code<br><br>Contact phone     216 930 0500         Email david@marburger-law.com |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
   (attach below)          ☐ I do not have supporting documentation.



PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT
ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE
PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING
DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show
only the last four digits of any social-security, individual's tax-identification, or financial-account number, only
the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery
of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the
disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain
information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy
Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the
Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby
release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal
data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that
personal identifier data or information concerning a minor individual has been included in a pleading, Prime
Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the
text of the filing and make an entry indicating the correction.

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                       12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

☒ **Fill in all of the information about the claim as of the date the case was filed.**

☒ **Fill in the caption at the top of the form.**

☒ **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

☒ **Attach any supporting documents to this form.**
Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

☒ **Do not attach original documents because attachments may be destroyed after scanning.**

☒ **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

☒ **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

☒ **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/gawker.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Gawker Media, LLC Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

**Do not file these instructions with your form**

**United States Bankruptcy Court**
**Southern District of New York**

|                                   |          |                                         |
|-----------------------------------|----------|-----------------------------------------|
|                                   | (        |                                         |
|                                   | (        | **Chapter 11**                          |
| **In re**                         | (        |                                         |
|                                   | (        | **Case No. 16-11700 (SMB)**             |
| **Gawker Media, LLC, et al.,**    | (        | **(Jointly Administered)**              |
|                                   | (        |                                         |
|                                   | (        | **Supplement to A.J. Daulerio's proofs of** |
|                                   | **Debtors.**  (  | **claim**                        |
|                                   | (        |                                         |
|                                   | (        |                                         |
|                                   | (        |                                         |

**Background**

1.     This Supplement accompanies and is incorporated within each of the

three separate proofs of claim that A.J. Daulerio is filing:  one against debtor Gawker

Media, LLC and one against each of two affiliated debtors, Gawker Media Group, Inc.

and Kinja Kft in their Chapter 11 bankruptcy matters. The information in this

Supplement and in the proof of claim form itself comes from various records and

information assembled on Mr. Daulerio's behalf by his counsel, David Marburger, who

prepared this Supplement for Mr. Daulerio.

A.     The last four digits of the taxpayer identification number of

Gawker Media LLC are 0492. Its mailing address is:  c/o Opportune LLP, Attn:

William D. Holden, Chief Restructuring Officer, 10 East 53rd St., 33rd Floor, New York,

NY 10020.

B.     The last four digits of the taxpayer identification number of Gawker Media Group, Inc. are 3231. Its mailing address is the same as Gawker Media LLC's mailing address.

C.     The last four digits of the taxpayer identification number of Kinja Kft are 5056. Its mailing address is the same as Gawker Media LLC's mailing address.

2.     On June 10, 2016, debtor Gawker Media LLC filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York. Gawker Media LLC's bankruptcy is pending under Bankruptcy **Case No. 16-11700**.

3.     On June 12, 2016, affiliated debtor Gawker Media Group, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York. Affiliated debtor Gawker Media Group, Inc.'s bankruptcy is pending under Bankruptcy **Case No. 16-11719**.

4.     Also on June 12, 2016, affiliated debtor Kinja Kft filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York. Affiliated debtor Kinja Kft's bankruptcy is pending under Bankruptcy **Case No. 16-11718**.

5.      This proof of claim asserts an ongoing duty to provide a legal defense to claimant A.J. Daulerio in recent, continuing, and expected legal proceedings and litigation.

6.      This proof of claim also asserts certain rights of Daulerio of indemnity against Gawker Media, LLC and/or the affiliated debtors.

### Judgment against claimant Daulerio and Gawker Media, LLC
### in *Bollea v. Gawker Media, LLC, et al.*

7.      Claimant A.J. Daulerio is one of three defendants named in a final judgment entered on June 8, 2016, in the civil suit of *Terry Bollea v. Gawker Media, LLC, et al.*, Circuit Ct of the Sixth Judicial Circuit for Pinellas County, Fla., Case No. 12-012447 CI-011.

8.      In his suit, Bollea accused Daulerio of posting a video of Bollea on the website Gawker.com with the knowledge and authority of Gawker Media, LLC. Bollea claimed that posting the video invaded Bollea's privacy and committed other civil wrongs. At the time—October, 2012—Daulerio was Editor-in-Chief of Gawker.com.

