Ropes & Gray LLP
Gregg M. Galardi
D. Ross Martin
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                                  :
In re                                             :        Chapter 11
                                                  :
Gawker Media LLC, *et al.*,[1]                    :        Case No. 16-11700 (SMB)
                                                  :
              Debtors.                            :        (Jointly Administered)
                                                  :
-------------------------------------------------------x

## DEBTORS' REPLY IN SUPPORT OF OBJECTIONS TO PROOFS OF CLAIM FILED BY XP VEHICLES GROUP AND REPLY TO XP VEHICLES' RESPONSE

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and

Gawker Hungary Kft. ("Gawker Hungary"), each as debtor and debtor in possession (the

"Debtors") in the above-captioned cases (the "Bankruptcy Cases"), hereby file this Reply in

Support of Objections to Proofs of Claim Filed by XP Vehicles Group and Reply to XP Vehicles'

Response, and respectfully set forth and represent as follows:

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

## PRELIMINARY STATEMENT

1.       On September 27, 2016, XP Vehicles Group filed the XP Vehicles Claims. Each proof of claim identically asserts an unsecured claim for $175,000,000; one against each of the Debtors [Claim Nos. 61, 62, 86, and 98] (the "XP Vehicles Claims").

2.       The initial XP Vehicles Claims do not state a claim in any respect. They do not even identify what "XP Vehicles Group" is—whether a corporation, partnership, or something else. Each of the XP Vehicles Claims is signed by Scott Douglas Redmond ("Mr. Redmond") as so-called "Trustee-Shareholder" of XP Vehicles.

3.       Each proof of claim begins with a three-page, unattributed document (Claims 61, 62 and 86 all have the same document; Claim 98 has a different one). Nowhere in these initial proofs of claim does XP Vehicles assert any legal cause of action.

4.       On October 31, 2016, Debtors filed the *Debtors' First Omnibus Objection to Proofs of Claim Filed by XP Vehicles Group, and Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012* [Docket No. 393] (the "Claims Objection").

5.       On November 15, 2016, the Court received the *Response to Notice of Debtors' First Omnibus Objection to Proofs of Claim Filed by XP Vehicles Group, and Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012 and Rejection of their Attempts to Violate Claimants Civil Rights* (the "Response"), which was subsequently entered on the docket for these chapter 11 cases on November 17, 2016 [Docket No. 458].

6.       The Response mentions various federal and California law causes of action for the first time, which it seems to direct at the Debtors. To the best of their knowledge, no complaint has been filed by XP Vehicles against the Debtors.

7.       As shown below, the various causes of action alleged in the Response are precluded by the applicable statutes of limitations, untenable on the merits, and concerned with

59862701_5

allegations similar to those in an action brought by Mr. Redmond over five years ago and dismissed under California's anti-SLAPP statute.

## **REPLY**

8.      The XP Vehicles Claims are based on a generalized conspiracy theory, alleged to involve many named persons and entities.  The Claims Objection noted that the XP Vehicles Claims themselves provided very little detail about what was actually alleged against the Debtors. In response to the Claims Objection, XP Vehicles has sent a series of emails to Debtors' counsel. Some of the same material was sent to the Court, and the Court has docketed it [Docket No. 458]. For completeness of the record, the Debtors are filing contemporaneously herewith a Declaration of D. Ross Martin that attaches copies of all the material emailed to Debtors' counsel.  In addition, Debtors' counsel communicated to XP Vehicles twice; once by email regarding the need to file materials with the Court and appear in court for hearings on the Objection, and once by email and regular mail regarding the process for handling the Claims Objection.  Copies of that correspondence are attached to this Reply as Exhibit B and Exhibit C.

9.      Importantly, in one of the responsive emails, XP Vehicles attached a form of complaint (the "Draft Complaint"), purporting to set forth causes of action against a multitude of prospective defendants, including Gawker Media. While it appears that the Draft Complaint was never filed, it is the most complete and specific elucidation of the allegations that XP Vehicles is asserting against the Debtors.  *E.g., In re Residential Capital, LLC*, 518 B.R. 720, 732 (Bankr. S.D.N.Y. 2014) (courts construe proofs of claim liberally when filed without assistance of counsel).[2]  For the convenience of the Court, a copy of just the Draft Complaint (excerpted from the responsive materials) is also attached as Exhibit D.

---

[2] The original Objection noted that it was unclear what XP Vehicles is, as an entity.  It may be that it is a dissolved California corporation.  It is clear that a corporation or entity can file a proof of claim without counsel, but typically

59862701_5

10.    As demonstrated below, despite these responses and the allegations in the Draft Complaint, the XP Vehicle Claims cannot withstand the Debtors' request to dismiss the claims or enter judgment on the pleadings.

## I.    Certain XP Vehicles Claims Should Be Disallowed As Duplicative

11.    None of the responsive material from XP Vehicles disputes the Debtors' objections that one of the XP Vehicles Claims is duplicative.  Therefore, as set forth in the Objection, Claim No. 98 should be disallowed on such basis so that there remains only a single proof of claim against each Debtor, Nos. 61 (GMGI), 62 (Gawker Media) and 86 (Gawker Hungary).

12.    With respect to the remaining proofs of claim, the additional specificity provided in the Draft Complaint makes clear that this Court should disallow all of the XP Vehicles Claims, which could not survive a motion to dismiss or for judgment on the pleadings for the reasons set forth in the Claims Objection and below.  To the extent that this Court does not disallow such claims, this Court should hold an evidentiary estimation hearing in connection with confirmation of the proposed chapter 11 plan.

## II.    The XP Vehicle Claims Should Be Disallowed In Their Entirety

### A.    The Statute of Limitations Precludes all of the XP Vehicles Claims

13.    The only express allegation regarding any actual conduct by Gawker Media is contained in paragraphs 16 and 22 of the Draft Complaint.  It refers to cancellation of a government contract in 2009 and a January 2011 *Gizmodo* article.  The statute of limitations with respect to every cause of action in the Draft Complaint, however, lapsed well before the Petition Date, with respect to an injury occurring in 2009 and a publication occurring in 2011.

---

must respond to any claims objection via counsel (because pleading is required), it is not clear whether a dissolved entity may appear without counsel through an individual charged with its dissolution. *In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2864972, at *1 (Bankr. S.D.N.Y. Sept. 29, 2006).

59862701_5

14.    Specifically, the Draft Complaint contains the following causes of action, which have the noted applicable statute of limitations:

- Intentional Interference with Contractual Relations (¶¶35-42)—two years (Cal. Code Civ. Proc. § 339);

- Intentional Interference with Prospective Economic Advantage (¶¶ 44-56)—two years (Cal. Code Civ. Proc. § 339);

- Cyberstalking (¶¶ 44-49)— at most three years (Cal. Code Civ. Proc. § 1708.7; *e.g.*, *Laskey v. RCN Corp.*, 357 F. App'x 139 (9th Cir. 2009))

- Fraud (¶¶ 44-46, 5-10[sic])—three years (Cal. Code Civ. Proc. § 338(d));

- Invasion of Privacy (¶¶ 44-47, 8-14[sic])—one year (Cal. Code Civ. Proc. § 335.1);

- Unfair Competition (¶¶ 4-22[sic] and 10-12[sic])—four years (Clayton Act; Cal. Bus. and Prof. Code § 17208); and

- RICO (unnumbered ¶¶ of Draft Complaint)—four years; *e.g.*, *Koch v. Christies Int'l, PLC*, 699 F.3d 141, 148 (2d Cir. 2012).

Thus, all of the XP Vehicles Claims should be disallowed as time barred.

15.    Indeed, even assuming, arguendo, that the longest of these limitations periods applies—the four years for RICO and unfair competition claims—all of the causes of action would be time barred.  The four-year period for RICO claims begins to run on the date of discovery of the injury.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *Koch*, 699 F.3d at 148.  The Supreme Court has rejected any later "discovery rules": it is not the date of discovery of the "pattern of alleged racketeering activity," and it is not the date of the last act of alleged racketeering activity.  *Rotella v. Wood*, 528 U.S. 549, 552 (2000); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997); *see also Koch*, 699 F.3d at 148-49; *Frankel v. Cole*, 313

F. App'x. 418 (2d Cir. 2009).  Unfair competition law, whether federal (Sherman Act, 15 U.S.C. § 15b) or California (Cartwright Act, Cal. Bus. & Prof. Code §§ 16750, 16750.1; Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, 17208), has the same four-year limitations period and the same rule that the statute of limitations runs when the defendant's particular act occurred and the injury occurred.  *See, e.g.*, *Garrison v. Oracle Corp.*, 159 F. Supp.3d 1044, 1064-66 (N.D. Cal. 2016).  Indeed, when the activities complained of are "open and notorious," no tolling applies.  *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 328 F. App'x 695, 698-99 (2d Cir. 2009) (rejecting unfair competition claims allegedly arising from the production of professional-wrestling toy-action figures).

16.    The Draft Complaint alleges that a government contract was cancelled in 2009, XP Vehicles purportedly provided "live testimony" to the U.S Government in 2010, and that *Gizmodo* published an article in 2011.  This is "open and notorious activity" and no conceivable "discovery" of the injury or cause of action against Gawker Media could occur later than the 2011 article.  Indeed, the Draft Complaint suggests (with some lack of clarity) that the 2011 Article was alleged retaliation for prior (undescribed and unspecified) "testimony," in which case the limitations period began immediately upon publication.  Thus, under the most favorable limitations period and the facts alleged, the statute of limitations expired in 2015 for four-year causes of action, and even earlier for the other causes of action alleged.

17.    If that were not enough to disallow the XP Vehicles Claims, then one final fact seals the fate of every one of these causes of action.   XP Vehicles cannot dispute that it knew of the purported injury and potential to sue Gawker Media in early 2011.  <u>Because the principal of XP Vehicles</u>, Mr. Scott Redmond (who personally signed all the proofs of claim for XP Vehicles in these chapter 11 cases) <u>actually sued Gawker Media in February 2011</u>, regarding the same

6

*Gizmodo* article.  A copy of the relevant complaint is attached as <u>Exhibit E</u>.  The limitations period has run.

### B.    Each "Cause of Action" Described in the Draft Complaint Fails as to Gawker Media

18.    The Claims Objection requested that Fed. R. Civ. P. 12(b)(6) and 12(c) be applied in this contested matter.  The Draft Complaint makes this, if anything, even more appropriate.  That Draft Complaint levels allegations against many possible defendants, but examining them specifically as to Gawker Media reveals that these allegations all would fail as a matter of law on a motion to dismiss or for judgment on the pleadings (taking the Claims Objection and this Reply as the relevant additional pleadings).

19.    The claim for <u>intentional interference with contractual relations</u> relates to an alleged 2005 government contract with, or grant to, XP Vehicles. There is not a single allegation relating to Gawker Media in that portion of the Draft Complaint.  Other allegations in the Draft Complaint state that the contract or grant was cancelled in 2009, well before the 2011 *Gizmodo* article.  Under California law, however, this cause of action requires (1) the existence of a valid contract (2) known to defendants (3) that defendants intended to breach or disrupt and (4) actually did breach or disrupt in a way that (5) caused harm to the plaintiff.  *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126, 791 P.2d 587, 589-90 (1990) (collecting cases); *accord Urica, Inc. v. Medline Indus., Inc.*, No. 14-56545, 2016 WL 5539868, at *1 (9th Cir. Sept. 30, 2016).  This portion of the XP Vehicles Claims must be disallowed because there is no allegation at all (not even a conclusory one) regarding the Debtors, and specifically regarding the Debtors' knowledge of the contract at issue except <u>after</u> it was cancelled.  The Debtors also could not have intended to disrupt that already-cancelled contract.

20.     The claim for <u>intentional interference with prospective economic advantage</u> does mention Gawker Media.  The elements of this cause of action under California law are: (1) that plaintiff and a third party were in an economic relationship that probably would have resulted in an economic benefit to plaintiff; (2) that defendant knew of this relationship and (3) intended to disrupt it by (4) engaging in wrongful conduct, such as misrepresentation or fraud or violation of a statute and (5) that the relationship was in fact disrupted (6) to the harm of the plaintiff and (7) that defendant's wrongful conduct was a substantial factor in causing plaintiff's harm. *Youst v. Longo*, 43 Cal. 3d 64, 71, n.6, 729 P.2d 728, 733, n.6 (Cal. 1987); *accord Hernandez v. Pac. Mar. Ass'n*, 379 F. App'x 668, 670 (9th Cir. 2010).  Here the allegations are of the most cursory variety.  "Defendants" (undifferentiated) are said to have "enlisted the services of the Defendants" (again undifferentiated) "in an effort to divest [XP Vehicles] of contacts in the industry and also of financial backing."  There is not a single specified contact or detail of prospective financial backing.  There is no allegation that Gawker Media (or the other Debtors) were the "Defendants" who did "the enlisting."  It is equally plausible (even taking some of these allegations as true solely for purposes of considering the Draft Complaint at this stage) that Gawker Media had its services "enlisted" but without any knowledge of the supposed contacts and prospective advantage that XP Vehicles had and lost.  This is the type of generalized, conclusory pleading that *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007), concludes is insufficient to allow allegations to proceed.  "[P]roofs of claim should at least allege facts from which liability . . . can be seen to exist." *Svenska Taendsticks Fabrik Aktiebolaget v. Irving Tr. Co. (In re Int'l Match Corp.)*, 69 F.2d 73, 76 (2d Cir. 1934); *see In re Residential Capital, LLC*, 518 B.R. 720, 731.

