ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Peter Walkingshaw (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                                         :
In re                                                    :    Chapter 11
                                                         :
Gawker Media LLC, *et al.*,[1]                           :    Case No. 16-11700 (SMB)
                                                         :
                    Debtors.                             :    (Jointly Administered)
                                                         :
---------------------------------------------------------x

# DEBTORS' STATEMENT IN FURTHER SUPPORT OF THEIR OBJECTION TO THE HUON CLAIMS [DOCKET NUMBER 392]

Gawker Media LLC ("Gawker Media"), Gawker Media Group Inc. ("GMGI"), and Gawker Hungary Kft. ("Gawker Hungary"), each as debtor and debtor in possession (the "Debtors") in the above-captioned cases (the "Bankruptcy Cases"), hereby files this Statement in Support of their Objection (the "Claims Objection") [Dkt. No. 392] to Proofs of Claim Nos. 14, 15, 19, 20, 21, 22, 23, 24, 46 and 47 filed by Meanith Huon (the "Huon Claims"). In further support of the Claims Objection, the Debtors respectfully represent the following:

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

59832551_5

**PRELIMINARY STATEMENT**

1. Although Mr. Huon has not responded to the Claims Objection, certain developments have taken place that should be brought to the attention of the Court and impact the Claims Objection.

2. As this Court knows, the Huon Claims are based on a civil action filed in the United States District Court for the Northern District of Illinois (the "Illinois Federal Court"). The Illinois Federal Court entered judgment for the defendants (including Gawker Media) on a motion to dismiss. Mr. Huon appealed and oral argument on that appeal occurred shortly before the Petition Date. The Debtors, and Mr. Huon agreed to a modification of the automatic stay solely for the purpose of the United States Court of Appeals for the Seventh Circuit deciding that appeal and issuing a ruling. On November 14, 2016, the Seventh Circuit issued a decision (the "Seventh Circuit Ruling"), a copy of which is attached to the Martin Declaration as Exhibit B, affirming the Illinois Federal Court nearly in its entirety, and thus affirming the Debtors' contention that they had no liability on the vast majority of Huon Claims. The Seventh Circuit, did, however reverse as to one potential defamatory statement, and that allegation has survived a motion to dismiss, with significant conditions imposed as a result of the Seventh Circuit ruling.

3. The Claims Objection rested on *res judicata* arguments, and in the alternative, on the substance of the motion to dismiss already submitted to the Illinois Federal Court. That Claims Objection also addressed in detail the authority of this Court to hear and determine the Huon Claims. This Reply addresses the impact of the Seventh Circuit's Ruling on the Claims Objection and the consequences of Mr. Huon's failure to respond to the Claims Objection.

4. As demonstrated below, the Seventh Circuit's ruling demonstrates that substantially all of the Huon Claims should be disallowed, and that the Court has the authority to determine the only remaining claim at the December 13th confirmation hearing.

2

**ARGUMENT**

I.     **This Court May Hear and Determine the Huon Claims**

5.     Mr. Huon could have asserted (although the Debtors disagree) that the Huon Claims were personal injury tort claims. In such a non-core matter, this Court would not be able to enter a final order regarding the estimation of the Huon Claims for distribution, without the express or implied consent of Mr. Huon.

6.     Under the most recent precedents of the United States Supreme Court and the Seventh Circuit (Mr. Huon's home circuit), however, Mr. Huon has given implied consent. Speicifcally, in *Wellness International v. Sharif*, __ U.S. __, 135 S. Ct. 1932 (2015), the Supreme Court held that a litigant in bankruptcy can give implied consent to bankruptcy court entry of final orders. *Id*. at 1947-48; *see, e.g.*, *In re TPG Troy, LLC*, 793 F.3d 228, 233 (2d Cir. 2015); *In re MBM Entm't, LLC*, 531 B.R. 363, 377–78 (Bankr. S.D.N.Y. 2015) (noting Supreme Court's ruling in *Wellness* was consistent with prior decisions in this District finding that parties could consent to the bankruptcy court entering judgment on non-core matters); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 455 (Bankr. S.D.N.Y. 2015). The *Wellness* Court addressed a situation in which the objection to bankruptcy court authority was not raised at the outset of briefing, and based its determination in part on its expressed significant concern for "judicial efficiency and checking gamesmanship." *Id*. at 1948.

