**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Gawker Media LLC, *et al.*,[1] | Case No. 16-11700 (SMB) |
| Debtors. | Jointly Administered |

**DECLARATION OF D. ROSS MARTIN**
**IN SUPPORT OF THE OBJECTION OF DEBTOR**
**GAWKER MEDIA LLC TO PROOF OF CLAIM**
**NOS. 14, 15, 19, 20, 21, 22, 23, 24, 46, 47 FILED BY MEANITH HUON**

Pursuant to 28 U.S.C. § 1746, D. Ross Martin declares as follows:

1.    I am a partner with the law firm Ropes & Gray LLP, counsel to Gawker Media LLC ("Gawker Media), Gawker Media Group, Inc. ("GMGI"), and Kinja Kft. ("Kinja"), (collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned cases.

2.    I submit this declaration in support of the *Debtors' Reply Memorandum in Support of Objections to Proofs of Claim Filed by Filed by Meanith Huon* (the "Huon Reply").

3.    Attached as Exhibit A is a true and correct copy of the Fourth Amended Complaint in the Huon Defamation Action filed by claimant Meanith Huon in the United States District Court for the Northern District of Illinois, Eastern Division.

4.    Attached as Exhibit B is a true and correct copy of the Order entered on November 14, 2016 by the Seventh Circuit Court of Appeals in the Huon Defamation Action, affirming in part and denying in part the opinion of the United States District Court for the Northern District of Illinois, Eastern Division.

---

[1]    The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

5.      Attached as Exhibit C is a true and correct copy of Mr. Huon's appellate brief to the Seventh Circuit Court of Appeals in the Huon Defamation Action.

6.      Attached as Exhibit D is a true and correct copy of Debtors' appellate brief to the Seventh Circuit Court of Appeals in the Huon Defamation Action.

7.      Attached as Exhibit E is a true and correct copy of Mr. Huon's reply brief to the Seventh Circuit Court of Appeals in the Huon Defamation Action.

8.      Attached as Exhibit F is a true and correct copy of the Order entered on December 4, 2014 by the United States District Court for the Northern District of Illinois, Eastern Division in the Huon Defamation Action, dismissing all claims against Gawker Media LLC with prejudice.

9.      Attached as Exhibit G is a true and correct copy of Debtors' Memorandum in Support of Gawker Defendants' Motion to Dismiss Mr. Huon's Complaint.

10.     Attached as Exhibit H is a true and correct copy of Mr. Huon's response to Debtors' Motion to Dismiss.

11.     Attached as Exhibit I is a true and correct copy of a letter sent by the Debtors' counsel to Mr. Huon, dated November 16, 2016.

Dated: November 29, 2016
       Boston, Massachusetts

                              */s/ D. Ross Martin*
                              D. Ross Martin

**<u>EXHIBIT A</u>**

Fourth Amended Complaint in the Huon Defamation Action filed by claimant Meanith Huon in
the United States District Court for the Northern District of Illinois, Eastern Division

# IN THE UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| **MEANITH HUON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **CIVIL ACTION NO.:   1: 11-cv-3054** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| **BREAKING MEDIA, LLC a/k/a** ) | |
| **BREAKING MEDIA;** ) | |
| **BREAKING MEDIA, INC. a/k/a** ) | |
| **BREAKING MEDIA;** ) | |
| **DAVID LAT; ELIE MYSTAL;** ) | |
| **JOHN LERNER; DAVID MINKIN;** ) | |
| **("ABOVETHELAW DEFENDANTS");** ) | |
| ) | |
| **GAWKER MEDIA, LLC a/k/a** ) | |
| **GAWKER MEDIA;** ) | |
| **BLOGWIRE HUNGARY SZELLEMI** ) | |
| **ALKOTAST HASZNOSITO KFT** ) | |
| **GAWKER MEDIA GROUP, INC. a/k/a** ) | |
| **GAWKER MEDIA;** ) | |
| **GAWKER ENTERTAINMENT, LLC** ) | |
| **GAWKER TECHNOLOGY, LLC** ) | |
| **GAWKER SALES, LLC,** ) | |
| **NICK DENTON; IRIN CARMON;** ) | |
| **GABY DARBYSHIRE** ) | |
| **("JEZEBEL DEFENDANTS").** ) | |
| ) | |
| **Defendants.** ) | |

## FOURTH AMENDED COMPLAINT

Plaintiff, Meanith Huon, complains of the Defendants as follows:

## CAUSE OF ACTION

1.      This a diversity action brought pursuant to 28 U.S.C. Section 1332 for defamation

(both per se and per quod), invasion of privacy (both false light and unreasonable intrusion upon

1

seclusion of another), intentional infliction of emotional distress, civil conspiracy (to defame

Plaintiff and to invade his privacy), <u>cyberstalking</u> and <u>cyberbullying</u>.

2.      This action arises out of Defendants' dissemination of knowingly false statements

about Plaintiff, Meanith Huon, in a variety of national and international social media as well as

on the Internet. To wit, Defendants falsely depicted Mr. Huon as, among other things, a rapist, a

serial rapist, a lawyer who posed as a supervisor and a talent scout to meet women, as someone

who got away with rape, and as a sexual deviant.   Defendants' statements were intended to, and

were in fact, read by many in the United States and people worldwide, including potential

business employers, clients, family and friends of Mr. Huon.

3.      Defendants' statements about Mr. Huon are untrue and were made with knowledge

of their falsity or with reckless disregard to the truth of such statements. Defendants wrote and

published, and intended for republication, the statements with malice and a conscious disregard

for the truth for the purpose of furthering Defendants' own agenda of generating ad revenue,

generating website traffic and comments among its website users, inciting users to post their own

defamatory content, publishing web content, preserving Defendants' influence in social media,

and/or securing material business and economic advantage.

4.      The false, malicious and defamatory statements that Defendants published on the

Internet websites evidence a highly offensive and outrageous prying by Defendants into

Plaintiff's private life and affairs.  By its conduct, Defendants engaged in cyberbullying and/or

cyberstalking of Mr. Huon.

5.      Defendants' broad dissemination of defamatory statements about Mr. Huon has

caused severe economic, competitive and reputational harm to Mr. Huon. The success of Mr.

Huon derives from his professional reputation as an attorney and his standing in the community.

Plaintiff has sustained loss of business and employment opportunities and has suffered a loss of

reputation in the business and legal community. Additionally, Mr. Huon personally has suffered

humiliation and embarrassment as a result of the dissemination of the false statements by

Defendants.

6.      Plaintiff seeks compensatory and punitive damages against Defendants for their

actions, as well as injunctive relief, enjoining Defendants (either directly or through any third

party) from further publishing or re-publishing the actionable and offensive statements either on

websites or elsewhere, from further publishing or re-publishing any detail from Plaintiff's private

life or affairs and from unreasonably intruding upon Plaintiff's right of privacy.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. Section 1332, in that complete diversity exists between Plaintiff and the Defendants and

the matter in controversy exceeds the sum of $75,000.00 dollars, exclusive of interest and costs.

8.      Venue is proper pursuant to 28 U.S.C. §1391 (b), because a substantial part of the

events or omissions giving rise to the claim occurred within the district.   Furthermore,

Defendants directed their conduct toward Plaintiff in this district.  Additionally, the state in which

the victim of Defendants' defamation lived has jurisdiction over the victim's defamation suit.

## THE PARTIES

9.      At all relevant times, Plaintiff, Meanith Huon, was and is a citizen of the State of

Illinois.  Citizenship for purposes of diversity jurisdiction is domicile, and domicile is the place

one intends to remain.  Dakuras v. Edwards, 312 F.3d 256, 258 (7th Cir. Ill. 2002).  Mr. Huon has

lived and practiced in Illinois since May of 1996 and intends to remain in Illinois.

3

10.    The Abovethelaw Defendants and the Jezebel Defendants have not disclosed their affiliates as required under FRCP 7.1 and Local Rule 3.2.   Plaintiff, Meanith Huon, has filed or will be filing a motion for expedited and limited discovery to compel the Defendants to disclose their affiliates.

11.    At all relevant times, Defendant, Breaking Media, LLC a/k/a Breaking Media, is a limited liability company organized and operating under the laws of the State of New York with its principal place of business in New York.  Thus, Breaking Media, LLC a/k/a Breaking Media is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

12.    On or about March 7, 2008, Defendant, Breaking Media, LLC, changed its name from Dead Horse Media, LLC to Breaking Media, LLC.  Exhibit 1.  Gavin D. McElroy signed as an authorized person on the Certificate of Amendment of the Articles of Organization of Dead Horse Media, LLC.  Exhibit 1.  Mr. McElroy is a partner with the New York firm of Frankfurt Kurnit Klein & Selz and a citizen of New York.  http://www.fkks.com/bios.asp?attorneyID=11

13.    The New York Secretary of State does not require LLCs to disclose all its members when the LLC formation document is filed.  NY CLS LLC § 203.

14.    At all relevant times, Defendant, Breaking Media, Inc. a/k/a Breaking Media, is a Delaware corporation organized and operating under the laws of the State of New York with its principal place of business in New York.  Thus, Breaking Media, Inc. a/k/a Breaking Media is a citizen of New York and Delaware, pursuant to 28 U.S.C. 1332(c).

15.    On or about December 30, 2011, Defendant, Breaking Media, Inc. merged with Breaking Media, LLC.  See Exhibit 2.  John Lerner signed the Certificate of Merger of Breaking Media, LLC, New York limited liability company, into Breaking Media, Inc., a Delaware

4

corporation, as Chief Executive Officer and Manager of Breaking Media, LLC.    Carter Burden

III signed the Certificate of Merger as president of Breaking Media, Inc. Exhibit 2.    Separate

corporations lose their separate identity after merger.    Hoefferle Truck Sales, Inc. v. Divco-

Wayne Corp., 523 F.2d 543, 548-549 (7th Cir. Ill. 1975).    After a foreign corporation merges into

a Delaware corporation, the surviving corporation for diversity jurisdiction is a citizen of

Delaware.    Hoefferle Truck Sales, Inc. v. Divco-Wayne Corp., 523 F.2d 543, 548-549 (7th Cir.

Ill. 1975).

16.    The name of the surviving corporation is Breaking Media, Inc.  Exhibit 2.

Defendant, Breaking Media, Inc. d/b/a Breaking Media is a continuation of or merger of

Breaking Media, LLC d/b/a Breaking Media.    In this case, the surviving corporation is Breaking

Media, Inc., a citizen of both New York and Delaware, with its principal place of business in

New York.

17.    At all relevant times, Defendant John Lerner was and is a citizen of the State of

New York.    Defendant Lerner was and is the Chief Executive Officer of Breaking Media.

http://breakingmedia.com/contact-us/ ; http://www.linkedin.com/in/jlerner?trk=pub-pbmap.

18.    At all relevant times, Carter Burden, III was and is a citizen of the State of New

York.    He is president of Breaking Media, Inc.    http://www.logicworks.net/about-us/team;

https://twitter.com/G_Clouds;

http://investing.businessweek.com/research/stocks/private/person.asp?personId=11177217&privc

apId=6814589&previousCapId=351238&previousTitle=GLOBAL%20ITECHNOLOGY%20IN

C.

19.     At all relevant times, Defendant, Breaking Media, LLC a/k/a Breaking Media, and

Defendant, Breaking Media, Inc. a/k/a Breaking Media owns, operates, controls, and/or publishes

several websites, including Abovethelaw.com and BreakingMedia.com which disseminate

information worldwide via the Internet.

20.     At all relevant times, Defendant, David Lat, was and is a citizen of the State of

New York.  Defendant Lat was and is the managing editor of Abovethelaw.com.  Defendant Lat

is the founding editor of Above the Law.  Prior to Above the Law, Lat worked as a litigation

associate at Wachtell, Lipton, Rosen & Katz, in New York.  He lives in New York, New York.

http://abovethelaw.com/author/david-lat/; http://twitter.com/DavidLat;

http://www.facebook.com/davidlat.

21.     At all relevant times, Defendant, Elie Mystal, was and is a citizen of the State of

New York.  Defendant Mystal was and is a writer and editor for Abovethelaw.com.   Defendant

Mystal lives in New York, New York and has written editorials for the New York Daily News

and the New York Times.   http://abovethelaw.com/author/elie-mystal/;

http://www.facebook.com/mystal.

22.     At all relevant times, Defendant, David Minkin was and is a citizen of the State of

New York.  Defendant Minkin was and is the publisher of Abovethelaw.com and

Breakingmedia.com.  Defendant Minkin can be reached at 212.334.1871 x1 (New York area

code). http://breakingmedia.com/contact-us/; http://www.linkedin.com/in/davidminkin.

23.     Defendants, Breaking Media, LLC a/k/a Breaking Media, Breaking Media, Inc.

a/k/a Breaking Media, Lat, Mystal, Lerner, and Minkin shall sometimes hereinafter be referred to

as the "Abovethelaw Defendants."

6

24.     At all relevant times, Defendant, Gawker Media LLC a/k/a Gawker Media, was

and is a limited liability company organized and operating under the laws of the State of

Delaware with its principal place of business in New York.   In response to a request for the

original formation document for Gawker Media, LLC, the Delaware Secretary of State produced

a Certificate of Incorporation for Blogwire, Inc.  The sole incorporator of Blogwire, Inc. is Nick

Denton.  Exhibit 3.  The Delaware Secretary of State allows a Delaware corporation to be

converted to a Delaware LLC.  6 Del. C. § 18-214.

25.     The Delaware Secretary of State does not require LLCs to disclose the identity of

all their members.  6 Del. C. § 18-201.

26.     Defendant, Nicholas Denton signed the Application for Authority of Defendant,

Gawker Media, LLC as the manager of  Defendant, Gawker Media, LLC.  Exhibit 3.  Defendant,

Gabrielle Darbyshire signed the Biennial Statement of Defendant, Gawker Media, LLC as a

member of  Defendant, Gawker Media, LLC.  Exhibit 3. Jesse Ma signed the Biennial Statement

of  Defendant, Gawker Media as a legal associate.  Exhibit 3.

27.     At all relevant times, Defendant Nick Denton was and is, a citizen  of Hungary

and the United Kingdom.  He resides at 76 Crosby Street, Apt 2B, New York, NY 10012-3957

and/or 81 Spring Street, Apt. 2B, New York, NY 10012-3904.  Mr. Denton was the founder of

Gawker Media and currently owns Gawker Media.  http://www.facebook.com/nicknotned;

http://advertising.gawker.com/execteam/.

28.     At all relevant times, Defendant, Gabby Darbyshire was and is a citizen of the

State of New York.  Defendant Darbyshire was, and currently is, the Chief Operating Officer of

7

Case: 1:11-cv-00099 Document #: 1-23 Filed: 12/13/12 Page 1 of 49 PageID #:1436

Gawker Media. http://twitter.com/gabyd; http://www.linkedin.com/pub/gabrielle-darbyshire/0/3/56; http://www.npr.org/2011/01/03/132613645/Gawker-Wants-To-Offer-More-Than-Snark-Vicious-Gossip

29.     At all relevant times, Jesse Ma was and is a citizen of the State of New York.  He is an associate counsel at Gawker Media.  http://jessema.com/; http://www.linkedin.com/in/jessema; https://twitter.com/jessema.

30.     At all relevant times, Defendant, Gawker Entertainment, LLC, was and is a New York limited liability company.  Thus, Defendant, Gawker Entertainment, LLC, was and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

31.     Jan Cohen signed the Articles of Organization of Defendant, Gawker Entertainment, LLC. Exhibit 4.  Gabrielle Darbyshire signed as the managing member on the Biennial Statement of  Defendant, Gawker Entertainment, LLC. Exhibit 4.   Exhibit 4.  Jesse Ma signed the Biennial Statement of Defendant, Gawker Entertainment, LLC as legal associate. Exhibit 4.   Defendants also filed documents with the California Secretary of State.  Exhibit 5. The managers or members listed are Gawker Media, LLC and "Nick Penton" for Gawker Entertainment, LLC.

32.     At all relevant times, Jan Cohen was and is, a citizen  of the United Kingdom. http://www.linkedin.com/in/janpcohen; http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=5520699; http://jpcesq.com/

8

33.     At all relevant times, Defendant, Gawker Technology, LLC, was and is a New York limited liability company.  Thus, Defendant, Gawker Technology, LLC,  was and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

34.     Nicholas Denton is identified as the president of Gizmodo, LLC a/k/a Defendant, Gawker Technology, LLC, Exhibit 6.   Nick Denton signed the Certificate of Amendment to the Articles of Organization of Defendant, Gawker Technology, LLC, on behalf Gawker Media.  Exhibit 6.  Gabrielle Darbyshire signed the Biennial Statements as a director, member, and vice president.  Exhibit 6.  Jesse Ma is identified as a legal associate.  Exhibit 6.  Defendants also filed documents with the California Secretary of State.  Exhibit 5.   The managers or members listed are Gawker Media, LLC and "Nick Penton" for Gawker Entertainment, LLC and Gawker Technology, LLC (f/k/a Gizmodo LLC).

35.     At all relevant times, Defendant, Gawker Sales LLC was and is a New York limited liability company.  Thus, Defendant, Gawker Sales LLC,  was and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

36.     Defendant, Gabrielle Darbyshire is identified as the organizer in the Articles of Organization for Defendant, Gawker Sales LLC.  Exhibit 7.  Ms. Darbyshire is identified as the COO of Defendant, Gawker Sales LLC in the Biennial Statement.  Exhibit 7.  Defendant, Nicholas Denton is identified as the  president of Defendant, Gawker Sales LLC in the Biennial Statement.  Exhibit 7.

37.     At all relevant times, Defendant, Gawker Media Group Inc. a/k/a Gawker Media, was and is a Cayman Islands corporation with its principal place of business in New York City, New York.  Thus, Defendant, Gawker Media Group Inc. a/k/a Gawker Media,  is a citizen of the

9

Cayman Islands, pursuant to 28 U.S.C. 1332(c). Defendant, Gawker Media Group, Inc. is a shell

corporation for the Defendants, Gawker Media LLC, Gawker Entertainment LLC, Gawker

Technology LLC, Gawker Sales LLC. http://blogs.reuters.com/felix-salmon/2010/12/01/the-

new-gawker-media/; http://www.newyorker.com/online/blogs/johncassidy/2010/12/gawker-

stalker-nick-denton-spotted-in-cayman-islands.html.

38.    The offices of Gawker Media Group Inc. a/k/a Gawker Media are located at 210

Elizabeth Street, Fourth Floor, New York, NY 10012, and its principal place of business is in

New York City, New York. http://advertising.gawker.com/contact/;

http://advertising.gawker.com/execteam/.

39.    At all relevant times, Defendant, BLOGWIRE HUNGARY SZELLEMI

ALKOTAST HASZNOSITO KFT, a/k/a Gawker Media was and is a Hungarian offshore

company. Thus, Defendant, BLOGWIRE HUNGARY SZELLEMI ALKOTAST

HASZNOSITO KFT is a citizen of Hungary, pursuant to 28 U.S.C. 1332(c). Defendant,

BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT, owns the domains

Gawker.com and Jezebel.com. http://whois.domaintools.com/gawker.com;

http://whois.domaintools.com/jezebel.com.

40.    At all relevant times, the principal place of business of Defendant, BLOGWIRE

HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT a/k/a Gawker Media is New York

City, New York. http://advertising.gawker.com/contact/;

http://advertising.gawker.com/execteam/.

41.    A "KFT" is a Hungarian corporate entity. Tempel Steel Corp. v. Loranger Ipari

KFT, 1998 U.S. Dist. LEXIS 4003 (N.D. Ill. Mar. 27, 1998) ("Dismissal of the action would

10

seem inappropriate here, given (1) what would appear to be a strong likelihood that the necessary

diversity of citizenship actually exists and (1)[sic] the consequent potential for curing the existing

error under Section 1653."); Hawkins v. Borsy, 2007 U.S. Dist. LEXIS 14358 (E.D. Va. Feb. 6,

2007); Dorfman v. Marriott Int'l Hotels, Inc., 2001 U.S. Dist. LEXIS 642 (S.D.N.Y. Jan. 26,

2001); Tableau Software, Inc. v. AnyAspect KFT, 2008 U.S. Dist. LEXIS 11364 (N.D. Cal. Feb.

1, 2008); Dorfman v. Felvono, 2002 U.S. Dist. LEXIS 3749 (S.D.N.Y. Mar. 5, 2002).

42.     A "KFT" has similar characteristics as a U.S. limited liability company.

Hungary's offshore legislation provides for the incorporation of a low-tax offshore company

(KFT).http://www.offshore-fox.com/offshore-corporations/offshore_corporations_0408.html;

http://www.atrium-incorporators.com/hungary-company-formation/  A Google of "KFT" reveals

PDF documents on doing business in Hungary.  (Some of these password protected PDF

documents cannot be uploaded to Pacer. Exhibit 8 is left intentionally blank.)

43.      Thus, Defendant, BLOGWIRE HUNGARY SZELLEMI ALKOTAST

HASZNOSITO KFT is a Hungarian limited liability company that owns the domains

Gawker.com and Jezebel.com.

44.      Defendants, Gawker Media LLC a/k/a Gawker Media, BLOGWIRE HUNGARY

SZELLEMI ALKOTAST HASZNOSITO KFT, Gawker Media Group Inc. a/k/a Gawker,

Gawker Entertainment LLC, Gawker Technology LLC, Gawker Sales LLC owns, operates,

controls, and/or publishes several websites, including Gawker.com and Jezebel.com, which

disseminate information worldwide via the Internet.

45.      At all relevant times, Defendant, Gawker Media LLC a/k/a Gawker Media owned,

operated, controlled, and/or published Fleshbot.com, a pornographic website.

11

46.     At all relevant times, Defendant, Irin Carmon was and is a citizen of the State of
New York.  Defendant Carmon is a reporter for Jezebel.com.  http://twitter.com/irincarmon;
http://irincarmon.com/

47.     Defendants, Gawker Media LLC a/k/a Gawker Media, BLOGWIRE HUNGARY
SZELLEMI ALKOTAST HASZNOSITO KFT, Gawker Media Group Inc. a/k/a Gawker Media,
Gawker Entertainment, LLC, Gawker Technology, LLC, Defendant, Gawker Sales LLC, Nick
Denton, Gabby Darbyshire, Irin Carmon  shall sometimes hereinafter be referred to as the
"Jezebel Defendants."

48.     The Jezebel Defendants are in the business of hosting websites designed to defame
targeted victims with obscene, false and fraudulent headlines and blog posts for the purpose of
generating web traffic which translates into advertising revenue.  In that regard, the Jezebel
Defendants, and each them, by and through their websites, disseminate pornography, salacious
headlines, blog posts and photographs concerning their targeted victims, thereby inflaming the
public and, thereafter, encouraging their readers to defame, malign, disparage and harass the
targeted victims by posting their own extreme, outrageous, and defamatory comments on these
websites.


**FACTS**

49.     Plaintiff , Meanith Huon, is an attorney   licensed to practice law in the State of
Illinois since May 9, 1996.  He is admitted to practice before the Northern District of Illinois, the
Central District of Illinois, the Southern District of Illinois,  (including the Federal Trial Bar for
the Northern District of Illinois), and the Seventh Circuit.  Mr. Huon has never been convicted of

Case 1:11-cv-09054   Document #: 262   Filed: 11/05/12   Page 13 of 35   PageID #:1755

a felony or misdemeanor.

50.     On or about July 2, 2008, Plaintiff was falsely accused by "Jane Doe" and charged with criminal sexual assault.  The investigating detectives never interviewed two key witnesses at the scene of the alleged occurrence.   According to the police report, the investigating detective told Mr. Huon that "that at no time was he being accused of striking [Jane Doe] nor physically threatening her with violence."  The investigating detective  stated in his report that he told Mr. Huon that Jane Doe "had been very intimidated by Huon reportedly yelling at her" and that "a small amount of physical contact" was alleged by Jane Doe.  The investigating detectives asked Jane Doe to contact Mr. Huon by telephone to arrange for a private meeting between Jane Doe and Mr. Huon.

51.     Shortly after his arrest in 2008, Jane Doe visited Mr. Huon's then defense attorney, William Lucco, but was turned away.   In 2009, Jane Doe Googled "Meanith Huon" and stalked him online, in an attempt to communicate with him.  Jane Doe found a blog that contained postings on God and musings on life, including the posting "10 reasons why I'd make a good husband for you 'dede'."   The blog did not state anything threatening or intimidating and did not refer to Jane Doe by her legal name.  Jane Doe advised Madison County prosecutors that she Googled Mr. Huon and found the aforesaid blog.  Unable to pressure Mr. Huon into accepting a guilty plea of 12 years in the 2008 case, the Madison County State's Attorney's Office retaliated by falsely arresting Mr. Huon and prosecuting him for cyberstalking and witness harassment  in 2009.

52.     In May of 2010, a trial was held in Madison County, Illinois and, after only two hours of deliberation, Plaintiff , Meanith Huon, was acquitted of the sexual assault charges.

13

53.     After Mr. Huon was acquitted in May of 2010, the cyberstalking and witness

harassment  charges in the 2009 case were not dismissed until almost seven months later on or

about December 6, 2011.  On or about the same day, the Madison County State's Attorney whose

office had prosecuted the case was sworn into office as an elected judge.

54.     Defendants are not reporters or journalists whose conduct is governed by a code of

ethics in news gathering and reporting, such as the Society of Professional Journalist Code of

Ethics.   http://www.spj.org/ethicscode.asp.  News organizations like the New York Times and

Business Week have a code of ethics.

55.     Defendants are website operators and bloggers who created websites to generate

advertising dollars from the traffic, including sponsored or moderated comments and discussions.

Defendants generate web traffic and advertising dollars by defaming individuals like Mr. Huon

and profiting from other people's miseries.

56.     Defendants did not make a report of an official proceeding but posted comments

from other web sources on the Internet. Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d

558, 588 (Ill. 2006).

57.     Defendants did not make a report that was a complete and accurate or a fair

abridgement of the official proceeding. Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d

558, 588 (Ill. 2006).


## I. ABOVETHELAW.COM

58.     On or about May 6, 2010, on the day that Plaintiff, Meanith Huon, was acquitted

of all sexual assault charges, the Abovethelaw Defendants, disseminated, published, and re-

published numerous actionable and offensive statements via a post on Abovethelaw.com which are false, misleading and defamatory statements of fact.

59.    The Abovethelaw Defendants posted a story on a former New York Giants linebacker who was charged with third-degree rape involving a 15 year-old girl .  The Abovethelaw Defendants followed this story with the prefatory comment that the next story regarding Mr. Huon is "from the files of the wanton and depraved".  What can be more wanton and depraved than raping a 15 year-old girl?

60.    On the day that Plaintiff, Meanith Huon, was acquitted of all sexual assault charges, the Abovethelaw Defendants posted  "breaking rape coverage".  The Abovethelaw.com Post is set forth herein below and a copy is attached as Exhibit 9:

## Rape Potpourri

We've got a couple of rape stories…

"Here at ATL, we're your one-stop shop for breaking rape coverage.  We cover the rape allegations of the rich and famous, as well as any alleged attorney rapists near you…

Our next story from the files of the wanton and depraved is a little more in our wheelhouse. A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models.

So far, so good.  I once pretended to be an Ostrich rancher from sub-Saharan Africa because I was trying to impress bubble gum princesses at a BU party.  But Huon's potentially harmless lies allegedly turn dastardly, pretty quickly:

The victim said she responded to a Craigslist ad posted by Huon in late

15

June, seeking promotional models, sending her resume, her phone number and two pictures of herself…

The two agreed to meet at the downtown St Louis bar Paddy O's, the victim testified.

But the next day, the victim was running late and called Huon. He told her to meet him at another bar, but when she got there, he told her the other promotional models left, and so he was going to interview her, the victim said.

And this people, is why God invented Google. Had the victim Googled Huon, she would have found stories like this, from the Madison County Record:

A Chicago attorney who was posing as a supervisor for a company that sets up promotions for alcohol sales at area bars was charged in Madison County July 2, with two counts of criminal sexual assault, two counts of criminal sexual abuse and one count of unlawful restraint.

Meanith Huon, 38, of 3038 S Canal St. in Chicago, was arrested by the Chicago Police Department on July 1, and was transferred to Madison County the next day.

Or she might have come across this link, at Lawyer Gossip:

Lawyer, Meanith Huon, 39, who was originally charged with criminal sexual assault, sexual abuse and unlawful restraint is now facing charges of harassment and cyber stalking!

Of course, women shouldn't have to assume that every guy they meet is a potential rapist. But apparently there are a lot of depraved dudes walking around out there that are potential rapists.

In any event:

Huon and the woman went to a couple of bars near Busch Stadium, then to a Laclede's Landing bar before Huon asked the victim if she wanted to go to Pop's

16

in Sauget to meet the other models.

The woman agreed, but told Huon she didn't have enough gas in her car, so she went with him, she said.

This is gonna end badly.

As Huon's Honda Civic crossed the Poplar Street Bridge, the victim said Huon drove past the Sauget exit and continued north on Interstate 55. As the car was moving, Huon fondled the woman, then forced her to perform oral sex on him, the victim said.

Oh, come on. If somebody was driving and tried to "force" me to perform oral sex on them. I'd just get out of the stupid car. Which is to say, I'd do *exactly* what the victim did in this case.

Huon exited Interstate 55 near New Douglas, looking, the victim said, for a secluded place to make out with her. The victim leaped from the moving car, she said, to escape Huon, leaving her cell phone, purse, shoes and identification in his car.

"If he wasn't going to take me back to the freeway, I had made a decision to do anything I could to get out of that car," the victim testified.

Assistant State's Attorney Chris Hoell showed pictures to the jury of the woman's bruised knees, skinned feet and cut toes.

Damn. If you can't get a woman to consensually stay in a moving vehicle, can you really get her to consensually agree to sex (insofar as lying to her about your job and your intentions to get her into the car counts as consensual in the first place)?

Obviously, Huon sees things differently.

Mike Mettes, Huon's defense lawyer, said during his opening statement that Huon and the victim met, but at some point in the evening, it became social

17

and the two of them had consensual sex.  But the victim asked for $500 and threatened if Huon didn't pay her, she would "cry rape," the attorney argued.

So we're not denying that she hurled herself out of a moving vehicle, we're contending that she jumped out of the car to make it look like she was raped? Right, sure. That sounds like the definition of incredible.

It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.

I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my _____to the other party's_____.  Such amorous undulations include, but are not limited to,_____ , _____, and _____, all proposals will be considered so long as no animals (barnyard or otherwise) are involved.

I claim no rights to future _____ , _____, or _____ , in exchange for this brief interruption in my chronic loneliness.

While I may be quite intoxicated right now, I know damn well what I'm doing.

61.    Defendants, Breaking Media, LLC a/k/a Breaking Media, Breaking Media, Inc. a/k/a Breaking Media, Lat, Mystal, Lerner, and Minkin published and disseminated the defamatory blog post and comments worldwide via the Internet.

62.    The post was written by Defendant Mystal. Defendants continued to republish and disseminate the above-mentioned defamatory statements worldwide after May 6, 2010.

63.    The actionable and offensive statements set forth in the Abovethelaw.com post include:

a.    Stating and/or inferring that Plaintiff is an attorney rapist;

18

b.    Stating and/or inferring that Plaintiff is wanton and depraved;

c.    Stating and/or inferring that Plaintiff had an excellent game to meet women;

d.    Stating  that Plaintiff allegedly listed Craigslist ads where he claimed to be a talent scout for models thereby inferring that Plaintiff is a sexual predator;

e.    Stating and/or inferring that Plaintiff told lies and is a liar;

f.    Stating and/or inferring that Plaintiff is dastardly;

g.    Stating that the complainant is a "victim" of Plaintiff thereby inferring that the complainant was actually criminally assaulted by Plaintiff;

h.    Stating that the complainant responded to a Craigslist ad posted by Plaintiff in late June seeking promotional models thereby inferring that Plaintiff is some kind of sexual predator;

i.    Stating that if the complainant had Googled Plaintiff's name, she would have found other stories in the Madison County Record and other sites inferring that Plaintiff had a criminal record, that there was more than one woman victim or was otherwise dangerous;

j.    Stating that Plaintiff was posing as a supervisor for a company that sets up promotions for alcohol sales at area bars;

k.    Stating and/or inferring that Plaintiff is a potential rapist and/or "depraved dude" walking around who is a potential rapist;

l.    Stating and/or inferring that Plaintiff fondled the complainant and forced her to perform oral sex on him;

m.    Stating that a photograph of the complainant showed bruised knees, skinned feet and cut toes, thereby inferring that Plaintiff caused physical harm to the complainant;

n.    Stating and/or inferring that Plaintiff lied to the complainant about a job and his intentions in order to lure her into a car;

19

o.      Stating that the complainant hurled herself out of a moving vehicle thereby inferring that she was assaulted and/or in danger of being assaulted by Plaintiff;

p.      Stating and/or inferring that Plaintiff has committed rape;

q.      Stating and/or inferring that Plaintiff is chronically lonely, was desirous of a hot body, sought amorous undulations and has or would have sexual relations with a barnyard animal;

r.      Stating and/or inferring that Plaintiff requires a consent form in order to have sex;

s.      Stating and/or inferring that Plaintiff had raped the complainant in "breaking rape coverage" on the date that he was acquitted of sexual assault charges;

t.      Stating and/or inferring that the complainant is a minor or bubble-gum princess;

u.      Stating and/or inferring that Plaintiff's acts or conduct was more depraved and wanton than  raping a 15 year-old girl;

v.      Stating and/or inferring that Plaintiff was a sex offender or sexual predator;

w.      Stating and/or inferring that Plaintiff was a pedophile;

x.      Stating and/or inferring that Plaintiff used the Internet to meet women for sex.

y.      Stating and/or inferring that Plaintiff told complainant that  "other promotional models left" and that Plaintiff " was going to interview her" thereby inferring that Plaintiff  lured complainant under the guise of a job interview.

z.      Stating and/or inferring that "This is gonna end badly" thereby inferring that the allegations of rape are credible.

aa.      Stating and/or inferring that "Oh, come on.  If somebody was driving and tried to "force" me to perform oral sex on them, I'd just get out of the stupid car.  Which is to

20

say, I'd do exactly what the victim did in this case", thereby improving the credibility of the defamation.

bb. Stating and/or inferring that the jury was allowed to consider the defense of rape in their deliberations: ""Damn. If you can't get a woman to consensually stay in a moving vehicle, can you really get her to consensually agree to sex (insofar as lying to her about your job and your intentions to get her into the car counts as consensual in the first place)? Obviously, Huon sees things differently."

cc. Stating and/or inferring that "It seems to me that there is entirely too much (alleged) raping going on in this country", thereby inferring that Plaintiff got away with rape and improving the credibility of the rape charges on the date of Mr. Huon's acquittal.

64. Defendants knew or should have known that certain statements in the blog post were false at the time they were made and published.

65. Defendants did not make a report of the official proceedings but relied on sources on the Internet. <u>Myers v. The Telegraph</u>, 332 Ill.App.3d 917, 922 (5th Dist. 2002).

66. Defendants never reviewed the transcript of the official proceedings before making the post.

67. The Abovethelaw Defendants by their attorney have admitted in pleadings filed with the Court that the defamatory posting contained no hyperlink to a news article.

68. Some of the aforesaid defamatory matter do not appear in the official record or proceedings.

69. Some of the aforesaid statements charged Mr. Huon with unfair business practices, impugning his integrity, prejudicing his practice of law, and/or implying that he

21

committed a crime and falls within several of the recognized categories of defamation *per se.*

Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 590 (Ill. 2006).

70.     Defendants' posting was not a fair abridgment of the official proceedings and did

not convey to readers "a substantially correct account."  Restatement (Second) of Torts § 611,

Comment f, at 300 (1977).

71.     Defendants' posting  expanded on the official report by the addition of fabricated

evidence designed to improve the credibility of the defamation.  Snitowsky v. NBC Subsidiary

(WMAQ-TV), Inc., 297 Ill.App.3d 314, 310 (1st Dist. 1988).

72.     Defendants intentionally omitted, among other things, the following facts:

a.      The complainant that is the subject of all the news articles is the same woman.

b.      The jury was not allowed to consider the consent defense, because Mr. Huon did

not testify and the trial judge barred the consent defense before closing arguments.  Thus, the

jury had to have found that no sexual contact took place.

c.      The complainant sustained minor injuries from walking or running in a cornfield.

d.      There was no evidence of a Craigslist ad for a job for promotional modeling.

e.      There was no evidence that Mr. Huon represented himself as a talent scout.

f.      The video evidence at trial showed Mr. Huon, dressed in shorts, on a Sunday

afternoon with the complainant, in a bar.

f.      There was no DNA evidence of semen and the complainant never went to the

hospital.

g.      The detectives never interviewed the two key witnesses at the scene who testified

at trial that the complainant gave different versions of the alleged incident.

     h.      The detectives asked the complainant to call Mr. Huon to arrange a private meeting and to ask for money.

     i.      The complainant had gone drinking with Mr. Huon at several bars for hours.

     j.      There was no physical evidence presented that the complainant jumped out of a moving car.

     k.      There was no evidence of force presented at trial.   The police report stated that complainant alleged that Mr. Huon raised his voice but that Mr. Huon never threatened the complainant.

     l.      The photograph of the complainant showed no injuries (besides from her walking in a cornfield barefoot) and showed her clothes to be completely intact with no tears.

     m .      Mr. Huon was not a St. Louis-area lawyer .   He was a financial advisor for St. Louis-based Edward Jones Investments at the time of the alleged incident.

     n.      The complainant was 26 years old at the time of the alleged incident and not a minor or a bubble gum princess.

     o.      The complainant's boyfriend was arrested in 2008 and  convicted and sentenced in 2009  in Federal Court in St. Louis, Missouri for possession and intent to distribute cannabis.

     p.      Mr. Huon was not charged with "rape" to the extent that he was not charged with forcing the complainant to have vaginal sexual intercourse by penile penetration.

     q.      The complainant made conflicting statements to two key witnesses—who were never interviewed by the detectives.

     r.      Defendants omitted that Mr. Huon had been acquitted on May 6, 2010.

     73.     Defendants defamed Mr. Huon and placed him in a false light by inaccurately reporting his defense attorney's opening argument.   Defendants omitted that Mr. Huon's defense

23

Case 1:11-cv-09054 Document #: 262 Filed: 11/05/12 Page 14 of 50 PageID #:1708

counsel was relying on information contained in the police report that was replete with false

statements and that opening argument is not a statement of the facts.

74.     Defendants created the following consent form which further defamed Mr. Huon

and placed him in a false light :

I, the undersigned, being of sound mind and hot body, do hereby consent

to affixing my _____to the other party's_____.  Such amorous undulations

include, but are not limited to,_____ , _____, and _____, all proposals will be

considered so long as no animals (barnyard or otherwise) are involved.

I claim no rights to future _____ , _____, or

_____ , in exchange for this brief interruption in my chronic loneliness.

While I may be quite intoxicated right now, I know damn well what I'm

doing. Exhibit 9.

75.     The consent form defames Mr. Huon and places him in a false light in that it

suggests that he has "chronic loneliness", was seeking a "brief interruption" for a "hot body"

from anyone other than a "barnyard" animal.

76.     The consent form defames Mr. Huon and places him in a false light in that he is

intimated as a rapist who needs to use a consent form.

77.     The consent form defames Mr. Huon and places him in a false light in that the trial

judge barred the consent defense and Mr. Huon's defense attorneys were barred from arguing

consent.   Consent was not a defense submitted to the jury for their deliberation.

78.     Defendants conducted no investigation into the reliability or accuracy of the

sources of the news articles or allegations on the internet.   Defendants never contacted Mr.

Huon before publishing the defamatory post.

24

79.     Defendants relied on a posting by a blog called Lawyergossip.com.
Defendants omitted that when Mr. Huon had asked Lawyergossip.com to remove the false and
defamatory statements, Lawyergossip.com contacted the Madison County States Attorney's
Office, who called Mr. Huon's defense attorney and threatened to bring more criminal charges
against Mr. Huon.

80.     Defendants omitted that when Mr. Huon asked the newspapers to remove the false
and defamatory statements, a reporter contacted   Mr. Huon's defense attorneys to complain
during trial, adversely affecting Mr. Huon's relationship with his defense attorney .

81.     The Abovethelaw Defendants have a history of cyberstalking or cyberbullying Mr.
Huon.  On or about July 3, 2008, Defendants  called Mr. Huon "Lawyer of the Day" and linked
the post to a defamatory article from the Madison County Record that contained false statements
and defamed Mr. Huon.   Defendants' post and links continued to be republished on the
Abovethelaw.com website and were made available worldwide on May 6, 2011.   The post
continued to be made available online to the world, including Illinois readers, after May 6, 2011.
A true and correct copy of this posting by Above The Law.com is attached hereto as Exhibit 10.

82.     The Abovethelaw Defendants intentionally invented facts in the postings by
identifying the same complainant that is the subject of several news articles or postings as
multiple and different victims.   The writer and editor, both Harvard-educated attorneys, have the
competency to read news articles or postings  that are written at the 6th grade level.

83.     The Abovethelaw Defendants knew or should have known that the same
complainant was the subject of the various news articles and postings, because   Defendants
called Mr. Huon in the July 3, 2008 posting " Lawyer of the Day" and attached a link to an article
regarding the complainant.

25

84.    The Abovethelaw Defendants knew or should have known that the allegations about Mr. Huon were false when Defendants' own posting falsely stated that Mr. Huon posed as a talent scout and as a supervisor for a promotions company.   Clearly, Mr. Huon cannot pose as two different people to the same woman.

85.    The Abovethelaw Defendants falsely stated or intimated that there were other women victims that Mr. Huon allegedly had raped but did not explain that the same woman is the subject of all news stories or blog posts and that Mr. Huon was acquitted of sexual assault.

86.    The Abovethelaw Defendants moderate and control its users' comments.  The Defendants have a written policy on the content of the users' comments and can moderate, control, delete, and/or promote comments and discussions:

**Monitoring and Enforcement; Termination**

We have the right to:

■Remove or refuse to post any User Contributions for any reason in our sole discretion.

■Take any action with respect to any User Contribution that we deem necessary or appropriate in our sole discretion if we believe that such User Contribution violates the Terms of Use, including the Content Standards, infringes any intellectual property right, threatens the personal safety of users of the Website and the public or could create liability for the Company.

■Disclose your identity to any third party who claims that material posted by you violates their rights, including their intellectual property rights or their right to privacy.

■Take appropriate legal action, including without limitation, referral to law enforcement, for any illegal or unauthorized use of the Website.

■Terminate your access to all or part of the Website for any or no reason, including without limitation, any violation of these Terms of Use.

*                              *                              *

**Content Standards**

26

These content standards apply to any and all User Contributions and Interactive Services. User Contributions must in their entirety comply with all applicable federal, state, local and international laws and regulations. Without limiting the foregoing, User Contributions must not:

■Contain any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable.

■Promote sexually explicit or pornographic material, violence, or discrimination based on race, sex, religion, nationality, disability, sexual orientation or age.

■Infringe any patent, trademark, trade secret, copyright or other intellectual property rights of any other person.

■Violate the legal rights (including the rights of publicity and privacy) of others or contain any material that could give rise to any civil or criminal liability under applicable laws or regulations or that otherwise may be in conflict with these Terms of Use and our Privacy Policy www.abovethelaw.com/privacy-policy/

■Be likely to deceive any person.

■Promote any illegal activity, or advocate, promote or assist any unlawful act.

■Cause annoyance, inconvenience or needless anxiety or be likely to upset, embarrass, alarm or annoy any other person.

■Be used to impersonate any person, or to misrepresent your identity or affiliation with any person or organization.

■Involve commercial activities and/or sales without our prior written consent, such as contests, sweepstakes and other sales promotions, barter, advertising or pyramid schemes.

■Give the impression that they emanate from us, if this is not the case. http://abovethelaw.com/terms-of-service/.  Exhibit 11.

        87.     The post was designed to incite users of the site to post their own defamatory

comments.   Defendants, and each of them, took an active part in encouraging users of the site

to post these salacious comments and, thereafter,  on information and belief, edited these

comments.  There were more than 107 comments or replies by users all of which resulted from

the active participation, incitement and encouragement of Defendants.

27

98.     The following is an example of a defamatory comment posted by a user of the website.  The Abovethelaw Defendants' user identified as "LatherRinseRepeat", posted the false and defamatory statement that "Huon has a history . . . Looks like he's in for another ass kicking" on the Abovethelaw.com website on or after May 6, 2011.   A copy of this posting is attached as Exhibit 12.   The aforesaid statement continued to be posted on the Abovethelaw.com website and made available worldwide after May 6, 2011.

99.     Defendants knew or should have known that the aforesaid statements were false at the time they were made and published.  Defendants did not promptly remove this comment even though the defamatory and false statement violated the Abovethelaw.com's own written content standards prohibiting "any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable."

## II.   JEZEBEL.COM

100.     More than one year after Plaintiff , Meanith Huon, was acquitted of sexual assault charges, on or about May 11, 2011, the Jezebel Defendants posted a blog post on the Jezebel.com website entitled "**Acquitted Rapist Sues Blogger For Calling Him Serial Rapist**" with an image of Mr. Huon's mugshot.  The post was written by Defendant Carmon.  The said post was disseminated, published and republished worldwide on the Internet.   The Jezebel.com post is set forth herein below as follows:

## Acquitted Rapist Sues Blogger For Calling Him Serial Rapist  [Mugshot of Meanith Huon]

A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. If Meanith Huon gets his way,

blogger sloppiness may cost ATL $50 million.

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him.

Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. His beef with Above The Law stems from a roundup post entitled "Rape Potpurri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to Forbes.

"And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far.

A true and correct copy of the Jezebel.com Post is attached hereto as Group Exhibit 13.

101.    A link to the Abovethelaw.com blog post was and is placed below the defamatory blog post:

Related: Rape Potpurri [ATL].  Group Exhibit 13.

29

102.     There were more than 4,374 views of the blog post.

103.     The Jezebel Defendants continue to publish and disseminate the aforesaid blog post.  Below the blog post in Discussions Section is the original headline:

"Acquitted Rapist Sues Blog For Calling Him Serial Rapist".  Group Exhibit 14.

104.     The Gawker Media Defendants disseminated, published, and republished the same defamatory blog post from Abovethelaw.com notwithstanding the fact that Abovethelaw.com had removed the defamatory blog post from its website.

105.     The rule that each republication of a libel constitutes a separate cause of action which starts the statute of limitations running anew is firmly established in Illinois.  MIDWEST BANK BUILDERS v. DUN & BRADSTREET, INC., 1978 U.S. Dist. LEXIS 17937 (N.D. Ill. May 4, 1978).  Republication can constitute a new cause of action if the publication is altered so as to reach a new audience or promote a different product. Lyssenko v. Int'l Titanium Powder, LLC, 2010 U.S. Dist. LEXIS 29771 (N.D. Ill. Mar. 25, 2010); When a defamatory statement is published to a third person, that person in turn may be liable for republication of the communication to yet another individual.  Solaia Tech., LLC v. Specialty Publ. Co., 221 Ill. 2d 558, 598 (Ill. 2006)

106.     Defendant republishes a defamatory statement when  defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with the goal of reaching a new audience online.   Where substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred.  Davis v. Mitan (In re Davis), 347 B.R. 607, 611-612 (W.D. Ky. 2006); Woodhull v. Meinel, 145 N.M. 533 (N.M. Ct. App. 2008).

107.     The Jezebel.com post is replete with actionable and offensive statements which are false, misleading and defamatory statements of fact, including the following:

a.      Stating and/or inferring that Plaintiff is an "Acquitted Rapist";

b.      Stating and/or inferring that Plaintiff is a rapist;

30

c.      Stating and/or inferring that Plaintiff is a serial rapist;

d.      Stating and /or inferring that Plaintiff had raped more than one woman.

e.      Stating and /or inferring that the lesson is that Google only takes you so far, thereby, inferring that Mr. Huon has a criminal background that does not show up in a Google search;

f.      Stating and/or inferring that Plaintiff has committed a crime by posting his mugshot more than one year after he was acquitted;

g.      Stating  and/or inferring that Plaintiff is a sexual predator or sex offender;

h.      Stating  and/or inferring that Plaintiff was acquitted "partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun".

108.     In addition to the actionable and offensive statements made by the Jezebel Defendants, the Jezebel Defendants engaged in other intentional acts of wrongdoing in an effort to intimidate, harass and destroy Plaintiff's reputation and to invade Plaintiff's privacy including, but  not limited to:

a.      Encouraging, aiding and abetting users of the Jezebel.com website to post salacious and defamatory statements about Plaintiff; and

b.      Posting Plaintiff's booking photo on its website and encouraging readers to Google Plaintiff's telephone number and address so that they may contact, harass and intimidate Plaintiff and interfere with Plaintiff's ability to conduct his business and maintain a livelihood.

109.     On information and belief, the Jezebel Defendants screens its commenters for inflammatory/defamatory posts, selects those who write  most inflammatory and defamatory comments to be commenters, and encourages these already defamation-prone commenters to post more comments and continue to escalate the dialogue for the purpose of increasing the inflammatory and defamatory nature of the comments, to increase traffic to its website for the

purpose of generating more revenue.

110.    On information and belief, certain commenters may actually be Jezebel
Defendants' employees, posting under an alias, and on information and belief, several
defamatory statements about Mr. Huon by unidentified "commenters" are actually Jezebel
Defendants'' employees. Plaintiff believes that discovery will reveal this to be the case.

111.    The Jezebel Defendants encourage and create an environment where defamation
flourishes.  The Jezebel Defendants promote posts from commentators that are the most
inflammatory.  The commentators feed off of one another's inflammatory comments to the point
of committing major defamations against the subject of the story.

112.    Defendant, Nick Denton, the founder of Gawker Media and Gawker plans a
business model based on comments and conversation, not posts and ads.

http://www.poynter.org/latest-news/mediawire/174904/gawker-plans-a-business-model-based-
on-comments-and-conversation-not-posts-and-ads/.

113.    According to Reuters, the Jezebel Defendants want to monetize comments:

In an internal memo on Thursday, Denton announced the formation of a new sales unit
that will focus on helping advertisers and brands take part in the new commenting
system…

According to the memo, Gawker is creating a new content unit within the sales
department that will be headed by Ray Wert, formerly editor of the Gawker-owned
automotive blog Jalopnik. This new unit will take over responsibility for all of Gawker's
branded content functions, as well as marketing communications and events — and the
purpose of the unit will be to promote the new Gawker discussion platform as a way for
marketers and brands to engage with customers in an open forum. Says Denton:
        We all know the conventional wisdom: the days of the banner advertisement are
        numbered. In two years, our primary offering to marketers will be our discussion
        platform.

http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-monetize-
comments/.  Exhibit 15.

114.     Reuters described the Jezebel Defendants' commenting system designed to
generate more money with advertisers as follows:
        So Gawker's new commenting system is based around threads, with the default view

32

being the main, most interesting thread. It's possible to click through to other threads, and every thread — indeed, every comment — has its own unique URL; what's more, the person who starts a thread has quite a lot of control over which comments in that thread will get featured.

What that means is that if an advertiser buys a sponsored post — and sponsored posts have been part of Gawker's menu of offerings for some time now — then once the new commenting system is in place, the advertiser will have a reasonably large degree of control of the conversation that most people see in that post. http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-monetize-comments/.  Exhibit 15.

115.    Defendants state on their website that it is the policy of the Defendants to only post comments that Defendants "love":

How do I get approved to comment?

We only approve the comments we love—so make sure you're adding something of quality to the post. Stay on-topic and seek to further the conversation. Leave us a juicy story on the #tips page or throw your hat into the ring of our open forums . . .

Do you have any tips for auditioning?

Leaving multiple high-quality comments on different threads with your newly created account increases your chances of getting approved.   See attached Group Exhibit 16.

116.    The Jezebel Defendants control, block, edit and promote the comments that users can leave regarding the blog post.   Defendants promote some comments and do not publish other comments. Defendants can promote certain comments by users, placing the comments at the top of the page or in a prominent location for all readers to view.   Defendants have "Featured" and "Promoted Discussion" Comments.   See attached Group Exhibit 16.

117.    The Jezebel Defendants' written policy states that its Comments and Discussion Section is by "invitation" only:

33

7. Comments – The comments sections on GM Sites are accessible to users by invitation only (such invitations coming either from Gawker Media editors directly or by referral from existing comment users). Gawker Media's comment user registration system has been designed so that, if the user so chooses, they can remain completely anonymous, even to us. Gawker Media will not accept responsibility for information posted in the Comments. In order to make our comments useful and interesting, the following guidelines have been established for comment users:

a. Do not post threatening, harassing, defamatory, or libelous material.

b. Do not intentionally make false or misleading statements.

c. Do not offer to sell or buy any product or service.

d. Do not post material that infringes copyright or any other intellectual property interest.

e. Do not post information that you know to be confidential or sensitive or otherwise in breach of the law.

f. Keep all comments relevant to the particular GM Site where the comment is being posted.

Please note that once you post a comment to one of our sites, it becomes part of the public conversation. Our policy is that we will not remove a user's comments unless we deem them to be in violation of our Terms of Use. So if you want to say something that you will later regret personally, it is advisable that you use a username that does not identify you. We cannot remove your comments simply because you have a change of heart about making them.

34

Additionally, it is our policy not to delete comment accounts. Gawker Media, however, reserves the right to remove comments and comment accounts entirely at its discretion, including for alleged violations of Terms of Use or legal rights.

Gawker Media is not responsible for the content of user comments. If a third party complains that your comment violates our Terms of Use or their rights, we will invite them to respond in the comments themselves. If they pursue the complaint, we will make reasonable efforts to contact you by the means you have provided us, to alert you to the situation. We will protect your contact information as described in our Privacy Policy, but may be compelled to turn it over pursuant to legal process. Exhibit 17.

118.   The terms and conditions of the Jezebel Defendants' Comments and Discussion Section is under the Advertising link for Jezebel.com:  http://advertising.gawker.com/legal/.

119.   The Jezebel Defendants violated is own terms and conditions by defaming Mr. Huon and encouraging its users to harass and defame Mr. Huon.

120.   In this case, the Jezebel Defendants promoted defamatory comments or inflammatory comments regarding Mr. Huon, thereby encouraging users to post more defamatory comments regarding Mr. Huon.

121.    Defendants' blog post was designed to incite users of the site to post their own defamatory comments.   Defendants, and each of them, took an active part in encouraging users

35

of the site to post these salacious comments and, thereafter, on information and belief, edited

these comments.  There were more than 80 comments or replies by users all of which resulted

from   the active participation, incitement and encouragement of Defendants.

122.   Defendants intentionally promoted, moderated, edited and/or selected comments

that called Mr. Huon a rapist and that defamed Mr. Huon.  The following are just some of the

defamatory comments posted by users of the website:

a.   SarahMc, wrote:

Just because a man is acquitted of rape does not mean he did not commit rape. That a jury

would decide "not guilty" does not magically erase what he did--if he did, in fact, rape

someone. The vast majority of rapists are never convicted of rape. Does that make them

not rapists?

b.   Dinosaurs and Nachos, girlfriend!, wrote: Innocent until proven guilty is a widely

misunderstood concept. It basically means that the mere fact that someone is charged with

a crime is not itself evidence that the person committed a crime.

Then you go to court. In court, there will be evidence presented. This evidence is where

an actual, legal determination is made. Nobody is declared "innocent" in a court of law,

they are found guilty or not guilty.

"Not guilty" is absolutely not the same thing as "innocent" from a legal standpoint. Those

words do not mean the same thing in the world of law. "Innocent until proven guilty" is

merely a concept for laymen to try to keep their non-lawyer brains from jumping to (non-

legal) conclusions.

c.   SorciaMacnasty, wrote: Nevermind "serial rapist," he sounds like a foreal crazy

person.

d.	deafblindmute, wrote:   According to the link under "strength" he traveled to

another city, used a false name, and then pretended to be a representative of a liquor

company and advertised a job for a model. Now, that doesn't mean that he did/didn't rape

her, but it is a goddamn shady way to start off an evening.

He must have had some damn good lawyers to push that out of the jury's mind.

My big question is, if she tried to run from him that night and he acknowledges that they

were together and there was some sexual interaction going on, what was his defense? I

don't care how drunk you are, in the middle of a wanted sexual encounter you don't jump

out of a moving car and run through a cornfield barefoot (fun fact: the bristly hair on corn

leaves feel like thousands of needles when you run through it). I mean, it's sort of his

word against hers for what was happening in the car, but we know that a third person saw

her after she ran from him.

Any more legally knowledgeable people know how a jury is supposed to treat this type of

evidence? Does the fact that its word vs. word in the car disqualify her claims to being

assaulted even though she ran away from him and said she was assaulted that night? How

can any sexual assault case be tried if that counts as reasonable doubt?

Arg this is more perplexing the more I think about it. Everything points to rape (his shady

actions and lies earlier in the night; her running from him to a stranger), but there is no

conclusive evidence I have heard speak of that proves he did/didn't do it.

God, it's almost as if our legal system is imperfect or something :/

e.	CassandraSays, writes:

Thanks, bartender and lawyer, for reminding me that since I have a vagina I'm not

allowed to go out in public and attempt to engage in any sort of enjoyable activity unless

I'm willing to have sex. With anyone who asks - my presence in a bar gives blanket permission to any guy who happens to find me attractive. I mean, if I didn't want to be raped I'd just stay at home, right?

f.     lanboyo, writes:   So he is actually upset about the "Serial" rapist part, actually he is just a one time accused rapist.

g.     JadeSays, writes:

Weird. I didn't know "where do I go to have fun" meant the same thing as "where do I go to get raped." It's great that that jury made that clear to me, otherwise I could get myself in some sticky situations like apparently accidentally begging to be raped. AWE. SOME.

h.     rachel723, writes:

you know it's women like you who don't understand the rules that make the rest of us ladies look bad.

I'm glad you learned before you actually got raped not to complain now if you do, you were asking for it!!

/sarcasm

i.     vikkitikkitavi, writes:

She jumped out of a moving car, leaving her shoes and purse behind and ran barefoot through a cornfield and pounded on a stranger's door to help her?

Fuck this "he's been acquitted" noise. He's a rapist alright, so we may as well call him one.

j.     tomsomething, writes:

I know you're going to get a million comments like hits, but the phrase "acquitted rapist" probably won't fly for a person who has already demonstrated his letigiousitousnicity.

38

k.      cool_as_KimDeal, writes:

Well shit! I didn't know kicking back at a bar and asking where I should go to have fun

meant that I hereby consent to any and all sexual activity, with anybody, with this

bartender here as my witness. Can I sign away my right to consent here on my bar tab?

Okay, great.

l.      HeartRateRapid, writes:

Yea, all those crazy bitches going to the cops and lying about being raped. Except that

false reports for stolen cars are more common. False rape reports make up less than 3% of

all reported rapes, and as I'm sure you know, it horrendously underreported.

Exhibit 18.

123.    The Jezebel Defendants blocked and prevented Mr. Huon from posting a reply

under his legal name.

124.    On a later date, the Jezebel Defendants moderated or censored Mr. Huon's attempt

to post a reply by removing or redacting his post.  None of the other users had their post redacted.

Exhibit 19.

125.    The Jezebel Defendants strategy is to monetize comments by encouraging,

promoting, editing, and publishing defamatory posts by its users directed at the subject of its post.

The Jezebel Defendants' strategy for monetizing the comments from advertisers is to have a

comment and discussion section that is larger in length than the original post.   The Jezebel

Defendants promote the most inflammatory posts to encourage more posting, thereby, creating

more monetizing opportunities from its sponsored advertising.

126.    Defendants, and each of them, engaged in a deliberate campaign to

defame and besmirch Plaintiff's name and reputation by disseminating, publishing and

republishing actionable and offensive statements about Plaintiff as more fully set forth herein

below.  Moreover, the Gawker Media Defendants engaged in a deliberate campaign to

relentlessly and unreasonably intrude into Plaintiff's right of privacy.

127.    The Jezebel Defendants promoted the following comment:

a/k/a Andpreciouslittleofthat, posted and edited a post to read: "Ed: Two seconds of

proper Googling will get you to Mr. Huon's firm webpage, complete with his phone

number, should you want to call and offer any critiques.   Exhibit 20.

128.    The Jezebel Defendants intentionally superimposed the arrest photograph of Mr.

Huon on the Abovethelaw.com blog post so that the words "**Rape Potpourri**" would be next to

Mr. Huon's photograph identifying him as a rapist.

129.    The Jezebel Defendants intentionally published and disseminated Mr. Huon's

arrest photograph next to the word "Rapist" and encouraged readers to Google Mr. Huon for his

address and telephone number for the malicious purpose of harassing and cyberstalking Mr.

Huon.

130.    A Google search of "Meanith Huon" results in the Jezebel Defendants' post being

the first search result.

131.    Defendants' attorneys published Mr. Huon's date of birth and Social Security

Number, in violation of FRCP 5.2, in this action on the publicly accessible Pacer System.  Mr.

Huon subsequently filed a Motion to Strike.  [Docket Nos. 109 and 110.]

132.    The Jezebel Defendants' attorneys have admitted in its pleadings that the Jezebel

Defendants viewed Mr. Huon as a sex offender and seek to track  Mr. Huon, who has never been

convicted of a felony or misdemeanor:

There is certainly a public interest in knowing about alleged sex crimes, and indeed, there

40

has been a great deal of legislative effort and attention to tracking and reporting on sex offenders . . .

It is curious, and somewhat frightening that the defendants Huon has targeted for his harassing lawsuits are those who publish on the internet precisely the place he has used as a stalking ground on at least two occasions, and the very tool he has used in the past for bullying . . .

It is understandable that Plaintiff is familiar with the "cyberstalking" statute. He has, after all been criminally charged with violating it (emphasis supplied) (Defendants' Memorandum, pages 12, 16, Docket No. 58).

133.    Defendants and its attorneys knew or should have known that the aforesaid statements are false.

134.    Defendants' attorneys in its pleadings describe Mr. Huon as a "serial plaintiff who has repeatedly been charged with crimes relating to the sexual abuse of women".  (Defendants' Memorandum, page 25, Docket No. 58).  Defendants and its attorneys knew or should have known that the aforesaid statement are false.

135.    Defendants and its attorneys seem to believe that just because Mr. Huon was falsely arrested, he can be defamed, bullied, harassed.  But as the Seventh Circuit noted, "such a rule 'would strip people who had done bad things of any legal protection against being defamed; they would be defamation outlaws.'" Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345, 1351  (7th Cir. 1995).

136.    The attorney litigation privilege does not cover the publication of defamatory matter that has no connection whatsoever with the litigation. Restatement (Second) of Torts § 586 comment.  Kurczaba v. Pollock, 318 Ill.App.3d 686, (1st Dist. 2000).

137.    The clients are principals, the attorney is an agent, and under the law of agency the principal is bound by his chosen agent's deeds. The rule is that all of the attorney's misconduct becomes the problem of the client.  Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc., 570 F.3d 845, 848 (7th Cir. Ill. 2009).  Thus, the Jezebel Defendants are bound by

41

the defamatory statements made by its attorneys that Mr. Huon is an alleged sex offender who

needs to be targeted and tracked.

138. Various versions of the same Jezebel.com blog post continue to be published and

republished and disseminated on the Internet worldwide.

139. The Jezebel Defendants republished or disseminated the same defamatory blog

post from Abovethelaw.com without explaining that the blog post contained false statements.

Defendants falsely stated that Abovethelaw.com was "sloppy". Defendant,

Abovethelaw.com, had disseminated false statements regarding Mr. Huon.

140. The Jezebel Defendants knew that Mr. Huon sued Abovethelaw.com for

publishing a defamatory blog post replete with false statements and that Mr. Huon was acquitted

more than a year ago. Defendants knew that Mr. Huon filed a false arrest and malicious

prosecution lawsuit against Madison County, Illinois and several defendants. But Defendants

continued to make false statements insisting that Mr. Huon was a serial rapist and that "The

lesson learned : Google only takes you so far."

141. Defendants continued to publish and disseminate the false statements after

Abovethelaw.com removed its defamatory statements regarding Mr. Huon.

142. Defendants engaged in retaliatory and vigilante justice by cyberstalking and

cyberbullying Mr. Huon, posting his booking photo on its website and encouraging readers to

Google Mr. Huon's telephone number and address and to contact him.

143. Defendants continued to call Mr. Huon a "rapist" who had been acquitted and

suggested that had the complainant investigated Mr. Huon by other methods besides Google, the

complainant would have learned that Mr. Huon was a serial rapist. Defendants knew that Mr.

Huon had no prior convictions and had no other arrests for rape.

42

144. Defendants defamed Mr. Huon and placed him in a false light as a serial rapist who got away with rape when Defendants placed an arrest photograph of Mr. Huon next to the bold title "**Acquitted Rapist Sues Blog for Calling Him Rapist**". Defendants" described the false statements made by Abovethelaw.com ad allegations made by Mr. Huon. Defendants then closed with the words: " The lesson learned : Google only takes you so far" . Defendants falsely intimated and made the false statement that Mr. Huon is a serial rapist, that he got away with rape, and that he was a sex offender who needed to be tracked and reported to members of the general public.

145. Defendants knew that Mr. Huon had sued Madison County, Illinois and several defendants for defamation, false arrest, malicious prosecution but never reported in detail the allegations of the Madison County lawsuit to its readers by posting a link to the Madison County lawsuit complaint. Defendants conducted no investigation into the allegations. Defendants knew of the allegations in the lawsuit Mr. Huon filed against Madison County, Illinois and several defendants but never discussed in detail the false arrest or malicious prosecution of Mr. Huon. Defendants never contacted Mr. Huon before publishing and disseminating the false statements.

146. Defendants knew that Abovethelaw.com had published false statements regarding Mr. Huon. Nevertheless, Defendants rushed to judge and convict Mr. Huon as a rapist in social media.

147. In fact, the Jezebel Defendants engaged in the same reckless or intentional misconduct as the Abovethelaw Defendants—after being put on notice that the Abovethelaw Defendants made false statements and misread the news stories or posts on the Internet. The

Jezebel Defendants either never read the news stories or intentionally misrepresented the news stories.

148.    Defendants intentionally omitted, among other things, the following facts:

a.    The jury was not allowed to consider the consent defense, because Mr. Huon did not testify and the trial judge barred the consent defense before closing arguments.  Thus, the jury had to have found that no sexual contact took place.

b.    The complainant sustained minor injuries from walking or running in a cornfield.

c.    There was no evidence of a Craigslist ad for a job for promotional modeling.

d.    There was no evidence that Mr. Huon represented himself as a supervisor for an alcohol promotional company.

e.    The video evidence at trial showed Mr. Huon, dressed in shorts, on a Sunday afternoon with the complainant, in a bar.

f.    There was no DNA evidence of semen and the complainant never went to the hospital.

g.    The detectives never interviewed the two key witnesses at the scene who testified at trial that the complainant gave different versions of the alleged incident.

h.    The detectives asked the complainant to call Mr. Huon to arrange a private meeting and to ask for money.

i.    The complainant had gone drinking with Mr. Huon at several bars for hours.

j.    There was no physical evidence presented that the complainant jumped out of a moving car.

44

k.    There was no evidence of force presented at trial.   The police report stated that complainant alleged that Mr. Huon raised his voice but that Mr. Huon never threatened the complainant.

l.    The photograph of the complainant showed no injuries (besides from her walking in a cornfield barefoot) and showed her clothes to be completely intact with no tears.

m .    The bartender testified she saw Mr. Huon and the complainant playing video games.

n.    The complainant's boyfriend was arrested in 2008 and  convicted and sentenced in 2009  in Federal Court in St. Louis, Missouri for possession and intent to distribute cannabis.

o.    Mr. Huon was not charged with "rape" to the extent that he was not charged with forcing the complainant to have vaginal sexual intercourse by penile penetration.

p.    The complainant made conflicting statements to two key witnesses—who were never interviewed by the detectives.

149.    Defendants disregarded the complaints from several readers that the blog post defamed Mr. Huon.

150.    Defendants intentionally defamed Mr. Huon and placed him in a false light to generate website traffic and buzz in its Comments and Discussion Section and, thereby, to increase advertising dollars.

151.    The Jezebel Defendants knew or should have known that certain statements in the aforesaid blog post were false at the time they were made and published.

152.    Defendants did not make a report of the official proceedings but relied on sources on the Internet.  Myers v. The Telegraph, 332 Ill.App.3d 917, 922 (5th Dist. 2002).

45

153.    Defendants never reviewed the transcript of the official proceedings before making the post.

154.    Some of the aforesaid defamatory matter do not appear in the official record or proceedings.

155.    Some of the aforesaid statements charged Mr. Huon with unfair business practices, impugning his integrity, prejudicing his practice of law, and/or implying that he committed a crime and falls within several of the recognized categories of defamation *per se*. Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 590 (Ill. 2006).

156.    Defendants' posting was not a fair abridgment of the official proceedings and did not convey to readers "a substantially correct account." Restatement (Second) of Torts § 611, Comment f, at 300 (1977).

157.    Defendants' posting expanded on the official report by the addition of fabricated evidence designed to improve the credibility of the defamation. Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc., 297 Ill.App.3d 314, 310 (1st Dist. 1988).


**Efforts by Plaintiff to Remove Actionable and Offensive Statements**

158.    Plaintiff has, on several occasions, contacted one or more of the Abovethelaw Defendants and the Jezebel Defendants for the purpose of convincing them to remove the actionable and offensive statements from their respective websites and to convince the said Defendants to refrain from engaging in the wrongful acts. Notwithstanding repeated requests, Defendants and each of them, failed to remove the actionable and offensive statements from their respective websites after being requested to do so, continued to host these websites with the offensive content, actively inviting and encouraging defamatory content, republished the actionable and offensive statements and edited comments, and continued to engage in the

46

Case 1:11-cv-09054 Document # 2626 Filed 11/05/12 Page 47 of 49 PageID #:1789

wrongful acts.

## **Public Perception**

159.    Since the publication of the actionable and offensive statements, any individual
reading these publications might believe that Plaintiff is a criminal and/or engaged in criminal
activity.

160.    Since the publication of the actionable and offensive statements, any individual
reading the publications might believe that Plaintiff:

        a.    Is a rapist;

        b.    Is a sexual predator;

        c.    Is a sex offender;

        d.    Lacks the integrity or ability to perform and/or discharge his duties as
an attorney;

        e.    Lacks the integrity or ability to perform and/or discharge his duties as
a business consultant; and

        f.    Lacks the integrity or ability to perform in his trade, profession, and
business.

Plaintiff remains concerned that individuals and organizations including prospective

legal clients will choose not to utilize his services based upon the actionable and offensive

statements.

## **Intent and Actual Malice**

161.    Defendants, and each of them, acted with intent and actual malice in that they
have tried and actively continue to try to cause substantial personal and professional harm to
Plaintiff. Defendants, and each of them, had every opportunity to investigate the reliability and
accuracy of the publications but failed to do so.

47

162.    Defendants acted with the intent to tortuously interfere with Plaintiff's business interests by dissuading prospective parties who read the publications, from becoming Plaintiff's clients and or doing business with him.

### The Harm Suffered By Plaintiff

163.    As a result of the actionable and offensive statements, Plaintiff has suffered a loss of reputation and business. In the legal and business community integrity, honesty and trust constitutes a substantial component of both retaining clients and obtaining new business.  The actionable and offensive statements make Plaintiff appear to be a criminal, a sexual predator, a sex offender, dishonest and someone you would never want to do business with.

164.    The actionable and offensive statements by Defendants have proximately caused Plaintiff to suffer damages including a decline in prospective business, loss of job or economic opportunities, loss of clients and business deals.  Furthermore, the actionable and offensive statements have negatively affected Plaintiff's personal relationships and have caused him to experience shame, severe emotional distress, loss of social status, esteem, and impairment of normal social functioning.

165.    Plaintiff's damages including both economic and personal injury damages, are unknown at this time and have not yet been fully realized, but are believed to be well in excess of Seventy-Five Thousand Dollars ($75,000.00).

### Plaintiff's Need For Injunctive Relief

166.    Although Plaintiff seeks compensatory and punitive damages, Plaintiff has no adequate remedy at law. Consequently, injunctive relief is necessary.

167.    Plaintiff has suffered and will continue to suffer irreparable harm if this Court Does not enjoin Defendants from publishing the actionable and offensive statements and enjoin the wrongful acts.  Plaintiff's livelihood, profession, business, personal life and relationships,

48

personal well-being and health will continue to be disrupted, negatively affected and substantially

injured as a result of Defendants' actionable and offensive statements and the wrongful acts.


168.    Plaintiff will suffer irreparable harm in the absence of appropriate injunctive

relief.  In contrast, Defendants will suffer no harm, because they have no legal right to engage in

the publication of the actionable and offensive statements or to engage in the wrongful acts.


## CLAIMS FOR RELIEF


## COUNT I

### (Defamation *Per Se* Against All Defendants)

169.  Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended

Complaint as paragraphs 1 to 168 of Count I as though fully set forth herein.

170.    Defendants, and each of them, published the actionable and offensive statements

on  the Internet which were viewed by third parties.

171.    The actionable and offensive statements include verifiably false statements the

defamatory character of which is apparent on its face and which are susceptible to only one

meaning and are of such a nature and character as to impute:

    a.    Criminal wrongdoing to Plaintiff;

    b.    False accusations of fornication;

    c.    That Plaintiff is unable to perform or lacks integrity in performing his

       employment duties; and/or

    d.    That Plaintiff lacks ability or otherwise prejudices him in his profession.

The actionable and offensive statements, therefore, constitute defamation *per se*.

172.    The actionable and offensive statements  prejudice Plaintiff and impute a lack of

ability to perform in his trade as an attorney or as a businessman.

173.    The actionable and offensive statements are so obviously harmful to Plaintiff that injury to Plaintiff and Plaintiff's integrity, virtue, human decency, respect for others and reputation within the legal and business community and elsewhere may be presumed.

174.    Defendants, and each of them, published the actionable and offensive statements without any cloak of privilege and with actual malice.

175.    The contents of the posts and comments were defamatory and false.

176.    The publication of the posts and comments constitute publications by Defendants.

177.    The erroneous and inflammatory comments concerning Mr. Huon were applied to Mr. Huon on the entire web page .   Any and all viewers of the blog post understood the defamatory (i.e. criminal, loathsome, immoral) meaning of the erroneous inflammatory information concerning Mr. Huon.

178.    Mr. Huon sustained special harm as a result of the publication of the erroneous and inflammatory communications by Defendants, including, but not limited to, the loss of his professional reputation.

179.    As a result of Defendants' conduct and the publication of the actionable and offensive statements, Plaintiff has suffered and continues to suffer damages including but not limited to, impairment of reputation and standing in the community, loss of business and harmed reputation, personal humiliation, mental anguish and pain and suffering.

180.    The actionable and offensive statements further convey a perception that Plaintiff exercises poor judgment as an attorney, has repeatedly committed sexual assault and will do so in the future, and that he is unable to responsibly carry out his fiduciary duties and obligations to his clients, the courts, his colleagues and the community.

181.    In addition to compensatory and punitive damages in a sum well in excess of the minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

Case 1:11-cv-09064    Document 1    Filed 11/05/12    Page 51 of 69    PageID #:1793

        a.      Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

        b.      Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

        c.      Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT II

### (Defamation *per quod* Against All Defendants)

182.  Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended Complaint as paragraphs 1 to 164 of Count II as though fully set forth herein.

183.  Defendants, and each of them, published the actionable and offensive statements on the Internet, which were viewed by third parties.

184.  Actionable and offensive statements include verifiably false statements which would be interpreted by the reader as defamatory.  Specifically those persons who read the actionable and offensive statements would construe the statements in such a way so as to impute to Plaintiff a history of criminal wrongdoing and rape.  Furthermore, persons who read the actionable and offensive statements, would impute to Plaintiff a lack of ability to perform in his trade as an attorney or as a businessman and would further impute to Plaintiff a lack of integrity, virtue, human decency, and respect for others such that persons reading these statements would not want to deal with Plaintiff either as a lawyer or as businessman.

185.  Defendants, and each of them, published the actionable and offensive statements without any cloak of privilege, with actual malice, and with the intent to injure Plaintiff's business and reputation in the legal and the business community.

186.  The actionable and offensive statements published by Defendants, and each of

Case 1:11-cv-09055    Document #: 261    Filed: 11/05/12    Page 52 of 69    PageID #:1794

them, have directly and proximately caused harm to Plaintiff's professional standing amongst lawyers and businessmen and has damaged Plaintiff's reputation for honesty and integrity, and has caused injury to Plaintiff's legal practice, business operations and good will and have negatively impacted the public's confidence in Plaintiff.

187.    The contents of the posts and comments were defamatory in that the above-mentioned statements were false.

188.    Each of the above statements contained in the posts that are of and concerning Mr. Huon is false, untrue, and defamatory, and the posts are libelous on their face.

189.    The Defendants, and each of them, jointly or separately, knew the statements as they apply to Mr. Huon to be false, and that the posts were intended by the Defendants to convey false or defamatory statements about Mr. Huon.

190.    The Defendants, and each of them, jointly or individually, wrote, printed, published and circulated, or caused to be written, printed, published and circulated, the libelous statements concerning Mr. Huon either with knowledge of the falsity of the statements or with reckless disregard for their truth.

191.    The statements were so understood by those who read them to have the defamatory meaning ascribed to them in this complaint and the Defendants, and each of them, jointly or separately, intended the statements   to be so understood and read by users and visitors of the website.

192.    The Defendants, and each of them, jointly or separately, intended the statements to be so understood and read by those who read the statements via third-party distribution, where permission for such further distribution was known and encouraged by the Defendants.

193.    At the time the statements were publicly distributed throughout the world, the Defendants, and each of them, jointly and separately, were in possession of evidence that would raise serious doubt about the truth of the statements made. Nevertheless, the Defendants, and each of them, jointly and separately, without due regard for the truth, falsity, or malicious nature

of the statements, formulated, published, and disseminated the statements.

194.     The defamatory statements were written and published with reckless disregard for the truth of the matter, and Defendants knew at the time the statements were formulated that they were false and injurious to Plaintiffs. The statements were intended by Defendants, and each of them, to directly injure Mr. Huon with respect to Mr. Huon' reputation, character, and business.

195.     Defendants, each of them, were also negligent in publishing the statements. With ordinary and reasonable care, Defendants would have realized, or could have discovered, that the statements pertaining to Mr. Huon were obviously false and grossly libelous, offensive and damaging to Mr. Huon.

196.     The defamatory statements   were not privileged in any manner. The statements were intended by Defendants, and each of them, to directly injure Mr. Huon with respect to his reputation, character, and business.

197.     As a legal result of the intentional and malicious conduct of the Defendants, and each of them, jointly and severally, Mr. Huon has suffered damage to business, trade, profession and occupation, all to Mr. Huon's special damages in a sum to be determined at time of trial.

198.     By engaging in the misconduct alleged above, the Defendants each engaged in unjust and deceitful conduct with the willful and conscious disregard for the rights of Mr. Huon. Defendants were aware of the probable dangerous consequences of their misconduct and willfully and deliberately failed to avoid those consequences, including subjecting Mr. Huon to cruel and unjust hardship, in conscious disregard of Mr. Huon's rights. Thus, an award of exemplary and punitive damages is justified.

199.     The publication of the blog posts constitute publication by Defendants.

200.     The erroneous and inflammatory comments concerning Mr. Huon were applied to Mr. Huon on the entire web page .   Any and all viewers of the blog post understood the defamatory (i.e. criminal, loathsome, immoral) meaning of the erroneous inflammatory information concerning Mr. Huon.

201.    Mr. Huon sustained special harm as a result of the publication of the erroneous and inflammatory communications by Defendants, including, but not limited to, the loss of his professional reputation.

202.    Moreover, as the result of the defamatory publication referred to herein, Mr. Huon has sustained irreparable harm to his reputation, emotional distress and loss of standing in the community.

203,    Defendants' acts described herein were reckless, outrageous, willful, and malicious, warranting the imposition of punitive damages.

204.    Plaintiff has, and will suffer, special damages and pecuniary loss directly from a loss of clients in his legal practice and the loss of profit from business deals and interactions in an amount well in excess of Seventy-Five Thousand ($75,000.00).

205.    Publication of the actionable and offensive statements by Defendants, and each of them, was done knowingly, willfully, maliciously, wantonly, and with the intent to confuse, mislead or deceive potential clients and business associates, and to create a false impression as to the nature of Plaintiff's integrity and virtue, and to disparage Plaintiff's reputation before the public and specifically within the legal and business community.

206.    In addition to compensatory and punitive damages in a sum well in excess of the minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

a.    Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

b.    Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

54

Case 1:11-cv-09064 Document #: 261 Filed: 11/05/12 Page 55 of 69 PageID #:1791

## COUNT III

### (Invasion of Privacy – False Light - Against All Defendants)

207.  Plaintiff repeats and realleges paragraphs 1 to 168 of this  Fourth Amended Complaint as paragraphs 1 to 168 of Count III as though fully set forth herein.

208.   Defendants, and each of them, published the actionable and offensive statements on the Internet which were viewed by third parties.

209.   The actionable and offensive statements include verifiably false statements susceptible to only one meaning, that are of such a nature and character as to invade Plaintiff's privacy by placing Plaintiff in a false light before the public.

210.   The actionable and offensive statements are so obviously and naturally harmful to Plaintiff that injury to Plaintiff, and Plaintiff's integrity, virtue, human decency, respect for others, reputation within the legal and business community and elsewhere may be presumed.

211.   The false light in which the actionable and offensive statements placed Plaintiff would be highly offensive to the reasonable person.

212.   Defendants' published the actionable and offensive statements without any cloak of privilege, with actual malice, with knowledge of or with reckless disregard for the falsity of the statements.

213.   In light of the forgoing, Defendants, and each of them, have invaded Plaintiff's privacy by placing Plaintiff in a false light before the legal and business community and before the public.

214.   In intentionally or recklessly stating and intimating the above-mentioned false statements, Defendants invaded Mr. Huon's privacy by portraying him in a false light.

215.   The false light in which Defendants portrayed Mr. Huon would be highly offensive to a reasonable person.

216.   Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Mr.   Huon would be placed.

217.    The publicity created by Defendants, and each of them, jointly or separately, placed Plaintiff in a false light in the public eye in that the reports were fabricated by Defendants, and each of them, and publicly conveyed, and was intended to convey, a calculatedly false and inaccurate impression of Mr. Huon as criminal and immoral person.

218.    The publicity created by the statements were highly objectionable to Mr. Huon, and would be to any person of ordinary sensibilities. The statements made Mr. Huon the object of scorn and ridicule by many residents of the Illinois and the United States and the world. The reports were intended to and did directly injure the Mr. Huon with respect to Mr. Huon's right to be left alone, as well as the Mr. Huon's reputation, character, and business.

219.    The formulation, publication, and public dissemination of the statements   by the Defendants was done with actual malice in that it was done with all or some of Defendants' knowledge of the reports' falsity, or in reckless disregard of the truth. At all relevant times, all or some of the Defendants were aware, or should have been aware, of facts contrary to the Defendants' malicious allegations.

220.    The publicity created by Defendants, and each of them, was done with malice in that it was made either with knowledge of the falsity of the statements or in reckless disregard of the truth. The statements describing Mr. Huon's actions, character and intention were calculated falsehoods.

221.    Defendants, and each of them, were also negligent in publishing the statements. With ordinary and reasonable care, Defendants would have realized, or could have discovered, that the reports were obviously false and grossly libelous, offensive, and damaging to Mr. Huon.

222.    As a legal result of the statements, Mr. Huon has suffered a loss of social status, esteem, and acceptance, causing him to experience shame, severe emotional distress, and impairment of normal social functioning, all to his general damages in a sum not determined at this time, but in excess of $75,000.00.

223.    As a further legal result of the above-mentioned disclosure, Mr. Huon has suffered

injury in his business, all to the Mr. Huon's special damages in an amount to be proven at trial.

224.     In making the disclosure described above, Defendants, and each of them, are guilty of unjust and deceitful conduct amounting to oppression, fraud, or malice in that Defendants made the disclosure with a willful disregard of Mr. Huon's rights. Defendants' acts in formulating, publishing, and disseminating the statements on their website, and in their allowing other websites and entities to freely reprint their materials, and in allowing readers to post their own defamatory comments, were done with the knowledge by Defendants that these acts would cause Mr. Huon to suffer great humiliation, mental anguish, and injury. Defendants' acts were therefore willful, wanton, intentional, and actually malicious and oppressive, justifying the award of exemplary and punitive damages according to proof at trial.

225.     As the result of so portraying Mr. Huon, Mr. Huon sustained severe personal injuries including, but not limited to, emotional distress, irreparable damage to his reputation, loss of standing in the community, and injury to his professional reputation.

226.     Defendants, and each of them, jointly and individually, wrote, printed, published, circulated, and continue to make available on their websites the defamatory statements for the purpose of, among other things, injuring Mr. Huon's reputation, injuring and interfering with his businesses, and publicly embarrassing and humiliating Mr. Huon. Defendants did so in furtherance of their agenda of preserving their influence worldwide and locally in social media, to generate website traffic, to generate advertising dollars, to sell more newspapers, and/or to advance their own material and economic advantage.

227.     Defendants' widespread and continued dissemination of statements that Mr. Huon is guilty of criminal and immoral conduct has exposed Mr. Huon to contempt, ridicule and embarrassment, and injury to his reputation and economic loss.

228.     The impact of Defendants' defamatory statements is particularly severe as a result of the fact that many readers of the websites are lawyers, attorneys, judicial clerks, law clerks, decision makers, businessmen or individuals employed in business and the legal community.

57

229.    The aforesaid conduct by Defendants, and each of them, was undertaken with the

specific intent to cause injury to Mr. Huon, and that such conduct was despicable and carried out

with willful and conscious disregard of Plaintiffs' rights and feelings and with ill-will, all of

which constitutes "malice."

230.    The foregoing conduct by Defendants, and each of them, was also intended to and

did subject Mr. Huon to unjust hardship in conscious disregard of Mr. Huon's rights and, as such,

constituted "oppression." As a direct and proximate result of Defendants' actions, Mr. Huon's

reputation, which is vital for the continuing success of his profession and business, has been

severely damaged by Defendants' conduct. By reason of such ill-will, malice and oppression, Mr.

Huon is entitled to punitive or exemplary damages against Defendants, and each of them, in an

amount sufficient to punish them and deter them from further similar conduct.

231.    Defendants' acts of defaming Mr. Huon were reckless, outrageous, willful, and

malicious, warranting the imposition of punitive damages.

232.    In addition to compensatory and punitive damages in a sum well in excess of the

minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

a.    Compelling Defendants, and each of them, to remove the actionable and

offensive statements from the Internet;

b.    Enjoining Defendants, and each of them, from further publishing or

repeating the actionable and offensive statements; and

c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's

law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT IV

**(Invasion of Privacy – Unreasonable Intrusion Upon the Seclusion of Another - Against the
All Defendants)**

1 to 233.  Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth

58

Amended Complaint as paragraphs 1 to 168 of Count IV as though fully set forth herein.

234.    The Defendants engaged in acts of wrongdoing identified in the aforesaid paragraphs in an effort to intentionally, unreasonably, and without authorization, intrude into Plaintiff's seclusion and/or to otherwise pry into Plaintiff's seclusion and right of privacy.

235    The wrongful acts by the   Defendants are offensive and objectionable to a reasonable person.

236.    The wrongful acts by the   Defendants constitute an unreasonable intrusion upon the private matters of Plaintiff.

237.    In light of the foregoing, the Defendants, and each of them, have invaded Plaintiff's privacy thereby proximately causing Plaintiff personal pain, anguish, suffering, humiliation, loss of reputation, loss of business and impairment of standing in the community.

238.    In addition to compensatory and punitive damages in a sum well in excess of the minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief enjoining the Defendants from engaging in the wrongful acts identified in the aforesaid paragraphs.

## **COUNT V**

### **(Intentional Infliction of Emotional Distress Against All Defendants)**

239.  Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended  Complaint as paragraphs 1 to 168 of Count V as though fully set forth herein.

240.    The actionable and offensive statements and the wrongful acts constitute conduct by Defendants, and each of them, that was extreme and outrageous.

241.    In publishing the actionable and offensive statements and engaging in the wrongful acts, Defendants intended to cause Plaintiff emotional distress and/or recklessly or consciously disregarded the probability that their acts would cause Plaintiff emotional distress.

242.    Defendants' acts of perpetuating false and inflammatory information concerning Mr. Huon, specifically constituted extreme and outrageous conduct.

59

243.    As a legal result of the intentional and malicious conduct of the Defendants, and each of them, jointly and separately, Mr. Huon has suffered damages.

244.    As an actual and proximate result of the acts of Defendants, and each of them, as herein alleged, Plaintiff has suffered severe and extreme emotional distress.

245.    In addition to compensatory and punitive damages in a sum well in excess of the minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

       a.    Compelling Defendants, and each of them, to remove actionable and offensive statements from the Internet;

       b.    Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

       c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT VI

### (Conspiracy to Defame Plaintiff Against All Defendants)

246.  Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended Complaint as paragraphs 1 to 168 of Count VI as though fully set forth herein.

247.    Defendants agreed between and among themselves, and with each other, to publish the actionable and offensive statements for the unlawful purpose of defaming Plaintiff and injuring Plaintiff's integrity, virtue, human decency, respect for others and his reputation within the legal and business community and dissuading the public from contacting, communicating or associating with Plaintiff.

248.    Defendants together, and each of them individually, published one or more of the actionable and offensive statements in furtherance of this common scheme, and Defendants together, and each one of them individually, did so knowingly and willfully.

249.    Defendants conspired to and did publish the actionable and offensive statements

without any cloak of privilege and with actual malice.

250. In addition to compensatory and punitive damages in a sum well in excess of the minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief in a form of an order:

a. Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

b. Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

c. Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT VII

### (Conspiracy to Invade Plaintiff's Privacy – False Light - Against All Defendants)

251. Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended Complaint as paragraphs 1 to 168 of Count VII as though fully set forth herein.

252. Defendants agreed between and among themselves, and with each other, to publish the actionable and offensive statements on the Internet for the unlawful purpose of invading Plaintiff's privacy by placing Plaintiff in a false light, and injuring Plaintiff's integrity, virtue, human decency, respect for others and reputation within the legal and business community, and elsewhere, dissuading members of the public from contacting, communicating, or associating with Plaintiff.

253. Defendants together, and each one of them individually, published one or more of the actionable and offensive statements on the Internet in furtherance of this common scheme and Defendants together, and each one of them individually, did so knowingly and willfully.

254. Defendants conspired to and did so publish the actionable and offensive statements without any cloak of privilege and with actual malice.

255. In light of the foregoing, Defendants did knowingly and willfully participate in a

61

Case 1:11-cv-09054   Document # 2626   Filed 11/05/12   Page 62 of 69   PageID #:1904

common scheme to commit an unlawful act against Plaintiff.

256.    In addition to compensatory and punitive damages in a sum well in excess of the minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief  in a form of an order:

        a.    Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

        b.    Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

        c.    Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT VIII

### (Tortious Interference With Plaintiff's Economic Advantage Against All Defendants)

257.  Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended Complaint as paragraphs 1 to 168 of Count VIII as though fully set forth herein.

258.    At all times material hereto, Plaintiff held a reasonable expectation of entering into valid business relationships, both in his legal practice and in business.

259.    Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, had knowledge of Plaintiff's expectancy of entering into valid business relationships with members of the public including, but not limited to, his retention as an attorney.

260.    Publication on the Internet of the actionable and offensive statements by Defendants were made by Defendants with a reasonable expectation that prospective clients and business associates and potential employers of Plaintiff who read the actionable and offensive statements would choose not to interact with Plaintiff.

261.    Defendants, and each of them, knowingly, purposefully, maliciously and intentionally, published the actionable and offensive statements in order to prevent Plaintiff from securing new clients and creating new business relationships.

262.    Defendants, and each of them, acted with the intent to tortuously interfere with
Plaintiff's business interests by dissuading prospective clients, prospective business associates
and potential employers from becoming Plaintiff's legal clients and business partners or
associates and from hiring Plaintiff.

263.    The actionable and offensive statements constitute an intentional and unjustifiable
interference with prospective clients and business partners and associates of Plaintiff and caused
prospective clients and business partners and associates to refrain from contacting and or doing
business with Plaintiff.

264.    As a proximate result of Defendants' conduct and publication of the actionable
and offensive statements, Plaintiff has suffered and continues to suffer damages including, but
not limited to, loss of prospective business.

265.    In addition to compensatory and punitive damages in a sum well in excess of the
minimum jurisdiction of this Court, Plaintiff is entitled to injunctive relief in a form of an order:

        a.      Compelling Defendants, and each of them, to remove the actionable and
offensive statements from the Internet;

        b.      Enjoining Defendants, and each of them, from further publishing or
repeating the actionable and offensive statements; and

        c.      Enjoining Defendants, and each of them, from interfering with Plaintiff's
law practice and maligning Plaintiff's personal, business and professional reputation.

## COUNT IX

### (Cyberstalking and Cyberbullying Against All Defendants)

266.    Plaintiff repeats and realleges paragraphs 1 to 168 of this Fourth Amended
Complaint as paragraphs 1 to 168 of Count IX as though fully set forth herein.

267.    Illinois has enacted a law to protect people from Cyberbullying or Cyberstalking.

63

268.    Sec. 12-7.5. Cyberstalking provides as follows:

(a) A person commits cyberstalking when he or she **engages in a course of conduct using electronic communication directed at a specific person**, and he or she knows or should know that would cause a reasonable person to:

(1) fear for his or her safety or the safety of a third person; **or**

**(2) suffer other emotional distress**.

(a-3) A person commits cyberstalking when he or she, knowingly and without lawful justification, **on at least 2 separate occasions**, **harasses another person through the use of electronic communication** and:

(1) at any time transmits a threat of immediate or   future bodily harm, sexual assault, confinement, or restraint and the threat is directed towards that person or a family member of that person; or

(2) **places that person or a family member of that person in reasonable apprehension** of immediate or future bodily harm, sexual assault, confinement, or restraint; or

(3) at any time knowingly **solicits the commission of an act by any person which would be a violation of this Code directed towards that person** or a family member of that person.

(a-5) A person commits cyberstalking when he or she, knowingly and without lawful justification, **creates and maintains an Internet website or webpage which is accessible to one or more third parties for a period of at least 24 hours, and which contains statements harassing another person** and:

(1) which communicates a threat of immediate or future bodily harm, sexual assault, confinement, or restraint, where the threat is directed towards that person or a family member of that person, or

(2) **which places that person or a family member of that person in reasonable apprehension** of immediate or future bodily harm, sexual assault, confinement, or restraint, or

(3) **which knowingly solicits the commission of an act by any person** which would be a violation of this Code directed towards that person or a family member of that person.

(b) Sentence. Cyberstalking is a Class 4 felony; a second or subsequent conviction is a Class 3 felony.

(c) For purposes of this Section:

64

(1) "Course of conduct" means 2 or more acts,  including but not limited to acts in which a defendant directly, **indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to** or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. The incarceration in a penal institution of a person who commits the course of conduct is not a bar to prosecution under this Section.

(2) "Electronic communication" means any transfer of  signs, signals, writings, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system. **"Electronic communication" includes transmissions by a computer through the Internet to another computer**.

(3) "Emotional distress" means significant mental  suffering, anxiety or alarm.

(4) "Harass" means to engage in a knowing and willful course of conduct directed at a specific person that alarms, torments, or terrorizes that person.

(5) "Non-consensual contact" means any contact with  the victim that is initiated or continued without the victim's consent, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim.

(6) "Reasonable person" means a person in the victim's circumstances, with the victim's knowledge of the defendant and the defendant's prior acts.

(7) "Third party" means any person other than the person violating these provisions and the person or persons towards whom the violator's actions are directed.

(d) Telecommunications carriers, commercial mobile service providers, and providers of information services, including, but not limited to, Internet service providers and hosting service providers, are not liable under this Section, except for willful and wanton misconduct, by virtue of the transmission, storage, or caching of electronic communications or messages of others or by virtue of the provision of other related telecommunications, commercial mobile services, or information services used by others in violation of this Section. (Source: P.A. 95-849, eff. 1-1-09; 96-328, eff. 8-11-09; 96-686, eff. 1-1-10; 96-1000, eff. 7-2-10; 96-1551, eff. 7-1-11.)  (Emphasis supplied.)

269.    Defendants engaged in a course of conduct using electronic communication

directed at Mr. Huon when Defendants published false statements of Mr. Huon calling or

intimating that he is a serial rapist or a rapist, publishing his booking photograph, and publishing

his address.   Defendants knew or should have known that this would cause a reasonable person

to suffer emotional distress.

270.    Pleading in the alternative, Defendants created and maintained an Internet website

or webpage which is accessible to one or more third parties for a period of at least 24 hours, and

which contains statements harassing Mr. Huon which placed Mr. Huon in reasonable

apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint.

Defendants called or intimated that Mr. Huon was a rapist or a serial rapist, published his

booking photograph, and published his address.

271.    Defendants created and maintained an Internet website or webpage which is

accessible to one or more third parties for a period of at least 24 hours, and which contains

statements harassing Mr. Huon and which knowingly solicits the commission of an act   by any

person which would be a violation of this Code directed towards Mr. Huon.   Defendants

encouraged its users to look up Mr. Huon's telephone number and contact information and harass

and cyberstalk him.  Defendants' attorneys published Mr. Huon's date of birth and Social

Security Number and personal information on the Pacer website.

272.    As a legal result of this intentional and malicious conduct of the Defendants, and

each of them, jointly and separately, Mr. Huon has suffered damages well in excess of the

minimum jurisdiction of this Court.

273.  Mr. Huon is asking the Court to create a civil cause of action for cyberstalking and

cyberbullying.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment on behalf of

Plaintiff and against Defendants, jointly and severally, and to award Plaintiff, on each Count:

1.      Compensatory damages in an amount well in excess of the minimum jurisdiction of this Court and not less than Seventy-Five Thousand Dollars ($75,000.00) ;

2.      Punitive damages in an appropriate amount to punish Defendants in excess of One Hundred Million Dollars ($100,000,000);

3.      Injunctive relief :

      a.      Compelling Defendants, and each of them, to remove the actionable and offensive statements from the Internet;

      b.      Enjoining Defendants, and each of them, from further publishing or repeating the actionable and offensive statements; and

      c.      Enjoining Defendants, and each of them, from interfering with Plaintiff's law practice and maligning Plaintiff's personal, business and professional reputation.

4.      Costs of suit incurred herein;

5.      Attorney's fees if permissible by law;

6.      The transfer of the domain names Abovethelaw.com, Jezebel.com, and Gawker.com to Plaintiff.

7.      An order for injunctive relief against any individual or entity from posting an article, blog post or comment that relies on the defamatory statements of the Defendants as a source.

8.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, Meanith Huon, demands a jury trial on all issues triable.

67

November 15, 2012

Respectfully submitted,

/s/ Meanith Huon

Meanith Huon
The Huon Law Firm
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2012, I caused to be served a true and correct copy of the foregoing Plaintiff's Fourth Amended Complaint by causing copies of same to be served electronically on all counsel of record who have appeared in this case.

/s/Meanith Huon_____
Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com

# STATE OF NEW YORK

## DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on September 27, 2012.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

080312000 576

CSC 45
DRAW DOWN

CERTIFICATE OF AMENDMENT

OF THE

ARTICLES OF ORGANIZATION OF

DEAD HORSE MEDIA LLC

(Under Section Two Hundred Eleven of the Limited Liability Company Law)

It is hereby certified that:

1.      The name of the limited liability company (the "Company") is Dead Horse Media LLC.

2.      The date of filing of the Company's Initial Articles of Organization was December 14, 2005.      Original Name : Meta Media LLC.

3.      The subject matter of the amendment effected hereby is as follows:

        To change the name of the Company from Dead Horse Media LLC to Breaking Media LLC

4.      To accomplish the foregoing amendments, Article 1 of the Articles of Organization of the Company, relating to the name of the company, is hereby amended as follows:

        "1. The name of the company is Breaking Media LLC".

IN WITNESS WHEREOF, I have subscribed the foregoing certificate of amendment of the articles of organization on the date set forth below and do hereby affirm, under the penalties of perjury, that the statements contained herein have been examined by me and are true and correct.

Dated: March 7, 2008

                                        Gavin D. McElroy, Authorized Person

FKKS: 348648.v1                                                   15084.300

080312000 *576*

CSC 45
DRAW DOWN

**CERTIFICATE OF AMENDMENT**

**OF THE**

**ARTICLES OF ORGANIZATION**

**OF**

**DEAD HORSE MEDIA LLC**

**(Under Section Two Hundred Eleven of the Limited Liability Company Law)**

*1 CC*

**STATE OF NEW YORK**
**DEPARTMENT OF STATE**

FILED MAR 1 2 2008

TAX $_____

BY: _____ *JTC*

**FRANKFURT KURNIT KLEIN & SELZ, PC**
**488 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**
**(212) 980-0120**

*Cust ref # 481758 RZm*

2008 MAR 12 PM 2:24

*JTC*

2008 MAR 12 PM 12:19

RECEIVED
FKKS: 348648.v1

15084.300

*620*

**CT-07**

**111 216 000**

486

New York State Department of State
Division of Corporations, State Records and Uniform Commercial Code
One Commerce Plaza, 99 Washington Avenue
Albany, NY 12231
www.dos.state.ny.us

# APPLICATION FOR AUTHORITY
## OF

Breaking Media, Inc.

*(Insert Corporate Name)*

Under Section 1304 of the Business Corporation Law

**FIRST:** The name of the corporation is:

Breaking Media, Inc.

If the name does not contain a required word or abbreviation indicating corporate character pursuant to § 301 of the Business Corporation Law, the corporation agrees to add the word or abbreviation _____ to the end of its name for use in this state.

*(Do not complete this section unless the corporation's true name is not available pursuant to §301 or § 302 of the Business Corporation Law.)* The fictitious name under which the corporation will do business in New York is:

Breaking Publishing

**SECOND:** The jurisdiction in which the corporation was organized is:

Delaware                     The date of its incorporation is: September 8, 2011

**THIRD:** This corporation is formed to engage in any lawful act or activity for which a corporation may be organized under the Business Corporation Law, provided that it is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

**FOURTH:** The county within this state in which the office of the corporation is to be located is:

New York

*(A county in New York State must be stated. Please note that the corporation is not required to have an actual physical office in this state.)*

DOS-1336-f-l (Rev. 07/11)

Page 1 of 3

FIFTH: The Secretary of State is designated as agent of the corporation upon whom process against the corporation may be served. The address to which the Secretary of State shall mail a copy of any process accepted on behalf of the corporation is:

611 Broadway, Suite 907D
New York, NY 10012
Attn: Chief Executive Officer

---

SIXTH: *(Check the statement that applies.)*

☒ The foreign corporation has not since its incorporation or since the date its authority to do business in New York was last surrendered, engaged in any activity in this state.

☐ The consent of the State Tax Commission is attached.

X _____
*(Signature)*

Carter Burden III
_____
*(Name of Signer)*

President
_____
*(Title of Signer)*

DOS-1335-f-l (Rev. 07/11)

Page 2 of 3

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "BREAKING MEDIA, INC." IS DULY
INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTEENTH DAY OF
DECEMBER, A.D. 2011.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES
HAVE NOT BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9231992

DATE: 12-15-11

4981771    8300

111298280

You may verify this certificate online
at corp.delaware.gov/authver.shtml

**CT-07**

**111216000**

*486*

# APPLICATION FOR AUTHORITY
## OF

Breaking Media, Inc.

*(Insert Corporate Name)*

Under Section 1304 of the Business Corporation Law

Filed by: Patricia Kelley

*(Name)*
Foley Hoag, LLP, 155 Seaport Blvd.

*(Mailing Address)*
Boston, MA 02210

*(City, State and Zip Code)*

*Note:* This form was prepared by the New York State Department of State for filing an application for authority for a business corporation. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. Annexed to the application for authority must be a Certificate of Existence from the official who files and maintains incorporation records in the jurisdiction of the corporation's incorporation. (Please note: This official is generally the Secretary of State and many jurisdictions refer to the Certificate of Existence as a Certificate of Good Standing.) The application must be submitted with a $225 filing fee. Checks should be made payable to the Department of State.  Cst ref # 8334155mc

(For Office Use Only)

# DRAWDOWN

*ICC*

**STATE OF NEW YORK
DEPARTMENT OF STATE**

FILED DEC 16 2011
TAX $
BY:

*new york*

2011 DEC 16 AM 11:54

DOS-1335-f-l (Rev. 07/11)

Page 3 of 3

*533*

**111230000** 283

## CT-07

### CERTIFICATE OF MERGER

#### OF

#### BREAKING MEDIA LLC
#### (a New York limited liability company)

#### INTO

#### BREAKING MEDIA, INC.
#### (a Delaware corporation)

### UNDER SECTION 904(a) OF THE NEW YORK BUSINESS CORPORATION LAW

The undersigned, being the Manager of Breaking Media LLC, a New York limited liability company, and the President of Breaking Media, Inc., a Delaware corporation, hereby certify as follows:

**FIRST:** The true name and jurisdiction of formation or organization of each of the constituent entities of the merger are as follows:

| Name | State of Organization/Formation |
|------|-------------------------------|
| Breaking Media LLC | New York |
| Breaking Media, Inc. | Delaware |

The fictitious name of Breaking Media, Inc. is "Breaking Publishing".

**SECOND:** Breaking Media LLC, which was originally formed under the name "META MEDIA LLC", filed its initial articles of organization with the Department of State of the State of New York on December 14, 2005.

**THIRD:** The Surviving Corporation filed its initial certificate of incorporation with the Secretary of State of Delaware on September 8, 2011. The Surviving Corporation filed its Application for Authority to transact business as a foreign corporation by the Department of State of the State of New York on December 16, 2011.

**FOURTH:** An Agreement and Plan of Merger (the "Merger Agreement") has been approved and executed by each of the constituent entities.

**FIFTH:** The name of the surviving corporation is Breaking Media, Inc., a Delaware corporation (the "Surviving Corporation").

**SIXTH:** The Surviving Corporation agrees that it may be served with process in the State of New York in any action or special proceeding for the enforcement of any liability or obligation of Breaking Media LLC, and for the enforcement as provided in the New York Business Corporation Law, of the right of members and owners of Breaking Media LLC to receive payment for their interests against the Surviving Corporation.

B3943309v2

**SEVENTH:** The Surviving Corporation hereby designates the New York Secretary of State as its agent upon whom process against it may be served in the manner set forth in Section 306(b) of the New York Business Corporation Law, in any action or special proceeding. The post office address to which the Secretary of State shall mail a copy of any process served upon the Secretary of State is:

> Breaking Media, Inc.
> 611 Broadway, Suite 907D
> New York, NY 10012
> Attn: John Lerner

**EIGHTH:** The Surviving Corporation agrees that, subject to the provisions of Section 623 of the New York Business Corporation Law, Section 1005 of the New York Limited Liability Company Law or any applicable statute, it will promptly pay to the members of Breaking Media LLC the amount, if any, to which they shall be entitled under the provisions of the New York Business Corporation Law, the New York Limited Liability Company Law or any applicable statute relating to the right of shareholders, members and owners to receive payment for their interests.

**NINTH:** The merger shall be effective on December 31, 2011.

**TENTH:** The merger of Breaking Media LLC into Breaking Media, Inc. is permitted by the laws of Delaware, the state of incorporation of the Surviving Corporation, and is in compliance therewith.

**ELEVENTH:** The executed Merger Agreement is on file at the principal place of business of the Surviving Corporation, located at 611 Broadway, Suite 907D, New York, NY 10012.

*[Signatures to follow]*

B3943309v2

- 2 -

IN WITNESS WHEREOF, Breaking Media LLC and Breaking Media, Inc. have caused this Certificate of Merger to be executed by the undersigned, as of the 29th day of December, 2011.

BREAKING MEDIA LLC,
a New York limited liability company

By:
Name: John Lerner
Title: Chief Executive Officer and Manager

BREAKING MEDIA, INC.,
a Delaware corporation

By:
Name: Carter Burden III
Title: President

*Signature Page to New York Certificate of Merger*

CT-07

111200000 283

Certificate of Merger

OF

Breaking Media LLC into

Breaking Media, Inc.

Under Section 1003 of the Limited Liability Company Law

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED  DEC 3 0 2011

TAX $

BY: _____

Filed by:

    Pat Kelley, Foley Hoag LLP
    155 Federal Street
    Boston MA 02210

DRAWDOWN

Cst ref# 8347887my

2011 DEC 29 PH 2:28

2011 DEC 30 AM 10:55

329

CT-07

**1201 0400 1031**

New York State Department of State
Division of Corporations, State Records and Uniform Commercial Code
One Commerce Plaza, 99 Washington Avenue
Albany, NY 12231
www.dos.state.ny.us

# CERTIFICATE OF AMENDMENT
## OF

Breaking Media, Inc.

*(Insert Name of Foreign Corporation)*

Under Section 1309 of the Business Corporation Law

**FIRST:** The name of the corporation as it appears on the index of names in the Department of State is: _____ Breaking Media, Inc. _____

*(Complete this paragraph only if the corporation has agreed to use a fictitious name in New York State.)* The fictitious name the corporation has agreed to use in New York State is:

Breaking Publishing

**SECOND:** The jurisdiction of incorporation of the corporation is:

Delaware

**THIRD:** The date on which the corporation was authorized to do business in New York State is:

12/16/2011

**FOURTH:** The Application for Authority is amended as follows:

*(If the true name of the foreign corporation has been changed, set forth a statement that the change of name has been effected under the laws of the jurisdiction of incorporation and the date the change was so effected.)*

Paragraph __FIRST__ of the Application for Authority is amended to follows:

Article 1 is being amended to discontinue the use of the corporation's current fictitious name.

DOS-1559-f-f (Rev. 05/10)

Page 1 of 2

120104001031

120104001031

Paragraph    N/A          of the Application for Authority is amended to read in its entirety as follows:

N/A

_____         John Lerner
         (Signature)                              (Name of Signer)

                                         Chief Executive Officer
                                                  (Title of Signer)

## CT-07

# CERTIFICATE OF AMENDMENT
# OF

Breaking Media, Inc.
(Insert Name of Foreign Corporation)

Under Section 1309 of the Business Corporation Law

Filer's Name:    Patricia F. Kelley, Sr. Corporate Paralegal

Address:    Foley Hoag LLP, 155 Seaport Blvd.

City, State and Zip Code:    Boston, MA  02210

NOTE: This form was prepared by the New York State Department of State. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores. The Department of State recommends that all documents be prepared under the guidance of an attorney. The certificate must be submitted with a $60 filing fee.

*For Office Use Only*

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   JAN 0 4 2012

TAX $ _____
BY: _LAH_
   NEW YORK

**DRAWDOWN**

Cst ref# 8352225ny

2012 JAN -4  PM 3: 58

DOS-1559-f-l (Rev. 05/10)

Page 2 of 2

1136

PAGE   1              **State of Delaware**

SECRETARY OF STATE
DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

*121033669*

9916566                                                    *09-14-2012*
MEANITH HUON
PO BOX 441
CHICAGO            IL     60690

ATTN: MEANITH HOUN

| DESCRIPTION | AMOUNT |
|---|---|
| GAWKER MEDIA LLC | |
| 3532534    4100   Plain Copy | |
| Plain Copy Fee | 12.00 |
| Expedite Fee, 24 Hour | 20.00 |
| FILING TOTAL | 32.00 |
| TOTAL PAYMENTS | 32.00 |
| SERVICE REQUEST BALANCE | .00 |

SENT BY: AML:          212 937 2124;          JUN-3-02   STATE OF DELAWARE
                                                         SECRETARY OF STATE PAGE 2
Case 1:11-cv-03054 Document #: 162-3 Filed: 11/15/12 Page 2 of 14 PageID #:1828
JUN 03 2002 1:17PM    HP LASERJET 3200          DIVISION OF CORPORATIONS
                                                FILED 01:30 PM 06/03/2002
                                                020353593 – 3532534

# CERTIFICATE OF INCORPORATION

## OF

## BLOGWIRE, INC.

## ARTICLE I

### Name

The name of the corporation is Blogwire, Inc. (the "Corporation").

## ARTICLE II

### Registered Office and Registered Agent

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## ARTICLE III

### Corporate Purpose

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "General Corporation Law").

## ARTICLE IV

### Capital Stock

The total number of shares of all classes of stock that the Corporation has authority to issue is 1,000, all of which shall be shares of Common Stock, par value $.01 per share.

## ARTICLE V

### Directors

To the fullest extent permitted by the General Corporation Law as it now exists and as it may hereafter be amended, no director of the Corporation shall be personally

liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

## ARTICLE VI

### Bylaws

The directors of the Corporation shall have the power to adopt, amend or repeal the bylaws of the Corporation.

## ARTICLE VII

### Amendment

The Corporation reserves the right to amend, alter, change or repeal any provision of this Certificate of Incorporation, in the manner now or hereafter prescribed by law, and all rights conferred on stockholders in this Certificate of Incorporation are subject to this reservation.

## ARTICLE VIII

### Incorporator

The name and mailing address of the sole incorporator is as follows:

Name

Nicholas Denton

Address

301 Elizabeth Street, Apt. 2U
New York, New York 10012

I, THE UNDERSIGNED, being the sole incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the Sate of Delaware, do make this Certificate of Incorporation, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 3rd day of June, 2002.

Nicholas Denton

2

**Delaware Division of Corporations**
**401 Federal Street – Suite 4**
**Dover, DE 19901**
**Phone: 302-739-3073**
**Fax: 302-739-3812**

**Certificate of Conversion from a**
**Delaware or Non-Delaware Corporation to**
**a Delaware Limited Liability Company**

Dear Sir or Madam:

Enclosed please find a form for a Certificate of Conversion from a Delaware or Non-Delaware Corporation to a Delaware Limited Liability Company. The fee to file the Certificate of Conversion is $200.00. Also, enclosed please find a form for a Certificate of Formation that is required to be filed simultaneously with the Certificate of Conversion. The fee for filing the Certificate of Formation is $90.00. Please submit the filing with 1 cover sheet with Conversion first. You will receive a stamped "filed" copy of your document. If you would like a certified copy it will be an additional $100.00. ($50.00 for the Conversion and $50.00 for the Formation) Expedited services are available please contact our office concerning these fees. Delaware entities converting to any other non-Delaware or domestic entity must also pay all applicable taxes. Please contact our Franchise Tax Department for assistance. Please make any check payable to "Delaware Secretary of State".

In order to process your request in a timely manner, please include a cover letter with your name, address and telephone/fax number to enable us to contact you if necessary. For your convenience a cover sheet is available at the following link. http://corp.delaware.gov/filingmemo.pdf. Please make sure you thoroughly complete all information requested on these forms. It is important that the execution be legible, we request that you print or type your name under the signature line.

Thank you for choosing Delaware as your corporate home. Should you require further assistance in this or any other matter, please don't hesitate to call us at (302) 739-3073.

Sincerely,

Department of State
Division of Corporations

Rev 09/05

STATE OF DELAWARE
CERTIFICATE OF CONVERSION
FROM A CORPORATION TO A
LIMITED LIABILITY COMPANY PURSUANT TO
SECTION 18-214 OF THE LIMITED LIABILITY ACT

1.) The jurisdiction where the Corporation first formed is_____.

2.) The jurisdiction immediately prior to filing this Certificate is_____.

3.) The date the corporation first formed is_____.

4.) The name of the Corporation immediately prior to filing this Certificate is
    _____.

5.) The name of the Limited Liability Company as set forth in the Certificate of
    Formation is _____.

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the
_____day of _____, A.D._____.

By:_____
                Authorized Person

Name:_____
                Print or Type

Case 1:11-cv-05054-Document #: 2823  Filed 11/15/22 Page 1 of 14  PageID #:1936

# STATE *of* DELAWARE
## LIMITED LIABILITY COMPANY
## CERTIFICATE *of* FORMATION

• **First:** The name of the limited liability company is _____

_____

• **Second:** The address of its registered office in the State of Delaware is

_____ in the City of _____

Zip Code_____.

The name of its Registered agent at such address is _____

_____.

• **Third:** (Insert any other matters the members determine to include herein.)

**In Witness Whereof**, the undersigned have executed this Certificate of Formation this
_____ day of _____, 20_____.

By:_____
Authorized Person(s)

Name:_____
Typed or Printed

F040823000 275

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
41 State Street
Albany, NY 12231
www.dos.state.ny

# APPLICATION FOR AUTHORITY
# OF

Gawker Media LLC

*(Insert name of Foreign Limited Liability Company)*

Under Section 802 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is: Gawker Media, LLC

If the name does not contain a required word or abbreviation pursuant to Section 204 of the Limited Liability Company Law, the following word or abbreviation is added to the name for use in this state:

(Do not complete this section unless the limited liability company's true name is not available pursuant to §204 of the Limited Liability Company Law.) The fictitious name under which the limited liability company will do business in New York is:

**SECOND:** The jurisdiction of organization of the limited liability company is: Delaware
. The date of its organization is: April 8, 2004

**THIRD:** The county within this state in which the office, or if more than one office, the principal office of the limited liability company is to be located is: New York
(A county in New York State must be stated. Please note that the limited liability company is not required to have an actual physical office in this state.)

**FOURTH:** The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process served against him or her is:
Gawker Media LLC
76 Crosby Street
New York, NY 10012

DOS-1361 (Rev. 06/03)

**FIFTH:** (Complete the statement that applies)

The address of the office required to be maintained in the jurisdiction of its formation is: _____

_____ The Corporation Trust Company

_____ 1209 Orange Street, Wilmington, DE 19801

No office is required to be maintained in the jurisdiction of its formation. The address of the principal office of the limited liability company is: _____

_____

_____

**SIXTH:** The foreign limited liability company is in existence in its jurisdiction of formation at the time of filing of this application.

**SEVENTH:** The name and address of the Secretary of State or other authorized official in its jurisdiction of organization where a copy of its articles of organization is filed is: _____

_____ Office of the Secretary of State

_____ 401 Federal St., Suite 3

_____ Dover, DE 19901

X     Nu Au L
      *(Signature)*

      **Nicholas Denton**
      *(Type or print name)*

      **Manager**
      *(Title or capacity of signer)*

**Please Note:** A certificate of existence or, if no such certificate is issued by the jurisdiction of formation, a certified copy of the articles of organization of the limited liability company and all subsequent amendments therefore, or if no articles of organization have been filed, a certified copy of the certificate filed as its organizational base and all amendments thereto, must be attached to the application for authority when submitted for filing. If such certificate or certified copy is in a foreign language, a translation in English thereto under oath of the translator shall be attached.



2

# Delaware
PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "GAWKER MEDIA LLC" IS DULY FORMED
UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING
AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE
SHOW, AS OF THE FOURTH DAY OF MAY, A.D. 2004.

3532534 8300

040323402

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 3091020

DATE: 05-04-04

F040823000 275

## APPLICATION FOR AUTHORITY
### OF

**Gawker Media LLC**
*(Insert name of Foreign Limited Liability Company)*
Under Section 802 of the Limited Liability Company Law

Filed by:   **Hunter N. Norton. c/o Withers Bergman LLP**
           *(Name)*

           **157 Church Street  P.O. Box 426**
           *(Mailing address)*
           **New Haven, CT 06502-0426**

           *(City, State and Zip code)*

NOTE: This form was prepared by the New York State Department of State for filing an application for authority for a foreign limited liability company to conduct business in New York State. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal supply stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The certificate must be submitted with a $250 filing fee made payable to the Department of State.

*(For office use only)*

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED

AUG 23 2004

TAX $._____

BY: _____

280

06/28/04  MON 17:52  [TX/RX NO 8357]

NYS DEPARTMENT OF STATE
DIVISION OF CORPORATIONS
41 State Street
Albany, NY 12231-0002

*Biennial Statement*

| | FILING PERIOD | FEE |
|---|---|---|
| 3093449 | 08/2006 | $9.00 |

Section 301 of the Limited Liability Company Law requires limited liability companies to update and provide a current service of process address to the Department of State every two years. Please sign, review and complete this form as necessary, and then return the statement with the required fee. The following is the service of process address currently on file with the Department of State:

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED AUG 18 2006

06081800
2269

For: GAWKER MEDIA LLC

Service of Process Address is the address to which the Secretary of State will forward any legal papers accepted on behalf of the limited liability company which commence a legal action against the company.

☑ **THE ADDRESS CURRENTLY ON FILE IS CORRECT.**

Only complete this box if the address presently set forth in the Department's records for the purpose is to be changed

| SERVICE OF PROCESS ADDRESS SHOULD BE CHANGED TO | |
|---|---|
| | |

GABRIELLE DARBYSHIRE
PRINT OR TYPE NAME OF SIGNER

MEMBER, AUTHORISED SIGNATORY
PRINT OR TYPE THE TITLE
OR CAPACITY OF SIGNER

SIGNATURE OF MEMBER, MANAGER,
AUTHORIZED PERSON OR ATTORNEY-IN-FACT

2269

IMPORTANT NOTICE

06081800

A New York Limited Liability Company which is no longer conducting business must file a Certificate of Dissolution pursuant to section 705 of the Limited Liability Company Law, and a foreign Limited Liability Company no longer conducting business in New York State should file a Surrender of Authority pursuant to section 806 of the Limited Liability Company Law or a Termination of Existence pursuant to section 807 of the Limited Liability Company Law. Questions regarding the filing of these certificates should be directed to the NYS Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0001 or by calling 518-473-2492.

Filing Period — the filing period is the calendar month during which the original Articles of Organization or Application for Authority was filed or the effective date that limited liability company existence began, if stated in the Articles of Organization.

Filing Fee: The statutory filing fee is $9.00. Checks and money orders must be made payable to the "Department of State". DO NOT mail cash.

Return this entire form, completed, with your $9.00 fee, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

Failure to timely file this statement will be reflected in the Department's records as past due or delinquent.

DOS-1299 (09/99)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement

For Internal Use Only

**3093449**

AR0808050500  2195

**Business Name:**

**GAWKER MEDIA LLC**

3093449

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

Filed By: _____

Cash # (if different than firm #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **08/2008** |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

### Part 1: Address for Service of Process (Address must be within the United States)

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

Name

Address

| City | State | Zip |
|---|---|---|
| | | |

### Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person

Signature

Title of Signer (Please Print)  MEMBER

Name of Signer (Please Print)  GABRIELLE DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

080805002195

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only

## 3093449

**Business Name:**

**GAWKER MEDIA LLC**

3093449

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

10081700

3124

Filed By: _____

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
| Filing Period: | 08/2010 |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

Name
GAWKER MEDIA LLC
Address
210 Elizabeth St, 4th Floor
City
New York
State
NY
Zip
10012

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature: Jerella

Title of Signer (Please Print): Legal Associate

Name of Signer (Please Print): Jose Ma, Esq.

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/08)

# Biennial Statement

NYS Department of State
Division of Corporations, State Records &
Uniform Commercial Code
http://www.dos.ny.gov

**BUSINESS NAME:**      **GAWKER MEDIA LLC**

**FILING PERIOD:**      **08/2012**

**Part 1 - Service of Process Address (Address must be within the United States or its territories)**

| Name |
|---|
| **GAWKER MEDIA LLC** |

| Address Line 1 |
|---|
| **210 ELIZABETH STREET** |

| Address Line 2 |
|---|
| **4TH FLOOR** |

| City | State | Zip Code |
|---|---|---|
| **NEW YORK** | **NY** | **10012** |

## Signer Information

I affirm that the statements contained herein are true to the best of my knowledge, that I am authorized to sign this Biennial Statement and that my signature typed below constitutes my electronic signature.

| Electronic Signature |
|---|
| **JESSE MA** |

| Capacity of Signer |
|---|
| **AUTHORIZED PERSON** |

**FILED WITH THE NYS DEPARTMENT OF STATE ON: 8/7/2012**
**FILING NUMBER: 120807006917 - 3093449**

04/25/2005 10 38 FAX  12124879777          White Fleischner Fino                    002/004

F 050426000 915

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

# ARTICLES OF ORGANIZATION
## OF
# GAWKER ENTERTAINMENT, LLC

Under Section 203 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is **GAWKER ENTERTAINMENT, LLC.**

**SECOND·** The purpose for which the Company is organized is to transact any lawful business for which limited liability companies may be formed

**THIRD:** The county within this state in which the office of the limited liability company is to be located is  New York County

**FOURTH:** The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served  The address within or without this state to which the Secretary of State shall mail a copy of any process against the limited liability company served upon it is  81 Spring Street, New York, NY 10012 Attn Mr Nicholas Denton

_S.P.Cohen_
Ian Cohen, Esq
Organizer

04/25/2005 10 38 FAX 12124879777          White Fleischner Fino          ☑003/004

F 050426000 915

**FILED**
**2005 APR 26 PM 3:30**

# ARTICLES OF ORGANIZATION
## OF
## GAWKER ENTERTAINMENT, LLC

Under Section 203 of the Limited Liability Company Law

Filed by

Jan Cohen, Esq
Cohen & Czarnik LLP
140 Broadway
36th Floor
New York, NY 10005

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED APR 26 2005

TAX $ _____
BY _____

**RECEIVED**
**2005 APR 25 PM 12:01**

2

050426000 966

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company Biennial Statement

**For Internal Use Only**

07041900
2370

**3196528**

**Business Name:**

**GAWKER ENTERTAINMENT, LLC**

3196528

Filed By: _RSH_

GAWKER ENTERTAINMENT, LLC
ATTN: MR. NICHOLAS DENTON
81 SPRING STREET
NEW YORK, NY 10012

Cash # (if different than film #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **04/2007** |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| | |
|---|---|
| GAWKER ENTERTAINMENT, LLC<br>ATTN: MR. NICHOLAS DENTON<br>81 SPRING STREET<br>NEW YORK, NY 10012 | **Name** SAME<br>**Address** 76 CROSBY ST<br>**City** NEW YORK  **State** NY  **Zip** 10012 |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature

Title of Signer (Please Print)  MANAGING MEMBER

Name of Signer (Please Print)  GABRIELLE DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

070419002370

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only

## 3196528

**Business Name:**

**GAWKER ENTERTAINMENT, LLC**

3196528

GAWKER ENTERTAINMENT, LLC
76 CROSBY ST
NEW YORK, NY 10012

AR09042400
3153

Filed By: _____ QL

Cash # (if different than item #): _____

| Required Fee: | $9.00 |
| Filing Period: | 04/2009 |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized.  Please review the address for service of process in Part 1.  Update the information in the space provided, if necessary.  If no changes are necessary, proceed to Part 2.  A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

GAWKER ENTERTAINMENT, LLC
76 CROSBY ST
NEW YORK, NY 10012

Name
GAWKER ENTERTAINMENT, LLC

Address
310 ELIZABETH ST, FOURTH FLOOR

City
NEW YORK

State
NY

Zip
10012

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature

Title of Signer (Please Print)
VICE PRESIDENT

Name of Signer (Please Print)
GABY DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement.  The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492.  The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution.  A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

090424003153

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

**Limited Liability Company
Biennial Statement**

For Internal Use Only

**3196528**

**Business Name:**

**GAWKER ENTERTAINMENT, LLC**

3196528

GAWKER ENTERTAINMENT, LLC
210 ELIZABETH ST
FOURTH FLR
NEW YORK, NY 10012

1042700    2814

Filed By: _____

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
| Filing Period: | 04/2011 |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER ENTERTAINMENT, LLC 210 ELIZABETH ST FOURTH FLR NEW YORK, NY 10012 | Name | | |
|---|---|---|---|
| | Address | | |
| | City | State | Zip |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature _Jessella_

Title of Signer (Please Print) _Senior Legal Associate_

Name of Signer (Please Print) _Jessella_

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

110427002814

200801910034



## State of California
### Secretary of State

**LLC-5**   File # _____

## LIMITED LIABILITY COMPANY
## APPLICATION FOR REGISTRATION

A $70.00 filing fee AND a certificate of good standing from an authorized public official of the jurisdiction of formation must accompany this form.

**IMPORTANT – Read instructions before completing this form.**

**FILED**
In the office of the Secretary of State
of the State of California

JAN 1 7 2008

This Space For Filing Use Only

---

**ENTITY NAME** (End the name in Item 1 with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME UNDER WHICH THE FOREIGN LIMITED LIABILITY COMPANY PROPOSES TO REGISTER AND TRANSACT BUSINESS IN CALIFORNIA

   GAWKER TECHNOLOGY, LLC

2. NAME OF THE FOREIGN LIMITED LIABILITY COMPANY, IF DIFFERENT FROM THAT ENTERED IN ITEM 1 ABOVE

---

**DATE AND PLACE OF ORGANIZATION**

3. THIS FOREIGN LIMITED LIABILITY COMPANY WAS FORMED ON   03 - 18 - 05   (MONTH)(DAY)(YEAR)   IN   NEW YORK   (STATE OR COUNTRY)

   AND IS AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES IN THAT STATE OR COUNTRY.

---

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 4 and 5 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 4 must be completed (leave Item 5 blank).)

4. NAME OF AGENT FOR SERVICE OF PROCESS

   Incorporating Services, Ltd.

5. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA    CITY    STATE   ZIP CODE
   CA

---

**APPOINTMENT** (The following statement is required by statute and should not be altered.)

6. IN THE EVENT THE ABOVE AGENT FOR SERVICE OF PROCESS RESIGNS AND IS NOT REPLACED, OR IF THE AGENT CANNOT BE FOUND OR SERVED WITH THE EXERCISE OF REASONABLE DILIGENCE, THE SECRETARY OF STATE OF THE STATE OF CALIFORNIA IS HEREBY APPOINTED AS THE AGENT FOR SERVICE OF PROCESS OF THIS FOREIGN LIMITED LIABILITY COMPANY.

**OFFICE ADDRESSES** (Do not abbreviate the name of the city.)

7. ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE    CITY AND STATE    ZIP CODE

   76 CROSBY STREET    NEW YORK , NY    10012

8. ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA, IF ANY    CITY    STATE   ZIP CODE
   CA

---

**EXECUTION**

9. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED

   JAN 16, 2008

   DATE

   SIGNATURE OF AUTHORIZED PERSON

   GABRIELLE DARBYSHIRE, MEMBER
   TYPE OR PRINT NAME AND TITLE OF AUTHORIZED PERSON

LLC-5 (REV 04/2007)    APPROVED BY SECRETARY OF STATE

# State of New York
# Department of State } ss:

I hereby certify, that GIZMODO, LLC a NEW YORK Limited Liability Company
filed Articles of Organization pursuant to the Limited Liability Company
Law on 03/18/2005, and that the Limited Liability Company is existing so
far as shown by the records of the Department.

A Certificate of Amendment GIZMODO, LLC, changing its name to GAWKER
TECHNOLOGY, LLC, was filed 07/11/2005.

*** 

*WITNESS my hand and the official seal
of the Department of State at the City of
Albany, this 14th day of January two
thousand and eight.*

*Special Deputy Secretary of State*

200801150414  102

I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

SEP 1 8 2012

Date:_____ 

DEBRA BOWEN, Secretary of State



**L**

# State of California
## Secretary of State

### STATEMENT OF INFORMATION
(Limited Liability Company)

| Filing Fee $20.00. If amendment, see instructions. |
| --- |
| IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM |

1. LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted.)

GAWKER TECHNOLOGY, LLC
200801910034

**FILED**
in the office of the Secretary of State
of the State of California

**JUL 0 8 2009**

This Space For Filing Use Only

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2.  SECRETARY OF STATE FILE NUMBER | 3.  STATE OR PLACE OF ORGANIZATION |
| --- | --- |
| 200801910034 | NEW YORK |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4.   STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | | ZIP CODE |
| --- | --- | --- | --- |
| 76 CROSBY STREET | NEW YORK, NY | | 10012 |
| 5   CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
| | | CA | |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6.   NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| --- | --- | --- | --- |
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7.   NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| --- | --- | --- | --- |
| NICK PENTON | 76 CROSBY STREET | NEW YORK, NY | 10012 |
| 8.   NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| GAWKER MEDIA LLC | 76 CROSBY STREET | NEW YORK, NY | 10012 |
| 9.   NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

10  NAME OF AGENT FOR SERVICE OF PROCESS

INCORPORATING SERVICES, LTD. (C2892002)

| 11.  ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| | | CA | |

**TYPE OF BUSINESS**

12.  DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

ONLINE MEDICA COMPANY

13.  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| ALAN MILLER | | AGENT | 7/7/2009 |
| --- | --- | --- | --- |
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

| LLC-12 (REV 03/2007) | APPROVED BY SECRETARY OF STATE |
| --- | --- |



# State of California
## Secretary of State

**STATEMENT OF INFORMATION**
(Limited Liability Company)

**33**

Filing Fee $20.00.  If amendment, see Instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted.)

   Gawker Technology LLC

**FILED**
in the office of the Secretary of State
of the State of California

FEB 03 2010

This Space For Filing Use Only

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION |
|---|---|
| 200801910034 | New York |

**NO CHANGE STATEMENT**

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the Secretary of State, check the box and proceed to Item 13.

If there have been any changes to the information contained in the last Statement of Information filed, or no Statement of Information has been previously filed, this form must be completed in its entirety.

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | ZIP CODE |
|---|---|---|
| | | |

| 5. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE CA | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| 8. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| 9. NAME | ADDRESS | CITY AND STATE | ZIP CODE |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

10. NAME OF AGENT FOR SERVICE OF PROCESS

| 11. ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE CA | ZIP CODE |
|---|---|---|---|
| | | | |

**TYPE OF BUSINESS**

12. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

13. THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| Gabrielle Darbyshire | | COO | 1/20/2010 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

LLC-12R (REV 03/2007)                                                                    APPROVED BY SECRETARY OF STATE


I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

SEP 1 8 2012

Date:_____

DEBRA BOWEN, Secretary of State



# State of California
## Secretary of State

31

### STATEMENT OF INFORMATION
(Limited Liability Company)

Filing Fee $20.00. If amendment, see instructions.

**FILED**
In the office of the Secretary of State
of the State of California

JUL 17 2009

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted)

GAWKER ENTERTAINMENT, LLC
200802810002

ACC This Space For Filing Use Only

DUE DATE:

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2  SECRETARY OF STATE FILE NUMBER | 3  STATE OR PLACE OF ORGANIZATION |
|---|---|
| 200802810002 | NEW YORK |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | ZIP CODE |
|---|---|---|
| 720 14TH ST | SACRAMENTO, CA | 95814 |

| 5  CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| NICK PENTON | 76 CROSBY ST | NEW YORK, NY | 10012 |
| 8  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| GAWKER MEDIA LLC | 76 CROSBY ST | NEW YORK, NY | 10012 |
| 9  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

10  NAME OF AGENT FOR SERVICE OF PROCESS

INCORPORATING SERVICES, LTD. (C2892002)

| 11  ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | CA | |

**TYPE OF BUSINESS**

12. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

ONLINE MEDIA COMPANY

13  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT

| ALAN MILLER | *Alan Miller* | AGENT | 7/7/2009 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

LLC-12 (REV 05/2007)

APPROVED BY SECRETARY OF STATE



# State of California
## Secretary of State

L

12

### STATEMENT OF INFORMATION
#### (Limited Liability Company)

Filing Fee $20.00. If this is an amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. LIMITED LIABILITY COMPANY NAME

   Gawker Entertainment, LLC

**FILED**
in the office of the Secretary of State
of the State of California

FEB 1 7 2012

This Space For Filing Use Only

**File Number and State or Place of Organization**

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION (If formed outside of California) |
|---|---|
| 200802810002 | New York |

**No Change Statement**

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of Information has been previously filed, this form must be completed in its entirety.

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to **Item 15.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | CITY | STATE | ZIP CODE |
| 7. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | | CITY | STATE CA | ZIP CODE |

**Name and Complete Address of the Chief Executive Officer, If Any**

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

**Name and Complete Address of Any Manager or Managers, or if None Have Been Appointed or Elected, Provide the Name and Address of Each Member** (Attach additional pages, if necessary.)

| 9. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

12. NAME OF AGENT FOR SERVICE OF PROCESS

| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE CA | ZIP CODE |
|---|---|---|---|
| | | | |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 1/31/2012 | Gaby Darbyshire | COO | Gaby Darbyshire |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

LLC-12 (REV 01/2012)                                                    APPROVED BY SECRETARY OF STATE

Case: 1:11-cv-03054 Document #: 152-1 Filed: 09/15/12 Page 9 of 12 PageID #:1852



I hereby certify that the foregoing
transcript of_____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

SEP 1 8 2012

Date:_____ 65

DEBRA BOWEN, Secretary of State

LLC-5   File # **2 0 0 8 0 2 8 1 0 0 0 2**

## State of California
### Secretary of State

**FILED**
In the office of the Secretary of State
of the State of California

**JAN 2 5 2008**

## LIMITED LIABILITY COMPANY
## APPLICATION FOR REGISTRATION

A $70.00 filing fee AND a certificate of good standing from an authorized public official of the jurisdiction of formation must accompany this form.

**IMPORTANT** – Read instructions before completing this form.

This Space For Filing Use Only

ENTITY NAME (End the name in Item 1 with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co." respectively.)

1   NAME UNDER WHICH THE FOREIGN LIMITED LIABILITY COMPANY PROPOSES TO REGISTER AND TRANSACT BUSINESS IN CALIFORNIA

**GAWKER ENTERTAINMENT, LLC**

2   NAME OF THE FOREIGN LIMITED LIABILITY COMPANY IF DIFFERENT FROM THAT ENTERED IN ITEM 1 ABOVE

DATE AND PLACE OF ORGANIZATION

3   THIS FOREIGN LIMITED LIABILITY COMPANY WAS FORMED ON   **04** – **26** – **05**   IN   **NEW YORK**
   (MONTH)  (DAY)  (YEAR)   (STATE OR COUNTRY)

AND IS AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES IN THAT STATE OR COUNTRY

AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both Items 4 and 5 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 4 must be completed; leave Item 5 blank.)

4   NAME OF AGENT FOR SERVICE OF PROCESS
   Incorporating Services, Ltd.

5   IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA   CITY   STATE   ZIP CODE
                                                                                              **CA**

APPOINTMENT (The following statement is required by statute and should not be altered.)

6   IN THE EVENT THE ABOVE AGENT FOR SERVICE OF PROCESS RESIGNS AND IS NOT REPLACED, OR IF THE AGENT CANNOT BE FOUND OR SERVED WITH THE EXERCISE OF REASONABLE DILIGENCE, THE SECRETARY OF STATE OF THE STATE OF CALIFORNIA IS HEREBY APPOINTED AS THE AGENT FOR SERVICE OF PROCESS OF THIS FOREIGN LIMITED LIABILITY COMPANY.

OFFICE ADDRESSES (Do not abbreviate the name of the city.)

7   ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE                       CITY AND STATE          ZIP CODE
   **76 CROSBY STREET**                                            **NEW YORK, NY**       **10012**

8   ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA, IF ANY          CITY        STATE        ZIP CODE
                                                                                 **CA**

EXECUTION

9   I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

**JANUARY 25, 2008**                   _Gaby Darbyshire_
DATE                                   SIGNATURE OF AUTHORIZED PERSON

                                       **GABRIELLE DARBYSHIRE, MEMBER**
                                       TYPE OR PRINT NAME AND TITLE OF AUTHORIZED PERSON

LLC-5 (REV 04/2007)                                        APPROVED BY SECRETARY OF STATE

## State of New York
## Department of State    } ss:

I hereby certify, that GAWKER ENTERTAINMENT, LLC a NEW YORK Limited
Liability Company filed Articles of Organization pursuant to the Limited
Liability Company Law on 04/26/2005, and that the Limited Liability
Company is existing so far as shown by the records of the Department.

***

*WITNESS my hand and the official seal
of the Department of State at the City of
Albany, this 14th day of January two
thousand and eight.*

*Special Deputy Secretary of State*

*200801150412  102*

**200802810002**

Case: 1:11-cv-03054 Document #: 162-5 Filed: 04/15/12 Page 12 of 12 PageID #:1855

03/17/2005 14 56 FAX  12124879777                    White Fleischner Fino                    ☑002/004

**0503180000286**

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

# ARTICLES OF ORGANIZATION
## OF
## GIZMODO, LLC

Under Section 203 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is **GIZMODO, LLC.**

**SECOND:** The purpose for which the Company is organized is to transact any lawful business for which limited liability companies may be formed

**THIRD'** The county within this state in which the office of the limited liability company is to be located is: New York County

**FOURTH:** The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process against the limited liability company served upon it is. 81 Spring Street, New York, NY 10012 Attn: Mr Nicholas Denton

Jan Cohen, Esq
Organizer

F0503180000286

---

## ARTICLES OF ORGANIZATION
## OF
## GIZMODO, LLC

Under Section 203 of the Limited Liability Company Law

Filed by:

Jan Cohen, Esq.
Cohen & Czarnik LLP
140 Broadway
36th Floor
New York, NY 10005

FILED
2005 MAR 18 AM 9:55

STATE OF NEW YORK
DEPARTMENT OF STATE

MAR 18 2005

FILED
TAX $
BY:

RECEIVED
2005 MAR 17 PM 3:03

2

297

F 0507110 0 *757*

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

# CERTIFICATE OF AMENDMENT
## OF
## ARTICLES OF ORGANIZATION
## OF

# GIZMODO, LLC

Under Section 211 of the Limited Liability Company Law

FIRST: The name of the limited liability company is **GIZMODO, LLC.**

If the name of the limited liability company has been changed, the name under which it was organized is:

SECOND: The date of the filing of the articles of organization is: <u>March 18, 2005</u>

THIRD: The amendment effected by this certificate of amendment is as follows:

Paragraph <u>First</u> of the Articles of Organization relating to <u>the limited liability company name</u> is hereby amended to read as follows: "<u>First: The name of the limited liabllity company is **GAWKER TECHNOLOGY, LLC**.</u>"

Nick Denton
President

07/06/2005 16:46 FAX 2124879777          WHITE FLEISCHNER & FINO                    ☑004

F 0507110 0 0 757

## CERTIFICATE OF AMENDMENT
### OF
### ARTICLES OF ORGANIZATION
### OF
### GIZMODO, LLC

Under Section 211 of the Limited Liability Company Law

Filed by:

Nick Denton
C/o Gawker Media
81 Spring Street
New York, NY 10012

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   JUL 1 1 2005
TAX $
BY:

2          794

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

**Limited Liability Company
Biennial Statement**

For Internal Use Only

**0 7 0 3 1 0 0 0**

2422

**3178939**

**Business Name:**

**GAWKER TECHNOLOGY, LLC**

3178939

**Filed By:** _____

Cash # (if different than film #): _____

GAWKER TECHNOLOGY, LLC
ATTN: MR. NICHOLAS DENTON
81 SPRING STREET
NEW YORK, NY 10012

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **03/2007** |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER TECHNOLOGY, LLC ✓<br>ATTN: MR. NICHOLAS DENTON ✓<br><s>81 SPRING STREET</s> →<br>NEW YORK, NY 10012 ✓ | Name<br>GAWKER TECHNOLOGY LLC | | |
|---|---|---|---|
| | Address<br>76 CROSBY ST | | |
| | City<br>NEW YORK | State<br>NY | Zip<br>10012 |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature _____

DIRECTOR, MEMBER
Title of Signer (Please Print)

GABRIELLE DARBYSHIRE
Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement

For Internal Use Only

**3178939**

AR09042800

2005

**Business Name:**

**GAWKER TECHNOLOGY, LLC**

3178939

Filed By: _____ KH

GAWKER TECHNOLOGY, LLC
ATTN: MR. NICHOLAS DENTON
76 CROSBY ST
NEW YORK, NY 10012

Cash # (if different than film #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **03/2009** |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

GAWKER TECHNOLOGY, LLC
ATTN: MR. NICHOLAS DENTON
76 CROSBY ST
NEW YORK, NY 10012

Name: GAWKER TECHNOLOGY LLC
Address: 210 ELIZABETH ST, FOURTH FLOOR
City: NEW YORK  State: NY  Zip: 10012

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature: _____
Title of Signer (Please Print): VICE PRESIDENT

Name of Signer (Please Print): GABY DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only

**11032100**

2827

Filed By: _____

Cash # (if different than firm #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **03/2011** |

(Make checks payable to the Department of State)

## 3178939

**Business Name:**

GAWKER TECHNOLOGY, LLC

3178939

GAWKER TECHNOLOGY, LLC
210 ELIZABETH ST
FOURTH FLOOR
NEW YORK, NY 10012

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

### Part 1: Address for Service of Process (Address must be within the United States)

| GAWKER TECHNOLOGY, LLC 210 ELIZABETH ST FOURTH FLOOR NEW YORK, NY 10012 | Name | | |
|---|---|---|---|
| | Address | | |
| | City | State | Zip |

### Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person

_Jessell._
Signature

_Sr. Legal Associate_
Title of Signer (Please Print)

_Jessella_
Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

080109000828

# Articles of Organization

## of

## GAWKER SALES, LLC

*Under Section 203 of the Limited Liability Company Law*

FIRST:   The name of the limited liability company is:

## GAWKER SALES, LLC

SECOND:   The county within this state in which the office of the limited liability company is to be located is:

**New York**

THIRD:   (Optional) The latest date on which the limited liability company is to dissolve is:

FOURTH:   The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The post office address within or without this state to which the Secretary of State shall mail a copy of any process against the limited liability company served upon him or her is:

## GAWKER SALES, LLC

**76 Crosby Street**
**New York, NY 10012**

FIFTH:   (Optional) The name and street address within this state of the registered agent of the limited liability company upon whom and at which process against the limited liability company can be served is:

SIXTH:   The effective date of the Articles of Organization is upon filing.

SEVENTH:   The limited liability company is to be managed by (check appropriate box):
- ☑ One or more members
- ☐ A class or classes of members
- ☐ One or more managers
- ☐ A class or classes of managers

IN WITNESS WHEREOF, this certificate has been subscribed on **January 8th, 2008** by the undersigned who affirms that the statements made herein are true under the penalties of perjury.

/S/ Gabrielle S. Darbyshire

Gabrielle S. Darbyshire - Organizer

080109000 828

# Articles of Organization

of

## GAWKER SALES, LLC

*(Under Section 203 of the Limited Liability Company Law)*

HUBCO #29
DRAWDOWN

2008 JAN -9 PM 2: 41

**Filer:**
Richard J. Girasole CPA PC
7522 13th Ave
Brooklyn, NY 11228

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED    JAN 09 2008
TAX $_____ $\emptyset$
BY: _____ ISW

2008 JAN -9 PM 12: 02
RECEIVED

918

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only

2603

**1 0 ^ 2 1 7 0 0**

Filed By: _____ KH

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
|---|---|
| Filing Period: | 01/2010 |

(Make checks payable to the Department of State)

## 3615290

Business Name:

GAWKER SALES, LLC

3615290

GAWKER SALES, LLC
76 CROSBY STREET
NEW YORK, NY 10012

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER SALES, LLC
76 CROSBY STREET
NEW YORK, NY 10012 | Name  Gawker Sales, LLC |
|---|---|
| | Address  210 Elizabeth, 4th Floor |
| | City  New York | State  NY | Zip  10012 |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature _____

Title of Signer (Please Print)  PRESIDENT

Name of Signer (Please Print)  NICHOLAS DENTON

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

100217002603

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement



For Internal Use Only

**12012500**

2b23

**3615290**

**Business Name:**

**GAWKER SALES, LLC**

3615290

GAWKER SALES, LLC
210 ELIZABETH
4TH FLOOR
NEW YORK, NY 10012

Filed By: _____

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
|---|---|
| Filing Period: | 01/2012 |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER SALES, LLC 210 ELIZABETH 4TH FLOOR NEW YORK, NY 10012 | Name | | |
|---|---|---|---|
| | Address | | |
| | City | State | Zip |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature

Title of Signer (Please Print)

GABY DARBYSHIRE
Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1298 (07/08)

120125002673

Case 15-01024-bbb    Document #268-2    Filed 09/22/43    Page 2 of 4    PageID #:269

# Rape Potpourri

By ELIE MYSTAL

We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together.

Yes, I said "tackle," because the first rape allegation is being hurled at my childhood hero, former New York Giants linebacker Lawrence Taylor. The New York Times reports:




> The former New York Giants linebacker Lawrence Taylor was arrested early Thursday morning and will be charged with third-degree rape involving a 15-year-old girl at a hotel in Montebello, N.Y., according to police.
>
> The Journal News reported that the victim was a runaway from the Bronx who was taken to the Holiday Inn in Montebello by a pimp, according to Ramapo supervisor Christopher St. Lawrence. She was treated at a hospital.

I think Breaking Media executive editor Matt Creamer said it best: "Somewhere, Joe Theismann is smiling."

The little boy inside of me (I'm referring to my inner child, not my lunch) can't believe that the man who revolutionized the linebacker position could rape a little girl. I'm locked into my childhood memories right now, because the part of me that is a rational adult is currently puking his guts out in the bathroom. A 15-year-old girl? If the allegations are true, one can only hope that LT experiences the business end of a true giant in the penitentiary.

Here at ATL, we're your one-stop shop for breaking rape coverage. We cover the rape allegations of the rich and famous, as well as any alleged attorney rapists near you…

Our next story from the files of the wanton and depraved is a little more in our wheelhouse. A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models.

So far, so good. I once pretended to be an Ostrich rancher from sub-Saharan Africa because I was trying to impress bubble gum princesses at a BU party. But Huon's potentially harmless lies allegedly turned dastardly, pretty quickly:

> The victim said she responded to a Craigslist ad posted by Huon in late June, seeking promotional models, sending her resume, her phone number and two pictures of herself…
>
> The two agreed to meet at the downtown St. Louis bar Paddy O's, the victim testified.
>
> But the next day, the victim was running late and called Huon. He told her to meet him at another bar, but when she got there, he told her the other promotional models left, and so he was going to interview her, the victim said.

0
Tweet
Submit
Share

And this, people, is why God invented Google. Had the victim Googled Huon, she would have found

> A Chicago attorney who was posing as a supervisor for a company that
> sets up promotions for alcohol sales at area bars was charged in Madison
> County July 2, with two counts of criminal sexual assault, two counts of
> criminal sexual abuse and one count of unlawful restraint.
>
> Meanith Huon, 38, of 3038 S Canal St. in Chicago, was arrested by the
> Chicago Police Department on July 1, and was transferred to Madison
> County the next day.

Or she might have come across this link, at Lawyer Gossip:

> Lawyer, Meanith Huon, 39, who was originally charged with criminal
> sexual assault, sexual abuse and unlawful restraint is now facing charges
> of harassment and cyber stalking!

Of course, women shouldn't have to assume that every guy they meet is a potential rapist. But
apparently there are a lot of depraved dudes walking around out there that are potential rapists.

In any event:

> Huon and the woman went to a couple of bars near Busch Stadium, then
> to a Laclede's Landing bar before Huon asked the victim if she wanted to
> go to Pop's in Sauget to meet the other models.
>
> The woman agreed, but told Huon she didn't have enough gas in her car,
> so she went with him, she said.

This is gonna end badly:

> As Huon's Honda Civic crossed the Poplar Street Bridge, the victim said
> Huon drove past the Sauget exit and continued north on Interstate 55. As
> the car was moving, Huon fondled the woman, then forced her to perform
> oral sex on him, the victim said.

Oh come on. If somebody was driving and tried to "force" me to perform oral sex on them, I'd just get
out of the stupid car. Which is to say, I'd do *exactly* what the victim did in this case:

> Huon exited Interstate 55 near New Douglas, looking, the victim said, for a
> secluded place to make out with her. The victim leaped from the moving
> car, she said, to escape Huon, leaving her cell phone, purse, shoes and
> identification in his car.
>
> "If he wasn't going to take me back to the freeway, I had made a decision
> to do anything I could to get out of that car," the victim testified.
>
> Assistant State's Attorney Chris Hoell showed pictures to the jury of the
> woman's bruised knees, skinned feet and cut toes.

Damn. If you can't get a woman to consensually stay in a moving vehicle, can you really get her to
consensually agree to sex (insofar as lying to her about your job and your intentions to get her into
the car counts as consensual in the first place)?

Obviously, Huon sees things differently:

> Mike Mettes, Huon's defense lawyer, said during his opening statement

> that Huon spoke with them again in the lobby, where the victim asked for
> $500 and threatened if Huon didn't pay her, she would "cry rape," the
> attorney argued.

So we're not denying that she hurled herself out of a moving vehicle, we're contending that she jumped out of the car to make it look like she was raped? Right, sure. That sounds like the definition of incredible.

It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.

> I, the undersigned, being of sound mind and hot body, do hereby consent
> to affixing my _____ to the other party's _____. Such amorous undulations
> include, but are not limited to, _____, _____, and _____, and all proposals
> will be considered so long as no animals (barnyard or otherwise) are
> involved.
>
> I claim no rights to future _____, _____, or _____, in exchange for this
> brief interruption in my chronic loneliness.
>
> **UPDATE**: Meanith Huon was acquitted of these charges. Please check
> here for our continuing coverage.
>
> While I may be quite intoxicated right now, I know damn well what I'm
> doing.

Lawrence Taylor Arrested After Rape Allegation [New York Times]
Testimony: Woman says she was raped by attorney posing as scout for models [Belleville News Democrat]

**Earlier**: Did You Know That the Real World Has an STD Waiver?

🗨 (107) Comments

Tags: Football, Rape, Sadness, Sex, Sports

A Legal Tabloid - News, Gossip, and Colorful Commentary on Law Firms and the le - Windows Internet Explorer

http://abovethelaw.com/cgi-bin/mt/mt-search.cgi?IncludeBlogs=12&search= meanith+huon

ove the Law - A Legal Tabloid - News, Gossip, ...

Web Search ▾    ⭐ Bookmarks ▾    📁 Settings ▾    ✉ Mail ▾    ⭐ My Yahoo! ▾    Answers ▾    🎮 Games ▾

# ABOVE THE LAW
A Legal Tabloid

HOME    HOT TOPICS
Big Law, Asia Chronicles, Bonuses, Bad Ideas, Law Schools, Roundtable, More

ARCHIVES    COMMUNITY    SUBSCRIBE    SEND TIPS

Keyword Search    Search

## Search Results

## Non-Sequiturs: 07.03.08

Thursday, July 3 2008, 3:40 PM - By Dana Lat

* The Top 100 Law and Lawyer Blogs (with pride of place going to ATL). [Criminal Justice Degrees Guide]

* Skadden: this home to the hotties also has a strong track record on diversity. [Conglomerate]

* Bruce Springsteen fans will appreciate Katrina Kuh's case for more judicial citation to the Boss. [PrawfsBlawg]

* Convicted tax fraudster Wesley: Snipes: has movie. will travel. [TaxProf Blog]

* Are we sure that Loyola 2L was a guy? [YouTube]

* Lawsuit of the Day: former Broward County Judge Jay Spechler sues Chief Judge Victor Tobin. [JAABlog]

* Lawyer of the Day: Meanith Huon. [Madison County Record]

📧 Recommend This   ✉ Email   🔗 Link To                    💬 (20) Comments

SUBSCRIBE
Enter your email address and start enjoying
Above The Law today!

Email:

Submit

ABOVE THE LAW

DOWNLOAD THE PDF AND GET VALUABLE
INSIGHT SUCH AS:
• How to enable legal, compliance, information
  security, forensics and IT
• Managing your eDiscovery & FRCP Regulations
• Information Governance: Managing Discovery

EXHIBIT B



# Terms of Use
## www.abovethelaw.com

Last Modified: January 17, 2011

**Acceptance of the Terms of Use**

Welcome to the website of Breaking Media, LLC ("Company", "we" or "us"). The following terms and conditions
(together with any documents referred to in them) ("Terms of Use") apply to your use of www.abovethelaw.com),
including any content, functionality and services offered on or through www.abovethelaw.com (the "Website"),
whether as a guest or a registered user.

Please read the Terms of Use carefully before you start to use the site. By using the Website or by clicking to



To use Facebook's social plugins, you must

Facebook social plugin

Follow @atlblog   34K followers

More subscription options . . . .

AWARD-
WINNING
iPad® APP

WestlawNext®

Access your research anytime, anywhere –
even offline – with our mobile apps.

KNOW THE DIFFERENCE »

Why switch to a
Concordance® solution?

# Terms of Use
## www.abovethelaw.com

Last Modified: January 17, 2011

**Acceptance of the Terms of Use**

Welcome to the website of Breaking Media, LLC ("Company", "we" or "us"). The following terms and conditions (together with any documents referred to in them) ("Terms of Use") apply to your use of www.abovethelaw.com], including any content, functionality and services offered on or through www.abovethelaw.com (the "Website"), whether as a guest or a registered user.

Please read the Terms of Use carefully before you start to use the site. By using the Website or by clicking to accept or agree to the Terms of Use when this option is made available to you], you accept and agree to abide by these Terms of Use and our Privacy Policy, found at www.abovethelaw.com/privacy-policy/ incorporated here by reference. If you do not want to agree to these Terms of Use or the Privacy Policy, you must exit the Website.

**Changes to the Terms of Use**

We may revise and update these Terms of Use from time to time in our sole discretion. You are expected to check this page from time to time to take notice of any changes we made, as they are binding on you. All material changes will apply prospectively only. Your continued use of the Website following the posting of revised Terms of Use means that you accept and agree to the changes.

**Accessing the Website and Account Security**

To use this Website, you represent and warrant that you are of legal age to form a binding contract with the



## Prohibited Uses

You may use the Website only for lawful purposes and in accordance with these Terms of Use. You agree not to use the Website:

- In any way that violates any applicable federal, state, local and international law or regulation (including, without limitation, any laws regarding the export of data or software to and from the US or other countries).

- For the purpose of exploiting, harming or attempting to exploit or harm minors in any way by exposing them to inappropriate content, asking for personally identifiable information or otherwise.

- To transmit, or procure the sending of, any advertising or promotional material without our prior written consent, including any "junk mail", "chain letter" or "spam" or any other similar solicitation.

- To impersonate or attempt to impersonate the Company or a Company employee, another user, or person or entity (including, without limitation, the use of e-mail addresses associated with any of the foregoing).

- To engage in any other conduct that restricts or inhibits anyone's use or enjoyment of the Website, or which, as determined by us, may harm the Company or users of the Website or expose them to liability.

Additionally, you agree not to:

- Use the Website in any manner that could disable, overburden, damage, or impair the site or interfere with any other party's use of the Website, including their ability to engage in real time activities through the Website.

- Use any robot, spider or other automatic device, process or means to access the Website.

- Use any manual process to monitor or copy any of the material on the Website or for any other unauthorized purpose without our prior written consent.

biglaw markets for US associates based in the US who are considering or seeking a lateral move or transfer to Asia.

The CBLA is having a seminar on Wednesday November 14 that deals with U.S. publicly traded Chinese companies going private. This is a very relevant topic in today's market, as there is currently a large pipeline of such public to private deals at Private Equity downstream practices of U.S. firms in Hong Kong / China. While the deal flow in the HK / China markets at U.S. firms has been significantly down over the past 15 months, Private Equity practices have been relatively busy, with M&A deals as usual, but also recently very busy with public to private deals. In fact, some of our firm clients in Hong Kong are currently seeking US associate lateral hires with such experience.

During Evan Jowers and Robert Kinney's most recent visit to Hong Kong, for a few weeks in September, they met with a number of US senior partners of top PE transactional practices and in each case the discussion included the significant pipeline of public to private deals (thought to be a two year pipeline). Part of these

with real case experience will discuss the topic with the audience. Please see the details below and register by November 9, 2012 if you would like to attend.

Wednesday, November 14

4:00 p.m. – 4:30 p.m. | Registration and Refreshments

4:30 p.m. – 6:15 p.m. | Panel Discussion

6:15 p.m. – 7:00 p.m. | Reception

**Panelists**

- Ted Farris, Partner – Dorsey & Whitney LLP
- Catherine X. Pan-Giordano, Partner – Dorsey & Whitney LLP
- Christy Shue, former Executive Vice President & Corporate Secretary, Harbin Electric, Inc.
- Dennis Galgano, Vice Chairman, Head of International Investment Banking – Morgan Joseph TriArtisan LLC
- Helen Cheng, Director – Houlihan Lokey
- Anthony Tomaro, CPA, Managing Director, UHY Advisors NY, Inc.

**Moderator**

- Geoffrey Sant, Special Counsel – Dorsey & Whitney LLP

## Monitoring and Enforcement; Termination

We have the right to:

- Remove or refuse to post any User Contributions for any reason in our sole discretion.

- Take any action with respect to any User Contribution that we deem necessary or appropriate in our sole discretion if we believe that such User Contribution violates the Terms of Use, including the Content Standards, infringes any intellectual property right, threatens the personal safety of users of the Website and the public or could create liability for the Company.

- Disclose your identity to any third party who claims that material posted by you violates their rights, including their intellectual property rights or their right to privacy.

- Take appropriate legal action, including without limitation, referral to law enforcement, for any illegal or unauthorized use of the Website.

- Terminate your access to all or part of the Website for any or no reason, including without limitation, any violation of these Terms of Use.

Without limiting the foregoing, we have the right to fully cooperate with any law enforcement authorities or court order requesting or directing us to disclose the identity of anyone posting any materials on or through the Website. YOU WAIVE AND HOLD HARMLESS THE COMPANY FROM ANY CLAIMS RESULTING FROM ANY ACTION TAKEN BY THE COMPANY DURING OR AS A RESULT OF ITS INVESTIGATIONS AND FROM ANY ACTIONS TAKEN AS A CONSEQUENCE OF INVESTIGATIONS BY EITHER THE COMPANY OR LAW ENFORCEMENT AUTHORITIES.

However, we can neither review all material before it is posted on the Website nor ensure prompt removal of objectionable material after it has been posted. Accordingly, we assume no liability for any action or inaction regarding transmissions, communications or content provided by any user or third parties. We have no liability or

Case: 1:11-cv-03054 Document #: 162-10 Filed: 11/15/12 Page 5 of 7 PageID #:1875

Without limiting the foregoing, we have the right to fully cooperate with any law enforcement authorities or court order requesting or directing us to disclose the identity of anyone posting any materials on or through the Website. YOU WAIVE AND HOLD HARMLESS THE COMPANY FROM ANY CLAIMS RESULTING FROM ANY ACTION TAKEN BY THE COMPANY DURING OR AS A RESULT OF ITS INVESTIGATIONS AND FROM ANY ACTIONS TAKEN AS A CONSEQUENCE OF INVESTIGATIONS BY EITHER THE COMPANY OR LAW ENFORCEMENT AUTHORITIES.

However, we can neither review all material before it is posted on the Website nor ensure prompt removal of objectionable material after it has been posted. Accordingly, we assume no liability for any action or inaction regarding transmissions, communications or content provided by any user or third parties. We have no liability or responsibility to anyone for performance or nonperformance of the activities described in this paragraph.

**Content Standards**

These content standards apply to any and all User Contributions and Interactive Services. User Contributions must in their entirety comply with all applicable federal, state, local and international laws and regulations. Without limiting the foregoing, User Contributions must not:

- Contain any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable.
- Promote sexually explicit or pornographic material, violence, or discrimination based on race, sex, religion, nationality, disability, sexual orientation or age.
- Infringe any patent, trademark, trade secret, copyright or other intellectual property rights of any other person.
- Violate the legal rights (including the rights of publicity and privacy) of others or contain any material

Corporate Secretary, Harbin Electric, Inc.

• Dennis Galgano, Vice Chairman, Head of International Investment Banking – Morgan Joseph TriArtisan LLC

• Helen Cheng, Director – Houlihan Lokey

• Anthony Tomaro, CPA, Managing Director, UHY Advisors NY, Inc.

**Moderator**

• Geoffrey Sant, Special Counsel – Dorsey & Whitney LLP

**Location**

New York University School of Law
Vanderbilt Hall, Classroom 220
40 Washington Square South
New York, NY 10012


Find out now. It's simple, it's free



Find out now.

It's simple,
it's free

Know the business profile
behind every click.

Learn More

bizo

New York University School of Law

Vanderbilt Hall, Classroom 220

40 Washington Square South

New York, NY 10012

## Popular Posts

1.  Departure Memo of the Day:
Parenting Gets The Best Of
One Biglaw Associate

responsibility to anyone for performance or nonperformance of the activities described in this paragraph.

## Content Standards

These content standards apply to any and all User Contributions and Interactive Services. User Contributions must in their entirety comply with all applicable federal, state, local and international laws and regulations. Without limiting the foregoing, User Contributions must not:

- Contain any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable.

- Promote sexually explicit or pornographic material, violence, or discrimination based on race, sex, religion, nationality, disability, sexual orientation or age.

- Infringe any patent, trademark, trade secret, copyright or other intellectual property rights of any other person.

- Violate the legal rights (including the rights of publicity and privacy) of others or contain any material that could give rise to any civil or criminal liability under applicable laws or regulations or that otherwise may be in conflict with these Terms of Use and our Privacy Policy www.abovethelaw.com/privacy-policy/

- Be likely to deceive any person.

- Promote any illegal activity, or advocate, promote or assist any unlawful act.

- Cause annoyance, inconvenience or needless anxiety or be likely to upset, embarrass, alarm or annoy any other person.

- Be used to impersonate any person, or to misrepresent your identity or affiliation with any person or organization.

- Involve commercial activities and/or sales without our prior written consent, such as contests, sweepstakes and other sales promotions, barter, advertising or pyramid schemes.

provided by you is accurate.

**Linking to the Website**

You may link to our homepage, provided you do so in a way that is fair and legal and does not damage our reputation or take advantage of it, but you must not establish a link in such a way as to suggest any form of association, approval or endorsement on our part where none exists.

You must not establish a link from any website that is not owned by you.

The Website must not be framed on any other site, nor may you create a link to any part of the Website other than the homepage.

The website from which you are linking must comply in all respects with the Content Standards set out in these Terms of Use.

You agree to cooperate with us in causing any unauthorized framing or linking immediately to cease. We reserve the right to withdraw linking permission without notice.

**Links from the Website**

If the Website contains links to other sites and resources provided by third parties, these links are provided for your convenience only. This includes links from advertisers, including banner advertisements. We have no control over the contents of those sites or resources, and accept no responsibility for them or for any loss or damage that may arise from your use of them. If you decide to access any of the third party websites linked to this Website, you do so entirely at your own risk and subject to the terms and conditions of use for such websites.

**Editorial Staff**

Managing Editor
David Lat

Editor
Elie Mystal

Assistant Editor
Staci Zaretsky

**How Can We Help You?**

Send tips to:
tips@abovethelaw.com

For tech issues email:
web@breakingmedia.com

For advertising or events email:
advertising@breakingmedia.com

For research or custom solutions email:
services@breakingmedia.com

Above the Law is published by Breaking Media. For a full list of our sites, services and staff visit breakingmedia.com






Case: 1:11-cv-03054 Document #: 162-11 Filed: 11/15/12 Page 1 of 1 PageID #:1878



Wei To Go (and Testify Against Dharun Ravi) « Above the Law: A Legal Tabloid - News and Colorful - Windows Internet Explorer

File   Edit   View   Favorites   Tools   Help

Favorites

LatherRinseRepeat   10 hours ago

Huon has a history

http://il.findacase.com/research

http://www.state.il.us/court/R

Looks like he's in for another a_ss kicking

Flag

helen micheal   9 hours ago

Wow. It's not often you read someone owning up to having attended Rutgers—let alone miss it

Like   Reply

Like   Reply

Contact Us

**Editorial Staff**

Managing Editor
David Lat

Editor
Elie Mystal

**How Can We Help You?**

Send tips to
tips@abovethelaw.com

For tech issues email
web@breakingmedia.com

For advertising or events email
advertising@breakingmedia.com

For research or custom solutions email
services@breakingmedia.com

Above the Law is published by Breaking Media
For a full list of our sites, services and staff visit
breakingmedia.com

EXHIBIT C

EXHIBIT D

# JEZEBEL

LAWSUITS

## Acquitted Rapist Sues Blog For Calling Him Serial Rapist

4,374 views, May 11, 2011 6:45 PM



By **Irin Carmon** —A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. If Meanith Huon gets his way, blogger sloppiness may cost ATL $50 million.

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and

MEANITH HUON

LATEST

Jezebel on Facebook

59,922 people like Jezebel.

NEWER STORIES

LAWSUITS   Acquitted Rapist Sues Blog For
Calling Him Serial Rapist



Case: 1:11-cv-03054 Document #: 162-13 Filed: 11/15/12 Page 1 of 1 PageID #:1880

http://jezebel.com/5800878/man-acqu...   Man Acquitted Of S... ×

Contact Irin Carmon:

COMMENT

DISCUSSIONS                                    FEATURED   ALL

Discussion now closed.

**SubvertAParadigm**

"Acquitted Rapist Sues Blog For Calling Him Serial Rapist"

11 May 2011 7:39 PM

WTF? Last time I checked, when a person is acquitted, he is legally not guilty. It doesn't matter if you like it or not - he went through the same processes that we're all subject to.

Edited by SubvertAParadigm at 05/11/11 7:39 PM

**Queenjulie** @SubvertAParadigm

If I were writing a blog post about a blog getting sued for multiple millions of dollars over incorrectly labeling a person a rapist, I would be pretty damn careful not to incorrectly label him a rapist myself. Apparently Jezebel feels differently.

ifes  @SubvertAParadigm  Agreed.

---

Carey Smears La Mer Moisturizer on the Asses of Her Twins

**DIRT BAG**    13,452
Keira Knightley's Breasts Discuss Anorexia, Feminism in *Allure*    441

**DUDE-BROS**    7,685
The Dude-Bro Spectrum

**TEXAS**    228
Texas Trying to Secede from Union, Austin Trying to Secede from Texas

**SQUEE**
Adorable Puppy Doesn't Want a Walk, Would Rather Stay In and Catch Some Zs

**2012 ELECTION**    355
There Are Too Many Lady Senators to Fit in the Bathroom at One Time

**FASHION NAZIS**    172
Coco Chanel Posed Naked for an

REUTERS    EDITION: U.S.

Register    Sign In

Search News & Quotes

Home    Business ▾    Markets ▾    World ▾    Politics ▾    Tech ▾    Opinion ▾    Breakingviews ▾    Money ▾    Life ▾    Pictures ▾    Video ▾

Investments | Insurance | Retirement

Learn more ›

Allianz (Ⓐ)

© Allianz SE 2012. Advisory services provided by investment advisers of Allianz Asset Management. Property & casualty insurance offered through Fireman's Fund Insurance Company. Life insurance and annuities issued by Allianz Life Insurance Company of North America, which is not licensed in New York State and does not solicit business there. In New York, annuities and life insurance issued by Allianz Life Insurance Company of New York. New York City. All are part of Allianz SE. Guarantees based on the financial strength and claims-paying ability of the issuing company.

Opinion                                                    » Analysis & Opinion Home

Felix Salmon

Follow Felix Salmon

Follow    RSS    ✉ Email    f Like    1.1k

## How Gawker wants to monetize comments

By Felix Salmon | MAY 22, 2012

✉ Email    🖨 Print    in Share    ✚1    🐦 Tweet    f Like   107

MEDIA

*Felix Salmon is the finance blogger at Reuters.*

ANY OPINIONS EXPRESSED HERE ARE THE AUTHOR'S OWN.

Case: 1:11-cv-03054 Document #: 162-14 Filed: 11/15/12 Page 2 of 4 PageID #:1882

# How Gawker wants to monetize comments

By Felix Salmon | MAY 22, 2012



✉ Email    🖨 Print    in Share    ✕ +1    💬 Tweet    f Like    107

**MEDIA**

Back in November, I grappled with the fact that online display ads in general, and banner ads in particular, are clearly not working very well; my suggested alternative was for brand advertisers to embrace the power of the external link. That was one suggestion; there are many, many more. But what they all have in common is that they're attempts to go beyond the ad, and to leverage the interactive power of the internet.

Over at Tumblr, David Karp is being characteristically vague about what he's offering to potential advertisers: all we know for the time being is that he "wants brands and marketers to use Tumblr as a way to tell stories that they can't otherwise tell on other social networks". Which sounds great, but doesn't even come close to answering the obvious first question, which is *how?*. I understand that the idea is to sell space on the right hand side of the screen, and that clicking on one of those units will take Tumblr users to the advertiser's tumblog. But this seems uncomfortably close to the idea that advertisers buy a banner ad and that clicking on that banner ad will take users to the advertiser's website. The tumblog itself might well tell a story — but then again, so might the advertiser's website. The difficult thing is getting users to click on things, especially when those things look like — and are clearly labeled as — ads.

Similarly, Facebook's revenue problems are based on much the same underlying issue: Facebook itself is highly interactive and immersive, but the ads you find there are not. And while there are one or two companies I will follow on Facebook, they're invariably companies which are



## Felix Salmon is the finance blogger at Reuters.

ANY OPINION EXPRESSED HERE ARE THE AUTHOR'S OWN.

**RECENT POSTS**

Counterparties: The tasks of the proletariat in the present recession

Why fuel-economy standards make sense

Charts of the day, mutual-fund outperformance edition

Counterparties: Unintended collateral

Similarly, Facebook's revenue problems are based on much the same underlying issue: Facebook itself is highly interactive and immersive, but the ads you find there are not. And while there are one or two companies I will follow on Facebook, they're invariably companies which are run by my friends. Facebook is a great place to keep up with what your friends are up to, but it still hasn't cracked the nut of working out how to make itself valuable to brand advertisers.

Now, Gawker Media's Nick Denton has a new idea:

In an internal memo on Thursday, Denton announced the formation of a new sales unit that will focus on helping advertisers and brands take part in the new commenting system...

According to the memo, Gawker is creating a new content unit within the sales department that will be headed by Ray Wert, formerly editor of the Gawker-owned automotive blog Jalopnik. This new unit will take over responsibility for all of Gawker's branded content functions, as well as marketing communications and events — and the purpose of the unit will be to promote the new Gawker discussion platform as a way for marketers and brands to engage with customers in an open forum. Says Denton:

> We all know the conventional wisdom: the days of the banner
> advertisement are numbered. In two years, our primary offering to
> marketers will be our discussion platform.

Last Friday, Denton gave me, along with a few other New York digital-media types, a preview of his new commenting system; yesterday, I had a pretty geeky conversation with Wert about how he intends to turn it into dollars.

Charts of the day, mutual-fund outperformance edition

Counterparties: Unintended collateral

How to protect New York from disaster

Can we have a TARP for jobs?

The necessity of a college education

Counterparties: Privatizing AIG

Poway: It's not too late to unwind

Counterparties: Obama's unemployment aphasia

**MORE REUTERS NEWS**

Both sides "dug in" as Chicago teachers strike drags on

Libya attack may have been planned and organized, U.S. officials say

Dutch PM Rutte wins election as pro-euro parties sweep

Obama vows to track down ambassador's killers, tightens security

Insight: Iran parks oil off Malaysia to dodge Western sanctions

**TAG CLOUD**

academe art autos banking Basel III bikes charts cities climate change commodities



Last Friday, Denton gave me, along with a few other New York digital-media types, a preview of his new commenting system; yesterday, I had a pretty geeky conversation with Wert about how he intends to turn it into dollars.

At Gawker, as at most other popular sites, the number of people reading the comments is vastly greater than the number of people writing them. But the way they're presented, they're not easy to read, there's far to many of them, and the signal-to-noise ratio tends to be extremely low.

So Gawker's new commenting system is based around threads, with the default view being the main, most interesting thread. It's possible to click through to other threads, and every thread — indeed, every comment — has its own unique URL; what's more, the person who starts a thread has quite a lot of control over which comments in that thread will get featured.

What that means is that if an advertiser buys a sponsored post — and sponsored posts have been part of Gawker's menu of offerings for some time now — then once the new commenting system is in place, the advertiser will have a reasonably large degree of control of the conversation that most people see in that post.

Denton's vision for Gawker Media's editorial product is very much moving towards comments and away from posts, and he reckons that advertisers will follow him in that direction if he blazes the trail. Expect Gawker's blog posts to get shorter, in future, and sometimes just be a headline, at least in the first instance, so that the conversation can get going before a pretty post can be put together. And if Denton's scheme goes according to plan, when you follow a link to a Gawker website, it will often — or maybe even usually — be a link to a comment, rather than to an original post. Eventually, it's possible to envisage a world where the distinction between the two is erased completely.

This is a very ambitious vision. Historically, Gawker has been pretty weak with respect to technological innovations, and so it's reasonable to take an I'll-believe-it-when-I-see-it approach

academe art autos **banking** Basel III
bikes **charts** cities climate change commodities
**counterparties** credit cards crime **davos**
default **economics** emerging markets
**employment** ETFs ethics **euro** Felix TV
governance **greece** **housing** imf
leadership M&A markets **media** munis
philanthropy private equity publishing
regulation risk **sovereign** **debt**
**stocks** **technocrats** technology trading
travel video **wine** world bank

## ARCHIVES

September 2012
August 2012
July 2012
June 2012
May 2012
April 2012
March 2012
February 2012
January 2012
December 2011



completely.

This is a very ambitious vision. Historically, Gawker has been pretty weak with respect to technological innovations, and so it's reasonable to take an I'll-believe-it-when-I-see-it approach any time that Nick Denton claims to have invented a revolutionary new technology. As Wert said to me, forums have been around on the internet since the 90s, and no one's managed to reinvent them yet. But a few companies like Reddit and Quora have pointed in interesting directions, and Wert was quite open about wanting to ape Reddit's AMA ("ask me anything") feature for his new advertorial conversations.

The idea is for these things to be more a PR/marketing product than a brand-advertising product. The idea is to get challenger brands, in particular, to take part: they tend to be very open and transparent about what they're up to, and they love the idea of engaging with the public as much as possible, if they can do so in a reasonably controlled environment. When that kind of a brand has some kind of news they want to share, doing so through a Gawker Media sponsored post will be a pretty effective way of getting the news out to a large number of people while at the same time sending the message that they're trying to be as transparent as possible and are happy to answer lots of questions in a friendly and conversational and open manner. The metric for success, says Wert, isn't going to be the number of pageviews they get; rather, it will be the amount of earned media they get — the degree to which other media outlets pick up on the initial announcement and the rest of the information that the company reveals in the comments section.

The conversation will probably only go on for a day or two, but after that the post — and all its associated comments — will live on in perpetuity, a much more open and accessible record of the announcement than any press release could be.

The problem here, for Denton — and the reason why he got an editorial guy to run this new project — is the old one: how to persuade his websites' readers to read the sponsored posts and

January 2012
December 2011
November 2011
October 2011
September 2011
August 2011
July 2011
June 2011
May 2011
April 2011
March 2011
February 2011
January 2011
December 2010
November 2010
October 2010
September 2010
August 2010
July 2010
June 2010
May 2010
April 2010
March 2010
February 2010

Case: 1:11-cv-03054 Document #: 162-15 Filed: 11/15/12 Page 2 of 3 PageID #:1886

The problem here, for Denton — and the reason why he got an editorial guy to run this new project — is the old one: how to persuade his websites' readers to read the sponsored posts and to engage in their comments sections. Wert's stated ambition — and you can hold him to this — is for his sponsored posts to be so well written and newsworthy and generally high quality that the editors of Gawker's websites will love to be able to feature them on their home pages. There have been very high-quality sponsored posts in the past, but Wert is going to have to work very hard, I think, to turn boring PR announcements into something of Gawker-level juiciness.

What's more, this move of Denton's is to a large degree a reversal of his stated aim back at the end of 2010, when he did his big network-wide redesign. Back then, I explained the departure of sales chief Chris Batty, now at Quartz, as being a function of the fact that Batty was a huge fan of the sponsored post, while Denton's redesign "essentially sacrifices the idea of having a sponsored post on the home page—something Batty was almost religious about—and replaces it with interstitial videos which aren't nearly as sharable, aren't extensible, and quite possibly won't even have permalinks." This move of Denton's, then, is a step backwards, in many ways, towards the Batty vision which he rejected two years ago.

Still, I do like the fact that Denton's constantly trying new things, constantly trying to reinvent what an online media company can and should be. Really ambitious brands, indeed, won't need Wert's help at all: they'll have the ability to dive straight into existing non-sponsored editorial posts and respond to commenters directly, much as they're already responding to people who talk about them on Twitter. But I suspect that the brands which do that will actually be more receptive, rather than less receptive, to Wert's sales pitch — they will already understand the power of conversation.

And in general, I like Denton's bigger idea of building a comments system designed more for the majority of readers who don't comment than it is for the minority of commenters themselves. I



April 2010
March 2010
February 2010
January 2010
December 2009
November 2009
October 2009
September 2009
August 2009
July 2009
June 2009
May 2009
April 2009
March 2009
June 2006

## RECENT POSTS

Counterparties: The tasks of the proletariat in the present recession

Why fuel-economy standards make sense

Charts of the day, mutual-fund outperformance edition

Counterparties: Unintended collateral

How to protect New York from disaster

Can we have a TARP for jobs?






conversation.

And in general, I like Denton's bigger idea of building a comments system designed more for the majority of readers who don't comment than it is for the minority of commenters themselves. I don't believe for a minute that the new system will attract the big-name commenters — Dov Charney, Brian Williams — that Denton really wants. But I do think that the new system will make very high-end comments threads much more common. And when those things do appear, they're wonderful.

I used to help run a site, back in the early days of the blogosphere, called MemeFirst. The posts were short; the comments threads were long, and generally very high quality. We didn't have much of a signal-to-noise problem, because very few people knew we existed. We were basically just a group of friends using the web as a discussion aid. But the fact is that even though there are many more readers than there are commenters, there are also many more commenters than there are posters. And collectively, those commenters are faster and funnier and more knowledgeable than the staff of any website.

Nick Denton wants to be the first publisher to develop the ability to effectively tap into that collective wisdom. And then, he wants to try to sell his new-found ability to advertisers. If — and only if — Denton can do the former, I suspect that Ray Wert has a decent shot of being able to do the latter.

**PREVIOUS POST**
**Comments**
MAY 22, 2012
8:05 PM UTC

**9 comments so far | 🔊 Comments RSS**

**NEXT POST**
**Comments RSS**

"Facebook's revenue problems are based on much the same underlying issue:

Facebook itself is highly interactive and immersive, but the ads you find there are not... it still hasn't cracked the nut of working out how to make itself valuable to brand advertisers."

**Counterparties: Unintended collateral**

How to protect New York from disaster

Can we have a TARP for jobs?

The necessity of a college education

**Counterparties: Privatizing AIG**

Poway: It's not too late to unwind

**Counterparties: Obama's unemployment aphasia**

Chart of the day, employment-status edition

Who is speaking for the poor?

**Counterparties: Draghi makes his move**

Chart of the day, party neighborhood edition

**Counterparties: Europe's shrinking money funds**





*to remain anonymous.*

## How do I get approved to comment?

We only approve the comments we love—so make sure you're adding something of quality to the post. Stay on-topic and seek to further the conversation. Leave us a juicy story on the #tips page or throw your hat into the ring of our open forums.

If we approve your comment, your username and password will be activated and you'll be able to login and comment freely from then on (or at least until you get banned).

## Do you have any tips for auditioning?

Leaving multiple high-quality comments on different threads with your newly created account increases your chances of getting approved.

Show your stuff—make your audition a worthy addition. "Firsts!", "yays" and "nays" will be summarily ignored. See Lifehacker's Guide To Weblog Comments for suggestions on how to begin.

We value intelligent contributions, respect for community etiquette, good grammar, and not feeding the trolls. Proper use of punctuation, capitalization and time taken in typing will earn you extra points. Ignoring any of the above will subtract considerably.

*Gawker's* The Comments We Love and the Comments We Hate



Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. His beef with Above The Law stems from a roundup post entitled "Rape Potpurri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to Forbes.

"And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far.

Lawyer Sues Legal Blog For $50 M Over Rape Story [Forbes]

Related: Rape Potpurri [ATL]

| DISCUSSION THREADS | Featured | All | Start a new thread |

**SarahMC**                                         11 May 2011 9:16 PM

Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would decide "not guilty" does not magically erase what he did—if he did, in fact, rape someone. The vast majority of rapists are never convicted of rape. Does that make them not rapists?

---

Pledge Saying Blacks Were Better Off During Slavery

11  Ann Coulter Calls Bill Maher A "Misogynist" To His Face

12  Same Sex Couples Required To Marry If They Want Partners To Receive Health Insurance

13  Jon Hamm Is Emotional, Very Emotional

14  Casey Anthony Juror Politely Slams Nancy Grace

15  The Arrested Development Movie Is Happening, People

16  TLC's Horrific Reenactment Of An Amniotic Sac Falling Out Of Woman

17  The Best Videos of the Week

18  10 Things You May Have Missed On TV This Week

19  Can Kate Middleton Bring Back

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

File   Edit   View   Favorites   Tools   Help

Favorites

M Gmail - Huon v. Jezebel - ...    Man Acquitted Of Sexu... ×

EXHIBIT F

**Pär Larsson**

It was the unmentionables, wasn't it?

**zegota**

Well, you *did* mention them.

**BettyCrockerPunkRock...**

I find that comment to be sub-Par.

Hide 6 replies

Show promoted discussions only

GAWKER  DEADSPIN  KOTAKU  JEZEBEL  io9  deadspin  GIZMODO  lifehacker

About   Masthead   Forums   Jobs   Legal   Privacy   Permissions   Advertising   Subscribe   Send a tip



Case: 1:11-cv-03054 Document #: 162-16 Filed: 11/15/12 Page 4 of 4 PageID #:1891

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com

File   Edit   View   Favorites   Tools   Help

Favorites

M Gmail - Huon v. Jezebel - ...   | Man Acquitted Of Sexu...

EXHIBIT F

**DISCUSSION THREADS    Featured    All    Start a new thread**

**Dinosaurs and Nachos, girlfriend!**                          Thu 12 May 2011 10:39 AM

Here's a funny thought.

Truth is an absolute defense to a defamation claim, right? So if this guy sues Above the Law for
defamation, Above the Law sort of gets the chance to re-try the rape case. Granted, there is not
much defense for implying that one charge was actually three, so I think they are screwed there.

But if this guy sues them for defamation because they called him a rapist, Above the Law can try
to show (in civil court, with a lower burden of proof) that he actually did commit the rape. The fact
that he was later acquitted may make it harder, but not necessarily impossible.

**SorciaMacnasty: Hearts back plz. for the love...**                  Thu 12 May 2011 10:13 AM

Nevermind "serial rapist," he sounds like a foreal crazy person.

**deafblindmute**   promoted by Donoowunologuic                  Thu 12 May 2011 6:04 AM

According to the link under "strength" he traveled to another city, used a false name, and then

Wages On

**WATCH**    Lindsay Lohan Hops On The
           'Sexy Vampire' Bandwagon
           [NSFW]

**STUDY**    Braiding Hair Fills Men With
           Rage

**IN BRIEF**   Levi Johnston's Book Cover Is
            Basically Perfect

**I DO**     The Navy Won't Perform Same-
           Sex Marriages After All

**MOURNING**  A Family Comes Together In Joy
            And Grieving

**SNAP**     Happy Hump Day!

**JUDGMENT**

**FASHION**   Trio Behind Fake George Clooney
            Fashion Line Sentenced To Jail

**MIDWEEK**   This Week In Tabloids: Random



GAWKER MEDIA

TERMS OF USE    PRIVACY POLICY    CONTEST RULES    PERMISSIONS

ABOUT    OUR TITLES    OUR WORK    OUR PRODUCTS    CONTACT

The Terms of Use covers all of the Gawker Media sites ("GM Sites") and any associated content, including, but not limited to, email and RSS feeds. Please read this statement carefully before proceeding to access any of the GM Sites or Gawker Media content. Your use of the GM Sites indicates your agreement to abide by the Terms of Use in effect.

**1. Use of Content** – Gawker Media is pleased to make its original content available under a Creative Commons Attribution Non-Commercial License, for non-commercial reproduction with credit to the source site. This license permits anyone to do the following with original Gawker Media content, in any medium:

a. To reproduce, remix, or otherwise alter original Gawker Media site material so long as the logo is displayed and credit is given. This includes, specifically, permission:

i. to reproduce quotes

ii. to reproduce screenshots of any page of a Gawker Media site

iii. to include original Gawker Media material in mash-ups, mixes, parodies, caricatures, etc… for movies, TV, print, or online

**7. Comments** – The comments sections on GM Sites are accessible to users by invitation only (such invitations coming either from Gawker Media editors directly or by referral from existing comment users). Gawker Media's comment user registration system has been designed so that, if the user so chooses, they can remain completely anonymous, even to us. Gawker Media will not accept responsibility for information posted in the Comments. In order to make our comments useful and interesting, the following guidelines have been established for comment users:

a. Do not post threatening, harassing, defamatory, or libelous material.

b. Do not intentionally make false or misleading statements.

c. Do not offer to sell or buy any product or service.

d. Do not post material that infringes copyright or any other intellectual property interest.

e. Do not post information that you know to be confidential or sensitive or otherwise in breach of the law.

f. Keep all comments relevant to the particular GM Site where the comment is being posted.

Please note that once you post a comment to one of our sites, it becomes part of the public conversation. Our policy is that we will not remove a user's comments unless we deem them to be in violation of our Terms of Use. So if you want to say something that you will later regret personally, it is advisable that you use a username that does not identify you. We cannot remove your comments simply because you have a change of heart about making them.

Additionally, it is our policy not to delete comment accounts. Gawker Media, however, reserves the right to remove comments and comment accounts entirely at its discretion, including for alleged violations of Terms of Use or legal rights.

Gawker Media is not responsible for the content of user comments. If a third party complains that your comment violates our Terms of Use or their rights, we will invite them to respond in the comments themselves. If they pursue the complaint, we will make reasonable efforts to contact you by the means you have provided us, to alert you to the situation. We will protect your contact information as described in our Privacy Policy, but may be compelled to turn it over pursuant to legal process.

**8. Image and Video Terms of Use** – Gawker Media sites typically display images, audio, and video (the "Material") as part of blog posts written by our editors. The types of Material editors are authorized to use on Gawker Media sites include



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 1 of 18 PageID #:1894

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu... ×    New Tab

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the difference between what they are and what they can be identified as in public. You can think he's a rapist to your hearts content, but you can't print it.

**taylvie3**

No, but someone found not guilty is innocent in the eyes of the law. Calling them differently on a blog opens you up to a libel suit. Truth would be a defense in a libel suit, but that would mean retrying a criminal case in a civil libel lawsuit to prevent paying $50M.

**SarahMC**

I understand that, but many people here are saying if a jury doesn't find a person guilty of something, it means they didn't do it, which is not true. For instance, Nick1693 above you just said if he's a rapist the facts will show it—which again, is not true. The facts might very well show it, but because the woman went out to get drunk, those facts are dismissed. I am not confused about what can and cannot be printed. I am confused by the view that if the courts don't convict someone, s/he must not have done it.

4:00 PM

**FASHION**   Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

**MIDWEEK**   This Week In Tabloids: Random
**MADNESS**   Chick Claims She Miscarried

23,386    Matt Bellamy's Fetus

**IN BRIEF**   Indiana Judge Lets Planned
Parenthood Defunding Stand

MORE STORIES



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File    Edit    View    Favorites    Tools    Help

Favorites

Man Acquitted Of Sexu... ×    New Tab

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File    Edit    View    Favorites    Tools    Help

Favorites

Man Acquitted Of Sexu... ×    New Tab

**Dinosaurs and Nachos, girlfriend!**

Innocent until proven guilty is a widely misunderstood concept. It basically means that the mere fact that someone is charged with a crime is not itself evidence that the person committed a crime.

Then you go to court. In court, there will be evidence presented. This evidence is where an actual, legal determination is made. Nobody is declared "innocent" in a court of law, they are found guilty or not guilty.

"Not guilty" is absolutely not the same thing as "innocent" from a legal standpoint. Those words

about what can and cannot be printed. I am confused by the view that if the courts don't convict someone, s/he must not have done it.

**FASHION**    Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 3 of 18 PageID #:1896

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

huon jezebel     Google

Favorites

Man Acquitted Of Sexu...

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

---

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist.

File   Edit   View   Favorites   Tools   Help

huon jezebel     Google

Favorites

Man Acquitted Of Sexu...     New Tab

DISCUSSION THREADS   Featured   **All**   Start a new thread

**Dinosaurs and Nachos, girlfriend!**          Thu 12 May 2011 10:39 AM

Here's a funny thought.

Truth is an absolute defense to a defamation claim, right? So if this guy sues Above the Law for defamation, Above the Law sort of gets the chance to re-try the rape case. Granted, there is not much defense for implying that one charge was actually three, so I think they are screwed there.

But if this guy sues them for defamation because they called him a rapist, Above the Law can try to show (in civil court, with a lower burden of proof) that he actually did commit the rape. The fact

---

4:00 PM

**FASHION**   Trio Behind Fake George Clooney Fashion Line Sentenced To Jail

Toilet Paper's Eternal Debate Wages On

**WATCH**   Lindsay Lohan Hops On The "Sexy Vampire" Bandwagon [NSFW]
11,508

**STUDY**   Braiding Hair Fills Men With Rage
5:00 PM
18,722

**IN BRIEF**   Levi Johnston's Book Cover Is Basically Perfect
15,513

**I DO**   The Navy Won't Perform Same-Sex Marriages After All



**BringeroftheLPain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

deafblindmute   promoted by Donovanesque                    Thu 12 May 2011 6:04 AM

According to the link under "strength" he traveled to another city, used a false name, and then pretended to be a representative of a liquor company and advertised a job for a model. Now, that doesn't mean that he did/didn't rape her, but it is a goddamn shady way to start off an evening. He must have had some damn good lawyers to push that out of the jury's mind.

My big question is, if she tried to run from him that night and he acknowledges that they were together and there was some sexual interaction going on, what was his defense? I don't care how drunk you are, in the middle of a wanted sexual encounter you don't jump out of a moving car and run through a cornfield barefoot (fun fact: the bristly hair on corn leaves feel like thousands of needles when you run through it). I mean, it's sort of his word against hers for what was happening in the car, but we know that a third person saw her after she ran from him.

FASHION   Trio Behind Fake George Clooney Fashion Line Sentenced To Jail

4:00 PM

FASHION   Trio Behind Fake George Clooney Fashion Line Sentenced To Jail

MIDWEEK MADNESS   This Week In Tabloids: Random Chick Claims She Miscarried Matt Bellamy's Fetus

23,386

IN BRIEF   Indiana Judge Lets Planned Parenthood Defunding Stand

MORE STORIES



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 5 of 18 PageID #:1898

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu...

BringerofthePain

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

---

**FASHION**    Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

4:00 PM

---

deafblindmute   promoted by Donovanesque                    Thu 12 May 2011 6:04 AM

According to the link under "strength" he traveled to another city, used a false name, and then
pretended to be a representative of a liquor company and advertised a job for a model. Now, that
doesn't mean that he did/didn't rape her, but it is a goddamn shady way to start off an evening.
He must have had some damn good lawyers to push that out of the jury's mind.

My big question is, if she tried to run from him that night and he acknowledges that they were
together and there was some sexual interaction going on, what was his defense? I don't care how
drunk you are, in the middle of a wanted sexual encounter you don't jump out of a moving car
and run through a cornfield barefoot (fun fact: the bristly hair on corn leaves feel like thousands
of needles when you run through it). I mean, it's sort of his word against hers for what was
happening in the car, but we know that a third person saw her after she ran from him.

---

**FASHION**       Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

**MIDWEEK**       This Week In Tabloids: Random
**MADNESS**       Chick Claims She Miscarried
23,386♦           Matt Bellamy's Fetus

**IN BRIEF**      Indiana Judge Lets Planned
Parenthood Defunding Stand

MORE STORIES



Man Acquitted Of Sexual Assault Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

**FASHION** Trio Behind Fake George Clooney Fashion Line Sentenced To Jail

4:00 PM

Any more legally knowledgeable people know how a jury is supposed to treat this type of evidence? Does the fact that its word vs. word in the car disqualify her claims to being assaulted even though she ran away from him and said she was assaulted that night? How can any sexual assault case be tried if that counts as reasonable doubt?

Arg this is more perplexing the more I think about it. Everything points to rape (his shady actions and lies earlier in the night; her running from him to a stranger), but there is no conclusive evidence I have heard speak of that proves he did/didn't do it.

God, it's almost as if our legal system is imperfect or something :/

**CassandraSays**

Thu 12 May 2011 3:36 AM



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 7 of 18 PageID #:1900
http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu... ×

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

---

FASHION   Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

4:00 PM

---

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu... ×

Any more legally knowledgeable people know how a jury is supposed to treat this type of evidence? Does the fact that its word vs. word in the car disqualify her claims to being assaulted even though she ran away from him and said she was assaulted that night? How can any sexual assault case be tried if that counts as reasonable doubt?

Arg this is more perplexing the more I think about it. Everything points to rape (his shady actions and lies earlier in the night; her running from him to a stranger), but there is no conclusive evidence I have heard speak of that proves he did/didn't do it.

God, it's almost as if our legal system is imperfect or something :/

**CassandraSays**

Thu 12 May 2011 3:36 AM



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu... ×    New Tab

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

**FASHION**   Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

4:00 PM

**JadeSays**

Weird. I didn't know "where do I go to have fun" meant the same thing as "where do I go to get raped." It's great that that jury made that clear to me, otherwise I could get myself in some sticky situations like apparently accidentally begging to be raped. AWE. SOME.

Wed 11 May 2011 10:20 PM

Edited by JadeSays at 05/11/11 10:21 PM

**rachel723**   promoted by SorciaMacnasty: He...

you know it's women like you who don't understand the rules that make the rest of us ladies look bad.

i'm glad you learned before you actually got raped not to complain now if you do, you were asking for it!!



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 9 of 18 PageID #:1902

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File    Edit    View    Favorites    Tools    Help

Favorites

Man Acquitted Of Sexu...    New Tab

4:00 PM

**FASHION**    Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File    Edit    View    Favorites    Tools    Help

Favorites

Man Acquitted Of Sexu...    New Tab

**SorciaMacnasty:** Hearts back plz, for the love...

Clearly, you need to spend more time learning the lingo, grrl.

**Hide 2 replies**

**SarahMC**                    Wed 11 May 2011 9:16 PM

Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would
decide "not guilty" does not magically erase what he did–if he did, in fact, rape someone. The vast
majority of rapists are never convicted of rape. Does that make them not rapists?

**Nicki693**

@SarahMC: No, but our legal system makes it so that someone is innocent until proven guilty.



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 10 of 18 PageID #:1903

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

FASHION    Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

4:00 PM

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

**SorciaMacnasty**: Hearts back plz, for the love...

Clearly, you need to spend more time learning the lingo, grrl.

**Hide 2 replies**

**SarahMC**            Wed 11 May 2011 9:16 PM

Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would decide "not guilty" does not magically erase what he did–if he did, in fact, rape someone. The vast majority of rapists are never convicted of rape. Does that make them not rapists?

**Nicki693**

@SarahMC: No, but our legal system makes it so that someone is innocent until proven guilty.



**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

FASHION   Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

4:00 PM

**SarahMC**

I understand that, but many people here are saying if a jury doesn't find a person guilty of something, it means they didn't do it, which is not true. For instance, Nick1693 above you just said if he's a rapist the facts will show it—which again, is not true. The facts might very well show it, but because the woman went out to get drunk, those facts are dismissed. I am not confused about what can and cannot be printed. I am confused by the view that if the courts don't convict someone, s/he must not have done it.

**Dinosaurs and Nachos, girlfriend!**

Innocent until proven guilty is a widely misunderstood concept. It basically means that the mere fact that someone is charged with a crime is not itself evidence that the person committed a crime.



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 12 of 18 PageID #:1905

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Google          huon jezebel

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

FASHION   Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

4:00 PM

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Google          huon jezebel

**SarahMC**

I understand that, but many people here are saying if a jury doesn't find a person guilty of something, it means they didn't do it, which is not true. For instance, Nick1693 above you just said if he's a rapist the facts will show it—which again, is not true. The facts might very well show it, but because the woman went out to get drunk, those facts are dismissed. I am not confused about what can and cannot be printed. I am confused by the view that if the courts don't convict someone, s/he must not have done it.

**Dinosaurs and Nachos, girlfriend!**

Innocent until proven guilty is a widely misunderstood concept. It basically means that the mere fact that someone is charged with a crime is not itself evidence that the person committed a crime.



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File    Edit    View    Favorites    Tools    Help

Favorites

Man Acquitted Of Sexu... ×    New Tab

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

found guilty or not guilty.

"Not guilty" is absolutely not the same thing as "innocent" from a legal standpoint. Those words do not mean the same thing in the world of law. "Innocent until proven guilty" is merely a concept for laymen to try to keep their non-lawyer brains from jumping to (non-legal) conclusions.

**Hide 5 replies**

**vikkitikkitavi**

**Wed 11 May 2011 9:09 PM**

She jumped out of a moving car, leaving her shoes and purse behind and ran barefoot through a cornfield and pounded on a stranger's door to help her?

Fuck this "he's been acquitted" noise. He's a rapist alright, so we may as well call him one

**FASHION**    Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu...    New Tab

Google

huon jezebel

4:00 PM

**FASHION**   Trio Behind Fake George Clooney
Fashion Line Sentenced To Jail

**BringerofthePain**

No, but it does mean that you can't *call* them rapists without being sued. It's merely the

---

Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu...    New Tab

Google

huon jezebel

**Wed 11 May 2011 9:09 PM**

**vikkitikkitavi**

She jumped out of a moving car, leaving her shoes and purse behind and ran barefoot through a
cornfield and pounded on a stranger's door to help her?

Fuck this "he's been acquitted" noise. He's a rapist alright, so we may as well call him one.

**smartgal**   promoted by femme-bot

A jury of his peers acquitted him of the crime. I suppose you have facts that weren't presented to
the jury?

**femme-bot**

The justice system sure sounds flawless

**messybessy**

Word. It's not like juries of peers acquit 95% of rape cases. Juries of peers exist in a vacuum where their judgement is in no way hindered by social misconceptions. That's why our legal system is like flawless.

**Hide 4 replies**                                             Wed 11 May 2011 8:35 PM

the.schwartz.is.not.with.me.    promoted by J...

Excuse me, but can we not call this guy an "acquitted rapist"? He was acquitted, so he's not guilty. He is not a rapist, end of story. He is a man acquitted of rape, but he is most definitely not a rapist, modifying adjective or not.

**JadeSays**

Eh, redacted. Nevermind!

Edited by JadeSays at 05/11/11 10:24 PM

**Hide 1 reply**

**lavenderstain**                                             Wed 11 May 2011 7:58 PM

**lavenderstain**

Wed 11 May 2011 7:58 PM

you know, i really dislike this man as much as the next (maybe even more given that he tarnishes the repute of my profession) BUT he WAS acquitted, meaning you could have at least used "Alleged" before the rapist acquitted. if anyone deserves to be sued for defamation...

Hide 1 reply

**SubvertAParadigm**

Wed 11 May 2011 7:39 PM

"Acquitted Rapist Sues Blog For Calling Him Serial Rapist"

WTF? Last time I checked, when a person is acquitted, he is legally not guilty. It doesn't matter if you like it or not - he went through the same processes that we're all subject to.

Edited by SubvertAParadigm at 05/11/11 7:39 PM

**Queenjulie**

If I were writing a blog post about a blog getting sued for multiple millions of dollars over incorrectly labeling a person a rapist, I would be pretty damn careful not to incorrectly label him a rapist myself. Apparently Jezebel feels differently.

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 17 of 18 PageID #:1910

Edited by SubvertAParadigm at 05/11 7:39 PM

**Queenjulie**

If I were writing a blog post about a blog getting sued for multiple millions of dollars over incorrectly labeling a person a rapist, I would be pretty damn careful not to incorrectly label him a rapist myself. Apparently Jezebel feels differently.

**Andrew_in_Seattle**  promoted by pleasanl\y...

Yeah, incredibly inept headline writing.

**doublylinkedlists**  promoted by SubvertAPar...

I really have to object to your statement "the same processes that we're all subject to" in regards to our justice system. Different types of people are subjected to RADICALLY different processes depending on many categories including race, gender, sexuality, ability, age and nationality. We do not have a fair justice system that is neutral in all cases. We have a racist and sexist justice system that ignores issues of difference, perpetuates discrimination, and calls it "neutrality".

**SubvertAParadigm**



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

Case: 1:11-cv-03054 Document #: 162-18 Filed: 11/15/12 Page 18 of 18 PageID #:1911

File   Edit   View   Favorites   Tools   Help

Favorites

Man Acquitted Of Sexu...   ×   New Tab

**SubvertAParadigm**

You can object to the minutiae of the statement all you want. The truth is, justice is a public value and therefore all justice systems are unfair and will never be truly fair to x, y, or z. It doesn't change the fact that legally if you are going to write a blog about someone who wrote a blog and is being sued for libel, you shouldn't actually write false statements in the title. That is a lie, and that is just another perpetuation of prejudices based on a system of "guilty until proven innocent," which is just as unfair. The guy was acquitted and whether or not we believe that is true is irrelevant to the material fact that he is currently, legally exonerated.

Edited by SubvertAParadigm at 05/12/11 6:20 AM

**doublylinkedlists**   promoted by SubvertAPar...

What you call "minutiae" are actually the reasons why so many mentally challenged people are put to death, and why so many rapists walk free, and why so many nonviolent offenders are in prisons, and why so many prisons are terrible terrifying environments, and why rich people don't serve the same sentences are poor ones, and a million other things.

You want to sit there and talk about "legal this" and "legal that" as if there's some sort of "law" separate from what actually happens in the real world, and that this separate "law" is more relevant than observations about who is really subject to violence from the state and who isn't

**doublylinkedlists**   promoted by SubvertAPar...

What you call "minutiae" are actually the reasons why so many mentally challenged people are put to death, and why so many rapists walk free, and why so many nonviolent offenders are in prisons, and why so many prisons are terrible terrifying environments, and why rich people don't serve the same sentences are poor ones, and a million other things.

You want to sit there and talk about "legal this" and "legal that" as if there's some sort of "law" separate from what actually happens in the real world, and that this separate "law" is more relevant than observations about who is really subject to violence from the state and who isn't.

I say that any discussion of "the law" and what's "legal" is incomplete when we pretend that we can talk about it "neutrally" (ie: from a white male perspective). And I say that referring to this important critical legal discourse as "minutiae" completely misses the point of having a justice system.

Otherwise, we just have another system where the "neutral" rich white male view of the world dominates, and other experiences are marginalized.

SubvertAParadigm

dominates, and other experiences are marginalized.

**SubvertAParadigm**

Oh please, you really have an agenda that is dealing with something completely beyond the realm of the story at hand. This isn't about who gets a fair trial and who doesn't. We all get the social injustices that happen to people for various reasons in the legal system. This isn't news to anyone here. It's like you didn't even read my reply. I'm not invalidating what you're saying, but in the realm of *what I was actually talking about versus what you decided to rant about they are two completely different things.* It is completely irrelevant whether or not the guy, according to popular opinion, raped someone. He was acquitted, and now he's suing a blog for misrepresenting him...WHILE BEING MISREPRESENTED ON THE BLOG THAT'S EXPLAINING THE STORY. Spare me the sociological context of law, because I already understand it. It doesn't change what's actually happening at this exact juncture.

Edited by SubvertAParadigm at 05/12/11 5:53 PM

**doublylinkedlists**   promoted by SubvertAPar...

It's obviously relevant because you don't give any reason other than "X is illegal. You shouldn't do X" as why Jezebel shouldn't have published the title the way they did. Maybe they didn't give a fuck. Maybe their lawyers told them they would get away with it. Maybe they realized the risks

Case: 1:11-cv-03054 Document #: 162-19 Filed: 11/15/12 Page 3 of 11 PageID #:1914

### SubvertAParadigm

Obviously none of that reasoning is true though for Jezebel, because the title of the article was changed by this afternoon. I honestly have no faith in our justice system whatsoever, frankly. It doesn't mean we aren't all subject to the same set of rules, old dead rich white guy rules, shitty as that may be. It's not that I think you shouldn't do X because X is illegal. It's that X will get you sued because X is technically false by the laws exist to protect the not guilty people from being defamed. If it were legal to just slander everyone and anyone based on what we assumed was the just vs the actual outcome for a case, witch hunts would ensue and innocent people would also be targeted.

Edited by SubvertAParadigm at 05/12/11 9:04 PM

**Hide 8 replies**

### thePrototype

Wed 11 May 2011 7:28 PM

I know someone that is prepping his libel case. His criminal case has not yet started, but he has a tort lawyer on speed dial, and from the sounds of it his case might get dropped before it gets to a judge.

Edited by thePrototype at 05/11/11 7:29 PM

### tomsomething

Wed 11 May 2011 7:28 PM

**SubvertAParadigm**

Obviously none of that reasoning is true though for Jezebel, because the title of the article was changed by this afternoon. I honestly have no faith in our justice system whatsoever, frankly. It doesn't mean we aren't all subject to the same set of rules, old dead rich white guy rules, shitty as that may be. It's not that I think you shouldn't do X because X is illegal. It's that X will get you sued because X is technically false by the laws exist to protect the not guilty people from being defamed. If it were legal to just slander everyone and anyone based on what we assumed was the just vs the actual outcome for a case, witch hunts would ensue and innocent people would also be targeted.

Edited by SubvertAParadigm at 05/12/11 9:04 PM

**Hide 8 replies**

**thePrototype**                                                    Wed 11 May 2011 7:28 PM

I know someone that is prepping his libel case. His criminal case has not yet started, but he has a tort lawyer on speed dial, and from the sounds of it his case might get dropped before it gets to a judge.

Edited by thePrototype at 05/11/11 7:29 PM

**tomsomething**                                                    Wed 11 May 2011 7:28 PM

Case: 1:11-cv-03054 Document #: 162-19 Filed: 11/15/12 Page 5 of 11 PageID #:1916



judge.

Edited by thePrototype at 05/11/11 7:29 PM

**tomsomething**

Wed 11 May 2011 7:28 PM

I know you're going to get a million comments like hits, but the phrase "acquitted rapist" probably won't fly for a person who has already demonstrated his letigiousitousnicity.

Edited by tomsomething at 05/11/11 7:29 PM

**mohamedzv2001**

Wed 11 May 2011 7:22 PM

So now to Jezebel, even if someone was acquitted, they're still a rapist, because ya know, an accusation is 100% true 100% of the time.

**HeartRateRapid**    promoted by onestravplz

Yea, all those crazy bitches going to the cops and lying about being raped. Except that false reports for stolen cars are more common. False rape reports make up less than 3% of all reported rapes, and as I'm sure you know, it horrendously underreported.

I'm also uncomfortable with the way the article was titled, but please don't bring in the rape apology bingo by relying on the old idea that most women lie about it.



**HeartRateRapid**   promoted by onestrawplz

Yea, all those crazy bitches going to the cops and lying about being raped. Except that false reports for stolen cars are more common. False rape reports make up less than 3% of all reported rapes, and as I'm sure you know, it horrendously underreported.

I'm also uncomfortable with the way the article was titled, but please don't bring in the rape apology bingo by relying on the old idea that most women lie about it.

**zegota**

Regardless of the statistics, calling someone an "acquitted [thing they were acquitted for]" is kind of stupid. Unless it's OJ, cause fuck him.

**mohamedzv2001**

I don't see where I said, "Oh derr, everyone crying rape is lying". What I said is not all rape accusations are true, and you know what, THAT'S KIND OF TRUE.

And really, you assumed that I was saying that most women lie about it, I said no such thing.

I don't see where I said, "Oh derr, everyone crying rape is lying". What I said is not all rape accusations are true, and you know what, THAT'S KIND OF TRUE.

And really, you assumed that I was saying that most women lie about it, I said no such thing.



**HeartRateRapid**   promoted by onestrawplz

You didn't have to bring up false accusations of rape at all, as it has nothing to do with the story. This guy was acquitted but obviously there was a strong enough case to bring it to trial. Most rape cases don't go anywhere, partially because of the perception that women lie and make false accusations. Or that they have 'buyer's remorse' which seems to be part of what happened in this case. A bartender said she was smiling and drinking? Clearly that means consent for everything.

I'm just sick of reading variations of "ya know, an accusation is 100% true 100% of the time" every time I read an article with the word rape in it.

Edited by HeartRateRapid at 05/11/11 7:52 PM

**HeartRateRapid**   promoted by onestrawplz

Yea, I'm not okay with that either, I just don't see how "well sometimes women lie about being raped" really adds anything.



**HeartRateRapid**  promoted by onestrawplz

Yea, I'm not okay with that either, I just don't see how "well sometimes women lie about being raped" really adds anything.

**Hide 5 replies**

**AndPreciousLittleofT...**                                          Wed 11 May 2011 7:11 PM

Running terrified and barefoot through a cornfield doesn't fit my definition of a place "to go to have fun."

ED: Two seconds of proper Googling will get you to Mr. Huon's firm webpage, complete with his phone number, should you want to call and offer any critiques.

Edited by AndPreciousLittleofThat at 05/11/11 7:14 PM

**cool_as_KimDeal**                                                Wed 11 May 2011 7:08 PM

Well shit! I didn't know kicking back at a bar and asking where I should go to have fun meant that I hereby consent to any and all sexual activity, with anybody, with this bartender here as my witness. Can I sign away my right to consent here on my bar tab? Okay, great.



phone number, should you want to call and offer any critiques.

Edited by AndPreciousLittleofThat at 05/11/11 7:14 PM

**cool_as_KimDeal**                                                    Wed 11 May 2011 7:08 PM

Well shit! I didn't know kicking back at a bar and asking where I should go to have fun meant that I hereby consent to any and all sexual activity, with anybody, with this bartender here as my witness. Can I sign away my right to consent here on my bar tab? Okay, great.

**taylvie3**

Don't forget to tip at least 20% for the waiver.

Hide 1 reply

**zegota**  promoted by Rooo sez BISH PLZ                              Wed 11 May 2011 7:03 PM

"Acquitted Rapist"

Um, is my understanding off, or is this man not (legally) a rapist? It seems calling him an "acquitted rapist" paints a target on Jezebel's back. Might wanna change that heading.



Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

http://jezebel.com/5800878/acquitted-rapist-sues-blog-for-calling-him-serial-rapist

File    Edit    View    Favorites    Tools    Help

Favorites        Man Acquitted Of Sexu...    ×    New Tab

zegota    promoted by Rooo sez BISH PLZ            Wed 11 May 2011 7:03 PM

"Acquitted Rapist"

Um, is my understanding off, or is this man not (legally) a rapist? It seems calling him an "acquitted rapist" paints a target on Jezebel's back. Might wanna change that heading.

**Rooo sez BISH PLZ**

It might be worth at least a fact check. 8 figures is a mighty big number.
#corrections

**Pär Larsson**    promoted by BettyCrockerPun...

Nah. This is Jez, man. Men are presumed guilty of original sin, until proven otherwise due to gayness or having been previously a woman - alongside some actually noteworthy news and commentary.

"Alleged rapist..." or "Aquitted man..." would have been, you know, responsible almost-journalism. Can't have that around here. People will get their unmentionables all in a twist.

**zegota**

Case: 1:11-cv-03054 Document #: 162-19 Filed: 11/15/12 Page 11 of 11 PageID #:1922

commentary.

"Alleged rapist..." or "Aquitted man..." would have been, you know, responsible almost-journalism. Can't have that around here. People will get their unmentionables all in a twist.

**zegota**

And see, then you went too far in the other direction. ಠ_ಠ

**BettyCrockerPunkRock...**

I find that comment to be sub-Par.

**Hide 4 replies**

Show all discussions

About    Masthead    Forums    Jobs    Legal    Privacy    Permissions    Advertising    Subscribe    Send a tip



Case: 1:11-cv-03054 Document #:162-20 Filed: 11/15/12 Page 1 of 1 PageID #:1923

**Meanith Huon**

11 May 2011 10:41 PM

Show 2 replies

replicated bitch moved this thread to 4complaints (see Community Policy)

**JadeSays**

11 May 2011 10:20 PM

Weird. I didn't know "where do I go to have fun" meant the same thing as "where do I go to get raped." It's great that that jury made that clear to me, otherwise I could get myself in some sticky situations like apparently accidentally begging to be raped.

AWE. SOME.

Edited by JadeSays at 05/11/11 10:21 PM

Show 2 replies

**SarahMC**

11 May 2011 9:16 PM

Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would decide "not guilty" does not magically erase what he did—if he did, in fact, rape someone. The vast majority of rapists are never convicted of rape. Does that make them not rapists?

Show 7 replies

**vikkitikkitavi**

11 May 2011 9:09 PM

She jumped out of a moving car, leaving her shoes and purse behind and ran barefoot through a



Acquitted Rapist Sues Blog For Calling Him Serial Rapist - Windows Internet Explorer

File   Edit   View   Favorites   Tools   Help

Favorites

Acquitted Rapist Sues Blog For Calling Him Serial...

running termed and barefoot through a cornfield doesn't fit my definition of a place "to go to have fun."

ED: Two seconds of proper Googling will get you to Mr. Huon's firm webpage, complete with his phone number, should you want to call and offer any critiques.

Edited by AndPreciousLittleofThat at 05/11/11 7:14 PM

Wed 11 May 2011 7:08 PM

**cool_as_KimDeal**

Well shit! I didn't know kicking back at a bar and asking where I should go to have fun meant that I hereby consent to any and all sexual activity, with anybody, with this bartender here as my witness. Can I sign away my right to consent here on my bar tab? Okay, great.

Wed 11 May 2011 7:03 PM

**zegota** promoted by Someone BISH #08

"Acquitted Rapist"

Um, is my understanding off, or is this man not (legally) a rapist? It seems calling him an "acquitted rapist" paints a target on Jezebel's back. Might wanna change that heading.

Show 1 reply

EXHIBIT G

## **EXHIBIT B**

Order entered on November 14, 2016 by the Seventh Circuit Court of Appeals

In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 15-3049

MEANITH HUON,

*Plaintiff-Appellant,*

*v.*

NICK DENTON, *et al.*,

*Defendants-Appellees.*

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CV 3054 — **John J. Tharp**, **Jr**. *Judge.*

—————————

ARGUED MAY 31, 2016 — DECIDED NOVEMBER 14, 2016

—————————

Before EASTERBROOK and WILLIAMS, *Circuit Judges*, and
YANDLE, *District Judge.**

WILLIAMS, *Circuit Judge.* Meanith Huon sued the website
Above the Law for implying that he was a rapist in an article
published on the same day he was acquitted of rape. When

—————————————

* Of the Southern District of Illinois, sitting by designation.

2                                                    No. 15-3049

another website, Jezebel (which was owned by Gawker at the time), reported on the lawsuit in an article entitled, "Acquitted Rapist Sues Blog for Calling Him Serial Rapist," Huon added Gawker to the lawsuit. He accused Gawker of defamation, false light invasion of privacy, and intentional infliction of emotional distress with regard to (i) the article's headline, (ii) its description of Huon's criminal trial and subsequent complaint against Above the Law, and (iii) certain comments posted by a number of anonymous third-party users (at least some of whom Huon claimed were Gawker employees). The district judge granted Gawker's motion to dismiss as to all of Huon's claims, and later denied him leave to file a fifth amended complaint. Huon appeals both decisions.

We conclude that the district judge correctly rejected Huon's defamation claim as to the article. The title can be construed innocently when viewed with the rest of the article as a whole, and the article's text fairly reported on both Huon's criminal trial and his initial complaint against Above the Law. In addition, the district judge did not err in denying Huon leave to file a fifth amended complaint, since Huon had ample opportunity to cure any deficiencies.

However, we reverse and remand the district judge's rejection of Huon's defamation claim as to the third-party user comments. Huon adequately alleged that Gawker helped create and develop at least some of the comments, and one of the comments constitutes defamation under Illinois law. We also reverse and remand the district judge's rejection of Huon's false-light and intentional-infliction claims, which were dismissed against Gawker based solely on the rejection of his defamation claims. Since part of his defamation claim

No. 15-3049                                                          3

can proceed, so too can his false-light and intentional-
infliction claims.

## I.  BACKGROUND

In July 2008, Plaintiff Meanith Huon was charged with
criminal sexual assault in connection with a sexual encoun-
ter he had with Jane Doe. Huon pleaded not guilty, claimed
that the encounter was consensual, and was acquitted by a
jury. On the day Huon was acquitted, the legal website
Above the Law (ATL) published an article entitled, "Rape
Potpourri" (ATL article). The article discussed two "rape
stories," one of which concerned Jane Doe's allegations and
Huon's opening statement at his criminal trial. At some
point after its initial publication, the ATL article was updat-
ed to note that Huon was acquitted.

One year after publication of the ATL article, Huon filed
suit against ATL, alleging defamation, intentional infliction
of emotional distress, and false light invasion of privacy.
Several days later, the website Jezebel published an article
entitled, "Acquitted Rapist Sues Blog for Calling Him Serial
Rapist" (Jezebel article). The article superimposed Huon's
2008 mugshot onto the ATL article and briefly explained the
circumstances of Huon's criminal trial and subsequent law-
suit against ATL. The article's title was later changed to read,
"*Man Acquitted of Sexual Assault* Sues Blog for Calling Him
Serial Rapist" (emphasis added), but otherwise remained the
same. The Jezebel article generated over 80 comments from
anonymous third-party users.

Huon amended his complaint in response to the publica-
tion of the Jezebel article, adding several new allegations
and nearly a dozen new defendants, including Irin Carmon,

4                                                    No. 15-3049

the Jezebel article's author; Gawker Media, Jezebel's then-owner; and Nick Denton, Gawker's founder (Gawker Defendants[1]). After Huon amended his complaint several additional times to cure certain jurisdictional defects, the Gawker Defendants moved to dismiss Huon's fourth amended complaint.

The district judge granted the motion in full. He rejected Huon's defamation claims as to the third-party user comments, finding insufficient allegations that Gawker employees had actually authored the comments, and concluding that the Communications Decency Act protects online publishers like Gawker from third-party comments. The judge also dismissed Huon's defamation *per se* claim, finding that the Article's headline was protected by the innocent construction rule and its text by the fair report privilege, and concluded that Huon had failed to plead the requisite special damages to maintain his defamation *per quod* claim. In addition, the judge dismissed Huon's false-light and intentional-infliction claims, noting that the failure of his defamation claims was dispositive. The district judge later denied Huon's motion to reconsider and for leave to file a fifth amended complaint. This appeal followed.[2]

---

[1] Following oral argument, we were notified that Defendants Gawker Media LLC and Nick Denton had separately filed petitions for bankruptcy protection under Chapter 11. Counsel for both Defendants tells us that the automatic stays in both bankruptcy proceedings have been modified so as to permit us to render a decision. We proceed accordingly.

[2] The ATL Defendants separately moved to dismiss Huon's fourth amended complaint. After the district judge granted their motion in part and denied it in part, the ATL Defendants and Huon settled. The ATL Defendants are not parties on appeal.

No. 15-3049                                                    5

## II. ANALYSIS

We review de novo the district judge's grant of the Gawker Defendants' motion to dismiss for failure to state a claim. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). A complaint need only contain enough factual content to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2009). While "detailed factual allegations" are not required, the complaint must contain more than mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). We review the complaint in the light most favorable to Huon and accept all well-pleaded facts as true. *Tamayo*, 526 F.3d at 1081.

### A. Jezebel Article's Title and Content Defamation Claim Properly Dismissed

A statement is defamatory under Illinois law if "it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). The *per se* designation applies if the statement's "defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation may be presumed." *Id.* A statement will usually constitute defamation *per se* if it falls into one of five categories; the only one at issue here concerns "statements imputing the commission of a crime." *Id.*

On appeal, Huon contends that two aspects of the Jezebel article constituted defamation *per se*: (1) the headline and adjacent graphic containing his mug shot, to which the district

judge applied the innocent construction rule; and (2) the article's description of the criminal trial and subsequent civil suit, to which the judge applied the fair report privilege. We consider each issue in turn.[3]

### 1. Innocent Construction Rule Applies to Headline and Graphic

A statement that is defamatory *per se* will not be actionable "if it is reasonably capable of an innocent construction." *Green v. Rogers*, 917 N.E.2d 450, 463 (Ill. 2009). Under this rule, a court must give the defendant's words their natural and obvious meaning, after having considered "both the substance of defendant's alleged statements and the context in which they allegedly were made." *Id.* at 464. "[I]f a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 925 (7th Cir. 2003) (citing *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill. 1996)). Nevertheless, "when the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Green*, 917 N.E.2d at 463.

Here, Huon maintains that the Jezebel article's headline, "Acquitted Rapist Sues Blog For Calling Him Serial Rapist," is defamatory because it imputes to him the commission of a crime (rape), and is not subject to an innocent construction.

---

[3] Huon's fourth amended complaint also alleges defamation *per quod*. But since Huon does not press this claim on appeal, we consider it forfeited. *See, e.g.*, *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

No. 15-3049                                                    7

According to Huon, the most reasonable meaning of the headline is that Huon has committed rape at least once, and that the word "acquitted," by itself, does not controvert this false insinuation.

We need not decide whether the headline itself defamed Huon because, even if it did, it is subject to an innocent construction. As the Gawker Defendants correctly note, headlines must be considered alongside the accompanying article and not in isolation. *See, e.g., Harrison v. Chi. Sun-Times, Inc.*, 793 N.E.2d 760, 772 (Ill. App. Ct. 2003) ("As a general rule in applying the innocent construction rule, a newspaper headline and the text of the article to which it refers are to be considered as one document and read together as a whole."); *accord Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 846 (Ill. 2006); *Seith v. Chi. Sun-Times, Inc.*, 861 N.E.2d 1117, 1127 (Ill. App. Ct. 2007); *cf. Tuite*, 866 N.E.2d at 127–28 (examining allegedly defamatory statements in the context of the entire book in which they were published); *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1217 (Ill. 1996) (examining allegedly defamatory word in magazine article alongside the adjacent sentences).

Huon argues that "[h]eadlines alone may be enough to make libelous *per se* an otherwise innocuous article," but the small handful of cases he relies on are unhelpful. All of them involve the laws of states other than Illinois, and many are distinguishable on their facts insofar as the allegedly defamatory front-page headline was not next to the underlying article. *See Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1083–84 (9th Cir. 2002) (emphasizing that "the magazine is displayed for sale in plastic wrapping, making the cover the key to what a reader can expect to find inside the magazine"); *Kaelin v.*

*Globe Commc'ns Corp.*, 162 F.3d 1036, 1041 (9th Cir. 1998) (concluding that a reasonable jury could find that the magazine article "was too far removed [17 pages] from the cover headline to have the salutary effect that [defendant] claims"). Here, in contrast, the complaint indicates that the headline and article were directly adjacent to one another.

The content of the underlying Jezebel article makes clear that the only instance of alleged rape was the one Huon was acquitted of. Indeed, one need only read the first sentence to see that this is so: "A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist." And two paragraphs later, after having discussed Huon's acquittal, the article explains that ATL "*mistakenly* believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender." (emphasis added).

Huon also contends the graphic containing his mugshot and the phrases "Above the Law" and "Rape Potpourri" constitutes defamation *per se*. We disagree. Above the Law was the name of the website that Huon had sued, "Rape Potpourri" was the headline of the ATL article, and the mugshot illustrated the subject matter at issue. So the innocent construction rule applies to the Jezebel article's headline and graphic.

## 2. Fair Report Privilege Applies to Discussion of Criminal Trial and Civil Lawsuit

Under Illinois law, a defamatory statement is not actionable if it falls within the fair report privilege, which applies to statements that are "complete and accurate or a fair

No. 15-3049                                                    9

abridgment of [an] official proceeding." *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 843–44 (Ill. 2006). Illinois courts have repeatedly stressed the importance of a robust privilege, as it "promotes our system of self-governance by serving the public's interest in official proceedings, including judicial proceedings." *Id.* at 842; *see also, e.g., Lulay v. Peoria Journal-Star, Inc.*, 214 N.E.2d 746, 747–48 (Ill. 1966) ("The right to speak and print about such actions of government is well established; denial of this right would be a serious infringement of both State and Federal constitutional guarantees of free speech and press.").

A report constitutes a fair abridgment if it conveys "a substantially correct account" to readers. *Solaia Tech.*, 852 N.E.2d at 844–45 (citation omitted). Because the summary of a legal proceeding "is bound to convey a somewhat different impression than the … proceeding itself," an abridgment is typically unfair only if it "significantly change[s] the defamation appearing in the governmental or public proceeding." *O'Donnell v. Field Enters., Inc.*, 491 N.E.2d 1212, 1217 (Ill. App. Ct. 1986). A determination "is made by comparing the gist or sting of the alleged defamation in the official report or proceedings with the gist or sting in the news account." *Harrison v. Chi. Sun-Times, Inc.*, 793 N.E.2d 760, 773 (Ill. App. Ct. 2003). Contrary to Huon's contention, the fair report privilege typically raises a question of law, not a question of fact, and is not concerned with the defendant's alleged subjective intent. *E.g., Solaia Tech.*, 852 N.E.2d at 842–43; *Missner v. Clifford*, 914 N.E.2d 540, 551 (Ill. App. Ct. 2009).

Huon argues that the privilege should not apply to the following sentence from the Jezebel article concerning his criminal trial: "Huon's version was that it was a consensual

encounter, and partly on the strength of the bartender's tes-
timony that the woman had been drinking and asked where
to go to have fun, the jury believed him." It bears noting,
however, that the district judge did not apply the fair report
privilege to this sentence, concluding instead that it did not
amount to defamation. *See Huon v. Breaking Media, LLC*, 75 F.
Supp. 3d 747, 768 (N.D. Ill. 2014) (statement "bolster[ed] ra-
ther than defame[d] his reputation" because it suggested
that "the jury found reason to discredit Jane Doe's claims
and therefore acquitted Huon of the charges").

We agree with the Gawker Defendants that the fair re-
port privilege applies to the Article's references to consent
and the bartender's testimony, since they appear to accurate-
ly capture the gist of what occurred at the trial. Huon's
counsel emphatically and repeatedly referenced consent
during opening statements, and the multiple facts that Huon
points to as grounds for his acquittal, taken together, dove-
tail with a consent-focused defense strategy. In addition,
Huon makes no attempt to explain how the statement about
the bartender's testimony mischaracterizes what she actually
said at trial.

We cannot, however, easily dismiss Huon's argument
about the Article's statement about the jury's beliefs—
especially since there is no indication as to what swayed any
particular juror's vote. The Gawker Defendants insist that
the statement is nothing more than a non-actionable opinion,
but we are dubious. The statement does not appear to be the
kind of subjective claim that courts applying Illinois law
have typically viewed as non-actionable, *see, e.g., Wynne v.
Loyola Univ.*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000) (explain-
ing that non-actionable statements typically contain no "ob-

jectively verifiable factual assertion"), and the article's con-
text more closely resembles a news article than an editorial.
However, we need not decide the issue, since we agree with
the district judge that the statement could not have injured
Huon's reputation in the eyes of the public. (If anything, the
statement improved it.)

Huon also maintains that the Jezebel article failed to cap-
ture the gist of his lawsuit against the ATL Defendants in
two ways. First, he faults the article for omitting the fact that
the ATL Defendants called him a rapist on the same day he
was acquitted. However, we fail to see how omitting this
fact, by itself, caused the gist to be inaccurate. The Jezebel
article accurately conveyed the crux of Huon's complaint
against the ATL Defendants—that ATL erroneously indicat-
ed Huon had committed multiple sexual assaults, and that
he was acquitted in the only case brought against him—and
Huon makes no attempt to explain why omitting the tem-
poral relationship between Huon's acquittal and publication
of the ATL article misrepresents the nature of his lawsuit. In
essence, Huon complains that the Jezebel article omitted a
factual allegation of only modest significance; yet without
such omissions, abridgments of legal proceedings could
never occur.

Second, Huon faults the Jezebel article for republishing
the ATL article's defamatory comments. *See Brennan v. Kad-
ner*, 814 N.E.2d 951, 970 (Ill. App. Ct. 2004) ("The republisher
of a defamatory statement made by another is himself liable
for defamation even if he gives the originator's name."). But
the Jezebel Article did not simply parrot the rape-based alle-
gations in the ATL article; rather, it summarized Huon's crit-
icism of these allegations, and, if anything, indicated that the

12                                                    No. 15-3049

criticism was founded, insofar as it noted that Huon was "acquitted" and that the ATL article was based on a "mistaken[] belie[f]." So the fair report privilege applies to the Jezebel article's statements regarding Huon's criminal trial and subsequent lawsuit against ATL.

## B. District Judge Erred in Dismissing Defamation Claim Involving Third-Party User Comments

### 1. Communications Decency Act Not Applicable

The Communications Decency Act states, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also id.* § 230(f)(3) (defining "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service"). This means that for purposes of defamation and other related theories of liability, a company like Gawker cannot be considered the publisher of information simply because the company hosts an online forum for third-party users to submit comments. *See, e.g., Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671–72 (7th Cir. 2008) (concluding that Craigslist "is not the author of the ads and could not be treated as the 'speaker' of the posters' words, given § 230(c)(1)"); *Doe v. GTE Corp.*, 347 F.3d 655, 658–59 (7th Cir. 2003) (explaining that "entities that know the information's content do not become liable for the sponsor's deeds," and noting that § 230(c) preempts contrary state law).

No. 15-3049                                                        13

A company can, however, be liable for creating and post-
ing, inducing another to post, or otherwise actively partici-
pating in the posting of a defamatory statement in a forum
that that company maintains. *See Chi. Lawyers' Comm.*, 519
F.3d at 671; *see also Fair Hous. Council of San Fernando Valley v.
Roommates.Com, LLC*, 521 F.3d 1157, 1166–67 (9th Cir. 2008)
(en banc) (concluding that a website was not a "passive
transmitter of information provided by others" but instead
helped develop the information by "requiring subscribers to
provide the information as a condition of accessing its ser-
vice, and by providing a limited set of pre-populated an-
swers"); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1199–1200
(10th Cir. 2009) (concluding that a website developed the in-
formation by "solicit[ing] requests" for the information and
then "pa[ying] researchers to obtain it").

Huon argues that the Act is inapplicable here because
Gawker's comments forum was not a mere passive conduit
for disseminating defamatory statements. Rather, Gawker
itself was an information content provider, insofar as the
Gawker Defendants: (1) "encouraged and invited" users to
defame Huon, through selecting and urging the most defa-
mation-prone commenters to "post more comments and con-
tinue to escalate the dialogue"; (2) "edited," "shaped," and
"choreographed" the content of the comments that it re-
ceived; (3) "selected" for publication every comment that
appeared beneath the Jezebel article; and (4) employed indi-
viduals who authored at least some of the comments them-
selves.

The district judge concluded that these arguments failed
to plausibly state a claim for relief. But we see nothing
farfetched about Huon's factual allegations—in particular,

14                                                      No. 15-3049

his contention that one or more of the comments were au-
thored by Gawker employees. Rather than asserting one or
two standalone factual allegations concerning Gawker's con-
trol over comments, Huon's fourth amended complaint de-
votes over four pages to detailing Gawker's alleged activi-
ties. Critically, the complaint hints at why Gawker employ-
ees might have anonymously authored comments, alleging
that increasing the defamatory nature of comments can in-
crease traffic to Gawker's websites, which can in turn en-
hance the attractiveness of Gawker's commenting system for
prospective advertisers. In doing so, the complaint quotes
several passages from a Reuters article that explains precise-
ly how Gawker was planning to "monetize" comments, and
why advertisers might find this commenting system appeal-
ing.

The Gawker Defendants may well be correct in contend-
ing that none of Huon's various allegations actually oc-
curred, but this doesn't mean that the allegations are so im-
plausible as to warrant dismissal under Rule 12(b)(6). *See
Twombly*, 550 U.S. at 555 (explaining that a complaint need
only plead enough facts to "raise a right to relief above a
speculative level, on the assumption that all the allegations
in the complaint are true (even if doubtful in fact)" (footnote
and citations omitted)); *id.* at 556 ("[A] well-pleaded com-
plaint may proceed even if it strikes a savvy judge that actu-
al proof of those facts is improbable, and that a recovery is
very remote and unlikely." (citation and internal quotation
marks omitted)). Discovery is the proper tool for Huon to
use to test the validity of his allegations, and if he is unable
to marshal enough facts to support his claim the Gawker De-
fendants can move for summary judgment. Moreover, to the
extent Gawker and other publishers are concerned that our

No. 15-3049                                                                15

ruling will result in a flood of frivolous lawsuits, we remind
them that sanctions are available under Federal Rule of Civil
Procedure 11 if it is determined that a plaintiff's factual alle-
gations were plead with improper purpose, are frivolous, or
were known by plaintiff's counsel to be lacking any factual
basis.

The Gawker Defendants proffer several arguments in
support of the Act's application here, but none are availing.
For example, they argue that Huon's allegations amount to
the kind of "traditional publishing activities" that other
courts of appeals have found warrant protection under the
Act. *See, e.g., Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th
Cir. 1997) (Under § 230, "lawsuits seeking to hold a service
provider liable for its exercise of a publisher's traditional ed-
itorial functions—such as deciding whether to publish,
withdraw, postpone or alter content—are barred."); *accord
Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18–20 (1st
Cir. 2016); *Jones v. Dirty World Entm't Recordings LLC*, 755
F.3d 398, 407 (6th Cir. 2014). But we need not wade into that
debate, since Huon has adequately pleaded that at least
some of the allegedly defamatory comments were authored
by Gawker employees—thus making Gawker an "infor-
mation content provider" under § 230(f).

In addition, the Gawker Defendants argue that Huon's
allegation that the Defendants induced the comments is be-
lied by Gawker's terms of use for commenters, which,
among other things, prohibited the posting of "harassing,
defamatory or libelous material." But the mere fact that a
terms-of-use statement exists does not establish that all
comments complied with it.

The Gawker Defendants also argue that Huon failed to plead facts plausibly establishing that Gawker authored the allegedly defamatory comments. As discussed above, however, there is nothing implausible about this allegation, and we reject the Gawker Defendants' invitation to interpret Rule 8, *Twombly*, and *Iqbal* as requiring more. Indeed, potentially meritorious claims could be prematurely and improperly dismissed if we were to accept the Gawker Defendants' position, since the information necessary to prove or refute allegations like Huon's is typically available only to defendants. *Cf. Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) ("Where pleadings concern matters peculiarly within the knowledge of the defendants, conclusory pleading on 'information and belief' should be liberally viewed." (citation and internal quotation marks omitted)).

### 2. One Comment Is Defamatory

The fact that Huon has plausibly alleged that Gawker employees created the defamatory comments, by itself, does not allow him to press forward with his defamation *per se* claim; the comments must actually constitute defamation. We have already discussed the general principles of defamation *per se* under Illinois law. But given the fact that the statements at issue were shared in a comments forum, a brief discussion of the distinction between actionable factual assertions and non-actionable opinions is in order.

Opinions that do not misstate actual facts are protected by the First Amendment and thus non-actionable. *E.g., Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)); *Moriarty v. Greene*, 732 N.E.2d 730, 739 (Ill. App. Ct. 2000)). Illinois courts consider the following three factors in differentiating

No. 15-3049                                                    17

between factual assertions and opinions: "(1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or social context signals that it has factual content." *J. Maki Const. Co. v. Chi. Reg'l Council of Carpenters*, 882 N.E.2d 1173, 1183 (Ill. App. Ct. 2008). Notably, "[w]ords that are mere name calling or found to be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable." *Pease v. Int'l Union of Operating Eng'rs Local 150*, 567 N.E.2d 614, 619 (Ill. App. Ct. 1991); *see also Milkovich*, 497 U.S. at 20 (statements that are not reasonably understood as stating actual facts should not be actionable, in order to ensure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation").

Here, most—but not all—of the comments do not constitute defamation *per se*. Some comments are not defamatory because they do not directly concern Huon himself, but instead relate to acquittal and guilt more generally. For example:

SarahMc:

> Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would decide "not guilty" does not magically erase what he did--if he did, in fact, rape someone. The vast majority of rapists are never convicted of rape. Does that make them not rapists?

Dinosaurs and Nachos, girlfriend!:

18                                                                    No. 15-3049

> Innocent until proven guilty is a widely misunderstood concept. It basically means that the mere fact that someone is charged with a crime is not itself evidence that the person committed a crime.
>
> Then you go to court. In court, there will be evidence presented. This evidence is where an actual, legal determination is made. Nobody is declared "innocent" in a court of law, they are found guilty or not guilty.
>
> "Not guilty" is absolutely not the same thing as "innocent" from a legal standpoint. Those words do not mean the same thing in the world of law. "Innocent until proven guilty" is merely a concept for laymen to try to keep their non-lawyer brains from jumping to (nonlegal) conclusions.

Other comments amount to hyperbole that cannot be reasonably understood as asserting objectively verifiable facts. For example:

> SorciaMacnasty:
>
> > Nevermind [sic] "serial rapist," he sounds like a foreal [sic] crazy person.

Still other comments, while referencing certain alleged facts surrounding Huon's criminal trial, do not directly accuse him of committing a crime and are better classified as non-actionable opinions—specifically, a rhetorical decrying of general notions of "rape culture" and "victim blaming." For example:

No. 15-3049                                                    19

cool_as_KimDeal:

> Well shit! I didn't know kicking back at a bar and asking where I should go to have fun meant that I hereby consent to any and all sexual activity, with anybody, with this bartender here as my witness. Can I sign away my right to consent here on my bar tab? Okay, great.

JadeSays:

> Weird. I didn't know "where do I go to have fun" meant the same thing as "where do I go to get raped." It's great that that jury made that clear to me, otherwise I could get myself in some sticky situations like apparently accidentally begging to be raped.

> AWE. SOME.

rachel723 (in reply to JadeSays's comment):

> you know it's women like you who don't understand the rules that make the rest of us ladies look bad.

> I'm glad you learned before you actually got raped not to complain now if you do, you were asking for it!!

> /sarcasm

HeartRateRapid:

> Yea, all those crazy bitches going to the cops and lying about being raped. Except

> that false reports for stolen cars are more
> common. False rape reports make up less
> than 3% of all reported rapes, and as I'm
> sure you know, it horrendously underre-
> ported.

Only the following comment qualifies as defamation *per se* under Illinois law:

> vikkitikkitavi:

>> She jumped out of a moving car, leaving
>> her shoes and purse behind and ran bare-
>> foot through a cornfield and pounded on a
>> stranger's door to help her?

>> Fuck this "he's been acquitted" noise. He's
>> a rapist alright, so we may as well call him
>> one.

This comment unequivocally accuses Huon of committing a crime (rape), and nothing in its context suggests it is more appropriately viewed as mere name-calling or stylistic exaggeration. So Huon's defamation *per se* claim as to this comment may proceed.

## C. False Light Invasion of Privacy and Intentional In-fliction of Emotional Distress Claims Improperly Rejected

The district judge rejected Huon's false-light and intentional-infliction claims based solely on the dismissal of Huon's defamation claims. It appears that this tethering is consistent with Illinois law. *See Madison v. Frazier*, 539 F.3d 646, 659 (7th Cir. 2008) (When an "unsuccessful defamation *per se* claim is the basis of [a plaintiff's] false-light claim, his false-

No. 15-3049                                                        21

light invasion of privacy claim fails as well."). But that rea-
soning no longer holds, since Huon's defamation *per se* claim
as to one third-party user comment was improperly dis-
missed. And because the false-light and intentional-infliction
claims have not been adequately briefed on appeal, we re-
verse the dismissal of those claims and remand for further
proceedings.

### D. No Error in Denying Motion for Leave to File Fifth Amended Complaint

Finally, Huon argues that the district judge erred in
denying him leave to file a fifth amended complaint to cure
certain alleged deficiencies relating to his defamation *per
quod* claim. Federal Rule of Civil Procedure 15(a)(1) instructs
that courts should freely give plaintiffs leave to amend their
complaints "when justice so requires." However, district
judges have "broad discretion" to deny leave to amend,
"where there is undue delay, bad faith, dilatory motive, re-
peated failure to cure deficiencies, undue prejudice to the
defendants, or where the amendment would be futile." *Arre-
ola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). "We review a
district court's denial of leave to amend for abuse of discre-
tion and reverse only if no reasonable person could agree
with that decision." *Schor v. City of Chi.*, 576 F.3d 775, 780
(7th Cir. 2009).

Huon has not satisfied this high bar. The district judge
explained that in each of his previously amended com-
plaints, Huon had added new factual and legal allegations,
added or removed defendants, or revised certain statements
in an attempt to cure jurisdictional deficiencies. In addition,
the judge emphasized that the modifications in the proposed
complaint could have been made earlier, since they purport

to cure deficiencies highlighted in the Defendants' motions
to dismiss Huon's second amended complaint. Why Huon
did not modify his third or fourth amended complaints ac-
cordingly remains a mystery. So the district judge did not err
in finding that Huon had ample opportunity to plead his
claims, and justice does not require an additional bite of the
apple. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d
328, 347–48 (7th Cir. 2012) (finding no abuse of discretion in
denying leave to amend where plaintiffs had already had
three opportunities to state a claim); *Emery v. Am. Gen. Fin.,
Inc.*, 134 F.3d 1321, 1322–23 (7th Cir. 1998) (same).

### III. CONCLUSION

The judgment of the district court is AFFIRMED in part and
REVERSED in part, and the case is REMANDED for proceedings
consistent with this opinion.

## **EXHIBIT C**

Mr. Huon's appellate brief to the Seventh Circuit Court of Appeals

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MEANITH HUON, | ) | |
| | ) | |
| **Plaintiff/Appellant,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NICK DENTON, | ) | COURT OF APPEALS |
| IRIN CARMON, | ) | CASE NO.:  15-3049 |
| GABY DARBYSHIRE, | ) | |
| | ) | DISTRICT COURT |
| GAWKER MEDIA, LLC a/k/a | ) | CASE NO.: 1:11-cv-3054 |
| GAWKER MEDIA, | ) | |
| | ) | |
| BLOGWIRE HUNGARY SZELLEMI | ) | |
| ALKOTAST HASZNOSITO KFT, | ) | |
| | ) | |
| GAWKER MEDIA GROUP, INC. a/k/a | ) | |
| GAWKER MEDIA, | ) | |
| | ) | |
| GAWKER ENTERTAINMENT, LLC, | ) | |
| | ) | |
| GAWKER TECHNOLOGY, LLC, | ) | |
| | ) | |
| GAWKER SALES, LLC., | ) | |
| | ) | |
| **Defendants/Appellees.** | ) | |

APPEAL FROM THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
CASE NO.: 1:11-cv-3054
THE HON. JOHN J. THARP, JR.

**AMENDED BRIEF AND APPENDIX OF PLAINTIFF/APPELLANT, MEANITH HUON**

Meanith Huon, The Huon Law Firm
Attorney for the Plaintiff-Appellant Meanith Huon
PO Box 441, Chicago, Illinois 60690
312-405-2789
Fax No.: 312-268-7276
huon.meanith@gmail.com
Illinois ARDC No.: 6230996

## <u>DISCLOSURE STATEMENT</u>

Plaintiff/Appellant Meanith Huon is representing himself *pro se*.  Huon is a licensed

Illinois attorney and is principal of his firm, The Huon Law Firm.

# TABLE OF CONTENTS

PAGE

DISCLOSURE STATEMENT ... 1

TABLE OF CONTENTS ... 2

TABLE OF AUTHORITIES ... 4

REVISED JURISDICTIONAL STATEMENT ... 10

STATEMENT OF ISSUES PRESENTED FOR REVIEW ... 16

STATEMENT OF THE CASE ... 18

SUMMARY OF THE ARGUMENT ... 28

ARGUMENT ... 31

STANDARD OF REVIEW ... 31

I. THE DISTRICT COURT ERRED IN DISMISSING
MEANITH'S DEFAMATION *PER SE* CLAIM. ... 32

A. THE "INNOCENT CONSTRUCTION" RULE
DOES NOT APPLY. ... 32

B. SO LONG AS THE PUBLICATION IS REASONABLY
SUSCEPTIBLE OF A DEFAMATORY MEANING, A
FACTUAL QUESTION FOR THE JURY EXISTS. ... 41

C. THE IMPACT OF THE HEADLINES AND
SUBHEADLINES CREATE A FALSE IMPRESSION
THAT MEANITH IS A RAPIST. ... 43

II. THE DISTRICT COURT ERRED BY FINDING
THAT THE FAIR REPORT PRIVILEGE PROTECTS
THE JEZEBEL.COM ARTICLE. ... 46

A. THE JEZEBEL.COM ARTICLE WAS NOT A
"FAIR ABRIDGEMENT" OF THE ORIGINAL PROCEEDINGS
IN THE CRIMINAL TRIAL. ... 46

B. THE JEZEBEL ARTICLE WAS NOT A "FAIR ABRIDGEMENT" OF THE
COMPLAINT IN THIS FEDERAL COURT LAWSUIT. ... 49

2

**TABLE OF CONTENTS**

**PAGE**

**C.  THE DISTRICT COURT ERRED BY DECIDING
A QUESTION OF FACT BY IMPLICITLY FINDING THAT
DEFENDANTS/APPELLEES DID NOT ABUSE THE PRIVILEGE.**  52


**III .  SECTION 230 OF THE COMMUNICATIONS
DECENCY ACT DOES NOT PROVIDE IMMUNITY
TO DEFENDANTS/APPELLEES.**                        53

**A.  DEFENDANTS/APPELLEES ARE INFORMATION
CONTENT PROVIDERS.**                              53

**B.  MEANITH HAS ADEQUATELY PLED AGENCY.**        57

**C.  A QUESTION OF FACT EXISTS AS TO WHETHER
DEFENDANTS/APPELLEES CREATED THE CONTENT.**        58

**IV.  THE DISTRICT COURT ERRED IN DISMISSING
THE FALSE LIGHT AND INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS CLAIMS AGAINST
THE DEFENDANTS/APPELLEES.**                        59

**V.  PLAINTIFF, MEANITH HUON, HAS NOT BEEN
AFFORDED EXCESSIVE OPPORTUNITIES TO AMEND.**       60

**CONCLUSION**                                     62

**CERTIFICATE OF COMPLIANCE WITH
F.R.A.P. RULE 32(a)(7)**                           63

**PROOF OF SERVICE**                               65

**CIRCUIT RULE 30(d) STATEMENT**                   67

**SHORT APPENDIX TO THE BRIEF**                    68

## TABLE OF AUTHORITIES

**PAGE**

Action Repair, Inc. v. American Broadcasting Companies, Inc.,
776 F.2d 143, 145 (1985)                                          41

Anthony v. Yahoo Inc.,
421 F.Supp.2d 1257 (N.D. Cal. 2006)                              54

Baker v. Warner,
231 U.S. 588, 594, 34 S.Ct. 175, 58 L.Ed. 384 (U.S. 1913.)      41

Bally Export Corp. v. Balicar, Ltd.,
804 F.2d 398 (7th Cir.1986)                                      12

Bright v. Hill's Pet Nutrition, Inc.,
2009 WL 2502098 (7th Cir. 2009)                                 60

Brown & Williamson Tobacco Corp. v. Jacobson,
713 F.2d 262 (7th Cir. 1983)                                  47, 52

Bryson v. News America Publications, Inc.,
174 Ill.2d 77, 672 N.E.2d 1207 (Ill. 1996)                  33, 34, 35

Catalano v. Pechous,
83 Ill.2d 146 (Ill. 1980)                                        32

Celle v. Filipino Reporter Enters.,
209 F.3d 163, (2d Cir. 2000)                                     41

Chapski v. Copley Press,
92 Ill.2d 344, 442 N.E.2d 195 (Ill. 1982)                    33, 41

Cianci v. New Times Publishing Co.,
639 F.2d 54 (2d Cir. 1980)                                       32

Chicago Lawyers' Committee for Civil Rights Under Law, Inc.
v. Craigslist, Inc.,
519 F.3d 666 (7th Cir. 2008)                                     54

Cook v. East Shore Newspapers, Inc., et. al.,
327 Ill.App. 559 (4th Dist. 1946)                               45

<u>**TABLE OF AUTHORITIES**</u>

<u>**PAGE**</u>

<u>Cook v. Winfrey</u>,
141 F.3d 322 (7th Cir. 1998)                                    47


<u>Curtis Publishing Company v. Vaughan</u>,
278 F.2d 23 (D.C. Cir. 1960.)                                   44


<u>DeHusson, et. al. v. Hearst Corp., et. al.</u>,
204 F.2d 234, 236 (7th Cir. 1953)                    42


<u>Doctor's Assocs. v. QIP Holder LLC</u>,
2010 WL 669870 (D. Conn. 2010)                                 58


<u>Doe v. Clavijo</u>,
72 F.Supp.3d 910 (N.D. Ill. 2014)                              58


<u>Doe v. Roe</u>,
2013 WL 2421771 (N.D. Ill.  2013)                              58


<u>Eastwood v. Nat'l Enquirer, Inc.</u>,
123 F.3d 1249 (9th Cir.1997)                                   49, 50


<u>Empire Printing Co. v. Roden</u>,
247 F.2d 8 (9th Cir.1957)                                      43


<u>Estill v. Hearst Publishing Co., Inc.</u>,
186 F.2d 1017, 1021  (7th Cir. 1951)                41


<u>Fair Housing Council of San Fernando Valley
v. Roommates.com, LL</u>C,
521 F.3d 1157 (9th Cir. 2007) (*en banc*)                      53, 54


<u>Gacek v. American Airlines, Inc.</u>,
614 F.3d 298 (7th Cir.2010)                                    57


<u>Government of the Canal Zone v. Burjan</u>,
596 F.2d 690 (5th Cir. 1979)                                   23


<u>Hadley v. Doe a/k/a Fuboy</u>,
2015 IL 118000                                                 36, 37

## TABLE OF AUTHORITIES

**PAGE**

Hatfill v. N.Y. Times Co.,
416 F.3d 320 (4th Cir. 2005)                                          41

HostLogic Zrt. v. GH Intern., Inc. ,
2014 WL 2968279                                                      14

Horowitz v. Animal Emergency and
Treatment Centers of Chicago, LLC, et. al.,
2012 WL 3598807 (N.D. Ill. 2012)                                     57

Hy Cite Corp. v. badbusinessbureau.com,
418 F.Supp.2d 1142, (D. Ariz. 2005)                                  54, 58

In re Perry,
423 B.R. 215 (S.D.Tex. 2010)                                         52

JPMorgan Chase Bank v.
Traffic Stream (BVI) Infrastructure Ltd.,
536 U.S. 88 (2002)                                                   12

Kaelin v. Globe Communications Corp.,
162 F.3d 1036, (9th Cir. 1998)                                       43, 44, 45

Klein v. Belle Alkali Co.,
229 F.2d 658 (4th Cir. 1956)                                         43

Kolegas v. Heftel Broadcasting Corp.,
154 Ill.2d 11, 607 N.E.2d 201 (1992)                                 33

Kuwik v. Starmark Star Marketing and Admin., Inc.,
156 Ill.2d 16 (1993)                                                 52

Lowe v. Rockford ,
179 Ill.App.3d 592 (2nd Dist. 1989)                                  47

Maple Lanes, Inc. v. News Media Corp.,
322 Ill.App.3d 842 (2nd Dist. 2011)                                  52

McNair v. Hearst Corporation,
494 F.2d 1309 (9th Cir. 1974)                                        44, 45

## TABLE OF AUTHORITIES

**PAGE**

Myers v. The Telegraph,
332 Ill.App.3d 917 (5th Dist. 2002)                        47

Nestle Purina PetCare Co. v. Blue Buffalo Co. Ltd.,
2015 WL 1782661 (E.D. Missouri 2015)                        55

Nwaokolo v. Immigration and Naturalization Service,
314 F.3d 303 (7th Cir. 2002)                                23

Owens v. CBS Inc.,
173 Ill. App. 3d 977, 527 N.E.2d 1296 (1988)                52

Parker v. House O'Lite Corp.,
324 Ill.App.3d 1014 (1st Dist. 2001)                      37

Pisani v. Staten Island University Hosp.,
440 F.Supp.2d 168 (E.D.N.Y. 2006)                           52

Pisciotta v. Old National Bankcorp.,
499 F.3d 629  (7th Cir. 2007)                               31, 32

Proesel v. Myers Publishing Company,
24 Ill.App.2d 501 (1st Dist. 1960.)                       41

Professional and Business Men's Life Ins. Co. v. Banker's Life Co.,
163 F.Supp. 274 (D.Mont.1958)                               43

Rowe v. Gibson,
798 F. 3d 622  (7th Cir. 2015)                              12, 23, 24

Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc.,
297 Ill.App.3d 314 (1[st]Dist. 1988)                        47

Solaia Technology, LLC v. Specialty Pub. Co.,
221 Ill.2d 558,580 (2006)                                   32, 46, 47

Solano, Jr. v. Playgirl, Inc.,
292 F.3d 1078 (9th Cir. 2002)                             42, 43

## TABLE OF AUTHORITIES

PAGE

Spanel v. Pegler,
160 F.2d 619 (7th Cir. 1947)                                              41

Stavros v. Marrese,
323 Ill.App.3d 1052 (1st Dist. 2001)                                        37

Tempel Steel Corp. v. Loranger Ipari KFT,
1998 U.S. Dist. LEXIS 4003 (N.D. Ill. Mar. 27, 1998).                       13

Tuite v. Corbitt,
224 Ill.2d 490, 866 N.E.2d 114 (Ill. 2007)                      33, 35-36, 39-41

Van Horne v. Muller,
185 Ill.2d 299, 308 (Ill. 1998)                                             37

Washington Post Co. v. Chaloner,
250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1919)                             41

Whitney Information Network, Inc. v. Xcentric Venture, LLC,
199 Fed.Appx. 738 (2006)                                                 58, 59

Wilson v. Humphreys (Cayman) Ltd.,
916 F. 2d 1239 (7th Cir. 1990)                                            12

Woodhull v. Meinel,
145 N.M. 533, 202 P.3d 126 (N.M. App. 2008)                              54, 58

47 U.S.C. § 230                                      16, 30-31, 53, 54, 56, 58-59

28 U.S.C. § 1291                                                            15

28 U.S.C. § 1332                                                        10-11, 12

British Nationality Act 1981 § 51(3)(a)(ii)                                 12

Cayman Islands Companies Law (2013 Revision), Article 6                     12

Cayman Islands Companies Law (2013 Revision), Article 81                    12

## TABLE OF AUTHORITIES

**PAGE**

Hungary's <u>Act VII of 1988 on Investment</u>                                          14

Hungary's <u>Act VI of Business Organizations</u>                                       14

Federal Rule of Civil Procedure 7.1                                                     10, 61

Federal Rule of Civil Procedure 8(a)(2)                                                 32

Federal Rule of Civil Procedure 15(a)                                                   60

Federal Rule of Evidence 201(d)                                                         11, 23-24

Northern District of Illinois Local Rule 3.2                                            10, 61

<u>Restatement (Second) of Torts</u> § 611, Comment f, at 300 (1977)                    47

"FORMING A HIGH TECHNOLOGY JOINT VENTURE
IN HUNGARY",
11 <u>Santa Clara Computer & High Tech. L.J</u>. 287                                    14

## REVISED JURISDICTIONAL STATEMENT

## A.  THE DISTRICT COURT HAD JURISDICTION OF THIS MATTER.

The District Court had jurisdiction over this matter under 28 U.S.C. § 1332(a)(1).

Plaintiff/Appellant Meanith Huon ("Huon"), a citizen of Illinois, sought compensatory damages

in an amount in excess of $75,000. (Doc. No.: 215, Page 6, PageID No.: 2969.)

There is complete diversity. (Doc. No.215, PageID 2969-2970.)  None of the

Defendants/Appellees reside or are incorporated in the State of Illinois. Defendants/Appellees

are the following parties:

1.   Gawker Entertainment, LLC., is a New York limited liability company with its

principal place of business in New York.  (Doc. No. 162-4, PageID No. 1840.)  Gawker

Entertainment, LLC.'s sole member is Gawker Media LLC, a Delaware limited liability

company with its principal place of business in New York.  (Defendants/Appellees' Disclosures

pursuant to FRCP 7.1 and Local Rule 3.2, Doc. No. 186, PageID No. 2265.)  (Plaintiff's Fourth

Amended Complaint, including Exhibits 3 to 7 consisting of documents filed with the Secretary

of State, Doc. No. 162-3. PageID No. 1831; Doc. 162, PageID No. 1749.)  Thus, Gawker

Entertainment, LLC, was and is a citizen of  New York, pursuant to 28 U.S.C. 1332(c).

2.   Gawker Technology, LLC , is a New York limited liability company with its

principal place of business in New York.  (Doc. No. 162-5. PageID No. 1844.)  Gawker

Technology, LLC.'s sole member is Gawker Media LLC, a Delaware limited liability company

with its principal place of business in New York.   (Doc.  No. 186, PageID No. 2265; Doc. No.

162-3, PageID No. 1831; Doc. 162, PageID No. 1749.)  Thus, Gawker Technology, LLC, was

and is a citizen of New York, pursuant to 28 U.S.C. 1332(c).

10

3.   Gawker Sales, LLC, is a New York limited liability company with its principal place

of business in New York.  (Doc. No. 162-7, PageID No. 1831.)  Gawker Sales, LLC.'s sole

member is Gawker Media LLC, a Delaware limited liability company with its principal place of

business in New York.  (Doc. No. 186, PageID No. 2265; Doc. No. 162-3, PageID No. 1831;

Doc. 162, PageID No. 1749.)  Thus, Gawker Sales, LLC, was and is a citizen of New York,

pursuant to 28 U.S.C. 1332(c).

4.   Gawker Media, LLC a/k/a Gawker Media, is a Delaware limited liability company

with its principal place of business in New York.  (Doc. No. 162-3. PageID No. 1831; Doc. 162,

PageID No. 1749.)  Gawker Media, LLC's sole member is Gawker Media Group, Inc., a

Cayman Islands corporation with its principal place of business in New York.  (Doc. No. 186,

PageID No. 2265; Doc. No. 162, PageID Nos. 1751 to 1752.)    Thus, Gawker Media, LLC., was

and is a citizen of New York and Delaware, pursuant to 28 U.S.C. 1332(c).

5.   Gawker Media Group, Inc. is a Cayman Islands corporation with its principal place of

business in New York.  (Doc. No. 162, PageID Nos. 1751 to1752.)    Gawker Media Group, Inc.

was formed on December 1, 2009 and is registered with Maple Corporate Services Limited,

located at PO Box 309, Ugland House, South Church Street, Cayman Islands.[1]   The principal

place of business for Gawker Media Group, Inc. d/b/a Gawker Media is 114 Fifth Avenue, NY,

NY 10011.[2]  Thus, Gawker Media Group, Inc. was and is a citizen of the Cayman Islands and

New York.

---

[1] Huon requests that the Seventh Circuit take judicial notice of the Cayman Islands Government
General Registry website, located at http://www.ciregistry.gov.ky, and the General Registry's
search result for Gawker Media Group, Inc., pursuant to Federal Rule of Evidence 201(d).

[2] Huon requests that the Seventh Circuit take judicial notice of Newmark Grubb Knight Frank's
press release and Gawker Media's staff memo reported in the media.

The U.S. Supreme Court has held that  a corporation organized under the laws of the

British Virgin Islands, an Overseas Territory of the United Kingdom, is a "citize[n] or subjec[t]

of a foreign state" for the purposes of alienage diversity jurisdiction, 28 U.S.C. § 1332(a)(2).

JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88 (2002). A citizen

of the Cayman Islands, a British Dependent Territory is a "citizen of the United Kingdom and

Colonies." British Nationality Act 1981 § 51(3)(a)(ii); Wilson v. Humphreys (Cayman) Ltd., 916

F. 2d 1239, 1242-1243 (7th Cir. 1990).   The Seventh Circuit has held that subject matter

jurisdiction existed in suits between citizens of the United States and Cayman Island

corporations, a British Dependent Territory.  Bally Export Corp. v. Balicar, Ltd., 804 F.2d 398,

399-400 (7th Cir.1986); Wilson, 916 F. 2d at 1242-1243.

The court system in the Cayman Islands is patterned after that of Great Britain. Wilson ,

916 F. 2d at 1242-1243.   In addition, the Common Law of England is recognized and applied by

the Courts in all cases where there has not been a specific local enactment. Id. Cayman Islands

companies are governed by the Companies Law.[3]  Cayman Islands corporate law is congruent

with US law to the extent that it affords its corporations a separate personality and limited

liability.   Article 6 of the Cayman Islands Companies Law (2013 Revision) limits the liability of

shareholders; Article 81 provides that company may contract in its own name on its own behalf.

---

http://www.ngkf.com/home/media-center/press-releases.aspx?d=6510#sthash.95yjnojp.dpbs;
https://commercialobserver.com/2014/09/gawker-relocating-to-114-fifth-avenue/
Rowe v. Gibson, 798 F. 3d 622  (7th Cir. 2015).

[3] The Cayman Island Companies Law is available at
http://www.cimoney.com.ky/regulatory_framework/reg_frame_law_reg.aspx?id=372

Gawker Media Group, Inc., is a holding company.    (Doc. No. 162, PageID No. 1752.)

Gawker Media, Inc.'s sole assets are equity securities in its subsidiaries, one of which is Gawker

Media, LLC:

> Gawker Media Group, Inc. has no operations or employees. Rather, it is a
> holding company. Other than a small bank account to facilitate purchases and sales
> of its stock, its sole assets are equity securities in two subsidiaries, Gawker Media,
> LLC, a Delaware limited liability company, and Kinja, KFT, an Hungarian entity.
> Declaration of Scott Kidder, Vice President of Operations for Gawker Media Group, Inc.,
> Quentin Tarantino v. Gawker Media Group, Inc., et. al., Case No.: CV 14-603-JFW, Doc.
> No. 11-1, Page ID No.64.  A copy of Kidder's Declaration is attached to Huon's First
> Amended Docketing Statement. (Case No. 15-3049, Doc No. 13-6).[4]

The New Yorker has reported that:

> Gawker is organized like an international money-laundering operation. Much of
> its international revenues are directed through Hungary, where Denton's mother hails
> from, and where some of the firm's techies are located. But that is only part of it.
> Recently, Salmon reports, the various Gawker operations—Gawker Media LLC, Gawker
> Entertainment LLC, Gawker Technology LLC, Gawker Sales LLC—have been
> restructured to bring them under control of a shell company based in the Cayman Islands,
> Gawker Media Group Inc.[5]

6.    Defendants/Appellees admit that Blogwire Hungary Szellemi Alkotast Hasznosito

KFT is a Hungarian corporate entity now known as Kinja, KFT with a corporate address in

Hungary and that Kinja, KFT is a citizen of Hungary. (Defendants/Appellees' Response to

---

[4] Huon requests that the Seventh Circuit take judicial notice of the pleadings filed by Defendant,
Gawker Media Group Inc., in Quentin Tarantino v. Gawker Media Group, Inc., et. al., Case No.:
CV 14-603-JFW (C.D. Cal.).

[5] Huon requests that the Seventh Circuit take judicial notice of this article at the website
http://www.newyorker.com/rational-irrationality/gawker-stalker-nick-denton-spotted-in-cayman-
islands; and judicial notice other articles from reputable news organizations at
http://www.nationalreview.com/corner/314853/gawker-and-bain-and-caymans-kevin-d-
williamson.

13

Huon's First Amended Docketing Statement, Case No. 15-3049, Doc No. 17.) (Case No. 15-3049, Doc No. 13-1 and 13-2, paragraph 9.)[6]

A KFT is a Hungarian corporate entity that is similar to a U.S. limited liability company. HostLogic Zrt. v. GH Intern., Inc. , 2014 WL 2968279, page 9, footnote 2 (M.D. Florida 2014); (Doc. No. 215, PageID No. 2970.).  Hungary's Act VII of 1988 on Investment and Act VI of Business Organizations ("Companies Act") expressly enables natural foreign persons and business organizations to legally form companies in Hungary.  "FORMING A HIGH TECHNOLOGY JOINT VENTURE IN HUNGARY", 11 Santa Clara Computer & High Tech. L.J. 287, page 6.

The Companies Act grants Hungarian businesses many of the same powers that U.S. companies possess.  Id. at 7.  Specifically, the Act permits all business associations to enter into contracts, acquire property and sue in court to enforce their rights.  Id.   All owners of the KFT enjoy limited liability.  Id. at 7.   The KFT is most similar to the United States close corporation.  Id. at 8.

The sole member of Blogwire Hungary Szellemi Alkotast Hasnosity KFT, n/k/a Kinja KFT ("Kinja KFT") is Gawker Media Group Inc., with an address at GB-Grand Cayman, PO Box 1034GT, Harbour Place, 4th Floor, 103 South Church Street .[7]  Financial journalist Felix

_____

[6] Huon requests that the Seventh Circuit take judicial notice of the pleadings filed by Defendant, Gawker Media, LLC, in Nautilus Insurance Company v. Blogwire Hungary Szellemi Alkotast Hasznosito KFT, et. al., No. 14-CV-5680 (SHS), (S.D. N.Y.).

[7] The data of companies registered at any Hungarian Court of Registration are available on the website of the Service of Company Information and Electronic Company Registration of the Ministry of Public Administration and Justice, http://www.e-cegjegyzek.hu/
Huon requests that the Seventh Circuit take judicial notice of the website http://www.e-cegjegyzek.hu/ and the search result for Kinja KFT.

14

Salmon at Reuters reported on the history and on the business structure  and characteristics of

Gawker Media, including Kinja, KFT, in an article called "The new Gawker Media". [8]

Nick Denton, the founder and owner of Gawker Media, is a citizen of Hungary and the

United Kingdom.  (Doc. No.: 215, PageID No.: 2970.)

Gaby Darbyshire, who was the Chief Operating Officer of Gawker Media, and Irin

Carmon, who was a reporter for Gawker Media's website Jezebel.com, are citizens of New York.

(Doc. No.: 215, Page 7, PageID No.: 2970.)


**B.  THIS COURT HAS JURISDICTION OF THIS MATTER.**

This Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291.  The District

Court entered a final judgment on September 16, 2015, which disposed of all of the claims and

defenses in the action. (Doc. Nos.: 269 and 270.)  Huon timely noticed his appeal on September

18, 2015. (Doc. No.: 273, PageID No.:3490.)

---

[8] http://blogs.reuters.com/felix-salmon/2010/12/01/the-new-gawker-media/

## ISSUES PRESENTED FOR REVIEW:

1.      Whether or not the District Court erred by applying the "innocent construction" rule, as a matter of law, to dismiss a defamation claim against Defendants/Appellees for publishing the headline "**Acquitted Rapist Sues Blog for Calling Him Serial Rapist**", superimposed above Huon's 2008 mugshot, next to the words "ABOVE THE LAW" and "**Rape Potpourri**", and above a story falsely implying that Huon was a rapist who escaped punishment.

2.      Whether or not the District Court erred by finding that the fair report privilege precludes Huon from pleading a defamation claim against the Defendants/Appellees based on an article about Huon's trial, which ended in an acquittal, when Defendants/Appellees went beyond describing the facts of the criminal prosecution of Huon and included false statements of fact in the report.

3.      Whether or not the District Court erred in dismissing Huon's false light and intentional infliction of emotional distress claims, based solely on the Court's erroneous finding that Huon could not state a claim for defamation.

4.      Whether or not the District Court erred in holding that Defendants/Appellees were immune under 47 U.S.C. § 230 for comments posted to their article of and concerning Huon, when Defendants/Appellees created and developed a web-based platform that "break[s] down the lines between the traditional roles of content creators and consumers"; created a system to monetize the comments in the discussion thread; recruited and paid writers to comment on stories on Gawker Media's own websites under an alias; invited users of the system or chose

16

users who had to "audition" to become commenters; and selected, approved, promoted, and

commercialized denigrating comments regarding Huon.

<u>**STATEMENT OF THE CASE**</u>

<u>**I.  STATEMENT OF FACTS**</u>

<u>**A. THE JEZEBEL ARTICLE CALLS HUON A RAPIST.**</u>

Huon was acquitted on May 6, 2010 of sexual assault charges by a jury in Madison County, Illinois, after approximately two hours of deliberation.  (Doc. No. 162, PageID No. 1755.)   Huon is innocent of the charges and has never been convicted of a felony or misdemeanor.

On the day of Huon's acquittal, a legal news and gossip website, Abovethelaw.com, published an article that falsely accused him of being a rapist (the "Abovethelaw.com Article").  (Doc. No. 215, PageID No. 2966.)   On May 6, 2011, Huon brought a defamation suit against several defendants, collectively referred to as the "Above the Law Defendants", associated with the publication of that article.  (Doc. No. 1, Doc. No. 215, PageID No. 2967.)

Huon's complaint states that he "was acquitted of sexual assault charges in Madison County, Illinois, after the jury deliberated for 2 hours."   (Doc. No. 1, PageID 2.)   Huon sued the Above the Law Defendants for, among other things, calling him a rapist **on the day** he was acquitted of sexual assault: "On May 6, 2010, after Mr. Huon was acquitted, Defendant Elie Mystal, posted the following on Abovethelaw.com: …" (Doc. No. 1, PageID 2.)

On May 11, 2011, **more than a year** after Huon had been acquitted and the Abovethelaw.com Article had been posted, Defendants/Appellees posted an article on Jezebel.com (the "Jezebel.com Article") , a blog for women[9] owned and operated by Defendant Gawker Media, LLC, calling Huon a rapist.

---

[9] http://jezebel.com/262130/the-five-great-lies-of-womens-magazines

The headlines of the Jezebel.com article was captioned "**Acquitted Rapist Sues Blog for Calling Him Serial Rapist**" (the "Jezebel.com Article")  (Doc.  No. 215, PageID No. 2967, Doc. No. 162, PageID No. 1770.)  Huon's 2008 mugshot was superimposed on the Jezebel.com Article.  The sub-headlines  "ABOVE THE LAW" was positioned next to Huon's booking photo.  The words "**Rape Potpourri**" was placed below the sub-headlines "ABOVE THE LAW".  Below that are the lines:  "We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together":



(Doc.  No. 162-12, PageID No. 1879; Doc.  No. 215, PageID No. 2967.)

The Jezebel.com Article incorporated the Abovethelaw.com Article by reference and hypertext .  However, Defendants/Appellees  modified the original headlines to the Abovethelaw.com Article, which did not include  Huon's booking photo.

The Jezebel.com Article reads as follows:

### Acquitted Rapist Sues Blogger For Calling Him Serial Rapist

A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. If Meanith Huon gets his way, blogger sloppiness may cost ATL $50 million.

19

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him.

Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. His beef with Above The Law stems from a roundup post entitled "Rape Potpourri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to *Forbes*.

"And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far. (Doc. No. 162, PageID No. 1771; Doc. No. 162-12, PageID No. 1879.)

The Jezebel.com Article displayed the category / search term "Rape Potpourri" on the article page. (Doc. No. 162, PageID No. 1771.) The Jezebel Article registered more than 4,374 page views. (Doc. No. 162, PageID No. 1772.)

## B. DEFENDANTS/APPELLEES ADDED HUON'S MUGSHOT, LABELED HUON "ABOVE THE LAW", AND LEFT OUT THE "UPDATE" THAT HUON HAD BEEN ACQUITTED.

Gawker Media and its writer Irin Carmon modified the Jezebel Article by adding Huon's mugshot. (Doc. No. 215, PageID 2967). Defendants/Appellees placed the words "ABOVE THE LAW" in large size font next to the mugshot. Below the words "ABOVE THE LAW" are the words "**Rape Potpourri**", in bold type. Below that, the text reads "We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together".

20

Defendants/Appellees left out the update to the original Abovethelaw.com Article that

Huon was acquitted:

UPDATE: Meanith Huon was acquitted of these charges. Please

check here for our continuing coverage.

(Doc. No. 215, PageID 2967.)

A copy of the original Abovethelaw.com Article can be viewed at Doc. 162-7, PageID

1866.

Gawker Media created a web site Jezebel.com/tag/meanith-huon, which linked to

Jezebel.com's coverage of Huon.

Defendants/Appellees later changed the headlines to the Jezebel.com Article to read:

**"Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist"** on the

following website: http://jezebel.com/5800878/man-acquitted-of-sexual-assault-sues-blog-for-

calling-him-serial-rapist--which is still available online. (Doc. No. 215, PageID 2967.)

## C. DEFENDANTS/APPELLEES CREATED AND DEVELOPED A COMMENTING SYSTEM THAT ALLOWED THEM TO CREATE ADDITIONAL CONTENT BY PAYING THEIR OWN WRITERS TO COMMENT, AND BY SELECTING USER COMMENTS TO PUBLISH, PROMOTE, COMMERCIALIZE IN CONNECTION WITH THEIR STORIES.

Defendants/Appellees wanted to create a web-based platform that "break[s] down the

lines between the traditional roles of content creators and consumers", by creating a business

model and commenting system that monetizes its readers' comments to the articles on Gawker

Media's websites. Specifically, Nick Denton and Gawker Media have described Gawker

Media's platform, called "Kinja", as breaking down the traditional walls between writers and

21

readers so as to allow both content creators and consumers—including Gawker Media writers

and advertisers-- to comment on Gawker Media stories online via the Kinja platform:

> Kinja is our publishing platform designed to make great stories by breaking down
> the lines between the traditional roles of content creators and consumers. Everyone —
> editors, readers, marketers — have access to the same tools to engage in passionate
> discussion and reveal the truth. Sharing, recommending, and following within the Kinja
> ecosystem allows for improved information discovery.
> http://advertising.gawker.com/platform/

In an internal memorandum, Denton explained that the purpose of Gawker Media's

commenting system was to generate more advertising dollars by commercializing and

monetizing the discussion thread to the stories on Gawker Media's websites:

> We all know the conventional wisdom: the days of the banner advertisement are
> numbered. In two years, our primary offering to marketers will be our discussion
> platform.  http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-
> monetize-comments/.

(Doc. No. 162, PageID No. 1774-1775.)

Gawker Media admitted that its "best writers were first elevated from the commentariat,

or came to our notice by writing an effective takedown of one our stories on their own blogs."

http://joel.kinja.com/introducing-recruits-1520191540.   Gawker Media created a program called

"Recruits" to recruit writers to comment on stories on Gawker Media websites:

> To address this, I'm creating a new program at Gawker Media that we're calling
> "Recruits." Recruits will be paid, short-term contractors who receive a monthly stipend,
> their own Kinja subsite attached to one of our eight core brands, mentoring and direction
> from our site leads and their staff, as well as an aggressive bonus structure that will
> reward the capturing of uniques (using the same Quantcast "people" metric we use across
> all the sites).  http://joel.kinja.com/introducing-recruits-1520191540. [10]

---

[10] http://gawker.com/5537233/gawker-media-seeks-community-interns;
http://deadspin.com/5429932/gawker-media-seeks-brave-interns-to-navigate-nasty-comments-
section.;http://www.americanpressinstitute.org/publications/reports/strategy-studies/shape-
comments/   ("Great Kinja commenters can even be contacted to write for pay through the
company's "Recruits" program.");
http://www.capitalnewyork.com/article/media/2014/06/8547356/gawker-media-graduates-its-

Gawker Media paid its writers to comment on Gawker Media's stories, based on eCPM or the effective cost per thousand impressions:[11]

> Recruits will operate on a $5 eCPM—earning $5 for every 1,000 uniques they bring in each month. We will "spot" Recruits their first $1,500 a month; we're not monsters. Recruits can post as little or as often as they'd like; determining the sweet spot will be part of their learning and tuning process. Monthly uniques over the first 300,000 ($1,500) a month will be paid out at the $5 eCPM, up to a maximum of $6,000. (An atypically aggressive bonus for Gawker, reached at just 1,250,000 uniques per month, but we want to reward initiative.) http://joel.kinja.com/introducing-recruits-1520191540.

Hundreds of "anonymous" comments posted to promote Gawker stories have been traced to actual Gawker employees.    (Doc. No. 195-6, PageID 2744-2749, Doc. No. 195-7, PageID 2750-2752.)[12]

Gawker developed and enforces a system of commenting on its websites by invitation only that monetizes the comments.    (Doc. No. 162, PageID 1774-1775.)  Gawker shapes the contents of the conversation of the comments and discussion and gives the advertiser "a reasonably large degree of control of the conversation that most people see in that post".  (Doc. No. 162, PageID 1774-1775.)

---

first-class-recruits; http://ajr.org/2014/03/27/pay-per-visit-debate-chasing-viral-traffic-hurting-journalism/

[11] Google's AdSense blog explains eCPM.  http://adsense.blogspot.com/2006/02/ecpm-what-exactly-is-that.html

[12] Meanith requests that the Seventh Circuit take judicial notice of the journalist Drew Johnson's articles on http://gawkersucks.blogspot.com.  Government of the Canal Zone v. Burjan, 596 F.2d 690 (5th Cir. 1979); Nwaokolo v. Immigration and Naturalization Service , 314 F.3d 303 (7th Cir. 2002); Rowe v. Gibson, 798 F. 3d 622  (7th Cir. 2015) (Seventh Circuit took judicial notice and made limited use of information from reputable medical websites); Federal Rule of Evidence 201(d).

Gawker Media's written policy is that comments are by invitation only:

1. Who can leave comments on Gawker?

Anyone who's auditioned successfully to become a commenter (see below) or anyone who's received an email invitation from us. The comment system is invitation-only because our editors want to spend more time providing new content and less time moderating comment threads.  http://gawker.com/126529/gawker-comments-faq.  (Doc. No. 162, PageID 1774-1775.)

Users of the Gawker Media platform have to audition to comment on Gawker Media's

websites:

2. How can I become a commenter?

To become a commenter, you need to audition, which means leaving at least one comment on the site . . .  Your comment will be received but won't appear until (and if) we approve it.  http://gawker.com/126529/gawker-comments-faq

Gawker Media selected and approve every comment to its articles:

How do I get approved to comment?
**We only approve the comments we love**—so make sure you're adding something of quality to the post. Stay on-topic and seek to further the conversation. Leave us a juicy story on the #tips page or throw your hat into the ring of our open forums . . .  (Emphasis supplied.)  http://gawker.com/126529/gawker-comments-faq[13]

(Doc. No. 162, PageID No. 1775.)

In this case, Gawker Media selected every comment to the Jezebel Article by invitation

only.  A number of the comments selected for publication by Gawker Media contained false

statements of and concerning Huon.  For brevity sake, the defamatory comments regarding

Meanith are quoted in the Argument Section but can be found in the record at Doc. No. 162,

PageID No. 1773-1774, PageID No. 1778-1781, Doc. 162-13, Page ID 1880, Doc. 162-18, Page

---

[13] Huon requests that the Seventh Circuit take judicial notice of Defendants/Appellees' admissions on its own websites.  Rowe v. Gibson, 798 F. 3d 622  (7th Cir. 2015); Fed. R. Evid. 201(d).

ID 1894 to 1919, Doc. 162-19, Page ID 1920 to 1922, Doc. 162-20, Page ID 1923, Doc. 162-21,

Page ID 1894 to 1924.

Gawker Media blocked Huon's rebuttal comment to the Jezebel Article.  (Doc.  No. 162,

PageID No. 1781.)

## II.  PROCEDURAL HISTORY

### A.  THE ORIGINAL FIRST AND SECOND AMENDED COMPLAINTS.

On May 6, 2011, Huon filed his Complaint against the Above the Law Defendants.

[Doc. 1.]

On July 11, 2011, after the Jezebel.com Article was published, Huon filed his First

Amended Complaint adding Defendants/Appellees, certain other news and media defendants,

and certain Doe defendants.  (Doc. No. 12.)   On June 23, 2011, Huon was granted leave to

voluntarily dismiss the other news and media defendants and Doe defendants and to file a

Second Amended Complaint.  (Docs. 21 and 22.)

### B.  DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT.

On September 22 and 23, 2011, attorneys for Defendants/Appellees filed their

Appearances. (Doc. Nos. 42 and 43.)  On September 26, 2011, the Above the Law Defendants

filed their Memorandum in Support of their Motion to Dismiss.  (Doc. No.  49.)  On September

30, 2011, Defendants/Appellees filed their Memorandum in Support of their Motion to Dismiss.

(Doc. No. 58.)  On January 30, 2012, all the parties had completed their briefing.  (Doc. No.

135.)

## C.  THE REASSIGNMENT OF THE CASE TO HON. JOHN THARP.

On August 1, 2012, the case was reassigned from Hon. Judge Marvin Aspen to the Hon.

Judge John Tharp. (Doc. No. 149.)

On August 13, 2012, Judge Tharp dismissed Huon's Second Amended Complaint *sua
sponte* for lack of subject matter jurisdiction.  (Doc. No. 151.)

On September 12, 2012, Huon filed his Third Amended Complaint.  (Doc. No. 156.)

The remaining Doe defendants were dropped from the Third Amended Complaint.  (Doc. No.

156.)   On September 14, 2012, the District Court dismissed Huon's Third Amended Complaint

*sua sponte* for lack of subject matter jurisdiction.  (Doc. No. 157.)

On November 15, 2012, Huon timely filed his Fourth Amended Complaint.  (Doc. No.

162).

## D.  DEFENDANTS' MOTIONS TO DISMISS THE FOURTH AMENDED COMPLAINT.

On January 7, 2014, the Gawker Defendants filed their Motion to Dismiss the Fourth

Amended Complaint and supporting Memorandum.  (Doc. Nos. 174 and 175.)

On January 7 and  24, 2013, the Above the Law Defendants filed their Motion to Dismiss

and Memorandum.  (Doc. Nos. 179 and 194.)  On April 11, 2013, all the parties had completed

their briefing, including replies.  (Doc. No. 191, 192, 200, 207, 210.)

## E.  THE DISTRICT COURT GRANTED THE GAWKER DEFENDANTS' MOTION TO DISMISS.

On December 4, 2014, the District Court entered a Minute Entry and Memorandum

Opinion granting the Motion to Dismiss of the Gawker Defendants and granting in part and

26

denying in part the Motion to Dismiss of the Above the Law Defendants. (Document Nos. 214 and 215.)

## F. THE DISTRICT COURT DENIED HUON LEAVE TO FILE A PROPOSED FIFTH AMENDED COMPLAINT PLEADING SPECIAL DAMAGES.

On January 1, 2015, Huon filed his Motion for Leave to File a Proposed Fifth Amended Complaint and for Reconsideration. (Doc. No. 223.)

On January 29, 2015, the District Court confirmed that it had not entered a Judgment pursuant to Rule 54(b); Judge Tharp took Huon's motion to reconsider and for leave to file a proposed fifth amended complaint under advisement. (Doc. No. 234.)

On May 20, 2015, the District Court denied Huon's motion to reconsider and for leave to file his proposed Fifth Amended Complaint. (Doc. No.248.) On May 28, 2015, the District Court referred the case for the purpose of conducting a settlement conference between Huon and the Above the Law Defendants and stayed the case, pending the settlement proceedings. (Doc. No. 249.)

On September 5, 2015, Huon filed a motion for entry of judgment under Rule 54(b) only against the Gawker Defendants and to lift the stay in part. (Doc. Nos. 261 and 263)

On or about September 10, 2015, a settlement was reached as to the Above the Law Defendants; however, the District Court denied Huon's motions for entry of judgment pursuant to Rule 54(b). The District Court stated it would enter a judgment in favor of the Gawker Defendants upon dismissal of the Above the Law Defendants. (Doc. No. 266.)

On September 16, 2015, the District Court dismissed the Above the Law Defendants with prejudice pursuant to the settlement. (Doc. 269.)

27

On September 16, 2015, the District Court entered a final judgment in favor of the

Gawker Defendants and against Huon.  (Document Nos.: 269 and 270.)   This appeal followed.

<u>SUMMARY OF ARGUMENT</u>

Plaintiff/Appellant Meanith Huon is an attorney with more than 19 years'

experience and has never been disciplined by the State Bar, and has never been convicted

of a felony or misdemeanor.  He is a victim of Defendant/Appellee's defamation—calling

him a "**Rapist**", when he is not one, more than a year after Huon's acquittal.

Huon was found **not guilty** of sexual assault by a jury of his peers, and the

statements made by Defendants/Appellees were false.

Defendants/Appellees committed this injustice by: (1) calling Huon a "**Rapist**" in its

headline on a blog for women called Jezebel.com; (2) positioning the sub-headline "ABOVE THE

LAW" and words "**Rape Potpourri**" next to Huon's 2008 mugshot (3) posting the lines, "We've

got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll

tackle them together",  next to Huon's mugshot; (4) writing a defamatory story, implying that

Huon is guilty of rape and escaped punishment; (5)  linking, quoting, and republishing another

defamatory story that was more than a year old from the blog Abovethelaw.com; (6) removing the

update from the Abovethelaw.com Article that Huon was acquitted; (7) categorizing the article

as "**Rape Potpourri**"; (8) falsely suggesting that Gawker Media and its writer Irin Carmon knew

what the jury relied on in finding Huon not guilty, when it never spoke to any juror; (9) falsely

implying that Huon got away with rape because the complaining witness had been unfairly

portrayed as having a few drinks and consenting to sex, when the consent defense was never

submitted to the jury for consideration; (10) falsely implying that Huon is a rapist who now

28

complains of being called a serial rapist when Huon sued the Abovethelaw.com Defendants for

calling him a rapist on the day of his acquittal; (11) drafting, editing, promoting or modifying the

comments below the story about Huon to mislead the public into believing that those statements

were created by third parties; (12) encouraging and inviting its daily visitors to audition and

submit comments by "invitation only" to disparage Huon, and shaping and choreographing the

content of those comments, to intensify and give credibility to the defamatory statements,

despite Huon's acquittal, all to maximize Defendants' own profit at the expense of Huon.

Defendants/Appellee's headlines and Jezebel.com Article are defamatory *per se*, because

the statements impugning Huon's integrity, prejudices his practice of law, and imply that he

committed a crime, thereby harming Huon's reputation, character, and career.

Falsely accusing someone of rape is actionable defamation. The District Court erred in

holding that the defamatory headline was capable of an innocent construction, because of the

word "acquitted" in the headline and article.    Illinois case law is extensive and clear:  The

"innocent construction" rule does not apply to an article that calls the plaintiff a criminal, simply

because the defendant uses isolated words that soften or disclaim the allegation.  The innocent

construction rule does not permit trial courts to strain to find unnatural, but possibly innocent,

meanings of words where that construction is clearly unreasonable and a defamatory meaning is

more probable.

The natural and obvious meaning of the words and implications of the defamatory

statements is that Huon is a rapist who got away with the serious crime of rape, not an innocent

man who was properly acquitted of the charges against him.  The Jezebel.com Article's headline

and the remainder of the Jezebel.com Article repeatedly imply that Huon did in fact commit a

29

rape and managed to get away with it, because the complaining witness had been unfairly

portrayed as having a few drinks and consenting to sex. The consent defense was never

submitted to the jury, and the jury was never polled.

Comments from readers—selected and promoted by Gawker Media employees--

evidences that readers of the Jezebel.com Article understood the natural and obvious defamatory

meaning of the headline and article: that Huon is a rapist who got away with rape.

Defendants/Appellees chose the denigrating comments to intensify the defamatory meaning in

the headlines and Article.

The District Court further erred in applying the fair report privilege to protect the

Jezebel.com Article, on the grounds that the Article was a fair abridgement of the complaint filed

against the Above the Law Defendants or of the original criminal prosecution brought against

Huon. The Article is plainly not a fair abridgement of the criminal proceedings, because

Defendants invented the fiction that Huon is a rapist and speculated as to the reasons for why

Huon was acquitted. Carmon writes that "Huon's version was that it was a consensual

encounter". However, Huon never testified at the criminal trial.

The District Court therefore erred by deciding, as a matter of law, that Defendants did not

abuse the fair reporting privilege, without even permitting discovery on that claim.

The District Court dismissed Huon's other tort claims on the basis that Huon purportedly

did not state a claim for defamation; this determination should be reversed as well.

The District Court further erred by holding that 47 U.S.C. § 230, which provides for

immunity for certain website operators for content posted to their websites, provided immunity

to Defendants/Appellees for defamatory comments posted to the Jezebel.com Article. Gawker

30

Media is an information content provider that is responsible, in whole or in part, for the creation

or development of the defamatory comments and discussion about the Jezebel.com Article's

content.   Gawker Media created and developed a web-based platform to give content creators--

including Gawker Media's writers and advertisers--the ability to post comments to Gawker

Media's stories.  Defendants/Appellees designed and developed the content and a specific

website dedicated to defaming Huon.

Finally, the District Court also erred in holding that Huon could not plead that

Defendants/Appellees had personal involvement in the creation of comments in the discussion

section of the Jezebel.com Article.  Immunity under Section 230 **does not** extend to defendants

who personally participate in creating such content.   Under federal notice pleading standards,

Huon adequately pled that Gawker Media employees actively posted comments under aliases,

and caused defamatory comments to be posted about Huon.  Users of the commenting system

had to be invited by Gawker Media or to audition for Gawker Media, before being permitted to

comment.  Gawker Media selected and promoted every comment.   This issue cannot be reached

on a motion to dismiss.  The District Court should have allowed Huon to conduct discovery.  At

the very least, Huon should have been granted leave to amend his complaint.

## ARGUMENT

## STANDARD OF REVIEW

An order granting a motion to dismiss, and the resulting judgment, is reviewed *de novo*.

Pisciotta v. Old National Bankcorp., 499 F.3d 629, 633 (7th Cir. 2007).  The facts alleged in the

complaint are taken as true, drawing all reasonable inferences in favor of the plaintiff.  Pisciotta,

499 F.3d at 633. "The complaint must contain only a short and plain statement of the claim

31

showing that the pleader is entitled to relief." Id.; Fed.R.Civ.P. 8(a)(2).  The complaint is

sufficient if it gives the defendant fair notice of the claims pleaded and rises above the

speculative level.  Pisciotta, 499 F.3d at 633.

## I.    THE DISTRICT COURT ERRED IN DISMISSING HUON'S DEFAMATION PER SE CLAIM.

### A.    THE "INNOCENT CONSTRUCTION" RULE DOES NOT APPLY.

Statements impugning a person's integrity, prejudicing his practice of law, and/or

implying that he committed a crime are defamatory per se.   Solaia Tech., LLC v. Specialty Publ.

Co., 221 Ill. 2d 558, 590 (Ill. 2006).  The Illinois Supreme Court has held that when someone is

charged with committing a crime, that statement is a fact, not an opinion.  Catalano v. Pechous,

83 Ill. 2d 146, 159-161 (Ill. 1980).   The Illinois Supreme Court in Catalano relied on Cianci v.

New Times Publishing Co., 639 F.2d 54 (2d Cir. 1980).  There, the Second Circuit held that

accusations of criminal activity—rape-- even in the form of opinion, are not constitutionally

protected under the First Amendment.  Cianci, 639 F.2d at  63-64 (2d Cir. 1980).

In this case, accusing someone of being a rapist in a headline is actionable defamation per

se under Illinois law.   Calling someone a rapist superimposed on his 2008 booking photo and

implying he got away with rape is defamation per se.  Insinuating that a rapist was upset because

he was accused of being a rapist and not a one-time rapist is defamation per se.  Calling someone

a rapist who was acquitted of rape because the complaining witness had been portrayed as

having a few drinks on a blog for women called Jezebel.com is defamation per se.  Accusing

someone of being **"Above the law"** and being the subject of rape stories and "**Rape Potpourri"**

is defamation per se.

32

The District Court erred by dismissing Huon's defamation *per se* count against
Defendants/Appellees based on the "innocent construction" rule, which states that where
defamation *per se* is alleged, the "words and implications" of the allegedly defamatory statement
must be "given their natural and obvious meaning" and "if, as so construed, the statement may
reasonably be innocently interpreted… it cannot be actionable per se." Chapski v. Copley Press,
92 Ill.2d 344, 442 N.E.2d 195, 199 (Ill. 1982).

However, the "innocent construction" rule is an extremely narrow carve-out from the
defamation *per se* cause of action.  The rule requires a court to consider the statement in context
and to give the words of the statement, and any implications arising from them, their natural and
obvious meaning. Kolegas v. Heftel Broadcasting Corp., 154 Ill.2d 11, 607 N.E.2d 201 (1992).
In construing the statement under the innocent construction rule, the court must "give the
allegedly defamatory words their natural and obvious meaning" and interpret them "as they
appeared to have been used and according to the idea they were intended to convey to the
reasonable reader." Bryson v. News America Publications, Inc., 174 Ill.2d 77, 93, 672 N.E. 2d
1207 (Ill. 1996). Courts must therefore interpret the allegedly defamatory words as they appeared
to have been used and according to the idea they were intended to convey to the reasonable
reader. Bryson, 174 Ill.2d at 93.

The Illinois Supreme Court in Chapski warned against "generally strain[ing] to find
unnatural but possibly innocent meanings of words where such construction is clearly
unreasonable and a defamatory meaning is more probable" Chapski, 92 Ill. 2d at 350-352
(1982).  "The rule also does not require courts to espouse a naïveté unwarranted under the
circumstances." Tuite v. Corbitt, 224 Ill. 2d 490, 503, 866 N.E.2d 114, 123 (Ill. 2007).

"The innocent construction rule does not apply, simply because allegedly defamatory words are 'capable' of an innocent construction." Bryson, 174 Ill.2d at 93.  When a defamatory meaning was clearly intended and conveyed, the court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule. Bryson, 174 Ill.2d at 93.  Bryson dispels the notion that the innocent construction rule applies whenever a word has more than one dictionary definition, one of which is not defamatory. Bryson, 174 Ill.2d at 93.

In Bryson, the plaintiff brought a defamation action against the author of an article that appeared in a magazine's "fiction" section, and against the publisher of that magazine, alleging the article defamed plaintiff by referring to and characterizing a character as a "slut," thereby implying the plaintiff was an "unchaste" individual. Bryson, 174 Ill.2d at 84-87.  The defendants claimed the assertion that plaintiff was a "slut" was not actionable *per se* because the word "slut" may reasonably be innocently construed as describing the plaintiff as a "bully," and that the American Heritage Dictionary includes a number of different definitions for the word "slut," including "a slovenly, dirty woman," "a woman of loose morals," "prostitute," a "bold, brazen girl," or "a female dog." Bryson, 174 Ill.2d at 92-93.

The Illinois Supreme Court explained that immediately preceding the sentence in which the plaintiff was called a "slut," the author/defendant described an incident that occurred two months earlier. The author stated that Bryson appeared at a bonfire with "two guys that nobody knew. One had a tattoo, and they were all drinking. Lots. Who knows what guys like that made Bryson do." The sexual implication underlying the use of "slut" is intensified with the commentary, "Who knows what guys like that made Bryson do." Bryson, 174 Ill.2d at 93-94.

34

Bryson is strikingly similar to the case at bar.  Defendants/Appellees use context and

innuendo to make very clear that they are calling Huon a rapist, and that Huon got away with

rape because the complaining witness had been unfairly painted as having gone drinking.  There

is no reasonable reading of the article as in fact being susceptible to the interpretation that Huon

was actually an innocent man who was properly acquitted.  Just as the context made clear the

meaning of "slut" in Bryson, the context makes clear the meaning of "acquitted rapist" here.

In Tuite, the Illinois Supreme Court reversed the dismissal of a defamation claim by a

lawyer against a book publisher where the book in question alleged that the lawyer was engaged

by several Mafia members who had been implicated by overwhelming evidence in a number of

serious crimes, but were jubilant when they secured the plaintiff's representation, because it

meant they were sure to be acquitted.  The court rejected the claimed innocent construction that

this was due to plaintiff's skills as a lawyer, and held that a reasonable reader would infer that

Tuite was expected to use illegal tactics to secure an acquittal for his clients.  Tuite, 224 Ill. 2d at

513.

Specifically, the Illinois Supreme Court rejected the argument that the use of some

isolated, disclaiming language was sufficient to require the application of the innocent

construction rule:

> Defendants, nonetheless, argue that terms such as  "better representation," "retainer,"
> "defense money," and "legal fees" in the excerpt indicate that Tuite was hired to provide
> legitimate legal services rather than to pay bribes. Defendants maintain that it is
> reasonable to accept the innocent construction that Tuite was hired on the basis of his
> legal skills. We disagree. The isolated use of those terms does not control the meaning of
> the excerpt.  Tuite 866 N.E.2d at 128.

The Tuite Court also rejected the argument that the lack of an explicit accusation against

Tuite was sufficient to bring the publication within the innocent construction rule.  Tuite, 224 Ill.

35

2d at 513.  <u>Tuite</u>, again, is very similar to the facts here.  The District Court relied on exactly the

sort of isolated disclaimer ("acquitted" rapist), and Defendants/Appellees' couching of their

language, in determining that the innocent construction could be placed on the Jezebel.com

Article.

In <u>Hadley v. Doe a/k/a Fuboy</u> ,an individual using the name "Fuboy" posted the

following comments:

> Hadley is a Sandusky waiting to be exposed. Check out the view he has of Empire
> [Elementary School] from his front door.

> Anybody know the tale of Hadley's suicide attempt? It is kinda "It's a Wonderful Life"
> with Pottersville win[n]ing out. We can just be happy that Stephenson County is fortunate
> enough to have this guy want to be of "service" again.  <u>Hadley v. Doe</u>, 2015 IL 118000, ¶
> 3.

Both the Illinois Supreme Court and the Illinois Appellate Court held that that Fuboy's

statement imputes the commission of a crime to the plaintiff Hadley. The appellate court took

judicial notice of the fact that, at the time Fuboy's comment was posted, "the Sandusky sexual

abuse scandal had dominated the national news for weeks. <u>Hadley</u>, 2014 IL App (2d) 130489, ¶

27,  2015 IL 118000, ¶ 36. While Fuboy did not explicitly state Hadley was a pedophile, the

Illinois Supreme Court concluded as it did in <u>Tuite</u>, that this is not fatal. <u>Hadley v. Doe</u>, 2015 IL

118000, ¶ 37; <u>Tuite</u>, 224 Ill.2d at 514.

Giving the words used by Fuboy their natural and obvious meaning, and considering the

timing of the comment, the Illinois Supreme Court held that the idea Fuboy intended to convey

to the reasonable reader by his statement, " Hadley is a Sandusky waiting to be exposed. Check

out the view he has of Empire from his front door," was that Hadley was a pedophile or had

engaged in sexual acts with children.  <u>Hadley v. Doe</u>, 2015 IL 118000, ¶ 37.

36

The Illinois Appellate Court in <u>Hadley</u> rejected the argument that the innocent construction rule applied because Sandusky was only an **accused** pedophile, and not a **convicted** pedophile, at the time of publication: "[W]ords are defamatory *per se* if they impute the commission of a crime, regardless of whether the subject was charged or convicted. Conviction is not a critical element."  2014 IL App (2d) 130489, ¶ 30.   "A statement need not state the commission of a crime with the particularity of an indictment to qualify as defamatory per se." <u>Van Horne v. Muller,</u> 185 Ill.2d 299, 308 (Ill. 1998).   <u>See also Parker v. House O'Lite Corp</u>., 324 Ill.App.3d 1014 (1st Dist. 2001); <u>Stavros v. Marrese</u>, 323 Ill.App.3d 1052, 1057 (1st Dist. 2001).

Under the Illinois Supreme Court's controlling interpretation of the "innocent construction" rule, Huon's defamation *per se* claim is clearly not barred by the rule. Defendants/Appellees called Meanith the "**Acquitted Rapist**"—the reasonable meaning of this is that he was indeed a rapist who managed to obtain an acquittal for some reason.  The obvious and natural meaning of the headline "**Acquitted Rapist Sues Blog for Calling Him Serial Rapist**" is that Huon is a one-time rapist who is complaining of being called a serial rapist.  You cannot be acquitted of rape and be an acquitted rapist, unless you are a rapist who has been acquitted of another rape or you are a rapist who got away with rape. It is not reasonable to construe this language any other way—no reasonable person would refer to someone who had **not** committed a rape as an "acquitted rapist"; rather, language such as "accused of rape", "charged with rape, but the charge was never proven", or "put on trial for a rape that the jury found he did not commit" would be used instead.  The word "rapist" only has one meaning, even with "acquitted" in front of it—and it is not an innocent one.

37

The wording of the entire headline makes an innocent construction impossible.  The words "**Acquitted Rapist**" stands in stark contrast to the words "**Serial Rapist**" in the same sentence.  "**Acquitted Rapist Sues Blog for Calling Him Serial Rapist**" is obviously intended as an ironic headline, and the intended irony makes absolutely no sense unless the headline is actually calling Huon a rapist.  The intended irony that is being conveyed is that a rapist is suing someone for calling him what he is.  The headline only works as a headline if it is in fact communicating that someone who **did** commit a rape is suing a blog for reporting that fact to its readers.  No "innocent construction" is possible, and Appellees have certainly not borne their burden of proof, <u>especially in the context of this motion to dismiss</u>.

Additionally, Gawker Media's commenters clearly understood the meaning being conveyed by "**Acquitted Rapist**", because comments selected by Gawker Media recommended that the headline "acquitted rapist" be changed:

> If I were writing a blog post about a blog getting sued for multiple millions of dollars over incorrectly labeling a person a rapist, I would be pretty damn careful not to incorrectly label him a rapist myself. Apparently Jezebel feels differently.
>
> "Acquitted Rapist"
> Um, is my understanding off, or is this man not (legally) a rapist? It seems calling him an "acquitted rapist" paints a target on Jezebel's back. Might wanna change that heading.[14]

Following these comments, Gawker Media and Carmon changed the headlines to **"Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist".**

Gawker Media employees selected, promoted, wrote, or commercialized comments to intensify the defamatory headlines and article.  The comments selected by Gawker Media from

---

[14] The Jezebel.com Article with the changed headlines and comments are still available online at <u>http://jezebel.com/5800878/man-acquitted-of-sexual-assault-sues-blog-for-calling-him-serial-rapist</u>

commenters (who were invited or chosen by Gawker Media to comment after an audition) are

evidence that the natural and obvious meaning of the words and implications of the statements

by readers is defamatory -- that Huon is a rapist who got away with of rape:

- Just because a man is acquitted of rape does not mean he did not commit rape. That a jury would decide "not guilty" does not magically erase what he did--if he did, in fact, rape someone. The vast majority of rapists are never convicted of rape. Does that make them not rapists?

- Nevermind "serial rapist," he sounds like a foreal crazy person.

- Thanks, bartender and lawyer, for reminding me that since I have a vagina I'm not allowed to go out in public and attempt to engage in any sort of enjoyable activity unless I'm willing to have sex. With anyone who asks - my presence in a bar gives blanket permission to any guy who happens to find me attractive. I mean, if I didn't want to be raped I'd just stay at home, right?

- So he is actually upset about the "Serial" rapist part, actually he is just a one time accused rapist.

- Weird. I didn't know "where do I go to have fun" meant the same thing as "where do I go to get raped." It's great that that jury made that clear to me, otherwise I could get myself in some sticky situations like apparently accidentally begging to be raped. AWE. SOME.

- . . . Fuck this "he's been acquitted" noise. He's a rapist alright, so we may as well call him one.

- Well shit! I didn't know kicking back at a bar and asking where I should go to have fun meant that I hereby consent to any and all sexual activity, with anybody, with this bartender here as my witness. Can I sign away my right to consent here on my bar tab? Okay, great.

(Doc. No. 162, PageID No. 1778-1781, Doc. 162-13, Page ID 1880, Doc. 162-18, Page ID 1894 to 1919, Doc. 162-19, Page ID 1920 to 1922, Doc. 162-20, Page ID 1923, Doc. 162-21, Page ID 1894 to 1924.)

The District Court relied solely on Defendants/Appellees' use of the word "acquitted"

once in the headline and once in the story.  Tuite is clear that the use of the word "acquitted" is

insufficient to invoke the "innocent construction" rule.  The word "acquitted" in this context is

precisely analogous to the language in the book at issue in <u>Tuite</u> about what a skilled lawyer

Tuite was.  Defendants/Appellees, just like the publisher in <u>Tuite</u>, published a story that in

language and tone portrayed Meanith as a rapist. As the Illinois Supreme Court held in <u>Tuite</u>, this

is not a situation where a court can save Appellees with an "innocent construction."   Being

acquitted of one rape or a series of rape does not absolve the false accusation in the headlines

calling Meanith a rapist.

 Defendants/Appellees also modified the original headlines from the Abovethelaw.com

Article, which was more than a year old.  Defendants/Appellees added Huon's mugshot,

positioned the words "ABOVE THE LAW" next to Huon's mugshot so as to insinuate that Huon

was "above the law", and classified the Jezebel.com story as "<span style="color:red">Rape Potpourri</span>".

Defendants/Appellees cut and posted the lines "We've got a couple of rape stories, but I don't

have enough rape humor to fill out two posts. So we'll tackle them together".  But

Defendants/Appellees left out the update from the Abovethelaw.com Article that Huon was

acquitted--more than a year ago.   In that context, it would be a stretch of the imagination and

unreasonable to construe "acquitted rapist" innocently.

 Furthermore, the Jezebel.com Article expanded on the original criminal proceeding to

lend credibility to the defamatory headlines, by falsely reporting that Gawker Media and Carmon

knew why Huon was acquitted.   Carmon invented the fiction that Huon got away with rape

because Huon's version was that the complaining witness had a few drinks and consented to sex,

when Carmon never interviewed a juror or Huon and when the issue of consent was never sent to

the jury for consideration.  Huon never testified in the criminal trial.  In that context, there is no

innocent construction and certainly no basis to apply the doctrine as a matter of law <u>at the</u>
<u>pleading stage</u>.

### B.   <u>SO LONG AS THE PUBLICATION IS REASONABLY SUSCEPTIBLE OF A DEFAMATORY MEANING, A FACTUAL QUESTION FOR THE JURY EXISTS</u>.

Importantly, the Illinois Supreme Court has held that "whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff." <u>Chapski</u>, 92 Ill.2d at 352; <u>Action Repair, Inc. v. American Broadcasting Companies, Inc</u>., 776 F.2d 143, 145 (1985).   "In applying the rule the court does not construe the factual allegations in the light most favorable to the defendant." <u>Tuite</u>, 224 Ill. 2d at 510.  Thus, if the likely intended meaning of a statement is defamatory, a court should not dismiss the plaintiff's claim under the innocent construction rule." <u>Tuite</u>, 224 Ill. 2d at 512.

The Illinois Supreme Court's holding reaffirms long standing jurisprudence that where the meaning of the words of the publication is in dispute, an issue of fact arises and must be determined by the jury. <u>Baker v. Warner</u>,  231 U.S. 588, 594, 34 S.Ct. 175, 58 L.Ed. 384 (U.S. 1913.).   Where the language used is capable of two meanings, one libelous and the other not, then the question of the meaning to be ascribed to it must be submitted to the jury. <u>Washington Post Co. v. Chaloner,</u> 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987;  <u>Estill v. Hearst Publishing Co., Inc.,</u> 186 F.2d 1017, 1021  (7th Cir. 1951); <u>Spanel v. Pegler</u>, 160 F.2d 619, 623 (7th Cir. 1947); <u>Celle v. Filipino Reporter Enters</u>., 209 F.3d 163, 177, 178 (2d Cir.2000); <u>Hatfill v. N.Y. Times Co.</u>, 416 F.3d 320 (4th Cir. July 28, 2005);  <u>Proesel v. Myers Publishing Company</u>, 24 Ill.App.2d 501, 510 (1st Dist. 1960.).

41

In <u>DeHusson, et. al. v. Hearst Corp., et. al.,</u> the Milwaukee Sentinel published a photo of

four boys with the headline "Slain School Girl Vanished With Someone In Cadillac." 204 F.2d

234, 236 (7th Cir. 1953). The Seventh Circuit held that the article was capable of conveying the

meaning that the plaintiffs were the youths being held on suspicion of murder, and that it is a

jury question how persons to whom it was originally published understood it. <u>DeHusson,</u> 204

F.2d at 238.

In <u>Solano, Jr. v. Playgirl, Inc.</u>, 292 F.3d 1078 (9th Cir. 2002), the January 1999 issue of

Playgirl magazine featured a cover photograph of actor Jose Solano, Jr., from the television

program "Baywatch". Solano was shown shirtless and wearing his red lifeguard trunks under a

heading reading: "TV Guys. PRIMETIME'S SEXY YOUNG STARS EXPOSED." Solano did

not appear nude in the magazine and sued Playgirl alleging it deliberately created the false

impression that he did so, making it appear he was willing to degrade himself and endorse such a

magazine. The 9th Circuit explained that "Solano's profile inside the magazine was of a

relatively innocent and nonsexual nature is of little significance." <u>Solano, Jr.</u> at 1083. The 9[th]

Circuit held that the issue was one for the jury to decide. <u>Solano, Jr.</u> at 1083. The Ninth Circuit

held that a jury reasonably could conclude that the Playgirl cover conveyed the message that

Solano was not the wholesome person he claimed to be, that he was willing to—or was "washed

up" and had to—sell himself naked to a women's sex magazine. <u>Solano, Jr.</u> at 1084.

Here, the Jezebel.com headlines and Article are capable of several defamatory meanings:

that Huon is a "**Rapist**"; that Huon is a rapist who got away with rape because Huon testified

that the sex was consensual (Huon never testified and the consent defense was not sent to the

jury to decide on); that Huon escaped punishment because the complaining witness was

42

portrayed as having drinks with him; that Huon is "ABOVE THE LAW"; that Huon was recently

charged with rape; that Huon is a serial rapist or sex offender; that Huon is a one-time rapist who

complains about being called a serial rapist.   It is for a jury to decide question of the meaning to

be ascribed to all of these actionable defamatory statements.

        Just like in Solano, Jr., Huon's mugshot on a blog for women called Jezebel.com calling

him an "**Acquitted Rapist**" and implying that he escaped punishment because the woman had

been unfairly characterized as drinking conveys the image that Huon is a sex offender who

victimizes women and needs to be outed to the female readers of Jezebel.com.  Huon's

appearance on a blog for women calling him a rapist in the headlines creates the false impression

that he's a criminal who needs to be registered and tracked like a sex offender.  This defamatory

meaning is evidenced in the comment invited, selected, approved, promoted, and

commercialized by Gawker Media:

> Two seconds of proper Googling will get you to Mr. Huon's firm webpage, complete
> with his phone number, should you want to call and offer any critiques.   (Doc.  No. 162,
> PageID 1782.)

## C.  THE  IMPACT OF THE HEADLINES AND SUBHEADLINES CREATE A FALSE IMPRESSION THAT MEANITH IS A RAPIST.

        Headlines alone may be enough to make libelous *per se* an otherwise innocuous article.

Empire Printing Co. v. Roden, 247 F.2d 8, 14 (9th Cir.1957); Kaelin, 162 F.3d at 1041.   A

defamatory charge does not have to be made in direct, positive language, but may be implied,

Professional and Business Men's Life Ins. Co. v. Banker's Life Co. 163 F.Supp. 274

(D.Mont.1958); Klein v. Belle Alkali Co., (4th Cir. 1956) 229 F.2d 658.  The jury can conclude

that the headline was placed where it was for its effect upon the reader in connection with the

other headlines.  Empire Printing Co., 247 F.2d at 15 (9th Cir.1957); Kaelin, 162 F.3d at 1041.

43

A false implication or impression may be created by the positioning of true statements and headlines, McNair v. Hearst Corporation, 494 F.2d 1309 (9th Cir. 1974).  Defamatory newspaper headlines that do not fairly and accurately reflect the gist of the text are not privileged, even though the story if read in its entirety would not be misleading. Curtis Publishing Company v. Vaughan, 278 F.2d 23, 29 (District of Columbia, 1960.).   This rule takes into account the very general practice of large segments of the public who read the headlines only and thus fail to get the full import of the article as an entity.  Id.  This rule is even more applicable today in an Internet world of viral posts, limited Twitter characters, shortened attention span, and the limited screen size of mobile and tablet devices.

Kaelin v. Globe Communications Corp., 162 F.3d 1036 (9th Cir.1998), involved a defamation action brought by Kato Kaelin, the houseguest of O.J. Simpson, against the Globe tabloid for publishing a front-page headline announcing, "COPS THINK KATO DID IT ... he fears they want him for perjury, say pals." Kaelin argued the "IT" implied the two brutal murders for which Simpson was tried and acquitted; the magazine claimed the word referred only to perjury, because the article inside the magazine explained that the police suspected Kaelin of having committed perjury.   The 9th Circuit Court of Appeals held: "Even assuming that such a [perjury] reading is reasonably possible, it is not the only reading that is reasonably possible as a matter of law. So long as the publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists." Kaelin, 162 F.3d at 1040.2

The 9th Circuit concluded that the accuracy and truth of the Globe article discussing the suspicion that Kaelin had perjured himself did not cure the false impression conveyed by the cover headline, which implied he was suspected of murder. Kaelin, 162 F.3d at 1041. The 9th

44

Circuit held that the issue was one for the jury to decide.  Id.  The Circuit Court of Appeals for

the Ninth Circuit held that reasonable jurors could find that clear and convincing evidence

established: (1) the front page headline falsely insinuated that the police believed that Kaelin

committed the murders; and (2) the false insinuation was not necessarily cured by the subheading

or by the non-defamatory story about Kaelin. Id.   See also McNair v. Hearst Corp., 494 F.2d

1309, 1310 (9th Cir. 1974).  See also Cook v. East Shore Newspapers, Inc., et. al., 327 Ill.App.

559, 561 (4th Dist. 1946).

       In this case, the Jezebel.com Article's headlines **"Acquitted Rapist Sues Blog for**

**Calling Him Serial Rapist"** created the false impression that Huon is a rapist who railroaded the

justice system.  Defendants intensified the defamatory meaning of the headlines by modifying

the original headlines from the Abovthelaw.com Article and placing the sub-headlines  "ABOVE

THE LAW" and the words in bold  "**Rape Potpourri**"  next to Huon's mugshot.  Defendants

republished the following lines from the Abovthelaw.com Article:  "We've got a couple of rape

stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together".

However, Defendants/Appellees conveniently omitted the "update" to the Abovethelaw.com

Article  that Huon was acquitted.  Although the Jezebel.com Article is still available online,

Defendants/Appellees have never added the "update" to the original Abovethelaw.com Article.

       Calling Huon a rapist is not cured by an article falsely claiming that Huon is a rapist who

complains of being called a serial rapist.  Insinuating that Huon is a one-time rapist who

complained of being called a serial rapist is defamatory *per se*.  Thus, the Jezebel.com Article

still charged Huon with commission of a crime and impeached his honesty, integrity, and

reputation.

45

## II.   THE DISTRICT COURT ERRED BY FINDING THAT THE FAIR REPORT PRIVILEGE PROTECTS THE JEZEBEL.COM ARTICLE.

The District Court erred by finding that the fair report privilege protects the Defendants/Appellees, on the grounds that the Jezebel.com Article contains a "fair abridgement" of Huon's complaint in this Federal Court litigation.  The original proceedings being examined should be the original proceedings in the Madison County criminal trial, not a complaint pled under notice pleading rules in Federal Court litigation.  The Jezebel Article is not a fair abridgement of the original proceedings in the criminal trial because it expands beyond the facts of the original criminal proceedings and fabricates factual claims.  Calling someone a rapist is not a fair abridgement of a proceeding that ended in an acquittal by a jury.  It is also not a fair abridgement of Huon's complaint against the Above the Law Defendants because it again extends beyond the facts of the proceeding and makes false factual claims.  Huon pled that he was acquitted and that he sued the Above the Law Defendants for calling him a rapist on the day that he was acquitted.   Nevertheless, Gawker Media and Carmon invented the fiction that Huon is a rapist who complained of being called a serial rapist.  Huon's allegation that he is innocent of the rape charges must be taken as true for purposes of a motion on the pleadings.

### A.   THE JEZEBEL ARTICLE WAS NOT A "FAIR ABRIDGEMENT" OF THE ORIGINAL PROCEEDINGS IN THE CRIMINAL TRIAL.

The District Court erred and decided questions of fact in finding that the Jezebel Article contains a "fair abridgement" of Huon's original complaint in this Federal Court litigation.  The fair report privilege has two requirements: (1) the report must be of an official proceeding; and (2) the report must be complete and accurate or a fair abridgement of the official proceeding.  Solaia Technology, LLC v. Specialty Pub. Co., 221 Ill.2d 558, 588 (Ill. 2006).

46

A fair abridgement means that the report must convey to readers "a substantially correct

account." Restatement (Second) of Torts § 611, Comment f, at 300 (1977); Solaia Technology,

LLC, 221 Ill.2d 2d 558,589-590 (2006).   The privilege does not permit the expansion of the

official report by the addition of additional, fabricated factual claims.  Snitowsky v. NBC

Subsidiary (WMAQ-TV), Inc., 297 Ill.App.3d 314, 310 (1st Dist. 1988).  The privilege also does

not apply to an inaccurate account of the proceedings;  Myers v. The Telegraph, 332 Ill.App.3d

917, 922 (5th Dist. 2002); Lowe v. Rockford ,179 Ill.App.3d 592, 597  (2d Dist. 1989).  "If you

embellish a defamatory statement with accusations you know to be false, taken from ancient

government reports that have no claim to contemporary credence, your repetition of those stale

accusations is not privileged".  Brown & Williamson Tobacco Corp., 713 F.2d 262 at 272; Cook

v. Winfrey, 141 F.3d 322, 330-31 (7th Cir. 1998).

In this case, the Jezebel.com Article is not a fair abridgement of the original **criminal

proceedings** in the  Madison County criminal trial.  Gawker Media and Irin Carmon expanded

on the official report by inventing facts designed to improve the credibility of the defamation and

was an inaccurate account of the original proceedings in the Madison County criminal trial.  The

Gawker Defendants invented the fact that Huon was a rapist but got away with rape.  Huon was

acquitted of sexual assault.

Moreover, the Gawker Defendants invented the fact that "Huon's version was that it was

a consensual encounter, and partly on the strength of a bartender's testimony that the woman had

been drinking and asked where to go to have fun, the jury believed him."  But Huon never

testified.   The consent defense was not an issue that the jury was allowed to consider, because

47

Huon never testified.  The jurors were not polled in the original proceedings.  (Document 179-2, PageID 2076.)

In addition, the reason for Huon's acquittal was not the "strength of the bartender's testimony" that the woman had been drinking and asked where to go to have fun. Video surveillance footage showed Jane Doe hanging out with Huon.  In this case, the District Court commented that "That is an odd argument given that the bartender's testimony about the victim's drinking and inquiry about where to go to have fun was almost certainly evidence that *the defense* elicited at trial."  (Doc. No.  215, PageID 2985.)    But Jezebel.com Article falsely implies that Huon, a rapist, escaped punishment, after the complaining witness had been unfairly portrayed as having a few drinks and asking where to go to have fun.  The Jezebel.com Article falsely implies that the complaining witness was unfairly portrayed as giving her consent to have sex when she had been drinking and asked where to go to have fun.   However, the jury in the criminal case was not allowed to consider the consent defense, and that is not the reason for why Huon was acquitted.  (Doc.  No. 162, PageID 1764.)  The Jezebel.com Article is an inaccurate abridgement of the original proceedings because it is not an accurate reports of the reasons—or any reason--why Huon was acquitted .

Huon was acquitted for the following reasons: (the following citations are to the long record in Meanith Huon v. Former Madison County State's Attorney Hon. William Mudge, et. al., Seventh Circuit Case No.: 13-2966, Southern District Court Case No. 3:12-cv-00166-MJR):

- Video surveillance footage showed Jane Doe hanging out with Huon.  (Doc. No. 150-1, Page ID No. 2970-2971.)

- Jane Doe's story to the detectives contradicted the different stories she told to the witnesses on the scene, who the detectives never interviewed: William Granda,

48

Marlin Mitchell, and Linda Bueller . (Doc. 150-2, PageID# 3125-3128, Doc. No. 145-7, PageID No. 2668, Doc. No. 78, PageID No. 929.)

- Jane Doe impeached herself  by testifying inconsistently as to whether she was interviewing for a promotional modeling job or was getting paid to hang out. (Doc. No. 150-4, Page ID No. 3570-3572.)

- The lead detective, William Marconi, Defendant, informed Huon  "that at no time was he being accused of striking, nor physically threatening her [Jane Doe] with violence. "  Huon was accused of "yelling" at Jane Doe.  (Doc. No. 150-1, Page ID No. 3015 to 3017; Doc. No. 150-8, Page ID No. 3741.)

- But Jane Doe could not remember any threatening statements made by Huon . (Doc. No. 150-4, Page ID No. 3521.)

- Photographs of Jane Doe show her clothes to be intact.  (Doc. No. 150-1, Page ID No. 2980, Doc. No. 150-3, Page ID Nos. 3291, 3293.)

- No semen or blood evidence was found.  (Doc. No. 150-3, PageID Nos. 3271-3772.)

- Jane Doe never saw a medical care provider; no rape kit was performed.   (Doc. No. 150-3, Page ID No. 3291.)

### B.   THE JEZEBEL ARTICLE WAS NOT A "FAIR ABRIDGEMENT" OF THE COMPLAINT IN THIS FEDERAL COURT LAWSUIT.

In addition, the Jezebel.com Article is not a fair abridgement of the complaint filed

against the Above the Law Defendants.  In Eastwood v. Nat'l Enquirer, Inc., 123 F.3d 1249 (9th

Cir.1997), the 9th Circuit addressed a publication's creating an implied false message.  In

Eastwood, the tabloid magazine National Enquirer's cover page headline advertised an

"Exclusive Interview" with actor/director Clint Eastwood. The magazine contained an article

with quotes allegedly attributable to Eastwood, cast as if Eastwood had been speaking directly to

the bylined Enquirer editor. Eastwood, 123 F.3d at 1250. Eastwood in fact had never given any

interview to the Enquirer—exclusive or otherwise. Although the magazine never expressly stated

that Eastwood actually had given it the interview, the court nevertheless reasoned that the

49

Enquirer had "signal[ed], through text and graphics, that he had willingly talked to the Enquirer." Id. at 1255.

Like the publisher in <u>Eastwood</u>, Carmon writes "Huon's version was that it was a consensual encounter", as if Huon gave an interview.    However, that never happened, and the consent defense was never submitted to the jury.  Gawker Media and Carmon speculated as to why Huon was acquitted of rape, but no juror was interviewed.  Defendants/Appellees reported on the story as if they had interviewed a juror or Huon or had witnessed the original criminal proceedings, to give a false impression that Defendants knew why Huon was acquitted of rape. But Carmon and Gawker Media made up the reasons for why Huon was acquitted.   Huon never gave his version at the criminal trial or to Carmon.  Gawker Media and Carmon invented a work of fiction.

The Jezebel.com Article's reference to Huon's Federal Court complaint is a superficial attempt to give credibility to the defamatory statements in the headlines and the Jezebel.com Article, just like Carmon's fictional interview with Huon.  Under federal notice pleading, Huon's Complaint in Federal Court pled that Huon "was acquitted of sexual assault charges in Madison County, Illinois, after the jury deliberated for 2 hours."   (Doc. No. 1, PageID 2.)   Huon sued the Abovethelaw.com Defendants for calling him a rapist **on the day** that he was acquitted of sexual assault: "On May 6, 2010, after Mr. Huon was acquitted, Defendant Elie Mystal, posted the following on Abovethelaw.com: …" (Doc. No. 1, PageID 2.)    As the plaintiff, Huon is the master of his complaint.  He is "the master of [his] fate, [he is] the captain of [his] soul."[15] Defendants cannot call Huon a rapist and raise as a defense, what Huon intended to mean in his complaint, under federal notice pleadings.   Although the Jezebel.com Article continues to be

---

[15] <u>Invictus</u> by William Ernest Henley.

available online, Defendants/Appellees have made no updates to reflect Huon's First, Second,

Third, or Fourth Amended Complaint.  (Doc.  No. 215, PageID 2967.)

      Furthermore, the fair report privilege neither protects a reporter's personal commentary

nor an indictment by innuendo. Gawker Media and Carmon modified the original headlines to

the Abovethelaw.com Article, adding Huon's mugshot, positioning the words "ABOVE THE

LAW" next to his mugshot, calling him an "**Acquitted Rapist**".  Like with the headlines to the

Abovethelaw.com Article, Defendants/Appellees lifted words out of context from the *Forbes*

article and Huon's complaint.   It seems that Carmon never reviewed the entire complaint in

Federal Court before running the story.  Carmon leaves out that in Huon's Complaint in Federal

Court, Huon sued the Above the Law Defendants for calling him a rapist **on the day** he was

acquitted of sexual assault.  Defendants/Appellees did not accurately summarize the *Forbes*

article, which begins with the sentences: "Getting publicly accused of committing rape is bad

enough. Getting publicly accused of committing multiple rapes is considerably worse." [16] The

*Forbes* article describes being publicly accused of rape as defamatory, regardless as to whether it

is once or several times  ("bad enough" to "considerably worse").   It is **not** a defense to a claim

for defamation for calling Huon a rapist that he is a one-time rapist, just not a serial rapist.   Just

like it is not a defense for calling someone a murderer that he is a one-time murderer , just not a

serial killer.  Accusing someone of any crime is defamatory.

      Finally, the question as to whether or not the Jezebel.com Article accurately summarizes

the Abovethelaw.com Article or the Belleville News Democrat ("BND") article or a story in

*Forbes* is irrelevant; the statements reported or implied in the Abovethelaw.com Article, the

---

[16] http://www.forbes.com/sites/jeffbercovici/2011/05/11/lawyer-sues-legal-blog-for-50m-over-rape-story/#6d40242b2228

51

BND Article, and *Forbes* are likewise defamatory.   As the District Court noted, the republisher

of a defamatory statement made by another is himself liable for defamation. See Owens v. CBS

Inc., 173 Ill. App. 3d 977, 992, 527 N.E.2d 1296, 1307 (1988).  Hyperlinking to a defamatory

content is a re-publication of that defamatory content. Pisani v. Staten Island University Hosp.,

440 F.Supp.2d 168 (E.D.N.Y.,2006); In re Perry, 423 B.R. 215 (S.D.Tex.,2010).   Calling Huon

a rapist or implying he is a criminal is defamation *per se*.

## C.  THE DISTRICT COURT ERRED BY DECIDING A QUESTION OF FACT BY IMPLICITLY FINDING THAT DEFENDANTS/APPELLEES DID NOT ABUSE THE PRIVILEGE.

Both the Seventh Circuit and Illinois courts have held that it is question of fact for a jury

as to whether the fair reporting privilege was abused.  Brown & Williamson Tobacco Corp. v.

Jacobson, 713 F.2d 262, 272 (7th Cir. 1983); Maple Lanes, Inc. v. News Media Corp., 322

Ill.App.3d 842 (2d Dist. 2011).   If the court finds a conditional privilege exists, and thus that the

communication was made in good faith by a defendant, the jury is then asked to determine

whether the defendant abused the privilege.  Kuwik v. Starmark Star Marketing and Admin.,

Inc., 156 Ill.2d 16, 27 (1993).

In the case at hand, the District Court tacitly decided that Defendants did not abuse the

fair report privilege based solely on Huon's pleading.  But the conclusion that the privilege

applied to the allegedly defamatory statements in this case required the District Court to resolve

factual issues that should not be reached on a motion to dismiss, such as whether

Defendants/Appellees reviewed any government reports from Huon's criminal trial, and what

Defendants/Appellees' reasons were for leaving out the update to the Abovethelaw.com Article

that Meanith had been acquitted and changing the headlines to the Abovthelaw.com Article.

52

Defendants/Appellees' repetition of stale accusations calling Meanith a "**Rapist**" is not

privileged—it is republication of a defamatory statement.

### III .  SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT PROVIDE IMMUNITY TO DEFENDANTS/APPELLEES.

The District Court erred in holding that Section 230 of the Communications Decency

Act, 47 U.S.C. § 230, provides immunity to Defendants/Appellees for comments posted to the

Jezebel.com Article.  Defendants/Appellees are information content providers who participated

in the creation of the content contained in their comments threads.  Defendants/Appellees created

and developed a website platform to break down the traditional distinction among writers,

readers, and advertisers, because Defendants/Appellees wanted to commercialize and monetize

the comments.  Gawker Media's writers and advertisers can comment on Gawker Media's

stories.  The commenting system is by invitation only; every person has to audition to become a

commenter.  Defendants/Appellees pay writers to comment on their own stories.  Even with

respect to comments by readers, every comment to a story on one of Defendants/Appellees'

websites must be selected by their employees.  Defendants/Appellees shape and control the

comments in the discussion threads.

### A.  DEFENDANTS/APPELLEES ARE INFORMATION CONTENT PROVIDERS.

Section 230 provides:  "No provider or user of an interactive computer service shall be

treated as the publisher or speaker of any information provided by another information content

provider."  47 U.S.C. § 230.  The immunity afforded by the CDA is not absolute and may be lost

if the site owner invites the posting of illegal materials or makes actionable postings itself.  Fair

Housing Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir.

53

2007) (*en banc*).

A website operator can be both a service provider and a content provider. <u>Fair Housing Council of San Fernando Valley,</u> 521 F.3d at 1162-1163.  However, with regard to content that it creates itself, or is "responsible, in whole or in part" for creating or developing, the website is a content provider.  <u>Id.</u> at 1162-1163.  Causing a particular statement to be made, is sufficient to vitiate the immunity and give rise to liability for a website.  <u>Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc</u>., 519 F.3 666 (7th Cir. 2008).   A website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.  <u>Fair Housing Council of San Fernando Valley,</u> 521 F.3d at 1167-1168.

Immunity is especially inappropriate **at the pleading stage** where the plaintiff alleged that the defendant created allegedly defamatory content.  <u>Hy Cite Corp. v. badbusinessbureau.com,</u> 418 F.Supp.2d 1142, 1148–49 (D.Ariz.2005).

Extensive authority supports Huon's contention that by participating in the creation and selection of user comments, Defendants/Appellees forfeited Section 230 immunity.  In <u>Woodhull v. Meinel</u>, 202 P.3d 126, 133 (N.M. App. 2008), the court rejected Section 230 immunity where the defendant solicited comments making fun of the plaintiff and then incorporated and featured them on the website.   In <u>Anthony v. Yahoo Inc</u>., 421 F. Supp. 2d 1257, 1262 (N.D. Cal. 2006), Yahoo! was held to have acted outside the scope of Section 230 protection where the plaintiff alleged that Yahoo! created fake profiles on its website.   In <u>Hy Cite Corp. v. badbusinessbureau.com,</u> 418 F.Supp.2d 1142, 1148 (D.Ariz. 2005) , plaintiff alleged that defendants operate a website known as the Rip-off Report and that persons using the Internet

54

have access to the website.   Persons accessing the website may view so-called Rip-off Reports,

make comments on those Reports, or post their own Rip-off Reports.  Plaintiff alleged that

defendants created editorial comments and titles to Rip-off Reports and that Defendants "solicit

individuals to submit reports with the promise that individuals may ultimately be compensated

for their reports." Id.  at 1148-1149.  The District Court concluded that these allegations arguably

could support a finding that Defendants are "responsible … for the creation or development of

information" provided by individuals submitting Rip-off Reports in response to Defendants'

solicitation.  Id.  at 1148-1149.  See also Nestle Purina PetCare Co. v. Blue Buffalo Co. Ltd.,

2015 WL 1782661 (E.D. Missouri 2015) (advertising firm that designed and built the advertising

campaign is an "information content provider" and accountable under the CDA for the content it

created for a website).

       In this case, Defendants/Appellees specifically admitted that they created a web-based

platform that "break[s] down the lines between the traditional roles of content creators and

consumers", to generate advertising revenue from Gawker Media's commenting system.

Defendants/Appellees called the platform "Kinja"--Blogwire Hungary Szellemi Alkotast

Hasznosito KFT is known as Kinja KFT.  Defendants/Appellees shaped the contents of the

conversation of the comments and discussion on its stories.  The comment system is invitation-

only .  Users were required to audition to become a commenter or to receive an email invitation

from Defendants/Appellees.  Gawker Media employees also created fake accounts to post

"anonymous" comments online  to promote Gawker Media's stories appear to be a companywide

policy.  Gawker Media admitted that some of its "best writers were first elevated from the

commentariat."  Gawker Media created a program called "Recruits" to recruit paid writers to

comment on stories on Gawker Media websites.

In Huon's case, Defendants/Appellants developed unlawful content and contributed

materially to the unlawfulness of the conduct.  Defendants/Appellees created original content

for a defamatory and bullying campaign against Huon at Jezebel.com,

Jezebel.com/tag/meanith-huon, and jezebel.com/5800878/man-acquitted-of-sexual-assault-

sues-blog-forcalling- him-serial-rapist.    Gawker Media's employees selected and "only

approve the comments [Gawker Media] we love".  Under the guise of outing a rapist who

escaped punishment,  Defendants/Appellees called Huon a "**Rapist**" and "ABOVE THE

LAW" next to his mugshot.  Defendants/Appellees encouraged and invited its 7 million daily

visitors to audition and submit comments by "invitation only" to disparage Huon, and shaped

and choreographed the content of those comments, to intensify and give credibility to the

defamatory statements, despite Huon's acquittal, all to maximize Defendants' own profit at

the expense of Huon.[17]  Gawker Media selected every comment to the Jezebel.com Article,

blocking Huon's rebuttal comment to the Jezebel.com Article.  Defendants/Appellees

designed and created the Kinja platform, invented the fiction about Huon being a  rapist, chose

the people who auditioned to be commenters (including Gawker Media employees) and

selected their comment to call Huon a rapist, and generated  advertising revenue from a

commercialized commenting system.  Thus, in denigrating Huon, Defendants/Appellees

caused defamatory comments to be posted about Huon.  Under these circumstances, Huon has

pleaded a viable and plausible claim that Defendants/Appellees are not immune under Section

230, and the District Court erred in deciding that Huon's claim must fail as a matter of law.

---

[17] http://gawker.com/stats/graph/uniques/monthly

### B. HUON HAS ADEQUATELY PLED AGENCY.

The District Court also rejected Huon's allegation that Gawker Media employees posting comments were acting within the scope of their employment.  It is well established, however, that in diversity cases, federal law governs procedure, not state law.  Horowitz v. Animal Emergency and Treatment Centers of Chicago, LLC, et. al., 2012 WL 3598807 at page 3 (N.D. Illinois, 2012) (holding that defendant's reliance on Illinois law on fact pleading agency lends no guidance); See Gacek v. American Airlines, Inc., 614 F.3d 298, 301–02 (7th Cir.2010). Pursuant to the federal notice pleading standards, the Court must accept all well-pleaded facts as true and draw all permissible inferences in the pleader's favor.  Horowitz, 2012 WL 3598807 at page 3.

In this case, Huon properly alleged that:

110.    On information and belief, certain commenters may actually be Jezebel Defendants' employees, posting under an alias, and on information and belief, several defamatory statements about Mr. Huon by unidentified "commenters" are actually Jezebel Defendants'' employees. Plaintiff believes that discovery will reveal this to be the case.  (Doc.  No. 162 Filed, PageID 1774.)

Huon's pled sufficient facts to support a claim that the commenters were acting within the scope of their employment or agency with Gawker Media.  The defamatory comments posted by Gawker Media employees were expressly pled in the complaint.  Huon further described Gawker Media's commenting system designed to monetize comments by its users, including Gawker Media employees.  Huon pled that Gawker Media selected, approved, and promoted every comment. Gawker Media admits on its websites that "We only approve the comments we love", that  some of its "best writers were first elevated from the commentariat" and that it pays

57

writers to comments on its own stories, and that every person has to audition to comment on any of the Gawker Media's websites.

In addition, scope of employment is a factual issue that cannot be resolved on a motion to dismiss.  "Because scope of employment is a fact-intensive issue, Illinois courts have held that it is generally inappropriate to resolve this issue at the motion to dismiss or summary judgment stage."  Doe v. Clavijo, 72 F. Supp. 3d 910, 913 (N.D. Ill. 2014); accord Doe v. Roe, 2013 WL 2421771 at page 3 (N.D. Ill. Jun. 3) ("Illinois courts have frequently declined to grant summary judgment (let alone a motion to dismiss) when scope of employment is at issue.").

The District Court therefore erred in holding, as a matter of law, that commenters employed or engaged by Gawker Media, were not acting within the scope of their employment.

## C.  A QUESTION OF FACT EXISTS AS TO WHETHER DEFENDANTS/APPELLEES CREATED THE CONTENT.

It is a question for the jury as to whether the defendants created the content within the meaning of Section 230 of the CDA, which cannot be decided on a motion to dismiss.  Hy Cite Corp. v Badbusinessbureau.com, L.L.C., 418 F.Supp.2d 1142, 1147-1149 (D. Ariz. 2005).  When the defendants actively solicits or causes defamatory statements to be made, it is a question for the jury as to whether the defendants created the content within the meaning of Section 230 of the CDA.  Doctor's Assocs. v. QIP Holder LLC, 2010 WL 669870 (D. Conn. Feb. 19, 2010); see also Woodhull v. Meinel, 145 N.M. 533, 540 (N.M. Ct. App. 2008), (A genuine issue of fact exists as to whether defendant's actions went beyond those intended to be immunized under the CDA.)

In Whitney Information Network, Inc. v. Xcentric Venture, LLC, 199 Fed.Appx. 738, 739 (11th Cir. 2006), defendants operated the websites "www.ripoffreport.com" and

58

"ripoffrevenge.com," and solicited consumers to submit complaints about any company that has

"ripped" the consumers off, and defendants then choose to publish certain of these complaints on

their website "www.ripoffreport.com," thereby implying that the companies named in the

complaints are "ripping off" consumers.  Defendant, Ed Magedson, submitted declarations that

the agents of the LLC defendant Xcentric Ventures, LLC "do not choose which stories to post,"

that they "are instructed never to add content to a report", and that defendants did not fabricate

and post any of the consumer complaints at issue. Id. at 743-744.  The Eleventh Circuit held that

defendants' declarations did not adequately rebut the allegations of the amended complaint and

that the district court therefore erred when it shifted the burden of proof to plaintiff based on

defendants' declarations and then granted defendants' motion to dismiss .  The Eleventh Circuit

held that defendants failed to establish that they were entitled to immunity under the CDA.

Whitney Information Network, Inc., 199 Fed.Appx. at 743-744.

        Here, no declarations were even filed by Defendants/Appellees.  The District Court

essentially shifted the burden from Defendant/Appellees to Huon, without giving Huon an

opportunity to conduct discovery.  The District Court made Huon prove his case at the pleading

stage.   However, it is a question of fact whether or not Defendants caused the defamatory

comments to be made within the meaning of Section 230 of the CDA and whether or not

Defendants' employees posted comments under aliases.

**IV.  THE DISTRICT COURT ERRED IN DISMISSING THE FALSE LIGHT AND
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS AGAINST
THE DEFENDANTS/APPELLEES.**

        The District Court's determination that the false light invasion of privacy and intentional

infliction of emotional distress claims against the Defendants/Appellees were insufficiently

pleaded was based wholly on its rejection of Huon's defamation claims.  (Doc. No. 215, PageID

2991, 2994.) These claims were never considered on their merits or dismissed on any other

ground other than the dismissal of the defamation claims.  Thus, a reversal on the defamation *per*

*se* count requires a reversal and remand on these claims as well.  Bright v. Hill's Pet Nutrition,

Inc., 2009 WL 2502098 (7th Cir. 2009) (reversal of judgment on one legal theory permits

plaintiff to litigate logically related claims on remand).

### V.  PLAINTIFF, MEANITH HUON, HAS NOT BEEN AFFORDED EXCESSIVE OPPORTUNITIES TO AMEND.

The District Court the District Court erred in denying Huon leave to file his proposed

Fifth Amended Complaint on the grounds that Huon has had numerous opportunities to amend

his pleadings.

Huon has not had numerous opportunities.  After Huon filed his original Complaint, he

filed his First Amended Complaint adding the Gawker Defendants and certain Illinois news and

media and John Doe defendants, pursuant to Federal Rule of Civil Procedure 15(a).  Huon then

was given leave to file his Second Amended Complaint voluntarily dismissing the aforesaid

Illinois news and media and John Doe defendants.

On August 14, 2012 and September 14, 2012, Judge Tharp dismissed Huon's Second and

Third Amended Complaint *sua sponte* for lack of subject matter jurisdiction.  With regard to the

Third Amended Complaint, the Court stated that "Huon makes at least two errors in attempting

to allege complete diversity: first, he fails to allege the citizenship of each members of the LLC

defendants, and second, he fails to allege the principal place of business of certain corporate

defendants."

60

However, discovery and the 26(f) conference have continued to be deferred in this case. (Doc. No. 34, PageID 283, Doc. No. 187, Doc. No. 163, Doc. No. 165, Doc. No. 234.)  Before the case was assigned to Judge Tharp, Defendants never made their initial Rule disclosures, pursuant to FRCP 7.1 and Local Rule 3.2.  (Doc. No. 163.)  Had Defendants timely made their Rule 7.1 disclosures, the issue of subject matter jurisdiction might have been moot.

Without discovery, on November 15, 2012, Huon timely filed his Fourth Amended Complaint.  On January 10, 2013, the Gawker Defendants made their Rule 7.1 disclosures. (Doc. Nos. 185 and 186.)   The District Court held that this matter was properly before the District Court under diversity jurisdiction.  (Doc. No. 215, PageID 2969.)

After two rounds of extensive briefing on Defendants' Motions to Dismiss from September 2011 to January, 2012 before Judge Aspen and from January 2013 to April 11, 2013 before Judge Tharp, Huon took the reasonable path by waiting for Judge Tharp to issue a ruling on the merits of the case.  More than a year after the second round of briefing was completed, the District Court ruled on Defendants' Motion to Dismiss.

Huon filed his First Amended Complaint against the Gawker Defendants on July 11, 2011.  Until the District Court ruled on the Gawker Defendants' Motion to Dismiss Huon's Fourth Amended Complaint on December 4, 2014, the District Court never decided the merits of Huon's defamation claims.  In footnote 16 of the District Court's Memorandum, the District Court concluded that "an adequately pleaded defamation *per quod* claim might survive as to the original headline of the Jezebel Article and the image placed directly below it."  Except for a single reference to the word "innocently" or "innocent",  the Gawker Defendants/Appellees' never developed a cogent argument for the "innocent construction" rule as a defense in its

61

Motion to Dismiss and Memorandum.   Rather, the District Court *sua sponte* held that the

defamatory headline was capable of an innocent construction, because of the word "acquitted."

Huon should have been afforded the opportunity to test his claims on the merits  or an

opportunity to cure any defects by amending his complaint.

## **CONCLUSION**

WHEREFORE, Plaintiff/Appellant Meanith Huon requests that this Honorable Court:

1.      Reverse the Minute Entry and the Judgment in a Civil Case dated September 16,

2015 and entered by the District Court.

2.      Reverse the Minute Entry and Order dated May 20, 2015 and entered by the

District Court.

3.      Reverse the Minute Entry and Memorandum Opinion and Order dated December

4, 2014 and entered by the District Court.

4.      Remand the case to the District Court for further proceedings.

5.      For any other relief that is just and equitable.

Respectfully submitted,

_____/s/Meanith Huon_____
Attorney for Plaintiff/Appellant, Meanith Huon

Dated:  March 2, 2016

62

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| **MEANITH HUON,** | ) | |
| | ) | |
| **Plaintiff/Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NICK DENTON,** | ) | **COURT OF APPEALS** |
| **IRIN CARMON,** | ) | **CASE NO.:  15-3049** |
| **GABY DARBYSHIRE,** | ) | |
| | ) | **DISTRICT COURT** |
| **GAWKER MEDIA, LLC a/k/a** | ) | **CASE NO.: 1:11-cv-3054** |
| **GAWKER MEDIA,** | ) | |
| | ) | |
| **BLOGWIRE HUNGARY SZELLEMI** | ) | |
| **ALKOTAST HASZNOSITO KFT,** | ) | |
| | ) | |
| **GAWKER MEDIA GROUP, INC. a/k/a** | ) | |
| **GAWKER MEDIA,** | ) | |
| | ) | |
| **GAWKER ENTERTAINMENT, LLC,** | ) | |
| | ) | |
| **GAWKER TECHNOLOGY, LLC,** | ) | |
| | ) | |
| **GAWKER SALES, LLC.,** | ) | |
| | ) | |
| **Defendants/Appellees.** | ) | |

### CERTIFICATE OF COMPLIANCE WITH
### TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
### AND TYPE STYLE REQUIREMENTS PURSUANT TO Fed. R. App. P. 32(a)(7)(B)

The undersigned, counsel of record for the Plaintiff-Appellant, Meanith Huon

furnishes the following in compliance with F.R.A.P Rule 32(a)(7):

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief **as originally filed on January 28, 2016** contains approximately  13,866 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and **exclusive of the revised jurisdictional statement mandated by this Court's Order of February 26, 2016.**  I have filed a motion to clarify or for other relief, including leave to file this amended brief with the revised jurisdictional statement and additional words *instanter* (Case No. 15-3049, Doc. 37.)

63

2. This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman, 12 points.

_____/s/Meanith Huon____
Attorney for Plaintiff/Appellant, Meanith Huon
Dated:  March 2, 2016

64

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| **MEANITH HUON,** | ) | |
| | ) | |
| **Plaintiff/Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NICK DENTON,** | ) | **COURT OF APPEALS** |
| **IRIN CARMON,** | ) | **CASE NO.:  15-3049** |
| **GABY DARBYSHIRE,** | ) | |
| | ) | **DISTRICT COURT** |
| **GAWKER MEDIA, LLC a/k/a** | ) | **CASE NO.: 1:11-cv-3054** |
| **GAWKER MEDIA,** | ) | |
| | ) | |
| **BLOGWIRE HUNGARY SZELLEMI** | ) | |
| **ALKOTAST HASZNOSITO KFT,** | ) | |
| | ) | |
| **GAWKER MEDIA GROUP, INC. a/k/a** | ) | |
| **GAWKER MEDIA,** | ) | |
| | ) | |
| **GAWKER ENTERTAINMENT, LLC,** | ) | |
| | ) | |
| **GAWKER TECHNOLOGY, LLC,** | ) | |
| | ) | |
| **GAWKER SALES, LLC.,** | ) | |
| | ) | |
| **Defendants/Appellees.** | ) | |

## NOTICE OF FILING

TO:    All counsel of record.

Please take notice that on March 2, 2016, I filed Plaintiff/Appellant, Meanith Huon's, **Appellant's Amended Brief, Short Appendix and this Notice of Filing** in the above-captioned case in the above-captioned case with the Clerk of the United States Court of Appeals for the Seventh Circuit via electronic filing.

Dated:  March 2, 2016

_____/s/Meanith Huon_____
Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

## **PROOF OF SERVICE**

I hereby certify that on March 2, 2016, I caused to be served a true and correct copy of the foregoing Notice of Filing and attached **Appellant's Amended Brief and Short Appendix,** by causing copies of same to be served on all counsel of record by electronic filing same.

_/s/Meanith Huon_____
Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

66

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| MEANITH HUON, | ) |
| | ) |
| Plaintiff/Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| NICK DENTON, | )       COURT OF APPEALS |
| IRIN CARMON, | )       CASE NO.:  15-3049 |
| GABY DARBYSHIRE, | ) |
| | )       DISTRICT COURT |
| GAWKER MEDIA, LLC a/k/a | )       CASE NO.: 1:11-cv-3054 |
| GAWKER MEDIA, | ) |
| | ) |
| BLOGWIRE HUNGARY SZELLEMI | ) |
| ALKOTAST HASZNOSITO KFT, | ) |
| | ) |
| GAWKER MEDIA GROUP, INC. a/k/a | ) |
| GAWKER MEDIA, | ) |
| | ) |
| GAWKER ENTERTAINMENT, LLC, | ) |
| | ) |
| GAWKER TECHNOLOGY, LLC, | ) |
| | ) |
| GAWKER SALES, LLC., | ) |
| | ) |
| Defendants/Appellees. | ) |

CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix

_____/s/Meanith Huon_____
Attorney for Plaintiff/Appellant, Meanith Huon

Dated: March 2, 2016

67

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MEANITH HUON, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NICK DENTON, | ) | COURT OF APPEALS |
| IRIN CARMON, | ) | CASE NO.:  15-3049 |
| GABY DARBYSHIRE, | ) | |
| | ) | DISTRICT COURT |
| GAWKER MEDIA, LLC a/k/a | ) | CASE NO.: 1:11-cv-3054 |
| GAWKER MEDIA, | ) | |
| | ) | |
| BLOGWIRE HUNGARY SZELLEMI | ) | |
| ALKOTAST HASZNOSITO KFT, | ) | |
| | ) | |
| GAWKER MEDIA GROUP, INC. a/k/a | ) | |
| GAWKER MEDIA, | ) | |
| | ) | |
| GAWKER ENTERTAINMENT, LLC, | ) | |
| | ) | |
| GAWKER TECHNOLOGY, LLC, | ) | |
| | ) | |
| GAWKER SALES, LLC., | ) | |
| | ) | |
| Defendants/Appellees. | ) | |

## TABLE OF CONTENTS FOR SHORT APPENDIX CONTAINING 30(a) and (b) MATERIALS

|  | PAGE |
|---|---|
| Minute Entry dated September 16, 2015, Doc. No. 269 | A000001 |
| Judgment in a Civil Case dated September 16, 2015, Doc. No. 270 | A000002 |
| Minute Entry dated May 20, 2015, Doc. No. 247 | A000003 |
| Order dated May 20, 2015 , Doc. No. 248 | A000008 |
| Minute Entry dated December 4, 2014, Doc. No. 214 | A000009 |

68

Case: 15-3049    Document: 39    Filed: 03/02/2016    Pages: 116

Memorandum Opinion and Order dated December 4, 2014, Doc. No. 215          A000010

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1
### Eastern Division

Meanith Huon

                                     Plaintiff,

v.                                                    Case No.: 1:11−cv−03054
                                                      Honorable John J. Tharp Jr.

Breaking Media, et al.

                                     Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, September 16, 2015:

     MINUTE entry before the Honorable John J. Tharp, Jr:Plaintiff's motion to
dismiss the ATL defendants by stipulation [267] is granted. Defendants Breaking Media,
LLC a/k/a Breaking Media, Breaking Media, Inc. a/k/a Breaking Media, David Lat, Elie
Mystal, John Lerner and David Minkin are dismissed with prejudice from this action, with
all parties to bear their own costs and attorneys' fees. Judgment is entered in favor of the
Gawker defendants. Enter Judgment Order. Case terminated. Mailed notice(air, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

A000001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

MEANITH HUON,

Plaintiff(s),

v.

BREAKING MEDIA, LLC et al.,

Defendant(s).

Case No.  11-cv-3054
Judge John J. Tharp

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which  ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant(s) Gawker Media, LLC. a/k/a Gawker Media, Blogwire Hungary Szellemi Alkotast Hasnosito KFT, Gawker Media Group, Inc. a/k/a Gawker Media, Gawker Entertainment, LLC., Gawker Technology, LLC., Gawker Sales, LLC., Nick Denton, Irin Carmon, and Gaby Darbyshire
and against plaintiff(s) Meanith Huon.
.
Defendant(s) shall recover costs from plaintiff(s).

---

☐    other:

---

This action was (check one):

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge John J. Tharp on a motion to dismiss Plaintiff's Fourth Amended Complaint.

Date:  9/16/2015

Thomas G. Bruton, Clerk of Court

Alberta Rone, Deputy Clerk

A000002

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MEANITH HUON,                                          )
                                           )
        Plaintiff,                                     )
                                           )
        v.                                             )
                                           )
BREAKING MEDIA, LLC a/k/a BREAKING            )
MEDIA; BREAKING MEDIA, INC. a/k/a             )
BREAKING MEDIA; DAVID LAT; ELIE MYSTAL;       )    No. 11 C 03054
JOHN LERNER; DAVID MINKIN; GAWKER             )
MEDIA, LLC a/k/a GAWKER MEDIA; BLOGWIRE       )    Judge John J. Tharp, Jr.
HUNGARY SZELLEMI ALKOTAST HASZNOSITO          )
KFT; GAWKER MEDIA GROUP, INC. a/k/a           )
GAWKER MEDIA; GAWKER ENTERTAINMENT,           )
LLC; GAWKER TECHNOLOGY, LLC; GAWKER           )
SALES, LLC; NICK DENTON; IRIN CARMON; and     )
GABY DARBYSHIRE,                              )
                                         )
        Defendants.                                    )

## ORDER

      For the reasons stated below, the plaintiff's Motion to Reconsider and for Leave to File a Fifth Amended Complaint [223] is denied.

## STATEMENT

      The plaintiff in this case has filed five versions of his complaint—the original and four amendments. His current motion argues that the Court erred in not allowing him a chance to file a sixth version. Five cracks at a complaint, however, is enough.

      This case involves state law claims for defamation and related torts against two groups of defendants: the Above the Law ("ATL") defendants and the Gawker defendants.[1] The suit began in May 2011 when Plaintiff Meanith Huon ("Huon") sued the ATL defendants and numerous John Does based on an allegedly defamatory article published on AboveTheLaw.com (the "ATL Article"). In July 2011, Huon filed a First Amended Complaint that added new allegations and

---

[1] The ATL defendants are Breaking Media, LLC a/k/a Breaking Media; Breaking Media, Inc. a/k/a Breaking Media; David Lat; Elie Mystal; John Lerner; and David Minkin. The Gawker defendants are Gawker Media, LLC a/k/a Gawker Media; Blogwire Hungary Szellemi Alkotast Hasznosito KFT; Gawker Media Group, Inc. a/k/a Gawker Media; Gawker Entertainment, LLC; Gawker Technology, LLC; Gawker Sales, LLC; Nick Denton; Irin Carmon; and Gaby Darbyshire.

1

additional defendants, including several of the Gawker defendants; many of the new allegations were based on an allegedly defamatory article published on Jezebel.com (the "Jezebel Article"). Less than two weeks later, Huon filed a Second Amended Complaint which removed some of the newly added non-Gawker defendants.

In September 2011, the ATL defendants moved to dismiss the Second Amended Complaint. The following month, the Gawker defendants named in the Second Amended Complaint likewise filed a motion to dismiss. The two motions were fully briefed when the case was transferred to this Court's docket in August 2012. Upon reviewing the case, the Court dismissed the Second Amended Complaint without prejudice due to deficiencies in the jurisdictional allegations, and denied the motions to dismiss that complaint as moot. Huon subsequently filed a Third Amended Complaint which contained updated jurisdictional allegations, removed some defendants, and added new allegations, claims, and the rest of the Gawker defendants.[2] Because the jurisdictional allegations were still insufficient, the Court dismissed the Third Amended Complaint without prejudice. Huon then filed the current Fourth Amended Complaint (the "Complaint"), a 68-page, 273-paragraph behemoth (not counting the 112 pages of exhibits) containing further updated jurisdictional information, in November 2012.

The ATL defendants filed a motion to dismiss the Complaint on January 7, 2013. The Gawker defendants who had been served also moved to dismiss the Complaint on that date. After receiving and reviewing the parties' briefs, the Court issued its ruling on the two motions on December 4, 2014. The Court granted the ATL defendants' motion to dismiss in part and denied it in part, and granted the Gawker defendants' motion to dismiss in its entirety. As to the Gawker defendants, the Court dismissed all nine counts of the Complaint with prejudice. As to the ATL defendants, the Court dismissed Counts II, IV, VI, VII, VIII, and IX with prejudice, allowed the remaining three counts (Counts I, III, and V) to survive only with respect to certain implications in the ATL Article, and dismissed those three counts with prejudice in all other respects. *See* Mem. Op., Dkt. 215, at 37.

On January 1, 2015, Huon filed the instant Motion to Reconsider and for Leave to File a Fifth Amended Complaint. The motion seeks leave to file the Proposed Fifth Amended Complaint which is attached as an exhibit to the motion and which contains new allegations relating to special damages in support of Count II; the motion thus implicitly requests that the Court modify its recent opinion to change the dismissal of Count II into a dismissal *without* prejudice. *See* Mtn. to Reconsider, Dkt. 223, ¶ 7. Count II was Huon's defamation *per quod* claim; the Court dismissed that claim on the basis that Huon had not pleaded special damages with the specificity required by Rule 9(g). *See* Mem. Op., Dkt. 215, at 24-26. The Court explained its decision to dismiss Count II *with* prejudice as follows:

> Given that Huon has had numerous opportunities to amend his pleadings and has been on notice of the potential deficiencies in his defamation *per quod* claim since September 2011 (when the ATL defendants filed a motion to dismiss the Second Amended Complaint and raised the special damages issue), the Court finds

---

[2] No evidence of service as to the Gawker defendants named for the first time in the Third Amended Complaint was ever filed on the docket.

2

that granting leave to replead is not warranted. *Cf. Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012) (affirming the district court's dismissal with prejudice where the plaintiffs had three opportunities to plead their claims, including an opportunity after a motion to dismiss in the case had been fully briefed). Huon has had ample opportunity to buttress his damage allegations but has not done so.

Mem. Op., Dkt. 215, at 26.

As the Court previously indicated, Huon has had numerous chances to replead the special damages allegations in support of Count II. He has filed five versions of his complaint, all of which contained a defamation *per quod* claim. Notably, in the course of briefing the motions to dismiss the Second Amended Complaint, not only did the ATL defendants challenge the sufficiency of the special damages allegations, *see* Mtn. to Dismiss, Dkt. 35, ¶ 2, but Huon's response to the ATL defendants' motion to dismiss the Second Amended Complaint specifically requested leave to replead special damages if the Court were to dismiss his defamation *per quod* claim, *see* Resp., Dkt. 135, ¶ XVI. And after the Court dismissed that complaint without prejudice based on the deficiencies in the jurisdictional allegations, Huon took advantage of the opportunity to amend his complaint by significantly expanding the allegations relating to special damages in the defamation *per quod* count in his Third Amended Complaint. *Compare* Second Amended Complaint, Dkt. 22, at 27-28, *with* Third Amended Complaint, Dkt. 156, at 49-50. He retained those expanded allegations in the current Complaint without making further material changes to them. *Compare* Third Amended Complaint, Dkt. 156, at 49-50, *with* Fourth Amended Complaint, Dkt. 162, at 53-54.

Huon now argues that although he has had multiple previous opportunities to replead his defamation *per quod* claim, he should be given an additional opportunity to replead Count II because he has not had a chance to amend following the dismissal of that count for failure to state a claim. Huon also "seeks additional time to consider repleading his other claims," though he does not identify the claims to which he is referring. Mtn. to Reconsider, Dkt. 223, ¶ 7. In support of his motion, Huon fails to identify any reason he could not have included the additional special damages allegations he now seeks to add in his third or fourth amended complaints, or why he needs more time to replead other claims.[3] Instead, he relies on two Seventh Circuit decisions indicating that a plaintiff is "generally" given at least one opportunity to amend his complaint following a dismissal for failure to state a claim. *Id.* ¶¶ 1-4 (citing *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010), and *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008)). As those opinions indicate, however, there is no absolute right to amend in such a situation. *See Bausch*, 630 F.3d at 562 ("A district court may deny leave to file an amended complaint in the case of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

---

[3] This is not a case, for example, where the plaintiff's ability to adequately plead his claim is limited by the defendant's control of information and documents. *See, e.g.*, *Olson v. Champaign Cnty.*, No. 12-3742, 2015 WL 1934388, at *6 (7th Cir. Apr. 30, 2015); *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010). Here, the pleading deficiency concerns information that is entirely within the plaintiff's own sphere.

3

cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" (alteration in original) (quoting *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007))); *Foster*, 545 F.3d at 585 (quoting the same passage from *Airborne Beepers*).

Moreover. both of the cases cited by Huon involved the dismissal of an *original* complaint immediately followed by entry of final judgment. *See Bausch*, 630 F.3d at 549; *Foster*, 545 F.3d at 584. The plaintiffs in those cases thus never had an opportunity to file *any* amended complaint, which is what concerned the Seventh Circuit. *See Bausch*, 630 F.3d at 558 ("[T]he district court erred in this case by dismissing plaintiff's *original* complaint and by denying her leave to amend her complaint." (emphasis added)); *Foster*, 545 F.3d at 584 ("'[A]n order dismissing the *original* complaint normally does not eliminate the plaintiff's right to amend once as a matter or right.'" (emphasis added) (quoting *Crestview Vill. Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 383 F.3d 552, 557 (7th Cir. 2004))).[4] Numerous recent Seventh Circuit opinions confirm this understanding. *See, e.g., Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, — F.3d —, 2015 WL 2151851, at *4 (7th Cir. May 8, 2015) ("Ordinarily, . . . a plaintiff whose *original* complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." (emphasis added)); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013) ("[P]laintiffs . . . almost always get an opportunity to amend their complaints at least once.").

Where, as here, a plaintiff has had multiple opportunities to plead his claims, the Seventh Circuit has repeatedly affirmed dismissals with prejudice and denials of leave to amend. *See, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347-48 (7th Cir. 2012) (affirming dismissal with prejudice where plaintiffs had two opportunities to replead, including an opportunity after a motion to dismiss had been fully briefed, and where plaintiffs had in fact taken advantage of that opportunity to replead); *Airborne Beepers*, 499 F.3d at 666-68 (affirming denial of leave to file Fourth Amended Complaint where plaintiff repeatedly failed to remedy the same deficiency and where the numerous complaints had caused substantial delay and prejudice to defendants); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1322-23 (7th Cir. 1998) ("[W]hile it is possible that the deficiencies of the complaint could be cured by further pleading, the plaintiff has had three chances over the course of three years to state a claim and the district judge was not required to give her another chance."). Given the procedural posture of this case—which has spanned four years, five complaints, and two rounds of motion to dismiss briefing—this is not a situation in which justice requires that the Court grant leave to amend.[5] *See* Fed. R. Civ. P.

---

[4] In addition, in *Bausch*, the Seventh Circuit noted that the dismissal of the complaint was procedurally erroneous because it was based on the defendant's affirmative defense of preemption, which should have been the subject of a motion for judgment on the pleadings rather than a motion to dismiss under Rule 12(b)(6). 630 F.3d at 561-62. That is not the case here, where the Court dismissed Count II on the basis of a pleading deficiency concerning an element of the plaintiff's claim, rather than a failure to anticipate an affirmative defense, and the plaintiff has had five opportunities to plead that claim.

[5] The Court therefore declines to consider the parties' arguments as to whether the deficiencies in the special damages allegations in Count II are curable and whether Huon's Proposed Fifth Amended Complaint in fact cures those deficiencies. As noted in the Court's

15(a)(2) ("The court should freely give leave when justice so requires."). To the contrary, justice requires that the defendants be spared yet another round of briefs, delay, and additional fees and costs necessary to respond to what would be the plaintiff's sixth version of his complaint. Accordingly, the Court denies Huon's motion for reconsideration, and Count II remains dismissed with prejudice.

Date: May 20, 2015

John J. Tharp, Jr.
United States District Judge

---

ruling on the motions to dismiss the Fourth Amended Complaint, however, "[e]ven if Huon had adequately pleaded special damages, his defamation *per quod* claim would largely fail" because the only items actionable as defamation *per quod* would be two implications in the ATL article (which were actionable as defamation *per se* in any event) and possibly the original headline of the Jezebel Article and the image below it. Mem. Op., Dkt. 215, at 26-27 n.26.

5

A000007

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1
### Eastern Division


Meanith Huon

<div style="text-align:center">Plaintiff,</div>

v.                                                                      Case No.: 1:11−cv−03054
                                                                        Honorable John J. Tharp Jr.

Breaking Media, et al.

<div style="text-align:center">Defendant.</div>

---


# NOTIFICATION OF DOCKET ENTRY


This docket entry was made by the Clerk on Wednesday, May 20, 2015:


    MINUTE entry before the Honorable John J. Tharp, Jr: Status hearing held and continued to 5/28/15 at 9:00 a.m. Plaintiff's motion to reconsider and for leave to file proposed fifth amended complaint [223] is denied. The Gawker defendants need not appear for future hearings. Mailed notice(air, )


**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

A000008

Case: 1:11-cv-03054 Document #: 214   Filed: 12/04/14 Page 1 of 1 PageID #:2985

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1
### Eastern Division

Meanith Huon

                                    Plaintiff,

v.                                                    Case No.: 1:11−cv−03054
                                                      Honorable John J. Tharp Jr.

Breaking Media, et al.

                                    Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, December 4, 2014:

        MINUTE entry before the Honorable John J. Tharp, Jr:The Gawker defendants'
motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is
granted in part and denied in part. A status hearing is set for 1/7/2015 at 9:00 a.m. Mailed
notice(air, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MEANITH HUON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 11 C 03054 |
| | ) |
| BREAKING MEDIA, LLC a/k/a BREAKING | ) Judge John J. Tharp, Jr. |
| MEDIA; BREAKING MEDIA, INC. a/k/a | ) |
| BREAKING MEDIA; DAVID LAT; ELIE MYSTAL; | ) |
| JOHN LERNER; DAVID MINKIN; GAWKER | ) |
| MEDIA, LLC a/k/a GAWKER MEDIA; BLOGWIRE | ) |
| HUNGARY SZELLEMI ALKOTAST HASZNOSITO | ) |
| KFT; GAWKER MEDIA GROUP, INC. a/k/a | ) |
| GAWKER MEDIA; GAWKER ENTERTAINMENT, | ) |
| LLC; GAWKER TECHNOLOGY, LLC; GAWKER | ) |
| SALES, LLC; NICK DENTON; IRIN CARMON; and | ) |
| GABY DARBYSHIRE, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Meanith Huon ("Huon"), brings state law claims for defamation and related

torts against two groups of defendants: the Above the Law ("ATL") defendants and the Gawker

defendants.[1] Huon initially sued the ATL defendants for publishing an allegedly defamatory

article on AboveTheLaw.com that discussed his criminal trial for sexual assault charges. He

subsequently amended his complaint to include claims against the Gawker defendants for

publishing an allegedly defamatory article on Jezebel.com about the filing of this lawsuit against

---

[1] The ATL defendants are Breaking Media, LLC a/k/a Breaking Media; Breaking Media, Inc. a/k/a Breaking Media; David Lat ("Lat"); Elie Mystal ("Mystal"); John Lerner ("Lerner"); and David Minkin ("Minkin"). The Gawker defendants are Gawker Media, LLC a/k/a Gawker Media ("Gawker Media, LLC"); Blogwire Hungary Szellemi Alkotast Hasznosito KFT ("Blogwire Hungary"); Gawker Media Group, Inc. a/k/a Gawker Media ("Gawker Media Group, Inc."); Gawker Entertainment, LLC ("Gawker Entertainment"); Gawker Technology, LLC ("Gawker Technology"); Gawker Sales, LLC ("Gawker Sales"); Nick Denton ("Denton"); Irin Carmon ("Carmon"); and Gaby Darbyshire ("Darbyshire").

1

the ATL defendants. The current Fourth Amended Complaint (the "Complaint") seeks relief against all the defendants for defamation *per se* (Count I), defamation *per quod* (Count II), false light invasion of privacy (Count III), intrusion upon seclusion (Count IV), intentional infliction of emotion distress (Count V), conspiracy to defame (Count VI), conspiracy to invade privacy (Count VII), tortious interference with prospective economic advantage (Count VIII), and cyberstalking and cyberbullying (Count IX). The ATL defendants have moved to dismiss all the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Several of the Gawker defendants have likewise moved to dismiss all the claims against them. For the reasons stated below, the Gawker defendants' motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is granted in part and denied in part.

## BACKGROUND

Meanith Huon is an attorney licensed to practice law in Illinois.[2] On July 2, 2008, Huon was charged with two counts of criminal sexual assault, two counts of criminal sexual abuse, and one count of unlawful restraint. The charges arose out of his alleged interactions with "Jane Doe" on June 29, 2008, in Madison County, Illinois. *See* Gawker Motion to Dismiss, Dkt. 191, at 25 (Exhibit A). Approximately one year later, on July 17, 2009, Huon was charged with cyberstalking and witness harassment based on allegations involving the same Jane Doe. *See id.*

---

[2] In reviewing a motion to dismiss, the Court may consider: (1) the plaintiff's complaint and any documents attached to it, (2) documents attached to the motion to dismiss that are critical to the complaint and referred to in it, (3) additional facts set forth in the plaintiff's response to the motion or in any documents attached to the response, as long as those additional facts are consistent with the allegations in the complaint, and (4) information that is subject to proper judicial notice (such as public records). *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). When considering these materials, the Court accepts the plaintiff's factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). The factual background is therefore summarized with this standard in mind and, except where otherwise indicated, is drawn from the Complaint (Dkt. 162) and accompanying exhibits (Dkts. 162-1 through 162-21).

2

at 29 (Exhibit C). Huon was tried on the 2008 sexual assault charges in May 2010 in Madison County. The trial began on May 4 and ended on May 6 with his acquittal on both charges. *See* Exhibit A to ATL Motion to Dismiss, Dkt. 190-1, at 2-4; Exhibit B to ATL Motion to Dismiss, Dkt. 190-2, at 2. The 2009 cyberstalking and witness harassment charges were ultimately dismissed in December 2011.

The charges against Huon and his criminal trial received publicity in local media and legal news sources; several of the resultant articles are relevant to the instigation of this case. On July 2, 2008, the day the sexual assault and related charges were filed, an article about those charges appeared in the *Madison County Record* (the "Madison County Article"). *See* Exhibit C to Response to ATL Motion to Dismiss, Dkt. 194-8. The following day, July 3, 2008, the legal blog AboveTheLaw.com published a post by defendant Lat (the "2008 ATL Post") that included the one-line statement "Lawyer of the Day: Meanith Huon" along with a link to the Madison County Article. Next, on August 24, 2009, a post discussing both the 2008 and 2009 charges appeared on the blog LawyerGossip.com (the "Lawyer Gossip Post"). *See* Exhibit F to Response to ATL Motion to Dismiss, Dkt. 194-13. Finally, on May 6, 2010, AboveTheLaw.com published an article by defendant Mystal titled "Rape Potpourri" (the "ATL Article").

The ATL Article provided information and commentary on two "rape stories": (1) the arrest of former New York Giants linebacker Lawrence Taylor based on a rape allegation, and (2) the allegations at issue in Huon's criminal trial and the opening statement made by Huon's defense lawyer at trial. The section of the ATL Article on Huon purported to link to and quote, *inter alia*, the Lawyer Gossip Post, the Madison County Article (which was also linked to in the 2008 ATL Post), and an article in the *Belleville News Democrat* titled "Testimony: Woman says

A000012

she was raped by attorney posing as scout for models" (the "BND Article").[3] At some point following the ATL Article's initial publication, an update was added toward the end of the piece indicating that Huon had been acquitted of the charges discussed.[4] AboveTheLaw.com allows readers to post comments on its articles (subject to certain terms of use), and the ATL Article eventually generated over 107 comments or replies from users.[5]

On May 6, 2011, one year after publication of the ATL Article, Huon sued the ATL defendants and the John Does who posted comments on the ATL Article for defamation, intentional infliction of emotional distress, and false light invasion of privacy.[6] *See* Initial Complaint, Dkt. 1. The filing of this suit, like the criminal charges against Huon, generated its share of publicity. On May 11, 2011, an article by defendant Carmon entitled "Acquitted Rapist Sues Blogger for Calling Him Serial Rapist" appeared on the women's interest blog Jezebel.com (the "Jezebel Article").[7] The Jezebel Article discussed Huon's criminal trial for sexual assault,

---

[3] In his response to the ATL motion to dismiss, Huon disputes the existence of the BND Article. However, the copy of the ATL Article attached as an exhibit to the Complaint reveals that the ATL Article presented the BND Article as one of its sources and indicates the title of the BND Article. Huon does not dispute the ATL Article's reliance on the Madison County Article and Lawyer Gossip Post.

[4] The update stated: "**UPDATE:** Meanith Huon was acquitted of these charges. Please check here for our continuing coverage." The words "check here" appeared in red text, as did other words and phrases in the ATL Article that were presented as hyperlinks.

[5] A saved version of the ATL Article is attached to the Complaint at Dkt. 162-8. The ATL Article is no longer available on AboveTheLaw.com, but it remains available online via the Internet Archive Wayback Machine at http://web.archive.org/web/20100512094544/http://abovethelaw.com/2010/05/rape-potpourri/ (last visited Dec. 4, 2014).

[6] The ATL defendants were served on June 15, 2011. *See* Waiver of Service of Summons, Dkt. 167; Waiver of Service of Summons, Dkt. 167-1. The current Complaint does not name any John Doe defendants.

[7] The headline of the Jezebel Article was changed at some point following the piece's initial publication. Screenshots of the original version are attached to the Complaint at Dkt. 162-12 and at Dkt. 162-16, at 2. The version with the changed headline is still available on Jezebel.com at http://jezebel.com/5800878/man-acquitted-of-sexual-assault-sues-blog-for-calling-him-serial-rapist (last visited Dec. 4, 2014).

4

his lawsuit against local law enforcement authorities for prosecutorial misconduct, and his initial complaint against the ATL defendants in the instant suit. The Jezebel Article mentioned the title of the ATL Article and included links to the ATL Article and other relevant sources. The Jezebel Article also included an image containing Huon's arrest photograph superimposed over a screenshot of the start of the ATL Article. Users who are invited by Gawker Media editors or by previously invited users may post comments on Jezebel.com articles (subject to certain terms of use), and the Jezebel Article eventually generated over 80 comments or replies from such users. According to Huon, some of the user comments were written by employees of the Gawker defendants, posting under aliases.

On July 11, 2011, two months after publication of the Jezebel Article, Huon filed a First Amended Complaint which added new allegations and defendants related to, *inter alia*, the Jezebel Article and associated comments. The three individual Gawker defendants and "Gawker Media" were among the defendants added to the suit in the First Amended Complaint. Huon soon filed a Second Amended Complaint which removed certain of the other recently added defendants. Gawker Media and the individual Gawker defendants were subsequently served on August 24, 2011. *See* Waiver of Service of Summons, Dkt. 167; Waiver of Service of Summons, Dkt. 167-1.

On September 21, 2011, the ATL defendants moved to dismiss the Second Amended Complaint. Shortly thereafter, Gawker Media, the individual Gawker defendants, and Jezebel.com (which has since been dropped from the suit) likewise filed a motion to dismiss. The two motions to dismiss were fully briefed at the time the case was transferred to this Court's docket on August 3, 2012. Upon reviewing the case, the Court dismissed the Second Amended Complaint without prejudice due to deficiencies in the allegations respecting diversity

5

A000014

jurisdiction. The Court denied the two motions to dismiss as moot in light of that ruling. Huon

then filed a Third Amended Complaint which contained updated jurisdictional allegations, added

new claims and defendants,[8] and removed some defendants. Since the jurisdictional allegations

in the Third Amended Complaint were still insufficient, the Court again dismissed the complaint

without prejudice.[9] On November 15, 2012, Huon filed the current Complaint with further

updated jurisdictional information. The ATL defendants and certain of the Gawker defendants

subsequently filed their respective motions to dismiss which are now under consideration.[10]

Based on the information in the Complaint and the notifications of affiliates filed

pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2, this matter is properly before

the Court under diversity jurisdiction in accordance with 28 U.S.C. § 1332. Huon, a citizen of

Illinois, is seeking compensatory damages in an amount well in excess of $75,000 and punitive

damages of $100,000,000. The corporate ATL defendants are: (1) Breaking Media, Inc., a New

York corporation that owns and operates AboveTheLaw.com and has its principal place of

business in New York, and (2) Breaking Media, LLC, an inactive limited liability company that

has merged into Breaking Media, Inc. The corporate Gawker defendants, which own and/or

---

[8] The defendants added in the Third Amended Complaint were Blogwire Hungary, Gawker Entertainment, Gawker Sales, and Gawker Technology. There is no evidence of service on the docket as to these four defendants, nor have there been any attorney appearances for them. Gawker Entertainment, Gawker Sales, and Gawker Technology are mentioned in the Gawker notification of affiliates filed pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2; however, Blogwire Hungary is not mentioned in that filing.

[9] The Court provided guidance to Huon as to the jurisdictional deficiencies in his complaints at the time of each dismissal.

[10] The Gawker motion to dismiss was filed on behalf of "Gawker Media a/k/a Gawker.com, Jezebel.com, Nick Denton, Irin Carmon, and Gaby Darbyshire." *See* Gawker Motion to Dismiss, Dkt. 191, at 1. Jezebel.com is no longer named as a defendant in this case. More important to note is the fact that the motion was *not* filed on behalf of the four Gawker defendants that were named for the first time in the Third Amended Complaint. As previously noted, there is no evidence of service as to those four defendants.

A000015

operate Jezebel.com, are: (1) Gawker Media Group, Inc., a Cayman Islands corporation that has

its principal place of business in New York, (2) Gawker Media, LLC, a limited liability company

whose only member is Gawker Media Group, Inc., (3) Gawker Entertainment, a limited liability

company whose only member is Gawker Media, LLC, (4) Gawker Sales, a limited liability

company whose only member is Gawker Media, LLC, (5) Gawker Technology, a limited

liability company whose only member is Gawker Media, LLC, and (6) Blogwire Hungary, a

Hungarian entity that is similar to a U.S. limited liability company.[11] The individual ATL

defendants—John Lerner, the Chief Executive Officer of Breaking Media; David Lat, the

founding and managing editor of AboveTheLaw.com; David Minkin, the publisher of

AboveTheLaw.com; and Elie Mystal, a writer and editor for AboveTheLaw.com—are all

citizens of New York. Two of the individual Gawker defendants—Gaby Darbyshire, the Chief

Operating Officer of Gawker Media; and Irin Carmon, a reporter for Jezebel.com—are also

citizens of New York. Nick Denton, the founder and owner of Gawker Media, is a citizen of

Hungary and the United Kingdom.

## DISCUSSION

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to

relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir.

---

[11] The record does not reveal Blogwire Hungary's members. This information is necessary to determine Blogwire Hungary's citizenship. *See Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equip. Co.*, 759 F.3d 787, 790 (7th Cir. 2014) ("[Since] Changzhou Fellowes is closer to a limited liability company than to any other business structure in this nation, it does not have its own citizenship—and it *does* have the . . . citizenship of its member . . . ."). But given that Blogwire Hungary has not appeared or been served in this case, is not discussed in any of the relevant filings besides the Complaint, and is likely a dispensable party that could be dropped from the lawsuit at a later date if necessary, the missing information about its citizenship is not a barrier to the Court's current exercise of jurisdiction over this matter. *Cf. Howell by Goerdt v. Tribune Entm't Co.*, 106 F.3d 215, 217-18 (7th Cir. 1997) (dismissing a corporate defendant named in the complaint whose citizenship was unknown and who was only briefly mentioned in the case filings).

A000016

2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although a court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, conclusory allegations merely restating the elements of a cause of action do not receive this presumption. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## A.    Liability for Publishing User Comments

All of Huon's claims other than his intrusion upon seclusion claim seek to hold the defendants liable for publishing "the actionable and offensive statements," a phrase Huon uses to refer collectively to the statements he challenges in the ATL Article, the Jezebel Article, and the reader comments associated with each of those articles. The defendants argue that Section 230(c)(1) of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230(c)(1), bars Huon's claims against them based on reader comments.[12] Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* The CDA explicitly preempts liability under any inconsistent state or local laws. *Id.* § 230(e)(3). For purposes of the CDA, an

---

[12] The Gawker defendants raised this argument in their motion to dismiss. The ATL defendants did not address the question of their liability for reader comments in their motion to dismiss or reply, and Huon did not raise the issue in his response to their motion—despite being on notice of the CDA's potential applicability to this case by virtue of the Gawker motion to dismiss. Since the ATL defendants could simply file a subsequent partial motion to dismiss premised on the CDA, or a summary judgment motion with respect to that issue, and Huon has already presented his legal arguments on the statute's proper interpretation in his response to the Gawker motion to dismiss, the Court will address the import of the CDA with respect to both the ATL defendants and the Gawker defendants.

A000017

interactive computer service is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). An information content provider is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3). In essence, the CDA says that "an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008).

Huon argues that the reader comments do not constitute information provided by "someone else," and that the defendants therefore are not protected by the CDA.[13] In support of this argument, he relies on the following allegations in the Complaint: (1) that the ATL Article and the Jezebel Article were designed to incite users to post defamatory comments in order to generate advertising revenue, (2) that the defendants encouraged users to post defamatory comments in response to the articles and subsequently edited those comments, (3) that the Gawker defendants intentionally placed defamatory comments about Huon in a prominent location, which encouraged other users to post defamatory comments, and (4) that some of the allegedly defamatory comments posted in response to the Jezebel Article were written by employees of the Gawker defendants, posting under aliases. None of these allegations takes the reader comments at issue outside the protection provided by the CDA.

---

[13] Huon does not dispute that the defendants qualify as "provider[s] or user[s] of an interactive computer service."

9

A000018

First, a website does not incite the posting of unlawful content merely by providing a forum for that content. *See Chicago Lawyers' Comm.*, 519 F.3d at 671-72 ("Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination . . . ."). This approach has been applied even where the forum is likely to or frequently does contain postings of an unlawful nature. *See, e.g., Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968-69 (N.D. Ill. 2009) (citing *Chicago Lawyers' Comm.*, 519 F.3d at 671) (rejecting the plaintiff's argument that Craigslist induced users to post unlawful ads by having an "adult services" category and granting judgment on the pleadings for the defendant). Huon's argument that the defendants incited defamatory comments is further undercut by the ATL defendants' and Gawker defendants' written policies, which Huon sets forth in the Complaint, that prohibit the posting of defamatory or otherwise illegal material. *See Dart*, 665 F. Supp. 2d at 969 ("Plaintiff's argument that Craigslist causes or induces illegal content is further undercut by the fact that Craigslist repeatedly warns users not to post such content."); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) ("[T]he website did absolutely nothing to encourage the posting of defamatory content—indeed, the defamatory posting was contrary to the website's express policies.").

Second, numerous courts have determined that the CDA applies even where a website edits third-party content or manipulates such content to make it more prominent. *See, e.g., Dowbenko v. Google Inc.*, No. 14-10195, 2014 WL 4378742, at *3 (11th Cir. Sept. 5, 2014) (finding that the plaintiff's defamation claim was preempted by the CDA despite his allegation that Google "manipulated its search results to prominently feature the article at issue"); *Fair Hous. Council*, 521 F.3d at 1169 ("A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his [CDA]

10

A000019

immunity . . . ."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish . . . or alter content—are barred [by the CDA]."). Thus, the fact that the defendants allegedly engaged in editorial functions such as determining the order of comments or making edits to them does not transform the defendants into "providers" of the comments for CDA purposes.

Finally, the allegation (on "information and belief") that some of the Jezebel Article comments were written by Gawker employees using aliases contains insufficient factual content to allow the Court to reasonably infer that the Gawker defendants were involved in creating those comments.[14] The Complaint does not allege that any of the named individual Gawker defendants posted comments to the article. Nor does it allege that the Gawker employees who allegedly posted comments did so within the scope of their employment, which is a required element of a *respondeat superior* claim in Illinois. *See Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (2012); *cf. Marquis v. Omniguide, Inc.*, 714 F. Supp. 2d 640, 646 (N.D. Tex. 2010) (granting a motion to dismiss with respect to an allegedly defamatory statement made by an unidentified company representative, where the plaintiff failed to allege that the representative acted within the scope of his employment). As a result of these pleading deficiencies, which are not resolved by the additional allegations in Huon's response to the Gawker motion to dismiss,[15] the

---

[14] Huon makes no similar argument as to the ATL defendants.

[15] The response states: "Gawker's writers are under constant pressure to generate web traffic to keep their jobs; writers' compensation is based on the amount of web traffic the story generates. Journalist Drew Johnson has traced hundreds of 'anonymous' comments posted to promote Gawker stories to actual Gawker employees . . . ." Response to Gawker Motion to Dismiss, Dkt. 192, at 2 (footnotes omitted). The response further states: "Mr. Johnson has investigated Gawker writers using aliases to promote their own stories and Gawker employees creating fake accounts to promote Gawker stories on Reddit.com. He concluded that the practice of creating fake accounts to post 'anonymous' comments online to promote Gawker's stories

11

Complaint fails to state a plausible claim that the Gawker defendants were "providers" of the comments allegedly written by Gawker employees.

Accordingly, Huon's claims are dismissed with prejudice to the extent they seek to hold the defendants liable for publishing the reader comments associated with the ATL Article and the Jezebel Article; the remaining sections of this opinion will address the defendants' liability for publishing only the content of the articles themselves.

### B.    Defamation (Counts I and II)

Huon brings defamation *per se* and *per quod* claims based on statements in the ATL Article and the Jezebel Article. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 459 (2009). The elements of a defamation claim for both *per quod* and *per se* actions are "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused

---

appear to be a companywide policy." *Id.* at 17. In support of these statements, Huon attaches a 2008 article indicating that Gawker writers receive a monthly salary plus a bonus based on the number of page views their posts receive, a July 2012 article describing recently introduced changes to Gawker's comment system, and several online posts written by Johnson in 2012. *See* Exhibits B through D to Response to Gawker Motion to Dismiss, Dkts. 195-2 through 195-7. The posts by Johnson suggest that a Gawker writer hired in February 2012 writes his Gawker articles using an alias and that, between March 2010 and November 2012, several Gawker employees or interns used aliases to create "shell" accounts on Reddit.com in order to promote Gawker articles. Read in conjunction with these supporting exhibits, none of the new factual allegations in Huon's response create a reasonable inference that Gawker employees, acting within the scope of their employment, used aliases to post comments *to the Jezebel Article*. In fact, none of the new allegations concern Gawker employees posting comments to *any* Gawker articles. Rather, the new allegations either describe developments after the publication of the Jezebel Article, suggest that some Gawker employees used aliases to post on non-Gawker websites, or "reveal" that Gawker compensates writers based on the popularity of their works, an unremarkable proposition which does nothing to push Huon's claim regarding the Gawker defendants' responsibility for some of the comments across the line "between possibility and plausibility."

12

A000021

damages." *Id.* at 491, 917 N.E.2d at 459. The two types of defamation claims differ only with

respect to the plaintiff's burden to plead and prove damages. In a defamation *per quod* action,

damage to the plaintiff's reputation is not presumed and the plaintiff must plead and prove

special damages. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501, 866 N.E.2d 114, 121 (2006); *see also*

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 390, 882 N.E.2d 1011,

1018 (2008) ("special damages [are] actual damages of a pecuniary nature"). In a defamation *per*

*se* action, damage is presumed if the statement falls within one of the five defamation *per se*

categories recognized in Illinois:

> (1) statements imputing the commission of a crime; (2) statements
> imputing infection with a loathsome communicable disease; (3)
> statements imputing an inability to perform or want of integrity in
> performing employment duties; (4) statements imputing a lack of
> ability or that otherwise prejudice a person in his or her profession
> or business; and (5) statements imputing adultery or fornication.

*Tuite*, 224 Ill. 2d at 501, 866 N.E.2d at 121. Even if a statement falls within one of these

categories, however, it is not actionable as defamation *per se* if it is reasonably capable of an

innocent construction. *Id.* at 502, 866 N.E.2d at 121. In applying the innocent construction rule,

"courts must interpret the words 'as they appeared to have been used and according to the idea

they were intended to convey to the reasonable reader.'" *Id.* at 512, 866 N.E.2d at 123 (quoting

*Bryson v. News Am. Publ'ns, Inc.*, 174 Ill. 2d 77, 93, 672 N.E.2d 1207, 1217 (1996)). The

preliminary determination of whether a statement is actionable as defamation *per se* is a question

of law. *Id.* at 510, 866 N.E.2d at 126.

Statements that do not contain verifiable facts—such as opinions or rhetorical

hyperbole—are not actionable as defamation; it is a question of law whether a statement is

factual in nature. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). Statements that are not

about the plaintiff also are not actionable as defamation. *BASF AG v. Great Am. Assurance Co.*,

13

A000022

522 F.3d 813, 820 (7th Cir. 2008) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d 558, 579, 852 N.E.2d 825, 839 (2006)). Further, statements that are privileged cannot support a defamation claim. *Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at 839. As relevant here, the fair report privilege protects publication of defamatory statements in a report of an official proceeding, provided that the report is "complete and accurate" or is "a fair abridgement" of the proceeding. *Id.* at 585, 588, 852 N.E.2d at 842, 843. Since the availability of the privilege hinges not on the reporter's status or source but on the accuracy and fairness of the report, the privilege applies regardless of whether the reporter is part of the established press and regardless of whether the reporter obtained the information directly from the official proceeding. *See, e.g.*, *Missner v. Clifford*, 393 Ill. App. 3d 751, 761, 914 N.E.2d 540, 550 (2009) ("Both media and nonmedia reporters may claim protection under the privilege."); *Bannach v. Field Enters., Inc.*, 5 Ill. App. 3d 692, 693, 284 N.E.2d 31, 32 (1972) (applying the privilege to a newspaper article that was based on a wire service report of an official proceeding).[16] It is a question of law whether the privilege applies. *Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at 842.

### 1.    Defamation *Per Se* (Count I)

Huon alleges that some of the statements in the ATL Article and the Jezebel Article fall under the first, third, fourth, and fifth defamation *per se* categories, but does not specify which statements are the basis of his defamation *per se* claim. The defendants argue that each potentially actionable statement is protected by the fair report privilege, is not about Huon, does not contain verifiable facts, does not fall into one of the defamation *per se* categories, or is

---

[16] Huon's contention that the privilege does not apply to bloggers because they are not "reporters" is therefore incorrect.

14

reasonably capable of an innocent construction.[17] The Court agrees with the defendants with respect to most of the statements in the ATL Article and all of the statements in the Jezebel Article, as explained below.

### a.    The ATL Article

The allegedly defamatory portions of the ATL Article consist of: (1) five text blocks summarizing Jane Doe's testimony and defense counsel's opening statement at Huon's criminal trial,[18] (2) commentary introducing and reflecting on the trial summaries in those text blocks, (3) a section facetiously suggesting the use of sexual consent forms and proposing putatively humorous language for such a form, and (4) a section containing quotations from the Madison County Article and the Lawyer Gossip Post and suggesting that if Jane Doe had Googled Huon before agreeing to meet him, she would have found those or similar articles.[19]

---

[17] The Gawker defendants also argue that the allegedly defamatory statements in the Jezebel Article are not actionable based on the "incremental harm" doctrine. Illinois courts have not recognized that doctrine, however. *Trudeau v. ConsumerAffairs.com, Inc.*, No. 10 C 7193, 2011 WL 3898041, at *8 (N.D. Ill. Sept. 6, 2011) (citing *Myers v. The Telegraph*, 332 Ill. App. 3d 917, 925, 773 N.E.2d 192, 200 (2002)).

[18] The ATL defendants assert that these five text blocks are quotations from the BND Article. The ATL Article itself suggests that to be the case, although it is not a model of journalistic clarity in that regard. Huon, for his part, disputes the existence of the BND Article, as noted previously. This question is irrelevant, however; if the material in the text blocks is defamatory and unprivileged, liability attaches regardless of whether it is original material or a republication. *See Owens v. CBS Inc.*, 173 Ill. App. 3d 977, 992, 527 N.E.2d 1296, 1307 (1988) ("[T]he republisher of a defamatory statement made by another is himself liable for defamation . . . ."); *see also Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (citing *Owens*, 173 Ill. App. 3d at 994, 527 N.E.2d at 1308).

[19] In his response to the ATL motion to dismiss, Huon also raises a new argument that the inclusion of a hyperlink to the Lawyer Gossip Post in the ATL Article constitutes a republication of statements in the Lawyer Gossip Post that Huon claims are defamatory. This theory is not viable because the CDA, which is applicable to this case for the reasons explained in Section A, provides liability protection for both linking to and posting third-party content. *See, e.g.*, *Nieman v. Versuslaw, Inc.*, No. 12-3104, 2012 WL 3201931, at *8 (C.D. Ill. Aug. 3, 2012) (finding that the plaintiff's invasion of privacy and defamation claims, which were based on links appearing on the defendants' websites, were barred by the CDA), *aff'd*, 512 F. App'x 635 (7th Cir. 2013).

A000024

The text blocks summarizing Huon's criminal trial are protected by the fair report privilege. Although the ATL Article does not explicitly state that it is reporting on Huon's trial, it is clear both from the phrasing in the article (including references to "testimony" and defense counsel's opening statement) and from a comparison of the article with the trial transcript, Exhibit B to ATL Motion to Dismiss, Dkt. 190-2, that those portions of the article constitute a report of an "official proceeding." Huon takes issue with the fact that the article only reports on material from the first day of his trial, but the fair report privilege does not apply only to coverage of trials in their entirety. *Cf. Solaia Tech.*, 221 Ill. 2d at 589, 852 N.E.2d at 844 (finding that the privilege applies to reporting on a complaint even when there has not been any judicial action). Further, while the article does not provide a complete report of everything that happened during the first day of Huon's trial, it is a "fair abridgment" of the proceedings. *See generally id.* at 590 (noting that a report is a fair abridgment if it conveys a "substantially correct account"). The article accurately summarizes Jane Doe's testimony as well as the defense's theory of the case, as explained in the defense opening, and does not convey an erroneous impression of what was said at the trial. *See id.* The fair report privilege therefore applies.

The commentary interspersed among the text blocks summarizing the trial likewise cannot support a defamation claim. The statements suggesting that Huon was an alleged rapist, that he listed Craigslist ads claiming to be a talent scout, that he came up with a scheme to meet women, and that he lied about himself and his intentions are all protected by the fair report privilege.[20] These statements, which serve to introduce and supplement the information in the

---

[20] Most of these statements appear in the commentary about Huon that precedes the first text block summarizing the trial; that commentary reads: "We cover the rape allegations of . . . any alleged attorney rapists near you. . . . A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models. . . . Huon's potentially harmless lies allegedly turned dastardly, pretty

16

text blocks, can be traced back to material in the trial transcript and do not convey an erroneous impression of what was stated.[21] Other commentary statements in the article suggesting that Huon's version of the events was "incredible," that his encounter with Jane Doe "end[ed] badly," and that Huon was "wanton," "depraved," "dastardly," and a "potential rapist" are non-actionable statements of opinion (*e.g.*, "Our next story [is] from the files of the wanton and depraved . . . . [A]pparently there are a lot of depraved dudes walking around out there that are potential rapists."). The remaining commentary statements that Huon claims are defamatory are simply not about him (*e.g.*, "I [Mystal] once pretended to be an Ostrich rancher . . . .").

The section of the article about sexual consent forms is also not actionable as defamation.

That section consists of the following text:

> It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.
>
> > I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my _____ to the other party's _____. Such amorous undulations include, but are not limited to, _____, _____, and

---

quickly." In addition, a comment after the third text block summarizing the trial questions whether "lying . . . about your job and your intentions to get [a woman] into [your] car counts as consensual."

[21] Huon challenges the ATL Article's use of the words "rape" and "rapist" given that he was charged with "criminal sexual assault" and not "rape." However, a report does not need to use the exact verbiage as the official proceeding in order to be protected by the fair report privilege. *See, e.g.*, *Harrison v. Chi. Sun-Times, Inc.*, 341 Ill. App. 3d 555, 572, 793 N.E.2d 760, 774 (2003) (finding that the fair report privilege applied where an article stated that the plaintiff had been convicted of kidnapping, even though she was actually found guilty of "wrongful removal"); *see also In re Det. of Lieberman*, 201 Ill. 2d 300, 315, 776 N.E.2d 218, 227 (2002) ("[T]he offense of rape was subsumed by the subsequently created offenses of criminal and aggravated criminal sexual assault . . . ."). Moreover, the term "rape" was used multiple times on the first day of Huon's trial, including by defense counsel in his opening argument. Thus, the fact that some of the statements in the ATL Article contain the words "rape" or "rapist" does not bring those statements outside the protection of the fair report privilege.

17

> ____, and all proposals will be considered so long
> as no animals (barnyard or otherwise) are involved.
>
> I claim no rights to future ____, ____, or ____, in
> exchange for this brief interruption in my chronic
> loneliness.
>
> While I may be quite intoxicated right now, I know
> damn well what I'm doing.

This section is not about Huon and does not contain any statements of fact, and therefore cannot

support a defamation claim.

By contrast, the section containing the statements about Googling Huon cannot be

disposed of so readily. That section appears after introductory material indicating that there were

rape allegations against Huon and that Jane Doe testified that she met him after responding to a

Craigslist ad he posted to recruit promotional models. The section states:

> And this, people, is why God invented Google. Had the victim
> Googled Huon, she would have found stories like this, from the
> Madison County Record:
>
>> A Chicago attorney who was posing as a supervisor
>> for a company that sets up promotions for alcohol
>> sales at area bars was charged in Madison County
>> July 2, with two counts of criminal sexual assault, two
>> counts of criminal sexual abuse and one count
>> of unlawful restraint.
>>
>> Meanith Huon, 38, of 3038 S Canal St. in Chicago,
>> was arrested by the Chicago Police Department on
>> July 1, and was transferred to Madison County the
>> next day.
>
> Or she might have come across this link, at Lawyer Gossip:
>
>> Lawyer, Meanith Huon, 39, who was originally
>> charged with criminal sexual assault, sexual abuse
>> and unlawful restraint is now facing charges of
>> harassment and cyber stalking!

Read in context, this material suggests that Huon was charged with sexual assault and related

offenses, and then subsequently charged with harassment and cyberstalking, all prior to the Jane

A000027

Doe incident. It thus creates the impression that he was alleged to have committed sexual assault

on two occasions—the first being the incident that prompted the sexual assault charges

mentioned in the Madison County Article and Lawyer Gossip Post, and the second being the

incident involving Jane Doe. The section also suggests that Huon posed as a promotions

supervisor in order to meet women on an occasion prior to his interactions with Jane Doe. Since

the section is erroneously presented as chronicling events unconnected to the Jane Doe incident,

it is not a "substantially correct account" of an official proceeding and the statements within it

are not protected by the fair report privilege. Further, since the statements convey the impression

that Huon was charged with sexual assault on a prior occasion and that he posed as a promotions

supervisor on a prior occasion, they qualify as defamation *per se*[22] and are not reasonably

capable of an innocent construction. *Cf. Solaia Tech.*, 221 Ill. 2d at 593-94, 852 N.E.2d at 846-47

(finding that a statement implying that a civil complaint had accused the plaintiff of committing

a crime was not capable of an innocent construction); *Kumaran*, 247 Ill. App. 3d at 227, 617

N.E.2d at 199 (finding that an article that impugned the plaintiff's personal integrity was not

capable of an innocent construction).

---

[22] The suggestion that Huon was charged with sexual assault on a prior occasion falls within multiple defamation *per se* categories. *Cf. Solaia Tech.*, 221 Ill. 2d at 592 (finding that a statement implying that the plaintiff had been accused of committing a crime fell "within several of the recognized categories of defamation *per se*"). The suggestion that he posed as a promotions supervisor on a prior occasion falls within the fourth defamation *per se* category, since Illinois courts recognize that attacks related to personal integrity and character can "prejudice" a plaintiff in his profession if he is engaged in a profession that requires a high degree of integrity. *See Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005); *see also Kumaran v. Brotman*, 247 Ill. App. 3d 216, 227, 617 N.E.2d 191, 199 (1993) ("By portraying plaintiff as a swindler, the article could be found to prejudice his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students."); *Green v. Rogers*, 384 Ill. App. 3d 946, 959, 895 N.E.2d 647, 661 (2008) (noting that statements impugning personal integrity can prejudice a lawyer in his profession), *aff'd in part and rev'd in part on other grounds*, 234 Ill. 2d 478, 917 N.E.2d 450 (2009).

19

A000028

Accordingly, Count I survives as to the ATL defendants only with respect to the statements in the section about Googling Huon that imply: (1) that Huon was charged with sexual assault on an occasion prior to the Jane Doe incident, and (2) that he posed as a promotions supervisor in order to meet women on an occasion prior to allegedly posting the ad to which Jane Doe responded (collectively, the "two actionable implications in the ATL Article"). Count I is dismissed with prejudice with respect to all other statements in the ATL Article.

### b. The Jezebel Article

Huon alleges that the Jezebel Article is defamatory based on: (1) the original article headline and the image placed directly below it, (2) the article's report of his criminal trial, (3) the article's report of his lawsuit based on the ATL Article, (4) a statement in the article commenting on the ATL Article and Huon's lawsuit, and (5) the hyperlink to the ATL Article placed at the bottom of the article.

The original headline of the Jezebel Article was "Acquitted Rapist Sues Blog For Calling Him Serial Rapist." The image below it contains Huon's arrest photograph superimposed over a screenshot showing the ATL Article's headline ("Rape Potpourri") and first two sentences ("We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together."). Huon alleges that the Jezebel Article's headline and the placement of his arrest photograph near the words "rapist" and "rape" in the headline and screenshot imply that he committed rape. Although it is defamatory *per se* to falsely suggest that a person is a rapist, the challenged items are not actionable as defamation *per se* because they are reasonably capable of an innocent construction. *See generally Tuite*, 224 Ill. 2d at 502, 866 N.E.2d at 121. The headline itself expressly states that Huon was acquitted, and even if one interprets it to imply that, despite the acquittal, Huon is a rapist, it would still not be actionable as defamation *per se*

20

under the innocent construction rule. Under Illinois law, "the innocent construction rule requires a writing 'to be read as a whole.'" *Id.* at 512 (quoting *John v. Tribune Co.*, 24 Ill. 2d 437, 442, 181 N.E.2d 105, 108 (1962)). Therefore, "a headline and the text of the article to which it refers are to be considered as one document and . . . . the 'import of the entire article' must be considered in reaching a determination of reasonable innocent construction." *Harrison*, 341 Ill. App. 3d at 570, 793 N.E.2d at 772 (quoting *Owen v. Carr*, 134 Ill. App. 3d 855, 860, 478 N.E.2d 658, 662 (1985), *aff'd*, 113 Ill. 2d 273, 497 N.E.2d 1145 (1986)). However one might interpret the Jezebel Article headline and accompanying image, the associated article clearly indicates that Huon was acquitted of the charges against him. Indeed, its opening words are "A Chicago man who was acquitted on a sexual assault charge . . . ." Thus, considered in the context of the article as a whole, the headline and image are reasonably capable of an innocent construction and are not actionable as defamation *per se*. *Cf. Salamone v. Hollinger Int'l, Inc.*, 347 Ill. App. 3d 837, 840-41, 807 N.E.2d 1086, 1090-91 (2004) (finding that a headline that implied that the plaintiff was a mobster was reasonably capable of an innocent construction since the text of the article indicated that the plaintiff was only *reputed* to be a mobster); *Antonelli v. Field Enters., Inc.*, 115 Ill. App. 3d 432, 435, 450 N.E.2d 876, 878 (1983) (same); *see also Knafel v. Chi. Sun-Times, Inc.*, 413 F.3d 637, 642 (7th Cir. 2005) (citing *Salamone*, 347 Ill. App. 3d 837, 807 N.E.2d 1086, and *Antonelli*, 115 Ill. App. 3d 432, 450 N.E.2d 876).

Huon's allegations based on the report of his criminal trial in the Jezebel Article likewise cannot support a defamation claim. Huon alleges that the report is defamatory insofar as it suggests that the jury acquitted him partly on the basis of a bartender's testimony. The challenged statement appears at the end of the article's discussion of his trial and reads as follows: "Huon's version was that it was a consensual encounter, and partly on the strength of a

21

bartender's testimony that the woman had been drinking and asked where to go to have fun, the

jury believed him." Huon asserts that the Gawker defendants never spoke to any jurors and

simply invented the idea that the jury relied on the bartender's testimony in reaching its decision.

That is an odd argument given that the bartender's testimony about the victim's drinking and

inquiry about where to go to have fun was almost certainly evidence that *the defense* elicited at

trial; Huon does not explain how a report that credits defense evidence with contributing to a

verdict of acquittal could defame the successful defendant. In any event, regardless of who

elicited the testimony, the statement about the jury's deliberations is not actionable for the simple

reason that it is not defamatory, much less defamatory *per se*. *See Green*, 234 Ill. 2d at 491, 917

N.E.2d at 459 ("A defamatory statement is a statement that harms a person's reputation to the

extent it lowers the person in the eyes of the community or deters the community from

associating with her or him."). The import of the statement is that the jury found reason to

discredit Jane Doe's claims and therefore acquitted Huon of the charges; it thus bolsters rather

than defames his reputation.

The challenged statements within the report of Huon's lawsuit against the ATL

defendants are also not actionable as defamation. The text relating to Huon's lawsuit reads as

follows:

> A Chicago man who was acquitted on a sexual assault
> charge is suing the legal blog Above The Law for implying that
> he's a serial rapist. If Meanith Huon gets his way, blogger
> sloppiness may cost ATL $50 million.
> . . . .
> . . . His beef with Above The Law stems from a roundup
> post entitled "Rape Potpurri," in which blogger Elie Mystal
> mistakenly believes that news accounts of the same incident are
> different incidents that should have tipped the woman off that
> Huon was a serial offender. "The content of the article were [sic]
> defamatory in that it incorrectly and recklessly portrayed Mr. Huon

A000031

as a serial rapist by treating the same complaining witness as three
different women," says the complaint, according to Forbes.

　　"And this, people, is why God invented Google," wrote
Mystal in the original post, linking to articles that in fact described
the same case. The lesson learned: Google only takes you so far.

Huon argues that the description of his lawsuit suggests that he did not contest any aspects of the

ATL Article other than the implication that he was a serial rapist. In addition, he alleges that the

reference to "blogger sloppiness" minimizes the ATL Article's inaccuracies and bolsters the

suggestion that he only objected to the serial rapist implication. These arguments are unavailing,

however, since the Jezebel Article contains a "fair abridgment" of Huon's initial complaint and

is therefore protected by the fair report privilege.[23] Although Huon later amended his complaint

to add additional allegations about the ATL Article, the initial complaint was premised solely on

the serial rapist implication. *See* Initial Complaint, Dkt. 1. In addition, it asserted that Mystal

omitted relevant information, acted recklessly, and did not read "the original source." *Id.* at 4-5.

Thus, in suggesting that Mystal was sloppy and that Huon only challenged the serial rapist

implication, the Jezebel Article conveys an accurate impression of Huon's initial complaint.

　　The two remaining components of the Jezebel Article that Huon challenges are also

inadequate to support a defamation claim. Huon alleges that the comment at the end of the report

of his lawsuit ("Google only takes you so far") implies that he has a criminal background that

does not show up in a Google search. But to a reasonable reader, this statement suggests that

Mystal should have performed further investigation when writing the ATL Article rather than

merely relying on Google; it implies that had Mystal done so, he would not have made the

mistake that he did. Contrary to Huon's argument, the observation that Mystal was mistaken, and

---

[23] The Court takes judicial notice of Huon's initial complaint. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) ("We may take judicial notice of documents that are part of the public record, including pleadings, orders, and transcripts from prior proceedings in the case.").

A000032

would have caught his mistake had he not relied exclusively on Google, suggests that Huon was

*not* involved in any prior similar episodes of sexual misconduct and implies nothing defamatory

about him. Finally, Huon alleges that the hyperlink to the ATL Article placed at the bottom of

the Jezebel Article constitutes a republishing of the allegedly defamatory content in the ATL

Article. As explained above, however, the CDA provides liability protection for hyperlinking to

third-party content in these circumstances. *See Nieman*, 2012 WL 3201931, at *8.

Since none of the statements or suggestions in the Jezebel Article can support a

defamation *per se* claim, Count I is dismissed with prejudice with respect to the Gawker

defendants.

### 2.    Defamation *Per Quod* (Count II)

Huon alleges that some of the statements in the ATL Article and the Jezebel Article,

while not constituting defamation *per se*, nonetheless are defamatory and support a defamation

*per quod* claim. The defendants argue that Huon has not pleaded special damages with the

specificity required by Rule 9(g). As the Seventh Circuit has recently explained:

> [Rule] 9(g), says that special damages must be "specifically
> stated". It can be hard to know how specific is specific enough, but
> "specifically" must be something less than the "particularity"
> standard that Rule 9(b) prescribes for allegations of fraud. We need
> not probe the meaning of "specifically", because it is enough to
> identify a concrete loss.

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), *cert. denied*, 134 S. Ct.

2829 (2014). In *Pippen*, the plaintiff's complaint identified "specific business opportunities that

had been available to him earlier but that, following the defendants' statements, were available

no more," which the Seventh Circuit found sufficiently pleaded special damages. *Id.* at 615; *see*

*also Underground Solutions, Inc. v. Palermo*, No. 13 C 8407, 2014 WL 4703925, at *6 (N.D. Ill.

Sept. 22, 2014) (citing *Pippen*, 734 F.3d at 614) (finding that special damages were sufficiently

24

A000033

pleaded where the complaint quoted emails from specific customers expressing concerns about using the plaintiff's products after reading the allegedly defamatory reports). In a prior case, the Seventh Circuit found that special damages were sufficiently pleaded where, "[a]lthough not naming the particular customers it lost, plaintiff listed specific figures of its gross sales before and after the publication [of the defamatory letter]." *Continental Nut Co. v. Robert L. Berner Co.*, 345 F.2d 395, 397 (7th Cir. 1965); *see also Action Repair, Inc. v. Am. Broad. Cos.*, 776 F.2d 143, 150 (7th Cir. 1985) (citing *Continental Nut*, 345 F.2d 395) (finding that the plaintiff's complaint failed to adequately plead special damages).

Here, the Complaint alleges that the allegedly defamatory statements "caused injury to Plaintiff's legal practice, business operations and good will," Complaint, Dkt. 162, ¶ 186, that Huon has "suffered damage to business, trade, profession and occupation," *id.* ¶ 197, and that he has suffered "pecuniary loss directly from a loss of clients in his legal practice and the loss of profit from business deals and interactions," *id.* ¶ 204. These allegations are nothing more than general, conclusory statements of economic loss allegedly resulting from publication of defamatory comments. In contrast to the plaintiffs in *Pippen*, *Underground Solutions*, and *Continental Nut*, Huon has not identified—or even suggested the existence of—any specific lost opportunities or clients, and has not provided any information indicating the relative success of his legal practice before and after publication of the ATL Article and Jezebel Article. Therefore, the Court finds that Huon has not pleaded special damages with sufficient specificity. *Cf. Tamburo v. Calvin*, No. 94 C 5206, 1995 WL 121539, at *9 (N.D. Ill. Mar. 17, 1995) (finding

A000034

that the plaintiff's allegations of "lost sales," "a devastating loss of business," and "loss of business reputation," were not specific enough to satisfy the requirements of Rule 9(g)).[24]

In his response to the ATL motion to dismiss, Huon requests leave to replead his defamation *per quod* claim.[25] Given that Huon has had numerous opportunities to amend his pleadings and has been on notice of the potential deficiencies in his defamation *per quod* claim since September 2011 (when the ATL defendants filed a motion to dismiss the Second Amended Complaint and raised the special damages issue), the Court finds that granting leave to replead is not warranted. *Cf. Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012) (affirming the district court's dismissal with prejudice where the plaintiffs had three opportunities to plead their claims, including an opportunity after a motion to dismiss in the case had been fully briefed). Huon has had ample opportunity to buttress his damage allegations but has not done so. Accordingly, Count II is dismissed with prejudice, and Huon can only move forward on his defamation claims with respect to statements that are actionable as defamation *per se*.[26]

---

[24] In his responses to the defendants' motions to dismiss, Huon attempts to buttress his defamation *per quod* claim by alleging that he also suffered a different type of pecuniary loss. He states that after publication of the ATL Article (which reported that he had allegedly claimed to be a talent scout) and the Jezebel Article (which linked to the ATL Article), a woman falsely accused him of posing as a talent scout, and he incurred attorney's fees in defending against the charges. This creative line of reasoning does not save Huon's defamation *per quod* claim, however, since the "talent scout" statement in the ATL Article is not actionable as defamation, as explained in Section B.1. Further, Huon has not plausibly alleged that publication of the ATL Article and Jezebel Article "caused" him to incur the attorney's fees, since he does not allege that the woman in question read the articles.

[25] Huon has not requested leave to replead any of his other claims.

[26] Even if Huon had adequately pleaded special damages, his defamation *per quod* claim would largely fail. Pursuant to the analysis in Section B.1.a, an adequately pleaded defamation *per quod* claim would survive only as to the two implications in the ATL Article that the Court finds to be actionable as defamation *per se*. And pursuant to the analysis in Section B.1.b, an adequately pleaded defamation *per quod* claim might survive as to the original headline of the Jezebel Article and the image placed directly below it, since the Court finds that material to be

A000035

### C.      False Light Invasion of Privacy (Count III)

Huon alleges that the defendants placed him in a false light by publishing the allegedly defamatory statements in the ATL Article and the Jezebel Article. Three elements are required to state a claim for the tort of false light invasion of privacy under Illinois law. First, the allegations must show that the plaintiff was "'placed in a false light before the public as a result of the defendants' actions.'" *Raveling v. HarperCollins Publishers Inc.*, No. 04-2963, 2005 WL 900232, at *3 (7th Cir. Mar. 4, 2005) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 17, 607 N.E.2d 201, 209 (1992)). Second, the court "'must determine whether a finder of fact could decide that the false light in which the plaintiff was placed would be highly offensive to a reasonable person.'" *Id.* (quoting *Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 419-20, 534 N.E.2d 987, 990 (1989)). Third, the plaintiff must allege "'that the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.'" *Id.* (quoting *Kolegas*, 154 Ill. 2d at 17-18, 607 N.E.2d at 209-10). Although false light is a branch of the tort of invasion of privacy, it is closely related to the tort of defamation, and the same privileges apply to false light and defamation claims. *Sullivan v. Conway*, 157 F.3d 1092, 1098-99 (7th Cir. 1998). Thus, where a false light claim is premised on allegedly defamatory statements that a court finds are not actionable as defamation, the false light claim fails as a matter of law. *See Madison*, 539 F.3d at 659 ("[B]ecause Madison's unsuccessful defamation *per se* claim is the basis of his false-light claim, his false-light invasion of privacy claim fails as well."); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003) ("Muzikowski has not asserted special

---

not actionable as defamation *per se* in light of the innocent construction rule, a rule which does not apply to defamation *per quod* actions and which thus would not preclude a defamation *per quod* claim based on the same material. *See generally Tuite*, 224 Ill. 2d at 501-02.

A000036

damages, and so the claim can succeed only on the statements [that are defamatory *per se*]."); *cf.*

*Tuite*, 224 Ill. 2d at 515, 866 N.E.2d at 129.

The Court need only examine Huon's false light claim with respect to the two actionable implications in the ATL Article, since the Court has determined that the Jezebel Article and the remainder of the ATL Article are not actionable as either defamation *per se* or *per quod*. The Court finds that Huon has adequately stated a false light claim on the basis of the two actionable implications in the ATL Article. Huon has adequately stated a defamation claim based on those implications, a finder of fact could decide that the implications would be highly offensive to a reasonable person, and the defendants have not challenged the sufficiency of Huon's allegations regarding actual malice. Accordingly, Count III is dismissed with prejudice as to the Gawker defendants, survives as to the ATL defendants with respect to the two actionable implications in the ATL Article, and is dismissed with prejudice as to the ATL defendants with respect to all other statements in the ATL Article.

## D.     Intrusion upon Seclusion (Count IV)

Huon alleges that the defendants intentionally and unreasonably intruded into his seclusion. The Illinois Supreme Court has joined the Illinois appellate courts in expressly recognizing the tort of intrusion upon seclusion. *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 425 (2012). The elements required to state a claim for the tort are: "(1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be 'highly offensive or objectionable to a reasonable person;' (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering." *Vega v. Chi. Park Dist.*, 958 F. Supp. 2d 943, 959 (N.D. Ill. 2013) (quoting *Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 71, 813 N.E.2d 1013, 1017 (2004)). "The nature of this tort depends upon some type of highly offensive

A000037

prying into the physical boundaries or affairs of another person. The basis of the tort is not

publication or publicity. Rather, the core of this tort is the offensive prying into the private

domain of another." *Lovgren*, 126 Ill. 2d at 416-17, 534 N.E.2d at 989; *see also Vega*, 958 F.

Supp. 2d at 959 (quoting *Lovgren*, 126 Ill. 2d at 417, 534 N.E.2d at 989). "Examples of prying

into private matters are opening a person's mail, searching a person's safe or wallet, and

reviewing a person's banking information." *Vega*, 958 F. Supp. 2d at 959 (citing *Lawlor*, 983

N.E.2d at 424).

Huon's Complaint is devoid of any factual allegations that the defendants engaged in acts

of prying or intrusion. To the contrary, the Complaint alleges that defendants invented "facts,"

improperly interpreted or relied on various articles that were readily available online, and failed

to contact Huon or conduct investigations prior to publishing the ATL Article and the Jezebel

Article. Rather than painting a picture of overzealous journalists who pried into Huon's private

affairs, the Complaint depicts shoddy journalists who made up information and could not be

bothered to do much more than copy and paste or summarize information from other articles

easily findable on the internet. As Huon has not alleged any intrusion, which is the first element

of this tort, he has failed to adequately plead his intrusion upon seclusion claim.[27] *See Vega*, 958

F. Supp. 2d at 961 ("Aside from peering into the windows of Vega's private residence, none of

the other allegations are sufficient to state a plausible claim for intrusion upon seclusion.

Accordingly, [the] motion to dismiss . . . is granted for all claims except the claim that the

investigators peered into Vega's windows."); *Lovgren*, 126 Ill. 2d at 417, 534 N.E.2d at 989

(finding that the plaintiff had failed to adequately plead the tort of intrusion into seclusion of

---

[27] In light of this ruling, the Court finds it unnecessary to discuss the remaining elements
of the tort or to reach the ATL defendants' alternate argument that the fair report privilege
precludes Huon's intrusion upon seclusion claim.

A000038

another because "the alleged offensive conduct and subsequent harm resulted from the defendants' act of publication, not from an act of prying"). Count IV is therefore dismissed with prejudice as to all defendants.[28]

### E. Intentional Infliction of Emotional Distress (Count V)

Huon alleges that the defendants' publication of the allegedly defamatory statements in the ATL Article and the Jezebel Article constituted intentional infliction of emotional distress. Under Illinois law, a plaintiff must satisfy three requirements to state a claim for intentional infliction of emotional distress. *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746-47 (7th Cir. 2008) (citing *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)). First, "the conduct involved must be truly extreme and outrageous . . . . [It] must go beyond all bounds of decency and be considered intolerable in a civilized community." *Honaker*, 256 F.3d at 490. Second, "the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress." *Id.* Third, "the conduct must in fact cause severe emotional distress." *Id.* In evaluating whether allegedly defamatory statements constitute "extreme and outrageous" conduct, Illinois courts consider the context of the statements, including whether the defendant improperly used "'a position of power which

---

[28] To the extent that Huon's Complaint can be read as attempting to state a claim for the tort of public disclosure of private facts, it fails for a similar reason: Huon has not identified any statements in the ATL Article or the Jezebel Article that reveal private facts about him. Since "private facts" are "intimate personal facts," matters of public record—including information such as a person's name, address, and age—do not qualify. *Best v. Malec*, No. 09 C 7749, 2010 WL 2364412, at *5 (N.D. Ill. June 11, 2010) (citing *Johnson v. K mart Corp.*, 311 Ill. App. 3d 573, 578-79, 723 N.E.2d 1192, 1196 (2000) and *Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 439, 390 N.E.2d 945, 948 (1979)). As explained above, the challenged portions of the articles consist of statements that are about matters of public record (*e.g.*, Huon's arrests, criminal trial, and lawsuits), statements that are allegedly false (*e.g.*, the two actionable implications in the ATL Article), statements that are not about Huon, and statements that are not factual in nature (*e.g.*, opinions); by definition, none of these items constitute private facts.

30

A000039

gives him the ability to adversely affect the plaintiff's interests.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Kolegas*, 154 Ill. 2d at 22, 607 N.E.2d at 212).

Since statements that do not rise to the level of defamation logically cannot rise to the even higher level of "extreme and outrageous conduct," the Court need only examine Huon's intentional infliction of emotional distress claim with respect to the two actionable implications in the ATL Article. *Cf. Flentye v. Kathrein*, 485 F. Supp. 2d 903, 922 (N.D. Ill. 2007) ("Under Illinois law, defamatory statements, if sufficiently extreme and outrageous, can support an IIED claim."); *Huon v. Beatty*, No. 1-09-2234, 2011 WL 9717454, at *1 (Ill. App. Ct. Mar. 25, 2011) ("Because the plaintiff asserts the same allegations from his [unsuccessful] defamation claims as the basis for his claims of IIED, the same allegations cannot constitute extreme and outrageous conduct.").[29] Drawing all reasonable inferences in Huon's favor, Huon has adequately alleged the elements of a claim for intentional infliction of emotional distress based on the implication that he was charged with sexual assault prior to his encounter with Jane Doe. Although the defendants argue that none of the allegedly defamatory statements constitute "extreme and outrageous conduct," Illinois courts have held that making sufficiently egregious defamatory statements can rise to that level in similar contexts.[30] *See, e.g.*, *Kolegas*, 154 Ill. 2d at 20-25, 607 N.E.2d at 211-13 (holding that radio disc jockeys' derogatory statements constituted defamation *per se* and supported a claim for intentional infliction of emotional distress); *see also Flentye*, 485 F. Supp. 2d at 922 (denying a motion to dismiss an intentional infliction of emotional distress claim premised on allegedly defamatory statements that included "assertions of a sexually repugnant nature"). Accordingly, Count V is dismissed with prejudice as to the Gawker

---

[29] This should come as no surprise to Huon, who was also the plaintiff in the *Beatty* case. The conduct on which Huon sued in *Beatty* is unrelated to the events at issue here.

[30] The ATL defendants do not challenge the adequacy of the allegations that the statements were intended to inflict, and in fact caused, severe emotional distress.

31

A000040

defendants, survives as to the ATL defendants with respect to the implication in the ATL Article

that Huon was previously charged with sexual assault, and is dismissed with prejudice as to the

ATL defendants with respect to all other statements in the ATL Article.

### F. Conspiracy (Counts VI and VII)

Huon alleges that the defendants conspired to publish the allegedly defamatory

statements in the ATL Article and the Jezebel Article in order to present him in a false light

(Count VII) and to defame him (Count VI). Under Illinois law, the elements of civil conspiracy

are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some

concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the

furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz*

*v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). Where a plaintiff successfully

establishes the existence of a conspiracy, co-conspirators may be held jointly liable for actions

by other members of the conspiracy. *See Geinosky*, 675 F.3d at 750. Liability for conspiracy

requires an underlying tort, however; "if a 'plaintiff fails to state an independent cause of action

underlying his conspiracy allegations, the claim for conspiracy also fails.'" *Jones v. City of Chi.*,

No. 08 C 3501, 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011) (quoting *Thomas v. Fuerst*,

345 Ill. App. 3d 929, 936, 803 N.E.2d 619, 626 (2004)). In addition, Illinois courts recognize the

intracorporate conspiracy doctrine, which provides that "because the acts of an agent are

considered to be the acts of the principal, an agent acting within the scope of his employment

cannot conspire with the principal nor with other agents." *Milliman v. McHenry Cnty.*, No. 11 C

50361, 2012 WL 5200092, at *4 (N.D. Ill. Oct. 22, 2012) (citing *Buckner v. Atl. Plant Maint.,*

*Inc.*, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998)); *see also Frontline Commc'ns, Inc. v.*

*Comcast Corp.*, No. 12-CV-8527, 2013 WL 4777370, at *3 (N.D. Ill. Sept. 5, 2013) ("Illinois

32

law is clear that a civil conspiracy does not exist between a corporations' own officers or employees.").

Since conspiracy is not an independent tort, the Court need only consider Huon's conspiracy claims with respect to the two actionable implications in the ATL Article, which the Court has found can support Huon's false light and defamation *per se* claims against the ATL defendants. Because the Gawker defendants are not liable for those claims, and because Huon has not alleged that there was a conspiratorial agreement between the ATL defendants and the Gawker defendants,[31] the Gawker defendants are not liable for the statements in the ATL Article under a conspiracy theory. As to the ATL defendants, since Huon's conspiracy claims based on the ATL Article are premised on an alleged agreement between the individual ATL defendants, all of whom are officers or employees of Breaking Media, the intracorporate conspiracy doctrine bars his conspiracy claims. Counts VI and VII are therefore dismissed with prejudice as to both the ATL defendants and the Gawker defendants.

### G.    Tortious Interference with Prospective Economic Advantage (Count VIII)

Huon alleges that the defendants tortiously interfered with his business interests by publishing the ATL Article and the Jezebel Article. To state a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must allege: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from

---

[31] The allegations in the Complaint provide no basis to infer a conspiratorial agreement between the ATL defendants and the Gawker defendants. Moreover, the additional allegations in Huon's responses to the motions to dismiss reveal that he has not premised his conspiracy claims on such an agreement. *See* Response to Gawker Motion to Dismiss, Dkt. 192, at 14; Response to ATL Motion to Dismiss, Dkt. 193, at 29.

A000042

the defendant's interference." *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01, 751 N.E.2d 1126, 1133-34 (2001) (quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07, 667 N.E.2d 1296, 1299 (1996)) (internal quotation marks omitted). A reasonable expectancy "requires more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (citing *Anderson*, 172 Ill. 2d at 408, 667 N.E.2d at 1300), *aff'd*, 547 F.3d 882 (7th Cir. 2008); *see also Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir. 1998) (quoting *Anderson*, 172 Ill. 2d at 408, 667 N.E.2d at 1299).

The Complaint states that Huon "held a reasonable expectation of entering into valid business relationships, both in his legal practice and in business," and that he had an "expectancy of entering into valid business relationships with members of the public including, but not limited to, his retention as an attorney." Complaint, Dkt. 162, ¶¶ 258, 259. The Complaint also alleges that Huon has suffered "a decline in prospective business" and "remains concerned that individuals and organizations including prospective legal clients will choose not to utilize his services." *Id.* ¶ 160, 164. These conclusory statements, which are unsupported by any facts other than the assertion that Huon is a licensed attorney, are insufficient to allege that Huon had a reasonable business expectancy. *See Del Monte Fresh Produce, N.A., Inc. v. Kinnavy*, No. 07 C 5902, 2010 WL 1172565, at *6 (N.D. Ill. Mar. 22, 2010) ("*Twombly* does require that Kinnavy set forth facts that make it plausible that she had a reasonable expectancy . . . ."). At best the statements establish, when read in the light most favorable to the plaintiff, that Huon *hoped* to obtain legal clients or enter into other business relationships.[32] As Huon has thus failed to

---

[32] That Huon was facing criminal charges until December 2011 further undermines the plausibility of his claim to have had reasonable business expectancies when the ATL Article and Jezebel Article were published.

A000043

adequately allege a reasonable business expectancy, *see Bus. Sys. Eng'g*, 520 F. Supp. 2d at 1022, it is unnecessary to consider whether he has satisfied any of the other elements of a tortious interference claim. *See Fredrick*, 144 F.3d at 503 (affirming dismissal of a tortious interference claim where the plaintiff "failed to allege any reasonable expectation of a business relationship" and instead alleged "merely that he wished to continue working as a commercial pilot"); *Pulliam v. Am. Express Travel Related Servs. Co.*, No. 08 C 6690, 2009 WL 1586012, at *6 (N.D. Ill. June 4, 2009) (dismissing a tortious interference claim where the plaintiff failed to allege facts sufficient to support a reasonable business expectancy); *Emery v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 02 C 9303, 2003 WL 22176077, at *10 (N.D. Ill. Sept. 18, 2003) (dismissing a tortious interference claim where the plaintiff alleged "no more than the mere hope [of obtaining] concrete opportunities"). Accordingly, Count VIII is dismissed with prejudice as to all defendants.

### H.      Cyberstalking and Cyberbullying (Count IX)

Huon alleges that the defendants violated the Illinois cyberstalking statute, 720 ILCS 5/12-7.5, and asks the Court to create a private cause of action for cyberstalking. Illinois courts apply a four-factor test to determine whether to imply a private right of action from a statute:

> Implication of a private right of action is appropriate if: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute.

*Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 460, 722 N.E.2d 1115, 1117-18 (1999). With respect to the fourth factor, a private right of action is generally implied "only in cases where the statute would be ineffective, as a practical matter, unless a private right of action were

A000044

implied." *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 395, 718 N.E.2d 181, 186 (1999). Since no Illinois court has addressed the question of whether there is an implied private right of action under the cyberstalking statute, this Court must predict how the Illinois Supreme Court would decide the issue. *See Iowa Physicians' Clinic Med. Found. v. Physicians Ins. Co. of Wisconsin*, 547 F.3d 810, 813 (7th Cir. 2008). The Court is mindful, however, of the Seventh Circuit's admonishment that federal courts sitting in diversity should be cautious in expanding state law beyond the boundaries established in that state's courts. *See King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997); *see also Markos v. Chicago Park Dist.*, No. 01 C 5544, 2002 WL 1008459, at *8 (N.D. Ill. May 13, 2002) (citing *King*, 113 F.3d at 97) (finding that an Illinois statute did not imply a private right of action).

Assuming without deciding that the first three factors of the *Fisher* test are met in this situation, the Court declines to imply a private right of action because doing so is not necessary to provide an adequate remedy for violations of the cyberstalking statute. The statute already provides a stiff penalty by categorizing cyberstalking as a Class 4 felony, *see* 720 ILCS 5/12-7.5(b), which is punishable by between one and three years of imprisonment, 730 ILCS 5/5-4.5-45; *see also People v. Sucic*, 401 Ill. App. 3d 492, 494, 928 N.E.2d 1231, 1234 (2010) (affirming defendant's conviction and three-year sentence for violating the Illinois cyberstalking statute). In addition, and as Huon's Complaint makes evident, a variety of tort remedies are potentially available to individuals who allege that they are victims of cyberstalking. Huon offers no argument that the combination of potential criminal prosecution and other civil causes of action provides inadequate remedies to victims of cyberstalking; in view of these remedies, the Court concludes that a private right of action under the statute is unnecessary and so declines to imply

A000045

one.[33] *Cf. Metzger v. DaRosa*, 209 Ill. 2d 30, 42, 805 N.E.2d 1165, 1171 (2004) ("We cannot say that the statutory framework . . . is so deficient that it is necessary to imply a private right of action . . . to effectuate its purpose."); *Lane v. Fabert*, 178 Ill. App. 3d 698, 702-03, 533 N.E.2d 546, 549 (1989) (declining to imply a private right of action where the statute at issue imposed a "substantial" fine and where the complaint demonstrated that "a wide array of remedies" was available to a plaintiff in such a situation). Accordingly, Huon cannot prevail on his cyberstalking claim and Count IX is dismissed with prejudice as to all defendants.

\*       \*       \*

For the reasons stated above, the Gawker defendants' motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is granted in part and denied in part. All of Huon's claims against the Gawker defendants are dismissed with prejudice. Huon's claims against the ATL defendants in Counts II, IV, VI, VII, VIII, and IX are dismissed in their entirety with prejudice. Huon's claims against the ATL defendants in Counts I and III survive only with respect to the two actionable implications in the ATL Article. Huon's claims against the ATL defendants in Count V survive only with respect to the implication in the ATL Article that he was charged with sexual assault prior to his encounter with Jane Doe. Huon's claims against the ATL defendants in Counts I, III, and V are dismissed with prejudice in all other respects.

Date: December 4, 2014

John J. Tharp, Jr.
United States District Judge

---

[33] In light of this ruling, the Court finds it unnecessary to reach the additional argument raised by the ATL defendants that the cyberstalking statute does not apply to the activity at issue.

37

A000046

# **EXHIBIT D**

Debtors' appellate brief to the Seventh Circuit Court of Appeals

# United States Court of Appeals

*for the*

# Seventh Circuit

---

Case No. 15-3049

MEANITH HUON,

*Plaintiff-Appellant,*

— v. —

NICK DENTON, *et al.*,

*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION, CASE NO. 1:11-CV-03054
HONORABLE JOHN J. THARP, JR.

## BRIEF FOR DEFENDANTS-APPELLEES NICK DENTON, IRIN CARMON, GABY DARBYSHIRE AND GAWKER MEDIA, LLC A/K/A GAWKER MEDIA

AMY J. HANSEN
LYNCH THOMPSON LLP
150 South Wacker Drive, Suite 2600
Chicago, Illinois 60606
(312) 445-4622

CHAD R. BOWMAN*
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
(202) 508-1100

*Attorneys for Defendants-Appellees Nick Denton, Irin Carmon,
Gaby Darbyshire and Gawker Media, LLC*

* Counsel of Record

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>15-3049</u>

Short Caption: <u>Huon v. Denton</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   <u>Gawker Media a/k/a Gawker.com Jezebel.com; Nick Denton; Irin Carmon; and Gaby Darbyshire.</u>

   <u>Defendant Gawker Media, LLC's sole member is Gawker Media Group, Inc., a holding company organized</u>

   <u>under the laws of the Cayman Islands, with its principal place of business in the Cayman Islands.</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   <u>Lynch Stern Thompson; Giskan Solotaroff Anderson & Stewart</u>

   <u>(NEW) Levine Sullivan Koch & Schulz, LLP</u>

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

       <u>Defendant Gawker Media, LLC's sole member is Gawker Media Group, Inc.</u>

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

       <u>No publicly held corporation owns 10% or more of Gawker Media, LLC's stock.</u>

Attorney's Signature: <u>s/ Chad R. Bowman</u>     Date: <u>02/10/2016</u>

Attorney's Printed Name: <u>(NEW) Chad R. Bowman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☒    No ____

Address: <u>Levine Sullivan Koch & Schulz, LLP, 1899 L St., NW, Suite 200, Washington, DC 20036</u>

   <u>(Mr. Bowman is joining the case as Counsel of Record for Defendants.)</u>

Phone Number: <u>202-508-1100</u>     Fax Number: <u>202-861-9888</u>

E-Mail Address: <u>cbowman@lskslaw.com</u>

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-3049

Short Caption: Huon v. Denton

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Gawker Media a/k/a Gawker.com, Jezebel.com, Nick Denton, Irin Carmon, and Gaby Darbyshire.

Defendant Gawker Media LLC's sole member is Gawker Media Group, Inc., a holding company organized

under the laws of the Cayman Islands, with its principal place of business in the Cayman Islands.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Lynch Stern Thompson; Giskan Solotaroff Anderson & Stewart

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Defendant Gawker Media LLC's sole member is Gawker Media Group, Inc.

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

No publicly held corporation owns 10% or more of Gawker Media LLC's stock.

Attorney's Signature:  s/ Amy J. Hansen                              Date:  10/14/15

Attorney's Printed Name:  Amy J. Hansen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes  ☒  No _____

Address:  Lynch Stern Thompson LLP; 150 S. Wacker Drive, Suite 2600; Chicago, IL 60606

Phone Number:  312-346-1600                    Fax Number:  312-896-5883

E-Mail Address:  ahansen@lstllp.com

rev. 01/15 GA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................iii

JURISDICTIONAL STATEMENT .......................................................... 1

COUNTERSTATEMENT OF ISSUES PRESENTED............................ 2

COUNTERSTATEMENT OF THE CASE............................................. 3

A. The Criminal Prosecution..................................................... 3

B. The First Complaint ............................................................ 7

C. The Gawker Report............................................................. 8

D. The Operative Complaint.................................................... 10

E. Proceedings Below ............................................................. 12

SUMMARY OF ARGUMENT .............................................................. 15

ARGUMENT......................................................................................... 17

STANDARD OF REVIEW ................................................................... 18

I. THE DISTRICT COURT PROPERLY APPLIED THE INNOCENT
    CONSTRUCTION RULE AND DISMISSED HUON'S DEFAMATION
    *PER SE* CLAIM............................................................................. 19

    A. The Innocent Construction Rule Is Properly Applied by the Court
        Considering the Entirety of a Challenged Publication .......................... 19

    B. The District Court Correctly Held the Headline and Graphic
        Accompanying the Gawker Report Were Not Defamatory *Per Se*......... 23

        1. The Phrase "Acquitted Rapist" Is Properly Subject to an
            Innocent Construction ..................................................... 23

        2. Neither Huon's Mugshot Nor the Screenshot of the Above the
            Law Article Is Defamatory .............................................. 27

        3. It Was Not Defamatory for the Gawker Report to State That
            Jurors Believed Huon's Defense....................................... 28

i

    C. Huon's False Light and Intentional Infliction Claims Also Fail ............. 29

II. THE GAWKER REPORT IS PROTECTED FROM DEFAMATION
    LIABILITY BY THE FAIR REPORT PRIVILEGE ...................................... 30

    A. The District Court Properly Considered the Underlying Official
        Records in Applying the Fair Report Privilege ...................................... 31

    B. The Gawker Report Accurately Summarized the Underlying
        Litigation Surrounding Huon's Acquittal and Complaint ..................... 33

III. THE DISTRICT COURT CORRECTLY HELD THE
    COMMUNICATIONS DECENCY ACT BARS HUON'S CLAIMS BASED
    ON READER COMMENTS ........................................................................ 36

    A. Huon Relies on Mischaracterizations of Irrelevant Materials ............... 38

    B. The District Court Correctly Held That Claims Against the
        Gawker Defendants Arising From User Posts Are Preempted ............. 41

    C. Huon Failed to Plead Facts Plausibly Establishing That Gawker
        Authored the Comments ........................................................................ 43

    D. Dismissal of Huon's Claims Arising From User Comments Can
        Also Be Affirmed on Various Alternate Grounds .................................. 47

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
    FORECLOSING A FIFTH AMENDED COMPLAINT ............................... 49

CONCLUSION ................................................................................................. 51

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    683 F.3d 328 (7th Cir. 2012) ............................................................. 18, 46, 49, 50

*Alam v. Miller Brewing Co.,*
    709 F.3d 662 (7th Cir. 2013) ............................................................................. 30

*Antonelli v. Field Enters., Inc.,*
    450 N.E.2d 876 (1st Dist. 1983) ........................................................................ 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................. 16, 30, 43, 44, 45

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) ........................................................................... 41

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................. 16, 30, 43, 44, 45

*Brooks v. Ross,*
    578 F.3d 574 (7th Cir. 2009) ....................................................................... 43, 47

*Brown & Williamson Tobacco Corp. v. Jacobson,*
    713 F.2d 262 (7th Cir. 1983) ............................................................................. 32

*Bryson v. News Am. Publ'ns, Inc.,*
    672 N.E.2d 1207 (Ill. 1996) ............................................................................... 21

*Carroll v. Lynch,*
    698 F.3d 561 (7th Cir. 2012) ............................................................................. 19

*Chapski v. Copley Press,*
    442 N.E.2d 195 (Ill. 1982) ................................................................................. 21

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v.*
    *Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) ..................................... 16, 37, 41, 42

*Conterras v. Vill. of Woodridge,*
    No. 93-C-7727, 1994 WL 174092 (N.D. Ill. May 5, 1994)...................................... 31

Case: 15-3049    Document: 42    Filed: 04/14/2016    Pages: 63

**Page(s)**

*Cook v. E. Shore Newspapers,*
  64 N.E.2d 751 (Ill. App. Ct. 4th Dist. 1945) ........................................ 22

*Dart v. Craigslist, Inc.,*
  665 F. Supp. 2d 961 (N.D. Ill. 2009) ............................................. 41, 42

*Dilworth v. Dudley,*
  75 F.3d 307 (7th Cir. 1996) ........................................................... 48, 49

*Doe v. GTE Corp.,*
  347 F.3d 655 (7th Cir. 2003) ......................................................... 37, 41

*Dowbenko v. Google Inc.,*
  582 F. App'x 801 (11th Cir. 2014) ........................................................ 41

*Eubanks v. Nw. Herald Newspapers,*
  922 N.E.2d 1196 (Ill. App. Ct. 2d Dist. 2010) ..................................... 32

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
  521 F.3d 1157 (9th Cir. 2008) .............................................................. 37

*Goddard v. Google, Inc.,*
  No. C 08-2738JF(PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ................. 43

*Gonzalez-Koeneke v. West,*
  791 F.3d 801 (7th Cir. 2015) ......................................................... 17, 50

*Green v. Rogers,*
  917 N.E.2d 450 (Ill. 2009) .................................................................. 20

*Hadley v. GateHouse Media Freeport Holdings, Inc.,*
  No. 12 C 1548, 2012 WL 2866463 (N.D. Ill. July 10, 2012) ................................ 44

*Harrison v. Chi. Sun-Times, Inc.,*
  793 N.E.2d 760 (Ill. App. Ct. 1st Dist. 2003) ...............15, 21, 22, 25, 26, 27, 31, 33

*Hill v. StubHub, Inc.,*
  727 S.E.2d 550 (N.C. Ct. App. 2012) ..................................................... 43

*Honaker v. Smith,*
  256 F.3d 477 (7th Cir. 2001) ............................................................... 30

*Huon v. Beatty,*
  No. 1-09-2234, 2011 WL 9717454
  (Ill. App. Ct. 1st Dist. Mar. 25, 2011) .................................................. 50

Page(s)

*Huon v. Johnson & Bell, Ltd.*,
    757 F.3d 556 (7th Cir. 2014) ................................................. 4

*Huon v. Mudge*,
    597 F. App'x 868 (7th Cir. 2015) ........................... 3, 4, 5, 6, 7, 34, 35, 50

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
    665 F.3d 930 (7th Cir. 2012) ................................................. 3

*Jacobson v. CBS Broad. Inc.*,
    19 N.E.3d 1165 (Ill. App. Ct. 1st Dist. 2014) .......................... 30

*Johnson v. Arden*,
    614 F.3d 785 (8th Cir. 2010) ................................................ 41

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ................................................ 41

*Kaelin v. Globe Commc'ns Corp.*,
    162 F.3d 1036 (9th Cir.1998) ................................................ 22

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ............................................ 41

*Knafel v. Chi. Sun-Times, Inc.*,
    413 F.3d 637 (7th Cir. 2005) ............................................ 19, 20

*Kuwik v. Starmark Star Mktg. & Admin., Inc.*,
    619 N.E.2d 129 (Ill. 1993) .................................................. 31

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014) .............................................. 45

*Lott v. Levitt*,
    556 F.3d 564 (7th Cir. 2009) .......................... 15, 20, 21, 45

*Madison v. Frazier*,
    539 F.3d 646 (7th Cir. 2008) ........................................ 21, 29

*Maple Lanes, Inc. v. News Media Corp.*,
    751 N.E.2d 177 (Ill. App. Ct. 2d Dist. 2001) .......................... 32

**Page(s)**

*McCauley v. City of Chicago,*
    671 F.3d 611 (7th Cir. 2011) .......................................................... 17, 43

*Muzikowski v. Paramount Pictures Corp.,*
    477 F.3d 899 (7th Cir. 2007) ......................................................... 20, 24

*Myers v. The Telegraph,*
    773 N.E.2d 192 (Ill. App. Ct. 5th Dist. 2002) ....................................... 33

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
    591 F.3d 250 (4th Cir. 2009) .............................................................. 44

*Newton v. Nat'l Broad. Co., Inc.,*
    930 F.2d 662 (9th Cir. 1990) .............................................................. 36

*O'Donnell v. Field Enters., Inc.,*
    491 N.E.2d 1212 (Ill. App. Ct. 1st Dist. 1986)................................... 32, 33, 35, 48

*Obado v. Magedson,*
    612 F. App'x 90 (3d Cir. 2015) ........................................................... 41

*Pippen v. NBCUniversal Media, LLC,*
    734 F.3d 610 (7th Cir. 2013) .............................................................. 19

*Pugh v. Tribune Co.,*
    521 F.3d 686 (7th Cir. 2008) ................................................................ 3

*Reed v. City of Chicago,*
    77 F.3d 1049 (7th Cir. 1996) .............................................................. 40

*Rowe v. Gibson,*
    798 F.3d 622 (7th Cir. 2015) .............................................................. 40

*Salamone v. Hollinger Int'l, Inc.,*
    807 N.E.2d 1086 (1st Dist. 2004) ....................................................... 22

*Scheidler v. Nat'l Org. for Women, Inc.,*
    739 F. Supp. 1210 (N.D. Ill. 1990) ....................................................... 3

*Schor v. City of Chicago,*
    576 F.3d 775 (7th Cir. 2009) .............................................................. 49

*Small v. Chao,*
    398 F.3d 894 (7th Cir. 2005) .............................................................. 18

**Page(s)**

*Solaia Tech., LLC v. Specialty Publ'g Co.,*
    852 N.E.2d 825 (Ill. 2006) ....................................................... 16, 19, 22, 31, 32, 36

*Stevens v. Tillman,*
    855 F.2d 394 (7th Cir. 1988) ........................................................................ 35, 48

*Tepper v. Copley Press, Inc.,*
    721 N.E.2d 669 (Ill. App. Ct. 2d Dist. 1999)................................................... 31, 33

*Tuite v. Corbitt,*
    866 N.E.2d 114 (Ill. 2006) ........................................................... 16, 20, 21, 25, 26

*Universal Commc'n Sys., Inc. v. Lycos, Inc.,*
    478 F.3d 413 (1st Cir. 2007) ................................................................................. 41

*Vargas-Harrison v. Racine Unified Sch. Dist.,*
    272 F.3d 964 (7th Cir. 2001) ................................................................................ 30

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) ................................................................................ 41


**Statutes**

47 U.S.C.
    § 230.........................................................................................................*passim*
    § 230(c)(1)................................................................................................................. 37
    § 230(e)(3) ................................................................................................................ 37
    § 230(f)(3) ................................................................................................................. 37


**Other Authorities**

FED. R. CIV. P.
    12(b) (2016) ............................................................................................................. 18
    12(b)(6) (2016).................................................................................................. 20, 43
    15(a) (2016) ............................................................................................................. 49
    15(a)(2) (2016)......................................................................................................... 18

## JURISDICTIONAL STATEMENT

The revised jurisdictional statement by plaintiff-appellant Meanith Huon

("Huon") is complete and correct.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.  Whether the district court correctly dismissed Huon's defamation *per se* claim arising from the headline of the challenged article, as accompanied by a photograph of Huon and an image of a portion of a separate news item that was then a subject of litigation, because the headline and accompanying images are subject to an innocent construction in the context of the article read as a whole.

2.  Whether the district court correctly dismissed Huon's remaining claims arising from the challenged article, which reported both on underlying criminal proceedings and the filing of this civil lawsuit, because they are barred by the fair report privilege under Illinois law.

3.  Whether the district court correctly dismissed Huon's claims for intentional infliction of emotional distress ("IIED") and false light invasion of privacy ("false light") for the same reasons as his defamation claims, and for failing to state a claim.

4.  Whether the district court correctly dismissed Huon's claims arising from third-party user comments posted online because those tort claims are preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and whether, as an alternative basis for affirmance, any of those user-submitted statements would give rise to a viable tort claim in any event.

5.  Whether the district court abused its discretion in denying Huon's motion for leave to file a Fifth Amended Complaint.

## COUNTERSTATEMENT OF THE CASE

In this action, Huon attempts to assert causes of action for defamation and related torts arising from an article published by Gawker Media, LLC ("Gawker"), and from third-party user comments posted on Gawker's website. The article at issue reported on the initial filing of this civil lawsuit against another publisher over its report about an Illinois criminal proceeding in which Huon was charged with sexual assault and acquitted by a jury. Following Gawker's publication, Huon amended his complaint to add Gawker and various other parties as defendants. Huon appeals portions of the order dismissing his claims with prejudice, and contends that the district court abused its discretion in denying him leave to file a Fifth Amended Complaint.

Because application of the fair report privilege in this case necessarily turns on what happened in prior criminal and civil proceedings, that record is set forth in some detail below.[1]

### A. The Criminal Prosecution

According to transcripts of 911 calls reported to the Madison County Sheriff's Department, a woman banged on doors in that Illinois county near midnight on June 29, 2008, distraught and claiming she had been kidnapped and sexually assaulted. *Huon v. Mudge* (*Mudge*), 597 F. App'x 868, 870-71 (7th Cir. 2015). "Jane

---

[1] A court may properly take judicial notice of documents filed in court for the purpose of establishing that they say what they purport to say, and for evaluating assertion of the fair report privilege. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 942-943 (7th Cir. 2012); *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008); *Scheidler v. Nat'l Org. for Women, Inc.*, 739 F. Supp. 1210, 1215 (N.D. Ill. 1990).

3

Doe"[2] told police that she had answered an online employment advertisement for an

alcohol brand promotion, and that a man calling himself "John" had met her at a

bar to discuss possible work. *Id.* at 871. She reported that they drank and talked,

and ultimately he offered her a ride in his car to a different club:

> When he passed the exit for the club, she explained, she became
> nervous and asked where they were going. It was at that point, [Jane
> Doe] told the detectives, that John started groping her and pulling at
> her clothing; she protested, but he grabbed her, digitally penetrated
> her, and forced her to perform oral sex. When John left the highway,
> she jumped from the slowing car, leaving her purse with her ID and
> cellphone inside.

*Id.*

The number through which "Jane Doe" had contacted the man turned out to be a

pre-paid phone registered to a fictitious "John Rogers," which had also been used to

contact four other women who declined similar employment offers. *Id.* Police traced

the phone to Huon, who matched the man in bar surveillance footage, and a search

found the alleged victim's purse in a garbage bag in his closet. *Id.* at 871-72. Huon

told police that the woman "had agreed to 'hang out' with him for $10 to $20 an

hour and willingly performed oral sex but then threatened to claim she had been

forcefully assaulted unless he paid her $500." *Id.* at 872.

On July 2, 2008, Huon – an attorney who had unsuccessfully sued his former law

firm for discrimination after being fired earlier that year, *Huon v. Johnson & Bell,*

*Ltd.*, 757 F.3d 556, 557 (7th Cir. 2014) – was charged with two counts of criminal

---

[2] The opening appellate brief in this case and the judicial transcript of Huon's criminal
proceedings redact the victim's name, although she was identified in Huon's separate civil
action against state officials and in resulting judicial rulings. Nevertheless, the Gawker
Defendants refer to her in this brief as "Jane Doe."

sexual assault, two counts of criminal sexual abuse, and one count of unlawful

restraint. Dkt.191, 2514 (criminal information).[3] Subsequently, he was also charged

with harassment of a witness and cyberstalking, for allegedly posting online

comments using Jane Doe's nickname and referencing her hometown, stating: "'I

love you. Marry me.'" Dkt.191, 2518 (criminal information); *Mudge*, 597 F. App'x at

872. Huon pleaded not guilty, went to trial on the two sexual assault charges,[4] and

was acquitted by a jury.

Significant portions of the trial transcript were submitted to the district court.

They reveal that, at trial, Jane Doe testified that Huon met her under false

pretenses and sexually assaulted her in his car, Dkt.179-3, 2177-85, and that,

terrified, she leaped from the car when he neared a stop sign, leaving behind her

shoes, purse, wallet, and cell phone, *id.* at 2190-91; *see also id.* at 2196.

The overarching theme of Huon's defense at trial was that the sexual contact

was consensual, a point emphasized by his lawyer in his opening statement:

> You are going to hear and see that all of these sex acts were
> consensual. You are going to see that [Jane Doe] was a willing
> participant in these sex acts and that these were 100 percent
> consensual.
>
> …
>
> You are not going to hear any evidence of any violence.  You are not
> going to hear any evidence of any threats of violence. You are only
> going to hear [Jane Doe] say, He told me to suck his dick and I did.

---

[3] Following the convention adopted by the opening brief, the Gawker Defendants cite
the district court record by docket number and PageID number ("Dkt.__, __").

[4] The state dismissed the three other charges on the eve of trial. Dkt.89-6, 1232.

*Id.* at 2115, 2118. Huon's lawyer explained that, following consensual sex in the car, Jane Doe tried to blackmail Huon, *id.* at 2116 ("She threatens to turn him in and call the police and say she was raped."). To bolster his argument, the attorney emphasized that Huon and the woman had spent the evening together "hanging out" and "having fun," *id.* at 2113, and that the woman was drunk when the alleged assault occurred, *id.* at 2117 ("She smelled, she wreaked [sic] of alcohol.").

Huon did not testify. 597 F. App'x at 872. During a cross-examination of his alleged victim, however, Huon's attorney questioned whether Jane Doe might have actually responded to an "online ad" for "adult jobs" or an ad for a "party girl," Dkt.179-3, 2216-23, focused on the amount of alcohol the woman had consumed during the evening, *id.* at 2222-23, 2235-49, and pressed her on apparent discrepancies between her original police statement and her testimony, *e.g.*, *id.* at 2213-16 (lack of account in police report about dead cell phone), 2226-28 (discrepancy regarding frequency of telephone calls to Huon), 2230-33 (discrepancy regarding whether meeting was job or interview).

On May 6, 2010, the jury acquitted Huon. *Id.* at 2075. The State's Attorney told reporters: "We thought our witness was credible, but apparently the jury did not." *Mudge*, 597 F. App'x at 872. Prosecutors later dismissed the charges of witness harassment. Dkt.89-7, 1237. Cook County prosecutors also voluntarily dismissed charges arising from a separate misdemeanor complaint that Huon, while posing as a fictional William Morris casting agent named "Nick Kew," had fondled another woman in a taxi during an "audition" for a film. Dkt.191, 2520-28, Dkt.132-1, 1525.

6

Following his acquittal, Huon sued Madison County and its sheriff's department,

two detectives, two sheriff's department supervisors, three police officers, the former

Madison County State's Attorney, two prosecutors, and the City of Chicago,

asserting 22 claims arising from the prosecution. *Mudge*, 597 F. App'x at 870.

Concluding that probable cause existed for each criminal charge against Huon, the

district court granted summary judgment to all defendants – a ruling affirmed by

this Court. *Id.* at 870.

## B. The First Complaint

Huon filed the original complaint ("Complaint") in this action on May 6, 2011.

Dkt.1, 1. Gawker was not named as a defendant in that complaint. Rather, Huon

sued various entities associated with the website *Above the Law* ("ATL"), which had

reported about the criminal proceedings against Huon. *Id.* at 3-4. Specifically, a

tongue-in-cheek article appearing in ATL cited two other online reports referencing

criminal charges against Huon and sarcastically chided the alleged victim for a lack

of due diligence because she did not know about those reports before agreeing to

meet a man following an Internet contact: "And this people, is why God invented

Google." *Id.* at 3.

The Complaint alleged that the ATL article was false because both it and the

two other referenced reports all described the *same* incident (rather than three

separate instances of alleged sexual assault):

> The aforesaid statement is false. Defendants omit that the same
> complainant is involved in all 3 articles.
>
> …

7

> The content of the article were [sic] defamatory in that it incorrectly
> and recklessly portrayed Mr. Huon as a serial rapist by treating the
> same complaining witness as three different women.

*Id.* at 4, 6. In short, the gravamen of the Complaint's allegation was that ATL erred

by implying that Huon was charged with sexually assaulting three women, rather

than just one, thus falsely depicting him as a "serial rapist." The Complaint sought

$50 million in damages. *Id.* at 8.

## C. The Gawker Report

Reporting on both the filing of the Complaint and on the underlying criminal

prosecution, as well as Huon's action against law enforcement officials, Gawker

published a report on May 11, 2011 on its website Jezebel.com ("the Gawker

Report"). The Gawker Report bore the headline: "Acquitted Rapist Sues Blogger For

Calling Him Serial Rapist," followed by a four-paragraph article. The opening

paragraph explained:

> A Chicago man who was acquitted on a sexual assault charge is suing
> the legal blog Above the Law for implying that he's a serial rapist. If
> Meanith Huon gets his way, blogger sloppiness may cost ATL $50
> million.

Dkt.162-12, 1879 (screen shot).

The Gawker Report proceeded to discuss the criminal trial, explaining, *inter*

*alia*, that "Huon's version was that it was a consensual encounter," *id.*, and that the

jury acquitted him; noted that "Huon is also suing local law enforcement authorities

… for prosecutorial misconduct," Dkt.162-16, 1889 (screen shot); and reported the

allegations against ATL in the Complaint, including by quoting the allegation that

"'[t]he content of the article were [sic] defamatory in that it incorrectly and

8

recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining

witness as three different women,'" *id.* The full text included embedded links to

previous reports of the legal proceedings it described and to a copy of the Complaint,

as well as to the challenged ATL report:

### Acquitted Rapist Sues Blogger For Calling Him Serial Rapist

A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. If Meanith Huon gets his way, blogger sloppiness may cost ATL $50 million.

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him.

Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. His beef with Above The Law stems from a roundup post entitled "Rape Potpourri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to *Forbes*.

"And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far.

Dkt.162-12, 1879, Dkt.162-16, 1889 (hereafter, the "Gawker Report"); *see also*

http://jezebel.com/5800878/man-acquitted-of-sexual-assault-sues-blog-for-calling-

9

him-serial-rapist.[5] The Gawker Report included an image of the headline and

opening sentence of the ATL article, as well as a photograph of Huon. *See* Gawker

Report.

Following publication, various readers – including Huon[6] – submitted comments,

available online below the Gawker Report.

## D. The Operative Complaint

Following publication of the Gawker Report, Huon filed a First Amended

Complaint adding claims against Gawker and the author of the Gawker Report, Irin

Carmon, its founder Nick Denton and its former chief operating officer Gaby

Darbyshire (together, "the Gawker Defendants"), along with 204 John Doe

defendants and a dozen defendants associated with various other online

publications that had reported on his lawsuit, including the Madison County

Record, Lawyergossip.com, the Belleville News Democrat, Newnation.tv, and the

Alton Telegraph. Dkt.12, 36-91. Huon later added as defendants various other

entities in Gawker's corporate family, which were never served. A15-16.

With regard to the Gawker Defendants, Huon alleged he was defamed by the

Gawker Report's headline, its summary of the criminal proceedings against him

---

[5] After Huon asserted a claim against Gawker, it changed the headline to "Man
Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist."

[6] Although Huon claims that the Gawker Defendants removed his post, Dkt.162, 1773,
his submitted comment remains online to this day, at http://jezebel.com/5800878/man-
acquitted-of-sexual-assault-sues-blog-for-calling-him-serial-rapist. His comment is third
from the final comment. Huon's profile on Gawker's website also lists his comment. *See*
Meanith Huon's Discussions (5/11/11 10:41 pm), https://kinja.com/meanith-huon-
old/discussions ( "I am going to sue you for defamation by amending the complaint to add
Irin Carmen [sic] and Jezebel as defendants and any John Does who posted defamatory
comments.").

(including that "Huon's version was that it was a consensual encounter," and that

"partly on the strength of a bartender's testimony that the woman had been

drinking and asked where to go to have fun, the jury believed him," *id.* at 53-54), its

quotation from the Complaint and from the ATL article at issue, its screen shot of

the headline of the ATL article, and its inclusion of Huon's booking photograph, *id.*

at 47-56. Huon also alleged that, because "Defendants control, block, edit and

promote the comments that users can leave regarding the article," the Gawker

Defendants were liable for allegedly defamatory statements made by commenters.

*Id.* at 47. Huon sought $100 million. *Id.* at 89.

Huon filed a Second Amended Complaint (Dkt.22, 122), a Third Amended

Complaint (Dkt.156, 1616), and the operative Fourth Amended Complaint (Dkt.162,

1743) ("FAC"), along the way drawing dispositive motions and dropping many of the

defendants from the case.[7]

In addition to challenging nearly every aspect of the Gawker Report, Huon's

FAC also identifies 12 user comments as allegedly defamatory. *Id.* at 1778-81.

These comments all offer opinions about the criminal court proceedings and civil

lawsuit, or about broader social themes. Some expressed opinions regarding Huon's

guilt or innocence in light of the trial allegations. *Compare id.* at 1779 (commenter

"deafblindmute": "Everything points to rape … but there is no conclusive evidence I

have heard speak of that proves he did/didn't do it"), *with id.* at 1780 (commenter

---

[7] Huon claimed that he had "inadvertently" sued defendants associated with the
Madison County Record, Lawyergossip.com, the Belleville News Democrat, Newnation.tv,
and the Alton Telegraph. Dkt. 19, 160.

"vikkitikkitavi": "She jumped out of a moving car, leaving her shoes and purse

behind and ran barefoot though a cornfield and pounded on a stranger's door to help

her?  … He's a rapist alright …."). Another commenter simply opined that "he

sounds like a foreal crazy person." *Id.* at 1778 (commenter "SorciaMacnasty"). One

comment summarized Huon's claim against ATL, *id.* at 1780 (commenter "lanboyo":

"So he is actually upset about the 'Serial' rapist part, actually he is just a one time

accused rapist."), while another predicted that Huon would sue Gawker, *id.*

(commenter "tomsomething": "the phrase 'acquitted rapist' probably won't fly for a

person who has already demonstrated his letigiousitousnicity"). Other comments

debated the meaning of criminal acquittals generally or offered sarcastic or

hyperbolic commentary about public attitudes toward date rape and gender. *Id.* at

1778-81 (commenters "SarahMc," "Dinosaurs and Nachos, girlfriend!",

"CassandraSays," JadeSays," "rachel723," "cool_as_KimDeal," and

"HeartRateRapid").

     The FAC alleges both that the Gawker Defendants "encourage[d]" inflammatory

posts by third parties and, "[u]pon information and belief," that "certain

commenters may actually be Jezebel Defendants' employees, posting under an

alias." Dkt.162, 1773-74. The pleading provides no factual basis for this speculation

and does not identify which of the reader comments "may actually" have been

authored by Gawker employees, or who those employees may be.

## E.  Proceedings Below

     On December 4, 2014, Judge John J. Tharp, Jr. ruled on pending motions to

dismiss by various defendants. A10-46. The court dismissed all claims arising from

user comments as foreclosed by Section 230 of the Communications Decency Act

("CDA"), 47 U.S.C. § 230. A17-21. The district court found Huon's allegations that

the Gawker Defendants incited, promoted, or highlighted the posts to be immaterial

for purposes of establishing their liability, and concluded that Huon's speculation

that some unidentified number of the comments may have been written by

unidentified Gawker employees using aliases to "contain[] insufficient factual

content to allow the Court to reasonably infer that the Gawker defendants were

involved in creating those comments." A20.

The court then separately considered the ATL article and the Gawker Report. It

concluded that the ATL article was potentially actionable as defamatory *per se* with

respect to two implications alleged by Huon: that, prior to the Jane Doe incident, he

had been charged with sexual assault or had used a false identity to meet women.

A29. The court otherwise dismissed Huon's claims arising from the ATL article.

With respect to the Gawker Defendants, the court dismissed Huon's defamation

*per se* claim based on his contention that the Gawker Report's inclusion of the

phrase "acquitted rapist" in its headline, above a photograph of Huon and an image

of the ATL article, was actionable because it implied he was a rapist. It did so on

the ground that, when considered in the context of the entire Gawker Report, which

made clear in its first paragraph that Huon had in fact been acquitted of the

charges against him, the headline and the image were subject to an innocent

construction, *i.e.*, that he had been charged but acquitted of sexual assault. A29-30.

In addition, the court held that challenged statements to the effect that the jury

13

believed Huon were not reasonably capable of a defamatory meaning, A30-31, and

that the Gawker Report's description of the criminal proceedings – including Huon's

challenge to the statement that the jury believed his argument that the encounter

was consensual – was protected by the fair report privilege. A31-32. The court also

dismissed Huon's claim of defamation *per quod* on the ground that he had failed to

plead special damages, A33-35, and similarly dismissed for failure to state a claim

Huon's causes of action for false light, intrusion upon seclusion, IIED, conspiracy,

tortious interference with prospective economic advantage, and cyberstalking and

cyberbullying. A36-46.

On January 1, 2015, Huon filed a motion for reconsideration and for leave to file

a Fifth Amended Complaint. Dkt.223. He principally sought to allege additional

facts supporting his claim that he had sustained special damages. *E.g.*, Dkt.223-1,

3150 ("Plaintiff experienced a decreased in income as an attorney in the period of

time following the publication of the Jezebel.com post as compared to the same

period prior to the publication of the subject defamatory statements."). On May 20,

2015, Judge Tharp denied the motion, holding that Huon "has had multiple

previous opportunities to replead his defamation *per quod* claim," A5, and that

dismissal with prejudice was therefore appropriate:

> Given the procedural posture of this case—which has spanned four
> years, five complaints, and two rounds of motion to dismiss briefing—
> this is not a situation in which justice requires that the Court grant
> leave to amend. … To the contrary, justice requires that the
> defendants be spared yet another round of briefs, delay, and additional
> fees and costs necessary to respond to what would be the plaintiff's
> sixth version of his complaint.

A6-7; *see also* A3 ("Five cracks at a complaint … is enough.").

14

Huon promptly attempted to appeal the dismissal of his claims against the

Gawker Defendants, Dkt.219, but was unable to do so given the pendency of his

remaining claims against the ATL defendants, Dkt.228. Subsequently, however, he

entered into a settlement with the ATL defendants, Dkt.256, 3451, and filed this

appeal from the district court's final judgment in favor of the Gawker Defendants.

He challenges only the dismissal of his defamation *per se* claim, with a cursory

argument regarding claims for IIED and false light, but does not appeal the

dismissal of his remaining claims, including for defamation *per quod*.

## SUMMARY OF ARGUMENT

1.  The district court properly rejected Huon's claim that the Gawker Report's

headline and accompanying image of the ATL article and photograph of Huon,

which he urged should be wrenched from its context and read apart from the rest of

the Gawker Report, either was not subject to any reasonable non-defamatory

construction or that a jury must resolve the question. It is well-established under

Illinois law both that headlines must be read in the context of the stories of which

they are a part, *Harrison v. Chi. Sun-Times, Inc.* (*Harrison*), 793 N.E.2d 760, 772

(Ill. App. Ct. 1st Dist. 2003), and that it is a question of law for the court to

determine whether a statement alleged to be defamatory *per se* is subject to an

innocent construction, *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009). Read in

conjunction with the full text of the Gawker Report, which repeatedly made clear

both that Huon was acquitted of the charges against him and that jurors believed

him, the headline phrase "acquitted rapist," as well as the accompanying graphic

depicting the ATL article along with Huon's photograph, were reasonably subject to an innocent construction: *i.e.*, that Huon was acquitted of the rape charges. Thus, under Illinois law, Huon could not state a viable claim for defamation *per se*. *Tuite v. Corbitt*, 866 N.E.2d 114, 122-23 (Ill. 2006).

2.   The district court correctly found that the Gawker Report's summary of multiple prior official proceedings – the criminal prosecution, trial, and acquittal of Huon on charges of sexual assault; Huon's then-pending civil action against law enforcement officials; and the filing of Huon's action against ATL – was a fair and accurate account of judicial records of which the court could properly take judicial notice and was therefore privileged as a matter of law. *Solaia Tech., LLC v. Specialty Publ'g Co.* (*Solaia*), 852 N.E.2d 825, 842 (Ill. 2006).

3.   The false light and IIED counts fail for the same reasons as the defamation *per se* claim, and for the additional reason that Huon failed to plead facts establishing essential elements of each of these claims.

4.   Section 230 of the CDA, 47 U.S.C. § 230, preempts the tort claims Huon has asserted that allegedly arise from user comments. *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.* (*Craigslist*), 519 F.3d 666, 670-71 (7th Cir. 2008). His allegations that the Gawker Defendants solicited, reviewed, edited, and hosted comments describe classic publishing activities protected by Section 230. Huon's alternate argument that the Gawker Defendants themselves posted user comments is not plausibly alleged by well-pleaded facts in the FAC. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

16

(2007); *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011). Indeed, Huon's argument before this Court is based almost entirely on new factual allegations that are themselves drawn from misleading snippets of quotations and mischaracterizations of documents that are irrelevant to the Gawker Report. Moreover, none of the user comments at issue is actionable in any event for one or more additional reasons – *e.g.*, because the comments are opinions based on privileged reports of judicial proceedings, are not defamatory in the first place, or are not "of and concerning" Huon.

5.    The District Court did not abuse its discretion in denying Huon leave to file a Fifth Amended Complaint, both because it provided "a reasonable explanation for why it denied the proposed amendment," *Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015), *reh'g denied* (Aug. 3, 2015), and because after "four years, five complaints, and two rounds of motion to dismiss briefing," A6-7, Huon had been provided more than enough opportunities to state a viable claim.

## ARGUMENT

This case originated as an action by Huon against ATL over a story about Huon's sexual assault trial. Huon claimed the ATL report implied he was a serial rapist. Gawker published an article on Huon's suit against ATL and the underlying sexual assault acquittal. Huon then sued Gawker, among other media entities, making it a defendant in the very action it had reported upon. Huon claims that, in reporting on his complaint that ATL falsely implied he was a serial rapist and on his trial and acquittal of sexual assault charges, Gawker committed defamation and related

17

torts. The district court correctly held that Gawker's report on Huon's judicial allegations, and its summary of underlying criminal and civil proceedings, does not give rise to a viable claim. Indeed, such reporting informs the public about court proceedings and is a quintessential function of the press.

In urging reversal, Huon focuses on three alleged errors: (1) the trial court's dismissal of Huon's claim for defamation *per se* based on the Illinois "innocent construction rule," Am. Br. of Plaintiff-Appellant Meanith Huon ("Br.") at 32-45; (2) the court's recognition that, because the Gawker Report accurately and fairly summarized the allegations of a civil complaint and proceedings in a criminal trial, the fair report privilege applied and foreclosed Huon's claims, *id.* at 46-53; and (3) the court's dismissal of claims arising out of user-generated content pursuant to Section 230 of the CDA because the operative complaint failed to allege facts plausibly establishing that the statutory preemption was inapplicable, *id.* at 53-59. Each of these rulings by the district court was demonstrably correct, and its dismissal of the operative complaint should be affirmed.

## STANDARD OF REVIEW

This Court reviews a Rule 12(b) dismissal *de novo. Small v. Chao*, 398 F.3d 894, 897 (7th Cir. 2005). It reviews the denial of a Rule 15(a)(2) motion for leave to file an amended pleading for "abuse of discretion, which is a 'heavy burden.'" *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012) (citation omitted).

## I.  THE DISTRICT COURT PROPERLY APPLIED THE INNOCENT CONSTRUCTION RULE AND DISMISSED HUON'S DEFAMATION *PER SE* CLAIM

Under Illinois law, even statements that may be defamatory *per se* – such as the imputation of a crime – are nonetheless not actionable in defamation if they are also reasonably capable of conveying a non-defamatory meaning. *Solaia*, 852 N.E.2d at 839; *see also, e.g.*, *Knafel v. Chi. Sun-Times, Inc.*, 413 F.3d 637, 639-40 (7th Cir. 2005). In such circumstances, a statement may be actionable as defamation *per quod*, but only if supported by plausible allegations of special damages. *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2829 (2014). Because Huon has not appealed the dismissal of his claim for defamation *per quod*, the only question before this Court is whether the district court erred in rejecting his claim for defamation *per se*. *Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012) (issues not raised in appellant's opening brief are waived).

The district court did not err. Huon's argument for reversal both misconstrues the scope of the innocent construction rule and, in analyzing the predicate issue of defamatory meaning, ignores the plain text of the Gawker Report.

### A.  The Innocent Construction Rule Is Properly Applied by the Court Considering the Entirety of a Challenged Publication

Huon misapprehends the legal standard governing application of the innocent construction rule in two critical respects. He incorrectly urges both (1) that an innocent construction analysis is improper "at the pleading stage," Br. 40-41, and (2) that a headline can be defamatory independent of the article to which it refers, Br. 43-45. Both premises are wrong.

*First*, it is well established that whether a statement is shielded from defamation liability by the innocent construction rule presents a question of law that is properly decided by the court. *Lott*, 556 F.3d at 569. Thus, while the district court must take all well-pleaded facts as true when deciding a Rule 12(b)(6) motion, "that does not mean that the court must take the plaintiff's *interpretation* of the allegedly defamatory words at face value. Figuring out the meaning of a statement and whether it is reasonably susceptible to an innocent construction is a question of law for the courts to resolve." *Id.*; *see also, e.g.*, *Knafel*, 413 F.3d at 640-41 (finding "no impediment … to a judge evaluating, in context on a motion to dismiss, the natural and obvious meaning of the accused language and then determining whether a statement may reasonably be innocently interpreted").

Nor is Huon correct in asserting that, if a publication "is reasonably susceptible of a defamatory meaning, a factual question for the jury exists." Br. 41. Although courts should not strain to find an innocent meaning nor "espouse a naïveté unwarranted under the circumstances," neither should they "balance a reasonable innocent construction of a statement with a reasonable defamatory construction." *Tuite*, 866 N.E.2d at 122-23. In other words, "if a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail." *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 904 (7th Cir. 2007); *see also Green v. Rogers*, 917 N.E.2d 450, 463 (Ill. 2009) ("a statement 'reasonably' capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted.") (citation omitted).

20

Indeed, the innocent construction rule is deliberately designed to be difficult for plaintiffs to overcome because it is meant to ease the burden on defendants caused by the presumption of damages in cases of defamation *per se*. *Lott*, 556 F.3d at 569 (the Illinois Supreme Court has "acknowledged that this rule puts a thumb on the scale for defendants but deemed this warranted in *per se* actions, where damages are presumed"); *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008) (same). Such additional protection for defendants, the Illinois Supreme Court has explained, "comport[s] with the constitutional interests of free speech and free press and encourage[s] the robust discussion of daily affairs," *Tuite*, 866 N.E.2d at 122, and provides "breathing space" for defendants' exercise of their First Amendment rights, *Chapski v. Copley Press*, 442 N.E.2d 195, 198-99 (Ill. 1982). The Illinois Supreme Court has repeatedly reaffirmed the rule on this basis and, as this Court has observed, "it is not our place to water down the Illinois high court's policy decision." *Lott*, 556 F.3d at 569.

*Second*, Illinois law requires that allegedly defamatory publications be analyzed as a whole and in context, *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1217 (Ill. 1996), and, specifically, that headlines and graphics must be read in the context of the articles they accompany, *Harrison*, 793 N.E.2d at 772 ("As a general rule in applying the innocent construction rule, a newspaper headline and the text of the article to which it refers are to be considered as one document and read together as a whole.") (collecting cases). Illinois courts routinely consider headlines together with the articles they accompany when applying the innocent construction rule. *See,*

21

*e.g.*, *Solaia*, 852 N.E.2d at 845-46 (finding headlines subject to innocent construction when "read together with the article" and citing *Harrison* with approval); *Salamone v. Hollinger Int'l, Inc.*, 807 N.E.2d 1086, 1091 (Ill. App. Ct. 1st Dist. 2004) (headline "Mob links hurt Rosemont casino bid" not defamatory because article characterized plaintiff "not as a mobster, but as a person who is believed to be, possibly erroneously, an organized crime figure").

Huon is simply wrong, therefore, when he claims that a headline or graphic can be defamatory independent of "an otherwise innocuous article" that it accompanies. Br. 43-45. Although Huon cites *Cook v. E. Shore Newspapers*, 64 N.E.2d 751 (Ill. App. Ct. 4th Dist. 1945), Br. 45, in support of his contention, that case does not support his view. The court in *Cook* expressly held that "[a]n article is to be understood according to the natural and obvious meaning of the words used, taking into consideration the article as a whole and including the headlines." 64 N.E.2d at 764. The remaining cases Huon cites are all from outside Illinois, and are therefore irrelevant to the construction of the unique requirements of the innocent construction rule as formulated by the Illinois courts.[8]

---

[8] For example, Huon relies heavily on *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036 (9th Cir.1998). Even apart from the fact that the case arises under California law, which does not recognize an innocent construction rule, *Kaelin* does not support Huon's position. The Ninth Circuit held that a front-page tabloid headline could properly be considered independently from the article it allegedly accompanied, which was buried 17 pages inside the publication. *Id.* at 1041. Key to the court's reasoning was a recognition that the "front page headline [in a supermarket tabloid] is unlike a conventional headline that immediately precedes a newspaper story." *Id.* In this case, in contrast, the headline and graphic Huon challenges *do* immediately precede the article they accompany. Moreover, faced with nearly identical facts to those in *Kaelin*, the Illinois Court of Appeals has held that a separate front-page headline *should* be construed together with the article to which it refers. *Harrison*, 793 N.E.2d at 772.

22

### B. The District Court Correctly Held the Headline and Graphic Accompanying the Gawker Report Were Not Defamatory *Per Se*

The district court correctly determined that, when considered in the context of the article of which they are a part, the headline and graphic accompanying the Gawker Report are reasonably understood as innocent and nondefamatory. A29-33. The gist of the Gawker Report is that Huon, after being acquitted of sexual assault charges, sought to vindicate his reputation by suing a blog that he alleged falsely branded him an accused *serial* rapist. The very first sentence of the Gawker Report identifies Huon as a "Chicago man who was acquitted on a sexual assault charge." The article proceeds to report that the jury in the criminal case believed Huon's defense, and chides ATL for "blogger sloppiness."

Huon, meanwhile, insists that the Gawker Report accused him of committing a rape simply because it contains the word "rapist." Br. 18-21, 28-30, 32, 37-40, 42-43. But a rational reading of the article reveals the opposite: From the very first word in the headline ("Acquitted") through the rest of the article, the Gawker Report repeatedly makes clear that a jury found Huon not guilty of the sexual assault charges lodged against him.

### 1. The Phrase "Acquitted Rapist" Is Properly Subject to an Innocent Construction

Huon devotes most of his brief to attacking the article's headline, "Acquitted Rapist Sues Blog For Calling Him Serial Rapist." Br. 37-38, 43-45. Even if improperly read in isolation, as Huon urges, the headline conveys three ideas: (1) Huon was acquitted of rape charges; (2) Huon is suing a blog; and (3) the lawsuit asserts that the blog falsely called him a serial rapist. None of these facts is false,

23

let alone defamatory – Huon himself  affirmatively pleads all of them.  *See* Dkt.162,

1755-56 ("Plaintiff, Meanith Huon, was acquitted of the sexual assault charges"); *id.*

1744 (defendants, including abovethelaw.com, "falsely depicted Mr. Huon as, among

other things, … a serial rapist"). The point of the headline – as well as the lawsuit

on which it reports – is that Huon contends that the characterization of him as a

"serial rapist" is false.

Even if "acquitted rapist" can be reasonably understood as meaning "a rapist

who has been acquitted of another rape" or "a rapist who got away with rape" as

Huon suggests, Br. 37, another reasonable interpretation is that "acquitted rapist"

means "a person acquitted of rape charges." The use of "acquitted" is not, as Huon

claims, "isolated, disclaiming language," Br. 35, 39-40. Rather, "acquitted" is the

very first word of a nine-word headline that is reinforced, not softened or

contradicted, by the article that follows, which makes clear that Huon was found

not guilty. Because there is a reasonable, innocent construction of the headline,

Huon's defamation claim must fail. *Muzikowski*, 477 F.3d at 904.

Huon's suggestions concerning how the headline might have been phrased only

underscore this point. To convey that a person was acquitted of rape charges, Huon

says, one should report that the person was "accused of rape," or "charged with

rape, but the charge was never proven," or "put on trial for a rape that the jury

found he did not commit." Br. 37. Reporting that Huon was "accused of rape,"

however, arguably implies that the charges may still be pending, and does not

convey the fact that a jury acquitted him. "Acquitted rapist," in contrast, reasonably

conveys that a final determination has been made in the accused's favor. Likewise, if Huon were correct that "acquitted rapist" necessarily conveys that Huon "got away with" rape (even though it does not), saying Huon was "charged with rape, but the charge was never proven" or that he was "put on trial for a rape that the jury found he did not commit" would carry the exact same alleged implication that a charged individual was really guilty but nevertheless escaped conviction on some sort of technicality or because of the heavy burden of proof in a criminal case. In other words, Huon does not suggest any alternative phrasing that remedies the unreasonable implication he finds in the headline.

In this case, the implication is especially unreasonable because a headline may not, as a matter of law, be read in isolation. *Harrison*, 793 N.E.2d at 772 ("Not only is the headline to be considered with the body of the article as a single entity, but the import of the entire article must be considered in reaching a determination of reasonable innocent construction.") (internal quotations omitted). Because "the context of a statement is critical in determining its meaning," the court must consider the allegedly defamatory publication as a whole rather than in isolated snippets. *Tuite*, 866 N.E.2d at 127. As the district court recognized, when considered in the context of the article of which it is a part, the headline's natural meaning is that Huon was found not guilty of rape. A30. Indeed, immediately under the headline, the article's opening sentence reports Huon's acquittal. *See* Gawker Report. The article goes on to state that the jury at Huon's criminal trial "believed

25

him" rather than his accuser and that Huon "is suing local law enforcement authorities in Madison County, Illinois, for prosecutorial misconduct." *Id.*

Taken as a whole, the alternate reasonable implication, indeed the more reasonable implication, is that Huon was acquitted and has filed lawsuits against both the authorities responsible for the failed prosecution and a blog that allegedly added insult to injury by calling him a serial rapist. *See, e.g.*, *Antonelli v. Field Enters., Inc.*, 450 N.E.2d 876, 878 (1st Dist. 1983) (headline referring to plaintiff as "mobster" not actionable under innocent construction rule because accompanying article called plaintiff a "reputed mobster" and thus only implied that others had "supposedly, perhaps erroneously imputed" his involvement with organized crime) (internal punctuation omitted). At the very least, in the context of an article that repeatedly refers to Huon's acquittal, the headline may reasonably be construed in a manner that is neither false nor defamatory and therefore is not actionable as defamation *per se*.

The Illinois Court of Appeals' decision in *Harrison* is particularly instructive. In that case, the plaintiff had been found to have violated an international child abduction treaty by bringing her daughter to Chicago from Italy against the wishes of her estranged husband. 793 N.E.2d at 763-64. The *Chicago Sun-Times* reported on the case and published a photograph of the plaintiff and her daughter on the newspaper's front page, accompanied by a two-sentence "leader" article, a headline reading "Kidnapped girl must go home," and a reference to an article inside the newspaper on page 16. *Id.* at 764. The article inside the newspaper reported in

detail on the civil case and stated that a federal judge had ordered the plaintiff to
return her daughter to Italy because she had been removed in violation of the
international treaty. *Id.*

The plaintiff claimed she was defamed by the front-page statement that she had
"kidnapped" her daughter and urged that the front-page material should be
considered independently from the longer article inside the newspaper. *Id.* at 772-
73. The Court of Appeals disagreed, holding that the front-page headline had to be
read in conjunction with the article itself and that, as a whole, the package could be
innocently construed as truthfully reporting that the plaintiff had been found civilly
responsible for unlawfully removing her daughter from Italy. *Id.* Rather than
viewing the front-page headline in isolation, the court held, "considering that the
statement was contained in a leader article which specifically referred to the inside
article, the page-16 article must be considered together with the front-page
statement." *Id.* at 773.

Just as in *Harrison*, even if the headline of the Gawker Report is susceptible to
the defamatory implication ascribed to it by Huon when read alone, the full report's
explanation that Huon was acquitted of the sexual abuse charges against him
renders the headline susceptible to an innocent construction as a matter of law.

### 2.  Neither Huon's Mugshot Nor the Screenshot of the Above the Law Article Is Defamatory

Huon's analogous claim that the graphic accompanying the Gawker Report also
implies that he is a rapist, Br. 32, 40, merits only brief discussion. Huon's
suggestion that the placement of his photograph next to the logo of the blog he sued

implies that *he* was "ABOVE THE LAW," *id.* at 40, is unreasonable given that the

opening sentence of the Gawker Report identifies the blog by name. *See* Gawker

Report. Similarly, the fact that the words, "Rape Potpourri" appear next to Huon's

photograph is because – as the article also makes clear – that was the headline of

the ATL article over which Huon had sued. As the district court correctly

recognized, the graphic merely illustrates the article by showing a picture of the

plaintiff and a partial screenshot of the blog post at issue, including its headline.

A29 ("The image below [the headline] contains Huon's arrest photograph

superimposed over a screenshot showing the ATL Article's headline ("Rape

Potpourri") and first two sentences.").[9]

### 3. It Was Not Defamatory for the Gawker Report to State That Jurors Believed Huon's Defense

Finally, Huon asserts that the following sentence in the article is defamatory:

"Huon's version was that it was a consensual encounter, and partly on the strength

of a bartender's testimony that the woman had been drinking and asked where to go

to have fun, the jury believed him." Br. 42-43, 47-48. Huon claims that this passage

is defamatory because it means he was "acquitted of rape because the complaining

witness had been portrayed as having a few drinks." *Id.* at 42-43. Putting aside the

fair report issue discussed *infra*, Huon cannot explain how this statement could

---

[9] Oddly, Huon also argues that the graphic is defamatory because it "conveniently
omitted the 'update' to the Abovethelaw.com Article that Huon was acquitted." Br. 45. He
does not explain how omitting a portion of an allegedly defamatory blog post could possibly
be defamatory, particularly given that the omitted information – that Huon was acquitted –
was repeatedly emphasized in the Gawker Report itself.

possibly damage *his* reputation. As the district court noted, the passage *enhances*

Huon's reputation by stating that the jury was swayed by his defense. A30.

Huon's contention that he was defamed by mentioning testimony about his

accuser's drinking is particularly puzzling because the FAC faults Gawker for

allegedly failing to report precisely the same information. The complaint claims that

Gawker "intentionally omitted" facts including that "[t]he complainant had gone

drinking with Mr. Huon at several bars for hours," and that "[t]he bartender

testified that she saw Mr. Huon and the complainant playing video games."

Dkt.162, 1786-87. Huon apparently believes the testimony that his accuser had

been drinking and socializing with him prior to the alleged sexual assault was

important and exculpatory, so it cannot at the same time be defamatory to say that

the jury relied in part on this testimony to acquit him. There is simply no rational

defamatory interpretation of this passage.

### C. Huon's False Light and Intentional Infliction Claims Also Fail

Huon's brief contains a cursory argument that his claims for false light and IIED

are properly revived. Br. 59-60. As the district court correctly determined, these

claims are dependent on his allegations of defamation *per se* and fail for the same

reasons. A36-37, 39-40. Because false light is a tort closely aligned with defamation,

where the underlying statements are not actionable as defamation, a false light

claim based on the same statements fails as a matter of law. *Madison*, 539 F.3d at

659. Likewise, because the Gawker Report is not defamatory as a matter of law, it

"logically cannot rise to the even higher level of 'extreme and outrageous conduct.'"

A40. These claims were, therefore, properly dismissed.[10]

## II. THE GAWKER REPORT IS PROTECTED FROM DEFAMATION LIABILITY BY THE FAIR REPORT PRIVILEGE

The district court correctly determined that the text of the Gawker Report was

privileged as a fair report of the criminal and civil litigation in which Huon was a

party. A31-32. The article accurately summarizes the criminal trial that resulted in

Huon's acquittal; Huon's defamation complaint against ATL; and Huon's civil rights

lawsuit. The Gawker Defendants are therefore immune from defamation liability

for accurately reporting on these proceedings, regardless of how ardently Huon

wishes to suppress the facts about them.

---

[10] Huon's non-defamation claims are legally infirm for the additional reason that he failed to plead facts establishing essential elements of each tort. Huon's false light claim did not adequately plead that the Gawker Defendants published the Gawker Report with actual malice, *i.e.*, with knowledge of falsity or a high degree of awareness of probable falsity. *Jacobson v. CBS Broad. Inc.*, 19 N.E.3d 1165, 1180 (Ill. App. Ct. 1st Dist. 2014), *appeal denied*, 23 N.E.3d 1201 (Ill. 2015). Huon's pleadings regarding actual malice, Dkt.162, 1797, are merely "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013) (same). Huon similarly fails adequately to plead essential elements of the IIED tort: That Gawker knew or intended the article would inflict severe emotional distress and that he suffered severe emotional distress as a result. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). Again, Huon's operative complaint, Dkt.162, 1801-02, simply recites the elements of the tort without pleading any facts that would "nudge[] [his] claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This Court may affirm the dismissal of Huon's claims for IIED and false light on these grounds as well. *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001) ("[W]e may affirm the district court's judgment on any ground that is supported in the record.") (internal quotations and citation omitted).

30

### A. The District Court Properly Considered the Underlying Official Records in Applying the Fair Report Privilege

It is well-established in Illinois, as it is in other U.S. jurisdictions, that the fair report privilege "protects the news media from defamation actions when it reports information obtained from governmental and public proceedings on matters of public interest and provides that such reports are nonactionable as defamation." *Harrison*, 793 N.E.2d at 773. The privilege exists to "promote[] our system of self-governance" by serving "the public's interest in the judicial system." *Solaia*, 852 N.E.2d at 842-44, 848; *see id.* ("[F]reedom of the press is illusory if a cloud of defamation liability darkens the media's reports of official proceedings.").

In Illinois, it is a question of law for the Court whether the fair report privilege bars a plaintiff's claims. *Id.* at 842. Huon's contention that the district court erroneously decided questions of fact in determining that the fair report privilege protects the Gawker Report, Br. 46, 52, is premised on a fundamental mischaracterization of Illinois law.

Specifically, Huon's argument relies on *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 619 N.E.2d 129, 134 (Ill. 1993). Br. 52. As Illinois courts have repeatedly explained, however, *Kuwik* did not involve the fair report privilege – which unlike other qualified privileges cannot be "abused" in the sense of publishing falsehoods with malice. *Conterras v. Vill. of Woodridge*, No. 93-C-7727, 1994 WL 174092, at *3-4 (N.D. Ill. May 5, 1994) (in *Kuwik* "the court was dealing with the qualified communications privilege, a privilege which is significantly different from the fair report privilege"); *see also Tepper v. Copley Press, Inc.*, 721 N.E.2d 669, 674

31

(Ill. App. Ct. 2d Dist. 1999) (same). The Illinois Supreme Court has made clear that

neither ill will (common-law malice) nor knowledge or subjective awareness of

probable falsity (constitutional or "actual malice") will defeat the fair report

privilege. *Solaia,* 852 N.E.2d at 843. Thus, as one Illinois appellate court explained,

"the only way the fair-report privilege can be abused is if the report published was

not an accurate or fair abridgement of the official proceeding." *Eubanks v. Nw.*

*Herald Newspapers*, 922 N.E.2d 1196, 1201 (Ill. App. Ct. 2d Dist. 2010) (rejecting

plaintiff's contention that jury question existed regarding whether fair report

privilege was abused).[11] It is well settled that this issue presents a question of law

that is properly resolved by the court. *Solaia,* 852 N.E.2d at 842.

The fair report privilege protects an account of an official proceeding so long as it

is a "fair abridgement" of the proceeding's content. *Id.* at 843. The privilege is lost

only if the challenged statement contains false and defamatory factual material

that was *not* revealed in the government proceeding. Put differently, if the

challenged statement carries the same defamatory "gist or sting" as the official

proceeding or document on which it reports, it is privileged. *O'Donnell v. Field*

*Enters., Inc.*, 491 N.E.2d 1212, 1216-17 (Ill. App. Ct. 1st Dist. 1986); *see also Solaia,*

852 N.E.2d at 844-45. Thus, a summary or paraphrase, even if lacking in technical

legal accuracy, is protected if it fairly and accurately captures the gist of the official

---

[11] The other cases on which Huon relies are similarly inapposite. Br. 52. In *Maple*
*Lanes, Inc. v. News Media Corp.*, 751 N.E.2d 177, 179-80 (Ill. App. Ct. 2d Dist. 2001), a jury
question existed only because there was a factual dispute regarding whether the county
sheriff had actually made the statement quoted in the article. No such dispute exists here.
And this Court decided *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 272-
73 (7th Cir. 1983), more than two decades before the Illinois Supreme Court clarified the
scope of the Illinois fair report privilege in *Solaia*.

proceeding or document on which it is based: "[T]he privilege that exists here is not

defeated merely because there may be a misstatement or some discrepancies

between the statements in the newspaper articles and the statements from the

governmental and public proceedings upon which they are based." *O'Donnell*, 491

N.E.2d at 1217; *see also Myers v. The Telegraph*, 773 N.E.2d 192, 198 (Ill. App. Ct.

5th Dist. 2002) ("If the gist of the defamation in the official report is the same as the

gist in the news account, then the news item is a fair abridgement of the

proceedings."); *Harrison*, 793 N.E.2d at 773-74 (headline conveyed accurate

summary of legal proceeding "[g]iven the complexities of the ruling" and

"[c]onsidering the space limitations inherent in the front-page headline"); *Tepper*,

721 N.E.2d at 675-76 (immaterial differences between government report and

article describing report did not defeat fair report privilege).

## B. The Gawker Report Accurately Summarized the Underlying Litigation Surrounding Huon's Acquittal and Complaint

Although Huon repeatedly asserts that the Gawker Defendants forfeited the

privilege because they "invented" or "made up" facts about the criminal case against

him and his lawsuit against ATL, Br. 47, 50, these assertions simply do not

withstand reasonable scrutiny. Huon's own pleadings and the underlying judicial

records confirm that the challenged statements in the Gawker Report are entirely

accurate accounts of the proceedings and documents they purport to describe, and

Huon's arguments to the contrary are unsupported by anything in the record.

For example, Huon claims Gawker "invented" this sentence: "Huon's version was

that it was a consensual encounter, and partly on the strength of a bartender's

33

testimony that the woman had been drinking and asked where to go to have fun,

the jury believed him." Br. 47-48. However, judicial records confirm that this

statement is substantially accurate. When police first arrived at Huon's door with a

search warrant, he told them that his accuser had performed a consensual sex act.

*Mudge*, 597 F. App'x at 872.[12] During his opening statement at trial, Huon's

attorney described in explicit detail Huon's contention that he and his accuser had

consensual sex. Dkt. 179-3, 2115 ("You are going to hear and see that all of these

sex acts were consensual."); *id.* at 2118 ("You are only going to hear [Jane Doe] say,

'He told me to suck his dick and I did.'"). Whether Huon personally testified at his

criminal trial – he did not – or whether the jury specifically adopted a "consent

defense" is an irrelevant technicality because, from the beginning to the end of his

criminal prosecution, "Huon's version" was precisely what Gawker reported: that

his accuser consented to sexual contact. And, regarding the bartender's testimony,

Huon's own complaint asserts that his accuser "had gone drinking with Mr. Huon at

several bars for hours" and that "[t]he bartender testified that she saw Mr. Huon

and the complainant playing video games." Dkt.162, 1786-87.[13]

---

[12] Huon urges this Court to review materials in the record of *Huon v. Mudge*, No. 13-2966. *See* Br. 48-49. Although unnecessary because this Court's opinion in that case fully recounts the relevant details, should the Court consider those records it should especially take note of Huon's admission to police that his accuser had voluntarily performed oral sex on him and his repeated insistence that the act was consensual. *Huon v. Mudge*, No. 13-2966, Dkt. 23, 5882 (police report filed as exhibit to Huon's opposition to summary judgment motion).

[13] Moreover, even if the description of the bartender's testimony were inaccurate, it conveys nothing defamatory about Huon. *See supra* at 28-29.

Huon's related contention that Gawker "invented" the jury's reasons for acquitting him is another red herring. Even apart from the fact that Huon is not defamed by a statement that the jury believed his defense, an analysis suggesting that certain testimony concededly in the record had influenced the verdict is a non-actionable expression of opinion. That opinion, in turn, is based on the fully disclosed, privileged, and undisputed facts about Huon's claims of consensual sex and his accuser's drinking. *Stevens v. Tillman*, 855 F.2d 394, 400-01 (7th Cir. 1988) ("When a statement in the form of an opinion discloses the defamatory facts (or refers to facts in the public record), it is not actionable apart from those facts."); *O'Donnell*, 491 N.E.2d at 1218 (editorial based on facts privileged as fair report of judicial proceeding not actionable as defamation). Indeed, Gawker's statement mirrors one made by Huon's prosecutor that this Court has previously held to be a protected expression of opinion. *Mudge*, 597 F. App'x at 877 (prosecutor's statement that "[w]e thought our witness was credible, but apparently the jury did not" was nonactionable opinion).

Huon's argument that the passage he challenges falsely implied that Gawker had interviewed him or the jurors who acquitted him, Br. 50, is nonsense. Even were this a reasonable interpretation of the article – and it is not – it does nothing to help Huon because the underlying facts *were* presented at trial. Whether Huon told police, jurors or a reporter (or all of them) that the sex was consensual, he indisputably contended as much in the criminal proceeding – and was acquitted, a non-defamatory fact that the Gawker Report repeatedly stated. Huon's claim that

Gawker "invented the fact that Huon was a rapist but got away with rape," Br. 47,

simply ignores the actual Gawker Report, which says no such thing.

Finally, Huon apparently contends that it was false and defamatory to report

that his original complaint in this lawsuit accused ATL of defaming him by

implying that he was a serial rapist. Br. 49-51.[14] But that is precisely what the

Complaint alleged: "The content of the article were [sic] defamatory in that it

incorrectly and recklessly *portrayed Mr. Huon as a serial rapist* by treating the

same complaining witness as three different women." Compl. at 6 (emphasis added);

*see also id.* at 7 (same). Huon is, as he says, "the master of his complaint." Br. 50.

Gawker cannot be liable for accurately reporting Huon's own allegations. *Newton v.*

*Nat'l Broad. Co., Inc.*, 930 F.2d 662, 684 (9th Cir. 1990) ("[Plaintiff] cannot fault

[Defendant] for relying on his own statements.").

## III.  THE DISTRICT COURT CORRECTLY HELD THE COMMUNICATIONS DECENCY ACT BARS HUON'S CLAIMS BASED ON READER COMMENTS

The district court correctly held that 47 U.S.C. § 230 preempts Huon's claims to

the extent they are premised on comments posted by readers on the Jezebel

website. A17-21. This statute states that "[n]o provider or user of an interactive

computer service shall be treated as the publisher or speaker of any information

---

[14] Huon also appears to contend that this Court cannot consider the Gawker Report to be a report regarding this lawsuit. Br. 46 ("The original proceedings being examined should be the original proceedings in the Madison County criminal trial, not a complaint pled under notice pleading rules in Federal Court [sic] litigation."). Huon is not entitled to choose his own facts, however, nor may he dictate which of the legal proceedings involving him may be reported upon by others. Accurate reports regarding his original complaint in this case are privileged because "there is no judicial-action limitation on the fair report privilege in Illinois." *Solaia*, 852 N.E.2d at 844.

provided by another information content provider." 47 U.S.C. § 230(c)(1). It defines

"information content provider" as "any person or entity that is responsible, in whole

or in part, for the creation or development of information" provided online, *id.*

§ 230(f)(3), and provides that "[n]o cause of action may be brought and no liability

may be imposed under any State or local law that is inconsistent with this section,"

*id.* § 230(e)(3); *see also Doe v. GTE Corp.*, 347 F.3d 655, 658 (7th Cir. 2003) (noting

that this provision "preempt[s] contrary state law").

This Court has explained that Section 230 means that a website operator such

as Gawker cannot be held liable for information posted on its website by "someone

else." *Craigslist*, 519 F.3d at 670-71. To be culpable for creating or developing

objectionable content, a website operator must "materially contribut[e] to its alleged

unlawfulness." *Fair Hous. Council of San Fernando Valley v. Roommates.Com,*

*LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008); *see also Craigslist*, 519 F.3d at 671-72

(to be liable for allegedly discriminatory housing advertisements, website operator

would have to be responsible for causing their "discriminatory content").

Section 230 bars Huon's claims based on reader comments because the actions

for which Huon claims the Gawker Defendants should be held liable – reviewing,

editing and hosting comments – are classic publishing activities protected by

Section 230. The comments were written by someone else and, despite the most

recent characterizations contained in his briefing to this Court, Huon's complaint

does not plead otherwise. Perhaps recognizing the legal flaws in his claim, Huon

now cites to – and misrepresents – various extra-judicial documents that, upon

inspection, do not support the assertions he makes about them. In any event, none of the identified third-party comments is actionable in tort as a matter of law and the district court properly dismissed Huon's claims arising from online third-party postings.

## A. Huon Relies on Mischaracterizations of Irrelevant Materials

In his effort to sidestep Section 230's preemption of his claims based on reader comments, Huon relies on internet postings by Gawker and others that were not pleaded or otherwise referenced in his complaint. *E.g.*, Br. 22-24 & nn.10-13. These documents not only describe events post-dating the Gawker Report but, on inspection, contradict on their face Huon's mischaracterizations of their contents.

For example, Huon asserts in his brief that Gawker's "Recruits" program was an initiative "to recruit writers to comment on stories on Gawker Media websites." Br. 22; *see also id.* at 56 (same). This is demonstrably false as revealed by the very document cited by Huon. The recruits program did *not* pay people to comment on other writers' stories; instead, Gawker paid recruits to write their *own* original content. *See* http://joel.kinja.com/introducing-recruits-1520191540 (cited at Br. 22-23); *see also* http://www.capitalnewyork.com/article/media/2014/06/8547356/gawker-media-graduates-its-first-class-recruits (cited at Br. 22 n.10). Nevertheless, Huon falsely asserts that "Gawker Media admits on its websites … that it pays writers to comments [sic] on its own stories," Br. 57-58, and that Gawker  "chose the people who auditioned to be commenters (including Gawker Media employees) and selected

their comment [sic] to call Huon a rapist," Br. 56.[15] It bears emphasis – because it is

wholly missing from Huon's description – that the documents cited by Huon reveal

that the program debuted in early 2014, *nearly three years after the Gawker Report

was published* (and well after district court briefing had been completed). Thus, the

"evidence" regarding Gawker's program is not only misrepresented to the Court, but

also demonstrably irrelevant because it post-dates the article at issue.

Huon similarly relies on posts from a blog titled "Gawker Sucks" by someone

using the name "Drew Johnson." Br. 23 & n.12. Huon asserts that these posts are

evidence that "[h]undreds of 'anonymous' comments posted to promote Gawker

stories have been traced to actual Gawker employees." *Id.* Presumably, the Johnson

postings are the source for Huon's otherwise unsupported claim that "Gawker

Media employees also created fake accounts to post 'anonymous' comments online to

promote Gawker Media's stories appear [sic] to be a companywide policy," *id.* at 55.

Here, too, Huon omits key information. First, nothing about the blog indicates its

reliability or veracity – to the contrary, the author obviously seethes with animosity

toward Gawker, as the title suggests. Second, these postings were made in

December 2012 and January 2013, more than a year and a half after publication of

the Gawker Report at issue and there is no indication in them that the author was

purporting to describe a practice that either existed at the time of the publication of

the challenged article or that pertained to the posting of comments *to Gawker*

---

[15] As explained in the document Huon cites, the "recruits" were provided their own page on a Gawker website to post their own original content, under the supervision of Gawker editors, and were paid based on the number of times a reader viewed their postings. http://joel.kinja.com/introducing-recruits-1520191540.

*articles* in any event. Dkt.23-16, 2744-49 (postings dated Jan. 8, 2013, Jan. 5, 2013,

Dec. 9, 2012, and Dec. 25, 2012); Dkt.23-17, 2750-52 (additional copy of posting

dated Dec. 9, 2012). As the district court correctly explained:

> [N]one of the new factual allegations in Huon's response create a
> reasonable inference that Gawker employees, acting within the scope
> of their employment, used aliases to post comments *to the Jezebel
> Article*. In fact, none of the new allegations concern Gawker employees
> posting comments to *any* Gawker articles.

A21. While Huon asks the Court to take judicial notice of these blog posts, Br. 23

n.12, and what he calls "Defendants/Appellees' admissions on its own websites," *id*.

at 24 n.13,[16] judicial notice would serve no purpose because these materials are

irrelevant as a matter of law. *Reed v. City of Chicago,* 77 F.3d 1049, 1054 (7th Cir.

1996) (declining to take judicial notice and striking records of state court

proceedings that were not part of record below and were irrelevant to appeal). The

Johnson blog posts in particular are not the type of material that is the proper

subject of judicial notice, which is reserved for facts the accuracy of which is

indisputable. *Rowe v. Gibson*, 798 F.3d 622, 629 (7th Cir. 2015), *reh'rg en banc

denied* (Dec. 7, 2015). Nevertheless, if this Court decides to consider these online

postings, it should examine what they actually say and when they were published,

rather than accept Huon's characterizations of them.

---

[16] Huon refers to "admissions" that the Gawker Defendants purportedly have made.
Br. 55. No defendant has made any admission in this case, of course, as no answer has been
filed and no discovery has been taken. The only source Huon cites for these purported
"admissions," Br. 22, is the blog post discussing the recruits program, which as explained
*supra* is irrelevant.

## B. The District Court Correctly Held That Claims Against the Gawker Defendants Arising From User Posts Are Preempted

The FAC asserts that Gawker is liable for "[e]ncouraging, aiding and abetting users of the Jezebel.com website to post salacious and defamatory statements" about him, Dkt.162, 1773; "promot[ing], moderat[ing], edit[ing] and/or select[ing] comments that called Mr. Huon a rapist and that defamed Mr. Huon," *id.* at 1778; and "moderat[ing] or censor[ing] Mr. Huon's attempt to post a reply by removing or redacting his post," *id.* at 1781.[17] All of these, however, are publishing activities that do not, either separately or collectively, serve to obviate the preemption provided by Section 230. *Craigslist*, 519 F.3d at 671.

Online publishers are not liable under Section 230 simply for making platforms available for third-party speech and deciding whether and under what conditions they will present to the public content created by others. *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967 (N.D. Ill. 2009) ("Intermediaries are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts.") (citing *GTE*, 347 F.3d at 659).[18] As the district court correctly observed, "the fact that the defendants allegedly engaged in editorial functions such as determining

---

[17] Although legally irrelevant to Section 230 preemption, as previously noted the allegation about Huon's comment is also false. *See supra*, note 6.

[18] Other federal circuits have similarly recognized that Section 230 protects the exercise of "traditional editorial functions" such as selecting, promoting and editing third-party comments. *See, e.g., Obado v. Magedson*, 612 F. App'x 90, 93-94 (3d Cir. 2015); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407-08 (6th Cir. 2014); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358-59 (D.C. Cir. 2014), *cert. denied*, 135 S. Ct. 680 (2014); *Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

the order of comments or making edits to them does not transform the defendants

into 'providers' of the comments for [Section 230] purposes." A20.

Further, Huon's assertion that Gawker is liable for "encouraging" defamatory

comments is undermined by his complaint, which notes that Gawker's terms of use

– its "rules of the road" for commenters – prohibit the posting of "threatening,

harassing, defamatory or libelous material," "false or misleading statements," and

information the user knows is "otherwise in breach of the law." Dkt.162, 1775-76.

The fact that Gawker explicitly prohibits defamatory comments eviscerates Huon's

conclusory assertion that Gawker built its business model on soliciting defamation.

*Dart*, 665 F. Supp. 2d at 969 ("Plaintiff's argument that Craigslist causes or induces

illegal content is further undercut by the fact that Craigslist repeatedly warns users

not to post such content."). As the district court explained, "a website does not incite

the posting of unlawful content merely by providing a forum for that content," and

the protections of Section 230 apply "even where the forum is likely to or frequently

does contain postings of an unlawful nature." A19; *see also Craigslist*, 519 F.3d at

671-72 ("Nothing in the service craigslist offers induces anyone to post any

particular listing or express a preference for discrimination; for example, craigslist

does not offer a lower price to people who include discriminatory statements in their

postings.").

Although Huon urges that it is somehow relevant if Gawker Media seeks to

"monetize" comments to its websites, *i.e.*, if it uses the comments sections to attract

readers and advertising revenue, Br. 16, 21-23, 53, 57, that is irrelevant. The

allegation is effectively that liability should be imputed because Gawker makes

money by disseminating content to an audience and selling space to advertisers who

want to reach that audience, but that is simply what corporate publishers do.

Nothing in Section 230 exempts for-profit publishers from its protections, and

courts across the country have therefore uniformly rejected similar arguments. *See,*

*e.g.*, *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 560 (N.C. Ct. App. 2012) ("the fact that a

website operates a commercial business or makes a profit has no relevance" to the

Section 230 analysis); *Goddard v. Google, Inc.*, No. C 08-2738JF(PVT), 2008 WL

5245490, at *3 (N.D. Cal. Dec. 17, 2008) ("[T]he fact that a website elicits online

content for profit is immaterial; the only relevant inquiry is whether the interactive

service provider 'creates' or 'develops' that content.").

### C. Huon Failed to Plead Facts Plausibly Establishing That Gawker Authored the Comments

It is now black-letter law that a plaintiff must make plausible allegations

supporting each element of his claim to survive a motion to dismiss under Rule

12(b)(6). *McCauley*, 671 F.3d at 616-17 (citing *Iqbal*, 556 U.S. at 680-81, and

*Twombly*, 550 U.S. at 555). Although the reviewing court must take the complaint's

well-pleaded allegations as true when deciding a motion to dismiss, "legal

conclusions and conclusory allegations merely reciting the elements of the claim are

not entitled to this presumption of truth." *Id.* at 616. Rather, a plaintiff must

"'provid[e] some specific facts' to support the legal claims asserted in the complaint."

*Id.* (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Huon's complaint falls far short of plausibly alleging the Gawker Defendants'

liability for the comments he challenges, because it does not plead any facts to

support his conclusory and speculative allegation that Gawker employees "may"

have written some of them. The *sole allegation* in the FAC addressing Gawker's

possible authorship of the comments offers conjecture, not facts:

> 110. *On information and belief*, certain commenters *may* actually be
> Jezebel Defendants' employees, posting under an alias, and *on
> information and belief*, several defamatory statements about Mr. Huon
> by unidentified 'commenters' are actually Jezebel Defendants" [sic]
> employees. *Plaintiff believes that discovery will reveal this to be the
> case.*

Dkt.162, 1774 (cited by Br.at 57) (emphases added). Such equivocal allegations are

insufficient to "unlock the doors of discovery" because they "do not permit the court

to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678-79.

Courts in the Seventh Circuit and elsewhere frequently have rejected similar

attempts to evade Section 230 with conclusory allegations of authorship. *See, e.g.*,

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 259 (4th Cir.

2009) (plaintiff auto dealership's allegation that defendant website "fabricated"

critical review was "pure speculation" not "based on any tangible fact"); *Hadley v.

GateHouse Media Freeport Holdings, Inc.*, No. 12 C 1548, 2012 WL 2866463, at \*2

(N.D. Ill. July 10, 2012) (denying motion to amend complaint to allege newspaper

was responsible for pseudonymous comment on its website because "[s]uch

allegations are purely speculative and would fail to meet the plausibility standard

outlined in *Twombly*"). To allow conclusory claims of authorship to overcome

Section 230 preemption would dramatically undercut the statute.

44

Indeed, the Ninth Circuit recently rejected similarly vague assertions that employees of the consumer review website Yelp had posted negative reviews of the plaintiffs' businesses as part of an extortion scheme. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135-36 (9th Cir. 2014). The Ninth Circuit held that the plaintiffs failed plausibly to plead extortion because

> while the Third Amended Complaint alleges generally that "approximately 200 Yelp employees or individuals acting on behalf of Yelp have written reviews of business on Yelp," and that Yelp's CEO admitted in a New York Times blog post that Yelp has paid users to write reviews, nothing connects these general allegations to the specific, negative reviews complained of here.

*Id.* at 1135. Similarly, in this case, Huon has failed to offer an allegation even as specific as the one rejected by the Ninth Circuit in *Levitt*, much less one that plausibly alleges that a Gawker employee wrote *any* of the comments about which he complains.

Huon attempts to divert attention from this fatal flaw by using sleight-of-hand – and without any record citation other than to ¶110 of the FAC (quoted above), Br. 53-59 – to suggest that his complaint does allege that Gawker employees wrote the comments at issue. First, Huon asserts that, "[u]nder federal notice pleading standards, Huon adequately pled that Gawker Media employees actively posted comments under aliases, and caused defamatory comments to be posted about Huon." Br. 31. This contention ignores not only the pleading requirements set out by the Supreme Court in *Iqbal* and *Twombly* – indeed, Huon cites neither – but also what his complaint actually says.

Next, Huon asserts that the Gawker Defendants "pay writers to comment on their own stories," Br. 53, and claims he alleged "that Gawker Media employees posting comments were acting within the scope of their employment," *id.* at 57. Huon similarly asserts, again without citing any supporting facts, that "[t]he defamatory comments posted by Gawker Media employees were expressly pled in the complaint." *Id.* Not only does the FAC *nowhere* allege that Gawker pays writers to comment on their own or other Gawker writers' articles, as discussed *supra* at 38-40, none of the purported evidence he cites in his brief is relevant.

For one thing, the FAC sets out a dozen comments that Huon claims are defamatory and affirmatively alleges both that they were all "posted by *users* of the website" and that the defendants merely "promoted, moderated, edited and/or selected" them. Dkt.162, ¶778 (emphasis added). Indeed, his opening brief in this Court repeatedly refers to the comments as being made by "readers," not Gawker writers. Br. 30, 39. Nowhere in any of the five complaints filed in this case, or in any of the briefing before the district court, has Huon alleged that any specific comment was written by a Gawker employee, named or otherwise, nor does he allege that any named defendant posted any comment to the article. A20. Allegations Huon now purports to make for the first time in his appellate briefs cannot cure this defect, as "it is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal." *Agnew*, 683 F.3d at 348 (internal quotations and punctuation omitted).

For another, Huon's argument that the district court improperly "rejected
Huon's allegation that Gawker Media employees posting comments were acting
within the scope of their employment," Br. 57, similarly assumes, albeit incorrectly,
that he properly pleaded that Gawker Media employees posted the comments. He
did not. A20 (holding that complaint "contains insufficient factual content to allow
the Court to reasonably infer that the Gawker defendants were involved in creating
those comments"). Accordingly, Huon's protestation that "scope of employment is a
factual issue that cannot be resolved on a motion to dismiss," Br. 58, misses the
mark. The question here is not whether posting comments under an alias would be
part of any Gawker employee's job duties, but whether Huon has properly pleaded
that Gawker employees, acting within the scope of their employment, posted any of
the specific comments he challenges. Simply put, Section 230 preempts Huon's
claims based on reader comments because he has not pleaded facts plausibly
establishing that Gawker employees created them. The district court's ruling to that
effect should therefore be affirmed.

### D. Dismissal of Huon's Claims Arising From User Comments Can Also Be Affirmed on Various Alternate Grounds

Huon's defamation claim based on the reader comments fails for additional
reasons, which provide alternate bases for affirmance because they are "contained
in the record," even if not relied on by the district court. *Brooks*, 578 F.3d at 578.
Each of the dozen reader comments he challenges is not actionable for one or more
independent grounds.

First, all but one of the challenged comments constitute expressions of opinions based on the facts disclosed in the Gawker Report, which, as described more fully *supra*, are either indisputably true or privileged reports of judicial proceedings. *Stevens*, 855 F.2d at 400-01; *O'Donnell*, 491 N.E.2d at 1218. *See supra*, at 35. As a result, they are immune from defamation liability. The exception is a comment that is not defamatory at all because it is not "of and concerning" Huon and merely expresses the writer's opinion regarding what an acquittal in a criminal case means. Dkt.162, 1778 ("Dinosaurs and Nachos, girlfriend!" commenter: "Innocent until proven guilty is a widely misunderstood concept. It basically means that the mere fact that someone is charged with a crime is not itself evidence that the person committed a crime.").[19]

Additionally, many of these comments also qualify as rhetorical hyperbole, which this Court has described as "a well-recognized category of, as it were, privileged defamation," consisting of "terms that are either too vague to be falsifiable or sure to be understood as merely a label for the labeler's underlying assertions." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). Those include comments that Huon "sounds like a foreal [sic] crazy person," Dkt.162, 1778 ("SorciaMacnasty"), and several comments decrying the general notion that drinking could be seen as justifying rape, *id.* 1779-80 ("CassandraSays: "Thanks,

---

[19] Several comments also not actionable because they do not refer to or say anything defamatory about Huon, but only discuss sexual mores, Dkt.162, 1780-81 (comments from "JadeSays," "rachel723," "cool_as_KimDeal," and "HeartRateRapid"), or do not make any *defamatory* statements about him, such as a comment that Huon is likely to sue, *id.* at 1778 (comment from "tomsomething").

bartender and lawyer, for reminding me that since I have a vagina I'm not allowed

to go out in public and attempt to engage in any sort of enjoyable activity unless I

want to have sex. … I mean, if I didn't want to be raped I'd just stay home, right?");

*id.* at 1780 ("JadeSays": "I didn't know 'where do I go to have fun' meant the same

thing as 'where do I go to get raped.'"); *id.* ("rachel723": "I'm glad you learned before

you actually got raped not to complain now if you do, you were asking for it!!

/sarcasm"); *id.* at 1781 ("cool_as_KimDeal": "Can I sign away my right to consent

here on my bar tab?"); *id.* ("HeartRateRapid": "Yea, all those crazy bitches going to

the cops and lying about being raped. Except that … false rape reports make up less

than 3% of all reported rates, and as I'm sure you know, it horrendously

underreported.").

## IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FORECLOSING A FIFTH AMENDED COMPLAINT

Huon's opening brief concludes with a short argument, bereft of citation to any

legal authority, that he "should have been afforded the opportunity" to file a fifth

amended complaint. Br. 60-62. This Court reviews a district court's denial of leave

to amend for abuse of discretion, *Agnew*, 683 F.3d at 347, and "reverse[s] only if no

reasonable person could agree with that decision." *Schor v. City of Chicago*, 576

F.3d 775, 780 (7th Cir. 2009). Huon cannot meet his burden.

Federal Rule of Civil Procedure 15(a) provides a plaintiff with one chance to

amend without leave of court, and "a district court is not required to grant such

leave when a plaintiff has had multiple opportunities to state a claim upon which

relief may be granted." *Agnew*, 683 F.3d at 347. Huon amended his complaint four

times and has already forced the Gawker Defendants to endure "two rounds of extensive briefing" on motions to dismiss. A3; *see also id.* ("Five cracks at a complaint … is enough."). This Court recently held that it will not reverse a denial of leave to amend "when the court provides a reasonable explanation for why it denied the proposed amendment." *Gonzalez-Koeneke*, 791 F.3d at 808. Here, the district court provided a five-page opinion detailing all of its reasonable grounds for denying Huon's attempt at a sixth bite at the apple. A3-7.

Moreover, Huon's proposed Fifth Amended Complaint did not address any of the grounds for dismissal at issue in this appeal. The proposed complaint differed from the FAC principally by including additional allegations of special damages in support of Count II, his claim for defamation *per quod*, A4, the dismissal of which Huon has not appealed. Thus, while Huon grumbles that he should have been given "an opportunity to cure *any defects* by amending his complaint," Br. 62 (emphasis added), he never explains how he would do so.[20] Because "[a] district court acts within its discretion in denying leave to amend … when the plaintiff fails to demonstrate how the proposed amendment would cure the deficiencies in the prior complaint," *Gonzalez-Koeneke*, 791 F.3d at 808, the district court acted well within its discretion in this case for this reason as well.

---

[20] Huon is well aware of the requirements for pleading defamation and IIED, having repeatedly litigated such claims in state and federal trial and appellate courts. *See Mudge*, 597 F. App'x at 877 (affirming dismissal of defamation claim); *Huon v. Beatty*, No. 1-09-2234, 2011 WL 9717454 (Ill. App. Ct. 1st Dist. Mar. 25, 2011) (affirming dismissal of defamation and IIED claims).

## CONCLUSION

Defendants respectfully request that this Court affirm the judgment below.


April 14, 2016

                              Respectfully submitted,

                              LEVINE, SULLIVAN, KOCH & SCHULZ, LLP

                              By: s/Chad R. Bowman
                                   Chad R. Bowman*
                                   1899 L Street, NW, Suite 200
                                   Washington, DC 20036
                                   (202) 508-1100

                              LYNCH THOMPSON LLP
                                   Amy J. Hansen
                                   150 S. Wacker Drive, Suite 2600
                                   Chicago, IL  60606
                                   (312) 445-4622

                              *Attorneys for Defendants-Appellees*
                              *Nick Denton, Irin Carmon, Gaby Darbyshire,*
                              *and Gawker Media, LLC*

## CIRCUIT RULE 32 CERTIFICATION

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,976 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12 point Century Schoolbook type for text and 11 point Century Schoolbook type for footnotes.

s/ Chad R. Bowman
Chad R. Bowman

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2016, the Brief of Defendants-Appellees Nick Denton, Irin Carmon, Gaby Darbyshire, and Gawker Media, LLC a/k/a Gawker Media was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

The following participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system:

> Meanith Huon
> The Huon Law Firm
> P.O. Box 441
> Chicago, IL 60690
> Huon.meanith@gmail.com
>
> *Attorney for Plaintiff-Appellant Meanith Huon*

s/ Chad R. Bowman
Chad R. Bowman

**<u>EXHIBIT E</u>**

Mr. Huon's reply brief to the Seventh Circuit Court of Appeals

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| **MEANITH HUON,** ) | |
| ) | |
| **Plaintiff/Appellant,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NICK DENTON,** ) | **COURT OF APPEALS** |
| **IRIN CARMON,** ) | **CASE NO.: 15-3049** |
| **GABY DARBYSHIRE,** ) | |
| ) | **DISTRICT COURT** |
| **GAWKER MEDIA, LLC a/k/a** ) | **CASE NO.: 1:11-cv-3054** |
| **GAWKER MEDIA,** ) | |
| ) | |
| **BLOGWIRE HUNGARY SZELLEMI** ) | |
| **ALKOTAST HASZNOSITO KFT,** ) | |
| ) | |
| **GAWKER MEDIA GROUP, INC. a/k/a** ) | |
| **GAWKER MEDIA,** ) | |
| ) | |
| **GAWKER ENTERTAINMENT, LLC,** ) | |
| ) | |
| **GAWKER TECHNOLOGY, LLC,** ) | |
| ) | |
| **GAWKER SALES, LLC.,** ) | |
| ) | |
| **Defendants/Appellees.** ) | |

APPEAL FROM THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
CASE NO.: 1:11-cv-3054
THE HON. JOHN J. THARP, JR.

<u>**REPLY BRIEF OF PLAINTIFF/APPELLANT, MEANITH HUON**</u>

Meanith Huon, The Huon Law Firm
Attorney for the Plaintiff-Appellant Meanith Huon
PO Box 441, Chicago, Illinois 60690
312-405-2789
Fax No.: 312-268-7276
huon.meanith@gmail.com
IL ARDC. No.: 6230996

Case: 15-3049    Document: 45    Filed: 04/28/2016    Pages: 35

# TABLE OF CONTENTS

                                                                                        **PAGE**

**TABLE OF CONTENTS**                                                                      1

**TABLE OF AUTHORITIES**                                                                   3

**ARGUMENT**                                                                               8

**I. HUON NEVER CALLED HIMSELF A "RAPIST."**                                               8

**II. CALLING HUON A "RAPIST" IS DEFAMATION *PER SE*,
AND IS NOT CAPABLE OF INNOCENT CONSTRUCTION.**                                             8

**III. COUCHING A STATEMENT WITH QUALIFYING WORDS
DOES NOT PROTECT IT FROM A DEFAMATORY ACTION,
UNDER THE INNOCENT CONSTRUCTION RULE.**                                                    9

**IV. IT IS NOT A DEFENSE TO A DEFAMATORY HEADLINE
CALLING A PERSON A "RAPIST" THAT THE ARTICLE IS
SOMEHOW LESS DEFAMATORY.**                                                                11

**V. THE JEZEBEL.COM ARTICLE INTENSIFIED THE
DEFAMATORY MEANING OF THE HEADLINES THAT
HUON IS A RAPIST.**                                                                       12

**VI. THE FAIR REPORT PRIVILEGE DOE NOT APPLY TO
DEFENDANTS' REPORTING OF HUON'S ORIGINAL COMPLAINT**.                                      13

**A. THE FAIR REPORT PRIVILEGE DOES NOT APPLY**.                                           13

**B. THE JEZEBEL.COM ARTICLE WAS NOT COMPLETE AND
ACCURATE.**                                                                               13

**C. IT IS A QUESTION FOR FACT AS TO WHETHERTHE
PRIVILEGE IS ABUSED.**                                                                    16

**VII. THE COURT SHOULD CONSTRUE THE FOURTH AMENDED
COMPLAINT IN THE LIGHT MOST FAVORABLE TO HUON.**                                          16

**VIII. THE GAWKER DEFENDANTS MISREPRESENTED TO THE
DISTRICT COURT THAT HUON HAD PENDING CRIMINAL CHARGES
ON SEPTEMBER 30, 2011.**                                                                  20

1

Case: 15-3049    Document: 45    Filed: 04/28/2016    Pages: 35

## TABLE OF CONTENTS

**PAGE**

**IX.  EVEN PRISONERS HAVE A CONSTITUTIONAL RIGHT TO
ACCESS TO THE COURTS.**    22

**X.  SECTION 230 OF THE COMMUNICATIONS DECENCY ACT
DOES NOT PROVIDE IMMUNITY.**    23

**A.  HUON ADEQUATELY PLEADS AGENCY.**    23

**B.  THE COURT CAN TAKE JUDICIAL NOTICE AT ANY TIME.**    25

**C. DEFENDANTS' ALTERNATE GROUNDS FOR AFFIRMANCE
ARE WITHOUT MERIT**.    27

**XI.  HUON SHOULD HAVE BEEN GIVEN LEAVE TO AMEND
HIS COMPLAINT**.    28

**CONCLUSION**    30

**CERTIFICATE OF COMPLIANCE WITH**

**F.R.A.P. RULE 32(a)(7)**    31

**PROOF OF SERVICE**    33

## TABLE OF AUTHORITIES

<div align="right">

**PAGE**

</div>

Action Repair, Inc. v. American Broadcasting Cos.,
776 F.2d 143, 150 (7th Cir. 1985)                                    8, 29

Antonelli v. Field Enterprises, Inc.
341 Ill. App.3d 555 (1st Dist. 2003)                                 8

Ashcroft v. Iqbal,
556 U.S. 662 (2009)                                                  24

Beauharnais v. People of State of Ill.,
343 U.S. 250, 72 S.Ct. 725 U.S. (1952)                               8

Bell Atlantic Co. v. Twombly,
550 U.S. 544, 570 (2007)                                             23, 24

Berkos v. National Broadcasting Co.,
161 Ill.App.3d 476, 515 N.E.2d 668 (1st Dist. 1987)                  9

Bounds v. Smith,
430 U. S. 817 (1977)                                                 22

Brown & Williamson Tobacco Corp. v. Jacobson,
713 F.2d 262(7th Cir. 1983)                                          16

Bryson v. News America Publications, Inc.,
174 Ill.2d 77, 672 N.E.2d 1207 (Ill. 1996)                           9

Catalano v. Pechous,
83 Ill. 2d 146 (Ill. 1980)                                           8

Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.,
519 F.3d 666 (7th Cir. 2008).                                        23

Cianci v. New Times Publishing Co.
639 F.2d 54(2d Cir. 1980)                                            8

<div align="center">

3

</div>

## TABLE OF AUTHORITIES

<div align="right"><b><u>PAGE</u></b></div>

Conley v. Gibson,
355 U.S. 41 , (1957)                                                        25

Cook v. Winfrey,
141 F.3d 322 (7th Cir. 1998)                                                16

Cooper v. Dupnik,
924 F.2d 1520 (9th Cir. 1991)                                               8

County. of Cook v. MidCon Corp.,
773 F.2d 892, 913 (7th Cir. 1985)                                          17

Dart v. Craigslist, Inc.,
665 F. Supp. 2d 961 (N.D. Ill.)                                            24

Dawson v. General Motors Corp.,
977 F.2d 369 (7th Cir.  1992)                                              25

Desnick v. American Broadcasting Companies, Inc.,
44 F.3d 1345  (7th Cir. 1995)                                              22

Dilworth v. Dudley,
75 F.3d 307, 309 (7th Cir. 1996)                                           28

Doherty v. City of Chicago,
75 F.3d 318 (7th Cir. 1996)                                                25

Dubinsky v. United Airlines Master Executive Council,
303 Ill.App.3d 317, 708 N.E.2d 441 (1st Dist. 1999)                        9

Facebook, Inc. v. Teachbook.com LLC,
819 F. Supp. 2d 764 (N.D. Ill. 2011)                                       25

Goddard v. Google, Inc.,
2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)                                  25

## TABLE OF AUTHORITIES

**PAGE**

Gonzalez-Koeneke v. West,
791 F. 3d 801, 808-909 (7th Cir. 2016)                                           30

Harrison v. Chicago Sun-Times, Inc.
115 Ill. App.3d 432 (1ts Dist. 1983)                                            9

Highsmith v. Chrysler Credit Corp.,
18 F.3d 434, 440 (7th Cir. 1994)                                                25

Hishon v. King & Spalding,
467 U.S. 69, 104 S.Ct. 2229 (1984)                                              25

Huon v. Johnson & Bell, Ltd.,
757 F.3d 556, 557 (7th Cir. 2014)                                               22

Huon v. Mudge,
597 Fed. Appx. 868, 2015 U.S. App. LEXIS (7th Cir. Jan. 5, 2015)                17

In re Thompson,
162 B.R. 748 (E.D.Mich.,1993)                                                   8

Indep. Trust Corp. v. Stewart Info. Servs. Corp.,
665 F.3d 930, 943 (7th Cir. 2012)                                               19

Kaelin v. Globe Communications Corp.,
162 F.3d 1036 (9th Cir.1998)                                                    11

Kolegas v. Heftel Broadcasting Corp.,
154 Ill.2d 11, 607 N.E.2d 201 (1992)                                            9, 10

Lewis v. Casey,
518 US 343 (1996)                                                               22

Lott v. Levitt,
556 F. 3d 564, 570 (7th Cir. 2009)                                              10

5

## TABLE OF AUTHORITIES

**PAGE**

Maple Lanes, Inc. v. News Media Corp.,
322 Ill.App.3d 842 (2nd Dist. 2011)                                    16

Milkovich v. Lorain Journal Co.,
497 US 1 (1990)                                                            9

NAACP v. Button,
371 US 415 (1963)                                                          22

Newton v. National Broadcasting Co., Inc.,
930 F. 2d 662 (9th Cir. 1990)                                          16

O'Donnell v. Field Enterprises, Inc.,
145 Ill. App.3d 1032 (1st Dist. 1986)                                  11

People v. Smith,
141 Ill.2d 40 (Ill. 1990)                                                  15

Pugh v. Tribune Co.,
521 F.3d 686 (7th Cir. 2008)                                               20

Rowe v. Gibson,
798 F. 3d 622  (7th Cir. 2015)                                             25

Scheidler v. Nat'l Org. for Women, Inc.,
739 F. Supp. 1210 (N.D. Ill. 1990)                                         20

Simonian v. Blistex, Inc.,
2010 WL 4539450 (N.D. Ill. Nov. 3, 2010)                                   24

Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc.,
297 Ill.App.3d 314 (1st Dist. 1988)                                        14

Solaia Technology v. Specialty Pub. Co.,
221 Ill.2d 558 (2006)                                              8, 13, 14, 28

6

## TABLE OF AUTHORITIES

**PAGE**

Stratman v. Brent,
291 Ill. App.3d 123, 683 N.E.2d 951 (2d Dist. 1997)                          28

Swanson v. Citibank, N.A.,
614 F.3d 400 (7th Cir. 2010)                                                 23

Tamayo v. Blagojevich,
526 F. 3d 1074, 1081 (7th Cir. 2008)                                         16

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308,127 S.Ct. 2499 (2007)                                           25

US v. White,
698 F.3d 1005 (7th Cir. 2012)                                                25

Federal Rule of Civil Procedure 9(g)                                         9

Federal Rule of Civil Procedure 12(b)(6)                                     25

Federal Rule of Civil Procedure 15(a)(1)                                     28

Federal Rule of Evidence 201(d)                                              25

Restatement (Second) of Torts § 611,
Comment e, at 300 (1977)                                                     13

Restatement (Second) of Torts § 611,
Comment f, at 300–01 (1977)                                                  14

7

## ARGUMENT

### I.  HUON NEVER CALLED HIMSELF A "RAPIST."

Defendants repeatedly imply that Huon called himself a "rapist" and sued the Above the

Law Defendants based solely on the implication that he was a serial rapist.  This is incorrect.

Huon never called himself a "**Rapist**" in the Original Complaint in this lawsuit or in the original

criminal proceedings.   Defendants called Huon  a "**Rapist**" in bold large fonts, superimposed

over his old mugshot, positioned next to the words "ABOVE THE LAW", "**Rape Potpourri**",

and "We've got a couple of rape stories"—more than a year after Huon was acquitted.

### II.  CALLING HUON A "RAPIST" IS DEFAMATION *PER SE*, AND IS NOT CAPABLE OF INNOCENT CONSTRUCTION.

Calling Huon a rapist is defamation *per* se.   The U.S. Supreme Court explained, No one

will deny "that it is libelous falsely to charge another with being a rapist".  Beauharnais v. People

of State of Ill., 343 U.S. 250, 72 S.Ct. 725 U.S. (1952);  Cooper v. Dupnik, 924 F.2d 1520 (9th

Cir. 1991); In re Thompson, 162 B.R. 748 (E.D.Mich.,1993).   The Illinois Supreme Court held

that accusing someone of a crime is a statement of fact.   Catalano v. Pechous, 83 Ill. 2d 146,

159-161 (Ill. 1980), relying on Cianci v. New Times Publishing Co. which held that accusations

of rape is not a constitutionally protected opinion.  (2d Cir. 1980), 639 F.2d 54.  The Illinois

Supreme Court held in Solaia that an article titled "Conspiracy of a Shakedown" charging an

attorney with unfair business practices, implied that he committed a crime and, thus, is

defamation *per se*.  Solaia Technology v. Specialty Pub. Co., 221 Ill.2d 558, 592 (2006).   "There

is no innocent construction for this statement. The natural and obvious implication of this

statement is that the plaintiffs committed a crime."  Solaia , 221 Ill.2d at 594.

Defendants' cases do not apply.  Plaintiff in Antonelli v. Field Enterprises, Inc. was a

8

convicted felon.  Huon is a not a convicted felon.  The headlines  "Kidnapped girl must go home" in Harrison v. Chicago Sun-Times, Inc. was reporting a court ruling that that a minor child taken from her home by her mother must be returned and is not analogous to "Acquitted Rapist Sues Blogger For Calling Him Serial Rapist."  The mother had not been exonerated.

### III.  COUCHING A STATEMENT WITH QUALIFYING WORDS DOES NOT PROTECT IT FROM A DEFAMATORY ACTION, UNDER THE INNOCENT CONSTRUCTION RULE.

The U.S. Supreme Court held that couching a statement in terms of an opinion does not protect it from a defamatory action:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."  As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a write could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the word 'I think'". . . .  Milkovich v. Lorain Journal Co., 497 US 1, 18-19 (1990).

The Illinois Supreme Court in Solaia agreed and held that couching a statement in terms of "ridicule, humor or sarcasm" is not a defense to defamation:

> However, there is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole. Bryson, 174 Ill.2d at 99-100, 220 Ill.Dec. 195, 672 N.E.2d 1207, citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S.Ct. 2695, 2705-06, 111 L.Ed.2d 1, 17-18 (1990); Dubinsky v. United Airlines Master Executive Council, 303 Ill.App.3d 317, 324, 236 Ill.Dec. 855, 708 N.E.2d 441 (1999) ("expressions of opinion may often imply an assertion of objective fact and, in such cases, would be considered actionable"). Indeed, "[i]t is well established that statements made in the form of insinuation, allusion, irony, or question, may be considered as defamatory as positive and direct assertions of fact." Berkos v. National Broadcasting Co., 161 Ill.App.3d 476, 487, 113 Ill.Dec. 683, 515 N.E.2d 668 (1987). Similarly, "[a] defendant cannot escape liability for defamatory factual assertions simply by claiming that the statements were a form of ridicule, humor or sarcasm." Kolegas, 154 Ill.2d at 16, 180 Ill.Dec. 307, 607 N.E.2d 201. The test is restrictive: a defamatory statement is constitutionally protected only if it

9

cannot be reasonably interpreted as stating actual fact. <u>Kolegas,</u> 154 Ill.2d at 14-15, 180
Ill.Dec. 307, 607 N.E.2d 201.  221 Ill.2d 558, 580 (2006), 852 NE 2d 825, 840.

Defendants are not privileged to call Huon a "Rapist" and then to glibly claiming that the

statements were a form of ridicule.   A "rapist" is a  "A person, typically a man, who commits

rape."[1]  An "acquitted rapist has only one reasonable construction—"a person who committed a

rape but got acquitted anyway".  The natural meaning of the headline "Acquitted Rapist Sues

Blogger For Calling Him Serial Rapist." is that Huon, a "Rapist", is suing a blog for calling him

a "Serial Rapist." If anything, the phrase "acquitted rapist" is even more defamatory than "rapist"

alone, because it makes two defamatory claims—that Huon is a rapist, and that he duped the

justice system into acquitting him anyway.

When Defendants call Huon an "Acquitted Rapist", Defendants are clearly saying Huon

got away with rape. That is what that phrase means. It does not matter if Defendants contend that

the body of the article says something differently. None of that matters, because when someone

is called an "Acquitted Rapist", he is being called a rapist.

Defendants can cite no case where calling someone a "Acquitted Rapist" was innocently

construed.   For example, in <u>Lott v. Levitt</u>—cited by Defendants—the plaintiff's reputation was

sullied when plaintiff's ideas, theories or hypothesis was criticized in a popular book that "makes

no mention of his methodology or what data set he used".   The facts of <u>Lott</u> are simply not

comparable to a publication calling Huon a "rapist".

Defendants do not cite any authority supporting the claim that Huon has the burden to

"suggest any alternative phrasing that remedies the unreasonable implication" , found on page 25

---

[1] http://www.oxforddictionaries.com/us/definition/american_english/rapist

10

of their brief.  Defendants deliberately chose a denigrating formulation that made Huon look like

a rapist who escaped punishment.

O'Donnell v. Field Enterprises, Inc. concerns a report on a criminal investigation that said

that the plaintiff was being investigated, but did not state that the plaintiff was guilty.  Huon was

called a "Rapist" more than a year after he was exonerated.

### IV. IT IS NOT A DEFENSE TO A DEFAMATORY HEADLINE CALLING A PERSON A "RAPIST" THAT THE ARTICLE IS SOMEHOW LESS DEFAMATORY.

Defendants' misuse the principle that publications must be taken as a whole to argue that

it does not matter how defamatory their headline was in calling Huon a rapist, because the small

print below allegedly presented a more balanced perspective.  That argument is inconsistent with

the facts and the law.  If Defendants' argument were accepted, then a defendant would be able

escape justice by posting the headlines calling someone a "Rapist" or a "Murderer" or a "Liar

and, in the body of the article, by writing that the defendant meant something else.

The headlines "Acquitted Rapist Sues Blogger For Calling Him Serial Rapist" contain a

defamatory meaning that is independent of the body of the article.  Kaelin v. Globe

Communications Corp., 162 F.3d 1036 (9th Cir.1998) is even more applicable in a digital world

with emails, texts and tweets, videos, images, viral news stories competing for people's growing

limited attention span.    The world no longer needs tabloids like the National Enquirer to find

salacious and denigrating stories.  Readers were able to view Hulk Hogan's sex video on

Gawker.com.   The average American news reader reads headlines and not much else.[2]

Headlines determine whether someone will click on a news article, especially with social media.

---

[2] https://www.washingtonpost.com/news/the-fix/wp/2014/03/19/americans-read-headlines-and-not-much-else/; https://www.americanpressinstitute.org/publications/reports/survey-

In a digital sharing age—where your reputation and professional and personal life can be destroyed with one post—there is every reason to consider a viral headline expressly calling Huon a "Rapist" defamatory *per se* even if it is ostensibly attached to an article containing less defamatory content.

## V.  THE JEZEBEL.COM ARTICLE INTENSIFIED THE DEFAMATORY MEANING OF THE HEADLINES THAT HUON IS A RAPIST.

With the body of the Jezebel.com Article, Defendants intensified the meaning of defamatory statement that Huon is a one-time "Rapist", who got away with rape, and now complains of being called a "serial rapist."    However, Huon sued the Above the Law Defendants for, *inter alia*, calling him a "rapist" **on the day he was acquitted** of sexual assault—more than a year before the Jezebel.com Article was even posted.  In fact, the defamatory meaning is so pronounced that Defendants continue to incorrectly depict Huon as having sued the Above the Law Defendants for calling him a "serial rapist" in their brief.

Omitting the update to the Abovethelaw.com Article is defamatory, because Defendants reported on a stale story more than a year after Huon was acquitted.   The Abovethelaw.com Article—like many news, gossip, stories, fiction on the Internet—reports on breaking news in real time.  The Jezebel.com Article resurrected a dead article on Huon's acquittal and implied that Huon got away with rape and now complained of being called a "serial rapist."   The Jezebel.com Article repeatedly emphasized that Huon, a "Rapist," was guilty of the crime that he was exonerated of.

---

research/how-americans-get-news/ ; http://www.newyorker.com/science/maria-konnikova/headlines-change-way-think

## VI.  THE FAIR REPORT PRIVILEGE DOE NOT APPLY TO DEFENDANTS' REPORTING OF HUON'S ORIGINAL COMPLAINT.

### A.  THE FAIR REPORT PRIVILEGE DOES NOT APPLY.

The Illinois Supreme Court in <u>Solaia</u>  held that the fair report privilege does not apply to

the contents of  "a complaint or petition, before any judicial action has been taken."

<u>Solaia Technology, LLC</u>,  221 Ill.2d at 588:

> However,
>
> **844 ***388 "[a] report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings[,] such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action." <u>Restatement (Second) of Torts</u> § 611, Comment e, at 300 (1977).

In this case, no official judicial action was taken between the time Huon filed his Original

Complaint on May 6, 2011 and the date that the Defendants published their post on May 11,

2011.  The initial status hearing was set on June 1, 2011.  (Doc. 7.)

### B.  THE JEZEBEL.COM ARTICLE WAS NOT COMPLETE AND ACCURATE.

Calling Huon an "Acquitted Rapist" is defamatory *per se*, because it means that Huon is a

"Rapist" and that he is a "Rapist" who got away with rape.  It does not matter whether this

witness or that witness did or did not testify in Huon's criminal case, or whether Huon's lawyer

said something in opening statements.  None of that matters because when someone is called an

"Acquitted Rapist", they are being called a "Rapist".

However, arguing in the alternative, the fair report privilege has two requirements: (1) the

report must be of an official proceeding; and (2) the report must be complete and accurate or a

fair abridgement of the official proceeding.  <u>Solaia Technology, LLC,</u>  221 Ill.2d at 588.  The fair

13

report privilege does not protect a reporter's personal "additions" or an indictment by

"innuendo" as to the integrity of any of the parties.  Restatement (Second) of Torts § 611,

Comment f, at 300–01 (1977); Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc., 297 Ill.App.3d

314, 310 (1st Dist. 1988).

 Solaia Tech., LLC., held that the statement regarding an attorney accusing him of a crime

was not a fair abridgement of a complaint, because it was baldly inaccurate.  221 Ill. 2d 558, 593

(Ill. 2006).  Defendant in Solaia summarized "key points" from the complaint; however, the

article was not a fair abridgement.  Although defendant selectively quoted part of a complaint's

first paragraph in the article, defendant perpetuated an error throughout the article.

 The Jezebel.com Article falls outside of this privilege because, *inter alia*, it adds that

Huon is an "Acquitted Rapist," calling him a "Rapist" even though he was found not guilty.

 In addition, the Jezebel.com Article adds, incorrectly, that acquittal does not mean that

Huon did not commit rape and implied that Huon got away with rape.

 Furthermore, the Jezebel.com Article invented the fiction that Defendants knew the

reasons for why the jury acquitted Huon--on the "strength" of a bartender's testimony that the

victim had been drinking—to create the false impression that Jane Doe had been unfairly

attacked for having a few drinks.  However, as Defendants now concede on pages 6 of its brief,

Huon was acquitted because the jury did not believe Jane Doe, who gave inconsistent testimony.

The State's Attorney told reporters that the jury did not believe that Jane Doe was credible.  All

of this is absent from the Jezebel.com Article.

 Defendants also invented the fiction that the jury considered the consent defense.

Defendants argue in its brief that from the beginning to the end of Huon's criminal prosecution,

underlying facts about consent were presented at trial.  However, Defendants do not cite to any

evidence of consent that was presented to the jury during a week-long trial.  Opening statement

is not evidence.  People v. Smith, 141 Ill.2d 40 (Ill. 1990).    The issue of the consent defense

was never submitted to the jury for deliberation, because Huon did not testify.   Without a

consent defense, the jury, who deliberated for approximately 2 hours, had to have reached the

conclusion that no sex act took place.

    The Jezebel.com Article also does not accurately summarize Huon's 48-page  complaint

against law enforcement authorities in Huon v. Mudge.  (Case No. 3:12-cv-00166-MJR-PMF

(S.D. Ill.),  Doc. No. PageID No. 1.)  Huon's complaint alleges that, *inter alia*, Jane Doe never

described any act of force and never described any threats, that Jane Doe made false statements,

and that Huon was acquitted.

    The Jezebel.com Article does not accurately summarize Huon's Original Complaint.

Huon does not call himself a "Rapist" in his Original Complaint. Under federal notice pleading,

the Court construes the complaint in the light most favorable to the plaintiff, accepting as true all

well-pleaded facts alleged, and drawing all possible inferences in Huon's favor.   Huon's

Original Complaint in Federal Court pled that Huon "was acquitted of sexual assault charges in

Madison County, Illinois, after the jury deliberated for 2 hours";  Huon sued the

Abovethelaw.com Defendants for calling him a rapist **on the day** that he was acquitted of sexual

assault;  after Huon was acquitted, the Above the Law Defendants, posted the Abovethelaw.com

Article calling Huon a rapist and falsely accusing him of posing as a "talent scout" ; that the

statement in Abovethelaw.com Article is false; that the Article implied that Huon got away with

rape (Doc. No. 1, PageID No. 2-3).

15

Huon filed his First Amended Complaint on July 22, 2011 but the Gawker Defendants

have continued to publish the Jezebel.com Article online.

In <u>Newton v. National Broadcasting Co., Inc</u>., cited by Defendants, the Ninth Circuit

held that there was no actual malice because journalists reported actual statements made by

Newton in an affidavit that Newton submitted. Defendants purport to cite to Huon's complaint,

but nothing in the complaint alleges that Huon called himself a "Rapist".

## C.  IT IS A QUESTION FOR FACT AS TO WHETHER THE PRIVILEGE IS ABUSED.

Both the Seventh Circuit and Illinois courts have held that it is question of fact for a jury

as to whether the fair reporting privilege was abused. <u>Brown & Williamson Tobacco Corp. v.

Jacobson</u>, 713 F.2d 262, 272 (7th Cir. 1983); <u>Maple Lanes, Inc. v. News Media Corp</u>., 322

Ill.App.3d 842 (2nd Dist. 2011);  "If you embellish a defamatory statement with accusations you

know to be false, taken from ancient government reports that have no claim to contemporary

credence, your repetition of those stale accusations is not privileged".  <u>Brown & Williamson

Tobacco Corp.</u>, 713 F.2d 262 at 272; <u>Cook v. Winfrey</u>, 141 F.3d 322, 330-31 (7th Cir. 1998).

In this case, whether the privilege was abused cannot be decided on a motion to dismiss.

## VII.  THE COURT SHOULD CONSTRUE THE FOURTH AMENDED COMPLAINT IN THE LIGHT MOST FAVORABLE TO HUON.

The Court construes the complaint in the light most favorable to the plaintiff, accepting

as true all well-pleaded facts alleged, and drawing all possible inferences in her favor. <u>Tamayo v.

Blagojevich</u>, 526 F. 3d 1074, 1081 (7th Cir. 2008). A complaint need not allege all, or any, of the

facts logically entailed by the claim, and it certainly need not include evidence.  <u>Tamayo</u> , 526 F.

3d at 1081.

16

Here, Huon's Fourth Amended Complaint should be construed in the light most favorable

to the plaintiff, including allegations relating to the underlying criminal matter. (Doc. No. 162,

PageID No. 1743.)

Instead of citing to the long record on appeal in this case, Defendants inappropriately cite

to the opinion in Huon v. Mudge, 597 Fed. Appx. 868, 2015 U.S. App. LEXIS (7th Cir. Jan. 5,

2015). But the collateral estoppel doctrine does not apply in this case. County. of Cook v.

MidCon Corp., 773 F.2d 892, 913 (7th Cir. 1985). In general, collateral estoppel precludes

litigation of issues in subsequent proceedings when (1) the parties against whom the estoppel is

asserted were parties to the prior adjudication, (2) the issues which form the basis of the estoppel

were actually litigated and decided on the merits in the prior suit, (3) the resolution of the

particular issues was necessary to the court's judgment, and (4) those issues are identical to

issues raised in the subsequent suit.

The resolution of the particular issues in this case was not necessary to the court's

judgment in Huon v. Mudge, 597 Fed. Appx. 868, 2015 U.S. App. LEXIS (7th Cir. Jan. 5, 2015).

There, the Seventh Circuit held that investigators "are not compelled to seek more information

undermining probable cause once it is established" and that what matters is what was known by

detectives when a suspect was arrested and charged. Huon v. Mudge, 597 Fed. Appx. 868, 2015

U.S. App. LEXIS pages 7-9 (7th Cir. Jan. 5, 2015).

More importantly, the Seventh Circuit stated that "factual disputes about immaterial

matters are irrelevant". Huon v. Mudge, 597 Fed. Appx. 868, 2015 U.S. App. LEXIS pages 2,

7-9 (7th Cir. Jan. 5, 2015).

The District Court in <u>Huon v. Mudge</u> relied on the deposition testimony of the

Defendant, Assistant State's Attorney Amy Gabriel, who essentially read excerpts of the Sheriff

Department report. (Case No: 3:12-cv-00166-MJR (S.D. Illinois), Doc. 181, PageID #7733, Doc.

146-1.)  Defendants in in <u>Huon v. Mudge</u> never deposed Jane Doe. (Case No: 3:12-cv-00166-

MJR (S.D. Illinois), Doc. 205, PageID #8575.)

The District Court found that " . . . a probable cause determination is based on the

officer's state of mind at that time, not the actual facts of the case" and that Huon's argument

that the Madison County Sheriff Report McKendry could not be corroborated is "irrelevant to the

probable cause analysis."  (Case No. 3:12-cv-00166-MJR-PMF (S.D. Ill.), Document No. 181,

PageID 7735.)

Huon disputes the facts cited by Defendants.  For example, certain of Defendants'

purported facts are rebutted by the deposition transcripts and documents filed in <u>Meanith Huon</u>

<u>v. Former Madison County State's Attorney Hon. William Mudge, et. al.</u>, Seventh Circuit Case

No.: 13-2966, Southern District Court Case No. 3:12-cv-00166-MJR) (the citations below refer

to the long record on appeal in <u>Huon v. Mudge,</u> except where noted):

- The only phone records contained in the record on appeal state that the cell phone
was registered to Meanith Huon (Doc. 150-15, PageID # 4258.).

- There were no other complaining witnesses:

Q. Were there any other alleged victims in this specific case?
A. Not that I'm aware of.  (Deposition of Detective Vucich, Doc. 150-2, Page ID#
3067.).

- Huon testified that Jane Doe tried to perform a simulated oral sex act outside his
pants while he was driving on Interstate 55 at highway speed and he tried to get
her to stop and that Doe voluntarily left the car.  (Defendant City of Chicago's
Motion for Summary Judgment, Doc. 146, page ID#  2678, Doc. 146-1. Page
ID#2678, 2795-2796).

18

- Chicago Police Officer Brian McKendry, who witnessed part of the interrogation, testified:

  Q. So you don't know whether or not the oral copulation actually took place or not, do you?

  A. No.   (Brian McKendry Deposition, Doc. 150-10, PageID 3858, 3834-3843, 3847-3854.).

- Only Detective David Vucich knew Jane Doe's nickname because she emailed him with an email address incorporating her nickname.  (Doc. 150-2, Page ID#3072-3073; 150-4, PageID 3559).

- Doe testified that Craigslist.com would have hid her email address. (See page 197 of excerpts from the trial transcript of People v. Huon, 2008 CF 1496, Doc. No. 179-3 in this lawsuit, Case No. 11-cv-3054.).

- Doe read a private blog that made no reference to her first or last name; the blog had thoughts about God and life, i.e. The Lord's Prayer. (Doc. 150-3, Page ID #3231; Doc. 150-1, Page ID #2947.)  The example Doe gave of a threatening post is the author driving to church to pray. (Doc. 150-16, Page ID# 4271.) .

Defendants' cases do not apply.  As the Seventh Circuit explained in Indep. Trust Corp.

v. Stewart Info. Servs. Corp., 665 F.3d 930, 943 (7th Cir. 2012):

> When the "adjudicative facts" are read in the proper context, it is apparent that the Receiver's argument is specious. The district court was reciting the long procedural history of this case. The Hargrove indictment, the Capriotti plea agreement, and Fidelity v. Intercounty are documents in the public domain that further that procedural narrative. The district court took judicial notice of the indisputable facts that those documents exist, they say what they say, and they have had legal consequences. The district court did not rely on the documents as proof of disputed facts in any other sense.

Defendants argue in a footnote that "A court may properly take judicial notice of documents

filed in court for the purpose of establishing that they say what they purport to say, and for

evaluating assertion of the fair report privilege." However, Defendants do not cite to documents

filed in this litigation in the record of appeal.

19

Pugh v. Tribune Co. took judicial notice of "publicly reported stock prices". Scheidler v.

Nat'l Org. for Women, Inc., took judicial notice that the National Organization of Women, Inc.

("NOW") filed a suit against Scheidler in a separate civil proceeding and paragraphs 17 to 34 of

NOW's complaint—which was not the subject of the defamatory comments. The District Court

did not take judicial notice of any disputed facts alleged but only that the allegations were made.

## VIII.   THE GAWKER DEFENDANTS MISREPRESENTED TO THE DISTRICT COURT THAT HUON HAD PENDING CRIMINAL CHARGES ON SEPTEMBER 30, 2011.

Huon has never been convicted of a felony or misdemeanor.   On May 6, 2010, on

Huon's date of acquittal, the Above the Law article falsely accused Meanith of being, among

other things, a rapist and posing as a "talent scout".  (Doc. No. 215, PageID No. 2966.)  There is

no reference to Huon posing as a talent scout in the original proceedings.  (Document 179-3,

PageID 2079 to 2251.)   The reference to posing as a "talent scout" appears in

TheAbovethelaw.com Article.  (Doc. 36-2, PageID No. 314.).

On May 11, 2011, Defendants posted the Jezebel.com Article , which incorporated the

Abovethelaw.com Article, with a link.  On May 11, 2011, Huon had no pending criminal

charges.

**After** the  Jezebel.com Article was published,  on July 5, 2011, Huon was falsely accused

by Stephanie Andrews of posing as a "talent scout".  Andrews' copycat claim mirrored the false

accusation that Huon posed as a talent scout that was circulated in the Abovethelaw.com Article,

which was incorporated by the Jezebel.com Article.    Huon was never accused of posing as a

"talent scout" in the original criminal proceedings.

20

On September 7, 2011, the criminal charges relating to Andrews' complaint were promptly dismissed at the second court date by the Cook County State's Attorney's Office. (Doc. No. 132, 132-1.)

However, on September 30, 2011, the Gawker Defendants asked the District Court to take judicial notice of Huon's arrest in the copycat claim. (Doc. No. 58, PageID 770.)

The Defendants/Appellees or their attorneys knew or should have known that the State's Attorney's Office had already *nolle prossed* all of Huon's misdemeanor charges on September 7, 2011. (Doc. No. 132, 132-1.)   In addition, the attorneys for the Defendants knew or should have known that the charges were for misdemeanor battery for contact of an "insulting nature", not for sexual battery.   (Doc. No. 109, 109-1, 117).

On September 30, 2011, Defendants/Appellees falsely accused Huon of being a sex offender and of stalking on at least two occasions.   (Doc No. 58, PageID 756-760.)   But Huon has ever been convicted of a crime involving felony or misdemeanor.   He has never been accused or charged with stalking two women "on at least two occasions."   The Defendants know that Jane Doe was the same complaining witness in the Madison County criminal cases, because Defendants published a story on it.

On December 30, 2011, the  Gawker Defendants again resurrected the Stephanie Andrews' copycat claim in its Reply Brief, without advising the Court that the charges had been *nolle prossed*. (Docket No.  117.)

On January 19, 2012, Huon filed documents indicating that the copycat claim charges had been dismissed on September 7, 2011.  (Doc. Nos. 128 and 128-1, 132 and 132-1.)

21

However, on January 30, 2013, the Gawker Defendants continued to resurrect the

copycat claim in its Replacement Memorandum in an effort to denigrate Huon.  (Doc. No. 191,

PageID 2520 and 2497.)  The Gawker Defendants submitted extrinsic materials in support its

Motion to Dismiss, misrepresenting to the District Court that Huon had pending criminal charges

on September 30, 2011.  (Doc. No. 191, PageID 2513-2530, 2519-2528.)

The District Court considered the extrinsic material submitted by the Gawker Defendants,

because the Court incorrectly found "That Huon was facing criminal charges until December

2011 further undermines the plausibility of his claim to have had reasonable business

expectancies when the ATL Article and Jezebel Article were published."  (Doc. No.  215,

PageID 2997.)

Defendants again attempt to resurrect the **Stephanie Andrews' copycat claim** on page 6 of

its brief and make no effort to correct Defendants' prior misrepresentation.

## IX.  EVEN PRISONERS HAVE A CONSTITUTIONAL RIGHT TO ACCESS TO THE COURTS.

Defendants raise collateral and non-relevant, citing to  Huon v. Johnson & Bell, Ltd., 757

F.3d 556, 557 (7th Cir. 2014)".   Even prisoners have a Constitutional right  to file a lawsuit in

the courts.  Bounds v. Smith, 430 U. S. 817 (1977), Lewis v. Casey, 518 US 343 (1996);

NAACP v. Button, 371 US 415 (1963).   Huon has never been convicted of a misdemeanor or

felony.   The incremental harm doctrine does not apply in Illinois.  "Such a rule 'would strip

people who had done bad things of any legal protection against being defamed; they would be

defamation outlaws.'" Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345, 1351

(7th Cir. 1995). The First Amendment and the Constitution protects Huon's rights to the Courts.

22

# X.  SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT PROVIDE IMMUNITY.

## A.  HUON ADEQUATELY PLEADS AGENCY.

Defendants quarrel with the evidentiary support for Huon's allegation that certain commenters may actually be Gawker Media employees, posting under an alias, on Jezebel.com. Defendants argue that a website gawkersucks.blogspot.com is not a reliable source for such information.  However, that is not an issue that can be reached on a motion to dismiss.  "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Co. v. Twombly, 550 U.S. 544, 570 (2007). "'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not…. As we understand it, the Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen."  Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010).

Huon's allegation is that certain commenters who posted comments about Huon on Jezebel.com may actually be Gawker Media employee.  That is sufficient to take this case outside of the scope of the protection of Section 230(c) of the Communications Decency Act, because such immunity does not extend to content actually created by Defendants, and Huon has pleaded a plausible story as to how the content at issue was created by Defendants.  Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 671 (7th Cir. 2008).  If Defendants feel they can show by competent evidence that Huon's allegation is untrue or unsupported by the evidence, that would be a matter for summary judgment, not a pleadings motion.

23

Additionally, Huon is entitled to allege that Defendants encouraged the publication of

defamatory material.  Defendants argue that the "encouragement" theory is foreclosed by the

purported policy of Gawker prohibiting defamatory posts, but that policy was clearly not

enforced in the case of the comments thread on the "Acquitted Rapist" story, and Huon has

pleaded a plausible theory that Defendants in fact encourage defamatory posts despite their

stated comments policy.  Dart v. Craigslist, Inc., 665 F. Supp. 2d 961, 969 (N.D. Ill.), is

distinguishable in that in Dart, Craigslist had not done anything to encourage improper posts; in

that context, Craigslist's guidelines were cited as an additional relevant factor.  Here, Huon has

alleged that Defendants encouraged defamatory postings and violated Gawker Media's own

terms and conditions by defaming Huon and by encouraging its users to harass and defame

Huon.  (Doc. No. 162, PageID 1777.)

Defendants suggest that Huon's allegation that Defendants authored the comments to the

Jezebel.com Article is insufficient because it is made on information and belief and alleges that it

will be proven by discovery.  However, the Twombly / Iqbal pleading standard does not prohibit

this kind of fact pleading.  Simonian v. Blistex, Inc., 2010 WL 4539450 at *3 (N.D. Ill. Nov. 3,

2010) ("[N]othing in either Twombly or Iqbal suggests that pleading based upon 'information

and belief' is necessarily deficient. The Court therefore concludes that pleading in this manner is

not categorically improper, especially when information lies uniquely within the control of the

defendant.")(Discussing Ashcroft v. Iqbal, 556 U.S. 662 (2009)).  Here, the information that will

confirm that Gawker Media employees were commenting on the Jezebel.com Article is solely in

the control of Defendants.  Huon's "information and belief" pleading is proper and must be taken

as true.

24

Goddard v. Google, Inc., cited by Defendants, hold that "[T]he… relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content."  2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008).  Huon is suing Defendants content creators and developers.  He has alleged that theory plausibly, and discovery should be permitted.

## B.  THE COURT CAN TAKE JUDICIAL NOTICE AT ANY TIME.

A plaintiff is "free on ... appeal to give [the Seventh Circuit] an unsubstantiated version of the events," provided it is consistent with the complaint, to show that the complaint should not have been dismissed.  Dawson v. General Motors Corp., 977 F.2d 369, 372 (7th Cir.  1992); Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 440 (7th Cir. 1994).  This rule is necessary to give plaintiffs the benefit of the broad standard for surviving a Rule 12(b)(6) motion as articulated in Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984) and Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, (1957).

The Court can take judicial notice at any time to admissions made by Gawker Media's then-editor on Defendants' websites.   A court may consider facts subject to judicial notice in the context of a motion to dismiss under Rule 12(b)(6).  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509 (2007); Doherty v. City of Chicago, 75 F.3d 318, 325 n.4 (7th Cir. 1996); Facebook, Inc. v. Teachbook.com LLC, 819 F. Supp. 2d 764, 771 (N.D. Ill. 2011).  A court can take judicial notice of admissions made by the Defendants in the form of postings on its websites.  US v. White, 698 F.3d 1005, 1017 (7th Cir. 2012); Facebook, Inc., 819 F. Supp. 2d at 771 (N.D. Ill. 2011); Rowe v. Gibson, 798 F. 3d 622  (7th Cir. 2015); Federal Rule of Evidence 201(d).

25

In this case, the Court can take judicial notice of admissions made by Gawker Media's ex-editor, Joel Johnson, who used the word "commentariat".[3]   In the discussion section to Johnson's post, Gawker Media's "Kinja" platform is referred to as a "commenting system."  A commenter asks Johnson "Should a writer be focused on promoting their blog/posts within the Gawker commentariat or to the wider world (eg via social media)?"  Johnson replies "But of course, yes, noticing a lot of traffic on a Kinja will certainly bring it to my consideration." Another commenter writes "Well, you got me to join up. So now I'm supposed to troll your websites? Is that how this works? Do I need to thoroughly critique all articles and point out any logical fallacy or errors? Because that's really what I'm best at. And being really damn annoying."  Johnson replies "It's a start! (If not a living.)"  The questions and answers posted by Johnson anticipates the question "Q. Won't this encourage bad or lazy attempts at journalism at 'traffic whoring'?"  When a commenter asks "It would be great if we had a specific kind of contract for this role, which spells out to the person what is expected of them, . . .", Johnson replies "Scott and I are working on an email template that will explain all the details to new recruits."

The commenting system is part of Gawker Media's business model to generate traffic and advertising revenue.  Blogs.Reuters.com reported that in an internal memorandum, Denton explained that the purpose of Gawker Media's commenting system was to generate more advertising dollars by commercializing and monetizing the discussion thread to the stories on Gawker Media's websites. [4]  (Doc. No. 162, PageID No. 1774-1775.)  The Reuters article was cited in Huon's revised jurisdictional statement which Defendants conceded " is complete and

---

[3] http://joel.kinja.com/introducing-recruits-1520191540.
[4] http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-monetize-comments/.

correct."[5]  (Case No.: 15-3049, Doc. 42, Page 63.)    Blogs.Reuters.com reported on the history

and on the business structure and characteristics of Gawker Media, including Kinja, KFT.  (Case

No. 15-3049, Doc: 39, Page 14-15.)  Felix writes that "The problem with Gawker Media's

current model . . . is that it's based on pageviews and those tyrannical CPMs. It's essentially a

junk-mail direct marketing model . . . " and that

> The CPM game, then, is looking increasingly like a race to the bottom, where publishers
> desperately try every trick in the book to boost their pageviews and ad impressions, just
> to compensate for the fact that their revenues per page are very small. The results —
> sensationalism, salaciousness, and slideshows — only serve to further erode the value of
> the sites in the eyes of advertisers, and put ever more downward pressure on those CPMs.
> It's a vicious cycle . . . [6]

    That Defendants bragged about their commenting system on a date after Huon sued

Defendants just means that the information was discovered at a later date.  The issue of when

evidence is discovered is not the same as the issue of whether it is relevant.  Huon is entitled to

discovery on the facts that Defendants have not bragged about on its websites.

## C.  THE COMMENTS ARE DEFAMATORY.

    Defendants' alternate grounds for affirmance are without merit.  "Opinions" which are

pregnant with factual claims can be actionable as defamatory.  Here, "opinions" that Huon is a

---

[5] Defendants are incorrect in stating that various Gawker entities have not been served.   In an
email from David Feige, counsel for the Defendants, Mr. Feige writes that Defendants' Motion
to Dismiss has been filed on behalf of:
>    Gawker Media Group, Inc.
>    Gawker Media, LLC
>    Gawker Entertainment, LLC
>    Gawker Sales, LLC
>    Gawker Technology, LLC
>    As well as the individual defendants.  (Doc. No. 237-1, Page ID 3395.)
Defendants returned a signed waiver of summons,  (Doc. 167-1), and their attorneys filed his
appearance (Doc. No. 42 and 43).

[6] http://blogs.reuters.com/felix-salmon/2010/12/01/the-new-gawker-media/

"rapist" stand in no different stead than the factual claim that he was an "acquitted rapist"—i.e.
"he is just a one time accused rapist".  "Opinions" that falsely attribute to Huon offensive beliefs
that he does not hold—i.e. that women cannot go out and drink and feel safe and secure--are
actionable as well.  The "opinion" that Huon is "crazy" is an accusation of mental illness and is
also actionable.  Stratman v. Brent, 291 Ill. App.3d 123, 683 N.E.2d 951, 958-59 (2d Dist. 1997).

     Nor are the comments protected by the rhetorical hyperbole rule, which is reserved for
"terms that are either too vague to be falsifiable or sure to be understood as merely a label for the
labeler's underlying assertions." Dilworth v. Dudley, 75 F.3d 307, 309 (7th Cir. 1996).  Claims
that Huon is a rapist and  is crazy are not vague, are falsifiable, and  are not sure to be understood
as merely a label for something else.  "There is no artificial distinction between opinion and fact:
a false assertion of fact can be defamatory even when couched within apparent opinion or
rhetorical hyperbole".  Solaia Technology, LLC , 852 N.E.2d at  840 (Ill. 2006).

## XI.  HUON SHOULD HAVE BEEN GIVEN LEAVE TO AMEND HIS COMPLAINT.

     This is not a case in which the District Court has told Plaintiff five times that his special
damages pleadings are inadequate.  Plaintiff initially pled what he believed were adequate
special damage allegations supporting his claim for defamation *per quod*.  Pursuant to Fed. R.
Civ. Proc. 15(a)(1), Plaintiff amended his Complaint twice to add or drop parties.

     After extensive briefing from September 2011 to January 2012, this case was reassigned
to Judge Tharp. On August 13, 2012 and September 14, 2012, Judge Tharp *sua sponte* dismissed
Huon's Second and Third Amended Complaint for lack of subject matter jurisdiction.  (Doc.
151, 157, 160.)  Judge Tharp made no substantive ruling on the defamation *per quod count* or the
merits of any other counts.  The August 13, 2012 order provides "The plaintiff is granted leave to

28

re-file a Third Amended Complaint on or before 9/12/12, addressing the jurisdictional issues noted in the Statement below." (Doc. 151.) The September 14, 2012 order provides "plaintiff is granted leave to file a fourth amended complaint on or before 9/28/12, properly alleging complete diversity of citizenship." (Doc. 157.)

Plaintiff then timely filed his Fourth Amended Complaint to address just these subject matter jurisdiction defects. Defendants then essentially filed the same motions to dismiss. From on or about April 11, 2013, to on or about December 4, 2014, Huon took the reasonable path and waited for a ruling. Had the Defendants made their Rule 7.1 disclosures timely, pursuant to FRCP 7.1(b), the issue of lack of subject matter jurisdiction may not have arisen.

Huon's proposed amended pleading sought to respond directly to footnote 26 of the District Court's Memorandum by adding paragraphs 207 to 222 to the proposed Fifth Amended Complaint. (Doc. No. 223-1, PageID 3149-3151. Huon's proposed amendments notifies the Defendants of the nature of Huon's claimed damages and identifies a concrete loss. _Action Repair, Inc. v. American Broadcasting Cos_., 776 F.2d 143, 150 (7th Cir. 1985); Federal Rule of Civil Procedure 9(g).

In his Reply Briefs in support of Huon's Motion for Leave to File a Proposed Fifth Amended Complaint, Huon explained how his proposed Fifth Amended Complaint would cure the deficiencies identified in Fourth Amended Complaint. (Doc. No. 237, PageID :3380, 3388-3392; Doc. No, 238, PageID 3396, 3398-3400.) Huon also explained how he adequately pled causation. (Doc. No. 237, PageID :3391, 3400-3403.)

29

Plaintiff in <u>Gonzalez-Koeneke v. West</u>—cited by Defendants—never even attempted to explain how she would amend her complaint to state a claim for relief to the District Court.  791 F. 3d 801, 808-909 (7th Cir. 2016).

Huon filed briefs on how his proposed pleadings would cure the identified deficiencies, with case law and arguments and even a discussion on causation.  Thus, the District Court's explanation is not reasonable.

## **CONCLUSION**

WHEREFORE, Plaintiff/Appellant Meanith Huon requests that this Honorable Court reverse the District Court's Orders granting the Gawker Defendants' Motion to Dismiss and denying Huon leave to file a Fifth Amended Complaint.

Respectfully submitted,

_____/s/Meanith Huon_____
Attorney for Plaintiff/Appellant


Dated:  April 28, 2016

30

<div align="center">

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

</div>

| | |
|---|---|
| **MEANITH HUON,** | ) |
| | ) |
|       **Plaintiff/Appellant,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **NICK DENTON,** | )    **COURT OF APPEALS** |
| **IRIN CARMON,** | )    **CASE NO.: 15-3049** |
| **GABY DARBYSHIRE,** | ) |
| | )    **DISTRICT COURT** |
| **GAWKER MEDIA, LLC a/k/a** | )    **CASE NO.: 1:11-cv-3054** |
| **GAWKER MEDIA,** | ) |
| | ) |
| **BLOGWIRE HUNGARY SZELLEMI** | ) |
| **ALKOTAST HASZNOSITO KFT,** | ) |
| | ) |
| **GAWKER MEDIA GROUP, INC. a/k/a** | ) |
| **GAWKER MEDIA,** | ) |
| | ) |
| **GAWKER ENTERTAINMENT, LLC,** | ) |
| | ) |
| **GAWKER TECHNOLOGY, LLC,** | ) |
| | ) |
| **GAWKER SALES, LLC.,** | ) |
| | ) |
|       **Defendants/Appellees.** | ) |

<div align="center">

**CERTIFICATE PURSUANT TO Fed. R. App. P. 32(a)(7)(B)**

</div>

    The undersigned, counsel of record for the Plaintiff-Appellant, Meanith Huon

furnishes the following, pursuant to F.R.A.P Rule 32(a)(7):

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because
this brief contains approximately 6,983 words, excluding the parts of the brief exempted by Fed.
R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type
style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a
proportionally spaced typeface using Microsoft Word in Times Roman, 12 points.

<div align="center">

31

</div>

\_\_\_\_\_/s/Meanith Huon\_\_\_\_
Attorney for Plaintiff/Appellant, Meanith Huon

Dated:  April 28, 2016

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MEANITH HUON, | ) | |
| | ) | |
| **Plaintiff/Appellant,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NICK DENTON, | ) | **COURT OF APPEALS** |
| IRIN CARMON, | ) | **CASE NO.: 15-3049** |
| GABY DARBYSHIRE, | ) | |
| | ) | **DISTRICT COURT** |
| GAWKER MEDIA, LLC a/k/a | ) | **CASE NO.: 1:11-cv-3054** |
| GAWKER MEDIA, | ) | |
| | ) | |
| BLOGWIRE HUNGARY SZELLEMI | ) | |
| ALKOTAST HASZNOSITO KFT, | ) | |
| | ) | |
| GAWKER MEDIA GROUP, INC. a/k/a | ) | |
| GAWKER MEDIA, | ) | |
| | ) | |
| GAWKER ENTERTAINMENT, LLC, | ) | |
| | ) | |
| GAWKER TECHNOLOGY, LLC, | ) | |
| | ) | |
| GAWKER SALES, LLC., | ) | |
| | ) | |
| **Defendants/Appellees.** | ) | |

**NOTICE OF FILING**

TO:    All counsel of record.

Please take notice that on April 28, 2016, I filed Plaintiff/Appellant, Meanith Huon's, **Appellant's Reply Brief and this Notice of Filing** in the above-captioned case in the above-captioned case with the Clerk of the United States Court of Appeals for the Seventh Circuit via electronic filing.

Dated:  April 28, 2016

_____/s/Meanith Huon_____
Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

33

## **PROOF OF SERVICE**

     I hereby certify that on April 28, 2016, I caused to be served a true and correct copy of the foregoing Notice of Filing and attached **Appellant's Reply Brief,** by causing copies of same to be served on all counsel of record by electronic filing same.


                       _/s/Meanith Huon_____
                       Meanith Huon
                       PO Box 441
                       Chicago, Illinois 60690
                       Phone: (312) 405-2789
                       E-mail: huon.meanith@gmail.com
                       IL ARDC. No.: 6230996

33

**<u>EXHIBIT F</u>**

Order entered on December 4, 2014 by the United States District Court for the Northern District
of Illinois, Eastern Division

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MEANITH HUON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 03054 |
| | ) | |
| BREAKING MEDIA, LLC a/k/a BREAKING | ) | Judge John J. Tharp, Jr. |
| MEDIA; BREAKING MEDIA, INC. a/k/a | ) | |
| BREAKING MEDIA; DAVID LAT; ELIE MYSTAL; | ) | |
| JOHN LERNER; DAVID MINKIN; GAWKER | ) | |
| MEDIA, LLC a/k/a GAWKER MEDIA; BLOGWIRE | ) | |
| HUNGARY SZELLEMI ALKOTAST HASZNOSITO | ) | |
| KFT; GAWKER MEDIA GROUP, INC. a/k/a | ) | |
| GAWKER MEDIA; GAWKER ENTERTAINMENT, | ) | |
| LLC; GAWKER TECHNOLOGY, LLC; GAWKER | ) | |
| SALES, LLC; NICK DENTON; IRIN CARMON; and | ) | |
| GABY DARBYSHIRE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Meanith Huon ("Huon"), brings state law claims for defamation and related

torts against two groups of defendants: the Above the Law ("ATL") defendants and the Gawker

defendants.[1] Huon initially sued the ATL defendants for publishing an allegedly defamatory

article on AboveTheLaw.com that discussed his criminal trial for sexual assault charges. He

subsequently amended his complaint to include claims against the Gawker defendants for

publishing an allegedly defamatory article on Jezebel.com about the filing of this lawsuit against

---

[1] The ATL defendants are Breaking Media, LLC a/k/a Breaking Media; Breaking Media, Inc. a/k/a Breaking Media; David Lat ("Lat"); Elie Mystal ("Mystal"); John Lerner ("Lerner"); and David Minkin ("Minkin"). The Gawker defendants are Gawker Media, LLC a/k/a Gawker Media ("Gawker Media, LLC"); Blogwire Hungary Szellemi Alkotast Hasznosito KFT ("Blogwire Hungary"); Gawker Media Group, Inc. a/k/a Gawker Media ("Gawker Media Group, Inc."); Gawker Entertainment, LLC ("Gawker Entertainment"); Gawker Technology, LLC ("Gawker Technology"); Gawker Sales, LLC ("Gawker Sales"); Nick Denton ("Denton"); Irin Carmon ("Carmon"); and Gaby Darbyshire ("Darbyshire").

1

the ATL defendants. The current Fourth Amended Complaint (the "Complaint") seeks relief against all the defendants for defamation *per se* (Count I), defamation *per quod* (Count II), false light invasion of privacy (Count III), intrusion upon seclusion (Count IV), intentional infliction of emotion distress (Count V), conspiracy to defame (Count VI), conspiracy to invade privacy (Count VII), tortious interference with prospective economic advantage (Count VIII), and cyberstalking and cyberbullying (Count IX). The ATL defendants have moved to dismiss all the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Several of the Gawker defendants have likewise moved to dismiss all the claims against them. For the reasons stated below, the Gawker defendants' motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is granted in part and denied in part.

## BACKGROUND

Meanith Huon is an attorney licensed to practice law in Illinois.[2] On July 2, 2008, Huon was charged with two counts of criminal sexual assault, two counts of criminal sexual abuse, and one count of unlawful restraint. The charges arose out of his alleged interactions with "Jane Doe" on June 29, 2008, in Madison County, Illinois. *See* Gawker Motion to Dismiss, Dkt. 191, at 25 (Exhibit A). Approximately one year later, on July 17, 2009, Huon was charged with cyberstalking and witness harassment based on allegations involving the same Jane Doe. *See id.*

---

[2] In reviewing a motion to dismiss, the Court may consider: (1) the plaintiff's complaint and any documents attached to it, (2) documents attached to the motion to dismiss that are critical to the complaint and referred to in it, (3) additional facts set forth in the plaintiff's response to the motion or in any documents attached to the response, as long as those additional facts are consistent with the allegations in the complaint, and (4) information that is subject to proper judicial notice (such as public records). *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). When considering these materials, the Court accepts the plaintiff's factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). The factual background is therefore summarized with this standard in mind and, except where otherwise indicated, is drawn from the Complaint (Dkt. 162) and accompanying exhibits (Dkts. 162-1 through 162-21).

2

at 29 (Exhibit C). Huon was tried on the 2008 sexual assault charges in May 2010 in Madison County. The trial began on May 4 and ended on May 6 with his acquittal on both charges. *See* Exhibit A to ATL Motion to Dismiss, Dkt. 190-1, at 2-4; Exhibit B to ATL Motion to Dismiss, Dkt. 190-2, at 2. The 2009 cyberstalking and witness harassment charges were ultimately dismissed in December 2011.

The charges against Huon and his criminal trial received publicity in local media and legal news sources; several of the resultant articles are relevant to the instigation of this case. On July 2, 2008, the day the sexual assault and related charges were filed, an article about those charges appeared in the *Madison County Record* (the "Madison County Article"). *See* Exhibit C to Response to ATL Motion to Dismiss, Dkt. 194-8. The following day, July 3, 2008, the legal blog AboveTheLaw.com published a post by defendant Lat (the "2008 ATL Post") that included the one-line statement "Lawyer of the Day: Meanith Huon" along with a link to the Madison County Article. Next, on August 24, 2009, a post discussing both the 2008 and 2009 charges appeared on the blog LawyerGossip.com (the "Lawyer Gossip Post"). *See* Exhibit F to Response to ATL Motion to Dismiss, Dkt. 194-13. Finally, on May 6, 2010, AboveTheLaw.com published an article by defendant Mystal titled "Rape Potpourri" (the "ATL Article").

The ATL Article provided information and commentary on two "rape stories": (1) the arrest of former New York Giants linebacker Lawrence Taylor based on a rape allegation, and (2) the allegations at issue in Huon's criminal trial and the opening statement made by Huon's defense lawyer at trial. The section of the ATL Article on Huon purported to link to and quote, *inter alia*, the Lawyer Gossip Post, the Madison County Article (which was also linked to in the 2008 ATL Post), and an article in the *Belleville News Democrat* titled "Testimony: Woman says

3

she was raped by attorney posing as scout for models" (the "BND Article").[3] At some point following the ATL Article's initial publication, an update was added toward the end of the piece indicating that Huon had been acquitted of the charges discussed.[4] AboveTheLaw.com allows readers to post comments on its articles (subject to certain terms of use), and the ATL Article eventually generated over 107 comments or replies from users.[5]

On May 6, 2011, one year after publication of the ATL Article, Huon sued the ATL defendants and the John Does who posted comments on the ATL Article for defamation, intentional infliction of emotional distress, and false light invasion of privacy.[6] *See* Initial Complaint, Dkt. 1. The filing of this suit, like the criminal charges against Huon, generated its share of publicity. On May 11, 2011, an article by defendant Carmon entitled "Acquitted Rapist Sues Blogger for Calling Him Serial Rapist" appeared on the women's interest blog Jezebel.com (the "Jezebel Article").[7] The Jezebel Article discussed Huon's criminal trial for sexual assault,

---

[3] In his response to the ATL motion to dismiss, Huon disputes the existence of the BND Article. However, the copy of the ATL Article attached as an exhibit to the Complaint reveals that the ATL Article presented the BND Article as one of its sources and indicates the title of the BND Article. Huon does not dispute the ATL Article's reliance on the Madison County Article and Lawyer Gossip Post.

[4] The update stated: "**UPDATE:** Meanith Huon was acquitted of these charges. Please check here for our continuing coverage." The words "check here" appeared in red text, as did other words and phrases in the ATL Article that were presented as hyperlinks.

[5] A saved version of the ATL Article is attached to the Complaint at Dkt. 162-8. The ATL Article is no longer available on AboveTheLaw.com, but it remains available online via the Internet Archive Wayback Machine at http://web.archive.org/web/20100512094544/http://abovethelaw.com/2010/05/rape-potpourri/ (last visited Dec. 4, 2014).

[6] The ATL defendants were served on June 15, 2011. *See* Waiver of Service of Summons, Dkt. 167; Waiver of Service of Summons, Dkt. 167-1. The current Complaint does not name any John Doe defendants.

[7] The headline of the Jezebel Article was changed at some point following the piece's initial publication. Screenshots of the original version are attached to the Complaint at Dkt. 162-12 and at Dkt. 162-16, at 2. The version with the changed headline is still available on Jezebel.com at http://jezebel.com/5800878/man-acquitted-of-sexual-assault-sues-blog-for-calling-him-serial-rapist (last visited Dec. 4, 2014).

Case: 1:11-cv-Doc:549 Document #: 29 Filed 1204/24 Page 5 of 34 PageID #:2598

his lawsuit against local law enforcement authorities for prosecutorial misconduct, and his initial complaint against the ATL defendants in the instant suit. The Jezebel Article mentioned the title of the ATL Article and included links to the ATL Article and other relevant sources. The Jezebel Article also included an image containing Huon's arrest photograph superimposed over a screenshot of the start of the ATL Article. Users who are invited by Gawker Media editors or by previously invited users may post comments on Jezebel.com articles (subject to certain terms of use), and the Jezebel Article eventually generated over 80 comments or replies from such users. According to Huon, some of the user comments were written by employees of the Gawker defendants, posting under aliases.

On July 11, 2011, two months after publication of the Jezebel Article, Huon filed a First Amended Complaint which added new allegations and defendants related to, *inter alia*, the Jezebel Article and associated comments. The three individual Gawker defendants and "Gawker Media" were among the defendants added to the suit in the First Amended Complaint. Huon soon filed a Second Amended Complaint which removed certain of the other recently added defendants. Gawker Media and the individual Gawker defendants were subsequently served on August 24, 2011. *See* Waiver of Service of Summons, Dkt. 167; Waiver of Service of Summons, Dkt. 167-1.

On September 21, 2011, the ATL defendants moved to dismiss the Second Amended Complaint. Shortly thereafter, Gawker Media, the individual Gawker defendants, and Jezebel.com (which has since been dropped from the suit) likewise filed a motion to dismiss. The two motions to dismiss were fully briefed at the time the case was transferred to this Court's docket on August 3, 2012. Upon reviewing the case, the Court dismissed the Second Amended Complaint without prejudice due to deficiencies in the allegations respecting diversity

jurisdiction. The Court denied the two motions to dismiss as moot in light of that ruling. Huon

then filed a Third Amended Complaint which contained updated jurisdictional allegations, added

new claims and defendants,[8] and removed some defendants. Since the jurisdictional allegations

in the Third Amended Complaint were still insufficient, the Court again dismissed the complaint

without prejudice.[9] On November 15, 2012, Huon filed the current Complaint with further

updated jurisdictional information. The ATL defendants and certain of the Gawker defendants

subsequently filed their respective motions to dismiss which are now under consideration.[10]

Based on the information in the Complaint and the notifications of affiliates filed

pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2, this matter is properly before

the Court under diversity jurisdiction in accordance with 28 U.S.C. § 1332. Huon, a citizen of

Illinois, is seeking compensatory damages in an amount well in excess of $75,000 and punitive

damages of $100,000,000. The corporate ATL defendants are: (1) Breaking Media, Inc., a New

York corporation that owns and operates AboveTheLaw.com and has its principal place of

business in New York, and (2) Breaking Media, LLC, an inactive limited liability company that

has merged into Breaking Media, Inc. The corporate Gawker defendants, which own and/or

---

[8] The defendants added in the Third Amended Complaint were Blogwire Hungary, Gawker Entertainment, Gawker Sales, and Gawker Technology. There is no evidence of service on the docket as to these four defendants, nor have there been any attorney appearances for them. Gawker Entertainment, Gawker Sales, and Gawker Technology are mentioned in the Gawker notification of affiliates filed pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2; however, Blogwire Hungary is not mentioned in that filing.

[9] The Court provided guidance to Huon as to the jurisdictional deficiencies in his complaints at the time of each dismissal.

[10] The Gawker motion to dismiss was filed on behalf of "Gawker Media a/k/a Gawker.com, Jezebel.com, Nick Denton, Irin Carmon, and Gaby Darbyshire." *See* Gawker Motion to Dismiss, Dkt. 191, at 1. Jezebel.com is no longer named as a defendant in this case. More important to note is the fact that the motion was *not* filed on behalf of the four Gawker defendants that were named for the first time in the Third Amended Complaint. As previously noted, there is no evidence of service as to those four defendants.

6

operate Jezebel.com, are: (1) Gawker Media Group, Inc., a Cayman Islands corporation that has its principal place of business in New York, (2) Gawker Media, LLC, a limited liability company whose only member is Gawker Media Group, Inc., (3) Gawker Entertainment, a limited liability company whose only member is Gawker Media, LLC, (4) Gawker Sales, a limited liability company whose only member is Gawker Media, LLC, (5) Gawker Technology, a limited liability company whose only member is Gawker Media, LLC, and (6) Blogwire Hungary, a Hungarian entity that is similar to a U.S. limited liability company.[11] The individual ATL defendants—John Lerner, the Chief Executive Officer of Breaking Media; David Lat, the founding and managing editor of AboveTheLaw.com; David Minkin, the publisher of AboveTheLaw.com; and Elie Mystal, a writer and editor for AboveTheLaw.com—are all citizens of New York. Two of the individual Gawker defendants—Gaby Darbyshire, the Chief Operating Officer of Gawker Media; and Irin Carmon, a reporter for Jezebel.com—are also citizens of New York. Nick Denton, the founder and owner of Gawker Media, is a citizen of Hungary and the United Kingdom.

## DISCUSSION

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir.

---

[11] The record does not reveal Blogwire Hungary's members. This information is necessary to determine Blogwire Hungary's citizenship. *See Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equip. Co.*, 759 F.3d 787, 790 (7th Cir. 2014) ("[Since] Changzhou Fellowes is closer to a limited liability company than to any other business structure in this nation, it does not have its own citizenship—and it *does* have the . . . citizenship of its member . . . ."). But given that Blogwire Hungary has not appeared or been served in this case, is not discussed in any of the relevant filings besides the Complaint, and is likely a dispensable party that could be dropped from the lawsuit at a later date if necessary, the missing information about its citizenship is not a barrier to the Court's current exercise of jurisdiction over this matter. *Cf. Howell by Goerdt v. Tribune Entm't Co.*, 106 F.3d 215, 217-18 (7th Cir. 1997) (dismissing a corporate defendant named in the complaint whose citizenship was unknown and who was only briefly mentioned in the case filings).

7

2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although a court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, conclusory allegations merely restating the elements of a cause of action do not receive this presumption. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A.    **Liability for Publishing User Comments**

All of Huon's claims other than his intrusion upon seclusion claim seek to hold the defendants liable for publishing "the actionable and offensive statements," a phrase Huon uses to refer collectively to the statements he challenges in the ATL Article, the Jezebel Article, and the reader comments associated with each of those articles. The defendants argue that Section 230(c)(1) of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230(c)(1), bars Huon's claims against them based on reader comments.[12] Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* The CDA explicitly preempts liability under any inconsistent state or local laws. *Id.* § 230(e)(3). For purposes of the CDA, an

---

[12] The Gawker defendants raised this argument in their motion to dismiss. The ATL defendants did not address the question of their liability for reader comments in their motion to dismiss or reply, and Huon did not raise the issue in his response to their motion—despite being on notice of the CDA's potential applicability to this case by virtue of the Gawker motion to dismiss. Since the ATL defendants could simply file a subsequent partial motion to dismiss premised on the CDA, or a summary judgment motion with respect to that issue, and Huon has already presented his legal arguments on the statute's proper interpretation in his response to the Gawker motion to dismiss, the Court will address the import of the CDA with respect to both the ATL defendants and the Gawker defendants.

interactive computer service is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). An information content provider is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3). In essence, the CDA says that "an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008).

Huon argues that the reader comments do not constitute information provided by "someone else," and that the defendants therefore are not protected by the CDA.[13] In support of this argument, he relies on the following allegations in the Complaint: (1) that the ATL Article and the Jezebel Article were designed to incite users to post defamatory comments in order to generate advertising revenue, (2) that the defendants encouraged users to post defamatory comments in response to the articles and subsequently edited those comments, (3) that the Gawker defendants intentionally placed defamatory comments about Huon in a prominent location, which encouraged other users to post defamatory comments, and (4) that some of the allegedly defamatory comments posted in response to the Jezebel Article were written by employees of the Gawker defendants, posting under aliases. None of these allegations takes the reader comments at issue outside the protection provided by the CDA.

---

[13] Huon does not dispute that the defendants qualify as "provider[s] or user[s] of an interactive computer service."

First, a website does not incite the posting of unlawful content merely by providing a forum for that content. *See Chicago Lawyers' Comm.*, 519 F.3d at 671-72 ("Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination . . . ."). This approach has been applied even where the forum is likely to or frequently does contain postings of an unlawful nature. *See, e.g.*, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968-69 (N.D. Ill. 2009) (citing *Chicago Lawyers' Comm.*, 519 F.3d at 671) (rejecting the plaintiff's argument that Craigslist induced users to post unlawful ads by having an "adult services" category and granting judgment on the pleadings for the defendant). Huon's argument that the defendants incited defamatory comments is further undercut by the ATL defendants' and Gawker defendants' written policies, which Huon sets forth in the Complaint, that prohibit the posting of defamatory or otherwise illegal material. *See Dart*, 665 F. Supp. 2d at 969 ("Plaintiff's argument that Craigslist causes or induces illegal content is further undercut by the fact that Craigslist repeatedly warns users not to post such content."); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) ("[T]he website did absolutely nothing to encourage the posting of defamatory content—indeed, the defamatory posting was contrary to the website's express policies.").

Second, numerous courts have determined that the CDA applies even where a website edits third-party content or manipulates such content to make it more prominent. *See, e.g.*, *Dowbenko v. Google Inc.*, No. 14-10195, 2014 WL 4378742, at *3 (11th Cir. Sept. 5, 2014) (finding that the plaintiff's defamation claim was preempted by the CDA despite his allegation that Google "manipulated its search results to prominently feature the article at issue"); *Fair Hous. Council*, 521 F.3d at 1169 ("A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his [CDA]

10

immunity . . . ."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish . . . or alter content—are barred [by the CDA].").

Thus, the fact that the defendants allegedly engaged in editorial functions such as determining the order of comments or making edits to them does not transform the defendants into "providers" of the comments for CDA purposes.

Finally, the allegation (on "information and belief") that some of the Jezebel Article comments were written by Gawker employees using aliases contains insufficient factual content to allow the Court to reasonably infer that the Gawker defendants were involved in creating those comments.[14] The Complaint does not allege that any of the named individual Gawker defendants posted comments to the article. Nor does it allege that the Gawker employees who allegedly posted comments did so within the scope of their employment, which is a required element of a *respondeat superior* claim in Illinois. *See Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (2012); *cf. Marquis v. Omniguide, Inc.*, 714 F. Supp. 2d 640, 646 (N.D. Tex. 2010) (granting a motion to dismiss with respect to an allegedly defamatory statement made by an unidentified company representative, where the plaintiff failed to allege that the representative acted within the scope of his employment). As a result of these pleading deficiencies, which are not resolved by the additional allegations in Huon's response to the Gawker motion to dismiss,[15] the

---

[14] Huon makes no similar argument as to the ATL defendants.

[15] The response states: "Gawker's writers are under constant pressure to generate web traffic to keep their jobs; writers' compensation is based on the amount of web traffic the story generates. Journalist Drew Johnson has traced hundreds of 'anonymous' comments posted to promote Gawker stories to actual Gawker employees . . . ." Response to Gawker Motion to Dismiss, Dkt. 192, at 2 (footnotes omitted). The response further states: "Mr. Johnson has investigated Gawker writers creating aliases to promote their own stories and Gawker employees creating fake accounts to promote Gawker stories on Reddit.com. He concluded that the practice of creating fake accounts to post 'anonymous' comments online to promote Gawker's stories

Complaint fails to state a plausible claim that the Gawker defendants were "providers" of the comments allegedly written by Gawker employees.

Accordingly, Huon's claims are dismissed with prejudice to the extent they seek to hold the defendants liable for publishing the reader comments associated with the ATL Article and the Jezebel Article; the remaining sections of this opinion will address the defendants' liability for publishing only the content of the articles themselves.

### B.    Defamation (Counts I and II)

Huon brings defamation *per se* and *per quod* claims based on statements in the ATL Article and the Jezebel Article. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 459 (2009). The elements of a defamation claim for both *per quod* and *per se* actions are "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused

---

appear to be a companywide policy." *Id.* at 17. In support of these statements, Huon attaches a 2008 article indicating that Gawker writers receive a monthly salary plus a bonus based on the number of page views their posts receive, a July 2012 article describing recently introduced changes to Gawker's comment system, and several online posts written by Johnson in 2012. *See* Exhibits B through D to Response to Gawker Motion to Dismiss, Dkts. 195-2 through 195-7. The posts by Johnson suggest that a Gawker writer hired in February 2012 writes his Gawker articles using an alias and that, between March 2010 and November 2012, several Gawker employees or interns used aliases to create "shell" accounts on Reddit.com in order to promote Gawker articles. Read in conjunction with these supporting exhibits, none of the new factual allegations in Huon's response create a reasonable inference that Gawker employees, acting within the scope of their employment, used aliases to post comments *to the Jezebel Article*. In fact, none of the new allegations concern Gawker employees posting comments to *any* Gawker articles. Rather, the new allegations either describe developments after the publication of the Jezebel Article, suggest that some Gawker employees used aliases to post on non-Gawker websites, or "reveal" that Gawker compensates writers based on the popularity of their works, an unremarkable proposition which does nothing to push Huon's claim regarding the Gawker defendants' responsibility for some of the comments across the line "between possibility and plausibility."

damages." *Id.* at 491, 917 N.E.2d at 459. The two types of defamation claims differ only with respect to the plaintiff's burden to plead and prove damages. In a defamation *per quod* action, damage to the plaintiff's reputation is not presumed and the plaintiff must plead and prove special damages. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501, 866 N.E.2d 114, 121 (2006); *see also Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 390, 882 N.E.2d 1011, 1018 (2008) ("special damages [are] actual damages of a pecuniary nature"). In a defamation *per se* action, damage is presumed if the statement falls within one of the five defamation *per se* categories recognized in Illinois:

> (1) statements imputing the commission of a crime; (2) statements imputing infection with a loathsome communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business; and (5) statements imputing adultery or fornication.

*Tuite*, 224 Ill. 2d at 501, 866 N.E.2d at 121. Even if a statement falls within one of these categories, however, it is not actionable as defamation *per se* if it is reasonably capable of an innocent construction. *Id.* at 502, 866 N.E.2d at 121. In applying the innocent construction rule, "courts must interpret the words 'as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader.'" *Id.* at 512, 866 N.E.2d at 123 (quoting *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill. 2d 77, 93, 672 N.E.2d 1207, 1217 (1996)). The preliminary determination of whether a statement is actionable as defamation *per se* is a question of law. *Id.* at 510, 866 N.E.2d at 126.

Statements that do not contain verifiable facts—such as opinions or rhetorical hyperbole—are not actionable as defamation; it is a question of law whether a statement is factual in nature. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). Statements that are not about the plaintiff also are not actionable as defamation. *BASF AG v. Great Am. Assurance Co.*,

13

522 F.3d 813, 820 (7th Cir. 2008) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d

558, 579, 852 N.E.2d 825, 839 (2006)). Further, statements that are privileged cannot support a

defamation claim. *Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at 839. As relevant here, the fair

report privilege protects publication of defamatory statements in a report of an official

proceeding, provided that the report is "complete and accurate" or is "a fair abridgement" of the

proceeding. *Id.* at 585, 588, 852 N.E.2d at 842, 843. Since the availability of the privilege hinges

not on the reporter's status or source but on the accuracy and fairness of the report, the privilege

applies regardless of whether the reporter is part of the established press and regardless of

whether the reporter obtained the information directly from the official proceeding. *See, e.g.*,

*Missner v. Clifford*, 393 Ill. App. 3d 751, 761, 914 N.E.2d 540, 550 (2009) ("Both media and

nonmedia reporters may claim protection under the privilege."); *Bannach v. Field Enters., Inc.*, 5

Ill. App. 3d 692, 693, 284 N.E.2d 31, 32 (1972) (applying the privilege to a newspaper article

that was based on a wire service report of an official proceeding).[16] It is a question of law

whether the privilege applies. *Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at 842.

### 1.    Defamation *Per Se* (Count I)

Huon alleges that some of the statements in the ATL Article and the Jezebel Article fall

under the first, third, fourth, and fifth defamation *per se* categories, but does not specify which

statements are the basis of his defamation *per se* claim. The defendants argue that each

potentially actionable statement is protected by the fair report privilege, is not about Huon, does

not contain verifiable facts, does not fall into one of the defamation *per se* categories, or is

---

[16] Huon's contention that the privilege does not apply to bloggers because they are not "reporters" is therefore incorrect.

14

reasonably capable of an innocent construction.[17] The Court agrees with the defendants with respect to most of the statements in the ATL Article and all of the statements in the Jezebel Article, as explained below.

a.    The ATL Article

The allegedly defamatory portions of the ATL Article consist of: (1) five text blocks summarizing Jane Doe's testimony and defense counsel's opening statement at Huon's criminal trial,[18] (2) commentary introducing and reflecting on the trial summaries in those text blocks, (3) a section facetiously suggesting the use of sexual consent forms and proposing putatively humorous language for such a form, and (4) a section containing quotations from the Madison County Article and the Lawyer Gossip Post and suggesting that if Jane Doe had Googled Huon before agreeing to meet him, she would have found those or similar articles.[19]

---

[17] The Gawker defendants also argue that the allegedly defamatory statements in the Jezebel Article are not actionable based on the "incremental harm" doctrine. Illinois courts have not recognized that doctrine, however. *Trudeau v. ConsumerAffairs.com, Inc.*, No. 10 C 7193, 2011 WL 3898041, at *8 (N.D. Ill. Sept. 6, 2011) (citing *Myers v. The Telegraph*, 332 Ill. App. 3d 917, 925, 773 N.E.2d 192, 200 (2002)).

[18] The ATL defendants assert that these five text blocks are quotations from the BND Article. The ATL Article itself suggests that to be the case, although it is not a model of journalistic clarity in that regard. Huon, for his part, disputes the existence of the BND Article, as noted previously. This question is irrelevant, however; if the material in the text blocks is defamatory and unprivileged, liability attaches regardless of whether it is original material or a republication. *See Owens v. CBS Inc.*, 173 Ill. App. 3d 977, 992, 527 N.E.2d 1296, 1307 (1988) ("[T]he republisher of a defamatory statement made by another is himself liable for defamation . . . ."); *see also Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (citing *Owens*, 173 Ill. App. 3d at 994, 527 N.E.2d at 1308).

[19] In his response to the ATL motion to dismiss, Huon also raises a new argument that the inclusion of a hyperlink to the Lawyer Gossip Post in the ATL Article constitutes a republication of statements in the Lawyer Gossip Post that Huon claims are defamatory. This theory is not viable because the CDA, which is applicable to this case for the reasons explained in Section A, provides liability protection for both linking to and posting third-party content. *See, e.g.*, *Nieman v. Versuslaw, Inc.*, No. 12-3104, 2012 WL 3201931, at *8 (C.D. Ill. Aug. 3, 2012) (finding that the plaintiff's invasion of privacy and defamation claims, which were based on links appearing on the defendants' websites, were barred by the CDA), *aff'd*, 512 F. App'x 635 (7th Cir. 2013).

15

The text blocks summarizing Huon's criminal trial are protected by the fair report privilege. Although the ATL Article does not explicitly state that it is reporting on Huon's trial, it is clear both from the phrasing in the article (including references to "testimony" and defense counsel's opening statement) and from a comparison of the article with the trial transcript, Exhibit B to ATL Motion to Dismiss, Dkt. 190-2, that those portions of the article constitute a report of an "official proceeding." Huon takes issue with the fact that the article only reports on material from the first day of his trial, but the fair report privilege does not apply only to coverage of trials in their entirety. *Cf. Solaia Tech.*, 221 Ill. 2d at 589, 852 N.E.2d at 844 (finding that the privilege applies to reporting on a complaint even when there has not been any judicial action). Further, while the article does not provide a complete report of everything that happened during the first day of Huon's trial, it is a "fair abridgment" of the proceedings. *See generally id.* at 590 (noting that a report is a fair abridgment if it conveys a "substantially correct account"). The article accurately summarizes Jane Doe's testimony as well as the defense's theory of the case, as explained in the defense opening, and does not convey an erroneous impression of what was said at the trial. *See id.* The fair report privilege therefore applies.

The commentary interspersed among the text blocks summarizing the trial likewise cannot support a defamation claim. The statements suggesting that Huon was an alleged rapist, that he listed Craigslist ads claiming to be a talent scout, that he came up with a scheme to meet women, and that he lied about himself and his intentions are all protected by the fair report privilege.[20] These statements, which serve to introduce and supplement the information in the

---

[20] Most of these statements appear in the commentary about Huon that precedes the first text block summarizing the trial; that commentary reads: "We cover the rape allegations of . . . any alleged attorney rapists near you. . . . A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models. . . . Huon's potentially harmless lies allegedly turned dastardly, pretty

text blocks, can be traced back to material in the trial transcript and do not convey an erroneous impression of what was stated.[21] Other commentary statements in the article suggesting that Huon's version of the events was "incredible," that his encounter with Jane Doe "end[ed] badly," and that Huon was "wanton," "depraved," "dastardly," and a "potential rapist" are non-actionable statements of opinion (*e.g.*, "Our next story [is] from the files of the wanton and depraved . . . . [A]pparently there are a lot of depraved dudes walking around out there that are potential rapists."). The remaining commentary statements that Huon claims are defamatory are simply not about him (*e.g.*, "I [Mystal] once pretended to be an Ostrich rancher . . . .").

The section of the article about sexual consent forms is also not actionable as defamation. That section consists of the following text:

> It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.
>
>> I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my ____ to the other party's ____. Such amorous undulations include, but are not limited to, ____, ____, and

---

quickly." In addition, a comment after the third text block summarizing the trial questions whether "lying . . . about your job and your intentions to get [a woman] into [your] car counts as consensual."

[21] Huon challenges the ATL Article's use of the words "rape" and "rapist" given that he was charged with "criminal sexual assault" and not "rape." However, a report does not need to use the exact verbiage as the official proceeding in order to be protected by the fair report privilege. *See, e.g.*, *Harrison v. Chi. Sun-Times, Inc.*, 341 Ill. App. 3d 555, 572, 793 N.E.2d 760, 774 (2003) (finding that the fair report privilege applied where an article stated that the plaintiff had been convicted of kidnapping, even though she was actually found guilty of "wrongful removal"); *see also In re Det. of Lieberman*, 201 Ill. 2d 300, 315, 776 N.E.2d 218, 227 (2002) ("[T]he offense of rape was subsumed by the subsequently created offenses of criminal and aggravated criminal sexual assault . . . ."). Moreover, the term "rape" was used multiple times on the first day of Huon's trial, including by defense counsel in his opening argument. Thus, the fact that some of the statements in the ATL Article contain the words "rape" or "rapist" does not bring those statements outside the protection of the fair report privilege.

17

> _____, and all proposals will be considered so long
> as no animals (barnyard or otherwise) are involved.
>
> I claim no rights to future _____, _____, or _____, in
> exchange for this brief interruption in my chronic
> loneliness.
>
> While I may be quite intoxicated right now, I know
> damn well what I'm doing.

This section is not about Huon and does not contain any statements of fact, and therefore cannot

support a defamation claim.

By contrast, the section containing the statements about Googling Huon cannot be

disposed of so readily. That section appears after introductory material indicating that there were

rape allegations against Huon and that Jane Doe testified that she met him after responding to a

Craigslist ad he posted to recruit promotional models. The section states:

> And this, people, is why God invented Google. Had the victim
> Googled Huon, she would have found stories like this, from the
> Madison County Record:
>
>> A Chicago attorney who was posing as a supervisor
>> for a company that sets up promotions for alcohol
>> sales at area bars was charged in Madison County
>> July 2, with two counts of criminal sexual assault,
>> two counts of criminal sexual abuse and one count
>> of unlawful restraint.
>>
>> Meanith Huon, 38, of 3038 S Canal St. in Chicago,
>> was arrested by the Chicago Police Department on
>> July 1, and was transferred to Madison County the
>> next day.
>
> Or she might have come across this link, at Lawyer Gossip:
>
>> Lawyer, Meanith Huon, 39, who was originally
>> charged with criminal sexual assault, sexual abuse
>> and unlawful restraint is now facing charges of
>> harassment and cyber stalking!

Read in context, this material suggests that Huon was charged with sexual assault and related

offenses, and then subsequently charged with harassment and cyberstalking, all prior to the Jane

18

Doe incident. It thus creates the impression that he was alleged to have committed sexual assault on two occasions—the first being the incident that prompted the sexual assault charges mentioned in the Madison County Article and Lawyer Gossip Post, and the second being the incident involving Jane Doe. The section also suggests that Huon posed as a promotions supervisor in order to meet women on an occasion prior to his interactions with Jane Doe. Since the section is erroneously presented as chronicling events unconnected to the Jane Doe incident, it is not a "substantially correct account" of an official proceeding and the statements within it are not protected by the fair report privilege. Further, since the statements convey the impression that Huon was charged with sexual assault on a prior occasion and that he posed as a promotions supervisor on a prior occasion, they qualify as defamation *per se*[22] and are not reasonably capable of an innocent construction. *Cf. Solaia Tech.*, 221 Ill. 2d at 593-94, 852 N.E.2d at 846-47 (finding that a statement implying that a civil complaint had accused the plaintiff of committing a crime was not capable of an innocent construction); *Kumaran*, 247 Ill. App. 3d at 227, 617 N.E.2d at 199 (finding that an article that impugned the plaintiff's personal integrity was not capable of an innocent construction).

---

[22] The suggestion that Huon was charged with sexual assault on a prior occasion falls within multiple defamation *per se* categories. *Cf. Solaia Tech.*, 221 Ill. 2d at 592 (finding that a statement implying that the plaintiff had been accused of committing a crime fell "within several of the recognized categories of defamation *per se*"). The suggestion that he posed as a promotions supervisor on a prior occasion falls within the fourth defamation *per se* category, since Illinois courts recognize that attacks related to personal integrity and character can "prejudice" a plaintiff in his profession if he is engaged in a profession that requires a high degree of integrity. *See Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005); *see also Kumaran v. Brotman*, 247 Ill. App. 3d 216, 227, 617 N.E.2d 191, 199 (1993) ("By portraying plaintiff as a swindler, the article could be found to prejudice his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students."); *Green v. Rogers*, 384 Ill. App. 3d 946, 959, 895 N.E.2d 647, 661 (2008) (noting that statements impugning personal integrity can prejudice a lawyer in his profession), *aff'd in part and rev'd in part on other grounds*, 234 Ill. 2d 478, 917 N.E.2d 450 (2009).

Accordingly, Count I survives as to the ATL defendants only with respect to the statements in the section about Googling Huon that imply: (1) that Huon was charged with sexual assault on an occasion prior to the Jane Doe incident, and (2) that he posed as a promotions supervisor in order to meet women on an occasion prior to allegedly posting the ad to which Jane Doe responded (collectively, the "two actionable implications in the ATL Article"). Count I is dismissed with prejudice with respect to all other statements in the ATL Article.

**b.      The Jezebel Article**

Huon alleges that the Jezebel Article is defamatory based on: (1) the original article headline and the image placed directly below it, (2) the article's report of his criminal trial, (3) the article's report of his lawsuit based on the ATL Article, (4) a statement in the article commenting on the ATL Article and Huon's lawsuit, and (5) the hyperlink to the ATL Article placed at the bottom of the article.

The original headline of the Jezebel Article was "Acquitted Rapist Sues Blog For Calling Him Serial Rapist." The image below it contains Huon's arrest photograph superimposed over a screenshot showing the ATL Article's headline ("Rape Potpourri") and first two sentences ("We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together."). Huon alleges that the Jezebel Article's headline and the placement of his arrest photograph near the words "rapist" and "rape" in the headline and screenshot imply that he committed rape. Although it is defamatory *per se* to falsely suggest that a person is a rapist, the challenged items are not actionable as defamation *per se* because they are reasonably capable of an innocent construction. *See generally Tuite*, 224 Ill. 2d at 502, 866 N.E.2d at 121. The headline itself expressly states that Huon was acquitted, and even if one interprets it to imply that, despite the acquittal, Huon is a rapist, it would still not be actionable as defamation *per se*

20

under the innocent construction rule. Under Illinois law, "the innocent construction rule requires a writing 'to be read as a whole.'" *Id.* at 512 (quoting *John v. Tribune Co.*, 24 Ill. 2d 437, 442, 181 N.E.2d 105, 108 (1962)). Therefore, "a headline and the text of the article to which it refers are to be considered as one document and . . . . the 'import of the entire article' must be considered in reaching a determination of reasonable innocent construction." *Harrison*, 341 Ill. App. 3d at 570, 793 N.E.2d at 772 (quoting *Owen v. Carr*, 134 Ill. App. 3d 855, 860, 478 N.E.2d 658, 662 (1985), *aff'd*, 113 Ill. 2d 273, 497 N.E.2d 1145 (1986)). However one might interpret the Jezebel Article headline and accompanying image, the associated article clearly indicates that Huon was acquitted of the charges against him. Indeed, its opening words are "A Chicago man who was acquitted on a sexual assault charge . . . ." Thus, considered in the context of the article as a whole, the headline and image are reasonably capable of an innocent construction and are not actionable as defamation *per se*. *Cf. Salamone v. Hollinger Int'l, Inc.*, 347 Ill. App. 3d 837, 840-41, 807 N.E.2d 1086, 1090-91 (2004) (finding that a headline that implied that the plaintiff was a mobster was reasonably capable of an innocent construction since the text of the article indicated that the plaintiff was only *reputed* to be a mobster); *Antonelli v. Field Enters., Inc.*, 115 Ill. App. 3d 432, 435, 450 N.E.2d 876, 878 (1983) (same); *see also Knafel v. Chi. Sun-Times, Inc.*, 413 F.3d 637, 642 (7th Cir. 2005) (citing *Salamone*, 347 Ill. App. 3d 837, 807 N.E.2d 1086, and *Antonelli*, 115 Ill. App. 3d 432, 450 N.E.2d 876).

Huon's allegations based on the report of his criminal trial in the Jezebel Article likewise cannot support a defamation claim. Huon alleges that the report is defamatory insofar as it suggests that the jury acquitted him partly on the basis of a bartender's testimony. The challenged statement appears at the end of the article's discussion of his trial and reads as follows: "Huon's version was that it was a consensual encounter, and partly on the strength of a

21

bartender's testimony that the woman had been drinking and asked where to go to have fun, the

jury believed him." Huon asserts that the Gawker defendants never spoke to any jurors and

simply invented the idea that the jury relied on the bartender's testimony in reaching its decision.

That is an odd argument given that the bartender's testimony about the victim's drinking and

inquiry about where to go to have fun was almost certainly evidence that *the defense* elicited at

trial; Huon does not explain how a report that credits defense evidence with contributing to a

verdict of acquittal could defame the successful defendant. In any event, regardless of who

elicited the testimony, the statement about the jury's deliberations is not actionable for the simple

reason that it is not defamatory, much less defamatory *per se*. *See Green*, 234 Ill. 2d at 491, 917

N.E.2d at 459 ("A defamatory statement is a statement that harms a person's reputation to the

extent it lowers the person in the eyes of the community or deters the community from

associating with her or him."). The import of the statement is that the jury found reason to

discredit Jane Doe's claims and therefore acquitted Huon of the charges; it thus bolsters rather

than defames his reputation.

      The challenged statements within the report of Huon's lawsuit against the ATL

defendants are also not actionable as defamation. The text relating to Huon's lawsuit reads as

follows:

>       A Chicago man who was acquitted on a sexual assault
> charge is suing the legal blog Above The Law for implying that
> he's a serial rapist. If Meanith Huon gets his way, blogger
> sloppiness may cost ATL $50 million.
>     . . . .
>     . . . His beef with Above The Law stems from a roundup
> post entitled "Rape Potpurri," in which blogger Elie Mystal
> mistakenly believes that news accounts of the same incident are
> different incidents that should have tipped the woman off that
> Huon was a serial offender. "The content of the article were [sic]
> defamatory in that it incorrectly and recklessly portrayed Mr. Huon

as a serial rapist by treating the same complaining witness as three
different women," says the complaint, according to Forbes.

"And this, people, is why God invented Google," wrote
Mystal in the original post, linking to articles that in fact described
the same case. The lesson learned: Google only takes you so far.

Huon argues that the description of his lawsuit suggests that he did not contest any aspects of the
ATL Article other than the implication that he was a serial rapist. In addition, he alleges that the
reference to "blogger sloppiness" minimizes the ATL Article's inaccuracies and bolsters the
suggestion that he only objected to the serial rapist implication. These arguments are unavailing,
however, since the Jezebel Article contains a "fair abridgment" of Huon's initial complaint and
is therefore protected by the fair report privilege.[23] Although Huon later amended his complaint
to add additional allegations about the ATL Article, the initial complaint was premised solely on
the serial rapist implication. *See* Initial Complaint, Dkt. 1. In addition, it asserted that Mystal
omitted relevant information, acted recklessly, and did not read "the original source." *Id.* at 4-5.
Thus, in suggesting that Mystal was sloppy and that Huon only challenged the serial rapist
implication, the Jezebel Article conveys an accurate impression of Huon's initial complaint.

The two remaining components of the Jezebel Article that Huon challenges are also
inadequate to support a defamation claim. Huon alleges that the comment at the end of the report
of his lawsuit ("Google only takes you so far") implies that he has a criminal background that
does not show up in a Google search. But to a reasonable reader, this statement suggests that
Mystal should have performed further investigation when writing the ATL Article rather than
merely relying on Google; it implies that had Mystal done so, he would not have made the
mistake that he did. Contrary to Huon's argument, the observation that Mystal was mistaken, and

---

[23] The Court takes judicial notice of Huon's initial complaint. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) ("We may take judicial notice of documents that are part of the public record, including pleadings, orders, and transcripts from prior proceedings in the case.").

23

Case 1:11-cv-09054    Document #: 216    Filed: 11/04/14    Page 14 of 35    PageID #:2908

would have caught his mistake had he not relied exclusively on Google, suggests that Huon was

*not* involved in any prior similar episodes of sexual misconduct and implies nothing defamatory

about him. Finally, Huon alleges that the hyperlink to the ATL Article placed at the bottom of

the Jezebel Article constitutes a republishing of the allegedly defamatory content in the ATL

Article. As explained above, however, the CDA provides liability protection for hyperlinking to

third-party content in these circumstances. *See Nieman*, 2012 WL 3201931, at *8.

Since none of the statements or suggestions in the Jezebel Article can support a

defamation *per se* claim, Count I is dismissed with prejudice with respect to the Gawker

defendants.

### 2.    Defamation *Per Quod* (Count II)

Huon alleges that some of the statements in the ATL Article and the Jezebel Article,

while not constituting defamation *per se*, nonetheless are defamatory and support a defamation

*per quod* claim. The defendants argue that Huon has not pleaded special damages with the

specificity required by Rule 9(g). As the Seventh Circuit has recently explained:

> [Rule] 9(g), says that special damages must be "specifically
> stated". It can be hard to know how specific is specific enough, but
> "specifically" must be something less than the "particularity"
> standard that Rule 9(b) prescribes for allegations of fraud. We need
> not probe the meaning of "specifically", because it is enough to
> identify a concrete loss.

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), *cert. denied*, 134 S. Ct.

2829 (2014). In *Pippen*, the plaintiff's complaint identified "specific business opportunities that

had been available to him earlier but that, following the defendants' statements, were available

no more," which the Seventh Circuit found sufficiently pleaded special damages. *Id.* at 615; *see*

*also Underground Solutions, Inc. v. Palermo*, No. 13 C 8407, 2014 WL 4703925, at *6 (N.D. Ill.

Sept. 22, 2014) (citing *Pippen*, 734 F.3d at 614) (finding that special damages were sufficiently

pleaded where the complaint quoted emails from specific customers expressing concerns about

using the plaintiff's products after reading the allegedly defamatory reports). In a prior case, the

Seventh Circuit found that special damages were sufficiently pleaded where, "[a]lthough not

naming the particular customers it lost, plaintiff listed specific figures of its gross sales before

and after the publication [of the defamatory letter]." *Continental Nut Co. v. Robert L. Berner

Co.*, 345 F.2d 395, 397 (7th Cir. 1965); *see also Action Repair, Inc. v. Am. Broad. Cos.*, 776 F.2d

143, 150 (7th Cir. 1985) (citing *Continental Nut*, 345 F.2d 395) (finding that the plaintiff's

complaint failed to adequately plead special damages).

Here, the Complaint alleges that the allegedly defamatory statements "caused injury to

Plaintiff's legal practice, business operations and good will," Complaint, Dkt. 162, ¶ 186, that

Huon has "suffered damage to business, trade, profession and occupation," *id.* ¶ 197, and that he

has suffered "pecuniary loss directly from a loss of clients in his legal practice and the loss of

profit from business deals and interactions," *id.* ¶ 204. These allegations are nothing more than

general, conclusory statements of economic loss allegedly resulting from publication of

defamatory comments. In contrast to the plaintiffs in *Pippen*, *Underground Solutions*, and

*Continental Nut*, Huon has not identified—or even suggested the existence of—any specific lost

opportunities or clients, and has not provided any information indicating the relative success of

his legal practice before and after publication of the ATL Article and Jezebel Article. Therefore,

the Court finds that Huon has not pleaded special damages with sufficient specificity. *Cf.

Tamburo v. Calvin*, No. 94 C 5206, 1995 WL 121539, at *9 (N.D. Ill. Mar. 17, 1995) (finding

that the plaintiff's allegations of "lost sales," "a devastating loss of business," and "loss of business reputation," were not specific enough to satisfy the requirements of Rule 9(g)).[24]

In his response to the ATL motion to dismiss, Huon requests leave to replead his defamation *per quod* claim.[25] Given that Huon has had numerous opportunities to amend his pleadings and has been on notice of the potential deficiencies in his defamation *per quod* claim since September 2011 (when the ATL defendants filed a motion to dismiss the Second Amended Complaint and raised the special damages issue), the Court finds that granting leave to replead is not warranted. *Cf. Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012) (affirming the district court's dismissal with prejudice where the plaintiffs had three opportunities to plead their claims, including an opportunity after a motion to dismiss in the case had been fully briefed). Huon has had ample opportunity to buttress his damage allegations but has not done so. Accordingly, Count II is dismissed with prejudice, and Huon can only move forward on his defamation claims with respect to statements that are actionable as defamation *per se*.[26]

---

[24] In his responses to the defendants' motions to dismiss, Huon attempts to buttress his defamation *per quod* claim by alleging that he also suffered a different type of pecuniary loss. He states that after publication of the ATL Article (which reported that he had allegedly claimed to be a talent scout) and the Jezebel Article (which linked to the ATL Article), a woman falsely accused him of posing as a talent scout, and he incurred attorney's fees in defending against the charges. This creative line of reasoning does not save Huon's defamation *per quod* claim, however, since the "talent scout" statement in the ATL Article is not actionable as defamation, as explained in Section B.1. Further, Huon has not plausibly alleged that publication of the ATL Article and Jezebel Article "caused" him to incur the attorney's fees, since he does not allege that the woman in question read the articles.

[25] Huon has not requested leave to replead any of his other claims.

[26] Even if Huon had adequately pleaded special damages, his defamation *per quod* claim would largely fail. Pursuant to the analysis in Section B.1.a, an adequately pleaded defamation *per quod* claim would survive only as to the two implications in the ATL Article that the Court finds to be actionable as defamation *per se*. And pursuant to the analysis in Section B.1.b, an adequately pleaded defamation *per quod* claim might survive as to the original headline of the Jezebel Article and the image placed directly below it, since the Court finds that material to be

26

## C.      False Light Invasion of Privacy (Count III)

Huon alleges that the defendants placed him in a false light by publishing the allegedly defamatory statements in the ATL Article and the Jezebel Article. Three elements are required to state a claim for the tort of false light invasion of privacy under Illinois law. First, the allegations must show that the plaintiff was "'placed in a false light before the public as a result of the defendants' actions.'" *Raveling v. HarperCollins Publishers Inc.*, No. 04-2963, 2005 WL 900232, at *3 (7th Cir. Mar. 4, 2005) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 17, 607 N.E.2d 201, 209 (1992)). Second, the court "'must determine whether a finder of fact could decide that the false light in which the plaintiff was placed would be highly offensive to a reasonable person.'" *Id.* (quoting *Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 419-20, 534 N.E.2d 987, 990 (1989)). Third, the plaintiff must allege "'that the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.'" *Id.* (quoting *Kolegas*, 154 Ill. 2d at 17-18, 607 N.E.2d at 209-10). Although false light is a branch of the tort of invasion of privacy, it is closely related to the tort of defamation, and the same privileges apply to false light and defamation claims. *Sullivan v. Conway*, 157 F.3d 1092, 1098-99 (7th Cir. 1998). Thus, where a false light claim is premised on allegedly defamatory statements that a court finds are not actionable as defamation, the false light claim fails as a matter of law. *See Madison*, 539 F.3d at 659 ("[B]ecause Madison's unsuccessful defamation *per se* claim is the basis of his false-light claim, his false-light invasion of privacy claim fails as well."); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003) ("Muzikowski has not asserted special

---

not actionable as defamation *per se* in light of the innocent construction rule, a rule which does not apply to defamation *per quod* actions and which thus would not preclude a defamation *per quod* claim based on the same material. *See generally Tuite*, 224 Ill. 2d at 501-02.

damages, and so the claim can succeed only on the statements [that are defamatory *per se*]."); *cf.*
*Tuite*, 224 Ill. 2d at 515, 866 N.E.2d at 129.

The Court need only examine Huon's false light claim with respect to the two actionable
implications in the ATL Article, since the Court has determined that the Jezebel Article and the
remainder of the ATL Article are not actionable as either defamation *per se* or *per quod*. The
Court finds that Huon has adequately stated a false light claim on the basis of the two actionable
implications in the ATL Article. Huon has adequately stated a defamation claim based on those
implications, a finder of fact could decide that the implications would be highly offensive to a
reasonable person, and the defendants have not challenged the sufficiency of Huon's allegations
regarding actual malice. Accordingly, Count III is dismissed with prejudice as to the Gawker
defendants, survives as to the ATL defendants with respect to the two actionable implications in
the ATL Article, and is dismissed with prejudice as to the ATL defendants with respect to all
other statements in the ATL Article.

### D.     Intrusion upon Seclusion (Count IV)

Huon alleges that the defendants intentionally and unreasonably intruded into his
seclusion. The Illinois Supreme Court has joined the Illinois appellate courts in expressly
recognizing the tort of intrusion upon seclusion. *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414,
425 (2012). The elements required to state a claim for the tort are: "(1) an unauthorized intrusion
or prying into a plaintiff's seclusion; (2) the intrusion would be 'highly offensive or
objectionable to a reasonable person;' (3) the matters upon which the intrusion occurred were
private; and (4) the intrusion caused anguish and suffering." *Vega v. Chi. Park Dist.*, 958 F.
Supp. 2d 943, 959 (N.D. Ill. 2013) (quoting *Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 71, 813
N.E.2d 1013, 1017 (2004)). "The nature of this tort depends upon some type of highly offensive

prying into the physical boundaries or affairs of another person. The basis of the tort is not publication or publicity. Rather, the core of this tort is the offensive prying into the private domain of another." *Lovgren*, 126 Ill. 2d at 416-17, 534 N.E.2d at 989; *see also Vega*, 958 F. Supp. 2d at 959 (quoting *Lovgren*, 126 Ill. 2d at 417, 534 N.E.2d at 989). "Examples of prying into private matters are opening a person's mail, searching a person's safe or wallet, and reviewing a person's banking information." *Vega*, 958 F. Supp. 2d at 959 (citing *Lawlor*, 983 N.E.2d at 424).

Huon's Complaint is devoid of any factual allegations that the defendants engaged in acts of prying or intrusion. To the contrary, the Complaint alleges that defendants invented "facts," improperly interpreted or relied on various articles that were readily available online, and failed to contact Huon or conduct investigations prior to publishing the ATL Article and the Jezebel Article. Rather than painting a picture of overzealous journalists who pried into Huon's private affairs, the Complaint depicts shoddy journalists who made up information and could not be bothered to do much more than copy and paste or summarize information from other articles easily findable on the internet. As Huon has not alleged any intrusion, which is the first element of this tort, he has failed to adequately plead his intrusion upon seclusion claim.[27] *See Vega*, 958 F. Supp. 2d at 961 ("Aside from peering into the windows of Vega's private residence, none of the other allegations are sufficient to state a plausible claim for intrusion upon seclusion. Accordingly, [the] motion to dismiss . . . is granted for all claims except the claim that the investigators peered into Vega's windows."); *Lovgren*, 126 Ill. 2d at 417, 534 N.E.2d at 989 (finding that the plaintiff had failed to adequately plead the tort of intrusion into seclusion of

---

[27] In light of this ruling, the Court finds it unnecessary to discuss the remaining elements of the tort or to reach the ATL defendants' alternate argument that the fair report privilege precludes Huon's intrusion upon seclusion claim.

another because "the alleged offensive conduct and subsequent harm resulted from the defendants' act of publication, not from an act of prying"). Count IV is therefore dismissed with prejudice as to all defendants.[28]

### E.    Intentional Infliction of Emotional Distress (Count V)

Huon alleges that the defendants' publication of the allegedly defamatory statements in the ATL Article and the Jezebel Article constituted intentional infliction of emotional distress. Under Illinois law, a plaintiff must satisfy three requirements to state a claim for intentional infliction of emotional distress. *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746-47 (7th Cir. 2008) (citing *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)). First, "the conduct involved must be truly extreme and outrageous . . . . [It] must go beyond all bounds of decency and be considered intolerable in a civilized community." *Honaker*, 256 F.3d at 490. Second, "the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress." *Id.* Third, "the conduct must in fact cause severe emotional distress." *Id.* In evaluating whether allegedly defamatory statements constitute "extreme and outrageous" conduct, Illinois courts consider the context of the statements, including whether the defendant improperly used "'a position of power which

---

[28] To the extent that Huon's Complaint can be read as attempting to state a claim for the tort of public disclosure of private facts, it fails for a similar reason: Huon has not identified any statements in the ATL Article or the Jezebel Article that reveal private facts about him. Since "private facts" are "intimate personal facts," matters of public record—including information such as a person's name, address, and age—do not qualify. *Best v. Malec*, No. 09 C 7749, 2010 WL 2364412, at *5 (N.D. Ill. June 11, 2010) (citing *Johnson v. K mart Corp.*, 311 Ill. App. 3d 573, 578-79, 723 N.E.2d 1192, 1196 (2000) and *Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 439, 390 N.E.2d 945, 948 (1979)). As explained above, the challenged portions of the articles consist of statements that are about matters of public record (*e.g.*, Huon's arrests, criminal trial, and lawsuits), statements that are allegedly false (*e.g.*, the two actionable implications in the ATL Article), statements that are not about Huon, and statements that are not factual in nature (*e.g.*, opinions); by definition, none of these items constitute private facts.

30

gives him the ability to adversely affect the plaintiff's interests.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Kolegas*, 154 Ill. 2d at 22, 607 N.E.2d at 212).

Since statements that do not rise to the level of defamation logically cannot rise to the even higher level of "extreme and outrageous conduct," the Court need only examine Huon's intentional infliction of emotional distress claim with respect to the two actionable implications in the ATL Article. *Cf. Flentye v. Kathrein*, 485 F. Supp. 2d 903, 922 (N.D. Ill. 2007) ("Under Illinois law, defamatory statements, if sufficiently extreme and outrageous, can support an IIED claim."); *Huon v. Beatty*, No. 1-09-2234, 2011 WL 9717454, at *1 (Ill. App. Ct. Mar. 25, 2011) ("Because the plaintiff asserts the same allegations from his [unsuccessful] defamation claims as the basis for his claims of IIED, the same allegations cannot constitute extreme and outrageous conduct.").[29] Drawing all reasonable inferences in Huon's favor, Huon has adequately alleged the elements of a claim for intentional infliction of emotional distress based on the implication that he was charged with sexual assault prior to his encounter with Jane Doe. Although the defendants argue that none of the allegedly defamatory statements constitute "extreme and outrageous conduct," Illinois courts have held that making sufficiently egregious defamatory statements can rise to that level in similar contexts.[30] *See, e.g.*, *Kolegas*, 154 Ill. 2d at 20-25, 607 N.E.2d at 211-13 (holding that radio disc jockeys' derogatory statements constituted defamation *per se* and supported a claim for intentional infliction of emotional distress); *see also Flentye*, 485 F. Supp. 2d at 922 (denying a motion to dismiss an intentional infliction of emotional distress claim premised on allegedly defamatory statements that included "assertions of a sexually repugnant nature"). Accordingly, Count V is dismissed with prejudice as to the Gawker

---

[29] This should come as no surprise to Huon, who was also the plaintiff in the *Beatty* case. The conduct on which Huon sued in *Beatty* is unrelated to the events at issue here.

[30] The ATL defendants do not challenge the adequacy of the allegations that the statements were intended to inflict, and in fact caused, severe emotional distress.

31

defendants, survives as to the ATL defendants with respect to the implication in the ATL Article
that Huon was previously charged with sexual assault, and is dismissed with prejudice as to the
ATL defendants with respect to all other statements in the ATL Article.

### F.    Conspiracy (Counts VI and VII)

Huon alleges that the defendants conspired to publish the allegedly defamatory
statements in the ATL Article and the Jezebel Article in order to present him in a false light
(Count VII) and to defame him (Count VI). Under Illinois law, the elements of civil conspiracy
are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some
concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the
furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz
v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). Where a plaintiff successfully
establishes the existence of a conspiracy, co-conspirators may be held jointly liable for actions
by other members of the conspiracy. *See Geinosky*, 675 F.3d at 750. Liability for conspiracy
requires an underlying tort, however; "if a 'plaintiff fails to state an independent cause of action
underlying his conspiracy allegations, the claim for conspiracy also fails.'" *Jones v. City of Chi.*,
No. 08 C 3501, 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011) (quoting *Thomas v. Fuerst*,
345 Ill. App. 3d 929, 936, 803 N.E.2d 619, 626 (2004)). In addition, Illinois courts recognize the
intracorporate conspiracy doctrine, which provides that "because the acts of an agent are
considered to be the acts of the principal, an agent acting within the scope of his employment
cannot conspire with the principal nor with other agents." *Milliman v. McHenry Cnty.*, No. 11 C
50361, 2012 WL 5200092, at *4 (N.D. Ill. Oct. 22, 2012) (citing *Buckner v. Atl. Plant Maint.,
Inc.*, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998)); *see also Frontline Commc'ns, Inc. v.
Comcast Corp.*, No. 12-CV-8527, 2013 WL 4777370, at *3 (N.D. Ill. Sept. 5, 2013) ("Illinois

law is clear that a civil conspiracy does not exist between a corporations' own officers or employees.").

Since conspiracy is not an independent tort, the Court need only consider Huon's conspiracy claims with respect to the two actionable implications in the ATL Article, which the Court has found can support Huon's false light and defamation *per se* claims against the ATL defendants. Because the Gawker defendants are not liable for those claims, and because Huon has not alleged that there was a conspiratorial agreement between the ATL defendants and the Gawker defendants,[31] the Gawker defendants are not liable for the statements in the ATL Article under a conspiracy theory. As to the ATL defendants, since Huon's conspiracy claims based on the ATL Article are premised on an alleged agreement between the individual ATL defendants, all of whom are officers or employees of Breaking Media, the intracorporate conspiracy doctrine bars his conspiracy claims. Counts VI and VII are therefore dismissed with prejudice as to both the ATL defendants and the Gawker defendants.

### G. Tortious Interference with Prospective Economic Advantage (Count VIII)

Huon alleges that the defendants tortiously interfered with his business interests by publishing the ATL Article and the Jezebel Article. To state a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must allege: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from

---

[31] The allegations in the Complaint provide no basis to infer a conspiratorial agreement between the ATL defendants and the Gawker defendants. Moreover, the additional allegations in Huon's responses to the motions to dismiss reveal that he has not premised his conspiracy claims on such an agreement. *See* Response to Gawker Motion to Dismiss, Dkt. 192, at 14; Response to ATL Motion to Dismiss, Dkt. 193, at 29.

33

the defendant's interference." *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01, 751

N.E.2d 1126, 1133-34 (2001) (quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07, 667

N.E.2d 1296, 1299 (1996)) (internal quotation marks omitted). A reasonable expectancy

"requires more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g,*

*Inc. v. Int'l Bus. Machines Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (citing *Anderson*,

172 Ill. 2d at 408, 667 N.E.2d at 1300), *aff'd*, 547 F.3d 882 (7th Cir. 2008); *see also Fredrick v.*

*Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir. 1998) (quoting *Anderson*, 172 Ill. 2d at 408,

667 N.E.2d at 1299).

The Complaint states that Huon "held a reasonable expectation of entering into valid

business relationships, both in his legal practice and in business," and that he had an "expectancy

of entering into valid business relationships with members of the public including, but not

limited to, his retention as an attorney." Complaint, Dkt. 162, ¶¶ 258, 259. The Complaint also

alleges that Huon has suffered "a decline in prospective business" and "remains concerned that

individuals and organizations including prospective legal clients will choose not to utilize his

services." *Id.* ¶ 160, 164. These conclusory statements, which are unsupported by any facts other

than the assertion that Huon is a licensed attorney, are insufficient to allege that Huon had a

reasonable business expectancy. *See Del Monte Fresh Produce, N.A., Inc. v. Kinnavy*, No. 07 C

5902, 2010 WL 1172565, at *6 (N.D. Ill. Mar. 22, 2010) ("*Twombly* does require that Kinnavy

set forth facts that make it plausible that she had a reasonable expectancy . . . ."). At best the

statements establish, when read in the light most favorable to the plaintiff, that Huon *hoped* to

obtain legal clients or enter into other business relationships.[32] As Huon has thus failed to

---

[32] That Huon was facing criminal charges until December 2011 further undermines the
plausibility of his claim to have had reasonable business expectancies when the ATL Article and
Jezebel Article were published.

34

adequately allege a reasonable business expectancy, *see Bus. Sys. Eng'g*, 520 F. Supp. 2d at

1022, it is unnecessary to consider whether he has satisfied any of the other elements of a

tortious interference claim. *See Fredrick*, 144 F.3d at 503 (affirming dismissal of a tortious

interference claim where the plaintiff "failed to allege any reasonable expectation of a business

relationship" and instead alleged "merely that he wished to continue working as a commercial

pilot"); *Pulliam v. Am. Express Travel Related Servs. Co.*, No. 08 C 6690, 2009 WL 1586012, at

*6 (N.D. Ill. June 4, 2009) (dismissing a tortious interference claim where the plaintiff failed to

allege facts sufficient to support a reasonable business expectancy); *Emery v. Ne. Ill. Reg'l

Commuter R.R. Corp.*, No. 02 C 9303, 2003 WL 22176077, at *10 (N.D. Ill. Sept. 18, 2003)

(dismissing a tortious interference claim where the plaintiff alleged "no more than the mere hope

[of obtaining] concrete opportunities"). Accordingly, Count VIII is dismissed with prejudice as

to all defendants.

### H.     Cyberstalking and Cyberbullying (Count IX)

Huon alleges that the defendants violated the Illinois cyberstalking statute, 720 ILCS

5/12-7.5, and asks the Court to create a private cause of action for cyberstalking. Illinois courts

apply a four-factor test to determine whether to imply a private right of action from a statute:

> Implication of a private right of action is appropriate if: (1) the
> plaintiff is a member of the class for whose benefit the statute was
> enacted; (2) the plaintiff's injury is one the statute was designed to
> prevent; (3) a private right of action is consistent with the
> underlying purpose of the statute; and (4) implying a private right
> of action is necessary to provide an adequate remedy for violations
> of the statute.

*Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 460, 722 N.E.2d 1115, 1117-18 (1999).

With respect to the fourth factor, a private right of action is generally implied "only in cases

where the statute would be ineffective, as a practical matter, unless a private right of action were

implied." *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 395, 718 N.E.2d 181, 186

(1999). Since no Illinois court has addressed the question of whether there is an implied private

right of action under the cyberstalking statute, this Court must predict how the Illinois Supreme

Court would decide the issue. *See Iowa Physicians' Clinic Med. Found. v. Physicians Ins. Co. of

Wisconsin*, 547 F.3d 810, 813 (7th Cir. 2008). The Court is mindful, however, of the Seventh

Circuit's admonishment that federal courts sitting in diversity should be cautious in expanding

state law beyond the boundaries established in that state's courts. *See King v. Damiron Corp.*,

113 F.3d 93, 97 (7th Cir. 1997); *see also Markos v. Chicago Park Dist.*, No. 01 C 5544, 2002

WL 1008459, at *8 (N.D. Ill. May 13, 2002) (citing *King*, 113 F.3d at 97) (finding that an

Illinois statute did not imply a private right of action).

Assuming without deciding that the first three factors of the *Fisher* test are met in this

situation, the Court declines to imply a private right of action because doing so is not necessary

to provide an adequate remedy for violations of the cyberstalking statute. The statute already

provides a stiff penalty by categorizing cyberstalking as a Class 4 felony, *see* 720 ILCS 5/12-

7.5(b), which is punishable by between one and three years of imprisonment, 730 ILCS 5/5-4.5-

45; *see also People v. Sucic*, 401 Ill. App. 3d 492, 494, 928 N.E.2d 1231, 1234 (2010) (affirming

defendant's conviction and three-year sentence for violating the Illinois cyberstalking statute). In

addition, and as Huon's Complaint makes evident, a variety of tort remedies are potentially

available to individuals who allege that they are victims of cyberstalking. Huon offers no

argument that the combination of potential criminal prosecution and other civil causes of action

provides inadequate remedies to victims of cyberstalking; in view of these remedies, the Court

concludes that a private right of action under the statute is unnecessary and so declines to imply

one.[33] *Cf. Metzger v. DaRosa*, 209 Ill. 2d 30, 42, 805 N.E.2d 1165, 1171 (2004) ("We cannot say that the statutory framework . . . is so deficient that it is necessary to imply a private right of action . . . to effectuate its purpose."); *Lane v. Fabert*, 178 Ill. App. 3d 698, 702-03, 533 N.E.2d 546, 549 (1989) (declining to imply a private right of action where the statute at issue imposed a "substantial" fine and where the complaint demonstrated that "a wide array of remedies" was available to a plaintiff in such a situation). Accordingly, Huon cannot prevail on his cyberstalking claim and Count IX is dismissed with prejudice as to all defendants.

\* \* \*

For the reasons stated above, the Gawker defendants' motion to dismiss [174] is granted and the ATL defendants' motion to dismiss [178] is granted in part and denied in part. All of Huon's claims against the Gawker defendants are dismissed with prejudice. Huon's claims against the ATL defendants in Counts II, IV, VI, VII, VIII, and IX are dismissed in their entirety with prejudice. Huon's claims against the ATL defendants in Counts I and III survive only with respect to the two actionable implications in the ATL Article. Huon's claims against the ATL defendants in Count V survive only with respect to the implication in the ATL Article that he was charged with sexual assault prior to his encounter with Jane Doe. Huon's claims against the ATL defendants in Counts I, III, and V are dismissed with prejudice in all other respects.

Date: December 4, 2014

John J. Tharp, Jr.
United States District Judge

---

[33] In light of this ruling, the Court finds it unnecessary to reach the additional argument raised by the ATL defendants that the cyberstalking statute does not apply to the activity at issue.

37

# **EXHIBIT G**

Debtors' Memorandum in Support of Gawker Defendants' Motion to Dismiss Mr. Huon's
Complaint

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| MEANITH HUON, | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| -against- | ) | 1:11-CV-3054 (JJT) |
| | ) | |
| GAWKER MEDIA LLC,  et at. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**<u>MEMORANDUM IN SUPPORT OF GAWKER DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FOURTH AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... i

INTRODUCTION ...........................................................................................1

THE PARTIES................................................................................................2

STATEMENT OF FACTS .................................................................................3

ARGUMENT ..................................................................................................4

      I. IT IS PLAINTIFF'S BURDEN TO PLEAD A VALID CLAIM .........................4

      II. PLAINTIFF'S FALSE LIGHT AND DEFAMATION CLAIMS ARE
          INSUFFICIENT AS A MATTER OF LAW ........................................5

          A. The Post Provides a Fair Report of Judicial Proceedings ...........................6
          B. The Remaining Statements at Issue are Protected Opinion ........................7
          C. The Allegedly Defamatory Statements Caused No Actionable Harm to
             Plaintiff's Reputation ......................................................................8
          D. Plaintiff is Suing Over Information He Wishes Were Included in the
             Post Rather Than What was Actually There................................9

      III. PLAINTIFF HAS NOT SUFFICIENTLY ALLEGED INTENTIONAL
           INFLICTION OF EMOTIONAL DISTRESS..................................10

      IV. PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY .................11

      V. "CYBERSTALKING" IS NOT A CIVIL CAUSE OF ACTION .....................13

      VI. SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS
          ANY CLAIMS AGAINST DEFENDANTS FOR READERS'
          COMMENTS ................................................................................13

      VII. PLAINTIFF'S CLAIMS AGAINST NICK DENTON AND GABY
           DARBYSHIRE MUST BE DISMISSED.......................................15

CONCLUSION..............................................................................................16

CERTIFICATE OF SERVICE ..........................................................................18

EXHIBITS A – E ...........................................................................................19

Case: 1:11-cv-09308 Document #: 44-11 Filed: 03/25/16 Page 3 of 40 PageID #:1497

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) .................................................................................4, 5, 12, 13

*Barrett v. Rosenthal*,
40 Cal. 4th 33, 62 (Cal. 2006) .......................................................................................15

*Batzel v. Smith*,
333 F.3d 1018, 1032 (2003) ...........................................................................................15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 570 (2007) ..............................................................................5, 10, 12, 13

*Ben Ezra, Weinstein, and Co., Inc. v. Am. Online Inc.*,
206 F.3d 980, 986 (10th Cir. 2000) ................................................................................15

*Carafano v. Metrosplash.com Inc.*,
339 F.3d 1119, 1123-25 (9th Cir. 2003) ........................................................................15

*Chi. Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666, 671 (7th Cir. 2008) ..................................................................................14

*Dimeo v. Max*,
248 Fed. App'x. 280, 282 (3rd Cir. 2007) ......................................................................14

*Donato v. Moldow*,
374 N.J. Super. 475, 487-88 (App. Div. 2005) ...............................................................15

*Fritz v. Johnson*,
807 N.E.2d 461, 470 (Ill. 2004) .....................................................................................11

*Gist v. Macon County Sheriff's Dep't*,
284 Ill. App. 3d 367, 371, 671 N.E.2d 1154, 1157 (Ill. App. Ct. 4th Dist. 1996) .............9

*Green v. Chicago Tribune Co.*,
286 Ill. App. 3d 1, 11 (Ill. App. Ct. 1st Dist. 1996) ........................................................10

*Haynes v. Alfred A. Knopf, Inc.*,
8 F.3d 1222, 1228 (7th Cir. 1993) ..............................................................................9, 11

*Henson v. CSC Credit Servs.*,
29 F.3d 280, 284 (7th Cir. 1994) .....................................................................................8

i

*Herron v. King Broadcasting Co.,*
    776 P.2d 98, 102 (Wash. 1989)........................................................................9

*Horowitz v. Baker,*
    168 Ill. App. 3d 603 (Ill. App. Ct. 3d Dist. 1988)............................................7

*Hurst v. Capital Cities Media, Inc.,*
    323 Ill. App. 3d 812, 823 (Ill. App. Ct. 5th Dist. 2001) ................................12

*Naeem v. McKesson Drug Co.,*
    444 F.3d 593, 605 (7th Cir. 2006) ................................................................10

*O'Donnell v. Field Enters., Inc.,*
    145 Ill. App. 3d 1032, 1036 (Ill. App. Ct. 1st Dist. 1986)...........................6, 7

*Parker v. House O'Lite Corp.,*
    324 Ill. App. 3d 1014, 1020 (Ill. App. Ct. 1st Dist. 2001)...............................5

*Pension Benefit Guar. Corp. v. White Consolidated Indus.,*
    998 F.2d 1192, 1196-1197 (3rd Cir.1993); 5B Charles A. Wright & Arthur R. Miller,
    *Fed. Practice & Procedure* § 1357 (3d ed. current through Sept. 2012) ....................................8

*Ray v. City of Chicago,*
    629 F.3d 660, 665 (7th Cir. 2011) ..................................................................7

*Reuter v. MasterCard Int'l, Inc.,*
    397 Ill. App. 3d 915, 928 (Ill. App. Ct. 5th Dist. 2010) ..........................11, 12

*Salamone v. Hollinger Int'l, Inc.,*
    347 Ill. App. 3d 837 .......................................................................................11

*Shiamili v. Real Estate Group of New York, Inc.,*
    892 N.Y.S.2d 52, 54 (N.Y. App. Div. 2009) ..................................................14

*Solaia Tech., LLC v. Specialty Publ. Co.,*
    221 Ill. 2d 558, 585 (Ill. 2006)........................................................................6

*Thermodyne Food Serv. Prods. V. McDonald's Corp.,*
    940 F.Supp. 1300, 1310 (N.D. Ill. 1996) ......................................................12

*United States v. Hope,*
    906 F.2d 254, 260 (7th Cir. 1990) ..................................................................7

*United States v. Wood,*
    925 F.2d 1580, 1582 (7th Cir.1991) ...............................................................8

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
    987 F.2d 429, 431 (7th Cir. 1993) ..................................................................7

**STATUTES**

Fed. R. Civ. Pro. 12(b)(6) ....................................................................................1

720 ILCS 5/12-7.5(b) ..........................................................................................13

Fed. R. Civ Pro. Rule 11 .....................................................................................13

47 U.S.C. § 230(c)(1) ..........................................................................................14

47 U.S.C. § 230(e)(3) ..........................................................................................14

Section 230, Communications Decency Act ........................................................14

805 ILCS 180/10-10(a) ........................................................................................16

**OTHER**

5B Charles A. Wright & Arthur R. Miller, *Fed. Practice & Procedure* § 1357
    (3d ed. current through Sept. 2012) ...........................................................5, 8

iii

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| MEANITH HUON, | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| -against- | ) | 1:11-CV-3054 (JJT) |
| | ) | |
| GAWKER MEDIA LLC,  et at. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S  FOURTH AMENDED COMPLAINT</u>

**NOW COME THE DEFENDANTS**, Gawker Media a/k/a Gawker.com, Jezebel.com, Nick Denton, Irin Carmon, and Gaby Darbyshire (collectively, "Gawker," or "Defendants"), by their attorneys, David Feige and Oren Giskan of Giskan Solotaroff Anderson & Stewart LLP, and move this court to dismiss plaintiff's complaint pursuant to Fed. R. Civ. Pro. 12(b)(6).

### PRELIMINARY STATEMENT

In his fourth amended complaint, Meanith Huon ("Plaintiff") seeks to bring an action against the Defendants for a kitchen sink of tortious conduct including intentional infliction of emotional distress, defamation *per quod*, defamation *per se*, false light, invasion of privacy, cyberstalking, cyberbullying, tortious interference, and civil conspiracy.  All of plaintiff's claims arise out of an eleven sentence item posted on a website (Jezebel.com) which reported on a separate defamation suit Plaintiff filed against co-defendant AbovetheLaw.com.  In the initial suit (now consolidated with the instant

matter) Plaintiff sued AbovetheLaw.com for reporting on a rape Plantiff had been

charged with.[1]  To date Mr. Huon has filed suit against more than 500 government, media

and "John Doe" defendants seeking damanges exceeding a quarter of a billion dollars.

To put this in perspective, Mr. Huon believes himself entitled to greater compensation

than has been paid collectively to every American inmate ever exonerated after being

wrongly convicted of a crime.

### THE PARTIES

**PLAINTIFF Meanith Huon** is an Illinois attorney, serial plaintiff[2], and former

criminal defendant who has filed multiple lawsuits against news organizations that have

reported on the criminal allegations filed against him. According to a criminal complaint

filed against him, in July 2008, Plaintiff was arrested after he forced a woman to have

oral sex with him, fondled her vaginal area and her breasts and refused to let her out of

the car while driving in Madison County.  (Exhibit A)  The woman was allegedly lured

over the Internet by the possibility of a job, telling authorities that she talked to Huon by

telephone and got the impression that the job was promoting alcohol sales in area taverns.

She and Huon met in downtown St. Louis, and he offered to drive her to a local saloon to

check out how the business was going. Instead of going to the tavern, Mr. Huon allegedly

sexually abused and assaulted her. According to the account of Capt. Brad Wells of the

Madison County Sheriff's Department, the woman eventually jumped out of the car and

contacted police. (Exhibit B).

---

[1] The rape charges reported on by the ATL defendants concern the incident in Madison County <u>not</u>  the
criminal charges brought against Plaintiff in Chicago.

[2] Plaintiff's history of using defamation lawsuits precedes the instant matter, having already had a
defamation case dismissed.  In that case Mr. Huon claimed partners at his law firm defamed him when they
decided to fire him after his associate review.  After years of litgation, the circuit court's dismissal of
Plaintiff's claims was upheld by the Illinois Appellate Divison on March 25th 2011.

2

Subsequent to his arrest on the sexual assault charges, Plaintiff was arrested again, this time for using the internet to harass and cyberstalk the alleged victim in the first case. (Exhibit C).  In this second case he was accused of contacting his alleged victim via the Internet and communicating indirectly with her in such a way as to cause her emotional distress, as well as maintaining an Internet Web page or Web site to harass the victim or an immediate family member.

After Plaintiff was acquitted of the 2008 sexual assault charges, he began a campaign of lawsuits, suing, to date, over 500 government, media and "john doe" defendants who had in some way reported on or been involved in his case.   These suits now include the instant Gawker Defendants whose allegedly tortious conduct seems to stem from reporting on these lawsuits and linking to an article plaintiff found offensive. Subsequent to filing the raft of suits, including the instant suit, Plaintiff, was arrested again, this time charged with posing as "Nick Kew" a casting agent for the William Morris, and thereafter committing four counts of battery involving the fondling of the breasts and vaginal area of a different complainant. (Exhibit D).

**DEFENDANT** Gawker Media a/k/a Gawker.com operates news and information websites which report on a wide variety of topics including media and politics.  Among the websites operated by Defendant Gawker Media are defendant Gawker.com and defendant Jezebel.com.  Defendant Nick Denton, is the founder of Gawker Media, and Defendant Gaby Darbyshire is the Chief Operating Officer of Gawker Media.  Defendant Irin Carmon is a reporter for Jezebel.com.

**STATEMENT OF FACTS**

3

Case: 1:11-cv-00649   Document #: 73-16 Filed: 03/01/13 Page 3 of 24 PageID #:249

On or about May 6, 2010, the website abovethelaw.com published a story concerning rape charges then pending against Plaintiff.  Plaintiff subsequently filed suit against abovethelaw.com for fifty million dollars ($50,000,000.00) for what plaintiff believed were tortious inaccuracies in the abovethelaw.com article. Upon plaintiff's acquittal of the rape charges against him, plaintiff also sued Madison County, Illinois, and numerous other defendants for a combined one hundred and thirty million dollars ($130,000,000.00) for a number of torts related to his arrest.   On or about May 11, 2011, defendant Jezebel.com published a brief eleven sentence item concerning Plaintiff's lawsuit against Abovethelaw.com, which included a hyperlink to the abovethelaw.com article.   Plaintiff then sued the instant Defendants.

Plaintiff now seeks One Hundred Million Dollars ($100,000,000.00) injunctive relief, the transfer of Defendants' domain names, as well as an injunction preventing any future party from relying on Defendants' article as a source, and costs.

## ARGUMENT

In his complaint, plaintiff lists many things that bother him, and dozens of facts he wishes someone would report on.  What he fails to do, however is actually state a cause of action against the Gawker Defendants for what *was* published.  Nothing in the eleven sentence item posted on Jezebel.com is actionable under any of the legal theories plaintiff advances.  For this reason, his complaint should be dismissed.

## I.    IT IS PLAINTIFF'S BURDEN TO PLEAD A VALID CLAIM

A motion to dismiss should be granted where, as here, Plaintiff pleads no facts that allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff's factual

allegations must demonstrate the existence of claims that are plausible on their face, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and she must show "more than a sheer possibility that [defendants have] acted unlawfully." *Iqbal*, 556 U.S. at 678. While Plaintiff's at this stage are often accorded some deference, Professors Wright and Miller have explained that:

> [o]ver the years, one significant exception to the general rule that the complaint will be construed liberally on a Rule 12(b)(6) motion has been employed by a number of federal courts. When the claim alleged is a traditionally disfavored "cause of action," such as malicious prosecution, libel, or slander, the courts have tended to construe the complaint by a somewhat stricter standard and have been more inclined to grant a Rule 12(b)(6) motion to dismiss.

5B Charles A. Wright & Arthur R. Miller, *Fed. Practice & Procedure* § 1357 (3d ed. current through Sept. 2012).

Here, plaintiff's claims against Gawker should all be dismissed because it is apparent from the face of his Fourth Amended Complaint that he has not, and cannot, state a claim upon which any relief can be granted.

## II.  PLAINTIFF'S FALSE LIGHT AND DEFAMATION CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW

None of Plaintiff's allegations concerning the post supports a claim for defamation or false light since the statements that Plaintiff identifies would not "tend[ ] to cause such harm to [Plaintiff's] reputation . . . that it lowers [Plaintiff] in the eyes of the community or deters third persons from associating with him." Parker v. House O'Lite Corp., 324 Ill. App. 3d 1014, 1020 (Ill. App. Ct. 1st Dist. 2001).  Indeed, every sentence is immunized as a fair report, innocuous because it can be innocently construed, or is simply non-actionable opinion.  Though Gawker will address Plaintiff's allegations here,

a simple chart (attached hereto as Exhibit E), goes through every statement in the post,

indicating which of these many defenses applies.

### A. The Post Provides a Fair Report of Judicial Proceedings

The information in the Post that Plaintiff claims is defamatory and casts him in a

false light is immunized from liability by the First Amendment as a fair and accurate

report of his arrest, trial and his lawsuit against instant co-defendants.  Indeed, as the

chart attached hereto as Defendants' Exhibit E will clearly demonstrate*, every single*

*sentence, and every single allegation in Defendants' Post is immunized under this rule*.

The Accurate reports of court proceedings are privileged against liability by the First

Amendment, even if the information stated in those proceedings is otherwise false or

defamatory. O'Donnell v. Field Enters., Inc., 145 Ill. App. 3d 1032, 1036 (Ill. App. Ct.

1st Dist. 1986). "The fair report privilege . . . promotes our system of self-governance by

serving the public's interest in official proceedings, including judicial proceedings."

Solaia Tech., LLC v. Specialty Publ. Co., 221 Ill. 2d 558, 585 (Ill. 2006). "If the news

media cannot report what it sees and hears at governmental and public proceedings

merely because it believes or knows that the information is false, then self-censorship by

the news media would result." O'Donnell, 145 Ill. App. 3d at 1036. Thus, "the fair report

privilege overcomes allegations of either common law or actual malice." Solaia, 221 Ill.

2d at 587. A report need not be a "complete report of the proceedings" to be privileged

"so long as it is a fair abridgment" or "substantially correct account" of the proceedings.

Id. at 589 (quoting Restatement (Second) of Torts § 611, cmt. f, at 300 (1977));

O'Donnell, 145 Ill. App. 3d at 1036.

6

To evaluate the fair report privilege, the Court may take judicial notice of the

transcript of the first day of Plaintiff's trial, which is attached to co-defendants

Abovethelaw.com's motion and are incorporated by reference here.  The court may also

take judicial notice of Plaintiff's initial complaint and subsequent proceedings in the

instant matter, as well as the certified copies of Plaintiff's arrests, attached hereto.  See

Ray v. City of Chicago, 629 F.3d 660, 665 (7th Cir. 2011) ("[D]istrict courts may take

judicial notice of certain documents—including records of administrative actions—when

deciding motions to dismiss."); Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987

F.2d 429, 431 (7th Cir.1993) ("Documents that a defendant attaches to a motion to

dismiss are considered part of the pleadings if they are referred to in the plaintiff's

complaint and are central to her claim."); United States v. Hope, 906 F.2d 254, 260 (7th

Cir. 1990) (taking judicial notice of state court hearing transcript).  The Jezebel item is a

fair and accurate summary of statements in those documents, as Exhibit E demonstrates.

## B.   The Remaining Statements at Issue are Protected Opinion

As  Exhibit E makes clear, every other statement at issue in the Jezebel item is either non-

actionable, or protected opinion. Only statements of fact, not opinion, are actionable as

defamation or false light; "[t]here is no such thing as a false idea or opinion." O'Donnell,

145 Ill. App. 3d at 1039-40 (affirming dismissal of defamation claim based on editorial

concerning criminal investigations and arrests because "it is clear that the ideas and

opinions in the item do not imply undisclosed defamatory facts as their bases" and "[t]o

the extent that the editorial makes disclosed factual statements, the statements are

privileged" under the fair report privilege.); see, e.g., Horowitz v. Baker, 168 Ill. App. 3d

603 (Ill. App. Ct. 3d Dist. 1988) (affirming dismissal of a defamation claim, holding that

7

statements in a newspaper article describing a previously-reported transaction as a "cozy little deal" and a "rip off" were "rhetorical hyperbole" and "an average reader would not regard the statements as factual reporting"). All of the statements that Plaintiff claims are defamatory fall into this category – and thus are protected.

### C. The Allegedly Defamatory Statements Caused No Actionable Harm to Plaintiff's Reputation

Plaintiff has stated no claim for defamation as a matter of law for the still further reason that, under the "incremental harm" doctrine, an allegedly false statement that causes only incremental damage to reputation is insufficient to state a claim for defamation. This court may take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment. *Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir. 1994); United States v. Wood, 925 F.2d 1580, 1582 (7th Cir.1991). ("On a motion to dismiss, we may take judicial notice of matters of public record outside the pleadings.") (citations omitted) Pension Benefit Guar. Corp. v. White Consolidated Indus., 998 F.2d 1192, 1196-1197 (3rd Cir.1993); 5B Charles A. Wright & Arthur R. Miller, *Fed. Practice & Procedure* § 1357 (3d ed. current through Sept. 2012). ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record ... also may be taken into account." Thus, in evaluating whether anything contained in the Gawker Defendants' brief item was capable of causing any further damage to Plaintiff's reputation, the court can take judicial notice of the fact that prior to the publication of Defendants' article, Plaintiff had been criminally charged with four counts of criminal sexual abuse, one count of unlawful restraint, one count of harassment of a witness, and one count of cyberstalking. The allegations were widely reported in Madison County and

on the internet.  In addition, the court can take judicial notice of the fact that Plaintiff was

subsequently arrested and criminally charged with posing as "Nick Kew" a casting agent

for the William Morris agency, and thereafter committing four counts of battery for

fondling the breasts and vaginal region of a woman he met over the internet.

The doctrine of incremental harm is "logically driven, as 'falsehoods which do no

incremental damage to the plaintiff's reputation do not injure the only interest that the

law of defamation protects.'" Gist v. Macon County Sheriff's Dep't, 284 Ill. App. 3d 367,

371, 671 N.E.2d 1154, 1157 (Ill. App. Ct. 4th Dist. 1996) (quoting Haynes v. Alfred A.

Knopf, Inc., 8 F.3d 1222, 1228 (7th Cir. 1993). "Falsehoods that do not harm the

plaintiff's reputation more than a full recital of the true facts about him would do are . . .

not actionable." Haynes, 8 F.3d at 1228. A publication "that contains a false statement is

actionable only when 'significantly greater opprobrium' results from the report

containing the falsehood than would result from the report without the falsehood." Id.

(quoting Herron v. King Broadcasting Co., 776 P.2d 98, 102 (Wash. 1989).  As a matter

of law, even based solely on what the court may consider in a 12(b)(6) motion, there was

nothing in Defendants' brief item that could have brought greater opprobrium upon

plaintiff, than his situation and status had already assumed.

### D.  Plaintiff is Suing Over Information He Wishes Were Included in the Post Rather Than What was Actually There

Plaintiff has also sued over a number of items, whose *absence* from Gawker's

eleven sentence item, in Plaintiff's mind constitutes defamation.  See FASC. ¶ 148(a)-(p)

(e.g. Plaintiff insists the post should have included a statement that the alleged victim

"sustained minor injuries from walking or running in a cornfield.").  While these items

are addressed in the chart attached, it is worth mentioning that there is nothing in the law

that supports Plaintiff's theory of recovery concerning omitted items.

### III.     PLAINTIFF HAS NOT SUFFICIENTLY ALLEGED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To state a claim for intentional infliction of emotional distress, Plaintiff must show

that first, Defendants' conduct was extreme and outrageous, going beyond all possible

bounds of decency; second, that Defendants intended to inflict severe emotional distress

or knew that there was a high probability that their conduct would inflict severe

emotional distress; and third, that Defendants' conduct did cause severe emotional

distress.  Naeem v. McKesson Drug Co., 444 F.3d 593, 605 (7th Cir. 2006); Green v.

Chicago Tribune Co., 286 Ill. App. 3d 1, 11 (Ill. App. Ct. 1st Dist. 1996).

Here, too, Plaintiff's claim must fail.  First, Plaintiff alleges no facts or

circumstances to suggest that Defendants' behavior is extreme or outrageous; instead,

Defendant states mere conclusions that fail to meet the required pleading standard.  See.

Twombly, 550 U.S. at 555. Moreover, nothing in Defendants' behavior was extreme or

outrageous, going beyond all possible bounds of human decency.  Writing and posting an

eleven sentence item about Plaintiff's lawsuit is well within the realm of Defendants' job

as journalists and publishers, and is nowhere near the level of extreme and outrageous

behavior required to state a claim for intentional infliction of emotional distress.  Second,

Plaintiff again fails to allege non-speculative facts to show that Defendants intended to or

knew that there was a high probability that their conduct would inflict severe emotional

distress.  Third, Plaintiff makes no showing anywhere in his complaint that he has

suffered any actual damages.  Plaintiff asserts that he has suffered damages "including a

decline in prospective business, loss of job or economic opportunities, loss of clients and

business deals. (FASC ¶164) and that the article has "negatively affected Plaintiff's

personal relationships and have caused him to   experience shame, severe emotional

distress, loss of social status, esteem, and impairment of normal social functioning." *Id.*

But in place of specifics, Plaintiff then concedes that "Plaintiff's damages including both

economic and personal injury damages are unknown at this time and have not yet been

fully realized" (*Id. at* ¶165).  Assertions such as those here that do not rise above the

level of speculation are not sufficient to state a claim for which relief can be granted.

Twombly 550 U.S. at 555; see also Salamone v. Hollinger Int'l, Inc., 347 Ill. App. 3d 837

(finding as insufficient assertions that members of the Plaintiff's community ceased

associating with him, repeat customers ceased patronizing his grocery store, and that he

suffered jokes and ridicule from his community, sleeplessness, depression, and weight

loss).  A failure to prove special damages is, in itself, fatal to a defamation claim.  See

Haynes v. Alfred A. Knopf*, Inc.*, 8 F.3d 1222, 1226 (7th Cir. 1993).[3]

## IV.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY

To state a claim for civil conspiracy, Plaintiff must prove: (1) an agreement

between a combination of two or more persons to accomplish by concerted action either

an unlawful purpose or a lawful purpose by unlawful means, (2) in the furtherance of

which one of the conspirators committed an overt tortious or unlawful act.  Fritz v.

Johnson, 807 N.E.2d 461, 470 (Ill. 2004); Reuter v. MasterCard Int'l, Inc., 397 Ill. App.

3d 915, 928 (Ill. App. Ct. 5th Dist. 2010).  Moreover, Plaintiff must allege an injury

caused by Defendants.  Reuter v. MasterCard Int'l, Inc., 397 Ill. App. 3d 915, 927 (Ill.

---

[3] It is worth noting that any damage to Plaintiff's reputation alleged caused by an eleven sentence item
which reported on a lawsuit Plaintiff filed against Abovethelaw.com must be considered in the context of
Plaintiff's extent reputation in the wake of his publicized arrest in connection with allegations of rape,
witness tampering, and cyberstalking.

App. Ct. 2010).  Finally, "a conspiracy claim alleging a tort as the underlying wrongful

act is duplicative where the underlying tort has been pled," <u>Thermodyne Food Serv.</u>

<u>Prods. V. McDonald's Corp.</u>, 940 F.Supp. 1300, 1310 (N.D. Ill. 1996), because allowing

a separate claim for civil conspiracy would lead to double damages.  <u>Id.</u> First, Plaintiff

has not made any showing of fact suggesting that any Gawker Defendant has made any

agreement with any other defendant listed.  <u>See Twombly</u>, 550 U.S. at 555.  In <u>Reuter v.</u>

<u>MasterCard Int'l, Inc.</u>, 397 Ill. App. 3d 915, 928 (Ill. App. Ct. 5th Dist. 2010), the court

held that while the plaintiff alleged sufficient facts to demonstrate knowledge of illegal

acts, the plaintiff failed to allege sufficient facts to demonstrate an agreement.  Here,

Plaintiff falls far short of alleging sufficient facts to demonstrate that any Gawker

Defendant had any knowledge of any illegal facts, much less that there was any

agreement whatsoever.

　　　　Second, even if a Gawker defendant had made an agreement with any other

defendant, the second factor must fail because Plaintiff fails to allege sufficiently that any

of the defendants committed any overt tortious or unlawful act, in furtherance of an

alleged conspiracy beyond their own publications. As the court observed in <u>Hurst v.</u>

<u>Capital Cities Media, Inc.</u>, 323 Ill. App. 3d 812, 823 (Ill. App. Ct. 5th Dist. 2001)

"Conspiracy is not a separate and distinct tort in Illinois. . . . There is no cause of action

unless an overt, tortious, or unlawful act is done that, in absence of the conspiracy, would

give rise to a claim for relief."  In addition, the allegations of this count are so vague as to

fail to state a claim under <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and

<u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (U.S. 2009). "A pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'

Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 555, 557).

## V. "CYBERSTALKING" IS NOT A CIVIL CAUSE OF ACTION

Plaintiff's complaint confuses something most law students understand by the time they receive their first year course schedules—civil and criminal laws are different. The fact that there is a criminal statute on the books does not, in itself create a civil private right of action nor does it imply that a claim will sound in tort. While it is understandable that Plaintiff is familiar with the "cyberstalking" statute (he has, after all been criminally charged with violating it), invoking it here is unavailing. Either Plaintiff is actually confused as to his power to prosecute on behalf of the State of Illinois—a curious state of affairs given Plaintiff's law degree and history--or these counts are merely a continuation of the legal harassment typical of the rest of Plaintiff's pleading. According to the Illinois statute he himself cites, cyberstalking is solely criminal, and there is no associated civil right of action. 720 ILCS 5/12-7.5(b) ("Cyberstalking is a Class 4 felony; a second or subsequent conviction is a Class 3 felony."). There is no good faith in such a pleading, and this count runs so far afield as to qualify as fully frivolous under Fed. R. Civ Pro. Rule 11.

## VI. SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS ANY CLAIMS AGAINST DEFENDANTS FOR READERS' COMMENTS

It appears that in this--his Fourth Amended and Supplemental Complaint (FASC), Plaintiff has dropped the 400 John Doe defendants, he had previously filed against, preferring to try to hold the Gawker Defendants liable for comments posted by others. As shown in Defendants' Exhibit E, most of Plaintiff's allegations against the Gawker

defendants concern information or statements contained in comments, or posts other than

the actual Jezebel.com item. (See FASC ¶ 122 A-L)

Section 230 of the Communications Decency Act states that "[n]o provider or user

of an interactive computer service shall be treated as the publisher or speaker of any

information provided by another information content provider."  47 U.S.C. § 230(c)(1).

A website is an interactive computer service when it enables computer access by multiple

users to a computer server.  See, e.g., Dimeo v. Max, 248 Fed. App'x. 280, 282 (3rd Cir.

2007).  In other words, "an online information system must not be treated as the publisher

or speaker of any information provided by someone else."  Chi. Lawyers' Comm. for Civ.

Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 671 (7th Cir. 2008) (internal

quotation marks omitted).  This law preempts any state law to the contrary:  "No cause of

action may be brought and no liability may be imposed under any State or local law that

is inconsistent with this section."  47 U.S.C. § 230(e)(3).

Plaintiff's own complaint establishes that Defendants provide an interactive

computer service, such that readers may post commentary in the "comments" section of

each article.  (FASC ¶ 48).  Plaintiff's defamation claim treats Defendants as the

publishers of the posts at issue (FASC ¶ 122) while acknowledging that they were

provided by other content providers, namely, the readers who wrote the posts.  (FASC ¶

122).  His own pleadings thus establish the applicability of Section 230.  See Shiamili v.

Real Estate Group of New York, Inc., 892 N.Y.S.2d 52, 54 (N.Y. App. Div. 2009), aff'd

2011 N.Y. LEXIS 1452 (N.Y. June 14, 2011).  Moreover, the core of Plaintiff's

complaints against the Gawker defendants concerns statements that were not even

contained in the Jezebel.com post, but rather in the Abovethelaw.com post which was

linked to. In such a case, the Gawker defendants are clearly entitled to CDA immunity.

As many courts have observed, The CDA is worded broadly enough to protect not only

ISPs, but also individuals who operate websites and web forums to which other

individuals can freely post content. <u>Donato v. Moldow</u>, 374 N.J. Super. 475, 487-88

(App. Div. 2005) (citing cases). Plaintiffs' allegations in this case—are essentially that

the Gawker Defendants republished a defamatory web posting. As multiple courts have

accepted, there is no relevant distinction between a user who knowingly allows content to

be posted to a website he or she controls and a user who takes affirmative steps to

republish another person's content; CDA immunity applies to both. <i>See</i> <u>Barrett v.

Rosenthal,</u> 40 Cal. 4th 33, 62 (Cal. 2006); <u>Carafano v. Metrosplash.com Inc.</u>, 339 F.3d

1119, 1123-25 (9th Cir. Cal. 2003); <u>Ben Ezra, Weinstein, and Co., Inc. v. Am. Online

Inc.</u>, 206 F.3d 980, 986 (10th Cir. N.M. 2000). As the Ninth Circuit aptly noted in <u>Batzel

v. Smith</u>, 333 F.3d 1018, 1032 (2003), "The scope of immunity cannot turn on whether

the publisher approaches the selection process as one of inclusion or removal, as the

difference is one of method or degree, not substance." Similarly, it does not matter <i>how</i>

Defendants republished the alleged defamatory statements—whether by email, website

post, or some other method. The point is that the Gawker Defendants—acted as re-

publishers of another person's information, and as such they are protected by the CDA.

Consequently, Section 230 stands as an absolute bar to every one of Plaintiff's claims

based on reader's comments.

## VII.    PLAINTIFF'S CLAIMS AGAINST NICK DENTON AND GABY DARBYSHIRE MUST BE DISMISSED

Without pleading any facts to support his claims, plaintiff has named two officers

of Gawker Media, Nick Denton and Gaby Darbyshire, as defendants. Under Illinois law,

however, "[T]he debts, obligations, and liabilities of a limited liability company, whether

arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of

the company.  A member or manager is not personally liable for a debt, obligation, or

liability of the company solely by reason of being or acting as a member or manager."

805 ILCS 180/10-10(a).

As Gawker Media is a limited liability company, this statute clearly applies to

Denton and Darbyshire.  Absent any specific allegations (which are not present in

Plaintiff's complaint), the alleged torts of the company cannot be magically grafted onto

its managers.  Therefore, all claims against defendants Denton and Darbyshire personally

should be dismissed.

## CONCLUSION

For all the forgoing reasons defendants hereby pray that the court dismiss each

and every count of the plaintiff's case, and award costs and fees, enter an Order barring

Plaintiff from filing additional lawsuits without leave of the Court, and other such relief

as the court should deem appropriate.

Dated:  New York, New York
January  7, 2013

Respectfully Submitted,

GAWKER MEDIA LLC, GAWKER
SALES, GAWKER
ENTERTAINMENT, GAWKER
TECHNOLOGY, NICK DENTON,
IRIS CARMON, GABY
DARBYSHIRE

By: _____/S/   David Feige_____
      One of their attorneys

David Feige
GISKAN SOLOTAROFF ANDERSON
& STEWART LLP
11 Broadway, Suite 2150
New York, NY 10004
T: 212.847-8315
F:  646.520.3235
David@DavidFeige.com

Cc:     Oren S. Giskan
GISKAN SOLOTAROFF ANDERSON
& STEWART LLP
11 Broadway, Suite 2150
New York, NY 10004
T: 212.847-8315
F:  646.520.3235
ogiskan@gslawny.com

**CERTIFICATE OF SERVICE**

Under penalties of law, I attest the following documents or items have been or are being

electronically served on all counsel of record for all parties on 1/7/13

Dated: New York, New York                    Respectfully Submitted,
January 7, 2013

                                       By: _____/S/  David Feige_____
                                              David Feige

David Feige
Oren S. Giskan
GISKAN SOLOTAROFF ANDERSON
& STEWART LLP
11 Broadway, Suite 2150
New York, NY 10004
T: 212.847-8315
F: 646.520.3235
David@DavidFeige.com

# EXHIBIT A

IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS

vs.                                                    No.    08-CF-

                                                       Class

MEANITH NMI HUON
M/A DOB

                        Defendant

CLERK OF CIRCUIT COURT #32
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

JUL 02 2008

## I N F O R M A T I O N

*William A. Mudge, State's Attorney in and for the County of Madison, State of Illinois, in the name and by the authority of the People of the State of Illinois, charges that:*

## MEANITH NMI HUON

*On the 29th day of June, 2008, at and in the County of Madison, in the State of Illinois, committed the offense of:*

<u>COUNT I: CRIMINAL SEXUAL ASSAULT (CLASS 1)</u> in that said defendant, committed an act of sexual penetration upon D.C., in that by the use of force the said defendant placed his penis in the mouth of D.C., in violation of 720 ILCS 5/12-13(a)(1), and against the peace and dignity of the said People of the State of Illinois.

<u>COUNT II: CRIMINAL SEXUAL ASSAULT (CLASS 1)</u> in that said defendant, committed an act of sexual penetration upon D.C., in that by the use of force the said defendant placed his finger in the vagina of D.C., in violation of 720 ILCS 5/12-13(a)(1), and against the peace and dignity of the said People of the State of Illinois.

<u>COUNT III: CRIMINAL SEXUAL ABUSE (CLASS 4)</u> in that said defendant, committed an act of sexual conduct with D.C., in that said defendant, by the use of force intentionally fondled the breast of D.C. for the purpose of the sexual arousal of the defendant, in violation of 720 ILCS 5/12-15(a)(1), and against the peace and dignity of the said People of the State of Illinois.

<u>COUNT IV: CRIMINAL SEXUAL ABUSE (CLASS 4)</u> in that said defendant, committed an act of sexual conduct with D.C., in that said defendant, by the use of force intentionally touched the vagina of D.C. for the purpose of the sexual arousal of the defendant, in violation of 720 ILCS 5/12-15(a)(1), and against the peace and dignity of the said People of the State of Illinois.

<u>COUNT V: UNLAWFUL RESTRAINT (CLASS 4)</u> in that said defendant knowingly and without authority detained D.C. , in that the said defendant repeatedly refused to allow D.C. to exit his vehicle, a Honda Civic, in violation of 720 ILCS 5/10-3(a), and against the peace and dignity of the said People of the State of Illinois.

State's Attorney, Madison County, Illinois

The undersigned on oath, says that the facts set forth in the foregoing information are true in substance and matter of fact.

Bail is set at $ _____

_____
JUDGE

Madison County Sheriff's Department

SWORN to before me this 2nd day of July, 2008.

_____
Notary Public

"OFFICIAL SEAL"
JENNIFER E. HAWKINS
Notary Public, State of Illinois
My commission expires 02/15/2010

# EXHIBIT B



# Chicago lawyer accused of harassing woman

By SANFORD J. SCHMIDT
2009-07-23 22:07:48



EDWARDSVILLE — A Chicago lawyer arrested and charged last year with criminal sexual assault, sexual abuse and unlawful restraint now faces charges of harassing his alleged victim and cyber stalking.

Meanith Huon, 39, was charged this week in Madison County Circuit Court with harassment of a witness and cyber stalking.

He is accused of contacting his alleged victim of last year via the Internet and communicating indirectly with her in such a way as to cause her emotional distress.

He also is accused of maintaining an Internet Web page or Web site to harass the victim or an immediate family member.

After being arrested last year for allegedly forcing the victim to perform sexual acts while driving on Interstate 55 in Madison County, he posted $10,000 cash bond and went back to Chicago.

Authorities say Huon began posting comments directed at the alleged victim, telling her he loves her and claiming that God wants them to be together.

The postings include a wide variety of professions of love, along with religious references. As recently as July 17, he posted: "I haven't kissed anyone since you kissed me. I miss you. There's nothing I can do about it. I follow God's Commandments. I walk the line because I love you."

He also posted "10 reasons why I'd make a good husband for you." The No. 1 reason was listed as "God brought us together." The suspect also allegedly posted the words: "We'd have great kids. My brains. Your looks."

Huon was arrested in early July 2008 after he allegedly forced a woman to have oral sex with him, fondled her vaginal area and her breasts and refused to let her out of the car while driving on I-55 into Madison County.

The woman allegedly was lured over the Internet by the possibility of a job.

She told authorities she talked to Huon by telephone and got the impression that the job was promoting alcohol sales in area taverns. She met Huon in downtown St. Louis, and he offered to drive her to a local saloon to check out how the business was going.

However, they did not go to the tavern, and Huon instead allegedly sexually abused and assaulted her, Capt. Brad Wells of the Madison County Sheriff's Department said last year. The woman eventually jumped out of the car and contacted police.

Police found evidence on the most recent case by obtaining a search warrant for the company that operates the Web site used by Huon. Once the evidence was obtained, Huon again was arrested July 19, this time at his home in Chicago, where he was being held Thursday in lieu of $75,000 bail.

Huon still is awaiting trial on the original Madison County charges, authorities said.

# EXHIBIT C

07/17/2009Scanned

IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS

vs.                                                                    No. 09-CF-

MEANITH NMI HUON
M/A DOB

              Defendant

**FILED**

JUL 17 2009

CLERK OF CIRCUIT COURT #36
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

## INFORMATION

*William A. Mudge, State's Attorney in and for the County of Madison, State of Illinois, in the name and by the authority of the People of the State of Illinois, charges that:*

## MEANITH NMI HUON

*At and in the County of Madison, in the State of Illinois, committed the offense of:*

COUNT I: HARASSMENT OF A WITNESS (CLASS 2) Between the 11th day of July, and the 17th day of July, 2009 in that said defendant with the intent to harass D.C., a person who is expected to serve as a witness in a legal proceeding, communicated indirectly with D.C. in such a manner as to produce emotional distress, in violation of 720 ILCS 5/32-4a, and against the peace and dignity of the said People of the State of Illinois.

COUNT II: CYBERSTALKING (CLASS 4) On or about the 11th day of July and the 17th day of July, 2009 in that said defendant knowingly and without legal justification, created and maintained an internet website or webpage which is accessible to one or more third parties for a period of at least twenty-four hours, and which contains statements harassing another person and which places that person or a family member of that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint, in violation of 720 ILCS 5/12-7.5, and against the peace and dignity of the said People of the State of Illinois.

                                         *William A. Mudge*
                                  *State's Attorney, Madison County, Illinois*

Bail is set at $ 75,000

               JUDGE
                             CH/JH

The undersigned on oath, says that the facts set forth in the foregoing information are true in substance and matter of fact.

                                               SID
Madison County Sheriff's Department

"OFFICIAL SEAL"
JENNIFER E. HAWKINS
Notary Public, State of Illinois
My commission expires 02/15/2010

SWORN to before me this 17th day of July, 2009.

Notary Public

# EXHIBIT D

| 29-2 | 26 Jul 2011 | CPD-630 |
|---|---|---|
| (Court Branch # or District #) | (Court Date/Time) | (Arresting Agency #) |

**MISDEMEANOR COMPLAINT** (This form replaces CCG-0655 , CCMC-0222 & CCMC-0225)     (Rev. 12/7/00) CCCR 0655

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

          **Plaintiff**

v.

     HUON, Meanith                         NO.

                  **Defendant.**         **11231631**

_____, **complainant, now appears before**
(Complainant's Name Printed or Typed)

**The Circuit Court of Cook County and states the following:**

That: _____ HUON, Meanith _____ of _____, **has, on or about**
          (defendant)                  (address)

_____ April 20, 2011 _____ **at the location of** _____ 1000 N. Lake Shore Drive, Chicago, Illinois
      (date)                              (place of offense)

**committed the offense(s) of** _____ BATTERY-Contact of Insulting Nature _____

**in that he/she** without legal justification, knowingly and intentionally made physical contact with ▮▮▮▮▮▮ while

riding in a cab, in that he fondled the buttocks of ▮▮▮▮▮▮ after posing as a casting agent for William Morris, Inc.

**in violation of** ____ 720 ____ **Illinois Compiled Statutes** ____ 5 ____ / ____ 12-3-A-2 ____
         (Chapter)                         (Act)          (Sub Section)

**AOIC Code**

**F I L E D**
MC-Br-29

JUL 6 2011

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

_____
(Complainant's Signature)

_____
(Complainant's Address)

_____
(Complainant's Telephone)

**STATE OF ILLINOIS** } ss:
**COOK COUNTY**

_____
(Complainant's Name Printed or Typed)

**The complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true.**

_____
(Complainant's Signature)

**Subscribed and sworn to before me on this** ____ 05TH ____ **day of** ____ JULY ____, 2011

_____
(Judge or Clerk)

**I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.**

**SUMMONS ISSUED,**   **Judge** _____
    or                                               Judge's No.

**WARRANT ISSUED,**   **Bail set at:** _____
    or

**BAIL SET AT:** _____ **Judge** _____
                                                   Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| 29-2 | 26 Jul 2011 | CPD-630 |
|---|---|---|
| (Court Branch # or District #) | (Court Date/Time) | (Arresting Agency #) |

**MISDEMEANOR COMPLAINT** (This form replaces CCG-0655, CCMC-6222 & CCMC-6225)

(Rev. 12/7/90) CCCR 0655

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

     v.           **Plaintiff**

        HUON, Meanith

               **Defendant.**

NO. _____

_____ (Complainant's Name Printed or Typed) _____ complainant, now appears before

The Circuit Court of Cook County and states the following:

That: _____ HUON, Meanith _____ of _____ (address) _____ has, on or about
      (defendant)

_____ April 20, 2011 _____ at the location of _____ 850 N. Dearborn, Chicago, Illinois _____
    (date)                                      (place of offense)

committed the offense(s) of _____ BATTERY-Contact of Insulting Nature _____

in that he/she without legal justification, knowingly and intentionally made physical contact with _____ in that
he fondled the breast of the victim after posing as a casting agent for William Morris, Inc.

in violation of _____ 720 _____ Illinois Compiled Statutes _____ 5 _____ / _____ 12-3-A-2 _____
        (Chapter)                            (Act)                 (Sub Section)

AOIC Code

(Complainant's Signature)

**FILED**
MC-Br-29
JUL 6 2011
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

STATE OF ILLINOIS } ss:
COOK COUNTY }

(Complainant's Address)

(Complainant's Telephone)

(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true.

_____ (Complainant's Signature)

Subscribed and sworn to before me on this _____ 05TH _____ day of _____ JULY _____ 2011
                                                (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,     Judge _____
    or

WARRANT ISSUED,     Bail set at: _____      Judge's No. _____
    or

BAIL SET AT: _____      Judge _____
                                                           Judge's No. _____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| 29-2 | .26 Jul 2011 | CPD-630 |
|---|---|---|
| (Court Branch # or District #) | (Court Date/Time) | (Arresting Agency #) |

**MISDEMEANOR COMPLAINT** (This form replaces CCG-0655 , CCMC-0222 & CCMC-0225)   (Rev. 12/7/00) CCCR 0655

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                          **Plaintiff**

      v.                            **NO.** _____

        HUON, Meanith

                         **Defendant.**

_____ complainant, now appears before
(Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states the following:

That:          HUON, Meanith      of _____ has, on or about
               (defendant)                                   (address)

   April 20, 2011      at the location of _____ 650 N. Dearborn, Chicago, Illinois
     (date)                                           (place of offense)

committed the offense(s) of _____ BATTERY-Contact of Insulting Nature

in that he/she without legal justification, knowingly and intentionally made physical contact with ▮▮▮▮▮▮ in that

he fondled the vagina of the victim after posing as a casting agent for William Morris, Inc.

_____

_____

in violation of _____720_____ Illinois Compiled Statutes _____5`_____ / _____12-3-A-2_____
          (Chapter)                                        (Act)               (Sub Section)

**AOIC Code**

                         _____ (Complainant's Signature)

              **F I L E D**
              MC-Br-29          _____ (Complainant's Address)

              JUL 6 2011

**STATE OF ILLINOIS** } **ss:**    DOROTHY BROWN     _____ (Complainant's Telephone)
**COOK COUNTY**          CLERK OF THE CIRCUIT COURT
                   OF COOK COUNTY, IL      _____ (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true.

                                        _____ (Complainant's Signature)

Subscribed and sworn to before me on this ___05TH___ day of _____JULY_____ , 2011

                                        (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED,**    Judge _____
        or                                                     Judge's No.

**WARRANT ISSUED,**   Bail set at: _____
        or

**BAIL SET AT:** _____ Judge _____
                                                       Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| 29-2 | 26 Jul 2011 | CPD-630 |
|---|---|---|
| (Court Branch # or District #) | (Court Date/Time) | (Arresting Agency #) |

**MISDEMEANOR COMPLAINT** (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)      (Rev. 12/7/99) CCCR 0655

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                           **Plaintiff**

      v.                  **NO.** _____

      HUON, Meanith

                          **Defendant.**

_____ complainant, now appears before
(Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states the following:

That: _____ HUON, Meanith _____ of _____ has, on or about
             (Defendant)                    (address)

April 20, 2011    at the location of      1000 N. Lake Shore Drive, Chicago, Illinois
(date)                                          (place of offense)

committed the offense(s) of _____ BATTERY-Contact of Insulting Nature

in that he/she without legal justification, knowingly and intentionally made physical contact with ███████ while

riding in a cab, in that he fondled the breast of ███████ after posing as a casting agent for William Morris, Inc.

in violation of _____ 720 _____ Illinois Compiled Statutes _____ 5 _____ / _____ 12-3-A-2
          (Chapter)                                   (Act)            (Sub Section)

AOIC Code

[ ][ ][ ][ ][ ][ ][ ][ ]    **FILED** MC-Br-29         _____ (Complainant's Signature)

                            **JUL 6 2011**       _____ (Complainant's Address)

STATE OF ILLINOIS } ss:   DOROTHY BROWN CLERK OF THE CIRCUIT COURT   _____
COOK COUNTY         OF COOK COUNTY, IL       (Complainant's Telephone)

                                         ███████
                                       (Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true.

                                      (Complainant's Signature)

Subscribed and sworn to before me on this _____ 05TH _____ day of _____ JULY _____ 2011
                                                   (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

SUMMONS ISSUED,    Judge _____
    or                                                       Judge's No.

WARRANT ISSUED,    Bail set at: _____
    or

BAIL SET AT: _____ Judge _____
                                                    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

CHICAGO ___ E DEPARTMENT          FINAL APPROVAL          CB #: 18180698
ARRES __ PORT                                            IR #: 1937979
                                                         YD #:
3510 S. Michig __ . Avenue, Chicago, Illinois 60653     RD #: HT259967
(For use by Chicago Police Department Personnel Only)   EVENT #: 1111113014
CPD-11, 420C(REV. 6/30)

Name: HUON, Meanith
Res:                                    Male
                         Beat: 923      Asian/Pacific
                                        Islander
    Attorney
DOB:                                    Brown Eyes
AGE:                                    Black Hair
POB: Cambodia/Khmer                     Short Hair Style
     Republic/Kampuchea                 Medium Complexion
SSN:
DLN:
ARMED WITH Unarmed

Arrest Date: 05 July  2011 15:14   TRR Completed? No   Total No Arrested:1   Co-Arrests    Assoc Cases
   Location: 2452 W Belmont Ave              Beat: 1913                      DCFS Ward ? No
            Chicago, IL 60618
            292 - Government Building/Property      Dependent Children?No
Holding Facility: District 019 Male Lockup
Resisted Arrest?  No

                                                                    Victim
1    Offense As Cited   720 ILCS 5.0/12-3-A-2
                        BATTERY - MAKE PHYSICAL CONTACT
                        Class A - Type M
2    Offense As Cited   720 ILCS 5.0/12-3-A-2               FILED
                        BATTERY - MAKE PHYSICAL CONTACT     MC - Br - 29
                        Class A - Type M
3    Offense As Cited   720 ILCS 5.0/12-3-A-2               JUL 6  2011
                        BATTERY - MAKE PHYSICAL CONTACT
                        Class A - Type M                    DOROTHY BROWN
                                                       CLERK OF THE CIRCUIT COURT
4    Offense As Cited   720 ILCS 5.0/12-3-A-2               OF COOK COUNTY, IL
                        BATTERY - MAKE PHYSICAL CONTACT
                        Class A - Type M

NO NARCOTICS RECOVERED

Print Generated By: ROGERS, Michael ( PC0K812 )      Page 1 of 5          05 JUL 2011 06:14

Chicago F       Department - ARREST Report                                      CB #:  18180858
                                                                         HUON, Meanith

NO WARRANT IDENTIFIED

Name:                                                    Injured?        Deceased?

                                          DOB:
                                          Age:           Hospitalized?

                                          Comments:      Treated and Released

NO ARRESTEE VEHICLE INFORMATION ENTERED

Confiscated Properties :
All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court
documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR     HUON, Meanith,     NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)
Meanith HUON turned himself in to Area Three Detectives accompanied by his attorney Kent Delgado.  The victim
signed complaints in that the offender who posed as Nick Kew, a casting agent for William Morris Inc., fondled her
breasts, buttocks and vagina during what was suppose to be an audition for the movie Basic Instinct.  HUON was advised of
his Constitutional Rights and invoked same.

Name check clear-No Investigative Alerts

Has I.D.

$500.00 U.S.C.

| Desired Court Date:     26 July 2011 | Bond Date: 05 July 2011 18:10 |
| Branch: 29-2   2452 W BELMONT - Room | Type:       Recognizance |
| Court Sgt Handle?  No | Receipt #:  I7565127 |
| Initial Court Date:  26 July 2011 | Amount:      $1,000.00 |
| Branch: 29-2   2452 W BELMONT - Room | |
| Docket #: | |

Print Generated By: ROGERS, Michael ( PC0K812 )              Page 2 of 5                    05 JUL 2011 06:14

**Chicago Police Department - ARREST Report**

CB #: 18180656
HUON, Meanlth

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

| | | | |
|---|---|---|---|
| Attesting Officer: | #21103 | HEALY, B E (PC0M240) | 05 JUL 2011 16:23 |

**ARRESTING OFFICERS**

| | | | | |
|---|---|---|---|---|
| 1st Arresting Officer: | #21117 | LA PALERMO, K A (PC0E484) | | **Beat** |
| | | | | 5327 |
| 2nd Arresting Officer: | #21103 | HEALY, B E (PC0M240) | | 5327 |

**APPROVING SUPERVISOR**

| | | |
|---|---|---|
| Approval of Probable Cause : #257 | MAGRUDER, J G (PC0P076) | 05 JUL 2011 16:36 |



# Chicago Police Department - ARREST Report

CB #: 18180658

HUON, Meanith

| | |
|---|---|
| Holding Facility: District 019 Male Lockup | Time Last Fed: |
| Received in Lockup: 05 July  2011 16:48 | Time Called: |
| Prints Taken:  05 July  2011 16:52 | Cell #: 3-5          Phone#: |
| Palmprints Taken: Yes | |
| Photograph Taken: 05 July  2011 16:51 | Transport Details : 1PO |
| Released from Lockup: 05 July  2011 18:12 | |

Is there obvious pain or injury?
Is there obvious signs of infection?
Under the influence of alcohol/drugs?
Signs of alcohol/drug withdrawal?
Appears to be despondent?
Appears to be irrational?
Carrying medication?

Presently taking medication?
(If female)are you pregnant?
First time ever been arrested?                     No
Attempted suicide/serious harm?
Serious medical or mental problems?
Are you receiving treatment?

Name : REFUSED

Res:                                        Beat:

NO INTERVIEWS LOGGED

NO VISITORS LOGGED

Print Generated By: ROGERS, Michael ( PC0K812 )          Page 4 of 5          05 JUL 2011 08:14



Chicago Police Department - ARREST Report

CB #: 18180858
HUON, Meanith

MOVEMENT LOG INFORMATION NOT AVAILABLE

Watch Commander Comments:

DOES NOT APPLY TO THIS ARREST

| Searched By: | #16095 | ESCAMILLA, V J (PC0U924) | Beat |
| Lockup Keeper: | #19879 | KUBON, R S (PC0K553) | |
| Fingerprinted By: | #16095 | ESCAMILLA, V J (PC0U924) | |

| Final Approval of Charges : | #257 | MAGRUDER, J G(PC0P076) | 05 JUL 2011 17:47 | Beat |

# EXHIBIT E

| Where applicable, the chart cites to pages of the transcript of Plaintiff's trial that demonstrate the applicability of the fair report privilege. | Source | Opinion | Fair Report | Section 230 | Non-Defamatory/Innocent Construction |
|---|---|---|---|---|---|
| **Eleven Sentence Item on Jezebel.com (sentence by sentence)** | | | | | |
| A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. | Instant Lawsuit | | x | | x |
| If Memrih Huon gets his way, blogger sleepiness may cost ATL $50 million. | Instant Lawsuit | | | | x |
| Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. | Exhibit A | | x | | x |
| A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. | Trans. 169-171, 177, 184 | | x | | x |
| She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. | Trans. 195-227 | | x | | x |
| Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him. | Trans. 150-157*** | | x | | x |
| Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. | Northern District of Illinois, Eastern Division: Case: 1:11-cv-0305 | | x | | x |
| His beef with Above The Law stems from a roundup post entitled "Rape Potpurri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was serial offender. | Instant Lawsuit | x | x | | x |
| "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to *Forbes*. | Forbes/ Plaintiff's Complaint | | | x | x |
| "And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. | Above the Law | | | x | x |
| The lesson learned: Google only takes you so far. | N/A | x | | | x |

# **EXHIBIT H**

Mr. Huon's response to Debtors' Motion to Dismiss

Case: 1:11-cv-03054 Document #: 3-45 Filed: 01/11/13 Page 1 of 30 PageID #:2662

# UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MEANITH HUON, | | ) |
| | Plaintiff, | ) |
| v. | | ) CIVIL ACTION NO.: 1: 11-cv-3054 |
| | | ) |
| NICK DENTON, et. al., | | ) |
| | Defendants | ) |

## PLAINTIFF, MEANITH HUON'S RESPONSE TO THE
## GAWKER DEFENDANTS' FRCP 12(b)(6) MOTION TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ....................................................................................1

THE PARTIES........................................................................................3

ARGUMENT ........................................................................................5

I. GAWKER'S STORY IS *PER SE* DEFAMATORY AND PLACES MR. HUON IN A FALSE LIGHT.......................................................................................................5

II. THE FAIR REPORT PRIVILEGE DOES NOT APPLY ................................7

III. THE GAWKER ACTIONS ARE NOT PROTECTED OPINION. .....................10

IV. NO ACTIONABLE HARM IS NOT A VIABLE DEFENSE ............................12

V. PLAINTIFF STATES A CLAIM FOR INFLICTION OF EMOTIONAL DISTRESS……...13

VI.    PLAINTIFF STATES A CLAIM FOR CIVIL CONSPIRACY………………………...13

VII.    THE COURT SHOULD CREATE A PRIVATE CAUSE OF ACTION FOR CYBERBULLYING AND/OR CYBERSTALKING……………………………....………14

VIII.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT ("CDA") DOES NOT APPLY...........................................................................................16

VIII.    PLAINTIFF STATES CLAIMS AGAINST DENTON AND DARBYSHIRE…..……...25

i

IX.     GAWKER IS LIABLE FOR REPUBLICATION ..............................................................26

X.      GAWKER USED AN IMPROPER HEADLINE………………………………………..27

XI.  RESPONSE TO DEFENDANTS' PRELIMINARY STATEMENT………………….27

XII.  CONCLUSION………………………………………………………………….…29

EXHIBITS A to M.

Case: 1:11-cv-Doc 499   Document #: 1-95   Filed: 11/29/16   Page 3 of 36   PageID #:2631

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Axelbank v. Rony,*
    277 F.2d 314 (9th Cir. 1960)……………………………………………………6

*Beauharnais v. People of State of Ill.,*
    343 U.S. 250, 72 S.Ct. 725 U.S. (1952)…………………………………………..6

*Ben Ezra, Weinstein, and Co., Inc. v. Am. Online Inc.,*
    206 F.3d 980, 986 (10th Cir. N.M. 2000)…………………………………...…24

*Burgess v. Abex Corp. ex rel. Pneumo Abex Corp.,*
    311 Ill.App.3d 900, 244 Ill.Dec. 319, 725 N.E.2d 792 (4th Dist. 2000))………………13

*Carafano v. Metrosplash.com, Inc.,*
    339 F.3d 1119 (9th Cir. 2003)……………………………………………..19

*Carson v. Allied News Co.,*
    529 F. 2d 206 (7th Cir. 1976)………………………………………………12, 23

*Catalano v. Pechous,*
    83 Ill. 2d 146, 159-161 (Ill. 1980). …………………………………………10, 26

*Chi. Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.,*
    No. 07-1101, 2008 U.S. App. LEXIS 5472 (7th Cir. Mar. 14, 2008)……...…19-20, 23-24

*Cianci v. New Times Pub. Co.*
    639 F.2d 54 (C.A.N.Y., 1980)…………………………………………………..5, 10

*Cooper v. Dupnik,*
    924 F.2d 1520 (9th Cir. 1991)…………………………………………………...6

*Curtis Publishing Company v. Butts,*
    388 U.S. 130, 87 S.Ct. 1975 (1967)……………………………………………..6

*Dimeo v. Max,*
    248 Fed. Appx. 280 (3d Cir. Pa. 2007)…………………………………………24

*Desnick v. American Broadcasting Companies, Inc.,*
    44 F.3d 1345, 1350 (7th Cir. 1995)……………………………………...........5

*Doctor's Assocs. v. QIP Holder LLC,*
    2010 U.S. Dist. LEXIS 14687, 66-71 (D. Conn. Feb. 19, 2010)……………………22-23

*Drink Group, Inc. v. Gulfstream Communications, Inc.,*
    7 F.Supp.2d 1009, 1010 (N.D.Ill. 1998)……………………………………………25

*Dubinsky v. United Airlines Master Executive Council,*
    303 Ill.App.3d 317 (1st Dist. 1999)………………………………………………..25

*Eagle Marine Industries, Inc. v. Union Pacific R. Co.,*
    363 Ill.App.3d 1166, 1177, (5th Dist. 2006),
    227 Ill.2d 377, 317 Ill.Dec. 642, 882 N.E.2d 522 (2008)……………………………15

*Eastwood v. National Enquirer, Inc.,*
    123 F.3d 1249, 1256 (9th Cir. 1997)……………………………………………9, 26-27

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
    489 F.3d 921, 927-928 (9th Cir. Cal. 2007)……………………………………..19-20, 24

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) (en banc)………………………………………...17, 19-20, 23

*Firth v. State of New York,*
    306 A.D.2d 666 (N.Y.A.D. 3 Dept. 2003)…………………………………………25-26

*Fisher v. Larsen,*
    138 Cal.App.3d 627 (1982)…………………………………………………………..6, 10

*Fontana v. TLD Builders, Inc.,*
    362 Ill.App.3d 491 (2nd Dist. 2005)……………………………………………..……25

*FTC v. Accusearch, Inc.,*
    570 F.3d 1187, 1199 (10th Cir. Wyo. 2009)……………………………………21-22, 24

*Gazette, Inc. v. Harris,*
    229 Va. 1, 325 S.E.2d 713 (Va.,1985)…………………………………………...…5

*Goehring v. Wright,*
    858 F.Supp. 989 (N.D. Cal. 1994)……………………………………………………6

*Horowitz v. Baker,*
    168 Ill.App.3d 603 (1988)……………………………………………………………11

iv

*Hy Cite Corp. v Badbusinessbureau.com, L.L.C.*,
    418 F.Supp.2d 1142, 1147-1149 (D. Ariz. 2005)…………………………………22

*In re Perry*,
    423 B.R. 215 (S.D.Tex.,2010)……………………………………….…….……6

*In re Thompson*,
    *162 B.R. 748 (E.D.Mich.,1993)*…………………………………….…….…..6

*Jones v. Dirty World Entm't Recordings, LLC*,
    766 F. Supp. 2d 828, 836 (E.D. Ky. 2011)…………………………………17, 22

*Kaelin v. Globe Communications Corp.*,
    162 F.3d 1036 (9th Cir. 1998)……………………………………………...26

*Kohler Co. v. Kohler Intern., Ltd.*,
    196 F.Supp.2d 690 (N.D.Ill. 2002)…………………………………………25

*Kurczaba v. Pollock, 318 Ill.App.3d 686*,
    (1st Dist. 2000)…………………………………………………….……..28

*Kuwik v. Starmark Star Marketing and Admin., Inc.*,
    156 Ill.2d 16, 27-28 (1993)……………………………………………..…..8

*Lowe v. Rockford* ,
    179 Ill.App.3d 592, 597  (2nd Dist. 1989)……………………………....8

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
    2004 U.S. Dist. LEXIS 6678, 31-32 (N.D. Tex. 2004)………………………17

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1, 19 (1990)…………………………………………………11

*Myers v. The Telegraph*,
    332 Ill.App.3d 917, 922 (5th Dist. 2002)………………………………..8,12-13

*Naked City, Inc. v. Chicago Sun-Times*,
    77 Ill. App. 3d 188, 395 N.E.2d 1042 (1979)…………………………...27

*O'Donnell v. Field Enters., Inc.*,
    145 Ill.App.3d 1032, 1036 (1986)…………………………………...……..11

v

*Owens v. CBS, Inc.,*
    173 Ill. App. 3d 977, 992-993 (Ill. App. Ct. 5th Dist. 1988). …………………………26

*Parker House v. O' Lite Corp.,*
    324 Ill.App.3d 1014, 1025……………………………………………………….....5

*People v. Defrates,*
    33 Ill. 2d 190, 194 (Ill. 1965)…………………………………………………………7

*Pisani v. Staten Island University Hosp.,*
    440 F.Supp.2d 168 (E.D.N.Y.,2006)…………………………………………………6

*Reed v. Albanese,*
    78 Ill.App.2d 53, 223 N.E.2d 419, 422 (1966)………………………………………..27

*Sawyer Realty Group, Inc. v. Jarvis Corp.,*
    89 Ill.2d 379, 1386 (Ill. 1982)……………………………………………………15

*Shiamili v Real Estate Group of N.Y., Inc.,*
    17 N.Y.3d 281, 291 (N.Y. 2011)……………………………………………………24

*Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc.,*
    297 Ill.App.3d 314, 310 (1st Dist. 1988)……………………………………..7, 8

*Solaia Technology, LLC v. Specialty Pub. Co.,*
    221 Ill.2d 558, 590 (Ill. 2006)……………………………………………………7, 8

*Spanel v. Pegler,*
    160 F.2d 619 (7th Cir. 1947)……………………………………………………27

*St. Amant v. Thompson,*
    390 U.S. 727, 88 S.Ct. 1323 (1968)…………………………………………..………6

*Time Savers, Inc.,*
    371 Ill. App. 3d at 771, 863 N.E.2d at 1167–68………………………………………14

*Trudeau v. ConsumerAffairs.com, Inc.,*
    2011 WL 3898041 (N.D.Ill. 2011)……………………………………………………13

*Van Horne v. Muller,*
    185 Ill.2d 299,  308 (Ill. 1998)…………………………………………………5, 6

*Westmeyer v. Flynn,*
    382 Ill.App.3d 952, 960 (1st Dist. 2008)……………………………………………25

*Widener v. Pacific Gas & Electric Co.,*
    75 Cal.App.3d 415, 434 (1977)……………………………………………..……9

*Woodhull v. Meinel,*
    145 N.M. 533, 540 (N.M. Ct. App. 2008)…………………………………………….23

**STATUTES AND RULES**

Section 230 of the Communications Decency Act, 47 U.S.C. § 230, ………………16-17, 24

FRCP 12(b)(6)……………………………………….…………………………………….23

FRCP Rule 7.1……………………………………….…………………………………….25

**OTHER AUTHORITIES**

*Good Samaritan or Defamation Defender? Amending the Communications Decency Act to*
    *Correct the Misnomer of Section 230 . . . Without Expanding ISP Liability,* 19
    SYRACUSE SCI. & TECH. L. REP. 1, 8 (2008)
    Tara E. Lynch………………………………………….……………………………16

Restatement (Second) of Torts § 611, Comment *f,* at 300–01 (1977)…………………………7, 8

*Restatement (Second) of Torts* § 586 comment…………………………………………..…..28

Restatement (Second) of Torts § 571, Comment c, at 187 (1977) ……………………..…..26
.
Restatement, Second, Torts § 578 (1977) ……………………………………………………...26

1 Harper & James, supra, § 5.20 at 417……………………………………………………..…..26

Prosser, Torts § 113 at 768 (4th ed. 1971) ………………………………………………..…..26

*Trial Handbook for Illinois Lawyers* – Civil § 1:11 (8th ed. 2012)
    Hon. Robert S. Hunter et al, …………………….…………………………………...……8, 14

vii

Plaintiff, Meanith Huon, responds to the the FRCP 12(b)(6) Motion and Memorandum of

Defendants, Gawker Media, Gawker Media Group Inc., Gawker Media LLC, Gawker

Entertainment LLC, Gawker Sales LLC, Gawker Technology LLC, Irin Carmon, Gabby

Darbyshire, Nick Denton, (collectively, "Gawker", or "Defendants")[1] as follows:

## <u>INTRODUCTION</u>

Meanith Huon is an attorney with more than 16 years' experience and has never been

disciplined by the State Bar.   He is a victim of Gawker' defamation—calling him a "**Rapist**"

when he is not one.  Indeed, Mr. Huon was found **not guilty** of sexual assault by a jury of his

peers, and the statements made by Defendants were false.

Then, rubbing salt on the wound, Gawker engages in a character assassination of Mr.

Huon with allegations which are, once again, false.  This smear campaign is an attempt to

misdirect this Court's attention from the facts relevant to this case, which are that Gawker called

Mr. Huon a "**Rapist**" on its website, thereby harming Mr. Huon's reputation, character, and

career.[2]  Gawker committed this injustice by: (1) writing a defamatory story; (2) linking,

quoting, and republishing another defamatory story; (3) falsely suggesting that it knew what the

jury relied on in finding Mr. Huon not guilty, when it never spoke to any juror; (4) drafting,

editing, promoting or modifying the comments below the story about Mr. Huon to mislead the

public into believing that those statements were created by third parties; (5) encouraging and

inviting its 4 million daily visitors to submit comments by "invitation only" to disparage Mr.

Huon and shaping and choreographing the content of those comments;  and (6) calling Mr. Huon

---

[1] See email from Gawker's attorney identifying the Gawker Defendants bringing the motion to dismiss. Exhibit "A".

[2] Gawker resorts to hyperbole and personal attacks against Mr. Huon to obscure the facts in this case.  Mr. Huon responds to Gawker's Preliminary Statement at the end of this Response brief.

1

a "**Rapist**" in their headline for their story, despite his acquittal, all to maximize Defendants'

own profit at the expense of Mr. Huon.

Gawker wrote a "news" story, created or controlled comments to that story, and invited,

solicited, or promoted third party comments—by "invitation only"-- to the story to shape a

public view of Mr. Huon that would drive traffic to Gawker's websites—20 million+ page views

a day globally.   Gawker created its own headline calling Mr. Huon the "**Acquitted Rapist**,"

posted a comment saying that even though Mr. Huon was not guilty, he was still a "**Rapist**",

fabricated a claim that the jury relied on the "strength" of a bartender's testimony that the victim

had been drunk, when Gawker in fact never interviewed any juror, and edited the comments to

its own story.  Gawker republished the AboveTheLaw.com ("ATL") story , reported the

defamatory headline "**Rape Potpourri**," and summarized parts of the story.[3]

Gawker developed and enforces a system of commenting on its websites by invitation

only that monetizes the comments.[4]  Gawker shapes the contents of the conversation of the

comments and gives the advertiser " a reasonably large degree of control of the conversation that

most people see in that post".[5]  A user of Gawker's websites cannot post a comment unless it is

first approved by Gawker. Nick Denton described the goal of the commenting system as "to

erase the traditional distinctions between writers, editors, readers, subject, and sources."[6]

Gawker's writers are under constant pressure to generate web traffic to keep their jobs; writers'

---

[3] The original headline is attached as Exhibit "H" calling Mr. Huon the "**Acquitted Rapist".** Gawker spoliated evidence or attempted to cover up its misdeeds by altering the original headline.

[4] Paragraphs 109 to 127, 4th Amended Complaint.

[5] Paragraphs 112 to 113, 4th Amended Complaint.

[6] Columbia Journalism Review, "Gawker's New Comment System", July 6, 2012. http://www.cjr.org/behind_the_news/no_comments.php?page=all .  Exhibit "B".

2

Case 1:11-cv-03054   Document #: 269   Filed: 03/22/16   Page 1 of 39   PageID #:2401

compensation is based on the amount of web traffic the story generates.[7] Journalist Drew

Johnson has traced hundreds of "anonymous" comments  posted to promote Gawker stories to

actual Gawker employees– ginning up their own pages.[8]

## THE PARTIES

**MEANITH HUON**

Mr. Huon is admitted to practice law in Illinois and before the Federal Courts sitting in

Illinois, including the Federal Trial Bar of the Northern District of Illinois and the 7th Circuit.  He

has never been convicted of a felony or misdemeanor; he has no pending criminal charges.

While Gawker attempts to improperly include a great deal of misleading, inflammatory,

and irrelevant evidence, what happened is that Mr. Huon was falsely accused of sexual assault by

"Jane Doe" in case no. 2008 CF 1496 in Madison County, Illinois .[9]  After Mr. Huon's arrest,

Jane Doe Googled Mr. Huon's name and a found a blog on God and life.  Unable to get Mr.

Huon to accept a plea deal in case no. 2008 CF 1496, the State's Attorney's Office charged Mr.

Huon with cyber stalking and harassment of a witness in case no. 2009 CF 1688.  After

deliberating approximately 2 hours, a jury found Mr. Huon  not guilty of sexual assault.  The

remaining charges were stricken from the trial call and left up in the air for 7 months until the

then-Madison County State's Attorney left office.  All remaining charges were dropped.

More than a year after being acquitted, Gawker ran its story on Mr. Huon calling him a

"**Rapist**" on its blog Jezebel.com and began a vigilante smear campaign of treating Mr. Huon

---

[7]See Exhibit "B" and Nick Denton's Internal Memorandum marked as Exhibit "C". Gawker tracks the web traffic for each of its writer.  http://gawker.com/stats-month.

[8]. See http://gawkersucks.blogspot.com.  Exhibit "D".

[9] Mr. Huon filed a motion to strike an exhibit revealing the name and hometown of the complaining woman in 2008 CF 1496, because she was the complainant in a sexual assault case.  Docket No. 50.

3

like a registered sex offender who needs to be outed and tracked.   The Gawker story republished the ATL story about Mr. Huon posing as a talent scout.   There was no evidence in the original proceedings that Mr. Huon posed as a talent scout.   *After* the Gawker story was posted, Mr. Huon was falsely accused by Stephanie Andrews of posing as a talent scout.[10]   By the second court date, the Cook County prosecutor agreed that the charges should be dropped.

The copycat case happened *after* the Gawker story and there are no defamation claims made about that case.  Gawker included the copycat case in its brief  to denigrate Mr. Huon.[11]

**THE GAWKER DEFENDANTS**

After denigrating Mr. Huon, Gawker describes itself as a "news" website reporting on "media and politics."  What Gawker leaves out is the fact that its irresponsible brand of Internet "journalism" has made it the one of the most sued collection of tabloid websites on the Internet.[12]  In fact, the complaint of Mr. Huon in this case is in line with the lack of fact checking that has become a hallmark of the Gawker websites (*see e.g.*, the *Los Angeles Times* article, dated May 20, 2011, entitled "*Schwarzenegger child: How Gawker named wrong 'baby mama'*"). [13]

Indeed, Gawker engages in unethical tactics that violate the canons and ethics of journalism.  The invasion  of Mr. Huon's privacy is consistent with Gawker's history of targeting individuals and disclosing  private facts about their lives.  Journalist Drew Johnson has

---

[10] A Google of Ms. Andrews' name and "Chicago" reveals that Ms. Andrews worked as a keyword editor at Info.com http://www.linkedin.com/in/scandrews29.

[11] Mr. Huon incurred attorneys' fees in defending himself in the charges and, thus, has suffered special damages.

[12] Bollea v. Gawker Media, LLC, 2012 U.S. Dist. LEXIS 185667 (M.D. Fla. Dec. 20, 2012); Biro v. Condé Nast, 2012 U.S. Dist. LEXIS 113188 (S.D.N.Y. Aug. 10, 2012); HarperCollins Publrs. L.L.C. v. Gawker Media LLC, 721 F. Supp. 2d 303 (S.D.N.Y. 2010).  See  Exhibit "E".

[13] See Exhibit "F".  Gawker's targets can be anyone, not just celebrities.  A 19 year old former high school student contended that Gawker posted altered yearbook photos on its websites showing her exposing herself. Gawker posted the photograph of a 16 year old rape victim.  http://gawker.com/5980588/there-might-be-a-way-to-prosecute-steubenville-rape-crew-leader-michael-nodianos?tag=Steubenville

investigated Gawker and writes "they'll plaster your personal information online for everyone to
see, and generally make you look bad on any future Google searches." [14]   Gawker seems to treat
lawsuits as a cost of doing business.  Gawker's $300 million blog empire generates advertising
dollars by posting salacious, unchecked "gossip" without any semblance of journalism.

## ARGUMENT

## I. GAWKER'S STORY IS *PER SE* DEFAMATORY AND PLACES MR. HUON IN A FALSE LIGHT.

      The Gawker Defendants argue that simply because Mr. Huon was charged with two
crimes (never mind that he was found not guilty), they cannot be held accountable for
defamation.  That is not the rule.  The Seventh Circuit noted, "such a rule 'would strip people
who had done bad things of any legal protection against being defamed; they would be
defamation outlaws.'"  *Desnick v. American Broadcasting Companies, Inc.,* 44 F.3d 1345, 1350
(7th Cir. 1995).   "A statement need not state the commission of a crime with the particularity of
an indictment to qualify as defamatory *per se*." *Parker House v. O' Lite Corp,*324 Ill.App.3d
1014, 1025; *Van Horne v. Muller*, 185 Ill.2d 299,  308 (Ill. 1998).  Reporting that plaintiff has
been charged with a crime when there are no pending charges is defamatory *per se*.  *Gazette, Inc.
v. Harris,* 229 Va. 1, 325 S.E.2d 713 (Va.,1985); *Cianci v. New Times Pub. Co.,* 639 F.2d 54
(C.A.N.Y., 1980)   In *Van Horne*, the Illinois Supreme Court held that a newscaster defamed the
plaintiff when the newscaster repeated the false account of a story during her news broadcast that
the plaintiff had assaulted a disc jockey.  The Court held, "In general, '[a]ll persons who cause or
participate in the publication of libelous or slanderous matters are responsible for such
publication.'" *Van Horne*, 185 Ill.2d at 308.  Hyperlinking a defamatory content is a re-

---

[14] See http://gawkersucks.blogspot.com.

5

publication of the defamatory content. *Pisani v. Staten Island University Hosp.*, 440 F.Supp.2d

168 (E.D.N.Y.,2006); *In re Perry*, 423 B.R. 215 (S.D.Tex.,2010).

It is well established that it is defamatory to call or imply that someone is a "rapist". As

the U.S. Supreme Court stated, No one will deny "that it is libelous falsely to charge another

with being a rapist". *Beauharnais v. People of State of Ill.,* 343 U.S. 250, 72 S.Ct. 725 U.S.

(1952); *Cooper v. Dupnik,* 924 F.2d 1520 (9th Cir. 1991); *In re Thompson*, 162 B.R. 748

(E.D.Mich.,1993). False accusations of criminal conduct, such as calling someone a "**Rapist**"

more than a year after he has been acquitted, are *per se* defamatory and places him in a false

light. But in addition to calling him a "**Rapist**," Gawker then posted a comment to their own

story that said that even though Mr. Huon was found not guilty, he is still a rapist. That, as well,

is *per se* defamatory. *Goehring v. Wright*, 858 F.Supp. 989 (N.D. Cal. 1994); *Fisher v. Larsen*,

138 Cal.App.3d 627 (1982); *Axelbank v. Rony*, 277 F.2d 314 (9th Cir. 1960). This type of *per se*

defamation supports a finding of malice and punitive damages in this case.[15] Gawker knew that

Mr. Huon had sued ATL for calling him a rapist. But Gawker tried to bolster the story that Mr.

Huon is a rapist by offering the excuse that ATL was sloppy with its facts and that Mr. Huon was

upset that he was called a serial rapist when he is just a one-time "**Rapist**".

Following its *modus operandi* of vigilante cyber bullying, Gawker posted the "**Rapist**"

story on its feminist website Jezebel.com and invited submissions for comments from its daily 4

---

[15] *See St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323 (1968); *Curtis Publishing Company v. Butts*, 388 U.S.
130, 87 S.Ct. 1975 (1967). The following actions by Gawker can be used to show its malice in this case: (i) Gawker
fabricated what the jury relied on in finding Mr. Huon innocent; (ii) Gawker fabricated what it means to be found
not guilty; (iii) Gawker called Mr. Huon a "rapist" after he was found not guilty; and (iv) Gawker republished a
defamatory headline with a copy of Mr. Huon's mugshot a year after he was acquitted, and published a link to the
defamatory article from AboveTheLaw.com.

Case 1:11-cv-09054  Document #: 269  Filed: 04/22/13  Page 14 of 19  PageID #:2403

million visitors to disparage Mr. Huon .[16]  Gawker created or controlled comments calling Mr.

Huon "crazy", a "rapist", a "one-time" rapist."

Gawker argues that the number of words used somehow removes the defamatory

meaning.  That is not the law.  In the context of defamation law, statements charging a person

with unfair business practices, impugning his integrity, prejudicing his practice of law, and/or

implying that he committed a crime falls within several of the recognized categories of

defamation *per se.   Solaia Technology, LLC v. Specialty Pub. Co.,* 221 Ill.2d 558, 590 (Ill.

2006).  Accusing someone of being a "**Rapist**", a stalker, a rapist who got away with rape,

posing as a talent scout, a sex offender, the "**Acquitted Rapist**", having pending criminal

charges are all defamatory *per se*. Mr. Huon adopts his arguments in his Response Brief to the

Above the Law Defendants' Motion to Dismiss.[17]

## II. THE FAIR REPORT PRIVILEGE DOES NOT APPLY.

The fair report privilege does not protect a reporter's personal "additions" or an

indictment by "innuendo" as to the integrity of any of the parties.[18]   The Gawker story falls

outside of this privilege because, *inter alia*, it (1) adds that Mr. Huon is an "acquitted rapist,"

calling him a "rapist" even though he was found not guilty; (2) adds, incorrectly, that acquittal

does not mean that he did not commit rape; and (3) adds innuendo (also fabricated) that the jury

acquitted on the "strength" of a bartender's testimony that the victim had been drinking.

---

[16] See the Gawker's public statistics on http://www.quantcast.com/p-d4P3FpSypJrlA.  Exhibit "G".

[17]  Mr. Huon was not charged with "Rape" in 2008.  He was charged with sexual assault. Rape" is defined as forcible vaginal intercourse.  People v. Defrates, 33 Ill. 2d 190, 194 (Ill. 1965).  It is not oral sex.  The FBI changed its definition in 2012.   http://www.fbi.gov/news/pressrel/press-releases/attorney-general-eric-holder-announces-revisions-to-the-uniform-crime-reports-definition-of-rape  The single word "Rape" alone is defamatory per se.

[18] Restatement (Second) of Torts § 611, Comment *f,* at 300–01 (1977); *Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc.,* 297 Ill.App.3d 314, 310 (1*st* Dist. 1988).

The Restatement, which has been adopted by Illinois for defamation,[19] provides that the statements made by Gawker's reporter are not privileged.  Restatement (Second) of Torts § 611, Comment *f,* at 300–01 (1977).  *Solaia Tech., LLC.*, cited by Defendants, held that statement regarding an attorney was not a fair abridgement of a complaint, and thus the fair report privilege did not apply.  221 Ill. 2d 558, 593 (Ill. 2006).  The defamation privilege for fair reports of judicial proceedings can be lost if the report is inaccurate or unfair, if the account is discolored or garbled, or if comments or insinuations are added.[20]  The privilege does not permit the expansion of the official report by the addition of fabricated evidence designed to improve the credibility of the defamation.  *Snitowsky v. NBC Subsidiary* (WMAQ-TV), Inc., 297 Ill.App.3d 314, 310 (1st Dist. 1988).  The privilege does not apply to an inaccurate account of the proceedings;  *Myers v. The Telegraph*, 332 Ill.App.3d 917, 922 (5th Dist. 2002);  *Lowe v. Rockford* ,179 Ill.App.3d 592, 597  (2nd Dist. 1989).

Accordingly, there can be no privilege here for the comments and text that were added by Gawker, including that Mr. Huon is a "**Rapist**," a statement that is not anywhere in the criminal complaint, and is contrary to the express findings of the jury.  In addition, Gawker's comment to its own story that just because Mr. Huon was found not guilty does not mean that he is not a rapist was an unprivileged comment or insinuation.  Moreover, Gawker fabricated and discolored facts.  As an extreme example, Gawker claimed that the jury, in finding Mr. Huon not guilty, relied "on the strength of a bartender's testimony that the woman had been drinking," when Gawker never interviewed or spoke to any jury members to find out what they did or did not rely

---

[19]  *Kuwik v. Starmark Star Marketing and Admin., Inc.,* 156 Ill.2d 16, 27-28 (1993).

[20] Hon. Robert S. Hunter et al, *Trial Handbook for Illinois Lawyers* – Civil § 1:11 (8th ed. 2012)

8

on.  The statement was plain make-believe.  It is for a jury to decide whether these are a fair

report of the complaint, but these defamatory items are nowhere in the original proceedings.

Here, either the fair report privilege does not apply at all, or Gawker lost the privilege

based upon its conduct.  Either way, there is no privilege for these statements.  In fact, Gawker's

actions relating to its story do not meet its own test for the fair report privilege because Gawker's

statements were not a "substantially correct account" of either the not guilty findings or what the

jury relied on in making its determination.  Specifically, the Fourth Amended Complaint alleges,

*inter alia:*

- Gawker posted a comment to its own article: "Just because a man is acquitted of rape does not mean he did not commit rape";

- Gawker simply fabricated that the Jury relied "partly on the strength of a bartender's testimony that the woman [accuser] had been drinking" when Gawker never spoke to a single juror to ask what they did or did not rely on;[21]

- Gawker republished the defamatory headline "**Rape Potpourri**", which means "a miscellaneous collection" of rape stories, along with a mugshot of Mr. Huon, and along with the sentence: "We've got a couple of rape stories"; and

- Finally, absent from Gawker's analysis is the headline that it now wants to ignore. Gawker initially published the story calling Mr. Huon an "**Acquitted Rapist**".  Gawker then changed the headline to its current title.[22]

These statements are not protected by privilege.[23]

---

[21] *See Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249, 1256 (9th Cir. 1997) (language suggesting that actor Clint Eastwood and the reporter had conversed was improper and actionable).  Just as Eastwood never spoke to the reporter, the reporter here never talked to a juror to determine what the jury relied on in finding Mr. Huon not guilty.

[22] The original headline is attached as Exhibit "H" calling Mr. Huon the "**Acquitted Rapist".** Gawker spoliated evidence or attempted to cover up its misdeeds by altering the original headline.

[23] The Gawker Defendants contend that there is "nothing that supports Plaintiff's theory of recovery concerning omitted items."  First, this is not Mr. Huon's theory.  He is suing for what Gawker did say, and not what was omitted.  Second, the law is plain that omissions by a reporter, inventing facts, and the failure to investigate absolutely give rise to defamation, particularly where the failure to investigate takes place on an issue that is not "breaking news" or "hot news."  *Widener v. Pacific Gas & Electric Co.*, 75 Cal.App.3d 415, 434 (1977), *partially*

9

Gawker also added its own "comments" to the article and edited others' comments to cause

Gawker to be liable for the defamatory content therein.   Or worse, according to one journalist,

Gawker likely wrote this comment itself.[24]  For brevity sake, Mr. Huon adopts his arguments in

his Response Brief to the Above the Law Defendants' Motion to Dismiss that Defendants are not

journalists and reporters and, thus, are not entitled to the privilege.  While Gawker creates and

develops content, that content is not "news".

### III.  THE GAWKER ACTIONS ARE NOT PROTECTED OPINION.

The Illinois Supreme Court has held that accusing someone of a crime is a statement of

fact.[25]  *Catalano v. Pechous,* 83 Ill. 2d 146, 159-161 (Ill. 1980).   The Illinois Supreme Court

relied on *Cianci v. New Times Publishing Co*. in which the Second Circuit held that accusations

of criminal activity-- committing a rape 12 years ago—is not a constitutionally protected opinion

(2d Cir. 1980), 639 F.2d 54.  Calling someone a "**Rapist**" is *not* a matter of opinion.  It is a fact,

which is capable of being proved true or false.  Saying: "Just because a man is acquitted of rape

does not mean he did not commit rape" is not only a statement of fact (he committed rape), it is a

completely incorrect statement of what it means to be found not guilty.  Saying that the jury

found Mr. Huon not guilty because it relied on the "strength" of a bartender's testimony that the

victim had been drinking is another fact that was simply made up by the Gawker writer.

Gawker relies on outdated cases before the law changed and that do not apply--the 1986

---

*overruled on other grounds*; *see also Fisher v. Larsen*, 138 Cal.App.3d 627, 639–40 (1982).

[24] *See* http://gawkersucks.blogspot.com

[25] *Catalano v. Pechous,* 83 Ill. 2d 146, 159-161 (Ill. 1980).

*O'Donnell* case and the 1988 *Horowitz* case.[26]  However, in 1990, the United States

Supreme Court reexamined the opinion defense and rejected what it called "the creation of an

artificial dichotomy between 'opinion' and fact."  *Milkovich v. Lorain Journal Co.,* 497 U.S. 1,

19 (1990) (First Amendment did not protect the story with the headline "Maple beat the law with

the 'big lie,'" beneath which appeared plaintiff's photograph). .[27]  The court held that there is no

separate First Amendment privilege for statements of opinion, and that a false assertion of fact

can be libelous *even if couched in terms of an opinion. Id*. at 18.

In this case,  Gawker took screen shots of the Above The Law article and posted them to

its website.  Below is an exact picture of what the Gawker "reporter" posted:



Above the picture is the headline in bold black letters: "**Acquitted Rapist Sues Blog for Calling**

**Him Serial Rapist.**"   The Gawker article takes the defamatory headline "**Rape Potpourri**" and

---

[26]  *O'Donnell v. Field Enters., Inc.,* 145 Ill.App.3d 1032, 1036 (1986); and *Horowitz v. Baker,* 168 Ill.App.3d 603 (1988).

[27]  'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: '[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' *Milkovich,* 497 U.S. at 19.

11

republishes it next to Mr. Huon's mug shot.  The original ATL article did not have Mr. Huon's

mugshot.[28]  The Gawker story quotes the first line of the ATL article, which states, "We got a

couple rape stories . . . ."  The Gawker article summarizes the ATL story, fabricates having

interviewed jurors to determine whether they thought a bartender's testimony was strong, and

then provides a link to the ATL story.  The Gawker then posted comments to their own story

about Mr. Huon.  Facts analogous to Gawker's claim that the jury believed Mr. Huon because it

relied on the strength of the bartender's testimony have been held to be unprotected opinion.  *See*

*Carson v. Allied News Co.,* 529 F. 2d 206 (7th Cir. 1976).  As explained by the Seventh Circuit

*Carson*:

> If a writer can sit down in the quiet of his cubicle and create conversations as 'a
> logical extension of what must have gone on' and dispense this as news, it is
> difficult to perceive what First Amendment protection such fiction can claim.

The Gawker article states the alleged victim's version of events at length and then suggests that

Gawker has firsthand knowledge that the jury relied on the bartender's testimony—but nowhere

in the record of the proceedings is there any evidence that the jury relied on that testimony.

Gawker cites to a link to support its statement that the jury relies on the "strength" of the

bartender's testimony.  That link takes a reader to a newspaper article that mentions a bartender

testified.  The article does not say that the jury relied on the strength of the bartender's

testimony.  Like in the *Carson* case, Gawker imagined that scenario and then reported it as true.

## IV.  NO ACTIONABLE HARM IS NOT A VIABLE DEFENSE

Gawker's "No Actionable Harm" defense is not recognized in Illinois.  The Illinois Court

of Appeal has specifically rejected this defense in Illinois. It explained in *Myers v. The*

*Telegraph*:

---

[28] The ATL story is attached as Exhibit "L".

No court in Illinois has explicitly adopted the incremental-harm defense. We decline to do so now. To establish the defense, a defendant would need to come forward with evidence establishing the plaintiff's deserved reputation. In turn, the plaintiff would be forced to either accept the defendant's characterization of his reputation or attempt to refute the claim. Consequently, a myriad of collateral, unrelated evidence will be presented, diverting the trial from the main objective-determining whether the offending statement is true or false. Additionally, the incremental-harm defense conflicts with the common law principles governing *per se* actions. 332 Ill.App.3d 917, 925, 773 N.E.2d 192, 200 (Ill.App. 5th Dist. 2002).

The cases that have analyzed the related defense of "substantial truth" have held that *discovery is required* and this cannot be decided on a 12(b)(6) motion. Judge Lefkow looked at Gawker's *Haynes* opinion, and explained that whether or not the defense is viable in Illinois, it is not properly raised until after the Plaintiff has been given the opportunity to conduct discovery. Specifically, in *Trudeau v. ConsumerAffairs.com, Inc.*, the Court held: " Because there has been no discovery and the court not taken judicial notice of the documents defendants attached to their motion for the truth of the matters asserted therein, the court cannot say that Trudeau could not have been harmed by the false statements in the article. 2011 WL 3898041 (N.D.Ill. 2011).

In this case, a Google Search of "Meanith Huon" will retrieve the Gawker story as the 1st or 2nd search result. The ATL Defendants and the news organizations have removed their defamatory post. It is for the jury to decide if Mr. Huon has been harmed by the Gawker story.

## V. PLAINTIFF STATES A CLAIM FOR INFLICTION OF EMOTIONAL DISTRESS

As discussed in the preceding paragraphs, Defendants engaged in extreme and outrageous conduct. More than a year after a jury acquitted Mr. Huon, Defendants disseminated a story calling Mr. Huon a "rapist." For brevity sake, Mr. Huon adopts his arguments in his Response Brief to the Above the Law Defendants' Motion to Dismiss.

## VI. PLAINTIFF STATES A CLAIM FOR CIVIL CONSPIRACY

Plaintiff states a claim for conspiracy. "To state a claim for civil conspiracy, a plaintiff

13

must allege the agreement and also a tortious act committed in furtherance of that agreement."[29]
The elements of civil conspiracy are: (1) a combination of two or more persons; (2) for the
purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful
purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an
overt tortuous or unlawful act.  *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill.App.3d 759, 309
Ill.Dec. 259, 863 N.E.2d 1156 (2nd Dist. 2007).

      Here, each of these elements is stated in the Fourth Amended Complaint.  To the extent
Gawker demands more specificity, it is well-settled that Mr. Huon is not required to plead with
specificity and precision the facts that are within the defendant's control and knowledge.  *Time
Savers, Inc.*, 371 Ill. App. 3d at 771, 863 N.E.2d at 1167–68.  Mr. Huon alleges that there was a
combination of two or more persons: Gawker Media and its entities, Nick Denton, Gabby
Darbyshire, Irin Carmon.[30]  The combination was for, among other things, to defame Mr. Huon
by calling him a "**Rapist**" and to invite third parties to submit salacious and defamatory
comments about Mr.  Huon for posting.[31]  One of the conspirators committed an overt tortuous
or unlawful act: Mr. Denton, the principal and moving force behind Gawker, created a website
and a business plan for monetizing comments based on defaming individuals;  Ms. Darbyshire
refused Mr. Huon's request to remove the story and managed the development of the content;
Ms. Carmon wrote the Gawker story.  The combination of these individuals and entities to act
caused the defamatory story and comments to be published on the World Wide Web.

---

[29] Robert S. Hunter et al., *Trial Handbook for Illinois Lawyers – Civil* § 22:42 (8th ed. 2012), (citing *Burgess v. Abex Corp. ex rel. Pneumo Abex Corp.*, 311 Ill.App.3d 900, 244 Ill.Dec. 319, 725 N.E.2d 792 (4th Dist. 2000)).

[30] Paragraphs 24 to 48 of the 4th Amended Complaint.

[31] Paragraphs 48 to 57, 100 to  137, 145 to 147, of the 4th Amended Complaint.

## VII.    THE COURT SHOULD CREATE A PRIVATE CAUSE OF ACTION FOR CYBERBULLYING AND/OR CYBERSTALKING.

The Courts can create a private right of action based on a criminal statute.  *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill.2d 379, 1386 (Ill. 1982).   "It has long been held that when a statute is enacted to protect a particular class of individuals, courts may *imply* a private right of action even though no express remedy has been provided in the statute."  *Eagle Marine Industries, Inc. v. Union Pacific R. Co.*, 363 Ill.App.3d 1166, 1177, (5th Dist. 2006) (emphasis added), *judgment rev'd on other grounds*, 227 Ill.2d 377, 317 Ill.Dec. 642, 882 N.E.2d 522 (2008).  The following factors are considered: (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether the plaintiff's injury is one the statute was designed to prevent; (3) whether a private right of action is consistent with the underlying purpose of the statute; and (4) whether implying a private right of action is necessary to provide an adequate remedy for violations of the statute.  *Id.*

Here, Mr. Huon is a victim of cyber stalking and cyber bullying.  Mr. Huon's injury is one the statute was designed to prevent, meaning repeated or continued harassment of a person using the Internet.  Gawker invited its 4 million a day visitors to treat Mr. Huon like a rapist.  Gawker posted the untrue and inflammatory comments for more than 24 hours, which caused Mr. Huon emotional distress.   The post and comments have remained on the Internet for almost 2 years.  A private right of action is consistent with the underlying purpose of the statute. [32] There is no public policy in encouraging false statements  to show up about in real time Google

---

[32] Addressing the American Psychological Association's ("APA") Annual Convention, Dr. Elizabeth Carll, of the APA Media Psychology Division, stated: "It is my observation that the symptoms related to cyberstalking and e-harassment may be more intense than in-person harassment, as the impact is more devastating due to the 24/7 nature of online communication, inability to escape to a safe place, and global access of the information.

15

search result or to go viral.   Implying a private right of action is necessary to provide an

adequate remedy for violations of the statute.    The criminal statute are inadequate to protect

victims like Mr. Huon, as the Madison County criminal case showed when the prosecutors

charged Mr. Huon with cyber stalking, after Jane Doe admitted to looking for his online presence

by Googling him.

## VIII.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT ("CDA") DOES NOT APPLY.

### A.    Gawker created the content.

Gawker may not seek the protection of Section 230 because Gawker is an "information

content provider" for the defamatory statements in question.  Gawker created the content by

calling Mr. Huon the "**Rapist**", despite a jury finding that he was not guilty, and by modifying

the original ATL article.  Gawker, and not some other party, fabricated the claim that the jury

relied on the strength of a bartender's testimony.   Gawker's assertion of the Fair Reporting

privilege concedes that Gawker created content.

The immunity of  Section 230 has nothing to do with the facts of this case.  Section 230

provides:  "No provider or user of an interactive computer service shall be treated as the

publisher or speaker of any information provided <u>by another</u> information content provider."[33]

47 U.S.C. § 230.   Section 230 does not protect website operators from liability as publishers

---

http://www.telegraph.co.uk/technology/internet/8687956/Cyberstalking-more-dangerous-than-traditional-bullying.html.

[33] 47 U.S.C. 230(c)(1) (emphasis added).  .  The idea behind the legislation was: how can Facebook be held liable for something that it did not even know was posted on its website. Tara E. Lynch, *Good Samaritan or Defamation Defender? Amending the Communications Decency Act to Correct the Misnomer of Section 230 . . . Without Expanding ISP Liability,* 19 SYRACUSE SCI. & TECH. L. REP. 1, 8 (2008).  Here, Gawker wrote the story, Gawker must approve each comment, even modified  and wrote the comments to its story, and Gawker blocked  Mr. Huon from posting a rebuttal.

Case 1:11-cv-09058   Document #: 269   Filed: 06/22/18   Page 14 of 39   PageID #:2713

who authored the content.  *MCW, Inc. v. Badbusinessbureau.com, L.L.C.,* 2004 U.S. Dist. LEXIS

6678, 31-32 (N.D. Tex. 2004) (Defendants wrote defamatory messages about  plaintiff with titles

such as "Con Artists," "Scam," and "Ripoff," organizing the reports under headings such as "Con

Artists" and "Corrupt Companies").   Gawker wrote the story, including the improper headline

calling Mr. Huon a "**Rapist**".

      **B.**      **Gawker created or controlled the comments.**

Gawker wrote the comments to its own story, or at least acted in a manner so as to be

considered an "information content provider" of those comments.  Journalist Drew Johnson has

traced hundreds of "anonymous" comments  posted to promote Gawker stories to actual Gawker

employees– ginning up their own pages. [34]  Mr.  Johnson has investigated Gawker writers

creating aliases to promote their own stories and Gawker employees creating fake accounts to

promote Gawker stories on Reddit.com.  He concluded that the practice of creating fake accounts

to post "anonymous" comments online  to promote Gawker's stories appear to be a

companywide policy.

The immunity afforded by the CDA is not absolute and may be forfeited if the site owner

invites the posting of illegal materials or makes actionable postings itself.  *Fair Housing Council*

*of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc); *Jones*

*v. Dirty World Entm't Recordings, LLC*, 766 F. Supp. 2d 828, 836 (E.D. Ky. 2011) (holding

website liable for comments posted by third parties).

In this case, Mr. Huon alleges that certain commenters may actually be Jezebel

Defendants' employees, posting under an alias, and several defamatory statements about Mr.

---

[34] Exhibit "I". *See* http://gawkersucks.blogspot.com.

Huon by unidentified "commenters" are actually Gawker employees.[35]

Furthermore, Gawker's commenting system is by "invitation only" and every comment must be approved by Gawker.  Gawker knows about the comments because it approves them.

## C.   Gawker provided the infrastructure and developed and choreographed the content of the commenting system to make money off of the most defamatory comments.

Gawker's  business model is to monetize comments and conversation.[36]  Nick Denton described the goal of the commenting system "to erase the traditional distinctions between writers, editors, readers, subject, and source"[37]  and to make money by monetizing comments from the 20 million+ page view Gawker gets each day.  Gawker's writers are under constant pressure to generate web traffic to keep their job, and the writers' compensation is based on the popularity of their stories and the amount of web traffic the story generates.[38]  There is a high turnover with Gawker's writers.   A writer left Gawker after possibly posting child porn on Gawker.[39]  Another Gawker's writer left after the writer was reported as having written fake stories or for having created fake accounts to promote his own stories.[40]  Journalist Drew Johnson has traced hundreds of "anonymous" comments  posted to promote Gawker stories to actual Gawker employees.  But Nick Denton, the principal and moving force behind Gawker,

---

[35] Paragraph 110, 4th Amended Complaint.

[36] Paragraphs 112 to 113, 4th Amended Complaint.

[37] Columbia Journalism Review, "Gawker's New Comment System", July 6, 2012. http://www.cjr.org/behind_the_news/no_comments.php?page=all .  Exhibit "B".

[38]See Exhibits "B" and Nick Denton's Internal Memorandum marked as Exhibit "C". Gawker tracks the web traffic for each of its writer.  http://gawker.com/stats-month.

[39]  See "Was Gawker writer fired for posting child porn?"  http://gawkersucks.blogspot.com/2012/12/was-gawker-writer-fired-for-posting.html. Exhibit "I".

[40] See http://gawkersucks.blogspot.com/2013/02/and-now-hes-gone.html.  Exhibit "I".

continues to run Gawker business model of defaming individuals to generate advertising dollars.

.

    In *Fair House. Council v. Roommates.com*, LLC, 521 F.3d 1157, 1171-1172 (9th Cir.

Cal. 2008), the 9th Circuit modified its prior holding in *Carafano*:

> As we explain above, see pp. 3458-64 supra, even if the data are supplied by third parties,
> a  website operator may still contribute to the content's illegality and thus be liable as a
> developer. n31 Providing immunity every time a website uses data initially obtained from
> third parties would eviscerate the exception to section 230 for "develop[ing]" unlawful
> content "in whole or in part." 47 U.S.C. § 230(f)(3).
>
> FOOTNOTES
>
> n31 We disavow any suggestion that *Carafano* holds an information content provider
> automatically immune so long as the content originated with another information content
> provider. 339 F.3d at 1125.
>
> We believe a more plausible rationale for the unquestionably correct result in *Carafano* is
> this: The allegedly libelous content there--the false implication that Carafano was
> unchaste--was created and developed entirely by the malevolent user, **without**
> **prompting or help from the website operator**. To be sure, the website provided neutral
> tools, which the anonymous dastard used to publish the libel, but the website did
> absolutely nothing to encourage the posting of defamatory content--indeed, the
> defamatory posting was contrary to the website's express policies. **The claim against the**
> **website was, in effect, that it failed to review each user-created profile to ensure that**
> **it wasn't  defamatory**. That is precisely the kind of  activity for which Congress
> intended to grant absolution with the passage of section 230. With respect to the
> defamatory content, the website operator was merely a passive conduit and thus could not
> be held liable for failing to detect and remove it. n32.  *Fair Hous. Council v.*
> *Roommates.com, LLC*, 521 F.3d 1157, 1171-1172 (emphasis supplied) (9th Cir. Cal.
> 2008).

    The 9th Circuit explained that Roommate.com, LLC was directly involved with

developing and enforcing a system that subjects subscribers to allegedly discriminatory housing

practices.  *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1171-1172 (9th Cir. Cal.

2008).  Causing a particular statement to be made, or perhaps causing the illegal content of a

statement  might be sufficient to create liability for a website.  *Chi. Lawyers' Comm. for Civ.*

19

*Rights Under Law, Inc. v. Craigslist, Inc.*, No. 07-1101, 2008 U.S. App. LEXIS 5472 (7th Cir.

Mar. 14, 2008); *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1171-1172 (9th

Cir. Cal. 2008).

      Here, Gawker is directly involved in developing and enforcing a system by "invitation

only" that defames individuals, discloses private facts, posts sex videos online, bullies

individuals.  Gawker invites users to submit the most outrageous and offensive comments to

increase the chances that the comments will be posted.   Gawker must approve each comment.

Gawker's only posts comments it loves under its comment by invitation only system:

> How do I get approved to comment?
>
> We only approve the comments we love—so make sure you're adding something of
> quality to the post. Stay on-topic and seek to further the conversation. Leave us a juicy
> story on the #tips page or throw your hat into the ring of our open forums . . .
> Do you have any tips for auditioning?
> Leaving multiple high-quality comments on different threads with your newly created
> account increases your chances of getting approved.[41]

Mr. Huon could not even post a rebuttal.   Defendants blocked and prevented Mr. Huon from

posting a reply under his legal name. On a later date,  Defendants moderated or censored Mr.

Huon's attempt to post a reply by removing or redacting his post.  None of the other users had

their post redacted.[42]  Thus, Gawker is developing and choreographing  the content.

      Moreover, the inflammatory "**Rapist**" story created by Gawker generated and provoked

more users to submit comments and discussions, thereby, generating more web traffic.  By

calling Mr. Huon the "**Rapist**", Gawker provoked more comments, and thus, contents, like the

---

[41] Paragraph 116-117, 4th Amended Complaint.

[42] Paragraph 123 to 124, Fourth Amended Complaint.

following:  "So he is actually upset about the 'Serial' rapist part, actually he is just a one-time

accused rapist".[43]  The reason why so many disparaging comments were made about Mr. Huon is

because Gawker posted a false and defamatory story calling Mr. Huon the "**Acquitted Rapist**".

    Gawker has a financial interest in developing the information that gets posted, since

every post can affect the number of web traffic and advertising dollars.  Gawker brags that the

Gawker system gives the advertiser a reasonably high degree of control and that it makes money

off of the conversation.

    In *FTC v. Accusearch, Inc.,*  the offending content was the disclosed confidential

information itself.   The 10th Circuit concluded that Accusearch was responsible for the

development of that content--for the conversion of the legally protected records from

confidential material to publicly exposed information. Accusearch solicited requests for such

confidential information and then paid researchers to obtain it. It knowingly sought to transform

virtually unknown information into a publicly available commodity. And as the district court

found and the record shows, Accusearch knew that its researchers were obtaining the information

through fraud or other illegality.  570 F.3d 1187, 1199 (10th Cir. Wyo. 2009).

    Here, Gawker knew that its editors, writers, or employees were defaming individuals—

because Gawker approved and promoted the comments it loved by "invitation only".  Gawker

paid its writers based on web traffic to their pages, Gawker invited submission from users or

created its own comments, and it shaped the conversation—all to generate advertising dollars.[44]

---

[43] Paragraph 122, 4th Amended Complaint.

[44]  On February 25, 2013, Gawker had over 4 million visits per day to its website and more than 27 million page views a day. Gawker ranked 37 in the US for website traffic.  By creating defamatory content, Gawker invites and encourages users to submit the most offensive comments.  Disparaging statements draws traffic.  Even a 1% response of 4 million visits is 270,000—270,000 potential comments.  Gawkers can edit or promote the most inflammatory comments and generate even more traffic.  Gawker can search through the hundreds, if not thousands,

21

In *Jones v. Dirty World Entertainment Recordings, LLC,* the court found that defendant service provider was a developer for the comments on its website and was responsible for the development of offensive content because it encouraged the development of offensive about the content. 840 F. Supp. 2d 1008, 1011 (E.D. Ky. 2012). Here, Gawker posts the defamatory story that starts the conversation, encourage its readers to post offensive comment about Mr. Huon, and shapes the conversation.

**D.  A question of fact exists as to whether Gawker created the content.**

A Federal Court has already held the CDA issues here cannot be decided on a motion to dismiss. *Hy Cite Corp. v Badbusinessbureau.com, L.L.C.,* 418 F.Supp.2d 1142, 1147-1149 (D. Ariz. 2005). When the defendants actively solicits or causes defamatory statements to be made, it is a question for the jury as to whether the Defendants created the content within the meaning of Section 230 of the CDA. *Doctor's Assocs. v. QIP Holder LLC,* 2010 U.S. Dist. LEXIS 14687, 66-71 (D. Conn. Feb. 19, 2010).

In *Doctor's Assocs.,* Quiznos ran an internet-based contest entitled "Quiznos v. Subway TV Ad Challenge". Quiznos' website invited customers to log onto the Contest website and enter the contest by uploading video submissions. Quiznos contended that these videos were posted as they were submitted, and without altering the creative content, in a manner that made it clear that the content was created by the contestants rather than by Quiznos. The District Court still held that whether the Defendants are responsible for creating or developing the contestant videos is an issue of material fact for jury. A reasonable jury may well conclude that the Defendants did not merely post the arguably disparaging content contained in the contestant

_of disparaging comments, post the most offensive comments, and shape the conversation. Exhibit "F"._

22

videos, but instead actively solicited disparaging representations about Subway and thus were responsible for the creation or development of the offending contestant videos.[45]

In this case, Gawker actively solicited disparaging content about Mr. Huon. Gawker called him a "**Rapist**" who got away with rape on a feminist blog and invited angry and disparaging submissions. Moreover, Gawker's own Terms and Conditions state "Do not post threatening, harassing, defamatory, or libelous material." But Gawker approved disparaging statements about Mr. Huon yet blocked Mr. Huon's response to clear his name. A reasonable jury can conclude that Gawker invited submissions to disparage Mr. Huon.[46]

### E. The Gawker Defendants' Cases Support Mr. Huon or do not apply.

The 9th Circuit does not read *Carafano* as granting CDA immunity to those who actively encourage, solicit and profit from the tortious and unlawful communications of others. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 489 F.3d 921, 927-928 (9th Cir. Cal. 2007). By providing a forum designed to publish sensitive and defamatory information, and suggesting the type of information that might be disclosed to best harass and endanger the targets, this website operator might well be held responsible for creating and developing the tortious information. *Id.* *Chi. Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) stated that "causing a *particular* statement

---

[45] See also *Woodhull v. Meinel*, 145 N.M. 533, 540 (N.M. Ct. App. 2008), ( a genuine issue of fact exists as to whether defendant's actions went beyond those intended to be immunized under the CDA. Instead of merely editing an email from a third party, defendant apparently requested potentially defamatory material for her own stated purpose of making fun of' plaintiff. That material was incorporated into an overall larger posting containing her own thoughts and contributions. )

[46] A FRCP 12(b)(6) is not grounds to strike part of the defamation claim (*i.e.*, the comments).

23

to be made, or perhaps [causing] the *discriminatory content of a statement*" might be sufficient to

create liability for a website. *Id.* at 671–72 (emphasis added).

In *Shiamili v Real Estate Group of N.Y., Inc.,* the court never decided whether to apply

the Ninth Circuit's view of "development" of the content  by the website, because there was no

allegation that the website invited the submission, created defamatory comments, approved every

comment, or posted a disparaging story. 17 N.Y.3d 281, 291 (N.Y. 2011).

Explaining <u>Ben Ezra, Weinstein, and Co., Inc. v. Am. Online Inc.</u>, 206 F.3d 980,

986 (10th Cir. N.M. 2000), the 10th Circuit in *F.T.C. v. Accusearch Inc.* said " In *Ben*

*Ezra*, however, America Online **had done nothing to encourage what made the**

**content offensive—**its alleged inaccuracy. . . [**A] website helps to develop unlawful**

**content, and thus falls within the exception to section 230, if it contributes materially**

**to the alleged illegality of the conduct** (emphasis supplied)."  570 F.3d 1187, 1199-1201

(10th Cir. 2009.  Here,  Gawker's actions were intended to generate the unlawful and

offensive content.  Gawker compares Nick Denton to the dark overlord Darth Vader

running an evil empire.[47]

*Dimeo v. Max,* 248 Fed. Appx. 280 (3d Cir. Pa. 2007) is not binding precedent and the 3rd

Circuit states it is not precedential.  Defendant in *Dimeo* did not encourage members to post

defamatory statements or create or shape content.

## VIII.        PLAINTIFF STATES CLAIMS AGAINST DENTON AND DARBYSHIRE.

Nick Denton is  the sole incorporator of Blogwire, Inc., the predecessor to Gawker

Media, LLC.  Mr. Denton signed a document as the manager of  Gawker Media, LLC, and Ms.

---

[47] Exhibit "C".

Darbyshire signed a document as a member of Defendant, Gawker Media, LLC.[48] Documents

from the Secretary of State, attached as exhibits to the 4th Amended Complaint, rebut

Defendants FRCP Rule 7.1 disclosure of affiliates. [49] Gawker's attorney has disclosed that

Gawker Media, LLC is the sole member of the Gawker Entertainment LLC, Gawker Sales LLC,

Gawker Technology LLC is.[50] Mr. Denton is the *alter ego* of Gawker Media. Section 805

ILCS 180/10-10(d) does not bar corporate veil piercing, such as *alter ego*, fraud, or

undercapitalization. *Westmeyer v. Flynn,* 382 Ill.App.3d 952, 960 (1st Dist. 2008). Accordingly,

Mr. Huon can sue Denton under a theory of piercing the corporate veil. *See Fontana v. TLD*

*Builders, Inc.,* 362 Ill.App.3d 491 (2nd Dist. 2005).

Mr. Huon asked Defendant Darbyshire, who is the COO of Gawker Media, LLC, to

remove the defamatory posts. She has the power to republish the defamatory posts, which

continues to be republished daily. Officers of a corporation can be personally liable for engaging

in tortious conduct. *See, e.g., Kohler Co. v. Kohler Intern., Ltd.,* 196 F.Supp.2d 690 (N.D.Ill.

2002); *Drink Group, Inc. v. Gulfstream Communications, Inc.,* 7 F.Supp.2d 1009, 1010 (N.D.Ill.

1998). Separate causes of action for defamation may be stated against additional defendants for

separate publication of defamatory material serving as a basis for another defamation claim.

*Dubinsky v. United Airlines Master Executive Council,* 303 Ill.App.3d 317 (1st Dist. 1999). The

republication rule applies to Internet postings. *Firth v. State of New York*, 306 A.D.2d 666

---

[48] See Exhibit "3" to the 4th Amended Complaint. The Secretary of State Documents attached to the 4th Amended
Complaint are attached here again as Exhibit "M".

[49] Defendants' 7.1 Disclosure states that "Gawker Media Group Inc is the only member of Gawker Media
LLC" and that "The parent company of GAWKER MEDIA LLC is GAWKER MEDIA GROUP INC." These
statements contradict each other. A member of an LLC cannot be its parent company.

[50] See Feige email attached as Exhibit "J". The Secretary of State documents attached as Exhibits 3 to 7 to the 4th
Amended Complaint rebut Defendants' 7.1 Disclosure and Mr. Feige's email.

(N.Y.A.D. 3 Dept. 2003). Moreover, these Defendants are liable under the conspiracy cause of action. The simple fact is that Gawker sensationalizes and fabricates stories to bring traffic to its website, and these Defendants participated in that conduct.

## IX. GAWKER IS LIABLE FOR REPUBLICATION

Since the beginning of United States defamation law, directing someone to libel has been held to be a republication for which liability attaches. .[51] Under common law, a person who republished a defamatory statement made by another was himself liable for defamation even though he gave the name of the originator. *Catalano v. Pechous* (1980), 83 Ill. 2d 146; *Owens v. CBS, Inc.,* 173 Ill. App. 3d 977, 992-993 (Ill. App. Ct. 5th Dist. 1988).

## X. GAWKER USED AN IMPROPER HEADLINE.

Gawker's headline "**Acquitted Rapist**" and Gawker's republication of the headline "**Rape Potpourri**" are enough to take this matter to a jury and are actionable defamation. *See Kaelin v. Globe Communications Corp.*, 162 F.3d 1036 (9th Cir. 1998). In *Kaelin*, the court made clear that Gawker could be successfully sued for libel over a false and defamatory headline, even when the story to which it referred was substantially accurate. *Id.* at 1042–43. There, an actor sued the *National Examiner* for the headline, "Cops Think Kato Did It."

The Gawker story and the republished ATL headline imply that even though Mr. Huon was acquitted, Mr. Huon is a "**Rapist**." In *Eastwood v. National Enquirer, Inc.*, 1997 WL 489027 (9th Cir. 1997), the Enquirer's front page touted an "Exclusive Interview" with Clint Eastwood. The court found that the language used, including descriptions of Eastwood's quotes and his demeanor while making certain statements, suggested "that the writer and the movie star

---

[51] Even repeating a defamatory statement made by a third person is defamation. Id; Restatement (Second) of Torts § 571, Comment c, at 187 (1977); Restatement, Second, Torts § 578 (1977); 1 Harper & James, supra, § 5.20 at 417; Prosser, Torts § 113 at 768 (4th ed. 1971).

had conversed." Eastwood never spoke to the Enquirer. *Id.* Illinois has followed this rule.[52]
As noted in *Eastwood,* the issue of whether the use of the headlines is defamatory is one for a
jury. Moreover, in addition to the headlines, as separate grounds for defamation, the Gawker
story itself, like the *Eastwood* case, suggests Gawker spoke to a juror and was informed by the
juror that the jury decided for Mr. Huon on the "strength" of the bartender's testimony.

## XII. DEFENDANTS DOES NOT MOVE TO DISMISS THE REMAINING COUNTS

Defendants do not move to dismiss Counts IV (Invasion of Privacy – Unreasonable
Intrusion Upon the Seclusion of Another - Against the All Defendants). Mr. Huon adopts his
arguments in his Response to the Above the Law Defendants' Motion to Dismiss. In this case,
Gawker disclosed private facts about Mr. Huon, including his personal life, and, worse, invented
private facts about him being a "**Rapist**."

## XII. RESPONSE TO DEFENDANTS' PRELIMINARY STATEMENT.

Defendants and its attorneys engage in name-calling and in focusing on matters not
connected to the litigation instead of trying to focus on the legal arguments. The Gawker
Defendants denigrate Mr. Huon as a "serial plaintiff". Mr. Huon has filed the same number of
lawsuits as the Defendants' attorney, David Feige: 3.[53] Defendants make the false statement that
Mr. Huon has sued more than 500 defendants, without offering any support. Mr. Feige, as a

---

[52]*Naked City, Inc. v. Chicago Sun-Times*, 77 Ill. App. 3d 188, 395 N.E.2d 1042 (1979); *Reed v. Albanese,* 78
Ill.App.2d 53, 223 N.E.2d 419, 422 (1966); *Spanel v. Pegler*, 160 F.2d 619 (7th Cir. 1947).

[53] On information and belief, David Feige, has appeared as a Class Action Plaintiff in *Feige v. RCN Corp.*, 2008
U.S. Dist. LEXIS 26922 (S.D.N.Y. Apr. 3, 2008) , 1:07-cv-08539-AKH (S.D.N.Y); 1:00-cv-02621-WHP
(S.D.N.Y.); **In re Trans Union Corp. Privacy Litig.**, 2005 U.S. Dist. LEXIS 17548 (N.D. Ill. Aug. 17, 2005),
1:00-cv-04729 (N.D.Ill.),; *Feige v. RCN Corp.,* 2008 U.S. Dist. LEXIS 26922 (S.D.N.Y. Apr. 3, 2008) Mr. Feige
served as a Class Action Plaintiff in 1:00-cv-02621-WHP (S.D.N.Y.) and in *Feige v. RCN Corp.*, 2008 U.S. Dist.
LEXIS 26922 (S.D.N.Y. Apr. 3, 2008).

serial Class Action plaintiff, brought a lawsuit against 190 million people seeking more than 19

billion dollars with no actual damages.[54]   Mr. Feige cannot cite to any case where Mr. Huon has

filed a meritless lawsuit.[55]   In contrast, Mr. Feige was chastised by the Federal Court for bringing

a meritless class action case because the defendant placed him on hold for 45 minutes.[56]

Mr. Feige's personal attacks are telling:

First, it supports the claim that Gawker was engaged in a vigilante style form of cyber

bullying by treating Mr. Huon as a registered sex offender:

> There is certainly a public interest in knowing about alleged sex crimes, and indeed, there
> has been a great deal of legislative effort and attention to tracking and reporting on sex
> offenders . . .

> It is curious, and somewhat frightening that the defendants Huon has targeted for his
> harassing lawsuits are those who publish on the internet precisely the place he has used as
> a stalking ground **on at least two occasions**, and the very tool he has used in the past for
> bullying . . .

> It is understandable that Plaintiff is familiar with the "cyberstalking" statute.  He has,
> after all been criminally charged with violating it (emphasis supplied).[57]

Second, Mr. Huon has never been charged with stalking "on at least two occasions",

is not a "sex offender," and has no pending criminal charges.[58]   Borrowing a playbook from

Gawker, Mr. Feige demonstrates the same style of sloppy investigation and inventing facts that

---

[54] "In the instant case, approval of a class action could result in statutory minimum damages of over  $ 19 billion, which is grossly disproportionate to any actual damage." *In re Trans Union Corp. Privacy Litig*., 211 F.R.D. 328, 350-351 (N.D. Ill. 2002).

[55] In *Huon v Johnson and Bell, Ltd*. the Seventh Circuit stated that "The  court  was  probably  misled  by the defendants' . . ." and  that, as a result,  "Huon's federal case  has  been  languishing  for  almost two  years". *Huon v. Johnson and Bell, Ltd., et.al. 657 F.3d 641 (7th Cir.).*

[56]   "Plaintiff's second cause of action is equally meritless."  *Feige v. RCN Corp.*, 2008 U.S. Dist. LEXIS 26922 (S.D.N.Y. Apr. 3, 2008).

[57] (Defendants' Memorandum, pages 12, 16, Docket 58).

Gawker did in its story.

## CONCLUSION

Therefore, the matter should proceed to discovery and then to trial so that Mr. Huon can

present his case to the jury.

WHEREFORE, Plaintiff, Meanith Huon, requests that this Honorable Court deny the

Gawker Defendants' Motion to Dismiss.

/s/Meanith Huon

Meanith Huon

## CERTIFICATE OF SERVICE

Under penalties of law, I attest the following documents or items have been or are being
electronically served on all counsel of record for all parties on March 12, 2013:

### MEANITH HUON'S RESPONSE TO THE GAWKER DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF LAW

/s/ Meanith Huon

Meanith Huon
The Huon Law Firm
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

---

[58]See verdict of not guilty in Case No. 08 CF 1496, nolle prosse order in Case No. 09 CF 1688, and nolle prosse
Case No. order in No. 11123163101, Exhibit "K".

29

Move to Inbox          More ▾

to me ▾

**Icloud** <davidfeige@me.com>
to me, gslaw, ogislan, ahansen, aszuch ⚬

Jan 10

Dear Mr. Huon,

The motion has been filed on behalf of:

Gawker Media Group Inc
Gawker Media LLC
Gawker Entertainment LLC
Gakwer Sales LLC
Gawker Technology LLC
As well as the individual defendants.

Hope that answers your question.

If not please feel free to follow up.

Best,

David Feige.

***NOTICE***
This message is confidential and may contain information that is

Case: 1:11-cv-03054 Document #: 195-2 Filed: 03/12/13 Page 1 of 4 PageID #:2729

How can we improve the way citizens and governments interact?

Knight News Challenge: Open Government

@knightfdn #newschallenge

+ Add your entry

Contact | Donate | Advertise

# COLUMBIA JOURNALISM REVIEW

The future of media is here



SUBSCRIBE
new | gift | renew

Saturday, March 09, 2013, Last Update: Fri 4:00 PM EST

The Industry   Politics & Policy   Business   Science   Culture   Magazine   Resources

Search:

## Behind the News



CJR on the media

06:50 AM - July 6, 2012

## Gawker's new comment system

Will it help or hurt the site's young writers?

**By Peter Sterne**

ONE PAGE

Gawker Media publisher Nick Denton recently introduced a new commenting system, called Kinja, on his network of websites. Rather than showing all comments on a given article, Kinja shows only the most interesting thread of comments and replies. Denton hopes this will finally make reporters and sources pay attention to the comments instead of dismissing them; to help ensure that, he's ordered his staff writers to reply to

ALSO BY PETER STERNE

- Financial reporting, for pros and the public
- USPS may start selling mag subscriptions
- A reporter is fired; colleagues quit in protest

RELATED ARTICLES

- Stories I'd like to see—The next terrorist attack, Obama's Medicare cuts, and the gun lobby
- Smith-Mundt reform: In with a whimper?—It's now legal to broadcast Voice of America stateside, but few seem to notice

*Help sustain serious reporting.*
*Give to CJR's*

**Fund for**

Case: 1:11-cv-03054 Document #: 195-2 Filed: 03/12/13 Page 2 of 4 PageID #:2730

hopes this will finally make reporters and sources pay attention to the comments instead of dismissing them; to help ensure that, he's ordered his staff writers to reply to interesting comments on their articles.

"The goal is to erase the traditional distinctions between writers, editors, readers, subject, and sources," Denton told CJR in a Gchat. At the same time, he insisted, "our goal is to help our writers each achieve greater influence and reach with the same amount of work." So which is it—does Denton want to empower writers or replace them? It seems unlikely that Gawker will go the way of *GOOD* magazine, which eliminated the distinction between writers and readers by firing its editorial staff and replacing them with a discussion system for unpaid contributors. (When asked about *GOOD*, Denton replied that it "sounds like they were trying to put a high-tech complexion on an old-fashioned bankruptcy," which suggests he doesn't intend to mimic *GOOD's* decisions.)

But it's not clear whether the interaction with commenters that Kinja demands will benefit or hurt Gawker staffers.

What seems clear is that Gawker staffers will have to embrace Kinja if they want to keep their jobs. Gawker staffers who spoke to Kat Stoeffel, the *New York Observer* media reporter who published an article about Kinja last week, strongly suggested as much, and the pressure on writers seems likely to increase given Gawker's lower-than-expected traffic numbers, obtained by CJR.

For the last few months, according to internal traffic stats from a former Gawker staffer, the Gawker network has missed its internal traffic goals for visitors from the US. In April, its traffic goal was 20.8 million unique visitors, but it received only 20.3 million visitors; in May, it expected 20.9 and received only 19.9 million visitors; and in June, it again aimed for 20.9 and received only 19 million visitors. (To be fair to Gawker, growth has



# Fund for Journalism's Future

**Click here to Donate**

---

**MOST POPULAR**    MOST COMMENTED    TWITTER

A *Businessweek* cover crosses a line - Minorities as greedy grotesqueries fueling a new housing bubble

The battle of New Orleans - Is Advance Publications securing the future of local news—or needlessly sacrificing it?

NYT cancels Green blog - No explanation from editors following surprise announcement

Nate Thayer accused of plagiarism - "I will defend to the death my reporting and attribution of this piece"

Dark shadows - In Washington, murder turns out to be color-coded

---

Sign up for emails

**MUST-READS FROM AROUND THE WEB**

The professor and the bikini model

benefit or hurt Gawker staffers.

What seems clear is that Gawker staffers will have to embrace Kinja if they want to keep their jobs. Gawker staffers who spoke to Kat Stoeffel , the *New York Observer* media reporter who published an article about Kinja last week, strongly suggested as much, and the pressure on writers seems likely to increase given Gawker's lower-than-expected traffic numbers, obtained by CJR.

For the last few months, according to internal traffic stats from a former Gawker staffer, the Gawker network has missed its internal traffic goals for visitors from the US. In April, its traffic goal was 20.8 million unique visitors, but it received only 20.3 million visitors; in May, it expected 20.9 and received only 19.9 million visitors; and in June, it again aimed for 20.9 and received only 19 million visitors. (To be fair to Gawker, growth has flatlined across the Web.)

At Gawker, numbers like these can often mean someone's job is in trouble. Not that fear for their livelihoods and constantly changing job descriptions are new for Denton's employees, who are treated differently from most professional writers and reporters. "Gawker writers are hardly professional," said former Gawker editor Choire Sicha, who now runs the website the Awl. "The guiding principles at Gawker are: People are pretty scared of Nick, people always feel they are about to be fired, and the job is shifting beneath their feet." Still, these less-than-stellar stats will increase pressure on writers to adapt to Kinja. Responding to the low traffic numbers, Denton explained that "making the best sites we can should increase uniques." For Denton, of course, a centerpiece of "the best sites" is Kinja.

So Gawker writers will embrace the new commenting platform. Whether this will help or hurt them depends to some degree on whether other, more prestigious news outlets—the

## MUST-READS FROM AROUND THE WEB

**The professor and the bikini model**
A world-renowned physicist meets a gorgeous model online. They plan their perfect life together. But first, she asks, would he be so kind as to deliver a special package to her?

**Juan Williams' plagiarism problem**
Fox News pundit blames researcher for word-for-word similarities

**Outmatched**
Conservatives' support for state-based think tanks is paying off in regressive legislation. Liberals are scrambling to keep up

**He who makes the rules**
President Obama's biggest second-term challenge is saving his first-term achievements from being dismembered by lobbyists and conservative jurists in the shadowy, Byzantine "rule-making" process

**VIDEO FEATURE**

**NYT cancels Green blog** - No explanation from editors following surprise announcement

**Nate Thayer accused of plagiarism** - "I will defend to the death my reporting and attribution of this piece"

**Dark shadows** - In Washington, murder turns out to be color-coded

Sign up for emails

Case: 1:11-cv-03054 Document #: 195-2 Filed: 03/12/13 Page 4 of 4 PageID #:2732

So Gawker writers will embrace the new commenting platform. Whether this will help or hurt them depends to some degree on whether other, more prestigious news outlets—the kind of places that Gawker's young writers aim to end up—follow Denton's lead. If these sites try to maintain a sharp distinction between writers and commenters, then time spent replying to comments could be wasted time for Gawker's young and ambitious writers.

Over the last decade, many Gawker staffers have gone on to choice jobs. Gabriel Snyder, a former editor, was scooped up by The Atlantic Wire, and he later hired away Gawker's TV reviewer, Richard Lawson. Maureen O'Connor was recently picked up by *New York Magazine* to edit features for its fashion blog, The Cut. Alex Pareene, Gawker's erstwhile politics editor, got a staff writing job at Salon, and his successor, Jim Newell, now contributes to Salon, Wonkette, and the *Guardian*. Elizabeth Spiers, Gawker's first editor, is now editor-in-chief of the *New York Observer*.

If anyone were worried about the effects that Kinja could have on journalism, it would be these Gawker alums, who got hired by more established journalistic outlets on the strength of their writing. But most aren't concerned. They're apathetic.

"If editors are looking there for talent," Pareene explained in an email, "I think they'll continue to read the site the same way I still do, which is by reading the posts and ignoring everything beneath them." He does not think editors at more established outlets—say, Salon—will look negatively on Gawker writers' interactions with commenters. "I don't really think mixing it up in the comments reflect poorly on a writer unless their comments are themselves poor. It shouldn't be much more damaging than engaging with people on Twitter." Newell agreed, writing in an email, "I don't see any new commenting scheme changing the fact that a staff writing job at Gawker is a great

## VIDEO FEATURE



AMANDA PALMER
THE ART OF ASKING

**The art of asking**
Amanda Palmer believes we shouldn't fight the fact that digital content is freely shareable — and suggests that creators can and should be directly supported by fans

## RECEIVE A FREE ISSUE
OF COLUMBIA JOURNALISM REVIEW





- If you like the magazine, get the rest of the year for just $19.95 (6 issues in all).
- If not, simply write cancel on the bill and return it. You will owe nothing.

First

Last

"If editors are looking there for talent," Pareene explained in an email, "I think they'll continue to read the site the same way I still do, which is by reading the posts and ignoring everything beneath them." He does not think editors at more established outlets—say, Salon—will look negatively on Gawker writers' interactions with commenters. "I don't really think mixing it up in the comments reflect poorly on a writer unless their comments are themselves poor. It shouldn't be much more damaging than engaging with people on Twitter." Newell agreed, writing in an email, "I don't see any new commenting scheme changing the fact that a staff writing job at Gawker is a great place to write whatever you want and have your byline noticed."

Kinja could even help writers land jobs. If other news organizations adopt similar comment systems, Gawker writers' experience with the platform will become a valuable resume booster. But will other outlets follow Gawker's lead? Denton thinks they will, once Kinja ushers in a new style of "public journalism" that will be more trustworthy than the traditional kind where reporters interview sources in private and then write about it. In Denton's vision, sources are interviewed in the comments of posts; while a journalist directs the interview, the public gets to grill the source right alongside the professional journalist. "It's time for the leakers and the moles to bypass the traditional gatekeepers of information; and it's time for them to be subject to challenge, not just by their pet reporter, but by readers," Denton said.

As an example of Kinja's potential benefits, Denton points to Judith Miller's credulous reporting on Ahmed Chalabi in The New York Times. "One assumes Ahmed Chalabi's account was subject to some test by Judith Miller of the Times, the chosen vehicle for his propaganda about Saddam's weapons of mass destruction," he wrote. "But not a sufficiently rigorous examination." Had Chalabi been publicly interviewed by Miller and

---

- If you like the magazine, get the rest of the year for just $19.95 (6 issues in all).
- If not, simply write cancel on the bill and return it. You will owe nothing.

First

Last

Address

City

State

Zip

Email

**Get My Free Issue Now**

**RESOURCES FOR JOURNALISTS**

**CJR's Guide to Online News Startups**
TRVL – A free iPad travel magazine

**Who Owns What**
Select a media company...

**The Business of Digital Journalism**
A report from the Columbia University Graduate School of Journalism

Case: 1:11-cv-03054 Document #: 195-3 Filed: 03/12/13 Page 2 of 3 PageID #:2734

propaganda about Saddam's weapons of mass destruction," he wrote. "But not a sufficiently rigorous examination." Had Chalabi been publicly interviewed by Miller and her readers in Kinja, Denton implied, maybe he would have been exposed.

Denton's dream is unlikely to become reality anytime soon. There's just no reason why sources, particularly sensitive and anonymous ones, would want to be interviewed in public. But it's still possible that other news organizations will want to adopt Kinja-like commenting systems. It's no secret that internet comment systems, particularly on mainstream news sites, are broken. Offensive and off-topic comments outnumber interesting comments so that the entire comment system is regarded as toxic and ignored by writers, which then leads to even more terrible comments from unregulated commenters. Sicha sums it up bluntly: "The comment space is treated like shit, so [commenters] act like shit." Even if it doesn't revolutionize journalism, Kinja could fix this problem, since it allows writers to control which comments are displayed. If Kinja does work, Gawker writers could find their commenter-engagement skills in high demand.

Clay Shirky, the NYU journalism professor and Future of News guru, thinks other sites should follow Gawker and try out new comment systems. "Gawker has demonstrated that it's possible to be a large, high-traffic site, and still do considerable experimentation with comments," he said. Could Kinja even come to the *Times* one day? Shirky demures. "My New Year's resolution for 2012," he explained, "is that when talking about the future of news, I won't discuss *The New York Times*." But, he added, "I think it will work for any place that has a lot of comments and a small group of users who control the comments," a description that encompasses plenty of news sites and blogs that might look to Gawker writers for help transitioning to a new comment system.

**The Business of Digital Journalism**
A report from the Columbia University Graduate School of Journalism

**Study Guides**
Questions and exercises for journalism students.

## CJR'S BLOGS & COLUMNS

**#RealTalk**
Freelancing for free – Sometimes—and only sometimes—it makes sense to write for free

**Minority Reports**
Writing about powerful women – The media should stop treating Sheryl Sandberg and Marissa Mayer as though they represent their whole gender

**Language Corner**
Cardinal rules – A real 'conclave' is at hand

**The Kicker**
Nate Thayer: freelance plagiarist? – Sloppy, yes
Plagiarist ... doesn't look like it

## THE MAGAZINE

**The Magazine**
Table of Contents
Subscribe
Back Issues

Case: 1:11-cv-03054 Document #: 195-3 Filed: 03/12/13 Page 3 of 3 PageID #:2735

Nate Thayer freelance plagiarist / – Sloppy, yes.
Plagiarist ... doesn't look like it

**THE MAGAZINE**

**The Magazine**
Table of Contents
Subscribe
Back Issues

Clay Shirky, the NYU journalism professor and Future of News guru, thinks other sites should follow Gawker and try out new comment systems. "Gawker has demonstrated that it's possible to be a large, high-traffic site, and still do considerable experimentation with comments," he said. Could Kinja even come to the *Times* one day? Shirky demures. "My New Year's resolution for 2012," he explained, "is that when talking about the future of news, I won't discuss *The New York Times*." But, he added, "I think it will work for any place that has a lot of comments and a small group of users who control the comments," a description that encompasses plenty of news sites and blogs that might look to Gawker writers for help transitioning to a new comment system.

If the rest of the Web follows Denton's lead, then Kinja may simply be the next platform, like Wordpress or Twitter, that digital-age journalists need to learn. "These jobs we have as writers change, sometimes radically," Sicha acknowledged. "Online-native outlets could just be the first to blur the line between writers and commenters." Rather than herald the death of writers, the dawn of Kinja may just indicate that engaging with commenters will soon become a must-have skill.

This skill could help young reporters, insofar as it ensures they can get good jobs, but it won't necessarily help them develop their reporting skills. Assuming that Denton's "public journalism" doesn't pan out and sources don't line up in the comments to be grilled by Gawker reporters, it's difficult to see how Kinja will make Gawker staffers into better journalists. Right now, young reporters often must write, blog, aggregate, and tweet, which leaves little time for actually reporting. Adding interaction with commenters to that list won't help.

Case: 1:11-cv-03054 Document #: 195-4 Filed: 03/12/13 Page 1 of 4 PageID #:2736



SIGN IN

SATURDAY, MAR 9, 2013

LATEST STORIES ▸

DROID
RAZR MAXX HD
THE LONGEST LASTING
4G LTE SMARTPHONE
CLICK TO EXPAND ▸

verizon

TRUE STORIES
Staring Into the Abyss

WRITING
When People Write for Free, Who Pays?

EGYPT
U.S. Delays Award to Egyptian Activist After Finding Her Anti-Semitic Tweets

HOMELESSNESS



TOP STORIES

JAN 1, 2008 3:02 AM

20,485 ♠ 31 ●

BY PAUL BOUTIN ●

Share    +1    f Like    0

Don't sweat it
HANDLE IT®

You Tube

Speed Stick



GAWKER

BLOGGING FOR DOLLARS

# Denton to pay bloggers based on traffic

Gawker Media dark overlord Nick Denton (pictured) has launched a new pay system for all Gawker Media blogs, after testing it at

Gawker Media dark overlord Nick Denton (pictured) has launched a new pay system for all Gawker Media blogs, after testing it at four of his leading sites. Denton's goal is to discourage "self indulgent" posts and "mind-numbing frequency" in favor of "linkworthy material, by which I mean a secret memo, a spy photo, a chart, a well-argued rant, a list, an exclusive piece of news, a well-packaged find." Where does a self-indulgent secret memo fit on that axis? I guess we'll find out after the jump.



From: Noah Robischon
Subject: Editor Newsletter - 2008 Preview Edition
Date: December 31, 2007 11:42:12 AM PST

In January, as you've no doubt heard, Gawker editorial is introducing a new bonus system. While your base monthly pay remains the same, the chance of a bonus will depend on your individual performance. More specifically: it will depend on the popularity of your posts that month. Below, an explanation of the background to the move; why now; and how the new system works.

1. BACKGROUND

It's only on the internet that a writer's contributions can be measured. At newspapers, a reporter's reputation depends on the opinion of their editors, which can be fickle. Some

---



U.S. Delays Award to Egyptian Activist After Finding Her Anti-Semitic Tweets

891

**HOMELESSNESS**



Bloomberg Blames NYC's Homeless Problem on Jet Setting Playboy Millionaires

**GEORGE W. BUSH PAIN...**    5,975



George W. Bush's Art Teacher Says He's Painted 50 Dogs

**EVERYDAY SUPERHERO**    7,760

Fat Dancing Speedo Man Is the Hero We Both Need and Deserve

**COMPILATION**    15,505



Bad Morning: Watch a Bunch of Cruel Jerks Wake People Up in the Shittiest Ways Imaginable

**BOOBS**    10,567

'A Couple of Boobs': The Tabloid Epic and the Headline That Could Not Be Contained

**JUSTIN BIEBER**    3,976

Gas Masks, Angel Wings and Fainting Spells: The Week We Lost Justin Bieber

Case: 1:11-cv-03054 Document #: 195-4 Filed: 03/12/13 Page 3 of 4 PageID #:2738

From: Noah Robischon
Subject: Editor Newsletter – 2008 Preview Edition
Date: December 31, 2007 11:42:12 AM PST

In January, as you've no doubt heard, Gawker editorial is introducing a new bonus system. While your base monthly pay remains the same, the chance of a bonus will depend on your individual performance. More specifically: it will depend on the popularity of your posts that month. Below, an explanation of the background to the move; why now; and how the new system works.

1. BACKGROUND

It's only on the internet that a writer's contributions can be measured. At newspapers, a reporter's reputation depends on the opinion of their editors, which can be fickle. Some people get on because they play the office politics well. Or simply because they're more aggressive in lobbying for more prominent jobs, or pay increases.

Advertising people say that the internet is special, because the audience's engagement is so much more measurable than that of newspaper readers, or television viewers. Which makes it so bizarre that most writers, on the internet as in print, are paid for the sheer brute quantity of their output.

Gawker has been equally backward. Sure, we pioneered the pageview bonus system, which rewards all writers for a site's performance. But, let's be honest: those bonuses have been allocated subjectively. And, in the large, writers have been rewarded, at $12 a post, for mind-numbing frequency. When we've paid a higher rate (the $200 "feature" rate) we've often not been rewarding better pieces; merely encouraging the padding of perfectly good, short items.

**COMPILATION** 15,506
Bad Morning: Watch a Bunch of Cruel Jerks Wake People Up in the Shittiest Ways Imaginable


**BOOBS** 10,587
'A Couple of Boobs': The Tabloid Epic and the Headline That Could Not Be Contained


**JUSTIN BIEBER** 4,526
Gas Masks, Angel Wings and Fainting Spells: The Week We Lost Justin Bieber


**MODERN TIMES** 3,100
Oversharing Dude Gets Vibrating Dildo Stuck Up His Ass, Livetweets Trip to ER [UPDATED with X-Ray]


**LOUIS C.K.** 3,084
Oh My God: The First Promo for Louis C.K.'s HBO Special Is the Greatest


**BEES** 267
Bees Attack Over 40 Young Children in South Africa

**DANIELLE FISHEL** 8,527
*Boy Meets World* Star Danielle


good, short items.

In short, we have repeated the bad habits of traditional media organizations: leaving remuneration to the arbitrary will of upper management; and, by treating words as if they were Soviet steel output targets, encouraging quantity over quality.

## 2. WHY NOW

Early on in the commercial blog era, frequency was the key to the success of a site: Engadget took a lead because it churned out 24 posts a day while Gizmodo, fearful of overwhelming its audience, stuck to a dainty dozen items. We learnt that lesson, and vowed never to be out-produced again. But we now really are reaching the limits of sheer volume. Readers can't take any more. And the proliferation of blogs, and social news services such as Digg, has changed the rules.

Where there was a shortage of attitude and commentary, there's now a surfeit. And what's in heavy demand, and short supply, is linkworthy material, by which I mean a secret memo, a spy photo, a chart, a well-argued rant, a list, an exclusive piece of feature she pioneered a packaged find. Gina showed on Lifehacker, with the style of feature she pioneered a couple of years ago, that it was possible to grow a site's audience without endlessly increasing the number of posts.

Second, our objective is not merely to provide gratification for a writer, or amusement for their pals, but to appeal to the wider readership of a site, and to new readers who might discover it through Digg or Google or some other link. It's fine to pen the occasional self-indulgent or self-referential item. But we're not going to waste the editorial budget on them, when we're investing so heavily in the sites. We need a more efficient form of bonus compensation — and one that's fair to the writers who care most about their readers.



**DANIELLE FISHEL**    8,521
*Boy Meets World* Star Danielle Fishel Sheds Childhood Innocence, Clothes for Latest Issue of *Maxim*



**HOLLY MADISON**    677
Holly Madison's Daughter Sounds Like a Very Bright Pasta



**DRONES**    148
Air Force Stops Reporting Drone Strikes in Afghanistan



**CHRISTINE TEIGEN**    15,540
*Sports Illustrated* Swimsuit Model Celebrates Twitter Milestone by Violating Instagram TOS with Fully Nude Pic (NSFW)



**BAD IDEAS**    816
Neptune Puts the Kibosh on Couple's Saccharine Seaside Proposal

These amazing pictures show a side of Iran that *Argo* didn't.



**ADAM CAROLLA**    5,896
Adam Carolla: "What's Wrong with Blacks and Latinos?"

**DOMINO'S**    5,895




them, when we're investing so heavily in the sites. We need a more efficient form of bonus compensation — and one that's fair to the writers who care most about their readers.

Third, the market for editorial talent is becoming more competitive. If a writer works like hell, or sparkles, we always run a risk: that somebody outside the organization notices before the news trickles up the management hierarchy. We need a mechanism to reward hard work, and stardom — to dispense pay increases automatically, if you will.

3. HOW IT WORKS

For several months now, we've displayed the number of views each item receives. It's not a perfect measure. The view count does not reflect attention paid to the posts on the front page; nor photo galleries (which are usually junk views anyhow); and it can overstate the value of cheap items with superficial appeal, but which damage a site's reputation. Nevertheless, it's the best measure we have, so we're going to use it to calculate bonuses.

From now on, you will be paid a set monthly fee. This is the total amount of money outlined in your editorial agreement or determined between you and your site lead. The era of counting posts that are worth $12 or $200 is over. You will be expected to contribute a set number of posts each month in exchange for your monthly base pay.

On top of your monthly base pay, you will be eligible for a bonus based on the number of pageviews your posts receive each month. This total includes any pageview on any story with your byline that was read during the month, even if the story is months or years old. You can track your monthly total here: (Click your site name in the rollup data section along the very top of the page).

Each site will be assigned a pageview rate, which is the dollar amount that each 1,000 pageviews on the site is worth. Although this sounds similar to an advertising CPM, this


Adam Carolla: 'What's Wrong with Blacks and Latinos?'


**DOMINO'S**
I Can't Stop Watching This Hilariously Stilted Japanese Domino's Ad

Chris Brown has some caring, nuanced, sensitive advice about how to talk to women.


**COLLEGE**
Women's College Students Will Pay in Blood for Throwing the Lamest Party Ever


**WTF**
Kindergarten Teacher Terminated After Bringing Vial of Her Blood to Class, Letting Children Taste It


**HEY SCIENCE**
Could the U.S. Have Assassinated Hugo Chavez Using Cancer?


**EXIT MUSINGS FOR A F...**
James Franco: The Cynical Wizard of Oz

**FOOD**
'Best Restaurant in the World' Offers Ants, Roe, and Horrible

You can track your monthly total here: (Click your site name in the rollup data section along the very top of the page).

Each site will be assigned a pageview rate, which is the dollar amount that each 1,000 pageviews on the site is worth. Although this sounds similar to an advertising CPM, this number has nothing to do with your site's revenue or advertising value. At the end of the month, if the money you earn in pageviews exceeds your monthly base pay, you will be paid the extra money as a bonus.

This chart should make it clearer. If your site has a PV rate of $5:

$2,000 = 400,000 views:

$5,000 = 1m views:

$7,000 = 1.4m views

Based on this example, if your base pay is $2,000 per month then you would need to get upwards of 400,000 pageviews to begin earning bonus. A total of 500,000 views would earn $500 bonus (or $2,500 total pay).

Your site lead will be able to tell you the pageview rate for your site, and give you a chart like this one to for calculating bonus.

For the majority of sites, there is no cap on the amount of bonus you can earn each month. Four sites are already using the new bonus system (Gawker, Wonkette, Gizmodo and Defamer). One guest editor on Wonkette landed a huge exclusive and walked away with an extra $3k in his paycheck.

James Franco: The Cynical Wizard of Oz

666

FOOD

'Best Restaurant in the World' Offers Ants, Roe, and Horrible Diarrhea Illness

like this one to for calculating bonus.

For the majority of sites, there is no cap on the amount of bonus you can earn each month. Four sites are already using the new bonus system (Gawker, Wonkette, Gizmodo and Defamer). One guest editor on Wonkette landed a huge exclusive and walked away with an extra $3k in his paycheck.

-Rules Of The Road-

* The pageview rate for each site will change at the beginning of each quarter. It cannot be changed at any other time.

* This bonus will replace all other bonuses that now exist.

* Site leads do not take part in this system. They are still measured on overall site performance.

* The site lead has the right to revoke pageviews on any post. This is to guard against the publication of material that may be inappropriate or illicit, and we hope it is never necessary.

The site leads have more detailed information about all of this, and can share specific numbers for your site to give you a better sense of how your pageviews will translate into bonus.

Please send questions to so that we can round them all up and answer for everyone.

All best,

- Noah and Nick

Case: 1:11-cv-03054 Document #: 195-5 Filed: 03/12/13 Page 4 of 4 PageID #:2743

bonus.

Please send questions to so that we can round them all up and answer for everyone.

All best,

- Noah and Nick

COMMENT

*Contact Paul Boutin:*

**DISCUSSIONS**

FEATURED    ALL

Discussion now closed.

raincoaster                                             03 Jan 2008 9:18 AM

@Owen Thomas: why the hell are you hiring people who don't even know how to use alt tags?






Case: 1:11-cv-03054 Document #: 195-6 Filed: 03/12/13 Page 1 of 6 PageID #:2744

Tuesday, January 8, 2013

# Catalogue of Gawker's alleged Reddit accounts

These are Reddit accounts I suspect were created by Gawker employees or Gawker interns for the purpose of promoting articles on Reddit.

Most of these are shell accounts with no commenting history. They aren't sockpuppets in the usual sense. Argon-aschleman is an exception, and I exposed him earlier. Also of note, the deleted Twitter account "Turnipsun" belonged to a Christopher Mascari, and Gizmodo's Christopher Mascari was Gawker's editorial marketing manager from 2010 to 2012. Therefore, these accounts appear to be the result of a company policy.

**argon_aschleman**
Created: October 21st, 2012. 02:47:26 UTC
Links: 6
URLs: All Deadspin

**argon-aschleman**
Created: November 16th, 2012. 05:44:42 UTC
Links: 7
URLs: All Deadspin

**turnipsun**
Created: March 2nd, 2010. 20:50:31 UTC
Links: 76
URLs: Gizmodo–42; Deadspin–8; Gawker–7; Jezebel–7; Kotaku–6; Lifehacker–3; Jalopnik–2; io9–1.

Links: 5
URLs: All Deadspin

**argon-aschleman**
Created: November 16th, 2012. 05:44:42 UTC
Links: 7
URLs: All Deadspin

**turnipsun**
Created: March 2nd, 2010. 20:50:31 UTC
Links: 76
URLs: Gizmodo–42; Deadspin–8; Gawker–7; Jezebel–7; Kotaku–6; Lifehacker–3; Jalopnik–2; io9–1.

3 DOWN, 215 TO GO…

Read more »

Posted by Drew Johnson at 11:48 PM    1 comment:

M  [icons]  +1  Recommend this on Google

Labels: Christopher Mascari, Gawker, Gizmodo, Reddit

Saturday, January 5, 2013

## 3,000+ pageviews

Thanks to everyone so far who has checked out this blog. This is still a new undertaking and I'm determining what tone it will finally take-- i.e. are there enough secrets about Gawker left to uncover, or will I settle into more of a FireJoeMorgan-type tone?

Case: 1:11-cv-03054 Document #: 195-6 Filed: 03/12/13 Page 3 of 6 PageID #:2746

# Gawker Sucks

Sunday, December 9, 2012

## Finding Mobutu

Most people reading this are probably familiar with Gawker Media properties. They're the collection of news and gossip sites run by Nick Denton.

Recently they've positioned themselves as the morality police of the web. If you say something deemed racist or sexist, or if you act like a troll, they'll plaster your personal information online for everyone to see, and generally make you look bad on any future Google searches. They even did this with the Horse_ebooks guy, even though his only infraction was having a popular twitter account.

Now mothers everywhere are telling their little kids, "Eat your vegetables, or else Gawker is going to expose you."

Well I'm not the least bit intimidated by Gawker. Their "morality" is corrupt. And I want to give them a taste of their own medicine.

The only Gawker writer who avoids revealing his true name is Mobutu Sese Seko. Mobutu runs the website *Et tu, Mr. Destructo?*. He has operated it for four years, and back in February he was hired to be Gawker's "screaming conscience," which means he's their main political columnist.

Mobutu, if you're reading this, prepare to get--as the trolls like to say--butthurt.

## Blog Archive

▶ 2013 (6)

▲ 2012 (8)

▼ December (8)

Exposing Deadspin: A recap

Was a Gawker writer fired for posting child porn?

Stay classy, Max Read

The Chief Keef incident

More to come...

Finding Mobutu

A man and his pencil

Denied?

website *El tu, Mr. Destructo?*. He has operated it for four years, and back in February he was hired to be Gawker's "screaming conscience," which means he's their main political columnist.

Mobutu, if you're reading this, prepare to get–as the trolls like to say–butthurt.

I went to Mobutu's blog, and looked at who'd left the earliest comments beginning in 2008. Two of the earliest comments were left by Cory Harris and Christian Lund. As luck would have it, Cory Harris and Christian Lund both have public Facebook profiles and their friends lists are visible. They aren't friends with each other, but they share a mutual friend: Jeb Tennyson Lund.

Mobutu mentions that he is married (Jeb Lund is married) and that he attended a small liberal arts college in Florida (Jeb Lund attended New College of Florida). What sealed the deal was a 2008 interview from *Metal Hammer* with Robert Schober, who at the time had just directed a music video for Metallica. In it, Schober says: "I was able to create an entire viral campaign with a blog about the cold war and propaganda films (written by Mr Destructo author Jeb Lund), produce fake news stories, and even had Kirk do a vlog on youtube about 'finding these films when they were touring in Russia.'"

I'm not surprised a Gawker writer made his start by producing fake news stories.

So. What sort of writer was Jeb Lund before becoming Mobutu? It turns out he was a professional wrestling columnist. He wrote extensively for the wrestling website Online Onslaught, providing Raw and Smackdown recaps and PPV predictions. Above all, Jeb enjoyed unloading his screaming conscience onto WWE's youngest star, Randy Orton. He would call Orton an "effide water-headed mutant shit-heel," and a "human toadstool" among other things. (Bear in mind, Jeb was around 27 then.)

I actually have nothing against professional wrestling, it's kind of like a ballet in which the performers occasionally fall onto thumbtacks. But quite a few commenters on Gawker have wondered whether "Mobutu" was the pseudonym for some established celebrity, and the answer is clearly no. If Nick Denton truly wants to create a society where everyone's secrets are known–as he explained in a recent panel–then he should welcome having Mobutu Sese Seko's identity be known. For him to claim anything else would be a double-standard.

Posted by Drew Johnson at 1:54 PM

Case: 1:11-cv-03054 Document #: 195-6 Filed: 03/12/13 Page 5 of 6 PageID #:2748

Tuesday, December 25, 2012

## Exposing Deadspin: A recap

1. A Deadspin writer named Timothy Burke gets banned from posting on Reddit. He doesn't know the reason.

2. He goes on Twitter and claims it's a plot by Reddit to protect pedophiles. He does this repeatedly.

3. I investigate on his behalf, and I clear up the misinformation for him. He was banned for spamming 150 of his own articles without ever participating on the site otherwise.

4. He keeps posting his own articles under different aliases.

5. Somebody calls him out for being a spammer.

6. He denies being a spammer and says there is a vendetta against Deadspin.

7. I step in and proceed to tear him a new one:

[−] SorkinMan  81 points 5 days ago

If you click on OP's name, you'll notice all his submissions come from Deadspin. Clearly he's a spammer.

That's my reason for downvoting, at least.

permalink   parent

   [−] argor-aschleman [S] -180 points 5 days ago

   Yup, totally a spammer. That or I just happen to see that Deadspin has the best quality videos and yet Reddit has a vendetta against them, so I try to get them some more attention.

[-] **SorkinMan** 81 points 5 days ago

If you click on OP's name, you'll notice all his submissions come from Deadspin. Clearly he's a spammer.

That's my reason for downvoting, at least.

permalink  parent

[-] **argon-aschleman** [S] -180 points 5 days ago

Yup, totally a spammer. That or I just happen to see that Deadspin has the best quality videos and yet Reddit has a vendetta against them, so I try to get them some more attention.

permalink  parent

[-] **Alphadog33** 277 points 5 days ago*

Listen mystery guy, I googled "Argon Aschleman" and found this old message board.

Clicking on Argon's name shows an old Hotmail address for "bubbaprog," which just happens to be Deadspin writer Timothy Burke's username on Twitter.

EVERY link you've submitted so far is for a Deadspin article written by Timothy Burke. Also, while your current username is argon-aschleman, I noticed that the similar user argon_aschleman ALSO took 100% of his links from Timothy Burke articles.

I wouldn't be annoyed, except previously when you got banned for spamming you went onto Twitter and placed the blame on Reddit for wanting "to protect pedophiles." A total falsehood.

Take some responsibility. When you get caught spamming, the proper thing is to apologize, not to get mad at the person who caught you and then continue on lying.

I know that exposing a person's identity is frowned upon here, but as far as I'm concerned you aren't a member of this community; you're just a spammer who spreads nasty lies about Reddit whenever you get caught.

permalink  parent



[-] argon-aschleman [S] -180 points 5 days ago

Yup, totally a spammer. That or I just happen to see that Deadspin has the best quality videos and yet Reddit has a vendetta against them, so I try to get them some more attention.

permalink  parent

[-] Alphadog33 277 points 5 days ago*

Listen mystery guy, I googled "Argon Aschleman" and found this old message board.

Clicking on Argon's name shows an old Hotmail address for "bubbaprog," which just happens to be Deadspin writer Timothy Burke's username on Twitter.

EVERY link you've submitted so far is for a Deadspin article written by Timothy Burke. Also, while your current username is argon-aschleman, I noticed that the similar user argon_aschleman ALSO took 100% of his links from Timothy Burke articles.

I wouldn't be annoyed, except previously when you got banned for spamming you went onto Twitter and placed the blame on Reddit for wanting "to protect pedophiles." A total falsehood.

Take some responsibility. When you get caught spamming, the proper thing is to apologize, not to get mad at the person who caught you and then continue on lying.

I know that exposing a person's identity is frowned upon here, but as far as I'm concerned you aren't a member of this community; you're just a spammer who spreads nasty lies about Reddit whenever you get caught.

permalink  parent

8.  Redditors applaud.  The Deadspin employee is exposed as a liar and douche.

Posted by Drew Johnson at 11:56 AM   2 comments:

Sunday, December 9, 2012

# Finding Mobutu

Most people reading this are probably familiar with Gawker Media properties. They're the collection of news and gossip sites run by Nick Denton.

Recently they've positioned themselves as the morality police of the web. If you say something deemed racist or sexist, or if you act like a troll, they'll plaster your personal information online for everyone to see, and generally make you look bad on any future Google searches. They even did this with the Horse_ebooks guy, even though his only infraction was having a popular twitter account.

Now mothers everywhere are telling their little kids, "Eat your vegetables, or else Gawker is going to expose you."

Well I'm not the least bit intimidated by Gawker. Their "morality" is corrupt. And I want to give them a taste of their own medicine.

The only Gawker writer who avoids revealing his true name is Mobutu Sese Seko. Mobutu runs the website *Et tu, Mr. Destructo?*. He has operated it for four years, and back in February he was hired to be Gawker's "screaming conscience," which means he's their main political columnist.

Mobutu, if you're reading this, prepare to get--as the trolls like to say--butthurt.

I went to Mobutu's blog, and looked at who'd left the earliest comments beginning in 2008. Two of the earliest comments were left by Cory Harris and Christian Lund. As luck would have it, Cory Harris and Christian Lund both have public Facebook profiles and their friends lists are visible. They aren't friends with each other, but they share a mutual friend: Jeb Tennyson Lund.

Mobutu mentions that he is married (Jeb Lund is married) and that he attended a small liberal arts college in Florida (Jeb Lund attended New College of Florida). What sealed the deal was a 2008 interview from

I went to Mobutu's blog, and looked at who'd left the earliest comments beginning in 2008. Two of the earliest comments were left by Cory Harris and Christian Lund. As luck would have it, Cory Harris and Christian Lund both have public Facebook profiles and their friends lists are visible. They aren't friends with each other, but they share a mutual friend: Jeb Tennyson Lund.

Mobutu mentions that he is married (Jeb Lund is married) and that he attended a small liberal arts college in Florida (Jeb Lund attended New College of Florida). What sealed the deal was a 2008 interview from *Metal Hammer* with Robert Schober, who at the time had just directed a music video for Metallica. In it, Schober says: "I was able to create an entire viral campaign with a blog about the cold war and propaganda films (written by Mr Destructo author Jeb Lund), produce fake news stories, and even had Kirk do a vlog on youtube about "finding" these films when they were touring in Russia."

I'm not surprised a Gawker writer made his start by producing fake news stories.

So...What sort of writer was Jeb Lund before becoming Mobutu? It turns out he was a professional wrestling columnist. He wrote extensively for the wrestling website Online Onslaught, providing Raw and Smackdown recaps and PPV predictions. Above all, Jeb enjoyed unloading his screaming conscience onto WWE's youngest star, Randy Orton. He would call Orton an "effete water-headed mutant shit-heel," and a "human toadstool," among other things. (Bear in mind, Jeb was around 27 then.)

I actually have nothing against professional wrestling, it's kind of like a ballet in which the performers occasionally fall onto thumbtacks. But quite a few commenters on Gawker have wondered whether "Mobutu" was the pseudonym for some established celebrity, and the answer is clearly no. If Nick Denton truly wants to create a society where everyone's secrets are known--as he explained in a recent panel--then he should welcome having Mobutu Sese Seko's identity be known. For him to claim anything else would be a double-standard.

Posted by Drew Johnson at 1:54 PM    8 comments:

Recommend this on Google

Labels: Gawker, Mobutu Sese Seko, Nick Denton

Case: 1:11-cv-03054 Document #: 195-8 Filed: 03/12/13 Page 1 of 2 PageID #:2753

# PACER
## Case Locator

**All Court Types Party Search**
Sun Mar 3 18:35:34 2013
51 records found

Filter Results     Download     New Search

**User:** fw1109 P
**Client:**
**Search:** All Court Types Party Search Name gawker All Courts Page: 1

### Civil Results

| | Party Name | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|
| 1 | Gawker (dft) | cacdce | 8:2011-cv-01383 | 320 | 09/09/2011 | 01/29/2012 |
| 2 | Gawker Entertainment, LLC (res) | cacdce | 2:2012-mc-00254 | 440 | 05/24/2012 | 07/09/2012 |
| 3 | Gawker Entertainment, LLC (dft) | flmdce | 8:2012-cv-02348 | 360 | 10/15/2012 | 01/03/2013 |
| 4 | Gawker Entertainment, LLC (dft) | flmdce | 8:2013-cv-00001 | 820 | 01/02/2013 | |
| 5 | Gawker Entertainment, LLC (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |
| 6 | Gawker Entertainment, LLC (dft) | nysdce | 1:2010-cv-09802 | 820 | 11/12/2010 | 06/28/2011 |
| 7 | Gawker Media (dft) | cacdce | 8:2011-cv-01383 | 320 | 09/09/2011 | 01/29/2012 |
| 8 | Gawker Media (dft) | flmdce | 8:2012-cv-02348 | 360 | 10/15/2012 | 01/03/2013 |
| 9 | Gawker Media (dft) | flmdce | 8:2013-cv-00001 | 820 | 01/02/2013 | |
| 10 | gawker media (dft) | flsdce | 1:2007-cv-20866 | 440 | 03/30/2007 | 10/04/2007 |
| 11 | Gawker Media (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |
| 12 | Gawker Media (dft) | nysdce | 1:2006-cv-00441 | 820 | 01/20/2006 | 03/21/2007 |
| 13 | Gawker Media Group Inc (dft) | nysdce | 1:2010-cv-09802 | 820 | 11/12/2010 | 06/28/2011 |
| 14 | GAWKER MEDIA GROUP INC. (dft) | nysdce | 1:2011-cv-04442 | 320 | 06/29/2011 | |
| 15 | Gawker Media, LLC (dft) | flmdce | 8:2012-cv-02348 | 360 | 10/15/2012 | 01/03/2013 |
| 16 | Gawker Media, LLC (dft) | flmdce | 8:2013-cv-00001 | 820 | 01/02/2013 | |
| 17 | Gawker Media, LLC (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |
| 18 | Gawker Media, LLC (dft) | ncwdce | 5:2012-cv-00163 | 320 | 11/01/2012 | |
| 19 | Gawker Media, LLC (dft) | nysdce | 1:2010-cv-09802 | 820 | 11/12/2010 | 06/28/2011 |
| 20 | Gawker News LLC (dft) | cacdce | 2:2009-cv-06912 | 820 | 09/23/2009 | 07/27/2010 |
| 21 | Gawker Sales LLC (dft) | cacdce | 2:2009-cv-06912 | 820 | 09/23/2009 | 07/27/2010 |
| 22 | Gawker Media Group LLC (dft) | nysdce | 1:2010-cv-09802 | 820 | 11/12/2010 | 06/28/2011 |

| # | Party Name | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|
| 21 | Gawker Sales LLC (dft) | cacdce | 2:2009-cv-06912 | 820 | 09/23/2009 | 07/27/2010 |
| 22 | Gawker Media Group LLC (dft) | nysdce | 1:2010-cv-08602 | 820 | 11/12/2010 | 06/28/2011 |
| 23 | Gawker Media Group, Inc (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |
| 24 | Gawker Media Group, Inc. (dft) | flmdce | 8:2012-cv-02348 | 360 | 10/15/2012 | 01/03/2013 |
| 25 | Gawker Media Group, Inc. (dft) | flmdce | 8:2013-cv-00001 | 820 | 01/02/2013 | |
| 26 | Gawker Media Group, Inc. (dft) | ncwdce | 5:2012-cv-00163 | 320 | 11/01/2012 | |
| 27 | Gawker Media LCC (dft) | cacdce | 2:2007-cv-06230 | 820 | 09/26/2007 | 10/07/2008 |
| 28 | Gawker Media LCC (dft) | nysdce | 1:2007-cv-05729 | 820 | 06/15/2007 | 08/31/2007 |
| 29 | Gawker Sales, LLC (dft) | flmdce | 8:2012-cv-02348 | 360 | 10/15/2012 | 01/03/2013 |
| 30 | Gawker Sales, LLC (dft) | flmdce | 8:2013-cv-00001 | 820 | 01/02/2013 | |
| 31 | Gawker Sales, LLC (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |
| 32 | Gawker Sales, LLC (dft) | nysdce | 1:2010-cv-08602 | 820 | 11/12/2010 | 06/28/2011 |
| 33 | Gawker Technology, LLC (dft) | flmdce | 8:2012-cv-02348 | 360 | 10/15/2012 | 01/03/2013 |
| 34 | Gawker Technology, LLC (dft) | flmdce | 8:2013-cv-00001 | 820 | 01/02/2013 | |
| 35 | Gawker Technology, LLC (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |
| 36 | Gawker Media LLC (dft) | alndce | 2:2009-cv-00949 | 320 | 05/14/2009 | 05/26/2010 |
| 37 | Gawker Media LLC (dft) | cacdce | 2:2005-cv-01575 | 820 | 03/02/2005 | 11/03/2005 |
| 38 | Gawker Media LLC (dft) | cacdce | 2:2009-cv-06912 | 820 | 09/23/2009 | 07/27/2010 |
| 39 | Gawker Media LLC (dft) | cacdce | 8:2011-cv-01383 | 320 | 09/09/2011 | 01/29/2012 |
| 40 | Gawker Media LLC (dft) | nysdce | 1:2010-cv-08782 | 820 | 11/19/2010 | 11/29/2010 |
| 41 | Gawker Media LLC (dft) | nysdce | 1:2011-cv-04442 | 320 | 06/29/2011 | |
| 42 | Gawker Media, LLC (res) | cacdce | 2:2012-mc-00254 | 440 | 05/24/2012 | 07/09/2012 |
| 43 | Gawker Technology, LLC (dft) | nysdce | 1:2010-cv-08602 | 820 | 11/12/2010 | 06/28/2011 |
| 44 | Gawker.com (dft) | ilndce | 1:2011-cv-03054 | 320 | 05/06/2011 | |

## Appellate Results

| # | Party Name | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|
| 45 | Gawker Entertainment, LLC (pty) | 11cae | 12-15959 | 4360 | 11/20/2012 | 01/03/2013 |
| 46 | Gawker Media (pty) | 03cae | 11-3750 | 3360 | 10/07/2011 | |
| 47 | Gawker Media (pty) | 09cae | 10-15387 | 4190 | 02/22/2010 | |
| 48 | Gawker Media Group, Inc. (pty) | 11cae | 12-15959 | 4360 | 11/20/2012 | 01/03/2013 |
| 49 | Gawker Media, LLC (pty) | 11cae | 12-15959 | 4360 | 11/20/2012 | 01/03/2013 |
| 50 | Gawker Sales, LLC (pty) | 11cae | 12-15959 | 4360 | 11/20/2012 | 01/03/2013 |
| 51 | Gawker Technology, LLC (pty) | 11cae | 12-15959 | 4360 | 11/20/2012 | 01/03/2013 |

• 48 Hours Sisters survive deadly attack at Utah cabin 7 of 9

• Sports NL MVP Braun appeals positive drug test 8 of 9

• Gallery 2011's last lunar eclipse 9 of 9

August 4, 2010 2:57 PM

- Print
- Text

# Rebecca Gayheart, "McSteamy" Eric Dane, Get Gawker Settlement Over Threesome Video

By
   Edecio Martinez
Topics
   Daily Blotter

- Add Comment Have Your Say
- Email StorySend to a Friend
- Share ThisTell Your Friends
- Tweet ThisTweet This
- MoreShare It



Eric Dane and Rebecca Gayheart (AP Photo, file)

**NEW YORK (CBS)** The legal battle between Gawker and actors Eric Dane and Rebecca Gayheart has been settled after the website agreed to take down the couple's homemade sex tape in return for them not suing the bejeezuz out of the gossip blog.

PICTURES: "McSteamy's" Naked Anatomy Hits Web
PICTURES: Who is Kari Ann Peniche?

The Grey's Anatomy star and his wife had sued Gawker in September for copyright infringement, after their threesome web video leaked to the internet, showing Dane, Gayheart and former beauty queen Kari Ann Peniche romping around naked and at times barely coherent.

The lawsuit claimed that Gawker "maliciously" distributed an uncensored version of the sex tape and refused to comply with a cease and desist order.

According to Reuters, Gawker and the couple agreed to private mediation, which facilitated a settlement that was filed with the Los Angeles County Superior Court last week. Sources close to the case valued the settlement in the low-six figures.

Dane and Gayheart were originally asking for more than $1 million in damages.

"Although we are confident that our use of the video on Gawker was protected fair use -- because the posts already had been available to our readers for nearly a year, and because we already had won an important decision from the court striking large parts of the plaintiffs' damages claims -- we agreed to remove the posts as part of a global settlement to avoid the burden of further litigation," Gawker chief operating officer Gaby Darbyshire said in a statement obtained by Reuters.

Dane first appeared in ABC's highly rated show, "Grey's Anatomy," in 2005, in which he played Dr. Mark Sloan, also known as McSteamy. His popularity with fans led to a regular role on the show.

Gayheart is a television and film actress known for roles in "CSI: Miami," "Nip/Tuck," and "Vanished." She also had a recurring role in the original Beverly Hills 90210 series.

Peniche is a former beauty queen who won Miss United States Teen, but was stripped of her title after appearing nude in Playboy.

At one point in the video, Gayheart, who seems to be holding the camera, says "I need to lay down too. I am very high." She then joins a naked Peniche, who was lounging on the bed.

Gawker had released a 12-minute edited version of the video in which everyone's lower private parts are blurred over. Other sites have been more revealing.

**MEDIA:**
PICTURES: "McSteamy's" Naked Anatomy Hits Web
PICTURES: Who is Kari Ann Peniche?

**MORE ON CRIMESIDER**
August 21, 2009 - Who is Kari Ann Peniche, the Other Woman in "McSteamy" Naked Web Vid?
August 17, 2009 - Report: Cops Looking at Grey's Anatomy Star Eric Dane's Naked Threesome Video; Are You?
September 20, 2009 - Mackenzie Phillips and John Phillips: Incest and Drugs Bombshell

Recommend    6 people recommend this. Be the first of your friends.

- Add Comment Have Your Say
- Email StorySend to a Friend





▼ Browse Voice Nation    Most Popular | Most Recent          Sign up ▼    Log in ▼

OCWEEKLY

Blogs                                                      United Health Group

Search OC Weekly    🔍    

Hey! Your mom called...

navelgazing

TOP
*blog*
STORIES

**Cannabis**
Obama Admin Promises (Again) Not to Wage War on Medical Pot
By Nick Schou


**Ex Cathedra**
Catholic League vs. Gustavo Arellano!
By Gustavo Arellano


**Disney**
Leaning Tower of Tires Now at Cars Land in Calif. Adventure
By Justin Shady


**Gimme That OC**
Billboard Advocates Separation of Church & State
By Matt Coker


**Breaking News**

## Ex-Arnold Schwarzenegger Flight Attendant Files $40 Million Libel Suit Against Gawker, National Enquirer

By R. Scott Moxley Wed., Aug. 3 2011 at 10:35 AM          Comments (6)

Categories: Breaking News, Crime & Sex, Film, Moxley, Politics

Share    Like    3         0               9 retweet    0    digg

**Arnold Schwarzenegger**'s longtime personal flight attendant has filed a $40 million lawsuit that claims **Gawker**, the *National Enquirer*, the London *Daily Mail* and other news outlets libeled her in articles portraying her as the ex-California governor's mistress and one of her sons as his secret love child.

In the July 28 suit, filed in Orange County Superior Court, **Tammy Tousignant** of Brea seeks damages for defamation by libel, invasion of privacy and misappropriation of personal images following a series of 2003 and 2011 articles that wrongly alleged she "was Arnold's lover" and that her son, Tanner, "was Arnold's."


Schwarzenegger

**Harry Frank Scolinos**, Tousignant's Pasadena-based lawyer, slammed the publications in his 117-page brief, which includes copies of the offending articles.

"Freedom of the press is a valuable right, but it is not a license for gossip tabloids to tar and feather innocent citizens and destroy their reputations for the rags' profit," wrote Scolinos. "Given the nearly instantaneous and worldwide availability of on-line and print articles, one would expect more rigorous standards to be imposed on those who report news, particularly where such 'news' involves disclosing very personal and private details of the lives of non-public figures."

According to the lawsuit, Tanner--a graduate of **Brea Olinda High School**--is the August 1992 offspring of Tammy and her husband Tom. The couple--married since 1992-- have another son, Conner, who was born in July 1997. Tammy worked as Schwarzenegger's flight attendant on the wealthy Hollywood actor's private jet from 1987 to 1999.

Articles in 2003 claimed that "not only was there an affair between Arnold and Tammy but that Tammy claimed that her son was fathered by Arnold," that Tanner "bears a physical resemblance to Arnold," and that the boy is "Arnold's love child."

Earlier this year, the *Los Angeles Times* reported that Schwarzenegger had privately

## Most Popular Stories

Viewed    Commented    Recent

**Woman Plunges to Her Death From Queen Mary**

**Obama Administration Promises (Again) Not to Wage War on Medical Marijuana**

**Clarence Butterfield: Appeals Court Rejects Sex With Daughter Complaint By Nutty Killer**

**Our Lady of Guadalupe Church in Santa Ana Has Fire by Baptism**

**[UPDATED With Details About The Accident:] Cal State Long Beach Fatal Elevator Accident Launches Investigation**

More Most Popular...

**TODAY'S DEAL IN OC**

$45 Beginner's Shooting Class For Two at LAX Firing Range ($100 Value)

GET IT NOW

EVERY CAR WE BUILD

Case: 1:11-cv-03054 Document #: 195-9 Filed: 03/12/13 Page 4 of 7 PageID #:2758

Local News

# Former Lake Norman High School student sues Gawker over photo, stories

  Tweet 1  f Recommend 2  +1  MORE

by JOE MARUSAK / The Charlotte Observer

Posted on November 2, 2012 at 9:03 PM

MOORESVILLE, N.C. -- A former Lake Norman High School student is suing two Internet media companies for libel after she says they posted altered yearbook photos on their websites showing what they claim is the student lifting her gown and exposing herself during the school's 2011 graduation ceremony.

Now 19, the Mooresville woman says in her lawsuit that strangers have harassed and ridiculed her since New York-based Gawker Media Group and Deep Dive Media of Beverly Hills, Calif., posted the altered photo with articles and headlines that humiliated her and led to "public scorn."

"Controversy Erupts after North Carolina High School Girl Flashes Crotch in Yearbook Photo," reads the headline on a May 25 article that's still posted on Deep Dive Media's www.opposingviews.com.

"Female High School Student Accused of Flashing Vagina in Yearbook Photo," says a headline the same day on www.gawker.com., which also continues to post the article.

The lawsuit says the websites published a cropped and altered version of a photograph that superimposed a black bar over most of the woman's face. Another black bar, where her legs touch, "is placed so that (she ) appears to have gathered and lifted the fabric of her graduation gown with her hands," the lawsuit says.

The cropped photo makes it appear as if she is standing and posing with her gown lifted, the suit says. The original photo shows the woman seated with fellow graduates and holding a ceremony program on her lap; her hands are resting on her lap, the lawsuit says.

None of her classmates in the original photo are looking, smiling and laughing at her, contrary to articles published on the websites, the lawsuit says.

Deep Dive's article says the woman "flashed her naked crotch," taking "the concept of doing something memorable at graduation to a whole new level," according to the lawsuit.

Gawker's story adds that child pornography charges weren't filed because of the girl's age. The yearbook is a "crotchbook," the article says. Those who kept the yearbook may be "sexually depraved," the article says, but are not "a bunch of degenerate upskirting pedophiles" because the woman is over 18.

The photo and accompanying articles appeared on the sites after WSOC-TV in Charlotte published the photo and related stories beginning on May

The photo and accompanying articles appeared on the sites after WSOC-TV in Charlotte published the photo and related stories beginning on May 23. The station issued an online apology June 14 and also apologized live on air.

The station's apology said any assertion that the woman lifted her gown and exposed her "bare genitals" "was merely the unsupported opinion of one of the parents of a student at the high school…"

No evidence supported the parent's claims, the station's apology said.

The woman's attorney, Christopher Mauriello of Cornelius, said the woman reached a "confidential resolution" with WSOC-TV, which is not a defendant in the lawsuit. The suit was originally filed in Iredell County Superior Court in September but was moved to federal court in Charlotte on Thursday.

The woman seeks up to $250,000 in damages, according to the lawsuit.

Mauriello sent letters to Gawker and Deep Dive on Aug. 2 asking them to retract their stories and photos. Gawker refused, and Deep Dive hasn't responded, he said. Mauriello said the sites should have verified the claims reported on WSOC before publishing them nationwide. "They published fake statements, and they put her in a false light," he said.

Gawker Media attorney Cameron Stracher said the suit has no merit. "The allegations are baseless," Stracher said in an email to the Observer. "The young woman was already the subject of a pre-existing controversy when the (Iredell-Statesville Schools) alerted parents to the photograph in the school yearbook.

"Gawker merely reported the controversy, never identified the girl, and the only 'altered' photo it posted was a smaller version of the original yearbook photo with a black bar obscuring the girl's face and thighs that had already been published by (WSOC-TV)."

Michael McNulty, managing editor of www.opposingviews.com, has not

Case: 1:11-cv-03054 Document #: 195-9 Filed: 03/12/13 Page 7 of 7 PageID #:2761

the (Iredell-Statesville Schools) alerted parents to the photograph in the school yearbook.

"Gawker merely reported the controversy, never identified the girl, and the only 'altered' photo it posted was a smaller version of the original yearbook photo with a black bar obscuring the girl's face and thighs that had already been published by (WSOC-TV)."

Michael McNulty, managing editor of www.opposingviews.com, has not responded to a request by the Observer for comment.

Dawn Creason, spokeswoman for the Iredell-Statesville Schools, said Friday that school system officials met with the student's parents when the issue surfaced "and together we developed a plan for correcting the 2012 Lake Norman High School yearbook."

A joint decision was made at the time to send home both a phone message and a letter, "asking parents and students for their cooperation in both repairing the yearbook and being sensitive to this extremely hurtful situation," Creason said.

She said numerous media outlets across the country published "this inaccurate and unfair story before it was ever called to the attention of Lake Norman High school parents."

"We certainly understand the frustration of this young woman and her parents, and we share in their embarrassment and anger," Creason said. "We wish her and her family much success as they seek justice and attempt to put this horrific situation behind them."



Next article

Case: 1:11-cv-03054 Document #: 195-10 Filed: 03/12/13 Page 1 of 1 PageID #:2762



Case: 1:11-cv-03054 Document #: 195-11 Filed: 03/12/13 Page 1 of 3 PageID #:2763

# JEZEBEL

/SUITS

## Acquitted Rapist Sues Blog For Calling Him Serial Rapist

ABOVE THE LAW

BIG LAW    SMALL LAW FIRMS

Rape Potpourri

4,374 views, May 11, 2011 6:45 PM

Like  3

Irin Carmon —A Chicago man who was acquitted on a sexual assault charge is suing the legal blog Above The Law for implying that he's a serial rapist. If Meanith Huon gets his way, blogger sloppiness may cost ATL $50 million.

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and

MEANITH HUON

LATEST

Jezebel on Facebook

Like

59,922 people like Jezebel.

Facebook social plugin

NEWER STORIES

LAWSUITS  Acquitted Rapist Sues Blog For
Calling Him Serial Rapist

Case: 1:11-cv-03054 Document #: 195-11 Filed: 03/12/13 Page 2 of 3 PageID #:2764

Huon, a lawyer, was initially charged with two counts of sexual assault, two counts of sexual abuse, and one count of unlawful restraint. A woman had jumped out of his car, ran through a cornfield barefoot, and knocked on a random person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked



**Rape Potpourri**

NEWER STORIES

**LAWSUITS** Man Acquitted Of Sexual Assault Sues Blog For Calling Him Serial Rapist

**MODELSLIPS** This Male Model Fell Over On

person's door saying he had forced her into sexual activity. She later said she believed she was spending time with him for a job opportunity related to alcohol promotions, until he allegedly yelled at her to perform oral sex. Huon's version was that it was a consensual encounter, and partly on the strength of a bartender's testimony that the woman had been drinking and asked where to go to have fun, the jury believed him.

Huon is also suing local law enforcement authorities in Madison County, Illinois for prosecutorial misconduct. His beef with Above The Law stems from a roundup post entitled "Rape Potpurri," in which blogger Elie Mystal mistakenly believes that news accounts of the same incident are different incidents that should have tipped the woman off that Huon was a serial offender. "The content of the article were [sic] defamatory in that it incorrectly and recklessly portrayed Mr. Huon as a serial rapist by treating the same complaining witness as three different women," says the complaint, according to *Forbes*.

"And this, people, is why God invented Google," wrote Mystal in the original post, linking to articles that in fact described the same case. The lesson learned: Google only takes you so far.

Lawyer Sues Legal Blog For $50 M Over Rape Story [Forbes]
Related: Rape Potpurri [ATL]

DISCUSSION THREADS    Featured    All    Start a new thread

---

8:45 PM    Sues Blog For Calling Him Serial
           Rapist

MODELSLIPS    This Male Model Fell Over On
12,619        The Runway

DICKS    Why I Hate My Giant Dong
100,481

WATCH    Tragic Sarah Ferguson Wore
17,578   Metaphorical "Hair Shirt" During
         Royal Wedding

SLUTS    Sluts Like Me
26,973

POLLS
15,283

         Toilet Paper's Eternal Debate
         Wages On

WATCH    Lindsay Lohan Hops On The

Case: 1:11-cv-03054 Document #: 195-12 Filed: 03/12/13 Page 1 of 6 PageID #:2766

Tuesday, January 8, 2013

# Catalogue of Gawker's alleged Reddit accounts

These are Reddit accounts I suspect were created by Gawker employees or Gawker interns for the purpose of promoting articles on Reddit.

Most of these are shell accounts with no commenting history. They aren't sockpuppets in the usual sense. Argon-aschleman is an exception, and I exposed him earlier. Also of note, the deleted Twitter account "Turnipsun" belonged to a Christopher Mascari, and Gizmodo's Christopher Mascari was Gawker's editorial marketing manager from 2010 to 2012. Therefore, these accounts appear to be the result of a company policy.

**argon_aschleman**
Created: October 21st, 2012. 02:47:26 UTC
Links: 6
URLs: All Deadspin

**argon-aschleman**
Created: November 16th, 2012. 05:44:42 UTC
Links: 7
URLs: All Deadspin

**turnipsun**
Created: March 2nd, 2010. 20:50:31 UTC
Links: 76
URLs: Gizmodo–42; Deadspin–8; Gawker–7; Jezebel–7; Kotaku–6; Lifehacker–3; Jalopnik–2; io9–1.

Links: 5
URLs: All Deadspin

**argon-aschleman**
Created: November 16th, 2012   05:44:42 UTC
Links: 7
URLs: All Deadspin

**turnipsun**
Created: March 2nd, 2010   20:50:31 UTC
Links: 76
URLs: Gizmodo–42; Deadspin–8; Gawker–7; Jezebel–7; Kotaku–6; Lifehacker–3; Jalopnik–2; io9–1.

3 DOWN, 215 TO GO…

Read more »

Posted by Drew Johnson at 11:48 PM   1 comment:

Recommend this on Google

Labels: Christopher Mascari, Gawker, Gizmodo, Reddit

Saturday, January 5, 2013

## 3,000+ pageviews

Thanks to everyone so far who has checked out this blog. This is still a new undertaking and I'm determining what tone it will finally take--i.e. are there enough secrets about Gawker left to uncover, or will I settle into more of a FireJoeMorgan-type tone?

Case: 1:11-cv-03054 Document #: 195-12 Filed: 03/12/13 Page 3 of 6 PageID #:2768

# Gawker Sucks

Sunday, December 9, 2012

## Finding Mobutu

Most people reading this are probably familiar with Gawker Media properties. They're the collection of news and gossip sites run by Nick Denton.

Recently they've positioned themselves as the morality police of the web. If you say something deemed racist or sexist, or if you act like a troll, they'll plaster your personal information online for everyone to see, and generally make you look bad on any future Google searches. They even did this with the Horse_ebooks guy, even though his only infraction was having a popular twitter account.

Now mothers everywhere are telling their little kids, "Eat your vegetables, or else Gawker is going to expose you."

Well I'm not the least bit intimidated by Gawker. Their "morality" is corrupt. And I want to give them a taste of their own medicine.

The only Gawker writer who avoids revealing his true name is Mobutu Sese Seko. Mobutu runs the website *Et tu, Mr. Destructo?*. He has operated it for four years, and back in February he was hired to be Gawker's "screaming conscience," which means he's their main political columnist.

Mobutu, if you're reading this, prepare to get--as the trolls like to say--butthurt.

### Blog Archive

▶ 2013 (6)

▲ 2012 (8)

▼ December (8)

    Exposing Deadspin: A recap

    Was a Gawker writer fired for posting child porn?

    Stay classy, Max Read

    The Chief Keef incident

    More to come...

    Finding Mobutu

    A man and his pencil

    Denied?

website *Et tu, Mr. Destructo?*. He has operated it for four years, and back in February he was hired to be Gawker's "screaming conscience," which means he's their main political columnist.

Mobutu, if you're reading this, prepare to get--as the trolls like to say--butthurt.

I went to Mobutu's blog, and looked at who'd left the earliest comments beginning in 2008. Two of the earliest comments were left by Cory Harris and Christian Lund. As luck would have it, Cory Harris and Christian Lund both have public Facebook profiles and their friends lists are visible. They aren't friends with each other, but they share a mutual friend: Jeb Tennyson Lund.

Mobutu mentions that he is married (Jeb Lund is married) and that he attended a small liberal arts college in Florida (Jeb Lund attended New College of Florida). What sealed the deal was a 2008 interview from *Metal Hammer* with Robert Schober, who at the time had just directed a music video for Metallica. In it, Schober says: "I was able to create an entire viral campaign with a blog about the cold war and propaganda films (written by Mr Destructo author Jeb Lund), produce fake news stories, and even had Kirk do a vlog on youtube about 'finding' these films when they were touring in Russia."

I'm not surprised a Gawker writer made his start by producing fake news stories.

So...What sort of writer was Jeb Lund before becoming Mobutu? It turns out he was a professional wrestling columnist. He wrote extensively for the wrestling website Online Onslaught, providing Raw and Smackdown recaps and PPV predictions. Above all, Jeb enjoyed unloading his screaming conscience onto WWE's youngest star, Randy Orton. He would call Orton an "effsie water-headed mutant shit-heel," and a "human toadstool" among other things. (Bear in mind, Jeb was around 27 then.)

I actually have nothing against professional wrestling, it's kind of like a ballet in which the performers occasionally fall onto thumbtacks. But quite a few commenters on Gawker have wondered whether "Mobutu" was the pseudonym for some established celebrity, and the answer is clearly no. If Nick Denton truly wants to create a society where everyone's secrets are known--as he explained in a recent panel--then he should welcome having Mobutu Sese Seko's identity be known. For him to claim anything else would be a double-standard.

Posted by Drew Johnson at 1:54 PM

Tuesday, December 25, 2012

## Exposing Deadspin: A recap

1. A Deadspin writer named Timothy Burke gets banned from posting on Reddit. He doesn't know the reason.

2. He goes on Twitter and claims it's a plot by Reddit to protect pedophiles. He does this repeatedly.

3. I investigate on his behalf, and I clear up the misinformation for him: He was banned for spamming 150 of his own articles without ever participating on the site otherwise.

4. He keeps posting his own articles under different aliases.

5. Somebody calls him out for being a spammer.

6. He denies being a spammer and says there is a vendetta against Deadspin.

7. I step in and proceed to tear him a new one:

[–] SorkinMan 81 points 5 days ago

If you click on OP's name, you'll notice all his submissions come from Deadspin. Clearly he's a spammer.

That's my reason for downvoting, at least.

permalink   parent

    [–] argor-aschleman [S] -180 points 5 days ago

    Yup, totally a spammer. That or I just happen to see that Deadspin has the best quality videos and yet Reddit has a vendetta against them, so I try to get them some more attention.

[–] **SorkinMan** 81 points 5 days ago

If you click on OP's name, you'll notice all his submissions come from Deadspin. Clearly he's a spammer.

That's my reason for downvoting, at least.

permalink  parent

⬆ ⬇ [–] **argon-aschleman** [S] -180 points 5 days ago

Yup, totally a spammer. That or I just happen to see that Deadspin has the best quality videos and yet Reddit has a vendetta against them, so I try to get them some more attention.

permalink  parent

◆ ◆ [–] **Alphadog33** 277 points 5 days ago*

Listen mystery guy, I googled "Argon Aschleman" and found this old message board.

Clicking on Argon's name shows an old Hotmail address for "bubbaprog," which just happens to be Deadspin writer Timothy Burke's username on Twitter.

EVERY link you've submitted so far is for a Deadspin article written by Timothy Burke. Also, while your current username is argon-aschleman, I noticed that the similar user argon_aschleman ALSO took 100% of his links from Timothy Burke articles.

I wouldn't be annoyed, except previously when you got banned for spamming you went onto Twitter and placed the blame on Reddit for wanting "to protect pedophiles." A total falsehood.

Take some responsibility. When you get caught spamming, the proper thing is to apologize, not to get mad at the person who caught you and then continue on lying.

I know that exposing a person's identity is frowned upon here, but as far as I'm concerned you aren't a member of this community; you're just a spammer who spreads nasty lies about Reddit whenever you get caught.

permalink  parent

Case: 1:11-cv-03054 Document #: 195-13 Filed: 03/12/13 Page 1 of 5 PageID #:2772



[–] **argon-aschleman** [S] -180 points 5 days ago

Yup, totally a spammer. That or I just happen to see that Deadspin
has the best quality videos and yet Reddit has a vendetta against
them, so I try to get them some more attention.

permalink  parent

[–] **Alphadog33** 277 points 5 days ago*

Listen mystery guy, I googled "Argon Aschleman" and found this
old message board.

Clicking on Argon's name shows an old Hotmail address for
"bubbaprog," which just happens to be Deadspin writer Timothy
Burke's username on Twitter.

EVERY link you've submitted so far is for a Deadspin article written
by Timothy Burke. Also, while your current username is argon-
aschleman, I noticed that the similar user argon_aschleman ALSO
took 100% of his links from Timothy Burke articles.

I wouldn't be annoyed, except previously when you got banned
for spamming you went onto Twitter and placed the blame on
Reddit for wanting "to protect pedophiles." A total falsehood.

Take some responsibility. When you get caught spamming, the
proper thing is to apologize, not to get mad at the person who
caught you and then continue on lying.

I know that exposing a person's identity is frowned upon here, but
as far as I'm concerned you aren't a member of this community;
you're just a spammer who spreads nasty lies about Reddit
whenever you get caught.

permalink  parent

8. Redditors applaud. The Deadspin employee is exposed as a liar and douche.

Posted by Drew Johnson at 11:56 AM    2 comments:

Sunday, December 9, 2012

## Finding Mobutu

Most people reading this are probably familiar with Gawker Media properties. They're the collection of news and gossip sites run by Nick Denton.

Recently they've positioned themselves as the morality police of the web. If you say something deemed racist or sexist, or if you act like a troll, they'll plaster your personal information online for everyone to see, and generally make you look bad on any future Google searches. They even did this with the Horse_ebooks guy, even though his only infraction was having a popular twitter account.

Now mothers everywhere are telling their little kids, "Eat your vegetables, or else Gawker is going to expose you."

Well I'm not the least bit intimidated by Gawker. Their "morality" is corrupt. And I want to give them a taste of their own medicine.

The only Gawker writer who avoids revealing his true name is Mobutu Sese Seko. Mobutu runs the website *Et tu, Mr. Destructo?*. He has operated it for four years, and back in February he was hired to be Gawker's "screaming conscience," which means he's their main political columnist.

Mobutu, if you're reading this, prepare to get--as the trolls like to say--butthurt.

I went to Mobutu's blog, and looked at who'd left the earliest comments beginning in 2008. Two of the earliest comments were left by Cory Harris and Christian Lund. As luck would have it, Cory Harris and Christian Lund both have public Facebook profiles and their friends lists are visible. They aren't friends with each other, but they share a mutual friend: Jeb Tennyson Lund.

Mobutu mentions that he is married (Jeb Lund is married) and that he attended a small liberal arts college in Florida (Jeb Lund attended New College of Florida). What sealed the deal was a 2008 interview from

I went to Mobutu's blog, and looked at who'd left the earliest comments beginning in 2008. Two of the earliest comments were left by Cory Harris and Christian Lund. As luck would have it, Cory Harris and Christian Lund both have public Facebook profiles and their friends lists are visible. They aren't friends with each other, but they share a mutual friend: Jeb Tennyson Lund.

Mobutu mentions that he is married (Jeb Lund is married) and that he attended a small liberal arts college in Florida (Jeb Lund attended New College of Florida). What sealed the deal was a 2008 interview from *Metal Hammer* with Robert Schober, who at the time had just directed a music video for Metallica. In it, Schober says: "I was able to create an entire viral campaign with a blog about the cold war and propaganda films (written by Mr Destructo author Jeb Lund), produce fake news stories, and even had Kirk do a vlog on youtube about 'finding' these films when they were touring in Russia."

I'm not surprised a Gawker writer made his start by producing fake news stories.

So. What sort of writer was Jeb Lund before becoming Mobutu? It turns out he was a professional wrestling columnist. He wrote extensively for the wrestling website Online Onslaught, providing Raw and Smackdown recaps and PPV predictions. Above all, Jeb enjoyed unloading his screaming conscience onto WWE's youngest star, Randy Orton. He would call Orton an "effete water-headed mutant shit-heel," and a "human toadstool" among other things. (Bear in mind, Jeb was around 27 then.)

I actually have nothing against professional wrestling, it's kind of like a ballet in which the performers occasionally fall onto thumbtacks. But quite a few commenters on Gawker have wondered whether "Mobutu" was the pseudonym for some established celebrity, and the answer is clearly no. If Nick Denton truly wants to create a society where everyone's secrets are known–as he explained in a recent panel–then he should welcome having Mobutu Sese Seko's identity be known. For him to claim anything else would be a double-standard.

Posted by Drew Johnson at 1:54 PM   8 comments:

Recommend this on Google

Labels: Gawker, Mobutu Sese Seko, Nick Denton

Case: 1:11-cv-03054 Document #: 195-13 Filed: 03/12/13 Page 4 of 5 PageID #:2775

Thursday, December 20, 2012

## Was a Gawker writer fired for posting child porn?

On Friday, October 12th, Gawker published a story which revealed the identity of an internet troll known as Violentacrez.

Violentacrez, whose real name is Michael Brutsch, was a moderator on the website Reddit. He was associated with several NSFW forums, two of which--Jailbait and Creepshots--seemingly catered to would-be pedophiles and would-be sexual predators.

A lot of fellow moderators felt this article broke community rules that were meant to protect Redditors' online anonymity. (For a detailed summary of the drama between Gawker and Reddit, I recommend this Quora answer.) News sites quickly cast the battle as one between anonymous internet creeps and the people who wished to expose them. Many sites used headlines to mark a clear stance, such as when The Atlantic Wire baldly declared, "Redditors Stand Up to Gawker to Protect Child Pornography."

Something else occurred during that week, however, which received very little notice. On October 11th, Louis Peitzman, an evenings and weekend editor who had worked for Gawker since January, wrote on his Twitter: *"I'm out at Gawker, effective immediately. Thank you to those of you who have read and supported my work there. It's been stressful but fun."* No reason was given and no official announcement was made on the website. Usually when a writer leaves amicably there will be a farewell post. I began looking for a possible reason why Louis had left, and soon found one.

One day earlier, on October 10th, Louis had written this post about an unverified photo that allegedly showed Justin Bieber posing nude in a full-frontal position. As of this writing, the post has received over 216,000 pageviews. Louis spent the post comparing the body in the picture with what was publicly known about the 18-year-old Bieber. In the comments section, several readers expressed concern over the material:

### Blog Archive

▲ 2013 (6)

▼ 2012 (8)

▼ December (8)

Exposing Deadspin: A recap

Was a Gawker writer fired for posting child porn?

Stay classy, Max Read

The Chief Keef Incident

More to come...

Finding Mobutu

A man and his pencil

Denied?

Case: 1:11-cv-03054 Document #: 195-13 Filed: 03/12/13 Page 5 of 5 PageID #:2776

# Gawker Sucks

Thursday, February 28, 2013

### And now he's gone

Mobutu Sese Seko has left Gawker. He revealed his true name in the process, and several commenters pointed out that, in fact, this blog revealed Mobutu's identity back in December.

Was there a direction connection between my blog post and Mobutu's decision from earlier today? I have no idea.

But I nailed it.

Posted by Drew Johnson at 10:39 PM

Recommend this on Google

## 6 comments:

**Anonymous** February 28, 2013 at 11:12 PM

I figured out who he was "by accident". You're no friggin' genius.

Reply

**Blog Archive**

▶ 2013 (6)
  ▼ February (2)
    And now he's gone
    6,000+ pageviews
    ▲ January (4)
  ▲ 2012 (8)

Case: 1:11-cv-03054 Document #: 195-14 Filed: 03/12/13 Page 1 of 1 PageID #:2777



More ▾

Jan 11

**David Feige** <David@davidfeige.com>
to Amy, me, Daniel, docketing, gslaw, Oren, Steven, docket, Mae, Steven, fschuba ▾

Mr. Huon,

As to the redaction issue, I understand completely.  Please know that as far as I knew (until yesterday morning) the filing was indeed properly redacted, and that within hours of my figuring out what the problem was (yesterday afternoon) the operations division agreed to temporarily seal the pleading pending a final order from the judge.  Indeed, that pleading is already under seal.  Additionally (though the technology department of the court is still investigating what they described as a very strange glitch) so far as they can tell, the issue would only arise if accessed via an iPad or mac running a particular browser.  Hence, in most instances the document will appear properly redacted both on the screen and in a printed version.

On the local rule question, I am slightly confused by your question, but will certainly attempt to clear up any issues.  In the 7.1 disclosures, we've indicated in 2(b) that Gawker Sales LLC, Gawker Entertainment LLC and Gawker Technology LLC each only have one member or affiliate.  That member is Gawker Media LLC.  Neither Mr. Denton nor Ms. Darbyshire are members of any of these entities.
In turn Gawker Media LLC has only one member or affiliate—and that is the corporate entity Gawker Media Group inc.
While Mr. Denton and Ms. Darbyshire may be officers of the LLC's or shareholders in the incorporated company, they are not members of any of the LLC's.
Perhaps the confusion involves the fact that officers and members/affiliates are not a coextensive group.

Given the above I hope you'll see that indeed our 7.1 (and 3.2) disclosures were both accurate and adequate.

Hopefully this clarifies the situation.  Let me know if it does not.

Best,

David

## THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

People
_____
Plaintiff/Petitioner

vs.

Meanith Huon
_____
Defendant/Respondent

No. 08

Div. CF

1496

### ORDER

Upon motion of the
State, Counts III, IV & V
are hereby nolle
prosequi

FILED

MAY 03 2010

CLERK OF CIRCUIT COURT #32
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

Date_____

_____
Judge

We, the jury, find the defendant Meanith Huon not guilty of Criminal Sexual Assault (oral penetration).





MAY 0 6 2010

CLERK OF CIRCUIT COURT #32
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS.

We, the jury, find the defendant Meanith Huon not guilty of Criminal Sexual Assault (digital penetration).





MAY 0 6 2010

CLERK OF CIRCUIT COURT #32
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**FILED**

MAY 0 7 2010

CLERK OF CIRCUIT COURT #32
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

THE PEOPLE OF THE )
STATE OF ILLINOIS, )
                              )
        VS.                   )     Case No. **08-CF-1496**
                              )
MEANITH HUON,                 )
                              )
        **Defendant.**        )
                              )

## JUDGE'S DOCKET ORDER

     Jury Trial resumed this date following adjournment. People present by Assistant State's Attorneys Chris Hoell and Amy Chapman. Defendant appears with his attorneys, Scott Rosenblum and Mike Mettes. Motions heard. Witnesses sworn. Evidence heard. Exhibits marked and admitted. Jury Instruction Conference completed. Closing arguments presented. Jury Instructions read to the Jury. Verdicts returned by the Jury as follows, "We, the Jury, find the Defendant, Meanith Huon, not guilty of Criminal Sexual Assault (oral penetration)", and "We, the Jury, find the Defendant, Meanith Huon, not guilty of Criminal Sexual Assault, (digital penetration). Jury excused. Order of not guilty entered on the verdicts.

**DATE: 5-6-10**
**CR: J. FARNSWORTH**

_Janet Heflin_
**Hon. JANET HEFLIN**
**Judge Presiding**

A true copy of the original on file in my office
Attested to this 22 day of June 20 10
MATT MELUCCI
Clerk of the Circuit Court, 3rd Judicial Circuit
Madison County, Illinois
By Lisa Williams
Deputy Clerk

CIRCUIT COURT MADISON COUNTY ILLINOIS

**THIRD JUDICIAL CIRCUIT**

**MADISON COUNTY, ILLINOIS**

STATE OF ILLINOIS
_____
Plaintiff/Petitioner

vs.

No. _09CF1688_

Div. _____

_____

MEANITH HUON
_____
Defendant/Respondent

**ORDER**

COMES Now State and files a nolle
prosequi in the cause in light of the jury verdict on
08CF1496. — and in response to Defendant's Motion to
Dismiss

ASA.

FILED

DEC 06 2010

CLERK OF CIRCUIT COURT #41
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

Date _12-6-10_

_____
Judge

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS       Page 001

PEOPLE OF THE STATE OF ILLINOIS

                        VS                      NUMBER 11123163101

        MEANITH      HUON

                CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint
with the Clerk of the Circuit Court.

Charging the above named defendant with:

    720-5/12-3-A-2                    M A      BATTERY - MAKE PHYSICAL C
    720-5/12-3-A-2                    M A      BATTERY - MAKE PHYSICAL C
    720-5/12-3-A-2                    M A      BATTERY - MAKE PHYSICAL C
    720-5/12-3-A-2                    M A      BATTERY - MAKE PHYSICAL C
The following disposition(s) was/were rendered before the Honorable Judge(s):

07/06/11 BOND SET BY RULE OF COURT              07/26/11 2829
07/26/11 APPEARANCE FILED
    CALABRESE ANTHONY JOHN
07/26/11 MOTION FOR DISCOVERY                               S        2
    CALABRESE ANTHONY JOHN
07/26/11 PERMISSION TO LEAVE JURIS              09/07/11 2829
    D MTN TO EXPND COND OF BOND GRANTED
    CALABRESE ANTHONY JOHN
09/07/11 DEF DEMAND FOR TRIAL
    CALABRESE ANTHONY JOHN
09/07/11 NOLLE PROSEQUI                     CALL
    CALABRESE ANTHONY JOHN

                                I hereby certify that the foregoing has
                                been entered of record on the above
                                captioned case.
                                Date 12/30/11

                                DOROTHY BROWN
                                CLERK OF THE CIRCUIT COURT OF COOK COUNTY

# Rape Potpourri

By ELIE MYSTAL

We've got a couple of rape stories, but I don't have enough rape humor to fill out two posts. So we'll tackle them together.

Yes, I said "tackle," because the first rape allegation is being hurled at my childhood hero, former New York Giants linebacker Lawrence Taylor. The New York Times reports:






> The former New York Giants linebacker Lawrence Taylor was arrested early Thursday morning and will be charged with third-degree rape involving a 15-year-old girl at a hotel in Montebello, N.Y., according to police.
>
> The Journal News reported that the victim was a runaway from the Bronx who was taken to the Holiday Inn in Montebello by a pimp, according to Ramapo supervisor Christopher St. Lawrence. She was treated at a hospital.

I think Breaking Media executive editor Matt Creamer said it best: "Somewhere, Joe Theismann is smiling."

The little boy inside of me (I'm referring to my inner child, not my lunch) can't believe that the man who revolutionized the linebacker position could rape a little girl. I'm locked into my childhood memories right now, because the part of me that is a rational adult is currently puking his guts out in the bathroom. A 15-year-old girl? If the allegations are true, one can only hope that LT experiences the business end of a true giant in the penitentiary.

Here at ATL, we're your one-stop shop for breaking rape coverage. We cover the rape allegations of the rich and famous, as well as any alleged attorney rapists near you…

Our next story from the files of the wanton and depraved is a little more in our wheelhouse. A St. Louis-area lawyer came up with an excellent little game to meet women. Meanith Huon allegedly listed Craigslist ads where he claimed to be a talent scout for models.

So far, so good. I once pretended to be an Ostrich rancher from sub-Saharan Africa because I was trying to impress bubble gum princesses at a BU party. But Huon's potentially harmless lies allegedly turned dastardly, pretty quickly:

> The victim said she responded to a Craigslist ad posted by Huon in late June, seeking promotional models, sending her resume, her phone number and two pictures of herself…
>
> The two agreed to meet at the downtown St. Louis bar Paddy O's, the victim testified.
>
> But the next day, the victim was running late and called Huon. He told her to meet him at another bar, but when she got there, he told her the other promotional models left, and so he was going to interview her, the victim said.

Case 1:14-cv-06659 Document #: 26 Filed 02/22/16 Page 9 of 8 PageID #:276

And this, people, is why God invented Google. Had the victim Googled Huon, she would have found

> A Chicago attorney who was posing as a supervisor for a company that
> sets up promotions for alcohol sales at area bars was charged in Madison
> County July 2, with two counts of criminal sexual assault, two counts of
> criminal sexual abuse and one count of unlawful restraint.
>
> Meanith Huon, 38, of 3038 S Canal St. in Chicago, was arrested by the
> Chicago Police Department on July 1, and was transferred to Madison
> County the next day.

Or she might have come across this link, at Lawyer Gossip:

> Lawyer, Meanith Huon, 39, who was originally charged with criminal
> sexual assault, sexual abuse and unlawful restraint is now facing charges
> of harassment and cyber stalking!

Of course, women shouldn't have to assume that every guy they meet is a potential rapist. But
apparently there are a lot of depraved dudes walking around out there that are potential rapists.

In any event:

> Huon and the woman went to a couple of bars near Busch Stadium, then
> to a Laclede's Landing bar before Huon asked the victim if she wanted to
> go to Pop's in Sauget to meet the other models.
>
> The woman agreed, but told Huon she didn't have enough gas in her car,
> so she went with him, she said.

This is gonna end badly:

> As Huon's Honda Civic crossed the Poplar Street Bridge, the victim said
> Huon drove past the Sauget exit and continued north on Interstate 55. As
> the car was moving, Huon fondled the woman, then forced her to perform
> oral sex on him, the victim said.

Oh come on. If somebody was driving and tried to "force" me to perform oral sex on them, I'd just get
out of the stupid car. Which is to say, I'd do *exactly* what the victim did in this case:

> Huon exited Interstate 55 near New Douglas, looking, the victim said, for a
> secluded place to make out with her. The victim leaped from the moving
> car, she said, to escape Huon, leaving her cell phone, purse, shoes and
> identification in his car.
>
> "If he wasn't going to take me back to the freeway, I had made a decision
> to do anything I could to get out of that car," the victim testified.
>
> Assistant State's Attorney Chris Hoell showed pictures to the jury of the
> woman's bruised knees, skinned feet and cut toes.

Damn. If you can't get a woman to consensually stay in a moving vehicle, can you really get her to
consensually agree to sex (insofar as lying to her about your job and your intentions to get her into
the car counts as consensual in the first place)?

Obviously, Huon sees things differently:

> Mike Mettes, Huon's defense lawyer, said during his opening statement

Case: 1:16-cv-03655 Document #: 26-2 Filed: 02/27/18 Page 4 of 8 PageID #:2161

> what Huon told the victim during a phone conversation that was social and the two of them had considered. During the call, the victim asked for $500 and threatened if Huon didn't pay her, she would "cry rape," the attorney argued.

So we're not denying that she hurled herself out of a moving vehicle, we're contending that she jumped out of the car to make it look like she was raped? Right, sure. That sounds like the definition of incredible.

It seems to me that there is entirely too much (alleged) raping going on in this country. If this keeps up, men and women are going to have to start carrying around sexual consent forms on their persons.

> I, the undersigned, being of sound mind and hot body, do hereby consent to affixing my _____ to the other party's _____. Such amorous undulations include, but are not limited to, _____, _____, and _____, and all proposals will be considered so long as no animals (barnyard or otherwise) are involved.
>
> I claim no rights to future _____, _____, or _____, in exchange for this brief interruption in my chronic loneliness.
>
> **UPDATE**: Meanith Huon was acquitted of these charges. Please **check here** for our continuing coverage.
>
> While I may be quite intoxicated right now, I know damn well what I'm doing.

Lawrence Taylor Arrested After Rape Allegation [New York Times]
Testimony: Woman says she was raped by attorney posing as scout for models [Belleville News Democrat]

**Earlier**: Did You Know That the Real World Has an STD Waiver?

---

💬 (107) Comments

Tags: Football, Rape, Sadness, Sex, Sports

PAGE 1



# State of Delaware

SECRETARY OF STATE
DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

121033669

9916566
MEANITH HUON
PO BOX 441
CHICAGO                    IL    60690

09-14-2012

ATTN: MEANITH HOUN

| DESCRIPTION | AMOUNT |
|---|---|
| GAWKER MEDIA LLC | |
| 3532534   4100   Plain Copy | |
| Plain Copy Fee | 12.00 |
| Expedite Fee, 24 Hour | 20.00 |
| FILING TOTAL | 32.00 |
| TOTAL PAYMENTS | 32.00 |
| SERVICE REQUEST BALANCE | .00 |

SENT BY: Case 1:11-cv-03054 Document #: 195-17 Filed: 03/12/13 Page 2 of 23 PageID #:3780

212 937 2124;        JUN-3-02

JUN 03 2002 1:17PM    HP LASERJET 3200

STATE OF DELAWARE
SECRETARY OF STATE   PAGE
DIVISION OF CORPORATIONS
FILED 01:30 PM 06/03/2002
020353593 - 3532534

# CERTIFICATE OF INCORPORATION

## OF

## BLOGWIRE, INC.

### ARTICLE I

### Name

The name of the corporation is Blogwire, Inc. (the "Corporation").

### ARTICLE II

### Registered Office and Registered Agent

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### ARTICLE III

### Corporate Purpose

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "General Corporation Law").

### ARTICLE IV

### Capital Stock

The total number of shares of all classes of stock that the Corporation has authority to issue is 1,000, all of which shall be shares of Common Stock, par value $.01 per share.

### ARTICLE V

### Directors

To the fullest extent permitted by the General Corporation Law as it now exists and as it may hereafter be amended, no director of the Corporation shall be personally

liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

## ARTICLE VI

### Bylaws

The directors of the Corporation shall have the power to adopt, amend or repeal the bylaws of the Corporation.

## ARTICLE VII

### Amendment

The Corporation reserves the right to amend, alter, change or repeal any provision of this Certificate of Incorporation, in the manner now or hereafter prescribed by law, and all rights conferred on stockholders in this Certificate of Incorporation are subject to this reservation.

## ARTICLE VIII

### Incorporator

The name and mailing address of the sole incorporator is as follows:

| Name | Address |
|------|---------|
| Nicholas Denton | 301 Elizabeth Street, Apt. 2U<br>New York, New York 10012 |

I, THE UNDERSIGNED, being the sole incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the Sate of Delaware, do make this Certificate of Incorporation, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 3rd day of June, 2002.

Nicholas Denton

2

**Delaware Division of Corporations**
**401 Federal Street – Suite 4**
**Dover, DE 19901**
**Phone: 302-739-3073**
**Fax: 302-739-3812**

**Certificate of Conversion from a**
**Delaware or Non-Delaware Corporation to**
**a Delaware Limited Liability Company**

Dear Sir or Madam:

Enclosed please find a form for a Certificate of Conversion from a Delaware or Non-Delaware Corporation to a Delaware Limited Liability Company. The fee to file the Certificate of Conversion is $200.00. Also, enclosed please find a form for a Certificate of Formation that is required to be filed simultaneously with the Certificate of Conversion. The fee for filing the Certificate of Formation is $90.00.  Please submit the filing with 1 cover sheet with Conversion first. You will receive a stamped "filed" copy of your document. If you would like a certified copy it will be an additional $100.00. ($50.00 for the Conversion and $50.00 for the Formation) Expedited services are available please contact our office concerning these fees.  Delaware entities converting to any other non-Delaware or domestic entity must also pay all applicable taxes.  Please contact our Franchise Tax Department for assistance.  Please make any check payable to "Delaware Secretary of State".

In order to process your request in a timely manner, please include a cover letter with your name, address and telephone/fax number to enable us to contact you if necessary.  For your convenience a cover sheet is available at the following link. http://corp.delaware.gov/filingmemo.pdf. Please make sure you thoroughly complete all information requested on these forms. It is important that the execution be legible, we request that you print or type your name under the signature line.

Thank you for choosing Delaware as your corporate home. Should you require further assistance in this or any other matter, please don't hesitate to call us at (302) 739-3073.

Sincerely,

Department of State
Division of Corporations

Rev 09/05

STATE OF DELAWARE
CERTIFICATE OF CONVERSION
FROM A CORPORATION TO A
LIMITED LIABILITY COMPANY PURSUANT TO
SECTION 18-214 OF THE LIMITED LIABILITY ACT

1.) The jurisdiction where the Corporation first formed is_____.

2.) The jurisdiction immediately prior to filing this Certificate is_____.

3.) The date the corporation first formed is_____.

4.) The name of the Corporation immediately prior to filing this Certificate is
    _____.

5.) The name of the Limited Liability Company as set forth in the Certificate of
    Formation is _____.

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the
_____day of _____, A.D._____.

By:_____
                    Authorized Person

Name:_____
                    Print or Type

**STATE *of* DELAWARE**
**LIMITED LIABILITY COMPANY**
**CERTIFICATE *of* FORMATION**

• **First:** The name of the limited liability company is _____

_____

• **Second:** The address of its registered office in the State of Delaware is

_____ in the City of _____

Zip Code_____.

    The name of its Registered agent at such address is _____

_____.

• **Third:** (Insert any other matters the members determine to include herein.)

 

**In Witness Whereof**, the undersigned have executed this Certificate of Formation this
_____ day of _____, 20_____.

                  By:_____
                       Authorized Person(s)

                Name:_____
                      Typed or Printed

F040823000 275

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
41 State Street
Albany, NY 12231
www.dos.state.ny

# APPLICATION FOR AUTHORITY
## OF

Gawker Media LLC

*(Insert name of Foreign Limited Liability Company)*

Under Section 802 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is: _Gawker Media, LLC_

If the name does not contain a required word or abbreviation pursuant to Section 204 of the Limited Liability Company Law, the following word or abbreviation is added to the name for use in this state:

(Do not complete this section unless the limited liability company's true name is not available pursuant to §204 of the Limited Liability Company Law.) The fictitious name under which the limited liability company will do business in New York is:

**SECOND:** The jurisdiction of organization of the limited liability company is: _Delaware_

_____ . The date of its organization is: _April 8, 2004_

**THIRD:** The county within this state in which the office, or if more than one office, the principal office of the limited liability company is to be located is: _New York_
(A county in New York State must be stated. Please note that the limited liability company is not required to have an actual physical office in this state.)

**FOURTH:** The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process served against him or her is:

Gawker Media LLC
76 Crosby Street
New York, NY 10012

DOS-1361 (Rev. 08/03)

**FIFTH:** (Complete the statement that applies)

The address of the office required to be maintained in the jurisdiction of its formation is: _____
 _____ The Corporation Trust Company

 _____ 1209 Orange Street, Wilmington, DE  19801 _____

No office is required to be maintained in the jurisdiction of its formation. The address of the
principal office of the limited liability company is: _____

_____

_____.

**SIXTH:** The foreign limited liability company is in existence in its jurisdiction of formation at the
time of filing of this application.

**SEVENTH:** The name and address of the Secretary of State or other authorized official in its
jurisdiction of organization where a copy of its articles of organization is filed is: _____
 _____ Office of the Secretary of State
 _____ 401 Federal St., Suite 3
 _____ Dover, DE 19901 _____.

X   
 _____
 (Signature)

 Nicholas Denton
 (Type or print name)

 Manager
 (Title or capacity of signer)

**Please Note:** A certificate of existence or, if no such certificate is issued by the jurisdiction of
formation, a certified copy of the articles of organization of the limited liability company and all
subsequent amendments therefore, or if no articles of organization have been filed, a certified copy
of the certificate filed as its organizational base and all amendments thereto, must be attached to
the application for authority when submitted for filing. If such certificate or certified copy is in a
foreign language, a translation in English thereto under oath of the translator shall be attached.

2

# Delaware

**PAGE 1**

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "GAWKER MEDIA LLC" IS DULY FORMED
UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING
AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE
SHOW, AS OF THE FOURTH DAY OF MAY, A.D. 2004.

3532534 8300

040323402

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

**AUTHENTICATION: 3091020**

**DATE: 05-04-04**

F0400823000 275

## APPLICATION FOR AUTHORITY
## OF

**Gawker Media LLC**
*(Insert name of Foreign Limited Liability Company)*
Under Section 802 of the Limited Liability Company Law

Filed by:   **Hunter N. Norton, c/o Withers Bergman LLP**
            *(Name)*

            **157 Church Street  P.O. Box 426**
            *(Mailing address)*
            **New Haven, CT 06502-0426**

            *(City, State and Zip code)*

NOTE: This form was prepared by the New York State Department of State for filing an application for authority for a foreign limited liability company to conduct business in New York State. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal supply stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The certificate must be submitted with a $250 filing fee made payable to the Department of State.

*(For office use only.)*

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED

AUG 23 2004

TAX $_____

BY:_____

280

NYS DEPARTMENT OF STATE
DIVISION OF CORPORATIONS
41 State Street
Albany, NY 12231-0002

*Biennial Statement*

| | FILING PERIOD | FEE |
|---|---|---|
| 3093449 | 08/2006 | $9.00 |

Section 301 of the Limited Liability Company Law requires limited liability companies to update and provide a current service of process address to the Department of State every two years. Please sign, review and complete this form as necessary, and then return the statement with the required fee. The following is the service of process address currently on file with the Department of State:

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED AUG 18 2006

06081800
2269

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

**For: GAWKER MEDIA LLC**

Service of Process Address is the address to which the Secretary of State will forward any legal papers accepted on behalf of the limited liability company which commence a legal action against the company.

☑   **THE ADDRESS CURRENTLY ON FILE IS CORRECT.**

Only complete this box if the address presently set forth in the Department's records for the purpose is to be changed.

| SERVICE OF PROCESS ADDRESS SHOULD BE CHANGED TO | |
|---|---|
| | |

GABRIELLE DARBYSHIRE
PRINT OR TYPE NAME OF SIGNER

MEMBER , AUTHORISED SIGNATORY
PRINT OR TYPE THE TITLE
OR CAPACITY OF SIGNER

SIGNATURE OF MEMBER, MANAGER,
AUTHORIZED PERSON OR ATTORNEY-IN-FACT

2269

**IMPORTANT NOTICE**

06081800

A New York Limited Liability Company which is no longer conducting business must file a Certificate of Dissolution pursuant to section 705 of the Limited Liability Company Law, and a foreign Limited Liability Company no longer conducting business in New York State should file a Surrender of Authority pursuant to section 806 of the Limited Liability Company Law or a Termination of Existence pursuant to section 807 of the Limited Liability Company Law. Questions regarding the filing of these certificates should be directed to the NYS Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0001 or by calling 518-473-2492.

Filing Period – the filing period is the calendar month during which the original Articles of Organization or Application for Authority was filed or the effective date that limited liability company existence began, if stated in the Articles of Organization.

Filing Fee: The statutory filing fee is $9.00. Checks and money orders must be made payable to the "Department of State". DO NOT mail cash.

Return this entire form, completed, with your $9.00 fee, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

Failure to timely file this statement will be reflected in the Department's records as past due or delinquent.

DOS-1299 (09/99)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement

For Internal Use Only

**3093449**

AR08080500  2195

**Business Name:**

**GAWKER MEDIA LLC**

3093449

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

Filed By: _____

Cash # (if different than firm #): _____

| Required Fee: | $9.00 |
| Filing Period: | 08/2008 |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER MEDIA LLC 76 CROSBY STREET NEW YORK, NY 10012 | Name |
| | Address |
| | City | State | Zip |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature

MEMBER
Title of Signer (Please Print)

GABRIELLE DARBYSHIRE
Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

**Limited Liability Company
Biennial Statement**

For Internal Use Only

**3093449**

**Business Name:**

**GAWKER MEDIA LLC**

3093449

GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012

10081700

Filed By: _____

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
|---|---|
| Filing Period: | 08/2010 |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER MEDIA LLC
76 CROSBY STREET
NEW YORK, NY 10012 | Name GAWKER MEDIA LLC | | |
|---|---|---|---|
| | Address 210 Elizabeth St, 4th Floor | | |
| | City New York | State NY | Zip 10012 |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature _____

Title of Signer (Please Print) Legal Associate

Name of Signer (Please Print) Jose Ma, Esq.

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/08)

100817003124

# Biennial Statement

NYS Department of State
Division of Corporations, State Records &
Uniform Commercial Code
http://www.dos.ny.gov

**BUSINESS NAME:**    GAWKER MEDIA LLC

**FILING PERIOD:**    08/2012

---

**Part 1 - Service of Process Address (Address must be within the United States or its territories)**

| Name |
|---|
| GAWKER MEDIA LLC |

| Address Line 1 |
|---|
| 210 ELIZABETH STREET |

| Address Line 2 |
|---|
| 4TH FLOOR |

| City | State | Zip Code |
|---|---|---|
| NEW YORK | NY | 10012 |

## Signer Information

I affirm that the statements contained herein are true to the best of my knowledge, that I am authorized to sign this Biennial Statement and that my signature typed below constitutes my electronic signature.

| Electronic Signature |
|---|
| JESSE MA |

| Capacity of Signer |
|---|
| AUTHORIZED PERSON |

## FILED WITH THE NYS DEPARTMENT OF STATE ON: 8/7/2012
## FILING NUMBER: 120807006917 - 3093449

04/25/2005 10 38 FAX  12124879777          White Fleischner Fino                    002/004

F 050426000 915

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

# ARTICLES OF ORGANIZATION
## OF
# GAWKER ENTERTAINMENT, LLC

Under Section 203 of the Limited Liability Company Law

FIRST: The name of the limited liability company is **GAWKER
ENTERTAINMENT, LLC.**

SECOND· The purpose for which the Company is organized is to transact any lawful
business for which limited liability companies may be formed

THIRD: The county within this state in which the office of the limited liability
company is to be located is  New York County

FOURTH: The Secretary of State is designated as agent of the limited liability
company upon whom process against it may be served  The address within or without
this state to which the Secretary of State shall mail a copy of any process against the
limited liability company served upon it is  81 Spring Street, New York, NY 10012 Attn
Mr  Nicholas Denton

Jan Cohen, Esq
Organizer

04/25/2005 10 38 FAX  12124879777        White Fleischner Fino                    ☒003/004

F 050426 000 915

# ARTICLES OF ORGANIZATION
## OF
### GAWKER ENTERTAINMENT, LLC

Under Section 203 of the Limited Liability Company Law

Filed by

Jan Cohen, Esq
Cohen & Czarnik LLP
140 Broadway
36th Floor
New York, NY 10005

FILED 2005 APR 26 PM 3:30

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED  APR 26 2005

TAX S
BY

RECEIVED 2005 APR 25 PM 12:01

2

050426 000 966

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only

07041900
2310

## 3196528

**Business Name:**

**GAWKER ENTERTAINMENT, LLC**

3196528

Filed By: _RSH_

GAWKER ENTERTAINMENT, LLC
ATTN: MR. NICHOLAS DENTON
81 SPRING STREET
NEW YORK, NY 10012

Cash # (if different than film #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **04/2007** |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER ENTERTAINMENT, LLC<br>ATTN: MR. NICHOLAS DENTON<br>81 SPRING STREET<br>NEW YORK, NY 10012 | Name SAME | | |
|---|---|---|---|
| | Address 76 CROSBY ST | | |
| | City NEW YORK | State NY | Zip 10012 |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature: _____
Title of Signer (Please Print): MANAGING MEMBER

Name of Signer (Please Print): GABRIELLE DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

070419002370

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

**Limited Liability Company
Biennial Statement**

For Internal Use Only

AR09042400
3153

Filed By: _____ QC

Cash # (if different than film #): _____

**3196528**

**Business Name:**

**GAWKER ENTERTAINMENT, LLC**

3196528

GAWKER ENTERTAINMENT, LLC
76 CROSBY ST
NEW YORK, NY 10012

| **Required Fee:** | **$9.00** |
|---|---|
| **Filing Period:** | **04/2009** |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

GAWKER ENTERTAINMENT, LLC
76 CROSBY ST
NEW YORK, NY 10012

Name GAWKER ENTERTAINMENT, LLC
Address 210 ELIZABETH ST, FOURTH FLOOR
City NEW YORK   State NY   Zip 10012

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature
Title of Signer (Please Print) VICE PRESIDENT

Name of Signer (Please Print) GABY DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

090424003153

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

**Limited Liability Company
Biennial Statement**

For Internal Use Only

1042700

2814

Filed By: _____

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
|---|---|
| Filing Period: | 04/2011 |

(Make checks payable to the Department of State)

## 3196528

**Business Name:**

**GAWKER ENTERTAINMENT, LLC**

3196528

GAWKER ENTERTAINMENT, LLC
210 ELIZABETH ST
FOURTH FLR
NEW YORK, NY 10012

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER ENTERTAINMENT, LLC | Name | | |
|---|---|---|---|
| 210 ELIZABETH ST | | | |
| FOURTH FLR | Address | | |
| NEW YORK, NY 10012 | | | |
| | City | State | Zip |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature: *Jessella*

Title of Signer (Please Print): *Senior Legal Associate*

Name of Signer (Please Print): *Jessella*

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

110427002814

**2008 0191 0034**

| LLC-5 | File # _____ |



# State of California
## Secretary of State

**FILED**
In the office of the Secretary of State
of the State of California

**JAN 1 7 2008**

## LIMITED LIABILITY COMPANY
## APPLICATION FOR REGISTRATION

A $70.00 filing fee AND a certificate of good standing from an authorized public official of the jurisdiction of formation must accompany this form.

**IMPORTANT** – Read instructions before completing this form.

This Space For Filing Use Only

ENTITY NAME (End the name in Item 1 with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME UNDER WHICH THE FOREIGN LIMITED LIABILITY COMPANY PROPOSES TO REGISTER AND TRANSACT BUSINESS IN CALIFORNIA

    GAWKER TECHNOLOGY, LLC

2. NAME OF THE FOREIGN LIMITED LIABILITY COMPANY, IF DIFFERENT FROM THAT ENTERED IN ITEM 1 ABOVE

---

DATE AND PLACE OF ORGANIZATION

3. THIS FOREIGN LIMITED LIABILITY COMPANY WAS FORMED ON ___03___ - ___18___ - ___05___ IN _____NEW YORK_____
    (MONTH)   (DAY)   (YEAR)   (STATE OR COUNTRY)

    AND IS AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES IN THAT STATE OR COUNTRY.

---

AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both Items 4 and 5 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 4 must be completed (leave Item 5 blank).)

4. NAME OF AGENT FOR SERVICE OF PROCESS

    Incorporating Services, Ltd.

5. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA | CITY | STATE: CA | ZIP CODE

---

APPOINTMENT (The following statement is required by statute and should not be altered.)

6. IN THE EVENT THE ABOVE AGENT FOR SERVICE OF PROCESS RESIGNS AND IS NOT REPLACED, OR IF THE AGENT CANNOT BE FOUND OR SERVED WITH THE EXERCISE OF REASONABLE DILIGENCE, THE SECRETARY OF STATE OF THE STATE OF CALIFORNIA IS HEREBY APPOINTED AS THE AGENT FOR SERVICE OF PROCESS OF THIS FOREIGN LIMITED LIABILITY COMPANY.

OFFICE ADDRESSES (Do not abbreviate the name of the city.)

7. ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | ZIP CODE

    76 CROSBY STREET | NEW YORK , NY | 10012

8. ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA, IF ANY | CITY | STATE: CA | ZIP CODE

---

EXECUTION

9. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

    JAN 16, 2008
    DATE

    _Gaby Starygel_
    SIGNATURE OF AUTHORIZED PERSON

    GABRIELLE DARBYSHIRE, MEMBER
    TYPE OR PRINT NAME AND TITLE OF AUTHORIZED PERSON

LLC-5 (REV 04/2007)   APPROVED BY SECRETARY OF STATE

# State of New York
# Department of State } ss:

I hereby certify, that GIZMODO, LLC a NEW YORK Limited Liability Company filed Articles of Organization pursuant to the Limited Liability Company Law on 03/18/2005, and that the Limited Liability Company is existing so far as shown by the records of the Department.

A Certificate of Amendment GIZMODO, LLC, changing its name to GAWKER TECHNOLOGY, LLC, was filed 07/11/2005.

\*\*\*

*WITNESS my hand and the official seal of the Department of State at the City of Albany, this 14th day of January two thousand and eight.*

*Special Deputy Secretary of State*

*200801150414 102*

I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

SEP 1 8 2012

Date:_____ 

DEBRA BOWEN, Secretary of State



# State of California
## Secretary of State

### STATEMENT OF INFORMATION
(Limited Liability Company)

| Filing Fee $20.00. If amendment, see instructions. |
| --- |
| IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM |

**1.  LIMITED LIABILITY COMPANY NAME** (Please do not alter if name is preprinted.)

GAWKER TECHNOLOGY, LLC
200801910034

**FILED**
in the office of the Secretary of State
of the State of California

**JUL 0 8 2009**

This Space For Filing Use Only

---

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2.  SECRETARY OF STATE FILE NUMBER | 3.  STATE OR PLACE OF ORGANIZATION |
| --- | --- |
| 200801910034 | NEW YORK |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4.   STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | | ZIP CODE |
| --- | --- | --- | --- |
| 76 CROSBY STREET | NEW YORK, NY | | 10012 |
| 5   CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
| | | CA | |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6   NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| --- | --- | --- | --- |
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages. if necessary.)

| 7.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| --- | --- | --- | --- |
| NICK PENTON | 76 CROSBY STREET | NEW YORK, NY | 10012 |
| 8.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| GAWKER MEDIA LLC | 76 CROSBY STREET | NEW YORK, NY | 10012 |
| 9.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

| 10  NAME OF AGENT FOR SERVICE OF PROCESS |
| --- |
| INCORPORATING SERVICES, LTD. (C2892002) |

| 11.  ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| | | CA | |

**TYPE OF BUSINESS**

12.  DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

ONLINE MEDICA COMPANY

13.  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| ALAN MILLER | | AGENT | 7/7/2009 |
| --- | --- | --- | --- |
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

| LLC-12 (REV 03/2007) | | APPROVED BY SECRETARY OF STATE |
| --- | --- | --- |



# State of California
## Secretary of State

**STATEMENT OF INFORMATION**
(Limited Liability Company)

**L**

**33**

Filing Fee $20.00.  If amendment, see Instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1.  LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted.)

Gawker Technology LLC

**FILED**
In the office of the Secretary of State
of the State of California

FEB 0 3 2010

This Space For Filing Use Only

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2.  SECRETARY OF STATE FILE NUMBER | 3.  STATE OR PLACE OF ORGANIZATION |
|---|---|
| 200801910034 | New York |

**NO CHANGE STATEMENT**

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the Secretary of State, check the box and proceed to Item 13.

If there have been any changes to the information contained in the last Statement of Information filed, or no Statement of Information has been previously filed, this form must be completed in its entirety.

**COMPLETE ADDRESSES FOR THE FOLLOWING**  (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4.  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| 5.  CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE  CA | ZIP CODE |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER**  (Attach additional pages, if necessary.)

| 7.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| 8.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| 9.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |

**AGENT FOR SERVICE OF PROCESS**  (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

10.  NAME OF AGENT FOR SERVICE OF PROCESS

| 11.  ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE  CA | ZIP CODE |
|---|---|---|---|

**TYPE OF BUSINESS**

12.  DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

13.  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| Gabrielle Darbyshire | | COO | 1/20/2010 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

LLC-12R (REV 03/2007)

APPROVED BY SECRETARY OF STATE

Case: 1:11-cv-03054 Document #: 19-17 Filed: 03/12/13 Page 25 of 42 PageID #:2812



I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

SEP 1 8 2012

Date:_____

DEBRA BOWEN, Secretary of State



# State of California
## Secretary of State

**STATEMENT OF INFORMATION**
(Limited Liability Company)

Filing Fee $20.00. If amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

31

L

**FILED**
In the office of the Secretary of State
of the State of California

**JUL 1 7 2009**

ACC

This Space For Filing Use Only

1.  **LIMITED LIABILITY COMPANY NAME** (Please do not alter if name is preprinted)

GAWKER ENTERTAINMENT, LLC
200802810002

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2  SECRETARY OF STATE FILE NUMBER | 3  STATE OR PLACE OF ORGANIZATION |
|---|---|
| 200802810002 | NEW YORK |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | ZIP CODE |
|---|---|---|
| 720 14TH ST | SACRAMENTO, CA | 95814 |

| 5  CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| NICK PENTON | 76 CROSBY ST | NEW YORK, NY | 10012 |
| 8.  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| GAWKER MEDIA LLC | 76 CROSBY ST | NEW YORK, NY | 10012 |
| 9  NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

10  NAME OF AGENT FOR SERVICE OF PROCESS

INCORPORATING SERVICES, LTD. (C2892002)

| 11  ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | CA | |

**TYPE OF BUSINESS**

12.  DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

ONLINE MEDIA COMPANY

13  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT

| ALAN MILLER | *Alan Smith* | AGENT | 7/7/2009 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

LLC-12 (REV 05/2007)

APPROVED BY SECRETARY OF STATE



# State of California
## Secretary of State

**L** 12

### STATEMENT OF INFORMATION
(Limited Liability Company)

**Filing Fee $20.00. If this is an amendment, see instructions.**

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FILED**
in the office of the Secretary of State
of the State of California

**FEB 1 7 2012**

This Space For Filing Use Only

1. LIMITED LIABILITY COMPANY NAME

Gawker Entertainment, LLC

**File Number and State or Place of Organization**

2. SECRETARY OF STATE FILE NUMBER
200802810002

3. STATE OR PLACE OF ORGANIZATION (If formed outside of California)
New York

**No Change Statement**

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

[✓] If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to **Item 15.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | CITY | STATE | ZIP CODE |
| 7. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | | CITY | STATE CA | ZIP CODE |

**Name and Complete Address of the Chief Executive Officer, If Any**

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

**Name and Complete Address of Any Manager or Managers, or if None Have Been Appointed or Elected, Provide the Name and Address of Each Member** (Attach additional pages, if necessary.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 9. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 10. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

12. NAME OF AGENT FOR SERVICE OF PROCESS

| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE CA | ZIP CODE |
|---|---|---|---|
| | | | |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 1/31/2012 | Gaby Darbyshire | COO | *Gaby Darbyshire* |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

LLC-12 (REV 01/2012)

APPROVED BY SECRETARY OF STATE



I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

SEP 1 8 2012

Date:_____ 65

*Debra Bowen*

DEBRA BOWEN, Secretary of State

**LLC-5**  File # **2 0 0 8 0 2 8 1 0 0 0 2**

## State of California
### Secretary of State

## LIMITED LIABILITY COMPANY
## APPLICATION FOR REGISTRATION

**FILED**
In the office of the Secretary of State
of the State of California

**JAN 2 5 2008**

A $70.00 filing fee AND a certificate of good standing from an authorized public official of the jurisdiction of formation must accompany this form.

IMPORTANT – Read instructions before completing this form.

This Space For Filing Use Only

ENTITY NAME (End the name in Item 1 with the words "Limited Liability Company," or the abbreviations "LLC" or "L L C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1   NAME UNDER WHICH THE FOREIGN LIMITED LIABILITY COMPANY PROPOSES TO REGISTER AND TRANSACT BUSINESS IN CALIFORNIA

GAWKER ENTERTAINMENT, LLC

2   NAME OF THE FOREIGN LIMITED LIABILITY COMPANY IF DIFFERENT FROM THAT ENTERED IN ITEM 1 ABOVE

DATE AND PLACE OF ORGANIZATION

3   THIS FOREIGN LIMITED LIABILITY COMPANY WAS FORMED ON   04 - 26 - 05   IN   NEW YORK
    (MONTH)  (DAY)  (YEAR)          (STATE OR COUNTRY)

AND IS AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES IN THAT STATE OR COUNTRY

AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both Items 4 and 5 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 4 must be completed (leave Item 5 blank).)

4   NAME OF AGENT FOR SERVICE OF PROCESS
Incorporating Services, Ltd.

5   IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA   CITY   STATE   ZIP CODE
                                                                                              CA

APPOINTMENT (The following statement is required by statute and should not be altered.)

6   IN THE EVENT THE ABOVE AGENT FOR SERVICE OF PROCESS RESIGNS AND IS NOT REPLACED, OR IF THE AGENT CANNOT BE FOUND OR SERVED WITH THE EXERCISE OF REASONABLE DILIGENCE, THE SECRETARY OF STATE OF THE STATE OF CALIFORNIA IS HEREBY APPOINTED AS THE AGENT FOR SERVICE OF PROCESS OF THIS FOREIGN LIMITED LIABILITY COMPANY.

OFFICE ADDRESSES (Do not abbreviate the name of the city.)

7   ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE    CITY AND STATE    ZIP CODE
76 CROSBY STREET                                 NEW YORK, NY     10012

8   ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA, IF ANY    CITY    STATE    ZIP CODE
                                                                      CA

EXECUTION

9   I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

JANUARY 25, 2008                        _(signature)_
DATE                                    SIGNATURE OF AUTHORIZED PERSON

                                        GABRIELLE DARBYSHIRE, MEMBER
                                        TYPE OR PRINT NAME AND TITLE OF AUTHORIZED PERSON

LLC-5 (REV 04/2007)                                      APPROVED BY SECRETARY OF STATE

# State of New York
# Department of State } ss:

I hereby certify, that GAWKER ENTERTAINMENT, LLC a NEW YORK Limited
Liability Company filed Articles of Organization pursuant to the Limited
Liability Company Law on 04/26/2005, and that the Limited Liability
Company is existing so far as shown by the records of the Department.

\* \* \*

*WITNESS my hand and the official seal*
*of the Department of State at the City of*
*Albany, this 14th day of January two*
*thousand and eight.*

*Special Deputy Secretary of State*

*200801130412  102*

**2 0 0 8 0 2 8 1 0 0 0 2**

Case: 1:11-cv-03054 Document #: 191-17 Filed: 03/12/13 Page 31 of 42 PageID #:2818

03/17/2005 14 56 FAX 12124879777          White Fleischner Fino          ☑002/004

**0503180002**86

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

# ARTICLES OF ORGANIZATION
## OF
## GIZMODO, LLC

Under Section 203 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is **GIZMODO, LLC.**

**SECOND:** The purpose for which the Company is organized is to transact any lawful business for which limited liability companies may be formed

**THIRD'** The county within this state in which the office of the limited liability company is to be located is: New York County

**FOURTH:** The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process against the limited liability company served upon it is. 81 Spring Street, New York, NY 10012 Attn: Mr Nicholas Denton

Jan Cohen, Esq
Organizer

03/17/2005 14 58 FAX 12124878777     White Fleischner Fino     ☑003/004

F-0503180000286

## ARTICLES OF ORGANIZATION
## OF
## GIZMODO, LLC

Under Section 203 of the Limited Liability Company Law

Filed by:

Jan Cohen, Esq.
Cohen & Czarnik LLP
140 Broadway
36th Floor
New York, NY 10005

FILED
2005 MAR 18 AM 9: 55

STATE OF NEW YORK
DEPARTMENT OF STATE

MAR 18 2005

FILED
TAX $
BY:

RECEIVED
2005 MAR 17 PM 3: 03

2

297

07/26/2005 18:46 FAX 2124879777      WHITE FLEISCHNER & FINO          ☒003

F 0507110 0 0 757

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

# CERTIFICATE OF AMENDMENT
## OF
## ARTICLES OF ORGANIZATION
## OF

## GIZMODO, LLC

Under Section 211 of the Limited Liability Company Law

FIRST: The name of the limited liability company is **GIZMODO, LLC.**

If the name of the limited liability company has been changed, the name under which it
was organized is:

SECOND: The date of the filing of the articles of organization is: <u>March 18, 2005</u>

THIRD: The amendment effected by this certificate of amendment is as follows:

Paragraph <u>First</u> of the Articles of Organization relating to <u>the limited liability company
name</u> is hereby amended to read as follows: "<u>First: The name of the limited liability
company is GAWKER TECHNOLOGY, LLC.</u>"

Nick Denton
President

07/06/2005 16:46 FAX 2124879777          WHITE FLEISCHNER & FINO                    ⏃004

F 05071100 0 757

# CERTIFICATE OF AMENDMENT
## OF
## ARTICLES OF ORGANIZATION
## OF
## GIZMODO, LLC

Under Section 211 of the Limited Liability Company Law

Filed by:

Nick Denton
C/o Gawker Media
81 Spring Street
New York, NY 10012

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   JUL 1 1 2005
TAX $
BY:

2          794

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement

**For Internal Use Only**

0 7 0 3 1 0 0 0

2422

### 3178939

**Business Name:**

**GAWKER TECHNOLOGY, LLC**

3178939

Filed By: _____

GAWKER TECHNOLOGY, LLC
ATTN: MR. NICHOLAS DENTON
81 SPRING STREET
NEW YORK, NY 10012

Cash # (if different than film #): _____

| **Required Fee:** | **$9.00** |
|---|---|
| **Filing Period:** | **03/2007** |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement will be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER TECHNOLOGY, LLC ✓<br>ATTN: MR. NICHOLAS DENTON ✓<br>81 SPRING STREET<br>NEW YORK, NY 10012 ✓ | Name GAWKER TECHNOLOGY LLC | | |
|---|---|---|---|
| | Address 76 CROSBY ST | | |
| | City NEW YORK | State NY | Zip 10012 |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature
DIRECTOR, MEMBER
Title of Signer (Please Print)

GABRIELLE DARBYSHIRE
Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 41 State Street, Albany, NY 12231-0002.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement

For Internal Use Only

**3178939**

ARO9042800

2005

**Business Name:**

**GAWKER TECHNOLOGY, LLC**

3178939

Filed By: _____ KH

GAWKER TECHNOLOGY, LLC
ATTN: MR. NICHOLAS DENTON
76 CROSBY ST
NEW YORK, NY 10012

Cash # (if different than film #): _____

| **Required Fee:** | $9.00 |
| **Filing Period:** | 03/2009 |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

GAWKER TECHNOLOGY, LLC
ATTN: MR. NICHOLAS DENTON
76 CROSBY ST
NEW YORK, NY 10012

Name: GAWKER TECHNOLOGY LLC
Address: 210 ELIZABETH ST, FOURTH FLOOR
City: NEW YORK   State: NY   Zip: 10012

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature: [signature]
Title of Signer (Please Print): VICE PRESIDENT
Name of Signer (Please Print): GABY DARBYSHIRE

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

090423002005

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

## Limited Liability Company
## Biennial Statement

For Internal Use Only

**11032100**

2827

## 3178939

**Business Name:**

**GAWKER TECHNOLOGY, LLC**

3178939

GAWKER TECHNOLOGY, LLC
210 ELIZABETH ST
FOURTH FLOOR
NEW YORK, NY 10012

**Filed By:** _____

Cash # (if different than film #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **03/2011** |
| (Make checks payable to the Department of State) | |

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER TECHNOLOGY, LLC 210 ELIZABETH ST FOURTH FLOOR NEW YORK, NY 10012 | Name | | |
|---|---|---|---|
| | Address | | |
| | City | State | Zip |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature

Title of Signer (Please Print)   Sr. Legal Associate

Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

110321002827

0 8 0 1 0 9 0 0 0 8 2 8

# Articles of Organization
## of
## GAWKER SALES, LLC

*Under Section 203 of the Limited Liability Company Law*

FIRST:  The name of the limited liability company is:

## GAWKER SALES, LLC

SECOND:  The county within this state in which the office of the limited liability company is to be located is:

**New York**

THIRD:  (Optional) The latest date on which the limited liability company is to dissolve is:

FOURTH:  The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The post office address within or without this state to which the Secretary of State shall mail a copy of any process against the limited liability company served upon him or her is:

## GAWKER SALES, LLC

**76 Crosby Street**
**New York, NY 10012**

FIFTH:  (Optional) The name and street address within this state of the registered agent of the limited liability company upon whom and at which process against the limited liability company can be served is:

SIXTH:  The effective date of the Articles of Organization is upon filing.

SEVENTH:  The limited liability company is to be managed by (check appropriate box):
- ☑ One or more members
- ☐ A class or classes of members
- ☐ One or more managers
- ☐ A class or classes of managers

IN WITNESS WHEREOF, this certificate has been subscribed on **January 8th, 2008** by the undersigned who affirms that the statements made herein are true under the penalties of perjury.


/S/ Gabrielle S. Darbyshire
_____

Gabrielle S. Darbyshire - Organizer


080109000828

01/09/2008 11:55:38 AM -0800 POWERED by BARASAX   Page 2 of 3

080109000 **828**

# Articles of Organization

of

## GAWKER SALES, LLC

*(Under Section 203 of the Limited Liability Company Law)*

2008 JAN -9 PM 2: 41

HUBCO #29
DRAWDOWN

**Filer:**
Richard J. Girasole CPA PC
7522 13th Ave
Brooklyn, NY 11228

**STATE OF NEW YORK
DEPARTMENT OF STATE**
FILED JAN 0 9 2008
TAX $ _____ Ø
BY: _____ LSW

2008 JAN -9 PM 12: 02
RECEIVED

LSW-Ø

918

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only

## 3615290

**Business Name:**

**GAWKER SALES, LLC**

3615290

GAWKER SALES, LLC
76 CROSBY STREET
NEW YORK, NY 10012

2603

**10⌐21700**

Filed By: ___KH___

Cash # (if different from film #): _____

| | |
|---|---|
| **Required Fee:** | **$9.00** |
| **Filing Period:** | **01/2010** |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

## Part 1: Address for Service of Process (Address must be within the United States)

GAWKER SALES, LLC
76 CROSBY STREET
NEW YORK, NY 10012

| Name | | | |
|---|---|---|---|
| Gawker Sales, LLC | | | |
| **Address** | | | |
| 210 Elizabeth, 4th Floor | | | |
| City | | State | Zip |
| New York | | NY | 10012 |

## Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person

Signature

Title of Signer (Please Print)
PRESIDENT

Name of Signer (Please Print)
NICHOLAS DENTON

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1299 (07/06)

NYS Department of State
Division of Corporations, Records and UCC
Albany, NY 12231-0002
www.dos.state.ny.us

# Limited Liability Company
# Biennial Statement

For Internal Use Only



12012500

2673

**3615290**

**Business Name:**

**GAWKER SALES, LLC**

3615290

GAWKER SALES, LLC
210 ELIZABETH
4TH FLOOR
NEW YORK, NY 10012

Filed By: _____

Cash # (if different than film #): _____

| Required Fee: | $9.00 |
|---|---|
| Filing Period: | 01/2012 |

(Make checks payable to the Department of State)

The Limited Liability Company Law requires limited liability companies to provide a current address for service of process to the Department of State every two years in the calendar month in which the limited liability company was formed or authorized. Please review the address for service of process in Part 1. Update the information in the space provided, if necessary. If no changes are necessary, proceed to Part 2. A limited liability company which fails to timely file its Biennial Statement shall be shown to be past due on the Department of State's records.

**Part 1: Address for Service of Process** (Address must be within the United States)

| GAWKER SALES, LLC
210 ELIZABETH
4TH FLOOR
NEW YORK, NY 10012 | Name | | |
|---|---|---|---|
| | Address | | |
| | City | State | Zip |

**Part 2: Signature of Member, Manager, Attorney-in-Fact or Authorized Person**

Signature

Title of Signer (Please Print): COO

GABY DARBYSHIRE
Name of Signer (Please Print)

Send the completed form, together with the $9.00 filing fee made payable to the Department of State, in the self-mailer envelope, to the Department of State, Division of Corporations, 99 Washington Ave. Albany, NY 12231-0001.

To pay with a credit card, send a Credit Card Authorization Form to the Department of State with your Biennial Statement. The Credit Card Authorization Form is available from the Department of State's website at www.dos.state.ny.us or by calling (518) 473-2492. The Biennial Statement with the Credit Card Authorization Form may be faxed to (518) 486-4680.

Call (518) 473-6385 if you have questions regarding this form.

A domestic limited liability company must file this form until it files Articles of Dissolution. A foreign limited liability company must file this form until it files a Certificate of Surrender of Authority or a Certificate of Termination of Existence.

DOS-1298 (07/08)

## **EXHIBIT I**

Letter sent by the Debtors' counsel to Mr. Huon, dated November 16, 2016



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

November 16, 2016

Gregg Galardi
T 212 596-9139
gregg.galardi@ropesgray.com

Meanith Huon
PO Box 441
Chicago, Illinois 60690

     Re:  In re Gawker Media LLC (Case No. 16-11700 (SMB), Bankr. S.D.N.Y.)

Dear Mr. Huon:

     As you know, my firm is bankruptcy counsel to Gawker Media LLC, Gawker Media Group Inc. and Gawker Hungary Kft. (f/k/a Kinja Kft.), all as debtors and debtors in possession (the "Debtors"), in chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), No. 16-11700-SMB (the "Bankruptcy Cases").  I am writing to you regarding the proofs of claim that you have filed against the Debtors (the "Claims"), our Objection to those Claims (Docket No. 392, the "Claims Objection"), the November 15, 2016 decision of the United States Court of Appeals for the Seventh Circuit, No. 15-3049 (the "Appellate Decision"), regarding the lawsuit that is the basis for the Claims (the "Pending Action") and the Claims Estimation and Plan Reserve Procedures (as defined below).  Because there has been significant activity in recent days on these matters and the hearings on December 1 and December 13 in the Bankruptcy Court are rapidly approaching and will significantly impact your recovery on the Claims, I wanted to set forth how the Debtors intend to proceed regarding your Claims at those upcoming hearings and begin a dialogue regarding efficiently resolving the Allowed amount of your Claims and the potential distribution on such Claims.

     Initially, I want to remind you that the Debtors agreed to a modification of the automatic stay solely for purpose of permitting the Seventh Circuit to decide the appeal before it.  The automatic stay has not been lifted for any proceedings on remand.  For clarity, we do believe that the Seventh Circuit can issue an order remanding the case, but at that point the proceedings in the United States District Court for the Northern District of Illinois (the "Illinois Federal Court") would be stayed pursuant to Bankruptcy Code Section 362(a).

     More importantly, as you probably know, the Debtors are presently soliciting votes on a proposed chapter 11 plan (the "Plan").  That Plan, we believe, maximizes the funds available for all stakeholders, and includes highly beneficial settlements that the Debtors have reached with a number of creditors and the official creditors committee, and calls for speedy resolution of many other claims, including your Claims (the "Plan Settlements").  Accordingly, the Debtors would not

ROPES & GRAY LLP

- 2 -                                                                November 16, 2016

consent to lifting the stay to enable you to liquidate the Claims in the Pending Action. Instead, the Debtors will proceed on those Claims in the Bankruptcy Court.

Specifically, as you should know, the Debtors filed the Claims Objection asserting two principal arguments for disallowance of all your Claims. The first argument was based on the doctrine of *res judicata*. The second argument was that the Claims should be dismissed on their merits as a matter of law. The hearing on the Claims Objection is December 1, 2016, and the deadline for you to contest those Claims Objections was November 14, 2016. You failed to respond and arguably on that basis the Claims in the Bankruptcy Court could be disallowed in their entirety. Assuming, however, that there was some basis for your not timely responding to the Claims Objection, we believe that most of the Claims you assert in the Bankruptcy Court can now be readily resolved. In particular, the portions of your causes of action that the Seventh Circuit held were not actionable (affirming the Illinois Federal Court) should be disallowed for the reasons set forth by the Seventh Circuit, leaving only the single portion of your Claims that the Seventh Circuit held survived a motion to dismiss (reversing the Illinois Federal Court) (the "Single-Comment Claim") to be litigated further. Thus, if you agree, we would propose to resolve the Claims Objection by submitting an order that provides that our objection to all of the Claims is sustained, except with respect to the Single-Comment Claim. As a result all Claims other then the Single-Comment Claim would be disallowed and we could avoid the hearing on the Claims Objection on December 1, 2016 and proceed only on the Single-Comment Claim. If this is not agreeable, at the December 1 hearing we will request the Court disallow all of the Claims based on your failure to respond to the Claims Objection, or in the alternative, disallow all Claims other than the Single Comment Claim against Gawker Media.

As you also should know, on November 14th, the Debtors filed and served on you a motion seeking approval of procedures for estimating claims in connection with the setting of reserves established by the Pan (the "Claims Estimation and Plan Reserve Procedures"). The hearing to approve procedures is also scheduled for December 1, 2016. If approved, those procedures would apply to your Claims, including the Single-Comment Claim, although in light of the Appellate Decision, we are considering filing a supplement to those Procedures with respect to your Claims. In any event, under the proposed Claims Estimation and Plan Reserve Procedures as may be supplemented, the Debtors intend to seek to estimate your Claims at a hearing commencing on December 13, 2016, in connection with the confirmation hearing.

Notwithstanding the above and the Debtors' position that all of your Claims should be disallowed, it would benefit all parties, including you as a creditor, to avoid the costs of litigation, especially given the limited recoveries that you would likely receive under the Plan, if that Plan is confirmed. Specifically, while we understand that you have filed Claims against each of the three Debtors, the primary, and we believe the only, potential Claim on which you might obtain a recovery is filed against Gawker Media based on the single comment noted in the Appellate Decision. Under the Plan, and as a result of the Plan Settlements, unsecured creditors of Gawker

ROPES & GRAY LLP

- 3 -                                                    November 16, 2016

Media are to receive their share of the Gawker Media Claims Reserve of about $3.75 million in cash and, if that were not adequate to pay unsecured claims in full, additional cash that would bring the total amount to $6.5 million.  So, if you believe your distribution on your Claims is in excess of this amount, you likely need to not only litigate the merits of your underlying Claims but also Plan confirmation and the Plan Settlements.  We point this out to draw your attention to the issues to be litigated and the potential costs, and so we are not "talking past each other" in any negotiations regarding your Claim and procedures.  The Debtors believe that as a result of the Plan Settlements and most particularly the settlement on the allocation of Sale Proceeds, your recoveries could be limited regardless of whether you ultimately prevail on the merits of your Claims and were to otherwise have significant damages.

        Thus, we think it mutually beneficial for the parties to agree about procedures for resolving your Claims or setting a reserve, and perhaps even getting you a distribution before year end.  To that end, we believe that costs would be significantly avoided if we engage in a realistic dialogue that (for the moment) sets aside the issues of liability (*e.g.,* whether some Gawker employee actually wrote the comment, which we have no evidence of) and focus first on the damages that you could possibly prove with respect to the Single-Comment Claim.  In particular, as you are undoubtedly aware, because the Seventh Circuit rejected your claims based on the headline and content of the *Jezebel* article, under Illinois law you will have to prove that the single, allegedly actionable comment actually caused incremental harm to you, despite the *ATL* article already having been published and the non-actionable fair reporting (as the Seventh Circuit held) that *Jezebel* did on the situation.  Thus, to proceed expeditiously and cost effectively, we would be willing to consider a few options: (i) we could mutually agree to proceed in the Bankruptcy Court on December 13th regarding the amount of your potential damage claim for the purposes of assessing the Debtors' Plan Reserves, leaving the Debtors' ultimate liability and a final award of damages to be determined at a subsequent trial date; (ii) you could provide us with a reserve request and some detail as to incremental harm caused by the single comment that was allegedly defamatory and we would try to come to some agreed upon reserve amount without litigation on December 13th; or (iii) we could attempt to settle the Pending Action for an Allowed Claim and an agreed upon year-end distribution.  As to (iii) the Plan includes a settlement offer for your Claims, via the so-called Convenience Class.  You are entitled to opt-in to the Convenience Class, and receive a payment of $25,000 (which we would anticipate making before year-end).  If that amount is not acceptable, you should provide us with a settlement offer and the factual detail substantiating that offer.  While we can give no assurances as to whether it will be acceptable, we will consider the

ROPES & GRAY LLP

- 4 -                                November 16, 2016

settlement offer and if appropriate enter into good faith negotiations regarding a settlement of the
Pending Action.

Should you have any questions regarding this matter or like to discuss the matter, please do
not hesitate to contact me.

Sincerely,

Gregg M. Galardi