**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| Gawker Media LLC, *et al.*,[1] | ) | Case No. 16-11700 (SMB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### DECLARATION OF D. ROSS MARTIN IN SUPPORT OF THE DEBTORS' REPLY IN SUPPORT OF OMNIBUS OBJECTIONS TO PROOFS OF CLAIM OF GOT NEWS LLC AND CHARLES C. JOHNSON

Pursuant to 28 U.S.C. § 1746, D. Ross Martin declares as follows:

1.      I am a partner with the law firm Ropes & Gray LLP, counsel to Gawker Media LLC ("<u>Gawker Media</u>), Gawker Media Group, Inc. ("<u>GMGI</u>"), and Gawker Hungary Kft. ("<u>Gawker Hungary</u>"), (collectively, the "<u>Debtors</u>"), as debtors and debtors in possession in the above-captioned cases.

2.      I submit this declaration in support of the *Debtors' Reply in Support of Omnibus Objections to Proofs of Claim of Got News LLC and Charles C. Johnson* (the "<u>Reply</u>").

3.      Attached as Exhibit 1 is a true and correct copy of the *Memorandum of Law in Opposition to a Motion to Transfer Venue, a Motion to Dismiss, and a Motion to Strike/Dismiss under California's Anti-SLAPP statute*, filed on October 16, 2015 by Charles C. Johnson and Got News, LLC in the United States District Court for the Eastern District of Missouri and provided via ECF to Gawker Media's counsel.  *See Johnson v. Gawker Media, LLC*, No. 4:15-CV-1137 CAS (E.D. Mo. Oct. 16, 2015), ECF No. 37.

---

[1]    The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (5056).  Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.  Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

4.      On October 19, 2015, Exhibit 1 was stricken from the docket of the Eastern District of Missouri case for filing error, as the length of 111 pages exceeded the allowable 20 page limit.  *See Johnson v. Gawker Media, LLC*, No. 4:15-CV-1137 CAS (E.D. Mo. Oct. 19, 2015), ECF No. 44.

5.      On page 64 of Exhibit 1, Johnson and Got News, LLC concede that "[t]here is a very *very* subtle level of satire in the bestiality section" of the December 15, 2014 article written by J.K. Trotter and titled, "Which of These Disgusting Chuck Johnson Rumors Is True?"

Dated: November 29, 2016
          Boston, Massachusetts

                                             */s/ D. Ross Martin*
                                             D. Ross Martin

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
(Eastern Division)

| | | |
|---|---|---|
| CHARLES JOHNSON and | : | |
| GOT NEWS, LLC | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 14:15-cv-001137 |
| v. | : | |
| | : | |
| GAWKER MEDIA, LLC, J.K. TROTTER, | : | |
| and GREG HOWARD | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN OPPOSITION TO:

**I.**      **MOTION TO TRANSFER VENUE**
**II.**     **MOTION TO DISMISS**
**III.**    **CALIFORNIA ANTI-SLAPP**
         **MOTION TO STRIKE/DIMSISS**

**…AND IN SUPPORT OF PLAINTIFFS' ARGUMENTS IN THE _
ALTERNATIVE, INCLUDING:**

**\***      **MOTION FOR LEAVE TO FILE PLAINTIFFS' FIRST _
AMENDED COMPLAINT, AND**
**\***      **MOTION TO STAY DEFENDANTS' CALIFORNIA ANTI-
SLAPP MOTION TO DISMISS PENDING DISCOVERY.**
**\***      **MOTION FOR LEAVE TO FILE RESPONSE IN EXCESS
OF PAGE LIMIT**

**CONTENTS**

i.    Facts    .    .    .    .    .    .    .    .    .    .    .    2

ARGUMENT

I.    VENUE    .    .    .    .    .    .    .    .    .    .    65

II.    MOTION TO DISMISS    .    .    .    .    .    .    .    70

    A.    PERSONAL JURISDICTION    .    .    .    .    .    70

        a.    Missouri Long Arm Statute    .    .    .    .    .    71

        b.    Specific Jurisdiction    .    .    .    .    .    .    71

        c.    General Jurisdiction    .    .    .    .    .    .    78

    B.    MISSOURI DEFAMATION    .    .    .    .    .    .    95

    C.    MISSOURI INJURIOUS FALSEHOOD    .    .    .    .    102

    D.    MISSOURI INVASION OF PRIVACY    .    .    .    .    103

III.    CALIFORNIA ANTI-SLAPP MOTION TO DISMISS    .    .    .    104

IV.    ARGUMENTS IN THE ALTERNATIVE    .    .    .    .    .    109

    A.    PLAINTIFFS' MOTION FOR LEAVE TO FILE
        FIRST AMENDED COMPLAINT    .    .    .    .    .    110

    B.    PLAINTIFFS' MOTION TO STAY DEFENDANTS'
        CALIFORNIA ANTI-SLAPP MOTION TO
        DISMISS PENDING THE COURT'S
        DETERMINATION ON THE LAW
        APPLICABLE IN THIS CASE    .    .    .    .    .    110

# FACTS

**Basics of the Gawker Business Model**

Defendant Gawker Media, LLC ("Gawker") is the owner of a family of related online media properties on a variety of topics, yet with each property organized around one theme. CITE COMPLAINT. The flagship media property is gawker.com. Gawker earns revenue, among other ways, by selling advertising on its media properties. By aggressively expanding its readership in the United States, Gawker earns revenue as readers view their published articles online, and advertisers pay for readers viewing the ads, which are interspersed among the articles.

Gawker currently touts its monthly readership at 64 million per month in the United States. See Complaint at Para. 8. It is clear that Gawker and its hosted advertisers specifically market to Missouri readers. Gawker has over a million readers in Missouri. See Plaintiffs' Ex. 21. Gawker properties have endlessly written about the Ferguson riots and related topics,[1] including publishing articles highly critical of Plaintiffs' efforts in investigative journalism regarding various "Ferguson" topics.[2] Further, Deadspin.com, a Gawker media property dedicated to sports, famously, viciously, repeatedly, and continuously, attacked the St. Louis Cardinals recently.[3] Attacking the Cardinals fan base - the majority of which live in the State of

---

[1] See, e.g., Plaintiffs' Ex. 67.

[2] See, e.g., Plaintiffs' Ex. 76.

[3] Drew Magary, "*Eat Shit, Cardinals*" June 16, 2015 (http://deadspin.com/eat-shit-cardinals-1711726377 last accessed October 4, 2015); Drew Magary, "*Why **Your** Cardinals Suck*," October 10, 2013 (http://deadspin.com/why-your-cardinals-suck-1443513646 last accessed October 4, 2015) (emphasis added); Tom Ley, "*Everyone Involved In The Cardinals Hacking Scandal Seems To Be An Idiot*," (http://deadspin.com/everyone-involved-in-the-cardinals-hacking-scandal-seem-1711682201 last accessed October 4, 2015); Samer Kalaf, "*Report: FBI Investigates the St. Louis Cardinals For Hacking the Astros*," June 16, 2015 (http://deadspin.com/report-fbi-investigates-st-louis-cardinals-for-hackin-1711673515, last accessed October 4, 2015); Drew Magary, "*Moron USA*

3

Missouri - is a "clickbait"[4] tactic, an internet publishing shock tactic designed to get a particular large audience to view web content (to drive advertising revenue) through the use of extremely crass insults and dubious sensational claims.

It is extremely common - especially for large online media companies such as Gawker - to extensively track the demographics of its readership. Tracking technology currently exists which allows advertisers on media websites to track readers' age, gender, **location**, and many other data points.[5] See e.g., Plaintiffs' Ex. 22. The advantages of this are obvious: it helps advertisers **custom tailor** their marketing on a *user by user* basis. See Plaintiffs' Ex. 40. For example, an advertiser of a product *unavailable* to the St. Louis, Missouri market would not want to waste money advertising to a St. Louis, Missouri reader. If deposed, the marketing arm of Gawker would certainly be able to answer highly specific questions relating to the demographics of their readership, and this would include highly specific questions regarding the readership in Missouri.  Some such data are publicly available. See, e.g., Plaintiffs' Ex.'s 21-23.

**Gawker Founder and Chief, Nick Denton**

He moved to Manhattan at the start of the decade after leaving another internet venture. Back then, I asked what he planned to do next. He gave me a long speech about something called 'web logs', or 'blogs' for short. Blogging, he said, was the future. It would free the net, turn it from something people merely looked at into something to which they contributed. Ordinary people would publish their thoughts and observations, not just journalists.

*Tod*...
*toda*...

**41**.

[4] Wikipedia defines "clickbait" as, "a pejorative term describing web content that is aimed at generating online advertising revenue, **especially at the expense of quality or accuracy**, relying on sensationalist headlines to attract click-throughs and to encourage forwarding of the material over online social networks…" (https://en.wikipedia.org/wiki/Clickbait last accessed October 4, 2015) (emphasis added). **See Plaintiff's Ex. 26-27 and 29.**

[5] For example, see Plaintiffs' Ex. 40, which is a screenshot taken by Plaintiffs' counsel when he visited gawker.com's home page (www.gawker.com) on Sunday, October 4, 2015. Note that there is an ad on the page marketing **"Budweiser Brewery Experience SAINT LOUIS - This Tour's For You - BudweiserTours.com"** This ad clearly is marketing to Plaintiffs' counsel because the gawker.com technology gurus have tracking tech which knows that Plaintiffs' counsel is a reader, **viewing the site from St. Louis, Missouri**.

4

After working for a time as a reporter for the Financial Times, Nick Denton founded

Gawker in 2003. His goal, even then, was to change journalism by turning *ordinary people* into

content creators:[6]

> Similarly, Denton admits that the journalistic standards of his blogs are lower
> than those in traditional media. But, he says, that's the whole point of the
> venture. "We go after sacred cows. We run stories on the basis of one anonymous
> source, in many cases, and a bit of judgment. We put it out there. We make clear
> the level of confidence we have in a story. We ask for help [from site visitors], we
> ask for corroboration, we ask for denials. Every single story is a work in progress,
> it's not meant to be final. It's like a reporter's notebook."

Denton used to describe himself as a pornographer.[7] Concurrent with starting Gawker, he

also began a pornography blog (also featuring hardcore porn) called "Fleshbot" which is part of

the Gawker empire. Denton's first big hits were as a result of publishing private sex tapes of

public figures. For example, the infamous Paris Hilton sex tape.[8]

He is an extreme advocate of running stories with slight or no corroboration. For

example, Denton told The Hollywood Reporter in 2013 in an article entitled, "*Gawker's Nick*

*Denton Explains Why Invasion of Privacy Is Positive for Society*":[9]

---

[6] Excerpt from, Jay Rayner, "*The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008.
http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9. 2015). See Pl. Ex. 7.
[7] Ben McGrath, "*Search and Destroy, - Nick Denton's Blog Empire*," The New Yorker, 18 October 2010.
http://www.newyorker.com/magazine/2010/10/18/search-and-destroy-ben-mcgrath (last accessed Oct. 9, 2015). See
Plaintiffs' Ex. 8.
[8] Excerpt from, Jay Rayner, "*The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008.
http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9, 2015). See Plaintiffs' Ex. 7.
[9] May 22, 2013, by Eriq Gardner (http://www.hollywoodreporter.com/thr-esq/gawkers-nick-denton-explains-why-
526548 last accessed October 8, 2015). See Plaintiffs' Ex. 10.

5

**THR: When you started Gawker, did you have an idea that you were going to change things?**

**Denton:** Yeah. The basic concept was two journalists in a bar telling each other a story that's much more interesting than whatever hits the papers the next day.

**THR: Do you think journalists censor themselves?**

**Denton:** Well, I used to think it had to do with legal reasons and people being too fearful of libel. But actually, now I think the larger factor is a journalist's desire for respectability -- not wanting to expose themselves, not wanting to say, "Hey we've heard this, we're not completely sure whether it's true." People are talking about this. We're just going to share with you as we would share with our colleagues what we have.

**THR: What have you learned along the way?**

**Denton:** We've removed a lot of obstacles to free journalism and yet --

**Cook:** There is still the desire to be right. That is still important to me and to everyone we work with. We want to get it right. Our standards for getting it right are different from larger, more established institutions, and we do not just throw out every tip that we get on the site. We evaluate and report.

**Denton:** That is a disagreement between us. That's a disagreement between me and a lot of our journalists is that I would like more of the tips to be published. Maybe not published under John's name but published under a tipster's name or under a tipster's anonymous handle. I would like them to be published.

The above quoted excerpt is critical because it demonstrates the operating principle of

Gawker: publish sensational rumors - regardless of whether or not Gawker has any possible way

of establishing the truth or falsity of the claim. Notably, in the above back-and-forth between the

interviewer, himself, and his colleague Cook, Denton specifically takes issue with Cook's

statement that "There is still the desire to be right." He distinguishes his site from other sites. He

baldly states that he wants anonymous tips to be published under an anonymous pseudonym, and

the truth is an afterthought.

**THR: One of the legal issues that's always coming up for Gawker again and again and again is privacy issues. Do you have a larger philosophy on privacy in this age?**

**Denton:** I think the world is coming around to our presumption on privacy, which is that when somebody becomes the publisher, as people do at quite a young age on Facebook. To the extent that they are published and they are viewed, they become some sort of public figure. That blurs the line between public and private in a way that has never been done before.

Denton has admitted that his site has lower journalistic standards than "traditional media." He lauds Gawker's willingness to "run stories on the basis of one anonymous source …" And he also has made clear that Gawker relies upon readers of his site to provide content for his site - in other words, that his readers are collaborators on articles:[10]



_____

[10] James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006 (http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015). See Plaintiffs' Ex. 9.

7

Denton has repeatedly said that he doesn't believe privacy exists. Again, his interview
with The Hollywood Reporter:

 In 2006, Gawker initiated a feature on the site called "Gawker Stalker,"[11] which allowed
the readership of the website to "crowdsource"[12] the geographic locations of celebrities in "real-
time."[13] Here's an example of what it looked like:

The feature tied-into Google Maps and allowed users to pinpoint the locations, much to the terror
of celebrities. Despite obvious concerns for the safety of individual public figures,[14] Denton was
extremely pleased with the scandal surrounding the new feature, because it made Gawker a great
deal of money:[15]

> The rhetorical question hangs midair. He is referring to the storm whipped up over "Gawker
> Stalker", which hit the headlines in March last year, when Denton decided to enhance a
> long-running feature, on which users could post sightings of celebrities in Manhattan, by
> pinpointing each brush with fame on a Google Map. Because of the instantaneity of the
> posts - readers would email or instant-message their tip-offs to the site in real time - it was
> branded a stalkers' charter by several stars and their publicists. Clooney called on fans "to
> render these guys useless " by bombarding Gawker with erroneous sightings. "A couple of
> hundred conflicting sightings and this website is worthless", he wrote in an email circulated
> by his publicist.
>
> Denton, a born mischief-maker, had scored a direct hit. It was just the thing to get his titles
> talked about in the right way. "We had a 50% increase in traffic on Gawker and Defamer for
> quite a long time", he says, "because the media went crazy about Clooney and his clash with
> this 'underground gossip website'."

---

[11] See Plaintiff's Ex. 5-6.

[12] "Crowdsourcing" has been defined by Merriam-Webster as: "The practice of obtaining needed services, ideas, or
content by soliciting contributions from a large group of people and especially from the online community rather
than from traditional employees or suppliers." (http://www.merriam-webster.com/dictionary/crowdsourcing last
accessed Oct. 9, 2015).

[13] "Real Time" has been defined by Merriam-Webster as, "The actual time during which something takes place."
(http://www.merriam-webster.com/dictionary/real%20time last accessed Oct. 9, 2015).

[14] Celebrities are already at high risk without Gawker creating a de facto GPS tracking device. By way of example,
John Lennon, born October 9, 1940, was shot and killed by a deranged fan.
https://en.wikipedia.org/wiki/Death_of_John_Lennon (last accessed October 9, 2015).

[15] James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006
(http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015).
See Plaintiffs' Ex. 9.

8

> Denton says: "We don't have to spend a penny on marketing because our stories spread by word of mouth or word of email and why would we want to kill that?" He adds with a smile: "Anyway why would we need to advertise when someone like George Clooney does the job so much better than we ever could?"

So, if Denton and Gawker cannot legitimately find a newsworthy, marketable story, they will rely upon dubious anonymous tips. And when no tips surface, Gawker will itself **create and incite news**, provoking public figures to respond in outrage to an internet website which has as its purpose tracking the figure's every move. But, such provocation has a big payoff:[16]

> The future, Nick says, lies with what he calls iterative reporting, in which posts are used to request information and to help stand up stories. 'As a print journalist, if you hear a rumour you try to stand it up and if you can't the story dies,' he says. 'With a blog you can throw the rumour out there and ask for help. You can say: "We don't know if this is true or not."' What about libel? 'We just have to make sure we're not doing it maliciously and that we also admit when we're wrong. Personally, as a print journalist, I always found the most interesting stories to be the ones hacks talked about in the bar after work. Those are the ones we deal in.' He goes further, talking about how he wants his readers to be the source of stories, how they'll split page-view bonuses with them if the story runs. 'I want to institutionalise and automate chequebook journalism.'

While Gawker Stalker has since been halted (at some point after 2007, it is unclear), it's a good example of Denton's vision (unrealized in 2003). His insistence on using readers as content creators - in effect crowd-sourcing content:[17]

> the loading of pages. On most news sites there is a divide between the original piece and the comments; a chasm between author and readers. In the latest release of Kinja, by contrast, the base unit of content is not a standalone article but an exchange between the author and the most insightful of the readers.

---

[16] James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006 (http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015). See Plaintiffs' Ex. 9

[17] Excerpt from, Jay Rayner, "*The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008. http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9. 2015). See Plaintiffs' Ex. 7.

This excerpt is important because it not only underscores the recklessness of Gawker as news reporting entity, but also because it again re-emphasizes Denton's vision of publishing reader/unpaid content creator and paid author collaboration. "As a print journalist, if you hear a rumour you try to stand it up and if you can't the story dies … [w]ith a blog you can throw the rumour out there and ask for help. You can say: 'We don't know if this is true or not.'"[18] Indeed, this is Gawker standing operating procedure, and we will see many examples of this, *infra*. And, as we shall see, the technological media sharing platform undergirding all of the Gawker media properties - Kinja - *nearly eliminates any distinction between paid and unpaid Gawker content creators*. "…he wants his readers to be the source of stories [and Gawker will] split page-view bonuses with them if the story runs…"[19]

## What is Kinja?

Kinja is a news content aggregator across Gawker sites.[20] It is a technological platform that incorporates a social media features and which unifies all Gawker properties. It allows Readers as well as paid Gawker Staff to create user profiles, chat real time, comment on news articles, and create unique blogs - which can sometimes become so popular by other users that Gawker will co-opt the blog and bring it into the Gawker family.

In essence, Kinja removes virtually all distinctions between paid staff content and unpaid staff content. And this is by design, because it is part of Nick Denton's vision:[21]

---

[18] *Id.*

[19] See Plaintiff's Ex. 24-25.

[20] https://en.wikipedia.org/wiki/Kinja (last accessed Oct. 9, 2015).

[21] Excerpt from Nick Denton, "*Introducing Group Chats In Kinja,*" http://product.kinja.com/introducing-group-chats-in-kinja-1517330082. February 6, 2014. Last accessed Oct. 8, 2015. See Plaintiffs' Ex. 42 - 45.

10

> Messaging applications are the standard for personal communication: swift, stripped down and lively. Kinja is an effort to apply the same qualities to public sites whether from Gawker writers, partner publishers or solo bloggers. It is a *collaborative journalism platform* with the following feature at its heart, what we call the *group chat.*
>
> Each group chat has an instigator, typically but not necessarily the blog owner or one of their authors. The instigator can launch a topic with a news or opinion piece with a headline; or just with a question to another user.
>
> Even a long and exhaustive article should be just a starting point. Sites on the latest Kinja template display subsequent discussion with the same graphical treatment and respect as the author's starter post. The exchange should read like a question–and–answer session, the classic web chat format. We believe this conversational format will encourage the story to develop and the truth to be tested.

This excerpt says it all. Kinja is the realization of Denton's dream of removing the barrier between "author" and reader. While paid staff are the only content creators who are permitted to *initiate* an article on the main Gawker media properties[22] such as deadspin.com, gawker.com, gizmodo.com, etc., any Kinja user - paid or unpaid by Gawker - can contribute and collaborate with the initiating author of the article, to refine and develop the story. See Plaintiffs' Ex. 42-45.

Many Gawker readers come to the Gawker family of sites **specifically to read the comments**:[23]

---

[22] See Plaintiffs' Ex. 46.

[23] Maggie Rose, "*World Future Part 4: The Future of Kinja,*" Aug. 5, 2015 http://maggierosetao.kinja.com/world-future-2015-part-4-the-future-of-kinja-1726375719 (last accessed Oct. 9, 2015).

future news needs. Users often come to Kinja for the comments, to hear what other "normals" are saying, or to see Neil deGrasse Tyson jumping into a post to explain a "screwed up Tweet" he posted or to discuss NASCAR physics with the Jalopnik community. While the majority of the Kinja community is quite liberal, it does allow for any person to jump into a conversation and discuss their point of view – we just need to encourage that more. We excel at publishing pieces with real depth, which is not a

It is not simply that unpaid content creators (e.g., reader-users) may comment on stand-alone articles, like a peanut gallery. No, this is something completely different. Here, unpaid content creators are a **central feature** of the article authorship process. "The instigator [the initiator of the article] can launch a topic with a news or opinion piece with a headline; *or just with a question to another user* ... Even a long and exhaustive article should be just a starting point [with the commenters given the same **respect** as the article's initiators] The exchange should read like a question-and-answer session, the classic web-chat format. We believe this conversational format will encourage the story to develop and the truth to be tested."[24]

Gawker is fulfilling Denton's vision of crowdsourcing the news. Gawker has built an entire technological platform to facilitate this collaboration. By offering unpaid content creators nearly same respect as paid content creators, Gawker is attempting to attract more and more collaborators. A sort of payment in kind if not in currency. And this trend will only continue. Gawker believes that the news will, long term, become entirely **dependent** upon crowdsourcing:[25]

---

[24] Nick Denton, "*Introducing Group Chats In Kinja*," http://product.kinja.com/introducing-group-chats-in-kinja-1517330082. February 6, 2014. Last accessed Oct. 8, 2015. (Emphasis added). See Plaintiffs' Ex. 42.
[25] Maggie Rose, "*World Future Part 4: The Future of Kinja,*" Aug. 5, 2015 http://maggierosetao.kinja.com/world-future-2015-part-4-the-future-of-kinja-1726375719 (last accessed Oct. 9, 2015). See Plaintiffs' Ex. 48.

