ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                              :
In re                                         :          Chapter 11
                                              :
Gawker Media LLC, *et al.*,[1]                :          Case No. 16-11700 (SMB)
                                              :
                        Debtors.              :          (Jointly Administered)
                                              :
-------------------------------------------------------x

**NOTICE OF FILING OF PLAN SUPPLEMENT
PURSUANT TO THE DEBTORS' AMENDED JOINT CHAPTER 11
PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC.,
GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.**

   **PLEASE TAKE NOTICE** that, on November 8, 2016, the above-caption debtors and

debtors in possession (the "Debtors") filed solicitation versions of the *Disclosure Statement for*

*the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc.,*

*Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 427] (the "Disclosure Statement"),

which included as Exhibit A thereto the *Debtors' Amended Joint Chapter 11 Plan of Liquidation*

*for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "Plan").

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

PLEASE TAKE FURTHER NOTICE that, the Plan and the Disclosure Statement contemplate the submission of certain documents (or forms thereof) and schedules (collectively, the "Plan Supplement") no later than November 30, 2016 (*i.e.*, five days before the December 5, 2016 deadline for voting on the Plan) or such later date as may be approved by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that, the Debtors hereby file the following Plan Supplement documents:

- **Exhibit A**      Form of Plan Administrator Agreement
- **Exhibit B**      Schedule of Retained Causes of Action
- **Exhibit C**      Settlement Agreement with Terry Gene Bollea
- **Exhibit D**      Settlement Agreement with Shiva Ayyadurai
- **Exhibit E**      Settlement Agreement with Ashley Terrill
- **Exhibit F**      Schedule of Professional Fee Claim Reserve Amounts

PLEASE TAKE FURTHER NOTICE that, the forms of the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

PLEASE TAKE FURTHER NOTICE that, the Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify, or supplement any document in the Plan Supplement; provided, that if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing on confirmation of the Plan (the "Confirmation Hearing"), the Debtors will file a blackline of such document with the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that, the Plan Supplement, Plan, and Disclosure Statement may be viewed for free at the website of the Debtors' claims and noticing agent, Prime

Clerk LLC ("Prime Clerk") at http://cases.primeclerk.com/gawker.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that, the Confirmation Hearing will be held before the Honorable Stuart M. Bernstein of the United States Bankruptcy Court for the Southern District of New York (the "Court"), in Room 723, One Bowling Green, New York, New York 10004-1408, on December 13, 2016, at 10:00 a.m. (New York Time).

**PLEASE TAKE FURTHER NOTICE** that, the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Court or otherwise.

Dated: November 30, 2016
      New York, New York

*/s/ Gregg M. Galardi*
ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com

*Counsel to the Debtors*
*and Debtors in Possession*

# EXHIBIT A

**Form of Plan Administrator Agreement**

PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (the "Agreement") is made this [__] day of December, 2016, by and between Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary"), and Gawker Media LLC ("Gawker Media," and collectively with GMGI and Gawker Hungary, the "Debtors") and Opportune LLP ("Opportune") for the purpose of Opportune providing plan administrator services to the Debtors. This Agreement sets forth, among other things, the scope of such services (the "Services"), and the basis of compensation for those Services.

## 1) Scope of Services

Opportune will provide the following plan administrator Services pursuant to the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may be amended and supplemented, the "Plan")[1] and the Order of the United States Bankruptcy Court for the Southern District of New York overseeing the Debtors' chapter 11 cases (the "Bankruptcy Court") confirming the Plan, dated as of December [__], 2016 (the "Confirmation Order"):

    a)   General Plan Administrator Functions. In connection with this engagement, Opportune shall make available to the Company William D. Holden, a Managing Director in Opportune's Restructuring Practice to serve in the role of Plan Administrator for the Debtors (the "Plan Administrator"). The Plan Administrator shall devote such time to the performance of his services hereunder as he determines appropriate in his discretion. The Plan Administrator hereby accepts its employment and appointment as the Plan Administrator.

    b)   Duties, Power and Rights. From and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof, and shall be the sole representative of the Debtors, succeeding to such powers as would have been applicable to the Debtors' officers and directors. The Plan Administrator shall have all duties, powers and rights set forth herein, in the Plan, and in the Confirmation Order, including, but not limited to, the following activities:

        i)     conduct a process for the sale or disposition of the Gawker.com Assets consistent with the terms of the Plan and any agreements of the Debtors;

        ii)     investigate and prosecute the Retained Causes of Action, if the Plan Administrator, in its sole discretion, deems appropriate;

        iii)    review, object to, and seek estimation of, Claims against, and Equity Interests in, the Debtors;

        iv)    compromise and settle Disputed Claims and Retained Causes of Action, in the ordinary course of business and without further notice to or order of the Bankruptcy Court;

        v)     administer and distribute the Plan Reserve Accounts pursuant to the Plan;

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

vi)   take control of, preserve, and convert to Cash any additional asset of the Debtors, subject to the terms of the Plan;

vii)  make distributions to holders of Allowed Claims against and Equity Interests in, the Debtors consistent with the terms of the Plan;

viii) pay expenses incurred in carrying out the powers and duties of the Plan Administrator, including professional fees incurred after the Effective Date;

ix)   prepare and file post-confirmation reports for each of the Debtors pursuant to the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules;

x)    support any audits of the Debtors conducted by U.S. and/or non-U.S. taxing authorities;

xi)   pay any fees due to the United States Trustee pursuant to section 1930(a)(6) of the Bankruptcy Code;

xii)  execute all documents appropriate to carry out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement;

xiii) retain persons and professionals, including Plan Administrator Counsel (as defined below), to assist in carrying out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement; and

xiv)  take such further actions as the Plan Administrator deems necessary to effect the provisions of the Plan.

Subject to his business judgment and fiduciary responsibilities, the Plan Administrator will work on a collaborative basis with Plan Administrator Counsel to perform the foregoing activities.

c)  <u>Finance and Accounting Functions</u>.   The Plan Administrator will have primary responsibility for the following finance and accounting functions (to include but not be limited to):

i)    manage the financial and operational reporting processes to all internal and external constituents;

ii)   review and development of any material drafted for consumption outside the Debtors;

iii)  oversight and approval of expenditures and cash payments; and

iv)   management of the Plan Reserve Accounts.

**2)  Compensation and Staffing**

a)  Opportune will be paid by the Debtors for its Services at the standard hourly billing rates in effect for its personnel, based on the position held by such Opportune Personnel, which hourly rates are subject to periodic adjustments by Opportune to reflect economic and other conditions.  Opportune's hourly rates currently in effect are as follows:

59798331_3

| Professional | Rate / Hr. |
| --- | --- |
| Partner | $ 835.00 |
| Managing Director | $ 715.00 |
| Director | $ 605.00 |
| Manager | $ 540.00 |
| Senior Consultant | $ 420.00 |
| Consultant | $ 335.00 |
| Administrative Professional | $220.00 |

b) In the event any Opportune personnel are called to testify either in court of via deposition (in either case, "Testimony"), that professional's hourly rate will be increased by $100 for all Testimony and the time spent for any direct preparation related thereto.

c) Both Opportune and the Debtors acknowledge that the above professional fees are within industry and market rates, and have been negotiated to reflect the facts specific to this engagement. As such, the Debtors believe that the fee structure is reasonable in light of the Services requested.

d) Opportune will bill for its fees and out-of-pocket expenses no less frequently than on a monthly basis by providing an invoice summarizing the number of hours worked and expenses incurred, and the Debtors agree to remit in full the payment of such fees and expenses promptly.

**3) Retention of Counsel and Agents**

The Plan Administrator shall hire counsel to advise it in connection with its duties, powers, and rights under this Agreement (the "Plan Administrator Counsel") and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties herein, and pay reasonable compensation to such advisors. The Plan Administrator shall be entitled to retain professionals in his or her sole discretion, including any professionals employed by the Debtor in the Bankruptcy Cases. The provision of services by a professional to the Debtor shall not disqualify such professional from employment by the Plan Administrator.

Any professionals retained by the Plan Administrator, including the Plan Administrator Counsel, shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred. The payment of the fees, costs and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court. Any successor Plan Administrator shall receive such reasonable compensation as may be approved by the Bankruptcy Court.

**4) Service of Plan Administrator.**

3

The Plan Administrator shall serve until (a) the termination of this Agreement, or (b) the Plan Administrator resigns or is otherwise discharged; provided, however, that if the Plan Administrator resigns, he or she shall continue to serve until a new Plan Administrator begins to serve.

## 5)  Closing of Bankruptcy Cases; Termination.

When (a) all Disputed Claims filed against the Debtors have become Allowed or have been Disallowed by Final Order, (b) all remaining assets of the Debtors and Plan Reserve Accounts have been liquidated and converted into Cash (other than those assets abandoned by the Debtors), and such Cash has been distributed in accordance with the Plan, and (c) all wind-down costs and expenses have been paid in full in Cash, the Plan Administrator shall promptly (i) seek authority from the Bankruptcy Court to close the Bankruptcy Cases for each of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules and (ii) effectuate the dissolution of the Debtors in accordance with applicable law. This Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 closing the Bankruptcy Cases of each of the Debtors.

Notwithstanding the foregoing, the Plan Administrator may dissolve Gawker Hungary prior to completion of the term of this Agreement, and upon such dissolution, Gawker Hungary shall no longer be deemed a party to this Agreement.

## 6)  No Liability

The Plan Administrator shall have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors or holders of Claims against or Equity Interests in the Debtors other than for fraud, gross negligence or wilful misconduct of the Plan Administrator.

## 7)  Indemnification

GMGI and Gawker Media shall jointly indemnify the Plan Administrator, Opportune, and their (as applicable) partners, employees, managers, principals, agents, affiliates, independent contracts, insurers (collectively, the "Indemnified Persons") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees and expenses paid or incurred by any Indemnified Person in connection with, arising out of or related to (whether from direct claims or third party claims) the engagement or this Agreement (including but not limited to any Indemnified Person's reasonable counsel fees and expenses). In addition to the foregoing indemnification, any Opportune personnel who may serve the Debtors shall be individually indemnified to the same extent as the most favourable indemnification GMGI or Gawker Media has extended to its officers or directors, whether under GMGI and Gawker Media's bylaws, certificates of incorporation, by contract or otherwise. The Plan Administrator shall be covered as an officer under GMGI's existing director and officer liability insurance policy as an "additional named insured" and as a "certificate holder" under each liability insurance policy of the Debtors, and, if not covered under such policies, the Plan Administrator shall be authorized to have an additional policy providing a comparable level of coverage purchased by the Debtors.  The provisions of this section are in the nature of contractual obligations and no change in applicable law or GMGI or Gawker Media's charter, bylaws or other organizational documents or policies shall affect the Plan Administrator rights hereunder. The foregoing

indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from the gross negligence, wilful misconduct or fraudulent acts of the Plan Administrator or Opportune.

