## **Attachment 1**

May 27, 2016 Summary Judgment Oral Argument Transcript

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
CAMDEN COUNTY, NEW JERSEY
DOCKET NO:  L-3675-14
A.D. NO.:_____

---------------------------

**MITCHELL WILLIAMS,**               )
                                     )
          **Plaintiff,**             )
                                     )               **TRANSCRIPT**
     **vs.**                         )
                                     )                   **OF**
**THE MLB NETWORK, INC.,**           )
**ET AL.,**                          )
                                     )                 **MOTION**
          **Defendant.**             )
---------------------------

                        Place:  Camden County Hall of Justice
                                101 South Fifth Street
                                Camden, New Jersey 08103-4001

                        Date:  May 27, 2016

**BEFORE:**

     THE HONORABLE KASSEL, J.S.C.

**TRANSCRIPT ORDERED BY:**

     JAIME VASSALIO
     (LexisNexis CourtLink)

**APPEARANCES:**

     LAURA C. MATTIACCI, ESQ.
     RAHUL MUNSHI, ESQ.
     (Console Law Offices, LLC)
     Attorneys for the Plaintiff

     PETER O. HUGHES, ESQ.
     RYAN T. WARDEN, ESQ.
     (Ogletree Deakins)
     Attorneys for the Defendant

**LAUREN A. VOLLMIN**
**A**UTOMATED TRANSCRIPTION SERVICES
*P.O. Box 1582*
*Laurel Springs, New Jersey 08021*
*(856) 784-4276*
*(856) 784-7245 (fax)*
autotranscripts@comcast.net

2

APPEARANCES (CONTINUED):

    CHAD R. BOWMAN, ESQ.
    THOMAS B. KELLY, ESQ.
    ELIZABETH SEIDLIN-BERNSTEIN, ESQ.
    (Levine Sullivan Koch & Schultz, LLP)
    Attorneys for the Defendant

---

3

# I N D E X

May 26, 2016

PROCEEDING                                    PAGE

Motion
Argument
  By Ms. Mattiacci                            3/54
  By Mr. Hughes                               39
  By Mr. Bowman                               35
Judge's Decision                              81

```
 1              THE COURT:  All right.  The latest
 2    installment of Williams of Williams versus MLB Network,
 3    L-3674-14.
 4              Appearances, please.
 5              MS. MATTIACCI:  Good afternoon, Your Honor;
 6    Console Law Offices for the plaintiff, Mitchell
 7    Williams.
 8              MR. MUNSHI:  Good afternoon, Rahul Munshi, on
 9    behalf of the plaintiff, Mitchell Williams.
10              MR. HUGHES:  Peter Hughes; Ogletree Deakins,
11    for defendant, MLB Network.
12              MR. WARDEN:  Ryan Warden, Ogletree Deakins,
13    defendant, MLB Network.
14              MR. BOWMAN:  Good afternoon, Your Honor, Chad
15    Bowman, for defendant Gawker Media, LLC.
16              MR. KELLEY:  Tom Kelley, Your Honor, for
17    Gawker Media, LLC.
18              MS. BERNSTEIN:  Elizabeth Seidlin-Bernstein
19    also for Gawker Media.
20              THE COURT:  Very good.  I'm not sure which
21    order the motions came in, but of the two motions, the
22    one motion by the plaintiff in regard to the contract
23    claims and the motion by Gawker in regard to the
24    defamation causes of action, the one that looks a bit
```

```
 1    cleaner to some extent are the contract claims.
 2              So unless somebody has a reason in doing it
 3    in the reverse order, let's do that first.  Who is
 4    going to be arguing on behalf of the plaintiff?
 5              MS. MATTIACCI:  I am, Your Honor.
 6              THE COURT:  All right.  Just one second.  All
 7    right.  All right.  Very good.  You may proceed.
 8              MS. MATTIACCI:  Thank you, Your Honor.  We
 9    bring this motion because the deposition testimony of
10    Mr. Catidi who is the CEO or was the CEO at the time of
11    MLB Network and the admitted decision maker in this
12    case, testified clearly as to the reason why he
13    terminated the contract, stopped paying Mr. Williams.
14              At his deposition, he testified the question
15    was:
16              "QUESTION:  Do you agree that the receipt of
17    this letter caused you to make the decision to no
18    longer pay Mitch  Williams?"
19              The letter being the letter that he received
20    from our office in response to the amendment that was
21    given to him.  Mr. Catidi's answer was clear, yes, it
22    was the receipt of the letter that caused him to stop
23    paying Mr. Williams.
24              There is no dispute that the only paragraph
25    that MLB Network is bringing into - is citing to in
```

1      order to say that they could terminate Mr. Williams
2      under this contract is 15.03 Section 2, Section 2 only.
3      They say he was not terminated under Section 1 or
4      Section 3.  Section 2 states that the artist should
5      prior to -- if the artist should prior to or during the
6      term hereof commits any act or omits any act of any
7      action which brings the artist into non-trivial public
8      disrepute, scandal, contempt or ridicule or what
9      shocks, insults or offends a substantial portion or a
10     group of community or reflects unfavorably in a non-
11     trivial manner on any of the parties.
12            And there is -- as a matter of law, there is
13     no way that receiving the letter or Mr. Williams having
14     the letter sent by his attorney to MLB Network would
15     violate 15.03, Section 2 of the contract.
16            THE COURT:  Right.  It's a bit of a stretch
17     to argue that that's the reason.  It takes the letter
18     out of context.  The whole case of MLB Network has been
19     based upon their morals clause of what happened here
20     and we touched on this in some previous oral arguments
21     is that given the benefit of all favorable inferences
22     to MLB Network as a summary judgment motion requires,
23     the inference is is that they believe they have a basis
24     for terminating the contract when they hear about these
25     allegations and Mr. Williams' behavior but made an

7

1      effort to salvage the relationship they offer him a
2      basis for remaining employed, not going to Little
3      League type of games, going for anger management, that
4      type of stuff.  There was some back and forth and
5      eventually that letter comes in where there -- MLB's
6      requested amendment to the contract is not accepted.
7            So the letter is sent to MLB and that
8      apparently was the straw that broke the camel's back
9      from their perspective, but that was only the straw, it
10     wasn't the entire back of the camel.  It was everything
11     combined.  At least their entitled to that inference.
12     You can make that argument before a jury but the
13     inference that they're entitled to is that it was the
14     amalgamation of events including the refusal to sign
15     the amendment that caused them to regard the morals
16     clause to be in violation.
17            MS. MATTIACCI:  Well, I think that inference
18     is a huge stretch because this is the decision-maker.
19     He is the CEO.  He could have testified as they wanted
20     him to testify and say oh, no, it wasn't the receipt of
21     the letter that caused it, but that's what he said.
22     That's his testimony.
23            THE COURT:   I understand that, but you can't
24     interpret snippets of colloquies in depositions taken
25     out of context.  The reason why there was the back and

```
 1        forth in regard to the proposed amendment was it as
 2        based upon what the news media had reported had
 3        occurred in Gawker have MLB concerned that there may be
 4        a violation of a morals clause.
 5                MS. MATTIACCI: Well okay.  So let me go to
 6        the second argument then, Your Honor, because --
 7                THE COURT:  I'm trying -- I'm trying -- where
 8        did all of this -- I want to get the moral clause out
 9        because the second --
10                MS. MATTIACCI: Yes.
11                THE COURT:  -- argument actually presented
12        more interesting a more interesting topic and I'm just
13        trying to --
14                MS. MATTIACCI:  If you have the -- I can give
15        you a copy of the contract, Your Honor, it's page 11 if
16        you don't have it.  If you do --
17                THE COURT:   What exhibit in --
18                MS. MATTIACCI: It is Exhibit A to plaintiff's
19        motion for summary judgment.
20                THE COURT:  All right.  All right.  Very
21        good.
22                MS. MATTIACCI: And page 11 at the bottom is
23        the morals clause.
24                THE COURT:   All right.  I'm there.
25                MS. MATTIACCI: Okay.  So the second argument,
```

```
 1        Your Honor, is that the decision maker, the CEO of MLB
 2        Network testified that he must conclude that the
 3        alleged conduct is true in order to trigger the morals
 4        clause.  He testified to that on page 111 of his
 5        deposition.
 6                The question was clear:
 7                "QUESTION:  Do you agree with me then that it
 8        would in order for you to trigger Section 1503, you
 9        must conclude that the alleged conduct is true.
10                "ANSWER:  Right.  The conduct from the entire
11        weekend, Saturday and Sunday.  Yes."
12                And then when asked if he concluded if the
13        alleged conduct was true he said he wasn't sure, he
14        didn't know if it was true or not.
15                THE COURT:   Well, how would he know?  He
16        wasn't there.  Let me give you an easier example.  O.J.
17        Simpson told some time in 1992 was a pitch man for
18        certain products as I recall.
19                These morals clauses, my guess is appeared in
20        virtually every contract involving a celebrity and a
21        product or something where they want the goodwill of
22        the celebrity as part of the advertisement pitch.
23        That's why celebrities are hired, rather than you or
24        me.
25                So these morals clauses are ubiquitous.  Now,
```

```
 1        I don't know for sure whether or not O.J. Simpson did
 2   what he was alleged in the criminal trial to do.  He
 3   was acquitted in the criminal trial.  In the civil
 4   trial, he was found culpable.
 5        But nobody -- I don't know what products Mr.
 6   Simpson had back in '90 -- back in 1992, but presumably
 7   if he was selling -- what was he -- what was his big
 8   account back then?
 9        MS. MATTIACCI: I think Hertz.
10        THE COURT:   Hertz.  Thank you.  Suppose
11   Hertz said, you know what, we weren't there when two
12   people were murdered, but the American public, a good
13   part of them thinks that Simpson is guilty.  We don't
14   want him pitching our Hertz products anymore.
15        The interesting question is whether or not A,
16   somebody at the product has to believe the accusation.
17   Why does it have to be -- who is this fellow who got
18   deposed on behalf of the MLB?
19        MS. MATTIACCI: He's the CEO  --
20        THE COURT:   Oh, the CEO.  Okay.
21        MS. MATTIACCI:  -- and the decision maker.
22        THE COURT:  As opposed to anybody else.  But
23   more importantly, does the person actually have to be
24   guilty of the underlying offense?  You can make the
25   argument that it's not fair to the celebrity if they're
```

```
 1   wrongfully accused of something and it just so happens
 2   that the chief executive of the company who may be
 3   looking for a reason to get rid of the celebrity, maybe
 4   the celebrity is not selling as much product as they
 5   had hoped and now somebody makes an accusation, it ends
 6   up in the paper and the CEO can very conveniently site
 7   I agree he killed two people, he beat his wife, he
 8   spray painted a slogan on a wall, he got drunk and spit
 9   in somebody's face.  Whatever the accusation may be
10   from time-to-time, anybody can make an accusation.
11        MS. MATTIACCI:  Right.
12        THE COURT:   Why should it matter that it
13   actually is believed or not believed by the employer
14   because the employer could always say it's kind of
15   self-serving if they want to get rid of the celebrity,
16   I believed it.
17        It seems an awkward test to put the ability
18   to terminate a contract solely on the subject of belief
19   of somebody who works for the employer.
20        MS. MATTIACCI: It shouldn't be.  I believe
21   that the way the contract is written and the language
22   of the contract, it had to have happened in order for
23   him to terminate.
24        THE COURT:  well, suppose it happened, but
25   the employer -- you can have a situation where it
```

```
 1    happened, 95 percent of the country believes it
 2    happened, but just because the CEO has some doubt then
 3    we don't have a violation of a morals clause?
 4            MS. MATTIACCI:  No.  No, Your Honor.  One,
 5    the contract is written -- because a lot of these
 6    contracts say -- specify in -- to the full discretion
 7    of the employer if the employer --
 8            THE COURT:  Well, let's take it -- let's take
 9    it -- let's see if the language in the morals clause
10    tells us --
11            MS. MATTIACCI: Right.
12            THE COURT:   -- if an artist should prior to
13    blah, blah, blah, blah --
14            MS. MATTIACCI: Commit.
15            THE COURT:   All right.
16            MS. MATTIACCI: Commit the act.  It does not
17    have the terms in there that you sometimes see in these
18    morals clauses where it says if in the sole discretion
19    of the employer the employer concludes --
20            THE COURT:   Right. He's got to commit the
21    act.  Okay.
22            MS. MATTIACCI: Yeah.
23            THE COURT:   Where does it say that the
24    employer has to believe the allegation that the
25    celebrity committed the act?  Where does it say that?
```

```
 1            MS. MATTIACCI: No, we are saying that that's
 2    even -- not -- what we are saying that the fact that
 3    the employer didn't even believe that he committed it
 4    how are they going to reach the height of he committed
 5    it?  I mean, they don't even believe that he committed
 6    it.
 7            THE COURT:   I know people that don't believe
 8    that Elvis is dead.  I know people that believe in wild
 9    conspiracy theories.  Some of them are -- maybe they're
10    right, I don't know.  But the point I'm making is that
11    whether or not an athlete or a celebrity is in
12    violation of a contractual morals clause shouldn't
13    depend upon the subject of belief of some individual
14    sitting on the 12$^{th}$ floor of some office who may not be
15    privy to all of the investigatory materials.
16            MS. MATTIACCI: Well --
17            THE COURT:   Did he read -- did this fellow
18    who you deposed, did he read every single police
19    report, every single witness statement, everything that
20    was generated out of this event?
21            MS. MATTIACCI: Ok
22            THE COURT:   And even if he did suppose he
23    has a bias against Mitch Williams?
24            MS. MATTIACCI:  Well, Your Honor, there were
25    no police reports, there was never an arrest, there was
```

14

```
 1    nothing of that nature.
 2              THE COURT:   But you understand the problem
 3    is is that if we -- if -- and by the way, nobody
 4    started any -- I don't -- the defense didn't start any
 5    case law as far as I can recall as to whether it is an
 6    objective test or a subjective test.  An objective test
 7    would be far simpler.
 8              We can look at the evidence against the
 9    athlete and determine whether that objectively speaking
10    the evidence preponderates in favor that he or she did
11    it or it preponderates in favor of he or she didn't do
12    it.
13              You can even use a higher standard if you
14    want, but at least it's subjective.  By saying we asked
15    the head of the company if he believes it, you turned
16    an objective standard into a subjective standard and if
17    the executive wants to get rid of the celebrity, he or
18    she can very easily say I believed it and then bingo,
19    the celebrity is out their income.
20              MS. MATTIACCI:  Well, the motion is based
21    upon the testimony of the decision maker.  He was the
22    one that was most intimately involved in the situation
23    and this decision maker said that his understanding of
24    the contract was that he had to have concluded that it
25    occurred in order to fire him.
```

15

```
 1              THE COURT:   Well, suppose he said -- do
 2    yourself a thought experiment.
 3              MS. MATTIACCI: Yes.
 4              THE COURT:   Suppose he said, you know
 5    something, after I read what happened, I've never seen
 6    a more guilty person than Mitch Williams, I would stake
 7    my life he is guilty.  Do you take your lawsuit and
 8    dismiss it?
 9              MS. MATTIACCI:  No, because I don't think
10    that even the conduct that was alleged would violate
11    the morals clause so --
12              THE COURT:   Well, but the point is of course
13    you wouldn't.  You wouldn't say that my client's multi-
14    million dollar contract claim depends upon whether or
15    not this guy says he believes or doesn't believe the
16    accusation.
17              Look, I don't know what happened that
18    particular day.  And ultimately we may have to sort it
19    out, but it seems to me absent case law the fairest way
20    to approach it is doing he do it or not?  What did he
21    do?
22              Because if he didn't do what's alleged why
23    should he lose his contract?  My point is it shouldn't'
24    depend upon what some fellow at Major League Baseball
25    thinks did or didn't happen.  All right?  Look, if the
```

1      contract said that, if the contract said it shall be a
2      violation of the morals clause whether the celebrity
3      did it or not if the company believes he did it.
4                Because remember, who is in the company?  The
5      companies are amorphous things and they only speak to
6      human beings.  Right?  So some human being has to
7      believe or not believe.
8                He didn't even say in the opinion of the CEO
9      if the celebrity, you know, violated the morals clause,
10     that's sufficient.  But they didn't write it that way.
11     The only term they use commits any act which to me
12     connotes that the athlete actually has to have done it
13     and if he didn't do it, it doesn't matter what anybody
14     thinks.
15               And the salutary results from that is that
16     people don't lose their jobs based upon false
17     allegations because anything can appear in the
18     newspaper, anything can appear in a magazine, accusing
19     anybody of anything and it seems to me not lose their
20     sources of income because somebody makes an allegation
21     in the paper and I'll tell you with the internet, you
22     know, in the old days it was a bit more difficult.
23               Today with the internet, a story that may
24     have been buried 30 years ago because somebody was a
25     crack pot, now ends up being on Google News, you know,

