## **Attachment 2**

June 1, 2016 Summary Judgment Oral Argument Transcript

```
                        SUPERIOR COURT OF NEW JERSEY
                        LAW DIVISION, CIVIL PART
                        CAMDEN COUNTY, NEW JERSEY
                        DOCKET NO. CAM-L-3675-14
                        APP. DIV. NO. _____
```

```
MITCHELL WILLIAMS,          :
                            :
        Plaintiff,          :         TRANSCRIPT
                            :
    v.                      :             OF
                            :
THE MLB NETWORK INC.,       :          MOTION
et al,                      :
                            :
        Defendant.          :
```

```
                PLACE:  Camden County Superior Court
                        Hall of Justice
                        101 South 5th St., Suite 150,
                        Camden, NJ 08103-4001

                DATE:   June 1, 2016
```

**BEFORE:**

    THE HONORABLE MICHAEL J. KASSEL, J.S.C.

**TRANSCRIPT ORDERED BY:**

    JAIME VASSALIO
    (LexisNexis CourtLink)

*Mary Nelson*
***AUTOMATED TRANSCRIPTION SERVICES***
***P.O. Box 1582***
***Laurel Springs, New Jersey***
***(856) 784-4276***
autotranscripts@comcast.net

**APPEARANCES:**

       LAURA C. MATTIACCI, ESQ.,
       (Console Law Offices, LLC),
       Attorney for the Plaintiff.

       RAHUL MUNSHI, ESQ.,
       (Console Law Offices, LLC),
       Attorney for the Plaintiff.

       PETER O. HUGHES, ESQ.,
       (Ogletree Deakins),
       Attorney for Defendant MLB Network.

       CHAD BOWMAN, ESQ.,
       (Chad Bowman, Esq.),
       Attorney for Defendant Gawker Media.

       THOMAS KELLEY, ESQ.,
       (Thomas Kelley, Esq.),
       Attorney for Defendant Gawker Media.

*Mary Nelson*
***AUTOMATED TRANSCRIPTION SERVICES***
***P.O. Box 1582***
***Laurel Springs, New Jersey***
***(856) 784-4276***
*autotranscripts@comcast.net*

3

1                          I N D E X
2                        June 1, 2016
3
4         ARGUMENT
5         Re: Defamatory Reporting
6         By Ms. Mattiacci            7
7         By Mr. Bowman                              29
8
9         Re: Profanity Directed at an Ump Used by Coach Williams
10        By Mr. Bowman                              39
11        By Ms. Mattiacci            48
12
13
14        Re: Profanity Directed at a Player by Coach Williams
15        By Mr. Bowman                              62
16        By Ms. Mattiacci            70
17
18        THE COURT
19        Decision on Issues          75
20
21
22
23
24
25

4

1                THE COURT:  Good morning, good morning.  Have
2         a seat, have a seat.  At least it's cool in here.
3         Williams versus MLB, 3674-14.  Appearances please.
4                MS. MATTIACCI:  Good morning, Your Honor.
5         Laura Mattiacci, Console Law Offices, for plaintiff,
6         Mitchell Williams.
7                MR. MUNSHI:  Good morning, Your Honor.  Rahul
8         Munshi at Console Law Offices, on behalf of the
9         plaintiff, Mitchell Williams.
10               MR. HUGHES:  Peter Hughes, Ogletree Deakins,
11        for MLB Networking.
12               MR. BOWMAN:  Good morning, Your Honor.  Chad
13        Bowman, on behalf of the defendant, Gawker Media.
14               MR. KELLEY:  Tom Kelley, Your Honor, also for
15        defendant, Gawker Media.
16               THE COURT:  And I'll again apologize for
17        certainly screwing up the names again with all, all
18        these attorneys.
19               All right.  We're going to -- oral argument
20        carries over from, what was it, Friday of last week?
21               THE CLERK:  Yes.
22               THE COURT:  Let me just repeat what I
23        indicated.  This is a tough case, by the way, in some
24        regards.  Many decisions in law are black or white.
25        And judges can make the wrong call.  They do all the

5

```
1    time.  I do all the time.  I mean, not all the time,
2    but with enough frequency to require a certain amount
3    of modesty.
4           But it either falls in one hole or the other.
5    This case, and this is, I think, a pretty good example
6    of being in a fairly gray area.  The reporting question
7    about the bean ball did have inaccuracies and did, and
8    did depict Williams in the worst light.  But, Ms.
9    Mattiacci, taken as a whole, I still don't see
10   sufficient evidence when the standard is clear and
11   convincing evidence, that I can say with any degree of
12   certainty or probability that the author -- what was
13   the reporter's name again?
14          MR. BOWMAN:  Tim Burke, Your Honor.
15          MS. MATTIACCI:  Mr. Burke.
16          THE COURT:  Burke.  That Burke knew it was
17   just -- it was complete garbage.  Certainly, as I say,
18   he took the liberty of depicting Williams in, in the
19   worst light.  Did he sell -- did he do it to sell -- as
20   used to say, sell newspapers.  Newspapers are becoming
21   obviously extinct.  But in order to generate revenue
22   for the Gawker?  I'm sure he did.
23          But you had at least one person say that Mr.
24   Williams instructed to, to hit the kid.  I understand
25   there's -- now there's a difference between the bean
```

6

```
1    ball, which apparently is to shoot for the person's
2    head, and a pitch that's meant for the body.  And there
3    was a discussion between Mr. Williams and his son.  And
4    the next pitch, whether it was 30 seconds later or five
5    minutes later, was a pitch that looked -- not just an
6    inside pitch.  It looked like it was going directly
7    towards the batter.
8           I agree with you, there were inaccuracies
9    between some of the reports that were given to this
10   reporter and what's depicted in the film.  It's true.
11   But it's not as -- it's, it's not the type of
12   fabrication -- you gave me an example yesterday of well
13   somebody sees justice walking into some cheap motel and
14   reports to the press well that justice is, is going
15   with hookers into the motel, that's a far more black
16   and white situation.  If the justice is going into a
17   motel because he wants to or she wants to spend the
18   night, that's perfectly innocent.  That there's no
19   degree of gray in that.
20          And if the justice is going into the hotel to
21   patronize a prostitute, there's no gradation of gray in
22   that.  There is a certain amount of gradation that you
23   put a lot of emphasis on this wasn't a bean ball.
24          But to make it an easier case, suppose Mr.
25   Williams acknowledged I told the pitcher to strike him
```

7

1   in the knee or the leg and the reporter just simply
2   said it was a, it was a bean ball, is that defamatory?
3           MS. MATTIACCI:  Your Honor, if -- there's --
4   Mr. Williams -- that would be defamatory because there
5   would be striking a, a person.
6           THE COURT:  Well that's where we disagree.
7   Fair enough, but that's where we disagree.
8   Hypothetically I just gave you I think (Indiscernible)
9   dates the disagreement.  If we have the exact same
10  case, but the only difference is, is that Mr. Williams
11  said I told the pitcher to strike him below the waist
12  in the leg, all right?  And it was -- it got reported
13  out by the Gawker as Mr. Williams instructing the
14  pitcher to bean him in the head, I don't think that
15  would be defamatory.
16          I think the acknowledgment of the truth of
17  the allegation that it was a pitch intended to hit the
18  batter would not make the specific body part that was
19  the subject of the intent -- hitting somebody in the
20  head almost certainly is worse.  I guess if you tell
21  somebody to hit somebody in the chest near the heart,
22  that can cause a problem, a serious problem too.  But I
23  don't regard that as being defamatory in the context of
24  a public person.

8

1           There are reasons in this country, though
2   there have been some criticism of the New York Times v
3   Sullivan standard, in that public persons and
4   celebrities are far more victims of false allegations,
5   but there's a reason for that.  And it was decided by
6   obviously a pay scale far above mine on the Superior
7   Court.
8           MS. MATTIACCI:  Well, Your Honor, you just
9   said, acknowledged that he intended to hit the child in
10  the knees or the, or the hips.  The -- that would -- he
11  never ordered that.
12          THE COURT:  Oh, I under, I under --
13          MS. MATTIACCI:  So I mean, --
14          THE COURT:  -- I just cite -- I just changed
15  the facts.  I understand that.  Mr. -- in this case Mr.
16  Williams said to pitch in tight or something like that.
17  I don't want to misuse the vernacular.  But it was
18  reported that Mr. Williams said to pitch him closer or
19  inside or whatever.  I understand that.
20          MS. MATTIACCI:  He just said pitch to him
21  inside, Your Honor.
22          THE COURT:  Fine.  But I was changing the
23  facts in order to test the Court's ruling in the sense
24  that suppose I made it an easier case.  I took away the
25  factual dispute and gave you a clearly legal issue.

9

```
 1       The facts are is that the coach -- forget about
 2   Williams.  The coach tells -- suppose some celebrity
 3   coach -- who else, who else is coaching these days as a
 4   former baseball player, anybody know?
 5       MS. MATTIACCI:  I think that there's a lot
 6   that are --
 7       THE COURT:  All right.  They like to be out
 8   there, but it's obviously salutary that they are
 9   coaching the kids and kids are learning the discipline
10   of the sport.
11       But support another, another celebrated major
12   league -- he was a famous guy, by the way.  I wasn't
13   into sports, but I remember when he played.  But
14   suppose an equally famous celebrity coach tells the
15   pitcher I want you to strike that kid, but I want it
16   below the waist, all right?  Because they just struck
17   our -- retaliation because they just struck our, our
18   player the inning before that.  And the press reports
19   it as a bean ball instruction.  That's -- now that's
20   not a factual dispute.  Everybody agrees with that.
21   The question is what's the legal ramification.  All
22   right?  Is that defamatory?  It's clearly inaccurate,
23   right?  The press --
24       MS. MATTIACCI:  Still --
```

10

```
 1       THE COURT:  -- when it, when it inaccurately
 2   reported it as a bean ball instruction when the
 3   instruction was to hit the kid below the waist.
 4       MS. MATTIACCI:  I would say still it's
 5   defamatory because it's still the intentional assault
 6   of a child. --
 7       THE COURT:  Right, but I think --
 8       MS. MATTIACCI:  -- It's against the rules.
 9       THE COURT:  -- you're legally wrong.  I don't
10   think it's defamatory in the New York Times v Sullivan
11   standard, all right?  The law allows there to be plenty
12   of inaccuracies out there even when the inaccuracies go
13   to whether or not the intention was to potentially kill
14   a kid.  If you, if you ask a kid to take a baseball --
15   I don't know how fast these pitches are.  When I was in
16   little league I got hit by some pitches and it hurt.
17   But that's why kids wear helmets.
18       MS. MATTIACCI:  Well, Your Honor, the core of
19   the case is that the reporter wrote "based upon a
20   source that said I heard him order the bean ball, I
21   heard him order it".  And there is -- and when you look
22   at the video, no one could have heard that.
23       THE COURT:  Agreed.  That's inaccurate.
24   There wasn't -- there's no evidence in this case that a
```

