**Hearing Date & Time: December 13, 2016 at 10:00 a.m. (Eastern Time)**

CHIESA SHAHINIAN & GIANTOMASI PC
One Boland Drive
West Orange, New Jersey 07052
Telephone: (973) 325-1500
Facsimile: (973) 325-1501
Robert E. Nies, Esq. (rnies@csglaw.com)
Michael R. Caruso, Esq. (mcaruso@csglaw.com)

*Attorneys for Mitchell Williams*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GAWKER MEDIA LLC, <u>et al.</u>, | Case No. 16-11700 (SMB) |
| Debtors. [1] | (Jointly Administered) |

**OBJECTION OF MITCHELL WILLIAMS TO CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT. [Dkt. 427]**

TO:    THE HONORABLE STUART M. BERNSTEIN
       UNITED STATES BANKRUPTCY JUDGE

Mitchell Williams ("**Williams**"), a creditor of Debtor Gawker Media LLC ("**Gawker**

**Media**" or "**Debtor**"), by and through his undersigned counsel Chiesa Shahinian & Giantomasi

PC, files this objection (the "**Objection**") to confirmation of *Debtors' Amended Joint Chapter 11*

*Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary*

*Kft.* [Docket No. 427] (the "**Plan**")[2]. In support of his Objection, Williams respectfully states:

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Lft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] The Plan is attached as Exhibit "A" to the *Notice of Filing Solicitation Version of the Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and*

## PRELIMINARY STATEMENT

The maze-like complexity of Debtors' Plan, when unraveled, lays bare multiple legal infirmities rendering the plan incapable of confirmation.[3]    Debtors likely will argue the complex Plan - - a single document that encompasses three inter-related debtor-companies, one being the parent with 100% ownership of the other two - - is born of necessity.

The fact is, however, few plans require the effort and diligence needed to decipher and understand the unfairness and illegality of Debtors' Plan.  Here, Debtors' Plan denies it effects a substantive consolidation of the three Debtor estates, yet clearly has elements of substantive consolidation in the payment of Intercompany insider debt, and in distributing cash for the Parent Debtors' equity interests, to the prejudice of Williams and all other general unsecured creditors of Gawker Media.  It allows the parent, GMGI, to share in Gawker Media's distributions by a deftly disguised, back-door distribution from Gawker Hungary of Gawker Media's cash.

Apart from a de facto substantive consolidation, the Plan illegally places Williams in Class 2E - - Gawker Media General Unsecured Convenience Class - - a class that Williams has not elected to join, but which, if left unchallenged, will limit his weighted voting rights under the Plan.[4]  At the same time, the Plan places in Class 2C - - Gawker Media General Unsecured Claims - - Bollea, Terrill and Ayyadurai, the only members of the Creditors Committee, whose claims are legally indistinguishable from Williams.  The Committee Members' claims,

---

*Gawker Hungary Kft.* [Docket No. 427]. Capitalized terms not otherwise defined herein shall have the same meaning as in the Plan.

[3] In this modern era of "plain language", creditors should not have to parse Plan definitions, a Disclosure Statement, a Plan Supplement, three Plan Settlements, and an Intercompany Settlement to glean the treatment afforded their claims vis-a-vis other creditors, the sources from which claims will be paid, and the legality of a Plan structure.

[4] Williams' Claim should be in Class 2C and Williams has voted his $50 Million Claim against confirmation.

6356911.2

however, clearly are distinguishable from those general unsecured creditor claims that are unrelated to personal tort injuries, but the latter are inexplicably included in Class 2C, while Williams is not included.  Moreover, those Creditors Committee Members are paid cash for their claims on the Effective Date, while all other 2C Claimants receive pro rata distributions from wholly contingent and unreliable sources of revenue - - the Gawker Media Claims Reserve and Gawker Media Contingent Proceeds Creditor Account, among other contingent sources.  Indeed, the primary fund from which all Class 2C Claimants will be paid, whether their claims are derived from personal injury torts of defamation or from selling paper products to Gawker Media, are proceeds from insurance policies that cover the Williams claims (as well as those of Terrill and Ayyadurai).  The right to litigate the insurance proceeds recovery is entrusted to the Debtors, not the Plan Administrator.  The litigation is to be commenced after confirmation.  The legal effect of this purposeful structure is the improper gerrymandering to confirm an illegal Plan, one that treats similarly situated creditors disparately and unfairly, and one which is at once not feasible and patently unfair to Williams by using his potential insurance proceeds to fund distributions for all 2C Claimants, while Williams is forced into Class 2E involuntarily.

Similarly, placing Bollea in Class 2C, with an inflated Allowed Claim of $115,000,000, virtually insures an impaired class - - impaired artificially solely by the exclusion of Post-Petition interest - - will vote to accept the Plan under §1129(a).  Another artificially impaired Class, one that is guaranteed to vote to accept the Plan to meet the requirements of §1129(a), is 2F(i) - - the Gawker Media Gawker Hungary Intercompany Claims - - is to be paid in full in cash, also with the exclusion of Post-Petition Interest as the only artificial impairment.  The Gawker Media Gawker Hungary Intercompany Claims,

3

however, are claims held by insiders, who are not entitled to vote despite the Plan presently permitting the insider class to vote, thus providing another impaired voting class that ostensibly would accept the Plan.  (See Discl. St. P. 6 2(F)(i)).  The Plan structure also precludes a cramdown confirmation under 11 U.S.C. §1129(b), because the Gawker Media Gawker Hungary Intercompany Claims are paid in full before 2C Claimants, a treatment that constitutes unfair and discriminatory treatment, improper classification, and violates the absolute priority rule.  Moreover, because the Gawker Media Intercompany payment will eventually be distributed by Gawker Hungary to GMGI - - the parent of Gawker Media - - the Plan structure, again, violates the absolute priority rule.  Thus, 11 U.S.C. §1129(b) cannot salvage confirmation of the Plan.

