Hearing Date and Time: December 13, 2016 at 10:00 a.m. (Eastern Time)
Response Deadline: December 5, 2016 at 4:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
In re                                                  :    Chapter 11
                                                       :
Gawker Media LLC, *et al.,*[1]                         :    Case No. 16-11700 (SMB)
                                                       :
              Debtors.                                 :    (Jointly Administered)
-------------------------------------------------------x

**CERTAIN WRITERS' RESPONSE IN SUPPORT OF CONFIRMATION OF THE
AMENDED CHAPTER 11 PLAN, OR IN THE ALTERNATIVE,
LIMITED OBJECTION AND RESERVATION OF RIGHTS**

Certain former and current writers, employees and/or independent contractors (the "Writers") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through their undersigned counsel, submit this *Response in Support of Confirmation of the Amended Chapter 11 Plan, or in the alternative, Limited Objection and Reservation of Rights* (the "Response"). In support of this Response, the Writers respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors' Amended Plan (as defined below) should be confirmed and the third party release and injunction set forth in the Amended Plan should be approved.

2.      Following the sale and liquidation of the Debtors' assets, the Writers face significant ongoing exposure to potential liability arising from services performed or content provided at the request and direction of the Debtors, without the protection of indemnification funded by an ongoing operation or adequate reserve.

---

[1]    The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10020. Kinja Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10020.

93634.1 12/05/2016

3. Unlike an insider seeking to escape claims for alleged fraudulent conduct or for an alleged breach of his or her fiduciary duty, ordinarily protected by insurance, the third party release and injunction in the Amended Plan in favor of the Writers seek to protect individuals from liability or claims arising from doing the exact task requested of them by the Debtors. At the request of the Debtors, the Writers provided written content for the Debtors to post online and which generated the Debtors' value. Because the Debtors' business involved so-called "shock journalism," the Debtors expected to generate a certain amount of litigation against the Debtors and the Writers. Based on the Debtors' business, the Debtors routinely defended claims and suits arising from content provided by the Writers, and indemnified and held the Writers harmless. Not fraud, not breach of fiduciary duty, but the very services and content required of the Writers by the Debtors generated not only the Debtors' value, but the existing and potential claims against the Writers.

4. Further protecting and encouraging the Writers to provide this written content without fear of personal financial harm or ruin from litigation designed to deter this type of speech is protected by our Constitutional right to free speech.

5. In exchange for the third party release and injunction, each Writer is providing consideration by giving up the very indemnification offered by the operating Debtors (whether through contractual agreement or the Debtors' practices and policies) to induce the Writers to provide the value-generating online Debtor content.

6. The waiver of each Writers' indemnification claim eliminates the need to pay these claims, maintain a claim reserve or otherwise dilute the distributions to the other creditors actually receiving cash under the Amended Plan, including creditors asserting claims against the Debtors and Writers arising from the publication of the content for which the Writers seek

indemnification.

7. Here, as part of the cost of doing business, the Debtors routinely defended the right to post potentially controversial content online and covered not only the Debtors' cost of defense and settlement, but also the costs that would otherwise have been incurred individually by the Writers.

8. In sum, the Debtors specifically invited or required the Writers to post the value generating "shock" journalistic content, content protected by the right to free speech, and this content generated the very value sold through the Debtors bankruptcy sale process. Now, however, without the release and injunction, the bankruptcy sale process, Amended Plan and continuing liquidation of the Debtors' assets strip the Writers, who can ill afford to bear these costs themselves, of meaningful indemnification protection for litigation costs arising from the posted content. At the same time, the Amended Plan would allow the Debtors' other creditors and equity holders to receive meaningful distributions from the value the Writers created with this very content.

9. This is the very situation where the Amended Plan should be confirmed and the third party release and injunction should be approved.

**RELEVANT BACKGROUND**

10. On June 10, 2016, Debtor Gawker Media LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On June 12, 2016, Debtors Gawker Media Group, Inc. and Kinja Kft. each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11. Each of the Writers filed a proof of claim against each of the Debtors prior to the September 29, 2016 claim filing deadline. Further, on October 5, 2016, counsel for the Writers

filed its *Verified Statement Pursuant to Bankruptcy Rule 2019* (the "Writers' 2019 Statement") [Docket No. 321].

12. The Writers consist of the 62 individuals listed on **Exhibit A** to the Writers' 2019 Statement.

13. On November 2, 2016, the Debtors filed the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 403], which included as Exhibit A thereto the Amended Chapter 11 Plan (the "Amended Plan"). The Amended Plan provides, generally, for the distribution of the cash generated from the sale of the Debtors' assets.

