# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
Gawker Media LLC, *et al.*,               :    Case No. 16-11700 (SMB)
                                          :
            Debtors.                      :    (Jointly Administered)
-------------------------------------------------------x

# MEMORANDUM OF LAW OF *AMICI CURIAE* SOCIETY OF PROFESSIONAL JOURNALISTS, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AND 19 OTHER MEDIA ORGANIZATIONS IN SUPPORT OF CONFIRMATION OF THE AMENDED CHAPTER 11 PLAN

BAKER & HOSTETLER LLP

Bruce W. Sanford
Mark I. Bailen
Christopher J. Giaimo
Andrew M. Grossman (*Of counsel*)
James F. Romoser (*Of counsel*)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
*mbailen@bakerlaw.com*
Phone: (202) 861-1500
Fax: (202) 861-1783

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................................ 2

ARGUMENT .................................................................................................................................. 3

I.      The First Amendment Provides Robust Protections Shielding Members of the Media from Defamation and Related Litigation. ........................................................................ 3

II.     In Both the Bankruptcy Context and Other Contexts, Courts Routinely Craft Special Safeguards for the Gathering and Publishing of News. ..................................................... 4

III.    Journalists' Claims Involving Indemnification Rights Against a Debtor Implicate Substantial First Amendment Interests Justifying a Third-Party Release. ......................... 6

IV.    The Equities Strongly Support Protection of Journalists' and the Public's First Amendment Interests. ........................................................................................................ 9

CONCLUSION ............................................................................................................................. 11

APPENDIX A ............................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                   **Page(s)**

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) ........................................................6

*Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988) ...................................................................3

*In re Bell & Beckwith*, 44 B.R. 661 (Bankr. N.D. Ohio 1984) ......................................................5

*In re Charles St. African Methodist Episcopal Church of Boston*, 478 B.R. 73
    (Bankr. D. Mass. 2012) ..............................................................................................................5

*In re Dow Corning Corp.*, 227 B.R. 111 (Bankr. E.D. Mich. 1998) ..............................................5

*In re Philadelphia Newspapers, LLC*, 450 B.R. 99 (Bankr. E.D. Pa. 2011) ......................... 4-5, 10

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ........................................................................3

*O'Neill v. Oakgrove Constr., Inc.*, 523 N.E.2d 277 (N.Y. 1988) ...................................................6

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) ....................................................3

*Thomas v. Bd. of Educ.*, 607 F.2d 1043 (2d Cir. 1979) ..................................................................4

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ..........................................................6

*Von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987) ....................................3

**Statute**

N.Y. C.P.L.R. § 215(3) ..................................................................................................................10

**Other sources**

Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, PEW RESEARCH CENTER ON
    JOURNALISM & MEDIA (June 15, 2016), http://www.journalism.org/2016/06/15/state-of-
    the-news-media-2016/ .................................................................................................................9

BUREAU OF LABOR STATISTICS, OCCUPATIONAL EMPLOYMENT AND WAGES, MAY 2015,
    http://www.bls.gov/oes/current/oes273022.htm .........................................................................7

Jonathan Randles, *Gawker Liquidation Plan Includes Legal Shield for Writers*, WALL STREET
    JOURNAL (Nov. 16, 2016), http://www.wsj.com/articles/gawker-liquidation-plan-
    includes-legal-shield-for-writers-1479333150 ..........................................................................5

The Society of Professional Journalists, the Reporters Committee for Freedom of the Press, and 19 other media organizations respectfully submit this *amicus* memorandum of law in support of the approval of the Amended Joint Chapter 11 Plan of Liquidation ("the Plan") for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. (collectively, "Gawker").

## PRELIMINARY STATEMENT

The liquidation plan in this proceeding contains third-party release and injunction provisions that serve fundamental First Amendment interests and avoid exposing individual journalists to unanticipated and inequitable personal liability. The Plan provides that, after the entry of a confirmation order, potential plaintiffs may not bring claims against Gawker's former reporters, editors, employees, and contractors arising out the content that Gawker published.[1] The Plan, in effect, creates an equivalent to the indemnification guarantee that was enshrined in these journalists' employment contracts or through Gawker's practices and policies. Journalists everywhere rely on such indemnification guarantees as a critical protection that allows them to engage in the sort of intrepid newsgathering and publishing that the First Amendment endorses.

