ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
Gawker Media LLC, *et al.*,[1]            :    Case No. 16-11700 (SMB)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
-------------------------------------------------------x

**DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION**
**OF DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR**
**GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER**
**HUNGARY KFT. AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO**

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ............................................................................................... 3

I.    Relevant History ........................................................................................ 3

      A.    Case Background ............................................................................. 3

      B.    The Plan .......................................................................................... 3

      C.    The Plan Settlements....................................................................... 5

II.   Voting Status............................................................................................... 5

ARGUMENT ..................................................................................................... 6

III.  The Plan Satisfies Each Requirement for Confirmation.......................... 7

      A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code
            (11 U.S.C. § 1129(a)(1)). ............................................................... 7

            i.     The Plan Satisfies the Classification Requirements of 11 U.S.C.
                   § 1122.................................................................................... 8

            ii.    The Plan Satisfies the Seven Mandatory Plan Requirements of 11
                   U.S.C. §§ 1123 (a)(1)-(a)(7). .............................................. 11

            iii.   The Plan Satisfies the Discretionary Plan Requirements of 11 U.S.C.
                   § 1123 (b)............................................................................. 12

            iv.    The Plan Settlements Are Fair and Equitable and Should Be
                   Approved............................................................................... 14

                   a.    The Standard for Approval of Settlements ............................ 15

                   b.    The Plan Settlements Satisfy the Requirements of Bankruptcy
                         Rule 9019 ...................................................................... 16

            v.     The Plan Injunctions, Exculpation and Releases Are Permissible and
                   Should Be Approved............................................................. 18

                   a.    The Claims Injunction In Section 9.01 Of The Plan Is
                         Permissible and Should Be Approved ................................... 18

                   b.    The Plan Interference Injunction In Section 9.02 Of The Plan Is
                         Permissible and Should Be Approved ................................... 18

                   c.    The Debtor Release Provisions In Section 9.03 Of The Plan Are
                         Permissible and Should Be Approved. .................................. 19

                   d.    The Exculpation Provisions In Section 9.04 Of The Plan Are
                         Permissible and Should Be Approved .................................. 22

                   e.    The Third-Party Releases In Section 9.05 Of The Plan Are
                         Permissible and Should Be Approved .................................. 24

      B.    The Debtors Have Complied with the Applicable Provisions of the
            Bankruptcy Code (11 U.S.C. § 1129(a)(2))........................................ 26

C.   The Plan Was Proposed in Good Faith and Not by any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)). ........................................................................... 27

D.   The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)). ............................................................... 29

E.   The Debtors Have Properly Disclosed Post-Emergence Directors and Officers and Their Appointment Is Consistent with Public Policy (11 U.S.C. § 1129(a)(5)). ......................................................................................... 29

F.   The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)). ............................................................... 30

G.   The Plan Is in the Best Interests of Creditors and Holders of Equity Interests (11 U.S.C. § 1129(a)(7)). ............................................................................. 30

H.   Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)). ............................ 33

I.   The Plan Complies with Statutorily-Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)). .................................................. 34

J.   The Plan Was Accepted by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)). .......................................................................................... 35

K.   The Plan Is Feasible (11 U.S.C. § 1129(a)(11)). .......................................... 35

L.   The Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)). ............................................................................. 37

M.   The Plan Does Not Need to Provide for the Payment of Retiree Benefits (11 U.S.C. § 1129(a)(13)). ............................................................................. 37

N.   The Plan Satisfies the Remainder of 11 U.S.C. § 1129(a). ............................. 37

O.   The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b). ......... 38

      i.   The Plan Does Not Discriminate Unfairly. ........................................... 38

      ii.   The Plan Is Fair and Equitable. ......................................................... 39

P.   The Principal Purpose of the Plan Is Not Avoidance of Taxes (11 U.S.C. § 1129(d)). .................................................................................................. 41

IV.   The Objections to Confirmation of the Plan Should Be Overruled. ................................. 41

A.   Objection of Charles C. Johnson and Got News LLC ............................................. 42

B.   Limited Objection of Albert James Daulerio ....................................................... 42

C.   Objection of Mitchell Williams ....................................................................... 42

D.   Objection of XP Vehicles ............................................................................... 43

CONCLUSION ...................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct. (In re Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996)..................................................................................8

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*,
   156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .........................16

*Bank of America Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)..........................................................................................38

*Clain v. International Steel Gp.*,
   156 Fed. Appx. 398 (2d Cir. 2005).......................................................................25

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
   699 F.2d 599 (2d Cir. 1983)...........................................................................16, 20

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
   416 F.3d 136 (2d Cir. 2005)................................................................................25

*Heartland FeD. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
   994 F.2d 1160 (5th Cir. 1993) ..............................................................................7

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................40

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ................... passim

*In re Advance Watch Co. Ltd.*,
   No. 15-12690 (MG), 2016 WL 323367 (Bankr. S.D.N.Y. Jan. 25, 2016) .............................36

*In re AMR Corp.*,
   No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) ...........................................19

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...........................................................39

*In re Bally Total Fitness of Greater N.Y., Inc.*,
   No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)........................... passim

*In re Bloomingdale Partners*,
   170 B.R. 984 (Bankr. N.D. Ill. 1994) ...................................................................9

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) ..................................................................39

*In re Calpine Corp.*,
   No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) ..............................................11, 22

*In re Cellular Info. Sys., Inc.*,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994) ............................................................27, 36

*In re Charter Commc'ns.*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................11, 19

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ..................................................................31

*In re DBSD North America, Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009) ..................................................................22

*In re DJK Residential LLC*,
   No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008) ................................................22, 23

*In re Dreier LLP*,
   429 B.R. 112 (2010) ........................................................................................24, 25

*In re Drexel Burnham Lambert Group, Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................7, 8, 31, 36

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2d Cir. 1992) ........................................................................19, 25, 34

*In re Elsinore Shore Assocs.*,
   91 B.R. 238 (Bankr. D.N.J. 1988) ........................................................................29

*In re Enron Corp.*,
   No. 02 Civ. 8489 (AKH), 2003 WL 230838 (S.D.N.Y. Jan. 31, 2003) ...........16, 20

*In re EUSA Liquidation Inc.*,
   No. 09-15008 (SMB), 2010 WL 4916559 (Bankr. S.D.N.Y. June 10, 2010) ........36

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................................................39

*In re Gaston & Snow*,
   Nos. 93-8517 (JGK), 93 Civ. 8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 04,
   1996) ....................................................................................................................27

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (2014) ..............................................................................................25

59689083_13

*In re Gilbertson Rests. LLC*,
  No. 04-003845, 2005 WL 783063 (Bankr. N.D. Iowa Apr. 4, 2005)......................................27

*In re Global Aviation Holdings Inc.*,
  Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. Dec. 11, 2012) ..................................................22

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...................................................................................27

*In re Hawker Beechcraft, Inc.*,
  Case No. 12-11873 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2014) ..................................................22

*In re Ionosphere Clubs, Inc.*,
  184 B.R. 648 (S.D.N.Y. 1995).................................................................................................25

*In re Jartran, Inc.*,
  44 B.R. 331 (Bankr. N.D. Ill. 1984) ......................................................................................31

*In re Karta Corp.*,
  342 B.R. 45 (S.D.N.Y. 2006)...................................................................................................25

*In re Motors Liquidation Co.*,
  447 B.R. 198 (Bankr. S.D.N.Y. 2011) ...................................................................................25

*In re Movie Gallery*,
  Case No. 07-33849 (Bankr. E.D. VA. Apr. 10, 2008)............................................................22

*In re Mrs. Weinberg's Kosher Foods, Inc.*,
  278 B.R. 358 (Bankr. S.D.N.Y. 2002) ...................................................................................26

*In re Neff Corp.*,
  Case No. 10-12610 (Bankr. S.D.N.Y. Sept. 21, 2010) ..........................................................22

*In re NII Holdings*,
  536 B.R. 61 (Bankr. S.D.N.Y. 2015).......................................................................................16

*In re One Times Square Assocs. Ltd. P'ship*,
  159 B.R. 695 (Bankr. S.D.N.Y. 1993).....................................................................................36

*In re Oneida Ltd.*,
  351 B.R. 79 (Bankr. S.D.N.Y. 2006) ...............................................................................19, 23

*In re Purofied Down Prods. Corp.*,
  150 B.R. ...........................................................................................................................15, 20

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)..............................................................................................22, 23

*In re Residential Capital, LLC*,
  Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) .................................................22

*In re Source Enters., Inc.*,
  No. 06-11707 (AJG), 2007 WL 2903954 (Bankr. S.D.N.Y. Oct. 1, 2007) ...........................27

*In re Stolrow's, Inc.*,
  84 B.R. 167 (B.A.P. 9th Cir. 1988)......................................................................................28

*In re Texaco, Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...................................................................................27

*In re Tower Auto., Inc.*,
  No. 05-10578 (Bankr. S.D.N.Y. July 9, 2007) .....................................................................22

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..............................................................................26, 27

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ......................................................................................9

*In re Victory Constr. Co.*,
  42 B.R. 145 (Bankr. C.D. Cal. 1984).....................................................................................31

*In re Wabash Valley Power Ass'n, Inc.*,
  72 F.3d 1305 (7th Cir. 1996) ..................................................................................................8

*In re WorldCom, Inc.*,
  No. 02-13533(AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ..........8, 22, 23, 39

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ......................................................................................38

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993)..................................................................................................38

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  843 F.2d 636 (2d Cir. 1988)..................................................................................7, 26, 27, 36

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*,
  115 F.3d 650 (9th Cir. 1997) ................................................................................................38

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007)..................................................................................................15

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)..................................................................................................16

*Upstream Energy Servs v. Enron Corp. (In re Enron Corp.)*,
  326 B.R. 497 (S.D.N.Y. 2005) .......................................................................................22

*Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Turnham Lambert Group, Inc.)*,
  134 B.R. 499 (Bankr. S.D.N.Y. 1991) ...........................................................................15

**STATUTES**

11 U.S.C. § 101(31) ...........................................................................................................30

11 U.S.C. § 1122 .....................................................................................................7, 8, 11

11 U.S.C. § 1123(a)(1) ......................................................................................................11

11 U.S.C. § 1123(a)(2) ......................................................................................................11

11 U.S.C. § 1123(a)(3) ......................................................................................................11

