## EXHIBIT C

**Executed Settlement Agreement with Terry Gene Bollea**

## SETTLEMENT AGREEMENT

The parties, **Terry Gene Bollea** ("**Bollea**"), on the one hand, and Gawker Media LLC ("**Gawker Media**"), Gawker Hungary Kft. (f/k/a Kinja Kft.) ("**Gawker Hungary**"), and Gawker Media Group, Inc. ("**GMGI**") (collectively Gawker Media, Gawker Hungary and GMGI are the "**Gawker Debtors**"), on the other hand, (all collectively, the "**Parties**"), enter into this Settlement Agreement ("**Agreement**") on this 9th day of December, 2016, and agree as follows:

## RECITALS

A.    WHEREAS, the Parties are/were involved in the following legal proceedings:

1.    Bollea filed suit against Nicholas G.A. Denton (a/k/a Nick Denton ("**Denton**"), the Gawker Debtors, and Albert James Daulerio (a/k/a A.J. Daulerio) ("**Daulerio**") (collectively, the "**Gawker Parties**"), amongst others, in the Sixth Circuit Court in and for Pinellas County, Florida, Case No. 12012477CI-011 (the "**Bollea I Lawsuit**"). Bollea asserted causes of action against the Gawker Parties for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section 934.10, Florida Statutes.

2.    On May 19, 2015, Gawker Media and its counsel, Gregg Thomas, Esq., filed an action against the Federal Bureau of Investigation and Executive Office for the United States Attorney, Case No. 8:15-cv-01202-SCB-EAJ (the "**FBI Action**"), in which they sought discovery under the Freedom of Information Act related to the Bollea I Lawsuit. The FBI Action resulted in the production of various documents, transcripts, audio recordings and video recordings which were generated or obtained by the FBI during its investigation of an extortion attempt against Bollea. Copies of DVDs containing video and audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, which were seized by the FBI, are currently being held under seal by the Judge in the Bollea I Lawsuit.

3.    On October 21, 2015, the Court in the Bollea I Lawsuit entered an Order permitting certain discovery to determine whether Gawker

Media, Denton and/or Daulerio provided transcripts or recordings that had been sealed in the Bollea I Lawsuit to *The National Enquirer* and/or *Radar Online*, in violation of a protective order (the "**Leak Order**"). *The National Enquirer* and *Radar Online* published articles in July and August 2015, disclosing the contents of recordings of Bollea, which they reported were part of sealed discovery in the Bollea I Lawsuit (the "**Leak**"). Denton, Daulerio and Gawker Media appealed the Leak Order to Florida's Second District Court of Appeal ("**Second DCA**"), which appeal [Case No. 2D15-5035] (the "**Leak Appeal**") is currently stayed as a result of the Suggestion of Bankruptcy filed with respect to the Gawker Media Bankruptcy Case (as described below in Paragraph A.7.).

4.    On March 1, 2016, the Bollea I Lawsuit proceeded to a jury trial. On March 18, 2016, the jury entered a verdict of liability and compensatory damages of $115 million against Denton, Daulerio and Gawker Media, jointly and severally. On March 21, 2016, the jury entered a verdict awarding punitive damages of $15 million against Gawker Media, $10 million against Denton, and $100,000 against Daulerio. On June 7, 2016, the Court in the Bollea I Lawsuit reduced these jury verdicts into a Judgment (the "**Judgment**"), which Judgment included a Permanent Injunction (the "**Permanent Injunction**").

5.    On May 2, 2016, Bollea filed a new action against several defendants including Gawker Media, Don Buchwald & Associates, Cox Radio, Inc. and others, in the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 16-002861-CI (the "**Bollea II Lawsuit**"). In the Bollea II Lawsuit, Bollea brings claims against Gawker Media for intentional interference with contractual relations and advantageous business relationships and intentional infliction of emotional distress. Gawker Media moved to disqualify the trial judge presiding over the Bollea II Lawsuit (the "**DQ Motion**"). When the DQ Motion was denied, Gawker Media appealed to the Second DCA [Case No. 2D16-2477] (the "**DQ Appeal**"). The claims against Gawker Media in the Bollea II Lawsuit are currently stayed as a result of the Suggestion of Bankruptcy filed with respect to the Gawker Media Bankruptcy Case (as described below in Paragraph A.7.), and the entire Bollea II Lawsuit is currently stayed in the Second DCA

pending a resolution by the Second DCA of Gawker Media's DQ Motion.

6.    On June 10, 2016, Denton, Daulerio and Gawker Media filed a Notice of Appeal of the Judgment in the Second DCA [Case No. 2D16-2535]; which appellate proceeding is currently stayed as a result of the Suggestion of Bankruptcy filed with respect to the Gawker Media Bankruptcy Case (as described below in Paragraph A.7.) (the "**Judgment Appeal**").

7.    On June 10, 2016, Gawker Media filed a bankruptcy petition for relief in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), styled *In re Gawker Media, LLC*, Case No. 16-11700 (SMB) (the "**Gawker Media Bankruptcy Case**").  On June 12, 2016, GMGI and Gawker Hungary also each filed a petition for relief in the Southern District of New York (collectively with the Gawker Media Bankruptcy Case, the "**Bankruptcy Cases**").

8.    On August 1, 2016, Denton filed a bankruptcy petition in the Bankruptcy Court; Case No. 16-12239 (SMB) (the "**Denton Bankruptcy Case**").

9.    On August 1, 2016, Bollea commenced collection efforts and proceedings supplementary against Daulerio in the Bollea I Lawsuit to execute on the Judgment (the "**Daulerio Collection Proceedings**"). Through the Daulerio Collection Proceedings, Bollea obtained an Order on August 17, 2016 transferring certain of Daulerio's assets to Bollea.  Amongst those assets were rights of indemnity that Daulerio claims to have for Gawker Media and GMGI to pay all or part of Daulerio's share of the Judgment (the "**Daulerio Indemnity Rights**"). Bollea and Daulerio both have asserted proofs of claim based on the Daulerio Indemnity Rights in the Bankruptcy Cases.  On November 28, 2016, the Gawker Debtors filed an objection to Daulerio's claims that are based on the Daulerio Indemnity Rights.  The Bankruptcy Court in the Bankruptcy Cases has not adjudicated whether or not the Daulerio Indemnity Rights are valid or the amount of any claims based on the Daulerio Indemnity Rights, and the Gawker Debtors as debtors and debtors in possession have reserved all rights to contest any claims based on the Daulerio Indemnity Rights.

10.     Daulerio also has commenced an appeal in the Second DCA [Case No. 2D16-3721] seeking reversal of the August 17, 2016, Order transferring the Daulerio Indemnity Rights to Bollea (the "**Daulerio Appeal**").

11.     On August 16, 2016, the Gawker Debtors conducted an auction approved by the Bankruptcy Court in the Bankruptcy Cases for the sale of substantially all of their assets  (excluding certain assets associated with the "gawker.com" website discussed below) (the "**Assets**").  During the auction, Ziff Davis, LLC and UniModa, Inc. (a division of Univision) engaged in active bidding for the Assets.  The bidding process started with a "stalking horse" bid by Ziff Davis, LLC of $90 million, and after several rounds of bidding, UniModa, LLC ("**Unimoda**") submitted the highest or otherwise best bid for the Assets, which bid consisted of $135 million in cash plus certain additional non-cash consideration. The Bankruptcy Court approved the sale of the Assets to Unimoda by order dated August 22, 2016 (the "**Sale Order**").

