# **EXHIBIT B**

E-mail Correspondence from XP Vehicles
Dec. 12, 2016 at 8:07 p.m. (ET)

**McGee, Alex**

| | |
|---|---|
| **From:** | XP VEHICLES <legal@xpvehicles.com> |
| **Sent:** | Monday, December 12, 2016 8:07 PM |
| **To:** | McGee, Alex |
| **Subject:** | Re: Honorable Judge Stuart M. Bernstein - RE: Gawker Case # 16-11700 (SMB) REQUEST FOR SIGNED SWORN STATEMENTS FOR COURT AND LAW ENFORCEMENT RECORDS |
| **Attachments:** | 126017005208-rep-1112033025.pdf |

XP Vehicles Task Force
Email: **legal@xpvehicles.com**
**BRANCHES CASE FILES: http://globalscoop.net  (in re: CASE #2788-D)**


Alliance of witnesses and victims in
association with Claimants and
Plaintiffs in pro per

Dec. 13, 2016




UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
In re
)
)
)
)
)
)
)
Gawker Media, LLC, et. al.
Debtors,
Chapter 11
Case No.: 16-11700 (SMB)
Jointly Administered

**REQUEST FOR SIGNED SWORN STATEMENTS FOR COURT AND LAW ENFORCEMENT
RECORDS BY CREDITORS BY ALLIANCE OF CREDITORS**

Recent leaks and disclosures by other creditors in this case have made the entire HR records of Defendants a
matter of public record and placed their life histories on public record for the rest of their lives. Since these
employees and contractors of debtors sought to end the lives of many of the creditors then it seems only fair that

they each testify in these matters. The following employees and staff of debtors are known to have detailed specific knowledge of the creation inside Gawker Media of the attacks on many of the creditors by and for Gawker Media and Gawker Media's clients.

Specifically, Creditors, including our group, demand that each of those Debtor persons listed below testify to the FBI under an FBI 302 documentation FOR this Court to hold on record with an answer to each of the following questions:

"*1. Do you have knowledge of any Obama White House staff, Hillary Clinton campaign staff or Obama White House staff receiving any benefits from or giving any benefits to Gawker Media or any person who is a party to Gawker Media?*"

"*2. Did you ever author an article published by Gawker Media for which you then entered comments in the comment section of that article?*"

"*3. Did you have any knowledge of Gawker Media working with owners or executives of Google, Inc or any Google affiliate?*"

"*4. Do you have any knowledge of Gawker Media misrepresenting the true purpose of the Gawker Media organization?*"

Adam Dachis

Adam Weinstein

Adrian Covert

Adrien Chen

Alan Henry

Albert Burneko

Alex Balk

Alexander Pareene

Alexandra Philippides

Allison Wentz

Andrew Collins

Andrew Magary

Andrew Orin

Angelica Alzona

Anna Merlan

Ariana Cohen

Ashley Feinberg

Ava Gyurina

Barry Petchesky

Brendan I. Koerner

Brendan O'Connor

Brent Rose

Brian Hickey

Camila Cabrer

Choire Sicha

Chris Mohney

Clover Hope

Daniel Morgan

David Matthews

Diana Moskovitz

Eleanor Shechet

Elizabeth Spiers

Elizabeth Starkey

Emily Gould

Emily Herzig

Emma Carmichael

Erin Ryan

Ethan Sommer

Eyal Ebel

Gabrielle Bluestone

Gabrielle Darbyshire

Georgina K. Faircloth

Gregory Howard

Hamilton Nolan

Hannah Keyser

Hudson Hongo

Hugo Schwyzer

Hunter Slaton

Ian Fette

Irin Carmon

James J. Cooke

James King

Jennifer Ouellette

Jesse Oxfeld

Jessica Cohen

Jesus Diaz

Jillian Schulz

Joanna Rothkopf

John Cook

John Herrman

Jordan Sargent

Joseph Keenan Trotter

Josh Stein

Julia Allison

Julianne E. Shepherd

Justin Hyde

Kate Dries

Katharine Trendacosta

Katherine Drummond

Kelly Stout

Kerrie Uthoff

Kevin Draper

Lacey Donohue

Lucy Haller

Luke Malone

Madeleine Davies

Madeline Davis

Mario Aguilar

Matt Hardigree

Matt Novak

Michael Ballaban

Michael Dobbs

Michael Spinelli

Neal Ungerleider

Nicholas Aster

Nick Denton

Omar Kardoudi

Owen Thomas

Patrick George

Patrick Laffoon

Patrick Redford

Rich Juzwiak

Richard Blakely

Richard Rushfield

Robert Finger

Robert Sorokanich

Rory Waltzer

Rosa Golijan

Ryan Brown

Ryan Goldberg

Sam Faulkner Bidle

Sam Woolley

Samar Kalaf

Sarah Ramey

Shannon Marie Donnelly

Shep McAllister

Sophie Kleeman

Stephen Totilo

Tamar Winberg

Taryn Schweitzer

Taylor McKnight

Thorin Klosowski

Tim Marchman

Timothy Burke

Tobey Grumet Segal

Tom Ley

Tom Scocca

Veronica de Souza

Wes Siler

William Haisley

William Turton

PROOF OF SERVICE

I hereby certify that on December 11, 2016, I caused to be served a true and correct copy
of the foregoing Notice of Filing and attached Meanith Huon's Objections by causing copies of
same to be served on all counsel of record and on the U.S. Trustee for the Southern District of
New York, Region 2, by electronic filing same.


XP Vehicles Task Force
Email: **legal@xpvehicles.com**
**BRANCHES CASE FILES: http://globalscoop.net  (in re: CASE #2788-D)**

Meanith Huon
Attorney for the Unsecured Creditor, Meanith Huon
PO Box 441
Chicago, Illinois 60690
312-405-2789
Fax No.: 312-268-7276
huon.meanith@gmail.com
Illinois ARDC No.: 6230996

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re** | ) | |
| | ) | |
| **Gawker Media, LLC, et. al.** | ) | **Chapter 11** |
| | ) | |
| Debtors, | ) | **Case No.: 16-11700 (SMB)** |
| | ) | |
| | ) | **Jointly Administered** |

**MEANITH HUON'S OBJECTIONS TO  CONFIRMATION OF THE AMENDED JOINT CHAPTER  11 PLAN OF LIQUIDATION OF DEBTORS, GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT. [DOCKET NO. 427]**

**AND**

**HUON'S OBJECTIONS TO DEBTORS' MOTION FOR APPROVAL OF CLAIMS ESTIMATION AND PLAN RESERVE PROCEDURES [DOCKET NO. 444]**

Meanith Huon ("Huon"), an unsecured creditor of Debtors, Gawker Media LLC, Gawker

Media Group, Inc., and Gawker Hungary KFT, ("Gawker Media" or "Debtors") objects to

confirmation of Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media

Group, Inc., Gawker Media LLC, and Gawker Hungary, and Huon further objects to Debtors'

Motion for Approval of Claims Estimation Motion and Plan Reserve Procedures.  In support of

his Objections, Huon states as follows:

## OBJECTIONS

A debtor seeking to confirm a plan under 11 U.S.C. § 524(g) must satisfy the

requirements of both § 524(g) and § 1129 of the Bankruptcy Code.   <u>In re Quigley Co., Inc.</u>, 437

BR 102, 124-125 (Bankr. S.D. N.Y. 2010). The proponent of confirmation bears the burden of

proof by a preponderance of the evidence.   <u>Id.</u> at 125.

