Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 16-11700-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6    In the Matter of:

7

8    GAWKER MEDIA, LLC,

9

10                   Debtor.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   December 1, 2016

19                   10:35 a.m.

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1   Debtor's Second Omnibus Objection to Claims (Satisfied

2   Claims)

3

4   Objection of Debtor Gawker Media, LLC to Proof of Claim No.6

5   (Mitchell Williams)

6

7   Motion for Omnibus Objection to Claim(s) Number: 14, 15, 19,

8   20, 21, 22, 23, 24, 46, 47 (Huon)

9

10   Motion for Omnibus Objection to Claim(s) Number: 61, 62, 86,

11   98 (XP Vehicles)

12

13   Debtor's Omnibus Objection to Proofs of Claim Nos. 54, 223

14   and 246 (Charles Johnson)

15

16   Debtor's Omnibus Objection to Proofs of Claim Nos. 53, 202

17   and 298 (Got News, LLC)

18

19   Debtor's Motion Pursuant to Bankruptcy Code Sections 105,

20   502(c) and 1129 Bankruptcy Rules 3018 and 3021 for approval

21   of Claims Estimation and Plan Reserve Procedures

22

23   Motion for an Order (I) Modifying the Automatic Stay, For

24   "Cause", Pursuant to 11 U.S.C. 362(d) to Permit an Appeal in

25   State Court Litigation Involving a Personal Injury

1    Defamation Claim Against Debtor; (II) Authorizing a Trial in

2    State Court of Williams Personal Injury Defamation Claim

3    Against Debtor, Solely to Establish Liability and Amount of

4    Williams' Claim; and (III) Granting Such Other and Further

5    Relief as may be appropriate.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

```
 1   A P P E A R A N C E S :

 2   ROPES & GRAY, LLP

 3        Attorneys for Debtor

 4        1211 Avenue of the Americas

 5        New York, New York 10036

 6

 7   BY:  GREGG M. GALARDI, ESQ.

 8        D. ROSS MARTIN, ESQ.

 9

10   SIMPSON THACHER & BARTLETT, LLP

11        Attorneys for unspecified

12        425 Lexington Avenue

13        New York, New York 10017

14

15   BY:  WILLIAM T. RUSSELL, JR., ESQ.

16        SANDY QUSBA, ESQ.

17

18   CHIESA, SHAHINIAN & GIANTOMASI, PC

19        Attorneys for Mitchell Williams

20        One Boland Drive

21        West Orange, New Jersey 07052

22

23   BY:  ROBERT E. NIES, ESQ.

24

25
```

Page 5

```
 1   COLE SCHOTZ
 2        Attorneys for unspecified
 3        Court Plaza North
 4        25 Main Street
 5        Hackensack, New Jersey 07601
 6
 7   BY:  WARREN A. USATINE, ESQ.
 8
 9   COHEN & GRESSER, LLP
10        Attorneys for Terry G. Bollea
11        800 Third Avenue
12        New York, New York 10022
13
14   BY:  DANIEL H. TABAK, ESQ.
15
16   RANDAZZA LEGAL GROUP
17        Attorneys for Charles Johnson
18        100 Pearl Street, 14th Floor
19        Hartford, Connecticut 06103
20
21   BY:  JAY MARSHALL WOLMAN, ESQ.
22
23
24
25
```

```
 1   LOCKE LORD, LLP

 2        Attorneys for Publicis Media

 3        3 World Financial Center

 4        New York, New York 10281

 5

 6   BY:  CASEY B. HOWARD, ESQ.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

1                    P R O C E E D I N G S

2            MR. GALARDI:  Good morning, Your Honor.  For the

3    record --

4            THE COURT:  Good morning.

5            MR. GALARDI:  -- Gregg Galardi on behalf of the

6    Gawker Media, Gawker debtors.  We just -- we've submitted an

7    amended agenda, Your Honor.  I'm going to go very quickly

8    through a couple of matters --

9            THE COURT:  Do you --

10           MR. GALARDI:  -- and then --

11           THE COURT:  Do you have a copy of it?

12           MR. GALARDI:  Yes.

13           THE COURT:  I signed those --

14           MR. GALARDI:  C&O.

15           THE COURT:  -- those -- I signed those.

16           MR. GALARDI:  Thanks.

17           THE COURT:  So we don't have to deal with those.

18           MR. GALARDI:  Okay.

19           THE COURT:  Thanks.

20           MR. GALARDI:  Your Honor, so with respect to the

21   matter one on the agenda which is an uncontested matter, we

22   did not submit an C&O on this one.  This is the debtor's

23   second omnibus objections to claims on the basis that those

24   claims were satisfied.

25           THE COURT:  Does anyone want to be heard in

Page 8

1    connection with that application?  The record should reflect

2    there's no response.  That application is granted.  Submit

3    an order.

4           MR. GALARDI:  Okay.  We'll submit the order that

5    deletes the one name.

6           Your Honor, two, three, four were the ones that

7    you had already mentioned.  The adjourned matters have been

8    adjourned pursuant to Your Honor's order.  I would just note

9    on the amended agenda, Your Honor, if you turn to page 6 of

10   that agenda, I just want to circle the numbers.  Your Honor

11   also authorized our adjournment of matter one, which was the

12   objection of claim Toshiba Iadara (ph).

13          Your Honor also authorized adjournment of matter 5

14   which was the objection to the director and officer claims

15   with respect to Gawker Hungary.  There was a pending

16   objection.

17          And with respect to matter eight your author --

18   Your Honor author -- authorized an adjournment of that.

19          THE COURT:  Wanna take --

20          MR. GALARDI:  At this point I would turn the

21   podium over to Mr. Martin who will handle the claims

22   objections and then I'll come back with respect to --

23          THE COURT:  Before you get to the claims

24   objections, let's deal with your claims estimation motion.

25   And I just want to understand --

1          MR. GALARDI:  Sure.

2          THE COURT:  -- the perceived need for the

3    aggressive schedule that's in there.  As I understand it,

4    you're concerned about a cram down fight and you  want to be

5    able to value the claims for confirmation purposes in order

6    to satisfy a cram down fight; is that --

7          MR. GALARDI:  I think that's not actually

8    accurate, Your Honor.  It's --

9          THE COURT:  Otherwise why do you have to know what

10   the amount of the claims are by December 13th?

11         MR. GALARDI:  Fair enough, Your Honor.  And I

12   think it's a good way to set the stage for the claims

13   objections because it gets informed.

14         Your Honor had raised a concern, and I think a

15   valid concern and creditors have expressed a concern and the

16   committee expressed a concern as I mentioned at the last

17   hearing.  As we have put forth in the plan there is a Gawker

18   Media reserve of roughly $3.75 million in cash.  That will

19   be available to unsecured creditors.  There's also, as I

20   described last time, there's another 750 from Columbus Nova

21   if it goes that far and there's a guarantee.

22         What we were concerned and wanted to set for

23   confirmation purposes is we would anticipate certain types

24   of objections coming into the plan that says that reserve is

25   unfair.  That reserve is not sufficient.  We think it is.

Page 10

1            THE COURT:  Let --

2            MR. GALARDI:  So that's a different type of

3    estimation --

4            THE COURT:  But can I -- let me just stop you.

5    Let me start with the Gawker holding company plan.  That's

6    essentially a pot plan with a waterfall, right?

7            MR. GALARDI:  Which one is that?

8            THE COURT:  The holding company plan.

9            MR. GALARDI:  The holding company plan is

10   essentially a pot plan --

11           THE COURT:  Okay.  And I think that --

12           MR. GALARDI:  And in --

13           THE COURT:  -- equity only gets something after

14   everybody's paid in full, right?

15           MR. GALARDI:  Correct.

16           THE COURT:  The Kinja (ph) plan is also a

17   waterfall plan where equity only gets something after all

18   the creditors are paid in full, right?

19           MR. GALARDI:  Correct.

20           THE COURT:  The only issue is with the Gawker

21   Media plan because equity may get -- or get -- retains the

22   right to get something if the Gawker name is sold or there

23   are residual assets that may be sold, right?

24           MR. GALARDI:  Correct.  But it's -- I do want to

25   say it's a little more complicated, just to be forthright

Page 11

1    with Your Honor.  The way the GMGI gets anything --

2              THE COURT:  Hold on.  Mr. Cabera (ph), I think

3    your case are ready so you don't have to sit around.

4              MR. CABERA:  Thank you, Your Honor.

5         (Laughter)

6              THE COURT:  All right.  Go ahead.

7              MR. GALARDI:  The way that the GMGI let's call it

8    equity because it's just simpler to think of it that way.

9    The way the GMGI equity gets anything is there's really two

10   avenues by which it gets something.  One if there was

11   residual at Gawker Media, LLC, but that's purely contingent

12   and that's not really any major --

13             THE COURT:  But --

14             MR. GALARDI:  -- recovery.

15             THE COURT:  But I thought that unsecured creditors

16   have to be paid in full before anything goes to the holding

17   company.

18             MR. GALARDI:  By way of Gawker Media making a

19   distribution to its direct parent, correct.

20             THE COURT:  Right.  And that's all that we're

21   concerned about in the cram down.

22             MR. GALARDI:  Correct.  And -- but I don't see the

23   cram down issue.  That's why I wanted to start --

24             THE COURT:  So --

25             MR. GALARDI:  -- with the fact --

1          THE COURT:  So what --

2          MR. GALARDI:  -- is the big issue --

3          THE COURT:  -- what -- that's -- you're saying

4    you're concerned somebody's going to say, it's not enough.

5          MR. GALARDI:  Correct.

6          THE COURT:  But that only matters if equity is

7    getting something.

8          MR. GALARDI:  Correct.

9          THE COURT:  So under which plan does equity get

10   something that is not a waterfall distribution where

11   unsecured creditors have to be paid in full first?

12         MR. GALARDI:  The only time that equity gets

13   something that is not a waterfall is, as Your Honor may

14   recall from the plan, part of the claims that are being paid

15   by Gawker Media is a intercompany claim to Kinja.

16         THE COURT:  Okay.

17         MR. GALARDI:  And then that, if you -- after it

18   pays its claim, goes up to GMGI on account of its equity

19   interest in Kinja, not in its equity interest of Gawker

20   Media.

21         THE COURT:  But then it's not getting a

22   distribution on account of its interest in Gawker Media.

23         MR. GALARDI:  And --

24         THE COURT:  It's not a cram down issue.

25         MR. GALARDI:  -- I -- we agree a hundred percent,

1   Your Honor.  And so --

2          THE COURT:  Does anybody disagree with that?

3          MR. GALARDI:  No.  No.  I think the only issue

4   here is if someone wants to say -- you know, again, it will

5   depend on voting.  And the only reason we wanted Your Honor

6   -- and, again, I could easily say the procedures don't need

7   to be approved.  We were trying to anticipate, one, a

8   concern; two, an evidentiary issue.  If someone says, I have

9   a $20 million claim --

10         THE COURT:  Right.

11         MR. GALARDI:  -- and you're paying Iadara $750,000

12  or you're paying Mr. Balaya (ph) $31 million, how am I out

13  of my $20 million claim going to accept 6.5 or 3.75 million.

14         Now I have two responses.  One is the creditors

15  vote for it, okay, and then I have the best interest test.

16  Those to me are the challenges and to satisfy the best

17  interest test I wanted to be able to say to Your Honor and

18  tell the world, these are the procedures that we think

19  should apply when I have a challenge to the reserve.

20         THE COURT:  Is -- is the objection then that

21  you're paying the set -- I'll call them the settling

22  plaintiffs on the effective date in a specific amount, but

23  you're not paying the unliquidated tort claimants?

24         MR. GALARDI:  I think that is part of their

25  objection, Your Honor, and that in doing so -- again, I'm

Page 14

1    anticipating everybody's objections because they're not due

2    till Monday.  But, again, we've thought about it obviously

3    in advance.  We anticipate people saying, look, there could

4    be an unfairness here because if Mr. Balaya walks away with

5    $31 million and then I only get two percent of my claim as

6    it turns out Mr. Juan (ph) has a hundred million in this

7    there is some objection there.  We're just saying --

8              THE COURT:  Why don't you just separately classify

9    the settling tort cases, the tort plaintiffs?  They have

10   settlements.  They have different rights.

11             MR. GALARDI:  Well, their settlements are

12   contingent upon the effective date of the plan, first of

13   all.

14             THE COURT:  Well, but for the plan to be effective

15   maybe you have to just separately classify them.

16             MR. GALARDI:  Your Honor, again, I didn't want to

17   be accused of (indiscernible) remanding in there and certain

18   treatment Your Honor had said something interesting at the

19   last hearing.  Mr. Balaya's taking I will say roughly 25

20   percent of his claim.

21             There is an open issue as to --

22             THE COURT:  There's two issues.

23             MR. GALARDI:  Yeah.

24             THE COURT:  The settlement is the settlement and

25   it's fair and --

1          MR. GALARDI:  Fine.

2          THE COURT:  -- you know, it's fair and reasonable.

3    The question is what he can pay the settlement or if he

4    simply has a claim to $31 million --

5          MR. GALARDI:  Correct.

6          THE COURT:  -- that gets paid when all the other

7    claims get paid.  And I understand that issue.  But it's

8    only an issue if you can't separately classify that -- those

9    claims.

10         MR. GALARDI:  Correct.  And, Your Honor, and we

11   chose between -- you know, and, look --

12         THE COURT:  Yeah.

13         MR. GALARDI:  -- I could easily modify the plan to

14   separately classify and still have the same fight and they

15   would have the same issue.

16         THE COURT:  I think --

17         MR. GALARDI:  I think that's --

18         THE COURT:  -- the problem --

19         MR. GALARDI:  -- a different issue.

20         THE COURT:  -- is the schedule and I think that

21   the objections that were raised to the procedure, the

22   proposed procedures --

23         MR. GALARDI:  Uh-huh.

24         THE COURT:  -- and particularly the expediency of

25   all of this are valid.  If you're not going to pay any

1    claims -- I guess you pay the Balaya claim, but it's just

2    not going to work by December --

3            MR. GALARDI:  And, Your Honor --

4            THE COURT:  -- 13th and that's -- and if that's

5    the key to confirming this plan, you're just not going to be

6    able to --

7            MR. GALARDI:  Yeah.

8            THE COURT:  -- confirm your plan.

9            MR. GALARDI:  Then it's not the key, Your Honor,

10   and actually I thought of it as more of a notice provision.

11   So I have no objection to not having those procedures.  It's

12   -- the issue is going to simply be if there is such a

13   challenge we'll deal with it at the confirmation hearing.

14   And I'm -- I was prepared to say exactly that.  You've just

15   gone to that --

16           THE COURT:  When is the voting supposed to be

17   complete?

18           MR. GALARDI:  Monday.

19           THE COURT:  All right.  So should I mark off your

20   estimation motion?

21           MR. GALARDI:  I think that's fine, Your Honor.

22           THE COURT:  All right.  It took me more time --

23           MR. GALARDI:  How --

24           THE COURT:  -- to read it than to have this --

25           MR. GALARDI:  How about --

1          THE COURT:  -- conversation.

2      (Laughter)

3          MR. GALARDI:  How about we do this?  How about we

4  just -- I understand where Your Honor is headed.  I would

5  like to see where -- I'm comfortable dropping it, but I

6  would like to see where we get with the claims today; is

7  that fair, and then --

8          THE COURT:  Well --

9          MR. GALARDI:  -- we can --

10          THE COURT:  -- I don't think we're going to

11  resolve the claims today.  Let me deal with -- the issue I

12  have with the claims, and this is why I can't resolve them

13  today is there is a preliminary issue obviously that

14  everybody has raised regarding whether these are personal

15  injury tort claims.  On a strictly narrow approach they are

16  probably not.  On the broadest approach they probably are.

17  On the hybrid approach you would have to look at it on a

18  claim by claim basis to determine what's the gravamen of the

19  claim.

20          And I'm just -- I can't resolve that today and

21  that's a threshold issue.  At least which approach to take

22  is a threshold issue.  It's got to be the same approach.

23  And then depending on which approach is taken it may require

24  a claim by claim analysis.  So there's no need to argue that

25  today.  I --

Page 18

1              MR. GALARDI:  But I think --

2              THE COURT:  -- have read all the stuff.

3              MR. GALARDI:  And I'm -- I would let Mr. Martin --

4              THE COURT:  The only question I have -- I have two

5     questions on that and I'll invite any audience participation

6     on this one.

7         (Laughter)

8              THE COURT:  I know that the term "personal injury

9     tort" appears in the 1984 amendments to Title XXVIII.  Does

10    it appear anywhere in Title XI and particularly the Title XI

11    that was adopted in 1979?

12             MR. GALARDI:  One question.  Could I ask for the

13    second question and then --

14             THE COURT:  Well, the second --

15        (Laughter)

16             THE COURT:  The second question which is somewhat

17    related to the first question is the legislative history

18    relating to the adoption of this notion of personal injury

19    tort claims.  My recollection of it, I lived through it, was

20    that there was a concern particularly in a case like

21    Manville that a Bankruptcy Court would be adjudicating

22    personal asbestos type claims through the claims resolution

23    process and which would prevent people from getting trials

24    by jury because you don't get jury trials in the claim

25    objection process.

1              And that the amendments were designed to take

2      those types of claims out of the objection process and

3      either put them in the District Court under 157(b)(5), I

4      think, or alternatively the Bankruptcy Court could always

5      grant relief from the automatic stay and let them be

6      liquidated in State Court.

7              But my recollection from the legislative history

8      at the time is that was supposed to be a very narrow

9      exception, whatever that means.  But I didn't see a

10     discussion of the legislative history in any of the papers I

11     saw.

12             MR. GALARDI:  I'm going to let Mr. Martin answer

13     those questions.

14             THE COURT:  All right.

15             MR. GALARDI:  He's much better at that.  But I

16     just -- and he'll probably make this point, but I want to

17     lead in -- I understand the personal injury issue, but I

18     also think regardless of the answer to your two questions,

19     and Mr. Martin can answer this, is there's the res judicata

20     elements.

21             THE COURT:  Yeah.  We'll talk about that --

22             MR. GALARDI:  Okay.

23             THE COURT:  -- with the Williams --

24             MR. GALARDI:  Yes.  I --

25             THE COURT:  -- issue.  That's --

Page 20

