```
                                                        Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 4

 5    In the Matter of:

 6

 7    GAWKER MEDIA, LLC,                    Case No. 16-11700 (SMB)

 8              Debtor.

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10    GAWKER MEDIA, LLC,                    Case No. 16-12239 (SMB)

11              Debtor.

12    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13

14                    U.S. Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17                    December 13, 2016

18                    10:34 AM

19

20    B E F O R E :

21    HON STUART M. BERNSTEIN

22    U.S. BANKRUPTCY JUDGE

23

24

25
```

1    Hearing re:  Confirmation hearing

2

3    Hearing re:  Bush Ross P.A. retention application

4

5    Hearing re:  Debtors first omnibus objection to claims (D&O

6    and employee indemnification claims)

7

8    Hearing re:  Case conference

9

10   Hearing re:  Debtors' application pursuant to Section

11   327(e), 328(a), and 330 of the Bankruptcy Code, Bankruptcy

12   Rules 2014 and 2016, and Local Rules 2014-1 and 2016-1 for

13   entry of an order authorizing the retention and employment

14   of Akin Gump Strauss Hauer & Feld LLP as special counsel to

15   the special committee of the board of Gawker Media Group,

16   Inc., effective nunc pro tunc to August 3, 2016

17

18   Hearing re:  Debtors' motion pursuant to Bankruptcy Code

19   Sections 105 and 502(e)(1) and Bankruptcy Rule 3018 for

20   estimation of claim nos. 293, 294, and 295 filed by Albert

21   James Daulerio

22

23   Hearing re:  Debtors' motion pursuant to Bankruptcy Code

24   Sections 105, 502(e), and 1129 and Bankruptcy Rules 3018 and

25   3021 for approval of claims estimation and plan reserve

1   procedures

2

3   Hearing re:  Motion of proposed Amici Curiae Society of

4   Professional Journalists, Reporters Committee for freedom of

5   the press, and 19 other media organizations for leave to

6   file memorandum of law as amici curiae

7

8   Hearing re:  Notice of agenda for hearing to be held

9   December 13, 2016 at 10:00 a.m. (prevailing Eastern time)

10

11   Hearing re:  Case conference

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Jamie Gallagher, Nicole Yawn, and Tracey

