UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                              :

In re:                            :       Chapter 11
                                :

Gawker Media LLC, *et al.*[1]        :       Case No. 16-11700 (SMB)
                                :

                    Debtors.     :       Jointly Administered
                                :

------------------------------------------------------------X

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), having:[2]

    a.    filed, on November 8, 2016, the (i) *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 427, Exhibit A] (the "Disclosure Statement"), as approved by the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* [Docket No. 413] (the "Disclosure Statement Order");

    b.    filed, on November 2, 2016, the Liquidation Analysis attached as Exhibit C to the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 405];

    c.    caused distribution, on or before November 7, 2016 (the "Solicitation Date"), of the forms of ballots and notices (collectively, the "Solicitation Packages") and notice of the confirmation hearing and the deadline for objecting to confirmation of the Plan (in substantially the form attached as exhibit 2 to the Disclosure

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Each Debtor's mailing address is c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[2] Unless otherwise noted herein, capitalized terms not defined in these findings of fact, conclusions of law, and order (collectively, this "Confirmation Order") shall have the meanings ascribed to them in the Plan (as defined herein). The rules of interpretation set forth in Section 1.01 of the Plan shall apply to this Confirmation Order.

Statement Order, the "Confirmation Hearing Notice"), consistent with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and the solicitation procedures approved thereby (the "Solicitation Procedures"); (as defined herein), and as evidenced by, among others, the *Affidavit of Service of Solicitation Materials* [Docket No. 446] (the "Solicitation Affidavit") filed on November 14, 2016 by Prime Clerk LLC;

d.    caused, on November 10, 2016, notice of the confirmation hearing to be published in *USA Today* (National Edition) (in substantially the form attached as exhibit 3 of the Disclosure Statement Order, the "Publication Notice"), as evidenced by the *Affidavit of Publication* [Docket No. 440];

e.    filed and served, on November 30, 2016, the *Notice of Filing of Plan Supplement Pursuant to the Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 516] ("Plan Supplement"), as evidenced by the *Affidavit of Service* [Docket No. 553];

f.    filed and served, on December 6, 2016, the *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Joint Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 563] (the "Voting Report"), as evidenced by the *Affidavit of Service* [Docket No. 573];

g.    filed and served, on December 9, 2016, the *Debtors' (I) Memorandum of Law in Support of Confirmation of Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. and (II) Omnibus Reply to Objections Thereto* [Docket No. 574] (the "Confirmation Brief"), as evidenced by the *Affidavit of Service* [Docket No. 588];

h.    filed, on December 11, 2016, the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 576, Exhibit A] (as may be subsequently amended or modified, the "Plan"), and served the same as evidenced by the *Affidavit of Service* [Docket No. 587].

**NOW, THEREFORE**, the Court having considered the legal and factual bases set forth in the documents filed in support of Confirmation and all evidence proffered by counsel at the hearing held on confirmation of the Plan (the "Confirmation Hearing"); and after due deliberation thereon and good cause appearing therefor:

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

### A.    Findings of Fact and Conclusions of Law

1.    All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation are hereby incorporated into this Confirmation Order to the extent not inconsistent herewith. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Court at the Confirmation Hearing and incorporated herein) constitutes an order of this Court, it is adopted as such.

### B.    Jurisdiction and Venue (28 U.S.C. §§ 157(b)(2) and 1334(a))

2.    This Court has jurisdiction over the Bankruptcy Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b).

### C.    Modifications to the Plan

3.    Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since entry of the Disclosure Statement Order do not materially or adversely affect or change the treatment of Claims or Equity Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The disclosure of any Plan modifications prior to or on the record at the Confirmation Hearing constitutes due and sufficient notice of any and all such Plan

modifications. The Plan as modified and attached to this Order as **Exhibit 1** shall constitute the

Plan submitted for Confirmation.

### D.    Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))

4.    The Plan complies with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1129(a)(1) of the Bankruptcy Code. This specifically includes:

a.    Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.

b.    Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Article 2 of the Plan specifies that Classes 1B, 2B, 3B, and 3C are Unimpaired under the Plan.

c.    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  Article 2 of the Plan sets forth the treatment of Classes 1A, 1C, 1D, 1E(i), 1E(ii), 1F, 1G, 2A, 2C, 2D, 2E, 2F(i), 2F(ii), 2(G), 3A, and 3D(i), which are the Impaired Classes.

d.    No Discrimination (11 U.S.C. § 1123(a)(4)).  Article 2 of the Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class except to the extent that a holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest.

e.    Implementation of the Plan (11 U.S.C. § 1123(a)(5)).  The Plan, the various documents included in the Plan Supplement (including various settlement agreements), and other settlements presented on the record and set forth in this Order provide adequate and proper means for implementation of the Plan.

f.    Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).  The transactions contemplated by the Plan (the "Plan Transactions") contemplate the liquidation of each of the Debtors and do not provide for issuance of equity securities by any of the Debtors or for any voting rights for holders of Equity Interests.

g.    Designation of Directors, Officers, or Trustee (11 U.S.C. § 1123(a)(7)).  On and after the Effective Date, the Debtors will be managed by the Plan Administrator pursuant to the Plan Administrator Agreement. The initial Plan Administrator, Opportune LLP, was disclosed in the Plan Administrator Agreement filed as part of the Plan Supplement, which is consistent with the interests of creditors and equity holders and public policy.

h.    Additional Plan Provisions (11 U.S.C. § 1123(b)).  The additional provisions of the Plan listed below are appropriate and consistent with the applicable provisions of the Bankruptcy Code.

59969188_7

     (i)     <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>.  As more particularly set forth in Article 7 of the Plan, the Plan provides for the rejection of all of the Debtors' executory contracts and unexpired leases (excluding insurance policies and the Intercompany Services Agreements necessary to preserve the Gawker.com Assets) as of the Effective Date.

     (ii)     <u>Retention of Claims (11 U.S.C. § 1123(b)(3))</u>.  Sections 4.05, 4.06, and 4.08 of the Plan provides that, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date.

     (iii)     <u>Cure of Defaults (11 U.S.C. § 1123(d))</u>.  Any defaults under the Intercompany Services Agreement assumed under the Plan are deemed cured as part of the Intercompany Settlement.

**E.     <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>**

     5.     The Debtors have complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code.  The Plan, the Disclosure Statement, the Disclosure Statement Order, the ballots for voting on the Plan, the Confirmation Hearing Notice, the Plan Supplement, and the other materials distributed by the Debtors in connection with Confirmation of the Plan (collectively, the "<u>Confirmation Materials</u>") provided all parties in interest with due and proper notice of the Confirmation Hearing and the objection deadline to Confirmation. On December 6, 2016, Prime Clerk, LLC (the "<u>Voting and Distribution Agent</u>") filed the Voting Certification with the Court. Votes to accept or reject the Plan have been solicited and tabulated fairly, and in good faith. Based on the record before the Court in the Bankruptcy Cases, the Debtors and their respective members, directors, officers, employees, representatives, attorneys, financial advisors, investment bankers, agents, restructuring advisors, and other professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy

59969188_7

Rules for the Southern District of New York in connection with all of their respective activities relating to the solicitation of acceptances to the Plan, their participation in the Bankruptcy Cases, and the activities described in section 1125 of the Bankruptcy Code and therefore are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**F.    Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))**

6.    Any payment made or to be made by the Debtors or by a person acquiring property under the Plan, for services or for costs and expenses in connection with the Bankruptcy Cases, or in connection with the Plan and incident to the Bankruptcy Cases, has been approved by, or is subject to the approval of, the Court as reasonable.

**G.    Plan Administrator (11 U.S.C. § 1129(a)(5))**

7.    The Debtors disclosed the identity of the Plan Administrator in the Plan Administrator Agreement. The identity and nature of compensation of any insiders to be retained or employed by the Debtors were disclosed in the Plan Supplement or at the Confirmation Hearing, including the Debtors' continued employment of Thomas Plunkett.

**H.    Best Interests of Creditors (11 U.S.C. § 1129(a)(7))**

8.    Each holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. To the extent there are unsecured creditors holding Claims against Gawker Hungary, such creditors will be paid at the statutory or otherwise applicable interest rate on their Allowed Claims, unless they agree otherwise.

9.    In that regard, the liquidation analysis attached as <u>Exhibit C</u> to the Disclosure Statement (the "<u>Liquidation Analysis</u>") and the other evidence related thereto in support of the

Plan that was submitted or adduced at the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that holders of Allowed Claims in every Class will recover as much or more under the Plan on account of such Claim or Equity Interest, as of the Effective Date, than the amount such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the "best interest of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

### I.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))

10.     Classes 1B, 2B, 3B, and 3C are Unimpaired by the Plan pursuant to section 1124 of the Bankruptcy Code and, accordingly, holders of Claims or Equity Interests in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 1A, 1C, 1D, 1E(i), 1E(ii), 1F, 1G, 2A, 2C, 2D, 2E, 2F(i), 2F(ii), 2G, 3A, 3D(i), 3D(ii), 3E are Impaired by the Plan.  Classes 1A, 1C, 1D, 1E(ii), 1F, 2A, 2C, 2D, 2E, 2F(i), 2G, 3A, 3D(ii) and 3E have voted to accept the Plan, as established by the Voting Certification. Holders of Claims or Equity Interests in Classes 1E(i), 1G, 2F(ii), and 3D(i) will not receive or retain any property on account of their Claims or Equity Interests and, accordingly, such Claims and Equity Interests are Impaired and such holders are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### J.    Treatment of Administrative Claims and Priority Tax Claims (11 U.S.C. § 1129(a)(9))

11.     The treatment of Administrative Claims and Priority Tax Claims pursuant to Article 2 of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

7

**K.** **Acceptance By at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10))**

12.    Claims in Classes 1A, 1C, 1D, 1E(ii), 1F, 2A, 2C, 2D, 2E, 2F(i), 2(G), 3A, 3D(ii) and 3E are entitled to vote under the Plan.  Classes 1A, 1C, 1D, 1E(ii), 1F, 2A, 2C, 2D, 2E, 2F(i), 2G, 3A, 3D(ii) and 3E have voted to accept the Plan, as established by the Voting Certification. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code as to each Debtor.

**L.** **Feasibility (11 U.S.C. § 1129(a)(11))**

13.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code because it provides for the liquidation of any remaining assets of the Debtors.

**M.** **Payment of Fees (11 U.S.C. § 1129(a)(12))**

14.    Sections 2.05(a)(ii), 2.06(a)(ii), and 2.07(a)(ii) of the Plan provide that all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date (or as soon thereafter as is practical) and amounts due thereafter shall be paid by the applicable Debtor in accordance therewith.

**N.** **Confirmation of Plan Over Non-Acceptance of Impaired Classes (11 U.S.C. § 1129(b))**

15.    No voting class rejected the Plan, and therefore section 1129(b) of the Bankruptcy Code does not apply. The Plan does not "discriminate unfairly" against any holders of Equity Interests in Class 1G deemed to reject the Plan. All similarly situated classes of holders of Class 1G will receive substantially similar treatment to any voting class. The Plan is also "fair and equitable" with respect to Class 1G. No holder of Claims or Equity Interests junior to Class 1G is receiving a distribution under the Plan. The Plan therefore satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that there is an Impaired Class that is deemed to reject the Plan.

## O.    Principal Purpose of the Plan (11 U.S.C. § 1129(d))

16.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

## P.    Plan Proposed in Good Faith

17.    The Debtors have proposed the Plan (including all other documents filed in connection with the Plan, or executed or to be executed in connection with the Plan Transactions and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications (collectively, the "Plan Documents") in good faith and not by any means forbidden by the law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Bankruptcy Cases, the docket in the Bankruptcy Cases and the proceedings therein and considered the testimony and other evidence adduced or provided regarding the formulation of the Plan, the facts and record of the Bankruptcy Cases, the Disclosure Statement, and the record of the Confirmation Hearing. The Plan was proposed with the purpose of maximizing the value of the Debtors' estates and to effectuate a liquidation of the Debtors. The Plan was the product of negotiations conducted at arm's length among the Debtors, the Committee, certain of their creditors, including former employees and independent contractors and significant equity holders.

## Q.    Vesting of Assets

18.    Except as otherwise provided in the Plan, upon the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all property of the estate of each Debtor not otherwise distributed or released on the Effective Date shall vest in that Debtor. The Debtors are

9

specifically authorized to sell the Gawker.com Assets pursuant to section 4.11 of the Plan without further approval of this Court.

**R.     Compromise, Settlement, Release, Exculpation, and Injunction Provisions**

19.     The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the compromises, settlements, releases, exculpations, and injunctions set forth in Article 4 and Article 9 of the Plan.  Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions and approval of the releases, exculpations, and injunctions set forth in Article 9 of the Plan.

**S.     Debtor Releases**

20.     The releases by the Debtors described in section 9.03 of the Plan (the "Debtor Releases") are an integral and necessary part of the Plan and represent a valid exercise of the Debtors' business judgment. The Debtor Releases are in the best interests of the Debtors, the Debtors' estates, and all holders of Claims and Equity Interests.

**T.     Third-Party Releases**

21.     The Court has jurisdiction to consider the third-party releases described in section 9.05 of the Plan (the "Third-Party Releases"). The Claims and Causes of Action covered by the Third-Party Releases are based on conduct for which a Debtor might be liable for Debtor Indemnification Obligations. Employees and Independent Contractors have filed Claims against the Debtors for Debtor Indemnification Obligations for potential and threatened litigation.

22.     The Third Party Releases are given and made after due notice and opportunity for hearing. The Third Party Releases were conspicuously set off in bold font in the Disclosure Statement, the Plan, the Confirmation Hearing Notice, and the Publication Notice.

23.     The Third-Party Releases are necessary based on the unique circumstances here, are an integral and necessary part of the Plan, and represent a valid exercise of the Debtors'

59969188_7

business judgment. As the Court found on the record at the Confirmation Hearing, the Third-Party Releases are in the best interests of the Debtors, the Debtors' estates and all holders of Claims and Equity Interests. Additionally, the Third-Party Releases are fair, equitable, and reasonable. The Third-Party Releases are narrowly tailored.

24.     The Third-Party Releases are given in exchange for good and valuable consideration provided by the Released Employees and Independent Contractors. The Released Employees and Independent Contractors have voted in favor of the Plan and are waiving and releasing all claims against the Debtors for Debtor Indemnification Obligations, unless otherwise agreed to by the Debtors or their insurance carriers. Each holder of a Claim or Equity Interest that has received or is deemed to have received distributions made under the Plan in turn benefits from an immediate distribution. Absent the Third-Party Releases in favor of the Released Employees and Independent Contractors, the Debtors might have been required to set aside additional reserves in respect of Debtor Indemnification Obligations, the Plan Settlements may not have been agreed to, and are therefore important to the Plan. Furthermore, the Debtors would be subject to substantial Claims for Debtor Indemnification Obligations in respect of claims or causes of action brought against the Released Employees and Independent Contractors.

## U.     Exculpation

25.     The Debtors formulated the Plan after negotiating with the Committee in good faith. The negotiations surrounding the Plan could not have occurred without the protection from liability that the exculpation provision in section 9.04 (the "Exculpation") provides. The Exculpation protects the Debtor's estates from the possibility of incurring Debtor Indemnification Obligations in respect of the actions covered by the Exculpation. The Exculpation is integral and essential to the Plan. The Exculpation is appropriately tailored to protect the Debtors and the Committee, and certain specified advisors and affiliates (the

11

"Exculpated Parties"), for the actions described in the Exculpation. The Exculpation was conspicuously set off in bold font in the Disclosure Statement, the Plan, the Confirmation Hearing Notice, and the Publication Notice.

26.    Negotiation and compromise among the Exculpated Parties was important to the formulation of the consensual Plan. The Exculpation is beneficial to the Debtors' estates, as the Debtors would otherwise have contingent indemnification obligations to certain of the Exculpated Parties that are the Debtors' directors or employees. The Exculpation is appropriately tailored and includes a carve-out for gross negligence and willful misconduct.

## V.    Injunctions

27.    The injunction provisions set forth in sections 9.01 (the "Claims Injunction") and 9.02 of the Plan (the "Plan Interference Injunction," and together with the Claims Injunction, the "Injunction Provisions") (a) are an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (b) are an integral element of the transactions incorporated into the Plan; (c) confer material benefits on, and are in the best interests of, the Debtors, the Debtor's estates, and their creditors; and (d) are important to the overall objectives of the Plan. The Claims Injunction is necessary to preserve the authority of the Debtors and the Plan Administrator to pursue retained claims under the Plan. The Plan Interference Injunction is necessary to preserve and enforce the terms of the Plan. The Injunction Provisions are a key component of the efficient liquidation of the Debtors' estates and prevent the potential for collateral attack of the Plan's terms.

28.    The Injunction Provisions were conspicuously set off in bold font in the Disclosure Statement, the Plan, the Confirmation Hearing Notice, and the Publication Notice.

29.    The Injunction Provisions are narrowly tailored to achieve their purpose. The Claims Injunction is limited to any Claim, debt, right, or Cause of Action for which a Debtor

retains sole and exclusive authority to pursue in accordance with Article 4 of the Plan. The Plan Interference Injunction (a) is limited to conduct arising before the Effective Date and (b) may be lifted after a party obtains relief from the Bankruptcy Court.

## W.    **The Plan Settlements**

30.    The Plan Settlements (a) are an integral element of the transactions incorporated into the Plan; (b) confer material benefits on, and are in the best interests of, the Debtors, the Debtors' estates, and the holders of Claims and Equity Interests by allowing a distribution to all Allowed Claims and Equity Interests pursuant to the terms of the Plan; (c) confer substantial cost savings and tax savings for the Debtors and the Debtors' estates by allowing for the substantial consummation of the Plan in 2016; (d) are important to the overall objectives of the Plan to finally resolve all Claims or Causes of Action settled by the Plan Settlements among or against the parties in interest in the Bankruptcy Cases with respect to the Debtors; and (e) are consistent with, and satisfy the requirements of, sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, Bankruptcy Rule 9019, and other applicable law.

### i.    *Second Lien Make-Whole Claims Settlement*

31.    The settlement between the Debtors and the Second Lien Lender set forth in section 4.01(a) of the Plan (the "Second Lien Make-Whole Claims Settlement") settles any outstanding claims that the Second Lien Lender may assert arising from or in connection with, the Second Lien Make Whole Provision (the "Second Lien Make Whole Claim").

32.    The Second Lien Make-Whole Claims Settlement is in the best interests of the Debtors' estates and the holders of Claims and Equity Interests. The Second Lien Make-Whole Claims Settlement is fair, equitable and falls above the lowest point in the range of reasonableness. Absent the Second Lien Make-Whole Claims Settlement, the Debtors would at least litigate whether the Second Lien Lender is entitled to payment on the Second Lien Make

Whole Claim. The Debtors' probability of success in respect of the Second Lien Make Whole Claim is uncertain.

33.    The Second Lien Make-Whole Claims Settlement is a product of arms-length, good faith negotiations between the Second Lien Lender and the Debtors, each of whom were represented by skilled and experienced professionals. The Debtors' independent director reviewed and approved the Second Lien Make-Whole Claims Settlement. The Committee supports the Second Lien Make-Whole Claims Settlement. No party has opposed the Second Lien Make-Whole Claims Settlement.

