```
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 16-11700-smb

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 5    In the Matter of:

 6

 7    GAWKER MEDIA, LLC,

 8              Debtor.

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10    Case No. 16-12239-smb

11    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

12    In the Matter of:

13

14    NICHOLAS G. A. DENTON,

15              Debtor.

16    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

17    Adv. Case No. 16-01248-smb

18    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

19    BOLLEA,

20                   Plaintiff,

21              v.

22    DENTON,

23                   Defendants.

24    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

25
```

1                    U.S. Bankruptcy Court

2                    One Bowling Green

3                    New York, NY   10004

4

5                    December 15, 2016

6                    10:22 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON STEWART M. BERNSTEIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO: TB

Page 3

1   Hearing re:  16-11700-smb Status Conference Re: Huon Claims

2   Objection

3

4   Hearing re:  16-11700-smb First Interim Application of Prime

5   Clerk LLC as Administrative Advisor to the Debtors for the

6   Period from 6/10/16 through 9/30/16.

7

8   Hearing re:  16-11700-smb First Application for Interim

9   Professional Compensation - First Interim Application of

10  Simpson Thatcher & Bartlett LLP for Approval and Allowance

11  of Compensation for Services Rendered and Reimbursement of

12  Expenses Incurred for Official Committee of Unsecured

13  Creditors of Gawker Media LLC, et al., Other Professional,

14  period: 6/24/2016 to 9/30/2016, fee:$1,216,165.75, expenses:

15  $23,586.99.

16

17  Hearing re:  16-11700-smb First Interim Application of

18  Cahill Gordon & Reindel LLP as Special Litigation Counsel to

19  the Debtors for the Period from 6/10/16 through 9/30/16.

20

21  Hearing re:  16-11700-smb First Interim Application of Ropes

22  & Gray LLP as Attorneys for the Debtors for the Period from

23  6/10/16 through 9/30/16.

24

25  Hearing re:  16-11700-smb First and Final Fee Application of

Page 4

1   Houlihan Lokey Capital, Inc. as Investment Banker to the

2   Debtors for the period from June 10, 2016 Through September

3   30, 2016.

4

5   Hearing re:  16-11700-smb First Application of Brannock &

6   Humphries as Special Litigation Counsel to the Debtors and

7   Debtors in Possession for the Period from June 10, 2016,

8   Through September 30,2016 for Brannock & Humphries, Special

9   Counsel

10

11   Hearing re:  16-11700-smb First Interim Fee Application of

12   Citrin Cooperman & Company, LLP as Independent Auditor and

13   Accounting Services Provider for the Debtors and Debtors in

14   Possession for the Period from June 10, 2016 Through

15   September 30, 2016

16

17   Hearing re:  16-11700-smb First Application for Interim

18   Professional Compensation First Application of Levine

19   Sullivan Koch & Schulz, LLP as Special Litigation Counsel

20   for the Debtors and Debtors in Possession for Allowance of

21   Compensation and for the Reimbursement of Expenses for the

22   Period from June 10, 2016 Through September 30,2016 for

23   Levine Sullivan Koch & Schulz, LLP, Special Counsel, period:

24   6/10/2016 to 9/30/2016, fee: $299,783.77, expenses:

25   $9,144.63.

1     Hearing re:  16-12239-smb Status Conference Re: Huon Claims

2     Objection

3

4     Hearing re:  16-12239-smb Case Conference

5

6     Hearing re:  16-01248-smb Pre-trial Conference

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Sonya Ledanski Hyde

Page 6

1  A P P E A R A N C E S :

2

3  COLE SCHOTZ P.C.

4       Attorney for Gawker Media & Nick Denton

5       Court Plaza North

6       25 Main Street

7       Hackensack, NJ 07601

8

9  BY:  WARREN A. USATINE

10

11  ROPES & GRAY LLP

12       Attorney for Gawker Media

13       1211 Avenue of the Americas

14       New York, NY 10036

15

16  BY:  GREGG M. GALARDI

17

18  CAHILL GORDON & REINDEL LLP

19       80 Pine Street

20       New York, NY 10005

21

22  BY:  SUSAN BUCKLEY

23

24

25

1    COHEN & GRESSER LLP

2          Attorney for Terry Bollea

3          800 Third Avenue

4          New York, NY 10022

5

6    BY:  DANIEL H. TABAK

7

8    ALSO PRESENT TELEPHONICALLY:

9

10   MEANITH HUON

11   TAYLOR B. HARRISON

12   ALEX MCGEE

13   SANDY QUSBA

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S

2              THE COURT:  Gawker.

3              MR. GALARDI:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. GALARDI:  Gregg Galardi on behalf of the

