

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 16-11700-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GAWKER MEDIA,

8           Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11              U.S. Bankruptcy Court

12              One Bowling Green

13              New York, NY  10004

14

15              February 14, 2017

16              10:45 AM

17

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

Page 2

1    Hearing re:  Motion for Omnibus Objection to Claim(s)

2    Number: 53, 202, 298 Notice of Debtors Omnibus Objection to

3    Proofs of Claim Nos. 53, 202 and 298

4

5    Hearing re:  Debtors' Omnibus Objection to Proofs of Claim

6    Nos. 54,223, and 246 (Charles Johnson)

7

8    Hearing re:  Motion for Entry of an Order Pursuant to 11

9    U.S.C. 365(f), Fed. R. Bankr. P. 6006, and LBR 6006-1

10   Authorizing Assignment of Certain Unexpired Nonresidential

11   Real Property Leases to 204-210 Elizabeth Street LLC, (II)

12   Fixing Cure Amounts in Connection Thereto, and (III)

13   Granting Related Relief

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   ROPES & GRAY LLP

 4       Attorney for the Debtors

 5       1211 Avenue of the Americas

 6       New York, NY 10036

 7

 8   BY:  D. ROSS MARTIN

 9       JONATHAN M. AGUDELO

10

11   RANDAZZA LEGAL GROUP

12       Attorney for Claimants Charles Johnson and Got News LLC

13       100 Pearl Street

14       Hartford, CT 06103

15

16   BY:  JAY MARSHALL WOLMAN

17

18

19

20

21

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2            THE COURT:  Good ahead.

3            MR. AGUDELO:  Good morning, Your Honor.  Jonathan

4    Agudelo from Ropes & Gray for the Debtors.  I'm here with my

5    colleague, Ross Martin, also from Ropes & Gray.

6            MR. WOLMAN:  Good morning, Your Honor.  Sorry, I'm

7    still rearranging the furniture.

8            THE COURT:  All right.  Go ahead.

9            MR. WOLMAN:  Jay Wolman with Randazza Legal Group

10   for Claimants, Charles C. Johnson and Got News, LLC.

11           THE COURT:  Okay.  Just before we start, what's

12   going on in the case, if you know?

13           MR. AGUDELO:  As my colleague, Mr. Galardi,

14   reported at the last hearing, I believe, the Debtors have

15   still not -- the effective date under the plan has still not

16   occurred but is expected to occur in the next few weeks.

17   Your Honor scheduled a status conference, I believe, for

18   March the 22nd for that purpose, and the Debtors expect that

19   by or around then, the effective date under the plan will

20   have occurred.

21           THE COURT:  Okay.

22           MR. AGUDELO:  There are two matters on the amended

23   agenda that we filed yesterday.  One is an uncontested

24   matter for a motion to assign leases and subleases; and the

25   other one is a contested matter for which -- on the claim

Page 5

1    objections for the claims of Mr. Johnson and Got News.  The

2    remaining matters originally scheduled for today's hearing

3    have been adjourned with the Court's permission to the March

4    7th hearing date.

5         THE COURT:  Let me deal with your motion to assign

6    the leases.  Does anybody want to be heard in connection

7    with that.  I think it's assigning subleases, technically.

8    Hearing no response, I'll approve that motion.  It seems

9    like a pretty good deal for the Debtor to extricate itself

10   from the property and get some money in return.  So you can

11   submit an order; you don't have to respond.  Go ahead.

12        MR. AGUDELO:  So, Your Honor...if I can, I'd just

13   like to put on the record the economic terms, because a few

14   of the amounts slightly changed.

15        THE COURT:  Okay.

16        MR. AGUDELO:  And I just want to state it for the

17   record.  So, specifically under the assignment, the landlord

18   will make three payments in connection...  There are two.

19   First, the landlord will pay the Debtors 50 percent of the

20   net profits that would be realized from the subleases

21   through the end of the term, which the Debtors expect will

22   be about $63,209.  This is an updated upward number from the

23   original amount in the motion.

24        Second, the landlord will reimburse the Debtors

25   for the portion of the property taxes that the Debtors have

Page 6

1    paid for this tax year.  Originally in the motion, the

2    figure was $42,722.92.  The parties have agreed to revise

3    downwards slightly to $40,389.73 to credit the landlord with

4    the amounts that Gawker has received from the subtenants in

5    respect to the property taxes.

6          And, third, the landlord will refund the Debtors -

7    - the security deposits it's holding in respect to the

8    leases.  This amount has not changed.  It's $315,203.53.

9          We did have -- the landlord asked for a few

10   modifications to the proposed order.  I can go through them

11   or I can submit --

12          THE COURT:  Why don't you submit a copy that's

13   blacklined off of the order you included with your motion?

14          MR. AGUDELO:  We will do that.  Thank you, Your

15   Honor.  I will turn it over to Mr. Martin for a contested

16   matter.

