**COHEN & GRESSER LLP**

800 Third Avenue
New York, New York 10022
Telephone: (212) 957-7600
Facsimile: (212) 957-4514
Daniel H. Tabak
Mark Spatz

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                                   :
                                                   :
In re:                                             :    Chapter 11
                                                   :
Gawker Media LLC et al.,                           :
                                                   :    Case No. 16-11700 (SMB)
                        Debtors.                   :
                                                   :
                                                   :
-----------------------------------------------------------------x
```

**OBJECTION OF TERRY G. BOLLEA TO MOTION OF THE DEBTORS FOR LEAVE
PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE TO CONDUCT DISCOVERY CONCERNING POTENTIAL PLAN
ISSUES AND POTENTIAL CAUSES OF ACTION, AND TO ESTABLISH
<u>DISCOVERY RESPONSE AND DISPUTE PROCEDURES</u>**

Terry G. Bollea, an unsecured creditor, objects to Debtors' Motion for Leave Pursuant to

Rule 2004 of the Federal Rules of Bankruptcy Procedure to Conduct Discovery Concerning

Potential Plan Issues and Potential Causes of Action, and to Establish Discovery Response and

Dispute Procedures (Dkt. No. 341, the "Motion").

**PRELIMINARY STATEMENT**

1.      Debtors' own confirmed Plan of Liquidation, which incorporates Debtors'

settlement agreements with Mr. Bollea, Shiva Ayyadurai and Ashley Terrill, defeats all three of

the purported goals of Debtors' Motion and expressly bars much of the discovery Debtors

nevertheless continue to demand.  Yet, like soldiers stranded on islands after hostilities have

ended, Debtors persist in fighting after the war is over.  But unlike isolated soldiers who are

unaware of a war's conclusion, Debtors signed the documents that were supposed to bring about

an end to hostilities.  As a result, they have no excuse for continuing to pursue their quixotic

Motion, which the Court should deny with prejudice.

2.      This Motion is nothing more than Debtors' effort to try to settle scores with Peter

Thiel and Charles Harder, whom Debtors blame for their bankruptcy filings.  Those bankruptcy

filings resulted from the actions of Debtors' founder Nick Denton and former Gawker.com

editor-in-chief A.J. Daulerio, who decided to post a sexually-explicit and illegally-recorded

video of Mr. Bollea on Gawker.com and then refused Mr. Bollea's requests to remove the video

from the website.  Their willful and malicious violation of Mr. Bollea's rights forced Mr. Bollea

to assert meritorious litigation against Gawker Media LLC ("Gawker Media"), which ultimately

led to a $140.1 million judgment, of which Gawker Media was directly liable for $130 million.

3.      Following intense negotiations, Debtors and Mr. Bollea agreed to a settlement

that was incorporated into Debtors' Plan of Liquidation, which this Court has confirmed.  The

purpose of the settlement agreement was to bring an end to all the litigation related to the posting

of the video.

4.      As part of the settlement agreement, Debtors agreed to pay $31 million to Mr.

Bollea to resolve the compensatory damages portion of the Florida judgment for Gawker Media

as well as Messrs. Denton and Daulerio, and Gawker Media also agreed not to appeal any

portion of the judgment or permanent injunction entered by the Florida court.  Subject to the $31

million payment, Debtors and Mr. Bollea agreed to mutual general releases that specifically

included releases for each party's attorneys.

2

5.      Because the parties sought an end to all the litigation, Mr. Bollea also agreed to cooperate and work in good faith to negotiate releases of Messrs. Denton and Daulerio that would resolve the punitive damages judgments against them.  Those awards had been carved out from Mr. Bollea's release of Debtors, who disclaimed responsibility to pay those separate awards.  Debtors, for their part, agreed to cooperate and work in good faith to negotiate mutual general releases between themselves and Mr. Denton on the one hand and Mr. Thiel on the other hand.

6.      The parties also reached a specific agreement as to this Motion.  Debtors agreed to suspend their prosecution of the Motion through at least the consummation of their Plan. They also agreed that they would never seek from Mr. Bollea or any other party any discovery whatsoever about Mr. Bollea.

