1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11700-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   GAWKER MEDIA, LLC,

8            Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11                  U.S. Bankruptcy Court

12                  One Bowling Green

13                  New York, NY  10004

14

15                  April 25, 2017

16                  10:01 AM

17

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

1    Hearing re:  Application for FRBP 2004 Examination Motion of

2    the Debtors for Leave Pursuant to Rule 2004 of the Federal

3    Rules of Bankruptcy Procedure to Conduct Discovery

4    Concerning Potential Plan Issues and Potential Causes of

5    Action, and to Establish Discovery Response and Dispute

6    Procedures

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    ROPES & GRAY LLP

4         Attorneys for the Debtor

5         1211 Avenue of the Americas

6         New York, NY 10036

7

8    BY:  GREGG M. GALARDI

9

10   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

11        Attorneys for Peter Thiel

12        One Rodney Square, P.O. Box 636

13        Wimington, DE 19899

14

15   BY:  SHANA A. ELBERG

16        TONY CLARK

17        ROBERT A. WEBER

18

19   CHADBOURNE & PARKE LLP

20        Attorneys for Harder Mirrel & Abrams and Charles J.

21        Harder LLP

22        1301 Avenue of the Americas

23        New York, NY 10019

24

25   BY:  SAMUEL S. KOHN

Page 4

1    COHEN & GRESSER LLP

2         Attorneys for Terry Bollea

3         800 Third Avenue

4         New York, NY 10022

5

6    BY:  DANIEL H. TABAK

7

8    ALSO PRESENT TELEPHONICALLY:

9

10    JIM CHRISTIE

11    JASON N. KESTECHER

12    ALEX MCGEE

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Gawker?

3              MR. GALARDI:  Good morning, Your Honor.  For the

4    record, Gregg Galardi, Ropes & Gray, on behalf of the Gawker

5    Debtor, which is now post-effective date, so on behalf of

6    the plan administrator.  This is the Debtor's motion that

7    has been adjourned a number of times with respect to a 2004

8    exam.  And if I may just proceed on that motion?

9              THE COURT:  Go ahead.

10             MR. GALARDI:  Your Honor, the motion was filed for

11   three purposes back on October 11th: the first was to

12   investigate various activity with the creditors and the

13   potential to designate votes; tips to help to formulate a

14   plan; and then third, for the purpose of investigating the

15   potential prima facie tort with respect to Mr. Thiel.

16             Your Honor, the objectors make much about the

17   motion not serving its purposes, but I think the chronology

18   and facts actually undermine those arguments.  It was filed

19   on October 11th; settlements were reached on October -- the

20   end of October; settlements got put into a plan.  All of the

21   settlements addressed the 2004 exam, and all of those

22   settlements held them in abeyance until after confirmation.

23             So the third purpose is the only purpose in which

24   we are prosecuting today, with respect to getting

25   information, with respect to the cause of prima facie tort.

Page 6

1    We have sought this because we would like to get more

2    information before filing the Complaint if a Complaint is

3    ever filed.  That was the status as of the objective date,

4    and it's also the basis for why there have been a number of

5    adjournments.

6              So let me just turn to the prima elements of the

7    prima facie tort and what we think we need and why we think

8    this is an appropriate 2004 exam.  There are, as everybody I

9    think agrees in the Court, four elements to the prima facie

10   tort: first, an intentional infliction of harm; two, that

11   harm has to be without justification and motivated solely by

12   malice; three, special damages; and four, it can be an act

13   that is otherwise lawful.

14             THE COURT:  What's the definition of malice?

15             MR. GALARDI:  That would meaning -- I'm not sure

16   of the specific, but it has to be solely the intention to

17   harm or to destroy or otherwise to inflict injury on the

18   party.

19             So, obviously -- well, not obviously -- the first

20   element.  We do not dispute that there is anything unlawful

21   about financing litigation.  We do not dispute that Mr.

22   Bollea could have his day in the Court, but that is not a

23   counter -- that is not a defense to the prima facie tort.

24             Second -- so one element is satisfied -- special

25   damages.  Your Honor has heard from the beginning of this

Page 7

1    case through the auction regarding potential loss of

2    business value, both prefiling and after filing, and,

3    indeed, we have reserve rights with respect to the auction

4    itself.  And Your Honor is familiar with the fact that as a

5    result of some of this litigation, we had to carver out

6    gawker.com from the sale.  So we think we can allege special

7    damages.

8              As to the intentional infliction of harm, I don't

9    think there's really a dispute that Mr. Thiel acted

10   intentionally.  He funded litigation admittedly.  He

11   authorized the search for plaintiffs.

12             THE COURT:  Can I ask you what more facts you need

13   to frame a Complaint?

14             MR. GALARDI:  Your Honor, I guess the real facts

15   and discovery would be with respect to the final element of

16   whether or no his motive was pretense.  What we have is a

17   series of articles, which is really the fourth on.  Is it

18   motivated solely by malice, as opposed to other motivations?

19   We have statements that we think can construe as malice, but

20   there are also other statements, which we readily admit are

21   out there.  He has made comments about, it's not a financial

22   fight, it's my greatest philanthropic thing I've done.

23             THE COURT:  Okay, so you have a good faith dispute

24   on that element.  Normally, you would allege that in the

25   Complaint and then take discovery.  Why is this different?

Page 8

1          MR. GALARDI:  Your Honor, it's different in the

2     sense that before -- and, again, from the plan administrator

3     standpoint, the whole point of 2004 is to see if there are

4     other -- it's an ambiguous, and we're going to be asked to

5     take on a litigation, potentially spending estate assets.

6          THE COURT:  Yeah, but the estate assets really

7     belong to equity at this point.  All the creditors have been

8     paid in full.

9          MR. GALARDI:  Well, but that doesn't belittle the

10    fact that you still have to have a fiduciary obligation to

11    those stakeholders to determine to spend those monies to

12    potentially investigation, and, again, we have investigated.

13    We have gone out prefiling with respect to contingency fee

14    lawyers.  And with respect to that to minimize the cost to

15    the estate, we would like to have additional facts to

16    determine whether people are prepared, on a contingency

17    basis, to take on this litigation.

18          The 2004 exam is exactly to that fact, and whether

19    we simply go on the public statements, which the press have

20    made on interviews, versus finding whether there are primary

21    sources directly from Mr. Thiel himself as to his

22    motivation.

