UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re:                                        :
                                              :
GAWKER MEDIA LLC, *et al.*,[1]                :          Chapter 11
                                              :          Case No. 16-11700 (SMB)
                        Debtors.              :
-----------------------------------------------------X

## MEMORANDUM DECISION REGARDING STAGE ONE ISSUES

**A P P E A R A N C E S :**

ROPES & GRAY LLP
*Counsel for the Debtors and Reorganized Debtors*
1211 Avenue of the Americas
New York, New York 10036

      Gregg M. Galardi, Esq.
      D. Ross Martin, Esq.
      Peter Walkingshaw, Esq.
          Of Counsel

RANDAZZA LEGAL GROUP, PLLC
*Counsel for Charles C. Johnson and Got News LLC*
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103

      Jay M. Wolman, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Prior to the petition date in these chapter 11 cases, Charles C. Johnson

("Johnson") and his company, Got News LLC ("GotNews," and together with Johnson,

the "Claimants") brought a lawsuit against Debtor Gawker Media LLC ("Gawker") and

two of its employees in California state court (the "California Action") alleging various

---

[1]    The debtors in these cases (the "Debtors") are: Gawker Media LLC, Gawker Media Group, Inc. and Gawker Hungary Kft. (f/k/a Kinja, Kft.).

torts arising out of the publication of certain content on Gawker's websites.[2]  Following

the commencement of the Debtors' chapter 11 cases, Johnson and GotNews filed Proofs

of Claim Nos. 53, 54, 202, 223, 246 and 298 (the "Claims"), one by each Claimant

against each Debtor based on the same allegations as the California Action.[3]  The

Debtors objected to the Claims.  (*Johnson Omnibus Objection* at 1-2; *GotNews Omnibus*

*Objection* at 1-2.)

The *Omnibus Objections* raised a host of issues but only two are presently before

the Court.  First, are the Claims "personal injury tort" claims which the Court cannot

adjudicate?  (*Scheduling Order Regarding Debtors' Objections to Proofs of Claim of*

*Got News LLC and Charles Johnson*, dated Jan. 24, 2017 (the "*Scheduling Order*"), at ¶

2 (ECF Doc. # 703).)  Second, does the California anti-SLAPP statute, CAL. CIV. PROC.

CODE § 425.16, apply to the *Omnibus Objections*?  (*Id.*)  For the reasons that follow, the

Court concludes that the Claims are not "personal injury tort" claims within the

meaning of 28 U.S.C. § 157(b)(2)(B), and the special motion and discovery-limiting

procedures under the California anti-SLAPP statute are inapplicable to these contested

matters.

---

[2]     The complaint in the California Action (the "*Complaint*") is annexed as Exhibit 3 to the *Debtors'*
*Omnibus Objection to Proofs of Claim Nos. 54, 223, and 246 Filed by Charles C. Johnson, and Motion to*
*Apply Fed. R. Civ. P. 12(b)(6) and 12(c), Pursuant to Bankruptcy Rules 9014 and 7012*, dated Oct. 31,
2016 (the "*Johnson Omnibus Objection*") (ECF Doc. # 396), and as Exhibit 3 to the *GotNews Omnibus*
*Objection* (as defined below).  Unless otherwise indicated, all references to "ECF Doc. # ___" are to
documents filed electronically on the docket in the main chapter 11 case, case no. 16-11700.  "*Holden*
*Declaration*" refers to the *Declaration of William D. Holden in Support of First Day Motions*, dated June
12, 2016.  (ECF Doc. # 7.)

[3]     *Johnson Omnibus Objection* at ¶ 2; *Debtors' Omnibus Objection to Proofs of Claim Nos. 53, 202,*
*and 298 Filed by Got News LLC, and Motion to Apply Fed. R. Civ. P. 12(b)(6) and 12(c), Pursuant to*
*Bankruptcy Rules 9014 and 7012*, dated Oct. 31, 2016 (the "*GotNews Omnibus Objection*," and together
with the *Johnson Omnibus Objection*, the "*Omnibus Objections*"), at ¶ 2 (ECF Doc. # 397).

## BACKGROUND

### A.    The Gawker Articles and Prepetition Litigation

As of petition date, the Debtors operated seven distinct media brands with corresponding websites covering news and commentary on a variety of topics, including current events, pop culture, technology and sports.  (*Holden Declaration* at ¶ 10-12.) The Debtors' websites allowed readers to engage with their content by "participating in online discussions," (*id.* at ¶ 13), and "commenting" on articles.  (*Cf., e.g., id.* at ¶ 15 (stating that the Debtors believe they "have the best commenting environment of any digital media group").)

Johnson is a web-based journalist and the owner of GotNews, which operates through the GotNews.com website.  (*Opposition to Omnibus Objections to Proofs of Claim as to Charles C. Johnson and Got News LLC,* dated Nov. 16, 2016 (the "*Opposition*") at ¶ 2 (ECF Doc. # 452); *Johnson Omnibus Objection* at ¶ 4; *GotNews Omnibus Objection* at ¶ 4.)  According to the *Complaint*, in the late summer of 2014, Johnson began investigating, and through GotNews reporting on, the events leading to the death of Michael Brown in Ferguson, Missouri, and its aftermath.  (*Complaint* at ¶¶ 98 p. 21- ¶ 108 p. 23; *Johnson Omnibus Objection* at ¶ 4; *GotNews Omnibus Objection* at ¶ 4.)  Following Johnson's and GotNews's publication of these and certain other articles, and allegedly in retaliation for Johnson's Ferguson-related reporting, (*Opposition* at ¶¶ 3-4), Gawker published several articles (the "Gawker Articles") about the Claimants.  (*Johnson Omnibus Objection* at ¶ 8; *GotNews Omnibus Objection* at ¶ 8; *Opposition* at ¶ 4.)  The Gawker Articles included statements criticizing Johnson's honesty as a reporter and his professional skills as a journalist.  They characterized

3

Johnson's reporting as "erroneous[]" and stories Johnson had covered as "complete[ly] fabricat[ed]," interpreted Johnson's statements regarding Michael Brown's death as suggesting that Brown "deserved to die" and contended that Johnson "gets things wrong *a lot*." (*Johnson Omnibus Objection* at ¶ 35 (emphasis in original) (quoting relevant Gawker Article); *GotNews Omnibus Objection* at ¶ 35 (emphasis in original) (same).) The Gawker Articles also cited "rumors" that Johnson had defecated in public and engaged in bestiality. (*Johnson Omnibus Objection* at ¶ 43 (quoting relevant Gawker Articles); *GotNews Omnibus Objection* at ¶ 43 (same).)

Gawker employees and affiliates and third parties posted comments on the articles relating to the articles and their content. (*Johnson Omnibus Objection* at ¶¶ 43, 47, 49 (quoting and discussing relevant Gawker Articles and comments); *GotNews Omnibus Objection* at ¶¶ 43, 47, 49 (same); *see also, e.g., Opposition*, Ex. 11.1 at 28-33 and Ex. 11.2 at 1-6 (attaching copies of comments) (ECF Doc. ## 452-11 and 452-12).) Additionally, Gawker, its employees and third parties posted content on the social media website twitter.com ("Twitter") that referenced and commented on the Gawker Articles and the rumors they discussed. (*See, e.g., Opposition*, Ex. 11.1 at 1-15 (attaching "screenshots" of Twitter posts by Gawker, its affiliates and third parties promoting, discussing and/or commenting on the Gawker Articles and their content).)

