**<u>Exhibit D</u>**

Complaint

FILED: NEW YORK COUNTY CLERK 06/22/2017 05:38 PM
INDEX NO. 155710/2017
NYSCEF DOC. NO. 1
16-11700-smb    Doc 985-4    Filed 08/21/17    Entered 08/21/17 17:03:04    Exhibit D
Complaint    Pg 2 of 21
RECEIVED NYSCEF: 06/22/2017

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PREGAME LLC d/b/a PREGAME.COM, a Nevada limited liability company and RANDALL JAMES BUSAK, professionally known as RJ BELL, | Index No.: |
| | **SUMMONS** |
| Plaintiffs, | |
| -against- | Date Purchased: |
| GIZMODO MEDIA GROUP, LLC, a Delaware Corporation, RYAN GOLDBERG and DOES 1-20, Inclusive, | |
| Defendants. | |

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial. The basis of venue is the various defendants' places of business and residence in the County of New York.

1

Dated:  New York, New York
        June 22, 2017

**HARDER MIRELL & ABRAMS LLP**


By: ____s/ Charles J. Harder_____
Charles J. Harder
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
(424) 203-1600
charder@hmafirm.com

**TARTER KRINSKY & DROGIN LLP**

Mark J. Rosenberg
Joel H. Rosner
1350 Broadway
New York, New York 10018
(212) 216-8000
mrosenberg@tarterkrinsky.com
jrosner@tarterkrinsky.com

*Attorneys for Plaintiffs*


To:    Gizmodo Media Group, LLC
       The Corporation Trust Company
       Corporation Trust Center
       1209 Orange Street
       Wilmington, DE 19801

       Ryan Goldberg
       180 Rugby Road
       Brooklyn, NY 11226-4550

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PREGAME LLC d/b/a PREGAME.COM, a Nevada limited liability company and RANDALL JAMES BUSAK, professionally known as RJ BELL, <br><br>            Plaintiffs, <br><br>    -against- <br><br> GIZMODO MEDIA GROUP, LLC, a Delaware Corporation, RYAN GOLDBERG and DOES 1-20, Inclusive, <br><br>            Defendants. | Index No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1.      This action by plaintiffs Randall James Busack, professionally known as RJ Bell ("Mr. Bell") and Pregame LLC dba Pregame.com ("Pregame") (collectively, "Plaintiffs") arises out of the publication of numerous false and defamatory statements about Plaintiffs by defendant Ryan Goldberg ("Mr. Goldberg") on Deadspin.com, which is owned and operated by Gizmodo Media Group, LLC ("GMG") (collectively with Mr. Goldberg, "Defendants").

2.      Mr. Bell is the Founder and CEO of Pregame.com, the largest sports betting media company compliant with U.S. law and a two-time Inc. 5000 company. Plaintiffs have been vetted by and earned the trust of nearly every major media outlet over the past decade, and Pregame has earned an A+ rating from the Better Business Bureau for the past eight (8) years. Pregame is also the exclusive odds provider for the Associated Press.

3.      Mr. Bell is the only sports bettor on Forbes' list of Gambling Gurus and has been deemed a "Las Vegas maven" by *USA Today*. Mr. Bell was featured in a positive and complimentary *New York Times Magazine* cover story. Mr. Bell's television appearances

include SportsCenter, Outside the Lines, First Take, CNN, Fox Business, CBS This Morning,

CBS Evening News, CNBC, Nightline and Fox Sports.  Mr. Bell's radio program appearances

include Dan Patrick, Colin Cowherd, Doug Gottlieb, Kevin & Bean, ESPN's NFL Countdown to

Kickoff, Sirius and NPR.  Mr. Bell has also been a solo presenter at the South by Southwest

festival.  Mr. Bell's content has been featured by The Wall Street Journal, Bloomberg,

Newsweek, The New York Times, Los Angeles Times, Yahoo, Associated Press, Maxim,

Pardon the Interruption, Rick Reilly, Sports Nation, Mike & Mike, Jim Rome and Sports

Illustrated.  Mr. Bell has also served as an expert witness regarding the topic of Las Vegas odds

in the United States District Court.

   4.  On June 23, 2016, an article written by Mr. Goldberg entitled "How America's

Favorite Sports Betting Expert Turned A Sucker's Game Into An Industry" (the "Story") was

posted on Deadspin.com.  The Story contains numerous false, fabricated, fictitious, and outright

libelous statements about Plaintiffs and their business practices.  Among other things, the Story

falsely states that Plaintiffs engage in deceptive and predatory business practices by profiting

from customers' betting losses, are paid by sportsbooks, and own sportsbook websites and

services, and presents false estimates of Plaintiffs' profits and expenses in the form of

sensational graphs.

   5.  Much of Plaintiffs' revenue is dependent upon the hard-earned trust they have

with their customers and being rightly perceived as honest in the eyes of the public, and the

truthful perception of being aligned with the interests of their customers.  Gamblers want to

know that the experts they seek out are giving them honest advice that the experts would stake

their own money on.  A claim that an expert is not doing this, and in fact stands to profit when

his or her customers lose, strikes at the very heart of this relationship and is absolutely poisonous

2

FILED: NEW YORK COUNTY CLERK 06/22/2017 05:38 PM
NYSCEF DOC. NO. 1
16-11700-smb    Doc 985-4    Filed 08/21/17    Entered 08/21/17 17:03:04    Exhibit D
Complaint    Pg 6 of 21
INDEX NO. 155710/2017
RECEIVED NYSCEF: 06/22/2017

for anyone in Plaintiffs' line of work.  The false and defamatory statements in the Story attack

the very high standing Plaintiffs have achieved by claiming that Plaintiffs' ultimate goal is for its

customers to lose their bets and that there is a financial incentive for Plaintiffs to deliberately

mislead their customers with bad advice, which is completely untrue.  Moreover, by virtue of

claiming that Plaintiffs own, operate and/or share in the profits of sportsbook websites, the Story

falsely accuses Plaintiffs of engaging in improper revenue sharing of bets with sportsbooks -

conduct which is potentially a criminal violation under U.S. law.

6.      Before the Story was published, Mr. Goldberg, a reporter for Deadspin.com and

author of the Story, reached out to Mr. Bell for an interview.  The tenor of the questions Mr.

Goldberg posed to Mr. Bell exhibited a clear negative agenda by Mr. Goldberg and were

premised on numerous false assumptions and inaccuracies.  In response, Mr. Bell provided Mr.

Goldberg with an official "on the record" statement which attempted to correct many of the

inaccuracies in a manner concise enough to ensure a likelihood it would be published in whole.

With regard to the other inaccuracies, Mr. Bell offered to answer any and all questions "on

background" to correct Mr. Goldberg's errors and ensure that a fair and accurate story was

written.  Despite being advised that his questions contained "multiple factual errors", Mr.

Goldberg refused to allow Mr. Bell to speak "on background", indicating that Mr. Goldberg had

no desire to even hear information that contradicted his established narrative and simply wanted

to write a "hit piece" about Plaintiffs.

7.      Shortly after the Story was published, Plaintiffs' attorney contacted Gawker

Media, LLC (the entity which was then operating Deadspin.com), advising it of the specific false

and defamatory statements contained in the Story and demanding a retraction and apology.

Gawker refused.  After GMG took over control of Deadspin.com, Plaintiffs' counsel

3

subsequently contacted GMG advising it of the same. GMG however, has failed to remove and/or retract the Story, which remains on Deadspin.com as of the date of this Complaint.

8.     Defendants' false and defamatory statements about Plaintiffs have caused tremendous harm to Plaintiffs' personal and professional reputation, including the hard-earned trust they have with their customers, the high standing they have with the media, and their actual and potential economic interests.

## **PARTIES**

9.     Plaintiff Pregame LLC dba Pregame.com is a Nevada limited liability company, with its principal place of business located in Las Vegas, Nevada, and is also licensed in the State of Nevada.

10.     Plaintiff Randall James Busack, professionally known for over ten (10) years as RJ Bell, is an individual domiciled in Las Vegas, Nevada.

11.     Defendant Gizmodo Media Group, LLC is a Delaware corporation, with its principal place of business in New York, New York. GMG operates and publishes Deadspin.com where the defamatory statements alleged in this Complaint are and were published.

12.     Defendant Ryan Goldberg is an individual domiciled in New York, New York, and was a writer for Deadspin.com and the author of the Story.

## **JURISDICTION AND VENUE**

13.     This Court has jurisdiction over Defendants under CPLR § 301 because Defendants have offices in, have their principal place of business in and/or are domiciled in New York, New York, and the causes of action alleged arise out of Defendants' activities in New York, New York.

4

14.    Venue is proper in this county under CPLR § 503 because Defendants have their principal place of business there and/or are domiciled there.

15.    Plaintiffs are presently unaware of the identity of the defendants sued herein as Does 1 through 20, and will amend this complaint to identify them once Plaintiffs learns of their identities.  GMG, Mr. Goldberg and Does 1 through 20 are collectively referred to herein as "Defendants."

## FACTS

16.    On or about June 23, 2016, an article written by Mr. Goldberg was published on Deadspin.com entitled "How America's Favorite Sports Betting Expert Turned A Sucker's Game Into An Industry" (the "Story").  A true and correct copy of the Story is attached hereto as **Exhibit A**.

17.    The Story contains false and defamatory statements that Plaintiffs profit from their customers' betting losses (a practice considered by many in the sports prediction industry to be particularly egregious) and are paid by sportsbooks, including:

    a.    "It's a can't-miss business plan, and it pays off twice.  First when customers buy the picks, and again when they fork over their money to sportsbooks on those losing bets.  This might explain why Pregame is so generous with discounts like 'bulk dollars' and half-price coupons, and why Bell trumpets the savings of subscriptions over single-game purchases.  Pregame has every incentive to keep buyers in the fold, and keep them betting."

    b.    "And tout sites are paid lavishly for those coveted referrals.  In light of this, what Pregame tells would-be pick-sellers makes sense: Winning really isn't the issue.  Losing is."

5

18.     The Story also contains false and defamatory statements that Plaintiffs have (or had) ownership and/or operational control of PregameAction.com, SharpBettor.ag and other online sportsbook-related "services" (a practice which could be illegal), including:

> a.    "Bell's comment specifically mentioned Pregame.com.  It did not mention Pregame Action or Sharpbettor.ag or any of the other services run by Bell, services through which Pregame customers are funneled when they want to deposit money at sportsbooks."

19.     The Story also contains false and defamatory statements by presenting incorrect records of the won/loss results of multiple Pregame Pros, which understate said won/loss results, and are presented in the form of sensational graphs that are falsely presented as accurate.

20.     The Story also contains false and defamatory statements by presenting incorrect estimates of pick expenses, which overstate said expenses, and are presented in the form of sensational graphs that are falsely presented as accurate.

21.     The foregoing statements of fact in the Story are false.  The facts are: Plaintiffs have had no financial dealings with any online sportsbook since 2008.  Plaintiffs receive no advertising revenue from any sportsbook and no revenue based upon a percentage of bettors' losses.  Moreover, in an abundance of caution and to avoid even the perception of having any misaligned interests with its customers, Plaintiffs have not received any revenue to promote any website that promotes sportsbooks in the last five years.  Plaintiffs do not have, nor have they ever had, any ownership or operational control of PregameAction.com, SharpBettor.ag or any other online sportsbook-related services.  Additionally, the incorrect profit and expense records, including their related graphs, are the result of clear errors in calculation and a gross

6

exaggeration of Pregame's expenses in nearly all cases by over 100% (double), and sometimes

by as much as 2000%.

22.    The foregoing false statements of fact were included in the Story and published

on Deadspin.com with knowledge that they were false and were likely to harm Plaintiffs'

personal and professional reputations, and with reckless disregard for the truth of the statements.

23.    The allegations in this Complaint, including the allegations below, demonstrate

actual malice.  Moreover, discovery has not yet commenced and Plaintiffs expect to obtain

through discovery additional evidence that would support actual malice.

24.    On June 14, 2016, before the Story was published, Mr. Goldberg contacted Mr.

Bell for an interview.  The tenor of the questions Mr. Goldberg posed to Mr. Bell exhibited a

clear negative agenda by Mr. Goldberg and were premised on numerous false assumptions and

inaccuracies.  In a June 14, 2016 email sent to Mr. Goldberg, Mr. Bell provided Mr. Goldberg

with an official "on the record" statement, which attempted to correct many of the inaccuracies

in a manner concise enough to ensure a likelihood it would be published in whole.  With regard

to all the other inaccuracies, Mr. Bell wrote: "[I'm] willing to offer you some guidance on

background.  This most certainly would assist you in avoiding multiple factual errors stated and

implied by your questions posed to me."  Despite being advised of having made "multiple factual

errors", Mr. Goldberg refused to allow Mr. Bell to speak "on background", indicating that Mr.

Goldberg had no desire to even hear information that contradicted his established narrative and

simply wanted to write a "hit piece" about Plaintiffs.  Mr. Goldberg has stated publicly that he

spent over one calendar year researching and writing the Story before first contacting Mr. Bell,

and his actions reflect a seemingly non-existent interest in contradictory information that could

make his finished story less sensational, even if new information corrected factual errors therein.

7

FILED: NEW YORK COUNTY CLERK 06/22/2017 05:38 PM
INDEX NO. 155710/2017
NYSCEF DOC. NO. 1
16-11700-smb    Doc 985-4    Filed 08/21/17    Entered 08/21/17 17:03:04    Exhibit D
RECEIVED NYSCEF: 06/22/2017
Complaint    Pg 11 of 21

25.     In response to Mr. Goldberg's refusal to allow Mr. Bell to speak "on background", Mr. Bell informed Mr. Goldberg that it was the consensus of Plaintiffs' journalistic contacts that Mr. Goldberg had "made a clear mistake".  While Mr. Bell did not want to participate in the Story so as to avoid giving the impression that he validated it, he also could not stand idly by and ignore the serious mistakes Mr. Goldberg had made about Plaintiffs.  Accordingly, Mr. Bell offered to have a Pregame executive make a written statement "on the record" to address the particularly egregious false claim that Plaintiffs owned or possessed operational control over PregameAction.com in order to "prevent [Mr. Goldberg] from making significant errors."  Mr. Goldberg accepted this offer and the executive's statement, which explained in detail how Plaintiffs did not own or operate PregameAction.com, was provided to Mr. Goldberg one week before the Story was published.  Mr. Goldberg however, failed to include this statement in the Story (nor did he reference the "on the record" denials contained therein), which falsely claimed that Plaintiffs owned and/or operated PregameAction.com and other sportsbook websites when it was published on June 23, 2016.

26.     On the day the Story was published, Mr. Bell wrote to Mr. Goldberg and advised him that the Story falsely stated that Plaintiffs owned and operated PregameAction.com and other sportsbook websites, and reiterated that Plaintiffs did not own or operate these websites.  Mr. Bell further stated "This now a legal matter.  This false statement is causing my company and myself damage.  Be aware that every minute this false statement is posted adds to the damage."  Only after being threatened with litigation was the Story updated on the same date to include Mr. Bell's denial of owning or operating PregameAction.com.  Moreover, the tone of the editorial comments included with the update was dismissive in a clear attempt to attack the veracity of the belatedly published denial.

8

27.     In an effort to cover up the fact that false information had been posted about
Plaintiffs and to mitigate potential exposure, the update claimed that Mr. Bell had refused to
respond to questions about Plaintiffs' purported involvement with PregameAction.com and other
sportsbook websites before the Story was published.  This statement is false as Plaintiffs
provided Mr. Goldberg with the written statement directly from the Pregame executive, which
explained in detail how Plaintiffs did not own or operate PregameAction.com, one full week
before the Story was published.  Mr. Goldberg explicitly confirmed receipt of this
communication.  This perpetuation of a false timeline further served to minimize Mr. Bell's
belatedly published denial by making it appear as though Plaintiffs did not deny that they owned
and/operated PregameAction.com until after the Story was published, when, in fact, Plaintiffs
provided Mr. Goldberg with a detailed denial (the Pregame executive's statement) before the
Story was published and Mr. Goldberg simply chose not to include it - nor reference its existence
- in the Story.

28.     On June 27, 2016, Plaintiffs' counsel sent a letter to Gawker Media, LLC,
demanding that it remove each of the false statements in the Story and publish a correction,
apology and retraction of those statements, and allowed Gawker Media, LLC a reasonable
amount of time to comply.  Gawker Media, LLC did not comply with Plaintiffs' demand.

29.     Then, on June 29, 2016, Mr. Bell published an article on Pregame.com, which
refuted, in detail, the false and defamatory statements in the Story, including, but not limited to a
lengthy discussion on the Story's false statement that Plaintiff owned and/or operated
PregameAction and other sportsbook websites.  Mr. Bell's article further advised that the
aforementioned false statement would subject Deadspin.com to substantial legal liability.  Upon
information and belief, Mr. Goldberg read this statement at or around the time it was published.

9

30.     On July 1, 2016, more than one week after the article was published and by which

time Plaintiffs' reputation was already damaged substantially, the Story was modified again to

surreptitiously alter the defamatory statement in Paragraph 18 herein, and buried in the middle of

the Story, so that the Story no longer stated that Plaintiffs "r[a]n" PregameAction.com,

Sharpbettor.ag or other online sportsbook services.  The editorial comment associated with this

alteration stated: "This story has been updated to reflect Bell's statement, offered, **after**

**publication**, that he does not 'run' any of the sportsbook referral sites which Pregame sends its

customers." (emphasis added)  In an attempt to conceal any wrongdoing, this update again

falsely implied that Plaintiffs did not deny that they owned and/or operated PregameAction.com

and/or other sportsbook websites until after publication of the Story, when, in fact, Plaintiffs

provided Mr. Goldberg with a detailed denial (the Pregame executive's statement) a week before

publication.  Moreover, the removal of the statement that Plaintiffs owned and/or operated

PregameAction.com, Sharpbettor.ag or other online sportsbook services constitutes a clear

admission that the statement was false and published without any proof or factual basis.

31.     The aforementioned "update" was buried deep in the body of the Story in an

attempt to conceal the admission that the initial statement was false and published without any

proof or factual basis.  In the process, Deadspin.com and Mr. Goldberg lied about the fact that he

was informed of the truth by Plaintiffs prior to publication.

32.     On July 5, 2016, rather than issuing an apology and retraction, as it should have,

Gawker posted a story which taunted Plaintiffs and their attorneys for appropriately demanding a

retraction of the Story, while at the same time intentionally omitting that the aforementioned

"update" purported to correct a major false and defamatory statement and that Mr. Goldberg

knew was false prior to publication.  This omission was made for the purpose of minimizing

Deadspin.com's liability for publishing false and defamatory statements about Plaintiffs and to

perpetuate the illusion that Deadspin.com was a reputable news source and that the Story was

well-researched and was truthful (which it was not). Defendants' knowledge of the falsity of the

defamatory statements and/or reckless disregard of the truth is further evidenced by the fact that

the false statement that Plaintiffs operate PregameAction.com is contradicted in a different part

of the Story that states: "Pregame Action's website was operated by Big Juice Media, a

marketing company registered in Port Coquitlam, British Columbia."

33.     The conduct exhibited in connection with the Story is consistent with

Deadspin.com's usual practices and procedures. Deadspin.com routinely engages in wrongful

conduct, and specifically, writes and publishes false and defamatory statements about people,

invades people's privacy and other rights, and publishes content that is irresponsible and that no

other legitimate publication will publish.

34.     Deadspin.com's philosophy and practice is to publish false scandal, for the

purpose of profit, knowing that false scandal drives readership, which in turn drives revenue, and

without regard to the innocent subjects of their stories whose careers are destroyed in the

process.

35.     For example, in 2010, Deadspin.com published a video of a clearly intoxicated

young woman engaged in sexual activity on the men's bathroom floor of an Indiana sports bar

(the footage was taken by another patron with his mobile phone). According to published

reports, Deadspin.com callously refused to remove the footage from its site for some time,

despite repeated pleas from the woman and despite the fact that it was not clear if the sex was

consensual or if the video was footage of a rape in progress.

11

36.    Deadspin.com paid a source for a photograph of what the source claimed was NFL quarterback Brett Favre's penis. Deadspin.com published the uncensored photo and reported that it showed Mr. Favre's penis.

37.    Deadspin.com also published a series of articles providing photographs of the genitals of various sports stars. Ranging from NFL players to professional wrestlers, Deadspin.com published images which were either accidentally posted to social media or leaked by an unknown person and published them without censorship or pixilation. In doing so, Deadspin.com may well have contributed to numerous acts of revenge porn, without regard to the consequences to the victims of exposing their images to millions of Deadspin.com viewers.

38.    Deadspin.com published a link to a surreptitiously and criminally recorded peephole video of sports personality Erin Andrews fully naked while changing clothes in her private hotel room, and Deadspin.com encouraged readers to click and view the video. It has been reported that more than a million viewers viewed the video at Deadspin.com.

39.    Plaintiffs' counsel sent a letter to GMG promptly after GMG was reported to be taking control of Deadspin.com, demanding that it remove each of the false statements in the Story and publish a correction, apology and retraction of those statements. Plaintiffs allowed GMG a reasonable amount of time to comply. However, GMG failed to comply with Plaintiffs' demand.

40.    The defamatory statements were greatly harmful to Plaintiffs. Plaintiffs lost ongoing and future business relationships as a result of the statements. In addition, Plaintiffs' reputation with its current and future customers grievously suffered, because Defendants published one of most harmful and incendiary allegations that can be ever made about anyone in the business of providing advice to gamblers—that rather than providing advice that Plaintiffs

12

FILED: NEW YORK COUNTY CLERK 06/22/2017 05:38 PM
NYSCEF DOC. NO. 1

INDEX NO. 155710/2017

RECEIVED NYSCEF: 06/22/2017

16-11700-smb    Doc 985-4    Filed 08/21/17    Entered 08/21/17 17:03:04    Exhibit D
Complaint    Pg 16 of 21

believed in and would risk their own money on, Plaintiffs stood to gain from giving bad advice
and seeing their customers lose their wagers.

41.     Plaintiffs request herein all available legal and equitable remedies to the
maximum extent permissible by law, including without limitation compensatory damages in an
amount not less than ten million dollars ($10,000,000), punitive damages, and a permanent
injunction against the defamatory statements at issue.

## FIRST CAUSE OF ACTION

### (Defamation)

42.     Plaintiffs repeat and reallege Paragraphs 1 through 41 of this Complaint as though
fully set forth therein.

43.     Defendants published, caused to be published and/or maintain the defamatory
statements in the Story on Deadspin.com as described in Paragraphs 17 through 20 herein.

44.     The defamatory statements in the Story were of and concerning Plaintiffs.

45.     The defamatory statements in the Story were false.

46.     Defendants published and/or maintain the defamatory statements in the Story on
Deadspin.com either knowing they were false or with reckless disregard for the truth.

47.     The defamatory statements in the Story also constitute defamation *per se* because
they harm Plaintiffs' reputation and business and impugn the basic integrity, creditworthiness
and/or competence of Plaintiffs, and accuse Plaintiff of activity that is potentially criminal.

48.     The defamatory statements made and/or maintained by Defendants were false,
and no applicable privilege or authorization protecting the statements can attach to them.

49.     The defamatory statements in the Story have caused Pregame (a two-time Inc.
5000 company) and Mr. Bell (deemed by Deadspin.com in the Story as "America's Favorite

13

Sports Betting Expert") damages, including to their reputation and their business interests, and in

amount of not less than ten million dollars ($10,000,000).

50.    Defendants' acts were willful and egregious conduct constituting malice.

Defendants' acts were willful and malicious.  As such, in addition to compensatory damages

and/or presumed damages, Plaintiffs demands punitive damages relating to Defendants' making

and/or maintaining of the above-referenced defamatory statements, in an amount to be

determined at trial.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

51.    Plaintiffs repeat and reallege Paragraphs 1 through 50 of this Complaint as though

fully set forth therein.

52.    Plaintiffs have, and had, valid business relationships with various third parties.

These third parties include but are not limited to: (a) Plaintiffs' customers; (b) Plaintiffs'

expected customers; (c) media outlets, producers and/or studios for television and radio shows

and projects on which Plaintiffs have an ongoing and/or recurring role as writer, correspondent

or advisor (including but not limited to NBC, CNN, ABC, CNBC, Fox, CBS, ESPN, NPR, the

Associated Press, The Wall Street Journal, The New York Times, Los Angeles Times,

Newsweek, Bloomberg, Maxim and Sports Illustrated); (d) third parties with whom Plaintiffs

have valid expected business relationships, based on their expertise and qualifications as

oddsmakers (including but not limited to current and expected customers, NBC, CNN, ABC,

CNBC, Fox, CBS, ESPN, NPR, the Associated Press, The Wall Street Journal, The New York

Times, Los Angeles Times, Newsweek, Bloomberg, Maxim and Sports Illustrated); (e) third

party content providers with whom Plaintiffs have any valid existing and/or expected business

14

relationships (including but not limited to current and expected Pregame sports handicappers); and (f) third parties with whom Plaintiffs have any valid existing and/or expected business relationships for sponsorships, endorsements, investments and/or advertising. These business relationships were reasonably likely and probable to result in Plaintiffs' economic advantage.

53.     Defendants had knowledge of these valid business relationships and expectancies.

54.     Defendants intentionally interfered with these valid business relationships and expectancies, inducing and/or causing the termination of valid relationships and expectancies, including but not limited to, Mr. Bell's role in a show on NBC National Radio which is simulcast on the NBC Sports Network, in which Mr. Bell appeared regularly for several years, by making and/or maintaining false, fabricated, fictitious and outright libelous statements about Plaintiffs in the Story.

55.     Defendants' conduct has intentionally interfered with these valid business relationships and expectancies, inducing and/or causing the termination of the valid relationships and expectancies by making and/or maintaining false, fabricated, fictitious and outright libelous statements about Plaintiffs and their business practices.

56.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than ten million dollars ($10,000,000).

57.     Defendants' actions were willful and constitute egregious conduct constituting malice or other dishonest, unfair or improper means. Plaintiffs demand punitive damages relating to Defendants' conduct in an amount to be determined at trial.

15

### <u>THIRD CAUSE OF ACTION</u>

### (Tortious Interference with Contractual Relations)

58.      Plaintiffs repeat and reallege Paragraphs 1 through 57 of this Complaint as though fully set forth therein.

59.      Plaintiffs have, and had, actual and valid business relationships with various third parties, including but not limited to Mr. Bell's role in a show on NBC National Radio which is simulcast on the NBC Sports Network, in which Mr. Bell appeared regularly for several years. This business relationship and Plaintiffs' other business relationships existed at the time Defendants published and/or maintained the false and defamatory statements contained in the Story.

60.      Defendants had knowledge of these actual and valid business relationships and expectancies.

61.      Defendants intentionally interfered with these actual and valid business relationships and expectancies, inducing and/or causing the termination of actual and valid relationships and expectancies, by making and/or maintaining false, fabricated, fictitious and outright libelous statements about Plaintiffs in the Story.

62.      Defendants' conduct has intentionally interfered with these actual and valid business relationships and expectancies, inducing and/or causing the termination of the actual and valid relationships and expectancies, including Mr. Bell's role in a show on NBC National Radio, by making false, fabricated, fictitious and outright libelous statements about Plaintiffs and their business practices.

16

63.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial, but no less than ten million dollars ($10,000,000).

64.     Defendants' actions were willful and constitute egregious conduct constituting malice or other dishonest, unfair or improper means.  Plaintiffs demand punitive damages relating to Defendants' conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

i.      Awarding compensatory and punitive damages in appropriate amounts to be determined at trial;

ii.     Awarding Plaintiffs the recovery of their costs associated with this action, including but not limited to their reasonable attorneys' fees and expenses;

iii.    An order enjoining Defendants from publishing, continuing to publish, or republishing the defamatory statements alleged herein in any medium; and

iv.     For such other and further relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial.

17

FILED: NEW YORK COUNTY CLERK 06/22/2017 05:38 PM
NYSCEF DOC. NO. 1

INDEX NO. 155710/2017

RECEIVED NYSCEF: 06/22/2017

16-11700-smb    Doc 985-4    Filed 08/21/17    Entered 08/21/17 17:03:04    Exhibit D
Complaint    Pg 21 of 21

Dated: New York, New York
       June 22, 2017

**HARDER MIRELL & ABRAMS LLP**

By:     s/ Charles J. Harder           
          Charles J. Harder

132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
(424) 203-1600
charder@hmafirm.com

**TARTER KRINSKY & DROGIN LLP**

Mark J. Rosenberg
Joel H. Rosner
1350 Broadway
New York, New York 10018
(212) 216-8000
mrosenberg@tarterkrinsky.com
jrosner@tarterkrinsky.com

*Attorneys for Plaintiffs*

18