Jonathan L. Flaxer

**Hearing Date: September 28, 2017 at 10:00 a.m. (EST)**

Michael S. Weinstein

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

711 Third Avenue

New York, New York 10017

(212) 907-7300

*Counsel to Pregame LLC and Randall James Busak*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

|  |  |  |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| Gawker Media LLC, *et al.*, | : | |
| | : | Case No. 16-11700 (SMB) |
| | : | (Jointly Administered) |
| Debtors. | : | |

-----------------------------------------------------------------X

## OBJECTION OF PREGAME LLC AND RANDALL JAMES BUSAK TO MOTIONS OF (1) GIZMODO MEDIA GROUP, LLC [DKT. NO. 985] AND (2) RYAN GOLDBERG [DKT. NO. 981], SEEKING TO ENFORCE ORDERS OF THIS COURT AND BAR PROSECUTION OF A STATE COURT ACTION AND IN RESPONSE TO THE JOINDER OF THE PLAN ADMINISTRATOR [DKT. NO. 997] TO SUCH MOTIONS

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. iii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 3

A.    The Chapter 11 Filings ................................................................................. 3

B.    The Article ...................................................................................................... 4

C.    The Bar Date .................................................................................................. 5

D.    The Plan .......................................................................................................... 6

E.    The Litigation ............................................................................................... 11

OBJECTION TO GIZMODO MOTION

A.    The Claims Asserted in the Complaint Are Explicitly Excluded From
      the Sale Order ............................................................................................... 12

B.    The Court Has No Jurisdiction Over the Claims Asserted in the State
      Court Action ................................................................................................. 12

      (1)    This Court Lacks Power to Resolve Gizmodo's Defenses
             to the State Court Action ................................................................. 12

      (2)    The Court Lacks "Arising Under" Jurisdiction ............................ 13

      (3)    The Court Lacks "Arising In" Jurisdiction ................................... 14

      (4)    The Court Lacks "Related to" Jurisdiction ................................... 15

C.    In the Alternative, the Court Must Abstain From Deciding Legal Issues in the
      State Court Action Pursuant to 28 U.S.C. § 1334(c)(2) ............................ 17

      (1)    Plaintiff's Request to Abstain is Timely (Factor 1) ...................... 17

      (2)    Plaintiffs Commenced the State Court Action (Factor 5) to Assert
             State Law Claims (Factor 2) ........................................................... 18

i

(3)    The Sole Basis for Jurisdiction is 28 U.S.C. § 1334 (Factor 4), But the
Court Lacks 'Arising Under' Jurisdiction (Factor 3)............................................18

(4)    The State Court Action Can be Timely Adjudicated in State Court
(Factor 6)........................................................................................................19

D.    In the Alternative, the Court Should Abstain Under 28 U.S.C. § 1334(c)(1)....................19

(1)    Resolving the Non-Core Dispute (Factor 7) Has No Impact on the
Administration of the Estate (Factor 1) ................................................................21

(2)    Plaintiffs Commenced a Proceeding in State Court (Factor 4) to Pursue
State law Causes of Action (Factor 2) that are Unsettled (Factor 3) Against
a Nondebtor (Factor 12) in a Jury Trial (Factor 11) ............................................22

(3)    The Jurisdictional Basis in Solely 28 U.S.C. § 1334 (Factor 5) and the
Claims Asserted are Not Related to the Bankruptcy Case (Factor 6)...................23

(4)    The State Law Claims Are Severable From Interpretation of the Sale Order
(Factor 7)........................................................................................................24

E.    If the Court Determines it Will Hear the Gizmodo Motion, Such Motion Should
Be Denied.............................................................................................................24

(1)    The Single Publication Rule Does Not Protect Gizmodo Since Gizmodo
is Not the Initial Publisher of the Story ................................................................25

(2)    Gizmodo Republished the Defamatory Material in the Story ..............................26

(3)    Gizmodo Republished the Defamatory Material to a New Audience ..................30

OBJECTION TO GOLDBERG MOTION....................................................................32

A.    Under the Unambiguous Language of the Third Party Release in the Plan,
Plaintiffs Claims are Not Barred............................................................................32

B.    The Plan Injunction is Likewise Not Applicable to Debtors ............................................33

C.    If the Court Determines That Plaintiffs Are Deemed to Have Received a
Distribution, the Court Should Voluntarily Abstain From Determining Whether
Goldberg Engaged in Willful Misconduct..........................................................34

D.    Goldberg's Other Arguments Also Fail...................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. Bank of America, N.A.*,
  390 B.R. 80 (S.D.N.Y. 2008) ................................................................. 36

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
  No. 11 Civ. 2232(NRB), 2011 WL 4965150 (S.D.N.Y. Oct.19, 2011) ................................. 15

*In re Ames Dep't Stores, Inc.*,
  Case No. 01-42217, 2006 WL 1288586 (Bankr. S.D.N.Y. Apr. 19, 2006) ............................ 19

*In re AOG Entm't, Inc.*,
  569 B.R. 563 (Bankr. S.D.N.Y. 2017) .......................................................... 17, 19

*Baker v. Simpson*,
  613 F.3d 346 (2d Cir. 2010) (per curiam) ...................................................... 14

*Castorina v. A.C. & S.*,
  49 N.Y.S.3d 238 (Sup. Ct. N.Y. Cty. 2017) .................................................... 22

*In re Casual Male Corp.*,
  317 B.R. 472 (Bankr. S.D.N.Y. 2004) .......................................................... 23

*Cubby, Inc. v. CompuServe, Inc.*,
  776 F. Supp. 135 (S.D.N.Y. 1991) ............................................................. 26

*In re Dana Corp., Inc.*,
  No. 06-10354, 2011 WL 6259640 (Bankr. S.D.N.Y. Dec. 15, 2011) ................................. 23

*In re Dreier*,
  438 B.R. 449 (Bankr. S.D.N.Y. 2010) .......................................................... 20

*Etheredge-Brown v. Am. Media, Inc.*,
  13 F. Supp. 3d 303 (S.D.N.Y. 2014) ........................................................... 30

*Executive Benefits Ins. Agency v. Arkison*,
  134 S. Ct. 2165 (2014) ....................................................................... 22

*In re Fairfield Sentry Ltd. Litigation*,
  458 B.R. 665 (S.D.N.Y. 2011) ................................................................. 13

*Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*,
  496 B.R. 706 (S.D.N.Y. 2013) ................................................................. 18

iii

*Gawker Media, LLC v. Bollea*,
    129 So. 3d 1196 (Fla. 2d DCA 2014) ...................................................................28

*In re General Media, Inc.*,
    335 B.R. 66 (Bankr. S.D.N.Y. 2005) ...............................................................16, 17

*Gregoire v. Putnam's Sons*,
    298 N.Y. 119 (1948) .....................................................................................24, 25

*Haefner v. New York Media, LLC*,
    No. 150189/08, 2009 WL 6346547 (Sup. Ct. N.Y. Cty., Oct. 22, 2009), *aff'd
    sub nom* 82 A.D.3d 481 (1st Dep't 2011) ...............................................................31

*K. Bell & Assocs., Inc. v. Lloyd's Underwriters*,
    97 F.3d 632 (2d Cir. 1996)....................................................................................36

*Karaduman v. Newsday, Inc.*,
    51 N.Y.2d 531 (1980) ...........................................................................................27

*In re Kassover*,
    336 B.R. 74 (Bankr. S.D.N.Y. 2006) .....................................................................16

*In re Leco Enters., Inc.*,
    144 B.R. 244 (S.D.N.Y. 1992)...............................................................................19

*McMillan v. Barclays Bank PLC*,
    No. 13-cv-01095, 2014 WL 4364053 (S.D.N.Y. Sept. 3, 2014) ............................14

*In Matter of Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016)............................................................................12, 14

*In re N.Y.C. Off-Track Betting Corp.*,
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) ...................................................................20

*In re New 118th LLC*,
    396 B.R. 885 (Bankr. S.D.N.Y. 2008) ...................................................................18

*In re New York Skyline, Inc.*,
    471 B.R. 69 (Bankr. S.D.N.Y. 2012) .....................................................................15

*In re New York Skyline, Inc.*,
    512 B.R. 159 (S.D.N.Y. 2014)...............................................................................21

*In re New York Skyline, Inc.*,
    Case No. 09-10181(SMB), 2015 WL 5071948 (Bankr. S.D.N.Y. Aug. 26,
    2015) ....................................................................................................................16

*Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*,
102 S.Ct. 2858 (1982) ............................................................................................13

*In re NTL, Inc.*,
295 B.R. 706 (Bankr. S.D.N.Y. 2003) ...................................................................21

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir. 1993) ...............................................................................13, 22

*Ortegon v. Giddens*,
638 Fed. Appx. 47 (2d Cir. 2016) ..........................................................................36

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
639 F.3d 572 (2d Cir. 2011) ...................................................................................15

*In re Philadelphia Newspapers, LLC*,
450 B.R. 99 (Bankr. E.D. Pa. 2011) ...................................................................26, 32

*In re Portrait Corp. of Am., Inc.*,
406 B.R. 637 (Bankr. S.D.N.Y. 2009) ...................................................................21

*Rinaldi v. Holt, Rinehart & Winston*,
42 N.Y.2d 369, *cert. denied*, 434 U.S. 969 (1977) ...............................................27

*Rinaldi v. Viking Penguin*,
52 N.Y.2d 422 (1981) .............................................................................................26

*Shively v. Bozanich*,
31 Cal. 4th 1230, 80 P.3d 676 (2003) ....................................................................25

*Stern v. Marshall*,
131 S.Ct. 2594 (2011) .......................................................................................13, 22

*Van Buskirk v. The N.Y. Times Co.*,
325 F. 3d 87 (2d Cir. 2003) ....................................................................................25

*Wellness Intern. Network, Ltd. v. Sharif*,
135 S.Ct. 1932 (2015) .............................................................................................22

*Winstar Holdings, LLC v. Blackstone Group L.P.*,
No. 07-cv-4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) .............................14

*Yiamouyiannis v. Consumers Union of U.S., Inc.*,
619 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 839 (1980) ...................................27

**Statutes**

28 U.S.C. 157(c)(2) ...........................................................................................22

28 U.S.C. § 1334.................................................................................................................. *passim*

Pregame LLC d/b/a Pregame.com ("**Pregame**") and Randall James Busack, professionally known as RJ Bell ("**Bell**," and together with Pregame, "**Plaintiffs**"), by and through their undersigned counsel, Golenbock Eiseman Assor Bell & Peskoe LLP, hereby files this objection (the "**Objection**") to (1) the Motion of Gizmodo Media Group, LLC to Enforce the Sale Order and to Bar Certain Plaintiffs from Prosecuting their State Court Action [Dkt. No. 985] (the "**Gizmodo Motion**"), and (2) the Motion of Ryan Goldberg (I) to Enforce Order Confirming Amended Joint Chapter 11 Plan of Liquidation and (II) To Bar and Enjoin Creditors from Prosecuting Their State Court Action [Dkt. No. 981] (the "**Goldberg Motion**," and collectively with the Gizmodo Motion, the "**Motions**"), and, in doing so, responds to the Joinder and Reservation of Rights by the Plan Administrator to the Motions [Dkt. 997].   In support of the Objection, Plaintiffs respectfully state as follows:

## PRELIMINARY STATEMENT

1.      By engaging in this meritless motion practice, Gizmodo makes clear that it believes it should be allowed to follow Gawker's "yellow journalism" practices of publishing libelous, invasive, indecent articles without being held to the same legal restrictions that ultimately lead to Gawker's demise.  Its purchase of Gawker's assets during Gawker's bankruptcy may immunize Gizmodo from claims that might have been brought against Gawker, but its purchase does not excuse Gizmodo from liability based on its own, post-sale use of the purchased assets.  Plaintiffs' lawsuit does not attempt to hold Gizmodo responsible for Gawker's prior actions.  Nor does it attempt to hold Gawker responsible.  The lawsuit instead focuses solely on Gizmodo's publication decisions post-sale.

2.      After it became known that Gizmodo's parent company planned on purchasing the Gawker assets, including Deadspin.com, Plaintiffs' counsel notified Gizmodo that the Story (as defined below) on Deadspin.com about Plaintiffs was libelous and asked that Gizmodo

1

immediately remove the defamatory statements in the article once it gained control of the website.  Gizmodo refused.  Rather, after the sale, Gizmodo published the Story on the Gizmodo-owned Deadspin.com, where the Story continues to be available to the world.  Left with no other options to remove the false and defamatory article, Plaintiffs filed the State Court Action (as defined below) against Gizmodo and its Story's author.

3.     In what is nothing more than a ploy to establish precedent that a company can skirt liability for the continued improper use of distressed assets, Gizmodo seeks to delay the State Court Action and instead put Plaintiffs' claims in front of this Court through this frivolous motion.  It is frivolous because it is based on a purposeful misdirection: it purports to invoke this Court's jurisdiction by falsely contending that Gizmodo needs this Court to "interpret" the Sale Order to determine whether Gizmodo can be liable for Gawker's prior publication.  Not only does this contradict the plain language of Plaintiffs' complaint, which seeks to hold Gizmodo liable for only its publication of the Story after it took over Deadspin.com, but the argument is unsupported by Gizmodo's own motion which fails to identify any provision of the Sale Order that requires this Court's "interpretation."   Plaintiffs do not challenge or seek any "interpretation" of the protections granted to Gizmodo under the Plan, nor do they challenge or seek an "interpretation" of any provision of the Sale Order either.  No one is claiming that any provision of the Sale Order is either ambiguous or requires "interpretation."  This is because the State Court Action solely seeks remedies for *post-sale* conduct – which is not covered by the Sale Order.

4.     What Gizmodo really seeks is to convince this Court to substitute itself for the state court in ruling on the merits of the State Court Action; *i.e.*, to decide the state law questions of (i) the application of the "single publication" rule and (ii) whether the Plaintiffs may maintain

2

separate tort claims for intentional interference with prospective economic advantage and

tortious interference with contractual relations.  As demonstrated below, this Court has no

jurisdiction with respect to these state law disputes, which are between two *non-debtors* and have

no conceivable effect on the bankruptcy estate.  Absent jurisdiction, this Court must abstain from

these disputes.  Without a reason to strip this case from the state court, where it is properly

situated, this Court should decline Gizmodo's invitation to assist in continued attempts to draw

additional viewers and to reap additional profits from Gawker posts which violated the

defamation law and basic standards of journalism when posted, and still do today.

5.    Turning to the Goldberg Motion, it should be denied because it relies on a

misreading of the co-extensive release and injunction provisions of the Plan, a reading that

unjustly benefits the writers to the detriment of potential claimants.  These provisions, which

limit the rights of certain parties, are meant to apply to parties who received or should be deemed

to have received a distribution from the Gawker estate.  Neither Plaintiff filed a claim nor

received a distribution from the estate.  Moreover, the Bar Date Order unambiguously excludes

Plaintiffs from being classified as a party deemed to have received a distribution.  To the

contrary, under the Bar Date Order, parties who do not file a claim are not treated as creditors for

purposes of voting and *distribution*.  Based on this clear language, Plaintiffs have been excluded

from parties deemed to have received a distribution, and the Plan's release and injunction

provisions do not apply to Plaintiffs.  Thus, the Goldberg Motion may summarily be denied.

## BACKGROUND

### A.    The Chapter 11 Filings

6.    On June 10, 2016 (the "**Petition Date**"), Gawker Media LLC ("**Gawker**") filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended,

the "**Bankruptcy Code**").  On June 12, 2016, the other above-captioned debtors (together with

3

Gawker, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

7.      Gawker and its associated websites, including Deadspin.com, routinely engaged in the practice of publishing false and defamatory articles about people or that invaded people's privacy rights.  In particular, under Gawker, Deadspin.com's philosophy and practice was to publish false scandal – knowing that false scandal drives readership, which in turn drives revenue – without regard to the innocent subjects of their stories whose reputations, careers, and businesses were destroyed in the process.  For example, Deadspin.com has published and encouraged readers to view:  (i) videos of clearly intoxicated unknown individuals engaged in sexual activity, (ii) photographs of the genitalia of famous athletes and sports stars, and (iii) a link to a criminally recorded peephole video of a sports personality changing her clothes in her hotel room (the person who created the video was convicted and incarcerated for it).

**B.      The Article**

8.      Ryan Goldberg ("**Goldberg**") wrote an article entitled "How America's Favorite Sports Betting Expert Turned a Sucker's Game Into an Industry" (the "**Story**"), which, on June 23, 2016, was posted on Deadspin.com – while the website was still owned and operated by Gawker.  The Story concerned Bell and Pregame.  Bell is the founder and Chief Executive Officer of Pregame.com, the largest sports betting media company compliant with U.S. law and a two-time Inc. magazine 5000 company.

9.      Consistent with Deadspin.com's usual practices and procedures, the Story contains numerous false, fabricated, fictitious, and outright libelous statements about Plaintiffs and their business practices.  Shortly after the Story was published, Plaintiffs' attorney contacted Gawker advising it of the specific false and defamatory statements contained in the Story, and demanded a retraction and an apology.

4

10.     On July 5, 2016, rather than issuing an apology and retraction, Gawker posted a story that taunted Plaintiffs and their attorneys for demanding retraction of the Story, while omitting that the Story had been "updated" to correct one, but not the many other, false and defamatory statements identified by Plaintiffs that Goldberg knew was false prior to publication.

11.     On June 13, 2016, the Debtors filed a motion to sell its assets to Gizmodo [Dkt. No. 21] (the "**Sale Motion**").  Due to the pending sale, on August 22, 2016, Plaintiffs' attorney sent a letter to Gizmodo listing the defamatory statements about Plaintiffs in the Story, and demanding that those defamatory statements be removed from the Story before Gizmodo published the Story as the new owner of Deadspin.com.  On August 28, 2016, the Court entered an order approving the Sale Motion [Dkt. No.  214] (the "**Sale Order**").  The Debtors' sale of substantially all of its assets to Gizmodo closed on or about September 9, 2016 (the "**Sale Closing Date**").  *See* Notice of Sale Closing [Dkt. No. 258].

12.     As of the Sale Closing Date, Gawker had not retracted the Story and was no longer capable of doing so.

**C.     The Bar Date**

13.     On or about July 20, 2016, Gawker filed its Schedule of Assets and Liabilities [Dkt. No. 116], which listed Busack as a general unsecured creditor with a disputed claim.

14.     By Order, dated August 11, 2016 [Dkt. No. 168] (the "**Bar Date Order**"), the Court established September 29, 2016 as the date by which all claims (other than claims by governmental units) and requests for payment of administrative expenses must be filed.

15.     Section 13 of such Order provides further that:  "(a) all holders of claims that fail to comply with this Order by timely filing a Proof of Claim in appropriate form shall not be treated as a creditor with respect to such claim for voting and distribution, and (b) all holders of a General Administrative Claims that fail to comply with this Order by timely filing a Request for

Payment in appropriate form shall be forever barred, estopped and enjoined from asserting such General Administrative Claim against the Debtors or their respective property… ." *Id.*

16.    Neither of the Plaintiffs filed any claims in the Debtors' bankruptcy cases.

**D.    *The Plan***

17.    On December 22, 2016, the Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* [Dkt. No. 638] (the "**Confirmation Order**") with respect to the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* dated December 11, 2016, that was annexed to the Confirmation Order as Exhibit 1 (as amended or supplemented, the "**Plan**").

18.    On March 17, 2017, the Plan became effective.  *See* Dkt. No. 825.

19.    Section 9.05 of the Plan provides for the following release:

**THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS. ON THE EFFECTIVE DATE AND EFFECTIVE SIMULTANEOUSLY WITH THE EFFECTIVENESS OF THIS PLAN, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN SHALL BE DEEMED TO HAVE FOREVER RELEASED UNCONDITIONALLY EACH OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE OR MAY BE BASED IN WHOLE OR IN PART UPON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR EXISTING ON OR PRIOR TO THE SALE CLOSING DATE ARISING OUT OF OR RELATING TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS THAT ARE NOT THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A**

6

**FINAL ORDER, THAT ARE NOT PRESERVED BY ANY SETTLEMENTS BETWEEN A HOLDER OF A CLAIM AND ANY OF THE DEBTORS, AND FOR WHICH THE DEBTORS HAVE DEBTOR INDEMNIFICATION OBLIGATIONS, <u>PROVIDED, HOWEVER,</u> THAT THE FOREGOING THIRD-PARTY RELEASES WILL APPLY ONLY TO RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS WHO VOTE IN FAVOR OF THE PLAN, AND ONLY TO THE EXTENT THAT EACH SUCH RELEASED EMPLOYEE AND INDEPENDENT CONTRACTOR WAIVES AND RELEASES ANY AND ALL OF ITS CLAIMS AGAINST THE DEBTORS FOR DEBTOR INDEMNIFICATION OBLIGATIONS, EXCEPT FOR ANY AMOUNTS ALREADY DUE AND OWING AS OF THE EFFECTIVE DATE.**

20.    As set forth in the foregoing release, each holder of a "Claim" that "has received or is deemed to have received distribution(s) made under the Plan" shall release all claims for which the Debtors have "Debtor Indemnification Obligations"[1] against "Released Employees and Independent Contractors"[2] who voted in favor of the Plan and waive their claims against the Debtor, except to the extent that the claim is the result of such employee's or independent contractor's gross negligence or willful misconduct.

21.    The Plan also includes an injunction with respect to claims against Released Employees and Independent Contractors.  The Debtors' initial version of the plan proposed the following injunction:

> **INJUNCTION AGAINST INTERFERENCE WITH PLAN. UPON THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL OF THE DEBTORS OR RELEASED EMPLOYEES AND INDEPENDENT**

---

[1] The Plan defines "Debtor Indemnification Obligations" as "indemnification, contribution, reimbursement, advance of defense costs, duty to defend or other such obligations of the Debtors arising out of (i) employment, severance or independent contractor agreements…, (ii) the Debtor's organizational documents or governing corporate documents, and (iii) the Debtors' policies and practices.  Plan, p. 4.

[2] The Plan defines "Releases Employees and Independent Contractors" as "each current and former employee, writer, editor and independent contractor that was employed by, or paid to contribute articles to, the Debtors, including, without limitation, current and former 1099 employees and current and former independent contractors, that filed a Proof of Claim in the Bankruptcy Cases."  Plan, p. 12.

**CONTRACTORS (WHETHER PROOF OF SUCH CLAIMS OR EQUITY INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, PRESENT OR FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER CONTENT PROVIDERS, PRESENT OR FORMER WRITERS, AGENTS, OFFICERS, DIRECTORS OR PRINCIPALS ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING … (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH PROCEEDINGS AGAINST THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS ARISE OUT OF OR RELATE TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS, (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST … (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH PROCEEDINGS AGAINST THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS ARISE OUT OF OR RELATE TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS, (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST … (B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH PROCEEDINGS AGAINST THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS ARISE OUT OF OR RELATE TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS, (IV) ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE…(B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT**

**SUCH PROCEEDINGS AGAINST THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS ARISE OUT OF OR RELATE TO SUCH RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS' WORK PERFORMED OR CONTENT PROVIDED ON BEHALF OF THE DEBTORS, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN; PROVIDED, HOWEVER, THAT (X) THE FOREGOING INJUNCTION SHALL NOT APPLY TO ACTIONS OR OMISSIONS THAT OCCUR AFTER THE SALE CLOSING DATE AND (Y) THE BANKRUPTCY COURT MAY PROVIDE RELIEF FROM THE FOREGOING INJUNCTION WITH RESPECT TO CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES NOT OTHERWISE RELEASED UNDER SECTIONS 9.03 AND 9.05 OF THIS PLAN.**

*See* Dkt. No. 576, Plan at §9.02.

22.    As described by Debtors' counsel at the December 13, 2016, hearing to confirm the Plan (the "**Confirmation Hearing**"), the Debtors' proposed injunction would have enjoined all claims against the Released Employees and Independent Contractors and have the Court "be the gatekeeper with respect to those actions" against Released Employees and Independent Contractors.  Tr. of December 13, 2016 Hearing, at 68:23-24.[3]

23.    At the Confirmation Hearing, the Court rejected the Debtors' proposal that the Court act as the sole arbiter as to whether claims against Released Employees and Independent Contractors are enjoined.  The Court stated:

> If I can make a suggestion that the injunction in favor of the third parties should just say to the extent the claims are released.  It may be that people will come back in the future and seek relief from that injunction or take their chance and just bring a litigation against writers, arguing that you were grossly negligent or you committed a willfully wrong act when you did whatever it is you did.  But, you know, that's something that we'll just have to allow the events play out, there's nothing that could be done about that.

Tr. of Confirmation Hearing at 88:7-17.

---

[3] A copy of the entire transcript for the Confirmation Hearing is annexed to the Goldberg Motion.

24.    In accordance with the Court's comments, the Plan includes the following

injunction with the highlighted modification:

**INJUNCTION AGAINST INTERFERENCE WITH PLAN. UPON
THE ENTRY OF THE CONFIRMATION ORDER, EXCEPT AS
EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION
ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT,
ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY
HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OR ALL
OF THE DEBTORS OR RELEASED EMPLOYEES AND INDEPENDENT
CONTRACTORS (WHETHER PROOF OF SUCH CLAIMS OR EQUITY
INTERESTS HAS BEEN FILED OR NOT), ALONG WITH THEIR
RESPECTIVE PRESENT OR FORMER EMPLOYEES, PRESENT OR
FORMER INDEPENDENT CONTRACTORS, PRESENT OR FORMER
CONTENT PROVIDERS, PRESENT OR FORMER WRITERS, AGENTS,
OFFICERS, DIRECTORS OR PRINCIPALS ARE PERMANENTLY
ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I)
COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER,
DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER
PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION,
ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE
OR OTHER FORUM) AGAINST OR AFFECTING … (B) THE
RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR
THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND
INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH
PROCEEDINGS AGAINST THE RELEASED EMPLOYEES AND
INDEPENDENT CONTRACTORS ARE RELEASED PURSUANT TO
SECTION 9.05 OF THE PLAN, (II) ENFORCING, LEVYING,
ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY
PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE
RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY
OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER
AGAINST … (B) THE RELEASED EMPLOYEES AND INDEPENDENT
CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED
EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT
SUCH ACTIONS ARE RELEASED PURSUANT TO SECTION 9.05 OF
THE PLAN, (III) CREATING, PERFECTING, OR OTHERWISE
ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY
ENCUMBRANCE OF ANY KIND AGAINST … (B) THE RELEASED
EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE
PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND
INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH ACTIONS
ARE RELEASED PURSUANT TO SECTION 9.05 OF THE PLAN, (IV)
ASSERTING ANY RIGHT OF SETOFF, DIRECTLY OR INDIRECTLY,**

**AGAINST ANY OBLIGATION DUE…(B) THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS OR THE PROPERTY OF ANY OF THE RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS, TO THE EXTENT SUCH ACTIONS ARE RELEASED PURSUANT TO SECTION 9.05 OF THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, AND (VI) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN; PROVIDED, HOWEVER, THAT (X) THE FOREGOING INJUNCTION SHALL NOT APPLY TO ACTIONS OR OMISSIONS THAT OCCUR AFTER THE SALE CLOSING DATE AND (Y) THE BANKRUPTCY COURT MAY PROVIDE RELIEF FROM THE FOREGOING INJUNCTION WITH RESPECT TO CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, AND LIABILITIES NOT OTHERWISE RELEASED UNDER SECTIONS 9.03 AND 9.05 OF THIS PLAN.**

25.     Notwithstanding that the Debtors modified the injunction solely to enjoin claims released under Section 9.05 of the Plan, Section 9.02 of the Plan retains the language that "[t]he Bankruptcy Court may provide relief from the foregoing injunction with respect to claims….not otherwise released under Section[] …9.05 of the Plan."

### E.    The Litigation

26.     Despite Plaintiffs' counsel's notification to Gizmodo regarding the defamatory nature of the Story and request that the Story be removed, Gizmodo, post-sale, continued to post the Story on Deadspin.com.  With no other options, on June 22, 2017, Plaintiffs filed a complaint (the "**Complaint**") against Gizmodo and Goldberg in the proceeding captioned *Pregame LLC d/b/a Pregame .Com, et al. v. Gizmodo Media Group, LLC, et al.*, in the Supreme Court for the State of New York, New York County (the "**State Court Action**").

27.     The Complaint in the State Court Action asserts three causes of action: defamation, intentional interference with a prospective economic advantage, and tortious interference with contractual relations.  For each cause of action, Plaintiffs allege that both

11

Gizmodo and Goldberg engaged in "willful and egregious conduct." *See* Complaint at ¶¶50, 57,

and 64. The Complaint seeks, *inter alia*, the retraction of the Story and an injunction preventing

the future publication of the defamatory statements in the Story.

## OBJECTION TO GIZMODO MOTION

**A.    *The Claims Asserted in the Complaint
Are Explicitly Excluded From the Sale Order***

28.    The Gizmodo Motion spills much ink regarding the Sale Order precluding

Plaintiffs' action, but its arguments do not support its conclusion. The injunction embedded in

the Sale Order only applies to claims and causes of action "that arose prior to the Sale Closing

Date." Gizmodo Motion, ¶ 39. The Complaint, however, seeks relief against Gizmodo solely

with respect to Gizmodo's *post-sale* conduct, *i.e.,* its post-sale publication of the patently

libelous Story despite Plaintiffs' demand. Thus, the Sale Order is irrelevant here because the

Complaint only seeks to hold Gizmodo responsible for its own post-sale conduct. *See In Matter*

*of Motors Liquidation Co.*, 829 F.3d 135, 157 (2d Cir. 2016) (holding that the free and clear

provisions of a Section 363 sale order does not bar claims based upon the purchaser's own post-

closing wrongful conduct). For this reason alone, the Gizmodo Motion fails and should be

denied.

**B.    *The Court Has No Jurisdiction Over
the Claims Asserted in the State Court Action***

**(1)    This Court Lacks Power to Resolve Gizmodo's Defenses
to the State Court Action**

29.    In an apparent attempt to overcome the irrelevance of the Sale Order, the

Gizmodo Motion attempts to tie the Sale Order to its defenses in the State Court Action: (i) the

"single publication" doctrine and (ii) that the tortious interference claims are duplicative of the

defamation claim. Gizmodo argues that the effect of these defenses (if successfully established)

12

is that, as a matter of state law, its conduct should be deemed to have occurred pre-sale and thus would become barred by the Sale Order. Under principles of bankruptcy jurisdiction, the state court, not this Court, must adjudicate the defenses to the claims asserted in the State Court Action because they have no relationship to this bankruptcy proceeding. They rather are part of a dispute involving private rights as between two non-debtors. As such, this Court possesses neither power nor jurisdiction to resolve them. *See, e.g., Stern v. Marshall*, 131 S.Ct. 2594 (2011); *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 102 S.Ct. 2858 (1982); *In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993). Gizmodo's sleight-of-hand in tying this private dispute to the Sale Order thus fails in that the Sale Order is not currently implicated, and, as explained below in paragraph 55 *infra*, will very likely not be implicated in the future regardless of how the state court rules on Gizmodo's defenses to Plaintiffs' tort claims.

### (2)    The Court Lacks "Arising Under" Jurisdiction

30.    By referral from the District Court, this Court has original jurisdiction over civil proceedings arising under title 11, or arising in or related to cases under title 11. *See* 28 U.S.C. § 1334(b). The claims and defenses in the State Court Action, however, do not arise under or arise in title 11, nor are they related to Gawker's bankruptcy case. Thus, this Court lacks jurisdiction to resolve the Gizmodo Motion.

31.    The claims and defenses in the State Court Action do not "arise under" the Bankruptcy Code. Proceedings "arise under" title 11 "when the cause of action or substantive right claimed is created by the Bankruptcy Code." *In re Fairfield Sentry Ltd. Litigation*, 458 B.R. 665, 674 (S.D.N.Y. 2011). The state law causes of action, and related defenses, are state law matters rather than substantive rights created by the Bankruptcy Code. Thus, there is no "arising under" jurisdiction.

### (3)    The Court Lacks "Arising In" Jurisdiction

32.    The Court also lacks "arising in" jurisdiction over the claims and defenses in the State Court Action.  Proceedings "arise in" a bankruptcy case if they "'are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy.'"  *Baker v. Simpson,* 613 F.3d 346, 351 (2d Cir. 2010) (per curiam) (*quoting In re Wood,* 825 F.2d 90, 97 (5th Cir. 1987)).   The "mere fact that the cause of action would never have arisen absent [a] particular bankruptcy is not enough to confer jurisdiction." *Winstar Holdings, LLC v. Blackstone Group L.P.*, No. 07-cv-4634, 2007 WL 4323003, at *4 (S.D.N.Y. Dec. 10, 2007).  Further, the mere fact that claims may be traced back to a bankruptcy case does not create arising in jurisdiction.  *See, e.g., McMillan v. Barclays Bank PLC*, No. 13-cv-01095, 2014 WL 4364053, at *3 (S.D.N.Y. Sept. 3, 2014) (no arising in jurisdiction when plaintiff asserts garden variety tort claims just because such claims can perhaps be traced back to a bankruptcy case).

33.    Here, the State Court Action asserts garden-variety tort claims that would have existed wholly outside of the bankruptcy case.  Thus, the claims do not 'arise in' the bankruptcy proceeding.

34.    Although ordinarily the Court has jurisdiction to interpret or enforce its own orders, under the instant facts this argument fails because Plaintiffs' lawsuit does not challenge the Sale Order or require the Court to interpret it.  Plaintiffs do not dispute that the Sale Order enjoins claims against Gizmodo for Gawker's pre-sale conduct.  But, the State Court Action solely seeks relief against Gizmodo for its own post-sale conduct.  Such conduct falls outside the scope of the Sale Order.  *See In Matter of Motors Liquidation Co.*, 829 F.3d at 157.  Thus, there is no aspect of the Sale Order that the Court needs to interpret or enforce.

14

35.     Gizmodo nevertheless asks this Court to adjudicate the ***merits*** of its defenses as a prerequisite to determining whether there is a reason to enforce the Sale Order.  This, however, gets the jurisdictional principles backward.  "A court's subject matter jurisdiction is determined at the time that the action is commenced, and subsequent events do not affect it."  *In re New York Skyline, Inc.*, 471 B.R. 69, 78 (Bankr. S.D.N.Y. 2012) (citations omitted).  At the time of the filing of the Gizmodo Motion, for the reasons stated herein, the Court lacked both the power and jurisdiction to decide the merits of Gizmodo's state law defenses.  The notion that the Court could decide the merits of Gizmodo's defenses in order to (remotely possibly) create a reason to enforce the Sale Order is precisely the type of "subsequent event" described in *New York Skyline*.[4]  The Court thus cannot adjudicate those defenses in order to create jurisdiction. Accordingly, the Court lacks 'arising in' jurisdiction to decide the merits of the claims and defenses in the State Court Action.

### (4)     The Court Lacks "Related to" Jurisdiction

36.     Not only does the Court lack 'arising under' or 'arising in' jurisdiction, the Court also lacks 'related to' jurisdiction.  Litigation between non-debtor parties is only "related to" a bankruptcy proceeding "if the action's 'outcome might have any conceivable effect on the bankruptcy estate.'" *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (citation omitted).  "Conceivable effects typically manifest themselves by altering the amount of property available for distribution to the creditors of a bankruptcy estate or the allocation of property among such creditors." *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC,* No. 11 Civ. 2232(NRB), 2011 WL 4965150, at *3 (S.D.N.Y. Oct.19, 2011) (citation, internal quotation marks, and alterations omitted).

---

[4] As explained in paragraph 55 *infra*, it is highly probable that the state court can conclusively decide all matters without any involvement from this Court.

15

37.    Here, the resolution of the claims and defenses in the State Court Action will have

no conceivable effect on the bankruptcy estate.  The State Court Action is brought by a non-

debtor asserting claims against another non-debtor.  If Plaintiffs succeed in their litigation against

Gizmodo, there will be no change to the allocation or amount of property available to the

Debtors' former creditors.  In fact, there will be no impact whatsoever on the bankruptcy estate.

Thus, there can be no conceivable effect on the bankruptcy estate and this Court lacks 'related

to' jurisdiction.

38.    In this respect, the bankrupt court's post-confirmation jurisdiction is severely

limited.  *See In re New York Skyline, Inc.*, Case No. 09-10181(SMB), 2015 WL 5071948, at *12

(Bankr. S.D.N.Y. Aug. 26, 2015) ("it is settled law that the bankruptcy court's jurisdiction

'shrinks' once a chapter 11 plan is confirmed.") (citation omitted).  "[A] party invoking the

bankruptcy court's post-confirmation jurisdiction must satisfy two requirements.  First, the

matter must have a close nexus to the bankruptcy plan or proceeding, as when a matter affects

the interpretation, implementation, consummation, execution or administration of the confirmed

plan and second, the plan must provide for the retention of jurisdiction over the dispute."  *In re

Kassover*, 336 B.R. 74, 79 (Bankr. S.D.N.Y. 2006).

39.    Under the Court's narrower, post-confirmation jurisdiction, the Court similarly

lacks jurisdiction over the claims and defenses in the State Court Action.  The defamation and

tortious interference claims have no nexus whatsoever to the bankruptcy case or the Debtors'

Plan.  The State Court Action asserts claims against a non-debtor purchaser based upon the

purchaser's own conduct after the sale.  As set forth above, should Plaintiffs succeed in their

litigation, there will be no impact whatsoever on the bankruptcy estate or the Plan.  Thus the

State Court Action has no nexus whatsoever to this bankruptcy proceeding.  *See, e.g., In re*

*General Media, Inc.*, 335 B.R. 66, 74-75 (Bankr. S.D.N.Y. 2005) (state law claims do not have a close nexus to bankruptcy when "[n]one of the claims arise under the Plan or require the Court to interpret it", and the estate ceased to exist once the property revested with the debtors). Gizmodo's sole basis for the existence of a nexus is the purported need for this Court to interpret its own order. But, as noted above, this is illusory. Neither Plaintiffs nor Gizmodo are challenging or seeking an interpretation of any of the provisions of or language of the Sale Order.

40.     In sum, the Court lacks jurisdiction as to the defamation and tortious interference claims, and thus the Gizmodo Motion should be denied.

**C.      *In the Alternative, the Court Must Abstain From Deciding Legal Issues in the State Court Action Pursuant to 28 U.S.C. § 1334(c)(2)***

41.     Pursuant to Section 28 U.S.C. § 1334(c)(2), "[t]he Court must abstain if (1) the motion to abstain was timely, (2) the action is based on a state law claim; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) 28 U.S.C. § 1334 provides the sole basis for federal jurisdiction, (5) an action is commenced in state court, and (6) that action can be "timely adjudicated" in state court. *In re AOG Entm't, Inc.*, 569 B.R. 563, 572 (Bankr. S.D.N.Y. 2017) (citing cases), 28 U.S.C. § 1334(c)(2). All of these factors are present here, and thus the Court must abstain from deciding Gizmodo's defenses in the State Court Action.

**(1)      Plaintiffs' Request to Abstain is Timely (Factor 1)**

42.     This request for abstention is timely. "The relevant considerations include (1) whether the movant 'moves as soon as possible after he or she should have learned the grounds for such a motion,' …(2) whether the moving party has already invoked the substantive process of the federal court on a matter going to the merits of the complaint, and in particular, moved for

abstention only after receiving an unfavorable outcome, …and (3) 'whether the granting of the motion would prejudice or delay the rights of others.'" *In re New 118th LLC*, 396 B.R. 885, 893-94 (Bankr. S.D.N.Y. 2008).  (citation and quotation omitted).

43.     As to the first consideration, this is Plaintiffs' first pleading in this case, and the request is made less than a month after Gizmodo sought to invoke this Court's jurisdiction.  *See, e.g., Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 712 (S.D.N.Y. 2013) (request for abstention timely when made 37 days after removal of state court action).  As a result, the first consideration suggests the request is timely.

44.     As to the second consideration, Plaintiffs have never appeared in the bankruptcy case nor sought to invoke the process of any other federal court related to the merits of the Complaint.  The second consideration is thus also satisfied.

45.     As to the final consideration, there would be no prejudice to Gizmodo because the state court is better situated to address the single publication doctrine and whether the tortious interference claims are duplicative, both of which are purely matters of state law.  These considerations support Plaintiffs' contention that the request for abstention is timely.[5]

> **(2)     Plaintiffs Commenced the State Court Action (Factor 5) to Assert State Law Claims (Factor 2)**

46.     The Complaint in the State Court Action asserts three state law causes of action – defamation, intentional interference with a prospective economic advantage, and tortious interference with a contract.  Thus, factors 2 and 5 support invocation of mandatory abstention.

> **(3)     The Sole Basis for Jurisdiction is 28 U.S.C. § 1334 (Factor 4), But the Court Lacks  'Arising Under' or 'Arising In' Jurisdiction (Factor 3)**

---

[5] Gizmodo's litigation tactics, however, are prejudicial to Plaintiffs.  The motion practice in this Court delays a determination of the merits of the State Court Action while Plaintiffs continue to be damaged by, and Gizmodo continues to profit from, the continued publication of the Story.

47.      Gizmodo asserts no basis, and in fact there is no basis, for federal jurisdiction over the state law claims in the State Court Action other than the existence of the bankruptcy case.  Thus, the sole basis for jurisdiction is 28 U.S.C. § 1334.  As set forth above, this Court lacks 'arising under' or 'arising in' jurisdiction over the causes of action and defenses in the State Court because they have no relationship to the Bankruptcy Code or Gawker's bankruptcy case, and neither of the parties seek to have this Court interpret or enforce the Sale Order.

### (4)      The State Court Action Can be Timely Adjudicated in State Court (Factor 6)

48.      "Absent contrary evidence, a federal court must presume that a state court will operate efficiently and effectively in adjudicating the matters before it."  *In re AOG Entm't, Inc.*, 569 B.R. at 573.  Moreover, this factor focuses on "whether allowing an action to proceed in state court will have any unfavorable effect on the administration of a bankruptcy case."  *In re Ames Dep't Stores, Inc.*, Case No. 01-42217, 2006 WL 1288586, at *12 (Bankr. S.D.N.Y. Apr. 19, 2006) (citing *In re Midgard Corp.*, 204 B.R. 764, 778 (B.A.P. 10th Cir. 1997)).

49.      There is no evidence that the state court cannot timely adjudicate the matter. Further, the State Court Action will have no impact on the administration of the Debtors' bankruptcy case because the Debtors have already confirmed a liquidating Plan that has gone effective.  *See In re Leco Enters., Inc.*, 144 B.R. 244, 252 (S.D.N.Y. 1992) (finding state courts can timely adjudicate actions given the lack of urgency in a liquidation proceeding).

50.      Because all six factors for mandatory abstention are present, this Court must abstain from adjudicating the defamation claim and the application of the single publication doctrine pursuant to 28 U.S.C. § 1334(c)(2).

### D.      In the Alternative, the Court Should Abstain Under 28 U.S.C. § 1334(c)(1)

51.      The Court should permissively abstain from rendering a decision concerning the Gizmodo's defenses to the State Court Action.  *See* 28 U.S.C. § 1334(c)(1).

52.    "Pursuant to 28 U.S.C. § 1334(c)(1), a court may abstain from hearing a proceeding within its jurisdiction in the interest of justice, or in the interest of comity with State courts or respect for State law."  *In re Dreier*, 438 B.R. 449, 458 (Bankr. S.D.N.Y. 2010) (internal quotation omitted).  Courts in this Circuit consider twelve factors in determining whether discretionary abstention is appropriate under 28 U.S.C. § 1334(c)(1):

(1)    the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention;

(2)    the extent to which state law issues predominate over bankruptcy issues;

(3)    the difficulty or unsettled nature of the applicable state law;

(4)    the presence of a related proceeding commenced in state court or other nonbankruptcy  court;

(5)    the jurisdictional basis, if any, other than 28 U.S.C. § 1334;

(6)    the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(7)    the substance rather than form of an asserted "core" proceeding;

(8)    the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9)    the burden on the court's docket;

(10)    the likelihood that the commencement of a proceeding in a bankruptcy court involves forum-shopping by one of the parties;

(11)    the existence of a right to a jury trial; and

(12)    the presence in the proceeding of nondebtor parties.

*In re N.Y.C. Off-Track Betting Corp.*, 434 B.R. 131, 147 (Bankr. S.D.N.Y. 2010) (citations omitted).

53.     Not all of these factors must be applied by the Court in determining permissive

abstention.  *See In re Portrait Corp. of Am., Inc.*, 406 B.R. 637, 641-642 (Bankr. S.D.N.Y.

2009).  Here, however, the vast majority of these factors weigh in favor of abstention.

**(1)     Resolving the Non-Core Dispute (Factor 7) Has No Impact on the
          Administration of the Estate (Factor 1)**

54.     The Debtors have already confirmed a Plan that has gone effective, and thus there

is no bankruptcy estate left to be administered.  *See In re NTL, Inc.*, 295 B.R. 706, 718 (Bankr.

S.D.N.Y. 2003) ("there will be little impact on the efficient administration of the bankruptcy

estate by virtue of the abstention, especially as the Plan has been confirmed").  In fact, it is

inherently inefficient to place additional burdens on the Court when the Plan has already been

confirmed and there will be no effect on the estate.

55.     Instead, judicial efficiency supports resolution of the matter by the state court.

Should the Court abstain, it is extremely unlikely that there will later be a reason for this Court to

be called on to interpret or enforce the Sale Order.  If Plaintiffs prevail on the "single

publication" issue, then the Sale Order will not be implicated.  Alternatively, in the unlikely

event that Plaintiffs lose on the "single publication" issue in the state court and on any appeals,

Plaintiffs acknowledge that they would not likely have a surviving claim that would not barred

by the Sale Order.  Thus, it is highly probable that the state court can conclusively decide all

matters without any involvement from this Court whatsoever.

56.     On the other hand, should this Court undertake to resolve Gizmodo's defenses,

judicial inefficiency, as well as gross inequity, will result.  Even if this Court had 'related to' or

'non-core' jurisdiction[6] over the claims and defenses in the State Court Action, this Court cannot

---

[6] *See In re New York Skyline, Inc.*, 512 B.R. 159, 173 (S.D.N.Y. 2014) ("[t]he terms 'non-core' and 'related' are
synonymous") (quoting *Stern v. Marshall*, 131 S.Ct. 2594, 2605 (2011)) (alteration in the original).

issue a final judgment unless all parties consent, and Plaintiffs do not consent.  *See* 28 U.S.C. 157(c)(2).[7]  Thus, absent abstention, this Court as well as the District Court, which would render a decision based on this Court's report and recommendation, would be undertaking the additional burden of resolving Gizmodo's state law defenses.  Should Plaintiffs prevail, they will nevertheless suffer delay and have to start from scratch in the state court since this Court and the District Court would lack the power to decide the merits of Gizmodo's state law defenses, and any interpretation of the state law defenses would not be binding on the state court.  *See, e.g., In re Orion Pictures Corp.*, 4 F.3d at 1102 (court lacked power to resolve disputed state law issues in ruling on debtor's motion to assume a contract)  *See also, e.g., Castorina v. A.C. & S.*, 49 N.Y.S.3d 238, 243 (Sup. Ct. N.Y. Cty. 2017) ("I am not bound by federal decisions interpreting New York state law.") (citing 28 N.Y. Jur. 2d, Courts and Judges §230).  Moreover, in this scenario, Gizmodo would get a second bite at the apple on its defenses from the state court.  Further, Plaintiffs would be forced to wait for three courts – this Court, the District Court, and the state court – to get a decision on the merits, all while Gizmodo continues to profit from, and Plaintiffs continue to be damaged by, the publication of the Story.  Such a grossly inequitable and inefficient result could be avoided by having the state court adjudicate the claims and defenses in the State Court Action, which would finally resolve the dispute

**(2)    Plaintiffs Commenced a Proceeding in State Court (Factor 4) to Pursue State Law Causes of Action (Factor 2) that are Unsettled (Factor 3) Against a Nondebtor (Factor 12) in a Jury Trial (Factor 11).**

57.    Plaintiffs have commenced an action in a non-bankruptcy court – the State Court Action – to pursue purely state law claims against Gizmodo, a non-debtor party, in a jury trial.

---

[7] Even if the Court has "core" jurisdiction, which it does not, the Court would still lack the power to finally decide the state law claims and defenses asserted in the State Court Action without Plaintiffs knowing and voluntary consent.  *See Stern v. Marshall*, 131 S.Ct. 2594, 2605 (2011); *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2170 (2014); *Wellness Intern. Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1944-1945 (2015).  Plaintiffs do not so consent.

This case is similar to *In re Casual Male Corp.*, 317 B.R. 472 (Bankr. S.D.N.Y. 2004), in which

the Court exercised its discretion to abstain from an action that "is seeking relief solely from . . .

a non-debtor party, and the outcome will have no effect on the [bankruptcy] estate or its other

creditors." *Id.* at 481.

58.    Additionally, although Plaintiffs believe that the law favors their position and

intend to vigorously advocate their position, due to some at least superficially contrary authority,

the defenses raised by Gizmodo are unsettled under state law.  *See infra* Section E.  Further, as

detailed in Section E herein, a ruling on Gizmodo's defenses implicates matters of public

importance that could have an immense impact on New York defamation law.  New York state

courts have a more significant interest in resolving unsettled legal and public policy issues

relating to defamation.  This Court should thus abstain.

### (3)    The Jurisdictional Basis in Solely 28 U.S.C. § 1334 (Factor 5) and the Claims Asserted are Not Related to the Bankruptcy Case (Factor 6)

59.    The only connection between the State Court Action and this Court is the

jurisdictional grant under 28 U.S.C. § 1334 and that the Court approved a Sale Order that barred

certain claims against Gizmodo related to Gawker's pre-sale conduct.  The Complaint on its face

only seeks relief for post-sale conduct, and thus the Sale Order is not implicated.  The claims

against Gizmodo have no relationship to the Bankruptcy Code or the Gawker bankruptcy case,

and neither Gizmodo nor Plaintiffs are asking the Court to interpret its own order.  "Bankruptcy

Courts have refrained from adjudicating matters where interpretation of their orders was not 'the

essence of the controversy' or the 'real issue.'" *In re Dana Corp., Inc.*, No. 06-10354, 2011 WL

6259640, at *4 (Bankr. S.D.N.Y. Dec. 15, 2011) (citing cases).  This Court should similarly

abstain from determining Gizmodo's defenses and let such matters be resolved in the State Court

Action.

**(4)    The State Law Claims Are Severable From Interpretation of the Sale Order (Factor 7)**

60.    Should this Court abstain, the state court will determine the applicability of Gizmodo's defenses to the claims asserted in the State Court Action.  As described above, regardless of the manner in which the state court resolves these defenses, it is unlikely that there will be any need for this Court to interpret or enforce its Sale Order.

61.    Based on the foregoing, all or the vast majority of the applicable factors weigh in favor of this Court abstaining from adjudicating Gizmodo's defenses to the State Court Action and none suggest a contrary result.[8]

**E.    *If the Court Determines it Will Hear the Gizmodo Motion, Such Motion Should be Denied***

62.    Should the Court determine that it has jurisdiction over and the power to decide the merits of Gizmodo's defenses to the State Court Action, the Gizmodo Motion should nevertheless be denied.  For the reasons set forth herein, Gizmodo cannot rely on the single publication doctrine.

63.    In 1948, the Court of Appeals New York specifically considered whether it should join numerous other jurisdictions in abandoning the rule of *Duke of Brunswick v. Harmer*, 14 Q. B. 185; 117 Eng. Rep. 75 (1849), that "each delivery to a third person of a defamatory article constituted a new publication of the libel, which in turn gave rise to a new cause of action" in light of the fact that the case "had its origin in an era which long antedated the modern process of mass publication and nationwide distribution of printed information."  *Gregoire v. Putnam's Sons*, 298 N.Y. 119, 122–23 (1948).  The court decided to follow the "single publication" trend because it followed the public policy underlying the legislature's adoption of statutes of limitations – "to outlaw stale claims."  *Id.*  Specifically, the court reasoned that

---

[8] The factors not discussed in detail herein (Factors 9 and 10) are neutral concerning abstention.

24

"[o]therwise, although a book containing libelous material may have been the product of but one edition or printing fifty years ago, if, by sale from stock or by display, the publisher continues to make unsold copies of the single publication available to the public today." *Id.* at 125.

64.    Since *Gregoire*, the rule has been utilized by New York courts as a means to further "a public policy of avoiding the exposure of publishers to a 'multiplicity of actions, leading to potential harassment and excessive liability, and draining of judicial resources.'" *Van Buskirk v. The N.Y. Times Co*., 325 F. 3d 87, 89-90 (2d Cir. 2003) (citation omitted).

**(1)    The Single Publication Rule Does Not Protect Gizmodo Since Gizmodo is Not the Initial Publisher of the Story**

65.    On its face, the single publication doctrine only applies to a single publisher, and cannot be used by a different publisher who licenses, adopts or otherwise publishes the same statement.  As set forth above, the public policy behind the doctrine is to prevent a multiplicity of actions against the ***same*** publisher for the ***same*** content.  *Gregoire,* 298 N.Y. at 126 ("it is our view that the publication of a libelous book, involving styling, printing, binding and those other acts which enable ***a publisher on a given date*** to release to the public thousands of copies of a single printing or impression, affords the one libeled a legal basis for only one cause of action which arises when the finished product is released by ***the publisher***.") (emphasis added); *Shively v. Bozanich*, 31 Cal. 4th 1230, 1245, 80 P.3d 676, 684 (2003), as modified (Dec. 22, 2003) ("Of course, because each person who takes a responsible part in a publication of defamatory matter may be held liable for the publication multiple causes of action, even under the single-publication rule, could be brought . . .") (citations omitted).

66.    Gizmodo is an entirely separate entity and thus an entirely separate publisher from Gawker, and therefore cannot bind its publication of the Gawker content to Gawker's original publication.

67.    The Sale Order provides that Gizmodo "is not and shall not be deemed… to be a legal successor, or otherwise be deemed a successor to [Gawker]" or to "have, de facto or otherwise, merged with or into [Gawker]" or to "be an alter ego or a mere continuation or substantial continuation of successor of [Gawker] in any respect."  Gizmodo thus cannot claim to be the same publisher as Gawker when the Sale Order itself rejects the possibility of Gizmodo and Gawker being one in the same.

68.    *In re Philadelphia Newspapers, LLC*, 450 B.R. 99 (Bankr. E.D. Pa. 2011), cited by Gizmodo, should be disregarded because, without explanation, it ignored the public policy of the single publication rule in terms of protecting one publisher from multiple civil actions stemming from a singular publication.  The decision does not cite similar cases, or any cases, in support of its conclusion nor has it been subsequently cited.  Comparatively, this decision conflicts with other holdings, such as *Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 435 (1981), which held that the change in the name of the book's publisher (despite the defendant owning both publication trade names) was a factor to consider in determining whether the second publication of a book was actionable.  Moreover, *In Re Philadelphia Newspapers* applied Pennsylvania law, which has a different single publication rule than New York law, which applies here.

**(2)    Gizmodo Republished the Defamatory Material in the Story**

69.    If the single publication rule were interpreted to bind the subsequent publisher of a statement to the originating publisher, it would wholly contradict the established rule that "'one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.'"  *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y. 1991)(*quoting Cianci v. New Times Publishing Co.*, 639 F.2d 54, 61 (2d Cir.1980) (Friendly, J.)

26

(*quoting* Restatement (Second) of Torts § 578 (1977)).  Further, if a subsequent publisher merely stepped into the shoes of the original publisher, there would be no need for republication privileges such as the general fair report privilege or New York's republication privilege, which enables a media defendant to republish another media publisher's statement without liability "absent a showing that the republisher 'had or should have had, substantial reasons to question the accuracy of the articles.'" *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 534 (1980).

70.    To be clear, although the New York courts have held that "[a]bsent some reason to believe that the material to be published is false, a republisher need not conduct its own independent accuracy check, but may instead rely on the research and reputation of the original publisher," *Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 839 (1980); *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, *cert. denied*, 434 U.S. 969 (1977), that is not the case here – Gizmodo had, or should have had, substantial reasons to question the accuracy of the articles at the Gawker owned sites, particularly at Deadspin.com.

71.    In fact, there is substantial evidence to support that Gizmodo was grossly irresponsible in republishing Gawker's Deadspin.com content.  Gawker did not have the reputation of a legitimate journalism outlet.

72.    Gawker was known for publishing salacious material as well as being the subject of lawsuits due to its publication of such material. Specifically:

- Gawker published a link on Deadspin.com to an illegally and secretly recorded "peephole video" depicting ESPN reporter Erin Andrews nude in a hotel room. (http://theweek.com/articles/503483/nabbing-culprit-behind-erin-andrews-peephole-pictures).  The person who created that video was later criminally convicted and incarcerated.

- Gawker also published on Deadspin.com a video depicting a young woman, who was not a celebrity or famous in any way, being sexually assaulted on the floor of

27

the men's restroom in a Midwest sports bar, and senior executives of Gawker/Deadspin initially refused to remove the footage even after the young woman and her father pleaded for its removal. (http://www.cosmopolitan.com/politics/news/a55146/ gawker-editor-sex-tape-ajdaulerio/).

- Gawker, on another of its sites, published apparently stolen footage of actors Eric Dane and Rebecca Gayheart nude in a hot tub; and only after the actors sued Gawker did Gawker remove the video and make a settlement payment to the actors whose privacy Gawker had invaded. (http://gawker.com/5341088/the-mcsteamy-naked-threesome-gets-the-celebrity-weekly-treatment).

- Gawker published photographs of Kate Middleton sunbathing topless at a remote location in Europe, taken by a paparazzo with a telephoto lens while she was on vacation. (http://gawker.com/5943253/these-topless-photos-of-kate-middleton-put-us-at-two-for-three-on-royal-nudie-pic-scandals). She sued the European press in France and England, and prevailed in those cases. (*See e.g.*, http://www.tmz.com/2017/09/05 /kate-middleton-prince-william-win-big-lawsuit-closer-magazine-topless-photos/). In a Gawker post in October 2012, Gawker's founder and CEO, Nick Denton, boasted: "We scored with Royal Breasts [Kate Middleton] and (this month) Hulk sex." (http://nypost.com/2016/03/10/gawker-owner-gloated-about-traffic-surge-from-hulk-sex-tape/). The Kate Middleton topless photos remain posted at Gawker.com.

- Gawker delivered $12,000 cash in a bag to a person who had a photograph purporting to be NFL quarterback Brett Favre's genitalia, which Gawker, of course, then published at Deadspin.com. (http://deadspin.com/brett-favres-cellphone-seduction-of-jenn-sterger-upda-5658206?skyline=true&s=i).

- Gawker also ran a feature entitled "Gawker Stalker" where they encouraged users to publish locations where celebrities were sighted in real time so that Gawker users could go to the locations and stalk the celebrities. (http://gawker.com/ 160338/introducing-gawker-stalker-maps).

- Gawker published the infamous stolen and illegally recorded "Hulk Hogan sex tape", featuring surreptitiously recorded explicit footage of the professional wrestler naked and having sex in a private bedroom. *See Gawker Media, LLC v. Bollea*, 129 So. 3d 1196 (Fla. 2d DCA 2014)

73.    Gawker's executives also made statements to the press that highlighted how its editorial policies were not only dismissive of privacy, but also of the obligation to get the facts right before running a story. Nick Denton, who was the founder and publisher of Gawker and its various websites before Gizmodo's purchase, stated specifically that Gawker's philosophy was

28

to run stories before they were confirmed, because corrections could always be made later on a website.  (https://www.vanityfair.com/news/2016/11/nick-denton-peter-thiel-plot-to-murder-gawker).  He also said "we don't seek to do good" and "we may inadvertently commit journalism," (https://www.poynter.org/news/denton-we-dont-seek-do-good-gawker-media), and he also made a profane statement to *Playboy* magazine that nobody gives a "f---" about privacy.  (http://www.hollywoodreporter.com/thr-esq/gawkers-nick-denton-testifies-hulk-875719).  AJ Daulerio, who Gawker hired as the editor-in-chief of Deadspin.com and later as the editor-in-chief of Gawker.com, in the latter role, published the Hulk Hogan sex tape, and testified at the ensuing trial for invasion of privacy that he thought it was acceptable to publish sex tapes – even the hypothetical explicit footage of a child engaged in sexual acts, as long as the child was at least 4 years old.  (http://nypost.com/2016/03/09/gawker-editors-line-a-sex-tape-of-a-4-year-old/).  Moreover, Daulerio called his Gawker's founder and publisher, Denton, the "monster media mogul who was out to ruin people on the Internet".  (https://www.nytimes.com/2015/06/14/ business/media/gawker-nick-denton-moment-of-truth.html?mcubz=1).

74.     Furthermore, Gawker was also heavily criticized in the media for publishing a piece purporting to "out" an executive at a rival media firm, a private individual who had no fame or notoriety whatsoever and whose sex life was clearly not a matter of any legitimate public concern.  (http://gawker.com/gawker-is-removing-story-about-conde-nast-cfo-1718582003).  Gawker was forced to take down that piece after a hailstorm of criticism.

75.     If that were not enough, the fact that Gizmodo bought Gawker in response to Gawker filing for bankruptcy after being hit with a multi-million dollar judgment for publishing private, un-newsworthy material, should have raised concern significant concerns about other material on the Gawker websites.  Moreover, looking at the Story itself, Gizmodo should have

been concerned about the accuracy of the article given (i) Gawker's subsequent updates to the Story, (ii) the user comments within the articles from numerous people disputing the contents of the Story, and (iii) Plaintiffs' counsel's letter of August 22, 2016 identifying the defamatory statements and demanding they not be published by Gizmodo.

76.      Gizmodo's own conduct acknowledges that Gawker's poor reputation.  Gizmodo removed at least six articles originally published by Gawker, replacing the webpages with content that read: "This story is no longer available as it has been the subject of litigation against the prior owners of this site. While the case against the prior owners was dismissed, the decision may be appealed."

77.      Thus, Gizmodo, when it purchased Gawker's assets, stood in a completely different position than, for instance, a purchaser of a reputable newspaper who could reasonably rely that the content that had been previously published was lawful and truthful.  Gizmodo could not rely on Gawker, and had an obligation to confirm Gawker's stories before republishing them. This creates an actionable cause of action based on post-sale conduct.

(3)      **Gizmodo Republished the Defamatory Material to a New Audience**

78.      Even if Gizmodo was somehow unified with Gawker in a manner where Gawker's initial publication of the Story could be construed as Gizmodo's initial publication, the September 9, 2016, date when Gizmodo officially gained control of Deadspin.com, would nonetheless constitute an actionable republication.  Republication gives rise to a new cause of action where the new publication "arises from a conscious act that is undertaken in order to reach a new audience." *Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303, 306 (S.D.N.Y. 2014).

79.    Here, Gizmodo placed Deadspin.com and its contents in front of a new audience by adding links to Deadspin.com, and the other purchased Gawker websites, to the top banner of its pre-existing webpages, including TheRoot.com.  *See* TheRoot.com.  In an interview, Gizmodo executives noted that its intent was to "offer up more choices" to the readers of its existing publications.  *See* Shan Wang, "Univision's plans for the former Gawker sites: A shared business backend, less duplication, and a push into TV," NIEMANLAB (February 6, 2017).

80.    Gizmodo's reliance on *Haefner v. New York Media, LLC*, No. 150189/08, 2009 WL 6346547 (Sup. Ct. N.Y. Cty., Oct. 22, 2009), *aff'd sub nom*  82 A.D.3d 481 (1st Dep't 2011) is inapposite.  *Haefner* only addressed whether links to original articles created the republication of the old articles by the new publisher.  It did not discuss whether a new publisher taking over an existing online publication created a republication of the old articles.

81.    It would be in error to allow Gizmodo to step into Gawker's shoes for the purposes of determining when publication occurred, but even if Gizmodo is permitted to claim the Gawker publication as its original publication, the single publication rule does still not end Plaintiffs' action because Gizmodo republished the statements the day it took over Deadspin.com and introduced the website to Gizmodo's pre-existing readership.

## OBJECTION TO GOLDBERG MOTION

**A.**    ***Under the Unambiguous Language of the Third Party Release in the Plan, Plaintiffs Claims are Not Barred***

82.    The Goldberg Motion's assertion that, pursuant to Section 9.05 of the Plan, Plaintiffs' claims against Goldberg are barred is plainly wrong.  Section 9.05 of the Plan defines persons whose claims are deemed released as against Released Employees and Independent Contractors as "each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan."

83.    Plaintiffs, however, neither received a distribution nor can they be deemed to have received distributions under the Plan.  To the contrary, as demonstrated below, the Plan and Bar Date Order exclude Plaintiffs from this definition.

84.    There is no dispute that Plaintiffs did not receive a distribution under the Plan. Instead, the Goldberg Motion relies on the contention that Plaintiffs should be deemed to have received a distribution the Plan.   But, based on this Court's Bar Date Order, Plaintiffs cannot be deemed to have received a distribution under the Plan.

85.    The Bar Date Order fixed September 29, 2016 as the last day to file a proof of claim against the Debtors.  Plaintiffs did not file a claim.  In this respect, the Bar Date Order provides that persons who did not file a claim "shall not be treated as a creditor with respect to such claim for the purposes of voting ***and distribution***."  Bar Date Order, at ¶13 (emphasis added).   Such order is final and law of the case.  Its unambiguous language excludes Plaintiffs from the category of parties "deemed to have received a distribution" under the Plan.  Thus, Plaintiffs cannot be "deemed to have received distributions under the Plan."[9]

---

[9] Ironically, Goldberg, at paragraph 54, relies on the claims bar date to support his position while ignoring the language of the Bar Date Order that gives rise to the claims bar date.  Thus, Goldberg concedes the applicability of the Bar Date Order while ignoring, or failing to appreciate, its impact.

86.    The *Philadelphia Newspaper* case relied on by Goldberg is inapposite because the language of the release at issue in that case differs from the language at issue here. *See In re Philadelphia Newspaper, LLC*, 450 B.R. 99 (Bankr. E.D. Pa. 2011). In that case, the bankruptcy court enforced a third party release against writers by "each Person . . . that has held, currently holds or may hold a Claim or Interest, and any Affiliate of such Person . . . ". 450 B.R. at 104. In the Plan, the third party release is limited to "each holder of a Claim or Equity Interest that has received or is deemed to have received distribution(s) made under the Plan." The *Philadelphia Newspaper* decision thus has no relevance to these facts.

87.    As Plaintiffs neither received a distribution nor can be deemed to have received a distribution, the release of Section 9.05 does not apply to Plaintiffs and their claims against Goldberg in the State Court Action.

**B.      *The Plan Injunction is Likewise Not Applicable to Debtors***

88.    The injunction provision of the Plan – Section 9.02 – solely enjoins actions against Released Employees and Independent Contractors "to the extent such actions are released pursuant to Section 9.05 of the Plan." Since, for the reasons set forth above, Plaintiffs claims as set forth in the Complaint are not covered by the release, the injunction cannot and does not apply to Plaintiffs' claim against Goldberg.

89.    Notwithstanding the foregoing, Goldberg attempts to rely on the last sentence of Plan Section 9.02, which provides that "[t]he Bankruptcy Court may provide relief from the foregoing injunction with respect to claims . . . not otherwise released under Section[] . . . 9.05 of the Plan." As discussed above, under the initial version of the Debtors' proposed plan, the Debtors proposed to enjoin all claims against the Released Employees and Independent Contractors, notwithstanding the limitation in the release in Section 9.05 of the Plan. Thus, since the injunction would have enjoined parties not covered by the release, the foregoing provision

33

provided a necessary safety valve for parties whose claims were "not otherwise released under

Section[] . . . 9.05 of the Plan" to obtain relief from the injunction.  At the Confirmation Hearing,

however, the Court suggested, and the Plan now provides, that the claims subject to the Plan

injunction be co-extensive with the claims released by Section 9.05.  Once the release and

injunction became co-extensive, the notion of a safety valve for claims "not otherwise released"

was rendered obsolete.  Goldberg thus relies on an anachronism that appears to serve no purpose

in light of the final language of the injunction.  It is unclear why such provision remained in the

Plan, but it does not apply to Plaintiffs because, in any event, their claims are not released by

Section 9.05 of the Plan and thus are not subject to the Plan injunction.

**C.**     ***If the Court Determines That Plaintiffs are Deemed to Have Received a Distribution,
the Court Should Voluntarily Abstain From Determining Whether Goldberg Engaged
in Willful Misconduct***

90.     Even if Plaintiffs could be somehow deemed to have received a distribution,

Plaintiffs' claims would still not be released because they are based on Goldberg's willful

misconduct.  Section 9.05 of the Plan provides that claims against Released Employees and

Independent Contractors are released only to the extent such claims "are not the result of gross

negligence or willful misconduct as determined by a final order . . . ".  Section 9.05 does not

state that the final order must be from this Court, and the Court anticipated that parties may "just

bring a litigation against writers, arguing that you were grossly negligent or you committed a

willfully wrong act when you did whatever it is you did.  But, you know, that's something that

we'll just have to allow the events play out, there's nothing that could be done about that."  Tr. of

Confirmation Hearing at 88:12-17.  That is exactly what Plaintiffs did here.

91.     As set forth in the Complaint, Plaintiffs allege, and seek a judgment, that

Goldberg engaged in "willful and egregious misconduct" (*see* Complaint at ¶¶50, 57, and 64).

Getting to that determination will require discovery and potentially a jury trial.  Thus, based on

the discussion in paragraphs 51 - 61 *supra* and as summarized below, the Court should abstain from determining whether Goldberg engaged in willful misconduct pursuant to 28 U.S.C. § 1334(c)(1).

92.    Many of the reasons that the Court should exercise its discretion to abstain under 28 U.S.C. § 1334(c)(1) with respect to the Gizmodo Motion are also applicable here.  Abstention is appropriate because: (i) it would be inefficient for the Court to decide the matter when the Debtors have already confirmed a Plan that has gone effective, and thus there is no estate to administer (Factor 1), (ii) Plaintiffs have commenced the State Court Action in a non-bankruptcy court (Factor 4), (iii) the State Court Action is between non-debtors (Factor 12), (iv) the State Court Action addresses purely state law claims (Factor 2), (v) Plaintiffs have requested a jury trial (Factor 11), (vi) the only alleged jurisdictional grant is pursuant to 28 U.S.C. § 1334 (Factor 5), and (vii) there is no relationship between the State Court Action and the bankruptcy proceeding (Factor 6).

93.    The only connection between the State Court Action and this Court is that the Plan released certain claims (but not Plaintiffs' claims) against certain parties like Goldberg. But, determining whether Goldberg engaged in willful misconduct is not a "core" proceeding (Factor 7), nor is there "arising under" nor "arising in" jurisdiction.  Even "related to" jurisdiction is doubtful.  The claims against Goldberg have no relationship to the bankruptcy case, and neither Goldberg nor Plaintiffs are asking this Court to interpret its own order.  In fact, there are no bankruptcy issues whatsoever to be resolved in deciding whether Goldberg engaged in willful misconduct.

35

94.    Based on the foregoing, the abstention factors weigh heavily in favor of this Court exercising its decision to abstain from determining whether Goldberg engaged in willful misconduct.

**D.    *Goldberg's Other Arguments Also Fail***

95.    Several additional arguments asserted in the Goldberg Motion, as demonstrated below, lack merit.

96.    The Goldberg Motion asserts that if Plaintiffs are not bound by the third party release, then the "deemed to have received" language of Section 9.05 of the Plan would be rendered meaningless.  First, any such observation, true or not, cannot overcome the plain language of Section 9.05 of the Plan.  Second, it is not true.  For example, if a claim were to be reinstated instead of receiving cash, it would make sense to deem such claim to have received a distribution.

97.    Additionally, the contention that Goldberg purportedly relied on the Plan release in consideration for releasing his own claims against the Debtors, if true, is not relevant.  Nor does the First Amendment have any relevance to the interpretation of an unambiguous contractual provision.  "[A] confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike." *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 88 (S.D.N.Y. 2008) (internal quotation and citation omitted).  Where contract terms are clear and unambiguous, the Court is "required to give effect to the contract as written." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation and citation omitted).  *See also Ortegon v. Giddens*, 638 Fed. Appx. 47, 49 (2d Cir. 2016) ("'[i]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence . . . '") (citation omitted).  Goldberg and other writers bargained for and received a broad release as

36

set forth in Section 9.05 of the Plan.  Goldberg's personal desire that the scope of the third party

release be broader than it actually is cannot change the actual words of the Plan.

**WHEREFORE**, Plaintiffs respectfully requests that this Court (i) sustain the Objection

and deny the Motions, and (ii) provide such other relief as is just.

Dated:  New York, New York
       September 15, 2017

                                GOLENBOCK EISEMAN ASSOR BELL
                                 & PESKOE LLP
                                *Counsel to Plaintiffs*
                                711 Third Avenue
                                New York, New York 10022
                                (212) 907-7300
                                By:    /s/ Jonathan L. Flaxer
                                        Jonathan L. Flaxer
                                        Michael S. Weinstein