# **EXHIBIT A**

## **July 1, 2016 Letter**



July 1, 2016

Charles J. Harder, Esq.
132 S. Rodeo Drive, Suite 301
Beverly Hills, CA 90212
Via Email: charder@hmafirm.com

    Re:    Randall Busak (RJ Bell) Retraction Demand

Dear Charles:

On Thursday, June 23, 2016, your client RJ Bell emailed Ryan Goldberg, the author of the Deadspin article from that same day titled, "How America's Favorite Sports Betting Expert Turned a Sucker's Game Into An Industry." Mr. Bell called a particular statement in the article "a lie." Mr. Goldberg responded by telling Mr. Bell there was proof for the statement, including information directly from Mr. Bell, and pointed out that more than a week before the story was published, Mr. Goldberg had asked Mr. Bell questions on the topic that Mr. Bell had declined to answer. Deadspin nonetheless updated the story to include Mr. Bell's belated contribution.

That email exchange – reflecting an effort to make the article as complete and accurate as possible – is typical of Mr. Goldberg's communications with Mr. Bell. Your letter mischaracterizes those communications, including by suggesting that Mr. Goldberg or Deadspin improperly refused information from Mr. Bell. Even a sample of the emails exchanged between Messrs. Goldberg and Bell prior to publication of the article illustrates this point. Although the email exchanges reveal that Mr. Bell was repeatedly asked to explain what he now characterizes as falsities, he sidestepped those questions, providing canned statements on his preferred topics. The exchanges also reveal that, after offering to provide information without allowing his name to be attached to it (*i.e.*, on background), Mr. Bell said he would instead provide an on the record statement. In fact, Mr. Bell said he "would be willing to personally add on-the-record statements in the question areas that especially require additional information." Despite that initial agreement, Mr. Bell ultimately decided against doing so prior to publication, instead complaining after the fact, including in your legal threat letter.

*****

RJ,

Deadspin and I are going to decline your offer to speak on background. We want to run a fair and accurate story and want to give you the opportunity to address the reporting that concerns you and Pregame, but we need to insist that you publicly stand behind anything you have to say.

---

Gawker Media LLC                                        114 Fifth Avenue, 2nd Floor New York, NY 10011

I hope you can reconsider answering questions on the record--it's in everyone's best interest that this story be accurate.

I'd especially like to ask about the line in your statement (which we will run in its entirety) about how "Pregame has had no financial dealings with any online sportsbook since 2008." How does that square with a more recent advertising kit, or sending bettors to Pregame Action where sportsbook promos were paired with Pregame dollars, or claims from sportsbook employees and former Pregame touts that say you had deals with online sportsbooks?

Regards,
Ryan

*****

Ryan, you're misunderstandings about PregameAction are significant. I would be willing to have the Pregame Executive who was key to that deal (he's still with the company) make a factual statement on-the-record if you'll include it in the story. His insight will most certainly prevent you from making significant errors. This statement cannot affect our agreement regarding my statement.

Additionally, I would be willing to personally add on-the-record statements in the question areas that especially require additional information … as long my general statement is not affected. I wouldn't require these additional comments to be used verbatim, but I would need your word that they would be used fairly where applicable.

RJ

*****

RJ,

Sure, I'd like to talk to this Pregame Executive, if he can shed light on the questions I have regarding Pregame Action. What's his name and can I call him?

Similarly, I would like to hear your on-the-record statements to the questions I initially sent. And as we agreed, we'll run the general statement.

Thanks,
Ryan

*****

After a few more emails, on June 15, Mr. Bell stated: "I need your clear agreement that the PregameAction written statement will be included in your article in its entirety." Mr. Goldberg responded: "I can't give you assurances that I will or won't publish something that I haven't seen yet, but I will be happy to include anything that addresses the questions at hand." Mr. Bell persisted in his requirement that Deadspin publish an as-of-yet unseen statement about Pregame Action in its entirety or not at all, and Mr. Goldberg agreed to this condition. The "take it or leave it" statement that eventually was provided, reprinted on pages 3-4

2

of your letter, was convoluted and largely irrelevant to the story. As a matter of editorial discretion and judgment, it was not included because it would not have made sense to readers in the context of the article, including details about Pregame Action that are unrelated to the article's principal subject. However, although the article did not include the statement verbatim, it nevertheless included the salient points related to Pregame, including that Pregame Action's website was operated by Big Juice Media.

Indeed, Mr. Bell's key points are all already included in the article. For example, the article twice quotes Mr. Bell as saying, "Pregame has had no financial dealings with any online sportsbook since 2008, and we've always followed the letter and spirit of the law." The article similarly quotes Bell as saying: "Pregame.com has ZERO financial dealings with ANY online sportsbook. Neither do I personally. Not a penny. That is UNIQUE among the major sites – meaning Pregame is the only major industry site that doesn't have to choose between offending an online SB advertiser and telling the truth. It's very important to me to remain independent – independent from online sportsbooks and independent from parent companies (with their own financial deals) dictating reporting."

The article also links to a statement Mr. Bell published on a pregame.com forum that responds to some of Mr. Goldberg's questions (even though Mr. Bell refused to provide the responses to Mr. Goldberg). The article even lays out your client's request to speak on background and why that was refused. In a further effort, Deadspin has changed part of a sentence that your client took particular issue with. Specifically, the clause your client contested previously said: "It did not mention Pregame Action or Sharpbettor.ag or any of the other services run by Bell…". That clause has been altered and the full sentence now reads: "It did not mention Pregame Action or Sharpbettor.ag, services through which Pregame customers are funneled when they want to deposit money at sportsbooks." (To be clear, Deadspin maintains that the initial wording was fair and accurate. The change was made as a showing of good faith, and because the adjustment does not detract from the meaning of the story.)

With respect to the two supposed falsities raised in your letter regarding records and calculations, you curiously appear to claim that records taken from your client's website are somehow false. While we understand that you would have had us perform the calculations differently, in ways that we believe would be inaccurate, those calculations were transparently included in the story and expressly used conservative numbers so that results were not unfair to your client. In this regard, we note that Mr. Bell has not challenged the authenticity of audio recordings, or denied that they are indeed recordings of him. Those recordings, as the article explains, offer further support for the calculations and the other information included in the article.

In short, you have provided no ground for a retraction. Should your client have documentation contradicting the article, or should he now be willing to consider the support for the article and provide an explanation for why it actually does not prove what it appears to, Deadspin would be happy to interview him and/or consider additional factual information he provides. As you must know, a publisher cannot retract a statement that was published based on a mass of evidence simply because the subject of the statement has an attorney who says it's untrue. Without a plausible counter explanation or documentation, we stand by the carefully and thoroughly reported article, one that goes to significant lengths to incorporate your clients' positions.

In light of all this, we take particular exception to the various threats to Mr. Goldberg, a freelance journalist. In addition to your June 23 letter's express threat of litigation, Mr. Bell's emails directly to Mr. Goldberg have, for example, (a) threatened that Mr. Bell would "aggressively address any unfairness in your finished article" by "back-channel[ing] all inaccuracies and unfairness to my wide circle of media friends" and

3

(b) ominously asserted "Think if you can defend this statement in court.  I promise you will have to."  Threatening an individual reporter, operating independently, with the prospect of becoming a personal defendant in a lawsuit is a grave thing to do.  Mr. Goldberg professionally reported an in-depth, investigative article about an unregulated industry that operates on the fringes of gambling, and repeatedly asked your client to come forward and speak for himself.  Threatening Mr. Goldberg personally is unnecessary and unjustified, and your action has the broader effect of deterring investigative journalism, particularly that undertaken by independent journalists who have the passion and freedom to doggedly pursue stories traditional outlets may not cover.  The Committee to Protect Journalists (CPJ) exists to "defend the right of journalists to report the news without fear of reprisal," and the threats by both you and your client directly contradict that mission.

      Finally, it has come to our attention that information relevant to the article appears to have been removed from pregame.com web pages since Mr. Goldberg first contacted Mr. Bell.  Any such removals by Mr. Bell or anyone on his or his companies' behalf must immediately cease and desist.  As you know, full preservation obligations apply to your clients.  Should it be necessary and appropriate, we will not hesitate to investigate spoliation of evidence or other failures to properly preserve.

      We reserve all rights.

Sincerely,

Heather Dietrick
President & General Counsel
Gawker Media LLC

4