Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11700-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GAWKER MEDIA, LLC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY 10004

15

16                  September 28, 2017

17                  10:20 AM

18

19

20

21   B E F O R E :

22   HON. STUART M. BERNSETIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

1    HEARING re Motion of Proposed Amici Curiae Society of

2    Professional Journalists, Reporters Coalition for Freedom of

3    the Press, and 19 Other Media Organizations for Leave to

4    File Memorandum of Law as Amici Curiae

5

6    HEARING re Motion of Ryan Goldberg to Enforce Order

7    Confirming Amended Joint Chapter 11 Plan of Liquidation and

8    (II) to Bar and Enjoin Creditors from Prosecuting their

9    State Court Action

10

11   HEARING re Motion of Gizmodo Media Group, LLC to Enforce the

12   Sale Order and to Bar Certain Plaintiffs from Prosecuting

13   Their State Court Actions

14

15

16

17

18

19

20

21

22

23

24

25

1

2    Transcribed by:   Sonya Ledanski Hyde

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1   A P P E A R A N C E S:

 2

 3   ROPES & GRAY LLP

 4        Attorneys for Plan Administrator

 5        1211 Avenue of the Americas

 6        New York, NY 10036

 7

 8   BY:  GREGG M. GALARDI

 9

10   BAKER HOSTETLER

11        Amicus Curiae

12        Washington Square, Suite 1100

13        1050 Connecticut Avenue, N.W.

14        Washington, DC 20036

15        New York, NY 10111

16

17   BY:  MARK I. BAILEN

18

19   GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE LLP

20        Attorneys for the Plaintiffs

21        711 Third Avenue

22        New York, NY 10017

23

24   BY:  JONATHAN L. FLAXER

25        S. PRESTON RICARDO
```

1  LATHAM & WATKINS, LLP

2       Attorneys for Gizmodo Media Group

3       355 South Grand Avenue

4       Los Angeles, CA  90071

5

6  BY:  PETER M. GILHULY

7

8  WILLIAMS & CONNOLLY, LLP

9       Gizmodo Media Group

10      725 Twelfth Street, NW

11      Washington, DC 20005

12

13  BY:  THOMAS G. HENTOFF

14

15  SAUL, EWING, ARNSTEIN & LEHR

16      Attorneys for Ryan Goldberg

17      1037 Raymond Boulevard

18      Suite 1520

19      Newark, NJ 07102

20

21  BY:  SHARON L. LEVINE

22      DIPISH PATEL

23

24

25

```
 1    ALSO PRESENT TELEPHONICALLY:

 2

 3    WAYNE FLICK

 4    SHAWN P. HANSEN

 5    ADAM E. MALATESTA

 6    ALEX MCGEE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

1                   P R O C E E D I N G S

2           MR. GALARDI:  Good morning, Your Honor.  For the

3   record, Gregg Galardi of Ropes and Gray on behalf the plan

4   administrator.  We submitted an agenda to Your Honor and

5   would like to proceed first with the amicus.  I think there

6   is a proposed amicus brief and whether they can, in fact,

7   appear on this matter.  There is an opposition to that.

8           THE COURT:  Right.

9           MR. GALARDI:  And then the second and third

10  matters, I'd like to ask Your Honor to reverse the order,

11  have the motion to enforce prior to the actual motion of

12  Ryan Goldberg to enforce the order confirming the amended

13  joint plan.

14          THE COURT:  All right.  Let me deal with the

15  amicus motion first.

16          MR. BALIEN:  Good morning, Your Honor.  My name is

17  Mark Balien of Baker Hostetler.  I'm counsel to the amici

18  curiae, the Society of Professional Journalists, the

19  Reporters Committee for Freedom of the Press and 19 other

20  media organizations.  I also serve as the outside general

21  counsel to the Society of Professional Journalists, an

22  organization with over 7,000 members nationwide whose

23  mission is dedicated to the perpetuation of a free press as

24  a cornerstone of our nation -- liberty.  We seek leave, Your

25  Honor, to file our amicus brief in furtherance of this

Page 8

1    mission to protect the free press which, in reality, is made

2    up of journalists who individually and collectively

3    research, investigate, report -- and report the news into

4    the public to ensure a well-informed citizenry, a critical

5    component of our self-government.  Our proposed brief is

6    short.  It's only four and a half pages, and serves to

7    augment the arguments of the movants Ryan Goldberg and

8    Gizmodo Media Group, and to emphasize the critical

9    importance to journalists everywhere of indemnification

10   agreements which in this case are in the form of a release

11   and injunction provisions that effectively replace the

12   journalists' indemnification guarantees.

13           THE COURT:  But what does your brief add that

14   hasn't been raised by Mr. Goldberg?

15           MR. BALIEN:  Well, essentially I believe we

16   augment the arguments.  We emphasize the point that there's

17   -- there are First Amendment interests here.  And we --

18           THE COURT:  But this is just an issue of whether

19   the plan release provisions preclude the suit in State

20   Court.  It's not a First Amendment case.  I remember we had

21   this discussion, maybe not with you, but at the confirmation

22   hearing and I approved the release of the writers at that

23   point, but it wasn't a complete release.  It carved out

24   willful conduct.  It didn't apply to people who were not

25   deemed, whatever that means, to accept the plan, so it's not

Page 9

1    a complete release and that's the basis of the decision in

2    the case.

3            MR. BALIEN:  Right, and frankly I believe it --

4    our brief does address this with respect to those -- they

5    carve out what you just described.  The plaintiffs, you

6    know, argue that the carve out applies here but this is

7    based, I believe, on a fundamental misunderstanding of the

8    release provision.  In our view, this language is a

9    carryover of the typical language that's incorporated into

10   indemnification agreements, especially ones involving

11   journalists and the media and which would relieve an

12   employer when an employee acts with willful misconduct or in

13   some other egregious manner.  It has no bearing on the

14   situation here where the company, in this case Gawker, fully

15   backed this reporter and this reporter's journalism was

16   supported by the company in that instance, and the

17   indemnification provision then would've been fully enforced.

18   He would've been provided indemnification.

19           The issue that they're trying to -- I believe that

20   the plaintiffs in this case are trying to do, they're trying

21   to twist this into some type of actual malice related or

22   other scienter requirement that's required under the libel

23   law, and in our view this is a completely separate issue

24   altogether.

25           THE COURT:  Well, he is being accused of an

1    intention tort in State Court, tortious interference with

2    contract, defamation; those are all intentional torts.

3           MR. BALIEN:  Right.  No, I understand that.  But

4    again, when it comes to willful misconduct in that language

5    in the release, it was meant to essentially incorporate the

6    provisions of the indemnification agreements which would

7    provide an employer an out.  For an example, about 20 years

8    ago, Chiquita Banana, a company sued -- threatened a suit

9    against Gannet's newspaper in Cincinnati, and they within, I

10   think ten days, literally just days after the publication

11   they were threatened with suit.

12          Gannet settled the case for $10 million before the

13   suit was even filed, and it turned out that the reporter

14   there was accused of breaking into the phone system of

15   Chiquita Banana's executives and stealing the phone records,

16   the voicemails.  In that case, he sought indemnification

17   when he was being pursued and that issue of indemnification

18   came up and there was arguments by the company that that was

19   willful misconduct, and that's where this issue comes into

20   play, it's whether or not this employee has acted outside

21   the bounds.

22          Here, there's no allegations in the complaint, in

23   the State Court action, that the employee has done any of

24   that.  There are these conclusory allegations that he

25   engaged in willful misconduct, but there's no factual basis

Page 11

1   for there to be any finding that there's this type of

2   willful misconduct that the indemnification provisions would

3   address and would ultimately be nullified because of that.

4            THE COURT:  Okay.  Thank you.  Mr. Flaxer?

5            MR. FLAXER:  Good morning, Your Honor.  Jonathan

6   Flaxer of Golenbock, Eiseman, Assor, Bell, and Peskoe on

7   behalf of plaintiffs.  We filed a very, you know, brief

8   opposition.  We don't see any relevance here because

9   everything that able counsel just described is all -- all

10  these arguments were made during the plan, you know, a

11  process.

12           Whatever points they made are already baked into

13  the plan and now we're having a debate about parsing the

14  words of the plan, and I don't think any of these other

15  considerations come in at this stage, number one, and number

16  two, I just think this -- these motions were made on August

17  21st to file these papers on late afternoon on Friday, was I

18  think, not the best way it could've been handled, so I think

19  for those reasons the motion should not be granted.

20           THE COURT:  Okay, thank you.  Look, I'll grant the

21  motion.  I'll take the papers for, (indiscernible) the

22  order.  Next?  You can submit an order.

23           MR. GILHULY:  Your Honor, if it pleases the Court,

24  we would like to have the motion of Gizmodo Media Group

25  taken first, to enforce the order, and then --

Page 12

1           THE COURT:  Anyone have a problem with that?  All

2    right, go ahead.

3           MR. GILHULY:  Thank you, Your Honor.  Good

4    morning, Your Honor, Peter Gilhuly of Lathan and Watkins,

5    LLP, on behalf of Gizmodo Media Group, which I will refer to

6    as GMG.  With me in the Court today is Thomas Hentoff, a

7    partner at Williams and Connolly, defamation counsel to GMG,

8    who is available to address any detailed single publication

9    rule the Court may have.

10           Your Honor, also in the Court with me is Lynn

11   Oberlander, executive vice president and general counsel of

12   GMG, directly behind me, and (indiscernible), senior vice

13   president and associate general counsel, head of litigation

14   of GMG.  Remarkably, Your Honor, the facts in this matter

15   are, I think, entirely undisputed.  I think you know the

16   timeframe and I will recite them briefly.  I think it might

17   be helpful as background here.  As you know, Your Honor, the

18   debtor filed bankruptcy on June 13th, 2016. Ten days later,

19   the article in question was published on June 23rd, was

20   published on the website Deadspin and has remained there

21   without alteration since.  On June 27, counsel for the

22   plaintiff sent a letter to Gawker demanding retraction of

23   that story.  On July 8th, the Court approved the sales

24   procedure order in this case.  On August 16th, the

25   bankruptcy sale auction was held.  On August 17th, notice of

Page 13

1    the bar date and customized proof of claim was sent to

2    plaintiffs.  On August 18th, the Bankruptcy Court held the

3    sale hearing in this case, and on August 22nd the -- after

4    GMG was declared the winning bidder, plaintiff's counsel

5    sent a letter to GMG's counsel demanding retraction of the

6    same story.  On August 28th, the bankruptcy sale order was

7    entered, and on June 22, 2017, one day short of a year after

8    the article had originally been published, the plaintiff's

9    filed their State Court lawsuit without mentioning

10   bankruptcy sale at all, nothing about the prior history, and

11   on August 21st, GMG filed its motion to enforce the Court

12   order.

13          Your Honor, I don't think that any of those facts

14   are contested, and the plaintiffs don't contest they had

15   actual notice of the sale and that they did not object to

16   the sale.

17          THE COURT:  I guess the only question, really, was

18   whether -- I take it that this article is still available?

19          MR. GILHULY:  Right.

20          THE COURT:  And the only question is whether, like

21   a continuing trespass -- every day it's up there, that's a

22   new tort, and all the parties have cited New York law, so

23   I'd assume everybody was thinking that New York law controls

24   this question.

25          MR. GILHULY:  Correct.

1           THE COURT:  And I understand the single

2    publication rule which is a rule of statute of limitations.

3    But is there also a rule that the tort occurs with the first

4    publication -- you know, I assume it came up at a time when

5    there was a single publication, the newspaper, but in this

6    day and age, is it still the rule that even if the offending

7    article appears every day for a year on a website that it is

8    still only a single tort that occurs when it first goes up?

9           MR. GILHULY:  Absolutely.  That is the force of

10   the rule, Your Honor.

11          THE COURT:  Well, as I said, has it been applied

12   in a situation that I just described?

13          MR. GILHULY:  Philadelphia Newspapers is the very

14   case.  It's right on all fours here, Your Honor.  It

15   involved a bankruptcy sale, it involved a single

16   publication, it involved a lawsuit in State Court seeking

17   exactly what the plaintiffs are, and it was barred.  In

18   fact, Your Honor, I'll read from Philadelphia Newspaper on

19   this very point.

20          "While the articles may remain extant and

21   available online, neither was republished after PMN," who's

22   the purchaser, "became the owner of the papers.  Neither did

23   PMN assume liability for defamation claims such as these in

24   the purchase agreement.  For that reason, the plaintiffs may

25   not look to the purchaser for any recovery."

1          And this is the law.  I mean, that is not

2     surprising at all.  That is the force of the law.  The New

3     York controlling law, the Firth case, Your Honor, makes that

4     very clear.

5          All right, Your Honor, I'm just going to go in

6     order of the arguments.  Your Honor, I think it's very

7     important to note at the onset of this issue, that this is

8     not some secondary or tertiary issue.  This issues was core,

9     front and center, in this matter from the beginning, as you

10    will recall from the bankruptcy case, and it was a primary

11    concern of the debtors, you know, to get a free and clear

12    order over these very issues that it's addressed.

13         THE COURT:  I don't understand them to be arguing

14    that the free and clear order didn't cut off whatever claims

15    might have arisen immediately prior to the sale order.

16         MR. GILHULY:  You're right.  I think you're right.

17         THE COURT:  I don't understand -- my, as I said, I

18    understand them to be arguing that each day that this

19    information is available is a new tort.

20         MR. GILHULY:  Your Honor, here's what I'd like to

21    do.  I'd like to go to the issues.  I may have Mr. Hentoff,

22    who's an expert on these issues, come and address you on

23    that issue.

24         Your Honor, I think the first thing is

25    jurisdiction.  I think it is really beyond argument that the

Page 16

1    Court's ability to interpret and enforce its argument is a

2    Court proceeding and the Travelers and GM cases make this --

3              THE COURT:  You can move on to your next point.

4              MR. GILHULY:  Okay.  Thank you.  I think it's also

5    not disputed, Your Honor, and I'll go through it if you

6    would like, but I do not -- I don't think the plaintiffs are

7    arguing that these are not adverse interests that are

8    otherwise, other than the issue you mentioned, they are not

9    arguing that the sale order doesn't bar pre-sale conduct.

10   So, I could go through that language; it's in our brief.  I

11   assume that --

12             THE COURT:  I don't understand them, and I'll hear

13   them, but I don't understand them to be arguing

14   (indiscernible) as you just said that the sale order does

15   not cut off -- the free and clear language doesn't cut off,

16   or the successful liability language doesn't cut off that

17   liability, if anything.

18             MR. GILHULY:  Your Honor, the other two arguments,

19   before I let Mr. Hentoff address you, are mandatory

20   abstention which I think if you conclude that there's core

21   jurisdiction here, that's the beginning and the end of the

22   argument.  There's -- (indiscernible) made that quite clear,

23   and I think there -- at least the other factor in mandatory

24   extension that's not present here is the motion enforce is

25   not solely based on state law.  There's just no way to

Page 17

1    conclude that.  This -- you have to interpret the text of

2    the order, the APA, and apply it to this situation, so it

3    just seems to me that mandatory extension is not an issue

4    here.  I'm happy to argue further, but it seems to me that

5    that goes nowhere.

6         Your Honor, as to permissive abstention, the Revco

7    and Ionosphere cases that we cite in our brief make it very

8    clear and reflect the wisdom that when jurisdiction plainly

9    exists and there's not mandatory extension does not apply, a

10   Bankruptcy Court should exercise permissive abstention in

11   really rare and unusual circumstances.  I -- we don't have

12   that here.  In particular, as other Courts have including

13   the WorldCom case, when the 12 factors that you look at for

14   permissive abstention are really weighed heavily in taking

15   this case.

16        First, Your Honor, as I say, this is a core

17   proceeding, the bankruptcy, that is one of the factors, and

18   we are seeking interpretation and enforcement of specific

19   language in a specific word that this Court has entered.

20   The proceeding -- and the proceeding here is the motion to

21   enforce, not the State Court action, Your Honor.  The

22   proceeding is plainly related to the bankruptcy case.  I

23   would say it's at the core.  The solution of this case was a

24   sale to my client.  It couldn't be more central to the case,

25   and the Winstar case, you know, found that when a sale is

Page 18

1   subject of the proceeding, was a central aspect and basic

2   function of the bankruptcy proceedings, you know, this is

3   when you do not abstain.

4          And related, Your Honor, the factors -- non-

5   bankruptcy law does not predominate over bankruptcy issues

6   and the relevant non-bankruptcy law is well settled.  I

7   mean, just take the second one first.  Mr. Hentoff is going

8   to tell you that the single publication rule is very well

9   settled.  There are not -- I mean there is -- the

10  Philadelphia Newspaper case cites the Firth case for things

11  like the fact that the first single publication rule applies

12  to the internet, posting on the websites.

13         It also cites, Philadelphia Newspaper sells the

14  seminal New York Firth case on the fact that links directing

15  to -- people to know where the article is published is also

16  not a valid argument for undoing the single publication

17  rule.  So, I will submit, and Mr. Hentoff will talk to you -

18  - address you on this, that the single publication rule is

19  well-settled law in New York.  It's not a complicated

20  analysis.

21         With respect to non-bankruptcy law not

22  predominating, Your Honor, to resolve our motion you need to

23  basically analyze Section 363, the text of the court order

24  which refers to the APA, and the single publication rule.

25  They all come together, but there is -- it's fundamentally a

1    bankruptcy issue.  Given this Court's familiarity with its

2    own sale order, the bankruptcy code, and the factual

3    underpinnings of the bankruptcy case, the Court is best

4    positioned to adjudicate this motion.  A State Court judge

5    would not understand, you know, the complexities of

6    bankruptcy law here and what the intent behind the order is.

7            THE COURT:  I'm not sure I do but that's

8    (indiscernible).

9            MR. GILHULY:  Your Honor, the idea what GMG forum

10   shopped is completely ridiculous.  Where else were we going

11   to go to enforce this Court's order, but this Court?  And

12   there's obviously no right to jury trial implicated in the

13   motion to enforce a court order.  I really don't think, Your

14   Honor, it's feasible to sever the claims, and this motion

15   doesn't burden this Court.  This Court is the right place

16   for this to get resolved, and I would submit to Your Honor

17   that the efficient administration of the estate would be

18   well served by, instead of going to other Courts, for you to

19   resolve this today.

20           Your Honor, and the fact that the plaintiffs and

21   GMG are non-debtor parties, that's true in every sale

22   context when you're trying to enforce a sale order.  You

23   don't have to enforce it against the debtor usually, you

24   have to enforce it against third parties.  So, I would say

25   the overwhelming majority of factors weigh in favor of you

1    not abstaining here, Your Honor, and, look, this case

2    involves, you know, a garden variety motion to enforce a

3    sale order.  The Court clearly has jurisdiction to enforce

4    its own order.  The sale order clearly bars pre-sale claims

5    against GMG, that's not disputed.

6          The single publication rule, as you will hear,

7    dictates that the article in question has been published

8    once by Gawker and has not been republished.  Mandatory

9    abstention is completely inapplicable here and permissive

10   abstention is imprudent.  As Judge Gerber said in the motors

11   liquidation case, the construction and enforcement of

12   Bankruptcy Court orders is important to the bankruptcy

13   system.  This is simply not the right case to erode

14   confidence in the basic bargains struck often in 363 sales.

15         Your Honor, with that I'm going to defer to Mr.

16   Hentoff to address the single publication issue.

17         THE COURT:  Thank you.

18         MR. HENTOFF:  Good morning, Your Honor.  May it

19   please the Court, Thomas Hentoff.

20         The -- I have four points to make, Your Honor.  I

21   think the first point, the question the Court made is, is

22   this a continuing tort.  And the answer is, that's the

23   question that the New York Court of Appeals decided in the

24   Firth case in 2002, that in a defamation the fact that an

25   article, or the case of Firth is was a report, remains

1    online so that people can see it and visit it day after day

2    after day, the New York Court of Appeals said that's not a

3    continuing tort.

4              We're going to apply the standard single

5    publication rule that applies in defamation cases generally,

6    and we're going to apply it online and then courts all over

7    the country followed Firth and applied the same rule.  In

8    fact, I would say the best way to understand the single

9    publication rule is, it is the opposite of a continuing

10   tort, and I think a good example of that would be imagine an

11   article that's on a website that a plaintiff claims is

12   defamatory and at the same time there's a photograph that's

13   embedded in that article that the photographer said, "You

14   didn't pay me for it, this is a copyright infringement."

15   Well, copyright infringement, not going to make an

16   (indiscernible) addition for some other case in the future,

17   but copyright infringement is understood to be a continuing

18   tort and so that photograph every day that it continues to

19   be distributed to people, that can be a new cause of action.

20   But under the standard single publication rule, as applied

21   on the internet by Firth and all the cases, it's the

22   opposite of a continuing tort and it's a single unitary

23   publication.

24             Now, my second point, Your Honor, is this is not

25   simply a rule that's applied in the statute of limitations

Page 22

1    context.  It is often applied in the statute of limitations

2    context, but in defamation law.  it's also very important

3    and comes up a lot on state of mind because under the actual

4    malice test that's a default standard for public figures and

5    in New York State under the gross irresponsibility test

6    which is the standard for matters of public concern where

7    you don't have a public figure, there's a big question.

8    what did the defendant know?  What was in their mind at the

9    time of publication?  And if not for the single publication

10   rule, every day that an article is on a website or continues

11   to be distributed, the defendant arguably is getting more

12   and more information and their state of mind always changes.

13   But the courts have been very clear.

14         We don't look at the defendant's state of mind

15   after the first time the article goes on the website, so

16   it's not just a statute of limitations rule, it's a unitary

17   publication rule that applies in a number of contexts.  So

18   in our motion, we cited the Bureau of Conde Nast case for a

19   different proposition, but that's a case in which the Court

20   held for actual malice purposes you can't look beyond the

21   first posting of the article on the website.

22         And then finally, as Mr. Gilhuly said, in

23   Philadelphia Newspapers which just applied the general law,

24   at least one of the plaintiffs in that case had filed

25   lawsuit within a year of the original article being

Page 23

1    published.  So, Philadelphia Newspapers is not a statute of

2    limitations case, it's a unitary publication case.

3            And then just my final point, is the law is clear

4    on this.  There are no exceptions that could be applied

5    here.  The plaintiffs are asking for an exception when

6    there's a change in ownership of the company that owns the

7    website.  As we say in our papers, Philadelphia Newspapers

8    applied regular law and rejected that argument.

9            And then finally as we note in our reply brief, it

10   would be a really bad exception to make to the single

11   publication rule because you could have, as we note, like

12   the Daily News was recently sold to the Tribune Company

13   which permits New York institution to continue, all the

14   people who are employed by it to keep their jobs, but if

15   that had been a republication, then I don't know, 50, 60, 70

16   years of archives from the Daily News would be subject to

17   new statute of limitations and people wouldn't be in a

18   position to engage in transactions for media companies

19   because they'd be afraid that any new transaction, you've

20   got liability for things that have been up for 10, 20, 30

21   years.  So, it's -- there is no exception to the law and it

22   would be a bad idea to make one.  Thank you.

23           THE COURT:  Thank you, (indiscernible).

24           THE COURT:  Oh, sure.  Go right ahead.

25           MR. GALARDI:  Your Honor, again, we have the

Page 24

1    Gawker and the plan administrator.  We joined this motion.

2    I do want to, as the historian of the case, remind Your

3    Honor of this actual sale proceeding.

4            As you may remember, we filed a reply in support

5    of the single publication rule.  There were a number of

6    people represented by the exact same counsel in that.  Mr.

7    Harder, who had said reservation of rights.  We had come in

8    and argued that single publication rule would protect the

9    successive buyer because that was part of the significant

10   value and we'd had a number of the negotiations regarding

11   that.

12           The plan administrators here are prepared to

13   testify, but I think the facts are uncontroversial that when

14   we sold, we took the view that this was a single

15   publication, that their acquisition would not be considered

16   a new publication, but all that Ms. (indiscernible) and Mr.

17   -- Dr. (indiscernible) did was file a reservation of rights.

18   Your Honor and I had this dialog about, can I overrule --

19   can you overrule a reservation of rights.  You said no, but

20   that was an issue that Your Honor was going to interpret on

21   the successor at some date, but it was the exact issue that

22   we'd raised here.  The counsel was the exact same counsel.

23   They did not raise that issue and did not fight that issue,

24   they just simply did -- laid in wait, so I just wanted to

25   remind Your Honor about that.  We did take the position with

Page 25

1    both buyers at that time that this would be covered by the

2    single publication rule for the reasons the gentleman from

3    Williams and Connolly argues, as this is not continuing

4    tort.  Thank you.

5              THE COURT:  Mr. Flaxer?

6              MR. FLAXER:  Like Mr. Gilhuly, I am not an expert

7    on the single publication rule either or, you know, New

8    York's law about defamation.  My partner, Mr. Ricardo was

9    here and if Your Honor wishes to hear more about that, he's

10   here to speak to those issues.  I may allude to them a

11   little bit, but I'm certainly not the expert.

12             I find myself in agreement with much of what Mr.

13   Gilhuly said, but when you get to nub of the issue we're --

14   we have opposite views.

15             THE COURT:  What's the nub?

16             MR. FLAXER:  The nub is that the basic question

17   that's raised here is whether the New York State Court where

18   the action is pending or this Court will decide a complex,

19   multilayered disputed issue of New York law.

20             THE COURT:  But how do I avoid doing that in order

21   to interpret the sale order?

22             MR. FLAXER:  Because, well, I think that's the

23   nub.  You can't interpret, in quote, because the reality is

24   you're not being asked to interpret the sale order.  The

25   sale order was clear.  What they've done is instead of going

Page 26

1    to State Court and either raising this issue there --

2            THE COURT:  Well, they're saying I don't have to

3    do anything.

4            MR. FLAXER:  They could've gone to a State Court

5    but they didn't.  They decided to come here on what we think

6    is a fundamental misdirection.

7            THE COURT:  So, what's the issue that the State

8    Court should decide?

9            MR. FLAXER:  The State Court is going to have a

10   trial with discovery and witnesses on this defamation claim

11   and on the intentional tort claims.

12           THE COURT:  But isn't one of the purposes of the

13   provisions of the sale order to cut off that claim before

14   you get to discovery and all that other stuff?

15           MR. FLAXER:  If it is, it's not in the sale order.

16   We didn't participate at all.  We are listed as a -- having

17   a disputed claim.

18           THE COURT:  Are you saying you're not bound by the

19   sale order?

20           MR. FLAXER:  No, I'm not saying that, but what I'm

21   saying is that when you analyze the jurisdictional and

22   abstention questions in the extent of your power, the fact

23   that we did not file a claim, that was submitted to the

24   jurisdiction of the Court, and never participated in any way

25   in the proceedings before this Court affects how you view

Page 27

1     the extent of your power here and the appropriate exercising

2     of your power.

3                    THE COURT:  Do you contend that the sale order

4     doesn't cut off pre-sale claims?

5                    MR. FLAXER:  Absolutely not.  The sale order --

6                    THE COURT:  Okay, so isn't the only issue whether

7     you're complaint alleges post-sale claims?

8                    MR. FLAXER:  No.  The issue is -- our complaints

9     on its face clearly only seeks redress for post-sale

10    conduct.

11                   THE COURT:  I disagree.  Your complaint, the

12    material facts, are alleged starting in Paragraph 16 but

13    mostly 17 to 20, which talk about the June 23rd, 2016,

14    article written by Mr. Goldberg which is the article at

15    issue.

16                   Then when I get to the defamation claim, which is

17    -- starts at Paragraph 42, says that defendants published or

18    caused to be published on or -- and/or maintained defamatory

19    statements in a story against them as described in

20    Paragraphs 17 through 20.

21                   So, if I'm a State Court judge looking at this and

22    I know nothing about the bankruptcy, case it looks to me

23    like your arguing that whatever wrong occurred, occurred on

24    June 23rd and you just told me that that would be barred by

25    this free and clear and successor liability provisions of

Page 28

1    the sale order.

2              MR. FLAXER:  You know, I think the answer is that

3    you can't frame the complaint without explaining the

4    background facts and the circumstances.

5              THE COURT:  So, where does it talk about the

6    bankruptcy and the sale order and that you're only suing for

7    claims that arose after the sale order, which would be

8    clearer to the judge who had to handle this in State Court?

9    Then they could make a motion to dismiss saying there were

10   no such claims.

11             MR. FLAXER:  You know, I --

12             THE COURT:  Mr. Flaxer, I've read it and it's not

13   in there.

14             MR. FLAXER:  Okay.  No, I'm sure there's nothing

15   in here about --

16             THE COURT:  All right.

17             MR. FLAXER:  -- the bankruptcy or the sale order

18   or any of that.  I'm looking at the prayer for relief which

19   is on Page 19, and in 3 it seeks an order enjoining

20   defendant from publishing, continuing to publish, or

21   republish, and the defendants are the only defendants in the

22   case.

23             THE COURT:  I always thought the wherefore clause

24   wasn't part of the plea.

25             MR. FLAXER:  I know, but we're trying to

Page 29

1    understand what is being sought here.  Here's -- the only

2    defendants are the buyer.

3            THE COURT:  I know what you're -- I know what's

4    being sought, but the question is, at least the way the

5    complaint frames it, is that it's being sought for a wrong

6    that occurred on June 23rd prior to the sale.  That's the

7    problem I have with the complaint.

8            MR. FLAXER:  I --

9            THE COURT:  And you can argue this 'til you're

10   blue in the face to a State Court judge and he or she would

11   probably tell you to come back here to do it.

12           MR. FLAXER:  You know, I severely doubt that, but

13   you know, at that point, it could be explained to the State

14   Court which is where this belongs, that no, to the extent

15   that you want us to amend the complaint to make that clear

16   we're happy to do that.  The only relief sought is against

17   these defendants for post-sale conduct.

18           THE COURT:  But you said these defendants

19   published something, and they didn't publish anything.  It

20   was Gawker that published it, their successors.

21           MR. FLAXER:  There is this concept embedded in the

22   New York law, that I'm not the expert on, about --

23           THE COURT:  But you're going to tell me about it

24   anyway, right?

25           MR. FLAXER:  -- about the concept of a

Page 30

1    republication and as Mr. Ricardo will explain to you, that

2    is not a simple issue.  New York State, unlike Pennsylvania,

3    has not adopted the uniform single publication act.  New

4    York has decided to go its own way and develop its own

5    common law about single publication, republication, and all

6    the very complicated issues that surround this.  I don't

7    think you want to be the judge to have to guess how a New

8    York State Court would decide to develop this law that's

9    also always changing and subject to reevaluation.

10            THE COURT:  But I'm being told there's a New York

11    State Court of Appeals (indiscernible) case that's

12    essentially on point.

13            MR. FLAXER:  Okay, well my partner -- I mean, if

14    you want him to speak to that now, I'll bring him up here.

15            THE COURT:  It's your show.

16            MR. FLAXER:  All right, well, why don't I keep

17    going through my argument and then --

18            THE COURT:  Okay, go ahead.

19            MR. FLAXER:  -- then we'll get to that.  So, I

20    think the notion of casting this as a motion to enforce or

21    interpret your order is superficial.  There's nothing in the

22    order that is alleged to be ambiguous, and --

23            THE COURT:  But, won't that make it easier to

24    enforce?

25            MR. FLAXER:  No, because the -- I -- we don't

Page 31

```
1    believe there's anything for you to enforce except if you

2    would like to read the relevant provisions of the order into

3    the record and then send us back to State Court.  Because

4    the order, like -- (indiscernible) like most sale orders

5    I've seen, they all say this applies up to the date of the

6    sale and applies to all pre-sale conduct but doesn't bar

7    post-sale conduct, and we --

8         THE COURT:  I don't think anybody's in

9    disagreement (indiscernible) that.

10        MR. FLAXER:  And so the only way you would ever

11   get to an issue about how -- about whether you should

12   enforce your order, is for you to substitute yourself for

13   the New York State Court System on the issue of single

14   publication and republication, and now we'll quit that,

15   leave it at the side for the moment.  But I will say that in

16   addition to the lack of dispute about what the order says on

17   this issue, there's no issue of bankruptcy law that you're

18   being asked to decide or think about.  This doesn't

19   implicate 363 or any of that.  There's nothing in the

20   bankruptcy code that this dispute would call upon you to

21   have to --

22        THE COURT:  But in light of that, can't I just

23   read the complaint for the reasons I said and say this is

24   complaint asserts a pre-sale claim.  Because that's the way

25   it's pleaded.
```

1            MR. FLAXER:  I think you could do that, but I

2     think you'd be elevating form over substance.  I think the

3     only defendants are the ones who are named in the complaint

4     and I will represent to the Court right now that we seek

5     nothing from the estate, from the debtor, or for any pre-

6     sale conduct.  It's just that you need to recite the

7     background to get to where you need to go, and I -- and we

8     understand.  One argument that I'm guessing they would make

9     in State Court is, okay, because of the way you set this up,

10    you can't seek any damages for anything that happened prior

11    to the sale date, and you know what?  That's right.  That is

12    --

13            THE COURT:  I think they're going to say you can't

14    seek any damages because whatever was done was done before

15    the sale.

16            MR. FLAXER:  Well, they're going to say that as

17    well.  But on the first -- but that one, we think they're

18    going to lose.  But we understand we have a problem, an

19    issue.  I don't want to say the word problem, it's an issue,

20    on the second.

21            We think the case law is clear that by simply

22    characterizing something as a motion to interpret or enforce

23    an order, doesn't mean that all considerations of

24    jurisdiction and the power of the Court suddenly go out the

25    window, the Court has to look at the substance of what is

Page 33

1    really -- what the Court's really being asked to decide.

2            THE COURT:  You're saying that if someone were to

3    claim post-confirmation let's say, maybe this is the other

4    case, it's clearly barred by the terms of the release,

5    discharge, or whatever that this Court would have no

6    jurisdiction and if somebody aggrieved by that lawsuit came

7    in and wanted to stop it because it violated the

8    confirmation (indiscernible), they'd have to go to State

9    Court and show them what the confirmation order says and

10   tell the State Court judge to figure it out?

11           MR. FLAXER:  You know, I think that's too generic.

12           THE COURT:  Well isn't it what's happening here?

13           MR. FLAXER:  No.  This is total -- I don't agree.

14   It's totally fact intensive.  If you accept my, you know,

15   credits.

16           THE COURT:  What are the disputed facts, though.

17           MR. FLAXER:  In -- on.

18           THE COURT:  In other words, the article is still

19   published, the sale occurred.  Isn't just purely a legal

20   question whether this there's a separate claim?

21           MR. FLAXER:  No, and again as the non-expert, I

22   will --

23           THE COURT:  Well, maybe I ought to hear from --

24   let me hear from the expert.

25           MR. FLAXER:  All right.  But there are several

Page 34

1    layers of issues that are going to require discovery.  So,

2    we view this as not being -- as this Court not having

3    jurisdiction --

4            THE COURT:  I just don't -- I'm sorry, I just

5    don't understand that.  You may think that the State Court

6    is a better place to answer the question, but I don't know

7    how you can say I don't have jurisdiction to enforce the

8    sale order.

9            MR. FLAXER:  If someone was seeking to enforce the

10   sale order in real substance as opposed to using the notion

11   of enforcing a sale order to move a state law dispute

12   between non, you know, debtors that has no effect on the

13   bankruptcy estate, to this Court, you know, you got to look

14   to the substance.  I view their position as elevating form

15   over substance.  There's no dispute any provision of the

16   sale order.  It otherwise has no effect on the bankruptcy

17   estate.  It doesn't arise under the code.  We don't think,

18   again --

19           THE COURT:  -- you disputing that the sale order

20   cuts off the claim that you say you're asserting?

21           MR. FLAXER:  Am I asserting that --

22           THE COURT:  You're saying that the sale order

23   doesn't cut it off, right?  And they're saying it does.

24   That sounds like a dispute over the sale order.

25           MR. FLAXER:  No, it's -- well, that's where I

Page 35

1   think you're elevating form over substance.  It's a dispute

2   over an issue of purely state law.  If they win in State

3   Court, then they will have established that the sale order

4   should cut the claim off, but at that point it's moot.  It

5   never comes back here because if we lose on that issue, we

6   lose anyway.

7          THE COURT:  Okay.  I got it.  Thank you.

8          MR. FLAXER:  So, on mandatory abstention, assuming

9   you concede that it is related to the bankruptcy case, which

10  we dispute, but if it is, there's no dispute that an action

11  has been commenced.  You know, notwithstanding their

12  argument that this is about -- it's about their motion to

13  enforce the order.  The action is clearly the State Court

14  action.  We're the ones who are raising mandatory abstention

15  (indiscernible) then you should abstain from getting --

16          THE COURT:  How would you demonstrate

17          MR. FLAXER:  -- State Court --

18          THE COURT:  How would you demonstrate it if the

19  case can be timely adjudicated in State Court?  I don't have

20  any statistical information.

21          MR. FLAXER:  Well --

22          THE COURT:  That's how you prove it.

23          MR. FLAXER:  I'll say two things on that.  I mean,

24  we've raised it.  They haven't said it can't be.  We could

25  have a hearing on that.  This isn't an evidentiary hearing.

Page 36

1    There are no, you know,

2            THE COURT:  I know you didn't have an evidentiary

3    hearing.  State Courts and the Federal Courts publish

4    statistics in terms of clear -- I just had a case like this,

5    clearance rates and caseloads and things like that.  It's

6    all published statistics.

7            MR. FLAXER:  I mean, my view is we raised it, they

8    didn't

9            THE COURT:  But you have to --

10           MR. FLAXER:  -- oppose it.

11           THE COURT:  -- sustain your burden of proof.  All

12    right.  All right.  I got it.

13           MR. FLAXER:  So, their only pushback on mandatory

14    abstention goes back to that they think this is about your

15    somehow interpreting the sale order, and we, for reasons

16    I've stated and won't state again, don't agree.

17           THE COURT:  (indiscernible)

18           MR. FLAXER:  Rather than pick through all of the

19    standards of permissive abstention which Your Honor is very

20    (indiscernible) with as is my adversary, we think the non-

21    bankruptcy issues predominate over the bankruptcy issues.

22    We don't think there are any bankruptcy issues whatsoever.

23    As my partner will explain, we think the single publication

24    rule issues are very complex, unsettled, will require

25    discovery, and are items that belong in the New York State

Page 37

1    Court for reasons I've already stated so I won't state them

2    again.

3         We also think it would be inefficient for Your

4    Honor to take this on.  That jumps ahead a little bit to the

5    extent that the power of the Court and whether you can

6    finally decide this or could only issue findings and

7    conclusions, but that again gets into the judicial

8    efficiency prong.  From my clients' perspective, they're

9    being damaged every day that this article stays up, and we

10   see the possibility of very protracted litigation in this

11   Court.  If I convince Your Honor that it's necessary to take

12   discovery on the state law issue and you decide to do it

13   anyway, if you agree with us, then we're going to start from

14   scratch in State Court all over again and we're going to

15   lose a lot of time.  If it goes to the State Court, it only

16   gets resolved once and it's finished.

17        It was a very good quote in the Casual Male case

18   which we cited about how the New York State Courts have a

19   significant interest with the laws of different -- the laws

20   of the various states are different.  We think that's

21   implicated here.  You know, I think what they seek is

22   difficult to square with the Second Circuit's decision in

23   Orion.  I guess what they're suggesting is that you can, I

24   guess make some limited finding, a non-binding finding on

25   the single publication rule.

1           THE COURT:  But that was a summary procedure

2    whether or not the debtor could, if (indiscernible) reject

3    the agreement with Showtime.  This isn't a summary

4    procedure.  I'll decide this, and it's not -- you know, if I

5    decide that it violates the sale order, for example, I'll

6    enter an injunction.  Not going to be a summary procedure.

7           MR. FLAXER:  I guess what's bothering me is the

8    issue of in a proceeding that is unique to this case,

9    whether you can finally decide a state law dispute between

10   non-debtors wherein -- this is where the fact that we never

11   filed the claim, I think, does have an effect.  Where once

12   of the parties is basically a stranger to the bankruptcy

13   case in terms of its own --

14           THE COURT:  But --

15           MR. FLAXER:  -- conduct whether you're in the

16   position or whether it was appropriate for you to finally

17   decide that issue particularly where --

18           THE COURT:  You just told me you were bound by the

19   sale order, though.  I don't understand that argument.  Sale

20   order was an in rem order which has obviously an effect on

21   everyone's in personam rights.  If you're bound by the sale

22   order, you're bound by the sale order the same as the debtor

23   is bound by the sale order, and the purchaser.

24           MR. FLAXER:  Except that your -- the way you frame

25   it, assumes the conclusion or assumes the resolution of the

Page 39

1      fundamental issue of New York State law --

2                    THE COURT:  No.

3                    MR. FLAXER:  -- that you shouldn't be getting into

4      in the first place.

5                    THE COURT:  You may be right, but I -- that's a

6      different issue from whether you're bound by the sale order.

7                    MR. FLAXER:  So, I think they're not inconsistent.

8      I can concede --

9                    THE COURT:  Do I really have to decide all this,

10     though?  I look at the complaint.  You're alleging a tort

11     that occurred on June 28th.

12                   MR. FLAXER:  Again, if you wanted to go that way,

13     I think it would be a mistake because I think you'd be

14     elevating form over substance.  We need to recite the

15     background, but I'm telling you here today that this

16     complaint is only against these defendants and it only seeks

17     relief for post-sale conduct.

18                   THE COURT:  So, in reciting the background, why

19     didn't you recite the sale and make that clear?

20                   MR. FLAXER:  You know, if you ordered us to amend

21     the complaint to do that, we would do it.

22                   THE COURT:  I'm just going to read the complaint.

23     That's all I have before me.

24                   MR. FLAXER:  I -- you know --

25                   THE COURT:  You want to amend your complaint?

Page 40

1          MR. FLAXER:  If it would get me out of this Court,

2    I would.

3          THE COURT:  Time is going to get you out of this

4    Court, because I have a very crowded Courtroom, so why don't

5    you wrap it.

6          MR. FLAXER:  Okay.  You know, I'm hoping you're

7    not listening too much to a lot of the background noise

8    about how we laid in wait and we should've done something in

9    the Bankruptcy Court --

10         THE COURT:  No, no, it's a straight question.

11         MR. FLAXER:  All right.

12         THE COURT:  Whether the claim is cut off by the

13   sale order; that's it.

14         MR. FLAXER:  I can go into --

15         THE COURT:  And as I said, you're as bound as the

16   debtor and the buyers are to that sale order, which you

17   apparently admit most of the time.

18         MR. FLAXER:  For purposes of this hearing, I'm not

19   debating the enforceability of the sale order.  What I'm

20   saying is that the sale order is abundantly clear that it

21   does not bar claims for post-sale conduct.

22         THE COURT:  No question about that.  I don't think

23   anybody's arguing that it does.

24         MR. FLAXER:  Right.  We agree on that, and we're

25   only --

1           THE COURT:  But you're alleging a pre-sale tort.

2           MR. FLAXER:  I -- as the representatives of these

3   parties here today, I'm here to tell you that that is not

4   true.  We are -- what we're really after for the most part,

5   I'm not waiving anything.  This is about getting that

6   article taken down.

7           THE COURT:  I understand.  No, I understand the

8   practical difficulties.

9           MR. FLAXER:  It's like killing my guy -- we got to

10  get that thing down.

11          THE COURT:  Right.  Now, look, I understand --

12          MR. FLAXER:  I'm going give you a policy point

13  since, you know, Mr. Gilhuly had the (indiscernible).  If

14  you take their argument, a party could publish a

15  horrendously defamatory article on a site owned by an

16  assetless company, leave it there for a week, and then move

17  it to the real site can claim, oh, you know, it's forever,

18  you know, insulated from any attack.  Doesn't seem right

19  that that can be the law.

20          THE COURT:  (Indiscernible) you put a timely claim

21  against the original publisher (indiscernible) and not only

22  seek damages but seek an injunction.

23          MR. FLAXER:  I'm not sure that's -- they seem to

24  have a very different view.

25          THE COURT:  Well, I think you could do that if you

Page 42

1    put --

2            MR. FLAXER:  (Indiscernible)

3            THE COURT:  That's not what happened here.  You

4    have the intervention of the sale order.  It's the

5    equivalent of bringing the action beyond the one year

6    statute of limitations.  That's essential what it is here.

7            MR. FLAXER:  So --

8            THE COURT:  And unless you have a new action today

9    (indiscernible) post-sale, you're late.

10           MR. FLAXER:  I'm --

11           THE COURT:  Let me -- you know, why don't you wrap

12   it up, it's --

13           MR. FLAXER:  I only want to allude to the fact

14   that there has been requests for attorneys' fees and things

15   that kind of sound like sanctions.  I hope the Court's not

16   taking any of that seriously.  If you are --

17           THE COURT:  I take everything seriously.

18           MR. FLAXER:  All right.  Then we -- if you decided

19   to reserve decision and it were not mentioned, I just want

20   to mention the fact that there's been no evidence on any of

21   that.  We would like the opportunity, if it is being

22   considered to have evidence on that and a full, you know,

23   briefing, and Mr. (indiscernible).  And I'll (indiscernible)

24   Mr. Ricardo.

25           THE COURT:  You're up.

1              MR. RICARDO:  Your Honor, Preston Ricardo for the

2      plaintiffs.  The defamation issue in this case is much more

3      interesting that what people have thus far made --

4              THE COURT:  Sounds pretty interesting so far,

5      okay?

6              MR. RICARDO:  Well, it's much more complex and

7      it's actually a novel question that's presented under New

8      York law, and I'll tell you why.

9              THE COURT:  All right.

10             MR. RICARDO:  You've only heard half the story.

11     You've heard what I would agree is an accurate recitation of

12     the single publication rule and if the story ended there, it

13     may very well be that this claim would be barred. But the

14     whole crux of the issue and the argument is that the post-

15     sale conduct falls under and constitutes what is an

16     exception to the single publication rule and that's

17     republication, and republication has happened here post-sale

18     by Gizmodo and this case is not on -- and I'll tell you why

19     -- this case is not at all like the Philadelphia case does

20     apply Pennsylvania law and New York law because in that case

21     there was an acquisition and nothing new -- the Court didn't

22     address anything new that happened or that the buyer did

23     after that, which I'll get into.  And those are the very

24     things, those actions are at issue here and they're -- that

25     part of the exception is acknowledged in every one of the

Page 44

1    New York cases that the movement has referred to as binding

2    and I agree that we have relevant New York decisions.  They

3    haven't addressed this issue but they actually favor the

4    plaintiffs, and here's why.

5           Firth is a Court of Appeals decision that you've

6    heard a lot about.  That's not like this case because all

7    you had with the website (indiscernible) at issue there, the

8    website alleged defamatory article was completely unrelated

9    modification to the website, some tweak, and the Court of

10   Appeals used the example of, you know, if it were to buy

11   into some tweak to the website constituting a republication,

12   then the Court of Appeals' own website if it could

13   potentially be exposed to a republication exception claim

14   merely by virtue of the fact that the Court of Appeals adds

15   things to its website like (indiscernible) opinions.

16           THE COURT:  What was the republication, though?

17   If the debtor continued to own --

18           MR. RICARDO:  Yes.

19           THE COURT:  -- the website, would a republication

20   have occurred in this case?  And if so, when?

21           MR. RICARDO:  Well, here's what -- when the

22   republication happens, and here's the fact issue and it's

23   been recognized as a fact issue by the most recent decision

24   that's been cited to this Court in these papers, and that's

25   a 2014 Etheridge-Brown decision by Judge Oetken from -- in

1    the Southern District applying New York law, he relies on

2    Firth, and you know he concludes -- he denies summary

3    judgment to American Media which had printed an alleged

4    defamatory article in the -- in hard copy of the National

5    Enquirer and then later published that article on a website,

6    and so the issue there was, was that republication.

7              THE COURT:  Well, that was a separate medium,

8    right?

9              MR. RICARDO:  It's a separate medium.

10             THE COURT:  Here --

11             MR. RICARDO:  And that's going to dovetail here

12   with what we have.  I've been setting the background for

13   this.

14             THE COURT:  But the argument, as I recall, the

15   allegation in the complaint is that they didn't take it down

16   after a demand.

17             MR. RICARDO:  Right.  And what they did instead,

18   they made it worse.

19             THE COURT:  Well, but that's -- where is that

20   alleged in the complaint?

21             MR. RICARDO:  The allegation in the complaint

22   about --

23             THE COURT:  That they made it worse, that they did

24   something different that made it worse.

25             MR. RICARDO:  Right, I'm loading (indiscernible).

Page 46

```
 1              THE COURT:  Or what's the republication?

 2              MR. RICARDO:  The republication is -- let me just

 3    read --

 4              THE COURT:  Are you saying it's a change --

 5              MR. RICARDO:  (indiscernible).

 6              THE COURT:  -- it's the change of ownership?

 7              MR. RICARDO:  It's when, and this is where it's

 8    not discussed in the Philadelphia case which is critical and

 9    it's discussed in every one of the New York cases as a

10    republication happens, one of the key fact issues and

11    factors is the extent to which the alleged republisher took,

12    made a conscious decision and efforts -- and these -- this

13    is quoted language essentially, I'm -- to reach a new

14    audience.  So, the last -- essentially the -- almost the

15    last sentence of Judge Oetken's decision denied summary

16    judgment to American Media it is.  It is plausible to infer

17    that the posting on the website of the original hard copy

18    National Enquirer article that was alleged to be defamatory

19    was done as part of a conscious effort to reach a new

20    audience.  Similarly here --

21              THE COURT:  Where do you allege that in the

22    complaint?

23              MAN:  We're looking.

24              THE COURT:  The only thing I saw in the complaint

25    is you'd asked them to take it down and they didn't take it
```

Page 47

1    down.

2           MR. RICARDO:  While they look, Your Honor, may I

3    just --

4           THE COURT:  Yes.

5           MR. RICARDO:  -- continue to say, similar here,

6    the Gizmodo made a conscious decision to try and reach a new

7    audience using, with this article being published, by cross-

8    promoting the Deadspin website containing the alleged --

9    what we allege is a defamatory article, to its entire new --

10   its whole customer base.

11          THE COURT:  But the complaint doesn't allege that.

12   All I have to look at is the complaint here, and you're

13   arguing --

14          MR. RICARDO:  We can amend that --

15          THE COURT:  --that the complaint --

16          MR. RICARDO:  We can amend the complaint, Your

17   Honor, to allege that the republication --

18          THE COURT:  If you want -- look, if you --

19          MR. RICARDO:  -- is reaching the new audience, and

20   the cross promotion which --

21          THE COURT:  If you want to consent to the

22   injunction on this complaint without prejudice to file a new

23   complaint, that's fine.  (Indiscernible) the relief, and

24   you'll have an opportunity to make allegations which maybe

25   are appropriate -- more appropriate for State Court because

Page 48

```
 1    it's clear that it's purely at State Court issue.  But as I

 2    said, you don't anything -- you don't allege what you say

 3    constitutes the republication, and as I read the complaint,

 4    although you say the background is important, you don't give

 5    the background of the bankruptcy or the (indiscernible)

 6    order or in case of Mr. Goldberg, the release, I guess.  But

 7    I'll hear that.  But if, you know, short of that because

 8    they've made the motion, short of some agreement, you know,

 9    I don't -- I'll just decide the motion based on the

10    complaint.

11              MR. FLAXER:  I mean, it seems to me we could agree

12    on the record to take to stay the State Court action, take

13    no further steps, give us a certain number of days to file

14    an amended complaint, and then Your Honor can decide whether

15    or not you want to have a new -- you know, a further

16    hearing, I mean that sounds like something that we could

17    out.

18              THE COURT:  Mr. Gilhuly?

19              MR. GILHULY:  Your Honor, you know, we've been

20    being very nice about this, but they completely wasted our

21    time and our money, a lot of money.  This is ridiculous.

22    They did not allege anything that could be a republication

23    in that complaint, zero.  And now they're trying to make it

24    up.  They're grasping for facts.  It -- I will tell you.  We

25    have an order that you entered that said it bars all pre-
```

Page 49

1    sale conduct.

2          THE COURT:  Let me ask you a question.  Now, let's

3    --

4          MR. GILHULY:  We are telling you --

5          THE COURT:  Let me just --

6          MR. GILHULY:  Yes.

7          THE COURT:  Assuming you're right, I agree with

8    you.  All you're going to get is an injunction without

9    prejudice to file the claim that doesn't -- that's not

10   barred by the sale order.

11         MR. GILHULY:  I understand they could file a new

12   complaint that would have to focus on real republication.

13         THE COURT:  So, that's what they're -- that's what

14   they're proposing to do.

15         MR. GILHULY:  Well, do we get attorney's fees for

16   having spent all of this money on a -- what is a frivolous -

17   -

18         THE COURT:  What's the basis of the attorney's

19   fees?  What's the statute or ruling that grants you

20   attorney's fees?  Did you ever send them a safe harbor?

21         MR. GILHULY:  No.

22         THE COURT:  Okay.  9011 is out.

23         MR. GILHULY:  I'm sorry?

24         THE COURT:  9011 is out.

25         MR. GILHULY:  Yes.  Your Honor, this was a hundred

1    (indiscernible) case.  They weren't able to bring all of

2    these arguments and ask for the injunction and resolve this.

3    Instead they wait one year shy, eight months after the

4    order, and file a complaint that doesn't allege anything

5    that could constitute republication.  They have wasted our

6    time and I just don't think this is a close issue at all.

7    I'm going to have Mr. Hentoff tell you why

8            THE COURT:  Very briefly.

9            MR. GILHULY:  Okay.

10           THE COURT:  I have a very crowded courtroom and

11   we've been at this for a while now.

12           MR. HENTOFF:  Thank you, Your Honor.  Just very

13   briefly, Mr. Ricardo's argument was made in the plaintiff's

14   objections to our motion and we responded to it fully in our

15   reply brief, and we explained why adding a link to a general

16   website for a totally different reason is not a

17   republication.  We cite the Hefnerand I'm happy to rest on

18   the argument that we made.

19           THE COURT:  Thank you.  All right.  I'll reserve

20   decision (indiscernible).

21           MS. LEVINE:  Good morning, Your Honor.  Sharon

22   Levine and Dipish Patel, Saul, Ewing, Arnstein, Lehr for

23   Ryan Goldberg, and if I could introduce Mr. Goldberg is in

24   court with us today.  Thank you.

25           Your Honor, it's been a lengthy hearing and I

Page 51

1   heard during that course that Your Honor's primary concerns

2   seem to revolve around two issues.

3            THE COURT:  Well, Mr. Goldberg's issue is a little

4   different.  We're not relying on the sale order, we're

5   relying on the confirmation order and specifically on the

6   release provisions in it.

7            MS. LEVINE:  Correct, and I heard Your Honor

8   question willful misconduct and the terms deemed released --

9            THE COURT:  Deemed.  Yes.

10           MS. LEVINE:  -- deemed to have received, and if we

11  could focus on those for a minute.  Your Honor, as you might

12  imagine, in connection with the context of negotiating the

13  plan and the disclosure statement and the release language,

14  there was some substantial back and forth.  We dealt

15  primarily through the debtors who we had understood were

16  negotiating with parties that didn't want us to get releases

17  on the other side, and were working through that language,

18  so obviously this wasn't the first language we proposed.  We

19  understand why Your Honor is raising these issues, but we

20  would respectfully submit that in this context this language

21  is sufficient to protect Mr. Goldberg.

22           First, with regard to intentional misconduct, Mr.

23  Goldberg didn't borrow the company car, go out on bender and

24  hit a pedestrian.

25           THE COURT:  But --

Page 52

1          MS. LEVINE:  He provided services in the ordinary

2    course of his business to his editors which content was

3    reviewed and then published prior to the sale.  At the time

4    of the confirmation -- I think Your Honor might've been

5    asking a question, I was --

6          THE COURT:  No, go ahead.

7          MS. LEVINE:  At the time of the confirmation, we

8    negotiated for release language that would provide that even

9    though when they sent the responsive letter it was clear

10   that Gawker Media was going to stand behind Mr. Goldberg and

11   protect him the way they had protected, historically, all of

12   their writers with regard to content that was provided

13   through the ordinary course, that they wanted the release of

14   the indemnification claim so they could do a finite claim

15   reconciliation and pay hundred-cent dollars to everybody who

16   actually asserted claims.  We understood that there seemed

17   to have been a pattern of behavior here where we were afraid

18   that separate and apart from just wanting money from the

19   Gawker settlement there were other agendas going on.  So the

20   deemed, or the ability to have gotten a release, a

21   distribution, is exactly what we were looking to protect

22   here where they lie in wait, don't go after the deep pocket

23   which is Gawker, don't let the issue get resolved through

24   the Bankruptcy Court through the process, and then come

25   later after Goldberg for reasons that are not exactly clear

Page 53

1    to us.

2           THE COURT:  Ms. Levine, you've told me a lot of

3    things that would have to be part of an evidentiary hearing.

4    Are you implicitly conceding that deemed to receive

5    distributions is an ambiguous phrase?

6           MS. LEVINE:  Your Honor, we --

7           THE COURT:  I can't understand it without that

8    background.

9           MS. LEVINE:  Well, two responses, Your Honor.

10   First of all, we think that Your Honor can consider the

11   entire record of the case as part of what Your Honor

12   considers in connection with this hearing.

13          THE COURT:  I don't know what that means.

14          MS. LEVINE:  The confirmation hearing and the

15   discussions that took place at the confirmation hearing with

16   regard to the release language.  Secondly, Your Honor, we

17   think that deemed to have received needs to have meaning for

18   the --

19          THE COURT:  So, what do you think it means?

20          MS. LEVINE:  We think it means that if somebody

21   was a creditor or an administrative expense claimant at the

22   time that the release language was approved and chose for

23   whatever reason that we don't fully understand here not to

24   exercise that right to get paid a hundred cents on whatever

25   their claim would've been if they'd come to Court and ask

Page 54

1    for the money, that they should be deemed to have received

2    that money and they should've be permitted, when Gawker the

3    deep pocket and the protector of the writer in this

4    circumstance, goes away to come after Ryan. And we would

5    respectfully submit that that was the contents -- context in

6    which the Court considered the applicability of third party

7    releases in this case.

8            THE COURT:  And what you think the willfulness --

9    willful misconduct, I think is the phrase.  What do you

10   think that means?

11           MS. LEVINE:  Your Honor, we think you have to look

12   at it under the facts and circumstances of the case and in

13   the context of the industry.

14           THE COURT:  That sounds like a factual issue,

15   though.

16           MS. LEVINE:  No, no --

17           THE COURT:  In other words, are you saying that I

18   can read it and know what it means without taking evidence?

19           MS. LEVINE:  I think that you can, Your Honor,

20   because if we read it the way the creditor here is looking

21   to have Your Honor read it, it writes the release out of the

22   plan, okay?  So, you know, willful misconduct is not

23   something that you have to first prove and defeat and win

24   and have Ryan be the victor in an underlying defamation suit

25   in order to have the release apply.  Here, this is exactly

Page 55

1    the type of claim that had been brought against the writers

2    prior to the time of the confirmation order and that we

3    discussed at the confirmation hearing as being exactly the

4    type of third party release and protection that the debtor's

5    counsel made as part of that hearing with regard to Your

6    Honor's consideration.

7           THE COURT:  So, what is the willful -- and I

8    understand your argument that it's -- creates an exception

9    that swallows up the entire rule of the release, but what

10   was it supposed to mean?

11          MS. LEVINE:  We would respectfully submit that it

12   -- what it means is the same way you look at willful

13   misconduct in any other context.  It means when somebody is

14   truly acting outside the scope of their employment, like the

15   hypothetical I gave earlier where they, you know, they took

16   the company car and went on a bender or they -- you know,

17   it's the type of thing that would've caused Gawker, had it

18   survived, not to be indemnifying Ryan.

19          THE COURT:  So, you think it's linked to the

20   indemnification obligation?

21          MS. LEVINE:  Yes, Your Honor.

22          THE COURT:  That's what was intended by the

23   parties?

24          MS. LEVINE:  Yes, and that's why when Ryan and the

25   other covered writers and content provided gave up their

Page 56

1    indemnification claims without also simultaneously having a

2    pot of money set aside to defend them from these types of

3    causes of action that especially in the case of Gawker, I've

4    been on everybody's radar screen.  This release was included

5    in the plan.

6              THE COURT:  Okay.  Thank you.

7              MS. LEVINE:  Your Honor --

8              THE COURT:  Wait, before you go.

9              MR. GALARDI:  Sorry.

10             THE COURT:  Who wants to give me the context? I

11   didn't mean to cut you off, Ms. Levine.  Are you done?

12             MS. LEVINE:  Your Honor, there -- obviously there

13   are other arguments in the brief but --

14             THE COURT:  I read it.

15             MS. LEVINE:  -- we'll just rely on those.

16             THE COURT:  Okay.

17             MR. GALARDI:  Your Honor, again I'm stepping up as

18   the historian part of the negotiations.  Your Honor, I want

19   to confirm Ms. Levine's understanding.  Whenever we did this

20   --

21             THE COURT:  Are you testifying now?

22             MR. GALARDI:  -- I can have Mr. --

23             THE COURT:  I'm not going to have an evidentiary

24   hearing now.

25             MR. GALARDI:  Your Honor --

Page 57

1          THE COURT:  The question is whether one is

2    necessary.

3          MR. GALARDI:  Your Honor, Your Honor asked me at

4    the hearing and I believe we said that this all came up in

5    the context of indemnification agreements and what the

6    company had done with their indemnification agreements.

7          THE COURT:  I remember.

8          MR. GALARDI:  Companies cannot indemnify people

9    for gross negligence and willful misconduct, so what we did

10   was -- and to match up with the U.S. trustee, as I think

11   we've said, is we reviewed the conduct, the letters, and

12   other than the one claim that we did bring which was against

13   (indiscernible), as you may recall, we did say because there

14   was a finding of punitives, we were very sensitive to this

15   issue and then with respect to the writers we did not

16   believe, we thought it was all within the course of their

17   conduct.  So, in negotiating the releases, we made, as Mr.

18   Holden would testify at the confirmation (indiscernible) on

19   his behalf, made a determination that the releases were

20   appropriate to the writers because we believe they did not

21   act outside their authority with respect to any known claims

22   or any known letters including the letters that we had

23   received that Your Honor has gone through.  That was the

24   context in which this provision was drafted.  Thank you.

25          MR. FLAXER:  I think where the plan is clear, the

1    other arguments that are being made on the language with

2    respect to the background and who said what to whom, I don't

3    think get implicated and we believe on the deemed to have

4    received a distribution, we think that is clear so it's not

5    necessary for the Court --

6             THE COURT:  You think -- what do you think deemed

7    to have received a distribution means?

8             MR. FLAXER:  I think that the Court's bar date

9    order clarifies it.

10            THE COURT:  But that came before the claim.

11            MR. FLAXER:  Right, but the plan specifically says

12   that it is the release ---

13            THE COURT:  Who is someone who's deemed -- and I'm

14   not asking this as a rhetorical question.  In your view, who

15   is someone who is deemed to have received a distribution but

16   doesn't actually receive a distribution?

17            MR. FLAXER:  So, for example, someone who has a

18   claim could have the claim somehow reinstated and get a

19   different type of treatment that's not a, you know,

20   distribution but they could be deemed to have received a

21   distribution.

22            THE COURT:  You mean a class that doesn't receive

23   anything is deemed to have received a distribution?

24            MR. FLAXER:  Or a creditor who has their claim,

25   you know, reinstated, for example.

Page 59

1          THE COURT:  I've never heard it in that context.

2          MR. FLAXER:  I mean --

3          THE COURT:  I've never heard the -- I don't recall

4    ever hearing the phrase.  I mean, it could've been in other

5    releases.

6          MR. FLAXER:  I think there could be, you know, we

7    could think through lots of examples, but the fact is that

8    the bar date order, and I think it's the injunction

9    provision specifically says that subject to any other orders

10   of the Court -- here.  "Upon the entry of the confirmation

11   order except as expressly provided in the plan, confirmation

12   order, or a separate order at the Bankruptcy Court."  So,

13   when this comes out already in place, is the bar date order

14   that provides --

15         THE COURT:  You don't file a timely claim, you

16   don't receive a distribution?

17         MR. FLAXER:  And --

18         THE COURT:  It's the same as the rule.

19         MR. FLAXER:  And it says shall not -- sorry, my

20   finding is --

21         THE COURT:  I know what it says.

22         MR. FLAXER:  It's very clear that you're not

23   deemed to be -- you're not deemed to have received a

24   distribution.  (Indiscernible.)

25         THE COURT:  It doesn't say that.  It just says you

Page 60

1    don't receive a distribution on both, which is what it

2    normally says.

3             MR. FLAXER:  I have it right here.  I think it's

4    important.  I think it's important I just read it in --

5             THE COURT:  Okay.

6             MR. FLAXER:  -- for the record.  I thought I had

7    it right here.  I apologize for the delay.  I know

8    everybody's waiting.

9             So, I think it's clear that Your Honor in your

10   comments on the record made clear that the injunction in the

11   release provision should be made to be co-extensive.  I --

12            THE COURT:  Right.

13            MR. FLAXER:  And it was not like that originally,

14   but, Your Honor insisted on that change and that change was

15   made and the injunction is abundantly clear that it only

16   applies to parties who are subject to the release and the

17   sale order -- I'm sorry, the bar date order provides that

18   all holders of claims that fail to comply with this order by

19   timely filing the proof of claim in appropriate form shall

20   not be treated as a creditor with respect to such claim

21   (indiscernible) voting and distribution.  I can't imagine it

22   being more clear that we're just not subject to that release

23   and injunction.

24            THE COURT:  But it's still -- you don't receive a

25   distribution, but it doesn't really answer the question what

Page 61

1    it means to be deemed to receive a distribution, which is

2    what I am having trouble with.

3              MR. FLAXER:  I mean, I think the bar date order

4    resolves that issue conclusively because it specifically

5    says if you don't file it, if you don't comply with the

6    order by filing a timely claim, you're not treated as a

7    creditor with respect to such claims for, dot-dot-dot,

8    distribution.  How can we be deemed to have received a

9    distribution in light of this language?  I don't --

10             THE COURT:  Well, to be --

11             MR. FLAXER:  I'm having -- I'm not seeing it.

12             THE COURT:  Could mean you're a creditor who was

13   entitled to receive a distribution had you filed a timely

14   proof of claim.

15             MR. FLAXER:  I mean --

16             THE COURT:  Because there was no discharge in this

17   particular case because it was a liquidated case.

18             MR. FLAXER:  You know, I think we can, you know,

19   fashion words to try to get around it, but I think it's very

20   clear.  I just don't think it could be more clear and they,

21   you know, they haven't pointed to any -- anybody else than

22   use who could possibly be in this category.  I mean this

23   notion of opening the floodgates doesn't seem to be backed

24   up by any facts.  But again, I'm basing my argument on, you

25   know, a lot of smart lawyers spent a lot of time with the

Page 62

```
1    plan.  They drafted it, they knew about the earlier orders

2    of the Court.  I think the words are clear and I'm -- and I

3    would submit to Your Honor that that should end the inquiry.

4    I think on the, you know, the willful misconduct is modified

5    by, is established by a final order.  Doesn't say a final

6    order of any particular Court, but it says by a final order.

7    I mean, I would submit that the volitional act of publishing

8    an article seems to me like intentional conduct.  They

9    didn't, you know, publish it by accident.  You know, we

10   allege that this is really --

11              THE COURT:  I guess an author doesn't publish it

12   because he writes it.

13              MR. FLAXER:  I used the wrong word, but --

14              THE COURT:  Yeah.

15              MR. FLAXER:  To produce it and make it available

16   for publication is a volitional act.  You know, we think

17   it's a dastardly defamation.  They don't agree.  You've

18   heard a lot on both sides, but you know, we believe that we

19   have a lot of equities on our side on this.  I just want to

20   take one moment to -- because we've heard so much about how

21   we're wasting our time and the timing and we lay in wait --

22   or I should say lied in wait.  You know, the decision to

23   pursue a defamation claim, by the way, I'm not the expert on

24   this, either.  I had somebody else --

25              THE COURT:  What are you an expert on?
```

Page 63

1              MR. FLAXER:  I'm beginning to wonder.  Is not one

2     that you take lightly because when the article gets

3     published you kind of hope it's not going to get a lot of

4     attraction and by filing claims or bringing lawsuits you can

5     bring more attention to it than it's worth so you'll like --

6     often the decision is made to wait.  Then the sale, you

7     know, process gets started.  We had hoped they would see the

8     light and bring it down.  They didn't.  It's not uncommon

9     for an action to be brought close to the expiration of the

10    statute.  We were hoping it would go away; it didn't, and we

11    thought we had to act.  So, there is another side to that.

12    I'm not getting into right or wrong, it's just it's not as

13    simple as they cast it.

14             Two last quick things on -- that I'd like to point

15    out.  My associated did me the favor of pointing out a case

16    in our brief on the mandatory abstention that says, absent

17    contrary to the evidence, a Federal Court may presume that a

18    State Court will operate efficiently and effectively in

19    adjudicating the matter (indiscernible) that's on Page 19.

20             And lastly, it is a request for a jury here, and I

21    think that raises even more layers and issues for Your Honor

22    to -- and that essentially, finally decide the State Court

23    issue in this context.

24             THE COURT:  Thank you.  Briefly.

25             MS. LEVINE:  Your Honor, two quick responses.  If

Page 64

1    you -- I would invite the Court's attention to, in Paragraph

2    32 and then again in Paragraph 40 of the motion -- of our

3    motion itself, we quote the transcript from our confirmation

4    in the discussion about the releases and what -- and it --

5    so it sort of talks to why we need more than just actually

6    received a distribution and if you look at the language we

7    quoted in Paragraph 40, it actually references the fact that

8    this letter in this particular case was sent during the

9    course of the bankruptcy case and that there was no proof of

10   claim filed, and therefore we needed to deal with releasing

11   claims for those folks who were, for whatever reason, lying

12   in wait.  In addition to that --

13        THE COURT:  Where are you reading this?

14        MS. LEVINE:  On Page 15 of the actual -- actually,

15   Your Honor, let me invite you to (indiscernible) on Page 11

16   at Paragraph 32 --

17        THE COURT:  All right.

18        MS. LEVINE:  -- quoting Mr. Galardi.  "We believe

19   that anybody who would be bringing such action should have

20   brought an action or claim in the bankruptcy knowing that

21   Gawker was in bankruptcy and therefor Gawker could've dealt

22   with those claims in bankruptcy."  And then it goes on, you

23   know, and it continues from there with the concept that we

24   understand that people may be choosing not to do that, and

25   that's a problem.  In 40, we go on and Mr. Galardi actually

Page 65

1    talked about this particular issue.  "Your Honor, let me ask

2    you a question.  Are there any creditors who have not filed

3    a claim, did not vote, and have not settled?"  And Mr.

4    Galardi, "Yes, in the following way, and I want to be clear

5    as I mentioned, Mr. Harder mentioned maybe I'm not getting

6    it right, but -- and I hate to use the president's name but

7    we have received from one -- from one law firm that we wrote

8    an article about the president elect that never got filed in

9    this case."  So, there are -- there were specific references

10   to actual claims where everybody knew about the bankruptcy

11   and everybody knew about the claims and there was an

12   affirmative decision not to bring them or deal with them in

13   the bankruptcy case and we would respectfully submit that

14   those are the claims that should be deemed to have received

15   a distribution.

16          Also, there was a reference made to the fact that

17   we don't think that this should be considered something

18   that's going to be sort of a repetitive, ongoing problem,

19   but if you take a look at the Jezebel case which we cite in

20   a footnote which is not before this Court, not only does it

21   eliminate Gawker who would've protected the writer in that

22   particular case, it was actually filed after the statute of

23   limitations, so there is a fear by the writers and that in

24   fact this is a reoccurring problem and they just really need

25   the release here to protect them, not only where people got

Page 66

1    paid their hundred cents in the bankruptcy but where they

2    could've and should've come forward and should be deemed to

3    have received that distribution in the bankruptcy.  Thank

4    you, Your Honor.

5            THE COURT:  Thank you.  Yes, sir?

6            MAN 1:  Your Honor, Samuel (indiscernible) on

7    behalf of the (indiscernible) law firm.  Because Your Honor

8    takes whatever the motion's wrote seriously, Your Honor was

9    correct, Rule 11 dead.  Mr. Goldberg mentioned 1927, and I

10   just want to say one thing, that like Mr. Flaxer said we'd

11   like the opportunity because this raises big questions.

12   First of all, whether 1927 applies to a single complaint

13   filed in State Court.  It was their decision to come to

14   Court.  They could have filed a motion to dismiss.  State

15   Court judges interpret Bankruptcy Court orders all the time.

16   That's number one, and they could've asked for sanctions

17   there under the (indiscernible), but they didn't.

18           Second of all, Your Honor, there's no basis as

19   Your Honor -- you know, it's not really appropriate to quote

20   Your Honor's opinions, but you quote a lot of Second Circuit

21   cases in (indiscernible) and the fact that we're sitting

22   here and discussing this for two hours and you didn't throw

23   us out in the first minute, clearly --

24           THE COURT:  That would be impolite, I wouldn't do

25   that.

Page 67

1          MAN 1:  But --

2          THE COURT:  Although I was sorely tempted.

3          MAN 1:  But the bottom line is if there's any

4    consideration which you think you should never have, you

5    should give us an opportunity to brief it properly.

6          THE COURT:  On this one, there are two exceptions

7    to the release that (indiscernible) is deemed to receive a

8    distribution.  I'm not sure what it means.  It could mean

9    that you're a creditor that didn't file a claim.  It could

10   mean -- I'm not really sure what it means.  The other, which

11   is more difficult, is this willful misconduct notion, and I

12   understand the -- and I think it's an ambiguous phrase.  I

13   do remember the background to this. I do remember that the

14   releases were the quid pro quo for the loss of the

15   indemnification rights and maybe it is appropriate to

16   interpret that exception as the types of things that the

17   company wouldn't (indiscernible) earlier, would not be

18   statutorily required or by agreement required to indemnify,

19   but the bottom line is these are ambiguous phrases.  They're

20   in the plan and I would like to hear evidence regarding the

21   negotiations of these phrases (indiscernible) relevant

22   evidence in order to interpret them and interpret the scope

23   of these exceptions to the releases.  So, parties want to

24   take discovery on that issue?

25          MR. FLAXER:  I mean, from our perspective, I think

1    the answer is yes.  I think we would also want to brief the

2    issue that it's -- that evidence shouldn't be taken.

3              THE COURT:  I've just concluded it should, to save

4    the ink.

5              MR. FLAXER:  And so I -- the answer is yes, but

6    I'd like a day or two to just confer and think about that a

7    little more because I don't want to put everybody to a lot

8    of work if there's a way around it, but as I stand here now,

9    I would think the answer is yes.

10             THE COURT:  All right.  All right.  Why don't I

11   give you 60 days to complete discovery.  All right, why

12   don't you submit a new order providing for 60 days to

13   complete discovery on the two issues I mentioned.  Let's say

14   the end of November because of Thanksgiving, the last day in

15   November.  Give you a pre-trial conference date and then

16   I'll fix a trial or hearing date at that point.

17             MR. FLAXER:  Thank you.

18             THE COURT:  Let me just give you the date, submit

19   an order.  Don't come on that date and tell me you've been

20   having problems with discovery.  If you're having problems

21   with discovery, well me before.

22             December 12th, okay?  For pretrial conference,

23   10:00.  At 10:00.  Okay.  Thank you.

24             MR. FLAXER:  Thank you, Your Honor.

25      (Whereupon these proceedings were concluded at 11:47 AM)

1                          I N D E X

2

3                         RULINGS

4                                          Page       Line

5

6   Motion of Proposed Amici Curiae Society of    10        20

7   Professional Journalists, Reporters Coalition for

8   Freedom of the Press, and 19 Other Media Organizations

9   for Leave to File Memorandum of Law as Amici Curiae

10  Granted

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya                  Digitally signed by Sonya Ledanski
                           Hyde
                           DN: cn=Sonya Ledanski Hyde, o, ou,
    Ledanski Hyde          email=digital1@veritext.com, c=US
7                          Date: 2017.10.12 10:54:32 -04'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 2, 2017