# EXHIBIT A



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                              :       Chapter 11
                                                   :
Gawker Media LLC, et al.,[1]                       :       Case No. 16-11700 (SMB)
                                                   :
          Debtors.                                 :       (Jointly Administered)
                                                   :
------------------------------------------------------------x

## EXPERT DECLARATION OF CHAD E. MILTON

I, Chad E. Milton, under the penalty of perjury, declare as follows:

1.      I am the co-founder and principal of Media Risk Consultants LLC. I submit this declaration in connection with the *Motion (I) to Enforce Order Confirming Amended Joint Chapter 11 Plan of Liquidation and (II) to Bar and Enjoin Creditors from Prosecuting their State Court Action* [Docket Number 981] (the "Motion"). In this declaration, I state and support my opinion that:

> In the specialty insurance field of media liability, insurers provide coverage for defamation and related claims to media insureds without exclusion for gross negligence or willful misconduct. The same is true for employees and non-employee content providers. Those insurers, having committed to insuring defamation and related claims, understand that it would be unfair and illusory to deny coverage for conduct that satisfies the elements of the torts.

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10020. Kinja Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10020.

A. <u>Qualifications</u>

2. I am an attorney at law and am now an inactive member of the bars of the states of Colorado and Missouri.

3. I have been an attorney, insurance-broker, and insurance company executive for almost forty years. During this time, my professional career has been focused on insurance-related issues in the media world.

4. I started in the media insurance field in 1978, where I was first associated with Employers Reinsurance Company, at the time the United States' largest media insurer. While with Employers Reinsurance Company, I served as in-house claims counsel and was tasked with defending claims and ultimately rose to the position of an officer and head of the libel claims department.

5. I left Employers Reinsurance Company in December 1980. In January 1981, I joined Media/Professional Insurance. During my time with Media/Professional Insurance, I held the title of Senior Vice President, Claims and Marketing. In my time there, Media/Professional Insurance became the largest underwriter of insurance for the world's communication media industry, covering defamation, copyright infringement, and other torts arising from media content. As media claims director, I had personal responsibility for claims worldwide and managed media liability litigation for insureds of all sizes and types of media (such as broadcast and print) in all levels of state and federal courts.

6. In August 2000, I left Media/Professional Insurance and joined Marsh LLC as Senior Vice President, National Practice Leader for Media Liability and Intellectual Property. While with Marsh, I communicated with and advised clients in the media industry (including

broadcasting companies, publishers, and advertisers) on issues related to insurance coverage and exposure.

7. I left Marsh in September 2009, and co-founded ThinkRisk Underwriting Agency LLC in September 2009. While with ThinkRisk Underwriting Agency LLC, I served as Executive Vice President. My duties included drafting insurance policies, endorsements and applications, addressing issues relating to underwriting and risk selection in the media industry, and the management of claims. As a result of my work at Marsh, I reviewed virtually all of the media insurance policies in the market.

8. In November 2011, I left ThinkRisk Underwriting Agency LLC and in January 2012, I co-founded Media Risk Consultants LLC, where I currently serve as a principal. Media Risk Consultants LLC is an independent media insurance and risk management consulting firm that provides advice on media liability insurance, risk management, policy drafting, product development, coverage, and claims management.

9. Over my many years of experience in the industry, I have worked with almost all of the major (and minor) media companies in this country. For example, my current firm's largest client is Mutual Insurance Company of Bermuda, which insures most of the largest newspaper-based media companies, including the New York Times, Washington Post, Dow Jones, and Gannett.

10. In addition to my work experience listed above, I frequently speak and have written on the topic of media insurance. As an example, I authored the chapter on media insurance policies titled "Insurance Policies" in Judge Robert Sack's leading treatise on defamation, *Sack on Defamation: Libel, Slander and Related Problems*.

11. This declaration is based on my nearly forty years of experience advising media companies in connection with insurance-related issues and serving as in-house counsel tasked with determining insurance coverage for defamation and related claims brought against insured media companies.

12. While I have not specifically investigated the merits of any pending action, I have reviewed section 9.05 of the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (the "Plan").

B. Insurance Practice

13. Throughout my professional career in the media insurance field, insurance companies have, as a matter of practice, routinely insured media companies for all types of losses, including losses arising from intentional conduct. The types of losses arising from intentional conduct include but are not limited to defamation claims and other related torts.

14. As a regular part of their business, media insurers provide insurance coverage to media companies – and to other covered persons, such as employees and freelance writers, as long as they are acting within the scope of their duties – for defamation and related claims that involve allegations of willful misconduct. As a regular part of their business, media insurers also provide insurance coverage to these same entities and individuals for defamation and related claims that involve allegations of negligence, gross negligence, and more serious allegations of misconduct, such as publishing with "actual malice." "Actual malice" is a term of art used in defamation cases that means a defendant either made a false statement with a "high degree of awareness of probable falsity" or "in fact entertained serious doubts as to the truth of his publication" and yet published anyway. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

15. To illustrate the expansive scope of coverage in the media industry, it is a generally accepted practice for insurance companies to pay and provide coverage for punitive damages; insurance policies generally allow the insured media company to select the applicable state law that applies to the insurance policy.

16. The purpose behind insurance companies' willingness to provide media insurance coverage for costs and damages arising from defamation claims, whether or not arising from alleged conduct including gross negligence and willful misconduct, is that any denial of coverage based on alleged gross negligence or willful misconduct would render a media insurance policy illusory and provide no coverage at all.

17. While so-called "intentional" act exclusions are common in insurance policies in other industries, they do not exist in media insurance policies. Each policy must be analyzed in the context of the industry the policy was written in, the nature of the activities being insured, and the nature of the claims anticipated.

18. Defamation is an intentional tort. To succeed on a defamation claim under New York law, the plaintiff must prove that the defendant (1) published a false and negative factual statement about an identifiable individual, (2) operated with either gross irresponsibility (if the plaintiff is a private figure) or with actual malice (for plaintiffs who are either general interest public figures or limited purpose public figures), and (3) caused the plaintiff damage. *See, e.g., Rosner v. Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015); *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199 (1975); *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). In either case – where there has been an allegation that an insured acted in a grossly irresponsible manner or acted with actual malice – the insurance company provides insurance coverage to the media company. The insurance coverage would not be withdrawn by the media

company in the event that a plaintiff prevailed on its claim by establishing that the employee or freelancer acted in a grossly irresponsible manner or with actual malice.

19. Based on my nearly forty years in the media insurance industry, first as in-house claims counsel and now as an advisor to companies, I can report that media companies routinely indemnify, protect, and hold harmless their writers, whether employees or freelancers, based on the coverage and protections afforded by insurance policies even when there has been an allegation of gross irresponsibility or actual malice. Based on my experience and to the best of my knowledge, I am not aware of any circumstance where insurance coverage was afforded to a media company and the media company refrained from indemnifying an employee or freelancer acting within the scope of his or her duties because of claims that the employee or freelancer engaged in conduct amounting to gross negligence or willful misconduct.

20. Based on my experience in the media industry, the release language set forth in section 9.05 of the Plan, which excludes claims arising from "willful misconduct" and "gross negligence" does not describe conduct by a writer acting within the scope of his or her employment that would cause exclusion from insurance coverage or from his or her employer's indemnification obligations.

21. If section 9.05 of the Plan were read to exclude a defamation plaintiff's claims of gross negligence or willful misconduct, it would conceivably exclude any and all defamation claims. In my experience, the indemnification obligations of a media company to its employees or freelancers do not contain any such exception, as it would render the indemnification obligation almost meaningless. This is because many if not most defamation lawsuits seek to prove that a defendant's conduct was intentional and wrongful and a purpose of the

indemnification obligation is to protect employees and freelancers not only when they win a defamation case but also when they lose one.

22.     Based on my experience, because insurance coverage would be available, as a matter of course, a media company would indemnify and defend its employees and freelancers for defamation claims alleging willful misconduct or gross negligence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 14, 2017

_____
Chad E. Milton