# EXHIBIT B

Page 1

1

2       UNITED STATES BANKRUPTCY COURT
        SOUTHERN DISTRICT OF NEW YORK
3       -------------------------------------------X

4       In re:                      Chapter 11

5       GAWKER MEDIA LLC, et al., Case No. 16-11700
                                    (SMB)
6
                                    Debtors.
7       -------------------------------------------X

8

9                       DATE: November 15, 2017

10                      TIME: 10:01 A.M.

11

12              DEPOSITION of CHAD E. MILTON, taken

13      by the Plaintiff, pursuant to Subpoena and to

14      the Federal Rules of Civil Procedure, held at

15      the offices of Golenbock Eiseman Assor Bell &

16      Peskoe, 711 Third Avenue, New York, New York

17      10017, before Robert X. Shaw, CSR, a Notary

18      Public of the State of New York.

19

20

21

22

23

24

25

Page 2

1
2    A P P E A R A N C E S :
3
     HARDER MIRELL & ABRAMS, LLP
4         Attorneys for Plaintiff
          132 S. Rodeo Drive, Fourth Floor
5         Beverly Hills, California 90212
          BY: DILAN A. ESPER, ESQ.
6             -and-
     GOLENBOCK EISEMAN ASSOR BELL &
7    PESKOE, LLP
          Attorneys for Plaintiff
8         Pregame LLC
          711 Third Avenue
9         New York, New York 10017
          BY: MICHAEL S. WEINSTEIN, ESQ.
10        212.907.7347
          desper@hmafirm.com
11        mweinstein@golenbock.com
12
13   SAUL EWING ARNSTEIN & LEHR LLP
          Attorneys for Ryan Goldberg
14        1037 Raymond Bouevard, Suite 1520
          Newark, New Jersey 07102
15        BY: DIPESH PATEL, ESQ.
          dipesh.patel@saul.com
16        973.286.6713
17   WILLIAMS & CONNOLLY, LLP
          Attorneys for Ryan Goldberg
18        725 12th Street, N.W.
          Washington, D.C. 20005
19        BY: THOMAS G. HENTOFF, ESQ.
20   GIZMODO MEDIA GROUP
          BY: LYNN OBERLANDER, ESQ.
21        EVP and General Counsel
          646.214.7898
22
23
               *       *       *
24
25

Page 3

1             Chad E. Milton
2    C H A D   E.   M I L T O N, called as a
3    witness, having been first duly sworn by a
4    Notary Public of the State of New York, was
5    examined and testified as follows:
6    EXAMINATION BY
7    MR. ESPER:
8         Q.   Please state your name for the
9    record.
10        A.   Chad E. Milton.
11        Q.   What is your address?
12        A.   8821 Alhambra Street, Shawnee
13   Mission, Kansas 66207
14        Q.   Good morning, Mr. Milton.
15        A.   Good morning.
16        Q.   Have you ever had your deposition
17   taken before?
18        A.   Yes.
19        Q.   How many times?
20        A.   Once.
21        Q.   Okay.  What was the occasion for
22   that?
23        A.   I really don't recall the
24   circumstances.  I was a fact witness in a,
25   involving an insurance policy, and there was

Page 4

1             Chad E. Milton
2    a dispute between two parties of which I had
3    information, but I've forgotten what it was.
4         Q.   Do you remember what type of
5    insurance it was?
6         A.   It was media liability insurance.
7         Q.   And was the underlying claim a
8    defamation claim?
9         A.   I don't remember.
10        Q.   Okay.  I'm going to go through a
11   few of the ground rules of the deposition.
12             First of all, you're allowed to
13   take a break whenever you want to.  This is a
14   deposition, not an inquisition.  If you need
15   to, at any point in time, just let me know.
16        A.   Okay.  Thank you.
17        Q.   Remember to let me finish each
18   question before starting your answer.  I'll
19   try and let you finish your answer before
20   starting the next question; that will allow
21   the court reporter we've just been talking
22   about to have a clear record, which is what
23   we want.  Do you understand that?
24        A.   I do understand it.  Thank you.
25        Q.   And do you understand that you are

Page 5

1             Chad E. Milton
2    under the same oath that you would be under
3    in a court of law and you have the same
4    obligation to give the most truthful and
5    correct testimony you can?
6         A.   Yes, I understand that.
7         Q.   Okay.
8              Who has employed you in this case?
9         A.   I was retained, I was engaged by a
10   law firm to, and asked to come as an expert
11   witness.
12        Q.   Which law firm?
13        A.   Well, my -- most of my dealings
14   were with the Saul Ewing law firm.
15        Q.   Okay.  Did you have any
16   communications, Yes or No, with Ropes & Gray?
17        A.   No.
18        Q.   Okay.  And did you have any
19   communications with Mr. Hentoff's office?
20        A.   Yes, I did.
21        Q.   Okay.  How much are you being
22   compensated?
23        A.   $300 an hour.
24        Q.   And how many hours about have you
25   worked on this so far?

Page 6

1           Chad E. Milton
2       A.   Six or seven.
3       Q.   Okay.  Have you ever been an expert
4   witness before?
5       A.   No.
6       Q.   Okay.  Now, you went into an
7   extensive discussion of your professional
8   background in your declaration and I
9   appreciate that;
10          MR. ESPER:  So, let's go ahead and
11       mark that as an exhibit.  We'll call it
12       Exhibit 5.
13          (Milton Exhibit 5, expert
14       declaration of Chad E. Milton, marked
15       for identification as of this date.)
16       Q.   I'm handing you Exhibit 5.
17          Please turn to paragraph 2 of your
18   declaration on page 2.
19       A.   Okay.
20       Q.   How long did you practice law?
21       A.   I was first admitted to the bar in
22   Colorado in 1974, and practiced law for two
23   years as a deputy state public defender
24   there.
25          Since then, I have never been in

Page 7

1           Chad E. Milton
2   the private practice of law.
3          My role at Media Professional
4   Insurance was what's called a claims
5   attorney, which is functioning as a
6   representative of the insurance company in
7   managing claims.  It's not the practice of
8   law in the sense that you are thinking of.
9       Q.   Okay.  And how long did you remain
10   in active status in Colorado?
11       A.   I went inactive shortly after I
12   left Colorado in 1976.  I stayed active for a
13   couple of years and then went inactive.
14       Q.   And then, when did you become a
15   member of the Missouri bar?
16       A.   I became a member of the Missouri
17   bar in -- took the bar exam there in February
18   of 1978.
19       Q.   Okay.  And how long were you active
20   in Missouri?
21       A.   I was active until about three
22   years ago.
23       Q.   Okay.  Now, you mentioned that you
24   worked as a claims attorney.  As a claims
25   attorney -- well, tell me what your job

Page 8

1           Chad E. Milton
2   description was when you worked as a claims
3   attorney?
4       A.   The job of claims attorney is to
5   represent the insurance company in the
6   management of claims.  In this context -- in
7   some contexts something like that can be
8   viewed as an adjuster.
9          In the context of media liability
10   insurance, all of the claims are litigated;
11   so, the function of the claims attorney is to
12   manage that litigation for the insurance
13   company.
14       Q.   Were you involved in the decisions
15   to undertake a duty to defend or contest a
16   duty to defend in cases?
17       A.   Yes.
18       Q.   Okay.  And were you involved in the
19   decision as to whether the insurance company
20   would reserve rights when it undertook the
21   duty to defend?
22       A.   Yes, I was.
23       Q.   Okay.  Were you the person who
24   would sign, actually sign the letter
25   undertaking the defense of reserving rights?

Page 9

1           Chad E. Milton
2       A.   Yes, I was.
3       Q.   Have you ever, in your work as a
4   claims attorney, signed a letter that
5   asserted that the insurance company was
6   denying coverage because the conduct at issue
7   was intentional?
8       A.   No, I don't believe I did.
9       Q.   Did you ever sign a letter in which
10   an insurance company reserved its rights with
11   respect to the issue of whether the conduct
12   at issue was intentional?
13       A.   No, I don't believe I did.  That
14   notion isn't in the media liability policies
15   that I've worked with.
16       Q.   Did you ever, as a claims attorney,
17   work with respect to other types of policies
18   held by media companies other than a media
19   liability policy?
20       A.   I'm sorry.  I didn't understand the
21   question.
22       Q.   Okay.  A media liability policy is
23   one type of an insurance policy that
24   insurance companies offer; right?
25       A.   Yes.  That's right.

Page 10

1                    Chad E. Milton
2        Q.    So, for instance, insurance
3    companies also offer things such as
4    comprehensive general liability policies;
5    correct?
6        A.    Yes, insurance companies do that.
7        Q.    So, and am I wrong to think that
8    not every insurance policy that the media
9    company has is a media liability insurance
10   policy; right?
11       A.    No.  That would be correct.
12             But in my experience, my experience
13   was only with the media liability policy.
14       Q.    That's what I was trying to get to.
15       A.    Right.
16       Q.    So, if a media organization that
17   was a policyholder of the company you were
18   working for made a claim with respect to some
19   pending claim, or even a lawsuit that had
20   been filed, but the claim was not made under
21   the media liability policy, it was made,
22   let's say, under their CGL, you wouldn't have
23   been involved in it?
24       A.    I would not have been involved.  I
25   would not have been involved.  And just by

Page 11

1                    Chad E. Milton
2    way of explanation, the organizations that I
3    worked with only managed the media liability
4    policy, and not any other kind of policy at
5    all.
6        Q.    Okay.  So, you, is it fair to say
7    you don't have any experience on what
8    insurance companies would or would not deny
9    coverage on under a CGL policy?
10       A.    I have no personal knowledge of
11   that.
12       Q.    All right.  And, indeed, you do not
13   have any personal knowledge of what media --
14   excuse me, what insurance companies would or
15   would not deny under any sort of policy
16   other than the media liability policy?
17       A.    I have no experience with that.
18       Q.    Okay.  And you would also have no
19   experience as to what situations an insurance
20   company would reserve its rights under a
21   policy that was not a media liability policy;
22   correct?
23       A.    That's correct.  That's outside my
24   experience.
25       Q.    Okay.  With respect to media

Page 12

1                    Chad E. Milton
2    liabilities policies, in your work as a
3    claims attorney, did you ever receive a
4    demand for coverage from a policyholder with
5    respect to an ordinary negligence case?
6             MR. HENTOFF:  Objection to the form
7        of the question.
8        A.    I think I understand what you're
9    asking; but, forgive me, I think you may be
10   asking a different question than what I have
11   in mind.
12             The answer to the question that I
13   understand you're asking, an ordinary
14   negligence case, such as you might find in a
15   general liability policy, the answer to that
16   is No, because those kinds of claims aren't
17   covered by the media liability policy.
18             There is a coverage in media
19   liability policies that's called contextual
20   negligence, or contextual errors omissions,
21   which involves coverage for harm to readers
22   of matter, where the reader is harmed by
23   relying on erroneous material, such as, the
24   most common example is fitness advice.
25       Q.    So, the idea behind that would be

Page 13

1                    Chad E. Milton
2    the media publication, let's say, has a
3    columnist who writes about health and welfare
4    issues, the columnist advises the readers to
5    go on a low cholesterol diet.
6        A.    Right.
7        Q.    And some reader comes out of the
8    woodwork later and says, I followed this
9    writer's advice, went on a low cholesterol
10   diet, and some terrible health outcome
11   resulted; that would be the sort of claim
12   that would fall under --
13       A.    Under the --
14       Q.    -- under the contextual errors and
15   omissions coverage?
16       A.    That's right.  And that's the kind
17   of negligence that I do have experience with.
18             The kind of negligence, the
19   ordinary negligence case I do not.
20       Q.    Okay.  So, if I have a slip and fall
21   on the first floor of the New York Times
22   building, that would not be covered under a
23   typical media liability policy?
24       A.    It would not be covered under a
25   typical media liability policy.

Page 14

Chad E. Milton

1
2      Just to be clear, the media
3  liability policy covers perils that arise in
4  the gathering, preparation and the utterance
5  of content.
6      Q.   Okay.  So, how about if a reporter
7  going out to cover a story or meet with a
8  source gets into a traffic accident; is that
9  covered under a media liability policy?
10     A.   No, it would not be.
11     Q.   And what's the reason for that?
12     A.   The reason is that that -- the
13  policies cover, typically cover named perils,
14  and except for the contextual errors and
15  omissions that I mentioned, negligence is not
16  a named peril.
17         So, the activities, the perils that
18  are covered are things like liable invasion
19  of privacy, copyright infringement, and so
20  forth; so that the example you gave wouldn't
21  give rise to a peril that would be covered by
22  the media liability policy.
23     Q.   Okay.  So, to take it one step
24  further, let's say a reporter was issued a
25  car by the media organization that employed

Page 15

Chad E. Milton

1
2  the reporter.
3         And the reporter got into that car
4  and drove somewhere on a personal errand --
5  say, to meet with a friend, or something like
6  that, something that had nothing to do with
7  the reporter's job, and the reporter in that
8  context ran someone over on the street in
9  that trip.
10        That would, in your experience, be
11  outside the bounds of a media liability
12  policy; correct?
13     A.   Yes, it would be outside the bounds
14  of a media liability policy.
15     Q.   Okay.  In your work as a claims
16  attorney, did you ever issue any sort of a
17  denial letter with respect to a claim that
18  your employer felt was outside the scope of
19  employment of the person who was the -- well,
20  that's a bad way framed question.
21         Do you understand the concept, at
22  least in a general sense, of scope of
23  employment in the law?
24     A.   Yes, I have a general understanding
25  of that.

Page 16

Chad E. Milton

1
2      Q.   So, did you ever have a situation
3  where an insured interposed a claim that
4  involved an employee who you had judged not
5  to be acting within the scope of their
6  employment?
7      A.   I don't recall any specific
8  instances like that that I can name, but I am
9  sure that that has happened.
10     Q.   And in that situation the typical
11  media liability policy only covers acts
12  within the scope of employment; correct?
13     A.   That would be right, only within
14  the scope of employment.
15     Q.   Okay.  So, although you don't
16  remember specifics, based on your experience
17  in the industry, an insurer would typically
18  deny coverage if it had determined that, in
19  fact, the actions occurred outside the
20  employee's scope of employment; correct?
21     A.   If the act occurred outside the
22  scope of employment, then the policy would
23  not apply; that would be right.
24     Q.   During your work as a claims
25  attorney, did you ever work with any policy

Page 17

Chad E. Milton

1
2  that was, that contained an exclusion for
3  willful misconduct?
4      A.   I don't recall that.  That kind of
5  language just isn't typical in media
6  liability policies.
7      Q.   And if I were to ask the same
8  question with respect to gross negligence,
9  would you give me the same answer?
10     A.   Yes, I would give you the same
11  answer.
12     Q.   Okay.  With respect to the
13  preparation of this declaration, Exhibit 5,
14  did you review any documents in preparing it?
15     A.   Well, as I state in the
16  declaration, I reviewed the section 9.05 of
17  the release language, but that's all.
18     Q.   Okay.  So, you didn't go back and
19  look at any of your own work papers, for
20  instance, in the past?
21     A.   Well, I did.
22         Just to sort of refresh my memory
23  about things, I read the, re-read the chapter
24  that is cited in the, in my declaration of --
25  it's part of Judge Sack's book.  I looked at

Page 18

```
 1              Chad E. Milton
 2   articles that are posted on my firm's
 3   Website.
 4        Q.   Okay.  So, we have 9.05.  We have
 5   the chapter of Judge Sack's book.  And we
 6   have articles on your Website, your company's
 7   Website.
 8              Other than those documents, are
 9   there any other documents that you reviewed
10   in preparing the opinion that you would in
11   this declaration?
12        A.   I did look at specimen policies of
13   media liability policies, just to confirm my
14   impressions.
15        Q.   Okay.  And just for the record,
16   what's a specimen policy?
17        A.   A specimen is a sample policy.
18        Q.   And let's just fill this out a bit.
19   Am I wrong that a typical insurance policy
20   contains a front page, a cover page, a
21   declarations page, and then contains a bunch
22   of mostly standardized language behind it;
23   correct?
24        A.   Yes, that structure is correct.
25        Q.   Right.  So, a specimen policy
```

Page 19

```
 1              Chad E. Milton
 2   contains language, which is standard, that's
 3   used by the insurance company repeatedly
 4   over time in various policies that it issues;
 5   correct?
 6        A.   Yes.  That's what a specimen policy
 7   is.
 8        Q.   So, a specimen policy would contain
 9   the language that is typically found in that
10   type of insurance policy; correct?
11        A.   That's -- yes, that's right.
12        Q.   Okay.  But there could be
13   situations where a specific insured might
14   negotiate a different term, or a change in
15   the specimen terms; correct?
16        A.   Yes, that happens.
17              It happens either by way of
18   changing the specimen policy, the standard
19   policy, by way of endorsement, or by creating
20   an entirely new policy, a new contract, which
21   is called a bespoke, or a manuscript policy.
22        Q.   And if I were just researching an
23   insurance issue and I wanted to know what do
24   insurance companies typically include in
25   terms of language on a particular point, I
```

Page 20

```
 1              Chad E. Milton
 2   would look at specimen policies; correct?
 3        A.   Yes.  That's right.
 4        Q.   And other than the specimen
 5   policies, articles on your company's Website,
 6   Judge Sack's book and paragraph 9.05 of the
 7   plan, is there anything else that you
 8   reviewed in preparation for your, making your
 9   declaration in this case?
10        A.   No.  There's nothing else.
11        Q.   Okay.  So, what do you do now?  You
12   talked about your work as a claims attorney.
13   What do you do now?
14        A.   Now I act as an independent
15   consultant on matters relating to media
16   liability risk and insurance.  Our clients
17   are insurance buyers, insurance brokers, and
18   insurance companies.
19        Q.   And as a consultant, do you
20   participate only in the purchasing process,
21   or do you also participate in the claims
22   process?
23        A.   We participate where the client
24   asks us to participate.  We've been involved
25   in the process of drafting insurance policies
```

Page 21

```
 1              Chad E. Milton
 2   for insurance companies.  We've been involved
 3   in helping insurance companies manage a
 4   runoff book of claims.  We've been involved
 5   in helping negotiate coverage disputes.
 6              And we've also been involved with
 7   helping insurance buyers place insurance.  We
 8   are not insurance brokers.
 9              So that we, we don't act as actual
10   in the placement of the policy, but we advise
11   on it.
12        Q.   Okay.  Has any of your clients ever
13   asked you to include an exclusion in a policy
14   for willful misconduct?
15        A.   No.
16        Q.   Has any of your clients ever asked
17   you to include an exclusion for gross
18   negligence?
19        A.   No.
20        Q.   In your current employment as an
21   independent consultant, have you ever come
22   across a policy that contained an exclusion
23   for willful misconduct?
24        A.   No.
25        Q.   Have you ever come across a policy
```

Page 22

1              Chad E. Milton
2    that included an exclusion for gross
3    negligence?
4         A.   No.
5         Q.   Has any one, any of your clients at
6    your current, during your current employment
7    as an independent consultant, ever asked you
8    to interpret a policy that contained a
9    willful misconduct exclusion?
10        A.   No.
11        Q.   And would your answer be the same
12   as to gross negligence?
13        A.   Yes, it would.
14        Q.   Okay.  And now, going back in your
15   prior employment, in your various positions
16   relating to the insurance industry, going all
17   the way back over four decades, has anyone
18   ever asked you to interpret language in a
19   policy excluding willful misconduct?
20        A.   No.  I don't think so.  That's just
21   not a concept that is in media liability
22   policies.
23        Q.   Okay.  And would your answer be the
24   same as to gross negligence?
25        A.   Yes, it would be.

Page 23

1              Chad E. Milton
2         MR. ESPER:  Okay.  Let's take a
3    short break.
4         Off the record.
5         (Whereupon, an off-the-record
6    discussion was held.)
7         MR. ESPER:  On the record.
8         Q.   Now, you indicated in your current
9    work you sometimes work for insurance
10   companies and sometimes for policyholders;
11   right?
12        A.   Yes.  That's right.  We work for
13   both.
14        Q.   Okay.  So, I want, for the next
15   question I'm going to ask you a hypothetical
16   and I want you to put yourself in a position
17   where you're working for a policyholder
18   rather than an insurance company, or a
19   potential policyholder that are seeking
20   insurance.
21        A.   Um-hum.
22        Q.   So, if your client seeking media
23   liability insurance is sent a draft policy by
24   an insurance company that contained a gross
25   negligence and willful misconduct exclusion,

Page 24

1              Chad E. Milton
2    you would go back to the insurance company
3    and ask them to take it out; wouldn't you?
4         A.   Yes, I would ask them to take it
5    out.
6         Q.   And why?
7         A.   Because exclusionary language like
8    that undercuts the entire purpose of a media
9    liability policy.  Because the media
10   liability policies cover perils, and
11   implicitly or explicitly cover the elements
12   that give rise to the perils.
13        And sometimes, in certain cases,
14   the evidence that supports the perils might
15   be called gross negligence or willful
16   misconduct.
17        And in those cases where I'm
18   representing the potential insured, I don't
19   want to run the risk of losing the benefit of
20   the insurance policy, because you run the
21   risk of losing, because you've lost the
22   claim.
23        I want coverage for the claims that
24   we lose, as well as for coverage for claims
25   that we win.

Page 25

1              Chad E. Milton
2         Q.   And to concretize this a bit, one
3    of the situations where you would be
4    concerned about the language of the exclusion
5    undercutting the purpose of the policy would
6    be where there was a defamation claim;
7    correct?
8         A.   Yes.  That is correct.  It's most
9    important in a defamation claim.
10        Q.   Your concern would be that a
11   defamation claim might end up falling within
12   the exclusion for gross negligence and
13   willful misconduct; correct?
14        A.   Yes, I would be concerned about
15   that.
16        Q.   Okay.  Now, even media liability
17   policies do contain some exclusions; correct?
18        A.   Yes, they do contain exclusions.
19        Q.   So, is it correct that a typical
20   exclusion would cover criminal acts by the
21   reporter?
22        A.   That is a typical exclusion.
23        Q.   Okay.
24        A.   Although in many policies that
25   exclusion has a carve-back for the coverage

Page 26

```
1                Chad E. Milton
2   can be extended to criminal acts under
3   certain circumstances.
4        Q.  Okay.  And what would be a typical
5   version of the carve-back that you just --
6        A.  The typical carve-back is that the
7   exclusion would not apply in circumstances
8   where the conduct was approved by the
9   insured's counsel, for reasons that it was
10  protected by the First Amendment.
11       Q.  Okay.  So, for instance, that might
12  cover a situation where a reporter was held
13  in contempt for refusing to reveal a source?
14       A.  Well, that's treated differently in
15  insurance, in a different place in insurance
16  policies.
17       Q.  Okay.  So, what would be an example
18  of something that an insurance company
19  counsel, in your experience, might approve in
20  terms of a criminal act?
21       A.  Counsel might approve an illegal
22  wiretap as a way of gathering, protecting
23  newsworthy information.
24       Q.  I understand.  Okay.
25           So, let's take a situation where
```

Page 27

```
1                Chad E. Milton
2   the exclusion does apply; so, it's not
3   conduct that's been approved by the insurance
4   counsel, it's just an illegal act by a
5   reporter that was never run by the insurance
6   counsel, and it's going to fall within the
7   exclusion.
8           Now, in your experience, do media
9   companies typically indemnify for that type
10  of conduct in their indemnification
11  agreements?
12       MR. HENTOFF:  Objection to the form
13     of the question.
14       A.  Yes, they would indemnify for that
15  kind of conduct; they would defend and
16  indemnify.
17           It would depend on what the
18  allegations of the complaint were.  If they
19  were a defamation claim, the defamation claim
20  would be -- if that defamation claim arose
21  from the conduct, or was, the publication had
22  information that was gathered during that
23  illegal wiretap, let's say, the defamation
24  claim would be covered.
25           If there were a separate claim for
```

Page 28

```
1                Chad E. Milton
2   the illegal intrusion, that claim would be
3   defended under a reservation of rights, but
4   would not be paid if there were a finding
5   that were, that there was a criminal conduct.
6        Q.  Okay.  I understand.  And I think I
7   understand where you're, what you're
8   testifying to; but I'm actually, I think,
9   asking a slightly different question, which
10  is part of your opinion that you've given in
11  this case.  It's not simply an opinion about
12  the content of the insurance policies, but
13  also an opinion about the content of media
14  company indemnification agreements; correct?
15       A.  No.  My opinion --
16       MR. HENTOFF:  Objection.  I'm
17     sorry.  Go ahead.
18       A.  No.  My opinion is only about
19  indemnification under insurance when
20  insurance is involved.
21       Q.  Okay.  Turn the page to paragraph
22  22 of your declaration.  I'll read it into
23  the record because it's short.
24           "Based on my experience, because
25  insurance coverage would be available, as a
```

Page 29

```
1                Chad E. Milton
2   matter of course a media company would
3   indemnify and defend its employees and
4   free-lancers for defamation claims alleging
5   willful misconduct or gross negligence."
6   That's an opinion about what media companies
7   would do, and not simply about what insurance
8   companies would do; right?
9        A.  No.  It's my understanding of the
10  paragraph, that has to do with indemnities in
11  the context of insurance coverage.
12       Q.  Okay.  But what did you mean by "a
13  media company would indemnify and defend"?
14       A.  What I mean is that a media company
15  would extend insurance coverage to its
16  employees and its independent contractors.
17       Q.  Okay.  So, you have no opinion as
18  to what might be contained in contracts
19  between a media company and their reporters?
20       A.  No.  I have no opinion about that.
21       Q.  And you have no idea of what
22  obligations a media company might believe it
23  has with respect to actually paying claims
24  made against their employees?
25       MR. HENTOFF:  Objection to the form
```

Page 30

1              Chad E. Milton
2    of the question.
3        A.   I have experience with media
4    companies that have asked to extend coverage
5    to employees in ways contrary to indemnity
6    agreements and contractual agreements.  And I
7    understand those situations.
8             In general, I don't have an opinion
9    about those contracts.
10       Q.   Okay.  And you do not in your work
11   routinely deal with the content of media
12   company indemnification agreements with their
13   employees; correct?
14       A.   That is correct.  I don't routinely
15   deal with that, with those contracts between
16   the publishers and their content providers.
17       Q.   Okay.  And if I were to, let's
18   say -- I'll ask you a question, and then I'll
19   ask if you have knowledge about that area.
20            But the question would be:  Outside
21   of what the insurance policy may contain and
22   what the insurance company may do, do media
23   companies typically undertake a legal
24   obligation to indemnify their reporters for
25   willful misconduct?  You would not have the

Page 31

1              Chad E. Milton
2    expertise to answer that question?
3        A.   I do not have the expertise to
4    answer that question.
5             I do know that media companies have
6    the power under most, the media liability
7    policies to extend coverage to independent
8    contractors, and have often been asked by
9    media companies to do that.
10       Q.   But that's an issue of what the
11   insurance company is going to end up
12   covering; correct?
13       A.   That is correct.  And that's the
14   only issue that I deal with.
15       Q.   And whatever may or may not be in
16   the contract between the media company and
17   the independent contractor, you would not
18   know that?
19       A.   Sometimes I see those contracts,
20   but that's not my issue and it's not
21   something that I'm asked to advise about.
22       Q.   And it's not something that you
23   have any particular expertise on?
24       A.   That's correct.  I don't have any
25   particular expertise.

Page 32

1              Chad E. Milton
2        Q.   And would your answer be the same
3    with respect to media companies undertaking
4    to indemnify their employees and their
5    contracts for acts of gross negligence?
6        A.   My answer would be the same.
7             Is that that's outside the scope of
8    my knowledge.
9             I do know that it's typical for
10   media companies to ask their insurer to cover
11   independent contractors.
12            MR. HENTOFF:  Off the record.
13            (Whereupon, an off-the-record
14            discussion was held.)
15       Q.   And I take it you also are
16   expressing no opinion about whether any
17   particular indemnification agreement made by
18   a media company would actually be enforced in
19   court, if somebody decided to test it?
20       A.   No.  I have no opinion about
21   enforceability of those contracts.
22       Q.   Okay.  So, you're not expressing
23   any opinion about whether an indemnification
24   agreement that indemnifies willful misconduct
25   would be considered a contract in violation

Page 33

1              Chad E. Milton
2    of public policy?
3        A.   No.  As between a publisher and its
4    free-lance writers, I have no opinion about
5    that.
6        Q.   Or as between a publisher and its
7    employed writers; right?
8        A.   Likewise, I have no opinion about
9    that.
10       Q.   And that your answer would be the
11   same as to contracts that indemnify, purport
12   to indemnify gross negligence; right?
13       A.   Well, with respect to all those
14   contracts between the publisher and other
15   persons, I have no opinion.
16       Q.   Now, let's go on to paragraphs 20
17   and 21 on page 6 of your declaration, Exhibit
18   5.  You can read them to yourself, so that
19   you know what we're going to talk about.
20       A.   Okay.
21            (Pause)
22       Q.   And I believe you've testified
23   earlier that in preparation for this
24   declaration, you read sections 9.05 of the
25   plan; correct?

Page 34

Chad E. Milton

1
2    A.    That's right.
3    Q.    Yeah.  So, did you read any of the
4  correspondence negotiating section 9.05 of
5  the plan?
6    A.    No, I didn't read any of that
7  correspondence.
8    Q.    Did you have any conversations with
9  any of the people who negotiated section 9.05
10  of the plan concerning what they talked about
11  with each other?
12    A.    No.  I had no conversations with
13  anyone about that.
14    Q.    Okay.  You have no opinion as to
15  what the drafters may have actually intended
16  when they included the language about gross
17  negligence and willful misconduct in section
18  9.05; correct?
19    A.    I have no knowledge and no opinion
20  about the intent behind this language.
21    Q.    Okay.  Have you ever advised anyone
22  who was drafting a plan of liquidation in a
23  bankruptcy court?
24    A.    No.  I've never been involved with
25  a bankruptcy.

Page 35

Chad E. Milton

1
2    Q.    And fair to stay that before this
3  case you've never been asked by anyone in any
4  capacity to interpret language contained in a
5  release in a bankruptcy plan?
6         MR. HENTOFF:  Objection to the form
7      of the question.
8    A.    No.  That's correct.  I've never
9  been asked to participate or advise in any
10  way in a bankruptcy claim.
11    Q.    So, you have no experience as to
12  how legal terminology is used in a bankruptcy
13  plan; correct?
14    A.    That's correct; I have no knowledge
15  about that.
16    Q.    So, for instance, if hypothetically
17  and I want to make clear, I'm assuming a fact
18  that may not actually be in evidence, but if,
19  hypothetically, gross negligence and willful
20  misconduct were terms of art in the
21  bankruptcy context, that's not something you
22  would know about; correct?
23    A.    That's correct; I would not know
24  about those terms of art.
25    Q.    Okay.  If you had been consulted by

Page 36

Chad E. Milton

1
2  the drafters of this bankruptcy plan back at
3  the time it was being drafted, you would have
4  told them not to include an exclusion for
5  gross negligence and willful misconduct;
6  correct?
7         MR. HENTOFF:  Objection to the form
8      of the question.
9    A.    Well, I don't think I can speculate
10  about what I would have said and what I would
11  have been consulted about.
12         If I were being asked to
13  participate about how there might be
14  insurance coverage involved, then I could
15  have advised about that.
16         But in the absence of the presence
17  of insurance, I would have no opinion.
18    Q.    Okay.  Let's add facts to the
19  hypothetical.
20         Let's suppose that the person who
21  asked you for advice told you that the
22  purpose of the releases would be to track the
23  insurance coverage that is available for
24  writers.  In that situation, would you then
25  advise the client that language regarding

Page 37

Chad E. Milton

1
2  gross negligence and willful misconduct not
3  be included in section 9.05?
4         MR. HENTOFF:  Objection to the form
5      of the question.
6    A.    I don't think I can say that I
7  would have an opinion about what I would
8  advise.
9         I would advise that irrespective of
10  the language in the contract, that there be a
11  mechanism to extend insurance coverage to
12  these persons.  And I would advise that the
13  insurance policy not have that sort of
14  exclusionary language.
15    Q.    And the reason you would advise
16  that is because, as you testified earlier, if
17  that language were included in the insurance
18  policy, it could have the effect of defeating
19  the purpose of the policy; correct?
20    A.    That's right.  And that's actually
21  the point of paragraph 21 of my statement.
22    Q.    Now, in paragraph 21 -- let's read
23  it for the record; that will make it easier.
24         "If section 9.05 of the plan were
25  read to exclude a defamation plaintiff's

Page 38

Chad E. Milton

1  claims of gross negligence or willful
2  misconduct, it would conceivably exclude any
3  and all defamation claims.  In my experience
4  the indemnification obligations of a media
5  company to its employees and free-lancers do
6  not contain any such exception, as it would
7  render the indemnification obligation almost
8  meaningless.
9      "This is because many, if not most
10  defamation lawsuits seek to prove that a
11  defendant's conduct was intentional and
12  wrongful and the purpose of the
13  indemnification obligations is to protect
14  employees and free-lancers not only when they
15  win a defamation case, but also when they
16  lose one."
17      So, first of all, you say, "many,
18  if not most defamation lawsuits seek to prove
19  that a defendant's conduct was intentional
20  and wrongful."
21      There are defamation cases that are
22  brought based on theories of ordinary
23  negligence; correct?
24      A.   Yes.  A lawsuit brought by a

Page 39

Chad E. Milton

1  private person in most states would allege
2  that the reporter's or writer's state of mind
3  was one of negligence.
4      They would still allege that the
5  statement was made intentionally.
6      Q.   However, am I not right to infer
7  that you are leaving open in this paragraph
8  the possibility that a defamation claim based
9  on ordinary negligence might not trigger the
10  gross negligence willful misconduct
11  exclusion; correct?
12      MR. HENTOFF:  Objection to the form
13  of the question.
14      A.   Yes.  It's my view that
15  exclusionary language doesn't exclude all
16  claims, but only certain claims.
17      And from an insurer's point of
18  view, and an insurance buyer's point of view,
19  if it excludes some claims, that makes the
20  policy unfair and illusory.
21      So, the short answer to your
22  question is Yes, but there's a longer answer,
23  too.
24      Q.   Okay.  And you said "unfair and

Page 40

Chad E. Milton

1  illusory."  I assume you think it would be
2  unfair because the fact is that people in the
3  journalism business often write about public
4  figures and, therefore, many defamation
5  claims would allege actual malice and
6  potentially be excluded; is that a fair
7  statement?
8      A.   I think that's a fair statement.
9      My point is that media companies
10  and their writers, when they have insurance
11  coverage, expect that there will be coverage
12  for the perils that arise from the insured
13  activity.  And to the extent that writers and
14  publishers do stories about public persons,
15  that conduct would rise to the level of
16  actual malice; and to then say that that kind
17  of conduct triggers an exclusionary policy
18  and denies coverage would be -- exclusionary
19  language would cause a claim to be denied
20  would be contrary to the expectations of the
21  insured, and thus illusory and unfair.
22      Q.   Okay.  Now, "illusory" is different
23  than "unfair"; isn't it?
24      A.   Yes.

Page 41

Chad E. Milton

1      Q.   If an insurance policy covers some
2  perils, but not every potential peril, that's
3  not considered in your experience an illusory
4  contract; is it?
5      A.   No, it's not.  In my experience an
6  illusory contract is one that offers coverage
7  for a peril and then takes it away.
8      Q.   But if a contract that -- an
9  insurance contract that offers coverage for
10  some perils, but not for other perils, might
11  be unfair, but would it be illusory; right?
12      MR. HENTOFF:  Objection to the form
13  of the question.
14      A.   It could be considered unfair.
15      I don't know that it's unfair to
16  say to an insured that these kinds of perils
17  aren't covered.
18      But that's not, that's not
19  illusory; that's just what the coverage of
20  the policy is.
21      Q.   If a hypothetical insurance policy
22  offered coverage with respect to defamation
23  of private figures, but not defamation of
24  public figures, would you consider such a

Page 42

```
 1              Chad E. Milton
 2   policy illusory?
 3              MR. HENTOFF:  Objection to the form
 4   of the question.
 5              Incomplete hypothetical.
 6       A.   I would not consider that to be
 7   illusory, because the expectation is made
 8   clear.  But it's not something that anybody
 9   would buy.
10       Q.   Let's go on with this.
11              Your first sentence in paragraph 21
12   says, "If section 9.05 of the plan were read
13   to exclude a defamation plaintiff's claims of
14   gross negligence or willful misconduct."  You
15   testified you read section 9.05.
16              Do you believe there is any other
17   reasonable reading of it, other than it would
18   exclude a defamation plaintiff's claims of
19   gross negligence and willful misconduct?
20              MR. HENTOFF:  Objection to the form
21   the question.
22              And if you're going to ask the
23   witness about section 9.05, would you
24   please show it to him so he can review
25   it before answering your question about
```

Page 43

```
 1              Chad E. Milton
 2   it?
 3              MR. ESPER:  I think I can ask the
 4   witness the question, and if the witness
 5   responds in a certain way, he responds
 6   in a certain way.  If he responds in
 7   another way, I can ask another question,
 8   or I can show him what I want to show
 9   him.
10              MR. HENTOFF:  You're permitted to
11   do whatever you want to do.
12              That's my objection.
13              MR. ESPER:  Yes.  Okay.
14       Q.   So, you reviewed section 9.05 in
15   preparing this declaration; correct?
16       A.   I did.
17       Q.   Okay.  So, your first sentence of
18   paragraph 21 states a hypothetical:  "If
19   section 9.05 were read to exclude a
20   defamation plaintiff's claim of gross
21   negligence or willful misconduct," and my
22   question is:  Did you conclude there was any
23   other possible reading of section 9.05?
24              MR. HENTOFF:  Objection to the form
25   of the question.  Same objection.
```

Page 44

```
 1              Chad E. Milton
 2       A.   I agree that those words are in the
 3   release.
 4              I also know from my experience that
 5   the words, exclusionary words in contracts
 6   and insurance policies and agreements are
 7   often interpreted at the moment that they
 8   become at issue.
 9              And from an insurer's point of
10   view -- which again, is all that I can speak
11   about -- from an insurer's point of view, I
12   could -- if such language like this were in
13   an insurance policy that was expected to
14   cover defamation claims, I would expect the
15   insurer to say that these words "gross
16   negligence willful misconduct" may apply to
17   some kinds, to some perils, but they do not
18   apply to defamation.
19       Q.   Did you engage in any research or
20   any gathering of facts to determine whether
21   the authors of 9.05 intended the release to
22   cover defamation claims?
23       A.   No.  I did no such research.
24       Q.   Is it fair to say that you simply
25   assumed that was the case?
```

Page 45

```
 1              Chad E. Milton
 2              MR. HENTOFF:  Objection to the form
 3   of the question.
 4       A.   No.  I made no assumption at all
 5   about what the drafters of section 9.05
 6   intended.
 7              I only meant to say that if this
 8   sort of language were to appear in an
 9   insurance contract, that the insurer would
10   likely say that this language is inoperative
11   as respects defamation claims for the reasons
12   that I've testified earlier.
13       Q.   But you don't know that for sure,
14   because you've never seen this language in a
15   media insurance policy; correct?
16              MR. HENTOFF:  Objection to the form
17   of the question.
18       A.   No.  That's correct.
19              MR. HENTOFF:  I'm sorry.  Could you
20   read back the question and the answer.
21              (Whereupon, the referred to
22   questions and answers were read back by
23   the Reporter.)
24       Q.   Did you engage in any analysis as
25   to whether a bankruptcy plan that did not
```

Page 46

Chad E. Milton

1          Chad E. Milton
2   contain an exclusion for gross negligence or
3   willful misconduct would be approved by a
4   bankruptcy court?
5          MR. HENTOFF:  Objection to the form
6      of the question.
7      A.    No.  As I testified earlier, I've
8   had no experience with bankruptcy and did no
9   research into bankruptcy proceedings in
10  connection with this.
11     Q.    And did you do any analysis as to
12  whether or not New York law would permit such
13  a release without the gross negligence or
14  willful misconduct language?
15     A.    No.  I did no such research.
16     Q.    Other than the opinions that you
17  included in then declaration, did you form
18  any other opinions relating to the issues in
19  this case?
20     A.    No.  My only opinions are set out
21  in the declaration.
22     Q.    Okay.
23         MR. ESPER:  Let's take a very short
24     break.
25         Off the record.

Page 47

1          Chad E. Milton
2          (Whereupon, a short recess was
3      taken.)
4          MR. ESPER:  Back on the record.
5      I have no further questions.
6          MR. HENTOFF:  So, I just have a
7      couple of questions.
8          MR. ESPER:  Go ahead.
9          MR. HENTOFF:  Okay.
10  EXAMINATION BY
11  MR. HENTOFF:
12     Q.    Mr. Milton, you recall that you
13  were asked some questions about circumstances
14  in which a libel case could be brought, but
15  the plaintiff would only be claiming
16  negligence as a standard of fault; do you
17  remember that?
18     A.    Yes, I do remember that.
19     Q.    And do you recall being asked
20  about --
21         Well, strike that question.
22         And in some cases can you tell us
23  about, very generally, about your
24  understanding of what the standard of fault
25  is -- let's say for right now, outside the

Page 48

1          Chad E. Milton
2   State of New York -- what is the standard of
3   fault when a libel case is brought by a
4   non-public figure, versus when a libel case
5   is brought by a public figure?
6          MR. ESPER:  Object as to form.
7      A.    Well, of course you don't know
8   until the end of the litigation whether the
9   plaintiff is a private person or a public
10  person.
11         But the law in most states is that
12  when the plaintiff is a private person, the
13  standard of conduct is negligence.
14     Q.    And what about if the plaintiff is
15  a public figure?
16         MR. ESPER:  Same objection.
17     A.    Then the standard of conduct is
18  actual malice -- that term of art, as knowing
19  a reckless disregard for the truth.
20     Q.    And is it ever disputed in a case
21  between the parties whether or not the
22  plaintiff qualifies as a public figure or a
23  non-public figure?
24         MR. ESPER:  Same objection.
25     A.    Yes, it's -- that's often disputed.

Page 49

1          Chad E. Milton
2      Q.    Let's imagine a situation in which
3   a plaintiff has filed a defamation lawsuit,
4   and a court determines that the plaintiff is
5   a non-public figure.  Do you understand that?
6      A.    Yes.
7      Q.    Are there circumstances in that
8   case in which the issue of whether the
9   defendant acted with actual malice might
10  nevertheless be litigated in that case?
11         MR. ESPER:  Same objection.
12     A.    Yes, actual malice would be
13  relevant, for instance, if, in fact, punitive
14  damages were sought.
15     Q.    Are you familiar with the concept
16  of the defense of privilege in a defamation
17  case?
18         MR. ESPER:  Same objection.
19     A.    Yes, I am.
20     Q.    Can you just give an example of a
21  kind of defamation privilege that might be
22  asserted by a defendant in a defamation case?
23         MR. ESPER:  Same objection.
24     A.    A defendant might assert that the
25  story was a fair and accurate report of a

Page 50

1            Chad E. Milton
2    public proceeding.
3        Q.   So, with regard to defamation cases
4    in which a privilege is asserted, let's
5    imagine still that the plaintiff is a
6    non-public figure.  Are there ever situations
7    in which either malice or actual malice is
8    litigated in the context of whether a
9    defamation privilege applies in the case?
10            MR. ESPER:  Same objection.
11       A.   Yes.
12            MR. HENTOFF:  I have no further
13       questions.
14   EXAMINATION (cont'd)
15   BY MR. ESPER:
16       Q.   Mr. Milton, in a situation where a
17   claim is made that could result in coverage,
18   but also could result in coverage ultimately
19   being denied, the insurance company has the
20   option of defending with a reservation of
21   rights; correct?
22       A.   Yes.  That's correct.
23            A claim that's potentially not
24   covered will be defended under reservation of
25   rights.

Page 51

1            Chad E. Milton
2            MR. ESPER:  No further questions.
3            MR. HENTOFF:  And we have no
4        further questions either.
5            THE WITNESS:  Thank you.
6            (Whereupon, at 11:19 a.m., the
7        Examination of this witness was
8        concluded.)
9
10
                    _____
11                  CHAD E. MILTON
12
13       Subscribed and sworn to before me
14         this _____ day of _____, 20___.
15
16
     _____
17       NOTARY PUBLIC
18
19
20
21
22
23
24
25

Page 52

1
2            E X H I B I T S
3       Milton Exhibit 5, expert          6
4       declaration of Chad E. Milton
5
6    (Exhibit Maintained By Reporter)
7            I N D E X
8    EXAMINATION BY                  PAGE
9    MR. ESPER                       3, 50
10   MR. HENTOFF                     47
11   INFORMATION AND/OR DOCUMENTS REQUESTED
12   (None)
13   QUESTIONS MARKED FOR RULINGS
14   (None)
15
16
17
18
19
20
21
22
23
24
25

Page 53

1
2            C E R T I F I C A T E
3
     STATE OF NEW YORK      )
4                           :  SS.:
     COUNTY OF NEW YORK     )
5
6
7        I, ROBERT X. SHAW, CSR, a Notary
8    Public for and within the State of New York,
9    do hereby certify:
10       That the witness whose examination
11   is hereinbefore set forth was duly sworn and
12   that such examination is a true record of the
13   testimony given by that witness.
14       I further certify that I am not
15   related to any of the parties to this action
16   by blood or by marriage and that I am in no
17   way interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto
19   set my hand this 22nd day of November 2017.
20
21
22            *Robert X. Shaw*
                ROBERT X. SHAW, CSR
23
24
25

### Exhibits

EX 0005 Chad E.
 Milton Exhibit 111517

---

### $

$300  5:23

---

### 1

1974  6:22
1976  7:12
1978  7:18

---

### 2

2  6:17,18
20  33:16
21  33:17 37:21,22
 42:11 43:18
22  28:22

---

### 5

5  6:12,13,16 17:13
 33:18

---

### 6

6  33:17
66207  3:13

---

### 8

8821  3:12

---

### 9

9.05  17:16 18:4 20:6
 33:24 34:4,9,18
 37:3,24 42:12,15,23
 43:14,19,23 44:21
 45:5

---

### A

absence  36:16

accident  14:8
act  16:21 20:14 21:9
 26:20 27:4
acting  16:5
actions  16:19
active  7:10,12,19,21
activities  14:17
activity  40:14
acts  16:11 25:20 26:2
 32:5
actual  21:9 40:6,17
add  36:18
address  3:11
adjuster  8:8
admitted  6:21
advice  12:24 13:9
 36:21
advise  21:10 31:21
 35:9 36:25 37:8,9,
 12,15
advised  34:21 36:15
advises  13:4
agree  44:2
agreement  32:17,24
agreements  27:11
 28:14 30:6,12 44:6
ahead  6:10 28:17 47:8
Alhambra  3:12
allegations  27:18
allege  39:2,5 40:6
alleging  29:4
allowed  4:12
Amendment  26:10
analysis  45:24 46:11
answering  42:25
answers  45:22
apply  16:23 26:7 27:2
 44:16,18
approve  26:19,21
approved  26:8 27:3
 46:3
area  30:19
arise  14:3 40:13
arose  27:20
art  35:20,24
articles  18:2,6 20:5
asks  20:24
asserted  9:5

assume  40:2
assumed  44:25
assuming  35:17
assumption  45:4
attorney  7:5,24,25
 8:3,4,11 9:4,16 12:3
 15:16 16:25 20:12
authors  44:21

---

### B

back  17:18 22:14,17
 24:2 36:2 45:20,22
 47:4
background  6:8
bad  15:20
bankruptcy  34:23,25
 35:5,10,12,21 36:2
 45:25 46:4,8,9
bar  6:21 7:15,17
based  16:16 28:24
 38:23 39:9
benefit  24:19
bespoke  19:21
bit  18:18 25:2
book  17:25 18:5 20:6
 21:4
bounds  15:11,13
break  4:13 23:3 46:24
brokers  20:17 21:8
brought  38:23,25
 47:14
building  13:22
bunch  18:21
business  40:4
buy  42:9
buyer's  39:19
buyers  20:17 21:7

---

### C

call  6:11
called  3:2 7:4 12:19
 19:21 24:15
capacity  35:4
car  14:25 15:3
carve-back  25:25
 26:5,6
case  5:8 12:5,14
 13:19 20:9 28:11

35:3 38:16 44:25
46:19 47:14
**cases** 8:16 24:13,17
38:22 47:22
**CGL** 10:22 11:9
**Chad** 3:1,10 4:1 5:1
6:1,14 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1
**change** 19:14
**changing** 19:18
**chapter** 17:23 18:5
**cholesterol** 13:5,9
**circumstances** 3:24
26:3,7 47:13
**cited** 17:24
**claim** 4:7,8 10:18,19,
20 13:11 15:17 16:3
24:22 25:6,9,11
27:19,20,24,25 28:2
35:10 39:9 40:20
43:20
**claiming** 47:15
**claims** 7:4,7,24 8:2,
4,6,10,11 9:4,16
12:3,16 15:15 16:24
20:12,21 21:4 24:23,
24 29:4,23 38:2,4
39:17,20 40:6 42:13,
18 44:14,22 45:11
**clear** 4:22 14:2 35:17
42:8
**client** 20:23 23:22
36:25
**clients** 20:16 21:12,
16 22:5
**Colorado** 6:22 7:10,12
**columnist** 13:3,4
**common** 12:24
**communications** 5:16,
19
**companies** 9:18,24
10:3,6 11:8,14 19:24
20:18 21:2,3 23:10

27:9 29:6,8 30:4,23
31:5,9 32:3,10 40:10
**company** 7:6 8:5,13,19
9:5,10 10:9,17 11:20
19:3 23:18,24 24:2
26:18 28:14 29:2,13,
14,19,22 30:12,22
31:11,16 32:18 38:6
**company's** 18:6 20:5
**compensated** 5:22
**complaint** 27:18
**comprehensive** 10:4
**conceivably** 38:3
**concept** 15:21 22:21
**concern** 25:10
**concerned** 25:4,14
**conclude** 43:22
**concretize** 25:2
**conduct** 9:6,11 26:8
27:3,10,15,21 28:5
38:12,20 40:16,18
**confirm** 18:13
**connection** 46:10
**considered** 32:25
41:4,15
**consultant** 20:15,19
21:21 22:7
**consulted** 35:25 36:11
**contained** 17:2 21:22
22:8 23:24 29:18
35:4
**contempt** 26:13
**content** 14:5 28:12,13
30:11,16
**contest** 8:15
**context** 8:6,9 15:8
29:11 35:21
**contexts** 8:7
**contextual** 12:19,20
13:14 14:14
**contract** 19:20 31:16
32:25 37:10 41:5,7,
9,10 45:9
**contractor** 31:17
**contractors** 29:16
31:8 32:11
**contracts** 29:18 30:9,
15 31:19 32:5,21
33:11,14 44:5
**contractual** 30:6

**contrary** 30:5 40:21
**conversations** 34:8,12
**copyright** 14:19
**correct** 5:5 10:5,11
11:22,23 15:12
16:12,20 18:23,24
19:5,10,15 20:2
25:7,8,13,17,19
28:14 30:13,14
31:12,13,24 33:25
34:18 35:8,13,14,22,
23 36:6 37:19 38:24
39:12 43:15 45:15,18
**correspondence** 34:4,7
**counsel** 26:9,19,21
27:4,6
**couple** 7:13 47:7
**court** 4:21 5:3 32:19
34:23 46:4
**cover** 14:7,13 18:20
24:10,11 25:20 26:12
32:10 44:14,22
**coverage** 9:6 11:9
12:4,18,21 13:15
16:18 21:5 24:23,24
25:25 28:25 29:11,15
30:4 31:7 36:14,23
37:11 40:12,19 41:7,
10,20,23
**covered** 12:17 13:22,
24 14:9,18,21 27:24
41:18
**covering** 31:12
**covers** 14:3 16:11
41:2
**creating** 19:19
**criminal** 25:20 26:2,
20 28:5
**current** 21:20 22:6
23:8

---

**D**

**date** 6:15
**deal** 30:11,15 31:14
**dealings** 5:13
**decades** 22:17
**decided** 32:19
**decision** 8:19
**decisions** 8:14

declaration  6:8,14,18
  17:13,16,24 18:11
  20:9 28:22 33:17,24
  43:15 46:17,21
declarations  18:21
defamation  4:8 25:6,
  9,11 27:19,20,23
  29:4 37:25 38:4,11,
  16,19,22 39:9 40:5
  41:23,24 42:13,18
  43:20 44:14,18,22
  45:11
defeating  37:18
defend  8:15,16,21
  27:15 29:3,13
defendant's  38:12,20
defended  28:3
defender  6:23
defense  8:25
demand  12:4
denial  15:17
denied  40:20
denies  40:19
deny  11:8,15 16:18
denying  9:6
depend  27:17
deposition  3:16 4:11,
  14
deputy  6:23
description  8:2
determine  44:20
determined  16:18
diet  13:5,10
differently  26:14
discussion  6:7 23:6
  32:14
dispute  4:2
disputes  21:5
documents  17:14 18:8,
  9
draft  23:23
drafted  36:3
drafters  34:15 36:2
  45:5
drafting  20:25 34:22
drove  15:4
duly  3:3
duty  8:15,16,21

## E

earlier  33:23 37:16
  45:12 46:7
easier  37:23
effect  37:18
elements  24:11
employed  5:8 14:25
  33:7
employee  16:4
employee's  16:20
employees  29:3,16,24
  30:5,13 32:4 38:6,15
employer  15:18
employment  15:19,23
  16:6,12,14,20,22
  21:20 22:6,15
end  25:11 31:11
endorsement  19:19
enforceability  32:21
enforced  32:18
engage  44:19 45:24
engaged  5:9
entire  24:8
errand  15:4
erroneous  12:23
errors  12:20 13:14
  14:14
ESPER  3:7 6:10 23:2,7
  43:3,13 46:23 47:4,8
evidence  24:14 35:18
Ewing  5:14
exam  7:17
EXAMINATION  3:6 47:10
examined  3:5
exception  38:7
exclude  37:25 38:3
  39:16 42:13,18 43:19
excluded  40:7
excludes  39:20
excluding  22:19
exclusion  17:2 21:13,
  17,22 22:2,9 23:25
  25:4,12,20,22,25
  26:7 27:2,7 36:4
  39:12 46:2
exclusionary  24:7
  37:14 39:16 40:18,19
  44:5

exclusions  25:17,18
excuse  11:14
exhibit  6:11,12,13,16
  17:13 33:17
expect  40:12 44:14
expectation  42:7
expectations  40:21
expected  44:13
experience  10:12
  11:7,17,19,24 13:17
  15:10 16:16 26:19
  27:8 28:24 30:3
  35:11 38:4 41:4,6
  44:4 46:8
expert  5:10 6:3,13
expertise  31:2,3,23,
  25
explanation  11:2
explicitly  24:11
expressing  32:16,22
extend  29:15 30:4
  31:7 37:11
extended  26:2
extensive  6:7
extent  40:14

## F

fact  3:24 16:19 35:17
  40:3
facts  36:18 44:20
fair  11:6 35:2 40:7,9
  44:24
fall  13:12,20 27:6
falling  25:11
fault  47:16,24
February  7:17
felt  15:18
figures  40:5 41:24,25
filed  10:20
fill  18:18
find  12:14
finding  28:4
finish  4:17,19
firm  5:10,12,14
firm's  18:2
fitness  12:24
floor  13:21
forgive  12:9

forgotten  4:3
form  12:6 27:12 29:25
  35:6 36:7 37:4 39:13
  41:13 42:3,20 43:24
  45:2,16 46:5,17
found  19:9
framed  15:20
free-lance  33:4
free-lancers  29:4
  38:6,15
friend  15:5
front  18:20
function  8:11
functioning  7:5

### G

gathered  27:22
gathering  14:4 26:22
  44:20
gave  14:20
general  10:4 12:15
  15:22,24 30:8
generally  47:23
give  5:4 14:21 17:9,
  10 24:12
Good  3:14,15
Gray  5:16
gross  17:8 21:17
  22:2,12,24 23:24
  24:15 25:12 29:5
  32:5 33:12 34:16
  35:19 36:5 37:2 38:2
  39:11 42:14,19 43:20
  44:15 46:2,13
ground  4:11

### H

handing  6:16
happened  16:9
harm  12:21
harmed  12:22
health  13:3,10
held  9:18 23:6 26:12
  32:14
helping  21:3,5,7
HENTOFF  12:6 27:12
  28:16 29:25 32:12
  35:6 36:7 37:4 39:13

41:13 42:3,20 43:10,
  24 45:2,16,19 46:5
  47:6,9,11
Hentoff's  5:19
hour  5:23
hours  5:24
hypothetical  23:15
  36:19 41:22 42:5
  43:18
hypothetically  35:16,
  19

### I

idea  12:25 29:21
identification  6:15
illegal  26:21 27:4,23
  28:2
illusory  39:21 40:2,
  22,23 41:4,7,12,20
  42:2,7
implicitly  24:11
important  25:9
impressions  18:14
inactive  7:11,13
include  19:24 21:13,
  17 36:4
included  22:2 34:16
  37:3,17 46:17
Incomplete  42:5
indemnification  27:10
  28:14,19 30:12
  32:17,23 38:5,8,14
indemnifies  32:24
indemnify  27:9,14,16
  29:3,13 30:24 32:4
  33:11,12
indemnities  29:10
indemnity  30:5
independent  20:14
  21:21 22:7 29:16
  31:7,17 32:11
industry  16:17 22:16
infer  39:7
information  4:3 26:23
  27:22
infringement  14:19
inoperative  45:10
inquisition  4:14

instance  10:2 17:20
  26:11 35:16
instances  16:8
insurance  3:25 4:5,6
  7:4,6 8:5,10,12,19
  9:5,10,23,24 10:2,6,
  8,9 11:8,14,19 18:19
  19:3,10,23,24 20:16,
  17,18,25 21:2,3,7,8
  22:16 23:9,18,20,23,
  24 24:2,20 26:15,18
  27:3,5 28:12,19,20,
  25 29:7,11,15 30:21,
  22 31:11 36:14,17,23
  37:11,13,17 39:19
  40:11 41:2,10,22
  44:6,13 45:9,15
insured  16:3 19:13
  24:18 40:13,22 41:17
insured's  26:9
insurer  16:17 32:10
  44:15 45:9
insurer's  39:18 44:9,
  11
intended  34:15 44:21
  45:6
intent  34:20
intentional  9:7,12
  38:12,20
intentionally  39:6
interposed  16:3
interpret  22:8,18
  35:4
interpreted  44:7
intrusion  28:2
invasion  14:18
involved  8:14,18
  10:23,24,25 16:4
  20:24 21:2,4,6 28:20
  34:24 36:14
involves  12:21
involving  3:25
irrespective  37:9
issue  9:6,11,12 15:16
  19:23 31:10,14,20
  44:8
issued  14:24
issues  13:4 19:4
  46:18

## J

**job**  7:25 8:4 15:7
**journalism**  40:4
**Judge**  17:25 18:5 20:6
**judged**  16:4

## K

**Kansas**  3:13
**kind**  11:4 13:16,18
  17:4 27:15 40:17
**kinds**  12:16 41:17
  44:17
**knowledge**  11:10,13
  30:19 32:8 34:19
  35:14

## L

**language**  17:5,17
  18:22 19:2,9,25
  22:18 24:7 25:4
  34:16,20 35:4 36:25
  37:10,14,17 39:16
  40:20 44:12 45:8,10,
  14 46:14
**law**  5:3,10,12,14
  6:20,22 7:2,8 15:23
  46:12
**lawsuit**  10:19 38:25
**lawsuits**  38:11,19
**leaving**  39:8
**left**  7:12
**legal**  30:23 35:12
**letter**  8:24 9:4,9
  15:17
**level**  40:16
**liabilities**  12:2
**liability**  4:6 8:9
  9:14,19,22 10:4,9,
  13,21 11:3,16,21
  12:15,17,19 13:23,25
  14:3,9,22 15:11,14
  16:11 17:6 18:13
  20:16 22:21 23:23
  24:9,10 25:16 31:6
**liable**  14:18
**libel**  47:14

**Likewise**  33:8
**liquidation**  34:22
**litigated**  8:10
**litigation**  8:12
**long**  6:20 7:9,19
**longer**  39:23
**looked**  17:25
**lose**  24:24 38:17
**losing**  24:19,21
**lost**  24:21
**low**  13:5,9

## M

**made**  10:18,20,21
  29:24 32:17 39:6
  42:7 45:4
**make**  35:17 37:23
**makes**  39:20
**making**  20:8
**malice**  40:6,17
**manage**  8:12 21:3
**managed**  11:3
**management**  8:6
**managing**  7:7
**manuscript**  19:21
**mark**  6:11
**marked**  6:14
**material**  12:23
**matter**  12:22 29:2
**matters**  20:15
**meaningless**  38:9
**meant**  45:7
**mechanism**  37:11
**media**  4:6 7:3 8:9
  9:14,18,22 10:8,9,
  13,16,21 11:3,13,16,
  21,25 12:17,18 13:2,
  23,25 14:2,9,22,25
  15:11,14 16:11 17:5
  18:13 20:15 22:21
  23:22 24:8,9 25:16
  27:8 28:13 29:2,6,
  13,14,19,22 30:3,11,
  22 31:5,6,9,16 32:3,
  10,18 38:5 40:10
  45:15
**meet**  14:7 15:5
**member**  7:15,16

**memory**  17:22
**mentioned**  7:23 14:15
**milton**  3:1,10,14 4:1
  5:1 6:1,13,14 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1,
  12
**mind**  12:11 39:3
**misconduct**  17:3
  21:14,23 22:9,19
  23:25 24:16 25:13
  29:5 30:25 32:24
  34:17 35:20 36:5
  37:2 38:3 39:11
  42:14,19 43:21 44:16
  46:3,14
**Mission**  3:13
**Missouri**  7:15,16,20
**moment**  44:7
**morning**  3:14,15

## N

**named**  14:13,16
**negligence**  12:5,14,20
  13:17,18,19 14:15
  17:8 21:18 22:3,12,
  24 23:25 24:15 25:12
  29:5 32:5 33:12
  34:17 35:19 36:5
  37:2 38:2,24 39:4,
  10,11 42:14,19 43:21
  44:16 46:2,13 47:16
**negotiate**  19:14 21:5
**negotiated**  34:9
**negotiating**  34:4
**newsworthy**  26:23
**Notary**  3:4
**notion**  9:14

## O

**oath**  5:2

objection  12:6 27:12
  28:16 29:25 35:6
  36:7 37:4 39:13
  41:13 42:3,20 43:12,
  24,25 45:2,16 46:5
obligation  5:4 30:24
  38:8
obligations  29:22
  38:5,14
occasion  3:21
occurred  16:19,21
off-the-record  23:5
  32:13
offer  9:24 10:3
offered  41:23
offers  41:7,10
office  5:19
omissions  12:20 13:15
  14:15
open  39:8
opinion  18:10 28:10,
  11,13,15,18 29:6,17,
  20 30:8 32:16,20,23
  33:4,8,15 34:14,19
  36:17 37:7
opinions  46:16,18,20
ordinary  12:5,13
  13:19 38:23 39:10
organization  10:16
  14:25
organizations  11:2
outcome  13:10

P

paid  28:4
papers  17:19
paragraph  6:17 20:6
  28:21 29:10 37:21,22
  39:8 42:11 43:18
paragraphs  33:16
part  17:25 28:10
participate  20:20,21,
  23,24 35:9 36:13
parties  4:2
past  17:20
Pause  33:21
paying  29:23
pending  10:19

people  34:9 40:3
peril  14:16,21 41:3,8
perils  14:3,13,17
  24:10,12,14 40:13
  41:3,11,17 44:17
permit  46:12
permitted  43:10
person  8:23 15:19
  36:20 39:2
personal  11:10,13
  15:4
persons  33:15 37:12
  40:15
place  21:7 26:15
placement  21:10
plaintiff  47:15
plaintiff's  37:25
  42:13,18 43:20
plan  20:7 33:25 34:5,
  10,22 35:5,13 36:2
  37:24 42:12 45:25
point  4:15 19:25
  37:21 39:18,19 40:10
  44:9,11
policies  9:14,17 10:4
  12:2,19 14:13 17:6
  18:12,13 19:4 20:2,
  5,25 22:22 24:10
  25:17,24 26:16 28:12
  31:7 44:6
policy  3:25 9:19,22,
  23 10:8,10,13,21
  11:4,9,15,16,21
  12:15,17 13:23,25
  14:3,9,22 15:12,14
  16:11,22,25 18:16,
  17,19,25 19:6,8,10,
  18,19,20,21 21:10,
  13,22,25 22:8,19
  23:23 24:9,20 25:5
  30:21 33:2 37:13,18,
  19 39:21 40:18 41:2,
  21,22 42:2 44:13
  45:15
policyholder  10:17
  12:4 23:17,19
policyholders  23:10
position  23:16
positions  22:15
possibility  39:9
posted  18:2

potential  23:19 24:18
  41:3
potentially  40:7
power  31:6
practice  6:20 7:2,7
practiced  6:22
preparation  14:4
  17:13 20:8 33:23
preparing  17:14 18:10
  43:15
presence  36:16
prior  22:15
privacy  14:19
private  7:2 39:2
  41:24
proceedings  46:9
process  20:20,22,25
professional  6:7 7:3
protect  38:14
protected  26:10
protecting  26:22
prove  38:11,16
providers  30:16
public  3:4 6:23 33:2
  40:4,15 41:25
publication  13:2
  27:21
publisher  33:3,6,14
publishers  30:16
  40:15
purchasing  20:20
purport  33:11
purpose  24:8 25:5
  36:22 37:19 38:13
put  23:16

Q

question  4:18,20 9:21
  12:7,10,12 15:20
  17:8 23:15 27:13
  28:9 30:2,18,20
  31:2,4 35:7 36:8
  37:5 39:14,23 41:14
  42:4,21,25 43:4,7,
  22,25 45:3,17,20
  46:6 47:21
questions  45:22 47:5,
  7,13

## R

ran  15:8
re-read  17:23
read  17:23 28:22
  33:18,24 34:3,6
  37:22,25 42:12,15
  43:19 45:20,22
reader  12:22 13:7
readers  12:21 13:4
reading  42:17 43:23
reason  14:11,12 37:15
reasonable  42:17
reasons  26:9 45:11
recall  3:23 16:7 17:4
  47:12,19
receive  12:3
recess  47:2
record  3:9 4:22 18:15
  23:4,7 28:23 32:12
  37:23 46:25 47:4
referred  45:21
refresh  17:22
refusing  26:13
relating  20:15 22:16
  46:18
release  17:17 35:5
  44:3,21 46:13
releases  36:22
relying  12:23
remain  7:9
remember  4:4,9,17
  16:16 47:17,18
render  38:8
repeatedly  19:3
reporter  4:21 14:6,24
  15:2,3,7 25:21 26:12
  27:5 45:23
reporter's  15:7 39:3
reporters  29:19 30:24
represent  8:5
representative  7:6
representing  24:18
research  44:19,23
  46:9,15
researching  19:22
reservation  28:3
reserve  8:20 11:20

reserved  9:10
reserving  8:25
respect  9:11,17 10:18
  11:25 12:5 15:17
  17:8,12 29:23 32:3
  33:13 41:23
respects  45:11
responds  43:5,6
resulted  13:11
retained  5:9
reveal  26:13
review  17:14 42:24
reviewed  17:16 18:9
  20:8 43:14
rights  8:20,25 9:10
  11:20 28:3
rise  14:21 24:12
  40:16
risk  20:16 24:19,21
role  7:3
Ropes  5:16
routinely  30:11,14
rules  4:11
run  24:19,20 27:5
runoff  21:4

## S

Sack's  17:25 18:5
  20:6
sample  18:17
Saul  5:14
scope  15:18,22 16:5,
  12,14,20,22 32:7
section  17:16 34:4,9,
  17 37:3,24 42:12,15,
  23 43:14,19,23 45:5
sections  33:24
seek  38:11,19
seeking  23:19,22
sense  7:8 15:22
sentence  42:11 43:17
separate  27:25
set  46:20
Shawnee  3:12
short  23:3 28:23
  39:22 46:23 47:2
shortly  7:11
show  42:24 43:8

sign  8:24 9:9
signed  9:4
simply  28:11 29:7
  44:24
situation  16:2,10
  26:12,25 36:24
situations  11:19
  19:13 25:3 30:7
slightly  28:9
slip  13:20
sort  11:15 13:11
  15:16 17:22 37:13
  45:8
source  14:8 26:13
speak  44:10
specific  16:7 19:13
specifics  16:16
specimen  18:12,16,17,
  25 19:6,8,15,18
  20:2,4
speculate  36:9
standard  19:2,18
  47:16,24
standardized  18:22
starting  4:18,20
state  3:4,8 6:23
  17:15 39:3
statement  37:21 39:6
  40:8,9
states  39:2 43:18
status  7:10
stay  35:2
stayed  7:12
step  14:23
stories  40:15
story  14:7
street  3:12 15:8
strike  47:21
structure  18:24
supports  24:14
suppose  36:20
sworn  3:3

## T

takes  41:8
talk  33:19
talked  20:12 34:10
talking  4:21

term  19:14
terminology  35:12
terms  19:15,25 26:20
  35:20,24
terrible  13:10
test  32:19
testified  3:5 33:22
  37:16 42:15 45:12
  46:7
testifying  28:8
testimony  5:5
theories  38:23
things  10:3 14:18
  17:23
thinking  7:8
time  4:15 19:4 36:3
times  3:19 13:21
told  36:4,21
track  36:22
traffic  14:8
treated  26:14
trigger  39:10
triggers  40:18
trip  15:9
truthful  5:4
turn  6:17 28:21
type  4:4 9:23 19:10
  27:9
types  9:17
typical  13:23,25
  16:10 17:5 18:19
  25:19,22 26:4,6 32:9
typically  14:13 16:17
  19:9,24 27:9 30:23

**U**

Um-hum  23:21
undercuts  24:8
undercutting  25:5
underlying  4:7
understand  4:23,24,25
  5:6 9:20 12:8,13
  15:21 26:24 28:6,7
  30:7
understanding  15:24
  29:9 47:24
undertake  8:15 30:23
undertaking  8:25 32:3

undertook  8:20
unfair  39:21,25 40:3,
  22,24 41:12,15,16
utterance  14:4

**V**

version  26:5
view  39:15,19 44:10,
  11
viewed  8:8
violation  32:25

**W**

wanted  19:23
ways  30:5
Website  18:3,6,7 20:5
welfare  13:3
willful  17:3 21:14,23
  22:9,19 23:25 24:15
  25:13 29:5 30:25
  32:24 34:17 35:19
  36:5 37:2 38:2 39:11
  42:14,19 43:21 44:16
  46:3,14
win  24:25 38:16
wiretap  26:22 27:23
woodwork  13:8
words  44:2,5,15
work  9:3,17 12:2
  15:15 16:24,25 17:19
  20:12 23:9,12 30:10
worked  5:25 7:24 8:2
  9:15 11:3
working  10:18 23:17
write  40:4
writer's  13:9 39:3
writers  33:4,7 36:24
  40:11,14
writes  13:3
wrong  10:7 18:19
wrongful  38:13,21

**Y**

years  6:23 7:13,22
York  3:4 13:21 46:12