**<u>Attachment 1</u>**

Complaint

US-DOCS\98333917.2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

```
-------------------------------------------------------x
INTERNATIONAL SCHERICK, LLC,            :  Index No.
a New York limited liability company aka :
"Superstar Machine"; and                :
GREGORY SCHERICK, an Individual,        :
                                        :
                    Plaintiffs,         :  COMPLAINT
                                        :
        vs.                             :  DEMAND FOR JURY TRIAL
                                        :
GIZMODO MEDIA GROUP, LLC,               :
a Delaware corporation; ANNA MERLAN, an :
Individual; EMMA CARMICHAEL, an         :
individual; and DOES 1-20, inclusive,   :
                                        :
                    Defendants.         :
                                        :
-------------------------------------------------------x
```

## PRELIMINARY STATEMENT

1.     This action by plaintiffs International Scherick, LLC, aka Superstar Machine

("Superstar Machine") and Gregory Scherick ("Mr. Scherick") (collectively "Plaintiffs") arises

out of the publication of numerous false and defamatory statements about Plaintiffs by

Defendants Anna Merlan ("Merlan") and Emma Carmichael ("Carmichael") in an article

featured on Jezebel.com, which is owned and operated by Defendant Gizmodo Media Group,

LLC ("Gizmodo Media") (collectively, "Defendants").

2.     Through this lawsuit, Plaintiffs seek the removal of the false and defamatory

article, which remains live on Jezebel.com and is the first Google.com search result for the terms

"International Scherick" and "Superstar Machine," because the article has caused and is

continuing to cause substantial reputational and economic harm to the Plaintiffs.  Plaintiffs also

1

seek compensation for the harm that these defamatory statements have caused and are continuing

to cause them. Superstar Machine's client base has dramatically declined due to pre-existing

members leaving the group and potential members deciding not to join due to adverse

persuasions about Plaintiffs' credibility and integrity arising from the defamatory statements at

issue and reservations about being affiliated with a group that has been publically accused of

being a "cult."

3.    Defendants are expected to falsely contend that the purpose of this lawsuit is to

harass or intimidate members of the media. Any such contentions would be false and are

nothing more than an effort to distract attention away from Defendants' own wrongful, harmful

conduct towards Plaintiffs and continued failure to practice ethical journalism by reporting

truthful information, and removing the defamatory statements from the article after Plaintiffs

demanded months ago that Defendants do so.

## INTRODUCTION

4.    Mr. Scherick, professionally known as International Scherick, is a successful life

coach. He developed Superstar Machine as a secondary-project to provide his services in a group

setting to those who cannot afford his one-on-one rate, and to foster a group where members can

support each other in their personal development.

5.    Throughout his years of practice, Mr. Scherick has successfully assisted many

people in overcoming personal trauma, insecurities, and other roadblocks, to allow them to better

achieve their goals, develop positive relationships, and possess a healthy sense of self.

6.    Superstar Machine did not and does not seek publicity or attention. Its website

and social media accounts are limited to its members. Similarly, Mr. Scherick does not seek

public appearances or interviews regarding Superstar Machine. This is purposeful because

2

Superstar Machine was designed to create an environment where its members can be open and honest, without external influences. Similarly, Superstar Machine does not want to attract members looking to network or otherwise exploit the group. Instead, Superstar Machine markets itself only through the positive word-of-mouth recommendations of its members.

7.     Merlan wrote an article entitled "Inside Superstar Machine, Which Ex-Members Say Is a Cult Preying on New York's Creative Women" (the "Article"), which was published by Gizmodo Media on or about September 10, 2016, on Jezebel.com, led by its Editor-in-Chief, Carmichael.

8.     Citing primarily to anonymous "sources," the Article contains numerous false, fabricated, and libelous statements about Plaintiffs.

9.     Plaintiffs' business is based on prospective and current members believing that Mr. Scherick and Superstar Machine can help them to live a more fulfilled life. The existence of the Article, which alleges that Mr. Scherick and Superstar Machine are nothing more than snake-oil salesmen seeking to prey on young women, isolating them from their friends and families, and convincing them that they are powerless without Mr. Scherick's guidance — allegations which are all completely false and highly defamatory — causes tremendous damage to Plaintiffs' professional reputations, and Mr. Scherick's personal reputation as well.

10.     Particularly because Superstar Machine lacks a social media and public internet presence, potential members of Superstar Machine and potential clients of Mr. Scherick were and are all but certain to see the Article online and avoid becoming a member of Superstar Machine or a client of Mr. Scherick, believing the defamatory statements to be true or possibly true.

3

11.     Merlan, Carmichael, and Gizmodo Media purposefully and deliberately wrote, edited and published, respectively, the false Article about Plaintiffs without consideration to the consequences that it would cause Plaintiffs, or while knowing that it would cause tremendous harm to Plaintiffs.

12.     When Merlan contacted Superstar Machine concerning the Article, she did so in an accusatory manner—requesting that Superstar Machine respond to the accusations made against it rather than attempting to engage it in a fact-finding discussion about its business. Superstar Machine told Merlan that it would provide her with information about Superstar Machine (information that would have refuted all of the defamatory statements in the Article) by a date certain in the near future. But, on just that date, Jezebel.com rushed to publish the Article in order to avoid the receipt of information that would prove all of the Article's defamatory statements false.

13.     Carmichael encouraged these unethical "journalistic" tactics. She has previously testified that publishing false rumors about a person is acceptable "journalism" because it supposedly leads to post-publication commentary of whether the rumors are true.

14.     Carmichael routinely engages in unethical practices. As one example, she was the Managing Editor of Gawker.com when it published a secretly-recorded sex tape of Terry Bollea aka Hulk Hogan, and was personally involved in the sex tape being edited and published. Carmichael testified at the *Bollea vs. Gawker Media* jury trial that she was "comfortable" with Gawker's actions and that if "history were to repeat itself" Gawker would do the same thing and publish the Bollea sex tape. A few days after her testimony, the jury awarded Mr. Bollea $115 million in compensatory damages and an additional $25 million in punitive damages.

4

15.     Gizmodo Media was well aware that Jezebel.com and its sibling websites routinely engaged in unethical journalistic practices when Gizmodo Media took over and published the websites, commencing on or about September 10, 2016. Gizmodo Media purchased the websites, including Jezebel.com, in Gawker Media, LLC's bankruptcy auction, following the $140 million judgment in the *Bollea v. Gawker Media* lawsuit.

16.     On or about August 22, 2016, Gizmodo Media's winning bid for the purchase of the Gawker Media assets, including Jezebel.com and its various articles, was approved by the Bankruptcy Court. That same day, Plaintiff's counsel sent a letter to Gizmodo Media's counsel, listing the false and defamatory statements in the Article, and demanding that Gizmodo Media not publish those statements once it officially acquired Jezebel.com. Gizmodo Media, through its counsel, responded that it would publish the Article in its entirety, and did so starting on or about September 10, 2016.

17.     Defendants' false and defamatory statements about Plaintiffs have caused tremendous harm to Plaintiffs' personal and professional reputation and business, by calling into question their honesty, ethics, and motives as professional coaches.

18.     Superstar Machine's client base has diminished from over 100 members to less than 30. This decline began after the publication of the Article, because members questioned Superstar Machine and Mr. Scherick, including their capabilities and credibility, and members sought to avoid being associated with the stigma that the Article affixed to Plaintiffs.

## **PARTIES**

19.     Plaintiff International Scherick, LLC, aka Superstar Machine, is a New York limited liability company, which does business in the City of New York, County of New York, State of New York.

5

20.     Plaintiff Gregory Scherick is an individual domiciled in Ashland, Oregon.

21.     Defendant Gizmodo Media Group, LLC is a Delaware corporation, with its

principal place of business in the City of New York, County of New York, State of New York.

Gizmodo Media operates and publishes Jezebel.com where the defamatory statements alleged in

this Complaint were and are published.

22.     Defendant Anna Merlan is an individual domiciled in the State of New York. She

is a reporter for Gizmodo Media Group, formerly a reporter for Jezebel.com, and the author of

the Article.

23.     Defendant Emma Carmichael is an individual domiciled in the State of New

York. She is an employee of Gizmodo Media Group and was the Editor-in-Chief at Jezebel.com

at the time the Article was written, edited and published.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over Defendants under CPLR § 301 because

Defendants have offices in, have their principal place of business in and/or are domiciled in New

York, New York, and the causes of action alleged arise out of Defendants' activities in New

York, New York.

25.     Venue is proper in this county under CPLR § 503 because Defendants have their

principal place of business there and/or are domiciled there.

26.     Plaintiffs are presently unaware of the identity of the defendants sued herein as

Does 1 through 20, and will amend this complaint to identify them once Plaintiffs learn of their

identities. Gizmodo Media; Merlan, Carmichael, and Does 1 through 20 are collectively referred

to herein as "Defendants."

6

## FACTS

### The Article

27.     The Article makes the following false and defamatory statements about Plaintiffs:

a.     "'At that point I'm grasping for straws,' Rose [only identified by her middle name] says. 'I think I was so damaged I was like, OK, cool. There's all these women who are really in touch with their emotions, and they seem on on [sic] top of their shit, and I'm not on top of mine right now.'
She pauses, looking for the right words.
'I was a prime target,' she says at last, ruefully."

b.     "'Poppy' says she was invited to join the group in 2010 2009 by Princess Superstar, the rapper and DJ. She says Princess told her Scherick was a 'modern-day guru,' who would turn her life around, 'make money flow to you,' and fix her every romantic problem."

c.     "'Poppy' says Scherick would also stress that the women couldn't do anything without his help."

d.     "The path for these women is twofold: tapping into the Divine's plan for their lives, and learning to be subservient to their male romantic partners."

e.     "The way he sold everything is that women are the leaders of the world, but, like, 'They don't know how powerful they are, that's my job. The Divine speaks through me. No one connects with the Divine like I do.'"

f.     "At the time, Scherick was doing private counseling sessions with both men and women, 'Poppy' says (Scherick is not listed in any state databases as being licensed as a counselor in New York, California, or Oregon, where he now lives; this was informal spiritual guidance)."

g.     "Despite all the bubbly positivity, Scherick and his helpers didn't brook any dissent in the ranks, 'Poppy' says: 'Whatever he says, goes.'"

7

h. "The women who left Superstar Machine and spoke to Jezebel all say Scherick has cultivated a group of women who served as his seconds-in-command, and whose role is to praise him, back up his decisions, and remind everyone coming into the group that they needed to give him 'a good experience.' Part of the broader emphasis, they say, was on 'serving the masculine.'"

i. "'For that reason, there weren't a whole lot of gay members in SSM,' 'Poppy' says. She instinctively understood that she should be quiet about the fact that she dated both men and women."

j. "'Dating women doesn't support what [SSM does] because they're all about serving the masculine,' ['Poppy'] says. 'Even when very out women had come to SSM with friends, they were never invited to really sign up.'"

k. "'She's not a good fit,' 'Poppy' recalls being told about a woman she brought along, a friend who she describes as 'very butch.'"

l. "Scherick's name change was the subject of a 'big conversation,' Poppy says, during a Sunday group discussion for the most "advanced" SSM members.

   As she remembers it, Scherick told the group that he had been called 'to a higher level of holding his value,' and that his old name no longer satisfied 'the Divine plan.'"

m. "The women who left SSM agreed to speak to Jezebel because they came to believe that the group is a cult, one that preys on its members' insecurities, exploits them financially, and isolates them from friends and family."

n. "Scherick's genius, the woman says, is his ability to identify women who are in transitional places in life – graduating, say, or leaving a long relationship, or arriving in the city.

8

'It's a perfect time to prey on women,' [Unknown Source who declined to identify herself to Merlan] says. She claims that Scherick convinces Superstar Machine members their problems are due to an innate personal flaw."

o.  "'He convinces you that you having problems because there's something wrong with you, or that you're not doing,' [Unknown Source who declined to identify herself to Merlan] says."

p.  "'Under the guise of empowerment, he was supposed to be making us heroes in our own lives and making us strong women,' ['Poppy'] says now. 'But really he was disempowering us and making us do whatever he wanted us to do.'"

q.  "Caitlin [last name withheld] also shared that she was having casual sex with a couple people, which Scherick disapproved of.

'[With] sex, he has strict rules about how soon you should be having sex with someone you're dating,' she recalls. 'There's no sex without confirmed monogamy. There needs to be a verbal confirmation of monogamy for there to be sex in a relationship. He said a woman's reasons for having sex is to get a relationship and a man's is to get more sex.'"

r.  "Caitlin was also unimpressed with the hard sell she got to sign up for the group. 'At the event, they pull you into another room when everyone's trying to leave and try to get you to sign up,' she says. 'They try to get your credit card info, your home address, all this stuff.'

The whole event left her with a sense that something was deeply wrong, she says.

'The way they pressured me to get credit card information that first time— I just had this weight sitting on my chest. It felt like the moment before

9

something really bad is about to happen in a movie. Like, this is not a good thing.'"

s.  "'When these young women arrived in New York, it was like hitting a speed bump while driving 70 miles per hour,' Caitlin says. 'They thought [the setback] was because something was "wrong with them" and were too ashamed to "go back home a failure" or ask for help. So International really filled the void for them the way some people would have fallen into hard drugs in the '80s. It was the love and recognition they were longing for in a very simple, glossy packet: 'If you properly relate to the masculine, all your problems will be solved.'"

t.  "Both Cantley and Arnold were brought in by the same woman; they said independently that they believe she ... will lose her coveted status if she fails to recruit new members."

u.  "Scherick had specific ideas about what type of sex was best, 'Poppy' adds.

    'Having anal sex was a marker of being a true, fierce powerful woman. The length of your orgasms were also markers of how intense your feminine power was.' In the higher levels, she said, 'We had phone calls having to share how long our orgasms were, the positions we masturbated in. People were claiming to have like 30-minute orgasms.'

    Scherick's justification for all of this was that he was trying 'to give you a better feminine experience,' 'Poppy' says."

v.  "Former group member 'Amber' says she witnessed the type of sexual advice Scherick doled out, and was so uncomfortable with it she eventually chose to leave the group. He told women, she says, 'to do stuff like get down on the floor,' or instructed them to go home and 'stick fingers up their asses, or stick, like, a carrot up your ass.'"

10

w. "'Rose' left the group after witnessing an interaction where a woman, under International's guidance, 'recovered' a memory of having been sexually abused by a family member.

'She was crying like a child,' 'Rose' remembers.

That was the last straw, she says. 'As soon as we were done I walked out the door and didn't say a word to anyone and emailed them like, "I quit. This is crazy."'

'Rose' obviously doesn't know if the woman was molested, she says now, but at the time the scenario 'seemed very manufactured,' she says."

x. "Besides mandatory meetings and phone calls each week, which the former members say ate up much of their time, they were also expected to post lengthy missives on a group message board, praising 'The Machine' for its positive impacts on their lives."

y. "There's punishment for falling out of line, Poppy says, which she experienced firsthand and often. ... 'You'd have to earn things back,' she says."

z. "In the end, the sex talk and the punishments 'started to get creepy for me,' 'Amber' says, as did the general, overwhelming stress Scherick placed on becoming submissive to men, and, as she saw it, to him."

aa. "They allege that SSM members occasionally attend OA [overeaters anonymous] meetings for the purpose of recruiting new people."

bb. "One of the things that distinguishes a cult from a spiritual self-help group is the attitude that group has towards communicating with outsiders. There's disagreement about how to categorize Superstar Machine, of course, but it's a fact that SSM members are subject to an exceedingly strict set of behavioral rules regarding communication, including restrictions on when they're allowed to talk to other members of the group."

11

INDEX NO. 651939/2017
RECEIVED NYSCEF: 09/06/2017

cc. "Members have to get permission to call or text each other, 'Rose' says. 'If we wanted to talk to women outside of the events who were in SSM, we had to get permission from Shana,' she explains. Members had to get permission to 'connect,' as phone calls or texts were referred to, and then tell Shana what had been discussed."

dd. "[R]emembers another former member, 'Jane'... 'I couldn't text them freely. I couldn't just hang out with them. If I texted them it had to be about the Machine.'"

ee. "Members also aren't exactly encouraged to talk to outsiders about SSM, unless they seem interested in joining."

ff. "'If you thought anything somebody said wasn't in line with International's teachings, you were required to go back and tell International about it,' she says. 'If you didn't and they found out about it because that person felt guilty, you'd get in trouble and you might be put down in a lower level but still have to pay at Celebrity level.'"

gg. "'Amber' also says that SSM relies on 'finger-pointing.' When she became concerned about being asked to aggressively recruit new members, ('it felt deceptive,' she says) she was punished by being placed on an 'intense' group phone call with other members, where all of them told her in turn how badly she'd messed up."

hh. "Another time, ['Amber'] says, she was singled out again for no reason she could see, told she wasn't 'holding as much value' as other members of the group. 'It was a psychological beating,' she says bluntly. 'They would randomly pick on you.'

Amber 'says the goal here, as always, was for the women being singled out to break down and cry. 'You'd break down in tears and cry right away

and they'd say that was so brave.' She participated in finger-pointing and punishment-administering too, she says.

  'Part of it was the fear of being in the hot seat yourself,' she explains. 'It was like Stanford prison experiment. If you give people power, they start to trip on it. It was scary. You didn't know what was coming at you. These are women you're supposed to bond with. The unpredictability of that is somehow toxic.'"

ii. "Therapy is also not encouraged, several former members say."

jj. "The last straw ['Poppy'] said, is when International, Shana, and International's partner began pressuring her to be part of a nonprofit they hoped to launch.

  At first, the stated purpose was to support artists, she says; later, it became about supporting International and his work. They learned that she had some family money, she says, and wanted her to ask her relatives for a gift of $50,000."

kk. "Poppy … received significantly more pressure and guilt to stay."

ll. "Most ironically, it seems that SSM was set up in a way that actually prevented its members from gaining the things the group was supposed to give them: confidence, clarity, mutually supportive industry friends, a leg up in their field. Many of the women in Superstar were at similar stages in the same fields—acting, yoga, the creative arts. But the women who left say they're not permitted to talk about anything but The Machine, meaning that women who could have helped each other benefit professionally weren't allowed to do so, and were instead encouraged to think of success as something held in the hands of a man who was financially interested in them feeling helpless."

13

mm.  "[SSM is a] scheme to give Scherick the success and adulation he dreams

of.

International's dream is to be rich, have great sex, make movies, come back

to Hollywood and own it," Rose says. Even this story, she adds, will likely be

taken by International as proof that Superstar Machine is developing according

to his grand vision.

28.     The false and defamatory statements listed in Paragraph 27, *supra*, are

collectively referred to herein as the "Defamatory Statements."

### The True Facts Regarding Superstar Machine

29.     The foregoing Defamatory Statements in the Article are statements of fact, are

false, and have caused tremendous harm to Plaintiffs' personal and professional reputations and

businesses.

30.     Mr. Scherick left a career as a writer and editor in the entertainment industry to

follow his calling of helping people tap into their unrealized potential and harness those skills to

lead a successful and fulfilled life.  Through word-of-mouth referrals from satisfied clients, his

business grew from a passion project to full-fledged business.

31.     As a life coach, Mr. Scherick is not required to have certification or license from a

state agency.

32.     Mr. Sherick uses a professional name "International" during coaching.  Mr.

Scherick has not legally changed his name nor did he not adopt the professional name as part of a

"Divine plan."

33.     Mr. Scherick does not have a typical client, rather, his clientele ranges from

entertainment professionals to mothers to artists to lawyers.  But his favorite clients are those

facing adversity, whether personally or professionally.  Mr. Scherick developed Superstar

Machine for these clients.

34.     Superstar Machine was and is a secondary project to Mr. Scherick's one-on-one

coaching.  It is meant to provide his services, at a great discount, to those who cannot afford his

14

one-on-one rate (various fee-based memberships are offered based on the amount of participation the member wishes to have with the group), as well as to foster a group where members can support each other in their personal development without being focused on networking, career advancement, or the one-upmanship that professional networks tend to cultivate.

35.     Superstar Machine thus appeals to people who would benefit from a life coach and support system, and does not target emotionally unstable or "damaged" individuals for membership, although these types of individuals could be more inclined to join the group than someone who feels stable in their situation.

36.     Superstar Machine focuses on personal rather than professional development. It does not promise to make its members rich or "fix" their relationship problems. Instead, Superstar Machine's purpose is to aid its members in realizing their individual strengths and what they need to achieve personal success.

37.     It does not discriminate in its membership based on race, religion, sexual orientation, or other such categories. In particular, Superstar Machine does not exclude gay persons from membership and has members of various sexual orientations.

38.     Superstar Machine purposefully maintains a low profile. It does not have public social media accounts or a public website. Mr. Scherick does not seek interviews or speaking engagements regarding Superstar Machine. Members are not gained through advertising, but instead through current and former members telling like-minded individuals about the group. Superstar Machine encourages its members to treat the group like one would an anonymous support group, such as alcoholics anonymous or overeaters anonymous, and not share intimate group details outside of the group. In doing so, Superstar Machine seeks to provide a safe, confidential space where its members can be open and honest, and eliminate any impression that it is publicly recruiting members. Nonetheless, Superstar Machine does not prohibit members from talking about the group with outside persons.

39.     Some Superstar Machine members are in other support groups and may choose to tell others in those groups about Superstar Machine. Members certainly are not instructed to

attend other support groups to "recruit new people" for Superstar Machine from these groups, nor do members attend such groups for the purpose of recruitment. Indeed, there is no requirement that existing members recruit members to maintain their "status." That said, if a person in an outside group learns of Superstar Machine, they might be encouraged to visit to see if Superstar Machine might be of interest to them.

40.     Visitors are informed of Superstar Machine's membership options and fees but Superstar Machine does not isolate visitors to try to intimidate them into signing up nor does Superstar Machine pressure members to commit to membership options beyond what they can afford.

41.     Superstar Machine never asks its members for money outside of membership fees and does not pressure members to stay in the group if they decide to leave. Some members, like the woman referred to as "Poppy" in the Article, would offer to contribute money to causes that the group hoped to launch but these offers were never influenced by Mr. Scherick nor were they ever accepted by Superstar Machine. Mr. Scherick did not ask members to support his work or attempt to launch causes that were meant to financially benefit him.

42.     Superstar Machine is not a cult by any stretch of the imagination. Among other things, there is no religious component to the group. It encourages its members to become stronger individuals through certain guidance and advice. It does not attempt to instill Mr. Scherick's opinions on its members nor does it use rewards or punishments to force members to act in a certain manner. Mr. Scherick certainly is not worshipped, nor is he the focus of the group's message. Rather, Mr. Scherick utilizes his coaching skills to help individuals confront their personal obstacles, which can range from past or current trauma, confidence issues, or relationship difficulties.

43.     Former clients who have worked with Mr. Scherick as a coach for years, often take proactive roles in guiding new members and helping them understand Mr. Scherick's coaching. Shana Kuhn-Siegel is one example.

44. Ms. Kuhn-Siegel is not a "follower" of Mr. Scherick. She initially worked with him as a coaching client, and later transitioned to becoming a coach herself and presently works with International Scherick, LLC.

45. Many of the members struggle with self-confidence issues or with realizing their untapped potential. Mr. Scherick's coaching addresses those obstacles that prevent members from feeling personal success or contentment. For example, Mr. Scherick uses the terms "Celebrity," "Icon," and "Megastar" to describe his members to make them understand that they are equal to the people whom society brands with such titles, to help provide members with added confidence.

46. To address many of the relationship issues that Superstar Machine's members have, Mr. Scherick coaches members not to let prior bad relationships prevent them from future good relationships. He encourages members to treat prospective partners as the members would want to be treated themselves and routinely states that decisions around when to engage in sex are entirely up to the individual.

47. While discussions about relationships and intimacy occur often in Superstar Machine, these conversations are generally member initiated and member driven. Mr. Scherick does not encourage members to be "subservient" to their male romantic partners or engage in specific sexual acts. Members are not required to share intimate information with the group and are encouraged to do so only if they are comfortable in the discussion.

48. If members do choose to share information with the group, they do so voluntarily. Members are not forced to participate nor are they given "manufactured" stories to recite. Although members might become emotional after sharing with the group, Superstar Machine does not purposefully try to "break" people or make them cry.

49. Superstar Machine does not hold itself out to be a professional or networking group. Instead, it encourages its members to engage in personal relationships rather than focus on networking or creating business relations with one another. That said, the group does not prohibit its members from interacting outside of group settings. Members sometimes work

17

together or engage in the same social activities, and reach out to other members to offer support
and encouragement.

### Merlan's "Investigation" of Superstar Machine

50.      Plaintiffs are not public figures and therefore not required to allege or prove
"actual malice." Notwithstanding, and though not a requirement, Defendants published the
aforementioned false statements of fact on Jezebel.com with reckless disregard for their truth
and, in some instances, with knowledge that they were false and were likely to harm Plaintiffs'
personal and professional reputations and business.

51.      Discovery has not yet commenced and Plaintiffs expect to obtain additional
evidence through discovery regarding Defendants' intentional, wrongful conduct.

52.      Merlan, a reporter with Jezebel.com since 2014, knew the types of articles that
would garner attention online, and, thus, was encouraged by her supervisors, including
Carmichael. An article about a life coach who formed a support group to help people address
their personal issues is not a subject that tends to attract large numbers of readers. However, an
article about a man who preys on emotionally fragile women to join his "cult" is almost certain
to draw many more times the web audience, and corresponding advertising revenue, than the
responsible and accurate article. Merlan and Carmichael chose the latter approach, which
included the Defamatory Statements, and Gizmodo Media chose to publish it – even after
Plaintiffs' counsel told them the Defamatory Statements were false and defamatory, and
publishing them would expose Defendants to liability and damages.

### Jezebel.com Encouraged the Publication of the Biased, Unsubstantiated Story

53.      Prior to September 10, 2016, Jezebel.com was owned by Gawker Media LLC.

54.      Historically, Jezebel.com was a women's lifestyle blog that focused on women's
issues and interests. In 2014, however, Gawker Media decided that it wanted to increase
Jezebel.com's website traffic to rival Gawker Media's other websites, including Gawker.com
and Deadspin.com, which were in the business of publishing nude imagery, sex tapes and
targeted salacious stories, which attracted both audience as well as numerous lawsuits; the *Bollea*

18

*v. Gawker* case being just one of many. As additional examples, Gawker.com published a private video of two married actors partially nude in their private hot tub, for which the actors sued Gawker Media. Gawker.com also published topless and bottomless photos of Dutchess Kate Middleton, taken by a paparazzi's telescope attached to a camera. Deadspin.com similarly published an uncensored photo that it claimed depicted a famous NFL quarterback's penis. Deadspin.com also published a link to a video of a female ESPN reporter, naked in her hotel room, taken by her stalker who tricked the hotel into giving him the room next door, and doctored the peephole in the door of her room. Deadspin.com's publication of the link caused the first million people to see the stalker's video of the reporter. (The reporter later won a $50 million jury verdict against the hotel and stalker, one week before Bollea, in a different court, won his $140 million verdict.) Deadspin.com's publication of sex tapes and nude imagery is not limited to public figures; the website habitually posts photos and video of unknown individuals (often college aged) engaged in sexual activity without making any attempt to disguise the individuals' identities.

55.     Carmichael had been the Managing Editor at Deadspin.com, where she worked on salacious stories, and then became the Managing Editor at Gawker.com, where she worked on more salacious stories, including the editing and posting of the Bollea sex video, before she was promoted by Gawker Media in 2014 to Editor-in-Chief of Jezebel.com.

56.     In that new role, Carmichael sought to make Jezebel.com's content more salacious—to more closely resemble the content of Gawker.com and Deadspin.com. While still focusing on female readers, the articles began to focus on topics that would titillate or outrage.

57.     Carmichael permitted the use of anonymous sources and did not care if the Jezebel.com writers or editors quoted sources who had strong biases or ulterior motives in providing information.

58.     Carmichael also adopted the policy that the best way to determine the truth of a rumor was to publish the rumor as fact, and then see if it is confirmed or refuted post-publication.

19

59.     With these policies, Carmichael worked with Jezebel.com's writers, including Merlan, to develop and publish salacious content. Carmichael was aware of the Article and the information that had been gathered for it, and did not require Merlan to speak to Superstar Machine, or obtain information from it, before publishing the Article. Indeed, the practice of rushing to publish before the subject who was being defamed could provide contrary information is one of the hallmarks of the "journalistic" practices of Gawker.com, Deadspin.com, and Carmichael.

60.     Further, on information and belief, Carmichael showed Merlan a 2011, first-person account published on Hairpin.com, a publication where Carmichael had once worked, which detailed one woman's experience almost joining an unnamed "cult." Merlan, in the Article, leaps to the conclusion that the account was about Superstar Machine, and published portions of the account in the Article.

### Feedback to the Story Established that the Claims Were False, Yet Jezebel.com Did Not Retract, Revise or Follow Up

61.     In the three days following the publication of the Article, numerous current and former Superstar Machine members wrote into the Comments section to the Article challenging the Article's allegations and questioning the reliance of unidentified sources with extreme biases against Superstar Machine.

> a.   "I am a current member of Superstar Machine and [another group run by International Scherick, LLC] and damn proud of it! Both of these collectives have helped me invaluably and continue to change my life in the most amazing ways and the results are tangible! ... International [Mr. Scherick's professional name] is such a cool, hilarious man and a genius AND is actually the most humble person I have ever met. He has helped me so much: with the amazing relationship I am in, with all the success I am having at my job, with becoming who I really am. And he supports people to be authentic which is why I continue to stay in SSM and love it. I always hated groups

20

because I felt like I had to act like everyone in the group and that made me
want to vom. In SSM I am supported to be original and so much of what
International says I agree with 100% and resonates for me a ton. He actually
lays down the truth in this crazy world we are living in. I mean look at what
is happening in our country! Politics, health care etc. The world is a
challenging state and things could be so much better. I am so grateful to get
to participate in SSM because it helps me stay sane amidst the craziness and
the drama out there and makes me feel excited to live my life, challenges and
all."

b. "He is a visionary and has helped me be super successful in my life and in
my marriage, and as a mom. The cult thing is ridiculous- last I checked cults
don't let you have outside relationships- well I can have relationships with
anyone I want to (and I do); I have an amazing evolving career thanks to
him; and over the years has helped me for free when I couldn't pay. Also
usually cult leaders are inappropriate with their members, well I've been
studying with him for 8 years and never ONCE saw him be inappropriate
with a woman, he is honorable and humble and a real genius."

c. "I never felt preyed upon. I was asked to participate in a group that was
especially designed for a particular kind of support. After investigating for
myself what kind of group this was, I waited for a year to join, with no
pressure from the girl who introduced me to the machine (this is the same girl
Ashley told you about). I actually thought SSM was bull***t and comical
when I attended an event, I audibly scoffed and left with no one holding me
back. Then a year later I had a traumatic experience, the event was in town a
month later, I went and I was moved and I thought I should try it for a while,
which I did. One of the best choices I've made in my life was attending that
event and joining SSM."

21

62.     Despite Jezebel.com's Editor-in-Chief's policy of waiting until after it publishes an article to investigate its truth, Jezebel.com failed to issue a retraction, correction, apology or follow up story addressing the conflicting testimonials.

63.     Instead, Merlan merely published Ms. Kuhn-Siegel's response to the Article as an "update"—at the very bottom of the 22-page Article, where the "update" was least likely to be seen, and after the Article had already been published and generated the vast majority (if not all) of the page views of the Article. Thus, the readers of the Article read it, including all of its Defamatory Statements, when it was first published, and very few of them, if any, had any reason to go back to the Article to check the bottom of its 22 pages to see if an "update" had been added at any point. Moreover, no reference to Ms. Kuhn-Siegel's response was made within the Article where it continued to state (falsely) that Superstar Machine had failed to provide a comment to the Article, thus further misleading readers to believe that Superstar Machine did not refute the Defamatory Statements.

64.     When Merlan received an email from a former Superstar Machine member, offering her own positive viewpoint about the group, Merlan simply posted the email within the many other Comments, below the 22-page Article, rather than contacting the member to learn the truth and revise the Article, or otherwise revising the Article based on the statements in the email to include the alternate commentary in a conspicuous place within the Article, or re-visiting the Defamatory Statements to determine if they were false and thus warranting their removal.

65.     Moreover, Jezebel.com and Merlan withheld several comments from Superstar Machine members from being generally posted in the Comments section of the Article, thus further suppressing the truth.

66.     Jezebel.com has a policy regarding comments that flags comments written by unknown persons, blocking them from general view, until the comments are reviewed by an administrator. Many of Superstar Machine's supporters were not regular readers of Jezebel.com, and therefore their comments were flagged as under review and could not be seen by readers unless individual readers affirmatively allowed the "pending" comments to be shown. When this

22

was brought to Merlan's attention, she claimed she was reviewing all comments to ensure that the pro-Superstar Machine comments were reviewed and made generally available, but she did not follow through, and as a result, there are pro-Superstar Machine comments that are not generally visible—and only become visible when the reader affirmatively enables the "pending" comments.

### Gizmodo Media Republished the Story Upon Acquiring Gawker Media's Assets, Even Though Gizmodo Media Had Reason to Question the Truth of the Article

67.     Shortly after the March 2016, jury verdict in *Bollea v. Gawker Media, LLC et al.*, Gawker Media filed for bankruptcy.

68.     UniModa, LLC, the parent company of Univision, bought many of Gawker Media's assets, including Jezebel.com, and transferred the assets to a newly-formed company called Gizmodo Media Group, LLC.

69.     UniModa bought Jezebel.com with the intent of maintaining and continuing the publication of the website. UniModa did not have a similar website within its company and believed that Jezebel.com would help it attract new viewers to UniModa's original publications and better serve its existing female readers.

70.     On August 22, 2016, Plaintiffs' counsel sent a letter to UniModa/Gizmodo Media, before it took control of Jezebel.com, demanding that UniModa/Gizmodo Media remove each of the Defamatory Statements in the Article. Plaintiffs allowed UniModa/Gizmodo Media a reasonable amount of time to comply. However, UniModa/Gizmodo Media failed to comply with Plaintiffs' demand, and sent Plaintiffs' counsel a letter stating that it would not comply.

71.     On or about September 10, 2016, UniModa/Gizmodo Media officially became the owner of Jezebel.com, and the new publisher of its content.

72.     Despite being aware that Gawker Media had questionable, if not outright unethical "journalistic" practices, that numerous lawsuits had been brought against Gawker Media stemming from its publications, and that Carmichael, as the Managing Editor of Gawker.com, had been partially responsible for the publication of the Bollea sex tape which led

23

to Gawker Media's bankruptcy, and who had publicly testified at the Bollea trial that she was "comfortable" with Gawker's publication of the sex tape, and would take exactly the same action if "history were to repeat itself," and having just received Plaintiffs' letter demanding removal of the Defamatory Statements and warning of legal consequences if they were not removed, Gizmodo Media made the decision to publish the Defamatory Statements.

73. Gizmodo Media did remove other articles from various Gawker Media websites, due to fears that keeping the articles online would expose Gizmodo Media to potential liability and damages for their publication. However, the Article at issue here was one that Gizmodo Media refused to remove or alter, notwithstanding Plaintiffs' demands shortly before Gizmodo Media's acquisition of Jezebel.com.

### The Article Continues To Harm Plaintiffs

74. The Defamatory Statements were tremendously harmful to Plaintiffs. As a life coach and life coaching business, statements that allege Plaintiffs are preying on women and do not provide legitimate services directly damage their professional credibility, as well as personal reputations. Statements that Mr. Scherick is providing services without a proper license or refusing to provide membership to gay individuals are defamatory *per se* by falsely alleging that he is in violation of the law, and such statements likewise have caused and are causing tremendous damage to his personal and professional reputation and business, and deter clients from utilizing his services.

75. Plaintiffs have lost ongoing and potential members, and individual life coaching clients, as a result of Defendants' publication of the Defamatory Statements in the Article. Professional relationships and potential partnerships have similarly been affected because people do not want to be affiliated with an alleged "cult."

76. Defendants published one of the most harmful and incendiary allegations that can be ever made about someone in the business of providing life coaching services: the allegation that Superstar Machine and Mr. Scherick, rather than placing their clients' interests first, have maliciously preyed on insecure women and controlled their lives.

24

77.     Plaintiffs' only means of rebuilding their reputations is to file this lawsuit, to prove in Court the falsity of the Defamatory Statements, and seek the permanent removal of the Defamatory Statements from Jezebel.com.

78.     Plaintiffs request herein all available legal and equitable remedies to the maximum extent permissible by law, including without limitation compensatory damages, punitive damages, and a permanent injunction against the defamatory statements at issue.

## FIRST CAUSE OF ACTION

### (Libel)

79.     Plaintiffs reallege and incorporate by this reference Paragraphs 1 through 78 of this Complaint as though fully set forth therein.

80.     Defendants published, caused to be published and/or maintain the defamatory statements in the Article on Jezebel.com as described in Paragraph 27 herein.

81.     The Defamatory Statements in the Article were of and concerning Plaintiffs.

82.     The Defamatory Statements in the Article were false.

83.     Defendants failed to utilize a reasonable level of care in publishing and/or maintaining the Defamatory Statements in the Article on Jezebel.com.

84.     The Defamatory Statements in the Article also constitute defamation *per se* because they harm Plaintiffs' reputation and impugn the basic integrity of Plaintiffs' business.

85.     The Defamatory Statements made and/or maintained by Defendants were false, and no applicable privilege or authorization protecting the statements can attach to them.

86.     The Defamatory Statements in the Article have caused International Scherick LLC and Mr. Scherick damages, including harm to their reputations and business interests.

87.     Defendants' acts were willful and egregious conduct constituting malice. Defendants' acts were willful and malicious.  As such, in addition to compensatory damages and/or presumed damages, Plaintiffs demand punitive damages relating to Defendants' making and/or maintaining of the above-referenced defamatory statements, in an amount to be determined at trial.

25

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

i.      An order enjoining Defendants from publishing, continuing to publish, or

republishing the Defamatory Statements alleged herein in any medium;

ii.     Awarding compensatory and punitive damages in appropriate amounts to be

determined at trial;

iii.    Awarding Plaintiffs the recovery of their costs associated with this action; and

iv.     For such other and further relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial.

Dated:  Beverly Hills, California
        September 6, 2017

                                        HARDER MIRELL & ABRAMS LLP

                                        By: _____
                                            Charles J. Harder
                                            132 S. Rodeo Drive, Fourth Floor
                                            Beverly Hills, California  90212
                                            (424) 203-1600

                                            Anthony J. Harwood
                                            488 Madison Avenue, Eighteenth Floor
                                            New York, New York 10022
                                            (212) 799-1400

                                            *Attorneys for Plaintiffs*

26