Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GAWKER MEDIA, LLC,              Case No. 16-11700-smb

8

9            Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                   U.S. Bankruptcy Court

14                   One Bowling Green

15                   New York, New York 10004

16

17                   April 9, 2018

18                   10:05 AM

19

20   B E F O R E :

21   HON STUART M. BERNSTEIN

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1    Hearing re:  Motion in Limine

2

3    Hearing re:  Motion of Ryan Goldberg (I) to Enforce Order

4    Confirming Amended Joint Chapter 11 Plan of Liquidation and

5    (II) to Bar and Enjoin Creditors from Prosecuting their

6    State Court Action

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Jamie Gallagher, and Pamela A.

25   Skaw

Page 3

1    A P P E A R A N C E S :

2    ROPES & GRAY

3         Attorney for the Plan Administrator

4         1211 Avenue of the Americas

5         New York, NY 10036-8704

6

7    BY:  ELIZABETH BIERUT, ESQ.

8

9    SAUL EWING ARNSTEIN & LEHR LLP

10        Attorneys for Ryan Goldberg

11        One riverfront Plaza

12        1037 Raymond Boulevard

13        Suite 1520

14        Newark, NJ 07102-5426

15

16   BY:  DISPESH PATEL, ESQ.

17        SHARON L. LEVINE, ESQ.

18

19   WILLIAMS & CONNOLLY LLP

20        Attorney for Ryan Goldberg

21        727 Twelfth Street, N.W.

22        Washington, D.C. 20005

23

24   BY:  THOMAS G. HENTOFF, ESQ.

25

1    HARDER LLP

2         Attorney for the Moving Party

3         132 S. Rodeo Drive

4         Fourth Floor

5         Beverly Hills, CA 90212

6

7    BY:  DILAN A. ESPER, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                   P R O C E E D I N G S

2            THE COURT:  Gawker Media?

3            MS. BIERUT:  Your Honor, Elizabeth Bierut on

4    behalf of the plan administrator.

5            THE COURT:  Okay.

6            MS. BIERUT:  Your Honor, we have two matters going

7    forward today, neither which are filed by the debtor, but

8    the first is a motion in limine to exclude the movant's

9    expert, which was filed by R.J. Bell (indiscernible), and

10   the second is the motion of Ryan Goldberg to enforce the

11   order confirming the plan and to bar and enjoin creditors

12   from prosecuting the State Court action.

13           THE COURT:  Okay.  I'll hear the motion in limine

14   first.

15           MR. ESPER:  Good morning, Your Honor.  Dilan Esper

16   for the moving party, and most of what we wanted to say

17   about this is covered in the papers, so I don't think a long

18   argument is necessary, I just wanted to hit two key points.

19           THE COURT:  Go ahead.

20           MR. ESPER:  One, Mr. Milton just has no relevant

21   expertise, he's never dealt with an insurance policy that

22   has a gross negligence or willful misconduct exclusion.  He

23   has no idea how, even if we took the analogy as it were

24   between what the insurance companies do and what is at issue

25   with this case with the bankruptcy plan, he has no idea how

Page 6

1    an insurance company would interpret a policy that said

2    gross negligence and willful misconduct.

3              And the other thing I would say is that he's

4    really at bottom his testimony is just an attempt to vary

5    the terms of the plan and read the language of gross

6    negligence and willful misconduct out of the plan, which is

7    not something that I think is an appropriate subject for

8    expert testimony.

9              If Your Honor just has any questions I can answer

10   them.

11             THE COURT:  Thank you.

12             MR. HENTOFF:  Your Honor, Thomas Hentoff for Ryan

13   Goldberg.

14             I think that movant's argument really goes to

15   cross-examination regarding Mr. Milton's testimony.

16             THE COURT:  But what's he going to tell me that's

17   relevant to the issues I have to decide?

18             MR. HENTOFF:  Well the Court has asked for

19   information about the parties' understandings with regard to

20   the language --

21             THE COURT:  An expert certainly can't testify

22   about the subjective understandings of the parties.

23             MR. HENTOFF:  Your Honor, the expert cannot

24   testify to the subjective understanding, but an expert can

25   testify to an industry that has specialized knowledge about

Page 7

1    an industry's custom and practice, and Mr. Milton is an

2    expert in the area of media liability insurance.  And as we

3    said in our opposition brief, when media companies provide

4    indemnification to their writers a primary way in which they

5    do it is to provide the insurance coverage that the media

6    liability insurers provide.

7            And Mr. Milton has over 40 years of experience in

8    this field and he knows what -- that kind of

9    indemnification, he knows what it covers, and it does cover

10   the very kind of intentional conduct that the plaintiff's

11   are arguing is carved out.

12           THE COURT:  But he's also going to testify that

13   he's never seen a U.S. policy that has these exclusions, and

14   obviously the plan has these exclusions.  So it's got to be

15   something different.

16           MR. HENTOFF:  Well that -- but that's -- the fact

17   that he's never seen that is actually very important to his

18   testimony, because that kind of a language it helps the

19   Court have some background to know that the kind of language

20   that's in the policy cannot apply to the very kinds of

21   defamation claims that the plaintiffs say cause an

22   exclusion.

23           THE COURT:  But isn't this essentially a contract

24   case?  I've seen the emails going back and forth and the

25   parties were negotiating over the language of 9.05 as well

Page 8

1    as 9.02, and the question is, you know, what do they mean?

2              MR. HENTOFF:  Yes, but courts in the Southern

3    District of New York have held that in helping a court

4    understand the meaning of a contract the customs and

5    practice in an industry is both relevant and is a proper

6    subject of expert testimony.

7              THE COURT:  But there's no evidence that they're

8    even focused on the insurance policies when they were

9    negotiating this.  I grant you they were focusing on the

10   debtor's obligations to indemnify, but I haven't seen a

11   debtor insurance policy or -- you know, I don't even know if

12   the insurance has to do with this.  They may be insured for

13   this particular defamation claim, whether or not its exclude

14   from the -- you know, under the plan.

15             MR. HENTOFF:  Sure, Your Honor.  So the expert

16   testimony about custom and practice in this industry helps

17   shed light on what the expectations of at least one side of

18   this were, the writers who gave up their indemnification

19   rights.

20             THE COURT:  You know it's a matter of contract

21   law, unspoken secret understandings are not relevant to

22   interpreting a contract.

23             MR. HENTOFF:  Your Honor, we've got a couple of

24   terms in this agreement.  These terms are --

25             THE COURT:  These terms are in every plan I've

Page 9

1    ever seen by the way.

2              MR. HENTOFF:  Right, Your Honor, but these terms

3    -- in terms of the mission that the indemnification provides

4    I think it's helpful for the Court to hear from an expert in

5    media liability insurance, which is the exact kind of

6    indemnification that we're talking about here.  And of

7    course the Court is well, you know, able to weigh the

8    testimony and ask questions.

9              THE COURT:  All right.

10             MR. HENTOFF:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             I'm going to grant the motion and exclude the

13   testimony.  I don't have any question about Mr. Milton's

14   qualifications, I'm satisfied that he is qualified as a

15   specialist in the field of media liability insurance.

16             In substance he's going to testify that media

17   policies insure against liability, against lawful

18   misconduct, including actual malice, gross, negligence,

19   intentional torts, and even punitive damages, but Mr. Milton

20   has never seen a U.S. policy that excludes coverage for

21   these types of claims and such exclusions he will opine

22   would render the coverage illusory.

23             He states, or at least implies, that the release

24   language in Section 9.05 would expressly exclude willful

25   misconduct -- which expressly excludes willful misconduct

1    and gross negligence, does not exclude defamation claims.

2              As I indicated, the testimony is not relevant.

3    The Court is interpreting a plan, not an insurance policy,

4    and the protections provided through the third-party release

5    are obviously less extensive than the scope of insurance

6    coverage.  For example, media liabilities do not contain

7    exclusions for willful misconduct and gross negligence, but

8    Section 9.05 does, and it must mean something.

9              The Court's role is that of a gatekeeper to decide

10   whether the plan releases the claims asserted in the State

11   Court complaint, not whether an insurance policy would cover

12   those claims.

13             Finally, the Court does not require Mr. Milton to

14   interpret the plan.  The language of Section 9.05 was

15   negotiated between the attorneys for the debtors and the

16   writers, and will be interpreted in accordance with the

17   principles that govern the interpretation of a contract.

18             So you can submit an order granting the motion.

19             All right.  Is Mr. Goldberg prepared to call his

20   first witness or do you want to make an opening statement?

21             MS. LEVINE:  Your Honor, if we could just a very

22   briefly opening statement.

23             THE COURT:  Sure.

24             MS. LEVINE:  But also can we allow Mr. Milton to

25   -- he's got a plane to catch.

1              THE COURT:  Oh, he's certainly excluded, yes.

2              MS. LEVINE:  So you're released.

3              MR. MILTON:  Thank you.

4              THE COURT:  Okay.

5              MS. LEVINE:  And, Your Honor, may I --

6              MR. ESPER:  And I have a little housekeeping

7     matter just before -- just to --

8              THE COURT:  Every time somebody has a little

9     housekeeping matter it takes a whole day.  Go ahead, what's

10    your housekeeping matter?

11             MR. ESPER:  I promise, Your Honor, this is

12    something the parties have actually agreed on.

13             THE COURT:  Oh, well all right then, I'm certainly

14    not going to get in the way of that.

15             MR. ESPER:  Your Honor, normally the order of

16    proof obviously would be that one side would present

17    witnesses and we would cross them and then we would present

18    witnesses.  In this case both parties basically are using

19    the same witnesses, the issues are just going to be as to

20    what the testimony is.

21             THE COURT:  You want to ignore the usual rules of

22    cross-examination and just question the witnesses as they

23    sit?

24             MR. ESPER:  Exactly.  No limitation on scope of

25    direct and the part -- my understanding with Mr. Patel is

Page 12

1    that the parties have agreed to this.

2              THE COURT:  All right.  That's fine.

3              MR. ESPER:  And one other housekeeping matter.

4              THE COURT:  Sure.

5              MR. ESPER:  Which is just --

6              THE COURT:  That was an easy one.  Go ahead.

7              MR. ESPER:  Yeah.  This is an easy one too, I just

8    want to -- and it can be resolved at the end if you want,

9    but I think it would be helpful to the Court if the parties

10   have some opportunity at the end of this to submit some sort

11   of legal contentions, short trial briefs, or proposed

12   findings of fact, whatever.

13             THE COURT:  Why don't we leave that for the end

14   and see what the evidence shows.

15             MR. ESPER:  Sure.  Thank you, Your Honor.

16             MS. LEVINE:  Your Honor, actually we'll just call

17   Mr. Gilardi.

18             THE COURT:  Okay.  Mr. Gilardi, would you raise

19   your right hand, please.

20                  GREG H. GILARDI, WITNESS, SWORN

21             THE CLERK:  Okay.  Please speak into the

22   microphone.  Go ahead.

23                       DIRECT EXAMINATION

24   BY MS. LEVINE:

25   Q    Good morning, Mr. Gilardi, thank you for being here

Page 13

1    this morning.

2    A    Good morning.

3    Q    Can you state your name and your firm name for the

4    record?

5    A    Sure.  It's Greg M. Gilardi, and I work at Ropes & Gray

6    LLP.

7    Q    And did Ropes & Gray represent Gawker Media and its

8    related entities in the bankruptcy cases?

9    A    Yes, it did.

10    Q    Did you personally lead that engagement?

11    A    Yes, I did.

12    Q    Are you currently still involved in the Gawker

13    bankruptcy cases?

14    A    Yes, I am.

15    Q    Was Mr. Holden involved in this bankruptcy cases prior

16    to confirmation?

17    A    Yes.  Mr. Holden was the chief restructuring officer

18    prior to confirmation and the effective date, and then as of

19    the effective date he became the plan administrator.

20    Q    And were you involved in the drafting of the plan of

21    reorganization?

22    A    Yes, I was.

23    Q    Including Sections 9.05 and 9.02?

24    A    Yes, I was.

25    Q    Do you recall the confirmation hearing date?

Page 14

```
1    A    December 13th maybe.  12th, 13th.

2    Q    Yes, December 13th, 2006.

3    A    '16.

4    Q    2016.

5    A    '16.

6    Q    Was it important to you to confirm the plan prior to

7    the end of the year of 2016?

8    A    Yes, it was.

9    Q    Was there a tax consequence to that?

10             MR. ESPER:  Objection.

11             THE COURT:  What's the objection?

12             MR. ESPER:  This calls for a legal conclusion as

13   phrased.

14             THE COURT:  Well I mean it's his understanding of

15   why -- it informs his understanding of why he wanted to

16   confirm the plan before the end of the year.  It's

17   overruled.  Go ahead, you can answer the question.

18             THE WITNESS:  Yes, there was.  There -- in light

19   of the sale approved by this Court and the closing of the

20   sale with Univision there were tax ramifications of trying

21   to close the plan and make distributions under the plan by

22   December 31st, 2016.  So we moved as fast as possible to

23   confirm that plan, and then also to make distributions I

24   would say under the plan but with the Court's approval prior

25   to December 31st even though the plan ultimately did not go
```

Page 15

1    formally effective until March of 2017.

2    BY MS. LEVINE:

3    Q    And as part of the timing that you were looking to

4    achieve was it important -- was it your understanding that

5    it was important to the debtors to resolve disputes that

6    would have led to objections to confirmation?

7    A    Yes.

8    Q    And did you enter into negotiations with the writers

9    with regard to resolving potential disputes as to

10   confirmation?

11   A    Yes.  There were discussions -- you were counsel to a

12   series of writers that had filed proofs of claim.

13   Mr. Denton, not a writer, but also had filed proofs of claim

14   and had his own bankruptcy going on.  And part of the

15   concerns that we had with respect to making distributions

16   confirming a plan was what we referred to as the

17   indemnification dam.

18       The indemnification dam was that there were a lot of

19   claims for contingent, in most instances claims against, for

20   example, Mr. Denton or claims against Mr. Cook, and I can't

21   remember the other names, so there was an issue as to

22   whether or not and how we would resolve those claims setting

23   up reserves or trying to resolve their claims prior to

24   confirmation so we didn't have to set up reserves.  So I

25   entered into negotiations with you as counsel, also with

Page 16

1    counsel to Mr. Denton, regarding the proper way to treat

2    those claims.

3         Mr. Delario (ph) also had a claim for indemnification

4    based upon the Terry Belaya (ph) litigation, also negotiated

5    with his counsel about a potential resolution of the Delario

6    potential indemnification claims.

7    Q    And when you say you, you're referring to Saul Ewing as

8    counsel for --

9    A    Saul Ewing, yes.  You and Mr. Patel were the lead

10   counsels at Saul Ewing, there was a counsel that represented

11   Mr. Delario and there was a counsel at Cole Schotz that

12   represented Mr. Denton.

13   Q    And did those negotiations include negotiations over

14   third-party releases?

15   A    Yes.  Those negotiations were with respect to not just

16   -- I put them together.  It's third-party releases and the

17   injunction provisions that are in the plan, and I believe

18   they're Sections 9.02 and 9.05.

19   Q    And at the time of the confirmation hearing were you

20   aware of certain demand letters that had been sent to the

21   debtors from creditors, including creditors that had not

22   filed proofs of claim?

23   A    Yes.  I mean I had been aware of them.  So we sold the

24   company, the company was sold in June.  Prior to selling the

25   company to Univision there were a series of demand letters

Page 17

1    both pre-bankruptcy and post-bankruptcy, and then at the

2    confirmation hearing we were aware that there were still

3    letters outstanding, although I think the last bar date may

4    have passed on December 8th, but there were still

5    outstanding letters that had come in regarding possible

6    claims and causes of action against both Gawker and writers

7    responsible for writing the articles or comments.

8    Q    And do you recall whether or not you discussed this

9    particular issue at the oral argument on the confirmation?

10   A    Yes, I used I think at least one example that I can

11   remember, but for example, I know that we had received a

12   letter with respect to an article written about the then

13   President Elect Trump, and I did describe that circumstance

14   to His Honor about the fact that we had not received a proof

15   of claim, but that was -- there were a series of letters,

16   and I described that situation and had done so I think

17   previously saying that that was one of the concerns that we

18   had with respect to those people -- the holders of that kind

19   of claim, which had not been filed a proof of claim, but

20   being a concern that they would eventually sue the writers.

21   Q    And was it your understanding that the third-party

22   releases in the plan was intended to bar those kinds of

23   claims?

24            MR. ESPER:   Objection.  That seeks his

25   subjective --

1          THE COURT:  Overruled.  I agree with you it's

2    conclusory, but I'll let him answer the question.

3          THE WITNESS:  Yes.  I mean again, it was our

4    intention -- and I'm going to step back.  It's always

5    difficult as a bankruptcy lawyer to balance the writing of a

6    third-party release as broad as possible with making sure

7    you get the plan confirmed, and that was always the issues.

8          With respect to trying to bar claims from, for

9    example, President Trump against Gawker for articles written

10   by Gawker writers we were trying to block those claims.

11         The way we did so was one, to try to put into the

12   release, and two, if the release was not adequate to at

13   least make sure that there was an injunction such that -- I

14   think I even said this at the hearing -- that at least the

15   party would have to come back to this Court to determine

16   what the motive and what the relevance of pursuing such a

17   claim was even if the release was not broad enough.

18         THE COURT:  Are you saying that the injunction is

19   broader than the release?

20         THE WITNESS:  Your Honor, I think I said it at

21   that hearing, and to the -- I had always thought that the

22   release could be broader -- I mean that the injunction could

23   be broader, because to the extent you couldn't get a

24   release, because for example, I think I used this in my

25   deposition, if the person was not released because -- and

Page 19

1    we'll get to the language I'm sure -- received or deemed to

2    receive, take Mr. Teal for example who didn't have as far as

3    I knew a claim -- and I said this in my deposition -- at

4    least if this person was released, the writers, from some

5    claims you may have to still come back and ask Your Honor

6    for permission to pursue it.  So that was the intention that

7    I had with respect to this.

8            And if you look at the language, I think the

9    language of the third party -- the injunction is a little

10   bit broader than the language and the release.

11           THE COURT:  Well it started out that way but the

12   plan that was confirmed had added to the extent of Section

13   9.05 three times the 9.02, which was not in the draft that

14   was being exchanged.  Where did that come from?

15           THE WITNESS:  Right.  So I think that was

16   partially a result of conversations with Your Honor at the

17   -- as I recall -- at the hearing and then -- and trying to

18   make those come closer together as a result of that

19   language, as I recall.

20           THE COURT:  So if the injunction is broader than

21   the release what is that language?

22           THE WITNESS:  Again, I think if you -- always

23   anticipating that there'd be something that we didn't cover,

24   it was always at least my intention as the attorney for the

25   debtor, representing the debtors, to say I wanted the Court

Page 20

1    to be the gatekeeper.  If they were exactly the same, they

2    didn't cover anything, if there was a dispute as to whether

3    the release covered it, at least they'd have to come back to

4    the Court to have a proceeding such as this proceeding.

5                    THE COURT:  Go ahead.

6    BY MS. LEVINE:

7    Q    In addition to the Trump claim had you received a

8    demand letter from the -- from R.J. Bell's attorney?

9    A    Yes.  My understanding is that I had not received it,

10   but it was in the files of Gawker and we were aware that

11   there was such a letter.  There were a few other letters as

12   well.

13   Q    And who was counsel to R.J. Bell in connection with

14   that letter?

15                    MR. ESPER:  Objection, relevance.

16                    THE COURT:  Overruled.

17                    THE WITNESS:  I believe it was the Harter (ph)

18   firm.  We had received most of our letters, if not all of

19   them, from the Harter law firm.

20   BY MS. LEVINE:

21   Q    And was the Harter law firm also representing other

22   creditors in the case?

23   A    Yes.  The Harter law firm again was not serving as

24   bankruptcy counsel, but the Harter law firm was Belaya's

25   counsel, Terrell's (ph)'s counsel, and Iudori's (ph)

Page 21

1    counsel, all of whom were involved from the day one of the

2    case, and I believe they were also members of the creditors'

3    committee.

4    Q    And they were -- were they involved in settlement

5    negotiations with regard to certain litigation that resulted

6    in allowed claims which were in fact paid 100 cents under

7    the plan?

8    A    Yes, let's not -- I don't want to go quickly to the 100

9    cents.

10        So in late October we began negotiations or finished

11    negotiations as well with Mr. Belaya, at which Mr. Harter

12    was present.  We focused on those settlement negotiations

13    because Mr. Belaya had all of his counsel there.

14        Then once we were a deal in principle with Mr. Belaya,

15    who Mr. Harter was one of the parties we were negotiating

16    with, along with Mr. Taback (ph), his bankruptcy counsel, we

17    then had separate meetings with Mr. Harter to negotiate the

18    terms of the Terrell and Iudori settlements.

19        All of those settlements against Gawker were finalized

20    I think in the beginning of November, at least in terms, and

21    then we did final documents.  They all got finalized by

22    December 13th, the confirmation hearing, they all received

23    their payments before the effective date and before

24    December 31st of 2016.

25    Q    In connection with those settlements were there

Page 22

1    releases?

2    A    There were releases of the Gawker entities.  I mean I'd

3    like to see them again, because part of the issue is how

4    much was released and where it was released.  But yes, there

5    were releases of the Gawker entities, there was also

6    cooperation agreements to get other types of releases.  But

7    there were releases, and I believe they all voted in favor

8    of the plan.

9         Mr. Belaya didn't get paid 100 cent dollars, that's why

10   I wanted to qualify that, because he gets a contingent

11   reserve, and I won't speak to -- they accepted a payment for

12   their claims in certain amounts, whether that's payment in

13   full or not, they don't have any residual claim.

14             THE COURT:  Who's they?

15             THE WITNESS:  I'm sorry.  Ms. Terrell and

16   Mr. -- Dr. Iudori both received payments, they reduced their

17   claims and received payments as well.

18   BY MS. LEVINE:

19   Q    Were the writers who provided the content was the

20   subject of those litigations released in connection with

21   those settlements?

22   A    No.  So it all depended -- each one was a little bit

23   different.

24        With respect to Ms. Terrell there has never been a

25   release of the writers of those claims.  There was ongoing

Page 23

1    litigation in the New York State Court and I believe that

2    what ultimately happened is Gawker got release, Mr. Cook and

3    the other person whose name escapes me right now,

4    Ms. Terrell withdraw her complaint without prejudice as I

5    recall, and so there was no exchange of releases -- there

6    was negotiations but they never reached that.

7         With Dr. Iudori I believe that there were releases.

8         And with Mr. Belaya there were releases but it took a

9    lot longer because it had to get negotiated through

10   Mr. Delario's lawyers, Mr. Denton's lawyers, and I believe

11   that they ultimately exchanged releases, I'm just not

12   completely sure.  But it did not happen until after

13   confirmation, at least with Mr. Delario, I believe.

14   Q    Generally in the ordinary course of business did Gawker

15   indemnify its writers and content providers in connection

16   with defamation tech claims?

17   A    Yes.  I mean I had had -- and again I can't -- not

18   privileged -- but my understanding -- and we had defended,

19   as the Court knows -- we came in with Mr. Denton at one

20   point -- there was a policy to indemnify and advance the

21   defense costs of writers who were sued.  Some writers had

22   actual contractual provisions to that.  I mean Mr. Delario

23   didn't, we put that in front of the Court at one point.  But

24   as a general matter it was policy, and I understand that

25   they had always done that and no one had paid their own

Page 24

```
 1   bill.

 2            MR. ESPER:  Move to strike, that's hearsay except

 3   for the --

 4            THE COURT:  It is hearsay, you were a little slow

 5   on that.  But isn't this stipulated to in the pretrial

 6   order?  I thought I read that that was part of the

 7   stipulation.  Yeah, it's at paragraph -- it's paragraph D of

 8   part 3.  Gawker Media, LLC generally indemnified its content

 9   providers for any claims, including claims of defamation and

10   related torts arising from the content provided to them for

11   the benefits of Gawker LLC.

12            So it's really stipulated to.  But it is hearsay

13   and there's no foundation for his testimony.  I won't strike

14   it only because it's a little late, but it's stipulated to.

15   Why don't you ask him what he knows about it?

16   BY MS. LEVINE:

17   Q   Well Mr. Gilardi, was it your understanding that there

18   was an indemnification right that the writers and content

19   providers had against Gawker?

20            MR. ESPER:  Objection, lack of foundation.

21            THE COURT:  Sustained.  Why don't you just put the

22   policies into evidence.  I remember seeing bylaws in this

23   case, and you know, there's evidence of that.

24            MS. LEVINE:  Actually, Your Honor I think I can

25   shortcut it and go a different way.
```

Page 25

 1              THE COURT:  You stipulated --

 2              MS. LEVINE:  We've stipulated that there was an

 3   indemnification and it's already in the record, and what

 4   we're really getting at is --

 5   BY MS. LEVINE:

 6   Q    Mr. Gilardi, as part of the settlement negotiations

 7   with regards to the indemnification proofs of claim that

 8   were filed by the writers, was it your intent to have the

 9   writers withdraw those claims or have those claims resolved

10   as part of the confirmation process?

11   A    Yes, it was.

12   Q    And as part of giving up those rights did the debtor

13   offer something to the writers in connection with that

14   negotiation?

15   A    Yeah.  We offered to try to obtain as broad a third-

16   party release as we could obtain and to also obtain an

17   injunction as far as we could within what His Honor would

18   approve to seek to get them released and to seek to get them

19   an injunction so that they -- people would have to come back

20   to the Court.

21   Q    And in exchange for the third-party release did the

22   writers provide consideration that included stipulating to

23   the withdrawal of their claims, stipulating not to object to

24   confirmation, and stipulating not to seek reserves with

25   regard to the claims reconciliation process?

Page 26

```
 1   A    What I understood the quid pro quo was, they would vote

 2   -- if they voted in favor of accepting the plan then those

 3   things would have automatically occurred.  So that we would

 4   not have to establish reserves, they would not assert

 5   indemnification claims, but they had to vote in favor of the

 6   plan to obtain those.  And I believe as I recall the record,

 7   they all voted in favor of the plan.  Your clients.

 8   Q    Now, turning to the language in the release, and in

 9   particular there's two clauses that we're going to focus on

10   for a minute.  The first one is going to be deemed to have

11   received, which is the discussion that we had at the prior

12   oral argument.

13        As lead bankruptcy counsel did you have a part in

14   drafting the language that was in 9.05?

15   A    Yes, I did.

16   Q    Did you formulate the deemed to have received language

17   that was in 9.05?

18   A    If I didn't specifically formulate it it was myself and

19   an associate, Josh Sterum (ph), who did, but I was the one

20   ultimately responsible for saying this is the language we

21   will go with.

22   Q    And did you -- and what is your understanding of that

23   language at the time you were drafting it?

24            MR. ESPER:  Objection, that's subjective

25   understanding.
```

1          THE COURT:  Well I'll overrule it.  I'm interested

2     in whether this was discussed or negotiated.

3          THE WITNESS:  The answer is as with any release --

4     third-party release -- so first the answer is, yes, I

5     thought about it and it was intended to be put in there.

6     What it was to cover was more a fact of circumstances that I

7     think you have to level set what we were trying to do.  One

8     was --

9     BY MS. LEVINE:

10    Q    I can -- let me -- I can narrow the questions --

11    A    Sure.

12    Q    -- to get more to where the judge is going.

13         Was it your understanding that the writers were

14    concerned about claims that had been asserted by creditors

15    who had not filed proofs of claim or might not be receiving

16    a distribution under the plan?

17    A    Yes, that was my understanding.

18    Q    And did you include any language in the release section

19    of 9.05 that was designed to address that issue?

20    A    Yes.  I believe the deemed to receive language was a

21    way to try to address that issue.

22    Q    Okay.  So now -- and now turning to the language in the

23    release with regard to the exclusion for intentional or

24    malicious conduct.  Do you recall that language?

25    A    I do recall that there is --

1              MR. ESPER:  Objection, that misstates the plan.

2              THE COURT:  Sustained.  It's willful misconduct or

3    gross negligence is the issue -- phrase, which is the usual

4    phrase.

5              THE WITNESS:  I have a book of exhibits in front

6    of me, may I look at the exhibits while --

7              MS. LEVINE:  Yes.

8              THE COURT:  Maybe you ought to show him some

9    exhibits.

10   BY MS. LEVINE:

11   Q    Please turn to Section 9.05?

12   A    Okay.  I'm going to tab 1, which is Exhibit 1, and I

13   think the plan is attached as Exhibit A to that.

14   Q    Okay.

15   A    And I will -- as I recall it's 9.05.

16             THE COURT:  Tab 1, I don't have that exhibit book.

17             THE WITNESS:  I have a binder of documents --

18             THE COURT:  Yeah, but that's --

19             THE WITNESS:  -- movant Ryan's binder of exhibits,

20   which has Exhibit 1, and I have an A behind it.

21             THE COURT:  I now have it.  Thank you.

22             THE WITNESS:  And I have Section 9.05 which

23   begins --

24             THE COURT:  Can I stop you?  I have Exhibits A, B,

25   C, et cetera, I don't have an Exhibit 1.

Page 29

```
 1                MR. ESPER:  A, B, C is my binder, Your Honor.

 2                THE COURT:  That's yours.

 3                MR. ESPER:  You should have a second binder with

 4     1, 2, 3.

 5                THE COURT:  This is a duplicate, I don't need

 6     this.  Okay.  Sorry, I got it.  Exhibit 1 is the

 7     confirmation order and the plan, right?

 8                THE WITNESS:  Correct.  And Exhibit A behind it,

 9     Your Honor, is the plan itself.

10                THE COURT:  Okay.

11                THE WITNESS:  And I'm turned to page 81 of 94 if

12     you read the top docket file.  That's where 9.05 starts and

13     82 is where it ends.

14     BY MS. LEVINE:

15     Q    With regard to the exclusionary language did you have

16     conversations with the United States Trustee's Office with

17     regard to the third-party releases?

18     A    Yes, I did.

19     Q    And did you have conversations with the creditors'

20     committee with regard to the language in the third-party

21     releases?

22     A    Well --

23     Q    Let me go back to the U.S. Trustee.  Did you have

24     conversations with regard to the scope of the releases with

25     the United States Trustee's Office?
```

Page 30

1    A    Yes, very brief conversations.

2    Q    And what were the -- what was your understanding of

3    what the United States Trustee was concerned about with

4    regard to third-party releases?

5              MR. ESPER:  Objection as phrased.  His

6    understanding is irrelevant.  She can ask --

7              THE COURT:  What did you say to U.S. Trustee and

8    what did the U.S. Trustee say to you?

9              MR. ESPER:  Exactly.

10             THE WITNESS:  The U.S. Trustee -- I drafted the

11   plan and I put the language willful misconduct and gross

12   negligence in here.  The U.S. Trustee, when I served out the

13   revised plan -- and I can't remember whether it was before

14   the disclosure statement hearing, and I think it was more

15   likely before the confirmation hearing -- asked me whether I

16   was looking for third-party releases, I said yes.  Asked me

17   if I had put in standard language of willful misconduct and

18   gross negligence, and I said yes.

19             To anticipate, as I do when I draft plans, usually

20   the U.S. Trustees always ask if you're going to get a

21   release make sure you carve out willful misconduct and gross

22   negligence.  I took the first step and did it, because I've

23   drafted a lot of these, and that's the language I always put

24   in.  And so he really just affirmed that I put in the

25   language.  There was no negotiation, there was no further

Page 31

1    decision.

2    BY MS. LEVINE:

3    Q    And did you have discussions with the writers with

4    regard to your understanding of your view of the scope of

5    that language and whether or not it would protect them

6    against defamation claims?

7    A    Well I never had discussions directly with writers, and

8    frankly I didn't have discussions in the context of the plan

9    with respect to whether this language covered defamation

10   claims or not defamation claims.

11       In conversations that I had with Mr. Delario's lawyer I

12   actually learned for the first time that you could -- and

13   this was before -- after I drafted this, but before the

14   confirmation -- that writers and parties in this business

15   can get released for -- they are indemnified for defamation.

16       Quite honestly this language was from my head as a

17   bankruptcy lawyer and was not looking at the defamation

18   claims and the implications of those defamation claims.

19   It's more the Delaware standard of limits of what you could

20   do with indemnification and gross negligence and my 20

21   something years of bankruptcy practice and dealing with the

22   U.S. Trustee's Office.

23   Q    Did you discuss the scope of the releases at the

24   confirmation hearing with the Court?

25   A    Yes, we discussed the scope of the releases with the

Page 32

1    Court.  I know His Honor asked me questions about it, but

2    I'm not sure if the language with the gross negligence and

3    willful misconduct and the context of defamation ever came

4    up at that hearing.  I don't recall.

5    Q    I'm going to invite your attention to Exhibit 2.

6    A    Okay.

7              THE COURT:  Are you offering Exhibit 1 into

8    evidence?

9              MS. LEVINE:  I was going to offer them all in at

10   the end, Your Honor, but --

11             THE COURT:  Well if you're going to read from them

12   they should be in evidence.

13             MS. LEVINE:  We offer --

14             THE COURT:  Any objection to the receipt of

15   Exhibit 1?

16             MR. ESPER:  No.

17             THE COURT:  I think you stipulated.

18             MR. ESPER:  No objection.  There was a number of

19   stipulations in the --

20             THE COURT:  Pretrial order.  So 1 is received.

21        (Ryan Goldberg's Exhibit No. 1 was admitted)

22             THE COURT:  And I think you stipulated to 2, which

23   is what we're about to turn to.  So 2 is received.

24   (Ryan Goldberg's Exhibit No. 2 was admitted)

25             THE COURT:  Go ahead.

Page 33

```
 1              MS. LEVINE:  Thank you, Your Honor.

 2   BY MS. LEVINE:

 3   Q    Mr. Gilardi, Exhibit 2 is a transcript of the

 4   confirmation hearing.

 5   A    Okay.

 6              THE COURT:  Why don't you just point me to what

 7   you want me to read.

 8              MS. LEVINE:  We are looking at page -- Your Honor,

 9   we're looking at page 82, starting at line 16.  And if you

10   carry over to page 83 up to line 8.

11              THE COURT:  Okay.  Go ahead.

12   BY MS. LEVIN:

13   Q    Mr. Gilardi, do you -- take a minute, please, and

14   review the colloquy.

15       (Pause)

16   A    And which page do you want me to read to line?

17   Q    Page 82.

18   A    I've read 82.

19   Q    Page 83 to line 8.

20   A    Okay.  I've done so.

21   Q    Do you recall that colloquy with the Court?

22   A    Yes, I do.

23   Q    Do you -- was it your -- is that still your view of the

24   third-party releases?

25   A    Yes, Your Honor.  I mean, yes, it is.
```

Page 34

1    Q    Thank you.

2         Mr. Gilardi, could you take a look at Bell's Exhibit G,

3    which is a November 2 communication -- email communication

4    from Ropes & Gray to Saul Ewing?

5    A    Different binder, right?  Okay.  Okay.

6    Q    Do you see that there's an email there that lists three

7    options with regard to the third-party releases?

8    A    Yes.

9              THE COURT:  Are you talking about 3?

10             MS. LEVINE:  Yes.

11             THE WITNESS:  It's Exhibit G in the other binder,

12   Your Honor.

13             MS. LEVINE:  Sorry, Your Honor, Bell's Exhibit G

14   first, then we're going to go to Goldberg's Exhibit 3.

15             THE COURT:  Okay.  Go ahead.

16   BY MS. LEVINE:

17   Q    Mr. Gilardi, did you draft the email?

18   A    I did.

19   Q    And do you recall sending it?

20   A    I have no doubt that I sent it.

21   Q    Did you provide three options with regard to the third-

22   party releases in the email?

23   A    I gave three options with respect to the language

24   that's in the below emails, yes, and how to deal with the

25   concerns expressed, yes.

Page 35

1    Q    Does this communication change your understanding of

2    the scope of the releases as you previously testified?

3    A    No, I think it captures what I was trying to do with

4    the language and what I thought could possibly get approved

5    and capture the language and help to explain to Dipesh, you

6    know, what were the bounds that I think we could go to and

7    what were the bounds of a potentially acceptable release to

8    the judge.

9    Q    And did you discuss the language with Saul Ewing in

10   addition to having sent the email?

11   A    I don't think I had any real conversations at this

12   point.  We were doing this pretty much by email.  I think

13   November 2nd was the day we were going to file the revised

14   disclosure statement.  I know we got an email back to this

15   and I know there were a -- maybe one or two more emails, but

16   I wasn't really the author other than the clarification and

17   adding some language, I think that all happened within maybe

18   a two-hour period.

19   Q    Turning to Goldberg's Exhibit 3.

20   A    Exhibit 3.  I have that in front of me.

21   Q    Is this an email from you to the creditors' committee?

22   A    It is.  Well counsel to the creditors' committee,

23   Mr. Russell and Sandy Kuspa (ph).

24   Q    Did you have any discussions with Mr. Russell after you

25   sent this email?

1    A    I don't recall any discussions.

2    Q    Do you still -- is it your -- do you believe that the

3    releases that are included in the plan are consistent with

4    your comments in this email?

5    A    Yes.  We drafted it and were going to seek a release

6    not only from people who received distributions but also

7    from those that did not.

8    Q    And is that the deemed to have received language?

9    A    That's my -- that was what we were trying to capture by

10   deemed to receive.

11            THE COURT:  Can I ask you a question?  The

12   language that's in 9.02 is the usual language, that

13   creditors are bound whether or not they file a claim.

14            THE WITNESS:  Yes.

15            THE COURT:  Why didn't you use that same language

16   for 9.05?

17            THE WITNESS:  I think, Your Honor, I had to go --

18   and again --

19            THE COURT:  It's just an unusual phraseology.

20            THE WITNESS:  It's a very unusual phraseology,

21   Your Honor, and I think I said this in my deposition, I

22   don't think I've ever used the language -- that sort of

23   language again.

24            I think the issue came down to if I used the

25   language in that section and not obtained the third-party

Page 37

```
 1    release I would have had a resolicitation issue.

 2              I don't remember why we went the way we did to be

 3    honest, I just know I was trying to go to a certain point,

 4    but again, leave open what I will call a person like

 5    Mr. Peter Teal to fight about later, because at that point

 6    we didn't think he was even a creditor.  Whereas creditors

 7    they can get distributions or not get distributions under

 8    bankruptcy plans, but you know, if we went to seven, you

 9    know, there's still a creditor.  So it was just that sort of

10    thought.

11              I mean the language admittedly could have been

12    more direct, but that's why we used that language.

13              THE COURT:  Are you saying that this received or

14    deemed to be received is a different -- is different from

15    the creditors whether or not they file a claim?

16              THE WITNESS:  Well I think -- again, take

17    President Trump, he never filed a claim.

18              THE COURT:  Right.

19              THE WITNESS:  He did put us on notice of a claim.

20    So arguably he's a creditor.

21              THE COURT:  Right.

22              THE WITNESS:  And under Chapter 7, right, even if

23    he didn't file a claim, he filed late, he would be entitled

24    to a distribution.

25              Mr. -- so arguably what I was trying to cover is
```

1   people we knew of who were definitely creditors so they

2   would be deemed to receive whether or not, and we were

3   concerned about the litigation tactic of not filing a claim

4   and then going after successors and going after writers.

5             Take Mr. Teal, and I'm not saying the language --

6   well we don't have it before you -- but I said this in the

7   deposition -- Mr. Teal, the only thing we ever said about

8   Mr. Teal was in 2008.  It's hard to think he was a creditor

9   or had a claim.  If I were put on the stand about that one I

10  -- it wasn't that I was trying to capture Mr. Teal

11  necessarily and that whether the language captures it again

12  I come back to there's a qualitative difference in my mind

13  as to those types of people.

14            THE COURT:  I just don't understand it, because --

15            THE WITNESS:  I understand.

16            THE COURT:  -- he's not a creditor, he can't be

17  deemed to have received a distribution, because only

18  creditors get distributions.

19            THE WITNESS:  Only creditors get distributions,

20  but can a creditor be deemed to get a distribution if they

21  didn't file a proof of claim?  That's really the question.

22  Was I trying to capture something broader than people who

23  prosecuted their claim --

24            THE COURT:  But that's what the language in 9.02

25  does that.  I just don't understand the selection of this

1    language.  And you seem to think there's a difference and I

2    -- if there's a difference I'd like to know it.

3                THE WITNESS:  To me that somebody could be deemed

4    to receive a distribution even if they didn't prosecute

5    their proof of claim.  That was the intention to get as

6    broad as we could.

7                THE COURT:  Go ahead.

8                MS. LEVINE:  No further questions at this time,

9    Your Honor.

10                          CROSS-EXAMINATION

11   BY MR. ESPER:

12   Q    Good morning, Mr. Gilardi.

13   A    Hello.  Good morning.

14   Q    Let me ask you about that last exchange --

15   A    Sure.

16   Q    -- that you just had be Judge Bernstein.  A bankruptcy

17   plan is a public document isn't it?

18   A    Yes.

19   Q    Any member of the public can go on Pacer and they might

20   have to pay a fee but they can look this up and read it,

21   right?

22   A    Correct.

23   Q    And is it fair to say based on your experience as a

24   bankruptcy lawyer that one of the purposes of the various

25   documents filed in the bankruptcy proceeding is to give

Page 40

1    everybody in the world notice as to whether or not they can

2    go ahead and file claims against the debtor, correct?

3    A    Correct.

4    Q    So if a prospective creditor read paragraph 9.05 of the

5    plan is it your belief sitting here today that the creditor

6    would conclude that even if they did not file a proof of

7    claim in the bankruptcy court that they were covered by your

8    language in 9.05?

9    A    Well when you say file a claim let's make sure we're

10   talking about the same thing.  Filing a claim against Gawker

11   they were already barred, there was bar dates.  Okay.  If

12   you're saying prosecuting a claim against a writer, is that

13   what you're asking me about?

14   Q    Yes.  I'm asking about a circumstance that you just

15   testified in 9.05 --

16   A    Sure.

17   Q    -- a claim against a third-party writer and the -- this

18   person -- this potential claimant has to determine whether

19   they can file that claim, correct?

20   A    Whether they can prosecute a claim against a writer for

21   an article written by a Gawker writer when they were a

22   Gawker writer they would go to that language, they would

23   also go to the transcript, which is also public, and they

24   would make the decision am I covered or not by the deem to

25   receive language?

1    Q    And is it your belief based on your expertise of the

2    bankruptcy law that a lawyer for such a potential claimant

3    will be able to read the deemed to receive distribution

4    language and make a conclusion definitively one way or

5    another as to whether their claim against the third party is

6    barred?

7              MS. LEVINE:  Your Honor, whether Mr. Gilardi is an

8    expert, we didn't offer him as an expert witness, just as a

9    fact witness.

10             THE COURT:  Are you objecting to the question?

11             MS. LEVINE:  So we would object --

12             THE COURT:  Sustained.

13   BY MR. ESPER:

14   Q    Mr. Gilardi, is it not true that you have over two

15   decades of experience in the bankruptcy courts?

16             THE COURT:  The problem with the question is

17   you're asking him what a reasonably prudent lawyer for a

18   creditor -- how that person would interpret the language,

19   and that's really an improper question.

20             MR. ESPER:  Okay.

21             THE COURT:  It says what it says.  I can figure

22   out what it says.

23             MR. ESPER:  Okay.

24   BY MR. ESPER:

25   Q    Did you -- when drafting 9.05 did you give any

Page 42

1   consideration to whether potential claimants reading this

2   language would be able to understand what deemed to have

3   received distribution means?

4   A    I don't recall thinking about that particular issue.

5   Q    At --

6            THE COURT:  Was this discussed in the disclosure

7   statement?

8            THE WITNESS:  The third-party releases were, Your

9   Honor, and that is one of the reasons that I was very clear

10  on the record at the confirmation hearing with respect to

11  Trump and to give exactly the example that I gave to Your

12  Honor, because Your Honor specifically asked me, are there

13  people who may have had claims that didn't file claims and

14  didn't vote?  The answer was, absolutely, yes, this language

15  was intended to cover them.

16           That's exactly why, to the extent there was

17  ambiguity and to the extent I've litigated enough third-

18  party releases, I wanted to be very clear with Your Honor

19  with this specific concrete example that said, that was the

20  kind of claim I was trying to bar.

21           THE COURT:  Okay.

22  BY MR. ESPER:

23  Q    Mr. Gilardi, do you consider yourself to have been the

24  most knowledgeable person with respect to the history of the

25  Gawker bankruptcy case?

1   A    Yes.

2   Q    Before this case I assume you had drafted plans in

3   previous bankruptcy cases?

4   A    Yes.

5   Q    About how many?

6   A    Over 30.

7   Q    Before the date of the confirmation hearing did you

8   have any oral discussions with Ms. Levine about the meaning

9   of the term deemed to have received distributions?

10  A    I think other than the exchange on the November 2nd

11  date I don't recall specific conversations.

12  Q    And to be clear, the exchange on the November 2nd date

13  that you're referring to is an email exchange, correct?

14  A    The email exchanges, yes.

15  Q    So there was no separate oral discussion of that matter

16  with Ms. Levine?

17  A    Not that I recall.

18  Q    Okay.  And before the date of the confirmation hearing

19  did you have any oral discussions with Dispesh Patel about

20  the meaning of the term deemed to have received

21  distributions?

22  A    Not that I recall.

23  Q    And did you have any oral discussions with any other

24  member of the Saul Ewing about the meaning of the term

25  deemed to have received the distribution?

Page 44

1   A    Not that I recall.

2   Q    Let's take a look at another exhibit.

3            MR. ESPER:  First of all I guess a housekeeping

4   matter, Your Honor, so --

5            THE COURT:  Uh-huh.

6            MR. ESPER:  -- that we don't have to move them in

7   one at a time.  I would move into evidence all of our

8   exhibits, all of which have been stipulated to by the other

9   side in the pretrial order.

10           THE COURT:  All right.  Any objection?

11           MS. LEVINE:  No, objection, Your Honor.

12           THE COURT:  All right.  And what are the -- what's

13   the range of exhibits?

14           MR. ESPER:  The range of exhibits --

15           THE COURT:  A to what?

16           MR. ESPER:  A to M.

17           THE COURT:  Okay.  They're received.

18      (Moving Party's Exhibit Nos. A through M were admitted)

19           MR. ESPER:  And then I would also, even though

20   it's unusual, I don't think the other side did it and I

21   think it's relevant and should be in evidence, I move into

22   evidence their Exhibit No. 1.

23           THE COURT:  It's already received.

24           MR. ESPER:  Okay.

25   BY MR. ESPER:

Page 45

1    Q    Mr. Gilardi, take a look at Exhibit G.  Now, you

2    discussed in your direct testimony the email on the top of

3    this email thread, but I want to direct you down to the

4    email below it.

5    A    Uh-huh.

6    Q    Which is the email that you were responding to from

7    Dipesh.  Do you see that?

8    A    I do.

9    Q    Okay.  And with respect to that email after quoting

10   9.05 or a draft of 9.05 Mr. Patel says, "What does deemed to

11   have received distributions mean?"  So you understood that

12   in writing your 1:06 p.m. email at the top that you were

13   responding to Mr. Patel's question, correct?

14   A    Correct.

15   Q    Okay.  And your first -- the part of your answer reads,

16   "I cannot say that the third parties received a distribution

17   if not proof of claim."

18   A    Uh-huh.

19   Q    So in saying this you were intending to communicate to

20   Mr. Patel that you did not believe that third parties who

21   did not file a proof of claim had actually received a

22   distribution, correct?

23   A    Correct.  If you didn't file a proof of claim you would

24   not actually receive a distribution.

25   Q    Now, as to the second part of this email you say --

Page 46

1   well I'll go up to the top, you say, "You tell me how you

2   want to address."  Did Mr. Patel tell you how he wanted to

3   address the issue?

4   A    There is subsequent email as to whether he accepts the

5   language, wanted to change the language, or something else,

6   but I don't have that email in front of me, I can't remember

7   how it all played out.

8   Q    Okay.  Take a look at Exhibit H.

9   A    Okay.

10  Q    Do you recall receiving Exhibit H?

11  A    Yes, I do.

12  Q    Okay.  And is Exhibit H Mr. Patel's response to your

13  question?

14  A    Yes, it looks like it.

15  Q    Okay.  And now go to Exhibit I.

16  A    Okay.

17  Q    And Exhibit I is your response to Mr. Patel?

18  A    Correct.

19  Q    Okay.  Now, would you turn to Exhibit J?

20  A    Uh-huh.

21  Q    First question is who is Mr. Sterum?

22  A    Mr. Sterum is it an associate at Ropes & Gray or now

23  counsel at Ropes & Gray.

24  Q    Okay.  And what was his relationship to this case?

25  A    He was other than the other partner on the case he was

Page 47

1    the senior most associate and primary drafter of the plan

2    that I reviewed.

3    Q    Okay.  So is it fair to say that I believe your earlier

4    testimony was that you were ultimately responsible for the

5    language in 9.02 and 9.05, is it fair to say you worked with

6    Mr. Sterum in the crafting of that language?

7    A    Yes.

8    Q    Okay.  Now, Mr. Sterum in the second sentence of this

9    email says, "We'd also prefer not to make a change to 9.05

10   to draw further attention to the issue, reduce the

11   likelihood of getting that section approved."  Do you see

12   that sentence?

13   A    Yes.

14   Q    Agree with Mr. Sterum?

15   A    We -- yeah.  Again, we covered this in my deposition.

16   The point was the fewer changes you make to language at the

17   last minute before a disclosure statement that you need to

18   go out on the more likely it is that you get the disclosure

19   statement approved.

20   Q    Was there any specific concern that you had about

21   drawing further attention to the issue in Section 9.05?

22   A    It's third-party releases, it always has the most

23   attention from the U.S. Trustee's Office and from everybody.

24   So the less you change things, if people had not commented

25   before you have less issues to address as you move to a

1    hearing.

2    Q     And why do third-party releases garner so much

3    attention?

4    A     Because generally speaking under the Bankruptcy Code

5    the only entity that should be released is the debtor

6    entity.

7    Q     Is it fair to say at a you fully informed Mr. Patel

8    that there was a risk that if the release language was

9    broader than what was ultimately included in 9.05 it would

10   not be approved by the Court?

11   A     I affirm -- yes, I said that there's a risk with any

12   third-party release, and if it were broader I think -- let's

13   go back to G -- G, Exhibit A, the first option is to me what

14   I was saying is make it broader, try to bind everyone, then

15   there's no consideration and the judge will likely not

16   approve, if he doesn't I don't want the argument, that the

17   votes were based on consideration they did not receive and

18   have to resolicit.  So that was a concern.

19   Q     And ultimately you took all of these concerns into

20   account in your written discussions with Mr. Patel and made

21   the choice to go with the language deemed to have received a

22   distribution, correct?

23   A     Correct.

24   Q     Did you give any consideration to including language

25   that said something along the lines of to the fullest extent

Page 49

1    permitted by applicable law all third parties shall be

2    deemed to be released unconditionally, each and every one of

3    the employees?  Did you give any consideration using that

4    sort of language?

5    A    I don't remember that specific language.  I know the

6    judge when we came to the confirmation hearing said to use

7    to the extent of the applicable law, but with respect to the

8    specific language you mention with respect to employees then

9    it would have been employees and independent contractors I

10   don't recall having a discussion or thinking about using

11   that broad of language.

12        And again, the other issue about that is to the extent

13   of applicable law the real issue here also went to the

14   solicitation issue and what their votes, the employees and

15   the independent contractors, were going to be basing their

16   vote to accept or reject on.  I didn't want a resolicitation

17   issue, because if I said you -- thou shalt get them and you

18   don't get them I had to resolicit, and we've talked about

19   the tax issue.

20   Q    Isn't it true that the language that you ultimately put

21   in Section 9.05 regarding "deemed to have received

22   distributions," was in your professional judgment the best

23   you could do to respond to the concerns of the Saul Ewing

24   firm regarding the releases of the riders while still

25   getting the release of language approved by the Court?

Page 50

1          MS. LEVINE:  Your Honor, I would object.  To the

2     extent he's again asking for an expert answer.  I'm not sure

3     if professional judgment teeters on that.

4          THE COURT:  He's asking him why he included a

5     particular provision or why he didn't include a different

6     provision (indiscernible).

7          THE WITNESS:  I think it's fair to say that, and

8     this e-mail says it, I pushed it as far as I thought I could

9     do with getting the plan confirmed.

10    BY MR. ESPER:

11    Q    Now, let's talk about the creditors committee.  There

12    was a privilege claim which I respect, and I don't want to

13    get into.  So I'm going to ask you, did you have any non-

14    privileged discussions with the creditor's committee

15    regarding the meaning of the term "deemed to have received

16    distributions?"

17          THE COURT:  He didn't represent the creditors

18    committee.  That wouldn't be privileged.

19          MR. ESPER:  Well, Your Honor -- I mean, the -- at

20    the deposition, Mr. -- I will represent to the Court Mr.

21    Gilardi and his counsel interposed a privilege claim on the

22    basis of a joint interest.  And I don't want to

23    mischaracterize their argument, just to say that --

24          THE WITNESS:  So with respect to the committee,

25    there were no non-privileged conversations regarding the

1    language "deemed to receive."  The only -- frankly, the only

2    communications are what you have, which were non-privileged

3    communications.

4    BY MR. ESPER:

5    Q    And just to make clear to the Court, with respect to

6    the privilege claims that your firm has interposed with

7    respect to communications with the creditors committee, you

8    are still interposing that privilege claim, correct?

9    A    Again, I don't -- since I was more of the witness as

10   opposed to the attorney, I don't remember whether we

11   actually stood on that or we decided to let the

12   communications go.  I kind of remember we said, and the

13   committee said, you can have the communications and we gave

14   you the communications subsequent which is how you got the

15   e-mail that was my e-mail to Mr. Russell.

16   Q    Okay.  Well, I'll ask you more broadly then.  Did you

17   have any discussions at all with the creditors committee

18   with respect to the meaning of the term "deemed to have

19   receive the distribution?"

20   A    Other than the e-mail, I don't believe there were any

21   other communications.

22   Q    Okay.  Now, "deemed to have receive a distribution," is

23   it fair to say that that language assumes that either

24   someone or something is doing the deeming?

25   A    It is fair to say that.

Page 52

```
 1    Q    Okay.  So in this instance, what is your understanding

 2    as to who or what was deeming to receive a distribution?

 3    A    Okay.  Sort of the mechanics here would be the

 4    following.  You would be deemed under the plan to have

 5    received a distribution.  So it was the plan, but the plan

 6    had to be approved.  So if the plan got approved, it would

 7    be the confirmation order and ultimately we -- it would be

 8    the Court that would have approved that language.

 9    Q    But the plan is deeming someone to have received a

10    distribution, correct?

11    A    Correct.  Essentially, you're drafting a contract that

12    says you're either a third party beneficiary or the third

13    party giver of a release.

14    Q    And Exhibit 1 is the plan?

15    A    Correct.

16    Q    Or Exhibit 1 is the order that attaches the plan?

17    A    Correct.

18    Q    Would you point out to me and the Court the provision

19    of the plan that you believe deems my client to have

20    received a distribution?

21    A    I'm not going to say it's a trick question.  There is

22    no specific thing that says your client, right?  What 9025 -

23    - let me go -- what 9025 talks about, as I recall, let me go

24    to the language.

25              THE COURT:  I think he's asking a different
```

Page 53

1    question.

2            THE WITNESS:  Okay.

3            THE COURT:  And that is there's a plan with a

4    disclosure statement.  I guess say anywhere that you deemed

5    to receive a distribution, whether or not you filed it.  Is

6    that your question?

7            MR. ESPER:  That is essentially my question, Your

8    Honor.

9            THE WITNESS:  I don't think there is specific

10   language to that effect.  I think it says that all interest

11   holders and all -- and that's why I want to go to the

12   language that's specific.

13   BY MR. ESPER:

14   Q    Well, take your time.  Go to the language that you

15   think best answers my question.

16   A    Okay.  So it's not the specific thing you're looking

17   for, but 9.05 says in the fourth line, "Each holder of a

18   claim," it doesn't say allowed, "or equity interest," it

19   doesn't say allowed, "that is received or is deemed to have

20   received distributions under the plan shall be deemed to

21   have forever released."  That's language that says not just

22   holders of allowed claims, or allowed interest, it's any

23   holder of a claim or an equity interest.

24   Q    So is it fair to say that there's no -- nothing in this

25   plan that you're aware of, other than the very sentence that

Page 54

1    uses the term "deemed to have received a distribution," that

2    defines the universe of people who are deemed to have

3    received a distribution in 9.05?

4    A    Well -- okay, I'll go back to some other definitions

5    again.  I've got to go back to the definition of claim

6    holder, but I think if you're a holder of a claim, it

7    doesn't mean you -- claim.  If you look at definition of a

8    claim, it means a claim against the debtor of the Bankruptcy

9    Code which has not been disallowed under an order for which

10   an order of disallowance has been reversed on appeal.

11        So I believe if you went through the definitions, you

12   could say was I -- if I were a holder of a claim, and a

13   claim is broadly defined, I would say okay.  Again, I'm the

14   lawyer, so I know.  But each holder of a claim, claim is

15   broadly defined in the Bankruptcy Code, each holder of an

16   equity interest, I could say that that would apply to me if

17   I held the claim.  It didn't say allowed.  It does say I'm

18   deemed or deemed to have received.

19        Again, I think you could say I'm on notice that I may

20   be deemed to have receive something, I could get a release.

21   I'm not saying there's other language that couldn't have

22   been more precise.  I'm saying that that's the language

23   that's here and somebody could have been on notice, take the

24   description of the president elect's claim at the

25   confirmation here.  I think there was a public knowledge

Page 55

1    that this could apply to you.

2    Q    But the language of the definition of claim in the plan

3    doesn't say who is deemed to have received a distribution,

4    does it?

5    A    No, it does not say that.

6            THE COURT:  Could you shut off the phone?

7            MR. ESPER:  I apologize.  I thought I shut it off.

8    I really apologize to the Court.  I literally shut the thing

9    off, I don't know --

10           THE COURT:  But it rang anyway, or it's deemed to

11   have rang.

12           MR. ESPER:  I knew that was coming at some point.

13   So stipulated, Your Honor.  Okay.

14   BY MR. ESPER:

15   Q    Now, can we take a look at 3 -- Section 3.05 of the

16   plan for a moment?

17   A    Yes.

18   Q    Section 3.05 entitled "Payments to plan reserve

19   account" reads, "Subject to section 3 point" --

20   A    Could you hold -- slow down one second.  I just have to

21   --

22   Q    Sure.

23   A    -- find it.  I found it.  I found it.

24           THE COURT:  Page 30 of the plan.

25   BY MR. ESPER:

Page 56

1    Q    Page 30 of the plan, page 67 of the --

2    A    Yeah, 67 on the top page.  Yeah, thank you.

3    Q    Okay.  So I will read the section, which is short.

4    "3.05, payments to plan reserve accounts.  Subject to

5    Section 3.04, any payment to a plan reserve account shall be

6    deemed a distribution to the applicable beneficiaries of

7    such plan reserve account as of the date of funding of the

8    plan reserve account."  Do you see that language?

9    A    I do.

10   Q    So first of all, let's go with a little bit of

11   background as to this.  The plan calls for the creation of

12   one or more reserve accounts to reserve money to pay claims

13   against the estate, right?

14   A    Correct.

15   Q    And if a proof of claim was filed and money was

16   reserved, but for one reason or another, that claim is

17   disallowed, that person would nonetheless have been deemed

18   to receive the distribution under Section 3.05, correct?

19   A    I don't think this refers to the person.  It's the

20   beneficiaries.  Whether that person ultimately is a

21   beneficiary of that is a different issue, right?  Because if

22   they don't have a claim, they're no longer going to be a

23   beneficiary.

24   Q    Okay.  So then -- so who is deemed to -- I want to use

25   the language.  What is deemed to be a distribution under

Page 57

1    3.05 to your understanding?

2    A    So as part of a confirmation of this plan, there were a

3    series of reserves established.  One was for unsecured

4    claims.  One was for some tax claims.  The whole point of

5    this was when -- whether we went on the effective date, and

6    in some instances before the effective date, we funded

7    reserves.

8        I'll give you the specific example and I'll talk about

9    the beneficiary.  There is a claim that is still pending in

10   this bankruptcy case, the claim of Mr. Johnson.  I can't

11   remember his first name.  We had to establish a reserve

12   pursuant to an order of the Court on the -- when we went to

13   confirmation, a reserve of $1.5 million for his potential

14   claim.  So that money got funded into a reserve on -- before

15   December 31st.

16       Mr. Johnson's claim has not ultimately been determined,

17   but if it is, then it will be deemed to have been a payment

18   to the plan reserve and therefore to Mr. Johnson, if it's

19   allowed, as of July -- as of December 2016.  So then when he

20   comes to pay taxes on those things, we'll have a date

21   certain by which he would have gotten it.

22       If, however, we prevail in our objection, he's never

23   receive that money.  It really is for the accounting of the

24   tax.

25               THE COURT:  I think the question is a different

                                                        Page 58

1    question, though.  We use here -- you're deemed to receive a

2    distribution if the payment is made on your behalf to the

3    plan reserve account because it is a dispute or something

4    like that.

5              THE WITNESS:  Correct.

6              THE COURT:  And under 9.05, you're deemed to

7    receive that distribution and that claim is released, even

8    if it's ultimately disallowed because you're deemed to

9    receive the distribution on the date that the reserve

10   account is funded for that claim, right?

11             What he's asking is if the claim is never funded to

12   the reserve account and that's the only deemed to be

13   distribution under the plan, then how can a creditor who

14   never files a claim be deemed to have received a

15   distribution?  Or how can a creditor whose claim was never

16   funded or paid --

17             THE WITNESS:  I understand your point and I don't

18   think the provisions were intended to work in tandem as

19   you're suggesting they do.  I think this was simply to say

20   for tax purposes, we're putting the money here.  For the

21   purposes of deemed to have received, Your Honor, because --

22   for example, take again Mr. Johnson who filed a claim, Mr.

23   Trump -- President Trump who didn't file a claim.  Mr. Trump

24   would never have had a reserve for his account.  We still

25   believe, as I gave you the example, Mr. Trump would have

Page 59

1    released his claim.

2              So Mr. Johnson is different than Mr. Trump in the

3    sense that he filed the proof of claim.  I don't think

4    there's a dispute as to whether or not -- now, if his claim

5    is disallowed and he wants to go sue the writers, that's not

6    -- we think that claim has been released.  He's participated

7    in the bankruptcy.  And even though he did not actually

8    receive, he's not deemed -- maybe he's deemed to receive --

9              THE COURT:  But he's deemed to receive the

10   distribution on his claim as funded in the reserve account.

11             THE WITNESS:  Well, this is a deemed -- a

12   distribution to the beneficiaries.  Again, we were thinking

13   of this as for tax purposes.  I understand again for the

14   actual date that they would have start (indiscernible)

15   liability for taxes, just like you do when you do

16   liquidating trusts, you put them in the beneficiaries.  And

17   those people start paying taxes on the day of a liquidating

18   trust for tax purposes.  This was drafted along those same

19   lines.  Not so much for, this is going to determine whether

20   you give a release or not.

21             THE COURT:  Go ahead.

22   BY MR. ESPER:

23   Q    Is it your custom when drafting a provision such as

24   9.05 and its language about "deemed to have receive a

25   distribution," to check whether similar language is used in

Page 60

1    other portions of the document?

2    A    I will say in this case, I don't know if I have a

3    practice because I have a lot of people drafting the plan.

4    So I assume they look around to see if it's -- if the

5    phrases are used.  If they didn't, I'm not surprised that

6    the word deemed showed up here as well.  But I think that's

7    -- generally, it's good practice to see if the phrases are

8    used just like when you write statutes in your Congress.

9    It's a good practice.  Does it always work?  No.

10   Q    And ultimately, as you testified earlier, you're

11   responsible for the language in 9.05, correct?

12   A    Absolutely.

13   Q    Let's move on to the subject of gross negligence or

14   willful misconduct.  Did you have any specific discussions

15   with anyone at the Saul Ewing law firm regarding the meaning

16   of the term gross negligence?

17   A    Not that I recall.

18   Q    And did you have any specific discussions with anyone

19   at the Saul Ewing law firm regarding the meaning of the term

20   willful misconduct?

21   A    Not that I recall.

22   Q    Do you have any specific discussions with the U.S.

23   Trustee regarding the meaning of the term gross negligence?

24   A    I would say it this way.  I didn't have express

25   conversations with the Office of the U.S. Trustee as to what

Page 61

1    it means in the context of this particular case.  What I did

2    have was discussions that I've already mentioned, very

3    short, did you put in your usual carve outs of gross

4    negligence, willful misconduct, which I interpreted to be

5    Delaware law-type provisions or what's usually carved out in

6    corporate charters.

7    Q    But you didn't have any discussions with the trustee

8    following on that about what the term gross negligence might

9    actually mean in the plan, correct?

10   A    Correct.

11   Q    And would your answer be the same with respect to

12   willful misconduct?

13   A    Correct.  It would be the same.

14   Q    And did you have any discussions with the creditors

15   committee regarding the meaning of the term gross

16   negligence?

17   A    Not that I recall.

18   Q    And did you have any discussions with the creditors

19   committee regarding the meaning of the term willful

20   misconduct?

21   A    Not that I recall.

22   Q    In your experience as a bankruptcy lawyer, you have

23   never received a third party release in a Court approved

24   bankruptcy plan that does not contain a carve-out for gross

25   negligence and willful misconduct, correct?

Page 62

1   A    I don't recall having seen any.

2          MR. ESPER:  Nothing further, Your Honor.

3          THE COURT:  Redirect?

4          MS. LEVINE:  Briefly, Your Honor.  Your Honor, for

5   housekeeping, I just want to make sure the Goldberg Exhibit

6   3 is moved into --

7          THE COURT:  I don't remember.  Was there any

8   objection to that one?  I don't think there was.

9          UNIDENTIFIED SPEAKER:  No, Your Honor, the parties

10  --

11         MR. ESPER:  I don't think there's an objection to

12  3, I think, it's fine.

13         THE COURT:  Okay.

14         MR. ESPER:  Yeah, no objection.

15         THE COURT:  All right.  3 is received.

16         (Goldberg Exhibit No. 3 admitted into evidence)

17         MS. LEVINE:  Thank you, Your Honor.  It's one of

18  the stipulated exhibits already.

19                    REDIRECT EXAMINATION

20  BY MS. LEVINE:

21  Q    Mr. Gilardi, I'm going to draw your attention back to -

22  - I draw your exhibit back to Mr. Bell's Exhibit G, which is

23  your e-mail regarding the third party releases to Saul

24  Ewing.  Do you have that in front of you?

25  A    I do.

1    Q    All right.  Do you see the time that e-mail was sent?

2    A    Yes.

3    Q    Do you see that it says 10:06:40?

4    A    Yes.

5    Q    I draw your attention now to Goldberg 3.

6    A    Goldberg 3.  I see it.

7    Q    Do you see the time that this e-mail was sent?

8    A    Yes, I do.

9    Q    And was it before or after the e-mail to Saul Ewing?

10   A    The e-mail to Saul Ewing was 10:06:40 p.m. and this was

11   10:14:09 p.m., so it was after.

12   Q    So at the time -- so as part of these negotiations, was

13   it your understanding that the release language in the plan

14   was intended to cover people who did not actually receive

15   distributions under the plan?

16   A    That's what I told the committee and that's what my

17   understanding was.

18   Q    You had some discussion with regard to the deemed to

19   have received language on cross-examination.  Do you recall

20   that colloquy?

21   A    Yes.

22   Q    Okay.  Is it your understanding that you included the

23   phrase "deemed to have receive," in addition to actually

24   having received in the release because you expected it would

25   expand upon those creditors that were barred and bound by

Page 64

1    the release?

2    A    Yes, I mean it was -- again, one says received.  One

3    says deemed to have received.  So -- and it was an or, so I

4    know enough that I was trying to go beyond merely having

5    received a distribution.

6    Q    Were there substantial revisions to the plan and the

7    disclosure statement up until the point in time you actually

8    filed it?

9    A    It depends on which one you're talking about.  At this

10   time, what precipitated these particular changes at the end

11   of October was what I referred to earlier as negotiations

12   with Mr. Belaya.  The plan got entirely renegotiated with

13   distributions and Gawker Media and all that during the last

14   week of October to the first week of November to try to put

15   all of this together on an expedited timeframe to make sure

16   I could get effective by that end of December.

17       So yes, there was substantial changes and instead of

18   having litigation regarding any wide number of issues,

19   including with Mr. Belaya and the allocation of sale

20   proceeds, this plan was the consensual plan that was trying

21   to bring all of those pieces together.  So there was

22   substantial changes at the time of this between the prior

23   plan and this plan.

24       After this, there were not so many changes.

25   Q    Well, there was some colloquy with regard to a

Page 65

1    potential inconsistency with the use of the "deemed to have

2    receive" language in Chapter 3 of the plan and the "deemed

3    to have receive" language in the release section of the

4    plan.  Was -- were all of these -- was this drafting taking

5    place simultaneously on the eve of the filing of the plan?

6    A    Again, I will say I focused a lot on Section 902, 905.

7    I did not focus a lot on Section 3.05 and what was going on

8    in 3.05 at that time.  If somebody showed me the draft, I

9    can say we were looking at it or not.  I don't remember that

10   it was in there.  I think it was not in there and put in in

11   this section, but I don't have a definitive recollection and

12   I believe we put it in there because we were establishing

13   the plan reserves and it refers to the plan reserves.  And

14   we wanted to make sure that we could make the distributions

15   and get the tax consequences.

16        So whether it matched up to 9.05, I just don't remember

17   us ever even thinking about it, to be honest.  I remember we

18   had two jobs.  Make sure we could make the distributions,

19   get the tax benefits, and look at the releases and make sure

20   we get as best we could under the circumstances.

21   Q    The attorney at the U.S. Trustee you were dealing with,

22   was that Mr. Zipes?

23   A    Yes.

24   Q    Do you recall conversations with Mr. Zipes about

25   whether or not you were intending to protect the writers in

Page 66

1    connection with the third party releases?

2    A    Yes, I do.

3    Q    And what were those conversations?

4    A    Well, Mr. Zipes and I had discussed it any number of

5    times.  But going into confirmation, I asked whether he had

6    concerns as the U.S. Trustee's office often has with third

7    party releases, and he thought this was a very good case for

8    third party releases.  So he was supportive of them, again.

9    Then he asked that question, did you put in your standard?

10   And I said yes, I'd make your job easy.  I'd put in the

11   gross negligence/willful misconduct standard carve-outs that

12   I do in all my plans.  And he said, then I think we'll have

13   no problems.

14       He reported back that he had no problems.  And at

15   confirmation, he had no problems with the third party

16   releases.

17   Q    But you did express to him that you were looking to

18   protect the writers --

19   A    Yes.

20   Q    -- during those conversations.  And what were you

21   looking to protect the writers from?

22   A    Again, the -- throughout this case we've been trying --

23   we had tried to protect the writers because, again, I was --

24   first, they didn't have a lot of assets.  They had always

25   relied on Gawker to fund litigation.  Two, there was a

Page 67

1    process by which people approved the articles.  And I had

2    numerous conversations with people approving the articles.

3         So if the process went through and the articles were

4    approved, the idea was to protect the writers from having

5    third parties sue them when they had no assets and where

6    Gawker had put its imprimatur by going ahead and allowing

7    the articles to go out, for better or worse.  Belaya turned

8    out to be for the worst, but the other articles, they had a

9    very good track record.

10        So the intention was to try to protect them and at the

11   same time, not everybody -- not have the writers come back

12   on indemnification claims against the company and not have

13   to pursue 502(c), 502(e) litigation with respect to every

14   writer on getting their claims to be estimated at zero,

15   because it would have slowed down the distributions.  And we

16   were completely conscious of a fact that there was a

17   billionaire out there who had now disclosed publicly that he

18   had financed litigation.  So this was a major concern for us

19   throughout the case.

20   Q    When you discussed the Trump litigation with the Court,

21   was it your intent to explain that the release covered

22   claims like those that were alleged by Mr. Trump?

23   A    Yes.

24   Q    And did you -- do you believe that this is the same

25   sort of claim and that it's covered by the release?

Page 68

1            MR. ESPER:  Objection.  That --

2            THE COURT:  Sustained.

3            MR. ESPER:  -- calls for a legal --

4            THE COURT:  Sustained.

5     BY MS. LEVINE:

6     Q    Is it your understanding that similarly this type of

7     claim should be barred by the release?

8            MR. ESPER:  Same objection.

9            THE COURT:  Same result.  It's sustained.

10           MS. LEVINE:  No further questions, Your Honor.

11           MR. ESPER:  Nothing further, Your Honor.

12           THE COURT:  I had a question.  Would you turn to

13    Exhibit G, which we've been discussing?

14           THE WITNESS:  Exhibit G, yes, Your Honor.

15           THE COURT:  And Mr. Patel's 3:57 p.m. e-mail says,

16    "What is deemed to have received a distribution mean?"  And

17    then asks, "If a third party hasn't filed a claim or a

18    lawsuit, is that party deemed to have received a

19    distribution for the purposes of 9.05?"  Right?  Did you --

20    and your response to that e-mail is the next e-mail above

21    it.  And you say, "I cannot say that third parties received

22    a distribution if not a proof of claim."

23           THE WITNESS:  Correct.

24           THE COURT:  And this is a response to his question

25    about what deemed to have received a distribution was?

Page 69

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  You can step down.  Let's take a

3   five minute recess.

4       (Recessed at 11:32 a.m.; reconvened at 11:42 a.m.)

5          THE COURT:  Be seated.  Call your next witness.

6          MS. BIERUT:  Your Honor, before we start with the

7   next witness, we just have a quick clarification about --

8          THE COURT:  Sure.

9          MS. BIERUT:  -- the common interest agreement we

10   had with the creditors committee.

11          THE COURT:  Yeah.

12          MS. BIERUT:  We had an agreement beginning from the

13   date of the Belaya settlement in October of 2016.  There's

14   got to be a common interest between the debtors and the

15   creditors committee.  After our initial production, R.J.

16   Balas' firm asked for an additional production.  But any

17   communications about the plan between the committee and the

18   debtors from September 16th through, I believe, November

19   2nd, 2016.  And we agreed to make that initial production on

20   the condition that privilege would not be waived.

21          So that's (indiscernible).

22          THE COURT:  I hear you.  Okay.

23          MS. LEVINE:  Your Honor, we call William Holden.

24          THE COURT:  Okay.  Please step up, Mr. Holden, and

25   raise your right hand.

Page 70

1                    WILLIAM HOLDEN, WITNESS, SWORN

2              THE COURT:  Okay.  Please take a seat and speak

3    into the microphone.

4                        DIRECT EXAMINATION

5    BY MS. LEVINE:

6    Q    Good morning, Mr. Holden.  Please state your full name

7    for the record.

8    A    William D. Holden.

9    Q    And what is your occupation?

10   A    I am a turn around and restructuring consultant.

11   Q    What's your current role in the Gawker bankruptcy

12   proceeding?

13   A    Right now I am the plan administrator.

14   Q    And prior to confirmation, did you hold a different

15   role?

16   A    Yes, prior to confirmation, I was the chief

17   restructuring officer.

18   Q    As the CRO, what were your duties, generally?

19   A    Generally, they initially started with preparing the

20   company to file for bankruptcy, then oversee the operations

21   and the develop -- the operations as well as the development

22   of a plan of reorganization or plan of liquidation in this

23   instance.

24   Q    Exhibit 1, tab A is the plan, if you could take a look

25   at that please.

Page 71

1    A    Big one or little one?

2         UNIDENTIFIED SPEAKER:  The big one.

3         THE WITNESS:  Yes.

4    BY MS. LEVINE:

5    Q    Did you have a role in formulating the plan?

6    A    Yes.

7    Q    And what was your role?

8    A    I provided the overall direction and represented the

9    company in the negotiations that were involved in developing

10   the plan.

11   Q    Did you speak to anybody besides your counsel with

12   regard to the formulation of the plan?

13   A    Not that I recall.

14   Q    So did you have any conversations that weren't

15   privileged with regard to formulation of the plan?

16   A    As I recall, all of my conversations were privileges

17   with Ropes & Gray.

18   Q    Did you review the third party release?  Did you have -

19   - let me do it this way.  Did you have a view with regard to

20   whether third party releases should be included in the plan?

21   A    They were critical to the plan, yes.

22   Q    And what was -- why were they critical to the plan?

23   A    There was a couple different factors at play here.  One

24   of the larger ones was the existence of a number of claims

25   that we could not quantify and that we needed to resolve.

Page 72

1    And those were claims from the writers.  And these were

2    claims that we needed to resolve in order to get a plan

3    confirmed.

4        The other factors that played into this related to the

5    -- the continued indemnification and protection that the

6    writers would have against a tax on them for work that they

7    did while they were employed or otherwise contracted with

8    Gawker.

9    Q    I invite your attention to Section 9.05 of the plan

10   document in front of you.  Did you review Section 9.05, the

11   third party release language in the plan before it was filed

12   with the Court?

13   A    Yes, I did.

14   Q    Did you understand this language to provide third party

15   releases in favor of the writers for contract provided to

16   both of them?

17          MR. ESPER:  Objection.  Lacks foundation.

18          THE COURT:  Well, it's also -- calls for legal

19   conclusion.  I guess you could say that's what you thought

20   it was, whether or not that's what it does.  Of course,

21   there are a lot of exclusions in it also, limitations.

22          MR. ESPER:  I also --

23          MS. LEVINE:  Just asking --

24          MR. ESPER:  Your Honor, I would also argue it lacks

25   foundation because of what he just testified.  Where would

Page 73

```
 1    he get that knowledge except from (indiscernible)?

 2            THE COURT:  No, it's as if she's waiving the

 3    attorney/client privilege.

 4            MS. LEVINE:  Your Honor, I'm just asking if he

 5    reviewed it and if he has a view about it.

 6            THE COURT:  A view what it means?  Isn't that what

 7    I'm supposed to do?

 8            THE WITNESS:  Yes.

 9            THE COURT:  Why don't you ask the -- answer the

10    first one.  Did you review it?

11            MS. LEVINE:  Was your intent --

12            THE WITNESS:  Yes, I reviewed the language in 9.05.

13    BY MS. LEVINE:

14    Q    Was it your intent to have the third party release

15    language release the writers?

16    A    My intent and direction, which I gave to Ropes & Gray -

17    -

18            MR. ESPER:  Objection, Your Honor.

19            THE COURT:  He's -- you know, if he's going to

20    testify to his communications with Ropes & Gray, he's going

21    to open it up.

22    BY MS. LEVINE:

23    Q    I'm just asking your intent.  I'm not asking what your

24    conversations were with counsel.

25    A    My intent was to get the broadest release possible.
```

1           THE COURT:  I don't think that's really a question

2    in the case.  It's certainly clear that the debtor wanted to

3    release -- get a lease for the other writers to deal with

4    these indemnity claims, which you would otherwise have to

5    estimate and presumably reserve for.

6           MS. LEVINE:  Your Honor, can I have a five minute

7    break?

8           THE COURT:  Five?  We just broke for five minutes.

9           MS. LEVINE:  Two seconds.

10          THE COURT:  Two seconds is short.  Okay.

11      (Pause)

12          THE COURT:  (Indiscernible), would you ask her to

13   come in and -- thank you.

14          MS. LEVINE:  Sorry, Your Honor.  Thank you.

15          THE COURT:  Okay.

16   BY MS. LEVINE:

17   Q    Mr. Holden, were you aware of the demand letters sent

18   by Trump prior to confirmation?

19   A    Yes, I was.

20   Q    And did you get a demand letter from R.J. Balas prior

21   to confirmation?

22   A    Yes, we did.

23   Q    And what was your understanding of the nature of the

24   claims that were being asserted in those letters?

25   A    I recall a demand for a retraction and apology, or an

Page 75

1    ability to have RJ Bell write something at the bottom of the

2    article.  The -- it was -- there was definitely claims of

3    defamation and hurting their business because we had written

4    some of these articles.

5    Q    Did -- specifically, do you recall the nature of the

6    claims asserted by Trump?  Was that a defamation claim as

7    well?

8    A    The claim by Trump was -- I can't remember or I'm not a

9    lawyer enough to know whether or not defamation has a

10   technical sort of threshold or a limit.  We were being told

11   to remove articles about his hairdresser and the

12   relationship that he had with his hairdresser.

13   Q    And why did he want those removed?

14   A    I believe that they were unflattering or I don't

15   remember if there was claims that they were untrue.  So the

16   specifics behind it I'm unaware of.  I can't recall.

17           MS. LEVINE:  Thank you.  No further questions, Your

18   Honor.

19           THE COURT:  Any cross-examination?

20                       CROSS-EXAMINATION

21   BY MR. ESPER:

22   Q    Mr. Holden, is it fair to say that in doing your job,

23   you sought the broadest release possible that would still

24   result in a confirmable plan?

25   A    That is accurate.

Page 76

1    Q    Okay.  You have no independent knowledge of what

2    "deemed to have receive distributions" meant other than

3    whatever communications you might have had with your

4    lawyers, is that correct?

5    A    There is a plain language element here which I relied

6    upon in terms of understanding what it means to be deemed to

7    do something.

8    Q    Okay.  But other than your personal interpretation and

9    whatever discussions you had with your lawyers, you have no

10   other information about what that term means, correct?

11   A    It's a term that's used in accounting frequently.

12   Q    Well, okay.  What does it mean in accounting?

13   A    You can deem a dividend in accounting, which basically

14   sets the funds aside for legal purposes.  The receiver can -

15   - the receiver of the dividend basically can, for legal and

16   tax purposes, say that they've actually received it even

17   though the cash has not necessarily hit their bank account.

18   Q    Is that the only symbol or use of the term deem that

19   you're familiar of in the accounting world?

20   A    I'm sure there must be others.  It's a pretty large

21   body of work.

22   Q    But that's the one you had in mind when you said in the

23   accounting world where deemed is used?

24   A    Sorry, repeat the question, sir.

25   Q    I asked you about 9.05 and deemed to have received a

Page 77

1    distribution and sources of your knowledge.  And I said

2    exclude attorneys, and I said obviously you have a personal

3    belief based on the plain language.  I said are there any

4    other sources you have and draw on for knowledge of what the

5    term means.  You said accounting.  I'm just trying to finish

6    up exploring that.  You cited this one instance in

7    accounting where the term deemed is used.  Do you have any

8    other instances in accounting that -- from your mind that

9    you were drawing on for the answer to my question?

10   A    That is the only immediate one that I can recall right

11   now.

12   Q    Okay.  And do you have to -- did you have any

13   communications with anyone other than your lawyers as to

14   what the meaning of the term gross negligence or willful

15   misconduct was?

16   A    I do not recall.

17            MR. ESPER:  Okay.  No further questions.

18            THE COURT:  Thank you.  You can step down.  Do you

19   have any further witnesses?

20            MS. LEVINE:  Your Honor, just brief redirect.

21            THE COURT:  Sure, I'm sorry.  Go ahead.

22                       REDIRECT EXAMINATION

23   BY MS. LEVINE:

24   Q    Mr. Holden, just to refresh your recollection, do you

25   recall being deposed in this case?

1    A    Yes.

2    Q    And do you recall being asked during that deposition if

3    you were deemed -- what your understanding was of deemed to

4    have received a distribution?

5    A    Yes.

6         MR. ESPER:  Your Honor, I object.  This is their

7    witness and they're impeaching him.

8         MS. LEVINE:  Well, actually, Your Honor, we're back

9    and forth on cross because he's their witness as well.

10        THE COURT:  That's true and I suppose she's

11   refreshing his recollection about what deemed to be received

12   means.

13        MS. LEVINE:  Your Honor, with the Court's

14   permission, I'd like to show Mr. Holden a portion of his

15   deposition transcript and ask him to --

16        THE COURT:  Why did you just ask him whether he was

17   asked that question and gave that answer?

18        MR. ESPER:  May I have a page cite quickly?

19        MS. LEVINE:  Page 23.

20        MR. ESPER:  Thank you.

21        MS. LEVINE:  Line 19 through page 24, line 13.

22        THE WITNESS:  Which exhibit, sorry?  I apologize.

23   It's not in the exhibit --

24   BY MS. LEVINE:

25   Q    Okay.  So, starting on page 23. Actually, I'll go back

Page 79

1   to line ten.

2       Did you form any belief as to what the words deemed to

3   receive a distribution meant?

4       Answer:  Form any, I don't understand what you mean by

5   formed any belief.

6       In other words, do you know what that term means?

7       Yes, I do.

8       What does the term mean?

9       That terms means if you had any participation in the

10  bankruptcy process.  If you had sent us a letter at some

11  point, if you filed a claim, if you had poked your head up

12  in any respect or capacity, you had the opportunity file a

13  claim and that claim resulted in adjudicated or had any

14  option to say -- not to file the claim which is the

15  equivalent of saying that you have a zero claim.

16      If you have a zero claim and if you file a claim, if

17  you are claimed, our bankruptcy paid a hundred cents on the

18  dollar to every claim that was filed.  Every claim that was

19  not filed, they got a hundred cents on nothing because they

20  didn't file it -- I'm paraphrasing, for which they filed,

21  they are deemed to have received consideration.

22  A    Can I -- and --

23          MS. LEVINE:  May I show him the --

24          THE COURT:  Yes.  Sure.

25          THE WITNESS:  I reviewed this last night.  The

Page 80

```
 1    question that I believe that I was asked was; excluding

 2    conversations that I've had with my lawyer; did I form any

 3    belief.

 4              This -- what's represented here is what we talked

 5    about extensively between Ropes and I and I don't know if

 6    I'm opening up unnecessary discussions.

 7              But this was all --

 8              MR. ESPER:  Your Honor, may I make a motion to

 9    strike?  The very next question at the deposition asked for

10    all sorts of knowledge and he says his lawyers.

11              THE COURT:  Ms. Levine.

12              MR. ESPER:  Question:  What is the -- and what's

13    the basis for your belief that this is what it -- this

14    means?  This is page 24, line 14.

15              Ms. Bierut:  I'll caution the witness not to

16    disclose any privileged conversations he might have had with

17    counsel.

18              Answer:  I relied on my counsel.

19              THE COURT:  Look.  I'm going to sustain the motion

20    to strike.  Maybe the question about foundation should have

21    been asked first at the deposition and he never would have

22    given that answer.

23              Mr. Gilardi has testified.  It sounds to me like

24    he really doesn't have any knowledge outside of what counsel

25    may have discussed with him.
```

Page 81

```
 1                  Do you have any other questions of the witness?

 2                  MS. LEVINE:  No, Your Honor.

 3                  THE COURT:  You can step down.  Thank you.

 4                  Do you have any other witnesses?

 5                  MS. LEVINE:  No, Your Honor.

 6                  THE COURT:  Do you have any other witnesses?

 7                  MR. ESPER:  We rest.

 8                  THE COURT:  All right.  Let me ask -- I want to

 9      ask a question before -- one of the requirements for being

10      the beneficiary of the release is to vote in favor of the

11      plan and to waive any claims for indemnity against the

12      estate.

13                  Is there any dispute that Mr. Goldberg satisfied

14      those conditions?  Mr. Esper?

15                  MR. ESPER:  I have no evidence to the contrary.

16                  THE COURT:  Well, that's not quite the answer to

17      the question.

18                  MR. ESPER:  Well, Your Honor, I'm not necessarily

19      aware of the evidentiary record about -- in the --

20                  THE COURT:  His note is reflected in the book,

21      that balance certification.  And I can take judicial notice

22      of that.  You know, I don't know if I could take judicial

23      notice of it for the truth and I can reopen the record.  But

24      I'm just trying to clear out those issues.

25                  MR. ESPER:  Yeah.  Well, lacking independent
```

Page 82

1   knowledge, I have no objection to the Court judicially

2   noticing whatever --

3            THE COURT:   Okay.

4            MR. ESPER:   -- his -- Mr. Goldberg's action was

5   with respect to that.

6            THE COURT:   That doesn't tell me about the waiver

7   though although there is a finding in the confirmation order

8   that the writers waived their claims against the estate.

9            MS. LEVINE:   Your Honor, two points.   First,

10  Mr. Goldberg did vote in favor of the plan and that's part

11  of the record.

12           And, second, there was a stipulation that was

13  entered following confirmation pursuant to which all of the

14  writers who did vote in favor of the plan also withdrew

15  their indemnification (indiscernible).

16           THE COURT:   Is there any dispute?

17           MR. ESPER:   There's no dispute.

18           THE COURT:   Okay.   I had raised two issues, two

19  potential -- two ambiguities when we had an earlier

20  conference relating to the scope of the release.

21           The first one, which there wasn't really much

22  evidence on, is what did willful misconduct and gross

23  negligence exclude?   But then I went back.   There was a

24  colloquy at the confirmation hearing and then I went back

25  and I looked at the findings in the confirmation order and

1      there's a specific finding that the claims and causes of

2      action covered by the third-party releases are based on

3      conduct for which the debtor might be liable with debtor

4      indemnification obligations.

5              Since the -- there's a part of the stipulated

6      facts is that the debtor indemnify defamation claims and

7      related claims arising from publication of materials.

8              I'm satisfied that, notwithstanding the willful

9      misconduct, gross negligence exclusion, that the defamation

10     claims are covered by the third-party release.

11             I am still having problems with the language of

12     deemed to be -- received or deemed to receive a

13     distribution.

14             When Mr. Gilardi testified, in his mind, he seemed

15     to make a distinction between that language of binding

16     people who are -- received a distribution or are deemed to

17     receive a distribution as opposed to the more typical

18     language that binds creditors whether or not they file a

19     claim and I just don't understand what that distinction is.

20             In addition -- let me just find that exhibit, it's

21     that Exhibit G.  Mr. Patel asked a very straight forward

22     question; what does deemed to be received mean if the third

23     party hasn't filed a claim or a lawsuit?  Is that third

24     party deemed to have received a distribution?

25             Mr.  Gilardi's answer changes the question

Page 84

1    somewhat but the answer is clearly negative in that first

2    paragraph and I just don't understand that.

3           MR. ESPER:  Your Honor, we actually -- and maybe

4    Mr. Gilardi could testify further if we need to reopen the

5    record, but we took the first paragraph to say that he

6    cannot say that third parties actually received a

7    distribution if they did not file a proof of claim --

8           THE COURT:  No, no.  I know what it says but

9    that's not the --

10          MR. ESPER:  So --

11          THE COURT:  -- question that Mr. Patel asked.  And

12   that's why I say he changed the question somewhat.

13   Mr. Patel wasn't asking about people who filed claims.  He

14   was specifically asking; are you deemed to receive a

15   distribution if you didn't file a lawsuit or a claim?  And

16   the response is a little different but it's certainly a

17   negative response.

18          MS. LEVINE:  We -- actually we took it as the

19   opposite.  In other words, we think that what Mr. Gilardi

20   was saying to us is if you're -- is if you actually received

21   a distribution, it's because you filed a proof of claim.

22          Deemed to have received a distribution has to

23   expand what would happen if you actually received a

24   distribution.  So, I cannot say that third parties received

25   a distribution if they did not file a proof of claim.

1    Therefore, I have to use the language, they were deemed to

2    have received a distribution, and we think that makes sense

3    -- we think that makes it --

4              THE COURT:  I'm not sure that's what that says.

5              MS. LEVINE:  But we think it makes even more

6    sense, Your Honor, if you tie it to the email which

7    Mr. Gilardi probably sent only a few seconds later which

8    said; heads up.  We're going to modify to include a release

9    for not only people who received distributions under the

10   plan but also from those who do not; which is what he sent

11   to the creditors' committee at -- immediate --

12             THE COURT:  Where is that?  Which exhibit?

13             MS. LEVINE:  That's Goldberg Exhibit 3.

14        (Pause)

15             THE COURT:  That doesn't really answer the

16   question.  Well, maybe you can clarify it in the proposed

17   findings of the fact.  But I just don't understand the

18   distinction that's being made here.

19             If it simply said, you're bound if you're a

20   creditor whether or not you filed a proof of claim, which is

21   what plans usually say and essentially what 9.02 says, I

22   would understand what that means.

23             But I don't -- and it's essentially the same

24   language if I'm going to let (indiscernible) you want it to

25   (indiscernible) but I just -- it's a very --

1          MS. LEVINE:  Your Honor, we're not disagreeing

2     that there's some ambiguity here.  We're not disagreeing --

3     well, you know, we're admitting that it was a very difficult

4     negotiation and I think Mr. Gilardi testified that part of

5     his concern was he sort of got to a certain place with the

6     United States Trustee's Office with regard to what he viewed

7     as third-party releases that would protect the writers and

8     that therefore he thought this language was substantially

9     similar enough, was -- to the language in the injunction,

10    that it would cover folks whether or not they actually got

11    paid a distribution or simply asserted a claim or chose not

12    to assert a claim and therefore did not get paid a

13    distribution but should be deemed to have been paid a

14    distribution because this was, for all intents and purposes,

15    if you asserted a claim and it was allowed, you got paid a

16    hundred cents on the dollar.

17          THE COURT:  The only evidence though regarding

18    Mr. Gilardi's communications with the U.S. Trustee is the

19    U.S. Trustee's concern that the plan include an exclusion

20    for willful and -- willful misconduct and gross negligence.

21    We've gotten past that.

22          The U.S. Trustee wasn't concerned with whether

23    creditors who filed a claim or didn't file a claim will be

24    deemed to receive a distribution or didn't receive a

25    distribution were covered by the release.  That's not the

Page 87

1    concern of the U.S. Trustee generally.

2         MS. LEVINE:  Correct, Your Honor.  But at the

3    confirmation hearing part of the colloquy that Mr. Gilardi

4    had with the Court was over this exact issue with regard to

5    the particular example of the Trump claim --

6         THE COURT:  Uh-huh.

7         MS. LEVINE:  -- which was similar to here, a

8    demand letter that basically said I'm mad at you for doing

9    this stuff and Mr. Gilardi specifically explained that that

10   is exactly the type of claim where we don't want somebody to

11   lie in wait, let the bankruptcy pass and then just go after

12   these innocent victim writers who only are in the situation

13   because they submitted content to Gawker.  It was reviewed

14   and posted.

15        In other words, we're not talking about which is

16   what we would interpret willful misconduct to be.  We're not

17   talking about somebody doing something, like posting

18   secret --

19        THE COURT:  Well, we're past willful misconduct

20   and I separate that --

21        MS. LEVINE:  No.  But my --

22        THE COURT:  -- from the other exclusion which is

23   received or deemed to receive a --

24        MS. LEVINE:  Right.  But the -- but the point

25   being he -- the goal, as explained through the Trump

Page 88

1    example, was to protect the writers from content properly

2    provided to Gawker and posted to the website and that was, I

3    believe, the reason for the specific use of the Trump

4    example at the time of the confirmation hearing.

5             THE COURT:  Okay.  Thank you.

6             MR. ESPER:  Your Honor, I would say that I have a

7    different view of the evidence.

8             First of all, I do want to say, just for the

9    record, I mean, I want to be helpful to the Court and focus

10   on what the Court's interested in.

11            Obviously, we have a different view of gross

12   negligence and willful misconduct.

13            THE COURT:  No.  I understand but there's a

14   finding in the confirmation order in terms of the types of

15   claims that were being released and I won't entertain a

16   collateral attack on the confirmation order at this point.

17            MR. ESPER:  No.  I -- as I said, I accept that.  I

18   wanted to note our position for the record.

19            THE COURT:  Okay.

20            MR. ESPER:  But the point here is to try and be

21   helpful to the Court, not to rehash issues where the Court

22   is not interested in hearing further argument.  So, I want

23   to focus on what the Court does want argued and that is the

24   deemed to have received distribution issue.

25            And my view of the evidence is as follows.  I

Page 89

1    think that Mr. Gilardi and Mr. Holden both made clear that

2    there were two issues here.

3          On the one hand, you had these writers, and they

4    clearly, the writers clearly wanted a stronger release of

5    their -- or claims against them as possible.  There's no

6    doubt about that.  They made their position clear a number

7    of times and, you know, part of why we're here is, you know,

8    Mr. Patel and Ms. Levine make that position very clear even

9    in this hearing.  They want the strongest possible release

10   and we understand that.

11         But there was another goal here.  The other goal

12   was to get a plan confirmed, to not draw any -- draw any

13   flap from the Trustee; to not draw any flap from the

14   creditors' committee; to not draw any flap from Your Honor.

15   And to get a plan confirmed, get claims paid, get releases

16   entered et cetera.

17         And Mr. Gilardi had both of those goals in mind.

18   He has the writers on the one hand saying, get us a broad

19   release but has his imperatives to get a plan confirmed on

20   the other hand.

21         And, quite honestly, I think what happened here is

22   that Mr. Gilardi made a strategic choice.  A strategic

23   choice not to put in clear language into the agreement,

24   release -- into the plan releasing all claims against third

25   parties because such language might very well be rejected by

Page 90

1    the Court, might very well have drawn an objection from the

2    U.S. Trustee et cetera.

3           So, instead, Mr. Gilardi made a strategic choice

4    to put something vague in there, to put something ambiguous

5    in there, that might be later construed -- that he hoped

6    might be later construed.  But he didn't express this hope

7    to anyone.  He didn't discuss at any time with anybody that,

8    in fact, what was going to happed was this release was, in

9    fact, going to bar -- he didn't go and call the Trustee and

10   say, you know --

11          THE COURT:  Let me just interrupt you.  He did, at

12   least with respect to the Trump claim or a Trump-type claim,

13   make clear at the confirmation hearing what the scope of the

14   release was intended to be and you had notice of that.  You

15   could have shown up and said, hey, wait a minute.  We don't

16   participate in the case.  We should be able to go forward.

17          MR. ESPER:  Your Honor, with respect, I think that

18   by the time the confirmation hearing has occurred, first of

19   all, the cake's already been baked.  We have the language.

20   The language means what it means.

21          Second of all, it kind of has the same flavor as,

22   for instance, statements on the floor of Congress which are

23   sometimes the worst form of legislative history which it

24   often is the case, it's not somebody saying exactly what the

25   provision does mean.  It's somebody saying what they would

1    like to have it mean or even sometimes what it doesn't mean

2    but what they want to put on the record as its meaning in

3    the hope that maybe they can influence an interpretation

4    down the line.

5              I think there is an aspect of -- you know, if you

6    look at Exhibit G and you look at Exhibit H and you look at

7    the communications between Mr. Gilardi and Mr. Patel, what's

8    going on there is essentially the following communication.

9              Mr. Patel:  I want you to get the broadest

10   possible release.

11             Mr. Gilardi:  If we try for too broad a release,

12   we might get rejected.  I can't do that.  There might be

13   consideration problems as well which I didn't mention before

14   but that was a concern, too.  So, I will do the best I can.

15             Having had that communication, Mr. Gilardi didn't

16   then inform Your Honor about that communication.  No.  He

17   gets on the -- up at the confirmation hearing and says, no,

18   no, no, no, no.  This is -- you know, this is what it's

19   intended to do.

20             But the cake's already baked by that point.

21   They've already had their negotiation, their discussion.

22   They've put it on the record and they've shown that they've

23   made a strategic choice not to go for the homerun.  They

24   made a strategic choice to take a single instead.

25             So, getting on to the record at the confirmation

1    hearing and then saying, well, we really hit a home run,

2    Your Honor, is too late.

3            And furthermore, the confirmation hearing, there

4    isn't anybody there representing the interests of non-claim

5    filers.

6            THE COURT:  Well, but you had -- forget about

7    anybody else, you had notice of the confirmation hearing,

8    right?

9            MR. ESPER:  Yes, we did.  But the bottom line is

10   Mr. Gilardi can make any statement he wants on --

11           THE COURT:  I guess what you're saying is that you

12   can't use statements of the confirmation hearing to

13   interpret ambiguous language; is that basically what you're

14   saying?

15           MR. ESPER:  Yeah.  I think it's a unilateral

16   statement and, you know, that is certainly insufficient in

17   this case to cause us to ignore what is the record of what

18   was a strategic choice by Mr. Gilardi.

19           THE COURT:  So, what do you think received or

20   deemed to have been received means?

21           MR. ESPER:  I think that under contract law at

22   bottom it is -- I believe -- I agree with Your Honor's

23   earlier conclusion in the earlier proceeding that it's

24   ambiguous.  That's why we're here.

25           So, now, we have to look at the traditional means

Page 93

1    of contract interpretation.  What does that mean?

2            First of all, as we've had enormous discussion

3    today, it means no subjective understandings.  It doesn't

4    matter what Mr. Gilardi thought in his own mind it might

5    mean.  It doesn't matter what he'd like it to mean.  Only

6    the objective manifestations of intent are important.

7            Second of all, we construe different parts of an

8    instrument together.  So, it happens that 3.05 is in the

9    same agreement and uses hauntingly similar language to 9.05.

10   So, we construe them together.  That's what you do under

11   contract law.

12           When you construe them together, you get a

13   harmonizing construction which is that if they had deposited

14   money into a reserve with respect to a specific claim, that

15   that claim hadn't been paid out of the reserve yet.

16   Nonetheless, that person is deemed to receive a distribution

17   you can't sue again.  His claim is released.

18           That's what it means and that's a perfectly

19   natural interpretation of it.  It -- whether or not it was

20   the interpretation that Mr. Gilardi and Mr. Patel secretly

21   hoped for is not relevant.  It's a plausible, reasonable

22   interpretation based on the established rules of contract

23   interpretation, not asking for any subjective understanding

24   of people that was unexpressed and based on the terms of the

25   plan.  What more can you ask for than that in a contract

Page 94

1    case?

2          The other thing I want to mention is there is one

3    other piece of evidence that I think sheds some light on

4    that and that is the bar date order.

5          THE COURT:  I know Mr. Flaxer was going to raise

6    this one.

7          MR. ESPER:  Well, Your Honor, you probably know

8    what I'm about to say.  But in the bar date order it says

9    that persons who do not file a claim shall not be treated as

10   creditors.  And this was not only in the order, it was put

11   in the notice as well.  So, it went out to the world.

12          If you haven't filed a claim, you're not treated

13   as a creditor.

14          Now, honestly, I have to say, I'm a little careful

15   about this because of the -- if you remember, Mr. Gilardi's

16   testimony, the definition of claim, you know, that the bar

17   date order does honestly refer to what constitutes a

18   creditor rather than who is deemed to receive a

19   distribution.

20          But still harmonizing the bar date order with the

21   plan, it would seem that it is perfectly natural that the

22   plan not treat parties who are not treated as creditors

23   under the bar date order as if they've received

24   distributions under the plan.

25          THE COURT:  So, you think under 9.02, if you have

Page 95

1    a claim and never file it, you're not a creditor bound by

2    9.02, the injunction provision?

3              MR. ESPER:  I think the injunction provision does

4    bar anybody who doesn't -- has a claim that's not -- that is

5    released by 9.05 from coming in here.  That's the language

6    of 9.02.

7              And I don't think the bar date order can modify

8    that language which is not vague.  It's completely clear.

9              But when we have language that is ambiguous, then

10   you can look at the bar date order and say that's of some

11   aid.

12             But, again, I want to emphasize, I really come

13   back to 3.05, the bar date order is very useful evidence but

14   3.05 is using basically the exact same term elsewhere in the

15   plan and that's very strong evidence.

16             THE COURT:  Okay.  Thank you.

17             MR. ESPER:  Thank you, Your Honor.

18             MS. LEVINE:  Your Honor, briefly?

19             THE COURT:  Very briefly though.

20             MS. LEVINE:  Your Honor, with respect to the issue

21   with regard to the oral argument at confirmation not being

22   evidence --

23             THE COURT:  An aid to interpretation, I guess, is

24   what he's saying.

25             MS. LEVINE:  We would argue that it is an aid to

1    interpretation.  We would also respectfully submit that it's

2    consistent with the testimony that we actually heard today

3    from Mr. Gilardi (indiscernible) up on the stand.

4           With regard to the deemed to have received

5    language, if you write the deemed to have received language

6    out of the release which is, in essence, what we're talking

7    about now, in the case of a hundred percent plan, you're, in

8    essence, saying that there is no release and you're

9    rendering it meaningless.

10          And the writers were very afraid that there was

11    the likelihood that there are people who were mad, who were

12    going to come after them, potentially harass them and they

13    would not have an ability economically to defend those

14    lawsuits without the ability to look to either Gawker for

15    indemnification or to a release that would be binding.

16          THE COURT:  I understand the concern of the

17    writers.  I'm concerned about that phrase which, again, I

18    come back to saying the same thing.  Mr. Gilardi apparently

19    perceived the difference between a phrase like that and a

20    phrase that says you're bound, creditors are bound whether

21    or not they filed a claim which, again, is the usual

22    language that you see in the plan.  And it's the language

23    that appears in 9.82.  Are you saying that they're the same?

24          MS. LEVINE:  We understand, Your Honor.  We

25    understand the concern but we think the deemed to have

1    received has to have meaning.  And, if you take it out, if

2    you only have people who filed proofs of claim, and

3    therefore either had their claim allowed at some number or

4    disallowed, then you're taking out deemed to have received,

5    then it has no meaning.

6              THE COURT:  Well, but if the meaning --

7              MS. LEVINE:  In addition to that, even if you

8    accept Mr. -- just to --

9              THE COURT:  -- the argument --

10             MS. LEVINE:  -- just to --

11             THE COURT:  Let me finish.  The argument is that

12   it has a very clear meaning.  You read Section 3.05, you're

13   deemed to receive a distribution if you have a disputed

14   claim and the payment is made to a reserve.

15             MS. LEVINE:  We would argue two things with regard

16   that, Your Honor.

17             First of all, actually if you take the argument

18   that if you don't file a claim, then you have no rights

19   under the plan.  There has to be a different way other than

20   calling somebody a creditor to bind them to the release.

21             And deemed to have received takes care of the

22   "problem" that is arguably there if they're not deemed a

23   creditor regardless of whether or not they file a proof of

24   claim under the bar date order.

25             THE COURT:  Well, we're going a little -- the head

Page 98

1    of the discharge provisions of Chapter 11 deal with that

2    situation.

3            MS. LEVINE:  And, in addition to that, Your Honor,

4    with regard to the different use of deemed to have received

5    for tax purposes, it's not uncommon, Your Honor, for

6    something to have a specific meaning for the IRS Code and

7    for tax purposes than for the release provisions.

8            And if Your Honor interprets deemed to have

9    received to mean only those monies that were deposited into

10   the reserve accounts, again, we're reaching the -- we're

11   reaching the conclusion where the deemed to have received

12   language is, in essence, written out of the release because

13   the payments that are made are paid only to creditors, all

14   of whom received a hundred percent distribution and would

15   not otherwise have claims against the writers.

16           So, that can't possibly be the interpretation.

17           Also, Your Honor, under 9.02, if you accept

18   R.J. Bell's interpretation --

19           THE COURT:  But people who deemed to have received

20   with unfiled claims aren't receiving any distribution,

21   right?

22           MS. LEVINE:  But that -- which is exactly the

23   point, Your Honor.  In other words, if you don't file a

24   proof of claim and you don't get a distribution and you just

25   lie in wait, as this circumstances and other lawsuits that

1    we're starting to see happen, that only the writers are

2    getting sued without the benefit now of the indemnification

3    that they would have gotten from Gawker.

4             In addition to that, Your Honor, under 9.02 --

5    under 9.02, if deemed to have received is confusing, and we

6    believe that it is, the appropriate course of action for

7    R.J. Bell would have been to come here first before hoping

8    that if they filed suit, they would just intimidate the

9    writers in order to have Your Honor --

10            THE COURT:  Well -- (indiscernible) on a decision

11   in this case.  State Court could presumably have interpreted

12   it also.

13            MS. LEVINE:  Your Honor, we respectfully submit

14   that that's part of the issue that we're grappling with

15   here.  The writers provided the content.  The content

16   provided the value.  The goal here was to protect the

17   writers with the release.

18            Obviously, we have a situation with some ambiguity

19   in the documentation.

20            But to come back to the Court that entered the

21   confirmation order was the hope under the injunction and

22   to --

23            THE COURT:  I understand that but how does that

24   affect the decision in the case?  So, they didn't come here

25   first.  Mr. Goldberg came here.

Page 100

1              But how does that answer any of the questions that

2      are raised?

3              MS. LEVINE:  Your Honor, we think it provides some

4      further -- it highlights the issue of writing deemed to have

5      received out of the release because what we're finding is

6      these cases are getting filed in State Court and unless the

7      writers then assume both the burden of defending those

8      litigations and coming back to this Court, they're in

9      exactly the place the parties had hoped to avoid by putting

10     the third-party releases in the -- into the plan.

11              So, I hear Your Honor that the --

12              THE COURT:  But the third-party releases don't

13     stop the lawsuit.  They may ultimately prevail in the course

14     of them but they might have to defend based upon either the

15     injunction or the third-party release.

16              It doesn't mean no lawsuits are filed.  They may

17     ultimately be dismissed because of -- you know, because of

18     the releases.  It was the situation with the Gizmodo issue

19     on the sale order.

20              All right.  Look.  Why don't we do this?

21              As I said, I've resolved the issue with the

22     willful misconducts and gross negligence issue.  I think

23     that's covered by paragraph 21 of the confirmation order.

24     The confirmation order is res judicata and I'm not inclined

25     to entertain a collateral attack on that finding.

Page 101

1          That's the kind of claim that was -- that is

2    excluded under the third-party releases.

3          I will have an issue with what this deemed to

4    receive means.

5          As I said, Mr. Gilardi testified that there's a

6    difference between that and barring all creditors, whether

7    or not they filed a claim.

8          There's an element here of kind of a purposeful

9    ambiguity in order to get the plan through.

10          You know, I -- and this thing about the tax issue,

11   you may be right.  It's just you're talking about two

12   different things.  One, you're talking about a third-party

13   release and, the other, you're talking about tax liability.

14          But I still have that issue.  So, I'll entertain

15   proposed findings of fact and conclusions of law.  You can

16   include the issue, just the completeness on willful

17   misconduct and gross negligence and, you know, point out

18   that the Court already found in paragraph 21 that's what the

19   release, the third-party release reaches.

20          MR. ESPER:  Your Honor, I just -- I'll probably

21   file something that goes along with your finding on that.

22   So, in other words, the proposed findings will include those

23   findings in their favor on the gross negligence.  I just

24   want to state for the record --

25          THE COURT:  Well, if you don't, they will.  So, it

Page 102

1    doesn't matter.

2         MR. ESPER:  Yeah.  I just want to state that if I

3    do file that, I would, obviously, reserve any -- whatever

4    rights we have.

5         THE COURT:  I understand.  What I'll ask you to do

6    is I guess Mr. Goldberg will file the first proposed

7    findings.  How long will it take you to do that?

8         MR. PATEL:  Two weeks, Your Honor.

9         THE COURT:  Two weeks from today.

10        When you file your proposed findings, also you can

11   email to chambers a copy of the proposed findings in Word

12   format.  Every proposed finding, by the way, has to have a

13   reference to the record unless it's a fair inference from

14   what preceded it with a reference.

15        MS. LEVINE:  Your Honor, could we just amend that

16   to two weeks from the day we get the transcript?

17        THE COURT:  I don't know when you're going to get

18   the transcript.  It's only a two-hour trial.

19        MS. LEVINE:  Okay.  Just in order -- in case -- a

20   lot of it's going to come from Mr. Gilardi's testimony.  I

21   don't want to misquote it.

22        THE COURT:  How about two weeks from Wednesday?

23   Today's Monday.

24        MS. LEVINE:  Okay.

25        THE COURT:  So, that's two weeks from the 11th.

Page 103

1    It's the 25th.

2            I'll give you two weeks to answer from the 25th,

3    whatever that date is.

4            MR. ESPER:  That's May 9th, I believe.

5            THE COURT:  How could it be May -- May 9th?  Okay.

6    And then I'll give you a week to replay.

7            You don't have to repeat your arguments in the

8    reply.  Just --

9            MR. ESPER:  May 16th.

10           THE COURT:  May 16th.  Okay.

11           No.  That can't be.  That's at least three weeks.

12           What's fourteen day -- fourteen days after

13   April 25th is May -- 9th -- which is May 8th, right?

14           MR. ESPER:  It's May 9.

15           THE COURT:  You said May 16th.

16           MR. ESPER:  No.  May 16th for the reply.

17           THE COURT:  Oh, okay.  And --

18           MR. ESPER:  April 25th, May 9th, May 16th.

19           THE COURT:  Same issue with you.  Email a copy of

20   the -- your proposed findings in Word format.  Every

21   paragraph should have a reference to the record.

22           And also if you can give me on a disk the exhibits

23   you are citing or the exhibits you're relying on and not

24   just one -- you know, one insert of a hundred and fifty

25   pages.  Separate them by exhibits.

1          All right.   Thank you very much.   That's it.

2      (Whereupon these proceedings were concluded at 12:28

3  p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3                      T E S T I M O N Y

 4    PLAINTIFF'S

 5    WITNESS                  EXAM BY                    PAGEE

 6    Greg H. Gilardi          Ms. Levine                   12

 7                             Mr. Esper                    39

 8                             Ms. Levine                   62

 9

10    William Holden           Ms. Levine                   70

11                             Mr. Esper                    75

12                             Ms. Levine                   77

13

14                       E X H I B I T S

15    PARTY     NO   DESCRIPTION                  EVID.

16    Ryan

17    Goldberg  1    Confirmation Order and Plan    32

18              2    Transcript                     32

19              3    Email to Creditors Comm.       62

20

21    PARTY     NO   DESCRIPTION                  EVID.

22    Moving

23    Party     A-M  Unknown                        44

24

25
```

Page 106

1                          I N D E X

2                            RULINGS

3                                                           PAGE

4

5    Motion in Limine                                         9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1                       C E R T I F I C A T I O N

2

3       I, Dawn South, certify that the foregoing transcript is a

4       true and accurate record of the proceedings.

5       Dawn South    Digitally signed by Dawn South
                       DN: cn=Dawn South, o, ou,
                       email=digital1@veritext.com, c=US
6       _____
                       Date: 2018.04.10 14:18:26 -04'00'

7       Dawn South

8       Certified Electronic Transcriber

9       Jamie Gallagher    Digitally signed by Jamie Gallagher
                           DN: cn=Jamie Gallagher, o, ou,
                           email=digital1@veritext.com, c=US
        _____
                           Date: 2018.04.10 14:19:09 -04'00'

10      Jamie Gallagher

11      Certified Electronic Transcriber

12      Pamela A Skaw    Digitally signed by Pamela A Skaw
                         DN: cn=Pamela A Skaw, o, ou,
                         email=digital1@veritext.com, c=US
        _____
                         Date: 2018.04.10 14:20:02 -04'00'

13      Pamela A. Skaw

14      Certified Electronic Transcriber

15

16

17      Date:  April 10, 2017

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501