**Hearing Date**: May 1, 2018 at 10:00 a.m. (prevailing Eastern Time)
**Objection Deadline**: April 30, 2018 at 12:00 p.m. (prevailing Eastern Time)

ROPES & GRAY LLP
Gregg M. Galardi
Kimberly J. Kodis
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Plan Administrator for the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                            :
In re:                                      :   Chapter 11
                                            :
Gawker Media LLC, *et al.*,[1]              :   Case No. 16-11700 (SMB)
                                            :
              Debtors.                      :   (Jointly Administered)
                                            :
------------------------------------------------------x

**PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 APPROVING RELEASE AGREEMENT WITH THIEL PARTIES**

William D. Holden as the Plan Administrator (as defined below) for Gawker Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft. ("Gawker Hungary") (collectively, the "Debtors") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases"), respectfully states the following in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1.      By this motion, the Plan Administrator seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) approving that certain release agreement

---

[1] The last four digits of the taxpayer identification numbers of the Debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Gawker Hungary, Kft. "v.a." (5056). The offices of the Debtors are located at 10 East 53rd Street, New York, NY 10022.

dated April 24, 2018 by and among Peter Thiel ("Mr. Thiel"), Thiel Capital LLC ("Thiel Capital", and together with Mr. Thiel, the "Thiel Parties"), the Debtors, and William D. Holden, solely in his capacity as plan administrator for the Debtors (the "Plan Administrator") (each individually, a "Party", and all collectively, the "Parties") annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "Release Agreement"), and (b) authorizing the Plan Administrator to take any and all actions reasonably necessary to consummate the Release Agreement and perform all obligations contemplated therein.

## JURISDICTION AND VENUE

2. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3. On June 10, 2016, Gawker Media filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On June 12, 2016, GMGI and Gawker Hungary each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4. On December 22, 2016, the Court confirmed the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft* (the "Plan") [Docket No. 576], which expressly contemplates the sale of certain assets of the Debtors. On March 17, 2017, the Plan went effective.

5. Pursuant to that certain Settlement Agreement by and between Terry Gene Bollea ("Mr. Bollea") and the Debtors, dated as of December 9, 2016 (the "Bollea Settlement") and the Plan, the Plan Administrator is obligated to attempt to sell the Gawker.com Assets (as defined in the Bollea Settlement) and to cooperate and work in good faith to secure settlement agreements with the Thiel Parties involving mutual general releases.

6.      On October 11, 2016, the Debtors filed a motion (the "2004 Motion") in the Chapter 11 Cases seeking discovery of the Thiel Parties, Charles J. Harder, Esq., and his law firm Harder Mirell & Abrams LLP (now known as Harder LLP) regarding possible claims that the Debtors might have against Mr. Thiel and/or others in connection with the reported financing by Mr. Thiel of litigation against the Debtors and others (the "Claims"). The 2004 Motion was granted on June 28, 2017. An order authorizing the issuance of subpoenas was entered on December 4, 2017 (the "2004 Order"), and the Plan Administrator issued subpoenas on December 14, 2017. Discovery pursuant to the 2004 Motion (the "2004 Investigation") was underway until recently when, with the negotiations leading to the Release Agreement, the Parties agreed to suspend those efforts. On February 9, 2018, the Thiel Parties filed a motion to extend the deadlines established under the 2004 Order (the "Motion to Extend"). On February 14, 2018, the Plan Administrator filed its reply in opposition to the Motion to Extend. A hearing on the Motion to Extend is scheduled to be heard by this Court on May 1, 2018.

7.      On January 10, 2018, Mr. Thiel submitted a bid for the Gawker.com Assets. The Plan Administrator believes, however, that the Thiel Parties' participation in an auction may have a chilling effect and that he may be able to elicit greater interest and higher bids from other prospective purchasers if the Thiel Parties are excluded from participation in the sale process and, therefore, asked the Thiel Parties not to participate in the sale process.

8.      Based on the information obtained by the Plan Administrator regarding the possible claims against the Thiel Parties, the Plan Administrator's interest in selling the Gawker.com Assets, and the Parties' desire to resolve this matter, the Parties have agree to resolve their disputes and enter into the Release Agreement, subject to this Court's approval.

9. The Release Agreement offers a number of benefits to the Debtors' estates, including the agreement of each of the Thiel Parties, for themselves and on behalf of the Thiel Releasing Persons (as defined in the Release Agreement), to not: (1) pursue or fund any cause of action or other similar actions, against: (i) any buyer or licensee of the Gawker.com Assets in the sale and licensing processes currently ongoing, or any subsequent buyer or licensee of the Gawker.com Assets, or (ii) any of the Debtors or any current or former employee or independent contractor thereof, in their capacity as such, in connection with any action related to the Gawker.com Assets taken on or before the date of the Release Agreement.; or (2) participate, cause any third party to participate or otherwise authorize any third party's participation, or provide funding to any third party for the purpose of participating, in any sale process for the Gawker.com Assets, except as expressly requested by the Debtors and agreed to by the Thiel Parties in their sole and absolute discretion (except that the Thiel Parties may continue to fund Mr. Bollea). The Plan Administrator believes that these provisions will protect the Debtors from indemnification claims by former employees and prevent the chilling of the bidding process that the Plan Administrator believes would result from the participation of the Thiel Parties. The Release Agreement also contemplates as follows:[2]

- *Archives.* The Thiel Parties, for themselves and on behalf of the Thiel Releasing Persons, agree they will not engage, cause any third party to engage, or provide funding to any third party for the purpose of engaging, in any action seeking to cause the web content archives (the "Archives"), or any portion thereof, created by or on behalf of any or all of the Debtors through the date of the Release Agreement, to be removed from the internet or any successor media.
- *Releases.* The Thiel Parties, for themselves and on behalf of the Thiel Releasing Persons, agree to absolutely and forever release and discharge the Debtors, the Plan Administrator, and their Released Persons from any and all claims and other similar actions arising out of or connected with the Debtors or their respective businesses

---

[2] The following summary of the Release Agreement is provided for illustrative purposes only and is qualified in its entirety by reference to the Release Agreement. In the event of any inconsistency between this Motion and the Release Agreement, the Release Agreement shall control in all respects.

through the date of the Release Agreement. Each of the Debtors, the Plan Administrator, and the Gawker Releasing Persons (as defined in the Release Agreement), agrees to absolutely and forever release and discharge the Thiel Parties and the Thiel Parties' Released Persons from any claims and other similar actions arising out of or connected with the Debtors or their respective businesses through the date of the Release Agreement.

To the extent that (i) it is determined that the Plan Administrator or the Gawker Entities do not have the authority to bind any of the Gawker Releasing Persons to the releases set forth in the Release Agreement, and (ii) any such Gawker Releasing Person asserts a claim or cause of action against any of the Thiel Parties or their Released Persons that otherwise would have been released pursuant to the Release Agreement, then such Gawker Releasing Person shall not be, and shall be deemed to never have been, (x) released pursuant to the Release Agreement, or (y) subject to a covenant not to bring a claim against such person.

- *Sale Process Format.* The Thiel Parties, for themselves and on behalf of the Thiel Releasing Persons, agree that the Plan Administrator will be permitted to conduct the sale process for the Gawker.com Assets, including but not limited to a public or private auction. The Plan Administrator and the Debtors agree that any sale or disposition of the Gawker.com Assets, or any portion thereof or interest therein, shall expressly exclude any right, title, and interest in and to the Claims and any similar or derivative causes of action against any of the Thiel Parties or their Released Persons (as defined in the Release Agreement), and will ensure that any definitive transaction documents in respect of such sale or disposition include such express agreement.

- *Termination of 2004 Investigation.* The Debtors and the Plan Administrator will send a letter or an email to the Thiel Parties, Charles J. Harder, Esq., and his law firm Harder LLP terminating the 2004 Investigation and withdrawing the subpoenas issued in connection therewith, with prejudice; pending such termination, the Parties agree that all actions with respect to the 2004 Investigation will be suspended.

- *Effective Date.* The Debtors and the Plan Administrator will file the Motion within three (3) business days of the execution of the Release Agreement. The Release Agreement will become effective upon entry by the Bankruptcy Court of an order approving such agreement and such order becoming final.

## APPLICABLE AUTHORITY

### I. Standard of Review

10. The procedural framework for a court's review of a settlement is set forth in Federal Rule of Bankruptcy Procedure 9019 (the "Bankruptcy Rules"). In relevant part, Bankruptcy Rule 9019(a) provides that "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

11. The standards for approval of a settlement are well established. In considering whether to approve a settlement, the court should:

> [A]pprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), *reh'g denied*, 391 U.S. 909 (1968).

12. The Second Circuit has identified a series of factors to be considered by courts in determining whether a settlement should be approved. They are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement'; (4) whether other parties in interest support the settlement; (5) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be obtained by officers and directors'; and (7) 'the extent to which the settlement is the product of arm's length bargaining.'"

*Iridium (Potomac) LLC v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y.2006)). *See also SEC v. Drexel Burnham Grp., Inc. (Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 292 (2d Cir. 1992); *Air Line Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 428 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

13. A settlement under Bankruptcy Rule 9019 need not result in the best possible outcome for the Debtors, but must not "fall below the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 595 (Bankr. S.D.N.Y. 1991). In determining the range of reasonableness, the bankruptcy court is not required to hold a full evidentiary hearing or even a "mini-trial" on the merits of the underlying dispute or, in other words, the claims and defenses that the parties have agreed to compromise. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009); *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 362 (Bankr. S.D.N.Y. 2002) ("In reviewing the settlement, the court is not required to conduct a mini-trial of the compromised issues or claims."); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 496 ("The standard does not require that the settlement be the best the debtor could have obtained nor does it require the court to conduct a mini-trial of the questions of law and fact."). Rather, the court's task is to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 497. The Court may give weight to the informed judgment of a debtor that a compromise is fair and equitable. *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *see also In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998).

14. Ultimately, the decision to accept or reject a settlement is within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). However, a court should exercise its discretion in favor of a settlement wherever possible, as settlements are generally favored in bankruptcy. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged."); *see also In re Hibbard Brown & Co.*, 217 B.R. 41, 46

(Bankr. S.D.N.Y. 1998) (citing *Nellis v. Shugrue*, 165 B.R. at 121) ("The decision to grant or deny a settlement or compromise lies squarely within the discretion of the bankruptcy court [and such] discretion should be exercised in light of the general public policy favoring settlements."); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (noting the paramount public policy for settlements).[3]

## II.  The Release Agreement Reflects the Debtors' Sound Business Judgment and is in the Best Interest of the Debtors' Estate

15. The Plan Administrator believes that entry into the Release Agreement represents a prudent exercise of his business judgment and satisfies the requirements of *TMT Trailer*. Significantly, Mr. Bollea, who holds a 45% interest in the Gawker Media Contingent Equity Proceeds (as defined in the Plan), and the holders of a large percentage of the other 55% interest in the Gawker Media Contingent Equity Proceeds – the parties with the economic interests in both the sale of the Gawker.com Assets and any litigation proceeds received from claims against the Thiel Parties – support the Release Agreement.

16. The Plan Administrator, in consultation with his attorneys, has analyzed the legal and factual issues concerning the Claims, as well as the risks and costs associated with litigating the Claims, and has concluded that the Release Agreement represents a fair and prudent resolution of the outstanding disputes.  In that regard, the Plan Administrator determined that proceeding with the 2004 Investigation would have been time-consuming and costly and, because of the complexities and issues involved, believes that such costs and risks outweigh the likelihood that he would prevail.

---

[3] Further, pursuant to Bankruptcy Code section 105(a), the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Authorizing the Debtors to proceed with the Release Agreement falls squarely within the spirit of Bankruptcy Rule 9019 as well as the Bankruptcy Code's predilection for compromise.  Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

17.     In addition, the Plan Administrator believes that entry into the Release Agreement will inure to the benefit of the Debtors' estates in a number of other ways.  *First*, the Thiel Parties will not participate in a sale of the Gawker.com Assets, and thus, the Plan Administrator believes he will be able to elicit greater interest and higher bids from other prospective and qualified buyers.  *Second*, the Release Agreement provides for a series of mutual releases that will protect the Debtors' estates from the potential of indemnification claims.  *Third*, the Thiel Parties will not seek to remove any Gawker.com Archives, which the Plan Administrator believes will provide comfort to potential bidders for the Gawker.com Assets.

18.     The Release Agreement is the product of arm's length bargaining between sophisticated parties, each of which was represented by counsel and provides more than sufficient benefit to the Debtors' estates and remaining constituencies to satisfy the requirements of Bankruptcy Rule 9019.  Thus, the Plan Administrator believes that the Release Agreement should be approved under Bankruptcy Rule 9019(a) as fair and reasonable, a valid exercise of the Debtors' reasonable and prudent business judgment, and in the best interests of the Debtors' estates and all parties in interest.

**III.    The Plan Provides for the Court's Retention of Post-Confirmation Jurisdiction over the Motion.**

19.     A bankruptcy court may exercise post-confirmation jurisdiction over a matter when two requirements are satisfied.  *See Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 73-74 (Bankr. S.D.N.Y. 2005) (Bernstein, J.).  First, "the matter must have a 'close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement.'"  *Id.* at 73 (quoting *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004)).  "Second, the plan must

provide for retention of jurisdiction over the dispute." *Id.* at 73-74. Notably, "the scope of post-confirmation jurisdiction mapped out by the case law usually meets the definition of a core proceeding." *Id.* at 74.

20. Here, the Plan Administrator is seeking approval of a settlement which will allow him to fulfill his obligations under the Plan, which is to attempt to sell the Gawker.com Assets. The Gawker.com Assets, together with the Claims being released, are the sole remaining assets of the Debtors' estate and such sale will inure to the sole benefit of the Debtors' prepetition creditors. Furthermore, the proposed Release Agreement brings to conclusion one of the central disputes that led to the filing of the Debtors' bankruptcy cases.

21. Second, the Plan provides for a retention of jurisdiction over approval of the Release Agreement. As set forth in Section 8.01 on the Plan, the Court retained exclusive jurisdiction, to the extent legally permissible, *inter alia*:

> "to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order". *See* Plan § 8.01(d);
>
> "to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code". *See* Plan § 8.01(h);
>
> "to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents". *See* Plan § 8.01(i);
>
> "to determine any matter … (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement". *See* Plan § 8.01(n); and
>
> "to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors." *See* Plan § 8.01(p).

As a result of these provisions, and others contained within Section 8.01 of the Plan, the Court retained jurisdiction to enter an order on this Motion.

## NOTICE

22. Notice of this Motion is being given to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the Internal Revenue Service; (c) the United States Attorney for the Southern District of New York; (d) Charles J. Harder, Esq.; (e) Harder LLP; (f) counsel to Peter Thiel and Thiel Capital LLC; (g) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (h) all other parties in interest in accordance with the procedures set forth in the *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates* [Docket No. 93].

## NO PRIOR REQUEST

23. No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

24. WHEREFORE the Plan Administrator respectfully requests entry of the Order granting the relief requested herein and such other and further relief as is just.


Dated: April 25, 2018
New York, New York

/s/ *Gregg M. Galardi*
ROPES & GRAY LLP
Gregg M. Galardi
Kimberly J. Kodis
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: Gregg.Galardi@ropesgray.com
         Kimberly.Kodis@ropesgray.com

*Counsel to the Plan Administrator for the Debtors*