**SAUL EWING ARNSTEIN & LEHR LLP**
Sharon L. Levine (admitted *pro hac vice*)
Dipesh Patel
1270 Avenue of the Americas, Suite 2005
New York, NY 10020
Telephone: (212) 980-7200

**WILLIAMS & CONNOLLY LLP**
Thomas G. Hentoff (admitted *pro hac vice*)
Chelsea T. Kelly
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000

*Attorneys for Ryan Goldberg*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                                        :
                                                              :
        Gawker Media LLC, *et al.,*[1]                        :        Chapter 11
                                                              :        Case No. 16-11700 (SMB)
                                    Debtors.                  :
---------------------------------------------------------------x
                                                              :
        Ryan Goldberg,                                        :
                                                              :
                                    Movant,                   :
                                                              :
            - against -                                       :
                                                              :
        Pregame LLC, d/b/a Pregame.com, and                   :
        Randall James Busack,                                 :
                                                              :
                                    Respondents.              :
---------------------------------------------------------------x

## MOVANT RYAN GOLDBERG'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[1] The last four digits of the taxpayer identification number of the debtors are: Gawker Media LLC (0492); Gawker Media Group, Inc. (3231); and Kinja Kft. (5056). Gawker Media LLC and Gawker Media Group, Inc.'s mailing addresses are c/o Opportune LLP, Attn: William D. Holden, Chief Restructuring Officer, 10 East 53rd Street, 33rd Floor, New York, NY 10020. Kinja Kft.'s mailing address is c/o Opportune LLP, Attn: William D. Holden, 10 East 53rd Street, 33rd Floor, New York, NY 10020.

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ......................................................................................................... 1

    I.    Findings of Fact ...................................................................................... 1

        A.    Case Background ...................................................................... 1

        B.    Gawker Media LLC's General Practice and the Underlying Claim .......... 4

        C.    Third-Party Release and Negotiations Related to the Third-Party Release ...................................................................... 5

        D.    The Confirmation Hearing ....................................................... 9

        E.    The Confirmation Order ........................................................ 11

        F.    Plan Provisions ...................................................................... 12

    II.    Issues Tried ......................................................................................... 13

    III.    Testimony on Issue:  Whether a party must have filed a claim to be "deemed to have received a distribution" under the Plan for purposes of Section 9.05 of the Plan ....................................................................... 13

        A.    Gregg Galardi ........................................................................ 13

CONCLUSIONS OF LAW ............................................................................................... 15

    I.    The Third-Party Release in Section 9.05 of the Plan Extends to Creditors that Did Not File a Claim in the Debtors' Bankruptcy Cases ............................. 15

        i.    The Parties' Objective Manifestation of Intent Demonstrates that the Third-Party Release Applies to Holders of Claims Whether or Not a Proof of Claim was Filed ............................................... 16

        ii.    Section 3.05 and Section 9.05 Cannot Be Harmonized Without Rendering Language Meaningless ......................................... 21

    II.    The "Willful Misconduct" and "Gross Negligence" Exclusions of the Third-Party Release Do Not Apply to Defamation Claims and Related Torts Arising Out Of Content Provided To or For the Benefit Of the Debtors ........................ 26

24477586.12 04/25/2018

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adelphia*,
544 F.3d 420 (2d Cir. 2008)..................................................................................19

*CP III Rincon Towers, Inc. v. Cohen*,
13 F. Supp. 3d 307 (S.D.N.Y. 2014)......................................................................21

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992)..................................................................................21

*God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*,
6 N.Y.3d 371, 845 N.E.2d 1265 (2006).................................................................22

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
230 F.3d 549 (2d Cir. 2000)..................................................................................21

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
889 F.2d 1274 (2d Cir. 1989)................................................................................15

*In re M. Fabrikant & Sons, Inc.*,
385 B.R. 87 (Bankr. S.D.N.Y. 2008)....................................................................16

*Nycal Corp. v. Inoco PLC*,
988 F. Supp. 296 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998)..............16

*In re: Residential Capital, LLC*,
533 B.R. 379 (Bankr. S.D.N.Y. 2015)..................................................................22

*Reyes v. Metromedia Software, Inc.*,
840 F. Supp. 2d 752 (S.D.N.Y. 2012)...................................................................22

*In re Smart World Technologies Inc.*,
423 F.3d 166 (2d Cir. 2005)..................................................................................19

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP*,
No. 12 CIV. 3610 PAC, 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013)....................22

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
63 N.Y.2d 396, 472 N.E.2d 315 (1984)................................................................22

*United States v. Manning*,
107 F.3d 5 (2d Cir. 1997)......................................................................................19

24477586.12 04/25/2018

*United States v. Pantelidis*,
    No. CRIM. 01-00694, 2004 WL 2188089 (E.D. Pa. Sept. 7, 2004)........................................16

*Wells v. Shearson Lehman/Am. Exp., Inc.*,
    72 N.Y.2d 11, 526 N.E.2d 8 (1988)........................................................................................16

*In re Young Broad. Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010)......................................................................................15

24477586.12 04/25/2018

Movant Ryan Goldberg ("Goldberg") respectfully submits his proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.    Findings of Fact

#### A.    Case Background

1.    On June 10, 2016 (the "Petition Date"), Debtor Gawker Media LLC ("Gawker Media") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ A).

2.    On June 12, 2016, the Debtors Gawker Media Group, Inc. and Gawker Hungary Kft. filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ A).

3.    Goldberg authored an article that was posted on Gawker Media's Deadspin.com website on June 23, 2016 (the "Article")—post-Petition Date.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ C).

4.    On June 24, 2016, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").    (D.I. 62, Appointment of Official Committee of Unsecured Creditors).

5.    The Committee was comprised of Terry Gene Bollea, Shiva Ayyadurai and Ashley Terrill (collectively, the "Committee Members").    (D.I. 62, Appointment of Official Committee of Unsecured Creditors; Tr. at  21:2-3).

6.    Each Committee Member, in his or her individual capacity, was represented by counsel Charles Harder of the firm Harder LLP.  (Tr. at 20:23-35, 21:1-3).

7.      The Committee was represented by the law firm of Simpson Thacher & Bartlett LLP. (D.I. 184, Order Authorizing the Retention and Employment of Simpson Thacher & Bartlett LLP as Counsel to the Official Committee of Unsecured Creditors Pursuant to Sections 328(A), 330 and 1103(A) of the Bankruptcy Code Effective *Nunc Pro Tunc* to June 24, 2016).

8.      On June 27, 2016 (post-Petition Date), Respondents' counsel Charles Harder sent a letter to Gawker Media that demanded the retraction of the Article. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ D and Goldberg's Stipulated Exhibit at VIII.I.5, Exhibit B to the Motion (as defined herein)).

9.      On August 11, 2016, the Bankruptcy Court entered an *Order (I) Establishing a Deadline to File Proofs of Claim, Certain Administrative Claims and Procedures Relating Thereto and (II) Approving the Form and Manner of Notice Thereof* [D.I. 168] (the "Claims Bar Date Order").  The Claims Bar Date Order set September 29, 2016 (the "Claims Bar Date") as the deadline to file claims or file requests for payment for claims arising between the Petition Date and July 31, 2016.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts, at III, ¶ G).

10.     The Claims Bar Date Order, notice of the Claims Bar Date, a Proof of Claim Form and the Administrative Claim Form (as those terms are defined in the Claims Bar Date Order) were served on Respondent Randall James Busack and Respondents'[2] counsel, Charles Harder.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ I).

11.     On August 22, 2016 (post-Petition Date), Respondents' counsel Charles Harder sent a letter to counsel for GMG demanding retraction of the Article.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ J).

---

[2]      Terms not defined herein shall have the same meaning as ascribed to them in the Joint Pretrial Order entered on March 15, 2018 [D.I. 1089].

12.    Respondents and their counsel did not file a proof of claim or request for payment prior to the Claims Bar Date.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ K).

13.    Goldberg, through counsel, filed three separate proofs of claim against each of the three Debtors for Debtor Indemnification Obligations (as defined in the Plan) (*See* Claims Register, Claim Numbers 235, 247 and 272).

14.    On November 4, 2016, this Court entered an *Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures with Respect to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft., (III) the Form of Ballots and Notices in Connection Therewith, and (IV) the Scheduling of Certain Dates with Respect Thereto* (the "Disclosure Statement Adequacy Order") [D.I. 413].  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ M).

15.    The Debtors' proposed Amended Joint Chapter 11 Plan of Liquidation contained a third-party release and injunction provision.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ N).

16.    The Confirmation Hearing Notice attached at Exhibit 2 to the Disclosure Statement Adequacy Order conspicuously set forth: (1) the deadline to file any objections to the Debtors' Amended Joint Chapter 11 Plan of Liquidation; (2) the date and time of the hearing to confirm the Debtors' Amended Joint Chapter 11 Plan of Liquidation; and (3), in bold and capitalized letters, the Amended Joint Chapter 11 Plan of Liquidation's third-party release and injunction provisions.  (*See* Disclosure Statement Adequacy Order, Exhibit 2).

17.    The Disclosure Statement Adequacy Order, which contained the Debtors' proposed Amended Joint Chapter 11 Plan of Liquidation and Confirmation Hearing Notice, was

24477586.12 04/25/2018

served on Respondent Randall James Busack and Respondents' counsel, Charles Harder. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ O).

18.    Respondents did not object to the Plan or the third-party release and injunction provisions of the Plan. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ P).

19.    Prior to the Confirmation Hearing (as defined herein), Respondents' counsel, Charles Harder, actively negotiated settlements on behalf of each Committee Member. (Tr. at 21:10-18). Each Committee Member's settlement is embodied in the Plan. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, pp. 32-33).

**B.    Gawker Media LLC's General Practice and the Underlying Claim**

20.    Gawker Media LLC generally indemnified its content providers, which includes its employees and independent contractors, from any claims, including claims of defamation and related torts, arising from content provided to, and for the benefit of, Gawker Media LLC. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ B).

21.    On June 22, 2017, Respondents, through their counsel Charles Harder, filed a complaint in New York Supreme Court asserting claims, including the Defamation Claims, based on the Article against Goldberg and GMG, the successful purchaser of the Debtors' assets. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ S).

22.    The claims asserted by Respondents against Goldberg are claims for which the Debtors would have a Debtor Indemnification Obligation (as defined in the Plan) to Goldberg. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ B).

23.    On August 21, 2017, Goldberg filed a *Motion for Entry of an Order (i) Enforcing the Amended Joint Chapter 11 Plan of Liquidation filed by Gawker Media Group, Inc., Gawker Media LLC and Gawker Hungary Kft. and (ii) Barring and Enjoining Pregame LLC, d/b/a*

*Pregame.com, and Randall James Busack* [D.I. 981] in this court (the "<u>Motion</u>").  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ T).

### C.    Third-Party Release and Negotiations Related to the Third-Party Release

24.    Gregg Galardi ("<u>Galardi</u>"), an attorney at Ropes & Gray LLP—counsel to the Debtors, personally led Ropes & Gray LLP's representation of the Debtors in their bankruptcy proceedings.  (Tr. at 13:5-6; 11).

25.    The Debtors' intent was to "protect the [Content Providers] from having third parties sue them."  (Tr. at 67:4-5).

26.    Galardi was involved in the drafting of the Plan including sections 9.02 and 9.05 of the Plan (Tr. at 13:20-24; 26:13-21) and was "responsible" for the "deemed to have received" language contained in section 9.05 of the Plan.  (Tr. at 26:16-21).

27.    The Debtors were aware that writers and content providers were concerned about the claims of creditors that did not file proofs of claim or might not be receiving a distribution under the Plan.  (Tr. at 27:13-17).

28.    The "deemed to have received" language set forth in section 9.05 of the Plan, applicable to "EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) MADE UNDER THE PLAN," was intended to address that concern by extending the third-party release to those claims holders that did not file a claim.  (Tr. at 27:18-21).

29.    The "deemed to have received language" of section 9.05 was intended to extend the third-party release to "go beyond merely having received a distribution."  (Tr. at 64:4-5).

30.    On November 2, 2016, counsel for Goldberg and other content providers ("<u>Content Providers</u>") sent an email to Galardi asking "[w]hat does 'deemed to have received

distribution(s)' mean?"  (D.I. 1089, Joint Pretrial Order, Respondent's Stipulated Exhibit, at VIII.II.G, E-mail string from Galardi to Patel, Bates Numbered ROPES 178-179).

31.     In response, Galardi differentiated between those that "receive" a distribution and those who are "deemed to have received" a distribution.  (D.I. 1089, Joint Pretrial Order, Respondent's Stipulated Exhibit at VIII.II.G, E-mail string from Galardi to Patel, Bates Numbered ROPES 178-179).

32.     On November 2, 2016 at 10:06:40 p.m., Galardi wrote "I cannot say that the third parties received a distribution if not proof of claim." (D.I. 1089, Joint Pretrial Order, Respondent's Stipulated Exhibit, at VIII.II.G, E-mail string from Galardi to Patel, Bates Numbered ROPES 179).

33.     In the same response, Galardi provided certain options as to the scope of the Plan's third-party release provision in section 9.05.  One of these options included "[a] try to bind everyone – but then no consideration to some, Judge will likely not approve and if he doesn't I do not want the argument that their votes were based on consideration they did not receive and so need to resolicit."  (D.I. 1089, Joint Pretrial Order, Respondent's Stipulated Exhibit at VIII.II.G, E-mail string from Galardi to Patel, Bates Numbered ROPES 178-179).

34.     Less than 8 minutes later, on November 2, 2016 at 10:14:09 p.m., Galardi sent an email to Committee counsel stating that the third-party release will apply to "not only people who receive distributions under plan but also from those that do not.  I understand fully the likelihood that they will not be approved, but anything short of the full third party release will be a problem[,]" making clear that the third-party release would apply to claim holders that do not receive a distribution under the Plan.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated

Exhibit at VIII.I.3, November 2, 2016 Email from Debtors' counsel to the Official Committee of

Unsecured Creditors, Document Production – ROPES-GWK-00003224).

35.     Other than this November 2, 2016 email to Committee counsel, Galardi did not

have any other or further discussions with Committee counsel regarding the scope of the third-

party release.  (Tr. at 35:24-25; 36:1).

36.     As demonstrated by the language itself and the correspondence between Galardi

and Committee counsel, the "deemed to have received" language set forth in section 9.05 of the

Plan was clearly intended to apply to parties that did not file a claim in the Debtors' bankruptcy

cases.  (Tr. at 42:8-20).

37.     In response to the Court's question, Galardi stated that the third-party release was

discussed in the Debtors' Disclosure Statement.  (Tr. at 42:6-8).  In addition, at the November 3,

2016 hearing to approve the Debtors' Disclosure Statement (the "Disclosure Statement

Hearing"), Galardi discussed the scope of the third-party release with the Court.

38.     Galardi at that hearing stated on the record that the Debtors "are subject to

litigation for publishing articles."  (D.I. 447, Transcript of Disclosure Statement Hearing, Tr. at

24:20-21).

39.     Galardi stated on the record that the Debtors "have the benefit of a bar date, [and]

administrative bar date," (D.I. 447, Transcript of Disclosure Statement Hearing, Tr. at 24:24-25);

however, the "[w]riters and the independent contractors that wrote the articles … will not have

that benefit." (D.I. 447, Transcript of Disclosure Statement Hearing, Tr. at 25:1-3).

40.     At the Disclosure Statement Hearing, this Court asked Galardi "[w]hat happens to

those claims if they're not filed or liquidated by the time of confirmation," (D.I. 447, Transcript

of Disclosure Statement Hearing, Tr. at 25:6-7).

24477586.12 04/25/2018

41.     In response to the Court's inquiry, Galardi repeated to the Court what he had stated to the Committee the previous evening: that addressing such claims was "[e]xactly why we have put in the plan a third-party release." (D.I. 447, Transcript of Disclosure Statement Hearing, Tr. at 25:8-9).[3]

42.     On December 5, 2016, the Content Providers filed a statement in support of the Plan and third-party release and injunction provisions.  (D.I. 546, Certain Writers' Response in Support of Confirmation of the Amended Chapter 11 Plan, or in the Alternative, Limited Objection and Reservation of Rights).

43.     The Content Providers supported approval of the third-party release because without the third-party release they would be subject to "potentially future claims … for content provided or services performed on behalf of the Debtors … .". (D.I. 546, Certain Writers' Response in Support of Confirmation of the Amended Chapter 11 Plan, or in the Alternative, Limited Objection and Reservation of Rights, ¶ 45).

44.     On December 5, 2016, the Society of Professional Journalists, the Reporters Committee for Freedom of the Press, and 19 other media organizations ("*Amici Curiae*") filed a Memorandum of Law in Support of Confirmation of the Amended Chapter 11 Plan.  (D.I. 547-1, Memorandum of Law of *Amici Curiae* Society of Professional Journalists, Reporters Committee For Freedom of the Press, and 19 Other Media Organizations in Support of Confirmation of the Amended Chapter 11 Plan).

---

[3]     Galardi continued: "We are saying to these people who have gotten a benefit under our bankruptcy case that they are being asked to waive the claims against those individuals.  So they would be barred from bringing any new claims against those individuals, i.e., the writers, the employees, and the independent contractors.  We believe they are getting consideration for that because they are going to be able to get distributions."  (D.I. 447, Transcript of Disclosure Statement Hearing, Tr. at 25:9-16).

24477586.12 04/25/2018

45.    The *Amici Curiae* supported confirmation of the Plan and approval of the Plan's third-party release and indemnification provisions as,

> [t]he Plan provides that, after the entry of a confirmation order, potential plaintiffs may not bring claims against Gawker's former reporters, editors, employees, and contractors arising out the content that Gawker published. The Plan, in effect, creates an equivalent to the indemnification guarantee that was enshrined in these journalists' employment contracts or through Gawker's practices and policies.

(D.I. 547-1, Memorandum of Law of *Amici Curiae* Society of Professional Journalists, Reporters Committee For Freedom of the Press, and 19 Other Media Organizations in Support of Confirmation of the Amended Chapter 11 Plan, p. 1).

46.    Goldberg voted in favor of the Plan.  (D.I. 563, pp. 3 and 9, Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Joint Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft).

47.    The third-party release was intended to "capture something broader than people who prosecuted their claim."  (Tr. at 38:22-23).

**D.    The Confirmation Hearing**

48.    The hearing to confirm the Debtors' Plan was held before this Court on December 13, 2016  (the "Confirmation Hearing").  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ Q).

49.    Committee counsel attended the Confirmation Hearing.  (Goldberg's Stipulated Exhibit at VIII.I.2, pp. 4-6).

50.    Respondents and Respondents' counsel, Charles Harder, received notice of the Confirmation Hearing.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ O).

51.    Neither Respondents nor Charles Harder attended the Confirmation Hearing. (Goldberg's Stipulated Exhibit at VIII.I.2, pp. 4 through 6).

52.    The Debtors explicitly stated that the third-party release extended to holders of claims that did not file a claim in the Debtors' bankruptcy proceedings. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.2, 82:16-25; 83:1-8).

53.    Debtors' counsel provided a specific example (the "Trump Example") of the type of claim subject to the third-party release:

> THE COURT: Let me ask you a question. Are there any creditors who have not filed a claim, did not vote and have not settled, to your knowledge?
>
> MR. GALARDI: That did not file a claim, that did not vote and --
>
> THE COURT: Did not settle.
>
> MR. GALARDI: Well, Your Honor, yes, in the following way and I want to be clear. As I mentioned and Mr. [Harder] mentioned, maybe I'm not getting it right, but I hate to use the President-elect's name, but we have received from one of -- from a law firm, you wrote an article about the President-elect, now that claim never got filed in this case. One of the reasons we're concerned about that is because the statute of limitations on that article has not run.
>
> THE COURT: Okay.
>
> MR. GALARDI: So that's the kind of creditor why we wanted the third-party release.

(D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.2, 82:16-25; 83:1-8).

54.    The third-party release was not subject to an opt-out provision as that would only apply to parties that filed claims. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.2, 74:18-25).

24477586.12 04/25/2018

55.    This Court provided an opportunity for any party to be heard in connection with confirmation of the Plan.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.2, 85:21-23).

56.    No party objected to the scope of the third-party release as explained and stated on the record by Galardi at the Confirmation Hearing.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.2, 87:23-24).

### E.    The Confirmation Order

57.    On December 22, 2016, this Court entered its Findings of Fact, Conclusions of Law, and Order Confirming Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. (the "Confirmation Order") [D.I. 638].  (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ R).

58.    The third-party release set forth in section 9.05 of the Plan applies to "defamation claims and related claims arising from publication of materials." (Tr. at 83:5-10).

59.    Goldberg provided good and valuable consideration in exchange for the third-party release by way of voting in favor of the Plan and agreeing to waive his Debtor Indemnification Obligations Claims against the Debtors.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, ¶ 24, the Confirmation Order).

60.    If not for the third-party release, "the Debtors would be subject to substantial Claims for Debtor Indemnification Obligations in respect of claims or causes of action brought against the Released Employees and Independent Contractors."  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, ¶ 24, the Confirmation Order).

**F.      Plan Provisions**

61.      Section 3.05 of the Plan titled "Payments to Plan Reserve Accounts" applies to beneficiary(ies) of certain Plan Reserve Accounts (as defined in the Plan) (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.1, p. 67, the Confirmation Order), and governs the date of distributions to said Plan Reserve Account beneficiaries (Tr. at 58:12-13).

62.      The beneficiaries of the Plan Reserve Accounts are holders of allowed claims. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1 – Exhibit A).

63.      The Plan provided for a 100% distribution to the Debtors' creditors. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.2, 87:24).

64.      Section 9.05 of the Plan is titled "THIRD-PARTY RELEASES OF RELEASED EMPLOYEES AND INDEPENDENT CONTRACTORS".   (D.I. 1089, Joint Pretrial Order, Stipulated Exhibit 1, at p. 81).

65.      The third-party release provision set forth in section 9.05 of the Plan applies to "EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT HAS RECEIVED OR IS DEEMED TO HAVE RECEIVED DISTRIBUTION(S) … .".   (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, p. 81).

66.      The third-party release applies to all holders of claim, not just holders of allowed claims.   (Tr. at 54:14-18).

67.      By stipulation and in accordance with the Plan and Confirmation Order, Goldberg withdrew his indemnification obligation claims against the Debtors as Goldberg is a "Released Employee and Independent Contractor" under the Plan.   (D.I. 928, Stipulation and Order Between the Plan Administrator and Certain Released Employees and Independent Contractors Regarding Proofs of Claim).

24477586.12 04/25/2018

68.     In a hearing on September 27, 2017, the Court found that the "deemed to have received distribution(s)" and "willful misconduct and gross negligence" language of section 9.05 of the Plan to be ambiguous.  (D.I. 1089, Joint Pretrial Order, Respondents' Stipulated Exhibit at VII.A, 66:6-12, Reporter's Transcript of Proceedings, September 27, 2017).

## II.    Issues Tried

69.     The following two issues were tried:

  a.  Whether a party must have filed a claim to be "deemed to have received a distribution" under the Plan for purposes of section 9.05 of the Plan.

  b.  Whether the "willful misconduct" and "gross negligence" carve-outs from the Plan's third-party release provision apply to the Defamation Claims arising from content or services provided to the Debtors while under the Debtors' employ as an independent contractor.

(D.I. 1089, Joint Pretrial Order, Issues to be Tried at V).

## III.    Testimony on Issue:  Whether a party must have filed a claim to be "deemed to have received a distribution" under the Plan for purposes of Section 9.05 of the Plan

### A.    Gregg Galardi

70.     At trial, Galardi provided testimony on the scope of the third-party release.

71.     Galardi is an attorney at Ropes & Gray LLP and personally led Ropes & Gray LLP's representation of the Debtors in their bankruptcy proceedings.  (Tr. at 13:5-6; 11).

72.     Galardi was involved in the drafting of the Plan including sections 9.02 and 9.05 of the Plan (Tr. at 13:20-24; 26:13-21).

73.     In his direct testimony, Galardi stated that after the sale of the Debtors' assets to GMG, the Debtors were motivated by certain tax consequences "to make distributions under a plan prior to December 31st, 2016."  (Tr. at 14:18-22)  As a result, the Debtors "moved as fast

as possible to confirm" a plan and make distributions under the Plan prior to December 31, 2016.
(Tr. at 14:22-23).

74.    Galardi testified that it was important to resolve disputes that would have led to objections to confirmation of the Plan.  (Tr. at 15:3-7).

75.    Galardi further testified that he entered into negotiations with counsel for the Content Providers to resolve to the Content Providers' indemnification claims.  (Tr. at 15:8-12).

76.    The negotiation with counsel for the Content Providers also included negotiations over the Plan's third-party release and injunction provisions.  (Tr. at 16:13-18).

77.    Galardi was responsible for the "deemed to have received" language set forth in section 9.05 of the Plan.  (Tr. at 26:16-21).

78.    Galardi was aware that writers and content providers were concerned with creditors that did not file proofs of claim or might not be receiving a distribution under the Plan. (Tr. at 27:13-17).

79.    Galardi testified that the "deemed to have received" language set forth in section 9.05 of the Plan was designed to address that concern by extending the third-party release to holders of claims that did not file a claims.  (Tr. at 27:18-21).

80.    Galardi testified that the third-party release was intended to "capture something broader than people who prosecuted their claim."  (Tr. at 38:22-23).

81.    Galardi testified that the "deemed to have received" language was used to extend the third-party release to holders of claims that do not receive a distribution.  (Tr. at 63:22-25; 64:1-5).

14

82.    Galardi testified that the language set forth in section 9.05 of the Plan was "absolutely" intended to apply to parties that did not file a claim in the Debtors' bankruptcy cases.  (Tr. at 42:8-20).

83.    Galardi testified that to the extent there was any ambiguity with regard to the third-party release, the purpose of the Trump Example used at the Confirmation Hearing was to provide a clear example of the kind of claim subject to the third-party release.  (Tr. at 42:8-20).

    a.    At the Confirmation Hearing, Galardi provided an example—the Trump Example—to the Court and all those in attendance of the very type of claim subject to the third-party release.  At the Confirmation Hearing, Galardi unequivocally stated that the third-party release applied to holders of claims who did not file a claim.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.2, 82:16-25; 83:1-8).

84.    Galardi testified that section 3.05 of the Plan was not intended to work "in tandem" with section 9.05 of the Plan.  (Tr. at 58:6-18).

85.    Galardi also testified that the language set forth in section 3.05 of the Plan was for tax purposes.  (Tr. at 59:12-13).

86.    Galardi testified that section 3.05 of the Plan was not drafted to determine who or what is giving a release under the Plan.  (Tr. at 59:19-20).

## CONCLUSIONS OF LAW

I.    **The Third-Party Release in Section 9.05 of the Plan Extends to Creditors that Did Not File a Claim in the Debtors' Bankruptcy Cases**

87.    The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989); *see also In re Young Broad. Inc.*, 430 B.R. 99, 116 (Bankr. S.D.N.Y. 2010)

*citing Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) ("The [c]ourt's objective is to 'give effect to the expressed intentions of the parties.'").

88.    When interpreting the meaning of a contract, it is the objective intent of the parties that controls. *Id.* (citing *Swaminathan v. Swiss Air Transp. Co.*, 962 F.2d 387, 389 (5th Cir. 1992)).  In the event "the parties' intent is not plain from the language they used, a court may look to the objective manifestations of intent gathered from the parties' words and deeds." *See In re M. Fabrikant & Sons, Inc.*, 385 B.R. 87, 95 (Bankr. S.D.N.Y. 2008) (citing *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,* 41 N.Y.2d 397, 393 N.Y.S. 2d 350, 361 N.E. 2d 999, 1001 (1977)); *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998) (relying on testimony regarding what was objectively expressed between the parties during negotiations); *Wells v. Shearson Lehman/Am. Exp., Inc.*, 72 N.Y.2d 11, 24, 526 N.E.2d 8, 15 (1988) (stating that uncommunicated subjective intent is irrelevant).  Additionally, at least one court has relied on statements made during oral argument as evidence to interpret ambiguous contract provisions.  *United States v. Pantelidis*, No. CRIM. 01-00694, 2004 WL 2188089, at *2 (E.D. Pa. Sept. 7, 2004) (relying on undisputed statements made during oral argument to assist in determining ambiguous terms of agreement).

       i.    **The Parties' Objective Manifestation of Intent Demonstrates that the Third-Party Release Applies to Holders of Claims Whether or Not a Proof of Claim was Filed**

89.    Based on the Debtors' words and deeds (communications with Committee counsel and statements made to this Court at the Disclosure Statement Hearing and Confirmation Hearing) and Galardi's April 9th testimony, the "deemed to have received" language of the third-party release provision set forth in section 9.05 of the Plan was clearly intended to extend to holders of claims whether or not a claim was filed in the Debtors' bankruptcy proceedings.

16

90.     The Debtors, by written communication to Committee counsel, explicitly and objectively stated their intent that the third-party release extend to claim holders that do not receive a distribution notwithstanding a possibility that the release would not get approved. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.3, November 2, 2016 Email from Debtors' counsel to the Official Committee of Unsecured Creditors, Document Production – ROPES-GWK-00003224).

91.     Just minutes prior to the Debtors' communication to Committee counsel on November 2, 2016, Debtors' counsel provided certain options to counsel for the Content Providers as to the scope of the third-party release.    (D.I. 1089, Joint Pretrial Order, Respondent's Stipulated Exhibit at VIII.II.G, E-mail string from Galardi to Patel, Bates Numbered ROPES 178-179).  One option was for the third-party release to bind everyone, but associated with said option was the risk that the release would not be approved by this Court. (D.I. 1089, Joint Pretrial Order, Respondent's Stipulated Exhibit at VIII.II.G, E-mail string from Galardi to Patel, Bates Numbered ROPES 178-179).

92.     Through the email to Committee counsel on November 2, 2016 at 10:14:09 p.m., the Debtors explicitly selected the option to bind all claims holders "understand[ing] fully the likelihood that they will not be approved, but anything short of the full third party release will be a problem."    (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.3, November 2, 2016 Email from Debtors' counsel to the Official Committee of Unsecured Creditors, Document Production – ROPES-GWK-00003224).

93.     The next day, at the November 3, 2016 Disclosure Statement Hearing, the Debtors reinforced the scope of the third-party release.  In response to the Court's question: "What happens to . . .  claims [regarding articles] if they're not filed or liquidated by the time of

17

confirmation?", the Debtors responded that covering such claims was "[e]xactly why we have put in the plan a third-party release" and "they would be barred from bringing any new claims" against the writers. (D.I. 447, Transcript of Disclosure Statement Hearing, Tr. at 25:8-16)

94.    The Debtors further reinforced the scope of the third-party release during the Confirmation Hearing when Debtors' counsel explicitly stated on the record that the third-party release applied to claims whether or not said claims were filed with the Bankruptcy Court. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.2, 82:16-25; 83:1-8).

95.    Further, at the Confirmation Hearing, Galardi stated on the record that the third-party release was not subject to an opt-out clause as that would only be applicable to those parties that filed a claim. (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.2, 74:18-25).

96.    The Court expressed a concern at the April 9, 2018 hearing that "[t]here's an element here of kind of a purposeful ambiguity in order to get the plan through" (Tr. at 101:8-9), and also invited Goldberg's counsel to further explain in this document the significance of Debtors' November 2, 2016 email to the Committee. (Tr. at 101:14-15). In all, the record shows that at every step along the way, including in that email and in statements to the Court at public hearings, the Debtors took pains to make clear to all parties that the claims of creditors who did not file proofs of claim would be released by section 9.05, and at every step along the way the Committee understood and acquiesced, as evidenced by its failure to object.

97.    The scope of the third-party release is further supported by Galardi's testimony on April 9, 2018. Galardi testified that the language set forth in section 9.05 of the Plan was "absolutely" intended to apply to parties that did not file a claim in the Debtors' bankruptcy cases. (Tr. at 42:8-20). Galardi further testified that the "deemed to have received" language set

forth in section 9.05 of the Plan was intended to extend the third-party release claim holders that did not file a claim. (Tr. at 27:13-21).

98.    No evidence was presented by Respondents disputing Galardi's statements from the Confirmation Hearing regarding the scope of the third-party releases.

99.    No evidence was presented by Respondents disputing Galardi's April 9th testimony as to the meaning of "deemed to have received" nor was any evidence presented establishing a reasonable alternative meaning of the phrase "deemed to have received."

100.    The Committee, a fiduciary to all general unsecured creditors, *In re Adelphia*, 544 F.3d 420, 424 n.l (2d Cir. 2008); *In re Smart World Technologies Inc.*, 423 F.3d 166, 175 n.12 (2d Cir. 2005), through counsel, attended the Confirmation Hearing.

101.    Committee counsel's silence in the weeks before, and during, the Confirmation Hearing with respect to the scope of the third-party release is further support that the scope of the release falls in-line with the parties' understanding that the third-party release was to apply to holders of claims whether or not a proof of claim was filed with the bankruptcy court. *See United States v. Manning*, 107 F.3d 5 (2d Cir. 1997) (Reasonable to infer silence constituted approval of settlement goals).

102.    In addition to the Debtors' expressed intent and the Committee's actions, the Content Providers and the *Amici Curiae* took affirmative steps in support of the third-party release reflecting the understanding that the release would release both claims for which proofs of claim had been filed and those for which proofs of claim had not been filed.

103.    Goldberg and the Content Providers: (1) voted in favor of the Plan (D.I. 563, Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Joint Plan of Liquidation for Gawker Media

19

Group, Inc., Gawker Media LLC, and Gawker Hungary Kft); (2) filed a statement in support of

the Plan and third-party release and injunction provisions that explicitly highlighted the Content

Providers' belief that the Plan's third-party release would apply to future claims arising out of

content provided to the Debtors (D.I. 546, Certain Writers' Response in Support of Confirmation

of the Amended Chapter 11 Plan, or in the Alternative, Limited Objection and Reservation of

Rights); and (3) withdrew their Debtor Indemnification Obligation claims (as defined in the

Plan) based on the Content Providers being "Released Employees and Independent Contractors"

under the Plan.  (D.I. 928, Stipulation and Order Between the Plan Administrator and Certain

Released Employees and Independent Contractors Regarding Proofs of Claim).

104.    The *Amici Curiae*, through its Memorandum of Law, openly supported

confirmation of the Plan and approval of the Plan's third-party release and injunction provisions

as the third-party release essentially replaced the "indemnification guarantee" that was provided

by the Debtors to its writers and content providers.  (D.I. 547-1, Memorandum of Law of *Amici

Curiae* Society of Professional Journalists, Reporters Committee For Freedom of the Press, and

19 Other Media Organizations in Support of Confirmation of the Amended Chapter 11 Plan).

105.    Forty-one days elapsed between the Debtors' November 2, 2016 communications

with Committee counsel and the Confirmation Hearing.  During that time, no evidence was

presented that demonstrates the Debtors or any other party intended anything other than the

third-party release to apply to both holders of claims that did file a proof of claim (that is,

persons who received a distribution), and holders of claims that did not file a proof of claim or

request for payment in the Debtors' bankruptcy proceedings (that is, persons who were deemed

to have received a distribution).

106.    Respondents and Respondents' counsel, Charles Harder—who actively negotiated resolutions on behalf of other creditors involved in the Debtors' bankruptcy proceedings, received notice of the Claims Bar Date, the Plan, the Confirmation Hearing Notice, and Disclosure Statement Adequacy Order.  Notwithstanding service of <u>all</u> relevant documents, Respondents and Respondents' counsel chose to sit on their rights, not file a proof of claim in the Debtors' bankruptcy cases and commence litigation against the writers after the Debtors ceased operating.  This maneuvering was the exact concern expressed by the Content Providers to the Debtors (Tr. at 27:13-17) and the "deemed to have received" language set forth in section 9.05 of the Plan was designed to protect the Content Providers from these very claims.  (Tr. at 27:18-21).

107.    The specific Trump Example cited by Debtors' counsel at the Confirmation Hearing was a clear reflection of the understanding of the parties the Debtors negotiated with, including Committee counsel and counsel to the Content Providers, regarding the scope of the third-party release and the types of claims barred by the third-party release.

108.    Based on the communicated intent and actions taken by all of the parties—the Debtors, counsel to the Content Providers and Committee counsel—the "deemed to have received" language clearly extends the third-party release set forth in section 9.05 of the Plan to claims whether or not a proof of claim was filed in the Debtors' bankruptcy cases.

ii.    **Section 3.05 and Section 9.05 Cannot Be Harmonized Without Rendering Language Meaningless**

109.    Under New York law, "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *CP III Rincon Towers, Inc. v. Cohen*, 13 F. Supp. 3d 307, 319 (S.D.N.Y. 2014), (vacated and remanded on other grounds) (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).    In a situation of an ambiguous contract

24477586.12 04/25/2018

provision, "an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000); s*ee also Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.  Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."); *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 374, 845 N.E.2d 1265, 1267 (2006) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L. Ed.2d 76 (1995)); *Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012) (stating that it is a "cardinal rule that a contract should not be read to render any provision superfluous."); *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 402, 472 N.E.2d 315 (1984) ("[O]ne of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."); *In re: Residential Capital, LLC*, 533 B.R. 379, 399 (Bankr. S.D.N.Y. 2015).  In addition to rendering any contract provision meaningless or superfluous, courts "must avoid interpreting a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'"  *SPCP Grp., LLC v. Eagle Rock Field Servs., LP*, No. 12 CIV. 3610 PAC, 2013 WL 359650, at *6 (S.D.N.Y. Jan. 30, 2013) (citing *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 CIV. 8440 PAC, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 513 F. App'x 109 (2d Cir. 2013)).

110.    The relevant language in section 3.05 is "deemed a Distribution" whereas the relevant language of section 9.05 is "DEEMED TO HAVE RECEIVED DISTRIBUTION(S)."

It is clear that the phrases in each section are not identical.  Further, there is no indication that the two sections were meant to refer to one another.  Indeed, the phrases "deemed to" and "deemed a" appear no less than thirty (30) times throughout the Plan.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1).

111.    No evidence was presented that section 3.05 and 9.05 of the Plan are interconnected.  Additionally, no evidence was presented related to the negotiations or drafting of section 3.05 of the Plan.  To the contrary, Galardi, the attorney responsible for drafting the Plan, testified that section 3.05 and section 9.05 were not intended to work in tandem,  (Tr. at 58:18-20; Tr. at 59:19-20) and that the "deemed to have received" language in section 9.05 of the Plan was intended to apply holders of claims whether or not a claim was filed during the bankruptcy proceedings.  (Tr. at 42:8-20).  Further, Galardi testified that section 3.05 of the Plan was not intended to be determinative of who or what is giving a third-party release.  (Tr. at 59:19-20).

112.    Any attempt to harmonize section 9.05 of the Plan with section 3.05 would not only render the third-party release in section 9.05 meaningless, but would also lead to an absurd and illogical result—both results being contrary to New York law.

113.    Section 3.05 of the Plan explicitly applies to "beneficiaries" of a "Plan Reserve Account" and establishes the date of distribution for tax purposes to said beneficiaries.  (Tr. at 58:19-20).  Section 9.05, on the other hand, applies to "each holder of a claim or equity interest" that "received or is deemed to have received distribution(s)" for the legal purpose of determining the scope of the Plan's third-party release provision.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, p. 81).

24477586.12 04/25/2018

114.    Section 3.05 applies only to beneficiaries of certain Plan Reserve Accounts.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, p. 67).  The beneficiaries of these accounts are holders of <u>allowed</u> claims.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1 – Exhibit A).  Under the Plan, holders of allowed claims are set to receive a 100% distribution on account of their claims.  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.2, 87:24).

115.    For purposes of section 9.05 of the Plan, the beneficiaries in section 3.05 of the Plan are to be paid in full and will "receive" a distribution.  However, as these beneficiaries have "received" or will "receive" a distribution under the Plan, the beneficiaries cannot be the sub-group intended to be captured by the "deemed to have received" language in section 9.05 of the Plan as the "deemed to have received" language was intended to "capture something broader than people who prosecuted their claim." (Tr. at 38:22-23).

116.    Limiting the third-party release set forth in section 9.05 of the Plan to the same subset of parties in section 3.05 not only eliminates the Plan's "deemed to have received" language in section 9.05, but would also lead to an absurd and commercially unreasonable result.

117.    There is no dispute that Goldberg is a Released Employee and Independent Contractor under the Plan.  Goldberg voted in favor of the Plan and stipulated to the withdrawal of his Debtor Indemnification Obligation claims.  As such, Goldberg provided "good and valuable consideration in exchange for the third-party release." (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit at VIII.I.1, ¶ 24, the Confirmation Order).

118.    Respondents' interpretation of the third-party release (i.e. the third-party release only applies to claim holders that filed claims) would render the release illusory and strip Goldberg, as well as the other Released Employees and Independent Contractors, of a release

that was intended to protect him from all holders of claims whether or not a claim was filed in the Debtors' bankruptcy cases. At the same time, it would leave Goldberg, and the other Released Employees and Independent Contractors, in the untenable position of defending content related claims without the benefit of the Debtors Indemnification Obligation Claims. This cannot and should not be the intended reading of "deemed to have received."

119.    The evidence before this Court, clearly reflects that it was the parties' intent to have the third-party release apply to claims holders whether or not a proof of claim was filed.

120.    Section 3.05 beneficiaries have or will be paid in full. Once paid, section 3.05 beneficiaries will no longer have any claims to release against the Released Employees and Independent Contractors. If the third-party release applied only to the beneficiaries set forth in section 3.05 of the Plan (i.e. creditors of allowed claims that are to be paid in full), the third-party release would be <u>meaningless and have no value</u>.

121.    Based on the significant distinction and the unreasonable result that would ensue, sections 3.05 and 9.05 are two wholly unrelated sections of the Plan that cannot and should not be harmonized.

122.    Further, equity demands that the third-party release extend to holders of claims that did not file claims in the Debtors' bankruptcy proceedings. As this Court has already found, Goldberg and the other Released Employees and Independent Contractors provided valuable consideration in exchange for a third-party release that all parties intended would apply to holders of claims that did not file a proof of claim. Not only did Goldberg and the other Content Providers vote in favor of the Plan and withdraw their Debtor Indemnification Obligations Claims, Goldberg and the other Content Providers provided the very content that led to the sale of the Debtors' assets that generated enough cash to pay the Debtors' creditors in full and make a

24477586.12 04/25/2018

distribution to equity.  Narrowing the scope of section 9.05 to apply only to holders of claims that filed claims will, as a practical matter, gut the release and effectively render it meaningless. It would leave Goldberg without any remedy to seek indemnification against the Debtors' estates.  Again, this cannot and should not be the intended reading of "deemed to have received."

123.    The third-party release in section 9.05, through the "deemed to have received" language, applies to holders of claims whether or not the claim holder filed a claim in the Debtors' bankruptcy proceedings.

## II.    The "Willful Misconduct" and "Gross Negligence" Exclusions of the Third-Party Release Do Not Apply to Defamation Claims and Related Torts Arising Out Of Content Provided To or For the Benefit Of the Debtors

124.    Pursuant to Paragraph 21 of the Confirmation Order, the "Claims and Causes of Action covered by the Third-Party Releases are based on conduct for which a Debtor might be liable for Debtor Indemnification Obligations."  (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.1, ¶ 21).

125.    The Defamation Claims arise out of the Article written for and posted on Gawker Media LLC's Deadspin.com website.  (D.I. 1089, Joint Pretrial Order, Stipulated Facts, at III, ¶ S).

126.    As Gawker Media LLC generally indemnified its content providers for any claims, including claims of defamation and related torts, arising from content provided to, and for the benefit of, Gawker Media LLC (D.I. 1089, Joint Pretrial Order, Stipulated Facts, at III, ¶ B.), the Defamation Claims are not subject to the "willful misconduct" and "gross negligence" exclusions of the third-party release set forth in section 9.05 of the Plan (Tr. at  83:5-10).

Dated:  April 25, 2018                    **SAUL EWING ARNSTEIN & LEHR LLP**


By:      */s/ Dipesh Patel*_____
         Sharon L. Levine (admitted *pro hac vice*)
         Dipesh Patel
         1270 Avenue of the Americas
         Suite 2005
         New York, NY 10020
         Telephone:  (212) 980-7200
         sharon.levine@saul.com
         dipesh.patel@saul.com

              -and-

         **WILLIAMS & CONNOLLY LLP**

         Thomas G. Hentoff (admitted *pro hac vice*)
         Chelsea T. Kelly
         725 Twelfth Street, N.W.
         Washington, D.C. 20005
         Telephone: (202) 434-5000
         thentoff@wc.com
         ckelly@wc.com

         *Attorneys for Ryan Goldberg*

27