Jonathan L. Flaxer
Michael S. Weinstein
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
711 Third Avenue
New York, New York 10017
(212) 907-7300

Dilan A. Esper
HARDER LLP
132 S. Rodeo Dr., 4th Floor
Beverly Hills, California 90212
(424) 203-1600

*Co-Counsel to Pregame LLC and Randall James Busak*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re                                                       :
                                                            :    Chapter 11
Gawker Media LLC, *et al.*,                                 :
                                                            :    Case No. 16-11700 (SMB)
                                                            :    (Jointly Administered)
                    Debtors.                                :
------------------------------------------------------------X

## [COUNTER-PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Findings of Fact**

1. On June 10, 2016 (the "Petition Date"), Debtor Gawker Media LLC ("Gawker Media") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ A).

2. On June 12, 2016, the Debtors Gawker Media Group, Inc. and Gawker Hungary Kft. filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ A).

3. Goldberg authored an article that was posted on Gawker Media's Deadspin.com website on June 23, 2016 (the "Article")—post-Petition Date. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ C).

{00091979;2}
.7

4. On June 24, 2016, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee"). (D.I. 62, Appointment of Official Committee of Unsecured Creditors).

5. The Committee was represented by the law firm of Simpson Thacher & Bartlett LLP. (D.I. 184, Order Authorizing the Retention and Employment of Simpson Thacher & Bartlett LLP as Counsel to the Official Committee of Unsecured Creditors Pursuant to Sections 328(A), 330 and 1103(A) of the Bankruptcy Code Effective Nunc Pro Tunc to June 24, 2016).

6. On June 27, 2016 (post-Petition Date), Respondents' counsel Charles Harder sent a letter to Gawker Media that demanded the retraction of the Article. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ D and Goldberg's Stipulated Exhibit at VIII.I.5, Exhibit B to the Motion (as defined herein)).

7. On August 11, 2016, the Bankruptcy Court entered an Order (I) Establishing a Deadline to File Proofs of Claim, Certain Administrative Claims and Procedures Relating Thereto and (II) Approving the Form and Manner of Notice Thereof [D.I. 168] (the "Claims Bar Date Order"). The Claims Bar Date Order set September 29, 2016 (the "Claims Bar Date") as the deadline to file claims or file requests for payment for claims arising between the Petition Date and July 31, 2016. (D.I. 1089, Joint Pretrial Order, Stipulated Facts, at III, ¶ G).

8. The Claims Bar Date Order, notice of the Claims Bar Date, a Proof of Claim Form and the Administrative Claim Form (as those terms are defined in the Claims Bar Date Order) were served on Respondent Randall James Busack and Respondents' counsel, Charles Harder. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ I).

9. On August 22, 2016 (post-Petition Date), Respondents' counsel Charles Harder sent a letter to counsel for GMG demanding retraction of the Article. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ J).

10. Respondents and their counsel did not file a proof of claim or request for payment prior to the Claims Bar Date. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ K).

11. Goldberg, through counsel, filed three separate proofs of claim against each of the three Debtors for Debtor Indemnification Obligations (as defined in the Plan) (See Claims Register, Claim Numbers 235, 247 and 272).

12. The Debtors' proposed Amended Joint Chapter 11 Plan of Liquidation contained a third-party release and injunction provision, which applies to claims by parties who have either received or have been deemed to receive a distribution. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ N).

13. The Confirmation Hearing Notice attached at Exhibit 2 to the Disclosure Statement Adequacy Order conspicuously set forth: (1) the deadline to file any objections to the Debtors' Amended Joint Chapter 11 Plan of Liquidation; (2) the date and time of the hearing to confirm the Debtors' Amended Joint Chapter 11 Plan of Liquidation; and (3), in bold and capitalized letters, the Amended Joint Chapter 11 Plan of Liquidation's third-party release and injunction provisions. (See Disclosure Statement Adequacy Order, Exhibit 2).

14. The Disclosure Statement Adequacy Order, which contained the Debtors' proposed Amended Joint Chapter 11 Plan of Liquidation and Confirmation Hearing Notice, was served on Respondent Randall James Busack and Respondents' counsel, Charles Harder. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ O).

15. On June 22, 2017, Respondents filed a complaint in New York Supreme Court asserting claims, including the Defamation Claims, based on the Article against Goldberg and GMG, the successful purchaser of the Debtors' assets. (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ S).

16. On August 21, 2017, Goldberg filed a Motion for Entry of an Order (i) Enforcing the Amended Joint Chapter 11 Plan of Liquidation filed by Gawker Media Group, Inc., Gawker Media LLC and Gawker Hungary Kft. and (ii) Barring and Enjoining Pregame LLC, d/b/a Pregame.com, and Randall James Busack [D.I. 981] in this court (the "Motion"). (D.I. 1089, Joint Pretrial Order, Stipulated Facts at III, ¶ T).

17. Pregame LLC and Randall James Busack have not actually received a distribution under the bankruptcy plan. (Respondents' Exhibit G; Trial Transcript 45:19-24.) The applicability of the third party release depends on whether they are deemed to have received distributions.

18. Gregg Galardi, Esq. of Ropes & Gray LLP led the team that drafted the language in the Plans of Reorganization submitted to the Court and was ultimately responsible for that language. Mr. Galardi has extensive experience drafting bankruptcy plans. (Trial Transcript 43:2-6.)

19. Goldberg and the other Gawker writers were represented by attorneys Sharon Levine, Esq. and Dipesh Patel, Esq. of Saul Ewing Arnstein & Lehr LLP. (Trial Transcript 15:8-16:12.)

20. Mr. Patel, representing the writers, sought to obtain the broadest possible release language barring the widest possible scope of third party claims against the writers. Respondents' Exhibit G.

21. Mr. Galardi was required, in drafting the language of the third party release provisions in the Plan, to balance the desires of Mr. Patel and his clients for a broad release against the necessity that the Plan be confirmed. (Trial Transcript 18:4-7 ("It's always difficult as a bankruptcy lawyer to balance the writing of a third-party release as broad as possible with making sure you get the plan confirmed, and that was always the issue[].") This included concerns that the Committee or the Office of the United States Trustee could object to a broader release and delay confirmation. (Trial Transcript 36:24-37:1 ("I think the issue came down to if I used the language in that section and not obtained the third-party release I would have had a resolicitation issue."), 47:20-48:1.)

22. Mr. Galardi also took into account the applicable legal standard which disfavors third party releases in bankruptcy plans. (Trial Transcript 48:2-6.)

23. Mr. Galardi also sought to confirm the Plan during the calendar year 2016 due to tax considerations. (Trial Transcript 14:6-15:1.)

24. Mr. Galardi chose not to include language that would unambiguously release third party claims by those who had not filed proofs of claim, instead using the ambiguous phrase "deemed to have received a distribution". Trial Transcript 37:11-12 ("I mean the language admittedly could have been more direct…".)

25. Mr. Patel inquired specifically as to the meaning of "deemed to have received a distribution", confirming that the phrase was ambiguous. Specifically, Mr. Patel asked "[w]hat does 'deemed to have received distribution(s)' mean?" (Respondents' Exhibit G.).

26. Mr. Galardi explained to Mr. Patel that the language was a compromise that might not cover all potential claims against the writers, but was the best that Mr. Galardi could do to

meet Mr. Patel's concerns and still get the Plan approved by the Court. (Trial Transcript 48:7-23, 49:20-50:9 ("I pushed it as far as I thought I could do with getting the plan confirmed.").)

27. Mr. Galardi told Mr. Patel that if Mr. Galardi included language that barred all third party claims, that could result in the Plan being rejected because the release lacked adequate consideration. (Respondents' Exhibit I.).

28. Less than 8 minutes later, on November 2, 2016 at 10:14:09 p.m., Galardi sent an email to Committee counsel stating that the third-party release will apply to "not only people who receive distributions under plan but also from those that do not. I understand fully the likelihood that they will not be approved, but anything short of the full third party release will be a problem[,]" making clear that the third-party release would apply to claim holders that do not receive a distribution under the Plan. (Movant's Exhibit 3.).

29. However, Galardi's statement to the Committee did not accord with Galardi's actions, as he had not changed the language and broadened the third party release provision and instead had kept the "deemed to have received a distribution" language that he both knew to be ambiguous and had just admitted to Mr. Patel was a compromise that did not release all third party claims. (Movant's Exhibit 1 § 9.05; Respondents' Exhibit I.)

30. Similarly, on November 3, 2016, Mr. Galardi put certain statements on the record in open Court regarding the purposed scope of the third party release provision. However, like Galardi's statements to the Committee on November 2, 2016, Mr. Galardi's statements to the Court were made with full knowledge that Mr. Galardi had in fact made a deliberate choice not to include language in the third party release that would bar all claims against third parties, even by those who did not file proofs of claim. (Movant's Exhibit 1 § 9.05; Respondents' Exhibit I.)

Mr. Galardi's statements to the Court thus carry little value in the interpretation of Section 9.05 of the Plan.

31. Mr. Galardi gave no consideration as to whether potential claimants would understand what "deemed to have received a distribution" meant. (Trial Transcript 41:25-42:3.)

32. Mr. Galardi could not identify who or what was deeming Mr. Busak or Pregame to have received a distribution. (Trial Transcript 51:22-55:5.)

33. The Chief Restructuring Officer, William Holden, confirmed in his testimony that his goal was to obtain the broadest possible third party release consistent with obtaining approval of the Plan. (Trial Transcript 72:22-25.)

34. Neither Goldberg nor any of the other writers appeared at the Plan confirmation hearing to object to the language "deemed to have received distributions," nor did any of them vote against the Plan. (D.I. 563, pp. 3 and 9, Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Amended Joint Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft).

35. On December 5, 2016, the Gawker writers filed a statement in support of the Plan and third-party release and injunction provisions. (D.I. 546, Certain Writers' Response in Support of Confirmation of the Amended Chapter 11 Plan, or in the Alternative, Limited Objection and Reservation of Rights).

36. Mr. Patel and Mr. Galardi harbored a backup plan where the injunction in the Plan would be broader than the release, thereby making the Court a "gatekeeper" with respect to third party claims. (Trial Transcript 18:11-17.) However, the Court ordered that the injunction be

narrowed to be congruent with the scope of the third party release. (Respondents' Exhibit 1 Section 9.02 (referring specifically to Section 9.05 to delimit scope of injunction).)

37. The language "deemed to have received a distribution" in Section 9.05 of the Plan tracks similar language in Section 3.05, which provides that when deposits are made to reserve accounts created pursuant to the Plan to cover later payments of claims, they are "deemed a distribution" to the beneficiaries. (Respondents' Exhibit A § 3.05.)

38. Mr. Galardi offered no explanation on the witness stand for why he would have used nearly identical language in Sections 3.05 and 9.05 to mean completely different things. He admitted that it was good practice to determine whether the language was already in another section of the Plan before using it in Section 9.05 and that he was ultimately responsible for determining whether language similar to "deemed to have received a distribution" was used elsewhere in the Plan. (Trial Transcript 59:23-60:12.)

39. Mr. Holden testified that to be "deemed to receive" something is a concept in accounting, which refers to when funds are set aside for later distribution. This is consistent with the function of Section 3.05 and inconsistent with Mr. Goldberg's interpretation of Section 9.05. (Trial Transcript 76:8-17.)

**Conclusions of Law**

40. The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

41. However, "when resolving disputes concerning the meaning of ambiguous contract language, unexpressed subjective views have no proper bearing". *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 302 (S.D.N.Y. 1997); *accord Wells v. Shearson Lehman/American*

*Express, Inc.*, 72 N.Y.2d 11, 24, 526 N.E.2d 8, 15 (1988) (stating that uncommunicated subjective intent is irrelevant).

42. In the event that "the parties' intent is not plain from the language they used, a court may look to the objective manifestations of intent gathered from the parties' words and deeds." *See In re M. Fabrikant & Sons, Inc.*, 385 B.R. 87, 95 (S.D.N.Y. 2008).

43. "A contract must be read as a whole in order to determine its purpose and intent, and ... single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Analisa Salon, Ltd. v. Elide Properties, LLC*, 30 A.D.3d 448, 448-49; 818 N.Y.S.2d 130, 131 (2d Dep't 2006). Where a contract uses similar language in different clauses, they should be construed to harmonize with each other. *Valle v. Rosen*, 138 A.D.3d 1107, 1109, 30 N.Y.S.3d 285, 287 (2d Dep't 2016) ("Construing the agreement as a whole, it is clear that the references to the plaintiff's 'retirement' and 'resignation' referred to the same event, which occurred on June 30, 2011.").

44. "[T]his Court will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961 (2001).

45. "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect...." *Eastman Kodak Co. v. STWB Inc.*, 232 F.Supp.2d 74, 91 (S.D.N.Y. 2002) (quoting *Restatement (Second) of Contracts* § 203(a) (1986)).

46. Goldberg argues that the statements of Galardi at oral argument can be used to interpret the Plan. However, a person's unilateral "opinion about the meaning of a contract" is

not admissible evidence as to its interpretation. *International Cards Co. v. MasterCard Int'l Inc.*, No. 13-cv-2576 (LGS), 2017 WL 1133425, at *3 (S.D.N.Y. Mar. 24, 2017).

47.     *United States v. Pantelidis*, No. CRIM 01-00694, 2004 WL 2188089, at *2 (E.D.Pa. Sept. 7, 2004), cited by Goldberg, is distinguishable. As the Court in *Pantelidis* noted: "The only evidence presented by the parties at the hearing held this date consisted of affidavits of counsel and statements made in the course of oral argument. There is no dispute about the accuracy of the affidavits, nor as to the credibility of statements made at oral argument." *Id.* Neither of those facts are true here. First, there is other, more reliable evidence that shows that Section 9.05 does not preclude the suit by Respondents including the similar language in Section 3.05 of the Plan and the e-mails in which Mr. Galardi and Mr. Patel acknowledged that Section 9.05 did not unambiguously release all third party claims. Second, Mr. Galardi's statements at oral argument are disputed, because they conflict with what he had told Mr. Patel immediately beforehand (*i.e.*, that Mr. Galardi made a deliberate choice not to include a blanket third party release).

48.     Based on these principles of contractual interpretation, the third party release in Section 9.05 of the Plan does not bar Pregame's and Mr. Busak's claims against Mr. Goldberg.

49.     The language of the Plan itself ("deemed to have received a distribution") has already been found by this Court to be ambiguous. The Court therefore received extrinsic evidence on the meaning of the Plan.

50.     While the Court found the language "deemed to have received a distribution" ambiguous, the language itself does not suggest that it would apply to claims by third parties who had not filed a proof of claim. There was no evidence presented of any legal or contractual mechanism that deems a person who does not file a proof of claim to have received a

distribution. Mr. Galardi was not able to identify any provision of the Plan that deems Mr. Busak or Pregame to have received a distribution. The language of the Plan also does nothing to put potential claimants who have not received distributions on notice that their claims against third parties would be barred.

51. The extrinsic evidence admitted included testimony and statements in oral argument by Mr. Galardi regarding what he subjectively intended as the drafter of Section 9.05. This evidence is entitled to little weight. Mr. Galardi's subjective understandings and legal arguments as to what Section 9.05 means do not assist this Court in interpreting the language.

52. The evidence showed that the language of Section 9.05 resulted from a conscious decision by Mr. Galardi and Mr. Holden to temper the language of the third party release in order to ensure approval of the Plan.

53. Mr. Goldberg's lawyers, as well, were well aware of the fact that Section 9.05 did not contain an explicit release of all claims against third parties interposed by persons or entities who had not filed proofs of claims, and chose to cause Mr. Goldberg to vote for the Plan understanding that this ambiguity existed.

54. The evidence further showed that Mr. Galardi was concerned that a broader third party release might not be legally permissible. Third party releases are disfavored. *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) ("it is clear that such a release is proper only in rare cases"). Further, Mr. Galardi specifically stated that there were potential issues with such a release being invalidated for lack of consideration.

55. The evidence also showed that Mr. Galardi was concerned about drawing an objection from the Office of the United States Trustee, thus slowing the process and possibly delaying approval of the Plan.

56. The most plausible interpretation of the language of Section 9.05 is that it should be harmonized with the nearly identical language of Section 3.05 of the Plan, which provides that the beneficiaries of payments made to Plan reserve accounts are deemed to receive a distribution. As they are slated to receive such payments in the future, it is reasonable to conclude that their claims against third parties are released.

57. Mr. Galardi offered no explanation as to why Section 9.05 would use very similar language to Section 3.05 if that language was intended to be given a completely different effect in the two sections.

58. Mr. Goldberg's argument regarding Section 3.05 turns the burden of proof on its head. Mr. Goldberg argues that because there was no evidence regarding the drafting of Section 3.05, the conclusion that should be drawn is that Mr. Busak and Pregame did not prove that the provisions were connected. However, the fact that they use similar language means that the default rule under New York principles of contract construction is that they should be construed together. Mr. Goldberg has the burden of showing, through evidence, why the two provisions were not intended to be given the same meaning. Mr. Goldberg has not met that burden.

59. Mr. Galardi's testimony that he did not believe Section 3.05 and Section 9.05 should be construed in harmony with each other is unexpressed subjective understanding and legal argument, and has little evidentiary weight. Mr. Galardi also testified that he did not even think about the interaction between Section 3.05 and Section 9.05 (even though he was

ultimately responsible for the language in both provisions), which renders his testimony as to whether these provisions should be construed together unreliable.

60. Mr. Goldberg argues that the Committee could have objected to Mr. Galardi's statements at the confirmation hearing as to the scope of third party releases. However, this does not follow—the Committee was comprised of creditors who filed proofs of claim. They were not representative of those such as Mr. Busack or Pregame who had not filed such proofs of claim. The case cited by Mr. Goldberg in support of this argument, *United States v. Manning*, No. 95-6402, 1997 WL 62973, at *1 (2d Cir. Feb. 12, 1997), merely holds that a lawyer can under certain circumstances have apparent authority to acquiesce to his clients' settlement of a case. *Manning* does not apply to the case at bar.

61. Mr. Goldberg further argues that the word "deemed" appears in a number of places elsewhere in the Plan. However, there are only two provisions of the Plan that speak of those deemed to receive distributions—Sections 3.05 and 9.05.

62. Mr. Goldberg also argues that harmonizing Sections 3.05 and 9.05 will render Section 9.05 meaningless. However, this is not true at all. Section 9.05 still releases all claims against third parties otherwise covered by the release which were made by parties who filed proofs of claim against Gawker, and further releases all claims against third parties otherwise covered by the release which were made by parties who are the beneficiaries of plan reserve accounts. The mere fact that the release language is not as broad as Mr. Goldberg would like (which was the product of conscious and knowing decisions by Mr. Galardi and Mr. Patel), does not mean that it releases nothing at all.

63. The Gawker writers, including Goldberg, stood to benefit from the confirmation of the Plan including its third party release provision, even if that third party release did not release all possible claims.

64. Mr. Busak and Pregame argued as an alternate ground to permit their state court suit that their claims were for "gross negligence" or "willful misconduct" and thus outside the scope of the third party releases.

65. The Court rejects this alternate ground for allowing the state court suit to go forward.

66. Pursuant to Paragraph 21 of the Confirmation Order, the "Claims and Causes of Action covered by the Third-Party Releases are based on conduct for which a Debtor might be liable for Debtor Indemnification Obligations." (D.I. 1089, Joint Pretrial Order, Goldberg's Stipulated Exhibit, at VIII.I.1, ¶ 21).

67. The Court made a specific finding in the Confirmation Order that the claims and causes of action that were covered by that order were those that the third party writers were indemnified for by Gawker. Because there is no factual dispute in this action that Gawker indemnified claims for gross negligence or willful misconduct against its writers, the Court finds for Mr. Goldberg on this issue.

WHEREFORE, the Court finds as follows:

68. Mr. Busak and Pregame are entitled to proceed on their state court action, because they are not deemed to have received a distribution under the Plan.

Dated: New York, New York
       May 9, 2018

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, New York 10017
(212) 907-7300

By:   /s/ Jonathan L. Flaxer
       Jonathan L. Flaxer
       Michael S. Weinstein

-and-

HARDER LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
(424) 203-1600

By:   /s/ Dilan A. Esper
       Dilan A. Esper

*Co-Counsel to Pregame LLC and*
*Randall James Busak*

{00091979;2}

3011684.2

15