## Exhibit D

**Termination Agreement**

EXECUTION VERSION

TERMINATION OF PLAN ADMINISTRATOR AGREEMENT

May 17, 2018

This Termination of Plan Administrator Agreement (this "Agreement") is entered into as of the date first written above, by and among Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary") and Gawker Media LLC (collectively with GMGI and Gawker Hungary, the "Debtors") and Opportune LLP ("Opportune").

For good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Termination of the Plan Administrator Agreement. Upon the date of entry by the Debtors and The Boathouse Group, LLC ("Boathouse") into the Plan Administrator Agreement in substantially the form attached hereto as Exhibit A, that certain Plan Administrator Agreement, dated as of March 17, 2017, by and among the parties hereto (the "Original PAA"), shall be terminated and shall be of no further force and effect (the "Termination"), effective as of May 1, 2018. The parties hereto hereby agree that no provision of, or right, liability or obligation of any party under the Original PAA shall survive the Termination. As of the date hereof, there are no accrued fees owed by the Debtors to Opportune or any of its affiliates. The Debtors hereby authorize Opportune to transfer all Debtor-related information to Boathouse. In connection with such authorization, Opportune hereby waives the client confidentiality provisions contained in paragraphs 5-11 of that certain Offer Letter between Will Holden and Opportune, dated March 2, 2016, as they apply to the Debtors.

2.    Payment Acknowledgment. Opportune hereby acknowledges that it has received from the Debtors a payment of $100,000.00 to be credited against work performed in respect of Opportune's engagement by the Debtors pursuant to that certain Master Consulting Agreement for Professional Advisory Services attached hereto as Exhibit B, which such payment, for the avoidance of doubt, was not made in respect of obligations arising from the Original PAA.

3.    Representations.  Each party signing this Agreement represents and warrants that the execution hereof by such party has been duly authorized by all necessary actions, that the person signing on behalf of such party has been duly authorized to do so, and that this Agreement constitutes a legal, valid and binding obligation of such party.

4.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York as applied to contracts made and performed within the State of New York without regard to principles of conflict of laws. THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT OR OTHERWISE) RELATING TO THIS AGREEMENT.

5.    Entire Agreement.  This Agreement contains the entire agreement among the parties hereto with respect to the subject matter of this Agreement and supersedes all written or verbal representations, warranties, commitments and other understandings with respect to the

subject matter of this Agreement prior to the date of this Agreement.

6.      <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, each of which shall be deemed an original and all of which together shall constitute the same agreement.

*[remainder of page left intentionally blank; signature page follows]*

The undersigned have executed this Termination of Plan Administrator Agreement as of the date first written above.

**Opportune LLP**

By: _____
Name: John Echols
Title:  Authorized Signatory


Date: _____, 2018

AGREED AND ACKNOWLEDGED:

**The Boathouse Group, LLC**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: _____, 2018

**Gawker Media Group, Inc.**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: _____, 2018

**Gawker Media LLC**

By:    Gawker Media Group, Inc.
        Its: Manager

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: _____, 2018

**Gawker Hungary Kft.**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: _____, 2018

The undersigned have executed this Termination of Plan Administrator Agreement as of the date first written above.

**Opportune LLP**

By: _____
Name: John Echols
Title:  Authorized Signatory


Date: _____, 2018


AGREED AND ACKNOWLEDGED:

**The Boathouse Group, LLC**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: 5 / 17 , 2018

**Gawker Media Group, Inc.**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: 5/17 , 2018


**Gawker Media LLC**

By:    Gawker Media Group, Inc.
       Its: Manager

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: 5/17 , 2018


**Gawker Hungary Kft.**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory


Date: 5/17 , 2018

69086726_7

Exhibit A

Plan Administrator Agreement

EXECUTION VERSION

## PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (this "Agreement"), effective as of the 17th day of May, 2018, by and among Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary") and Gawker Media LLC ("Gawker Media," and collectively with GMGI and Gawker Hungary, the "Debtors") and The Boathouse Group, LLC ("Boathouse"), and is executed for the purpose of setting forth, among other things, the scope of plan administrator services (the "Services") to be provided by Boathouse to the Debtors, and the basis of compensation for those Services.

## 1) **Scope of Services**

Boathouse will provide the following plan administrator Services pursuant to the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may be amended and supplemented, the "Plan")[1] and the Order of the United States Bankruptcy Court for the Southern District of New York overseeing the Debtors' chapter 11 cases (the "Bankruptcy Court") confirming the Plan, dated as of December 22, 2016 (the "Confirmation Order"):

a) General Plan Administrator Functions.    In connection with this engagement, Boathouse shall make available to the Debtors William D. Holden, who has heretofore served as the Plan Administrator for the Debtors on behalf of Opportune LLP, to serve in the role of Plan Administrator for the Debtors (the "Plan Administrator"). The Plan Administrator shall devote such time to the performance of his services hereunder as he determines appropriate in his discretion. The Plan Administrator hereby accepts its employment and appointment as the Plan Administrator.

b) Duties, Power and Rights. From and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof, and shall be the sole representative of the Debtors, succeeding to such powers as would have been applicable to the Debtors' officers and directors. The Plan Administrator shall have all duties, powers and rights set forth herein, in the Plan, and in the Confirmation Order, including, but not limited to, the following activities:

   i)    conduct a process for the sale or disposition of the Gawker.com Assets consistent with the terms of the Plan and any agreements of the Debtors;

   ii)   investigate and prosecute the Retained Causes of Action, if the Plan Administrator, in its sole discretion, deems appropriate;

   iii)  review, object to, and seek estimation of, Claims against, and Equity Interests in, the Debtors;

   iv)   compromise and settle Disputed Claims and Retained Causes of Action, in the ordinary course of business and without further notice to or order of the Bankruptcy Court;

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

v)    administer and distribute the Plan Reserve Accounts pursuant to the Plan;

vi)    take control of, preserve, and convert to Cash any additional asset of the Debtors, subject to the terms of the Plan;

vii)    make distributions to holders of Allowed Claims against and Equity Interests in, the Debtors consistent with the terms of the Plan;

viii)    pay expenses incurred in carrying out the powers and duties of the Plan Administrator, including professional fees incurred after the Effective Date;

ix)    prepare and file post-confirmation reports for each of the Debtors pursuant to the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules;

x)    support any audits of the Debtors conducted by U.S. and/or non-U.S. taxing authorities;

xi)    pay any fees due to the United States Trustee pursuant to section 1930(a)(6) of the Bankruptcy Code;

xii)    execute all documents appropriate to carry out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement;

xiii)    retain persons and professionals, including Plan Administrator Counsel (as defined below), to assist in carrying out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement;

xiv)    take such further actions as the Plan Administrator deems necessary to effect the provisions of the Plan; and

xv)    in connection with each potential Sale Transaction (as defined below), assist and advise with the analysis, evaluation, pursuit and effectuation of any such Sale Transaction.  Services related to such will consist of:

    (1) Preparing and developing lists of prospective buyers and other investors;

    (2) Communicating with such prospective buyers and other investors and preparing and distributing appropriate information, documents and other material, including, if appropriate, preparing an information memorandum;

    (3) If necessary, developing financial and operational data and presentations;

    (4) If necessary, coordinating and conducting an auction culminating in a Sale Transaction; and

    (5) Structuring and negotiating any transaction or series of related transactions that constitute the disposition to one or more third parties of the assets of any entity comprising the Debtors, including, without limitation, through the sale or exchange of capital stock, options or assets with or without a purchase option, or any similar transaction (each, a "Sale Transaction").

2

Subject to his business judgment and fiduciary responsibilities, the Plan Administrator will work on a collaborative basis with Plan Administrator Counsel to perform the foregoing activities.

c) <u>Finance and Accounting Functions</u>.    The Plan Administrator will have primary responsibility for the following finance and accounting functions (to include but not be limited to):

    i)    manage the financial and operational reporting processes to all internal and external constituents;

    ii)    review and development of any material drafted for consumption outside the Debtors;

    iii)    oversight and approval of expenditures and cash payments; and

    iv)    management of the Plan Reserve Accounts.

## 2)  **Compensation and Staffing**

a) Boathouse will be paid by the Debtors for its Services at the standard hourly billing rates in effect for its personnel, based on the position held by such Boathouse personnel, which hourly rates are subject to periodic adjustments by Boathouse to reflect economic and other conditions.  Boathouse's hourly rates currently in effect are as follows:

| Professional | Rate / Hr. |
| --- | --- |
| Managing Director | $ 715.00 |
| Manager | $ 540.00 |
| Consultant | $ 335.00 |
| Administrative Professional | $ 220.00 |

b) In the event any Boathouse personnel are called to testify either in court of via deposition (in either case, "<u>Testimony</u>"), that professional's hourly rate will be increased by $100 for all Testimony and the time spent for any direct preparation related thereto.

c) Both Boathouse and the Debtors acknowledge that the above professional fees are within industry and market rates, and have been negotiated to reflect the facts specific to this engagement.  As such, the Debtors believe that the fee structure is reasonable in light of the Services requested.

d) Boathouse will bill for its fees and out-of-pocket expenses no less frequently than on a monthly basis by providing an invoice summarizing the number of hours worked and expenses incurred, and the Debtors agree to remit in full the payment of such fees and expenses promptly.

e) In addition to the other fees provided for in this Agreement, upon the closing of a Sale Transaction, Boathouse shall earn, and the Debtors shall thereupon pay immediately

and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee (the "Sale Transaction Fee") based upon AGC (as defined below), calculated as follows:

i)   For AGC up to $500,000: $10,000 (the "Minimum Sale Transaction Fee"), plus
ii)  For AGC from $500,001 to $750,000: 4% of such incremental AGC, plus
iii) For AGC from $750,001 to $1,000,000: 5% of such incremental AGC, plus
iv)  For AGC from $1,000,001 to $2,500,000: 6% of such incremental AGC, plus
v)   For AGC from $2,500,001 to $5,000,000: 7% of such incremental AGC, plus
vi)  For AGC from $5,000,001 to $10,000,000: 8% of such incremental AGC, plus
vii) For AGC over $10,000,001: 9% of such incremental AGC.

If more than one Sale Transaction is consummated, Boathouse shall be paid the Sale Transaction Fee based on AGC from the initial Sale Transaction and then, for any subsequently consummated Sale Transaction, Boathouse shall be paid the outstanding incremental amount of the Sale Transaction Fee that would have been payable if AGC of such subsequent Sale Transaction and all prior Sale Transactions were aggregated and characterized as a single Sale Transaction, calculated in the manner set forth above.

For the purpose of calculating the Sale Transaction Fee, the Aggregate Gross Consideration ("AGC") shall be, without duplication, the total proceeds and other consideration paid to, or received by, or to be paid to or received by, any entity comprising the Debtors, or any of its equity or debt holders, or other parties in interest, in connection with the relevant Sale Transaction, net of the aggregate amount of cash and cash equivalents (including any option exercise price paid or deemed paid in connection with a Sale Transaction) sold or otherwise directly or indirectly transferred in the Sale Transaction.  Such proceeds and consideration shall be deemed to include, without limitation and without duplication (and as calculated as set forth herein): any earnest funds deposited by a potential counterparty (to the extent released to the Debtors or their constituents and/or applied to the Sale Transaction); cash, notes, securities and other property; non-contingent payments made in instalments (*e.g.*, a seller note) and/or insurance proceeds actually received by a Debtor in respect of the occurrence of an insurable event that materially diminishes the value of the assets of such Debtor.

For the purposes of calculating AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the closing of the Sale Transaction as follows:

viii)   If such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the closing of the Sale Transaction;
ix) If such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten-trading-day period immediately prior to the closing of the Sale Transaction; and
x) If such securities have not been traded prior to the closing of the Sale Transaction, Boathouse will use its commercially reasonable best efforts to determine a fair market value thereof for the purposes of calculating AGC.

If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. The value of any purchase money or other promissory notes shall be deemed to be the face amount of principal thereof.

**3) Retention of Counsel and Agents**

The Plan Administrator shall hire counsel to advise it in connection with its duties, powers, and rights under this Agreement (the "Plan Administrator Counsel") and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties herein, and pay reasonable compensation to such advisors. The Plan Administrator shall be entitled to retain professionals in his or her sole discretion, including any professionals employed by the Debtor in the Bankruptcy Cases. The provision of services by a professional to the Debtor shall not disqualify such professional from employment by the Plan Administrator.

Any professionals retained by the Plan Administrator, including the Plan Administrator Counsel, shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred. The payment of the fees, costs and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court. Any successor Plan Administrator shall receive such reasonable compensation as may be approved by the Bankruptcy Court.

**4) Service of Plan Administrator**

The Plan Administrator shall serve until (a) the termination of this Agreement, or (b) the Plan Administrator resigns or is otherwise discharged; provided, however, that if the Plan Administrator resigns, he or she shall continue to serve until a new Plan Administrator begins to serve.

**5) Closing of Bankruptcy Cases; Termination**

When (a) all Disputed Claims filed against the Debtors have become Allowed or have been Disallowed by Final Order, (b) all remaining assets of the Debtors and Plan Reserve Accounts have been liquidated and converted into Cash (other than those assets abandoned by the Debtors), and such Cash has been distributed in accordance with the Plan, and (c) all wind-down costs and expenses have been paid in full in Cash, the Plan Administrator shall promptly (i) seek authority from the Bankruptcy Court to close the Bankruptcy Cases for each of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules and (ii) effectuate the dissolution of the Debtors in accordance with applicable law. This Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 closing the Bankruptcy Cases of each of the Debtors.

Notwithstanding the foregoing, the Plan Administrator may dissolve Gawker Hungary prior to completion of the term of this Agreement, and upon such dissolution, Gawker Hungary shall no longer be deemed a party to this Agreement.

**6) No Liability**

The Plan Administrator shall have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors or holders of Claims against or Equity Interests in the Debtors other than for fraud, gross negligence or wilful misconduct of the Plan Administrator.

**7) Indemnification**

GMGI and Gawker Media shall jointly indemnify the Plan Administrator, Boathouse and their (as applicable) partners, employees, managers, principals, agents, affiliates, independent contracts, insurers (collectively, the "Indemnified Persons") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees and expenses paid or incurred by any Indemnified Person in connection with, arising out of or related to (whether from direct claims or third party claims) the engagement or this Agreement (including but not limited to any Indemnified Person's reasonable counsel fees and expenses). In addition to the foregoing indemnification, any Boathouse personnel who may serve the Debtors shall be individually indemnified to the same extent as the most favourable indemnification GMGI or Gawker Media has extended to its officers or directors, whether under GMGI and Gawker Media's bylaws, certificates of incorporation, by contract or otherwise. The Plan Administrator shall be covered as an officer under GMGI's existing director and officer liability insurance policy as an "additional named insured" and as a "certificate holder" under each liability insurance policy of the Debtors, and, if not covered under such policies, the Plan Administrator shall be authorized to have an additional policy providing a comparable level of coverage purchased by the Debtors. The provisions of this section are in the nature of contractual obligations and no change in applicable law or GMGI or Gawker Media's charter, bylaws or other organizational documents or policies shall affect the Plan Administrator rights hereunder. The foregoing indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from the gross negligence, wilful misconduct or fraudulent acts of the Plan Administrator or Boathouse.

**8) Other Matters**

a) Access to Information. In connection with this engagement, Boathouse shall have complete and full access to all Debtor information that Boathouse deems appropriate. Additionally, Boathouse will have reasonable access to the Debtors' employees, counsel and other representatives (collectively the "Representatives") necessary to perform the Services as outlined in this Agreement. It is understood that Boathouse is relying solely upon the information supplied by the Debtors and its Representatives without assuming any responsibility for independent investigation or verification thereof. All confidential information concerning the Debtors that is given to Boathouse will be used solely in the course of performance of the Services outlined in this Agreement. Except as required by law, such confidential information will not be disclosed to a third party without the Debtors' consent.

b) Projections; Reliance; Limitation of Duties. The Debtors understand that the Services to be rendered may include the preparation of projections and other forward-looking statements for use in evaluating potential transactions and settlements and that numerous factors can affect the actual outcomes, which may materially and adversely

differ from those projections and other forward-looking statements. In addition, Boathouse will be relying on information provided by others.

c) <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York and the state and federal courts located in the State of New York shall have exclusive jurisdiction in relation to any claim arising out of this Agreement.    BOATHOUSE AND THE DEBTORS HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT, OR OTHERWISE) RELATING TO THIS AGREEMENT.

d) <u>Dispute Resolution</u>.    Without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

e) <u>Retention of Jurisdiction</u>.    The Bankruptcy Court shall retain jurisdiction over the Debtors to the fullest extent permitted by law, including, but not limited to, for the purposes of interpreting and implementing the provisions of this Agreement.

f) <u>Conflict with Plan</u>.    The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan.    To that end, the Plan Administrator shall have full power and authority to take any action consistent with the purposes and provisions of the Plan.    In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control; <u>provided</u>, <u>however</u>, that provisions of this Agreement adopted by amendment and approved by the Bankruptcy Court following substantial consummation (as such term is used in section 1127(b) of the Bankruptcy Code) shall control over provisions of the Plan.

g) <u>Severability</u>.    If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, this Agreement shall be deemed to be amended to the extent necessary to make such provision enforceable, or, if necessary, this Agreement shall be deemed to be amended to delete the unenforceable provision or portion thereof.    In the event any provision is deleted or amended, the remaining provisions shall remain in full force and effect.    Notwithstanding the foregoing, the parties recognize and agree that this Agreement is to be interpreted and applied in such manner as to, as nearly as possible, give effect to the parties' intent to all provisions hereof, including, without limitation, such provisions as may be declared to be unenforceable.

h) <u>Assignment</u>.    No party hereto shall have the right to assign its rights hereunder, in whole or in part without the prior written consent of the other party (other than to such party's affiliates or subsidiaries which shall not require such consent).    This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

7

i) <u>Modifications</u>.  No change, modification, extension, renewal, ratification, waiver or rescission of this Agreement or of any of the provisions hereof shall be binding unless it is in writing and signed by both parties hereto.  Further, no waiver or forbearance by either party hereto with respect to any right granted to such party herein shall operate or be construed to be a waiver or forbearance of such party's right to exercise such right in the future.

j) <u>Notices</u>.  Notices regarding or required by this Agreement must be in writing and delivered to the parties at the mailing addresses set forth below or to such other address as a party may designate in writing.  Any notice required under this Agreement will be deemed effective upon delivery to the party to whom it is addressed.

<u>If to Boathouse</u>:

William D. Holden
44 Lynden Street
Rye, NY 10580

<u>If to GMGI</u>:

Gawker Media Group, Inc.
c/o The Boathouse Group, LLC
Attn: William D. Holden
Plan Administrator
44 Lynden Street
Rye, NY 10580

<u>If to Gawker Hungary</u>:

Gawker Hungary Kft.
c/o The Boathouse Group, LLC
Attn: William D. Holden
Plan Administrator
44 Lynden Street
Rye, NY 10580

<u>If to Gawker Media</u>:

Gawker Media LLC
c/o The Boathouse Group, LLC
Attn: William D. Holden
Plan Administrator
44 Lynden Street
Rye, NY 10580

with copies to:

Ropes & Gray LLP
1211 Avenue of the Americas

8

New York, NY 10036-8704
Attn:  Gregg M. Galardi
         D. Ross Martin
         Joshua Y. Sturm

k)  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties hereto regarding the subject matter hereof and supersedes any prior agreements (whether written or oral) among the parties regarding the subject matter hereof.  This Agreement may be executed in any number of counterparts each of which shall be an original, but all of which together shall constitute one and the same instrument.

[*Remainder of Page Left Intentionally Blank*]

The parties hereto have either executed and acknowledged this Plan Administrator Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers.

**The Boathouse Group, LLC**


By: _____
Name:     William D. Holden
Title:      Authorized Signatory


Date: _____, 2018

**Gawker Media Group, Inc.**


By: _____
Name:     William D. Holden
Title:      Authorized Signatory

Date: _____, 2018


**Gawker Media LLC**


By:      Gawker Media Group, Inc.
         Its: Manager

By: _____
Name:     William D. Holden
Title:      Authorized Signatory

Date: _____, 2018


**Gawker Hungary Kft.**


By: _____
Name:     William D. Holden
Title:      Authorized Signatory


Date: _____, 2018

<u>Exhibit B</u>

Master Consulting Agreement for Professional Advisory Services

# MASTER CONSULTING AGREEMENT
# FOR PROFESSIONAL ADVISORY SERVICES

This Master Consulting Agreement for Professional Advisory Services ("Agreement") is effective as of May 1, 2018 (the "Effective Date") by and between Opportune LLP, a Texas limited liability partnership, and affiliates with an address of 711 Louisiana, Suite 3100, Houston, Texas 77002 ("Opportune LLP"), and Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary") and Gawker Media LLC (collectively with GMGI and Gawker Hungary, the "Client" or "Gawker"), with an address of 44 Lynden St. Rye, NY 10580. Opportune LLP and affiliates are collectively referred to as "Opportune" herein, and Opportune and Client may sometimes be referred to herein individually as a "Party" and together as the "Parties".

## Recitals

**Whereas**, Opportune is engaged in the business of rendering professional advisory services on a contractual basis; and,

**Whereas**, Client is, among other things, a former debtor in bankruptcy and currently under the direction of a Plan Administrator in conducting wind-up and liquidation of Client's affairs that has need from time to time to utilize the services of consulting professional advisory services providers such as Opportune; and,

**Whereas**, Client has a need to obtain consulting professional advisory services (the "Services") for the Term (as defined below) and Opportune is qualified to provide the Services; and,

**Now, therefore,** in consideration of the material provisions and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## Agreement

1. **Term/Termination of Agreement.**  The term of this Agreement shall commence on the Effective Date and shall continue thereafter until terminated by either Party hereto upon seven (7) days' prior written notice to the other Party (the "Term").

2. **Consulting Services to be Provided.**  It is understood and agreed that from time to time during the term of this Agreement, Client may, within its sole discretion, request Opportune to perform certain Services.  The Services performed by Opportune will be at the direction of the Client's designee.  The Services will be governed by a specific work order ("Work Order") as agreed between the Parties in writing.  See a sample Work Order in attached Exhibit "B". In the event of any conflict between this Agreement and a Work Order, the terms of this Agreement shall prevail.  If there is no Work Order, this Agreement will control.  Services may include Tax Assistance which is discussed more fully below.

3. **No Exclusivity.**    Nothing in this Agreement shall be interpreted as Client having any obligation or liability to request Opportune's services on any particular project or any minimum number of projects.   Similarly, Opportune shall not be precluded from accepting a similar engagement from any other client.  In the event a conflict arises, the Parties will address as soon as possible.

4. **No Employment Relationship.**  Without exception or qualification, the Parties agree that at no time during the term of this Agreement shall Opportune be considered an employee of Client, but rather Opportune shall at all times be and remain an independent contractor of Client.  At no time shall Opportune hold itself out to any third party as an employee of Client.  Opportune shall not at any time have any authority to make or enter into any contract, agreement, warranty or representation on behalf of Client or to create any obligation, express or implied, on behalf of Client.

5. **Payment.**  Unless covered by a specific Work Order, Opportune's fees for the Services requested by Client under this Agreement are as set forth in Exhibit "A" hereto, unless as modified by any specific Work Order.  All fees for the Services will be billed monthly to Client in the form of a written invoice detailing the Services performed and the number of hours worked by Opportune in performance of the Services, except as provided in the paragraph below.  Client shall make payment of all undisputed fees within thirty (30) calendar days following Client's receipt of Opportune's written invoice.  Client shall provide written notification to Opportune of any disputed fees as soon as practicable upon Client's receipt of a written invoice from Opportune.  Such contract fees shall be the only consideration Opportune shall be paid for the Services herein.

   Opportune hereby acknowledges that it has received from Client a payment of $100,000.00 to be credited against Services to be provided hereunder.  To the extent that any portion of such amount has not, upon the termination of this Agreement, constituted advance payment of undisputed fees or expenses hereunder, Opportune shall return such portion to Client within 30 days of the termination hereof, unless otherwise agreed by the parties hereto.

6. **Expenses.**  Client will pay Opportune for all reasonable and customary out-of-pocket expenses incurred by Opportune in the performance of the Services; provided, however, Opportune shall take all reasonable steps to minimize all such cost and expenses.  Opportune shall keep and maintain all records and receipts for any amount reimbursed by Client hereunder for a period of not less than one (1) year after the termination of this Agreement.

7. **Confidentiality.**    Opportune acknowledges, understands and agrees that all of the information and data (both within Client and any third party which is the subject of the Services) to which Opportune shall be exposed during the Term of the Agreement is highly confidential and proprietary, and that the disclosure of such information and data, or any part thereof, shall cause serious, significant and irreparable injury to Client financially.  Opportune agrees to keep and maintain, and to cause its personnel to keep and maintain the confidential nature of all of the information and data to which Opportune shall be exposed to as a consequence of this Agreement. Opportune shall not disclose in any manner or format, any of the information or data (regardless of the form

of such information or data) to any person or party, except as may be instructed by Client in writing. For the purposes of this provision, all information and data belonging to Client which Opportune may be exposed pursuant to this Agreement shall be considered proprietary to Client. This provision shall apply equally to any work product (including notes and drafts of any work product) which may be created in connection herewith, except as otherwise provided herein.

8. **Ownership of Opportune's Work Product.** It is understood and agreed that the any final report resulting from the Services shall remain Client's property. To the extent that Opportune utilizes any of its property (including, without limitation, any hardware or software) in connection with the Services, such property shall remain the property of Opportune, and Client shall not acquire any right or interest in such property. Opportune shall have ownership (including, without limitation, copyright ownership) and all rights to use and disclose Opportune's ideas, concepts, know-how, methods, techniques, processes and skills, and adaptations thereof in conducting Opportune's business (collectively, "Know-How") regardless of whether such Know-How is incorporated in any way in the final report.

9. **Opportune is not a CPA Firm**. Opportune is not a CPA firm, and the report or any results shall not constitute an Attestation, Valuation, Solvency Opinion, Fairness Opinion or otherwise, and may not be relied upon by Client or any other part as such. Any advice given or report issued by Opportune is provided solely for Client's use and benefit and only in connection with the Services that are provided. Except as required by law and/or process related to Client's chapter 11 proceedings, Client shall not provide any Opportune work product to any third-party and Client shall not refer to Opportune (directly or indirectly) in any public filing or other document, without Opportune's prior written consent, which consent shall not be unreasonably withheld. In no event, regardless of whether consent or pre-approval has been provided, shall Opportune assume any responsibility to any third-party to which any advice or report is disclosed or otherwise made available.

10. **Opportune's Liability for Taxes/Compensation/Insurance.** Opportune shall be solely responsible and liable for any and all benefits for its employees arising out of or related to any Services under this Agreement. Opportune shall be solely responsible and liable for providing and paying for any type and amount of insurance covering Opportune and the Services to be rendered hereunder, including, but not limited to, general liability insurance, personal injury insurance, vehicular insurance (including all lines of coverage for rental vehicles), medical insurance, life insurance, etc. Opportune shall be solely responsible and liable for any federal and state income taxes, withholding taxes, unemployment taxes, FICA taxes, worker's compensation payments and any other assessment which may be imposed by any governmental authority as a result of or arising out of the Services.

11. **Applicable Law and Dispute Resolution.** New York law, and not merely its choice of law rules, shall apply to any dispute between Opportune and Client. Client consents to the jurisdiction of New York courts and agrees that any suit filed shall be filed in New York County, New York, and that New York County, New York is proper venue for any such suit. OPPORTUNE AND CLIENT HEREBY IRREVOCABLY WAIVE, TO THE

FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT, OR OTHERWISE) RELATING TO THIS AGREEMENT.

12. **Indemnification.** Opportune shall release, protect, defend, indemnify and hold the Client harmless from and against any and all claims, costs, charges, demands losses, judgments and/or liabilities made by or arising in favor of the owner of third party IP Rights (as defined below) in or to services, software, procedures or processes which may result or arise from Opportune furnishing the Services. For purposes of this Contract, "IP Rights" shall mean any and all rights that may exist in any jurisdiction under any laws, rules, or regulations relating to patents, copyrights, trade secrets, trademarks, or other intellectual property rights, whether or not such rights are registered or perfected.

13. **Consequential Damages**. Neither Party shall be liable to the other Party for special, indirect, consequential, exemplary and /or punitive damages (collectively, "Consequential Damages"), and each Party hereto shall be responsible for and shall defend, indemnify and hold the other harmless from and against its own Consequential Damages resulting from or arising out of this Agreement, including, without limitation, loss of profit or business interruptions, howsoever, the same may be caused.

14. **Opportune Liability.** Client agrees, accepts and acknowledges that any legal proceedings arising from or in connection with this Agreement (including all amendments and engagements related thereto) must be commenced within one (1) year from the termination of this Agreement or conclusion of each particular engagement letter (whichever occurs first in time), and that no action or claim will be brought against any employee or subcontractor of Opportune. Further, in no event shall Opportune be liable to Client (or any person and/or entity claiming through Client or the Services), under any legal theory, for any amount in excess of the total professional fees paid by Client to Opportune related to the specific services during the immediate six (6) month period prior to the date the alleged liability occurred.

15. **Compliance with Applicable Laws and Client Policies**. Opportune shall at all times during the Term comply with all applicable laws as well as the policies and procedures of Client. Opportune shall not pay any commissions or fees or grant any rebates or other remuneration or gratuity to any person in connection with the business of Client or its affiliated or subsidiary companies. Opportune shall not accept any rebates nor accept any commissions or fees in connection with the business of Client or its affiliated or subsidiary companies.

16. **Force Majeure.** Opportune shall not be liable to Client for any delays or non-performance resulting from circumstances or causes beyond Opportune's reasonable control, including, but not limited to acts of God.

17. **Severability of Terms.** If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, this Agreement shall be deemed to be amended to the extent necessary to make such provision enforceable, or, if necessary, this Agreement shall be deemed to be amended to delete the unenforceable provision or portion thereof. In the event any provision is deleted or amended, the remaining

provisions shall remain in full force and effect. Notwithstanding the foregoing, the Parties recognize and agree that this Agreement is to be interpreted and applied in such manner as to, as nearly as possible, give effect to the Parties' intent to all provisions hereof, including, without limitation, such provisions as may be declared to be unenforceable.

18. **Entire Agreement.**  This Agreement constitutes the entire understanding between the Parties with respect to the matters provided herein, superseding all negotiations and prior discussions, agreements and understandings, whether oral or written, relating to such matters.

19. **Assignment.**  Neither Party hereto shall have the right to assign its rights hereunder, in whole or in part without the prior written consent of the other Party (other than to such Party's affiliates or subsidiaries which shall not require such consent). This Agreement shall be binding upon and inure to the benefit of the Parties' respective successors and permitted assigns.

20. **Amendment.**  No change, modification, extension, renewal, ratification, waiver or rescission of this Agreement or of any of the provisions hereof shall be binding unless it is in writing and signed by both Parties hereto. Further, no waiver or forbearance by either Party hereto with respect to any right granted to such Party herein shall operate or be construed to be a waiver or forbearance of such Party's right to exercise such right in the future.

21. **Income Tax Matters: Caveats and Conditions:**  Client acknowledges and agrees that any Services constituting tax advice or assistance ("Tax Assistance") provided pursuant to this Agreement or any Work Order is defined as tax advice as described in U.S. Treasury Department Circular 230 and applicable law and regulations, as in effect at any time relevant to any tax year or transaction related to the Tax Assistance. Our Services and Tax Assistance will be based solely upon:

   a. The representations, information, documents and other facts provided to Opportune by Client, its personnel and any representatives thereof;

   b. Opportune's assumption that there will be timely execution, delivery and performance as may be required by any representation or documents submitted by Client with respect to Opportune's Tax Assistance;

   c. The understanding that Opportune will only be responsible to provide Tax Assistance with respect to the specific matter, transaction or question actually presented by Client, including the type of tax and the taxing jurisdiction specifically identified by Client (e.g., federal, foreign, state, local, sales, excise, etc.);

   d. Client acknowledges that Client will maintain ultimate responsibility for all management decisions and management functions. Client understands and agrees that the ultimate responsibility, with respect to the appropriate application and interpretation of any oral or written communications, rests with management of Client. Opportune will not be held liable for any misinterpretations of oral or written communications regarding the application of Tax Assistance.

e.  Client's understanding that any Tax Assistance provided pursuant hereto will be based upon the law, regulations, cases, rulings, and other tax authority in effect at the time specific Tax Assistance is provided. If there are subsequent changes in or to the foregoing tax authorities (for which Opportune shall have no specific responsibility to advise Client), Client acknowledges that such changes may result in that Tax Assistance being rendered invalid or necessitate (upon Client's request) a reconsideration of that prior Tax Assistance;

f.  Client's understanding and agreement that the results of Opportune's Tax Assistance may be audited and challenged by the Internal Revenue Service ("IRS") and other tax authorities, who may not agree with our positions. In this regard, Client understands that the result of any Tax Assistance is not binding on the IRS, or other tax authorities or the courts and should never be considered a representation, warranty, or guarantee that the IRS or the courts will concur with our advice or opinion; and

g.  Opportune, as a result of providing such Tax Assistance, is under no obligation to represent Client with respect to any such challenge or an administrative or judicial challenge thereof. Opportune would generally be available to represent Client before the appropriate tax authorities and/or the U.S. Securities and Exchange Commission.

22. **Reportable Transactions:**

The IRS and several states have promulgated rules that require taxpayers to disclose their participation in reportable transactions (referred to herein as "Listed Transactions") by attaching a disclosure form to their federal and/or state income tax returns and, when necessary, by filing a copy of that disclosure form with the Internal Revenue Service and/or the applicable state tax authority. These rules impose significant disclosure obligations that may encompass transactions entered into in the normal course of business. Failure to make the appropriate disclosures could result in substantial penalties. Client is responsible for ensuring that it has properly disclosed all reportable transactions. Opportune will not be responsible for any penalties resulting from Client's failure to make any required disclosure in a complete, accurate, and timely manner.

The Opportune Services included within the scope of this Agreement and/or any Work Order do not include any undertaking by Opportune to identify any reportable transactions or disclosure obligations unless specifically described in a separate Work Order. If Client is unclear about the scope or application of the relevant reportable transaction disclosure obligations or may have participated in reportable transaction, Opportune recommends that Client immediately discuss the matter and potential disclosure obligations with an Opportune or other qualified tax professional. Additionally, we note that in certain cases including sales of assets in restructuring events and bankruptcy proceedings (including those pursuant to a court order) may fall within Listed Transaction definitions. Opportune assumes no responsibility to identify and advise Client as to proper and timely reporting of these events except as set out in a specified Work Order.

Upon Client's request, Opportune will assist Client in determining whether a transaction might be subject to Federal or a specific state's reportable transaction disclosure rules. Opportune will rely on the factual information described or provided by Client as

accurate and complete in providing the specific Tax Assistance requested by Client. Opportune is not responsible for any other transactions for which disclosure may have been required but which have not been brought to the attention of Opportune and included within the scope of the specific engagement. Opportune will provide Client with a separate memorandum supporting the reportable transaction conclusions, and the rationale for such conclusions, if specifically engaged by Client pursuant to a Work Order to provide such documentation. The relevant documentation will only address Client's federal and/or specific state(s) potential reportable transaction disclosure considerations or obligations as identified and described in the applicable Work Order. In that case, the Opportune documentation will be based on a review and application of the relevant disclosure provisions to the specific information, books and records, and facts described or provided to Opportune by Client.   Please note that Federal Treasury regulations provide that the receipt of an opinion regarding the tax consequences of a transaction is not relevant to the determination of whether the transaction is the same or substantially similar to an IRS-defined Listed Transaction.

23. **Notices.**   Notices regarding or required by this Agreement must be in writing and delivered to the Parties at the mailing addresses set forth below or to such other address as a party may designate in writing. Any notice required under this Agreement will be deemed effective upon delivery to the Party to whom it is addressed.

Opportune:

Opportune LLP and affiliates
Attn:  Managing Partner
711 Louisiana
Suite 3100
Houston, Texas 77002
Phone:  713.490.5050

Client:

Gawker Media LLC
c/o The Boathouse Group, LLC
Attn: William Holden
44 Lynden St.
Rye, NY 10580
Phone: 917.400.1200

24. **Execution**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes.  Such counterparts together shall constitute one and the same instrument.  A Party's execution of this Agreement may be evidenced by an executed signed page sent to the other Party by facsimile or pdf transmission, and in such circumstance, the original signature page shall be provided to such other Party promptly.

*[remainder of page left intentionally blank]*

- 7 -

IN WITNESS WHEREOF, Client and Opportune do hereby execute and agree to this Agreement effective as of the Effective Date.

**Opportune LLP**

By: _____

       Printed Name: W. Lynn Loden

       Title: Managing Director


**Client:**

By: _____

       Printed Name: William D. Holden

       Title: Authorized Signatory

**Exhibit "A"**

| | |
|---|---|
| Partner | $835/hour |
| Managing Director | $715/hour |
| Director | $605/hour |
| Manager | $540/hour |
| Senior Consultant | $420/hour |
| Consultant | $335/hour |
| Administrative Professional | $220/hour |

Opportune reviews its fees on an annual basis, and the fees may change during the term of this Agreement.  Opportune will notify you in advance of any changes.

**EXHIBIT B**

**Work Order
for
Services between
Opportune LLP and Company Name
[5/1/2018]**

This Work Order ("Work Order") is entered into by and between Company Name ('Company Name" or "Company") and Opportune LLP ("Opportune" or "Supplier") and is effective as of [DATE].   This Work Order is issued under and is subject to the Master <u>Consulting Agreement ("MCA") by and between Company Name and Opportune dated [DATE].</u> The terms and conditions of the MCA are incorporated herein by reference as though fully set forth herein.

Title:

1. <u>Designated Points of Contact</u>

   Client:
   Opportune:

2 . <u>Work Order Description</u>

   [e.g., provide advisory services to Company for the selection, monitoring and evaluation of capital investments.  The primary focus will be a comparison of similar companies and how they select and evaluate their capital investments.]

3. <u>Scope of Services</u>

   Opportune will provide the following services and deliverables:

   - Item 1
   - Item 2
   - Item 3

4. <u>Term:</u>  This Work Order will commence on [DATE], and shall terminate after the Scope of Services is complete which is estimated to be on or before [DATE].  Additional services and further analysis will be contracted in a separate Work Order at the Company's request.

5. <u>Location of Work:</u>  The work identified in this Work Order will be primarily performed at Company Name and Opportune offices.

6. <u>Client Responsibilities</u>
- Client shall be reasonably available to assist in project deliverables and answer questions.
- Client decisions are made in a timely manner.
- Client will provide access to current systems and documentation for analysis purposes.

7. <u>Opportune Responsibilities</u>:  Opportune's responsibility will be to prepare the deliverables identified in Section 3 - Scope of Services.

8. <u>Compensation, Payment, Fees and Expenses:</u>  Opportune shall provide Services as requested by Company's representative via written approved Work Order and accept as full compensation, the fees specified in the Work Order contained herein at the rates below.  Travel expenses are not expected for the completion of the Work Order.  Company will reimburse Opportune for actual expenses incurred and approved by Company.

Opportune will send Company monthly bills as the work is performed, which are payable within 30 days of the invoice date.

The following table lists the hourly rate, estimated work hours and fees by Opportune personnel for this project.  Work will be billed on an hourly basis and equal actual hours worked and invoiced monthly.   Company Name will be required to approve any fees and expenses that would exceed the estimated fees listed in the following table before they are incurred.

|  | Rate | Estimate | Estimated Fees |
|---|---|---|---|
| (Partner) | $835 / hour | hours | $ |
| (Managing Director) | $715/ hour | hours | $ |
| (Director) | $605/ hour | hours | $ |
| (Manager) | $540/ hour | hours | $ |
| (Senior Consultant) | $420/ hour | hours | $ |
| (Consultant) | $335/ hour | hours | $ |
| **Resources Subtotal** |  |  | **$** |
|  |  |  |  |
| Expenses (estimated) |  |  | $ |
| **Estimate Total** |  |  | **$** |

Hourly rates are valid until December 31, 2018, and may be adjusted for any work performed in 2019.  Opportune typically adjusts rates on the first of the year to account for employees' promotions, raises, and labor market changes.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date and year first written above.

Acceptance

**Opportune Tax, LLC**                                    **Company Name**

Signature:                                                        Signature:

Name:   W. Lynn Loden                               Name

Title:   Manager                                            Title

Date:                                                              Date:

**Opportune, LLP**

Signature:

Name:   W. Lynn Loden

Title:   Managing Director

Date: