

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4

5   In the Matter of:

6

7   GAWKER MEDIA, LLC,                Case No. 16-11700-smb

8

9                   Debtor.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  United States Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17                  May 17, 2018

18                  10:15 a.m.

19

20

21

22

23  B E F O R E :

24  HON STUART M. BERNSTEIN

25  U.S. BANKRUPTCY JUDGE

Page 2

1    Notice of Hearing on Plan Administrator's Motion for Entry

2    of an Order Pursuant to Federal Rule of Bankruptcy Procedure

3    9019 Approving Release Agreement with Thiel Parties (related

4    document(s)1105)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

Page 3

```
1    A P P E A R A N C E S :

2    ROPES & GRAY, LLP

3         Attorneys for Debtor

4         1211 Avenue of the Americas

5         New York, New York 10036

6

7    BY:  GREGG M. GALARDI, ESQ.

8         KIMBERLY KODIS, ESQ.

9

10   LATHAM & WATKINS, LLP

11        Attorneys for Gizmodo Medial Group

12        53rd at Third, 885 Third Avenue

13        New York, New York 10022

14

15   BY:  MARC A. ZELINA, ESQ.

16

17   COHEN & GRESSER, LLP

18        Attorneys for Terry Bollea

19        800 Third Avenue

20        New York, New York 10022

21

22   BY:  DANIEL H. TABAK, ESQ.

23

24

25
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 4

1    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

2         Attorneys for Peter Thiel and Thiel Capital

3         One Rodney Square

4         Wilmington, Delaware 19899

5

6    BY:   ANTHONY W. CLARK, ESQ.

7         ROBERT A. WEBER, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              MR. GALARDI:  Good morning, Your Honor.  For the

3      record, Gregg Galardi on behalf of the plan administrator

4      for the Gawker estates.  There's only one matter on the

5      agenda today and that is the proposed 9019 settlement with

6      respect to the Thiel parties.

7              Your Honor, we have a choice and I'll defer to

8      Your Honor.  I could put on a proffer of Mr. Holden in

9      support of that settlement or I can call him to the stand

10     and ask questions.  There are no -- there is one outstanding

11     objection which is really not an objection to the

12     settlement.  It's a request to have more in the settlement

13     as opposed to the actual settlement.

14             THE COURT:  Why don't you make the proffer and

15     then is Mr. Holden present?

16             MR. GALARDI:  Mr. Holden is present.

17             THE COURT:  All right.  So if somebody wants to

18     cross-examine him, they can.  Go ahead.

19             MR. GALARDI:  That's fine, Your Honor.

20             If called to the stand Mr. Holden would testify

21     that, one, he is the current plan administrator of the

22     Gawker estates at -- under the confirmed plan of

23     reorganization; that he is familiar with the 9019 settlement

24     and determined that it was in the best interest of the

25     beneficiaries of that estate to enter into the settlement

Page 6

1    under Section 9019 of the Bankruptcy Code.

2            In particular, Mr. Holden would testify that with

3    respect to the assets and the claims against Mr. Thiel that

4    are being released here, there are really two sets of

5    beneficiaries with respect to the underlying causes of

6    action.

7            First, he would testify that Mr. Bollea who has an

8    interest in the creditor trust would have a roughly 45

9    percent interest in the benefits of any claims or causes of

10   action with respect to the estate.

11           With respect to the other set of beneficiaries

12   they would be the equity holders of the GMGI and they hold

13   about 55 percent of the interest in any recovery under those

14   estates.

15           With respect to the -- and I'm going to call them

16   the 55 for the sake of convenience, Your Honor.  With

17   respect to the 55 percent holders Mr. Holden would testify

18   that he talks regularly with them and did discuss the terms

19   of the settlement that has been put forth before the Court.

20   For Your Honor's information Mr. Denton, I believe, is 40

21   percent of that or greater when you consider his family.

22   Columbus Nova, who is also involved in that, is a

23   significant holder as are various former employees and

24   others.  There are about four or five people that regularly

25   participate in the calls, and that Mr. Holden discussed the

Page 7

1    settlement with those parties both before entering into the

2    settlement with respect to the strategy and structure and

3    also after the settlement for which they did give their

4    consent and approval.

5              In addition, Mr. Holden would testify that the

6    settlement was also put for -- with Mr. Bollea and his

7    counsel discussed both before and after discussions with Mr.

8    Thiel were finalized and Mr. Bollea and his counsel have

9    affirmed that they too are supportive of the settlement.

10             So in the first instance after discussions with

11   the persons that have the most significant economic interest

12   both in the causes of actions that are being settled and

13   with respect to the potential sale of the Gawker.com assets

14   they not only have not objected, they are supportive of this

15   settlement and supportive of going forward.

16             With respect to the specific claims Mr. Holden

17   would testify that Mr. -- that he has on behalf of the

18   estate done four things to check the value of these claims.

19             First of all, as Your Honor is aware, Mr. Holden

20   did solicit interest in parties purchasing the Thiel claims

21   and found no parties were interested in it other than Mr.

22   Thiel and Mr. Thiel's interest was in the context of buying

23   the assets and believed I think that the assets, if I may

24   quote, were spurious claims.

25             In addition, Mr. Holden will testify -- would

Page 8

1    testify that he has solicited the interest of three to four

2    contingency fee law firms to take these actions on on a

3    contingency basis and did so both based upon the information

4    provided in our 2004 and after they reviewed the book that

5    came out with respect to those causes of action.  And those

6    parties have not agreed to participate and had no interest

7    in pursuing the litigation against Mr. Thiel on a

8    contingency basis.

9            Third, and somewhat ironically, we've also

10   contacted -- Mr. Holden would testify that he contacted

11   litigation finance entities to see whether those parties

12   would be prepared to finance the litigation and obviously

13   the litigation with Mr. Thiel is partially (indiscernible)

14   finance.

15           Again, those parties showed no interest in

16   pursuing the litigation and based upon that they stepped

17   aside and did not want to take on a litigation financing.

18   Obviously there was somewhat of a conflict for those

19   parties, but we decided to solicit that interest as well.

20           Finally, Mr. Holden has done an independent

21   assessment with his professionals regarding the claims and

22   causes of action and has determined that it is better to

23   settle those.  In particular we also contacted the 55

24   percent shareholders about whether they wanted to fund the

25   litigation themselves since they would get the upside of

Page 9

1    such litigation.  We gave them an estimated budget for

2    litigation that say my firm or another firm would do, and

3    based on that litigation budget and based upon their

4    assessment of the causes of action and their independent

5    view of those causes of action, they too said not to use the

6    estate assets to continue to pursue the claims at that --

7    this point.

8             So based upon that Mr. Holden determined that it

9    would be better to approach Mr. Thiel and those parties with

10   respect to the claims and causes of action.  That is not to

11   say Mr. Holden believes that there are no causes of action.

12   But what all of the parties said was they may be able to

13   survive a motion to dismiss, and I think Your Honor may have

14   even mentioned that in the context of the 2004 request.

15   However, it's one thing to survive a motion to dismiss, but

16   based on the cause of action assessment that you might be

17   caught into a very expensive litigation.  And Mr. Thiel had

18   made it absolutely positively and his counsel at Skadden

19   made absolutely positively that this would not be settled,

20   that this would have to go through trial and that would be a

21   very expensive process.

22            With respect to the claims and causes of action

23   themselves, there was an assessment of all of the people

24   that litigation financed the contingencies, my firm and the

25   independent persons to look at the claims and causes of

Page 10

1    action.

2            With respect to the one cause of action that was

3    perhaps the only cause of action that could be brought that

4    was a commercial tort under New York law Your Honor may

5    recall from the 2004 there was much about what would be the

6    applicable law.  There were defenses raised and possible

7    including a statute of limitations defense.  There would

8    have been an argument that we could have extended to two

9    years which would have been June of this year, although the

10   time frame for that would have been open to many disputes.

11   And needless to say it would have been costly litigation to

12   have pursued.

13           Based upon all of that Mr. Holden would testify

14   that he believed in his judgment and after conversing with

15   the Bollea and the 55 percent holders that it was

16   appropriate to settle that litigation and avoid those costs

17   and expense given that no party was willing to bet on that

18   litigation at that point in time.

19           As a result Mr. Holden would also testify that he

20   entered into negotiations with the Thiel parties with

21   respect to a concern that the 55 percent holders had but Mr.

22   Bollea did not have.  In particular, as Your Honor is aware,

23   we are permitted to go sell the Gawker.com assets.  And in

24   that context Mr. Holden would testify that he did reach out

25   to approximately 140 parties to see if they were interested

Page 11

1    in purchasing these assets.

2              We did, I believe, by recollection Mr. Holden

3    would testify that he received about six offers for those

4    assets from the parties solicited, and then one offer from

5    Mr. Thiel with respect to the assets which included not only

6    a purchase of the assets, but as I mentioned before a

7    purchase of the claims and causes of action.

8              With respect to those bids that were blinding --

9    that were blind bids asked to be provided the highest and

10   best Mr. Holden would testify that Mr. Thiel's bid was at

11   that time not the highest and best bid.  Mr. Holden would

12   further testify that based upon, one, his familiarity with

13   the Unimota (ph) bid originally, based upon his discussions

14   with the 140 bidders that he solicited, based upon the

15   incoming calls, many of the bidders were concerned about Mr.

16   Thiel's intention to bid at the auction and what that would

17   mean and whether they would be prepared to put in their

18   highest or otherwise best bid if Mr. Thiel was in the bid.

19             Accordingly, Mr. Holden discussed with the 55

20   percent holders as well as Mr. Bollea who had the economic

21   interest in the sale proceeds what I will call an unusual

22   provision to keep a bidder out of the auction process.

23             Based upon those discussions with the potential

24   bidders and Mr. Holden's belief based on those discussions

25   and discussions with other parties that Mr. Thiel -- that

Page 12

1    Mr. Thiel's presence in the auction process may result in

2    bidders bidding low and not coming to an auction especially

3    if it was an open auction.

4              Mr. Holden decided in consultation with Mr.

5    Bollea, his counsel and in consultation with the other

6    parties to seek to resolve that matter by asking Mr. Thiel

7    in exchange for the release to remain out of the 363 sale

8    process hoping that that would yield greater value.

9              As a result we negotiated into the settlement

10   which does provide that Mr. Thiel in exchange for the

11   release of the claims and causes of action that I've

12   described on behalf of Mr. Holden for this would not

13   participate in the auction and not participate in the bid

14   process or criticisms of the bid process so long as Mr.

15   Holden discharged his fiduciary obligations.

16             With respect to discharging the fiduciary

17   obligations, we have gotten the consent, as I've mentioned,

18   to Mr. Bollea who had to be consulted on those processes and

19   the 55 percent holders.

20             In essence, Your Honor, Mr. Holden would testify

21   that with respect to the gives and the gets under a

22   settlement the gives are a complete release of the claims

23   against Mr. Thiel and a stopping of the 2004 investigation

24   and the no running no further expenses.

25             With respect to the gets of the settlement is,

Page 13

1    one, we believe that there is a benefit to the sale process,

2    one, we do not have to now fight whether that process will

3    be a closed bid process, an open auction.  We're now free to

4    proceed with an open auction process, stalking horse and

5    approval.  Your Honor does have jurisdiction with respect to

6    that under our plan as to oversee the sale of that process.

7              In addition, we avoid the costs and expenses of

8    fighting both those processes.  If you read the settlement

9    Mr. Thiel can still fund Bollea with respect to the plan,

10   the provisions of the plan, the process.  So even leaving

11   aside the litigation, we are avoiding those costs.

12             In addition, Your Honor, we think significantly

13   that the estate has gotten a purchaser protection; that is,

14   that as long as they don't do anything with the assets

15   that's new on the Gawker.com, that that purchaser can be

16   free of the litigation or funding of litigation under

17   Section 3 of the settlement agreement.

18             Your Honor, with respect to the settlement

19   agreement itself or Mr. Holden would testify with respect to

20   the settlement agreement itself -- and if I may hand up, I

21   don't know if your clerk has one just to review.

22             THE COURT:  Thank you.

23             MR. GALARDI:  Your Honor, with respect to the

24   settlement agreement, and I think this goes to the Unimota

25   objection so it's important to put on some testimony from

Page 14

1    Mr. Holden on this section.

2           Your Honor, with respect to Section 3 of the

3    settlement or release agreement as we call it, Mr. Holden

4    would testify that it says that there are actions against

5    certain parties that are, in fact, not going to be funded by

6    Mr. Thiel.  And if you read that section and Unimota is

7    correct, what you see is that with respect to actions of

8    employees with respect to the specifically defined

9    Gawker.com assets and only with respect to the Gawker.com

10   assets Mr. Thiel has agreed not to fund litigation with

11   respect to any actions with respect to the Gawker.com

12   assets.

13          Mr. Holden would testify that in earlier versions

14   he had requested, but not obtained a broader lack of -- a

15   broader restriction on Mr. Thiel funding including, I think

16   the language that Unimota suggested with respect to the

17   Gawker.com assets which are now not the Gawker.com assets,

18   all the assets that were sold to Unimota and that the Thiel

19   parties simply did not agree with that provision.  So there

20   was an attempt to get that, but that this was the best that

21   it could do.

22          In addition, Mr. Holden would testify, as Your

23   Honor has heard before, that there is still always a concern

24   with the independent directors with the independent writers

25   and independent consultants.  Mr. Holden would also testify

Page 15

1    as I testified that there was an issue of deem or deemed to

2    consent which is currently under Your Honor's to rule on.

3    But with respect to 6.1 I think Your Honor may recall my

4    testimony and I think Mr. Holden noted this testimony

5    before, that there was always an issue open with respect to

6    whether Mr. Thiel who probably didn't have a claim against

7    the estate would give a release.

8           Section 6.1 of the releases does provide that Mr.

9    Thiel and the Thiel parties do give a release to all of the

10   Gawker entities including any of the parents, agents,

11   members, managers, independent contractors, representatives,

12   any of their estates, officers, directors, and any other

13   individual.  They have been requested and Mr. Thiel has

14   given a release with respect to those parties.  So however

15   Your Honor rules on the consent and deemed consent issue at

16   least this document would provide them with a release.  That

17   doesn't mean they can't -- that Mr. Thiel can't fund under

18   3.1, but it does mean he's released.

19          And, Your Honor, they're learning from my friend,

20   Mr. Clark, one of the concerns that I know Your Honor had in

21   Sun Edison was the fact that how could we give a release for

22   third parties.  I would like to say it's couched as a

23   release, but it really is a standstill agreement.  If you

24   look at 6.3 you're getting a release to the extent that the

25   law allows you to get a release, but really what it says is

Page 16

1          Mr. Thiel has agreed or coveted not to pursue any of the

2     released parties as they were defined so long as those

3     released parties do not pursue Mr. Thiel.

4          So I think it's -- whether you want to call it a

5     release or a simple covenant not to sue, and then they have

6     a specific performance obligation, that protects it.

7          Obviously, one of the employees and principals is

8     Mr. Denton.  We didn't go through the process of having Mr.

9     Denton sign this document.  We didn't want to get into a

10    disparagement agreement and all of those agreements as Mr.

11    Holden would testify.  But that -- you know, it sort of

12    shared mutual destruction.  If you want to go sue the

13    billionaire then be ready for him to sue you back.

14         Your Honor, with that explanation Mr. Holden would

15    suggest that in light of the standard under TMT we believe

16    that the settlement is appropriate:  One, that it has

17    balanced the litigation probability of success as opposed to

18    its future benefits;

19         Two, that it is complex, protracted litigation

20    with a lot of expense, inconvenience and delay;

21         That the paramount interest of creditors, as I

22    mentioned, Mr. Holden believes that the creditors here, the

23    interested parties here are Mr. Bollea and the shareholders.

24    They have both supported this settlement.

25         That whether the other parties in interest support

1    the settlement there really are no other parties in

2    interest.  I guess you could say that the employees are

3    parties in interest since we made them beneficiaries.  But

4    we think we've done as best we can with them, although

5    obviously someone could always ask for a bigger gift.

6          The competency of counsel I'll let other people

7    judge that on my competency and the competency of Mr. Clark

8    leaving that comment.

9          The breadth of the releases to be obtained by the

10   officers and directors, again, I've described the breadth.

11   They're as broad as we can possibly get on both sides. but

12   it is a standstill.  And Your Honor is aware and the history

13   would show that this is the result of arm's length

14   negotiations between Mr. Holden, Mr. Thiel and the

15   respective counsels.

16         With that, Your Honor, we would request approval

17   and pass Mr. Holden to anyone who would like cross-

18   examination.

19         THE COURT:  All right.  Is there anybody who

20   objects to the proffer or wants to cross-examine Mr. Holden?

21         Hearing no response I'll accept the proffer.

22         Does anybody else want to be heard in connection

23   with the settlement?

24         MR. ZELINA:  Good morning, Your Honor.  Marc

25   Zelina of Latham & Watkins on behalf of Gizmodo Media Group

Page 18

1    which I'll refer to today as GMG.

2            As Your Honor knows, GMG purchased substantially

3    all of the debtors' assets free and clear of all liens,

4    claims and encumbrances pursuant to a sale order that was

5    entered by Your Honor back in August of 2016.

6            That sale order contained express language that

7    barred all persons from asserting claims against GMG related

8    to, and I'm quoting, "the debtors, the acquired assets, the

9    ownership, sale or operation of the acquired assets, and the

10   business prior to the closing."

11           As Your Honor knows the closing occurred in

12   September of 2016.  Notwithstanding these express terms, GMG

13   has been and continues to be harassed by lawsuits and by

14   plaintiffs asserting causes of action that arose prior to

15   the closing date.

16           In fact, as Your Honor is aware in 2017 in August

17   we were forced to file a motion to enforce that sale order

18   after (indiscernible) and Mr. Busek (ph) filed a lawsuit in

19   New York State Court asserting claims against GMG and the

20   articles that were based on an article that was published

21   prior to the sale closing date.

22           Even after Your Honor entered that order to

23   enforce the sale order, another lawsuit was filed by the

24   same law firm that was -- that represented (indiscernible)

25   and Mr. Busek and they served a claim on GMG asserting a

Page 19

1    cause of action based yet again on claims that arose not

2    only prior to the sale closing date, but prior to the

3    bankruptcy of the debtors at a time when the debtors were

4    running the business.

5            The persistent harassment is what brings us back

6    to the podium today, Your Honor.  The harassment is not only

7    harming my client, GMG, but it's also harming the debtors'

8    current and former employees and independent contractors

9    and, you know, it has caused harm to the debtors' estates as

10   well who were deposed and who testified in the pregame

11   litigation.

12           So, Your Honor, the language in Section 3 that

13   debtors' counsel referenced, it's true.  It appears to carve

14   out -- it appears to only apply and prevent funding of -- by

15   the Thiel parties of causes of action related to the

16   Gawker.com assets.  In other words, it specifically carves

17   out those acquired assets.

18           And while GMG does not oppose a resolution and an

19   agreement between the debtors and the Thiel parties, we do

20   believe this settlement agreement simply doesn't go far

21   enough.  It should encapsulate GMG in the first instance and

22   it should encapsulate the employees of the debtors related

23   not only to the Gawker.com assets, but also to the acquired

24   assets.

25           And we believe that this is an opportunity where

1    Your Honor can again reinforce Your Honor's sale order and

2    Your Honor's order to enforce the sale order and halt any

3    current or future litigation that may be funded by the Thiel

4    parties against my client.

5            So that is the basis for our objection and if you

6    have any questions, Your Honor, I would be happy to respond.

7            THE COURT:  Does anyone want to respond to the

8    response?

9            MR. GALARDI:  Yes, Your Honor.

10           Your Honor, I'm going to start with saying that

11   I'm completely sympathetic but that's my prelude to saying

12   four -- four responses to this subject.

13           One is I don't believe they have standing here as

14   they are not an effected party.

15           Two, even if Your Honor said they had standing

16   they do have their order and I think everybody has to be put

17   in context that it is because they decided to exercise a

18   right to put back the Gawker.com assets that we were in this

19   position to try to sell those assets separately, and their

20   opportunity came and went at the time for those releases.

21           Third,  I think the testimony is from Mr. Holden

22   as proffered and not contested Mr. Holden specifically tried

23   to get exactly what they would now want and the Thiel

24   parties specifically rejected that.  So while it would have

25   been a nice to have, it doesn't undermine that the

1    settlement satisfies 1919 and therefore we would ask that

2    you overrule the objection.

3              THE COURT:  All right.

4              MR. CLARK:  Your Honor, Tony Clark of Skadden Arps

5    for the Thiel parties.  I rise only to say that if the Court

6    has any questions for us I'm happy to address them.

7    Otherwise I don't have any further comments.

8              THE COURT:  Okay.  My question about Gizmodo is

9    how do I force these two parties to agree to what you want

10   them to agree to, or really the Thiel parties to agree to

11   what you want them to agree to?

12             MR. ZELINA:  Your Honor, I appreciate that

13   question and Your Honor has broad discretion to enforce --

14   to approve a settlement order --

15             THE COURT:  But it -- but how isn't the settlement

16   in the benefit of the estate?  I understand that it could

17   benefit your client more.  It doesn't benefit your client.

18   But tell me why it's not a benefit to the debtor.

19             MR. ZELINA:  Well, it certainly does benefit to

20   the debtors to a certain degree.  However, we just think it

21   doesn't go far enough.  We think the debtors could be

22   brought in to future actions that are asserted against our

23   clients.

24             THE COURT:  But that's their call really and their

25   business judgment is this deal makes sense; that getting a

Page 22

1    release and I guess they'll take their chances in the

2    future.  I guess they feel that if Thiel is not funding or

3    allegedly funding litigations that's sufficient.  And it

4    will also facilitate the sale of the Gawker.com assets.  It

5    wasn't mentioned, but I assume buyers are going to be

6    concerned that what happened with Gizmodo would happen with

7    a buyer of the Gawker.com assets; that they would be the

8    subject of a lawsuit funded or allegedly funded by Mr.

9    Thiel.

10            So how doesn't it benefit --

11            MR. ZELINA:  We would agree with that and we think

12    that the language that Gizmodo has suggested be added would

13    --

14            THE COURT:  I understand that.  But this is a

15    contract.  They don't -- one side won't agree to that and

16    the other side is willing to agree to the contract without

17    that language.  So, you know, what's -- how do I do anything

18    about that?  You're saying I should reject the deal even

19    though it's a benefit to the debtor because Gizmodo is not

20    included in the deal, basically.  Isn't that what you're

21    saying?

22            MR. ZELINA:  In part.  The other part is --

23            THE COURT:  What's the other part?

24        (Laughter)

25            MR. ZELINA:  The other part is, again, that the

Page 23

1    debtors could also be harmed down the line, but --

2              THE COURT:  But --

3              MR. ZELINA:  -- your point is taken that they

4    agreed to this and --

5              THE COURT:  -- that's their call.  Look, you have

6    several opportunities.  You can make your own deal, I guess,

7    with the Thiel parties as the debtor did.  You have the

8    benefit of the sale order which I've already ruled on.  And

9    if somebody brings frivolous litigation within the meaning

10   of Rule 12 or Rule 9011 you certainly have your remedies.

11   Obviously, if somebody brings litigation which is clearly

12   barred by the sale order and everybody reading the sale

13   order would know it, you know, you certainly have -- there's

14   certainly plenty you can do about that.

15             So I'll approve the settlement.  The settlement

16   essentially buys a form -- buys a peace to the debtor that

17   allows the debtor to go forward with the sale of the

18   Gawker.com assets.  It's a little unusual in the sense that

19   a bidder is agreeing not to bid at the auction.  But based

20   on Mr. Holden's testimony Mr. Thiel's participation will

21   chill the bidding rather than encourage it.

22             I'm satisfied that the settlement meets the

23   Iridium factors and for that reason I'll approve it.

24             You can submit an order.

25             Thank you.

1            MR. GALARDI:  Thank you, Your Honor.

2            MR. ZELINA:  Thank you for the time, Your Honor.

3            MR. GALARDI:  That's all for us today, Your Honor.

4            THE COURT:  Thank you.

5        (Whereupon, these proceedings concluded at 10:40 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4    DESCRIPTION                                          PAGE

5    Notice of Hearing on Plan Administrator's Motion

6    for Entry of an Order Pursuant to Federal Rule

7    of Bankruptcy Procedure 9019 Approving Release

8    Agreement with Thiel Parties (related

9    document(s)1105)                                      23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3       I, Sherri L. Breach, CERT*D-397, certified that the

4   foregoing transcript is a true and accurate record of the

5   proceedings.

6

Sherri L      Digitally signed by Sherri L Breach
7             DN: cn=Sherri L Breach, o, ou,
              email=digital1@veritext.com,
Breach        c=US
8             Date: 2018.05.21 16:35:43 -04'00'
    _____

9   Sherri L. Breach

10  AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12  Date:  May 21, 2018

13

14

15

16

17

18

19

20

21

22  Veritext Legal Solutions

23  330 Old Country Road

24  Suite 300

25  Mineola, NY 11501