**Hearing to Consider Entry of Bidding Procedures Order**
**Objection Deadline**: June 12, 2018 at 4:00 p.m. (prevailing Eastern Time)
**Proposed Hearing Date and Time**: June 20, 2018 at 10:00 a.m. (prevailing Eastern Time)

**Hearing to Consider Entry of Sale Order**
**Objection Deadline**: June 12, 2018 at 4:00 p.m. (prevailing Eastern Time)
**Proposed Hearing Date and Time**: July 17, 2018 at 10:00 a.m. (prevailing Eastern Time)

ROPES & GRAY LLP
Gregg M. Galardi
Joshua Y. Sturm
Kimberly J. Kodis
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel to the Plan Administrator for the Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                            :
In re:                                      :        Chapter 11
                                            :
Gawker Media LLC, *et al.*,[1]              :        Case No. 16-11700 (SMB)
                                            :
                    Debtors.                :        (Jointly Administered)
                                            :
--------------------------------------------------------x

**PLAN ADMINISTRATOR'S MOTION FOR (I) AN ORDER (A) AUTHORIZING
AND APPROVING BIDDING PROCEDURES, BREAKUP FEE AND EXPENSE
REIMBURSEMENT, (B) AUTHORIZING AND APPROVING THE PLAN
ADMINISTRATOR'S, ON BEHALF OF THE DEBTORS, ENTRY INTO THE
STALKING HORSE ASSET PURCHASE AGREEMENT, (C) APPROVING NOTICE
PROCEDURES, (D) SCHEDULING A SALE HEARING AND (E) APPROVING
PROCEDURES FOR ASSIGNMENT OF CERTAIN CONTRACTS AND (II) AN ORDER
(A) AUTHORIZING THE SALE OF THE DEBTORS' GAWKER. COM ASSETS FREE
AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND
ENCUMBRANCES, (B) APPROVING THE ASSET PURCHASE AGREEMENT AND
(C) AUTHORIZING THE PLAN ADMINISTRATOR, ON BEHALF OF THE DEBTORS,
TO ASSIGN CERTAIN EXECUTORY CONTRACTS OF THE DEBTORS**

William D. Holden, as the plan administrator (the "Plan Administrator") for Gawker

Media LLC ("Gawker Media"), Gawker Media Group, Inc. ("GMGI"), and Gawker Hungary,

---

[1]     The last four digits of the taxpayer identification numbers of the Debtors are: Gawker Media LLC (0492);
Gawker Media Group, Inc. (3231); and Gawker Hungary, Kft. "v.a." (5056).  The offices of the Debtors are
located at 44 Lynden Street, Rye, NY 10580.

Kft. "v.a.", f/k/a Kinja, Kft. ("Gawker Hungary"), the debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully submits this motion (the "Motion"),[2] pursuant to sections 105, 363, 365, 503(b) and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Rules").[3] In support of the Motion, the Plan Administrator respectfully states as follows:

### Preliminary Statement

1.      During the Chapter 11 Cases, the Debtors completed a sale (the "Unimoda Sale") of the majority of their assets to Univision Communications Inc. ("Unimoda"), but Unimoda declined to acquire the Debtors' Gawker.com Website and certain related assets (collectively, the "Gawker.com Assets").  As part of the Unimoda Sale agreements, the Plan Administrator agreed not to undertake the sale of the Gawker.com Assets until March 2018 (the "Restricted Period").

2.      On May 17, 2018, the Court approved a settlement agreement (the "Release Agreement") between the Plan Administrator, on behalf of the Debtors, Peter Thiel ("Mr. Thiel") and Thiel Capital LLC  ("Thiel Capital," and together with Mr. Thiel, the "Thiel Parties"), which provides, among other things, that the Thiel Parties and Thiel Releasing Persons (as defined in the Release Agreement) are not permitted to[4]:

---

[2]    Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings given to them in the Stalking Horse APA or the Bidding Procedures, as applicable.

[3]    This Motion also references the Guidelines for the Conduct of Asset Sales promulgated by General Order M-383 of this Court (the "Sale Guidelines").

[4]    The Release Agreement also provides that "the Plan Administrator and the [Debtors] agree that any sale or disposition of the Gawker.com Assets, or any portion thereof or interest therein, shall expressly exclude any right, title and interest in and to the Claims and any similar or derivative causes of actions any of the Thiel Parties or their Released Persons."  *Release Agreement* § 2.

[P]articipate, cause any third party to participate or otherwise authorize any third party's participation, or provide funding to any third party for the purpose of participating, in any sale process for the Gawker.com Assets, except as expressly requested by the [Debtors] and agreed to by the Thiel Parties in their sole and absolute discretion.

*Release Agreement* § 1. The Thiel Parties, however, may continue to fund Mr. Bollea.

3.      To achieve the goal or pursuing a value-maximizing process for the sale of the Debtors' last remaining material assets, the Gawker.com Assets, the Plan Administrator engaged in a broad marketing effort, and entered into a stalking horse asset purchase agreement (the "Stalking Horse APA") with Didit Holdings, LLC, as buyer (the "Stalking Horse Bidder" or "Buyer"). The Stalking Horse Bidder is a Delaware limited liability company.

4.      The consideration offered by the Stalking Horse Bidder is $1,131,600 in cash plus the assumption of certain liabilities (the "Assumed Liabilities"), subject to certain adjustments and subject to higher or otherwise better offers.

5.      In consultation with Terry Gene Bollea ("Mr. Bollea") and other stakeholders holding the remaining interest in the Debtors, the Plan Administrator and his advisors developed bidding procedures for the sale of the Gawker.com Assets (the "Bidding Procedures"). Under the Bidding Procedures, parties may submit bids for the purchase and sale of the Gawker.com Assets (hereafter, the "Purchased Assets"). The Bidding Procedures are intended to generate the greatest level of interest and the highest or otherwise best offer for the Purchased Assets. The Plan Administrator believes that the Stalking Horse APA and the Bidding Procedures represent the best available option to maximize value for the Debtors' various stakeholders.

6.      By this Motion, the Plan Administrator seeks, among other things, an order approving the Bidding Procedures, the Debtors' entry into the Stalking Horse APA, the Assignment Procedures (as defined below), and an order approving the sale of the Purchased

Assets to the Stalking Horse Bidder or the bidder who submits the highest or otherwise best offer for the Purchased Assets.

### Background

7.      On June 10, 2016, Gawker Media filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On June 12, 2016, GMGI and Gawker Hungary, f/k/a Kinja, Kft. each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.      On December 22, 2016, the Court confirmed the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft* (the "Plan") [Docket No. 576], which expressly contemplates the sale of the Purchased Assets. *Plan* § 4.11 ("The Plan Administrator in conjunction with its advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets upon the expiration of the non-compete agreement that is part of the Unimoda Sale.").  The Plan also incorporated that certain Settlement Agreement by and between Mr. Bollea and the Debtors, dated as of December 9, 2016 (the "Bollea Settlement"), which also obligated the Plan Administrator to attempt to sell the Purchased Assets.  *See Plan* § 4.01(c).

9.      On March 17, 2017, the Plan went effective (the "Effective Date").

10.     On the Effective Date, pursuant to 11 U.S.C. § 1141(b), "all property of the estate of each Debtor not otherwise distributed or released . . . vest[ed] in that Debtor for the benefit of the holders of Claims against and Equity Interests." *Plan* § 4.06.

### Jurisdiction

11.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     Under the Plan, this Court retained exclusive jurisdiction of the Chapter 11 Case proceedings to the extent legally permissible, including for the purpose of determining any matter "in connection with the Sale of the [Purchased Assets]." *Plan* § 8.01(n).

### Relief Requested

13.     Pursuant to sections 105, 363, 365, 503(b) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1, the Debtors seek entry of:

A.     the "Bidding Procedures Order," substantially in the form attached hereto as **Exhibit A**:

   (i)     authorizing and approving the Bidding Procedures, substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order;

   (ii)    authorizing and approving certain bidding protections to the Stalking Horse Bidder, including a breakup fee (the "Breakup Fee") and expense reimbursement (the "Expense Reimbursement," and together with the Breakup Fee, the "Stalking Horse Protection"), each subject to the occurrence of certain conditions set forth in the Stalking Horse APA;

   (iii)   setting the deadline for potential bidders to submit a proposal to purchase the Purchased Assets (the "Bid Deadline"), scheduling the auction for the Purchased Assets (the "Auction"), and scheduling the hearing with respect to the approval of the sale and notices related thereto (the "Sale Hearing");

   (iv)    authorizing and approving (a) notice of the Auction and the Sale Hearing, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "Sale Notice"), and (b) notice of the assignment of certain contracts of the Debtors, substantially in the form attached as **Exhibit 3** to the Bidding Procedures Order (the "Assignment Notice");

   (v)     authorizing and approving the entry by the Plan Administrator, on behalf of the Debtors, into  (but not consummation of) the Stalking Horse APA, subject only to higher and better offers submitted in accordance with the Bidding Procedures;

   (vi)    authorizing and approving the procedures set forth in paragraphs 18-20 of the Bidding Procedures Order for the assignment of certain of the Debtors' executory contracts (the "Assignment Procedures"); and

   (vii)   granting related relief; and

B.     the "Sale Order," substantially in the form attached hereto as **Exhibit B**, authorizing and approving:

(i)     the sale of the Purchased Assets (such sale, the "Sale Transaction") free
        and clear of all liens, claims, interests and encumbrances;

(ii)    the assignment of certain executory contracts and unexpired leases in
        connection therewith; and

(iii)   granting related relief.

### The Proposed Sale Transaction Marketing Process

14.     Pursuant to the terms of the Plan, the provision restricting the use of the
Purchased Assets that is part of the Unimoda Sale, and the Bollea Settlement, the Plan
Administrator initiated a sale process for the Purchased Assets.   The Plan Administrator
contacted a broad group of more than one hundred and fifty (150) potential stalking horse
bidders that could potentially be interested in consummating a sale.   National newspapers have
also published several stories describing the ongoing marketing process.[5]

15.     On April 24, 2018, the Plan Administrator, on behalf of the Debtors, and the Thiel
Parties entered the Release Agreement.

16.     On May 18, 2018, the Court entered an order approving the Release Agreement.

### The Need for a Timely Sale Process

17.     The Plan Administrator believes that the auction process and the time periods set
forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and
information necessary to formulate a bid to purchase the Purchased Assets.   In formulating the

---

[5]     *See, e.g.*, Jonathan Randles, Ex-*Gawker Employees Launch Crowdfunding Drive to Buy Website*, WALL ST. J.
(Dec. 11, 2017), https://www.wsj.com/articles/ex-gawker-employees-launch-crowdfunding-drive-to-buy-
website-1513002375; Michael M. Grynbaum, *Thiel Makes a Bid for Gawker.com, a Site He Helped Bankrupt*,
N.Y. TIMES (Jan. 12, 2018), https://www.nytimes.com/2018/01/12/business/media/thiel-gawker-
bid.html?_r=1; Maya Kosoff, *Some Ex-Employees Plan to Wrestle Peter Thiel for the Ghost of Gawker Past*,
Vanity Fair Hive Blog (Dec. 15, 2017), https://www.vanityfair.com/news/2017/12/some-ex-employees-plan-to-
wrestle-peter-thiel-for-the-ghost-of-gawker-past.; Jonathan Randles, *Peter Thiel Agrees Not to Buy Gawker*,
WALL ST. J. (Apr. 25, 2018), https://www.wsj.com/articles/peter-thiel-agrees-not-to-buy-gawker-1524666697;
John Bowden, Peter *Thiel Reaches Agreement Saying He Won't Buy Gawker*, HILL (Apr. 25, 2018),
http://thehill.com/homenews/media/384796-peter-thiel-agrees-not-to-buy-gawker; Jon Levine, *Gawker Slayer
Peter Thiel Agrees to Drop Bid for Bankruptcy Site – and Its Story Archive*, WRAP (Apr. 25, 2018),
https://www.thewrap.com/gawker-slayer-peter-thiel-agrees-drop-bid-bankrupt-site-story-archive/.

procedures and time periods, the Plan Administrator balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to quickly and efficiently sell the Purchased Assets.

18.     Completion of the sale process in a timely manner will maximize the value of the Purchased Assets.  Pursuant to the Unimoda Sale, the Gawker.com Website has been dormant since August 2016, so an expeditious sale is critical to minimize deterioration of realizable value. The time periods set forth in the Bidding Procedures were negotiated by the Stalking Horse Bidder, and failure to adhere to such time periods could jeopardize the closing of the Sale Transaction, which the Plan Administrator believes is the best means of maximizing the value of the Purchased Assets.  Thus, the Plan Administrator has determined that pursuing the Sale Transaction in the manner and with the procedures proposed is in the best interest of the Debtors and will provide all interested parties with sufficient opportunity to participate.

### Stalking Horse APA and Sale Order[6]

19.     The Stalking Horse APA is attached hereto as **Exhibit C**.  Certain material terms of the Stalking Horse APA are described below:

> **Purchased Assets**: The Buyer will acquire the Purchased Assets set forth on Section 1.01 of the Disclosure Schedules, other than the Excluded Assets.
>
> **Assumed Liabilities**: The liabilities to be assumed by the Buyer are those obligations arising after the Closing related to or arising in connection with the Purchased Assets, but only to the extent that such liabilities and obligations do not relate to any breach of, default under or violation of the Stalking Horse APA by any Seller.
>
> **Base Purchase Price**: The Base Purchase Price of $1,131,600, plus the assumption of Assumed Liabilities.
>
> **Termination and Other Deadlines**: Among other things, the provisions of the Stalking Horse APA allow both the Buyer and Sellers can terminate the Stalking

---

[6]   The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse APA. In the event of any inconsistencies between the provisions of the Stalking Horse APA and the terms set forth herein, the terms of the Stalking Horse APA will govern.

Horse APA by: (a) mutual written consent of Sellers and Buyer; (b) Buyer or any Seller if a final, nonappealable order permanently enjoining or otherwise prohibiting the Sale Transactions has been issued by a governmental entity of competent jurisdiction; (c) either Sellers or Buyer, by written notice given to the other, if there has been a material breach of any of the representations, warranties, covenants or agreements made by Sellers and/or Buyer in the Stalking Horse APA that would result in the failure to satisfy any of the applicable conditions specified in the Stalking Horse APA; *provided*, that such breach, if capable of cure, has not been cured within fifteen (15) days after receipt of the written notice; (d) by Buyer, if (i) following the entry by the Court of the Procedures Order, such order is (A) modified, amended or supplemented in a manner adverse to Buyer without Buyer's prior written consent or (B) vacated, reversed or stayed or (ii) following the entry by the Court of the Approval Order, such order is (A) modified, amended or supplemented in a manner adverse to Buyer without Buyer's prior written consent or (B) vacated, reversed or stayed; provided, that with respect to a termination of the Stalking Horse APA pursuant to clause (i)(A) or clause (i)(B) of Section 7.01(d), Buyer may exercise such termination right only within five business days of such modification, amendment or supplement; (e) by Buyer, if the Court shall not have entered the Procedures Order within 35 days after the date hereof; provided, that Buyer shall not be entitled to terminate the Stalking Horse APA pursuant to Section 7.01(e) if, prior to such termination, the Court shall have entered the Procedures Order; (f) by Buyer, if the Court shall not have entered the Approval Order within 75 days after the date hereof and such order does not become a Final Order within 90 days after the date hereof; provided, that Buyer shall not be entitled to terminate the Stalking Horse APA pursuant to Section 7.01(f) if, prior to such termination, the Court shall have entered the Approval Order or such order has become the Final Order, as applicable; (g) by Buyer, if the Procedures Order is entered by the Court and a Court-sanctioned auction for the Purchased Assets is not held (pursuant to the Procedures Order or otherwise) (the "Auction") within 60 days after the date hereof, unless an auction is not required pursuant to the terms of the Procedures Order; provided, that Buyer shall not be entitled to terminate the Stalking Horse APA pursuant to Section 7.01(g) if, prior to such termination, the Auction shall have been held; (h) by Sellers or Buyer, if the Auction is held and Buyer is not the winning bidder at the Auction; and (i) by Buyer, if any condition(s) to Closing set forth in the Approval Order shall not have been met within 60 days after the Approval Order is entered by the Court (the "Outside Date"); *provided*, that the right to terminate the Stalking Horse APA under Section 7.01(i) shall not be available to Buyer if the failure of Buyer to fulfill, or the breach by Buyer of, any obligation under the Stalking Horse APA or the Approval Order has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date.

**Stalking Horse Protection:** Under the terms of the Stalking Horse APA, the Sellers will pay to the Buyer the Breakup Fee in the amount of $50,000 (*i.e.*, 4.42% of the Purchase Price) and Expense Reimbursement not to exceed

$100,000 if, among other things, the Stalking Horse APA is terminated because a Superior Bid has been submitted.

**Assigned Contracts:** Certain contracts included in the Purchased Assets are being assigned to and assumed by Buyer (the "Assigned Contracts"). Upon request by a counterparty to any Assigned Contract, Buyer will provide evidence of adequate assurance of future performance under such Assigned Contract.

**Archives**: Prior to Closing, the Plan Administrator or any Seller may elect to preserve the Archives, or some portion thereof, by granting a third-party institution or platform (the "Archiving Service") a license to publish the Archives in perpetuity in the forms in which they exist on the date that the Stalking Horse APA is executed by both Buyer and Seller. Sellers covenant and agree that they shall ensure that the canonical URL for each webpage included in the Archives directs to the respective original Gawker domain included in the Purchased Assets.

**No Successor Liability**: The terms of the proposed Sale Order provide that the Stalking Horse Bidder and its affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities assumed under or pursuant to the Stalking Horse APA.

### The Bidding Procedures

20.     The Bidding Procedures are designed to maximize value for the Debtors and will enable the Plan Administrator to review, analyze and compare all bids received to determine which bid or collection of bids is in the best interests of the Debtors and their stakeholders. The Bidding Procedures describe, among other things, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing Bidding Procedures. The Plan Administrator submits that the Bidding Procedures afford him a sufficient opportunity to pursue a sale process that will maximize the value for the Debtors.

21.     The Debtors have requested that the Bankruptcy Court establish the following key dates and deadlines for the sale process:

| June 12, 2018 at 4:00 p.m. | Objection deadline with respect to entry of (i) Bidding Procedures Order; and (ii) Sale Order |
|---|---|
| June 20, 2018 at 10:00 a.m. | Proposed date of the hearing on the Motion |
| June 22, 2018 | Date on which the Debtors shall file and serve the Assignment Notice |
| July 2, 2018 at 5:00 p.m. | Preliminary Bid Deadline: the deadline by which a person interested in participating in the bidding process must deliver the Preliminary Bid Documents |
| July 5, 2018 at 4:00 p.m. | Objection deadline with respect to the proposed assignment of any of the executory contracts or unexpired leases listed on the schedule attached to the Assignment Notice |
| July 9, 2018 at 12:00 p.m. | Qualified Bid Deadline:  the deadline by which all Qualified Bids must be actually received by the Debtors' investment banker and legal advisors, as set forth in the Bidding Procedures |
| July 11, 2018 | Date on which the Debtors shall designate Qualified Bidders and notify all Qualified Bidders and Notice Parties of such designation and the Baseline Bid |
| July 12, 2018 at 10:00 a.m. | Auction:  the date and time of the Auction, if one is needed, will be held at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 |
| July 17, 2018 at 10:00 a.m. | Proposed date of the Sale Hearing |

**Assignment Procedures**

22.    The Assignment Procedures in the Bidding Procedures Order establish procedures for notifying the counterparties to four (4) executory contracts in the event the Debtors decide to assign such contracts to the eventual purchaser.

23.    The Assignment Procedures provide that, on or before the date that is two (2) business days following entry of the Bidding Procedures Order, the Plan Administrator shall file with the Court and serve via first class mail the Assignment Notice on all non-Debtor counterparties to all Assigned Contracts, and their respective known counsel, and provide a copy

-10-

of same to the Stalking Horse Bidder. Upon request by a counterparty under any Assigned Contract, the Plan Administrator shall serve, by electronic mail, the evidence of adequate assurance of future performance under the Assigned Contracts provided by the Stalking Horse Bidder, including the legal name of the proposed assignee, the proposed assignee's financial ability to perform under the Assigned Contracts and a contact person with the proposed assignee that counterparties may contact if they wish to obtain further information regarding the Stalking Horse Bidder. Objections, if any, to the proposed assignment by the Stalking Horse Bidder of any Assigned Contract must be filed with the Court and served in accordance with the Assignment Procedures so as to be actually received before the Sale Objection Deadline (as defined in the Bidding Procedures Order).

24.     If the Stalking Horse Bidder is not the Successful Bidder, or if the Successful Bid identifies different contracts for assignment, the Plan Administrator will provide counterparties to the Assigned Contracts with an opportunity to object to the assignment of any Assigned Contract by no later than one (1) day before the Sale Hearing, solely on the issue of whether the Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

## **Sale Notice**

25.     Within three (3) days of the entry of the Bidding Procedures Order, the Plan Administrator (or his agents) will serve the Sale Notice on (a) the Office of the United States Trustee for the Southern District of New York; (b) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Debtors' assets that are the subject of the proposed sale of the Purchased Assets, if any; (c) all parties entitled to notice pursuant to Bankruptcy Rule 2002; (d) each counterparty to the Debtors' Assigned Contracts; (e) all applicable state and local taxing authorities; (f) the Internal Revenue Service; (g) each

governmental agency that is an interested party with respect to the sale of the Purchased Assets contemplated by the Stalking Horse APA and the transactions proposed thereunder; (h) the Securities and Exchange Commission; and (i) counsel to the Stalking Horse Bidder (collectively, the "Notice Parties").

26.     Promptly after the conclusion of the Auction, the Plan Administrator will file a notice identifying the Successful Bidder and the Back-Up Bidder, if any, and shall file with the Court a notice of Successful Bidder and the Back-Up Bidder, if any (the "Notice Of Successful Bidder").

27.     The Plan Administrator submits that the Sale Notice, the Assignment Notice, and the Notice of Successful Bidder, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, comply fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto.  Therefore, the Plan Administrator respectfully requests that this Court approve the form of the Sale Notice and the notice procedures proposed above.

### Extraordinary Provisions Under the Court's Guidelines for the Conduct of Asset Sales

28.     The Bidding Procedures and the Stalking Horse APA contain the following provisions that may be considered Extraordinary Provisions under the Sale Guidelines:

a.     **Requested Findings as to Successor Liability**:  The proposed Sale Order includes findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.  As noted above, the Plan Administrator will provide actual notice of the Auction, the Bidding Procedures, and the Sale Transactions to each of the Notice Parties.  The Plan Administrator submits that such notice is adequate for the Court to make findings in connection with the Sale Order that the Stalking Horse Bidder will have no liability with respect to the Debtors' respective businesses or operations of any of the Debtors' obligations based on any theory of successor or vicarious liability.  The Plan Administrator believes that the Stalking Horse Bidder will give substantial consideration under the Stalking Horse APA in exchange for such release from successor liability.

b.  **Requested Findings as to Fraudulent Conveyance**:  The proposed Sale Order includes findings of fact and conclusions of law with respect to the consideration provided by the Stalking Horse Bidder and the elements of a fraudulent transfer. The Plan Administrator believes that the bidding process and the Auction will support the Court's findings and conclusions that the consideration paid constitutes reasonably equivalent value and is fair and reasonable, and the Plan Administrator and the Successful Bidder acted in good faith and without any intent to hinder, delay, or defraud any of the Debtors' present or future creditors. The Plan Administrator believes that such findings are necessary to maximize the value of the Purchased Assets.

c.  **Relief from Bankruptcy Rule 6004(h)**:  The Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h) because, to preserve the value of the Purchased Assets, the Sale Transactions should be consummated as soon as practicable.

**Legal Basis for Relief Requested**

**The Plan Provides for the Court's Retention of Post-Confirmation Jurisdiction over this Motion**

29.     A bankruptcy court may exercise post-confirmation jurisdiction over a matter when two requirements are satisfied.  *See Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 73-74 (Bankr. S.D.N.Y. 2005) (Bernstein, J.).  First, "the matter must have a 'close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement.'"  *Id.* at 73 (quoting *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004)).  "Second, the plan must provide for retention of jurisdiction over the dispute." Id. at 73-74.  Notably, "the scope of post-confirmation jurisdiction mapped out by the case law usually meets the definition of a core proceeding." *Id.* at 74.

30.     The Plan Administrator is seeking relief that will allow him to fulfill his obligations in implementing provisions of the Plan, requiring him to attempt to sell the Debtors' final remaining assets.  *See Plan* § 4.11 ("The Plan Administrator, in conjunction with its

advisors, shall undertake the sale, disposition, or other transaction with respect to the Gawker.com Assets upon the expiration of the non-compete agreement that is part of the Unimoda Sale."). The Purchased Assets are the sole remaining material assets of the Debtors, and as such, the sale will inure to the sole benefit of the Debtors' remaining stakeholders.

31.    Second, the Plan expressly provides for a retention of jurisdiction over approval of the Motion. As set forth in Section 8.01(n) on the Plan, the Court expressly retained exclusive jurisdiction, to the extent legally permissible, "to determine any matter . . . (2) in connection with the sale of the Gawker.com Assets, and (3) resulting from any Gawker.com Asset sale agreement," *see Plan* § 8.01(n), and also, *inter alia*:

> "to determine any and all controversies and disputes arising under or in connection with the Plan, the settlements contemplated under the Plan, and such other matters as may be provided for in the Confirmation Order". *See Plan* § 8.01(d);

> "to issue orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code". *See Plan* § 8.01(h);

> "to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents". *See Plan* § 8.01(i); and

> "to make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including distributions from the Debtors." *See Plan* § 8.01(p).

32.    As a result of these provisions, and others contained within Section 8.01 of the Plan, the Court retained jurisdiction to enter an order on this Motion.

**The Bidding Procedures are Fair, Appropriate and Designed to Maximize the Value**
**Received for the Purchased Assets**

33.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Plan Administrator submits that the Bidding Procedures are appropriate, consistent with procedures routinely approved by courts in this district, ensure that

the bidding process is fair and reasonable and will yield the maximum value for the Debtors and their stakeholders.  The Bidding Procedures proposed herein are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders not funded by the Thiel Parties are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the Plan Administrator and all parties in interest can be assured that the consideration for the Purchased Assets will be fair and reasonable.  At the same time, the Bidding Procedures provide the Plan Administrator with an adequate opportunity to consider all competing offers and to select, in his reasonable business judgment, the highest and best offer for the Purchased Assets.  Accordingly, the Plan Administrator submits that the Court should approve the Bidding Procedures.

**Approval of the Sale is Warranted Under Section 363 of the Bankruptcy Code**

34.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).   In the Second Circuit, a debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Roaming LLC v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (a judge determining a section 363(b) application must expressly find from the evidence presented a good business reason to grant the application); *see also Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) (same).

35.     As set forth herein and as will be presented at the Sale Hearing, the Plan Administrator, on behalf of the Debtors, possesses ample and sound business reasons for selling the Purchased Assets.  Any delay in the sale of the Purchased Assets could result in further deterioration of the Purchased Assets' value.  In contrast, approval of the proposed Bidding Procedures and the consummation of the proposed Sale Transaction will enable the Debtors to maximize the value of the Purchased Assets and thereby maximize recoveries for the Debtors' stakeholders.  For these reasons, the Plan Administrator has determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interests of the Debtors.

36.     The Plan Administrator, on behalf of the Debtors, has also met the additional requirements necessary for approval of a sale under section 363 of the Bankruptcy Code.  As stated herein, the Plan Administrator will provide adequate notice of the Sale Transaction to interested parties, and the Plan Administrator submits that the aforementioned notice procedures are reasonable and adequate under the circumstances.  In addition, from the date of entry of the Bidding Procedures Order through the Auction, the Plan Administrator will market the Purchased Assets to maximize the number of participants who may participate at the Auction and to obtain the highest and best offer for the Purchased Assets.  The Plan Administrator's marketing efforts and the Bidding Procedures will ensure that the Plan Administrator receives fair consideration for the Purchased Assets.

37.     Finally, the Stalking Horse Bidder has proceeded in good faith.  Both the Plan Administrator and the Stalking Horse Bidder were represented by sophisticated advisors in the arm's-length negotiations of the Stalking Horse APA.  As such, it is a valid exercise of the Plan Administrator's business judgment to seek the relief requested by this Motion.

**The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear**

38.     The Plan Administrator, on behalf of the Debtors, requests approval to sell the Purchased Assets free and clear of any and all liens, claims, interests and encumbrances (except for Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor may sell estate property "free and clear of any interest in such property of an entity other than the estate" if:

a.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

39.     The Plan Administrator submits that the sale transaction will satisfy the requirements of section 363(f) of the Bankruptcy Code.  To the extent a party objects to the Sale Transaction on the basis that it holds a lien or encumbrance on the Purchased Assets, the Plan Administrator believes that any such party could be compelled to accept a monetary satisfaction of such Claims or that such lien would be in bona fide dispute.  In addition, the Plan Administrator will provide any such party with notice of, and an opportunity to object to, the Sale Transaction.  Absent objection, each such party will be deemed to have consented to the sale of the Purchased Assets.

-17-

40.     Accordingly, the Plan Administrator believes that the Sale Transaction (i) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code, and (ii) should be approved free and clear of all liens, claims, interests and encumbrances.

**A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m)**

41.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under [section 363(b)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.   A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee," or an attempt to take grossly unfair advantage of other bidders.

*Gucci*, 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m) of the Bankruptcy Code)).  In other words, a party would have to show fraud or collusion between the buyer and the debtor or trustee or other bidders in order to demonstrate a lack of good faith.  *See, e.g.*, *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *Rock Indus. Mach. Corp.*, 572 F.2d at 1198).   Due to the absence of a bright line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.,* 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach. Corp.,* 572 F.2d at 1198).

42.    The Plan Administrator submits that the Stalking Horse Bidder, or other Successful Bidder arising from the Auction, is, or would be, a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Stalking Horse APA, or any marked version thereof, is, or would be, a good faith agreement on arm's-length terms. The consideration to be received by the Plan Administrator pursuant to the Stalking Horse APA is substantial, fair, and reasonable. Additionally, the parties will enter into the Stalking Horse APA in good faith and after extensive, arm's-length negotiations, during which both parties have been and will be represented by competent counsel of similar bargaining positions.

43.    There is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale Transaction or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code. Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Plan Administrator in consultation with the Plan Administrator's professionals. Accordingly, the Plan Administrator believes that the Stalking Horse Bidder (or other Successful Bidder) and the Stalking Horse APA (or other purchase agreement) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

**The Breakup Fee and Expense Reimbursement Have Sound Business Purpose and Should Be Approved**

44.    The Stalking Horse APA provides for the Stalking Horse Protection, including: (i) the Breakup Fee in the amount of $50,000 (*i.e.*, 4.42% of the Purchase Price), which will be paid to the Stalking Horse Bidder within thirty (30) days of the effectiveness of the termination

of the Stalking Horse APA by the Sellers; and (ii) the Expense Reimbursement not to exceed $100,000, which will be paid to the Stalking Horse Bidder within thirty (30) days of the effectiveness of such termination. The Stalking Horse Protection was heavily negotiated in good faith and was necessary to secure the Stalking Horse Bidder's commitment to purchase the Purchased Assets. In addition, as stated above, the Plan Administrator believes that the presence of the Stalking Horse Bidder will set a floor for the value of the Purchased Assets and attract other potential buyers to bid for the Purchased Assets, thereby maximizing the realizable value of the Purchased Assets for the benefit of the Debtors' remaining stakeholders and other parties-in-interest.

45.    Courts in this district have recognized that bid protections may be used to protect bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and that such fees can be "important tools to encourage bidding and to maximize the value of the debtor's assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993). Such stalking horse bid protections enable a debtor to assure a sale to a contractually-committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity to obtain even greater benefits for the estate through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

46.    The Stalking Horse Protection is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder. The Breakup Fee represents no more than approximately 4.42% of the base

purchase price for the Debtors' assets. The Expense Reimbursement is an amount equal to the reasonable out-of-pocket documented fees and expenses incurred by the Stalking Horse Bidder in connection with the Stalking Horse APA, and is capped at $100,000.

47.     Courts in this district have approved breakup fees and expense reimbursements so long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *Integrated Res., Inc.*, 147 B.R. at 657. The Plan Administrator submits that the Breakup Fee and the Expense Reimbursement will not chill bidding, are reasonable, and ultimately will promote the Plan Administrator's ability to maximize the value of the Debtors.

48.     This Court has approved protections similar to the proposed Stalking Horse Protection as reasonable and consistent with the type and range of bidding protections typically approved  *See, e.g.*, *In re Choice Building Supplies of Westchester Co. Inc.*, No. 13-23859 (RDD) (Bankr. S.D.N.Y. May 5, 2014) (approving bidder protections of approximately 3.64% of the purchase price); *In re HMX Acquisition Corp.*, No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012) (approving bidder protections of approximately 3.46% of the purchase price); *In re Cabrini Med. Ctr.*, No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a breakup fee of approximately 3.75% of the purchase price); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 23, 2009) (approving a breakup fee and expense reimbursement totaling approximately 3.72% of the total purchase price); *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a breakup fee and expense reimbursement totaling approximately 3.43% of the purchase price); *In re SiliconGraphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving a breakup fee and expense reimbursement totaling approximately 6% of the total purchase price).

49.     In addition, this Court has also granted superpriority administrative expense status to breakup fees that become due under the terms of a stalking horse purchase agreement. *See In re Cabrini Med. Ctr.*, No. 09-14398 (AJG), 2009 WL 7193577, at \*5 (Bankr. S.D.N.Y. Dec. 30, 2009) (granting stalking horse purchaser an allowed superpriority administrative expense claim with respect to the debtor's obligation to pay a breakup fee where, among other things, purchaser required such superpriority as a prerequisite to entering into the sale); *see also In re Worldspace, Inc.*, No. 08-12412 (PJW), 2010 WL 4739929, at \*6 (Bankr. D. Del. Jun. 2, 2010) (granting breakup fee superpriority administrative status where such breakup fee was an essential element of the purchase agreement); *In re Taylor-Wharton Int'l LLC*, No. 09-14089 (BLS), 2010 WL 5093120, at \*5 (Bankr. D. Del. May 12, 2010) (granting stalking horse bidder an allowed superpriority administrative expense claim in each of the debtors' chapter 11 cases with respect to the debtors' obligation to pay a breakup fee and expense reimbursement, subject only to certain expenses arising in connection with the debtors' postpetition financing arrangement). The Buyer requires the Breakup Fee and the Expense Reimbursement as a precondition to entering into the Stalking Horse APA, and the Plan Administrator has determined the inclusion of it into the Stalking Horse APA is absolutely necessary to successfully pursue the Sale Transaction and maximize recoveries for the Debtors.

50.     The Stalking Horse Protection is necessary to successfully pursue the Sale Transaction, will not chill bidding, and will maximize recoveries for the Debtors. Accordingly, the Plan Administrator submits that the Stalking Horse Protection reflects a sound business purpose and is fair and appropriate under the circumstances, and should be approved.

## Assignment of Executory Contracts and Unexpired Leases Should Be Authorized

51.     As stated above, section 365(a) of the Bankruptcy Code provides that a debtor may, subject to court approval, "assume or reject any executory contract or unexpired lease of

the debtor." 11 U.S.C. § 365(a).  Bankruptcy court approval of a debtor's decision to assume or reject an executory contract is appropriate where the debtor exercised reasonable business judgment.  *See, e.g., Orion* 4 F.3d 1095 at 1099.

52.     Once an executory contract is assumed, the trustee or debtor may elect to assign such contract.  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if (A) the trustee assumes such contract . . . and (B) adequate assurance of future performance by the assignee . . . is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case.  Adequate assurance may be provided, among other means, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

53.     The Plan Administrator, on behalf of the Debtors, requests approval under Bankruptcy Code section 365(f)(2) of the Debtors' assignment of the Assigned Contracts to the Stalking Horse Bidder or the Successful Bidder.  The Plan Administrator further requests that the Sale Order provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or the Successful Bidder notwithstanding any provisions in the Assigned Contracts, including those described in Bankruptcy Code sections 365(f)(1) and (f)(3), that prohibit such assignment.

54.    On August 22, 2016, the Debtors assumed the Assigned Contracts.[7]

55.    To the extent necessary, the Plan Administrator will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Stalking Horse Bidder or the Successful Bidder to perform under the Assigned Contracts.  The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or the Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under Bankruptcy Code section 365(f)(2)(B).

56.    Further, as set forth above, the Plan Administrator will give notice to all parties to the Assigned Contracts.  Accordingly, the Plan Administrator submits that implementation of the proposed Assignment Procedures is appropriate in these cases.

**Requests for Immediate Relief and Waiver of Stay**

57.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   FED. R. BANKR. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."   FED. R. BANKR. P. 6006(d).  The Plan Administrator requests that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

58.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules

---

[7]    *See Notice of Filing of Closing Designated Contracts List of Designated Contracts to be Assumed and Assigned to the Successful Bidder on the Closing Date in Connection with the Sale of Substantially All of the Debtors' Assets* [Docket No. 193].

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2011).   Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

59.     In light of the deteriorating value of the Purchased Assets as the Gawker.com Website continues to remain dormant, the Plan Administrator believes that the Sale Transaction should be consummated as soon as practicable to maximize the value of the Purchased Assets. Accordingly, the Plan Administrator hereby requests that the Bidding Procedures Order and the Sale order be effective immediately upon entry of such orders and that the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

**Notice**

60.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel to the Stalking Horse Bidder; (iv) counsel to the Debtors' prepetition and postpetition lenders, (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002, and (vi) all other parties in interest in accordance with the procedures set forth in the *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates* [Docket No. 93] .   The Plan Administrator has also provided notice in accordance with the Sale Guidelines to (a) entities known or reasonably believed to have expressed an interest in acquiring

any of the assets offered for sale, (b) all parties who are known to claim interests in or liens upon the Purchased Assets, and (c) parties to executory contracts and unexpired leases proposed to be assigned as part of the Sale Transaction. The Plan Administrator submits that no other or further notice need be provided.

**No Prior Request**

61.    No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these Chapter 11 Cases.

WHEREFORE, the Plan Administrator respectfully requests that the Court: (a) enter the Bidding Procedures Order in substantially the form attached hereto as **Exhibit A**; (b) enter the Sale Order in substantially the form attached hereto as **Exhibit B**, authorizing the sale of the Purchased Assets to the Stalking Horse Bidder or another Successful Bidder(s) at the Auction; and (c) grant such other and further relief to the Plan Administrator as the Court may deem proper.

Dated: May 29, 2018
        New York, New York

/s/ *Gregg M. Galardi*
ROPES & GRAY LLP
Gregg M. Galardi
Joshua Y. Sturm
Kimberly J. Kodis
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: Gregg.Galardi@ropesgray.com
        Joshua.Sturm@ropesgray.com
        Kimberly.Kodis@ropesgray.com

*Counsel to the Plan Administrator for the Debtors*