# Exhibit C

## Stalking Horse APA

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

by and among

**GAWKER MEDIA GROUP, INC.,**

**GAWKER MEDIA LLC,**

**GAWKER HUNGARY, KFT. "V.A.",**

and

**DIDIT HOLDINGS, LLC,**

dated as of

**May 29, 2018**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of May 29, 2018, is entered into by and among Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media LLC, a Delaware limited liability company ("GM LLC"), Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft., a Hungarian corporation ("Gawker Hungary" and together with Holdco and GM LLC, "Sellers" and each individually, a "Seller"), and Didit Holdings, LLC, a Delaware limited liability company ("Buyer").

### RECITALS

WHEREAS, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, the rights and obligations of Sellers to the Purchased Assets (as defined in Section 1.01) and the Assumed Liabilities (as defined in Section 1.03), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### PURCHASE AND SALE

**Section 1.01  Purchase and Sale of Assets**. Subject to the terms and conditions set forth herein, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, all of Sellers' right, title and interest in the assets set forth on Section 1.01 of the disclosure schedules (the "Disclosure Schedules") attached hereto (the "Purchased Assets").

**Section 1.02  Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include the assets set forth on Section 1.02 of the Disclosure Schedules (the "Excluded Assets", and together with the Purchased Assets, the "Assets").

**Section 1.03  Assumption of Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations arising after the Closing (as defined in Section 2.01) related to or arising in connection with the Purchased Assets, but only to the extent that such liabilities and obligations do not relate to any breach of, default under or violation of this Agreement by any Seller (collectively, the "Assumed Liabilities"), which such Assumed Liabilities shall include, but shall not be limited to, the obligations of Buyer set forth in Section 8.02 and those liabilities and obligations set forth in Section 1.03 of the Disclosure Schedules. Following the Closing, Sellers shall have no further obligations with respect to the Purchased Assets.

**Section 1.04  Purchase Price**. The aggregate purchase price for the Purchased Assets shall consist of $1,131,600 (the "Purchase Price"), plus the assumption of the Assumed Liabilities. Buyer shall pay the Purchase Price to Sellers at the Closing in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.04 of the Disclosure Schedules.

**Section 1.05  Allocation of Purchase Price**. Sellers and Buyer agree to the allocation of the Purchase Price for all purposes (including tax and financial accounting) as 45% to the Gawker Media Contingent Proceeds Creditor Account (as defined in the Amended Joint Chapter 11 Plan of Liquidation for Sellers, dated as of December 11, 2016 (the "Sellers' Bankruptcy Plan")), 33% to GM LLC and 22% to Gawker Hungary, in accordance with Sellers' Bankruptcy Plan (the "Bankruptcy Allocation Formula"). Buyer and Sellers shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

# ARTICLE 2
# CLOSING

**Section 2.01** **Closing**.  The closing (the "Closing") of the transactions contemplated by this Agreement (the "Contemplated Transactions") shall take place no later than the third business day following the full satisfaction or due waiver of all of the closing conditions set forth in ARTICLE 6 hereof, or at such other location or on such other date as is mutually agreeable to Buyer and Sellers (the "Closing Date"), at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 or by electronic means of transmittal.  The consummation of the Contemplated Transactions shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 2.02** **Closing Deliverables**.

(a) At the Closing, Sellers shall deliver to Buyer the following:

(i) an assignment and assumption agreement in the form of Exhibit A hereto (the "Assignment and Assumption Agreement") and duly executed by Sellers, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities and all other liabilities arising from, or relating to, the Purchased Assets;

(ii) an assignment in the form of Exhibit B hereto (the "Intellectual Property Assignment Agreement") and duly executed by Sellers, transferring all of Sellers' right, title and interest in and to the trademark registrations, copyright registrations and domain name registrations included in the Purchased Assets to Buyer;

(iii) copies of all consents, approvals, waivers and authorizations referred to in Section 3.02 of the Disclosure Schedules;

(iv) a certificate of the Plan Administrator (as defined in ARTICLE 3) certifying as to the resolutions of the Plan Administrator for GM LLC and Holdco, and the Managing Director for Gawker Hungary, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the Contemplated Transactions by each Seller;

(v) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement; and

(vi) a copy of the sale order entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in form substantially similar in all material respects to the Proposed Sale Order (as defined in Section 5.06).

(b) At the Closing, Buyer shall deliver to Sellers the following:

(i) 80% of the Purchase Price;

(ii) the Assignment and Assumption Agreement duly executed by Buyer;

(iii) copies of all consents and authorizations referred to in Section 4.02 of the Disclosure Schedules; and

2

(iv) a certificate of an officer of Buyer: (A) certifying as to the resolutions of the sole member of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the Contemplated Transactions; (B) setting forth Buyer's agreement in writing to be bound by (1) Paragraph 12 and Paragraph 17 (to the extent that Paragraph 17 relates to the Purchased Assets) of that certain Settlement Agreement, dated December 9, 2016, by and among Sellers and Terry Gene Bollea, and (2) the terms of that certain License Agreement, dated as of September 9, 2016, by and among Sellers and UniModa, LLC, a New York limited liability company, in accordance with Section 10 thereof; and (C) certifying as to the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer that the statements contained in this ARTICLE 3 are true and correct as of the date hereof and as of the Closing Date. For purposes of this ARTICLE 3, "Sellers' knowledge," "knowledge of Sellers" and any similar phrases shall mean the actual knowledge of William D. Holden (the "Plan Administrator").

**Section 3.01  Organization and Authority of Sellers; Enforceability**. Sellers are duly organized, validly existing and in good standing under the laws of their respective jurisdictions of organization. Sellers have full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out their obligations hereunder and to consummate the Contemplated Transactions; provided, however, that Sellers shall seek approval (including the entry of orders in respect of the Contemplated Transactions, "Bankruptcy Approval") of the Contemplated Transactions by the Bankruptcy Court, and such Bankruptcy Approval shall have been granted prior to the Closing and shall be in effect and not subject to any stay pending appeal at the time of the Closing. The execution, delivery and performance by Sellers of this Agreement and the documents to be delivered hereunder and the consummation of the Contemplated Transactions have been duly authorized by all requisite actions on the part of each Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Sellers, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (the "Bankruptcy Exception").

**Section 3.02  No Conflicts; Consents**. Except as set forth on Section 3.02 of the Disclosure Schedules, the execution, delivery and performance by Sellers of this Agreement and the documents to be delivered hereunder, and the consummation of the Contemplated Transactions, do not and will not, subject to Bankruptcy Approval being in effect and not subject to any stay pending appeal at the time of the Closing, (a) violate or conflict with the organizational documents of any Seller or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sellers or the Purchased Assets. Except as otherwise set forth herein, no consent, approval, waiver or authorization is required to be obtained by Sellers from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Sellers of this Agreement and the consummation of the Contemplated Transactions.

1878876.11 30921-0001-000
67258229_14

**Section 3.03    Assigned Contracts**.  Section 3.03 of the Disclosure Schedules includes each contract included in the Purchased Assets and being assigned to and assumed by Buyer (the "Assigned Contracts").  Complete and correct copies of each Assigned Contract have been made available to Buyer.  There are no disputes pending or threatened under any Assigned Contract.  Upon request by a counterparty to any Assigned Contract, Buyer shall provide evidence of adequate assurance of future performance of such Assigned Contract, including Buyer's financial ability to perform under such Assigned Contract and a contact person that such counterparty may contact if they wish to obtain further information regarding Buyer.  The Approval Order (as defined in Section 6.01(b)) shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned by Sellers to Buyer, of the Assigned Contracts.  The cure amounts as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assigned Contracts, shall be paid by Sellers to the non-Sellers counterparty to the Assigned Contracts prior to the Closing.

**Section 3.04    Settlement Agreements**.  Sellers have made available to Buyer, on or prior to the date hereof, the following:

(a)    That certain Settlement Agreement, dated November 1, 2016, by and among Sellers and Dr. Shiva Ayyadurai;

(b)    That certain Settlement Agreement, dated November 1, 2016, by and among Sellers and Ashley Terrill; and

(c)    That certain Settlement Agreement, dated December 9, 2016, by and among Sellers and Terry Gene Bollea.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE 4 are true and correct as of the date hereof and as of the Closing Date.  For purposes of this ARTICLE 4, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual knowledge of Kevin Lee, after reasonable due inquiry.

**Section 4.01    Organization and Authority of Buyer; Enforceability**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the Contemplated Transactions.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the Contemplated Transactions have been duly authorized by all requisite action on the part of Buyer.  This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the Bankruptcy Exception.

**Section 4.02    No Conflicts; Consents**.  Other than as listed on Section 4.02 of the Disclosure Schedules, the execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the Contemplated Transactions, do not and will not: (a) violate or conflict with the certificate of formation, operating agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance,

4

rule or regulation applicable to Buyer.  Other than as listed on Section 4.02 of the Disclosure Schedules, no consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Contemplated Transactions.

Section 4.03    **Legal Proceedings**.  To Buyer's knowledge:  (a) there is no legal suit, action or proceeding of any nature pending or threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the Contemplated Transactions; and (b) no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such legal suit, action or proceeding.

Section 4.04    **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Buyer.

Section 4.05    **Reserved**.

Section 4.06    **Sale "As Is, Where Is"**.  Buyer acknowledges and agrees that upon the Closing, Sellers shall sell and convey to Buyer and Buyer shall accept the Purchased Assets "AS IS, WHERE IS, WITH ALL FAULTS," except to the extent expressly provided otherwise in this Agreement and any document executed by Sellers and delivered to Buyer at the Closing.  Except as expressly set forth in this Agreement, Buyer has not relied and will not rely on, and no Seller and/or representative of any or all Sellers shall be liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Purchased Assets or relating thereto (including specifically, without limitation, information packages or presentations distributed with respect to the Purchased Assets) made or furnished by any Seller or any agent or third party representing or purporting to represent any Seller, to whomever made or given, directly or indirectly, orally or in writing.

Section 4.07    **Deposit**.  Within two business days after the Bankruptcy Court approves bidding procedures substantially similar in all material respects to the Proposed Bidding Procedures (as defined in Section 5.05), Buyer shall deliver 20% of the Purchase Price (the "Deposit") to Sellers, to be held as a deposit until (a) the Closing (in which case the Deposit shall thereupon be retained by Sellers, and Sellers shall distribute such funds in accordance with the Bankruptcy Allocation Formula), (b) the termination of this Agreement by Sellers in accordance with Section 7.01(c) (in which case the Deposit shall thereupon be released to Sellers, and Sellers shall distribute such funds in accordance with the Bankruptcy Allocation Formula) or (c) the termination of this Agreement in accordance with Section 7.01(a), Section 7.01(b), Section 7.01(d), Section 7.01(e), Section 7.01(f), Section 7.01(g), Section 7.01(h) or Section 7.01(i) or by Buyer in accordance with Section 7.01(c) (in which case the Deposit shall thereupon be released to Buyer).

Section 4.08    **Identity of Buyer**.  Neither Buyer nor any of its affiliates nor any officer, director, or shareholder of Buyer or any of its affiliates is a current or former officer, director, shareholder, employee or contractor of any Seller.

## ARTICLE 5
## COVENANTS

Section 5.01    **Public Announcements**.  Unless otherwise required by applicable law, prior to the Closing, Buyer shall not make any public announcements regarding this Agreement or the Contemplated Transactions without the express consent of the Plan Administrator (which consent shall not be unreasonably withheld or delayed).

**Section 5.02    Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, value added and other taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Sellers shall cooperate with respect thereto as necessary).  The parties agree that (a) the Purchased Assets do not constitute a trade or business as defined in Treas. Reg. §1.355-3(b)(2)(ii), and (b) all Purchased Assets constitute intangible assets as defined in the Internal Revenue Code of 1986, as amended, §197.

**Section 5.03    Further Assurances**.  Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Contemplated Transactions and the documents to be delivered hereunder.

**Section 5.04    Archives**.

(a)    The parties agree and acknowledge that prior to the Closing, the Plan Administrator or any Seller may elect to preserve the Archives (as defined in Section 1.01 of the Disclosure Schedules), or some portion thereof, by granting a third-party institution or platform (the "Archiving Service") a license to publish the Archives in perpetuity in the forms in which they exist on the date hereof.  In order to maintain the search engine optimization value of the Archives on the original domains for the benefit of Buyer, Sellers covenant and agree that they shall ensure that the canonical URL for each webpage included in the Archives directs to the respective original Gawker domain included in the Purchased Assets the ("Original Gawker URL"), including, without limitation, by taking, or causing the Plan Administrator to take, the following steps prior to sharing the Archives, or a copy thereof, with any third party:

(i)    The code of each webpage shall be edited to include a rel="canonical" link tag identifying the Original Gawker URL as canonical by adding the following code to the <head> section of the webpage code, inserting the Original Gawker URL where indicated:

<link rel="canonical" href = "*[ORIGINAL GAWKER URL]*>

<meta name="robots" content="noindex">

(ii)    The third-party recipient of the Archives shall be required to refrain from removing or deactivating the rel="canonical" link tag and the "noindex" tag from the <head> section of the webpage code.

(iii)    The third-party recipient of the Archives shall be required to either: (A) house the Archives exclusively behind a firewall or other non-web-based system; or (B) place the Archives in a specified directory that is disallowed to web robots via /robots.txt, by specifying in the /robots.txt code:

User-agent: *
Disallow: /[SPECIFIED DIRECTORY]/

(b)    At all times, provided that Sellers have complied with the obligations set forth in Section 5.04(a) above, Buyer covenants and agrees to waive any and all claims it may have at law or at equity

6

arising out of or relating to the Plan Administrator's, Sellers' and/or any of the Archiving Service's handling and/or maintenance of the Archives.

(c) From and after the Closing, Buyer covenants and agrees that (i) it shall maintain, or shall cause to be maintained, in all material respects, the Archives in a medium and manner generally accessible to the public through the internet and (ii) it shall not make any claim as to ownership of the Archives as against the Archiving Service for purposes of DMCA takedown requests.

Section 5.05    **Bankruptcy Auction**.  Immediately following the date hereof, Sellers shall file a motion seeking Bankruptcy Court approval of an order entitling Buyer to the Breakup Fee and the Expense Reimbursement set forth in Section 7.02(b)(ii) hereof and approving bidding procedures substantially in accordance with the form attached as Exhibit C hereto (the "Proposed Bidding Procedures").

Section 5.06    **Bankruptcy Approval**.  In connection with seeking Bankruptcy Approval, Sellers shall prepare and file with the Bankruptcy Court a proposed order approving the Contemplated Transactions in the form attached hereto as Exhibit D (the "Proposed Sale Order").

## ARTICLE 6
## CONDITIONS TO OBLIGATION TO EFFECT THE CLOSING

Section 6.01    **Conditions to Obligations of Buyer and Sellers**.  The obligations of the parties hereto to consummate the Closing are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a) No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the Contemplated Transactions shall be in effect, and no law shall have been enacted or shall be deemed applicable to the Contemplated Transactions that makes the consummation of any such transaction illegal;

(b) Bankruptcy Approval shall have been granted pursuant to an order substantially similar in all material respects to the Proposed Sale Order (the "Approval Order"), and the Approval Order shall have become a Final Order (as defined below); and

(c) any condition(s) to Closing set forth in the Approval Order shall have been met.

For purposes of this Agreement, a "Final Order" means an order, judgment or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

Section 6.02    **Conditions to Obligations of Sellers**.  The obligations of Sellers to consummate the Contemplated Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a) the representations and warranties set forth in ARTICLE 4 above will be true and correct in all respects at the Closing, other than such representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time;

(b) Buyer shall have performed and complied in all material respects with all of its covenants hereunder required to be performed and complied with by it at or prior to the Closing; and

7

(c) Buyer shall have delivered to Sellers a certificate to the effect that each of the conditions specified above in Section 6.02(a) and Section 6.02(b) above has been satisfied.

Sellers may waive in writing any condition specified in this Section 6.02 at or prior to the Closing.

**Section 6.03    Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the Contemplated Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a) the representations and warranties set forth in ARTICLE 3 above will be true and correct in all respects at the Closing, other than such representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time;

(b) Each Seller shall have performed and complied in all material respects with all of its covenants hereunder required to be performed and complied with by it at or prior to the Closing; and

(c) Entry of an order by the Bankruptcy Court approving bidding procedures substantially similar in all material respects to the Proposed Bidding Procedures (the "Procedures Order"), and the Procedures Order shall not have been vacated, reversed, modified, amended, supplemented or stayed.

Buyer may waive in writing any condition specified in this Section 6.03 at or prior to the Closing.

### ARTICLE 7
### TERMINATION

**Section 7.01    Termination of Agreement**.  This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time prior to the Closing:

(a) by mutual written consent of Sellers and Buyer;

(b) by Buyer or any Seller if a final, nonappealable order permanently enjoining or otherwise prohibiting the Contemplated Transactions has been issued by a governmental entity of competent jurisdiction;

(c) by either Sellers or Buyer, by written notice given to the other, if there has been a material breach by (i) Buyer, in the case of notice from Sellers or (ii) any Seller, in the case of notice from Buyer, of any of the representations, warranties, covenants or agreements made by such person in this Agreement that would result in the failure to satisfy any of the applicable conditions specified in ARTICLE 6; provided, that such breach, if capable of cure, has not been cured within 15 days after receipt such written notice;

(d) by Buyer, if (i) following the entry by the Bankruptcy Court of the Procedures Order, such order is (A) modified, amended or supplemented in a manner adverse to Buyer without Buyer's prior written consent or (B) vacated, reversed or stayed or (ii) following the entry by the Bankruptcy Court of the Approval Order, such order is (A) modified, amended or supplemented in a manner adverse to Buyer without Buyer's prior written consent or (B) vacated, reversed or stayed; provided, that with respect to a termination of this Agreement pursuant to clause (i)(A) or clause (i)(B) of this Section 7.01(d), Buyer may exercise such termination right only within five business days of such modification, amendment or supplement;

1878876.11 30921-0001-000
67258229_14

(e)    by Buyer, if the Bankruptcy Court shall not have entered the Procedures Order within 35 days after the date hereof; provided, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 7.01(e) if, prior to such termination, the Bankruptcy Court shall have entered the Procedures Order;

(f)    by Buyer, if the Bankruptcy Court shall not have entered the Approval Order within 75 days after the date hereof and such order does not become a Final Order within 90 days after the date hereof; provided, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 7.01(f) if, prior to such termination, the Bankruptcy Court shall have entered the Approval Order or such order has become the Final Order, as applicable;

(g)    by Buyer, if the Procedures Order is entered by the Bankruptcy Court and a Bankruptcy Court-sanctioned auction for the Assets is not held (pursuant to the Procedures Order or otherwise) (the "Auction") within 60 days after the date hereof, unless an auction is not required pursuant to the terms of the Procedures Order; provided, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 7.01(g) if, prior to such termination, the Auction shall have been held;

(h)    by Sellers or Buyer, if the Auction is held and Buyer is not the winning bidder at the Auction; and

(i)    by Buyer, if any condition(s) to Closing set forth in the Approval Order shall not have been met within 60 days after the Approval Order is entered by the Bankruptcy Court (the "Outside Date"); provided, that the right to terminate this Agreement under this Section 7.01(i) shall not be available to Buyer if the failure of Buyer to fulfill, or the breach by Buyer of, any obligation under this Agreement or the Approval Order has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date.

Any party desiring to terminate this Agreement shall give written notice of such termination to the other parties.

**Section 7.02    Effect of Termination**.

(a)    In the event of a termination of this Agreement pursuant to Section 7.01, this Agreement (other than the provisions of this ARTICLE 7 and Section 4.04 (No Brokers), Section 5.01 (Public Announcements), Section 9.01 (Expenses), Section 9.10 (Governing Law), Section 9.11 (Submission to Jurisdiction) and Section 9.12 (Waiver of Jury Trial), which shall survive such termination) shall then be null and void and have no further force and effect, and all other rights and liabilities of the parties hereunder will terminate without any liability of any party to any other party, except for liabilities arising in respect of material breaches under this Agreement by any party prior to such termination.

(b)    Notwithstanding anything herein to the contrary:

(i)    if this Agreement is terminated in accordance with Section 7.01(a), Section 7.01(b), Section 7.01(d), Section 7.01(e), Section 7.01(f), Section 7.01(g), Section 7.01(h) or Section 7.01(i), or by Buyer in accordance with Section 7.01(c), Sellers shall disburse the Deposit to Buyer by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.04 of the Disclosure Schedules;

(ii)    if this Agreement is terminated in accordance with Section 7.01(h), Sellers shall pay to Buyer or its designee the sum of $50,000 (the "Breakup Fee"), plus

9

reasonable costs and expenses incurred by Buyer in connection with entry into this Agreement, not to exceed $100,000 (the "Expense Reimbursement"), within 30 days of the effectiveness of such termination, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.04 of the Disclosure Schedules.  For the avoidance of doubt, in the event this Agreement is terminated in accordance with Section 7.01(h), payment of the Breakup Fee and the Expense Reimbursement shall not be conditioned on Bankruptcy Approval, unless Buyer requests that Sellers seek such approval prior to making payment of the Breakup Fee and the Expense Reimbursement or the Bankruptcy Court orders otherwise; and

(iii)    if this Agreement is terminated by Buyer pursuant to Section 7.01(c), Section 7.01(d), Section 7.01(e), Section 7.01(f), Section 7.01(g) or Section 7.01(i), so long as Buyer is not then in material breach of the terms hereof, Sellers shall pay to Buyer or its designee the Expense Reimbursement, within 30 days of the effectiveness of such termination, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.04 of the Disclosure Schedules.

## ARTICLE 8
## INDEMNIFICATION

**Section 8.01    Survival**.  All representations and warranties of Buyer contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period beginning on the Closing Date and ending on the date that is 18 months following the Closing Date (the "Survival End Date"); provided, however, that if written notice of an indemnification claim shall have been delivered to Buyer in compliance with this Agreement before the aforementioned time period has elapsed with respect to any breach of any such representation or warranty, such representation or warranty shall survive, but solely with respect to the matter that is the subject of such indemnification claim notice, until such matter is finally resolved.  All covenants and agreements of Buyer contained herein that contemplate performance in full at or prior to the Closing shall survive the Closing until the Survival End Date (and all claims in respect of any breach thereof occurring prior to the Closing (which shall survive the Closing) must be brought on or prior to the Survival End Date) and all covenants and agreements contained herein that contemplate performance after the Closing shall survive the Closing in accordance with their terms; provided, further, that notwithstanding the foregoing, if written notice of an indemnification claim shall have been delivered to Buyer in compliance with this Agreement before the aforementioned time period has elapsed with respect to any breach of any covenant or agreement, such covenant or agreement shall survive, but solely with respect to the matter that is the subject of such indemnification claim notice, until such matter is finally resolved.  Notwithstanding the foregoing or anything to the contrary in this Agreement, no representation or warranty of any Seller shall survive the Closing.

**Section 8.02    Indemnification by Buyer**.  Buyer shall defend, indemnify and hold harmless Sellers, their affiliates and their respective agents, advisors, stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorney's fees and disbursements and the fees of The Boathouse Group, LLC, arising from or relating to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder;

10

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder; or

(c)    any Assumed Liability.

Section 8.03    **Indemnification Procedures**.    Whenever any claim shall arise for indemnification hereunder, Sellers shall promptly provide written notice of such claim to Buyer.  In connection with any claim giving rise to indemnification hereunder resulting from or arising out of any action by a person or entity who is not a party to this Agreement, Buyer, at its sole cost and expense and upon written notice to Sellers, may assume the defense of any such action with counsel reasonably satisfactory to Sellers.  Sellers shall be entitled to participate in the defense of any such action, with their counsel and at their own cost and expense.  If Buyer does not assume the defense of any such action, Sellers shall be obligated to defend against such action in such manner as they may deem appropriate, including, but not limited to, settling such action, after giving notice of it to Buyer, on such terms as Sellers may deem appropriate, and no action taken by Sellers in accordance with such defense and settlement shall relieve Buyer of its indemnification obligations herein provided with respect to any damages resulting therefrom.  Buyer shall not settle any action without Sellers' prior written consent (which consent shall not be unreasonably withheld or delayed).  For the avoidance of doubt, no Seller shall have the obligation to defend a claim for indemnification hereunder.

Section 8.04    **Effect of Investigation**.  No Seller shall be liable under this ARTICLE 8 with respect to any losses arising out of matters within the knowledge of Buyer on the date hereof or at the Closing Date.  For the avoidance of doubt, all information that is available to Buyer, could have been available to Buyer through reasonable investigation, or is generally available to the public shall be deemed to be within the knowledge of Buyer.

Section 8.05    **Exclusive Remedies**.  Following the Closing, the provisions of this ARTICLE 8 shall be Buyer's exclusive remedy for any and all claims relating to the subject matter of this Agreement or any of the other documents to be delivered hereunder.

<div align="center">

**ARTICLE 9**
**MISCELLANEOUS**

</div>

Section 9.01    **Expenses**.  All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the party incurring such costs and expenses.

Section 9.02    **Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given:  (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.02):

|  |  |
|---|---|
| If to Sellers: | The Boathouse Group, LLC<br>44 Lynden Street<br>Rye, NY 10580<br>Attention:  William D. Holden<br>Email:  wholden@boathouse-llc.com |
| with a copy (which shall not constitute notice) to: | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention:  Gregg Galardi, Esq.<br>Email:  gregg.galardi@ropesgray.com |
| If to Buyer: | Didit Holdings, LLC<br>330 Old Country Road, Ste. 206<br>Mineola, NY 11501<br>Attention:  Bert E. Brodsky<br>Email:  bbrodsky@sandata.com |
| with a copy to: | Davis & Gilbert LLP<br>1740 Broadway<br>New York, NY 10019<br>Attention:  Gary A. Kibel, Esq.<br>                   Jonathan L. Sagot, Esq.<br>Email:      gkibel@dglaw.com<br>                   jsagot@dglaw.com |

Section 9.03    **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 9.04    **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions be consummated as originally contemplated to the greatest extent possible.

Section 9.05    **Entire Agreement**.  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 9.06    **Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Buyer may not assign its rights or obligations hereunder without the prior written consent of Sellers, which consent shall not be unreasonably withheld or delayed.  No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.07    Third-party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except that Terry Gene Bollea shall be a third party beneficiary of Section 2.02(b)(iv)(B) of this Agreement.

**Section 9.08    Amendment and Modification**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 9.09    Waiver**.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10    Governing Law**.  All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

**Section 9.11    Submission to Jurisdiction**.  Any legal suit, action or proceeding arising out of or based upon this Agreement or the Contemplated Transactions may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and county of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**Section 9.12    Waiver of Jury Trial**.  Each party acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the Contemplated Transactions.

**Section 9.13    Specific Performance**.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.14    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[remainder of page left intentionally blank]*

The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS

GAWKER MEDIA GROUP, INC.

By: _____
Name: William D. Holden
Title: Authorized Signatory

GAWKER MEDIA LLC

By: _____
Name: William D. Holden
Title: Authorized Signatory

GAWKER HUNGARY, KFT. "v.a."

By: _____
Name: William D. Holden
Title: Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

BUYER                                DIDIT HOLDINGS, LLC
                                     By: did-it.com, LLC, its sole member

                                     By: _____
                                     Name: Bert E. Brodsky
                                     Title: Manager

*[Signature Page to Asset Purchase Agreement]*