Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11700-smb

4   - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   GAWKER MEDIA, LLC,

8

9            Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - -x

12

13            United States Bankruptcy Court

14            One Bowling Green

15            New York, New York  10004-1408

16

17            June 20, 2018

18            10:02 AM

19

20   B E F O R E:

21   HON. STUART M. BERNSTEIN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO:  F. FERGUSON

1    HEARING RE Motion for Entry of Bidding Procedures Order.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn

```
 1   A P P E A R A N C E S :

 2   ROPES & GRAY

 3   Attorneys for Debtor

 4   1211 Avenue of the Americas

 5   New York, New York  10036-8704

 6

 7   BY:  GREGG M. GALARDI, ESQ.

 8        KIMBERLY KODIS, ESQ.

 9

10   COHEN & GRESSER,LLP

11        Attorney for Terry Bollea

12        800 Third Avenue

13        New York, New York  10022

14

15   BY:  DANIEL H. TABAK, ESQ.

16

17   SKADDEN, ARPS, SLATE, MEAGHER, & FLOM, LLP

18        Four Times Square

19        New York, New York  10036

20

21   BY:  JASON KESTECHER, ESQ.

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              Gawker?

4              MR. GALARDI:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. GALARDI:  Gregg Galardi, on behalf of the plan

7     administrator.  Your Honor, today is the time and place for

8     the hearing on a motion to approve bid procedures.  Thanks

9     again for squeezing us in.  I understand you did have a

10    cancellation around this time.

11             With respect to the bid procedures, Your Honor, we

12    filed a motion seeking approval of the bid procedures after

13    having negotiations.  And Mr. William Holden's (ph) in the

14    courtroom today, and I would like to proceed by proffer,

15    Your Honor.

16             THE COURT:  Go ahead.

17             MR. GALARDI:  Yes.  Mr. Holden, if called as a

18    witness today, would testify that he had conducted an

19    initial sale/solicitation process, in which he conducted and

20    contacted over 150 potential buyers of the assets.  In that

21    process, he asked and there was a letter to give us your

22    final offer, pursuant to a closed bid process.  And we

23    received the bid from Mr. Lee (ph), which is reflected in

24    this document.

25             We also had received, as Your Honor is aware, a

Page 5

1   bid from Mr. Teal (ph), which was a lower bid, and other

2   bids.  We then proceeded to pursue settlement negotiations

3   with Mr. Teal.  And the last time that I was in court with

4   Your Honor, you approved that settlement agreement.

5         Once that settlement agreement was finalized, we

6   filed a bid procedures motion that now allowed Mr. Kevin Lee

7   or his firm to purchase the assets at a price over $1.1

8   million.  That process now contemplated an open auction, a

9   two-step process, in which the current stalking horse bidder

10  would receive certain bid protections.  The bid protections

11  being a $50,000 termination fee and expense reimbursement up

12  to $100,000, which we are seeking approval today.

13        Subsequent to filing that motion, Mr. Holden would

14  testify that he went out again to 80 to 90 of the interested

15  parties, that he has received 16 executed MBAs and at least

16  4 -- 2 to 3 other parties are still pursuing a transaction.

17  So we are hopeful that we will be able to secure a higher or

18  otherwise better bid.  Your Honor, we have asked for a

19  particular schedule to be approved with respect to the

20  solicitation of such higher or better bids and subject to

21  approval of the stalking horse protections that I've

22  mentioned.  That process would be that preliminary bids be

23  presented with certain types of materials to us by July 2nd.

24  Mr. Holden will have the authority to modify, should that

25  holiday period become a problem, but that we would ask

Page 6

1    qualified bids and ask Your Honor to approve the qualified

2    bid deadline be July 9th, that we would have a proposed sale

3    hearing on July 17th, and that we would conduct an auction

4    prior to those dates.

5            With respect to the sale itself, Your Honor, this

6    is the final asset of the -- of the company that we would

7    need to liquidate.  It was the asset left behind by

8    Univision.  We believe that the value -- we hope that the

9    value will go up, but we have  provided the bidder with bid

10   protections, in the event that we determine to terminate the

11   sale process or we get a higher or a better bid from a third

12   party.  Again, though the percentage of the bid break-up

13   fee, $50,000, is a higher percentage than what I'll call the

14   standard 3 percent, --

15           THE COURT:  So the 10 percent?

16           MR. GALARDI:  When you add --

17           THE COURT:  When you include the expenses.

18           MR. GALARDI:  When you add the expense

19   reimbursement, yes, it is 10 percent, and you, as I do,

20   calculate that as both the termination fees as well as that.

21   And it's over 10 percent.  The reason for the justification,

22   as Mr. Holden would testify, is, one, it was a request.  We

23   did negotiate back and forth.  And we'll also add that Mr.

24   Bollea also suggested that the fee was high -- was on the

25   high side, which, as a percentage, is true.

1          We tried to negotiate down.  We were unable to do

2     so.  That being said, given the size of the actual purchase

3     price, given that most of it is an expense reijmbursement

4     for negotiating and doing the transaction, and given that

5     the bidding permit is not that large, and after that period

6     of time, the bidding permit, we do not believe, will chill

7     bidding.  We still believe that it is in the range of

8     reasonable and should be approved by the Court under 363,

9     despite the fact that, when you add the two together and you

10    take the maximum expense reimbursement, it would be over 10

11    percent, but 10 percent of a million  dollars.  So we would

12    ask Your Honor to approve that fee and move forward, though

13    I have stated and Mr. Holden would testify, that there are

14    still three or four other bidders.  I don't believe any of

15    those bidders has complained about the break-up fee.

16          THE COURT:  They would have no standing.

17          MR. GALARDI:  And we don't believe that they will

18    chill.

19          THE COURT:  They would have no standing.

20          MR. GALARDI:  Well, but even in a -- well, we

21    won't bid it because the number's too high to go.  They're

22    interested at the higher price, given that --

23          THE COURT:  Well,

24          MR. GALARDI:  -- they know right now that that

25    number would go forward.

1           THE COURT:  One of the questions I have in, sure,

2      these types of transactions is the plan administrtor

3      consider that maybe you should just have an auction without

4      a stalking horse bidder.

5           MR. GALARDI:  Yes, Your Honor.

6           THE COURT:  Since there appear to be other

7      interested bidders.

8           MR. GALARDI:  Yes, Your Honor, but none of the

9      other bidders has come forward with a definitive agreement

10     at the prices.  And, Your Honor, based upon the prior bids

11     and the range of numbers, which are confidential, we did --

12     he did consider not having that.  But, one, we would have

13     lost what we believed to be the floor that was clearly the

14     highest after a solicitation of 150 bidders.  And despite

15     going back out and depsite there being a lot of notoriety

16     and despite how it going other people, has not had any other

17     person come by and say I will give you this deal and take a

18     lesser break-up fee or no break-up fee and have not offered

19     the kind of money at a higher or better bid or suggested

20     that they would be prepared to proceed with that break-up

21     fee.

22           THE COURT:  Did anyone offer more money after the

23     deal was approved?

24           MR. GALARDI:  They have not offered anything yet

25     of more money since the Teal deal was approved, although we

Page 9

1    did get aadditionlinnterest.  I know I had four or five

2    emails, and Mr. Holden has received additional emails to get

3    people interested and entities -- importantly, Your Honor,

4    without disclosing entities, there have been entities that

5    are now interested that, whether it was because of Mr. Teal

6    or not, there's been no causal relationship.  But at least

7    certain entities have contacted us about being interested in

8    bidding for the asset and that was subsequent to the Teal

9    settlement being approved, I believe, about a month ago.

10             THE COURT:  Who were the remaining parties that

11   have any interest in this auction, besides Mr. Bollea?

12             MR. GALARDI:  Oh, with respect to the economic

13   interests of the return?

14             THE COURT:  Yeah.

15             MR. GALARDI:  Mr. Bollea, which has the 45 percent

16   interest.  And then, again, I refer to them as the

17   equityholders.  So there is about 65 equity holders, but I

18   believe 45 percent of that -- 40 percent is in Mr. Denton's

19   (ph) interest.  And then there are three or four other

20   parties.

21             Columbus Nova (ph), whose may sound familiar, Your

22   Honor, was part of the financing, but also had an equity

23   interest in that.  They have one of the next largest

24   interests.  And then, two of the former employees, officers

25   of the company, and one counsel to the company was an

1    investor, and those are the next three.  And those are the

2    five entities that we normally speak to and give regular

3    updates during this matter.

4              THE COURT:  And they're familiar with the

5    application?

6              MR. GALARDI:  They are familiar with the

7    application.  They are familiar with the number.  They have

8    been advised as to the termination fee and the provisions.

9    Obviously, they would like the Gawker interests to go to a

10   similar type of entity.

11             But at the same time, they are prepared to proceed

12   with this.  I can't say, Your Honor, in all candor --

13   Mr. Holden would testify that there is still this lingering

14   interest in potentially not going forward with the sale at

15   this time because there are certain events.  The Thiel

16   movies are coming out.  The Gawker is getting some names.

17             So one of the issues that we do, in fact, wrestle

18   with and the former employees who are equity holders do

19   often raise is is this the best time.  Could we get a better

20   and higher price subsequent to this time?  And that's --

21   that has really been their concern at this price.

22             Obviously, Mr. Bollea has expressed his interest

23   in selling it now and selling it for the highest value, and

24   no one has said do not proceed with the sale.  We are hoping

25   that the auction erases all of those concerns.

Page 11

1          THE COURT:  Well, how are you going to know if you

2     could sell it for more money after these movies come out?

3          MR. GALARDI:  Again, that's -- we're going to be

4     consulting, again, with people and interests.  I mean,

5     Mr. Holden has been out consulting with movie producers, the

6     Hollywood people who are doing these kinds of projects.  And

7     they've still not shown a financial interest in backing it

8     for, as I'd like to say, a Netflix series on Gawker or those

9     kinds of things, even though there is a Gawker vs. Thiel

10    movie coming out.  That person hasn't expressed an interest

11    yet in buying it.

12          So again, absent somebody saying I think we can do

13    something, I think we believe currently, and why we filed

14    the motion, is that this will get us the highest and best

15    price and the time does not, in fact, increase the value.

16    We consult -- and Mr. Holden consults with media people

17    about whether they think the value would increase over time,

18    and so far, they believe that it's -- this is the best time

19    to sell.

20          THE COURT:  Do your proposed conditions of sale

21    allow you to withdraw or not accept any offers?

22          MR. GALARDI:  We can breach the agreement, and

23    that will trigger that $150,000 shot.  So we have to be

24    ready, willing, and able to do that and pay that price,

25    which is -- again, goes to Your Honor's point of it is 10

Page 12

1    percent of the fee.  That would be an economic decision to

2    make at that point in time.

3             THE COURT:  Does anybody object to the offer of

4    proof and want to cross-examine Mr. Holden?

5             Hearing no response, I'll accept the proffer as

6    his testimony.

7             Now you can go ahead with the application.

8             MR. GALARDI:  Your Honor, again, for the reasons

9    set forth in the proffer, we would ask Your Honor to approve

10   the bid procedures.  We did propose a form of order.  I

11   don't know if Your Honor has any questions of the order.

12            I would draw your attention to paragraph 29 of

13   that order, because I drew my attention to it.  And that

14   sentence should be stricken.  It was a leftover from the

15   first proffer sale.  It really is a provision that governs

16   sales within the first 21 days of a bankruptcy case, and

17   that was in the proposed order, paragraph 29.  So that

18   should be stricken.

19            THE COURT:  Okay.

20            MR. GALARDI:  They are, in fact, irrelevant.  I

21   don't know if Your Honor had other questions about the

22   proposed procedures.

23            THE COURT:  I do have several questions.  One of

24   the questions I have is that your transaction contemplates

25   the assumption and assignment of agreements.

1          MR. GALARDI:  It's actually just the assignment of

2     agreements that were previously assumed, Your Honor.

3          THE COURT:  Oh.  I guess my --

4          MR. GALARDI:  Which I believe --

5          THE COURT:  I guess my question is you know, this

6     is -- this case was confirmed a year ago.

7          MR. GALARDI:  Correct.

8          THE COURT:  Why am I approving a sale at all or an

9     assignment of agreements?

10         MR. GALARDI:  Your Honor, two things.  One is, as

11    Your Honor may not remember, the -- well, I'm going to say

12    three reasons.  One, Your Honor did, in fact, retain

13    jurisdiction over the sale of these assets, because it was

14    one of the requirements.

15         THE COURT:  Okay, that's -- it wasn't mentioned in

16    the application.  I didn't look at the plan or the

17    confirmation order.

18         MR. GALARDI:  I'm sorry.  I apologize for that.

19    We have -- we have done that.

20         THE COURT:  All right.

21         MR. GALARDI:  And that was one of the issues that

22    Mr. Bollea insisted, and part of the settlement of that also

23    became one of the issues in the Thiel settlement.  So that's

24    one of the reasons we're back here.  You did retain

25    jurisdiction.

Page 14

1         Two, the bidder actually wants a court order that

2  given that provision, would do it.  And as to the assignment

3  of contracts, I believe Your Honor, despite the assumption,

4  has to be done by confirmation and effective date.  But an

5  assignment can still be part of retained jurisdiction.

6         THE COURT:  Okay.  All right.  Just a minor thing

7  to start out with.

8         Oh, I have a question.  Paragraph 9 of your order

9  -- and this comes up sometimes in these auctions.  There's a

10  reference to the stalking horse getting credit for the full

11  amount of the stalking horse bid.  I've had auctions where

12  people don't know what they're bidding because of that

13  procedure.

14         MR. GALARDI:  Your Honor, and we actually had the

15  same debate, and I think you then had it with Skadden in the

16  San Edison (ph) issue.

17         THE COURT:  Yep, that may have been the case where

18  they didn't know what the bid was.

19         MR. GALARDI:  Well, but ours does know.  And the

20  bottom line is -- and I'd like to call it the crooked ladder

21  or what otherwise -- is whenever we value and we make it

22  clear to the bidders at the outset if you are not the

23  stalking horse bidder, you are -- every bid you bid we are

24  deducting the termination fee and that.  So it is net value

25  to the estate.

1          THE COURT:  Okay, as long as it's just a

2     consideration of value and all the bidders are bidding the

3     same dollars.

4          MR. GALARDI:  That's all it is.  Correct, we're

5     looking at the bottom line after taking account the break-up

6     fee and the expense reimbursement, yes, Your Honor.  And I

7     make it clear in the transcript of the auction at the start

8     and make it clear any number of times, because we do give

9     the net value to the estate when we say what is a higher or

10    otherwise better bid.

11         THE COURT:  All right.  Paragraph 11 -- each of

12    the debtors has signed the stalking horse agreement, right?

13         MR. GALARDI:  Yes.

14         THE COURT:  And it's the stalking horse agreement

15    --

16         MR. GALARDI:  The plan administrator assigned it

17    on behalf of each of those.

18         THE COURT:  Okay.  And the stalking horse

19    agreement is what commits the obligors to pay the stalking

20    horse fee and the expense reimbursement?

21         MR. GALARDI:  Correct.

22         THE COURT:  Right.  First of all, there's a

23    reference to the respective estates, but there are no

24    estates any more, right?

25         MR. GALARDI:  Well, it's a plan administrator for

1    those estates.  So there's still some money in each of the

2    estates.  So I'm not -- it's not a debtor-in-possession any

3    more.  I'm not sure if you're making that distinction.

4            THE COURT:  It's the asset you're selling still.

5            MR. GALARDI:  Yes.

6            THE COURT:  What are the assets of these estates?

7            MR. GALARDI:  Well, there is -- well, --

8            THE COURT:  There are causes of action, right?

9            MR. GALARDI:  No.  Yeah, but that's not any more.

10   It really is the I.P. rights and the license rights, and the

11   contracts are still in -- again, maybe GMGI (ph), which is

12   the parent, is not correct.

13           THE COURT:  Right.

14           MR. GALARDI:  But in Gawker and in the Hungarian

15   -- and in Gawker Hungary, they each used (ph) 11 interests,

16   and we still have to close out that Hungarian entity.

17           THE COURT:  Okay.  Okay.  A couple of comments.

18   This is in 13 and maybe elsewhere, this notion of adequate

19   assurance and future performance, with respect to the

20   assigned contracts.

21           MR. GALARDI:  Yeah.

22           THE COURT:  First of all, the way your order is

23   written somebody has to complain about that before the

24   auction is over and we know who the bidder is.  So how can

25   the non-contract party complain about lack of adequate

Page 17

1    assurance of future performance if the party doesn't know

2    who the successful bidder is, since -- yeah, I get that they

3    have a successful bidder obviously bears on whether or not

4    that party --

5            MR. GALARDI:  Your Honor is correct.  So we can

6    modify that.  Look, they should complain about the stalking

7    horse, obviously, by the deadline.

8            THE COURT:  Right.  You know what?

9            MR. GALARDI:  The normal process I do is --

10           THE COURT:  It's also the debtor's obligation.

11           MR. GALARDI:  We have an obligation to prove it.

12   I understand that.

13           THE COURT:  Yes, and even in the absence of an

14   objection, you have an affirmative burden to --

15           MR. G ALARDI:  Right.

16           THE COURT:  -- demonstrate adequate assurance of

17   future performance.  The non-debtor party doesn't even have

18   to object to it.

19           MR. GALARDI:  Your Honor, this was not intended to

20   take away our affirmative obligation.

21           THE COURT:  Well, --

22           MR. GALARDI:  It really is the --

23           THE COURT:  It does, because there's all sorts of

24   waivers, and it places the burden on the buyer -- I'm sorry

25   -- on the non-debtor party to complain about adequate

1    assurance.  I'm looking at 19 and some of the sub-

2    paragraphs.

3              MR. GALARDI:  Would you just -- would you like us

4    to strike those paragraphs and just say the debtor will

5    carry its burden?

6              THE COURT:  Well, why don't you just say that, you

7    know, you'll demonstrate adequate assurance of future

8    performance?  That's your burden, and it may just be that

9    this is the -- you know, the buyer, and the buyer can

10   perform all the obligations.

11             MR. GALARDI:  Okay.

12             THE COURT:  And that may be sufficient.

13             MR. GALARDI:  And that is fine, Your Honor.  I've

14   normally had contract parties, third parties, say that

15   doesn't give them enough time and they wanted a deadline.

16   But I'm fine.

17             THE COURT:  Well, yeah, I mean, that's another

18   problem that you have to figure out who the buyer is,

19   particularly, --

20             MR. GALARDI:  Your Honor, I have --

21             THE COURT:  -- if it's a vehicle just formed to

22   buy this particular asset.

23             MR. GALARDI:  Your Honor, in this circumstance,

24   probably the easiest way is to say if Your Honor is

25   comfortable, they can raise any issues with respect to

Page 19

1    adequate assurance at the sale hearing.  I have no problem,

2    because I have the burden anyway.

3              THE COURT:  But they still don't know until that

4    moment.

5              MR. GALARDI:  Well, but the sale hearing is after

6    the auction.  So they'll know.  We'll file a notice.

7              THE COURT:  How many days after it?

8              MR. GALARDI:  It's two days after.

9              THE COURT:  Well, we'll see what happens.

10             MR. GALARDI:  I still have the burden.  Nothing's

11   relieved me of the burden.

12             THE COURT:  All right.

13             MR. GALARDI:  But I'm just saying if they want to

14   object, I don't have a problem raising it at the hearing.

15             THE COURT:  Right.

16             MR. GALARDI:  And I'm sure Your Honor would hear

17   them, and I don't want to have a notice problem.  So I don't

18   have to put a deadline in here for this.

19             THE COURT:  All right.  Paragraph 26 -- the

20   stalking horse has standing to enforce the terms of this

21   order.  What does that mean?

22             MR. GALARDI:  Standing to enforce the terms of a

23   bid procedure order, under which they've gotten benefits.

24             THE COURT:  To the extent they've gotten

25   contractual benefits, yeah.

Page 20

1              MR. GALARDI:  Correct.

2              THE COURT:  Or the benefits under the order.

3              MR. GALARDI:  It means that, if we didn't pay the

4      termination fee and they've got the provisions, they can

5      come back to this Court and say -- that, to me, is --

6              THE COURT:  I'm approving that they have

7      contractual right for that.

8              MR. GALARDI:  Correct.

9              THE COURT:  Okay, on your bidding procedures, page

10     99 -- and I see this a lot.  It basically says that,

11     notwithstanding the bid procedures, you can make any changes

12     you think are appropriate.

13             MR. GALARDI:  Correct.

14             THE COURT:  So why have bid procedures?

15             MR. GALARDI:  Your Honor, because, one, it frames

16     any objection to that.  Two, we have to consult with

17     Mr. Bollea.  And, three, obviously, Your Honor is not going

18     to say that we can just do anything.  So if we need --

19             THE COURT:  Well, --

20             MR. GALARDI:  If it doesn't have the material

21     modification in there, then I'd certainly put the material

22     --

23             THE COURT:  Put in the material modification?

24             MR. GALARDI:  That's fine.

25             THE COURT:  Does anybody else want to be heard in

Page 21

1    connection with this application?

2           All right, well, hearing no response, I'll approve

3    the application.  There has been a substantial marketing

4    effort -- and a lot of this will be reviewed again at the

5    sale hearing.  But obviously, there's been a substantial

6    marketing effort, and that marketing effort bears on the

7    appropriateness of the business judgment of entering into a

8    stalking horse contract.  I had raised the issue about

9    whether or not it makes sense to simply go forward with the

10   naked auction.  But the administrator considered that,

11   considered as an exercise of business judgment, that it made

12   more sense to lock in a potential buyer.

13          You know, the estate is giving up value, but the

14   bottom line is, although everybody would prefer that that

15   value -- potentially that value -- while everyone would

16   prefer that that value flowed to the debtors and the

17   beneficiaries of the sale, it's certainly an appropriate

18   exercise of business judgment to lock in the bid.  So I'll

19   approve it.

20          You can -- with those changes, you can send me a

21   blackline copy of the order and the bid procedures and a

22   clean copy.

23          MR. GALARDI:  Thank you, Your Honor.

24          THE COURT:  Okay?  Thank you very much.

25          MR. GALARDI:  That's all the matters for us today,

Page 22

1    Your Honor.

2              THE COURT:  All right, thank you.

3              MR. GALARDI:   Thank you.

4         (Whereupon, these proceedings concluded at 10:23 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

1                              I N D E X

2                                RULING

3                                                              PAGE

4    Debtor's Motion For Entry of a

5    Bidding Procedures Order                                  20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 24

1                    C E R T I F I C A T I O N

2

3    I, Nicole Yawn, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6    Nicole        Digitally signed by Nicole Yawn
                   DN: cn=Nicole Yawn, o, ou,
                   email=digital1@veritext.com,
     Yawn          c=US
7                  Date: 2018.07.11 12:43:35 -04'00'
     _____

8    Nicole Yawn

9

10   Date:  July 11, 2018

11

12

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501