## Exhibit 1

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

by and among

**GAWKER MEDIA GROUP, INC.,**

**GAWKER MEDIA LLC,**

**GAWKER HUNGARY, KFT. "V.A.",**

and

**BDG GMGI ACQUISITION, INC.,**

dated as of

**July 12, 2018**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July 12, 2018, is entered into by and among Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media LLC, a Delaware limited liability company ("GM LLC"), Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft., a Hungarian corporation ("Gawker Hungary" and together with Holdco and GM LLC, "Sellers" and each individually, a "Seller"), and BDG GMGI Acquisition, Inc., a Delaware corporation ("Buyer").

## RECITALS

WHEREAS, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, the rights and obligations of Sellers to the Purchased Assets (as defined in Section 1.01) and the Assumed Liabilities (as defined in Section 1.03), subject to the terms and conditions set forth herein; and

WHEREAS, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered the Order (I) Authorizing and Approving Bidding Procedures, Breakup Fee and Expense Reimbursement, (II) Authorizing and Approving the Debtors' Performance of Pre-Closing Obligations Under the Stalking Horse Asset Purchase Agreement, (III) Approving Notice Procedures, (IV) Scheduling a Sale Hearing and (V) Approving Procedures for Assignment of Certain Contracts (Docket No. 16-11700 (SMB)) (the "Procedures Order").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

**Section 1.01    Purchase and Sale of Assets**.  Subject to the terms and conditions set forth herein, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, all of Sellers' right, title and interest in the assets set forth on Section 1.01 of the disclosure schedules (the "Disclosure Schedules") attached hereto (the "Purchased Assets").

**Section 1.02    Excluded Assets**.  Notwithstanding the foregoing, the Purchased Assets shall not include the assets set forth on Section 1.02 of the Disclosure Schedules (the "Excluded Assets", and together with the Purchased Assets, the "Assets").

**Section 1.03    Assumption of Liabilities**.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations arising after the Closing (as defined in Section 2.01) related to or arising in connection with the Purchased Assets, but only to the extent that such liabilities and obligations do not relate to any breach of, default under or violation of this Agreement by any Seller (collectively, the "Assumed Liabilities"), which such Assumed Liabilities shall include, but shall not be limited to, the obligations of Buyer set forth in Section 8.02 and those liabilities and obligations set forth in Section 1.03 of the Disclosure Schedules.  Following the Closing, Sellers shall have no further obligations with respect to the Purchased Assets.

**Section 1.04    Purchase Price**.  The aggregate purchase price for the Purchased Assets shall consist of $1,350,000.00 (the "Purchase Price"), plus the assumption of the Assumed Liabilities.  Buyer shall pay the Purchase Price minus the Deposit (as defined in Section 4.06) to Sellers at the Closing in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.04 of the Disclosure Schedules.

**Section 1.05    Allocation of Purchase Price**. Sellers and Buyer agree to the allocation of the Purchase Price for all purposes (including tax and financial accounting) as 45% to the Gawker Media Contingent Proceeds Creditor Account (as defined in the Amended Joint Chapter 11 Plan of Liquidation for Sellers, dated as of December 11, 2016 (the "Sellers' Bankruptcy Plan")), 33% to GM LLC and 22% to Gawker Hungary, in accordance with Sellers' Bankruptcy Plan (the "Bankruptcy Allocation Formula"). Buyer and Sellers shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

## ARTICLE 2
## CLOSING

**Section 2.01    Closing**. The closing (the "Closing") of the transactions contemplated by this Agreement (the "Contemplated Transactions") shall take place no later than the third business day following the full satisfaction or due waiver of all of the closing conditions set forth in ARTICLE 6 hereof, or at such other location or on such other date as is mutually agreeable to Buyer and Sellers (the "Closing Date"), at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 or electronic means of transmittal; provided, however, that the Closing shall occur no later than 10:00 AM, New York City time, on August 2, 2018 (the "Termination Date"). The consummation of the Contemplated Transactions shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 2.02    Closing Deliverables**.

(a)    At the Closing, Sellers shall deliver to Buyer the following:

(i)    an assignment and assumption agreement in the form of Exhibit A hereto  (the "Assignment and Assumption Agreement") and duly executed by Sellers, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities and all other liabilities arising from, or relating to, the Purchased Assets;

(ii)    an assignment in the form of Exhibit B hereto (the "Intellectual Property Assignment Agreement") and duly executed by Sellers, transferring all of Sellers' right, title and interest in and to the trademark registrations, copyright registrations and domain name registrations included in the Purchased Assets to Buyer;

(iii)    copies of all consents, approvals, waivers and authorizations referred to in Section 3.02 of the Disclosure Schedules;

(iv)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement; and

(v)    a copy of the sale order entered by the Bankruptcy Court in form substantially similar in all material respects to the Proposed Sale Order (as defined in Section 5.05).

(b)    At the Closing, Buyer shall deliver to Sellers the following:

(i)    Cash in the amount of the Purchase Price minus the Deposit;

(ii)    the Assignment and Assumption Agreement duly executed by Buyer;

2

(iii)    the Intellectual Property Assignment Agreement duly executed by Buyer; and

(iv)    a certificate of an officer of Buyer setting forth Buyer's agreement in writing to be bound by (1) Paragraph 12 and Paragraph 17 (to the extent that Paragraph 17 relates to the Purchased Assets) of that certain Settlement Agreement, dated December 9, 2016, by and among Sellers and Terry Gene Bollea, and (2) the terms of that certain License Agreement, dated as of September 9, 2016, by and among Sellers and UniModa, LLC, a New York limited liability company, in accordance with Section 10 thereof.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer that the statements contained in this ARTICLE 3 are true and correct as of the date hereof and as of the Closing Date.  For purposes of this ARTICLE 3, "Sellers' knowledge," "knowledge of Sellers" and any similar phrases shall mean the actual knowledge of William D. Holden (the "Plan Administrator").

**Section 3.01    Organization and Authority of Sellers; Enforceability**.  Sellers are duly organized, validly existing and in good standing under the laws of their respective jurisdictions of organization.  Sellers have full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out their obligations hereunder and to consummate the Contemplated Transactions; provided, however, that Sellers shall seek approval (including the entry of orders in respect of the Contemplated Transactions, "Bankruptcy Approval") of the Contemplated Transactions by the Bankruptcy Court, and such Bankruptcy Approval shall have been granted prior to the Closing and shall be in effect and not subject to any stay pending appeal at the time of the Closing. The execution, delivery and performance by Sellers of this Agreement and the documents to be delivered hereunder and the consummation of the Contemplated Transactions have been duly authorized by all requisite actions on the part of each Seller.  This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Sellers, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (the "Bankruptcy Exception").

**Section 3.02    No Conflicts; Consents**.  Except as set forth on Section 3.02 of the Disclosure Schedules, the execution, delivery and performance by Sellers of this Agreement and the documents to be delivered hereunder, and the consummation of the Contemplated Transactions, do not and will not, subject to Bankruptcy Approval being in effect and not subject to any stay pending appeal at the time of the Closing, (a) violate or conflict with the organizational documents of any Seller or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sellers or the Purchased Assets.  Except as otherwise set forth herein, no consent, approval, waiver or authorization is required to be obtained by Sellers from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Sellers of this Agreement and the consummation of the Contemplated Transactions.

**Section 3.03    Assigned Contracts**.  Section 3.03 of the Disclosure Schedules includes each contract included in the Purchased Assets and being assigned to and assumed by Buyer (the "Assigned Contracts").  Complete and correct copies of each Assigned Contract have been made available to Buyer. There are no disputes pending or threatened under any Assigned Contract.  Upon request by a

3

counterparty to any Assigned Contract, Buyer shall provide evidence of adequate assurance of future performance of such Assigned Contract, including Buyer's financial ability to perform under such Assigned Contract and a contact person that such counterparty may contact if they wish to obtain further information regarding Buyer.  The Approval Order (as defined in <u>Section 6.01(b)</u>) shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned to Buyer, of the Assigned Contracts.  The cure amounts as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assigned Contracts, shall be paid by Sellers to the non-Sellers counterparty to the Assigned Contracts prior to the Closing.

**Section 3.04    Settlement Agreements**.  Sellers have made available to Buyer, on or prior to the date hereof, the following:

(a)    That certain Settlement Agreement, dated November 1, 2016, by and among Sellers and Dr. Shiva Ayyadurai;

(b)    That certain Settlement Agreement, dated November 1, 2016, by and among Sellers and Ashley Terrill; and

(c)    That certain Settlement Agreement, dated December 9, 2016, by and among Sellers and Terry Gene Bollea.

### ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE 4 are true and correct as of the date hereof and as of the Closing Date.  For purposes of this ARTICLE 4, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual knowledge of Kevin Lee, after reasonable due inquiry.

**Section 4.01    Organization and Authority of Buyer; Enforceability**.  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  Buyer has full power and corporate authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the Contemplated Transactions.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the Contemplated Transactions have been duly authorized by all requisite action on the part of Buyer.  This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the Bankruptcy Exception.  Buyer is a wholly owned subsidiary of BDG Media, Inc.

**Section 4.02    No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the Contemplated Transactions, do not and will not:  (a) violate or conflict with the Buyer's certificate of incorporation or bylaws; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer.  No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Contemplated Transactions.

4

**Section 4.03    Legal Proceedings**.  To Buyer's knowledge:  (a) there is no legal suit, action or proceeding of any nature pending or threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the Contemplated Transactions; and (b) no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such legal suit, action or proceeding.

**Section 4.04    Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Buyer.

**Section 4.05    Sale "As Is, Where Is"**.  Buyer acknowledges and agrees that upon the Closing, Sellers shall sell and convey to Buyer and Buyer shall accept the Purchased Assets "AS IS, WHERE IS, WITH ALL FAULTS," except to the extent expressly provided otherwise in this Agreement and any document executed by Sellers and delivered to Buyer at the Closing.  Except as expressly set forth in this Agreement, Buyer has not relied and will not rely on, and no Seller and/or representative of any or all Sellers shall be liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Purchased Assets or relating thereto (including specifically, without limitation, information packages or presentations distributed with respect to the Purchased Assets) made or furnished by any Seller or any agent or third party representing or purporting to represent any Seller, to whomever made or given, directly or indirectly, orally or in writing.

**Section 4.06    Deposit**.  Buyer has delivered $226,320 (the "Deposit") to Sellers, to be held as a deposit until (a) the Closing (in which case the Deposit shall thereupon be retained by Sellers, and Sellers shall distribute such funds in accordance with the Bankruptcy Allocation Formula), (b) the termination of this Agreement automatically in accordance with Section 7.01(f) or by Sellers in accordance with Section 7.01(c) (in which case the Deposit shall thereupon be released to Sellers, and Sellers shall distribute such funds in accordance with the Bankruptcy Allocation Formula) or (c) the termination of this Agreement in accordance with Section 7.01(a), Section 7.01(b), Section 7.01(d), Section 7.01(e) or Section 7.01(h) or by Buyer in accordance with Section 7.01(c) (in which case the Deposit shall thereupon be released to Buyer).

**Section 4.07    Identity of Buyer**.  Neither Buyer nor any of its affiliates nor any officer, director, or shareholder of Buyer or any of its affiliates is a current or former officer, director, shareholder, employee or contractor of any Seller.

## ARTICLE 5
## COVENANTS

**Section 5.01    Public Announcements**.  Unless otherwise required by applicable law, prior to the Closing, Buyer shall not make any public announcements regarding this Agreement or the Contemplated Transactions without the express consent of the Plan Administrator (which consent shall not be unreasonably withheld or delayed).

**Section 5.02    Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, value added and other taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Sellers shall cooperate with respect thereto as necessary).  The parties agree that (a) the Purchased Assets do not constitute a trade or business as defined in Treas. Reg. §1.355-3(b)(2)(ii), and (b) all Purchased Assets constitute intangible assets as defined in the Internal Revenue Code of 1986, as amended, §197.

5

**Section 5.03    Further Assurances**.  Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Contemplated Transactions and the documents to be delivered hereunder.

**Section 5.04    Archives**.

(a)    The parties agree and acknowledge that prior to the Closing, the Plan Administrator or any Seller may elect to preserve the Archives (as defined in Section 1.01 of the Disclosure Schedules), or some portion thereof, by granting Internet Archive, a California nonprofit public benefit corporation (the "Archiving Service"), a license to publish the Archives in perpetuity in the forms in which they exist on the date hereof in accordance with that certain License Agreement, by and among Sellers, on one hand, and the Archiving Service, on the other, in substantially the form attached as Exhibit C hereto.  In order to maintain the search engine optimization value of the Archives on the original domains for the benefit of Buyer, Sellers covenant and agree that they shall ensure that the canonical URL for each webpage included in the Archives directs to the respective original Gawker domain included in the Purchased Assets the ("Original Gawker URL"), including, without limitation, by taking, or causing the Plan Administrator to take, the following steps prior to sharing the Archives, or a copy thereof, with any third party:

(i)    The code of each webpage shall be edited to include a rel="canonical" link tag identifying the Original Gawker URL as canonical by adding the following code to the <head> section of the webpage code, inserting the Original Gawker URL where indicated:

<link rel="canonical" href = "*[ORIGINAL GAWKER URL]*>

<meta name="robots" content="noindex">

(ii)    The third-party recipient of the Archives shall be required to refrain from removing or deactivating the rel="canonical" link tag and the "noindex" tag from the <head> section of the webpage code.

(iii)    The third-party recipient of the Archives shall be required to either: (A) house the Archives exclusively behind a firewall or other non-web-based system; or (B) place the Archives in a specified directory that is disallowed to web robots via /robots.txt, by specifying in the /robots.txt code:

User-agent: *
Disallow: /*[SPECIFIED DIRECTORY]*/

(b)    At all times, provided that Sellers have complied with the obligations set forth in Section 5.04(a) above, Buyer covenants and agrees to waive any and all claims it may have at law or at equity arising out of or relating to the Plan Administrator's, Sellers' and/or any of the Archiving Service's handling and/or maintenance of the Archives.

(c)    From and after the Closing, Buyer covenants and agrees that (i) it shall maintain, or shall cause to be maintained, in all material respects, the Archives in a medium and manner generally accessible to the public through the internet and (ii) it shall not make any claim as to ownership of the Archives as against the Archiving Service for purposes of DMCA takedown requests.

**Section 5.05    Bankruptcy Approval**.  In connection with seeking Bankruptcy Approval, Sellers shall prepare and file with the Bankruptcy Court a proposed order approving the Contemplated Transactions substantially in the form attached as <u>Exhibit D</u> hereto (the "<u>Proposed Sale Order</u>").

## ARTICLE 6
## CONDITIONS TO OBLIGATION TO EFFECT THE CLOSING

**Section 6.01    Conditions to Obligations of Buyer and Sellers**.  The obligations of the parties hereto to consummate the Closing are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a)    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the Contemplated Transactions shall be in effect, and no law shall have been enacted or shall be deemed applicable to the Contemplated Transactions that makes the consummation of any such transaction illegal;

(b)    Bankruptcy Approval shall have been granted pursuant to an order substantially similar in all material respects to the Proposed Sale Order (the "<u>Approval Order</u>"), and the Approval Order shall have become a Final Order (as defined below); and

(c)    any condition(s) to Closing set forth in the Approval Order shall have been met.

For purposes of this Agreement, a "<u>Final Order</u>" means an order, judgment or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

**Section 6.02    Conditions to Obligations of Sellers**.  The obligations of Sellers to consummate the Contemplated Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a)    the representations and warranties set forth in ARTICLE 4 above will be true and correct in all respects at the Closing, other than such representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time; and

(b)    Buyer shall have performed and complied in all material respects with all of its covenants hereunder required to be performed and complied with by it at or prior to the Closing.

Sellers may waive in writing any condition specified in this <u>Section 6.02</u> at or prior to the Closing.

**Section 6.03    Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the Contemplated Transactions are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a)    the representations and warranties set forth in ARTICLE 3 above will be true and correct in all respects at the Closing, other than such representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time; and

(b)    Each Seller shall have performed and complied in all material respects with all of its covenants hereunder required to be performed and complied with by it at or prior to the Closing.

Buyer may waive in writing any condition specified in this Section 6.03 at or prior to the Closing.

## ARTICLE 7
## TERMINATION

**Section 7.01    Termination of Agreement**.    This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by Buyer or any Seller if a final, nonappealable order permanently enjoining or otherwise prohibiting the Contemplated Transactions has been issued by a governmental entity of competent jurisdiction;

(c)    by either Sellers or Buyer, by written notice given to the other, if there has been a material breach by (i) Buyer, in the case of notice from Sellers or (ii) any Seller, in the case of notice from Buyer, of any of the representations, warranties, covenants or agreements made by such person in this Agreement that would result in the failure to satisfy any of the applicable conditions specified in ARTICLE 6; provided, that such breach, if capable of cure, has not been cured within 15 days after receipt such written notice;

(d)    by Buyer, if following the entry by the Bankruptcy Court of the Approval Order, such order is (A) modified, amended or supplemented in a manner adverse to Buyer without Buyer's prior written consent or (B) vacated, reversed or stayed;

(e)    by Buyer, if the Bankruptcy Court shall not have entered the Approval Order within 15 days after the date hereof and such order does not become a Final Order within 30 days after the date hereof; provided, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 7.01(e) if, prior to such termination, the Bankruptcy Court shall have entered the Approval Order or such order has become the Final Order, as applicable;

(f)    automatically, if the Closing has not occurred on or prior to the Termination Date, so long as Sellers are (i) in material compliance with their obligations hereunder through the Termination Date and (ii) the Approval Order has been entered by the Bankruptcy Court and such order has not been (A) modified, amended or supplemented in a manner adverse to Buyer without Buyer's prior written consent or (B) vacated, reversed or stayed;

(g)    [Reserved];

(h)    by Buyer, if any condition(s) to Closing set forth in the Approval Order shall not have been met on or prior to the Termination Date; provided, that the right to terminate this Agreement under this Section 7.01(h) shall not be available to Buyer if the failure of Buyer to fulfill, or the breach by Buyer of, any obligation under this Agreement or the Approval Order has been the cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date; or

(i)    [Reserved].

Any party desiring to terminate this Agreement shall give written notice of such termination to the other parties.

**Section 7.02    Effect of Termination**.

8

(a)    In the event of a termination of this Agreement pursuant to Section 7.01, this Agreement (other than the provisions of this ARTICLE 7 and Section 4.04 (Brokers), Section 5.01 (Public Announcements), Section 9.01 (Expenses), Section 9.10 (Governing Law), Section 9.11 (Submission to Jurisdiction) and Section 9.12 (Waiver of Jury Trial), which shall survive such termination) shall then be null and void and have no further force and effect, and all other rights and liabilities of the parties hereunder will terminate without any liability of any party to any other party, except for liabilities arising in respect of material breaches under this Agreement by any party prior to such termination.

(b)    Notwithstanding anything herein to the contrary, if this Agreement is terminated in accordance with Section 7.01(a), Section 7.01(b), Section 7.01(d), Section 7.01(e), or Section 7.01(h), or by Buyer in accordance with Section 7.01(c), Sellers shall disburse the Deposit to Buyer by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.04 of the Disclosure Schedules.

## ARTICLE 8
## INDEMNIFICATION

**Section 8.01    Survival**.  All representations and warranties of Buyer contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period beginning on the Closing Date and ending on the date that is 18 months following the Closing Date (the "Survival End Date"); provided, however, that if written notice of an indemnification claim shall have been delivered to Buyer in compliance with this Agreement before the aforementioned time period has elapsed with respect to any breach of any such representation or warranty, such representation or warranty shall survive, but solely with respect to the matter that is the subject of such indemnification claim notice, until such matter is finally resolved.  All covenants and agreements of Buyer contained herein that contemplate performance in full at or prior to the Closing shall survive the Closing until the Survival End Date (and all claims in respect of any breach thereof occurring prior to the Closing (which shall survive the Closing) must be brought on or prior to the Survival End Date) and all covenants and agreements contained herein that contemplate performance after the Closing shall survive the Closing in accordance with their terms; provided, further, that notwithstanding the foregoing, if written notice of an indemnification claim shall have been delivered to Buyer in compliance with this Agreement before the aforementioned time period has elapsed with respect to any breach of any covenant or agreement, such covenant or agreement shall survive, but solely with respect to the matter that is the subject of such indemnification claim notice, until such matter is finally resolved.  Notwithstanding the foregoing or anything to the contrary in this Agreement, no representation or warranty of any Seller shall survive the Closing.

**Section 8.02    Indemnification by Buyer**.  Buyer shall defend, indemnify and hold harmless Sellers, their affiliates and their respective agents, advisors, stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorney's fees and disbursements and the fees of the Plan Administrator, arising from or relating to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder;

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder; or

(c)    any Assumed Liability.

9

**Section 8.03    Indemnification Procedures**.    Whenever any claim shall arise for indemnification hereunder, Sellers shall promptly provide written notice of such claim to Buyer.  In connection with any claim giving rise to indemnification hereunder resulting from or arising out of any action by a person or entity who is not a party to this Agreement, Buyer, at its sole cost and expense and upon written notice to Sellers, may assume the defense of any such action with counsel reasonably satisfactory to Sellers.  Sellers shall be entitled to participate in the defense of any such action, with their counsel and at their own cost and expense.  If Buyer does not assume the defense of any such action, Sellers shall be obligated to defend against such action in such manner as they may deem appropriate, including, but not limited to, settling such action, after giving notice of it to Buyer, on such terms as Sellers may deem appropriate, and no action taken by Sellers in accordance with such defense and settlement shall relieve Buyer of its indemnification obligations herein provided with respect to any damages resulting therefrom.  Buyer shall not settle any action without Sellers' prior written consent (which consent shall not be unreasonably withheld or delayed).  For the avoidance of doubt, no Seller shall have the obligation to defend a claim for indemnification hereunder.

**Section 8.04    Effect of Investigation**.  No Seller shall be liable under this ARTICLE 8 with respect to any losses arising out of matters within the knowledge of Buyer on the date hereof or at the Closing Date.  For the avoidance of doubt, all information that is available to Buyer, could have been available to Buyer through reasonable investigation, or is generally available to the public shall be deemed to be within the knowledge of Buyer.

**Section 8.05    Exclusive Remedies**.  Following the Closing, the provisions of this ARTICLE 8 shall be Buyer's exclusive remedy for any and all claims relating to the subject matter of this Agreement or any of the other documents to be delivered hereunder.

## ARTICLE 9
## MISCELLANEOUS

**Section 9.01    Expenses**.  All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the party incurring such costs and expenses.

**Section 9.02    Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given:  (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.02):

If to Sellers:                          The Boathouse Group, LLC
                                             44 Lynden Street
                                             Rye, NY 10580
                                             Attention:  William D. Holden
                                             Email:  wholden@boathouse-llc.com

10

69891880_9

|  |  |
|---|---|
| with a copy (which shall not constitute notice) to: | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention:  Gregg Galardi, Esq.<br>Email:  gregg.galardi@ropesgray.com |
| If to Buyer: | BDG GMGI Acquisition, Inc.<br>315 Park Avenue South<br>New York, New York<br>Attention:  CFO<br>Email:  legalnotices@bustle.com |
| with a copy to: | Gunderson Dettmer LLP<br>1 Bush Plaza, Ste. 1200<br>San Francisco, CA 94104<br>Attention:  Josh Cook, Esq.<br>Email:      jcook@gunder.com |

**Section 9.03    Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.04    Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions be consummated as originally contemplated to the greatest extent possible.

**Section 9.05    Entire Agreement**.  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), in the body of this Agreement will control.

**Section 9.06    Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Buyer may not assign its rights or obligations hereunder without the prior written consent of Sellers, which consent shall not be unreasonably withheld or delayed.  No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.07    Third-party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except that Terry Gene Bollea shall be a third-party beneficiary of Section 2.02(b)(iv)(1) of this Agreement.

**Section 9.08    Amendment and Modification**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

11

**Section 9.09    Waiver**.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10    Governing Law**.  All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

**Section 9.11    Submission to Jurisdiction**.  Any legal suit, action or proceeding arising out of or based upon this Agreement or the Contemplated Transactions may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and county of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**Section 9.12    Waiver of Jury Trial**.  Each party acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the Contemplated Transactions.

**Section 9.13    Specific Performance**.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.14    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[remainder of page left intentionally blank]*

12

      The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS                          GAWKER MEDIA GROUP, INC.


By_____
Name: William D. Holden
Title: Authorized Signatory

GAWKER MEDIA LLC


By_____
Name: William D. Holden
Title: Authorized Signatory

GAWKER HUNGARY, KFT. "v.a."


By_____
Name: William D. Holden
Title: Authorized Signatory

BUYER

BDG GMGI ACQUISITION, INC.

By _____

Name:

Title:

EXHIBIT A

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT A

## ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of _____, 2018, by and among Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media LLC, a Delaware limited liability company ("GM LLC"), Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft., a Hungarian corporation (together with Holdco and GM LLC, "Assignors"), and BDG GMGI Acquisition, Inc., a Delaware corporation ("Assignee").

## RECITALS

WHEREAS, Assignors wish to assign, and Assignee wishes to assume, certain of Assignors' assets and Assignors' rights and obligations under certain agreements in the manner set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

SECTION 1.  Assignment and Assumption.  Assignors hereby assign and transfer to Assignee all of the right, title, privileges and interest of any Assignor in and to, and all of the obligations of such Assignor under, all of the agreements listed on Schedule I.  Assignee hereby accepts the foregoing assignment and assumes and agrees to observe and perform all of the obligations of the respective Assignor in such agreements from and after the date hereof.

SECTION 2.  Governing Law. THIS AGREEMENT, AND ALL CLAIMS ARISING HEREUNDER, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 3.  Counterparts.  This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

*[Signature page follows]*

The undersigned have hereunto set their hands as of the day and year first above written.

ASSIGNORS:

GAWKER MEDIA LLC


By_____
Name: William D. Holden
Title: Authorized Signatory

GAWKER HUNGARY, KFT. "v.a."


By_____
Name: William D. Holden
Title: Authorized Signatory


ASSIGNEE:

BDG GMGI ACQUISITION, INC.


By_____
Name: Deb Schwartz
Title: CFO

[Signature Page to Assignment and Assumption]

## Schedule I

1. Master Services Agreement between MarkMonitor, Inc. and Gawker Hungary, dated as of June 6, 2017.

2. JW Player Order – Gawker Media LLC – 2017 between JW PLAYER / LONGTAIL AD SOLUTIONS, INC. and GM LLC, dated as of June 27, 2017.

3. JW Player Terms of Service, last revised February 12, 2018, available at https://www.jwplayer.com/TOS/.

4. Video Storage and Hosting January through December 2018 statement of work between Viddler, Inc. and GM LLC, dated as of December 8, 2017.

5. Viddler, Inc. Business Services Agreement, last updated April 22, 2015, available at http://www.viddler.com/business-help/sla/.

6. AWS Customer Agreement between Amazon Web Services, Inc. and GM LLC.

EXHIBIT B

FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

EXHIBIT B

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "IP Assignment"), dated as of _____, 2018 and effective as of 5:01 AM GMT on such date, is made by Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media LLC, a Delaware limited liability company ("GM LLC"), Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft., a Hungarian corporation ("Gawker Hungary" and together with Holdco and GM LLC, the "Sellers"), each located at 44 Lynden Street, Rye, NY 10580, in favor of BDG GMGI Acquisition, INC. ("Buyer"), a Delaware corporation, located at 315 Park Avenue South, New York, NY, the purchaser of certain assets of the Sellers pursuant to an Asset Purchase Agreement between Buyer and the Sellers, dated as of July 12, 2018 (the "Asset Purchase Agreement").

WHEREAS, under the terms of the Asset Purchase Agreement, the Sellers have conveyed, transferred, and assigned to Buyer, among other assets, certain intellectual property of the Sellers, and have agreed to execute and deliver this IP Assignment, for recording with the United States Patent and Trademark Office and the United States Copyright Office, and corresponding entities or agencies in any applicable jurisdictions;

NOW THEREFORE, the parties agree as follows:

1. Assignment. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Sellers hereby irrevocably convey, transfer, and assign to Buyer, and Buyer hereby accepts, all of the Sellers' right, title, and interest in and to the following (the "Assigned IP"):

(a)  the trademark registrations set forth on Schedule 1 hereto and all issuances, extensions, and renewals thereof;

(b)  the copyright registration set forth on Schedule 2 hereto and all issuances, extensions, and renewals thereof;

(c)  the domain name registrations set forth on Schedule 3 hereto and all extensions and renewals thereof;

(d)  all derivatives, versions, releases, updates, modifications and improvements of the foregoing and all documentation for or tangible embodiments of any of the foregoing;

(e) all rights of any kind whatsoever of the Sellers accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

(f)  any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(g)  any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.  <u>Recordation and Further Actions</u>. The Sellers hereby authorize the Commissioner for Trademarks in the United States Patent and Trademark Office, the Register of Copyrights in the United States Copyright Office and the officials of corresponding entities or agencies in any applicable jurisdictions to record and register this IP Assignment upon request by Buyer. Following the date hereof, upon Buyer's reasonable request and at Buyer's sole cost and expense, the Sellers shall take such steps and actions, and provide such cooperation and assistance to Buyer and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Assigned IP to Buyer, or any assignee thereof or successor thereto.  In the event Buyer is unable, after reasonable effort, to secure the Sellers' cooperation in delivering such further instruments or further actions discussed herein, the Sellers hereby irrevocably designate and appoint Buyer and its duly authorized officers and agents as the Sellers' agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act on the Sellers' behalf and to do all lawfully permitted acts with the same legal force and effect as if executed by the Sellers.

3.  <u>Terms of the Asset Purchase Agreement</u>. The parties hereto acknowledge and agree that this IP Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of the Sellers and Buyer with respect to the Assigned IP. The representations, warranties, covenants, agreements, and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

4.  <u>Specific Performance</u>. The parties agree that irreparable damage may occur if any provision of this IP Assignment were not performed in accordance with the terms hereof and that the parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

5.  <u>Severability</u>. If any provision of this IP Assignment shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this IP Assignment or the validity or enforceability of this IP Assignment in any other jurisdiction, and the parties shall negotiate in good faith to modify such provision so that it is valid or enforceable to the parties.

6.  <u>Counterparts</u>. This IP Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this IP Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this IP Assignment.

7.  <u>Successors and Assigns</u>. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

8.  <u>Governing Law</u>. This IP Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this IP Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

The Sellers have duly executed and delivered this IP Assignment as of the date first above written.

SELLERS                                          GAWKER MEDIA GROUP, INC.


By_____
Name:   William D. Holden
Title:   Authorized Signatory


GAWKER MEDIA LLC


By_____
Name:   William D. Holden
Title:   Authorized Signatory


GAWKER HUNGARY, KFT. "v.a."


By_____
Name:   William D. Holden
Title:   Authorized Signatory

AGREED TO AND ACCEPTED:                    BDG GMGI ACQUISITION, INC.


By: _____
Name: Deb Schwartz
Title: CFO
Address for Notices:  315 Park Avenue South
                                    New York, New York

**SCHEDULE 1**

**ASSIGNED TRADEMARK REGISTRATIONS**

| Trademark | Class of Mark | Jurisdiction | Filing Date | Status | Registration No. |
|---|---|---|---|---|---|
| Gawker | Standard Character | United States | 8/26/2003 | Registered | 2901710 |
| Gawker | | EU | 3/16/2010 | Registered | 8957961 |
| Gawker | | CA | 2/1/2010 | Registered | TMA785433 |

## SCHEDULE 2

## ASSIGNED COPYRIGHT REGISTRATION

| Grantor | Title | Filing Date/Issued Date | Status | Application/ Registration No. |
|---|---|---|---|---|
| Gawker Media LLC | The Gawker Guide to Conquering All Media | 10/17/2007 | Registered | TX0006831598 |

# SCHEDULE 3

## DOMAIN NAME REGISTRATIONS

gawker.com
gawker.co.in
gawker.com.tw
gawker.in
gawker.tw
gawker.pl
gawker.com.ph
gawkershop.com
gawkerartists.com
gawker.hk
gawker.cn
gawker.com.hk
gawker.se
gawker.it
gawker.be
gawker.co
gawkerstalker.co
gawker.nl
gawkernet.com
gawker.hu
gaw.kr
gawkerassets.xxx
gawkerclips.xxx
gawkermedia.xxx
gawkershop.xxx
gawkervideo.xxx
gawkermedia.com
gawker.es
gawker.dk
gawkerassets.com
gawker.fr
gawkervideo.com
gawker.design
gawker.tech
gawker.tv
gawker.media
gawker.me
gawkerhd.com
studioatgawker.com
gawkerclips.com
gawkertv.com

EXHIBIT C

FORM OF LICENSE AGREEMENT

EXHIBIT C

# LICENSE AGREEMENT

This LICENSE AGREEMENT (this "Agreement"), dated as of _____, 2018, is made by and among Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media LLC, a Delaware limited liability company ("GM LLC"), Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft., a Hungarian corporation ("Gawker Hungary", and together with Holdco and GM LLC, the "Grantors" and each individually, a "Grantor"), and Internet Archive, a California nonprofit public benefit corporation ("User").

1. <u>License</u>. Subject to the terms and conditions of this Agreement, the Grantors license to User, to the extent that the Grantors own or control such rights and without express or implied representations or warranties of any kind, an irrevocable, royalty-free, non-exclusive, non-transferable, worldwide, perpetual right to permanently preserve and make publicly available for scholarly and research purposes the Archives (as defined in <u>Section 2</u>), via the internet and/or any similar publicly accessible media developed in the future.

2. <u>Definition</u>. The "Archives" means content published on or before August 22, 2016 (and related archives thereof, and including the copyrights thereto) created specifically for and initially published to the general public on the primary gawker.com domain or any of the sub-domains listed on <u>Schedule I</u> hereto (but not any content or related archives and copyrights initially published to the general public on any other domain, site or "vertical", including Deadspin, Gizmodo, Jalopnik, Jezebel, Kotaku or Lifehacker and their associated domains and sub-domains). For the avoidance of doubt, the Archives shall not include (a) any technology related to the display of content on websites previously operated by the Grantors or (b) any content or archives associated with any sub-domains that are not listed on <u>Schedule I</u> hereto.  Notwithstanding anything to the contrary herein, the "Archives" shall not include any materials that constitute the Content as defined in that certain Settlement Agreement, dated as of December 9, 2016, by and between the Grantors, on the one hand, and Terry Gene Bollea, on the other (the "Bollea Settlement").

3. <u>Consideration</u>. As consideration in full for the rights granted herein, User shall pay to the Grantors a one-time fee in the amount of $100.00, on the date hereof, by wire transfer of immediately available funds to the account or accounts specified by the Grantors. In further consideration of the rights granted herein, User hereby waives any and all claims it has, or may have in the future, against the Grantors arising from, relating to, or with respect to the Archives.

4. <u>Reservation of Rights</u>. Neither this Agreement, nor any act, omission, or statement by any Grantor or User, or any representative thereof, conveys any ownership right in any of the Archives, or to any element or portion thereof, or other materials provided by or on behalf of any Grantor under this Agreement. Except for the rights specifically licensed to User herein, all right, title, and interest in and to the Archives are and will remain with the Grantors. No use by any Grantor of the Archives in any medium or manner shall be deemed to interfere with the limited permissions made to User by the Grantors herein.

5. <u>Representations and Warranties</u>. User represents and warrants that User has the full right, power, and authority to enter into this Agreement and perform its obligations hereunder. The execution, delivery and performance of this Agreement by User have been duly authorized by all necessary organizational action of User, and when executed and delivered by both parties, this Agreement will constitute a legal, valid and binding obligation of User, enforceable against User in accordance with its terms and conditions.

6. <u>Covenants</u>. User agrees that:

   a. It shall not attack title to or any rights of any Grantor in and to the Archives.

   b. It shall use its best efforts to, in perpetuity, preserve and make publicly available for scholarly and research purposes the Archives via the internet and/or any similar publicly accessible media developed in the future.

   c. It shall not use the Archives for any purpose other than as set forth in <u>Section 1</u> hereof.

   d. It shall not remove or deactivate the rel="canonical" link tag and the "noindex" tag from the <head> section of the webpage code on any page of the Archives.

   e. It shall (1) house the Archives exclusively behind a firewall or other non-web-based system; or (2) place the Archives in a specified directory that is disallowed to web robots via /robots.txt, by specifying in the /robots.txt code:

   > User-agent: *
   > Disallow: /[SPECIFIED DIRECTORY]/

7. <u>Indemnification</u>. User shall indemnify, defend, and hold harmless the Grantors, or any one of them, and their respective officers, directors, employees, agents, affiliates, successors and assigns, from and against any claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements, arising from or relating to any breach by User of its representations, warranties, or other obligations hereunder.

8. <u>Equitable Remedies</u>. User acknowledges that a breach or threatened breach by User under this Agreement would give rise to irreparable harm to the Grantors for which monetary damages would not be an adequate remedy. In the event of such a breach or a threatened breach by User, the Grantors will, in addition to any and all other rights and remedies that may be available to them at law, at equity, or otherwise in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to (a) post a bond or other security, or (b) prove actual damages or that monetary damages will not afford an adequate remedy.

9. <u>General</u>.

a. <u>UniModa License Agreement</u>. User agrees to be bound by the terms of that certain License Agreement, dated as of September 9, 2016, by and among the Grantors and UniModa LLC, a Delaware limited liability company, in accordance with Section 10 thereof.

b. <u>Bollea Settlement</u>. User agrees to be bound by the terms of Paragraph 12 of the Bollea Settlement.

c. <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

d. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, or invalidate or render unenforceable such term or provision, in any other jurisdiction.

e. <u>Assignment</u>. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective permitted successors and assigns.

f. <u>Governing Law; Venue</u>. All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule. Any legal suit, action, or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be instituted in the federal courts of the United States of America or the courts of the State of California in each case located in the City of San Francisco and County of San Francisco, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such legal suit, action, or proceeding.

g. <u>Amendment and Modification</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto.

h. <u>Waiver</u>. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; and any single or partial exercise of any right, remedy, power or privilege hereunder shall not preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

i. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*remainder of page left intentionally blank*]

The parties hereto have duly executed this Agreement as of the date first written above.

GRANTORS:                          **GAWKER MEDIA GROUP, INC.**
                                   **GAWKER MEDIA LLC**
                                   **GAWKER HUNGARY, KFT. "v.a."**


                                   By: _____
                                   Name:  William D. Holden
                                   Title:   Authorized Signatory


USER:                              **INTERNET ARCHIVE**


                                   By: _____
                                   Name:  Brewster Kahle
                                   Title:   Chief Executive Officer, Digital
                                            Librarian and Founder

## Schedule I

### Sub-Domains

1.  defamer.gawker.com
2.  valleywag.gawker.com
3.  rankings.gawker.com
4.  internet.gawker.com
5.  thevane.gawker.com
6.  dog.gawker.com
7.  morningafter.gawker.com
8.  domesticity.gawker.com
9.  blackbag.gawker.com
10. disputations.gawker.com
11. antiviral.gawker.com
12. drugs.gawker.com
13. finevining.gawker.com
14. fortressamerica.gawker.com
15. review.gawker.com
16. truestories.gawker.com
17. justice.gawker.com
18. tktk.gawker.com
19. takes.gawker.com
20. art.gawker.com
21. thecuck.gawker.com
22. publicpool.gawker.com
23. bestrestaurant.gawker.com
24. politburo.gawker.com
25. documents.gawker.com
26. thewest.gawker.com
27. slow.gawker.com
28. sonyhack.gawker.com
29. interviews.gawker.com
30. phasezero.gawker.com
31. frenchgawker.gawker.com
32. themachines.gawker.com
33. dodgeandburn.gawker.com

EXHIBIT D

FORM OF PROPOSED SALE ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Gawker Media LLC, *et al.*,[1] | Case No. 16-11700 (SMB) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. [•]** |

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' GAWKER. COM ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS,
RIGHTS, INTERESTS AND ENCUMBRANCES, (II) APPROVING THE ASSET
PURCHASE AGREEMENT AND (III) AUTHORIZING THE DEBTORS TO ASSIGN
<u>CERTAIN EXECUTORY CONTRACTS</u>**

Upon the motion (the "<u>Motion</u>") of  the Plan Administrator[2] for the entry of an order,
pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "<u>Bankruptcy
Code</u>"), and rules 1005, 2002, 6004, 6006, 9007, 9014 and 9019 of the Federal Rules of
Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (i) approving the Asset Purchase Agreement by
and among Gawker Media LLC, Gawker Media Group, Inc., and Gawker Hungary, Kft. "v.a.",
f/k/a Kinja, Kft., the debtors (collectively, the "<u>Debtors</u>"), acting through the Plan Administrator,
and Didit Holdings, LLC (together with its permitted designees, successors and permitted assigns
in accordance with the Asset Purchase Agreement, the "<u>Buyer</u>"), dated May 29, 2018
(substantially in the form attached hereto as **Exhibit 1**, and as may be amended, modified or
supplemented from time to time in accordance with the terms thereof, the "<u>Stalking Horse APA</u>"),
whereby the Debtors have agreed to sell, and Buyer has agreed to acquire, substantially all of the

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors are: Gawker Media LLC (0492); Gawker Media
Group, Inc. (3231); and Gawker Hungary, Kft. "v.a." (5056).  The offices of the Debtors are located at 44 Lynden Street, Rye,
NY 10580.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures or the
Stalking Horse APA, as applicable.

Debtors' assets related to the Gawker.com website (collectively, and as specifically set forth and defined in the Stalking Horse APA, the "Purchased Assets") other than the Excluded Assets, and the Debtors have agreed to transfer and Buyer has agreed to assume certain of the Debtors' liabilities (collectively, and as specifically set forth and defined in the Stalking Horse APA, the "Assumed Liabilities") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Stalking Horse APA, the "Transactions"); (ii) authorizing and approving the sale of the Purchased Assets (the "Sale"), free and clear, to the maximum extent permitted under section 363(f) of the Bankruptcy Code, of any and all interests, including, without limitation, liens (as such term is defined in section 101(37) of the Bankruptcy Code, including, without limitation, any liens arising out of bulk transfer law), debts, claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, costs, expenses, causes of action, avoidance actions, demands, guaranties, options, rights, contractual commitments, settlements, injunctions, restrictions, interests, encumbrances, reclamation rights, and similar matters of any kind whatsoever, whether known or unknown, fixed or contingent, or arising prior to or subsequent to the commencement of these chapter 11 cases (the "Cases") and whether imposed by agreement, understanding, law, equity or otherwise (each of the foregoing collectively or individually, and including to the extent not specified above, Successor or Transferee Liability (as defined in paragraph 21 below), including any and all claims and causes of action of defamation, libel or slander with respect to any content published by the Debtors prior to Closing, but excluding Assumed Liabilities, the "Adverse Interests") with all such Adverse Interests to attach to the net proceeds of the Sale, in the order of their priority, with the same validity, force and effect that they now have against the Purchased Assets, subject with respect to such net proceeds to any rights, claims and defenses the Debtors or any parties in interest

may possess with respect thereto; (iii) authorizing the assignment to Buyer of certain executory contracts of the Debtors in accordance with the Stalking Horse APA, the Bidding Procedures Order (as defined herein) and this Order; and (iv) granting other relief; and the Court having entered an order approving the bidding procedures and granting certain related relief on [•], 2018 [Docket No. [•]] (the "Bidding Procedures Order"); [and an auction (the "Auction") having been held on [•], 2018 in accordance with the Bidding Procedures Order; and Buyer having been deemed the Successful Bidder by the Plan Administrator pursuant to the Bidding Procedures Order;] and the Court having conducted a hearing on the Motion on [•], 2018 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion and other evidence submitted in support thereof, the Stalking Horse APA, the Bidding Procedures Order and the record of the hearing before the Court on [•], 2018; and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and it appearing that due notice of the Motion, the Stalking Horse APA, the Bidding Procedures Order [and the Auction] has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors their stakeholders and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FINDS AS FOLLOWS:**

<u>**Jurisdiction, Venue, Statutory Bases and Final Order**</u>

A.    This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334.

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may

enter a final order consistent with Article III of the United States Constitution.  Venue of this

proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory and legal predicates for the relief requested in the Motion and

provided for herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy

Rules 1005, 2002, 6004, 6006, 9007, 9014 and 9019.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C.

§ 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary

under Bankruptcy Rules 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made

applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay

in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

### Notice of the Transactions, Stalking Horse APA, Sale Hearing [and Auction]

E.      Actual written notice of the Sale Hearing, [the Auction,] the Motion and the Sale,

and a reasonable opportunity to object or be heard with respect to the Motion and the relief

requested therein, has been afforded to all known interested entities including to the following

parties: (i) the office of the United States Trustee for the Southern District of New York; (ii) parties

who are known or reasonably believed to have asserted any lien, encumbrance, claim or other

interest in the Debtors' assets that are the subject of the proposed sale of the Purchased Assets, if

any; (iii) all parties who have filed a notice of appearance and request for service of papers in the

Cases pursuant to Bankruptcy Rule 2002; (iv) each counterparty to the Debtors' Assigned

Contracts (as defined in the Stalking Horse APA); (v) all applicable state and local taxing

authorities, including the Internal Revenue Service; (vi) each governmental agency that is an

interested party with respect to the sale of the Purchased Assets contemplated by the Staking Horse

APA and the transactions proposed thereunder; (vii) the Securities and Exchange Commission; and (viii) counsel to Buyer.

F.     The foregoing notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, [the Auction,] the Sale Hearing, the Stalking Horse APA or the Transactions is required.  The disclosures made by the Plan Administrator concerning the Stalking Horse APA, [the Auction,] the Transactions and the Sale Hearing were good, complete and adequate.

G.     The Plan Administrator has filed and served assignment notices (the "Assignment Notices") upon all non-Debtor counterparties to all Assigned Contracts notifying such parties that the Plan Administrator, on behalf of the Debtors, may seek to assign such contracts on the Closing Date of the Sale as provided in the Stalking Horse APA.

### Highest and Best Offer

H.     As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Plan Administrator conducted a marketing process in accordance with, and has otherwise complied in all material respects with, the Bidding Procedures Order.  The Bidding Procedures were non-collusive and substantively and procedurally fair to all parties.  All interested persons and entities have been afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit higher or otherwise better bids to purchase the assets of the Debtors and (iii) object and be heard in connection with the Sale Motion and the relief granted by this Order.  [The Auction contemplated by the Bidding Procedures was held on [•], 2018.  At the conclusion of the Auction, Buyer was selected by the Plan Administrator as the Successful Bidder.] [The Plan Administrator did not receive any Qualified Bids for the Purchased Assets prior to the Bid Deadline.  Therefore,

no Auction was necessary under the terms of the Bidding Procedures and the Buyer was named by the Plan Administrator as the Successful Bidder.]

I.    The Purchased Assets were adequately marketed by the Plan Administrator, the consideration provided by Buyer under the Stalking Horse APA constitutes or provides the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Purchased Assets and the assumption of all Assumed Liabilities, and the performance of the other covenants set forth in the Stalking Horse APA will provide a greater benefit for the Debtors than would be provided by any other available alternative.  Buyer is the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order.  The Plan Administrator's determination that the Stalking Horse APA constitutes the highest and best offer for the Purchased Assets is a valid and sound exercise of the Plan Administrator's business judgment.  Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the Stalking Horse APA.  The Sale and Stalking Horse APA likewise comply with the Bidding Procedures Order and all other applicable orders of this Court.

J.    Approval of the Motion and the Stalking Horse APA and the consummation of the Transactions contemplated thereby is in the best interests of the Debtors, their respective equity holders and creditors and other parties in interest and there is substantial risk of deterioration of the value of the Purchased Assets if the Sale is not consummated quickly.  The Debtors and Plan Administrator have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the Stalking Horse APA.

K.    Entry of an order approving the Stalking Horse APA and all the provisions thereof is a necessary condition precedent to Buyer's consummation of the Transactions.

**Arms' Length Sale**

L.       The Stalking Horse APA and the Transactions contemplated thereunder were proposed, negotiated and entered into by and between the Plan Administrator, on behalf of the Debtors, on the one hand, and Buyer, on the other hand, without collusion or fraud of any kind, in good faith and at arm's length.  There has been no showing that the Plan Administrator or Buyer have engaged in any action or inaction that would cause or permit the Stalking Horse APA or the Transactions to be avoided or impose any costs or damages under section 363(n) of the Bankruptcy Code.  Specifically, Buyer has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among the bidders.  In addition, none of Buyer or its respective affiliates, present or contemplated members, officers, directors, partners, shareholders or any of their respective heirs, successors and assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

**Good Faith of Buyer**

M.       Buyer is entering into the Transactions in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and the court decisions thereunder, and is therefore entitled to the full protection of that provision with respect to all aspects of the transactions contemplated by the Stalking Horse APA, including the acquisition of the Purchased Assets, and otherwise has proceeded in good faith in all respects in connection with this proceeding.

N.       In accordance with section 365 of the Bankruptcy Code, including section 365(f)(2) of the Bankruptcy Code, the Plan Administrator has shown that Buyer has the wherewithal, financial and otherwise, to perform all of its obligations under the Stalking Horse APA.

### No Fraudulent Transfer

O.       The consideration provided by Buyer pursuant to the Stalking Horse APA for its purchase of the Purchased Assets, the assumption of the Assumed Liabilities and the performance of the covenants contained in the Stalking Horse APA constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and under the laws of the United States, any state, territory, possession thereof or the District of Columbia.

P.       There has been no showing that the Plan Administrator, on behalf of the Debtors, or Buyer (i) has entered into the Stalking Horse APA or proposes to consummate the Transactions for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors or (ii) is entering into the Stalking Horse APA or proposing to consummate the Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

Q.       By virtue of the consummation of the Transactions contemplated by the Stalking Horse APA, (i) Buyer is not a continuation of the Debtors, there is no continuity between Buyer and the Debtors, there is no common identity between the Debtors and Buyer, there is no continuity of enterprise between the Debtors and Buyer, Buyer is not a mere continuation of the Debtors, and Buyer does not constitute a successor to the Debtors, (ii) Buyer is not holding itself out to the public as a continuation of the Debtors and (iii) the Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtors.

**Validity of Transfer**

R.    Each Debtor's Board of Directors or equivalent and Buyer have authorized the execution and delivery of the Stalking Horse APA, the sale of all Purchased Assets to Buyer and the assumption of all Assumed Liabilities to Buyer.  The Plan Administrator and Buyer (i) have full corporate power and authority to execute and deliver the Stalking Horse APA and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Transactions and (iii) have taken all action necessary to authorize and approve the Stalking Horse APA and to consummate the Transactions, and no further consents or approvals are required for the Plan Administrator or Buyer to consummate the Transactions contemplated by the Stalking Horse APA, except as otherwise set forth therein.

S.    Other than the Assumed Liabilities, Buyer shall have no obligations with respect to any liabilities of the Debtors or any Adverse Interests against any of the Debtors or their property, and Buyer and its successors and assigns are released from any and all claims, causes of action, obligations, liabilities, demands, damages, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating, in any manner whatsoever, to the Purchased Assets, except for liabilities and obligations arising expressly under, or expressly assumed by Buyer under, the Stalking Horse APA.

T.    The consummation of the Sale and Transactions is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 363(n) and 365(f)(2) of the Bankruptcy Code, and with respect to the Assigned Contracts, all of the applicable requirements of such sections have been or will be complied with in respect of the Transactions as of the effective date of assignment.

U.      The Purchased Assets constitute property of the Debtors and title thereto is presently vested in the Debtors pursuant to the Plan and within the meaning of section 541(a) of the Bankruptcy Code.  The sale of the Purchased Assets to Buyer will be, as of the Closing Date or such later date as such Purchased Assets are transferred under the Stalking Horse APA, a legal, valid and effective transfer of such assets, and each transfer and assignment vests or will vest Buyer with all right, title and interest of the Debtors to the Purchased Assets free and clear of all Adverse Interests.

## Section 363 Is Satisfied

V.      Entry into the Stalking Horse APA and consummation of the Transactions contemplated thereby constitute the exercise of the Plan Administrator's sound business judgment consistent with its fiduciary duties and such acts are in the best interests of the Debtors, their respective equity holders and creditors and other parties in interest.    The Debtors have demonstrated both (i) good, sufficient and sound business reasons and justifications and (ii) compelling circumstances for the sale of the Purchased Assets to Buyer pursuant to section 363(b) of the Bankruptcy Code and the Plan.  Such business reasons include the facts that (i) the Debtors' Plan expressly contemplated the sale of the Purchased Assets after the Plan was consummated; (ii) the Stalking Horse APA constitutes the highest and best offer for the Purchased Assets; (iii) the Stalking Horse APA and the consummation of the Transactions contemplated thereby present the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Purchased Assets; and (iv) unless the sale of the Purchased Assets is consummated expeditiously as provided for in the Motion and pursuant to the Stalking Horse APA, equity holders' recoveries may be diminished.

W.      The Plan Administrator, on behalf of the Debtors, may sell and assign the Purchased Assets free and clear of all Adverse Interests, and the Transactions will not subject Buyer or any of Buyer's assets to any liability for any Adverse Interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), because, with respect to each creditor asserting an Adverse Interest, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Adverse Interests who did not object or who withdrew their objections to the Sale, the Transactions or the Assignment Notices are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of Adverse Interests are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Adverse Interests, if any, attach to the proceeds of the Sale, in the same order of priority and with the same validity, force and effect that such Adverse Interest holder had before the Sale, subject to any rights, claims and defenses of the Debtors, as applicable, or as otherwise provided herein.

X.      Buyer would not have entered into the Stalking Horse APA and would not consummate the sale of all Purchased Assets, thus adversely affecting the Debtors, their respective equity holders and creditors and other parties in interest, if the sale of the Purchased Assets was not free and clear of all Adverse Interests or if Buyer would be liable for any Adverse Interests.

Y.      A sale of the Purchased Assets other than one free and clear of all Adverse Interests would adversely impact the Debtor, and would yield substantially less value for the Debtors, with less certainty than the Sale.  Therefore, the Sale contemplated by the Stalking Horse APA is in the best interests of the Debtors, their respective equity holders and creditors and all other parties in interest.

### Assignment of the Assigned Contracts

Z.       The assignment of the Assigned Contracts pursuant to the terms of the Bidding Procedures Order, this Order and the Stalking Horse APA are integral to the Stalking Horse APA, are in the best interests of the Debtors and their respective equity holders and creditors and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Plan Administrator.

AA.      The assignment to Buyer of each of the Assigned Contracts shall be free and clear of all Adverse Interests against Buyer.

BB.      Buyer has provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts to be assigned under the Stalking Horse APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer, notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

CC.      No default exists in the Debtors' performance under the Assigned Contracts as of the date of the Closing.

### Compelling Circumstances for an Immediate Sale

DD.      Time is of the essence.  To maximize the value of the Debtors' assets, it is critical that the Transactions close within the time constraints set forth in the Stalking Horse APA. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 4001, 6004, and 6006.

EE.      The Plan Administrator has demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale other than in

the ordinary course of business, in that, among other things, the immediate implementation of this Order and the consummation of the Sale are both necessary to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors and their respective equity holders and creditors and all other parties in interest in the Cases, and to provide the means for the Debtors to maximize creditor recoveries.

FF.    The transactions contemplated by the Stalking Horse APA and this Order neither impermissibly restructure the rights of any Debtors' creditors or equity holders.

GG.    Nothing in the Stalking Horse APA creates any third party beneficiary rights in any person or entity not a party to the Stalking Horse APA.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

1.    The Motion is granted and approved to the extent set forth herein.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court prior to the date hereof or as resolved in this Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

3.    Findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures hearing held on [•], 2018, are incorporated herein by reference.

4.    Where appropriate herein, findings of fact shall be deemed conclusions of law and conclusions of law shall be deemed findings of fact.

### Approval of the Stalking Horse APA

5.      The Stalking Horse APA and all of the Transactions contemplated therein are approved.  The failure specifically to include any particular provision of the Stalking Horse APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse APA be authorized and approved in its entirety, with such amendments thereto as may be made by the parties in accordance with this Order.

6.      The Plan Administrator and the Debtors are authorized to (i) take any and all actions necessary and appropriate to execute and deliver, perform under, consummate, implement and effectuate the Stalking Horse APA, together with any and all instruments and documents that may be reasonably necessary or desirable to fully close the Transactions, including the sale to the Buyer of all Purchased Assets, in accordance with the terms and conditions set forth in the Stalking Horse APA and this Order, and to implement and effectuate the terms of the Stalking Horse APA and this Order; (ii) take any and all actions as may be necessary or appropriate to the performance of the Plan Administrator's and the Debtors obligations as contemplated by the Stalking Horse APA and this Order, without any further corporate action or order of this Court; and (iii) assign any and all Assigned Contracts as and when provided in the Stalking Horse APA.

7.      Buyer has no obligation to proceed with the Closing unless and until all conditions precedent to its obligations to do so, as set forth in the Stalking Horse APA, have been met, satisfied or waived in accordance with the terms of the Stalking Horse APA.

8.      The Plan Administrator is hereby authorized and directed to (i) hold the Deposit in accordance with the Stalking Horse APA and (ii) distribute the Deposit pursuant to the terms of the Stalking Horse APA.

9.      All persons and entities are prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Plan Administrator, on behalf of the Debtors, to transfer the Purchased Assets to Buyer in accordance with the Stalking Horse APA and this Order.  All amounts, if any, to be paid by the Plan Administrator, on behalf of the Debtors, to Buyer pursuant to the Stalking Horse APA, including any allowed claims for breach thereof, shall (i) constitute allowed administrative expenses pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) be protected as provided in the Stalking Horse APA and the Bidding Procedures Order, (iii) not be altered, amended, discharged or affected by any plan proposed or confirmed in the Cases without the prior consent of Buyer and (iv) be due and payable if and when any of the Plan Administrator's and Debtors' obligations arise under the Stalking Horse APA without further order of the Court.

10.     At the Closing, the Debtors will be authorized to fully perform under, consummate and implement the terms of the Stalking Horse APA together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Stalking Horse APA, this Order and the Transactions.

11.     Nothing contained in (a) in the chapter 11 Plan confirmed in these Cases, (b) the order confirming the Plan, or (c) any order of any type or kind in these Cases or any related proceedings subsequent to the entry of this Sale Order shall conflict with or derogate from the provisions of the Stalking Horse APA (or any agreement contemplated thereby), this Order, and to the extent of any conflict or derogation between this Order or the Stalking Horse APA (or any agreement contemplated thereby) and such Plan or order, the terms of this Order and the Stalking Horse APA (or any agreement contemplated thereby) shall control.

12.     Each and every federal, state and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Transactions, including all agreements entered into in connection therewith, and this Order.

13.     To the extent available under applicable law, Buyer shall be authorized, as of the Closing Date, to operate any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Purchased Assets and the Assigned Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are transferred to Buyer as of the Closing Date.

14.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to Buyer on account of the filing or pendency of the Cases.

### Sale and Transfer Free and Clear of Adverse Interests

15.     Upon Closing (or thereafter as of the filing of any Assigned Contract), all of the Debtors' right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in Buyer pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Adverse Interests, with all such Adverse Interests to attach to the net proceeds of the Sale, in the order of their priority, with the same validity, force and effect that they now have against the Purchased Assets, subject with respect to such net proceeds to any rights, claims and defenses the Debtors or any parties in interest may possess with respect thereto. Such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets. All persons or entities, presently or on or after Closing, in possession of some or all of the

Purchased Assets shall surrender possession of the Purchased Assets to Buyer or its respective designees.

16.    This Order (i) shall be effective as a determination that, as of the Closing no Adverse Interests other than Assumed Liabilities will be assertable against Buyer or any of its respective assets (including the Purchased Assets), (ii) shall be effective as a determination that, as of the Closing (a) the Purchased Assets shall have been transferred to Buyer free and clear of all Adverse Interests and (b) the conveyances described herein have been effected, and (iii) is and shall be binding upon entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions.

17.    Other than the Assumed Liabilities, Buyer shall have no obligations with respect to any Adverse Interests of the Debtors, and Buyer and its affiliates, successors and assigns are released from any and all Adverse Interests arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the business of the Debtors prior to the Closing or the transfer of the Purchased Assets to Buyer, except for the Assumed Liabilities expressly assumed under the Stalking Horse APA.  The holders of claims related to the Assumed Liabilities shall have the right

to seek payment directly from Buyer on account of the Assumed Liabilities; *provided*, however, that Buyer reserves any and all rights, defenses or objections with regard to such Assumed Liabilities, including, but not limited to, Buyer's rights under the Stalking Horse APA.

18.    Except with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Adverse Interests arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the business prior to the Closing or the transfer of Purchased Assets to Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Adverse Interests against Buyer, its property or the Purchased Assets. Following the Closing, no holder of any Adverse Interest shall interfere with Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Adverse Interest, or based on any action the Plan Administrator may take in the Cases.

19.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Adverse Interests against or in the Purchased Assets shall not have delivered to the Plan Administrator prior to the Closing of the Transactions in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all Adverse Interests that the person or entity has with respect to such Purchased Assets, then only with regard to the Purchased Assets that are purchased by Buyer pursuant to the Stalking Horse APA and this Order, (i) the Plan Administrator is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (ii) Buyer is hereby

authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Adverse Interests against Buyer and the applicable Purchased Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

## No Successor or Transferee Liability

20.     Buyer shall not be deemed, as a result of any action taken in connection with the Stalking Horse APA, the consummation of the Transactions, the transfer, or operation or use of the Purchased Assets to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for Buyer, with respect to any obligations arising after the Closing as an assignee under Assigned Contracts); (ii) have, *de facto* or otherwise, merged with or into the Debtors; or (iii) be an alter ego or a mere continuation or substantial continuation or successor in any respect of the Debtors, including within the meaning of any foreign, federal, state or local revenue, pension, Employee Income Security Act of 1974 ("ERISA"), tax, labor, employment, environmental or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

21.     Except as expressly provided in the Stalking Horse APA with respect to Assumed Liabilities, Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of labor law, employment law, ERISA and benefits

law, antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing or such later time as Buyer is assigned and assumes any Assigned Contract.

22.    Buyer has given substantial consideration under the Stalking Horse APA for the benefit of the holders of any Adverse Interest.  The consideration given by Buyer shall constitute valid and valuable consideration for the releases of any potential claims of Successor or Transferee Liability of Buyer, which releases shall be deemed to have been given in favor of Buyer by all holders of any Adverse Interests.

23.    Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter, any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceedings against Buyer, or its assets (including the Purchased Assets), or its successors and assigns, with respect to any (i) Adverse Interest or (ii) Successor or Transferee Liability including the following actions with respect to clauses (i) and (ii): (a) commencing or continuing any action or other proceeding pending or threatened; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any Adverse Interest; (d) asserting any setoff, right of subrogation or recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated

or taken in respect hereof; or (f) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

### Good Faith of Buyer

24.     The Transactions contemplated by the Stalking Horse APA are undertaken by Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Transactions (including the assignment of the Assigned Contracts), unless such authorization and consummation of the Sale are duly and properly stayed pending such appeal.

25.     Buyer is entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code.  There has been no showing that the Plan Administrator or Buyer engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

26.     The consideration provided by Buyer for the Purchased Assets under the Stalking Horse APA is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

### Assignment of Assigned Contracts

27.     The Plan Administrator, on behalf of the Debtors, is authorized at the Closing to assign each of the Assigned Contracts in accordance with the Stalking Horse APA and this Order to Buyer free and clear of all Adverse Interests pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to Buyer.

28.     Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtors' assignment of such Assigned Contracts in accordance with the Stalking Horse APA but will be effective and binding upon Buyer with respect to any purported assignment for the remaining term of such Assigned Contract.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assignment to Buyer of the Assigned Contracts have been satisfied.  Upon the Closing or such later time as is provided in the Stalking Horse APA with respect to the assignment of any Assigned Contract, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assigned Contracts, and such Assigned Contracts shall remain in full force and effect for the benefit of Buyer.

29.     Each non-Debtor counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing  or arising by reason of the Closing or the transfer of the Purchased Assets, including any breach related to or arising out of change-in-control in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (ii) asserting against Buyer (or its property, including the Purchased Assets) any claim, counterclaim, breach, or condition asserted or assertable against the Debtors existing as of the Closing  or arising by reason of the transfer of the Purchased Assets, except for

the Assumed Liabilities. In addition, without relieving Buyer of its obligations under the Stalking

Horse APA, nothing in the Order, the Motion or the Stalking Horse APA shall affect the Debtors'

obligations under section 365(d)(3) of the Bankruptcy Code (or Buyer's assumption thereof) prior

to the assignment of any Assigned Contracts.

30.    Upon the Closing, Buyer shall be deemed to be substituted for the Debtors as a

party to the applicable Assigned Contracts, and the Debtors shall be released, pursuant to section

365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts from and after

such assignment. There shall be no assignment fees, increases or any other fees charged to Buyer

or the Debtors as a result of the assignment of the Assigned Contracts.

31.    Buyer has provided adequate assurance of future performance under the Assigned

Contracts (including any Assigned Contract that becomes such post-Closing) within the meaning

of section 365(f)(2)(B) of the Bankruptcy Code.

**The Sale Does Not Require the Appointment of a Consumer Privacy Ombudsman**

32.    Buyer shall be subject to reasonable restrictions by the Plan Administrator in order

to comply with the Debtors' privacy policy, which broadly provides that, if the Debtors or any

portion of their assets are acquired, the Debtors may share all types of information with the

acquiring company. As the Debtors' privacy policy does not prohibit the transfer of personally

identifiable information, appointment of a consumer privacy ombudsman is not required.

**Other Provisions**

33.    Effective upon the Closing, the Debtors, on behalf of themselves and their

respective past, present and future subsidiaries, parents, divisions, affiliates, agents,

representatives, insurers, attorneys, successors and assigns (collectively, the "Debtor Releasing

Parties"), hereby release, remise, acquit and forever discharge Buyer and its past, present and

future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies and partners (except, in each case, the Debtor Releasing Parties) (collectively, in their capacities as parties being released pursuant to this paragraph 34, the "Buyer Released Parties"), from any and all claims, contracts, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, liabilities, costs and expenses, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute or common law of any kind, nature, or description, including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution, which any Debtor Releasing Party has, may have had or may hereafter assert against any Buyer Released Party arising from or related in any way, either directly or indirectly, to the negotiation, documentation, performance or consummation of the Stalking Horse APA or any other agreements entered into in connection with the transactions contemplated thereby; *provided*, *however*, that the foregoing release shall not apply to the Debtors' rights or Buyer's obligations under this Order or the Stalking Horse APA and/or any other agreements entered into in connection with the transactions contemplated hereby or thereby.

34.    Subject to the terms of the Stalking Horse APA, the Stalking Horse APA and any related agreements may be waived, modified, amended or supplemented by agreement of the Plan Administrator and Buyer without further action or order of the Bankruptcy Court if it does not

have a material adverse effect on the Debtors.  Any material modification, waiver, amendment or supplement to the Stalking Horse APA must be approved by order of the Bankruptcy Court.

35.    The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Plan Administrator and the Debtors to the extent necessary, without further order of this Court, to allow Buyer to deliver any notice provided for in the Stalking Horse APA and allow Buyer to take any and all actions permitted or required under the Stalking Horse APA in accordance with the terms and conditions thereof.  Buyer shall not be required to seek or obtain any further relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Stalking Horse APA or any other sale-related document.

36.    All persons, all Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Adverse Interests are hereby barred and estopped from taking any action against Buyer or the Purchased Assets to recover property on account of any Adverse Interests or on account of any Liabilities of the Debtors other than Assumed Liabilities pursuant to the Stalking Horse APA.

37.    The provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of all Adverse Interests shall be self-executing, and neither the Plan Administrator nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

38.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Stalking Horse APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors

to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale.  This Court retains jurisdiction to compel delivery of the Purchased Assets, to protect Buyer and its assets, including the Purchased Assets, against any Adverse Interests and Successor or Transferee Liability and to enter orders, as appropriate, pursuant to sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Purchased Assets and the Assigned Contracts to Buyer.  This Court retains jurisdiction to adjudicate disputes between Buyer and holders of claims related to the Assumed Liabilities regarding the Assumed Liabilities.

39.     The Transactions contemplated hereunder shall not be affected by any bulk sales laws.

40.     Buyer has standing to seek to enforce the terms of this Order.

41.     The Plan Administrator, on behalf of the Debtors, is authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order.

42.     Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9014 or otherwise, this Order shall not be stayed, the terms and conditions of this Order shall be effective immediately upon entry and the Plan Administrator, on behalf of the Debtors, and Buyer are authorized to close the Sale immediately upon entry of this Order.  Time is of the essence in closing the Sale, and the Plan Administrator and Buyer intend to close the Sale as soon as practicable.  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being dismissed as moot.

43.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

44.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

45.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

46.    To the extent there are any inconsistencies between the terms of the Bidding Procedures Order, this Order and the Stalking Horse APA, the terms of this Order shall control.

Dated: [•], 2018
    New York, New York

<div style="text-align:right">

_____
STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

</div>

DISCLOSURE SCHEDULES

## DISCLOSURE SCHEDULES

### July 12, 2018

These disclosure schedules (these "Disclosure Schedules") are being furnished by Gawker Media Group, Inc., a Cayman Island exempted company ("Holdco"), Gawker Media LLC, a Delaware limited liability company ("GM LLC"), Gawker Hungary, Kft. "v.a.", f/k/a Kinja, Kft., a Hungarian corporation ("Gawker Hungary" and together with Holdco and GM LLC, "Sellers" and each individually, a "Seller"), to BDG GMGI Acquisition, Inc., a Delaware corporation ("Buyer"), in connection with the execution and delivery of that certain Asset Purchase Agreement dated as of the date hereof, by and among Sellers and Buyer (the "Agreement").  Capitalized terms used in these Disclosure Schedules and not otherwise defined herein are used as defined in the Agreement.  Headings included herein are included solely for ease of reference and shall not in any way limit the disclosures contained herein.

These Disclosure Schedules are arranged in separate sections and subsections corresponding to the numbered and lettered sections and subsections contained in the Agreement, and the information disclosed in any numbered or lettered section or subsection shall be deemed to relate to and to qualify (a) the particular representation or warranty set forth in the corresponding numbered or lettered section or subsection of the Agreement permitting such disclosure, (b) any other representation or warranty in the Agreement that is expressly cross-referenced and (c) any other representation or warranty in the Agreement to the extent that it is reasonably apparent on the face of such disclosure that such disclosure is applicable to such other section or subsection of the Agreement.  These Disclosure Schedules (including any exhibits, annexes attached hereto and the documents referred to herein) are incorporated by reference into the Agreement and should be considered an integral part of the Agreement.

Where any representation or warranty of Sellers is qualified by the materiality of the matters to which the representation or warranty relates, the inclusion of such matters in these Disclosure Schedules shall not be construed as a determination by Sellers that such matters are material for any other purpose. The information contained in these Disclosure Schedules is disclosed solely for the purposes of the Agreement; the inclusion of any item herein shall not be deemed an admission of any obligation or liability to any third party, or an admission to any third party against Sellers' interests.

Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be reflected herein.  Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature.  References to all agreements in these Disclosure Schedules are only summaries and are not intended to be full descriptions of those agreements. All references to agreements are qualified in their entirety by reference to those agreements, in the form that has been made available, and all such agreements should be read in their entirety.

**Section 1.01     Purchased Assets.**

The following domain names/URLs and any sub-domains of such:

gawker.com
gawker.co.in
gawker.com.tw
gawker.in
gawker.tw
gawker.pl
gawker.com.ph
gawkershop.com
gawkerartists.com
gawker.hk
gawker.cn
gawker.com.hk
gawker.se
gawker.it
gawker.be
gawker.co
gawkerstalker.co
gawker.nl
gawkernet.com
gawker.hu
gaw.kr
gawkerassets.xxx
gawkerclips.xxx
gawkermedia.xxx
gawkershop.xxx
gawkervideo.xxx
gawkermedia.com
gawker.es
gawker.dk
gawkerassets.com
gawker.fr
gawkervideo.com
gawker.design
gawker.tech
gawker.tv
gawker.media
gawker.me
gawkerhd.com
studioatgawker.com
gawkerclips.com
gawkertv.com

The following trademarks:

| Trademark | Class of Mark | Jurisdiction | Filing Date | Status | Registration No. |
|---|---|---|---|---|---|
| Gawker | Standard Character | United States | 8/26/2003 | Registered | 2901710 |
| Gawker | | EU | 3/16/2010 | Registered | 8957961 |
| Gawker | | CA | 2/1/2010 | Registered | TMA785433 |

The following copyright:

| Grantor | Title | Filing Date/Issued Date | Status | Application/ Registration No. |
|---|---|---|---|---|
| Gawker Media LLC | The Gawker Guide to Conquering All Media | 10/17/2007 | Registered | TX0006831598 |

The following social media accounts:

> The account "Gawker" on each of Facebook, Twitter, YouTube, Instagram, Pinterest, Tumblr, Snapchat, Google+ and Vine.

> The account "Valleywag" on Twitter.

> The account "Defamer" on each of Facebook and Twitter.

The following content:

Content published on or before August 22, 2016 (and related archives thereof, and including the copyrights thereto) created specifically for and initially published to the general public on the primary gawker.com domain or any of the sub-domains listed below (but not any content or related archives and copyrights initially published to the general public on any other domain, site or "vertical", including Deadspin, Gizmodo, Jalopnik, Jezebel, Kotaku or Lifehacker and their associated domains and sub-domains) (the "Archives"). For the avoidance of doubt, (a) published content shall not include any technology related to the display of content on websites operated by Sellers and (b) any content or archives associated with any sub-domains that are not listed below shall not be included.

The following sub-domains:

| Sub-Blog | Domain |
|---|---|
| Defamer | defamer.gawker.com |
| Valleywag | valleywag.gawker.com |
| Rankings | rankings.gawker.com |
| Weird Internet | internet.gawker.com |

| The Vane | thevane.gawker.com |
|---|---|
| Dog | dog.gawker.com |
| Morning After | morningafter.gawker.com |
| Domesticity | domesticity.gawker.com |
| Blackbag | blackbag.gawker.com |
| Disputations | disputations.gawker.com |
| Antiviral | antiviral.gawker.com |
| Drugs | drugs.gawker.com |
| Fine Vining | finevining.gawker.com |
| Fortress America | fortressamerica.gawker.com |
| Gawker Review of Books | review.gawker.com |
| True Stories | truestories.gawker.com |
| Justice | justice.gawker.com |
| Tktk | tktk.gawker.com |
| One Man's Take | takes.gawker.com |
| Art | art.gawker.com |
| The Cuck | thecuck.gawker.com |
| Public Pool | publicpool.gawker.com |
| The Best Restaurants in New York | bestrestaurant.gawker.com |
| Politburo | politburo.gawker.com |
| Documents | documents.gawker.com |
| The West | thewest.gawker.com |
| Slowgawker | slow.gawker.com |
| Sony Hack | sonyhack.gawker.com |
| Interviews | interviews.gawker.com |
| PhaseZero | phasezero.gawker.com |
| FrenchGawker | frenchgawker.gawker.com |
| Themachines | themachines.gawker.com |
| Dodgeandburn | dodgeandburn.gawker.com |

The Assigned Contracts.

**Section 1.02     Excluded Assets.**

Google G Suite Business Accounts and associated applications
Bank accounts
Service agreements with professionals
American Express accounts
Cloud storage account(s)
Slack, Basecamp or other communications/messaging platform accounts
Intercompany assets
Shares of equity or partnership interests
Historical books and records (including but not limited to QuickBooks and NetSuite)
The following potential claims and causes of action:

> Any and all claims and causes of action arising out of or related to the Assets (or the proceeds thereof), including but not limited to any Claims (as defined in that certain Release Agreement, dated as of April 24, 2018, by and among Sellers, Peter Thiel, Thiel Capital LLC and William D. Holden, solely in his capacity as plan administrator for Sellers (the "Release Agreement")) and any similar or derivative causes of action against Peter Thiel, Thiel Capital LLC or their Released Persons (as defined in the Release Agreement).

### Section 1.03     Assumed Liabilities.

All liabilities arising from or related to the Assigned Contracts.

**Section 1.04     Wire Instructions.**

Gawker Media LLC

Name of Bank:
ABA No.:
Account No.:
Account Name:

Gawker Hungary, Kft. "v.a."

Name of Bank:
ABA No.:
Account No.:
Account Name:

Gawker Media Contingent Proceeds Creditor Account

Name of Bank:
ABA No.:
Account No.:
Account Name:

Buyer or its designee

ACCOUNT NAME:
BANK ROUTING (ABA#):
BANK ROUTING (SWIFT#):
ACCOUNT NUMBER:
BANK NAME:
ADDRESS:

**Section 3.02     No Conflicts; Consents.**

Sellers intend to seek approval by the Bankruptcy Court of the Contemplated Transactions.

### Section 3.03    Assigned Contracts.

Contracts between Sellers and MarkMonitor, JWPlayer, Viddler and Amazon Web Services.