

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 16-11700-SMB

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GAWKER MEDIA, LLC

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                   United States Bankruptcy Court

14                   One Bowling Green

15                   New York, NY  10004

16

17                   July 17, 2018

18                   10:22 AM

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  UNKNOWN

1    HEARING re Sale Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    ROPES & GRAY LLP

 4          Attorneys for Plan Administrator

 5          1211 Avenue of the Americas

 6          New York, NY 10036

 7

 8    BY:  GREGG M. GALARDI

 9          KIMBERLY J. KODIS

10

11    COHEN & GRESSER LLP

12          Counsel for Terry Bollea

13          800 Third Avenue

14          New York, NY 10022

15

16    BY:  DANIEL H. TABAK

17

18    DORSEY

19          51 West 52nd Street

20          New York, NY 10019

21

22    BY:  JESSICA D. MIKHAILEVICH

23

24

25
```

1    APPEARING TELEPHONICALLY:

2    STEVEN H. CHURCH

3    TAYLOR B. HARRISON

4    ROBERT A. WEBER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          MR. GALARDI:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GALARDI:  For the record, Gregg Galardi on

5     behalf of the plan administrator.  The only matter on the

6     agenda today for Gawker is the -- your -- our motion for

7     approval of a sale of the remaining what we call the Gawker

8     assets.

9               Your Honor, with respect to the sale of assets,

10    there are two people in the courtroom today that I'll --

11    unless Your Honor would want to proceed direct, I would end

12    up proffering their testimony?

13          THE COURT:  Go ahead.  Because there's a lot of

14    factual findings in your order that I don't have any

15    evidence to support.

16          MR. GALARDI:  We'll take those up as you -- as we

17    go, Your Honor.  But with respect to the actual evidence for

18    today's factual findings, one is I would refer Your Honor to

19    Docket Number 1150, which was the auction transcript that

20    was submitted to the Court.  That is the transcript of the

21    specific auction that was held in our offices on the --

22          THE COURT:  Well, for example, you have a finding

23    at Paragraph E about notice.  How do I know that --

24          MR. GALARDI:  Your Honor --

25          THE COURT:  -- was the notice you gave?

Page 6

1              MR. GALARDI:  Your Honor --

2              THE COURT:  There's no reference to the

3      certificates of service.

4              MR. GALARDI:  And Your Honor, we would put in --

5      and I was going to ask Your Honor to take judicial notice of

6      two other docket numbers.  One is Docket Number 1144, which

7      is notice of the service of the executory contracts and

8      Docket Number 1146 which is the notice of the sale hearing.

9              Your Honor, at Docket Number 1150 Your Honor also

10     has, and we did make reference to this, judicial notice can

11     be taken of the transcript of the bid procedures hearing,

12     which was held on June 20th, which also put forth notice.

13             THE COURT:  But those are just a list of names.

14     How do I know, for example, that those are the people on the

15     2002 list?  You know, you're asking me to make a specific

16     finding that you served all people who filed a notice of

17     appearance.  If I just look at names, I don't know that to

18     be the case.

19             MR. GALARDI:  Well, actually, I think it's more

20     broken down by that.  And if we can -- again, Your Honor, if

21     the claims agent makes a representation that they served all

22     of the people and you correspond that to the 2002 list, I

23     have not gone back, quite honestly, to look at the

24     certificate of service, but I believe they break it down by

25     the kind of parties that they do and who they serve.  And

Page 7

1   that's the claims agent who is an agent of the court to

2   serve those people who are on the 2002 list.  They do the

3   regular service, so that's why I give you the docket number,

4   it's 1144 and 1146, because those are the court approved

5   persons.  I don't go back and check each one, but that's

6   their job --

7               THE COURT:  But I should do that, huh?

8               MR. GALARDI:  -- to service that.  No, Your Honor,

9   but you shouldn't do it.

10              THE COURT:  Okay.

11              MR. GALARDI:  But certificates of service for a

12  claims agent who's hired as the arm of the bankruptcy court

13  to serve all purpose -- people on the 2002 list, who is

14  directed to do so, would send the notice to those persons on

15  the service list.

16              As to serving, also, the auction transcript, the

17  notice of designation of successful bidder, all of those are

18  the claims agent's job.  And unless someone challenges that

19  they don't do the job, and you look at the names, they serve

20  the people on the 2002 list.  If I need to bring the claims

21  agent in, we'll, you know, do that.

22              THE COURT:  Why don't you just refer to the

23  certificates of service and say it's good and adequate

24  service?

25              MR. GALARDI:  That's fine.

Page 8

1          THE COURT:  I'm not --

2          MR. GALARDI:  That's fine.

3          THE COURT:  -- suggesting --

4          MR. GALARDI:  I understand, Your Honor.

5          THE COURT:  I'm not suggesting that you didn't

6   make adequate service.  All I'm saying is, if I looked at

7   the certificate of service I couldn't make the specific

8   findings that you have in here.

9          MR. GALARDI:  That's fine.  Your Honor, we can

10  modify that, if Your Honor's preference is to refer to the

11  certificate of services and that we believe that that is

12  good and adequate notice as we believe that it covered the

13  2002 list, interested parties, et cetera.  We certainly can

14  make those modifications.

15         With respect to the sale itself, Your Honor, Your

16  Honor does have a transcript in front -- that has been

17  filed, which is the auction transcript.

18         THE COURT:  I don't have that.  All I -- I ran off

19  the -- what do you call it, the sale order that you sent,

20  but I didn't get the documents you filed yesterday.

21         MR. GALARDI:  If I may approach, Your Honor?

22         THE COURT:  Sure.  Thanks.

23         MR. GALARDI:  Your Honor, what I've handed up and

24  what was also filed, along with a number of other documents

25  last Friday with the notice of the designation which is the

Page 9

```
1    Docket Number 1150, is the notice of the -- which is the

2    transcript of the actual auction that was conducted in our

3    offices.

4              THE COURT:  Were there any other bidders?

5              MR. GALARDI:  Yes, Your Honor.

6              THE COURT:  How many bidders were there?

7              MR. GALARDI:  Your Honor, there was the stalking

8    horse bidder, and as set forth in that auction transcript,

9    as Mr. Holden would testify, we received one bid prior to

10   the deadline on Monday of last week with respect to an

11   overbid.  That bid was a qualifying overbid by the number

12   set forth in the bid procedures.  That is by the BDG GMGI

13   Acquisition.

14             Then we received another bid on I think it was

15   Wednesday morning that was executed and deposit received by

16   a company called Online Logo Maker, LLC.

17             As required by the settlement with Mr. Bollea, we

18   consulted with Mr. Bollea about whether or not we should

19   accept that higher or otherwise bid and allow that person to

20   participate in the auction, despite the fact that it was a

21   bid that came in after the bid deadline.  We also consulted

22   with -- although the administrator doesn't have to have

23   approval from, they -- we also consulted with our equity

24   holders and determined that in light of that bid satisfying

25   all the requirements, a deposit being put in, and it being a
```

1    bid that satisfied the qualified bid, and that the person

2    had the financial wherewithal, we decided to extend the

3    deadline and allow that person to participate in the

4    auction.

5              THE COURT:  How much was the winning bid?

6              MR. GALARDI:  The winning bid was, as reflected in

7    that, $1.35 million.

8              THE COURT:  And what was the stalking horse

9    contract?

10             MR. GALARDI:  The stalking horse was, I think we

11   had two rounds of bids, so it was in the 1.035 range, I

12   believe is the number, Your Honor.

13             THE COURT:  So you got another $300,000?

14             MR. GALARDI:  Three hundred minus -- we got

15   roughly two rounds of bids and we received about, after

16   paying off the break-up fee, about an 100, $150,000 in bids.

17             Your Honor, so when we conducted the auction, we

18   had three bidders present at the auction in our offices,

19   reflected by the auction transcript.  As a result of BDG

20   GMGI's acquisition being both timely and satisfying all the

21   requirements, we deemed that, and knowing more about its

22   financial wherewithal, we deemed that to be the highest and

23   bed bid, as set forth in the auction transcript.  And as Mr.

24   Holden would testify, we then set forth the rules of the

25   auction.  That higher and better bid by BDG was also agreed

Page 11

1   to by Mr. Bollea.

2            We then asked the questions whether the bidders

3   would agree, which the stalking horse had not agreed,

4   whether anyone would stand in place to be the back-up

5   bidder.  All of the bidders agreed to be -- stand in place

6   with the back-up bidder.  All of the bidders also agreed and

7   we set a closing date of August 2nd for the transaction.

8   And we set that the 2nd back-up bidder would then stay open

9   for a period of seven days following that as set forth in

10  the auction.

11           We then commenced the auction with the -- what we

12  deemed to be the lower bid at that point, the stalking horse

13  bidder.  As reflected in that instance, the stalking horse

14  bidder did not make another bid.  We had a two pass rule.

15  Then Online Logo Maker did make a bid.  That was then

16  followed by a higher bid by BBG.  The stalking horse didn't

17  bid and then everybody passed and that's how we arrived at

18  the number $1.35 million.  So two rounds of bidding followed

19  along with the initial overbid, so that's roughly $150,000

20  or $100,000 increase in the bid.

21           At the conclusion all the parties passed and we

22  announced that BBG GMGI, which was the timely overbid filed

23  on the Monday, was the highest and best bid and concluded

24  the auction.

25           With respect to BBGMI and with respect to Mr.

Page 12

1    Holden's efforts, this was the culmination of efforts that

2    we would try to incorporate by reference to his testimony

3    and his proffer at the bid procedures hearing.  But just a

4    quick summary, after going out to over 150 parties last --

5    in the last -- after the bid procedures hearing approved the

6    stalking horse bid, there was five to ten that were

7    interested, as I've just stated to the Court, ultimately two

8    incremental bids, three bidders at the auction, and the

9    auction was conducted.  It was a rather short auction, but

10   it was conducted and no one had any objections.

11            The documents and the asset purchase agreements

12   were essentially identical on all terms.  We spent some days

13   from Monday to the auction conforming the agreement of BDG

14   GMGI but it was not a material change, it was really how the

15   break-up fee would work for the payment.

16            With respect to BDG GMGI, Your Honor had asked

17   about this the last time, but we should put the following,

18   and Ms. Schwartz here is the CFO, and I'll put on a very

19   short proffer as to their adequate assurance.

20            THE COURT:  Go ahead.

21            MR. GALARDI:  BDG GMGI Acquisition is a subsidiary

22   of BDG Media, Inc.  BDG Media, Inc.'s current valuation is

23   approximately or over $195 million.  It has cash on its

24   balance sheet of $12 million.  It has 240 employees.  It has

25   strategic partners and venture capitalists invested in that,

1    including Time Warner, Sabine and others, and expects --

2    last year it had over $45 million in revenues and expects to

3    have over $75 million in revenues this year.

4            BDGI as a business is a digital content

5    corporation that owns websites and associated social media.

6    Its brands include Bustle, ROMPER, Elite Daily and The Zoe

7    Report.  And its intentions with respect to Gawker are to do

8    a relaunch of it, but to do so with certain, you know,

9    editorial changes which will be in its discretion.

10           And that it -- and at this point, Your Honor, with

11   respect to adequate assurance, to fill in their financial

12   wherewithal to meet the contracts, Mr. Holden would testify

13   that approximately, currently the operations and those

14   contracts that are being assigned, not assumed, we did that

15   in the context of the plan, cost about $100,000 a year to

16   operate, and there's maybe $100,000 of maintenance.  So we

17   have no objections.  They were -- received notice of both

18   the bid, the auction, the successful bidder.  We've not had

19   any contacts, we've had no objections from any parties.  But

20   we believe that BDG Media and BDG GMGI Acquisition, the

21   actual acquiring entity, has the financial wherewithal, has

22   the experience and is more than able to perform the

23   contracts as they are assigned.

24           Your Honor, with respect to the business judgment,

25   Mr. Holden would testify that in his view, after having

Page 14

1    solicited the bids, and as we talked a little bit about the

2    bids procedures hearing, he does believe that now is the

3    time to sell the assets of the company.  We had discussed,

4    with Mr. Bollea, as Mr. Holden would testify, possibly

5    withdrawing the assets.  You'll even see a reference to that

6    in the auction transcript.  I will say that there are

7    certain equity holders that we had talked about who we --

8    the 55 percent of the contingent, who would have preferred

9    not to proceed with the sale.  We did suggest to them if

10   they wanted to not proceed with the sale they can come up

11   with an economic arrangement to do so, to take it off, to

12   sort of backstop the price, because we were going to auction

13   and had the price.  We have received no offers or further

14   objections in that regard, so we believed that -- so that at

15   this point, and Mr. Holden would testify, that in his

16   business judgment this is the proper time to sell the

17   assets.

18           He would also note that in the event that we chose

19   to withdraw the assets we would be probably in some

20   litigation with Mr. Bollea because Mr. Bollea also believes

21   that now is the time to sell the assets.  We did approach

22   them about that, and there was relatively little interest in

23   proceeding, at that time, on another course.

24           So in Mr. Holden's judgment, and as Your Honor

25   knows under the plan Mr. Holden is the plan administrator

Page 15

1    with the authority to sell these assets, and after

2    consulting with those people who have an economic interest,

3    and offering those people who have an economic interest to

4    backstop what would have been walking away from a

5    transaction, not receiving that, having no objections, and

6    having no formal objections filed, Mr. Holden would request,

7    and believes it's in the best interest of these cases, to

8    sell these assets.

9            This is the last asset of the case.  It will also

10   allow us to close up the case in a timely fashion and

11   believes that it's in the best interest to do so.

12           With respect to any relationships between BDG and

13   Gawker or the plan administrator or formal -- former members

14   of the board of directors, Mr. Holden would also testify

15   that there are no relationships with any of the former.

16   They are not insiders, none of the acquirers are insiders.

17   There has been no interest, there has been no attempt, that

18   we are aware of, to at all impede or otherwise collude to

19   keep the price of the bid lower.  The auction, I think, also

20   reflects that there was an auction, a market check on these,

21   and we just simply didn't get as much as we might otherwise

22   have liked.

23           Ms. Schwartz would also, if called to testify,

24   would also testify that none of the BDG acquisition or any

25   of the BDG Media persons are insiders or affiliated with any

Page 16

1    of the Gawker entities.  Indeed they were in existence prior

2    to --

3              THE COURT:  Or the plan administrator, I assume?

4              MR. GALARDI:  Or the plan administrator, correct,

5    Your Honor.  So there is no insider transactions.

6              Ms. -- they would also testify, and Mr. Holden

7    would testify, and I know this goes to findings, that all of

8    the bidders have made proposals that had to be free and

9    clear of any liens, claims and encumbrances.  Right now we

10   don't know of claims and encumbrances because all of these

11   are unsecured assets, but they are taking free and clear.

12             Another aspect of both of the transactions, Mr.

13   Holden would testify, and why we think this sale is in the

14   best --

15             THE COURT:  Is that why you had the phrase "free

16   and clear" nine times in the order?

17             MR. GALARDI:  People were concerned about it, and

18   that's probably why it's nine times --

19             THE COURT:  Well, I --

20             MR. GALARDI:  -- in the order.

21             THE COURT:  -- crossed out the next eight, once I

22   read it once.

23             MR. GALARDI:  Excuse me?

24             THE COURT:  I will cross out the next eight times.

25             MR. GALARDI:  I understood that, and I looked at

1    it and I had -- well, there's the findings and there's the

2    order, so I'd ask you to wait till after the second one.

3    But, Your Honor, I understand.

4         With respect to -- oh, and one other aspect of

5    this which believes Mr. Holden would testify why it's in the

6    best interest of the company to close the sale at this time

7    is that all of the bidders agreed to an archive agreement

8    whereby the archives could remain.  We are going to enter

9    into an archive agreement so that the Gawker archives are

10    available.

11         I would also note that there was some concern

12    about taking down articles and concerns, that's why we were

13    concerned about that.  We did provide notice -- some of our

14    equity members mentioned that they were concerned about it,

15    we did provide notice, and I specifically reached out to

16    counsel, who you're aware of, with the employees and the

17    writers to say, if you have concerns about this, we cannot

18    be the safeguard of the articles any longer, it's going to

19    new hands.  They appreciated that, but took no action.  We

20    have no objections.  They understand that that is a risk,

21    although we hope, and one of the reasons we protected the

22    archives, that the articles main up, is that they will still

23    have access to that information on the Internet.

24         I don't know if Your Honor has other questions or

25    wants to go through the order and --

1            THE COURT:  Well, we'll go through the order in a

2    minute.  Let me ask if anyone wants to, first of all object

3    to what is essentially a proffer of Mr. Holden's testimony

4    and Ms. -- is it Ms. Schwartz -- Ms. Schwartz's testimony,

5    or wants to cross examine either witness?  Hearing no

6    response, I'll accept the proffer as the evidence at the

7    hearing.

8            Does anybody want to be heard with respect to the

9    transaction or any other matter relating to the transaction?

10           MR. GALARDI:  And Your Honor, just to give a

11   precise number, and Mr. Tabak was nice enough to pull it

12   out, the precise number of the stalking horse bid was

13   $1,131,600 and there was $150 million of bid protection but

14   the bids went through.

15           MAN:  Slightly less.

16           THE COURT:  One hundred and fifty thousand, I

17   assume.

18           MR. GALARDI:  A -- yes, $150,000 total break-up

19   fee (indiscernible).

20           THE COURT:  All right.  Thank you.  Does anybody

21   else want to be heard?

22           All right.  I'll approve the transaction.  I'm

23   familiar with the marketing efforts which were set -- which

24   have been set out on the record, both in litigation and in

25   connection with the sale motion and the issues that arose in

1   connection with the marketing efforts.  So I'm satisfied

2   that the marketing was adequate.  And since this was a

3   competitive auction, this is the best evidence of what a

4   fair and reasonable price is.  So I'll approve the

5   transaction.

6           I think, Mr. Galardi, that your order is

7   unnecessarily long.  And the longer it is, the longer it

8   will take me to go through it, because I read every word and

9   I cross out a lot.

10          I think the evidentiary findings that you want are

11  set forth in our form order that we have online, which are

12  sufficient.

13          If the contract, which I'm approving provides for

14  somebody to do something, you don't have to put it in the

15  order.  I'm approving the contract and I'm authorizing the

16  plan administrator to perform the contract, and that's all

17  you really need.

18          There's a lot of -- there's several findings here

19  relating to the compelling circumstances of the sale.  I

20  don't know why you need this.  This was an adequately

21  noticed sale, it's a post-confirmation sale.

22          I don't think there are any Lionel issues.  All I

23  really have to decide, based on the evidence, is that it's

24  an appropriate exercise of business judgment to sell the

25  asset to the buyer.  And for the reasons that you've

1    articulated, and I've accepted as part of the record, that's

2    sufficient.

3            With respect to your "free and clear" language, I

4    have two comments.  First of all, does anybody else have an

5    interest in these assets?  I know that Mr. Bollea has an

6    interest in the income stream, I don't know if that's an

7    assignment or an equitable interest or what.  But who else

8    has an interest in these assets?

9            MR. GALARDI:  Your Honor, there may be parties who

10   have asserted, over time, some interest.  For example,

11   copywrite people, and we -- they've been noticed.  So they

12   may say, oh, well this is a copyrighted photo or something

13   like that.

14           So it's that kind of concern where people seem to

15   come out of the woodwork in these cases, that is why it's

16   necessary to protect those kinds of interests.  They've been

17   noticed, they've been watching the Gawker case, they've

18   reached out to us.  So we think we do need that language.

19           THE COURT:  All right.  You have a free and clear

20   provision for the assignment of the contracts.  But there's

21   no free and clear provision in Section 365.  Where does that

22   come from?

23           MR. GALARDI:  Your Honor, but again, it's also a

24   sale of a contract.  So to the extent it's a sale --

25           THE COURT:  So what's the difference between an

Page 21

1    assignment and a sale?  That's one I pondered for many

2    years, since I read that decision, I forget the case, but --

3              MR. GALARDI:  Well, I mean, an assignment can just

4    be an assignment without cash, without consideration.  You

5    could assign rights under a contract, you can also buy the

6    right and assign it to them.  So I think that there are

7    differences.  I'm not -- you know, metaphysically at this

8    point I'm not going to say much more than that.

9              THE COURT:  Well --

10             MR. GALARDI:  But I have seen cases, for example,

11   when you have leases where people have rights on mortgages

12   that you want to both sell and assign those rights so that

13   you can get it free and clear of that mortgage.  And I've

14   seen mortgagees object on those grounds.

15             So that's they that kind of language is usually in

16   there.  You do two things with contracts.

17             THE COURT:  Okay.  I never thought of a mortgage

18   as an executory contract, but --

19             MR. GALARDI:  No, but it can be a lien on a

20   contract, right?  You can have rights as a mortgagee, and if

21   you want to sell a lease --

22             THE COURT:  Oh, I see.

23             MR. GALARDI:  -- subject to or free and clear of

24   that, you can try to sell free and clear of that.

25             THE COURT:  I question whether you can do that,

Page 22

1    but --

2              MR. GALARDI:  I understand you question it.  I've

3    seen people do it and I've seen disputes about it through my

4    years.

5              THE COURT:  All right.  Again, the sale is

6    approved for the reasons I've stated.  I would suggest you

7    come back with a more concise order.

8              MR. GALARDI:  We will do so, obviously, Your

9    Honor.  It's also --

10             THE COURT:  I will -- you know, I will read

11   whatever you give me --

12             MR. GALARDI:  I know you will.

13             THE COURT:  -- it just takes longer to read a long

14   (indiscernible) redundant order.

15             MR. GALARDI:  We will try to shorten it and work

16   with the buyer --

17             THE COURT:  Okay.  I think you --

18             MR. GALARDI:  -- and the back-up bidder for that,

19   Your Honor.

20             THE COURT:  -- ought to go back to our proposed

21   orders which are in our guidelines.

22             MR. GALARDI:  That's fine, Your Honor.  We will

23   start --

24             THE COURT:  All right. Thank you --

25             MR. GALARDI:  -- there, but I appreciate it.

1            THE COURT:  -- very much.  Good luck.

2            MR. GALARDI:  Thank you.  Thank you.

3       (Whereupon these proceedings were concluded at 10:45 AM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                                   Page      Line

5          Sale transaction                          22         5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

     Ledanski Hyde
7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2018.07.24 16:50:31 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 24, 2018