```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                          :
                                                :          Chapter 11
GAWKER MEDIA LLC, et al.,                       :          Case No. 16-11700 (SMB)
                                                :
                        Debtors.                :
------------------------------------------------------------X
```

# MEMORANDUM DECISION DENYING MOTION TO ENJOIN PLAINTIFFS FROM CONTINUING STATE COURT ACTION AGAINST RYAN GOLDBERG

**A P P E A R A N C E S :**

SAUL EWING ARNSTEIN & LEHR LLP
1270 Avenue of the Americas, Suite 2005
New York, NY 10020

>   Sharon L. Levine, Esq.
>   Dipesh Patel, Esq.
>        Of Counsel

— and —

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

>   Thomas G. Hentoff, Esq.
>   Chelsea T. Kelly, Esq.
>        Of Counsel

*Co-Counsel to Ryan Goldberg*

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
711 Third Avenue
New York, New York 10017

>   Jonathan L. Flaxer, Esq.
>   Michael S. Weinstein, Esq.
>        Of Counsel

— and —

HARDER LLP
132 S. Rodeo Dr., 4th Floor
Beverly Hills, California 90212

>   Dilan A. Esper, Esq.
>        Of Counsel

*Co-Counsel to Pregame LLC and Randall James Busack*[1]

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The confirmed Plan in these cases[2] included a third-party release in favor of the Debtors' employees and independent contractors (collectively, the "Providers") who provided content for publication on the Debtors' websites (the "Provider Release"). However, the Provider Release only barred lawsuits brought by an entity "that has received or is deemed to have received distributions made under the Plan."[3] In a subsequent state court lawsuit described in *In re Gawker Media LLC*, 581 B.R. 754 (Bankr. S.D.N.Y. 2017) ("*Gawker*"), Pregame LLC and Randall James Busack (collectively, the "Plaintiffs") sued Gizmodo Media Group LLC ("Gizmodo"), the purchaser of substantially all of the Debtors' assets, and Ryan Goldberg, a Provider, for defamation and related claims based on the Debtors' publication of an article Goldberg had authored. The Plaintiffs did not file claims in the Debtors' cases and did not receive distributions under the Plan.

Relying on the Provider Release, Gizmodo and Goldberg filed separate motions in this Court to enjoin the Plaintiffs from prosecuting the state court lawsuit, but this

---

[1] "Busack" is sometimes spelled "Busak" in the pleadings.

[2] The confirmed Plan (*Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft,* dated Dec. 11, 2016) is attached as Exhibit 1 to the *Findings of Fact, Conclusions of Law, and Order Confirming Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft,* dated Dec. 22, 2016 (the "Confirmation Order") (ECF Doc. # 638).

[3] The Providers had to meet other conditions under the Provider Release, but they are not in dispute.

opinion only concerns Goldberg's motion. (*See Motion of Ryan Goldberg (I) to Enforce Order Confirming Amended Joint Chapter 11 Plan of Liquidation and (II) to Bar and Enjoin Creditors from Prosecuting Their State Court Action*, dated Aug. 21, 2017 ("Motion") (ECF Doc. # 981-1).) Finding the scope of the Provider Release to be ambiguous with respect to the Plaintiffs' claims, the Court held a trial. Based upon the trial record, the Court concludes that Goldberg failed to carry his burden of demonstrating that the Provider Release covers the Plaintiffs' state court claims, and accordingly, the Motion is denied.

## FINDINGS OF FACT[4]

**A.   Introduction**

On June 10, 2016 (the "Petition Date"), Debtor Gawker Media LLC ("Gawker Media") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (Stipulated Facts ¶ A.)[5] On June 12, 2016, Debtors Gawker Media Group, Inc. and Gawker Hungary Kft. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. (Stipulated Facts ¶ A.)

Goldberg authored an article that was published on Gawker Media's Deadspin.com website after the Petition Date on June 23, 2016 (the "Article"). (Stipulated Facts ¶ C.) On June 27, 2016, the Plaintiffs' counsel Charles Harder of the

---

[4]   In this decision, "PX" refers to the Plaintiffs' trial exhibits, "DX" refers to the Debtors' trial exhibits, and "Tr." refers to the trial transcript, a copy of which can be found at ECF Doc. # 1103.

[5]   The Stipulated Facts are set forth in Section III of the Joint Pretrial Order, dated Mar. 15, 2018 (ECF Doc. # 1089).

3

firm Harder LLP sent a letter to Gawker Media demanding the retraction of the Article.[6] (Stipulated Facts ¶ D.) On July 1, 2016, Gawker Media's president and general counsel, Heather Dietrick, responded that Gawker Media would not retract the Article. (Stipulated Facts ¶ E.) On August 22, 2016, Harder sent another letter, this time to Gizmodo, demanding the removal of the Article prior to the closing of the sale, but Gizmodo also informed Harder that it would not remove the Article. (Stipulated Facts ¶ J.)

In the meantime, on August 11, 2016, the Court entered an order setting September 29, 2016 as the deadline for filing pre-petition claims or requests for payment for claims arising between the Petition Date and July 31, 2016. (Stipulated Facts ¶ G.) The Claims Bar Date Order, notice of the Claims Bar Date, a Proof of Claim Form and the Administrative Claim Form (as those terms are defined in the Claims Bar Date Order) were served on the Plaintiffs' counsel, Charles Harder (Stipulated Facts ¶ I), but the Plaintiffs did not file proofs of claim or requests for payment prior to the Claims Bar Date. (Stipulated Facts ¶ K.)

---

[6] Harder LLP also represented the three members of the unsecured creditors' committee (the "Committee"), Terry Gene Bollea, Shiva Ayyadurai and Ashley Terrill, individually, but the Committee was represented by Simpson Thacher & Bartlett LLP.

4

**B.    The Provider Release and Injunction**

    **1.    The November Plan**

The Debtors filed their original plan and disclosure statement on September 30, 2016.  (ECF Doc. # 308.)  The original plan did not contain any third-party releases in favor of the Providers or anyone else.  The attorneys for the Providers filed a reservation of rights without any specific objection to the disclosure statement on October 31, 2016, (ECF Doc. # 390), and one day before the November 3, 2016 hearing to approve the disclosure statement, the Debtors filed an amended plan and disclosure statement at 11:58 a.m.

Article IX of the amended plan, filed November 2, 2016 (the "November Plan"), included third-party releases and an injunction to protect the Providers.[7]  Section 9.05 provided, in pertinent part, that "each holder of a claim or equity interest that has received or is deemed to have received distribution(s) made under the Plan" released the "Released Employee Parties"[8] from claims arising prior to or on the Petition Date

---

[7]    A copy of the November Plan is attached as Exhibit A to the corresponding amended disclosure statement filed on November 2, 2016.  (ECF Doc. # 403.)

[8]    "Released Employee Parties" was not defined in the November Plan.  The November Plan defined a different term, "Released Employees and Independent Contractors" as "each current and former employee, writer, editor, and independent contractor that was employed by, or paid to contribute articles to, the Debtors including, without limitation, current and former 1099 employees and current and former independent contractors, that filed a Proof of Claim in the Bankruptcy Cases."  (November Plan at 12.)  A subsequent amendment dropped the phrase "Released Employee Parties" and substituted the defined term.

(essentially, pre-petition claims) except for claims resulting from gross negligence or willful misconduct.

The modified injunction in section 9.02 was much broader. It prohibited "all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not)" from commencing or continuing any action against the "Released Employee Parties." (November Plan § 9.02.) Thus, the injunction expressly barred lawsuits against the "Released Employee Parties" by creditors, whether or not they had filed claims, regardless of when their claims arose and notwithstanding that the claims were based on willful misconduct or gross negligence and expressly which were excluded from the third-party release. The broad injunction was designed to cast the Court in the role of gatekeeper. The Debtors' counsel testified at trial that it would force entities whose claims were not released under section 9.02 to nonetheless seek relief from the injunction in this Court before proceeding against a Provider on an unreleased claim. (*See* Tr. 18:8-19:10.)

The Debtors' desire to release the Providers was motivated by their need to confirm a plan prior to year-end for tax reasons and to expedite distributions. (Tr. 14:6-15:1.) Gawker Media generally indemnified its content providers for any claims, including claims for defamation, arising from the content provided to and for the benefit of Gawker Media. (Stipulated Facts ¶ B.) Providers, including Goldberg, had filed contingent indemnification claims. Absent the Providers' withdrawal of their contingent indemnification claims, the Debtors would have to resolve the claims prior to

confirmation or set up reserves to pay them should they be allowed at a future date. (Tr. 15:11-24.) This would delay confirmation possibly into the next year. Furthermore, the Providers might vote to reject the proposed plan if they did not receive releases. A third-party release was intended as a *quid pro quo* for the elimination of the Debtors' indemnification obligations and the Providers' support for the plan. (Tr. 26:1-6.)

### 2. The Negotiations

The third-party release and injunction in favor of the Providers included in the November Plan resulted from negotiations between the Debtors' attorney, Gregg Galardi, and the Providers' attorney, Dipesh Patel, beginning in October 2016, that were conducted entirely through the exchange of emails. (*See* Tr. 35:9-12.) Counsel initially focused on the injunction in section 9.02. As then drafted, it did not expressly refer to the Providers. Mr. Patel requested certain specific language that provided protection to the Providers, and also asked Mr. Galardi to modify the definition of "Released Party" to expressly include the Providers. (PX B (10/18/16 email sent at 4:28 p.m.).)[9] Mr. Patel subsequently expressed a concern that under the release language, as drafted, only the Debtors were giving a release. In that case, the Providers might not be willing to give up their indemnification claims. (PX C (10/28/16 email sent at 11:53 a.m.).) Mr. Galardi responded that the Debtors would add third-party release language to protect the

---

[9]    The clocks that timed the emails passing between Ropes & Gray, the Debtors' counsel, and Saul Ewing LLP, the Providers' counsel, were not in sync. For example, the email appearing at the top of PX C that begins "not really," indicates that it was sent by Mr. Galardi on October 28, 2016 at 4:05:11 p.m. The same email, which is part of the email chain included in PX D, indicates that it was sent (or more likely, received by Saul Ewing) at 9:05 a.m., seven hours before it was sent. When identifying an email, I will use the time indicated on the referenced trial exhibit.

Providers based on the Providers voting to accept the plan and waive their indemnification claims.  (PX C (10/28/16 email sent at 4:05:11 p.m.).)

After the November Plan and accompanying disclosure statement were filed, Mr. Patel emailed Mr. Galardi regarding the language in section 9.05.  He questioned what "deemed to have received a distribution(s)" meant, and asked if a third party who had not filed a lawsuit or a claim was "deemed to have received a distribution" for the purposes of the section.  (PX G (11/2/16 email sent at 3:57 p.m.).)  Mr. Galardi responded that "I cannot say that third parties received a distribution if not [sic] proof of claim."  (PX G (11/2/16 email sent at 10:06:40 p.m.).)  He suggested three options, and asked Mr. Patel how he wanted to address the issue.  First, the language could be re-drafted to bind everyone, but the Court "will likely not approve" the release of claims by entities that did not receive consideration, and Mr. Galardi did not want to face an argument by the Providers that their votes, based on consideration they did not receive, had to be resolicited.  Second, the Debtors could retain the present language but he predicted that the Providers would likely not vote for a plan "because of the release of indemnity rights and claims that only partially protect them."  Third, the Debtors could drop the third-party releases altogether, but this was undesirable because the Debtors would then have to object to the Providers' indemnification claims.  (*Id.*)

While awaiting Mr. Patel's answer, Mr. Galardi sent an email to the attorneys for the Committee at Simpson Thacher.  It read:

> Heads Up — we are going to modify to include a release from not only people who receive distributions under the plan but also from those that do not.  I understand fully the likelihood that they will not be approved, but anything short of a full third party release will be a problem.

8

(DX 3 (11/2/16 email sent at 10:14:09 p.m.).)

The need to modify the third-party release was mooted by Mr. Patel's response sent approximately twenty minutes later. He side-stepped the issue he had raised regarding the ambiguous "deemed to have received" language. After asking whether section 9.02 was subject to the third-party release set forth in section 9.05 (at the time, it was not), he stated that he read the injunction language in section 9.02 to bar actions by any entity that held a claim whether or not a proof of claim had been filed. "If the injunction in 9.02 extends to the 'released employees and independent contractors,' we may be fine with the language of 9.05." (PX H (11/2/16 email sent at 10:36:28 p.m.).) Mr. Galardi replied that "[i]f that solves the problem, I can make that change." (PX I (11/2/2016 email sent at 10:38:28 p.m.).)

Mr. Galardi's associate, Joshua Sturm, wrote to Mr. Patel several minutes later confirming that the Debtors' lawyers read section 9.02 the same as Mr. Patel. (PX J (11/2/16 email sent 10:46:09 p.m.).) In other words, the injunction barred claims by creditors against the Providers even if they did not file claims and receive distributions. He added "[w]e'd also prefer not to make a change to 9.05 to draw further attention to the issue reduce the likelihood of getting that section approved." (*Id.*) The email included a re-drafted section 9.02 that expressly referred to the "Released Employees and Independent Contractors" as beneficiaries of the injunction. (*Id.*) Mr. Patel replied that "[w]ith the change to 9.02, we are good with the language of 9.05." (PX K (11/2/16 email sent at 7:05 p.m.).) A subsequent email exchange in the same exhibit clarified that the change Mr. Patel referred to was the substitution of "Released Employees and

9

Independent Contractors," a defined term under the November Plan, for "Released Employees," an undefined term, in section 9.02. The November Plan incorporated the changes agreed to between the lawyers for the Debtors and the Providers.

### 3. The Disclosure Statement and Confirmation Hearings

The hearing to approve the disclosure statement took place on November 3, 2016. During the hearing, the Court questioned Mr. Galardi about the third party releases and whether they released a creditor's cause of action against a Provider if the creditor had not filed a proof of claim. Mr. Galardi did not answer the question, and instead, stated that the creditors were giving the Provider Release in exchange for their distributions in the case:

> THE COURT: What happens to those claims[10] if they're not filed or liquidated by the time of confirmation?
>
> MR. GALARDI: Exactly why we have put in the plan a third-party release. We are saying to those people who have gotten a benefit under our bankruptcy case that they are being asked to waive the claims against those individuals [the Providers]. So they would be barred from bringing any new claims against those individuals, i.e., the writers, the employees, and the independent contractors. We believe they are getting consideration for that because they are going to be able to get distributions.

(Transcript of Hr'g, held Nov. 3, 2016, at 25:8-16 (ECF Doc. # 447).) Following the hearing, the Court approved the proposed disclosure statement with some irrelevant modifications and scheduled the confirmation hearing. (*See* Stipulated Facts ¶ M.) The Plaintiffs received notice that the disclosure statement had been approved together with copies of the approved disclosure statement and

---

[10] "Those claims" referred to the Providers' indemnification claims.

10

proposed plan, (Stipulated Facts ¶ O), and did not object to the plan, the third-party release or the injunction.[11] (Stipulated Facts ¶ P.)

The Court conducted the confirmation hearing on December 13, 2016. Through an offer of proof, the Debtors emphasized that the Provider Release in section 9.05 was necessary because the Providers had written articles for the Debtors up through the closing date of the asset sale, and the Debtors had received threats or requests to take down the content from their websites. (Transcript of Hr'g, held Dec. 13, 2016, at 67:20-25.)[12] Mr. Galardi further stated that the Debtors did not include an option in the ballot allowing a creditor to opt out of the third-party release because that procedure only worked with creditors that had filed claims. (*Id.* at 74:19-23.) The Court asked whether there were creditors who had not filed claims or settled and did not vote. Mr. Galardi identified one specifically, and explained that all such claims would also be released:

> THE COURT: Let me ask you a question. Are there any creditors who have not filed a claim, did not vote and have not settled, to your knowledge?

---

[11] The Plaintiffs had little reason to object to the Provider Release because it did not cover their post-petition claims. On December 11, 2016, however, only two days before the confirmation hearing, the Debtors filed a revised plan that modified section 9.05 to cover claims that were existing or arose prior to the closing of the sale of substantially all of the Debtor's assets to Gizmodo. (*See Notice of Filing of Revised Version of Debtors' Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft. and Proposed Form of Order Approving Such Joint Chapter 11 Plan*, dated Dec. 11, 2016, Ex. B, at 46 (ECF Doc. # 576-2).) The sale closed after the publication of the Article, and the revised third-party release now covered the Plaintiffs' claims. On the other hand, section 9.02 in the November Plan enjoined their claims.

[12] A copy of the transcript of the confirmation hearing was received in evidence as DX 2.

11

    ....

    MR. GALARDI:    Well, Your Honor, yes, in the following way and I want to be clear.  As I mentioned and Mr. Holden mentioned, maybe I'm not getting it right, but I hate to use the President-elect's name, but we have received from one of -- from a law firm, you wrote an article about the President-elect, now that claim never got filed in this case.  One of the reasons we're concerned about that is because the statute of limitations on that article has not run.

    THE COURT:    Okay.

    MR. GALARDI:    So that's the kind of creditor why we wanted the third-party release.

(*Id.* at 82:16-83:8.)

The Court confirmed the Plan at the conclusion of the hearing, expressly approving the Provider Release, but suggesting that the injunction in favor of the Providers be made co-extensive with the Provider Release.  (*Id.* at 87:6-88:10.)  The Plan subsequently presented by the Debtors and confirmed by the Court included a change to section 9.02 that limited the injunction in favor of the Providers "to the extent such actions are released pursuant to section 9.05 of the Plan."  The post-hearing revised plan did not change section 9.05 or the language that limited the release to the holder of a claim or equity interest that received or "is deemed to have received" a distribution under the Plan.

The Court signed the Confirmation Order on December 22, 2016.  Two findings are relevant to the issues that the Court subsequently tried.  First, the Court found that the Provider Release covered conduct for which the Debtors might be obligated to indemnify the Providers, (Confirmation Order ¶ 21), and the Providers' waiver of their indemnification claims and acceptance of the Plan

constituted consideration for the release. (*Id.* ¶ 24.) Second, the creditors and interest holders who received or were deemed to have received a distribution under the Plan also benefited from the Provider Release because the settlement with the Providers and the withdrawal of their indemnification claims allowed the Debtors to confirm the Plan and immediately pay them their distributions. (*Id.*) ("Each holder of a Claim or Equity Interest that has received *or is deemed to have received* distributions made under the Plan in turn *benefits from* an *immediate distribution*." (emphasis added).)

## C. The State Court Litigation

On June 22, 2017, the Plaintiffs sued Gizmodo and Goldberg in New York state court based on state law claims arising from the publication (and in Gizmodo's case, the alleged republication) of the Article, including defamation, intentional interference with prospective economic advantage and tortious interference with contractual relations.[13] Gizmodo sought an injunction against the Plaintiffs in this Court arguing that their claims were barred by the Court's order approving the sale of the Debtors' assets. Goldberg filed the separate Motion contending that the claims the Plaintiffs asserted against him were barred by the Plan and the Confirmation Order. The Court dealt with the two motions separately.

The Gizmodo motion raised purely legal issues. In *Gawker*, the Court ruled that the defamation and related claims asserted against Gizmodo arising from the pre-sale

---

[13] A copy of the complaint is attached as Exhibit A to the Motion.

publication of the Article were barred by the "free and clear" provisions of the sale order, 581 B.R. at 761, and left to the state court the question of whether the complaint asserted a post-sale republication claim against Gizmodo under New York law. *Id.* at 762.

The Goldberg Motion required a trial. The Court had identified two ambiguities regarding whether the Provider Release covered the Plaintiffs' causes of action. First, it only reached as far as creditors who "were deemed to have received distribution(s) made under the plan." The Plaintiffs had not filed claims and had not received distributions. It was unclear whether they were deemed to have received distributions within the meaning of the Plan. Second, the Plan carved out claims for gross negligence and willful misconduct. The Plaintiffs' state court claims alleged intentional misconduct, and it was similarly uncertain whether the Provider Release excluded these claims.

After the parties had the opportunity to conduct discovery, the Court heard testimony and received numerous documents in evidence, particularly the emails discussed above. At the conclusion of the hearing, the Court ruled that based upon the stipulated fact that the Debtors indemnified their Providers against defamation liability and the finding in the Confirmation Order that the claims covered by the Provider Release were based on the conduct for which the Debtors might be liable for indemnification, the exclusion for willful and grossly negligent conduct was not intended to exclude the defamation claims from the Provider Release. (Tr. 82:18-83.10.) Although not expressly addressed, the Provider Release would also cover the Plaintiffs' other tort claims arising from the publication of the Article. Turning to the

14

other ambiguity, the Court invited proposed findings of fact and conclusions of law regarding what the parties meant by the phrase "deemed to have received distributions made under the Plan."

## DISCUSSION

The Plan designates New York law as controlling, (Plan § 1.07), and both sides agree that the meaning of the ambiguous phrase must be decided in accordance with New York's principles of contract interpretation. Under New York law, the fundamental objective of contract interpretation is to give effect to the intentions of the parties. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989); *Hartford Accident & Indemnity Co. v. Wesolowski*, 305 N.E.2d 907, 909 (1973). If "the parties' intent is not plain from the language they used, a court may look to the objective manifestations of intent gathered from the parties' words and deeds." *See In re M. Fabrikant & Sons, Inc.*, 385 B.R. 87, 95 (Bankr. S.D.N.Y. 2008) (citing *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E. 2d 999, 1001 (1977)); *accord Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998) (relying on testimony regarding what was objectively expressed between the parties during negotiations); *cf. Wells v. Shearson Lehman/Am. Exp., Inc.*, 526 N.E.2d 8, 15 (1988) (stating that uncommunicated subjective intent is irrelevant). "In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown Bros.*, 361 N.E.2d at 1001. A contract must be read as a whole to determine its purpose and intent, and "single clauses cannot be construed by taking

them out of their context and giving them an interpretation apart from the contract of which they are a part." *Analisa Salon, Ltd. v. Elide Properties, LLC*, 818 N.Y.S.2d 130, 131 (N.Y. App. Div. 2006) (internal quotation marks and ellipses omitted). Furthermore, a court should not adopt a "construction which would render a contractual provision meaningless or without force or effect." *Valle v. Rosen*, 30 N.Y.S.3d 285, 287 (N.Y. App. Div. 2016) (internal quotation marks omitted).

Although Goldberg is seeking an injunction, he is, in essence, asserting the Provider Release as a defense to the Plaintiffs' claims and as a bar under the co-extensive provisions of section 9.02. A party asserting the affirmative defense of release has the initial burden of showing that the release covers the plaintiff's claims; the burden then shifts to the plaintiff to show facts that would void the release. *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011); *see also Gerszberg v. Iconix Brand Grp., Inc.*, No. 17-CV-8421 (KBF), 2018 WL 2108239, at *4 (S.D.N.Y. May 7, 2018) (under New York law, "a defendant has the initial burden of establishing that it has been released from any claims.").

Goldberg has failed to carry his burden. Mr. Galardi and Mr. Patel, the persons who negotiated the Provider Release, understood that the "deemed to have received" language in the third-party release in the November Plan only "partially protected" the Providers and did not cover creditors who did not receive consideration under the Plan. At trial, Mr. Galardi attempted to explain what was intended, but his testimony was not

particularly helpful.[14]  The Court noted that the typical third-party release language, which actually appeared in section 9.02, binds creditors whether or not they filed claims, and asked Mr. Galardi why he didn't use that phraseology.  Mr. Galardi responded that he was not comfortable with using the same language in the Provider Release for fear that the Court would not approve.  (Tr. 36:11-37:1.)  This testimony was consistent with the concerns he expressed to Mr. Patel and his representation to the Court at the hearing to approve the disclosure statement that the Provider Release only extended to creditors who had received a benefit from the case through a distribution.[15]

In fact, Mr. Galardi could not provide a cogent meaning to the phrase "deemed to have received" except that it was narrower than section 9.02.  Admitting that he was concerned that the Court might not approve a broad third-party release, he instead strove for ambiguity.  He had been practicing bankruptcy for twenty years, (Tr. 31:20-21), and selected a phrase "deemed to have received" that he had never used before and never used again.  (Tr. 36:11-37:1.)  He acknowledged at trial that he could have been more direct.  (Tr. 37:11-12.)

Although Mr. Patel raised an issue about the meaning of "deemed to have received" a distribution, he dropped it, satisfied that the injunction in section 9.02 was broad enough to bar claims by creditors who did not file claims.  This resolution

---

[14]  Mr. Patel did not testify.

[15]  Mr. Galardi also testified in response to further questioning by the Court that a creditor could be deemed to receive a distribution if the creditor didn't "prosecute" its proof of claim.  (Tr. 38:14-39:6.)  It was not clear what he meant by "prosecute," and whether he was intending to refer to a creditor that filed a proof of claim and abandoned it, or a creditor who did not file a proof of claim.

satisfied the Debtors' lawyers who did not want to draw attention to section 9.05 by amending it.[16] However, the Plan confirmed by the Court cut back the injunction and limited it to the scope of the Provider Release; if the claim was not released, it was not enjoined.

At the confirmation hearing, quoted earlier, Mr. Galardi had stated that the Debtors and the Providers wanted the third-party release to cut off the claims of creditors who had not filed claims. That was what they wanted but it was not what they asked for as was evident from the views Mr. Galardi expressed when negotiating the language of the Provider Release with Mr. Patel, the "heads up" he gave the Committee's counsel that he planned to modify the release (which he never did) to cover claims by creditors who do not receive distributions, and his testimony at trial that he did not use the broader language of section 9.02, which expressly barred creditors who had not filed proofs of claim from suing the Providers, because he was concerned that the Court would not approve such a release. Moreover, the Confirmation Order, drafted by the Debtors' counsel and submitted after the confirmation hearing, included an express finding that tied the Provider Release to an actual distribution, stating the each creditor "that has received or is deemed to have received distributions made under the Plan in turn benefits from an immediate distribution." (Confirmation Order ¶ 24.) Creditors that did not file claims did not receive any distribution or any benefit. I therefore disregard his contrary statements at the confirmation hearing as indicative of the

---

[16] Nevertheless, the Debtors slipped in an amendment two days before the confirmation hearing that extended the Provider Release beyond pre-petition claims to cover post-petition, pre-sale closing claims.

parties' understanding that the "deemed to have received" language covered creditors who did not file claims and receive a distribution.[17]

Nor does the Court's interpretation that the Provider Release does not cover the Plaintiffs' claims render it meaningless. According to Goldberg's counsel, limiting the Provider Release to creditors who filed claims is meaningless because the Debtors' confirmed a 100% Plan that paid the creditors holding allowed claims in full. (*See* Tr. 96:4-9.) However, when the Provider Release was being negotiated, the Debtors were not proposing a 100% plan. The November Plan impaired virtually every class, meaning the creditors were not receiving 100% of their claims.

Finally, there are other reasonable interpretations of the phrase "deemed to have received distributions made under the Plan." At the Debtors' request, the Court approved the payment of certain pre-petition claims immediately and outside of a plan, including to "critical vendors." Ordinarily, pre-petition claims are paid under a confirmed plan. Despite their pre-payment, payments to unsecured creditors prior to confirmation could be deemed to have been paid under the plan. In addition, creditors who assigned their bankruptcy claims against the Debtors could be deemed to have received the distribution paid to their assignees, and hence, barred from suing on any

---

[17] Goldberg cites *United States v. Pantelidis*, No. CRIM. 01-00694, 2004 WL 2188089 (E.D. Pa. Sept. 7, 2004) to support the proposition that the Court can rely on counsel's statements to interpret an ambiguous contract. There, the Court determined the meaning of an ambiguous contract based on the affidavits of counsel and statements made during oral argument because there was "no dispute about the accuracy of the affidavits, nor as to the credibility of statements made at oral argument. *Id.* at *2. Here, the evidence of the contemporaneous negotiations belies Mr. Galardi's testimony and oral statements.

claims they retained against Providers.  Furthermore, creditors who filed claims that were disallowed could nevertheless be deemed to have received a distribution based on their participation in the case.

I recognize that the Court's conclusion does not effectuate the bargain Goldberg thought he struck when he waived his indemnity claims and voted in favor of the Plan.  However, it is clear for the reasons stated that the Providers' counsel and Debtors' counsel understood that the Provider Release did not cover claims by creditors who did not participate in or receive a benefit from the bankruptcy cases.  Counsel tried to "finesse" the limitation with ambiguous language by relying on the broader injunction, but the injunction was subsequently cut back to be co-extensive with the Provider Release.  In the end, the third-party release that would have released the Plaintiffs' claims is not the one they agreed to, and the Court cannot rewrite the Plan.

Accordingly, the Motion is denied.  The Court has considered Goldberg's other arguments and concludes that they are without merit.  Settle order on notice.

Dated:   New York, New York
         August 3, 2018

                                            /s/ *Stuart M. Bernstein*
                                            STUART M. BERNSTEIN
                                            United States Bankruptcy Judge