## Exhibit B

**2019 Plan Administrator Agreement**

# AlixPartners

Mr. William D. Holden                                          June 3, 2019
Plan Administrator
Gawker Media Group, Inc.
c/o AlixPartners, LLP
909 Third Avenue
New York, NY  10022

**Re:    Plan Administrator Agreement**

Dear Mr. Holden:

This letter, together with the attached Schedules and General Terms and Conditions, sets forth the agreement ("Agreement") between AlixPartners, LLP ("AlixPartners") and Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary") and Gawker Media LLC ("Gawker Media", and collectively with GMGI and Gawker Hungary, the "Company" or "Debtors") for the engagement of AlixPartners to provide, among other things, plan administrator services (the "Services") to the Debtors, and the basis of compensation for those Services.

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedules and General Terms and Conditions. The Company and AlixPartners are each a "party," and together the "parties."

## Objectives and Tasks

AlixPartners will provide plan administrator Services pursuant to the Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC and Gawker Hungary Kft (as may be amended and supplemented, the "Plan")[1] and the Order of the United States Bankruptcy Court for the Southern District of New York overseeing the Debtors' chapter 11 cases (the "Bankruptcy Court") confirming the Plan, dated as of December 22, 2016 (the "Confirmation Order"), and pursuant to the terms and conditions set forth in the Plan Administrator Agreement dated March 17, 2017, as amended in its entirety on May 17, 2018 (the "Plan Administrator Agreement"), attached hereto as Schedule 2.

## Staffing

Randall S. Eisenberg will be the managing director responsible for the overall engagement. William D. Holden, who previously served as the Plan Administor for the Debtors on behalf of Opportune LLP and subsequently on behalf of The Boathouse Group, LLC, will continue to serve in the role of Plan Administrator for the Debtors (the "Plan Administrator") on behalf of AlixPartners, assisted by a staff of consultants at various levels who have a wide range of skills and abilities related to this type of assignment. In addition, AlixPartners has relationships with, and may periodically use, independent contractors with specialized skills and abilities to assist in this engagement.

We will periodically review the staffing levels to determine the proper mix for this assignment. We will only use the necessary staff required to complete the requested or planned tasks.

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

# **Alix**Partners

Gawker Media Group, Inc.
June 3, 2019
Page 2 of 10

**Timing and Fees**

AlixPartners will commence this engagement on or about June 3, 2019 or such other date as Willian Holden commences employment with AlixPartners, and after receipt of a copy of the executed Agreement.

The Company shall compensate AlixPartners for its services, and reimburse AlixPartners for expenses, as set forth in the Plan Administrator Agreement (attached hereto as Schedule 2), at current AlixPartners standard hourly rates set forth on Schedule 1.

* * *

If these terms meet with your approval, please sign and return a copy of this Agreement.

We look forward to working with you.

Sincerely yours,

ALIXPARTNERS, LLP

Randall S. Eisenberg
Managing Director

Acknowledged and Agreed to:

GAWKER MEDIA GROUP, INC.

By:

Its: Plan Administrator

Dated: 6/11/19

# AlixPartners

### Schedule 1

### Fees and Expenses

1.  **Fees:** AlixPartners' fees will be based on the hours spent by AlixPartners personnel at AlixPartners' hourly rates, which are:

| | |
|---|---|
| Managing Director | US$990 – US$1,165 |
| Director | US$775 – US$945 |
| Senior Vice President | US$615 – US$725 |
| Vice President | US$440 – US$600 |
| Consultant | US$160 – US$435 |
| Paraprofessional | US$285 – US$305 |

AlixPartners reviews and revises its billing rates on January 1 of each year.

2.  **Sale Transaction Fee:** Pursuant to the terms set forth in the Plan Administrator Agreement attached hereto as Schedule 2.

3.  **Expenses:** In addition to the Fees set forth in this Schedule, the Company shall pay directly, or reimburse AlixPartners upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and meals.

4.  **Payment:** AlixPartners will submit monthly invoices for services rendered and expenses incurred. All invoices shall be due and payable immediately upon receipt. No discount is provided for prompt payment, and none shall be taken, but interest on any invoices paid late shall accrue in accordance with the General Terms and Conditions.

**Alix**Partners

**Schedule 2**

**Plan Administrator Agreement**

EXECUTION VERSION

## PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (this "Agreement"), effective as of the 17th day of May, 2018, by and among Gawker Media Group, Inc. ("GMGI"), Gawker Hungary Kft. ("Gawker Hungary") and Gawker Media LLC ("Gawker Media," and collectively with GMGI and Gawker Hungary, the "Debtors") and The Boathouse Group, LLC ("Boathouse"), and is executed for the purpose of setting forth, among other things, the scope of plan administrator services (the "Services") to be provided by Boathouse to the Debtors, and the basis of compensation for those Services.

### 1) Scope of Services

Boathouse will provide the following plan administrator Services pursuant to the *Amended Joint Chapter 11 Plan of Liquidation for Gawker Media Group, Inc., Gawker Media LLC, and Gawker Hungary Kft.* (as may be amended and supplemented, the "Plan")[1] and the Order of the United States Bankruptcy Court for the Southern District of New York overseeing the Debtors' chapter 11 cases (the "Bankruptcy Court") confirming the Plan, dated as of December 22, 2016 (the "Confirmation Order"):

a) General Plan Administrator Functions.    In connection with this engagement, Boathouse shall make available to the Debtors William D. Holden, who has heretofore served as the Plan Administrator for the Debtors on behalf of Opportune LLP, to serve in the role of Plan Administrator for the Debtors (the "Plan Administrator"). The Plan Administrator shall devote such time to the performance of his services hereunder as he determines appropriate in his discretion. The Plan Administrator hereby accepts its employment and appointment as the Plan Administrator.

b) Duties, Power and Rights. From and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof, and shall be the sole representative of the Debtors, succeeding to such powers as would have been applicable to the Debtors' officers and directors. The Plan Administrator shall have all duties, powers and rights set forth herein, in the Plan, and in the Confirmation Order, including, but not limited to, the following activities:

i) conduct a process for the sale or disposition of the Gawker.com Assets consistent with the terms of the Plan and any agreements of the Debtors;

ii) investigate and prosecute the Retained Causes of Action, if the Plan Administrator, in its sole discretion, deems appropriate;

iii) review, object to, and seek estimation of, Claims against, and Equity Interests in, the Debtors;

iv) compromise and settle Disputed Claims and Retained Causes of Action, in the ordinary course of business and without further notice to or order of the Bankruptcy Court;

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

v)      administer and distribute the Plan Reserve Accounts pursuant to the Plan;

vi)     take control of, preserve, and convert to Cash any additional asset of the Debtors, subject to the terms of the Plan;

vii)    make distributions to holders of Allowed Claims against and Equity Interests in, the Debtors consistent with the terms of the Plan;

viii)   pay expenses incurred in carrying out the powers and duties of the Plan Administrator, including professional fees incurred after the Effective Date;

ix)     prepare and file post-confirmation reports for each of the Debtors pursuant to the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules;

x)      support any audits of the Debtors conducted by U.S. and/or non-U.S. taxing authorities;

xi)     pay any fees due to the United States Trustee pursuant to section 1930(a)(6) of the Bankruptcy Code;

xii)    execute all documents appropriate to carry out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement;

xiii)   retain persons and professionals, including Plan Administrator Counsel (as defined below), to assist in carrying out the powers and duties enumerated in the Plan, Confirmation Order, and this Agreement;

xiv)    take such further actions as the Plan Administrator deems necessary to effect the provisions of the Plan; and

xv)     in connection with each potential Sale Transaction (as defined below), assist and advise with the analysis, evaluation, pursuit and effectuation of any such Sale Transaction.  Services related to such will consist of:

(1) Preparing and developing lists of prospective buyers and other investors;

(2) Communicating with such prospective buyers and other investors and preparing and distributing appropriate information, documents and other material, including, if appropriate, preparing an information memorandum;

(3) If necessary, developing financial and operational data and presentations;

(4) If necessary, coordinating and conducting an auction culminating in a Sale Transaction; and

(5) Structuring and negotiating any transaction or series of related transactions that constitute the disposition to one or more third parties of the assets of any entity comprising the Debtors, including, without limitation, through the sale or exchange of capital stock, options or assets with or without a purchase option, or any similar transaction (each, a "Sale Transaction").

68883099_5

Subject to his business judgment and fiduciary responsibilities, the Plan Administrator will work on a collaborative basis with Plan Administrator Counsel to perform the foregoing activities.

c) <u>Finance and Accounting Functions</u>.    The Plan Administrator will have primary responsibility for the following finance and accounting functions (to include but not be limited to):

i) manage the financial and operational reporting processes to all internal and external constituents;

ii) review and development of any material drafted for consumption outside the Debtors;

iii) oversight and approval of expenditures and cash payments; and

iv) management of the Plan Reserve Accounts.

## 2) **Compensation and Staffing**

a) Boathouse will be paid by the Debtors for its Services at the standard hourly billing rates in effect for its personnel, based on the position held by such Boathouse personnel, which hourly rates are subject to periodic adjustments by Boathouse to reflect economic and other conditions.    Boathouse's hourly rates currently in effect are as follows:

| Professional | Rate / Hr. |
|---|---|
| Managing Director | $ 715.00 |
| Manager | $ 540.00 |
| Consultant | $ 335.00 |
| Administrative Professional | $ 220.00 |

b) In the event any Boathouse personnel are called to testify either in court of via deposition (in either case, "<u>Testimony</u>"), that professional's hourly rate will be increased by $100 for all Testimony and the time spent for any direct preparation related thereto.

c) Both Boathouse and the Debtors acknowledge that the above professional fees are within industry and market rates, and have been negotiated to reflect the facts specific to this engagement.    As such, the Debtors believe that the fee structure is reasonable in light of the Services requested.

d) Boathouse will bill for its fees and out-of-pocket expenses no less frequently than on a monthly basis by providing an invoice summarizing the number of hours worked and expenses incurred, and the Debtors agree to remit in full the payment of such fees and expenses promptly.

e) In addition to the other fees provided for in this Agreement, upon the closing of a Sale Transaction, Boathouse shall earn, and the Debtors shall thereupon pay immediately

3

and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee (the "Sale Transaction Fee") based upon AGC (as defined below), calculated as follows:

i)   For AGC up to $500,000: $10,000 (the "Minimum Sale Transaction Fee"), plus
ii)  For AGC from $500,001 to $750,000: 4% of such incremental AGC, plus
iii) For AGC from $750,001 to $1,000,000: 5% of such incremental AGC, plus
iv)  For AGC from $1,000,001 to $2,500,000: 6% of such incremental AGC, plus
v)   For AGC from $2,500,001 to $5,000,000: 7% of such incremental AGC, plus
vi)  For AGC from $5,000,001 to $10,000,000: 8% of such incremental AGC, plus
vii) For AGC over $10,000,001: 9% of such incremental AGC.

If more than one Sale Transaction is consummated, Boathouse shall be paid the Sale Transaction Fee based on AGC from the initial Sale Transaction and then, for any subsequently consummated Sale Transaction, Boathouse shall be paid the outstanding incremental amount of the Sale Transaction Fee that would have been payable if AGC of such subsequent Sale Transaction and all prior Sale Transactions were aggregated and characterized as a single Sale Transaction, calculated in the manner set forth above.

For the purpose of calculating the Sale Transaction Fee, the Aggregate Gross Consideration ("AGC") shall be, without duplication, the total proceeds and other consideration paid to, or received by, or to be paid to or received by, any entity comprising the Debtors, or any of its equity or debt holders, or other parties in interest, in connection with the relevant Sale Transaction, net of the aggregate amount of cash and cash equivalents (including any option exercise price paid or deemed paid in connection with a Sale Transaction) sold or otherwise directly or indirectly transferred in the Sale Transaction. Such proceeds and consideration shall be deemed to include, without limitation and without duplication (and as calculated as set forth herein): any earnest funds deposited by a potential counterparty (to the extent released to the Debtors or their constituents and/or applied to the Sale Transaction); cash, notes, securities and other property; non-contingent payments made in instalments (*e.g.*, a seller note) and/or insurance proceeds actually received by a Debtor in respect of the occurrence of an insurable event that materially diminishes the value of the assets of such Debtor.

For the purposes of calculating AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the closing of the Sale Transaction as follows:

viii)   If such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the closing of the Sale Transaction;
ix) If such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten-trading-day period immediately prior to the closing of the Sale Transaction; and
x)  If such securities have not been traded prior to the closing of the Sale Transaction, Boathouse will use its commercially reasonable best efforts to determine a fair market value thereof for the purposes of calculating AGC.

If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. The value of any purchase money or other promissory notes shall be deemed to be the face amount of principal thereof.

### 3) **Retention of Counsel and Agents**

The Plan Administrator shall hire counsel to advise it in connection with its duties, powers, and rights under this Agreement (the "Plan Administrator Counsel") and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties herein, and pay reasonable compensation to such advisors. The Plan Administrator shall be entitled to retain professionals in his or her sole discretion, including any professionals employed by the Debtor in the Bankruptcy Cases. The provision of services by a professional to the Debtor shall not disqualify such professional from employment by the Plan Administrator.

Any professionals retained by the Plan Administrator, including the Plan Administrator Counsel, shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred. The payment of the fees, costs and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court. Any successor Plan Administrator shall receive such reasonable compensation as may be approved by the Bankruptcy Court.

### 4) **Service of Plan Administrator**

The Plan Administrator shall serve until (a) the termination of this Agreement, or (b) the Plan Administrator resigns or is otherwise discharged; provided, however, that if the Plan Administrator resigns, he or she shall continue to serve until a new Plan Administrator begins to serve.

### 5) **Closing of Bankruptcy Cases; Termination**

When (a) all Disputed Claims filed against the Debtors have become Allowed or have been Disallowed by Final Order, (b) all remaining assets of the Debtors and Plan Reserve Accounts have been liquidated and converted into Cash (other than those assets abandoned by the Debtors), and such Cash has been distributed in accordance with the Plan, and (c) all wind-down costs and expenses have been paid in full in Cash, the Plan Administrator shall promptly (i) seek authority from the Bankruptcy Court to close the Bankruptcy Cases for each of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules and (ii) effectuate the dissolution of the Debtors in accordance with applicable law. This Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 closing the Bankruptcy Cases of each of the Debtors.

Notwithstanding the foregoing, the Plan Administrator may dissolve Gawker Hungary prior to completion of the term of this Agreement, and upon such dissolution, Gawker Hungary shall no longer be deemed a party to this Agreement.

5

6) **No Liability**

The Plan Administrator shall have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors or holders of Claims against or Equity Interests in the Debtors other than for fraud, gross negligence or wilful misconduct of the Plan Administrator.

7) **Indemnification**

GMGI and Gawker Media shall jointly indemnify the Plan Administrator, Boathouse and their (as applicable) partners, employees, managers, principals, agents, affiliates, independent contracts, insurers (collectively, the "Indemnified Persons") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees and expenses paid or incurred by any Indemnified Person in connection with, arising out of or related to (whether from direct claims or third party claims) the engagement or this Agreement (including but not limited to any Indemnified Person's reasonable counsel fees and expenses). In addition to the foregoing indemnification, any Boathouse personnel who may serve the Debtors shall be individually indemnified to the same extent as the most favourable indemnification GMGI or Gawker Media has extended to its officers or directors, whether under GMGI and Gawker Media's bylaws, certificates of incorporation, by contract or otherwise. The Plan Administrator shall be covered as an officer under GMGI's existing director and officer liability insurance policy as an "additional named insured" and as a "certificate holder" under each liability insurance policy of the Debtors, and, if not covered under such policies, the Plan Administrator shall be authorized to have an additional policy providing a comparable level of coverage purchased by the Debtors. The provisions of this section are in the nature of contractual obligations and no change in applicable law or GMGI or Gawker Media's charter, bylaws or other organizational documents or policies shall affect the Plan Administrator rights hereunder. The foregoing indemnification obligations shall not apply in the event that a court of competent jurisdiction finally determines that such claims resulted directly from the gross negligence, wilful misconduct or fraudulent acts of the Plan Administrator or Boathouse.

8) **Other Matters**

   a) Access to Information.  In connection with this engagement, Boathouse shall have complete and full access to all Debtor information that Boathouse deems appropriate. Additionally, Boathouse will have reasonable access to the Debtors' employees, counsel and other representatives (collectively the "Representatives") necessary to perform the Services as outlined in this Agreement.  It is understood that Boathouse is relying solely upon the information supplied by the Debtors and its Representatives without assuming any responsibility for independent investigation or verification thereof.    All confidential information concerning the Debtors that is given to Boathouse will be used solely in the course of performance of the Services outlined in this Agreement.  Except as required by law, such confidential information will not be disclosed to a third party without the Debtors' consent.

   b) Projections; Reliance; Limitation of Duties.  The Debtors understand that the Services to be rendered may include the preparation of projections and other forward-looking statements for use in evaluating potential transactions and settlements and that numerous factors can affect the actual outcomes, which may materially and adversely

6

differ from those projections and other forward-looking statements. In addition, Boathouse will be relying on information provided by others.

c) <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York and the state and federal courts located in the State of New York shall have exclusive jurisdiction in relation to any claim arising out of this Agreement.    BOATHOUSE AND THE DEBTORS HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT, OR OTHERWISE) RELATING TO THIS AGREEMENT.

d) <u>Dispute Resolution</u>.    Without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

e) <u>Retention of Jurisdiction</u>.  The Bankruptcy Court shall retain jurisdiction over the Debtors to the fullest extent permitted by law, including, but not limited to, for the purposes of interpreting and implementing the provisions of this Agreement.

f) <u>Conflict with Plan</u>.    The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan.  To that end, the Plan Administrator shall have full power and authority to take any action consistent with the purposes and provisions of the Plan.    In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control; <u>provided</u>, <u>however</u>, that provisions of this Agreement adopted by amendment and approved by the Bankruptcy Court following substantial consummation (as such term is used in section 1127(b) of the Bankruptcy Code) shall control over provisions of the Plan.

g) <u>Severability</u>.  If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, this Agreement shall be deemed to be amended to the extent necessary to make such provision enforceable, or, if necessary, this Agreement shall be deemed to be amended to delete the unenforceable provision or portion thereof.  In the event any provision is deleted or amended, the remaining provisions shall remain in full force and effect.  Notwithstanding the foregoing, the parties recognize and agree that this Agreement is to be interpreted and applied in such manner as to, as nearly as possible, give effect to the parties' intent to all provisions hereof, including, without limitation, such provisions as may be declared to be unenforceable.

h) <u>Assignment</u>.  No party hereto shall have the right to assign its rights hereunder, in whole or in part without the prior written consent of the other party (other than to such party's affiliates or subsidiaries which shall not require such consent).    This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

68883099_5

i) <u>Modifications</u>.  No change, modification, extension, renewal, ratification, waiver or rescission of this Agreement or of any of the provisions hereof shall be binding unless it is in writing and signed by both parties hereto.  Further, no waiver or forbearance by either party hereto with respect to any right granted to such party herein shall operate or be construed to be a waiver or forbearance of such party's right to exercise such right in the future.

j) <u>Notices</u>.  Notices regarding or required by this Agreement must be in writing and delivered to the parties at the mailing addresses set forth below or to such other address as a party may designate in writing.   Any notice required under this Agreement will be deemed effective upon delivery to the party to whom it is addressed.

    <u>If to Boathouse</u>:

    William D. Holden
    44 Lynden Street
    Rye, NY 10580

    <u>If to GMGI</u>:

    Gawker Media Group, Inc.
    c/o The Boathouse Group, LLC
    Attn: William D. Holden
    Plan Administrator
    44 Lynden Street
    Rye, NY 10580

    <u>If to Gawker Hungary</u>:

    Gawker Hungary Kft.
    c/o The Boathouse Group, LLC
    Attn: William D. Holden
    Plan Administrator
    44 Lynden Street
    Rye, NY 10580

    <u>If to Gawker Media</u>:

    Gawker Media LLC
    c/o The Boathouse Group, LLC
    Attn: William D. Holden
    Plan Administrator
    44 Lynden Street
    Rye, NY 10580

with copies to:

    Ropes & Gray LLP
    1211 Avenue of the Americas

New York, NY 10036-8704
Attn:  Gregg M. Galardi
       D. Ross Martin
       Joshua Y. Sturm

k)  <u>Entire Agreement</u>.   This Agreement constitutes the entire agreement among the
parties hereto regarding the subject matter hereof and supersedes any prior
agreements (whether written or oral) among the parties regarding the subject matter
hereof.   This Agreement may be executed in any number of counterparts each of
which shall be an original, but all of which together shall constitute one and the same
instrument.

[*Remainder of Page Left Intentionally Blank*]

68883099_5

The parties hereto have either executed and acknowledged this Plan Administrator Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers.

**The Boathouse Group, LLC**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory


Date: ___5/17___, 2018

**Gawker Media Group, Inc.**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: ___5/17___, 2018

**Gawker Media LLC**


By:    Gawker Media Group, Inc.
       Its: Manager

By: _____
Name:    William D. Holden
Title:    Authorized Signatory

Date: ___5/17___, 2018


**Gawker Hungary Kft.**

By: _____
Name:    William D. Holden
Title:    Authorized Signatory


Date: ___5/17___, 2018

*[Signature Page to Plan Administrator Agreement]*

**Alix**Partners

### Data Protection Schedule

### Processing, Personal Data and Data Subjects

In connection with this Agreement, AlixPartners will not be receiving any Personal Data subject to the General Data Protection Regulation ((*EU*) *2016/679*) (the "GDPR") or any applicable legislation implementing any provisions of the GDPR as may be enacted time to time (together the "Data Protection Legislation").

---

**AlixPartners, LLP**
General Terms and Conditions

---

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

### Section 1. Company Responsibilities

The Company will undertake responsibilities as set forth below:

1. Provide reliable and accurate detailed information, materials, documentation and

2. Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by AlixPartners in connection with this Agreement.

AlixPartners' delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management.

### Section 2. Retainer, Billing, Payments and Taxes

**Retainer.** Upon execution of the Agreement, the Company shall promptly pay AlixPartners the agreed-upon advance retainer as set forth on Schedule 1. Invoices will be offset against the retainer. Payments of invoices will be used to replenish the retainer to the agreed-upon amount. Any unearned portion of the retainer will be applied against the final invoice or returned to the Company at the end of the engagement.

**Billing and Payments.** All payments to be made to AlixPartners shall be due and payable upon delivery of invoice via check or wire transfer to AlixPartners' bank account, as shown on the invoice. All amounts invoiced are based on services rendered and expenses incurred to date, and are not contingent upon future services or Work Product (as defined below), or the outcome of any case or matter. "Fees," as used in this Agreement, shall include all amounts payable by the Company to AlixPartners in accordance with Schedule 1, including any success fee or break fee, but excluding reimbursable expenses.

If any Fees and/or expenses are not paid by the Company on the relevant due date, AlixPartners shall be entitled to charge interest on the unpaid amount until payment is made in full. Interest shall be calculated using the lesser of (i) one percent (1%) per month (12% per annum) or (ii) to the maximum extent permitted by law.

**Taxes.** AlixPartners' fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on AlixPartners' income generally). If AlixPartners' fees are subject to any taxes, such as State sales tax, Goods and Services Tax/Harmonized Sales Tax or Value Added Tax, then AlixPartners will include such taxes on its invoices as separate line items.

### Section 3. Relationship of the Parties

The parties intend that an independent contractor relationship will be created by the Agreement. As an independent contractor, AlixPartners will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business. Employees of AlixPartners will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. AlixPartners will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business. Nothing in this Agreement is intended to create, nor shall be deemed or construed to create a fiduciary or agency relationship between AlixPartners and the Company.

AlixPartners is providing advisory and consulting services only, and will not make management decisions for the Company. While AlixPartners may from time to time suggest options that may be available to the Company, the ultimate decision as to such options rests with the Company, and AlixPartners makes no promise or guarantee about the outcome of the Company's matters.

AlixPartners is not an accounting firm and does not give accounting advice or guidance. While AlixPartners' work may involve analysis of accounting, business and other related records, this engagement does not constitute an audit in accordance with either generally accepted auditing standards or the standards of the Public Company Accounting Oversight Board or any other similar governing body.

AlixPartners is not authorized to practice law or provide legal advice. No services provided under this Agreement are intended to be, nor should be construed to be, legal services.

### Section 4. Confidentiality

Each party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party during the performance of AlixPartners' services hereunder (the "Confidential Information"), and neither party will disclose any Confidential Information to any other person or entity. "Confidential Information" includes the terms of this Agreement, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of

| **AlixPartners, LLP** |
| General Terms and Conditions |

either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, AlixPartners from making such disclosures of Confidential Information that AlixPartners reasonably believes are required by law or any regulatory requirement or authority to clear client conflicts. AlixPartners may also disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information as it relates to the services being provided under this Agreement, provided AlixPartners is responsible for any breach of these confidentiality obligations by any such parties. AlixPartners may make reasonable disclosures of Confidential Information to third parties, such as the Company's suppliers and/or vendors, in connection with the performance of AlixPartners' obligations and assignments hereunder, provided AlixPartners reasonably believes that such third party is bound by confidentiality obligations. In addition, AlixPartners will have the right to disclose to any person that it provided services to the Company or its affiliates and a general description of such services, but shall not provide any other information about its involvement with the Company. The obligations of the parties under this Section 4 shall survive the end of any engagement between the parties for a period of three (3) years.

Work Product (as defined in Section 5) may contain AlixPartners proprietary information or other information that is deemed to be Confidential Information for purposes of this Agreement, and the parties may not want to make public. Therefore, the parties acknowledge and agree that (i) all information (written or oral), including advice and Work Product (as defined in Section 5), generated by AlixPartners in connection with this engagement is intended solely for the benefit and use of the Company in connection with this Agreement, and (ii) no such information shall be used for any other purpose or disseminated to any third parties, or, quoted or referred to with or without attribution to AlixPartners at any time in any manner or for any purpose without AlixPartners' prior approval (not to be unreasonably withheld or delayed), except as required by law. The Company may not rely on any draft or interim Work Product.

### Section 5. Intellectual Property

All analyses, final reports, presentation materials, and other work product (other than any Engagement Tools, as defined below) that AlixPartners creates or develops specifically for the Company and delivers to the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Company Confidential Information as defined above. AlixPartners may retain copies of the Work Product and any Confidential Information necessary to support the Work Product subject to its confidentiality obligations in this Agreement.

All methodologies, processes, techniques, ideas,

concepts, know-how, procedures, software, tools, templates, models, utilities and other intellectual property that AlixPartners has created, acquired or developed or will create, acquire or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of AlixPartners. The Company shall not acquire any interest in the Engagement Tools other than a limited worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product.

The Company acknowledges and agrees, except as otherwise set forth in this Agreement, that any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

### Section 6. Framework of the Engagement

The Company acknowledges that it is retaining AlixPartners solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement.

### Section 7. Indemnification and Other Matters

The Company shall indemnify, hold harmless and defend AlixPartners and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "AlixPartners Parties") from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of AlixPartners that is the subject of the Agreement. The Company shall pay damages and expenses as incurred, including reasonable legal fees and disbursements of counsel. If, in the opinion of counsel, representing both parties in the matter covered by this indemnification creates a potential conflict of interest, the AlixPartners Parties may engage separate counsel to represent them at the Company's expense.

The Company's indemnification obligations in this Section 7 shall be primary to, and without allocation against, any similar indemnification obligations that AlixPartners may offer to its personnel generally.

AlixPartners is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third party products or services are against the third-party vendor and not against AlixPartners is instrumental in procuring such third-party product or service.

### Section 8. Governing Law and Arbitration

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

| AlixPartners, LLP |
| :---: |
| General Terms and Conditions |

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in New York, New York under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, either party may proceed directly to a court of competent jurisdiction to enforce the terms of this Agreement for any claim in connection with (i) the non-payment of Fees or expenses due under this Agreement, or (ii) the non-performance of obligations under Section 7.

In any court proceeding arising out of this Agreement, the parties hereby waive any right to trial by jury.

### Section 9. Termination and Survival

The Agreement may be terminated at any time by written notice by one party to the other; provided, however, that notwithstanding such termination AlixPartners will be entitled to any Fees and expenses due under the provisions of the Agreement (for fixed fee engagements, Fees will be pro rata based on the amount of time completed). Such payment obligation shall inure to the benefit of any successor or assignee of AlixPartners.

Additionally, unless the Agreement is terminated by the Company due to AlixPartners' material breach (and such material breach continues after 30 days' written notice thereof and opportunity to cure) AlixPartners shall remain entitled to the success fee(s), if any, that otherwise would be payable during the 12 months after the date of termination of the Agreement.

Sections 2, 4, 5, 7, 8, 9, 10, 11, 12 and 13 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement.

### Section 10. Non-Solicitation of Employees

The Company acknowledges and agrees that AlixPartners has made a significant monetary investment recruiting, hiring and training its personnel. During the term of this Agreement and for a period of two years after the final invoice is rendered by AlixPartners with respect to this engagement (the "Restrictive Period"), the Company and its affiliates agree not to directly or indirectly hire, contract with, or solicit the employment of any of AlixPartners' Managing Directors, Directors, or other employees/ contractors.

If during the Restrictive Period the Company or its affiliates directly or indirectly hires or contracts with any of AlixPartners' Managing Directors, Directors, or

other employees/contractors in violation of the preceding paragraph, the Company agrees to pay to AlixPartners as liquidated damages and not as a penalty the sum total of: (i) for a Managing Director, $1,000,000; (ii) for a Director, $500,000; and (iii) for any other employee/contractor, $250,000. The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse AlixPartners for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that AlixPartners has made in its Managing Directors, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

### Section 11. Limitation of Liability

THE ALIXPARTNERS PARTIES SHALL NOT BE LIABLE TO THE COMPANY, OR ANY PARTY ASSERTING CLAIMS ON BEHALF OF THE COMPANY, EXCEPT FOR DIRECT DAMAGES FOUND IN A FINAL DETERMINATION TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE, BAD FAITH, SELF-DEALING OR INTENTIONAL MISCONDUCT OF ALIXPARTNERS. THE ALIXPARTNERS PARTIES SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, LOST PROFITS, LOST DATA, REPUTATIONAL DAMAGES, PUNITIVE DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE ALIXPARTNERS PARTIES' AGGREGATE LIABILITY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IS LIMITED TO THE AMOUNT OF FEES PAID TO ALIXPARTNERS FOR SERVICES UNDER THIS AGREEMENT (OR IF THE CLAIM ARISES FROM AN ADDENDUM TO THIS AGREEMENT, UNDER THE APPLICABLE ADDENDUM) (THE "LIABILITY CAP"). The Liability Cap is the total limit of the AlixPartners Parties' aggregate liability for any and all claims or demands by anyone pursuant to this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by AlixPartners pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the AlixPartners Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the AlixPartners Parties pursuant to this Agreement exceed the Liability Cap.

### Section 12. General

**Equitable Remedies.** Each party acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of the Agreement. Each party agrees that the non-breaching party shall have the right to seek a restraining order and/or an injunction for any breach of the Agreement. If any provision of the Agreement is found to be invalid or unenforceable, then it shall be deemed modified or

| **AlixPartners, LLP** |
| General Terms and Conditions |

restricted to the extent and in the manner necessary to render the same valid and enforceable.

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent possible.

**Entire Agreement.** This Agreement, including the letter, the Terms and the schedule(s), contains the entire understanding of the parties relating to the services to be rendered by AlixPartners and supersedes any other communications, agreements, understandings, representations, or estimates among the parties (relating to the subject matter hereof) with respect to such services. The Agreement, including the letter, the Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the parties. AlixPartners is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties.

**Related Matters.** If an AlixPartners Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse AlixPartners for any professional time and expenses (including reasonable external and internal legal costs and e-discovery costs) incurred to respond to the request, except in cases where an AlixPartners Party is a party to the proceeding or the subject of the investigation.

**Joint and Several.** If more than one party signs this Agreement, the liability of each party shall be joint and several. In addition, in the event more than one entity is included in the definition of Company under this Agreement, the Company shall cause each other entity which is included in the definition of Company to be jointly and severally liable for the Company's liabilities and obligations set forth in this Agreement.

**Third-Party Beneficiaries.** The AlixPartners Parties shall be third-party beneficiaries with respect to Section 7 hereof.

**Notices.** All notices required or permitted to be delivered under the Agreement shall be sent, if to AlixPartners, to:

AlixPartners, LLP
2000 Town Center, Suite 2400
Southfield, MI 48075
Attention: General Counsel

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to AlixPartners. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

**Section 13. Bankruptcy Related Matters**

Notwithstanding any to the contrary in these Terms, in the event the Company files for protection under the U.S. Bankruptcy Code, the following provisions will prevail:

The Company shall promptly apply to the Bankruptcy Court for approval of the Company's retention of AlixPartners under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to AlixPartners. AlixPartners shall have no obligation to provide any further services if the Company becomes a debtor under the U.S. Bankruptcy Code unless AlixPartners' retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to AlixPartners. The Company shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to AlixPartners' fee and expense matters.

The Company and AlixPartners agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement.

AlixPartners will have the right to obtain independent legal counsel to obtain advice with respect to its services under this engagement. The Company will reimburse AlixPartners' for the reasonable fees and expenses of such independent legal counsel.

AlixPartners acknowledges that, during the pendency of any Bankruptcy Court approved retention, the indemnification provisions and Liability Cap set forth above may be subject to modification as stated within the Bankruptcy Court's retention order.

Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, AlixPartners may have incurred but not billed fees and reimbursable expenses which relate to the prepetition period. AlixPartners will seek Bankruptcy Court approval to apply the retainer to these amounts.

If AlixPartners finds it desirable to augment its consulting staff with independent contractors (an "I/C") in this case, (i) AlixPartners will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that AlixPartners is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time AlixPartners is involved in providing services to the Company. AlixPartners' standard practice is to charge for an I/C's services at the rate equal to the compensation provided by AlixPartners to such I/C.

| **AlixPartners, LLP** |
| General Terms and Conditions |

### Section 14. Data Protection

All capitalized terms used in this Section and not otherwise defined in this Agreement shall have the meanings given to them in the General Data Protection Regulation ((EU) 2016/679) (the "GDPR") and all applicable legislation implementing any provisions of the GDPR as may be enacted from time to time (together the "Data Protection Legislation").

The parties acknowledge and agree that, in performing services pursuant to this Agreement, AlixPartners may from time to time be required to Process certain Personal Data on behalf of the Company. In such cases: (1) the Company will ensure that it is lawfully permitted to transfer the Personal Data to AlixPartners for the purposes of AlixPartners performing services under this Agreement; and (2) AlixPartners shall (i) act as the Company's Processor for the purposes of the Data Protection Legislation; (ii) only Process such Personal Data in accordance with the Company's written instructions (including when making an international transfer of Personal Data) unless required to do so by law; (iii) implement appropriate technical and organisational measures to reasonably protect that Personal Data against unauthorized or unlawful Processing and accidental, unauthorized or unlawful loss, destruction, alteration, damage, disclosure or access; and (iv) obtain commitments from all AlixPartners' personnel who have access to and/or Process such Personal Data to keep such Personal Data confidential.

If AlixPartners is Processing Personal Data relating to individuals located in the EU or otherwise subject to the Data Protection Legislation, (x) AlixPartners and the Company shall each comply with all relevant provisions of the Data Protection Legislation, and (y) the nature and extent of such Processing shall be set out in the GDPR Data Protection Schedule of this Agreement. AlixPartners shall, in relation to any Personal Data processed by AlixPartners in connection with this Agreement: (1) at the Company's cost, assist the Company in complying with its obligations as the Controller (or as Processor, as the case may be) of the Personal Data, to respond to requests from Data Subjects exercising their rights set out in Articles 12 to 22 of the GDPR; (2) notify the Company without undue delay on becoming aware of a Personal Data Breach; (3) upon termination or expiration of this Agreement, at the written direction of the Company either delete or return any Personal Data and any copies thereof to the Company (except to the extent AlixPartners is required by law to retain such Personal Data, and except for Personal Data located on AlixPartners' disaster recovery or backup systems where it will be destroyed upon the normal expiration of the backup files); and (4) maintain appropriate records to demonstrate compliance with this Section.
AlixPartners is part of an international business, headquartered in the United States of America ("US"). AlixPartners may in the ordinary course of its business, including the performance of the services under this Agreement, transfer Personal Data received outside the US to its US-based affiliates. AlixPartners' US-based affiliates are certified under the EU-US

Privacy Shield framework and any transfer of Personal Data from outside the US to its US-based affiliates will be transferred subject to, and in accordance with, the Privacy Shield requirements. AlixPartners' entities located in the EU have also entered into standard data protection clauses (in accordance with Article 46.2 (c) of the GDPR) with their non-EU-based affiliates. The Company acknowledges and agrees that AlixPartners, as reasonably required for the performance of the services pursuant to this Agreement, be permitted to transfer Personal Data to its affiliates, subject to, and in accordance with, the Privacy Shield requirements and/or the aforementioned standard data protection clauses. Except as allowed above, AlixPartners shall not transfer any Personal Data received in the EU and subject to the Data Protection Legislation outside of the European Economic Area without the prior written consent of the Company.

The Company consents to AlixPartners appointing third party Processors of Personal Data under this Agreement. AlixPartners confirms that it will enter into a written agreement with any third-party Processor prior to supplying them with the Personal Data, incorporating terms which are substantially similar to those set forth in this Section. As between the Company and AlixPartners, AlixPartners shall remain fully liable for all acts or omissions of any third-party Processor appointed by AlixPartners pursuant to this paragraph.