9.      Gawker Media, LLC, published Gawker.com and its content. In October, 2012, Gawker Media, LLC owned a subsidiary— Gawker Entertainment, LLC—which employed Daulerio and others to create the content shown on Gawker.com. A copy of Daulerio's employment contract with Gawker Entertainment, LLC accompanies this Supplement as **Exhibit 8**.

10.     In December, 2012, Gawker Media, LLC restructured how it operated. It assumed the rights and liabilities of Gawker Entertainment, LLC and other subsidiaries. Gawker Media, LLC assumed Gawker Entertainment, LLC's employment relationships. One of those employment relationships was the employment of Daulerio. Gawker Media, LLC assumed the rights and duties expressed in Daulerio's employment contract with Gawker Entertainment, LLC. See Gawker Media LLC's verified responses to interrogatories, a copy of which accompanies this Supplement as **Exhibit 6.**

11.     Daulerio left the employ of Gawker Media, LLC in January, 2013. Gawker Entertainment, LLC dissolved in February, 2013.

12.     The final judgment of June 8, 2016, in the *Bollea* suit adjudges that Bollea shall recover jointly and severally the sum of $115 million in compensatory damages at an annual interest rate of 4.78% from Daulerio, Gawker Media, LLC, and Nicholas Denton (founder and CEO of Gawker Media, LLC). It also adjudges that Bollea shall recover $100,00 in punitive damages from Daulerio at the same interest rate. A copy of the judgment accompanies this Supplement as **Exhibit 2.**

13.     Daulerio and the other two defendants have appealed that final judgment to the Florida Second District Court of Appeal, where that appeal is pending. Proceedings there are stayed because of Gawker Media, LLC's bankruptcy

proceedings in this Court. A copy of the notice of appeal accompanies this
Supplement as **Exhibit 3**.

14.    Holding Gawker Media, LLC liable for the acts of Daulerio means that
the trial court in the Bollea case adjudged Daulerio's acts to have been within the
scope of his employment.

### Bollea's execution of the judgment against claimant Daulerio

15.    Gawker Media, LLC's bankruptcy proceedings in this Court have effected
an automatic stay of further proceedings in the Florida trial court in the *Bollea* case as
to Gawker Media, LLC. One of the other three defendants, Nick Denton, also has
petitioned for bankruptcy, resulting in the same kind of stay of proceedings against
Denton.

16.    Daulerio has not petitioned for relief in any bankruptcy court. The
Florida trial court has not stayed proceedings in aid of Bollea executing the $115.1
million judgment against Daulerio. Such proceedings have been and continue to be
underway.

17.    On August 17, 2016, the Florida trial court issued an order finding that
Daulerio possessed certain property or assets which may be used to satisfy all or part
of the final judgment. The court decided that Daulerio owned legal rights "arising
from a policy and practice" of Gawker Media, LLC and its parent, affiliated debtor

Gawker Media Group, Inc., under which "the companies agreed to defend against and pay all of the Final Judgment entered against Mr. Daulerio." A copy of that order accompanies this Supplement as **Exhibit 4**. See paragraph 7d of the order.

18.     The same order of August 17, 2016, "hereby transferred and assigned to Mr. Bollea" the rights of Daulerio to have Gawker Media, LLC and Gawker Media Group, Inc. "pay part or all of the Final Judgment." It added: "Mr. Bollea is hereby deemed to be the owner of the rights, with full power and authority to seek to enforce said rights" against Gawker Media, LLC and Gawker Media Group, Inc., subject to the bankruptcy stay. The order also added that "any payments" received by enforcing the transferred rights "shall be applied toward satisfaction of the Final Judgment."

19.     Daulerio has appealed the order of August 17, 2016, to the Florida Second District Court of Appeal. His appeal remains pending. A copy of his notice of appeal accompanies this Supplement as **Exhibit 5**.

20.     Toward satisfying the judgment, Bollea has served a writ of garnishment approved by the Florida trial court upon Chase Bank covering all of the money in Daulerio's personal bank account (about $1,500).

21.     As Daulerio acquires assets in the future, he expects Bollea to undertake further proceedings to seize those assets toward satisfaction of the $115.1 million

judgment. That may require Daulerio to engage counsel licensed to practice law in California who has experience with creditors' and debtors' rights under California law.

22.    Since the *Bollea* suit's inception through the filing of Gawker Media LLC's bankruptcy petition, Gawker Media, LLC and/or one of the affiliated debtors supplied Daulerio with a defense by paying for the services of the law firm Levine Sullivan Koch & Schulz LLP and the law firm of Thomas & LoCicero to represent Daulerio.

23.    Since the filing of Gawker Media, LLC's bankruptcy petition, the Levine Sullivan firm and the Thomas firm have provided legal services for Daulerio. The fees for the services performed by the Levine Sullivan firm between the time of filing the bankruptcy petition through late September, 2016, are about $190,000. See letter from Levine Sullivan firm dated September 28, 2016, a copy of which accompanies this Supplement as **Exhibit 1**.

24.    Daulerio expects the Levine Sullivan and Thomas law firms to continue to render services to defend him in the *Bollea* litigation after September, 2016, such as by continuing him and the other two defendants in their appeals of the final judgment. Daulerio does not know yet the amount of the fees that would be incurred for those future services by those firms.

25.    Because a conflict of interest prevents the Levine Sullivan and Thomas firms from counseling Daulerio about whatever rights he has against Gawker Media, LLC and the affiliated debtors for indemnity and a continued defense—and in asserting any such rights on Daulerio's behalf—those firms have not provided those kinds legal services to Daulerio.

26.    So in September, 2016, Daulerio retained the law firm of Marburger Law LLC to provide legal services to him arising from the *Bollea* litigation that the other firms cannot provide, and to provide legal services to him arising from the *Bollea* litigation where it seems prudent for Daulerio to have Marburger Law LLC providing services only for him instead of the same counsel simultaneously representing him, Gawker Media, LLC and the affiliated debtors. The fees for the services of Marburger Law LLC will be about $20,000 for the month of September, 2016. See letter from Marburger Law LLC, dated September 29, 2016, a copy of which accompanies this Supplement as **Exhibit 9**.

27.    Services from Marburger Law LLC will continue after September, 2016, in defending Daulerio in matters arising from the *Bollea* suit. Daulerio does not know yet the amount of the fees that he will incur from Marburger Law LLC for those future services. Those services will include at least prosecuting Daulerio's appeal of the trial court's order of August 17, 2016, transferring his indemnity rights and other property

to Bollea (**Exhibit 8**) and representing Daulerio at a hearing before the trial court in

the *Bollea* suit set for late October, 2016.

### What Daulerio seeks in this proof of claim

28.    **Duty to defend**. Daulerio asserts that the debtor Gawker Media, LLC

and/or the affiliated debtors owe to him a continuing duty to provide all of the

following, beginning on June 10, 2016, and continuing into the future:

- legal services and related expenses in defending Daulerio in the *Bollea* suit through all stages of the litigation in all courts, arbitrations, mediations, agencies, and other tribunals;

- legal services and related expenses in defending proceedings before any court, tribunal, arbiter, mediator, official, or agency that arise from Bollea's attempts to satisfy the trial court's judgment of June 8, 2016; or to satisfy a judgment rendered on any new trial or remittitur; or to satisfy any other judgment or order entered in the Bollea suit against Daulerio;

- legal services and related expenses in asserting and defending Daulerio's proofs of claim before this Court against debtor Gawker Media, LLC and the affiliated debtors Gawker Media Group, Inc. and Kinja Kft;

- legal services and related expenses in settling, or in attempts to settle, Daulerio's duty to satisfy any judgment, order, claim, demand, decision, or award against Daulerio arising out of the *Bollea* litigation;

- all other legal services and related expenses necessary or beneficial to protect Daulerio's legal interests as affected or potentially affected by the *Bollea* litigation and by any and every claim, demand, and proceeding arising from that litigation;

- payment to the Levine Sullivan and Thomas law firms for services rendered in representing Daulerio in the *Bollea* suit since June 10, 2016, and related expenses;

- payment to Marburger Law LLC for services rendered in preparing this proof of claim and for all other services rendered in representing Daulerio in matters arising from the *Bollea* litigation, and related expenses.

29.   **Duty to indemnify re Bollea judgment**. This proof of claim seeks from

debtor Gawker Media, LLC and/or the affiliated debtors the full amount of all money

seized by Bollea toward satisfying the Florida trial court's June 8, 2016, judgment

(**Exhibit 2**) and the full value of all other property of Daulerio seized by or on behalf of

Bollea as of September 29, 2016, and in the future toward satisfying the judgment *plus*

all associated costs and expenses paid by or demanded from Daulerio, the total

amount of which is not known yet. Among such property is the value of Daulerio's

shares in affiliated debtor Gawker Media Group, Inc., which Daulerio transferred to

Bollea under the trial court's order of August 17, 2016 (**Exhibit 4**) and all amounts

seized by Bollea from Daulerio's bank account or seized by Bollea by writ of

garnishment or attachment (or some functionally equivalent instrument of the law) of

compensation earned by Daulerio as an employee or independent contractor. The total value and amount of such money and property is not known yet.

30.     **Duty to indemnify re future orders, judgments**. This proof of claim also seeks from debtor Gawker Media, LLC and/or the affiliated debtors the full amount that Daulerio pays, or that a court orders him to pay, or that any person demands from him to pay to satisfy any and every future order or judgment, if any, entered against him by any court in the *Bollea* litigation, or to satisfy any and every future order, judgment, decision, or award against Daulerio imposed by any other court, tribunal, arbiter, official, or agency in any proceeding arising from the *Bollea* litigation. This includes associated costs and expenses incurred by Daulerio. The total amount is not known yet.

31.     **Duty to indemnify re future settlements**. This proof of claim also seeks from debtor Gawker Media, LLC and/or the affiliated debtors the full value and amount of all money or other property that Daulerio pays or transfers to settle his duty to satisfy any and every judgment, order, claim, demand, decision, litigation, or award against him arising in and arising from the *Bollea* litigation. This includes the full value and amount of all money or other property that Daulerio has not paid or transferred, but is obligated to pay or transfer, to settle such a duty—to the extent that the person to which he is obligated (or that person's assignee) makes a demand

for the payment or transfer. The total amount or value of such payment or transfer is not known yet.

32.    **Amount of claim listed on Form 410.** The amount of Daulerio's claim listed on Form 410, line 7 is $6 million. The $6 million amount is an estimate only, based on legal fees incurred as of September, 2016, potential future legal fees, amounts and value of Daulerio's property seized by (and transferred to) Bollea as of September 29, 2016, and potential future seizures by or on behalf of Bollea.

### The sources of the obligation to defend and indemnify Daulerio

33.    The sources of Gawker Media LLC's and/or the affiliated debtors' duty to defend Daulerio and to indemnify him arise from *at least* each of three independent sources:

i.    his employment contract with Gawker Entertainment, LLC (**Exhibit 8**), which Gawker Media, LLC and/or the affiliated debtors Gawker Media Group, Inc. and Kinja Kft assumed;

ii.    the general company practice and policy of Gawker Media, LLC and/or the affiliated debtors Gawker Media Group, Inc. and Kinja Kft (see declaration of William Holden, chief restructuring officer ¶s 19, 24, a copy of which accompanies this Supplement as **Exhibit 7**), and Gawker Media, LLC's established course of providing a defense to Daulerio since the inception of the *Bollea* suit;

iii.    the law of the State of New York.

### Daulerio's reservations of rights

34.   Daulerio reserves the right to amend and further supplement his proof of claim against debtor Gawker Media, LLC and/or the affiliated debtors Gawker Media Group. Inc. and Kinja Kft.

35.   Daulerio reserves the right to file additional proofs of claim for additional claims or for higher priorities and to use any setoff rights that he may have against additional claims.

36.   Daulerio further reserves all rights accruing to him.

37.   The filing of this Proof of Claim is not intended to be, and shall not be, construed as any of the following: (1) an election of remedy; (2) a waiver of any past, present, or future defaults or events of default; (3) a waiver or limitation of any of his rights; (4) a waiver of any theories of recovery; (5) a waiver as to any other claims; (6) an admission that any or all of the claims in his proofs of claim are not entitled to be treated as expenses of administration; (7) a consent to the determination of the debtor's or affiliated debtors' liabilities to Daulerio by this Bankruptcy Court or by any other court; (8) a consent to the jurisdiction or venue of this Bankruptcy Court or any other court.

-o-

# EXHIBIT C

**to Plaintiff's Emergency Motion to Enforce Permanent
Injunction and Prevent A.J. Daulerio from Engaging in
Revenge Porn, Extortion and Video Voyeurism**

***ELECTRONICALLY FILED 10/06/2016 03:36:16 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***



**LEVINE SULLIVAN
KOCH & SCHULZ, LLP**

1899 L Street, NW
Suite 200
Washington, DC 20036
(202) 508-1100 | Phone
(202) 861-9888 | Fax

Seth D. Berlin
(202) 508-1122
sberlin@lskslaw.com

September 28, 2016

**VIA ELECTRONIC MAIL**

David Marburger, Esq.
Marburger Law, LLC
14650 Detroit Ave
Suite 450
Lakewood, OH 44107
david@marburger-law.com

Re:    A.J. Daulerio's Legal Fees

Dear Mr. Marburger:

As you know, along with local counsel, this firm represents A.J. Daulerio in connection with the proceeding captioned *Terry Gene Bollea v. Gawker Media, LLC, et al.*, No. 12012447CI-011, currently pending in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, as well as in various appellate proceedings arising out of that proceeding (collectively, the "Bollea Proceedings").

As you requested, I am writing to advise you that LSKS's outstanding fees and costs for representing Mr. Daulerio in the Bollea Proceedings are approximately $190,000. This figure covers the period between June 10, 2016 (when Mr. Daulerio's co-defendant Gawker Media, LLC filed for bankruptcy) and August 31, 2016, and includes fees incurred representing Mr. Daulerio individually and his share of fees incurred in connection with our joint representation of all three defendants in the Bollea Proceedings. It does not include any fees or costs for work performed this month or any fees or costs that might be incurred going forward.

Please let me know if you have any questions. Thank you.

Sincerely,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By: _____
Seth D. Berlin

Washington    New York    Philadelphia    Denver

# EXHIBIT D

## to Plaintiff's Emergency Motion to Enforce Permanent Injunction and Prevent A.J. Daulerio from Engaging in Revenge Porn, Extortion and Video Voyeurism

MARBURGERLAW

September 29, 2016

A.J. Daulerio
via email:  adaulerio@gmail.com

    Re:  Services arising from *Bollea* litigation

Dear Mr. Daulerio:

This confirms that Marburger Law LLC has provided services and incurred expenses
on your behalf during September, 2016, arising from the *Bollea* litigation.

Among those services:  preparing proofs of claim to be filed in the United States
Bankruptcy Court for the Southern District of New York; assessing and planning to
protect your legal interests in the *Bollea* litigation where such services have not been,
or cannot be, provided by the law firms of Levine Sullivan Koch & Schulz, LLP and
Thomas and LoCicero.

I estimate that Marburger Law LLC's legal fees and related expenses for the month of
September, 2016 will be about $20,000.

Very truly yours,

David Marburger

## **<u>EXHIBIT E</u>**

**GMGI Board Resolution**

## RESOLUTIONS OF THE BOARD OF
## DIRECTORS OF GAWKER MEDIA GROUP, INC.

WHEREAS, the Board of Directors (the "Board of Directors") of Gawker Media Group, Inc. (the "Company"), a Cayman Islands exempted company, does hereby consent to the taking of the following actions and does hereby adopt the following resolutions;

WHEREAS, the Board of Directors has considered presentations by the management of, and the financial and legal advisors to, the Company regarding the potential liabilities and liquidity situation of the Company, the strategic alternatives available to it, and the effect of the foregoing on the Company's business, creditors, and other parties in interest;

WHEREAS, the Board of Directors has had the opportunity to consult with the Company's management, and financial and legal advisors and other professionals, and fully consider each of the strategic alternatives available to the Company; and

WHEREAS, based on its review of all available alternatives and advice provided by such advisors and professionals, the Board of Directors has determined that it is in the best interest of the Company, its subsidiaries and their respective stakeholders, for the Company and its subsidiaries to take the actions specified in the following resolutions:

**Chapter 11 Filing**

RESOLVED:    That in the judgment of the Board of Directors of the Company, it is desirable and in the best interests of the Company, its creditors, and other parties in interest, that the Company and its affiliates file or cause to be filed a voluntary petition for relief (the "Chapter 11 Case") under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

RESOLVED:    That the Company file or cause to be filed the Chapter 11 Case under the provisions of the Bankruptcy Code in the Bankruptcy Court.

RESOLVED:    That any officer of the Company, including the Chief Executive Officer, the President or the Chief Restructuring Officer (collectively, the "Authorized Officers") be, and hereby are, authorized to execute and file, or cause to be executed and filed, on behalf of the Company or any of its affiliates or subsidiaries, a chapter 11 petition for relief in the Bankruptcy Court.

RESOLVED:    That any Authorized Officer of the Company, acting alone or with one or more other Authorized Officers be, and hereby are, authorized to execute and file on behalf of the Company all schedules, lists and other papers or documents, and to take any and all action which they deem reasonable, advisable, expedient,

convenient, necessary or proper to obtain chapter 11 relief, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business.

RESOLVED: That in order to minimize disruption during the pendency of the Chapter 11 cases, it is in the best interests of the Company to amend the Operating Agreement of Gawker Media LLC in accordance with that certain Amendment No. 3 to the Operating Agreement of Gawker Media LLC, dated on or about the date hereof, to allow a person not to be disqualified as Member (as defined therein) of Gawker Media LLC due to the bankruptcy- or insolvency-related circumstances enumerated therein.

RESOLVED: That in order to minimize disruption during the pendency of the Chapter 11 cases, the Operating Agreement of Gawker Media LLC be amended in accordance with that certain Amendment No. 3 to the Operating Agreement of Gawker Media LLC, dated on or about the date hereof, to allow a person not to be disqualified as Member of Gawker Media LLC due to the bankruptcy- or insolvency-related circumstances enumerated therein.

## Retention of Professionals

RESOLVED:  That the Authorized Officers be, and they hereby are, and each of them acting singly is, authorized to employ the law firm of Ropes & Gray LLP as bankruptcy counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including filing any pleadings; and in connection therewith, the Authorized Officers be, and they are, and each of them acting singly is, authorized to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon filing of the Chapter 11 Case, and cause to be filed an appropriate application for authority to retain the services of Ropes & Gray LLP.

RESOLVED:  That the Authorized Officers be, and they hereby are, and each of them acting singly is, authorized to employ and retain the firm of Opportune LLP (including for William Holden of Opportune to serve as the Company's CRO), to provide management services, in accordance with the terms of an engagement agreement between the Company and Opportune, LLP (the "Opportune Services Agreement"), to represent and assist the Company in carrying out its duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the Authorized Officers be, and they are, and each of them acting singly is, authorized to negotiate the final terms of the Opportune Services Agreement, execute the Services Agreement, and cause to be filed an appropriate application for authority to retain the services of Opportune LLP.

RESOLVED:   That the Authorized Officers be, and they hereby are, and each of them acting singly is, authorized to employ and retain the firm of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), as investment banker in accordance with the terms of an engagement agreement between the Company and Houlihan Lokey (the "HL Services Agreement") to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the Authorized Officers be, and they are, and each of them acting singly is, authorized to negotiate the final terms of the HL Services Agreement, execute the HL Services Agreement, and cause to be filed an appropriate application for authority to retain the services of Houlihan Lokey.

RESOLVED:   That the Authorized Officers be, and they hereby are, and each of them acting singly is, authorized to employ and retain the firm of Prime Clerk LLC as notice, claims, and balloting agent and as administrative advisor to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the Authorized Officers be, and they are, and each of them acting singly is, authorized to negotiate the final terms of Prime Clerk LLC's retention, execute appropriate retention agreements, and cause to be filed an appropriate application for authority to retain the services of Prime Clerk LLC.

RESOLVED:   That the Authorized Officers be, and they hereby are, and each of them acting singly is, authorized to employ any other professionals to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, each of the Authorized Officers, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of any other professionals as necessary.

**Cash Collateral & Adequate Protection**

RESOLVED:   That the Company will obtain benefits from the use of collateral, including cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), which is security for certain prepetition secured lenders (collectively, the "Secured Lenders") party to:

a.   The loan and security agreement (as subsequently amended, the "First Lien Credit Agreement") with Silicon Valley Bank ("Silicon Valley Bank"), pursuant to which Silicon Valley Bank agreed to provide to Gawker Media LLC a term loan facility in the aggregate principal amount of $7,666,666.67 (the "First Lien Term Loan") and a letter of credit with an undrawn face amount of $5,302,066.00 (the "First Lien Letter of Credit"). The obligations under the First Lien Credit Agreement are guaranteed by the Company and Kinja Kft. and are secured on a first priority basis by liens on substantially all of the assets of Gawker Media LLC, Kinja Kft., and the Company.

    b.   The loan and security agreement (the "Second Lien Credit Agreement") with US VC Partners LP ("US VC Partners"), a Delaware limited partnership, pursuant to which US VC Partners agreed to extend a term loan facility to the Company in the initial amount of $15,000,000 (the "Second Lien Term Loan").  The obligations under the Second Lien Credit Agreement are guaranteed by Gawker Media LLC and Kinja Kft. and the Second Lien Debt is secured by a second priority lien on substantially all of the assets of the Company, Gawker Media LLC, and Kinja Kft.

RESOLVED:    That in order to use and obtain the benefits of the Cash Collateral, and in accordance with section 363 of the Bankruptcy Code, the Company will provide certain adequate protection to the Secured Lenders (the "Adequate Protection Obligations"), to be documented in a proposed order with terms substantially similar to those considered by the Board of Directors (the "Cash Collateral Order").

RESOLVED:    That the general terms proposed to be included in the Cash Collateral Order to which the Company will be subject, and the actions and transactions contemplated thereby be, and hereby are authorized and approved, and each of the Authorized Officers of the Company be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to take such actions and negotiate or cause to be prepared and negotiated and to execute, deliver, perform and cause the performance of, the terms proposed to be included in the Cash Collateral Order, and such other agreements, certificates, instruments, receipts, petitions, motions or other papers or documents to which the Company is or will be a party, incur and pay or cause to be paid all fees and expenses and engage such persons, with such changes, additions and modifications thereto as the officers of the Company executing the same shall approve, such approval to be conclusively evidenced by such officers' execution and delivery thereof.

RESOLVED:    That the Company, as debtor and debtor in possession under the Bankruptcy Code be, and hereby is, authorized to incur the Adequate Protection Obligations and to undertake any and all related transactions, and that that the Authorized Officers be, and they hereby are, authorized and directed, and each of them acting alone hereby is, authorized, directed and empowered in the name of, and on behalf of, the Company, as debtor and debtor in possession, to take such actions as in their discretion is determined to be necessary, desirable, or appropriate to secure and maintain use of the Cash Collateral.

RESOLVED:    That each of the Authorized Officers of the Company be, and hereby is, authorized, directed and empowered in the name of, and on behalf of, the Company to file or to authorize the filing of any Uniform Commercial Code (the "UCC") financing statements, any other equivalent filings, any intellectual property filings and recordation and any necessary assignments for security or other documents in the name of the Company that are deemed necessary or appropriate to perfect any lien or security interest granted under the Cash Collateral Order, including any such UCC financing statement containing a

generic description of collateral, such as "all assets," "all property now or hereafter acquired" and other similar descriptions of like import, and to execute and deliver, and to record or authorize the recording of, such mortgages and deeds of trust in respect of real property of the Company and such other filings in respect of intellectual and other property of the Company, in each case as the Agents may reasonably request to perfect the security interests of the Agents under the Cash Collateral Order.

RESOLVED:    That each of the Authorized Officers of the Company be, and they hereby are, authorized, directed and empowered in the name of, and on behalf of, the Company to take all such further actions, including, without limitation, to pay or approve the payment of all fees and expenses payable in connection with the Adequate Protection Obligations and all fees and expenses incurred by or on behalf of the Company in connection with the foregoing resolutions, which shall in their sole judgment be necessary, proper or advisable to perform the Company's obligations under or in connection with the Cash Collateral Order or any of the other adequate protection documents and the transactions contemplated therein and to carry out fully the intent of the foregoing resolutions.

**Debtor-In-Possession Financing**

RESOLVED:    That the Company would obtain benefits from debtor-in-possession financing ("DIP Financing") in connection with the chapter 11 case, part of which would be used to satisfy the Company's and subsidiaries' obligations under the First Lien Credit Agreement, depending on the size of the DIP Financing.  Accordingly, (a) the Board of Directors authorizes and approves (i) the execution, delivery, and performance of a debtor in possession credit agreement (the "Credit Agreement"), in the initial amount of up to $22 million, generally on the terms described to the Board of Directors (but with any such changes thereto as the Authorized Officer(s) executing the same shall approve), and any security agreements, guarantee agreements, other agreements, notes, consents, certificates, amendments, assignments, and instruments in connection therewith (the "Credit Documents," together with the Credit Agreement, the "Financing Documents"), (ii) the granting of a security interest in any assets of the Company as collateral or the guaranty of the obligations of the debtors under the Credit Agreement, and (iii) any transactions effected or to be effected pursuant to the terms and provisions of the Financing Documents; and (b) any Authorized Officer(s) be, and hereby is, authorized and empowered, in the name and on behalf of the Company, to negotiate, execute, deliver, and perform or cause the performance of the Financing Documents, as such Authorized Officer executing the same considers necessary, appropriate, proper, or desirable to effectuate the transactions contemplated by the Financing Documents and other financing arrangements necessary, appropriate, proper, or desirable in the interest of the Company in connection with the chapter 11 case, such determination to be conclusively evidenced by such execution or taking of such action.

**Sale of Assets and Indemnification**

RESOLVED:    That each of the Authorized Officers shall be, and hereby are, authorized to commence the process of marketing and selling the assets of the Company and its subsidiaries outside of a chapter 11 filing and/or in a process approved by the Bankruptcy Court after a chapter 11 filing.  Furthermore, each of the Authorized Officers shall be, and hereby are, authorized to enter into an asset purchase agreement to sell the assets of the Company and its subsidiaries (the "Sale"), which Sale may be subject to potential higher or better offers in a chapter 11 proceeding.  Each of the Authorized Officers are authorized to adjust the terms of the Sale as necessary, including with respect to price and the particular assets to be sold.

RESOLVED:    That the Company would obtain benefits in connection with the chapter 11 case from indemnifying writers and editors who are named as defendants in civil actions, in connection with their work for the Company (each a "Company-Related Action"), in which the Company or any of its subsidiaries are also named ("Employee Defendants"). Accordingly, the Board of Directors authorizes any Authorized Officer to take any actions necessary, appropriate, proper, or desirable in the interest of the Company in connection with the chapter 11 case, such determination to be conclusively evidenced by such execution or taking of such action, to indemnify any Employee Defendant up to the full amount of their costs and expenses in connection with any Company-Related Action.

**General**

RESOLVED:    That each of the Authorized Officers be, and hereby is, with power of delegation, authorized, empowered and directed to execute and file all petitions, schedules, motions, lists, applications, pleadings, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper, or desirable in connection with the Company's chapter 11 case, with a view to the successful prosecution of such case.

RESOLVED:    That the omission from these resolutions of any agreement, document or other arrangement contemplated by any of the agreements, documents or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements, documents or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officers to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by, and the intent and purposes of, the foregoing resolutions.

RESOLVED:    That all acts, actions, and transactions relating to the matters contemplated by the foregoing Resolutions previously done, on or prior to the date hereof, in the name

and on behalf of the Company, in connection with the transactions contemplated by the foregoing resolutions, are in all respects ratified, approved, confirmed and adopted as acts and deeds by and on behalf of the Company.

RESOLVED:    That the Authorized Officers be, and hereby are, and each of them acting singly is, authorized and directed, on behalf of and in the name of the Company, to enter into, execute, deliver, certify, file, and/or record and perform such agreements, instruments, motions, affidavits, applications for approvals or ruling of governmental or regulatory authorities, certificates, and other documents and to take such other actions as in the judgment of the Authorized Officer shall be or become necessary, appropriate, and desirable to prosecute to a successful completion the Chapter 11 Case and otherwise exercise the rights and powers of the Company as a member or manager (however denominated, or any officer of the Company so empowered) of the Company's subsidiary, Gawker Media, LLC, including any amendments as may be necessary or advisable to the Operating Agreement of Gawker Media, LLC.

RESOLVED:    That each of the Authorized Officers (and their designees and delegates) be and hereby is authorized and empowered to take all actions or to not take any action in the name of the Company with respect to the transactions contemplated by these resolutions hereunder as the sole shareholder, partner, member, or managing member of each direct subsidiary of the Company, in each case, as such Authorized Officer shall deem necessary or desirable in such Authorized Officers' reasonable business judgment as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein.

RESOLVED:    That all members of the Board of Directors of the Company have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Company, or hereby waive any right to have received such notice.