21.    The claim for cyberstalking does not expressly mention Gawker Media. Generously construed, it could allege that Gawker Media refused to remove the 2011 Gawker story from the web.  Under California law this cause of action requires: (1) engaging in a pattern of conduct the with an intent to alarm or harass the plaintiff, (2) that, as a result, causes plaintiff either (i) to fear reasonably for their safety or for the safety of an immediate family member or (ii) to suffer substantial emotional distress and the pattern of conduct would cause a reasonable person to suffer substantial emotional distress and (3) either involves (i) a credible threat by the defendant against the plaintiff made with the intent to place plaintiff in reasonable fear of their safety or their immediate family's safety or (ii) the violation of a restraining order. Cal. Civ. Code § 1708.7; *e.g.*, *Kenney v. City of San Diego*, No. 13-248-WQH-DHB, 2013 WL 5346813, at *5 (S.D. Cal. Sept. 20, 2013).  The Draft Complaint does not state such a claim, because it does not involve the safety of family members or emotional distress.  XP Vehicles alleges that it was a business, and perhaps an incorporated entity.  But a corporation cannot suffer personal injuries of this sort because it is not a human being.  *See generally Roemer v. C.I.R.*, 716 F.2d 693, 699 n.4 (9th Cir. 1983) ("[A] corporation by its very nature cannot suffer a personal injury.").  This portion of the XP Vehicles Claims must the disallowed.

22.    The claim for fraud is woefully inadequate as to Gawker Media.  The statement complained of concerns a statement by the search-engine defendants that they could not remove the 2011 *Gizmodo* article form search results, and the alleged falsity of that statement.  The allegation actually is not that the *Gizmodo* article was itself fraudulent.  Nor could it be; the 2011 *Gizmodo* article was directed at readers, not to somehow induce XP Vehicles to take any action. This alleged cause of action is perhaps where the Draft Complaint becomes most inadequate because the remaining allegations are made with the bracketed instructions of a form pleading

left in the Draft Complaint. There simply is no plausible connection of this cause of action to the Debtors.

23.    The claim for underline invasion of privacy is unintelligible as a cause of action brought by a business or entity. Such entity has no specific right to privacy. *Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 878 (1980). Furthermore, the allegations are of the failure of search engines to remove links to the 2011 *Gizmodo* article because various matters "are no longer of public concern." The Second Circuit rejected the cause of action of "a right to be forgotten" long ago. *Sidis v. F-R Publ'ng Corp.*, 113 F.2d 806 (1940) (child prodigy did not have invasion of privacy claim, under common law or statute, based on *New Yorker* profile published later in life).

24.    The claim for underline unfair competition does mention Gawker Media—but only as the publisher of an allegedly false article, not as the subject of the competition based claim, which is denominated as a class action. The Draft Complaint has the vague allegation that "INC is a business incorporated in the State of California and at all times herein owned and operated its search engine and its ancillary commercial enterprises from [its headquarters in Santa Clara, California." [sic] Here again, the allegations of this cause of action focus on the failure of Internet search engines to remove links to certain articles or websites upon request. This cause of action in the Draft Complaint (even if somehow within the statute of limitations) is not against the Debtors. In addition, no relief has been sought in this Court to file a class proof of claim. The class allegations state that "39% of the population of the United States of America" is within the class. No class status was asserted in the original proof of claim, and it cannot be amended after the bar date to be a class claim, even if the class allegations were not preposterous.

25.    Finally, the claim for underline RICO violations fails because there are no specific factual allegations at all. This portion of the Draft Complaint consists entirely of legal citations and

conclusory statements.  There are only two arguably "factual statements": (i) "The patterns of

RICO compliant [sic] behavior are easily visible and proven in this case," Exhibit D at 24; and

"Plaintiffs have been damaged in their business, brand, opportunity, civil rights and property by

these 'racketeers.'" *Id.*, both of which are entirely conclusory statements.  Consequently, XP

Vehicle's RICO claims also fail as a cause of action at the pleading stage.

> **C.    Mr. Scott Redmond (the so-called "Trustee Shareholder" of XP Vehicles) Has Raised Similar Allegations Before, and a California Court Rejected Them and Awarded Gawker Media Damages under the Anti-SLAPP Statute**

26.     In the final analysis, the XP Vehicles Claims (construed liberally) all arise from

some alleged defamatory or false statements in a 2011 *Gizmodo* article.  The XP Vehicles Claims

are all signed by Mr. Scott Redmond, who lists his title as "trustee shareholder."  Mr. Redmond

has once before asserted causes of action arising from this same Gawker article.  *See* Exhibit E

(Complaint).[3]

27.     A California state trial court did not merely reject the allegations against Gawker

Media arising from the 2011 article.  When Gawker Media filed a special motion under the

California Anti-SLAPP statute, the trial court entered an order awarding over $67,000 of

affirmative damages to Gawker Media.  The California Court of Appeals (First Division) then

affirmed that ruling in a 14-page opinion.  *See Redmond v. Gawker Media LLC*, No. A132785

(Cal. Ct. App. 1st Dist., Div. 1; August 10, 2012).  A copy of that ruling is attached as Exhibit F

("Op.").

28.     This entire contested matter regarding the XP Vehicles Claims and a 2011

*Gizmodo* article can be summed up by the following: a California appeals court labeled the

---

[3] This prior action may be why the Draft Complaint does not include any causes of action for defamation or false
light, which were expressly rejected in that 2011 complaint.

59862701_5

article "completely transparent."  Op. at 13.  That article cannot give rise to any liability, and the

XP Vehicles Claims must be disallowed.

[*Remainder of this page intentionally left blank*]

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court (a) grant the Claims Objection and disallow the XP Vehicles Claims, and (b) grant such other and further relief as may be just and proper.

Dated: November 29, 2016
      New York, New York

*/s/ D. Ross Martin*

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
jonathan.agudelo@ropesgray.com
peter.walkingshaw@ropesgray.com

*Counsel to the Debtors and Debtors in Possession*

59862701_5

**<u>EXHIBIT A</u>**

Declaration of D. Ross Martin, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| Gawker Media LLC, *et al.*,[1] | ) Case No. 16-11700 (SMB) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DECLARATION OF D. ROSS MARTIN, ESQ. IN SUPPORT OF THE**
**DEBTORS' REPLY MEMORANDUM IN SUPPORT OF**
**OBJECTIONS TO PROOFS OF CLAIM FILED BY XP VEHICLES GROUP**

Pursuant to 28 U.S.C. § 1746, D. Ross Martin declares as follows:

1.      I am a partner with the law firm Ropes & Gray LLP, counsel to Gawker

Media LLC ("Gawker Media), Gawker Media Group, Inc. ("GMGI"), and Kinja Kft. ("Kinja"),

(collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned cases.

2.      I submit this declaration in support of the *Debtors' Reply Memorandum in*

*Support of Objections to Proofs of Claim Filed by XP Vehicles Group* (the "XP Vehicles

Reply").

3.      On September 27, 2016, XP Vehicles Group (the "Claimant") filed a proof

of claim against each of the Debtors in these chapter 11 cases, each asserting an unsecured claim

for $175,000,000 [Claim Nos. 61, 62, 86, and 98].

4.      On October 31, 2016, Debtors filed the *Debtors' First Omnibus Objection*

*to Proofs of Claim Filed by XP Vehicles Group, and Motion to Apply Fed. R. Civ. P. 12(b)(6)*

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker
Media Group, Inc. (3231); and Gawker Hungary Kft. (5056).  Gawker Media LLC and Gawker Media Group, Inc.'s
mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd
Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn:
William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

*and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012* [Docket No. 393] (the "XP Vehicles Objection").

5.      On November 15, 2016, the Court received the *Response to Notice of Debtors' First Omnibus Objection to Proofs of Claim Filed by XP Vehicles Group, and Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c) Pursuant to Bankruptcy Rules 9014 and 7012 and Rejection of their Attempts to Violate Claimants Civil Rights* (the "Response"), which was subsequently entered on the docket for these chapter 11 cases on November 17, 2016 [Docket No. 458].

6.      Attached as Exhibit B is a true and correct copy of D. Ross Martin's correspondence to the Claimant, sent on November 13, 2016 at 4:29 p.m. (ET).

7.      Attached as Exhibit C is a true and correct copy of Gregg Galardi's correspondence to the Claimant, sent on November 22, 2016 at 12:14 p.m. (ET).

8.      Attached as Exhibit D is a true and correct excerpt of pages from the Response that appears to be a form of complaint (the "Draft Complaint").

9.      Attached as Exhibit E is a true and correct copy of Mr. Scott Redmond's February 2011 California complaint against Gawker Media et al. (the "California Complaint").

10.     Attached as Exhibit F is a true and correct copy of the Opinion entered on August 10, 2012 affirming the trial court order granting defendant's motion to strike the California Complaint under California Code of Civil Procedure § 425.16 ("Op.").

*[Remainder of page intentionally left blank.]*

I declare under penalty of perjury that, to the best of my knowledge and after reasonable

inquiry, the foregoing is true and correct.

Dated: November 29, 2016
        Boston, Massachusetts

*/s/ D. Ross Martin*
D. Ross Martin

# **EXHIBIT B**

D. Ross Martin, Esq. Correspondence to XP Vehicles - Nov. 13, 2016 at 4:29 p.m. (ET)

**Martin, D. Ross**

| | |
|---|---|
| **From:** | Martin, D. Ross |
| **Sent:** | Sunday, November 13, 2016 4:29 PM |
| **To:** | legal@xpvehicles.com |
| **Cc:** | Walkingshaw, Peter |
| **Subject:** | In Gawker Media LLC et al., Bankr S.D.N.Y. 16-11700 |

Ladies & Gentlemen,

We, as counsel to Gawker Media LLC, Gawker Media Group Inc. and Gawker Hungary Kft. (f/k/a Kinja Kft.), as debtors and debtors in possession (collectively, the "Debtors"), are in receipt of your emails of November 11, 12 and 13, 2016. We write to repeat certain information and to bring certain matters to your attention.

1.      Any response you make to our claims objection must be filed with the bankruptcy court. The deadline to do so remains tomorrow, November 14, 2016. Emailing the document to us, and/or to other parties in the bankruptcy case, or to any other government address, is not sufficient. You can consult the Court's website regarding filing. Failure to file an objection in a timely manner can result in the bankruptcy court summarily denying your claims, and the Debtors will seek such relief (as well as alternatively seeking denial of your claim on various other grounds) if you do not file. The potential consequence of not timely filing was set forth expressly in the notice of our claims objection (see #4 below).

In general, relief from the bankruptcy court must be sought by motion filed with the bankruptcy court, not by email to us or to PrimeClerk.

2.      Certain of your emails indicate that you would not attend the hearing set for December 1, 2016. Please note that failure to attend the hearing could also result in the bankruptcy court denying your claims.

3.      If your claims are not denied at the December 1 hearing, there will also be a hearing commencing on December 13, 2016 that could affect your claim. The Debtors have already given you notice of that hearing, and of various important deadlines before that date. That hearing (a "confirmation hearing") can continue from day to day, and to various further days, by announcement in court.

To avoid any lack of clarity, we also intend to seek additional relief that could relate to your claim. That would also occur on December 13, 2016 (and there may be preliminary hearings as well, before that date). The Debtors would give notice, in the manner contemplated by the Bankruptcy Code, Bankruptcy Rules, local rules and Case Management Order, of such additional relief.

In light of the statement in at least one of your emails that you cannot attend the December 1 hearing, purely for logistical purposes we would like to know if you cannot attend the December 13 hearing. The Debtors do not intend to adjourn the matters set forth for December 1 to the later date.

Also please note that the Debtors have no intention of delaying the December 13 hearing, the timing of which is necessary to the transactions contemplated in the chapter 11 plan (and disclosure statement) that is on file (and of which the Debtors have given notice).

4.      Various of your emails complain of a lack of notice. The Bankruptcy Rules require 30 days notice, by mail, of the hearing on objections to claims. That is what we have given for the December 1 hearing. We have

1

checked our records and the notice was properly mailed on October 31, 2016, to the exact address listed on the proofs of claim you filed.  We also note that the same address is contained on your recent email correspondence.

Furthermore, although it was not required by the rules, an email with our claims objection was also sent on October 31, 2016 to the email address listed on your proof of claim forms.

5.  Please note that Judge Bernstein has specific rules regarding required attendance at hearings, as well as the sometimes-used substitute of appearing by phone.

For your convenience, the Judge's Chambers rule on telephonic appearances is here: http://www.nysb.uscourts.gov/judges-info/judge-example

In order to participate live in a hearing by phone, you have to request and receive permission from the Court at least two days in advance.  Getting that permission is separate from actually arranging the telephonic appearance.  The telephonic appearance may cost money, because it is provided through a private service.  The service is known as "Courtcall", and their number is: 866-582-6878

We do not know whether Judge Bernstein would permit your appearing at any hearing by phone.  We reserve the right to object to your appearance by phone, and to move for suspension of any telephonic hearing should participation not be in an orderly and appropriate manner.  We do expect there to be witnesses and other evidence at the hearing that starts on December 13, 2016.

-- Ross

**EXHIBIT C**

Gregg Galardi, Esq. Correspondence to XP Vehicles - Nov. 22, 2016 at 12:14 p.m. (ET)

**Martin, D. Ross**

| | |
|---|---|
| **From:** | Galardi, Gregg |
| **Sent:** | Tuesday, November 22, 2016 12:14 PM |
| **To:** | XP VEHICLES (legal@xpvehicles.com) |
| **Cc:** | Martin, D. Ross; Walkingshaw, Peter |
| **Subject:** | Gawker December 1 and December 13 Hearings |
| **Attachments:** | XP Vehicles.pdf |

Please review the attached.  We are available to discuss at your convenience

**Gregg M. Galardi**
**ROPES & GRAY LLP**
T +1 212 596 9139 | M +1 917 434 3178
1211 Avenue of the Americas
New York, NY 10036-8704
Gregg.Galardi@ropesgray.com
www.ropesgray.com

1



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

November 22, 2016

Gregg Galardi
T 212 596-9139
gregg.galardi@ropesgray.com


XP Vehicles Group
c/o Scott Redmond
601 Van Ness Avenue
San Francisco, California 94102

Re: *In re Gawker Media LLC* (Case No. 16-11700 (SMB), Bankr. S.D.N.Y.)

Dear Mr. Redmond:

As you know, my firm is bankruptcy counsel to Gawker Media LLC, Gawker Media Group
Inc. and Gawker Hungary Kft. (f/k/a Kinja Kft.), all as debtors and debtors in possession (the
"Debtors"), in chapter 11 cases pending in the United States Bankruptcy Court for the Southern
District of New York (the "Bankruptcy Court"), No. 16-11700-SMB (the "Bankruptcy Cases"). I
am writing to you regarding the proofs of claim that "XP Vehicles Group" has filed against the
Debtors (the "Claims"), our Objections to those Claims (Docket Nos. 393, the "Claims Objection"),
and the Claims Estimation and Plan Reserve Procedures (as defined below). Because the hearings
on December 1 and December 13 in the Bankruptcy Court are rapidly approaching and will
significantly impact your recovery on the Claims, I wanted to set forth how the Debtors intend to
proceed regarding the Claims at those upcoming hearings and begin a dialogue regarding efficiently
resolving the Allowed amount of the Claims and the potential distribution on such Claims.

As you probably know, the Debtors are presently soliciting votes on a proposed chapter 11
plan (the "Plan"). That Plan, we believe, maximizes the funds available for all stakeholders, and
includes highly beneficial settlements that the Debtors have reached with a number of creditors and
the official creditors committee, and calls for speedy resolution of many other claims, including the
Claims (the "Plan Settlements").

Accordingly, the Debtors believe it is in the best interests of their stakeholders to proceed on
the Claims Objection in the Bankruptcy Court at the December 1 hearing. We also wish to make
clear that if the Bankruptcy Court does not disallow the Claims based on the current Objection at
the December 1 hearing, the Debtors presently intend to seek estimation of the Claims at the
December 13 hearing. In that regard, on November 14th, the Debtors filed and served on you a
motion seeking approval of procedures for estimating claims in connection with the setting of
reserves established by the Plan (the "Claims Estimation and Plan Reserve Procedures"). The
hearing to approve procedures is also scheduled for December 1, 2016, and objections are due
November 28, 2016. If approved, those procedures would apply to the Claims and under the

ROPES & GRAY LLP

- 2 -                                                November 22, 2016

proposed Claims Estimation and Plan Reserve Procedures, the Debtors intend to seek to estimate the Claims at a hearing commencing on December 13, 2016, in connection with the confirmation hearing.

Notwithstanding the above and the Debtors' position that the Claims should be disallowed, it would benefit all parties, including XP Vehicles as an alleged creditor, to avoid the costs of litigation, especially given the limited recoveries that it would likely receive under the Plan, if that Plan is confirmed. Under the Plan, and as a result of the Plan Settlements, unsecured creditors (with allowed claims) of Gawker Media are to receive their share of the Gawker Media Claims Reserve of about $3.75 million in cash and, if that were not adequate to pay unsecured claims in full, additional cash that would bring the total amount to $6.5 million. So, if you believe the distribution on the Claims is in excess of this amount, XP Vehicles likely would need to not only litigate the merits of the underlying Claims but also Plan confirmation and the Plan Settlements. We point this out to draw your attention to the issues to be litigated and the potential costs, and so we are not "talking past each other" in any negotiations regarding the Claims and procedures. The Debtors believe that as a result of the Plan Settlements and most particularly the settlement on the allocation of Sale Proceeds, recoveries could be limited regardless of whether XP Vehicles ultimately prevails on the merits of the Claims.

Thus, we think it mutually beneficial for the parties to agree about procedures for resolving the Claims or setting a reserve. So, to proceed expeditiously and cost effectively, either (i) you should provide a realistic proposed reserve, or (ii) we could attempt to settle the Claims. As to settlement, the Plan includes a settlement offer for the Claims, via the so-called Convenience Class. You are entitled to opt-in to the Convenience Class, and receive a single payment of $25,000 (which we would anticipate making before year-end).

If that amount is not acceptable, you should provide us with a settlement offer. That offer should be realistic. While we can give no assurances as to whether a particular offer will be acceptable, we will consider the settlement offer and if appropriate enter into good faith negotiations regarding a settlement of the Claims.

Should you have any questions regarding this matter or like to discuss the matter, please do not hesitate to contact me or my partner Ross Martin.

Sincerely,

*Gregg Galardi*

Gregg M. Galardi

# **EXHIBIT D**

Draft Complaint

# APPENDIX

# CASE MERIT NOTES #1

This is not a completed complaint. This is a conceptual drafting item. All of the charges are not yet included in this section of notes.

Plaintiffs
XXX
XXXX

Tel. No.:  XXX
E-Mail:  XXXX

The Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF XXX

PLAINTIFFS )
)
) **COMPLAINT FOR RICO**
   **RACKETEERING AND**
   **ORGANIZED CRIME**
)
) **INTENTIONAL INTERFERENCE**
   **WITH CONTRACTUAL**
   **RELATIONS**

) **INTENTIONAL INTERFERENCE**
   **WITH PROSPECTIVE ECONOMIC**
   **ADVANTAGE**
Plaintiffs, )
     **CYBERSTALKING**
       **FRAUD**
     **INVASION OF PRIVACY**
) **UNFAIR COMPETITION**
vs. )
)
ALPHABET/Google/YouTube INC.,

| a California corporation, | | |
| Defendants, INC, a Tesla Motors | ) | JURY TRIAL DEMANDED |
| John Doerr, Elon Musk, | ) | |
| Larry Page, Kleiner Perkins | ) | Date: |
| and DOES 1 through 50, | ) | Time: |
| Inclusive. | ) | Dept.: |
| _____ | ) | Trial Date: |

The Plaintiffs a California business, and …. do hereby submit their Complaint for RICO…….Cyberstalking, Intentional Infliction of Emotional Distress, and for Injunctive Relief and allege as follows:

# GENERAL ALLEGATIONS

1.    The Plaintiffs [hereinafter referred to as "Plaintiffs"], are  residents of San Francisco County, California.

2.    The Plaintiffs., [hereinafter referred to as "Plaintiffs"], include a California corporation duly authorized to conduct business in the State of California and does, in fact, conduct business in the County of San Francisco, California.

3.    The Defendant, ALPHABET, Google and Youtube INC., [hereinafter referred to as "ALPHABET"], are the same California Corporation duly authorized to conduct business in the State of California and does, in fact, conduct business in the County of San Francisco, California.

4.    The Defendant, Tesla Motors, INC., [hereinafter referred to as "Defendants"], is a California Corporation duly authorized to conduct business in the State of California and does, in fact, conduct business in the County of San Francisco, California.

5.    The Defendant, Kleiner Perkins INC.,is a California Corporation duly authorized to conduct business in the State of California and does, in fact, conduct business in the County of San Francisco, California.

6. The Defendants Elon Musk, John Doerr, Jared Cohen, Eric Schmidt, Sergy Brin, Larry Page and DOES 1 through 50 are members of the above named Defendant organizations as well as members of a Cartel operating in violation of U.S. RICO statutes.

9.    The true names and capacities of the Defendants, DOES 1 through 50, inclusive, are presently unknown to the Plaintiffs at this time and the Plaintiffs sue those Defendants and each of them, by such fictitious names pursuant to the pertinent provisions of the California Code of Civil Procedure.

10.    The Plaintiffs are informed and believe and, based on that information and belief, allege that some of the named Defendants herein and each of the parties designated as DOES and every one of them, are legally responsible jointly and severally for the events and happenings referred to in the within Complaint for …….., Intentional Infliction of Emotional Distress, Cyberstalking, and for Injunctive Relief.

11.    The Plaintiffs are informed and believe and based on that information and belief allege that at all times mentioned in the within Complaint, all Defendants were the agents and

employees of their co-Defendants and, in doing the things alleged in this Complaint, were acting within the course and scope of such agency and employment.

12.      As to any corporate employer specifically named or named as a DOE herein, the Plaintiffs are informed and believe and therefore allege that any act, conduct, course of conduct or omission, alleged herein to have been undertaken with sufficient, malice, fraud and oppression to justify an award of punitive damages, was, in fact, completed with the advance knowledge and conscious disregard, authorization, or ratification of and by an officer, director, or managing agent of such                                                                                                corporation.

# STATEMENT OF FACTS

13.      In or about May 3, 2005, the Plaintiff Plaintiffs, received, in recognition by the United States Congress in the Iraq War Bill, a grant issued by the United States Congress and the United States Department of Energy in the amount of $825,000.00, plus additional access to resources as, and for, the development of fuel cell and energy storage technology to be used in connection with the research and development of an electric car to be used by the Department of Defense and the American retail automotive market in order to create domestic jobs, enhance national security and provide a domestic energy solution derived from entirely domestic fuel sources..

10.      Beginning In, or about, July of 2006, the Plaintiff Plaintiffs, was contacted by various investors representing the Venture Capital  officers and investors of the Defendant Defendants as agents of Defendants's RechargeIT project, Kleiner Perkins Group, In-Q-Tel and associated parties funded by and reporting to Defendants.  These investors feigned interest in the emerging technology and requested further information from the Plaintiff Plaintiffs in this regard.

11.      In or about August 21 of 2009, the fuel cell and electric vehicle project of the Plaintiff Plaintiffs, was suddenly defunded as to the Plaintiff Plaintiffs.

12.      The same funds for the research and development of electric car  technology was then, subsequently in the same year, awarded to the Defendants Defendants and ALPHABET for the exploitation of non-domestic energy materials which Defendants hold stock and managing control of the source and supply chain, via a sophisticated series of relationships between Defendants and competing electric vehicle efforts to Plaintiffs.

13.      In or about September 20, 2009 the Plaintiffs, was contacted by the Government Accountability Office of the United States with a request that he participate in an investigation being conducted by that entity into the business practices of the Defendants,   pursuant to anti-trust allegations.

14.      In or about January 15, 2010, the Plaintiffs, did, in fact, provide live testimony to the Government Accountability Office of the United States, The Department of Justice, Robert Gibbs and his staff at the White House Press Office and the Washington Post White House Correspondent. The testimony provided by the Plaintiff Plaintiffs, was, in fact, truthful and did, in fact, tend to support the veracity of the anti-trust allegations alleged by the Government Accountability Office.

16.      In or about January, 2011 Defendants exchanged funds with tabloid publications and those tabloid publications coincidentally published two articles and a custom animated film including false, defamatory, misleading and manufactured information belittling the Plaintiff Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project director.

17.      In or about _Feb. 20, 2011, the Defendant YOU TUBE, published a custom produced and targeted attack video that also included false, defamatory, misleading and manufactured

information belittling the Plaintiffs, and discrediting his reputation as an inventor, project developer and project director.

19.     In or about _____, the Plaintiffs, contacted the Defendant, YOU TUBE and Defendants, with a written request that it delete the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project director from its website.

20.     In or about _____, the Plaintiffs, contacted the Defendant, Defendants, with a written request that it delete the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project director from its search engine.

21.     All of the written demands of the Plaintiffs, were to no avail and none of the Defendants, GAWKER, Defendants or YOU TUBE agreed to edit, delete, retract or modify any of the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, product developer and project director from their websites.

22.     The Plaintiffs, whose businesses had already suffered significant  damage as the result of the online attacks of the Defendants, Defendants, GAWKER and YOU TUBE, contacted renown experts and especially Search Engine Optimization and forensic internet technology (IT) experts to clear and clean the internet of the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, product developer and project director from their websites.

23.     None of the experts hired by the Plaintiff Plaintiffs, at substantial expense,were successful in their attempts to clear, manage or even modify the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, product developer and project director which only Defendants, the controlling entity of the internet, refused to remove.

24.     All efforts, including efforts to suppress or de-rank the results of a name search for "Plaintiffs" failed and even though tests on other brands and names, for other unrelated parties did achieve balance, the SEO and IT tests clearly proved that Defendants was consciously, manually, maliciously and intentionally rigging it's search engine and adjacent results in order to "mood manipulate" an attack on Plaintiffs.

25.     In fact, the experts and all of them, instead, informed the Plaintiffs, that, not only had the Defendant, Defendants locked the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project director into its search engine so that the information could never be cleared, managed or even modified, the Defendant, Defendants had assigned the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project director  "P8"algorithmic internet search engine code  embedded in the internet information-set programmed into Defendants's internet architecture.

25.     "P8" standing is standing assigned and programmed into the internet, by the Defendant, Defendants to matters it designates as dependable and true therefore attributing primary status as the most significant and important link to be viewed by online researchers regarding the subject of their search.

26.     At all times pertinent from January 1, 2006, 2011 to in or about November 20, 2015, the Defendant, Defendants, maintained that it had no subjective control or input into the rankings

of links obtained by online researchers as the result of a search on its search engines and that it's search engine algorithms  And the functions of it's media assets were entirely "arbitrary"

27.    In or about April 15, 2015, The European Commission took direct aim at Defendants Inc. , charging the Internet-search giant with skewing results

28.    In those proceedings, although the Defendant, Defendants, continued to maintain that it had no subjective control or input into the rankings of links obtained by online researchers as the result of a search on its search engines and that it's staff had no ability to reset, target, mood manipulate, arrange adjacent text or links, up-rank, down-rank or otherwise engage in human input which would change algorithm, search results, perceptions or subliminal perspectives of consumers, voters, or any other class of users of the world wide web, also known as The Internet, s, the court, in accord with evidence submitted, determined that the Defendant, Defendants, does in fact have and does in fact exercise subjective control over the results of information revealed by searches on its search engine. The EU case, and subsequent other cases, have demonstrated that Defendants sells such manipulations to large clients in order to target their enemies or competitors or raise those clients subliminal public impressions against competitors or competing political candidates.

29.    As a result of receiving this information, the Plaintiffs, became convinced of the strength and veracity of his original opinion that the Defendants, GAWKER, YOU TUBE and Defendants, had, in fact posted the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project designer had been intentionally designed, published, orchestrated and posted by them in retaliation to the true testimony provided by the Plaintiffs, to the Government Office of Accountability of the United States in May of 2005 aand to the Securities and Exchange Commission, The Federal Bureau of Investigation, The United States Senate Ethics Committee and other investigating parties, and had been disseminated maliciously and intentionally by them in an effort to do damage to his reputation and to his business prospects and to cause him severe and irremediable emotional distress.

30.    In fact, the Plaintiffs, has suffered significant and irremediable damage to his reputation and to his financial and business interests.  As a natural result of this damage, as intended, by the Defendants, GAWKER, Defendants and YOU TUBE, the Plaintiffs, has also suffered severe and irremediable emotional distress.

31.    To this day, despite the age of the false, defamatory, misleading and manufactured information belittling the Plaintiffs, describing him as a scam artist and discrediting his reputation as an inventor, project developer and project director, in the event any online researcher, searches for information regarding the Plaintiffs, the same information appears at the top of any list of resulting links.

## Cause of Action
# INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### [Against the Defendants and DOES 1 through 50, inclusive]

22.    The Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1 through _____ inclusive as though fully set forth herein.

35.    On or about May 3, 2005, the Plaintiff Plaintiffs, received, in recognition by the United States Congress in the Iraq War Bill, a grant issued by the United States Congress and the

United States Department of Energy in the amount of $825,000.00, plus additional access to resources as, and for, the development of fuel cell and energy storage technology to be used in connection with the research and development of an electric car to be used by the Department of Defense and the American retail automotive market in order to create domestic jobs, enhance national security and provide a domestic energy solution derived from entirely domestic fuel sources.

36.    The Defendant Defendants knew of the above described contractual relationship existing between the Plaintiffs  and Plaintiffs and the United States Department of Energy in that the grant was made public record and, at the request of representatives of the Venture [Capital] Department of the Defendant Defendants, the Plaintiffs and Plaintiffs, believing that the request for information was as to providing additional funding for the project, did, in fact, submit complete information regarding the subject of the grant to the Defendant Defendants.

37.    The Defendant, Defendants, who had and has personal and business relationships with executive decision-makers at the United States Department of Energy and other Federal and State officials, lobbied those executive decision-makers to cancel, interfere and otherwise disrupt the grant in favor of the Plaintiffs Plaintiffs and Plaintiffs, with the intention of terminating the funding in favor of the Plaintiffs and Plaintiffs and applying the information they pirated from the Plaintiffs and Plaintiffs, for their own benefit as well as terminating Plaintiffs's competing efforts, which third party industry analysts felt could obsolete Defendants's and YouTube's efforts

38.    The Defendant, Defendants, was successful in its efforts and, in or about August of 2009, the grant in favor of the Plaintiffs and Plaintiffs, was summarily canceled.

39.    Commencing in or about, _____, the Defendant, Defendants, and its owners commenced to take credit for advancement in its own energy storage and Internet media technology as based on the information it had pirated from the Plaintiffs and Plaintiffs.

40.    The interference of the Defendant, Defendants, with the relationship of the Plaintiffs and Plaintiffs was intentional and constitutes an unfair business practice under in violation of Business and Professions code section 17200. Individuals approached Plaintiffs offering to "help" Plaintiff get his ventures funded or managed. Those individuals were later found to have been working for Kleiner Perkin's the founding investor of Defendants and current share-holder of Defendants. Plaintiffs discovered that those "helpful" individuals were helping to sabotage development efforts and pass intelligence to Defendants

41.    As a proximate result of the conduct of the Defendant, Defendants and severance and termination of the grant to the Plaintiffs and Plaintiffs, the Plaintiffs and Plaintiffs have suffered damages including financial damage, damage to their reputation and loss of critical intellectual property.

42.    The aforementioned acts of the Defendant, Defendants were willful, fraudulent, oppressive and malicious.  The Plaintiff is therefore entitled to punitive damages.]

## Cause of Action
# INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### [Against the Defendants and DOES 1 through 50, inclusive]

43.    The Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1 through _____ inclusive as though fully set forth herein.

44.     In or about the fall of 2009, when the Plaintiffs and Plaintiffs discovered that their grant from the United States Department of Energy had been terminated and defunded, the Plaintiffs Plaintiffs and Plaintiffs, of course, informed other members of the energy and automotive technology industry of the facts of Defendants's behavior and specifically the behavior that gave rise to termination of the grant.

45.     The Defendant, Defendants became aware that the Plaintiffs Plaintiffs and Plaintiffs were intent on telling the truth about these facts, about true ownership of the intellectual property relied on by Defendants in its own vehicle, energy and internet media technology and about Defendants's theft of this property.

46.     In order to put a stop to the Plaintiffs and Plaintiffs and in an effort to discredit them, divest them of contacts in the industry and also of financial backing, the Defendant Defendants enlisted the services of the Defendants,  Defendants.'s own wide array of media and branding manipulation tools which are service offerings of Defendants.

47.     In 2011, GAWKER published an article describing the Plaintiffs and Plaintiffs as scam artists and scammers.

48.     In _____, YOU TUBE posted a video which depicted the Plaintiffs and Plaintiffs as………

49.     For     example,     the     GAWKER     article,     entitled, "_____," states that:
SEE ATTACHED BACKGROUND SHEET of the Defendants, GAWKER and Defendants, did significant damage to the reputation of the Plaintiffs and Plaintiffs in the technology community.

50. Defendants has paid tens of millions of dollars to Gawker Media and has a business and political relationship with Gawker Media

54.     Also as intended by the Defendant, Defendants, this damage, especially because the false representations become immediately apparent to anyone conducting an internet search for "Plaintiffs" have caused investors to shy away from the Plaintiffs and Plaintiffs, causing the Plaintiffs and Plaintiffs, further difficulty in obtaining funding from in or about 2011 to the present time and have placed on HR and job hiring databases negative and damaging red flags about Plaintiffs, relative to the Gawker and Defendants attacks in order to prevent him from working. Additionally, representatives from Defendants sent a copy of the attack article to the employer of Plaintiff via their HR office and communicated with said employer that "You don't want him working for you with this kind of article out there, do you?" Resulting in his termination.. .

55.     As a proximate result of the conduct of the Defendants, Defendants, GAWKER and Plaintiffs, the Plaintiffs and Plaintiffs have suffered severe financial damage as the result of loss of their good will and reputation.

56.     The aforementioned acts of the Defendants, Defendants, GAWKER and YOU TUBE were willful, fraudulent, oppressive and malicious.  The Plaintiff is therefore entitled to punitive damages.

# Cause of Action
# CYBERSTALKING

### [Against the Defendants and DOES 1 through 50, inclusive]

43.     The Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1 through _____ inclusive as though fully set forth herein.

44.      By hiring and/or making an arrangement with associated tabloids to publish an article replete with false and misleading statements disparaging the Plaintiff, in the guise of publishing opinion, the Defendant Defendants intended to harass the Plaintiff and did in fact harass the Plaintiff.

45.      By refusing to remove the offending publication and, in fact, assigning it a value associated with truth and a position in its web browser that came up and still comes up the first and most prominent link pursuant to any search for the Plaintiffs and maintaining this link for the past 5 years as permanent, uneditable and unmovable, the Defendant, Defendants intended and continues to intend to harass the Plaintiff.

46.      By doing the things described in paragraphs 44 and 45 above, the Plaintiff, Defendants, did and does continue to intend to cause the Plaintiff substantial emotional distress and the Plaintiff, commencing in or about his discovery of the post and the link has and continues to experience substantial emotional distress as any reasonable person would.

47.      The Defendant Defendants engaged in the pattern of conduct described above with the intent to place the Plaintiff in reasonable fear for his safety or in reckless disregard for the safety of the Plaintiff.  The Plaintiff admits here that the Defendant did not have the intent to do physical harm to the Plaintiff but, by arranging for publication of the subject article and ensuring that the subject article could not be moved or altered and would be certain to appear first and permanently as the result of any search for the Plaintiffs intended to do significant damage to Plaintiffs's financial interests this in retaliation for his testimony at the proceedings described above and to ensure that the Plaintiff Plaintiffs would have not future as a competitor in the world of technology populated by the Plaintiff and the Defendant Defendants.

48.      The Plaintiff attached his corroborating evidence to the within complaint as Exhibit A.  These are the results of any search for the Plaintiff on the Defendant Defendants's search engine commencing in April ? of 2011 and continuing to the present time.

49.      On _____, the Plaintiff REMOND did contact Defendants with a written request to remove the offending content.  The Defendant Defendants, stating that it has no control over the results of any search on its search engine and that [algorhythm], refused to and continues to refuse to allow any member of the public to search for the Plaintiffs without publishing results that falsely identify the Plaintiff as a scam artist.

PUNITIVE DAMNAGES

# Cause of Action
# FRAUD

**[Against the Defendants and DOES 1 through 50, inclusive]**

43.      The Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1 through _____ inclusive as though fully set forth herein.

44.      As above, in response to the request of the Plaintiff Plaintiffs regarding removal of the Gawker article of _____, 2011, the Defendant Defendants stated that has no control over the results of any search on its search engine and that [algorhythm], refused to and continues to refuse to allow any member of the public to search for the Plaintiffs without publishing results that falsely identify the Plaintiff as a scam artist.

45.      The Defendant made this statement with the intent to induce the Plaintiff Plaintiffs to rely on it.

46.      The Plaintiff continued to rely on the statement and to believe that the Defendant Defendants has not power or authority to manipulate the results of searches conducted on its search

engine until in or about _____ 2015 when it became clear as the result of the litigation commenced in the EU by _____ that Defendants does in fact have such ability and does, in fact, exercise this ability regularly to manipulate and manage any of the results of any search on its engine.

5.    On or about [*date*], defendant [*name*] made the following representation(s) to the plaintiff: [*allege in exact language, or as close to exact language as possible, the representations of material fact claimed by the plaintiff to be false*].

6.    The representations made by the defendant were in fact false. The true facts were [*specify*].

7.    When the defendant made these representations, he/she/it knew them to be false and made these representations with the intention to [deceive and defraud the plaintiff and to] induce the plaintiff to act in reliance on these representations in the manner hereafter alleged, or with the expectation that the plaintiff would so act.

8.    The plaintiff, at the time these representations were made by the defendant and at the time the plaintiff took the actions herein alleged, was ignorant of the falsity of the defendant's representations and believed them to be true. In reliance on these representations, the plaintiff was induced to and did [*specify actions taken by plaintiff*]. Had the plaintiff known the actual facts, he/she would not have taken such action. The plaintiff's reliance on the defendant's representations was justified because [*specify*].

9.    As a proximate result of the fraudulent conduct of the defendant(s) as herein alleged, the plaintiff was [*allege facts showing allowable damages, e.g.*, induced to expend (*number*) hours of his/her time and energy in an attempt to derive a profit from the (*specify type of business*) sold to the plaintiff by the defendant(s) but has received no profit or other compensation for his/her time and energy], by reason of which the plaintiff has been damaged in the sum of $.

10.    The aforementioned conduct of the defendant(s) was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant(s) with the intention on the part of the defendant(s) of thereby depriving the plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected the plaintiff to a cruel and unjust hardship in conscious disregard of the plaintiff's rights, so as to justify an award of exemplary and punitive damages.

# Cause of Action
# INVASION OF PRIVACY

**[Against the Defendants and DOES 1 through 50, inclusive]**

**Right to be forgotten**

43.    The Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1 through _____ inclusive as though fully set forth herein.

44.    The Defendant, Defendants, first by arranging for and allowing/posting the gawker article, then by coding a link to the article that permanently placed the article at the top of any search results for the Plaintiffs has invaded the inalienable privacy rights of the Plaintiffs as protected by Article I section 1 of the Constitution of the State of California.

45.    The intrusion commenced in or about April of 2011 and continues to this day, is significant and remains unjustified by any legitimate countervailing interest of the Defendant, Defendants.

46.    For five years, when any member of the public searches on the Defendant Defendants's search engine, for the Plaintiffs the first link to pop up refers to the Plaintiffs as a scam artist.

47.    The pervasiveness and longevity of this link plus its placement at the very top of any search result has resulted in a significant, albeit intentional interference with the right of the Plaintiff Plaintiffs to engage in and conduct personal and business activities, to enjoy and defend life and liberty, acquiring possessing and protecting property and pursuing and obtaining safety, happiness and privacy.

COURT determined public controversy?  Public figure but the time has pass

8. The facts disclosed about plaintiff were and remain false.  Even in the event the Gawker article might have at one time garnered protection by the First Amendment as opinion regarding a public controversy and about a semi-public figure, no further controversy exists or even could.

9.    Five years have passed and, despite the lack of current content of controversy, the Plaintiffs remains saddled with a personal, permanent and immovable reference on the internet that characterizes him as scam artist in the world of internet technology.

10.    The Plaintiff Plaintiffs has done the best he could in these years to move on with new projects and new investors.  He has made every effort to start anew and has been precluded from doing so by the gawker article.

9.    Maintenance of the original posting of April 2011 for five years is offensive and objectionable to the Plaintiff Plaintiffs and certainly would be to a reasonable person of ordinary sensibilities in that the original posting is false and defamatory and was intentionally arranged for by Defendants so as to do significant damage to the personal and professional reputation of the Plaintiffs, because it has accomplished this damage, because there is no manner other than at the Defendant Defendants's hand by which the link can be altered or removed or the search results edited or limited and because there exists no reason that the Plaintiff Plaintiffs should not be allowed to enjoy a right to move on with is life independent of a label that had no basis in truth and reality in the first place.

10. The facts regarding the charcetr oif the Plaintiffs  included in the gawker article are certainly no longer of any legitimate public concern nor are they newsworthy nor are they tied to any current controversy or dialogue.

11.    IN FACT, THE Plaintiff Plaintiffs can truly no longer be considered a public figure or even a semi-public figure as the GAWKER article has fairly successfully put him out of business and kept him out of business for the past five or more years.

11.  As a proximate result of the above disclosure, plaintiff  [*specify injury suffered by plaintiff, e.g.,* was scorned and abandoned by his/her friends and family, exposed to contempt and ridicule, and suffered loss of reputation and standing in the community, all of which caused him/her humiliation, embarrassment, hurt feelings, mental anguish, and suffering], all to his/her general damage in an amount according to proof.

[12. As a further proximate result of the above-mentioned disclosure, plaintiff (*specify special damages suffered by plaintiff, e.g.,* has suffered injury to his/her business, in that he/she has lost (*number*) patients from his/her medical practice), all to his/her special damage in an amount according to proof.]

[13.  In making the disclosure described above, defendant was guilty of oppression, fraud, or malice, in that defendant made the disclosure with  (the intent to vex, injure, or annoy plaintiff *or* a willful and conscious disregard of plaintiff's rights *or state facts showing such intent or disregard*). Plaintiff therefore seeks an award of punitive damages.]

[14.  Defendant has threatened to continue disclosing the above information. Unless and until enjoined and restrained by order of this court, defendant's continued publication will cause plaintiff great and irreparable injury in that (*specify facts supporting allegation, e.g.,* plaintiff will suffer continued humiliation, embarrassment, hurt feelings, and mental anguish). Plaintiff has no adequate remedy at law for the injuries being suffered in that (*specify facts supporting allegation, e.g.,* a judgment for monetary damages will not end the invasion of plaintiff's privacy).]

## Cause of Action
# UNFAIR COMPETITION – CLASS ACTION

### [Against the Defendants and DOES 1 through 50, inclusive]

43.    The Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1 through _____ inclusive as though fully set forth herein.

4.    The Plaintiff Plaintiffs brings this action on his own behalf and on behalf of all persons similarly situated. The class that the Plaintiff Plaintiffs represents is composed of all persons who, at any time since the date four years before the filing of this complaint, sought to have offensive, irrelevant and outdated material posted to the internet and available through a search on the Defendant, Defendants's search engine corrected, removed or re-ranked and have been informed by the Defendant, Defendants that the Defendant Defendants that the Defendant, Defendants does not have the ability to do so and _____ state Defendants's published policy..

5.    The persons in the class are so numerous, an estimated 39% of the population of the United States of America, that the joinder of all such persons is impracticable and that the disposition of their claims in a class action is a benefit to the parties and to the court.

5.    There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that each member of the class is or has been in the same factual circumstances, hereinafter alleged, as the Plaintiff Plaintiffs.  Proof of a common or single state of facts will establish the right of each member of the class to recover. The claims of the Plaintiff Plaintiffs are typical of those of the class and the Plaintiff Plaintiffs will fairly and adequately represent the interests of the class.

6.    There is no plain, speedy, or adequate remedy other than by maintenance of this class action because the Plaintiff Plaintiffs is informed and believes that each class member is entitled to restitution of a relatively small amount of money, amounting at most to $5,000.00 each, making it economically infeasible to pursue remedies other than a class action. Consequently, there would be a failure of justice but for the maintenance of the present class action.]

7.    The Defendant Defendants INC is a business incorporated in the State of California and at all times herein mentioned owned and operated a its search engine and its ancillary commercial enterprises from [its headquarters in Santa Clara, California.

8.    On _____, 2011, GAWKER, a well-known internet bomb manufacturer published an article about the Plaintiffs.  The article falsely, maliciously and without regard for the truth, labelled the Plaintiffs a scam artist.

9.    Any search on the Defendant, Defendants's search engine for "Plaintiffs" resulted and to this day still results in a display of the GAWKER article with the Plaintiff Plaintiffs described as a scammer in the first line of the Defendants link.

10.    Publication of the article by GAWKER and the linking by Defendants caused the Plaintiff Plaintiffs immediate and irreparable harm to his reputation, to his business interests and to his personal life.

11.    Some five years have passed and the Plaintiffs continues to suffer damage to his reputation to his business interests and to his personal life as the result of the publication by GAWKER and DefendantsS link to it.

12.    In or about _____, the Plaintiffs, directed a written request to the Defendant Defendants Inc to unlink the GAWKER publication to any search for his name or to delete the offending article.

13.    The Defendant, Defendants, responded by stating that it had no ability or legal obligation to do so as the request didn't fall within its own policies for removal.

19.    The position of the Defendant, Defendants is illegal, false and unfair.

20.        The position of the Defendant is illegal as it infringes on the rights of individuals as protected by the Constitution of the State of California which protects the rights and freedoms of individuals to [All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.]

21.    The position of the Defendant is unfair as it deprives individuals of rights protected by the Constitution of the State of California which protects the rights and freedoms of individuals to [All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.]

22.    The position of the Defendant, Defendants, is false because, as a processor of personal information and a controller of that information, the Defendant, Defendants also possesses the technical, logistical and _____ power and ability to delete, re-rank and _____ any information obtained as the result of a search on its search engine.

10.    As a direct, proximate, and foreseeable result of the Defendant's wrongful conduct, as alleged above, the Plaintiff Plaintiffs and millions of others other members of the Plaintiff class, who are unknown to the Plaintiff but can be identified through inspection of the Defendant's records reflecting requests for removal it has already received and by other means, have been subjected to unlawful and unwanted publication of in accurate, inadequate, irrelevant, false, excessive, malicious and defamatory internet postings about themselves and as a result of the Defendant, Defendants's present policies, have thereby been deprived of their right to privacy and the right to control information published about them as this control now apparently is vested in the Defendant Defendants, INC and not in and of themselves.

11.    The Plaintiff is entitled to relief, including full restitution for the unfair practices of the Defendant, Defendants as these have damaged his reputation and his business prospects and deletion or de-ranking of any article naming him a scam artist as inaccurate and currently irrelevant.

12.    The Defendant, Defendants, has failed and refused to accede to the Plaintiff's request for a removal of the offending article or for any de-ranking or separation of the article from a search for his name.  The Plaintiff is informed and believes and thereon alleges that the Defendant has likewise failed and refused, and in the future will fail and refuse, to accede to the requests of other individuals requests for removal, de-ranking or the separation of search results from a simple search for their name.

12. The Defendant's acts hereinabove alleged are acts of unfair competition within the meaning of Business and Professions Code Section 17203. The Plaintiff is informed and believes that the Defendant will continue to do those acts unless the court orders the Defendant to cease and desist.

# Cause of Action

# RICO VIOLATIONS OF THE "Racketeer Influenced and Corrupt Organizations Act"

The **Racketeer Influenced and Corrupt Organizations Act**, commonly referred to as the **RICO Act** or simply **RICO**, is a United States federal law that provides for extended criminal penalties and a civil cause of action for acts performed as part of an ongoing criminal organization. The RICO Act focuses specifically on racketeering, and it allows the *leaders* of a syndicate to be tried for the crimes which they *ordered* others to do or assisted them in doing, closing a perceived loophole that allowed a person who instructed someone else to, for example, murder, to be exempt from the trial because he did not actually commit the crime personally.[1] RICO was enacted by section 901(a) of the Organized Crime Control Act of 1970 (Pub.L. 91–452, 84 Stat. 922, enacted October 15, 1970), and is codified at 18 U.S.C. ch. 96 as 18 U.S.C. §§ 1961–1968. Enacted as Title IX of the Organized Crime Control Act of 1970, and signed into law by the President of the United States.

Under RICO, a person who has committed "at least two acts of racketeering activity" drawn from a list of 35 crimes—27 federal crimes and 8 state crimes—within a 10-year period can be charged with racketeering if such acts are related in one of four specified ways to an "enterprise". Those found guilty of racketeering can be fined up to $25,000 and sentenced to 20 years in prison per racketeering count. In addition, the racketeer must forfeit all ill-gotten gains and interest in any business gained through a pattern of "racketeering activity."

Defendants are hereby indicted under the RICO provisions and a pre-trial restraining order or injunction to temporarily seize defendant's assets and prevent the transfer of potentially forfeitable property, as well as the requirement for defendants to put up a performance bond are hereby ordered.

The patterns of RICO compliant behavior are easily visible and proven in this case.

Plaintiffs have been damaged in their business, brand, opportunity, civil rights and property by these "racketeers". The Plaintiff have proven the existence of an "enterprise". The defendants invested the proceeds of the pattern of racketeering activity into the enterprise (18 U.S.C. § 1962(a)); The defendants acquired or maintained an interest in, or control of, the enterprise through the pattern of racketeering activity (subsection (b)); the defendants conducted or participated in the affairs of the enterprise "through" the pattern of racketeering activity (subsection (c)); The defendans conspired to do the above (subsection (d)).[4] The corrupt enterprise is the 'prize,' 'instrument,' 'victim,' and 'perpetrator' of the racketeers.[5]

Criminal and civil components allow the recovery of treble damages (damages in triple the amount of actual/compensatory damages) and Plaintiffs hereby demand treble damages.

# RELIEF AND DAMAGES

13. The plaintiff has incurred and, during the pendency of this action, will incur expenses for attorney's fees and costs herein. Such attorney's fees and costs are necessary for the

prosecution of this action and will result in a benefit to each of the members of the class. The sum of $500,000.00 is a reasonable amount for attorney's fees herein.

WHEREFORE, the plaintiff prays for judgment as follows:

1. For restitution to the plaintiff and each other member of the class, as his or her interest may appear, of all sums unlawfully collected by the defendant from the plaintiff and other members of the class since [*date*];

2. For interest on these sums at the legal rate from the date of each unlawful collection [*or other prayer for interest*];

3. For a permanent injunction enjoining the defendant, and the defendant's agents, servants, and employees, and all persons acting under or in concert with them, to cease and desist from the following acts:

a. [*Specify according to allegations, e.g.,* Towing any vehicles in (*city*) without adequate warning];

b. [*Continue as appropriate*];

[4. For (*Specify if return or refund sought, e.g.*, an order requiring the defendant to return title to the plaintiff's 1995 Ford Probe, License Plate No. 1234567).]

5. For [*Specify actions required to provide relief for class, e.g.*, an order requiring the defendant to compile a list identifying, as far as possible, all other persons who have had their vehicle towed by the defendant, and to send each such person a written offer to return any vehicle whose title was improperly transferred and to refund the unconscionable towing fees].

6. For the payment of the plaintiff's attorney's fees out of the moneys recovered for the joint benefit of the members of the class;

7. For costs of suit herein incurred; and

8. For such other and further relief as the court may deem proper.

 [*firm name, if any*]

By: [*signature*]


WHEREFORE, plaintiff prays judgment against defendant as follows:

1.  For general damages according to proof;

[2.  For special damages according to proof;]

[3.  For exemplary or punitive damages;]

[4. For (*specify injunctive relief sought, e.g.*, a preliminary injunction and a permanent injunction enjoining defendant and his/her agents, servants, and employees, and all persons acting under, in concert with, or for him/her from continuing to publish the above-described private facts about plaintiff);]

5. For costs of suit herein incurred; and

6. For such other further relief as the court may deem proper.

# CALCULATIONS OF DAMAGES

The recent leaks along with evidence acquired from federal investigators and other lawsuits has delivered a high value opportunity for Plaintiffs attacked by a Cartel. Plaintiffs are seeking a $3 million sponsor for a lawsuit with over $100 billion in potential recoveries.

How are the Damages against the victims of the Cleantech Crash Crimes calculated?

Report to the FBI and FTC – Cleantech Alliance

The Defendants John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts; including David Axelrod, Robert Gibbs, David Plouffe, Rahm Emanual, Steve Rattner, received over 50 billion dollars in profits from the crimes.

They received over 50 billion dollars at the expense of the victims because they intentionally, maliciously and in a coordinated manner, circumvented, those monies from the victims.

The amount of money that John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts acquired from these crimes is confirmed by reports at the Securities and Exchange Commission, The Internal Revenue Service and stock market transfer records. Each competing automobile manufacturing company that they sabotaged, including Bright Automotive, Eco-Motors, Zap, XP Vehicles, Aptera, Brammo and others, had the potential to make as much money, or more money, than Elon Musk's Tesla Motors. These other companies offered lower cost, safer, longer range vehicles which higher volumes of consumers had demanded. This means that, if these companies had not been sabotaged by John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts, they would have made even more money than Tesla Motors. Thus Tesla Motors, and by extension, Nissan Leaf, provide a minimum baseline damages amount reference for some of the victims.

Each competing energy manufacturing company that they sabotaged, including Millenium Cell, Zap, Limnia Energy, and others, had the potential to make as much money, or more money, than Elon Musk's and Panasonic's lithium ion battery revenues. These other companies offered lower cost, safer, longer range energy production and storage systems which higher volumes of consumers had demanded. This means that, if these companies had not been sabotaged by John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts, they would have made even more money than the Cartel's lithium ion monopoly. Thus Tesla Motors Panasonicrevenues and Steven Chu's related Lithium ion holdings and associates revenues provide a minimum

baseline damages amount reference for some of the victims.

John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts used character assassination as a vendetta process to seek to destroy the brands, reputations and witness testimony of the victims by manipulating their properties: Google, Media Matters and Gawker Media to author and distribute character assassination propaganda to the majority of the world's population via their pre-arranged and contrived control of the vast majority of digital media. In a similar case, Plaintiff Terry Bollea (AKA: Hulk Hogan) was awarded $145 million dollars in damages because of character assassination efforts by the same parties. The attacks on Plaintiffs in the Cleantech Crash Crimes exceeded the resources used against Terry Bollea by many magnitudes and thus, the $145 million dollar figure would be a minimum damages figure for each Plaintiff in the cleantech Crash Crimes attacked in such a manner. For example, Google, owned by the Defendants, locked the attacks on the front page on the top line of Google for over five years, without ever moving it, even though Plaintiffs purchased thousands of servers, and take-down requests to attempt to move the attacks even a few lines lower. This proves that Google was manually, and daily rigging the attacks. Thus, the damages award to the Plaintiffs should be much higher than the Terry Bollea award.

Government funding which was circumvented by John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts from Plaintiffs to themselves was not the largest quantified value of loss. Working with Goldman Sachs, John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts exploited the White House relationship with The Fed and the SEC to create a massive stock market valuation padding scheme which yielded historical profits. By stating government funds as "profit" and switching back and forth from stock skims to government funds in accounting records, tremendous stock market profits were placed in the pockets of Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts. Had Plaintiffs not been circumvented by Defendants then Plaintiffs would have acquired these same benefits. The stock market loss to the Plaintiffs at the expense of the

Plaintiffs is also calculated into the damages consideration.

John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts ordered Steven Chu, Lachlan Seward, Carol Battershel, Kathy Zoi and other executives at the U.S. Department of Energy, who they had placed into positions in the U.S. Department of Energy as shills on their behalf, to lie to and defraud the applicants. All of the money from the U.S. Department of Energy had been secretly hard-wired and the distribution of it covertly arranged to go to John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts stealthed ownerships. Thus, the applicants, who had superior technology, more customer orders, better value and provided less of a national security risk were defrauded into spending tens of millions of dollars on the applicant process via false promises and assurances of success which were already known to be lies from the first 2007 forward. The losses in time, expenses and time-to-market delays created by these fraudulent promises and assertions by the agents, in public office, covertly working for John Doerr, Larry Page, Elon Musk, Steve Westly, Steve Jurvetson, Steve Spinner and their White House cohorts are calculated into these damages.

Plaintiffs are demanding from the U.S. Government, The California State Government and the individual Defendants; general damages according to proof; special damages according to proof; exemplary or punitive damages; For a preliminary injunction and a permanent injunction enjoining defendant and their/her agents, servants, and employees, and all persons acting under, in concert with, or for him/her from continuing to publish the above-described private facts about Plaintiffs; for costs ofsuit herein incurred; for such other further relief as the court may deem proper; and fr an award of 15%

of Defendants gross revenue since inception wherein that revenue was derived from profits made from the use of, or interdiction of, Plaintiffs patented and trade secret products, services and technology which Defendants covertly acquired information about and copied for profit.

In a generic calculation, at the lowest minimum calculation of damages, the amount of damages appears to exceed $100 Billion. Forensic accounting based on Subpoenas will be required to finalize the amount but recent leaks and witness testimony confirm the veracity of these assumptions.

# EXHIBIT E

February 2011 California Complaint

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* GAWKER MEDIA, LLC, a Delaware limited
liability company, GAWKER SALES, LLC, a New York limited liability
company, JOHN HERMANN, an individual, ADRIAN COVERT, an
individual, and DOES 1-10, Inclusive
**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Scott Redmond, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is:<br>(El nombre y dirección de la corte es): San Francisco Superior Court<br><br>400 McAllister Street<br>San Francisco, CA 94102-4514 | CASE NUMBER:<br>(Número del Caso):<br>CGC-11-508414 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

CLERK OF THE COURT

DATE:
(Fecha) FEB 22 2011

Clerk, by
(Secretario)

Deputy
(Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

THE ANNEXED INSTRUMENT IS
CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.
ATTEST: CERTIFIED

OCT 28 2016

CLERK OF THE COURT
Superior Court of California, County of San Francisco
BY: Jacqueline Chambers
DEPUTY CLERK

JACQUELINE CHAMBERS

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Scott Redmond, in pro per
601 Van Ness Avenue, Suite 3613
San Francisco, CA 94102

TELEPHONE NO.: 415-968-9107   FAX NO.:
ATTORNEY FOR *(Name):* in pro per

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA 94102-4514
BRANCH NAME:

**F I L E D**
San Francisco County Superior Court

FEB 2 2 2011

CLERK OF THE COURT
BY: _____
                    Deputy Clerk

CASE NAME:
Redmond v. Gawker Media, LLC, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | CGC-11-508414 |
| | | | JUDGE: |
| | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☑ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.☑ monetary   b.☑ nonmonetary; declaratory or injunctive relief   c.☑ punitive
4. Number of causes of action *(specify):*
5. This case ☐ is ☑ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date:
Scott Redmond
_____
(TYPE OR PRINT NAME)          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

Scott Redmond, *in pro per*
601 Van Ness Avenue, Suite E3613
San Francisco, CA 94102
Telephone: 510-868-2862

SUMMONS ISSUED

**FILED**

San Francisco County Superior Court

FEB 2 2 2011

CLERK OF THE COURT
BY: _____
Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| SCOTT REDMOND, an individual,<br><br>Plaintiff,<br><br>v.<br><br>GAWKER MEDIA, LLC, a Delaware limited liability company, GAWKER SALES, LLC, a New York limited liability company, JOHN HERRMAN, an individual, ADRIAN COVERT, an individual, and DOES 1 – 10, Inclusive,<br><br>Defendants. | Case No. **CGC-11-508414**<br><br>**VERIFIED COMPLAINT FOR:**<br><br>(1) **DEFAMATION *PER SE***<br>(2) **DEFAMATION *PER QUOD***<br>(3) **FALSE LIGHT** |

Plaintiff Scott Redmond ("Plaintiff") alleges as follows:

**PARTIES AND JURISDICTION**

1.     At all times relevant to this Complaint, Plaintiff resided in the City of San Francisco, County of San Francisco, State of California.

2.     Upon information and belief, Defendant Gawker Media, LLC ("Gawker Media") is, and at all times relevant hereto was, a Delaware limited liability company with its principal place of business in the State of New York.

3.     Upon information and belief, Defendant Gawker Sales, LLC ("Gawker Sales") is, and at all times relevant hereto was, a New York limited liability company with its principal place

COMPLAINT

1    of business in the State of New York.  Gawker Media, LLC and Gawker Sales, LLC are

2    collectively referred to herein as "Gawker" and own and operate the websites www.gawker.com

3    and  www.gizmodo.com.

4         4.    Defendant John Hermann ("Hermann") is an individual who, at all times relevant

5    to this Complaint, worked as a writer for www.gizmodo.com.  On further information and belief,

6    Hermann works and/or resides within the territorial jurisdiction of this Court.

7         5.    Defendant Adrian Covert ("Covert") is an individual who, at all times relevant to

8    this Complaint, worked as a writer for www.gizmodo.com.  On further information and belief,

9    Covert works and/or resides within the territorial jurisdiction of this Court.

10        6.    Jurisdiction is proper in San Francisco Superior Court because the actions of the

11   Defendants which give rise to the claims in the subject complaint gave rise to damages that

12   Plaintiff suffered in the County of San Francisco, State of California.

13        7.    Plaintiff does not know the true names of Defendants DOES 1 through 10 and

14   therefore sues them by those fictitious names.  Plaintiff on information and belief alleges, that

15   each of those Defendants was in some manner legally responsible for the events and happenings

16   alleged in this Complaint and for Plaintiff's damages.  Plaintiff will identify the names and

17   capacities and relationships of DOES 1 through 10 by amendment to this Complaint when and if

18   Plaintiff subsequently ascertains and learn such information.  Each reference to a named

19   Defendant herein below includes a reference to the fictitiously named Defendants.

20        8.    On information and belief, Plaintiff alleges that at all times mentioned in this

21   Complaint, Defendants were the agents and employees of their co-Defendants and acting within

22   the course and scope of such agency and employment with the permission and consent of its co-

23   Defendants and doing the things alleged in this Complaint within the course and scope of said

24   agency and employment.  Plaintiff is informed and believes that except as otherwise alleged

25   herein, each of the Defendants is, and at all times relevant to this Complaint was, the agent,

26   employer, partner, joint venturer, alter ego, affiliate, and/or co-conspirator of the other

27   Defendants and in doing the things alleged herein, was acting within the course and scope of such

28

2

COMPLAINT

1     positions at the direction of, and/or with the permission, knowledge, consent, and/or ratification

2     of the other Defendants.

3     **<u>FACTUAL ALLEGATIONS</u>**

4     9.     This action arises out of defamatory statements that Defendants published and

5     distributed.

6     10.     At all times relevant to this Complaint, Plaintiff acted as the lead investor of a

7     company called Peep Wireless Telephony Company, Inc..

8     11.     In or around January of 2011, Defendants published an article through

9     www.gizmodo.com and/or www.gawker.com entitled "The Greatest Scam in Tech." Plaintiff

10     attaches a copy of that article hereto as Exhibit "A" (the "Article") and incorporates same as

11     though fully set forth herein.

12     12.     The Article discusses Plaintiff's company, Peep Wireless, and identifies Plaintiff

13     by name in that article. The Article not only accuses Plaintiff of running a company that uses

14     "knock-off" and non-functioning technology, but it also directly implies that Plaintiff has put

15     forth his Peep Wireless venture, along with others, to scam investors into giving him money.

16     Referring to Plaintiff's past work, Defendants write:

17        Ultimately, the companies just disappear, legacies reduced to comically

18        vague blurbs on Redmond's resume - if that. There is no point in trying to

19        ascribe motives to what Redmond does, and we don't want to make this

20        about character intent. The point is, these ventures rarely - if ever - work,

21        and through the harsh lens of hindsight, some look like they weren't ever

22        meant to.

23     13.     In addition to the following excerpt, the Article makes the following demonstrably

24     false suggestions about Plaintiff:

25        • He employs "knock-off" or inferior technology;

26        • He deceives investors for the purpose of obtaining money for himself or his projects;

27        • He has only or predominantly resided over failed start-up companies;

28

3

COMPLAINT

- He takes advantage of trends in the technology sector without necessarily having a novel idea or the expertise of the subject technology;
- He misrepresents his role in the companies and / or the success of these companies in his resume;
- He promoted and / or sold certain non-functional devices;
- He did not invest money in his own projects;
- He lies about having experience in numerous sectors; and
- He did not receive funding from the federal government for one of his projects.

14.    The Article further suggests that Plaintiff seeks out projects involving "cash prizes," further suggesting that he will resort to distortions and scams, as the title of the article suggests, for profit.

15.    The Article contains other false statements that both directly and implicitly impugn Plaintiff's character and integrity, particularly as a businessman.

16.    The authors of the Article made the above statements without conducting the appropriate minimum research.

### FIRST CAUSE OF ACTION

**(Against All Defendants for Libel *Per Se*)**

17.    Plaintiff hereby incorporates by reference the above paragraphs of this Complaint as if set forth herein.

18.    The Article describes Plaintiff as a dishonest businessman, willing to put forth misleading descriptions of shoddy products to solicit unsuspecting investors.  The Article explicitly seeks to dissuade investors from investing in Plaintiff's projects, including Peep Wireless.

19.    The Article contains false statements:  In fact, Plaintiff never intentionally provided any inferior quality products, nor did he make any misrepresentations in the course of promoting his company, Peep Wireless, or its products.

20.    The statements in the Article are unprivileged.

21.    The statements in the Article have a natural tendency to injure Plaintiff's business

4

COMPLAINT

1  reputation because they attribute dishonesty and overly opportunistic, even predatory activities to

2  Plaintiff. The statements in the Article otherwise impugn Plaintiff's ability to develop products

3  and/or manage a business and/or provide truthful information about his products to investors.

4      22.    The Defendants published the Article with knowledge of the falsity of the

5  statements contained therein, or with a reckless disregard for the truth of those statements.

6      23.    At all times, Herman and Covert worked for and published their article in the name

7  of www.gizmodo.com, a Gawker-owned website.

8      24.    In addition to causing other damages, the Article has prevented employers from

9  hiring Plaintiff. Upon information and belief, the Article caused Plaintiff to lose his last job.

10      25.    The Defendants' actions as stated above have damaged Plaintiff in an amount to be

11  proven at trial, but which Plaintiff estimates to be no less than $5,000,000. Plaintiff further seeks

12  costs of suit herein, as well exemplary or punitive damages for the malicious conduct of

13  Defendants, and in such other amounts as Plaintiff may subsequently establish at trial.

14      **SECOND CAUSE OF ACTION**

15      **(Against All Defendants for Libel *Per Quod*)**

16      26.    Plaintiff hereby incorporates by reference the above paragraphs of this Complaint

17  as if set forth in full herein.

18      27.    One or more individuals knowingly and intentionally distributed the Article on

19  behalf of Gawker.

20      28.    Upon information and belief, Hermann and Covert, as agents of Gawker, as well

21  as individually, caused the preparation of and/or the distribution of the Article.

22      29.    The Article is false. Plaintiff did not intentionally provide any inferior quality

23  products, nor did he make any misrepresentations in the course of promoting his company, Peep

24  Wireless, or its products.

25      30.    The statements in the Article are unprivileged.

26      31.    The statements in the Article have a natural tendency to injure Plaintiff's business

27  reputation because they attribute dishonesty and overly opportunistic activities to Plaintiff. The

28

1    statements in the Article otherwise impugn Plaintiff's ability to develop products and/or manage a

2    business and/or provide truthful information about his products to investors.

3         32.    The Defendants, Herman and Covert, published the Article with knowledge of the

4    falsity of the statements contained therein, or with a reckless disregard for the truth of those

5    statements.

6         33.    At all times, Herman and Covert worked for and published their article in the name

7    of www.gizmodo.com, a Gawker-owned website.

8         34.    In addition to causing other damages, the Article has prevented employers from

9    hiring Plaintiff.  Upon information and belief, the Article caused Plaintiff to lose his last job.

10        35.    The Defendants' actions as stated above have damaged Plaintiff in an amount to be

11   proven at the time of trial, but which Plaintiff estimates to be not less than $5,000,000.  Plaintiff

12   further seeks costs of suit herein, as well exemplary or punitive damages for the malicious

13   conduct of Defendants, and such other amounts as Plaintiff may subsequently establish at trial.

14                            **THIRD CAUSE OF ACTION**

15                      **(Against All Defendants for False Light)**

16        36.    Plaintiff hereby incorporates by reference the above paragraphs of this Complaint

17   as if set forth in full herein.

18        37.    The Statements communicated by Defendants convey a false impression because

19   they imply that Plaintiff has used dishonesty and artifice to promote his products.  Further, the

20   statements imply a willingness of Plaintiff to put forth shoddy or scam projects in order to gain

21   investment.

22        38.    In fact, Plaintiff has conducted himself in the promotion of his products,

23   particularly Peep Wireless, with honest discussion and has used diligent efforts to create a

24   "cutting edge" wireless technology.

25        39.    The article also contains an image with the phrase "Smoke and Mirrors" written

26   across.  It also refers to Plaintiff's company as a "larger-than-life prank on the tech world."

27        40.    These  statements suggest, among other things, that Plaintiff lied about his

28   technology.  He has not.

                                6

41.    The article states that Plaintiff's companies "just disappear." It suggests that he did not intend for these companies to exist or that the companies failed. In fact, several of Plaintiff's companies either changed names, merged, or went to a buyer in a purchase.

42.    The also states that Plaintiff claims that has worn "many hats," thereby implying that he misrepresented the scope of his experience. He did not.

43.    The false impressions conveyed by the statement are highly offensive because they impugn Plaintiff's honesty and/or his ability to create functional products. The Defendants issued the misleading statements with complete disregard for the accuracy of those statements, and without conducting prior research. The Article further even admits that the authors of the article did not contact Peep Wireless or Plaintiff before publishing the article.

44.    The Defendants' actions as stated above have damaged Plaintiff in an amount to be proven at the time of trial, but which Plaintiff estimates to be not less than $5,000,000. Plaintiff further seeks costs of suit herein, as well exemplary or punitive damages for the malicious conduct of Defendants, and all in such other amount as Plaintiff may subsequently establish at trial.

\

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendants, and that the Court award Plaintiff, as follows:

## ON ALL CAUSES OF ACTION

1.    For compensatory damages, according to proof at the time of trial, but which Plaintiff estimates to be not less than $5,000,000;

2.    For exemplary or punitive damages in an amount sufficient to set an example of Defendants;

3.    For costs of suit herein; and

4.    For such other relief as the Court may deem just and proper.

7

COMPLAINT

DATED: February 18, 2011

_____

Scott Redmond
*In Pro Per*

**8**

COMPLAINT

## VERIFICATION

### STATE OF CALIFORNIA, COUNTY OF ORANGE

I have read the foregoing VERIFIED COMPLAINT and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February _18_, 2011, at _SAN FRANCISCO_, California.

SCOTT REDMOND



9

COMPLAINT

## **EXHIBIT F**

*Redmond v. Gawker Media LLC*, No. A132785

(Cal. Ct. App. 1st Dist., Div. 1; August 10, 2012)

Filed 8/10/12  Redmond v. Gawker Media, LLC CA1/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SCOTT REDMOND, | A132785 |
| Plaintiff and Appellant, | |
| v. | (San Francisco City & County Super. Ct. No. CGC-11-508414) |
| GAWKER MEDIA, LLC, et al., | |
| Defendants and Respondents. | |

Gawker Media, LLC, and Gawker Sales, LLC (collectively, Gawker) published an article in a technology weblog questioning claims made by Scott Redmond, the chief executive officer (CEO) of a small startup technology company, about the company's products and his past business successes.  Redmond sued Gawker and the article's writers, John Herrman and Adrian Covert, for libel and false light.  Defendants moved successfully for an order striking the complaint under Code of Civil Procedure section 425.16 (hereafter section 425.16).  Redmond contends the trial court erred in finding he had not established a probability of prevailing on his libel claims.  Based on our independent review of the record, we affirm the trial court's order.

## I.  BACKGROUND

### A.  *The Parties*

Redmond is the CEO and founder of Peep Wireless Telephony Company (Peep), which he describes as "an early stage company developing software intended to replace the current system of server racks and cell towers employed by wireless network carriers."  Redmond has also founded other companies which he asserts have successfully

developed, designed, or built prototypes of a range of high-technology products using his ideas and inventions. On January 13, 2011, the technology weblog, Gizmodo, published a post by two of its writers, defendants Herrman and Covert, expressing skepticism about Peep and some of Redmond's other business ventures and technologies (hereafter the article or the post). Gawker owns and operates Gizmodo.

## B. *The Article*

Entitled "Smoke & Mirrors: The Greatest Scam in Tech," Herrman and Covert's article begins with the authors' tongue-in-cheek commentary about how the consumer electronics industry promotes its products to technology reporters like themselves: "In the tech world, a few questions are usually enough. Does the product work? Is the idea good? How much does it cost? But as Peep Telephony reminds us, there's a fourth, all-important qualification: Is it *real*? [¶] The Consumer Electronics Show [(CES)], which took place in Las Vegas last week, is a place where you get lied to. A lot. Always, basically, which is one of the reasons reporters attending CES mope so melodramatically: for every cool thing you see, you have to endure hours of pitches, all of which are misleading, and many of which, disingenuously so. [¶] But that's how this industry—and plenty of others—work. They pitch; we parse. They stretch the truth; we try to make it contract. It can be a crude and occasionally uncomfortable system, but it generally works."

The article goes on to describe Peep and a number of Redmond's other business ventures based on information gathered from his Web sites and other sources accessible on the Internet.[1] Links to Redmond's Web sites and to YouTube video clips promoting his products were provided throughout the article. Written in a breezy, irreverent prose style, the article openly questions whether any of Redmond's products and product claims are technologically feasible and whether his product descriptions make

---

[1] The post states the authors tried to reach the company three times but were unsuccessful. Redmond disputes whether they made a good faith effort to contact him.

2

technological sense or were mere "technobabble" without real substance.[2]  Hermann and

Covert summed up Redmond's business history as follows:  "In addition to [the

technology] being arguably impossible, the problems with Peep go much deeper than

unclear business plans and sketchy PR. [¶] Peep Wireless is just the latest in a string of

seemingly failed tech startups that spans back about two decades, all conceived, helmed

and seemingly driven into the ground by one man: Scott Redmond.  We've done a bit of

digging into the Peep CEO's past projects, and they don't give us much faith in his

current endeavor, to say the least. [¶] The pattern is easy to pick out:  This dude shows up

whenever there's a bubble or hot trend in the tech business world that has yet to make it

to the marketplace.  Then he strings together a bunch of technical jargon that hardly

informs what he's doing, and presumably gets some kind of funding . . . . [and forms

companies] around said bubble. . . . [¶] Ultimately, the companies just disappear . . . .

There's no point in trying to ascribe motives to what Redmond does, and we don't want

to make this about character or intent.  Point is, these ventures rarely—if ever—work.

And through the harsh lens of hindsight, some look like they weren't ever meant to."

    The article mentions and provides links to Web sites describing past projects of

Redmond's—none of which seemed to still be ongoing according to the authors: a mid-

1990's technology to stream major films free to any computer or television, even without

an Internet connection; a virtual reality product; an inflatable, build-it-yourself electric-

powered automobile; a personal flying device; and a hydrogen fuel storage system.  The

article's concluding paragraphs return to the theme that claims about new consumer

technology products generally should never be taken at face value:  "This post isn't

meant as some kind of personal hatchet job, and to be honest, one shouldn't be necessary

---

[2] For example:  "Peep's promises are manifold: customers will 'never need to pay
a phone bill again,' and 'all their email, Internet and media access would be free
forever'. . . . [¶] But a visit to Peep's website is vexing.  Every page is jam-packed with
sentences that don't make sense, literally and technologically. . . . [¶] To be frank, this all
sounds like bullshit.  In fact, the combination of everything described was so strange, it
almost made the company seem like a larger-than-life prank on the tech world."

to dissuade investors from throwing money at this venture.  Peep's background information is freely available online, and everything you see above was discovered with a few quick searches on Google.  Any investor—or reporter, for that matter—should be able to see these red flags on their own. . . . . [¶] Rather, this is a glimpse at what happens when hype overcomes all else.  It represents an unchecked version of the pungent, insidious promotional id of events like CES.  And it's worryingly familiar."

The article generated hundreds of comments from readers, expressing praise and criticism for the authors, positive and negative reaction to Redmond and his products, and opinions and views on a range of subjects related to the CES and the technology industry.

## C. *Redmond's Lawsuit*

Redmond contacted Gizmodo by e-mail to complain about the piece, and requested to speak to someone "preferabl[y] live on CNN, to understand why you allowed an obvious competitor[']s attack on my company and on me personally."  Joe Brown, the Gizmodo features editor, replied and offered to meet with Redmond and to correct any factual inaccuracies in the article.  Redmond responded with a lengthy e-mail reproducing the text of the Hermann/Covert article interspersed with Redmond's two- or three-sentence responses to many of its assertions.  The e-mail stated in part:  "[A]ttached is a list of the factual inaccuracies [the article] contains [and] an explanation of the corrected facts in response. . . . [A]ttached are the true facts.  Will you agree to publish them as a fair and accurate counterpoint to the inaccurate post?"  Gizmodo posted Redmond's e-mail in full on January 18, 2011.  This posting also generated voluminous comments from readers.  Gawker declined Redmond's subsequent demand that the January 13 and 18 articles be removed from the Internet.

On February 22, 2011, Redmond sued Gawker for libel per se, libel per quod, and false light.  The complaint alleged, among other things, that the Gizmodo article falsely asserts or implies Redmond (1) runs a company using " 'knock-off' " and nonfunctioning technology, (2) uses his ventures to scam investors into giving him money, (3) has predominately or exclusively presided over failed start-up companies, (4) takes advantage of trends in technology without having a novel idea or expertise in the subject

4

technology, (5) misrepresented the success of his companies, and (6) lies about his business and technological experience.  The complaint specifically quotes only one portion of the article:  " 'Ultimately, the companies just disappear, legacies reduced to comically vague blubs on Redmond's resume—if that.  There's no point in trying to ascribe motives to what Redmond does, and we don't want to make this about character [or] intent.  The point is, these ventures rarely—if ever—work, and through the harsh lens of hindsight, some look like they were never meant to.' "  Redmond cites this as an example of how the article "directly implies [he] has put forth his Peep Wireless venture, along with others, to scam investors into giving him money."

## D. *Gawker's Anti-SLAPP Motion*

Gawker filed a special motion to strike Redmond's complaint under section 425.16[3] on the following grounds:  (1) the Gizmodo article constituted protected speech in connection with a public issue; (2) the statements in the article were protected opinions and could not support a libel action; (3) alternatively, if the statements were not opinions, they were substantially true; and (4) Redmond was a limited-purpose public figure who could not prove the requisite "actual" malice.

The trial court granted Gawker's motion to strike the complaint, ruling (1) all three of Redmond's causes of action arose out of conduct in furtherance of the constitutional right of free speech in connection with a public issue; and (2) Redmond failed to establish a probability of prevailing in his claims because (a) in context, the statements in issue constituted statements of protected opinion rather assertions of verifiable fact, and (b) Redmond is a limited-purpose public figure, but failed to present any prima facie evidence of actual malice.

---

[3] Section 425.16 is commonly referred to as the "anti-SLAPP statute."  SLAPP stands for Strategic Lawsuit Against Public Participation.  Section 425.16 was enacted in order to discourage the practice of filing retaliatory, meritless lawsuits against opponents on a public issue in order to chill their exercise of free speech.  (See legislative findings in Code Civ. Proc., § 425.16, subd. (a).)

Redmond timely appealed from the trial court's order.

## II. DISCUSSION

Redmond contends the trial court erred in determining (1) the statements in issue concerned a matter of public interest, (2) the statements were of opinion rather than fact, (3) he is a limited-purpose public figure, and (4) he failed to show a likelihood of establishing defendants published the article with actual malice.[4]

### A. *Standard of Review*

Subdivision (b)(1) of section 425.16 provides in pertinent part "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

An order granting a special motion to strike under section 425.16 is reviewed de novo. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907.) We apply our independent judgment to determine whether the plaintiff's causes of action arose from acts by the defendants in furtherance of the defendants' right of petition or free speech in connection with a public issue. (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 721, disapproved on another point in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10.) Assuming this threshold condition is satisfied, we must then independently determine, from our review of the record as a whole, whether appellant has established a reasonable probability he would prevail on his claims at trial. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 653, disapproved on another point in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.) We must reverse the judgment of dismissal if appellant made a prima facie showing in the trial court of facts which, if proved at trial, would support a judgment in his favor. (*Church of Scientology*, at p. 653.)

---

[4] Based on our disposition of issues (1) and (2), we have no occasion to reach the latter two issues in this opinion.

6

## B. *Nexus to a Public Issue*

Redmond argues Gawker failed to meet its burden of showing how the post invokes any issue of public interest. He asserts he "never offered any goods for purchase to the general public," but merely offered them "to a limited number of pre-qualified investors." Thus, according to Redmond, the subject matter of the post as Redmond defines it—his "truthfulness in connection with his investment opportunity available to a limited segment of the populace"—does not concern a matter of public interest.

Subdivision (e) of section 425.16 defines the statutory phrase " 'in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue,' " in relevant part to include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest . . . ." (§ 425.16, subd. (e)(3).)

Redmond does not dispute his claims arise from an exercise of free speech rights in a "place open to the public or a public forum." (§ 425.16, subd. (e)(3).) As the Supreme Court has recognized, the Internet is " 'the most participatory form of mass speech yet developed' " and thus Internet communication is "entitled to 'the highest protection from governmental intrusion.' " (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 863.) Where, as here, the "gravamen of the lawsuit is the content of [the defendant's] Web site," the action arises from an "act in furtherance of the right of free speech." (*Kronemyer v. Internet Movie Database Inc*. (2007) 150 Cal.App.4th 941, 946–947; see also *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4 and cases cited therein [Web sites accessible to the public are public forums for purposes of the anti-SLAPP statute].)

Speech has been found to concern a public issue where it (1) concerned a person or entity in the public eye, (2) addressed conduct that could directly affect a large number of people beyond the direct participants, or (3) contributed to the public debate on a topic of widespread public interest. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 (*Wilbanks*); accord, *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.)

7

In this case, Gawker came forward with evidence that before cowriting the article, defendant Hermann had viewed posts by other Internet commentators raising similar questions and concerns about Redmond's Peep venture. These included a January 3, 2011 Twitter post by Sascha Segan, a mobile device analyst and editor for PC Magazine, which included a link to a January 3 article in PC Magazine's online news site entitled, "Peep Proposes Wireless P2P System,"[5] describing some of the claims Peep was making about its technology. The Twitter post asked, "Wireless folks, does this read like crazy to you?" The linked article contains quotes about the product from an unnamed Peep "spokesman," apparently sent to the author by e-mail, as well as language taken from a Peep press release announcing plans to demonstrate its software product for investors at the CES.

Herrman also reviewed a January 4, 2011 CNET online news article by regular CNET contributor, Rafe Needleman, expressing his own skepticism about the Peep technology. Needleman had interviewed Redmond at the CES who told him he was there to seek out business partners for his company. Among other things, the CNET article's author wrote that his "credulity strained" at some of Redmond's claims and he doubted "if Peep ha[d] the discipline to develop any of its ideas into viable businesses." Gawker submitted evidence the CNET article generated a considerable number of reader comments, both positive and negative, about Redmond's venture.

Herrman identified two other Web pieces regarding the Peep venture posted in the days leading up to the 2011 CES. A post in the weblog www.crunchgear.com labeled Peep's promotion "the first outrageous claim of CES," and generated numerous pro and con reader comments on Peep's claimed technology. Another post on www.rcrwireless.com also questioned the viability of Peep's technology, stating Peep

---

[5] "P2P" refers in this context to a "peer-to-peer" network in which mobile device users would transmit and receive communication through one another's devices, without needing or having to pay for an external infrastructure of cell towers, base stations, and servers.

"wins our award for sheer originality," and "it's nice to see a bit of mobile madness is alive and well at CES."

As mentioned earlier, Gawker produced a press release issued by Peep on January 3, 2011, announcing it would be demonstrating its technology to potential commercial partners and investors at a Las Vegas hotel suite during the CES.  Peep's own Web site included several videos promoting the company and its technology, and boasted extensive press coverage about the Peep "team" claiming "[t]here are over 2000 media articles about their past successes."  The videos were also available on the Peep Wireless YouTube channel.  Another of Redmond's Web sites, for Clever Industries LLC, described him as an "award-winning visionary" whose "ventures and services are acclaimed in over 2500 press and media acknowledgements."  The site stated his past projects had been featured on the Discovery Channel, Fox, E! Entertainment, Green Seed Radio, CNET, the New York Times, the Wall Street Journal, Aero News, NPR, XM Radio, the Mike O'Meara radio show, and in "hundreds" of other publications and media outlets, achieving "extensive media acclaim globally."  Redmond's evidentiary submissions in opposition to Gawker's motion to strike did not contradict Gawker's evidence on the question of whether the Gizmodo article concerned an issue of public interest.  In fact, Redmond sought judicial notice of other publications and Web sites describing technologies under development by well-known companies he contended were similar to those ridiculed by the Gizmodo article.

The preamble to section 425.16 states its provisions are to be construed broadly to safeguard the constitutional right of free speech. (§ 425.16, subd. (a).)  Broad construction must therefore be given to the phrase "an issue of public interest" in subdivision (e)(3). (*Tamkin v. CBS Broadcasting, Inc*. (2011) 193 Cal.App.4th 133, 143.)  Here, Redmond sought to be and was "a person or entity in the public eye." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.)  He actively promoted his product ideas in Internet media heavily trafficked by tech consumers and members of the tech community.  He sent out press releases, responded to inquiries by well-known tech writers, gave interviews, maintained Web sites with promotional videos, and sought to use the CES

9

and the publicity surrounding it as a means to bring his company to the attention of the public and potential investors. His own Web sites touted media interest in his ventures as a selling point. Moreover, the Gizmodo article was disseminated in a public forum and concerned a public controversy. At least four articles about Peep, as well as a widely followed Twitter message by a well-known tech analyst, had preceded the Gizmodo article. Four of these had expressed open skepticism about Redmond's technological claims, and significant reader response had been generated.

*Wilbanks*, decided by this court, presents somewhat analogous facts. The defendant in *Wilbanks* published a Web site about a very specialized topic, the use of "viatical settlements," arrangements by which dying persons sell their life insurance policies to obtain funds for medical care and other purposes. (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 889.) The underlying suit was brought by a firm in the business of brokering such arrangements after the defendant used her Web site to warn potential customers against using the firm. (*Id.* at pp. 889–890.) This court held in part the publication was connected to an issue of public interest because it was in the nature of consumer protection information, providing information relevant to choosing among brokers. (*Id.* at pp. 890, 898–901.) Similarly here, the Gizmodo article was a warning to a segment of the public—consumers and investors in the tech community—that Redmond's claims about his latest technology were not credible. That segment was at least as large as the rather specialized group of consumers involved in *Wilbanks*. Although Redmond states he was not offering any product to consumers, and was only seeking to reach qualified investors, he was doing the latter by claiming to have developed a high-impact technology that would be of tremendous interest and value to consumers and to the cellular telephone industry. He actively sought media attention for his company with such claims, and succeeded in getting it. He cannot now plausibly maintain there was no public interest in whether the claims were credible.

We therefore find this case comes within the purview of section 425.16.

**C.** *Opinion Versus Fact*

False statements in publications, even if objectively unjustified or made in bad faith, cannot form the basis for a libel action if they are statements of opinion rather than fact. (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 578.) "[O]pinions are the lifeblood of public discussion promoted by the First Amendment, under which speakers remain free to offer competing opinions based upon their independent evaluations of the facts." (*Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1356 (*Paterno*).) The determination of whether an allegedly libelous statement constitutes fact or opinion is a question of law for the court. (*Campanelli*, at p. 578.)

California courts use a " 'totality of the circumstances' " test to determine whether an alleged defamatory statement is one of fact or of opinion. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 (*Baker*).) We look both to the language of the statement and to the full context in which it appears. (*Ibid.*) "[W]hat constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole." (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 (*Gregory*).) Where, for example, the language of the statement is "cautiously phrased in terms of apparency," the statement is less likely to be reasonably understood as a statement of fact rather than opinion. (*Id.* at p. 603.) Disclosure of the facts supporting the challenged statement is also highly significant in determining whether it is actionable. (*Carr v. Warden* (1984) 159 Cal.App.3d 1166, 1170.)

Redmond places great reliance on his contention the word "scam" in the article's title —"Smoke & Mirrors: The Greatest Scam in Tech"—is an assertion of fact about his business rather than opinion. But the word "scam" has no precise meaning. (See *McCabe v. Rattiner* (1st Cir. 1987) 814 F.2d 839, 842 (*McCabe*).) Although undoubtedly a pejorative term, "scam" means different things to different people and is used to describe a wide range of conduct. (*Ibid.*) It could refer to anything involving an arguably inaccurate representation, from exaggerating the value of a product or charging too much

11

for it to carrying out a massive criminal fraud.  It would not be unusual to see the word
"scam" used in a pure opinion piece expressing the author's opinion of a restaurant, a
product or service, a piece of legislation, or a business proposal.  "The lack of precision
makes the assertion 'X is a scam' incapable of being proven true or false." (*Ibid.*)  Thus,
defendants' use of the term "scam," by itself, does nothing to establish a probability
Redmond will prevail against them in a libel claim.

Viewing the full context of the article, we believe it falls into the category of
constitutionally protected opinion rather than fact.  First, the article is written in a casual
first-person style, which puts the reader on notice the authors are expressing their own
views rather than stating objectively verifiable facts.  (See *McCabe, supra,* 814 F.2d at
p. 843.)  The article has the tone and style of a sarcastic product or movie review—
negative about its subject matter to be sure, but with little pretense of objectivity.  The
authors assert, for example, Peep's product descriptions "don't make sense," "sound[]
like bullshit," and are "filled with meaningless technobabble."  Redmond's video of his
concept for the standardization of fuel cell components, makes "the thing seem[] more
like a movie prop."  Peep "is just the latest in a string of seemingly failed tech startups
. . . all conceived, helmed and seemingly driven into the ground by . . . Scott Redmond."[6]
In our view, the article's general tenor and language would give a reasonable reader the
impression the authors were expressing subjective opinions, not reporting facts.  (See,
e.g., *Paterno*, *supra*, 163 Cal.App.4th at p. 1356 ["loose and figurative" language signals
constitutionally protected opinion rather than actionable, false assertions of fact].)

_____

[6] The assertion Redmond's businesses "seemingly failed" is inherently subjective.
(See *Gray v. St. Martin's Press, Inc.* (1st Cir. 2000) 221 F.3d 243, 249–250 [statement
the plaintiff's company had "failed" was "very much a matter of opinion"].)   Equally,
the assertion his companies "just disappear" has so many possible meanings—from going
out of business to losing public or Internet visibility—that it cannot be classified as a true
or false objective fact.  (See *Eisenberg v. Alameda Newspapers, Inc.* (1999)
74 Cal.App.4th 1359, 1382 [statement must be provably false before there can be
liability].)

12

Second, the article is completely transparent.  The sources upon which the authors rely for their conclusions are specified, and the article incorporates active links to many of the original sources—mainly Web sites and promotional material created and maintained by Redmond and his ventures.  As the article states in its concluding paragraphs, "Peep's background information is freely available online, and everything you see above was discovered with a few quick searches on Google."  Having ready access to the same facts as the authors, readers were put in a position to draw their own conclusions about Redmond and his ventures and technologies.  As shown by the comments posted, many readers did view these sources, and not all of them agreed with the authors' views.  Statements are generally considered to be nonactionable opinion when the facts supporting the opinion are disclosed.  (*Baker*, *supra*, 42 Cal.3d at p. 266, fn. 7; see also *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1156–1157 ["when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment"].)

Third, the authors couched their conclusions in the language of "apparency" (*Gregory*, *supra*, 17 Cal.3d at p. 603):  Peep's technological claims were "*arguably* impossible"; Peep was "just the latest in a string of *seemingly* failed startups . . . *seemingly* driven into the ground" by Redmond; Redmond "*seems* drawn to areas where there are cash prizes available"; some of Redmond's ventures "look like" they were never meant to work.  (Italics added.)  The authors also expressly disclaim any intention to impute bad motives or character to Redmond, and invite readers to check Redmond's own Web site or conduct their own Google search to find out about his ventures.  All of this qualifying language reinforces the impression that Herrman and Covert were expressing their personal, subjective perspective rather than declaring objective facts.

For these reasons, we conclude the Gizmodo article constituted protected opinion and cannot provide the basis for a successful libel suit.  As Redmond concedes, his false light cause of action based on the same publication therefore also fails. (See *Reader's*

13

*Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 265 [liability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication].)

### III.  DISPOSITION

The order granting defendants' motion to strike is affirmed.

_____
Margulies, J.

We concur:

_____
Marchiano, P.J.

_____
Banke, J.