7.     On remand, the Seventh Circuit's consideration of *Wellness* describes the type of litigation conduct that satisfies this standard for implied consent. 617 F. App'x 589 (7th Cir. 2015). The party (Sharif) asserting the right to non-core adjudication (in the district court) failed to raise the personal injury issue in its opening brief. *Id*. at 590. This was held to be implied consent and waiver. *Id*. at 590-91; *see Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. at 455.

3

8. The parallel to this case is striking. Mr. Huon filed a proof of claim, which may be a personal injury tort claim.[2] He also entered an appearance in an adversary proceeding in this case. Appearance of Counsel, *In re Gawker Media, LLC v. Huon et al.*, Case No. 16-01085 (SMB) (Bankr. S.D.N.Y. July 13, 2016), Docket No. 40. He was the beneficiary of a court-approved modification of the automatic stay allowing his appeal to proceed to its conclusion in the Seventh Circuit. Order Modifying the Automatic Stay with Respect to the Huon Litigation, *In re Gawker Media, LLC v. Huon et al.*, Case No. 16-01085 (SMB) (Bankr. S.D.N.Y. July 27, 2016), Docket No. 54. Mr. Huon also appeared before this Court and requested the right to seek fees and costs related to the adversary proceeding, which right was ultimately granted. Motion to Dismiss Complaint, or Alternatively, for Mandatory or Permissive Abstention at 16, *In re Gawker Media, LLC v. Huon et al.*, Case No. 16-01085 (SMB) (Bankr. S.D.N.Y. July 13, 2016), Docket No. 42; Order Dismissing Meanith Huon from the Adversary Proceeding with Prejudice at 2, *In re Gawker Media, LLC v. Huon et al.*, Case No. 16-01085 (SMB) (Bankr. S.D.N.Y. Aug. 11, 2016).

9. The Claims Objection set forth in multiple places the non-core and "personal injury tort claim" issue raised by the Huon Claims. At the very beginning of the Claims Objection, Paragraph 1 asserts that the Claims Objection is a core matter and Paragraph 2 then specifically mentions section 157(b)(2) of the Bankruptcy Code and personal injury tort claims. Additionally, there are express cross references to <u>four pages</u> of the Claims Objection that describe the issue in detail. Obj. ¶¶ 28-36. Huon was thus fully on notice that the Debtors would seek to have the bankruptcy court hear and determine his claims. The Claims Objection did not seek to "hide the ball" or "sandbag" Mr. Huon, an attorney admitted pro hac vice in these cases.

---

[2] The original Objection discussed that (a) defamation is not a "personal injury tort claim" under the so-called "strict test" that three courts in this District have adopted and (b) in *Stern v. Marshall*, the Supreme Court expressly left open the question of whether defamation is a personal injury tort claim.

4

59832551_5

The Debtors openly and deliberately raised the consent issue, going so far as to warn "Mr. Huon might consent (whether expressly or impliedly) to this Court's entry of final orders regarding his claim. Section 157(c)(2)." Obj. ¶ 36.

10. This was "'notification of the right to refuse' adjudication by a non-Article III court." *Wellness*, 135 S.Ct. at 1948; *see Sec. Inv'r Prot. Corp.*, 531 B.R. at 455 (finding summons provided sufficient notice to defendant that a failure to respond would constitute implied consent to the entry of a default judgment by the bankruptcy court). There is nothing more that the Debtors needed to do to put Mr. Huon on notice of his statutory rights, even assuming the Huon Claims are personal injury tort claims. Mr. Huon needed to respond timely to the Debtors' assertions that the Huon Claims were not personal injury tort claims and that he did not consent. He did not do so, and consequently, this Court may hear and determine the Huon Claims. *See In re Leslie Fay Cos.*, 212 B.R. 747, 773 (Bankr. S.D.N.Y. 1997), *aff'd*, 222 B.R. 718 (S.D.N.Y. 1998), *aff'd sub nom. Falbaum v. Leslie Fay Cos.*, 182 F.3d 899 (2d Cir. 1999) (rights to district court resolution of personal injury tort claim can be waived).

11. Critically, the justification here for finding implied consent is even stronger than in *Wellness* because this case involves only a statutory right to a district court ruling on the claim, not a constitutional right to a district court judgment. The *Wellness* decisions considered consent and waiver regarding the <u>constitutional</u> right to entry of judgment by a court that provides the parties with the full protections provided by an Article III court. In contrast, this case does not involve Constitutional rights regarding so-called *Stern*-governed counterclaims. This case involves only the determination of Mr. Huon's proof of claim against the estate, which is a quintessential "core" bankruptcy determination as to what Mr. Huon's proportionate share of the

5

creditor recovery will be. *See, e.g.*, *Stern v. Marshall*, 546 U.S. 462, 475 (2011) (bankruptcy courts can hear and determine matters integral to the claims allowance process).

12. Because the risks of a slower, inefficient and disrupted bankruptcy process are so great, Mr. Huon needed to assert his statutory right with the utmost clarity and vigilance. *See Wellness*, 135 S. Ct. at 1948 (noting the "pragmatic virtue" of "increasing judicial efficiency" in connection with bankruptcy courts). He did not respond to the Claims Objection even after the Debtors wrote him a letter following the response deadline and Seventh Circuit Ruling. *See* Martin Declaration, Exhibit I. Orderly bankruptcy cases require adherence to and enforcement of deadlines when debtors provide "notice and opportunity to be heard." 11 U.S.C. 102(1). He did not timely assert those statutory rights in this contested matter. He has consented to this Court proceeding on determining the Huon Claims.

**II.    The Huon Claims Should Be Disallowed, Except the Single Comment Claim**

  **A.    Certain Huon Claims Should Be Disallowed as Amended, Superseded or Duplicative**

13. Mr. Huon's lack of response justifies this Court's disallowance of amended, superseded and duplicative claims. Thus, as set forth in the Claims Objection, the Huon Claims should be disallowed except with respect to a single proof of claim against each Debtor, Claim Nos. 22 (GMGI), 46 (Gawker Media) and 47 (Gawker Hungary).

  **B.    The Huon Claims Should Be Disallowed Consistent with the Seventh Circuit Ruling and *Res Judicata***

14. Mr. Huon attempted to impose broad liability for various statements in a *Jezebel.com* article, the headline of the article, two aspects of an accompanying photograph, and numerous statements posted in the comments section contained on the relevant webpage below the actual story. In the Claims Objection the Debtors focused on two, alternative substantive grounds for disallowance. First, the Debtors contended that the doctrine of *res judicata* justified

6

59832551_5

disallowing all of the Huon Claims, which at that time had been dismissed by final order of the Illinois Federal Court, but also noted an open question regarding the application of *res judicata* under Illinois law. Obj. 11-12; *see In re Best Payphones, Inc.*, No. 01-15472-SMB, 2002 WL 31767796 (Bankr. S.D.N.Y. Dec. 11, 2002) (determining the same *res judicata* question under New York law). In the alternative, the Debtors argued for disallowance of all of the Huon Claims on the grounds set forth in the Illinois Federal Court's ruling, considered as persuasive authority in the event that *res judicata* did not technically apply.

15. Because the Seventh Circuit Ruling reversed (albeit in only a single respect) the final order of the district court, this Court does not now need to decide the open question under Illinois law regarding *res judicata*. The underlying decision does not now dispose of the entirety of Mr. Huon's complaint and so no longer would give rise to *res judicata*. Because the Seventh Circuit has now provided direct, persuasive authority regarding the Huon Claims, this Court may simply rule on the merits and need not decide the more complicated issue of whether Illinois law would give collateral estoppel effect to the existing rulings. For the convenience of this Court considering this persuasive authority to disallow most of the Huon Claims, the Debtors are contemporaneously filing copies of Mr. Huon's operative complaint and relevant briefing in and decisions of the Illinois District Court and the Seventh Circuit. Given the extensive opportunity for the Debtors and Mr. Huon to be heard through that prior briefing, which is incorporated herein by reference, and Mr. Huon's failure to respond to the Objection, the Debtors submit that this Court can review that briefing and the prior rulings, and at the December 1, 2016 hearing on the Objection, disallow all portions of the Huon Claims except the remaining cause of action based on a single comment (the "<u>Single-Comment Claim</u>"). Seventh Circuit Ruling at 2-3.

59832551_5

16.     Importantly, the Seventh Circuit Ruling placed severe limits on the manner in which Mr. Houn could ultimately succeed on the Single-Comment Claim. Consequently, this allows for a straightforward estimation hearing in connection with plan confirmation because the remaining issues are surrounding the Single-Comment Claim are limited and clearly defined. Those issues are described *infra*.

### III.    Issues Remaining Regarding the Huon Claims

17.     The Seventh Circuit Ruling did not reinstate some broad path to large liability based solely on an anonymous comment. In the first instance, the *Gawker.com* article at issue in the Huon Claims is only a follow-on article to the publication <u>by an entirely different, non-Gawker online news publisher</u>, thus limiting the possible incremental damages from a single anonymous comment on the *Jezebel* website. Furthermore, the Seventh Circuit opinion described in detail the only manner in which Gawker Media could be liable for a comment on its website, which is tightly circumscribed by federal statute, section 230 of the Communications Decency Act (the "CDA") (certain case citations omitted), stating:

> The Communications Decency Act states, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); see also id. § 230(f)(3) (defining "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service"). This means that for purposes of defamation and other related theories of liability, a company like Gawker cannot be considered the publisher of information simply because the company hosts an online forum for third-party users to submit comments.
>
> . . .
>
> Huon argues that the Act is inapplicable here because Gawker's comments forum was not a mere passive conduit for disseminating defamatory statements. Rather, Gawker itself was an information content provider, insofar as the Gawker Defendants: (1) "encouraged and invited" users to defame Huon, through selecting and urging the most defamation-prone

8

> commenters to "post more comments and continue to escalate the dialogue"; (2) "edited," "shaped," and "choreographed" the content of the comments that it received; (3) "selected" for publication every comment that appeared beneath the Jezebel article; and (4) employed individuals who authored at least some of the comments themselves.
>
> The district judge concluded that these arguments failed to plausibly state a claim for relief. But we see nothing farfetched about Huon's factual allegations—***in particular, his contention that one or more of the comments were authored by Gawker employees.*** Rather than asserting one or two standalone factual allegations concerning Gawker's control over comments, Huon's fourth amended complaint devotes over four pages to detailing Gawker's alleged activities. ***Critically, the complaint hints at why Gawker employees might have anonymously authored comments,*** alleging that increasing the defamatory nature of comments can increase traffic to Gawker's websites, which can in turn enhance the attractiveness of Gawker's commenting system for prospective advertisers. In doing so, the complaint quotes several passages from a Reuters article that explains precisely how Gawker was planning to "monetize" comments, and why advertisers might find this commenting system appealing.
>
> The Gawker Defendants . . . argue that Huon's allegations amount to the kind of "traditional publishing activities" that other courts of appeals have found warrant protection under the Act. But we need not wade into that debate, since ***Huon has adequately pleaded that at least some of the allegedly defamatory comments were authored by Gawker employees***— thus making Gawker an "information content provider" under § 230(f).
>
> The Gawker Defendants also argue that Huon failed to plead facts plausibly ***establishing that Gawker authored the allegedly defamatory comments***. As discussed above, however, there is nothing implausible about this allegation, and we reject the Gawker Defendants' invitation to interpret Rule 8, Twombly, and Iqbal as requiring more.

__ F.3d at __; slip op. at 12-16 (emphasis added).

18. As a result, further resolution of the Single-Comment Claim involves only four discrete issues:

- First, whether GMGI or Gawker Hungary have any possibility of liability at all.

9

- Second, even with a statement that is considered defamation *per se* in an estimation hearing,[3] what the damages could be under Illinois law.

- Third, whether the defamatory statement in the Single-Comment Claim was authored by a Gawker employee.

- Fourth, whether Gawker's activities with respect to commenters takes Gawker outside the protections of CDA Section 230.

### A. GMGI and Gawker Hungary Have No Liability

19. As noted above, Mr. Huon has a single, live proof of claim against each of the three Debtors in these cases. All are based solely on Mr. Huon's Illinois federal court lawsuit. That lawsuit does name GMGI and Gawker Hungary (f/k/a Kinja Kft.) as defendants. However, there are only generalized allegations regarding the activities of GMGI or Gawker Hungary. Martin Declaration, Exhibit A, Fourth Amended Complaint ¶¶ 33-48. There are no specific allegations regarding GMGI and Gawker Hungary relating to the Single-Comment Claim that could form the only possible remaining basis for liability. Indeed, the only allegation that GMGI is involved is that it is a "shell company" (actually a holding company, as the Court is aware). *Id.* ¶ 37. The only allegation regarding Gawker Hungary's involvement is that it owns two Internet domain names (licensed to Gawker Media, as the Court is aware). *Id.* ¶ 43. And then there is the non-specific allegation that these defendants "are in the business of hosting websites." *Id.* ¶ 48.

20. The Illinois Federal Court dismissed Mr. Huon's counts for conspiracy, which perhaps were a basis for alleged liability of GMGI and Gawker Hungary. Mr. Huon did not

---

[3] The Debtors reserve the right to argue at summary judgment or trial, if any, that the statement is not defamation *per se*.

challenge the dismissal of those counts on appeal. Consequently, the Huon Claims against GMGI and Gawker Hungary should be estimated at $0.

### B. There Are Not Substantial Damages

21. Even if Gawker Media were determined to be liable for the Single Comment Claim (*see* parts C-D *infra*), the allowed amount of the Mr. Huon's Single-Comment Claim cannot be large, and may be simply estimated by this Court, which is the finder of fact (*see* Part I *supra*). Specifically, under Illinois law regarding defamation *per se*, courts presume injury to a plaintiff's reputation, and do not require a plaintiff to plead or prove actual damage to reputation. *See Gibson v. Philip Morris, Inc.*, 685 N.E.2d 638, 646 (Ill. App. 5th Dist. 1997). They do not require pleading of "special damages." *Carson v. Allied News Co.*, 529 F.2d 206, n.21 (7th Cir. 1976); *see also Newell v. Field Enters., Inc.*, 415 N.E.2d 434, 448–49 (Ill. App. 1st Dist. 1980); *Halpern v. News-Sun Broad. Co.*, 368 N.E.2d 1062, 1068 (Ill. App. 2d Dist. 1977); *Owens v. CBS Inc.*, 527 N.E.2d 1296, 1309–10 (Ill. App. 5th Dist. 1988).

22. But the notion that Mr. Huon is entitled to $100 million in damages is simply not tenable. The doctrine of presumed damages is designed to be compensatory, and therefore is a balanced doctrine. It is "an estimate, however rough, of the probable extent of actual loss a person had suffered and would suffer in the future, even though the loss could not be identified in terms of advantageous relationships lost, either from a monetary or enjoyment-of-life standpoint." *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1138 (7th Cir. 1987). Courts will reduce the damages where the jury arrived at the amount by pure speculation and there was no case law precedent in the vicinity of the lower court's award, in order to preserve the compensatory nature of presumed damages. *See Republic Tobacco Co. v. N. A. Trading Co., Inc.*, 381 F.3d 717, 734–35 (7th Cir. 2004). For example, the Seventh Circuit in

*Republic Tobacco* reduced a $3.36 million presumed damages award to $1 million, where the Court found $1 million would be enough to compensate plaintiff for presumed harm.

23. At a simple and brief estimation hearing, Mr. Huon and Gawker Media will be able to put on straightforward evidence regarding a rational amount of this type of compensatory-yet-presumed damages under Illinois law. That evidence would include the fundamental facts that (a) the *Jezebel* report was only secondary, coming on the heels of the original non-Gawker report by the website *Abovethelaw.com*, (b) that defamatory statement supporting the Single-Comment Claim <u>is in the comments section</u> of an otherwise non-defamatory article, which the Seventh Circuit held to be a fair report of the lawsuit that (at the time) was between Mr. Huon and *Abovethelaw.com*, (c) the comment was anonymous, which would affect the credence a reasonable reader would give to it, following on an article that specifically referenced that Mr. Huon's acquittal, (d) the author of the comment was simply reporting a set of already well known facts about the trial and then voicing his or her opinion based on those facts, and not claiming to speak from any particular basis of knowledge or expertise. While the amount of another settlement (Mr. Huon settled with *Abovethelaw*, Op. 4 n.2) is not evidence as to liability or the amount of damages, Fed. R. Evid. 408, the amount paid should reduce any open-ended liability awarded under the rubric of presumed damages, which is compensatory and should not yield a double award.

**C.    The Single-Comment Claim Statement Was Not Written by a Gawker Employee**

24. The Seventh Circuit Ruling reviewed the granting of Gawker Media's motion to dismiss, and therefore accepted the allegations of Mr. Huon's complaint as true. It made clear that "[t]he Gawker Defendants may well be correct in contending that none of Huon's various allegations actually occurred, but this doesn't mean that the allegations are so implausible as to

12

59832551_5

warrant dismissal under Rule 12(b)(6)." Op. at 14. The allegation central to their being any possible liability was that "allegedly defamatory comments were authored by Gawker employees." However, as will be demonstrated at the December 13th hearing, that allegation turns out not to be true.

25. Following the Seventh Circuit Ruling, a quick investigation of publicly available information has revealed evidence, which will carry the relevant evidentiary burdens, that the writer of the single anonymous comment at issue was not a Gawker employee. The comment was posted under the pseudonym "vikkitikkitavi" and the evidence will demonstrate that Huon will not be able to carry his burden to show that a Debtor employee is the same person that commented on Gawker websites.

26. Specifically, the Debtors' investigation will permit the Debtors to put into evidence support for the following:

- In order to comment on Gawker Media operated websites, a commenter needed to establish a username unique on Gawker Media websites.

- The username vikkitikkitavi is used on several other websites.

- One particular anonymous blog with that username is "vikkitikkitavi' blog] (the "<u>Vikkitikkitavi Blog</u>")

- The Vikkitikkitavi Blog was established in 2005 and, as of November 2016, contained 1484 blog posts.

- There is at least one post on the Vikkitikkitavi Blog that is identical to a comment by user vikkitikkitavi, including use of an identical picture, and that matching post and comment were both made on February 27, 2015, and concerned the death of Leonard Nimoy, a topic that had nothing to do with Mr. Huon.

- The Vikkitikkitavi blog contains personal identifying information (such as the author being from Indiana, descriptions of events and persons (by first name) from the

13

author's youth, etc.) that could lead to identification of the author.

27.  This constitutes a preponderance of evidence that the Single-Comment Claim statement was not posted by a Gawker employee. It is extraordinarily unlikely that a future Gawker employee would have set up a blog in 2005 and then used it to post intentionally defamatory comments in 2014. A writer seeking to do what Mr. Huon alleges, "posting under an alias" (4th Am. Compl. ¶ 110), would likely not be continuously doing so under a single username, much less from Indiana.

28.  This evidence meets any applicable standard of proof. The objector to a bankruptcy claim (the Debtors here) has an initial burden to put forward sufficient evidence to rebut the *prima facie* validity of the proof of claim under Rule 3001. *In re Dreier*, 544 B.R. 760, 766 (Bankr. S.D.N.Y. 2016). This meets that standard. Then the burden of proof shifts to the creditor (here Mr. Huon). *Id*. Mr. Huon can attempt, but it seems extraordinarily unlikely, to succeed in finding evidence that is stronger than this significant circumstantial evidence that vikkitikktavi is an independent commenter. The burden of proof in an estimation proceeding under section 502(c) of the Bankruptcy Code has the same burden-shifting mechanic. *In re Loucheschi LLC*, 471 B.R. 777, 779 (Bankr. D. Mass. 2012). The evidence above will meet a preponderance of the evidence standard, as compared to what Mr. Huon is likely to produce for evidence, on the central liability question the Seventh Circuit identified: whether the author of the Single-Comment Claim statement was a Gawker employee.

**D.  Gawker Media's Practices Regarding Its Comments Sections Are Within the Protections of CDA Section 230**

29.  The Seventh Circuit did not need to reach the protections of CDA Section 230 because it concluded that the Complaint alleged that a Gawker employee had authored the comments, and so the Complaint did not seek to hold Gawker liable as a publisher. Section 230

14

preempts state law and provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). If Mr. Huon is still pressing an argument that Gawker can be liable for the comment solely because of its comment-publishing practices (a "Comment-Moderation Claim"), then that claim fails based both on his allegations and on the facts regarding Gawker practices.

30. The Second Circuit recently set forth a comprehensive discussion of CDA Section 230 "immunity." *FTC v. LeadClick Media LLC*, 838 F.3d 158 (2d Cir. 2016). That case involved an Internet advertising service that was actively involved in creating and promoting false news sites for the benefit of a single customer (selling ineffective diet programs) that constituted 85% of the entire business of the advertising service.

31. The Second Circuit explained that there are three elements of CDA Section 230 immunity. First, the defendant must be an "interactive service provider." Second, the source of the liability must be a statement or information that comes from another "information content provider" – such that the defendant is not "responsible, in whole or in part, for the creation or development" of the statement or information. Third, the cause of action must be of a type that seeks to treat defendants as liable for being "speakers or publishers." In this case there is no meaningful dispute under the first prong that Gawker Media was an interactive service provider (it provides the ability for individuals to post comments that are responses to articles and to each other), or under the third prong that defamation law is a type of liability that seeks to hold a defendant liable as a speaker or publisher and so is covered by CDA Section 230, *Ricci v. Teamsters Union Local 456*, 781 F.3d 25 (2d Cir. 2015). And so the second element "another

15

59832551_5

information service provider," is the only section 230 element at issue for any Comment-Moderation Claim that Mr. Huon asserts.

32. Congress declared that the immunity of CDA Section 230 is intended to "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." *FTC v. LeadClick*, 838 F.3d at 173 (quoting 47 U.S.C. § 230(b)(2)). "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). "The statute aims to promote the continued development of the internet, through the availability of educational and informational resources to our citizens and to offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *LeadClick*, 838 F.3d at 176. (citations and quotation marks omitted). "Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Ricci*, 781 F.3d at 28. "Section 230 immunity is broad," and "close cases . . . must be resolved in favor of immunity." *LeadClick*, 838 F.3d at 173 (citations and quotation marks omitted).

33. Moderation of comments on its website do not, in the language of CDA Section 230, make Gawker Media "responsible . . . in part for the creation or development of" those comments. "A defendant [] will not be held responsible unless it assisted in the development of what made the content unlawful." *Id.* at 174 (*citing FTC v. Accusearch*, 570 F.3d 1187 (10th Cir. 2009)). The *LeadClick* case, and the examples discussed therein, are instructive of this principle. In *LeadClick* the defendant's activities "far exceeded that of neutral assistance," by "participat[ing] in the development of [the challenged] deceptive websites." It told the "other

16

information service providers" what edits to make to their websites. It directed customers ("affiliates") to use fake websites, and did so to support a customer (the diet-plan LeanSpa) that provided 85% of LeadClick's revenue. As the Second Circuit concluded, this was not neutral at all.

34. So too with the case of *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008). There, the "material contribution to the alleged unlawfulness" was taking data from users (both prospective lessors and lessees) and then collating it in a manner that allowed unlawful housing discrimination. In *FTC v. Accusearch Inc.*, the service "paid researchers to uncover confidential phone records protected by law, and then provided that information to paying customers." 570 F.3d at 1199. This was not acting as "a neutral intermediary," but instead "specifically encourage[d] development of what [was] offensive about the content," the disclosure of legally confidential phone records. *Id.*

35. Website comment moderation is nothing like situations of active involvement in discriminatory housing practices, paying for confidential phone records, or a deceptive advertising scheme using fake websites.

36. There is no evidence that Gawker Media's practice of initially selecting commenters sought out persons whose goal was to defame others or drive advertising revenues. Mr. Huon's complaint has only conclusory allegations on this score.[4] But the screening of

---

[4] These classic examples of conclusory allegations are: (a) "Encouraging, aiding and abetting users of the Jezebel.com website to post salacious and defamatory statements about Plaintiff," (b) "On information and belief, the Jezebel Defendants screens its commenters for inflammatory/defamatory posts, selects those who write most inflammatory and defamatory comments to be commenters, and encourages these already defamation-prone commenters to post more comments," and (c) "The Jezebel Defendants encourage and create an environment where defamation flourishes. The Jezebel Defendants promote posts from commentators that are the most inflammatory. The commentators feed off of one another's inflammatory comments to the point of committing major defamations against the subject of the story." Not a single actual example is provided. This is exactly the type of allegation that the Supreme Court condemned in *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 564-65 (2006). In this case the Seventh Circuit specifically avoiding deciding whether these were sufficient allegations to proceed, or conduct on which to base liability.

persons who can participate in an online conversation is no different that decision a host makes regarding guest invitations, or introducing one guest to another at an event. The host is not liable for a defamatory statement that one guest might make to another. *See, e.g.*, *Weber v. Multimedia Entm't, Inc.*, 2000 U.S. Dist. LEXIS 5688, *33 (S.D.N.Y. Apr. 29, 2000).

37. Any free marketplace of ideas creates a potential forum for a defamatory statement. While the Internet provides a significant enhancement to the freedom of that marketplace, that does not mean the marketplace should be sued for the defamatory statement of one person in it. Mr. Huon was not without recourse; nothing prevents the defamed person from seeking redress against the speaker. Mr. Huon, for all his effort in having sued two media organizations and taken an appeal all the way to the Seventh Circuit, never conducted the simple internet searches that led the debtors in possession to discover that the commenter-in-question ("vikkitikkitavi") is not a Gawker employee. Gawker actually reported online <u>regarding his acquittal</u>, and how another website sued him despite that acquittal. Mr. Huon instead tried to satisfy himself with the *in terrorem* effect of suing every Gawker entity he could find via Internet research, without any commensurate Internet research regarding the very speaker/commenters that he complained about.

38. Congress by statute has made clear that the market-maker in the Internet marketplace of ideas should not have liability. Mr. Huon cannot (a) obtain stay-relief from this Court so his appeal could be decided, (b) file a proof of claim, (c) fail to respond timely to a claims objection, (d) have every claim rejected by the appellate court except a single anonymous comment, and then (e) obtain a $100 million allowed bankruptcy claim and disrupt confirmation of a chapter 11 plan that successfully resolves for all creditors what was a seemingly an intractable mass of litigation at the outset of these cases. This Court should disallow all of the

18

59832551_5

Huon Claims except the Single-Comment Claim against Gawker Media, and hold an evidentiary estimation hearing regarding that limited remaining claim commencing on December 13, 2016 in connection with confirmation.

59832551_5

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court (a) enter the Proposed Order, and (b) grant such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: November 29, 2016<br>New York, New York | */s/ D. Ross Martin*<br>ROPES & GRAY LLP<br>Gregg M. Galardi<br>D. Ross Martin<br>Peter Walkingshaw (admitted *pro hac vice*)<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>Telephone: (212) 596-9000<br>Facsimile: (212) 596-9090<br>gregg.galardi@ropesgray.com<br>ross.martin@ropesgray.com<br>peter.walkingshaw@ropesgray.com<br><br>*Counsel to the Debtors*<br>*and Debtors in Possession* |