## (1) Crowd-sourcing / collaboration / socialization of everything

As with many other sectors, the news will become increasingly depending on gathering information from every person possible, especially those who have firsthand accounts of an event or those who are experts in the topic being discussion. How can we highlight and maximize this in our system?

**Paid or unpaid by Gawker**, all content creators are statistically ranked by how much traffic they bring to Gawker's sites.[26]  And some unpaid content creators are among the highest ranked (by number of new visitors that they've brought to Kinja blogs where they publish in the past 30 days).[27] For example, J.K. Trotter and Greg Howard, paid content creators for Gawker/Kinja as well as Defendants in this case, are ranked at 97th and unranked, respectively.[28] "Collin Krum," on the other hand, is an unpaid content creator, as is Kevin Purdy, who are ranked 117 and 115 respectively. See Plaintiffs' Exhibit 19-20.[29]  Thus, in a very real way, *paid and unpaid* content creators are competing against one another.

On the Gawker flagship websites, paid Gawker content creators (i.e. "journalists"[30]), such as Defendants Howard and Trotter, are heavily encouraged to interact with unpaid content creators in the "discussion" section beneath the article initiated by the paid content creator.

---

[26] See http://gawker.com/stats/leaderboard (last accessed Oct. 10, 2015). See Plaintiffs Ex. 49-51.

[27] *Id.*

[28] *Id.*

[29] For evidence that they do not work for Gawker.

[30] "Journalist" is in quotes in deference to Nick Denton's vision of removing the barriers between the stuffy "journalist" professionals and unpaid content creators, such that there is now no substantive distinction between the two on the Gawker family of properties.

13

hard to incentivize. This came across most clearly in discussions of Kinja, Gawker's publishing platform. Kinja, which allows users not only to comment on posts on Gawker sites but also to publish independent posts of their own, was born out of Denton's vision of collaborative journalism—the idea, in short, that the best stories emerge not from the dogged efforts of a lone reporter but from the collective work of a writer and her devoted audience, which provides tips, serves as valuable sources, engages in spirited debate, or moves the story forward in other ways.

For Denton's vision to be realized, Gawker staffers had to be highly interactive with their audience in the comments section of each post. But this presented a major problem for Gawker's management. Over the years, employees had been conditioned to use numbers as an important gauge of their job performance, yet interactions on Kinja were not easily quantified. There were attempts to do so: During my time at Gawker, then-editorial director Joel Johnson emailed each site's editorial staff about a new policy that writers were expected to participate in the comments section of at least 80 percent of their posts (and called out, by name, those who had failed to meet the target).

Interacting in the "discussion" is important for both collaboration as well as marketing, activating the readership and expanding the reach of Gawker among users/readers:[31]

So, as the quote above makes clear, collaboration between paid and unpaid content creators is central to Gawker's media strategy, and crucial from both a content creation standpoint as well as a marketing standpoint. The interactivity is so important, Gawker incentivizes its paid staff to do so. "Gawker executives introduced a "Kinja bonus," modeled after the unique bonus,[32] in an effort to boost writers' engagement with the comments."[33]

Readers can, at will, filter comments in the article discussion based on their interactivity with the paid content creator. For example, commenters interacted with by the paid content creator, as well as comments preferred by the paid content creator are filtered separate from all other comments. See Plaintiff's Exhibit 44.

**User Profiles and Burner Accounts**

---

[31] Caitlin Petre, "*The Traffic Factories: Metrics at Chartlet, Gawker Media, and The New York Times*," Tow Center for Digital Journalism at Columbia School of Journalism, May 7, 2015. http://towcenter.org/research/traffic-factories (last accessed Oct. 9, 2015). See Plaintiffs' Ex. 52 and 67.

[32] Paid writers get a bonus for the number of unique visitors they bring to Gawker sites.

[33] See Caitlin Petre, "*The Traffic Factories* …" cited *supra*. See Plaintiffs' Ex. 52.

14

A media empire, such as Gawker, that seeks to crowdsource the news is obviously heavily reliant upon unpaid content creators, especially if those content creators have scandalous tips which they seek to provide to Gawker. On the other hand, the large mob might only have an incomplete store of facts to provide. If what a collaborator does provide is simply uncorroborated defamatory speculation, the publication of that uncorroborated defamatory speculation would subject the collaborating "tipster" to a defamation lawsuit. If the large mob of unpaid content providers and prospective tipsters sees that their comrades are getting sued for their defamatory statements, this would obviously make them less inclined to provide tips. However, no worry: Gawker has an App for that.

To circumvent liability for the tipster, Gawker has not only created **tutorials** for unpaid content creator collaborators to leak information without fear of defamation suit repercussions (see *infra*), but Gawker **has actually designed, as part of its Kinja platform, specific tools to avoid liability for defamation actions** - burner accounts and Gawker SecureDrop.

A "burner account" is an anonymous Kinja user profile wherein Gawker does not store any personally identifying information about the user. In fact, Gawker doesn't even store the burner account user password, so users must keep it in a safe place because they only get the key code when they setup the account. See Plaintiffs exhibit 53. In the case before this Court, the anonymous unpaid content creator collaborator commenters at issue used "burner accounts," to protect their anonymity.

15

In "How to Leak to Gawker Anonymously,"[34] a Gawker "how to" article written by
Defendant J.K. Trotter, Trotter describes a variety of alternatives for the would-be tipster to
circumvent liability for defamation:



In the article, Trotter describes a variety of different sophisticated tactics designed to foil any
attempts by "unwanted third parties" to discover the identity of the tipster. Among the tactics he
discusses are burner accounts and also a special tool launched by Gawker Media called
"SecureDrop," which Trotter describes as, "a safe way for sources to communicate privately and
anonymously with us … For instructions on how to reach Gawker Media staffers securely via
encrypted email or chat, go here." The article then links to a full length article about

---

[34] J.K. Trotter, "*How to Leak to Gawker Anonymously*," August 8, 2014. http://gawker.com/how-to-leak-to-gawker-
anonymously-1613394137 (last accessed Oct. 9, 2015). See Plaintiff's Exhibit 53.

16

"SecureDrop," more fully describe below. However, here is what Trotter has to say about

"burner accounts:"

**Burner Kinja accounts**

If you're reading this, you're already using Kinja, Gawker Media's discussion platform. And if you click or tap "Reply" at the bottom of this post, you'll have the opportunity to create a Burner account, which enables a user to comment and post on Kinja without being associated with a third party such as Google, Facebook, or Twitter.

Burner accounts are designed to supply sufficient protections to a person seeking to publish information anonymously. Gawker Media immediately deletes logs of IP addresses that visit websites in its network, which in theory would prevent anyone from demanding those addresses from us to try to find out the identity of a commenter—after

all, we wouldn't have them. Gawker Media websites are, however, connected to third-party servers operated by several companies that provide Gawker with banner advertisements and traffic analytics. Meaning, it's **still a good idea to use Tor** if anonymity is important to you.

**Gawker Media SecureDrop Privacy Terms**

- We don't ask or require you to provide any personally identifying information when you submit materials through SecureDrop.

- The system does not record your IP address, information about your browser, computer, or operating system. Furthermore, the SecureDrop pages do not embed third-party content or deliver persistent cookies to your browser.

As described above, Trotter also instructs tipsters to use Gawker's "SecureDrop," and he

hyperlinks to a Gawker site which carries a "how-to" article specific to using "SecureDrop":[35]

**How SecureDrop Works**

Created by Aaron Swartz and developed by the Freedom of the Press Foundation, SecureDrop employs rigorous security protocols and makes use of the Tor network to establish a communications channel that is hardened against interception or subsequent leak investigations. Your messages will be encrypted and read on a machine that is not connected to the internet. Gawker Media's SecureDrop will not record or retain your IP address or any information about your browser or your visit, nor will it place any persistent cookies or third-party trackers on your machine. And the use of the Tor's anonymizing software makes it extremely difficult for anyone to prove or even suspect that you used SecureDrop.

Please read our privacy terms carefully. It explains what type of information SecureDrop does and does not collect, and why.

---

[35] "Welcome to the Gawker Media SecureDrop." Undated. https://gawkermediagroup.com/securedrop/ (last accessed Oct. 9, 2015). See Plaintiffs' Ex. 53.

18

We want you to leak us things. Sometimes an email will suffice, or a call to our tips line, or even an anonymous comment on a post. But sometimes sources want to contact us without leaving a digital trail.

SecureDrop is designed to help you do just that. It is a way for you to send us things—messages, tips, files, documents—while maximizing your anonymity and frustrating any attempts (including by us) to identify you as the source.

For details on how SecureDrop protects your anonymity, please see our privacy terms below. And for other secure ways to reach us, including encrypted email, encrypted chats, and snail mail, please go here.

- The server will only store the date and time of the newest message sent from each source. Once you send a new message, the time and date of your previous message is automatically deleted.

- Reporters decrypt and read each message on a machine that has never been connected to the internet, and will delete messages from the server on a regular basis. The date and time of any message will be securely deleted from the server when the message is deleted.

- Please keep in mind that the actual messages you send and receive through SecureDrop may include personally identifying information. For this reason, once you read a reporter's message, we recommend you delete it. It will then be securely deleted from the file system.

Clearly, as evidenced by Gawker's own statements, Gawker "SecureDrop" is carefully and deliberately devised means for Tipsters to totally circumvent defamation liability. ("maximizing your anonymity and frustrating any attempts (including by [Gawker]) to identify [the Tipster] as the source"). Gawker's SecureDrop goes to extraordinary lengths to help Tipsters circumvent defamation liability:[36]

---

[36] *Id.*

Gawker's SecureDrop "how-to" is shockingly blatant in the description of the system's purpose. But if Gawker itself cannot get the information, how is it possible for anyone to get the information?

**Gawker's Pattern of Unethical Journalism**

As evidenced above in the frank words of founder Nick Denton, Gawker takes great pride in running stories with little or no investigation. See Plaintiff's Ex. 67. Uncorroborated anonymous tips, questionable data and sources - the propriety of the claims are unimportant. If it's a sensational story - if it's clickbait that will bring in advertising revenue - then it's a "good" story for Gawker, and it will be published on their websites. What follows below is a **very** brief history of Gawker's most famous acts of journalistic malpractice.

<b>Conde Nast Executive David Geithner</b>

In July of 2015, Gawker published an article alleging that a Conde Nast executive[37] - David Geithner, brother of former Treasury Secretary Timothy Geithner - had solicited sex from a homosexual escort. David Geithner is publicly heterosexual, married, and the father of three young children.[38] There was immediate public outrage. Reports surfaced that the article might have been based on false accusations, a hoax even.[39] And, even if true, Geithner was a limited

---

[37] Media titan Conde Nast is a direct competitor of Gawker. See Erik Wemple, "*Conde Nast Exec Story: Gawker is Keeping its Sleaze Game in Shape*," The Washington Post, July 17, 2015 (https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/07/17/conde-nast-exec-story-gawker-is-keeping-its-sleaze-game-in-shape/ last accessed Oct. 9, 2015) See Plaintiffs' Ex. 28 and 31.

[38] Jordan Sargent, "*Conde Nast's CFO Tried to Pay $2,500 for a Night with a Gay Porn Star,*" Gawker, July 16, 2015 ( article has been removed from site but is available at https://archive.is/EUkg0#selection-1198.0-1200.0 last accessed Oct. 6, 2015). See Plaintiffs' Ex. 17.

[39] Charles Johnson, "*Is The Gawker Story An Elaborate Hoax? Sure Looks That Way,*" GotNews.com July 17, 2015 (http://www.gotnews.com/breaking-exclusive-is-the-gawker-story-an-elaborate-hoax-sure-looks-that-way/ last accessed Oct. 10, 2015). See Plaintiffs' Ex. 33.

20

public figure at best. There had been no previous public knowledge of his sexuality as anything other than heterosexual. Gawker had just thrown a bomb into the man's life. And there were additional ethics in journalism questions.

Subsequent to the publication of the Gawker piece purporting to "out" Geithner as a closet homosexual, other media outlets began to scrutinize Gawker's reporting of the story. The source of the article was the alleged gay prostitute and porn star Leif Derek Truitt (porn alias Brodie Sinclair) - a man the Gawker article referred to as "Ryan." Other news outlets interviewed "Ryan" and revealed him to be a deeply troubled man with paranoid delusions.[40] Worse, upon further investigation, it became likely Ryan's motivation for contacting Gawker, might have been to blackmail Geithner.[41]

A tidal wave of other news outlets condemned Gawker for a variety of reasons. First, Gawker had taken ONE WORKDAY to investigate, vet, and publish the article on the Geithner "sex scandal."[42] Gawker's actions demonstrated that the *rush to publish* clearly outweighed any concern for the accuracy of the reporting. "Shadowy encounters plus possible criminal activity plus high-ranking official in the classic New York industry of publishing equal a pretty

---

[40] Chuck Ross, "*Interview With The Gay Porn Star Behind That Terrible Gawker Article*," The Daily Caller, July 17, 2015 (http://dailycaller.com/2015/07/17/exclusive-interview-with-the-gay-porn-star-behind-that-terrible-gawker-article/ last accessed Oct. 9, 2015). See Plaintiffs' Ex. 36.

[41] Robby Soave, "*Gawker Helps Gay Escort Blackmail Timothy Geithner's Brother, Ted Cruz Is the Hero of the Story*," Reason Magazine, July 17, 2015 (https://reason.com/blog/2015/07/17/gawker-helps-gay-escort-blackmail-timoth last accessed Oct. 9, 2015). See Plaintiffs' Ex. 47.

[42] James West, "*Gawker Took Only One Day to Report and Vet the Story That Blew Up in Its Face*," Mother Jones, Friday July 24, 2015 (http://www.motherjones.com/media/2015/07/gawker-conde-nast-fallout-timeline-denton last accessed October 9, 2015). See Plaintiffs' Ex. 16.

21

automatic editor decision at the gossip site. Publish! The rest of the world, meanwhile, screams in condemnation…"[43]

Second, the source relied upon was clearly problematic at best. "Ryan" believes the end of the world is near because since 1980 the numbers 666 have been selected as the winning lottery number 25 times; that 9/11 was carried out by the Russian government; that Barack Obama is the "son of the devil;" that he ("Ryan") has ultra secret information that he *must* release to the media about who *really* is responsible for the Pennsylvania train crash of May 2015, and the downing of Malaysian Airlines Flight 370.[44] "Unfortunately, I'm just a guy who has a lot of information. I wish I didn't," was "Ryan's" explanation to one news outlet.[45]

Gawker, for it's part, ultimately took the story down. But, founder Nick Denton, in explaining its decision to take down the story, gave a non-apology apology, apologizing merely for being insensitive, and for *arguably* participating in "gay-shaming."[46] In his quasi-*mea culpa*, it's impossible to say precisely what he or Gawker may be apologizing for. However, he did state that, "The point of [the Geithner sex scandal story] was not in my view sufficient to offset the embarrassment to the subject and his family."[47]

## Actor James Franco

---

[43] Erik Wemple, "*Conde Nast Exec Story: Gawker is Keeping its Sleaze Game in Shap*e," The Washington Post, July 17, 2015 (https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/07/17/conde-nast-exec-story-gawker-is-keeping-its-sleaze-game-in-shape/ last accessed Oct. 9, 2015) See Plaintiffs' Ex. 31.

[44] Chuck Ross, "*Interview With The Gay Porn Star Behind That Terrible Gawker Article*," The Daily Caller, July 17, 2015 (http://dailycaller.com/2015/07/17/exclusive-interview-with-the-gay-porn-star-behind-that-terrible-gawker-article/ last accessed Oct. 9, 2015). See Plaintiffs' Ex. 36.

[45] *Id.*

[46] Nick Denton, "*Taking a Post Down*," July 17, 2015 (http://nick.kinja.com/taking-a-post-down-1718581684 last accessed Oct. 9, 2015). See Plaintiffs' Ex. 30.

[47] *Id.*

22

In the wake of the David Geither "sex scandal" fiasco, a former Gawker writer, Current

*Vanity Fair* contributor Richard Lawson, publicly admitted that during his time at Gawker he

fabricated stories.[48] "When I was at Gawker I wrote baseless posts accusing an actor of raping an

ex-boyfriend. I did it [because] my boss told me to, but I wanted to, too."[49] Lawson went on to

describe his sympathy for the young Gawker author (27 year-old Jordan Sargent) who was

clearly working under an unscrupulous superior and under enormous pressure.[50]

The fabricated articles Lawson referenced were a series of articles he wrote which

accused actor James Franco of (a) being a closeted homosexual, and (b) having **raped** a man and

then paid the victim to keep him quiet.

In Lawson's first article, entitled, "Which Actor Is Crazy, Violent, And Gay?,"[51] her

merely quoted a New York Post article,[52] which reported on a rumor about an **unnamed** actor

who was a closeted homosexual and reportedly sexually assaulted his ex-boyfriend after

sneaking into the ex-boyfriend's home. Again, the New York Post Article did not name the

rumored actor, and did not give enough details from which an identity could be discerned.

---

[48] Larry Womack, "*Anyone Else Think James Franco Should Sue the Hell Out of Gawker*," Huffington Post, July 17, 2015 (http://www.huffingtonpost.com/larry-womack/james-franco-gawker_b_7816032.html last accessed Oct. 10, 2015). See Plaintiffs' Ex. 15.

[49] *Id*.

[50] See Plaintiff's Ex. 89.

[51] Richard Lawson, "Which Actor Is Crazy, Violent, and Gay?" Gawker, August 18, 2008 (http://gawker.com/5038208/which-actor-is-crazy-violent-and-gay last accessed Oct. 10, 2015). See Plaintiffs Ex. 13.

[52] Staff Writer, "*Just Asking*," The New York Post, August 18, 2008 (http://pagesix.com/2008/08/18/just-asking-88/ last accessed Oct. 10, 2015). See Plaintiffs' Ex. 32.

23

In Lawson's second article, entitled, "So Really, Which Actor Raped His Gay Lover?,"[53] he decided to engage in pure speculation as to who the New York Post article might be referring to. Lawson made a case for three possible actors, including Franco:

> "And then there's the compelling case of James Franco. Basically the rumor is that Franco dated the guy about two years ago, and still had a key to his house. Guy goes to the Oscars party, comes back and Franco is waiting for him and then awfulness goes down. He's' rumored to have been abusive towards an old girlfriend, also an actor, some five years ago."

Further, he encouraged commenters to his article to engage in speculation, and he also encouraged commenters to detail, in their comments any morsel of fact or evidence they might have.[54]

In a third article, entitled, "The People Have Spoken, And They Think James Franco is a Rapist,"[55] Lawson concludes, based upon the polling he did from the commenters in the previous post, that James Franco is the rapist that The New York Post was reporting on. The tone and tenor of Lawson's series of articles is completely bizarre. It is at once joking, but at the same time, the article is responding to a real fact - i.e., that a man was raped. The whole premise of Lawson's series of articles on the unknown gay rapist, is that presumably there is a gay rapist - because The New York Post reported that there was a credible rumor about an unknown actor being a closeted homosexual rapist who had paid-off his victim to keep him quiet about the attack. The readers, for their part, are left completely confused. They cannot discern whether or

---

[53] Richard Lawson, "*So Really, Which Actor Raped His Gay Lover?*" Gawker, August 21, 2008 (http://gawker.com/5040051/so-really-which-actor-raped-his-gay-lover last accessed Oct. 10, 2015). <u>See Plaintiffs' Ex. 34</u>.
[54] *Id*.
[55] Richard Lawson, "*The People Have Spoken And They Think James Franco Is a Rapist*," Gawker, August 22, 2008 (http://gawker.com/5040524/the-people-have-spoken-and-they-think-james-franco-is-a-rapist last accessed Oct. 10, 2015). <u>See Plaintiffs' Ex. 14 and 34</u>.

not the article is an elaborate hoax or an extremely morbid and dark commentary on the power of elites to silence their victims.

A month later, in a fourth article entitled, "'Gay Rapist' Actor Surprisingly Cool About His Sexuality,"[56] Lawson <u>again</u> revisits the topic. Here, it's helpful to quote Lawson at length to unpack his deceptions:

> Is James Franco gay or what? You'll remember there was that ominous rumor that he once raped his gay lover that was sort of intense and icky. We're told that the original tip that prompted the *Page Six* blind item, about an actor who broke into his ex-boyfriend's house an sexually assaulted him, mentioned Franco specifically. We received several other anonymous (and admittedly questionable) emails saying the same thing, one providing explicit details. So who the heck knows, but for whatever reason the rumor had traction. Which makes us queasy. But now the actor is on the cover of *Out* magazine this month, acting calm, collected, and confident in his heterosexuality, so we're all confused again. In the interview, he discusses

The excerpt above alleges several things:

> (a) that there was an ominous rumor that Franco once raped his gay lover;

> (b) that Gawker, Lawson or both received some information from some source to suggest that the original New York Post article about the unknown actor come gay rapist was actually based on a "tip" from a source, and that in the original telling of the "tip" the actor-culprit was reported to be Franco;

> (c) that Gawker, Lawson or both have received multiple anonymous emails which, although questionable in their reliability, nevertheless name Franco as the unknown gay rapist from the New York Post article;

---

[56] Richard Lawson, "'*Gay Rapist' Actor Surprisingly Cool About His Sexuality*," Gawker, September 29, 2008 (http://gawker.com/5056330/gay-rapist-actor-surprisingly-cool-about-his-sexuality last accessed Oct. 9, 2015). <u>See</u> Plaintiffs' Ex. 35.

(d) Lawson states that he doesn't know if the rumor about Franco is true, but that the rumor had "traction";

(e) that the rumor makes Lawson and possibly other Gawker staff "queasy"; and

(f) that Gawker staff or Lawson or both are uncertain as to Franco's true sexuality, given his decision to grace the cover of "Out" Magazine.[57]

The passage quoted above is the most reckless and deceitful of Lawson's four article series on Franco. In it, he gives multiple pieces of evidence that would lead a reader to believe that there was some credence to the accusation that James Franco is a closeted homosexual and a rapist. First, the only reason a rumor circulated - *ominous* or otherwise - was that by his own admission, Lawson started the rumor!

Second, Lawson then states that he and Gawker have special knowledge that the New York Post article was based on a source who specifically named Franco as a gay rapist. Here again, judging by Lawson's admission that he fabricated the Franco articles, its unlikely that the source of the New York Post article named Franco.

Third, Lawson knows full well, that because he fabricated the entire story, that any anonymous emails naming Franco as the gay rapist *are not only questionable, but actually false*.

Fourth, Lawson states that the rumor about Franco had "traction," though he suggests that he doesn't know whether or not the rumor is true. However, we now know that the rumor wasn't true because Lawson concocted the rumor. Lawson's *aww-shucks*, "So who the heck knows," is a device designed to at once (i) give the audience the appearance of objective reporting, and (ii) inoculate himself from defamation liability.

---

[57] Out, "is a popular gay and lesbian fashion, entertainment, and lifestyle magazine, with the highest circulation of any gay monthly publication in the United States." (https://en.wikipedia.org/wiki/Out_(magazine) last accessed Oct. 10, 2015).

Fifth, Lawson says that the whole affair makes him queasy. The tone of this article is one of reporting on actual events. There is no satirical playfulness in it. In saying that the rumor of Franco raping another man and then paying him to stay quiet makes him queasy, Lawson is making a moral judgment about an act, the existence of which he has repeatedly listed evidence (see 'a' through 'f' above).

Finally, Lawson references both verbally as well as pictorially, that Franco's likeness graces the cover of the current *Out* magazine issue and is featured in the magazine discussing his clear heterosexuality. Being heterosexual then appearing on the cover of a homosexual themed magazine is facially ironic. Lawson uses this irony to back-handedly question Franco's true sexuality again, and then use this uncertainty as yet another piece of evidence which would lend support to the idea that Franco could be homosexual, and therefore that it's also possible as a closeted homosexual, that he is therefore possibly the unknown gay rapist.

### Wrestler Hulk Hogan

Terry Bolea, known by his wrestling name "Hulk Hogan," was surreptitiously filmed nude, in an enclosed bedroom, having sex with Heather Clem in 2006.[58] Clem was at that time the wife of Hogan's friend and radio personality Bubba Clem.

In 2012, Gawker obtained - *through an anonymous source* - a copy of the sex tape, and proceeded to **publish the sex tape** and as well as an essay on its website.[59] Thereafter, Hogan filed suit against Gawker, Heather Clem and Bubba Clem, alleging, among other things, that

---

[58] Tim Walker, "*Hulk Hogan v. Gawker: Wrestling Legend Takes On Website in $100m Sex-Tape Legal Battle*," The Independent, July 3, 2015. (http://www.independent.co.uk/news/world/americas/hulk-hogan-vs-gawker-wrestling-legend-takes-on-website-in-100m-sex-tape-legal-battle-10365533.html last accessed Oct. 9, 2015.) See Plaintiffs' Ex. 1.

[59] *Id*. See also Plaintiffs' Ex. 2 - 4.

27

Bubba had been the one to record the sexual encounter.[60] Hogan has repeatedly stated that he did

not know he was being filmed, and has vowed to destroy Gawker in court for their intrusion into

his privacy.

### Comedian Louis C.K.

Gawker published (the author was simply listed as "Gawker Sources") an article in

March of 2012 entitled, "Which Beloved Comedian Likes to Force Female Comics to Watch

Him Jerk Off?"[61] The article recounts *anonymous tips* that some **unnamed comedian** - "our

nation's most hilarious stand-up comic and critically cherished sitcom auteur … traps

unsuspecting women in his hotel room and makes them stick around until he's done

[masturbating]." The article went on to give additional details, recounting a story about the same

**unnamed comedian** from the "Aspen Film Festival a few years ago" wherein the unnamed

comedian trapped two women in a hotel room and forced them to watch him masturbate.

Thereafter, as the article explains, the unnamed comedian's "extremely powerful" manager

contacted the women and threatened to destroy their careers if they complained.

---

[60] *Id.*

[61] Gawker Sources, "*Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off,*" Gawker, March, 19, 2012 (http://gawker.com/5894527/which-beloved-comedian-likes-to-force-female-comics-to-watch-him-jerk-off?comment=48089921 last accessed Oct. 9, 2015.) See Plaintiffs' Ex. 11.

28

One of the commenters on our post affirmed that the whispers of C.K. taking his dick out whenever he pleases are well-known within the comedy world:

> I have it on good authority (friends in the biz) that it's Louis CK. I've heard stories about his propensity for whipping it out and jerking off in front of women at inappropriate times (i.e. dinner table, bar, etc.).

This was not the first allegation of sexual misconduct levied against C.K. In March of 2012, we ran a blind item titled "Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off?," which described an incident that had supposedly taken place in Aspen a few years prior involving "our nation's most hilarious stand-up comic and critically cherished sitcom auteur" and two unnamed female comedians:

The article detailed attempts to reach out to one of the unnamed victims, but the victim refused to comment, stating only, "first of all, your facts are wrong. And secondly, I don't want to be a part of this story. I'm sure you understand."[62]

---

[62] *Id.*



**Baberaham Lincoln**
3/19/12 10:45pm

I have it on good authority (friends in the biz) that it's Louis CK. I've heard stories about his propensity for whipping it out and jerking off in front of women at inappropriate times (i.e. dinner table, bar, etc.).

People are somehow aghast and skeptical about this, especially because his humor is so self-deprecating. Um, hello. Our heros are not always heroic. People with cultural and/or financial leverage do shitty things, no matter how "insecure" or self-flagellating they play on stage. In fact, insecurity is a major reason they behave this way: I've found that men who encounter unexpected success and power are more likely to feel entitled to sexual attention, consensual or otherwise, siting a tortured, rejected adolescence as the reason they've somehow earned the right to fuck whomever they damn well please without any consideration of consequences for either party. They can't manage the confidence they've earned. I can't tell you how many comedians have defended cheating on their significant others by saying "but, I used to be a fat nerd reject who couldn't get laid! How else do you expect me to handle my success?"

At this point, the most deranged and unexpected of comedian behaviors doesn't surprise me anymore. Not only do they wear their damage on their sleeve, they make a living from it. Violations or personal/societal boundaries are dismissed by people who can and should hold them accountable as "quirks" or excused by the whole "all comedians are fucked up" myth. So, so many of them are sexually dysfunctional pervs.

Oh, and someone down thread said it's Marc Maron. Highly, highly doubt it. He's aggressive and confident, but also way too neurotic and paranoid to sexually assault someone. Not saying it couldn't ever happen, I'm just saying I'm 99.9% sure it's not habitual.

Subsequently, in <u>May of 2015</u>, Gawker's subsidiary blog website called "Defamer"[63]

published an article written by Jordan Sargent entitled, "Louis C.K. Will Call You Up To Talk

About His Alleged Sexual Misconduct."[64] The article describes an unnamed source given the

---

[63] "Defamer" is a subsidiary blog within the Gawker family of sites. The content theme is self-explanatory. http://defamer.gawker.com

[64] Jordan Sargent, "Louis C.K. Will Call You Up to Talk About His Alleged Sexual Misconduct," Defamer-Gawker, May 5, 2015 (http://defamer.gawker.com/louis-c-k-will-call-you-up-to-talk-about-his-alleged-s-1687820755  last accessed Oct. 9, 2015). <u>See Plaintiffs' Ex. 12</u>.

pseudonym "Jason." "Jason" explained that two female friends of his had been mistreated by Louis C.K., but the only incident described by "Jason" is supposedly from 2014, wherein Louis C.K. purportedly came up behind the one friend, grabbed her by the back of the neck and whispered, "I'm going to fuck you." On the basis of this, Jason is reported as having had an email communication with Louis C.K.,[65] wherein Jason accuses C.K. of sexual assault and C.K. responds by asking Jason for his telephone number. The article says that thereafter, the two men had a vacuous phone conversation, wherein, C.K. was "sizing [Jason] up' to 'find out what I had heard.'"

The article then connects Jason's account with the Gawker article published back in 2012:

> We had no means of verifying Jason's claims directly. He said the women he knew had told him they wouldn't come forward, citing C.K.'s reputation and power in the comedy world. The two members of the comedy duo who were supposedly subjected to the Aspen jerk-off incident wanted nothing to do with the story then, and did not respond for comment when contacted before the publication of this post.
>
> We've reached out to C.K.'s rep about these allegations and are awaiting word back.
>
> Have you been sexually harassed by Louis C.K., or do you know someone who has? Have you heard rumors of the sort? If so, please leave a comment below or contact me at jordan@gawker.com, anonymity guaranteed.

The problem with the above excerpt, is that it improperly attempts to bolster its case against Louis C.K. by citing to the 2012 Gawker article. The section written by paid-Gawker-

---

[65] The article published screenshots of the supposed emails with C.K. as well as the actual email address purportedly belonging to Louis C.K.

content-creators does not accuse Louis C.K. However, many **anonymous**, unpaid-content-creators (Kinja commenters) *do name* Louis C.K. in the 2012 article. In fact, the 2015 article cites as evidence, comments by unpaid-content-creator-commenters on the 2012 article:

The anonymous unpaid-content-creating-commenter from the 2012 article calls herself "Barberaham Lincoln" and claims to have a great deal of comedy industry insider knowledge, but without any substantiation whatsoever:

After citing to "Barberaham Lincoln," the 2015 article recounts yet another anonymous source which told the author about a similar incident involving an unnamed comedian (the author is deliberately unclear whether or not he is referring to Louis C.K. or whether or not the unnamed source specifically mentioned that the comedian in question was Louis C.K.) at a comedy festival in *Montreal* "several years ago." "The comedian allegedly took two women up to his room, but at some point they barged out, claiming he had started masturbating in front of them without warning." The article closed by mentioning additional unsuccessful attempts to corroborate the allegations as being properly against Louis C.K. The attempts purportedly failed because Jason's female friends who were assaulted refused to come forward, citing their fear of C.K.'s power in the comedy industry. The article closes with a call to action, asking unpaid content creator commenters to comment with any information:

The Louis C.K. articles compared with the previous described ethical lapses, *supra*, represent a pattern at Gawker: recklessly publishing sensational claims (e.g., rape, sexual assault, serial rape and sexual assault) which carry the prospect of career destruction[66] on the basis of weak, unsubstantiated tips. A further pattern is using their anonymous-unpaid-content-creator-

---

[66] See generally, Bill Cosby.

commenters as sources in their own right, but which in effect amounts to Gawker citing to itself. Thus, Gawker's articles are self-reinforcing. Gawker can be the source of the rumor, and then repeatedly earn revenue on subsequent articles based upon the rumor it itself initiated.

### Charles Johnson and Got News Have Spent Tens of Thousands of Dollars Investigating the Michael Brown Shooting and Ferguson Riots, and Building Positive Branding and Goodwill among Missouri Readers

Beginning in August of 2014 shortly after the death of Michael Brown, Plaintiffs began investigating matters relating to the death of Brown, and also the subsequent riots.[67] The Brown death and the Ferguson Riots were among the top media stories in the St. Louis, Missouri media market for 2014.[68] The riots destroyed large swaths of Ferguson, Missouri, nearly overran police positions on multiple occasions and resulted in multiple US Department of Justice investigations, public official firings, and additional riots throughout the St. Louis region, such that the Missouri Governor was forced to dispatch more than 2,000 National Guardsmen.[69]

Into this hotbed, Johnson not only personally traveled throughout the St. Louis region to report on events, but he also developed sources within local law enforcement and in various places regionally, who assisted him in his reporting.[70]

For example, local and national law enforcement sources provided Johnson with credible information which suggested that Michael Brown, as a juvenile, was implicated in a murder.[71] As a result of these leads, Johnson has invested <u>tens of thousands of dollars</u> in trying to convince

---

[67] See Plaintiff's Ex. 61-63.
[68] See Plaintiff's Ex. 66.
[69] *Id.*
[70] See Plaintiff's Ex. 61-63.
[71] See Plaintiff's Ex. 63.

Missouri courts to unlock Michael Brown's juvenile records.[72] In pursuit of this objective,

Johnson has filed multiple lawsuits in multiple Missouri Circuit Courts.[73] Upon ultimately being

denied by the juvenile court of St. Louis County in mid-September 2014, Johnson temporarily

halted his pursuit. There was wide speculation that the juvenile records might be released in the

wake of the non-indictment of Officer Darren Wilson, as part of the open-access policy of St.

Louis County Prosecuting Attorney Bob McCulloch. Upon discovering that the records were not

reviewed as part of the grand jury evidence, Plaintiffs resumed the legal battle for the records by

appealing the denial to the Missouri Court of Appeals for the Eastern District of Missouri in late

November, 2014.[74] On or about December 4, 2014, a preliminary writ was granted by the Court

of Appeals, but the writ was ultimately permanently denied on December 18, 2014.[75] In May of

2015, Johnson appealed the records denial to the Missouri Supreme Court, which ultimately

denied him the records.

     Throughout the long and arduous battle to determine the factual background of Michael

Brown, Plaintiffs were not only reporting on their efforts but also actively engaged in reporting

on many items which were simply overlooked by most media outlets - both locally in St. Louis

and nationally. As a result of his reporting, and his exposure of facts which did not fit the

common and hackneyed narrative pushed by Gawker[76] and other media entities external to St.

Louis, Missouri, Plaintiffs became a very popular news and opinion website for readers in the St.

---

[72] See Plaintiff's Ex. 63.

[73] See Plaintiff's Ex. 63.

[74] See Plaintiff's Ex. 63.

[75] See Plaintiff's Ex. 63.

[76] For example, one Gawker editor has encouraged hackers to steal former Officer Darren Wilson's money. The general implication being that Wilson is a racist murderer. See Charles Johnson, "*Gawker Blogger Calls for Hackers to Steal Darren Wilson's Money*," Gotnews, September 9, 2014 (http://gotnews.com/gawker-blogger-calls-hackers-steal-officer-darrenwilsons-money/ last accessed Oct. 9, 2015). See Plaintiffs Ex. 61.

Louis Region.[77] Plaintiffs' reputation amongst St. Louisans became very positive and Plaintiffs'

brand, goodwill, and website traffic, all surged.[78] Between September of 2014 and February of

2015, Got News enjoyed an online readership of nearly 83,000 people in Missouri, including at

least 37,441 in the St. Louis Region. However, this all began to change when Gawker began a

coordinated attack upon him.

### Gawker, Trotter and Howard:
### The Attempts to Discredit, Marginalize,
### and Humiliate Charles Johnson and Got News

Gawker staff first began to track the career of Plaintiff Charles Johnson during the

summer of 2014.[79] Johnson is generally of a different ideological persuasion then the

Defendants.[80] However, it was not until Johnson became famous for his investigation into the

Michael Brown shooting and Ferguson Riots that the Defendants seriously took aim at Johnson

and embarked upon their campaign to discredit, marginalize, smear, and humiliate Plaintiffs.

### Motivations for Defamation

On December 4, 2014, Defendant Greg Howard published an article entitled, "Charles

Barkley Has Nothing to Say to America."[81] Citing the deaths of Michael Brown and Eric Garner

as emblematic of *the* quintessential American atrocity, the article is an impassioned manifesto of

Howard's belief that the American justice system is, by design, a machine developed to destroy

black people:

---

[77] See Plaintiff's Ex. 66.
[78] See Plaintiff's Ex. 66.
[79] See, e.g., Adam Weinstein, "*Is Ratfucking Journalism Dead*?" Gawker, July 8, 2014 (http://gawker.com/is-ratfucking-journalism-dead-1601527887 last accessed Oct. 10, 2015). See Plaintiff's Ex. 68
[80] *Id.*
[81] See Plaintiffs' Ex. 75.

35

This conversation is over; there is not debate to be had about the killing of Eric Garner, and there really isn't one to be had on the degradation, imprisonment, and systemic murder of minorities. It is a system of control, a machine, doing the work it was designed to do. Those who blame its workings on its victims, invoking black pathologies and enumerating all the ways in which black people need to become better and more moral to earn the right to complain about being killed without their killers even facing any consequences, are engaging in an old, tired respectability politics. They don't know what the fuck they're talking about.

Charles Barkley does not know what the fuck he's talking about.

Later, Howard continued...



A discussion broke out underneath the section initiated by Howard, between Howard, a paid-content-creator, and a number of unpaid-content-creators. The discussion carried into December 5th, where Howard had this exchange:

36

 **jijijojiji** > Greg Howard
12/08/14 10:22am

As a whole, the black population has higher unemployment rates, lower
educational achievement, and higher rate of absentee fathers, which, among
other indicators, are factors that correlate with higher crime rates. The higher
crime rate in a particular community will cause that community to have more
interaction with the police. More interaction with the police results in more
opportunity for things like the Garner and Brown incidents to occur.


10

While the lack of proper education and lack of employment opportunities are
undoubtedly complicated by systemic disadvantages attributable to centuries
of racial oppression, that does not relieve the individuals and communities for
their complicity in the problem.

Understand now?

↪ Reply

 **Greg Howard** > jijijojiji
12/08/14 1:22pm

Wait, so if I understand you correctly—and please, help me to do so if I
don't—you're attributing things like "higher unemployment rates, lower
educational achievement, and higher rate of absentee fathers" to black
people just being kinda built like that? Something in the blood?


1

↪ Reply  |  **1** replies

37



**jijijojiji** › Greg Howard
12/08/14 2:21pm

Not at all. I don't know what to attribute it to. The facts are that the black
community, as a whole, has lower educational achievement, higher
unemployment rates, and higher prevalence of single-parenthood. I don't
know what causes them. I suspect it is a combination of systemic
disadvantages and cultural failings. Yet, these are all factors that correlate
with higher rates of criminal activity (note: the book Freakonomics touched on
this in the context of abortion and crime statistics). Higher criminal activity in
a community generally means that the community has more interaction with
the police. More interaction with the police provides more opportunity for
police brutality. This (the higher crime rate among black people versus white
people) is just one part of a large problem. Please note that I am not denying
the fact that black people are treated more harshly by the criminal justice
system, but the fact remains that black people commit more crimes per capita
than white people. So, there is room to improve for everyone.

Full disclosure: I am white (you probably have figured that out). However, I do
not speak from a place of complete ignorance. In fact, I wrote my seminar
paper in law school on a critical race theory topic involving the criminal justice
system's disparate treatment of people of color.

☆
9

↪ Reply | **1 replies**



**Greg Howard** › jijijojiji
12/08/14 3:00pm

Well, now that you've finished explaining black people to a black person, I'm
going to assign you some reading. You should read this, from Ta-Nehisi
Coates. You should realize your theorizing is unnecessary. I say this in the
nicest possible way, because I wouldn't dare to be as condescending as you are
without knowing what I'm actually talking about, but you should shut the fuck
up a little bit. Everything you're talking about is already knowable.


3

↪ Reply | **1 replies**

Thereafter, Howard's interaction with unpaid-content-creators ceased, but then picked up again on December 8th:

> The sin is not in talking without knowing what it is you're talking about, but in seeking out someone who doesn't know what he's talking about with a camera and a microphone, as if what he had to say mattered, or as if him offering his hard truths could deliver a kind of absolution. In giving Barkley and those like him a platform out of some sense of fairness, some sense that the natural counter to a fully justified rage is a lecture about how bad things happen when you don't submit to an arbitrary authority, some sense that there are hard truths that need to be spoken about how the problem with black people is black people, the media is allowing for the possibility that, maybe, Garner's video doesn't tell the whole story. Maybe you didn't see what you saw, and by extension, black and brown men and women really are somehow to blame for their deaths. Maybe the solution to the deaths of Eric Garner and Michael Brown and Tamir Rice and hundreds of years of state-sanctioned genocide is to just sit down with an old basketball player and talk a little bit more about all the ways in which black people are in the wrong.

The unpaid-content-creator responded then responded, and from there, the conversation continued through the rest of the day:

39



**jijijojiji** > Greg Howard
12/08/14 3:40pm

I've already read that. I've maintained to anyone who will listen that centuries
of classifying an entire race of people as property and then another century of
"separate but equal" have far more damaging effects than can mitigated in a
few decades of the civil rights and post-civil rights era (if the latter even
exists). Black people have every reason to be upset with the hand they were
dealt in this country. I read a lot of what Coates writes. I was not trying to
explain black people to a black person. I was explaining my original comment.
Sorry if you feel condescended to. Not my intention.

You took a nasty tone. I did not. I did not question your knowledge or
experience. You questioned mine. Sorry that you cannot engage in a
conversation where points are raised that you apparently disagree with.

None of what I said is untrue. And, aside from you mischaracterizing what I
am saying and your ad hominem attacks, you have not actually addressed
anything I've said.


11

↳ Reply



**Greg Howard** > jijijojiji
12/08/14 4:04pm

Read it again.


1

↳ Reply

 **jijijojiji** › Greg Howard
12/08/14 4:57pm

Your refusal to acknowledge a fact does not deny it of its veracity.


10

↳ Reply

 **Greg Howard** › jijijojiji
12/08/14 5:06pm

What's your fact? You have no facts. "there are problems in the black
community that indisputably contribute to the problem" is not a fact. "The
facts are that the black community, as a whole, has lower educational
achievement, higher unemployment rates, and higher prevalence of single-
parenthood. I don't know what causes them. I suspect it is a combination of
systemic disadvantages and cultural failings" is not a fact. You literally don't
know what the fuck you're talking about. There are no cultural failings. It's
centuries of oppression and white supremacy. You're admitting you have no
facts, and then are trying to tell me you have facts. How can you read this
entire article without realizing I'm talking about you, too?


8

↳ Reply | 3 replies

 **jijijojiji** › Greg Howard
12/08/14 4:31pm

One for you: http://www.pbs.org/wgbh/pages/fro...


5

↳ Reply

 **Greg Howard** › jijijojiji
12/08/14 4:48pm

Nah, I mean this very seriously. There aren't two sides to this. If you think
there are, you are wrong. If you find someone who thinks there are, they are
wrong, too. I don't care if they're black or white. W.E.B. DuBois was wrong.
Angela Davis was wrong. This isn't a debate. That said, you have a great day.


5

↳ Reply

41

The above exchange was reproduced in full here because it precisely illuminates Mr. Howard's position regarding the death of Michael Brown. First, there are no two positions or conclusions on Michael Brown's death. There is only one appropriate position/conclusion, and Mr. Howard is aware of it. Second, the appropriate conclusion is that Michael Brown's death is a microcosm, a small sample of a much larger problem. The problem is an American justice system that is built to crush black people and destroy black culture. But even this isn't the true problem, because it itself is just a broader symptom. No, the true ultimate cause of the death of Michael Brown - or Eric Garner - is centuries of oppression and genocide stemming from the American instantiation of white supremacy. Finally, Mr. Howard essentially conveys that he isn't interested in statistics, and rejects the suggestion of there being multiple sources of black community social problems. According to Mr. Howard's own words, there are no internally based problems within the American black community. Again, key to the problem is centuries of oppression stemming from white supremacy, period.

It's important to understand Mr. Howard's position because as is evidenced from the discussion above, Howard reacted viciously and insultingly - over a period of three days(!) - when an unpaid-content-creator suggested alternative theories. Evidently the unpaid-content-creator struck a nerve. "…but you should shut the fuck up a little bit." "Read it again." "There aren't two sides to this. If you think there are, you're wrong." "You literally don't know what the fuck you're talking about."

If Mr. Howard is willing to react this way to a mere random unpaid-content-creator, how might he feel about a journalist trending in the news for his dogged reporting of the Michael Brown death and Ferguson Riots from a diametrically opposed point of view?

42

On December 5, 2014, one day after Defendant Greg Howard published his the article described immediately above, Plaintiffs published an article on the Gotnews website entitled, "BREAKING: GotNews Wins First Stage of Appeal on Michael Brown Records, #Ferguson."[82]

In retaliation, on December 9, 2014, Defendants Howard and Trotter published three defamatory articles designed to malign and humiliate Plaintiffs.

Trotter published the first article at 11:25 am, entitled, "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained."[83] In the article, Trotter's motivation for sliming Plaintiffs is explained through an abstract discussion:[84]

**Johnson seems pretty clearly incompetent. But why do people *loathe* him?**

Johnson's work for larger news organizations is mostly inept rubbish. But the stuff he publishes on GotNews.com tends to be intensely hateful— bizarre, non-sequitur, victim-attacking bile directly from, and directly for, the online right-wing's id.

Johnson likes to publish articles, for example, insinuating that victims of police violence—particularly black victims—pretty much had it coming. Earlier this year, he collected screenshots of murdered teenager Michael Brown's Instagram account. "Brown's Instagram account also shows a violent streak that may help explain what led to a violent confrontation with Police officer Darren Wilson," Johnson wrote. In other words, Brown deserved to die.

---

[82] Gotnews, December 5, 2014 (http://gotnews.com/breaking-gotnews-wins-first-stage-appeal-michaelbrown-records-ferguson-ericgarner/ last accessed, Oct. 9, 2015).

[83] Gawker, December 9, 2014 (http://gawker.com/what-is-chuck-johnson-and-why-the-web-s-worst-journal-1666834902  last accessed Oct. 9, 2015). See Plaintiff's Ex. 71.

[84] Id.

43

Notably, in the passage above, in a Q&A heading style, Trotter tries to suggest that the loathing felt for Plaintiffs is held by parties other than Trotter. However, the tone and tenor of the entire article make it very clear that Trotter himself also loathes Johnson. Trotter maliciously characterizes Johnson as a racist, as well as using malicious paraphrasing to suggest that Johnson is a racist. The passage above specifically names Michael Brown as well as a pregnant woman who by Ferguson police accounts was shot with a bean bag round while riding in a vehicle driven by her boyfriend as the boyfriend attempted to run over a police officer during one of the many chaotic nights of the Ferguson Riots.[85] Later in the article, Trotter notes that Johnson has a budding career in journalism, and has been, "offered a platform by some of the most influential conservative publications."

Overall, the article is purely an attack on Johnson. The implication of the article is that Johnson is persona non-grata, and that readers should remember him as being the worst kind of "conservative" filth. The article reads as though Trotter were exposing a threat. To introduce the audience to the target, who would subsequently be personally attacked in disgusting ways and ultimately isolated from any friends or support.[86]

And this is confirmed in the discussion section of the second article on Johnson that Defendant Trotter would publish on December 9, 2014 (at 4:20 p.m.), in an article entitled, "The Daily Caller Can't Quit Chuck Johnson."[87] In the article, Trotter repeatedly states that Johnson wrote **false** stories. "You may be aware that Charles C. Johnson of **GotNews.com** had a role in several notorious (and false) stories published by Tucker Carlson's Daily Caller. Yes, this

---

[85] See Plaintiff's Ex. 71.
[86] See, e.g., Rule 13, https://en.wikipedia.org/wiki/Rules_for_Radicals last accessed Oct. 9, 2015.
[87] See Plaintiffs' Ex. 72.

includes the infamous debunked article - to which Johnson "contributed reporting" - about New Jersey Senator Bob Menendez supposedly soliciting prostitutes in the Dominican Republic."[88]

But this second Trotter article was actually the third article[89] of the day written by Gawker staff about Johnson, and an unpaid-content-creator discussed this with Trotter in the article, with Trotter explaining to the individual:



"[W]hat he did requires a particular kind, and intensity, of policing from third party outlets (such as Gawker). He crossed a certain Rubicon … and that deserves to be noted in a way that a mass audience can understand."[90]

---

[88] *Id.*

[89] Greg Howard's, "*Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time*?," was published at 4:00 p.m. on 12/9/14. See Plaintiffs' Ex. 70.

45

And here we have Defendant Trotter's motivation. Plaintiffs 'crossed a line,' and Mr. Trotter believed it was his job to publicly defame and humiliate Plaintiffs as punishment.

### Defamatory Statements - The First Trotter Article

In the first Trotter article on December 9th, at **11:25am** ("What is Chuck Johnson…")[91], Trotter describes Johnson as being, "well-known for publishing stories that fall apart under the slightest scrutiny." Trotter then proceeds to clearly defame Johnson at least twice by following up from this statement and stating as evidence that, "The list of Johnson stories that have been proven wrong is long, but his greatest hits include":

Importantly, Trotter is attacking Johnson's ability as a journalist, directly accusing him of *falsely reporting* in an article that senate candidate (for New Jersey) Cory Booker didn't actually reside in New Jersey at the time of his candidacy (thereby rendering him ineligible, if true). Trotter cites to another article[92] as evidence that Booker did in fact live in New Jersey, and thus proof that Johnson falsely reported. However, the article Trotter cites to *is itself inconclusive* on the matter. Trotter did not state that Johnson **might** have misreported Booker's place of residence. Trotter conclusively stated that Johnson did falsely report Booker's residence, despite knowing full well that the article which Trotter himself cites as evidence, makes no concrete conclusion.

---

[90] *Id.*

[91] Gawker, December 9, 2014 (http://gawker.com/what-is-chuck-johnson-and-why-the-web-s-worst-journal-1666834902 last accessed Oct. 9, 2015). See Plaintiffs Ex. 57 and 71.

[92] Ruby Cramer, "*Cory Booker: Yes, I Live In Newark*," Buzz Feed News, Oct. 14, 2013 (http://www.buzzfeed.com/rubycramer/cory-booker-yes-i-live-in-newark#.lmZ115Wm1 last accessed Oct. 9, 2015). See Plaintiff's Ex. 85.

Trotter also states in the excerpt above that Johnson **completely fabricated** an a article he wrote, reporting on allegations of misconduct by Senator Robert Menendez. "The story turned out to be a ***complete fabrication***."

Johnson's article was not a lie, not a fabrication, and in fact the Senator has been indicted (March 6, 2015) by the Department of Justice on 14 counts, including corruption charges.[93] The *Department of Justice* reports that the allegations of sex with underage prostitutes in the Dominican Republic <u>has been corroborated</u>.[94] The case against Senator Menendez continues to be litigated, so it remains to be seen if the allegations are legally true. However, in the passage above, Trotter cites **as proof** that Johnson *fabricated* - that is, completely *invented* - the Menendez story, an article by ABC News,[95] which <u>does not reach a conclusion</u> and at best for Trotter, merely expresses doubt about Johnson's allegations in his article. Trotter, on the other hand, reports that **conclusively**, Johnson lied and made up the entire article.

This article by Trotter is no satire. Trotter makes clear, damning, and false factual allegations. Journalism is Johnson's profession. And calling him incompetent and calling him unreliable and calling him a liar - and offering evidence to support your allegations - is no different than calling a doctor a "quack" or a "butcher" and attempting to bolster one's claim by **falsely** citing to claims of malpractice.

---

[93] Chuck Ross, "*DOJ: Underage Prostitution Allegations Against Robert Menendez Backed By 'Corroborating Evidence,'*" The Daily Caller, August, 24, 2015 (http://dailycaller.com/2015/08/24/doj-underage-prostitution-allegations-against-robert-menendez-backed-by-corroborating-evidence/ last accessed Oct. 9, 2015). <u>See Plaintiff's Ex. 64.</u>
[94] *Id*.
[95] Rhonda Schwartz, Brian Ross and Ned Berkowitz, "*The Menendez Prostitution 'Scandal': How It Happened,*" ABC News Online, March 6, 2013 (http://abcnews.go.com/Blotter/robert-menendez-prostitution-scandal-happened/story?id=18664472 last accessed Oct. 9, 2015). <u>See Plaintiff's Ex. 65.</u>

- Erroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark.
- Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The story turned out to be a complete fabrication, and may have even been planted by the Cuban government.

In the passage and article cited above, Trotter reports on Johnson with what can only be described as a reckless disregard for the truth or worse, actual malice. In the allegation regarding Johnson's reporting on Cory Booker's residence, Trotter's cited source draws no conclusions. In the allegation regarding Senator Menendez, Trotter had knowledge of the *actual falsity* of what he was saying, because the article he cited to clearly drew no concrete conclusions about Johnson's reporting. And Trotter cited **no** other sources to support his statement that Johnson had fabricated the story about Senator Menendez.

***

Though Trotter's article was initiated on **December 9, 2014**, at **11:25am**,[96] because of the collaborative nature of the article, or *discussion*, discussions continued thereafter. At **12:30pm**,[97] unpaid-content-creator "*Cmcalumna*" posted a response directly to J.K. Trotter.[98] Though she is anonymous, in the post, she identifies herself as having attended the same college as Charles Johnson, and suggests that she has special knowledge of Johnson: "Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark

---

[96] Although Johnson was in California during this time period and the Defendants in New York, all times cited are in Eastern Standard Time. Unless otherwise noted in this section, all discussion posts between paid and unpaid content creators are posted to the First Trotter article posted at 11:25am.

[97] See Plaintiff's Ex. 76.

[98] See Plaintiffs' Ex. 74.

48

(a dorm)." She then let slip her motivation for releasing such a tidbit of information: "I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems." Trotter replied to *Cmcalumna*, simply stating, "What."[99]

When another unpaid-content-creator asked *Cmcalumna* to "elaborate on the poop story," *Cmcalumna* replied, at **1:05pm**,[100] that since she started at college two years after Johnson, she didn't actually have any basis of knowing whether or not Johnson had publicly defecated. Rather, she simply described upper-classmen talking about it "regularly" but yet that it was an "undisputed fact that he did it."[101]

At **1:44 p.m.**,[102] anonymous unpaid-content-creator "*ChekhovsGum(ItsGonnaPop!)*" posted a discussion piece directly communicated to J.K. Trotter. In the discussion, ChekhovsGum(ItsGonnaPop!) portrays herself as a contemporary of Johnson's and describes various grievances against Johnson. At **2:06 p.m.**,[103] Trotter responded and simply said: "Yeesh."[104]

At **1:44 p.m.**,[105] anonymous unpaid-content-creator "*CCJ Facebook Friend*" published a discussion directed at J.K. Trotter, in which he claims to faithfully reproduce, from Johnson's **Private**, **invite-only** Facebook account page, a letter written by Johnson and posted on Johnson's

---

[99] *Id.*
[100] See Plaintiff's Ex. 76.
[101] *Id.*
[102] See Plaintiff's Ex. 76.
[103] *Id.*
[104] *Id.*
[105] *Id.*

Facebook wall for dissemination to former classmates of his on Facebook. "This is from his Facebook account late last night. I don't know how to screenshot the whole thing."[106]

*Notably, the letter posted by CCJ Facebook Friend is exactly the same as the one* <u>*Greg Howard*</u> *would publish two hours later in his post on Deadspin.* Greg Howard did not have access to Johnson's Facebook page, because they were not Facebook friends.

At <u>**1:46 p.m.**</u>,[107] J.K. Trotter responded to *CCJ Facebook Friend* by saying: "Oh dear." (However, on <u>December 10, 2014</u>,[108] Trotter would respond again to *CCJ Facebook Friend*, seeking additional leads, information, collaboration: "Are there any other comments on that Facebook post?"*)*

Between <u>**2:00 p.m. and 2:14 p.m**</u>., Greg Howard **emailed** Charles Johnson and asked asked various questions:[109] "Chuck, we just got a tip that you wrote up a Facebook post for your past classmates. Just checking to see it actually happened and is accurate. [The email goes on to quote a portion of the letter posted by *CCJ Facebook Friend* to the First Trotter article initiated/instigated at <u>**11:25 am**</u>.] This is your writing, correct? Thanks, Greg."[110]

At <u>**2:06 p.m.**</u>,[111] Johnson responded: "Run it in its entirety. Don't do me like you did Cory Gardner, though."

At <u>**2:09 p.m.**</u>,[112] Howard responded: "Did you play football?"

---

[106] *Id.*
[107] <u>See Plaintiff's Ex. 54 and 58-60.</u>
[108] *Id.*
[109] <u>See Plaintiffs Ex. 87</u>. Note that time appears as 11am because it was received by Charles Johnson in California at 11am (2 p.m. Eastern Time).
[110] *Id.*
[111] *Id.*
[112] *Id.*

At **2:11 p.m.**,[113] Johnson responded again to Howard: "Oh, and do please tell Nick Denton that I say hi."

At **2:14 pm**,[114] Howard replied: "I'm working from home."

Also at **2:14 pm**,[115] Johnson immediately responded, "Oh, and the comments about me shitting on the floor were made up," - referencing the *Cmcalumna* discussion post earlier at **12:30 pm and 1:05p.m.** on the Trotter article.

At **2:20 p.m.**,[116] Howard again emailed Johnson: "If you have time, we got a tip that you had a 2002 bestiality charge expunged from your record because you were a minor at the time. Is this true?"

At **4:00 p.m.**, Greg Howard initiated/ "instigated" his piece, "Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?"[117] The article includes references to anonymous rumors that Johnson publicly defecated in college: "there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident." Howard then proceeded to solicit additional tips, photos, and context from additional kinja content-creators.

At **4:15 p.m.**,[118] Howard posts a discussion post on his "clowntroll" article discussion section, stating: "I'll tell you what, There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker." The phrase "good-ass kinja" is hyperlinked and if clicked re-

---

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746 last accessed Oct. 9, 2015). See Plaintiffs Ex. 70, 84, and 90.

[118] *Id.*

51

directs the viewer precisely to the 1:05pm discussion piece[119] by *Cmcalumna* in the First Trotter article ("What Is Chuck Johnson…").

At **4:34 p.m.**,[120] Gawker writer Jordan Sargent posts a discussion post directed at Greg Howard on the "clowntroll" article, stating, "This guy shitting on the floor is a very apt metaphor for why he's in the news now."

At **4:19 p.m.**,[121] content creator "IkerCatsillas" posts a discussion piece (directed at Trotter) on the First Trotter article: "Please J.K. You gotta scoop this poop story for us. For journalism. I need to know more." At **4:43 p.m.**,[122] Trotter responds: "[Deadspin] is on it." The phrase "on it" is hyperlinked and links to Greg Howard's "clowntroll" article.

At **5:09 p.m.**,[123] *ChekhovsGum(ItsGonnaPop!)* wrote a discussion post on the First Trotter article, and directed at Cmcalumna: "I have heart breaking news, team, there was never any proof that he actually was the one who pooped on the floor. Someone did poop on the floor and just to sort of troll the Mountain King himself, people started posting that he pooped. It was one of those things no one could proof or disprove … but alas it's not *really* true."

At **10:26 p.m.**,[124] *Cmcalumna* wrote a discussion post on Howard's Deadspin "clowntroll" article, replying to Greg Howard's previous discussion post ("…There is some good-ass kinja to be had re: chuck shitting on the floor one time over at Gawker") *in which she clarifies that she has no proof of the defecation incident having occurre*d: "I think you made my

---

[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] See Plaintiff's Ex. 70.

52

year **by writing an entire article based on my comment**. I'd give anything to have some proof, but I wasn't there when it occurred … I am so glad when someone googles his name this will appear. I hope him pooping in stark [dorm] follows him forever, just goes to show you how important it is to use a bathroom (and not be an asshole your entire life)." (emphasis added). So, to recap, *Cmcalumna* has no proof that Johnson publicly defecated, but yet she is extremely pleased that Howard wrote his article based upon her comment. She is further pleased because Johnson has been defamed, and now, whenever someone "google's" his name, it will be tarnished with filth.

On **December 9, 2014**, sometime shortly after *Cmcalumna* initiated the rumor about public defecation, the first "tweet" was published on Twitter. See <u>Plaintiffs Ex. ___</u>. That was ground zero. There would ultimately be hundreds thousands of tweets published repeating the defamatory accusation that Johnson was a public defecator.

Also on **December 9, 2014**, sometime after instigating his article, Howard himself tweeted on Twitter:[125] "We need answers: Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" He then posted a link to the article he instigated.

On **December 9, 2014**, at **4:20 p.m.**, Trotter initiated/ "instigated" a piece entitled, "The Daily Caller Can't Quit Chuck Johnson." Thereafter, he continued to engage with other content creators in discussions.[126]

---

[125] <u>See Plaintiffs' Ex. 81.</u>
[126] <u>See, e.g., Plaintiffs' Ex. 87.</u>

53

As mentioned above, on **December 10, 2014**,[127] at **2:20 p.m.**, Trotter responded again to *CCJ Facebook Friend*, seeking additional leads, information, collaboration: "Are there any other comments on that Facebook post?"

On **December 12, 2014**, at **12:42 p.m.**,[128] Trotter emailed Charles Johnson:

> Hi Charles,
> I'm a reporter at Gawker, and I'm writing because we've received a pair of allegations involving you, and wanted to give you an opportunity to address them.[129]
>
>                       ***
>
> The second allegation is that, in 2002, you were photographed sexually assaulting a sheep behind a family member's ranch in San Bernardino County, near Wrightwood; that you were arrested by the San Bernardino County Sheriff and later convicted of this; and that, in 2007, you successfully petitioned to have records of the incident expunged. Is this allegation true? The sources for both claims supplied detailed accounts of each of the incidents described above. Please let me know if you have any other questions, or if you need any other information to address these allegations. My deadline working deadline is midnight EST, but that is flexible, so please let me know if you require more time.
>
> Thanks,
> J.K. Trotter.

Johnson responded:[130] "Neither story is true. I honestly have no idea where these crazy stories come from."

On **December 12, 2014**, at **4:08 p.m.**,[131] Trotter would follow up with Johnson:

---

[127] *Id.*

[128] *Id.*

[129] The first rumor Trotter discusses is not part of this suit and is therefore omitted from the excerpt. Please see <u>Plaintiffs' Ex. 83</u> for the full text.

[130] *Id.*

[131] *Id.*

The first story comes from a person who says they were physically present, and personally witnessed the conversation. We've verified that this person attended Claremont with you. This person provided a very specific account of the incident. The second story comes a person [sic] who is friends with an officer in the San Bernardino County Sheriff, who is familiar with the details of the alleged assault. Apparently the incident has become fairly well-known within that county's law enforcement circles. Again, I just wanted to get your input before putting anything up. I'm fairly sure you understand that."

On **December 15, 2014**, at **3:30 p.m**., Trotter initiated/ "instigated"[132] the article, "Which of These Disgusting Chuck Johnson Rumors Are True?"[133] Subsequent to this, Trotter continued to engage in discussions with other content-creators. See Plaintiffs' Exhibits 78-79.

**Also on December 15, 2014**,[134] Greg Howard published on his Twitter social media account a hyperlink to Trotter's instigated article ("Which of These Disgusting Rumors…") and stating: "Torn. I kinda feel like sheepfucking is something you grow into. On the other hand, [Charles Johnson] is a prodigy."

### Defamatory Content - Howard's "Instigated" Article

Later in the day on December 9th, at 4:00pm, Defendant Greg Howard - who is employed by Gawker, but writes as a sports commentator for Gawker's sports blog "Deadspin" - would publish an article on a subsidiary of Deadspin, entitled, "Wait, Did Clowntroll Blogger Chuck Johnson Shit on The Floor One Time?"[135]

---

[132] Recall that this is a term ("instigate") of art native to Kinja and Gawker, and derives from founder Nick Denton's vision of a seamless discussion experience, involving the collaboration of paid and unpaid content creators.

[133] See Plaintiff's Ex. 78-79.

[134] See Plaintiffs' Ex. 55.

[135] Deadspin, December 9, 2014 (http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746 last accessed Oct. 9, 2015).

55

In the article, Howard states that on December 9th, some anonymous person emailed him a letter that Charles Johnson posted to his **private, invitation-only** Facebook account bulletin board/wall addressed to past friends and acquaintances from college. The private account was only accessible by individuals Johnson had, at some point in his life, specifically authorized to view his *private* Facebook profile. Howard was not one of those persons.

However, we know from the timeline above, that at *1:44 p.m.* on 12/9/14 *CCJ Facebook Friend* published the letter in a discussion post on Trotter's "What is Chuck Johnson…" We also know that sixteen minutes later, Howard emailed Johnson about the letter. Johnson had seen the article posted by Trotter, and had watched the comments - including the comment by *Cmcalumna*, which initiated the rumor about public defecation. Johnson anticipated rightly that Howard, Trotter, and Gawker were circling vultures aimed at maligning him, and he attempted to defuse the defamation as quickly as possible, by affirmatively stating to Howard that the accusations were false.

Howard didn't care, he evidently thought that since he had anonymous third party content creators on Gawker raising the accusation for him, that this would inoculate him against defamation liability. And, given the ambiguity of *Cmcalumna's* first discussion post on the first Trotter article, Howard probably thought that this was enough wiggle room to permit multiple interpretations, thereby allowing him to hide in the ambiguity of the comment. And, this is clearly in the Gawker playbook as is evidenced by their history, pattern, and practice. Incite, lure, instigate unpaid content creators to publish tips and additional material to the site. Leverage the protections of Communications Decency Act Section 230. Then enjoy free reign to republish defamatory content.

56

However, *before* he was able to publish his own post, *Cmcalumna* herself made it clear that she had no basis of knowledge about the supposed defecation event. So, instead of basing his reporting of the public defecation on discussion posts on Trotter's article, he misrepresents that he saw such allegations on Johnson's Facebook page. "Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident."[136] However, as mentioned, Howard doesn't have access to this page. And in any event there were **no comments** made on Johnson's Facebook page during this time that referenced or alleged public defecation.[137] So in other words, Howard lied about his source. His source was an anonymous Gawker content creator. But, Howard didn't want his audience to realize he was merely reporting on the baseless comments of an anonymous commenter to a Gawker article. So, to give the accusations greater weight, he reported that he saw them on Johnson's Facebook wall.

Howard probably thought he was doubly protected, because he had gone through the rote, mechanical process of contacting Johnson to attempt to "verify" the rumor. However, there seems to be little point in attempting to verify a rumor, if you publish the rumor anyway, with absolutely no evidence. The only reason to do this is to *juxtapose* an individual with a filthy concept and then attach supposed ambiguous truths to give an air of credibility to the filthy accusations - such that it might be true, but it might not. And, just like Richard Lawson's smearing of James Franco, the Gawker way is to play coy: *we're just asking a question, right? Did he do it? Who knows?* "Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" As described more fully, *infra*, merely asking a question or raising a question can

---

[136] See Plaintiff's Ex. 77-79.

[137] See Plaintiffs' Ex. 97. These screenshots evidence that Howard lied about where he saw the floor defecating comments, as there were no floor defecation comments on Johnson's Facebook page.

indeed be defamatory.[138] *Johnson v. St. Louis Dispatch Co.*, 65 Mo. 539 (Mo. 1877); *Hunt v. Gerlemann*, 581 S.W.2d 913 (Mo. Ct. App. 1979). Further, leaving out critical facts also erases any opinion privilege. "The privilege does not apply, however, where the statement of opinion implies the existence of undisclosed defamatory facts. *Hammer v. City of Osage Beach*, 318 F.3d. 832, 843 (8th Cir. Mo. 2003).

Howard closed out his article by smearing and defaming Johnson further: "…[H]e's been caught lying many times before…"[139] However, Howard provides no evidence of Johnson having ever lied, nor does he provide any evidence that Johnson was ever caught lying. In other words, it's a bald, unsupported allegation which Howard made in Reckless disregard for the truth or falsity thereof.

Then, later, Howard posted a discussion post in his own piece, adverting to *Cmcalumna's* defamatory discussion posts. And when *Cmcalumna* ultimately posted a discussion post reply directly to Howard, informing him in no uncertain terms that she had absolutely no basis of knowledge as to whether or not Johnson publicly defecated, Howard still refused to print a retraction.

### Trotter's Third Instigated Article

On December 15, 2014, Trotter "instigated" an article: "Which of These Disgusting Chuck Johnson Rumors Is True?"[140] In the usual Gawker we're-trying-to-say-the-magic-words-to-avoid-liability-for-defamation style of - *aww-shucks, we're just asking questions, doesn't the public need to know?* - Trotter opens the article with:

---

[138] See Plaintiff's Ex. 77-79.
[139] See Plaintiff's Ex. 77-79.
[140] See Plaintiff's Ex. 69.

58

"You may have read The New York Times' profile of Charles C. Johnson, the
worst journalist on the internet. You also may have seen several very elaborate,
very unbelievable, and very gross rumors about Johnson's past misdeeds floating
around Twitter and Facebook. So maybe you're wondering: Which of those
rumors are real?"

At the outset, Trotter has framed the article as an *investigation* into the veracity of rumors

which were initiated external to Gawker. However, at least as to the public defecation rumors,

such rumors were originated by Gawker content creators. Thus, Gawker was both the source of

the rumor, as well as the supposed humble and innocent - aww shucks - reporter. As we will see,

the article repeatedly represents that Trotter was both the recipient of hot tips from anonymous

sources, investigated those tips by making numerous inquiries, and reaching out to Charles

Johnson to confirm or disconfirm the rumors.

Public Defecation Rumor

Trotter himself admits that **two** Gawker content-creators using anonymous "burner"

Kinja accounts were the source of the rumor. "Last week, two of Johnson's college classmates,

using Gawker burner accounts, filled in the details of the shitting story."[141] Trotter noted noted

that Greg Howard had first written about the rumor a week prior.[142]

---

[141] See Plaintiff's Ex. 73-74.
[142] *Id.*

59

Trotter then represents that he is quoting from two different content-creators, when really, he is quoting the same content creator's discussion post to Trotter's first article ("What is Chuck Johnson…"):[143]

The first classmate:

> Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm). I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems.

The second:

> I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassman talked about it regularly and it was an undisputed fact that he did it. Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people talking about it can be seen in the comment archives from 2008-2011.

In reality, though he represents above that he is quoting from two different content-creators discussion posts, he is actually quoting *the same content creato*r: *Cmcalumna*.[144] However, he also indirectly cites to an additional content creator inside the "second" classmate's quote (that is the second *Cmcalumna* quote) ("[confirmed by another commenter]"), a content

---

[143] *Id.*

[144] Trotter is quoting *Cmcalumna* from different discussion posts. See Plaintiff's Ex. 76.

creator self-dubbed: "*GotNews*."[145] *GotNews*' discussion post, to a casual observer, seems to give credibility to *Cmcalumna's* initial discussion posts.

Trotter then quotes from *ChekhovsGum(ItsGonnaPop!)*[146] (which Trotter mistakes as *Cmcalumna.) ChekhovsGum(ItsGonnaPop!)'s* quote simply says that there is no evidence to prove or disprove the rumor about Charles Johnson and public defecation. "It was one of those things no one could prove or disprove."

Trotter then quotes Johnson denying that he ever publicly defecated.

Abruptly, after laying out supposed evidence for Johnson the public defecator, Trotter issues a *non sequitur*: "Verdict: There is no evidence that Chuck Johnson took a shit on the floor in college. Chuck Johnson was, however, so thoroughly disliked in college that his classmates chose to blame an unattributed shit on him."

The problem here is two-fold. First, after building up what was really just a rumor that *emerged* on *Gawker's own blog* as a raging controversy that seemingly *everyone* was talking about, Trotter abruptly and without any explanation concludes that the rumor is false. The audience perceives this as mere posturing to avoid liability. It's mysterious and suggests to the reader that the rumor may actually be true.

Furthermore, despite Trotter's investigation - which lasted several days, as he not only reached out to Johnson for confirmation/disconfirmation, but he also requested more information from content creator *CCJ Facebook Friend*,[147] hoping to get more tips - Trotter failed to mention

---

[145] See Plaintiff's Ex. 77.

[146] *Id.*

[147] See Plaintiff's Ex. 86.

that *Cmcalumna* had fully recanted to Greg Howard in a discussion post on Greg Howard's "clowntroll" article.

So Trotter's methodology was, similar to Howard's, similar to Richard Lawson's, and Jordan Sargent, and literally scores of content creators paid by Gawker through the years, to solicit and cultivate content created by *anonymous* sources, protected by layers of anonymity which even Gawker can't pierce, and published on Gawker's websites (for the amusement of other readers and to the profit of Gawker) then portray the state of affairs as being rife with speculation and rumor that is simply so pervasive that it becomes newsworthy. Then, use that artificially created event as an excuse and opportunity to smear Johnson, while attempting to say the magic words and avoid liability for his participation in the defamation of Johnson.

Importantly, the end result is that the audience of Gawker - and the thousands of people they have subsequently communicated with about this story, may be less inclined to believe that the story is true. But there has been enough ambiguity craftily inserted to permit the rumor to persist for quite some time. In fact, one might say that such is the hallmark of a great rumor - especially a defamatory one - that *in the minds of the public* it cannot be conclusively disproven. And this ambiguity and uncertainty are exactly the sort of punishment that Trotter described to fellow content creators in his discussion posts, previously. After all, Johnson had crossed a line.

<u>Sex With Sheep</u>

Trotter then described another anonymous tip that had been given not to himself, but to Greg Howard: "Chuck had a 2002 bestiality charge expunged from his record due to his being a

minor, 14 at the time."[148] Trotter noted that as a result, Howard emailed Johnson and asked him to confirm or deny the accusation. Johnson did not respond directly, but posted the inquiry to on Twitter and ridiculed it. Notably, Trotter acknowledges in his writing that *normally, this would have been enough to dissuade Gawker staff from reporting on the matter*, except that later, yet another anonymous tipster sent a communication to Greg Howard: "…the bestiality story is 100% true."

Trotter then recounts the very elaborate story given by the tipster. The level of detail, for the reader, lends the story great credibility. Further, unlike other anonymous tipsters who are unwilling to communicate verbally, this one was willing to talk at length on the phone, which shows a lack of hesitancy and willingness to be directly questioned and challenged. Trotter details following up on the lead, contacting the San Bernardino Sheriff's Office, The San Bernardino County District Attorney's Office, a representative of the juvenile division, and numerous database searches including public records and newspapers. However, the juvenile division director informed Trotter that as a matter of policy they do not divulge information pertaining to juvenile records. And the public database and newspaper database searches also turned up no results. Although, Trotter noted: "This does not necessarily mean that the arrest didn't occur, though; editors don't necessarily publish all incidents involving the police, and public records databases would not contain an expunged record."

Finally, here, as with the public defecation rumor analysis, Trotter ends with what he hopes is a prophylactic conclusion: "Verdict: There is no evidence that Chuck Johnson was arrested in 2002 for pinning a sheep to a fence and fucking it. Johnson is, however, the kind of

---

[148] See Plaintiff's Ex. 77.

63

guy about whom random people make up and circulate rumors about him being arrested in 2002 for pinning a sheep to a fence and fucking it."

There is a very *very* subtle level of satire in the bestiality section. Subtle, because it presupposes one is entirely familiar with the work of Johnson. Trotter and Howard were aware of the Plaintiffs' lengthy efforts to acquire the juvenile records of Michael Brown, and his counter-mainstream-media-narrative approach to covering the Ferguson Riots. In fact, these were likely major motivators for their decision to attack and defame Johnson. Johnson had received tips from confidential - not *anonymous* - sources in law enforcement that Michael Brown had been implicated in a murder as a minor. Plaintiffs spent enormous resources, alongside other media establishments, trying to acquire those records, even pursuing the records to the Missouri Supreme Court, but to no avail. Gawker and a litany Gawker writers spilled much ink indicting the American criminal justice system, police, and holding Brown to be a blameless martyr.[149]

However, the general Gawker audience would probably not have been, and neither Trotter nor Howard ever mention the Brown juvenile records in any of their posts about Johnson. However, there is clearly a similarity. There was a clear motivation for Howard and Trotter to attack Johnson in this way.

As evidenced by his own words, supra, Howard strongly believes that Michael Brown (like Eric Garner) was blameless in his own death, and that he was killed as a result of a racist, supremacist, genocidal structural regime and its its storm trooper police and justice system (the design of which is to destroy black people). As we've seen above, Howard is extremely intolerant of alternative viewpoints on this matter. Viciously so. So, his motivation - retaliation -

---

[149] See Plaintiff's Ex. 71.

seems clear. Similarly, J.K. Trotter has written that Johnson is a racist spewing hate and intolerance through his reporting on the Ferguson Riots and Michael Brown.[150] Trotter has also stated repeatedly that Johnson has crossed a line - and somebody needed to do something about it.[151]

<u>Defendant Howard has a long and continuous history of fabricating defamatory rumors.</u>

Defendant Mr. Howard has a long history of defaming people whom he simply does not like or disagrees with. Jason Whitlock is a competing sports writer (Mr. Howard writes primarily for Deadspin.com a sports blog). Mr. Howard and other dead spin writers have set out to destroy Mr. Whitlock's reputation in a very similar way to their attacks on Mr. Johnson. <u>See Plaintiff's Ex. 26.</u> They have fabricated stories about him and mischaracterized his statements. There are a number of reasons Mr. Howard may dislike Mr. Whitlock but some claim it is because he is to the political right of Mr. Howard and Gawker media (just like Mr. Johnson). *Id*. Mr. Whitlock is claiming that Howard has made up stories about him and encouraged Deadspin writers to use the word "nigger" twice, in stories about him. <u>See Plaintiff's Ex. 25.</u> It is apparent that Mr. Howard is trying to create the same sort of mischaracterized racial animus that he attributed to Mr. Johnson by mischaracterizing him and his ideas. *Id*. Mr. Howard and Gawker have a long and continuing history of creating offensive libelous material about those who disagree with them.

## ARGUMENT

## I.     VENUE IS APPROPRIATE IN MISSOURI.

---

[150] *Id*.
[151] *Id*.

The facts of this case demonstrate that venue is appropriate under 1391 (a) and there is no

suitable reason to transfer venue under 1404.

**A.      Venue is appropriate under 1391(b)(2).**

"A civil action may be brought in, a judicial district in which a substantial part of the

events or omissions giving rise to the claim occurred, or a substantial part of property that is the

subject of the action is situated. 28 USCS § 1391. A substantial part of the claim occurred in

Missouri. Mr. Johnson has a significant connection to this forum due to his journalistic coverage

of the events surrounding Michael Brown and the Ferguson riots. Mr. Johnson was involved in

significant coverage of the Michael Brown controversy and was even entrenched in a long legal

battle, alongside the St. Louis Post Dispatch, seeking access to Michael Brown's juvenile

records. (Jeremy Kohler, *Juvenile Court: Michael Brown Had No Most-Serious Felony*

*Convictions or Pending Cases*, St. Louis Post Dispatch (Sep. 4, 2014, 12:20 AM),

http://www.stltoday.com/news/local/crime-and-courts/juvenile-court-michael-brown-had-no-

most-serious-felony-convictions/article_43c9bbbb-356f-5ea6-b9e2-7dde7e3e5c83.html; *News*

*Organizations Sue for Access to Possible Michael Brown Juvenile Records*, Fox News (Sep. 3,

2014), http://www.foxnews.com/us/2014/09/03/news-organizations-sue-for-access-to-possible-

michael-brown-juvenile-records/). The Defendant's defamatory statements made on the internet

were accessible nationwide, but due to Mr. Johnson's significant attachment to this district and

the attention he draws from the St. Louis public, he has been harmed here to a greater degree

than in other areas of the country. In fact a number of the defendant's defamatory statements

about Mr. Johnson have been in relation to his coverage of St. Louis and Michael Brown. In his

article, "*What Is Chuck Johnson, and Why? The Web's Worst Journalist, Explained*", one of the

defendants Mr. Trotter, talked at length about Mr. Johnson's coverage of the Michael Brown

shooting. (J.K. Trotter, *What Is Chuck Johnson, and Why? The Web's Worst Journalist,

Explained*, Gawker.com (Dec. 9, 2014, 11:25 AM), http://gawker.com/what-is-chuck-johnson-

and-why-the-web-s-worst-journal-1666834902) In the article, Mr. Trotter implied that Mr.

Johnson's coverage of the Michael Brown shooting made him incompetent, was the reason

people "loathed" him, and proved he was a racist. (*Id.*) Mr. Trotter mischaracterized Mr.

Johnson's reports on Michael Brown blatantly and incorrectly suggesting that he believed

"Brown deserved to die." (*Id.*)

Furthermore, as this court previously stated in a case surrounding internet defamation,

"The plaintiff is not required to select the venue with the most substantial nexus to the dispute;

rather, it must simply choose a venue where a substantial part of the events giving rise to the

claim occurred." *Wieland v. John Rigby & Co.,* 2010 U.S. Dist. LEXIS 37472, at 2 (E.D. Mo.

Apr. 15, 2010) (quoting *Capital Corp. Merch. Banking, Inc. v. Corporate Colocation, Inc.*, 2008

U.S. Dist. LEXIS 68154, at 2 (M.D. Fla. Aug. 26, 2008).

Mr. Johnson is entitled to file in any venue where a substantial part of the events giving

rise to the claim occurred. Mr. Johnson's injury occurred nationwide, but most specifically, due

to his St. Louis fame as an internet journalist, he was injured here.

**B.      There is no reason to transfer venue under 1404(a).**

Section 1404(a) states, "For the convenience of parties and witnesses, in the interest of

justice, a district court may transfer any civil action to any other district or division where it

might have been brought or to any district or division to which all parties have consented." 28

USCS § 1404. The decision to transfer venue under 1404 lies within the broad discretion of the

67

Case 1:16-cv-01057-AS   Document 6-18   Filed 05/16/18   Page 69 of 111   PageID #: 821

district court. *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513,

520 (2d Cir. 1989). The court must balance several specific factors to determine if a case should

be transferred, despite plaintiff's choice of venue. *White v. ABCO Eng'g Corp.*, 199 F.3d 140,

143 (3d Cir.1999). The court in, *Terra International, Inc. v Mississippi Chemical Corp.*, 119

F.3d 688, 696 (8th Cir. 1997), outlined the factors for transfer in this circuit.

The factors to be analyzed are: (1) The convenience of the parties (*Missouri is no more

inconvenient for Defendants than is California*); (2) Convenience of the Witness (*There are few

witnesses in this case, and it would be no more convenient to send them across the country than

to St. Louis*); (3) Accessibility to records and documents (*Most, if not all records and documents

in this case are likely to be stored electronically and are accessible anywhere*); (4) The location

where the conduct occurred (*Mr. Johnson was injured nationwide but as stated above has a

significant interest in protecting his reputation and Got News' brand and readership in St. Louis

and Missouri*); (5) The applicability of each forum state's substantive law ( *Missouri law should

apply, but Mr. Johnson can prevail under the law of any of the proposed forums*); (6) Judicial

Economy-- Moving the lawsuit would be unnecessarily onerous on Mr. Johnson. Mr. Johnson

does not have the same means as the Defendants and starting the process over would be a much

greater financial burden on him. Also, Mr. Johnson is already represented by counsel in St.

Louis. The defendants also have counsel in St. Louis and are represented by one of the most

prominent first amendment attorneys in the nation. In addition, it is highly unlikely that Missouri

courts are more crowded than those of New York or California. In fact, the most recent statistics

gathered from the US courts website, reveal the Southern District of NY and the Eastern District

of CA (the two alternative forums) are vastly more crowded. (*Federal Court Management*

*Statistics*, US Courts.gov, (Jun. 30, 2015), http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2015.) The Eastern District of CA has 5,772 filings with 7, 611 pending, the Southern District of NY has 13,013 filings with 18,069 pending, but Eastern District of MO only has 3,350 filings with 18,069 pending. Sending this case to another forum would result in casting it to an already overworked court, burdening all parties; (7) Plaintiff's choice of forum (*Mr. Johnson chose this forum in relation to his reputation in the area and his choice should be given significant weight*); (8) The comparative costs to the parties in litigation in each forum (*Missouri would be no more expensive for defendants than would be California, In fact both parties have counsel in St. Louis already*); (9) Each party's ability to enforce a judgment (This is neutral); (10) Obstacles to a fair trial (This is also neutral); (11) Conflict of Laws issues (*Again Missouri law should apply, however Mr. Johnson can prevail under any law this court should apply*); (12) The advantages of having a local court determine local law-- Mr. Johnson has significant connections to St. Louis related to his work and he deserves the right to defend his good name in an area where his reputation matters. In fact this suit has already garnered local media attention. The St. Louis Post Dispatch is currently reporting on this case. (Valerie Schremp Hahn, *Blogger Files Defamation Suit in St. Louis County against Gawker*, St. Louis Post Dispatch (Jun. 18, 2015, 8:55 PM), http://www.stltoday.com/news/local/crime-and-courts/blogger-files-defamation-suit-in-st-louis-county-against-gawker/article_b31c966c-76da-508d-8d5e-b669ff737f5d.html). Also as one court observed, "A lawsuit is not purely a matter of private concern. When an action involves injuries sustained in a particular locale, the public interest supports adjudication of the controversy in that locale, where it may be a matter of local attention." *In re Eastern Dist. Repetitive Stress Injury Litig.*, 850 F. Supp. 188, 195 (E.D.N.Y.

69

1994). Because the majority of the factors to be analyzed in this circuit show no relevant reason

to transfer this case, Mr. Johnson's choice of venue should be preserved and this case should

remain in this court.

Missouri courts are just as equipped to handle this case as are those in other jurisdictions.

Mr. Johnson has complete faith in Missouri's judicial system and believes arguing his case

before this court will grant him a fair and impartial opportunity to defend his good name. Since

under federal law this venue is proper, all the factors for venue weigh in Mr. Johnson's favor,

and there is no reason to deprive Mr. Johnson of fair trial in his chosen forum, the motion for

transfer of venue should be denied.

## II.    PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### A.    THIS COURT CAN HAS PERSONAL JURISDICTION OVER DEFENDANTS

Contrary to Defendants arguments, this case has several meaningful connections to

Missouri and Defendants' defamatory publications were directed at and caused negative effects

against Plaintiffs in the state of Missouri. Specifically, Gawker and its subsidiaries regularly

direct articles at Missouri and Missouri residents. Gawker and its subsidiary websites direct

content at Missouri readers, and Gawker et al have a significant number of Missouri readers.

Plaintiffs' also attempted, beginning in December 2014 and following through into the spring of

2015, to obtain the criminal juvenile records of Michael Brown Jr., the controversial figure at the

center of a national news story regarding police violence in St. Louis County. Many of the

defamatory publications contained in Plaintiff's Petition were published in the midst and in

vicious retaliation against Plaintiffs for trying to uncover facts which would cast doubt on

70

Brown's reputation, which Gawker itself had upheld and lionized. Plaintiff pursued the juvenile

criminal records first through the Sunshine Act, and then brought a lawsuit in St. Louis County

Circuit Court. When Plaintiffs were denied by St. Louis County Circuit Court, they brought the

case before the Missouri Eastern District Court of Appeals, were again denied, and applied for a

Missouri Supreme Court Appeal. Plaintiffs established a positive in Missouri through his many

media appearances. Johnson published numerous articles, statements, and content relating to the

Michael Brown Controversy on his website, Gotnews.com, as well as travelled to St. Louis to

observe the Circuit Court's hearing on the County's Motion to Dismiss. Johnson interviewed

with local news organizations, made statements, and appeared on local television.

## 1.     THIS COURT HAS SPECIFIC JURISDICTION OVER DEFENDANTS.

To establish specific jurisdiction, a plaintiff must demonstrate that both (1) "a

defendant's conduct was covered by the [Missouri] long-arm statute" and (2) "the exercise of

jurisdiction comports with due process requirements." *Myers v. Casino Queen, Inc.*, 689 F.3d

904, 909 (8th Cir. 2012) (citation omitted). Plaintiffs meet both requirements.

Missouri's long-arm statute permits jurisdiction where the cause of action arises out of

the defendant's "transaction of any business within this state" or the "commission of tortious act

within this state." Mo. Ann. Stat. § 506.500(1), (3). The 8th Circuit Court of Appeals has held

that the proper test for determining specific jurisdiction is the Zippo "sliding scale" model.

Under the Zippo approach, Courts use a sliding scale to determine where a defendant of its

website falls along a spectrum between doing business over the internet on the one hand versus

merely posting information accessible to foreign jurisdictions. Gawker and its subsidiaries

71

operate a number of websites, including gawker.com, deadspin.com, kotaku.com, jalopnik.com, jezebel.com, gizmodo.com, lifehacker.com, kinja.com, and fleshbot.com. The websites follow similar models, and when examining them closely, they fall unequivocally on the "interactive" side of the Zippo spectrum. These are by no means "passive" sites. They are built on and their business model relies upon **interaction** with readers in various foreign jurisdictions. Readers who wish to create content are able to create logins with passwords so they may create discussion posts on articles posted by Gawker and its subsidiaries (further explained in the Facts section of this Response). Not only this, but unpaid content creators are highly encouraged to create blog websites of their own, and to collaborate with paid content creators to produce content on Gawker's own commercial websites (thus earning Gawker readers and revenue in the process). The demographic statistics from Quantcast demonstrate that Defendants have over one million unique Missouri users. *See* Plaintiffs' Ex. 21.

Deadspin.com publishes articles specifically targeting local professional sports teams, which are written to specifically address the fans of those sports teams. The very nature of gawker.com is that it is an interactive gossip website. Designed to fulfill the reptilian desire of human beings to gawk, a huge number of Gawker's articles are specifically written and designed to incite reactions from its readers. Those reactions are posted beneath the article on the website. They are viewable by everyone, and oftentimes the article's author will interact with readers within the comments, direct readers to specific comments, or ask within the body of the article for readers' reactions in the comments.

Further supporting the Court's determination that Defendants' websites fall on the interactive side of the Zippo scale is the fact that Defendants' websites' interactions with

Missouri readers are of a commercial nature. Gawker and its subsidiaries advertise on their

websites. They use tracking software to collect data about the location of the reader and

purposefully populate the page with ads based upon that data. For example, a St. Louis, Missouri

reader may see an ad for St. Louis Budweiser Brewery Tours.  *See* Plaintiff's exhibit 40.  The St.

Louis Budweiser Brewery is located at 1200 Lynch St. in St. Louis, Missouri. Defendants know

who is reading their content and they intentionally direct advertising at those readers based on

their location in foreign jurisdictions. In this way, Defendants generate profit through Missouri

residents and Missouri Business ad revenue and thus avail themselves of the benefits of the laws

of Missouri.

## 2.     DEFENDANTS' CASES ARE NOT ANALOGOUS.

Defendants cases are easily distinguishable from the case at bar. First, *Johnson*

*Chiropractic Ctr., LLC v. Clark,* 2014 WL 3818191 (E.D. mo. Aug. 1, 2014) is distinguishable

factually. In that case, the defendant website offered a video containing allegedly defamatory for

sale. The judge in that case saw the video as merely information from a Texas seminar, and did

not find sufficient business transactions with the forum state. Here, Defendants have established

business transactions with Missouri businesses and customers. Not by merely posting a video for

sale, but by specifically directing advertising based on intricate demographic data allowing

custom-tailored advertising, to its million-plus Missouri readers. And further, by posting

defamatory content about a journalist who had significant connections with the State of Missouri

through his in-person investigative work on the Michael Brown Controversy, during which

Plaintiff spent time physically in St. Louis, Missouri conducting research, seeking records in-

person related to the investigation, and also generating good will and readership through his

many media appearances in St. Louis and many articles written about the Ferguson Riots. This case is factually dissimilar to the *Johnson* case.

Defendants argue that due process would not permit specific jurisdiction even if the long-arm statute applies. The Eighth Circuit has developed five factors to consider when deciding whether specific jurisdiction is proper: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of Missouri in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Johnson v. Arden*, 614 F.3d 785, 795 (8th Cir. 2010). Defendants cite again to *Johnson*, which Plaintiffs have distinguished above, and also to *Steinbuch v. Cutler*, an 8th Circuit Case addressing whether a bookseller was subject to specific jurisdiction in Arkansas, denied personal jurisdiction finding that plaintiff had "not shown enough specifics about the quality and quantity of [defendant's] contacts." *Steinbuch v. Cutler*, 518 F.3d 580, 588 (8th Cir. 2008). Defendants in this case have deliberately left the facts of *Steinbuch* underdeveloped in their brief. *Steinbuch* is distinguishable from the case at bar. Personal Jurisdiction is about notice. The idea is that a court will find personal jurisdiction where a defendant "purposely availed itself of the privilege of conducting business in the state and should therefore have reasonably anticipated being haled into court." *Id.* at 587. In *Steinbuch,* the plaintiff had not shown that defendant publisher purposefully availed itself because there was uncertainty as to the depth of the publisher's involvement in advertising plaintiff's book in Arkansas, and the 8th Circuit remanded the case to allow plaintiff to elicit whether the contacts were sufficient through tailored discovery. *Id.* at 589. The 8th Circuit also noted that the trial court in *Steinbuch* emphasized the relatively small number of sales in Arkansas and the lack of

74

substantial advertising campaign in that state. Here, the number of readers and revenue generated through advertising to Missouri readers is much more significant. Quantcast demographic data collected for Gawker media shows that Defendants have over **one million unique Missouri readers**. *See* Plaintiffs' Ex. 21.

### 3.   DEFENDANTS HAVE INTENTIONALLY DIRECTED TORTIOUS ACTIVITY AT MISSOURI RESIDENTS.

Defendants specifically targeted defamatory articles at Plaintiffs in vengeful retaliation for work that Plaintiffs had done within the State of Missouri about newsworthy issues occurring within the State of Missouri; i.e., the Ferguson Riots. The present case is more like one missing from Defendants' briefs, *Baldwin v. Fischer-Smith,* which is the leading Missouri case on internet defamation. In that case, a Missouri dog breeding company filed a defamation action against defendants, Arizona and Florida dog breeders who created a website and defamed plaintiffs in order to damage plaintiffs business and reputation. There the court found personal jurisdiction and found that defendants directed their tortious acts at Missouri residents. Importantly, the court in *Baldwin* eschewed the 7th Circuit *Calder* opinion's requirement that the defendant target the forum state itself as opposed to forum residents. *Baldwin v. Fischer-Smith*, 315 S.W.3d 389, 397 (Mo. App. 2010). The *Baldwin* court also emphasized that Google searches for the plaintiff's kennel would return links to the defamatory website, where at least 25 "hits," or page views, were by Missouri users, meaning at least 25 individual Missouri residents observed the page. *Id.* at 392. Here, a Google search for Plaintiff's name similarly returns links to defamatory content published by Defendants.

As described more fully in Facts, *supra*, Gawker regularly engages in strategic

clickbaiting" in order to target particular geographical jurisdiction audiences. For example,

deliberately insulting St. Louis Cardinals' fans in order to get their attention - and eyeballs - on

the webpage - and advertisers. See, e.g., Plaintiffs' Ex. 41. And Gawker maintains technology

which allows it to track key consumer demographics based primarily upon geographic location,

in order to microtarget marketing on a consumer-by-consumer basis. See, e.g., Plaintiffs Ex. 21-

23, and 40 ("Budweiser ST. LOUIS Brewery Tours").

Gawker as well as Gawker paid content creators maintain social media accounts,

including Twitter accounts. See, e.g., Plaintiffs' Exhibits' s 55-57, 93. Gawker as well as Gawker

paid content creators often have thousands or tens of thousands (Gawker has in excess of

576,000) of Twitter followers - that is, individual content consumers. Gawker, and paid content

creators Greg Howard, J.K. Trotter, Anna Merlan, and Erin Gloria Ryan, all have Twitter

followers *who reside in the State of Missouri*. See, e.g., Plaintiffs' Ex. 58-60, 98 (examples of

Gawker and Gawker paid author twitter account followers). Gawker, Howard, Trotter, Merlan,

and Ryan also published (or, "tweeted") to all of their followers, defamatory statements about

Johnson and advertised hyperlinks to defamatory articles written about Johnson between

December 9, 2014 and December 15, 2014. See, e.g., Plaintiffs Ex. 55-57, 93. In so doing, they

evidenced an intent to engage in business in the State of Missouri and also to specifically

transmit the defamation to Missouri to a Missouri audience.

Without having access to discovery on the number of pageviews Defendants have record

of, but having seen the Quantcast demographic data which shows there are over **one million**

**unique Missouri users**, Plaintiffs are extremely confident that Defendants' defamatory articles

76

received far more than 25 pageviews from Missouri residents. *See* <u>Plaintiffs' Ex. 21</u>. Indeed, it is more likely that the absolute number of Missouri residents who viewed the defamatory content published by Defendants is in the tens of thousands. Further, the *Baldwin* court was not persuaded by the "occasionally-expressed concern about internet activities exposing a defendant to jurisdiction in many forums." To that effect, they stated the following:

A tortfeasor who mails a thousand bombs to recipients in one state, and one to recipients in each of the other forty-nine states, should not be relieved from geographic responsibility for the consequences of his actions in each of those states simply because he is subject to suit everywhere, or because his conduct has a uniquely intensive relationship with a single state. *Id.* at 398.

The above note describes the case at bar. Defendants have failed to show insufficient contacts with the State of Missouri. Due process is not offended if Missouri exercises jurisdiction over the Defendants in this case.

Finally, Defendants have specifically and purposefully targeted a journalist who had cultivated good will and readership in the State of Missouri. Johnson had done so through his investigative reporting regarding the Ferguson Riots and the Michael Brown Controversy, an investigation which brought him physically to St. Louis, to the St. Louis County Circuit Court, and into the homes of Missourians over local broadcast radio and television, not to mention his website. And Johnson publicly and with great media attention, pursued Michael Brown's juvenile records all the way to the Missouri Supreme Court. Defendants did not agree with the nature and content of Plaintiff Johnson's reporting regarding these issues. Because of their rabid disagreement with his views, Defendants deliberately defamed him, published negative rumors and statements which were not true. Defendants did this specifically for the purpose of destroying Johnson and Gotnews' reputation, readership and goodwill in the State of Missouri.

77

As the *Baldwin* court stated, "if you pick a fight in Missouri, you can reasonably expect to settle it here." *Id.* This Court may exercise personal jurisdiction over the Defendants. Therefore, this Court should deny Defendants' Motion to Dismiss for lack of Personal Jurisdiction.

.     **B.     THIS COURT HAS GENERAL JURISDICTION OVER DEFENDANTS**

"General jurisdiction may be exercised if a defendant has maintained systematic and continuous presence in a forum state such that it has purposefully availed itself of the privileges of a particular state's laws to the point where exercising jurisdiction does not offend the traditional notions of fair play or substantial justice. *Arnold v. AT&T, Inc.*, 874 F. Supp. 2d 825, 831 (E.D.Mo. 2012) (specific phrases such as, "Defendants regularly, actively, knowingly, and continuously conduct business in Missouri," and that alleged internet activity "documents their regular, active, knowing, and continuous business within the state of Missouri," are indicative of an assertion of general jurisdiction).

As alluded to in the Facts section of this Response, Defendants collect data regarding the demographics of their readership and are fully aware that it has over **one million unique Missouri readers**, monthly. *See* e.g. Plaintiffs' Ex. 21. Defendants craft articles targeting readers based upon that demographic data. In this way, Defendants have had an ongoing and continuous presence in Missouri, as they have catered to over one million unique Missouri readers. Not only that, Defendants utilize tracking software to track the location of its readers and then populates its webpages with advertising tailored to those readers based on location and other collected data. For example, Plaintiff's counsel accessed gawker.com from a St. Louis, Missouri address and the page contained an ad for St. Louis Budweiser Brewery Tours. *See* e.g., Plaintiffs' Ex. 40.  As part of any successful business model, a company must know their customers and what they

78

want. Gawker is no different. Its customers are its readers, who contribute by frequenting the
sites, generating ad revenue for Defendants. Because of Defendants' data harvesting, and
because Defendants use that data to inform their contributors and advertisers, Defendants'
conduct business within the State of Missouri regularly, actively, knowingly, and on an ongoing
basis. To suggest that Gawker did not intend to enter this forum is to also suggest Gawker would
be perfectly content to lose this forum's one million monthly readers and attendant advertising
revenue. For the reasons stated above, this Court has general jurisdiction over Defendants.

B.     DEFAMATION

1.     **Plaintiff Is A Limited Public Figure. Plaintiff Is Also A Private Figure**

The law currently recognizes a distinction between "all purpose public figures," "limited
purpose public figures," and "private figure." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 94 S.
Ct. 2997, 41 L. Ed. 2d 789 (1974)

In *Gertz*, the Court explained "those who have attained [public figure status] have
assumed roles of prominence in the affairs of society. Some occupy positions of such persuasive
power and influence that they are deemed public figures *for all purposes*. More commonly, those
classed as public figures have thrust themselves to the forefront of particular controversies in
order to influence the resolution of the issues involved." *Id*. (emphasis added). In either event,
they invite attention and comment. *Id*. All purpose public figures have extremely powerful
access to communication channels to *effectively* defend their reputations. Limited purpose public
figures have less. Private persons have very little. *Id*. Public figures can be said to have
"voluntarily exposed themselves to increased risk of injury from defamatory falsehoods. No such
assumption is justified with respect to private individuals." *Id*.

79

The California Supreme Court, for example, has held that a single interview with the "bakersfield television station," as compared with defamation in a newspaper with a circulation of 2.5 million, is ineffective and contributes to finding an individual to be a "private person." *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98 Cal. (Cal. 1998). Similarly, one who comments about defamatory statements in a bid to diffuse them or defend one's reputation, does not make the individual a voluntary public figure. *Id*.; see also *Cockram v. Genesco, Inc*., 680 F.3d 1046 (8th Cir. Mo. 2012).

However, the scope of the risk of injury is congruent with the type and kind of "voluntary exposure." For example, professional and collegiate sports coaches are limited public figures *as to their job performance in such context*, as such individuals voluntarily enter a career in sports. *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130. An expert in, and outspoken advocate of plastic surgery was found to be a limited public figure, such that statements alleging that his surgical techniques resulted in disfigurement were entitled to constitutional protection. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 53 Cal. Rptr. 3d 752, 2007 Cal. App. LEXIS 107 (Cal. App. 3d Dist. 2007)("A person becomes a limited public figure by injecting himself into the public debate about a topic that concerns a substantial number of people. Once he places himself in the spotlight on a topic of public interest, **his private words and conduct <u>relating to that topic</u> become fair game**")(emphasis added).

Furthermore, the US Supreme Court has described a defamation equitable estoppel rule. "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111 (1979); *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98

80

Cal. (Cal. 1998); *Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 771 P.2d 406, 257 Cal. Rptr.

708 (Cal. 1989). Plaintiffs note that it was Defendants who published defamatory statements

about Plaintiffs, and that it was Defendant Howard who first reached out to Plaintiff Johnson

regarding the rumors of public defecation and bestiality. Plaintiff Johnson responded to Howard

for the purpose of diffusing the situation and defending his reputation by denying the rumors.

Yet Defendants argue that Plaintiffs actions make him a public figure. Thus, the equitable

estoppel rule applies.

> **2.    Johnson Is a Limited Public Figure for Limited Number of Purposes**

As a scrappy young reporter trying to establish a brand in a very competitive industry,

Johnson is clearly a limited public figure for the purposes of his career - a journalist. He is also a

limited public figure for the purposes of every news story he has published which has either

entered into pre-existing controversy or independently generated controversy. For example, as

discussed in the Facts, *supra*, Johnson has published many articles about the Ferguson Riots. He

is therefore a limited public figure as to *that topic area.*

However, prior to Defendants conspiring to manufacture disgusting rumors about him,

which are provably false, Johnson was never a public figure for purposes of the topical areas of

public defecation and bestiality. As a result, as to all defamatory comments relating to public

defecation and bestiality, Johnson is a **private** figure. And this is established in other ways.

As *Gertz* made clear, the all purpose/limited purpose public figure distinction focuses on

the relative power the individual has to command media, as well as whether or not the individual

voluntarily entered the arena of public controversy.

81

Prior to Defendants' smear campaign against him, Johnson's internet journalism presence was growing. But even at its zenith, it never approached the astronomically large circulation of Gawker Media. Gotnews' website has averaged 250,000 unique visitors per month in the past year. And of course, in the wake of Defendants' defamatory comments, his power in media to defend himself and his reputation drastically diminished far beneath this.[152] In contrast, Gawker has maintained a steady circulation of about **62-64 million** unique visitors **per month**. The difference in power ratio is overwhelmingly large. At a minimum, Gawker is about 256 times larger than Gotnews.[153] There is simply no way Johnson could be said to have been able to effectively defend his reputation, further confirming his status as a limited public figure as a journalist. In addition, Gawker had approximately 576,000 Twitter followers in December of 2014, as compared with Johnson's paltry ~16,000. This means that Gawker was 36 times[154] more powerful than Johnson.

Prior to Defendants' defamation, rumors of bestiality were non-existent. But subsequent to Defendants' acts, rumors of Johnson publicly defecating and of bestiality were ubiquitous across the internet. Johnson *did not voluntarily enter the controversy*.

When Trotter published his first article attacking Johnson at 11:25 am on December 9, 2014, this immediately drew Johnson's attention. For example, the Gawker Twitter Account tweeted out to it's 576,000 followers on Twitter, an advertisement to the Trotter instigated piece, and the tweet mentioned *@chuckcjohnson*, which was Johnson's Twitter Account. As a result,

---

[152] For example, compare Plaintiffs' Ex. _____ with Plaintiffs' Ex. _____.
[153] 64 million divided by 250 thousand equals 256.
[154] 16,000 x 36 = 576,000.

Johnson was immediately notified by Twitter.[155] So when Greg Howard contacted him at 2:00

p.m. about his Facebook post (the letter to friends and others), this led Johnson to wonder how it

could be that Howard could have known about the letter. After all, Greg Howard was not a

"Facebook Friend" of Johnson's, and therefore did not have access to his private thoughts. Upon

viewing the discussion post (posted at  1:46 p.m). by content creator *CCJ Facebook Friend*,

Johnson realized that this was how Greg Howard had discovered the Facebook post - the

anonymous content creator had copied the letter and pasted it within a discussion post on the

Trotter article.

Upon viewing other comments, Johnson came across the *Cmcalumna* comment from

12:30 p.m. Johnson immediately knew three things: (1) Gawker writers, by design, use

anonymous content creators who post discussion posts on "instigated" articles as an

excuse/occasion to write "hit pieces;" (2) if *Howard* was contacting him about the Facebook

post, reposted on the *Trotter* article, it meant that more than one Gawker writer was planning on

a writing a "hit piece"[156] on him that day;[157] and (3) Since Howard had seen the discussion post

by *CCJ Facebook Friend*, it was only a matter of time before Howard noticed the *Cmcalumna*

post, which either Howard or Trotter would write about. And this is especially so, because

Cmcalumna made numerous posts which elicited dozens of responses. So, in an effort to preempt

both Howard and Trotter, Johnson, mistakenly believing that Gawker, Howard, or Trotter cared

about truth in reporting, thought that by confirming in an email to Howard (at 2:14 p.m.) that the

---

[155] Twitter automatically notifies users when some other use mentions them in a tweet.

[156] "Hit piece" is simply common slang for an article designed to undercut and attack an individual, entity, or group.

[157] And this is confirmed by Trotter's *own admissions* on discussion posts of his own, wherein he describes that he made the conscious decision to write three articles about Johnson in the same day in order to punish Johnson for 'crossing the line.' See Plaintiffs' Ex. __.

accusation was **false**, this would prevent any further defamatory content from being published on Gawker.

And we should pause here to ponder: when a massive media establishment has obviously set-out to defame and humiliate you regarding **manufactured** matters supposedly from your personal life and childhood, what options does one have to attempt to defend one's reputation? See *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696; *Cockram v. Genesco, Inc.*, 680 F.3d 1046 (8th Cir. Mo. 2012). Attempting to preemptively diffuse an article is probably the best option Johnson had to try and defend his reputation against Defendants' defamation. If this act signifies that he "voluntarily entered the controversy," then the only legal option anyone has when posed with such a situation is simply to remain as a sitting duck. Legally enforced victimhood. In fact, from a damages standpoint, it could be argued that Johnson had a duty to mitigate his damages in the best way he knew how.

***Johnson quite rightly recognized*** that Howard and Trotter had conspired to defame him. We know this because *six minutes later*, at 2:20 p.m., Howard emailed Johnson to ask him to confirm or deny, "a tip that you had a 2002 bestiality charge expunged from your record because you were a minor at the time. Is this true?"[158] This clearly evidences Defendants intent to continue their campaign of defamation against Johnson.

Having already seen Howard and Trotter write four (4) hit pieces on him in one day,[159] Johnson had good reason to believe that there was more to come. In another attempt to preempt

---

[158] See Plaintiffs' Ex. 83.
[159] See Plaintiffs' Exhibits ___.

the defamatory articles, On December 10, 2014[160] Johnson Tweeted out a screenshot of
Howard's absurd request to his Twitter followers in order to mock it.

On December 12, 2014, at 12:42 p.m.Trotter emailed Johnson and asked him to confirm
or deny the bestiality accusations.[161] In the email, Trotter makes clear that he is vigorously
investigating two disgusting rumors about Johnson. In a second email at 4:08 p.m.,[162] Trotter
made a second request for Johnson to confirm or deny. Later, Johnson Tweeted out to his
followers.

> **3.** **As to defamatory statements made by Defendants relating to Plaintiff Johnson's journalistic contributions, Plaintiff has properly alleged that Defendants published those statements with actual malice.**

Defendants argue that Plaintiffs have failed to plausibly allege "actual malice." Public or
Limited Public figures are required to plead "actual malice," meaning that a challenged statement
was made "with knowledge that it was false or with reckless disregard of whether it was false or
not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Critically, as Defendants point
out, the test is subjective, meaning that the speaker must have "Made false remarks with a high
degree of awareness of probable falsity, or that the defendant entertained serious doubts as to the
truth of his publication." *Campbell v. Citizens for Honest Gov't*, 255 F.3d 560, 569 (8th Cir.
2001). As to defamatory statements which accuse Plaintiffs of getting caught lying in their
reporting, and that Plaintiffs fabricated stories (*See* statements A, B, and N of Plaintiff's exhibit
99), Plaintiff Johnson is a Limited Public Figure under Missouri Law, and therefore to make a
claim for defamation, Plaintiffs must plead "actual malice." Plaintiffs' have done so.

---

[160] See Plaintiffs' Ex. 83.
[161] See Plaintiffs' Ex. 83.
[162] See Plaintiffs' Ex. 83.

Defendants' arguments are without merit. Defendants cannot demonstrate a lack of knowledge as to the truth or falsity of specific statements they made about Plaintiff Johnson referred to within Plaintiff's' Petition. *See* statements A, B, and N of Plaintiffs' ex. 99. For example, Defendant Trotter states that Plaintiff Johnson "erroneously report[ed] that former Newark Mayor Cory Booker didn't actually reside in Newark." That statement is false, and it is verifiable. Howard hyper-linked the words "didn't actually reside in Newark," to an article from Buzzfeed, attached as exhibit 85. That article states that, according to Booker himself, among others, he does live in Newark, but provides no explicit and unequivocal evidence as to that fact. Rather, it circumvents the question by stating that Booker's office provided rental payments for an apartment in Newark. In other words, the article itself does not demonstrate that Plaintiff Johnson's reporting of the issue was "erroneous." Nor does Defendant Howard attempt to clarify exactly what about Johnson's reporting was erroneous, which would have demonstrated neutral reporting. Instead, Howard makes a bald, patently false statement harmful to Plaintiffs' business.

The 8th Circuit has stated that when analyzing "actual malice," it will focus on "the defendant's attitude toward the truth of the statements," and that "the privilege protects a journalist who 'believes, reasonably and in good faith, that his report accurately conveys the charges made.' It does not protect one who 'in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure." *Price v. Viking Penguin*, 881 F.2d 1426 at 1434 (internal citations omitted). In reaching its holdings, *Price* relied heavily upon *Edwards v. National Audubon Society, Inc.* , 556 F. 2d 113 (2d Cir. N.Y. 1977) , cert. denied, 434 U.S. 1002 (1977). Additional key requirements described by *Edwards*, were that the trustworthiness of the *source* be **manifest**, and that the topic

86

area or subject matter be "serious." "At stake in this case is a fundamental principle. Succinctly stated, when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity." *Edwards v. National Audubon Soc*., 556 F.2d at 120. We believe that the New York Times cannot, consistently with the First Amendment, be afflicted with a libel judgment for the accurate reporting of **newsworthy accusations** made by a **responsible and well-noted organization** like the National Audubon Society. *Edwards*, at 122. (emphasis added).

In this case, Trotter did not report that Johnson had "erroneously reported" because he believed that charge was accurate, but rather, he espoused and concurred with charges made by others, regardless of their accuracy, for the purpose of launching a personal attack on Defendant Johnson. For a deeper analysis of Defendant Trotter's motivation for seeking to personally attack Defendant Johnson, see the Facts Section of this brief. These facts must be taken as true and construed favorably toward the plaintiff in a Motion to Dismiss. Therefore, the Court should deny Defendants' Motion to Dismiss, as Plaintiffs' have properly stated a claim for defamation under Missouri Law.

Furthermore, Plaintiffs can demonstrate a meeting of the minds between Trotter, Howard, and Gawker, and its anonymous users to retaliate against Plaintiff Johnson for his investigation into Mike Brown's juvenile criminal records and his reporting on the riots in Ferguson, Missouri. Defendants' articles came within days of Plaintiffs' announcement that Plaintiffs' request for Brown's records had been taken up on appeal to the Court of Appeals for the Eastern District of Missouri.

87

Throughout Trotter's and Howard's articles, both authors eschew fair and neutral reporting. Trotter's first article, entitled "What is Chuck Johnson? The World's Worst Journalist, Explained," is a several page indictment of Plaintiff Johnson both as a human being and as a journalist. Despite the fact that Johnson has uncovered a number of major news stories in his career, Trotter makes no mention of these. Instead, in an attempt to rake Johnson over the coals, Trotter espouses and concurs with unproven charges against Johnson made by anonymous (on unimportant, non-serious matters) others, and accuses Johnson of being "really racist," and "incompetent." Trotter even attempts to preempt any legal action for defamation by claiming that, "Johnson isn't really a marginal or peripheral figure in mainstream conservatism," implying that Johnson is a "public figure." Trotter and Howard not only knew that the statements regarding Johnson's journalistic acumen were false, they planned and conspired to publish the statements anyway, as well as carefully planned out how to craft their articles specifically to avoid legal recourse by Plaintiffs. Defendants have circumstantially shown a deep, personal, and very real animosity towards Johnson, his business, his reporting style, and his personal beliefs.

Actual malice can be shown as to Trotter's accusation that the Daily Caller's story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic "turned out to be a complete fabrication." *See* statement C, Plaintiffs' ex. 99. These allegations have been corroborated and proven true. See ex. 64. In March of 2015, the Department of Justice indicted Senator Menendez with criminal charges. The Menendez story is a complicated one. Fair reporting on it would more than merely one line which suggests that Plaintiff contributed to its fabrication. The subjective actual malice standard can be a slippery slope that would allow Trotter to say that he subjectively believed the story was made up. However, that subjective

88

belief cannot be the basis of a reporting of a defamatory fact, with nothing else to suggest its truth. These facts must be taken as true and construed favorably toward the plaintiff in a Motion to Dismiss. Therefore, the Court should deny Defendants' Motion to Dismiss, as Plaintiffs' have properly stated a claim for defamation under Missouri Law.

Finally, the allegation that Johnson, "has been caught lying several times before," is a verifiable fact, is false, is harmful to Plaintiffs' business, and was published with "actual malice." *See* statement A, Plaintiffs' ex. 99. Defendant Howard made that statement in his article entitled, "Wait, Did Clowntroll Blogger Chuck Johnson Shit on the Floor One Time?" Howard cannot claim that this fact was "reported" neutrally, since he does not flesh out the allegation, cite to evidence, or link to other articles so that the reader can determine for herself whether the charge was true. Johnson has never lied in his reporting, nor has he been "caught lying." *See* Plaintiffs' Ex. 91. Indeed, a reasonable reader of that statement would have no reason from reading the statement to assume anything other than that it was true. Thus, Defendant Howard acted with actual malice as to that particular false statement. These facts must be taken as true and construed favorably toward the plaintiff in a Motion to Dismiss. Therefore, the Court should deny Defendants' Motion to Dismiss, as Plaintiffs' have properly stated a claim for defamation under Missouri Law.

Plaintiffs are not public figures with respect to the defamatory statements alleged in the Complaint which refer not to Plaintiffs' journalism, but which charge Plaintiff with public defecation and bestiality. Plaintiffs' concede that they are limited public figures as to the statements made about journalism, since that is an area where Plaintiffs have purposefully joined in public discourse. However, as to statements about public defamation and bestiality, Plaintiff

89

Johnson did not affirmatively posit those facts, nor did he initiate or encourage discussion publicly regarding those charges. *See* statements D-AJ, excluding N, Plaintiffs' ex. 99. Rather, Plaintiff Johnson clearly and unequivocally communicated to Defendant Howard that those particular rumors were false. *See* Plaintiffs Ex. 87. Yet, Howard and Trotter would not leave the matter alone. Defendants attempt to argue in their Suggestions in Support that Johnson "pre-emptively" denied rumors Howard published. Plaintiff Johnson is a journalist familiar with the *modus operandi* of Gawker Media and its writers to publish dirt, whether or not it's true, about people, particularly those whom Gawker Media and its writers despise. Johnson knew this, and, in an attempt to quash the defamation before it began, reached out to Howard. Despite Johnson's unequivocal denial of the absurd and disgusting rumors, Howard published them anyway, suggested that they were true, and deliberately misrepresented and selectively quoted from the statements of the anonymous contributors who were his "sources." Specifically, Howard failed to mention in his article that the first quoted anonymous source in that article, *Cmcalumna*, recanted her statement that Johnson publicly defecated in school. *See* ex. 73.

Johnson is not a public figure, and as to the charges of bestiality and public defecation, he did not "voluntarily and purposefully inject himself into [the] controversy in an attempt to influence the resolution of the controversy." *Cockram v. Genesco, Inc.*, 640 F.3d 1046, 1053 (8th Cir. 2012). In *Cockram*, the 8th Circuit found that the plaintiff could not made a limited public figure in a defamation suit merely by agreeing to be interviewed in order to defend her reputation. Johnson behaved similarly to the plaintiff in *Cockram.* He did not "voluntarily inject himself" into a discussion about whether he publicly defecated or committed bestiality as a teenager. It was not until Howard contacted Johnson that Johnson replied with his unequivocal

90

denial of the rumors. Thus, it was clearly Howard who attempted to bring Johnson into the public conversation regarding the rumors. Defendants' argument that Johnson voluntarily made the ugly rumors a matter of public import must fail for the same reason that defendants' argument in *Cockram* failed. There, as here, plaintiff does not become a public figure merely by joining the conversation in order to defend their reputation. Johnson defended his reputation to Howard and denied the rumors. He is not a public figure as to these charges, he is a private figure. Thus, as to those claims, Plaintiffs need only show negligence to recover for defamation. Plaintiffs have properly plead the elements of this standard, and therefore the Court should deny Defendants' Motion to Dismiss.

### 4. The Defamatory Statements Are Actionable.

Defendants' argue that the statements Plaintiffs have alleged are not actionable. They argue that the statements were opinion and not fact, that the statements were neutrally reported, and that, given the context of the statements, they did not assert facts about Plaintiffs, but, rather, that they were simply poking fun at Plaintiffs' expense. Defendants' arguments are without merit. Rather than restating arguments already made by Plaintiffs in their argument for "actual malice" *supra*, Plaintiffs incorporate by reference, the arguments regarding the factual nature of the articles and statements as if fully stated in this section.

First, "the defamation analysis is comprised of two components, each of which has a number of sub-parts. First, there is the question of whether the statement is defamatory at all; to be defamatory, a statement must be clear as to the person addressed, See *Diez* at 253, **and must cast aspersions on that person's reputation so as "to lower him in the estimation of the community or to deter third persons from associating with him."** *Henry* at 779 (quoting

91

Restatement 2nd of Torts, § 559)." We next inquire whether some privilege applies to this statement which prevents it from being actionable. HN5 Statements of opinion are protected by an absolute privilege which is rooted in the First Amendment to the United States Constitution; that is, even if they are made maliciously or insincerely, they do not give rise to a cause of action. *Diez* at 253. **The only exception to this rule which is recognized in Missouri is that the privilege does not apply when the statement of opinion necessarily implies the existence of undisclosed defamatory facts**,

*Pape v. Reither*, 918 S.W.2d 376, 1996 Mo. App. LEXIS 499 (Mo. Ct. App. 1996)

The test for determining whether a statement is an opinion is "'whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact.'" *Ribaudo*, 982 S.W.2d at 705 (quoting *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 314 (Mo. 1993)). The court must examine "the totality of the circumstances to determine [843] whether the ordinary reader would have interpreted the statement as an opinion." *Diez*, 834 S.W.2d at 252 (citing Henry v. Halliburton, 690 S.W.2d 775, 788 (Mo. 1985) (Henry)). The privilege does not apply, however, where the statement of opinion implies the existence of undisclosed defamatory facts. 15 Ribaudo, 982 S.W.2d at 704 (citing Pape, 918 S.W.2d at 380). *Hammer v. City of Osage Beach*, 318 F.3d 832, 2003 U.S. App. LEXIS 1656, 55 Fed. R. Serv. 3d (Callaghan) 432 (8th Cir. Mo. 2003)

**A charge of specific criminal conduct would be a statement of fact.** *Id*. at 790. A statement that refers to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that the plaintiff was being accused of a

92

crime or that the defendant disagreed with the plaintiff's conduct and used pejorative statements or vituperative language to indicate his or her disapproval. *Id.* at 788-89.

In addition, Defendants have incorrectly argued that questions cannot be defamatory. To support this conclusion, Defendants cite to law from the D.C. Circuit. However, such is not the law in Missouri. On the contrary, for over a century, Missouri has plainly recognized that questions, can indeed be defamatory. *Johnson v. St. Louis Dispatch Co.*, 65 Mo. 539 (Mo. 1877); *Hunt v. Gerlemann*, 581 S.W.2d 913 (Mo. Ct. App. 1979) (Insurance company slandered Plaintiff by asking question such as "How did you set the fire?" Implying plaintiff fraudulently burned down her house for the insurance money); *McDonald v. F. W. Woolworth Co.*, 135 S.W.2d 359 (Mo. Ct. App. 1939) (Defamatory Statement, "What are you doing stealing that electric light bulb?"). Other jurisdictions also recognize this. *Meaney v. Loew's Hotels, Inc.*, 29 A.D.2d 850 (N.Y. App. Div. 1st Dep't 1968); *Cantrell v. American Broadcasting Cos.*, 529 F. Supp. 746 (N.D. Ill. 1981).

### 5.   Defendants have deliberately interfered with Plaintiffs' ability to hold unpaid content creators accountable.

Part of Gawker's strategy of publishing private,[163] salacious, sensational and scandalous material online - without any care as to the legitimacy of it - is to incite anonymous content creators on their websites to publish defamatory content.[164]

As described above, Gawker has purposefully created and/or appropriated different tools, such as "burner accounts" and Gawker "SafeDrop" in order to protect their anonymous sources from "third party" investigations which could establish the identity of the defaming anonymous

---

[163] See <u>Plaintiffs' Ex. 10</u>.
[164] See <u>Plaintiffs' Ex. 11-15</u>.

content creators and tipsters.[165] By Gawker's own admission, Gawker does not keep any data on holders of "burner accounts,"[166] and in fact purposefully deletes any information it temporarily has[167] - all to permit defaming anonymous content creators to circumvent defamation liability. Gawker has a vested interest in continuing to do this, because it earns Gawker revenue. Alleging that actors are "Gay Rapists" makes money. Alleging that Louis C.K. is a sexual predator makes money. Receiving and publishing the Hulk Hogan Sex tape, and the Paris Hilton sex tape, makes money. See "Facts," *supra*.

Trotter admitted that anonymous content creator *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)* were both anonymous content creators who had kinja profiles using "burner accounts."[168] Given that Trotter wrote Gawker's "how-to" article on how to circumvent defamation liability,[169] Trotter knows very well that this means Gawker can't know the identity of the content creators - by design. Trotter also knows that he can quote these content creators without fear, because no one will ever be able to find them.

The First Amendment cannot be used as a sword and a shield. *Dalitz v. Penthouse Int'l,* 168 Cal. App. 3d 468, 2nd District Court of Appeal (1985); Garland v. Torre, 259 F.2d 545, 2nd Circuit Court of Appeals. Yet, this is precisely what Defendants are attempting to do. Furthermore, they have alleged Communications Decency Act Section 230 immunity. Because they have deliberately and maliciously by design sought to circumvent defamation liability,

---

[165] See Plaintiffs' Ex. 5-9.
[166] See Plaintiffs' Ex. 53.
[167] See Plaintiffs' Ex. 53.
[168] See Plaintiffs' Ex. 77.
[169] See Plaintiffs' Ex. 53.

effectively denying Plaintiffs of all chance of recovering from *ChekhovsGum(ItsGonnaPop!)* or *Cmcalumna*.

## C.   DEFENDANTS ARE NOT IMMUNE FROM LIABILITY UNDER CDA 230(C)1.

230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provide by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information. By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is "responsible, in whole or in part, for the creation or development of [the] information." 47 U.S.C. 230(f)(3).

As the Court stated in *Jones v. Dirty World Entm't Recordings, LLC*, "230(c)1's grant of immunity is not without limits, however. It applies only to the extent that an interactive computer service provider is **not** also the information content provider for the content at issue." An 'information content provider' is defined as 'any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.' A website operator can simultaneously act as both a service provider and a content provider. If a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it." *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 408 (6th Cir. 2014).

As to the charges made by Trotter and Howard that Plaintiffs' erroneously reported on the Booker incident, got "caught lying several times," and "fabricated" the Menendez scandal,

Trotter and Howard were information content providers. *See* statements A, B, and N in Plaintiff's ex. 99. They were first parties responsible for authoring the defamatory content. CDA 230(c)1 immunity does not apply to them as to those statements.

Further, regarding the rumors against Plaintiff Johnson that he committed bestiality as a teenager and public defecation as a college student, Defendants materially contributed to those defamatory statements by republishing them, interacting with anonymous content providers and encouraging them to provide more information, setting up a system whereby people may anonymously contribute to the website to avoid liability for defamation, by drafting multiple articles and generating salacious headlines about the rumors, and by selectively quoting from the anonymous content providers who were the "sources" of the defamatory material. Defendants were more than mere service providers allowing anonymous posters a forum for discourse. Rather, Defendants actively and deliberately published the rumors. Cultivating and republishing the offensive postings were their "raison d'etre," as it were. *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1200 (10th Cir. 2009).

This case is similar to *General Steel*. There, the question presented was whether posts on a blog hosted by defendant and curated by defendant which included defamatory content injurious to plaintiff's business were "developed" by defendants, or whether defendants simply republished information on the internet from third parties which contained defamatory content about the plaintiff. *General Steel Domestic Sales, LLC v. Chumley*, 2015 U.S. Dist. LEXIS 108789.

Reviewing several relevant decisions, the Jones court concluded that taking actions necessary to display content created or developed by another does not constitute development of

96

information for the purpose of § 230(f)(3). Id. at 414. Inviting or encouraging third parties to post content does not constitute development. Id. When an operator of a website ratifies or adopts third party content, including through the posting of commentary by the website operator, the website operator does not develop the information. Id. at 415. Further, choosing to publish or not to publish third party content does not constitute development. Id. at 415 - 416.

Noting the less than neutral nature of the IRLM page, the court noted that notes that defendant did not post a court order dated May 7, 2013, in which defendants were found liable for willful and false advertising targeting General Steel. Defendant's purchase of internet advertising which leads users to the IRLM Page showed, General Steel contended, that defendants' conduct in developing the IRLM Page was not neutral. In finding for the plaintiff, the court noted that some of the quotations on defendants' IRLM Page included separate, non-consecutive portions of the document quoted. In addition, the court noted that defendant Chumley wrote the summary descriptions contained in some of the posts, and he chose the excerpts which were quoted in each post. The court found that CDA 230(c)1 did not provide immunity to defendants, stating:

To the extent the defendants chose certain summaries and quotations describing the referenced court proceedings, failed to accurately describe the proceedings as a whole, and posted those quotations and summaries on the IRLM Page, the defendants developed the information they posted on that page. These editorial choices can be seen as a choice to emphasize unflattering allegations made against General Steel without summarizing or quoting information which reflects the nature and outcome of the court proceeding described. The claims of General Steel are founded on its contention that the defendants created an inaccurate image of

97

General Steel by highlighting on the IRLM Page unflattering allegations against General Steel
without also describing the context of those claims or how those claims were resolved.
**Highlighting the unflattering allegations without providing other relevant information
reasonably can be seen as contributing to the allegedly defamatory or otherwise actionable
nature of the underlying information. Such actions specifically encourage development of
what is allegedly unlawful or legally actionable about the content and, thus, constitutes
development of the information for the purpose of 230 immunity.**
*Id.* at 22-23.

"A comparison of the summaries and quotations created by the defendants with the
relevant underlying document indicates that the defendants developed this information by
highlighting what is allegedly unlawful or legally actionable about the information. As to these
posts, the defendants are information content providers under 230 who are not entitled to 230
immunity." *Id.* at 23.

Similarly, here, a comparison between the anonymous content providers' original posts
and the articles published by Gawker and authored by Trotter and Howard will indicate that
Defendants developed the information by highlighting the more outrageous and sensational
allegations unfairly and selectively. There, as here, defendants materially contributed to the
underlying defamatory content, not only by selectively quoting from anonymous content
providers, but also by summarizing those providers' contributions, deliberately leaving out any
posts sympathetic to Plaintiff, and authoring additional content for the purposes of highlighting
unlawful defamatory information about Plaintiffs in order to harm Plaintiffs' business. See
Plaintiff's exhibits, all Gawker articles about Johnson, generally. Note that the articles are not

98

simply republishing contributions from anonymous contributors, but that the authors, Trotter and Howard, developed and published their own thoughts, as well as summarized the information in their own words, for the purpose of harming Plaintiffs' business. Defendants are not precluded from liability by CDA 230. Thus, the Court should deny their Motion to Dismiss.

Furthermore, this Court should carefully consider whether to grant Defendants CDA 230(c)1 immunity as to the statements made by anonymous content providers whom Defendants interacted with, republished, and used as "sources." Plaintiffs have made the argument that Defendants materially contributed to the underlying defamatory statements. However, in the alternative, Plaintiffs note that because Defendants provided these anonymous content providers with "burner accounts," designed to protect their anonymity absolutely, even as to Defendants, Plaintiffs have no way of identifying the anonymous content providers or directly suing them. Thus, even though Plaintiffs have a property right in pursuing a cause of action against the anonymous content providers for defamation, Plaintiffs can never realize that right -and are therefore denied it- in violation of the 14th Amendment. *Zinermon v. Burch,* 494 u.s. 113 (1990). Defendants are well aware of this fact, and it has been and continues to be their intention and general purpose to allow anonymous content providers to publish illegal statements while both Defendants and the anonymous content providers totally skirt liability. CDA Section 230, when used as a sword and a shield by Defendants, essentially establishes a conspiracy to deprive civil rights. *Lugar v. Edmondson Oil Co.*, 457 u.s. 922 (1982); *see also, Boddie v. Connecticut*, 401 U.S. 371 (1979). Defendants have civilly conspired with anonymous content providers, then, in order to deny Plaintiffs their civil rights. That is unless Plaintiffs are able to hold Defendants accountable for their material contributions to the underlying defamatory statements.

99

CDA 230 is not a universal shield against all claims. 47 U.S.C.S. § 230 of the Communications Decency Act of 1996 (CDA) provides immunity only if the interactive computer service does not create or develop the information "in whole or in part." 47 U.S.C.S. § 230(f)(3) *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1161 (9th Cir. Cal. 2008). Further, if a website helps to develop unlawful content, it falls within the exception to 47 U.S.C.S. § 230, if it contributes materially to the alleged illegality of the conduct. *Id.* In Roommates, the 9th Circuit held that the CDA does not provide immunity to websites which induce third parties to express illegal preferences. *Id.* at 1165. The court explained: "The CDA does not grant immunity for inducing third parties to express illegal preferences. Roomate's own acts--posting the questionnaire and requiring answers to it--are entirely its doing and thus section 230 of the CDA does not apply to them. Roommate is entitled to **no immunity**." *Id.* In other words, in that case, Roommates was using CDA 230 to shield it from liability for facilitating the breaking of California law. Here, Gawker - **by it's own doing, and not by a third party** - provides anonymous unpaid content creators and tipsters the tools to *completely circumvent any defamation liability*,[170] and thereby depriving Plaintiffs of their 14th Amendment property interest in their legal claim. *Zinermon v. Burch*. 494 U.S. 113 (1990)

But of course, Plaintiffs question whether or not unpaid content creators are actually third parties. Payment certainly is an issue. But courts across the country have repeatedly held that unpaid internships are permissible, so long as the intern gets valuable experience. Here, Gawker monitors all Kinja content creators[171] - paid and unpaid - in a gigantic audition network. Those

---

[170] See Plaintiff's Ex. 53.
[171] See Plaintiffs' Ex. 49, 19-20.

100

unpaid blogs which do well are scooped up by Denton and Gawker; those unpaid content creators are sometimes offered jobs or contracts.

Gawker founder Nick Denton's goal from the inception of the company has been to eliminate the barrier between paid and unpaid content creator, permitting seamless collaboration. In effect, "crowdsourcing" the news. Now that he has a very close approximation to that ambitious program, he and Gawker seek to use the shield of CDA 230 to immunize large swaths of content creators who are, in actuality, agents of Gawker. As Gawker writers have noted before, a good many consumers come to Gawker specifically to view the discussion posts by paid and unpaid content creators alike. And Gawker will only increase its use of unpaid content creators in the future to continue to outsource content, for free.[172]  Unpaid content creators are not third parties but are in fact agents of Gawker, filling a deliberately designed role.[173] Not only this, but in this specific case, paid and unpaid content creators worked together to achieve the publication of entirely defamatory content.

In addition, because Denton's vision is to scoop up as many unpaid content creators into his giant crowdsourcing tool, and because Denton and Gawker have taken affirmative steps to immunize them from all liability so long as they avail themselves of the ample Gawker tools for avoiding third party (i.e., Plaintiffs') scrutiny, Denton and Gawker have *voluntarily waived any CDA 230 immunities*. Gawker must accept the bitter with the sweet. If Gawker wishes to profit off of the labor of untold tens or hundreds of thousands, and also to deny Plaintiffs here as well as everywhere the opportunity to avail themselves of legal remedies,

---

[172] See Plaintiffs' Ex. 48.
[173] See generally, Plaintiffs' Ex. 11-15.

Gawker must also accept the consequences of its deliberate actions. Denton doesn't believe in privacy rights.[174] Well, the law of Missouri still does.

### D.    MISSOURI INJURIOUS FALSEHOOD

    1.    PLAINTIFFS HAVE PROPERLY PLED A CLAIM FOR INJURIOUS FALSEHOOD UNDER MISSOURI LAW.

*Cuba's Ready Mix v. Brock Concrete Foundations, Inc*., provides that "Missouri courts have recognized this tort as stated in the Restatement (Second) of Torts, § 623A, which states: One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."

*Cuba's United Ready Mix, Inc. v. Bock Concrete Foundations, Inc.*, 785 S.W.2d 649, 651, (Mo. Ct. App. 1990).

And,

"Disparagement of Quality -- Trade Libel" is discussed in Restatement (Second) of Torts § 626, which states:

"The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property." *Id.*

---

[174] See <u>Plaintiffs' Ex. 10</u>. Gawker also doesn't believe in complying with court orders. <u>Ex. 4</u>.

Plaintiffs have within their petition properly alleged the elements of a trade libel or injurious falsehood claim in accordance with Missouri law. Plaintiffs have alleged and have provided facts supporting their allegation that Defendants intentionally published defamatory statements about Plaintiffs with the desired result of harming Plaintiffs' business and that Defendants knew the statements were false or acted in reckless disregard for their truth or falsity. For similar reasons as those stated in Plaintiffs' Defamation argument, Plaintiffs have also properly asserted claims for injurious falsehood under Missouri Law. Therefore, Plaintiffs' claims for injurious falsehood should not be dismissed.

### E.    MISSOURI INVASION OF PRIVACY

The tort of invasion of privacy is a cognizable legal claim in the state of Missouri which was  recognized by the Eastern District of Missouri in *Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319, 324-25 (Mo.App. E.D. 2008). In *Sullivan v. Pulitzer Broadcasting Co.*, the Supreme Court of Missouri set forth the situation in which such a tort might be plead:

"It may be possible that in the future Missouri courts will be presented with an appropriate case justifying our recognition of the tort of "false light invasion of privacy." The classic case is when one publicly attributes to the plaintiff some opinion or utterance, whether harmful or not, that is false, such as claiming that the plaintiff wrote a poem, article or book which plaintiff did not in fact write." *Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d 475 (Mo. banc 1986).

Therefore, Defendants have failed to show that the tort of invasion of privacy is not a cause of action in the Eastern District of Missouri. For that reason, this Court should deny Defendants' Motion to Dismiss as to Plaintiffs' claim for false light invasion of privacy.

103

IV.    **DEFENDANT'S CALIFORNIA ANTI-SLAPP MOTION TO STRIKE CANNOT BE PERMITTED IN THIS MATTER.**

A.    **The California Anti-SLAPP Is Precluded By The Rules Enabling Act, As It Interferes With Rules 8, 11, 12, and 56 of the Federal Rules of Civil Procedure.**
*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010)

Defendants argue, "The California Anti-SLAPP statute provides a mechanism 'to dismiss meritless lawsuits designed to chill the defendant's free speech rights at the earliest stage of the case.' If an anti-SLAPP motion is successful, the case is dismissed with prejudice and the defendants are awarded their attorneys fees and costs." (Anti-SLAPP, at para. 2). In so stating, Defendants are admitting that the Anti-SLAPP is a procedural mechanism designed to test the sufficiency of Plaintiffs' pleadings.

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), the Supreme Court re-affirmed *Sibbach v. Wilson*, 312 U.S. 1 (1941) and *Hanna v. Plumer*, 380 U.S. 460 (1965) in holding that where a state law conflicts with a Federal Rule of Procedure, the state law, so long as it is not substantive, but procedural, is preempted by the Rules Enabling Act. The key is a validity test, which looks to the nature of the Federal Rule (and not the nature of the state law). The question is whether or not the Federal Rule is substantive or procedural. If the Rule is procedural, it is valid and will survive a "facial challenge" and the state law is preempted. See *Unity Healthcare, Inc. v. County of Hennepin*, 2015 U.S. Dist. (Minn.) LEXIS 83246 (Minnesota Anti-SLAPP cannot be applied in Federal Court); See also *Boulter II*, 2012 U.S. Dist. LEXIS 151231, 2012 WL 5245458, at *2 (D.C. Anti-SLAPP cannot be applied

104

because to do so would violate the Seventh Amendment right to trial by jury); Clermont,

FEDERAL COURTS, PRACTICE & PROCEDURE: THE REPRESSIBLE MYTH OF SHADY

GROVE, 86 Notre Dame L. Rev. 987 (2011).

The Federal Rules already provide numerous "mechanisms" to test the sufficiency of

Plaintiffs' pleadings. For example, Rule 8. "Under Federal Rule of Civil Procedure 8(a)(2), a

pleading must contain a "short and plain statement of the claim showing that the pleader is

entitled to relief." As the Court held in *Twombly*, 550 U.S. 544, the pleading standard Rule 8

announces does not require "detailed factual allegations," but it demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation. *Id*., at 555. A pleading that offers

"labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not

do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of

"further factual enhancement."

To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to "state a claim to relief that is plausible on its face." *Id*., at 570. A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. *Id*. **The plausibility

standard is not akin to a "probability requirement," but it asks for more than a sheer

possibility that a defendant has acted unlawfully.** Ibid. Where a complaint pleads facts that are

"merely consistent with" a defendant's liability, it "stops short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id*., at 557." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78

(2009)(emphasis added)(internal citations largely omitted).

105

The Supreme Court of the United States itself has, as quoted above, said that the pleading standard in Federal Court under Federal Rules is **NOT** *a probability standard*. It is a "**plausibility**" standard. Plausible has been defined as "superficially fair, reasonable, or valuable, but often specious," and "appearing worthy of belief." However, the California Anti-SLAPP statute (C.C.P. Section 425.16(b)(1) specifically states that a plaintiff's lawsuit is subject to strike, "unless the court determines that the plaintiff established that there is a **probability** that the plaintiff *will prevail* on the claim." (emphasis added). Probability has been defined as, "supported by evidence strong enough to establish presumption but not proof," and "likely to be or become true or real."

The Anti-SLAPP creates no substantive rights, it simply  provides a procedural mechanism to vindicate existing rights. Even under California State law, it is something special: it is distinguishable from a motion to dismiss. In addition the fact that plaintiff's suit survives the Anti-SLAPP is inadmissible in evidence later in the suit. And, oddly, it allows a losing defendant the automatic option of interlocutory appeal, against clear U.S. Supreme Court instructions that interlocutory appeals are to granted sparingly. See *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009); *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). Thus it is a state law determining Federal Procedure. This, *Shady Grove* tells us, cannot happen.

The Anti-SLAPP enables penalties upon the losing plaintiff of attorneys fees and costs (or losing defendant, if the defendant is shown to have frivolously brought the Anti-SLAPP or done so for the purpose of delay). But this is done in a completely different manner than Fed. R. Civ. P. 11, and thus the California Anti-SLAPP impermissibly interferes with the Federal Rules yet again. See *Estate of C.A. v. Grier*, No. CIV.A. H-10-0531, 2010 WL 4236865, at 6 (S.D.

106

Tex. Oct. 15, 2010); *Garza v. Scott & White Mem'l Hosp.*, 234 F.R.D. 617, 622-23 (W.D. Tex.

2005). In the *Garza* case, the court found that a Texas statute, which provided for dismissal of

medical malpractice suits and imposition of costs and fees upon plaintiff's failure to file an expert

report within 120 days of filing suit, conflicted with the Federal Rules in a number of ways. For

one, the statute infringed on a court's discretion to impose sanctions for frivolous claims under

Rule 11.

 Moreover, Fed. R. Civ. P. 12 tests pleadings for legal sufficiency, and surviving that, the

plaintiff can proceed to discovery before having its facts tested at summary judgment, Fed. R.

Civ. P. 56. The Anti-SLAPP, on the other hand, halts all discovery and instead requires

plaintiffs' facts be tested, even though the plaintiff may have, without the Anti-SLAPP, been

able to discovery vital facts which could have permitted survival of summary judgment.

 For all of these reasons, the California Anti-SLAPP cannot be applied in Federal Court

because it impermissibly interferes with the Federal Rules, in contravention of *Shady Grove* and

the Rules Enabling Act.

 **B.** **The California Anti-SLAPP Is Inapplicable As To Defendants Defamatory
Statements Relating To Accusations Of Public Defecation and Bestiality;
Defendants' Speech Is Not Protected by C.C.P. Section 425.16(e)(3)-(4)
(Public Issue or Interest).**

 California's Anti-SLAPP law provides heightened procedural protection to a defendant's

speech in only four areas. Of those four areas, only two are possibly applicable in this matter.

The remaining two require that the defendant's speech be a matter of "public interest," and a

defendant must show the statements were made in connection with a public issue or an issue of

public interest. *Albanese v. Menounos*, 218 Cal. App. 4th 923, 929 (2013). The statute itself does

not define what "public interest" means, but a variety of California cases make very clear that

false rumors about Plaintiffs' childhood and private life are not matters of public interest. "A

public figure is either [an all purpose public figure] or [one who] has thrust himself to the

forefront of a **particular public controversy** in order to influence the resolution of the issues

involved." *Gertz*, at p. 345 (emphasis added). For this purpose, a public controversy does not

equate with any controversy of interest to the public. *Time, Inc. v. Firestone* (1976) 424 U.S.

448, 454 [47 L. Ed. 2d 154, 163, 96 S. Ct. 958].) For example, a divorce action between the

scion of one of America's wealthiest industrial families and his Palm Beach society wife may

have piqued the public's interest but was not a public controversy. *Id.*, at p.454; see generally,

*Weinberg v. Feisel*, (2003) 110 Cal. App. 4th 112, 1132 (2 Cal. Rptr. 3d 385) (collecting a vast

swath of Supreme Court and California cases, with analysis):

> "The statute does not provide a definition for "an issue of public interest," and it
> is doubtful an all-encompassing definition could be provided. However, the
> statute requires that there be some attributes of the issue which make it one of
> public, rather than merely private, interest. A few guiding principles may be
> derived from decisional authorities. First, "public interest" does not equate with
> mere curiosity. ( *Time, Inc. v. Firestone, supra*, 424 U.S. at pp. 454–455 [47 L.
> Ed. 2d at p. 163]; *Briscoe v. Reader's Digest Association, Inc*. (1971) 4 Cal.3d
> 529, 537 [93 Cal. Rptr. 866, 483 P.2d 34].) Second, a matter of public interest
> should be something of concern to a substantial number of people. ( *Dun &
> Bradstreet v. Greenmoss Builders, supra*, 472 U.S. at p. 762 [86 L. Ed. 2d at p.
> 604].) Thus, a matter of concern to the speaker and a relatively small, specific
> audience is not a matter of public interest. (Ibid.; *Hutchinson v. Proxmire* (1979)
> 443 U.S. 111, 135 [61 L. Ed. 2d 411, 431, 99 S. Ct. 2675].) Third, there should
> be some degree of closeness between the challenged statements and the asserted
> public interest ( *Connick v. Myers* (1983) 461 U.S. 138, 148–149 [75 L. Ed. 2d
> 708, 720–721, 103 S. Ct. 1684]); the assertion of a broad and amorphous public
> interest is not sufficient ( *Hutchinson v. Proxmire, supra*, 443 U.S. at p. 135 [61
> L. Ed. 2d at p. 431]). Fourth, the focus of the speaker's conduct should be the
> public interest rather than a mere effort "to gather ammunition for another round
> of [private]  [1133]  controversy …." ( *Connick v. Myers, supra*, 461 U.S. at p.
> 148 [75 L. Ed. 2d at p. 721].) Finally, "those charged with defamation cannot, by

108

their own conduct, create their own defense by making the claimant a public figure." ( *Hutchinson v. Proxmire, supra,* 443 U.S. at p.135 [61 L. Ed. 2d at p. 431].) A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. ( Ibid.; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th at p. 926.)."

*Id.*

As *Albanese v. Menounos* and *Weinberg v. Feisel* make clear, the false, and facially dubious accusations relating to Johnson's personal, private life as well as his childhood, simply cannot be deemed to be speech in the public interest under California law. Furthermore, here as in *Connick v. Myers*, 461 U.S. at p. 148, the focus of Defendants' conduct was not the public interest but a private vendetta to "gather ammunition for another round" of private controversy. Moreover, given Defendants' role in creating the controversy, they are *equitably estopped* from citing to the public interest as a defense. *Hutchinson v. Proxmire,* 443 U.S. at p.135. And as a result, Defendants cannot now make use of California's Anti-SLAPP as a shield.

## V.    ARGUMENTS IN THE ALTERNATIVE

### B.    PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

See attached Motion.

### C.    PLAINTIFFS' MOTION TO STAY DEFENDANTS' CALIFORNIA ANTI-SLAPP MOTION TO DISMISS PENDING THE COURT'S DETERMINATION ON THE LAW APPLICABLE IN THIS CASE

See attached Motion.

### D.    SHOULD THE COURT FIND IT LACKS JURISDICTION OVER DEFENDANTS, PLAINTIFFS CONSENT TO DEFENDANTS' MOTION FOR TRANSFER TO CALIFORNIA.

Plaintiffs urge the Court to consider the fact that, should the Court dismiss the case

without prejudice, the effect on Plaintiff would be as if the Court dismissed with prejudice. This

is because in both California and New York, claims for defamation and injurious falsehood are

barred by a one year statute of limitations, which would leave Plaintiffs only until December 9,

2015 to replead his case in either of those states. Rather than unduly prejudice Plaintiffs,

Plaintiffs note that simply granting Defendants' Motion for Transfer to California would

accomplish the same result as dismissing the case without prejudice and would be a more

economical use of judicial resources. Therefore, should the Court find it lacks both general and

specific jurisdiction over Defendants, Plaintiff's consent to Defendants' Motion to Transfer the

case to California, and ask that the Court grant that Motion.

<u>Conclusion</u>

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' Motion to

Dismiss and Motion to Strike or Dismiss Pursuant to the California Anti-SLAPP Law.

Alternatively, should the Court find in favor of Defendants, Plaintiffs pray that this Court grant

them leave to file an amended complaint, that the court stay its determination as to Defendants'

Anti-SLAPP motion pending discovery, and that the Court, should it find jurisdiction lacking,

transfer the case to a Federal District Court in California, and any other relief this Court deems

just and proper.

**Respectfully submitted,**

110

THE BURNS LAW FIRM, LLC

_/s/ John C. Burns_____
John C. Burns #66462MO
1717 Park Avenue
St. Louis, MO 63104
Phone: (314) 339-8388
Fax:    (314) 932-2171
john@burns-law-firm.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served, via the Court's electronic notification system, on October 16, 2015, upon all parties of record.

_/s/ John C. Burns_____

111