**8) Other Matters**

a) Access to Information.  In connection with this engagement, Opportune shall have complete and full access to all Debtor information that Opportune deems appropriate. Additionally, Opportune will have reasonable access to the Debtors' employees, counsel and other representatives (collectively the "Representatives") necessary to perform the Services as outlined in this engagement Letter.  It is understood that Opportune is relying solely upon the information supplied by the Debtors and its Representatives without assuming any responsibility for independent investigation or verification thereof.  All confidential information concerning the Debtors that is given to Opportune will be used solely in the course of performance of the Services outlined in this Agreement.  Except as required by law, such confidential information will not be disclosed to a third party without the Debtors' consent.

b) Projections; Reliance; Limitation of Duties.  The Debtors understand that the Services to be rendered may include the preparation of projections and other forward-looking statements for use in evaluating potential transactions and settlements and that numerous factors can affect the actual outcomes, which may materially and adversely differ from those projections and other forward-looking statements. In addition, Opportune will be relying on information provided by others.

c) Governing Law.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York and the state and federal courts located in the State of New York shall have exclusive jurisdiction in relation to any claim arising out of this Contract.  OPPORTUNE AND THE DEBTORS HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT, OR OTHERWISE) RELATING TO THIS AGREEMENT.

d) Dispute Resolution.  Without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

e) Retention of Jurisdiction.  The Bankruptcy Court shall retain jurisdiction over the Debtors to the fullest extent permitted by law, including, but not limited to, for the purposes of interpreting and implementing the provisions of this Agreement.

f) Conflict with Plan.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan.  To that end, the Plan Administrator shall have full power and authority to take any action consistent with the purposes and provisions of the Plan.  In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control; provided, however, that provisions of this Agreement adopted by amendment and

5

approved by the Bankruptcy Court following substantial consummation (as such term is used in section 1127(b) of the Bankruptcy Code) shall control over provisions of the Plan.

g) <u>Severability</u>.  If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, this Agreement shall be deemed to be amended to the extent necessary to make such provision enforceable, or, if necessary, this Agreement shall be deemed to be amended to delete the unenforceable provision or portion thereof.  In the event any provision is deleted or amended, the remaining provisions shall remain in full force and effect.  Notwithstanding the foregoing, the parties recognize and agree that this Agreement is to be interpreted and applied in such manner as to, as nearly as possible, give effect to the parties' intent to all provisions hereof, including, without limitation, such provisions as may be declared to be unenforceable.

h) <u>Assignment</u>.  No party hereto shall have the right to assign its rights hereunder, in whole or in part without the prior written consent of the other party (other than to such party's affiliates or subsidiaries which shall not require such consent).  This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

i) <u>Modifications</u>.  No change, modification, extension, renewal, ratification, waiver or rescission of this Agreement or of any of the provisions hereof shall be binding unless it is in writing and signed by both parties hereto.  Further, no waiver or forbearance by either party hereto with respect to any right granted to such party herein shall operate or be construed to be a waiver or forbearance of such party's right to exercise such right in the future.

j) <u>Notices</u>.  Notices regarding or required by this Agreement must be in writing and delivered to the parties at the mailing addresses set forth below or to such other address as a party may designate in writing.   Any notice required under this Agreement will be deemed effective upon delivery to the party to whom it is addressed.

k) <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof and supersedes any prior agreements (whether written or oral) between the parties regarding the subject matter hereof.  This Agreement may be executed in any number of counterparts each of which shall be an original, but all of which together shall constitute one and the same instrument.

[*Remainder of Page Left Intentionally Blank*]

59798331_3

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Plan Administrator Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers.

**Opportune LLP**

By: _____

Name: _____

Address: _____

_____

Date: _____, 2016

**Gawker Media Group, Inc.**

By: _____

Name: _____

Address: _____

_____

Date: _____, 2016

**Gawker Hungary Kft.**

By: _____

Name: _____

Address: _____

_____

Date: _____, 2016

**Gawker Media LLC**

By: _____

Name: _____

Address: _____

_____

Date: _____, 2016

59798331_3

## **EXHIBIT B**

**Schedule of Retained Causes of Action**

## Schedule of Retained Causes of Action

This schedule represents a list of the Retained Causes of Action in connection with the Plan (subject to the terms thereof).  The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this schedule at any time in accordance with the Plan. If the Plan is not confirmed, no limitation will be created on claims and Causes of Action of the Debtors.

As defined in Section 1.01 of the Plan, "Retained Causes of Action" means Claims and/or Causes of Action against third-parties that are not released under the Plan or any Order of the Bankruptcy Court and are retained and prosecuted by the Debtors on behalf of the Debtors' estates, as identified in the Plan Supplement.  Pursuant to the Plan Administrator Agreement, the Plan Administrator may investigate, prosecute, and/or compromise and settle the Retained Causes of Action, if, the Plan Administrator, in its sole discretion, deems appropriate.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement (including this Schedule of Retained Causes of Action), or the Disclosure Statement to any Retained Causes of Action against it as any indication that the Debtors or the Plan Administrator will not, or may not, pursue any and all available Retained Causes of Action against it.  The Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity.**

Unless any Retained Causes of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Debtors and the Plan Administrator expressly reserve all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Causes of Action upon, after, or as consequence of, confirmation or consummation of the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that any Debtor may hold against any Entity shall vest in the Plan Administrator.

For the avoidance of doubt, Retained Causes of Action **do not** include any Claim or Cause of Action released pursuant to Section 9.03 of the Plan.

Notwithstanding, and without limiting the generality of, the foregoing, the following is an indicative (but in no way exclusive) list of specific types of Claims, rights, Causes of Action, suits, and proceedings expressly preserved by the Debtors and the Plan Administrators:

1. Causes of Action against Nicolas G.A. Denton, including, but not limited to, claims related to the repayment of the $200,000 Promissory Note for funds that GMGI lent Denton on June 7, 2016 and claims related to the reimbursement of legal fees advanced to Mr. Denton by Gawker Media,.

2. Causes of Action against any Entity described in or arising out of the investigation contemplated in the letter dated October 18, 2016, from the Committee to the Debtors, requesting that the Debtors consent to the Committee

being granted standing to commence and prosecute an enumerated list of claims, as described in section VI.D. of the Disclosure Statement.

3. Causes of Action against Peter Thiel and any other Entity that result from the investigation that is the subject of the *Motion of the Debtors for Leave Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to Conduct Discovery Concerning Potential Plan Issues and Potential Causes of Action, and to Establish Discovery Response and Dispute Procedures* [Docket No. 341], unless expressly waived or settled.

4. Causes of action against any insurers, including, but not limited to, claims for coverage related to (i) the settlement of the Terrill Claims and Ayyadurai Claims, (ii) other Claims filed in the Bankruptcy Cases that may be covered by insurance, and (iii) claims for reimbursement of legal fees in connection with the same.

5. Causes of action against any Professional not released pursuant to Section 9.03 of the Plan.

6. Preference actions arising under sections 547(b) and 544 of the Bankruptcy Code.

Notwithstanding any of the foregoing, the Debtors reserve all rights to raise any defenses, including, but not limited to, those related to setoff or other offsets in connection with filed proofs of claim under applicable law, including, but not limited to, section 502(d) of the Bankruptcy Code.

## **EXHIBIT C**

**Settlement Agreement with Terry Gene Bollea**

## SETTLEMENT AGREEMENT

The parties, **Terry Gene Bollea** ("**Bollea**"), on the one hand, and Gawker Media LLC ("**Gawker Media**"), Gawker Hungary Kft. (f/k/a Kinja Kft.) ("**Gawker Hungary**"), and Gawker Media Group, Inc. ("**GMGI**") (collectively Gawker Media, Gawker Hungary and GMGI are the "**Gawker Debtors**"), on the other hand, (all collectively, the "**Parties**"), enter into this Settlement Agreement ("**Agreement**") on this _____ day of November, 2016, and agree as follows:

## RECITALS

A.    WHEREAS, the Parties are/were involved in the following legal proceedings:

1.    Bollea filed suit against Nicholas G.A. Denton (a/k/a Nick Denton ("**Denton**"), the Gawker Debtors, and Albert James Daulerio (a/k/a A.J. Daulerio) ("**Daulerio**") (collectively, the "**Gawker Parties**"), amongst others, in the Sixth Circuit Court in and for Pinellas County, Florida, Case No. 12012477CI-011 (the "**Bollea I Lawsuit**"). Bollea asserted causes of action against the Gawker Parties for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section 934.10, Florida Statutes.

2.    On May 19, 2015, Gawker Media and its counsel, Gregg Thomas, Esq., filed an action against the Federal Bureau of Investigation and Executive Office for the United States Attorney, Case No. 8:15-cv-01202-SCB-EAJ (the "**FBI Action**"); in which they sought discovery under the Freedom of Information Act related to the Bollea I Lawsuit. The FBI Action resulted in the production of various documents, transcripts, audio recordings and video recordings which were generated or obtained by the FBI during its investigation of an extortion attempt against Bollea. Copies of DVDs containing video and audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, which were seized by the FBI, are currently being held under seal by the Judge in the Bollea I Lawsuit.

3.    On October 21, 2015, the Court in the Bollea I Lawsuit entered an Order permitting certain discovery to determine whether Gawker

Media, Denton and/or Daulerio provided transcripts or recordings that had been sealed in the Bollea I Lawsuit to *The National Enquirer* and/or *Radar Online*, in violation of a protective order (the "**Leak Order**"). *The National Enquirer* and *Radar Online* published articles in July and August, 2015, disclosing the contents of recordings of Bollea, which they reported were part of sealed discovery in the Bollea I Lawsuit (the "**Leak**"). Denton, Daulerio and Gawker Media appealed the Leak Order to Florida's Second District Court of Appeal ("**Second DCA**"), which appeal [Case No. 2D15-5035] (the "**Leak Appeal**") is currently stayed (as a result of the Suggestion of Bankruptcy filed with respect to the Gawker Media Bankruptcy Case as described below in Paragraph A.7.).

4.    On March 1, 2016, the Bollea I Lawsuit proceeded to a jury trial. On March 18, 2016 the jury entered a verdict of liability and compensatory damages of $115 million against Denton, Daulerio and Gawker Media, jointly and severally. On March 21, 2016, the jury entered a verdict awarding punitive damages of $15 million against Gawker Media, $10 million against Denton, and $100,000 against Daulerio. On June 7, 2016, the Court in the Bollea I Lawsuit reduced these jury verdicts into a Judgment (the "**Judgment**"), which Judgment included a Permanent Injunction (the "**Permanent Injunction**").

5.    On May 2, 2016, Bollea filed a new action against several defendants including Gawker Media, Don Buchwald & Associates, Cox Radio, Inc. and others, in the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 16-002861-CI (the "**Bollea II Lawsuit**"). In the Bollea II Lawsuit, Bollea brings claims against Gawker Media for intentional interference with contractual relations and advantageous business relationships and intentional infliction of emotional distress. Gawker Media moved to disqualify the trial judge presiding over the Bollea II Lawsuit (the **"DQ Motion"**). When the DQ Motion was denied, Gawker Media appealed to the Second DCA [Case No. 2D16-2477] (the "**DQ Appeal**"). The claims against Gawker Media in the Bollea II Lawsuit are currently stayed as a result of the Suggestion of Bankruptcy filed with respect to the Gawker Media Bankruptcy Case (as described below in Paragraph A.7.), and the entire Bollea II Lawsuit is currently stayed in the Second DCA

pending a resolution by the Second DCA of Gawker Media's DQ Motion.

6.    On June 10, 2016, Denton, Daulerio and Gawker Media filed a Notice of Appeal of the Judgment in the Second DCA [Case No. 2D16-2535]; which appellate proceeding is currently stayed as a result of the Suggestion of Bankruptcy filed with respect to the Gawker Media Bankruptcy Case (as described below in Paragraph A.7.) (the "**Judgment Appeal**").

7.    On June 10, 2016, Gawker Media filed a bankruptcy petition for relief in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), styled *In re Gawker Media, LLC*, Case No. 16-11700 (SMB) (the "**Gawker Media Bankruptcy Case**"). On June 12, 2016, GMGI and Gawker Hungary also each filed a petition for relief in the Southern District of New York (collectively with the Gawker Media Bankruptcy Case, the "**Bankruptcy Cases**").

8.    On August 1, 2016, Denton filed a bankruptcy petition in the Bankruptcy Court; Case No. 16-12239(SMB) (the "**Denton Bankruptcy Case**").

9.    On August 1, 2016, Bollea commenced collection efforts and proceedings supplementary against Daulerio in the Bollea I Lawsuit to execute on the Judgment (the "**Daulerio Collection Proceedings**"). Through the Daulerio Collection Proceedings, Bollea obtained an Order on August 17, 2016 transferring certain of Daulerio's assets to Bollea. Amongst those assets were rights of indemnity that Daulerio claims to have for Gawker Media and GMGI to pay all or part of Daulerio's share of the Judgment (the "**Daulerio Indemnity Rights**"). Bollea and Daulerio both have asserted proofs of claim based on the Daulerio Indemnity Rights in the Bankruptcy Cases. On November 28, 2016, the Gawker Debtors filed an objection to Daulerio's claims based on the Daulerio Indemnity Rights. The Bankruptcy Court in the Bankruptcy Cases has not adjudicated whether or not the Daulerio Indemnity Rights are valid or the amount of any claims based on the Daulerio Indemnity Rights, and the Gawker Debtors as debtors and debtors in possession have reserved all rights to contest any claims based on the Daulerio Indemnity Rights.

10.     Daulerio also has commenced an appeal in the Second DCA [Case No. 2D16-3721] seeking reversal of the August 17, 2016, Order transferring the Daulerio Indemnity Rights to Bollea (the "**Daulerio Appeal**").

11.     On August 16, 2016, the Gawker Debtors conducted an auction approved by the Bankruptcy Court in the Bankruptcy Cases, for the sale of substantially all of their assets  (excluding certain assets associated with the "gawker.com" website discussed below) (the "**Assets**").  During the auction, Ziff Davis, LLC and UniModa, Inc. (a division of Univision), engaged in active bidding for the Assets.  The bidding process started with a "stalking horse" bid by Ziff Davis, LLC of $90 million, and after several rounds of bidding, UniModa, LLC ("**Unimoda**") submitted the highest or otherwise best bid for the Assets, which bid consisted  of $135 million in cash plus certain additional non-cash consideration. The Bankruptcy Court approved the sale of the Assets to Unimoda by order dated August 22, 2016 (the "**Sale Order**").

12.     On September 9, 2016, the sale of the Assets closed, pursuant to which Unimoda paid $135 million for the Assets (the "**Cash Proceeds**").  (Unimoda elected to exclude the website content at *www.gawker.com,* the corresponding domain name, the GAWKER trademark, and related intellectual property (the "**Gawker.com Assets**") from the purchased assets.  The Gawker.com Assets remain a part of the Gawker Debtors' bankruptcy estates.)  Pursuant to the Sale Order, the net Cash Proceeds were placed in an account owned by Gawker Media, subject to all creditors' rights to contest the allocation of the Cash Proceeds between Gawker Media and Gawker Hungary (the "**Allocation Dispute"**).

13.     On October 11, 2016, Gawker filed a motion in the Bankruptcy Cases seeking discovery of Peter Thiel, Charles J. Harder, Esq. and his law firm, Harder Mirell & Abrams LLP, and others regarding possible claims that the Gawker Debtors' might have against Mr. Thiel and/or others in connection with the reported financing by Mr. Thiel of Mr. Bollea's litigation and/or litigation by others (the "**2004 Motion**"). The 2004 Motion remains pending.

14.    On October 13, 2016, in the Bollea I Lawsuit, Bollea filed his Amended Motion for Sanctions and for Order to Show Cause Against Daulerio, individually, as well as against Daulerio's counsel in the Bollea I Lawsuit, Levine Sullivan Koch & Schultz (the "**Sanctions Motion**").  The Sanctions Motion remains pending.

15.    On October 24, 2016, Bollea filed a Dischargeability Complaint against Denton in the Denton Bankruptcy Case; Adversary Case No. 16-ap-01248(SMB) (the "**Denton Dischargeability Adversary**").

B.    WHEREAS, on October 27, 2016, the Parties entered into a Settlement Term Sheet memorializing the essential and material terms and conditions of their settlement of pending litigation and legal proceedings, which requires the execution of this Agreement.

C.    WHEREAS, on November 2, 2016, the Gawker Debtors filed an Amended Joint Chapter 11 Plan of Liquidation (the "**Plan**") and a disclosure statement for that Plan ("**Disclosure Statement**"), both of which incorporated the settlement memorialized in this Agreement.  On November 4, 2016, the Bankruptcy Court entered an order approving the adequacy of the Disclosure Statement, and the Gawker Debtors thereafter commenced solicitation with respect to the Plan.  The Gawker Debtors shall seek confirmation of the Plan at a hearing before the Bankruptcy Court currently scheduled for December 13, 2016.

D.    WHEREAS, each of the Parties to this Agreement believes that it is in the best interests of Bollea, the Gawker Debtors, the Gawker Debtors' bankruptcy estates and their stakeholders, to settle and resolve all claims, disputes, issues or matters that exist between them, in order to: (1) avoid the extremely high costs and uncertainty of continuing with the aforementioned legal proceedings, including, but not limited to, the costs and professional expenses the bankruptcy estates would incur through litigation in the Bankruptcy Cases and the possibility that protracted litigation and appeals would cause Bollea, other creditors and/or GMGI equity holders to receive payment, if at all, years into the future; (2) avoid the lengthy appellate process in the Bollea I Lawsuit; (3) avoid lengthy litigation of issues that have been raised and may be raised in the Bankruptcy Cases relating to the Judgment, Denton Bankruptcy Case, the Allocation Dispute, the Denton Dischargeability Adversary and the Daulerio Collections Proceedings; and (4) avoid the possibility that the appellate process in the Bollea I Lawsuit

could result in a new jury trial, with its associated legal fees and costs, uncertainties and associated appeals of a new judgment.

E.   WHEREAS, the Parties understand and agree that the agreement reflected herein is subject to the approval of the Bankruptcy Court in the Bankruptcy Cases; and such approval is a condition precedent to the Parties' performance of their respective duties and obligations set forth in this Agreement.

## AGREEMENT

1.   **Recitals:**  The above recitals are true and correct, incorporated herein as an integral part of this Agreement, and a material inducement to enter into this Agreement.

2.   **The Plan**: The Plan has been amended so as to be consistent with the terms of this Agreement.  To the extent any future amendments to the Plan are necessary, the Gawker Debtors warrant that any such amendments will be consistent with the terms of this Agreement unless otherwise agreed to by the Parties in writing.  If the Bankruptcy Court denies confirmation of the Plan, the Parties will take commercially reasonable efforts consistent with the Bankruptcy Court's order denying approval of the Plan to seek to obtain approval of this Agreement in a subsequent plan proposed by the Gawker Debtors.

3.   **The Effective Date:**  The Effective Date of this Agreement shall be the date upon which this Agreement and the Plan are approved by the Bankruptcy Court and all conditions necessary to the consummation of the Plan shall have been satisfied (the **"Effective Date"**), unless the Bankruptcy Court denies confirmation of the Plan, in which case the Effective Date shall be the date upon which this Agreement is approved by the Bankruptcy Court in a subsequent plan incorporating the terms of this Agreement proposed by the Gawker Debtors and all conditions necessary to the consummation of that subsequent plan shall have been satisfied**.**  The Gawker Debtors shall take all such steps as are reasonable and necessary to cause the Effective Date to occur on or before December 31, 2016.

4.   **Settlement Payment:**  On the Effective Date, or within three (3) business days thereafter, the Gawker Debtors will pay to Bollea the sum of $31,000,000 (THIRTY ONE MILLION DOLLARS AND ZERO CENTS)

(the "**Settlement Payment**").   The Settlement Payment shall be made to Terry Bollea c/o Charles J. Harder, Esq. of Harder Mirell Abrams, LLP, by wire transfer as follows: ████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████.   The payment of the Settlement Payment and any distributions from the Gawker Media Contingent Proceeds Creditor Account (as set forth in Paragraphs 6-8 below) shall be in full satisfaction of the "**Settled Claims,**" which are defined as  (1) any claims asserted by Bollea against the Gawker Debtors, including all proofs of claim filed against the Gawker Debtors by Bollea; and (2) any claims asserted by Bollea against third-parties for which the Gawker Debtors have or may have indemnification, contribution, reimbursement, advance of defense costs, duty to defend or other such obligations arising out of (i) employment, severance or independent contractor agreements, (ii) the Gawker Debtors' organizational documents or governing corporate documents, or (iii) the Gawker Debtors' policies and/or practices (the "**Debtor Indemnification Obligations**").   The Settlement Payment and distributions from the Gawker Media Contingent Proceeds Creditor Account are a compromise of the damages awarded in the Bollea I Lawsuit Judgment and shall not be construed as a total or complete recovery by Bollea for the damages awarded in the Judgment, nor as compensation for any other injuries or damages suffered or incurred by Bollea, including but not limited to, the damages Bollea seeks to recover from Don Buchwald & Associates, Inc., Tony Burton, Michael Calta, Matthew Christian Loyd, Keith M. Davidson, Keith M. Davidson & Associates, P.L.C., Cox Radio, Inc., Tasha Nicole Carrega and Lori Burbridge (collectively, the "**Bollea II Defendants**") in and based on the facts and causes of action at issue in the Bollea II Lawsuit.   The punitive damages already awarded to Bollea and against Denton and Daulerio in the Bollea I Lawsuit, as well as any additional punitive damages which may be sought by Bollea through the Sanctions Motion, are also expressly *excluded* from the Settled Claims.

5.    **Plan Support:**  Bollea agrees to support and vote in favor of confirmation of the Plan.

6.    **Sale of Gawker.com**:  After the Effective Date, the Plan Administrator (as defined in the Plan) shall attempt to sell the Gawker.com Assets.   The Plan Administrator shall be responsible for all costs and expenses associated with such sale.   The Gawker.com Assets shall not be sold to Denton or any

insider of the Gawker Debtors, without the express written consent of Bollea.  Before the Plan Administrator begins any sale process for the Gawker.com Assets, Bollea shall be provided with notice and consultation rights with respect to the sale process.  Forty Five percent (45%) of the net proceeds received from the sale of the Gawker.com Assets shall be deposited into a separate segregated account or trust for the benefit of the Gawker Media's unsecured creditors (the "**Gawker Media Contingent Proceeds Creditor Account**").  Net proceeds received from the sale of the Gawker.com Assets shall mean the proceeds from the sale or disposition of the Gawker.com Assets net of any payments made (a) to any purchasers of the Gawker.com Assets and (b) to an investment bank, if any, working for the Debtors in connection with the sale.   Until such time that the Gawker.com Assets are sold, the Gawker Debtors shall not place any new content on the Gawker.com website that mentions, refers to, relates to or discusses, in any way, Bollea or any of his family members or attorneys.

7.      **Participation in Third-Party Claims**:  The Plan Administrator shall have no obligation to pursue third-party claims for the benefit of the Gawker Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement (as defined in the Plan) or are consistent with the Plan Administrator's fiduciary obligations.  If and to the extent that Bollea requests information regarding the commencement of any third-party claim process, the Plan Administrator shall provide Bollea such information as is reasonably requested, excluding any privileged or other confidential information.   In the event that such third-party claims are pursued, they shall be prosecuted on a contingency fee basis, and Gawker Media shall be responsible for the costs and expenses associated with the prosecution of such claims.  The third-party claims shall be identified at the time of the filing of the Plan Supplement.  Forty-five (45) percent of the net proceeds of any claims prosecuted on behalf of Gawker, GMGI and/or Gawker Hungary against any third-parties shall be deposited into the Gawker Media Contingent Proceeds Creditor Account and distributed pursuant to the Plan, ***excluding*** (i) proceeds received by any Debtor(s) on account of the outstanding $200,000 loan from GMGI to Denton and (ii) claims against any insurers relating to coverage on account of the Debtors' settlement or payment of claims of Ashley Terrill, Shiva Ayyadurai, and any other litigation plaintiff creditor of the Debtors, which proceeds will be deposited in the Gawker Media Claims Reserve established under the Plan.  Net proceeds as used in this paragraph shall mean any applicable recoveries from third-party claims brought by the Plan Administrator net of any setoffs

from such recoveries or contingency fees paid to attorneys out of the recoveries.

8. **Gawker Media Contingent Proceeds Creditor Account**: The proceeds of the Gawker Media Contingent Proceeds Creditor Account shall be distributed *pro rata* to the unsecured creditors of Gawker Media with allowed claims, except as to any creditors who disclaim their interest in the Gawker Media Contingent Proceeds Creditor Account. For purposes of the distribution of the proceeds of the Gawker Media Contingent Proceeds Creditor Account, the amount of Bollea's allowed claim is $84,000,000.

9. **Delivery and Destruction of Content:** Within seven (7) days of the Effective Date, Daulerio's October 4, 2012 post on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe for Work but Watch it Anyway," (the "**Daulerio Post**") shall be permanently removed and deleted from the Gawker.com website. Within thirty (30) days of the Effective Date, the 1:41 video posted on Gawker.com on or about October 4, 2012 (the "**Gawker Video**"), the 30 minute video delivered to Daulerio at Gawker in September 2012 (the "**30-Minute Video**"), and the originals or any copies, portions or excerpts of any and all other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (a/k/a Heather Cole), and any written transcripts, summaries, audio recordings or other recordings of said recordings of Bollea that emanated from recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (a/k/a Heather Cole) (i.e. video recordings and audio recordings obtained by or through discovery in the State Court Action and the FBI Action) (collectively, all of which including the Daulerio Post are defined as the "**Content**") in the possession, custody or control of the Gawker Debtors shall be delivered to Bollea, in care of his counsel Charles J. Harder, Esq., and thereafter deleted from all electronic systems and storage devices (including without limitation websites, social media accounts, servers, hard drives, backup tapes, disks, drives, devices and files of all kinds) which are in the possession, custody or control of the Gawker Debtors. The deletion of the Content in the possession, custody or control of the Gawker Debtors from all electronic systems and storage devices shall be confirmed by the independent computer forensic expert appointed in the Bollea I Lawsuit, ATX Forensics, LLC. Bollea shall bear the cost for any services performed by ATX Forensics, LLC. The Gawker Debtors shall also demand the return and deletion of any and all Content in the possession, custody or control of their counsel, including but not limited to, Levine

Sullivan Koch & Schultz ("**LSKS**"), Thomas & Locicero and Brannock & Humphries, as well as the Gawker Debtors' former general counsel, Heather Dietrick; and any such Content that is returned to the Gawker Debtors by their counsel shall then be returned to Bollea in care of his counsel, Charles J. Harder, Esq. The Gawker Debtors shall also demand and cooperate in obtaining Declarations under penalty of perjury from Heather Dietrick, Denton and Daulerio, in substantially the same form as those attached as **Composite Exhibit A**. The Gawker Debtors also agree that as of the Effective Date, they will never again use, publish, disseminate or transmit any Content, or assist anyone in doing so, either directly or indirectly, except as required by this Agreement.

10. **Content Ownership:**    The Gawker Debtors shall quitclaim, assign and transfer to Bollea any and all of their rights, title, interest in, arising out of or associated with any Content, including but not limited to any works of authorship, ownership rights, copyrights, all other intellectual property rights and/or all similar rights, if any, as more specifically set forth in the Rights Transfer Agreement attached hereto as **Exhibit B**.  The Gawker Debtors further affirm, represent and warrant that they have not assigned, sold or transferred any of these rights, title or interests in the Content or arising out of or associated with any Content to any other person or entity.

11. **Consent to Third-Party Transfer:**    The Gawker Debtors shall enter into and, if necessary to achieve the turnover or deletion of the Content described herein, support (at Bollea's expense) all reasonable and appropriate stipulations, motions, directives and/or requests, to be filed or submitted with all appropriate courts, tribunals, offices and persons, including without limitation the Florida state and federal courts (including trial and appellate courts), the FBI, Tampa Police Department, U.S. Attorney's Office, Hillsborough County State Attorneys' Office, Judge James R. Case (Ret.), court reporters, vendors, attorneys and representatives of all such persons and entities, directing such persons and entities to deliver to Bollea or his counsel of all Content in their possession, custody or control, and/or that such Content be permanently deleted and destroyed, and that no copies, versions or excerpts thereof may be retained by any of them.  The Gawker Debtors shall also destroy, and instruct their counsel to destroy, all materials which any of them obtained from any of the above-listed persons and entities, by any means, including, but not limited to, through discovery in the Bollea I Lawsuit and the FBI Action.

12. **Continuing Duty to Turnover:**    The Gawker Debtors shall have a continuing obligation to turn over to Bollea, in care of his counsel, any and all Content, should any of them ever come into possession, custody or control of any Content in the future, and to cooperate with Bollea and his counsel in connection with the acquisition, deletion and/or removal of Content.  If any Gawker Debtors ever learn of the existence of any Content, in any location other than in the possession of Bollea or his counsel, such Gawker Debtors will promptly notify Bollea's counsel of same in writing, and provide all information regarding same.

13. **Satisfaction of Judgment**:    Within three (3) business days after Bollea's receipt of the Settlement Payment *and* the Bankruptcy Court's order approving the Final Settlement Agreement and a plan of reorganization or liquidation (the "**Approval Order**") becoming a final, non-appealable order, Bollea shall file and record in the Bollea I Lawsuit (a) a Satisfaction of the Final Judgment as to Gawker Media; (b) a Partial Satisfaction of the Final Judgment as to Denton (the Partial Satisfaction shall be only as to the joint and several $115 million compensatory damage award, and shall exclude punitive damages unless Denton has entered into a settlement agreement with Bollea that releases Bollea's punitive damages award as to Denton); and (c) a Partial Satisfaction of the Final Judgment as to Daulerio (the Partial Satisfaction shall be only as to the joint and several $115 million compensatory damage award, and shall exclude punitive damages unless Daulerio has entered into a settlement agreement with Bollea that releases Bollea's punitive damages award as to Daulerio).  The filing and recording of any Satisfactions of Final Judgment shall not impact or preclude Bollea's right to the distributions from the Gawker Media Contingent Proceeds Account set forth in Paragraphs 6 through 8, above.

14. **Dismissal of Appeals**:    Within three (3) business days of the filing of the Satisfaction of Final Judgment as to Gawker Media, the Gawker Debtors shall file Notices of Voluntary Dismissals with Prejudice of all pending appeals associated with the Bollea I Lawsuit, including, without limitation, Florida Second DCA Case Nos. 2D15-5035 (the Leak Appeal) and 2D16-2535 (the Judgment Appeal).

15. **Dismissal of Gawker Media from Bollea II**:    Within three (3) business days of Bollea's receipt of the Settlement Payment *and* the Approval Order becoming a final, non-appealable order, Bollea shall dismiss his claims against Gawker Media in the Bollea II Lawsuit with prejudice.  Further,

subject to the Approval Order becoming a final, non-appealable order, Bollea agrees that he shall not join or add GMGI, Gawker Hungary, Denton, Daulerio, Heather Dietrick, or any of the Gawker Debtors' current or former employees, writers, agents or independent contractors as parties (the "**Bollea II Released Parties**") to the Bollea II Lawsuit and waives any right to seek any damages or compensation from the Bollea II Released Parties arising out of Bollea's claims in the Bollea II Lawsuit.  This release and agreement not to pursue claims, damages and compensation as to the Bollea II Released Parties in connection with the Bollea II Lawsuit specifically *excludes* all of the other Bollea II Defendants; any and all of Bollea's rights, claims, demands, remedies, causes of action, damages, relief and rights to compensation against the other Bollea II Defendants; and any claims against Denton and Daulerio for any breach of any representations and warranties made in connection with separate settlement agreements by Denton and/or Daulerio relating to the Leak.  Within three (3) business days of the Approval Order becoming a final, non-appealable order, Gawker Media shall dismiss with prejudice its DQ Appeal (Florida Second DCA Case No. 2D16-2477) and withdraw its DQ Motion with prejudice.

16.    **Bollea Release**:  Effective upon receipt of the Settlement Payment (the "**Bollea Release Effective Date**"), Bollea, for himself and his  predecessors, successors and assigns, and heirs, as applicable, hereby absolutely and forever releases and discharges the Gawker Debtors, and each of their respective subsidiaries and/or affiliate corporations, officers, directors, shareholders, members, employees, insurers (if any), managers, agents, attorneys, representatives, affiliates, shareholders, consultants, contractors and attorneys-in-fact (the "**Gawker Released Parties**") from any and all claims, demands, damages (including any claim(s) for punitive damages), debts, liabilities, accounts, reckonings, obligations, costs (including attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature, whether in law or in equity, whatsoever, which Bollea now has, ever had, or may claim to have, whether known to Bollea or not, against any of the Gawker Released Parties, from the beginning of time until the Bollea Release Effective Date; specifically *excluding* the Permanent Injunction entered in the State Court Action, Bollea's claims for punitive damages against Denton and Daulerio, the relief sought in the Sanctions Motion, and claims and causes of action based upon the obligations, representations and warranties set forth in this Agreement and in any settlement agreements reached between Bollea and Denton and/or Daulerio.  This release by Bollea also specifically *excludes* all of Bollea's claims, causes of action, remedies,

damages, relief, injuries, demands and rights to compensation against or from each and every of the other Bollea II Defendants.  This Bollea Release is provided as a compromise of the damages awarded in the Judgment and should not be construed as a total or complete recovery by Bollea of the damages awarded in the Judgment, as compensation for any of the damages and injuries at issue in the Bollea II Lawsuit, nor as a release of any of the other Bollea II Defendants.

17.    **The Gawker Released Parties' Release:**  Effective upon the recording of the Satisfaction of Final Judgment as to Gawker Media (the "**Gawker Release Effective Date**"), the Gawker Released Parties absolutely and forever release and discharge Bollea and his predecessors, successors and assigns, heirs, representatives, employees, managers, agents, attorneys, consultants, contractors, affiliates, attorneys-in-fact and insurers ("**Bollea Released Parties**") from any and all claims, demands, damages (including any claim(s) for punitive damages), debts, liabilities, accounts, reckonings, obligations, costs (including  attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature, whether in law or in equity, whatsoever, which the Gawker Released Parties now have, ever had, or may claim to have, whether known to the Gawker Released Parties or not, against any of the Bollea Released Parties, from the beginning of time until the Gawker Release Effective Date; specifically *excluding* any claims and causes of action based upon the obligations, representations and warranties set forth in this Agreement.  Notwithstanding the foregoing, no Gawker Released Party (other than Bollea personally, from whom no discovery will be sought) is released from any obligations to respond to any discovery, except to the extent set forth in paragraph 18.

18.    **2004 Motion and Associated Claims**:  The Gawker Debtors will continue to suspend prosecution of the 2004 Motion through at least the Effective Date (the "**Suspension Period**").  In the event that the Suspension Period expires and the Gawker Debtors pursue the 2004 Motion, the Gawker Debtors shall not seek from Bollea or any other third party any discovery about Bollea, including, without limitation, discovery concerning the subject matter of the 2004 Motion, litigation funding or finance, the Bollea I Lawsuit, the Bollea II Lawsuit, the Bankruptcy Cases, the Denton Bankruptcy Case, the Daulerio Collection Proceedings, and/or any and all related proceedings, whatsoever.

19.    **Cooperation to Secure Agreements**:  The Parties shall cooperate and work in good faith to secure settlement agreements with Denton and Daulerio, as set forth in the Cooperation to Secure Agreements attached hereto as **Exhibit C**.  The Parties expressly agree that it is not a condition of any other obligation or right in this Agreement that any or all of the agreements described in the Cooperation to Secure Agreements be consummated.

20.    **Dismissal of Dischargeability Action:**    Bollea agrees that, upon the consummation of a settlement agreement with Denton, the Dischargeability Action against Denton will be dismissed with prejudice.

21.    **Daulerio Proceedings**:    Bollea agrees that, upon the consummation of a settlement agreement with Daulerio, Bollea will withdraw the Sanctions Motion solely as to Daulerio in his individual capacity with prejudice and will dissolve the writ of garnishment pending against Daulerio in the Bollea I Lawsuit.   Bollea further agrees to suspend all collection efforts against Daulerio and suspend prosecution of the Sanctions Motion solely as against Daulerio in his individual capacity, pending negotiation of the contemplated settlement agreement with Daulerio.  If that settlement agreement cannot be reached, Bollea may recommence collection efforts against Daulerio as to the punitive damages awarded against Daulerio and may prosecute the Sanctions Motion as to Daulerio in his individual capacity.   Bollea agrees that, as to Daulerio's counsel, LSKS, he will advise the judge in the Bollea I Lawsuit of the settlement reached between the Parties, and defer to the Bollea I Lawsuit judge as to whether she is inclined to proceed with the Sanctions Motion as to LSKS.

22.    **Miscellaneous Provisions:**

   A.    **Binding Effect.** This Agreement shall bind and inure to the benefit of each of the Parties hereto and their respective successors in interest.

   B.    **Final Integrated Agreement.** This Agreement constitutes the entire, final and binding understanding between the Parties hereto.  No other statement or representation, written or oral, express or implied, has been received or relied upon in the Agreement, unless specifically set forth herein, and all prior and contemporaneous discussions, statements and negotiations made or which have occurred prior to or simultaneous with the date of this Agreement shall be deemed merged into this Agreement, and of no legal force or effect.  No supplement,

modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties. The Parties hereto agree to execute such other documentation as is necessary to carry out the terms of this Agreement.

C.    **Voluntary Agreement.**    Each Party enters into this Agreement knowingly and voluntarily, in the total absence of any fraud, mistake, duress, coercion, or undue influence and after careful thought and reflection upon this Agreement and, accordingly, by signing this document, each signifies full understanding, agreement and acceptance.

D.    **Representation Regarding Non-Assignment of Claims.**  Each Party represents that it has not assigned or transferred to any third party, any claims or rights that it has or might have relating to any and all claims, contentions or any matters in dispute between or relating to the Parties as of the Effective Date.

E.    **Multiple Counterparts.**  This Agreement, and any document referred to herein, may be executed in any number of counterparts and by facsimile or email (*i.e.*, a .pdf file), each of which shall be deemed an original and all of which together shall constitute one single legal instrument.

F.    **Authorship.**  Each of the Parties hereto have jointly participated in the negotiation and drafting of this Agreement.  In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the Parties hereto and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any ambiguity or question of interpretation or intent shall be decided by the Bankruptcy Court

G.    **Governing Law/Enforcement of Terms**.  This Agreement shall be construed under the laws of the State of New York.  Any action to enforce or interpret any of the terms and conditions of this Agreement shall be brought in the Bankruptcy Court or, if the Bankruptcy Court determines that jurisdiction does not lie therein, in the state or federal courts of New York, New York, and all parties hereto consent to the exclusive jurisdiction and venue of such court(s) for the enforcement and/or interpretation of this Agreement.

H.    **Waiver.**  Any waiver by any Party of any provision of this Agreement or breach thereof will not operate or by construed as a waiver of any other provision or subsequent breach thereof.  Any waiver by a Party must be in writing to be effective.

I.    **Severability**.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

**[SIGNATURES FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the Parties execute this Settlement Agreement as of November _____, 2016.


Date: _____, 2016          _____

                                       TERRY GENE BOLLEA, professionally
                                       known as "Hulk Hogan"


Date: _____, 2016          GAWKER MEDIA LLC

                                       By: _____

                                       Print: _____ Title: _____


Date: _____, 2016          GAWKER HUNGARY, KFT

                                       By: _____

                                       Print: _____ Title: _____


Date: _____, 2016          GAWKER MEDIA GROUP, INC.

                                       By: _____

                                       Print: _____ Title: _____

## **<u>Composite Exhibit A</u>**

## DECLARATION OF ALBERT JAMES DAULERIO

1.      My name is Albert James Daulerio, aka "A.J. Daulerio."  I am over the age of eighteen and have personal knowledge of the matters set forth in this Declaration.

2.      I am aware, and have been advised by my counsel, that it is a crime if I attest to any facts set forth in this Declaration that I know or believe to be untrue.

3.      In September, 2012, I was the Editor-In-Chief of Gawker.com.   In that capacity, I was contacted by Tony Burton about a Hulk Hogan sex tape.  Mr. Burton asked for my mailing address in order to arrange for the delivery of a DVD.  Shortly thereafter, one of my colleagues at Gawker received a DVD intended for me that contained a video and audio recording—just over 30 minutes long—of Terry Bollea, aka Hulk Hogan, having conversations and engaging in sexual activity in a bedroom with Heather Clem, nka Heather Cole (The "30-Minute Video").  Soon after receiving the 30-Minute Video, Mr. Burton contacted me to confirm that I had received the DVD.

4.      On October 4, 2012, I posted an article on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe For Work but Watch it Anyway" (the "10/4/2012 Post"), which included a 1:41 excerpt derived from the 30-Miniute Video (the "Gawker Video").

5.      In early 2013, I resigned from Gawker.com.  When I left Gawker, I did not have and did not take the originals or any copies, portions or excerpts, in full or in part, whether in hard copy or electronic format, of the 30-Minute Video or the Gawker Video.

6.      I was not personally involved in any way in, did not assist or facilitate, did not solicit, request or induce any other person to provide, and I have no personal knowledge of the source of, any transcripts and/or recordings of Bollea in the Clems' bedroom that were reported to be sealed discovery leaked to *The National Enquirer* and/or *Radar Online* (as stated in articles published in July-August 2015).   These articles are the subject of the October 21, 2015 Order entered in the lawsuit filed against me and others by Mr. Bollea in Pinellas County, Florida (Pinellas County Case No. 12012447CI-011).

7.      Since I left Gawker in early 2013, I have not had any copies of, nor any remote access to, directly or indirectly, the 30-Minute Video, the Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom

of Bubba Clem and Heather Clem; with the exception that, when preparing for the trial of this case in March 2016, my attorneys, Levine Sullivan Koch & Schulz ("LSKS"), provided me with a single flash drive (the "Flash Drive") containing digital copies of various exhibits expected to be introduced at trial.

8.    I signed a declaration in October, 2016, which my new counsel filed with the Pinellas County, Florida court, attesting that the Flash Drive contained the Gawker Video and 30-Minute Video.  That was based on what LSKS told my new counsel, David Marburger, was on the Flash Drive.  In hindsight, I am not positive whether the 30-Minute Video was on the Flash Drive.

9.    During the first weekend of October, 2016, I delivered the Flash Drive to a lawyer of the LSKS law firm.  While that Flash Drive was in my possession, I did not make any copies of, save, store, send, disseminate, distribute or deliver any of the materials it contained, did not record any of the materials it contained, did not upload an of the contents of the Flash Drive to any other electronic device(s), drives, storage systems, cloud based storage or similar media; and I did not ask, permit, direct or otherwise allow any other person or entity to copy, upload, record, disseminate, distribute, deliver, send, save, store or disclose any of the contents of the Flash Drive to any other person or entity.

10.    When I delivered that Flash Drive to LSKS, it contained the only copy of the 30-Minute Video and the Gawker Video that I believed to be in my possession or under my control (excluding any copies that the law firm had).

11.    To the best of my knowledge, since I returned the Flash Drive to LSKS, I have not possessed nor had access to, directly or indirectly, the 30-Minute Video, the Gawker Video, any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem, and/or any transcripts or summaries of such recordings.

12.    I have never received, heard or viewed any materials designated as "Highly Confidential-Attorneys' Eyes Only" under a Protective Order or any other Order entered in the Pinellas County, Florida lawsuit filed against me by Mr. Bollea.

13.    Since October 4, 2012, I have owned no more than five cell phones, three laptop computers, and three iPads.  All three of my iPads and three of my cell phones were lost or stolen, but none of them contained the 30-Minute

Video, the Gawker Video or any other audio or video recordings of Mr. Bollea in the Clems' bedroom. In 2015, I delivered two (2) laptop computers and one (1) cell phone to the LSKS law firm. These devices are currently being stored in the LSKS vault. In August, 2015, I purchased a third (3rd) laptop computer and another cell phone. Those are currently in my possession.

14.    As part of my settlement with Mr. Bollea in this case, I have agreed that a computer forensic expert, ATX Forensics, LLC, shall be entitled to take possession of the two (2) laptop computers and cell phone currently being stored in LSKS's vault, create a forensic image of such devices, and then completely delete and/or destroy the hard drives on those devices. Once these devices are wiped clean, they shall be returned to me. The forensic images of the hard drives of these devices shall be maintained confidentially by ATX Forensics, LLC; and no one shall have access to their contents, including Mr. Bollea. These forensic images shall be maintained by ATX Forensics, LLC for a period of ten (10) years, so that they may be preserved for purposes of any pending litigation. In the event that any person or entity makes a discovery request or issues a subpoena calling for the disclosure of any of the contents of these devices, ATX Forensics, LLC shall prepare an index of their contents to be reviewed by me and/or my counsel for responsiveness and privileged or confidential information, before any of their contents may be disclosed.

15.    In October, 2016, I gave my third laptop and my current cell phone to my counsel, David Marburger. With my approval, he gave them to the forensic digital investigation firm of Vestige, Ltd. in Medina, Ohio, which was to make an image of the laptop's and phone's hard drives and delete everything from the original hard drives. I will instruct Vestige to provide the forensic image of my third laptop and cell phone to ATX Forensics, LLC without retaining any copies. I will also instruct Vestige to provide a certification that the hard drive on my third laptop computer and cell phone, both of which have since been returned to me, were completely and permanently deleted or, if they were replaced, that the original hard drives have been destroyed. Once Vestige delivers the forensic image of the hard drives of my third laptop computer and cell phone to ATX Forensics, LLC, I understand that ATX Forensics, LLC will preserve the images subject to the same terms and conditions set forth in paragraph 12, above.

16.    Except as set forth in Paragraphs 9, 13, and 15 above, since the date of my 10/4/12 Post, I have never delivered, transferred, provided, sent,

disseminated, distributed, copied, saved, stored, uploaded, downloaded, recorded or otherwise preserved the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video or any other video or audio recordings of Mr. Bollea in the Clems' bedroom to anyone other than Gawker Media's counsel of record in the Bollea I Lawsuit.   Since the date of my 10/4/12 Post, I have never instructed, allowed, asked, permitted or directed, indirectly or directly, any other person or entity to deliver, transfer, provide, transmit, send, disseminate, distribute, copy, save, store, upload, download, or record or otherwise preserve the originals of any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video or any other video or audio recordings of Mr. Bollea in the Clems' bedroom to anyone.

I declare under penalty of perjury that the foregoing is true and correct.


Signed on _____    (date)


_____
A.J. Daulerio

## <u>DECLARATION OF NICHOLAS DENTON</u>

1.  My name is Nicholas Denton.  I am over the age of eighteen and have personal knowledge of the matters set forth in this Declaration.

2.  I am aware, and have been advised by my counsel, that it is a crime to attest to any facts set forth in this Declaration that I know or have reason to believe are not true.

3.  I am currently the executive vice president of Gawker Media, LLC ("Gawker Media"), and was previously the CEO of Gawker Media.

4.  In October, 2012, I became aware that the then-Editor-In-Chief of Gawker.com, A.J. Daulerio ("Daulerio"), received a DVD containing a video and audio recording—just over 30 minutes long—of Terry Bollea, aka Hulk Hogan ("Bollea"), having conversations and engaging in sexual activity in a bedroom with Heather Clem, nka Heather Cole (the "30-Minute Video").

5.  On October 4, 2012, Daulerio posted an article on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe For Work but Watch it Anyway" (the "10/4/2012 Post"), which included a 1:41 excerpt derived from the 30-Miniute Video (the "Gawker Video").

6.  Bollea thereafter filed suit against me, Daulerio, Gawker Media, Gawker Hungary Kft. (f/k/a Kinja Kft.) ("Gawker Hungary"), and Gawker Media Group, Inc. (collectively, Gawker Media, Gawker Hungary and GMGI are the "Gawker Debtors") (collectively, Denton, Daulerio and the Gawker Debtors are referred to as the "Gawker Parties"), amongst others, in the Sixth Circuit Court in and for Pinellas County, Florida, Case No. 12012477CI-011 (the "Bollea I Lawsuit").  Bollea asserted causes of action for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section 934.10, Florida Statutes.

7.  On May 19, 2015, Gawker filed an action against the Federal Bureau of Investigation and Executive Office for the United States Attorney, Case No. 8:15-cv-01202-SCB-EAJ (the "FBI Action"), in order to obtain discovery related to the Bollea I Lawsuit.

8.    On October 21, 2015, the Court in the Bollea I Lawsuit entered an Order permitting certain discovery to determine whether I, Daulerio and/or Gawker Media were involved in leaking certain sealed discovery related to the Bollea I Lawsuit and FBI Action to *The National Enquirer* and/or *Radar Online* (the "Leak Order").    *The National Enquirer and Radar Online* published articles in July and August, 2015, disclosing contents of recordings of Bollea, which they reported were part of sealed discovery in the Bollea I Lawsuit (the "Leak").    We appealed the Leak Order to Florida's Second District Court of Appeal ("Second DCA"), which appeal [Case No. 2D15-5035] is currently stayed.

9.    On May 2, 2016, Bollea filed a new action against several defendants including Gawker Media, Don Buchwald & Associates, Cox Radio, Inc. and others, in the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 16-002861-CI (the "Bollea II Lawsuit").    In the Bollea II Lawsuit, Bollea asserted claims against Gawker Media for intentional interference with contractual relations and advantageous business relationships and intentional infliction of emotional distress.    Gawker Media moved to disqualify the trial judge presiding over the Bollea II Lawsuit (the "DQ Motion").    When the DQ Motion was denied, Gawker Media appealed to the Second DCA [Case No. 2D16-2477]. The claims against Gawker Media in the Bollea II Lawsuit are currently stayed as a result of the Suggestion of Bankruptcy filed with respect to Gawker Media's pending bankruptcy proceedings in the Southern District of New York, and the entire Bollea II Lawsuit is currently stayed in the Second DCA pending a resolution by the Second DCA of Gawker Media's DQ Motion.

10.    In my capacity as a named party and then-CEO of Gawker Media, I was responsible for supervising the Bollea I Lawsuit, FBI Action and Bollea II Lawsuit.

11.    I never received or viewed any of the contents of any materials designated as "Highly Confidential—Attorneys' Eyes Only" under a Protective Order entered in the Bollea I Lawsuit.

12.    I have never provided, delivered, transferred, transmitted, sent, saved, stored, uploaded, downloaded or provided access to the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video or any other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, or any written transcripts or summaries of such recordings to anyone other than Gawker's counsel of

record in the Bollea I Lawsuit.

13.    I am not aware of any current or former employee, agent, officer, director, manager or member of the Gawker Debtors ever providing the original or any copies, in full or in part, of the 30-Minute Video or the Gawker Video to anyone other than Gawker Media's counsel of record in the Bollea I Lawsuit.

14.    I do not own, hold or assert, and have never asserted any, rights, title or interest in, arising out of and/or relating to the 30-Minute Video, the Gawker Video, the 10/4/12 Post, or any other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, or any written transcripts or summaries of such recordings, and I have never assigned, sold or transferred or purported to assign, sell or transfer, any such rights, title or interest to any other person or entity.

15.    I do not currently have, possess or have access to the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video, or any other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, or any written transcripts or summaries of such recordings.

16.    To the best of my knowledge, since the Judgment was entered in the Bollea I Lawsuit, I have not had any access to, directly or indirectly, the originals or any copies of the 30-Minute Video, Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.  I understand that the Permanent Injunction entered in the Bollea I Lawsuit, which I am not appealing, shall remain in full force and effect, and is and shall continue to be binding on and enforceable against me.

17.    I have no personal knowledge of the source of, any transcripts and/or recordings of Bollea in the Clems' bedroom that were reported on by *The National Enquirer* and *Radar Online* in July-August 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____  (date)


                                    _____
                                    Nicholas Denton

## DECLARATION OF HEATHER DIETRICK

1.    My name is Heather Dietrick.  I am over the age of eighteen and have personal knowledge of the matters set forth in this Declaration.

2.    As an attorney, I am aware that it is a crime to attest to any facts set forth in this Declaration that are not true.

3.    I was formerly the President and General Counsel of Gawker Media, LLC ("Gawker Media").

4.    On October 4, 2012, Mr. Daulerio posted an article on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe For Work but Watch it Anyway" (the "10/4/2012 Post"), which included a 1:41 excerpt derived from the 30-Miniute Video (the "Gawker Video").

5.    Bollea thereafter filed suit against Nick Denton; A.J. Daulerio; Gawker Media; Gawker Media Group, Inc. ("GMGI"); Gawker Entertainment, LLC; Gawker Technology, LLC; Gawker Sales, LLC; Kate Bennert, and Blogwire Hungary Szellemi Alkotast Hasznosito KFT aka "Gawker Media", amongst others, in the Sixth Circuit Court in and for Pinellas County, Florida, Case No. 12012477-CI-011 (the "Bollea I Lawsuit").  Bollea asserted causes of action for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section 934.10, Florida Statutes.

6.    On May 19, 2015, Gawker Media filed an action against the Federal Bureau of Investigation and Executive Office for the United States Attorney, Case No. 8:15-cv-01202-SCB-EAJ (the "FBI Action").

7.    On October 21, 2015, the Court in the Bollea I Lawsuit entered an Order permitting certain discovery to determine whether I, Denton, Daulerio and/or Gawker Media were involved in leaking certain sealed discovery related to the Bollea I Lawsuit and FBI Action to *The National Enquirer* and/or *Radar Online* (the "Leak Order").  *The National Enquirer and Radar Online* published articles in July and August, 2015, disclosing contents of recordings of Bollea, which it reported were part of sealed discovery in the Bollea I Lawsuit (the "Leak").  We appealed the Leak Order to Florida's Second District Court of Appeal ("Second DCA"), which appeal [Case No. 2D15-5035] is currently stayed.

8.    On May 2, 2016, Bollea filed a new action against several defendants including Gawker Media, Don Buchwald & Associates, Cox Radio, Inc. and others, in the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 16-002861-CI (the "Bollea II Lawsuit").  In the Bollea II Lawsuit, Bollea asserted claims against Gawker Media for intentional interference with contractual relations and advantageous business relationships and intentional infliction of emotional distress.  Gawker Media moved to disqualify the trial judge presiding over the Bollea II Lawsuit (the "DQ Motion").  When the DQ Motion was denied, Gawker Media appealed to the Second DCA [Case No. 2D16-2477]. The claims against Gawker Media in the Bollea II Lawsuit are currently stayed as a result of the Suggestion of Bankruptcy filed with respect to Gawker Media's pending bankruptcy proceedings in the Southern District of New York, and the entire Bollea II Lawsuit is currently stayed in the Second DCA pending a resolution by the Second DCA of Gawker's DQ Motion.

9.    In my capacity as General Counsel of Gawker Media, I was responsible for supervising the Bollea I Lawsuit, FBI Action and Bollea II Lawsuit.

10.    As Gawker Media's counsel, I was a "Qualified Person" entitled to receive and view materials designated as "Highly Confidential—Attorneys' Eyes Only" under a Protective Order entered in the Bollea I Lawsuit.

11.    I have never provided, delivered, transferred, transmitted or provided access to the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video or the Gawker Video to anyone other than Gawker Media's counsel of record in the Bollea I Lawsuit.

12.    I am not aware of any current or former employee, agent, officer, director, manager or member of Gawker Media providing the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video or the Gawker Video to anyone other than Gawker Media's counsel of record in the Bollea I Lawsuit.

13.    I have never provided, delivered, transferred, or transmitted copies of, or access to the contents of, any materials designated as "Highly Confidential-Attorney's Eyes Only" in the State Court Action to any other person.

14.    Since I left Gawker Media, and to the best of my knowledge, I have not had any access to, directly or indirectly, the 30-Minute Video, Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.

15.    I was not, directly or indirectly, involved in any way in providing or disseminating, and have no personal knowledge of the source of, any transcripts and/or recordings of Bollea in the Clems' bedroom that were reported on by *The National Enquirer* and *Radar Online* in July-August 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____ (date)


_____
Heather Dietrick

## Exhibit B

## RIGHTS TRANSFER AGREEMENT

For good and valuable consideration set forth in that certain Settlement Agreement between Gawker Media LLC ("Gawker Media"), Gawker Hungary Kft. (f/k/a Kinja Kft.) ("Gawker Hungary"), and Gawker Media Group, Inc. ("GMGI") (collectively, the "Gawker Debtors") and Terry Gene Bollea (a/k/a Hulk Hogan) ("Bollea") dated as of November ___, 2016, the Gawker Debtors hereby perpetually, irrevocably and unconditionally assign, transfer and convey to Bollea all of the Gawker Debtors' rights, title and interest, including without limitation all rights in, arising out of, and/or associated with any works of authorship, copyrights, trademarks and all other intellectual property rights, in and to any and all video recordings, audio recordings, written transcripts and/or written summaries, and all related content, as well as all derivative works therefrom, depicting Bollea in any way in the bedroom of Bubba Clem and Heather Clem including all conversations, nudity and/or sexual activity related thereto, and further including all rights in, arising out of and/or associated with Bollea's name, voice, image, likeness and identity, and including without limitation rights of personality, privacy and publicity, rights of attribution and any other rights of any alleged author (all such works, along with the exception stated in the following two sentences, are collectively referred to herein as the "Works"). The Works shall specifically include, but not be limited to the following:

1.    The 1:41 video posted on Gawker.com on or about October 4, 2012 (the "**Gawker Video**");

2.    The 30 minute video delivered to Daulerio at Gawker in September 2012 (the "**30-Minute Video**");

3.    A.J. Daulerio's post accompanying the 1:41 video published on Gawker.com on October 4, 2012 ("**Daulerio's Post**"); and

4.    The originals or any copies, portions or excerpts of any and all other video and/or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (aka Heather Cole), and any and all written transcripts and summaries thereof or relating thereto.

As for any rights in or associated with the Works held by the Gawker Debtors, the Gawker Debtors represent and warrant to Bollea that the Gawker Debtors exclusively own all such rights, title and interest in and to the Works, have never

transferred any of their rights in or associated with the Works to any third-party, nor licensed to any third-party any rights in or associated with the Works, and that the Works are free from any liens, encumbrances, security interests and restrictions on transfer.

Any of the Works authored by A.J. Daulerio while he was employed by or for the Gawker Debtors were works for hire owned exclusively by the Gawker Debtors.

Should the Gawker Debtors acquire any right, title or interest in or to the Works, or any of them, after the Effective Date, then all such rights, title and interest will automatically revert to Bollea, unless Bollea expressly states that he does not wish to acquire such rights in a writing signed by Bollea.

The Gawker Debtors agree to cooperate with Bollea in connection with the enforcement of authorship rights, copyrights and trademarks in connection with the Works, including without limitation, signing documentation consistent with the foregoing. The Gawker Debtors shall take all actions and execute all documents as Bollea may reasonably request to effectuate the transfer of the Works and the vesting of complete and exclusive ownership of the Works in Bollea.

A breach of this Rights Transfer Agreement will result in irreparable harm to Bollea, for which there is no adequate remedy at law. Accordingly, in the event of a breach, Bollea shall be entitled to specific performance, injunctive relief and other adequate remedies to enforce and protect his rights hereunder. In the event such legal action becomes necessary, the Gawker Debtors waive the necessity of posting a bond.

Agreed and accepted:

Date: _____, 2016        GAWKER MEDIA LLC

                                    By: _____

                                    Print: _____ Title: _____


Date: _____, 2016        GAWKER HUNGARY KFT

                                    By: _____

                                    Print: _____ Title: _____

Date: _____, 2016          GAWKER MEDIA GROUP, INC.

                                     By: _____

                                     Print: _____ Title: _____




Date: _____, 2016          _____

                                     TERRY GENE BOLLEA, professionally
                                     known as "Hulk Hogan"

## Exhibit C

## Cooperation to Secure Agreements

The Gawker Debtors will assist Bollea in reaching an agreement with Nick Denton, pursuant to which, in exchange for the dismissal of Bollea's Dischargeability Complaint against Denton in *In re Nicholas A.G. Denton,* Case No. 16-12239-smb (the "**Denton Bankruptcy Case**"), with prejudice, and the satisfaction of Bollea's punitive damage award against Denton in the Bollea I Lawsuit (which punitive damages would then be included as a claim satisfied by the Settlement Payment as set forth in Paragraph 4 of the Agreement), Denton shall agree to the dismissal of the Leak Appeal and the Judgment Appeal, the execution by Denton of a declaration substantially in the form attached to this Agreement as **Exhibit A**, and the return and assignment of any rights associated with the Content, and Denton and Bollea shall execute for themselves, the Denton Estate, and each of their successors, assigns and heirs, mutual general releases of each other and their estates, predecessors, successors, assigns, heirs, agents, attorneys and representatives, and each of them, of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature whatsoever from the beginning of time; specifically excluding the Permanent Injunction entered in the Bollea I Lawsuit, the other Bollea II Defendants, and other obligations as may be applicable under the Agreement between Bollea and Denton.

The Gawker Debtors will assist Bollea in reaching an agreement with AJ Daulerio, pursuant to which, in exchange for the satisfaction of Bollea's punitive damage award against Daulerio in the Bollea I Lawsuit (which punitive damages would then be included as a claim satisfied by the Settlement Payment as set forth in Paragraph 4 of the Agreement), and the resolution of the Daulerio Collection Proceedings and other pending motions in the Bollea I Lawsuit, Daulerio shall agree to the dismissal of the Daulerio Appeal, Leak Appeal and Judgment Appeal, the return and assignment of any rights associated with the Content as set forth in the Rights Transfer Agreement, and the execution by Daulerio of a Declaration substantially in the form attached to this Agreement as **Exhibit A**, Daulerio and Bollea shall execute for themselves and each of their predecessors, successors, assigns, heirs, insurers, agents, representatives and attorneys, mutual general releases of each other and their predecessors, successors, assigns, heirs, insurers (if any), agents, attorneys and representatives, and each of them, of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations,

costs (including attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature whatsoever from the beginning of time; specifically excluding the Permanent Injunction entered in the Bollea I Lawsuit, the relief sought in the Sanctions Motion as to LSKS, the other Bollea II Defendants, and other obligations as may be applicable under the Agreement between Bollea and Daulerio.

The Parties will cooperate and work in good faith to facilitate an agreement between The Gawker Debtors, Nick Denton, Peter Thiel, and Thiel Capital, LLC, for themselves, and each of their respective subsidiaries, officers, directors, shareholders, members, predecessors, successors, assigns, heirs, insurers, agents, representatives, and attorneys, which agreement would include mutual general releases.

## **<u>EXHIBIT D</u>**

**Settlement Agreement with Shiva Ayyadurai**

## SETTLEMENT AGREEMENT

The parties, Dr. Shiva Ayyadurai ("**Ayyadurai**"), on the one hand, and Gawker Media, LLC ("**Gawker**"), Kinja KFT, now known as Gawker Hungary, KFT ("**Gawker Hungary**"), and Gawker Media Group, Inc. ("**GMGI**") (collectively, the "**Debtors**"), on the other hand, (all collectively, the "**Parties**"), enter into this Settlement Term Sheet ("**Term Sheet**") on this 1st day of November 2016, which sets forth the essential and material terms and conditions of their agreement in principle to resolve certain pending legal proceedings and disputes between and amongst them, while also resolving aspects of other disputes involving certain other parties (the "**Settlement Agreement**").

## RECITALS

WHEREAS**,** on May 10, 2016, Ayyadurai filed a complaint, *Shiva Ayyadurai v. Gawker Media LLC, et al.*, Case No. 1:16-cv-10853-JCB (the "**Complaint**"), in the United States District Court for the District of Massachusetts (the "**District Court**"), against Gawker, Sam Biddle, John Cook and Nick Denton (the **"Lawsuit**").

WHEREAS, the Complaint arises from three articles published at *gizmodo*.com and *gawker*.com, titled: "The Inventor of Email Did Not Invent Email?" published on Gizmodo.com on February 22, 2012; "Corruption, Lies, and Death Threats: The Crazy Story of the Man Who Pretended to Invent Email" published on Gizmodo.com on March 5, 2012 (collectively, the "**Two Gizmodo.com Articles**"); and "If Fran Drescher Read Gizmodo She Would Not Have Married This Fraud" published on Gawker.com on September 8, 2014 (the "**Gawker.com Article**") (all three articles being referred to collectively herein as the "**Content**") regarding Ayyadurai's claims of having invented email and Gawker's claims that he was a "fraud" for making such claims.

WHEREAS, Ayyadurai seeks at least $35 million in damages in the Lawsuit.

WHEREAS, on June 10, 2016, Gawker filed a voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and on June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

WHEREAS, on September 30, 2016, the Debtors filed a proposed disclosure statement (as it may be modified, amended, or supplemented, the "**Disclosure Statement**") and plan of reorganization (as it may be modified, amended, or supplemented, the "**Plan**"), and have sought to have the Disclosure Statement approved on November 3, 2016, and the Plan confirmed at a hearing scheduled for December 14, 2016.

WHEREAS, on October 11, 2016, the Debtors filed their motion for leave pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to conduct discovery concerning potential Plan issues and potential causes of action (the "**Rule 2004 Motion**").

WHEREAS, Ayyadurai filed two proofs of claim against Gawker, asserting a general unsecured claim of $35 million based on the claims in the Complaint and an unliquidated administrative priority claim based on Gawker's post-petition failure to remove the Content from its websites (collectively, the "**Ayyadurai Claims**").

WHEREAS, on October 10, 2016, in the Lawsuit, Gawker, Sam Biddle and John Cook filed a Motion to Dismiss the Complaint.  The Court has not yet held a hearing on, or ruled on, the motion.

WHERAS, on October 31, 2016, the Debtors filed an objection to each of the Ayyadurai Claims [Docket Nos. __, __ ].

## AGREEMENT

1.  **The Plan**: The Plan shall be amended so as to be consistent with the terms of this Term Sheet.

2.  **The Effective Date.** The Effective Date of this Settlement Agreement shall be the date upon which the Settlement Agreement and the Plan are approved by the Bankruptcy Court and all conditions necessary to the consummation of the Plan shall have been satisfied (the **"Effective Date").**  The Gawker Entities shall take all such steps as are reasonable and necessary to cause the Effective Date to occur on or before December 31, 2016.

3.  **Settlement Payment:**  On the Effective Date, or within three (3) business days thereafter, the Gawker Entities will pay to Ayyadurai the sum of $750,000 (Seven Hundred Fifty Thousand Dollars and zero cents) (the

"**Settlement Payment**").  The payment of the Settlement Payment shall be in full satisfaction of: (1) any claims asserted by Ayyadurai against the Gawker Entities, including all proofs of claim filed by Ayyadurai; (2) subject to paragraph 10 only in the case of Biddle and Cook, any claims (including claims in the Ayyadurai Action) against any employee, director, officer, manager, or independent contractor of the Gawker Entities (including Denton, Cook and Biddle); and (3) any claims asserted or that could be asserted by Ayyadurai against any other third-parties for which the Gawker Entities have or may have, directly or indirectly, indemnification, contribution or reimbursement obligations.  The Settlement Payment shall be made to Dr. Shiva Ayyadurai c/o Charles J. Harder, Esq. of Harder Mirell Abrams, LLP, by wire transfer as follows:  City National Bank, 400 N. Roxbury Dr., Beverly Hills, CA 90210, Harder Mirell & Abrams LLP Attorney Client Trust Account, ABA/Routing #122016066, Account #123-695-623, SWIFT Code: CINAUS6L.  Gawker Entities shall release Ayyadurai of any and all claims, causes of action, damages and remedies.

4.    **Allocation and Plan Support:**  Subject to entry of an order approving a disclosure statement, Ayyadurai agrees to support and vote in favor of confirmation of a plan of reorganization in which the Debtors obtain approval to consummate, and that incorporates, this Settlement Agreement.

5.    **Unsecured Creditors Trust**:  Ayyadurai waives and shall not receive any distribution or payment from the Unsecured Creditors Trust that will be established in the Plan.

6.    **Removal of the Gawker.com Article:**  Within 3 days following the Effective Date, the Gawker.com Article will be removed from *gawker.com*. The Gawker Entities agree that, as of the Effective Date, they will never again use, publish, disseminate or transmit the Gawker.com Article, or assist anyone in doing so, either directly or indirectly, and the Gawker.com Article will not be included with the *gawker.com* website content if and when that domain name and/or any corresponding website content is sold to a buyer.

7.    **Content Ownership:**  The Gawker Entities will quitclaim, assign and transfer any and all of their rights, title, interest, ownership rights, copyrights and all similar rights, if any, to Ayyadurai as to the Content.

8.    **Dismissal of Ayyadurai Action**:  Within three (3) business days following payment of the Settlement Payment and removal of the Gawker.com Article,

Ayyadurai shall file a notice dismissing, with prejudice, the Ayyadurai Action.

9.  **2004 Motion and Associated Claims**:  The Gawker Entities shall, upon execution of this Term Sheet, immediately suspend prosecution of the 2004 Motion until at least the Effective Date (the "**Suspension Period**").  The Gawker Entities shall not seek from Ayyadurai or any third party any discovery regarding Ayyadurai, including, without limitation, discovery concerning the subject matter of the 2004 Motion, litigation funding or finance, the Ayyadurai Action, the Gawker BK Action, the Denton BK Action, and any and all related proceedings, except for the following discovery to Ayyadurai only:  any litigation financing agreement(s) relating to the Lawsuit or claims in the lawsuit, and any non-privileged retainer agreements with Charles J. Harder, Esq. or the law firm of Harder Mirell & Abrams LLP relating to the Lawsuit or claims in the Lawsuit.

10.  **Cooperation Agreement**:  Biddle and Cook shall not be released from liability to Ayyadurai solely to the extent that such liability would not trigger, directly or indirectly, any indemnification, contribution or reimbursement obligation of any Gawker Entity (*e.g.,* punitive damages liability to the extent not indemnifiable), unless Biddle and/or Cook executes an agreement with Ayyadurai containing a mutual release of claims as to the parties and their respective agents, representatives, insurers and attorneys.  During the Suspension Period, the Parties shall cooperate and work in good faith to secure the agreement set forth in the Cooperation Agreement.  Good faith, as used in this paragraph, shall not mean or require any monetary payment by any of the Parties to another party or to the persons from whom the Parties will be seeking the relief requested in the Cooperation Agreement.

**IN WITNESS WHEREOF**, the Parties execute this Settlement Term Sheet as of November 1, 2016.

Date: _____, 2016    _____
                                Dr. Shiva Ayyadurai


Date: _____, 2016    GAWKER MEDIA, LLC
                                By: _____
                                Print: _____ Title: _____

{00074808;1}                         4

Ayyadurai shall file a notice dismissing, with prejudice, the Ayyadurai Action.

9.    **2004 Motion and Associated Claims**:  The Gawker Entities shall, upon execution of this Term Sheet, immediately suspend prosecution of the 2004 Motion until at least the Effective Date (the "**Suspension Period**").  The Gawker Entities shall not seek from Ayyadurai or any third party any discovery regarding Ayyadurai, including, without limitation, discovery concerning the subject matter of the 2004 Motion, litigation funding or finance, the Ayyadurai Action, the Gawker BK Action, the Denton BK Action, and any and all related proceedings, except for the following discovery to Ayyadurai only:  any litigation financing agreement(s) relating to the Lawsuit or claims in the lawsuit, and any non-privileged retainer agreements with Charles J. Harder, Esq. or the law firm of Harder Mirell & Abrams LLP relating to the Lawsuit or claims in the Lawsuit.

10.    **Cooperation Agreement:**  Biddle and Cook shall not be released from liability to Ayyadurai solely to the extent that such liability would not trigger, directly or indirectly, any indemnification, contribution or reimbursement obligation of any Gawker Entity (*e.g.,* punitive damages liability to the extent not indemnifiable), unless Biddle and/or Cook executes an agreement with Ayyadurai containing a mutual release of claims as to the parties and their respective agents, representatives, insurers and attorneys.  During the Suspension Period, the Parties shall cooperate and work in good faith to secure the agreement set forth in the Cooperation Agreement.  Good faith, as used in this paragraph, shall not mean or require any monetary payment by any of the Parties to another party or to the persons from whom the Parties will be seeking the relief requested in the Cooperation Agreement.

**IN WITNESS WHEREOF**, the Parties execute this Settlement Term Sheet as of November 1, 2016.

Date: _____, 2016    _____
Dr. Shiva Ayyadurai

Date: __11 / 7____, 2016    GAWKER MEDIA, LLC
By: _____
Print: William D. Holden    Title: C.R.O.

Date: 11/1 _____, 2016    GAWKER HUNGARY, KFT

By: _____

Print: William D. Holden    Title: Managing Director


Date: 11/1 _____, 2016    GAWKER MEDIA GROUP, INC.

By: _____

Print: William D. Holden    Title: C. R. O.

## **Cooperation Agreement**

The Gawker Entities will assist Ayyadurai in reaching an agreement with Biddle and Cook, pursuant to which, in exchange for the dismissal of the claims asserted against Biddle and Cook in the Ayyadurai Action with prejudice, a mutual release of claims.  It is expressly understood that the Settlement Agreement is not contingent on the Parties being able to secure Biddle's or Cook's agreement or cooperation.

# EXHIBIT E

**Settlement Agreement with Ashley Terrill**

# SETTLEMENT AGREEMENT

The parties, Ashley Terrill ("**Terrill**"), on the one hand, and Gawker Media, LLC ("**Gawker**"), Kinja KFT, now known as Gawker Hungary, KFT ("**Gawker Hungary**"), and Gawker Media Group, Inc. ("**GMGI**") (collectively, the "**Debtors**"), on the other hand, (all collectively, the "**Parties**"), enter into this Settlement Term Sheet ("**Term Shee**t") on this [  ] day of October, 2016, which sets forth the essential and material terms and conditions of their agreement in principle to resolve certain pending legal proceedings and disputes between and amongst them, while also resolving aspects of other disputes involving certain other parties (the "**Settlement Agreement**").

# RECITALS

**WHEREAS,** on January 19, 2016, Terrill filed a complaint, *Ashley Terrill v. Gawker Media LLC, et al.*, No. 16-CV-00411 (S.D.N.Y.) (the "**Complaint**"), in the United States District Court for the Southern District of New York (the "**District Court**"), against Gawker Media, Sam Biddle, John Cook, and Nick Denton (the **"Lawsuit**").

WHEREAS, the Complaint arises from an article at *gawker*.com, authored by Sam Biddle titled "Tinder Confidential:  The Hookup App's Founders Can't Swipe Away the Past" (the "**Article**") regarding Terrill's investigation into a former executive for the dating application Tinder, and Terrill's belief that she was being harassed for undertaking the investigation.

WHEREAS, Terrill seeks at least $10 million in damages in the Lawsuit.

WHEREAS, on June 10, 2016, Gawker Media filed a voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and on June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

WHEREAS, on September 30, 2016, the Debtors filed a proposed disclosure statement (as it may be modified, amended, or supplemented, the "**Disclosure Statement**") and plan of reorganization (as it may be modified, amended, or supplemented, the "**Plan**"), and have sought to have the Disclosure Statement approved on November 3, 2016, and the Plan confirmed at a hearing scheduled for December 14, 2016.

WHEREAS, on October 11, 2016, the Debtors filed their motion for leave pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to conduct discovery concerning potential Plan issues and potential causes of action (the "**Rule 2004 Motion**").

WHEREAS, Terrill filed two proofs of claim against Gawker Media, asserting a general unsecured claim of $10 million based on the claims in the Complaint and an unliquidated administrative priority claim based on Gawker Media's post-petition failure to remove the Content from its websites (collectively, the "**Terrill Claims**").

WHEREAS, in the Lawsuit, Gawker, Sam Biddle, and John Cook requested permission of the District Court to file a motion to dismiss the First Amended Complaint; the Court granted such permission and has ordered such motion to be filed on or before November 11, 2016.  The motion has not yet been filed.

WHERAS, on October 31, 2016, the Debtors filed an objection to each of the Terrill Claims [Docket No. 399].

## AGREEMENT

1. **The Plan**: The Plan shall be amended so as to be consistent with the terms of this Term Sheet.

2. **The Effective Date.** The Effective Date of this Settlement Agreement shall be the date upon which the Settlement Agreement and the Plan are approved by the Bankruptcy Court and all conditions necessary to the consummation of the Plan shall have been satisfied (the **"Effective Date"**).  The Gawker Entities shall take all such steps as are reasonable and necessary to cause the Effective Date to occur on or before December 31, 2016.

3. **Settlement Payment:**  On the Effective Date, or within three (3) business days thereafter, the Gawker Entities will pay to Terrill the sum of $500,000 (Five Hundred Thousand Dollars and Zero cents) (the "**Settlement Payment**").  The payment of the Settlement Payment shall be in full satisfaction of: (1) any claims asserted by Terrill against the Gawker Entities, including all proofs of claim filed by Terrill; (2) subject to paragraph 11 only in the case of Biddle and Cook, any claims (including claims in the Terrill Action) against any employee, director, officer, manager, or independent contractor of the Gawker Entities (including Denton, Cook and Biddle); and

(3) any claims asserted or that could be asserted by Terrill against any other third-parties for which the Gawker Entities have or may have, directly or indirectly, indemnification, contribution or reimbursement obligations.  The Settlement Payment shall be made to Ashley Terrill c/o Charles J. Harder, Esq. of Harder Mirell Abrams, LLP, by wire transfer as follows:  City National Bank, 400 N. Roxbury Dr., Beverly Hills, CA 90210, Harder Mirell & Abrams LLP Attorney Client Trust Account, ABA/Routing #122016066, Account #123-695-623, SWIFT Code: CINAUS6L. On the Effective Date, the Gawker Entities shall be deemed to release Terrill of any and all claims, causes of action, damages and remedies.

4.    **Allocation and Plan Support:**  Subject to entry of an order approving a disclosure statement, Terrill agrees to support and vote in favor of confirmation of a plan of reorganization in which the Debtors obtain approval to consummate, and that incorporates, this Settlement Agreement.

5.    **Unsecured Creditors Trust**:  Terrill waives and shall not receive any distribution or payment from the Unsecured Creditors Trust that will be established in the Plan.

6.    **Removal of the Article:**  Within 3 days following the Effective Date, the Article will be removed from *gawker*.com.  The Gawker Entities agree that, as of the Effective Date, they will never again use, publish, disseminate or transmit the Article, or assist anyone in doing so, either directly or indirectly, and the Article will not be included with the *gawker.com* website content if and when that domain name and/or any corresponding website content is sold to a buyer.

7.    **Delivery and Deletion of Materials and Recordings:**  Within 3 business days following the Effective Date, all of the materials and files that Terrill provided to Gawker, including but not limited to hard copies, emails, contents of a zip drive, contents of a thumb drive, and the storage devices themselves (collectively, the "**Materials**"), and also any and all audio recordings and/or video recordings of Terrill created by Gawker and/or Biddle, including all transcripts, summaries, notes and other writings relating to any and all such recordings (collectively, the "**Recordings**"), will be delivered to Terrill, in care of her counsel Charles J. Harder, Esq.  On or before the Effective Date, Gawker Entities shall destroy and not retain any originals, copies, extracts or other reproductions in whole or in part of the

Materials and Recordings including any electronic, digital, or other back-up copies, contained on any systems or devices in the possession, custody or control of Gawker Entities.

8.   **Content Ownership:**  The Gawker Entities will quitclaim, assign and transfer any and all of their rights, title, interest, ownership rights, copyrights and all similar rights, if any, to Terrill as to the Article and Recordings.

9.   **Dismissal of Terrill Action**:  Within three (3) business days following payment of the Settlement Amount, removal of the Article, and completion of the action items set forth in Paragraph 7, Terrill shall file a notice dismissing, with prejudice, the Terrill Action.

10.   **2004 Motion and Associated Claims**:  The Gawker Entities shall, upon execution of this Term Sheet, immediately suspend prosecution of the 2004 Motion until at least the Effective Date (the "**Suspension Period**").  The Gawker Entities shall not seek from Terrill or any third party any discovery regarding Terrill, including, without limitation, discovery concerning the subject matter of the 2004 Motion, litigation funding or finance, the Terrill Action, the Gawker BK Action, the Denton BK Action, and any and all related proceedings, except for the following discovery to Terrill only:  any litigation financing agreement(s) relating to the Lawsuit or claims in the lawsuit, and any non-privileged retainer agreements with Charles J. Harder, Esq. or the law firm of Harder Mirell & Abrams LLP relating to the Lawsuit or claims in the Lawsuit..

11.   **Cooperation Agreement:**  Biddle and Cook shall not be released from liability to Terrill solely to the extent that such liability would not trigger, directly or indirectly, any indemnification, contribution or reimbursement obligation of any Gawker Entity (*e.g.,* punitive damages liability to the extent not indemnifiable), unless Biddle and/or Cook executes an agreement with Terrill and delivers to the Gawker Entities, who shall in turn deliver to Terrill, all Materials and Recordings, and destroy and not retain any originals, copies, extracts or other reproductions in whole or in part of the Materials and Recordings including any electronic, digital, or other back-up copies, contained on any systems or devices, as described in the attached Cooperation Agreement.  Upon the execution of such agreement and delivery to Terrill, the individual executing such agreement (Biddle and/or Cook) shall be released from any and all liability to Terrill.  During the Suspension Period, the Parties shall cooperate and work in good faith to

secure the agreement set forth in the Cooperation Agreement. Good faith, as used in this paragraph, shall not mean or require any monetary payment by any of the Parties to another party or to the persons from whom the Parties will be seeking the relief requested in the Cooperation Agreement.

**IN WITNESS WHEREOF**, the Parties execute this Settlement Term Sheet as of November 1, 2016.

Date: __11/1/2016__, 2016    _____

Ashley Terrill

Date: _____, 2016    GAWKER MEDIA, LLC

By: _____

Print: _____ Title: _____

Date: _____, 2016    GAWKER HUNGARY, KFT

By: _____

Print: _____ Title: _____

Date: _____, 2016    GAWKER MEDIA GROUP, INC.

By: _____

Print: _____ Title: _____

secure the agreement set forth in the Cooperation Agreement.  Good faith, as used in this paragraph, shall not mean or require any monetary payment by any of the Parties to another party or to the persons from whom the Parties will be seeking the relief requested in the Cooperation Agreement.

**IN WITNESS WHEREOF**, the Parties execute this Settlement Term Sheet as of November 1, 2016.


Date: _____, 2016    _____
                                Ashley Terrill


Date: 11/1_____, 2016    GAWKER MEDIA, LLC
                                By: _____
                                Print: William Holden      Title: CRO


Date: 11/1_____, 2016    GAWKER HUNGARY, KFT
                                By: _____
                                Print: William Holden      Title: Managing Director


Date: 11/1_____, 2016    GAWKER MEDIA GROUP, INC.
                                By: _____
                                Print: William Holden      Title: CRO

## Cooperation Agreement

The Gawker Entities will assist Terrill in reaching an agreement with Biddle and Cook, pursuant to which, in exchange for the dismissal of the claims asserted against Biddle and Cook in the Terrill Action with prejudice, and mutual release of claims, Biddle and Cook will deliver on the Effective Date to the Gawker Entities, who will in turn provide to counsel to Terrill (a) the Materials and Recordings, and will destroy and not retain any originals, copies, extracts or other reproductions in whole or in part of the Materials and Recordings including any electronic, digital, or other back-up copies, contained on any systems or devices, in Biddle's or Cook's possession, custody and/or control, and (b) a certification under penalty of perjury that he has no Materials or Recordings, after undertaking best efforts to locate Materials and Recordings (including directing the Gawker Entities to any place on their former premises in which Biddle or Cook believes Materials and/or Recordings might be located).

It is expressly understood that the Settlement Agreement is not contingent on the Parties being able to secure Biddle's or Cook's agreement or cooperation.

# **EXHIBIT F**

**Schedule of Professional Fee Claim Reserve Amounts**

## Schedule of Professional Fee Claim Reserve Amounts

| **Professional Fee Claim Reserve** | **Reserve Amount** |
|---|---|
| GMGI Professional Fee Claim Reserve | $   500,000 |
| Gawker Media Professional Fee Claim Reserve | $ 5,466,515 |
| Gawker Hungary Professional Fee Claim Reserve | $ 3,644,343 |