17

1      the third thing down, all of a sudden everybody is
2      talking about.
3                It goes viral as -- to use the nomenclature.
4      So neither side cited a case -- which was rather
5      surprising because these moral clauses as I say are
6      ubiquitous.  But it seems to me that the issue
7      concerning whether or not Mr. Williams did what Gawker
8      alleged he did in their articles as being the basis of
9      a violation of the morals clause doesn't depend upon
10     the subjective belief of the CEO of Major League
11     Baseball Network.
12               It should depend upon whether or not Mr.
13     Williams actually did what the Gawker alleged that he
14     did.
15               MS. MATTIACCI:  Okay.  On that point then,
16     Your Honor, there is absolutely zero evidence that he
17     ever ordered a bean ball of a child.
18               THE COURT:   We'll deal with that.  That's a
19     separate -- that at best is probably going to be
20     injurious so we'll deal with that.  But that dovetails
21     more to the defamation causes of action and we'll deal
22     with that.
23               But remember you're -- your motion was based
24     upon getting the CEO to say certain things. By the way,
25     he didn't say he didn't believe it.  I think he hedged

```
 1   it a bit.  What exactly did he say?
 2           MS. MATTIACCI: He said he wasn't sure.
 3           THE COURT:  Wasn't sure.  Which actually may
 4   be honest.  I mean, I'm -- look, I'm privy -- I have --
 5   the record should reflect this is what, about ten
 6   pounds worth of stuff?  All right?  All the witnesses
 7   statements, everything else assuming I actually read
 8   each statement; I sat in my apartment at 11 o'clock
 9   last night until 5 o'clock in the morning, I read every
10   piece of -- every document, every piece of evidence in
11   this case they conflict.  I don't know what happened,
12   right?  It's like -- it's like anything else in life,
13   there are a number of different versions and ultimately
14   that's what we have juries for.  We have juries sort it
15   out for better or for worse.
16           The jury might not get it right, who knows
17   but both sides are entitled to have a jury pass on the
18   allegation that Mr. Williams misbehaved during that
19   Little League game.
20           All right.  What's your -- what other
21   arguments do you want to pose in regard to the contract
22   claim?
23           MS. MATTIACCI: Well, the fact that even
24   taking the conduct that MLB alleges he engaged in that
25   violates the morals clause no reasonable jury could
```

```
 1   conclude that that rises to the level that he violated
 2   the morals clause as it's written.
 3           That does not bring Mr. Williams into non-
 4   trivial, non-trivial, meaning significant public
 5   disrepute, scandal, contempt, or ridicule which shocks
 6   or insults or offends a substantial portion or group of
 7   the community or reflects unfavorably in a non-trivial
 8   meaning substantial as confirmed by MLB, that's what he
 9   means substantial in any of the parties.
10           So even if you take that he got into an
11   argument with the ref --
12           THE COURT:  Well, that doesn't -- I don't
13   think anybody argues that the manager of a team arguing
14   with the umpire somehow is eight standard deviations
15   away from the norm.  I'm not a -- I wasn't an athlete
16   when I was young and I didn't participate all that much
17   but from what I've seen on T.V. the manager is arguing
18   with the referees and umpires are pretty much standard
19   for the game.
20           The obvious allegation in this case I think
21   stands out as being if true particularly reprehensible
22   is the order to have some 10-year-old throw a baseball
23   at some other ten-year-old's head.  That's what's being
24   alleged here.  And if that's true, that would be meet
25   the morals clause.
```

1      If that gets kicked off, then you're right,
2  some of the other stuff may be a bit more murky.  But
3  at this point in time it looks like it represents jury
4  issues until and unless that gets thinned out of a
5  case.
6      MS. MATTIACCI:  Okay.  Thank you, Your Honor.
7      THE COURT:  Anybody from the defense in
8  regard to the contract issues? Anybody want to --
9  anybody want to -- only because you know it's -- a lot
10  of my comments cut both ways.
11      Anybody aware of a case that suggests how a
12  morals clause that contains language like this should
13  be interpreted in terms of -- is it an objective
14  standard, is it a subjective standard? Anybody have any
15  authority on that?
16      MR. HUGHES:  The issue -- I'm sorry, Your
17  Honor, Peter Hughes, the issue wasn't raised in the
18  motion, so I didn't really look into it for this.
19      THE COURT:  Well, eventually, if the case
20  goes to the jury the jury is going to be charged and I
21  assume that one of the issues is is does a jury have to
22  determine that, in fact, the plaintiff did do what was
23  alleged because if he didn't, it doesn't matter if
24  everybody at MLB Network believes he did, if he didn't
25  do it, it's not a violation of the morals clause.

21

1      MR. HUGHES: Your Honor, I would say suffice
2  to say the evidence we could win under either standard.
3      THE COURT:  No, but if that -- if you want
4  to win and have the win stick, the jury has to be
5  properly instructed and everybody should know the prism
6  upon which the case has to be tried and I'm not going
7  to put you on the spot. You're right, it wasn't -- it's
8  not a central part of the motion, but to me it's one of
9  the more interesting things raised tansgenerally in the
10  motion papers is is that can somebody who is innocent
11  of an allegation, but the allegation is well publicized
12  in the media, thereby destroying the celebrity's good
13  will.
14      I'm trying to think of an example, of a more
15  recent example if somebody was falsely accused of
16  something, anybody think of anything that comes to
17  mind?
18      MS. MATTIACCI: Well, Your Honor, the CEO was
19  asked that exact question of whether the -- whether he
20  could be terminated under the morals clause --
21      THE COURT:  Right.
22      MS. MATTIACCI: -- if it was a defamatory
23  publication.  It said if we were assumed that a
24  publication like Deadspin writes an article that
25  defames Mr. Williams, made  a false statement.  He

1     ordered a kid to throw a bean ball.  That's just not
2     true, but the article catches fire, it gets reported.
3     People Tweet about it, et cetera, do you believe under
4     the agreement that you would then be able to terminate
5     the agreement based on a defamatory publication that is
6     out there?
7                 "ANSWER:  No."
8                 THE COURT:   He's probably right.  It seems
9     intuitively unfair.  You may think well it's unfair for
10    the employer to be stuck with a radioactive employee,
11    but they could avoid that by redrafting a morals clause
12    that basically says it doesn't matter if you did it or
13    not, if people think you did it, in this country or in
14    this world is just as bad as doing it because once the
15    allegation is out there it's difficult to put the genie
16    back into the bottle and we don't want you pitching our
17    product or, you know, or being the spokesman for our
18    company if everybody out there thinks that you did it,
19    even if you didn't do it.
20                But that's not the way this moral -- at least
21    it's not clear that that's the way that this morals
22    clause was written.
23                MS. MATTIACCI: Exactly, Your Honor.
24                THE COURT:   It probably was taken from a
25    million other morals clauses that are out there

23

1     involving Hollywood celebrities and athletes and the
2     like and but maybe there's case law in California where
3     you see a bit more of this because of the celebrity
4     culture out there.
5                 MS. MATTIACCI: Right.
6                 THE COURT:   All right.
7                 MS. MATTIACCI: I just had one other issue for
8     the breach of contract claim and that is that even if
9     it was determined that he engaged in the conduct
10    alleged that it was determined that that conduct
11    violated the morals clause that it was not a material
12    breach of the contract --
13                THE COURT:   Yeah, I saw that.  I'll make
14    short work of that.  It's true that there is one part
15    in the contract that specifies what is a material
16    breach and there are maximums of contract
17    interpretation that allow -- for the inference then
18    well, if the drafters of the contract were very
19    specific that A is a material breach and they don't say
20    that B, C, and D are material breaches than ipso facto
21    they didn't intend B, C, and D to be material breaches.
22                There are maximums of contract interpretation
23    that allow that but there are also maximums of contract
24    interpretation that go the opposite direction that one
25    would not infer that just because there are certain

1   language specify in some parts, that the other parts
2   that don't contain that language specificity meant to
3   disinclude it specifically in this particular case it's
4   hard to imagine the intent of the employer in putting
5   in a morals clause to have a situation where you have a
6   very blatant morals clause violation and yet even
7   though the celebrity no longer has any value in regard
8   to their name, that the employer still wants to pay
9   them as though they were out -- they were the person
10  that was hired before the allegation went out there.
11          That's an awkward way of putting it, but it's
12  hard to imagine a morals clause violation that by its
13  definition is not trivial.  If it's trivial, it's not a
14  morals clause violation.  If it's a non-trivial morals
15  clause violation, it's hard to imagine a situation
16  where one would not say it's material.
17          MS. MATTIACCI: Well, let me just address a
18  couple of things one, the definition of material
19  breach.  Material goes to the essence of the contract.
20  The essence of this contract was Mr. Williams being an
21  analyst, MLB paying him to be an analyst.
22          THE COURT:  No.  The essence of the contract
23  was Mr. Williams was Mr. Williams.  They're paying
24  because Mr. Williams is Mr. Williams.  They're not
25  going to pay me to do -- I might know more than -- for

25

1   all you know, I might know more about baseball than Mr.
2   Williams.  I don't, but you don't know that.
3          MS. MATTIACCI: I know, Your Honor.
4          THE COURT:  All right. But I am just some
5   name, Mr. Williams has a cachet to his name and that
6   was in part the reason why he's paid.  When you pay for
7   a celebrity and you have a morals clause you're paying
8   a premium to have the value of the celebrity's name
9   that even though somebody -- you may find somebody that
10  spends 24 hours a day studying baseball in their attic
11  and they might know a huge amount about statistics and
12  they could quote you somebody's batting average from
13  1953, but they're not Mr. Williams and there's no added
14  value in having them discuss baseball.
15          The whole value of having somebody like Mr.
16  Williams, particularly Mr. Williams, is that he is a --
17  he is a large -- his name more so than a lot of other
18  names remains prominent.  All right?  Even somebody
19  like me who as I say didn't really follow baseball for
20  many, many years I had heard of Mr. Williams.
21          If you ask me now to name a single player on
22  the Phillies, I couldn't do it.  All right?  I could
23  name a few players from the past, the guy that hit all
24  the home runs, Schmidt.  Steve Carlton.  I'm not going
25  to embarrass myself in trying to name more, but I could

```
 1        name Mr. Williams.  You kind of remember the name out
 2        there.
 3                And by hiring him the whole business that
 4        people who otherwise would not pay attention to Major
 5        League Baseball Network will say well, Mitch Williams
 6        is a commentator and that they'll get more of an
 7        audience because what he has to say is going to be more
 8        interesting, more informed than just, you know, a guy
 9        on the street coming on commenting about it.
10                MS. MATTIACCI:  Okay.  But, Your Honor, with
11        all due respect, that's not what the language of the
12        contract says.  I mean, you are putting in words to the
13        contract, we're just going about the four corners of
14        this contract and what the language says and it does
15        not say that this is a material breach, it doesn't even
16        say that this is a breach.
17                It doesn't say that the -- we can stop paying
18        him if he reaches it.
19                THE COURT:  I don't think the draft is I
20        have a place next to every single clause whether it was
21        or wasn't a material breach.  Your argument would be
22        strengthened if he did that 95 percent of the time and
23        just simply omitted any reference to this.
24                But on one occasion they specified that that
25        is a material breach and in no other occasion do they
```

27

```
 1        cite either something is or is not a material breach.
 2                So you have the assemblance of an argument,
 3        but at best it's a jury issue.
 4                MS. MATTIACCI:  Okay.  Well, I just -- just
 5        for the record, I know one of the other issues that was
 6        brought up in the motion to dismiss was that there was
 7        this user paragraph that they could still use him and
 8        keep the contract intact in that they could have -- MLB
 9        could have chosen to do that and they didn't but I
10        think that they're -- I just wanted to make the
11        distinction there in case that was the other thing
12        holding you up was there could be -- you could still
13        terminate the contract under the morals clause not use
14        him and have to pay him because other terms of the
15        contract would still exist.
16                THE COURT:  Yeah, I remember that kind of
17        came up in the past --
18                MS. MATTIACCI: Yes.
19                THE COURT:  -- and I wasn't particularly --
20                MS. MATTIACCI: It came up because the MLB
21        would have the ability to just simply not use him.
22        They could not put him on the air.  The contract would
23        still be intact, but they don't have to pay him.
24                THE COURT:  Yeah, but it -- but if that was
25        the intent using after all, this was a fairly hard
```

28

```
1    paying contract.  If the intent was that a violation of
2    the morals clause would give the employer the option so
3    to speak of stopping the use of the celebrity, but they
4    would still have to pay him, the contract would have
5    been far more specific that that -- that that is --
6    that a morals clause violation would entitle the
7    employee to at least compensation even though it would
8    no longer entitle them to air time, that type of thing
9    and that wasn't specific.
10             MS. MATTIACCI: Well, what it also -- it is
11   specific is it does give them the ability to terminate
12   the contract which would mean the other obligations of
13   MLB would go by the wayside and particularly paragraph
14   14 the indemnity clause which they would have to still
15   indemnify him for all actions during the course of the
16   contract, if they just didn't put him put him on the
17   air under the user clause, they could do that but they
18   would still be obligated to cover any liability.
19             THE COURT:  Yes, but the indemnity
20   agreements are a completely different beast.  It's not
21   uncommon for employees to say look, you know, I'm might
22   -- there are a number of things that happened out there
23   that may result in me being sued, that type of thing.
24   I want you to protect me.
25             Suppose Mr. Williams says something in a
```

29

```
1    broadcast that somebody else thinks defames them and he
2    is the recipient of a defamation lawsuit?
3             MS. MATTIACCI: Right.
4             THE COURT:  He would want Major League
5    Baseball to defend him, he wouldn't want to go out
6    there and hire his own lawyer and pay a huge amount of
7    money to lawyers to defend him in a defamation lawsuit
8    that he was a defendant in; particularly if it didn't
9    result from some private dispute.
10             If it resulted from him saying something on
11   the air about somebody saying some player was not a
12   good player or saying that some manager was an idiot or
13   something like that somebody might file a lawsuit and
14   the indemnification agreement obviously was intended to
15   protect Mr. Williams from those types of things and
16   here is the thing.  Even -- I'm not -- it's not before
17   me, but I'm not sure that even if there's a violation
18   of the moral's clause if somebody before -- at least
19   before the morals clause violation alleged that Mr.
20   Williams did defame them he almost certainly would be
21   entitled to indemnification.
22             It wouldn't relieve Major League Baseball of
23   their obligation to provide indemnity.  I think it does
24   prospectively if it there is a morals clause violation
25   relieve them of their obligation to pay.
```

```
1              MS. MATTIACCI: Yes.  I mean, it's -- the
2     point was that the indemnity lasts through the term of
3     the contract.  So the gain for MLB by terminating the
4     contract under the morals clause as opposed to just not
5     using him and exercising their right under the user
6     clause is that they gain the relief for the liability
7     of Mr. Williams for the term of the contract.
8              So there is a difference.  There's a
9     distinction between simply not using it.
10             THE COURT:   There's -- as I say there's a an
11    assemblance of an argument there but it's difficult for
12    me to by looking at this contract to think that the
13    intent was that if there was a morals clause violation,
14    Major League Baseball Network could stop using the
15    athlete, but we still have an obligation -- I mean, if
16    the morals clause obligation occurred on the first day
17    of the contract, they would have an obligation to pay
18    him throughout the entirety of the contract and it's
19    hard to believe that that was their intent.
20             MS. MATTIACCI:   Okay.  So just so I'm clear,
21    the jury question then on the breach of contract claim
22    is going to be whether or not he ordered the bean ball.
23             THE COURT:   Yeah, it seems to me in thinking
24    out loud I hate to have the jury verdict sheet to be 50
25    pages long, but almost certainly they would need to be
```

```
1     a determination as to whether or not the allegations
2     that form the basis of the morals clause violation, in
3     fact, occurred and if they did occur and I'm correct
4     about the posture of the law, it may be that there is
5     no morals clause violation.  Do you want to argue with
6     that, Mr. Hughes?
7              MR. HUGHES:  No, Your Honor.  I just want to
8     make clear it has never been there is no evidence,
9     there is no testimony, there is no pleading, there is
10    no brief, there is no anything that ever said that the
11    contract was terminated solely because of the hit
12    batter.  That is an absolute falsehood and the attempt
13    of counsel to put that on the record --
14             THE COURT:   Well, I'm not sure -- you seem
15    to be a little bit heated.
16             MR. HUGHES:   I am because she just said so
17    the only issue for jury is whether he ordered a bean
18    ball.
19             THE COURT:   No, I don't think that was -- I
20    didn't interpret the question to be that.  I think it's
21    one of the more important issues that need to be
22    resolved and not just the bean ball allegation, there
23    are other allegations and we're going to have to figure
24    out how to put it before the jury if it goes that far.
25             But if legally in order to have a morals
```

1    clause violation it has to be that the -- in this case,
2    the athlete has to have committed the underlying acts
3    then the jury has to be very specific about what's been
4    proven and what's not been proven in regard to the
5    underlying acts, right?  And there might be a dispute
6    as to whether certain allegations either by themselves
7    are more complicated in aggregation with the other
8    allegations is sufficient.
9              But the jury will need to determine what's
10   been proven and what's not been proven and it may be
11   that even if -- even assuming this bean ball thing goes
12   by the wayside, it may be that no one allegation may be
13   sufficient but when you combine them all, that might be
14   sufficient.
15             There's also a maximum of interpretation
16   using a Latin expression to say that, you know, the
17   singular may not do the trick, but the accumulation
18   combined and viewed as a whole may be sufficient.  But
19   the trial is not tomorrow.  I'm not going to worry
20   about it now, but I think the central positon is is
21   that whether or not Mr. Williams actually did anything
22   that's alleged is something that the jury is going to
23   have to determine and it's going to have to be
24   demonstrated in order for the morals clause to be
25   implicated.

1              Anybody on this side of the table want to
2    disagree that the morals clause is not violated at the
3    outset and, in fact, doesn't commit the underlying acts
4    that form the basis of the triggering of the morals
5    clause?
6              MR. HUGHES:  Your Honor, I would just say I
7    haven't looked at the specific law so I can't comment
8    one way or the other.
9              THE COURT:  All right.  All right.  What's
10   the next issue?
11             MR. HUGHES:  I believe the next issue, Your
12   Honor, is Gawkers Media -- is Gawker's motion for
13   summary judgment, all claims against it.
14             THE COURT:   All right.  This is going to be
15   time consuming.  And probably the smartest things to do
16   is to take what I regard as being the worst allegation,
17   see what the proof is in regard to that and seeing
18   whether or not it meets the level of fair and
19   convincing that the utterer or the publisher of the
20   defamatory comment, allegedly defamatory comment must
21   have known of the falsity.
22             Anybody want to disagree with using that
23   procedure then we'll take the bean ball one first and
24   we'll go through the entire record item by item to see
25   what we have, what we don't have.  I mean, this stuff

1    as you can see this stuff weighs pounds and pounds of
2    stuff -- pounds and pounds of evidence and you've each
3    spent a very -- I commend both sides.  You spent an
4    enormous -- all three sides, you spent an enormous
5    amount of time reiterating the record but it's not all
6    crystalized in my brain to the point where I can just
7    simply rattle them all off.
8              We'll take them item-by-item.  Because one of
9    the allegations in regard to the bean ball is is that
10   nobody actually, I don't know whether the allegation is
11   nobody actually said it or that Williams said to pitch
12   close or something like that.
13             There were sources that were used that have
14   never been revealed, et cetera, et cetera.  Who set up
15   the movie stand here?
16             MS. MATTIACCI:  Chad.
17             MR. BOWMAN:  We did that, Your Honor.
18             THE COURT:   Do you have something you want
19   to show me on the movies?  What do you want to how me?
20             MR. BOWMAN:  Maybe I can do that, Your Honor.
21   Maybe I can help you with the ten pounds of material
22   and we'll take the bean ball allegation.
23             We did a lot of discovery in this case --
24             THE COURT:   Right.
25             MR. BOWMAN:  There were 13 depositions.

35

1              THE COURT:   Let's start with that.
2              MR. BOWMAN:  Okay.
3              THE COURT:   My thought is that it doesn't
4    matter what discovery reveals, it matters what the
5    Gawker knew when the stuff was published.  Right?
6              MR. BOWMAN:  We agree with that, Your Honor.
7              THE COURT:   All right.  So we have to focus
8    on two separate dates, all right?  What did the Gawker
9    know on day one and what did the Gawker know, what was
10   it three or four days later something like that?
11             MR. BOWMAN:  The two stories at issue were
12   made May 11th and May 16th, yes, Your Honor.
13             THE COURT:   Five days later, right, not what
14   discovery revealed a year and a half later, right?
15             MR. BOWMAN:  What discovery revealed is only
16   relevant in one respect.  I mean, I think that the
17   discovery showed A, that he reporter did a significant
18   amount of research and had three sources for each of
19   the challenge issues and the reporter tried to confirm
20   and did confirm to the best of his ability to report
21   it.
22             THE COURT:   You're talking about something
23   different.
24             MR. BOWMAN:  Yeah.  The second issue, Your
25   Honor, is the -- what discovery has actually revealed

1    is helpful to know that nothing was fabricated.  The
2    allegations didn't start with Mr. Burke.  Mr. Williams
3    was accused of ordering a bean ball on the field of
4    play that day by opposing coaches.  He admits that.
5            THE COURT:   Yeah, that's what I disagree --
6    here is where I disagree.  Post incident discovery that
7    reveals either falsity or truthfulness is probably
8    legally irrelevant.
9            It's what the publisher knew at the time and
10   I think you'll all agree that you pointed out the case
11   law, that is not an objective standard in terms of
12   knowing falsity, it's the subject of the standard.
13   What did in this case, the reporter, I think what was
14   the reporter's name?
15            MR. BOWMAN:   Tim Burke, Your Honor.
16            THE COURT:   Burke?
17            MR. BOWMAN:   Tim Burke.
18            THE COURT:   It's what Burke actually thought
19   in his mind at the time the articles were published and
20   even if a reasonable person would have thought these
21   articles are false, if Burke thought they were true,
22   then there is no proof of actual malice under the New
23   York Times be sold in standard.
24            MR. BOWMAN:   We certainly agree with that,
25   Your Honor, and we don't believe there's anything in

37

1    the record that shows Mr. Burke.
2            THE COURT:   All right.  But so the only post
3    incident discovery that's going to matter is what was
4    revealed in discovery that further puts light on what
5    was in Burke's head during the two relevant days in
6    question not on whether or not Burke ultimately is
7    vindicated or not vindicated and believing or not
8    believing in the truthfulness of the allegations.
9            MR. BOWMAN:   Certainly, Your Honor.
10            THE COURT:   What did you want to show me on
11   the screen?
12            MR. BOWMAN:   Well, there -- when Mr. Burke
13   wrote the second article --
14            THE COURT:   Uh-huh.
15            MR. BOWMAN:   -- the May 16th article, that
16   article included two of the allegations that are at
17   issue, the allegation of the P word and the allegation
18   of the hit batter.  And he embedded in his article the
19   clips that he reviewed when he followed up what he was
20   told by one source and confirmed that with two other
21   sources and he put those in the article and to the
22   extent that Your Honor wanted to see those, we have
23   those prepared for you.
24            THE COURT:   All right.
25            MR. BOWMAN:   But I'm happy to talk through

```
 1      what he knew about each of those issues.
 2              THE COURT:   What's there -- what I've always
 3      said I thought was the worst allegation that was what
 4      we'll call the bean ball incident.
 5              MR. BOWMAN:   Certainly.   So Source Four this
 6      is -- it is relevant that Mr. Burke had reported the
 7      events of game one, he understood the conduct of game
 8      one and he was following a story and so whether or not
 9      it was unlikely to be true, it has to be viewed through
10      the prism of the reporting he had done about the
11      ejection at game one.
12              So for game two, Mr. Burke received an email
13      from Source 4.   We produced -- Gawker produced in
14      discovery all of these written communications redacting
15      only the source identity and Mr. Burke testified about
16      all of these communications and the sources and the
17      best place for that description is the Burke
18      certification.
19              But Source 4 contacted them and gave him a
20      description of what happened including, you know, this
21      -- Mr. Williams ordered the batter be hit.   Reported
22      that to Mr. Burke.   Now, in the Lawrence case which is
23      the Supreme Court case -- that --
24              THE COURT:   Well, report -- an email was
25      sent to Burke.
```

```
 1              MR. BOWMAN:   Yes.
 2              THE COURT:   What exactly did the email say?
 3      Where is that in all of this?
 4              MR. BOWMAN:   The email is the Burke
 5      certification Exhibit --
 6              MS. MATTIACCI: It's BB, Your Honor.
 7              MR. BOWMAN:   The Burke certification, Exhibit
 8      M.
 9              THE COURT:   Which exhibit is it?
10              MR. BOWMAN:   Exhibit M, Your Honor.
11              THE COURT:   Yeah.
12              MR. BOWMAN:   And the email about half way
13      down is describing this source is following up and
14      saying yes, this -- I witnessed game one and I also saw
15      a game, a championship game the next day and you
16      wouldn't believe what happened.
17              And this source writes, "But however, this
18      brings me to yesterday's --
19              THE COURT:   Well, how much -- there's like
20      22 single space lines here.   Which line are you looking
21      at?
22              MR. BOWMAN:   The line that starts about two-
23      thirds of the way down, Your Honor, beginning with the
24      word "but".
25              THE COURT:   "But however this brings me,"
```

1    all right.
2              MR. BOWMAN:  Yesterday's title game.
3              THE COURT:  All right.
4              MR. BOWMAN:  Right from the get-go he's
5    tipping off pitches to his kids, was at one point heard
6    to say by a couple of our coaches and a couple of our
7    players to our pitcher, don't act like a P, star, star,
8    star, star, star, I personally didn't hear that
9    although I don't know why our coaches or kids would
10   make it up.
11             Every time he would come over to the coaches
12   -- the first base coach, he would look to start
13   something with one of our coaches.  Later in the game
14   and obviously this can't be proven but when our pitcher
15   came to bat, our coaches had said something to the home
16   plate umpire warning him thinking that our kid was
17   going to be thrown out.
18             Well, don't you know, first pitch to our
19   pitcher batting hits him.  That was the first tip that
20   came into Mr. Burke.
21             THE COURT:  All right.
22             MR. BOWMAN:  Reporting that Mr. Williams had
23   talked to his player, his coaches thought that --
24   ordered the player to hit him and the first pitch hits
25   him.

1              THE COURT:  Hold on just one second.  Hold
2    on.  Does it say anything that Williams ordered the
3    pitcher at bat be hit by a pitch?
4              MR. BOWMAN:  This source didn't, Your Honor.
5    This source said what you see here --
6              THE COURT:  Right.  Right.
7              MR. BOWMAN:  -- thinking our kid was going to
8    be thrown out.  So Mr. Burke didn't run with the story.
9    He didn't print the story based on Source 4.  He did
10   more reporting.
11             THE COURT:  All right.
12             MR. BOWMAN:  You can see at the bottom of
13   this email chain, this source provides some additional
14   information and Mr. Burke starts following up.  He
15   tracks down another source, Source 6, sends Source 6 a
16   message --
17             THE COURT:  All right.
18             MR. BOWMAN:  Source 6 then responds, you can
19   see on Exhibit O there's an email to Source 6 on a
20   Facebook message.  Source 6 responds.
21             THE COURT:  Hold on.  Hold on.  Hold on.
22             MR. BOWMAN:  Sorry, it's the --
23             THE COURT:  It's a different exhibit.
24             MR. BOWMAN:  It's the page marked Gawker
25   0059, Your Honor.

1          THE COURT:   All right.  I got it.
2          MR. BOWMAN:   And that is a Facebook chat as
3    Mr. Burke is contacting sources and attempting to
4    confirm this information.
5          THE COURT:   It's a Facebook chat?
6          MR. BOWMAN:   It's a Facebook chat record,
7    Your Honor.
8          THE COURT:   All right.
9          MR. BOWMAN:   And this individual --
10          THE COURT:   Mr. Burke is chatting with this
11    Source 6?
12          MR. BOWMAN:   Yes, Your Honor.
13          THE COURT:   On Facebook.
14          MR. BOWMAN:   Yes.
15          THE COURT:   Okay.
16          MR. BOWMAN:   It's a messaging --
17          THE COURT:   Yeah.
18          MR. BOWMAN:   -- platform, I believe.  He asks
19    for more information and on the next page you can see
20    Gawker 0060 is Source 6's response.
21          THE COURT:   Uh-huh.
22          MR. BOWMAN:   "He walked by our catcher and
23    after the first inning he said that the pitcher is a,"
24    P word, "a couple of our kids heard him and one kid
25    asked his parents on the way home why would he call our

---

1    pitcher the name," and asked what it meant.  He also
2    called his pitcher and catcher to the side before the
3    bottom of the fifth inning and told his pitcher to hit
4    him with the first pitch."  And then it goes over, "In
5    the last inning I heard him and (readacted) pitcher
6    heard him and (redacted) told the ump."
7          THE COURT:   All right.
8          MR. BOWMAN:   That's what Source 6, I heard
9    him.
10          THE COURT:   Yeah.
11          MR. BOWMAN:   And Tim Burke didn't stop there.
12    Tim Burke said can you tell me anyone else I can talk
13    to.  Tim Burke if you look ahead, Exhibit P --
14          THE COURT:   All right.
15          MR. BOWMAN:   -- Tim Burke found another
16    person who he believed to be at the game and to be a
17    witness and sent him an email and said, "Hey, can we
18    talk?"
19          THE COURT:   What source is this?  What
20    source --
21          MR. BOWMAN:   This would be Source 7.
22          THE COURT:   This is Source 7.  All right.
23    All right.
24          MR. BOWMAN:   And Source 7 didn't want to do
25    the communication over email so set up a phone call

1    with Mr. Burke and Mr. Burke testified about his
2    conversation with Source 7 including that Source 7
3    confirmed the order hit by batter and confirmed the P
4    word.  And so Mr. Burke then in --
5                THE COURT:   Was it clear whether or not
6    Source 7 had firsthand knowledge or was repeating what
7    somebody else told him?  Was that -- just so I'm clear,
8    Source 7 is purely Burke saying this is what Source 7
9    told me there is no documentary email evidence.
10               MR. BOWMAN:  Yes, Your Honor.  This was a
11   telephone conversation.
12               THE COURT:   All right.  Does Burke say that
13   Source 7 said that he, he being Source 7, had firsthand
14   information, I'm not talking about the P word now,
15   we're talking about the beaning, or that somebody told
16   Source 7 that that's what happened?
17               MR. BOWMAN:  Source 7 told that to Mr. Burke.
18   I don't know, I can't recall in the testimony whether
19   Mr. Burke was asked specifically whether he asked
20   Source 7 if it was a personal observation.  Mr. Burke
21   knows the answer to that question, but it's difficult
22   to reveal that without revealing the identity of Source
23   7.
24               THE COURT:   Well, there's the bottom line.
25   I don't want to know what -- it doesn't matter to me

---

1    what the real answer is.  What is the materials before
2    me on the summary judgment motion reveal about whether
3    or not Source 7's information was hearsay or non-
4    hearsay?
5                MR. BOWMAN:  Source 7 said that the SJ
6    Titan's catcher reported that Williams called the
7    pitcher if you were --
8                THE COURT:  Start from the beginning.  Where
9    are you reading from?
10               MR. BOWMAN:  I'm sorry.  This is the Burke
11   certification paragraph 28.
12               THE COURT:   All right.  Which says?
13               MR. BOWMAN:  And reported that Williams
14   called -- and said that Williams -- wait a minute.  And
15   believed the player was going to be thrown out.  That's
16   what the -- the person said.
17               THE COURT:   All right.  Well --
18               MR. BOWMAN:  I will say about the hearsay
19   point, Your Honor, there is no requirement that
20   journalists can only get information of personal
21   intervention.
22               THE COURT:   I understand that.  What I'm
23   trying to -- I understand that but that's true but the
24   flip side is also true, generally speaking the law
25   recognizes that individuals that report personal

1    information based upon personal knowledge have more
2    reliability than individuals repeating what might be
3    triple hearsay or that type of thing.
4          So you're right, and particularly when it
5    deals with the defamation of a public figure and the
6    standard is so high in terms of the clear and
7    convincing hearsay and triple hearsay might be
8    sufficient.  But in terms of trying to get a handle on
9    how reliable or unreliable this evidence is, which
10   ultimately is what I have to do.
11         In fact, it's the plaintiff's job to prove
12   that they were very -- as a whole was very unreliable
13   it's important to know whether or not the information
14   is first-hand information or whether or not it might be
15   hearsay.  The best -- from what you presented to me,
16   the best I can say is that it's not clear whether it
17   was hearsay or non hearsay.
18         MR. BOWMAN:  Your Honor, I would respectfully
19   disagree with you on one point.  I think the
20   reliability would to to an objective standard,
21   negligence.  The question here isn't whether it was
22   reliable, it's whether there's any clear and convincing
23   basis to believe that when three sources independently
24   told Mr. Burke that this happened --
25         THE COURT:  But you're combining it now.

47

1          MR. BOWMAN:  -- that it matched the video --
2          THE COURT:  That he knew it was false.
3          THE COURT:  Is it Mr. O'Connor -- Mr. --
4          MR. BOWMAN:  Mr. Bowman, Your Honor.
5          THE COURT:  Mr. Bowman, all right.  You're
6    conflating an apple with an orange. You're exactly
7    right, I look upon this as a totality.  I don't just
8    break it up into pieces and say this is triple hearsay,
9    this is double hearsay.
10         If I have three sources and if they're truly
11   independent of each other, which we don't really know,
12   this can be some guy, his brother and his sister
13   calling and I don't know, all right, it's more reliable
14   the more independent they are.  It's a matter of common
15   sense.
16         And it may be there are three independent
17   sources all reporting triple hearsay, they'll all be
18   reporting the same one false allegation or they may --
19   one of them, you know, may be a separate source.  But
20   it seems to me that it's incumbent upon the Court in
21   examining this evidence to make some determination as
22   to the individual reliability of each piece sitting by
23   itself and then doing the more difficult job and
24   determining even if one piece sitting by itself isn't -
25   - wouldn't be reliable enough to get a search warrant,

```
1        for example --
2                MR. BOWMAN:  Uh-huh.
3                THE COURT:   -- all right, but taking this
4        totality is sufficient to at least allow publication,
5        in reference to a public figure without having the
6        media publisher sue for defamation.  So but from what
7        you've presented, I think I can fairly characterize it
8        as being unclear if it's hearsay or non-hearsay.
9                I'm talking just now about Source 7.
10               MR. BOWMAN:  For Source 7, I agree, it's
11       personal observation and maybe one level of hearsay.  I
12       think it's worth thinking about --
13               THE COURT:   No, but the beaning is not
14       personal observation.
15               MR. BOWMAN:  No, it's personal observation of
16       the exchange and the hit batter and what the batter
17       said.
18               THE COURT:   All right.  But -- all right.
19               MR. BOWMAN:  But I think it's worth looking
20       at the cases.  The most recent --
21               THE COURT:   I want to deal with the evidence
22       first.  By the way, we need to break pretty soon, not
23       for me, but for my court clerk, BeBe (phonetic) and my
24       law clerk here, Mr. White.
25               MR. BOWMAN:  Yes, sir. I'm sorry.
```

```
1                THE COURT:   We're not going to finish this
2        today.  I have to call it a day at four o'clock.  It's
3        not because I don't want to work beyond four o'clock,
4        it's because we have to start paying staff overtime
5        after four o'clock and we're under very strict orders
6        given budgetary problems in not doing that unless it's
7        a judicial emergency.
8                I don't want to impose upon anybody, but I'm
9        available as early as Tuesday morning.  Monday of
10       course, we're down. Anybody not available to come back
11       either Monday morning or Monday --
12               MS. MATTIACCI: Tuesday, Judge.
13               THE COURT:   Tuesday.  Tuesday morning.  I
14       could do it Monday also.
15               MR. BOWMAN:  Your Honor, I have an appellate
16       argument out of town on Tuesday morning, I'm sorry.
17               THE COURT:   All right.  How about Tuesday
18       afternoon?
19               MR. BOWMAN:  It's in Chicago.  I don't think
20       I'll be back by Tuesday afternoon.
21               THE COURT:   All right.  Well, you're going
22       to need to discuss the sooner the better, but there's
23       no way I'm going to rush this through and I'm not going
24       to finish before four o'clock.
25               MR. BOWMAN:  Okay.
```

1    THE COURT:   All right?  I hope to finish the
2   beaning before four o'clock but there are other
3   allegations and I've got to go through the record and
4   make factual determinations as to the reliability as to
5   each piece and the reliability total and then whether
6   or not it was so unreliable that it must have been that
7   Mr. Burke could not believe what he had published,
8   right?  All right?
9    So we'll need to -- let's go -- do you need
10   to take a break now? Anybody need to take a break?  All
11   right.  Let's go further.  All right.
12    So we have three sources.  Are those the
13   three sources for it?
14    MR. BOWMAN:  Those are the three sources for
15   the hit batter, Your Honor.
16    THE COURT:   All right.  Was he aware of any
17   contradictory sources?
18    MR. BOWMAN:  The -- he was aware that when
19   confronted with the accusation Mr. Williams said I told
20   him to pitch inside which was fully reported in the
21   story.  And, in fact, is Mr. Williams' litigation
22   position.  The story relied on source four, six, and
23   seven --
24    THE COURT:   Yeah.
25    MR. BOWMAN:  -- relied on Mr. Burke's viewing

51

1   of the videotape that appeared to corroborate what he
2   was told and --
3    THE COURT:   How long is the videotape?  How
4   long is the videotape that you wanted to play?
5    MR. BOWMAN:  The videotape is 30 seconds, 40
6   seconds.
7    THE COURT:   All right.  Let's dim the lights
8   and play it.  Are you ready to play it now?
9    All right.  Mr. Burke had played the video
10   before this was all published?
11    MR. BOWMAN:  Yes, Your Honor, and in the
12   story embedded two clips that he understood
13   corresponded with what the three sources each had told
14   him about the P-word allegation and about the hit by
15   pitch.  And this is the clip that he put in about the
16   hit by pitch.
17    (Videotape is played.)
18    (Videotape concluded.)
19    MR. BOWMAN:  So, Your Honor, what Mr. Burke
20   wrote in his certification is that what he saw here was
21   Mr. Williams coming out and talking to his catcher.
22   The catcher then going out and talking to the pitcher,
23   the very first live pitch thrown at the next batter,
24   struck the batter and both the coaches come to the
25   line.

```
 1                    THE COURT:  Replay that again.  I missed
 2     that part.  Replay that again.
 3                    MR. BOWMAN:  Okay.
 4                    THE COURT:  I don't mean the whole thing,
 5     the part of Mr. Williams coming out right before the
 6     pitch.
 7                    MR. BOWMAN:  At the very beginning, I think.
 8                      (Videotape is played.)
 9                    MR. BOWMAN:  Mr. Williams is in the red shirt
10     with the white hat, Your Honor.
11                       (Videotape is concluded.)
12                    THE COURT:  All right.  And then the first
13     pitch is what we just saw.  Right.
14                    MR. BOWMAN:  And then there a couple of warm
15     up pitches and then the first live pitch, the batter.
16     And we would submit the issue, this isn't a situation
17     like Connitan (phonetic) where the reporter had a good
18     story and purposely chose not to watch the video
19     because he didn't want to ruin it.
20                    The reporter confirmed what he thought he
21     knew with multiple sources and went and watched the
22     video and what he saw on the video as he wrote in his
23     certification was Mr. Williams talking to the catcher,
24     the catcher talking to the pitcher and the first live
25     pitch hitting the batter and the coaches coming down to
```

```
 1     complain.
 2                    Now, I don't know standing here could I swear
 3     the Mr. Williams ordered the bean ball?  Of course not.
 4     But Mr. Burke saw nothing in this video that convinced
 5     him that that was the -- that what all three of his
 6     sources were telling him was false.
 7                    THE COURT:  Yeah, but you kind of play
 8     doubles advocate.  What could he have seen that would
 9     have -- I mean, nobody disputes that the opposing kid
10     got hit, right?
11                    MR. BOWMAN:  No one disputes that.
12                    THE COURT:  So what is it likely to have
13     shown that would have contradicted the sources?
14                    MR. BOWMAN:  He's practicing good journalism,
15     Your Honor.  He had three sources tell him this.  He
16     went and looked at it to see if it looked right to him
17     and as he testified it did.
18                    THE COURT:  I don't see --  my take is a
19     little bit different. Certainly nothing inconsistent on
20     the video with what sources, four, six, and seven are
21     alleging, but the conduct appears to be on its face
22     innocuous.  The manager speaks to the catcher, the
23     catcher speaks to the pitcher. Just out of curiosity,
24     why wouldn't the manager, if the manager wanted the
25     pitcher to hit the opposing kid, why wouldn't he have
```

```
 1        just spoken directly to the pitcher?
 2              MR. BOWMAN:  I don't know that, Your Honor.
 3    I mean, at the -- you know, at most, it's ambiguous,
 4    but Mr. Burke had a reasonable understanding based on
 5    the resources --
 6              THE COURT:  We're getting into the argument,
 7    but I understand.  I just wanted to see what -- all
 8    right.  So you're telling me that what we have that
 9    might have been contradictory is Mr. Williams' own
10    statement?  Was there anything else that Burke had that
11    contradicted what either four, six, or seven were
12    saying?
13              MR. BOWMAN:  No, Your Honor.
14              THE COURT:  All right.  Let me go -- who is
15    arguing this part of it?  Ms. Mattioli (sic)?
16              MS. MATTIACCI: Yes, Your Honor.
17              THE COURT:  All right.  Do you disagree with
18    anything factually that Mr. Bowman has alleged?
19              MS. MATTIACCI:  Absolutely, Your Honor.
20              THE COURT:  All right. What do you have?
21              MS. MATTIACCI:  Okay.  There is one single
22    source that talks at all about any kid being hit,
23    that's it.  There is zero --
24              THE COURT:  What source is that?
25              MS. MATTIACCI: Six.
```

```
 1              THE COURT:  So you're saying only Source 6.
 2              MS. MATTIACCI: Yes. And Source 6 does not say
 3    anything about a bean ball.  He puts bean ball in the
 4    headline.  Bean ball has a specific meaning, it's a --
 5              THE COURT:  Hold on.
 6              MS. MATTIACCI: -- it's a ball to the head.
 7              THE COURT:  All right.  Source 6 is --
 8    Source 6 --
 9              MS. MATTIACCI: I believe it's Exhibit O to
10    defendant's motion, it's that Facebook chat.
11              THE COURT:  All right.  Here it is.  But the
12    email says if this is Source 6, I'm going to write it
13    down.  This is Source 6.  "He also called his pitcher
14    and catcher to the side before the bottom of the fifth
15    inning and told his pitcher to hit him with the first
16    pitch."  That seems pretty clear to me.  What is
17    ambiguous about that?
18              MS. MATTIACCI: That does not say he ordered a
19    bean ball.  Bean ball has a specific meaning.  It's a
20    ball to the head. I'm just starting with -- like those
21    are layers, but argument number one not a single
22    source, zero, says the word bean ball.  Bean ball is
23    not shown on a video.  Bean ball never happens.  It's a
24    complete and total fiction.  He wrote a fiction in a
25    headline.
```

```
 1              THE COURT:   But you're arguing again. You
 2    acknowledge that there was at least one source that
 3    directly said that Mr. Williams requested or whatever
 4    the appropriate terms is that the  pitcher hit the
 5    opposing batter with the first pitch.
 6              MS. MATTIACCI: Right. So you have -- so he
 7    has this one source, that's it.  Those other sources
 8    are just repeating what this source says.  There's no
 9    other independent source.
10              Mr. --
11              THE COURT:  Well, how do you know that
12    they're repeating in the sense of that --
13              MS. MATTIACCI: Because there's nothing --
14    there is -- Source 4.
15              THE COURT:   I don't know -- here's the
16    problem.  I don't know whether or not there's a
17    relationship between four, six, and seven at all.  I
18    don't know.  Maybe there is, maybe there is not.  The
19    record isn't clear.  For all I know is six may have
20    asked four and seven to send emails and letters and
21    phone calls to try to set up -- set Williams up or it
22    can be opposite each one was separately outraged by
23    what they had seen and on their own decided to contact
24    the media.
25              The record is not clear as to that in part
```

```
 1    because these are confidential sources -- they're not
 2    anonymous sources, they're confidential sources, it's
 3    one of your bones of contention in your expert's report
 4    which by the way I will resolve before four o'clock and
 5    get that out of the way, probably right after this,
 6    this particular issue.
 7              But --
 8              MS. MATTIACCI: May I address Source 4?
 9              THE COURT:   Yes.
10              MS. MATTIACCI: Source 4 says, "Later in the
11    game --
12              THE COURT:   Hold on.
13              MS. MATTIACCI: Sure.
14              THE COURT:   All right.  Later in the game --
15              MS. MATTIACCI:  "And obviously this can't be
16    proven but when our pitcher came to bat, our coaches
17    had said something to the home plate umpire warning him
18    thinking that our kid was going to be thrown at."
19              There's nothing in there that says that Mr.
20    Williams ordered bean ball or ordered a kid to be hit.
21    Nothing.
22              THE COURT:   I don't disagree with that.
23              MS. MATTIACCI: Okay.
24              THE COURT:   All right.
25              MS. MATTIACCI: So then Source 7 testified in
```

1   deposition because we have no notes, no email, no
2   Facebook from Seven, but Seven does not testify as to
3   personal knowledge.  He testifies as to what he heard
4   from other people.
5          THE COURT:   Right.
6          MS. MATTIACCI: So the only one we have is
7   Source 6.  Now, Mr. Burke, the reporter, this is --
8   what you saw right now is Mr. Burke's version that he
9   cropped and edited from the original tape that he saw.
10  The original tape that he reviewed was on Ripken's
11  website and we have it for you to play for you.
12         THE COURT:   All right.
13         MS. MATTIACCI: It's a much wider screen and
14  you can see from the end of the top of the fifth to the
15  beginning of the bottom of the fifth, the entire break.
16  So in hands he has this Source 6 and his Source 6 says,
17  "He also called his pitcher and catcher to the side
18  before the bottom of the fifth inning and told his
19  pitcher to hit him with the first pitch."  Mr. Burke
20  then looks at the full video that you didn't get to see
21  and nowhere, nowhere does Mr. Williams call his pitcher
22  and catcher to the side.  It doesn't happen.
23         THE COURT:   Mr. Williams spoke to the
24  catcher?
25         MS. MATTIACCI: Mr. Williams only spoke to the

59

1   catcher at one point, okay?  So what he -- so what Mr.
2   Burke does when he publishes his article, he does not
3   state what his only source said.  His only source said
4   he called his pitcher and catcher to the side before
5   the bottom of the fifth and told his pitcher to hit
6   him.
7          He hasn't published that.  Instead, he makes
8   up a new story and says that Mr. Williams told the
9   catcher and then the catcher told the pitcher and so he
10  has his own story and then he crops and edits the video
11  so you can only see part of the video that matches the
12  new story that he made up because he knew he did not
13  have video that matched the only source that he had.
14         That -- if that isn't reckless disregard of
15  the truth.  He -- what was he going to do?  Publish
16  this and then play that?  He can't.
17         THE COURT:   Just so I'm clear, I haven't
18  seen what you were mentioning have I?
19         MS. MATTIACCI: I -- well, it's in the -- we
20  submitted it with the briefs but --
21         THE COURT:   All right.  But
22         MS. MATTIACCI: But, you know, we submitted
23  two clips.
24         THE COURT:   You're going to have to play it.
25         MS. MATTIACCI: Okay.

```
 1                    THE COURT:   We're going to take a break, but
 2      before we do that, I do want to discuss because I can
 3      probably handle it quickly.  Are you talking about
 4      these things?
 5                    MS. MATTIACCI: Uh-huh.
 6                    THE COURT:   All right.  Do you want these
 7      back?  Do you have your own copies?
 8                    MS. MATTIACCI: We have our own copies.  You
 9      can have them, Your Honor.
10                    THE COURT:   All right. Let's deal with the
11      issue before we take a break of the late expert's
12      report or who wants to argue that first?  Are you Mr.
13      Kelley?
14                    MR. KELLEY:  I am Mr. Kelley, Your Honor.
15                    THE COURT:   All right.  I got one right.
16      All right.
17                    MR. KELLEY:  I don't want to --
18                    THE COURT:   All right.  Complainant serves
19      an expert report on you from professional journalist
20      the day of the discovery end date.
21                    MR. KELLEY:  That's right.
22                    THE COURT:   At five o'clock or whenever it
23      was.  All right?  All right?
24                    MR. KELLEY:  All right.  I won't --
25                    THE COURT:   The only thing that they did
```

```
 1      wrong as I can see is that they, they being the
 2      plaintiffs, did not attach a 417-7 certification at
 3      that time to indicate that the due diligence, they
 4      couldn't have served it on you before then.  Right?
 5      That wasn't done, right?
 6                    MR. KELLEY:  That's right.
 7                    THE COURT:   All right.  Had it been done
 8      with what they later did do, on the merits what would
 9      your argument be, because they're saying we need to get
10      all of these depositions done before we give it to our
11      expert, we didn't want to basically do amended reports
12      one after another so it wasn't until towards the end of
13      the discovery period that we finished the depositions
14      which probably is true, they gave the dates, that's the
15      earliest they got the report.
16                    MR. KELLEY:   Your Honor, this was a very
17      time intensive period so, you know, every two or three-
18      week increment is a big deal.  It wasn't just it to our
19      to serve the certificate.  The problem with the
20      certificate is that it ignores that they knew well both
21      what the opinions were going to be and the fact that
22      they were going to rely on expert which is all we
23      needed to know to be able to get going on vetting their
24      expert, preparing for a deposition, starting to look
25      for our expert which, you know, finding one that can
```

```
 1        give testimony by June now or three weeks ago is
 2        something that would have been impossible.
 3              They knew everything except what occurred in
 4        two depositions.
 5              THE COURT:   Let me ask you this.  Suppose 21
 6        days before the discovery end date they said that
 7        Andrew Verzilli (phonetic) and what's Kaplan's
 8        captain's first name?
 9              MR. KELLEY:    Joel.
10              THE COURT:  Joel Kaplan are going to be
11        experts, Kaplan is going to be testifying about opining
12        about professional standards in journalism, Verzilli is
13        going to give the standard economics report, right, and
14        that was done 21 days before, but you don't have the
15        reports.  What are you going to do other than --
16              MR. KELLEY:   I can -- I can -- excuse me.
17              THE COURT:   Yeah.
18              MR. KELLEY:    I can do an awful lot
19        researching and vetting an expert before I even know
20        his opinions but the problem is that these last two
21        depositions they're supposedly waiting for were
22        witnesses how had no contact whatsoever with Mr. Burke,
23        hence all they could say is perhaps what Mr. Burke
24        might have learned had he contacted with them, what
25        these witnesses had to say was not relevant to Burke's
```

```
 1        state of mind, not even relevant to his adherence to
 2        journalistic practices.
 3              THE COURT:   What was the date of the last
 4        deposition that would have been relevant to Burke's
 5        professional standards?
 6              MR. KELLEY:   I'm going to need some help on
 7        that, it would be the last deposition before
 8              MR. BOWMAN:   It's in Burke's deposition.
 9              MR. KELLEY:   Mr. Burke's deposition was
10        February 17th and I don't think there was after that
11        any deposition of any witness that he had contact with.
12              THE COURT:   All right.  All right.  Who is
13        going to be arguing on behalf of the plaintiff for
14        this?
15              MS. MATTIACCI: I am, Your Honor.
16              THE COURT:   Ms. Mattiacci?
17              MS. MATTIACCI: Yes.
18              THE COURT:   Well, why wasn't a 4-7 -- the
19        first problem you have is the easiest one, why wasn't a
20        417-7 certification attached with these expert reports
21        when they were served on the last day of discovery?
22              MS. MATTIACCI: Yeah,  all I can say is it
23        should have been, you know and --
24              THE COURT:   All right.
25              MS. MATTIACCI: -- you know, we just -- we're
```

```
 1        as diligent as we could be given the circumstances and
 2        the amount of depositions that were being taken that
 3        month and we didn't know what the deposition testimony
 4        was going to be until it was taken and so to the extent
 5        --
 6              THE COURT:   Well, do you agree that at least
 7        that some of those depositions did not relate to the
 8        professional standards of Mr. Burke?
 9              MS. MATTIACCI: No, I don't believe so because
10        they are information that had to do with what occurred
11        and sources that he could have contacted.  They are
12        obvious sources of --
13              THE COURT:   Uh-huh.
14              MS. MATTIACCI: -- that were available to him.
15              THE COURT:   Right.
16              MS. MATTIACCI: We told Gawker that if they
17        wanted to depose him we are 70 days before a trial date
18        was scheduled, summary judgment motion is pending we
19        would make him available for depositions and --
20              THE COURT:   I want to be clear on the
21        record.  Did you disclose the identity of either the
22        captain or Verzilli before the last day of discovery?
23              MS. MATTIACCI: No, Your Honor.
24              THE COURT:   Why not?
25              MS. MATTIACCI:  It was just we were -- the
```

```
 1        day we got the report and we saw it was a report that
 2        we could use, we disclosed that.  I mean, not until
 3        that time did we know that we would definitely be using
 4        the reports.
 5              THE COURT:   All right.  Mr. Kelley, here is
 6        the problem.  The best practice has been around now in
 7        this state for 16 years and five months and trial court
 8        judges still struggle with how strictly to enforce the
 9        various rules concerning discovery practices.
10              Technically, you're right.  This amendment
11        was served more than 20 days before the discovery end
12        date.  That kicked in 417-7.  417-7 unique among the
13        rules of court actually contains the remedy for a
14        violation of it.
15              It says that the 417-7 certification is not
16        attached we have the amendment to answers to
17        interrogatories the receiver of the amendment may act
18        like he or she never got it and also puts the onus on
19        the receiver if there is a 417-7 certification and you
20        want to contest it, you've got to file a motion
21        contesting it within 20 days.
22              So I could say that's the one court rule of
23        all of them, this whole book, there's well over a 1,000
24        pages now, well over 2,400 pages now, and growing where
25        the remedy for the violation is built into the rule.
```

1       At least in terms of the civil practice.  There might
2    be some family.  That's just a bad memory to me now and
3    criminal, I'm not even going to express an opinion on.
4           But most trial judges don't do that. There is
5    the de facto practice and even though the rule
6    specifies 20 days before the discovery end date, most
7    attorneys think they have pretty much free range to
8    serve anything they want until the discovery end date.
9           The defense can protect themself in this
10   context by getting a court order that requires the
11   plaintiff to serve the expert reports or at least
12   identify their experts well before the discovery end
13   date.  Was that done in this case?
14           MR. KELLEY:   A request for a court order was
15   not made.
16           THE COURT:   All right. All right.  That's
17   not to be critical, but there are mechanisms that are
18   available to prevent one side from at the -- literally
19   the last minute from dumping on the other side
20   amendments to answers to interrogatories.
21           This is an unusual case.  It presents
22   complications and issues.  There's a lot of money at
23   stake, et cetera, et cetera.  It's not a simple one car
24   hitting another car, all you have to do is line up the
25   orthopedic surgeon or the chiropractor and the case is

1    ready to proceed.
2           My inclination is to permit the amendment and
3    then permit the defense a reasonable amount of time to
4    respond to both experts.  That's what 99 percent of the
5    judges out there would do and I'm not a one-percenter,
6    at least I don't think I'm a one-percenter.
7           So if that's the remedy did you want to
8    respond to it?
9           MR. KELLEY:   If that's the remedy, the
10   problem is that it's just physically impossible for me
11   to prepare myself by deposing the witness and finding
12   and vetting and preparing a responsive expert before
13   the trial date.
14           THE COURT:   Well, the trial date gets moved.
15           MR. KELLEY:   I would request that as the
16   minimal remedy that fairness requires in this
17   situation.
18           THE COURT:   All right.  Well, we're going to
19   take a break.  Think about how much time you need, the
20   trial date will have to be moved.  I will reopen
21   discovery to allow a discovery deposition if you want
22   to of the plaintiff's experts that will allow you to
23   get a response report from either the economist and
24   slash or the professional standards expert or move the
25   trial date and then we'll see where we go at that point

1      in time.  All right?
2                  MR. HUGHES:  Your Honor?
3                  THE COURT:   Yes, Mr. Hughes?
4                  MR. HUGHES:  I did not make this motion
5      because it was a motion in limine and Your Honor
6      appeared to want it closer in time.  I would just add -
7      -
8                  THE COURT:  Well, let me explain that, let
9      me go further.  There may be some confusion.  The court
10     rules actually specify that motions in limine are not
11     supposed to be placed on the regular Friday motion
12     docket.  So that's why you got the form letter in the
13     mail.
14                 But I think everybody was correct in that
15     since in order to determine at least some of the
16     motions you have to determine the admissibility of the
17     report one goes with the other.  So that's why I'm
18     deciding now rather than, you know, an hour before jury
19     selection, that type of thing.
20                 MR. HUGHES:  Sure.
21                 THE COURT:  All right.
22                 MR. HUGHES:  And again, I would just observe
23     that Mr. Kaplan, I don't think really pertains to
24     anything directly related to MLB Network.
25                 However, with respect to Mr. Verzilli --

1                  THE COURT:   Right.
2                  MR. HUGHES:  -- the rule 417-7 certification
3      that was submitted even belatedly doesn't even
4      undertake to give good cause --
5                  THE COURT:  All right.  I'll deal with that
6      separately, fair enough.
7                  MR. HUGHES:  It's --
8                  THE COURT:  All right.  Ms. Mattiucci (sic)
9      -- am I pronouncing your last name correctly?
10                 MS. MATTIACCI:  Mattiacci.  That's fine.
11     Anything.
12                 THE COURT:  Mattiacci, you appear before me,
13     I always butcher their names.
14                 MR. KELLEY:  Your Honor, before you pass on
15     from me there was a second aspect of our motion just
16     dealing with relevance.  I trust you're going to deal
17     with that down the road?
18                 THE COURT:  Yes, but I -- he -- you're
19     talking about Kaplan, I assume, not Verzilli.
20                 MR. KELLEY:   Yes.
21                 THE COURT:   Well, he discusses -- he
22     discusses -- those were tricky issues and frankly I'm
23     more inclined to punt those until we get closer to the
24     trial since it may be that some of his opinions are
25     barred, some of them aren't, I read his report

1    yesterday and it kind of -- it kind of summarizes the
2    defense -- the plaintiff's position about these things
3    is the way I would categorize it, but you know, there
4    are plenty of cases if you want I can cite them, that
5    discourage trial court judges from making in limine
6    rulings concerning the admissibility of expert opinion
7    before they've had a much better sense of the case and
8    I wasn't surprised -- I mean, one issue that the expert
9    spends a lot of time on is whether or not there was a
10   professional obligation to speak directly to Mr.
11   Williams before publishing these articles and he says
12   that there was.
13          There was also a lot of time spent discussing
14   whether or not sources that did not request
15   confidentiality be in essence sua sponte by Mr. Burke
16   granted confidentiality.  But if I deal with those
17   arguments on the merits, it's not going to be between
18   now and four o'clock, it may not be next week and it
19   may not be until we get much closer to trial.
20          But right now what I'm inclined to do is
21   determine whether or not there was a discovery
22   violation by the plaintiff that requires me to bar
23   either Kaplan or Verzilli.  I'm satisfied as to Kaplan
24   that the need to accumulate some deposition transcripts
25   justified the service of the report more than 20 days

71

1    before the discovery end date, but who raised the issue
2    concerning Verzilli?
3          MR. HUGHES:  I'm sorry.
4          THE COURT:   Mr. Hughes raised the issue
5    concerning Verzilli so and Ms. Mattiucci, Mattiacci,
6    what's your response to that?
7          MS. MATTIACCI: Well, I mean, I don't know why
8    MLB is even concerned because it's a breach of contract
9    action against them so it's just the balance of the
10   contracts, we don't need Verzilli for that.
11          In terms of the future economic loss --
12          THE COURT:   I could ask Mr. Hughes why he's
13   concerned about that if you want.
14          MR. HUGHES:  Because the report has some
15   accumulation of damages, you know, add on finitum until
16   Mr. Williams supposedly retires and that's precisely
17   why I'm concerned about it is that it has no --
18          THE COURT:   Well, Mr. --
19          MR. HUGHES:   That portion has no relevance
20   to us.  It also indicates that there are amounts that
21   need to be deducted because Mr. Williams would have had
22   to undertake expense to comply with the contract.  I
23   agree with the concept.  I don't necessarily agree with
24   that expert's number.
25          THE COURT:   The objection, there are two

1    separate objections.  One objection is is that on the
2    merits there are parts of the report that ought to be
3    barred and the other objection is that if the report is
4    being served on an untimely basis.  Are you asserting
5    both or just one?
6              MR. HUGHES:   I'm sorry, Your Honor.  I was
7    only responding to the question as to why I even cared
8    about it.
9              THE COURT:  You're objecting on the basis
10   that it's out of time.
11             MR. HUGHES:   I'm objecting on the basis that
12   it's out of time --
13             THE COURT:   All right.
14             MR. HUGHES:   -- that there was no
15   certification given at all at the time.
16             THE COURT:   All right.
17             MR. HUGHES:   And the basis of the expert's
18   report is Mr. Williams' financial information.  It was
19   all totally within his control at all times.  He didn't
20   have to wait for a deposition or an interrogatory or --
21             THE COURT:  All right.
22             MR. HUGHES:   Or the word of God.
23             THE COURT:   Ms. Mattiacci?
24             MS. MATTIACCI:  We were just intending to
25   give the most updated economic loss report we could.

73

1    We didn't -- there was no set expert report deadline in
2    the scheduling order.  We believe that we had to serve
3    it by the end of the discovery deadline.  We weren't
4    sitting on it.  We got it right as we received it, it
5    went out the door to them as soon as possible.
6              THE COURT:   The answer is is that for
7    somebody to actually 21 -- suppose these reports at
8    least in rough draft form were sitting on somebody's
9    desk 22 days before the discovery end date and somebody
10   picked up the court rule book and actually read 417-7
11   there would have been a suspicion that maybe we can't
12   wait till the discovery end date, maybe we have to
13   serve this tomorrow but I don't want to come down too
14   hard on the plaintiffs and a lot of lawyers regard the
15   discovery end date in that 20 days before the discovery
16   end date as the drop dead, so to speak, deadline for
17   service and absent a court order that requires the
18   service of expert reports at some earlier point in time
19   to avoid this various situation most trial court judges
20   myself included are reluctant to start carving out
21   either side's case when there have been these type of
22   discovery violations particularly when I can address it
23   by giving the other side ample time if they wish to get
24   an expert that will respond to the late serve.
25             So there really isn't a particularly

```
 1    compelling reason for Verzilli to have been served on
 2    the last day of discovery rather than 20 days before
 3    discovery but because of Appellate Division reversals
 4    and because the practice tends to be that before
 5    leniency when at least the report is served before the
 6    discovery end date and that six month after the
 7    discovery end date we see too much of that too but
 8    that's a different problem is that the remedy is not
 9    bar the report, the remedy is to afford you, Mr.
10    Hughes, much like I gave to Mr. Bowman adequate time to
11    respond.
12              All right?  Let's take a break.  Let's take
13    10-15 minutes.
14                        (Recess)
15              THE COURT:  All right.  We're back on the
16    record.  All right.  We left off on the issue
17    concerning the Verzilli report I think I indicated that
18    the Court's treat those type of violations with some
19    leniency.
20              So that's what my inclination is; is to allow
21    both reports in and allow the defense ample opportunity
22    to either take a discovery deposition and, slash, or
23    have their own experts.  Anybody want to be heard about
24    that and if it means postponing the trial, postpone the
25    trial.
```

```
 1              MR. KELLEY:  I don't think, you know, given
 2    Your Honor's ruling on that I have any disagreement
 3    except that certainly it would make it impossible for
 4    us to get the on experts without postponing the trial.
 5              THE COURT:  And that's a given.  When is the
 6    trial date?
 7              MR. HUGHES:   June 27th.
 8              THE COURT:  Yeah, that would be postponing
 9    it till after Labor Day.  I'm going to -- by the way,
10    do you want to hold the settlement conference?  I
11    highly recommend you get either somebody an attorney
12    that both side trust.  Thank you.  Just one second.
13              Order a retired judge, et cetera, et cetera,
14    et cetera, that will devote an entire to this thing.  I
15    don't have an entire day to devote to a settlement
16    conference.
17              MR. HUGHES:  Your Honor, can I --
18              THE COURT:  I'm not forcing anybody, but
19    that would be my recommendation.
20              MR. KELLEY:  And I just remind Your Honor,
21    actually, I noticed one out for a settlement conference
22    in front of Your Honor on June 6th so everybody can --
23              THE COURT:  The computer is my friend.  Hey,
24    BeBe, if you do nothing else today, I want you to
25    remove this case from the settlement conference.
```

```
 1                    THE CLERK: Should we cancel it?
 2                    THE COURT:   Yeah, I'm going to give you a
 3      trial date obviously for the fall and I'm not forcing
 4      or twisting arms, but if you all want a real settlement
 5      conference before a judge that is better at settling
 6      cases than I do, I'm very lackadaisical about settling
 7      cases.
 8                    I'm one of the few people that believe that
 9      more cases should go to trial rather than less.  It
10      keeps everybody in the system honest if we tried more
11      cases.  So I don't squeeze arms.  If you want and there
12      are judges out there that are very good.  Most of you
13      know who they are and I'm perfectly willing to
14      accommodate the trial date to allow you time.  Some of
15      them are very busy and takes some time to get booked by
16      them.
17                    But if that's what you want to do, by all
18      means, see if you can agree on an arbitrator and a date
19      and if it means postponing the trial a little bit more
20      I'm glad to accommodate it.  All right?  All right.
21                    Let's go back now to -- all right.  So I'm
22      denying the motion to bar both reports.  How much time
23      do you think you'll need, Mr. Bowman?
24                    MR. BOWMAN:  Your Honor, I have the month of
25      June where I can hopefully get the deposition of Mr.
```

77

```
 1      Kaplan in.  I'm gone the month of July and will need
 2      some time to work with an expert --
 3                    THE COURT:   Sounds like we're talking about
 4      120 days give or take.  Does that sound reasonable?
 5                    MR. BOWMAN:  At least and I have some other
 6      issues we need to talk about.  One is our admitted
 7      counsel in Pennsylvania is on maternity leave until
 8      November.
 9                    THE COURT:   All right.  Does the -- you mean
10      the prog nece counsel?  Who is the admitted -- you're
11      the prog nece county, you're the maternity person?
12                    MR. BOWMAN:  I'm from Colorado.
13                    THE COURT:   Who is the maternity person?
14                    MS. SEIDLIN-BERNSTEIN:  I'm the New Jersey
15      attorney and also the maternity person.
16                    THE COURT:   All right.  Well but who needs
17      the -- I hate to just postpone everything until
18      November, right?  Is there any reason why this stuff
19      can't get done in the next 120 days?
20                    MR. BOWMAN:  I just don't know because I
21      haven't explored schedules for counsel deposing
22      experts.
23                    THE COURT:   All right.  Here is what I'm
24      going to do.  I'm going to give you the 120 days.  I'm
25      going to give you a new trial date now.  If it looks
```

1    like as time goes on that things are becoming difficult
2    for any reason as the old saying goes, we're open 8:30
3    to 4:30, arrange a conference call and I'm glad to
4    discuss it.
5            I did discuss -- what's 120 days -- it's May
6    27th -- our new discovery end date is September 27th.
7    But for the limited purpose of addressing the Verzilli
8    and Kaplan expert reports.  All right?  We'll give you
9    a trial date in -- it doesn't work to give you a date
10   between Thanksgiving and Christmas, too many holidays,
11   too much going on.
12           I'm glad to give you the first day in
13   January.  I don't have my 2017 calendar.  I only have
14   the 2016.  Do you have a 2017?
15           THE CLERK:  Yes, I do.
16           MS. MATTIACCI: Your Honor, if there is any
17   way we can make it earlier.  I mean, we're going to
18   have the next -- it's actually more than 120 days from
19   today because it's four months from today that you're
20   making the discovery end date.
21           THE COURT:   Right.  But the 120 brings it to
22   September 27th, right?
23           MS. MATTIACCI: Right, which is actually 150
24   from today, right?
25           THE COURT:   I thought that was 120.

---

1            MS. MATTIACCI: I'm sorry.  Four months today.
2            THE COURT:  Right.  That's 120.
3            MS. MATTIACCI: Yeah, 120.
4            MR. HUGHES:   Yes, Your Honor.
5            THE COURT:   All right?  So that gives you to
6    the end of September and then the problem is is that
7    once you begin, remember, we're down that Thanksgiving
8    week in November for judicial college and from that
9    time until the first of the year it's basically the
10   Christmas holidays, people take a vacation.  It just
11   becomes very difficult to schedule anything lengthy.
12           If this were a two-day trial I could shoe
13   horn it in.  It's not a two-day trial, right?
14           MS. MATTIACCI: Can we do October?  Is that
15   possible?
16           THE COURT:   I can give you an October date,
17   but -- sure --
18           MR. HUGHES:   Your Honor, that's going to be
19   very problematic for MLB Network.  That's right in the
20   middle of the playoffs, the World Series and all of our
21   witnesses are going to be directly involved in that.
22           THE COURT:   Right.  It's going to have to
23   be that first Monday in January.  I'm trying to give
24   you -- it doesn't do you any good to give you a date
25   that you'll be spending time giving off for only -- to

1   have one side say look, I'm not really ready and part
2   of the problem is that plaintiff served these two
3   reports on the last possible day which puts them in a
4   stronger position than you.  Do you follow?
5           MS. MATTIACCI: I understand that.  I'm just
6   saying we are -- we can be ready as quickly as Your
7   Honor I know you want to get these cases going and
8   moving so any time you want to give us an October a
9   November -- I don't see -- this is not going to be a
10  month-long trial.  It's going to be maybe five days of
11  testimony at the most; maybe not even that much.  I
12  mean --
13          THE COURT:   Actually, I can move a month --
14  I can get it -- I really don't have a sense of how long
15  it's going to be now, but I can give you a late
16  November date.  But here is the thing.  My last date in
17  the building is probably going to be December 16th.
18  You follow?
19          MS. MATTIACCI: Okay.
20          THE COURT:   Which means if I give you --
21  we're back from judicial college it looks like probably
22  Thanksgiving this year is probably the 23rd, right?
23          MR. HUGHES:   The 24th, Your Honor.
24          THE COURT:   Oh, the 24th?  Oh, I'm looking
25  at 2017.

81

1           THE CLERK:  Let me show you.  Go back a
2   little more, it should be November.
3           THE COURT:   The 24th.  So I can give you the
4   28th.
5           MS. MATTIACCI: That would be wonderful, Your
6   Honor.
7           THE COURT:   Anybody have a problem with the
8   28th?
9           MR. KELLEY:   Well, you know, my only
10  objection is that all of the motions in limine and all
11  of that, those deadlines go back and so the week of
12  Thanksgiving will be adjudicating all those motions.
13          THE COURT:   No, it won't.  In regard to --
14  here is the thing.  You can assume in regard to motions
15  in limine that I will resolve all motions in limine
16  that I resolve will before jury selection.  If I get --
17  if the 28th is the date -- let me see the calendar
18  again.
19          All right.  That gives you the 28th until
20  December 2nd is one week, December 9th is -- that gives
21  you three weeks.  Assuming we need two or three days to
22  finish the motions in limine and two or three days to
23  pick a jury, that probably gives you about seven or
24  eight trial days.
25          If it looks like it's not going to fit, I'm

82

```
 1        not going to take any chances, my nightmare scenario is
 2        is that I start a case that I can't finish because of
 3        the holidays.  You follow?
 4               MS. MATTIACCI: Honestly, I think, Your Honor,
 5        I think we start on Monday we're done on Thursday.  I
 6        mean, I don't see this being a --
 7               THE COURT:  If you're right then I have no
 8        problem with doing it.  But if it looks like plausibly
 9        it's going to be more extensive than that then, you
10        know, it may have to be kicked off till January.
11               But I'll give you that date for now.  We'll
12        see how it works with way.  I don't have any problem
13        with that.  All right.  November 28th.  Yeah.  All
14        right.
15               By the way, what I'm going to -- we're going
16        to take a break fairly soon so I can give you orders
17        that so that orders can be prepared memorializing my
18        rulings.  What I don't want is to get orders under the
19        five-day rule and then objections under the five-day
20        rule.
21               All right.  So does the plaintiff -- to go
22        back to the beaning issue, what other arguments do you
23        have that would show that Burke must have known that
24        the allegation was false?
25               MS. MATTIACCI: Okay, Your Honor.  Can we play
```

83

```
 1        for you --
 2               THE COURT:  Yes.
 3               MS. MATTIACCI: -- the --
 4               THE COURT:  Do you have it set up?
 5               MS. MATTIACCI: Yes.  It's set up.
 6               THE COURT:  All right.
 7               MS. MATTIACCI: It's ready to go.  This is the
 8        entire break between the top and the bottom of the
 9        fifth inning.  This is what Mr. Burke looked at before
10        he cropped and edited it.  And before we play it, bear
11        in mind this is the statement that he has, this is the
12        only statement, "He also called his pitcher and catcher
13        to the side before the bottom of the fifth inning and
14        told his pitcher to hit him with the pitch, the first
15        pitch.  I heard him and my pitcher heard him and told
16        the ump.  The first pitch hit him in the ribs," and
17        then this is what he actually looked at where you will
18        see number one he never calls his pitcher and catcher
19        over to the eddge, to the side.  There is no -- you
20        will not see in here anybody indicating that they heard
21        Mr. Williams order a bean ball ever and just so that --
22        does Your Honor mind if I step over here --
23               THE COURT:  Yeah, but that's not -- nobody
24        is asserting that.  I mean, there is nothing on any
25        evidence where a judge or a jury can see on a video all
```

84

1    we hear anybody ordering a bean ball.
2              MS. MATTIACCI: Right.  And in fact, the
3    evidence on this video contradicts that that happened
4    because if that happened, there would be some reaction
5    by somebody --
6              THE COURT:   All right.
7              MS. MATTIACCI: But here is this person in the
8    blue shirt, it's the coach of the opposite team, of the
9    other team.  Mr. Williams is going to come out in his
10   red shirt talking to his son who is the catcher and
11   then you're going to see in this wide angle which is
12   different from what you were just shown, what you were
13   just shown was that real short clip.
14             THE COURT:   Excuse me.  Just one second.
15   What's up?  I'm sorry.  Go ahead.
16             MS. MATTIACCI:  Okay.
17                  (Videotape is played.)
18             MS. MATTIACCI: So here is the coach of the
19   other team, there is Mr. Williams.  The umpire is
20   standing right there.  And he wrote that players and
21   coaches overheard Mr. Williams order the bean ball
22   based upon that.
23             MR. WARDEN:  Keep going?
24             MS. MATTIACCI:  Keep going, yes.  Because now
25   all this time goes by.  Apparently a kid, Mr. Williams

85

1    just ordered the intentional kid of a ten-year-old with
2    a ball and that is his how -- this is what happens, the
3    other coach sits down next to him and is just sitting
4    there --
5              THE COURT:   Why would the other coach have
6    overheard it?
7              MS. MATTIACCI: It didn't happen.
8              THE COURT:   The point -- but I don't know
9    what I just saw disputes that Williams whispered to his
10   -- you're saying the catcher is his son?
11             MS. MATTIACCI: The catcher is his son.
12             THE COURT:   Yeah, you wouldn't expect
13   somebody that's standing I don't know, 30 feet away
14   give or take to necessarily overhear that.
15             MS. MATTIACCI: Exactly.  The only source that
16   Mr. Burke had to go off on said I heard him and my
17   pitcher heard him and told the ump.  It doesn't -- it's
18   never there.
19             THE COURT:   I get your point.
20             MS. MATTIACCI: It's not there.  So then he
21   was like, this is what Mr. Burke, we're talking about
22   Mr. Burke, he has this statement, he sees the full
23   video.  It doesn't happen.  So then he crops it down so
24   you can't see the sidelines, he cuts it to just where
25   Mr. Williams talks to the catcher and he then he

```
 1          doesn't publish --
 2                  THE COURT:   Explain to me the cutting part.
 3                  MS. MATTIACCI: Yes.
 4                  THE COURT:   What was cut out that was
 5          exculpatory?
 6                  MS. MATTIACCI: He --
 7                  MR. HUGHES:   Mr. Burke simply zoomed in,
 8          Your Honor.
 9                  MS. MATTIACCI: The whole beginning of it. The
10          whole beginning.  The beginning when Mr. -- when the
11          coach is over here, you don't see the coach standing
12          like right next to Mr. Williams when this apparent
13          ordering happens.  He cuts that out and then he crops
14          it down so you can't see the sidelines and then he does
15          not publish what six says.  He doesn't publish what his
16          only source says happened.
17                  THE COURT:   Well, before we get to that, I'm
18          focusing on the video.
19                  MS. MATTIACCI: Yeah.
20                  THE COURT:   Frankly, the inference is that
21          the video was reduced just because it may have been too
22          long to expect viewers or listeners to play the whole
23          thing.  What exculpatory was cut out?
24                  You say the distance between the coach and
25          Mr. Williams was cut out?
```

```
 1                  MS. MATTIACCI: Yes.  Well, because if he
 2          published a truthful article, it would be what his
 3          source said and if he published what his source said
 4          and played the expanded video --
 5                  THE COURT:   Yeah.
 6                  MS. MATTIACCI: -- it does not -- it doesn't
 7          match.  It doesn't show that.  So instead, he crops it
 8          so that you don't see -- you don't see any -- he makes
 9          it seem like somebody could have overheard this when
10          they crop it.
11                  When you crop it down, when we watched that
12          first video, you don't see the scope of look how much
13          space is on the other end of the sidelines, how far
14          back.
15                  THE COURT:   Well, you're going to have to
16          play the -- the earlier version from today back so --
17          play again to me one last time what you say was cropped
18          out.  Let's start from the beginning and I want you to
19          tell me what was cropped out.
20                  MS. MATTIACCI: If this video?
21                  THE COURT:   Yeah.
22                  MS. MATTIACCI: Yeah, okay.  So if we go back
23          to the beginning.
24                      (Video is played.)
25                  MS. MATTIACCI: So in what Mr. Burke decided
```

```
 1        to do, you don't see any of this on Mr. Burke's
 2        version.  You don't see any of that coach walking over.
 3                THE COURT:   How does this help Mr. Williams?
 4        How does seeing this --
 5                MS. MATTIACCI: Because now they just crop it
 6        right here.
 7                THE COURT:   Right.
 8                MS. MATTIACCI: And they say oh, all of these
 9        witnesses heard Mr. Williams order this bean ball.  But
10        when you look at it it's a visual --
11                THE COURT:   Stop it for one second.
12                    (Videotape is stopped.)
13                MR. BOWMAN:  I mean, what this actually shows
14        --
15                THE COURT:   No, I don't want to -- your
16        argument is is that the redacted video that Burke put
17        on the website allows for a stronger inference that
18        there were witnesses to Williams allegedly telling his
19        son to tell the pitcher to strike the opposing batter?
20                MS. MATTIACCI: It allowed him to make a new
21        story, a story that no source had told him.
22                THE COURT:   Yeah, but I'm still trying to --
23                MS. MATTIACCI: The new story is that --
24                THE COURT:   I understand -- from what I
25        recall when Mr. Williams is speaking to his son, there
```

```
 1        wasn't anybody, there wasn't any third person within
 2        what I'll call whispering distance.  Anybody want to
 3        disagree with --
 4                MS. MATTIACCI: Not according -- yes, their
 5        only source says I heard him --
 6                THE COURT:   Well, I'll get to what the
 7        source says.  I'm looking at what the video depicts.
 8                MS. MATTIACCI:  Right.  The video doesn't
 9        depict what the source said.
10                THE COURT:   I'll get to that.
11                MS. MATTIACCI: Okay
12                THE COURT:   You agree that in neither the
13        redacted version or this version is there a third human
14        being within a whispering distance of Mr. Williams and
15        Mr. Williams' son.
16                MS. MATTIACCI: Oh, no.  You can see on the
17        video that the umpire is like within ten feet and the
18        coach is behind -- right behind him when the -- if you
19        play it.  Why don't we play it again so you can see it?
20                THE COURT:   Play it again.
21                MS. MATTIACCI: You can see that the coach and
22        the umpire are close by.  The coach his even closer.
23        The coach is closer.
24                    (Videotape is played.)
25                THE COURT:   Now, let's freeze it at that
```

```
 1      point.
 2                       (Videotape is stopped.)
 3              THE COURT:   All right.  It looks like we got
 4      -- it may be freezing early, but at the time that Mr.
 5      Williams begins to first talk to his son, we've got one
 6      guy -- that's the home plate umpire to the right?
 7              MS. MATTIACCI: Home plate umpire, yes.
 8              THE COURT:   He looks like he's about I don't
 9      know five feet, ten feet max to the ten-year-old and
10      Mr. Williams and you got somebody to the left.  Who is
11      that?
12              MS. MATTIACCI: That's the coach of the other
13      team.
14              THE COURT:   He's a little bit further.  It
15      looks like he's about 10 feet, 12 feet, something like
16      that.  Anybody want to disagree with those distances?
17              MR. BOWMAN:   He's walking away.  I mean, in
18      this freeze-frame he's probably that far away, but he
19      passed much closer and that was swoon both in the clip
20      version and in this version.
21              THE COURT:   All right.  Let's continue.
22                       (Videotape is played.)
23              THE COURT:   All right.  So the coach walks
24      away and the umpire or a few seconds longer remained in
25      the vicinity and then everybody broke up.  All right.
```

91

```
 1      Now let's play the redacted version.  Let me see if
 2      there is anything material missing in the redacted
 3      version.
 4                       (Videotape is stopped.)
 5              MR. BOWMAN:   Why don't you let that -- I
 6      mean, at some point you should let that role and see
 7      all the reactions after they hit batter.
 8                       (Videotape is played.)
 9              THE COURT:   Actually, the redacted version
10      looks a lot clearer.  Let's stop it there for a second.
11                       (Videotape is stopped.)
12              THE COURT:   Why does this look clearer to me
13      visually?  Am I the only person that thinks it a little
14      bit clearer?  Am I seeing things?  I don't know.
15              MS. MATTIACCI: It's cropped in.  It's cropped
16      I so you can't see the --
17              MR. BOWMAN:   Mr. Burke was posting it on
18      website so one of the things Mr. Burke does and he
19      talks about it in his certification is he creates video
20      clips.  He thought this was the most relevant portion
21      as he says in his certification and he clipped a piece
22      of that when he was describing what the witness told
23      them, he put the piece in so the people reading the
24      story could see for themselves what the witnesses were
25      saying.
```

1          THE COURT:   Ms. Mattiacci, the clip version
2    we go to Mr. Williams coming out and talking to his son
3    without the minute or two of the people milling around
4    a bit.  But I still don't understand what it is that
5    was taken out that you think deliberately evidence is
6    an attempt to contort a story?
7          MS. MATTIACCI: Because he made up a story.
8    The story that he wrote is not a story from any source.
9          THE COURT:   Yeah, but what did he take out?
10   Here is the thing.  If three guys rob a bank and
11   they're all on video and one of the guys wants to try
12   to produce an exculpatory tape he would try to get the
13   video and excise himself out of the video and you would
14   say, okay,  we know what he's trying to do.  Three guys
15   robbed a bank, the video depicts two guys, where is the
16   third guy?  I could understand why somebody would edit
17   a tape to take themselves out.
18          Here I don't understand what was taken out
19   that destroys the -- and remember, the Courts don't
20   look at these stories with a fine tooth comb.  We
21   basically say whether or not the larger story from the
22   picture essentially is -- I won't say true, because
23   that's not the standard, essentially is so obviously
24   false that the person responsible for his publication
25   had to have known it was false.

1          And frankly, I'm trying to understand what
2    the redaction of the tape and I still don't get what it
3    is that was taken out that is so helpful in showing
4    that Source Number 6's allegation must have been false.
5          MS. MATTIACCI: Okay.  Well, it's two separate
6    things.  Source 6's allegation is false because none of
7    it is in the video.  It's not on -- what Source says is
8    not on the video.
9          THE COURT:   I understand the part about
10   Source 6 says that Williams speaks to pitcher and
11   catcher and this only depicts Williams speaking to
12   catcher, right?
13          MS. MATTIACCI: Correct.
14          THE COURT:   But that's in the -- that's the
15   redacted version and the short version and the long
16   version.
17          MS. MATTIACCI: So I think what the short
18   version does is in the article he says that multiple
19   people -- that people overheard this that heard him say
20   this and when you're in that cropped version you think
21   oh, there must be people like really close by that must
22   of heard this.
23          And then when you watch the real, the
24   unedited, that's why you realize no, nobody could have
25   heard this.  That's ridiculous.

```
 1              THE COURT:   I think that's a stretch.  I
 2    think I have a better grasp.  I don't think the editing
 3    out of what was edited out was for the purpose of
 4    somehow showing that others couldn't have heard.  They
 5    both clearly -- both the edited and unedited basically
 6    only show that the only two people that might have
 7    reasonably overheard unless Mr. Williams is screaming
 8    at the top of his lungs to do something are the home
 9    plate manager and very briefly the other coach --
10              MS. MATTIACCI: But that's a secondary
11    argument.  The first argument is that the only source
12    he has and what the source says happened does not
13    appear on any of the video.  So the reason he cropped
14    it --
15              THE COURT:   He also called his pitcher --
16    all right.  You're saying Source 6 could not have been
17    in the video.
18              MS. MATTIACCI:   What Source 6 relayed does
19    not appear on the video.  Source 6 is his only source -
20    -
21              THE COURT:   All right.  Source 6 is he
22    walked by our catchers so that implies Source 6 is a
23    member of the opposing team, not probably a ten-year-
24    old kid but probably a coach, a manager?  Is that the
25    proper terminology?  A manager, right?
```

95

```
 1              MS. MATTIACCI: Right.
 2              THE COURT:   Right.  He's an adult.  All
 3    right?
 4              MS. MATTIACCI: Uh-huh.
 5              THE COURT:   All right.  A couple of our kids
 6    heard him, one kid asked his parents on his way home
 7    why he would call our pitcher a name and asked what it
 8    meant.  He also called his pitcher and catcher to the
 9    side before the bottom of the fifth and told his
10    pitcher to hit him with the first pitch.  I think the
11    last thing I heard in -- and the last thing, I heard
12    him and I heard him and -- why is that blocked out?
13              MR. BOWMAN:   Your Honor, because that would
14    identify the source.
15              THE COURT:   I'm trying to understand the
16    sentence.  I heard him and blank pitcher heard him and
17    blank told the ump.  There was somebody's name there or
18    something?
19              MR. BOWMAN:   Yes, Your Honor.  Or a pronoun.
20              THE COURT:   All right.  All right.  Could
21    this have been accurate?
22              MR. BOWMAN:   Yes, Your Honor.
23              THE COURT:   How is that?  Williams didn't
24    speak to the pitcher, he spoke to the catcher.
25              MR. BOWMAN:   The pitcher is the batter and he
```

```
 1     said I heard him and the sources saying --
 2             THE COURT:   Well, the pitcher is the --
 3             MR. BOWMAN:  -- the pitcher heard him, that's
 4     the batter.
 5             THE COURT:   The pitcher is not Williams'
 6     pitcher, the pitcher is the opposing team's pitcher at
 7     bat.
 8             MR. BOWMAN:  Right.  The opposing team's
 9     pitcher at bat.  Yes, Your Honor.
10             THE COURT:   All right.
11             MS. MATTIACCI: That's the second part of it;
12     no, not the first.  What Your Honor was talking about
13     he called his pitcher and catcher to the side.  He
14     means Mitch Williams' pitcher and Mitch Williams'
15     catcher.  His refers to Mr. Williams and that is not
16     true.
17             MR. BOWMAN:  That's subsidiary.  It's
18     shorthand for talking to the catcher and the the
19     pitcher. You know, that's subsidiary to the overall
20     meaning of what three sources told Mr. Burke.  I just -
21     - two things for the record, Your Honor.
22             This -- I know we've referred to this as a
23     redaction.  This is a cropping.  This is zooming in.
24     This isn't cutting something out.  And also, you know,
25     the issue here is whether there's clear and convincing
```

```
 1     evidence that Burke fabricated something.  This isn't
 2     even --
 3             THE COURT:   I understand.  Just anybody
 4     wonder, you know, a court is spending hours upon hours
 5     dissecting evidence that, you know, maybe Burke spent
 6     six seconds on.  I don't have the famous idea, but I
 7     don't know any way you want.  If this goes appeal, the
 8     Appellate Division might spend three weeks dissecting
 9     all this stuff who knows.
10             MR. BOWMAN:  Fair point, Your Honor.  My only
11     point was that this is evidence of what happened not
12     evidence any sort of evidence about what Burke thought.
13     Mr. Burke was deposed --
14             THE COURT:  Right.
15             MR. BOWMAN:  Mr. Burke produced his
16     documents.
17             THE COURT:   All right.  Let me get to the
18     bottom line.  What else would you want to tell me or
19     argue to me about the video?
20             MS. MATTIACCI: Well, that says I heard him
21     and my pitcher heard him and told the ump.  It does not
22     -- this video does not in any way show that anybody
23     would have heard him and the pitcher heard him and --
24             THE COURT:   That's a fair point that the
25     pitcher is hard to know because if the pitcher is the
```

```
 1    batter, where is he in all of this?
 2              MR. BOWMAN:  To the right of the --
 3              THE COURT:   I mean, the kid --
 4              MR. BOWMAN:  Why don't play it?
 5              MS. MATTIACCI:  Yeah.
 6                  (Videotape is played.)
 7              THE COURT:  It's that kid, obviously, to the
 8    right, right?  He's in the -- he's kind of --
 9              MR. BOWMAN:  Yeah.
10              THE COURT:   All right.  I get it.  All
11    right.
12                  (Videotape is stopped.)
13              MS. MATTIACCI: And then nobody tells the ump.
14    The ump testified nobody said anything about a kid
15    getting hit beforehand or warning him and then in the
16    article that Mr. Burke publishes he says that the ump
17    was warned ahead of time and that the ump warned both
18    benches before the pitch was thrown. The video doesn't
19    show that at all, he published it anyway.
20              THE COURT:   All right.  Mr. Bowman?
21              MR. BOWMAN:  I think the testimony shows that
22    it was the base coach umpire who was warned.  But
23    again, you know, Mr. Burke had sources telling him this
24    incident occurred and we can nitpick about whether or
25    not it was the catcher then told the pitcher, or the
```

```
 1    pitcher and the catcher at the same time, but those are
 2    all subsidiary to the point of this video that Mr.
 3    Burke was looking at and wrote about in his
 4    certification and testified about.
 5              He was looking to see whether there was
 6    anything here that contradicted the gist of what he had
 7    been told that there was an order to hit the batter.
 8    Mr. Burke testified that there wasn't and even if one
 9    accepts the proposition that he missed something,
10    that's not actual malice.
11              But I don't think he did here; at most this
12    is ambiguous.
13              THE COURT:   All right.  Ms. Mattiacci, I'm
14    inclined to agree.  This is a fairly close case and
15    it's not exactly exemplary reporting because it's a
16    very serious allegation to allege that an adult, a
17    former Major League baseball player is ordering a ten-
18    year-old kid to bean.  Was that the word that was used
19    earlier?
20              MS. MATTIACCI:  Bean ball, yes, Your Honor.
21              THE COURT:   To bean.  I mean, that could
22    potentially kill another kid and you're correct that
23    even the best source so to speak, Source 6, doesn't
24    allege a bean.  He says he hit him with the first
25    pitch.
```

100

```
 1              But I'm supposed to look at things not
 2    begrudgingly and with a fine tooth comb and the essence
 3    is is that there are sources that appear to be
 4    multiple.  One is stronger than the other that allege
 5    that there was a specific instruction to hit the
 6    opposing batter with the pitch.
 7              MS. MATTIACCI: Your Honor, but that -- the
 8    standard is whether there are interary consistencies,
 9    contradictions, failure to pursue the most obvious
10    available sources of a corroborating evidence.
11              There was a contradictory email that was sent
12    to Mr. Burke that said that what was published is not
13    true.
14              THE COURT:   Well, that's what I thought I
15    meant to ask you --
16              MS. MATTIACCI: Yeah.
17              THE COURT:   -- what did you have to
18    contradict it? You've indicated the video.  You've
19    indicated -- I didn't mean to cut you off if you have
20    something, what else do you have?
21              MS. MATTIACCI: Yeah.  So there was an email
22    that was sent by Laura Redmond.
23              THE COURT:   Before publication.
24              MS. MATTIACCI: Before publication.
25              THE COURT:   Where is that in all of this?  I
```

101

```
 1    think in our exhibit it was AA.
 2              THE COURT:   AA?  I don't see any AAs.
 3              MS. MATTIACCI: It's to our motion, I know
 4    that the --
 5              MR. BOWMAN:  Your Honor, it's exhibit -- the
 6    first certification we're looking at it's Exhibit J,
 7    Your Honor.
 8              THE COURT:   All right.
 9              MR. BOWMAN:  It's Gawker 0058 is the date
10    stamp on that email.
11              THE COURT:   All right.
12              MR. BOWMAN:  And before we leave the bean
13    ball, do you want to hear argument on the law or do you
14    just want to focus on the facts?
15              THE COURT:   No.  No.  I know what the law
16    is.  This is the email that says when you were going up
17    post -- when are you going up -- when  are you going up
18    post some factual -- is that what you're referring to?
19              MS. MATTIACCI: Yes, Your Honor.
20              THE COURT:   All right.  "When are you going
21    up?  Post some factual rebuttal regarding this, many of
22    us have been trying to set the record straight.  Nobody
23    wants to hear it because it's not good for you to have
24    to correct yourself.  Have some class and respond to
25    the parents of our team.  Mitch Williams is far from
```

```
 1       the person you let that parent from the other side
 2       describe.  He is the most caring coach to those boys
 3       and trains them well.  They display exceptional
 4       sportsmanship even in the toughest of moments such as
 5       this you have disgraced 12 10-year-old boys for the
 6       pleasure of trying to destroy a man's career and
 7       reputation. The incident was both instigated by and
 8       prolonged by the umpire.  The picture you posted was
 9       from a parent on the other team who was shown the most
10       distasteful and personal form of revenge for losing  a
11       baseball game.  He did notice that the reports came out
12       after we came back the next day to beat this team in
13       the semi-final game?  As to our side or are you
14       interested in the truth?"  It's signed by a Laura
15       Romond, R-O-M-O-N-D?
16             MS. MATTIACCI: Yes.
17             THE COURT:   What is this addressing the
18       specific issue of alleged to have beaned another kid?
19             MS. MATTIACCI: Well, Mr. Burke could have
20       reached out to her.  She's an obvious source that would
21       have corroborated or contradicted what was being
22       alleged and he never did.  He never even called Mr.
23       Williams to get his comment.  He never called either of
24       the umpires to find out.  The umpire is the one closest
25       sitting there.
```

```
 1             He -- he publishes that the whole umpire he
 2       writes in the article, "The home umpire who had been
 3       made aware of the upcoming bean ball warned both
 4       benches."  It's not in the video.  That's --
 5             THE COURT:   That's a fair point. But this
 6       person from what I recall of the tape, there are only
 7       four potential people who might have reasonably
 8       overheard something that Mr. Williams' son, the home
 9       plate umpire and the coach from the other side who was
10       in 10 feet away give or take for a second or two.
11             Laura -- who would Laura Redmond know based
12       on -- at least based upon firsthand knowledge whether
13       or not there was some type of nefarious communication
14       between Williams and his son before that pitch?
15             MS. MATTIACCI: The point is is that it was
16       somebody else that he could have --
17             THE COURT:   I understand that but this is
18       not a tape of the Kennedy assassination, it doesn't
19       require that the full-fledged investigation of this
20       very potential witness before something is published
21       only in the context of a public figure that the person
22       publishing the story not know that it was false.
23             Was the home plate umpire ever spoken to
24       about what he had seen?
25             MS. MATTIACCI:  No.
```

1          MR. BOWMAN:  Two corrections.  The home plate
2    umpire was deposed.  The --
3          MR. BOWMAN:  Mr. Williams -- Mr. Burke didn't
4    know the identity of the umpires in his certification
5    and in the record he tried calling Ripken Baseball and
6    they didn't call him back.
7          It's also -- I want to correct the statement
8    here about he didn't respond to this email.  His
9    testimony is unrebutted testimony is he doesn't
10   remember seeing this email.  I came in -- he has
11   Tuesdays and Wednesdays off because he works all
12   weekend because he covers sports, he doesn't remember
13   receiving this email.  He didn't choose not to contact
14   this person.
15         MS. MATTIACCI: The home plate umpire was
16   deposed and testified it's false.  I mean, what was
17   published was false.  He was never --
18         THE COURT:  Yeah, but was this done before
19   publication?
20         MS. MATTIACCI:  No, that's why I'm saying he
21   was never contacted.
22         THE COURT:  All right.
23         MS. MATTIACCI: So he was never contacted --
24         THE COURT:  We're still stuck in the same
25   place.  What other evidence do you want me to consider

1    that contradicted Source 6's allegations?
2          MS. MATTIACCI: Well, you would agree with me,
3    Your Honor, that that -- what he wrote here about what
4    the umpire did is contradicted by the video.
5          THE COURT:  It does not appear to be
6    consistent.
7          MS. MATTIACCI: Right.  The article writes
8    that the player was hit square in the ribs,
9    contradicted by the video.
10         THE COURT:  Yeah, but it's hard to tell and
11   I think those are minor points from what I saw it
12   looked like the pitch was a wayward pitch.  I couldn't
13   tell you what part of the body.  If you want we could
14   play it again and I could describe what it looks like.
15   But remember, the law doesn't require that these
16   articles give every single fact a hundred percent
17   correct.
18         The defamatory aspect of this is that an
19   adult told a child to hit another child with a
20   baseball.  I agree with you to some extent that beaning
21   as I guess it's commonly known is worse than throwing a
22   baseball at the body but only marginally worse, a
23   baseball thrown at somebody's body may be even by a
24   ten-year-old can cause some serious injury.
25         MS. MATTIACCI:  Right.  I mean, it's -- what

1   he reported as Mr. Williams ordering the assault of a
2   ten year old is contradicted by the video itself.
3          THE COURT:   I don't see it as being
4   contradicted.   I see the video neither corroborating
5   nor contradicting the allegation.   I mean in essence
6   you have Mr. Williams speaking to his son and only Mr.
7   Williams and his son know for sure what was said in
8   that particular moment.   I don't regard the video as
9   either contradicting that allegation or corroborating
10   the allegation.   It's not like you can see Mr. Williams
11   pantomiming with a baseball and pointing to the head of
12   the other kid and saying see this baseball and I want -
13   - nothing like that.
14          MS. MATTIACCI: Your Honor, but he had the
15   video and he has one source and they don't match.   So
16   he changed the story.   The story he printed is not the
17   same story of the source.
18          It's equivalent -- what if there was a
19   Supreme Court justice --
20          THE COURT:   Right.
21          MS. MATTIACCI: Who was -- it was published
22   that -- let's just say that somebody Facebooked Gawker
23   or another publication and said I saw a Supreme Court
24   Justice walk into a hotel room with a prostitute and I
25   have a video of it?   And well, it's a public figure,

1   we're going to publish it.
2          THE COURT:   Well, and use an analogy and
3   suppose a video shows the justice going in with a young
4   woman, right?   You don't know from looking at that
5   video was that his wife, was that his daughter is that
6   his next door neighbor or is that a prostitute?   The
7   video -- but looking at the video wouldn't either
8   corroborate or contradict the allegation.
9          MS. MATTIACCI: Here is the difference.
10          THE COURT:   Right.
11          MS. MATTIACCI: It's the -- it would be the
12   equivalent of a source saying I have a video of the
13   justice going into a  hotel room on Route 130 with a
14   woman.
15          THE COURT:   Right.
16          MS. MATTIACCI: And here is the video and then
17   you go look at the video and it's the justice walking
18   into the Lowes in Philadelphia and a woman is in the
19   vicinity and walking in.
20          Well, that's -- no, the source said that they
21   personally -- because this is I heard, I heard --
22          THE COURT:   But let's make it -- let's use
23   that -- as it's getting close to closing time,
24   something to think about in fact to bring it all back.
25   Let's take away from this.   Let's use what we just

1   proposed used, three separate people communicate with
2   the news media and said I know that Justice X is
3   patronizing a prostitute at a hotel on Route 130.  All
4   right?  And there is a video that shows the justice
5   walking with the young woman into a motel, but it's not
6   on Route 130.  Let's make it on Route 30, whatever, all
7   right?
8           And the news media publishes the allegation,
9   all right?  What's the result?
10          MS. MATTIACCI: Well, it's --
11          THE COURT:  Supposing the (indiscernible)
12  standard applies because it's an article about a public
13  figure, a judge, so there's no question the actual
14  malice standard applies.
15          MS. MATTIACCI: But there's more facts because
16  the fact is is that if that -- it would be the
17  equivalent of that author publishing it with the source
18  saying I saw him walk into that hotel on Route 30 or on
19  -- you know, so it would be completely different.  It's
20  like I saw him walk into a hotel at the Lowes.
21          THE COURT:  Well suppose on of the three
22  sources say -- two of the three sources say that it
23  happened, but they don't indicate the basis of their
24  allegation.  One of the three sources says I know it
25  happened because I saw him walk in with somebody that

1   was a known prostitute, you know, February 3rd or
2   whatever it was.
3           MS. MATTIACCI: Uh-huh.
4           THE COURT:  All right?  And suppose further
5   that the news media outlet does no further
6   investigation, they just run the story?  What's the
7   result?
8           MS. MATTIACCI: You can't do that because --
9   well, let me say this.  What this reporter had access
10  to was more information than what you have there
11  because it would be the equivalent of that person
12  saying I was there and I was standing next to him when
13  he walked into the hotel and then we get the security
14  tape of the whole hotel lobby and everybody is coming
15  in and out and there's nobody else in this vicinity.
16          So that person who said I was there and I saw
17  the person go in, wasn't on the tape.  So therefore, if
18  the person goes and publishes --
19          THE COURT:  But that's a more blaring case.
20  If it's one source, it's an easier case if you say
21  this.  If one source calls and says I says I saw the
22  justice go into the Merry Times Motel on Route 130 on
23  February 4th at ten o'clock and the reason why I know
24  it was that date and time is that's my own anniversary
25  and blah, blah, blah, blah, and the news media outlet

1   doesn't go with the story, they then contact the motel
2   and they find out that the motel had closed six months
3   earlier, all right?  That's a much tougher case --
4           MS. MATTIACCI: Uh-huh.
5           THE COURT:   But I don't regard that as being
6   this case.  The video that we've gone over time and
7   time again I regard as being inconclusive either way.
8   I regard don't regard it as being particularly helpful
9   or hurtful to either side.  So what we're kind of stuck
10  with is three people that report it, one of which is a
11  stronger reporting because it appears to be non-
12  hearsay, and you also -- and we really haven't
13  discussed this and we need to discuss it and we need to
14  break in a few seconds, but Mr. Williams apparently
15  indicated that he had not ordered a bean ball, but that
16  he had told the pitcher, the pitching side.  This is
17  what the Gawker is alleging.
18          Which frankly, somewhat corroborates the
19  allegation.  Telling a ten-year-old to pitch another --
20  another ten-year-old to pitch inside sounds like it can
21  be dangerously close to hitting the other player.
22          MS. MATTIACCI: Yeah, just that, Your Honor
23  pitching inside is perfectly legal.  It's a strategy in
24  baseball.
25          THE COURT:   Yeah, but here's the problem.

111

1   I'm not a baseball player.  I mean, we'll have to
2   address that and perhaps there is something that each
3   side needs to investigate a little bit further.  I know
4   a little bit about baseball, it wasn't as though I was
5   raised in a monastery, but my understanding of telling
6   somebody to pitch inside, is the ball gets closer to
7   the person or the batter, no?
8           MS. MATTIACCI: There's a home plate you
9   either pitch it straight down the middle, you pitch it
10  outside, you pitch it inside.  They're all strikes.
11  We're not even talking about balls.  So he's saying
12  pitch inside, go on the inside corner because that way
13  the kid would pull it -- I mean, Mr. Williams went into
14  deposition testimony about this but where the kid
15  usually puts his hands on the plate, he would pull it
16  inside and hit a foul ball because he's a good pitcher.
17  That's why he -- and there is nothing -- I mean, they
18  had pitchers that were throwing curve balls.
19          So we're not talking this was nothing
20  nefarious in any way.
21          THE COURT:   The record should reflect my own
22  limitations is that I am not an expert on baseball and
23  you may be right, but the impression I got from the
24  commendation to pitch inside was not as benign as yours
25  and the impression I got and I want to perfectly

1    transparent was of brushing the batter back so to
2    speak.
3           MS. MATTIACCI: Well, that's why the jury has
4    to hear this case because you're just hearing the spin
5    of how they're putting it on.
6           MR. BOWMAN:  Your Honor --
7           THE COURT:  It's not such much a spin as
8    that there 400 trial judges in New Jersey and we all
9    have different life experiences.  Today I'm handling a
10   baseball case.  I'm not an expert on baseball.
11   Tomorrow it will be a medical malpractice case as to
12   whether or not a particular valve was used in the right
13   context in an aortic valve replacement.  I'm not a
14   cardiac surgeon either and the next day after that
15   somebody is going to be alleging something that
16   involves some esoteric terminology and some contract
17   involving the sale of beer.
18          The record should reflect that I'm doing the
19   best I can with issues concerning literally baseball
20   and appropriate behavior and some of this stuff frankly
21   is not stuff that I deal with in my everyday life on a
22   day-to-day basis.
23          I'm not trying to cut you off, Mr. Bowman?
24          MR. BOWMAN:  I just have two quick points for
25   the record.  I mean, I think the question here isn't

1    what Mr. Williams thought an inside pitch is or what I
2    think an inside pitch is or what Your Honor thinks an
3    inside pitch it.  It's how Mr. Burke understood that
4    word.  The other thing I want to say about your
5    hypothetical, you know, I think with all due respect
6    the answer is clear, the Lawrence case there was one
7    source that told a reporter that a public official was
8    under investigation for bribery. That as a matter of
9    law was not actual malice because there was no evidence
10   the reported doubted that one source.
11          Here you have three and there's likewise no
12   evidence.  There's some speculation of what the
13   reporter should have thought, but the Supreme Court in
14   this state has consistently said that what a reporter
15   should have known, that's not relevant.  What's
16   relevant is what the reporter did know.
17          MS. MATTIACCI: And I may I end on Your Honor,
18   that looking at Source 6, he or she says I heard him
19   and my pitcher heard him, and the pitcher told the ump.
20   It's not in the video.  At no point shows that in any
21   way that anybody heard that.
22          THE COURT:  Yeah, I acknowledge that the
23   video does not corroborate and to some extent I agree
24   that it contradicts it, but the major points that there
25   -- remember, to some extent there is some

1   corroboration.  Mr. Williams did speak with the
2   catcher.  The catcher then speaks to the pitcher, the
3   first pitch is very inside.  It's not as though it's
4   close.  But it looks like it's directed -- the pitch is
5   directed directly at the person of the batter.
6           Underlying all of that is the aware all of
7   these briefs is that there is a lot of bad blood
8   allegedly being alleged and bad behavior and other
9   things which you can't take this in isolation.  We
10  haven't even gone to the allegations as to whether Mr.
11  Williams called another player using the P word, you
12  called somebody else using the F word, or did something
13  else.
14          And we'll try and disentangle that sometime
15  relatively soon, but none of this stuff should be taken
16  in isolation if the law requires me to view these
17  motions based upon the perspective of Mr. Burke and
18  it's hard for me to determine based upon what's been
19  presented that Burke had to have known that the
20  allegation forget about whether it was a bean pitch,
21  the allegation that Mr. Williams instructed the catcher
22  to instruct your son, to instruct the picture to hit
23  the other team's pitcher who was at the plate.
24          None of the stuff you presented leads me to
25  conclude that Mr. Burke had to have known that that was

1   a falsehood.
2           MS. MATTIACCI:  Well, Your Honor, with all
3   due respect, you're setting the bar higher than we have
4   to prove.
5           THE COURT:  We'll go into that.  We'll go
6   into that.  I'm not ruling it on it at this point.
7   We'll go into that.  All right.  Let's discuss
8   scheduling.  It's already five after.
9           Bebe, do you want to have Jeanette -- where
10  is Matt?  Matt, do you want to bring in my calendar,
11  please?  I'm going to have to let you all go before we
12  get the orders on my previous rulings memorialized.
13  I'm going to keep my fingers cross and impose upon each
14  side if they want to send me an order, but to exchange
15  them among yourselves to see if you can agree with
16  something before you send it to me, thank you.
17          MR. BOWMAN:  Uh-huh.
18          THE COURT:  Any reason why I can't have you
19  back some time next week?
20          MS. MATTIACCI: I have oral argument in
21  Reading on Thursday, Your Honor.
22          THE COURT:  How about Friday, June 3rd?
23          MR. BOWMAN:  I have a personal conflict on
24  Friday.  Is there any chance we can do it on Thursday,
25  Your Honor?

```
 1                    THE COURT:    Ms. Mattiacci just indicated
 2       she has to --
 3                    MR. BOWMAN:    I'm sorry.   I'm sorry.   I was
 4       looking at my calendar.   How about Wednesday?
 5                    THE COURT:    How about Wednesday?
 6                    MS. MATTIACCI: Wednesday is okay, Your Honor,
 7       for me.
 8                    THE COURT:    All right.  All right.   I
 9       haven't heard any descents yet.  All right.  Nine
10       o'clock.  See if we can finish it up before lunch.
11                    MS. MATTIACCI: Your Honor, is there anything
12       that you want us to particularly focus on to prepare
13       for argument on Wednesday?
14                    THE COURT:    I thought about that.  I don't
15       need the briefs about the law and type of stuff.   FI
16       you want to send me another page on it, that's fine.
17       But if you want to basically give me a cheat sheet
18       concerning evidence that you -- in your case, evidence
19       that has that contradicts what it is that Mr. Burke
20       thought concerning the truthfulness of the allegations
21       at the time of publication.  Kind of what I've been
22       doing up until now is taking each piece of evidence and
23       trying to understand what the evidence was that would
24       support Burke thinking what was true and then inviting
25       the plaintiff to give me the evidence that must have
```

117

```
 1       contradicted it in such a way that Burke most have
 2       known it as false, not that he may have doubted this
 3       sincerity of it, but that he actually would have
 4       transformed his belief into a belief that he's now
 5       publishing a false allegation.
 6                    If you want to do that, I'm open to it, but
 7       I'm not requiring anybody to do it.
 8                    MS. MATTIACCI:  May I address that because I
 9       want to make sure I'm on the right field, so to speak.
10       The -- we have to prove that he had a high degree of
11       awareness of probable falsity or entertain serious
12       doubt as to the truth of this statement.
13                    THE COURT:    Right.
14                    MS. MATTIACCI: Not that he had to have known.
15                    THE COURT:    Right.  That may have been a bit
16       of an overstatement of a certainty but to use the
17       language let's see -- I'll take from our Supreme Court
18       in Durando versus Nutley Sun which is a relatively
19       recent 2012 case although this is on page 252, although
20       the actual malice standard is difficult to meet a
21       plaintiff will satisfy the standard despite an editors
22       position that they can show the story was fabricated by
23       the defendant is the product of his imagination or is
24       based on a wholly, on an uninvited, unverified
25       unanimous telephone call. And likewise, the publisher
```

```
 1    will not prevail when his allegations are so inherently
 2    importable that only reckless man would have been put
 3    them in circulation where there are obvious reasons to
 4    doubt the voracity of an information or the accuracy of
 5    his reports.  And probably that last bit of language is
 6    the language that's most helpful to you.
 7              MS. MATTIACCI: Yes.
 8              THE COURT:  So I still think it's an
 9    extremely high standard because remember attached to
10    all of that is not just proof by a preponderance of the
11    evidence, it's proof by clear and convincing evidence,
12    so it's a very high standard.
13              MR. BOWMAN:  Your Honor, may I just request
14    that if something is submitted it be submitted by five
15    o'clock on Tuesday and served on us by email so we also
16    see it before the hearing?
17              THE COURT:   Oh, sure.  That should be no
18    doubt about that.  Everybody should get here at the
19    same time.  Anybody else have any questions or concerns
20    We should ultimately finish this up on Wednesday and
21    see where we are and if anybody wants to readdress any
22    issues concerning trial dates or discovery end dates
23    between there's a something you can be able to find out
24    between now and Wednesday, no better way than to spend
25    your Memorial Day weekend in contacting proposed
```

```
 1    experts to see what they need an average time they'll
 2    need to refute something the other side has done, I'll
 3    be glad to address that also on Wednesday morning.
 4    Anybody have any further questions or concerns?
 5              MR. BOWMAN:  Thank you, Your Honor.
 6              MS. MATTIACCI: No, Your Honor.
 7              THE COURT:   Have a good holiday.  All right.
 8              MR. HUGHES:   Thank you, Your Honor.
 9              THE COURT:  All right.
10
11                        * * *
12       (Whereupon, proceedings of 5/27/2016 were concluded)
```

120

## C E R T I F I C A T I O N

1
2
3
4      I, Lauren Vollmin, the assigned transcriber, do hereby
5      certify that the foregoing transcript of proceedings
6      before the Camden County Superior Court on
7      May 27, 2016, digitally Recorded, from Index
8      Number 1:44:03 to 3:03:59; Index Number 3:18:22 to
9      4:09:01 is prepared in full compliance with the current
10     Transcript Format for Judicial Proceedings and is a
11     true and accurate compressed transcript of the
12     proceedings as recorded.
13
14
15     AUTOMATED TRANSCRIPTION SERVICES
16
17     BY:      *Lauren A. Vollmin*              _____
18              Lauren A. Vollmin                A.O.C. #469
19
20     Dated:  November 22, 2016
21
22
23
24