11

```
 1    bean ball was ordered.  I agree with that.  There is
 2    evidence in this case that somebody said --
 3              From the Defense, since I don't memorize his
 4    exact writing, what did the source.  I don't know if it
 5    was number six or source six --
 6              MS. MATTIACCI:  It's source number six, Your
 7    Honor.
 8              THE COURT:  -- said --
 9              MS. MATTIACCI:  It said, "I heard him order
10    ... here it is.  I -- after -- it says, "He also called
11    his pitcher and catcher to the side before the bottom
12    of the fifth", which it did not happen.
13              THE COURT:  Yeah, I agree, it's inaccurate.
14    He didn't call the pitcher.  He called the catcher.
15              MS. MATTIACCI:  "And told his pitcher to hit
16    him with the first pitch".
17              THE COURT:  That's what, that's what I'm
18    focusing on. --
19              MS. MATTIACCI:  Right.
20              THE COURT:  -- To hit him with the -- and by
21    the way, when you look at it, what happens is the first
22    pitch occurs.  And clearly to me there's an inference
23    that the pitch was aimed at the batter.  It wasn't just
24    some kid throwing the ball errantly.  Clearly -- in
25    fact we used to call it -- I don't know if they call it
```

12

```
 1    this, a brush back pitch.  It clearly was -- it clearly
 2    actually was more than --
 3              MS. MATTIACCI:  A brush back pitch --
 4              THE COURT:  -- a brush back --
 5              MS. MATTIACCI:  -- is not intended to hit the
 6    child though.  That's just --
 7              THE COURT:  Yeah, you know what, when you're
 8    a ten-year-old, you know, maybe, maybe you're not that
 9    accurate to get one inch to the left or one inch to the
10    right.  I would, I would not feel comfortable 60 feet
11    and six inches from a ten-year-old who was instructed
12    just to brush me back. --
13              MS. MATTIACCI:  Well, Your Honor, with all
14    due --
15              THE COURT:  -- I'm more concerned that maybe
16    the pitch would go three inches to the, to the right
17    and hit me.  And whether or not it's in the head or
18    somewhere else, I don't feel like getting hit by a
19    baseball.
20              MS. MATTIACCI:  Well I understand, Your
21    Honor.  But with all due respect, it's the -- this is
22    an elite level of, of children.  I mean, this is like,
23    this is -- if they were -- there are people that are
24    prepared for the Olympics in three years.  I mean,
25    these are high level athletes.  And he knows --
```

13

1       THE COURT:  These are ten-year-old kids, not
2  high level athletes.
3       MS. MATTIACCI:  But, Your Honor, if you saw
4  the -- this is, this is travel -- you have to try out
5  for the team.  It's $3000 to be at the tournament.  We
6  can show clips of, of how good these, these kids are.
7  They're --
8       THE COURT:  And (Indiscernible) -- it's been
9  a long time since I was a ten-year-old.  But I can tell
10  you a ten-year-old is a ten-year-old.  And I can tell
11  you -- I don't care if it's, if it's major league.  And
12  I'll be the first to confess I can't tell the
13  difference between a major league game and a minor
14  league game in terms of performance.
15       But I can tell you this.  That I do not
16  regard it as being defamatory once we focus on the
17  legal issue as to whether or not the added aggravating
18  factor of alleging that it was a bean ball as opposed
19  to what source six said, which is basically hit the kid
20  without specifying what part of the body was the intent
21  of the hit, involving ten-year-olds, all right, who --
22  there are plenty of major league pitchers, by the way,
23  who I understand don't have all that great control over
24  their pitches.  It's not like --

14

1       MS. MATTIACCI:  I understand.  But, Your
2  Honor, --
3       THE COURT:  -- I mean, Sandy Koufax, which is
4  a name that -- he pitched well before your time.  But
5  when I was a kid he was a very big celebrity pitcher
6  who could throw a baseball about 100 miles an hour,
7  which is pretty lethal.  And when he started out he was
8  wild.  He must have been a -- quite an experience if
9  you were a batter in Brooklyn in the mid-1950's facing
10  a 20-year-old who could throw a baseball 100 miles per
11  hour.  And you didn't know whether or not it was going
12  to end up six, six feet to your left or six feet to
13  your right, or whether or not it was coming straight at
14  you.  And that was major league level.  These are ten-
15  year-olds.
16       MS. MATTIACCI:  Yes, but, Your Honor, you're
17  putting your own admittedly inexperience thought
18  process and judging these facts, when these are facts
19  that are in dispute that the jury should --
20       THE COURT:  But I'm not, I'm not, I'm not --
21  I have to judge the facts.  I have to judge it.  If you
22  take an appeal an appelate -- two or three Appellate
23  Division judges will judge appeal (sic) -- if it gets
24  to the New Jersey Supreme Court, you'll have seven
25  Supreme Court justices.  And they all bring to the

15

```
 1    table our experiences.  What else can they do?  I can't
 2    block it out.  I can't, I can't put myself in the shoes
 3    of either Mr. Williams or Mr. -- what's the reporter's
 4    name again?
 5            MS. MATTIACCI:  Mr. Burke.
 6            MR. BOWMAN:  Mr. Burke, Your Honor.
 7            THE COURT:  Mr. Burke.  I can't put myself in
 8    their shoes and live their lives and take their life
 9    experiences and then focus on the case based upon how
10    they've lived their lives.  I have to do it based upon
11    what I have.  And again, --
12            MS. MATTIACCI:  I know.
13            THE COURT:  -- we come to the same -- I come
14    to the same conclusion.
15            MS. MATTIACCI:  Well can I, can I bring you
16    back then to the, to the source?  Because the most
17    important part is the only source that he has about --
18    even if we assume bean ball, we've just put bean ball
19    aside and we just talk about an instruction to hit the
20    batter.  He says I heard him and my pitcher heard him
21    and told the ump.  That's, that's the relay that was --
22    supposedly happened to back up this allegation.  And
23    when you watch --
24            THE COURT:  Yeah, but here's what I'm
25    focusing on.  I am not -- here's what I'm not doing.
```

16

```
 1    This is also before your time, but it's a matter of
 2    this -- do you remember there's some Zapruder films
 3    from the Kennedy assassination?
 4            MS. MATTIACCI:  Yes, well I've read about
 5    them.
 6            THE COURT:  Okay.  Have you ever seen the
 7    film?
 8            MS. MATTIACCI:  No.
 9            THE COURT:  It's a film.  All right.  It's
10    been the subject probably of ten million hours of
11    scientific analysis where literally every frame of this
12    Zapruder -- by the way, the amateur videographer was
13    Abrahanm Zapruder, Z-A-P-R-U-D-E-R I believe it's
14    spelled.  He's been dead many, many years.  He was at
15    Dealey Plaza that day in Dallas.  And the film has been
16    analyzed with scientific, with a scientific fine tooth
17    comb for the past 50 years.
18            I am not doing that with the 90-second,
19    three-minute, four-minute film here, all right?  There
20    was an allegation made that a pitcher, who had a repu
21    -- that a coach, who had a reputation when he was in
22    professional sports -- I said previously, but I think
23    it's unfair to simply judge somebody today based upon
24    what the alleged -- how they allegedly behaved 20 years
25    or so ago.  But, nevertheless, the law requires me to
```

1   factor people's reputation, even old reputations into
2   the way they might behave prospectively.  And Mr.
3   Williams was not known as Mother Theresa when he was a
4   baseball player.
5           And when you focus on multiple forces and
6   what they allege, and when you look at the film of what
7   happened, I cannot say as a matter of law that there's
8   clear and convincing evidence that Mr. -- what was his
9   name again?
10          MS. MATTIACCI:  Burke.
11          MR. BOWMAN:  Burke, Your Honor.
12          THE COURT:  Mr. Burke, I probably should
13  write that down.  That Mr. Burke knew the ar -- the
14  allegations were false or probably knew the allegations
15  were false when they were published by the Gawker.
16          And I want to give you one last chance to put
17  your concerns on the record.  I want to give all the
18  Defense attorneys their chance to put on the record
19  what they think I might have missed in my analysis of
20  the case.  And I want to move onto the next allegation.
21          MS. MATTIACCI:  Yes, Your Honor, it's, it's
22  not just that he knew that it was false.  Darunda
23  (phonetic) makes clear that if the allegations are so
24  inherently improbable that only a reckless man would
25  have put them into circulation.

1           And the allegation that he said he was basing
2   it off of a source that said I heard the pitcher and
3   the ump -- and told the ump, and we have video evidence
4   that that never occurred -- there is no communication
5   that he -- that anybody around that conversation could
6   have heard the statement.
7           Secondly, to the extent even if somebody had
8   supersonic hearing to hear something, the reaction of
9   the folks that are in the vicinity belie, make it
10  inherently improbable that a intentional assault of a
11  child, whether it be at the head or the body was
12  ordered.  Because an adult who heard that would have
13  reacted in some manner, stopped the game, told the
14  umpire, made sure that that ten-year-old did not go up
15  to the plate only to be beaned.  And that did not
16  occur.  So it was inherently improbable that Mr.
17  Williams gave that instruction.
18          And to the extent, Your Honor, that you're
19  going to say well Mr. Williams had a reputation to be
20  wild, to make the leap that he would then instruct the
21  intentional assault of a child because he had a
22  nickname of the Wild Thing, is, is beyond -- it's
23  beyond the pale.  I mean, that --
24          THE COURT:  No, but it's not that, it's not
25  that simple.  It's not that simple.  I'm certainly not

19

```
1    saying that because somebody's nickname when they were
2    a professional athlete decades ago, that, therefore,
3    the most outlandish allegation that's done 25 years
4    later must be true.
5           What I'm saying is that -- and I'm commenting
6    because the Defense in their briefs have argued
7    relentlessly that I should factor in the plaintiff's
8    reputation in determining whether or not there was bad
9    faith in publication of these allegations.  And what
10   I've done in the past actually is distanced myself from
11   that and tried to look at the facts as best they have
12   been known by Mr. Burke without regard to whether or
13   not his nickname was the Wild Thing or the Wild One or
14   whatever it was.
15          But I would be legally in error if I simply
16   shut my eyes to the fact that Mr. Williams had a
17   reputation for being a bit outside the box many, many
18   years ago.  And he did not have a reputation for being
19   somebody that was very docile.  That's the best way I
20   can put it.  That's as I understood it.  And I, I
21   wasn't, I wasn't a sports fan.  But I heard of him and
22   that's what I heard.  Maybe that's unfair, but that's,
23   that's in the reporter's head, you know.
24          MS. MATTIACCI:  It, it -- but, Your Honor,
25   it's not in the reporter's head.  All those documents
```

20

```
1    that the Defense attached, none of them were reviewed
2    by Burke.  Burke didn't read any of those articles
3    before --
4           THE COURT:  I'm not talking about the
5    documents.  I -- Burke is a sports reporter, right, of
6    some sort?
7           MS. MATTIACCI:  Some, sometimes.
8           THE COURT:  Right.  My guess is he knew and
9    thought that Mr. Williams had a reputation as a major
10   league baseball player, that had Mr. Williams been
11   something other than Muhatma Gandhi, right?  That's the
12   point I'm making.
13          MS. MATTIACCI:  But it -- I understand what
14   you're saying his reputation as.  I mean, --
15          THE COURT:  Mr. Williams was known as, as
16   being an individual that created a stir.  No?
17          MS. MATTIACCI:  Okay.  So just because he --
18          THE COURT:  Where's the nickname Wild, Wild
19   Thing come from?  I don't know.  Maybe you tell me.
20   Where -- how did he get that?  It's not in the record
21   before me.  Does anybody explain it?  That was his
22   nickname.
23          MS. MATTIACCI:  It was, but it -- that was,
24   that was because of his control of the pitches.  I
```

1   mean, he, himself, would -- had, had a style that when
2   he threw, he fell to the ground when he --
3           THE COURT:  Fair, fair enough.  Your
4   contention is, is that Mr. Williams had no reputation
5   at all for being a fiery personality.
6           MS. MATTIACCI:  No, I mean, he had, he had a
7   personality --
8           THE COURT:  Well that's my point.
9           MS. MATTIACCI:  Right.  Well Mr. --
10          THE COURT:  I don't, I don't --
11          MS. MATTIACCI:  -- Mr. Munshi has reminded
12  me, Mr. Burke testified he did not know where the
13  nickname came from.  He did not know the, the source of
14  the nickname.
15          THE COURT:  Yeah, but he, but he -- I
16  understand that.  He's not an expert on, on Mitchell
17  Williams.  What I'm saying is, is that Mr. Williams has
18  -- I think it's fair to say either had in the past or
19  has presently, I don't know, a reputation -- I think
20  that's the fairest characteration (sic) as a fiery
21  personality, a big personality, that type of thing, and
22  not as being a docile person.  That's the point I'm
23  making.  If that's an unfair characterization, so be
24  it.  But that's my understanding of it.

1           But more importantly, Burke is the one you'd
2   have to question about to what extent he thought Mr.
3   Williams' reputation played a role, if anything at all,
4   in determining the accuracy of these accusations when
5   they were coming into him.  The "him" being Burke.
6           MS. MATTIACCI:  Yeah, he -- all he had was
7   one e-mail from a parent that said that he was tossed
8   out of a game seven years ago.  I mean, that's, that's
9   it.  He had no other -- he didn't do any investigation.
10  He didn't read any articles --
11          THE COURT:  But was Burke asked at his
12  deposition, a day before this first e-mail came in
13  about Mr. Williams did you have any type of knowledge
14  concerning Mr. Williams' reputation, good, bad or
15  indifferent.  Was he asked that --
16          MS. MATTIACCI:  Yes, --
17          THE COURT:  -- at his deposi --
18          MS. MATTIACCI:  -- yes.
19          THE COURT:  -- and what did he say?
20          MS. MATTIACCI:  He didn't -- he just knew of
21  him as a ML -- as a pitcher. --
22          THE COURT:  All right.
23          MS. MATTIACCI:  -- He didn't, he didn't have
24  any preconceived notions about him. --
25          THE COURT:  All right.  That's what he said

23

```
 1      --
 2              MS. MATTIACCI:  -- He really didn't know him.
 3              THE COURT:  Fair enough, if that --
 4              MS. MATTIACCI:  He said he was like, I think
 5      an Orioles fan or something.
 6              THE COURT:  All right.  Well the Defense will
 7      have to explain why they put so much emphasis then in
 8      their briefs about Williams' reputation.  That's fine.
 9      All right, go ahead.
10              MS. MATTIACCI:  And, you know, I don't -- so
11      the -- in addition to that, I mean, we have set forth,
12      and in the papers that I submitted yesterday, Your
13      Honor, that we're talking about the, the, the ways in
14      which the courts look at how we can establish actual
15      malice.  We're not going to be able to cut open the
16      brain of Burke and say this is what he -- the brain
17      says he was thinking.  We have to use circumstantial
18      evidence.  And the circumstantial evidence that the
19      courts say that we look to is whether there -- the
20      allegations were so inherently improbably.  And I think
21      --
22              THE COURT:  Right.
23              MS. MATTIACCI:  -- looking at the, looking at
24      the reaction of those when this alleged ordering of the
25      hit occurred, nobody reacts.  Nobody does anything.  If
```

24

```
 1      that, if that actually happened, then somebody would
 2      have reacted.
 3              First -- and also let me say that Burke,
 4      Burke just wrote an article about how Mr. Williams was
 5      ejected from a game, from having an argument with an
 6      umpire and saying a curse word.  Then he gets
 7      information about -- five days later about another game
 8      that happened a day after and there's no ejection.
 9      There's no ejection from this game.  There's, there's
10      no even allegation that that happened.
11              So in Burke's mind -- if you just got
12      information that he was ejected from a game for
13      cursing, but now you have an allegation he actually
14      ordered the intentional assault of a ten-year-old in
15      view of an umpire with an um -- and the umpire was told
16      about it, yet he was not ejected, that would cause
17      serious doubt in the mind of Mr. Burke that maybe the
18      allegation is not true.
19              And he went and he published it anyway
20      because he wanted the story that he wanted.  And as the
21      expert says, and looking at the expert report, which is
22      -- should not be discounted here, he says that the fact
23      that, that in reading all of the materials, in his
24      expert opinion Mr., Mr. Burke had the story he wanted
25      and he fixed the facts to be how he wanted them.
```

1           And of most importance was the fact that
2  these sources that came forward, Mr. Burke told them,
3  imposed anonymity on them.  I'm not going to give your
4  name.  I'm just going to use your information.  And he
5  did that because he entertained serious doubts as to
6  the truthfulness of what was being published, because
7  had he given the full story, the full truth, he knew
8  that the story would fall apart because it was just
9  being maligned by parents of the other team.
10           There's a line in Mr. Burke's second article
11  where it says a source told us that he threw the pitch
12  with the intent to throw the batter out, to get the
13  batter out of the game, the pitcher out of the game.
14  That is from no source.  There is no source that says
15  that.  And yet he says a witness said that that was to
16  throw the batter out of the game.
17           We looked at -- we have source six in the
18  Facebook page.  We have source, source seven, an
19  affidavit from source seven, plus an interrogatory
20  response from source seven.  He never says in there
21  that, that that -- it was with the intention of
22  throwing the kid out of the game.
23           He wrote the story with the facts that he
24  wanted, even though the sources contradicted it and the
25  video didn't support it.  And he did it anyway.

1           And that's why -- I mean, when we're looking
2  at what is actual malice: allegations so inherently
3  improbable, only a reckless man would put them in
4  circulation and -- or, or where there are obvious
5  reasons to doubt the voracity of the informant.
6           You have to doubt the voracity of the
7  informant of source six when what he says happened
8  could not have happened when you look at the video.
9  And that's the only source that they have of a hit
10  batter incident.
11           So that is more than enough that we would
12  need.  And when you take all the inferences in favor of
13  the plaintiff to meet the standard for actual malice
14  under the law, Your Honor, it's for -- a jury question
15  that the jury should decide.
16           MR. BOWMAN:  Your Honor, may I be heard?
17           THE COURT:  Of course.  I haven't forgotten
18  you're standing there.  But I --
19           MR. BOWMAN:  I don't want to interrupt, but
20  --
21           THE COURT:  No, but it was clear to Ms.
22  Mattiacci that I'm going in your direction.  So I'm
23  giving her ample opportunity, since almost certainly
24  there's going to be an appeal, to put on the record

```
 1      that what she wants to put on the record in terms of
 2      her argument.
 3              But I should note the briefs in these cases
 4      with the appendices probably weigh 30 pounds.  And it's
 5      hard to imagine that either of you could make an
 6      argument orally that you haven't made repeatedly in any
 7      of the briefs.  Remember, the briefs are part of the
 8      appellate record.
 9              But I'll just comment before I give -- is it
10      Mr. Bowman?
11              MR. BOWMAN:  Yes, Your Honor.
12              THE COURT:  Before I give Mr. Bowman the
13      floor, that it's all well and good to look at the
14      published decision and reiterate what the test is.
15      That's perfectly appropriate.  But everybody, every
16      practicing attorney that does defamation work
17      understands that if the victim of the alleged
18      defamatory conduct is a celebrity, is a public person,
19      that the hurdle that they have to jump over in order to
20      even get the case before a jury is very, very
21      substantial.  And that is not, and that is not by
22      accident.  That is designed to do that.  The courts are
23      encouraged.
24              You know, you just correctly, Ms. Mattiacci,
25      stated the law in regards to well somebody's mental
```

```
 1      state has to be proven circumstantially.  I can't get
 2      into the brain of Mr. Burke.  Nobody can.  So we look
 3      at what he, what he says he knew what was available and
 4      we decide whether or not a jury should be the ones to
 5      ultimately decide whether he entertained serious doubts
 6      about the accuracy of the allegations contained in
 7      these reports.
 8              But in defamation actions where the standard
 9      is New York Times v Sullivan, the courts are encouraged
10      to pull the trigger.  And I'll just read one case.  I
11      thought I was going to read one case.  There are case
12      laws (sic) -- there are cases that very clearly
13      encourage trial court judges not to sit back and simply
14      say well those are -- these are all jury issues when
15      they involve defamation causes of action.  And I wish I
16      had the cases handy.  You are both well aware of them.
17              But there's a reason for that.  We have the
18      First Amendment in this country.  I don't want to be
19      sanctimonious.  But the only that the sanctim -- the
20      only way that the First Amendment has life if we -- is
21      if we give the benefit of virtually every doubt to the,
22      to the media outlet when they make allegations against
23      public persons, all right?
24              If you're a public person in you're the
25      victim of a false allegation, maybe you don't feel all
```

1    that thrilled that some judge is saying well the First
2    Amendment requires you to, in essence, have to defend
3    against false allegations.
4            But if we allow all these allegations of
5    falsity to go to juries, there's no -- media outlets
6    can't afford to defend in every court in this country
7    every time some celebrity, some public person, some
8    politician, some judge -- to some extent I'm a public
9    person.  You could go out there, Ms. Mattiacci, and say
10   that I have leprosy.  I don't have leprosy, by the way.
11   But if you make the allegation, it would presumably be
12   governed by the New York Times v Sullivan standard.
13   I'd have to show, if I decided to sue you for
14   defamation, that you had to have known that I didn't
15   have leprosy.
16           Suppose Mr. Bowman over there whispers in
17   your ear that I do have leprosy.  And you say well
18   that's my source.  I probably don't even get to a jury
19   probably.  Who knows?  But that is done to protect your
20   First Amendment right to speak about me.
21           So again, I don't want to be too
22   sanctimonious about it, but there are reasons why
23   there's a very, very a high standard that's put in
24   effect and whether or not I believe that -- I'm not
25   going to go any further about what my own personal

1    beliefs are.  It's legally irrelevant.  That's as best
2    I --
3            Mr. Bowman, you've been itching to go for a
4    long time now.  So let me give you 15 seconds.
5            MR. BOWMAN:  Your Honor, I'm happy to receive
6    my time.  I have some factual disagreements with the
7    representations Ms. Mattiacci has made about the
8    record.  I'm happy to discuss those if there's anything
9    that particularly troubles you.  But I think you have
10   the standard --
11           THE COURT:  But she's, she's made certain
12   point.  If you do look at the film there are obviously
13   some glaring inconsistencies.  And perhaps the most
14   disturbing -- I'm not concerned about the small things.
15   One of the sources said Williams spoke to both the
16   catcher and the pitcher.  He didn't.  He spoke just to
17   the catcher.
18           But if the source says that people heard
19   Williams order a brush back pitch or a hit pitch,
20   whatever you want to call it, it doesn't look like
21   anybody at the stadium was up in arms about it.  You
22   would think that if a coach, celebrity or not, is
23   ordering a ten-year-old to hit another ten-year-old,
24   and then the pitch occurs, they would have been up in

```
 1   arms.  How do you explain the rather docile response by
 2   everybody on the field?
 3           MR. BOWMAN:  Well Mr. Williams testified in
 4   this case that as soon as the batter was hit both the
 5   -- you can see both the coaches coming on the line.
 6   And the coach for the other team yelling I told you, I
 7   told you to the umpire. --
 8           THE COURT:  Well let's play it.  Let's, let's
 9   see concretely what it is that you say supports that.
10           MR. BOWMAN:  Mr. -- if you look at the -- I
11   think paragraph 75 of the statement of undisputed
12   facts, Mr. Williams testified to that.  So --
13           THE COURT:  I don't, I don't have a crystal
14   recollection --
15           MR. BOWMAN:  Right.  No, I --
16           THE COURT:  -- of paragraph 75 --
17           MR. BOWMAN:  I'm just giving you the citation
18   to the statement of undisputed facts.  It's the --
19           THE COURT:  Let's play it.
20           MR. BOWMAN:  -- hit by pitch clip.
21           THE COURT:  Let's play it.
22           MR. BOWMAN:  And so -- look, Your Honor, even
23   if it's ambiguous, clearly you're right, that a
24   reporter's rational interpretation of an ambiguous
25   document --
```

```
 1              (Video recording played)
 2           THE COURT:  I don't -- we'll give you a
 3   chance to set it up --
 4           MS. MATTIACCI:  You'll notice as well, nobody
 5   speaks to the umpire.
 6           THE COURT:  Let's -- let me allow Mr. Bowman
 7   to get to the point where the pitch occurs.  And you
 8   show me where the out -- where the parents and the
 9   coaches are outraged that some ten-year-old was
10   intentionally struck.  Show me where that happens.
11           MR. BOWMAN:  Sure.  I'm going to turn the
12   sound for --
13       (Video recording continues momentarily and stops)
14           MR. BOWMAN:  So, Your Honor, what I'm trying
15   to illustrate is that Mr. Burke's interpretation is not
16   unreasonable and in fact --
17           THE COURT:  No, but you're making, you're
18   making -- I understand.  You're making arguments now.
19           MR. BOWMAN:  Right, yeah.
20           THE COURT:  One of the main points that the
21   plaintiff does have, in looking at the big picture --
22           MR. BOWMAN:  Yeah.
23           THE COURT:  -- is if you have an allegation
24   that the pitcher was actually instructed to hit the
25   batter and then it's on film that it occurs, you would
```

33

```
1    expect there to be a bit more outrage somewhere on, on
2    the field.  Aren't parents watching this?
3              MR. BOWMAN:  Parents are watching that, Your
4    Honor.
5              THE COURT:  Is the, is the kid that got hit,
6    is his parents, is his parents there, are his parents
7    there?
8              MR. BOWMAN:  The, the story reported and
9    discovery has, has revealed that the kid who heard that
10   or thought he heard that went and talked to the two
11   coaches.  And then the two coaches, after the, the, the
12   hit by pitch, come down and talk to the umpire and the
13   umpire said I didn't hear it, and sends them both back.
14   But they did both come down to complain, Your Honor.
15             THE COURT:  Is that disputed by the
16   plaintiff?
17             MS. MATTIACCI:  Yeah, absolutely, Your Honor.
18   There --
19             THE COURT:  Let's play it, let's play it.  We
20   may not hear it, but let's see -- after the pitch who
21   at least looks like they're complaining about the
22   pitch.
23             MR. BOWMAN:  Sure.  Now I'll turn the sound
24   up when we get to the hit by pitch, so if you can pick
25   up anything.
```

34

```
1              THE COURT:  Fair enough, fair enough.
2              MR. BOWMAN:  What's happening?
3              UNIDENTIFIED:  Going backwards.
4              MR. BOWMAN:  Oh.
5              MS. MATTIACCI:  I would just like to point
6    out, Your Honor, that apparently this ordering the
7    assault of a child happened like a minute and 45 minute
8    -- seconds ago and everyone is just warming up and
9    walking around and doing nothing.
10             THE COURT:  Well they may not be --
11             MR. BOWMAN:  Ms. Mattiacci --
12             THE COURT:  -- I -- but I agree, not
13   everybody in the stadium -- it's not like Williams had
14   a loudspeaker and said hit the next pitcher.  He's
15   whispering to the catcher.  My point is that I'm trying
16   to add -- Mr. Bowman, to respond to your point -- is
17   that after in fact the bad pitch occurs, is the
18   response one of outrage or is the response people
19   shrugging their shoulders and say okay, a kid got hit
20   by a pitch.  It happens in baseball.  It's a fact of
21   life.
22             MR. BOWMAN:  Why are you going back?
23             MS. MATTIACCI:  Yeah, the first base coach
24   comes down.  He goes --
25             THE COURT:  Let's see, let's see --
```

```
 1              MS. MATTIACCI:  -- like this and then he, he
 2    --
 3              THE COURT:  -- let's see what -- well why are
 4    you describing it to me when we're going to be seeing
 5    it hopefully in about 90 seconds, --
 6              MR. BOWMAN:  Yes, Your Honor.
 7              THE COURT:  -- 120 seconds?
 8              MR. BOWMAN:  We're now letting it run.
 9              THE COURT:  All right.
10          (The judge addresses an unrelated matter)
11          (Video played from 9:41:02 to 9:42:42)
12              THE COURT:  Let's stop there for one second.
13    The Appellate Division can take look at the tape and
14    draw their own conclusion.
15              I have to tell you, Ms. Mattiacci, that looks
16    like a pitch he was throwing right at the batter, all
17    right?  I don't know what Mr. Williams said or didn't
18    say five minutes earlier, but I can tell you, anybody
19    who looks at that -- and as I said, I wasn't, I wasn't
20    the star, ten-year-old athlete.  I did not play in
21    elite little league.  But I can tell you that looks
22    like a pitch, it was deliberately aiming for the
23    batter.  Now let's keep playing it. --
24              MR. BOWMAN:  Sure.
```

36

```
 1              THE COURT:  -- Anybody that looks at it can
 2    draw their own conclusions.  That's my conclusion.
 3              MR. BOWMAN:  And, Your Honor, I -- you've got
 4    to say see for yourself.  But you can see the third
 5    base coach for the SJ Titans and the first base coach
 6    from the SJ Titans immediately, rather than check on
 7    the batter, walk down to talk to the umpire --
 8              THE COURT:  Well we'll see, let's play it
 9    through.
10              (Video played at 9:43:26)
11              THE COURT:  All right.
12              MR. BOWMAN:  (Indiscernible) --
13              MS. MATTIACCI:  And the next batter, the next
14    batter went up to the plate.
15              (Video stopped at 9:43:48)
16              MR. BOWMAN:  Yes.
17              THE COURT:  All right.  Again somebody can
18    view the tape.  I did not see a whole lot of outrage on
19    that field.  There may have been some discussion.  I
20    can't tell what's discussing -- but I can tell you the
21    most salient thing, S-A-L-I-E-N-T, that I saw, it looks
22    like a very deliberate pitch by the pitcher to strike
23    the batter.  That's what it looks like to me.
24              MS. MATTIACCI:  Your Honor, he --
```

```
 1                 MR. BOWMAN:  We agree with that, Your Honor,
 2       and --
 3                 THE COURT:  Thank you.
 4                 MR. BOWMAN:  -- we would submit respectfully
 5       that in a situation where three different sources that
 6       told him that happened, one who claimed he heard it and
 7       where the video seemed to support that, and in the
 8       context of reporting the day before --
 9                 THE COURT:  Mr. Bowman, I don't want to cut
10       you off, --
11                 MR. BOWMAN:  Sure.
12                 THE COURT:  -- it's already ten of 10:00.  I
13       want to go onto the next matter.  If there's an appeal,
14       everything you've argued in your briefs are
15       incorporated into the appellate record.  I don't want
16       anybody to feel they have to repeat every single
17       argument they've made.  It's been made.  But I have to
18       tell you, after all the dust settles -- and I just --
19       again, I've seen this tape myself now four or five
20       times.  But now that I've seen it again, that very
21       first pitch was not even close.  It was aimed at the
22       batter, right?
23                 Pitches can be wild, that's true.  But I can
24       tell you if I was the parent of that ten-year-old and I
25       had any inkling that the opposing coach had just told
```

38

```
 1       the pitcher to strike my kid, I would have been out on
 2       the field.  And I may have been arrested or ejected,
 3       and maybe my position as a judge would have prevented
 4       me from making too much of a nuisance of myself.  But I
 5       would have been outraged.
 6                 These are ten-year-olds and not major league
 7       players and not minor league players and not college
 8       players.  And it looked like a deliberate, it looked
 9       like a deliberate hit to me.
10                 But I want to move onto the next allegation.
11       And leaves -- hear first from the Defense what were the
12       sources, what was the basis, what was the next item
13       that survived the previous summary judgment motion?
14                 MR. BOWMAN:  Well taking them in
15       chronological order, it's the, the use of the MF word
16       at the game the day before on, I think it was May 11th,
17       May 10th.
18                 THE COURT:  It was by -- allegedly by Mr.
19       Williams to who?
20                 MR. BOWMAN:  Allegedly by Mr. Williams.  The
21       source one reported that --
22                 THE COURT:  To who?
23                 MR. BOWMAN:  Oh, --
```

39

```
1              THE COURT:  I mean, did, did Mr. Williams
2     just simply yell it out to the field?  Did he yell it
3     out --
4              MR. BOWMAN:  During --
5              THE COURT:  -- to a particular person?
6              MR. BOWMAN:  Sorry.  During the ejection,
7     Your Honor.  That was the, the game that from which --
8              THE COURT:  I --
9              MR. BOWMAN:  -- Mr. Williams was ejected,
10    argued with the umpire.
11             THE COURT:  Mr. Williams was in an argument
12    with the umpire.  And Mr. Burke alleged that Mr.
13    Williams called the umpire, using the MF word?
14             MR. BOWMAN:  He used the MF word, yes, Your
15    Honor.
16             THE COURT:  In front of the kids.
17             MR. BOWMAN:  Yes, Your Honor.
18             THE COURT:  And what's the source of that?
19             MR. BOWMAN:  So the source of that was Mr.
20    Burke -- source one, which is exhibit A of the Burke
21    certification.  Source one sent an e-mail tip to Mr.
22    Burke saying --
23             THE COURT:  Hold on, what -- exhibit A --
24    I've got about eight different exhibit A's here.
```

40

```
1              MR. BOWMAN:  I apologize, Your Honor.  This
2     is the Burke certification in which the reporting and
3     attaches all the documents that were submitted.
4              THE COURT:  All right.  It looks like my, my
5     exhibit A begins with an e-mail May 10th 2014, 8:32
6     p.m.  Is that what we're talking about?
7              MR. BOWMAN:  That's it, Your Honor.
8              THE COURT:  All right.  "Coach got kicked out
9     his son's little league game for threatening an umpire
10    at Ripken Stadium".  These -- are all of these from the
11    same source?
12             MR. BOWMAN:  Yes, Your Honor, this is an e-
13    mail chain.
14             THE COURT:  All right.  So then Burke
15    responds, "Please tell us more".  Mitch is a coach for
16    the Jersey Wild where the son, Declan (phonetic), plays
17    ball.  They play the game versus the only pirates.  He
18    has been arguably the ball's ... his friend was upset
19    about a play at the plate where his team was called
20    out.  "In the top of the fifth while he was coaching,
21    he yelled to another parent (Indiscernible) the umpire
22    fired.  The umpire confronted him and Mitch went off.
23    He threatened the umpire, called him an MF'r in front
24    of ten-year-olds.  They were face to face, inches from
25    each other arguing.  Had to be restrained by other
```

```
 1    coaches.  The umpire rightfully kicked him out.  He
 2    refused to leave".
 3              Is any of this on tape?
 4              MR. BOWMAN:  No, Your Honor, this was e-mail
 5    communications.
 6              THE COURT:  All right.  So source one -- all
 7    right.  Any other sources specifically allege that in
 8    the presence -- I'm not concerned about Mitch Williams
 9    calling the umpire a curse word.  I'm concerned about
10    the allegation that Mitch Williams called the umpire a
11    curse word in front of ten-year-olds, all right?
12         Anybody else make that specific allegation?
13              MR. BOWMAN:  That specific allegation?
14              THE COURT:  Yes.
15              MR. BOWMAN:  I believe source three did --
16    no, actually -- yeah, source three, which would be
17    exhibit F.
18              THE COURT:  F?  This is May 11th, 8:10 p.m.
19              MR. BOWMAN:  Oh, sorry, yes, exhibit E, Your
20    Honor.
21              THE COURT:  Exhibit what?
22              MR. BOWMAN:  Exhibit E to the same
23    declaration.  And so what, what Mr. Burke did --
24              THE COURT:  Let me see what E is.
25              MR. BOWMAN:  Yeah.
```

```
 1              THE COURT:  "I can confirm I was ejected for
 2    repeated arguments with the umpire.  I did not hear him
 3    curse."  Something is blocked out "players".
 4              MR. BOWMAN:  Name.  "Players who were in the
 5    vicinity --
 6              THE COURT:  This --
 7              MR. BOWMAN:  -- reported to me that they did.
 8              THE COURT:  All right, hold on.  All right.
 9    "I did not hear him curse ... blank.  "... players who
10    were in the vicinity ... all right.  There was a --
11    what's blacked out is what is the name of a specific
12    player?
13              MR. BOWMAN:  It's -- it would be source
14    identifying to -- yes, Your Honor.
15              THE COURT:  "I did not hear him curse ...
16    blank.  "... players who were in the vicinity reported
17    to me that, that they did".  All right, it's weaker,
18    but it's something.  All right.
19              MR. BOWMAN:  And that in -- I think, Your
20    Honor, the, the reporting is also in the context of --
21    the article had linked to a previous report which is
22    attached, the same certification as exhibit B about a
23    prior incident which Mitch Williams had cursed at a
24    sporting event and answers in part your question about
25    reputation.
```

43

1           THE COURT:  Exhibit B I have -- it says dead
2   span, "Mitch Williams supports youth athletics, is not
3   at all insane".  Is that what you're referring to?
4           MR. BOWMAN:  Yes, Your Honor.
5           THE COURT:  That's dated March 11, 2008.  And
6   Burke stated he specifically knew of this, read of
7   this.  What did he say about why this -- when this was
8   in his brain?
9           MR. BOWMAN:  This was linked to -- in the
10   article that is challenged in this case.
11           THE COURT:  All right.
12           MR. BOWMAN:  He said the article says he has
13   a bit of history and linked to this article.  So Mr.
14   Burke was aware of this history.
15           THE COURT:  Well -- what does this article
16   say that Mr. Williams did previously?
17           MR. BOWMAN:  Previously --
18           THE COURT:  Does this article in any way
19   suggest that he previously used very foul language in
20   front of ten-year-olds?
21           MR. BOWMAN:  Told us yesterday that he was
22   sorry for using the F word while yelling at the ref.
23   Yes, Your Honor.
24           THE COURT:  Where is that?

44

1           MR. BOWMAN:  That is in the italicized
2   paragraph.
3           THE COURT:  Where it begins "Williams, who
4   now sells his own brand"?
5           MR. BOWMAN:  Yes, Your Honor.
6           THE COURT:  All right.  This -- before I read
7   it, this is something that -- "Williams, who now sells
8   his own brand of salsa and who later this month starts
9   hosting a Phillies pregame show on the Big Talk at 1210
10   (Indiscernible) told us yesterday that he was sorry for
11   using the F word while yelling at the ref. 'I'm
12   emotional when it comes to my kids.  What I saw
13   happening was completely unfair.' Williams said,
14   referring to his daughter's team being fouled
15   repeatedly with a lack of calls from the ref." Sorry.
16           So this is something that Williams is
17   apologizing for that occurred before this incident.
18           MR. BOWMAN:  Yes, Your Honor.  And this is
19   the same incident that resulted in the New York Times
20   story that we had cited in our papers --
21           THE COURT:  Okay.
22           MR. BOWMAN:  -- in which he discussed.
23           THE COURT:  All right.
24           MR. BOWMAN:  So, so anyway, the context, so
25   Mr. Burke has source one, told him this happened.  Mr.

45

```
1     Burke doesn't run with the story.  He checks online.
2     He checks social media.  He gets a tweet about the
3     ejection --
4               THE COURT:  Just so I understand, dated 3-11-
5     08, 2:20 p.m.  What does that refer to?
6               MR. BOWMAN:  This is a previous report that
7     ran in 2008, Your Honor.
8               THE COURT:  All right.  So, so the sporting
9     event that Williams is apologizing for occurred
10    sometime before March 11, 2008.
11              MR. BOWMAN:  Yes, Your Honor.
12              THE COURT:  And the article is published on
13    March 11th 2008 --
14              MR. BOWMAN:  Yes, Your Honor.
15              THE COURT:  -- and it is linked in this --
16    when this, when this occurred.  What was the date of
17    the --
18              MR. BOWMAN:  I think it was -- May 11th was
19    the --
20              MS. MATTIACCI:  May 11th.
21              MR. BOWMAN:  -- article.
22              MS. MATTIACCI:  2014.
23              MR. BOWMAN:  2014.
24              THE COURT:  All right, May 24 (sic), fair
25    enough.
```

46

```
1               MR. BOWMAN:  The article is attached to the
2     same declaration as exhibit G.
3               THE COURT:  All right, fair enough.
4               MR. BOWMAN:  And if you look at exhibit G,
5     you can also see the photographs that were provided
6     with source three, which are consistent with a heated
7     argument.
8               THE COURT:  All right.
9               MR. BOWMAN:  And so --
10              THE COURT:  Which source provided -- I have a
11    photograph of Williams about three inches from the face
12    of, of the umpire.
13              MR. BOWMAN:  Source three provided that
14    photograph.
15              THE COURT:  Source three?
16              MR. BOWMAN:  Yeah.  And so, so as part of the
17    reporting, Mr. Burke knew of the previous reputation.
18    Source one told him that he used the MF word in front
19    of kids.  He attempted to confirm source three, as you
20    may say, weaker, but also said that players told him
21    that was true.  Source three provided the photographs.
22    And then source two provided a similar account of a
23    heated argument, although source two said that I
24    couldn't hear him swear from where I was. --
25              THE COURT:  Just so I'm clear.
```

47

```
 1            MR. BOWMAN:  Yeah.
 2            THE COURT:  We have one source that
 3   specifically makes the allegation, --
 4            MR. BOWMAN:  Yes, Your Honor.
 5            THE COURT:  -- the clear allegation.  I don't
 6   care what the number is.  A different source says he
 7   didn't hear it, but that some of the kids said they
 8   heard it.
 9            MR. BOWMAN:  Yes, Your Honor.
10            THE COURT:  And yet, who's the source that
11   provided the photograph between those two?  It was the
12   weaker source, right?
13            MR. BOWMAN:  Yes, Your Honor.
14            THE COURT:  And then you have the 2008
15   article.  It doesn't matter who provided it.  Nobody is
16   claiming that's a forgery, right?
17            MR. BOWMAN:  That's true, Your Honor.
18            THE COURT:  But that, that Burke had it when
19   these articles in May 2014 were published, right?
20            MR. BOWMAN:  Yes, Your Honor.
21            THE COURT:  All right.  That's the core of
22   the, of the basis for it, right?
23            MR. BOWMAN:  Right.  That's the core of the
24   basis.  And the last thing I'll say is the context is
25   important because much of what source one said was
```

48

```
 1   corroborated by the other sources.  We had three
 2   sources about the, the confrontation and the ejection
 3   --
 4            THE COURT:  By three.  I just see two.
 5            MR. BOWMAN:  You asked about the MF word.
 6   Source one and source three about the MF word.  Source
 7   two also described the confrontation, although didn't
 8   hear the swearing.
 9            THE COURT:  Right.
10            MR. BOWMAN:  But aspects of what source one
11   and source -- that were all consistent with each other,
12   just one heard that.
13            THE COURT:  I don't regard -- that, that --
14   the last source that corroborated that there was
15   some argument between the manager or the coach and the
16   umpire, that to me is anemic.  Even in little leagues
17   coaches argue with refs.  It's part of the culture.
18            MR. BOWMAN:  Right.  It's only relevant to
19   the extent, Your Honor, that if we're trying to get in
20   Mr. Burke's head and ask is there clear and convincing
21   evidence that he knew this was fabricated --
22            THE COURT:  I understand that, but I --
23            MR. BOWMAN:  -- he has multiple sources
24   telling him similar things, I think it's relevant.
```

49

```
 1              THE COURT:  I get it.  I don't give it much
 2    weight.  All right.
 3              MR. BOWMAN:  So, so that's what he had.  And
 4    --
 5              THE COURT:  All right.  Ms. Mattiacci?
 6              MS. MATTIACCI:  Yes, so this --
 7              THE COURT:  What, what do you have -- do you
 8    have anything that specifically contradicts this?  Do
 9    you have any evidence that was -- I want to be clear
10    before I allow you to go further.  Any evidence that
11    when Burke published this article, that he, he -- he
12    being Burke -- actually had contradictory evidence?
13              MS. MATTIACCI:  Yes, source two.  "I did not
14    hear him curse".  Source two follows up.  After that
15    first female --
16              THE COURT:  Are you talking about the same
17    exhibit that was just brought to my attention a few
18    minutes ago?
19              MS. MATTIACCI:  I think so, but two pages,
20    two pages in.
21              THE COURT:  Well hold on.  Is this part of
22    the Defense's exhibit package?
23              MR. BOWMAN:  Yes, Your Honor.
24              MS. MATTIACCI:  Yes.
25              THE COURT:  Which letter was it again?
```

50

```
 1              MS. MATTIACCI:  In the Defense's, I think it
 2    was --
 3              MR. BOWMAN:  I believe it's C.
 4              THE COURT:  C?
 5              MS. MATTIACCI:  So you see the first -- the
 6    e-mail that he drew your attention to was May 11th at
 7    9:04.
 8              THE COURT:  Yes, I have that, right.
 9              MS. MATTIACCI:  Okay.  So you go two pages
10    over.
11              THE COURT:  Hold on.
12              MS. MATTIACCI:  To May 11th --
13              THE COURT:  I don't have, I don't have --
14    mine doesn't have anything two pages over.
15              MS. MATTIACCI:  Okay.  So we have to look in
16    plaintiff's binder, Your Honor, so they didn't include
17    it then.
18              MR. BOWMAN:  We did include it actually.
19    I'll give you the --
20              THE COURT:  Somebody have an extra they can
21    just hand it up, rather than me trying to find it in
22    all this?
23              MS. MATTIACCI:  Yes, Your Honor.
24              MR. BOWMAN:  It's exhibit I, Your Honor.
```

```
 1            THE COURT:  Exhibit I, all right.  Make sure
 2   we're on the same page.  It begins, "Sunday, May 11th
 3   2014, 8:45 p.m. to Timothy Burke, re: pic of Williams",
 4   is that -- are we all on the same page?
 5            MR. BOWMAN:  Actually H, Your Honor, H and I
 6   are both the follow-up of that source.
 7            THE COURT:  H.
 8            MR. BOWMAN:  H, yeah.  "May 11th 2014, 8:44
 9   p.m., pic of Williams".
10            MS. MATTIACCI:  Right. --
11            MR. BOWMAN:  Yes, Your Honor.
12            THE COURT:  All right.
13            MS. MATTIACCI:  -- The middle one, the 8:41,
14   "Tim, --
15            THE COURT:  All right.
16            MS. MATTIACCI:  -- I never stated that
17   Williams called the ump a MF, mother F.  I have an
18   issue with what he did, but that information did not
19   come from me".
20            THE COURT:  All right.  Is this from the same
21   source that had previously said that Williams did call
22   the umpire --
23            MS. MATTIACCI:  No.
24            MR. BOWMAN:  No.  And if you read above that,
25   he responded, "I know you didn't.  Another parent did".
```

```
 1            THE COURT:  Well, Ms. Mattiacci, how does
 2   this contradict -- how is this contradictory?  This
 3   source doesn't --
 4            MS. MATTIACCI:  Because this is --
 5            THE COURT:  -- never said that he heard
 6   Williams.  Is this the same source that said he didn't
 7   hear it, but that the, the -- some of the players heard
 8   it?
 9            MS. MATTIACCI:  No, that's source number
10   three.
11            THE COURT:  So this is --
12            MS. MATTIACCI:  This is source -- I'm saying
13   --
14            THE COURT:  -- a completely different source.
15            MS. MATTIACCI:  -- it's contradictory because
16   this is a witness that's standing right there during
17   this event, does not hear any cursing.  And the other
18   -- source three is also standing there during the event
19   and does not hear any cursing.  Mr. Burke never reaches
20   out to the plaintiff to get any -- to, to get
21   corroboration for the plaintiff.
22            The statement -- Mr. Burke says in his
23   article, observers, plural.  "Observers tell us
24   plaintiff called umpire a MF'r."  There -- he does not
25   have observers.  He has one person.  And if he was
```

53

```
 1    truthful and not purposely avoiding the truth, he would
 2    say witnesses who were standing nearby never heard
 3    that.  He would -- he never contact --
 4            THE COURT:  How do I know?  I'm looking now
 5    at the exhibit you just referred to.  How do I know
 6    where this source was, whether or not he was in a
 7    position or she was in a position to have heard it if
 8    in fact it was stated?
 9            MS. MATTIACCI:  Because he just -- this
10    witness describes the events in -- at 9:04 a.m.
11            THE COURT:  Hold on, where's that?
12            MS. MATTIACCI:  That was the original one
13    that we were looking at.  I'm not sure what they are in
14    the defendant's binder.  It should be the previous
15    pages, the -- it should be the first page of that e-
16    mail chain.
17            THE COURT:  Anybody in the Defense know --
18    I'm looking --
19            MR. BOWMAN:  Yeah, exhibit C is the initial
20    e-mail chain with source two, Your Honor.
21            THE COURT:  All right.  So this is source
22    two.
23            MR. BOWMAN:  Right.  Source one --
24            MS. MATTIACCI:  The getting the pictures.
```

54

```
 1            MR. BOWMAN:  -- was the one who was the
 2    original --
 3            THE COURT:  Hold on, --
 4            MR. BOWMAN:  -- and source three --
 5            THE COURT:  -- hold on.
 6            MR. BOWMAN:  -- right.  And this is source
 7    two.
 8            THE COURT:  "Tim, it was such ... and this is
 9    what you're referring to, Ms. --
10            MS. MATTIACCI:  Yes.
11            THE COURT:  -- all right.  "Tim, it was such
12    (Indiscernible).  I guess I can confirm it.  I'm
13    working on getting you some pictures of him in the
14    umpire's face.  He was arguing with calls and making
15    comments to both of the umpires all game.  He was
16    coaching first base since the game was going on.  And
17    the second base umpire threw him out.  He said he was
18    making a comment to one of the parents in the stands.
19    When the second base umpired tossed him, he was making
20    comments the whole game about bad calls.  And the
21    second base ump just had enough.  He went nuts."
22            That doesn't help you, Ms. Mattiacci.  "He
23    got in the umpire's face like it was in the major
24    leagues.  I will get, I will get you a few of the
25    pictures or post them on Twitter.  He claimed that the
```

55

```
 1     umpire was about 65-years-old, threatened him.  He said
 2     to pick a place, a time and place to fight Mitch."
 3              MS. MATTIACCI:  Right.  There's no cursing
 4     though, there's no cursing. --
 5              THE COURT:  I understand that. --
 6              MS. MATTIACCI:  -- He didn't hit anybody --
 7              THE COURT:  -- But again, I don't -- I'm not,
 8     just so the record is clear, I'm not putting this under
 9     an electron microscope, all right?  It doesn't help you
10     that the, the best source you have -- you're right.
11     That does say I never heard Mr. Williams use the MF'r
12     word.  That is your best source.
13              But he also says "he went nuts", which
14     doesn't depict somebody who is in complete control of
15     themself when he's having a dispute with the umpire.
16     "The game was delayed for about ten minutes, as he
17     needed to call in an official from Ripken until he was
18     finally removed.  It was crazy.  Never saw a player get
19     ejected from a game and not leave".
20              Who's he referring to in that, never saw a
21     player get ejected?
22              MS. MATTIACCI:  But --
23              THE COURT:  Who is he referring to?
24              MS. MATTIACCI:  I have no idea.  But, Your
25     Honor, this is --
```

56

```
 1              THE COURT:  No, that's not a rhetorical
 2     question. --
 3              MS. MATTIACCI:  -- false.
 4              THE COURT:  -- Is it -- was it -- Mr.
 5     Williams wasn't a player.  Who was the player?
 6              MS. MATTIACCI:  No, I have no idea what --
 7              THE COURT:  Anybody know?
 8              MR. BOWMAN:  I think, Your Honor, that was a
 9     misstatement.  I think he was referring to -- there was
10     never --
11              THE COURT:  Well did anybody get ejected from
12     the game other than Mitch Williams?
13              MR. BOWMAN:  Anybody.  No, Your Honor.
14              THE COURT:  Ms. Mattiacci, let's not play
15     games.  He's referring to Mitch Williams.  He never saw
16     a player -- and not leave?  This is all going on while
17     ten-year-olds are playing baseball?  This is not a
18     close case, Ms. -- this allegation is not close.
19              MS. MATTIACCI:  But it's a false statement of
20     fact.  It says observers --
21              THE COURT:  I'm pulling the trigger on it.
22     This is not close.  A source said he heard it.  There
23     is some contradictory evidence.  But even your best
24     source is depicting somebody that's out of control,
25     who's being described by your most favorable source as
```

57

```
 1        "he went nuts" and "never saw a player", that's
 2   obviously a mistake.  Mr. Williams is not a ten-year-
 3   old player.  He's the coach.  "... get ejected from the
 4   game and not leave.  This is all going on while ten-
 5   year-olds are playing baseball, trying to play ...
 6   actually he says basketball.  He makes another mistake.
 7            MS. MATTIACCI:  Your Honor, it's not true
 8   though. --
 9            THE COURT:  All right.  That's why --
10            MS. MATTIACCI:  -- It's not true as --
11            THE COURT:  -- take an appeal, Ms. Matti --
12   take an appeal. --
13            MS. MATTIACCI:  Okay.
14            THE COURT:  -- This is not close, all right?
15   I don't know if Mr. Williams said it.  All I know is
16   that based upon what this reporter had, all right,
17   there's no evidence, nothing clearly and convincingly
18   that somehow this reporter knew that this was an
19   absolutely false allegation.
20            MS. MATTIACCI:  May I just state for the
21   record, Your Honor, it's not --
22            THE COURT:  If it's not something con -- is
23   it something already not contained or argued in your
24   brief?
```

58

```
 1            MS. MATTIACCI:  I'm -- I don't -- I'm just
 2   saying that the -- well I guess -- I don't know.  He,
 3   he never contacted the plaintiff or anybody from
 4   Ripken.  What ended up happening was the umpire got
 5   ejected from the tournament and Mr. Williams was
 6   reinstated because it was the umpire who threatened
 7   him.
 8            THE COURT:  I, I understand, --
 9            MS. MATTIACCI:  That would be a truthful --
10            THE COURT:  -- I understand that.
11            MS. MATTIACCI:  -- recount, that he was
12   purposely --
13            THE COURT:  I thought the reporter --
14            MS. MATTIACCI:  -- avoiding the truth.
15            THE COURT:  -- yeah.  I agree with you that
16   this reporter should have had -- by the way, just so
17   I'm clear, did the reporter ever try to reach out to
18   Mr. Williams --
19            MS. MATTIACCI:  Never, never.
20            THE COURT:  -- I'm asking, I'm asking -- let
21   me ask Mr. --
22            MR. BOWMAN:  A couple of corrections there.
23   --
24            THE COURT:  -- Bowman.
```

1    MR. BOWMAN:  -- The reporter did call Ripken
2    Baseball.  Ripken Baseball didn't return his call.  He
3    did attempt to contact the umpire.  He did not
4    personally attempt to contact Mr. Williams.  He
5    included Mr. Williams' tweets and statements in his
6    story and recounted his response, that I was pitching
7    inside.  But he didn't individually contact --
8    THE COURT:  No, no, but did Mr. Williams
9    tweet about --
10    MR. BOWMAN:  Yeah.
11    THE COURT:  -- whether or not he had used a
12    foul word in front of the kids?
13    MR. BOWMAN:  No, Your Honor, he tweeted his
14    version of what happened during the ejection and that
15    was included in the story.
16    THE COURT:  All right.  Well frankly, and
17    I'll say this for the record.  The reporter should have
18    given Mr. Williams a call and asked him about it.  And
19    of course, if Mr. Williams denied, put the denial in
20    the, in the article.  Fundamental fairness required
21    that --
22    Ms. Mattiacci, you know the law in regard to
23    defamation with public officials, celebrities and the
24    like doesn't require that.

1    MS. MATTIACCI:  It doesn't require that in
2    and of itself.  But looking at the totality of how it
3    was handled, whether it -- was there a purposeful
4    avoidance of the truth here?  Absolutely.
5    THE COURT:  Absolutely not.  This, this is a
6    much easier case.  Your best source -- I don't need to
7    look at the tape.  Your best source describes your
8    client as somebody that was out of control, all right?
9    This is not close.
10    MS. MATTIACCI:  Well that's not my best
11    source.  I mean, that's the only source that, that
12    (Indiscernible) --
13    THE COURT:  I understand that, but --
14    MS. MATTIACCI:  -- the call.
15    THE COURT:  -- this looks like a credible --
16    you know something?  To me, if I'm the reporter, I like
17    this source.  It is not somebody that has -- he or she
18    doesn't look like they have an ax to grind against
19    Mitchell Williams.  This is the same person that says
20    to the reporter, just so you know, I did not hear Mr.
21    Williams use the MF'r word.  He takes the trouble of
22    texting, e-mailing the reporter to make sure that he
23    did not hear it.  This is somebody that is trying to
24    give as best as they can an accurate recitation of what
25    happened.  This doesn't look like somebody that's

1    simply trying to smear Mr. Williams' name.  And this
2    person says "he went nuts" et cetera, et cetera, et
3    cetera.
4            MS. MATTIACCI:  Right.  But, Your Honor,
5    that, that -- if that was what was written in the
6    article, we wouldn't be here today because it doesn't
7    --
8            THE COURT:  And if we give him the First
9    Amendment, reporters couldn't do what this reporter
10   particularly did, which was -- I agree with you.  It
11   looks like he, he was depicting Mr. Williams in a very,
12   very poor light, but he had sources that justified him
13   doing it.  He wasn't inventing it from thin air.
14           What's the third issue --
15           MS. MATTIACCI:  Well --
16           THE COURT:  -- that we need to resolve?  I'm
17   moving forward.
18           MS. MATTIACCI:  -- okay.  Let me just -- can
19   I just state for the record he was --
20           THE COURT:  Yeah.
21           MS. MATTIACCI:  -- making it up.  Observers
22   tell us, he doesn't have observers.  He said it was a
23   profanity laced tirade.  There is no profanity laced
24   tirade.  Even if you accept that he said by one source
25   at one time, he said the MF word, there -- that, that

62

1    is not a profanity laced tirade.  He was making stuff
2    up to make it something that is click bait, so that
3    people will click on it.  Because they're not going to
4    click on something that says Mr. Williams got in, got
5    in an argument with the umpire.  Nobody cares about
6    that.
7            So they have to ratchet it up and say
8    observers tell us that he said MF'r, that it was a
9    profanity laced tirade.  There's no evidence of that
10   whatsoever.  Yet he printed it anyway.  And that's --
11   to, to just defame him and, and to make money off of
12   it.
13           THE COURT:  All right.  Mr. Bowman, anything
14   you want to -- I'll give you a few minutes.  And then
15   I'm going to move onto what is probably the remaining
16   allegation of a defamatory utterance that I did not
17   grant previous summary judgment on.
18           MR. BOWMAN:  Yeah, I don't think I need to
19   add anything.
20           THE COURT:  Actually I think it's the 46
21   Tinley (phonetic) motion.  It was a motion to dismiss.
22           MR. BOWMAN:  Yes, Your Honor.  I, I don't
23   think I need anything to the MF word.  The record --
24           THE COURT:  All right.  What's the final --
25   what's the last --

63

```
 1              MR. BOWMAN:  -- speaks for itself.
 2              THE COURT:  -- what's the last issue?
 3              MR. BOWMAN:  The last allegation is that Mr.
 4     Williams used the P word to refer to another player.
 5     And that, of course, happened in the context of --
 6              THE COURT:  Was that the first day or the
 7     second day?
 8              MR. BOWMAN:  The second day, Your Honor.  So
 9     the, the -- there were five games over two days.  The
10     -- there was a loss on Saturday where Mr. Williams was
11     ejected and argued with the umpire, and as a result of
12     the first story.
13              The next day there was another game, the
14     championship game, where the batter was struck and
15     where the other sources came forward.  So in -- after
16     having reported the first story about the, the Saturday
17     game, there were -- sources started contacting Mr.
18     Burke again.
19              And if you look at exhibit L, this is a
20     contact by source four on Facebook.  And he says --
21              THE COURT:  This is source what?
22              MR. BOWMAN:  I'm sorry, this is exhibit L,
23     Your Honor.
24              THE COURT:  I have it.  What is the source,
25     source what?
```

64

```
 1              MR. BOWMAN:  This is source four, Your Honor.
 2              THE COURT:  Four.
 3              MR. BOWMAN:  Essentially --
 4              THE COURT:  "What an unbelievable douche bag
 5     Mr. Williams acted like all weekend.  He's an
 6     embarrassment.  Can you give any examples of this
 7     behavior?  B-W-A-H-A-H-A, boy, can I."
 8              MR. BOWMAN:  And then so --
 9              THE COURT:  Hold on.  Where are the --
10     where's the allegation?
11              MR. BOWMAN:  That was the initial contact.
12     And the next exhibit, exhibit M, Mr. Burke said, "Can
13     you give me examples of what you're talking about?"
14     And source four then sent a long e-mail, which is
15     exhibit M.
16              THE COURT:  My exhibit M is not a long e-
17     mail.  My exhibit M is May 13th 2014 --
18              MR. BOWMAN:  I'm sorry, M, M, Your Honor.
19              THE COURT:  M, M as in Michael, that's what
20     I'm looking at.
21              MR. BOWMAN:  Yes.  It's May 13th 2014 --
22              THE COURT:  Yeah, this is what I got.
23              MR. BOWMAN:  -- Tim -- yes, well a page-long
24     e-mail.
25              THE COURT:  It's not a long e-mail.
```

65

```
 1                MR. BOWMAN:  Is it the -- marked exhibit P-
 2      19, Your Honor, at the bottom?
 3                THE COURT:  It says Gawker 0052.
 4                MR. BOWMAN:  0051 is the first page of that,
 5      Your Honor.  Is that --
 6                THE COURT:  I don't have it, don't have it.
 7                MR. BOWMAN:  -- page got omitted in your
 8      copy?
 9                THE COURT:  Yeah, yeah.
10                MR. BOWMAN:  Can I bring you that?
11                THE COURT:  Uh-huh, sure.
12                MR. BOWMAN:  Let's see here, certification.
13      H, K, K -- yeah.
14                THE COURT:  Thank you.
15                MR. BOWMAN:  I apologize, Your Honor, if that
16      was --
17                THE COURT:  That's all right.
18                MR. BOWMAN:  -- missing from the documents I
19      provided.
20                THE COURT:  Yeah, it was.  Because the
21      problem is, is that you have -- it's on the -- you have
22      two, you know, back and front copying.  This doesn't
23      have -- this wasn't back and front.  What you're
24      referring to should have been on the back of this and
25      it wasn't.
```

66

```
 1                MR. BOWMAN:  Yes, sorry.  It's two-sided
 2      copying.  It's exhibit M to the Burke certification.
 3                THE COURT:  So in addition now to whatever
 4      duties you have as an attorney, you have to make sure
 5      that when you ask somebody to copy something and it
 6      requires both front and back copying, that they do it.
 7                All right.  "Tim, not only did I witness the
 8      Mitch Williams'incident on Saturday, also saw first-
 9      hand how he acts when we played his team in the title
10      game of the tournament yesterday (Sunday).  As far as
11      Saturday, he played on the field next to us, so I
12      figured I'd catch some of their game since we might
13      wind up playing them.  He was so in the wrong, it's not
14      even funny!  The umpire was not, N-O-T the aggressor,
15      nor did he get really mad until Mitch just became
16      overbearing!
17                He basically was questioning every call,
18      balls and strikes, bitching, whining, et cetera.  He
19      was basically a horse's ass.  While he was -- well it
20      really exploded on a very close play.  He went off
21      cursing the ump, yelling at a spectator or two or
22      three.  He was extremely embarrassing.  And for a coach
23      of a ten-year-old team, it was, it was sad to look at!
24                He was subsequently kicked out and then
25      refused to leave.  He should have been banned ... it
```

1   says for the tournament.  "... but my better guess that
2   he made a phone call or two.  He used his influential
3   powers, so to speak.  Now mind you, I'm watching this
4   as a neutral observer, so I have cross to bear here."
5           He's using the wrong cliche, but that's a
6   different point.  No ax to grind is probably what he
7   meant.  "It didn't bother me either way who won.  His
8   attempt to cover up and put his spin on it via Twitter,
9   a blatant misguided information in an attempt to spin
10  things his way.  Anyone who was there can tell you what
11  really happened.  Of course, he and his organization
12  will deny a well different version to cover their
13  butts.
14          But, however, this brings to me -- this bring
15  me to yesterday, a Tyler (phonetic) game versus us.
16  Right from the get-go he is tipping off pitches to his
17  kids, wasn't at one point heard to say by a couple of
18  coaches and a couple of players throwing pitches, don't
19  act like a little P.  There's ... all right.
20          "I personally didn't hear that, although I
21  don't know why our coaches or kids would make it up.
22  Every time he would come over to coach first base, he
23  would look to start something with our coaches.  He
24  then went on to hold up the game, complaining about
25  substituting players and such.

68

1           Later in the game, and obviously this can't
2   be proven, when our pitcher came out to bat, our
3   coaches had said something to the home plate umpire,
4   warning him, thinking that our kid was going to be
5   thrown at.  Well don't you know it, the first pitch to
6   our pitcher batting hits him.  Umpire and tournament
7   director then warned everyone.  His son, who was
8   catching most of the day, was talking crap to our kids
9   all day.
10          Basically in a nutshell both days I saw this
11  guy.  He acted like an arrogant, classless, foul-
12  mouthed tool bag and definitely not someone I want
13  coaching my kids."
14          And there's a black out.  "... can be found
15  on Facebook and can not only verify this, but possibly
16  give you more info on the Sunday game ... as again, we
17  have more black out.  "He said he'd be more than
18  willing to talk to you.  As of yesterday I was told
19  that Ripken people are having a meeting regarding Mr.
20  Williams.  Good luck".  All right.
21          Any corroboration of this?
22          MR. BOWMAN:  That was source four.  So Mr.
23  Burke then -- I'll skip over source five.  Source five
24  is generally corroborating about other reputation.
25  Again, you asked earlier whether Mr. Burke knew

69

```
 1     anything about his reputation.  That's relevant to
 2     that.
 3            But source six is the person whose
 4     information was provided by source four.  If you turn
 5     to exhibit O.  And if you don't have the two-sided
 6     copies, I have an extra set here.
 7            THE COURT:  Yeah, hold on.
 8            MR. BOWMAN:  Let's give him -- let me give
 9     all the Burke exhibits.
10            THE COURT:  It looks like stuff from
11     Facebook.  Oh, specifically does any source corroborate
12     the allegation that Mr. Williams was calling kids,
13     using the P word?
14            MR. BOWMAN:  Yes, source six, Your Honor. --
15            THE COURT:  All right, let me --
16            MR. BOWMAN:  -- We're going to hand you
17     exhibit O.
18            THE COURT:  All right.
19            MR. BOWMAN:  What we're handing up, Your
20     Honor, is the entire Burke certification tab with all
21     of the double-sided exhibits that you were not given.
22            THE COURT:  O?
23            MR. BOWMAN:  Yes, O, Your Honor.
24            THE COURT:  Right.  All right.  "Can you tell
25     me any more about Mitch Williams' behavior this
```

70

```
 1     weekend, specifically what he said to your pitcher?  I
 2     heard it was especially inappropriate.  Thanks.  He tur
 3     -- he walked by our catcher.  And after the first
 4     inning he said that pitcher, he said that pitcher is a
 5     P word.  A couple of our other kids heard him.  And one
 6     kid asked his parents on the way home why he would call
 7     our pitcher names and asked him what it meant.
 8            He also called his pitcher and catcher to the
 9     side before the bottom and told him ... back to the
10     other --
11            MR. BOWMAN:  You've already got that part,
12     Your Honor.
13            THE COURT:  All right, all right.
14            MR. BOWMAN:  And then the, the last bit of
15     corroboration is not in an e-mail.  This -- Mr. Burke
16     had another source he tracked down, exchanged e-mail
17     with that person.  The e-mail is at exhibit P.  Mr.
18     Burke set up a phone call with that person.  When
19     deposed Mr. Burke didn't remember all the details of
20     the phone call, but Mr. Burke said that that -- during
21     that phone call it was his understanding -- this is
22     source seven -- confirmed both the P comment and the,
23     and the hit by -- instruction --
24            THE COURT:  All right.  Source --
25            MR. BOWMAN:  -- to hit the batter.
```

```
 1              THE COURT:  -- seven you're alleging that
 2    source seven was a verbal corroboration rather than an
 3    e-mail or a fax or something like that?
 4              MR. BOWMAN:  It was a telephone conversation,
 5    Your Honor.  And that those were the sources.  The
 6    contexts of --
 7              THE COURT:  I get it, I get it.  Ms. --
 8              MR. BOWMAN:  -- the previous day and from
 9    these sources.
10              THE COURT:  -- I get it, I get it.
11              Ms. Mattiacci?
12              MS. MATTIACCI:  Okay.  So it's not all these
13    sources.  They cite three people, none of which heard
14    it first-hand, none of them.  Source four says "I
15    personally did not hear that".  Source six says "I
16    didn't hear it".  And source seven also says --
17              THE COURT:  Well source six, source six is
18    more detailed.  Can I, can I impose of Mr. Hughes
19    (sic)?
20              MR. BOWMAN:  Mr. Bowman.
21              THE COURT:  Mr. -- no, I know you're Mr. --
22              You're Mr?
23              MS. MATTIACCI:  Kelley.
24              THE COURT:  Mr. Kelley. --
25              MR. BOWMAN:  Kelley.
```

```
 1              THE COURT:  -- Mr. Kelley, do you want to
 2    give me that -- I gave it back to you prematurely.  But
 3    that's a very detailed e-mail.  And I'm again, going to
 4    get to the key point here.
 5              MR. KELLEY:  We'd be happy to leave this with
 6    the Court.  It's got a clip on it now.
 7              THE COURT:  You see all this stuff here?  I'm
 8    not looking for more.
 9              MR. KELLEY:  I realize that.
10              THE COURT:  Exhibit what, which exhibit was
11    it?
12              MR. KELLEY:  Exhibit six is exhibit M, Your
13    Honor -- or I'm sorry, source six was exhibit M.
14              THE COURT:  All right.  Now I got nothing in
15    exhibit M.
16              MR. BOWMAN:  Oh, I'm sorry.  Oh, four was M.
17    My apologies, Your Honor.  It's O.
18              THE COURT:  All right.  Six is O.
19              MR. BOWMAN:  Yes.
20              THE COURT:  All right.  "He walked by our
21    catcher and after the first inning he said that pitcher
22    is a P word.  A couple of other, a couple other of our
23    kids heard him and one kid asked his parents on the way
24    home why he would call our pitcher names and asked him
25    what it meant."  All right.
```

73

1    It's not clear what the source did or didn't
2  hear, but that's very specific information that's
3  coming from a different source.  And there's a specific
4  allegation that one of the kids asked his parents what
5  it meant, which actually has a ring of voracity to it.
6    MS. MATTIACCI:  Yeah, Your Honor, this is --
7  they -- he did not follow-up with anybody.  He didn't,
8  he didn't -- this is -- none of these statements say
9  that the person actually heard it.  The only person
10  that allegedly had heard this is the catcher.  He
11  doesn't talk to the catcher.  He doesn't talk to the
12  catcher's parents.  He doesn't talk to the coaches of
13  the teams.  He -- the coaches of this kid's team sent
14  e-mails in that said they never heard him use any curse
15  words, never heard him order a bean ball or the
16  intentional hit of a kid.
17    THE COURT:  What's the, what's -- what is --
18  what do you have, what do you have specifically that
19  was given to Burke that actually contradicts this?
20    MS. MATTIACCI:  No, I'm saying that failure
21  --
22    THE COURT:  No, but did anybody -- did, did
23  Burke have anything -- again, I want to emphasize for
24  the record, it's obvious.  This is not a murder
25  investigation, all right?  This is one reporter who's

74

1  getting information from, it looks like irate parents,
2  making allegations.  The law doesn't obligate him to
3  track down every possible lead to make sure that he
4  doesn't falsely accuse a former professional athlete of
5  using a foul word.  These parents are accusing Mr.
6  Williams of using an inappropriate word in the presence
7  of the kids.
8    And while I agree with you, it doesn't appear
9  that any, any of these parents specifically allege it
10  in their e-mails or texts that they actually heard it,
11  they are clearly indicating that the kids heard it.
12  And of particular importance is this source six alleges
13  that one of the kids asked his parents basically what
14  the word meant, which either if it had happened --
15  either it's completely fabricated -- I'm not talking
16  about the use of the P word.  Either this source is
17  completely fabricating that a kid asked his parent what
18  the word meant or if happened.
19    And it's highly corroborative since I didn't
20  know what the word meant when I was ten-years-old in
21  any particular context.  And that's exactly what you
22  would expect a ten-year-old to do if he hears an adult
23  use a word in anger and the kid doesn't know what the
24  word means.

```
 1              But do you, but do you have anybody that
 2    wrote in to Burke and said I was there the whole time.
 3    I was in a position to hear everything, and, and Mr.
 4    Williams never used any obscene language?
 5              MS. MATTIACCI:  How would anybody have
 6    written that in beforehand when they didn't know that
 7    he was going to put that false allegation in, in an
 8    article?
 9              THE COURT:  Well they may not have.  I, I --
10    they may not have.
11              MS. MATTIACCI:  So if, if -- you can't -- Mr.
12    -- the obligation of the reporter is to pursue most
13    obvious, available sources for corroboration.  Because
14    as the New Jersey courts have said, --
15              THE COURT:  All right.  This is, this is
16    another example where the reporter never directly gave
17    Mr. Williams a phone call and said you know what, there
18    are allegations here that you -- that you're using in
19    front of these ten-year-old kids the P word.  What's
20    your response?  That was never done?
21              MR. BOWMAN:  No, Your Honor, that was never
22    done.
23              THE COURT:  All right.  I agree, that's
24    really shoddy, S-H-O-D-D-Y.  And the record should be
25    clear, I don't approve of that at all.  Before an
```

76

```
 1    article is published about either an athlete or
 2    celebrity alleging that type of behavior in front of
 3    ten-year-olds, the subject of the allegation should be
 4    contacted and asked for their position.  And if they do
 5    deny it, that should be placed in the article.
 6    Fundamental fairness requires that.
 7              But, Ms. Mattiacci, I don't believe the law
 8    under New York Times v Sullivan requires it. --
 9              MS. MATTIACCI:  I believe there that the
10    courts, that the --
11              THE COURT:  Argue it to the Appellate
12    Division. --
13              MS. MATTIACCI:  Okay.
14              THE COURT:  -- And that should be the case.
15    I have no problem with it.  It should have been done.
16    I agree with you, by the way.  It's inexcusable.
17              MS. MATTIACCI:  There's also not just Mr.
18    Williams, but how about the coaches of the other team
19    who were in the vicinity?  They were never contacted.
20              THE COURT:  All right, all right.  I'm
21    granting the motion for summary judgement. --
22              MS. MATTIACCI:  And the catcher.
23              THE COURT:  -- I got it.  You're going to
24    have to make your argument in Trenton.  Let Trenton
25    impose an obligation.  I'm not fighting you on it.  I
```

77

```
 1      think it should have been done.  If Mr. Williams didn't
 2      say it and the article contained his denial, it would
 3      have been a fairer depiction of what occurred.  I don't
 4      know what happened there.
 5                 But I can say with full confidence I don't
 6      believe Burke, when this stuff was published, was
 7      convinced he was publishing a pack of lies.  He may
 8      have had his own ax to grind.  He may very well have
 9      wanted to sell to subscribers of the --
10                 Does it require a subscription to the Gawker?
11      Can anybody read this stuff?  What does it require?
12                 MS. MATTIACCI:  They make money off of ads.
13      Any time something --
14                 THE COURT:  Advertisements, all right.
15                 MS. MATTIACCI:  -- gets clicked on.  Maybe
16      that's why they have to make their headlines --
17                 MR. BOWMAN:  Like every other --
18                 MS. MATTIACCI:  -- as salacious as possible.
19                 MR. BOWMAN:  -- website, Your Honor.  It's a,
20      it's a --
21                 THE COURT:  That's the economic model these
22      days.  That's why newspapers are going out of business.
23      How do you, how do you sell newspapers for $1.50 when
24      you can get this stuff for free?
```

78

```
 1                 MS. MATTIACCI:  Well they're trying to make
 2      money by publishing false and defamatory statements
 3      about people that ruining their lives.
 4                 THE COURT:  That may be the case, but --
 5                 MS. MATTIACCI:  They're ruining their lives,
 6      Your Honor, because they have no -- and they don't --
 7      they note -- they have video evidence that it's not
 8      true.  They put in salacious headlines that cause the
 9      MLB Network to pull him off the air.  And now he cannot
10      support his children --
11                 THE COURT:  Well that's a separate issue, but
12      that's a separate, that's a separate issue.  That's,
13      that's --
14                 MS. MATTIACCI:  No, it's not a separate
15      issue, Your Honor.
16                 THE COURT:  No, I haven't granted summary
17      judgment to the MLB Network.  And I've indicated, I
18      think it was Friday, that I personally -- and the law
19      supposedly supports me -- is that you can't use the
20      moral clause to yank somebody's source of income if
21      they're living if the allegation isn't true.  This is a
22      defamation cause of action.  This is not your breach of
23      contract cause of action against MLB Network.  We, we
24      do have Mr., Mr. Hughes is it, --
25                 MR. HUGHES:  Yes, Your Honor.
```

79

```
 1              THE COURT:  -- sitting there.  And he's your
 2    adversary in that.  But I strongly believe that the
 3    moral clause ought to be interpreted in such a way that
 4    it actually matters whether or not the person committed
 5    the alleged immoral conduct.  If a person didn't, they
 6    shouldn't have their livelihood stripped away from
 7    them.  That's a different day and that's not what we're
 8    talking about here.
 9              All right, let me return -- so before you
10    leave I want an order to sign.  Let me return this to
11    you, Mr. --
12              MR. KELLEY:  Kelley.
13              MS. MATTIACCI:  Kelley.
14              THE COURT:  -- Kelley, thank you.
15              MR. KELLEY:  Thank you, sir.
16              THE CLERK:  And it's spelled the same way as
17    Judge Kelley.
18              THE COURT:  I don't even know how Judge
19    Kelley's last name is spelled.  I never bother to write
20    to him.
21              THE CLERK:  It has an E in it.
22              THE COURT:  That's fascinating to note.  All
23    right.
24              MR. KELLEY:  The E is my cross to bear.
```

80

```
 1              THE COURT:  All right.  I'm using that
 2    correctly then.  All right.
 3                   (Proceedings concluded)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

```
 1                          CERTIFICATION
 2
 3          I, Mary Nelson, the assigned transcriber, do
 4     hereby certify the foregoing Transcript of Proceedings
 5     in the Camden County Superior Court, Law Division, on
 6     June 1, 2016 and digitally recorded from 9:01 to 10:22,
 7     is prepared in full compliance with the current
 8     Transcript Format for Judicial Proceedings and is a
 9     true and accurate compressed transcript of the
10     proceedings as recorded.
11
12
13
14     Name  /s/ Mary Nelson                   A.O.C. No. 219
15     AUTOMATED TRANSCRIPTION SERVICES   Dated: 11-22-16
16
17
18
19
20
21
22
23
24
```