Finally, Debtors' Plan is a contingent, speculative house of cards, rendering it demonstrably unfeasible.  For example, on the Effective Date Gawker Media is required to establish and fund the Gawker Media Claims Reserve, the primary source of funds for dividends paid to Class 2C Claimants.  Discl. Statement ¶6(c)(ii).  Yet, the Gawker Media Claims Reserve is funded primarily from insurance proceeds from third-party litigation that has not been commenced and is under Debtors' sole control.  The litigation purportedly may be brought against insurers for coverage of the litigations commenced by Terrill, Ayyadurai, Williams, and "any other litigation plaintiff creditor of the Debtors", such as all Article Lawsuits.  See page 7 of the Bollea Settlement Agreement.  Apparently, Bollea's potential insurance recovery is inexplicably excluded from the Gawker Media Claim Reserve.  Fundamentally, this source of Plan payments is purely contingent and speculative, it indiscriminately excludes potential insurance proceeds from the Bollea litigation, and, at least as to Williams, Debtors have until days ago denied any such insurance proceeds exist.  This

4

concern also applies to the contingent and speculative nature of the Gawker Media Contingent Proceeds Creditor Account. These proceeds are to be derived from third-party litigation, excluding insurance proceeds, (i) to be litigated by a Plan Administrator that does not presently exist; (ii) for litigation that is not even pending; and (iii) for litigation, the success of which is impossible to determine. That cannot constitute a reliable source for Plan distributions.

As will be demonstrated in detail below, the Plan cannot be confirmed as proposed. Accordingly, Williams respectfully request entry of an Order denying confirmation of the Plan.

## RELEVANT FACTUAL BACKGROUND

### *General Background.*

1.     On June 10, 2016 (the "**Petition Date**"), Gawker Media filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "**Bankruptcy Code**"). On June 12, 2016, Gawker Media Group, Inc. ("**GMGI**") and Gawker Hungary Kft. ("**Gawker Hungary**" and, collectively with GMGI and Gawker Media, the "**Debtors**") each filed a voluntary petition for relief under the Bankruptcy Code. Gawker Media and Gawker Hungary are wholly-owned subsidiaries of GMGI. [Dkt. 427, at page 9, solicitation version of Disclosure Statement (defined below)].

2.     Debtors' cases are jointly administered for procedural purposes only and at least purport not to be substantively consolidated. [Dkt. 41, *Order Directing Joint Administration of Related Chapter 11 Cases*]. Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, although it is unclear what

operations continue as the Plan is one of liquidation. No request for the appointment of a trustee or examiner has been made in the Debtors' Bankruptcy Cases.

3.    On June 24, 2016, the United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Committee**") [Dkt. 62]. The members of the Committee are: Terry Gene Bollea ("Bollea"), Shiva Ayyadurai ("Ayyadurai"), and Ashely A. Terrill ("Terrill") (collectively, the "**Committee Members**").

4.    On August 22, 2016, this Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Approving and Authorizing the Debtors' Entry Into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 214] (the "**Sale Order**"), and on September 9, 2016, the Debtors consummated the sale of substantially all of their assets to Unimoda, LLC for $135 Million cash (the "**Sale Proceeds**"). Pursuant to the Sale Order, the Sale Proceeds were transferred to a separate segregated account held by Gawker Media, without prejudice to any party in interest's right to contest the allocation of the Sale Proceeds. See Sale Order at ¶¶ 41, 43.

### *The Williams Claim.*

5.    Williams has timely filed Proof of Claim No. 6 against Gawker Media (the "**Williams Claim**") based on contingent, unliquidated damages for personal injury, defamation torts to his character and reputation. On June 1, 2016 – nine days before Gawker Media filed for bankruptcy – the Superior Court of New Jersey, Camden County (the "**New Jersey State Court**") entered a facially defective and infirm summary judgment order dismissing the Williams Claim without a written or reasoned oral opinion (despite two days of oral argument

6

and having previously twice refused to dismiss the Williams Claim on the pleadings).

6.       Gawker Media has objected to the Williams Claim [Dkt. 391]. Williams filed opposition to Gawker Media's objection [Dkt. 459] and contemporaneously moved for relief from the automatic stay to permit an appeal of the New Jersey State Court litigation [Dkt. 460], which motion Gawker Media has opposed. On December 1, 2016, the Bankruptcy Court held a hearing on these matters and reserved decision.

***Disclosure Statement***.

7.       Within days of Debtors having settled the Bollea tort claim, on November 2, 2016, the Debtors filed their *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 403] (as amended and including all exhibits and supplements thereto, the "**Disclosure Statement**") which included, as Exhibit "A" thereto, the Plan. On November 4, 2016, this Court entered an *Order Approving (I) The Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) The Form of Ballots and Notices in Connection Therewith, and (IV) The Scheduling of Certain Dates with Respect Thereto* [Docket No. 413] (the "**Disclosure Statement Order**").

***Plan and Plan Settlements***.

8.       The Plan incorporates certain Plan Settlements[5], including: (i) an intercompany settlement of disputes among the Debtors regarding $13 Million in outstanding intercompany

---

[5] The Plan Settlements for Bollea, Terrill, and Ayyadurai were filed on November 30, 2016, and are attached as exhibits to the *Notice of Filing of Plan Supplement Pursuant to the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Dkt. 516].

6356911.2

debt and the allocation among the Debtors of the Sale Proceeds, among other assets and liabilities; (ii) a settlement of Bollea's claims in exchange for $31 Million in cash on the Effective Date plus other consideration; (iii) a settlement of Terrill's claims in exchange for $500,000 in cash on the Effective Date; and (iv) a settlement of Ayyadurai's claims in exchange for $750,000 in cash on the Effective Date. [Dkt. 427, page 2, 30].  In each Plan Settlement, Bollea, Terrill and Ayyadurai pledge an affirmative vote to confirm the Plan.

9.    The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor, and purports to effect no substantive consolidation [separate cite] [Dkt. 427, Plan §2.01]. Most distributions to be made under the Plan will be made on the Effective Date except for Gawker Media distributions, which distributions are used first to pay the Gawker Hungary Intercompany debt in full and, thereafter, for distributions to equity interests in GMGI, as explained below. The Plan's classification and treatment of claims and equity interests that are relevant to this Objection are summarized in the Disclosure Statement and Plan as follows:

## Gawker Media

| Class | Description of Class | Treatment of Allowed Claim in Class | Status/Voting Rights | Amount | Recoveries |
|-------|---------------------|-------------------------------------|---------------------|--------|-----------|
| 2C | Gawker Media General Unsecured Claims | Distributions made in the following order up until it receives the amount of its Allowed Claim, excluding Post-Petition Interest:<br><br>FIRST: on the Gawker Media Claims Reserve Distribution Date, a Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;<br><br>SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account;<br><br>THIRD: A Distribution equal to its Pro Rata share of Cash held in the Second Lien Make-Whole Reserve; and | Impaired / Entitled to Vote | Asserted: $858,551,246 plus unliquidated amounts<br><br>Est. Allowed: $32.5 million to $36 million (**including Bollea Claims, Terrill Claims, and Ayyadurai Claims**) | 15 – 100% |

6356911.2

| | | | | | |
|---|---|---|---|---|---|
| | | FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve. | | | |
| 2E | Gawker Media General Unsecured Convenience Class | A single distribution on the Effective Day in Cash of the lesser of (a) the Allowed amount of its Claim and (b) $25,000, in full and complete settlement and release of, and in exchange for, such Claim and any other Claim held by such General Unsecured Convenience Creditor against any of the Debtors. | Impaired / By electing to participate in the Gawker Media Convenience Claims Class, holders of Claims in Class 2E are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures )Plan § 3.02(e)(iii)[sic.] (Emphasis supplied) | Unknown: Depends on creditor elections | Lesser of (a) the Allowed Claim amount and (b) $25,000 |
| 2F(i) | Gawker Media Gawker Hungary Intercompany Claims | Pursuant to Intercompany Settlement, Gawker Hungary Intercompany Claims against Gawker Media will be satisfied in full in Cash, excluding Post-Petition Interest. | Impaired / Entitled to Vote | Resolved Pursuant to Settlement | 80-100% |

## Gawker Hungary

| Class | Description of Class | Treatment of Allowed Claim in Class | Status/Voting Rights | Amount | Recoveries |
|---|---|---|---|---|---|
| 3E | Gawker Hungary Membership Interest | (a) A distribution of all of the Cash held by Gawker Hungary after payment in full of the Class 3C Claims [Estimated to not exceed $500,000] and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Class 1C Claims and anticipated expenses of liquidating Gawker Hungary, and<br><br>(b) upon dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan | Impaired/ Entitled to Vote | One Member | $0 to $42 million |

6356911.2

**GMGI**

| Class | Description of Class | Treatment of Allowed Claim in Class | Status/Voting Rights | Amount | Recoveries |
|---|---|---|---|---|---|
| 1F | Preferred Equity Interests | Pro Rata share of GMGI Cash remaining after payment of all Class 1A Claims have been paid in full, [Allowed and fixed at $1,250,000, of which $500,000 is paid in cash on the Effective Date] up to the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference. | Impaired / Entitled to Vote | Distributions up to the aggregate GMGI Preferred Shares Liquidation Preference of $60.6 million | $0 to $42 million |

10.    Class 2C - Gawker Media General Unsecured Claims - includes general unsecured creditors who will receive pro rata distributions to be made potentially after the Effective Date (see, the Gawker Media Claims Reserve Distribution Date and the Gawker Media Contingent Proceeds Creditor Account Distribution Date).  Class 2C includes Bollea, Terrill and Ayyadurai, each of whom will receive on the Effective Date a cash settlement payment in a sum certain plus, in the case of Bollea, a pro rata distribution of 45% of the Gawker Media Contingent Proceeds Creditor Account (third-party litigation recoveries, excluding proceeds of litigated insurance coverage denials for tort claims) and the Debtors' quitclaim assignment of all right, title and interest in and to the valuable Content (as defined in the Bollea Settlement, attached as Exhibit "C" to the Plan Supplement, Dkt. 516).  The amount of Bollea's distribution is speculative, but is valued by Debtors at $115,000,000.

11.    Under the terms of their respective Plan Settlements, the Committee Members have agreed to vote in favor of confirmation of the Plan. The claims of Terrill and Ayyadurai are deemed allowed for voting purposes in the amounts of their respective settlements of $500,000 and $750,000. (Dkt. 427, Plan § 4.01(d)). The claim of Bollea, however, is deemed allowed for voting purposes in the amount of a purely speculative recovery of $115,000,000 (i.e., $31 Million cash plus a contingent and speculative $84 Million recovery from the Gawker Media

10

Contingent Proceeds Creditor Account).   (Dkt. 427, Plan § 4.01(c); see also section 8 of the Bollea Settlement attached as Exhibit "C" to the Plan Supplement, Dkt. 516).

12.    Class 2E - Gawker Media General Unsecured Convenience Class - includes the Williams Claim, despite the fact Williams has not elected to be included in Class 2E. The Class 2E designation of the Williams Claim may change, as Williams clearly should be included in Class 2C with Bollea, Terrill, and Ayyadurai, and subject to the Bankruptcy Court's allowance of the Williams Claim and a successful appeal and trial in the New Jersey State Court.

13.    The Plan's treatment of Class 2F(i) - Gawker Media Gawker Hungary Intercompany Claims - includes, among other things, a distribution of $16 Million in cash from Gawker Media **on the Effective Date**, "to repay up to any outstanding amounts of the Gawker Media Gawker Hungary Intercompany Claims, **including any interest that accrues on such outstanding amounts** through the Gawker Media Claims Reserve Distribution Date, **which repayment to Gawker [Hungary] [sic.] shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI** pursuant to the treatments set forth in in Section 3.01 of this Plan." (Dkt. 427, Plan §3.02(f)(ii)). (Emphasis supplied).  Those payments to Gawker Hungary are made after payment of up to $750,000 remaining due to the Gawker Hungary Second Lien Make-Whole Claims but <u>before</u> payment in full of Class 2C General Unsecured Claims.  Incidentally, the inclusion of interest being paid through the Gawker Media Claims Reserve Distribution Date belies the Plan treatment of Class 2F(i) as being impaired, because no post-petition interest purportedly is being paid under the Plan.

14.    The Plan's treatment of Class 3E Gawker Hungary Membership Interest provides that:

> GMGI will receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Hungary Membership Interest, (a) **on the Effective Date, a distribution of all of the Cash held by Gawker Hungary** after payment

11

in full of the Allowed Claims against Gawker Hungary and any amounts reserved by the Plan Administrator, **in its reasonable discretion**, for Disputed Claims against Gawker Hungary and anticipated expenses of liquidating Gawker Hungary, and (b) **on the date of the dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan.**

(Dkt. 427, Plan §3.03(f)(ii)). (Emphasis supplied). Allowed Claims against Gawker Hungary (Class 3A and Class 3C) are estimated in the combined amount of approximately $1.25 Million to $2.25 Million, according to the Disclosure Statement, of which $500,000 to Class 3A will be paid in cash on the Effective Date. (Dkt. 403, page 7 and Dkt. 427, page 18).

15.     The Plan's treatment of Class 1F GMGI Preferred Equity Interests proposes a "**[p]ro [r]ata share of any remaining distributable Cash** after the GMGI Second Lien Make-Whole Claim has been paid in full ($750,000 after cash payment of $500,000 on Effective Date), **up to an aggregate total of the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference**." (Dkt. 427, Plan §3.01(g)(ii)). Class 1G Common Equity Interests of GMGI are entitled to any residual Cash after distribution to holders of Allowed GMGI Preferred Share Equity Interests (Id. §3.01(h)(ii)). The GMGI Second Lien Make-Whole Claim – Class 1A - is allowed in the amount of $2 Million, according to the Disclosure Statement. (Dkt. 427, page 4).

16.     Debtors assert that, pursuant to the Plan and as part of the Plan Settlements incorporated therein, unsecured creditors of Gawker Media will have first recourse to a total of $6.5 Million of cash most of which is comprised of (i) a pro rata share of the Gawker Media Claims Reserve and (ii) a pro rata distribution of 45% of the Gawker Media Contingent Proceeds Creditor Account (collectively the "**Gawker Media Available Assets**"). Debtors further assert that the $6.5 Million "cash" component of the Gawker Media Available Assets will be fully funded on the Effective Date. That funding, however, would seem impossible and therefore

6356911.2

render the Plan unfeasible, because the Gawker Media Claims Reserve and the Gawker Media Contingent Proceeds Creditors Account are both funded by third-party litigations that have not been commenced and are wholly contingent and speculative. [Dkt. 427, page 31]. Accordingly, the funding for unsecured creditors under the Plan is premised on the bet that the $6.5 Million cash component of the Gawker Media Available Assets (i) will be recovered from future third-party litigation, and (ii) is more than adequate to pay the full amount of the Allowed Gawker Media General Unsecured Claims that are not yet subject to consensual settlement agreements.

17.     Section 7 of the Bollea Settlement, titled "Participation in Third-Party Claims", provides that forty-five (45%) percent of the net proceeds of any claims prosecuted by the Plan Administrator on behalf of Debtors against any third-parties shall be deposited into the Gawker Media Contingent Proceeds Creditor Account and distributed pursuant to the Plan, ***excluding***, among other things:

> "claims against any insurers relating to coverage on account of the Debtors' settlement or payment of claims of Ashley Terrill, Shiva Ayyadurai, ***and any other litigation plaintiff creditor of the Debtors***, which proceeds will be deposited in the Gawker Media Claims Reserve established under the Plan."

[Dkt. 516, page 23]. (Emphasis supplied). Williams is included in the category of "any other litigation plaintiff creditor of the Debtors" as are the other personal injury defamation tort plaintiffs in the Article Lawsuits against the Debtors.

18.     The Disclosure Statement and Plan are silent about whether the terms of the applicable insurance policies provide for the payment of the proceeds to Debtors' estates or directly to personal injury defamation tort claimants, like Williams and others. Section 4.06 of the Plan, however, would vest insurance proceeds in each respective Debtor, not with a personal injury litigant for whom the insurance proceeds rightfully belong. Until Friday, December 2,

2016, the Debtors had not conclusively determined whether insurance coverage existed for the Williams Claim. Debtors advised for the first time on Friday, December 2, 2016 that there is $2 Million of insurance coverage (through AIG and an excess carrier) applicable to the Williams Claim, which limited insurance proceeds may also be available to other personal injury defamation tort claimants and which may be fully depleted by Debtors' legal costs in defending the litigation.

## OBJECTION

19.     Section 1129(a) of the Bankruptcy Code provides that courts shall confirm a plan of reorganization only if all of the requirements of sections 1129(a)(1)-(13) are met. See 11 U.S.C. § 1129(a). As the proponent of a chapter 11 plan, "[t]he Debtor bears the burden of proving compliance with each of the requirements of 11 U.S.C. § 1129(a)," In re Fur Creations by Varriale. Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (citation omitted), and must prove each of the requisite elements of section 1129(a) by a preponderance of the evidence. In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994). If all of the requirements of section 1129(a) are not met, the Court may still confirm the Plan, but only if the requirements of section 1129(b) are satisfied. See 11 U.S.C. § 1129(b) (allowing confirmation of plan that is "fair and equitable," but only where debtor has otherwise satisfied all of the requirements of 1129(a) except for obtaining approval of all impaired classes).

20.     Moreover, the Bankruptcy Court has an independent duty to determine whether the debtor has met its evidentiary burden under sections 1129(a) and (b) prior to entering an order confirming a chapter 11 plan. See In re Ne. Dairy Coop. Fed'n. Inc., 73 B.R. 239, 248 (Bankr. N.D.N.Y. 1987). The Court's duty in this regard exists even in the absence of a valid

6356911.2

plan objection. See In re E. Sys., Inc., 118 B.R. 223, 224 (Bankr. S.D.N.Y. 1990), superseded by statute on other grounds. Fed. R. Bankr. P. 3018(a).

21.      The Plan cannot be confirmed because it fails to satisfy several of the requirements of sections 1129(a) and (b) of the Bankruptcy Code. Specifically, and as described in detail below, the Plan: (I) improperly gerrymanders an impaired, accepting class of claims by artificially impairing Class 2C - Gawker Media General Unsecured Claims - and Class 2(f)i – Gawker Media Gawker Hungary Intercompany Claims - by non-payment of post-petition interest; (II) improperly gerrymanders the classification of unsecured creditors of Gawker Media to insure approval of Class 2C by including an inflated Allowed Claim for Bollea of $115,000,000; (III) unfairly discriminates against general unsecured creditors of Gawker Media, including Williams, in violation of section 1129(b)(1); (IV) is not feasible; and (V) illegally violates the absolute priority rule of section 1129(b)(2) in its proposed distribution scheme, which allows for a payment in full on the Effective Date of the Gawker Media Gawker Hungary Intercompany Claims, before Class 2C creditors are paid, and is a disguised attempt to distribute a recovery to GMGI's equity before the higher priority, general unsecured creditors of Gawker Media receive their pro rata distributions.

**I.      The Plan Improperly Gerrymanders an Accepting Class of Claims by Artificially Impairing Class 2C - Gawker Media General Unsecured Claims.**

**A.   Improper Classification.**

22.      There exists "one clear rule" regarding the classification of claims in a plan of reorganization: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1992). Here, the Plan improperly gerrymanders an "impaired" accepting class of general unsecured creditors of Gawker Media at Class 2C (comprised of all general unsecured

creditors, including three creditors, Bollea, Terrill and Ayyaduari, holding in excess of $115

Million in claims) in an attempt to negate Williams' vote, and about a dozen other members of

that same class - - the Article Lawsuit holders.   Furthermore, the Committee Members will

receive payment in full in cash in a sum certain on the Effective while other members of Class

2C will receive pro rata distributions potentially after the Effective Date.   In exchange for that

preferred treatment, each Committee Member has contracted to vote for the Plan.   No legitimate

reason for such classification and disparate treatment can possibly exist, except to guarantee the

Plan's confirmation over the objection of creditors like Williams. Rather, the Debtors' proposed

classification is blatant gerrymandering. The Plan's attempt to gerrymander an accepting Class

2C by including the Committee Members in that class with inflated Allowed Claims should not

be countenanced by the Bankruptcy Court.   Similarly, Class 2F(i) is gerrymandered because

affiliate Debtor Gawker Hungary is the only "impaired" member of that class entitled to vote

(presumably in favor of its Plan treatment providing for payment in full excluding post-petition

interest).   Debtor Gawker Hungary, however, is an insider that is not entitled to vote. As a

condition to plan confirmation, the Court must find that at least one class of claims that is

impaired under the plan has accepted the plan, determined without including any acceptance of

the plan by any insider. See 11 U.S.C. § 1129(a)(10).

    23.    Section 1122(a) of the Bankruptcy Code states that "a plan may place a claim or

an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class." While the plan proponent has substantial flexibility, In re

Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992),

"classification is constrained by two straight-forward rules: Dissimilar claims may not be

classified together; similar claims may be classified separately only for a legitimate reason." In

re Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996). Claims are similar if they have

"substantially similar rights to the debtor's assets." Drexel Burnham Lambert Group, Inc., 138

B.R. at 757 (emphasis added); accord In re AOV Indus., Inc., 792 F.2d 1140, 1150 (D.C. Cir.

1986).

24.    Here, the Committee Members have substantially identical rights as Williams has

to the Debtors' assets, but for their respective Plan Settlements. Accordingly, under these

circumstances, the Debtors should have placed Williams, Bollea, Terrill, and Ayyaduari in Class

2C, along with general unsecured creditors of Gawker Media without settlement agreements.

While the Debtor might argue that the Plan Settlements distinguish the claimants because they

are settlements, that distinction, if permitted, would exclude all unsettled general unsecured

creditors, not just all Article Lawsuit holders and Williams.

## B.    Disparate Treatment of Similar Creditor Claims.

25.    The flipside of the classification question is equality of treatment. Section

1123(a)(4) of the Bankruptcy Code requires the plan to "provide the same treatment for each

claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a

less favorable treatment of such particular claim or interest." Section 1123(a)(4) does not require

precise equality, only approximate equality. In re Dow Corning Corp., 255 B.R. 445, 497 (E.D.

Mich. 2000), aff'd in part and remanded in part, 280 F.3d 648 (6th Cir. 2002); In re Resorts Int'l,

Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990) ("This is not to be interpreted as requiring precise

equality of treatment, but rather, some approximate measure since there is no statutory obligation

upon plan proponents to quantify exactly what each class member is relinquishing by a release.")

"Without question, the 'same treatment' standard of section 1123(a)(4) does not require that all

claimants within a class receive the same amount of money." In re Joint Eastern and Southern

17

Dist. Asbestos Litig., 982 F.2d 721, 749 (2d Cir. 1992). Further, courts have recognized that "the key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." In re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008); see also In re Quigley Co., Inc., 437 B.R. 102, 146–48 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.").

26.     Here, the general unsecured creditors of Gawker Media do not have the same opportunity as the Committee Members to share in the value of the Debtors' assets because they are not receiving payment in full on the Effective Date. Moreover, they are not receiving other valuable consideration, such as the Content, which Debtors are assigning to Bollea.

### C. Artificial "Impairment" for Confirmation.

27.     Not only is Class 2C improperly gerrymandered, but to the extent distributions on account of such claims reflect "similar" impairment -- such as withholding a nominal amount of accrued post-petition interest, presuming post-petition interest is even due -- it is purely artificial. Thus, Class 2C cannot be counted as an impaired accepting class for the purposes of a cram down.  The same rationale applies to Class 2F(i) – in which the sole member of that Class, the insider Gawker Hungary, will be satisfied in full in cash, excluding post-petition interest.

28.     Courts have condemned plan modifications that improve or only slightly impair a creditor's position for no justifiable reason other than creating a class that is artificially "impaired" and, thus, eligible to vote in favor of the plan. See, e.g., In re Windsor on the River Assocs., Ltd., 7 F.3d 127, 131 (8th Cir. 1993) (refusing to confirm plan under 1129(a)(10) where debtor artificially impaired two classes of claims by delaying partial payment until after effective date even though it had the necessary funds to pay in full on effective date); In re Lettick

Typografic. Inc., 103 B.R. 32, 39 (Bankr. D. Conn. 1989)(same). As a result, this court has held

that for a debtor to impair a class of creditors, "[t]here must be a showing that the proposed

impairment is necessary for economical or other justifiable reasons and not just to achieve a

'cram down.' " In re Fur Creations by Varriale. Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995).

Thus the impairment of Classes 2C and 2F(i) has no reasonable basis other than the need to

create an accepting impaired class. The cases are clear that this is impermissible.

## II.    The Plan Unfairly Discriminates Against General Unsecured Creditors of Gawker Media in Violation of Section 1129(b)(1).

29.    The Plan unfairly discriminates against general unsecured creditors of Gawker

Media in violation of section 1129(b)(1) because, on the Effective Date, the Committee

Members are paid in full, the Gawker Media Gawker Hungary Intercompany Claims are paid in

full, and equity interests in GMGI may be paid *before* pro rata distributions are made to general

unsecured creditors of Gawker Media, claimants which have equal or higher priority under

applicable law. Such disparate treatment epitomizes unfair discrimination under the Bankruptcy

Code.

30.    Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection

by an impaired class only if, among other things, "the plan does not discriminate unfairly." 11

U.S.C. § 1129(b)(1). The burden is upon the Debtors to prove that the Plan does not

discriminate unfairly. In re Armstrong World Indus., Inc., 348 B.R. 111, 122 (D. Del. 2006); In

re Sentry Operating Co. of Tex, Inc., 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).

31.    Courts have developed various methods to determine whether a plan unfairly

discriminates against a dissenting class. "The hallmarks of the various tests have been whether

there is a reasonable basis for the discrimination, and whether the debtor can confirm and

consummate a plan without the proposed discrimination." In re Lernout & Hausnie Speech

6356911.2

Products. N.V., 301 B.R. 651, 660 (Bankr. D. Del. 2003). Traditionally, in this district, bankruptcy courts apply a four-factor test to determine unfair discrimination. The factors considered are:

(1)    whether the discrimination is supported by a reasonable basis;
(2)    whether the debtor could consummate the plan without the discrimination;
(3)    whether the discrimination is proposed in good faith; and
(4)    whether the degree of discrimination is in direct proportion to its rationale.

In re Worldcom. Inc., No. 02-13533(ALG), 2003 WL 23861928, at *60 (Bankr. S.D.N.Y. Oct. 31, 2003); In re Buttonwood Partners. Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

32.    While relatively minor differences in the recovery of different claimants may be upheld if reasonable, courts have consistently rejected "grossly disparate" discrepancies. See, e.g., Oxford Life Ins. Co. v. Tucson Self-Storage. Inc. (In re Tucson Self-Storage, Inc.), 166 B.R. 892 (B.A.P. 9th Cir. 1994) (finding that an approved plan provided unsecured trade creditors with a 100% recovery while providing unsecured deficiency claims with only a 10% recovery could not be confirmed because it discriminated unfairly in violation of section 1129(b)(1)); In re Rotella, No. 91-00453, 1994 WL 362271, at *6 (Bankr. N.D.N.Y. Mar. 23, 1994) (refusing to confirm plan of reorganization that provided an interest rate of 7% to the IRS while providing another secured creditor with an interest rate of 9%, and confirming plan only after debtors equalized the interest rates); In re Caldwell, 76 B.R. 643, 646 (Bankr. E.D. Tenn. 1987) (confirmation denied where 100% of credit card debt was proposed to be paid but only 22.7% of all other unsecured debt would be paid); In re Aztec Company, 107 B.R. 585, 591-92 (Bankr. M.D. Tenn. 1989) (unfair discrimination where deficiency claim received 3% and class dominated by insiders received 100%); In re Creekside Landing. Ltd., 140 B.R. 713 (Bankr. M.D. Tenn. 1992) (40% distribution on deficiency claim and 75% to other general unsecured

6356911.2

claims deemed unfair discrimination because the debtor failed to articulate a reasonable basis for the discrimination and failed to demonstrate why the consummation of the plan could not be accomplished without discriminatory treatment).

33.    Debtors here propose to pay fixed, cash distributions to the Committee Members, 100% of the Gawker Media Gawker Hungary Intercompany Claims on the Effective Date and to distribute value to Debtors' equity interests on the Effective Date, before making pro rata distributions to general unsecured creditors of Gawker Media. Simply put, such disparate treatment is grossly inequitable and without any articulated rationale.

34.    Moreover, it is patently unfair for the Gawker Media Claims Reserve to be funded from insurance proceeds applicable to personal injury defamation tort claimants and used, according to Plan §3.02(c), to pay pro rata all general unsecured creditors of Gawker Media in Class 2C. The Gawker Media Claims Reserve is highly speculative and contingent on the outcome of third-party litigation, which therefore may be unlikely to provide any recovery. Any recovery that may be realized, however, should go solely to the personal injury defamation tort claimants for whom insurance proceeds are intended, not to the entirety of Class 2C general unsecured creditors of Gawker Media.

35.    The Plan's treatment of Class 2C, therefore, must fail under the Four-Factor Test. The Debtors' proposed treatment of Class 2C is inconsistent with the letter and spirit of the Code. As such, the Debtors' proposed Plan is not confirmable.

### III.    The Plan Is Not Feasible Because the Gawker Media Claims Reserve is Highly Contingent and Speculative on the Outcome of Third-Party Litigation.

36.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor

21

to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). This requirement, commonly known as the "feasibility" standard, requires that "the Plan is workable and has a reasonable likelihood of success." In re Drexel Burnham Lambert Group, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992). To address the feasibility of the Plan, the Court must assess the probability of the actual performance of the Plan. See In re 2670 W. Ridge Rd. LLC, 431 B.R. 12, 16 (Bankr. W.D.N.Y. 2010). In this regard: "[s]incerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises." In re Bergman, 585 F.2d 1171, 1179 (2d Cir. 1978).

37.    To support a finding of feasibility, the bankruptcy courts in this district generally require evidence at the confirmation hearing that a plan: (a) is reasonable, persuasive, credible and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the plan is feasible and confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, except as provided in the plan; and (e) establishes that the debtors will have sufficient funds available to meet their obligations under the plan. See In re Reader's Digest Ass'n, 2010 Bankr. LEXIS 5550, at *47-48 (Bankr. S.D.N.Y. Jan. 19, 2010); In re Am. Media, Inc., 2010 Bankr. LEXIS 4942, at *39-40 (Bankr. S.D.N.Y. Dec. 20, 2010); In re Lear Corp., 2009 Bankr. LEXIS 4426, at *31 (Bankr. S.D.N.Y. Nov. 5, 2009); In re Calpine Corp., 2007 Bankr. LEXIS 4390, at *34-35 (Bankr. S.D.N.Y. Dec. 19, 2007). See also In re PC Liquidation Corp., 2006 Bankr. LEXIS 4638, at *9 (Bankr. E.D.N.Y. Nov. 13, 2006) (estate must have sufficient funds to meet the obligations under the plan with respect to the payment of allowed claims).

6356911.2

38.     Williams does not assert condition (d) applies, as the Plan is one for liquidation, not reorganization. To the contrary, Williams asserts the Plan cannot deliver on its promises, without violating multiple Bankruptcy Code provisions and relying upon contingent and speculative litigation recoveries. Indeed, the Plan is not feasible and cannot be confirmed because the Debtors premise the Plan on the gamble that the $6.5 Million cash component of the Gawker Media Available Assets (i) will be recovered from future third-party litigation (i.e., the source of funds for the Gawker Media Claims Reserve and the Gawker Media Contingent Proceeds Creditor Account) and (ii) is more than adequate to pay the full amount of the Allowed Gawker Media General Unsecured Claims. However, the Plan does not provide for the probability that Gawker Media General Unsecured Claims may exceed $6.5 Million, especially if the Williams Claim or another substantial Article Lawsuit is allowed.

## IV.    The Plan's Distribution Scheme Violates the Absolute Priority Rule of Section 1129(b)(2).

39.     The Debtors' Plan fails to comply with section 1129(b)(2)(B)(ii) of the Bankruptcy Code--commonly known as the "absolute priority rule"--in that it allows the insider Class 2F(i) claimants - - the Gawker Media Gawker Hungary Intercompany Claims - - and GMGI's equity interests an opportunity to recover substantial distributions, up to $42 Million, while senior, dissenting general unsecured creditors of Gawker Media - - Williams included - - are entitled only to a contingent and speculative recovery from third-party litigation that has not even been commenced yet and is unlikely to result in payment in full. The failure and inability to comply with the absolute priority rule (which is a prerequisite to a cramdown) makes the Plan unconfirmable.

40.     The absolute priority rule provides that a plan of reorganization is not fair and equitable--and, thus, not confirmable through the cramdown provisions of section 1129(b) of

6356911.2

the Bankruptcy Code--if it allocates any property whatsoever to any junior class (e.g., insider, Intercompany Claimants and equity holders) prior to all senior classes (e.g., general unsecured creditors) receiving payment in full.

41.    Apart from an improper payment of Intercompany debt to an insider, the Plan is a disguised distribution to Gawker Media's equity interests because it transfers value from Gawker Media, through Gawker Hungary, and ultimately to the equity interests of the parent company, GMGI. This proposed outcome clearly violates the absolute priority rule and runs directly contrary to the Supreme Court's holding in <u>Bank of America Nat'l Trust v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434 (1999), which flatly prohibits existing equity from retaining any interest in a debtor (even if in exchange for substantial new value, which is absent here) unless for reasons inapposite here - - senior creditors are paid in full or, alternatively, the transaction in question is market tested or the Debtors terminate exclusivity to allow other parties in interest the opportunity to propose competing plans of reorganization. Here, the Debtors have not only retained exclusivity but proposed a Plan that (i) provides holders of Gawker Media general unsecured claims with a speculative recovery at best, and for less than what Committee Members in the same Class are guaranteed, and (ii) allows insider Gawker Hungary debt to be paid in full on the Effective Date, which in turn provides GMGI's equity interests (a junior interest holder) to receive valuable distributions on the Effective Date. The proposed Plan structure is in clear violation of the Supreme Court's holding in <u>LaSalle</u>.

## <u>RESERVATION OF RIGHTS</u>

42.    Williams reserves his rights to supplement and amend this Objection, seek discovery with respect to the same, and introduce evidence at any hearing relating to this Objection or to consider the Plan, all without in any way limiting any other rights of Williams to

further object to confirmation of the Plan on any grounds as may be appropriate. Further, Williams reserves his right to join in or respond to any objection made by any person relating to the confirmation of the Plan.

## CONCLUSION

43.    For each of the reasons set forth above, Williams respectfully submits the Court should enter an order denying confirmation of the Plan and granting such other and further relief, as the Court deems just and proper.

Respectfully submitted,

**CHIESA SHAHINIAN & GIANTOMASI PC**
*Attorneys for Mitchell Williams*


By:    */s/ Robert E. Nies*
        ROBERT E. NIES

One Boland Drive
West Orange, New Jersey 07052
Tel:    (973) 530-2012
Fax:    (973) 530-2212
E-Mail:  rnies@csglaw.com

Dated: December 5, 2016

25