14. In addition, the Amended Plan provides for releases in favor of the Writers to each Writer who votes in favor of the Amended Plan and waives his or her indemnification claims against the estates. In reliance on this promise of a release and injunction, each of the Writers voted in favor of the Amended Plan.

## THE AMENDED PLAN

15. Section 9.05 of the Amended Plan provides the following:

> **THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS. ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS,**

-4-

> **REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE ARISING OUT OF OR RELATING TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, PROVIDED, HOWEVER, THAT THE FOREGOING THIRD-PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE.**

(the "Release"). *See Amended Plan § 9.05*.

16. The Debtors seek approval of the Release in the Amended Plan.

17. Additionally, the Debtors seek approval of an injunction to enjoin third parties from commencing or continuing a suit against the Released Employees and Independent Contractors (the "Injunction") basically to give effect to the Release.[2] *See Amended Plan § 9.02*.

---

[2] Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Amended Plan.

-5-

18.     To benefit from the proposed Release, each Writer must: (1) vote in favor of the plan; and (2) waive any claim for indemnification against the Debtors and the Debtors' bankruptcy estates.

19.     Based on the terms of the Amended Plan, and specifically the language of the Release and the Injunction, each Writer has voted in favor of the Amended Plan.

## ARGUMENT

### A.    The Release

21.     This court has the jurisdiction to approve the Release in favor of the Writers. *See In re FairPoint Commc'ns, Inc.,* 452 B.R. 21, 29 (Bankr. S.D.N.Y. 2011) ("[A] bankruptcy court has 'related to' jurisdiction to enjoin non-debtor litigation if the bankruptcy estate may be obligated to indemnify or contribute to the losing party.").

22.     The Second Circuit in *Metromedia* recognizes the appropriateness of third party releases in unique situations - like we find here. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005). Non-debtor releases and exculpations "are permissible under some circumstances, but not as a routine matter." *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007).

23.     The Second Circuit counsels that analyzing non-debtor releases is not "a matter of factors and prongs," but rather requires a finding of unique circumstances. *Adelphia*, 368 B.R. at 362 (citing *Metromedia*, 416 F.3d at 142).

24.     *Metromedia* specifically noted that third party releases, while rare, are appropriate under certain circumstance, including when:

    a.     the released party "substantially contributed" to the debtor estate; or

    b.     the released claims would create indemnification or contribution claims

93634.1 12/05/2016

against the debtor estate impacting the debtor's reorganization efforts. *Metromedia*, 416 F.3d at 141-42.

25. The recent case of *In re Genco Shipping & Trading Limited* addressed the permissibility of third party releases, and specifically, approved a third party release for holders of indemnification claims against the debtor's estates. 513 B.R. 233 (Bankr. S.D.N.Y. 2014).

26. In *Genco*, the debtor, through its chapter 11 plan, sought approval of the standard releases usually requested by a debtor as well as certain third party releases for the benefit of non-debtors. *Id.* at 268. While the usual releases for the benefit of the debtor did not draw any objections, the requested third party releases drew the ire of the official equity committee formed in the case and the Office of the United States Trustee. *Id*.

27. In addressing the third party releases requested in *Genco*, Judge Lane stated that third party releases will be approved "where they comport with the Second Circuit's guidance in *Metromedia*." *Id.* at 271. In applying the *Metromedia* standard to the requested third party release, Judge Lane approved the third party release "for claims that would trigger indemnification or contribution claims against the [d]ebtors . . . .". *Id.* The permitted indemnification release in *Genco* applied to any indemnification obligation that existed prior to the bankruptcy filing. *Id.*

28. To the extent it is argued, albeit inappropriately, that under 11 U.S.C. § 502(e) the Writers' indemnification claims are disallowable, this provides further (not less) support for the Release. The Writers, who very much expected the Debtors to be around to defend and resolve claims based on content provided to the Debtors, now find themselves disproportionately prejudiced. While the Debtors, the Debtors' creditors, and even equity, all stand to benefit from the value the Writers created through the content they provided to the Debtors, if the Release is

-7-

not approved, the Writers, the value creating party, will be the only party left vulnerable to attacks they can ill afford to defend or settle, with perhaps no ability to monetize their indemnification claim and receive a distribution from the Debtors' estates.

29.     Where the Bankruptcy Court for the Southern District of New York in *Genco* approved a third party release for the benefit of holders of indemnification claims against a debtor's estate, in *In re MPM Silicones, LLC*, Judge Drain approved a third party release for the benefit of those parties who provided "substantial consideration" under a proposed plan. No. 14-22503-RDD, 2014 WL 4436335, at *33 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd,* 531 B.R. 321 (S.D.N.Y. 2015).

30.     In approving the third party release requested in *MPM Silicones, LLC*, Judge Drain determined that the released third party provided substantial consideration to the debtors by (1) subordinating its deficiency claim to those of the debtor's trade creditors who were being paid in full under the debtor's plan and (2) underwriting a $600 million equity investment under the debtor's plan. *Id.*

31.     Here we have the unique circumstances required by *Metromedia*. The Writers provided the content that gave rise not only to the Debtors' value which resulted in the sale that created the cash to be distributed to creditors under the Amended Plan, including distributions to litigation claimants, but also serves as the basis to current and future claims against the Writers. The Writers relied on the Debtors' indemnification to protect them, as codefendants with the Debtors, in suits where they were challenged for contributing the very content that created the value the Debtors sold. Taking away the Debtors, the deep pocket target, leaves the Writers vulnerable to liability for having done exactly what the Debtors asked of them – provide content.

32. Based on the unique circumstances of these cases, the Release should be approved. First, the Writers have valid indemnification claims against the Debtors and their respective bankruptcy estates; second, as reflected below, the Writers are providing substantial consideration under the Amended Plan; and third, the Writers have substantially contributed to the Debtors' bankruptcy efforts.

    **i.**     **The Released Claims Would Create Indemnification Or Contribution Claims Against The Debtors' Estates Impacting The Debtors' Wind Down Efforts**

        a.     Each Writer, by way of contract with the Debtors or through the Debtors' practices and policies, have the right to indemnification against the Debtors and the Debtors' bankruptcy estates.

        b.     If the Release is not approved, the claims subject to the Release would create additional obligations against the Debtors and their respective bankruptcy estates due to the continued exposure the Writers, and in turn the Debtors, would have based on claims related to content provided or service performed by the Writers to the Debtors.

        c.     As of the filing of this Response, several Writers are subject to pending lawsuits amounting to liability in excess of $100,000,000. The Writers' potential liability is significant.

        d.     If the Release is not approved, the Writers have the right to seek indemnification for these current and future lawsuits, which will impact the Debtors' ability to orderly wind down their bankruptcy estates. This is to say that the estates will be left with fewer funds

for distribution, as more funds will need to be set aside for indemnification to the Writers, and must be prepared to defend a host of potential lawsuits against the Writers.

**ii.** **The Writers Are Providing Consideration Under The Amended Plan**

a. In voting to approve the Amended Plan, the Writers agree to provide consideration by foregoing their right to seek indemnification from the Debtors for potential liability they may incur based on services performed or content provided to the Debtors.

b. By foregoing their right to indemnification, the Writers allowed the Debtors' estates to make substantially more funds available for distribution to the Debtors' other creditors, as opposed to requiring the Debtors to set aside reserves and hold those funds to defend lawsuits against the Writers for content provided to the Debtors and for claims the Debtors are being released and discharged from under the Amended Plan. Without the Release, the Debtors, through the indemnification obligations, would have to continue to litigate and incur other costs for the very claims against the Debtors and Writers arising from Gawker content they hope to resolve through the distributions and settlements under the Amended Plan.

c. Furthermore, by foregoing their right to seek indemnification, the Writers have protected the Debtors' estates from having to expend

-10-

significant time and other resources defending contentious litigation going forward. The Release, along with the Injunction, will stop this distracting litigation in its tracks, making for a more effective confirmation.

  iii. **The Writers "Substantially Contributed" to the Debtors' Estates**

    a. As stated above, the very content provided by the Writers ultimately led to the robust sale of the Debtors' assets. Based in part on the Writers' content, during the course of these bankruptcy proceedings, the Debtors' sold its operations to UniModa, LLC for approximately $135 million.

    b. The fruits of the Writers' labor have allowed the Debtors and their creditors to receive the proposed distributions set forth under the Amended Plan.

  iv. **The Release Provides Value to the Debtors' Remaining Intellectual Property**

    a. Through the Amended Plan, the Debtors propose to market and sell the remaining Gawker.com Assets. The sale proceeds from the Gawker.com Assets will be available for distribution to the Debtors' unsecured creditors.

    b. In the event that the Release is not approved, it is submitted that the market value of the Gawker.com Assets will be negatively impacted by the market's perception of the brand.

-11-

        c.      The Writers provided content or performed services at the direction of the Debtors. This, alone, has opened the Writers up to significant liability. If the Release is not approved and the Writers are left exposed to significant current and future liability, the perception of "Gawker" will be one of a company that did not protect its own employees. There is no doubt that this perception will negatively impact the value of the Gawker.com Assets.

32. Based on the foregoing circumstances, approval of the Release is appropriate as the facts of these cases meet the rare and unique circumstances established in *Metromedia*, and falls in-line with the third party releases previously approved by this District in *MPM Silicones, LLC* and *Genco Shipping*.

    **B.**    **The Injunction**

33. The Injunction serves as a mechanism to enforce the Release. Notably, the Injunction is limited in scope, in that it only applies to those claims arising from or out of the services performed or content provided to the Debtors by the Released Parties and Independent Contractors. The narrowness of the language set forth in the Injunction is significant, as the Debtors are not asking for a blanket release. Instead, the terms of the Injunction allow for third parties to seek relief from the Injunction if a third party believes that a claim does not arise from services performed or content provided. The Injunction is narrowly tailored to protect the Writers from liability that stems directly from their work for the Debtors, and nothing else.

34. Furthermore, just as this Court has the authority to approve the Release, this Court also has the authority to approve the Injunction. *See In re Bally Total Fitness of Great N.Y., Inc.*,

No. 07-12395 (BRL), 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007); *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992).

35. Based on the foregoing, this Court should approve the Injunction.

**C.    Public Policy Impact on Free Speech**

36. While this is not the first time a court within this District will decide whether approval of a third party release is appropriate, it is novel in its public policy implications based on the uniqueness of the facts in these cases. More specifically, the decision to approve or not approve the Release at issue will have significant implications impacting, and more specifically deterring, writers generally and their ability to exercise free speech.

37. When a writer chooses to publish a piece with a media company like the Debtors, he or she secures protection from exposure to liability through the guarantee of the right to indemnification. This protection allows writers generally, not just the Writers involved in these cases, to fully and freely express their thoughts and opinions in the media without restraint resulting from the threat of lawsuits. If writers were not afforded this protection, the resulting impact would be less freedom of expression, and effectively a chilling of free speech.

38. The Writers who worked for the Debtors were free to express their thoughts and ideas through writing, even if controversial, because of the security afforded to them through the right of indemnification.

39. If this Court decides to strip away that right by not approving the Release, the public-policy impact is that writers will face the threat of impending lawsuits and be less likely to freely and fully publish their writing. After all, writing on controversial issues will always bring contentious litigation not only against the media outlet, but also the writers by default. In

-13-

order to ensure true freedom of speech, writers must be entitled to the protection of the media outlet.

40. Writers as a whole want the guarantee that even if the media outlet through which their pieces are being published ends up in bankruptcy, their right to protection by way of indemnification will not be rendered valueless. The decision to approve the Release before this Court will directly and more broadly impact writers' ability to freely and fully publish their work.

41. In support of this argument, the Writers hereby incorporate the arguments set forth in the Amicus Brief filed by The Society of Professional Journalists and related organizations.

## LIMITED OBJECTION AND RESERVATION OF RIGHTS

42. As noted above, the Writers have voted in favor of the Amended Plan based on the specific language of the Release and the Injunction.

43. If the Amended Plan is not confirmed, or if the Release and/or Injunction specifically are not approved, the Writers reserve the right to assert any and all indemnification claims they have or may have against the Debtors and the Debtors' bankruptcy estates.

44. Additionally, in the event that the Release and/or Injunction are not approved, the Writers object to the amount of the Gawker Media Claims Reserve.

45. Currently, the Debtors propose to set aside $3,750,000 for the benefit of Gawker Media LLC's general unsecured creditors. The amount of the Gawker Media Claims Reserve, as set forth in the Amended Plan, is inadequate, as it fails to take into account any potential liability the Writers may face for content provided or services performed while employed by the Debtors. It must be noted that several of the Writers, alongside the Debtors, are subject to pending

-14-

lawsuits asserting damages and liability claims in excess of $100,000,000. While the Writers vigorously dispute the merits of any of these claims, if the pending lawsuits, and potentially future claims, against the Writers alone for content provided or services performed on behalf of the Debtors proceed, the Writers would be entitled to indemnification from the Debtors.

46. Accordingly, if the Amended Plan is not approved, or if the Release and/or Injunction specifically are not approved, the Gawker Media Claims Reserve must be increased to take into account: (1) these potential liabilities; (2) the cost to defend against these disputed claims; and (3) the damages that may arise in the event a court renders a decision against the Writers in these disputed matters.

47. The Writers reserve the right to amend or supplement this Response based upon any facts or arguments that come to light prior to the confirmation hearing on the Amended Plan.

Dated: December 5, 2016

**SAUL EWING LLP**

By: */s/Sharon L. Levine*
Sharon L. Levine
Dipesh Patel
1037 Raymond Boulevard
Suite 1520
Newark, NJ 07102
Telephone: (973) 286-6713
Facsimile: (973) 286-6821
slevine@saul.com
dpatel@saul.com

-and-

555 Fifth Avenue
Suite 1700
New York, NY 10017
Telephone: (212) 980-7200

*Attorneys for the Writers*

93634.1 12/05/2016