*Amici* write to underscore that the third-party release and injunction provisions at issue here require more than a robotic application of the *Metromedia* test. In evaluating them, this Court should remain sensitive to the First Amendment and other policy values that they serve. An overwhelming body of First Amendment jurisprudence makes clear that the law strikes a balance in favor of providing "breathing space" for journalists to do their jobs, even when that may, at times, compromise potential claims against some journalists. The release and injunction here are crucial to preserve that breathing space. To eliminate them from the Plan would not just

---

[1] See sections 9.02 and 9.05 of the Plan.

1

harm the well-being of Gawker's former employees; it also would send a chilling message to journalists everywhere that, in the event of a media company's bankruptcy, what had heretofore been their employer's liabilities could suddenly become their own.

## **IDENTITY AND INTEREST OF *AMICI CURIAE***

*Amici* are representatives and members of the news media. They have a strong interest in ensuring that First Amendment interests and background principles of media law are considered and upheld in bankruptcy proceedings, like this one, that affect how the risk of legal liability is allocated between media companies, individual journalists, and unknown plaintiffs. *Amici* also are uniquely situated to explain the important practical considerations involved in the preservation of journalists' indemnification rights, as reflected in the Plan's third-party release and injunction provisions.

The 21 *amici* are: American Society of News Editors, Association of Alternative Newsmedia, The E.W. Scripps Company, First Look Media Works, Inc., Freedom of the Press Foundation, International Documentary Assn., Investigative Reporting Workshop at American University, The Media Consortium, MediaNews Group, MPA—The Association of Magazine Media, National Press Photographers Association, New England First Amendment Coalition, Online News Association, PEN America, Radio Television Digital News Association, The Reporters Committee for Freedom of the Press, Reporters Without Borders, The Seattle Times Company, Society of Professional Journalists, Tully Center for Free Speech, and Vox Media. Each is described more fully in Appendix A.[2]

---

[2] No part of this brief was authored by any party's counsel, and no person or entity other than *amici curiae* funded its preparation or submission.

2

**ARGUMENT**

I. **The First Amendment Provides Robust Protections Shielding Members of the Media from Defamation and Related Litigation.**

For more than five decades, courts have steadfastly recognized that the threat of litigation against the press, particularly libel litigation, poses serious First Amendment risks because it chills the ability of journalists to gather news and convey information to the public. This recognition emerged with the constitutionalization of libel law in *New York Times v. Sullivan*, 376 U.S. 254 (1964). There, the Supreme Court explained that libel lawsuits raise special constitutional concerns: unlike other, garden-variety tort actions, these suits against the media inherently implicate the First Amendment because they contravene the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270. Since *Sullivan*, a raft of media law jurisprudence has elaborated on that commitment. In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986), the Supreme Court explicitly recognized the chilling effect of private suits for damages against media defendants and held that, in order to mitigate that chilling effect, the First Amendment mandates that even some false journalism, theoretically actionable on the merits, be nevertheless protected. The rule that "[f]reedoms of expression require breathing space" is thus well enshrined in the law. *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988).

The law of this Circuit, like all circuits, reflects the national and constitutional commitment to the work that journalists do. "[T]he process of newsgathering is a protected right under the First Amendment . . . emanat[ing] from the strong public policy supporting the unfettered communication of information by the journalist to the public." *Von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987). Preserving this policy goal requires that courts—including bankruptcy courts—remain vigilant about obstacles that may get in its

way.  "At the heart of the First Amendment is the ineluctable relationship between the free flow of information and a self-governing people, and courts have not hesitated to remove the occasional boulders that obstruct this flow." *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1047 (2d Cir. 1979).  One such boulder, of course, is "the chilling effect that inexorably produces a silence of fear" when journalists face highly uncertain and potentially crippling personal liability.  *Id.* Because journalists and their employers frequently agree to indemnification arrangements precisely to mitigate this chilling effect, any court should tread carefully before vitiating the protections that indemnification provides.

## II.     In Both the Bankruptcy Context and Other Contexts, Courts Routinely Craft Special Safeguards for the Gathering and Publishing of News.

The principles summarized above, though springing from defamation lawsuits, extend to many other contexts, including bankruptcy proceedings.  In circumstances similar to those here, the U.S. Bankruptcy Court for the Eastern District of Pennsylvania upheld and enforced a third-party release and injunction contained in a media company's liquidation plan.  *In re Philadelphia Newspapers, LLC*, 450 B.R. 99 (Bankr. E.D. Pa. 2011).  The relevant provision, like the provision in the Gawker liquidation plan, enjoined plaintiffs from bringing post-confirmation lawsuits against the media company's reporters over articles that had been published prior to the bankruptcy.  *Id.* at 101, 104-05.  When two plaintiffs nonetheless sought to bring state-court defamation actions over pre-petition articles, the bankruptcy court enforced the Plan injunction, held that the claims were subject to the releases contained therein, and explained that the plaintiffs were without recourse against the debtor media company or its reporters.  *Id.* at 106.

Crucial to the result in *In re Philadelphia Newspapers* was the fact that the plaintiffs, though not receiving "actual notice" of the bankruptcy proceeding, had nevertheless "received sufficient notice of the bankruptcy case and deadlines relevant to their claims in order to act to

4

protect their interests," including through publication in the *Wall Street Journal* and other newspapers. *Id.* at 102-03. The situation here is precisely the same: any unknown plaintiffs who may have live claims against former Gawker employees undoubtedly have been on constructive notice of this bankruptcy proceeding and the opportunity to timely present their claims. The Gawker bankruptcy—and the proposed third-party release provisions—have been highly publicized, including in the *Wall Street Journal*,[3] and pursuant to this Court's order of November 4, 2016 (Dkt. No. 413), Gawker has published a formal Confirmation Hearing Notice in *USA Today* providing sufficient notice to persons not otherwise receiving notice by mail of the opportunity to raise objections.

Aside from *In re Philadelphia Newspapers*, the issue of third-party releases benefitting journalists does not arise frequently in published bankruptcy decisions. But bankruptcy courts have tailored their rulings in other ways to avoid colliding with First Amendment interests or other constitutional principles. *E.g.*, *In re Charles St. African Methodist Episcopal Church of Boston*, 478 B.R. 73, 87 (Bankr. D. Mass. 2012) (declining to decide whether entity was the trustee of a nominee trust because doing so would have implicated First Amendment considerations); *In re Dow Corning Corp.*, 227 B.R. 111, 113 (Bankr. E.D. Mich. 1998) (denying request to limit debtor's ability to publicize bankruptcy plan based in part on First Amendment concerns); *In re Bell & Beckwith*, 44 B.R. 661, 663 (Bankr. N.D. Ohio 1984) (recognizing First Amendment implications of request to prevent publication of customer information in course of bankruptcy proceeding).

---

[3] *See, e.g.*, Jonathan Randles, *Gawker Liquidation Plan Includes Legal Shield for Writers*, WALL STREET JOURNAL (Nov. 16, 2016), http://www.wsj.com/articles/gawker-liquidation-plan-includes-legal-shield-for-writers-1479333150.

5

Furthermore, looking beyond the bankruptcy context, courts routinely carve out special protections to allow appropriate "breathing space" for newsgathering and other protected First Amendment activity. For instance, in New York, as in many states, there is a general rule prohibiting the commercial use of a person's name or likeness without the person's permission—but courts recognize an exception for publishers engaged in the dissemination of the news. *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). There is a general rule requiring individuals to produce relevant information in civil discovery—but there is an exception for journalists who acquired such information in the course of newsgathering. *O'Neill v. Oakgrove Constr., Inc.*, 523 N.E.2d 277, 278 (N.Y. 1988). And in the antitrust context, courts recognize an exception to the general rule prohibiting anticompetitive conduct for conduct that constitutes First Amendment advocacy. *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965). As in these contexts, and as in *In re Philadelphia Newspapers*, third-party release and injunction provisions for members of the press raise special concerns and mandate special solicitude to the interests involved.

### III. Journalists' Claims Involving Indemnification Rights Against a Debtor Implicate Substantial First Amendment Interests Justifying a Third-Party Release.

Although premised on contract law, the indemnification rights that publishers typically accord their reporters and editors against libel claims implicate substantial First Amendment interests. Logically, journalists' claims as creditors of a publisher's bankruptcy estate implicate those very same interests. The policies advanced by the First Amendment—including freedom of speech, freedom of the press, and the public's interests in transparency and accountability—strongly support limited third-party release and injunction provisions, like the ones included in the Plan, that are provided as compensation for the discharge of journalists' indemnification rights against their publisher.

6

Both traditional and internet publishers typically indemnify their reporters and editors against claims arising from their journalism, including defamation claims. Such indemnification agreements are crucial to news reporting and publishing in the present age for the reason that few reporters and editors can individually afford to defend even a marginal defamation claim. This is a matter of simple economics. The median salary for a full-time reporter is $36,000.[4] Legal expenses for even the most minimal court proceedings—a motion to dismiss and appeal of dismissal—can amount to tens of thousands of dollars, if not more. Additional proceedings such as discovery, summary judgment, and trial can cause those expenses to balloon, sometimes into the millions when a plaintiff litigates aggressively.

As a practical matter, without the promise of indemnification, even the threat of a baseless libel action may suffice to kill a reporter's pursuit of a story or place an entire topic out of bounds, rendering the First Amendment's protection of the freedom of the press a dead letter in every way that counts. Few journalists could bear the risk of reporting on controversial matters, and the public would go uninformed on matters of intense and legitimate public interest, such as allegations of criminal conduct, government corruption, and corporate malfeasance. By providing indemnification, publishers facilitate the kind of newsgathering and investigation that is central not only to their own businesses, but also to the press's role as a watchdog and check on abuses by the powerful. *Amici* attest that indemnification agreements are often crucial to a reporter's initial decision to work for a media company.

Moreover, in practice, indemnification also facilitates the division of labor that publishing the news requires. Enterprise reporting often entails the collaboration of multiple reporters, editors, and production staff, each of whom contributes to the final published product.

---

[4] BUREAU OF LABOR STATISTICS, OCCUPATIONAL EMPLOYMENT AND WAGES, MAY 2015, http://www.bls.gov/oes/current/oes273022.htm.

Likewise, even for less demanding stories, the publisher (and not the reporter) is often responsible for packaging the article, which can include selecting the headline, adding media such as photographs and videos, and taking other steps that serve to frame or contextualize the reporting. In some instances, these kinds of decisions can create or heighten an alleged defamatory impact. Absent indemnification, collaboration of this sort would carry an added risk for reporters, who might face legal claims based, in whole or in part, on the publisher's decisions about production and framing in which the reporter was not involved.

While a publisher's business may fail, the other interests served by indemnification carry on. Journalists who have moved on to other publications still face the threat of retaliatory litigation by subjects of negative reporting published by their former employer. Indeed, such threats may be all the more potent when a publisher's bankruptcy cuts off its ability to fund a reporter's legal defense. The result may be, once again, to compromise the independence of the media, as well as the public's right to know.

These things are relevant here in two respects. First, they demonstrate the value of the indemnification claims held by the former employees of a bankrupt publisher. Those rights are not incidental terms of employment agreements, but central to the employment relationship, no less than salary, benefits, and other consideration. Second, the important First Amendment interests served by those indemnification rights weigh heavily in support of allowing a publisher's former employees to release their indemnification claims in exchange for the release of third-party claims based on the content they produced, thereby serving the very same interests.

The concerns that motivate publishers to indemnify their employers are especially acute in light of the current state of the media industry. Many traditional publishers are facing strained finances, and sometimes increased risk of bankruptcy, due to declining circulation, declining

8

advertising revenues, and increased competition by online and social media.[5] At the same time, online media are rapidly expanding into public accountability journalism but are often thinly capitalized, reflecting the lower start-up costs of online publishing. Online media are vibrant, but the other side of the coin is that many outlets are short-lived. The current reality is that the outlets for journalism are more financially tenuous than they were in the past, such that reporters are increasingly likely to hold indemnification claims against publishers in bankruptcy. Recognizing the value of such claims by allowing them to serve as consideration for third-party releases in bankruptcy proceedings is therefore crucial to ensuring the continued independence and vigor of the press.

**IV.     The Equities Strongly Support Protection of Journalists' and the Public's First Amendment Interests.**

Given that a bankruptcy court appropriately takes account of equitable considerations in evaluating a proposed liquidation plan, the equities here overwhelmingly support approval of the third-party release and injunction contained in the Plan for at least five reasons.

First, as described above, such releases serve the public interest as reflected in the First Amendment's protection of freedom of the press by facilitating an independent media and vigorous reporting on matters of public interest. They prevent the powerful from taking advantage of a bankruptcy and resulting lapse of an indemnification agreement to threaten reporters and influence their future reporting.

Second, such releases alleviate a potentially severe hardship for a publisher's former employees in the form of potential exposure to substantial legal fees and liability. Those risks are not ones that the employees expected to bear during their employment, because they had the

---

[5] *See, e.g.*, Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, PEW RESEARCH CENTER ON JOURNALISM & MEDIA (June 15, 2016), http://www.journalism.org/2016/06/15/state-of-the-news-media-2016/.

9

benefit of indemnification rights.  Providing alternative relief that continues that protection thereby places those employees—especially reporters—in a similar position to the one for which they bargained in good faith.

Third, it would be inequitable for former employees to bear the burden of defending defamation claims when, as described above, the defamatory impact may have been created or heightened by the publisher.

Fourth, the hardship to third parties is minimal or, more likely, non-existent.  The claims that would be released are ones based on publications that are months or years old—predating the shutdown of Gawker.com and sale of Gawker Media's other properties—but have not yet been aired in litigation or even a threat letter.  Even if there are any such claims, the delay at this point in prosecuting them, notwithstanding widespread reporting on this bankruptcy proceeding, suggests that they have little merit or value and that they will soon expire, anyway, due to the relatively brief limitations period for defamation claims.  *See* N.Y. C.P.L.R. § 215(3) (within one year of publication of the offending statement).  Moreover, even if some potential claimant has somehow not received notice of this proceeding, the Plan provides for publication of such notice in a fashion that satisfies due process requirements, giving them an opportunity to contest the Plan's approval or file a timely claim on the estate.  *See In re Philadelphia Newspapers, LLC*, 450 B.R. 99, 103 (Bankr. E.D. Pa. 2011).

Fifth, as a practical matter, any defamation actions brought against former Gawker employees after confirmation of the Plan are likely to be intended to harass or intimidate rather than to provide compensation for actual injury.  While Gawker had assets, reporters generally lack the deep pockets necessary to defend a defamation claim, much less to pay out a judgment

10

at the conclusion of litigation. With Gawker's assets dissipated, the only purpose of a threatened defamation action could be to harass or intimidate its former employees.

In sum, while it is extremely unlikely that the third-party release and injunction provisions would cut off any meritorious claims, they would further the public interest in uninhibited, robust, and wide-open debate and provide valuable security and peace of mind to Gawker's former employees and to journalists everywhere.

## CONCLUSION

For the foregoing reasons, the *amici* respectfully request that the Court approve the Plan with the third-party release and injunction provisions for the former writers, employees, and contractors of Gawker.

December 5, 2016                                      Respectfully submitted,

                                                      BAKER & HOSTETLER LLP

                                                      /s/ *Mark I. Bailen*
                                                      Bruce W. Sanford
                                                      Mark I. Bailen
                                                      Christopher J. Giaimo
                                                      Washington Square, Suite 1100
                                                      1050 Connecticut Avenue, N.W.
                                                      Washington, DC 20036-5304
                                                      *mbailen@bakerlaw.com*
                                                      Phone: (202) 861-1500
                                                      Fax: (202) 861-1783

                                                      *Counsel for Amici Curiae*

**APPENDIX A**

Description of *Amici*:

 The Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

 The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

 With some 500 members, American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

 Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

 The E.W. Scripps Company serves audiences and businesses through television, radio and digital media brands, with 33 television stations in 24 markets. Scripps also owns 34 radio stations in eight markets, as well as local and national digital journalism and information businesses, including mobile video news service Newsy and weather app developer WeatherSphere. Scripps owns and operates an award-winning investigative reporting newsroom in Washington, D.C. and serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

 First Look Media Works, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

 Freedom of the Press Foundation is a non-profit organization that supports and defends public-interest journalism focused on transparency and accountability. The organization works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including public advocacy, legal advocacy, the promotion of digital security tools, and crowd-funding.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Investigative Reporting Workshop, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

The Media Consortium is a network of the country's leading, progressive, independent media outlets. Our mission is to amplify independent media's voice, increase our collective clout, leverage our current audience and reach new ones.

MediaNews Group's more than 800 multi-platform products reach 61 million Americans each month across 18 states.

MPA—The Association of Magazine Media, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

New England First Amendment Coalition is a non-profit organization working in the six New England states to defend, promote and expand public access to government and the work it does. The coalition is a broad-based organization of people who believe in the power of transparency in a democratic society. Its members include lawyers, journalists, historians and academicians, as well as private citizens and organizations whose core beliefs include the principles of the First Amendment. The coalition aspires to advance and protect the five freedoms of the First Amendment, and the principle of the public's right to know in our region. In collaboration with other like-minded advocacy organizations, NEFAC also seeks to advance understanding of the First Amendment across the nation and freedom of speech and press issues around the world.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the

public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

PEN America stands at the intersection of literature and human rights to protect open expression at home and abroad. Our mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible. PEN America has over 4,400 members, a nationwide community of novelists, journalists, editors, poets, essayists, playwrights, publishers, translators, agents, and other professionals, and an even larger network of devoted readers and supporters.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Reporters Without Borders has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

Vox Media owns several web sites, including Vox, The Verge, SB Nation, and Recode, with 170 million unique monthly visitors.