11 U.S.C. § 1123(a)(4) ......................................................................................................11

11 U.S.C. § 1123(a)(5) ......................................................................................................12

11 U.S.C. § 1123(a)(6) ......................................................................................................12

11 U.S.C. § 1123(a)(7) ......................................................................................................12

11 U.S.C. § 1123(b)(1) ......................................................................................................12

11 U.S.C. § 1123(b) (2) .....................................................................................................12

11 U.S.C. § 1123(b)(3) ................................................................................................. passim

11 U.S.C. § 1123(b)(4) ......................................................................................................13

11 U.S.C. § 1123(b)(5) ......................................................................................................13

11 U.S.C. § 1123(b) (6) .....................................................................................................13

11 U.S.C. § 1126(g) .....................................................................................................34, 38

11 U.S.C. § 1129(a)(1) .....................................................................................................7, 8

11 U.S.C. § 1129(a)(2) ......................................................................................................26

11 U.S.C. § 1129(a)(3) .................................................................................................27, 28

11 U.S.C. § 1129(a)(4) ......................................................................................................29

59689083_13

11 U.S.C. § 1129(a)(5)................................................................................................29, 30

11 U.S.C. § 1129(a)(6)......................................................................................................30

11 U.S.C. § 1129(a)(7)...............................................................................10, 30, 31, 33

11 U.S.C. § 1129(a)(8)................................................................................33, 35, 38

11 U.S.C. § 1129(a)(9)..............................................................................................34, 35

11 U.S.C. § 1129(a)(11)............................................................................................35, 36

11 U.S.C. § 1129(a)(12)....................................................................................................37

11 U.S.C. § 1129(a)(13)....................................................................................................37

11 U.S.C. § 1129(b)(1) ................................................................................................38, 39

11 U.S.C. § 1129(b)(2) ................................................................................................39, 40

11 U.S.C. § 1129(d) ..........................................................................................................41

28 U.S.C. § 1930................................................................................................................37

31 U.S.C. § 3717................................................................................................................37

## OTHER AUTHORITIES

Fed. R. Bankr. P. 9019 ................................................................................. passim

H.R. Rep. No. 595, 95th...................................................................................................8

H.R. Rep. No. 95-595 (1977)...........................................................................................26

S. Rep. No. 95-989 (1978) ...............................................................................................26

S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) ........................................................34

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ........................................................8

Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary Kft., (f/k/a Kinja Kft., "Gawker Hungary"), as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Bankruptcy Cases") submit this memorandum of law in support of confirmation ("Confirmation") of the Debtors' *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 427] (as further modified, amended or supplemented from time to time, the "Plan"),[3] pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      These Bankruptcy Cases began as a result of a $130 million Florida state court judgment in favor of Mr. Terry Gene Bollea against one of the three Debtors, Gawker Media. Despite obstacles and the continuing threat of further litigation, the Debtors conducted a successful auction process for substantially all of their assets, which led to competitive bidding by two interested bidders and yielded $135 million in gross proceeds – a 50% increase in price at the auction.

2.      The Plan is the result of extensive efforts by the Debtors after that sale to bring these cases to a consensual resolution and provides the means for allocating the sale proceeds (the "Unimoda Sale Proceeds") and the Debtors' other remaining assets and liabilities among the three Debtor estates, as well as a resolution of other inter-Debtor and third party disputes, all in order to facilitate efficient distributions to stakeholders. It is the product of both the Debtors' analysis of intercompany claims and issues, and good-faith, arm's-length negotiations between

---

[3]    Capitalized terms used and not defined herein have the meanings ascribed to them in the Plan and the associated Disclosure Statement (as defined herein), as applicable.

the Debtors and their key stakeholders in the Bankruptcy Cases, including the Committee, unsecured litigation creditors Mr. Bollea, Dr. Shiva Ayyadurai, and Ms. Ashley Terrill, the Second Lien Lender, and major holders of the Debtors' Equity Interests. Those negotiations ultimately led to the global resolutions embodied in the Plan which enjoy widespread stakeholder support. These Bankruptcy Cases, which began in a myriad of litigation, now have 100% of votes cast to accept the Plan. As a result, the Plan was accepted unanimously by every class entitled to vote.

3.      The Plan incorporates three separate plans of liquidation that distribute assets to each Debtor's creditors and interest holders. Taken together, the Plan provides for the payment in full to holders of all Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims, and Allowed Gawker Hungary General Unsecured Claims. As described further below, the Plan also provides that unsecured creditors of Gawker Media will have first recourse to a total of at least $6.5 million of Cash plus certain contingent proceeds (collectively, the "Gawker Media Available Assets"), which the Debtors believe will also provide for payment in full, excluding Post-Petition Interest, of the Allowed Gawker Media General Unsecured Claims (and Punitive Damage Claims, if any).[4]   Moreover, the Plan provides for a substantial recovery to the holder of the Disputed Second Lien Make-Whole Claims against GMGI, Gawker Media, and Gawker Hungary, and to the holders of Preferred Equity Interests in GMGI.

4.      In light of the widespread support of the Plan, and because the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, and all other applicable law, the Debtors respectfully submit that the Plan should be confirmed.

---

[4]      Confirmation in accordance with section 1129 of the Bankruptcy Code is not, however, dependent on there being such payment in full because of the settlements in the Plan, the structure of the Plan and the vote of the unsecured classes at Gawker Media.

59689083_13

## BACKGROUND

I.    **Relevant History**

    A.    **Case Background**[5]

5.    On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the filing date in respect of each Debtor, the "Petition Date").  The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    No request for the appointment of a trustee or examiner has been made in the Bankruptcy Cases.  On June 24, 2016, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 62] (the "Committee").

    B.    **The Plan**

7.    On September 30, 2016, the Debtors filed the *Debtors' Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "Original Disclosure Statement") [Docket No. 308], which included as Exhibit A thereto, the Debtors' Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. (the "Original Plan"). That Original Plan formed the basis of continued negotiations with the Committee, various creditors and major equity holders.

8.    On November 2, 2016, as a result of those continued negotiations, the Debtors filed an amended version of the Original Disclosure Statement [Docket No. 403] (the

---

[5]    A more detailed description of the events leading up to the Bankruptcy Cases and the proposal of the Plan is available in the Disclosure Statement.

59689083_13

"Disclosure Statement"), which included an amended version of the Original Plan. The Disclosure Statement and the amended version of the Original Plan each reflected, among other changes, revisions related to effectuating a settlement of the claims relating to the Bollea Judgment and the settlement of certain other litigation claims.

9.    On November 4, 2016, the Court entered an *Order Approving (I) The Adequacy Of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary KFT., (III) the Form of Ballots and Notices in Connection Therewith, and (D) the Scheduling of Certain Dates with Respect Thereto* [Docket No. 413] (the "Disclosure Statement Order"), approving the Disclosure Statement. Shortly thereafter, the Debtors began solicitation of acceptances of the Plan. On November 8, 2016, the Debtors filed the solicitation versions of the Plan and Disclosure Statement [Docket No. 427].

10.    On November 30, 2016, the Debtors filed the *Plan Supplement Pursuant to the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 516] (the "Plan Supplement").

11.    The deadline for all holders of Claims or Equity Interests entitled to vote on the Plan to submit their Ballots was December 5, 2016 at 5:00 p.m. (New York Time) (the "Voting Deadline"), and the deadline to file objections to the Plan was December 5, 2016 at 4:00 p.m. (New York Time). The hearing on Confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on December 13, 2016 at 10:00 a.m. (New York Time). Only two timely objections to Confirmation (the "Confirmation Objections") remain unresolved, neither of which prevent the Court from confirming the Plan.[6]

---

[6]    Attached as **Exhibit A** hereto is a table listing the Confirmation Objections with brief responses detailing why the Debtors believe such objections should be overruled.

C.      **The Plan Settlements**

12.     The Plan incorporates five interrelated and interdependent settlements (the "Plan Settlements") resolving various inter-Debtor and third party claims (collectively, the "Settled Claims") that fall into three broad categories: the inter-Debtor allocation and intercompany claims disputes, the Second Lien Lender make-whole dispute, and disputes with three litigation creditors. A more thorough description of the Settled Claims and a discussion of the Plan Settlements is set forth in Article VII of the Disclosure Statement.

II.    **Voting Status**

13.     Consistent with Local Bankruptcy Rule 3018-1(a), on December 6, 2016, the Court-appointed Notice and Claims Agent, Prime Clerk LLC (the "Notice and Claims Agent"), filed the voting certifications and reports (the "Voting Certification").[7]  As set forth in greater detail in the Voting Certification, all Entities entitled to vote on the Plan voted to accept the Plan, and as a result, all classes of Claims and Equity Interests entitled to vote on the Plan voted to accept the Plan:

| Class | Ballots Voting to Accept | | Result |
|---|---|---|---|
| | % Amount | % Number | |
| Class 1A – Second Lien Make-Whole Claim | 100% | 100% | ACCEPTS |
| Class 1C – General Unsecured Claims | 100% | 100% | ACCEPTS |
| Class 1D – General Unsecured Convenience Claims | 100% | 100% | ACCEPTS |
| Class 1E (ii) – Gawker Media Intercompany Claims | Deemed to Vote to Accept the Plan | | ACCEPTS |
| Class 1F – Preferred Equity Interests | 100% | 100% | ACCEPTS |

| Class | Ballots Voting to Accept | | Result |
|---|---|---|---|
| | % Amount | % Number | |
| Class 2A – Second Lien Make-Whole Guaranty Claim | 100% | 100% | ACCEPTS |
| Class 2C – General Unsecured Claims | 100% | 100% | ACCEPTS |
| Class 2D – Punitive Damages Claims | 100% | 100% | ACCEPTS |
| Class 2E – General Unsecured Convenience Claims | 100% | 100% | ACCEPTS |

---

[7]     *See* Voting Certification [Docket No. 563].

59689083_13

| Class | Ballots Voting to Accept | | Result |
|---|---|---|---|
| | % Amount | % Number | |
| Class 2F (i) – Gawker Media Intercompany Claims | Deemed to Vote to Accept the Plan | | ACCEPTS |
| Class 2G – Membership Equity Interest | Deemed to Vote to Accept the Plan | | ACCEPTS |

| Class | Ballots Voting to Accept | | Result |
|---|---|---|---|
| | % Amount | % Number | |
| Class 3A – Second Lien Make-Whole Claim | 100% | 100% | ACCEPTS |
| Class 3D (ii) – Gawker Media Intercompany Claims | Deemed to Vote to Accept the Plan | | ACCEPTS |
| Class 3E – Membership Equity Interest | Deemed to Vote to Accept the Plan | | ACCEPTS |

14.     The following Classes of Claims are Unimpaired under the terms of the Plan and, therefore, were not entitled to vote and are presumed to have accepted the Plan: Class 1B: GMGI – Other Priority Claims; Class 2B: Gawker Media – Other Priority Claims; Class 3B: Gawker Hungary – Other Priority Claims; and Class 3C: Gawker Hungary – General Unsecured Claims.

15.     The following Classes of Claims and Equity Interests are deemed to have rejected the Plan: GMGI – Gawker Hungary Intercompany Claims; GMGI – Common Equity Interests; Gawker Media – GMGI Intercompany Claims; and Gawker Hungary – GMGI Intercompany Claims.

16.     As a result of (and as part of) the Plan Settlements, the Committee, the Second Lien Lender, and certain unsecured creditors support the Plan (collectively, the "Supporting Parties").   In total, over 170 creditors and interest holders voted to accept the Plan, while no Entities voted to reject the Plan.

**ARGUMENT**

17.     The argument portion of this Memorandum is divided into two parts.   In Section III, the Debtors explain why the Plan satisfies the legal requirements for Confirmation.   In Section IV, the Debtors explain why filed objections to Confirmation should be overruled.   In **Exhibit A** hereto, the Debtors include two tables addressing additional submissions received

-6-

relating to Confirmation. The first table summarizes the Debtors' responses to two Confirmation objections that have not yet been resolved. The second table summarizes Confirmation objections that the Debtors have resolved and other statements in support of Confirmation and reservations of rights that do not oppose Confirmation. The facts relevant to Confirmation of the Plan and approval of the Plan Settlements are set forth in the Disclosure Statement and the Plan, all of which are incorporated herein by reference, plus any evidence and testimony to be adduced at the Confirmation Hearing.

**III.    The Plan Satisfies Each Requirement for Confirmation.**

18.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[8] The Debtors respectfully submit that the Plan complies with all relevant sections of the Bankruptcy Code, including sections 1122, 1123, 1125, 1126, and 1129 thereof, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York, and applicable non-bankruptcy law.

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

19.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code, including the rules governing classification of claims and interests.[9] To determine whether the Plan complies with section

---

[8]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown") (footnote omitted).

[9]    *See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this

---

-7-

1129(a)(1) of the Bankruptcy Code, the Court must ensure that the requirements of sections 1122

and 1123 of the Bankruptcy Code are met.

> **i.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122.**

20.    Section 1122 of the Bankruptcy Code provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.[10]

21.    Courts have repeatedly stated that "[a] debtor in bankruptcy has considerable

discretion to classify claims and interests in a chapter 11 reorganization plan."[11]    In *Wabash*

*Valley Power*, the court identified at least three circumstances in which separate classification is

permissible: (a) where "'significant disparities exist between the legal rights of the holder[s of

the different claims] which render the two claims not substantially similar'" (indeed, such claims

are required to be separately classified); (b) where "there are 'good business reasons' to do so";

and (c) where "the claimants have sufficiently different interests in the plan."[12]

22.    Indeed, "[s]eparate classification of similar claims is permissible only upon proof

of a legitimate reason for separate classification."[13]    A lack of similarity can be demonstrated by

---

provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan") (citations omitted); *see also* S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977).

[10]    11 U.S.C. § 1122.

[11]    *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1996) (subsequent history omitted) (citing *In re Woodbrook Assocs.*, 19 F.3d 312 (7th Cir. 1994)); *accord Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct. (In re Chateaugay Corp.)*, 89 F.3d 942, 949-50 (2d Cir. 1996); *In re Drexel Burnham Lambert Grp.*, 138 at 757.

[12]    *Wabash Valley Power*, 72 F.3d at 1321 (alterations in original; citations omitted).

[13]    *Bos. Post Rd. Ltd. P'ship. v. FDIC (In re Bos. Post Rd.)*, 21 F.3d 477, 481 (2d Cir. 1994); *see also In re WorldCom, Inc.*, No. 02-13533(AJG), 2003 WL 23861928, at *47 (Bankr. S.D.N.Y. Oct. 31, 2003) ("A debtor

differences in "legal rights or bankruptcy priorities," as well as "business reasons relevant to the success of the reorganized debtor."[14]

23.    As a threshold matter, all holders of Claims and Equity Interests entitled to vote elected unanimously to accept the plan so any change to the Debtors' classification scheme would still yield the same result: all classes entitled to vote would still have voted to accept the Plan under any alternative classification.    Nevertheless, the Plan also meets the statutory classification requirements.

24.    In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are not required to be classified, the Plan designates 22 further Classes of Claims and Equity Interests.    The Plan has a non-consolidated structure, respecting the corporate separateness of each of the Debtors.    Thus, classification of Claims and Equity Interests must be analyzed on a debtor-by-debtor basis.    This Plan is a plan for each of the Debtors and must be confirmed as to each of them.[15]

25.    The Classes of Claims against and Interests in the Debtors under the Plan are as follows:

| GMGI Classes | | Gawker Media Classes | | Gawker Hungary Classes | |
|---|---|---|---|---|---|
| 1A | Second Lien Make-Whole Claim | 2A | Second Lien Make-Whole Guaranty Claim | 3A | Second Lien Make-Whole Guaranty Claim |
| 1B | Other Priority Claims | 2B | Other Priority Claims | 3B | Other Priority Claims |
| 1C | General Unsecured Claims | 2C | General Unsecured Claims | 3C | General Unsecured Claims |
| 1D | General Unsecured Convenience Claims | 2D | Punitive Damage Claims | 3D(i) | GMGI Intercompany Claims |
| 1E(i) | Gawker Hungary Intercompany Claims | 2E | General Unsecured Convenience Claims | 3D(ii) | Gawker Media Intercompany Claims |
| 1E(ii) | Gawker Media Intercompany Claims | 2F(i) | Gawker Hungary Intercompany Claims | 3E | Membership Interest |

---

need not place all substantially similar claims in the same class as long as the debtor has a reasonable basis for the separate classification.").

[14]    *In re Bloomingdale Partners*, 170 B.R. 984, 997 (Bankr. N.D. Ill. 1994) ("As an example, it might be vital to a debtor to be able to treat customers' warranty claims differently than trade creditor claims, even though they are all general unsecured claims.").

[15]    *See In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) (holding that section 1129(a)(10) of the Bankruptcy Code "must be satisfied by each debtor in a joint plan")

-9-

| GMGI Classes | | Gawker Media Classes | | Gawker Hungary Classes |
|---|---|---|---|---|
| 1F | Preferred Equity Interests | 2F(ii) | GMGI Intercompany Claims | |
| 1G | Common Equity Interests | 2G | Membership Interest | |

26.    For each of the Debtors, the Plan separates (i) Claims from Equity Interests, (ii) Priority Claims from General Unsecured Claims, (iii) General Unsecured Claims from Intercompany Claims, and (iv) the Second Lien Make-Whole Claims from both the General Unsecured Claims and the Intercompany Claims.    More particularly, pursuant to the Intercompany Settlement and due to the unique and different rights and potential litigation claims of each of the Debtors, the Intercompany Claims of each Debtor held against the other two Debtors have been separately classified.    Similarly, Gawker Media separately classified Punitive Damage Claims, on the basis that such claims would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code and could therefore lead to a different "best interest" analysis under section 1129(a)(7)(A)(ii) of the Bankruptcy Code.    Additionally, GMGI separately classified preferred and common Equity Interests based upon the liquidation preference to which the preferred Equity Interests are entitled under GMGI's organizational documents.

27.    Finally, in light of the significant number of contingent and unliquidated litigation claims filed against the Debtors, and the anticipated costs of resolving such claims, the Debtors created a General Unsecured Convenience Claim Class at each of GMGI and Gawker Media, as an elective option to holders of Claims who voted in favor of the Plan.    The Debtors did not classify any creditors as members of this class.    Instead, holders of GMGI General Unsecured Claims, Gawker Media General Unsecured Claims, and Gawker Media Punitive Damage Claims had the option to elect to be a member of this Class and receive the treatment provided for such Class in the Plan.    Six holders of claims elected to receive such treatment.

-10-

28. This classification scheme was not designed with an eye toward fashioning (nor, given the overwhelming and across-the-board acceptance, did it create) a single impaired accepting class. Rather, it is the variance in the nature of the Claims or Equity Interests in such Classes that required separate classification. The classification scheme set forth in the Plan also allows each Class of Impaired creditors and equity holders, receiving distributions, the opportunity to cast meaningful votes on the Debtors' Plan, satisfying the basic purposes of classification under section 1122 of the Bankruptcy Code.

29. As the titles of the Classes suggest, these Classes of Claims and Equity Interests are different and the Debtors have valid business, factual, and legal reasons for separately classifying the various Classes of Claims and Equity Interests created under the Plan.[16] Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### ii. The Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123 (a)(1)-(a)(7).

30. Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of a plan of reorganization.[17] The Plan meets the seven mandatory requirements of section 1123(a) because:

- As required by section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates classes of claims and interests;

- As required by section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan identifies unimpaired classes of claims and interests;

- As required by section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies treatment of impaired classes of claims and interests;

---

[16] *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 264 (Bankr. S.D.N.Y. Nov. 17, 2009) (finding that the plan's separate classification was "appropriate given the disparate legal rights and payment expectations" of noteholders and general unsecured creditors); *In re Calpine Corp.*, No. 05–60200 (BRL), 2007 WL 4565223, at *7 (Bankr. S.D.N.Y. Dec. 19, 2007) (finding that "[v]alid business, factual and legal reasons" justified separate classification of various claims and interests); *Bally Total Fitness*, 2007 WL 2779438, at *3 (same).

[17] *See* 11 U.S.C. § 1123(a)(1)–(7).

- As required by section 1123(a)(4) of the Bankruptcy Code, Article 3 of the Plan provides the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

- As required by section 1123(a)(5) of the Bankruptcy Code, the Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation: (i) the consummation of the transactions contemplated under Article 3 of the Plan and those occurring on the Effective Date, the Gawker Media Claims Reserve Distribution Date, and the Gawker Media Contingent Proceeds Distribution Date (collectively, the "Plan Transactions"); (ii) the cancellation of certain existing agreements, obligations, instruments, and Equity Interests; (iii) the vesting of all property of the estate of each Debtor not otherwise distributed or released on the Effective Date in that Debtor for the benefit of the holders of Claims against and Equity Interests in that Debtor consistent with the treatments set forth in Article 3 of the Plan; and (iv) the appointment of the Plan Administrator and, granting to the Plan Administrator the duties, powers, and rights set forth in sections 4.08-4.10 of the Plan and § 1 of the Plan Administrator Agreement; and (v) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan;

- Section 1123(a)(6) is inapplicable as the Plan Transactions contemplate only liquidation of each of the Debtors and do not provide for issuance of equity securities by any of the Debtors or for any voting rights for holders of Equity Interests; and

- As required by section 1123(a)(7) of the Bankruptcy Code, the Plan Administrator, Opportune LLP, that will manage the Debtors after the Effective Date has been disclosed in the Plan Supplement, which is consistent with the interest of the creditors and public policy, and pursuant to section 4.07 of the Plan, upon the Effective Date, any of the Debtors' remaining officers and members of their boards of directors shall be deemed to have resigned, if they have not already done so, without the necessity of any further action or writing.

31.    In light of the foregoing, the Debtors respectfully submit that the Plan satisfies

section 1123(a) of the Bankruptcy Code.

### iii.    The Plan Satisfies the Discretionary Plan Requirements of 11 U.S.C. § 1123 (b).

32.    Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization, but are not required.  For example, a

plan may impair or leave unimpaired any class of claims or interests and provide for the

-12-

assumption or rejection of executory contracts and unexpired leases. 11 U.S.C. § 1123(b)(1),

(2). A plan also may provide for: (a) the settlement or adjustment of any claim or interest

belonging to the debtor or to the estate; (b) the retention and enforcement by the debtor, by the

trustee, or by a representative of the estate appointed for such purpose, of any such claim or

interest; or (c) the sale of all or substantially all of the property of the estate, and the distribution

of the proceeds of such sale among holders of claims or interests.[18] Finally, a plan may "modify

the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights

of holders of any class of claims" and may "include any other appropriate provision not

inconsistent with the applicable provisions of [Title 11]."[19]

- The Plan provides for the rejection of executory contracts or unexpired leases to which the Debtors are parties, with the exception of insurance policies and the Intercompany Services Agreements necessary to preserve the Gawker.com Assets.[20]

- As discussed in subsection iv below, the Plan is a settlement and compromise of the claims and interests of various parties based upon the relationship and transactions among such parties and the Debtors.

- The Plan provides for the retention and enforcement of certain claims by the Plan Administrator.[21]

- The Plan also contemplates the future sale of remaining property of the estate, the Gawker.com Assets, by the Plan Administrator.[22]

- The Plan provides for the impairment of certain Classes of Claims and Equity Interests, while leaving others unimpaired. The Plan thus modifies the rights of the holders of certain Claims and Equity Interests and leaves the rights of others unaffected.[23]

33.     In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes

additional appropriate provisions that are not inconsistent with applicable sections of the

Bankruptcy Code, including:

---

[18] *Id.* § 1123(b)(3), (b)(4).
[19] *Id.* § 1123(b)(5),(6).
[20] *See* Plan, Article 7.
[21] *See id.*, Section 4.06.
[22] *See id.*, Section 4.10.
[23] *See id.*, Article 3.

-13-

- The provisions of Sections 3.07, 3.08, and 3.09 of the Plan governing distributions on account of Allowed Claims and Equity Interests;

- The provisions of Section 5.01 establishing procedures for resolving objections to and the estimation of Claims;

- The provisions of Article 8 governing retention of jurisdiction by the Court over certain matters after the Effective Date; and

- The provisions of Article 9 including certain injunctions, exculpation, and releases that are appropriate for the reasons set forth in the subsection v below.

34.    The foregoing Plan provisions are proper because, among other things, they are the product of arm's-length negotiations, have been critical to obtaining the support of the various constituencies for the Plan, and are a part of the Plan that received support from all voting members in the Voting Classes.  Such provisions are fair and equitable, are given for valuable consideration and are in the best interests of the Debtors and their estates.  As the evidence at the Confirmation Hearing will show, none of these provisions is inconsistent with the Bankruptcy Code and, thus, the requirements of Bankruptcy Code section 1123(b) are satisfied.

### iv.    The Plan Settlements Are Fair and Equitable and Should Be Approved.

35.    As described in Section VII of the Disclosure Statement, the Plan incorporates the following proposed settlements of the various interrelated disputes facing the Debtors: (i) the Intercompany Settlement, including the settlement of allocation disputes and intercompany claims; (ii) the Second Lien-Make-Whole Settlement; and (iii) the "Litigation Settlements" of the Bollea Claims, Ayyadurai Claims, and Terrill Claims.  The Plan Settlements are in the best interests of the estates and rise above the lowest point in the range of reasonableness.  Accordingly, they should be approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

### a.    The Standard for Approval of Settlements

36.    Section 1123 of the Bankruptcy Code states that a chapter 11 plan may provide for the settlement of any claim belonging to the debtor or to its estate.[24]  When evaluating plan settlements under section 1123(b) of the Bankruptcy Code, courts consider the standards used to evaluate compromises and settlements under Bankruptcy Rule 9019.[25]

37.    Approval of settlements depends upon "whether the settlement is in the 'best interests of the estates.'"[26]  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness."[27]  In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors:  (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay;" (3) the paramount interests of creditors; (4) whether other parties-in-interest support the settlement; (5) the nature and breadth of releases to be obtained by officers and directors, if any; (6) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; and (7) "the extent to which the settlement is the product of arm's length bargaining."[28]

38.    In reviewing a settlement, a bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement or assess the minutia of each and

---

[24]    *See* 11 U.S.C. § 1123(b)(3)(A).
[25]    *See, e.g.*, *Resolution Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995).
[26]    *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007) (quoting *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 523 (S.D.N.Y. 1993).
[27]    *In re Drexel Burnham Lambert Grp.*, 134 B.R. at 505.
[28]    *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted) (hereafter, "*Iridium*").

every claim.[29]   As one court explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement in its entirety is appropriate for the . . . estate."[30]   Importantly, it is black-letter law that a court's evaluation of a proposed settlement should not involve a "mini-trial . . . [on] the merits."[31]

### b.    The Plan Settlements Satisfy the Requirements of Bankruptcy Rule 9019

39.    The Plan Settlements are the result of extensive analysis by the Debtors and their advisors, and are well within the range of reasonableness, both collectively and individually.  For the following reasons, the risks and costs of litigating the Settled Claims outweigh any benefit to the Debtors' estates:

- The Settled Claims, particularly those relating to intercompany allocations and the Bollea Judgment, involve contested questions of law and fact that would require prolonged analysis, discovery, and litigation proceedings;

- The Debtors estimate that the cost to their estate of litigating the allocation of the Unimoda Sale Proceeds and appeal of the Bollea Judgment would be $9-12 million;

- Additional litigation over other Intercompany Claims, as well as the Second Lien Make-Whole Claims and those of Ayyadurai and Terrill would add additional significant litigation expense;

---

[29]   *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citations omitted).

[30]   *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), aff'd sub nom. *Sobchack v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.)*, 17 F.3d 600 (2d Cir. 1994) (emphasis added); *see also In re Enron Corp.*, No. 02 Civ. 8489 (AKH), 2003 WL 230838, *3 (S.D.N.Y. Jan. 31, 2003) (affirming bankruptcy court's decision that a settlement "as a whole was fair and equitable"); *In re NII Holdings*, 536 B.R. 61, 131 (Bankr. S.D.N.Y. 2015) (approving settlement that provided the best means of maximizing value for the Debtors and all of their creditors); *In re Ionosphere Clubs*, 156 B.R. at 430 ("[t]he appropriate inquiry is whether the Settlement Agreement in its entirety is appropriate for the . . . estate.").

[31]   *In re Adelphia Commc'ns*, 368 B.R. at 225:

It is not necessary for the court to conduct a "mini-trial" of the facts or the merits underlying the dispute.  Rather, the court only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement.  In doing so, the court is permitted to rely upon opinions of the trustee, the parties, and their attorneys.

*see Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) ("[S]ince the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation, the court must not turn the settlement hearing into a trial or a rehearsal of the trial.").

59689083_13

- Continued litigation of the Settled Claims would substantially delay confirmation of a plan and distributions to stakeholders;

- As explained in section VII of the Disclosure Statement, the likely outcomes in litigation over these disputes would be uncertain, and have been taken into account in formulating the Plan Settlements; and

- Intercompany allocations and disputes are a gating item to formulating any scheme of distribution, and the size of the Bollea Judgment means that resolution of Bollea's claims will necessarily have a dramatic effect on recoveries available to other Gawker Media unsecured creditors; and

- In contrast, settlement of the Settled Claims eliminates very substantial litigation expenses and uncertainty.

40.     Accordingly, the Plan Settlements are in the best interests of creditors because they maximize the recoveries of creditors and equity interest holders under the Plan and collectively resolve the most significant disputes regarding the Debtors' estates without litigation that would have otherwise plagued the Debtors' cases.  Litigation of any or all of the Settled Claims would reduce the proceeds available for distribution to the Debtors' creditors and stakeholders, and also eliminate certain tax benefits obtained by commencing Plan distributions in 2016.

41.     In reaching the Plan Settlements, the Debtors were guided by the Independent Director charged with reviewing any settlement proposals, consulted with creditors and equity holders, and the balance in resolving disputes was to give creditors more value through allocation resolution and claims settlement in exchange for settlements facilitating expeditious distributions and establishment of reserves for the balance of the contingent and unliquidated claims.  The Plan Settlements are the product of good-faith, arm's-length negotiations among the Debtors and the Committee, the Second Lien Lender, certain major unsecured creditors, and major equity holders as evidenced by numerous hours of negotiations among the Debtors' various stakeholders.  Parties to the Plan Settlements have been represented by skilled and experienced professionals.

-17-

42.     The Plan Settlement enjoys the support of each of the Debtors, the Committee, the Second Lien Lender, certain major unsecured creditors, and major equity holders.  No objections were filed with respect to the Plan Settlements with Bollea or the Second Lien Lender.  More significantly, all Entities entitled to vote on the Plan voted to accept.  Based on these results, the Court can easily conclude that the Plan Settlements are supported not just by "other parties-in-interest," but by an overwhelming majority of the Debtors' stakeholders.

43.     For the foregoing reasons, the Debtors submit that an analysis of the *Iridium* factors demonstrates that the Plan Settlements fall well within the range of reasonableness, are fair, equitable and in the best interests of the estates, and should be approved by the Court.

     v.     **The Plan Injunctions, Exculpation and Releases Are Permissible and Should Be Approved.**

        a.     **The Claims Injunction In Section 9.01 Of The Plan Is Permissible and Should Be Approved**

44.     Section 9.01 of the Plan permanently enjoins non-Debtor parties from pursuing actions or proceedings for which the Debtor retains sole and exclusive authority under Article 4 of the Plan.  This provision is necessary to preserve the authority to pursue retained claims granted to the Debtors and Plan Administrator under the Plan and should be approved.

        b.     **The Plan Interference Injunction In Section 9.02 Of The Plan Is Permissible and Should Be Approved**

45.     Section 9.02 of the Plan (the "Plan Interference Injunction") enjoins proceedings against the Debtors and Released Employees and Independent Contractors for conduct prior to the Effective Date where those claims would affect the Debtors or the Released Employees and Independent Contractors or their property, or otherwise interfere with provisions of the Plan. Importantly, the Bankruptcy Court may provide relief from the Plan Interference Injunction with respect to proceedings not otherwise released under Sections 9.03 and 9.05 of the Plan.

-18-

46.    The Plan Interference Injunction is necessary to preserve and enforce the terms of the Plan, the Debtor Release, the Third-Party Releases and the Exculpation, and shield the beneficiaries of those provisions from unnecessary litigation.  The Plan Interference Injunction is narrowly tailored to achieve that purpose, with specific limitation to pre-Effective Date conduct.  Further, the Injunction provisions are a key component of the efficient liquidation of the Debtors estates and prevent the potential for collateral attack of Plan terms.[32]  Finally, the injunction does not permanently alter parties' rights, but instead adds a requirement to first obtain relief from the Plan Interference Injunction from the Bankruptcy Court before pursuing any enjoined actions.  Thus, the Court should approve the Plan Interference Injunction as a means to prevent potential unauthorized interference with the Plan.

### c.    The Debtor Release Provisions In Section 9.03 Of The Plan Are Permissible and Should Be Approved.

47.    Under Bankruptcy Code section 1123(b)(3)(A), a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[33] The rules governing the approval of a settlement under Bankruptcy Rule 9019 are useful in evaluating plan releases.  It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[34]  Debtor releases are granted by courts in the Second Circuit where the Debtors establish that such releases are in the "best interests of the estate."[35]  Courts often find that releases pursuant to a settlement are appropriate.[36]  In reviewing such releases, courts

---

[32]    *See SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992).

[33]    11 U.S.C. § 1123(b)(3).

[34]    *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 263 n.289, 269 (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[35]    *See In re Charter Commc'ns.*, 419 B.R. at 257 ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[36]    *See, e.g., Spiegel*, No. 03–11540 (BRL), 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); *In re AMR*

frequently use the benchmark for approval of a settlement under Bankruptcy Rule 9019.[37]  Under

Bankruptcy Rule 9019, the Court may approve a settlement so long as it does not "'fall[] below

the lowest point in the range of reasonableness.'"[38]

48.    Section 9.03 of the Plan provides that, on the Effective Date, the Debtors release

unconditionally (i) specified Released Parties from claims based on occurrences taking place or

existing on or prior to the Petition Date that are in connection with the Debtors, their assets, or

property and (ii) each Released Employee and Independent Contractor from claims based on

occurrences taking place or existing on or prior to the Petition Date that are not the result of

gross negligence or willful misconduct as determined by a final order, and for which the Debtors

have indemnification obligations (the "Debtor Releases").

49.    As defined in the Plan, the "Released Parties" include (i) the Debtors, (ii) the

Second Lien Lender, (iii) the Committee, and (iv) with respect to each of the foregoing entities in

clauses (i) through (iii), respective current and former subsidiaries, predecessors, successors,

assigns, heirs, insurers, agents, representatives, directors, managers, officers, equity holders,

principals, current and former members, advisory board members, financial advisors, partners,

attorneys, accountants, investment bankers, consultants, representatives, and other professionals,

excluding Levine Sullivan Koch & Schultz, LLP and the chapter 11 bankruptcy estate of Nick

Denton.  The "Released Employees and Independent Contractors" include each current and

---

*Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement).

[37] *See, e.g., Bally Total Fitness*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) and Bankruptcy Rule 9019(a)).

[38] *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman*, 464 F.2d at 693); *see also In re Enron Corp.*, 2003 WL 230838, at *2 ("[A]pproval of the settlement lies within the sound discretion of the bankruptcy court . . . .") (citations omitted); *In re Purofied Down Prods.*, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute]."); *In re Ionosphere Club*, 156 B.R. at 426-27.

-20-

former employee, writer, editor, and independent contractor that was employed by, or paid to contribute articles to, the Debtors including, without limitation, current and former 1099 personnel and current and former independent contractors, that filed a Proof of Claim in the Bankruptcy Cases.

50.     The Debtors have proposed the Debtor Release based on their sound business judgment and submit that the Debtor Release is reasonable and satisfies the standard that courts generally apply when reviewing settlements.   The Debtors considered the potential claims reviewed by the Committee and identified to the Debtors in the Standing Request.   The Debtor Releases are limited solely to claims or causes of action that belong to the Debtors, and consists primarily of actions the Debtors believe are unlikely to generate meaningful proceeds or other benefits for the Debtors' estates in light of the merits of such actions and the litigations costs associated therewith.   Importantly, the Debtor Releases are tailored to carve out claims against the chapter 11 estate of the Debtors' former Chief Executive Officer and founder, Nick Denton, and certain other claims.

51.     With respect to the Debtor Releases of Released Employees and Independent Contractors, it extends solely to Released Employees and Independent Contractors who vote in favor of the Plan.   That Debtor Releases are also granted in consideration for Released Employees and Independent Contractors waiving and releasing any and all claims against the Debtors for indemnification obligations (except for amounts already due and owing).   Absent such waiver and release, the Debtors could potentially be liable to indemnify Released Employees and Independent Contractors for claims asserted against them.   Even if no such liability were to materialize, the potential for such claims would delay expeditious distribution of

-21-

the Debtors' assets.  Additional evidence in support of the Debtor Releases will be presented at the Confirmation Hearing.

52.     Finally, many courts have approved similar debtor-release provisions in other chapter 11 cases.[39]  Accordingly, the Debtors submit that the Debtor Releases are consistent with applicable law, represent a valid settlement and release of claims the Debtors may have pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, are a valid exercise of the Debtors' business judgment, and are in the best interests of the estates.

### d.     The Exculpation Provisions In Section 9.04 Of The Plan Are Permissible and Should Be Approved

53.     Courts evaluate exculpation provisions based upon a number of factors, including whether the provision is integral to the plan and whether protection from liability was necessary for plan negotiations.[40]  Generally speaking, the effect of an appropriate exculpation provision is to set a standard of care of gross negligence or willful misconduct in future litigation for acts arising out of the restructuring.[41]  Additionally, where a Court confirms a plan proposed in good

---

[39]     *See, e.g.*, *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2014); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Global Aviation Holdings Inc.*, No. 12-40783 (CEC) (Bankr. E.D.N.Y. Dec. 11, 2012); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. Sept. 21, 2010); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009); *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Tower Auto., Inc.*, No. 05-10578 (Bankr. S.D.N.Y. July 9, 2007); *see also In re Movie Gallery*, No. 07-33849 (Bankr. E.D. Va. Apr. 10, 2008).

[40]     *See Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were negotiated in good faith and at arms' length, necessary to successful reorganization, and integral to the plan); *In re Worldcom, Inc.*, 2003 WL 23861928 at *28 (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *Upstream Energy Servs v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct).

[41]     *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (reasoning that an exculpation provision did not affect third party liability but rather "set[] forth the appropriate standard of liability" for the exculpated parties); *see also Calpine Corp.*, 2007 WL 4565223, at *10 (finding that an exculpation provision that did not relieve any party of liability for gross negligence or willful misconduct was appropriate); *Enron Corp.*, 326 B.R. at 501, 503-04 (holding that an exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).

faith, it is appropriate to set the standard of liability for those involved in the negotiation and formulation of that plan.[42]

54.    Accordingly, exculpation clauses appropriately prevent future collateral attacks against parties that have made substantial contributions to a debtor's reorganization.  Courts in this District generally have specified three categories of parties that are appropriate candidates for exculpation: (a) parties indemnified by the estate for their services; (b) parties to "[u]nique [t]ransactions" that "contribute[] substantial consideration to the reorganization"; and (c) any party when the exculpation provision is consensual and those voting had full notice.[43]

55.    Here, Section 9.04  of the Plan provides an exculpation and limitation of liability (the "Exculpation") for the Debtors and the Committee, and certain specified advisors and affiliates (collectively, the "Exculpated Parties"), for actions leading up to, and in connection with the Plan, which excluding actions or omissions constituting willful misconduct or gross negligence as determined by a final order.  The Exculpation provision is appropriate under applicable law because the Exculpated Parties satisfy the relevant standard.  Negotiation and compromise were crucial to the formulation of a consensual Plan.  Moreover, the Debtors would have separate indemnification obligations to certain of the Exculpated Parties that are their directors or employees.  Finally, the Exculpation provision, including its carve out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others.[44]

---

[42]    *See In re PWS Holding*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity" for "actions within the scope of their duties"); *accord In re Worldcom, Inc.*, 2003 WL 23861928, at *28.

[43]    *In re Adelphia Commc'ns*, 368 B.R. at 268.

[44]    *See, e.g.*, *In re Oneida*, 351 B.R. at 94, n.22 (approving exculpation provision that covered prepetition lenders, DIP lenders, creditor committees and their members, and the respective affiliates of each, except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see also In re DJK Residential LLC*, No.

#### e.    The Third-Party Releases In Section 9.05 Of The Plan Are Permissible and Should Be Approved

56.    Section 9.05 of the Plan provides a similar release from claims and causes of action against the Released Employees and Independent Contractors which any holder of a Claim or Equity Interest may be entitled to assert, but only if such holder has received or is deemed to have received Distribution(s) under the Plan (the "Third-Party Releases").  In both the Plan and the Disclosure Statement, the Third-Party Releases (as well as the Debtor Release, the exculpation provisions and the injunction enforcing the releases) was conspicuously set off in bold font, and in soliciting votes on the Plan, the Debtors sent a Confirmation Hearing Notice to parties not entitled to vote on the Plan, which unambiguously provided in bold font that the Plan contained certain releases by the Debtors and third-party releases by certain holders of Claim and Equity Interests.

57.    The proposed third-party releases in Section 9.05 of the Plan should be approved. Consideration and approval of third-party releases proceeds in two steps: first determining jurisdiction and then whether the release is appropriate.[45]  "Related to jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, or the dispute would have an effect on the estate."[46]  Where the third-party claim is based on conduct for which the debtor would be liable, and there is a contribution or indemnification claim against the debtor, there is jurisdiction to order a third-party release.[47]  Such releases also need to have certain specificity, so that there is not "substantial uncertainty regarding who is

---

08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct); *Bally Total Fitness*, 2007 WL 2779438, at *8 (approving an exculpation provision that excluded gross negligence and willful misconduct and exculpated, among others, the DIP lenders, prepetition noteholders, the creditors committee, and new investors in certain circumstances without unresolved objections).

[45]    *In re Dreier LLP*, 429 B.R. 112, 132 (2010).
[46]    *Id*. at 131.
[47]    *Id*. at 133.

being released and for what."[48]   In this case, the proposed third-party release is for defamation and similar claims, for work performed by employees and independent contractors of the Debtors (and thus claims for which the Debtors would also be liable), and for which the Debtors have indemnification obligations as a matter of industry practice.

58.    A printed copy of the Confirmation Hearing Notice was mailed to approximately 4,391 potential parties-in-interest.[49]   Additionally, the Debtors published notice of the Confirmation Hearing on November 10, 2016, in the *USA Today* (National Edition), as evidenced by the *Affidavit of Publication*.[50] Each such notice made parties aware of the releases included in the Plan.

59.    Once there is jurisdiction, non-debtor third-party releases in chapter 11 plans are then permissible "in rare cases" upon a finding of "unique circumstances."[51]   Analyzing and proving such releases is "not a matter of factors and prongs,"[52] although there is guidance from the issues that the Second Circuit considered in *Metromedia*.  Evidence supporting the necessary findings and conclusions includes (but is not limited to) situations where the releases are important to the plan, where there is a fund available from which the releasing parties could have sought recovery (sometimes including payment in full), whether the released parties have provided a substantial contribution in connection with the plan and its transactions, and whether the released claims would give rise to contribution or similar claims over against the estate.[53]  In the final analysis, third-party releases are appropriate in unique circumstances, and not all the

---

[48]    *Id.* at 133-34.
[49]    *See* Voting Certification.
[50]    *See* Docket No. 440.
[51]    *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005); *In re Dreier LLP*, 429 B.R. at 130.
[52]    *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 (2014).
[53]    *E.g., Clain v. Int'l Steel Grp.*, 156 F. App'x 398, 399-400 (2d Cir. 2005); *In re Drexel Burnham*, 960 F.2d at 293; *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 53-57 (S.D.N.Y. 2006); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648 (S.D.N.Y. 1995); *In re Motors Liquidation Co.*, 447 B.R. 198, 220-21 & n.66 (Bankr. S.D.N.Y. 2011); *In re Adelphia Comm'cns Corp.*, 368 B.R. at 266-69.

factors need be present.[54]    As will be demonstrated at the Confirmation Hearing, these Bankruptcy Cases are unique, and among other things, the Third-Party Releases involve First Amendment issues, the release of short-time-period claims, for which third-parties could not expect to collect substantial amounts except from the Debtors, which have not been brought against the Debtors and arise in connection with a high-visibility bankruptcy case (there are no meaningful issues of notice), and for which substantial indemnification obligations could potentially upset an extremely valuable plan settlement.

### B.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

60.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.    The case law and legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[55]    The Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Notice and Claims Agent pursuant to the Disclosure Statement Order.[56]

---

[54]    *E.g.*, *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 364-65 (Bankr. S.D.N.Y. 2002) (approving a channeling injunction as part of a chapter 7 settlement).

[55]    *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the [Bankruptcy] Code.") (citations omitted); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (stating that to comply with section 1129(a)(2), "the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with [Bankruptcy] Code §§ 1125 and 1126.") (citation omitted); *see also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[56]    *See* Voting Certification.

Solicitation of the Plan pursuant to the procedures established in the Disclosure Statement Order conformed to the requirements of Bankruptcy Rule 3017(a) and Local Bankruptcy Rule 3017-1(a) and (b) with respect to the contents and transmittal of the Disclosure Statement.

### C.    The Plan Was Proposed in Good Faith and Not by any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).

61.    Section 1129(a) of the Bankruptcy Code compels a bankruptcy court to reject a plan if it is not proposed in "good faith" or is "forbidden by law."[57]    The Second Circuit has construed the good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'"[58]    Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[59]    The bankruptcy court is in the best position to assess the good faith of the parties' proposals.[60]

62.    In determining whether the good faith requirement has been satisfied, a court will focus on "'the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"[61]    Accordingly, bankruptcy courts have asserted that the good faith requirement is satisfied if the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate and/or distributing that value to creditors.[62]

---

[57]    11 U.S.C. § 1129(a)(3); *see also Greer v. Gaston & Snow (In re Gaston & Snow)*, Nos. 93-8517 (JGK), 93 Civ. 8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

[58]    *In re Johns-Manville*, 843 F.2d at 649 (citations omitted); *In re Texaco Inc.*, 84 B.R. 893, 901-07 (Bankr. S.D.N.Y. 1988), *appeal dismissed sub nom. Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco Inc.)*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (citations and quotations omitted).

[59]    *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citing cases).

[60]    *In re Adelphia Commc'ns*, 368 B.R. at 247; *In re Toy & Sports Warehouse*, 37 B.R. at 149.

[61]    *In re Granite Broad. Corp.*, 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (citations omitted).

[62]    *See In re Gilbertson Rests. LLC*, No. 04-003845, 2005 WL 783063, at *4 (Bankr. N.D. Iowa Apr. 4, 2005); *see also In re Source Enters., Inc.*, No. 06-11707 (AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (finding that the good faith requirement satisfied in plan filed with legitimate and honest purposes of

63.     Here, the Debtors have proposed the Plan with honesty, good intentions, and a desire to effectuate a full, fair, efficient and orderly wind-down and liquidation that is fair for all stakeholders.  Ultimately, the Plan reflects a consensus among key stakeholders about the most appropriate and efficient distribution of the Debtors' remaining assets, following the Unimoda Sale.  Throughout the Bankruptcy Cases, the Debtors have upheld their fiduciary duties to stakeholders by seeking to maximize the value of the Debtors' estates.

64.     It has been held that good faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors."[63]  Indeed, the Plan is the product of extensive arm's-length negotiations.  These negotiations were difficult and contentious, and the Plan reflects a series of compromises that do not provide for a perfect outcome for any of the Debtors' constituents, but represent a good faith effort to provide the highest available recoveries to the various stakeholders under the totality of the circumstances.  The relatively small number of objections to the Plan have all come from holders of Disputed Gawker Media General Unsecured Claims (including one who voted to accept the Plan).  These creditors, to the extent that their Claims are ultimately allowed, will have first recourse to the Gawker Media Available Assets.  As evidence at the Confirmation Hearing will show, that amount should be more than sufficient to satisfy Allowed Gawker Media unsecured claims.  In any event, the Plan Settlement reflects an appropriate compromise regarding assets available to creditors at Gawker Media.  Accordingly, the Debtors submit that the Plan was proposed in good faith and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

---

maximizing value of the estate and effectuating equitable distribution), *aff'd sub nom. Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541 (S.D.N.Y. 2008).

[63]     *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988).

**D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)).**

65.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses be subject to approval of the bankruptcy court as reasonable.  Here, all payments made or to be made by the Debtors for services rendered and expenses incurred in connection with the Bankruptcy Cases, including all Professional Fee Claims, have been approved by, or are subject to, approval by the Court as reasonable.  In particular, the Plan only provides for the payment of Allowed Administrative Claims.[64]  After notice and a hearing, in accordance with the procedures established by the Bankruptcy Code and prior Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Court.[65]  In addition, section 4.01(a) of the Plan provides for the payment of the fees and expenses of counsel to the Second Lien Lender pursuant to the terms of the applicable Second Lien Loan and Security Agreement (and provides a mechanism for Court review in the event that there is a dispute as to the reasonableness of any fees or expenses).  These procedures ensure that all fees and expenses payable under the Plan will be subject to review for reasonableness and, therefore, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**E.    The Debtors Have Properly Disclosed Post-Emergence Directors and Officers and Their Appointment Is Consistent with Public Policy (11 U.S.C. § 1129(a)(5)).**

66.    Section 1129(a)(5)(A) of the Bankruptcy Code requires that, before confirmation, the proponent of a plan must disclose the identities and affiliations of the proposed directors and officers of the reorganized debtors, and that the appointment or continuance of such directors and officers be consistent with the interests of creditors and equity security holders and with public

---

[64]    *See* Plan, Sections 2.05(a)(i), 2.06(a)(i), and 2.07(a)(i); *see generally In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed" administrative expenses).

[65]    *See id.*

policy.[66]  In addition, section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."[67]

67.    This simplifies and makes less expensive the post-emergence governance of the Debtors.  The Plan Administrator will oversee the management and distribution of the Debtors' assets.  The Plan Supplement identified Opportune LLP as Plan Administrator and provided a copy of the Plan Administrator Agreement, which outlines the duties and obligations of the Plan Administrator.  No party in interest has objected to the selection of Opportune LLP as Plan Administrator.  Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code to the extent they may be applicable.

**F.    The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)).**

68.    Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval.[68]  Section 1129(a)(6) of the Bankruptcy Code does not apply because there is no governmental regulatory commission that has jurisdiction over the Debtors' rates.

**G.    The Plan Is in the Best Interests of Creditors and Holders of Equity Interests (11 U.S.C. § 1129(a)(7)).**

69.    The so-called "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either (i) accepted the plan or will receive or (ii)

---

[66]    11 U.S.C. § 1129(a)(5)(A).
[67]    *Id.* § 1129(a)(5)(A).
[68]    *Id.* § 1129(a)(6).

retains property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.[69]  Put differently, the best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[70]  Also, the best interest test focuses on individual dissenting creditors or interest holders, rather than classes of claims or interests.[71]

70.    A court, in considering whether a plan is in the "best interests" of creditors, is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all of the debtor's assets under chapter 7 of the Bankruptcy Code.[72]  As section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.  The test requires that each holder of a claim or interest either accepts the plan or will receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

71.    To determine the value that impaired creditors and equity interest holders would receive if any of the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the aggregate dollar amount that likely would be generated by the hypothetical liquidation of such Debtor's assets by a chapter 7 trustee (the "Chapter 7

---

[69]    *Id.* §1129(a)(7); *In re Adelphia Commc'ns*, 368 B.R. at 251.

[70]    *In re Adelphia Commc'ns*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[71]    *In re Leslie Fay Cos.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997); *In re Drexel Burnham*, 138 B.R. at 761.

[72]    *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); *In re Jartran, Inc.*, 44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test satisfied by showing that, upon liquidation, cash received would be insufficient to pay priority claims and secured creditors so that unsecured creditors and stockholders would receive no recovery); *In re Victory Constr. Co.*, 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984).

Liquidation Value"). The Liquidation Value available to holders of Claims and Equity Interests would be reduced by, among other things, (a) the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, (b) asset disposition expenses, (c) applicable taxes, (d) litigation costs, (e) Claims arising from the wind down of the debtor during the pendency of the chapter 7 case, and (f) all unpaid Administrative Claims incurred by the debtor during the debtor's chapter 11 case that are allowed in the chapter 7 case.

72.    The Debtors performed a liquidation analysis that was attached as Exhibit C to the Disclosure Statement (the "Liquidation Analysis"). The Liquidation Analysis detailed a number of assumptions that were relied upon in developing a model of a hypothetical chapter 7 liquidation, including, among other things, that (i) the Trustee proceeds with the significant settlements with the creditors set forth in the Plan, including the Litigation Settlements and the Intercompany Settlement with respect to allocation, thereby establishing the allowed amount of certain litigation claims and avoiding extensive legal costs and delay related to those litigation claims and the allocation dispute; (ii) the Trustee is able to succeed on the prosecution of the claims objections filed by the Debtors, with the exception of those related to the Settled Claims, on the same time frame and for the same cost, despite having not been previously involved in the Bankruptcy Cases; (iii) the Trustee makes distributions to creditors before year-end securing the corresponding tax benefits associated therewith, and (iv) the Trustee would likely recover the statutory 3% fee based on the amount of liquidated assets and some costs for professionals fees and expenses based on a 6-12 month liquidation process.[73]

---

[73]    Additionally, the Liquidation Analysis assumes that in a chapter 7 liquidation the Second Lien Lender would not agree to subordinate a portion of the Second-Lien Make-Whole Claim to the holders of the Gawker Media General Unsecured Claims and Punitive Damage Claims. The Liquidation Analysis also does not include any litigation costs for any of the Debtors related to the Intercompany Claims or any recovery for Gawker Media on account of the Fiduciary Duty Claim, but does assume that Gawker Media would be liable for the full amount of its Intercompany Debts. Thus, as reflected in the Liquidation Analysis, the recoveries for holders of Gawker Media General Unsecured Claims would be further reduced in a chapter 7 liquidation.

-32-

73.     As detailed in the Liquidation Analysis, the estimated proceeds available for allocation at each of the Debtors in a hypothetical chapter 7 liquidation would be reduced by approximately 0.4% – 0.6% at GMGI, 4.4% – 5.15% at Gawker Media, and 4.0% – 4.5% at Gawker Hungary.   Thus, in a liquidation scenario, there would undoubtedly be less funds available for distribution to holders of the GMGI Preferred Equity Interests, the Gawker Media General Unsecured Claims and the Gawker Hungary Membership Interests after the payment of all other senior debts at each of the Debtors.   Accordingly, the best interests test is satisfied as to each Impaired Class of Claims and Equity Interests because each holder of a Claim or Equity Interest in each such Class will receive or retain under the Plan, on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive in a chapter 7 liquidation of the Debtors' assets on such date.   All holders of Claims and Equity Interests received the Liquidation Analysis, attached to the Disclosure Statement, and have been provided ample time to consider the contents thereof, and none challenged the analysis or raised objections.   Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.      Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)).**

74.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept the plan or be unimpaired thereby.   Pursuant to section 1126(c) of the Bankruptcy Code, a class of *claims* accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims in that class vote to accept the plan. Pursuant to section 1126(d) of the Bankruptcy Code, a class of *interests* accepts a plan if holders of at least two-thirds in amount of the allowed interests in that class vote to accept the plan.   A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is

conclusively presumed to have accepted the plan.[74]  On the other hand, a class is deemed to have

rejected a plan if the plan provides that the claims or interests of that class do not receive or

retain any property under the plan on account of such claims or interests.[75]

75.    As set forth above and as evidenced in the Voting Certification, all of the Voting

Classes voted to accept the Plan.[76]  Although Classes 1E(i), 2F(ii) and 3D(i) are not receiving

any recovery under the Plan, they have accepted the Plan pursuant to the Intercompany

Settlement.  Further, although Class 1G is deemed to reject the Plan, as discussed more fully in

Section O below, the Debtors meet the requirements of sections 1129(b) of the Bankruptcy Code

to "cram down" such Class.

I.    **The Plan Complies with Statutorily-Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).**

76.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be

paid in full on the effective date of a plan and that the holders of certain other priority claims

receive deferred cash payments.   In particular, pursuant to section 1129(a)(9)(A) of the

Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy

Code – administrative claims allowed under section 503(b) of the Bankruptcy Code – must

receive cash equal to the allowed amount of such claims on the effective date of the plan.[77]

Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind

specified in section 507(a)(4) through (7) of the Bankruptcy Code – generally, wage, employee

benefit and deposit claims entitled to priority – must receive deferred cash payments of a value

equal to the allowed amount of such claim or cash equal to the allowed amount of such claim on

---

[74]   *Id*. § 1126(f); *see In re Drexel Burnham*, 960 F.2d at 290 (noting that an unimpaired class is presumed to have accepted the plan); *see also* S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan.").

[75]   11 U.S.C. § 1126(g).

[76]   *See* Section II above; *see also* Voting Certification.

[77]   11 U.S.C. § 1129(a)(9)(A).

59689083_13

the effective date of the plan, depending upon whether the class has accepted the plan.[78]  Finally,

section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8)

of the Bankruptcy Code – *i.e.*, priority tax claims – must receive deferred cash payments over a

period not to exceed five years after the petition date, the present value of which equals the

allowed amount of the claim.  *See* 11 U.S.C. § 1129(a)(9)(C).  The Plan satisfies these

requirements by providing that Allowed Administrative Expense Claims, Priority Tax Claims,

and Allowed Other Priority Claim will receive payment in full, except to the extent that a holder

of such claims agrees to lesser treatment.

**J.      The Plan Was Accepted by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)).**

77.      Section 1129(a)(10) of the Bankruptcy Code is an alternative requirement to

section 1129(a)(8), which requires that each class of claims or interests either accept a plan or be

unimpaired thereunder.  Section 1129(a)(10) of the Bankruptcy Code provides that a plan may be

confirmed (subject to the other requirements set forth herein) if a class of claims is impaired

under a plan and at least one impaired class of claims accepts the plan, excluding acceptance by

any insider.

78.      Here, all of the Voting Classes facilitates voted to accept the Plan.[79]  Therefore,

the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Is Feasible (11 U.S.C. § 1129(a)(11)).**

79.      Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization

may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor or any successor to the

---

[78]      *See id.* § 1129(a)(9)(B).
[79]      *See* Voting Certification.

59689083_13

debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[80]  One

commentator has stated that this section "requires courts to scrutinize carefully the plan to

determine whether it offers a reasonable prospect of success and is workable."[81]  To demonstrate

that a plan is feasible, it is not necessary that success be guaranteed; rather, a debtor must show

only a reasonable assurance that consummation of the plan will not likely be followed by a

further need for financial reorganization.[82]

80.    The Plan does not contemplate reorganization of the Debtors' assets.  Rather, the

Debtors have sold substantially all of their assets and will distribute the proceeds to creditors in

accordance with the Plan.  The Plan sets forth certain Cash payments that the Debtors or the Plan

Administrator must make on the Effective Date.  As evidence at the Confirmation Hearing will

show, the Debtors' current cash balances, as allocated pursuant to the Intercompany Settlement,

are sufficient to make such Effective Date payments and also to satisfy all administrative and

other priority obligations due to be paid pursuant to the Plan on or after the Effective Date.  For

the foregoing reasons, the Debtors submit the Plan satisfies the feasibility requirement of section

1129(a)(11) of the Bankruptcy Code.

---

[80]    11 U.S.C. § 1129(a)(11).

[81]    7 Collier on Bankruptcy ¶ 1129.03 [11], at 1129-64 (Lawrence P. King et al., 15th ed. rev. 1999); *see also In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("'It is not necessary that the success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.'") (citations omitted), *aff'd sub nom. One Times Square Assocs. Ltd. P'ship v. Banque Nat'l de Paris (In re One Times Square Assocs. Ltd. P'ship)*, 165 B.R. 773 (S.D.N.Y.), *aff'd mem.*, 41 F.3d 1502 (2d Cir. 1994); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); *In re Johns-Manville*, 68 B.R. at 635.

[82]    *See In re Drexel Burnham*, 138 B.R. at 762 ("'It is not necessary that success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.' . . .   The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since guarantee of future is not required.") (citations omitted)); *In re Johns-Manville*, 843 F.2d at 649 ("Success need not be guaranteed."); *In re Advance Watch Co.*, No. 15-12690 (MG), 2016 WL 323367, at *6 (Bankr. S.D.N.Y. Jan. 25, 2016) ("Section 1129(a)(11) of the Bankruptcy Code is satisfied, as confirmation of the Plan is not likely to be followed by the need for further liquidation or financial reorganization of the Debtors."); *In re EUSA Liquidation Inc.*, No. 09-15008 (SMB), 2010 WL 4916559, at *6 (Bankr. S.D.N.Y. June 10, 2010) ("The Plan satisfies section 1129(a)(11) because it provides for the liquidation of the Debtor. The Debtor has sold or abandoned substantially all of its assets and will distribute cash to creditors.").

**L.    The Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)).**

81.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.  The Plan provides that the outstanding fees due to the United States Trustee from Gawker Media pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date.  The Plan further provides that all fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from after the Effective Date shall be paid in accordance therewith until the earlier of the conversion or dismissal of the Bankruptcy Cases under section 1112 of the Bankruptcy Code or closing of the Bankruptcy Cases pursuant to section 350(a) of the Bankruptcy Code.  The Plan thus complies with the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.    The Plan Does Not Need to Provide for the Payment of Retiree Benefits (11 U.S.C. § 1129(a)(13)).**

82.    The Debtors do not owe any "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).  Accordingly, section 1129(a)(13) of the Bankruptcy Code is not implicated by the Plan.

**N.    The Plan Satisfies the Remainder of 11 U.S.C. § 1129(a).**

83.    The final requirements of section 1129(a) of the Bankruptcy Code are inapplicable to the Bankruptcy Cases and confirmation of the Plan.  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation.  Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these cases.  The Debtors are not an individual, and, accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable.   The Debtors are a moneyed, business, or commercial corporation, and, accordingly, section 1129(a)(16) of the Bankruptcy Code is also inapplicable.

-37-

59689083_13

## O.    The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b).

84.    Section 1129(b) of the Bankruptcy Code provides that, if a chapter 11 plan satisfies all applicable requirements of section 1129(a) other than section 1129(a)(8)'s requirement that all impaired classes accept the plan, the plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[83]

85.    As discussed above, the Impaired Classes entitled to vote all voted in favor of the Plan.  However, Class 1G (GMGI – Common Equity Interests) was not entitled to Vote on the Plan, and therefor was deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  As discussed in more detail below, the Debtors meet the "cram down" requirements in section 1129(b) of the Bankruptcy Code to confirm the Plan over the deemed rejection of Class 1G.

### i.    The Plan Does Not Discriminate Unfairly.

86.    The Bankruptcy Code does not set forth any one standard for determining if a plan discriminates unfairly against impaired, rejecting classes.[84]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether "unfair

---

[83]  *Id.* § 1129(b)(1).  *See also Bos. Post Rd.*, 21 F.3d at 480 ("[i]f the debtor chooses to utilize the cramdown procedure (having failed to secure the vote of all the impaired classes), the plan must meet all of the statutory requirements enumerated in § 1129(b) (essentially that the plan is fair and equitable and does not discriminate unfairly against any impaired claims)"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable.'"); *see also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he [p]lan [must satisfy] the 'cramdown' alternative . . . in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus.  Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993) (the plan "must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan").

[84]  *See In re Johns-Manville*, 68 B.R. at 636 ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard . . . ."); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. Ltd. P'ship)*, 526 U.S. 434 (1999).

discrimination" exists.[85]    At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[86]    Courts in the Second Circuit have ruled that "[u]nder section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."[87]

87.    Here, the Plan does not discriminate unfairly against holders of Equity Interests in Class 1G.    The Common Equity Interests in Class 1G that are not receiving distributions are legally distinct and subordinate to all the Preferred Equity Interests in Class 1F that are receiving distributions.    Specifically, the Preferred Equity Interests have a liquidation preference that entitles them to a right to distributions from the liquidation of the Debtors' assets *senior* to the rights of holders of Common Equity Interests in GMGI.    Accordingly, the Plan does not discriminate unfairly against holders of Equity Interests in Class 1G, thereby satisfying the first prong of section 1129(b)(1).

ii.    **The Plan Is Fair and Equitable.**

88.    A plan is considered "fair and equitable" pursuant to sections 1129(b)(2)(C)(ii) of the Bankruptcy Code if, with respect to a class of impaired interests, the plan provides that no holder of any junior interest will receive or retain under the plan on account of such junior

---

[85]    *See In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances."); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[86]    *See In re WorldCom*, 2003 WL 23861928, at *59 (requiring a reasonable basis to justify disparate treatment).

[87]    *Id. See also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale," but also noting that the second prong assessing whether the debtor cannot consummate the plan without discrimination, is not dispositive of the question of unfair discrimination).

interest in any property.[88]  This central tenet of bankruptcy law, known as the "absolute priority

rule," requires that if the holders of claims or interests in a particular class receive less than full

value for their claims, no holders of claims or interests in a junior class may receive any property

under the plan.[89]  The corollary of the absolute priority rule is that senior classes cannot receive

more than a 100% recovery for their claims.

89.    With respect to Gawker Hungary and GMGI, the Debtors anticipate that all

Allowed claims will be paid in full so senior Equity Interests are entitled to distributions of

residual value.  In the case of Gawker Hungary, that means that all value remaining after claims

are satisfied gets distributed to GMGI, as the holder of the Membership Interest in Gawker

Hungary.  All claims against GMGI will also be satisfied in full, so remaining Cash at GMGI

will be distributed to holders of Preferred Equity Interests at GMGI on a Pro Rata basis.  As

described in paragraph 87, the Preferred Equity Interests have a liquidation preference that

entitles them to a right to distributions from the liquidation of the Debtors' assets *senior* to the

rights of holders of Common Equity Interests.  The Debtors do not expect that Distributions on

account of the Preferred Equity Interests will exceed that liquidation preference, so they do not

anticipate any distributions to GMGI Common Equity Interests.

90.    Even if a class had voted to reject, the absolute priority rule would be satisfied at

Gawker Media as well.  The most junior class of equity interests, the Membership Interest in

Gawker Media held by GMGI will receive distributions only if and when all General Unsecured

Claims and Punitive Damage Claims against Gawker Media are satisfied in full, exclusive of

Post-Petition Interest.

---

[88]    11 U.S.C. § 1129(b)(2)(B).

[89]    *See In re 203 N. LaSalle St. P'ship*, 526 U.S. at 441-42.

91.     As evidence at the Confirmation Hearing will demonstrate, the Debtors expect that the Gawker Media Available Assets will be more than sufficient to ensure Gawker Media's general unsecured creditors receive payment in full of Allowed Claims.  Those Gawker Media Available Assets include a minimum of $6.5 million of Cash placed in reserves to which Gawker Media's unsecured creditors will have first recourse.

**P.     The Principal Purpose of the Plan Is Not Avoidance of Taxes (11 U.S.C. § 1129(d)).**

92.     Section 1129(d) of the Bankruptcy Code states "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[90]  The purpose of the Plan is to expeditiously distribute the Debtors' assets and wind down the Debtors' estates, not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no Governmental Unit, or any other party, has thus far raised any objection to the Plan on these grounds, and the Debtors do not anticipate any such objections will be filed.  The Debtors therefore submit that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**IV.    The Objections to Confirmation of the Plan Should Be Overruled.**

93.     The Debtors received four objections to Confirmation (the "Confirmation Objections").  At the present time, only two remain outstanding.  **Exhibit A** hereto includes two tables summarizing submissions received relating to Confirmation.  The first table summarizes the Debtors' responses to the two outstanding Confirmation Objections. The second table summarizes Confirmation objections that the Debtors have resolved and other statements and reservations of rights that do not oppose Confirmation.  Responses to the legal arguments raised in the Confirmation Objections are set forth below.

---

[90]    11 U.S.C. § 1129(d).

-41-

### A.    Objection of Charles C. Johnson and Got News LLC

94.    Charles C. Johnson and Got News LLC filed an objection to Confirmation [Docket No. 540] on the grounds that (i) the Plan Settlements with Ayyadurai and Terrill are unreasonable, unfair and inequitable because they do not meet the requisite Rule 9019 standards and (ii) the Third-Party Release, Plan Interference Injunction and Exculpation provisions of the Plan are improper.  As explained in paragraphs 35-43 and 56-59 above and in the chart attached as **Exhibit A**, and as will be shown by evidence at the Confirmation Hearing, these objections should be readily overruled.

### B.    Limited Objection of Albert James Daulerio

95.    Albert James Daulerio ("Daulerio") filed a limited objection to Confirmation asserting that the Gawker Media Available Assets would be insufficient to satisfy his Claims, including a reservation of rights [Docket No. 543] (the "Daulerio Objection").  The Debtors have reached an agreement resolving the Daulerio Objection as well as the motion to estimate the amount of Daulerio's Claims [Docket No. 495], which will be described at the Confirmation Hearing.

### C.    Objection of Mitchell Williams

96.    The Debtors have resolved the Confirmation objection of Mitch Williams ("Williams") [Docket No. 552] (the "Williams Objection"), and anticipate seeking approval of a settlement of his Disputed Claims.  Nevertheless, the Debtors respond to the Williams Objection in the attached chart, in part because the Williams Objection mischaracterizes portions of the Plan and the Debtors wish to avoid any misunderstandings.

-42-

**D.      Objection of XP Vehicles**

97.      After the Objection Deadline, XP Vehicles ("XP") has made submissions that the

Debtors believe should be treated as late-filed objections to Confirmation [Docket No. 570].

Responses are addressed in the chart attached as Exhibit A hereto.

[Remainder of Page Left Intentionally Blank]

-43-

## **CONCLUSION**

For the reasons set forth herein, the Plan satisfies fully all applicable requirements of the

Bankruptcy Code.    Therefore, the Debtors respectfully request that the Court confirm the Plan

pursuant to section 1129 of the Bankruptcy Code.


Dated: December 9, 2016                    */s/ Gregg M. Galardi*
      New York, New York                    ROPES & GRAY LLP
                                           Gregg M. Galardi
                                           D. Ross Martin
                                           Joshua Y. Sturm
                                         Jonathan M. Agudelo
                                         1211 Avenue of the Americas
                                         New York, NY 10036-8704
                                         Telephone: (212) 596-9000
                                         Facsimile: (212) 596-9090
                                         gregg.galardi@ropesgray.com
                                         ross.martin@ropesgray.com
                                         joshua.sturm@ropesgray.com
                                         jonathan.agudelo@ropesgray.com
                                       *Counsel to the Debtors*
                                       *and Debtors in Possession*