12.     On September 9, 2016, the sale of the Assets closed, pursuant to which Unimoda paid $135 million for the Assets (the "**Cash Proceeds**").  Unimoda elected to exclude the website content at *www.gawker.com,* the corresponding domain name, the GAWKER trademark, and related intellectual property (the "**Gawker.com Assets**") from the purchased assets.  The Gawker.com Assets remain a part of the Gawker Debtors' bankruptcy estates.  Pursuant to the Sale Order, the net Cash Proceeds were placed in an account owned by Gawker Media, subject to all creditors' rights to contest the allocation of the Cash Proceeds between Gawker Media and Gawker Hungary (the "**Allocation Dispute"**).

13.     On October 11, 2016, Gawker filed a motion in the Bankruptcy Cases seeking discovery of Peter Thiel, Charles J. Harder, Esq. and his law firm, Harder Mirell & Abrams LLP, and others regarding possible claims that the Gawker Debtors' might have against Mr. Thiel and/or others in connection with the reported financing by Mr. Thiel of Mr. Bollea's litigation and/or litigation by others (the "**2004 Motion**"). The 2004 Motion remains pending.

14.    On October 13, 2016, in the Bollea I Lawsuit, Bollea filed his Amended Motion for Sanctions and for Order to Show Cause Against Daulerio, individually, as well as against Daulerio's counsel in the Bollea I Lawsuit, Levine Sullivan Koch & Schultz (the "**Sanctions Motion**").  The Sanctions Motion remains pending.

15.    On October 24, 2016, Bollea filed a Dischargeability Complaint against Denton in the Denton Bankruptcy Case; Adversary Case No. 16-ap-01248  (SMB)  (the  "**Denton Dischargeability Adversary**").

B.    WHEREAS, on October 27, 2016, the Parties entered into a Settlement Term Sheet memorializing the essential and material terms and conditions of their settlement of pending litigation and legal proceedings, which requires the execution of this Agreement.

C.    WHEREAS, on November 2, 2016, the Gawker Debtors filed an Amended Joint Chapter 11 Plan of Liquidation (the "**Plan**") and a disclosure statement for that Plan ("**Disclosure Statement**"), both of which incorporated the settlement memorialized in this Agreement.  On November 4, 2016, the Bankruptcy Court entered an order approving the adequacy of the Disclosure Statement, and the Gawker Debtors thereafter commenced solicitation with respect to the Plan.  The Gawker Debtors shall seek confirmation of the Plan at a hearing before the Bankruptcy Court currently scheduled for December 13, 2016.

D.    WHEREAS, each of the Parties to this Agreement believes that it is in the best interests of Bollea, the Gawker Debtors, the Gawker Debtors' bankruptcy estates and their stakeholders, to settle and resolve all claims, disputes, issues or matters that exist between them, in order to: (1) avoid the extremely high costs and uncertainty of continuing with the aforementioned legal proceedings, including, but not limited to, the costs and professional expenses the bankruptcy estates would incur through litigation in the Bankruptcy Cases and the possibility that protracted litigation and appeals would cause Bollea, other creditors and/or GMGI equity holders to receive payment, if at all, years into the future; (2) avoid the lengthy appellate process in the Bollea I Lawsuit; (3) avoid lengthy litigation of issues that have been raised and may be raised in the Bankruptcy Cases relating to the Judgment, Denton Bankruptcy Case, the Allocation Dispute, the Denton Dischargeability Adversary and the Daulerio Collections Proceedings; and

(4) avoid the possibility that the appellate process in the Bollea I Lawsuit could result in a new jury trial, with its associated legal fees and costs, uncertainties and associated appeals of a new judgment.

E.    WHEREAS, the Parties understand and agree that the agreement reflected herein is subject to the approval of the Bankruptcy Court in the Bankruptcy Cases; and such approval is a condition precedent to the Parties' performance of their respective duties and obligations set forth in this Agreement.

## AGREEMENT

1.    **Recitals:**  The above recitals are true and correct, incorporated herein as an integral part of this Agreement, and a material inducement to enter into this Agreement.

2.    **The Plan**: The Plan has been amended so as to be consistent with the terms of this Agreement.  To the extent any future amendments to the Plan are necessary, the Gawker Debtors warrant that any such amendments will be consistent with the terms of this Agreement unless otherwise agreed to by the Parties in writing.  If the Bankruptcy Court denies confirmation of the Plan, the Parties will take commercially reasonable efforts consistent with the Bankruptcy Court's order denying approval of the Plan to seek to obtain approval of this Agreement in a subsequent plan proposed by the Gawker Debtors.

3.    **The Effective Date:**  The Effective Date of this Agreement shall be the date upon which this Agreement and the Plan are approved by the Bankruptcy Court and all conditions necessary to the consummation of the Plan shall have been satisfied (the **"Effective Date"**), unless the Bankruptcy Court denies confirmation of the Plan, in which case the Effective Date shall be the date upon which this Agreement is approved by the Bankruptcy Court in a subsequent plan incorporating the terms of this Agreement proposed by the Gawker Debtors and all conditions necessary to the consummation of that subsequent plan shall have been satisfied**.** The Gawker Debtors shall take all such steps as are reasonable and necessary to cause the Effective Date to occur on or before December 31, 2016.

4.    **Settlement Payment:**  On the Effective Date, or within three (3) business days  thereafter,  the  Gawker  Debtors  will  pay  to  Bollea  the  sum  of

$31,000,000 (THIRTY ONE MILLION DOLLARS AND ZERO CENTS) (the "**Settlement Payment**").  The Settlement Payment shall be made to Terry Bollea c/o Charles J. Harder, Esq. of Harder Mirell Abrams, LLP, by wire transfer as follows:  City National Bank, 400 N. Roxbury Dr., Beverly Hills, CA 90210, Harder Mirell & Abrams LLP Attorney Client Trust Account, ABA/Routing #122016066, Account #123-695-623, SWIFT Code: CINAUS6L.  The payment of the Settlement Payment and any distributions from the Gawker Media Contingent Proceeds Creditor Account (as set forth in Paragraphs 6-8 below) shall be in full satisfaction of the "**Settled Claims,**" which are defined as  (1) any claims asserted by Bollea against the Gawker Debtors, including all proofs of claim filed against the Gawker Debtors by Bollea; and (2) any claims asserted by Bollea against third-parties for which the Gawker Debtors have or may have indemnification, contribution, reimbursement, advance of defense costs, duty to defend or other such obligations arising out of (i) employment, severance or independent contractor agreements, (ii) the Gawker Debtors' organizational documents or governing corporate documents, or (iii) the Gawker Debtors' policies and/or practices (the "**Debtor Indemnification Obligations**").  The Settlement Payment and distributions from the Gawker Media Contingent Proceeds Creditor Account are a compromise of the damages awarded in the Bollea I Lawsuit Judgment and shall not be construed as a total or complete recovery by Bollea for the damages awarded in the Judgment, nor as compensation for any other injuries or damages suffered or incurred by Bollea, including but not limited to, the damages Bollea seeks to recover from Don Buchwald & Associates, Inc., Tony Burton, Michael Calta, Matthew Christian Loyd, Keith M. Davidson, Keith M. Davidson & Associates, P.L.C., Cox Radio, Inc., Tasha Nicole Carrega and Lori Burbridge (collectively, the "**Bollea II Defendants**") in and based on the facts and causes of action at issue in the Bollea II Lawsuit.  The punitive damages already awarded to Bollea and against Denton and Daulerio in the Bollea I Lawsuit, as well as any additional punitive damages which may be sought by Bollea through the Sanctions Motion, are also expressly *excluded* from the Settled Claims.

5.    **Plan Support:**  Bollea agrees to support and vote in favor of confirmation of the Plan.

6.    **Sale of Gawker.com Assets**:    After the Effective Date, the Plan Administrator (as defined in the Plan) shall attempt to sell the Gawker.com Assets.   The Plan Administrator shall be responsible for all costs and

expenses associated with such sale.  The Gawker.com Assets shall not be sold to Denton or any insider of the Gawker Debtors, without the express written consent of Bollea.  Before the Plan Administrator begins any sale process for the Gawker.com Assets, Bollea shall be provided with notice and consultation rights with respect to the sale process.  Forty Five percent (45%) of the net proceeds received from the sale of the Gawker.com Assets shall be deposited into a separate segregated account or trust for the benefit of the Gawker Media's unsecured creditors (the "**Gawker Media Contingent Proceeds Creditor Account**").  Net proceeds received from the sale of the Gawker.com Assets shall mean the proceeds from the sale or disposition of the Gawker.com Assets net of any payments made (a) to any purchasers of the Gawker.com Assets and (b) to an investment bank, if any, working for the Debtors in connection with the sale.  Until such time that the Gawker.com Assets are sold, the Gawker Debtors shall not place any new content on the Gawker.com website that mentions, refers to, relates to or discusses, in any way, Bollea or any of his family members or attorneys.

7.      **Participation in Third-Party Claims**:  The Plan Administrator shall have no obligation to pursue third-party claims for the benefit of the Gawker Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement (as defined in the Plan) or are consistent with the Plan Administrator's fiduciary obligations.  If and to the extent that Bollea requests information regarding the commencement of any third-party claim process, the Plan Administrator shall provide Bollea such information as is reasonably requested, excluding any privileged or other confidential information.   In the event that such third-party claims are pursued, they shall be prosecuted on a contingency fee basis, and Gawker Media shall be responsible for the costs and expenses associated with the prosecution of such claims.  The third-party claims shall be identified at the time of the filing of the Plan Supplement.  Forty-five (45) percent of the net proceeds of any claims prosecuted on behalf of Gawker, GMGI and/or Gawker Hungary against any third-parties shall be deposited into the Gawker Media Contingent Proceeds Creditor Account and distributed pursuant to the Plan, *excluding* (i) proceeds received by any Debtor(s) on account of the outstanding $200,000 loan from GMGI to Denton and (ii) claims against any insurers relating to coverage on account of the Debtors' settlement or payment of claims of Ashley Terrill, Shiva Ayyadurai, and any other litigation plaintiff creditor of the Debtors, which proceeds will be deposited in the Gawker Media Claims Reserve established under the Plan. Net proceeds as used in this paragraph shall mean any applicable recoveries

from third-party claims brought by the Plan Administrator net of any setoffs from such recoveries or contingency fees paid to attorneys out of the recoveries.

8.    **Gawker Media Contingent Proceeds Creditor Account**:  The proceeds of the Gawker Media Contingent Proceeds Creditor Account shall be distributed *pro rata* to the unsecured creditors of Gawker Media with allowed claims, except as to any creditors who disclaim their interest in the Gawker Media Contingent Proceeds Creditor Account.  For purposes of the distribution of the proceeds of the Gawker Media Contingent Proceeds Creditor Account, the amount of Bollea's allowed claim is $84,000,000.

9.    **Delivery and Destruction of Content:**  Within seven (7) days of the Effective Date, Daulerio's October 4, 2012 post on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe for Work but Watch it Anyway," (the "**Daulerio Post**") shall be permanently removed and deleted from the Gawker.com website.  Within thirty (30) days of the Effective Date, the 1:41 video posted on Gawker.com on or about October 4, 2012 (the "**Gawker Video**"), the 30 minute video delivered to Daulerio at Gawker in September 2012 (the "**30-Minute Video**"), and the originals or any copies, portions or excerpts of any and all other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (a/k/a Heather Cole), and any written transcripts, summaries, audio recordings or other recordings of said recordings of Bollea that emanated from recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (a/k/a Heather Cole) (i.e. video recordings and audio recordings obtained by or through discovery in the State Court Action and/or the FBI Action) (collectively, all of which including the Daulerio Post are defined as the "**Content**") in the possession, custody or control of the Gawker Debtors shall be delivered to Bollea, in care of his counsel Charles J. Harder, Esq., and thereafter deleted from all electronic systems and storage devices (including without limitation websites, social media accounts, servers, hard drives, backup tapes, disks, drives, devices and files of all kinds) which are in the possession, custody or control of the Gawker Debtors.  The deletion of the Content in the possession, custody or control of the Gawker Debtors from all electronic systems and storage devices shall be confirmed by the independent computer forensic expert appointed in the Bollea I Lawsuit, ATX Forensics, LLC.  Bollea shall bear the cost for any services performed by ATX Forensics, LLC.  The Gawker Debtors shall also demand the return and deletion of any and all Content in the possession,

custody or control of their counsel, including but not limited to, Levine Sullivan Koch & Schultz ("**LSKS**"), Thomas & Locicero and Brannock & Humphries, as well as the Gawker Debtors' former general counsel, Heather Dietrick; and any such Content that is returned to the Gawker Debtors by their counsel shall then be returned to Bollea in care of his counsel, Charles J. Harder, Esq. The Gawker Debtors shall also demand and cooperate in obtaining Declarations under penalty of perjury from Heather Dietrick, Denton and Daulerio, in substantially the same form as those attached as **Composite Exhibit A**. The Gawker Debtors also agree that as of the Effective Date, they will never again use, publish, disseminate or transmit any Content, or assist anyone in doing so, either directly or indirectly, except as required by this Agreement.

10. **Content Ownership:**  The Gawker Debtors shall quitclaim, assign and transfer to Bollea any and all of their rights, title, interest in, arising out of or associated with any Content, including but not limited to any works of authorship, ownership rights, copyrights, all other intellectual property rights and/or all similar rights, if any, as more specifically set forth in the Rights Transfer Agreement attached hereto as **Exhibit B**.  The Gawker Debtors further affirm, represent and warrant that they have not assigned, sold or transferred any of these rights, title or interests in the Content or arising out of or associated with any Content to any other person or entity.

11. **Consent to Third-Party Transfer:**  The Gawker Debtors shall enter into and, if necessary to achieve the turnover or deletion of the Content described herein, support (at Bollea's expense) all reasonable and appropriate stipulations, motions, directives and/or requests, to be filed or submitted with all appropriate courts, tribunals, offices and persons, including without limitation the Florida state and federal courts (including trial and appellate courts), the FBI, Tampa Police Department, U.S. Attorney's Office, Hillsborough County State Attorneys' Office, Judge James R. Case (Ret.), court reporters, vendors, attorneys and representatives of all such persons and entities, directing such persons and entities to deliver to Bollea or his counsel all Content in their possession, custody or control, and/or that such Content be permanently deleted and destroyed, and that no copies, versions or excerpts thereof may be retained by any of them.  The Gawker Debtors shall also destroy, and instruct their counsel to destroy, all materials which any of them obtained from any of the above-listed persons and entities, by any means, including, but not limited to, through discovery in the Bollea I Lawsuit and the FBI Action.

12. **Continuing Duty to Turnover:**   The Gawker Debtors shall have a continuing obligation to turn over to Bollea, in care of his counsel, any and all Content, should any of them ever come into possession, custody or control of any Content in the future, and to cooperate with Bollea and his counsel in connection with the acquisition, deletion and/or removal of Content.  If any Gawker Debtors ever learn of the existence of any Content in any location other than in the possession of Bollea or his counsel, such Gawker Debtors will promptly notify Bollea's counsel of same in writing, and provide all information regarding same.

13. **Satisfaction of Judgment**:   Within three (3) business days after Bollea's receipt of the Settlement Payment ***and*** the Bankruptcy Court's order approving the Final Settlement Agreement ***and*** a plan of reorganization or liquidation (the "**Approval Order**") becoming a final, non-appealable order, Bollea shall file and record in the Bollea I Lawsuit (a) a Satisfaction of the Final Judgment as to Gawker Media; (b) a Partial Satisfaction of the Final Judgment as to Denton (the Partial Satisfaction shall be only as to the joint and several $115 million compensatory damage award, and shall exclude punitive damages unless Denton has entered into a settlement agreement with Bollea that releases Bollea's punitive damages award as to Denton); and (c) a Partial Satisfaction of the Final Judgment as to Daulerio (the Partial Satisfaction shall be only as to the joint and several $115 million compensatory damage award, and shall exclude punitive damages unless Daulerio has entered into a settlement agreement with Bollea that releases Bollea's punitive damages award as to Daulerio).  The filing and recording of any Satisfactions of Final Judgment shall not impact or preclude Bollea's right to the distributions from the Gawker Media Contingent Proceeds Account set forth in Paragraphs 6 through 8, above; and shall not be construed as a release or satisfaction of any of Bollea's claims, causes of action and/or damages against the Bollea II Defendants.

14. **Dismissal of Appeals**:   Within three (3) business days of the filing of the Satisfaction of Final Judgment as to Gawker Media, the Gawker Debtors shall file Notices of Voluntary Dismissals with Prejudice of all pending appeals associated with the Bollea I Lawsuit, including, without limitation, Florida Second DCA Case Nos. 2D15-5035 (the Leak Appeal) and 2D16-2535 (the Judgment Appeal).

15. **Dismissal of Gawker Media from Bollea II**:  Within three (3) business days of Bollea's receipt of the Settlement Payment *and* the Approval Order becoming a final, non-appealable order, Bollea shall dismiss his claims against Gawker Media in the Bollea II Lawsuit with prejudice.  Further, subject to the Approval Order becoming a final, non-appealable order, Bollea agrees that he shall not join or add GMGI, Gawker Hungary, Denton, Daulerio, Heather Dietrick, or any of the Gawker Debtors' current or former employees, writers, agents or independent contractors as parties (the "**Bollea II Released Parties**") to the Bollea II Lawsuit and waives any right to seek any damages or compensation from the Bollea II Released Parties arising out of Bollea's claims in the Bollea II Lawsuit.  This release and agreement not to pursue claims, damages and compensation as to the Bollea II Released Parties in connection with the Bollea II Lawsuit specifically *excludes* all of the other Bollea II Defendants; any and all of Bollea's rights, claims, demands, remedies, causes of action, damages, relief and rights to compensation against the other Bollea II Defendants; and any claims against Denton and Daulerio for any breach of any representations and warranties made in connection with separate settlement agreements by Denton and/or Daulerio relating to the Leak.  Within three (3) business days of the Approval Order becoming a final, non-appealable order, Gawker Media shall dismiss with prejudice its DQ Appeal (Florida Second DCA Case No. 2D16-2477) and withdraw its DQ Motion with prejudice.

16. **Bollea Release**:  Effective upon receipt of the Settlement Payment (the "**Bollea Release Effective Date**"), Bollea, for himself and his predecessors, successors and assigns, and heirs, as applicable, hereby absolutely and forever releases and discharges the Gawker Debtors, and each of their respective subsidiaries and/or affiliate corporations, officers, directors, shareholders, members, employees, insurers (if any), managers, agents, attorneys, representatives, consultants, contractors and attorneys-in-fact (the "**Gawker Released Parties**") from any and all claims, demands, damages (including any claim(s) for punitive damages), debts, liabilities, accounts, reckonings, obligations, costs (including attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature, whether in law or in equity, whatsoever, which Bollea now has, ever had, or may claim to have, whether known to Bollea or not, against any of the Gawker Released Parties, from the beginning of time until the Bollea Release Effective Date; specifically *excluding* the Permanent Injunction entered in the State Court Action, Bollea's claims for punitive damages against Denton and Daulerio, the relief sought in the Sanctions Motion, and claims and causes of action

based upon the obligations, representations and warranties set forth in this Agreement and in any settlement agreements reached between Bollea and Denton and/or Daulerio.  This release by Bollea also specifically *excludes* all of Bollea's claims, causes of action, remedies, damages, relief, injuries, demands and rights to compensation against or from each and every of the Bollea II Defendants.  This Bollea Release is provided as a compromise of the damages awarded in the Judgment and should not be construed as a total or complete recovery by Bollea of the damages awarded in the Judgment, as compensation for any of the damages and injuries at issue in the Bollea II Lawsuit, nor as a release of any of the Bollea II Defendants.

17.   **The Gawker Released Parties' Release:**  Effective upon the recording of the Satisfaction of Final Judgment as to Gawker Media (the "**Gawker Release Effective Date**"), the Gawker Released Parties absolutely and forever release and discharge Bollea and his predecessors, successors and assigns, heirs, representatives, employees, managers, agents, attorneys, consultants, contractors, affiliates, attorneys-in-fact and insurers ("**Bollea Released Parties**") from any and all claims, demands, damages (including any claim(s) for punitive damages), debts, liabilities, accounts, reckonings, obligations, costs (including  attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature, whether in law or in equity, whatsoever, which the Gawker Released Parties now have, ever had, or may claim to have, whether known to the Gawker Released Parties or not, against any of the Bollea Released Parties, from the beginning of time until the Gawker Release Effective Date; specifically *excluding* any claims and causes of action based upon the obligations, representations and warranties set forth in this Agreement.  Notwithstanding the foregoing, no Gawker Released Party (other than Bollea personally, from whom no discovery will be sought) is released from any obligations to respond to any discovery, except to the extent set forth in Paragraph 18.

18.   **2004 Motion and Associated Claims**:  The Gawker Debtors will continue to suspend prosecution of the 2004 Motion through at least the Effective Date (the "**Suspension Period**").  In the event that the Suspension Period expires and the Gawker Debtors pursue the 2004 Motion, the Gawker Debtors shall not seek from Bollea or any other third party any discovery about Bollea, including, without limitation, discovery concerning the subject matter of the 2004 Motion, litigation funding or finance, the Bollea I Lawsuit, the  Bollea  II  Lawsuit,  the  Bankruptcy  Cases,  the  Denton

Bankruptcy Case, the Daulerio Collection Proceedings, and/or any and all related proceedings, whatsoever.

19. **Cooperation to Secure Agreements**:  The Parties shall cooperate and work in good faith to secure settlement agreements with Denton,  Daulerio, Peter Thiel, and Thiel Capital, LLC as set forth in the Cooperation to Secure Agreements attached hereto as **Exhibit C**.  The Parties expressly agree that it is not a condition of any other obligation or right in this Agreement that any or all of the agreements described in the Cooperation to Secure Agreements be consummated.

20. **Dismissal of Dischargeability Action:**   Bollea agrees that, upon the consummation of a settlement agreement with Denton, the Dischargeability Action against Denton will be dismissed with prejudice.

21. **Daulerio Proceedings**:   Bollea agrees that, upon the consummation of a settlement agreement with Daulerio, Bollea will withdraw the Sanctions Motion solely as to Daulerio in his individual capacity with prejudice and will dissolve the writ of garnishment pending against Daulerio in the Bollea I Lawsuit.  Bollea further agrees to suspend all collection efforts against Daulerio and suspend prosecution of the Sanctions Motion solely as against Daulerio in his individual capacity, pending negotiation of the contemplated settlement agreement with Daulerio.  If that settlement agreement cannot be reached, Bollea may recommence collection efforts against Daulerio as to the punitive damages awarded against Daulerio and may prosecute the Sanctions Motion as to Daulerio in his individual capacity.  Bollea agrees that, as to Daulerio's counsel, LSKS, he will advise the judge in the Bollea I Lawsuit of the settlement reached between the Parties, and defer to the Bollea I Lawsuit judge as to whether she is inclined to proceed with the Sanctions Motion as to LSKS.

22. **Miscellaneous Provisions:**

   A.   **Binding Effect.**  This Agreement shall bind and inure to the benefit of each of the Parties hereto and their respective successors in interest.

   B.   **Final Integrated Agreement.**  This Agreement constitutes the entire, final and binding understanding between the Parties hereto.  No other statement or representation, written or oral, express or implied, has been received or relied upon in the Agreement unless specifically set

forth herein, and all prior and contemporaneous discussions, statements and negotiations made or which have occurred prior to or simultaneous with the date of this Agreement shall be deemed merged into this Agreement and of no legal force or effect. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties. The Parties hereto agree to execute such other documentation as is necessary to carry out the terms of this Agreement.

C.   **Voluntary Agreement.**   Each Party enters into this Agreement knowingly and voluntarily, in the total absence of any fraud, mistake, duress, coercion, or undue influence and after careful thought and reflection upon this Agreement and, accordingly, by signing this document, each signifies full understanding, agreement and acceptance.

D.   **Representation Regarding Non-Assignment of Claims.**   Each Party represents that it has not assigned or transferred to any third party, any claims or rights that it has or might have relating to any and all claims, contentions or any matters in dispute between or relating to the Parties as of the Effective Date.

E.   **Multiple Counterparts.**   This Agreement, and any document referred to herein, may be executed in any number of counterparts and by facsimile or email (*i.e.*, a .pdf file), each of which shall be deemed an original and all of which together shall constitute one single legal instrument.

F.   **Authorship.**   Each of the Parties hereto have jointly participated in the negotiation and drafting of this Agreement. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the Parties hereto and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any ambiguity or question of interpretation or intent shall be decided by the Bankruptcy Court

G.   **Governing Law/Enforcement of Terms**.   This Agreement shall be construed under the laws of the State of New York. Any action to enforce or interpret any of the terms and conditions of this Agreement shall be brought in the Bankruptcy Court or, if the Bankruptcy Court

determines that jurisdiction does not lie therein, in the state or federal courts of New York, New York, and all parties hereto consent to the exclusive jurisdiction and venue of such court(s) for the enforcement and/or interpretation of this Agreement.

**H.**    **Waiver.**  Any waiver by any Party of any provision of this Agreement or breach thereof will not operate or be construed as a waiver of any other provision or subsequent breach thereof.  Any waiver by a Party must be in writing to be effective.

**I.**    **Severability**.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

### [SIGNATURES FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the Parties execute this Settlement Agreement as of December 9, 2016.

Date: _____, 2016          _____
                                       TERRY GENE BOLLEA, professionally
                                       known as "Hulk Hogan"

Date: _____, 2016          GAWKER MEDIA LLC

                                       By: _____

                                       Print: _____ Title: _____

Date: _____, 2016          GAWKER HUNGARY, KFT

                                       By: _____

                                       Print: _____ Title: _____

Date: _____, 2016          GAWKER MEDIA GROUP, INC.

                                       By: _____

                                       Print: _____ Title: _____

## <u>Composite Exhibit A</u>

## <u>DECLARATION OF ALBERT JAMES DAULERIO</u>

1.    My name is Albert James Daulerio, aka "A.J. Daulerio."  I am over the age of eighteen and have personal knowledge of the matters set forth in this Declaration, either firsthand or through my counsel.

2.    I am aware, and have been advised by my counsel, that making a materially false statement of fact in a declaration can subject me to a criminal prosecution for perjury if I knew or believed that the statement was not true when I signed the declaration.

3.    In September, 2012, I was the Editor-In-Chief of Gawker.com.  In that capacity, I was contacted by Tony Burton about a Hulk Hogan sex tape.  Mr. Burton asked for my mailing address in order to arrange for the delivery of a DVD.  Shortly after that, one of my colleagues at Gawker received a DVD intended for me that contained a video and audio recording—just over 30 minutes long—of Terry Bollea, aka Hulk Hogan, having conversations and engaging in sexual activity in a bedroom with Heather Clem, n/k/a Heather Cole (The "30-Minute Video").  Soon after receiving the 30-Minute Video, Mr. Burton contacted me to confirm that I had received the DVD.

4.    On October 4, 2012, I posted an article on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe For Work but Watch it Anyway" (the "10/4/2012 Post"), which included a 1:41 excerpt derived from the 30-Miniute Video (the "Gawker Video").

5.    In early 2013, I resigned from Gawker.com.  When I left Gawker, I did not have and did not take the originals or any copies, portions or excerpts, in full or in part, whether in hard copy or electronic format, of the 30-Minute Video or the Gawker Video.

6.    On July 24, 2015, July 28, 2015, August 10, 2015 and August 26, 2015, *The National Enquirer* and *Radar Online* published the articles attached hereto as **Composite Exhibit 1**, which report on statements attributed to Mr. Bollea and that transcripts containing such statements "have been filed in a Florida court, under seal…"  I am not the source of any of the statements attributed to Mr. Bollea in the articles attached as **Exhibit 1**.  I have no personal, firsthand knowledge of how *The National Enquirer* or *Radar Online* obtained any of the statements attributed to Mr. Bollea in **Exhibit 1**.  Before the articles attached as **Exhibit 1** were published, I had not read or heard any

of the statements attributed to Mr. Bollea in the articles, and I did not possess, have custody, or control of any recordings, summaries, transcripts or other records of the statements attributed to Mr. Bollea on any medium (*e.g.,* magnetic, digital, electronic paper). I do not know whether it is true that transcripts that contained the statements that were attributed to Mr. Bollea in **Exhibit 1** are filed under seal in a Florida court, or were filed under seal when the articles in **Exhibit 1** were posted. I did not assist or facilitate, request or induce, any other person or entity to provide any of the statements attributed to Mr. Bollea, nor any recordings, transcripts, summaries, or other records containing such statements, to *The National Enquirer* or *Radar Online*.

A. Before any of the articles attached as Exhibit 1 were posted, I had read online reports of the existence of one or more audio recordings of Hulk Hogan that supposedly contained language described in ways that are consistent with the nature of the statements attributed to Mr. Bollea in the articles comprising Exhibit 1). I may have conversed with others orally or in writing about the substance of those online reports, but I did not learn or know what words Hogan supposedly used.

B. Before any of the articles attached as Exhibit 1 was posted, I did not know that any of my lawyers possessed or controlled any record whose content included any of the language—whether verbatim or in substance—attributed to Hulk Hogan in the articles attached as Exhibit 1, if, indeed, any of my lawyers possessed or controlled any such record.

7. Since I left Gawker in early 2013, I have not had any copies of, nor any remote access to, directly or indirectly, the 30-Minute Video, the Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem; with the exception that, when preparing for the trial of this case in March 2016, my attorneys, Levine Sullivan Koch & Schulz ("LSKS"), provided me with a single flash drive (the "Flash Drive") containing digital copies of various exhibits expected to be introduced at trial.

8. I signed a declaration in October, 2016, which my counsel filed with the Florida court, attesting that the Flash Drive contained the Gawker Video and 30-Minute Video. That was based on my attorneys at the Levine Sullivan firm telling my new counsel, David Marburger, that the 30-Minute Video

was on the Flash Drive.  In hindsight, I am not positive whether the 30-Minute Video was on the Flash Drive.

9.    During the first weekend of October 2016, I delivered the Flash Drive to a lawyer of the LSKS law firm.  While that Flash Drive was in my possession, I did not make any copies of, save, store, send, disseminate, distribute, or deliver any of the materials it contained, did not record any of the materials it contained, did not upload any of the contents of the Flash Drive to any other electronic device(s), drives, storage systems, cloud based storage or similar media; and I did not ask, permit, direct or otherwise allow any other person or entity to copy, upload, record, disseminate, distribute, deliver, send, save, store or disclose any of the contents of the Flash Drive to any other person or entity.

10.    When I delivered that Flash Drive to LSKS, it contained the only copy of the 30-Minute Video and the Gawker Video that I believed to be in my possession or under my control (excluding any copies that the law firm had). I deleted nothing from the Flash Drive before delivering it to the Levine Sullivan firm.  Accordingly, if the 30-Minute Video is on that Flash Drive now, I agree that it was on the Flash Drive when I possessed it.  If it was, I never accessed, opened, copied, transferred, saved, stored, sent, uploaded or downloaded the file containing the 30-Minute Video.  As set forth in the Settlement Agreement, I hereby instruct LSKS to immediately deliver the Flash Drive to Mr. Bollea's counsel, Charles Harder, Esq.

11.    To the best of my knowledge, since I returned the Flash Drive to LSKS, I have not possessed nor had any access to, directly or indirectly, the 30-Minute Video or the Gawker Video contained on the Flash Drive, nor possessed nor had access to any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.

12.    Since October 4, 2012, I have owned up to five (5) cell phones, three (3) laptop computers, and three (3) iPads.  All three of my iPads were lost or stolen, but none of them contained the 30-Minute Video, the Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.  One of my cell phones broke, and two others were lost or stolen, but none of them contained the 30-Minute Video, the Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.  During the course of this litigation, I delivered two (2) laptop computers and one (1) cell phone to the LSKS law firm.  These devices are currently being stored in the LSKS vault.

In August, 2015, I purchased a third (3rd) laptop computer and a cell phone. Those are currently in my possession.

13.    As part of my settlement with Mr. Bollea in this case, I have agreed that a computer forensic expert, ATX Forensics, LLC, shall be entitled to take possession of the two (2) laptop computers and cell phone currently being stored in LSKS's vault, create a forensic image of such devices, and then completely delete and/or destroy the hard drives on those devices. Once these devices are wiped clean, they shall be returned to me. The forensic images of the hard drives of these devices shall be maintained confidentially by ATX Forensics, LLC; and no one shall have access to their contents, including Mr. Bollea. These forensic images shall be maintained by ATX Forensics, LLC for a period of ten (10) years, so that they may be preserved for purposes of any pending litigation. In the event that any person or entity makes a discovery request or issues a subpoena calling for the disclosure of any of the contents of these devices, ATX Forensics, LLC shall prepare an index of their contents to be reviewed by me and/or my counsel for responsiveness and privileged or confidential information, before any of their contents may be disclosed.

14.    In October, 2016, I gave my third laptop and my current cell phone to my counsel, David Marburger. With my approval, he gave them to the forensic digital investigation firm of Vestige, Ltd. in Medina, Ohio, which was to make an image of the laptop's and phone's hard drives and delete everything from the original hard drives. I will cause my counsel, David Marburger, to instruct Vestige to provide the forensic image of my third laptop and cell phone to ATX Forensics, LLC without retaining any copies. I will also cause Mr. Marburger to instruct Vestige to provide a certification that the hard drive on my third laptop computer and cell phone, both of which have since been returned to me, were completely and permanently deleted or, if they were replaced, that the original hard drives have been destroyed. Once Vestige delivers the forensic image of the hard drives of my third laptop computer and cell phone to ATX Forensics, LLC, I understand that ATX Forensics, LLC will preserve the images subject to the same terms and conditions set forth in paragraph 13, above. I will instruct Mr. Marburger to take the above-described actions within three (3) business days of the recording of the Daulerio Punitives Satisfaction, as set forth in the Settlement Agreement with Mr. Bollea.

15.    Except as otherwise described explicitly in this Declaration, since the date of my 10/4/2012 Post, I have never delivered, transferred, provided,

transmitted, sent, disseminated, distributed, copied, saved, stored, uploaded, downloaded or recorded the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video or any other video or audio recordings of Mr. Bollea in the bedroom of Bubba and Heather Clem to anyone other than Gawker's counsel of record in the State Court Action. Since the date of my 10/4/2012 Post, I have never instructed, allowed, asked, permitted or directed, indirectly or directly, any other person or entity to deliver, transfer, provide, transmit, send, disseminate, distribute, copy, save, store, upload, record, disclose or otherwise preserve the originals or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video or any other video or audio recordings of Mr. Bollea in the bedroom of Bubba and Heather Clem to anyone.

16.    I hereby acknowledge the entry, validity and enforceability of a Permanent Injunction against me by Pinellas County, Florida Circuit Court Judge Pamela Campbell on or about June 7, 2016, a copy of which is attached hereto as **Exhibit 2**, and agree to be bound by the Permanent Injunction.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____ (date)

_____
A.J. Daulerio

## DECLARATION OF NICHOLAS DENTON

1.      My name is Nicholas G.A. Denton aka Nick Denton.  I am over the age of eighteen and have personal knowledge of the matters set forth in this Declaration.

2.      I am aware, and have been advised by my counsel, that it is a crime to attest to any facts set forth in this Declaration that are not true.

3.      I am currently the Executive Vice President of Gawker Media, LLC ("Gawker Media") and was previously the CEO of Gawker Media.

4.      In October, 2012, I became aware that the then-Editor-In-Chief of Gawker.com, A.J. Daulerio ("Daulerio"), received a DVD containing a video and audio recording—just over 30 minutes long—of Terry Bollea, aka Hulk Hogan ("Bollea"), having conversations and engaging in sexual activity in a bedroom with Heather Clem, nka Heather Cole (the "30-Minute Video").

5.      On October 4, 2012, Daulerio posted an article on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe For Work but Watch it Anyway" (the "10/4/2012 Post"), which included a 1:41 excerpt derived from the 30-Miniute Video (the "Gawker Video").

6.      Bollea thereafter filed suit against me, Daulerio, Gawker Media, Gawker Hungary Kft. (f/k/a Kinja Kft.), and Gawker Media Group, Inc. (collectively, the "Gawker Debtors") (collectively, Denton, Daulerio and the Gawker Debtors are referred to as the "Gawker Parties"), amongst others, in the Sixth Circuit Court in and for Pinellas County, Florida, Case No. 12012477CI-011 (the "Bollea I Lawsuit").  Bollea asserted causes of action for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section 934.10, Florida Statutes.

7.      On May 19, 2015, Gawker filed an action against the Federal Bureau of Investigation and Executive Office for the United States Attorney, Case No. 8:15-cv-01202-SCB-EAJ (the "FBI Action"), in order to obtain discovery related to the Bollea I Lawsuit.

8.      On October 21, 2015, the Court in the Bollea I Lawsuit entered an Order permitting certain discovery to determine whether I, Daulerio and/or Gawker

Media were involved in leaking certain sealed discovery related to the Bollea I Lawsuit and FBI Action to *The National Enquirer* and/or *Radar Online* (the "Leak Order").  *The National Enquirer and Radar Online* published articles in July and August, 2015, disclosing contents of recordings of Bollea, which they reported were part of sealed discovery in the Bollea I Lawsuit (the "Leak").  We appealed the Leak Order to Florida's Second District Court of Appeal ("Second DCA"), which appeal [Case No. 2D15-5035] is currently stayed.

9.      On May 2, 2016, Bollea filed a new action against several defendants including Gawker Media, Don Buchwald & Associates, Cox Radio, Inc. and others, in the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 16-002861-CI (the "Bollea II Lawsuit").  In the Bollea II Lawsuit, Bollea asserted claims against Gawker Media for intentional interference with contractual relations and advantageous business relationships and intentional infliction of emotional distress.  Gawker Media moved to disqualify the trial judge presiding over the Bollea II Lawsuit (the "DQ Motion").  When the DQ Motion was denied, Gawker Media appealed to the Second DCA [Case No. 2D16-2477].  The claims against Gawker Media in the Bollea II Lawsuit are currently stayed as a result of the Suggestion of Bankruptcy filed with respect to Gawker Media's pending bankruptcy proceedings in the Southern District of New York, and the entire Bollea II Lawsuit is currently stayed in the Second DCA pending a resolution by the Second DCA of Gawker Media's DQ Motion.

11.     I never received or viewed any of the contents of any materials designated as "Highly Confidential—Attorneys' Eyes Only" under a Protective Order entered in the Bollea I Lawsuit.

12.     I have never provided, delivered, transferred, transmitted, sent, saved, stored, uploaded, downloaded or provided access to the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video, or any other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (nka Heather Cole), or any written transcripts or summaries of such recordings, to anyone other than Gawker's counsel of record in the Bollea I Lawsuit, except for the Gawker Video and the 10/4/2012 Post as and while they appeared on Gawker.com.

13.     I never provided and do not know that any current or former employee, agent, officer, director, manager or member of the Gawker Debtors ever provided the original or any copies, in full or in part, of the 30-Minute Video

or the Gawker Video to anyone other than Gawker's counsel of record in the Bollea I Lawsuit.

14.     I do not own, hold or assert, and have never asserted any, rights, title or interest in, arising out of and/or relating to the 30-Minute Video, the Gawker Video, the 10/4/2012 Post, or any other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, or any written transcripts or summaries of such recordings, and I have never assigned, sold or transferred or purported to assign, transfer or sell, any such rights, title and or interest to any other person or entity.

15.     Except insofar as my jointly retained attorneys with the Gawker Debtors have possession of such materials, I do not currently have, possess or have access to the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video, the Gawker Video, or any other video or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem, or any written transcripts or summaries of such recordings

16.     To the best of my knowledge, since the Judgment was entered in the Bollea I Lawsuit, I have not accessed or had any copies of the 30-Minute Video, Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.   I understand that the Permanent Injunction entered in the Bollea I Lawsuit, which I am not appealing, shall remain in full force and effect, and the order and judgment contained in the Permanent Injunction shall continue to be binding on and enforceable against me.

17.    I did not personally provide or disseminate, and do not know the source of, any transcripts and/or recordings of Bollea in the Clems' bedroom that were reported on by *The National Enquirer* and *Radar Online* in July-August 2015.  I did not assist in or facilitate, solicit, request or induce, any other person or entity to provide the transcripts and/or recordings of Bollea in the Clems' bedroom to *The National Enquirer* or *Radar Online* in July-August 2015 and do not know who provided those transcripts and/or recordings to *The National Enquirer* and *Radar Online*.

I declare under penalty of perjury that the foregoing is true and correct.

     Signed on _____ (date)

                       _____

                       Nicholas G.A. Denton aka
                       Nick Denton

## DECLARATION OF HEATHER DIETRICK

1.      My name is Heather Dietrick.  I am over the age of eighteen and have personal knowledge of the matters set forth in this Declaration.

2.      As an attorney, I am aware that it is a crime to attest to any facts set forth in this Declaration that are not true.

3.      I was formerly the President and General Counsel of Gawker Media, LLC ("Gawker Media").

4.      On October 4, 2012, A.J. Daulerio posted an article on Gawker.com titled, "Even for a Minute, Watching Hulk Hogan Have Sex in a Canopy Bed is Not Safe For Work but Watch it Anyway" (the "10/4/2012 Post"), which included a 1:41 excerpt derived from the 30-Miniute Video (the "Gawker Video").

5.      Bollea thereafter filed suit against Nick Denton; A.J. Daulerio; Gawker Media; Gawker Media Group, Inc. ("GMGI"); Gawker Entertainment, LLC; Gawker Technology, LLC; Gawker Sales, LLC; Kate Bennert, and Blogwire Hungary Szellemi Alkotast Hasznosito KFT aka "Gawker Media", amongst others, in the Sixth Circuit Court in and for Pinellas County, Florida, Case No. 12012477-CI-011 (the "Bollea I Lawsuit").  Bollea asserted causes of action for invasion of privacy by intrusion upon seclusion, publication of private facts, violation of Florida common law right of publicity, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of section 934.10, Florida Statutes.

6.      On May 19, 2015, Gawker Media filed an action against the Federal Bureau of Investigation and Executive Office for the United States Attorney, Case No. 8:15-cv-01202-SCB-EAJ (the "FBI Action").

7.      On October 21, 2015, the Court in the Bollea I Lawsuit entered an Order permitting certain discovery to determine whether I, Denton, Daulerio and/or Gawker Media were involved in leaking certain sealed discovery related to the Bollea I Lawsuit and FBI Action to *The National Enquirer* and/or *Radar Online* (the "Leak Order").  *The National Enquirer and Radar Online* published articles in July and August, 2015, disclosing contents of recordings of Bollea, which it reported were part of sealed discovery in the Bollea I Lawsuit (the "Leak").  We appealed the Leak Order to Florida's Second District Court of Appeal ("Second DCA"), which appeal [Case No. 2D15-5035] is currently stayed.

8.      On May 2, 2016, Bollea filed a new action against several defendants including Gawker Media, Don Buchwald & Associates, Cox Radio, Inc. and others, in the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 16-002861-CI (the "Bollea II Lawsuit").   In the Bollea II Lawsuit, Bollea asserted claims against Gawker Media for intentional interference with contractual relations and advantageous business relationships and intentional infliction of emotional distress.   Gawker Media moved to disqualify the trial judge presiding over the Bollea II Lawsuit (the "DQ Motion").   When the DQ Motion was denied, Gawker Media appealed to the Second DCA [Case No. 2D16-2477]. The claims against Gawker Media in the Bollea II Lawsuit are currently stayed as a result of the Suggestion of Bankruptcy filed with respect to Gawker Media's pending bankruptcy proceedings in the Southern District of New York, and the entire Bollea II Lawsuit is currently stayed in the Second DCA pending a resolution by the Second DCA of Gawker's DQ Motion.

9.      In my capacity as General Counsel of Gawker Media, I was responsible for supervising the Bollea I Lawsuit, FBI Action and Bollea II Lawsuit.

10.     As Gawker Media's counsel, I was a "Qualified Person" entitled to receive and view materials designated as "Highly Confidential—Attorneys' Eyes Only" under a Protective Order entered in the Bollea I Lawsuit.

11.     I have never provided, delivered, transferred, transmitted or provided access to the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video or the Gawker Video to anyone other than Gawker Media's counsel of record in the Bollea I Lawsuit.

12.     I am not aware of any current or former employee, agent, officer, director, manager or member of Gawker Media providing the original or any copies, portions or excerpts, in full or in part, of the 30-Minute Video or the Gawker Video to anyone other than Gawker Media's counsel of record in the Bollea I Lawsuit.

13.     I have never provided, delivered, transferred, or transmitted copies of, or access to the contents of, any materials designated as "Highly Confidential-Attorney's Eyes Only" in the Bollea I Lawsuit Action to any other person.

14.    Since I left Gawker Media, and to the best of my knowledge, I have not had any access to, directly or indirectly, the 30-Minute Video, Gawker Video or any other audio or video recordings of Mr. Bollea in the bedroom of Bubba Clem and Heather Clem.

15.    I was not, directly or indirectly, involved in any way in providing or disseminating, and have no personal knowledge of the source of, any transcripts and/or recordings of Bollea in the Clems' bedroom that were reported on by *The National Enquirer* and *Radar Online* in July-August 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _____ (date)


_____
Heather Dietrick

## Exhibit B

## RIGHTS TRANSFER AGREEMENT

For good and valuable consideration set forth in that certain Settlement Agreement between Gawker Media LLC ("Gawker Media"), Gawker Hungary Kft. (f/k/a Kinja Kft.) ("Gawker Hungary"), and Gawker Media Group, Inc. ("GMGI") (collectively, the "Gawker Debtors") and Terry Gene Bollea (a/k/a Hulk Hogan) ("Bollea") dated as of December___, 2016, the Gawker Debtors hereby perpetually, irrevocably and unconditionally assign, transfer and convey to Bollea all of the Gawker Debtors' rights, title and interest, including without limitation all rights in, arising out of, and/or associated with any works of authorship, copyrights, trademarks and all other intellectual property rights, in and to any and all video recordings, audio recordings, written transcripts and/or written summaries, and all related content, as well as all derivative works therefrom, depicting Bollea in any way in the bedroom of Bubba Clem and Heather Clem including all conversations, nudity and/or sexual activity related thereto, and further including all rights in, arising out of and/or associated with Bollea's name, voice, image, likeness and identity, and including without limitation rights of personality, privacy and publicity, rights of attribution and any other rights of any alleged author (all such works, along with the exception stated in the following two sentences, are collectively referred to herein as the "Works").  The Works shall specifically include, but not be limited to the following:

1.    The 1:41 video posted on Gawker.com on or about October 4, 2012 (the "**Gawker Video**");

2.    The 30 minute video delivered to Daulerio at Gawker in September 2012 (the "**30-Minute Video**");

3.    A.J. Daulerio's post accompanying the 1:41 video published on Gawker.com on October 4, 2012 ("**Daulerio's Post**"); and

4.    The originals or any copies, portions or excerpts of any and all other video and/or audio recordings of Bollea in the bedroom of Bubba Clem and Heather Clem (aka Heather Cole), and any and all written transcripts and summaries thereof or relating thereto.

As for any rights in or associated with the Works held by the Gawker Debtors, the Gawker Debtors represent and warrant to Bollea that the Gawker Debtors exclusively own all such rights, title and interest in and to the Works, have never

transferred any of their rights in or associated with the Works to any third-party, nor licensed to any third-party any rights in or associated with the Works, and that the Works are free from any liens, encumbrances, security interests and restrictions on transfer.

Any of the Works authored by A.J. Daulerio while he was employed by or for the Gawker Debtors were works for hire owned exclusively by the Gawker Debtors.

Should the Gawker Debtors acquire any right, title or interest in or to the Works, or any of them, after the Effective Date, then all such rights, title and interest will automatically revert to Bollea, unless Bollea expressly states that he does not wish to acquire such rights in a writing signed by Bollea.

The Gawker Debtors agree to cooperate with Bollea in connection with the enforcement of authorship rights, copyrights and trademarks in connection with the Works, including without limitation, signing documentation consistent with the foregoing.  The Gawker Debtors shall take all actions and execute all documents as Bollea may reasonably request to effectuate the transfer of the Works and the vesting of complete and exclusive ownership of the Works in Bollea.

A breach of this Rights Transfer Agreement will result in irreparable harm to Bollea, for which there is no adequate remedy at law.  Accordingly, in the event of a breach, Bollea shall be entitled to specific performance, injunctive relief and other adequate remedies to enforce and protect his rights hereunder.  In the event such legal action becomes necessary, the Gawker Debtors waive the necessity of posting a bond.

Agreed and accepted:

Date: _____, 2016          GAWKER MEDIA LLC

By: _____

Print: _____ Title: _____

Date: _____, 2016          GAWKER HUNGARY KFT

By: _____

Print: _____ Title: _____

Date: _____, 2016          GAWKER MEDIA GROUP, INC.

                                      By: _____

                                      Print: _____ Title: _____

Date: _____, 2016          _____

                                      TERRY GENE BOLLEA, professionally
                                      known as "Hulk Hogan"

## Exhibit C

## Cooperation to Secure Agreements

The Gawker Debtors will assist Bollea in reaching an agreement with Nick Denton, pursuant to which, in exchange for the dismissal of Bollea's Dischargeability Complaint against Denton in *In re Nicholas A.G. Denton,* Case No. 16-12239-smb (the "**Denton Bankruptcy Case**"), with prejudice, and the satisfaction of Bollea's punitive damage award against Denton in the Bollea I Lawsuit (which punitive damages would then be included as a claim satisfied by the Settlement Payment as set forth in Paragraph 4 of the Settlement Agreement between Bollea and the Gawker Debtors to which this exhibit is an attachment and whose defined terms are used herein), Denton shall agree to the dismissal of the Leak Appeal and the Judgment Appeal, the execution by Denton of a declaration substantially in the form attached to the Agreement as **Exhibit A**, and the return and assignment of any rights associated with the Content, and Denton and Bollea shall execute for themselves, the Denton Estate, and each of their successors, assigns and heirs, mutual general releases of each other and their estates, predecessors, successors, assigns, heirs, agents, attorneys and representatives, and each of them, of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature whatsoever from the beginning of time; specifically excluding the Permanent Injunction entered in the Bollea I Lawsuit, the other Bollea II Defendants, and other obligations as may be applicable under the Agreement between Bollea and Denton.

The Gawker Debtors will assist Bollea in reaching an agreement with AJ Daulerio, pursuant to which, in exchange for the satisfaction of Bollea's punitive damage award against Daulerio in the Bollea I Lawsuit (which punitive damages would then be included as a claim satisfied by the Settlement Payment as set forth in Paragraph 4 of the Agreement), and the resolution of the Daulerio Collection Proceedings and other pending motions in the Bollea I Lawsuit, Daulerio shall agree to the dismissal of the Daulerio Appeal, Leak Appeal and Judgment Appeal, the return and assignment of any rights associated with the Content as set forth in the Rights Transfer Agreement, and the execution by Daulerio of a Declaration substantially in the form attached to this Agreement as **Exhibit A**, Daulerio and Bollea shall execute for themselves and each of their predecessors, successors, assigns, heirs, insurers, agents, representatives and attorneys, mutual general releases of each other and their predecessors, successors, assigns, heirs, insurers (if any), agents, attorneys and representatives, and each of them, of and from any and

all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorneys' fees), expenses, liens, actions, and causes of action of every kind and nature whatsoever from the beginning of time; specifically excluding the Permanent Injunction entered in the Bollea I Lawsuit, the relief sought in the Sanctions Motion as to LSKS, the other Bollea II Defendants, and other obligations as may be applicable under the Agreement between Bollea and Daulerio.

The Parties will cooperate and work in good faith to facilitate an agreement between the Gawker Debtors, Nick Denton, Peter Thiel, and Thiel Capital, LLC, for themselves, and each of their respective subsidiaries, officers, directors, shareholders, members, predecessors, successors, assigns, heirs, insurers, agents, representatives, and attorneys, which agreement would include mutual general releases.