Federal Rule of Bankruptcy 3015(f) provides as follows:

> (f) Objection to Confirmation; Determination of Good Faith in the Absence of an
> Objection. An objection to confirmation of a plan shall be filed and served on the debtor,
> the trustee, and any other entity designated by the court, and shall be transmitted to the
> United States trustee, before confirmation of the plan. An objection to confirmation is
> governed by Rule 9014. If no objection is timely filed, the court may determine that the
> plan has been proposed in good faith and not by any means forbidden by law without
> receiving evidence on such issues.

## <u>I.  DEBTORS' PLAN IS NOT BEING PROPOSED IN GOOD FAITH AND</u> <u>PROVIDES FOR UNEQUAL TREATMENT.</u>

A bankruptcy court is a court of equity.   <u>Executive Benefits Ins. Agency v. Arkison</u>, 134

S. Ct. 2165, 2171 (U.S. 2014).

Pursuant to 11 U.S.C. § 1129(a)(3), the party seeking confirmation must show that "[t]he

plan has been proposed in good faith and not by any means forbidden by law."   <u>In re Quigley</u>

<u>Co., Inc.</u>, 437 BR 102, 125 (Bankr. S.D. N.Y. 2010). "Good faith" is not defined in the

Bankruptcy Code  The Seventh Circuit defined "good faith" as follows:

> Though the term "good faith," as used in section 1129(a)(3), is not defined in the
> Bankruptcy Code, the term is generally interpreted to mean that there exists "a reasonable
> likelihood that the plan will achieve a result consistent with the objectives and purposes
> of the Bankruptcy Code." ... Thus, for purposes of determining good faith under section
> 1129(a)(3) ... the important point of inquiry is the plan itself and whether such plan will
> fairly achieve a result consistent with the objectives and purposes of the Bankruptcy
> Code.  <u>In re Madison Hotel Assocs.</u>, 749 F.2d 410 (7th Cir.1984).  In re Quigley Co.,
> Inc., 437 BR 102, 125 (Bankr. S.D. N.Y. 2010).

As the Bankruptcy Court explained in <u>In re Quigley Co., Inc.</u>:

> . . . Among other things, good faith provides "a check on the debtor's intentional impairment of claims." <u>Combustion Eng'g</u>, 391 F.3d at 246; <u>accord In re Greate Bay Hotel & Casino, Inc.</u>, 251 B.R. 213, 240 (Bankr. D.N.J.2000) ("Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3)."); <u>In re Sandy Ridge Dev. Corp.</u>, 881 F.2d 1346, 1353 (5th Cir.1989) (remanding to determine whether the separate classification and impairment of two creditors for the apparent purpose of procuring acceptance of the plan violated the requirement of good faith); <u>In re Dunes Hotel Assocs.</u>, 188 B.R. 174, 189 (Bankr.D.S.C.1995) (artificial impairment of de minimis claim held by sole, friendly creditor to procure accepting impaired class constitutes artificial impairment 126*126 in violation of § 1129(a)(10) and lack of good faith under § 1129(a)(3)); <u>In re Daly</u>, 167 B.R. 734, 737 (Bankr.D.Mass. 1994) ("[A] contrived and artificial impairment can be viewed either as a violation of the requirement of an accepting impaired class, § 1129(a)(10), or as a violation of the requirement that the plan be proposed in good faith, § 1129(a)(3), or as both."). <u>In re Quigley Co., Inc.</u>, 437 BR 102, 125-126 (Bankr. S.D. N.Y. 2010).

Section 1123(a)(4) also requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).   <u>In re Quigley Co., Inc.</u>, 437 BR 102, 146. (Bankr. S.D. N.Y. 2010)  Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.  <u>Id.</u>

In <u>In re Quigley Co., Inc.</u>, 1968, Pfizer, Inc. had acquired Quigley in 1968 and became its parent corporation.  In 1992, Quigley sold substantially all of its operating assets.  In 2004, Quigley filed a Chapter 11 petition.  The Bankruptcy Court denied confirmation of Quigley's Fourth Amended and Restated Plan of Reorganization , stating that "this is a Quigley bankruptcy in name only."  In re Quigley Co., Inc., 437 BR 102, 126 (Bankr. S.D. N.Y. 2010).  The Bankruptcy Court stated that "Pfizer wrongfully manipulated the voting process to assure

2

confirmation of the Quigley plan, and thereby gain the benefit of the channeling injunction for itself and the other Pfizer Protected Parties" and that the plan was "designed to free the Pfizer Protected Parties from derivative liability, and only incidentally, to reorganize Quigley to the extent necessary to confirm the plan." Id. at 126.

As the Bankruptcy Court stated, "In a nutshell, Pfizer bought enough votes to assure that any plan would be accepted. To do so, it had to first alter its historical approach to settling asbestos claims." Id. at 127.   The Bankruptcy Court noted that "The ballot results depict a high correlation between the Pfizer Settlement Agreements and the rate of acceptance." Id. at 128. On the next page of the opinion, the Bankruptcy Court stated that "I infer from this disparity that the Settling Claimants, through the Settling Law Firms, were motivated to accept the Fourth Plan by virtue of the financial incentive under the Pfizer Settlement Agreements". Id. at 129.

In In re Quigley Co., Inc., "the Non-Settling Claimants as a group were being compelled to give up their valuable derivative claims — which the Settling Claimants have already surrendered — to get the same 7.5% distribution". In re Quigley Co., Inc., 437 BR 102, 148. (Bankr. S.D. N.Y. 2010)

In this case, Debtors intend to impair Huon's claims by categorizing it as contested—depriving Huon's ability to vote for or against the plan--and Debtors' Plan does not provide for the same treatment for each claim by an unsecured creditor with an article-related claim.   On information and belief, Debtors' Plan places unsecured creditors, Terry Gene Bollea  ("Bollea"), Shiva Ayyadurai ("Ayyadurai"), and Ashely A. Terrill ("Terrill")—the only members of the Unsecured Creditors' Committee—in Class 2C , Gawker Media General Unsecured Claims.[1]

---

[1] A creditors' committee and its members  "have a fiduciary duty to all creditors represented by the committee." In re Barney's, Inc., 197 BR 431, 441-442 (Bankr. S.D.N.Y. 1996) (Citing In re

3

See Objection of Mitchell Williams to Confirmation of Amended Joint Chapter 11 Plan

("Williams' Objection") (Docket Number 545, Page 2).    However, on information and belief,

Debtors' Plan tries to place other unsecured creditors in Class 2E,  Gawker Media General

Unsecured Convenience Class.  ("Williams' Objection", Docket Number 545, Page 2.)

Huon has not elected to join Class 2E.  Huon has never agreed to a less favorable

treatment of his particular claim or interest.  On information and belief, Debtors elected to not

place Huon in the same class as Bollea, Ayyadurai, and Terrill.  Huon was informed by counsel

for Debtors via a telephone call that Huon could not vote on Debtors' Plan, because Huon's

claim was a contested claim.

In contrast, on information and belief, Bollea, Ayyadurai, and Terrill, are paid cash for

their claims, "while all other 2C Claimants receive pro rata distributions from wholly contingent

and unreliable sources of revenue - - the Gawker Media Claims Reserve and Gawker Media

Contingent Proceeds Creditor Account, among other contingent sources."  ("Williams'

Objection", Docket Number 545, Page 3.)

With regard to Huon's claims, Debtors have proposed the "Gawker Media Claims

Estimation and Plan Reserve Procedures."  (Docket No. 444).  On information and belief,

Debtors' Estimation Motion designates claims of Huon as a "Contested Claim", whose treatment

may be "estimated at zero… for the purposes of the Confirmation Hearing and Plan distributions

pursuant to these procedures":

a. To the extent that any Contested Claim is not disallowed by a pending Claims
Objection and the holder of such Contested Claim does not file a Reserve

---

Grant Broadcasting of Philadelphia, Inc., 71 B.R. 655, 664 (Bankr.E.D.Pa.1987), In re Mesta
Machine Co., 67 B.R. 151, 156 (Bankr. W.D.Pa.1986), and Woods v. City Nat'l Bank & Trust
Co. of Chicago, 312 U.S. 262, 268-69, 61 S.Ct. 493, 497-98, 85 L.Ed. 820, reh'g denied, 312
U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145 (1941)).

4

Objection, the Contested Claim will be estimated at zero for purposes of the
Confirmation Hearing unless the Court orders that the Contested Claim be
estimated at a different amount for the purposes of the Confirmation Hearing and
Plan distributions pursuant to these procedures.  (Docket Number 444, Page
9;"Williams' Objection", Docket Number 545, Page 2.)

However, Debtors' Claims Estimation and Plan Reserve Procedures deprive Huon of his

right to a jury trial under the Seventh Amendment of the U.S. Constitution.  Title 28 U.S.C. §

157(b)(2)(B) states, in relevant part:

Core proceedings include, but are not limited to –

allowance or disallowance of claims against the estate…, and estimation of claims or
interests for the purposes of confirming a plan under chapter 11… of title 11 but not the
liquidation  or estimation of contingent or unliquidated personal injury tort… claims
against the estate for purposes of distribution in a case under title 11.

28 U.S.C. § 157(b)(2)(B).

28 U.S.C. § 157(b)(5) provides as follows:

(5) The district court shall order that personal injury tort and wrongful death claims shall
be tried in the district court in which the bankruptcy case is pending, or in the district
court in the district in which the claim arose, as determined by the district court in which
the bankruptcy case is pending.

If a bankruptcy court determines that a personal injury tort or wrongful death claim is

allowable as a matter of law, § 157(b)(2)(B) prevents the bankruptcy court from valuing the

claim.  In re GI Holdings, Inc., 323 BR 583, 615 (Bankr. D. N.J. 2005).  At this juncture, §

157(b)(5) and § 1411(a) direct where such a valuation is to take place and by what procedure —

a jury trial in the district court.   In re GI Holdings, Inc., 323 BR 583, 615 (Bankr. D. N.J. 2005)

(Citing 28 U.S.C. § 157(b) and 28 U.S.C. § 1411(a).)

28 U.S.C. § 1411(a) provides as follows:

5

(a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.

Here, Huon demanded a jury trial in his Fourth Amended Complaint in his civil lawsuit, Huon v. Nick Denton, et. al., Case No. 11-cv-3054, now pending in the Northern District of Illinois.

For the same reasons just discussed, on information and belief, the "Plan unfairly discriminates against general unsecured creditors of Gawker Media in violation of section 1129(b)(1) because, on the Effective Date, the Committee Members are paid . . . , the Gawker Media Gawker Hungary Intercompany Claims are paid . . . , and equity interests in GMGI may be paid before  pro rata distributions are made to general unsecured creditors of Gawker Media, claimants which have equal or higher priority under applicable law."  ("Williams' Objection", Docket Number 545, Page 19).   On information and belief, "Debtors  here  propose  to  pay  fixed,  cash  distributions  to  the  Committee Members, 100% of the Gawker Media Gawker Hungary Intercompany Claims on the Effective Date and to distribute value to Debtors' equity interests on the Effective Date, before making pro rata  distributions to  general  unsecured creditors of  Gawker Media." (Williams Objection, Docket Number 545, Page 21).

Debtors have conceded that Huon has a meritorious or viable claim:

As noted above, Mr. Huon has a single, live proof of claim against each of the three Debtors in these cases. All are based solely on Mr. Huon's Illinois federal court lawsuit. That lawsuit does name GMGI and Gawker Hungary (f/k/a Kinja Kft.) as defendants. See Debtors' Statement in Further Support of Their Objection to the Huon Claims, Docket No. 498, Page 10.

As the Seventh Circuit stated:

Rather, Gawker itself was an information content provider, insofar as the Gawker Defendants: (1) "encouraged and invited" users to defame Huon, through selecting and urging the most defamation-prone commenters to "post more comments

6

and continue to escalate the dialogue"; (2) "edited," "shaped," and "choreographed" the content of the comments that it received; (3) "selected" for publication every comment that appeared beneath the Jezebel article; and (4) employed individuals who authored at least some of the comments themselves.

The district judge concluded that these arguments failed to plausibly state a claim for relief. But we see nothing farfetched about Huon's factual allegations—in particular, his contention that one or more of the comments were authored by Gawker employees. Rather than asserting one or two standalone factual allegations concerning Gawker's control over comments, Huon's fourth amended complaint devotes over four pages to detailing Gawker's alleged activities. Critically, the complaint hints at why Gawker employees might have anonymously authored comments, alleging that increasing the defamatory nature of comments can increase traffic to Gawker's websites, which can in turn enhance the attractiveness of Gawker's commenting system for prospective advertisers. In doing so, the complaint quotes several passages from a Reuters article that explains precisely how Gawker was planning to "monetize" comments, and why advertisers might find this commenting system appealing.  (Docket Number 499, Pages 199-200.)

The Seventh Circuit also reversed the dismissal of Huon's False Light Invasion of Privacy and

Intentional Infliction of Emotional Distress Claims.  (Docket Number 499, Page 206.)

With regard to damages, Debtors admitted  on page 11 of its brief that damages for

defamation *per se* are presumed:

Specifically, under Illinois law regarding defamation per se, courts presume injury to a plaintiff's reputation, and do not require a plaintiff to plead or prove actual damage to reputation. See Gibson v. Philip Morris, Inc., 685 N.E.2d 638, 646 (Ill. App. 5th Dist. 1997). They do not require pleading of "special damages." Carson v. Allied News Co., 529 F.2d 206, n.21 (7th Cir. 1976); see also Newell v. Field Enters., Inc., 415 N.E.2d 434, 448–49 (Ill. App. 1st Dist. 1980); Halpern v. News-Sun Broad. Co., 368 N.E.2d 1062, 1068 (Ill. App. 2d Dist. 1977); Owens v. CBS Inc., 527 N.E.2d 1296, 1309–10 (Ill. App. 5th Dist. 1988).  See Debtors' Statement in Further Support of Their Objection to the Huon Claims, Docket No. 498, Page 11.

Then, curiously, Debtors seem to imply that presumed damages should be in the range of One

Million Dollars, based on an opinion rendered in 2004:

For example, the Seventh Circuit in Republic Tobacco reduced a $3.36 million presumed damages award to $1 million, where the Court found $1 million would be enough to

compensate plaintiff for presumed harm.  See Debtors' Statement in Further Support of
Their Objection to the Huon Claims, Docket No. 498, Pages 11-12.

But Huon—who filed his case in 2011 and litigated it before the U.S. District Court and

the Seventh Circuit Court of Appeals—cannot vote on the plan, because Debtors classify Huon

as a contested claim and seem to want to estimate Huon's claim at zero.  Huon's position is

worse than the non-settling claimants in In re Quigley Co., Inc., because under Debtors' Plan,

Huon may recover nothing at all.

However, Terrill and Ayyadurai, who filed their lawsuits in 2016, were able to cast their

vote on Debtors' Plan that settles Terrill's claims for Five Hundred Thousand Dollars

($500,000.00) and Ayyadurai's claims for Seven Hundred and Fifty Thousand Dollars

($750,000.00).  Both article-related claims of Terrill and Ayyadurai are at the pleading stage.

Debtors had previously argued that the Ayyadurai's claims arising from a 2012 Gizmodo

Articles are time-barred under the Massachusetts Three-Year Statute of Limitations.   See

Objection of Debtor Gawker Media, LLC to Proof of Claim filed by Shiva Ayyadurai, Docket

Number 372, Page 12.  Debtors  had also previously argued that Ayyadurai's remaining claims

failed to state a cause of action.  (Docket Number 372.)  With regard to Terrill's article claims,

Debtors had previously argued that the Terrill failed to state cause of action under Federal Rules

of Civil Procure 12(b)(6) and (c).  See Objection of Debtor Gawker Media LLC to Proof of

Claim Filed by Ashley Terrill, Docket Number 399.  These arguments made by Debtors were not

pled in the alternative.  Debtors submitted proposed orders dismissing the Terrill and Ayyadurai

claims in their entirety.  Arguably, like the settling claimants in In re Quigley Co., Inc., Terrill

and Ayyadurai were financially motivated to accept the Debtors' Plan.[2]

 Arguably, akin to the bankruptcy in In re Quigley Co., Inc., this is a Gawker Media

bankruptcy in name only.  On information and belief, Debtors' Plan "allows the insider Class

2F(i) claimants - - the Gawker Media Gawker Hungary Intercompany Claims - - and GMGI's

[Gawker Media Group, Inc.'s] equity interests an opportunity to recover substantial

distributions, up to $42 Million . . ."  (Williams Objection, Docket Number 545, Page 24.).  On

information and belief, Debtors' Plan is "an improper payment of Intercompany debt to an

insider" and a "disguised distribution to Gawker Media's equity interests because it transfers

value from Gawker Media, through Gawker Hungary, and ultimately to the equity interests of

the parent company, GMGI".  (Williams Objection, Docket Number 545, Page 24.)

Debtor's Amended Joint Chapter 11 Plan reads like a philosophical dissertation and

thesis on Immanuel Kant.  Socrates never wrote a thing.  For example, on information and belief,

pursuant to 3.02(f) the Debtors' Plan:

Pursuant to the Intercompany Settlement,

Gawker Hungary will receive on account of the Gawker Media Gawker Hungary
Intercompany Claim (i) a distribution of $16,000,000 in Cash from Gawker Media on the

---

[2] On information and belief, "both the claims of Ms. Terrill and Dr. Ayyadurai were
prosecuted by the same attorney, Charles Harder, who prevailed against Gawker on behalf of
Terry Bollea a/k/a Hulk Hogan; unlike Mr. Bollea, who had a liquidated invasion of privacy
claim, the other two claims sounded primarily in libel and are unliquidated."  See Claimants
Charles C. Johnson's and Got News, LLC's Objection to Debtors' Amended Joint Chapter 11
Plan ("Got News' Objection")  Docket No. 540, Page 4.  Debtors have contended or implied that
Peter Thiel funded litigation against Gawker Media.  Debtors filed a Complaint in Adversary
Proceeding No.: 16-01085 (SMB), a Motion for a Preliminary Injunction, a Memorandum of
Law, and Ex Parte Motion for a Temporary Restraining Order.  (Case Number 16-01085, Docket
Numbers 1, 3, 5, 7.; Case No.: 16-11700,  Docket Numbers 341 and 342.)

9

Effective Date, and (ii) a distribution of any Cash remaining at Gawker Media on the
Gawker Media Claims Reserve Distribution Date . . . Docket No. 427, Page 108.

However, as Huon explained in his Amended Appellate Court brief to the Seventh

Circuit, Gawker Media Group, Inc. is a holding company.   (Huon v. Denton, et. al., Doc. No.

Case No.: 11-cv-3054 (N.D. Ill.) 162, PageID No. 1752.)   Gawker Media, Inc.'s sole assets are

equity securities in its subsidiaries, one of which is Gawker Media, LLC:

> Gawker Media Group, Inc. has no operations or employees. Rather, it is a
> holding company. Other than a small bank account to facilitate purchases and sales
> of its stock, its sole assets are equity securities in two subsidiaries, Gawker Media,
> LLC, a Delaware limited liability company, and Kinja, KFT, an Hungarian entity.
> Declaration of Scott Kidder, Vice President of Operations for Gawker Media Group, Inc.,
> Quentin Tarantino v. Gawker Media Group, Inc., et. al., Case No.: CV 14-603-JFW, Doc.
> No. 11-1, Page ID No.64.  A copy of Kidder's Declaration is attached to Huon's First
> Amended Docketing Statement. (Case No. 15-3049, Doc No. 13-6).[3]

Gawker Media Group Inc. is the sole member of Blogwire Hungary Szellemi Alkotast

Hasnosity KFT, n/k/a Kinja KFT ("Kinja KFT").[4]  See Docket Number 499, Pages 220-225.

In his Fourth Amended Complaint, Huon attached copies of documents from various

Secretaries of States regarding the various Gawker Media LLCs.  See Docket Number 499,

Pages 86 to 127.  At all relevant times, Gawker Media LLC a/k/a Gawker Media, was and is a

limited liability company organized and operating under the laws of the State of Delaware with

its principal place of business in New York.   See Huon's Fourth Amended Complaint, Docket

---

[3] Huon requests that the Bankruptcy Court take judicial notice of the pleadings filed by
Defendant, Gawker Media Group Inc., in Quentin Tarantino v. Gawker Media Group, Inc., et.
al., Case No.: CV 14-603-JFW (C.D. Cal.).

[4] The data of companies registered at any Hungarian Court of Registration are available on the
website of the Service of Company Information and Electronic Company Registration of the
Ministry of Public Administration and Justice, http://www.e-cegjegyzek.hu/
Huon requests that the Bankruptcy Court take judicial notice of the website http://www.e-
cegjegyzek.hu/ and the search result for Kinja KFT, pursuant to Federal Rule of Evidence
201(d).

Number 499, Pages 10 to 12.  In response to a request for the original formation document for

Gawker Media, LLC, the Delaware Secretary of State produced a Certificate of Incorporation for

Blogwire, Inc.  (Docket Number 499, Pages 10-12.)  The sole incorporator of Blogwire, Inc. is

Nick Denton.  (Docket Number 499, Pages 10-12.)  Denton signed the Application for Authority

of Gawker Media, LLC as the manager of  Defendant, Gawker Media, LLC.  (Docket Number

499, Pages 10-12.)  Gabrielle Darbyshire signed the Biennial Statement of Defendant, Gawker

Media, LLC as a member of  Gawker Media, LLC.

     Like Pfizer in In re Quigley Co., Inc., on information and belief, Gawker Media altered

its historical approach to settlements and not removing defamatory posts by settling with Bollea,

Ayyadurai, and Terrill and removing the defamatory posts.  Like Pfizer, on information and

belief, Gawker Media assigned claims to various classes and designated certain claims as

contested to try to affect the voting process and assure confirmation of the Debtors Plan, and

thereby gain the benefit of the channeling injunction for itself and the other Gawker Media

related entities and insiders and former writers and editors.  On information an belief, Debtors'

plan was designed to free Nick Denton and Gawker Media related entities from derivative

liability, and only incidentally, to reorganize Gawker Media to the extent necessary to confirm

the plan.   In this case, "The Plan does not contemplate reorganization of the Debtors' assets.

Rather, the Debtors have sold substantially all of their assets and will distribute the proceeds to

creditors in accordance with the Plan. The Plan sets forth certain Cash payments that the Debtors

or the Plan Administrator must make on the Effective Date."  Docket Number 574, Page 45.  In

settling  the claims of Bollea, Ayyadurai, and Terrill, Gawker Hungary will receive a distribution

of at least $16,000,000 in cash from Gawker Media, and Gawker Media and its related entities,

11

Nick Denton, Gawker Media's writers and editors would escape liability from the claims of

Huon and certain other unsecured creditors, whose claims could be estimated to zero.

## II.  DEBTOR'S PLAN IS NOT FAIR AND EQUITABLE.

"[T]he court should afford [third parties] the protection of the injunction only if they

contribute to the trust in amounts that are consistent with their likely liability ... outside of

bankruptcy." In re Quigley Co., Inc., 437 BR 102, 133-134 (Bankr. S.D. N.Y. 2010) (Citing 4

COLLIER ON BANKRUPTCY ¶ 524.07[2], at 524-59 (16th ed. 2010)). Section 524(g) requires

that a channeling injunction under the plan be "fair and equitable with respect to the persons that

might subsequently assert... demands, in light of the benefits provided, or to be provided, to such

trust on behalf of such debtor or debtors or such third party." 11 U.S.C. § 524(g)(4)(B)(ii). In re

Quigley Co., Inc., 437 BR 102, 133.  The phrase "fair and equitable" implies, at least where the

trust does not propose to pay 100%, that there must be a relationship between the benefits

received and the contributions made by the third-party that receives the benefit of the injunction.

In re Quigley Co., Inc., 437 BR 102, 133.

In In re Quigley Co., Inc., the benefit that Pfizer stood to realize from the channeling

injunction from future derivative liability for asbestos claims was $613. In re Quigley Co., Inc.,

437 BR 102, 140.  However, the present value of Pfizer's contribution was approximately $216

million.  The Bankruptcy Court stated that ". . . only about $147 million of Pfizer's total

contribution will reach the Futures. This represents less than 25% of the benefit that Pfizer will

receive, and is not "fair and equitable."" In re Quigley Co., Inc., 437 BR 102, 140.

As the Second Circuit stated:

. . . a nondebtor release is a device that lends itself to abuse. By it, a non-debtor can shield
itself from liability to third parties. In form, it is a release; in effect, it may operate as a

12

16-11700-smb    Doc 591-2    Filed 12/12/16    Entered 12/12/16 23:41:54    Exhibit
Exhibit B - E-mail Correspondence from XP Vehicles Dec. 12    2016 at 807    Pg 23 of 35

16-11700-smb    Doc 575    Filed 12/11/16    Entered 12/11/16 00:43:41    Main Document
Pg 14 of 26

bankruptcy discharge arranged without a filing and without the safeguards of the Code.
The potential for abuse is heightened when releases afford blanket immunity.  In re
Metromedia Fiber Network, Inc., 416 F. 3d 136, 142 (2nd Cir. 2005).

No case has tolerated nondebtor releases absent the finding of circumstances that may be

characterized as unique.  In re Metromedia Fiber Network, Inc., 416 F. 3d 136, 142 (2nd Cir.

2005).  A nondebtor release in a plan of reorganization should not be approved absent the finding

that truly unusual circumstances render the release terms important to success of the plan,

focusing on the considerations discussed on pages 142 and 143 of In re Metromedia Fiber

Network, Inc., 416 F. 3d 136, 143 (2nd Cir. 2005).

In this case, on information and belief, "[u]nder the Amended Plan, at Article 9, §§ 9.02,

9.04, & 9.07, [unsecured] claimants are permanently enjoined from commencing or continuing

suits against employees and independent contractors of Debtors and all claims against them are

deemed exculpated and released, except in the case of gross negligence or willful misconduct."

See  Claimants Charles C. Johnson's and Got News, LLC's Objection to Debtors' Amended

Joint Chapter 11 Plan ("Got News' Objection"), Docket No. 540, Page 5.  On information and

belief, "the Estate receives nothing in exchange for the injunctive relief and exculpation set forth

in Sections 9.02 & 9.04" of the Debtor's Plan.    ("Got News' Objection",  Docket No. 540, Page

7.)

### III.  THE FIRST AMENDMENT SHOULD NOT SERVE AS A SHIELD AGAINST DEFAMATION, CYBERBULLYING, OR FAKE NEWS IN THE  DIGITAL AND INTERNET AGE .

The First Amendment should not be serve as a shield to protect writers and entities that

defame, bully, or denigrate others in a digital era of viral posts, mobile devices, Tweets, fake

13

news and digital advertising.  Today a single post can destroy a person's reputation and his or her

ability to sustain a living, survive, and enjoy the right to the pursuit of happiness.

The First Amendment has served to adequately protect journalists who follow the codes

of ethics. [5] [6]  The U.S. Supreme Court has held that couching a statement in terms of an opinion

does not protect it from a defamatory action:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of
> facts which lead to the conclusion that Jones told an untruth.  Even if the speaker states
> the facts upon which he bases his opinion, if those facts are either incorrect or
> incomplete, or if his assessment of them is erroneous, the statement may still imply a
> false assertion of fact.  Simply couching such statements in terms of opinion does not
> dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as
> much damage to reputation as the statement, "Jones is a liar."  As Judge Friendly aptly
> stated: "[It] would be destructive of the law of libel if a write could escape liability for
> accusations of [defamatory conduct] simply by using, explicitly or implicitly, the word 'I
> think'". . . .   Milkovich v. Lorain Journal Co., 497 US 1, 18-19 (1990).

The Illinois Supreme Court in Solaia agreed and held that couching a statement in terms

of "ridicule, humor or sarcasm" is not a defense to defamation:

---

[5] Certain national journalism organizations have formulated codes of ethics or "canons of
journalism."  Conradt v. NBC Universal, Inc., 536 F.Supp.2d 380, 397 (S.D.N.Y.,2008).    On
information and belief, Gawker Media has been a serial defendant.  Huon has not sued Forbes,
the Wall Street Journal or the New York Times for their reporting.

[6] The fair report privilege does not extend to the stereotypical "blogger" sitting in his
pajamas at his computer posting on the Internet or a self-appointed journalist who blogs on a
website.   In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1156-1157 (Concurring
opinion) (D.C. 2006); Too Much Media, LLC v. Hale, 206 N.J. 209, 242 (N.J. 2011).  If that
were the case, "anyone with a Facebook account, could try to assert the privilege."  Too Much
Media, LLC 206 N.J. at 242.   Bloggers and website operator exhibit none of the recognized
characteristics traditionally associated with the news process, nor do website operators
demonstrate an established affiliation with any news entity so as to allow it to claim any
privileges.  Too Much Media, LLC v. Hale, 413 N.J.Super. 135, 160 (N.J.Super.A.D.,2010),
aff'd, 206 N.J. 209 (N.J.,2011).  A blogger merely comments on the writings of others on and
creates no independent product of its own nor makes a material substantive contribution to the
work of others.  Id at 159.

14

However, there is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole. <u>Bryson</u>, 174 Ill.2d at 99-100, 220 Ill.Dec. 195, 672 N.E.2d 1207, <u>citing Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18-19, 110 S.Ct. 2695, 2705-06, 111 L.Ed.2d 1, 17-18 (1990); <u>Dubinsky v. United Airlines Master Executive Council</u>, 303 Ill.App.3d 317, 324, 236 Ill.Dec. 855, 708 N.E.2d 441 (1999) ("expressions of opinion may often imply an assertion of objective fact and, in such cases, would be considered actionable"). Indeed, "[i]t is well established that statements made in the form of insinuation, allusion, irony, or question, may be considered as defamatory as positive and direct assertions of fact." <u>Berkos v. National Broadcasting Co.</u>, 161 Ill.App.3d 476, 487, 113 Ill.Dec. 683, 515 N.E.2d 668 (1987). Similarly, "[a] defendant cannot escape liability for defamatory factual assertions simply by claiming that the statements were a form of ridicule, humor or sarcasm." <u>Kolegas</u>, 154 Ill.2d at 16, 180 Ill.Dec. 307, 607 N.E.2d 201. The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact. <u>Kolegas,</u> 154 Ill.2d at 14-15, 180 Ill.Dec. 307, 607 N.E.2d 201.  <u>Solaia Technology v. Specialty Pub. Co.</u>, 221 Ill.2d 558, 580 (2006), 852 NE 2d 825, 840.

But Gawker Media's business model is not journalism.  Financial journalist Felix Salmon at Reuters reported on the history and on the business structure  and characteristics of Gawker Media, including Kinja, KFT, in an article called "The new Gawker Media". [7]  Nick Denton and Gawker Media wanted to create a web-based platform that "break[s] down the lines between the traditional roles of content creators and consumers", by creating a business model and commenting system that monetizes its readers' comments to the articles on Gawker Media's websites.  Specifically, Denton and Gawker Media have described Gawker Media's platform, called "Kinja", as breaking down the traditional walls between writers and readers so as to allow both content creators and consumers—including Gawker Media writers and advertisers-- to comment on Gawker Media stories online via the Kinja platform:

Kinja is our publishing platform designed to make great stories by breaking down the lines between the traditional roles of content creators and consumers. Everyone — editors, readers, marketers — have access to the same tools to engage in passionate discussion and reveal the truth. Sharing, recommending, and following within the Kinja

---

[7] http://blogs.reuters.com/felix-salmon/2010/12/01/the-new-gawker-media/

16-11700-smb   Doc 375   Filed 12/13/16   Entered 12/13/16 00:23:41   Main Document
                Pg 17 of 28

16-11700-smb   Doc 591-2   Filed 12/14/16   Entered 12/14/16 15:54   Exhibit
Exhibit B - E-mail Correspondence from KP Vehicles Dec. 12   2016 at 807     Pg 26 of 35

ecosystem allows for improved information discovery.
http://advertising.gawker.com/platform/

In an internal memorandum, Denton explained that the purpose of Gawker Media's

commenting system was to generate more advertising dollars by commercializing and

monetizing the discussion thread to the stories on Gawker Media's websites:

> We all know the conventional wisdom: the days of the banner advertisement are
> numbered. In two years, our primary offering to marketers will be our discussion
> platform.  http://blogs.reuters.com/felix-salmon/2012/05/22/how-gawker-wants-to-
> monetize-comments/.

(Huon v. Denton, et. al., No. 11-cv-3054 (N.D. Ill.), Doc. No. 162, PageID No. 1774-1775.)

Gawker Media's business model presaged the growing popularity of fake news.  As

observed in the recent Presidential election, fake news stories are becoming an increasing

problem. [8]  The proliferation of fake news sites is driven by the advertising dollars fake news or

false statements generate. [9] [10]  Inventing fiction about people and reporting on it is creating

fake news.[11]  It is akin to Gawker Media's plan for monetizing comments and business model of

generating advertising dollars by defaming people.

In a digital age where Americans become victims of  cyberbullying online, revenge porn,

fake news, the need for defamation and privacy laws to protect the average American is even

---

[8] http://www.forbes.com/sites/quora/2016/11/24/did-fake-news-on-facebook-influence-the-
outcome-of-the-election/#439f3ad722cc
Huon requests that the Bankruptcy Court take judicial notice of this article at the website and
judicial notice of other articles from reputable news organizations cited in Huon's Objections.

[9] http://www.latimes.com/business/technology/la-fi-tn-fake-news-ad-economy-20161208-
story.html

[10] http://www.nytimes.com/2016/11/15/technology/google-will-ban-websites-that-host-fake-
news-from-using-its-ad-service.html

[11] See for example:
http://www.cjr.org/criticism/washington_post_fake_news_russian_propaganda.php.

16

greater.[12]   The protection afforded by laws prohibiting defamation and invasion of privacy are

needed more now in a world where a blogger in pajamas sitting in front of a computer can make

millions from advertising dollars by destroying a person's reputation with a single post.  Wanna

be journalists should be deterred from writing viral but defamatory articles in an effort to propel

their career to land a job with a more reputable news organization—one that follows the canons

of journalism.   The average American should not need a billionaire to fund litigation against

defamation or cyber bullying.

    The arguments made by the Society of Professional Journalists, the Reporters Committee

for Freedom of the Press, and 19 other media organizations are well-intentioned but purely

abstract and hypothetical, and belied by history.  In this case, Debtors were able to negotiate a

settlement with Bollea, Ayyadurai, and Terrill, and were able to retain some of the best and

brightest to propose a Plan that would allow certain class of claimants—other than Huon--to

recover substantial distributions.  The bankruptcy did not stop Gawker Media from disparaging

Huon.[13]   "The Debtors are still in the process of developing a plan for the maximization of value

---

[12] https://www.whitehouse.gov/the-press-office/2011/03/10/president-and-first-lady-call-united-effort-address-bullying
Huon requests that the Bankruptcy Court take judicial notice of this website.  Government of the
Canal Zone v. Burjan, 596 F.2d 690 (5th Cir. 1979); Nwaokolo v. Immigration and
Naturalization Service , 314 F.3d 303 (7th Cir. 2002); Rowe v. Gibson, 798 F. 3d 622  (7th Cir.
2015) (Seventh Circuit took judicial notice and made limited use of information from reputable
medical websites); Federal Rule of Evidence 201(d).

[13] After the Gawker defendants filed a Suggestion of Bankruptcy in Huon's appeal at 11:18 am
Central Time on June 14, 2016, (Case: 15-3049 Document: 51, Pages: 2), Gawker Media ran
another story regarding Huon at 3:10 pm Central Time on June 14, 2016, resurrecting the
original Jezebel.com Article and its associated comments with a link:  http://gawker.com/now-
peter-thiels-lawyers-wants-to-silence-reporting-on-t-1781918385.

realizable from the residual Gawker.com Assets, and are considering various options with

respect thereto."(Docket Number 427, Page 73.)[14]

In stark contrast, Huon has personally experienced being defamed by Gawker Media's

publication of the comment calling Huon a "rapist", after he was exonerated; struggling to find

stable work as an attorney; being yelled at by employers, after someone Googled Huon; working

a variety of jobs to eke out an existence, including as an insurance agent and a door to door

salesman; working in inclement winter selling door to door or collecting insurance premiums in

neighborhoods in Chicago where shooting incidents occur.  Huon has experienced being

repeatedly called a "rapist", a sex offender, or a criminal after he was exonerated.  Gawker

Media repeatedly misrepresented to the District Court that Huon had pending criminal charges

after September 30, 2011—a false statement that made its way into a published opinion.  See

Huon's Reply brief to the Seventh Circuit Court of Appeals.  (Docket Number 499, Page 411.)

After being defamed by Gawker Media, not being able to find stable work as an attorney with a

law firm, and finding work as a financial advisor, Huon has experienced losing his job because

he had to spend the time learning bankruptcy law and to move to dismiss himself as a defendant

in an adversary complaint filed by Gawker Media in New York Bankruptcy Court for the

Southern District of New York and because did not have time to meet his sales goals.[15]  The

several members of a special interest group probably never experienced being repeatedly and

---

[14] Huon's Fourth Amended Complaint seeks "The transfer of the domain names . . . ,
Jezebel.com, and Gawker.com to Plaintiff" and "Punitive damages . . ." (Docket Number 499,
Page 70.)
[15] Huon moved to dismiss Gawker Media, LLC's Complaint in the adversary proceedings in
Case No.: 16-01085, pursuant to Fed. R. Civ. P. 12(b)(6), or alternatively, moves this Honorable
Court to abstain from hearing the adversary proceedings against Huon, pursuant to 28 U.S.C. §
1334(c)(2) and 28 U.S.C. § 1334(c)(1).  Huon was dismissed with prejudice as a defendant in
that case.  (Case No.: 16-01085, Docket Number 67).

falsely accused of being a "rapist" or a criminal or a sex offender and having strangers, friends or
family steer clear of you.

Even prisoners have a Constitutional right  to file a lawsuit in the courts.  <u>Bounds v.
Smith</u>, 430 U. S. 817 (1977), <u>Lewis v. Casey</u>, 518 US 343 (1996); <u>NAACP v. Button</u>, 371 US
415 (1963).   Huon has never been convicted of a misdemeanor or felony.   The incremental
harm doctrine does not apply in Illinois.  "Such a rule 'would strip people who had done bad
things of any legal protection against being defamed; they would be defamation outlaws.'"
<u>Desnick v. American Broadcasting Companies, Inc.,</u> 44 F.3d 1345, 1351  (7th Cir. 1995). The
First Amendment and the Constitution protects peoples' rights to seek redress from the Courts
from those who seek to denigrate and disparage innocent victims.

The First Amendment adequately protects a journalist who follows the rules of law.  But
who will protect the average American from the rogue or wannabe journalist?  Who will protect
the next generation of Americans when the next technology startup uses machine language or
artificial intelligence or chat bots to write fake news stories to chase advertising dollars by
profiting from other people's misery?   Neither media power brokers nor tech billionaires should
choose winners and losers in a Democracy.   The rule of law affords aggrieved persons the right
seek justice and a remedy.

Huon is not a defamation outlaw. He is "the master of [his] fate, [he is] the captain of
[his] soul."[16]

## IV.  DEBTORS PLAN IS NOT FEASIBLE.

Section 1129(a)(11) of the Bankruptcy Code requires the plan proponent to prove that
"confirmation of the plan is not likely to be followed by the liquidation, or the need for further

---

[16] <u>Invictus</u> by William Ernest Henley.

financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." In re Quigley Co., Inc., 437 BR 102, 142 (Bankr. S.D. N.Y. 2010).   The plan must be workable and stand a reasonable likelihood of success.  In re Quigley Co., Inc., 437 BR 102, 142 (Bankr. S.D. N.Y. 2010) (Citing Kane v. Johns-Manville Corp., 843 F. 2d 636, 649 (2nd Cir.1988).  "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." In re Quigley Co., Inc., 437 BR 102, 142 (Bankr. S.D. N.Y. 2010)  (Citing In re Leslie Fay Companies, Inc., 207 BR 764, 789 (Bankr. S.D. N.Y. 1997).

In re Quigley Co., Inc., the Bankruptcy Court stated that "Although Quigley will remain viable and profitable for the five years that it operates under the Pfizer Claims Services Agreement, Quigley's prospects after five years are less certain."  437 BR 102, 142 (Bankr. S.D. N.Y. 2010).  Quigley's "business plan was speculative at best and visionary at worst." Id. at 142.  Except in one case, Quigley "failed to attract any new business since the Petition Date." Id.  There was no "credible evidence of a viable market" for Quigley's services.  Id. at 142-143.

In this case, "The Plan does not contemplate reorganization of the Debtors' assets.  Rather, the Debtors have sold substantially all of their assets and will distribute the proceeds to creditors in accordance with the Plan. The Plan sets forth certain Cash payments that the Debtors or the Plan Administrator must make on the Effective Date."  Docket Number 574, Page 45.  In this case, there is no credible evidence that Gawker.com is a viable brand.  In fact, the evidence is to the contrary: Univision did not keep the Gawker.com site.[17]  Gawker.com had

---

[17] http://www.forbes.com/sites/ryanmac/2016/08/18/univision-wont-keep-gawker-com-or-founder-nick-denton/#4395ac103264

retooled itself in 2015 from writing stories about celebrities like Hulk Hogan to writing about

politics.[18]  The business model of generating traffic and advertising dollars by making fun of

people and invading their privacy has been superseded by business models at sites like

BuzzFeed.com that does not denigrate people. [19] [20] [21]  Even if Debtors' Plan were confirmed,

Gawker Media may eventually find itself back in court because Gawker Media and Denton have

no workable business model, other than to generate advertising dollars by denigrating and

defaming people.   That's not journalism or news.  That's just cyberbullying.

## V. CONCLUSION

WHEREFORE, Creditor,  Meanith Huon requests that this Honorable Court:

1.      Enter an order denying confirmation of the Debtor's Amended Plan;

2.      Enter an order denying Debtors' Motion for Approval of Claims Estimation Motion and

Plan Reserve Procedures.

Respectfully submitted,

_____/s/Meanith Huon____
Attorney for Defendant, Meanith Huon

Dated:  December 11, 2016

---

[18] http://www.nytimes.com/2015/11/18/business/media/gawker-politics-media.html?_r=0
[19] http://www.theatlantic.com/politics/archive/2014/03/no-haters-vs-all-haters-buzzfeed-gawker-battle-internets-soul/359105/
[20] http://nick.kinja.com/what-is-to-be-done-1678519275
[21] https://gigaom.com/2015/01/09/nick-denton-says-the-traffic-game-is-over-and-buzzfeed-has-won/

Meanith Huon
Attorney for the Defendant, Meanith Huon
PO Box 441
Chicago, Illinois 60690
312-405-2789
Fax No.: 312-268-7276
huon.meanith@gmail.com
Illinois ARDC No.: 6230996

22

Meanith Huon
Attorney for the Unsecured Creditor, Meanith Huon
PO Box 441
Chicago, Illinois 60690
312-405-2789
Fax No.: 312-268-7276
huon.meanith@gmail.com
Illinois ARDC No.: 6230996

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re** | ) | |
| | ) | |
| **Gawker Media, LLC, et. al.** | ) | **Chapter 11** |
| | ) | |
| **Debtors,** | ) | **Case No.: 16-11700 (SMB)** |
| | ) | |
| | ) | **Jointly Administered** |

### <u>NOTICE OF FILING</u>

TO:   All counsel of record.
Greg M. Zipes, Trial Attorney, Office of William K. Harrington, the United States
Trustee for Region 2, Southern District of New York

Please take notice that on December 11, 2016, I filed the following:

**<u>MEANITH HUON'S OBJECTIONS TO  CONFIRMATION OF THE AMENDED JOINT
CHAPTER  11 PLAN OF LIQUIDATION OF DEBTORS, GAWKER MEDIA GROUP,
INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT. [DOCKET NO. 427]</u>**

**<u>AND</u>**

**<u>HUON'S OBJECTIONS TO DEBTORS' MOTION FOR APPROVAL OF CLAIMS
ESTIMATION AND PLAN RESERVE PROCEDURES [DOCKET NO. 444]</u>**

in the above-captioned case in the above-captioned case with the Clerk of the United States
Bankruptcy Court, Southern District of New York.

23

Dated:  December 11, 2016

\_\_\_\_/s/Meanith Huon_____

Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
Fax No.: 312-268-7276
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996

24

## PROOF OF SERVICE

I hereby certify that on December 11, 2016, I caused to be served a true and correct copy of the foregoing Notice of Filing and attached Meanith Huon's Objections by causing copies of same to be served on all counsel of record and on the U.S. Trustee for the Southern District of New York, Region 2, by electronic filing same.

I also mailed a copy of this Notice of filing and attached Meanith Huon's Objections by U.S. mail by mailing a copy, postage prepaid, to Greg M. Zipes, Trial Attorney, Office of William K. Harrington, the United States Trustee for Region 2, Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014, by depositing same in a U.S. Post Office Box located in Chicago, Illinois on or by December 12, 2016.

_/s/Meanith Huon_____
Meanith Huon
PO Box 441
Chicago, Illinois 60690
Phone: (312) 405-2789
Fax No.: 312-268-7276
E-mail: huon.meanith@gmail.com
IL ARDC. No.: 6230996