```
 1              MR. GALARDI:  -- I just don't want to leave that

 2    --

 3              THE COURT:  -- a separate issue, okay, because --

 4              MR. GALARDI:  Right.

 5              THE COURT:  And I think the Williams issue goes

 6    hand in hand with this relief from stay motion.

 7              MR. MARTIN:  That's correct.

 8              MR. GALARDI:  Yes.

 9              THE COURT:  They're connected.  So I'll hear Mr.

10    Martin on those two questions that I raised.

11              MR. MARTIN:  For the record, Your Honor, Ross

12    Martin, Ropes & Gray for the debtors and debtors-in-

13    possession.  I'll be upfront with the Court.  I actually do

14    not know the answer to the first question about whether it

15    appears --

16              THE COURT:  Well, you just have to --

17              MR. MARTIN:  -- under the second -- it's a great -

18    - it's a good question.

19              THE COURT:  You just have to do a search of the

20    phrase --

21              MR. MARTIN:  That's correct.

22              THE COURT:  -- in the Bankruptcy Code.  It's easy

23    these days.

24              MR. MARTIN:  I -- absolutely.

25         (Laughter)
```

Page 21

1            MR. MARTIN:  Absolutely, Your Honor.  And --

2            THE COURT:  I don't think you're going to find it.

3            MR. MARTIN:  I agree with that, that it is --

4            THE COURT:  And the reason I raise it --

5            MR. MARTIN:  -- it only appears in this context.

6            THE COURT:  The reason I raise it is I've seen

7    some cases where they refer to that language.  I think it's

8    in 522(b)(11) which talks about personal bodily injury.

9            MR. MARTIN:  Correct.  I think we cited --

10            THE COURT:  And --

11            MR. MARTIN:  -- that.

12            THE COURT:  Yeah.  But the -- and the argument is

13    that congress knew how to say personal bodily injury when it

14    wanted, but that's a different statute enacted by a

15    different congress.  And I'm not sure --

16            MR. MARTIN:  Correct.

17            THE COURT:  -- that I can read it in pari materia

18    or anything like that.  So that's why I raise the question.

19            MR. MARTIN:  So that is --

20            THE COURT:  That's the answer to the first

21    question, no.

22            MR. MARTIN:  And the second question, Your Honor,

23    is the following.  We -- I did not look through the

24    legislative history and I'll be --

25            THE COURT:  Well, it's referred to --

Page 22

1           MR. MARTIN:  -- upfront about that.

2           THE COURT:  -- in Karena versus Coach (ph).

3           MR. MARTIN:  That is correct.  And -- but if one

4    focuses on the language of the statute before one gets to

5    the legislative history, and having read the cases going

6    back and there are cases in this district from after --

7    short -- relatively shortly after --

8           THE COURT:  These cases are all over --

9           MR. MARTIN:  -- it in --

10          THE COURT:  -- the place.

11          MR. MARTIN:  That's correct.  It -- the view

12   appears to me is that after the enactment of these

13   provisions there was a focus in the courts on 157(b)(5)

14   where it says trial and the analysis in the courts tended to

15   start from that and intended to frame it somewhat like the

16   Court posed the question here which was, isn't this designed

17   to take the objection entirely out.  That's the framing --

18          THE COURT:  Just on the --

19          MR. MARTIN:  -- the Court's view.

20          THE COURT:  -- liquidation.  I don't -- I'm not

21   suggesting that, for example, if the statute of limitations

22   had already run on the underlining claim before anything was

23   ever done that I couldn't sustain an objection on a legal

24   basis that didn't require the liquidation of the claim or

25   it's barred by res judicata or collateral estoppel or any of

Page 23

1   the -- I'm not suggesting that.

2           MR. MARTIN:  Okay.

3           THE COURT:  I'm just focusing because the statute

4   only focuses on the liquidation of this language.

5           MR. MARTIN:  Correct.  And we raised -- that's the

6   argument we raised --

7           THE COURT:  For distribution purposes.

8           MR. MARTIN:  -- and I wanted to --

9           THE COURT:  No.  No.  I -- it's clear to me going

10  back -- I think it's Ionosphere (ph) or one of those cases

11  --

12          MR. MARTIN:  The Shatagay (ph) case is the --

13          THE COURT:  Shatagay case is that certainly if

14  there's an illegal problem -- if there's a legal problem

15  with the claim that it was not an enforceable claim on the

16  date it was filed because of res judicata, collateral

17  estoppel, things like that or statute of limitations, that

18  the Court has the authority to expunge the claim that

19  doesn't require the liquidation of the claim.

20          MR. MARTIN:  That I would agree with, Your Honor.

21          THE COURT:  So getting back to my original

22  question, and let's assume we don't have those things, put

23  Williams aside, what was the purpose -- what was the object

24  of the amendment?

25          MR. MARTIN:  Well, it -- with respect to this case

Page 24

1    where the tort claims are defamation claims we really don't

2    know the answer to that.  It's --

3              THE COURT:  Okay.

4              MR. MARTIN:  -- it just does --

5              THE COURT:  Fair enough.

6              MR. MARTIN:  -- not get at that question.  And one

7    thing that I did go look at in draft -- both drafting the

8    papers and in preparation for this hearing is that question,

9    of course, came up in Stern v Marshall in the Supreme Court

10   of the United States and they reserved the question.  And

11   the briefs in that case is one of the places that I looked.

12   And there's not guidance as to this particular kind of tort

13   --

14             THE COURT:  Right.

15             MR. MARTIN:  -- is the issue.  So it's a little

16   bit of a round complicated way of saying I'm pretty sure --

17             THE COURT:  This is why I --

18             MR. MARTIN:  -- there's not a definitive answer to

19   that question.

20             THE COURT:  This is why I intend to reserve

21   decision on --

22             MR. MARTIN:  Okay.

23        (Laughter)

24             MR. MARTIN:  Understandable, Your Honor.

25             We could proceed to some of the claims because

Page 25

1    they do raise --

2              THE COURT:  Right.

3              MR. MARTIN:  -- some of the preliminary issues.

4    If --

5              THE COURT:  Right.

6              MR. MARTIN:   If that would please the Court  I'm

7    happy to do that.

8              THE COURT:  That's fine.  Actually, why don't we

9    start with the XP vehicles claims.  Is anyone here

10   representing XP Vehicles Task Force?  All right.  I received

11   -- well, my chambers received an e-mail from XP Vehicles

12   Task Force today.

13             I guess my question is, and I got this ream of

14   paper which I guess was attached to their claim, did Gawker

15   ever publish an article or mention XP?

16             MR. MARTIN:  So, Your Honor, if I could elaborate

17   -- give a little bit of an elaborate answer to that

18   question.

19             We were not immediately sure about that either

20   based on the --

21             THE COURT:  I mean, I've read --

22             MR. MARTIN:  -- original filing.

23             THE COURT:  -- all the conspiracy stuff, but --

24             MR. MARTIN:  So there is in the materials, and I'm

25   not actually sure whether it is in the one that they sent to

Page 26

1    the Court, but it was in one that we submitted with our

2    reply, what is styled as a draft complaint.  And that

3    mentions a 2011 Dismoto (ph) Gawker, one of the other Gawker

4    brand names, Dismoto article.  And that is the mention of a

5    Gawker published statement, the only one that we can find.

6            THE COURT:  And what did that statement say?

7            MR. MARTIN:  That statement -- that article --

8            THE COURT:  What did it say about XP or --

9            MR. MARTIN:  What it referred to, Your Honor, it

10   -- what it discussed was what it considered the business

11   methods of a Mr. Scott Redmond who was the person who signed

12   the claims on behalf of XP in terms of going to --

13           THE COURT:  He signed it on behalf of XP Task

14   Force which is not XP, Inc, which would own the claim.

15           MR. MARTIN:  Your Honor, my --

16           THE COURT:  Or by the telephone number is the same

17   XP, I think.

18           MR. MARTIN:  Yeah.  Yes, it is, Your Honor.  The

19   -- we looked into this and it appears that XP, Inc. was

20   dissolved in California.  And so we find ourselves in the

21   position that Judge Gonzalez faced in the Enron case where

22   there was a dissolved corporation asserting a claim and we

23   decided not to get into the nicey's of that.

24           THE COURT:  Well, that's part of winding up.  Even

25   if you're dissolved you can still want to --

1          MR. MARTIN:  He signed the proofs of claim as to

2    Mr. Scott Redmond as "trustee shareholder" of XP Vehicles.

3    I'm happy to have a litigation about that, Your Honor, but I

4    -- we actually think it can be -- once he identified that it

5    is a 2011 article --

6          THE COURT:  Isn't it barred by any statute of

7    limitations?

8          MR. MARTIN:  That is the argument we make in the

9    papers, Your Honor.  He identifies a list of causes of

10   action, the longest of which are unfair competition and Rico

11   conspiracy claim or Rico claims, four year limitations

12   period from the injury.

13         THE COURT:  Well --

14         MR. MARTIN:  It's a public article.  They would

15   have expired before the petition date.  And it's

16   straightforward.

17         THE COURT:  Okay.  I'll expunge that claim.  It's

18   not clear to me -- well, certainly the claim doesn't allege

19   facts which would support any of these other conspiracy

20   related tort claims.  You've told me that there was one

21   article which referred to XP in 2011 that's barred by any

22   defamation statute of limitations that might exist.  I will

23   note that XP's e-mail said that it didn't show up because it

24   thought the Court would get back to it about advancing the

25   expenses to come here.  The Court has no power to advance

Page 28

1    expenses in that situation.

2            So I will expunge that claim and you can submit an

3    order.

4            MR. MARTIN:  Thank you, Your Honor.

5            THE COURT:  Next with respect to Mr. Huon, he has

6    one surviving aspect of the -- is he represented here today,

7    Mr. Huon?

8            MR. MARTIN:  I don't know whether he's on the

9    phone, Your Honor.

10           THE COURT:  Is anyone -- well, I didn't authorize

11   anybody to argue on the phone.

12           In any event, he has a surviving claim relating to

13   the allegation that someone at corporate ghost wrote, I

14   guess, a comment.  And that is really wrapped up with the

15   initial issue of whether or not I can liquidate that claim

16   with some number between zero and some higher number.  And

17   it will just go through that process.

18           MR. MARTIN:  That is correct, Your Honor, except

19   that we have the additional issue in his case of waiver

20   because he has not responded to the claims objection at all.

21   And so it is our view that similar to Wellness, and this

22   Court has addressed that issue, he did not respond to the

23   claims objection.  Now --

24           THE COURT:  So you're arguing that he waived --

25           MR. MARTIN:  The right --

1          THE COURT:  -- any objection to my entering a

2     final judgment or in this case liquidating his claim through

3     the claims objection process.

4          MR. MARTIN:  That is correct, Your Honor.  In the

5     Madoff case, and I do not presume to understand it as Your

6     Honor does, this Court --

7          THE COURT:  I don't understand it either, but --

8     (Laughter)

9          THE COURT:  That should be obvious if you read the

10    opinion.

11    (Laughter)

12          MR. MARTIN:  That this Court approved waiver of

13    claims where there was a notice of the right to consent in

14    the summons.  Here we had in the claims objection a lengthy

15    discussion as including a paragraph that discussed whether

16    he would expressly or enviably consent.

17          In addition to that, Your Honor, after the Seventh

18    Circuit ruled we sent -- and we -- this is in the record in

19    our reply under declaration we sent Mr. Huon a letter

20    stating that we intended to go forward estimating his claim

21    in the Bankruptcy Court and --

22          THE COURT:  He never responded --

23          MR. MARTIN:  -- there is no response.

24          THE COURT:  -- to the claim objection?

25          MR. MARTIN:  He -- we have spoken with him on more

1    than one occasion, Your Honor, but he has -- and we have

2    told him that we intend to go forward.  I would say for

3    myself, Your Honor, had he asked for additional time after

4    the Seventh Circuit ruled, which was the same day as the

5    original objection deadline, I would have been compelled to

6    give him some time.

7              And -- but he has not filed any response and our

8    view is that under Wellness and the other cases that he has

9    waived the right to seek the District Court --

10             THE COURT:  Well, are you arguing that the claim

11   should be stricken because he's essentially in default or

12   that he's waived the objection to -- he's waived his current

13   objection or Wellness objection?

14             MR. MARTIN:  I do -- we considered that, Your

15   Honor.  Let me just lay out the facts of that because I'm

16   not sure that they support a default.

17             So we objected at a time when the matter was still

18   under advisement in the Seventh Circuit.  There was --

19             THE COURT:  And he --

20             MR. MARTIN:  There was a --

21             THE COURT:  -- did he respond to that?

22             MR. MARTIN:  No.  He has not responded to the

23   claims objection.  The claims objection was that the federal

24   -- the United States --

25             THE COURT:  Okay.

1          MR. MARTIN:  -- District Court in the Northern

2     District of Illinois had dismissed his claims.  It was a

3     final order.  It was res judicata while the thing was --

4     while it was on appeal.  And that was the basis of the

5     objection.

6          Now that the Seventh Circuit reversed on the one

7     claim I don't -- I do not think that the mere fact he did

8     not respond the first time would be grounds for us to --

9          THE COURT:  Okay.  But --

10         MR. MARTIN:  -- fully default him.

11         THE COURT:  -- you put in a supplemental --

12         MR. MARTIN:  Correct, Your Honor.

13         THE COURT:  -- paper I think two days ago.  You

14    know, maybe he didn't respond because he thought the Seventh

15    Circuit was going to affirm and he was done.  Don't you

16    think he should be entitled to respond to your supplemental

17    --

18         MR. MARTIN:  I do agree --

19         THE COURT:  -- objection?

20         MR. MARTIN:  -- with that, Your Honor.

21         THE COURT:  All right.  So let's --

22         MR. MARTIN:  I --

23         THE COURT:  -- adjourn his application, write him

24    a letter, say he's been granted ten days to file any

25    response to the supplemental application.

Page 32

```
 1              MR. MARTIN:  If I could, Your Honor, I may have
 2    misunderstood the question.
 3              THE COURT:  All right.
 4              MR. MARTIN:  The original objection in our view
 5    squarely raised the issue of this Court deciding that claim
 6    and that -- of entering final order on his claim.
 7              THE COURT:  But can I -- I know what you're going
 8    to say.  Your original objection didn't really raise the
 9    question that's now come up because you were arguing based
10    upon the District Court's determination before you even get
11    to the liquidation issues.  I could strike the claim as a
12    matter of law under collateral estoppel grounds.
13              MR. MARTIN:  It actually did raise the substantive
14    issues, Your Honor.
15              THE COURT:  It did?
16              MR. MARTIN:  We did actually say as an alternative
17    -- and let me just make sure that I'm correct about that,
18    Your Honor, so that I'm not -- because we knew it was
19    pending.
20              THE COURT:  Okay.
21         (Pause)
22              MR. MARTIN:  I just want to be precise about this,
23    Your Honor.
24              THE COURT:  All right.
25              MR. MARTIN:  So if you would bear with me for just
```

1    a moment.

2         (Pause)

3              THE COURT:  Did the original objection raise this

4    current issue?

5              MR. GALARDI:  Yes.

6              MR. MARTIN:  Yes, it did.  It did.  In --

7              THE COURT:  All right.

8              MR. MARTIN:  -- four pages it raised that issue,

9    Your Honor.

10             THE COURT:  All right.  Well --

11             MR. MARTIN:  My point is not to, in light of the

12   Court's earlier comments to force the Court to make a

13   decision --

14             THE COURT:  No.

15             MR. MARTIN:  -- today, but I do want -- we would

16   like to press the waiver point on whether it can be

17   determined because there is a live claim and we -- it may

18   matter --

19             THE COURT:  Well, I mean --

20             MR. MARTIN:  -- whether we can get it determined

21   here.

22             THE COURT:  -- I guess you squarely raised the

23   waiver or you squarely raised the Stern issue in the

24   original claim objection.

25             MR. MARTIN:  As well as the consent issue.

Page 34

1           THE COURT:  Well, it's the same thing, waiver

2   consent express -- consent express or implied.  And he never

3   responded to that or objected to that as I understand.

4           MR. MARTIN:  Correct.

5           MR. GALARDI:  Your Honor, just as an officer of

6   the Court since I had the most -- actually had conversations

7   with Mr. Huon, we've actually discussed the issue --

8           THE COURT:  Right.

9           MR. GALARDI:  -- and he is a lawyer.  He appeared

10  pro hac vice.  So I explained to him -- you know, and,

11  again, he understood that we were going to go forward with

12  this estimation.  He read the waiver objection.  He read the

13  supplement and call.  We've been in other conversations with

14  regard to resolving his claims, but he's aware of all of

15  those issues.

16          THE COURT:  All right.  All right.  I'm satisfied

17  from what you've told me that he's waived what I've referred

18  to as the Stern objection.  The issue was teed up in the

19  original objection.  It was discussed specifically with him.

20  He never put in a response.  You know, if I were do or

21  standing on the other side of the podium I might argue that

22  his claim should be stricken based on default, but you're

23  not asking for that and he might be entitled to that anyway

24  in addition to the implied consent.

25          But I'm satisfied from the way the issue was

1    raised and discussed with him and the fact that he's never

2    objected that he's waived any objection to the Court

3    entering a final judgment.

4             And if you just want to schedule a hearing we'll

5    just schedule a hearing or, you know what, schedule a

6    conference.  Write him a letter telling him that a

7    conference will be scheduled, set procedures; that if he

8    doesn't appear at the conference either directly or through

9    an attorney a judgment may be entered against him in

10   connection with the claim so that we get --

11             MR. MARTIN:  Certainly.

12             THE COURT:  -- him in here and we can proceed.

13             MR. MARTIN:  Thank you, Your Honor.

14             THE COURT:  All right.  What's next?

15             MR. MARTIN:  We were going to address -- we were

16   going to propose to address the Williams matter next, Your

17   Honor --

18             THE COURT:  Okay.

19             MR. MARTIN:  -- which we agree should be discussed

20   together because --

21             THE COURT:  Right.

22             MR. MARTIN:  -- they fit together.  Is there

23   anyone here representing --

24             MR. NIES:  Yes, Your Honor.

25             THE COURT:  -- Mr. Williams?  Oh, okay.  Step --

Page 36

1          MR. MARTIN:  I'm happy to put them together from

2     the estate's perspective first, Your Honor.

3          THE COURT:  Well --

4          MR. MARTIN:  However you would like to proceed.

5          THE COURT:  -- one of the questions I had with

6     Williams is whether the State Court lended a decision from

7     the bench, the result of which is simply memorialized in

8     that order that everybody's referred to or whether -- I

9     mean, obviously he dismissed the claim and maybe that makes

10    it final for purposes of collateral estoppel because he

11    doesn't intend to do anything further on it.

12          But I was just curious whether the judge rendered

13    a decision from the bench which, you know, we all do.

14          MR. MARTIN:  The -- we did actually anticipate

15    that question, Your Honor.  I have certified copies of the

16    transcript and we can hand those up.

17          THE COURT:  By the way while you've got this, and

18    this is for everybody here, first of all when you submit

19    papers -- this is all in my chambers rules -- the pleadings

20    have to be in text searchable format.

21          MR. MARTIN:  I apologize, Your Honor.

22          THE COURT:  When you file -- yours I think were.

23    When you -- and I don't know if anybody's were.  But when

24    you file papers on ECF that have exhibits, each exhibit has

25    to be filed separately so that they can be reviewed.  When

Page 37

1    you deliver chambers copies and there are exhibits, please

2    separately them with exhibit folders.

3            MR. MARTIN:  Okay.  Will do, Your Honor.

4            THE COURT:  And put them in a -- either bind them

5    if they're lengthy, bind them or put them in a

6    (indiscernible).  Don't just put a rubber band around them

7    because --

8            MR. MARTIN:  We will double check, Your Honor,

9    that's --

10            THE COURT:  They wind up on the floor half the

11    time.  They're very hard to put together.

12            Now my question --

13            MR. NIES:  Before you do this, Your Honor --

14            THE COURT:  I'm sorry.  Would you just identify

15    yourself?

16            MR. NIES:  I'm sorry.  It's Rob Nies from the Law

17    Firm of Chiesa, Shahinian & Giantomasi and I represent

18    Mitchell Williams.

19            THE COURT:  Okay.

20            MR. NIES:  But --

21            MR. MARTIN:  I can cede the podium for a minute if

22    --

23            THE COURT:  Okay.  Sure.

24            MR. MARTIN:  -- that would be helpful.

25            THE COURT:  That's -- I'm just interested in

1   whether the judge rendered a decision from the bench which

2   explained why he was doing what he was doing.  You were

3   about to give me a big transcript which is --

4           MR. NIES:  I'm not about to give you a big

5   transcript, but --

6           THE COURT:  But you're going to say no.

7           MR. NIES:  -- I'm actually, you know, a little bit

8   shocked if that's, you know, the appropriate word that today

9   after we have raised in three pleadings that nobody has

10  cited to a single finding of fact of an unmaterial --

11          THE COURT:  Well --

12          MR. NIES:  -- disputed -- of a material disputed

13  --

14          THE COURT:  Well --

15          MR. NIES:  -- fact --

16          THE COURT:  -- I -- I'm surprised that if the

17  judge rendered a decision from the bench given what has been

18  raised that nobody gave me a transcript.  So --

19          MR. NIES:  Me, too.  Or, by the way, how about

20  just excerpting one single finding of fact or one single

21  conclusion of law.

22          THE COURT:  Well, I'm not sure that the judge

23  makes findings of fact in a motion for summary judgment.  He

24  or she just determines that there are no factual issues --

25  material factual issues --

1              MR. NIES:  No.  In New Jersey --

2              THE COURT:  -- in dispute.

3              MR. NIES:  In New Jersey under the Court -- and

4     I'm --

5              THE COURT:  I'm not -- let me deal with your

6     Rucker Feldman argument which you're about to make right

7     now.

8              MR. NIES:  well --

9              THE COURT:  Rucker Feldman has nothing to do with

10    this case.

11             MR. NIES:  Well, I'll tell you what it did --

12             THE COURT:  Let me just finish.  The debtor is not

13    complaining that it was injured by the New Jersey judgment.

14    The debtor is very happy with the New Jersey judgment.

15    You're the one who is really asking me to look behind the

16    New Jersey judgment and impeach it.

17             The issue is whether the New Jersey judgment is

18    entitled to preclusive effect under the doctrine of

19    collateral estoppel.  You didn't raise res judicata.  I

20    don't know why.  It sounded like it was a final judgment for

21    res judicata purposes even if it wasn't the final judgment

22    for appeal purposes.  But that's something else.  And that's

23    the only issue.

24             MR. NIES:  Well, if I just may then, so we're

25    disposing of the 12(b)(6) and the 12(c).  That is clearly a

Page 40

1    Rucker Feldman argument.  So if we're resolving that, they

2    lost twice in the State Court on motions to dismiss --

3              THE COURT:  But the State Court ultimately entered

4    a judgment -- let me finish -- ultimately entered a judgment

5    which as between Mr. Williams and Gawker is final.  The

6    State Court judge is not going to do anything else --

7              MR. NIES:  I --

8              THE COURT:  -- and the question is whether it's

9    entitled to issue --

10             MR. NIES:  Okay.

11             THE COURT:  -- under New Jersey law.

12             MR. NIES:  Then we're only talking about

13   collateral estoppel.

14             THE COURT:  Right.

15             MR. NIES:  We're not dealing with the 12(b)(6) and

16   --

17             THE COURT:  Well, I don't know --

18             MR. NIES:  -- as the 12(b) -- well, I don't want

19   to come back and have that be the argument because that's an

20   easy one to address and Rucker Feldman applies to that.  So

21   let me deal with collateral estoppel.  I'm not trying to --

22             THE COURT:  Okay.

23             MR. NIES:  -- be --

24             THE COURT:  All right.  Let's --

25             MR. NIES:  Let me deal with collateral estoppel.

Page 41

1          THE COURT:  You've got a judgment.  All right.

2          MR. NIES:  What we have said to you is that the

3    principle of Rucker Feldman is that a lower federal court

4    cannot serve as an appellate tribunal for a State Court

5    order to overturn that.  That's --

6          THE COURT:  I agree that --

7          MR. NIES:  -- the principle.

8          THE COURT:  I agree that's one of the elements of

9    the Rucker Feldman --

10         MR. NIES:  So --

11         THE COURT:  -- doctrine.

12         MR. NIES:  So I am making admittedly a nuance

13   argument and that is in the first instance, and Your Honor

14   hit the nail right on the head.  What you said was are there

15   findings of fact, are there any kind of legal conclusions,

16   is there a reasoned opinion --

17         THE COURT:  But that's not a Rucker Feldman issue.

18   That's a claim preclusion --

19         MR. NIES:  Well, I respect that.

20         THE COURT:  I'm sorry.  An issue of preclusion

21   issue under New Jersey law.

22         MR. NIES:  But I respectfully submit if you rule

23   that you can apply collateral estoppel principles you have

24   implicitly ruled that that judgment was properly entered

25   under New Jersey court rules.

Page 42

1              So I'm saying it's a fundamental issue.  You can

2       --

3              THE COURT:  I'm not going to review that.

4              MR. NIES:  Okay.  But you can get to it the other

5       way and that is if you want to determine whether or not this

6       is a -- two things, a final order and, two, sufficiently

7       firm to why --

8              THE COURT:  It doesn't have to be a final order

9       for issue preclusion.

10             MR. NIES:  Well --

11             THE COURT:  It's final in the sense -- it's

12      sufficiently final in the sense that the New Jersey judge is

13      not going to consider any of the issues between Mr. Williams

14      and Gawker any further unless an appellate court tells it

15      it's supposed to do it, right?

16             MR. NIES:  Correct.

17             THE COURT:  Okay.  So --

18             MR. NIES:  So that's -- okay.  So let's --

19             THE COURT:  Well, let me ask you a different

20      question.  Suppose he had written a 50 page opinion and you

21      got the same piece of paper at the end of the day, a

22      judgment entered based on the opinion, would you be arguing

23      that collateral estoppel didn't apply?

24             MR. NIES:  Oh, absolutely because --

25             THE COURT:  Why?

Page 43

1           MR. NIES:  -- New Jersey court rules require a

2    written opinion, a well-reasoned opinion.  That's what they

3    require.  So --

4           THE COURT:  But I don't --

5           MR. NIES:  -- facially --

6           THE COURT:  -- have -- but I don't necessarily

7    need that for collateral estoppel, do I?

8           MR. NIES:  Well, I think you do because -- let me

9    say this, Your Honor.  Again, collateral estoppel is a

10   equitable remedy.  The idea that we would mechanically say

11   here that a summary judgment order was entered, therefore

12   it's entitled to collateral estoppel is completely contrary

13   to what the principle is.

14          You in the beginning again made a very good point;

15   that is we can't really deal with the objections to claims

16   because you've got to take them individually.  Collateral

17   estoppel says the same thing.  It says, it's an equitable

18   doctrine.  It's only applied where fairness would require it

19   be applied.  And most importantly it's not a rigid

20   application.  It's an application to be applied after

21   there's a careful assessment and consideration of all

22   relevant facts including whether Williams had an opportunity

23   to review the State Court decision in New Jersey.

24          THE COURT:  Let me stop you.  This all started

25   when I asked, do you have a transcript in which the judge

Page 44

1    rendered a decision from the bench.

2              MR. MARTIN:  Yes, we do, Your Honor.

3              THE COURT:  Okay.  Did the judge render a decision

4    from the bench?

5              MR. MARTIN:  Yes.

6              THE COURT:  Why wasn't it ever given to me?

7              MR. MARTIN:  I'm sorry, Your Honor.

8              THE COURT:  Why wasn't it ever given to me

9    considering that this issue about the existence or

10   sufficiency of the decision has been put in issue since the

11   beginning of this case?

12             MR. MARTIN:  The answer to that, Your Honor, is

13   that there -- Mr. Nies understandably is trying to conflate

14   the issue of issue preclusion with the issue of direct

15   preclusion.  This is not a situation where he -- where we're

16   trying to apply a specific issue that a New Jersey Court

17   decided --

18             THE COURT:  All right.  I understand.

19             MR. MARTIN:  -- to some other thing.

20             THE COURT:  He's raised the same claim --

21             MR. MARTIN:  It's the same --

22             THE COURT:  -- in the Bankruptcy Court.

23             MR. MARTIN:  -- claim and so the order itself is

24   all that is necessary.  And in the interest of, frankly,

25   Your Honor, not putting in a lot more paper there's a clear

Page 45

1    order of the Court after a lengthy summary judgment hearing.

2    That's what's required.

3              THE COURT:  Did he decide anything from the bench

4    or did he just say I'll reserve decision and then at the end

5    of the day --

6              MR. MARTIN:  No.  There are --

7              THE COURT:  -- issued a ten page order?

8              MR. MARTIN:  He commented on the various claims

9    from the bench.  I'm happy to read through those and have

10   them submitted or --

11             THE COURT:  Well, if you could provide them to me

12   it would be helpful.  Then I could make a determination

13   whether or not --

14             MR. MARTIN:  I would be happy to --

15             THE COURT:  -- he's --

16             MR. MARTIN:  -- put in a very short supplement,

17   Your Honor, to point to specific things and Mr. Nies can

18   respond.

19             THE COURT:  All right.

20             MR. NIES:  Your Honor, then if I may address the

21   basic requirement of a sufficiently firm.  So if Your Honor

22   looks at whether collateral estoppel should apply, not only

23   do we have to look at the estimation hearing, not only the

24   objection to the relief from stay, but we have to look at

25   the plan.

Page 46

1          What will happen is if you disallow the claim on

2    collateral estoppel arguably whatever benefit from that

3    which generally is the Court has -- doesn't have to repeat

4    the two years of litigation.  That's the general benefit.

5          THE COURT:  Uh-huh.

6          MR. NIES:  That doesn't happen here.

7          THE COURT:  Why?

8          MR. NIES:  Well, because I'm going to have to

9    repeat the litigation.

10         THE COURT:  Why?

11         MR. NIES:  Well, because if I want to participate

12   I'm going to have to argue that a reserve be set.  I'm going

13   to have to argue that I can ultimately liquidate my claim

14   and come back here and ask Your Honor to revisit the

15   disallowance.  I will have incurred the -- all the costs

16   that I would have incurred before.

17         THE COURT:  Well, I agree with you -- and this

18   really gets into your relief from stay motion.

19         MR. NIES:  It does.

20         THE COURT:  The only reason to grant relief from

21   the stay in a case like this is if I decide that I'm going

22   to give preclusive effect to the State Court judgment

23   because then you have a right to go and litigate and I'm due

24   that.  However, that doesn't stop me from striking your

25   claim.  If you win in the end you come back under 502(h) and

Page 47

1    you seek reconsideration of the order expunging the claim.

2           Now all the money has been distributed because --

3           MR. NIES:  It's a meaningless remedy.

4           THE COURT:  You're at a --

5           MR. NIES:  It comes with --

6           THE COURT:  I agree with you.

7           MR. NIES:  It's a meaningless remedy.

8           THE COURT:  I agree with you.

9           MR. NIES:  That's why the plan is important.

10          THE COURT:  Well, I -- but that's what's going to

11   happen.  If it turns out that the State Court determination

12   in essence is a nullity for the purposes that we're talking

13   about, but I have jurisdiction -- not jurisdiction, I have

14   the ability to liquidate your claim because it's not a

15   personal injury tort claim, there's no reason to grant

16   relief from the automatic stay.  I'll just ignore the State

17   Court and we'll go forward with the proceedings.

18          So what I'm saying is I have to determine really

19   those two issues first --

20          MR. NIES:  I agree.

21          THE COURT:  -- before I consider.

22          And just so there's no dispute I'm making the

23   determination under Section 362(e) to extend the stay or not

24   let the stay automatically end because in the words of the

25   statute -- I'm just looking for it.  I'm looking at number

Page 48

1    four.

2              MR. NIES:  That's acceptable, Your Honor.

3              THE COURT:  All right.  Because I think these are

4    very -- I mean, they're very serious issues --

5              MR. NIES:  We're not trying --

6              THE COURT:  All right.

7              MR. NIES:  -- to short circuit --

8              THE COURT:  Well, I'm just -- under 362(e) I'm

9    making the finding that's required to continue the stay and

10   I don't hear an objection.  But I have to determine those

11   two issues first and, frankly, even if I expunge your claim,

12   if I do expunge your claim on res judicata collateral

13   estoppel grounds I'll probably grant your motion so you can

14   go back to State Court and appeal.  And, you know, you can

15   do what you can do.  But that's the remedy that the

16   Bankruptcy Code provides.

17             MR. NIES:  Well, but except when you have a --

18   coupled with a plan that says if you disallow the claim and

19   the -- all claims have either been disallowed or allowed,

20   the full $6.9 million can be distributed.

21             THE COURT:  No question.

22             MR. NIES:  And it can be distributed by the end of

23   this year.

24             THE COURT:  That is --

25             MR. NIES:  And so as  --

Page 49

1          THE COURT:  -- certainly correct.

2          MR. NIES:  -- a result 502(j) obviously doesn't do

3     anything.

4          THE COURT:  I agree with you.

5          MR. NIES:  But that is exactly what I would submit

6     is a consideration, a relevant consideration for the

7     application of the fairness doctrine collateral estoppel.

8     It is not mechanically done.  It's done as a equitable

9     remedy and you're an equitable court.

10          So if you look at the whole situation and on

11     balance I'm going out to re-litigate a claim and spend

12     hundreds of thousands of dollars for a meaningless remedy,

13     Your Honor might look at -- and my suggestion is when we

14     deal with on the hearing the personal injury case I think we

15     reserve the issue about collateral estoppel so that we get

16     those relevant factors before Your Honor.

17          THE COURT:  But I don't have a hearing on that

18     unless I determine that collateral estoppel doesn't apply

19     and I have jurisdiction to hear the case.

20          MR. NIES:  But you can't --

21          THE COURT:  I say jurisdiction.  Please excuse me.

22     It's not a --

23          MR. NIES:  I know.

24          THE COURT:  -- subject matter jurisdiction issue.

25          MR. NIES:  But you can't decide the second part.

Page 50

1                THE COURT:  Well --

2                MR. NIES:  You can't decide the first without

3      deciding -- so I assumed there would be some either hearing

4      or further briefing on that issue.

5                THE COURT:  On which issue?

6                MR. NIES:  Personal injury tort claim.

7                THE COURT:  Well, you've briefed it already.

8                MR. NIES:  Okay.

9                THE COURT:  I mean, what, you want to put in

10     supplemental briefing?

11               MR. NIES:  No.  I'm just saying that both of those

12     require to some extent evidence.  They're not mechanical.

13     You need to hear from someone.  For example --

14               THE COURT:  Evidence on whether collateral

15     estoppel applies?

16               MR. NIES:  I believe so.  If you were to take a

17     fair consideration of the -- assessment and consideration of

18     the relevant factors, and let me give you --

19               THE COURT:  So what are the factors --

20               MR. NIES:  Let me give you an --

21               THE COURT:  Let me ask you a question.  What are

22     the factual issues that would have to be --

23               MR. NIES:  I'll tell you exactly --

24               THE COURT:  -- resolved?

25               MR. NIES:  So under New Jersey law there are two

1    things that would be factual in nature.  One is did Williams

2    even have an opportunity to appeal that order before the

3    Bankruptcy was filed?  And I'll tell you this.  So you have

4    the bankruptcy filed nine days after the June 1st summary

5    judgment order is entered.

6              THE COURT:  But I've read the New Jersey cases and

7    the federal cases that discuss New Jersey law and collateral

8    estoppel can apply to a non-final order as -- you know,

9    that's why I used the example if he had written a 50 page

10   decision and it was clear what he had decided, I don't think

11   we would be having this conversation.

12             MR. NIES:  I -- well --

13             THE COURT:  Your problem --

14             MR. NIES:  -- what I'm saying --

15             THE COURT:  Your problem is you're arguing I don't

16   know what he decided, right?

17             MR. NIES:  I'm sorry.

18             THE COURT:  You're really saying collateral

19   estoppel doesn't apply because we don't know if he decided

20   the issues or what he decided with respect to Mr. Williams'

21   claim.

22             MR. NIES:  It's more direct.  It's in violation of

23   a New Jersey -- it is.  But that's the reason we're --

24             THE COURT:  I have not seen --

25             MR. NIES:  On an emergent appeal we would have

Page 52

1    that turned over in a minute.

2              THE COURT:  I have not seen any New Jersey cases

3    that say that in order to apply collateral estoppel you must

4    apply with certain rules of the New Jersey courts.

5              MR. NIES:  Oh, well, that's unquestionable. You

6    have to apply what New Jersey law would apply for collateral

7    estoppel.

8              THE COURT:  I understand.  But I haven't seen any

9    case that said in order to do that you have to comply with

10   the procedural requirements --

11             MR. NIES:  We cited that in our --

12             THE COURT:  -- before --

13             MR. NIES:  We cited that in our brief.

14             THE COURT:  All right.  All right.  I've heard

15   enough about this.

16             MR. NIES:  Could I ask for one other point, just

17   --

18             THE COURT:  Yes.

19             MR. NIES:  So with collateral estoppel.  And

20   these, again, these are New Jersey cases.  So another

21   factual issue is whether Williams had any reason to believe

22   when the summary judgment order was entered that there would

23   be a subsequent proceeding in which he would be barred such

24   that he had to immediately appeal that order.  That order

25   didn't have to be appealed.  The time to appeal it still

Page 53

```
1    exists right now.
2              So there's no factual basis to conclude that he
3    knew Gawker was going to file a bankruptcy nine days later.
4              THE COURT:  Let me ask you a question, though.
5              MR. NIES:  That's a factor.
6              THE COURT:  Okay.  If he had filed the same case
7    in New Jersey six days later do you think he would be
8    directly estopped from litigating that case in light of the
9    summary judgment order because the bankruptcy is no
10   different really.
11             MR. NIES:  I think the Court would go through
12   exactly the analysis I'm asking this Court to go through.
13             THE COURT:  Well --
14             MR. NIES:  Was there any reason to anticipate
15   there would be another case filed six days later.  It's the
16   same analysis.
17             THE COURT:  But what difference does it make?
18             MR. NIES:  The difference that it makes is
19   collateral estoppel is not a mechanical application.
20             THE COURT:  All right.  Look, let me see the -- I
21   would like to see the transcript and what you contend are
22   the judge's rulings.  So you can provide a copy of that to
23   me and Mr. Nies.  Do it in a letter.  Send a copy to Mr.
24   Nies.  And if you want to make a comment on it in a
25   responsive letter you can do that.
```

1            And then I'll reserve -- I've already reserved

2    decision on this personal injury tort issue, but it may be

3    that we don't get to that issue in your case.

4            MR. NIES:  I'm optimistic we will.

5            THE COURT:  Okay.

6            MR. NIES:  I also have co-counsel who are personal

7    injury attorneys that they're going to have to read the

8    transcript.  So -- but I --

9            THE COURT:  All right.

10           MR. NIES:  -- until I get it I'll --

11           THE COURT:  As I understand there were two days of

12   oral argument at this --

13           MR. NIES:  Two days of oral -- so there had to be

14   some issues they grappled with.  There should be some --

15           THE COURT:  Well, that's why I want to see what

16   the transcript says.

17           MR. NIES:  But there should be some reasoned

18   decision with that.

19           THE COURT:  Sometimes the reasons are very simple

20   and obvious.

21       (Laughter)

22           MR. NIES:  But they have to be stated in New

23   Jersey, so.

24           THE COURT:  Look, for all I know, and I didn't

25   read the transcript, they said Williams is a public figure.

1    There's no malice and that's why I'm dismissing the

2    complaint.  And you know what?  That will be collateral

3    estoppel.

4              MR. NIES:  And it took them two days to do it, but

5    okay.

6              THE COURT:  Well --

7              MR. NIES:  I --

8              THE COURT:  -- fortunately I'm not taking two days

9    to do it.

10         (Laughter)

11             THE COURT:  Thank you very much.

12             MR. MARTIN:  We will keep the letter --

13             MR. NIES:  Thank you, Your Honor.

14             MR. MARTIN:  -- at that appropriate length, Your

15   Honor.

16             THE COURT:  Yes.

17             MR. NIES:  All right.  Thank you, Your Honor.

18             THE COURT:  Just point -- you know what, don't --

19   you don't even have to characterize the transcript.  Just

20   tell me what you want me to read.  That's all.

21             MR. MARTIN:  I understand.

22             THE COURT:  And if you want me to read something

23   else and they haven't given it to me --

24             MR. NIES:  I will.  I will.

25             THE COURT:  -- you give it to me.

1          MR. NIES:  What do we -- do we have some kind of a

2     date to come back after we --

3          THE COURT:  No.  I don't need any further argument

4     on this.  When can you provide me with the letter and what

5     -- the portions of the transcript you want me to read or all

6     of -- actually, you should --

7          MR. MARTIN:  Today, Your Honor.

8          THE COURT:  -- probably give me all of the

9     transcript and just tell me what you want me to read.

10         MR. MARTIN:  Today, Your Honor.

11         THE COURT:  All right.  So can we say, Mr. Nies,

12    that by -- how long will it take you to respond?  I realize

13    -- well, you're going to have to get --

14         MR. NIES:  Well --

15         THE COURT:  -- the personal injury guy to read

16    this, right?

17         MR. NIES:  And candidly, Your Honor, as you

18    indicated in the beginning the fast track that this is on --

19         THE COURT:  It's -- the track is rapidly slowing.

20    Don't worry.

21         MR. NIES:  Well, but we have to file objections to

22    confirmation --

23         THE COURT:  Well --

24         MR. NIES:  -- by Monday.

25         THE COURT:  File them.

1          MR. NIES:  And they're extensive and I'm not

2     saying we won't -- we'll do it.

3          THE COURT:  Okay.  You give me the transcript by

4     tomorrow.  You give me any response by a week from tomorrow.

5          MR. NIES:  Thank you, Your Honor.

6          THE COURT:  All right.  But give me the entire

7     transcript and then just point out the pages --

8          MR. MARTIN:  That was our intention.

9          THE COURT:  -- or the parts that you want me to

10    read.

11         MR. NIES:  Thank you, Your Honor.

12         THE COURT:  Next.  I think the only one left is

13    Johnson, right?

14         MR. MARTIN:  Yes.  It's -- and it's two claims,

15    Your Honor --

16         THE COURT:  Right.

17         MR. MARTIN:  -- of Got News, LLC and Mr. Johnson.

18         THE COURT:  They're essentially the same --

19         MR. MARTIN:  They are.  I believe identical --

20         THE COURT:  -- claim and the same objection.

21         MR. MARTIN:  -- claims, Your Honor.

22         THE COURT:  All right.

23         MR. MARTIN:  I will be very brief, Your Honor, to

24    open.  The proof of claim was filed and the basis asserted

25    for the claim was an attachment of a complaint that had been

Page 58

1    filed in the State of California.

2              THE COURT:  Right.

3              MR. MARTIN:  We objected on substantive grounds.

4    One of the things I've come to learn in this case is that in

5    these defamation claims you have to walk through each and

6    every statement.  And so we did that and then in the

7    response perhaps because of the potential application of the

8    California anti-slap rules which would potentially let the

9    estate recover legal fees Got News and Mr. Johnson took the

10   position that their proof was not a continuation of the

11   California action, but was a new New York forum --

12             THE COURT:  Well.

13             MR. MARTIN:  -- item.  And so I -- if I might,

14   Your Honor --

15             THE COURT:  This is covered by a Second Circuit

16   case which nobody cited.  Is Mr. -- who represents Mr.

17   Johnson?

18             MR. WOLMAN:  Good after -- good morning, Your

19   Honor.  Jay Wolman of Randazza Legal Group.

20             THE COURT:  I would commit to your reading in re:

21   Kudair Brothers.

22             MR. WOLMAN:  I was going to cite that one.  I

23   didn't have a chance to --

24             THE COURT:  Well, you --

25             MR. WOLMAN:  -- raise that issue --

Page 59

1            THE COURT:  -- get a chance.  673 Fed 3d 180, the

2     filing of the proof of claim is a continuation for -- it's

3     contained the transfer of the California case so you have to

4     apply the California conflict of law rules to the claim

5     which doesn't necessarily mean California law applies, but

6     -- so that's item number one that you have to brief.

7            MR. WOLMAN:  That's where we thought we were, Your

8     Honor, on the original objection.

9            THE COURT:  Well, but you didn't cite Kudair and I

10    -- all you said is because he lives there California law

11    applies.  And while that may turn out to be the result, I'm

12    not sure that's the right answer.  Certainly, a one-liner

13    like that doesn't do it.

14            MR. WOLMAN:  It's -- with respect, Your Honor, the

15    complaint starts with, he was harmed in California, and --

16            THE COURT:  Well, if that's --

17            MR. WOLMAN:  -- so that was the --

18            THE COURT:  -- if that's it --

19            MR. WOLMAN:  -- purpose of not --

20            THE COURT:  Well, is there a concession that

21    California law applies to his claim?

22            MR. WOLMAN:  Well, if I may, Your Honor, paragraph

23    228 of that complaint actually says that the injuries

24    occurred in Missouri and throughout the country.

25            THE COURT:  All right.  Look, it's --

1                    MR. WOLMAN:  So --

2                    THE COURT:  You --

3                    MR. WOLMAN:  I think there's a (indiscernible)

4    issue here.

5                    THE COURT:  A what?

6                    MR. WOLMAN:  (Indiscernible).

7                    THE COURT:  Would you -- I'm not familiar with

8    that.

9                    MR. WOLMAN:  D-E P-E-C-A-E --

10                   THE COURT:  Perhaps you could use a synonym.

11        (Laughter)

12                   MR. WOLMAN:  Basically that there's not a single

13   choice of law issue, that we may have to go item by item as

14   to what was applied for the substantive law of New York or

15   California for defamation.  Perhaps the substantive law of

16   Missouri for false slight, or maybe it's California --

17                   THE COURT:  Why --

18                   MR. WOLMAN:  -- Your Honor --

19                   THE COURT:  Why Missouri?

20                   MR. WOLMAN:  My client was investigating via

21   Michael Brown --

22                   THE COURT:  Right.  I know that.

23                   MR. WOLMAN:  -- (indiscernible) Ferguson.  That's

24   in Missouri.

25                   THE COURT:  But why would Missouri law apply to an

Page 61

1    article about your client that happened to talk about his

2    investigation?

3              MR. WOLMAN:  Because it spoke -- it's been

4    targeted towards --

5              THE COURT:  All right.

6              MR. WOLMAN:  -- Missouri at the time.  But if Your

7    Honor wants to look at California Your Honor can, but then

8    the question of does California anti-slap apply is itself a

9    separate issue.  And why my clients --

10             THE COURT:  But --

11             MR. WOLMAN:  -- should have to face a different

12   regime than any other creditor --

13             THE COURT:  I have a question about the slap --

14   the anti-slap law and particularly I think it was that last

15   article that addressed his pre-employment activities.  Is

16   the article that was published what is attached I guess as

17   Exhibit 5 to the debtor's objection -- oh, no.  I'm sorry.

18   It's not --

19             MR. WOLMAN:  I believe it's December 14th --

20             THE COURT:  Okay.

21             MR. WOLMAN:  -- which I believe is --

22             THE COURT:  It's not -- it's December 15th I

23   think, isn't it?

24             MR. WOLMAN:  I think it's the (indiscernible)

25   rumors article.

```
1              THE COURT:  Yeah.  That's the one.  Okay.  Right.

2    December 15th.  Is that what the article looked like when it

3    was published?

4              MR. WOLMAN:  I believe so, Your Honor.  I don't

5    have any --

6              THE COURT:  So my question is --

7              MR. WOLMAN:  I'm not sure I --

8              THE COURT:  Well --

9              MR. WOLMAN:  I mean, I understand --

10             THE COURT:  -- I'll tell you what --

11             MR. MARTIN:  (Indiscernible) --

12             MR. WOLMAN:  (Indiscernible).

13             THE COURT:  I'll tell you what --

14             MR. MARTIN:  -- archive version because I believe

15   it's been taken down from the main cite.

16             THE COURT:  Well, let me --

17             MR. WOLMAN:  I don't think so.

18             THE COURT:  -- let me tell you what --

19             MR. MARTIN:  One of them was taken down.

20             THE COURT:  -- let me tell you what my issue is.

21   And maybe this is a -- is it the Computer Decency Act --

22             MR. MARTIN:  The Communications Decency Act.

23             THE COURT:  Yeah.  I'm sorry.  Communications

24   Decency Act is not anti-slap.

25             As I look at this article the debtor is saying
```

Page 63

1    that you are protected under the CDA because the article

2    includes comments by third parties?

3              MR. MARTIN:  Your Honor, the argument is that the

4    comments are from other content providers.  They are non --

5              THE COURT:  Okay.

6              MR. MARTIN:  -- Gawker folks and --

7              THE COURT:  Okay.  But --

8              MR. MARTIN:  -- that is -- Gawker is not liable

9    for them as a matter of the federal statute.

10             THE COURT:  But what if you write an article and

11   you just cut and paste defamatory articles or comments in

12   your article?

13             MR. MARTIN:  This is precisely why the communicate

14   -- the Communications Decency Act was enacted to facilitate

15   things like comments.  These aren't that --

16             THE COURT:  No.  I understand blogs where there's

17   a hyperlink and people can comment.  But here's somebody who

18   is writing an article.  In other words, if somebody instead

19   of cutting and pasting a comment from a blog cut and pasted

20   a portion of a law review article and put it into the

21   article they were writing, the same stuff, you wouldn't be

22   arguing that the Communications Decency Act had anything to

23   do with it, would you?

24             MR. MARTIN:  There might be other defenses, but I

25   agree with that.

Page 64

1          THE COURT:  No.  I'm not -- I'm just talking about

2     the CDA.

3          MR. MARTIN:  That's correct.

4          THE COURT:  So why is it any different if they --

5     somebody decides to write an article and cuts and pastes

6     third party comments into the article and then comments on

7     these comments or uses them for some purpose in the article?

8     I understand the separate blogs where there's a hyperlink,

9     but this isn't what this is.

10         MR. MARTIN:  I'll confess, Your Honor.  I'm not

11    sure I'm following the exact point of the --

12         THE COURT:  Okay.  That's why I started -- I

13    thought --

14         MR. MARTIN:  It --

15         THE COURT:  I thought you were saying that the

16    comments of third parties that were included in this final

17    article are protected by the CDA.

18         MR. MARTIN:  Right.  The parts that are in the

19    comment sections, that's correct.

20         THE COURT:  Well, that's what I'm trying to

21    understand.  You know, maybe I'm ignorant about this stuff.

22         MR. MARTIN:  I --

23         THE COURT:  I'm looking at an article.  It

24    contains what appear to be e-mails or comments by third

25    parties and they're included in the article.  They're

1     selected and included by the author.  It's not just a blog

2     where, you know, the order --

3              MR. MARTIN:  Yes.

4              THE COURT:  -- anything is written.  So why is

5     that protected by the CDA?

6              MR. MARTIN:  That's not a CDA question, Your

7     Honor.  That is -- that statement is not being adopted and

8     the article is reporting on that people are talking about

9     it.

10             THE COURT:  Okay.

11             MR. MARTIN:  It is nice -- when Gawker reports on

12    what someone else said and says, I'm reporting on what

13    someone else said, that's not Gawker adopting or making that

14    statement.

15             THE COURT:  I thought you were raising a CDA

16    argument because it was a third party statement, simply

17    because it was a third party statement.

18             MR. MARTIN:  We also are, Your Honor, because in

19    Mr. Johnson in Got News's response, which was at -- came out

20    after the Huon decision in the Seventh Circuit, they have

21    said that the Seventh Circuit decision means that the

22    comments themselves can be actionable and they believe that

23    their allegations fall within those.

24             THE COURT:  I guess the question I have, and maybe

25    it's not a CDA question, is if you take something that

Page 66

1   somebody has written and publish it and separately that item

2   is defamatory, let's say, and you probably should and say,

3   here's what somebody said, does that give rise to a separate

4   claim of defamation?  That's my question.

5           MR. MARTIN:  Not if we're publishing it in a

6   context of fair reporting that there's a dispute.  Imagine

7   that there's a lawsuit going on -- I'll give a perfect

8   example, Your Honor.  Mr. Huon's case.

9           THE COURT:  Right.

10          MR. MARTIN:  A different press source, a different

11  -- an entirely different blog published an article about Mr.

12  Huon's trial.  And the Gawker article is about the above the

13  law article and it was held to be -- the article was held to

14  be fair use and the comments were where the Seventh Circuit

15  --

16          MR. WOLMAN:  Fair point.  It was Fair Point.

17          MR. MARTIN:  Fair point.  Excuse me.

18          THE COURT:  Yeah.  The -- Huon's a little

19  different.  You were reporting on a trial at that point or

20  on the aftermath of a trial.

21          MR. WOLMAN:  But the fair report privilege would

22  apply with -- you know, this has to be separate privilege

23  issue.  I don't believe that they've raised any fair report

24  issue on this.

25          THE COURT:  Well --

1              MR. WOLMAN:  The issue -- in terms of Your Honor's

2      question about just the structure of the Communications

3      Decency Act Section 230 it does not protect where you're

4      writing an article and sticking in comments.

5              THE COURT:  You select comments.  Sure.

6              MR. WOLMAN:  And sticking in material from --

7              THE COURT:  Well --

8              MR. WOLMAN:  -- whatever source.

9              THE COURT:  -- isn't that what happened in that

10     third article?

11             MR. WOLMAN:  And --

12             THE COURT:  That's my question, or am I seeing --

13     or is what is, in fact, something --

14             MR. WOLMAN:  No.  No.  No.  That --

15             THE COURT:  -- different from the article?

16             MR. WOLMAN:  That's a different issue.

17             UNIDENTIFIED SPEAKER:  That's a different issue.

18             MR. WOLMAN:  But if I may, the traditional

19     publishing function is you can select either -- if I have

20     comments in moderation I may click publish or click not

21     publish on a comment.  That in a separate comment section --

22     and staying below the line in the comment section, that

23     would be normally what fits within the 230 regime of

24     protection.

25             Here, certainly the authorship of the -- creating

Page 68

1    an article out of whole cloth based on prior comments from

2    another article or whatnot is not within the traditional

3    publishing function but is actually creating the content and

4    choosing these parts in the article.

5            But in terms of what has been alleged or hasn't

6    been raised for the 230 defense is some of those below the

7    line comments by other commentors (sic) such as somebody

8    named CMS Alumna or thereabout which in many cases would be

9    protected by Section 230.  Gawker normally would be if Kinja

10   were a normal commenting platform.  And I think this is

11   where I would say we differ.

12           And I cited in my brief certainly Enigma Software

13   Group versus Bleeping (sic) Computer.  We were on the losing

14   side of that in Bleeping Computer and recognize that the

15   Southern District of New York is holding to an agency theory

16   where if you're saying that these third parties are your

17   agents, they are your people, then you are liable for their

18   actions as content creators.

19           THE COURT:  The agents being --

20           MR. WOLMAN:  And --

21           THE COURT:  -- the people who respond to these

22   blogs or --

23           MR. WOLMAN:  Yes, Your Honor --

24           THE COURT:  -- provide material --

25           MR. WOLMAN:  -- because --

1           THE COURT:  -- along with -- how can they be the

2      debtor's agents?  What's the --

3           MR. WOLMAN:  Because unlike normal commenting on

4      the Washington Post or some other system, I don't know if

5      they even still have commenting there, but Gawker and Kinja

6      specifically said that they were "breaking down the lines"

7      between the "content creators and consumers."  And that's

8      where it's different; that rather than having just authors,

9      Mr. Howard, Mr. Trotter, that CMS Alumna is a Gawker author.

10          THE COURT:  I'm sorry.  Who is it?

11          MR. WOLMAN:  The commenter by the pseudo name CMS

12     Alumna, the one who --

13          THE COURT:  You're saying like in the Huon case

14     that's actually a Gawker employee?

15          MR. WOLMAN:  I'm -- not necessarily sub -- you

16     know, someone Mr. Trotter or Mr. Howard is CMS Alumna I

17     don't know.  Discovery may have to find that out.

18          THE COURT:  Well --

19          MR. WOLMAN:  But it's different --

20          THE COURT:  -- you know, you don't get --

21          MR. WOLMAN:  -- is that you --

22          THE COURT:  -- you don't get discovery until --

23          MR. WOLMAN:  I --

24          THE COURT:  -- (indiscernible).

25          MR. WOLMAN:  The point being it may be come out

Page 70

1    that the issue is here not only is Mr. Trotter and Mr.

2    Howard an agent of Gawker whose --

3              THE COURT:  Well, they wrote --

4              MR. WOLMAN:  -- writings --

5              THE COURT:  They wrote the articles.

6              MR. WOLMAN:  -- whose writings --

7              THE COURT:  There's no question about that.

8              MR. WOLMAN:  -- bind Gawker and make them liable.

9    CMS Alumna because -- whoever that is, if that's the court

10   reporter, who knows who that is, if that person, she

11   presumably, feminine --

12             THE COURT:  Can I ask you where you're getting --

13             MR. WOLMAN:  -- is --

14             THE COURT:  -- CMS Alumna from?  I'm looking -- if

15   you look at the top of the pages are we looking at the

16   debtor's omnibus objection which -- the debtor's objection

17   which includes the three articles?  You see there are ECF

18   numbers along the top?

19             MR. WOLMAN:  Yes.  Just looking to see -- just

20   looking for a page cite.  What is --

21             UNIDENTIFIED SPEAKER:  Your Honor, could you say

22   that page number again?

23             THE COURT:  That's what I'm asking -- it's 143

24   pages and (indiscernible) and I'm just wondering what page

25   we're looking at.

1              MR. WOLMAN:  All right.  Well, the objection does

2       not include the one with the conference, Your Honor.  So

3       I've got to now flip over.  I apologize.

4              THE COURT:  Well, that's -- that's my first

5       question.  Am I looking -- are we talking about the same

6       articles?

7              MR. WOLMAN:  We are.  It's just been -- for

8       example, the December 9th article, it's then below the line

9       comments.

10         (Pause)

11             THE COURT:  Maybe I'm not understanding the

12      terminology above the line and below the line.

13             MR. WOLMAN:  Okay.  Sorry.  Well, one of the

14      things we can look at is in response is that we -- I guess

15      at ECF 452-12 the exhibit 11.2 --

16             THE COURT:  By the way I wish you would put

17      exhibit dividers in your exhibits also.

18             What exhibit do you want me to look at on what

19      page?

20             MR. WOLMAN:  11.2 --

21             THE COURT:  11.2?

22             MR. WOLMAN:  The substantiating exhibit is part 2,

23      page 15 of 40.

24             THE COURT:  Exhibit 2?

25             MR. WOLMAN:  I'm sorry.  Exhibit 2, page 19 of 40.

1              THE COURT:  But these are articles -- why don't we

2      get back to the articles we're talking about?  These are not

3      the articles we're talking about, the subject of the

4      complaint.

5              MR. WOLMAN:  Yes.

6              THE COURT:  As I understand they're trying to show

7      a pattern in practice of reporting --

8              MR. WOLMAN:  Well, there's several things.

9              THE COURT:  -- which I'm not sure is admissible,

10     but --

11             MR. WOLMAN:  The --

12             THE COURT:  Let --

13             MR. WOLMAN:  The first article accused my client

14     of being a liar.

15             THE COURT:  Right.

16             MR. WOLMAN:  And basically cited to articles that

17     don't actually say that and completely misrepresents what

18     those say.  So --

19             THE COURT:  Do I have to decide truth or falsity

20     on this motion?

21             MR. WOLMAN:  In terms of whether or not it's

22     defamatory, false and defamatory --

23             THE COURT:  Well, in other words there are many

24     elements and let's take the first article because the

25     article really goes to your client's reporting skills as to

Page 73

1   which he may be at least a limited public person.

2           MR. WOLMAN:  Yes, Your Honor.

3           THE COURT:  And there are a lot of elements and,

4   you know, couldn't I possibly decide this as a matter of

5   privilege without ever getting to the truth or falsity, the

6   actual truth or falsity of the public (indiscernible)

7   article?

8           MR. WOLMAN:  Well, I mean, Your Honor can decide

9   on Section 230 grounds.  I don't know what privilege you

10  would be --

11          THE COURT:  Well, but that's my point.  A lot of

12  the stuff you're raising --

13          MR. WOLMAN:  I mean, for --

14          THE COURT:  -- goes to the truth or falsity --

15          MR. WOLMAN:  And the question of whether or not --

16          THE COURT:  -- of what he's saying --

17          MR. WOLMAN:  -- it was published with actual

18  malice.

19          THE COURT:  And I -- well, I doubt I could decide

20  those motions as a matter of law which is essentially what

21  we're talking about.  Now -- but there are certain legal

22  issues which I presumably could decide, a CDA issue, whether

23  or not there is a privilege and I understand the issue of

24  malice is tied up with that.  It may be an expression of law

25  and fact, but I would like to return to the articles that

1    are the subject of the claim so that you can show me what

2    you mean by above the line and below the line --

3                    MR. WOLMAN:   Certainly.

4                    THE COURT:   -- so I'm understanding this --

5                    MR. WOLMAN:   And let me give a better --

6                    THE COURT:   And what is the article that is

7    actually published and what is the article -- and what is it

8    that's -- has been added because somebody published a blog

9    that somebody wrote in, but it wasn't in the original

10   article.

11                   MR. WOLMAN:   There were three articles published

12   and they attached them.   However, those articles also had a

13   comments section below --

14                   THE COURT:   Okay.   But that --

15                   MR. WOLMAN:   -- that that comment section is the

16   Kinja system and it's where our allegation is that the Kinja

17   comments are themselves Gawker agents.

18                   THE COURT:   Okay.   And where is their allegations

19   that the debtors -- the debtor controlled these people which

20   is an element of a principal agency relationship, that they

21   controlled their actions?

22                   MR. WOLMAN:   The issue -- well, control was not an

23   issue really in the Enigma versus Bleeping Computer.   But if

24   we're going to --

25                   THE COURT:   But that --

1           MR. WOLMAN:  -- see on a --

2           THE COURT:  But that's the general issue --

3           MR. WOLMAN:  It's a question of --

4           THE COURT:  -- for an agency --

5           MR. WOLMAN:  -- a parent's authority also.  So

6    where they're being held out as agents.

7           THE COURT:  Where are they being held out as

8    agents?  I mean, so --

9           MR. WOLMAN:  The Kinja system itself which I

10   pointed to on one of the pages says that they're breaking

11   down the lines between the comment -- the creators and the

12   customers and such that they're effectively appointing the

13   commentors whose comments they choose to publish or not

14   publish --

15          THE COURT:  Who chooses to --

16          MR. WOLMAN:  Gawker.  Because one of the things is

17   there's -- I apologize for my language, but I think Mr.

18   Howard, you know, at one point referred to some good ass

19   Kinja referring to even potentially unpublished statements

20   there.  They are referring to things that are published

21   versus unpublished by their Kinja authors, that's what I'm

22   going to refer to them as, who were in most circumstances

23   potentially be checked by -- Gawker might be protected.  But

24   here they way they've held them out and utilized these

25   commentors, if Your Honor wants to look at some of the

Page 76

1    comments, you know, it's --

2              THE COURT:  Well, I -- again, I'm --

3              MR. WOLMAN:  -- page 19 of 30.

4              THE COURT:  -- coming back to what is the article

5    that was published and what has been added to the exhibits

6    by publishing the comments and who published them.  If the

7    debtor issued the article with the published comments, in

8    other words it's actually selected, which comments to

9    publish, and I realize this is not an agency issue, but it's

10   actually selected which comments to publish then, to me,

11   that's no different than as I said cutting and pasting law

12   review article and putting it in there.

13             MR. WOLMAN:  There's --

14             THE COURT:  On the other hand if people can read

15   these comments because there's a link to them like there's a

16   link to, you know, customer reviews on Amazon --

17             MR. WOLMAN:  Well, they just appear right below

18   the article.

19             THE COURT:  And they're actually part of the art

20   -- they're actually part of what's published.

21             MR. MARTIN:  They're -- the -- if I could, Your

22   Honor.

23             THE COURT:  Or is it constantly changing because

24   any day you go to the --

25             MR. MARTIN:  It is --

1        THE COURT:  -- website there may be more --

2        MR. MARTIN:  It is changing in the following way,

3   and I think that there is a live dispute about, and it may

4   ultimately be a factual dispute about whether what Mr.

5   Wolman would characterize as the Kinja system is active

6   enough to fall outside the protections of Section 230 of the

7   Communications Decency Act where -- but it is also clear

8   that the fact that you have anonymous commentors below and

9   there is some comment moderation, some comments are

10  stricken, Kinja happens to put some more recent comments at

11  the top saying that's easier to read, that act alone does

12  not -- those acts alone in our view is that what Kinja does

13  does not take it outside the statutory protections.  It is

14  not necessarily the same, first of all, as straight First

15  Amendment law because there's a statutory protection which

16  was in reaction to some First Amendment cases that applied

17  liability.

18        But I would just to cut to the end of it, Your

19  Honor, what we're deciding today and not deciding today, I

20  think it is fair there would be a, probably a factual

21  dispute about how does that system operate and factually is

22  it in or out of the safe harbor under the CDA.

23        THE COURT:  So how could I resolve that issue -- I

24  couldn't resolve it as a matter of law then?  What can I

25  resolve as a matter of law?

Page 78

1          MR. MARTIN:  The -- with the statute of

2  limitations issue now that they're saying it's -- they agree

3  that it's a continuation of the California action.

4          There's an issue, for example, o n--

5          THE COURT:  Wouldn't different torts have

6  different statutes of limitations or are they all deemed if

7  they arise from the defamation to be limited to --

8          MR. MARTIN:  They're the same under defamation and

9  we would not dispute that the California action was filed

10  within the California statute.

11          THE COURT:  So if the California statute of

12  limitations controls -- and, first, it's a New York

13  borrowing statute so it's possible that there could be

14  shorter statute of limitations under California law --

15          MR. MARTIN:  Correct.

16          THE COURT:  -- but if the California limitation

17  controls the action is not on time.

18          MR. MARTIN:  It is not except in an indirect way,

19  Your Honor, which --

20          THE COURT:  Right.

21          MR. MARTIN:  -- is that Got News, which is a

22  artificial entity, filed that California complaint without a

23  lawyer and didn't do anything about it.

24          THE COURT:  You want relief from the stay and go

25  back and litigate that issue in California?

Page 79

1          MR. MARTIN:  If that's how the Court prefers to

2     proceed, that there's nothing --

3          THE COURT:  Well, because --

4          MR. MARTIN:  -- that prevents the Court from

5     deciding whether that makes it an enforceable claim under

6     California law.  I mean, there's been hearings and Mr.

7     Johnson himself has appeared in California.  If my firm has

8     to appear for Got News in California that's not an issue.

9          THE COURT:  You're telling me that this claim is

10    going to be stricken, this complaint is going to be stricken

11    and -- I'm sorry, the complaint, and that under principals

12    of res -- coming back to it res judicata or the collateral

13    estoppel the claim in this case, therefore, has to be

14    stricken.  You're going to have to go back to the California

15    court --

16         MR. MARTIN:  That's --

17         THE COURT:  -- and make that argument.

18         MR. WOLMAN:  But California could have raised that

19    sua sponte, that the corporation was unrepresented.  And Mr.

20    Johnson himself appeared.

21         MR. MARTIN:  The -- if I might, Your Honor, the

22    notion that the California court was going to raise

23    something sua sponte for a complaint that was never served

24    --

25         THE COURT:  Right.

1          MR. MARTIN:  -- that they decided not to pursue,

2     if -- much of this, Your Honor, if I might return to the

3     opening point of the hearing.  As Mr. Galardi indicated this

4     is really all about a question of the reserves and the plan

5     objections that we're going to see on Monday.  If ultimately

6     we don't need to proceed in an expedited way with respect to

7     one or more of these claims, I completely understand.  This

8     Court could decide the issues or it might feel it's more

9     appropriate to go back to California.

10          THE COURT:  Well, if you're raising this

11     California -- this issue that the complaint wasn't properly

12     filed it may be because it wasn't served for so long as a

13     failure to prosecute or something like that --

14          MR. MARTIN:  That is not the case.  We did look at

15     that, Your Honor, and I don't mean to --

16          THE COURT:  All right.  So you're saying --

17          MR. MARTIN:  -- create issues.

18          THE COURT:  -- that this complaint is dismissal by

19     the California court because of the form in which it was

20     presented and that I guess you can argue that once dismissed

21     by the California court the claim can't be pursued here for

22     many of the same reasons as Mr. Williams --

23          MR. MARTIN:  As to Got News.  I do want to be

24     clear.  We do not take obviously Mr. Johnson himself as an

25     individual and could file himself.

1            THE COURT:  All right.  I guess that also brings

2    me to the separate issue in this case about whether a

3    corporation -- whether the personal injury tort and wrongful

4    death terminology which is the way it appears in the statute

5    was ever intended to be applied to an intentional tort

6    against the corporation.  I --

7            MR. WOLMAN:  And as Your Honor mentioned, you

8    know, it could have said personal bodily injury.

9            THE COURT:  Well, it didn't.

10            MR. WOLMAN:  You know, I would concede a

11   corporation does not have a body to physically injury.

12            THE COURT:  It could have said a lot of things.

13   It could have said, here's what we need.  A person --

14       (Laughter)

15            THE COURT:  -- a person (indiscernible) shall

16   include, but it doesn't, or it could have been defined in

17   101.  I looked at that also, but it just doesn't.  So it's

18   just a question I raised.  But if that's not going to get

19   you anywhere because it really doesn't matter at the end of

20   the day.

21            MR. MARTIN:  We actually do think it matters, Your

22   Honor, just to set this up.  It will matter as to what -- it

23   may matter because the damages to one may be much different.

24            THE COURT:  Well, do you want relief from the

25   automatic stay to go back and litigate this issue in

Page 82

1   California?

2            MR. MARTIN:  The answer to that, Your Honor, is we

3   would like to see the confirmation objections because it

4   depends on whether it's going to hold up what we're trying

5   to do in Bankruptcy Court.  And I mean that in all

6   seriousness

7            THE COURT:  No.  I appreciate that.  It's just,

8   you know, when you're raising the kind of issue that there's

9   an effect in the complaint under state law, I can't dismiss

10  that complaint.  So that complaint is out there.

11           MR. MARTIN:  Well, if I might, Your Honor, the

12  question under 502(b)(1) is whether it would succeed is

13  whether it would be enforceable in California.

14           THE COURT:  And the problem with it is what?

15           MR. MARTIN:  Is that it was --

16           THE COURT:  Not signed by a lawyer?

17           MR. MARTIN:  It's not signed by a lawyer and --

18           THE COURT:  So wouldn't the California judge just

19  say, Mr. -- Got News, go get a lawyer to sign the complaint?

20           MR. MARTIN:  They could, Your Honor, except that

21  the California -- I was actually surprised by this a little

22  bit myself because of the three-year service rule in

23  California.  But the California Supreme Court itself has set

24  a strict rule which has been only moderated recently and is

25  quite clear that the baseline is a strict rule.

Page 83

1          So I don't -- I hear you, Your Honor.

2          THE COURT:  I would think that, you know, if you

3    want to go and litigate that issue it's probably better

4    litigating it in California.

5          But -- so let me return to this.  What are the

6    issues -- I mean, we have the underlying issue of personal

7    injury tort and here there's a little bit of a twist on it

8    because one of the claims is a corporation.  What are the

9    other legal issues that are presented by this objection?

10         MR. MARTIN:  So I think, Your Honor, if we return

11   to first principles here we have, as Your Honor indicated, a

12   threshold question of personal injury tort as to each of the

13   two claimants.  And then this was a -- the procedural

14   posture of this is a complaint filed in a State Court and

15   there should be a motion to dismiss.

16         And just to give a little history to it, a

17   somewhat different, but a complaint based on some of the

18   same articles was filed in Missouri originally.

19         THE COURT:  But that was dismissed for lack of

20   personal jurisdiction.

21         MR. MARTIN:  That's correct, Your Honor.  But

22   there was also lengthy briefing.  There are a number of

23   motion to dismiss arguments that can be made that we believe

24   would dispose of the entire matter.  It's a matter of law.

25   I'm certain Mr. Wolman would --

Page 84

1           THE COURT:  What would the --

2           MR. MARTIN:  -- (indiscernible).

3           THE COURT:  But what would the disposition in

4    Missouri have to do with this?

5           MR. MARTIN:  No.  I was only using that as an

6    example, Your Honor.  I apologize for confusing the issue.

7    There was not only a motion to dismiss there for lack of

8    personal jurisdiction.  A substantive motion was brought as

9    well and it was simply mooted when the Court --

10          THE COURT:  All right.

11          MR. MARTIN:  -- said no.

12          THE COURT:  So the Court didn't consider it.

13          MR. MARTIN:  And so now the debtor would intend to

14   do the same thing it did there which is to bring a motion to

15   dismiss like in any defamation claim and, in addition, in

16   the anti-slap motion which raises the bar --

17          THE COURT:  That -- assuming that California law

18   applies in the first instance.  So there's the second issue

19   of the conflict of law which has to be resolved.

20          MR. MARTIN:  Except I believe, Your Honor, that

21   the California anti-slap rule applies not only if

22   substantive California law applies.  It applies to any, I

23   believe, on -- and this is my plain reading of the statute,

24   applies to any action for a defamation of --

25          THE COURT:  Why would --

Page 85

1                MR. MARTIN:  -- that nature brought in California.

2                THE COURT:  If California law had nothing to do

3       with this case why would the California anti-slap provisions

4       apply?

5                MR. MARTIN:  Because the California legislature

6       might determine that it does not want defamatory lawsuits

7       used in a particular way in its courts.

8                THE COURT:  No.  I --

9                MR. MARTIN:  In part, Your Honor, if I may, the --

10      somewhat for the reason that Mr. Wolman said which is modern

11      publications don't just occur in one place.  And so

12      California has decided as a matter of its --

13               THE COURT:  Oh, I see --

14               MR. MARTIN:  -- law that --

15               THE COURT:  -- what you're saying.  All right.

16               MR. MARTIN:  -- substantively if you bring a

17      defamation action in California that you can bring --

18               THE COURT:  Regardless of which law applies.

19               MR. MARTIN:  That the anti-slap applies.

20               THE COURT:  I understand.  Okay.

21               MR. MARTIN:  And that raise -- our view, there may

22      be disputes about this, but our view is that the -- one of

23      the aspects of anti-slap is fees, but the other is that it

24      in a way raises that initial 12(b)(6) kind of bar somewhat

25      under their statute.  It uses the word possibility rather

Page 86

1    than plausibility that we're used to evaluating.

2              And that is its intent, to make the initial --

3              THE COURT:  So you're telling -- but that's not

4    really -- from what you're telling me it obviously applies

5    because the proceeding was commenced in California

6    regardless of where -- which substantive law applies, right?

7              MR. MARTIN:  That is our position and I don't mean

8    to go back to --

9              THE COURT:  Is there a dispute about that?

10             MR. MARTIN:  Your Honor, I am not familiar with

11   any case where a debtor could apply California anti-slap

12   with --

13             THE COURT:  Well, it doesn't have to be --

14             MR. MARTIN:  -- to a California claimant different

15   from any other claimant anywhere in the country.  Just, you

16   know, and we would -- so if there was a relief from the

17   automatic stay, if we were litigating in California, yes, of

18   course, in California a slap would be evoked.

19             THE COURT:  Okay.  But then you're -- you say --

20   and this gets back to that Kudair Brothers case.  It's

21   designed to protect your quorum selection in the first

22   instance.  You selected the California forum --

23             MR. MARTIN:  Yes.

24             THE COURT:  -- and if the law is that the anti-

25   slap provisions apply to any California litigation

Page 87

1    regardless of what substantive law applies to the defamation

2    claim, you've selected it.  And if that's the law, that's

3    the law.

4              MR. MARTIN:  I would say that's a procedure --

5    that's something Your Honor doesn't necessarily have to

6    apply statute of limitations directly with anti-slap.  Those

7    are two different regimes.  So there's nothing that says

8    just because you're applying the California statute of

9    limitations you have to then in a New York case apply

10   California anti-slap to the --

11             THE COURT:  But that's what they're telling me and

12   maybe it's because of the procedural posture of the case,

13   but the Second Circuit has basically analogized this

14   situation to a transfer of the California litigation --

15             MR. MARTIN:  Yes.

16             THE COURT:  -- to New York and California law has

17   to be applied and have there been any cases where there's a

18   complaint transferred from California, a defamation

19   complaint transferred from California to another

20   jurisdiction under 1404 where the Court then applies the

21   California anti-slap law.

22             MR. MARTIN:  There is, Your Honor, and there's a

23   Second Circuit case that is cited in our papers in

24   Diversity.  Suffice it to say, Your Honor, if I can go back

25   to your question, your real question which is --

Page 88

```
 1              THE COURT:  I've been asking questions --

 2              MR. MARTIN:  -- what are we going to have to

 3   decide?

 4              THE COURT:  -- for two hours.

 5         (Laughter)

 6              MR. MARTIN:  What are we going to have to decide

 7   --

 8              THE COURT:  Right.

 9              MR. MARTIN:  -- there is a question that we should

10   probably all brief about about this question in California

11   anti-slap.  I'm not going to try to run over Mr. Wolman

12   today on that question.

13              THE COURT:  So the --

14         (Laughter)

15              THE COURT:  -- I guess the question is in the --

16   their scenario, which this is, does the California anti-slap

17   law apply to the claim objection based upon the fact that

18   you initiated the case in California --

19              MR. MARTIN:  That is correct.

20              THE COURT:  -- regardless of which substantive law

21   applies to the --

22              MR. WOLMAN:  I would say that the (indiscernible)

23   didn't say it.  One way or the other it didn't come down --

24              THE COURT:  I know, but as I read the case the

25   implication is it's preserving your forum selection and what
```

Page 89

1    effort California would have done --

2            MR. WOLMAN:  And certainly if Your Honor comes

3    down that way, you know, we'll show that's at least with

4    respect to the writings -- the matters not related to Mr.

5    Johnson's writings rather where he's not a limited public

6    interest figure where there's no public interest in the

7    subject matter certainly the California anti-slap law really

8    wouldn't apply anyway.

9            THE COURT:  How would I decide the public interest

10   as a matter of law?

11           MR. WOLMAN:  Probably Your Honor is not able to.

12           THE COURT:  Okay.  So let's talk again about --

13           MR. WOLMAN:  So --

14           THE COURT:  -- what can be decided and whether

15   it's appropriate to decide these issues or to decide some

16   other issues because there are a lot of issues in this

17   particular one.

18           What I have is the personal injury tort issue, the

19   issue of whether the California anti-slap law applies

20   regardless of what the outcome may be upon the application

21   of that law.  I have the issue of which substantive law

22   applies and I guess it could be a different issue depending

23   on the tort because there are different claims in the case,

24   right?

25           MR. WOLMAN:  Yes, Your Honor.

1          MR. MARTIN:  It is certainly an issue we could

2     differ about.  That's correct.

3          THE COURT:  All right.  What else?

4          MR. MARTIN:  We have the -- my list, Your Honor,

5     is the personal injury tort issue, the anti-slap issue, the

6     public figure issue and the other first amendment issues

7     that we have.  At this -- it does strike me, Your Honor,

8     that this is akin to what happens in claims objections from

9     time to time and why the bankruptcy rules provide for

10    flexible procedures.  Sometimes they're simple depending on

11    our views and the Court's views and sometimes they're not.

12         THE COURT:  This is not simple, not because the

13    facts may not be.  The facts aren't --

14         MR. MARTIN:  I don't --

15         THE COURT:  -- necessarily difficult.  It's --

16         MR. MARTIN:  And I don't think --

17         THE COURT:  -- the law.

18         MR. MARTIN:  -- public figures should be decided

19    on --

20         THE COURT:  I was going to say --

21         MR. MARTIN:  -- a question of law.

22         THE COURT:  -- I don't know how I would decide

23    unless -- you know, unless there's a few clips that were

24    included in the papers show as a matter of law that he's a

25    public figure.  I just -- I don't know how I would decide

Page 91

1    that point.

2              MR. MARTIN:  My --

3              THE COURT:  It's not like he's such a notorious --

4    he's not Tom Brokaw.

5              MR. MARTIN:  No.  We concede, Your Honor.

6              THE COURT:  You know --

7              MR. MARTIN:  But there may be --

8              THE COURT:  And I don't mean to be fastidious, but

9    everybody knows Tom Brokaw.  I'm not sure everybody knows

10   Mr. Johnson and I don't know what it -- and that may not

11   matter.  But I don't know how I could decide that as a

12   matter of law.

13             MR. MARTIN:  That I agree with Your Honor.  My

14   only point was that there may -- there are other First

15   Amendment and --

16             THE COURT:  Right.

17             MR. MARTIN:  -- defenses in or around liable that

18   the Court would need to decide and could resolve and we

19   believe --

20             THE COURT:  Tell me.  I understand public figure.

21   I'm not sure I could decide that as a matter of law.

22             MR. MARTIN:  All right.  So we have fair

23   reporting, the fact that some of it is satire and we believe

24   he has conceded that in a judicial pleading so that -- you

25   asked a question earlier, do you have to decide truth or

Page 92

1    falsity and can you do that.  That's an example.  The satire

2    doctrine is one where it's a false statement and you can

3    sort of take it in a box perhaps.  We wouldn't concede that.

4    But if it's satire it's not libelous.  And we have that's

5    issue and that's on the --

6               MR. WOLMAN:  Your --

7               MR. MARTIN:  -- face of the complaint.

8               THE COURT:  And that's directed at the third

9    article?

10              MR. MARTIN:  I believe -- yes, Your Honor.

11              MR. WOLMAN:  Yeah.  And if I may, Your Honor --

12              THE COURT:  I don't know what the definition of

13   satire is.

14              MR. MARTIN:  Well --

15              MR. WOLMAN:  They raised the admission in a

16   pleading issue, in their most recent pleadings.  I didn't

17   have a chance to respond to --

18              MR. MARTIN:  That is correct.

19              MR. WOLMAN:  -- that.  And it says certainly that

20   it's, you know, very subtle satire is what the Missouri

21   attorney referred to it as which means it's practically non-

22   existent.  For them -- you know, there -- you know, they may

23   be commenting on or trying to somehow relate it to Mr.

24   Johnson looking into Mr. Brown's juvenile record, but really

25   when in context with his alleged activities as an undergrad,

1    you know, putting them together it really doesn't fit as

2    satire.  Nobody's going to perceive it as satire.  It's

3    coming across as false statements of fact.

4                THE COURT:  You know --

5                MR. MARTIN:  If I might, Your Honor, this is the

6    point in bankruptcy contested matters where the lawyers

7    should go and do our best, which usually we can, to organize

8    a list of issues for the Court and we can report back on

9    what we think they are.

10                THE COURT:  Well, I -- that's certainly fair with

11    respect to satire and maybe it's like you think you know it

12    when you see it.

13                MR. MARTIN:  That may be, Your Honor.

14                THE COURT:  And it didn't strike me as satire, not

15    in the Jonathan Swift sense of it.  But I don't know.

16                MR. MARTIN:  There are -- in any event, Your Honor

17    --

18                THE COURT:  You know, I think of parody or

19    something like that, but --

20                MR. MARTIN:  That's correct.

21                THE COURT:  -- that's not what it struck me as.

22    But go ahead.  What else?

23                MR. MARTIN:  I meant -- I did mean I'm happy to go

24    through the objection on the items, Your Honor, but I did

25    actually mean --

Page 94

1          THE COURT:  I just want to know what can be

2     decided as a matter of law because you don't have to go

3     through the objection if we all agree these are just factual

4     issues and it may or may not make sense to clear out some of

5     these other issues.  For example, is it the anti-slap

6     provisions that just shift the burden of proof?

7          MR. MARTIN:  No.  It is not a burden shift.  It is

8     a -- the way I think about it, Your Honor, the statute says

9     that if we make a motion we can put in -- first we can put

10    in affidavits and they can put in affidavits in response.

11    There may be -- and their affidavits are taken as true and

12    supplemental to the complaint.  But there may be things that

13    we raise that are indisputable.  So it brings some

14    additional material into the complaint.  That's step one

15    under the way the statute works.

16          And step two is it says that the issue for the

17    Court to decide is not plausibility in the Iqbal Twombly

18    12(b)(6) but possibility of success which is designed to be

19    slightly higher.  Yes, I know that the Court's probably not

20    --

21          THE COURT:  In this case Mr. Johnson would have to

22    show --

23          MR. MARTIN:  That is correct.

24          MR. WOLMAN:  Mr. Johnson would have to show a

25    possibility of success through evidence --

```
 1              MR. MARTIN:  I'm sorry.

 2              THE COURT:  But that just sounds like an

 3    evidentiary dispute.

 4              MR. MARTIN:  It is not.  It is meant to be a

 5    threshold dispute that a Court makes based not just on the

 6    complaint, but on this initial exchange --

 7              THE COURT:  All right.

 8              MR. MARTIN:  -- of affidavits.

 9              MR. WOLMAN:  But --

10              THE COURT:  It doesn't --

11              MR. WOLMAN:  -- it is evidentiary.

12              THE COURT:  Well, it doesn't sound like a very

13    difficult standard to meet.

14              MR. MARTIN:  It is actually designed to be a

15    probability precisely so that --

16              THE COURT:  I think you said possibility.

17              MR. MARTIN:  I believe -- it's probability, Your

18    Honor.

19              THE COURT:  Oh, probability.

20              MR. MARTIN:  I apologize.

21              THE COURT:  Okay.

22              MR. MARTIN:   I misspoke.

23              THE COURT:  Because that's why it sounded such a

24    -- like a lower threshold.

25              MR. MARTIN:  Yes.  It's a probability of success.
```

1       It's a --

2              THE COURT:  All right.  Well --

3              MR. MARTIN:  It's in the --

4              THE COURT:  Okay.  All right.  I would give you an

5       opportunity to put in further proof if I decided that the

6       anti-slap provisions applied so you don't have to do that at

7       this point since you may not have to do that.

8              So I'm still -- I still have my three items:  The

9       personal injury tort, the applicability of the anti-slap and

10      the conflict of laws on the various causes of action.

11             MR. MARTIN:  There is, for example, Your Honor,

12      among the things raised in our objection courts decide --

13      facing these first amendment and liable questions decide as

14      a matter of law often on 12(b)(6) motions or otherwise

15      whether or not statements are opinions or are statements of

16      fact.  And that is an issue --

17             THE COURT:  Okay.

18             MR. MARTIN:  -- that they take up on the

19      pleadings.  It can sometimes turn into a question, but --

20             THE COURT:  Yeah.  But I can read the -- I can

21      read it and --

22             MR. MARTIN:  But we can --

23             THE COURT:  -- use my judgment.

24             MR. MARTIN:  That is correct, Your Honor.  So

25      there's a certain set of those kinds of issues that get

Page 97

1    raised that we have raised in the papers that the Court

2    would have to decide.

3           It -- if the Court were to decide that I would

4    want -- one of the suggestions I was going to make, whether

5    we were coming back on an estimation or otherwise, is it

6    would be profitable to have a -- you know, a hearing like

7    one would have on a sophisticated lengthy motion to dismiss

8    to walk through all those issues.  They have a side and they

9    have a side.

10          THE COURT:  Well, there's a disagree -- there

11   seems to be an underlying disagreement as to what are the

12   statements that are at issue.  You've identified I think 12

13   and they say there are more.

14          MR. MARTIN:  Correct, Your Honor.  And if I may,

15   sometimes the Court can decide on say 12(b)(6) whether nor

16   not something is opinion or fact.

17          THE COURT:  Right.

18          MR. MARTIN:  Other times it can't and you need

19   expert opinion as to whether --

20          THE COURT:  Right.

21          MR. MARTIN:  -- or not -- as to how basically the

22   average reader, a reasonable reader would perceive a

23   writing.

24          THE COURT:  But do I really need, you know, it --

25   I think it was in the first article there was a statement

Page 98

1       Mr. Johnson erroneously reported something.  I think it was

2       Corey Booker or something.  It just sounds like a statement

3       of fact.  Why isn't that -- and I'm just using that as an

4       example because it struck me there's a disagreement over

5       that one.

6                   MR. MARTIN:  This gets into the question, Your

7       Honor, of the doctrine of opinion based on disclosed facts.

8       People can say, this is an issue in Mr. Huon's case

9       actually, but -- on a different kind of statement.  But you

10      can say something that if you just excerpt that conclusion

11      this appears to be a fact.  But if it's stated as this is

12      what I believe based on these fully disclosed facts, it is

13      under First Amendment law opinion based on fully disclosed

14      facts.

15                  And as Your Honor pointed out earlier that is part

16      of what gets into some of the collateral articles that are

17      put in and what's -- what makes these kinds of cases even at

18      the motion to dismiss stage mushroom a little bit or look

19      into some of these statements.  And some -- Mr. Wolman is

20      correct.  Sometimes they're resolved on motions to dismiss

21      and sometimes they're not.

22                  THE COURT:  Well, and maybe go through it on a

23      statement by statement basis --

24                  MR. MARTIN:  That is correct, Your Honor.

25                  THE COURT:  -- and read it in context.  But --

Page 99

```
1              MR. WOLMAN:  And --

2              THE COURT:  And let me just finish.  When I read a

3     statement, you know, Mr. Johnson erroneously reported that a

4     former New York -- former Newark mayor, Corey Bicker, didn't

5     actually reside in Newark, that just sounds like a statement

6     of fact.

7              MR. MARTIN:  And if I may on the opinion of

8     undisclosed facts or disclosed facts issue, certainly, Your

9     Honor, if something sounds like an opinion relying on a

10    fact, I think so and so is a liar and you don't say really

11    why, you know, that -- but then you -- or you then link to

12    something maybe that's then giving -- in the secondary case

13    you're giving them the reason why.

14             If you're just saying as a matter of fact he got

15    it wrong, it erroneously reported, period, even if you have

16    a link that doesn't necessarily mean that the average reader

17    is then going to click through to determine the accuracy of

18    a stated fact.  It's different than if somebody gives their

19    opinion and says here's why.  Click here.

20             THE COURT:  By the way the issue that Mr. Nies

21    concerned that you may get a very tiered victory if it turns

22    out that the case is reversed on appeal and all the money

23    has been distributed may cause some of you to want to get to

24    the settlement table and fix your claims and possibly get

25    paid expeditiously.  I know that there are big numbers in
```

Page 100

1    the claims, but I don't think they're worth the numbers that

2    you put in the claims.

3                UNIDENTIFIED SPEAKER:  Appreciate that.

4                THE COURT:  Okay.

5           (A chorus of thank you)

6                THE COURT:  All right.  Thank you.

7           (Whereupon, these proceedings concluded at 12:18 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4     DESCRIPTION                          PAGE        LINE

5     Debtor's Second Omnibus Objection to

6     Claims (Satisfied Claims)             8           2

7

8     Motion for Omnibus Objection to Claim(s)

9     Number: 14, 15, 19, 20, 21, 22, 23, 24, 46,

10    47 (Huon)                            35           4

11

12    Motion for Omnibus Objection to Claim(s)

13    Number: 61, 62, 86, 98 (XP Vehicles)  28          2

14

15    Debtor's Motion Pursuant to Bankruptcy Code

16    Sections 105, 502(c) and 1129 Bankruptcy

17    Rules 3018 and 3021 for approval of Claims

18    Estimation and Plan Reserve Procedures    --        -

19

20

21

22

23

24

25

Page 102

1                          I N D E X

2

3                          RULINGS

4     DESCRIPTION                              PAGE      LINE

5     Motion for an Order (I) Modifying the

6     Automatic Stay, For "Cause", Pursuant to

7     11 U.S.C. 362(d) to Permit an Appeal in

8     State Court Litigation Involving a Personal

9     Injury Defamation Claim Against Debtor;

10    (II) Authorizing a Trial in State Court of

11    Williams Personal Injury Defamation Claim

12    Against Debtor, Solely to Establish Liability

13    and Amount of Williams' Claim; and (III)

14    Granting Such Other and Further Relief as may

15    be appropriate.                          --        --

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T I O N

2

3          I, Sherri L. Breach, CERT*D-397, certified that the

4     foregoing transcript is a true and accurate record of the

5     proceedings.

6     Sherri          Digitally signed by Sherri Breach
                       DN: cn=Sherri Breach, o=Veritext,
7     Breach          ou, email=digital@veritext.com,
                       c=US
8                      Date: 2016.12.02 15:02:02 -05'00'
      _____

9     Sherri L. Breach

10    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12    Date:  December 2, 2016

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501