25   Williams

Page 4

1    A P P E A R A N C E S :

2    ROPES & GRAY LLP

3         Attorneys for the Debtor

4         1211 Avenue of the Americas

5         New York, NY 10036

6

7    BY:  D. ROSS MARTIN, ESQ.

8         JONATHAN M. AGUDELO, ESQ.

9         GREGG M. GALARDI, ESQ.

10

11   SIMPSON THACHER & BARTLETT LLP

12        Attorneys for Unsecured Creditors Committee

13        425 Lexington Avenue

14        New York, NY 10017

15

16   BY:  SANDY QUSBA, ESQ.

17        WILLIAM T. RUSSELL, JR.

18

19   CHIESA SHAHINIAN & GIANTOMASI, PC

20        Attorney for Creditor Mitchell Williams

21        One Boland Drive

22        West Orange, NJ 07052

23

24   BY:  MICHAEL R. CARUSO, ESQ.

25

1   WILMER CUTLER PICKERING HALE AND DORR, LLP

2        7 World Trade Center

3        250 Greenwich Street

4        New York, NY 10007

5

6   BY:  ANDREW GOLDMAN, ESQ.

7

8   COLE SCHOTZ

9        25 Main Street

10       Hackensack, NJ 07601

11

12  BY:  WARREN A. USATINE, ESQ.

13

14  COHEN & GRESSER LLP

15       Attorney for Terry Bollea

16       800 Third Avenue

17       New York, NY 10022

18

19  BY:  DANIEL H. TABAK, ESQ.

20

21

22

23

24

25

Page 6

1    SAUL EWING, LLP

2         Attorneys for Certain Writers

3         1037 Raymond Boulevard

4         Suite 1520

5         Newark, NJ 07102

6

7    BY:  SHARON L. LEVINE, ESQ.

8         DIPESH PATEL, ESQ.

9

10   BAKER HOSTETLER

11        1050 Connecticut Ave, NW

12        Washington, DC 20036

13

14   BY:  MARK BAILEN, ESQ.

15        CHRISTOPHER GIAIMO, ESQ.

16

17   JAY MARSHALL WOLMAN, CIPP

18        100 Pearl Street

19        14th Street

20        Hartford, CT 06103

21

22   BY:  JAY MARSHALL WOLMAN, ESQ.

23

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         201 Varick Street

4         Suite 1006

5         New York, NY 10014

6

7   BY:  GREG ZIPES, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Okay.  I read that you're an MVP in
 3     law 360, Mr. Galardi.  I'm honored that you're hearing here
 4     today.
 5            MR. GALARDI:  Don't believe everything you read,
 6     Your Honor.
 7            THE COURT:  I don't.
 8            MR. GALARDI:  And it didn't make page 6.  So I'll
 9     (indiscernible).  I was kind of --
10            THE COURT:  Okay.  Congratulations.
11            MR. GALARDI:  Well -- thank you, Your Honor.
12     We'll see how valuable I am after today's hearing.  Your
13     Honor, first I'd like to turn to the amended agenda that we
14     filed last night and I think that will set the stage.
15            THE COURT:  The amended agenda?  I don't have an
16     amended agenda.
17            MR. GALARDI:  You don't have an amended agenda, we
18     will --
19            THE COURT:  Have we ever seen amended agenda?
20            MR. GALARDI:  Again, things are moving.
21            THE COURT:  All right.  Give one to my clerk.
22            MR. GALARDI:  Yes, I have.
23            THE COURT:  Thank you.
24            MR. GALARDI:  I think we did reach out to your
25     office and advised us to the status of the confirmation
```

Page 9

1    hearing, but let me move through the matters on the amended

2    agenda.  There's just some updates, but all are positive.

3    First, Your Honor has already entered a CNO with respect to

4    the first matter.  Turning to the second matter, there was a

5    motion for a proposed amicus curiae by the Society of

6    Professional Journalists.  Your Honor did, in fact, grant a

7    motion to shorten the time to be heard, that is to be heard

8    today in connection with the confirmation.  I don't know if

9    Your Honor wants to hear that.  I don't think there are any

10   objections.

11          THE COURT:  Is there any objection to the receipt

12   of the amicus brief?  Hearing no response, I'll grant the

13   motion and receive the brief.

14          MR. GALARDI:  And then finally, Your Honor -- and

15   next, rather, Your Honor, the Simpson Thacher fee

16   application by consent has been moved over to December 15th.

17          THE COURT:  Let me mark these on my calendar here

18   because I had them in a different order.  It's no longer on

19   my calendar, so it may have been moved.

20          MR. GALARDI:  Yeah, I think we moved it because we

21   filed a notice of adjournment when we had agreed with the

22   U.S. Trustee to move all the fee application matters over to

23   the 15th and coordinated with Your Honor's office.

24          THE COURT:  Okay.

25          MR. GALARDI:  Which brings us to matter four,

Page 10

1    which is the debtors' proposed confirmation of an amended

2    joint plan of liquidation.  Your Honor, I think before we

3    start with evidence on that, what I'd like to do is go

4    through the objections.  We believe, as I stand here today,

5    that we have resolved all of the objections with the

6    possible exception of what we conclude as an objection from

7    XP Vehicles.  I know Your Honor has received a number of e-

8    mails.  We've received a number of e-mails.  My partner,

9    Mr. Martin, will be handling that.

10            If I could go through the objections, I think it

11   would be helpful for Your Honor in framing the evidence

12   today as to what we had proposed to do to resolve those

13   objections.

14            The first objection is the general objection of

15   Mr. Charles Johnson and Got News to the amended plan.  Your

16   Honor may remember that we were here on December 1st with

17   respect to claims objection.  We had a motion to estimate.

18   Mr. Johnson filed an objection to the confirmation.  We have

19   settled that and, again, Mr. Martin can put more details on

20   as we get through this.  But the key for the confirmation is

21   one, we have settled that by reserving $1.5 million of the

22   Gawker Media unsecured assets to be a reserve to pay any

23   allowed claim of Mr. Johnson.  And I'm going to go through

24   the claims reserve.  But that resolves his objection and the

25   parties have agreed to other terms.  But that was to resolve

Page 11

1   the confirmation objection.

2           Next you have the limited objection of Albert

3   James Daulerio.  Your Honor may recall Mr. Daulerio is

4   subject to the judgment with Mr. Denton and the company with

5   respect to Mr. Bollea.  Mr. Daulerio's objection was an

6   objection again to the Gawker Media reserve being not

7   adequate.  We have resolved that objection by allocating

8   $500,000 of the Gawker Media unsecured claims reserve to the

9   payment of the allowed fees and expenses of Mr. Daulerio.

10  Again, the debtor reserving all rights to object to whether

11  that number is too high, but that is a cap.  It is not a --

12  it will not go higher.  That has resolved the objection to

13  Mr. Daulerio's -- that Mr. Daulerio raised to the plan.

14          There was also a limited objection of Publicist

15  Media Agency's confirmation.  They were concerned about set-

16  off rights and the plan not protected their set-off rights.

17  This was a contract, part of which was taken by the buyer,

18  part of which is with us.  There is -- they actually owe --

19  we think it's probably the buyer, certain funds.  They

20  wanted to maintain their rights of set-off.  We have

21  resolved that objection with language in the proposed

22  confirmation order that would, in fact, protect their rights

23  of set-off to the extent that they still have a set-off.

24          The next objection is an objection of Mitchell

25  Williams.  Your Honor will recall he was here on

Page 12

1    December 1st.  We had a pending claims objection.  We had a

2    pending estimation motion.  There was also a stay -- a

3    motion to lift stay to pursue the appeal.  As Your Honor

4    will hear in the evidence, we have resolved Mr. Mitchell

5    Williams' objection to confirmation pursuant to an agreement

6    to settle and pay Mr. Williams' claim, the total amount of

7    $125,000.  We'll put on evidence as to how that structured

8    payment, again, subject to Your Honor approving that, his

9    settlement will be -- resolve his objection, resolve the

10   stay motion, resolve the estimation motion, and resolve all

11   of the underlying litigation.

12           Your Honor, the next one listed is the certain

13   writers' response in support of confirmation.  It also had

14   the limited objection with respect to the Gawker Media

15   unsecured claims reserve.  That was to support the third

16   party releases.  Your Honor will hear evidence later on

17   today regarding the benefits of that and I believe that

18   based upon everything that I will tell Your Honor and that

19   will testify for Mr. Holden today, we will fit -- even if we

20   paid all of the claims, the maximum amounts with the

21   agreements in the reserves, we will have more than adequate

22   funds to pay from the reserves as a result of the

23   settlement.

24           The next memorandum, as I mentioned, was the

25   amicus curiae.  Your Honor has granted their appearance.

Page 13

1    They have filed an amicus in support of the third party

2    releases for the writers and journalists and editors of the

3    company.

4            The next objection is really a statement of Dr.

5    Shiva Ayyadurai and Ashley Terrill.  Your Honor may recall

6    we lifted the stay with respect to those two individuals.

7    We had entered into settlements.  We filed the plan

8    settlement -- the plan supplement.  In those plan

9    supplements, you will notice that there are carve-outs with

10   respect to pursuing potential causes of action or getting

11   cooperation agreements.  We have settled this objection to

12   confirmation by adding language in the plan that you saw

13   that was filed, I believe, Sunday night and provided to Your

14   Honor on Monday with --

15           THE COURT:  I didn't see it.

16           MR. GALARDI:  Okay.  It has language in it that

17   provides that with respect to specific settlements where

18   there was a carve-out to the third party releases and

19   injunctions, that this is carved out.  So they would be

20   permitted to pursue, that is Dr. Ayyadurai and Ms. Terrill

21   would be permitted to pursue the underlying writers.  I will

22   address that a little bit later with respect to the

23   settlements.  My understanding is the cooperation agreements

24   are done with Mr. -- with Dr. Ayyadurai, so there will be no

25   pursuit with respect to the writers, Mr. Biddle and

Page 14

1    Mr. Cook.  With respect to Ms. Terrill, I think they reached

2    an impasse and you'll hear a little bit about that when I

3    give a proffer or put Mr. Holden on.  But that objection to

4    confirmation as been resolved nonetheless.

5             The next one is Mr. Martin has filed a submitting

6    documentation regarding XP Vehicles.  The matter has, I

7    said, not been resolved.  We have not had XP Vehicles.  It

8    was a late objection to the extent it was an objection.

9    Mr. Martin will take up that objection when the Court wants

10   to hear the objection specifically.  There was a response by

11   Mr. Bollea as Mr. Williams or Mr. Johnson had said that

12   those settlements were not proper with respect to Mr. Bollea

13   or Mr. -- Dr. Ayyadurai or Ms. Terrill.  We will put on

14   evidence to that, but that was a response.

15            And then finally, I believe, yesterday we received

16   a confirmation objection from Meanith Huon who is not, I

17   believe, on the call today but wants to be on the call on

18   the 15th.  Your Honor has -- may recall that Your Honor has

19   ruled on parts of his claims objection, found that Mr. Huon

20   has submitted himself to the jurisdiction of this Court.

21   Mr. Huon has, in fact, filed a confirmation objection.  We

22   resolved that yesterday with the agreement that we'll also

23   put on the record at the 15th because Mr. Huon wants to be

24   on that hearing.  We will settle that claim, resolving all

25   the 7th Circuit litigation, all the litigation in Illinois,

1   all of the claims litigation here for the payment of

2   $100,000 out of the estate.

3            Those are the objections.  If we go -- we can go

4   forward with confirmation in one of two ways, Your Honor,

5   and it's your docket and I understand it's quite full.  One

6   is I could proceed by direct testimony with Mr. Holden.  I

7   don't believe there's any contested testimony, or I can try

8   to do a -- I can do a proffer for Mr. Holden and spare the

9   direct testimony.

10           THE COURT:  Well, I'm happy to hear a proffer

11  subject to possible cross-examination by parties.  The

12  questions that are raised are not necessarily in any order:

13  satisfaction of the best interest test; two, the

14  settlements, the reasonableness of the settlements and

15  you've told me about a couple more so we can deal with them

16  today; and there's a third one that I had in mind that will

17  come to me, but --

18           MR. GALARDI:  Third party releases, by any chance?

19           THE COURT:  The third party releases.  All right.

20  So those are the -- obviously there were more issues under

21  1129(a).  I note that everybody voted for the plan.

22           MR. GALARDI:  Correct --

23           THE COURT:  Acceptance of the 1129(b), and fair

24  and equitable test, and all of that other stuff is not

25  present.

Page 16

1           MR. GALARDI:  Correct, Your Honor.  Maybe what I

2    will do is do it this way.  I will do a proffer and then

3    maybe just to clean up, I'll have Mr. Holden go on the stand

4    a little bit with respect to the liquidation analysis.  That

5    will give Your Honor an opportunity --

6           THE COURT:  That's fine.  You don't have to do a

7    proffer with respect to the 1123(a) and (b) elements because

8    I can read the plan --

9           MR. GALARDI:  Right.

10          THE COURT:  -- and determine whether or not

11   they're satisfied.

12          MR. GALARDI:  And that's what I anticipated, Your

13   Honor.  And with respect to the settlements, I think I can

14   put those on.  And the third party releases I'll put on.  So

15   let me start with the proffer and then see where we go from

16   there.

17          THE COURT:  Go ahead.

18          MR. GALARDI:  In the Courtroom today is

19   Mr. William Holden who is now sitting over behind me off to

20   what you would look to your right.  Mr. Holden, if called as

21   a witness, would testify that he's employed by Opportune and

22   has served as the chief restructuring officer of GMGI and

23   Gawker Media.  And since the sale to Unimoda (ph), has been

24   the managing director of Gawker Hungary.  He's been employed

25   by the debtor since May of 2016 and has been actively

1    involved in these cases, has attended all board calls, and

2    worked closely with the independent director of the debtors,

3    Scott Tillman, regarding the sale, the claims resolution

4    process, and the formulation and prosecution of the plans of

5    reorganization and disclosure statements that have been

6    filed before the Court.

7            He has been designated by the debtors with the

8    consent of the committee to serve as the plan administrator,

9    should the plan of reorganization be confirmed and go

10   effective.  With respect to the plan of reorganization,

11   Mr. Holden would testify that he has reviewed, approved, and

12   signed each of the disclosure statement and plan of

13   reorganization filed in these cases, believe the information

14   therein to be true and correct, and that such plan has been

15   prosecuted in good faith with the intention to maximize

16   value to all stakeholders and provide stakeholders a fair

17   and equitable distribution to the assets in accordance with

18   the absolute priority rule.

19           In that regard, Mr. Holden would testify although

20   styled as a joint plan of reorganization, it consists of

21   three plans of reorganization, one for each individual

22   debtor: GMGI, Gawker Media, and Gawker Hungary.  He would

23   also testify that each debtor is organized under different

24   laws.  GMGI is organized under Cayman Islands law.  Gawker

25   Hungary under Hungarian law.  And Gawker Media under

Page 18

1    Delaware law in the United States.

2              Mr. Holden would then testify that the primary

3    assets to be distributed under the plans of reorganization

4    were derived from the sale of assets to Unimoda and to an

5    allocation of those sale proceeds between Gawker Media and

6    Gawker Hungary.  In that regard, Mr. Holden would testify

7    that the assets sold in the sale to Unimoda consisted solely

8    of the assets of Gawker Media and of Gawker Hungary and no

9    assets of Gawker -- of GMGI were sold.  That Gawker Media's

10   assets consisted -- so with respect to the Gawker Media

11   plan, which constitutes a POT plan, it consists of sale

12   proceeds and certain other existing bank accounts that have

13   existed since the petition date and had cash that was

14   clearly cash of Gawker Media.

15             Gawker Hungary's assets for the purposes of the

16   distributions under its plan also consisted of its share of

17   sale proceeds and the intercompany claim against Gawker

18   Media.  And the Gawker Media -- that Gawker Hungary had no

19   other significant assets as of the petition date or as of

20   the consummation of the sale.

21             And as I said before, Mr. Holden would also

22   testify that GMGI had no material assets other than its

23   equity interest in Gawker Media and Gawker Hungary as of the

24   petition date or as of the closing sale.  And consequently,

25   Mr. Holden would describe each of the plans as a POT plan

1    pursuant to which cash proceeds from the sale and other cash

2    that was on hand as of the consummation of the sale dates

3    was being distributed.

4                With respect to the liquidation analysis,

5    Mr. Holden would testify that he and others developed the

6    liquidation analysis filed in support of the plan of

7    reorganization.

8                Your Honor, maybe what would be a good idea is I

9    know you have tons of paper up there, but if I may --

10               THE COURT:  Well --

11               MR. GALARDI:  -- bring the -- an exhibit that I

12    would have had for Mr. Holden, it may be easy to move around

13    in or --

14               THE COURT:  That's fine.  Is that the liquidation

15    analysis that's attached to --

16               MR. GALARDI:  Yeah.  That's the liquidation

17    analysis.

18               THE COURT:  Yeah.  I've got that.  I have it.

19    Okay.

20               MR. GALARDI:  If other people -- we have a couple

21    of binders.  It may be easier to move around in, but it's

22    Exhibit 5 in mine.  It's Exhibit 5 in that binder there,

23    sorry.

24               Now, Mr. Holden will testify that he and others at

25    Opportune developed the liquidation and filed in support of

Page 20

1    the plan.  That he would further testify that the

2    liquidation analysis and Your Honor can see from, I think

3    it's -- I'm going to use the docket pages at the top of it,

4    pages 266 of 557, 267 of 557, and 268 of 557, that those

5    pages reflect individual liquidation analysis with respect

6    to each of the specific debtors.

7            That in doing this liquidation analysis, what

8    Mr. Holden did was to commence the liquidation analysis with

9    the assets, which assets reflect the sale proceeds, net of

10   payments of various secured claims, as well as the other

11   assets remaining on the company's books and records and in

12   their accounts as of the closing of the consummation of the

13   sale, but brought forward to a date of December 31st, 2016

14   so there are fees that would have been taken out in those

15   amounts.

16           With respect to the liquidation analysis, Mr.

17   Holden would testify that he began with the analysis of

18   Gawker Media LLC and proceeded to go through the waterfall

19   with respect to Gawker Media LLC and what would be achieved

20   under that liquidation.  With respect to Gawker Media, LLC,

21   he assumed -- and with respect to all of the liquidation

22   analysis, Mr. Holden would testify that he assumed that in

23   each of those cases that a liquidating trustee would accept

24   and be able to consummate each and every one of the plan

25   settlements that is set forth in the plan of reorganization.

Page 21

1                    THE COURT:  Does that include the allocation of

2       the sale proceeds?

3                    MR. GALARDI:  That includes the allocation of the

4       sale proceeds, Your Honor.

5                    THE COURT:  So what was the allocation to Gawker

6       Media, LLC?

7                    MR. GALARDI:  The ultimate allocation reached as a

8       result of settlements, and we'll go back to that at some

9       point, but it was 60 percent -- roughly 60 percent of the

10      assets of the sale proceeds, Your Honor.

11                   THE COURT:  So what does that translate to in

12      dollars?

13                   MR. GALARDI:  Of the net sale proceeds -- you did

14      this to me last time and then I did it after the fact.  So

15      60 percent -- well, let's just start with 135, 60 percent --

16                   THE COURT:  Well, you're starting with a cash --

17                   MR. GALARDI:  -- about 88.

18                   THE COURT:  You're starting with a cash value of

19      55 -- 53,000,869.70.

20                   MR. GALARDI:  Correct.

21                   THE COURT:  So it looks like it's about 100

22      million dollars of net proceeds?

23                   MR. GALARDI:  Well, Your Honor, if you look --

24      let's do it this way.  If you look at the cash, you'd see

25      the 53,000,869?

Page 22

1              THE COURT:  Yes.

2              MR. GALARDI:  And then if you go to the page to

3      the right, you'll see Gawker Hungary starting with cash of

4      33,970?

5              THE COURT:  Yes.

6              MR. GALARDI:  Okay.  Those are net cash proceeds

7      after paying certain expenses with the sale and paying down

8      secured debt.  Those are the resulting numbers and certain

9      expenses.  I have to go back and we -- and Mr. Holden would

10     testify, as we're doing it as a proffer, that he treated the

11     debt as 65 -- 60/40 percent debt, 60 percent/40 percent with

12     the Columbus Nova debt to arrive at those numbers.  And then

13     also took expenses, for example, there's a break up date and

14     certain expenses to arrive at these net numbers as of that

15     date.

16             THE COURT:  So the expenses were allocated just as

17     the proceeds were?

18             MR. GALARDI:  Exactly.

19             THE COURT:  Okay.

20             MR. GALARDI:  Unless there was another reason to

21     allocate them differently, Your Honor.

22             So they're starting with that analysis, Your

23     Honor, what the liquidation analysis with Gawker Media shows

24     that is if you go through the straight absolute priority

25     rule and you move all the way down, you will see, as

1    Mr. Holden would testify, that the low recovery for the

2    unsecured creditors of Gawker Media is 90.6 percent and a

3    high recovery of 93.1 percent.

4          What Mr. Holden would testify is that even

5    assuming that the trustee, a Chapter 7 trustee, could

6    effectuate all of these settlements, including the plan

7    settlement, and get the benefit of all of those settlements,

8    that the creditors -- the unsecured creditors of Gawker

9    Media would receive less than they are receiving or not more

10   than -- less than they are receiving under the plan, because

11   under the plan as now set forth with respect to the

12   settlements that I put on the record with respect to the

13   reserves, unsecured creditors will be paid 100 percent at

14   Gawker Media.

15          THE COURT:  Okay.

16          MR. GALARDI:  Now, importantly, Your Honor, then

17   once we -- once -- Mr. Holden, he would testify that once

18   you ran through the numbers here with respect to the Gawker

19   Media, I will draw Your Honor to a -- your attention to an

20   intercompany claim line on the Gawker Media, which is three

21   or four lines from the bottom.  This is also set forth in

22   the disclosure statement and was subject to certain

23   objections.

24          Mr. Holden would testify that in doing the

25   liquidation analysis that that entire claim was somewhere

Page 24

1    around $21 million to $24 million, but that there was a 90

2    percent payment and what happens is that money gets fed back

3    into the Gawker -- you'll see the intercompany payment

4    receivable in the inter -- in the Gawker Hungary assets.

5    Okay, so that's -- when I said before when Mr. Holden would

6    testify, there was the initial allocation of cash from the

7    sale.  And then there was a payment on account of an

8    unsecured claim that then funded the Gawker Hungary account.

9            Mr. Holden would testify today that that number is

10   much higher than what will actually be paid over on account

11   of the intercompany account, which I'll explain a little bit

12   later today, so there were objections to that but there have

13   been other reserves put forth and we'll explain that when I

14   go through the plan.

15           Mr. Holden would then testify with respect to

16   Gawker Hungary based on the assets that it has available to

17   itself and its -- his review of the claims, he would have

18   the allocation of proceeds 40 percent net of all the secured

19   claims, plus anything it receives on the intercompany

20   claims.  And since there are very few claims under the

21   Gawker Hungary plan, you will see that all creditors under

22   the Gawker Hungary plan will, in fact, be paid in full under

23   a liquidation analysis.  You can't get better than paid in

24   full.  Well, maybe you could with some interest.

25           And then what there is is remaining proceeds for

Page 25

1   distribution.  You will see at the bottom of that page 38 to

2   40 million dollars, which those proceeds then form the basis

3   of the liquidation analysis for GMGI.

4            Your Honor, I don't know if you have to turn the

5   page or go to 268, you will see then at the Gawker GMGI

6   level, you will see the gross liquidation proceeds being

7   roughly the same numbers.  There was a little bit of bank

8   cash left online.  There is a loan that is owed for

9   Mr. Denton of $200,000 that is added into that, not material

10  assets.  But based on the unsecured claims and based on

11  third party releases and resolving the indemnification

12  claims of people who might be at GMGI, that ultimately under

13  the liquidation analysis, and these numbers have changed

14  given certain facts and I'll explain it, that the equity may

15  get anywhere from 34 to 38 million dollars at the end of the

16  case.

17           With respect to the plan itself, Mr. Holden would

18  testify that no junior class of creditors is receiving any

19  distribution under the Gawker Media plan until and only if

20  the Gawker Media unsecured creditors receive payment in

21  full.  In particular, there are two --

22           THE COURT:  That's a credit down test.  You don't

23  have to satisfy that.

24           MR. GALARDI:  I'm sorry -- because we haven't --

25           THE COURT:  The plan has been accepted by

Page 26

1    everybody who voted on it.

2            MR. GALARDI:  Correct.

3            THE COURT:  It doesn't matter.

4            MR. GALARDI:  Correct, Your Honor.  But there was

5    a couple of questions about the voting and the

6    gerrymandering and so I just wanted to make that point as to

7    that.

8            THE COURT:  I didn't understand the objections as

9    to 2(e) and 2(c) but --

10           MR. GALARDI:  I won't need to make their objection

11   since we settled with them.

12           THE COURT:  Good.

13           MR. GALARDI:  So Your Honor, I think I understood

14   it, but I don't need to do it.

15           Your Honor, with respect to the purchase price

16   allocation settlement, and I think, Your Honor, just for the

17   sake of everybody being on the same page because there are a

18   number of settlements, if Your Honor would turn to the

19   disclosure statement.  It is, perhaps, helpful to look at

20   the disclosure statement, the revised version, I believe

21   it's on page 23.  It starts on the disclosure statement.

22   It's in the binder that I've just handed out.  It's behind

23   tab 3.  There was a notice of a filing of disclosure

24   statement.  But I do want to take up each of the settlements

25   and how those were negotiated.

1              It starts on page 23 of the disclosure statement.

2    I have it on page --

3              THE COURT:  Is that 23 of 139?  Because that's the

4    leaflet you sent to me.

5              MR. GALARDI:  I have actually page 34 of 557.  I

6    can hand one up if it makes it easier --

7              THE COURT:  Well, I have different --

8              MR. GALARDI:  -- it's the (indiscernible) notice

9    of filing.

10             THE COURT:  What's the page number on it?

11             MR. GALARDI:  It's actually page 23 at the bottom

12   of the page.

13             THE COURT:  Yeah.

14             MR. GALARDI:  Yeah, it's probably the same

15   version.  It hasn't been changed.  It was the --

16             THE COURT:  This is the November 4th version.

17             MR. GALARDI:  That's fine.  Yes, Your Honor.  With

18   respect to the plan settlements, there are, as Mr. Holden

19   would describe, there were in broad terms three basic plan

20   settlements, all of which were intertwined.  One of which

21   was the purchase price allocation settlement that I just

22   went through.  But Mr. Holden would testify that a critical

23   settlement was the settlement and allocation of the sale

24   proceeds, which settlement allocated the value of the asset

25   sold to Unimoda approximately 60 percent to Gawker Media,

Page 28

1    and 40 percent to Gawker Hungary.

2              In that regard, Mr. Holden would testify that

3    historically, asset value was considered to be held 33

4    percent by Gawker Media and 67 percent to Gawker Hungary

5    based on a -- based, in part, on a transfer pricing that the

6    debtors received in December 2011.  And, in fact, Mr. Holden

7    would further testify that in the plan that the debtors

8    filed back on September 30th, that was the allocation of

9    assets and value that was taken at that time.

10             Mr. Holden would then testify that the creditors

11   committee and certain creditors, including Mr. Bollea raised

12   challenges to the allocation and the allocation of expenses

13   with respect to that particular allocation, as well as to

14   the importance and validity of that transfer pricing memo,

15   which had not been updated since December of 2011.  And as a

16   result, the debtors and creditors committee, and certain

17   creditors have been in negotiations along with negotiations

18   with respect to Unimoda pursuant to the asset purchase

19   agreement and tax advisors to Gawker Hungary regarding the

20   proper allocation.

21             As a result of the negotiations with those parties

22   over the last couple of months, and as a result of the

23   settlements and being able to fund the settlements, the

24   debtors have determined to settle such asset issues by

25   allocating the value received in the Unimoda sale,

1       approximately 60 percent Gawker Media and 40 percent

2       Hungary.  That is also the distribution as I've mentioned

3       already.  Mr. Holden would testify in the beginning of the

4       liquidation analysis.  And then unless otherwise dictated by

5       the circumstances and other considerations, expenses have

6       been allocated consistent with that allocation.

7               As part of the intercompany settlements, there is

8       also an intercompany settlement between Gawker Media and

9       Gawker Hungary.  With respect to that settlement, Mr. Holden

10      would testify that --

11              THE COURT:  Is that intercompany debt?

12              MR. GALARDI:  This is intercompany debt between

13      Media and Hungary, correct, Your Honor.  But based on the

14      current books and records of Gawker Media and Gawker

15      Hungary, Gawker Media would owe net Gawker Hungary

16      approximately $23 million.  Again, the creditors committee

17      and other parties raised concerns regarding the bonafides of

18      those intercompany claims, in part because of the -- they

19      were based on the transfer pricing memo.

20              In that regard, Mr. Holden would testify that

21      Opportune and other advisors conducted an investigation into

22      the validity and enforceability of these intercompany

23      claims, the potential causes of action that Gawker Media

24      might be able to assert against Gawker Hungary, and that

25      although it determined -- that is Opportune determined and

Page 30

1    the debtors determined that they believed that the debt was

2    good, valid, and properly enforceable in the full amount of

3    $23 million, as part of the sale proceeds allocation

4    settlement, a settlement with Gawker Hungary, the

5    intercompany debt was recharacterized, importantly, to an

6    approximate $19 million.  That's not a write off.  Taxes,

7    we're obviously very concerned about taxes.  So it's

8    important that it was recharacterized to $19 million.

9             Under the plan as proposed, it was proposed that

10   Gawker Hungary would then be paid no more than 16 million on

11   account of its intercompany claim by Gawker Media, leaving a

12   balance of $3 million to be paid if and only if the

13   unsecured creditors of Gawker Media were paid in full.

14   However, Mr. Holden would also testify that as a result of

15   establishing conservative reserves for plan purposes --

16   sources and uses of cash, conservative returns with respect

17   to priority tax claims and tax claims and administrative

18   expenses, that currently Gawker Hungary will likely only be

19   receiving $10 million on the effective date of the plan,

20   hopeful that it would receive 16.  That is part of the

21   settlement that Gawker Hungary had agreed to subordinate, as

22   mentioned, the additional $3 million in addition to the 16.

23             Mr. Holden would also --

24             THE COURT:  How much is Gawker Hungary

25   subordinating?

Page 31

1          MR. GALARDI:  Three of 16, but now it's really 9

2     of the 16 at least, Your Honor.

3          THE COURT:  It's getting -- okay.

4          MR. GALARDI:  Okay?  And, Your Honor, with respect

5     to this, because of circumstances with respect to taxes and

6     ability to pay taxes, Mr. Holden would also testify that if

7     the plan should not go effective before the end of the year,

8     he would like authority to distribute 5 of the $10 million

9     before the year ends so that Gawker Hungary can pay certain

10    tax obligations that need to be paid before year end.  In

11    that regard, Mr. Holden would testify that upon the

12    consummation of the sale, all assets were put into a bank

13    account in the name of Gawker Media, but that, in part,

14    because of the tax implications, it would be best to

15    transfer funds up to $5 million by year end through the

16    intercompany as a partial pay down.

17          Mr. Holden would then testify that this

18    intercompany settlement with Hungary was part of the arm's

19    length negotiations among the parties with respect to the

20    overall sale proceeds allocation and with respect to the

21    payment of the creditors' claims.  That the settlement

22    enables the unsecured creditors of Gawker Media to receive

23    more than they might otherwise receive in the Chapter 11

24    cases.  That that is a result of, among other things, tax

25    implications, that the settlement was entered into based

Page 32

1    upon, among other things, the estimated cost of litigation

2    between the estates, a consideration of the likelihood of

3    prevailing on the litigation, and the effect of the timing

4    of the litigation on the ultimate distribution of proceeds

5    to unsecured creditors.

6            So Mr. Holden would opine that the settlement,

7    both of the sale proceeds, as well as the Gawker Hungary

8    payment on the intercompany claim should be approved as fair

9    and equitable and in the best interest of all of the

10   debtors' estates.

11           Turning now to the other intercompany settlement

12   between GMGI and Gawker Media.  With respect to that

13   settlement, Mr. Holden would testify that a result of the

14   sale proceeds and the Gawker Media/Gawker Hungary

15   settlements, GMI -- GMGI is expected to receive a

16   significant distribution of cash, likely in excess of $30

17   million.  Your Honor, I'll stop there.  It's $30 million as

18   opposed to the liquidation analysis because of that $9

19   million drop that I talked about on the intercompany and the

20   reserves being established at Gawker Media.

21           The committee and the other parties had also

22   raised concerns (indiscernible) of claims and causes of

23   action that Gawker Media might have against GMGI and its

24   officers and directors, including breaches of fiduciary duty

25   and impermissible dividends.  But the debtors and the

1     advisors determined that no such causes of action existed

2     and that even if such actions existed, the unsecured

3     creditors of Gawker Media likely would be paid in full and

4     then suffer no damages.  That, nonetheless, to provide some

5     consideration in exchange for the releases of the GMGI, as

6     well as their board members, and to otherwise avoid costly

7     and time consuming litigation that might provide no material

8     benefit to Gawker Media estate and its creditors.

9          GMGI agreed to provide the unsecured creditors of

10    Gawker Media with a $2 million fully funded guarantee.  Mr.

11    Holden would then testify that the GMGI settlement is fair

12    and reasonable, and that the potential claims and causes of

13    action that Gawker Media may have against GMGI but that the

14    GMGI guarantee, which is a settlement, is the result of

15    arm's length negotiations among various parties, including

16    the committee, Mr. Bollea, the equity holders.

17          THE COURT:  What is the $2 million guaranteeing?

18    What's the debt that's being guaranteed?

19          MR. GALARDI:  The unsecured claims, okay -- and

20    when we had a lot of unsecured claims and we didn't know the

21    full amount of them, right, there was the concern -- Your

22    Honor expressed it and the committee expressed it, that if

23    we only put $3.75 million of cash aside for those claims,

24    they may exceed that number.

25          So one of the things was to make that 3.75 5.75.

Page 34

1    GMGI gave a guarantee that if the claims actually exceeded

2    that 3.75, then you'd have another $2 million of cash funded

3    and it would never be distributed to the unsecured creditors

4    -- to the equity.  And that --

5            THE COURT:  Is that guarantee necessary now in

6    light of the various settlements?

7            MR. GALARDI:  I don't believe it's going to be

8    necessary, but we're going to keep the money there and I'll

9    explain that for writers and other issues, Your Honor.  But

10   in light of the reserve numbers and where the claims came

11   out, I think we're going to be well below that number.

12           THE COURT:  Okay.

13           MR. GALARDI:  That the settling -- this issue

14   saves significant costs and expenses and that the settlement

15   reflects Gawker Media receiving at least its lowest possible

16   recover in an intercompany litigation, and likely more.

17           Your Honor, now I'd like to turn for Mr. Holden to

18   proffer with respect to the specific settlements that are in

19   the plan and then I can also do the other settlements that I

20   mentioned.  With respect to the plan settlements with

21   specific creditors, Mr. Holden would testify that as part of

22   the plan and negotiations, the debtors entered into three

23   settlements with three individual creditors.  Those

24   creditors are Mr. Bollea, Ms. Terrill, and Mr. -- and

25   Dr. Ayyadurai.  That those three -- Mr. Holden would testify

Page 35

1    that those three creditors are members of the creditors

2    committee and, as such, and in their individual capacity,

3    have been actively involved in the cases.  That these three

4    creditors have common outside counsel of Charles Harter, but

5    not the same bankruptcy counsel, although Terrill and Dr.

6    Ayyadurai share bankruptcy counsel.  That all three

7    creditors had prepetition litigation, but only Mr. Bollea's

8    litigation had proceeded to judgment, and that the debtors

9    believed that all three litigations, and possibly others,

10   were financed by Peter Thiel, a Silicon Valley billionaire,

11   whom the debtors sought 2004 discovery and have been held in

12   abeyance since the entry of the settled -- the initial

13   settlement agreements.

14          That as a result of those creditors' activities in

15   the cases, the concerns about the litigation financing, and

16   the status of the underlying proceedings and claims, and

17   other considerations the debtors determined to proceed with

18   settlement negotiations with those parties, that in that

19   regard, the plaintiffs creditors were different in material

20   respects from other creditors, such as Mr. Huon,

21   Mr. Johnson, Got News, XP Vehicle, and Williams, who had

22   also filed large, unsecured claims based on defamation and

23   other matters.

24          In particular, debtors have already -- Mr. Holden

25   would testify and particularly the debtors had already

Page 36

1    received favorable judgments on Wan and Johnson, upon which

2    they intended to rest and didn't want to proceed with

3    negotiations on those.  With --

4            THE COURT:  Is it favorable judgment with respect

5    to Johnson?  Williams?

6            MR. GALARDI:  Williams, I'm sorry.  Thank you for

7    correcting me, Your Honor.  Thank you for correcting my

8    proffer of Mr. --

9            THE COURT:  Mr. Johnson's attorney got a little

10   nervous there.  He missed that one.

11           MR. GALARDI:  Thank you.  That's right.  That XP

12   Vehicles was an unknown claim at the filing of the

13   bankruptcy case and other than after filing an objection to

14   that claim had we heard -- had not heard much from XP

15   Vehicles.

16           And finally, with respect to Mr. Johnson and Got

17   News, there had been litigation commenced that was

18   dismissed, but ultimately refiled in California as of the

19   petition date, but they had not served the complaint.  And

20   despite the action having been on the docket for about six

21   months or more, before the bankruptcy and not taken part in

22   the bankruptcy cases other than to file proofs of claims.

23           That the settlement negotiations with Bollea and

24   Terrill and Dr. Ayyadurai took place over three days near

25   the end of October in the offices of Ropes & Gray, and that

Page 37

1    prior to those meetings, there were settlement negotiations

2    with those parties directly, with the creditor's committee,

3    and certain other third parties regarding the settlement of

4    those claims either individually or collectively.  That

5    there were back and forth offers being made directly through

6    counsel from the debtors, the creditors, and the times

7    communications through third parties.  And that Mr. Holden

8    did, in fact, play a part in the negotiations of the

9    settlement.  That the debtors were concerned about the cost

10   of litigation, that the debtors were concerned of any

11   judgments, whether even favorable with respect to Ayyadurai

12   and Terrill would be subject to appear given the financing,

13   and that the other defendants -- there were other defendants

14   that the debtors were also concerned about, namely the

15   writers and other editors of their companies that were

16   subject to these litigations, including Mr. Denton and

17   Mr. Daulerio.

18           In that regard, the company in negotiating the

19   settlement was concerned about the time that it would take

20   to litigate these settlements, the appeals that would be

21   involved in these litigations, and the impact that it would

22   have on confirming a plan of reorganization and making a

23   distribution.  That the debtors had considered lists and

24   contacts of the plan allocation and wanted to resolve those

25   allocation issues, along with making sure that there were

1    payments both for these claims and that the claims were, in

2    fact -- and the claims of other general, unsecured

3    creditors.

4           Mr. Holden would further testify that, with

5    respect to Mr. Bollea, that the debtor has negotiated a

6    settlement that the debtors believed was too high, because

7    they believed that they would prevail on the appeal.  And

8    Mr. Holden would further testify that, based on Mr. Bollea's

9    statements and statements of his counsel, that the Bollea

10   settlement was too low in light of the fact that Mr. Bollea

11   had been successful in obtaining $115 million compensatory

12   damage judgment as well as a $15 million punitive judgment

13   against the debtors as well as punitive judgments against

14   Mr. Denton in the amount of $10 million and 1 against Mr.

15   Daulerio in the amount of $100,000.

16          Mr. Holden would then testify that the settlement

17   with Mr. Bollea was very favorable to the debtors in the

18   following respects.  First, absent an appeal, the judgment

19   could not be overturned, and the appeal would be taken place

20   in the Florida court.  And the debtors are paying $31

21   million on a $115 million judgment.

22          Two, the debtors were able to have the individual

23   defendants' judgments also settled by the payment of $31

24   million, except with respect to any potential punitive

25   damage claims against Mr. Denton and against Mr. Daulerio.

Page 39

1   With respect to the punitive damage claims with respect to

2   Mr. Denton and Mr. Daulerio, the debtors have negotiated a

3   cooperation agreement whereby if they cooperated with

4   Mr. Bollea in securing cooperation agreements with

5   Mr. Denton and Mr. Daulerio, those defendants would not have

6   to pay any amount of damages on punitive damage claims and

7   that they simply would cooperate and receive mutual

8   releases, which in the instance of Mr. Denton would also

9   facilitate a resolution of his own bankruptcy case.

10              I'm pleased to say that as I don't have the

11  document papers, but it has been reported to me by both

12  Mr. Denton's counsel, by Mr. Bollea's counsel, and

13  Mr. Daulerio's counsel that all of those cooperation

14  agreements, as we stand here today, have, in fact, been

15  executed and that those settlements will be, in Mr. Denton's

16  case, separately approved, hopefully, in our case so there

17  will be no further litigation with respect to the underlying

18  judgment.  And in addition, as part of the settlement, as

19  Mr. Holden would testify, there was another litigation in

20  which only the company was named.  And it only began in the

21  beginning, what we call the Bollea II litigation, that with

22  respect to the Bollea II litigation, that is also settled

23  for no additional payment to Mr. Bollea.

24              And Mr. Bollea, in the settlement agreement, which

25  is attached in the -- in the plan supplement -- and there's

Page 40

1    a couple little changes that have been made, but nothing

2    substantive.  That as part of that settlement, Mr. Bollea

3    has also agreed not to name threatened third parties,

4    including Mr. Daulerio and Mr. Denton and Ms. Dietrick, who

5    is the general counsel, that those parties would not be

6    named in the litigation.  That does not, obviously,

7    preclude, to some extent, other parties bringing them in for

8    our discovery.  We'll talk about that when I talk about the

9    indemnification.

10            In addition, Mr. Bollea has agreed to receive his

11   share of 45 percent of what we call the Gawker Media

12   contingent proceeds account.  That account is to be funded

13   by proceeds, if any, from the actions that the debtors may

14   take with respect to third parties and with respect to the

15   sale of gawker.com.  That was going to be shared with any

16   other unsecured creditor, Your Honor.  But as a result of

17   the other settlements, there will be no other unsecured

18   creditors sharing in that 45 percent.  So Mr. Bollea will be

19   the sole beneficiary of the contingent proceeds account.

20            You can be assured that we do not believe that

21   that will make the 31.  We gave them an unsecured claim of

22   $84 million.  It's irrelevant at this point, but we do not

23   believe the assets in that account are anywhere near $84

24   million.  And he will not be receiving anything above

25   payment in full.  In fact, we believe the proceeds are

Page 41

1    probably far less than that.

2            As Mr. Holden would testify, he believes that the

3    cost and expense of the litigation with respect to Bollea,

4    the cost and expense with respect to the Bollea II

5    litigation could range anywhere from 1 to $10 million and

6    would only delay the distributions.  And while the company

7    believes that it could ultimately prevail on appeal and

8    still does believe it could prevail on appeal -- and I know

9    Mr. Denton and Mr. Daulerio still believe that they could

10   prevail on appeal -- it was time to resolve the settlement

11   and put this matter behind us for the benefit of the

12   creditors and the rest of the estate.  That will be

13   Mr. Holden's testimony with respect to the settlement with

14   Mr. Bollea.

15           I would say --

16           THE COURT:  Can I ask you a question?

17           MR. GALARDI:  Sure.

18           THE COURT:  All the creditors are being paid in

19   full, right?

20           MR. GALARDI:  Correct.

21           THE COURT:  So this is essentially a dispute

22   between equity --

23           MR. GALARDI:  Correct.

24           THE COURT:  -- and the litigants at this point?

25           MR. GALARDI:  And it has been, Your Honor, for the

Page 42

1    most part, since we received the sale proceeds.  And I will

2    say from the -- and it really came down to the allocation

3    issue, to a large extent, because of the allocation -- I'll

4    put it on the record that the allocation had been two-

5    thirds, one-third to Gawker Hungary, those creditors could

6    not have been paid in full.  And frankly, had we not had a

7    successful auction, this would have been an even uglier case

8    from all parties' concern.

9              THE COURT:  Okay.

10             MR. GALARDI:  And in regard to the settlements,

11   Your Honor, and since you raised the point, I'll make it

12   clear.  All of these settlements -- one, the committee has

13   been the guardian of the Gawker Media unsecured creditors

14   because of the potential issues.  Although we don't believe

15   we ever had any conflicts.

16             And with respect to the interests of the preferred

17   shareholders, we have capped the preferred shareholders, who

18   include Mr. Denton as the largest holder, Columbus Nova, who

19   is one of the large holders, Mr. Plunkett (ph), who is one

20   of the large secured involved in these negotiations.  And in

21   each time when we had the settlement conversations, we

22   noticed all of the parties -- and Mr. Tillman has been

23   involved bringing everybody together without -- and

24   Mr. Holden have been involved.  That basically, on that

25   basis, we believe that the Bollea settlement should be

Page 43

1    approved.

2            Mr. Holden would also note -- and again, a

3    slightly different request than I'm sure Your Honor has

4    received on other confirmations of plan.  And I would say

5    this with respect to Bollea, with respect to Terrill, with

6    respect to Ayyadurai.  In the event that the plan does not

7    go effective by December 31st, Mr. Holden would like the

8    authority to make payments to Mr. Bollea on the settlement.

9    And I know Mr. Bollea's counsel doesn't object to that in

10   the amount of $31 million before year-end.

11           The simple basis for that, as Mr. Holden would

12   testify, is that because the game (ph) occurred in 2016, the

13   payment occurring in 2016 will avoid certain tax

14   implications and then having to refile taxes in subsequent

15   years.  So with respect to these payments, that's why one of

16   the reasons why it was so important, as Mr. Holden would

17   testify, that the reserves in all of this, all the amounts

18   be set at the cap so no one will be prejudiced by the early

19   payments.  We're going to ask for authority to make certain

20   of those payments actually immediately before or maybe a

21   week or two before going effective on the plan of

22   reorganization.

23           With respect to the Terrill settlement, Your

24   Honor, Mr. Holden would also testify that he participated

25   and was aware of and approved, along with Mr. Tillman, the

Page 44

1    settlement with Ms. Terrill.  In that regard, Mr. Holden

2    would testify that those settlement conversations also

3    occurred in New York in the last two weeks of October and at

4    the same time that the Bollea settlements were negotiated.

5    and Mr. Holden would testify that Mr. Harder (ph) was

6    involved in those negotiations.  He was the common counsel

7    to the three defendants -- three plaintiffs.

8         Notwithstanding the fact that those parties were

9    all present in the Ropes offices in New York, those

10   conversations and those settlement negotiations with

11   Ms. Terrill were held separately from the negotiations with

12   Mr. Bollea.  Mr. Bollea had additional counsel, and

13   Mr. Harder was only tangentially involved.  Mr. Taybeck (ph)

14   was involved primarily on behalf of Mr. Bollea.

15        In those conversations with Mr. Harder with

16   respect to Terrill and those conversations and similarly

17   with Mr. -- Dr. Ayyadurai were held separately and as the

18   result of those conversations, separately negotiated

19   agreements with certain different terms in those agreements.

20   And they were negotiated apart from and the settlement with

21   Mr. Bollea.  Mr. Holden would testify that it was not a

22   package deal, that there was not a we'll pay you x and you

23   carve up how you get it paid.  It was actually a specific

24   back-and-forth negotiation with Mr. Bollea that was actually

25   a back-and-forth negotiation with counsel to Ms. Terrill and

Page 45

1    a back-and-forth negotiation with counsel to Dr. Ayyadurai.

2            That those settlements were -- that those

3    settlement negotiations reflected many offers and counter-

4    offers; that Mr. Tillman was involved in those discussions

5    and that both parties, as I mentioned, will resolve in

6    litigation.  (Indiscernible) to resolve the litigations with

7    Ms. Terrill in particular for the payment of $500,000, the

8    debtors and Mr. Holden and Mr. Tillman considered a number o

9    factors, including, one, the costs and expense of

10   litigation; two, the fact that although a pending motion

11   could dismiss this, there was a pending motion to dismiss in

12   the underlying Newark action, that there was a list (ph)

13   that the debtors would lose that motion to dismiss and that,

14   even if the debtors succeeded in that motion, based upon the

15   weeks that Mr. Thiel was financing that litigation, that it

16   would inevitably be an appeal of that litigation.  And if

17   there was an appeal, there would be a chance of reversal.

18   And if there was a trial, that it would be a costly and

19   time-consuming litigation.

20           Thus, in connection with the Terrill settlement,

21   the debtors believed that again, there was nothing wrong

22   with what they did, that they did not defame Ms. Terrill,

23   and that they would fight the substance of those

24   litigations.  The debtors determined that it was in their

25   best interests to settle that litigation for the payment of

Page 46

1     $500,000.  As part of that settlement, the debtors also

2     agreed to cooperate to obtain cooperation agreements from

3     the authors or writers that were named in that lawsuit,

4     including Mr. Denton, Mr. Cook and Mr. Biddle.

5              Unfortunately, I am unable to report today that

6     those cooperation agreements have all been entered into.  I

7     believe Mr. Denton has one, but I'm not sure.  I will leave

8     that to his counsel.

9              That said, that litigation can then -- so as a

10    result of that litigation, the debtors have been able to

11    resolve the Terrill claim for compensatory damages and

12    punitive damages against the debtors, full compensatory

13    damages against all of the other defendants, leaving only

14    the potential of a punitive damage judgment, should

15    Ms. Terrill decide to proceed in that litigation against the

16    writers and potentially Mr. Denton, since I don't know as we

17    stand here right now whether he has received his release.

18    But I believe he has.

19              With respect to that --

20              THE COURT:  So are those settlements final, or are

21    you waiting to sign these cooperation agreements?

22              MR. GALARDI:  Your Honor, from the debtors'

23    standpoint, our settlement is final.  It doesn't -- it's not

24    conditioned on them signing that.  With respect to the

25    individuals and the future of the litigation, that is not

Page 47

1     final as I stand here today.  They may still end up with

2     those agreements, as they have in Mr. Ayyadurai's case.

3                 THE COURT:  But does that prevent the debtor from

4     confirming its plan?

5                 MR. GALARDI:  No, no.  In fact, part of the

6     settlement negotiation was specifically that there was no

7     requirement, simply a duty to cooperate, which we've not

8     heard anything that we did anything other than cooperate.

9     Whether it would be friendly cooperation or threatened

10    cooperation, it was cooperation, as Mr. Holden would

11    testify.

12                With respect to Dr. Ayyadurai's claims, Mr. Holden

13    would also testify with respect to Dr. Ayyadurai that again,

14    those settlement conversations, again, were taken place both

15    prior to the meetings in New York and also during the

16    meetings in New York and also subsequent to the meetings in

17    New York, that during the meetings in New York, that the

18    parties met over the course of three days, that those

19    settlement negotiations were separate and apart from the

20    negotiations with Mr. Bollea, that those negotiations went

21    back and forth regarding offers and counter-offers, that

22    those settlement negotiations were conducted at arms'

23    length, that Dr. Ayyadurai was represented by Mr. Harder,

24    who was independently negotiating the amounts for Dr.

25    Ayyadurai.

1           That as part of those settlements, again, the

2     debtor considered, one, the costs of litigation; two, the

3     likelihood that it would prevail in its pending motion to

4     dismiss; three, the fact that even if it were to prevail in

5     the motion to dismiss, given the potential financing that we

6     -- that the debtors believe that Peter Thiel was providing,

7     that there would be an appeal of that litigation.  The

8     appeal itself would be expensive litigation.  And that, in

9     fact, if they did not prevail on the motion to dismiss, that

10    the litigation would be costly.

11          The debtors also considered the likelihood of

12    success.  Though the debtors believed that there was no

13    likelihood of success with respect to Mr. Ayyadurai, counsel

14    to Dr. Ayyadurai did, in fact, provide his position with

15    respect to why Dr. Ayyadurai may, in fact, prevail in those

16    litigations.  As a result of those back-and-forth

17    negotiations, the consideration of costs, the debtors

18    determined that settling the litigation with Dr. Ayyadurai

19    in the amount of $750,000, again, which amount the debtors

20    would like to pay on or before December 31st of this year,

21    2016 for the reasons that Mr. Holden had, in proper

22    testimony with respect to the tax savings.

23          My understanding and part of that settlement

24    agreement was also that the debtors negotiate cooperation

25    agreements with Dr. Ayyadurai on behalf of Dr. Ayyadurai --

Page 49

1    between Dr. Ayyadurai and Mr.s Biddle and Cook and that my

2    understanding is that those agreements have, in fact, been

3    reached.  And I believe Mr. Goldman, who is counsel here

4    today, has advised me that with respect to Dr. Ayyadurai,

5    the parties have resolved all of their issues.

6        With respect to all of the three -- those three

7    creditor settlements, Your Honor, all of those settlements

8    had a specific provision in it with respect to content that

9    was on either the websites or in the possession of the

10   debtors.  With respect to all of that content, the debtors

11   have agreed to either return or quit claim any such content

12   back to the plaintiffs in that action.  With respect to that

13   content, Mr. Holden would testify that, indeed, that

14   content, he does not believe, has any value to the estate.

15   But, in fact, it would be detrimental to the estate and

16   would not enhance the sale of the value of gawker.com.

17   Indeed, anybody who would acquire gawker.com or that content

18   could, could -- I won't say will be -- could be subject to a

19   republication risk of that content and therefore, subject

20   themselves to litigation.

21       So in valuing the settlement, the fact that the

22   debtors looked at that content, looked at the fact that the

23   parties were going to pursue that content, possibly pursue

24   republication arguments as they had even pursued with

25   respect to the successor Unimoda (ph), Mr. Holden would

Page 50

1    testify that he believes that in giving that content and

2    quit claiming that content that he was giving no valuable

3    estate to those creditors in addition to the cash component

4    of those settlements.

5           Your Honor, the other settlement that Dr. -- that

6    Mr. Holden would testify is the settlement with -- I call

7    them Columbus Nova, but it is the second lien they call the

8    settlement that is set forth in the plan.  And it is a

9    secured claim.  Again, Mr. Holden would testify that he

10   participated in settlement negotiations and meetings with,

11   I'll call them, Columbus Nova with respect to the make-whole

12   plan.  Mr. Holden would testify that, upon the consummation

13   of the sale, the debtors paid Columbus Nova the full amount

14   of the outstanding debt, approximately $15 million; fees

15   with respect to that debt, and default interest with respect

16   to that debt, leaving only the make whole -- what's called

17   the make-whole claim of a 25 percent amount in addition to

18   the amounts that I just listed.

19          Mr. Holden would testify that the debtors raised

20   concerns regarding the belief (ph) that that extra 25

21   percent would be punitive and considered that they could

22   possibly subordinate it and, if not eliminate it,

23   subordinate it and at least subordinate it to all claims

24   against all the estates but still senior to the

25   (indiscernible).  In fact, Mr. Holden would testify that in

Page 51

1    that regard, considered that the loan had allowed the equity

2    to continue to finance the litigation against Bollea and

3    also to be able to help finance these cases and therefore,

4    at worst, that they would be subordinated to the claims.

5           With respect to that settlement, what Mr. Holden

6    would testify is that, as a result of those negotiations,

7    Columbus Nova agreed to payment of $500,000 from each of the

8    debtors on the effective date and then agreed to subordinate

9    the balance of their payment of 750 of each of the entities

10   until all of the creditors of those entities were paid in

11   full.  At the time, obviously, Your Honor, Mr. Holden would

12   testify that Gawker Media would -- I mean, Gawker Hungary

13   would be able to pay its $750,000.  But at the time that

14   settlement was negotiated, there was still a concern that

15   the debtors would not be able to pay all of the unsecured

16   creditors at Gawker Media and might not be able to pay all

17   of the unsecured creditors of GMGI because of the

18   indemnification obligations.

19          As a result, Columbus Nova agreed to subordinate

20   that claim, wasn't impaired, and voted to accept the plan.

21   And the only addition to that was that, as part of and prior

22   to the effective date, the debtors have agreed to pay any

23   accrued and unpaid attorneys' fees at Columbus Nova before

24   year-end as part of the settlement.  Mr. Holden would then

25   testify that, based on the probability of a litigation

1    regarding the make-whole, that based upon the costs and

2    expenses of such litigation and the amount that was at risk

3    in that litigation, about $3.75 million, that he believes

4    that the settlement of that litigation was in the best

5    interests of the debtors because such litigation in that

6    settlement did, in fact, provide $750,000 that might have

7    been used to top off the unsecured claims at Gawker Media

8    and that they would delay the payment on the GMGI claim in

9    the event that there were large indemnification claims at

10   GMGI.  So Mr. Holden would ask for approval of that

11   settlement.

12           Your Honor, what I turn to --

13           THE COURT:  What about the Mitch Williams

14   settlement?

15           MR. GALARDI:  Okay, I was going to do that last,

16   and we'll do that.

17           THE COURT:  All right.

18           MR. GALARDI:  With respect to Mr. Williams, what

19   Mr. Holden would testify is the following.  That the debtors

20   have filed an objection to the claim of Mr. Williams, that

21   Mr. Williams, in response to that, as well as to estimate

22   that claim, that Mr. Holden would testify that with respect

23   to Williams, the debtors' position was that he had no claim

24   because the New Jersey Court had granted summary judgment

25   and motion to dismiss with respect to all of his claims.

Page 53

1    Mr. Williams, on the other hand, was, as Your Honor is

2    aware, filed a motion to lift stay to bring -- to pursue an

3    appeal arguing that that summary judgment motion was

4    improvidently granted and take an appeal with respect to

5    that litigation.

6         With respect to the litigation itself, the debtors

7    have agreed to settle the (indiscernible) litigation on the

8    following terms.  The debtors have agreed to pay a total

9    consideration to Mr. Williams of $125,000.  With respect to

10   that $125,000, Mr. Holden would testify that, in

11   conversations with the insurance carriers, he and the

12   insurance carriers believed that the costs of the appeal

13   alone, leaving aside any subsequent trial, would range

14   anywhere from 75,000 to $125,000.

15        In those conversations, the insurance counsel

16   agreed to reimburse or pay to Mr. Williams, depending upon

17   the timing, 100,000 of the $125,000 judgment.  In addition

18   then, the remaining $25,000 we would allow Mr. Williams to

19   elect convenience class treatment, which we had offered and

20   paid from the estate $25,000.  As part of the settlement,

21   the insurance carriers also agreed, without us having to put

22   in invoices, that they would reimburse Ropes & Gray 25 --

23   would reimburse the estate for any fees that Ropes & Gray

24   expended on contesting the Williams' claim as a result of

25   our bringing it to a settlement.

1            And as a result, the estates will take that

2    $25,000 and if necessary -- it may not be necessary now --

3    take that $25,000 and put it in the unsecured creditors

4    reserve.  Therefore, from a settlement standpoint,

5    Mr. Holden would testify that the Williams' settlement has

6    no net effect on any recoveries to the unsecured creditors,

7    that the estate avoids the costs of litigation, some of

8    which, under insurance rates, may not, in fact, be

9    reimbursed, that they are being fully reimbursed for 100,000

10   of that and that, even with respect to the 25,000 with

11   respect to Mr. Williams, that the debtors are receiving and

12   the estates and the unsecured creditors are receiving the

13   benefit of the additional 25 that will be reimbursed to the

14   estate for the Ropes & Gray's fees in litigating that.

15           Mr. Williams has agreed that with respect to --

16           THE COURT:  So the estate's paying $25,000 either

17   to you or to Mr. Williams, right?

18           MR. GALARDI:  Yes, but they're getting that

19   reimbursed.  Yes, there's a net zero to the estate.  But the

20   -- we were looking at it from the unsecured creditors'

21   standpoint, reimburse that estate.  That's true.

22           With respect to -- I'm trying to think.  Oh, with

23   respect to the Williams' litigation, upon payment of that

24   amount, Mr. Williams has agreed to dismiss his litigation.

25   Mr. Williams will not amend the litigation.  Mr. Williams

Page 55

1    will not pursue in the litigation the various John Does that

2    were possible writers, authors, or editors of articles which

3    he may have pursued.  There is no agreement to provide back

4    the content that was put on the website.  There was not a

5    republication risk.  And Mr. Holden would request that,

6    based on the costs of litigation, based upon the likelihood

7    or prevailing, based upon the insurance recovery, based upon

8    the fact that no unsecured creditors are actually prejudiced

9    by the recoveries to Mr. Williams, and based upon the facts

10   that he believes that this is a fair and reasonable

11   settlement and should be approved by Your Honor.

12           Your Honor, I might as well take up Mr. Meanith

13   Huon's now.

14           THE COURT:  Yes.

15           MR. GALARDI:  While we may hear more about this,

16   he did want me to say that he wanted to be on, but he didn't

17   want to pay for two court calls.  And he'll be on on the

18   15th.

19           With respect to Mr. Huon, Your Honor may recall

20   that the debtors had filed an objection to Mr. Huon's

21   claims, that those claims -- on the basis that those claims

22   have been disallowed on motions to dismiss by the Illinois

23   -- I believe it's the state court.  No, it's the federal

24   court.

25           THE COURT:  It's the district court.

Page 56

1          MR. GALARDI:  It's the district court, yes, Your

2    Honor.  And that he had taken an appeal as of the

3    commencement of these cases to the Seventh Circuit.  With

4    respect to the Seventh Circuit, right before his deadline to

5    respond to our objection to his claim, the Seventh Circuit

6    reversed on one of those counts finding that there was not

7    -- it was not proper to grant a motion to dismiss on what

8    we've referred to as the single comment claim.  Mr. Huon's

9    single comment claim rested on the fact that either there

10   was at least an evidentiary issue or a factual issue to

11   determine whether or not an employee did that and whether or

12   not the Gawker Media advertising or incentive policies were

13   such that there was an actionable conduct.

14          The Seventh Circuit did find, however, that the --

15   that the comment itself was defamation, per se.  With

16   respect to Mr. Huon's conversations -- I've had

17   conversations with Mr. Huon.  Mr. Holden has been involved

18   or at least listened in on certain conversations yesterday

19   and Mr. Tillman as well and has heard the back-and-forth

20   with respect to those litigations.

21          Frankly, the debtors wanted to oppose Mr. Huon on

22   that, because it does raise interesting First Amendment

23   issues in the district court as to whether or not you can be

24   liable for comments, whether or not the policy.

25   Notwithstanding that, the debtors determined that it was

Page 57

1    better not to spend the amount on the litigation, as the

2    debtors considered the litigation, in the event that it went

3    forth in the -- in the district court there, it was going to

4    be a factual litigation with respect to tracking down

5    employees.  And that would have been expensive litigation.

6    Even to the extent that Your Honor had jurisdiction, which

7    we believed Your Honor had, Mr. Huon believed that he would

8    take an appeal of that jurisdiction, and that would have

9    cost.

10          If Mr. Huon had proceeded pro se and has actually

11   been quite successful in certain pro se matters --

12          THE COURT:  Well, he's a lawyer.

13          MR. GALARDI:  Yes.  Well, -- and so, he has

14   actually proceeded pro hoc.  You're right, Your Honor and

15   has been successful in those litigations and made clear that

16   he was going to take an appeal.  Based on the costs and

17   expenses of the appeals, the issues that were raised, and

18   with respect to the underlying issue, which could be a

19   factual issue, the debtors determined that it was better to

20   offer Mr. Huon a settlement.

21          Mr. Huon accepted a settlement.  It was $100,000.

22   I think he'll testify.  And he'll say 99,999.  We won't go

23   into the reasons, but we're going to say $100,000 settlement

24   for Mr. Huon with respect to his claim.

25          The debtors believe that entering into that

Page 58

1    settlement to resolve the claims objection, the estimation,

2    the Seventh Circuit litigation, all of the claims against

3    the writers and other people that were named in the long

4    litigation, including board members and former board

5    members, is a reasonable settlement based upon the

6    likelihood of success, the costs and expense of litigation,

7    the likelihood of prevailing, and any objections that we may

8    have had with respect to the reserves of the debtors under

9    the plan.  So we would ask Your Honor to approve the

10   settlement with respect to Mr. Huon as well.

11           Your Honor, I think -- I think maybe it would be

12   good to just put on some evidence about the Gawker available

13   assets so that you can, you know, make those findings.  With

14   respect to the Gawker available assets, Your Honor,

15   Mr. Holden would testify that there are really three

16   financial sources for the payment of unsecured claims.

17   First is there is a Gawker unsecured claims reserve.

18           As Mr. Holden would testify, that unsecured claim

19   reserve, after paying the Bollea settlement, after paying

20   the Ayyadurai settlement, after paying the Terrill

21   settlement, and after making any distribution on the inter-

22   company claim would have been funded on the effective date

23   in the amount of $3.75 million.  In addition, Mr. Holden

24   would testify that in addition to those assets, as I had

25   mentioned before, Columbus Nova was leaving $750,000 behind

Page 59

1    to pay the unsecured creditors.  And those funds would have

2    been funded on the effective date and not released unless

3    and until Gawker Media unsecured creditors received payment

4    in full.

5            Finally, Mr. Holden would also testify that, with

6    respect to the GMGI guarantee, that GMGI agreed to fund up

7    to $2 million to pay unsecured claims if that first 3.75 and

8    that next 750 were not paid in -- were not sufficient to pay

9    in full the amount of those claims.  That's what we would

10   refer to and Mr. Holden would refer to as the Gawker

11   available assets.  In addition, Mr. Holden would testify

12   that it was a requirement of the GMGI plan to fully fund in

13   cash the Gawker -- the GMGI guarantee on the date.  So all

14   of these would have been funded in cash available to the

15   unsecured creditors.

16           Mr. Holden would testify that one of the concerns,

17   especially after finding out about the settlements with

18   respect to the Bollea, Ayyadurai, and Terrill that the

19   committee had raised was the concern that there would be

20   adequate cash to pay the general unsecured creditors a

21   Gawker Media in full, or at least the same percentage, if

22   not a higher percentage than was being received by

23   Mr. Bollea.  As a result, these funds were established to

24   pay the unsecured creditors, and there have been back-and-

25   forth with the unsecured creditors committee during the

1    course of the cases and subsequent to the settlements to

2    confirm that we believed and that they believed that the

3    amounts were sufficient to fund and pay in full these

4    claims, or at least pay a very high percentage, no higher --

5    and no lower percentage than was paid to Mr. Bollea.

6              As a result of the settlements, Mr. Holden can

7    testify as follows.  That based upon his review of the base

8    amount of the unsecured liquidated claims in these cases,

9    there is about $900,000 funded, liquidated, unsecured claims

10   and that the reserve -- we're going to start subtracting

11   numbers -- that the reserve will have funding available for

12   each of those claims.

13             THE COURT:  Did he include the two settlements?

14             MR. GALARDI:  No, I'm going to include those, Your

15   Honor.  So we start with 900.  Based upon a review --

16   Mr. Holden would testify that, based on a review of the

17   claims registry, he classified claims into essentially three

18   groups of claims, Your Honor.

19             First, the liquidated -- well, more like the

20   trade-payable type claims, where you may dispute amounts.

21   But they were filed in a liquidated amount.  They're not

22   contingent.  And they may be disputed as a rounding error,

23   more or less.  With respect to those claims, Mr. Holden

24   would testify that there are about $900,000 worth of those

25   claims.

Page 61

1                Next, Mr. Holden would testify that, with respect

2      to Mr. Daulerio, he was setting aside $500,000 for the claim

3      of Mr. Daulerio with respect to attorneys' fees that had

4      been incurred to date.  With respect to the balance of the

5      writers and --

6                THE COURT:  That's an absolute cap, though, isn't

7      it?

8                MR. GALARDI:  It is an absolute cap, right.  So

9      all of these are caps.  We're taking people on their claim

10     as a cap.  We're taking the 500 as a cap.  And as Your Honor

11     may recall when I filed the estimation motion, which is late

12     -- which is now going to be withdrawn, the way we were going

13     to do the analysis is let's take all the caps and see what's

14     left of the claims.

15               THE COURT:  Right.

16               MR. GALARDI:  So right now, it's a claim.  So you

17     have 900 plus the 500 for the --

18               THE COURT:  Daulerio.

19               MR. GALARDI:  -- Mr. Daulerio.  Now, with respect

20     to Mr. Williams, that settlement will have no effect on the

21     numbers, because, as I said, they will be reimbursed and put

22     into the proceeds by way of, one, the 100,000 that the

23     insurance carrier is paying and, two, the 25 that will be

24     reimbursed on fees.  So that has no net effect on the

25     reserve.

Page 62

1              As part of the Johnson settlement, the debtors

2     have agreed to reserve, with respect to that, $1.5 million,

3     again a cap on recovery.  So with --

4              THE COURT:  And Mr. Huon?

5              MR. GALARDI:  Mr. Huon's being paid 100 out of

6     that reserve, Your Honor.

7          (Pause)

8              MR. GALARDI:  So if my math is correct, which is

9     always questionable, I have 900.  I'll do Mr. Huon next.

10    That brings it to a million and 500 for Mr. Daulerio.

11    That's 1.5 million and a reserve for Mr. Johnson at GotNews

12    at 1.5.  So nearly of the 3.75 that's cash, we believe we

13    have 750,000 more than is necessary to be able to pay all of

14    the remaining unsecured claims in this case.

15             THE COURT:  Not counting the Columbus Nova

16    subordination and the $2 million guarantee?

17             MR. GALARDI:  Correct.  So, in essence, if we go

18    forward with the plan, Your Honor -- and I'm going to talk a

19    little bit about the indemnification plan.  Because in

20    addition, there are other indemnification claims and defense

21    costs it's possible that certain writers will have,

22    depending upon Your Honor's ruling on the third party

23    releases and also that Terrill matter that I mentioned.

24             But, Your Honor, with respect to that, we believe

25    all of the claims that are liquidated amount known as of

Page 63

1    today -- and it's actually extended fees, which is really

2    Mr. Daulerio.  We have $750,000 even at the first level in

3    excess of what we will need to pay those claims.

4            Now, I would also like to now, with respect to

5    Mr. Johnson's claim, Your Honor, to give Your Honor more

6    comfort.  It is our understanding and Mr. Holden would

7    testify that we have had conversations with the insurance

8    carrier.  Mr. Johnson is now the remaining claim, with

9    respect to one of the policies for which we have, in fact,

10   received coverage for part of Mr. Johnson's proceedings

11   before and that, between the first layer of coverage and the

12   excess coverage, there is at least 1.1 million, 1.2 million

13   remaining of coverage.

14           So with respect to that $1.5 million reserve and

15   the potential for settlement or otherwise, there is

16   insurance coverage that will also give us a level of comfort

17   with respect to that reserve.  But again, the 1.5 is a cap,

18   but I want Your Honor to understand that certain of the

19   monies would then flow through to the inter-company claim

20   and go back up to the parent.

21           Your Honor, so Mr. Holden would testify that, in

22   his view, Gawker available assets are, in fact, based upon

23   the settlements, based upon the reserves, and based upon the

24   agreements, adequate to pay the Gawker Media unsecured

25   claims in full on the effective date or upon their allowance

Page 64

1   as soon as after.  Your Honor will notice -- and we'd like

2   to amend the plan in light of the settlements -- that one of

3   the provisions -- and Mr. Holden would testify, but I'll

4   (indiscernible) -- is that we are not going to make

5   distributions until all of the claims were settled, because

6   there were so many of them and we didn't want to do so.

7            One of the things that we think will be beneficial

8   to, again, facilitate whatever settlements is instead of

9   waiting now, since you have essentially independent

10  reserves, to ask Your Honor to authorize us, in the plan

11  administrator's discretion, to make those distributions as

12  those settlements relieve (ph) instead of waiting for

13  everybody to resolve.

14           THE COURT:  Isn't the only unresolved claim at

15  this point the Johnson GotNews?

16           MR. GALARDI:  Again, I always preface this with

17  Your Honor -- if Your Honor approves the third party

18  releases, I believe that plus what the equity has agreed

19  after conversations and what I'd like to have Your Honor

20  authorize is -- I said there was $750,000 left in the

21  reserve.  The debtors are standing by the writers and will

22  stand by the writers in their right to defend against the

23  Terrill litigation.  We would like to make that money

24  available for that one unique carve-out.

25           I'm seeing Terrill as essentially I opted out of

1    the releases type provision.  And what we would do is, if

2    they're going to opt out, we're not going to insist that

3    those writers laid their claims on that.  And we would like

4    the administrator -- and we'd have the consent of the major

5    equity people.  Again, Mr. Denton's subject to your

6    jurisdiction, but to be able to use that money.

7            And we're going to keep the 2 million out there a

8    little bit.  We don't think it's going to cost that much,

9    but we don't think it's fair for the writers to continue to

10   be litigating without costs waiving their claims, with that

11   narrow exception.

12           I think I've gone through the media reserve.  Your

13   Honor, let's -- I think maybe now I can go on to the

14   releases and cover all of your topics.

15           Your Honor, with respect to the debtor releases --

16   and if we turn to the plan, which is -- and again, Your

17   Honor, there have been no objections to these.  In fact,

18   there's been motions in support of these.  But I think it is

19   worth me explaining how do we work through these and then

20   the testimony.

21           Your Honor, as is normal -- I have it on page 40,

22   41, and 42 of the plan.  On the filed version, I have 122,

23   123, and 124, and 125 of 557.  Are we together?

24           THE COURT:  Yes.

25           MR. GALARDI:  Okay.  Your Honor, with respect to

Page 66

1    the provisions of the plan, I think that they are common but

2    yet immediately tailored as -- I will put in a proffer.

3    9.01 is an injunction against asserting claims against the

4    debtors.  And I don't need to put Mr. Holden, because it's a

5    legal question.  I wanted Your Honor to be aware that this

6    injunction is broader than the releases.  It --

7            THE COURT:  But, you know, this is a liquidating

8    plan, and the debtor doesn't get a discharge.  If the debtor

9    doesn't get a discharge, why does the debtor get an

10   injunction against the filing of claims?  If somebody wants

11   to go out and sue the debtor, I understand you get an

12   injunction against interference with property that's going

13   to be distributed under the plan.  But if somebody wants to

14   go out and get a -- you know, a judgment against a debtor,

15   aren't they entitled to do that?

16           MR. GALARDI:   Your Honor, you're 100 percent

17   correct --

18           THE COURT:  But --

19           MR. GALARDI:  -- that they would be entitled to do

20   that, but let me -- the reason that we have an injunction

21   here -- and I think Your Honor could be, to some extent, the

22   guardian of that injunction.  And I think this is unique

23   circumstances, which is why I wanted to bring this out

24   because they go hand-in-hand with the third party releases.

25           THE COURT:  Third party releases are something

1    else.  All I'm saying is, as a debtor, this is a liquidating

2    plan.  The debtor is not entitled to a discharge under

3    1141(d)(3).  And if the debtor isn't entitled to a

4    discharge, it's not entitled to a release, injunction,

5    exoneration, limitation of liability, whatever you want to

6    call it.

7             MR. GALARDI:  But an injunction is different than

8    a release or discharge, Your Honor.  All it means is that

9    they have to come back here before they pursue actions.  If

10   Your Honor has exactly the circumstances that you just

11   raised, we have no doubt Your Honor will, in fact, dissolve

12   the injunction.

13            THE COURT:  So why put it in the plan?

14            MR. GALARDI:  Because, Your Honor, there is a

15   safeguard and an important point here.  As we have mentioned

16   in Mr. Holden's testimony, this injunction is partially to

17   protect the writers and the other employees from lawsuits.

18   For example -- and it goes to the third party releases.  So

19   I don't believe that they are at all completely separate.

20            Your Honor, the debtors and their writers and

21   editors have written articles straight through the

22   consummation of the sale process, as employees.  As

23   Mr. Holden would testify, there have been threats or

24   requests to take down content throughout the cases up until

25   the consummation of the sale.  Your Honor, the only people

Page 68

1    after the debtor gets -- we had a bar date.  We get the

2    protection of the bar date.

3           We've had administrative bar dates.  We get the

4    protection of those bar dates.  That said, the average

5    statute of limitations, depending upon the publication, is

6    one to three years.

7           Your Honor has heard testimony that we want to get

8    all this money out.  And obviously, we have legal remedies

9    against the editors and the writers for their contingent

10   claims.  You can do 502(c).  You can do 502(e)(1).

11          But there is a significant risk, and we do have a

12   pending 2004 motion that says that we want a third party

13   release, we want the writers to have it.  But in the event

14   somebody wants to come to this court and pursue those

15   parties or the debtors, we would like Your Honor to be the

16   gatekeeper and determine on a case-by-case is this a cause

17   of action that should, in fact, go forward.  Your Honor can

18   make that determination.  We'll have the high standard to

19   say no.

20          But if we determine, for example, that there is

21   some other billionaire funding litigation against writers

22   who generally don't have a ton of money but are only going

23   against us for indemnification claims, we would like Your

24   Honor to be the gatekeeper with respect to those actions.

25          THE COURT:  Well, I can't -- assuming a third

Page 69

1    party release is appropriate, why can't the third party

2    release in favor of the writers be broader than the release

3    or the discharge that the debtor is getting?

4            MR. GALARDI:  Your Honor -- and I can hear

5    Ms. Levine in the back and Mr. Goldman in the back.

6            Your Honor, if the third party release -- and we

7    tried to narrow it because of the Second Circuit law in the

8    third party release.  As Your Honor will notice, if you go

9    to Section 905, the third party release -- and there is an

10   open issue here -- released employees and independent

11   contractors.  But it did have the qualifications -- and I

12   know the U.S. Trustee would look -- was looking for this --

13   gross negligence and willful misconduct.

14           THE COURT:  It also says to the fullest extent

15   provided by law.

16           MR. GALARDI:  Right, but again, then we'll have

17   arguments.  Again, arguments that the writers and employees

18   will have to make is okay, Your Honor --

19           THE COURT:  Well, that's always an argument --

20   that's always an argument that can be made down the road,

21   though.

22           MR. GALARDI:  Sure, but, Your Honor, why not have

23   that argument before Your Honor and make somebody lift the

24   injunction and make the argument before to interpret your

25   own plan?

Page 70

1          THE COURT:  I'm looking at the writers differently

2     from the debtor.  I think the law is very clear with the

3     debtor.

4          MR. GALARDI:  And, Your Honor, --

5          THE COURT:  I suppose that somebody could sue the

6     debtor but be precluded from suing the writers.

7          MR. GALARDI:  Your Honor, if -- and if I've missed

8     your point that 901 should not be an injunction against a

9     certain claims against the debtors.  But if we can put it

10    with respect to the employees and independent contractors to

11    mirror and work with the third party release, I have no

12    objection to that.

13         THE COURT:  I'm just wondering why that can't be

14    done.

15         MR. GALARDI:  I think it can be done, Your Honor.

16    mean, I'm happy to come back to Your Honor if somebody wants

17    to pursue an action and say we've gotten -- you know, we've

18    liquidated our assets.  There's no more assets.

19         THE COURT:  Yeah, well, I don't know why anybody

20    would want to sue a shell.

21         MR. GALARDI:  Exactly why I wanted to do it.

22         THE COURT:  That's precisely why the shell doesn't

23    get a discharge.

24         MR. GALARDI:  Exactly.  But, Your Honor, that's --

25    and again, the other aspect of this is look, Your Honor, we

Page 71

1    had this debate to some extent early on with Mr. Denton.  To

2    some extent, I can argue at times that a claim against the

3    writers and directors, because of indemnification

4    obligations, is, in essence -- either it's a claim against

5    us, or it's an extension of the stay.  Again, that was the

6    thinking behind 901.

7              THE COURT:  I don't have a problem with the

8    jurisdiction.  Because if they have indemnification rights,

9    it could have an adverse impact on the estate or the -- I

10   guess the post-confirmation estate.

11             MR. GALARDI:  Well, and, Your Honor, --

12             THE COURT:  But that's a jurisdictional issue.

13             MR. GALARDI:  Correct, but again, if you think of

14   the way in which we're going to be able to make the

15   distributions we're trying to make, indemnification claims

16   could be out there for three years.

17             THE COURT:  Uh-huh.

18             MR. GALARDI:  The whole point is we don't want

19   that -- we called it the indemnification dam -- to stop the

20   distributions.  And frankly, though the debtor has rights

21   under 502(c) and 502(e)(1), it's not what we want to do as a

22   First Amendment media company to be arguing with those

23   individuals that their claims should be disallowed or come

24   back under 502(j) when and if you have claims for costs.  An

25   estimation under 502(c) is not an easy fight to have.  So

Page 72

1    one of these reasons was to make sure we gave the writers

2    and editors the greatest protection we could possibly give

3    them, have Your Honor, who sat before this case, understand

4    why we're doing this, and then work through the releases and

5    the third party releases.

6            THE COURT:  Well, why don't you tell me why third

7    party releases are the ones you propose are appropriate in a

8    case like this?

9            MR. GALARDI:  Your Honor, again, in a case like

10   this, third party releases, I believe, are -- if not in a

11   case like this, I don't know what other case, except one

12   aspect of this.  First, the circumstances are unique, Your

13   Honor.  As Mr. Holden would testify and has been proffered,

14   one, there are significant First Amendment concerns.  And

15   although we are a liquidating debtor, that was our business.

16   And we do want to protect the writers and editors.

17           Two, we believe the writers and editors have, in

18   fact, provided substantial consideration in these cases.

19   One, by continuing to write the articles and generating the

20   revenue, but more importantly, as tailored, the writers and

21   editors that have, in fact, voted in favor of the plan have

22   given consideration, consideration not only with respect to

23   the waiver of their claims, but also consideration that is

24   tantamount and will amount to certain tax advantages and

25   therefore, a bigger pot to all of the entities by allowing

Page 73

1    us to consummate that plan, make the distributions, and

2    avoid litigation with respect to, as I've mentioned now

3    twice, 502(c) estimation for their defense costs and 502(e)

4    with respect to the rights of indemnification and arguing

5    that their claim should be zero with a right to hold a

6    reserve and come back under 502(j).

7            In addition, Your Honor, we think that these

8    particular provisions of 9.05 have been narrowly tailored.

9    In particular, as I pointed out to Your Honor, if Mr. Holden

10   would testify, we have not -- though there is an issue in

11   the law.  We have not tried to give a third party release

12   with respect to gross negligence or willful misconduct.

13   Second, the only parties getting the third party releases

14   are the released employees and independent contractors.

15           And if Your Honor goes back to the definition,

16   those are essentially those people that were writers,

17   editors of articles.  With respect to those individuals,

18   Your Honor, Mr. Holden would testify that, based on his

19   knowledge, they are not particularly wealthy individuals,

20   nor can they stand to defend the litigation on behalf of

21   themselves in the event that somebody brought a litigation.

22   In addition, under the circumstances, as I have said, the

23   statute of limitations is one to three years.  So we think

24   that the value of these third party releases are really for

25   a limited time.

Page 74

1          We believe that anybody who would be bringing such

2      action should have brought an action or claim in the

3      bankruptcy, knowing that Gawker was in bankruptcy and

4      therefore, Gawker could have dealt with those claims in

5      bankruptcy.  And we believe that anybody that would simply

6      go against the writer knowing them -- going against a writer

7      as a Gawker writer -- would only be doing so whether it was

8      for a malicious intent or other intent, because knowing that

9      they do not have substantial assets.  And the only assets

10     that they have would be the indemnification claims that they

11     would have against the debtor and not having the resources

12     to defend, we believe that those third party releases under

13     these circumstances for both pre and post-petition articles

14     written on behalf of the debtors are appropriate in these

15     circumstances.

16          So we think we satisfy the unique circumstances,

17     we think we satisfy the substantial consideration, we think

18     we've narrowly tailored.  And to the extent, as I've

19     mentioned, Your Honor, sometimes third-party releases come

20     with a box that you can check to check out, with respect to

21     those parties -- but that's only good as people who have

22     filed claims -- with respect to the one party that

23     essentially checked the box to check out, Terrell, that's

24     left, we're letting them go ahead and pursue it and we're

25     going to indemnify.  And that's going to be costly for us to

Page 75

1    do so, but we think it's valuable to do so.

2          And we are getting consideration from those

3    parties with respect -- from the employees and the other

4    contractors in exchange for not having claims and being able

5    to make distribution and achieve a greater recovery for

6    unsecured creditors.  Less risk to the recoveries of the

7    unsecured creditors of Gawker Media and a greater recovery

8    for the other preferred shareholders, though that is -- but

9    with respect to that, the preferred shareholders who as Your

10   Honor has noted really is a fight between preferred

11   shareholders versus the creditors, the preferred

12   shareholders have chosen to leave that reserve there, take

13   less early, and they themselves have chosen to leave at

14   least part of that guaranty available so that they can stand

15   behind the writers.

16         So we think in those circumstances these third-

17   party releases are appropriate under the Second Circuit

18   standard.

19         Your Honor, I think I addressed your topics, I

20   think I addressed what I need:  the best interests, the

21   settlements, the third party; is there any other topics that

22   you would like me to address?

23         THE COURT:  No.

24         MR. GALARDI:  I would turn it over to Mr. Martin

25   just to deal with the XP and some more detail on the Johnson

Page 76

1   seller.  Thank you.

2          Your Honor, just as a record matter, I would move

3   into evidence the certification of the voting tabulation.  I

4   don't know if it's been moved --

5          THE COURT:  Does anybody object to the receipt of

6   the voting tabulation?

7          It's received.

8          MR. GALARDI:  Thank you, Your Honor.

9          MR. MARTIN:  Your Honor, for the record, Ross

10  Martin of Ropes & Gray for the debtors, debtors in

11  possession.

12         As Mr. Galardi indicated, I'd like to take up the

13  Johnson settlement and then the various submissions by XP

14  Vehicles, and what I'm going to discuss will be provided for

15  in a red-lined order, which I'm happy to hand up as well, if

16  that would be appropriate.

17         THE COURT:  Well, Johnson is not really a

18  settlement, you're just cap -- you're just reserving in

19  capital, right?

20         MR. MARTIN:  That is exactly what I was going to

21  start with, Your Honor.  Unlike the settlements that

22  Mr. Galardi went through, which are substantive, final

23  settlements with allowed claim amounts, in Mr. Johnson's

24  case we are only resolving the confirmation objection and

25  objection to the estimation motion, which we're withdrawing.

1          THE COURT:  As long as nobody has an objection to

2     that, because no money, no property of the estate is being

3     paid, that's fine.

4          MR. MARTIN:  Okay.  Just for the record, Your

5     Honor, I think as Mr. Galardi indicated, part of that

6     arrangement also is that GotNews and Mr. Johnson will not be

7     pursuing claims against writers who would have

8     indemnification claims over, for much of the reasons that

9     Mr. Galardi just indicated.

10         And I think we spoke on December 1, we have had

11    some discussions with GotNews and Mr. Johnson's counsel

12    about a potential scheduling and sequencing of that

13    litigation; we intend to be back about that.  We don't have

14    that all worked out yet, maybe we'll have disputes, maybe we

15    won't, but as Your Honor indicated there's no substantive

16    approval of an allowed claim there.  So unless the Court has

17    any other questions on that --

18         THE COURT:  No.

19         MR. MARTIN:  -- I'll leave that where it is.

20         Your Honor, next is with respect to XP Vehicles

21    and I'll move through this quickly, Your Honor.  As the

22    Court is aware, XP Vehicles filed claims against each of the

23    debtors prior to the bar date.  Our claims objections to

24    those were heard on December 1st and in fact the Court

25    disallowed all of those claims in an order which is Docket

Page 78

1    No. 529 for among other reasons, but principally on statute

2    of limitations grounds.

3              At various times subsequent to that order

4    disallowing the claims, XP Vehicles has sent to our office,

5    as well as sent to the Court, not always exactly the same

6    documents as far as we can tell, but has emailed various

7    documents.  Some of those, in our view, relate to the claims

8    disallowance and we'll be filing a separate set of papers

9    with respect to that, but some we believe are best

10   characterized as relating to confirmation.  And so we would

11   propose that the confirmation order address those and deal

12   with them.  And I'm happy to go through that, it will not

13   take very long.

14             THE COURT:  What are the objections to

15   confirmation?

16             MR. MARTIN:  Your Honor, in --

17             THE COURT:  By an entity not holding an allowed

18   claim.

19             MR. MARTIN:  That is why they should be

20   disallowed, Your Honor, that is exactly correct.

21             If I could for the record, Your Honor, just point

22   out precisely which items we would like to be considered as

23   objections to confirmation.

24             THE COURT:  Go ahead.

25             MR. MARTIN:  Your Honor, the debtors filed a

Page 79

1    declaration, Docket No. 570, it's my declaration, which has

2    four exhibits.  And with respect to those, Exhibits A, B and

3    D each relate to confirmation.  A mentions the amicus brief

4    of certain writers; Exhibit B, an email from XP Vehicles

5    invokes Mr. Williams' objection to confirmation; and Exhibit

6    D, although it does not expressly note confirmation,

7    discusses the size of the asset pool available to creditors;

8    and we would propose that all of those be considered

9    objections to confirmation and overruled on the grounds that

10   XP Vehicles does not have an allowed claim.

11            Exhibit C actually specifically refers to the

12   claims estimation motion by docket number and we would

13   simply -- in the confirmation order would ask that that

14   objection -- or be deemed an objection to the claims

15   estimation motion, but be deemed moot because we're going to

16   be withdrawing that motion.

17            Last night, Your Honor, yesterday -- last evening

18   we received two more emails from XP Vehicles and last night

19   I filed a follow-up declaration, Docket No. 591, which has

20   only those two emails attached.  And one of those, Exhibit

21   A, attaches Mr. Juan's (ph) confirmation objection, and

22   again we would ask that that be treated a confirmation

23   objection by XP Vehicles, but disallowed because they have

24   no claim.

25            Exhibit B appears to be best characterized as a

Page 80

1    request for discovery, which should also be disallowed

2    because they have no claim and therefore are not allowed to

3    object to confirmation.

4              We would memorialize that all in a single

5    paragraph, Your Honor, of the proposed confirmation order,

6    and unless the Court has further questions, that's how we

7    propose to treat those various items.

8              THE COURT:  Does anyone want to be heard in

9    connection with the XP claim object -- confirmation

10   objection?

11             The record should reflect there's no response.

12             I'll sustain the objection for the reason XP

13   doesn't have an allowed claim.  XP is not here to articulate

14   its objection.  I had raised the issue about whether XP can

15   appear without counsel; the objections were not signed by

16   counsel as far as I can tell.  And to the extent they

17   incorporate the objections of others, those objections have

18   been resolved and not hearing from XP, I will assume that

19   their objections have also been resolved.

20             MR. MARTIN:  Thank you, Your Honor.  I have

21   nothing further.

22             MR. GALARDI:  Your Honor, with all due respect, I

23   believe the Court misspoke and said it was sustaining the

24   objection of XP.

25             THE COURT:  No, I'm overruling the objection.

Page 81

1           MR. GALARDI:  Okay, thank you.

2           MR. MARTIN:  Thank you.

3           THE COURT:  Thanks.  Now, let me take a step back.

4    Does anybody object to the proffer of Mr. Holden's testimony

5    or want to cross-examine Mr. Holden?

6           MR. ZIPES:  Your Honor --

7           THE COURT:  Yes, sir.

8           MR. ZIPES:  -- Greg Zipes with the U.S. Trustee's

9    Office.  I don't think it's necessary to put him on the

10   stand.  I just wanted two points of clarification relating

11   to the best-interests test.  And these may have been

12   answered and I may have missed them, but one is -- the one X

13   factor might be indemnification and I just wanted to confirm

14   -- and there is money going to equity or proposed money

15   going to equity, so I just wanted to confirm that in the

16   debtor's best estimate that there are sufficient funds set

17   aside for any potential indemnification and/or release

18   claims.  And secondly, just to confirm that creditors are

19   not getting interest under this plan and that there is some

20   confirmation that's okay with the creditors as money is

21   going back to equity.

22           THE COURT:  Well, they don't vote as to the plan,

23   there's no --

24           MR. ZIPES:  The settlement --

25           THE COURT:  -- let me stop.  There's no absolute

Page 82

1    priority issue, everybody has voted for the plan.  So even

2    if they're not getting interest and they would otherwise be

3    entitled to insist on it, they voted for a plan that doesn't

4    provide for the payment of interest.

5              MR. ZIPES:  And we're -- well, okay, we're talking

6    about -- okay.  Your Honor, I know as to the settlement

7    parties that isn't an issue because they settled for what

8    they did, but under the best-interests test, theoretically

9    there's some --

10             THE COURT:  Oh, I see what you're saying.

11             MR. ZIPES:  -- but, Your Honor, I don't think that

12   that's a big number and this is -- these --

13             MR. GALARDI:  Your Honor, may I just make one

14   clarification?  It's very important and I thought I did, but

15   Mr. Holden would testify --

16             THE COURT:  Let me ask you a question.  Are there

17   any creditors who have not filed a claim, did not vote and

18   have not settled, to your knowledge?

19             MR. GALARDI:  That did not file a claim, that did

20   not vote and --

21             THE COURT:  Did not settle.

22             MR. GALARDI:  Well, Your Honor, yes, in the

23   following way and I want to be clear.  As I mentioned and

24   Mr. Holden mentioned, maybe I'm not getting it right, but I

25   hate to use the President-elect's name, but we have received

Page 83

1    from one of -- from a law firm, you wrote an article about

2    the President-elect, now that claim never got filed in this

3    case.  One of the reasons we're concerned about that is

4    because the statute of limitations on that article has not

5    run.

6              THE COURT:  Okay.

7              MR. GALARDI:  So that's the kind of creditor why

8    we wanted the third-party release.

9              But I also want to correct Mr. Zipes on one thing.

10   And I thought Mr. Holden and my proffer did it, but as an

11   equity holder -- so again, let's take the capital structure

12   -- GMGI is the equity holder of Gawker Media, LLC; GMGI is

13   not getting any distribution under this plan directly.  So

14   when we talk about equity, and we're really talking about

15   Mr. Denton, the only way that money goes is by way of the

16   intercompany claim and whatever residual is left in that

17   estate is going to pay the intercompany claim, it is not a

18   payment on account of its equity interest.  That's how the

19   numbers are working out.

20             So I think that's important to make the record

21   clear.

22             THE COURT:  You're saying something different

23   then.  And maybe Gawker Media is not the best example of it,

24   but take Gawker Hungary, the creditors are getting a hundred

25   percent under the plan --

1          MR. GALARDI:  Correct.

2          THE COURT:  -- are they getting interest?

3          MR. GALARDI:  No one voted there and we don't

4    think there are any creditors --

5          THE COURT:  Well, the issue that's being raised

6    though is in a hypothetical Chapter 7 case, if we made all

7    the assumptions that you made --

8          MR. GALARDI:  Correct.

9          THE COURT:  -- they'd be getting interest.

10          MR. GALARDI:  Your Honor, with respect to that,

11    that we will reserve for interest on the one claim we know

12    of of $30,000 and can modify the plan.  That person did not

13    vote, hadn't objected to late claim.  So, again, that is

14    more of an academic for me, but --

15          THE COURT:  Because for the Gawker Media case, I

16    think the estimate in the liquidation analysis was 91 to 93

17    percent, so they weren't going to get interest in a

18    hypothetical Chapter 7 using that case.  And are there any

19    unsecured creditors in the group case?

20          MR. GALARDI:  Not other than the indemnification

21    claims, which again, if Your Honor approves the third-party

22    release, we don't believe there are claims.

23          THE COURT:  So it sounds like it's only in -- best

24    interest comes down -- putting aside equity for the moment,

25    best interest comes down to the question of paying interest

1    on this one Gawker Hungary claim.

2            MR. GALARDI:  And on the Gawker Hungary claim, the

3    claim we've put in the estimation that went through the

4    liquidation analysis, we put in $100,000 and the claim is

5    $35,000, and everything else has been paid in the ordinary

6    course and that's a disputed claim.

7            THE COURT:  Okay.  Does that solve the -- resolve

8    the best interests --

9            MR. ZIPES:  That resolves -- it's not going to be

10   an issue in this case obviously.

11           THE COURT:  Okay.

12           MR. GALARDI:  And I will put on the record,

13   because Mr. Zipes asked me and I said before there's 750

14   left behind in that Gawker Media reserve for the writers and

15   directors, that is a change to the plan, but it is a change

16   that benefits the writers and officers.  I think when they

17   came in here today they believed there would be no such

18   funds, but in light of the fact we couldn't settle that one

19   aspect and the potential, that actually is additional and it

20   doesn't harm any creditor.

21           THE COURT:  All right.  Does anyone else want to

22   be heard in connection with the application to confirm the

23   plans?

24           Hearing no response, I'll grant the application.

25   This turns out to be a hundred-percent case in which the

Page 86

1  real issue is between the creditors in equity.  At this

2  point the debtor has satisfied the elements of 1129(a).  The

3  plan is feasible; we've just had the discussion about the

4  best-interests test, so the debtor has satisfied that.

5  Everyone who voted voted in favor of the plan.  So in

6  economic terms, the plan is certainly an acceptable plan.

7          With respect to the settlements, I'm satisfied

8  that the settlements are -- certainly fall within the realm,

9  certainly fall within the lowest point of the range of

10  reasonableness, which is the standard in this circuit, which

11  is why I state it that way.  The principal claims or all of

12  the claims are, except for Bollea, unliquidated tort claims.

13  And I understand the debtor has defenses or thinks they have

14  defenses and I understand they're going to make motions to

15  dismiss, but if you make a motion to dismiss and lose any

16  one of these cases and go before a jury, you can have

17  another Bollea situation with a devastating judgment.

18          So the ability to settle the claims in the

19  amounts, assure 100-percent payment to the creditors, avoid

20  the litigation risks I just described, and avoid the costs

21  and delays of further litigation certainly makes all these

22  settlements reasonable.

23          With respect to this discharge issue, I'm prepared

24  to enjoin any -- from the debtor's point of view -- any

25  interference with property which is being distributed under

1     the plan.  For the reasons I've stated, I don't think that

2     the debtor -- I'm sure that the debtor is not entitled to a

3     discharge and no one -- if someone wants to sue a shell --

4     and I'm putting the writers aside for the moment, but if

5     somebody wants to sue a shell, they're entitled to under the

6     Bankruptcy Code.  The writers and -- I'll refer to the

7     writers; I know you refer to them as writers and independent

8     contractors, but I'll just use the phrase writers -- the

9     writers are in a slightly different position.  I'm not

10    prepared to say that the First Amendment requires the

11    release of non-debtor writers in a Chapter 11 case of this

12    kind.  If Congress thought that was appropriate, Congress

13    would include that in the Bankruptcy Code as it has included

14    non-debtor stays in the Bankruptcy Code, for instance, in

15    Chapter 13.

16              That said, I appreciate the First Amendment

17    issues, I appreciate the tradition and perhaps the legal

18    requirement that the publisher of articles has to stand

19    behind the writers.  The writers don't make a lot of money.

20    And the writers have agreed I guess as part of this deal to

21    surrender any indemnification claims, except with respect to

22    the Terrell claim because that's an opt-out claim.

23              I also note that no one has objected to the

24    releases.  This is a 100-percent plan or 100-percent plans.

25    And even the preferred shareholders, who are really the

Page 88

1    parties in interest, the Holcomb (ph) class, as is sometimes

2    said in these cases, is leaving $2 million on the table at

3    least as a guarantee to make sure that the claims are paid,

4    including any indemnification claim.

5              So under the circumstances, I will approve the

6    third-party releases.

7              I know that there's an appropriate carveout for

8    gross negligence and willful misconduct.  If I can make a

9    suggestion that the injunction in favor of the third parties

10   should just say to the extent the claims are released.  It

11   may be that people will come back in the future and seek

12   relief from that injunction or take their chance and just

13   bring a litigation against writers, arguing that you were

14   grossly negligent or you committed a willfully wrong act

15   when you did whatever it is you did.  But, you know, that's

16   something that we'll just have to allow the events play out,

17   there's nothing that could be done about that.

18             So I understand that you want to make payment

19   before the end of the year.  Given the amount of money

20   that's available, I don't have a problem with that -- oh,

21   one other thing.  9.04, your exculpation provision, you

22   should carrot in at the beginning to the extent permitted by

23   Section 1125(b) of the Bankruptcy Code.

24             Get me a confirmation order that I can review.

25             MR. GALARDI:  Thank you.  And --

1          THE COURT:  Shorter is better than longer.  And

2     with respect to objections, you can simply say that any

3     objections not resolved prior to the hearing or on the

4     record are overruled.

5          MR. GALARDI:  Thank you, Your Honor.  One other --

6     and I just -- I missed, but -- I know I listed the money,

7     but I want to make one other request, Your Honor, and I

8     apologize in rushing the proffer.

9          As by my count there would be Bollea, 31 million;

10    Terrell, 500,000; Ayudari (ph), 750; Williams, 125; Juan,

11    100.  We do have and the intercompany claim I said is I

12    think around $5 million.  The one other thing, and I

13    apologize for not raising it, there is a sales tax payment

14    that needs to be made of 500 for which individual directors

15    and other former directors have been noticed, we would like

16    to be able to make that $500,000 payment as well.

17         THE COURT:  Well, why can't you go effective

18    before the end of the year?

19         MR. GALARDI:  We are still in negotiations with

20    Unimoto (ph) regarding the allocation; we have not resolved

21    that entirely.  And we have the ability to waive it and

22    there are other reasons, Your Honor, but we may very well go

23    effective before the end of the year, when I get this order

24    in and we're going to make certain decisions.

25         THE COURT:  All right.

1        MR. GALARDI:  Okay?  So that way I just wanted to

2   let Your Honor be aware and I'm sure Mr. Holden is now happy

3   that I've mentioned that $500,000.

4        THE COURT:  Okay.

5        MR. GALARDI:  Thank you very much, Your Honor.

6        THE COURT:  So again the only claim left is the

7   Johnson/GotNews claim, at least at this point?

8        MR. GALARDI:  That's what I understand to be the

9   case, Your Honor.

10        THE COURT:  Okay.

11        MR. GALARDI:  Your Honor, now I just -- I think

12   everything else can move rather quickly.

13        The next matter on the agenda I believe is Matter

14   No. 5.  Since Your Honor will confirm the plan -- that was

15   the debtor's request to hire special counsel for the

16   independent director, Akin Gump, it's been adjourned a

17   number of times -- with confirmation of the plan, not to ask

18   Your Honor to approve the fees, but we believe that the Akin

19   Gump fees are about $80,000.  The Committee has withdrawn

20   its objection based on confirmation.  It will be up to Your

21   Honor, can we submit an order or would you like to have this

22   matter --

23        THE COURT:  This is the -- is this counsel for the

24   independent director?

25        MR. GALARDI:  Correct.

```
1              THE COURT:  Yeah, it's really a money issue -- I
2      mean duplication-of-services issue.
3              MR. GALARDI:  Correct.
4              THE COURT:  It's not -- there's nothing improper
5      about the independent director having separate counsel.  I
6      had the same concerns you have that you have Ropes & Gray
7      and independent counsel doing the same stuff for the same
8      clients, so -- but we'll deal with that at a fee
9      application.
10             MR. GALARDI:  So we'll submit -- counsel for Akin
11     Gump is here, we'll submit a C&L for the order, Your Honor,
12     and obviously the rights are reserved with respect to
13     duplication.
14             Your Honor, the next matter on the agenda was our
15     first omnibus objection to director, officer and employee
16     indemnification claims, they went to Hungary.  That matter
17     is now mooted by Your Honor's confirmation, confirming the
18     plan and approval of the releases.
19             THE COURT:  Right.
20             MR. GALARDI:  With respect to No. 7, it's the
21     motion to estimate that was carried from the December 1
22     hearing.  We will withdraw that motion; there is no longer
23     any need for that motion.
24             And with respect to Matter 8, which was the notice
25     of motion from Mr. Daulerio to estimate -- our motion to
```

1    estimate his claims, obviously we'll resolve that with the

2    $500,000.  So that matter is resolved and need not be

3    prosecuted.

4            I suspect, Your Honor, we have a hearing on

5    December 29th with respect to the underlying merits of

6    Mr. Daulerio's claim of 500, I'm expecting that we will

7    probably request an adjournment as we get the invoices.

8            THE COURT:  All right.

9            MR. GALARDI:  Your Honor, one, I'd like to thank

10   you for all of your time on this matter so far.  I'm sure we

11   will be back, but I do appreciate your efforts in moving

12   these cases forward in the six months.

13           THE COURT:  Oh, I thought he was going to object

14   to confirmation.

15       (Laughter)

16           THE COURT:  It's always the person who stands up

17   as they're about to leave.  All right, what did you forget?

18           MR. GALARDI:  Oh, Your Honor, one other thing, I

19   think -- and Counsel to Johnson is here and GotNews -- we do

20   have the status conference on Thursday --

21           THE COURT:  The 15th.

22           MR. GALARDI:  -- and should we move -- are we

23   having the Johnson status conference?

24           UNIDENTIFIED SPEAKER:  Well, it's scheduled as a

25   hearing right now.

1          MR. GALARDI:  It's scheduled as a hearing.  I

2     don't think it needs to be a hearing, I think we would

3     change it to a status conference on that matter, if that's

4     possible.

5          THE COURT:  That's fine.  Do you want to come in

6     on Thursday?

7          MR. GALARDI:  I think we could.  Does that work

8     for you?  Because you had --

9          THE COURT:  Because you had a lot of issues, as I

10    recall --

11         UNIDENTIFIED SPEAKER:  It's a status conference,

12    right?

13         MR. GALARDI:  Yeah, just a status conference.

14         UNIDENTIFIED SPEAKER:  If it's a status conference

15    now --

16         MR. GALARDI:  Just leave it as a status

17    conference?

18         UNIDENTIFIED SPEAKER:  Could I just take a look

19    and see?  Maybe we could do it on the 29th, that way you

20    don't have to come back up.

21         MR. GALARDI:  We'd all like to come back on the

22    29th.

23        (Pause)

24         THE COURT:  Why don't the two of you talk?

25        (Laughter)

1          MR. GALARDI:  Thank you, Your Honor.

2          THE COURT:  What else, anything else?

3          MR. GALARDI:  That's it, Your Honor.  Thank you

4    very much.

5          THE COURT:  Anything -- anybody want to remind Mr.

6    Galardi of anything that he forgot?

7       (Laughter)

8          THE COURT:  Thank you very much.  Good luck.

9       (A chorus of thank you)

10          THE COURT:  Thank you.

11       (Whereupon these proceedings were concluded at 12:24

12    PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           I N D E X

 2

 3                           RULINGS

 4                                                          PAGE

 5   Motion of proposed Amici Curiae Society of          9

 6   Professional Journalists, Reporters Committee for

 7   freedom of the press, and 19 other media organizations

 8   for leave to file memorandum of law as amici curiae

 9

10   Debtors' motion pursuant to Bankruptcy Code Sections    85

11   105, 502(e), and 1129 and Bankruptcy Rules 3018 and

12   3021 for approval of claims estimation and plan

13   reserve procedures

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 96

1                    C E R T I F I C A T I O N

2

3    I, Jamie Gallagher, Nicole Yawn, and Tracey Williams certify

4    that the foregoing transcript is a true and accurate record

5    of the proceedings.

6    Jamie                    Digitally signed by Jamie Gallagher
                              DN: cn=Jamie Gallagher, o=Veritext,
     Gallagher                ou, email=digital@veritext.com, c=US
7    _____ Date: 2016.12.14 15:44:57 -05'00' ____

8    Jamie Gallagher

9    Nicole                   Digitally signed by Nicole Yawn
                              DN: cn=Nicole Yawn, o=Veritext,
                              ou, email=digital@veritext.com,
     Yawn                     c=US
10   _____ Date: 2016.12.14 15:46:38 -05'00'

11   Nicole Yawn

12   Tracey Williams          Digitally signed by Tracey Williams
                              DN: cn=Tracey Williams, o=Veritext,
                              ou, email=digital@veritext.com, c=US
13   _____ Date: 2016.12.14 15:47:08 -05'00' ____

14   Tracey Williams

15   AAERT Certified Electronic Transcriber CET-914

16

17

18

19

20   Date:  December 14, 2016

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501