### ii.    *Intercompany Settlement*

34.    The settlement among the Debtors set forth in section 4.01(b) of the Plan (the "Intercompany Settlement") settles the claims or Causes of Action that any Debtor may assert against any other Debtor.

35.    The Plan resolves the Intercompany Claims among the Debtors by (a) allocating 60% of the Unimoda Purchase Price to Gawker Media and 40% to Gawker Hungary; (b) providing that GMGI will make the $2 million GMGI Plan Guaranty in satisfaction of Gawker Media's Intercompany Claims against GMGI, which reserve will be used to satisfy holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damages; (c) providing that GMGI will transfer 45% of Gawker Media Contingent Proceeds to the Gawker Media Contingent Proceeds Creditor Account, which will be used to satisfy holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damages Claims; and (d) providing that Gawker Media will make a distribution to Gawker Hungary in partial satisfaction of Gawker Hungary's Intercompany Claims against GMGI, with an additional distribution to satisfy the Gawker Media Gawker Hungary Intercompany Claims of any Cash remaining at Gawker Media after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims

14

have been satisfied pursuant to Section 3.02(c) and 3.02(d) of the Plan. Gawker Media will receive no distributions in respect of its Claims against Gawker Hungary. Each of the Debtors additionally agrees to the terms of the Plan Settlements and the establishment of the Plan Reserve Accounts.

36.    The Intercompany Settlement is in the best interests of the Debtors, the Debtors' estates and the holders of Claims and Equity Interests. The Intercompany Settlement is fair, equitable and falls above the lowest point in the range of reasonableness. Absent the Intercompany Settlement, the Debtors would be required to litigate intercompany disputes which would involve several contested questions of law and fact that would require prolonged analysis, discovery, and litigation proceedings. The outcome of such litigation would be uncertain and the cost of litigation substantial. Continued litigation over the Intercompany Claims would delay Confirmation of a Plan and distribution to the Debtors' creditors and equity holders. The Debtors' independent director reviewed and approved the Intercompany Settlement. The Committee supports the Intercompany Settlement. No party has opposed the Intercompany Settlement.

### iii.    *Bollea Claims Settlement*

37.    The settlement between the Debtors and Bollea set forth in section 4.01(c) of the Plan and in the settlement agreement attached as Exhibit C of the Plan Supplement (the "Bollea Claims Settlement") settles the Bollea Claims.

38.    The Bollea Claims Settlement is in the best interests of the Debtors, the Debtors' estates and the holders of Claims and Equity Interests. The Bollea Claims Settlement is fair, equitable and falls above the lowest point in the range of reasonableness. Absent the Bollea Claims Settlement, the Debtors will expend substantial litigation expenses (a) pursuing the appeal of the trial court judgment that Bollea obtained against Gawker Media in the Bollea I

Lawsuit for $115 million in compensatory damages (the "Bollea Compensatory Judgment") and

$15 million in punitive damages (the "Bollea Punitive Damages Judgment"), as well as a $10

million punitive damages judgment against Nicholas Denton and a $100,000 punitive damages

judgment against Albert Daulerio; and (b) defending the Bollea II Lawsuit. The Debtors'

probability of success in respect of the Bollea Claims is uncertain. The Debtors have estimated

that the cost of appealing the Bollea I Lawsuit and defending the Bollea II Lawsuit could be in

the millions of dollars. Continued litigation over the Bollea Claims would delay confirmation of

a plan and distribution to the Debtors' creditors and equity holders. If the Bollea Compensatory

Judgment and the Bollea Punitive Damage Judgment were ultimately allowed at their full

amount, it would eliminate all non-contingent distributions to holders of Allowed Gawker Media

General Unsecured Claims. The Bollea Claims Settlement permits holders of Allowed Gawker

Media General Unsecured Claims to receive a distribution on their Claims.

39.    The Bollea Claims Settlement is a product of arms-length, good faith negotiations

between Bollea and the Debtors, each of whom were represented by skilled and experienced

professionals. The Debtors' independent director reviewed and approved the Bollea Claims

Settlement. The Committee supports the Bollea Claims Settlement.

### iv.    *Terrill Claims Settlement*

40.    The settlement between the Debtors and Terrill set forth in section 4.01(d) of the

Plan and in the settlement agreement attached as exhibit E of the Plan Supplement (the "Terrill

Claims Settlement") settles the Terrill Claims, including but not limited to the lawsuit brought by

Terrill captioned *Ashley Terrill v. Gawker Media LLC, et al.*, No. 16-CV-00411 (S.D.N.Y.)

which asserts damages of at least $10 million (the "Terrill Lawsuit").

41.    The Terrill Claims Settlement is in the best interests of the Debtors, the Debtors'

estates and the holders of Claims and Equity Interests. The Terrill Claims Settlement is fair,

equitable and falls above the lowest point in the range of reasonableness. Absent the settlement of the Terrill Claims, the Debtors will expend substantial litigation expenses defending the Terrill Lawsuit. The Debtors' probability of success in respect of the Terrill Claims and the Terrill Lawsuit is uncertain. Furthermore, continued litigation over the Terrill Claims would at the very least delay distribution to the Debtors' stakeholders.

42.    The Terrill Claims Settlement is a product of arms-length, good faith negotiations between Terrill and the Debtors, each of whom were represented by skilled and experienced professionals. The Debtors' independent director reviewed and approved the Terrill Claims Settlement. The Committee supports the Terrill Claims Settlement.

v.    *Ayyadurai Claims Settlement*

43.    The settlement between the Debtors and Ayyadurai set forth in section 4.01(d) of the Plan and in the settlement agreement attached as Exhibit D of the Plan Supplement (the "Ayyadurari Claims Settlement") settles the Ayyadurai Claims, including but not limited to the lawsuit brought by Ayyadurai captioned *Ayyadurai v. Gawker Media LLC, et al.*, No. 16-CV-10853 (D. Mass.), which asserts damages of at least $35 million (the "Ayyadurai Lawsuit").

44.    The Ayyadurai Claims Settlement is in the best interests of the Debtors, the Debtors' estates and the holders of Claims and Equity Interests. The Ayyadurai Claims Settlement is fair, equitable and falls above the lowest point in the range of reasonableness. Absent the settlement of the Ayyadurai Claims, the Debtors could expend substantial litigation expenses defending the Ayyadurai Lawsuit. The Debtors' probability of success in respect of the Ayyadurai Claims and the Ayyadurai Lawsuit is uncertain. Furthermore, continued litigation over the Ayyadurai Claims would at the very least delay distribution to the Debtors' stakeholders.

59969188_7

45.     The Ayyadurai Claims Settlement is a product of arms-length, good faith negotiations between Ayyadurai and the Debtors, each of whom were represented by skilled and experienced professionals. The Debtors' independent director reviewed and approved the Ayyadurai Claims Settlement. The Committee supports the Ayyadurai Claims Settlement.

### X.    Retention of Jurisdiction.

46.     Except as otherwise provided in any of the Plan Documents, the Court shall retain jurisdiction over the Bankruptcy Cases and all matters arising out of, or related to, the Bankruptcy Cases and the Plan, including the Retained Causes of Action.

### Y.    Waiver of Stay

47.     Given the facts and circumstances of these cases, it is appropriate that the 14-day stay imposed by Bankruptcy Rules 3020(e) be waived.  In that regard, the Court finds that it is in the best interests of the Debtors and their estates that the Debtors be permitted to make distributions prior to the Effective Date of the Plan in connection with the Plan Settlements with creditors Bollea, Terrill, Ayyadurai, Williams and Huon, the holders of Allowed GMGI General Unsecured Convenience Claims and Gawker Media General Unsecured Convenience Claims and such other Claims described on the record of the Confirmation Hearing prior to December 31, 2016, even if the conditions to the Effective Date of the Plan have not been satisfied or waived by the Debtors prior to December 31, 2016.

**BASED ON THE FORGOING, IT IS HEREBY ORDERED THAT:**

### A.    Confirmation

48.     The Plan is confirmed, ~~The terms of the Plan Documents are incorporated by reference into, and are an integral part of, the Plan and this Confirmation Order and are authorized and approved,~~ and the Debtors are authorized to implement their provisions and

consummate the Plan without any further authorization except as expressly required by the Plan or this Confirmation Order.**[SMB: 12/22/16]**

49.    ~~The failure to specifically describe or include any particular provision of the Plan or the Plan Documents in this Confirmation Order shall not diminish or impair the effectiveness of such provision, and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan and the Plan Documents.~~**[SMB: 12/22/16]**

50.    All changes, amendments, alterations and modifications to the Plan made after entry of the Disclosure Statement Order are hereby approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to accept the Plan, as altered, amended or modified subsequent to the entry of the Disclosure Statement Order. Each of the Debtors is deemed to have voted to accept the Plan pursuant to the Solicitation Procedures.

### B.    <u>Plan Implementation</u>

51.    <u>Filing and Recording</u>.  This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities. ~~including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.~~ Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation

Order without payment of any stamp tax or similar tax imposed by state or local law.**[SMB: 12/22/16]**

52.    <u>Treatment of Executory Contracts and Unexpired Leases</u>.    Rejection of the Executory Contracts and Unexpired Leases pursuant to section 7.01 of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code is hereby approved. Any executory contract or unexpired lease (excluding insurance policies and the Intercompany Services Agreements necessary to preserve the Gawker.com Assets) that (i) has not expired by its own terms on or prior to the Confirmation Date, or (ii) has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date shall be deemed rejected on the Effective Date.

53.    Pursuant to section 7.02 of the Plan, Claims created by the rejection of executory contracts and unexpired leases pursuant to Section 7.01 of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Plan Administrator no later than sixty (60) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to section 7.01 of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Debtors' estates and their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article 5 of the Plan.

54.   <u>Plan Administrator</u>.   The Plan Administrator is Opportune LLP, whose appointment is hereby approved. Any successor Plan Administrator shall be determined in accordance with the Plan Administrator Agreement.

55.   <u>Exemption from Transfer Taxes</u>.   Pursuant to section 1146(c) of the Bankruptcy Code, none of (a) the issuance, transfer or exchange of any security under, in furtherance of, or in connection with, the Plan, (b) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan, or (c) the disposition and/or encumbrance of assets in connection with any transactions contemplated hereunder, shall be subject to any stamp, ~~real estate transfer, mortgage recording sales, use,~~ or other similar tax.**[SMB: 12/22/16]**

**C.    <u>Compromise and Settlement of Claims, Equity Interests, and Controversies</u>**

56.   Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims (including the Claims settled by the Plan Settlements), Equity Interests, controversies, or issues relating to the contractual, legal, and subordination rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest, as reflected in the Plan Settlements.

57.   In accordance with the provisions of the Plan and subject to section 4.06 of the Plan, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, without any further notice to or action, order, or approval of the Bankruptcy Code, after the Effective

Date, the Debtors, acting through the Plan Administrator, may compromise and settle Claims against the Debtors and their estates and Causes of Action against any person or entity.

### D.    Debtor Releases

58.    The release provisions as set forth in sections 9.03 of the Plan are approved in their entirety pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and shall be immediately effective as of the Effective Date and binding on all persons to the extent set forth therein.

### E.    Third-Party Releases

59.    The release provisions as set forth in sections 9.05 of the Plan are approved in their entirety pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and shall be immediately effective as of the Effective Date and binding on all persons to the extent set forth therein.

### F.    Exculpation

60.    To the extent permitted by section 1125(e) of the Bankruptcy Code, the exculpation provision set forth in section 9.04 of the Plan is hereby approved in its entirety pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and shall be immediately effective as of the Effective Date and binding on the Debtors, the holders of all Claims and Equity Interests, and any other person or entity identified in the Plan, and their respective successors and assigns.

### G.    Injunction

61.    The injunction provisions set forth in sections 9.01 and 9.02 of the Plan are hereby approved in their entirety pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and shall be immediately effective as of the Effective Date and binding on all persons to the extent set forth therein.

H.    **Certain Government Matters**

62.    As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in the Plan or Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors are entitled to under the Bankruptcy Code, if any. The discharge, release and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action.

63.    Accordingly, notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (a) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any Claim of the United States arising after the Effective Date; (c) any valid right of setoff or recoupment of the United States against any of the Debtors; or (d) any liability of the Debtors under police or regulatory statutes or regulations to any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Effective Date. Nor shall anything in this Confirmation Order or the Plan: (i) enjoin or otherwise bar the United States or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by the United States or any Governmental Unit are discharged or otherwise barred by this Confirmation Order, the Plan, or the Bankruptcy Code.

64.    Moreover, nothing in the Confirmation Order or the Plan shall release or exculpate any non-debtor, including any Released Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the

23

environmental laws, or the criminal laws against the Released Parties, nor shall anything in this Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceeding against the Released Parties for any liability whatsoever; provided, however, that the foregoing sentence shall not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

## I.    Payment of Insurance Proceeds

65.    Every insurer that is party to an insurance policy with a Debtor is authorized to make distributions out of any such insurance policy or proceeds of such policy directly to the insured Debtor pursuant to the terms of the insurance policy, whether to reimburse the insured Debtor's estate, exhaust and/or settle coverage under the insurance policy, and/or retire the insurance policy.

## J.    Professional Compensation and Reimbursement Claims

66.    All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Committee prior to the Effective Date must be filed with the Bankruptcy Court and served on the Plan Administrator, Debtors, the Committee, their respective counsel, and the United States Trustee, no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Plan Administrator, the United States Trustee, and the requesting party no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

**K.**    **Inconsistency**

67.    In the event of any inconsistency between the Plan (including the Plan Supplement) and this Confirmation Order, the Plan shall govern. To the extent any provisions of any final Plan Supplement document may conflict or is inconsistent with any provision in the Plan, the terms of the final Plan Supplement document shall govern and be binding and exclusive.

**L.**    ~~**Substantial Consummation**~~

68.    ~~On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.~~**[SMB: 12/22/16]**

**M.**    **Severability**

69.    Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may not be deleted or modified; and (c) nonseverable and mutually dependent.

**N.**    **Administrative Claims Bar Date**

70.    Except as otherwise provided in the Plan, requests for payment of Administrative Claims (other than Professional Fee Claims) not required to be have been filed by a prior Administrative Claim Bar Date, must be filed and served on the Debtors and Plan Administrator within sixty (60) days of the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the

59969188_7

applicable Debtor and the requesting party no later than the Administrative Claims Objection Deadline, which is the date that is one-hundred-twenty (120) days after the Effective Date.

## O.    Dissolution of the Committee

71.    On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases.

## P.    Conditions to Effective Date

72.    The Plan shall not become effective unless and until the conditions set forth in section 6.02 of the Plan have been satisfied or waived pursuant to section 6.03 of the Plan.

73.    Notwithstanding anything to the contrary in the Plan or any other Plan Document, in light of the resolutions reached with creditors and other constituencies, the Debtors are authorized, but not directed, to make distributions in respect of the Second Lien Lender Expenses, the Bollea Claims Settlement, the Terrill Claims Settlement, the Ayyadurai Claims Settlement, the Allowed Gawker Media General Unsecured Convenience Claims and such other payments and distributions described on the record of the Confirmation Hearing Date prior to the Effective Date of the Plan to obtain tax, administrative and other benefits for their respective estates and stakeholders, including but not limited to payment of  sales and use taxes due to the New York Department of Taxation and Finance that accrued prior to the Petition Date but became due and payable during the pendency of the Bankruptcy Cases, in an amount not to exceed $600,000.

## Q.    Bankruptcy Rule 3020(e)

74.    The 14-day stay of this Confirmation Order set forth in Bankruptcy Rule 3020(e) is waived.

59969188_7

R.    **Resolution of Confirmation Objections**

i.    *Publicis Confirmation Objection Resolution*

75.    In resolution of the *Limited Objection of Publicis Media Agencies' to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Docket No. 544], notwithstanding anything to the contrary in the Plan, the setoff and recoupment rights of Starcom Worldwide, Inc. and its affiliated agencies in the media advertising and related business, if any, related to proof of claim nos. 307, 309, and 310 filed in the Bankruptcy Cases, are not extinguished by virtue of the Plan or this Confirmation Order.

ii.    *Williams Claims Settlement*

76.    In resolution of the Mitch Williams's Plan confirmation objection [Docket No. 545], the Debtors' objections to proofs of claim filed by Williams [Docket No. 391] (the "Williams Claim Objection"),Williams's motion to lift the automatic stay [Docket No. 444] (the "Williams Lift Stay Motion"), and in full in full and complete satisfaction, release, and discharge of, and in exchange for, any Claims filed by Williams, including proof of claim no. 6 (the "Williams Claims") (the "Williams Claim Settlement"), Williams is deemed to have an Allowed Gawker Media General Unsecured Convenience Class claim in the amount of $25,000. The Debtors are authorized to make an additional payment to Williams for $100,000 (the "Insurance Proceeds Payment") on or as soon as reasonably practicable after the Effective Date. The Debtors' insurer is authorized to reimburse the Debtors for the Insurance Proceeds Payment pursuant to the terms of the insurance policy and any other agreement with the Debtors. Upon the Debtors' payment of the $125,000, Williams shall be deemed to have withdrawn with prejudice the Williams Lift Stay Motion and shall **be** enjoined from taking any appeal from the pre-petition dismissal and summary judgment of the New Jersey lawsuit referenced in the

27

Williams Claim Objection (the "New Jersey Lawsuit") or taking any other action with respect to the Debtors or any of the Debtors' Employee and Independent Contractors related to the New Jersey Lawsuit.

77.    The Williams Claim Settlement is in the best interests of the Debtors, the Debtors' estates and the holders of Claims and Equity Interests. The Williams Claim Settlement is fair, equitable and falls above the lowest point in the range of reasonableness.

78.    The Williams Claim Settlement is a product of arms-length, good faith negotiations between Williams and Gawker Media, both of whom were represented by skilled and experienced professionals. Gawker Media's independent director reviewed and approved the Williams Claim Settlement. The Committee supports the Williams Claim Settlement. All parties in interest have been provided with adequate notice of the Williams Claim Settlement pursuant to Bankruptcy Rule 6004.

### iii.    *Daulerio Confirmation Objection Resolution*

79.    In resolution of (i) Albert James Daulerio's Plan confirmation [Docket No. 543]and (ii) the Debtors' estimation motion in respect of Mr. Daulerio's Claims [Docket No. 495], the Debtors are authorized to establish and fund a reserve of $500,000 with respect to the three proofs of claim (Nos. 293, 294, 295) filed by Daulerio against the Debtors. The Debtors and Daulerio reserve their rights in respect of the their objections to the Daulerio Claims [Docket No. 493], but in no event will payment on Mr. Daulerio's Claims exceed $500,000.

80.    For the avoidance of doubt, Daulerio is a Released Party and a Released Employee and Independent Contractor, as such terms are defined in the Plan, with respect to any actions other than the Bollea I Lawsuit.

### iv.    *Huon Confirmation Objection Resolution*

81.    The objections set forth in Meanith Huon's Plan confirmation objection*Objections to Confirmation of Amended Joint Chapter 11 Plan of Liquidation of Debtors, Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. [Dkt. 427] & Huon's Objections to Debtors' Motion for Approval of Claims Estimation and Plan Reserve Procedures [Docket No. 444]* [Docket No. 575] are resolved pursuant to the statements set forth on the record at the Confirmation Hearing and will be subject to a separate order.

### v.    *Got News and Johnson Confirmation Objection Resolution*

82.    In resolution of the (i) Got News LLC and Charles C. Johnson's (together, GN/Johnson) Plan confirmation objection [Docket No. 540] and (ii) GN/Johnson's objection to the Debtors' claim estimation motion [Docket No. 486], Gawker Media is authorized and directed (upon the Effective Date) to establish and fund a single reserve of $1,500,000 (the "GN/Johnson Claims Reserve") with respect to proof of claim no. 223 filed by Charles C. Johnson ("Johnson") in the Bankruptcy Cases (the "Johnson Claim") and proof of claim no. 298 filed by Got News LLC ("Got News") in the Gawker Media chapter 11 case (the "Got News Claim"). The GN/Johnson Claims Reserve shall be used solely to make distributions to satisfy the Johnson Claim and the Got News Claim to the extent that any such Claims become Allowed Claims and shall not be used for any other purpose pending the entry of an order with respect to the allowance or disallowance of the Johnson Claim and Got News Claim. In no event shall Johnson or Got News collectively recover in excess of $1,500,000 in respect of the Johnson Claim, the Got News Claim, any other Claim by GN/Johnson, and the articles (including comments thereto) referenced in any Johnson Claim or Got News Claim (collectively, the "Articles").

83.    Johnson and Got News shall not amend (a) the Johnson Claim or the Got News Claim or (b) any lawsuit regarding the Articles in order to add additional defendants.

84.    Johnson and Got News release unconditionally and are hereby deemed to release unconditionally each of GMGI, Gawker Hungary, Joseph Keenan Trotter, and Gregory Howard from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the date hereof (the "GN/Johnson Release").

85.    Without limiting the generality of the foregoing, each of Johnson and Got News acknowledges that there is a possibility that, subsequent to the date of entry of this Confirmation Order, it or he will discover facts, or incur or suffer claims or causes of action, which were unknown or unsuspected on the date of this Confirmation Order, and which if known by it or he at that time may have materially affected the decision to provide the GN/Johnson Release. Each of Johnson and Got News, on behalf of itself and himself, further acknowledges and agrees that by reason of this Confirmation Order, and the GN/Johnson Release contained herein, it and he are assuming any risk of such unknown or unsuspected facts and such unknown or unsuspected Claims. Johnson and Got News have been advised of the existence of Section 1542 of the California Civil Code which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

30

Notwithstanding such provisions, the GN/Johnson Release contained herein shall constitute a full

waiver and release in accordance with its terms and each of Johnson and Got News, expressly

waives and relinquishes the provisions, rights, and benefits of any statute or principle of public

policy or common law of the United States, or of any state thereof (including Section 1542 of the

California Civil Code), which either narrowly construes releases purporting by their terms to

release such unknown or unsuspected claims or causes of action in whole or in part, or restricts

or prohibits the releasing of such claims or causes of action.

86.    Gawker Media agrees that the GN/Johnson Release shall not reduce the liability,

if any, or amount of damages, if any, in respect of the Johnson Claim or the Got News Claim.

None of the Debtors, Johnson or Got News admits any liability in respect of the Johnson Claim,

the Got News Claim, or the Articles or that it had no claim against any the parties subject to the

GN/Johnson Release.

87.    Proof of claims Nos. 54 and 246 filed by Johnson in these Bankruptcy Cases and

proof of claim nos. 53 and 202 filed by Got News in these Bankruptcy Cases (collectively, the

"GN/Johnson Released Proofs of Claim") are disallowed in their entirety. None of the Debtors

shall use the disallowance of such claims as against GMGI and Gawker Hungary as evidence of

"Anti-SLAPP" liability of Johnson or Got News.  Prime Clerk LLC is authorized and directed to

expunge the GN/Johnson Released Proofs of Claim.

88.    The Debtors, Johnson, and Got News each reserves all of its rights in respect of

the (i) Johnson Claim; (ii) Got News Claim; and (iii) the Debtors' objections to the Johnson

Claims and the Got News Claims [Docket Nos. 396-97].

### vi.    *XP Vehicles Objections to Confirmation and Estimation Motions*

89.    The Debtors have filed two declarations attaching communications they received

from so-called XP Vehicles and/or XP Vehicles Group, and those declarations indicate that all of

the communications were sent to the Debtors after the deadline for objections to confirmation of the Plan. [Dkt Nos. 570, 591]. Some of these emails may have also been sent to the Court, although not yet docketed. The Debtors have requested that the Court treat the emails attached to those declarations as filings in connection with confirmation. The Court hereby treats Exhibit C to Docket No. 570 as an objection to the Estimation Motion. The Estimation Motion is being withdrawn, and therefore this objection is moot. The Court hereby treats Exhibits A, B and D to Docket No. 570, and Exhibit A to Docket No. 591, as objections to confirmation. The Court has disallowed all filed proofs of claim of XP Vehicles [Dkt No. 529], and that order is not stayed. Therefore these confirmation objections are overruled as XP Vehicles is not a creditor and has no standing; in the alternative, they are denied as late-filed and/or late-served. The Court hereby treats Exhibit B to Docket No. 591 as a motion for discovery in connection with confirmation, and that motion is denied because XP Vehicles has no allowable claims and therefore no standing, and its confirmation objections have been overruled.

90.     **Notwithstanding anything to the contrary in this order the Plan or any Plan Supplement, nothing in the Schedule of Retained Causes of Action (ECF Doc #516, at pp. 13-14 of 66) shall preclude and party from asserting any available defense to any retained cause of action asserted by or on behalf of the Debtors. [SMB: 12/22/16]**

New York, New York
Dated: <u>December 22nd</u>, 2016

> /s/ STUART M. BERNSTEIN
> THE HONORABLE STUART M. BERNSTEIN
> UNITED STATES BANKRUPTCY JUDGE

59969188_7

**<u>EXHIBIT 1</u>**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                              :

In re                            :        Chapter 11
                              :

Gawker Media LLC, *et al.*,[3]      :        Case No. 16-11700 (SMB)
                              :

           Debtors.        :        (Jointly Administered)
                              :
_____x

## AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GAWKER MEDIA GROUP, INC., GAWKER MEDIA LLC, AND GAWKER HUNGARY KFT.[4]

ROPES & GRAY LLP
Gregg M. Galardi
D. Ross Martin
Joshua Y. Sturm
Jonathan M. Agudelo
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Debtors*
*and Debtors in Possession*

---

[3]    The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary Kft. (f/k/a Kinja Kft.) (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10022. Gawker Hungary Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10022.

[4]    Pursuant to the Unimoda APA, the Debtor entity that was formerly named Kinja Kft. was required to be re-named, and has now been re-named as Gawker Hungary Kft.

# TABLE OF CONTENTS

                                                                                                    **Page**

**ARTICLE 1 DEFINITIONS AND CONSTRUCTION OF TERMS** ........................................................1

1.01    Terms Defined in the Plan ............................................................................................1
1.02    Terms Defined in the Bankruptcy Code ........................................................................14
1.03    Rules of Interpretation ..................................................................................................14
1.04    Exhibits ........................................................................................................................14
1.05    Time Periods ................................................................................................................14
1.06    Reference to Monetary Figures ....................................................................................15
1.07    Governing Law .............................................................................................................15

**ARTICLE 2 CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** .................................15

2.01    Summary of Classification ...........................................................................................15
2.02    Settlement of Claims .....................................................................................................16
2.03    Professional Fee Claims ...............................................................................................16
2.04    Bar Date for Administrative Claims .............................................................................16
2.05    Classification of Claims Against and Equity Interests in GMGI ...................................17
        (a)     GMGI Unclassified Claims ..............................................................................17
                (i)     GMGI Administrative Claims ................................................................17
                (ii)    GMGI United States Trustee's Fees .......................................................17
                (iii)   GMGI Professional Fee Claims. ............................................................17
                (iv)    GMGI Priority Tax Claims ....................................................................17
        (b)     GMGI Classified Claims ..................................................................................17
2.06    Classification of Claims Against and Equity Interests in Gawker Media ........................18
        (a)     Gawker Media Unclassified Claims ..................................................................18
                (i)     Gawker Media Administrative Claims ....................................................18
                (ii)    Gawker Media United States Trustee's Fees ...........................................18
                (iii)   Gawker Media Professional Fee Claims. ................................................18
                (iv)    Gawker Media Priority Tax Claims ........................................................18
        (b)     Gawker Media Classified Claims ......................................................................18
2.07    Classification of Claims Against and Equity Interests in Gawker Hungary .....................19
        (a)     Gawker Hungary Unclassified Claims ...............................................................19
                (i)     Gawker Hungary Administrative Claims .................................................19
                (ii)    Gawker Hungary United States Trustee's Fees ........................................19
                (iii)   Gawker Hungary Professional Fee Claims. .............................................19
                (iv)    Gawker Hungary Priority Tax Claims. ....................................................19
        (b)     Gawker Hungary Classified Claims ...................................................................20
2.08    Unimpaired Classes Deemed to Accept Plan .................................................................20
2.09    Impaired Classes Deemed to Reject the Plan .................................................................20
2.10    Impaired Classes Entitled to Vote on Plan ....................................................................20
2.11    Impairment and Voting Controversies ...........................................................................20

**ARTICLE 3 TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS** ..................21

3.01    Classification and Treatment of Claims Against and Equity Interests in GMGI ..............21
        (a)     Class 1A – GMGI Second Lien Make-Whole Claim ..........................................21
        (b)     Class 1B – GMGI Other Priority Claims ...........................................................21
        (c)     Class 1C – GMGI General Unsecured Claims ....................................................22
        (d)     Class 1D – GMGI General Unsecured Convenience Claims ...............................22
        (e)     Class 1E(i)  – GMGI Gawker Hungary Intercompany Claims .............................22
        (f)     Class 1E(ii)  – GMGI Gawker Media Intercompany Claims ...............................23
        (g)     Class 1F – GMGI Preferred Shares ....................................................................23
        (h)     Class 1G – GMGI Common Equity Interests .....................................................23

3.02    Classification and Treatment of Claims Against and Equity Interests in Gawker Media ...................24
        (a)     Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claims. .............................24
        (b)     Class 2B – Gawker Media Other Priority Claims .................................................................24
        (c)     Class 2C – Gawker Media General Unsecured Claims ........................................................25
        (d)     Class 2D – Gawker Media Punitive Damage Claims ..........................................................25
        (e)     Class 2E – Gawker Media General Unsecured Convenience Claims ...................................26
        (f)     Class 2F(i) – Gawker Media Gawker Hungary Intercompany Claims .................................26
        (g)     Class 2F(ii) – Gawker Media GMGI Intercompany Claims.................................................27
        (h)     Class 2G – Gawker Media Membership Interest ..................................................................27
3.03    Classification and Treatment of Claims Against and Equity Interests in Gawker Hungary.................28
        (a)     Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claim...........................28
        (b)     Class 3B – Gawker Hungary Other Priority Claims .............................................................28
        (c)     Class 3C – Gawker Hungary General Unsecured Claims......................................................29
        (d)     Class 3D(i) – Gawker Hungary GMGI Intercompany Claims..............................................29
        (e)     Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims ................................29
        (f)     Class 3E – Gawker Hungary Membership Interest ...............................................................29
3.04    Compliance with Tax Requirements ...............................................................................................30
3.05    Payments to Plan Reserve Accounts. ..............................................................................................30
3.06    Set-offs and Recoupments ..............................................................................................................30
3.07    Allocation of Distributions .............................................................................................................30
3.08    Manner of Payments .......................................................................................................................30
3.09    Delivery of Distributions.................................................................................................................31
3.10    Uncashed Checks ............................................................................................................................31
3.11    Amendment to Claims.....................................................................................................................31
**ARTICLE 4 IMPLEMENTATION OF THE PLAN .........................................................................................31**

4.01    Plan Settlements .............................................................................................................................31
        (a)     The Second Lien Make-Whole Claims Settlement...............................................................31
        (b)     Intercompany Settlement ...................................................................................................32
        (c)     Bollea Settlement ...............................................................................................................32
        (d)     Other Settlements ..............................................................................................................33
4.02    Effective Date Transactions............................................................................................................33
4.03    Gawker Media Claims Reserve Distribution Date Transactions.......................................................33
4.04    Gawker Media Contingent Proceeds Distribution Date Transactions...............................................34
4.05    Corporate Action ............................................................................................................................34
4.06    Vesting of Assets............................................................................................................................35
4.07    Resignation of Officers and Directors .............................................................................................35
4.08    Plan Administrator ..........................................................................................................................35
4.09    Plan Administrator Agreement ........................................................................................................36
4.10    Plan Indemnity. ..............................................................................................................................36
4.11    Sale of Gawker.com Assets.............................................................................................................36
4.12    Binding Effect ................................................................................................................................36
4.13    Continuation of Stays .....................................................................................................................36
4.14    Cancellation and Surrender of Instruments, Securities, and Existing Agreements ............................37
4.15    Dissolution of the Debtors...............................................................................................................37
4.16    Dissolution of the Committee..........................................................................................................37
**ARTICLE 5 PROVISIONS FOR TREATMENT OF  SUBSEQUENT PLAN DISTRIBUTIONS...................37**

5.01    Objections to and Estimation of Claims ..........................................................................................37
5.02    Professional Fee Claim Procedures..................................................................................................37
5.03    Professional Fee Claim Reserves.....................................................................................................38
5.04    Payments and Distributions on Disputed Claims..............................................................................38
**ARTICLE 6 CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN ......................38**

6.01    Conditions to Confirmation.............................................................................................................38
6.02    Conditions to the Effective Date .....................................................................................................38

| | | |
|---|---|---|
| 6.03 | Waiver of Conditions to Confirmation or the Effective Date | 39 |
| 6.04 | Effect of Nonoccurrence of Conditions to the Effective Date | 39 |
| 6.05 | Notice of Effective Date | 39 |
| **ARTICLE 7 TREATMENT OF CONTRACTS AND LEASES** | | **39** |
| 7.01 | Rejection of Executory Contracts and Unexpired Leases | 39 |
| 7.02 | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 39 |
| **ARTICLE 8 RETENTION OF JURISDICTION** | | **40** |
| 8.01 | Retention of Jurisdiction | 40 |
| **ARTICLE 9 INJUNCTIONS, RELEASES, AND EXCULPATION** | | **41** |
| 9.01 | **INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.** | 41 |
| 9.02 | **INJUNCTION AGAINST INTERFERENCE WITH PLAN.** | 41 |
| 9.03 | **RELEASES BY THE DEBTORS** | 43 |
| 9.04 | **EXCULPATION** | 43 |
| 9.05 | **THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS** | 44 |
| 9.06 | Waiver of Statutory Limitations on Releases | 44 |
| **ARTICLE 10 MISCELLANEOUS** | | **45** |
| 10.01 | Severability | 45 |
| 10.02 | Revocation of the Plan | 45 |
| 10.03 | Effectuating Documents; Further Transactions; Timing | 45 |
| 10.04 | Exemption from Transfer Taxes | 45 |
| 10.05 | Binding Effect | 45 |
| 10.06 | Modification of Treatment | 46 |
| 10.07 | Notices | 46 |
| 10.08 | Post-Confirmation Fees And Reports | 48 |

-iii-

Gawker Media LLC, a Delaware limited liability company ("Gawker Media"), Gawker Media Group, Inc., a Cayman Island corporation ("GMGI"), and Gawker Hungary Kft., a Hungarian corporation ("Gawker Hungary"), propose the following joint chapter 11 plan of liquidation (the "Plan") for the resolution of all outstanding Claims against and Equity Interests in the Debtors pursuant to section 1121 of the Bankruptcy Code. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Only holders of certain Claims and Equity Interests specified in Section 2.10 are entitled to vote on the Plan. The Plan is the product of a preliminary analysis of intercompany claims and issues, and the Debtors have held significant discussion regarding the Plan with the Second Lien Lender, the Official Committee of Unsecured Creditors, Terry Gene Bollea, other creditors and equityholders. A Disclosure Statement, distributed contemporaneously with the Plan, contains a discussion of the Debtors' assets, liabilities, history, material asset sale and a summary of the Plan and the proposed settlements and distributions to be made hereunder.

Other agreements and documents supplementing the Plan and Exhibits to the Plan will be filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

**ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY AND CONSULT WITH COUNSEL AND OTHER APPLICABLE PROFESSIONALS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. WITHOUT LIMITING THE FOREGOING, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE PARTICULARLY URGED TO READ CAREFULLY THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SET FORTH IN ARTICLE 9 BECAUSE SUCH PROVISIONS AFFECT NOT ONLY SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST THE DEBTORS, BUT ALSO SUCH HOLDERS' RIGHTS AND CLAIMS AGAINST CERTAIN NON-DEBTOR PERSONS IDENTIFIED IN SUCH ARTICLE. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, IN BANKRUPTCY RULE 3019 THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION OF TERMS

1.01    <u>Terms Defined in the Plan</u>. Capitalized terms used in the Plan shall have the following meanings when used in capitalized form in the Plan:

"<u>Administrative Claim</u>" means a Claim against any of the Debtors for costs and expenses of administration of such Debtor's Bankruptcy Case that is allowed under section 503(b) of the Bankruptcy Code and that is entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (i) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the estates and operating the applicable Debtor; (ii) all fees and charges assessed against a Debtor estate under Chapter 123 of Title 28 of the United States Code;

- 1 -

and (iii) all other Claims entitled to administrative claim status pursuant to a non-appealable order of the Bankruptcy Court, excluding Professional Fee Claims.

"<u>Administrative Claims Bar Date</u>" means, (i) with respect to Administrative Claims arising through July 31, 2016, September 29, 2016 at 5:00 p.m. (New York Time); (ii) with respect to Administrative Claims arising between August 1, 2016 and September 30, 2016, inclusive, November 15, 2016 at 5:00 p.m. (New York Time); (iii) with respect to Administrative Claims arising from October 1, 2016 through the Effective Date, the date that is thirty (30) days after the Effective Date at 5:00 p.m. (New York Time), and (iv) such other date(s) that the Bankruptcy Court may approve with respect to the filing of Administrative Claims.

"<u>Administrative Claims Objection Deadline</u>" means the date that is one-hundred-twenty (120) days after the Effective Date.

"<u>Allowed</u>" means with respect to any Claim or Equity Interest, except as otherwise provided herein: (i) a Claim that is evidenced by a Proof of Claim filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be filed); (ii) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely filed; or (iii) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection has been so interposed and the Claim shall have been Allowed by a Final Order.

"<u>Avoidance Actions</u>" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

"<u>Ayyadurai</u>" means Dr. Shiva Ayyadurai.

"<u>Ayyadurai Claims</u>" means all claims of Ayyadurai that Ayyadurai has asserted or may assert, including without limitation pursuant to (a) the proceedings in *Ayyadurai v. Gawker Media LLC, et al.*, No. 16-CV-10853 (D. Mass.), and (b) any proofs of claim filed against any Debtor for Claims or Administrative Claims.

"<u>Bankruptcy Cases</u>" means the Gawker Media Bankruptcy Case, the GMGI Bankruptcy Case and the Gawker Hungary Bankruptcy Case, collectively.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York, except to the extent that the reference is withdrawn as to any proceeding or Bankruptcy Case, or 28 U.S.C. § 157 or other law requires entry of a particular judgment by the District Court.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as in effect on the Petition Date and as thereafter amended, together with local rules adopted by the Bankruptcy Court, or such similar rules as may be in effect from time to time in the Bankruptcy Court, all as in effect at the relevant time of application.

"<u>Bollea</u>" means Terry Gene Bollea, aka Hulk Hogan.

"<u>Bollea I Lawsuit</u>" means the proceedings in *Bollea v. Gawker Media LLC, et al*., No. 12012447-CI-011 (Fla. 6th Jud. Cir. Pinellas Cty.).

"<u>Bollea II Lawsuit</u>" means the proceedings in *Bollea v. Buchwald, et.al.*, No. 16-002861-CI (Fla. 6th Jud. Cir. Pinellas Cty.).

"<u>Bollea Claims</u>" means all claims of Bollea, whether filed in a Proof of Claim or not, (a) against any of the Debtors including, but not limited to, claims (i) under the Bollea I Lawsuit and the Bollea II Lawsuit, including on account of the Bollea Compensatory Judgment and the Bollea Punitive Damage Judgment, (ii) based on theories of veil piercing, substantive consolidation, or *alter ego*, and (b) against third-parties for which the Debtors have Debtor Indemnification Obligations.

"<u>Bollea Compensatory Judgment</u>" means the judgment against Gawker Media for compensatory damages in favor of Bollea in the amount of $115,000,000 in the Bollea I Lawsuit.

"<u>Bollea Punitive Damage Judgment</u>" means the judgment against Gawker Media for punitive damage in favor of Bollea in the amount of $15,000,000 in the Bollea I Lawsuit.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"<u>Cash</u>" means cash, cash equivalents, and other readily marketable securities or instruments.

"<u>Causes of Action</u>" means all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, and Avoidance Actions belonging to or that can be brought on behalf of the Debtors' estates, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or indirectly or derivatively in law, equity, or otherwise.

"<u>Claim</u>" means any "claim" against any of the Debtors as defined in section 101(5) of the Bankruptcy Code which has not been disallowed by an order of the Bankruptcy Court or for which an order of disallowance of the Bankruptcy Court has been reversed on appeal by a Final Order of an appellate court.

"<u>Claims Bar Date</u>" means, as applicable, the General Claims Bar Date, Administrative Claims Bar Date, and/or Governmental Claims Bar Date.

59969188_7

"Class" means any class of holders of Claims or Equity Interests as specified in Article 3 of the Plan.

"Committee" means the Official Unsecured Creditors' Committee appointed for the Bankruptcy Case.

"Confirmation Date" means the date on which the Confirmation Order is entered on the docket by the Bankruptcy Court.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming this Plan.

"Debtor Indemnification Obligations" means indemnification, contribution, reimbursement, advance of defense costs, duty to defend or other such obligations of the Debtors, arising out of (i) employment, severance or independent contractor agreements (including the employment agreement of Denton), (ii) the Debtors' organizational documents or governing corporate documents, and (iii) the Debtors' policies and practices.

"Debtors" means Gawker Hungary, GMGI, and Gawker Media, each as a debtor and debtor in possession in the Bankruptcy Cases, and after the Effective Date.

"Denton" means Nicholas G.A. Denton, aka Nick Denton.

"DIP Loan" means the loan under the Financing Agreement, dated as of June 13, 2016 (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof), by and among Gawker Media, as borrower, GMGI and Gawker Hungary, as guarantors, the lenders from time to time party thereto, and Cerberus Business Finance LLC, as administrative and collateral agent for the lenders.

"DIP Lender" means Cerberus Business Finance LLC, as lender under the DIP Agreement.

"Disallowed" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest, or any portion thereof, that (i) has been disallowed by an order entered by the Bankruptcy Court, (ii) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (iv) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed timely filed under applicable law or this Plan, (v) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (vi) has been withdrawn by the holder thereof.

"Disclosure Statement Order" means an order entered by the Bankruptcy Court approving, among other things, the Disclosure Statement with respect to the Plan as containing

adequate information pursuant to section 1125 of the Bankruptcy Code, authorizing solicitation of the Disclosure Statement and the Plan, and approving related solicitation materials.

"Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest, or any portion thereof, that is not an Allowed Claim or Equity Interest or a Disallowed Claim or Equity Interest.

"Distribution" means any initial or subsequent payment or transfer to holders of Claims or Equity Interests made under the Plan.

"Distribution Record Date" means the date designated as the "Voting Record Date" in the Disclosure Statement.

"Effective Date" means a Business Day, as determined by the Debtors, that: (a) is as soon as reasonably practicable after the Confirmation Date; and (b) is the day on which (i) all conditions to the Effective Date in Section 6.02 have been met or waived pursuant to Section 6.03 and (ii) no stay of the Confirmation Order is in effect.

"Equity Interest" means any rights of holders of equity of the Debtors, including GMGI Preferred Shares, GMGI Common Shares, the Gawker Media Membership Interest and the Gawker Hungary Membership Interest.

"Final Order" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Bankruptcy Case (or any related adversary proceeding) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in any Bankruptcy Case (or any related adversary proceeding), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek *certiorari* or similar discretionary review or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for *certiorari* or similar discretionary review or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* or similar discretionary review that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* or similar discretionary review was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, Bankruptcy Rule 9024 or any analogous rule in a nonbankruptcy forum, may be filed relating to such order shall not prevent such order from being a Final Order.

"Final Professional Fees" means Professional Fee Claims that accrue through the Effective Date.

"First Gawker Hungary Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which  Gawker Media

promised to pay $8,000,000 to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.

"Gawker.com Assets" means the assets relating to the Gawker.com Website that were excluded from the Unimoda Sale and remain owned by the Debtors.

"Gawker Hungary" means Gawker Hungary Kft., fka Kinja Kft., a Hungarian corporation, or any successor corporation thereof as debtor and debtor in possession.

"Gawker Hungary Administrative Claim" means an Administrative Claim against Gawker Hungary.

"Gawker Hungary Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by Gawker Hungary, No. 16-11718 (SMB).

"Gawker Hungary General Unsecured Claim" means a General Unsecured Claim against Gawker Hungary.

"Gawker Hungary Intercompany Notes" means the First Gawker Hungary Promissory Note and the Second Gawker Hungary Promissory Note.

"Gawker Hungary Priority Tax Claim" means a Priority Tax Claim against Gawker Hungary.

"Gawker Hungary Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for Gawker Hungary Professional Fees.

"Gawker Hungary Professional Fees" means the amount of Final Professional Fees allocable to Gawker Hungary.

"Gawker Hungary Second Lien Make-Whole Guaranty Claim" means an Allowed Secured Claim of the Second Lien Lender against Gawker Hungary as guarantor under the Second Lien Loan and Security Agreement on account of alleged obligations under the Second Lien Make-Whole Provision.

"Gawker Hungary Second Lien Make-Whole Guaranty Reserve" means a reserve in the amount of $750,000 established on the Effective Date to be distributed pursuant to Section 3.03(a) of this Plan.

"Gawker Media" means Gawker Media LLC, a Delaware limited liability company as debtor and debtor in possession.

"Gawker Media Administrative Claim" means an Administrative Claim against Gawker Media.

"Gawker Media Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by Gawker Media, No. 16-11700 (SMB).

"Gawker Media Claims Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, in the aggregate amount of $3,750,000 plus any proceeds from the Gawker Media Claims Reserve Retained Causes of Action, established by Gawker Media on the Effective Date, for the benefit of holders of Allowed Gawker Media General Unsecured Claims and Allowed Gawker Media Punitive Damage Claims.

"Gawker Media Claims Reserve Distribution Date" means a Business Day designated by the Plan Administrator that shall be promptly following such time as (i) either (a) there remain no Disputed Claims against Gawker Media or (b) an amount has been reserved that is deemed adequate by the Plan Administrator to satisfy all amounts of Disputed Claims against Gawker Media that may be Allowed, and (ii) the Plan Administrator distributes all remaining Cash held in the Gawker Media Claims Reserve in accordance with this Plan.

"Gawker Media Claims Reserve Retained Causes of Action" means the Retained Causes of Action against (i) Nicholas G.A. Denton related to the repayment of the $200,000 Promissory Note for funds that GMGI lent Denton on June 7, 2016 and (ii) any insurers, including, but not limited to, claims for coverage related to (a) the settlement of the Terrill Claims and Ayyadurai Claims, (b) other Claims filed in the Bankruptcy Cases that may be covered by insurance, and (c) claims for reimbursement of legal fees in connection with the same.

"Gawker Media Contingent Proceeds" means (i) the proceeds from the sale or disposition of the Gawker.com Assets net of any payments made (a) to any purchasers of the Gawker.com Assets and (b) to an investment bank, if any, working for the Debtors in connection with the sale; and (ii) any recoveries from Retained Causes of Action net of any setoffs from such recoveries or contingency fees paid to attorneys out of the recoveries.

"Gawker Media Contingent Proceeds Creditor Account" means a separate, segregated bank account to be established on the Effective Date and administered by the Plan Administrator, into which 45.0% of Gawker Media Contingent Proceeds will be deposited for the benefit of holders of Claims against Gawker Media.

"Gawker Media Contingent Proceeds Distribution Date" means a Business Day, as designated by the Plan Administrator in its sole discretion, upon which a Distribution is made to holders of Claims in Classes 2C and 2D, according to their respective entitlements under Section 3.02 of the Plan, as a result of the receipt of Gawker Media Contingent Proceeds.

"Gawker Media Contingent Equity Proceeds" means 55% of the Gawker Media Contingent Proceeds.

"Gawker Media Convenience Class Creditor" means a holder of a General Unsecured Claim against Gawker Media that elects to receive the treatment set forth in Section 3.02(e) of this Plan from Gawker Media in full settlement and satisfaction of all Claims against any of the Debtors, including Gawker Hungary and GMGI.

"Gawker Media General Unsecured Claim" means a General Unsecured Claim against Gawker Media, including the Bollea Claims, the Terrill Claims and the Ayyadurai Claims.

"Gawker Media General Unsecured Convenience Claim" means the Claim of a Gawker Media Convenience Class Creditor.

"Gawker Media Priority Tax Claim" means a Priority Tax Claim against Gawker Media.

"Gawker Media Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve by Gawker Media in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for Gawker Media Professional Fees.

"Gawker Media Professional Fees" means the amount of Final Professional Fees allocable to Gawker Media.

"Gawker Media Punitive Damage Claim" means a Claim asserted against Gawker Media, including the Bollea Punitive Damage Claim, that in a chapter 7 case of any of the Debtors, would have the priority set forth in section 726(a)(4) of the Bankruptcy Code.

"Gawker Media Second Lien Make-Whole Guaranty Claim" means an Allowed Secured Claim of the Second Lien Lender against Gawker Media as guarantor under the Second Lien Loan and Security Agreement on account of alleged obligations under the Second Lien Make-Whole Provision.

"Gawker Media Second Lien Make-Whole Guaranty Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, established by Gawker Media on the Effective Date in the amount of $750,000 to be distributed pursuant to Sections 3.02(a). 3.02(c), and 3.02(d) of this Plan.

"General Claims Bar Date" means September 29, 2016 at 5:00 p.m. (New York Time), by which general Proofs of Claim were required to be filed in the Debtors' Bankruptcy Cases.

"General Retained Causes of Action" means the Retained Causes of Action other than the Gawker Media Claims Reserve Retained Causes of Action.

"General Unsecured Claim" means, any Claim, to the extent of the amount of such Claim which (i) is not secured by any valid and unavoidable lien on or security interest in property of the applicable Debtor, or (ii) is greater than the value of any valid and unavoidable lien on or security interest in property of the Debtor which secures such Claim.

"GMGI" means Gawker Media Group, Inc., a Cayman Island corporation, and the parent company of Gawker Media and Gawker Hungary as debtor and debtor in possession.

"GMGI Administrative Claim" means an Administrative Claim against GMGI.

"GMGI Bankruptcy Case" means the bankruptcy case commenced in the Bankruptcy Court by GMGI, No. 16-11719 (SMB).

"GMGI Common Shares" means outstanding common shares of GMGI, including any GMGI Common Shares acquired through the exercise of GMGI Common Share Options.

"GMGI Common Share Options" means options to acquire GMGI Common Shares.

"GMGI Convenience Class Creditor" means a holder of a General Unsecured Claim against GMGI that elects to receive the treatment set forth in Section 3.01(e) of this Plan from Gawker Media in full settlement and satisfaction of all Claims against any of the Debtors, including Gawker Hungary and GMGI.

"GMGI General Unsecured Convenience Claim" means the Claim of a GMGI Convenience Class Creditor.

"GMGI Distribution Date" means a Business Day, as designated by the Plan Administrator in its sole discretion, upon which a Distribution is made to holders of Claims against, and Equity Interests in, GMGI as a result of Distributions to GMGI from Gawker Media or Gawker Hungary, Allowance or Disallowance of Disputed Claims against GMGI, or as the Plan Administrator may otherwise determine.

"GMGI General Unsecured Claim" means a General Unsecured Claim against GMGI.

"GMGI Plan Guaranty" means a guaranty in the amount of $2,000,000 by GMGI, in consideration for the Intercompany Settlement, which amount shall be deposited in the GMGI Plan Guaranty Reserve on the Effective Date.

"GMGI Plan Guaranty Reserve" means a reserve maintained in a separate, segregated account by the Plan Administrator, established by Gawker Media on the Effective Date, funded by the GMGI Plan Guaranty in consideration for the Intercompany Settlement, for the benefit holders of Allowed Gawker Media General Unsecured Claims and Allowed Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

"GMGI Preferred Options" means options to acquire GMGI Series A Preferred Shares.

"GMGI Preferred Shares" means all outstanding GMGI Series A Preferred Shares and the GMGI Series B Preferred Share, including all GMGI Preferred Shares acquired through the exercise of GMGI Preferred Options.

"GMGI Preferred Shares Liquidation Preference" means an amount per GMGI Series A Preferred Share or GMGI Series B Preferred Share (as applicable) equal to the GMGI Share Original Issue Price for such Series A Preferred Share or Series B Preferred Share (as applicable) plus all declared and unpaid dividends on such Series A Preferred Share or Series B Preferred Share.

"GMGI Priority Tax Claim" means a Priority Tax Claims against GMGI.

"GMGI Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $250,000 to GMGI, with interest on the outstanding principal amount payable at the rate of 2.00%, compounded annually.

"GMGI Professional Fee Claim Reserve" means an amount to be determined by the Plan Administrator and identified in the Plan Supplement that will be held in reserve in a segregated account, which reserve shall be held in trust and maintained by the Plan Administrator, solely for the benefit and payment of Allowed Claims for GMGI Professional Fees.

"GMGI Professional Fees" means the amount of Final Professional Fees allocable to GMGI.

"GMGI Second Lien Make-Whole Claim" means the Allowed Secured Claim of the Second Lien Lender against GMGI as Borrower under the Second Lien Loan and Security Agreement on account of alleged obligation under the Second Lien Make-Whole Provision.

"GMGI Series A Preferred Shares" means Series A Preferred Shares of GMGI.

"GMGI Series B Preferred Shares" means Series B Preferred Shares of GMGI.

"GMGI Share Original Issue Price" means, with respect to the GMGI Series A Preferred Shares, $0.55 per share, and with respect to the GMGI Series B Preferred Shares, $0.836 per share.

"Governmental Claims Bar Date" means December 9, 2016 at 5:00 p.m. (New York Time), or such other date as may be established by an Order of the Bankruptcy Court, by which Governmental Units may file Proofs of Claim in the Debtors' Bankruptcy Cases.

"Impaired" means, with respect to any Claim, Equity Interest, or Class, the condition or effects described in section 1124 of the Bankruptcy Code.

"Intercompany Claims" means any claims by any Debtor against another Debtor, including, but not limited to, claims arising from the Gawker Hungary Intercompany Notes and the GMGI Promissory Note.

"Intercompany Services Agreements" means, collectively, (i) the Master License Agreement, dated as of January 1, 2011 (as may have been amended or modified and in effect as of the Petition Date), between Gawker Media and Gawker Hungary, (ii) the Development Agreement, dated as of January 1, 2007 (as amended on January 21, 2013, as may have been further amended or modified and in effect as of the Petition Date), by and between Gawker Media and Gawker Hungary, and (iii) the Intercompany Services Agreement, dated as of January 1, 2012 (as may have been amended or modified and in effect as of the Petition Date), by and between Gawker Media and Gawker Hungary.

"Intercompany Settlement" means the settlement among the Debtors incorporated in the Plan Settlements, as set forth in Section 4.01(a) herein.

59969188_7

"LSKS" means Levine Sullivan Koch & Schultz, LLP.

"Other Priority Claim" means the Claims against the Debtors, if any, entitled to priority under section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

"Petition Date" means the date of the filing by each Debtor of its voluntary petition commencing the Bankruptcy Case, which for Gawker Media was June 10, 2016, and for GMGI and Gawker Hungary was June 12, 2016.

"Plan" means these Amended Joint Chapter 11 Plans of Liquidation for the Debtors, dated December 11, 2016, filed by the Debtors, together with the exhibits thereto, either in their present form or as altered, amended, or modified from time to time.

"Plan Administrator" means the Person identified in the Plan Supplement, or other filing with the Bankruptcy Court, who shall be reasonably acceptable to the Committee, and retained as of the Effective Date pursuant to the Plan Administrator Agreement, as the employee or fiduciary responsible for implementing the applicable provisions of the Plan relating to the Plan Reserve Accounts and liquidation of any remaining assets of the Debtors.

"Plan Administrator Agreement" means an agreement, to be entered into as of the Effective Date, by the Debtors and the Plan Administrator, which sets forth, among other things, the duties, indemnification and compensation of the Plan Administrator.

"Plan Reserve Accounts" means Gawker Hungary Second Lien Make-Whole Guaranty Reserve, Gawker Media Claims Reserve, Gawker Media Contingent Proceeds Creditor Account, Gawker Media Second Lien Make-Whole Guaranty Reserve, GMGI Plan Guaranty Reserve, and the Professional Fee Claim Reserves.

"Plan Settlements" means the Intercompany Settlement, the Second Lien Make-Whole Claims Settlement, the Bollea Settlement, and the other settlements as may be incorporated in the Plan as set forth in Section 4.01 of the Plan.

"Plan Supplement" means the compilation of documents and forms of documents as amended from time to time that constitute exhibits to the Plan filed with the Bankruptcy Court no later than five (5) days before the deadline for voting on the Plan (or such later date as may be approved by the Bankruptcy Court), which shall include a copy of the final settlement agreements between the Debtors and each of Bollea, Ayyadurai, and Terrill and any other separately documented Plan settlements.

"Post-Petition Interest" means with respect to eligible Claims, interest that accrues from the Petition Date through the Effective Date, calculated at the higher of (i) the federal judgment rate established by 18 U.S.C. § 1961(a) and (ii) any contractual rate applicable to such Claim.

"Priority Tax Claim" means an Unsecured Claim of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means, that proportion that an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such Class.

"Professional" means any professional, claims agent, or other person employed in the Bankruptcy Case pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Bankruptcy Case pursuant to section 503(b)(4) of the Bankruptcy Code, including, without limitation, Ropes & Gray LLP, Opportune LLP, Prime Clerk LLC, Akin Gump Strauss Hauer & Feld LLP, LSKS, Brannock & Humphries, Thomas & LoCicero PL, Cahill, Gordon & Reindel LLP, Citrin Cooperman & Company LLP, Simpson Thacher & Bartlett LLP, Deloitte Financial Advisory Services LLP, Reczicza Dentons Europe LLP, and Mourant Ozanne.

"Professional Fee Claim" means (i) any amounts that the Bankruptcy Court allows pursuant to section 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by Professionals employed by the Debtors and the Committee, and (ii) any amounts the Bankruptcy Court allows pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases.

"Professional Fee Claim Reserves" means (i) the Gawker Media Professional Fee Claim Reserve, (ii) the Gawker Hungary Professional Fee Claim Reserve, and (iii) the GMGI Professional Fee Claim Reserve.

"Proof of Claim" means a proof of claim filed against any of the Debtors in the Bankruptcy Cases.

"Released Party" means, each of, and solely in its capacity as such: (i) the Debtors, (ii) the Second Lien Lender, (iii) the Committee, and (iv) with respect to each of the foregoing entities in clauses (i) through (iii), respective current and former subsidiaries, predecessors, successors, assigns, heirs, insurers, agents, representatives, directors, managers, officers, equity holders, principals, current and former members, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, excluding LSKS and the chapter 11 bankruptcy estate of Denton.

"Released Employees and Independent Contractors" means each current and former employee, writer, editor, and independent contractor that was employed by, or paid to contribute articles to, the Debtors including, without limitation, current and former 1099 employees and current and former independent contractors, that filed a Proof of Claim in the Bankruptcy Cases.

"Retained Causes of Action" means Claims and/or Causes of Action against third-parties that are not released under the Plan or any Order of the Bankruptcy Court and are retained and prosecuted by the Debtors on behalf of the Debtors' estates, as identified in the Plan Supplement.

"Sale Closing Date" means September 9, 2016, the date of closing of the Unimoda Sale.

"Sale Order" means the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II)*

-12-

*Approving and Authorizing the Debtors' Entry Into the Asset Purchase Agreement and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 214].

"Schedules" means, collectively, (a) the schedules of assets, liabilities, and executory contracts and unexpired leases and (b) the statement of financial affairs, as each may be amended and supplemented from time to time, filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code.

"Second Gawker Hungary Promissory Note" means that certain Amended and Restated Subordinated Promissory Note, dated as of January 21, 2016, pursuant to which Gawker Media promised to pay $5,000,000 to Gawker Hungary, with interest on the outstanding principal amount payable at the rate of 1.75%, compounded annually.

"Second Lien Lender" means US VC Partners LP, a Delaware limited partnership, solely in its capacity as lender under the Second Lien Loan and Security Agreement.

"Second Lien Lender Expenses" means all unpaid reasonable and documented fees and out-of-pocket costs and expenses of the Second Lien Lender incurred in connection with the Bankruptcy Cases to the extent payable or reimbursable under the Second Lien Loan and Security Agreement, including, but not limited to, the reasonable and documented fees and out-of-pocket costs and expenses of Latham & Watkins LLP, as counsel to the Second Lien Lender.

"Second Lien Loan and Security Agreement" means that Second Lien Loan and Security Agreement, dated as of January 21, 2016, by and among GMGI and the Second Lien Lender, pursuant to which the Second Lien Lender agreed to provide to GMGI the Second Lien Term Loan.

"Second Lien Make-Whole Claims" means the GMGI Second Lien Make-Whole Claim, the Gawker Media Second Lien Make-Whole Guaranty Claim, and the Gawker Hungary Second Lien Make-Whole Guaranty Claim.

"Second Lien Make-Whole Claims Settlement" means the settlement among the Debtors and the Second Lien Lender incorporated in the Plan Settlements, as set forth in Section 4.01(b) herein.

"Second Lien Make-Whole Provision" means the provision set forth in Section 2.1.5 of the Second Lien Loan and Security Agreement requiring GMGI to pay to the Second Lien Lender $3,750,000 upon prepayment, refinancing, substitution or replacement of Second Lien Term Loan obligations prior to the applicable maturity date.

"Second Lien Term Loan" means that certain term loan facility in the aggregate principal amount of $15,000,000 plus any fees, expenses and outstanding interest, provided by the Second Lien Lender to GMGI, pursuant to the Second Lien Loan and Security Agreement.

"Secured" means, with respect to any Claim, secured by a valid and unavoidable lien on or security interest in property of the Debtors, to the extent of the value of such lien or security interest.

"Solicitation Procedures" means those solicitation procedures annexed as Exhibit 1, and approved pursuant, to the Disclosure Statement Order.

"Terrill" means Ashley Terrill.

"Terrill Claims" means all claims of Terrill that Terrill has asserted or may assert, including without limitation pursuant to (a) the proceedings in *Ashley* Terrill *v. Gawker Media LLC, et al.*, No. 16-CV-00411 (S.D.N.Y.), and (b) any proofs of claim filed against any Debtor for Claims or Administrative Claims.

"Unimoda" means UniModa, LLC.

"Unimoda APA" means that certain Asset Purchase Agreement by and between the Debtors and UniModa, dated August 17, 2016, as amended, modified or supplemented from time to time in accordance with the terms thereof.

"Unimoda Purchase Price" means the $135,000,000 cash purchase price paid, and such other consideration provided, to the Debtors under the Unimoda APA.

"Unimoda Sale" means the sale of substantially all of the Debtors' assets, excluding the Gawker.com Assets, pursuant to the Unimoda APA.

"United States Trustee" means the Office of the United States Trustee for the Southern District of New York.

1.02    Terms Defined in the Bankruptcy Code.  Capitalized terms used in the Plan that are not defined in Section 1.01 but which are defined in the Bankruptcy Code shall have the respective meanings specified in the Bankruptcy Code.

1.03    Rules of Interpretation.  For purposes of the Plan: (i) whenever it appears appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means such document substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified, or supplemented; (iv) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; and (v) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, except to the extent inconsistent with the express provisions of this Section 1.03 of the Plan.

1.04    Exhibits.  Exhibits to the Plan may be amended from time to time, and both original and amended Exhibits may be filed with the Bankruptcy Court from time to time, but in no event later than five (5) days before the deadline for voting on the Plan (or such later date as may be approved by the Bankruptcy Court).  Current copies of Exhibits may be obtained by reference to the Bankruptcy Court's docket or shall be provided to parties in interest upon written request to the Debtors.

1.05    Time Periods.  Except as specifically provided in the Plan, Bankruptcy Rule 9006(a) applies to the computation of any period of time prescribed or allowed by the Plan, and Bankruptcy Rules 9006(b) and 9006(c) apply respectively to the enlargement or reduction of any period of time prescribed or allowed by the Plan.

1.06    Reference to Monetary Figures.  All references in the Plan to monetary figures refer to the lawful currency of the United States of America.

1.07    Governing Law.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of a contract, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and constructed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

# ARTICLE 2
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

2.01    Summary of Classification.  This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  The Claims against and Equity Interests in each of the Debtors are categorized below for all purposes under the Plan, including voting, confirmation, and distribution pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  To the extent a holder has a Claim that may be asserted against more than one Debtor, such holder shall receive a separate Ballot for each such Claim, and may submit a Ballot with respect to each such Claim, which Ballot shall be counted as a vote of such Claim against the Debtor with respect to which such Ballot is submitted.

A Claim or Equity Interest is (i) classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and (ii) classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Except as otherwise specifically provided for in this Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, United States Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified.  For purposes of the Plan, such Claims have, however, been allocated among the Debtors for determining expected distributions under the Plan.  The classification of all other Claims and Equity Interests against each of the Debtors under the Plan is detailed in the tables contained in Sections 2.05(b), 2.06(b) and 2.07(b) below.  Each table specifies the Classes that are (i) Impaired or Unimpaired by this Plan, (ii) entitled to vote to accept or reject this Plan in

-15-

accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that, in the event no holder of a Claim or Equity Interest with respect to a specific Class for a particular Debtor timely submits a Ballot in compliance with the Solicitation Procedures indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan pursuant to the Confirmation Order.  The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

2.02    Settlement of Claims.    Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan of (i) each Debtor against the other Debtors, (ii) the Second Lien Lender against each Debtor with respect to the Second-Lien Make-Whole Claims, (iii) the Debtors and Bollea regarding the Bollea Claims, and (iv) among certain creditors and each of the Debtors, as set forth in greater detail in Section 4.01 of the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are fair and equitable.

2.03    Professional Fee Claims.    To the extent that a Professional's final fee application is Allowed by the Bankruptcy Court, or claims pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases are Allowed by the Bankruptcy Court, the requesting Person will receive: (i) payment of Cash from the GMGI Professional Fee Claim Reserve, Gawker Media Professional Fee Claim Reserve and/or Gawker Hungary Professional Fee Claim Reserve, as applicable, in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases, such payment to be made before the later of (a) the Effective Date or (b) three Business Days after the order Allowing such Person's final fee application, or (ii) payment on such other terms as may be mutually agreed upon by the holder of the Professional Fee Claim and the applicable Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Person during the Bankruptcy Cases).

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals shall terminate.

2.04    Bar Date for Administrative Claims.    Except as otherwise provided herein, requests for payment of Administrative Claims (other than Professional Fee Claims) not required to be have been filed by a prior Administrative Claim Bar Date, must be filed and served on the Debtors and Plan Administrator within sixty (60) days of the Effective Date.  Holders of

-16-

Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the applicable Debtor and the requesting party no later than the Administrative Claims Objection Deadline.

2.05    Classification of Claims Against and Equity Interests in GMGI.

(a)    GMGI Unclassified Claims.    Allowed Administrative Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against GMGI will be paid in full in Cash, pursuant to the following terms:

(i)    GMGI Administrative Claims.  Each holder of an Allowed Administrative Claim against GMGI will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    GMGI United States Trustee's Fees.  The outstanding fees due to the United States Trustee from GMGI pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from GMGI after the Effective Date shall be paid by GMGI in accordance therewith until the earlier of the conversion or dismissal of the GMGI Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the GMGI Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    GMGI Professional Fee Claims.    Approved GMGI Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02, and 5.03 of this Plan.

(iv)    GMGI Priority Tax Claims.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against GMGI, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and GMGI.

(b)    GMGI Classified Claims.  All other Claims against and Equity Interests in GMGI are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1A | Second Lien Make-Whole Claim | Impaired | Yes |
| 1B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |

59969188_7

| 1C | General Unsecured Claims | Impaired | Yes |
| 1D | General Unsecured Convenience Claims | Impaired | N/A |
| 1E(i) | Gawker Hungary Intercompany Claims | Impaired | No (Deemed to Reject) |
| 1E(ii) | Gawker Media Intercompany Claims | Impaired | Yes |
| 1F | Preferred Shares | Impaired | Yes |
| 1G | Common Equity Interests | Impaired | No (Deemed to Reject) |

2.06    Classification of Claims Against and Equity Interests in Gawker Media.

(a)    Gawker Media Unclassified Claims.    Allowed Administrative Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against Gawker Media will be paid in full in Cash, pursuant to the following terms:

(i)    Gawker Media Administrative Claims.    Each holder of an Allowed Administrative Claim against Gawker Media will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    Gawker Media United States Trustee's Fees.    The outstanding fees due to the United States Trustee from Gawker Media pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date.    All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from Gawker Media after the Effective Date shall be paid by Gawker Media in accordance therewith until the earlier of the conversion or dismissal of the Gawker Media Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Gawker Media Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    Gawker Media Professional Fee Claims.    Approved Gawker Media Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02, and 5.03 of this Plan.

(iv)    Gawker Media Priority Tax Claims.    On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim against Gawker Media, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and Gawker Media.

(b)    Gawker Media Classified Claims.    All other Claims against and Equity Interests in Gawker Media are classified as follows:

-18-

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 2A | Second Lien Make-Whole Guaranty Claim | Impaired | Yes |
| 2B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2C | General Unsecured Claims | Impaired | Yes |
| 2D | Punitive Damage Claims | Impaired | Yes |
| 2E | General Unsecured Convenience Claims | Impaired | N/A |
| 2F(i) | Gawker Hungary Intercompany Claims | Impaired | Yes |
| 2F(ii) | GMGI Intercompany Claims | Impaired | No (Deemed to Reject) |
| 2G | Membership Interest | Impaired | Yes |

2.07    Classification of Claims Against and Equity Interests in Gawker Hungary.

(a)    Gawker Hungary Unclassified Claims.    Allowed Administrative Claims, United States Trustee Fees, Professional Fee Claims, and Priority Tax Claims against Gawker Hungary will be paid in full in Cash, pursuant to the following terms:

(i)    Gawker Hungary Administrative Claims.    Each holder of an Allowed Administrative Claim against Gawker Hungary will receive, in full and final satisfaction and discharge thereof, Cash equal to the unpaid portion of such Allowed Administrative Claim (except to the extent such holder agrees to less favorable treatment thereof) on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim.

(ii)    Gawker Hungary United States Trustee's Fees.    The outstanding fees due to the United States Trustee from Gawker Hungary pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) will be paid in full on or before the Effective Date.  All fees payable pursuant to 28 U.S.C. § 1930 (and any applicable interest pursuant to 31 U.S.C. § 3717) from Gawker Hungary after the Effective Date shall be paid by Gawker Hungary in accordance therewith until the earlier of the conversion or dismissal of the Gawker Hungary Bankruptcy Case under section 1112 of the Bankruptcy Code or closing of the Gawker Hungary Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

(iii)    Gawker Hungary Professional Fee Claims.    Approved Gawker Media Professional Fee Claims will be satisfied pursuant to the procedures set forth in Sections 2.03, 5.02,  and 5.03 of this Plan.

(iv)    Gawker Hungary Priority Tax Claims.    On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which a Priority

-19-

Tax Claim becomes an Allowed Priority Tax Claim against Gawker Hungary, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction and discharge thereof, (a) payment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) payment as agreed between the holder of the Allowed Priority Tax Claim and Gawker Hungary.

       (b)    <u>Gawker Hungary Classified Claims</u>.  All other Claims against and Equity Interests in Gawker Hungary are classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 3A | Second Lien Make-Whole Guaranty Claim | Impaired | Yes |
| 3B | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 3C | General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| 3D(i) | GMGI Intercompany Claims | Impaired | No (Deemed to Reject) |
| 3D(ii) | Gawker Media Intercompany Claims | Impaired | Yes |
| 3E | Membership Interest | Impaired | Yes |

       2.08    <u>Unimpaired Classes Deemed to Accept Plan</u>.  Classes 1B, 2B, 3B, and 3C are Unimpaired under the Plan.  Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims against or Equity Interests in the Debtors in such Classes are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

       2.09    <u>Impaired Classes Deemed to Reject the Plan</u>.  Holders in Classes 1E(i), 1F, 2F(ii), and 3D(i) are not entitled to receive or retain any property under the Plan on account of their Claims.  Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims against the Debtors in such Classes are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

       2.10    <u>Impaired Classes Entitled to Vote on Plan</u>.  Classes 1A, 1C, 1E(ii), 1F, 2A, 2C, 2D, 2F(i), 2G, 3A, 3D(ii), and 3E are Impaired.  Accordingly, holders of Claims against or Equity Interests in the Debtors in such Classes are entitled to vote on the Plan pursuant to the Solicitation Procedures.

       2.11    <u>Impairment and Voting Controversies</u>.  If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Equity Interests, is impaired under the Plan or entitled to vote on the Plan pursuant to the Solicitation Procedures, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

59969188_7

## ARTICLE 3
## TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

3.01    <u>Classification and Treatment of Claims Against and Equity Interests in GMGI</u>.

(a)    <u>Class 1A – GMGI Second Lien Make-Whole Claim</u>.    As a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)    Classification:  Class 1A shall consist of the GMGI Second Lien Make-Whole Claim.

(ii)    Allowance:  The GMGI Second Lien Make-Whole Claim is Allowed as a Secured Claim against GMGI in the amount of $2,000,000.

(iii)    Treatment:  The Second Lien Lender will receive, in full and complete settlement and release of, and in exchange for, the GMGI Second Lien Make-Whole Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000, (b) on, or as soon as practicable after, the date that there are no longer any Disputed GMGI General Unsecured Claims, a distribution equal to any remaining GMGI Cash after all Allowed GMGI General Unsecured Claims have either been paid in full or provided for in a reserve deemed adequate by the Plan Administrator to pay all Allowed GMGI General Unsecured Claims, up to an aggregate total of $750,000 (or to the extent provided in clause (c) below, up to an aggregate total of $1,500,000), and (c) in the event that Gawker Hungary dissolves before making the payment to  the Second Lien Lender described in Section 3.03(a)(iii)(b) of the Plan, then the Second Lien Lender will receive, in addition to the distribution described in clause (b) above, the distribution set forth in Section 3.03(a)(iii)(b) of the Plan from GMGI, Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

(iv)    Voting:  Class 1A is Impaired.  The holder of the GMGI Second Lien Make-Whole Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    <u>Class 1B – GMGI Other Priority Claims</u>.

(i)    Classification:  Class 1B shall consist of all Other Priority Claims against GMGI.

(ii)    Treatment:  Except to the extent that a holder of an Allowed GMGI Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed GMGI Other Priority Claim will receive on account of, and in full and complete settlement, and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting: Class 1B is Unimpaired.    Each holder of an Allowed GMGI Other Priority Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of GMGI Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)    <u>Class 1C – GMGI General Unsecured Claims</u>.

(i)    Classification: Class 1C shall consist of the GMGI General Unsecured Claims.

(ii)    Treatment:  Except to the extent that a holder of an Allowed GMGI General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed GMGI General Unsecured Claim will receive, in full and complete settlement and release, and in exchange for, such Claim distributions equal to its Pro Rata share of GMGI Cash distributed on the Effective Date, or within 15 days of Allowance of such Claim, up to the amount of its Allowed Claim plus Post-Petition Interest.

(iii)    Voting: Classes 1C is Impaired.  Holders of Claims in Class 1C are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(d)    <u>Class 1D – GMGI General Unsecured Convenience Claims</u>.

(i)    Classification:    Class 1D shall consist of the GMGI Unsecured Convenience Claims.

(ii)    Treatment:  Each holder of a GMGI General Unsecured Claim that elects to have its Claim(s) treated as an GMGI General Unsecured Convenience Claim will (a) receive, in full and complete satisfaction of such Claim(s) against GMGI, as well as any other asserted Claims held by such GMGI General Unsecured Convenience Creditor against Gawker Media and/or Gawker Hungary, a single distribution on the Effective Date in Cash from the Gawker Media Claims Reserve of the lesser of (i) the Allowed amount of its Claim and (ii) $25,000 and (b) have all of its Claims against GMGI, Gawker Media, and/or Gawker Hungary Disallowed and expunged (with any Debtor objections to such Claims sustained).

(ii)    Voting: Class 1D is Impaired.  By electing to participate in the GMGI Convenience Claims Class, holders of Claims in Class 1D are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures.

(e)    <u>Class 1E(i) – GMGI Gawker Hungary Intercompany Claims</u>.

(i)    Classification: Class 1E(i) shall consist of the Gawker Hungary Intercompany Claims against GMGI.

(ii)    Treatment:  Any and all Intercompany Claims held by Gawker Hungary against GMGI are resolved pursuant to the Intercompany Settlement, with no distribution on account of such Claims.

-22-

(iii)     Voting:   Class 1E(i) is Impaired. Holders of Claims in Class 1E(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(f)     <u>Class 1E(ii) – GMGI Gawker Media Intercompany Claims</u>.

(i)     Classification:   Class 1E(ii) shall consist of the Gawker Media Intercompany Claims against GMGI.

(ii)     Treatment:   Pursuant to the Intercompany Settlement, in satisfaction of any and all Intercompany Claims held by Gawker Media against GMGI, on the Effective Date, GMGI will fund the GMGI Plan Guaranty Reserve.

(iii)     Voting:   Classes 1E(ii) is Impaired.  Holders of Claims in Class 1E(ii) are entitled to vote to accept or reject the Plan.

(g)     <u>Class 1F – GMGI Preferred Shares</u>.

(i)     Classification: Class 1F shall consist of the holders of GMGI Preferred Shares.

(ii)     Treatment: Except to the extent that a holder of a GMGI Preferred Share agrees to less favorable treatment, each holder of a GMGI Preferred Share will receive, in full and complete settlement and release of, and in exchange for, such GMGI Preferred Share, on each date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after the GMGI Second Lien Make-Whole Claim has been paid in full, up to an aggregate total of the amount of each holder's applicable GMGI Preferred Shares Liquidation Preference.

(iii)     Voting:  Class 1F is Impaired.  Holders of Equity Interests in Class 1F are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(h)     <u>Class 1G – GMGI Common Equity Interests</u>.

(i)     Classification:   Class 1G shall consist of the holders of GMGI Common Shares.

(ii)     Treatment: Except to the extent that a holder of a GMGI Common Share agrees to less favorable treatment, each holder of a GMGI Common Share will receive, in full and complete settlement, release, and discharge of, and in exchange for, such GMGI Common Share, on each date applicable Distributions are made, a Pro Rata share of any remaining distributable Cash after holders of Allowed GMGI Preferred Shares have received distributions in cash totaling the aggregate amount of their respective GMGI Preferred Shares Liquidation Preferences.

(iii)     Voting:  Holders of Claims in Class 1G are not expected to receive any Distributions under the Plan and are therefore not entitled to vote to accept or reject

-23-

the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

        3.02    Classification and Treatment of Claims Against and Equity Interests in Gawker Media.

        (a)    Class 2A – Gawker Media Second Lien Make-Whole Guaranty Claims.  As part of a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

        (i)    Classification:  Class 2A shall consist of the Gawker Media Second Lien Make-Whole Guaranty Claim.

        (ii)    Allowance:  The Gawker Media Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Media in the amount of $1,250,000.

        (iii)    Treatment: The Second Lien Lender will receive, in full and complete settlement, release, and discharge of, and in exchange for, the Gawker Media Second Lien Make-Whole Guaranty Claims, (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) on the Gawker Media Claims Reserve Distribution Date, distributions equal to any Cash remaining in the Gawker Media Second Lien Make-Whole Guaranty Reserve after distributions with respect to Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

        (iv)    Voting:  Class 2A is Impaired.  The holder of the Gawker Media Second Lien Make-Whole Guaranty Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

        (b)    Class 2B – Gawker Media Other Priority Claims.

        (i)    Classification:  Class 2B shall consist of all Other Priority Claims against Gawker Media.

        (ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Gawker Media Other Priority Claim will receive on account of, and in full and complete settlement and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

        (iii)    Voting:  Class 2B is Unimpaired.  Each holder of an Allowed Gawker Media Other Priority Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of such Other Priority Claims are not entitled to vote to accept or reject the Plan.

-24-

(c)    Class 2C – Gawker Media General Unsecured Claims.

(i)    Classification:  Class 2C shall consist of the Gawker Media General Unsecured Claims.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media General Unsecured Claim agrees to less favorable treatment, including electing to participate in the Gawker Media Convenience Class or as otherwise provided in Section 4.01(c) and (d) of the Plan, each holder of an Allowed Gawker Media General Unsecured Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, Distributions made in the following order until such holder receives the full amount of its Allowed Claim, excluding Post-Petition Interest, from the sources identified below:

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account; *provided* that, for the purpose of calculating Pro Rata shares of the Gawker Media Contingent Proceeds Creditor Account only, the amount of each Allowed Gawker Media General Unsecured Claim shall be reduced dollar-for-dollar by the amount of any Distribution made to the holder of such Allowed Gawker Media General Unsecured Claim from the Gawker Media Claims Reserve pursuant to this Section 3.02(c)(ii) of the Plan;

THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve.

(iii)    Voting:  Class 2C is Impaired.  Holders of Claims in Class 2C are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(d)    Class 2D – Gawker Media Punitive Damage Claims.

(i)    Classification:  Class 2D shall consist of the Gawker Media Punitive Damage Claims.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Media Punitive Damage Claim agrees to less favorable treatment, including electing to participate in the Gawker Media Convenience Class or as otherwise provided in Section 4.01(c) and (d) of the Plan, each holder of an Allowed Gawker Media Punitive Damage Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, Distributions made in the following order until such holder receives the full amount of its Allowed Claim, excluding Post-Petition Interest, from the sources identified below:

-25-

FIRST: A Distribution equal to its Pro Rata share of Cash in the Gawker Media Claims Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

SECOND: A Distribution equal to its Pro Rata share of the Gawker Media Contingent Proceeds Creditor Account remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest;

THIRD: A Distribution equal to its Pro Rata share of Cash held in the Gawker Media Second Lien Make-Whole Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest; and

FOURTH: A Distribution equal to its Pro Rata share of the GMGI Plan Guaranty Reserve remaining after satisfaction of all Allowed Gawker Media General Unsecured Claims, excluding Post-Petition Interest.

(iii)    Voting:  Class 2D is Impaired.  Holders of Claims in Class 2D are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(e)    Class 2E – Gawker Media General Unsecured Convenience Claims.

(i)    Classification:  Class 2E shall consist of the Gawker Media General Unsecured Convenience Claims.

(ii)    Treatment:   Each holder of a Gawker Media General Unsecured Claim or Gawker Media Punitive Damage Claim that elects to have its Claim(s) treated as a Gawker Media General Unsecured Convenience Claim will (a) receive, in full and complete satisfaction of such Claim(s) against Gawker Media, as well as any other asserted Claims held by such Gawker Media General Unsecured Convenience Creditor against GMGI and/or Gawker Hungary, a single distribution on the Effective Date in Cash from the Gawker Media Claims Reserve of the lesser of (i) the Allowed amount of its Claim and (ii) $25,000 and (b) have all of its Claims against Gawker Media, GMGI, and/or Gawker Hungary Disallowed and expunged (with any Debtor objections to such Claims sustained).

(ii)    Voting:  Class 2E is Impaired.  By electing to participate in the Gawker Media Convenience Claims Class, holders of Claims in Class 2E are deemed to have voted to accept the Plan pursuant to the terms of the Solicitation Procedures.

(f)    Class 2F(i) – Gawker Media Gawker Hungary Intercompany Claims.

-26-

(i)     Classification:   Class 2F(i) shall consist of Gawker Hungary Intercompany Claims against Gawker Media, including, but not limited to, the Claim resulting from the Gawker Hungary Intercompany Notes.

(ii)    Treatment:   Pursuant to the Intercompany Settlement, Gawker Hungary will receive on account of the Gawker Media Gawker Hungary Intercompany Claim (i) a distribution of up to $16,000,000 in Cash from Gawker Media on the Effective Date, and (ii) a distribution of any Cash remaining at Gawker Media on the Gawker Media Claims Reserve Distribution Date after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have either (a) received the full amount of the treatment set forth in Sections 3.02(c) and 3.02(d) of this Plan or (b) or an amount has been reserved that the Plan Administrator deems adequate to pay the full amount of the treatment set forth in Sections 3.02(c) and 3.02(d) of this Plan, to repay up to any outstanding amounts of the Gawker Media Gawker Hungary Intercompany Claims, including any interest that accrues on such outstanding amounts through the Gawker Media Claims Reserve Distribution Date, which repayment to Gawker Media shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of this Plan.

(iii)   Voting:   Class 2F(i) is Impaired.  Holders of Claims in Class 2F(i) entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(g)     Class 2F(ii) – Gawker Media GMGI Intercompany Claims.

(i)     Classification:   Class 2F(ii) shall consist of GMGI Intercompany Claims against Gawker Media, including, but not limited to the Claim resulting from the GMGI Promissory Note.

(ii)    Treatment:   Any and all Intercompany Claims held by GMGI against Gawker Media are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)   Voting:   Class 2F(ii) is Impaired.  Holders of Claims in Class 2F(ii) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(h)     Class 2G – Gawker Media Membership Interest.

(i)     Classification:  Class 2G shall consist of GMGI, the holder of the Gawker Media Membership Interest.

(ii)    Treatment:   GMGI will receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Media Membership Interest, (a) its Pro Rata share of the Gawker Media Contingent Equity Proceeds as soon as reasonably practicable after receipt and (b) on the Gawker Media Claims Reserve Distribution Date, Cash remaining in the Gawker Media Claims Reserve after either (x) satisfaction of all Allowed Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims, excluding Post-Petition Interest or (y) creation of a reserve that the Plan Administrator

deems adequate to satisfy such claims, which amounts in subsections (a) and (b) of this paragraph shall be immediately distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments set forth in in Section 3.01 of the Plan.

(iii)    Voting:  Class 2G is Impaired.  GMGI, in its capacity as holder of the Gawker Media Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

3.03    Classification and Treatment of Claims Against and Equity Interests in Gawker Hungary.

(a)    Class 3A – Gawker Hungary Second Lien Make-Whole Guaranty Claim.  As part of a settlement under Bankruptcy Rule 9019, which settlement is conditioned on the occurrence of the Effective Date, the Second Lien Lender and the Debtors have agreed as follows:

(i)    Classification: Class 3A shall consist of the Gawker Hungary Second Lien Make-Whole Guaranty Claim.

(ii)    Allowance:  The Gawker Hungary Second Lien Make-Whole Guaranty Claim is Allowed as a Secured Claim against Gawker Hungary in the amount of $1,250,000.

(iii)    Treatment:  The Second Lien Lender will receive, in full and complete settlement and release of, and in exchange for, the Gawker Hungary Second Lien Make-Whole Guaranty Claim, (a) on the Effective Date, a distribution in Cash in the amount of $500,000 and (b) on, or as soon as practicable after, the date that all Allowed GMGI General Unsecured Claims have either been (i) paid in full or (ii) provided for in a reserve deemed adequate by the Plan Administrator to pay all Allowed GMGI General Unsecured Claims, a distribution in Cash from the Gawker Hungary Second Lien Make-Whole Guaranty Reserve up to an aggregate total of $750,000; provided, however, that in the event that Gawker Hungary dissolves before the payment to the Second Lien Lender described in clause (b) above occurs, then GMGI assumes this obligation and the Second Lien Lender will receive the corresponding distribution in Cash from GMGI in addition to and Pro Rata with the treatment of the GMGI Second Lien Make-Whole Claim set forth in Section 3.01(a)(iii)(b) of the Plan.

(iv)    Voting:  Class 3A is Impaired.  The holder of the Gawker Hungary Second Lien Make-Whole Guaranty Claim is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(b)    Class 3B – Gawker Hungary Other Priority Claims.

(i)    Classification:  Class 3B shall consist of all Other Priority Claims against Gawker Hungary.

(ii)    Treatment:  Except to the extent that a holder of an Allowed Gawker Hungary Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Gawker Hungary Other Priority Claim will receive on account of, and in full and

-28-

complete settlement and release of such Claim, payment in full in Cash on the later of (i) (a) the Effective Date, or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon thereafter as practicable; or (ii) such other date as may be ordered by the Bankruptcy Court.

(iii)    Voting:    Class 3B is Unimpaired.  Holders of claims in Class 3B are not entitled to vote to accept or reject the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(c)    Class 3C – Gawker Hungary General Unsecured Claims.

(i)    Classification:    Class 3C shall consist of the Gawker Hungary General Unsecured Claims.

(ii)    Treatment:    Except to the extent that a holder of an Allowed Gawker Hungary General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Gawker Hungary General Unsecured Claim will receive, in full and complete settlement and release of, and in exchange for, such Claim, a distribution on the Effective Date equal to payment in full in Cash of the Allowed Gawker Hungary General Unsecured Claim, plus Post-Petition Interest.

(iii)    Voting:    Class 3C is unimpaired.  Holders of claims in Class 3C are not entitled to vote to accept or reject the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(d)    Class 3D(i) – Gawker Hungary GMGI Intercompany Claims.

(i)    Classification:    Class 3D(i) shall consist of the GMGI Intercompany Claims against Gawker Hungary.

(ii)    Treatment:    Any and all Intercompany Claims held by GMGI against Gawker Hungary are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:    Class 3D(i) is Impaired.  Holders of claims in Class 3D(i) are not entitled to vote to accept or reject the Plan and are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

(e)    Class 3D(ii) – Gawker Hungary Gawker Media Intercompany Claims.

(i)    Classification:    Class 3D(ii) shall consist of the Gawker Media Intercompany Claims against Gawker Hungary.

(ii)    Treatment:    Any and all Intercompany Claims held by Gawker Media against Gawker Hungary are resolved pursuant to the Intercompany Settlement with no distribution on account of such Claims.

(iii)    Voting:  Class 3D(ii) is Impaired.  Holders of claims in Class 3D(ii) are entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

(f)    Class 3E – Gawker Hungary Membership Interest.

(i)    Classification:  Class 3E shall consist of GMGI, the holder of the Gawker Hungary Membership Interest.

(ii)    Treatment:  GMGI will receive, in full and complete settlement, release, and discharge of, and in exchange for the Gawker Hungary Membership Interest, (a) on the Effective Date, a distribution of all of the Cash held by Gawker Hungary after payment in full of the Allowed Claims against Gawker Hungary and any amounts reserved by the Plan Administrator, in its reasonable discretion, for Disputed Claims against Gawker Hungary and anticipated expenses of liquidating Gawker Hungary, and (b) on the date of the dissolution of Gawker Hungary, a distribution of the remaining Cash and assets held by Gawker Hungary, which shall be distributed to holders of Allowed Claims against and Equity Interests in GMGI pursuant to the treatments specified in Section 3.01 of the Plan.

(iii)    Voting:  Class 3E is Impaired.  GMGI, in its capacity as holder of the Gawker Hungary Membership Interest, is entitled to vote to accept or reject the Plan pursuant to the terms of the Solicitation Procedures.

3.04    Compliance with Tax Requirements.  For purposes of distributions on any interest-bearing obligations, distributions under the Plan shall be applied first in payment of the principal portion of such Allowed Claims and, after full payment of such principal portion, then to the portion of such Allowed Claims comprised of any interest accrued but unpaid at the Petition Date.  Notwithstanding any other provision of this Plan, each entity receiving a distribution pursuant to this Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other tax obligations.

3.05    Payments to Plan Reserve Accounts.  Subject to Section 3.04, any payment to a Plan Reserve Account shall be deemed a Distribution to the applicable beneficiary(ies) of such Plan Reserve Account as of the date of funding of the Plan Reserve Account.

3.06    Set-offs and Recoupments.  Except to the extent an Administrative or Priority Claim has been previously Allowed or is Allowed by the Plan, a Debtor may, but shall not be required to, set off or recoup against any Administrative or Priority Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Administrative or Priority Claim, claims of any nature whatsoever which a Debtor may have against the holder of such Administrative or Priority Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Administrative Claim hereunder shall constitute a waiver or release by the applicable Debtor of any such claim or counterclaim that it may have against such holder.

-30-

3.07    <u>Allocation of Distributions</u>.  Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

3.08    <u>Manner of Payments</u>.  Unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Debtors shall be made, at the election of the Debtors or the Plan Administrator, as applicable, by check drawn on a domestic bank or by electronic or wire transfer from a domestic bank; <u>provided</u>, <u>however</u>, that no Cash payments shall be required to be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than twenty dollars ($20.00).

3.09    <u>Delivery of Distributions</u>.  Subject to the provisions of Section 3.09 of the Plan, distributions and deliveries to each holder of an Allowed Claim or Equity Interest will be made (i) at the address set forth for such holder in the Debtor's Schedules if no proof of claim has been filed on behalf of such holder, (ii) at the address reflected in the proof of claim filed by such holder, or (iii) at the address set forth in any written notices of address change delivered after the date of any related proof of claim by such holder.  If any distribution is returned as undeliverable, no further distributions to the applicable holder will be made unless and until the Plan Administrator is notified of the holder's then current address, in which case all missed distributions will be made to the holder without interest on the next GMGI or Gawker Media Distribution Date, as applicable.  Any claim in respect of such an undeliverable distribution shall be made on or before the first anniversary of the Effective Date or the applicable GMGI or Gawker Media Distribution Date.  After such date, all claims in respect of undeliverable distributions shall be discharged and forever barred and the Debtors shall retain all monies related thereto.  The Debtors shall be entitled to rely upon the register of Claims as of the Distribution Record Date.

3.10    <u>Uncashed Checks</u>.  Checks issued by the Debtors on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing directly to the applicable Debtor by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first anniversary of the (a) Effective Date or, (b) as applicable, the GMGI Distribution Date or the Gawker Media Distribution Date, or (ii) ninety (90) days after the date of issuance of such check.  After such date, all claims in respect of voided checks shall be discharged and forever barred and the applicable Debtor shall retain all monies related thereto.

3.11    <u>Amendment to Claims</u>.  On or after the Effective Date, except as provided herein, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the Plan Administrator, and, to the extent such prior authorization is not received, any such amended Claim filed shall be deemed disallowed in full and expunged without any further action.

-31-

## ARTICLE 4
## IMPLEMENTATION OF THE PLAN

4.01    Plan Settlements.    The terms of this Plan incorporate the Plan Settlements among the Debtors, the Second Lien Lender, Bollea, and certain other creditors that shall become effective on the Effective Date.    The terms of the Plan Settlements are as follows:

(a)    The Second Lien Make-Whole Claims Settlement.    In full and complete settlement, release, and discharge of, and in exchange for, any outstanding claims that the Second Lien Lender may assert arising from, or in connection with, the Second Lien Make Whole Provision, the Second Lien Lender agrees to receive the treatment of the Second Lien Make-Whole Claims set forth in Sections 3.01(a), 3.02(a), and 3.03(a) of this Plan.    In addition to the foregoing, the Debtors shall, on the Effective Date and to the extent invoiced, pay the Second Lien Lender Expenses, without application by any such parties to the Bankruptcy Court, and without notice and a hearing; provided, however, if the Debtors and any such party cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on the Effective Date and any disputed amounts to be escrowed by the Debtors).

(b)    Intercompany Settlement.    In full and complete settlement, release, and discharge of, and in exchange for, any claims that any of the Debtors might have against one another on account of (i) the Gawker Hungary Intercompany Notes, (ii) the GMGI Promissory Note, (iii) any Claims or Causes of Actions that any Debtor may assert against any other Debtor, including, without limitation and claims or causes of action arising based on subrogation, veil piercing or *alter ego*, and (iv) allocation among the Debtors' estates of (1) the Unimoda Purchase Price, (2) payment of outstanding principal, accrued interest and fees under the DIP Loan and the Second Lien Term Loan, (3) professional fees and other administrative expenses accrued from each Debtor's Petition Date through closing of the Unimoda Sale, (4) Final Professional Fees, (5) the Second Lien Make-Whole Claims Settlement, and (6) any other allocation of claims among the Debtor estates, each of the Debtors agrees to the following provisions:

(i)    the Debtors will allocate the proceeds and expenses listed above in Section 4.01(b)(iv) of this Plan in a manner that provides for establishment of the Plan Reserve Accounts and treatments of Claims and Equity Interests set forth in Article 3 of this Plan;

(ii)    GMGI will provide the GMGI Plan Guaranty for the benefit of holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims;

(iii)    GMGI shall transfer 45.0% of Gawker Media Contingent Proceeds for deposit in the Gawker Media Contingent Proceeds Creditor Account for satisfaction of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims.

(iv)    Each of the Debtors agrees that the treatment of Claims and Equity Interests of each of the Debtors against or in the other Debtors will be as set forth in Article 3 of this Plan; and

(v)    each of the Debtors agrees to the terms of the Second Lien Make-Whole Claims Settlement, the Bollea Settlement, and the settlement of the Terrill Claims and Ayyadurai Claims.

(c)    Bollea Settlement.  In full and complete settlement, release, and discharge of, and in exchange for, the Bollea Claims, Bollea will receive (i) on the Effective Date, or within three Business Days thereafter, $31,000,000 in Cash from Gawker Media, and (ii) his Pro Rata share (calculated based on an Allowed Gawker Media General Unsecured Claim amount of $84,000,000) of Distributions from the Gawker Media Contingent Proceeds Creditor Account.

(d)    Other Settlements.  In full and complete settlement, release, and discharge of, and in exchange for, the Ayyadurai Claims and the Terrill Claims, Ayyadurai and Terrill will receive, on the Effective Date, or within three Business Days thereafter, $750,000 and $500,000 respectively, in Cash from Gawker Media, have their Claims be deemed Allowed in such amounts solely for voting purposes, and waive any entitlement to Distributions from the Gawker Media Contingent Proceeds Creditor Account,.

4.02    Effective Date Transactions.    On the Effective Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(a)    GMGI establishes and funds the GMGI Professional Fee Claim Reserve, Gawker Media establishes and funds the Gawker Media Professional Fee Claim Reserve, and Gawker Hungary establishes and funds the Gawker Hungary Professional Fee Claim Reserve;

(b)    Gawker Media establishes and funds the Gawker Media Claims Reserve and Gawker Media Second Lien Make-Whole Guaranty Reserve, and establishes the Gawker Media Contingent Proceeds Creditor Account;

(c)    Gawker Hungary establishes and funds the Gawker Hungary Second Lien Make-Whole Guaranty Reserve;

(d)    GMGI establishes and funds the GMGI Plan Guaranty Reserve;

(e)    Gawker Hungary makes distributions to holders of Claims against and Equity Interests in Gawker Hungary, pursuant to the Plan treatments set forth in Section 3.03 of the Plan, subject to the reserve required under Section 3.03(a)(iii)(b)(2) of this Plan;

59969188_7

(f)      Gawker Media makes distributions to holders of certain Claims against, and Equity Interests in, Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a)(iii)(a), 3.02(b), 3.02(e), 3.02(f)(i), and 3.02(h) of this Plan; and

(g)      GMGI makes distributions to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserves required under Sections 3.01(a)(iii)(b) and 3.01(a)(iii)(c) of this Plan.

4.03      <u>Gawker Media Claims Reserve Distribution Date Transactions</u>.  On the Gawker Media Claims Reserve Distribution Date, the following transactions shall be deemed to occur, and the following distributions shall be deemed to be made, in the order set forth below:

(a)      Gawker Media makes distributions to, or creates reserves for the benefit of, holders of Claims against and Equity Interests in Gawker Media, pursuant to the Plan treatments set forth in Sections 3.02(a), 3.02(c), and 3.02(d) of this Plan;

(b)      Gawker Media makes any distributions remaining due to, or creates reserves for the benefit of, holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve;

(c)      Gawker Media makes any distributions remaining due to, or creates reserves for the benefit of, holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from the GMGI Plan Guaranty Reserve;

(d)      Gawker Media makes any distributions remaining due to, or creates reserves for the benefit of, holders of Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims from any Cash remaining at Gawker Media;

(e)      The Plan Administrator distributes to the Second Lien Lender any amounts remaining in the Gawker Media Second Lien Make-Whole Guaranty Claims Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have either (i) been satisfied in full, excluding Post-Petition Interest or (ii) creation of a reserve that the Plan Administrator deems adequate to satisfy such Claims;

(f)      The Plan Administrator distributes to GMGI any amounts remaining in the GMGI Plan Guaranty Reserve after Gawker Media General Unsecured Claims and Gawker Media Punitive Damage Claims have either (i) been satisfied in full, excluding Post-Petition Interest or (ii) creation of a reserve that the Plan Administrator deems adequate to satisfy such Claims;

(g)      Gawker Media repays any Cash remaining to Gawker Hungary on account of Gawker Media Gawker Hungary Intercompany Claims that remain outstanding, including

-34-

accrued interest on such outstanding Gawker Media Gawker Hungary Intercompany Claims, which amount Gawker Hungary then distributes to GMGI for distribution to holders of Claims against and equity interests in GMGI pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) and Section 3.01(a)(iii)(c) of this Plan;

(h)    Gawker Media distributes any Cash remaining after satisfaction of all outstanding Gawker Media Gawker Hungary Intercompany Claims to GMGI for distribution to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) and Section 3.01(a)(iii)(c) of this Plan; and

(i) GMGI makes distributions of remaining Cash at GMGI to holders of Claims against and Equity Interests in GMGI, pursuant to the Plan treatments set forth in Section 3.01 of the Plan, subject to the reserve required under Section 3.01(a)(iii)(b) and Section 3.01(a)(iii)(c) of this Plan.

4.04    Gawker Media Contingent Proceeds Distribution Date Transactions.  On each Gawker Media Contingent Proceeds Distribution Date, the Plan Administrator shall make Distributions from the Gawker Media Contingent Proceeds Creditor Account to holders of Claims against Gawker Media pursuant to Sections 3.02(c) and 3.02(d) of this Plan.

4.05    Corporate Action.  Confirmation of the Plan shall constitute authorization for the Debtors, and their respective trustees, officers, board of directors, and agents, to effectuate the Plan and to execute, issue, deliver, file, or record all contracts, instruments, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other entity except for those expressly required pursuant to this Plan.  All matters provided for in the Plan involving any corporate action to be taken by or required of the Debtors in connection with the Plan shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects, without any requirement of further action by the Debtors, or their agents, representatives, trustees, stockholders, members, managers, officers, or directors.

4.06    Vesting of Assets.  Except as otherwise provided in the Plan, upon the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all property of the estate of each Debtor not otherwise distributed or released on the Effective Date shall vest in that Debtor for the benefit of the holders of Claims against and Equity Interests in that Debtor consistent with the treatments set forth in Article 3 of this Plan.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, after the Effective Date, each of the Debtors shall retain and enforce any claims or interests belonging to each of their respective chapter 11 bankruptcy estates that were not released by the Plan.  From and after the Effective Date, the Debtors, acting through the Plan

Administrator, may take any action consistent with the terms of the Plan, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

4.07    <u>Resignation of Officers and Directors</u>.  Upon the Effective Date, any of the Debtors' remaining officers and members of their boards of directors shall be deemed to have resigned, if they have not already done so, without the necessity of any further action or writing, and they shall be released from any responsibilities, duties, and obligations that arise after the Effective Date to the Debtors or their creditors under the Plan or applicable law.

4.08    <u>Plan Administrator</u>.  On and after the Effective Date, the Debtors will be managed by the Plan Administrator, who shall have all corporate powers, including those for which board and/or shareholder voting would otherwise be necessary.  The initial Plan Administrator shall be identified in the Plan Supplement.  Except as otherwise ordered by the Court, the expenses incurred by the Debtors on or after the Effective Date may be paid by the Debtors in accordance with the Plan Administrator Agreement, without further order of the Bankruptcy Court.  The Plan Administrator shall have no obligation to pursue the Retained Causes of Action identified in the Plan Supplement for the benefit of the Debtors' stakeholders, except to the extent that such obligations are set forth in the Plan Administrator Agreement or are consistent with the Plan Administrator's fiduciary obligations.  In the event that such claims are pursued, they shall be prosecuted on a contingency fee basis, and the Debtors shall be responsible for the costs and expenses associated with the prosecution of such claims.  The Plan Administrator shall deposit (i) 45% of any proceeds resulting from the General Retained Causes of Action into the Gawker Media Contingent Proceeds Creditor Account and (ii) 100% of any proceeds resulting from the Gawker Media Claims Reserve Retained Causes of Action into the Gawker Media Claims Reserve.

4.09    <u>Plan Administrator Agreement</u>.  On the Effective Date, the Plan Administrator Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.  After the Effective Date, the Plan Administrator Agreement may be amended in accordance with its terms without further order of the Court.  The Plan Administrator Agreement shall be substantially in the form contained in the Plan Supplement, which shall be filed prior to the Confirmation Hearing.

4.10    <u>Plan Indemnity.</u>  In addition to the matters set forth in this Plan and not by way of limitation thereof, the Plan Administrator, on behalf of the Debtors, may, in its sole discretion, determine to continue to indemnify and/or hold harmless any Persons who are or were managers, officers, directors, employees, writers, editors, and independent contractors that were employed by, or paid to contribute articles to, the Debtors including, without limitation, current and former 1099 employees and current and former independent contractors of any of the Debtors at any time on or after the Petition Date on account of and with respect to any claims (whether or not any Proof of Claim or cure claim has been filed with respect thereto) or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities threatened or asserted by any Person against any such managers, officers, directors, employees, writers, editors, and independent contractors that were employed by, or paid to contribute articles

-36-

to, the Debtors including, without limitation, current and former 1099 employees and current and former independent contractors of any of the Debtors with respect to or based upon, in whole or in part, any act taken or omitted to be taken, or alleged act taken or omitted to be taken, in such capacities on or prior to the Effective Date, irrespective of whether such amounts are owed in connection with a prepetition or postpetition act or omission, but in each case only to the extent that the acts, omissions or alleged acts or omissions of such applicable Person were indemnifiable by the Debtors (whether in the bylaws, certificates of incorporation, charters, operating agreements, board resolutions, or employment contracts).  The Plan Administrator, on behalf of the Debtors, is further authorized, but not required, to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the Debtors' directors and officers tail insurance policy, without further notice to or order of the Bankruptcy Court.

       4.11   <u>Sale of Gawker.com Assets</u>.  The Plan Administrator, in conjunction with its advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets upon the expiration of the non-compete agreement that is part of the Unimoda Sale.

       4.12   <u>Binding Effect.</u>  On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan

       4.13   <u>Continuation of Stays</u>.  Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

       4.14   <u>Cancellation and Surrender of Instruments, Securities, and Existing Agreements</u>.  On the Effective Date and concurrently with the applicable distributions made pursuant to Articles 3 of the Plan, except the Membership Interests in Gawker Media and Gawker Hungary, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests against the Debtors shall be deemed cancelled and of no further force and effect against the Debtors, without any further action on the part of any Debtor.  From and after the making of the applicable distributions pursuant to the Plan, the holders of such notes, instruments, certificates, and other documents shall have no rights against the Debtors arising from or relating to such notes, instruments, certificates, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan.

       4.15   <u>Dissolution of the Debtors</u>.  Any Debtor not yet dissolved shall be dissolved upon the occurrence of the final Gawker Media Claims Reserve Distribution Date and its completion of its respective duties and obligations under the Plan, and all corporate approvals necessary for such action shall be deemed satisfied.  The Plan Administrator may, in its discretion, dissolve Gawker Hungary (as required under the Unimoda APA) or Gawker Media following the Effective Date but prior to the Gawker Media Claims Reserve Distribution Date,

upon the completion of Gawker Hungary or Gawker Media's duties and obligations under the Plan.

4.16    Dissolution of the Committee.  On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Bankruptcy Cases, except to the extent necessary to prosecute any appeals or other matters with respect to which they have been granted standing. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

**ARTICLE 5**
**PROVISIONS FOR TREATMENT OF**
**SUBSEQUENT PLAN DISTRIBUTIONS**

5.01    Objections to and Estimation of Claims.  After the Effective Date, the Debtors or the Plan Administrator shall have sole authority to object to the allowance of Claims and Equity Interests with respect to which they dispute liability in whole or in part.  All objections shall be litigated to a Final Order; provided, however, that the Debtors or the Plan Administrator may compromise and settle, withdraw, or resolve by any other method approved by the Bankruptcy Court, any objections to Claims or Equity Interests.  In addition, the Debtors or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim.  Except as otherwise provided by order of the Bankruptcy Court, the Debtors or the Plan Administrator may file an objection to any Claim or Equity Interest until 180 days after the Effective Date.

5.02    Professional Fee Claim Procedures.  All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Committee prior to the Effective Date must be filed with the Bankruptcy Court and served on the Plan Administrator, Debtors, the Committee, their respective counsel, and  the United States Trustee, no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Plan Administrator, the United States Trustee, and the requesting party no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

5.03    Professional Fee Claim Reserves.  On and after the Effective Date, the Plan Administrator shall set aside and withhold from distribution, the Professional Fee Claim Reserves.  Amounts held in the Professional Fee Claim Reserves shall not constitute property of the Debtors, shall reflect the Plan Administrator's good faith estimate of the fees required to administer each of the Debtors after the Effective Date, and shall only be distributed in accordance with this Section 5.03.  In the event there is a remaining balance in the GMGI, Gawker Media, or Gawker Hungary Professional Fee Claim Reserve after payment of all Allowed Professional Fee Claims against the applicable Debtor, in accordance with Section 2.03 of the Plan, such remaining amount, if any, shall be returned to the applicable Debtor for

distribution pursuant to the Plan. For the avoidance of doubt, the amount reserved by the Plan Administrator pursuant to this Section 5.03 shall not be deemed an admission as to the allowability or amount of any Claim in whole or in part. To the extent that the Professional Fee Reserves prove insufficient to satisfy Professional Fee Claims, the Plan Administrator shall pay Professionals from funds that might otherwise be available to distribute to holders of Allowed Claims and Equity Interests.

5.04    <u>Payments and Distributions on Disputed Claims</u>. On the Gawker Media Distribution Date and each GMGI Distribution Date, each holder of an Allowed Claim and Equity Interest will receive all payments and distributions to which such holder is then entitled under the Plan. No partial payments and no partial distributions shall be made with respect to a Disputed Claim until the resolution of all Disputed Claims by settlement, Final Order, or other form of resolution of such Claim reasonably determined by the Plan Administrator.

## ARTICLE 6
## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

6.01    <u>Conditions to Confirmation</u>. The confirmation of the Plan by the Bankruptcy Court shall be subject to, and conditioned upon, entry of an order by the Bankruptcy Court approving the Disclosure Statement.

6.02    <u>Conditions to the Effective Date</u>. The effectiveness of the Plan shall be subject to, and conditioned upon:

(a)    The Confirmation Order becoming a Final Order,

(b)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made or, if made, remaining pending,

(c)    the Debtors and UniModa agree to the tax allocation of the Unimoda Purchase Price to the assets sold in the Unimoda Sale; and

(d)    All other actions and documents necessary to implement the Plan shall have been effected or executed.

6.03    <u>Waiver of Conditions to Confirmation or the Effective Date</u>. The conditions to confirmation and the conditions to the Effective Date may be waived in whole or part at any time by any Debtor without an order of the Bankruptcy Court.

6.04    <u>Effect of Nonoccurrence of Conditions to the Effective Date</u>. The Debtors reserve the right to seek to vacate the Plan at any time prior to the Effective Date. If the Confirmation Order is vacated pursuant to this Section 6.04 or if the Effective Date does not otherwise occur: (i) the Plan shall be null and void in all respects, and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against, or any interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

59969188_7

6.05    Notice of Effective Date.    The Debtors shall provide notice of the Effective Date of the Plan in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court.

## ARTICLE 7
## TREATMENT OF CONTRACTS AND LEASES

7.01    Rejection of Executory Contracts and Unexpired Leases.    Pursuant to sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies and the Intercompany Services Agreements necessary to preserve the Gawker.com Assets) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, shall be deemed rejected on the Effective Date.    The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of executory contracts and unexpired leases pursuant to this Section of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

7.02    Claims Based on Rejection of Executory Contracts and Unexpired Leases. Claims created by the rejection of executory contracts and unexpired leases pursuant to Section 7.01 of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Plan Administrator no later than thirty (30) days after the Effective Date.    Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section 7.01 for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Debtors' estate and their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article 5 of the Plan.

## ARTICLE 8
## RETENTION OF JURISDICTION

8.01    Retention of Jurisdiction.    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of these proceedings to the extent legally permissible, including for the following purposes, among other things:

(a)    to determine any and all applications, adversary proceedings, and contested matters pending as of the Effective Date, if any;

(b)    to determine any and all objections to the allowance of Claims and Equity Interests, if any;

(c)    to determine any and all applications for allowance of compensation and reimbursement of expenses;

-40-

59969188_7

(d)      to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order;

(e)      to effectuate payments under and performance of the provisions of the Plan;

(f)      to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to determine the Debtors' motion, if any, to modify the Plan in accordance with section 1127 of the Bankruptcy Code;

(h)      to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)      to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, in the Confirmation Order;

(j)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

(k)      to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

(l)      to hear and determine any request for relief from the injunction provided for under section 9.02 of this Plan;

(m)      to enter a final decree closing the Bankruptcy Case;

(n)      to determine any matter (1) under the Unimoda APA, (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement;

(o)      to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

(p)      to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors; and

(q)      to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

-41-

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Cases, including the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### ARTICLE 9
### INJUNCTIONS, RELEASES, AND EXCULPATION

9.01    **INJUNCTION AGAINST ASSERTING CLAIMS OF DEBTORS.
ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES OTHER THAN THE PLAN ADMINISTRATOR ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING (WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR OTHERWISE) ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEBT, RIGHT, OR CAUSE OF ACTION OF THE DEBTORS FOR WHICH A DEBTOR RETAINS SOLE AND EXCLUSIVE AUTHORITY TO PURSUE IN ACCORDANCE WITH ARTICLE 4 OF THE PLAN.**

9.02    **INJUNCTION AGAINST INTERFERENCE WITH PLAN.  UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS OR RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, PRESENT OR FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER CONTENT PROVIDERS, PRESENT OR FORMER WRITERS, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING (A) PROPERTY OF ANY OF THE DEBTORS BEING DISTRIBUTED UNDER THE PLAN AND (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH PROCEEDINGS AGAINST THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS ARE RELEASED PURSUANT TO SECTION 9.05 OF THE PLAN, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST (A) PROPERTY OF ANY OF THE DEBTORS BEING DISTRIBUTED**

-42-

UNDER THE PLAN AND (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH ACTIONS ARE RELEASED PURSUANT TO SECTION 9.05 OF THE PLAN, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST (A) PROPERTY OF ANY OF THE DEBTORS BEING DISTRIBUTED UNDER THE PLAN AND (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH ACTIONS ARE RELEASED PURSUANT TO SECTION 9.05 OF THE PLAN, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE (A) IN RESPECT OF PROPERTY OF ANY OF THE DEBTORS BEING DISTRIBUTED UNDER THE PLAN AND (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH ACTIONS ARE RELEASED PURSUANT TO SECTION 9.05 OF THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN; PROVIDED, HOWEVER, THAT (X) THE FOREGOING INJUNCTION SHALL NOT APPLY TO ACTIONS OR OMISSIONS THAT OCCUR AFTER THE SALE CLOSING DATE AND (Y) THE BANKRUPTCY COURT MAY PROVIDE RELIEF FROM THE FOREGOING INJUNCTION WITH RESPECT TO CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES NOT OTHERWISE RELEASED UNDER SECTIONS 9.03 AND 9.05 OF THIS PLAN.

9.03    **RELEASES BY THE DEBTORS.**    ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, THE DEBTORS, ON THEIR OWN BEHALF AND AS REPRESENTATIVE OF THE DEBTORS' ESTATES, RELEASE UNCONDITIONALLY AND ARE HEREBY DEEMED TO RELEASE UNCONDITIONALLY, (I) EACH AND ALL OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE IN CONNECTION WITH THE DEBTORS, THEIR ASSETS, OR PROPERTY AND (II) EACH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR

-43-

HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE PETITION DATE THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE DEBTORS DO NOT WAIVE ANY DEFENSES THAT THE DEBTORS HAVE TO CLAIMS THAT SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR MAY ASSERT AGAINST THE DEBTORS.

9.04   <u>EXCULPATION</u>.  TO THE EXTENT PERMITTED BY SECTION 1125(e) OF THE BANKRUPTCY CODE AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND APPROVED IN THE CONFIRMATION ORDER, NONE OF THE DEBTORS OR THE COMMITTEE, NOR ANY OF THEIR RESPECTIVE FORMER OR CURRENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, ADVISORS, AFFILIATES, ATTORNEYS, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, RESTRUCTURING ADVISORS, REPRESENTATIVES, OR AGENTS SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF, (I) ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY RELATING TO THE COMMENCEMENT AND PROSECUTION OF THE BANKRUPTCY CASES, (II) THE FORMULATION, NEGOTIATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, (III) THE SOLICITATION OF ACCEPTANCES OF THE PLAN, (IV) THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR (V) THE ENFORCEMENT OF THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, AND DOCUMENTS DELIVERED THEREUNDER; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACTIONS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER. IN ADDITION, THE EXCULPATED PARTIES SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. NOTHING HEREIN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ATTORNEY DISCIPLINARY RULES.

9.05   <u>THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS</u>.  ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS,

-44-

**SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE SALE CLOSING DATE ARISING OUT OF OR RELATING TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, THAT ARE NOT PRESERVED BY ANY SETTLEMENTS BETWEEN A HOLDER OF A CLAIM AND ANY OF THE DEBTORS, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, <u>PROVIDED, HOWEVER</u>, THAT THE FOREGOING THIRD-PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE<u>.</u>**

       9.06    <u>Waiver of Statutory Limitations on Releases</u>.  Each of the releasing parties in each of the releases contained in sections 9.03 and 9.05 above expressly acknowledges that although ordinarily a general release may not extend to claims which the releasing party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

**ARTICLE 10**
**MISCELLANEOUS**

       10.01    <u>Severability</u>.   Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

       10.02    <u>Revocation of the Plan</u>.   The Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to

-45-

prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

10.03  <u>Effectuating Documents; Further Transactions; Timing</u>.  Each of the officers of the Debtors shall be deemed to be authorized as fully as if under resolutions of the Debtors' boards of directors or shareholders to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such action(s) as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.  All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously.

10.04  <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(c) of the Bankruptcy Code, none of (i) the issuance transfer or exchange of any security under, in furtherance of, or in connection with, this Plan, (ii) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by this Plan (including real and personal property), or (iii) the disposition and/or encumbrance of assets in connection with any transactions contemplated hereunder (including any subsequent sale of property pursuant to the Plan), shall be subject to any stamp, real estate transfer, mortgage recording sales, use, or other similar tax.

10.05  <u>Binding Effect</u>.  The Plan shall be binding upon, and shall inure to the benefit of the Debtors, the holders of all Claims and Equity Interests, and any other Person identified in the Plan, and their respective successors and assigns.

10.06  <u>Modification of Treatment</u>.  The Debtors reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the holder of such Claim or Equity Interest at any time after the Effective Date upon the prior written consent of the holder whose Allowed Claim or Equity Interest treatment is being adversely affected.

10.07  <u>Notices</u>.  Any notice required or permitted to be provided under the Plan shall be in writing and served by: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight carrier service, freight prepaid, to be addressed as follows:

If to Gawker Media LLC, to:

Gawker Media LLC
c/o Opportune LLP
Attn: William D. Holden
Chief Restructuring Officer
10 East 53rd Street, 33rd Floor
New York, NY 10022

If to Gawker Hungary, to:

Gawker Hungary Kft.

c/o Opportune LLP
Attn: William D. Holden
10 East 53rd Street, 33rd Floor
New York, NY 10022

If to GMGI, to:

Gawker Media Group, Inc.
c/o Opportune LLP
Attn: William D. Holden
Chief Restructuring Officer
10 East 53rd Street, 33rd Floor
New York, NY 10022

with copies to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attn: Gregg M. Galardi
       D. Ross Martin
       Joshua Y. Sturm
       Jonathan M. Agudelo
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
ross.martin@ropesgray.com
joshua.sturm@ropesgray.com
jonathan.agudelo@ropesgray.com


If to the Plan Administrator:

Opportune LLP
Attn: William D. Holden
Chief Restructuring Officer
10 East 53rd Street, 33rd Floor
New York, NY 10022

[*Remainder of page intentional left blank.*]

10.08  <u>Post-Confirmation Fees And Reports</u>.  Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator shall be responsible for the timely payment of all fees incurred pursuant to section 1930 of Title 28 to the United States Code. Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator also shall file with the Bankruptcy Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the Bankruptcy Case remain open, in a format prescribed by the United States Trustee in accordance with the guidelines of the Office of the United States Trustee.

New York, New York
December 11, 2016

GAWKER MEDIA LLC

By: _____
Name: William D. Holden
Title: Chief Restructuring Officer

GAWKER MEDIA GROUP, INC.

By: _____
Name: William D. Holden
Title: Chief Restructuring Officer

GAWKER HUNGARY KFT.

By: _____
Name: William D. Holden
Title: Managing Director

## **SUMMARY OF EXHIBITS**

| Exhibit | Document |
|---|---|
| A | Form of Plan Administrator Agreement |

**Exhibit A**
Form of Plan Administrator Agreement

PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (the "Agreement") is made this [__] day of December, 2016, by and between Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary"), and Gawker Media LLC ("Gawker Media," and collectively with GMGI and Gawker Hungary, the "Debtors") and Opportune LLP ("Opportune") for the purpose of Opportune providing plan administrator services to the Debtors.  This Agreement sets forth, among other things, the scope of such services (the "Services"), and the basis of compensation for those Services.

**1) Scope of Services**

Opportune will provide the following plan administrator Services pursuant to the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may be amended and supplemented, the "Plan")[5] and the Order of the United States Bankruptcy Court for the Southern District of New York overseeing the Debtors' chapter 11 cases (the "Bankruptcy Court") confirming the Plan, dated as of December [__], 2016 (the "Confirmation Order"):

    a)   General Plan Administrator Functions.  In connection with this engagement, Opportune shall make available to the Company William D. Holden, a Managing Director in Opportune's Restructuring Practice to serve in the role of Plan Administrator for the Debtors (the "Plan Administrator").  The Plan Administrator shall devote such time to the performance of his services hereunder as he determines appropriate in his discretion.  The Plan Administrator hereby accepts its employment and appointment as the Plan Administrator.

    b)   Duties, Power and Rights.  From and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof, and shall be the sole representative of the Debtors, succeeding to such powers as would have been applicable to the Debtors' officers and directors.  The Plan Administrator shall have all duties, powers and rights set forth herein, in the Plan, and in the Confirmation Order, including, but not limited to, the following activities:

        i)   conduct a process for the sale or disposition of the Gawker.com Assets consistent with the terms of the Plan and any agreements of the Debtors;

        ii)   investigate and prosecute the Retained Causes of Action, if the Plan Administrator, in its sole discretion, deems appropriate;

        iii)   review, object to, and seek estimation of, Claims against, and Equity Interests in, the Debtors;

        iv)   compromise and settle Disputed Claims and Retained Causes of Action, in the ordinary course of business and without further notice to or order of the Bankruptcy Court;

        v)   administer and distribute the Plan Reserve Accounts pursuant to the Plan;

---

[5] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

vi)    take control of, preserve, and convert to Cash any additional asset of the Debtors, subject to the terms of the Plan;

vii)    make distributions to holders of Allowed Claims against and Equity Interests in, the Debtors consistent with the terms of the Plan;

viii)   pay expenses incurred in carrying out the powers and duties of the Plan Administrator, including professional fees incurred after the Effective Date;

ix)    prepare and file post-confirmation reports for each of the Debtors pursuant to the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules;

x)    support any audits of the Debtors conducted by U.S. and/or non-U.S. taxing authorities;

xi)    pay any fees due to the United States Trustee pursuant to section 1930(a)(6) of the Bankruptcy Code;

xii)   execute all documents appropriate to carry out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement;

xiii)  retain persons and professionals, including Plan Administrator Counsel (as defined below), to assist in carrying out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement; and

xiv)   take such further actions as the Plan Administrator deems necessary to effect the provisions of the Plan.

Subject to his business judgment and fiduciary responsibilities, the Plan Administrator will work on a collaborative basis with Plan Administrator Counsel to perform the foregoing activities.

c)  Finance and Accounting Functions.  The Plan Administrator will have primary responsibility for the following finance and accounting functions (to include but not be limited to):

i)    manage the financial and operational reporting processes to all internal and external constituents;

ii)    review and development of any material drafted for consumption outside the Debtors;

iii)   oversight and approval of expenditures and cash payments; and

iv)   management of the Plan Reserve Accounts.

## 2)  **Compensation and Staffing**

a)  Opportune will be paid by the Debtors for its Services at the standard hourly billing rates in effect for its personnel, based on the position held by such Opportune Personnel, which hourly rates are subject to periodic adjustments by Opportune to reflect economic and other conditions.  Opportune's hourly rates currently in effect are as follows:

59969188_7

| Professional | Rate / Hr. |
|---|---|
| Partner | $ 835.00 |
| Managing Director | $ 715.00 |
| Director | $ 605.00 |
| Manager | $ 540.00 |
| Senior Consultant | $ 420.00 |
| Consultant | $ 335.00 |
| Administrative Professional | $220.00 |

b) In the event any Opportune personnel are called to testify either in court of via deposition (in either case, "Testimony"), that professional's hourly rate will be increased by $100 for all Testimony and the time spent for any direct preparation related thereto.

c) Both Opportune and the Debtors acknowledge that the above professional fees are within industry and market rates, and have been negotiated to reflect the facts specific to this engagement. As such, the Debtors believe that the fee structure is reasonable in light of the Services requested.

d) Opportune will bill for its fees and out-of-pocket expenses no less frequently than on a monthly basis by providing an invoice summarizing the number of hours worked and expenses incurred, and the Debtors agree to remit in full the payment of such fees and expenses promptly.

## 3) Retention of Counsel and Agents

The Plan Administrator shall hire counsel to advise it in connection with its duties, powers, and rights under this Agreement (the "Plan Administrator Counsel") and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties herein, and pay reasonable compensation to such advisors. The Plan Administrator shall be entitled to retain professionals in his or her sole discretion, including any professionals employed by the Debtor in the Bankruptcy Cases. The provision of services by a professional to the Debtor shall not disqualify such professional from employment by the Plan Administrator.

Any professionals retained by the Plan Administrator, including the Plan Administrator Counsel, shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred. The payment of the fees, costs and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court. Any successor Plan Administrator shall receive such reasonable compensation as may be approved by the Bankruptcy Court.

59969188_7

**4)  Service of Plan Administrator.**

The Plan Administrator shall serve until (a) the termination of this Agreement, or (b) the Plan Administrator resigns or is otherwise discharged; provided, however, that if the Plan Administrator resigns, he or she shall continue to serve until a new Plan Administrator begins to serve.

**5)  Closing of Bankruptcy Cases; Termination**.

When (a) all Disputed Claims filed against the Debtors have become Allowed or have been Disallowed by Final Order, (b) all remaining assets of the Debtors and Plan Reserve Accounts have been liquidated and converted into Cash (other than those assets abandoned by the Debtors), and such Cash has been distributed in accordance with the Plan, and (c) all wind-down costs and expenses have been paid in full in Cash, the Plan Administrator shall promptly (i) seek authority from the Bankruptcy Court to close the Bankruptcy Cases for each of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules and (ii) effectuate the dissolution of the Debtors in accordance with applicable law. This Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 closing the Bankruptcy Cases of each of the Debtors.

Notwithstanding the foregoing, the Plan Administrator may dissolve Gawker Hungary prior to completion of the term of this Agreement, and upon such dissolution, Gawker Hungary shall no longer be deemed a party to this Agreement.

**6)  No Liability**

The Plan Administrator shall have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors or holders of Claims against or Equity Interests in the Debtors other than for fraud, gross negligence or wilful misconduct of the Plan Administrator.

**7)  Indemnification**

GMGI and Gawker Media shall jointly indemnify the Plan Administrator, Opportune, and their (as applicable) partners, employees, managers, principals, agents, affiliates, independent contracts, insurers (collectively, the "Indemnified Persons") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees and expenses paid or incurred by any Indemnified Person in connection with, arising out of or related to (whether from direct claims or third party claims) the engagement or this Agreement (including but not limited to any Indemnified Person's reasonable counsel fees and expenses). In addition to the foregoing indemnification, any Opportune personnel who may serve the Debtors shall be individually indemnified to the same extent as the most favourable indemnification GMGI or Gawker Media has extended to its officers or directors, whether under GMGI and Gawker Media's bylaws, certificates of incorporation, by contract or otherwise. The Plan Administrator shall be covered as an officer under GMGI's existing director and officer liability insurance policy as an "additional named insured" and as a "certificate holder" under each liability insurance policy of the Debtors, and, if not covered under such policies, the Plan Administrator shall be authorized to have an additional policy providing a comparable level of coverage purchased by the Debtors.  The provisions of this section are in the nature of contractual obligations and no change in applicable law or GMGI or Gawker Media's charter, bylaws or other organizational

4

documents or policies shall affect the Plan Administrator rights hereunder. The foregoing indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from the gross negligence, wilful misconduct or fraudulent acts of the Plan Administrator or Opportune.

**8)  Other Matters**

a) Access to Information.  In connection with this engagement, Opportune shall have complete and full access to all Debtor information that Opportune deems appropriate. Additionally, Opportune will have reasonable access to the Debtors' employees, counsel and other representatives (collectively the "Representatives") necessary to perform the Services as outlined in this engagement Letter.  It is understood that Opportune is relying solely upon the information supplied by the Debtors and its Representatives without assuming any responsibility for independent investigation or verification thereof.  All confidential information concerning the Debtors that is given to Opportune will be used solely in the course of performance of the Services outlined in this Agreement.  Except as required by law, such confidential information will not be disclosed to a third party without the Debtors' consent.

b) Projections; Reliance; Limitation of Duties.  The Debtors understand that the Services to be rendered may include the preparation of projections and other forward-looking statements for use in evaluating potential transactions and settlements and that numerous factors can affect the actual outcomes, which may materially and adversely differ from those projections and other forward-looking statements. In addition, Opportune will be relying on information provided by others.

c) Governing Law.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York and the state and federal courts located in the State of New York shall have exclusive jurisdiction in relation to any claim arising out of this Contract.  OPPORTUNE AND THE DEBTORS HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT, OR OTHERWISE) RELATING TO THIS AGREEMENT.

d) Dispute Resolution.  Without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

e) Retention of Jurisdiction.  The Bankruptcy Court shall retain jurisdiction over the Debtors to the fullest extent permitted by law, including, but not limited to, for the purposes of interpreting and implementing the provisions of this Agreement.

f) Conflict with Plan.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan.  To that end, the Plan Administrator shall have full power and authority to take any action consistent with the purposes and provisions of the Plan.  In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control;

5

provided, however, that provisions of this Agreement adopted by amendment and approved by the Bankruptcy Court following substantial consummation (as such term is used in section 1127(b) of the Bankruptcy Code) shall control over provisions of the Plan.

g) Severability.  If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, this Agreement shall be deemed to be amended to the extent necessary to make such provision enforceable, or, if necessary, this Agreement shall be deemed to be amended to delete the unenforceable provision or portion thereof.  In the event any provision is deleted or amended, the remaining provisions shall remain in full force and effect.  Notwithstanding the foregoing, the parties recognize and agree that this Agreement is to be interpreted and applied in such manner as to, as nearly as possible, give effect to the parties' intent to all provisions hereof, including, without limitation, such provisions as may be declared to be unenforceable.

h) Assignment.  No party hereto shall have the right to assign its rights hereunder, in whole or in part without the prior written consent of the other party (other than to such party's affiliates or subsidiaries which shall not require such consent).  This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

i) Modifications.  No change, modification, extension, renewal, ratification, waiver or rescission of this Agreement or of any of the provisions hereof shall be binding unless it is in writing and signed by both parties hereto.  Further, no waiver or forbearance by either party hereto with respect to any right granted to such party herein shall operate or be construed to be a waiver or forbearance of such party's right to exercise such right in the future.

j) Notices.  Notices regarding or required by this Agreement must be in writing and delivered to the parties at the mailing addresses set forth below or to such other address as a party may designate in writing.  Any notice required under this Agreement will be deemed effective upon delivery to the party to whom it is addressed.

k) Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof and supersedes any prior agreements (whether written or oral) between the parties regarding the subject matter hereof.  This Agreement may be executed in any number of counterparts each of which shall be an original, but all of which together shall constitute one and the same instrument.

[*Remainder of Page Left Intentionally Blank*]

6

        IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this
Plan Administrator Agreement, or caused it to be executed and acknowledged on their behalf by
their duly authorized officers.

**Opportune LLP**                              **Gawker Media Group, Inc.**


By:    _____              By:    _____

Name: _____               Name: _____

Address: _____              Address: _____
         _____                       _____

Date:  _____, 2016                       Date:  _____, 2016


                                            **Gawker Hungary Kft.**


                                            By:    _____

                                            Name: _____

                                            Address: _____
                                                     _____

                                            Date:  _____, 2016


                                            **Gawker Media LLC**


                                            By:    _____

                                            Name: _____

                                            Address: _____
                                                     _____

                                            Date:  _____, 2016