6    Gawker debtors.  For convenience, I think we should go

7    through the agenda in the order of the amended agenda.

8              THE COURT:  Did you file an agenda?  I don't think

9    I have it.

10             MR. GALARDI:  Yeah, we did back on -- I will hand

11   up.  If I might approach.

12             THE COURT:  Yes.  Thank you.

13             MR. GALARDI:  So, Your Honor, the first matter on

14   the agenda is a status conference.  I don't know Mr. Meanith

15   Huan is on the phone.

16             THE COURT:  Yeah, the Denton estate is also on

17   (indiscernible).

18             MR. HUON:  I'm on the phone, Judge.

19             THE COURT:  So I'll deal with the Dent -- I'll

20   deal with both of these at the same time.

21             MR. GALARDI:  That's what I was going to ask, Your

22   Honor.

23             THE COURT:  All right, Mr. Huon, this is a status

24   conference on your claims in both the Denton estate and the

25   Gawker estate.  But my understanding is they've been

Page 9

1    resolved.

2              MR. GALARDI:  Yes, Your Honor.  As I mentioned --

3              MR. HUON:  Yes, Judge.

4              MR. GALARDI:  As I mentioned at the confirmation

5    hearing and I've spoken to Mr. Huon again yesterday.  As put

6    on the record at the confirmation hearing, we have agreed to

7    settle the Gawker Media estate, which will also settle the

8    claims against Mr. Denton, for the payment of $100,000.  We

9    will make that payment with respect to that claim before

10   year end.

11             And I believe there is a status conference in the

12   Illinois court, and we've agreed that we will advise the

13   Court that there is a pending settlement and will take care

14   of the remaining matters once the settlement payments have

15   been made.

16             THE COURT:  When will I get the confirmation

17   order?

18             MR. GALARDI:  It was filed last night.

19             THE COURT:  All right, okay.  Any questions, Mr.

20   Huon?

21             MR. HUON:  No, Judge.  Thank you for letting me

22   appear by phone.  I'm sorry I didn't file an appearance

23   earlier.  You know, it's (indiscernible) motion.  But, yes,

24   we settled for $99,999.99, so thank you, Judge.

25             THE COURT:  Sounds close enough, okay.

Page 10

1           MR. HUON:  Okay.

2           THE COURT:  Thank you very much.

3           MR. HUON:  Thank you, Judge.  May I be excused,

4     Judge?

5           THE COURT:  Yes.

6           MR. HUON:  Thank you.  All right, have a nice day.

7           MR. GALARDI:  Your Honor, the next matter on the

8     agenda are a series of fee applications, one of which is

9     final, which is the Houlihan Lokey, and the others are

10    interim fee applications for the Debtors and the committees'

11    professionals.

12          Your Honor, pursuant to Your Honor's earlier

13    orders, the fee applications have been submitted and there

14    was a 20 percent holdback.  After conversations with the

15    United States Trustee, subject to Your Honor's approval, the

16    U.S. Trustee has agreed that there only needs to be a 5

17    percent holdback with respect to what's already been

18    approved.

19          The professionals, including my firm, have also

20    have, I think, November and will have December outstanding.

21    Given this -- given what has occurred in the case, we would

22    ask Your Honor to approve those.  I can give Your Honor

23    numbers with respect to each of the professionals.

24          THE COURT:  I have some problems with a couple of

25    these.

Page 11

1          MR. GALARDI:  Okay.

2          THE COURT:  I was looking at the Cahill

3     application.

4          MR. GALARDI:  Okay.

5          THE COURT:  First of all, there's no project

6     billing; they just include monthly fee statements.  But it

7     looks like the entire application is related to retention

8     issues and editing time records.

9          MR. GALARDI:  Your Honor, Ms. Buckley is here.

10    With respect to that, and that was one of our concerns in

11    the beginning of the case because this relates to a

12    settlement Your Honor will hear on the end of this month

13    with Malmedia.  Most of that, that was because they had to

14    file the fee application and do the time detail they have

15    been negotiating and had previously negotiated the Malmedia.

16    So in some of these instances, with the small professionals

17    that are on a unique matter, the fee application process is

18    actually more expensive than the work being performed by it.

19         THE COURT:  Well --

20         MR. GALARDI:  I estimate --

21         THE COURT:  You know, there's got to be some

22    proportion though.  I think, looking at the total

23    application, you know, I looked through the term records.

24    And because there's no -- it's done by month to month and

25    there's no project bullet, and the only projects are the

Page 12

1   litigation itself and the settlement, the retention work,

2   and the preparation of the monthly bills.  It's all they

3   did.  It's very hard to determine the proportion of work

4   that went to editing time records, which is not compensable,

5   or preparing monthly bills.  They don't have to seek monthly

6   bills; that's for their convenience.  But it's not intended

7   to increase the amount of legal fees in the case.

8           MR. GALARDI:  Understood, and we've had

9   conversation with Cahill.  And, Your Honor, I mean, I think

10  the -- and I hate to go back to the first day and I know

11  they honor -- but this is one of the reasons that we're

12  seeking to have ordinary course.  I know that's improper,

13  but for exactly the reason --

14          THE COURT:  Well, this is a good reason not to

15  have ordinary course.

16          MR. GALARDI:  Well, actually I think it's --

17          THE COURT:  You need someone to review them.  All

18  right, look, I will adjourn this one.  But I do need -- it's

19  not a long timeframe, but I do need just some project

20  billing on those three projects.  I want to see the amount

21  of time that was spent looking at time records, reviewing

22  bills, on retention matters, and how much was really spent

23  on the underlying litigations.

24          MR. GALARDI:  Okay, Your Honor.

25          THE COURT:  I'm confident Cahill knows how to do a

Page 13

1    -- you know, a retention application.

2              MR. GALARDI:  Sure.

3              THE COURT:  Yes?

4              MS. BUCKLEY:  Your Honor, Susan Buckley here from

5    Cahill.  I can address some of these issues.

6              THE COURT:  Well, it's just a question of my being

7    able to read the application and understand this.  It's

8    going well and you're sending monthly bills and everything

9    is monthly to the bills.  You didn't do a lot I know, but it

10   would be helpful to know, for example, how much time was

11   actually spent preparing the retention application.  I

12   noticed in the bills, and it's more so in a couple of the

13   other ones, the amount of time that was spent reviewing the

14   time records or preparing monthly bills and things like

15   that, so that you get paid on a monthly basis.  That's fine

16   if you want to be paid on a monthly basis, but that's for --

17   as I said, that's for the professionals.  That's not

18   designed to increase the amount of legal fees; it's not

19   required by the bankruptcy code, as opposed to a fee

20   application at the end of the case.

21             And these are issues I have with this one and

22   there's other one that I have the same issue with.  So what

23   I'm going to ask you to do is just divide it into project

24   categories.  I'm sure Mr. Levitan knows what I'm talking

25   about.  And it'll be simple enough to present it that way so

Page 14

1    I'll have an idea of how much time was spent.

2             MS. BUCKLEY:  If I may, Your Honor, the problem

3    with these -- this particular submission is the case was

4    largely negotiated and settled days before Gawker filed

5    bankruptcy.  The settlement --

6             THE COURT:  Well, how much time did you spend on

7    the litigation?

8             MS. BUCKLEY:  The litigation started about a year

9    before the Gawker bankruptcy.

10            THE COURT:  And how much do you think your firm

11   billed on that?  I'm just trying to get a sense of the

12   proportion of the amount of time preparing fee applications

13   and the amount of time doing the actual legal work to which

14   the applications pertain.

15            MS. BUCKLEY:  Well, the fee application was a

16   minor portion of the entire litigation.

17            THE COURT:  No, I understand that, because you got

18   to -- because it only related to the tail end of the

19   litigation.

20            MS. BUCKLEY:  Yes.

21            THE COURT:  But what I'm suggesting is if you did

22   a lot of work and this was just, you know, the end of the

23   day that you billed $50 million on the litigation, then

24   maybe $20,000 for a fee application to just finish it off

25   isn't unreasonable.  On the other hand, if I see you did

Page 15

1    $5,000 worth of work, but you're seeking compensation for --

2    I don't know anything else about the case --

3            MS. BUCKLEY:  Well, we can certainly --

4            THE COURT:  Let me finish.  And you're seeking

5    $20,000 for preparing a fee application, that strikes me as

6    a little unreasonable.

7            MS. BUCKLEY:  No, the case was -- I doubt it went

8    that it went into the millions, but it was certainly --

9            THE COURT:  Why don't we do this.  I'll allow 50

10   percent of it, subject to review at the end of the case.

11   But please give me time records that I can review at the end

12   of the case to make that determination.  And you can amplify

13   your final fee application by just explaining all the work

14   that was involved, and that this was just the tail end of a

15   long and expensive litigation.

16           MS. BUCKLEY:  We can certainly do that, Your

17   Honor.

18           THE COURT:  All right.  So I'll allow 50 percent

19   on an interim basis on that one, 100 percent of the expenses

20   on an interim basis, all subject for review at the end of

21   the case.

22           With respect to the Florida counsel that were

23   retained.  First of all, I want to make sure that there was

24   that allocation that was required under the order.

25           MR. GALARDI:  Yes, Your Honor, they did.  In fact,

Page 16

1   this is only the allocation with respect to the estate.  I

2   have fee applications with respect to the balance of the

3   parties.  They all apologize, but, again, given the

4   expensive travel and we didn't get them on CourtCall early

5   enough, they're not attending today.

6          THE COURT:  That's fine.  I have a similar comment

7   with the Brannock & Humphries fee application.  If I look at

8   the work that was done -- so that's the invoice through

9   September 30th, let me just check.  Yeah, it's almost all

10  reviewing time records and retention orders, and there is no

11  project going.  So I'll do the same thing I did with the

12  other, with the Cahill order.  I'll allow 50 percent on an

13  interim basis, 100 percent of the expenses on an interim

14  basis, but they have to break it down by project.  And I

15  know there was only one project, but here was other work

16  that was done.

17         And, again, there's a lot of time spent on

18  retention issues, monthly submissions and editing bills, you

19  know, just -- other than reviewing the bills to make sure

20  that no privileged information is being disclosed.  And I

21  don't understand why lawyers can't prepare time records that

22  don't disclose confidential or secret information.  But

23  short of that, it's not compensable, in my view.

24         With respect to the rest of the applications, I'll

25  abide by the U.S. Trustee's recommendation.  I'll allow 95

1   percent on an interim basis -- we'll get to the final one in

2   a minute -- and 100 percent of the -- oh, I'm sorry.

3           MR. GALARDI:  No, Your Honor.

4           THE COURT:  And 100 percent of the expenses on an

5   interim basis, subject to review at the end of the case.

6   Now, Houlihan was?

7           MR. GALARDI:  Houlihan was a fee app -- a final

8   fee application, Your Honor, with respect to their

9   engagement.  The U.S. Trustee has asked about the

10  calculation of the fees; so did the committee.  The fee had

11  been calculated in accordance with Your Honor's order that

12  approved the Houlihan fee application.

13          THE COURT:  Was this based on the sale?

14          MR. GALARDI:  This was based on the sale and on

15  the DIP fee.  There was two fees involved in that one, Your

16  Honor.  There was about a million on the DIP fee, and then

17  there was another, about four or four and a half -- I think

18  it's a $4 million fee with respect to the sale and the

19  access price.  And as Your Honor, from the confirmation

20  order, you understand what that excess price enabled us to

21  do in this case.

22          THE COURT:  Well, is there still an issue about

23  the computation of the fee?

24          MR. GALARDI:  No, there isn't.  It is what it is.

25          THE COURT:  Is the committee --

Page 18

1              MR. ZIPES:  No issue, the committee

2     (indiscernible).

3              THE COURT:  All right, then I'll allow the fee on

4     a final basis and the expenses on a final basis.

5              MR. GALARDI:  And there was a compromise, just for

6     the record, Your Honor, on the fees after the U.S. Trustee -

7     - on the expenses, I'm sorry -- after the U.S. Trustee

8     inquired with respect to that.

9              THE COURT:  What did they get down to?

10             MR. GALARDI:  Do you remember about the

11    calculations?  I don't have the number.

12             MR. ZIPES:  There was some travel time and some

13    meals, Your Honor.

14             THE COURT:  So they're getting $5 million, and you

15    got them taking a private car instead of the subway?

16             MR. ZIPES:  Your Honor, it's -- yes.

17             THE COURT:  Good job.  All right, you can submit

18    an order.

19             MR. GALARDI:  Thank you, Your Honor.  I turn it

20    over to --

21             MR. ZIPES:  The United States, one issue.

22             THE COURT:  Oh, sure.

23             MR. ZIPES:  Just with the -- with two of these fee

24    applications, I think the Court made a ruling with respect

25    to 50 percent.  And it's not usually for me to defend fees,

Page 19

```
 1    but I think they've already been paid 80 percent, so I just
 2    --
 3              THE COURT:  Well, they don't have to pay anything
 4    back, but let's just leave it the way it is.
 5              MR. GALARDI:  Your Honor.
 6              THE COURT:  Is there any more work in Florida for
 7    these lawyers?
 8              MR. GALARDI:  Your Honor, I don't believe there's
 9    going to, other than the mechanics of getting the matters
10    dismissed and of that sort of thing.
11              THE COURT:  Oh, another thing I noticed in a
12    couple of these Florida applications are, I never granted
13    relief from the stay, right?
14              MR. GALARDI:  Correct.
15              THE COURT:  Yet, there seems to be a lot of work
16    done.  And I understand the work initially in June when the
17    case was filed, but in July/August/September, relating to
18    stays, and I don't know the estates are being billed for
19    that.
20              MR. GALARDI:  Your Honor, I believe that -- and
21    I'll go back and look at it -- but all of that work was
22    probably, especially in the Levine application, related to
23    the preliminary injunction stay work.  And then there were -
24    - there were still proceedings going on that Mr. -- well, it
25    shouldn't be in on their compensation.  But the estate was
```

1   dealing with potential motions to lift stay issues, so I

2   think that's going to be mostly consulting.  I will have

3   them clarify that on the next fee application.

4           THE COURT:  All right.

5           MR. GALARDI:  So that we look back at that time.

6           THE COURT:  All right, thank you.

7           MR. GALARDI:  Thank you.

8           MAN 1:  Your Honor, thank you.  I assumed that

9   since facts or your fee application is covered by your prior

10  ruling.

11          THE COURT:  Yes.

12          MAN 1:  Thank you.  We had been speaking with U.S.

13  Trustee on efficiency for final fee applications.  Two of

14  our professionals are law firms, foreign law firms -- one is

15  in the Cayman Islands, one is in Hungary -- and they were

16  retained earlier in these cases to handle lien

17  investigations.  Relatively di mimimis work, they've

18  submitted fee statements.  Between the two firms, it comes

19  out to just under $35,000.

20          We've spoken with the U.S. Trustee because we're

21  sensitive to the cost of a final fee application.  And I

22  believe the U.S. Trustee was comfortable with a very short

23  form submission for their final fee app, so we avoid running

24  up incremental costs.  But we wanted to obviously speak with

25  Your Honor before we either incur those costs or take that

Page 21

1    approach.

2              THE COURT:  So you want an advisory opinion?

3              MAN 1:  I think we're looking for guidance, Your

4    Honor.  We don't want to waste money and the state resources

5    if we don't have to.

6              THE COURT:  Why don't you try out the U.S.

7    Trustee's language and see if we have an issue.

8              MAN 1:  Very good, Your Honor, appreciate that.

9              MR. ZIPES:  And, Your Honor, I think in light of

10   what you just stated about project billing, we should

11   explore that issue as well with these time records.

12             THE COURT:  Yeah.  Well, if it's only $35,000,

13   that's one thing.

14             MR. ZIPES:  Between two firms, Your Honor.

15             THE COURT:  Particularly when you have firms that

16   don't do a lot of bankruptcy work, but just send monthly

17   bills, and it's very hard to figure out what they've done.

18   All right.

19             MR. ZIPES:  Thank you, Your Honor.

20             MR. GALARDI:  Your Honor, the last two matters on

21   the agenda were adjourned matters.  One was that Mr.

22   Johnson, today was going to be a status conference on his

23   claim.  I think Your Honor has already granted relief to

24   adjourn that matters, and the Got News matter over to

25   January 26th.

1          Your Honor, there are two other matters that are

2     on for -- we have a hearing on January -- on December 29th.

3     One was the 2004 examination of Mr. Thiel, and then the

4     other was A.J. Daulerio, who was a defendant in one of the

5     Florida actions, has a claims objection.  Your Honor, we

6     could make a request to the Court by way of email, but I

7     thought I would request that those matters also be adjourned

8     over to the January 26th date so we can file a notice of

9     adjournment.  We're in conversations with Mr. Thiel's

10    counsel about whether we resolve that, and Mr. Daulerio's

11    claim should be resolved consensually by that time with

12    respect to the fees.

13          THE COURT:  Is there any objection to the other

14    parties to the adjournment?  So Mr. Thiel --

15          MR. GALARDI:  No, we've spoke with both counsel --

16    Skadden, Arps -- on Mr. Thiel and Mr. Daulerio's counsel.

17          THE COURT:  That's fine.  Just inform my chambers-

18    -

19          MR. GALARDI:  Thank you, Your Honor.

20          THE COURT: -- so that it gets puts on the

21    calendar.

22          MR. GALARDI:  Your Honor, that concludes our

23    matters.

24          THE COURT:  Right.  In our haste, I missed the

25    Denton matters.  We're going to get that.  Now that you have

Page 23

1    a better idea of where Mr. Denton stands, when will you be

2    able to file a plan?

3            MR. TABAK:  We expect to file a plan probably in

4    January.  We could file it potentially between now and then,

5    but he's not going to get his distributions until then.  And

6    so, and this is also not advisory opinion request, it's

7    guidance.

8            THE COURT:  I'm not sure what the difference is.

9            MR. TABAK:  There is one remaining, but contingent

10   claim, but it's with the Gawker estate.  They're the only

11   party that still has a proof of claims by extension deadline

12   out there we expect will --

13           THE COURT:  Which Gawker is that?

14           MR. TABAK:  It's the Gawker --

15           THE COURT:  Media?

16           MR. TABAK:  Mr. Galardi's estate.

17           MR. GALARDI:  Your Honor, with respect to the --

18   under our plan -- and we've done an investigation with Mr.

19   Denton -- we will not be pursuing any claims other than the

20   repayment of the $200,000 loan with interest.  So we will

21   have to resolve that.  That is the only real remaining

22   matter left from us.

23           THE COURT:  What is there to resolve?

24           MR. TABAK:  The only thing there to resolve is

25   that Mr. Denton has a stub indemnification claim that

Page 24

1    survived the release of indemnifications under the Gawker

2    plan.

3              THE COURT:  Yeah, but this is a loan

4    (indiscernible) indemnified by his bar (indiscernible)

5    lender?

6              MR. TABAK:  Sorry?

7              THE COURT:  He gets indemnified by his lender?

8              MR. TABAK:  No, no.  He also has claims over to

9    the Gawker estate for some of the fees that were incurred

10   pre his filing by Florida counsel, and so we're going to try

11   to work all that at the same time.

12             THE COURT:  All right.

13             MR. TABAK:  So back to guidance.  You know,

14   assuming we're able to file a 100-cent plus interest case

15   that doesn't require any validating.

16             THE COURT:  A very simple disclosure statement.

17             MR. TABAK:  A very simple summary disclosure

18   statement.

19             THE COURT:  Then you'll get to tell everybody how

20   you're going to pay the claim this way.

21             MR. TABAK:  Yeah, and potentially combined with

22   the confirmation hearing.

23             THE COURT:  Although I have to give preliminary

24   approval to the disclosure statement.

25             MR. TABAK:  Yeah.

1                THE COURT:  I guess I could have it at the same

2    time if there's no validating.

3                MR. TABAK:  If there's no validating.  That was my

4    point exactly.  But, actually, I'm going to confer with Mr.

5    Zipes to make sure he's comfortable with the procedure that

6    we're going to propose; then we'll roll it out to Your

7    Honor.

8                THE COURT:  At least get the money in your

9    account.  I don't know what the problem is.

10               MR. TABAK:  Sorry?

11               THE COURT:  As long as the money is in your

12   account.

13               MR. TABAK:  The money will be the account by the

14   time we come before you.

15               THE COURT:  Now, can I mark Bollea v. Denton off?

16               MR. TABAK:  Okay, so Bollea v. Denton, which we

17   also had a status conference in, is the 523 action.  We have

18   our own separate settlement agreement with Bollea.  As you

19   recall from Mr. Galardi on Tuesday, the $10 million punitive

20   damage award was not resolved through the Gawker settlement;

21   that remained.

22               We had to negotiate our own separate agreement

23   with Mr. Bollea that dealt with, you know, how the content,

24   if any, came into Mr. Denton's possession, so forth and so

25   on, was to be treated.

1           And also resolving for no incremental

2    consideration, cash consideration, the $10 million punitive

3    award.  We have a signed agreement that we're either going

4    to present to Your Honor under 9019 for approval of -- or

5    more likely bake into our plan.

6           And so, we do have this adversary proceeding

7    outstanding.  We've already extended the time for us to

8    answer; we obviously don't want to have to answer.  And so,

9    I think what we'll do, unless Your Honor has an objection,

10   is just stipulate an answer date that goes far beyond,

11   hopefully, what the time we can (indiscernible).

12          THE COURT:  That's fine.  When is the next Gawker

13   omnibus date?

14          MR. GALARDI:  We have December 29th and January

15   65th.

16          THE COURT:  All right, I'll adjourn the Denton

17   matters to January 26th.

18          MR. TABAK:  Okay.

19          THE COURT:  Hopefully by then you'll have your

20   distribution and you'll apply the plan.

21          MR. TABAK:  That's correct.  The other contingent

22   litigation claims against Mr. Denton.  I (indiscernible)

23   obviously settled this part of the Gawker plan, although we

24   do have our own separate agreement just memorializing that

25   Mr. Denton is also released.  Awaiting signature pages on

Page 27

1    that, but that should be done.  Mr. Huon, I guess,

2    technically, there was also the return date of our claim

3    objection from Mr. Huon.  I know he's no longer on the

4    phone, but Mr. Galardi's settlement also settles any

5    liability for Mr. Denton.  And so those were our contingent

6    claims.  The rest are going to be the as-scheduled or proof

7    of claim that we're not going to oppose claims in his

8    estate, so we should be able to deal with those through a

9    plan that we file.

10            THE COURT:  Denton is not involved in the Johnson?

11            MR. TABAK:  He is not involved in the Johnson

12    case.

13            MR. GALARDI:  And, Your Honor, as part of the

14    Johnson settlement, they did agree with respect to any

15    potential defendants, they're not pursuing those defendants.

16    That's solely with respect to Gawker Media only.

17            THE COURT:  Okay, all right.  All right, then,

18    thank you very much.

19            MR. TABAK:  Thank you, Your Honor.

20            MR. GALARDI:  Thank you, Your Honor.

21            (Whereupon these proceedings were concluded at

22    10:43 AM)

23

24

25

Page 28

1                       C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5        Sonya
                              Digitally signed by Sonya Ledanski Hyde
6        Ledanski Hyde        DN: cn=Sonya Ledanski Hyde, o=Veritext,
                              ou, email=digital@veritext.com, c=US
7                             Date: 2016.12.19 15:12:49 -05'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 29, 2016