17          MR. MARTIN:  Good morning, Your Honor.  Ross

18   Martin, Ropes & Gray, for the Debtors in Possession.  We're

19   here this morning on a further hearing on the Debtor's

20   claims objections to Mr. Charles Johnson and related entity,

21   Got News, LLC.

22          The Court at the last hearing we had, which was

23   actually before confirmation, the Court had requested that a

24   party submit additional briefing on two questions, and those

25   are the questions raised here today.  The first is the scope

Page 7

1    of the so-called personal injury tort or wrongful debt

2    claim's exception to the Bankruptcy Court's authority to

3    hear and determine claims disputes.  And the second is the

4    question of to what extent the California Anti-SLAPP Statute

5    should apply in the Court's determination of allowing or not

6    allowing the claims.

7              There's obviously been extensive briefing on this,

8    Your Honor.  I'm happy to -- and I know the Court was

9    actively involved at the last hearing so I'm not --

10             THE COURT:  I reviewed the briefing.  I have the

11   briefs.

12             MR. MARTIN:  Well, what I would say maybe in

13   summary, Your Honor, and I'm happy to take questions, is

14   that on the personal injury tort claim matter there are

15   really two interpretive questions that are raised.  The

16   first is whether Got News, an artificial entity, not an

17   individual, has a personal injury tort line.  That's an

18   independent question.  We, in the supplemental papers --

19             THE COURT:  Isn't that informed, though, by the

20   question of whether or not personal injuries or bodily type

21   injuries which a corporation can't suffer, or there's a

22   broader notion that they include reputational injuries,

23   commercial injuries, things like that?

24             MR. MARTIN:  I see them as -- understanding the

25   Court's point, I do see them as separate.  And if you

Page 8

1    looked, for example, at an issue that Judge Glenn faced in

2    ResCap, which is not a reputational issue but emotional

3    distress damages, that's clearly something that a

4    corporation does not have.  So, I would agree with the

5    Court, maybe there's a little bit of an overlap here.

6            THE COURT:  But once you get beyond bodily injury

7    -- although emotional -- I recognize that emotional distress

8    can cause bodily injury, but once you get beyond pure bodily

9    injury, can you really distinguish Judge Glenn's decision?

10            MR. MARTIN:  I'm not sure I fully understand the

11    question of distinguishing Judge Glenn's decision.  What I

12    would say, Your Honor, is this -- is that on the question of

13    whether an artificial entity can have the claim, there's --

14    on that question I think the text of the statute --

15            THE COURT:  There are no cases that have

16    considered this issue?

17            MR. MARTIN:  There is one case that has rejected

18    the notion.  Agrees with us and rejected the notion that is

19    cited in our papers.  It's a Bankruptcy Court case.  There's

20    nothing above that.  But we do cite a Supreme Court case,

21    admittedly, it's a FOIA case, but deals with the question

22    whether the phrase "personal privacy" in the statute can

23    apply to corporations.  Clearly an area where corporations

24    can have the same kind of privacy concerns.  But the Supreme

25    Court specifically distinguished the term person, which is

 1   often used in the United States code, to refer to all kinds

 2   of entities, both individuals and artificial entities, from

 3   personal, which it said expressed an intent to focus on

 4   individuals.

 5            So, admittedly, FOIA is not the Bankruptcy Code --

 6   we shouldn't pretend otherwise -- but otherwise that

 7   decision is foursquare on the question -- when Congress

 8   writes the word personal --

 9            THE COURT:  But we're not talking about the

10   Bankruptcy Code; we're talking about Title 28.

11            MR. MARTIN:  And that is a point we've also raised

12   in our papers.  Because as the Court raised at the last

13   hearing, there is a reference in the Title 11 to personal

14   bodily injury.  One of the points we make in our papers, and

15   I think this goes to the second question of why limit to

16   bodily injury?

17            In the first instance, that's something, frankly,

18   I didn't realize before until I went back to the

19   supplemental briefing -- is that the definitions -- the way

20   Title 11 itself is constructed in terms of the definitions

21   in 101 and the rules of construction in Section 102 actually

22   refer only to that title.  The lead in to the definition --

23            THE COURT:  Well, it's also kept by a different

24   Congress.

25            MR. MARTIN:  That is correct, although...

Page 10

1           THE COURT:  The Bankruptcy Code was passed in '78

2     and the Federal Judgeship Amendments were in 1984.

3           MR. MARTIN:  That is correct, although to be fair

4     -- because this is a...  We saw a (indiscernible) effect,

5     there's a split of authority in this district.  So there's

6     not a point in putting -- not putting the cards on the table

7     here.  It can be said that the '84 amendments also had

8     amendments to Title 11.  Not insubstantial ones.  But in

9     general we agree.  And if you simply look at the language of

10    the statute, Title 11, where it has definitions and

11    instruction, those are, in fact, limited to -- in this

12    title.

13          But to come back to the bodily injury point, I

14    think the point I'd like to emphasize this morning, Your

15    Honor, is the following:  Because it appears following the

16    supplemental briefing, the real dispute we have is not so

17    much about legislative history and there'd be lots of

18    disputes about how much we use that -- but really a

19    fundamental question of how to think about what Congress was

20    doing, or what the statute means.  Should it be as my

21    brother says, look to common law because the term is

22    undefined?  Or as we say, look to a contemporary meaning in

23    the structure of the statute?

24          And on that point I want to make a very simple

25    point going to our interpretation that it should be limited

Page 11

1    to bodily injury.  We know that in 1978, Congress obviously

2    wanted to give the broadest possible authority to non-

3    Article 3 courts.  In fact, it was so broad, it was struck

4    down in Marathon.  And then they went back to the drawing

5    board in the 1984 amendments and also made it quite broad --

6    in fact, we know now, actually that also was a little bit

7    too broad.

8           Congress has repeatedly, in the structure of that

9    statute, wanted to make it -- to give the Bankruptcy Courts

10   as much authority as possible and make bankruptcy

11   administration as efficient as possible.  That is a major

12   structural goal of the statute.

13          Now, there's no question that in 1984 there was a

14   statutory -- not a constitutional issue but a statutory

15   (indiscernible) effort to have a carve out for personal

16   injury tort -- what turned out to be personal injury tort or

17   wrongful death claims.

18          The way we think about it and the reason, I think

19   maybe the core reason we think that it should be limited to

20   bodily injury is because that is best in keeping with what

21   the structure of the statute is trying to do, which is

22   maximize the authority of the Bankruptcy Courts subject to a

23   statutory carve out, but to not overly interfere with

24   bankruptcy administration at the same time.

25          THE COURT:  Aren't you just saying that where the

Page 12

1   statute is ambiguous I should've gotten the narrow

2   interpretation rather than a court interpretation in this

3   particular circumstance?  That's basically what you're

4   saying.

5           MR. MARTIN:  That is one way to view it.  But for

6   a reason, Your Honor.  Not simply as a matter of rote

7   interpretation.  But one of the dangers in Judge Glenn's

8   approach, it's not 100 percent clear to me how much he

9   really disagrees with a little bit narrower approach.  But

10  one of the dangers of a case by case approach and not

11  limiting it to bodily injury, which can be pretty easily

12  determined, is that you're going to end up with a lot more

13  cases that could potentially interfere with bankruptcy

14  administration in different kinds of cases.

15          And there's no indication in the legislative

16  history or the structure -- more importantly, the structure

17  of the statute that Congress was trying to turn over all

18  tort claims or some broad...  They were clearly making an

19  accommodation to a lobbying effort by the plaintiff's bar.

20  That is just apparent on its face.

21          But what the Court has to discern, or any court

22  facing this question has to discern is how broad did they

23  really mean and what fits in the structure of the statute?

24  And the thing that seems to us simplest for courts to

25  determine covers really what is the core of what the

1       personal injury bar would have been concerned with are

2       things that are bodily injuries.

3                THE COURT:  Can I ask you a question?  Suppose all

4       the facts are as curved, and Mr. Johnson says, you know,

5       what he did made me feel terrible.  And there are physical

6       manifestations and a doctor says he developed an ulcer,

7       whatever.  Does that then bring his injury within the

8       exception?

9                MR. MARTIN:  I do not think so.  And I'll give the

10      Court another example, which is --

11               THE COURT:  So tell me where you draw the line.

12               MR. MARTIN:  We draw the line at personal injury

13      torts that are of their nature bodily injury focused torts.

14      A car accident.  The one example that's in the legislative

15      history -- battery.  Any other kind of physical...

16               THE COURT:  Are you saying they all have to be

17      impact injuries?

18               MR. MARTIN:  I do, Your Honor.

19               THE COURT:  That reminds me back to law school, of

20      how the emotional infliction of mental distress developed.

21               MR. MARTIN:  Correct.  So Judge Glenn has a note

22      in his ResCap opinion where he faced this question under a

23      number of different states' laws, and the states had

24      different law about what they require.  And I found it

25      interesting that -- a fact pattern that's similar to one

1    that Your Honor has raised is under Massachusetts law,

2    intentional infliction of emotional distress requires a

3    physical manifestation.

4           THE COURT:  Physical impact or physical --?

5           MR. MARTIN:  No, physical manifestation of harm.

6    And Judge Glenn said that he dismissed -- that he had an

7    example of that...he was referencing that he had made a

8    decision about that in another claim case in ResCap, and

9    that got me thinking about the exact question you raise.  I

10   don't think about intention of infliction of emotional

11   stress, a physical impact kind of tort.  And you can see

12   from all the difficulty that Judge Glenn had dealing with it

13   on a case by case basis, exactly why the rule should be

14   looking at the statute, looking at the structure, looking at

15   what we know about what Congress was trying to do, and the

16   structure of trying to maximize bankruptcy efficiency while

17   recognizing there was -- Congress made a carve out.  There's

18   no question about that.

19          But Congress wasn't trying to make a carve out and

20   make bankruptcy administration -- create a whole bunch of

21   additional things the Bankruptcy Courts were going to have

22   to decide a margin about whether these were personal injury

23   tort or wrongful death claims.  That should be an easy

24   threshold determination.  And the natural reading, sitting

25   there in 1984, is bodily injury torts.  Because that way --

Page 15

1    and we say this in our reply -- the most natural reading

2    would cover bodily injury torts, survivorship actions for

3    those torts, and wrongful death claims.  And that really

4    does sort of simply capture in a way that will not cause

5    lots of case by case determinations, and does the most

6    justice to what the statute is trying to accomplish.

7              THE COURT:  Okay, why don't you move on to the

8    other issue?

9              MR. MARTIN:  On the anti-SLAPP issue, Your Honor,

10   again, I think we've briefed this a fair bit, so I'll just

11   try to summarize --

12             THE COURT:  Well, one of the arguments -- one of

13   the principal arguments is that it conflicts with the

14   bankruptcy rules.  And in those circumstances, the state

15   procedure would ordinarily fall under usual jurisprudence.

16   Tell me why it doesn't conflict with the bankruptcy

17   procedures.

18             MR. MARTIN:  It does not, Your Honor, because the

19   bankruptcy -- start with the Bankruptcy Code itself.  The

20   Bankruptcy Code says you file a proof of claim, you sign it

21   under penalty of perjury.  That claim is allowed.  Until an

22   objection is filed, at which point it is not allowed.  It's

23   in this limbo state at that point under the code.

24             And then the Bankruptcy Code is clear.  And the

25   statutory language here is actually quite telling, because

Page 16

1    under 502(b)1, what it says is the claim is disallowed -- it

2    is unenforceable as a matter of any non-bankruptcy law.

3              THE COURT:  Well, it's disallowed once an

4    objection is filed.  Those are the grounds for objections.

5    The mere filing of an objection causes a disallowance of the

6    claim under 502(b)1, I think.  And then there's a litigation

7    because the filing of the objection commences a contested

8    matter.

9              MR. MARTIN:  Well, if the Court were to interpret

10   it that way --

11             THE COURT:  That's how everybody interprets it.

12   You are disallowed, and then, for example, if you're talking

13   about plan voting, then you can make a motion under Rule

14   3018(a) --

15             MR. MARTIN:  Correct.

16             THE COURT:  -- to have your claim allowed for

17   voting purposes in some specific --

18             MR. MARTIN:  If that is the case, Your Honor, then

19   even more so, this is -- the cause of action that is the

20   basis of this proof of claim was filed in California State

21   Court, it would not be -- if we're -- the anti-SLAPP law in

22   California would make that claim unenforceable.  There's a

23   threshold determination on the paper with the additional

24   affidavits from one side -- there's a threshold

25   determination that has to be made, otherwise that claim is

Page 17

1    simply --

2         THE COURT:  Assuming somebody makes the special

3    motion to (indiscernible)?

4         MR. MARTIN:  That is correct.  But as is noted,

5    for example, in the Travelers case, the Supreme Court's

6    Travelers case, every defense available is available to the

7    trustee on the claims objection.  So that really is

8    fundamentally the point, Your Honor, is that...

9         Let me attack it one other way, Your Honor --

10   although this is talked about in the Raleigh case, for

11   example.  In bankruptcy you have a collective proceeding

12   where you've got lots of parties in interest, often

13   creditors, and, in fact, with respect to Gawker Media, that

14   is the case.  The Gawker Media estate has lots of creditors,

15   including the Gawker Hungary entity on an intercompany claim

16   -- all that's been settled.  And the Got News and Johnson

17   claims are one claim against that particular entity.

18        Those entities all have claims they might enforce

19   in lots of different fora.  And the logical way to deal with

20   all those is for Bankruptcy Courts to ask the question -- if

21   they all went and got judgments in all their different

22   places, that's what the lead-in to 502 effectively says:

23   the claim is allowed in lawful currency in the United States

24   as the petition date.  If everybody got judgments in

25   whatever they could go get them, what's the number they

Page 18

1  would bring?  And then we'd whack it up against the assets

2  of the estate.

3          In that circumstance, having the Bankruptcy Courts

4  do their best under flexible claims administration

5  procedures, which the Bankruptcy Courts have complete

6  flexibility to control -- it's not like an adversary.  The

7  Bankruptcy -- in a contested matter, the Bankruptcy Court

8  can put in and out the various part 7 rules.  But the

9  Bankruptcy Court's job is to best mirror what would have

10  happened if they got a judgment so you know what the

11  distributive share is.  And that makes sense as a matter of

12  bankruptcy policy.

13          Mr. Wolman's clients have a claim originating in

14  California, Mr. Tabek's clients had claims originating in

15  Florida --

16          THE COURT:  Let me ask you a question, putting

17  aside the bankruptcy issue and the objection to the claim.

18  Suppose California law said you had to file an answer to a

19  complaint in ten days or you were in default.  And let's say

20  the Southern -- the federal rules say you have to file an

21  answer within 30 days or you're in default.  And they file

22  their answer in 20 days.  Do I apply California law to cut

23  off that claim?

24          MR. MARTIN:  No, Your Honor.

25          THE COURT:  Why not?

1          MR. MARTIN:  I think for two reasons.  That is an

2    instance where the bankruptcy rule passed under the

3    Bankruptcy Code -- the Rules Enabling Act for Bankruptcy

4    Jurisdiction...  It is 100 percent clear that the time to

5    respond is 30 days.  And, in fact, I believe that's one of

6    the rules --

7          THE COURT:  The reason I asked the question -- I

8    know what the rules say -- the reason I asked the question

9    is, you're saying that a Federal Court or a Bankruptcy Court

10   is supposed to mirror and leave in this case the creditors

11   exactly where they would be if they had litigated this case

12   in State Court, win or lose.  And what I'm suggesting is a

13   scenario, purely procedural, where they would lose in State

14   Court but not necessarily in the Bankruptcy Court -- or

15   Federal Court.

16          MR. MARTIN:  Correct.

17          THE COURT:  So, in mirroring the result of a State

18   Court litigation where I say, you lose even though your

19   answer isn't really laid under the federal rules of civil

20   procedure.

21          MR. MARTIN:  Well, in that circumstance, Your

22   Honor, for example, there's a separate statutory reason that

23   -- if it's a failure of the plaintiff in that circumstance

24   to file the paper by the deadline, there's actually a

25   separate statutory provision aside from 502, the automatic

Page 20

1    stay would prevent them from actually filing that paper.

2            THE COURT:  Let's take bankruptcy out of it.  I

3    said take bankruptcy out of it.  Let's just assume it's a

4    litigation...  Let's say this litigation started in

5    California and went to the Southern District of New York for

6    whatever reason.  And they were in default because they

7    didn't file their answer in a timely fashion under

8    California law, but they're not in default under federal

9    rules and civil procedure.

10           MR. MARTIN:  So, let me --

11           THE COURT:  If the Federal -- assuming the Federal

12   District Court is supposed to do the same thing the

13   Bankruptcy Court does, and that is mirror the case as if it

14   was filed -- as if it was to transfer (indiscernible) court,

15   which is what I think the law is, do they then lose?

16           MR. MARTIN:  Let me say this.  First, Your Honor,

17   I think the diversity question is different than the

18   bankruptcy question.  I think we've been very clear about

19   that.  I actually think that -- it's one of the reasons I

20   focus on the language of the 502(b)1, because theory --

21   those questions are a separate set of questions about

22   diversity jurisdiction and what Congress can do.  And the

23   question here is -- in bankruptcy I actually think it's

24   somewhat broader, but let me come exactly to the fact that

25   the Court raises, which is -- let's say that...Mr. Wolman's

1    client had filed their complaint, and we had filed a motion

2    to dismiss, and they had failed to respond under the time

3    permitted in California, and then we had filed a petition in

4    bankruptcy.

5            So, they had defaulted under California --

6    procedurally defaulted under California law at that point,

7    but perhaps the California court has not entered the final

8    determinative judgment on that question.

9            THE COURT:  Mm hmm.

10           MR. MARTIN:  I think I have the fact pattern

11   correct.  And, meanwhile, a bankruptcy case has been filed.

12   In that circumstance, I think the claim is disallowable.

13   They defaulted under California law.  And I think this Court

14   can take that...  I think under...  If I understand the fact

15   pattern correctly --

16           THE COURT:  I'm not sure I agree with you in the

17   absence of an order form the California court entering a

18   default judgment.  I'm not sure I agree with you.

19           MR. MARTIN:  The default scenario is -- it is an

20   interesting one, and I would respectfully disagree with the

21   Court on the example.  That's what oral argument is about.

22   But I would also note that defaults are lifted for lots of

23   discretionary reasons, so it's not quite the same fact

24   pattern as where -- as anti-SLAPP, where the legislature has

25   -- the California legislature has imposed a very specific

1   test and a very specific process.

2          THE COURT:  Do you -- I don't think you did, but

3   has either side cited any cases where anti-SLAPP has been

4   applied to a bankruptcy claim objection?

5          MR. MARTIN:  No.  And it's been applied on the

6   claims outbound from the estate, but I'm not aware of any

7   where it's been applied in the claims.

8          THE COURT:  Or where it's been -- or where

9   somebody said, I disagree; it doesn't apply in the claim

10  objection scenario?  In other words, it's never been

11  litigated.

12         MR. MARTIN:  I do not -- Your honor, I do not

13  believe it's been litigated before.

14         THE COURT:  Okay.

15         MR. MARTIN:  If the Court doesn't have further

16  questions for me at that moment, that's what I have.

17         THE COURT:  I'll hear from Mr. Wolman.

18         MR. MARTIN:  Thank you very much, Your Honor.

19         THE COURT:  Thank you.

20         MR. WOLMAN:  Good morning again, Your Honor.

21         THE COURT:  Let me start with the question that I

22  had asked on the personal injury aspect of this.  If -- you

23  know, I have the Madoff case and a lot of people who were

24  victims of Madoff have suffered not only financial injury

25  but all sorts of emotional injuries, psychic injuries, which

1    manifest themselves in identifiable physical injury.

2              Under those circumstances, if a person brought a

3    fraud claim in that situation, would that be a personal

4    injury tort claim that's at least a non-core proceeding?

5              MR. WOLMAN:  Thank you, Your Honor.  Fraud --

6              THE COURT:  I'm really talking about the physical

7    manifestations of something that you wouldn't normally

8    associate --

9              MR. WOLMAN:  I understand, Your Honor.

10             THE COURT:   -- with kind of a bodily impact type

11   tort.

12             MR. WOLMAN:  I think Your Honor's taking an

13   approach that the statute's not contemplating.

14             THE COURT:  I don't know what the statute is --

15             MR. WOLMAN:  If I may --

16             THE COURT:  I mean, I think I have an idea.  At

17   least I know how it came about but it's not --

18             MR. WOLMAN:  The reason why I'm saying that is

19   because my brother cited Massachusetts law; under Chapter

20   93A Massachusetts you can get emotional distress damages.

21   Those are not --

22             THE COURT:  Where do you draw the line, is the

23   question.

24             MR. WOLMAN:  Certainly.  What we're looking at

25   here -- and that's why wrongful death actually is quite

1    informative -- is the statute contemplates personal injury

2    claims, which, under the contemporary understanding in 1984,

3    even Black's Law Dictionary cited by them, under the entire

4    history of personal injury law -- because my brother and the

5    Debtor have cited no case prior to 1984, where personal

6    injury was interpreted as not including slander or libel --

7    in common law, personal injury includes these reputational

8    harms going back to Blackstone.

9           THE COURT:  But if you look at Black's, which you

10   just mentioned, personal injury is synonymous with bodily

11   injury, and other types of torts are referred to as private

12   injury.

13          MR. WOLMAN:  It doesn't really, though, provide --

14          THE COURT:  You can find a source that will

15   support any argument.

16          MR. WOLMAN:  But then the problem is Black's is

17   just Black's.  The entire case history, as we set forth,

18   shows that -- if I may, Your Honor --

19          THE COURT:  I'm just trying to cut to the --

20          MR. WOLMAN:  -- personal injury is equivalent to

21   injury of the person under law.  And that's what --

22          THE COURT:  It sounds to me like what you're

23   saying is there's a traditional notion of what a personal

24   injury is.  It includes slander, and that's what Congress

25   was thinking about, as opposed to thinking about the types

1    of tort injuries that were on the minds of the asbestos

2    plaintiffs lawyers who were pushing this amendment.

3                MR. WOLMAN:  Exactly, Your Honor.  Because

4    wrongful death had to be a statutory cause of action, even

5    though you and I might think of course a wrongful death is a

6    personal injury.

7                THE COURT:  Do you think that Congress was

8    thinking about survival actions and actions that die with

9    the victim when it tagged on wrongful death to personal

10   injury torts?  Or were they thinking -- or was the concern

11   about people with mesothelioma, and lung cancer, and things

12   like that from asbestos who don't survive?

13               MR. WOLMAN:  The reason it would need to be added

14   is because it does not fit within the traditional common law

15   notion of what is a personal injury claim under state law.

16   State by state, every state has a different law.

17               THE COURT:  So, why wasn't this exception in the

18   original '78 amendments...?

19               MR. WOLMAN:  Congress does plenty of things that

20   don't contemplate the necessary outcome for it.  But when

21   they were going back in '84, some lawyers, obviously

22   lobbyists, thought about the implications --

23               THE COURT:  Who had just read Blackstone, no

24   doubt.

25               MR. WOLMAN:  I'm sorry?

1          THE COURT:  Who had just read Blackstone.

2          MR. WOLMAN:  But the entirety of the legal history

3   refers to injury to persons being synonymous with personal

4   injury.  The entire history of the concept of personal

5   injury for the last 200 years, 250 years, includes these

6   types of actions.

7          THE COURT:  Does the restatement of torts define

8   personal injury?

9          MR. WOLMAN:  I actually did not refer to

10  restatement.  I'd be happy to look, Your Honor.

11         THE COURT:  I can look.

12         MR. WOLMAN:  But if I may, that's why, for

13  example, I didn't refer to FCC v.  AT&T because there the

14  statutory term is not a common law phrase, whereas the

15  Supreme Court action took care to distinguish personal

16  jurisdiction -- applies to companies because it also is

17  synonymous with in personam actions.

18         THE COURT:  Well, you know, personal is an

19  adjective that's attached to a lot of phrases and means

20  different things.  A personal injury can be synonymous with

21  a direct injury as opposed to a derivative injury.  So, you

22  can read a lot of cases that took about what personal means

23  -- (indiscernible) case, it might have an entirely different

24  context.

25         But I come back to my broad question.  Wasn't

Page 27

1    fraud a personal injury tort in common law?

2           MR. WOLMAN:  I believe fraud was an injury to

3    property; not an injury to person.  And that's what the

4    difference is.  A slander is an injury to person or a

5    personal injury, as the case law shows that they are

6    synonymous terms.

7           THE COURT:  One of your claims for existence is

8    invasion of privacy, as I recall, isn't it?

9           MR. WOLMAN:  There's a false (indiscernible), yes,

10   Your Honor.

11          THE COURT:  Right.  And that was not really a tort

12   of common law until Louis Brandeis and Charles Warren wrote

13   an article about it and the concept of the right of privacy

14   arose out of that.  So, do you think that that is a personal

15   injury tort if it wasn't a tort of common law until this law

16   review order?

17          MR. WOLMAN:  If I may...the underlying terms refer

18   to -- and the origin of personal injury claims and injury to

19   person refer to -- your slander and libel fit is right of

20   personal security.  And I would suggest an invasion of

21   privacy claim falls along an invasion or violation of the

22   right of personal security.

23          THE COURT:  But if it wasn't a tort of common law,

24   it doesn't fit within your argument that Congress intended

25   for common law torts -- common law personal injury torts in

Page 28

1    --

2             MR. WOLMAN:  Well, the courts created a common law

3    tort.  It's not a statutory tort; it's a common law tort --

4             THE COURT:  Well, it is -- I think it is a

5    statutory tort.  Invasion of privacy.

6             MR. WOLMAN:  It depends on the state you're in.

7             THE COURT:  Right.  I know I had a case in Florida

8    where -- some Florida --

9             MR. WOLMAN:  Florida does have a statute, yes,

10   Your Honor.  Many states do not.

11            THE COURT:  All right, why don't we move on to the

12   anti-SLAPP?  And the first question I have is if this were a

13   Federal District Court, in other words, the case had been

14   transferred to a Federal District Court a mile north, is

15   there any question that the anti-SLAPP provisions of

16   California law would apply?

17            MR. WOLMAN:  The 2nd Circuit has not specifically

18   weighed in.  There have been questions back and forth.  And

19   so, is Your Honor suggesting under removal jurisdiction?

20            THE COURT:  Well, let's say that the same thing

21   happened...  I'm essentially a transferee court under

22   Coudert, and if instead of the case coming here because of

23   the bankruptcy filing, the California District Court

24   transferred the case to the Southern District of New York

25   for whatever reason.  So, the Southern District...  New York

1    is also a transferee court in that sense.  Would the

2    California Anti-SLAPP Statute apply to that litigation so

3    that the defendant could make the motion that it's

4    essentially (indiscernible) -- and that Gawker is

5    essentially making this?

6             MR. WOLMAN:  I'm going to duck Your Honor's

7    question for just a second here.

8             THE COURT:  Okay.  But you'll come back to it,

9    though?

10            MR. WOLMAN:  Yes.  Because in California -- this

11   was a state action, but let's say --

12            THE COURT:  Did this start as a state action?

13            MR. WOLMAN:  Yes, Your Honor.

14            THE COURT:  Okay.

15            MR. WOLMAN:  Let's say Gawker had removed to

16   Federal Court, as it did in Missouri, and then filed an

17   anti-SLAPP motion.  The 9th Circuit certainly has permitted,

18   although it's called -- Judge Kazinski has called into

19   question under removal jurisdiction --

20            THE COURT:  It's clearly a law of the 9th Circuit.

21            MR. WOLMAN:  Of the 9th Circuit.

22            THE COURT:  And California.

23            MR. WOLMAN:  And California, where much of the

24   anti-SLAPP statute applies but not all of it.  The Court

25   recently -- 9th Circuit recently ruled that there is no

Page 30

1    interlocutory appeal.  The 9th Circuit has said it does not

2    need to be limited to -- filed with 60 days.  The 9th

3    Circuit has said that the automatic stay of discovery does

4    not apply.

5              And arguably a 2nd Circuit court may well agree

6    with the 9th Circuit on that.  However, I would respectfully

7    submit that it's a little different when you're filing a

8    proof of claim because it is not a removed case that's been

9    transferred directly or referred directly.  What we have is

10   a separate filing where, as I said, the issue here, the only

11   things that are left are these -- this burden-shifting

12   framework and then fees of your successor, which you don't

13   even get to then if you don't get to the burden shifting.

14             But what is the purpose of the burden shifting

15   framework when a proof of claim already meets the burden?

16   It is deemed to --

17             THE COURT:  But -- all right, stop, stop.  Even

18   where anti-SLAPP applies, you could survive a motion to

19   dismiss under 12(b)6 but still lose an anti-SLAPP motion,

20   right?

21             MR. WOLMAN:  That is feasible, yes, Your Honor.

22             THE COURT:  All right, so, even if your claim was

23   legally sufficient, which is really what we're saying under

24   the bankruptcy rules -- are you saying that the bankruptcy

25   rules provide more than legal sufficiency?

1          MR. WOLMAN:  Yes.

2          THE COURT:  I guess you're right.  They have

3   evidentiary effect.

4          MR. WOLMAN:  Evidentiary.  And that's where the

5   bankruptcy procedural rules differ from the federal rules of

6   civil procedure.  And that's why I would say perhaps it

7   might apply in a removal case but not here because we

8   already have --

9          THE COURT:  All right.  I understand.

10          MR. WOLMAN:  -- an evidentiary...  We've already

11   met the evidentiary burden before they filed their motion.

12          THE COURT:  But, obviously, they're free to make a

13   motion for summary judgment even in a contested matter.

14          MR. WOLMAN:  Certainly.  Meaning the prima facie

15   evidentiary standard does not mean you win the case.  You

16   see that all the time in employment discrimination claims.

17          THE COURT:  No, I know.  I realize that 3001 is an

18   evidentiary boost, not just a legal sufficiency boost.

19          MR. WOLMAN:  Correct.  And so, once we met the

20   prima facie case, there is no purpose to burden shifting

21   left, so there's nothing left substantive and this is not

22   changing the ultimate burden of proof of the case.  Of

23   course the claimants always have, at the end of the day, the

24   ultimate burden of persuasion.  Nobody's denying that.  They

25   have that whether or not an anti-SLAPP motion is filed.

1          THE COURT:  I have another question.  What happens

2     to the presumption if the Debtor makes a motion that has

3     contrary evidence -- that goes back to whether the

4     presumption just disappears from the case or it still has

5     some validity.  In other words, they used to be, or there

6     may be two theories of what happens to a presumption when

7     the party submits evidence contrary to the presumption.

8          MR. WOLMAN:  Then that goes to the ultimate --

9          THE COURT:  Well, no, but if the presumption

10    disappears, then your objection to the SLAPP motion is less

11    convincing because they submit evidence presumably as part

12    of the motion that shows that you don't have a high

13    probability of success.  And then what happens?

14          MR. WOLMAN:  Your Honor, I'm not aware --

15          THE COURT:  Can you still rely on the presumption?

16          MR. WOLMAN:  -- of the presumption disappearing.

17    A presumption can be overcome...

18          THE COURT:  Well, there are different theories in

19    evidence about what happens to a presumption.  I was just

20    wondering what would happen in this case.

21          MR. WOLMAN:  I would say that in that case you can

22    overcome a presumption but not that the initial underlying

23    presumption --

24          THE COURT:  That's the result you'd like but I

25    don't know if that's the law.  Go ahead.

```
 1              MR. WOLMAN:  And I would suggest, you know,

 2   Gawker's had four briefs; we've had two.  Gawker hasn't said

 3   that the presumption disappears.

 4              THE COURT:  Okay, fair enough.

 5              MR. WOLMAN:  Is there anything --

 6              THE COURT:  No.  Thank you.

 7              MR. WOLMAN:  Thank you, Your Honor.

 8              THE COURT:  Do you have anything else?

 9              MR. MARTIN:  If I might just respond to two

10   questions that -- just perhaps it was (indiscernible).

11   Obviously (indiscernible).  On the question that the Court

12   raised about transfer of the action from California back to

13   here, to take Mr. Wolman's example, I think that some care

14   should be taken because there's a circuit split on the

15   question of whether anti-SLAPP applies.

16              THE COURT:  I thought the 2nd Circuit said -- I

17   don't know if it was California -- maybe it was a California

18   case -- that it basically sits as a 9th Circuit court or

19   bound by 9th Circuit law in this situation that I describe?

20              MR. MARTIN:  Yes, Your Honor, yes.  And the second

21   issue that I wanted to raise, Your Honor, was as to the

22   restatement, which obviously the Court can look at as well,

23   but it's actually a somewhat contemporaneous secondary

24   statement towards a somewhat contemporaneous round of that

25   time, with a lot of uniform law projects.
```

Page 34

1              We were actually looking at that in preparation

2     for this hearing.  And, for example, the restatement groups

3     torts into bodily injury, kind of a set of bodily injury

4     torts, as opposed to privacy kind of torts.  So I would

5     commend that to the Court to...

6              THE COURT:  Do you know what section that is?

7              MR. MARTIN:  I don't remember the number off hand.

8              THE COURT:  Is that the restatement -- second or

9     third at this point?

10             MR. MARTIN:  Second.

11             THE COURT:  Does it define personal injury?

12             MR. MARTIN:  It does not, I believe, Your Honor.

13    Interestingly enough, in the interest of a colloquy, it's

14    assault, battery, false imprisonment, I think, and a

15    malicious...  But it's a set of attacks on the person.  And

16    I think it can be read to say that is what was commonly

17    understood.  Obviously the mesothelioma situation was

18    foremost in their minds but, again, and I'll sit down after

19    this, I think that taking into account the ease of

20    bankruptcy administration and not making this a case by case

21    issue and having clear minds around that is important.

22    Thank you, Your Honor, for a tremendous amount of time on

23    this issue.

24             THE COURT:  Thank you.

25             MR. WOLMAN:  Your Honor, if I may just make one

Page 35

1    quick point on the restatement.  I believe false

2    imprisonment is one of those pauses that's traditionally a

3    violation of the right of personal security under which

4    libel and slander also derive as personal injuries.

5            THE COURT:  Well, it doesn't shock me that falsely

6    imprisoning somebody is a personal injury tort.

7            MR. WOLMAN:  True.  But it does not injure the

8    body of the person; it interferes with their right of

9    personal security, which is also the same thing where libel

10   and slander arise as personal -- that's injuries to person.

11           THE COURT:  But assault doesn't injure somebody

12   either under the law -- common law torts.  But it's a

13   personal injury.

14           MR. WOLMAN:  I agree.  I completely agree, Your

15   Honor.

16           THE COURT:  All right.  All right, thank you very

17   much.  I just want to see counsel inside for a couple of

18   minutes.  Just give me a couple of minutes to clean up my

19   desk.  Thanks.

20           (Whereupon these proceedings were concluded at

21   11:28 AM.)

22

23

24

25

Page 36

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5
     Sonya Ledanski
6                              Digitally signed by Sonya Ledanski Hyde
     Hyde                      DN: cn=Sonya Ledanski Hyde, o=Veritext,
7                              ou, email=digital@veritext.com, c=US
                               Date: 2017.02.15 15:58:48 -05'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 15, 2017