7.      Mr. Bollea has lived up to each of his settlement agreement obligations to help put all of the litigation in the past.  Mr. Bollea entered into separate settlement agreements that released Messrs. Denton and Daulerio from the punitive damages claims against them.  Mr. Bollea did so even though he received no monetary compensation at all from those agreements. Mr. Bollea, through his counsel, also worked in good faith to secure a settlement agreement with releases between Mr. Thiel, Mr. Denton and Debtors.  Following weeks of negotiations, Mr. Bollea's counsel was able to bring about an agreement acceptable to Mr. Denton and Mr. Thiel.

8.      Debtors, however, have not met their obligations to move forward.  They simply are unwilling to accept the jury's finding that their own willful and malicious actions caused

their demise; instead, they have found scapegoats in Mr. Thiel and Mr. Harder.[1]  And Debtors

had a right to attack Mr. Thiel and Mr. Harder by bringing this (albeit meritless) Motion – ***until***

Debtors entered into their settlement agreement with Mr. Bollea.  Now, though, that settlement

agreement precludes Debtors' continued pursuit of their Motion in several ways.

9.      As an initial matter, two of the three ostensible bases for Debtors' Motion are now

moot.  Debtors purported to bring their Motion on the theories that (1) they may seek to

designate the votes of Mr. Bollea and other creditors on a plan of reorganization; and (2) they

want to be able to assess those creditors' economic incentives to facilitate settlements that would

be incorporated into a proposed reorganization plan.  Putting aside that those arguments were

specious when made, these purported goals are moot because Debtors have reached agreements

with those creditors and this Court has already confirmed Debtors' Plan.

10.      The designation and negotiation theories, of course, were always fig leaves.

Debtors' real objectives in filing this Motion were to exert leverage in settlement discussions and

to take discovery in an effort to embarrass and harass Mr. Thiel and Mr. Harder.  For purposes of

this Motion, Debtors described these goals as an investigation into whether they had grounds to

pursue litigation against "Mr. Thiel and/or other parties" in connection with Mr. Bollea's

successful lawsuit against Gawker Media.

11.      Debtors' purported litigation goal has always been doomed to failure.  Debtors

themselves acknowledge that they would have a "heavy burden" to bring a *prima facie* tort claim

because one element they must allege and prove is that the defendant's conduct was "without

excuse or justification and motivated solely by malice."  Motion at 17.  But Debtors' Motion

---

[1] *See*, *e.g.*, Tim Gihring, *Sex, Lies, and Hulk Hogan: How a South High Grad is Riding the Storm of Trump-Era Journalism*, MINNPOST (Feb. 2, 2017),  https://www.minnpost.com/media/2017/02/sex-lies-and-hulk-hogan-how-south-high-grad-riding-storm-trump-era-journalism (quoting Gawker.com's final editor in-chief rationalizing, "I think there was a sense that we were paying for our sins at first, but the Peter Thiel thing threw that out the window. Suddenly our downfall wasn't that we had flown too close to the sun but that we had pissed off this rich guy.").

rests on the upside-down notion that Gawker Media's actions in publishing a secretly-recorded, sexually-explicit video of Mr. Bollea – and refusing to take down the video in response to Mr. Bollea's pleas – were wholly justified while the lawsuit seeking to hold Gawker Media responsible for the consequences of its malicious actions was entirely unjustified.  The Florida jury reached the exact opposite conclusion, finding that Gawker Media committed intentional torts and was liable for $115 million in compensatory damages and $15 million in punitive damages.  The Florida trial judge agreed, finding clear and convincing evidence that Gawker Media "maliciously engaged in intentional misconduct."  Both of those findings are final and no longer subject to appeal.  As a result, Debtors cannot meet their burdens of alleging or proving that people who assisted Mr. Bollea in vindicating his rights acted without excuse or justification.

12.    Even if Debtors had a sustainable claim, their settlement agreement with Mr. Bollea expressly precludes Debtors from asserting any claim against Mr. Harder and obligates them to cooperate and work in good faith to release Mr. Thiel as well.  It also precludes Debtors from taking the discovery that they acknowledge is a prerequisite to pursuing a *prima facie* tort claim.  Yet Debtors have not amended their Motion to reflect the terms of the Bollea-Gawker Settlement Agreement, which was incorporated into their Plan and approved by this Court as part of the Confirmation Order.  While Debtors may prize their vendetta against Mr. Thiel and Mr. Harder more than their obligations under settlement agreements and court orders, this Court administers orders, not grudges.

13.    All of the individuals involved in the underlying Bollea litigation have agreed to move on with their lives and release claims they may have had against their former adversaries.  Messrs. Denton, Thiel and Bollea have asked Debtors to do so too.  But Debtors, who are now

non-operating corporate entities, persist in seeking to settle scores and place blame for their

demise on others.  It is past time for them to stop.

14.      Debtors have released Mr. Harder and agreed that they would release Mr. Thiel.

Those obligations, as well as obligations not to seek the discovery that would be necessary to

bring the claims Debtors propose, are part of this Court's order confirming Debtors' Plan of

Liquidation.  Mr. Bollea respectfully requests that the Court deny Debtors' Motion because it is

both meritless and barred by the Confirmation Order.

## BACKGROUND

15.      On or about October 4, 2012, Gawker Media, LLC ("Gawker Media"), Nick

Denton and A.J. Daulerio (the "Judgment Debtors") posted on Gawker.com secretly and illegally

recorded video footage of Mr. Bollea engaging in sexual activity in a private bedroom.  *See*

Declaration of Shane B. Vogt in Support of Defendant Terry Bollea's Opposition to the Motion

(the "Vogt Declaration" or "Vogt Decl.") ¶ 2.

16.      On October 5, 2012, Mr. Bollea's attorney sent a letter to the Judgment Debtors

demanding that they remove the video.  Ex. A (October 5, 2012 Letter from David Houston to

Nick Denton).[2]  Mr. Bollea specifically offered to forego any legal remedies against the

Judgment Debtors if they simply removed the video and disclosed all persons who were involved

in providing the video to Gawker Media.  *Id.* ("If you immediately disclose the requested

information and refrain from becoming involved with any use of the video, Hulk Hogan will

consider this matter closed and will not seek legal remedies against you for the issues raised in

this letter.").

17.      On that same day, Mr. Bollea's attorney emailed Mr. Denton asking once again

that the Judgment Debtors remove the video.  Ex. B (October 5, 2012 Email from David Houston

---

[2] All referenced exhibits are attached to the Vogt Declaration.

to Nick Denton).  In his email, Mr. Bollea's attorney wrote, "You of course are free to do whatever you choose, but we would deem [it] a significant sign of good faith if you choose to remove [the video] voluntarily and would not proceed against you or your company."  *Id.*  Mr. Bollea's attorney proceeded to write, "I have no intention of attempting to harm you or your business but rather only protect my client."  *Id.*

18.     The Judgment Debtors refused to remove the video.  Instead, in a transparent effort to attract more attention to their website without in any way minimizing the invasion of Mr. Bollea's privacy, they offered only to publish a statement by Mr. Bollea in response to the video.  *See* Ex. C (October 9, 2012 Email from Cameron Stracher to David Houston).

19.     With no other recourse to protect his privacy, on October 15, 2012, Mr. Bollea sued the Judgment Debtors and a number of other defendants in the matter *Bollea v. Gawker Media, LLC, et al.*, No. 12012447-CI-011 (Fla. 6th Jud. Cir., Pinellas Cty.) (the "Bollea Litigation").  *See* Vogt Decl. ¶ 2.  In March 2016, Mr. Bollea's action against the Judgment Debtors proceeded to trial on five claims:  (1) publication of private facts; (2) invasion of privacy based on intrusion; (3) violation of Florida's common law right of publicity; (4) intentional infliction of emotional distress; and (5) violation of Florida's Security of Communications Act.  *Id.* ¶ 3.

20.     On March 18, 2016, the jury returned a verdict for Mr. Bollea on all five counts and awarded $115 million in compensatory damages against the Judgment Debtors.  *Id.* ¶ 4; Ex. D (March 18, 2016 Trial Tr. 3834:10-3837:2).

21.     The jury also found that *each* of the Judgment Debtors acted with the "specific intent to harm [Mr. Bollea] when they posted the video on the Internet," and thus punitive damages against each of them were warranted.  Ex. D at 3837:3-20; *see also* Ex. E (Verdict

Form at 10) (checking off "Yes" for each defendant in response to the question, "[d]id Defendant(s) have a specific intent to harm Plaintiff when they posted the VIDEO on the Internet?"). On March 21, 2016, the jury awarded Mr. Bollea an additional $25.1 million in punitive damages divided as follows: $15 million against Debtor, $10 million against Mr. Denton, and $100,000 against Mr. Daulerio. Ex. F (Final Judgment ¶¶ 2-4); Ex. G (Punitive Damages Verdict Form).

22.     On June 7, 2016, the Florida court entered a final judgment incorporating the jury's awards. The Florida Court also entered a permanent injunction precluding the Judgment Debtors from certain uses of the video materials in their possession. Ex. H (Permanent Injunction) at 9. In doing so, the Florida court found that Mr. Bollea established by clear and convincing evidence that the Judgment Debtors "maliciously engaged in intentional misconduct." *Id.*, ¶ 44.

23.     On June 10, 2016, shortly after the judgment was entered in the Bollea Litigation, Gawker Media filed for bankruptcy protection.

24.     Although Gawker Media proceeded under Chapter 11, it never actually planned to reorganize so that it could continue to engage in its core business. Rather, its goal was to sell its assets. *See, e.g.*, Declaration of William D. Holden in Support of First Day Motions (Dkt. No. 7) ¶ 38 ("The Company . . . determined that seeking chapter 11 relief and selling the Company quickly was in the best interests of the Company and its constituencies."). Accordingly, prior to

filing for bankruptcy Debtors secured a stalking horse bid in the amount of $90 million.[3]

Ultimately, Debtors were able to sell their assets for $135 million – $45 million more than the

stalking horse bid.

25.      On October 11, 2016, Debtors' filed this Motion with a hearing date set for

November 3, 2016.

**Every Interested Party Except Debtors Wants to Move On.**

26.      During the week of October 24, 2016, pre-scheduled settlement meetings between

Debtors and counsel for Mr. Bollea, Dr. Ayyadurai and Ms. Terrill took place.  Those

discussions resulted in term sheets for settlements.

27.      Ultimately, Debtors and Mr. Bollea entered into a settlement agreement based on

the term sheet they signed in October.  In exchange for a payment of $31 million to Mr. Bollea,

the parties agreed not only to end their litigation against each other but also to put an end to other

litigation or potential litigation.  First, the settlement agreement included a release for each

parties' attorneys, thus releasing Mr. Harder and his firm from any claims by Debtors.  Second,

Mr. Bollea agreed to support and vote in confirmation of Debtors' Plan, thus avoiding potentially

expensive litigation over allocation of the sale proceeds.  Third, Debtors agreed to suspend

prosecution of this Motion until the Effective Date of the settlement agreements, *i.e.* when all

conditions necessary to consummation of the Plan have been satisfied.  Fourth, Debtors agreed

never to seek from Mr. Bollea or anyone else any discovery whatsoever about Mr. Bollea.  Fifth,

Debtors and Mr. Bollea agreed to cooperate and work in good faith to secure settlement

---

[3] *See* Debtors' Motion For (I) an Order (A) Authorizing and Approving Bidding Procedures, Breakup Fee and
Expense Reimbursement, (B) Authorizing and Approving The Debtors' Entry Into and Assumption of The Stalking
Horse Asset Purchase Agreement, (C) Approving Notice Procedures, (D) Scheduling a Sale Hearing and (E)
Approving Procedures for Assumption and Assignment of Certain Contracts and Leases and Determining Cure
Amounts and (II) an Order (A) Authorizing the Sale of Substantially All of The Debtors' Assets Free and Clear of
All Claims, Liens, Rights, Interests and Encumbrances, (B) Approving the Asset Purchase Agreement and (C)
Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases, Dkt. No. 21 ¶ 3
("Debtors' Sale Motion").

agreements between Mr. Bollea and Messrs. Denton and Daulerio as well as between Mr. Thiel

and Thiel Capital, LLC on the one hand and Debtors and Mr. Denton on the other hand, with

each agreement to contain mutual general releases in exchange for no compensation.  Finally,

Debtors agreed that Mr. Bollea would have an allowed claim of $84 million for purposes of the

45% recovery of unsecured creditors on, *inter alia*, certain claims that could be brought by

Debtors (which could include claims against Mr. Thiel if he was unwilling to agree to mutual

general releases).[4]

28.      Debtors also entered into settlement agreements with Dr. Ayyadurai and Ms.

Terrill.  Those settlement agreements prevent Debtors from seeking any discovery regarding Dr.

Ayyadurai or Ms. Terrill, with the sole exceptions of litigation financing agreement(s) and non-

privileged retainer agreements with Charles Harder and his firm relating to the underlying

litigations that were being settled.  Ayyadurai and Terrill Settlements Dkt. 516. Ex. D, ¶ 9, & Ex.

E, ¶ 9.  Dr. Ayyadurai and Ms. Terrill also committed to support Debtors' plan of liquidation and

vote in favor of it.  Dkt. 516. Ex. D, ¶ 4, & Ex. E, ¶ 4.

29.      Debtors' Plan expressly incorporated the terms of Debtors' settlements with Mr.

Bollea, Dr. Ayyadurai and Ms. Terrill.  Plan, § 4.01.

30.      Consistent with their obligations under their settlement agreements, Mr. Bollea,

Dr. Ayyadurai and Ms. Terrill each voted in favor of the Plan.  No party sought to have their

votes designated.

31.      On December 22, 2016, this Court entered an order confirming the Plan (the

"Confirmation Order") (Dkt. No. 638).  The Confirmation Order specifically approved the

Bollea-Gawker Settlement Agreement. *Id.*, ¶¶ 30, 37-39, 56.  It also approved Debtors'

---

[4] The remaining 55% ultimately would go to equityholders of Gawker Media Group, Inc.  Mr. Denton holds
approximately 30% of that equity on a diluted basis. *See*, *e.g.*, Gawker Media Group, Inc. Voluntary Petition for
Non-Individuals Filing for Bankruptcy (16-11700, Dkt. No. 1) at 15-18.

settlement agreements with Ayyadurai and Terrill.  *Id.*, 30, 40-45, 56.

32.    Pursuant to his obligations under the Bollea-Gawker Settlement Agreement, Mr. Bollea reached settlements with Messrs. Denton (as a debtor-in-possession) and Daulerio that involved Mr. Bollea's release of the $10 million judgment he held against Mr. Denton and the $100,000 judgment he held against Mr. Daulerio in exchange for no cash consideration.  The Court approved Mr. Bollea's settlement with Mr. Denton on March 22, 2017.  (16-01248, Dkt. No. 14).

33.    In accordance with the obligations of Debtors and Mr. Bollea to cooperate and work in good faith to obtain mutual general releases between Peter Thiel and Thiel Capital LLC on the one hand and Debtors and Mr. Denton on the other, Mr. Bollea, through counsel, facilitated discussions to obtain those releases.  Mr. Thiel and Mr. Denton, neither of whom have any obligation to enter into a settlement agreement with each other, reached an agreement in principle on the terms of mutual releases.  Along with Mr. Bollea, they asked Debtors to join that agreement.  Debtors, who have an obligation to facilitate the agreement, have refused.

34.    Thus, despite receiving all the benefits of their settlement agreement with Mr. Bollea, including the resolution of all of Mr. Bollea's litigation against Debtors and their agents, Debtors are refusing to provide Mr. Bollea with certain key benefits he bargained for.  The Court should deny Debtors Motion, which cannot be reconciled with Debtors' obligations under the Bollea-Gawker Settlement Agreement.

## ARGUMENT

## I.    LEGAL STANDARD

35.    The underlying purpose of Rule 2004 is to "allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate."  *Keene Corp. v. Johns–Manville Corp.* (*In re Johns–Manville Corp.*), 42 B.R. 362, 364 (S.D.N.Y. 1984).  Accordingly, Rule 2004

is generally used for examination of the debtor, not its creditors.  *See In re GHR Energy Corp.,* 33 B.R. 451, 455 (Bankr. D. Mass. 1983)) ("While it is true, in some instances, that creditors may possess information relative to the debtor's business and conduct which the debtors do not possess, this would be the exception."); *see also In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 586–87 (Bankr. S.D.N.Y. 2001) ("The purpose [of a Rule 2004 examination] is to allow inquiry into the debtor's acts, conduct or financial affairs so as to discover the existence and location of assets of the estate." (quoting *In re Dinubilo,* 177 B.R. 932, 940–941 (E.D. Cal. 1993))).  Moreover, given its limited application, Rule 2004 cannot be used for "purposes of abuse or harassment" and it "cannot stray into matters which are not relevant to the basic inquiry." *In re MF Glob. Inc.*, No. 11-02790 MG, 2013 WL 74580, at *1 (Bankr. S.D.N.Y. Jan. 8, 2013) (citing *In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wis.1984)); *accord Picard v. Marshall* (*In re Bernard L. Madoff Inv. Secs. LLC*), Adv. Pro. No. 08–01789, 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) (finding 2004 examination request improper where the requested discovery would have no bearing on property, liabilities, or financial condition of the estate).

36.    The party seeking Rule 2004 discovery has the burden to show good cause for the examination it seeks.  *Picard*, 2014 WL 5486279, at *2.  "Generally, good cause is shown if the [Rule 2004] examination is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004) (quoting *In re Dinubilo*, 177 B.R. at 943); *accord In re Drexel Burnham Lambert Grp.,* 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).  The Court must also "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *In re Drexel Burnham,* 123 B.R. at 712.

37.    Finally, "the examination should not be so broad as to be more disruptive and costly to the [producing party] than beneficial to the [requesting party]." *In re Texaco, Inc.,* 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987).  Thus, Rule 2004 examinations must be limited to a legitimate scope, if any.  *In re Drexel Burnham,* 123 B.R. at 711 (explaining that while a Rule 2004 examination "can be legitimately compared to a fishing expedition . . . however, the net, in the discretion of the Court, can be carefully stitched to limit its catch"); *In re Texaco* 79 B.R. at 553 (denying 2004 examination requests that were not necessary to evaluate or propose a plan of reorganization).  While courts in the past may have referred to discovery under Rule 2004 as a "fishing expedition," that Nineteenth Century concept is no longer applicable in an age of electronically stored information and a new emphasis on proportionality in discovery.  *In re SunEdison, Inc.*, 562 B.R. 243, 249-50 (Bankr. S.D.N.Y. 2017).

## II.    THE CONFIRMED PLAN OF LIQUIDATION BARS DEBTORS FROM CONTINUING TO PURSUE THEIR MERITLESS MOTION FOR RULE 2004 DISCOVERY

38.    Debtors' Motion was meritless from the start because they had no basis for advancing any of the three purported goals they claimed as justification for the intrusive discovery they sought.  Now, Debtors' Motion is also barred by the confirmation of their Plan of Liquidation.  It is too late for Debtors to designate votes of creditors (who voted in favor of Debtors' Plan) or to obtain discovery for the purpose of settling claims that have already been settled.[5]  And Debtors' agreements to release Mr. Harder, work cooperatively and in good faith to release Mr. Thiel, and limit the discovery they could even seek on this Motion prevent Debtors

---

[5] The timing of Debtors' motion and selected hearing date make it obvious that these arguments were a sham from the start.  Debtors scheduled the hearing to take place *after* pre-scheduled settlement talks, and the amount of time in Debtors' requested discovery schedule would not have permitted a timely motion to designate votes under Debtors' proposed schedule for confirmation.

from bringing claims against Mr. Harder or Mr. Thiel.  The Court should therefore deny Debtors' Motion.

A.      **Rule 2004 Discovery to Determine Whether to Designate Votes or to Settle with Creditors Is Inappropriate and Now Moot.**

39.      Debtors' first purported rationale for seeking discovery is the pretext that some basis may exist to designate the votes of Mr. Bollea, Dr. Ayadurrai, or Ms. Terrill pursuant to 11 U.S.C. § 1126(e), which provides that "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."  Putting aside that Debtors point to no actions by any creditor during the bankruptcy case that could possible support designation of his vote[6] – indeed they do not even mention any creditor in their argument section on this issue[7] – and that Debtors' own cases limit designation of a creditor's vote to situations where a creditor impeded a *reorganization*, not a liquidation,[8] this issue is now moot.  Mr. Bollea, Dr. Ayadurrai, and Ms. Terrill each agreed to vote in favor of the Plan, they each voted in favor of the Plan, and the Court has already confirmed the Plan with those votes being tabulated.  No discovery can change this result.

---

[6] As the statute makes clear, and as even the cases cited by Debtors recognize, the designation inquiry turns on the creditor's conduct during the course of the bankruptcy proceedings rather than prepetition events.  *See In re Bataa/Kierland, LLC*, 476 B.R. 558, 568 (Bankr. D. Ariz. 2012) (finding it difficult to conceive how the creation of the debt at issue "months before the bankruptcy filing and even more months before the filing of a plan and the opportunity for [that creditor] to cast an official vote" could have any bearing on whether that creditor's vote was solicited or procured in bad faith).

[7] The closest Debtors come to discussing Mr. Bollea is their assertion that the amount spent on attorney's fees, described as $10 million, may be evidence of bad faith.  Motion, ¶ 31.  Even if such prepetition attorney's fees were somehow relevant to Mr. Bollea's conduct before this Court, Debtors by their own admission spent $13 million in defending against the Bollea Litigation.  *See* Transcript of Hearing re: Trial Motion for Preliminary Injunction and/or Extension of the Automatic Stay (55:16-17) ("So far we've spent – the company's spent $13 million defending the Hogan case.").  Debtors' real gripe is not disproportionate spending; it is Debtors' sour grapes that Mr. Bollea got a much, much better return on investment.

[8] *See* Motion, ¶ 27 (quoting *In re Dune Deck Owners Corp.*, 175 B.R. 839, 845 (Bankr. S.D.N.Y. 1995) as permitting designation where creditor sought to obtain benefits that depended "on the debtor's failure to reorganize"); *id.*, ¶ 28 (quoting *In re MacLeod Co.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986) as permitting designation where creditor rejected plan "for the ulterior purpose of destroying or injuring debtor in its business").

40.    Debtors' second contention is that they want a Rule 2004 examination "to allow the Debtors to understand and account for the creditors' economic incentives as they prepare a plan of reorganization [sic]," including reaching settlement agreements with creditors.  Motion, ¶ 34.  Indeed, Debtors claimed this information was "critical" to understand as the plan process went forward.  *Id.*, ¶ 37.  Debtors cite no legal authority permitting a Rule 2004 examination of a creditor's economic incentives for settlement purposes, and for good reason – permitting such examinations has no legitimate purpose but would allow debtors to obtain intrusive discovery and an unfair advantage in the settlement process over any creditor with a disputed claim.[9]  In any event, Debtors already reached settlements with Mr. Bollea, Dr. Ayadurrai, and Ms. Terrill and incorporated those settlements into their confirmed Plan without any discovery pursuant to Rule 2004 or otherwise.  So Rule 2004 discovery plainly was not "critical" for Debtors to reach those settlements or prepare their Plan.

**B.    The Settlements Incorporated in the Confirmed Plan Preclude Debtors from Pursuing 2004 Discovery.**

41.    Finally, Debtors' third pretext for issuing a flurry of subpoenas is that they purportedly want to explore whether they can bring *prima facie* tort claims against "Mr. Thiel and/or other parties."  Motion, ¶ 18.  Of course, as Debtors recognize, they cannot succeed on a *prima facie* tort claim under New York law unless they meet a "heavy burden" of alleging and then proving that the targets of their claims were acting "without excuse or justification and motivated solely by malice."  Motion, ¶ 41 (citation omitted).  Even assuming New York substantive law applies, it is a burden they cannot possibly bear with regard to the Bollea

---

[9] It is, of course, well within a creditor's right to protect its self-interest by seeking to maximize recovery under a prospective plan. *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 62 (Bankr. S.D.N.Y. 2006); *see also In re Dune Deck Owners Corp.*, 175 B.R. at 844 ("[A] creditor is free to vote its self-interest with respect to its claim.").  This is true even if a creditor does so in an aggressive or overreaching manner. *In re Adelphia Commc'ns Corp.*, 359 B.R. at 62.

Litigation because the jury's finding of liability and the Florida court's entry of a permanent injunction by themselves demonstrate that the claim was not made "without excuse or justification." *See Brandt v. Winchell*, 3 N.Y.2d 628, 636 (1958) (rejecting *prima facie* tort claim as a matter of law because persuading a government agency to bring charges is in the public interest even if motivated solely by malice). Those determinations are binding and no longer subject to appeal, so issue preclusion prevents Debtors from contending that the Bollea Litigation lacked all justification. *See GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1210 n.2 (S.D.N.Y. 1981) ("[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979))). As a result, Debtors cannot bring a successful *prima facie* tort claim against anyone based on the Bollea Litigation.

42.     But even if Debtors could somehow plead and then prove a *prima facie* tort claim, the settlements that are incorporated into the confirmed Plan preclude them from pursuing their 2004 Motion.

43.     First, Debtors have expressly released Mr. Bollea and his lawyers (including Mr. Harder and his firm) from any claims that are covered by the topics included in the 2004 Motion. Bollea-Gawker Settlement, ¶ 17. As a result, Debtors cannot assert claims against Mr. Harder or his firm.[10]

44.     Second, Debtors have agreed to cooperate and work in good faith to secure a settlement agreement with mutual general releases between Peter Thiel and Thiel Capital, LLC

---

[10] Debtors also concede that they cannot bring a *prima facie* tort claim against a defendant acting for profit, self-interest, or business reasons. Motion, ¶ 41 & 42 n.9. Debtors do not even suggest that Mr. Harder and his firm were not motivated at least in part by the entirely legitimate goal of earning fees, so no *prima facie* tort claim would rest against them in any event.

on the one hand and Debtor and Mr. Denton on the other hand. Bollea-Gawker Settlement

Agreement, ¶ 19 & Ex. C. Mr. Thiel and Mr. Denton have reached an agreement in principle

that effectuates those mutual releases. Debtors' continued pursuit of their 2004 Motion violates

their obligations under the Bollea-Gawker Settlement Agreement to release Mr. Thiel and Thiel

Capital, LLC.

45.    Finally, Debtors also agreed to limit the discovery they could receive through the

2004 Motion. As to Mr. Bollea, Debtors specifically agreed that they "shall not seek from

Bollea or any other third party *any discovery about Bollea, including*, without limitation,

*discovery concerning the subject matter of the 2004 Motion*, litigation funding or finance," any

of the underlying litigations between Mr. Bollea and Debtors or any of the bankruptcy cases of

Debtors or Mr. Denton. Bollea-Gawker Settlement Agreement, ¶ 18 (emphasis added). As to

Dr. Ayyadurai and Ms. Terrill, Debtors included the same agreement in their settlement

agreements except that Debtors were permitted to seek litigation financing agreements as to

their lawsuits and non-privileged retainer agreements with Charles Harder or his law firm. Dkt.

516. Ex. D, ¶ 9, & Ex. E, ¶ 9. In complete disregard of these provisions, Debtors have not

narrowed the discovery they seek through their 2004 Motion to reflect these agreements.

46.    Indeed, Debtors' agreement to forego discovery regarding Mr. Bollea and limit

their discovery relating to Mr. Bollea, Dr. Ayyadurai, and Ms. Terrill solely to litigation

financing agreements and non-privileged retainer agreements also precludes Debtors from

instituting a *prima facie* tort claim against Mr. Thiel. Debtors concede that without the

information they sought in their 2004 Motion, they do not "understand whether they have a

reasonable basis to believe they can meet" their admittedly "heavy burden" of proving a *prima*

*facie* tort. Motion, ¶ 42. And without understanding that they have a reasonable basis to prove

17

their claim, Debtors are precluded from asserting it under Federal Rule of Bankruptcy

Procedure 9011(b).  So there is no point to providing Debtors with the very limited discovery

they can still obtain because they will be unable to plead the elements of a *prima facie* tort in

any event.

47.     In sum, the Motion should be denied because Debtors have entered into binding

agreements incorporated into their confirmed Plan that preclude them from following through

on the sole remaining objective of the Motion, determining whether they can assert a *prima

facie* tort claim.  Debtors have explicitly released Mr. Harder and his law firm from any claims,

and they have agreed to cooperate and act in good faith in granting a general release to Mr.

Thiel and his corporation.  Debtors have agreed to forego an appeal of the judgment against

them in the Bollea Litigation, so they are precluded from alleging, much less proving, that the

people involved in bringing that litigation acted without justification.  And they have also

agreed to forego the critical discovery that they admit they would need before they can allege a

*prima facie* tort claim.  Debtors' agreements, and the Confirmation Order that incorporates

them, therefore require the denial of this Motion.

48.     Simply stated, it is time for Debtors to honor their agreements to lay down their

arms.

### RESERVATION OF RIGHTS

49.     Mr. Bollea reserves the right to raise objections to the Motion at the hearing.

**CONCLUSION**

50.     Debtors continue to pursue this Motion as though they had not reached settlements with Mr. Bollea, Dr. Ayyadurai, and Ms. Terrill that are incorporated into Debtors' confirmed Plan and that moot or preclude all of their arguments.  Because those settlements preclude Debtors' Motion, the Court should deny Debtors' Motion with prejudice.

Date:   April 18, 2017
        New York, New York

<div style="margin-left:40%">

Respectfully submitted


____/s/Daniel H. Tabak_____
Daniel H. Tabak
Mark Spatz
COHEN & GRESSER LLP
800 Third Avenue, 21st Floor
New York, New York 10003
Tel:  (212) 957-7600
dtabak@cohengresser.com
mspatz@cohengresser.com


Eric B. Fisher
Jessica L. Jimenez
BINDER & SCHWARTZ LLP
366 Madison Avenue, Sixth Floor
New York, New York 10017
Tel:  (212) 933-4551
efisher@binderschwartz.com
jjimenez@binderschwartz.com


Shane B. Vogt (admitted *pro hac vice*)
BAJO CUVA COHEN TURKEL
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 868-6650
shane.vogt@bajocuva.com


*Attorneys for Terry G. Bollea*

</div>