23          THE COURT:  Can I ask you a different question.

24    To what extent do the settlements limit what you can inquire

25    into?

Page 9

1              MR. GALARDI:  Well, Your Honor, the settlements

2      clearly provide that we cannot ask for the documents about

3      the Bollea or the Bollea settlement.  They also clearly

4      limit that we cannot ask about documents, other than one

5      separate class, with respect to Ayyadurai and Terrill.  We

6      are clearly limited by that.

7              THE COURT:  So what's left?

8              MR. GALARDI:  Well, we submitted Mr. Wong's

9      documents.  Mr. Wong has -- what -- has not --

10             THE COURT:  I've seen those.

11             MR. GALARDI:  Okay?  There are allegations with

12     respect to solicitation of plaintiffs' actions.  We have

13     been advised in conversations and wanted to explore that

14     many other plaintiffs were approached about potentially

15     financing the litigation, and we don't have that

16     information.  We also have information that it was four or

17     five years in the making, when eventually it came out that

18     he was financing the Bollea litigation.  So we think simple

19     emails can say -- I mean, I doubt we have an email of this

20     sort -- but if Mr. Thiel writes to his friend, I am going to

21     put Gawker out of business at all costs, I do not care.

22             THE COURT:  You hope to find that, right?

23             MR. GALARDI:  I hope to find that email, exactly.

24     But, look, it's (indiscernible), I know them very well.  I'm

25     sure he doesn't have that email.  But we would like to see

1    whether those emails to make sure that we can do the proper

2    cost benefit analysis with respect to pursuing the

3    litigation.

4           Your Honor, and I also do want to add, okay.  We

5    also have an obligation, and I think this is important, as

6    Your Honor has -- as has been pointed by Mr. Bollea's

7    counsel, there was a cooperation agreement.  And that

8    cooperation agreement required that we negotiate in good

9    faith with respect to settlements, including the Daulerio

10   settlement, the Denton settlement.  Both of those were

11   accomplished.

12          We did get a settlement agreement.  It was not

13   cast in stone, as they will readily admit.  The issue was

14   whether there was adequate consideration for us to give a

15   release to Mr. Thiel in that document.

16          Given the facts, given what Your Honor has

17   noticed, clearly, we could sign a Complaint.  The question

18   is whether we're going to pursue those assets.  We ask for

19   simple documents to, in fact, provide us to either confirm

20   that we can give that release -- again, Mr. Clark probably

21   will.

22          THE COURT:  But that's a different issue.  You're

23   not seeking documents now to decide whether or not you're

24   going to give the release.

25          MR. GALARDI:  Well, again, they go both ways, Your

Page 11

1    Honor.  If we don't find documents to justify, we can either

2    withdraw or we can negotiate a release.  I do think the

3    documents are critical to either.  It's confirmatory to do

4    it.

5            THE COURT:  So why don't you just sue him like

6    everybody else would do and get your discovery, and then

7    determine whether or not to settle?

8            MR. GALARDI:  Your Honor, if you don't grant the

9    2004, that may be the position we're in, and we'll see if a

10   law firm is prepared to do that.

11           THE COURT:  You're not suggesting that this Court

12   would have jurisdiction?

13           MR. GALARDI:  No, I'm not suggesting that this

14   Court would have jurisdiction.

15           THE COURT:  So you want information about a

16   litigation over which this Court doesn't have jurisdiction.

17           MR. GALARDI:  I think that's correct, Your Honor,

18   but I don't think that's a limitation on 2004 because it's

19   an estate cause of action.  And I still believe that just

20   because Your Honor doesn't have the jurisdiction to enter

21   final findings, it is still an asset of the estate that Your

22   Honor has jurisdiction over.

23           I don't know if Your Honor has any other

24   questions.

25           THE COURT:  No.

1          MR. GALARDI:  Thank you.

2          THE COURT:  Thank you.

3          MR. TABAK:  Good morning, Your Honor.  Dan Tabak

4     from Cohen & Gresser, on behalf of Mr. Bollea.

5          THE COURT:  What's your interest in this?  Since

6     he can't get any discovery about your case, why are you

7     involved in this?

8          MR. TABAK:  We're involved in this because we have

9     a settlement agreement.  And under that settlement

10    agreement, first, we wanted -- Mr. Bollea wants to move

11    forward.  The longer that this is in the public's sphere,

12    the more difficult it is for him to move forward with his

13    other --

14          THE COURT:  Why?  I don't understand that.

15          MR. TABAK:  For example, Mr. Bollea was

16    interviewed on Good Morning America.  He's tried to promote

17    a new store that he opened at Hogan's Beach in Orlando.  And

18    the questions that Good Morning America puts on -- airs are

19    mostly about the lawsuit.  Mr. Bollea wants to advertise his

20    store, not the lawsuit.  That's why this was -- actually,

21    the full third day of our settlement negotiations were about

22    these provisions.  And it was to have these mutual

23    provisions where Mr. Bollea agrees to give up, not just

24    theoretical hypothetical claims against Mr. Denton and Mr.

25    Daulerio, he gives us judgments in hand.  And in return, the

Page 13

1    debtors were supposed to give up --

2              THE COURT:  Sure, he gets $31 million, right?

3              MR. TABAK:  That's part of it.

4              THE COURT:  Plus, plus there's something at the

5    end possibly.

6              MR. TABAK:  That's right, 45 percent of this

7    lawsuit, which he doesn't think the debtors should bring or

8    the plan administrator.

9              THE COURT:  No, but that's not his call.

10             MR. TABAK:  That's right.

11             THE COURT:  In other words, your deal provides

12   that if the debtor brings this lawsuit and recovers, he gets

13   45 percent of it?

14             MR. TABAK:  That's ultimately --

15             THE COURT:  You should be all for this application

16   then.

17             MR. TABAK:  Mr. Bollea is not because he thinks

18   that the application, it's not fair, it's not meritorious.

19   And it's going to do exactly what he's tried to avoid -- get

20   this lawsuit out of the top paragraph of every story about

21   him.  He wants the stories about him to be about his

22   outstanding wrestling career, to be about the stores that

23   he's opening, to be about other things.  That's why he

24   bargained specifically for this provision, and it's a

25   parallel provision to the Denton and Daulerio provisions.

Page 14

1            And it's interesting, nowhere in Gawker's reply

2    papers do they address the language in the provision,

3    because there is no reading of the provision that says they

4    get to cooperate and work in good faith to secure releases,

5    but first, they get to take some discovery to see whether

6    they have claims.

7            THE COURT:  Well, there's no release.  Now I think

8    the only issue is whether or not a debtor in this particular

9    situation -- post-confirmation, no benefit to creditors, et

10   cetera, et cetera -- is entitled to take 2004 discovery

11   about a possible claim.

12           MR. TABAK:  I would say so, Your Honor, except

13   that this settlement agreement is part of the plan.  It

14   needs to be enforced as part of the plan.  Mr. Bollea lived

15   up to his obligations.

16           THE COURT:  But the Ayyadurai and Terrill

17   settlements clearly allow him to get some discovery about

18   this.  That's also part of the plan.

19           MR. TABAK:  That's right, and he can get that

20   discovery.  But the way this was set up was, if Mr. Denton

21   or Mr. Daulerio were not interested in mutual general

22   releases, then we wouldn't have to negotiate them.  Mr.

23   Denton was; Mr. Daulerio, we dragged kicking and screaming.

24   Wait till you see his bill for this.

25           THE COURT:  You know, I have to tell you, Mr.

Page 15

1    Tabak.  He can't get any discovery about your client from

2    Harder or anybody else, and I just don't know what you're

3    protesting.  He may bring the action anyway, and, you know,

4    he has the right to do that presumably.

5            MR. TABAK:  First, we think on the settlement

6    agreement, he doesn't have the right any longer.  He has to

7    work in good faith to get the releases from Mr. Thiel.  Mr.

8    Thiel's offered not just to --

9            THE COURT:  So then he's saying the dis -- if you

10   want get back into that, he's saying he needs the discovery

11   in order to determine what the value of the claim is.

12           MR. TABAK:  But that was something that he decided

13   in October.  That was part of our agreement in October.  For

14   instance, he knew -- when we reached a settlement in

15   October, he knew that he had a very heavy burden to lift.

16   He knew that according to Gawker's own papers, they

17   essentially could not meet Rule 11 at that time.

18           They did not understand whether they had a claim.

19   And he still gave up the discovery about Mr. Bollea, gave up

20   almost all discovery about Terrill and Ayyadurai.  And he

21   agreed that if Mr. Thiel was willing to give a mutual

22   general release, that Gawker would meet and do the same

23   thing.  And that was a key and integral part, it was a full

24   day of negotiations.

25           THE COURT:  If you're telling me, or Thiel is

Page 16

1    telling me since he's the party in interest, that the debtor

2    breached an agreement that was for his benefit, he can bring

3    a breach of contract action.  But I don't see how that has

4    anything to do with the 2004 application.  Why don't you

5    wrap up.

6            MR. TABAK:  The other issue on the discovery is,

7    Your Honor, I agree with you that there shouldn't be any

8    discovery about Bollea.  That's the clear language, no

9    discovery.

10           THE COURT:  He's agreeing with this.

11           MR. TABAK:  He's not.  His papers say that he

12   wants to ask Thiel why Thiel was funding the Bollea

13   litigation.

14           THE COURT:  Well, as I read the Bollea settlement,

15   he can't ask any questions or get any discovery relating to

16   the financing of the Bollea lawsuit.

17           MR. TABAK:  Including litigation.  That's the way

18   I read it.

19           THE COURT:  All right.

20           MR. TABAK:  That's not what their papers say that

21   they plan to do.

22           THE COURT:  Well, so he's asking for the sun, the

23   moon, and the stars and he's not going to get it, but he

24   still may get the sun.

25           MR. TABAK:  What Mr. Bollea's concern is that

1    we're going to be spending a lot of time in this Court, and

2    I'm going to be spending a lot of time at depositions

3    arguing over what's the difference between the sun, the

4    moon, and the stars, and that the sun is a star.

5               THE COURT:  That's the overall deal that's struck.

6    For example, there's nothing that prevents the debtor from

7    inquiring to Mr. (indiscernible) or other possible entities

8    or persons out there who Mr. Thiel decided to finance, and

9    that's the deal.

10              MR. TABAK:  We understand that.  We want to make

11   clear that what the debtors are saying in their papers that

12   they can ask Mr. Thiel about why he financed the Bollea

13   litigation, as Your Honor said, that that's not permitted.

14   But we also believe Mr. Bollea lived up to his obligations.

15   He gave up real claims and judgment, not theoretical claims,

16   in a parallel provision, that the debtors are now saying

17   they get to take discovery to see if there's anything else.

18              THE COURT:  I really -- I don't understand your

19   argument.  Thanks.  Mr. Clark, am I going to hear you oppose

20   a 2004 application today?

21              MR. CLARK:  Your Honor, it is --

22              THE COURT:  And I will remember everything you

23   say.

24              MR. CLARK:  This is becoming a subspecialty for

25   me.  I can argue either side or all sides.

Page 18

1              THE COURT:  It's like the old story about Abraham

2     Lincoln and the Illinois Supreme Court.  They said, how can

3     you argue two different sides on two different days; and he

4     said, I got to be right once.

5              MR. CLARK:  Me and a broken watch, we're right

6     twice a day, Your Honor.

7              THE COURT:  I'll give you once, go ahead.

8              MR. CLARK:  Good morning, Your Honor.  Tony Clark

9     and my colleague, Shana Elberg and Rob Weber for objector,

10    Peter Thiel.

11             Your Honor, I'm going to focus, based on your

12    comments, on what I call the no-fish issue here.  Under Rule

13    2004, historically, it had been described as a legitimate

14    fishing expedition.  Now, Gawker's reply recognizes -- and

15    Your Honor's most recent decision, I think in Sun Edison,

16    recognizes -- that's no longer the case.  Proportionality is

17    required for a 2004 examination.

18             But even under that broader outdated standard,

19    there at least had to be a fish to be found from the

20    discovery that was being requested.  And, here, there is no

21    fish.  The only rationale that they're offering now --

22    they've abandoned the plan and the voting pretext for the

23    discovery.  Their only justification now is that the debtors

24    may have a prima facie tort case claim against Mr. Thiel,

25    and it just needs to figure that out from what Mr. Galardi

Page 19

1    calls a simple document request.  But when you look at it on

2    its face, it's a virtually unlimited document proctology

3    examination he wants to take from Mr. Thiel and Mr.

4    (indiscernible).

5             THE COURT:  It's not the best analogy, you know.

6             MR. CLARK:  I got better analogies coming, Your

7    Honor.  And he wants all of that discovery before Gawker's

8    professionals, who seem to have drunk the Gawker prior

9    management's Kool-Aid on the Bollea litigation,

10   notwithstanding that damning final judgment in Florida,

11   before they'd be satisfied.

12            And the fights -- and Mr. Tabak referred to this -

13   - the fights that are going to follow between Gawker on the

14   one hand and Mr. Thiel, Mr. Harder, and other targets of the

15   discovery of the bounds of the discovery, infinite privilege

16   issues, no double countless --

17            THE COURT:  Well, Gawker didn't represent Thiel,

18   so I don't know what the privilege issue is there, and

19   that's what he's most interested in.

20            MR. CLARK:  Well, they're going to talk to Mr.

21   Harder about everything to do with Mr. Bollea and Mr. Thiel.

22            THE COURT:  Well, they can't do that.

23            MR. CLARK:  I agree they can't do that, but that's

24   what they say they want to do.

25            THE COURT:  Do you agree that you can't do that?

1          MR. GALARDI:  We agree that we can't do it, and

2     they all are forgetting the papers were filed on the 11th,

3     and we explained this to them in Florida.

4          THE COURT:  Right.  Okay, so we've made some

5     progress today.

6          MR. CLARK:  In any event, those fights, I think --

7     Your Honor, I'm going to be a crystal ball reader -- are

8     going to be clogging up the docket in this Court for some

9     time to come, but the real question is to what end.  Whether

10    you look at this under Florida law that we say controls --

11    Florida law which doesn't even recognize prima facie tort --

12    or under New York law.

13         THE COURT:  Can I ask you a question?

14         MR. CLARK:  Yes, sir.

15         THE COURT:  And I've read a lot about what the

16    elements of the cause of action are and whether they can

17    prove it.  Do I really have to decide whether or not a

18    hypothetical Complaint, which they may or may not ever file,

19    will survive a motion to dismiss in order to determine

20    whether there's cause to give the discovery so they know

21    whether they can file a Complaint in the first instance.

22         MR. CLARK:  No, I don't think it's a 12(b)

23    standard, Judge.  But I do think that there has to -- they

24    have to -- they have the burden of establishing good cause

25    for the examination.  And to do that, they've got to at

 1    least show on the face of things that there's, if not a

 2    claim that'll survive Rule 12(b)(6), at least something

 3    that's substantially colorable.

 4             THE COURT:  Well, you know that Mr. Thiel financed

 5    the Bollea litigation.

 6             MR. CLARK:  That is correct.

 7             THE COURT:  And the only issue seems to be what

 8    his motive was, whether it was malice or something else.

 9             MR. CLARK:  Two issues: I think that's the one

10    that's gotten the most attention, and that is clearly an

11    issue; the second issue, though, is whether, as to any

12    hypothetical theoretical speculative claim against Mr.

13    Thiel, there is any suggestion in the record of special

14    damages.  And the only damages here come from the Bollea

15    case, tens of millions of dollars in damages.

16             THE COURT:  Well, they weren't able to sell the

17    Gawker website because it was toxic.

18             MR. CLARK:  That's interesting, Your Honor.  As I

19    look at the record of the auction and what happened, you had

20    your stalking horse bidder -- I think it was Ziff Davis --

21    coming in at whatever the number was, $80 or $90 million --

22    and then Mr. Galardi conducted an auction at which Univision

23    also showed up.  And there was -- they were in the fortunate

24    situation of having at least a two-horse race and back-and-

25    forth bids, and eventually it got up to $135 million and

Page 22

1    Univision was the winner.

2            At that time, the agreement provided that

3    Univision had effectively a put option on the gawker.com

4    assets.  It didn't have to take them if it didn't want to.

5    And I don't know, a couple of weeks after Your Honor

6    approved -- confirmed the plan and approved the sale, they

7    elected not to take the gawker.com assets, and let those

8    with the estate.  The purchase price didn't come down, so

9    that's not a detriment to the estate.  To the extent those

10   assets have any value at all, it was a benefit, so there's

11   no damage from that.

12           The only damage they say comes out of the Bollea

13   lawsuit.  He talks about that they're going to look for

14   prima facie torts by -- he's suggestive that they're going

15   to look at prima facie torts allegedly by Mr. Thiel in

16   connection with others, besides Mr. Bollea, who might have

17   had claims against Gawker.  But the only claimants that have

18   incited to, in these proceedings that resulted in any loss

19   are, as I say, Mr. Bollea.  And then I guess you could look

20   at Ayyadurai and Terrill, who, between them, got settlements

21   of a little bit over a million dollars.

22           But all of those settlements were presented by

23   Gawker to this Court for approval, and the Gawker folks

24   argued that those settlements were fair and reasonable, and

25   this Court so found in confirming the plan.  So those are

Page 23

1    not special damages that could be laid at Mr. Thiel's

2    doorstep under any analysis.

3           And as to the other theoretical claimants?  They

4    haven't brought any claims against Gawker.  They haven't

5    caused any loss to Gawker, ad given its post-confirmation

6    state, they never will.  So there's no possibility of a

7    prima facie tort theory, Your Honor, at all.

8           Now on the issue that you focused on, Judge, on

9    malice.  What that element of prima facie tort under New

10   York law says is that the intentional act inflicting harm

11   has to be -- it's not just solely by malice.  There are

12   actually two elements to this: it's got to be an act that is

13   without excuse or justification, that's one; and then

14   motivated solely by malice.  And the first element of that,

15   that's still in play in here.

16          With respect to Bollea, that element can't be

17   satisfied because the Court in Florida found that Gawker

18   acted maliciously, tortuously, and it was subject to

19   punitive damages.  And Gawker in settling out those claims

20   effectively agreed to allow that judgment to become final

21   and of record.  So you can't deny that there was

22   justification and excuse for bringing a claim against Gawker

23   that was successful.

24          And then you go to the second part of that; was

25   that motivated solely by malice?  Well, the papers that they

1    submitted to Your Honor show that that is not the case.

2    First of all, the articles that they cite to show -- cite

3    specifically to Mr. Thiel's acknowledgement in public that

4    he had an economic motive here, a sharing in whatever the

5    recovery to Mr. Bollea would be.

6              THE COURT:  You know, it sounds like you're

7    arguing a motion for summary judgment.

8              MR. CLARK:  I'm just pointing out what the record

9    is in front of Your Honor.

10             THE COURT:  I understand, but the focus of the

11   Rule 2004 exam is to develop the facts to support the

12   claims.  And the fact that he can't support the claims now

13   doesn't mean that I should deny the 2004 application.

14             MR. CLARK:  But it's a proportionality issue, Your

15   Honor.  In order for them to justify the kind of probing,

16   expensive, time-consuming examination they're looking for

17   here, they got to show that there is some, as I just said,

18   that there's some fish.

19             THE COURT:  So what do you think the appropriate

20   area of inquiry would be that Mr. Thiel should submit to?

21             MR. CLARK:  If the Court --

22             THE COURT:  What's the proportional area of

23   inquiry?

24             MR. CLARK:  There shouldn't be any.  But if the

25   Court sees --

1          THE COURT:  That's not proportionality; that's

2     just he hasn't shown cause at all.

3          MR. CLARK:  But if Your Honor thinks there should

4     be some, I would suggest the inquiry should be -- at least

5     initially and then we can come back to Your Honor if we have

6     to -- an interrogatory -- one: Mr. Thiel, please identify

7     each and every person whose litigations claims, or potential

8     claims, against Gawker you agreed to fund and support.

9          THE COURT:  You know, the problem with

10    interrogatories are they're questions written by lawyers and

11    answered by lawyers.  So why not just get the copies of the

12    agreements or, you know, the underlying documents.

13         MR. CLARK:  Unless, that's the other point, Your

14    Honor.  You mentioned this to Mr. Galardi.  Look at the

15    agreements; what do they say?  Those settle -- and we are

16    clearly a third-party beneficiary to those agreements -- but

17    what does it say.  All three of them, I'm going to put some

18    ellipses in here, but I'll just quote.  All three of them

19    say the same thing: The debtors shall not seek from any

20    third party any discovery about Bollea or Ayyadurai or

21    Terrill, including without limitation, discovery concerning

22    the subject matter of the 2004 motion.

23         THE COURT:  And what's the exception for Ayyadurai

24    and Terrill?

25         MR. CLARK:  They can get from Ayyadurai and

1    Terrill any non-privileged, as I recollect it, non-

2    privileged retention agreements with their lawyers or

3    funding agreements with third parties.

4              THE COURT:  Okay.

5              MR. CLARK:  They can get that.  They don't need

6    anything from Mr. Thiel on that.

7              THE COURT:  Unless he has copies of it.

8              MR. CLARK:  If he's already got it.

9              THE COURT:  You're saying that the discovery is

10   limited only to asking Ayyadurai and Terrill?

11             MR. CLARK:  Under the Ayyadurai and Terrill

12   agreements, that's right.  It says that they can ask for

13   those documents from either -- let me --

14             THE COURT:  I don't think that's the concern.

15             CLERK:  I had -- Your Honor was asking about that

16   and I remembered it from Mr. Galardi's reply, so I went to

17   his reply.  It says, the quote from the Ayyadurai and

18   Terrill settlement agreements is on Page 12 and 13 of the

19   reply, Your Honor.

20             THE COURT:  Go ahead.

21             MR. CLARK:   And going over from 12 to 13, it

22   says: The Gawker entities shall not seek from the two of

23   them or any third party -- skipping down -- discovery

24   concerning the subject matter of the 2004 motion, which

25   eliminates all of this.

Page 27

1              THE COURT:  Subject to?

2              MR. CLARK:  The exception at the top of Page 13:

3    Except for the following discovery to Ayyadurai and Terrill,

4    any litigation financing agreements and any non-privileged

5    retainer agreements.  So that allows him to go to those two,

6    but it doesn't allow him to go to Mr. Thiel for that.

7              THE COURT:  Do you agree with that interpretation?

8              MR. GALARDI:  Your Honor, I actually don't agree,

9    and I understand that that's the brief.  But, again, with

10   respect to Mr. Thiel, Mr. Clark is ignoring the very big

11   section that says, the 2004 can go forward, suspend

12   prosecution.  In the event that the suspension period

13   expires and the Gawker debtors pursue the 2004 with respect

14   to Bollea, we will not seek Bollea or the discovery with

15   respect to the Bollea agreement.  And with respect to

16   Ayyadurai and Terrill, we can seek those documents.  The

17   agreements, I actually agree -- I'm sorry.  We seek those

18   agreements from Ayyadurai and Terrill, but not from Mr.

19   Bollea.

20             THE COURT:  Okay.  So you could -- putting either

21   issues aside, you could ask for that information from

22   Ayyadurai and Terrill, but you can't ask Harder, for

23   example, for a copy of an agreement that might exist between

24   Thiel and Ayyadurai or Terrill.

25             MR. GALARDI:  Correct.

1          THE COURT:  Okay.

2          MR. CLARK:  Right.  So he'd get those documents

3    from the two of them; they've agreed to that.  But he has

4    agreed, in both those two settlement agreements and the

5    Gawker when Mr. Galardi started to quote from Bollea.

6          THE COURT:  If you eliminate Bollea, Ayyadurai,

7    and Terrill, you could ask Mr. Thiel for any other

8    settlement -- any other litigation finance agreements,

9    right?

10          MR. CLARK:  I could give you an answer to that

11   right now.  There aren't any.  So it's a waste of time to go

12   through it, Your Honor.  He can have his discovery from the

13   two people who he settled with and who agreed to give him

14   documents -- very limited documents.  But he's made a

15   promise and he's gotten the benefit of the pro -- look, what

16   they got from Mr. Tabak's client in that agreement was a

17   reduction of liabilities by roughly $100 million -- so they

18   go the benefit of that bargain.  And Mr. Bollea and Mr.

19   Thiel, a third-party beneficiary of this agreement, they're

20   entitled to the benefit of the bargain as well.  It says,

21   they shall not seek discovery concerning the subject matter

22   of a 2004 motion from any third party.  Mr. Thiel is a third

23   party.  They should be held to their promise.

24          If the Court has any other questions, I'd be happy

25   to address them.

Page 29

1                THE COURT:  I don't.

2                MR. CLARK:  I did have a great speech about the

3     First Amendment and the right to privacy, Your Honor, but

4     I'm not going to take up your time.

5                THE COURT:  All right.  Why don't you wait around

6     and we'll listen to it at the end.

7                MR. CLARK:  We'll do it at lunch or maybe I'll

8     give it to you this afternoon.

9                THE COURT:  I look forward to it.

10               MR. CLARK:  Thank you.

11               MR. KOHN:  Good morning, Your Honor.  For the

12    record, Samuel Kohn of Chadbourne & Parke, on behalf of

13    Harder Mirell & Abrams and Charles J. Harder, the Harder

14    Firm.  Mr. Harder is in the Courtroom here today.  Mr. Clark

15    talked about proportionality and Your Honor said, well,

16    proportionality means what discovery do they want and what

17    discovery should I allow.  First of all, this is a discovery

18    targeted at lawyers.  And, you know, under the --

19               THE COURT:  I was deposed when I was a lawyer.  It

20    wasn't pleasant, but --

21               MR. KOHN:  But under the Dennis Friedman standard,

22    there is, the Second Circuit did tell us what the standards

23    are.  And two items are very -- two elements are very, very

24    relevant of Dennis Friedman: number one, the need to depose

25    a lawyer; and number two, the disruption of the attorney-

Page 30

 1    client privilege.

 2            THE COURT:  Could he depose Mr. Harder, though,

 3    about his communications with Mr. Thiel?  He didn't

 4    represent Mr. Thiel I take it.

 5            MR. KOHN:  Well, why would he need to depose Mr.

 6    Clark?

 7            THE COURT:  Well, don't answer a question with a

 8    question.  We don't do that.

 9            MR. KOHN:  No, under the Dennis Friedman standard,

10    I would say no.

11            THE COURT:  Why not?

12            MR. KOHN:  Because he could depose Mr. Thiel.

13            THE COURT:  But he's not Mr. Thiel's lawyer; he's

14    a fact witness.

15            MR. KOHN:  He doesn't have to.  He has to -- well,

16    in order to get the claim against Mr. Thiel -- I'm not

17    suggesting that he does that.

18            THE COURT:  I understand we're speaking

19    hypothetically.

20            MR. KOHN:  But though we're speaking

21    hypothetically because he could depose Mr. Thiel about

22    communications with Mr. Harder; therefore, he doesn't need,

23    under the Dennis Friedman standard, to depose.  He can't

24    depose.

25            THE COURT:  So even though he's a fact witness and

1    not Mr. Thiel's lawyer, he can't ask -- Gawker can't ask Mr.

2    Harder about communications with (indiscernible).

3              MR. KOHN:  Because you can get that information

4    from other sources.

5              THE COURT:  I understand you're saying that, but

6    that's true of everything.

7              MR. KOHN:  Well, something Your Honor --

8              THE COURT:  So you're saying that because he's a

9    lawyer --

10             MR. KOHN:  Yes.

11             THE COURT:  -- even though he wasn't functioning

12   as a lawyer for Mr. Thiel --

13             MR. KOHN:  Yes.

14             THE COURT:  -- he gets protection?

15             MR. KOHN:  Yeah.  Otherwise, what does that first

16   element mean?  It means you depose the lawyer.  What does

17   that element mean?

18             THE COURT:  But that's in connection with matters

19   relating to the representation.

20             MR. KOHN:  No, no, no, there's a separate element.

21   Those are four separate elements under Dennis Friedman.

22   There's four separate elements: the need to depose the

23   lawyer; the role in connection with the matter on which

24   discovery is sought and in relation to the pending

25   litigation; the risk of accounting privilege; and to the

1    extent of discovery already conducted.  Those are four

2    distinct elements under the 2nd Circuit precedent.

3              The need to depose the lawyer means that if you

4    can get the information from somebody else -- you don't go

5    to Shelton, you don't go back to the Eighth Circuit case in

6    Shelton, but it's an element to consider, and it's also

7    whether you need to depose the lawyer.  So here's another

8    thing.  Let's take a look at --

9              THE COURT:  Can I ask you a question?  If Mr.

10   Harder witnessed an automobile accident and he was a fact

11   witness, would the same rules apply because he's a lawyer

12   and you can get the information from somebody else, you

13   can't ask him any questions?

14             MR. KOHN:  Well, no, because he was involved.

15             THE COURT:  Well, he's in involved in this also.

16             MR. KOHN:  Well, not really, not really.  He's not

17   involved in the issue.  But, Your Honor, let me just talk

18   about -- a little bit about the breadth of the discovery

19   that they want.

20             THE COURT:  First about discovery you think is

21   appropriate first.

22             MR. KOHN:  I would suggest none against Mr.

23   Harder.

24             THE COURT:  All right.  So what, you're going to

25   tell me that it's too broad?

1              MR. KOHN:  But, wait -- an interrogatory, an

2      interrogatory of what financing agreements are there, other

3      than Bollea.  And I can tell you that there aren't any.  But

4      let's take a look at the appendix that they attached.  First

5      of all, this is on Page 33 of 49 of Document 341, which was

6      not amended by this motion.

7              THE COURT:  Well, it will have -- maybe it has to

8      be amended because two of the three rationale.

9              MR. KOHN:  First of all, there's no limitation in

10     time, that's number one.  No limited time on the request at

11     all.

12             THE COURT:  But, you know, if that's your argument

13     --

14             MR. KOHN:  Well, wait a minute, no.

15             THE COURT:  Let me just finish.

16             MR. KOHN:  Yeah.

17             THE COURT:  If you're telling me that it's

18     disproportionate and there is some discovery that may be

19     appropriate, normally, I'd say meet and confer, and if you

20     can't agree, come back and I'd resolve it.  But that's not

21     what you're arguing.  You're arguing that no discovery is

22     appropriate.

23             MR. KOHN:  Right.  I'm arguing because the

24     information, the first item says litigation agreements --

25     you can get litigation agreements from other than the

Page 34

1    lawyer; finance agreements -- you can get information other

2    than the lawyer; agreements with Thiel, consents,

3    consultations regarding litigation -- that could be

4    privileged; strategies -- privileged; solicitation --

5    privileged.

6             THE COURT:  So he asserts privilege.

7             MR. KOHN:  Retainer agreements --

8             THE COURT:  Wait, wait.  He's asking for

9    documents.

10            MR. KOHN:  Right.

11            THE COURT:  If the documents are privileged, you

12   file a privilege log, and then I look at the documents if

13   they can't be resolved and I decide that.

14            MR. KOHN:  Right, I know, Your Honor.  But let's

15   take a perspective here.  The Harder Firm is not Sun Edison.

16   There's 12 people, four staff.

17            THE COURT:  Thank goodness.

18            MR. KOHN:  Okay, there are 12 lawyers and there

19   are four staff members.

20            THE COURT:  Okay.  Have you asserted that it is a

21   burden?  That's something that gets worked out in the meet

22   and confer.

23            MR. KOHN:  It goes to the 2004, because if it's

24   burdensome to the party that's being examined, that's part

25   of the 2004 analysis.

Page 35

1           THE COURT:  Where is the affidavit in the record

2    which talks about the burden?

3           MR. KOHN:  You could submit it?  We could submit -

4    -

5           THE COURT:  If it's burdensome, normally the party

6    that's being asked to produce the discovery has the burden

7    of showing that it's burdensome.

8           MR. KOHN:  Let me just say one thing, Your Honor.

9           THE COURT:  I mean, Mr. Clark has told me there's

10   no burden.  All he has to say is there are no such

11   agreements.  That doesn't sound very burdensome.

12           MR. KOHN:  Let me -- the Harder firm, Mr. Harder

13   and the Harder firm were released.  This is just like an end

14   run to get back at the firm.  That's all Gawker is doing.

15   And they're also trying to drag other people that filed

16   claims or filed cease and desist letters or do anything

17   against Gawker, to get back at them.  These people want to

18   get back on their lives.  These are peoples' lives were

19   ruined by Gawker.  They want to get back.

20           What's going to happen if Your Honor is going to

21   order the 2004 discovery, it's like the rape victim being

22   raped again by Gawker, because they're going to be dragged

23   into the public arena again because one of these documents

24   is going to refer to other clients.  They want documents

25   from other clients -- not Bollea, not Ayyadurai, not Terrill

Page 36

1    -- but other clients that were victimized by Gawker.  And

2    then you have press reporters out here.  Are they going to

3    say, Court allows Harder Firm to divulge secrets of clients.

4    That's what going to happen, because I'm in the case a week

5    and I'm getting emails.

6              THE COURT:  But that's not the case.  He's not

7    going to have to divulge any secret.  Let me just finish.

8    What you're saying is because there's a possibility that

9    Gawker may ask for otherwise confidential or secret

10   information or privileged information, there should be no

11   2004 discovery.  But we have ways to deal with that.  You

12   object on grounds of privilege, assuming a work-product

13   privilege or attorney-client privilege.  You file a

14   privilege lot.  I look at the documents if it's necessary,

15   and I make a decision.  That's the way we deal with these

16   issues.

17             MR. KOHN:  Except for one thing.  There are 10 --

18   there's thousands and thousands -- here, let me just read

19   one thing that he says.  Without limitation to Thiel,

20   without limitation to the debtors, retainer or such other

21   agreements between Harder clients and Harder, the Harder

22   firm.  That's every single retainer.

23             THE COURT:  Then that may be too broad and they

24   may not be entitled to that.

25             MR. KOHN:  Right.  So where do you -- so here's

1   another thing.  Solicitations, by the Harder firm of

2   potential clients.

3            THE COURT:  Let me stop you.  If you're arguing

4   that they have not shown cause for the 2004 exam, that's

5   fine, I'll hear the argument.  If you're saying that the

6   request is too broad, I'll say meet and confer, and then

7   come back to me with any disputes.  So don't tell me that,

8   you know, they're asking for a lot of stuff they're not

9   entitled to.  That's not unusual, that's what a meet and

10  confer is for, assuming they are otherwise entitled to

11  discovery.

12           MR. KOHN:  So, okay, fair enough.  So they haven't

13  shown good cause because the claim that's left is this

14  malicious tort claim.  Now the only damage that could

15  possibly have asserted -- the only damages that they can get

16  is the Bollea, the Bollea litigation, the causes of the

17  Bollea litigation.  There's nothing else that damaged, that

18  they're damaged about.  So you're talking about malicious

19  tort, where is the damage?

20           THE COURT:  But that's what the purpose is.

21           MR. KOHN:  Where's the fish?

22           THE COURT:  That's the purpose of the discovery in

23  a 2004 context.  Putting aside whether it's appropriate in

24  this context or not, debtors take 2004 discovery to discover

25  claims.  They don't have to prove their claims in order to

Page 38

1    get the discovery they need to prove their claims.

2              MR. KOHN:  Yeah, but we know what the damages are

3    now.  We know what the damage is.  We don't have to take

4    discovery to know what the damages are, do we?  We know that

5    Gawker was damaged and was only damaged by the Bollea

6    lawsuit, and all documents related to the Bollea lawsuit are

7    off limits and the modus of Bollea are off limits because

8    that's the only damage that there is.  That's a record; that

9    is something that Your Honor could take judicial notice of.

10   What is the damage; where is the damage that they are trying

11   to assert?

12             THE COURT:  Okay, but normally, they would file a

13   Complaint and you make a motion to dismiss because they

14   failed to allege special damages.

15             MR. KOHN:  But if you know this in the beginning,

16   why are you allowing 2004?

17             THE COURT:  So I have to decide a motion to

18   dismiss in order to decide the 2004.

19             MR. KOHN:  No, no.  You can now find, as a matter

20   of law, there is no claim because of the judicial notice.

21             THE COURT:  I can't decide there's no claim

22   without a Complaint in front of me.  Okay, why don't you

23   wrap it up?  I have a (indiscernible).

24             MR. KOHN:  Okay.  So, anyway, I was just talking

25   about why, based on Friedman's standards, if you're talking

1    about lawyers, there should be -- and I really didn't get

2    into what's going to happen to the Harder Firm.

3         What the reputation to the Harder Firm is going to

4    be, because people will then see that the Harder Firm's

5    records are out there in the public at Gawker again.  And

6    then Gawker, who knows, is going to publicize these records.

7    Again, that is a privacy issue that Your Honor should take

8    into consideration for going against Harder, because that's

9    what Gawker did previously and now they're going to do it

10   again.  And they're going to take these records; what are

11   they going to do with these?  How do we know that these

12   documents that are going to be sent to Gawker that Gawker is

13   not going to make a big fuss about.

14        THE COURT:  So you want me to impose a gag rule.

15        MR. KOHN:  Either that, yeah, yeah, please, do

16   that or not approve the 2004 because of the proportion --

17   not because of the -- because of the privacy issues, and

18   these people are being dragged again into the public arena.

19        THE COURT:  I don't understand the privacy issues.

20        MR. KOHN:  Can I tell you, Your Honor?  I'll tell

21   you.  Because the Gawker was a monster.  It ruined peoples'

22   lives.  That's what they did for a living.  These are people

23   --

24        THE COURT:  But it's not operating anymore.

25        MR. KOHN:  The victims are petrified.  Yes, but

Page 40

1    there are editors that look at these documents and say, to

2    their friend down the street, go ahead and publish it.  And

3    then all of a sudden, it will get into the public record

4    again.  So these people that were victimized by Gawker in

5    the first instance, any records that Harder may produce,

6    privileged or not privileged, will be (indiscernible).

7            THE COURT:  So you're saying that if Harder has

8    non-privileged records which support a viable claim, they

9    shouldn't be produced because they might get out in the

10   public?

11           MR. KOHN:  Well, first of all, I'm saying there's

12   no viable claim, that's number one.  There's no viable claim

13   in this matter because it's impossible to be a viable claim

14   because there is no damages with Bollea.

15           THE COURT:  Wrap it up, please.

16           MR. KOHN:  Okay.  So, anyway, if you're getting to

17   -- Gawker talks about the fact that, you know, that some of

18   our cases talk about depositions in that documents in terms

19   of lawyers, but they fail to recognize on the side of

20   patsies, which also talked about documents including

21   depositions.  And also, the disruption of the privilege is

22   going to be very important and a disruption to the debtors,

23   to the Harder Firm, because of what they're going to do.

24           So, you know, Mr. Hardee was released.  He was

25   released from everything, and he was released personally and

Page 41

1    he was released from the law firm.  And this -- for the

2    smoking gun document that he's looking for, he could get

3    from Mr. Thiel.  And if he doesn't --

4              THE COURT:  But that's not what Mr. Thiel's

5    attorney says.

6              MR. KOHN:  And if he can't get it from Mr. Thiel

7    and he won't get it from Mr. Thiel because I know he won't

8    get it from Mr. Thiel, then the 2004 is not appropriate.

9    Thank you.

10             THE COURT:  Thank you.

11             MR. GALARDI:  Just very briefly, Your Honor.

12             THE COURT:  Very briefly.

13             MR. GALARDI:  First, the standard is not a motion

14   to dismiss or summary judgment.  Your Honor has pointed that

15   out.  The second, as I pointed out before, the 2004 request,

16   we admit, needs to be proportional in this sense.  So, for

17   example, as I've often before, I don't need to go forward

18   with depositions until we find a document.  I'm more than

19   willing to talk about that, more than willing to build in

20   all of the settlements and have Mr. Tabak involved.  So

21   that's important.

22             Next, it's not a fishing expedition where you're

23   fishing beyond a cause of action.  We've been very

24   particular about the cause of action.

25             And, third, I think we're hearing things that are

Page 42

1    a little bit too cute and I want to point it out.  Mr. Clark

2    says burdensome defense, says there's no documents, there's

3    no other litigation agreements.  But -- and then Mr. Harder

4    says it's going to be very burdensome because they've got to

5    go through all these agreements.  I'm just to posit that

6    what we believe has gone on and from Mr. Wong and from

7    others that we have spoken with, there was an agreement

8    between Mr. Thiel and Mr. Harder where Mr. Thiel said, I'll

9    fund litigations.  I don't need to know the particular

10   plaintiff, so there may not be a Wong-Thiel agreement, a

11   Wong-other person agreement.  That's the kind of agreement

12   that we think we should be able to get, and that's not a

13   client privileged document.

14           So those are the kinds of documents that we think

15   we should -- can get with very proportional discovery, very

16   pointed discovery.  Happy to work with Mr. Clark, worked

17   with him for many years.

18           THE COURT:  Mr. Clark's going to -- you're all

19   going to set a stop to this.

20           MR. CLARK:  As I did say, Your Honor, there are no

21   such documents.  And the only point I would make is that if

22   Mr. Galardi can take this discovery --

23           MR. GALARDI:  Submit an affidavit from him that

24   there are no such documents?

25           MR. CLARK:  We could give you an affidavit.  We

1    could do that.

2              MR. GALARDI:  You have no such financing

3    documents, let's -- let me talk to Mr. Clark.

4              THE COURT:  Okay.

5              MR. GALARDI:  I'd like to meet and confer about

6    this.  We're not trying to overdo the discovery.

7              MR. CLARK:  But, Your Honor, the one other point I

8    would make, and that is -- and I asked this question before

9    -- to what end?  He gets this discovery, he gets to ask this

10   question.

11             THE COURT:  You're saying there's no discovery.

12             MR. CLARK:  No, my point is that he asks for these

13   things in connection with what?  In connection with non-

14   Bollea people who might have had some discussion about a

15   claim against Gawker.  But those claims have never been

16   brought, no damages have ever arisen from them; and,

17   therefore, there can be no -- what he's looking for is

18   discovery in aid of an attempt to commit a prima facie tort.

19             THE COURT:  I haven't -- I didn't mean to cut Mr.

20   Galardi.

21             MR. CLARK:  Yes, and I'm sorry, but I just wanted

22   to get that point in.

23             THE COURT:  All right.

24             MR. CLARK:  Thank you.

25             MR. GALARDI:  Your Honor, and, again, the question

Page 44

1   is there may be simply one document.  There may be a

2   document that says, we'll fund every kind of litigation you

3   have.  Go find plaintiffs, go find potential plaintiffs, Mr.

4   Harder, and I'll finance it.  It may be a document that

5   says, oh, I looked up Bollea and I'll finance the Bollea

6   litigation.  I do not -- I'm not entitled to the second

7   documents.  I think we are entitled to the first document,

8   and we'd like to know what kind of documents there are.

9   Thank you.

10          THE COURT:  Thank you.  I'll reserve decision.

11          MR. GALARDI:  Thank you, Your Honor.

12          MR. CLARK:  Thank you, Your Honor.

13          MR. KOHN:  Thank you, Your Honor.

14      (Whereupon these proceedings were concluded at 10:47

15   AM)

16

17

18

19

20

21

22

23

24

25

Page 45

1               C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya
    Ledanski Hyde
    Digitally signed by Sonya Ledanski
    Hyde
    DN: cn=Sonya Ledanski Hyde, o, ou,
    email=digital1@veritext.com, c=US

7   Date: 2017.04.26 16:31:48 -04'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  April 26, 2017