As a consequence of the publication of the Gawker Articles, Johnson filed a *pro se Complaint* on behalf of himself and GotNews in California state court.[4] The *Complaint*

---

[4]    Johnson had previously brought a Missouri state court action against the Defendants that was removed to the United States District Court for the Eastern District of Missouri and ultimately dismissed

named Gawker and J.K. Trotter and Greg Howard, the authors of the Gawker Articles, as defendants. Counts I and II asserted claims against Gawker and Trotter sounding in defamation and injurious falsehood, (*Complaint* at ¶ 226 p. 48 - ¶ 241 p. 54),[5] Counts III and IV asserted the same claims against Gawker and Howard, (*id.* at ¶ 232 p. 54- ¶ 247 p. 58), and Count V alleged that all of the defendants had cast both plaintiffs in a false light by "giv[ing] publicity to fictional matters not of public concern" and misrepresenting the plaintiffs' statements. (*Id.* at ¶ 232 p. 58 - ¶ 238 p. 60 (emphasis omitted).) Finally, Count VI asserted a claim against all defendants under 42 U.S.C. § 1983 based on a conspiracy to interfere with the plaintiffs' civil rights. (*Id.* at ¶ 232 p. 60 - ¶ 240 p. 62.) As a result, one or both plaintiffs suffered damages including injury to their reputation, jeopardy to their business, emotional injury and lost business and investments due to damaged business reputations. (*Id.* at ¶ 238 p. 53- ¶ 239 p. 54, ¶ 245 p. 57 - ¶ 246 p. 58, ¶ 236 p. 59 - ¶ 237 p. 60, ¶ 240 p. 62.)

## B.    The Claims and the *Omnibus Objections*

Gawker filed a chapter 11 petition on June 10, 2016, (*Voluntary Chapter 11 Petition of Gawker Media LLC*, filed June 10, 2016 (ECF Doc. # 1)), thereby staying the California action as against Gawker. 11 U.S.C. § 362(a)(1). Debtors Gawker Hungary Kft. ("Gawker Hungary") (f/k/a/ Kinja, Kft.) and Gawker Media Group, Inc. ("GMGI") filed their chapter 11 petitions two days later. (*Voluntary Chapter 11 Petition of Kinja,*

---

for lack of personal jurisdiction. *Johnson v. Gawker Media*, No. 4:15-CV-1137 CAS, 2016 WL 193390 at *1, *11 (E.D. Mo. Jan. 15, 2016).

[5]    The *Complaint* begins each set of claims with paragraph 232. As a result, certain paragraph numbers appear four times in the *Complaint*. For this reason, the decision refers to the paragraph numbers and the pages where the paragraphs are found.

*Kft.*, filed June 12, 2016 (Case No. 16-11718, ECF Doc. # 1); *Voluntary Chapter 11 Petition of Gawker Media Group, Inc.*, filed June 12, 2016 (Case No. 16-11719, ECF Doc. # 1).)

On September 28, 2016, GotNews and Johnson filed the Claims, consisting of six total claims, one against each Debtor by each of GotNews and Johnson. (*Johnson Omnibus Objection* at ¶ 3; *GotNews Omnibus Objection* at ¶ 3.) Each proof of claim asserted an unsecured claim for $20 million based on "damages from tortious conduct," and attached the *Complaint.* In connection with confirmation of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "*Plan*"), the Debtors and the Claimants agreed that the Debtors would establish and fund a single reserve of $1.5 million solely to satisfy the Claims "to the extent [the] Claims become Allowed Claims" (as defined in the *Plan*), and further agreed to cap the Claimants' recovery on account of the Claims at $1.5 million. (*Findings of Fact, Conclusions of Law, and Order Confirming Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC and Gawker Hungary Kft.*, dated Dec. 22, 2016 at ¶ 82 (ECF Doc. # 638).)

The Debtors filed the *Omnibus Objections* on October 31, 2016 seeking to disallow the Claims. They argued first that Federal Rules of Civil Procedure 12(b)(6) and/or 12(c) should be made applicable pursuant to Bankruptcy Rule 9014 because the Claims "sound in tort," are "based on outside litigation," and should be resolved in a manner "analog[ous] . . . to the ordinary civil litigation process." (*Johnson Omnibus Objection* at ¶¶ 13-15, *GotNews Omnibus Objection* at ¶¶ 13-15.) As to the Claims themselves, the *Objections* contended that they were barred as a matter of California law

6

under the California anti-SLAPP statute, (*Johnson Omnibus Objection* at ¶¶ 16-31; *GotNews Omnibus Objection* at ¶¶ 16-31), and that the statements by Gawker, its employees and/or third parties that formed the basis of the *Complaint* constituted opinion and were not actionable defamation, were framed as questions rather than assertions of fact or were third party statements for which the Debtors could not be liable under section 230 of the Communications Decency Act, 47 U.S.C. § 230. (*Johnson Omnibus Objection* at ¶¶ 32-50; *GotNews Omnibus Objection* at ¶¶ 32-50). Further, the false light claims by both Claimants failed because their defamation claims were not actionable (*Johnson Omnibus Objection* at ¶¶ 51-52; *GotNews Omnibus Objection* at ¶¶ 51-52), and the false light cause of action was not available to GotNews because GotNews, as a corporate entity, does not have the interests, including privacy and feelings, that the tort seeks to protect. (*GotNews Omnibus Objection* at ¶ 53.)

Additionally, even if the Gawker Articles were actionable, Johnson failed to allege and could not prove that Gawker acted with actual malice because he is an all-purpose public figure, or at least a limited-purpose public figure. (*Johnson Omnibus Objection* at ¶¶ 53-65; *GotNews Omnibus Objection* at ¶¶ 54-66.). The alleged violation of Section 1983 was also baseless because the Claimants did not allege state action or deprivation of a cognizable right. (*Johnson Omnibus Objection* at ¶¶ 66-69; *GotNews Omnibus Objection* at ¶¶ 67-70.) Further, the Claims against GMGI and Gawker Hungary fail because those Debtors were not named in the *Complaint* and the one-year California law statute of limitations for libel and defamation had run by the time the Claims were filed. (*Johnson Omnibus Objection* at ¶¶ 70-72; *GotNews Omnibus Objection* at ¶¶ 71-73.) Finally, this Court can fully adjudicate the disallowance of the Claims because they

were not personal injury tort claims within the meaning of 28 U.S.C. § 157(b)(2)(B). (*Johnson Omnibus Objection* at ¶¶ 73-80; *GotNews Omnibus Objection* at ¶¶ 74-81.)

The Claimants filed their *Opposition* on November 16, 2016. The *Opposition* disputed essentially all of the Debtors' contentions and argued that Federal Rules of Civil Procedure 12(b)(6) and 12(c) should not apply, (*Opposition* at ¶ 5-7), the California anti-SLAPP statute was inapplicable, (*id.* at ¶ 8-10), the Debtors were liable for defaming the Claimants and casting them in a false light, (*id.* at ¶¶ 11-28), the liability extended to GMGI and Gawker Hungary (*id.* at 29), and the Claims were personal injury torts that must be adjudicated in the United States District Court for the Southern District of New York. (*Id.* at ¶¶ 5, 30.)

Given the numerous legal issues involved and in the interest of efficiency, the Court directed the parties to meet and confer regarding scheduling and briefing on the *Omnibus Objections*. (*Scheduling Order* at 2.) Subsequently, the parties agreed that they would proceed by submitting the two, aforementioned issues to the Court in the first instance: "(a) which of the . . . Claims, if any, are 'personal injury tort and wrongful death claims' within the meaning of . . . section 157(b)(2)(B) of [title 28 of the United States Code] and (b) whether the California anti-SLAPP statute applies in these contested matters, and if so, in what manner." (*Scheduling Order* at ¶ 2.)

## DISCUSSION

### A.    "Personal Injury Tort" Claims

Bankruptcy courts have jurisdiction over all civil proceedings arising under, arising in or related to cases under the Bankruptcy Code.  28 U.S.C. § 1334(b); *see also Amended Standing Order of Reference*, dated Jan. 31, 2012, No. M-431, 12 Misc. 00032 (referring proceedings in this District arising under, arising in or related to the Bankruptcy Code to this Court).  However, bankruptcy courts exercise limited power to enter final orders and judgments with respect to matters that are not core.  *E.g.*, *Stern v. Marshall*, 564 U.S. 462, 474-75 (2011).  The "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution" in a bankruptcy case is  not core, 28 U.S.C. § 157(b)(2)(B), and must be tried in the District Court where the bankruptcy case is pending or where the claim arose.  28 U.S.C. § 157(b)(5).[6]  Accordingly, the threshold issue is whether the Claimants' defamation and related claims assert personal injury tort claims within the meaning of these statutory provisions.

The starting point for the interpretation of any statute is the plain language of the statute itself.  *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989).  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"  *Id.* at 242 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)); *accord Hartford Underwriters Ins. Co. v. Union Planters Bank,*

---

[6]     Section 157(b)(5) is not jurisdictional, and a personal injury tort claimant can consent to entry of a final judgment in the bankruptcy court, *Stern*, 564 U.S. at 479, but the Claimants have not consented. (*See Opposition* at ¶ 5.)

*N. A.*, 530 U.S. 1, 6 (2000).  Plainness or ambiguity is determined by reference to the statutory language itself, "the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)); *accord United Sav. Assn. of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").  Where the statute's language and context fail to resolve the ambiguity, a court may resort, in order, to canons of statutory construction and legislative history to aid in its interpretation.  *United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005).

The phrase "personal injury tort or wrongful death claims," or some variation, was introduced into title 28 under the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984) (the "1984 Amendments"), and appears in several provisions.  *See* 28 U.S.C. §§ 157(b)(2)(B) *&* (O), 157(b)(5), 1411(a) (addressing the right to trial by jury with regard to a personal injury or wrongful death claim).[7]  However, title 28 does not define "personal injury" or "personal injury tort," and the Second Circuit has not construed these terms as used in the cited sections.  *See In re Residential Capital, LLC*, 536 B.R. 566, 571 (Bankr. S.D.N.Y. 2015).

Lower courts in the Second Circuit and elsewhere have adopted different approaches to determine whether a particular claim constitutes a "personal injury tort"

---

[7]    In addition, 28 U.S.C. § 157(b)(4) states that non-core proceedings under § 157(b)(2)(B) are not subject to the mandatory abstention provisions of 28 U.S.C. § 1334(c)(2).

claim. *Id.* at 571-75 (collecting cases). The "narrow view" requires a trauma or bodily injury or psychiatric impairment beyond mere shame or humiliation to meet the definition of "personal injury tort." *Id.* at 571-72 (citations omitted); *accord Perino v. Cohen (In re Cohen)*, 107 B.R. 453, 455 (S.D.N.Y. 1989) (stating that a claim based on a violation of New York's anti-discrimination law "is not a claim for a 'personal injury tort' in the traditional, plain-meaning sense of those words, such as a slip and fall, or a psychiatric impairment beyond mere shame and humiliation," and that "[t]here is no legislative history that would bring this plaintiff's claim for a tort without trauma within the statutory exception for a personal injury tort."). The broad view interprets "personal injury tort" to "embrace[] a broad category of private or civil wrongs or injuries for which a court provides a remedy in the form of an action for damages, and include[] damage to an individual's person and any invasion of personal rights, such as libel, slander and mental suffering." *Residential Capital*, 536 B.R. at 572 (quoting *Boyer v. Balanoff (In re Boyer)*, 93 B.R. 313, 317-18 (Bankr. N.D.N.Y. 1988) and collecting cases). Finally, under the intermediate, "hybrid" approach, a bankruptcy court may adjudicate claims bearing the "earmarks of a financial, business or property tort claim, or a contract claim" even where those claims might appear to be "personal injury torts" under the broad view. *Id.* (quoting *Stranz v. Ice Cream Liquidation, Inc. (In re Ice Cream Liquidation, Inc.)*, 281 B.R. 154, 161 (Bankr. D. Conn. 2002) and citing, *inter alia*, *Adelson v. Smith (In re Smith)*, 389 B.R. 902, 908-13 (Bankr. D. Nev. 2008)). Given the absence of a statutory definition and the facial reasonableness of each interpretation, the phrase "personal injury tort," as used in 28 U.S.C. § 157(b)(2)(B) and (b)(5), is ambiguous.

Turning first to the canons of statutory interpretation, and specifically the canon *noscitur a sociis*, the Court concludes that the narrow interpretation, which requires trauma or bodily injury, or a psychic injury beyond mere shame or humiliation, is the correct interpretation. *Noscitur a sociis* is, put simply, the principle that "a word is known by the company it keeps." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015); *accord United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."); *see also* 2A NORMAN SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47:16 at 353-64 (7th ed. 2014) ("SUTHERLAND") (discussing *noscitur a sociis*). The Supreme Court has relied on the *noscitur a sociis* canon "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Here, the relevant statutory provisions couple "personal injury torts" and "wrongful death." "Wrongful death" refers to "[a] death caused by a tortious injury." BRYAN A. GARNER, BLACK'S LAW DICTIONARY 485 (10th ed. 2014) ("BLACK'S"). The term "personal injury tort" should be construed in a manner meaningfully similar to "wrongful death," and require a physical trauma.

The legislative history regarding the relevant provisions of the 1984 Amendments also supports the narrow interpretation. The personal injury tort/wrongful death exception originated with lobbying, including testimony, from personal injury lawyers who found themselves and their clients dragged into the *Johns-Manville* case and other asbestos bankruptcies. *In re Dow Corning Corp.*, 215 B.R. 346, 353-54 (Bankr. E.D. Mich. 1997). In the wake of the Manville bankruptcy and the Supreme Court's decision

12

in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), the Senate conducted hearings to consider amendments to the Bankruptcy Code and related jurisdictional provisions. *See The Manville Bankruptcy and Amendments to the Bankruptcy Code Relating to the Northern Pipeline Decision: Hearing Before the Subcomm. on Courts of the S. Comm. on the Judiciary*, 97th Cong., 2d Sess. (Nov. 10, 1982) (Serial No. J-97-150). Robert Steinberg, Esq., appearing on behalf of the Asbestos Litigation Group, an association of lawyers representing plaintiffs in asbestos litigation, testified that "the bankruptcy courts have other challenging and difficult issues to deal with and should not be a repository for thousands and thousands of personal injury claims and the necessity to litigate those." *Id.* at 58 (statement of Robert Steinberg, Esq., Counsel, Asbestos Litigation Group). John P. Sears, Esq., another representative of the Asbestos Litigation Group, submitted a letter to Senator Robert Dole that referred to "the well-established principle of American jurisprudence that the exercise of an individual's constitutional right to a trial by jury of a personal injury and wrongful death claim is the most effective and fair method of resolution," and stated that "[a]sbestos victims must not be stripped of their constitutional right to a trial by jury of their personal injury and wrongful death claims." *Id.* at 108 (letter from John P. Sears, Esq., Counsel, Asbestos Litigation Group to Sen. Robert Dole, Chairman, Subcomm. on Courts, S. Comm. on the Judiciary).

In June 1984, Congress took up the final debate on the amendments that ultimately became part of the 1984 Amendments. Senator DeConcini explained that "[t]he amendments that I propose seek to balance effective bankruptcy administration with the constitutional concerns reflected in the Marathon decision and the concerns of

personal injury tort claimants." 130 CONG. REC. 17,154 (1984). While recognizing that "[b]ankruptcy courts must retain their traditional, long established, and undisputed power to resolve such claims inexpensively and expeditiously if our bankruptcy system is to work," including the estimation of claims, and "[a] broad limitation on estimation of contract claims . . . would create unnecessary delays and increased cost if there had to be de novo review by a district court judge of every such matter," the exemption of personal injury tort actions from the list of core proceedings addressed a concern of many of his colleagues. *Id.* Personal injury tort creditors "do not voluntarily become involved" with the debtor, and "should have the protection of having any final order entered by an article III district court judge." *Id.* Senator DeConcini referred to "claims arising from automobile accidents" as examples of the personal injury tort claims he had in mind, *id.* at 17,155, and Representative Kastenmeier, the ranking majority member on the House Judiciary Committee and one of the floor managers, described the exceptions to core jurisdiction under the 1984 Amendments, including the personal injury tort/wrongful death exception, as a "narrow category of cases." 130 CONG. REC. 20,227-28 (1984).

"Where Congress adopts language urged by a witness, it may be assumed that Congress also adopted the intent voiced by the witness." *In re Teligent, Inc.*, 268 B.R. 723, 737 (Bankr. S.D.N.Y. 2001) (citations omitted); *see also* 2A SUTHERLAND § 48:10 at 596-97 ("Federal courts frequently look to committee member and interested-party statements made during committee hearings about conditions requiring legislative attention as an aid to determine legislative intent. Because committee hearing records are distributed to Congress members, courts assume they had knowledge of these

14

statements and the evils they described, and that passage of a proposed bill is some evidence of their intent to remedy these evils." (footnote omitted)).  The representatives of the Asbestos Litigation Group testified before the Senate about their concerns resulting from their experience in the *Johns-Manville* bankruptcy, about a bankruptcy court's power to estimate and liquidate personal injury and wrongful death claims, and the denial of the right to try those claims before a jury.  Those specific concerns – and no others – were addressed by exempting personal injury tort and wrongful death claims from the otherwise broad definition of core claims in 28 U.S.C. § 157(b), singling them out from the provisions of mandatory abstention, 28 U.S.C. § 157(b)(4), requiring them to be heard in an Article III court, 28 U.S.C. § 157(d)(5) and preserving the right to trial by jury.  28 U.S.C. § 1411(a).  Although Congress did not intend to limit personal injury tort claims to asbestos claims – Senator DeConcini referred to the example of an automobile accident – the exception was intended to be narrow and not derogate from the bankruptcy court's traditional role of resolving claims through the claims resolution process.

The broad interpretation ignores both the canons of construction and the legislative history, and cuts a broad exception that removes all tort claims from the jurisdiction of the bankruptcy court's claims resolution process.  Generally, "[a] tort is conduct that amounts to a legal wrong and that causes harm for which courts will impose civil liability.  Conduct that counts only as breach of contract may lead to legal liability under the rules of contract law, but breach of contract is not usually considered to be a tortious wrong."" DAN B. DOBBS, *ET AL.*, LAW OF TORTS § 1 (2d ed. Updated June 2017) (footnotes omitted).  The courts adopting the broad interpretation define

"personal injury tort" to encompass "a broad category of private or civil wrongs or injuries for which a court provides a remedy in the form of an action for damages, and include[] damage to an individual's person and any invasion of personal rights, such as libel, slander and mental suffering." *Residential Capital*, 536 B.R. at 572 (quoting *Boyer*, 93 B.R. at 317). This is largely the same definition as the traditional definition of "tort." Thus, the broad interpretation essentially equates "personal injury tort" with any "tort," and renders the limiting phrase "personal injury" superfluous. While "personal injury" can be defined in both the narrow and broad senses, *see* BLACK'S 906 (defining "personal injury" as (i) synonymous with "bodily injury" and (ii) as "[a]ny invasion of a personal right"), and all tort creditors are involuntary creditors, the Congress that passed the 1984 Amendments viewed the personal injury/wrongful death limitation as a narrow exception to the bankruptcy court's jurisdiction to resolve claims, and did not intend to remove all torts from that process.

The hybrid approach finds no support in the words of the relevant statutes, any canon of construction or the legislative history, and is unworkable as this case shows. Under the hybrid approach, bankruptcy courts examine claims for the "earmarks of a financial, business or property tort claim, or a contract claim" and "reserve[] the right to resolve the personal injury tort claim issue by (among other things) a more searching analysis of the complaint." *Residential Capital*, 536 B.R. at 572 (quotation omitted). The thrust of the *Complaint* is that the Gawker Articles attacked Johnson's skills and integrity as a journalist, and he (and GotNews) suffered reputational and economic damage. However, the Gawker Articles also referred to rumors of public defecation and bestiality that occurred when Johnson was younger and had nothing to do with his later

16

professional career.  It is difficult to fit those repeated rumors under the rubric of a
business tort, unless, the "searching analysis" allows me to inquire into the motives of
the speaker and conclude that repeating these rumors was intended to undermine
Johnson's reputation as a journalist.

Having adopted the narrow interpretation, the Court readily concludes that the
Claims do not assert "personal injury torts."  Torts such as defamation, false light and
injurious falsehood do not require proof of trauma, bodily injury or severe psychiatric
impairment, and the *Complaint* does not allege that the Claimants suffered these
injuries.[8]  The only "personal injury" that Johnson asserts is an "emotional injury," but
incidental claims of emotional injury do not suffice to transform a tort claim into a
personal injury tort when it otherwise would not be.  *See Siewert v. Christy* (*In re
Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*), 194 B.R. 728,
734 (S.D.N.Y. 1995) (finding incidental claims of emotional damages insufficient to
"transform [a] business tort into a personal injury tort" (citing *Bertholet v. Harman*, 126
B.R. 413, 415 (Bankr.D.N.H.1991))); *see also In re Atron Inc. of Michigan*, 172 B.R. 541,
544 (Bankr. W.D. Mich. 1994) (stating that Congress did not intend to allow creditors to
divest bankruptcy courts of ability to liquidate claims "by merely alleging a questionable,
ambiguous emotional injury in the context of a nontraditional personal injury tort
claim").  Finally, while claims under section under 42 U.S.C. § 1983 can be more varied
and involve a "personal injury," the Claimants' section 1983 claims do not involve any
trauma, injury or impairment, and accordingly, do not constitute personal injury tort

---

[8]     GotNews is a business, and by definition, no cause of action can be asserted against a business
that "by its nature" is a personal injury action in that it involves some physical, bodily harm.  *See
Residential Capital*, 536 B.R. at 575-76.

claims. *See Vinci v. Town of Carmel (In re Vinci)*, 108 B.R. 439, 440, 442 (holding that claims under 42 U.S.C. § 1983 based on alleged constitutional violations arising from government agency's directive to remove tires from business site were not "personal injury torts" under 11 U.S.C. § 157(b)(5) as claims did not involve bodily injury).

Next, the Claimants' argument that "personal injury tort" should be accorded its common law meaning is unpersuasive. They rely, in the main, on a line of cases dating back to the 19th century in support of the proposition that Congress intended to give "personal injury" its broad, common law definition. (*See Response to Debtors' Supplemental Brief in Further Support of its Omnibus Objections to Claims of Charles C. Johnson and Got News, LLC*, dated Feb. 8, 2017 (the "*GotNews/Johnson Supplement*") at ¶¶ 13-19 (ECF Doc. # 745).) These cases primarily dealt with the construction of section 17 of the Bankruptcy Act of 1898 (the "Bankruptcy Act"), which exempted from discharge, in relevant part, debts arising from "willful and malicious injuries to the person or property of another." *See, e.g.*, *McDonald v. Brown*, 51 A. 213, 214 (R.I. 1902) (finding debt arising from libel judgment nondischargeable as arising from willful and malicious injury under Bankruptcy Act); *Sanderson v. Hunt,* 76 S.W. 179, 179 (Ky. 1903) (finding debt arising from slander judgment nondischargeable as arising from willful and malicious injury under Bankruptcy Act); *Nat'l Sur. Co. of N.Y. v. Medlock*, 58 S.E. 1131, 1133 (Ga. Ct. App. 1907) (same); *Thompson v. Judy*, 169 F. 553, 556 (6th Cir. 1909) (citing *McDonald* and *Sanderson* and affirming lower court affirming lower court finding that libel judgment was nondischargeable as arising from willful and malicious injury); *In re Bernard*, 278 F. 734, 735 (E.D.N.Y. 1921) (citing *Thompson*, *McDonald*, and *Medlock* and finding libel judgment nondischargeable as

arising from willful and malicious injury), *rev'd on other grounds* 280 F. 715 (2d Cir. 1922).

As discussed earlier, however, neither the rules of interpretation nor the legislative history support the notion that the personal injury lawyers who first suggested the exception for "personal injury torts," or the Congress that adopted it, had a common law definition in mind.  Moreover, the Claimants' authorities stand for the unremarkable proposition that a defamation judgment arising from willful and malicious conduct was nondischargeable as a "willful and malicious injur[y] to the person or property of another" under the Bankruptcy Act, which also remains the law under section 523(a)(6) the Bankruptcy Code.  *E.g.*, *Zaretsky v. Berlin* (*In re Berlin*), 513 B.R. 430, 432 (Bankr. E.D.N.Y. 2014).  The relevant statutory text and the structure and history of the statutory scheme, however, provide no basis for equating "injury to the person" under the former Bankruptcy Act (or the current section 523 of the Bankruptcy Code) with "personal injury" within the meaning of 28 U.S.C. § 157.

I am mindful that at least one bankruptcy court has expressly adopted the common law definition of "personal injury" in construing 28 U.S.C. § 157(b)(5).  That court wrote that the "hybrid" approach "is the most appealing because it is closely aligned with what are traditionally thought of as the 'common law torts,'" including torts resulting in reputational harm.  *Smith*, 389 B.R. at 908.  But this does not explain why the statutory language added in the 1984 Amendments *should* be read in a manner aligned with the common law definition, particularly since that is not what Congress intended.  As set forth above, importation of the common law meaning of "personal injury" would run contrary to the principles of statutory interpretation.

19

Finally, the Claimants contend that a process under which the bankruptcy court's would determine GotNews's Claims prior to Article III adjudication of Johnson's Claims would violate their equal protection rights by giving a natural person access to an Article III tribunal but denying it to a corporate person, and by making Johnson's access to Article III adjudication "ephemeral." (*GotNews/Johnson Supplement* at ¶¶ 25-27.) This concern is misplaced as this Court may properly resolve all of the Claims for the reasons set forth above. Additionally, this concern highlights another benefit of the narrow approach: courts should construe statutes to avoid constitutional problems unless the avoiding construction is plainly contrary to congressional intent. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). Here, application of the narrow approach avoids the potential constitutional problem the Claimants raise.

For these reasons, the Court concludes that the "personal injury tort" exception to core jurisdiction set forth at 28 U.S.C. § 157(b)(2)(B) is limited to claims involving bodily injury, physical trauma and/or a severe "psychiatric impairment beyond mere shame and humiliation," *Cohen*, 107 B.R. at 455, and the Claims do not meet this definition. Accordingly, this Court has core jurisdiction to liquidate the Claims.

**B.    Applicability of the California Anti-SLAPP Statute**

**1.    The California Anti-SLAPP Statute**

SLAPP refers to "strategic lawsuits against public participation."  California, like many other states, has enacted an anti-SLAPP statute "in the public interest to encourage continued participation in matters of public significance, [which] should not be chilled through abuse of the judicial process."  CAL. CIV. PROC. CODE § 425.16(a); *see Wilcox v. Superior Court,* 33 Cal. Rptr. 2d 446, 450 (Cal. Ct. App. 1994) ("[W]hile SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPPs are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." (quoting George W. Pring, *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 PACE ENVT'L L. REV., 3, 5-6, 8 (1989))).

The California anti-SLAPP statute, among other things, provides an expedited procedural mechanism – a special motion – for short-circuiting SLAPP lawsuits:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

CAL. CIV. PROC. CODE § 425.16(b)(1).  Once the defendant shows that the plaintiff's claim arises from a protected activity (the right to petition or speak freely in connection with a public issue), the motion to strike shifts the burden to the plaintiff to demonstrate a probability of success, and stays discovery until the motion is resolved unless the court orders specified discovery for cause shown.  *Id.* at § 425.16(g).  In determining whether the plaintiff has established a probability of success, a court "shall consider the

pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based," *id.* at § 425.16(b)(2), but the determination that a plaintiff has established a probability of success on the underlying claim is inadmissible in evidence "at any later stage of the case, or in any subsequent action," and does not affect any "burden of proof or degree of proof otherwise applicable" in the case or any subsequent proceeding.  *Id.* at § 425(b)(3).  Finally, the anti-SLAPP statute contains a cost shifting provision.  A defendant that prevails on the motion to strike is entitled to recover attorney's fees and costs subject to certain exceptions not relevant here; a prevailing plaintiff is entitled to recover his costs and reasonable attorney's fees if the court finds that motion was frivolous or intended to cause unnecessary delay.  *Id.* at § 425.16(c)(1).

The issue presented is whether the special motion to strike under the California anti-SLAPP statute applies to the *Omnibus Objections.*[9]

### 2.    Applicability

As a general matter, the California anti-SLAPP statute will apply in diversity litigation "if state conflict-of-law principles call for a rule of decision (1) that would apply to the suit if it were brought in state court, (2) that is 'substantive' within the meaning of [*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)] and (3) that is not displaced by a valid federal law or rule governing the same issue."  *Liberty Synergistics*, 718 F.3d at 153; *accord Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014).  Although

---

[9]       It appears that a federal court may parse an anti-SLAPP statute's provisions and conclude that some apply while others do not.  *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 144 (2d Cir. 2013) ("[T]he aspects of California's anti-SLAPP rule considered substantive by federal law continue to apply in this case.")  I do not decide whether the provisions are severable.

the issue has arisen in the context of a claim objection, the claim is based on state law (except for the Section 1983 claim), was pending in state court before the bankruptcy, and accordingly, I conclude that the rules applicable to diversity actions should apply here. *See Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 187 (2d Cir. 2012) (noting that while bankruptcy jurisdiction is a form of federal question jurisdiction, "*Erie* made clear that state law provides the rules of decision for the *merits* of state law claims in bankruptcy court" (emphasis in original) (citations omitted)).

### a.    Is the anti-SLAPP law applicable in state court?

"[A] federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court." *Liberty Synergistics*, 718 F.3d at 151. Where, however, a diversity action is transferred from one federal court to another federal court, the transferee court must apply the choice-of-law rules of the state in which transferor court sits. *Ferens v. John Deere Co.*, 494 U.S. 516, 530-31 (1990); *Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964). When a bankruptcy claim is wholly-derived from a pre-petition action pending in the courts of another state, and a party in interest objects to the claim, the bankruptcy court must look to the choice of law rules of the state where the pre-petition complaint was filed. *Coudert Bros*, 673 F.3d at 191.

The Claims in these cases parallel the *Complaint* – they attach the *Complaint* – and accordingly, California's choice of law rules apply. This means that I must pretend that I am sitting as a California court. *Liberty Synergistics*, 718 F.3d at 153. California's anti-SLAPP law is procedural as a matter of California state law, and therefore applies

even if the substantive law of another jurisdiction governs the merits of the claim. *Id.* at

154. Thus, a California court would apply the state's anti-SLAPP law to the Claims even

if the substantive law of another state governed the merits, and I must too unless it is

not substantive or conflicts with a valid federal statute or rule.

### b.    Is the anti-SLAPP law substantive?

Although the anti-SLAPP law is procedural under California state law, whether it

is substantive under *Erie* is a question of federal law. *Id.*, 718 F.3d at 152; *see Gasperini*

*v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal

courts sitting in diversity apply state substantive law and federal procedural law.")

Unlike the choice of law question, Second Circuit law governs the interpretations of

federal law even when the case is transferred from a court sitting in another circuit.

*Liberty Synergistics*, 718 F.3d at 154 n.17; *accord Desanio v. Warner-Lambert & Co.*,

467 F.3d 85, 90 (2d Cir. 2006) ("As to issues of federal law, we are permitted – indeed,

required – to reach our own conclusions.").

In *Hanna v. Plumer*, 380 U.S. 460 (1965), the Supreme Court identified the twin

considerations that determine whether a state law is substantive under *Erie*:

> [W]hen a federal court sitting in a diversity case is faced with a question of
> whether or not to apply state law, the importance of a state rule is indeed
> relevant, but only in the context of asking whether application of the rule
> would make so important a difference to the character or result of the
> litigation that failure to enforce it would unfairly discriminate against
> citizens of the forum State, or whether application of the rule would have
> so important an effect upon the fortunes of one or both of the litigants that
> failure to enforce it would be likely to cause a plaintiff to choose the federal
> court.

*Id.* at 468 n.9; *accord Gasperini*, 518 U.S. at 428. The Second Circuit did not decide in

*Liberty Synergistics* whether the California anti-SLAPP statute is substantive under

*Erie.* 718 F.3d at 153; *accord Liberty Synergistics Inc. v. Microflo Ltd.*, 637 F. App'x 33, 34 n.1 (2d Cir. 2016). In *Adelson*, however, the Second Circuit observed that anti-SLAPP statutes are generally applied in federal proceedings under *Erie*, 774 F.3d at 809 (collecting cases), and specifically ruled that the immunity[10] and mandatory fee-shifting provisions of the Nevada anti-SLAPP statute are substantive under federal law, although the applicability of the statute's provision staying discovery was a "closer question."[11] *Id.*

As noted, the California anti-SLAPP statute includes a mandatory fee-shifting provision. While it does not include an express immunity provision like its Nevada counterpart, the Ninth Circuit has construed the California anti-SLAPP statute as providing "substantive immunity from suit." *Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003). Moreover, the California and Nevada statutes are substantially similar in terms of the protections they afford the defendant. In relevant part, the defendant who makes the special motion to dismiss must first establish by a preponderance of the evidence that the plaintiff's claim is based on the defendant's good faith communication in furtherance of a protected activity. NEV. REV. STAT. § 41.660(3)(a). If the defendant satisfies its burden, the plaintiff must supply *prima facie* evidence of a probability of prevailing on the claim. *Id.* § 41.660(3)(b). In determining whether the plaintiff has met its burden, "the plaintiff must meet the same burden of proof that a plaintiff has been required to meet pursuant to California's anti-Strategic Lawsuits Against Public

---

[10]    NEV. REV. STAT. § 41.650 provides: "A person who engages in a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern is immune from any civil action for claims based upon the communication." The immunity provision was amended in 2013 to provide immunity from suit rather than immunity from liability, 2013 Nev. Stat. 622, 623, but this change does not alter the Court's analysis.

[11]    The *Adelson* Court did not decide the close question because the District Court had denied discovery under Rule 56 of the Federal Rules of Civil Procedure. 774 F.3d at 809.

25

Participation law as of June 8, 2015." NEV. REV. STAT. § 41.665(2). If the court denies

the special motion, its determination will not be admitted into evidence or affect the

burden of proof at a later stage of the underlying action or subsequent proceeding. *Id.* §

41.660(3)(c). Given the similar procedural protections granted under the Nevada and

California anti-SLAPP statutes and Nevada's recent express incorporation of the

California statute's burden of proof imposed on the plaintiff, the California statute

implies the same level of immunity as the Nevada statute expressly grants.[12] In

addition, other circuit courts have expressly held that anti-SLAPP statutes satisfy the

twin purposes of *Erie*: they discourage forum shopping and avoid the inequitable

administration of the law. *See, e.g., Godin v. Schencks,* 629 F.3d 79, 92 (1st Cir. 2010)

(declining to apply the Maine anti-SLAPP law "would thus result in an inequitable

administration of justice between a defense asserted in state court and the same defense

asserted in federal court" and incentivize forum shopping by allowing a plaintiff to avoid

the law's "burden-shifting framework, rely upon the common law's per se damages rule,

and circumvent any liability for a defendant's attorney's fees or costs."); *United States ex

rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999)

("Plainly, if the [California] anti-SLAPP provisions are held not to apply in federal court,

a litigant interested in bringing meritless SLAPP claims would have a significant

incentive to shop for a federal forum. Conversely, a litigant otherwise entitled to the

---

[12] This does not necessarily mean that either Nevada or California grant immunity in the true sense. Rejecting an immunity argument based on the D.C. anti-SLAPP statute that, like California, did not include an express immunity provision, the Court stated that "qualified immunity allows defendants to avoid liability even when they may have violated the law so long as they acted reasonably. Qualified immunity (on its own) does not tell a court what showing is necessary at the motion to dismiss or summary judgment stages in order to dismiss a case before trial." *Abbas v. Foreign Policy Group*, 783 F.3d 1328, 1335 (D.C. Cir. 2015). The point is that Nevada statute at issue in *Adelson* and California anti-SLAPP statute provide similar procedural immunities.

protections of the Anti–SLAPP statute would find considerable disadvantage in a federal proceeding. This outcome appears to run squarely against the 'twin aims' of the *Erie* doctrine."); *cf. Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 168-69 (5th Cir. 2009) ("Louisiana law, including the nominally-procedural Article 971 [of the Louisiana Code of Civil Procedure]," which provides for a motion to strike that is similar to California's, "governs this diversity case.")

Based on the foregoing, the Court concludes that the California anti-SLAPP statute is substantive under *Erie*. In addition to its similarities to the Nevada anti-SLAPP statute, which the Second Circuit has found to be substantive at least in part, its provisions meet the twin purposes of *Erie*. First, the failure to apply the anti-SLAPP law would encourage forum shopping. Given a choice, a plaintiff bringing a SLAPP suit would be well-advised to bring his claim in federal court if he could avoid the procedural and mandatory fee shifting provisions of a state anti-SLAPP statute. Second, not applying the anti-SLAPP law could lead to different results on the same claim depending on whether the litigation was brought in state or federal court. Accordingly, the California anti-SLAPP law will apply in resolving the *Omnibus Objection* unless it is displaced by a valid federal law or rule, in this case, the Federal Rules of Civil Procedure.

### c.    Does the California anti-SLAPP law conflict with federal law?

Whether a conflict exists between a state rule and a federal rule depends on "whether, when fairly construed, the scope of [the relevant federal rule] is sufficiently broad to cause a direct collision with state law or, implicitly, to control the issue before the court, thereby leaving no room for the operation of that [state] law." *Burlington*

*Northern R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987) (citations and quotations omitted).  If a federal rule "answers the question in dispute," it governs notwithstanding the state law.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (majority opinion); *accord Abbas*, 783 F.3d at 1333.

The earlier discussion implied that a state rule will always be applied if it is substantive in that it affects a litigant's rights or the outcome of the case; otherwise, the failure to apply the state rule in federal court will encourage forum shopping and lead to the inequitable administration of justice.  Nevertheless, even if a state rule is substantive under *Erie*, "[t]he short of the matter is that a Federal Rule governing procedure is valid whether or not it alters the outcome of the case in a way that induces forum shopping."  *Shady Grove*, 559 U.S. at 416 (plurality opinion).

Several federal civil rules, including Rules, 8, 12 and 56, govern pleading and the disposition of a litigation prior to trial, and touch upon the same areas as California's anti-SLAPP procedures.  Claims objections are contested matters, *In re Drexel Burnham Lambert Grp., Inc.*, 159 B.R. 420, 424-25 (S.D.N.Y. 1993), and hence, Rule 56 automatically applies.  *See* FED. R. BANKR. P. 9014(c) (making FED. R. BANKR. P. 7056 applicable to contested matters); FED. R. BANKR. P. 7056 (incorporating Rule 56).  Rules 8 and 12 do not automatically apply to a claim objection, but the Court may direct at any stage of the contested matter that other Part VII rules apply, including Federal Bankruptcy Rules 7008 and 7012.  FED. R. BANKR. P. 9014(c).  The Debtors have asked the Court to declare Federal Civil Rule 12 applicable, which may be appropriate given that the Claims attach the *Complaint*, but that issue is not currently before the Court.

The question that has divided the circuit and district courts is whether some or all of the relevant Federal Rules of Civil Procedure conflict with the provisions of anti-SLAPP statutes, and therefore displace them.  In *Newsham*, the Ninth Circuit concluded that there was no "direct collision" between the special motion to strike and the mandatory fee-shifting provisions under the California anti-SLAPP statute on the one hand, and Rules 12 or 56 of the Federal Rules of Civil Procedure on the other.  190 F.3d at 972.  If the special motion is denied, motions under Rule 12 and Rule 56 could still be made.  *Id.*  Furthermore, the anti-SLAPP statute served an interest not directly addressed by the Federal Rules: protection of the constitutional rights to freedom of speech and petition for redress of grievances.  *Id.* at 973 (citation omitted).  In *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001), however, the Court ruled that the discovery-limiting aspects of section 425.16(f) and (g) of the California anti-SLAPP statute collided with the discovery-allowing aspects of Rule 56, and did not apply in federal court.  *Id.* at 846; *accord Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 980 (C.D. Cal. 1999).

In *Godin*, the First Circuit upheld the special motion procedures contained in Maine's anti-SLAPP statute.[13]  According to the Court of Appeals, Rules 12(b)(6) and 56 (as well as Maine's analogous procedural rules) apply generally while the anti-SLAPP statute provides special procedures in a limited class of cases involving petitioning

---

[13]    The Maine anti-SLAPP statute, ME. REV. STAT. tit. 14, § 556 provides, in relevant part, that the plaintiff must show "that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party.  In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  The statute also stays discovery, but the Court may order specified discovery for good cause shown.  Finally, it includes a non-mandatory provision that allows the Court to award attorneys' fees and expenses to the moving party if the special motion is granted.

activity.  629 F.3d at 88.  In addition, Rule 12(b)(6) tests the legal sufficiency of the complaint while the anti-SLAPP statute provides a different mechanism to dismiss the complaint on an entirely different basis.  *Id.* at 89.  Similarly, the factfinder does not evaluate material factual disputes under Federal Civil Rule 56, but the anti-SLAPP statute requires the Court to consider whether the defendant's conduct had a reasonable basis in the law, and whether the conduct caused the plaintiff's injury.  *Id.*  Moreover, the anti-SLAPP statute "alters what plaintiffs must prove to prevail" and provides substantive legal defenses which are not the province of Federal Civil Rules.  *Id.*  Finally, the stay of discovery except for good cause under the Maine law is consistent with the burdens imposed on the opponent of a summary judgment motion under Federal Civil Rule 56(d) (formerly Rule 56(f)).[14]  *Id.* at 90.

Curiously, other decisions have seized on the same procedural differences that *Godin* cited, and pointed to those differences in reaching the opposite conclusion that a direct conflict existed between the Federal Rules and the particular anti-SLAPP statute at issue.  For example, within the Ninth Circuit, several judges have expressed the view that *Newsham* was wrongly decided even while acknowledging that it is Ninth Circuit law.  In *Makaeff v. Trump University, LLC*, 715 F.3d 254 (9th Cir. 2013), Chief Judge

---

[14]    The *Metabolife* Court had rejected this conclusion:

Although Rule 56(f) facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery "where the nonmoving party has not had the opportunity to discover information that is essential to its opposition."

*Metabolife*, 264 F.3d at 846. (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n.5 (1986)).

Kozinski stated in a concurring opinion that the California anti-SLAPP statute directly

collided with the Federal Rules of Civil Procedure:

> The California anti-SLAPP statute cuts an ugly gash through this orderly
> process.  Designed to extricate certain defendants from the spiderweb of
> litigation, it enables them to test the factual sufficiency of a plaintiff's case
> prior to any discovery; it changes the standard for surviving summary
> judgment by requiring a plaintiff to show a "reasonable probability" that
> he will prevail, rather than merely a triable issue of fact; it authorizes
> attorneys' fees against a plaintiff who loses the special motion by a
> standard far different from that applicable under Federal Rule of Civil
> Procedure 11; and it gives a defendant who loses the motion to strike the
> right to an interlocutory appeal, in clear contravention of Supreme Court
> admonitions that such appeals are to be entertained only very sparingly
> because they are so disruptive of the litigation process.

*Id.* at 274 (Kozinski, C.J., concurring); *accord Makaeff v. Trump University, LLC*, 736

F.3d 1180, 1188-89 (9th Cir. 2013) ("*Trump en Banc*") (Watford, J., dissenting from

denial of hearing *en banc*).  In addition, after *Metabolife* "crippled" the discovery-

limiting provisions of the California statute at the expense of a quick and inexpensive

termination of a SLAPP suit, it created a "hybrid procedure where neither the Federal

Rules nor the state anti-SLAPP statute operate as designed."  *Makaeff v. Trump*

*University, LLC*, 715 F.3d at 275 (Kozinski, C.J., concurring); *accord Trump en Banc*,

736 F.3d at 1189 (Watford, J., dissenting from denial of rehearing *en banc*).

    In his concurrence in *Travelers Cas. Ins. Co. of Am. v. Hirsh*, 831 F.3d 1179 (9th

Cir. 2016), joined by Judge Gould, Judge Kozinski concluded that the California anti-

SLAPP statute directly conflicted with Rule 12(b)(6).  831 F.3d at 1183-84 (Kozinski, J.,

concurring).  The Rule 12(b)(6) standard requires the plaintiff to state a claim plausible

on its face.  *Id.* at 1183.  The California rule requires the plaintiff to demonstrate "that

the claim is legally sufficient and 'supported by a sufficient prima facie showing of facts

to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'"

*Id.* (quoting *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002)).

"'Probability' is a much higher bar than 'plausibility,'" *id.*, and additionally, the

California special motion requires supporting evidence while Rule 12 does not.  *Id.*  Rule

12's plausibility standard "*alone* strikes the right balance between avoiding wasteful

litigation and giving plaintiffs a chance to prove their claims," and "[u]sing California's

standard in federal court means that some plaintiffs with plausible claims will have their

cases dismissed before they've had a chance to gather supporting evidence.  It's obvious

that the two standards conflict."  *Id.* at 1183-84 (emphasis in original) (citing *Bell

Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) and *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009)).

Judge Gould's separate concurrence stated that he was persuaded to the same

view by Judge Kozinski's concurrence and the D.C. Circuit's opinion in *Abbas*, which

construed the D.C. anti-SLAPP statute, D.C. CODE § 16-5502.  *Id.* at 1186 (Gould, J.,

concurring); *see also Abbas,* 783 F.3d at 1332-33 (discussing issue before the Court).

The D.C. special motion requires the defendant to make a *prima facie* showing that the

claim arises from a protected activity.  D.C. CODE § 16-5502(b).  If it does, the "motion

shall be granted unless the responding party demonstrates that the claim is likely to

succeed on the merits, in which case the motion shall be denied."  *Id.*  The filing of the

special motion stays discovery, but the court may order specified discovery if it if it will

enable the plaintiff to defeat the motion and is not unduly burdensome, but may shift

the defendant's cost of compliance to the plaintiff.[15]  *Id.* at § 16-5502(c).  A separate

---

[15]    D.C. CODE § 16-5503 includes provides for a special motion to quash efforts to seek "personal
identifying information" under certain circumstances.

32

provision authorizes non-mandatory fee shifting.  D.C. CODE § 16-5504.  *In Abbas*, the
Court concluded, primarily for the reasons articulated by Judge Kozinski and the other
Ninth Circuit "dissenters," that the D.C. anti-SLAPP statute conflicted with Rules 12 and
56, particularly in light of the additional hurdle placed on the plaintiff to survive
dismissal and get to trial.  *See Abbas*, 783 F.3d at 1334-36 (discussing conflict and citing
Chief Judge Kozinski's concurrence in *Makaeff* and Judge Watford's dissent in *Trump
en Banc*).

Some of the California district courts have carved out a curious middle ground to
avoid a conflict.  In *Rogers v. Home Shopping Network*, the defendants made a special
motion under the California anti-SLAPP statute, and the plaintiff requested the
opportunity to take discovery notwithstanding the statutory stay.  57 F. Supp. 2d at 974.
The *Newsham* Court had already held that the special motion procedure applied in
federal diversity actions, but had not yet addressed the discovery provisions in the
California statute.  *Id.* at 977-79.  The *Rogers* court concluded that the discovery-
limiting provisions conflicted with the discovery-allowing provisions in Rule 56, *Id.* at
981-82, and the Ninth Circuit adopted this view in *Metabolife*.  264 F.3d at 846; *accord
Travelers*, 831 F.3d at 1186 (Kozinski, J., concurring).

The *Rogers* court also addressed how the special motion would work in federal
court, an issue that *Newsham* did not decide.  The court ultimately concluded that to
avoid a conflict, the special motion must apply the same standards as the Federal Rules:

> In sum, § 425.16 applies in federal court.  However, it cannot be used in a
> manner that conflicts with the Federal Rules. This results in the following
> outcome: If a defendant makes a special motion to strike based on alleged
> deficiencies in the plaintiff's complaint, the motion must be treated in the
> same manner as a motion under Rule 12(b)(6) except that the attorney's

> fee provision of § 425.16(c) applies.  If a defendant makes a special motion
> to strike based on the plaintiff's alleged failure of proof, the motion must
> be treated in the same manner as a motion under Rule 56 except that
> again the attorney's fees provision of § 425.16(c) applies.

57 F. Supp. 2d at 983; *accord In re Bah*, 321 B.R. 41, 45 n.6 (B.A.P. 9th Cir.2005);

*Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, 448 F. Supp. 2d 1172,

1180 (C.D. Cal. 2006); *Brit Uw Ltd. v. City of San Diego*, No. 14cv2195 JM(WVG), 2016

WL 6269730, at *6 (S.D. Cal. Jan. 22, 2016); *Bautista v. Hunt & Henriques,* No. C-11-

4010 JCS, 2012 WL 160252, at *3-4 (N.D. Cal. Jan. 17, 2012).  The Ninth Circuit

adopted this standard in an unreported opinion, *Z.F. v. Ripon Unified Sch. Dist.*, 482 F.

App'x 239, 240 (9th Cir. 2012) ("If a defendant makes an anti-SLAPP motion to strike

founded on purely legal arguments, then the analysis is made under Fed. R. Civ. P. 8

and 12 standards; if it is a factual challenge, then the motion must be treated as though

it were a motion for summary judgment and discovery must be permitted.")  Under this

approach, the special motion is governed by the same rules that apply to motions to

dismiss and motions for summary judgment under the Federal Rules, the discovery

provisions in Rule 56 trump the discovery provisions under CAL. CIV. PROC. CODE section

425.16, and the only aspect of the state law that remains intact is the mandatory-fee

shifting provisions.

    Based on the foregoing, the Court concludes that the special motion procedures

conflict with the procedures set forth in Rule 56 (and Rule 12 should it be made

applicable) primarily for the reasons expressed by Judge Kozinski in his concurrences

and the decisions in *Abbas* and *Rogers*.[16]  At bottom, the literal application of the

---

[16]     In the claims objection context, the special motion procedure also conflicts with Rule 3001(f) of
the Federal Rules of Bankruptcy Procedure which provides that "[a] proof of claim executed and filed in

34

California statute would require a federal court to dismiss a lawsuit that would not be subject to dismissal under Federal Rules 12 and 56. The Ninth Circuit has recognized this conflict and substantially cut back on the statutory procedures that govern the California anti-SLAPP special motion, essentially treating it as a motion subject to the Federal Rules of Civil Procedure. Furthermore, the special motion requires the Court to evaluate the facts and make factual findings in determining whether the plaintiff has shown a probability of success. Thus, the court must decide disputed factual issues without the benefit of a trial and its attendant protections not the least of which is the ability to cross-examine witnesses. It is not surprising that the highest courts of two states have concluded that comparable anti-SLAPP statutes violate the right to a jury trial under that particular state's constitution. *E.g., Opinion of the Justices (SLAPP Suit Procedure)*, 641 A.2d 1012, 1015 (N.H. 1994); *Davis v. Cox*, 351 P.3d 862, 874 (Wash. 2015) (*en banc*).[17]

Accordingly, the Court concludes that even though the California anti-SLAPP statute is substantive under *Erie*, the literal application of the special motion procedures conflict with Rule 56 (and Rule 12 to the extent it is made applicable), and does not apply to the disposition of the *Omnibus Objection*. I do not decide whether the fee

---

accordance with these rules shall constitute *prima facie* evidence of the validity and the amount of the claim." If the claimant is entitled to the presumption, the initial burden of going forward rests with the objecting party. If the objecting party does not come forward with any evidence, the objection must be overruled. Under the anti-SLAPP statute, however, once the defendant shows that the claim arose from a protected activity, and without regard to its merit, the burden shifts to the claimant to go forward with evidence showing a probability of success.

[17]    The Washington Court noted distinctions between the California and Washington anti-SLAPP statutes, focusing primarily on the different burdens of proof. *Davis*, 351 P.3d at 869-71. Despite these differences, the California statute suffers from the same fundamental problem as the Washington law; it deprives a litigant of the right to a trial by jury to resolve all factual disputes.

shifting procedures are severable and survive, and leave that for another day.  I have considered the parties' remaining arguments, and conclude that they lack merit.

## CONCLUSION

For the reasons set forth above, the Claims are not "personal injury tort" claims within the meaning of 28 U.S.C. § 157, and consequently that the Court may adjudicate their allowance or disallowance and liquidate the Claims.  Additionally, the California anti-SLAPP's special motion procedures are inapplicable to the disposition of the *Omnibus Objection*.

Settle order.

Dated:   New York, New York
          August 21, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge